# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

                Plaintiffs,

                v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.

                Defendants, and

DANIEL BLUMKIN, et al.,

                Relief Defendants.

**CASE NO.**

**FILED UNDER SEAL**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A RECEIVER, OTHER EQUITABLE RELIEF, AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

The Consumer Financial Protection Bureau (Bureau), the People of the State of New York by Letitia James, Attorney General of the State of New York (NYAG), the State of Colorado *ex rel*. Philip J. Weiser, the State of Delaware *ex. rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney General Keith Ellison, the State of North Carolina ex rel. Joshua H. Stein, Attorney General, and the State of Wisconsin (collectively, the States and with the Bureau, the Plaintiffs) ask the Court to issue a temporary restraining order (TRO) halting Defendants from continuing to take millions of dollars in illegal fees from cash-strapped consumers. As explained below, Defendants begin requesting and receiving exorbitant fees as soon as an individual signs up for their "debt-relief services," even though Defendants know they may not settle any individual consumer's debts for many months (if at all), in flagrant violation of the Telemarketing Sales Rule's (TSR or the Rule) direct prohibition on up-front fees. Defendants' wanton disregard for the law and the harm it continues to cause consumers warrants immediate relief. The Rule seeks to protect consumers who are already suffering financial distress from using their scarce funds to pay in advance for promised results that often do not materialize.[1] Furthermore, the Rule was motivated by concerns that consumers were paying advanced fees to debt-relief services, instead of making payments to their creditors, and were not only incurring late charges and additional interest but were also suffering lasting harm to their creditworthiness.[2]

---

[1] Telemarketing Sales Rule, 75 Fed. Reg. 48482 (Aug. 10, 2010) (to be codified at 16 C.F.R. Part 310).
[2] *Id.*

The Rule applies to telemarketing and contains an exemption for sales made face-to-face where there is "direct, substantive and personal contact between the consumer and the seller."[3] Defendants indisputably sell their services via telemarketing. Defendants appear to attempt to evade the Rule by hiring notary services to conduct perfunctory singing sessions in person, after the consumer has already been sold Defendants' debt relief services over the phone. As explained below, Defendants are wrong as a matter of law and their conduct is plainly covered by the Rule.

Since at least January 2016, Defendants StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Versara Lending, LLC, and Strategic Family, Inc. (collectively, SFS) and Individual Defendants Ryan Sasson and Jason Blust (Individual Defendants) have participated in and benefited from a scheme designed to take illegal fees from consumers while promising to help them settle their debts. Frequently, SFS and the Individual Defendants have operated in the shadows, hiding behind dozens of façade law firms (Façade Firms)[4] located throughout the United States that purportedly help consumers settle their debts, but in reality do little, if any, work for consumers. In some cases, SFS and the Individual Defendants created entities, referred to herein as Client Services Subsidiaries, that operate as a common enterprise with SFS and purportedly provide administrative services on behalf of the Façade Firms. In truth,

---

[3] Federal Trade Commission, Complying with the Telemarketing Sales Rule, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (last visited Sept. 18, 2023).

[4] The Façade Firms are typically a dba or alternate name for an existing or newly-created solo practitioner firm. These firms do not appear to perform much additional work outside of their work with SFS.

these entities allow SFS and the Individual Defendants to operate behind the scenes while siphoning money from consumers via the Façade Firms.

Immediately after enrolling consumers in the "debt-relief services" and monthly thereafter, SFS and the Client Services Subsidiaries, as well as the Individual Defendants (collectively, Defendants), begin billing and collecting exorbitant fees. Defendants promptly collect these fees despite knowing that they may never negotiate settlement of the consumers' debts, and even if they do negotiate some debts, settlement may not occur for several months.

The amount of fees Defendants have charged and continue to charge consumers is substantial and bears no relationship to whether and when any debt has been settled. Every month the consumers pay into escrow accounts managed by payment processing companies selected by Defendants, with the understanding that the money is being saved in these accounts to pay creditors. The consumers have been instructed to stop paying their creditors and pay into these accounts instead. However, as directed by Defendants, the payment processing companies withdraw hundreds or thousands of dollars in fees from each account, purportedly for SFS's service fee for non-attorney work, a legal retainer fee, a legal administrative fee, and a fee for the payment processors' own services. Critically, Defendants begin collecting these fees *before* any of the consumer debt is settled, and the fees bear no relationship to results obtained for consumers. Indeed, the timing and nature of such fees is beyond dispute: many contracts signed by consumers contain a fee schedule showing when the fees would be withdrawn, starting with the consumer's first deposit into the escrow account. Moreover, consumers' account statements clearly show fees being withdrawn long before any settlements were paid to a creditor, a clear violation of the TSR.

Defendants' business model is directly designed to attempt to evade scrutiny and legal action from law enforcement, regulators, and other consumer protection organizations. Defendants constantly evolve and shift their practices and programs and the entities through which they operate, in order to continue taking unlawful fees from consumers in violation of the TSR. In 2023 alone, 125 complaints against SFS-related entities have been filed in the Federal Trade Commission's (FTC) Sentinel database. As explained below, Defendants' flagrant violation of the TSR's prohibitions against requesting and receiving advance fees and charging fees untethered from results, and the substantial, ongoing harm such violations have caused and are causing to consumers, calls for immediate relief.

## I.      RELIEF REQUESTED

Plaintiffs request that this Court issue an *ex parte* TRO against Defendants with an order to show cause why a preliminary injunction should not issue. Plaintiffs propose that the TRO enjoin Defendants from engaging in the illegal practices highlighted in the complaint and this memorandum, freeze Defendants' assets, appoint a temporary receiver who will have immediate access to the Receivership Defendants'[5] businesses, enjoin the destruction of any relevant evidence or documentation, and authorize limited expedited discovery, including sworn financial reporting. Each form of requested relief is addressed in detail below. These temporary measures are necessary to prevent ongoing harm to consumers and to protect against the risk of asset dissipation, thereby preserving this Court's ability to provide effective final relief for consumers whom Defendants have victimized.

---

[5] The Receivership Defendants include SFS and the Client Services Subsidiaries (collectively the Corporate Defendants) along with the following Relief Defendants: Strategic ESOP, Strategic ESOT, Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments, LLC, the Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee, Lit Def Strategies, LLC, and Relialit, LLC.

## II.    PARTIES

### A.  Plaintiffs

The Bureau is an independent agency charged with enforcing the Consumer Financial Protection Act (CFPA) and other federal consumer financial laws.[6] It has the authority to bring civil actions against persons violating federal consumer financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law."[7] These consumer financial protection laws include the Telemarketing and Consumer Fraud and Prevention Act (TCFPA),[8] which targets deceptive and abusive acts in telemarketing, and the Telemarketing Sales Rule, which is an implementing regulation of the TCFPA.[9]

The People of the State of New York, by Letitia James, Attorney General of the State of New York, is authorized to take action to enjoin repeated and persistent fraudulent and illegal business conduct under New York Executive Law § 63(12) as well as deceptive business practices under New York General Business Law § 349, and to obtain legal or equitable relief, including rescission or reformation of contracts, restitution, the appointment of a receiver, disgorgement of ill-gotten monies, or other relief as may be appropriate.  The NYAG is authorized to enforce the TSR[10] as well as the CFPA[11].

The State of Colorado, by Philip J. Weiser, Attorney General of Colorado, is authorized under the TCFPA, 15 U.S.C. § 6103(a), to bring this action to enforce the TSR.

Kathleen Jennings, Attorney General of Delaware, is authorized under the TCFPA, 15 U.S.C. § 6103(a), to bring this action to enforce the TSR.

---

[6] 12 U.S.C. §§ 5491, 5564.
[7] 12 U.S.C. § 5564(a).
[8] 15 U.S.C. §§ 6101-6108.
[9] 16 C.F.R. Part 310.
[10] 15 U.S.C. § 6103(a).
[11] 12 U.S.C. § 5552.

The People of the State of Illinois, by Kwame Raoul, Attorney General of Illinois, is authorized under the TCFPA, 15 U.S.C. § 6103(a), to bring this action to enforce the TSR.

Keith Ellison, Attorney General of the State of Minnesota, is authorized under the TCFPA, 15 U.S.C. § 6103(a), to bring this action on behalf of the State of Minnesota and its citizens to enforce the TSR.

The State of North Carolina, by Joshua H. Stein, Attorney General of North Carolina, is authorized under the TCFPA, 15 U.S.C. § 6103(a), to bring this action to enforce the TSR.

The State of Wisconsin, by Joshua L. Kaul, Attorney General of Wisconsin, is authorized under the TCFPA, 15 U.S.C. § 6103(a), to bring this action to enforce the TSR. The State of Wisconsin is further authorized by Wis. Stat. §§ 165.25 and 220.04 to enforce the Wisconsin state laws pleaded in the Complaint.

The States have specific authority to enforce the TCFPA and the TSR, including the TSR's prohibitions on debt relief services, 16 C.F.R. 310.4(a)(5), and to seek to enjoin activity in violation of the TCFPA.[12]

## B. Defendants

### 1. The SFS Entities

Strategic Family, Inc. is the parent company of other SFS defendants, including StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC;

---

[12] *See* 15 U.S.C. § 6103 (providing that a State "may bring a civil action on behalf of its residents . . . to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the court may deem appropriate.")

BCF Capital, LLC; T Fin, LLC; Versara Lending, LLC; and Strategic Consulting, LLC.[13] SFS's principal offices are located at 115 Lawrence Bell Drive, Buffalo, NY 14221 and 711 Third Avenue, 6th Floor, New York, NY 10017.[14]

SFS owns and controls various Client Services Subsidiaries that carry out many of the tasks that Façade Firms promise to handle. The Client Services Subsidiaries include the entities listed in the left column of the table below.[15] SFS also acts through and hides behind numerous Façade Firms, none of which are named as parties to this lawsuit. Each Façade Firm corresponds to one of the Client Services Subsidiaries.[16] The Façade Firms include the entities listed in the right column of the table.[17]

---

[13] Declaration of Timothy Hanson ("Hanson Declaration") ¶ 11; Declaration of Theresa Ridder ("Ridder Declaration") ¶ 11.
[14] Ridder Declaration ¶ 11(e)-(g).
[15] *Id.* ¶ 14.
[16] *Id.*
[17] *Id.* Although Plaintiffs have taken every possible step to ascertain the correct names of the entities listed in the table, it is possible that some of the names in the table are not accurate.

| SFS's Client Services Subsidiaries | Façade Firms |
|---|---|
| CS 1 PAAS Services, LLC, f/k/a Anchor Client Services, LLC | Anchor Law Firm PLLC |
| Bedrock Client Services, LLC | A. Florio & Associates, PLLC, d/b/a Bedrock Legal |
| Boulder Client Services, LLC | Boulder Legal Group, LLC |
| Canyon Client Services, LLC | JMS Industries, LLC, d/b/a Canyon Legal Group, LLC |
| Carolina Client Services, LLC | Daniel Rufty Legal PLLC, d/b/a Carolina Legal Services |
| Great Lakes Client Services, LLC | Great Lakes Law Firm, LLC |
| Guidestone Client Services, LLC | The Brian A. Moore Law Firm, LLC, d/b/a Guidestone Law Group, LLC |
| Harbor Client Services, LLC | Harbor Legal Group LLC, f/k/a The Atlas Law Group, LLC |
| Heartland Client Services, LLC | Henry Legal Group, PLLC, d/b/a Heartland Legal Group |
| CS 2 PAAS Services, LLC, f/k/a Monarch Client Services, LLC | Burnette Legal Group, LLC, d/b/a Monarch Legal Group |
| Newport Client Services, LLC | Greene Legal Group LLC, d/b/a Newport Legal Group |
| Northstar Client Services, LLC | Northstar Legal Group LLC |
| Option 1 Client Services, LLC | Gardner Legal LLC, d/b/a Option 1 Legal Group |
| Pioneer Client Services, LLC | Pioneer Law Firm, P.C., f/k/a John B Dougherty P.C. |
| Rockwell Client Services, LLC | Hodyno & Associates, PLLC, d/b/a Rockwell Legal Group |
| Royal Client Services, LLC | Royal Legal Group, LLC |
| Stonepoint Client Services, LLC | Donald Norris Associates PLLC, d/b/a Stonepoint Legal Group |
| CS 3 PAAS Services, LLC, f/k/a Summit Client Services, LLC | Wyolaw, LLC, d/b/a Summit Law Firm |
| Whitestone Client Services, LLC | The Sands Law Group, d/b/a Whitestone Legal |

As described *infra*, SFS and the Client Services Subsidiaries operate as a common enterprise as they maintain officers and employees in common, operate under common control, share offices, and commingle funds.

### 2. The Individual Defendants

SFS was founded by Individual Defendant Ryan Sasson, among others.[18] Sasson currently serves as SFS's Chief Executive Officer.[19] As the CEO of SFS, Sasson coordinates with the Façade Firms to conceal Defendants' role in providing debt-relief services and controls the Client Services Subsidiaries that correspond to each Façade Firm. Sasson also bought or originally registered many Façade Firm websites.[20]

Individual Defendant Jason Blust runs the Façade Firm operations for SFS behind the scenes.[21] Specifically, Blust has exercised substantial control over and involvement in the establishment of the Façade Firms' business policies.[22] For instance, Blust recruited attorneys to help run, or serve as figureheads for, the Façade Firms, including at least one SFS employee who simultaneously serves as a member of multiple Façade Firms while working for SFS.[23] Blust also acts as a liaison between the Façade Firms and SFS.[24] When consumer complaints are escalated, Blust is often consulted about the resolution of the matter.[25]

---

[18] Declaration of Patrick Callahan ("Callahan Declaration") ¶ 8(a).
[19] *Id.*
[20] Ridder Declaration ¶ 18(a).
[21] Callahan Declaration ¶¶ 16-21; Ridder Declaration ¶¶ 19-20; Hanson Declaration ¶ 16.
[22] Callahan Declaration ¶¶ 16-21; Ridder Declaration ¶¶ 19-20; Hanson Declaration ¶ 16.
[23] Callahan Declaration ¶ 17.
[24] Callahan Declaration ¶¶ 17(c), 20.
[25] Ridder Declaration ¶ 20; Callahan Declaration ¶¶ 17(c), 20.

3. **The Relief Defendants**

In May 2017, Strategic Financial Solutions, LLC adopted Relief Defendant Strategic Employee Stock Ownership Plan (Strategic ESOP) and became the ESOP's sponsor.[26] In December 2017, the Strategic ESOP purchased all the shares of Strategic Family, Inc.'s common stock funded by Relief Defendant Strategic Employee Stock Ownership Trust (Strategic ESOT), thus becoming wholly employee owned.[27] The Strategic ESOT holds all the shares of SFS stock and possibly maintains funds held in trust, while the ESOP determines how the plan is administered, who participates in it, and who runs the day-to-day operations.[28]

Relief Defendants Daniel Blumkin and Albert Ian Behar are founders of SFS.[29] Relief Defendant Duke Enterprises, LLC is a corporation controlled by Ryan Sasson, Relief Defendant Twist Financial, LLC is a corporation controlled by Blumkin, and Relief Defendant Blaise Investments, LLC is a corporation controlled by Albert Ian Behar.[30] Relief Defendants Lit Def Strategies, LLC and Relialit, LLC are corporations controlled by Jason Blust.[31] Relief Defendant Donald J. Holmgren is the Trustee of the Blust Family Irrevocable Trust, and Relief Defendant Jaclyn Blust received money from the Blust Family Irrevocable Trust.[32] Defendants have funneled consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to each of these Relief Defendants.

---

[26] Callahan Declaration ¶ 12(a).
[27] *Id.* ¶ 12(b).
[28] *Id.*
[29] *Id.* ¶ 8(a).
[30] *Id.* ¶¶ 9-10; Ridder Declaration ¶ 12(b).
[31] Ridder Declaration ¶¶ 21-22, 26.
[32] Hanson Declaration ¶¶ 37-38.

### III.   STATEMENT OF FACTS

Strategic Financial Solutions, LLC is a limited liability company with a principal place of business located in New York that conducts business as a debt-relief firm and services consumers who often have a significant amount of unsecured debt.[33] All of the SFS entities maintain offices in Manhattan and Buffalo, NY.[34] Typically, debt-relief companies advise consumers to stop paying their unsecured creditors and instead deposit money into an account set up by the company for the purpose of attempting to settle the consumers' debts for less than what they actually owe. The debt-relief companies then contact the creditors and try to negotiate a lower payment to settle the debt. In some cases, creditors will agree to reduce the amount owed even after the creditors have charged off the debt. Debt-relief services like these are risky for consumers because, among other things, while the consumers are paying money into the account set up by the debt-relief company, the consumers' account balances with their creditors rise due to late fees and interest. Moreover, the consumers' credit reports will reflect non-payment and their credit scores will drop, and the consumers may be sued by their creditors for non-payment.

SFS's practices and programs regarding debt relief, as well as the entities through which it operates, are ever-changing,[35] likely as a means of evading the scrutiny of law enforcement agencies and regulators and avoiding negative online reviews that would dissuade consumers from enrolling. As explained below, recent consumer complaints suggest that SFS continues to use the Façade-Firm model to collect illegal fees from consumers, and other consumer complaints suggest that SFS is simultaneously using other models to collect illegal fees.[36]

---

[33] Ridder Declaration ¶ 9.
[34] *Id.* ¶¶ 9(b), 11(e)-(g).
[35] *Id.* ¶¶ 54-57.
[36] *Id.*

Throughout the changes in SFS's business model, however, what has remained constant is its practice of billing fees before debt has been settled and charging fees that are untethered from the results it obtains for consumers. Therefore, Plaintiffs seek a TRO and emergency relief specifically based on and targeting those practices.

## A. Overview of SFS's Façade Firm Debt-Relief Service Model

Through May 2023, at least, SFS sent deceptive solicitations to consumers, and SFS continues to collect advance fees in violation of the TSR. SFS attracted financially distressed consumers through techniques such as targeted mail solicitations suggesting that the consumers have been pre-approved for a debt-consolidation loan or may be eligible for such a loan.[37] Consumers then called SFS (presumably because the phone number on the mailer routed to SFS), and an SFS representative who was not an attorney gathered additional information from the consumer.[38] If the consumer agreed to enroll in the debt-relief service, then the representative assigned the consumer to one of the Façade Firms in SFS's attorney network.[39] The consumer's information was added to a retainer agreement under the firm's name.[40] SFS also advertised its services through a variety of web sites for the Façade Firms that SFS utilized in facilitating the scheme.[41]

After the consumer decided to enroll in the program, the SFS representative arranged for the consumer to meet with a third-party notary, who was not an employee of SFS, a Client Services Subsidiary, or a Façade Firm.[42] The consumer signed the enrollment documents in the

---

[37] Id. ¶¶ 28-37; Callahan Declaration ¶ 27.
[38] Callahan Declaration ¶ 27.
[39] Id. ¶ 28.
[40] Id. ¶ 42.
[41] Id. ¶ 29.
[42] Id. ¶¶ 45-47.

13

presence of the notary.[43] Sometimes these meetings were in person; sometimes they occurred over the phone or virtually.[44] Many consumers were not given a copy of the contract that they signed.[45]

The notary meetings were formulaic, brief, and non-substantive. The notaries read to consumers from a script prepared by SFS, and SFS instructed consumers to direct questions to SFS via phone rather than asking notaries.[46] One consumer described the notary process as a "flyby presentation" and said the notary, who made clear he could not explain things because he was just a notary and not an employee, seemed "like a robot going through a script."[47]

Communications between SFS executives acknowledge the cursory and non-substantive nature of the notary meetings, which both a Senior Vice President of Sales at SFS and Senior Director of Negotiations described as "pencil-whip[ping]."[48] The Senior Vice President also noted that "we don't give 'em a copy of the contract when they sign"[49] and the Senior Director of Negotiations described the presentation as "fluffy" and "almost like CYA on our end."[50]

The contracts between the notary companies and SFS or Façade Firms required individual notaries to provide consumers an "in-person presentation," but the contracts did not require the notary to read the presentation prior to the meeting or otherwise have any substantive knowledge of SFS's debt-relief services.[51] Nor did the contracts require the individual notaries to

---

[43] Declaration of E.S. (E.S. Declaration) ¶ 6; Declaration of P.G. (P.G. Declaration) ¶ 6.
[44] Callahan Declaration ¶ 60.
[45] Callahan Declaration ¶¶ 15(c), 58.
[46] Callahan Declaration ¶¶ 52-53.
[47] E.S. Declaration ¶¶ 7-8.
[48] Callahan Declaration ¶ 56; Ridder Declaration ¶ 73.
[49] *Id.*
[50] *Id.*
[51] Callahan Declaration ¶ 48.

be able to meaningfully interact with consumers on behalf of the company about the product.[52] Furthermore, as explained in greater detail in Part V.A.4 below, one of the notaries noted that he was not there to give consumers advice, but to get consumers to sign documents.[53] He said that that if consumers posed questions, he was told to have the consumer contact one of Defendants' sales representatives.[54]

After a consumer signed the retainer agreement with the notary, an attorney from the assigned Façade Firm contacted the consumer and read a short script welcoming the consumer to the program.[55] After this preliminary "welcome call," consumers who tried to reach their assigned attorney generally communicated solely with and through SFS non-attorney employees.[56]

At the same time, behind the scenes, SFS presumably also assigned the consumer to a Client Services Subsidiary owned by SFS that corresponded to and often used a name similar to the Façade Firm.[57] For example, Bedrock Legal Group, Anchor Law Firm, and Monarch Legal Group are Façade Firms, and Bedrock Client Services, Anchor Client Services, and Monarch Client Services are Client Services Subsidiaries owned by SFS.[58] The Client Services Subsidiaries employed non-attorney negotiators who were tasked with negotiating settlements on behalf of the consumers – if these negotiations happened at all.[59] When SFS employees answered phone calls from consumers who were enrolled in the service, a computer program told the SFS

---

[52] *Id.*; *see also id.* ¶¶ 50-52, 56.
[53] Ridder Declaration ¶ 75; S.P. Investigative Interview 15:1-10.
[54] Ridder Declaration ¶ 75; S.P. Investigative Interview 15:9-11, 32:7-33:14.
[55] Callahan Declaration ¶ 61.
[56] P.G. Declaration ¶ 9; Declaration of S.M. (S.M. Declaration) ¶ 8; Callahan Declaration ¶¶ 62, 65.
[57] Ridder Declaration ¶ 14; *see also* Table *supra* at 9.
[58] Ridder Declaration ¶ 14.
[59] Callahan Declaration ¶¶ 63-65.

employee the name of the Façade Firm to which the consumer was assigned, and the SFS employee used that information to answer the phone using the name of the assigned Façade Firm.[60]

Once the consumers signed the enrollment documents, an SFS representative instructed the consumers to stop paying their debts, and the consumers were told that the Façade Firm would contact their creditors on their behalf.[61] But when consumers stopped paying their debts, their creditors added interest and fees to their account balances.[62] And sometimes creditors filed debt-collection lawsuits against these consumers.[63] In addition, some consumers stated that their creditors were never contacted by the Façade Firm or anyone else connected with the debt-relief service.[64]

## B. Defendants immediately collect fees before any debts are settled, and those fees ultimately bear no relationship to any settlement achieved.

After signing the enrollment documents, consumers were required to immediately begin making monthly deposits into an escrow account managed by payment processing companies such as Global Client Solutions, LLC (GCS) or Account Management Systems, Inc. formerly known as Reliant Account Management, LLC (RAM).[65] Defendants immediately began withdrawing fees on a monthly basis from the GCS and RAM accounts without regard to whether SFS or the Façade Firm had settled any of the consumer's debts.[66] The consumers'

---

[60] Callahan Declaration ¶ 15(c).
[61] P.G. Declaration ¶ 8; Declaration of P.K. (P.K. Declaration) ¶¶ 15, 27; Declaration of S.K. (S.K. Declaration) ¶ 8.
[62] P.K. Declaration ¶ 29; Declaration of D.K. (D.K. Declaration) ¶ 9.
[63] P.K. Declaration ¶ 28; Declaration of S.E. (S.E. Declaration) ¶ 9; S.M. Declaration ¶ 9.
[64] Declaration of K.L. (K.L. Declaration) ¶ 23; Declaration of E.K. (E.K. Declaration) ¶¶ 12-13.
[65] *See* Callahan Declaration ¶ 15(c).
[66] E.S. Declaration at 60-67 (attachments); P.G. Declaration at 50-54 (attachments); Callahan Declaration ¶ 67.

contracts with the Façade Firms contain a payment schedule that shows the amounts that will be deducted, the dates the deductions will be made, and what fees the payments cover. For instance, one consumer, P.G., entered into the contract with her Façade Firm, Carolina Legal Services, on June 26, 2020, and enrolled debts totaling $44,208.00 into the program.[67] Beginning on July 5, 2020, P.G. made a deposit every two weeks in the amount of $438.34 into her escrow account.[68] The payment schedule noted that for the first 18 months, a bi-weekly fee of $233.33 would be collected from the escrow account as a "service cost."[69] The service cost was calculated based on the total amount of debt initially enrolled in the program.[70] The payment schedule also states that (a) for the first 9 months, a bi-weekly "retainer" fee of $50-75 would be collected from the escrow account; and (b) for the entire 36 months of the contract, a bi-weekly "legal administrative" fee of $44.50 and a monthly "banking" fee of $10.95 would be collected from the escrow account.[71] These fees consumed the bulk of P.G.'s monthly deposits. For example, when P.G. made her first deposit of $438.34, only $74.56 was left in her escrow account after the fees were deducted.[72] The contract did not provide for any contingencies or variance based upon outcomes obtained by Defendants; instead, P.G. was charged the flat-rate fees monthly regardless of whether any debts were resolved and regardless of the amount of savings obtained (if any).[73] During the entire period that P.G. was enrolled in the debt-relief service, roughly 64% of the funds she paid into her account were deducted as fees and only 6.5% of the funds were

---

[67] P.G. Declaration at 29, 31 (attachments).
[68] *Id.* at 31, 50-54.
[69] *Id.* at 31.
[70] For P.G., the service cost was 19% of the debt enrolled in the program. *Id.*
[71] *Id.*
[72] *Id.* at 50-54.
[73] P.G. Declaration at 29, 31; Callahan Declaration ¶ 69(c).

paid to creditors.[74] (The remainder was ultimately refunded when the attorney who she believed was representing her in the debt-relief service had his law license suspended.[75])

Similarly, E.S., was enrolled in the debt-relief service between approximately May 2020 and May 2022.[76] The payment schedule in E.S.'s contract provided that a monthly "service" fee of $256 would be charged for the first twenty-two months that she was enrolled in the debt-relief service.[77] As in the example above, this fee was based on the total amount of the debt initially enrolled in the program, adding up to 17% of the total debt.[78] The contract did not provide for any contingencies or variance based upon outcomes obtained by Defendants or the Façade Firms; instead, E.S. was charged the flat-rate service fee monthly regardless of whether the companies resolved any of her debts or negotiated a debt reduction on her behalf.[79] E.S.'s account statements show that she deposited approximately $2,114 into her escrow account during the first six months she was enrolled in the program, and neither SFS, a Façade Firm, nor any other entity made a settlement payment to E.S.'s creditors during these first six months.[80] By the end of this first six-month period, however, approximately 91% of the funds she had deposited into her account (roughly $1,900) had been withdrawn as fees.[81] During the entire period E.S. was enrolled in the debt-relief service, approximately 84% of the funds she deposited into her account were deducted as fees, and only 16% of the funds were paid to creditors.[82]

---

[74] P.G. Declaration ¶¶ 50-54; Callahan Declaration ¶ 71.
[75] P.G. Declaration ¶¶ 11-12; Callahan Declaration ¶ 71.
[76] E.S. Declaration ¶ 11.
[77] E.S. Declaration at 48 (attachments).
[78] E.S. Declaration at 48 (attachments); Callahan Declaration ¶ 72.
[79] E.S. Declaration at 48 (attachments); Callahan Declaration ¶ 72.
[80] E.S. Declaration at 62-66 (attachments); Callahan Declaration ¶ 73.
[81] E.S. Declaration at 62-66 (attachments); Callahan Declaration ¶ 73.
[82] E.S. Declaration at 60-67 (attachments); Callahan Declaration ¶ 73.

Defendants charge consumers exorbitant fees in connection with the debt-relief service. Furthermore, until at least 2021, the fees were either flat rate (administrative and retainer fees) or based on a percentage of the total amount of "enrolled debt" (service fees) that the consumer wanted settled; the fees bore no relation to individual debt settlements, if any, that Defendants negotiated.[83] In addition, because so many consumers were enrolled in the service, SFS collected a substantial amount of total fees, even when considering only those fees that were collected prior to obtaining any outcomes for consumers.

Between approximately January 1, 2016 and March 15, 2021, data obtained from RAM for approximately 34,000 consumers enrolled in SFS's program shows that these consumers collectively paid over $100,000,000 in fees to Defendants and the Façade Firms (including retainer fees, legal admin fees, and service fees) *before* any debt-relief payments were made to creditors.[84] Over $84,000,000 of those fees went directly to the Client Services Subsidiaries. This figure does not account for fees collected from consumers with accounts managed by GCS, and it also does not include fees that were collected after SFS or the Façade Firm made at least one debt-relief payment to a creditor on the consumer's behalf.[85] Evidence demonstrates that a large portion of the fees collected through RAM and GCS was ultimately funneled to SFS, the Client Services Subsidiaries, or the Individual Defendants.[86]

**C.  Defendants' debt-relief scheme is constantly evolving but remains unlawful.**

As noted above, SFS's practices and programs regarding debt relief, as well as the entities through which it operates, are constantly shifting. Nevertheless, recent consumer

---

[83] Callahan Declaration ¶ 73.
[84] Declaration of Joanna Cohen ("Cohen Declaration") ¶¶ 5, 11, 28.
[85] *Id.* ¶¶ 9, 11, 21.
[86] Hanson Declaration ¶¶ 20-39.

complaints suggest that SFS, working through the façade firms, continues to collect substantial fees (a) before resolving any debt for consumers, and (b) that are based on a percentage of the enrolled debt rather than on results obtained.[87] These complaints also suggest that Strategic Consulting, LLC is working directly with consumers and performing services for the new façade firms.[88] In 2023 alone, there are 125 consumer complaints in the FTC's Sentinel database against SFS-affiliated Façade Firms.[89] These consumers are being harmed by Defendants' unlawful conduct. For example, one consumer complained that he was charged nearly $10,000 in advance fees between July 2020 and June 2023, and none of his debts were settled.[90] Defendants were still charging C.E. fees in September 2023.[91] C.E.'s and other consumers' claimed experiences are consistent with SFS's advance-fee business model and strongly suggest that SFS continues to violate the TSR.

## IV.    ARGUMENTS & AUTHORITIES

In the Second Circuit, in order to grant preliminary injunctive relief, the district court must: (1) determine that Plaintiffs have a "fair and tenable chance of ultimate success on the merits" and (2) balance the equities.[92] When the Bureau and States act to protect consumers and

---

[87] Ridder Declaration ¶¶ 54-57.

[88] *Id*. ¶ 57.

[89] *Id*. ¶ 54.

[90] *Id*. ¶ 55(a).

[91] C.E. Declaration at 129 (attachments).

[92] *FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 199 (S.D.N.Y. 2000) (citing *United States v. Sun & Sand Imps., Ltd.*, 725 F.2d 184, 188 (2d Cir. 1984)); *People v. Apple Health & Sports Clubs, Ltd*., 571 N.Y.S.2d 23, 24 (N.Y. App. Div. 1st Dept. 1991) ("since the legislature authorizes injunctive relief for fraudulent and illegal conduct such as that which occurred here, proof of irreparable injury is unnecessary) *aff'd at* 80 N.Y.2d 803; *see also FTC v. Cuban Exch., Inc.*, No. 12-cv-5890, 2012 WL 6800794, at *1, 3 (E.D.N.Y Dec. 19, 2012) (recommending FTC's application for TRO be granted in a case where FTC was alleging claims under the Telemarketing Act); *SEC v. Morgan*, No. 1:19-CV-00661 EAW, 2019 WL 2385395, at *4 (W.D.N.Y. June 5, 2019) (quotation omitted) ("In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction").

prevent violations of federal law, they proceed "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest."[93] Thus, "[w]here Congress expressly provides for Government enforcement of a statute by way of injunction, and the Government has satisfied the statutory conditions of the statute, irreparable harm to the public is presumed."[94] The TCFPA specifically authorizes the Bureau and States to enjoin unlawful actions and enforce compliance with the TSR.[95]  For this reason, irreparable harm is presumed when the Plaintiffs bring a consumer protection case like this one.[96]

**A.  Plaintiffs will likely prevail on their claims under the TSR.**

Here, Plaintiffs have gathered extensive evidence that makes it likely they will prevail on the merits in demonstrating that Defendants are charging consumers both advance fees generally (Count 1) and advance fees after a settlement of some but not all debts, where the fees that are charged are not proportional to the amount of debt actually settled or based on a fixed percentage of the amount saved (Count 2) in violation of the TSR.

The TSR prohibits abusive telemarketing acts or practices, including charging advance fees.[97] Specifically, the regulation states that

> [i]t is an abusive telemarketing act or practice and a violation of [the TSR] for any seller or telemarketer to . . .

---

[93] *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808-09 (2d Cir. 1975); 12 U.S.C. § 5564(a) (empowering the Bureau to seek permanent or temporary injunctive relief against "any person [who] violates a Federal consumer financial law").

[94] *United States v. Schmitt*, 734 F. Supp. 1035, 1049 (E.D.N.Y. 1990).

[95] 15 U.S.C. § 6103.

[96] *Verity Int'l*, 124 F. Supp. 2d at 199; *see also United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972) ("The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained."); *see also Mgmt. Dynamics, Inc.*, 515 F.2d at 808.

[97] 16 C.F.R. § 310.4.

(i) Request[] or receiv[e] payment of any fee or consideration for any debt relief service[98] until and unless:

> (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; [and]

> (B) The customer has made at least one payment pursuant to [the] agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; . . .[99]

In addition, the TSR requires that if debts are being settled individually—as Defendants purport to do—"any fee" charged must (1) "bear[] the same proportional relationship to the total fee from for renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount [at the time of enrollment] bears to the entire debt amount [at the time of enrollment]" or (2) be "a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration."[100] Accordingly, to prevail in this action, Plaintiffs need to show that Defendants: (i) are sellers or telemarketers subject to the TSR; and (ii) they "request or receive payment of any fee or consideration for any debt relief service" either (a) before renegotiating, settling, reducing, or otherwise altering the terms of at least one debt ("advance fees"), or (b) that is not tethered to the percentage of the enrolled debt that is settled or reduced, or the amount saved ("unlawful fees"), as a result of individual debt settlements. To the extent Plaintiffs make such a showing, Individual Defendant Sasson is liable

---

[98] The TSR defines a debt relief service as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." *Id.* § 310.2(o).

[99] *Id.* § 310.4(a)(5)(i).

[100] *Id.* § 310.4(a)(5)(i)(C).

if Plaintiffs establish that he controlled a company that violated the TSR as described above, and that he knew or was recklessly indifferent to the company's status as a telemarketer or seller under the TSR and the company's request or receipt of advance fees or unlawful fees.[101] In addition, Individual Defendants Sasson and Blust are liable if Plaintiffs establish that they substantially assisted the violations of others. The evidence provided by Plaintiffs satisfies all of the above elements.

### 1. Defendants SFS, the Client Services Subsidiaries, and the non-party Façade Firms are sellers or telemarketers as defined by the TSR.

As explained above, pursuant to a campaign to induce consumers to purchase its services, SFS initiates and receives interstate telephone calls to and from consumers. During these calls, SFS offers to renegotiate, settle, or alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors. Thus, SFS is a "telemarketer" offering "debt-relief services" under the TSR.[102] In addition, SFS, its Client Services Subsidiaries, and the non-party Façade Firms provide, offer to provide, or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, SFS, its Client Services Subsidiaries, and the non-party Façade Firms are also "sellers" offering "debt-relief services" under the TSR.[103]

### 2. Defendants SFS and the Client Services Subsidiaries request and receive advance fees (Count 1).

The evidence clearly demonstrates that Defendants SFS and the Client Services Subsidiaries charge monthly fees *immediately* after consumers enroll in the debt-relief service,

---

[101] *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 368 (S.D.N.Y. July 3, 2019); *Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5; *Tax Club, Inc.*, 994 F. Supp. 2d at 471.
[102] *Id*. § 310.2(o), (ff).
[103] *Id*. § 310.2(o), (dd).

regardless of whether and when a consumer's enrolled debts are reduced, in violation of the TSR.[104] Indeed, the fee structure was front-loaded so that Defendants and the Façade Firms took a larger percentage of fees early in the program. Some consumers paid fees for many months and yet Defendants and the Façade Firms never settled any of their debts. And even for consumers who saw one or more of their debts renegotiated or settled, they typically had to wait 7-9 months and pay thousands of dollars in fees before Defendants or the Façade Firms obtained such a resolution.[105]

The timing of such fees is beyond dispute. Indeed, the contract documents that the consumers signed to enroll in Defendants' debt-relief services explicitly state that consumers will be charged a service fee immediately after enrolling in the program, and this fee is based on a percentage of the total amount of debt enrolled. Consumers are also charged additional fixed fees, such as a retainer fee, a legal administration fee, and a banking fee, on a recurring basis beginning immediately upon entering the debt-services program, regardless of whether any settlements have been reached.[106]

A review of individual consumers' account statements is illustrative. E.S. enrolled in Defendants' debt-relief service between approximately May 2020 and May 2022. Her account statements show that the first settlement payment was made to a creditor approximately six months after she started making deposits into her escrow account.[107] At that point, she had deposited approximately $2,114 into her escrow account. Before any of her debts were settled

---

[104] *Id*. § 310.4(a)(5)(i)(A), (B).
[105] *See* Callahan Declaration ¶ 15(c) and Exhibit 10, cited therein. (stating that SFS withdrew monthly fees from escrow accounts "as soon as enrollment documents [were] signed, [and] before Strategic settles any debt for the consumer" and explaining that "[m]any clients do not receive their first settlement until they have been in the program for 7-9 months or so").
[106] *See, e.g.*, P.K. Declaration at 33 (attachments).
[107] E.S. Declaration at 60-67 (attachments).

and she made her first settlement payment, however, approximately 91% of the funds she had

deposited (roughly $1,900) had been deducted as fees.[108] Furthermore, the payment schedule that

E.S. received when she signed her contract noted that a service fee of $256 would be charged on

a monthly basis for the first 22 months, regardless of whether Defendants had yet renegotiated,

reduced, or settled any of her enrolled debts.[109] Additional fees were also collected monthly.

Similarly, P.G. was enrolled in Defendants' debt-relief service between approximately June 2020

and May 2021. She deposited approximately $7,452 into her account before the first settlement

payment was made to a creditor, approximately nine months after she enrolled in the program.[110]

Before she made her first settlement payment, however, 68% of the funds P.G. had deposited

into her account (roughly $5000) had been deducted to cover fees.[111] Furthermore, P.G.'s

payment schedule was similar to E.S.'s: it stated that a service fee of $233 would be charged on

a biweekly basis for the first 36 months, regardless of whether Defendants had yet renegotiated,

reduced, or settled any of her enrolled debt.[112] Additional fees were also collected monthly.[113]

     These consumers are just a small sample of the thousands of consumers Defendants have

preyed upon. A sample of payment data from RAM for approximately 34,000 consumers

enrolled in SFS's program between approximately January 1, 2016 and March 15, 2021, shows

that this subset of consumers collectively paid over $104,000,000 in fees to Defendants and the

Façade Firms (including service fees, retainer fees, and legal admin fees) *before* any debt-relief

payments were made to creditors.[114] This figure does *not* account for fees collected from

---

[108] *Id.*
[109] *Id.* at 48 (attachments).
[110] P.G. Declaration ¶ 10 & at 50-54 (attachments).
[111] *Id.*
[112] P.G. Declaration at 31-32 (attachments).
[113] *Id.*
[114] Cohen Declaration ¶ 28.

consumers with accounts managed by GCS, nor does it include fees that were collected after a consumer had made at least one debt-relief payment to a creditor. As explained below, a large portion of the fees collected through RAM and GCS was ultimately funneled to SFS, the Client Services Subsidiaries, or the Individual Defendants, and then ultimately to the Relief Defendants.

### 3. Defendants SFS and the Client Services Subsidiaries request and receive unlawful fees (Count 2).

In addition to charging advance fees, the fee amounts SFS and the Client Services Subsidiaries charge is not tethered to any results they may obtain, which is an independent violation of the TSR.[115] Indeed, the contracts explicitly provide that the service fee is a percentage of the *enrolled* debt, without any connection to the percentage of debt that Defendants are able to settle or the amount of savings they obtain for the consumer.

A review of the account statements of and contracts signed by the same consumers discussed in the preceding section illustrates this violation as well. The payment schedules E.S. and P.G. received when they signed their contracts explained that a fee of $256 or $233 (respectively) would be charged on a monthly basis for the first 22 months (E.S) or 36 months (P.G.) that these consumers were enrolled in the debt-relief service.[116] Although it was understood that Defendants would be attempting to resolve the consumers' enrolled debts individually, their contracts did not provide for any contingencies or variance based upon outcomes obtained by Defendants or the Façade Firms.[117] During the entire period E.S. was enrolled in the debt-relief service, Defendants resolved only $1,543.33 (less than 5%) of her total enrolled debts. Yet they collected $5,128.74 in service fees (representing over 90% of the quoted

---

[115] 16 C.F.R. § 310.4(a)(5)(i)(C).
[116] E.S. Declaration at 48 (attachments); P.G. Declaration at 31-32 (attachments).
[117] E.S. Declaration at 48 (attachments); P.G. Declaration at 31-32; Callahan Declaration ¶ 72.

fee) and $1,073.00 in retainer fees (representing approximately 90% of the quoted fee). Indeed, approximately 84% of the funds she deposited into her account were deducted as fees and only 16% of the funds were paid to creditors.[118] Similarly, during the entire period P.G. was enrolled in the debt-relief service, Defendants resolved only $544.53 (approximately 1%) of her total enrolled debts. Yet they collected $3,733.12 in service fees (representing over 94% of the fee owed under the contract) and $800.00 in retainer fees (representing 80% of the fee owed under the contract). Roughly 64% of the funds she deposited into her account were deducted as fees and only 6.5% of the funds were paid to creditors.[119] Thus, for both E.S. and P.G., the fees charged bore no relationship to either (1) the proportion of the total enrolled debt that had been resolved, or (2) the amount saved for the consumer as a result of the renegotiation, settlement, reduction, or alteration.[120]

Furthermore, the timing of the fees charged to E.S. and P.G. as well as the timing of fees in the RAM payment data sample discussed above is further evidence of the unlawful nature of the fees. Indeed, where Defendants requested or received fees before they had obtained any results for the consumers (as was the case for all $84,000,000 of fees highlighted above), such fees inherently cannot be tethered to the nature of any results (*i.e.*, percentage of enrolled debt settled or amount of savings for consumers), as required by 16 C.F.R. § 310.4(a)(5)(i)(C).

### 4. The TSR's prohibition on advance and unlawful fees applies, despite SFS's use of third-party notaries to obtain signatures from consumers.

The fact that Defendants request or receive advance fees and unlawful fees cannot reasonably be disputed. To avoid TSR liability, Defendants may contend that their debt-relief

---

[118] E.S. Declaration at 60-67 (attachments).
[119] P.G. Declaration at 50-54 (attachments). The remainder was ultimately refunded when the attorney who she believed was representing her in the debt-relief service had his law license suspended. P.G. Declaration ¶¶ 11-12.
[120] *See* P.G. Declaration at 31-32; E.S. Declaration at 48 (attachments).

services are exempt from the TSR's prohibitions on advance fees and unlawful fees under 16

C.F.R. § 310.6(b)(3). Notably, establishing that Defendants' practices and conduct satisfy the

exemption's requirements is Defendants' burden. *United States v. Dish Network LLC*, 75 F.

Supp. 3d 916, 937 (C.D. Ill. 2014). Plaintiffs raise the issue here for the Court's awareness,

however, in light of the *ex parte* nature of this application.

Specifically, Defendants may rely on section 310.6(b)(3), which provides in relevant part:

(b) The following acts or practices are exempt from this Rule:

(3) Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller . . . .

According to long-standing guidance from the FTC addressing this exemption:

[t]he key to the face-to-face exemption is the direct, substantive and personal contact between the consumer and the seller. The goal of the TSR is to protect consumers against deceptive or abusive practices that can arise when a consumer has no direct contact with an invisible and anonymous seller other than the telephone sales call. A face-to-face meeting provides the consumer with more information about – and direct contact with – the seller and helps limit potential problems the TSR is designed to remedy.[121]

Similarly, a Utah district court recently considered the meaning of the TSR's

face-to-face exemption, deciding whether the presentation "must be the same as the subject of

the telemarketing call" or whether "any face-to-face presentation by the seller is sufficient,

regardless of subject."[122] In addressing that question, the court noted that the exemption's use of

"the word 'presentation' indicates that more than some type of de minimis or ancillary face-to-

---

[121] Federal Trade Commission, Complying with the Telemarketing Sales Rule, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (last visited Jan. 6, 2024).

[122] *FTC v. Nudge LLC*, No. 2:19-cv-867, 2022 WL 2132695, at *37 (D. Utah June 14, 2022).

face contact or communication between the consumer and seller is required."[123] The court further explained that "a welcome letter handed out at some events referenc[ing] the opportunity to participate" in the program in question did not satisfy the face-to-face exemption because it did not constitute a "presentation" as required by the exemption.[124]

Here, the attached evidence shows that Defendants' practices do not satisfy the TSR's face-to-face exemption for multiple reasons. First, the exemption only applies if the requisite presentation is done "by the seller," but the notaries do not meet that definition. Under the TSR, a "seller" is one who "provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."[125] But the notaries were offering nothing to the *consumer* in exchange for consideration – rather their customers were the Defendants. Indeed, the notaries who participated in face-to-face meetings with consumers were not employees of SFS, the Client Services Subsidiaries, or the Façade Firms, but rather were independent contractors paid by third-party signing companies that contracted with the Façade Firms.[126] By the time consumers met with the notary, they had already been "sold" the program via SFS employees over the phone. The notary's job was just to get the consumer's signature.[127]

Second, the notaries' meetings with consumers were also insufficient to trigger the exemption, as they were brief and not substantive. While "the key to the face-to-face exemption is the direct, substantive and personal contact" via a "presentation,"[128] statements by senior SFS

---

[123] *Id.*
[124] *Id.* at *39.
[125] 16 C.F.R. § 310.2(dd).
[126] Callahan ¶ 47; Ridder Declaration ¶ 75; S.P. Investigative Interview 13:3-7.
[127] Ridder Declaration ¶ 75.
[128] Federal Trade Commission, Complying with the Telemarketing Sales Rule, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (last visited Sept. 18, 2023); *Nudge*, 2022 WL 2132695, at *37.

executives, consumers, and notaries who handled signings for Defendants, as well as the notaries' contracts, all show that the meetings were perfunctory, superficial, and insufficient.

SFS executives acknowledged that the meetings with the notaries were cursory. According to a Senior Vice President of Sales at SFS:

> [A]ll we do is just get these people to just kind of pencil whip and sign [the contract] . . . . It doesn't seem like it's as meaty as we make it sound. . . I didn't realize we don't give 'em a copy of the contract when they sign.[129]

In the same conversation, a Senior Director of Negotiations replied:

> I agree with you, it's almost like you're pencil-whipped into signing that day because since you already came all the way here, you know just let's get through this – and I think they just made it more fluffy you know as far as the um presentation, if you will, and they sign the presentation – so I mean it's almost like a CYA on our end.[130]

Furthermore, the contracts also did not require the notaries to be able to answer any questions posed by the consumers. In practice, the notary companies regularly called SFS if a consumer had questions or concerns.[131] Consumers similarly confirm that notaries did not answer their direct questions and instead often advised the consumer to call the sales representative (an employee of SFS or the Client Services Subsidiary) with whom the consumer had previously spoken or referred the consumer to the documents they were signing.[132] One notary, S.P., testified that he had no contacts with the Façade Firm.[133] Rather, his only contact was with "the signing firm that contacted me."[134] The presentation that S.P. provided to consumers indicated that he was a representative of a Façade Firm, which he did not agree

---

[129]  Ridder Declaration ¶ 73; Callahan Declaration ¶ 56.
[130] Ridder Declaration ¶ 73; Callahan Declaration ¶ 56.
[131] Callahan Declaration ¶ 51.
[132] Callahan Declaration ¶ 57; S.E. Declaration ¶ 5; E.K. Declaration ¶ 8; M.S. Declaration ¶ 5.
[133] Ridder Declaration at ¶ 75 (referring to exhibit 25); S.P. Investigative Interview 10:16-23.
[134] Ridder Declaration at ¶ 75; S.P. Investigative Interview 10:19-21.

with.[135] When he questioned that representation, he was told that was the format that the Façade Firms use.[136] S.P. was regularly instructed that he was not there to give consumers advice.[137] Rather he was there to "make sure they sign what they do and explain the documents, quote, to the best of my ability."[138] If consumers have questions, S.P. was instructed to have the consumer call the Façade Firm.[139]

Finally, the notaries' contracts simply required them to schedule appointments and oversee the execution of documents, including "getting all appropriate signatures from the client."[140] Furthermore, at least some contracts between the signing companies and the Façade Firms did not require the notaries to have any substantive knowledge about the product or to be able to meaningfully interact with consumers on behalf of the company about the product. This is consistent with statements by consumers: one consumer described the notary process as a "flyby presentation" and said that the notary, who made clear he could not explain things because he was just a notary and not an employee, seemed "like a robot going through a script."[141] Indeed, some contracts paid the notaries more for the meeting if the documents were fully signed, incentivizing the notaries to obtain the signatures.

These brief, flyby meetings do not qualify for the exemption.[142] Publicly available guidance from the FTC explains that companies "can't get around the [TSR] by hiring

---

[135] *Id.* at 7:8-13.
[136] *Id.*
[137] *Id.* at 15:7-8.
[138] *Id.* at 15:9-11.
[139] *Id.* at 33:2-13.
[140] Callahan Declaration ¶ 48.
[141] E.S. Declaration ¶ 7.
[142] FTC, *Debt Relief Services and the Telemarketing Sales Rule: What People Are Asking*, at https://www.ftc.gov/system/files/documents/plain-language/bus73-debt-relief-services-telemarketing-sales-rule-what-people-are-asking.pdf (last visited Jan. 6, 2024).

representatives just to hold cursory pre-enrollment meetings with potential customers."[143] That is exactly what Defendants sought to do here, except using independent contractors assigned by a third party. The only direct or substantive interaction consumers could have with anyone from SFS before they signed the contract was by phone.

In sum, the evidence submitted by Plaintiffs clearly shows that Defendants were charging advance and unlawful fees to consumers enrolled in the program in violation of the TSR, and no exemption applies to this conduct. Thus, Plaintiffs will likely prevail on their claims under the TSR.[144]

## B. As members of a common enterprise, SFS and the Client Services Subsidiaries are jointly and severally liable for the TSR violations.

SFS and the Client Services Subsidiaries are jointly and severally liable for the unlawful conduct at issue here because they have operated as a common enterprise.[145] When a common enterprise exists, "each entity within a set of interrelated companies may be held jointly and severally liable for the action of other entities that are part of the group."[146] When determining whether a common enterprise exists between two or more defendants, courts consider five non-

---

[143] *Id.*

[144] *Cf. Bureau of Consumer Financial Protection v. Progrexion Marketing, Inc.*, No. 2:19-cv-00298-BSJ, 2023 WL 2548008, at *4-6 (D. Utah Mar. 10, 2023) (concluding that defendants had violated the provisions of the TSR prohibiting advance fees in context of credit repair services when they charged clients fees on a monthly basis "without waiting six months and without providing a consumer report at the six-month mark showing results have been achieved").

[145] *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (explaining that "[c]orporate entities that operate in a common enterprise may be held liable for one another's deceptive acts and practices") (citation and quotations omitted); *FTC v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011).

[146] *See CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *16-17 (S.D.N.Y Dec. 2, 2016) (internal quotations and citation omitted) (concluding that plaintiffs had alleged sufficient facts to establish common enterprise liability at pleading stage when plaintiffs had alleged facts that addressed some, but not all, of the five nondispositive factors); *New York v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 366 (S.D.N.Y. 2019) (applying common enterprise theory to multiple defendants alleged to have violated TSR).

dispositive factors: "whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."[147] Here, the evidence demonstrates the existence of a common enterprise between SFS and its Client Services Subsidiaries.

First, SFS and its Client Services Subsidiaries maintain officers and employees in common. In a 2018 tax return, Sasson is listed as an Officer of Strategic Family, Inc., the holding company for the common enterprise.[148] SFS and its Client Services Subsidiaries also share employees.[149] Although individual employees' salaries were often paid by Strategic Client Support, f/k/a Pioneer Client Services, many employees perform work for all of the Client Services Subsidiaries without distinction.[150] In some instances, the same employees answer phone lines associated with multiple Client Services Subsidiaries. For example, one employee whose salary was paid by Strategic Client Support, LLC answered consumer calls while holding himself out to be a representative of at least six different Façade Firms.[151] Indeed, Strategic CS is invoiced by ADP not only for multiple SFS entities, but for multiple Façade Firms as well.[152]

Second, SFS and the Client Services Subsidiaries operate under the common control of Individual Defendant Sasson. Sasson is the Chief Executive Officer of SFS and, along with others, founded the company in 2007.[153] Additionally, as of 2017, Sasson owned about 26% of SFS through ownership of other corporate entities.[154] Sasson is also listed in bank documents as

---

[147] *See CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *16-17 (S.D.N.Y Dec. 2, 2016.
[148] Ridder Declaration ¶ 12(a).
[149] Callahan Declaration ¶¶ 22-3.
[150] *Id.* ¶ 22.
[151] *Id.* ¶ 23(b).
[152] Ridder Declaration ¶ 18(c).
[153] *Id.* ¶ 8(a).
[154] *Id.* ¶ 9.

the owner/manager/account signatory of many of the Client Services Subsidiaries that are used to funnel money to SFS.[155]  Sasson was listed as the authorized officer on a master signature card for nineteen entities affiliated with SFS, including a dozen Client Services Subsidiaries.[156]

Third, the companies share office space on the sixth floor at 711 3rd Avenue, New York, NY 10018, and 115 Lawrence Bell Drive, Buffalo, New York 14221.[157] The companies also all share a phone system. The system is controlled by SFS, which hired a company to analyze calls across the enterprise.[158]

Fourth, the companies are commingling assets. Bank account documents show that an account for Strategic Financial Solutions was transferred to Strategic Client Support, suggesting that the two companies do not operate independently.[159] Plus bank documents show that Sasson, SFS's CEO, opened accounts for Strategic Client Support, LLC Strategic Financial Solutions, LLC, Strategic Consulting, LLC, Strategic CS, LLC, BCF Capital, LLC, and Anchor Client Services, LLC.[160] Perhaps most significantly, an analysis of bank accounts held by Pioneer Client Servicing, Boulder Client Services, and Bedrock Client Services shows that they all transferred millions of dollars to various companies in the SFS common enterprise, including Strategic Client Support, LLC, Strategic NYC, LLC, Strategic CS, LLC, and Strategic Consulting, LLC.[161] For example, between October 2017 and December 2020, an account held by Strategic NYC, LLC shows incoming transfers totaling approximately $73,000,000 from at least 9 different Client Services Subsidiaries and outbound transfers totaling approximately

---

[155] Hanson Declaration ¶¶ 11, 29; Ridder Declaration ¶¶ 12(e), 13
[156] Hanson Declaration ¶ 11.
[157] Ridder Declaration ¶¶ 11(e)-(g).
[158] Callahan Declaration ¶¶ 19-20, 23-25.
[159] Hanson Declaration ¶¶ 25-28.
[160] Id. ¶¶ 9-11; Ridder Declaration ¶ 12(e).
[161] Id. ¶ 8.

$96,000,000 to at least 8 different SFS entities.[162] Plaintiffs's analysis of these entities' accounts

suggests they are functionally commingling assets.[163] Finally, SFS and Client Services

Subsidiaries take fees from consumer accounts, even where a consumer is allegedly associated

with a different Client Service Subsidiary. For example, between January 1, 2016 and March 15,

2021, for consumers associated with Rockwell Client Services, Bedrock Client Support took

$182.00 in fees, Harbor Client Services took over $2,000,000 in fees, Monarch Client Services

took $7.00 in fees, and Versara Lending took $181,522.49.[164]

**C.  Defendants Ryan Sasson and Jason Blust are liable for TSR violations.**

Ryan Sasson is liable for the foregoing TSR violations, because of his own personal

actions, and Sasson and Jason Blust are liable because they substantially assisted others'

violations.

    **1.  Individual Defendant Sasson is liable for the violations based on his direct participation or his ability to control the companies, and his knowledge or reckless indifference to requesting or receiving advance and unlawful fees in the context of telemarketing or selling debt relief services.**

In order to obtain injunctive relief against an individual for corporate violations of the

TSR, an individual will be liable "if (1) he participated directly in the deceptive acts or had the

authority to control them and (2) he had knowledge of the misrepresentations, was recklessly

indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of

---

[162] *Id.* ¶ 26.
[163] *See 4 Star Resolution*, 2015 WL 7431404, at *4 (concluding that plaintiffs had established a fair and tenable chance of proving defendants operated as a common enterprise when, among other things, over $11,000,000 was transferred among the corporate defendants between 2010-2014); *Tax Club, Inc.*, 994 F. Supp. 2d. at 467 (determining that complaint alleged sufficient facts to support the existence of commingling when funds were transferred among the bank accounts of the corporate defendants, and consumer funds processed through a credit card merchant account in the name of one corporate defendant were often deposited in a bank account in the name of another corporate defendant).
[164] Cohen Declaration ¶¶ 18-20.

fraud along with an intentional avoidance of the truth."[165] A person's role and authority within the company can demonstrate the requisite control.[166]

Here, Sasson directly participated in, controlled, or had managerial responsibility for and knowledge of the enterprise's actions. Sasson is the current CEO of Strategic Financial Solutions, LLC and one of its founders.[167] As the CEO of SFS, Sasson coordinates with Blust and other Façade Firm attorneys to conceal Defendants' role in providing debt-relief services.[168] Sasson controls the Client Services Subsidiaries that correspond to each Façade Firm.[169]  Sasson opened and controlled bank accounts for SFS and the Client Services Subsidiaries.[170] Thus, Ryan Sasson is individually liable based on his ability to control the companies and his knowledge of, or reckless indifference to, SFS and the Client Services Subsidiaries telemarketing, and requesting and receiving advance and unlawfully calculated fees.

### 2. Individual Defendants Sasson and Blust are liable for the violations because they provided substantial assistance.

Sasson and Blust are liable based on the substantial assistance that they provided to the Corporate Defendants in their violations. Under the TSR, a person is liable for substantially assisting any seller or telemarketer when the person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act of practice that violates the TSR.[171] To establish substantial assistance under the TSR, courts require: 1) an underlying TSR violation; 2) substantial assistance or support to the seller or telemarketer violating the TSR; and 3) that the

---

[165] *Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5; *Tax Club, Inc.*, 994 F. Supp. 2d at 471; *See also Fed. Trade Comm'n v. LeadClick Media, LLC,* 838 F.3d 158, 169 (2d Cir. 2016).
[166] *Tax Club, Inc.*, 994 F. Supp. 2d at 471.
[167] Callahan Declaration ¶ 8(a).
[168] Callahan Declaration ¶¶ 8, 16-21.
[169] Callahan Declaration ¶ 8; Ridder Declaration ¶¶ 12-13.
[170] Hanson Declaration ¶¶ 9-11.
[171] 16 C.F.R. § 310.3(b).

person knew or consciously avoided knowing that the seller or telemarketer violated the TSR.[172]

"The substantial assistance doctrine does not impose a demanding standard, as it requires only that the assistance be more than casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule."[173] Courts can infer knowledge or conscious avoidance of knowledge when the person providing substantial assistance received complaints about the violations.[174]

Sasson and Blust substantially assisted the Corporate Defendants' TSR violations. As explained above, Sasson maintains extensive control over the Corporate Defendants. Blust maintains, and—along with Sasson—controls multiple Façade Firms to conceal SFS's involvement in the debt-relief service. Blust recruited an SFS employee to simultaneously serve as a supervising attorney for multiple Façade Firms while working for SFS.[175] Indeed, this attorney was a member of so many firms she could not remember the complete list.[176] And she explained that other attorneys who work in SFS's offices in Manhattan are also supervising attorneys for other law firms associated with Blust.[177] When employees of SFS or its Client Services Subsidiaries are unable to resolve escalated consumer issues, they often consult with Blust or send the issue to him for resolution.[178]

Given the roles Sasson and Blust have played in, among other things, establishing the business structure and coordinating the numerous members of the common enterprise, they knew or consciously avoided knowing about the TSR violations. For example, Sasson controlled many

---

[172] *Consumer Health Benefits Ass'n*, 2011 WL 3652248, at *5.

[173] *Id.*

[174] *Id.*

[175] Callahan Declaration ¶ 17(a)-(d).

[176] *Id.* ¶ 17(b).

[177] *Id.* ¶ 17(c).

[178] *Id.* ¶¶ 17(c)-(d).

of the Client Services Subsidiary bank accounts which received advance fees from consumer accounts at RAM, and both Sasson and Blust were involved in addressing consumer complaints against SFS and the Façade Firms.[179] Accordingly, Sasson and Blust substantially assisted in the Corporate Defendants' violations and should be held individually liable.

**D.  Continued violations of the TSR will cause irreparable harm.**

Allowing Defendants to continue to collect fees that violate the TSR during the course of litigation will cause irreparable harm to consumers. As a threshold matter, Plaintiffs do not need to make a showing of irreparable injury in cases like this one, where Congress has expressly authorized courts to order injunctive relief to prevent violations of a statute because irreparable harm to the public is presumed.[180] Even without the presumption, Plaintiffs' evidence establishes a likelihood of irreparable harm.

As noted above, Defendants and the Façade Firms unlawfully requested or received at least $100,000,000 in advance and unlawful fees between January 2015 and mid-March 2021—an average of more than $1,500,000 a month in consumer harm. And that number is an understatement, as it only accounts for one of Defendants' two escrow companies and only focuses on payments made before the first debt-relief payment, thereby excluding many of the enrolled consumers and the ongoing harm caused by charging fees that were untethered from results obtained for consumers. Notably, Plaintiffs are requesting redress to consumers, making the potential damage amount substantial.

---

[179] Callahan Declaration ¶¶ 17(c)-(d); Ridder Declaration ¶¶ 12-13, 20; Hanson Declaration ¶¶ 9-11
[180] *See Verity Int'l*, 124 F. Supp. 2d at 199; *see also Diapulse*, 457 F.2d at 28; 12 U.S.C. § 5565(a)(2); 15 U.S.C. § 53(b); 15 U.S.C. § 6105(b), (d); *Schmitt*, 734 F. Supp. at 1049.

In order to preserve the Court's ability to award redress or other damages, it is important to ensure that Defendants do not dissipate any available funds. But Defendants' banking practices raise serious concerns that such dissipation would occur without preliminary injunctive relief. First, Defendants have a track record of changing banks, making it difficult to find their assets.[181] For example, in July 2018, the Client Services Subsidiaries stopped all transfers of consumer funds to accounts at Valley Bank, f/k/a Bank Leumi, closing the accounts shortly thereafter.[182] The same month, the Client Services Subsidiaries began collecting consumer funds in accounts at Key Bank.[183] Then in June 2021, Defendants closed all SFS accounts at Key Bank and opened accounts at a different bank.[184] Second, bank records show that Jason Blust has already transferred assets to an irrevocable trust account, which makes it difficult to seize assets and satisfy judgments. Between March 2020 and April 2021, Relief Defendant Lit Def Strategies, which is controlled by Jason Blust, transferred $36,000,000 to the Blust Family Trust.[185] Third, Defendants have transferred large sums into private accounts, including those held or controlled by Individual Defendants or their family.[186]

**E.  The public interest and balance of hardships support a TRO.**

Granting the injunction requested by Plaintiffs is also in the public interest. Halting Defendants' unlawful conduct and preserving assets to redress consumers outweighs any interest that Defendants have in continuing their illegal practices. In balancing public and private

---

[181] Hanson Declaration ¶¶ 17-19.
[182] *Id*. ¶ 17.
[183] *Id.* ¶ 18.
[184] *Id.* ¶ 19.
[185] *Id.* ¶ 37.
[186] *Id.* ¶¶ 29-39.

interests, public equities receive far greater weight.[187] This principle is especially important in the context of enforcing consumer-protection laws.[188]

Here, Defendants have *no* cognizable interest in continuing their illegal conduct and no legitimate claim to hardship to the extent the Court enjoins their unlawful operations.[189] The balance of hardships thus tips decidedly in favor of the Plaintiffs.

**F.  The scope of the proposed preliminary injunctive relief is appropriate and necessary to secure effective final relief for victimized consumers.**

> **1.  The conduct provisions in the proposed TRO are narrowly tailored to prevent ongoing consumer injury.**

The preliminary injunctive relief proposed by Plaintiffs is narrowly tailored to prevent ongoing consumer injury by temporarily prohibiting Defendants from engaging in the illegal conduct described above. Section I of the proposed TRO is warranted based on the fact that Defendants have a long history of violating the TSR and have collected over $84,000,000 in illegal advance fees from consumers (Count 1) (and substantially more when accounting for unlawful fees (Count 2)). Furthermore, these provisions are necessary because Defendants' scheme of collecting advance and unlawful fees is constantly evolving. While Plaintiffs have obtained significant information during the covert investigation of the structure of the enterprise and the flow of unlawfully obtained funds to Defendants, Defendants appear to regularly alter

---

[187] *Cuban Exch., Inc.*, 2012 WL 6800794, at *2; *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989).

[188] *FTC v. Campbell Capital*, No. 18-cv-1163-LJV-MJR, 2018 WL 5781458, at *3 (W.D.N.Y. Oct. 24, 2018) ("[T]he public interest in ensuring the enforcement of federal consumer protection is strong[.]") (citation and internal quotations omitted); *see also FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (noting that the public interest in preserving illicit proceeds for restitution victims is great).

[189] *See Cuban Exch., Inc.*, 2012 WL 6800794, at *2 (explaining that there is "no oppressive hardship to defendants in requiring them to comply with the [FTC Act], refrain from fraudulent misrepresentation or preserve their assets from dissipation or concealment") (citation and internal quotations omitted).

how they operate in an effort to evade detection by federal and state regulators. The risk of harm to Defendants during this temporary stoppage of unlawful activity is low, while the risk of harm to consumers if Defendants are permitted to continue is extremely high.[190] The conduct provisions in the proposed order will ensure that Defendants will not continue to profit from an unlawful scheme to collect advance fees. "[T]here is no oppressive hardship to defendants in requiring them to comply with the [law]," which is all that these provisions require.[191]

### 2. An asset freeze is essential to preserve the possibility of effective final relief for victimized consumers.

When district courts determine plaintiffs are likely to prevail in a final determination on the merits, courts issue orders preserving assets to ensure that assets are available to provide restitution to injured consumers.[192] The Second Circuit has "characterized the freezing of assets as ancillary relief that facilitates monetary recovery by preserving the status quo pending litigation of statutory violations."[193]

To obtain an asset freeze against a relief defendant, the government must show that the person has received ill-gotten funds and does not have a legitimate claim to those funds.[194] Alternatively, a court may freeze a relief defendant's assets where the government can

---

[190] *Campbell Capital*, 2018 WL 5781458, at *3 (explaining that "there is no legitimate public interest in permitting [d]efendants to continue operating if their business consists of activities that violate the FTC Act, the FDCPA, and New York state law, and the public equities must receive greater weight than private concerns").

[191] *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *see FTC v. Kitco*, 612 F. Supp. 1282, 1296-97 (D. Minn. 1985) (holding that an order prohibiting misrepresentation will not unduly harm defendants, since it will not prohibit them from doing business, but only from doing business in an unlawful manner).

[192] *See Campbell Capital*, 18-cv-1163-LJV-MJR, 2018 WL 5781458, at *4 (W.D.N.Y. Oct. 24, 2018) (noting that an asset freeze is appropriate "where there is a significant risk of the dissipation of defendants' assets during the course of the litigation").

[193] *FTC v. Strano*, 528 Fed. App'x 47, 49 (2d Cir. 2013).

[194] *SEC v. Cavanaugh*, 155 F.3d 129, 136 (2d Cir. 1998).

41

demonstrate that the defendant exercises complete control over that third party.[195] Courts

likewise order complete asset freezes where the relief defendant's assets are commingled with

the defendant's fraudulent assets, because requiring the government to identify specific assets

tainted by fraud would incentivize defendants to "spend[] down illicit gains while protecting

legitimately obtained assets . . . or by commingling and transferring" such gains.[196] This Court's

ability to provide effective final relief for consumers would be irrevocably compromised if that

happened. Here, asset freezes are warranted against both Defendants and Relief Defendants.

### a. An asset freeze is warranted against Asset-Freeze Defendants[197].

An asset freeze is warranted against the Defendants here because courts have held, and

experience has shown, that defendants who repeatedly persist in carrying out illegal schemes are

likely to waste assets – or transfer assets beyond the reach of law enforcement – before the action

resolves. Where, as here, a company's business operations are permeated by illegality, courts

have found a strong likelihood that assets may be dissipated during litigation.[198] Courts have also

frozen individual defendant's assets where, as here, the individuals controlled – or had

constructive knowledge of – the illegal practices at issue.[199]

### b. An asset freeze is warranted against several Relief Defendants.

An asset freeze is also warranted against several Relief Defendants because the

Individual Defendants own and control the bank accounts for the Relief Defendants and the

Individual Defendants have commingled funds in these accounts with funds obtained from

---

[195] *See SEC v. Zubkis*, No. 97-cv-8086, 2003 WL 22118978, at *5 (S.D.N.Y. Sept. 11, 2003); *SEC v. Hickey*, 322 F.3d 1123, 1131-32 (9th Cir. 2003).

[196] *SEC v. I-Cubed Domains, LLC*, 664 Fed. App'x 53, 56 (2d Cir. 2016).

[197] The Asset-Freeze Defendants are all Defendants and Relief Defendants.

[198] *Grand Teton Professionals, LLC*, 2019 WL 4439501, at *4.

[199] *See FTC v. Am. Fin. Support Servs., Inc.*, No. 19-cv-02109 , 2019 WL 6337435, at *10 (C.D. Cal. Nov. 26, 2019).

consumers through Defendants' unlawful acts and practices. Individual Defendant Jason Blust directs and controls Relief Defendants Lit Def Strategies, LLC and Relialit, LLC, which are his consulting companies. As of June 2021, Blust was the sole member and manager of both companies.[200] He is also the sole beneficial owner for bank accounts for those two entities.[201] Jason Blust uses his consulting companies to direct consumer funds from the Façade Firms to himself. Between December 30, 2019 and March 30, 2021, Lit Def Strategies received over $30,000,000 from 18 Façade Firms associated with Client Services Subsidiary defendants.[202] Moreover, Blust has control over the bank accounts for John Dougherty & Associates, d/b/a Pioneer Law Firm, which receives substantial funds from Client Services Subsidiaries.[203]

Likewise, Individual Defendant Sasson and Relief Defendants Daniel Blumkin and Ian Behar direct and control Relief Defendants Duke Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC, respectively.[204] Between October 2016 and September 2017, SFS transferred almost $9,000,000 to Relief Defendants Duke Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC.[205] Sasson was the signatory on the SFS account that transferred the funds.[206] And between May 2018 and March 2020, Strategic Family, Inc. transferred in aggregate over $63,000,000 to Relief Defendants Duke Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC.[207] Accordingly, Relief Defendants Duke

---

[200] Ridder Declaration ¶ 22 (a)-(b).
[201] Hanson Declaration ¶¶ 32, 34; Ridder Declaration ¶ 21.
[202] Hanson Declaration ¶ 35.
[203] Ridder Declaration ¶ 19; Hanson Declaration ¶16.
[204] Ridder Declaration ¶¶ 12(a)-(c).
[205] Hanson Declaration ¶ 29. During this time period, SFS transferred over $3,400,000 to Duke Enterprises, LLC, over $2,200,000 to Twist Financial, LLC, and over $3,200,00 to Blaise Investments, LLC.
[206] *Id.*
[207] Hanson Declaration ¶ 30.

Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC should be subject to an asset freeze because they have received ill-gotten funds and they lack a legitimate claim to those funds as they are not bona fide purchasers with legal or equitable title to the funds.[208]

An asset freeze should also be ordered for the Blust Family Irrevocable Trust and Jaclyn Blust. Between March 2020 to April 2021, Lit Def Strategies—which as noted above, Jason Blust controls and should itself be subject to a freeze—transferred $36,000,000 to the Blust Family Irrevocable Trust.[209] Between July 2020 and April 2021, the Blust Family Irrevocable Trust then transferred $8,300,000 to Relief Defendant Jaclyn Blust.[210] Accordingly, Relief Defendants Jaclyn Blust and Blust Family Irrevocable Trust, through its trustee Donald J. Holmgren, should be subject to an asset freeze because they have received ill-gotten funds and they lack a legitimate claim to those funds. An asset freeze is also warranted against Strategic ESOP and Strategic ESOT. If SFS holds money in any accounts under these names, that money should be frozen to preserve the possibility of effective relief for victimized consumers.

Accordingly, the Court should order an asset freeze in this case to ensure that funds are available for redress to consumers in the event it determines such relief is appropriate.

### 3. *Ex parte* relief is appropriate under the circumstances.

The risk of asset dissipation in this case, coupled with Defendants' ongoing law violations, justifies *ex parte* relief. Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" before the adverse party can be heard in opposition. Mindful of this concern,

---

[208] *See FTC v. Brace*, No. 15-cv-00875 RJA-JJM, 2016 WL 11795485, at *1-2 (W.D.N.Y. Feb. 24, 2016); *FTC v. Fed. Check Processing, Inc.*, No. 14-cv-122S, 2016 WL 5940485, at *4 (W.D.N.Y. Oct. 13, 2016).
[209] Hanson Declaration ¶ 37.
[210] *Id.* ¶ 38.

federal courts in New York have granted government requests for *ex parte* temporary restraining orders in cases where there is a likelihood of asset transfer or dissipation.[211]

The risk of asset dissipation is particularly acute here. At least one Defendant has already transferred funds to a family trust, which demonstrates an inclination to hide funds from potential creditors. In addition, the Individual Defendants are recidivists who were former employees of Legal Helpers Debt Resolution which was the subject of multiple government actions by the Illinois Attorney General and the states of Wisconsin, North Carolina, and West Virginia between 2011 and 2014 for charging unlawful up-front fees, failing to reduce consumers' debts as promised, and attempting to avoid advance-fee bans by recruiting attorneys to act as fronts for the businesses.[212] The fact that these individuals are now involved in another common enterprise that is defrauding unsuspecting consumers suggests these individuals would not hesitate to move funds to protect these assets from their victims. Providing notice to Defendants before an asset freeze is in place would create a significant risk of asset dissipation.

---

[211] *See Campbell Capital*, 2018 WL 5781458, at *4-5 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery in unlawful debt collection practices case); *see, e.g.*, *FTC v. 4 Star Resolution LLC*, No. 15-cv-112S (W.D.N.Y. Feb. 10, 2015), ECF No. 29 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery in action against debt collectors); *FTC v. Vantage Point Servs., LLC*, No. 15-cv-0006S (W.D.N.Y. Jan. 5, 2015), ECF No. 11 (same); *FTC v. Pairsys, Inc.*, No. 1:14-cv-1192 (N.D.N.Y. Sept. 30, 2014), ECF No. 7 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, and immediate access); *FTC v. Nat'l Check Registry, LLC*, No. 14-cv-490-A (W.D.N.Y. Jun. 24, 2014), ECF No. 14 (granting TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery); *FTC v. Fed. Check Processing, Inc.*, No. 14-cv- 0122 (W.D.N.Y. Feb. 24, 2014), ECF No. 11 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery); *FTC v. PCCare247, Inc.*, No. 12-7189 (S.D.N.Y. Oct. 2, 2012), ECF No. 13 (granting *ex parte* TRO with asset freeze, financial reporting, immediate access, and expedited discovery); *FTC v. Navestad*, No. 09-6329 (W.D.N.Y. June 25, 2009), ECF No. 7 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, and immediate access).

[212] *See Complaint*, ¶ 52 (citing numerous governmental, as well as private, actions against Legal Helpers); https://illinoisattorneygeneral.gov/pressroom/2012_07/20120709.html.

**4. The Court should appoint a temporary receiver, who will have immediate access to the Receivership Defendants, to secure the Receivership Defendants' property; direct the Defendants and Relief Defendants to preserve records; and allow limited expedited discovery and financial reporting.**

The Court should issue an order appointing a temporary receiver who will have immediate access to the business premises of the Receivership Defendants[213] to secure the Defendants' and Relief Defendants' property, as defined in the proposed TRO. The Court should also direct the Defendants, Relief Defendants, and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons or entities in active concert or participation with any of them, including third party service providers such as computing providers and email providers, to preserve records, including electronically stored records and evidence, and allow limited expedited discovery and financial reporting.

  *a. The Court should appoint a temporary receiver.*

When determining whether to exercise their broad discretion to appoint a receiver, courts consider "a host of relevant factors, and . . . no one factor is dispositive."[214] These factors include:

> [f]raudulent conduct on the part of the defendant; imminent danger that the property will be lost, diminished in value, or squandered; the inadequacy of available legal remedies; the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing the appointment; the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interests in the property; and whether the interests of the plaintiff and others sought to be protected will in fact be served by receivership.[215]

The appointment of a receiver is "particularly necessary" where "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be

---

[213] *See* Notes 209-11 *supra.*
[214] *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009).
[215] *Altisssima Ltd. v. One Niagra, LLC*, No. 08-cv-756 (JTC), 2009 WL 1322319, at *1 (W.D.N.Y. May 8, 2009).

subject to diversion and waste."[216] Appointment of a temporary receiver is appropriate in this

case. Plaintiffs have established a strong likelihood of both success in this action and irreparable

injury to consumers, as well as the risk of dissipation of the money that Defendants took from

consumers in violation of law. While Plaintiffs have substantial evidence of the unlawful activity

that Defendants are engaging in to collect fees prohibited by the TSR, the scheme is constantly

being altered to evade enforcement efforts to protect consumers from harm. A receiver is

necessary here to assist this Court, to ensure compliance with its order, to disentangle the

companies and bank accounts, and to protect consumers who may have a current debt settlement

contract with Defendants. Defendants' operation of their business under myriad names and

addresses and numerous bank accounts underscores the facility with which Defendants can move

their property to frustrate Plaintiffs' efforts to gather evidence supporting their claims and

substantiating the significant consumer harm in this case. Moreover, Individual Defendants'

history of recidivism, and their role in leading the numerous Corporate Defendants, raises the

concern that they may seek to conceal property and evidence that would support Plaintiffs'

claims against them. In the same vein, it is necessary for the Court to prevent Defendants and

Relief Defendants from destroying information that is pertinent to Plaintiffs' allegations.[217]

Courts in this district have regularly appointed a receiver in similar circumstances.[218]

> b. *The Court should grant the temporary receiver immediate access to the Receivership Defendants' business premises.*

In order to preserve records and locate assets, Plaintiffs further request that the Court

grant the temporary receiver immediate access to the Receivership Defendants' business

---

[216] *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981).
[217] *See SEC v. Unifund SAL*, 910 F.2d 1028, 1040 n.11 (2d Cir. 1990) (characterizing orders preventing destruction or alteration of records as "innocuous").
[218] *See* Notes 199-209 *supra*.

premises, as defined in the proposed TRO. Such requests have been granted *ex parte* in several government actions in this district and others.[219] The request for the temporary receiver to have immediate access is necessary to prevent irreparable harm in the form of the dissipation or concealment of assets or documents. Plaintiffs are only seeking immediate access for the temporary receiver and not for the Plaintiffs.

> c.  *The Court should grant leave for limited, expedited discovery.*

Plaintiffs also seek leave of Court for limited, expedited discovery to locate and identify assets and documents. District courts are authorized to fashion discovery to meet the need of particular cases. Federal Rules of Civil Procedure 26(d), 33(a), and 34(b) authorize the Court to alter default provisions, including applicable time frames, that govern interrogatories and production of documents. A narrow, expedited discovery order reflects the Court's broad and flexible authority in equity to grant preliminary emergency relief in cases involving the public interest.[220] Here, expedited discovery, as described in Section XVIII of the proposed TRO, is warranted to locate assets, locate documents, identify the identities of the injured consumers, determine information about the use of third-party notaries and ensure compliance with an order of this Court. The request for expedited discovery is limited to this purpose and is necessary to prevent irreparable harm in the form of the dissipation or concealment of assets or documents.

---

[219] *See* Note 209, *supra*.

[220] *See Fed. Express Corp. v. Fed. Expresso, Inc.*, No. 97-cv-1219, 1997 WL 736530, *2 (N.D.N.Y. Nov. 24, 1997) (noting that expedited discovery "will be appropriate in some cases, such as those involving requests for preliminary injunction," and concluding that early discovery was appropriate where plaintiff's requests were "reasonably tailored to the time constraints" involved and to the "specific issues" to be addressed at the preliminary injunction hearing) (quoting commentary to Fed. R. Civ. P. 26(d)).

Courts in this district have granted leave for plaintiffs to conduct limited expedited discovery in similar circumstances.[221]

        *d.*   *The Court should order prompt financial reporting by the Asset-Freeze Defendants.*

Finally, as described in Section IV of the proposed TRO, the Court should order the Asset-Freeze Defendants, as defined in the Proposed TRO, to make prompt and full disclosure of the scope and financial information related to the Asset-Freeze Defendants' corporate accounts, along with their personal finances. This information is necessary to ensure that the Court is fully advised regarding (1) the nature, extent, and location of the Asset-Freeze Defendants' assets; (2) the sources of the funds in the accounts of the Asset-Freeze Defendants; (3) the recipient(s) of any payments of funds from the accounts of the Asset-Freeze Defendants; and (4) the total amount of consumer injury. Courts in this district have order prompt financial reporting in similar circumstances.[222]

## CONCLUSION

SFS, the Client Services Subsidiaries, and the Individual Defendants are causing irreparable harm to consumers and will continue to do so unless their practices violating the TSR are enjoined. Plaintiffs therefore respectfully request this Court to grant the proposed TRO, and subsequently a preliminary injunction, enjoining Defendants from engaging in the illegal practices discussed above and order other preliminary relief, including freezing the Asset -Freeze Defendants' assets, appointing a temporary receiver who will have immediate access to the premises of the Receivership Defendants, enjoining the destruction of any relevant evidence or

---

[221] *See* Note 209, *supra*.
[222] *Id.*

documentation, and authorizing limited expedited discovery, including sworn financial reporting, to stop ongoing harm and ensure effective final relief for consumers victimized by Defendants.

Dated: January 9, 2024                              Respectfully submitted,

                                                    Attorneys for Plaintiff
                                                    Consumer Financial Protection Bureau

                                                    ERIC HALPERIN
                                                    Enforcement Director

                                                    RICHA SHYAM DASGUPTA
                                                    Deputy Enforcement Director

                                                    TIMOTHY M. BELSAN
                                                    Assistant Litigation Deputy

                                                    _/s/ Vanessa Buchko_
                                                    Vanessa Buchko
                                                    E-mail: vanessa.buchko@cfpb.gov
                                                    Phone: 202-435-9593
                                                    Monika Moore
                                                    E-mail: monika.moore@cfpb.gov
                                                    Phone: 202-360-5905
                                                    Joseph Sanders
                                                    E-mail: joseph.sanders@cfpb.gov
                                                    Phone: 202-377-9846
                                                    1700 G Street NW
                                                    Washington, DC 20552
                                                    Facsimile: (202) 435-7722

                                                    LETITIA JAMES
                                                    Attorney General of the State of New York

                                                    _/s/ Christopher L. Boyd_
                                                    Christopher L. Boyd
                                                    Assistant Attorney General
                                                    350 Main Street, Suite 300A
                                                    Buffalo, NY 14202
                                                    Phone: (716) 853-8457
                                                    Email: Christopher.Boyd@ny.ag.gov

                                                    PHILIP J. WEISER
                                                    Attorney General

State of Colorado

 /s/ Kevin J. Burns
Kevin J. Burns, CO Reg. No. 44527
*Pro hac vice application pending*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

KATHLEEN JENNINGS
Attorney General State of Delaware

*/s/ Marion M. Quirk*
Marion M. Quirk (*pro hac vice,* pending)
Director of Consumer Protection
Kevin D. Levitsky (*pro hac vice*
forthcoming, if required)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov
Kevin.Levitsky@delaware.gov

KWAME RAOUL
Attorney General
State of Illinois

By: */s/ Greg Grzeskiewicz*
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau
*Pro hac vice application forthcoming, if
required*
Daniel Edelstein, Supervising Attorney,
Consumer Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Amanda E. Bacoyanis, Assistant Attorney

General, Consumer Fraud Bureau
*Pro hac vice application forthcoming*
Matthew Davies, Assistant Attorney
General,
Consumer Fraud Bureau
*Pro hac vice application forthcoming, if required*
Office of the Illinois Attorney General
115 S. LaSalle St., 26th Floor
Chicago, Illinois 60603
312-814-2218
Greg.Grzeskiewicz@ilag.gov
Daniel.Edelstein@ilag.gov
Amanda.Bacoyanis@ilag.gov
Matthew.Davies@ilag.gov

KEITH ELLISON
Attorney General of Minnesota

*/s/ Evan Romanoff*
Evan Romanoff
Assistant Attorney General (*pro hac vice* pending)
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/  M. Lynne Weaver*
M. Lynne Weaver (*pro hac vice* pending)
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Lewis W. Beilin*
Assistant Attorney General (*pro hac vice* pending)
Wisconsin Department of Justice

17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
beilinlw@doj.state.wi.us