## DECLARATION OF PATRICK CALLAHAN
## PURSUANT TO 28 U.S.C. § 1746

I, Patrick Callahan, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.      I am a citizen of the United States and am over eighteen (18) years of age. I am an employee of the Consumer Financial Protection Bureau ("CFPB" or "Bureau"). I am a Senior Investigator working in the Office of Enforcement in the Bureau's office in Washington, D.C. As an employee of the Bureau, my current duties include conducting financial and data analysis for investigations and litigation, conducting consumer and former employee interviews, and preparing summary fact declarations for investigations. I have been an employee of the Bureau since August 2, 2020. I previously worked as an investigator for nine years for the United States Department of Labor.

2.      As part of my job, I research and investigate persons and entities that may be violating the Consumer Financial Protection Act and other statutes enforced by the Bureau. I was assigned to work on the Bureau's investigation of Strategic Financial Solutions, LLC that led to the lawsuit against the following entities:

*Corporate Defendants*

- Strategic Family, Inc.;

- StratFS, LLC (f/k/a Strategic Financial Solutions, LLC);

- Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC);

- Strategic CS, LLC;

- Strategic FS Buffalo, LLC;

1

- Strategic NYC, LLC;

- BCF Capital, LLC;

- T Fin, LLC;

- Strategic Consulting, LLC (f/k/a Consult America, LLC);

- Versara Lending, LLC (f/k/a Fusion Processing, LLC);

- Anchor Client Services, LLC (now known as CS 1 PaaS Services, LLC);

- Bedrock Client Services, LLC (f/k/a HCS, LLC);

- Boulder Client Services, LLC;

- Canyon Client Services, LLC;

- Carolina Client Services, LLC;

- Great Lakes Client Services, LLC;

- Guidestone Client Services, LLC;

- Harbor Client Services, LLC;

- Heartland Client Services, LLC;

- Monarch Client Services, LLC (now known as CS 2 PaaS Services, LLC);

- Newport Client Services, LLC;

- Northstar Client Services, LLC;

- Option 1 Client Services, LLC;

- Pioneer Client Servicing, LLC (f/k/a Strategic Financial Solutions, LLC);

- Rockwell Client Services, LLC;

- Royal Client Services, LLC;

- Stonepoint Client Services, LLC;

- Summit Client Services, LLC (now known as CS 3 PaaS Services, LLC);

- Whitestone Client Services, LLC;

*Individual Defendants*

- Ryan Sasson;

- Jason Blust;


*Relief Defendants*

- Daniel Blumkin;

- Albert Ian Behar;

- Strategic ESOP;

- Strategic ESOT;

- Twist Financial, LLC;

- Duke Enterprises, LLC;

- Blaise Investments, LLC;

- The Blust Family Irrevocable Trust, through Donald J Holmgren, Trustee;

- Jaclyn Blust;

- Lit Def Strategies, LLC; and

- Relialit, LLC (collectively, "Relief Defendants").


3.      Collectively, Strategic Family, Inc., StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Strategic Consulting, LLC (f/k/a Consult America, LLC), and Versara Lending, LLC (f/k/a Fusion Processing, LLC) are herein referred to as "SFS."

4.      Collectively, Anchor Client Services, LLC (n/k/a CS 1 PaaS Services, LLC), Bedrock Client Services, LLC (f/k/a HCS, LLC), Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PaaS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC (f/k/a Strategic Financial Solutions, LLC), Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (n/k/a CS 3 PaaS Services, LLC), and Whitestone Client Services, LLC are herein referred to as the "Client Services Subsidiaries."

5.      SFS and Client Services Subsidiaries, as defined above, are referred to collectively as "Corporate Defendants." Ryan Sasson and Jason Blust are referred to collectively as "Individual Defendants." And the Corporate Defendants with the Individual Defendants are referred to collectively as "Defendants."

6.      Defendants partner with purported law firms around the country to offer debt-relief services to consumers. These firms are not named as defendants in Plaintiffs' action. They are referred to herein as "Façade Firms." The Façade Firms include the following:

- A. Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio & Associates, PLLC;

- Anchor Law Firm, PLLC;

- Boulder Legal Group, LLC;

- The Brian A Moore Law Firm LLC d/b/a Guidestone Law Group;

- Burnette Legal Group, LLC d/b/a Monarch Legal Group;

- Daniel Rufty Legal PLLC d/b/a Carolina Legal Services;

- Donald Norris Associates PLLC d/b/a Stonepoint Legal Group;

- Gardner Legal LLC d/b/a Option 1 Legal;

- Great Lakes Law Firm, LLC;

- Greene Legal Services, LLC d/b/a Newport Legal Group;

- Harbor Legal Group, LLC;

- Henry Legal Group, LLP d/b/a Heartland Legal Group;

- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

- JMS Industries, LLC d/b/a Canyon Legal Group, LLC;

- Pioneer Law Firm, P.C. f/k/a John B Dougherty P.C.;

- Northstar Legal Group, LLC;

- Royal Legal Group, LLC;

- The Sands Law Group, A Professional Law Corporation d/b/a Whitestone Legal Group; and

- WyoLaw, LLC d/b/a Summit Law Firm.

7.   As part of my work on this matter, I:

a.   reviewed certain records maintained by financial institutions, including KeyBank National Association (KeyBank), Bank of America, National Association (Bank of America), Associated Bank, National Association (Associated Bank), and Bank Leumi USA, acquired by Valley National Bank on April 1, 2022 (Valley Bank);

b.   reviewed records maintained by third-party payment processors used by Defendants to process payment for consumers, including records from Ram Payment, LLC (formerly, Reliant Account Management,

LLC) (RAM) and Global Client Solutions, LLC (a/k/a Global Holdings, Inc. or Global);

c.   searched and reviewed public records, databases, websites, and consumer complaints;

d.   reviewed documents responsive to Civil Investigative Demands (CIDs) regarding the Defendants;

e.   reviewed documents responsive to requests made to certain State Attorney Generals' Offices;

f.   reviewed phone records; and

g.   reviewed enforcement proceedings and litigation related to the Defendants.

### Sasson controls the SFS entities

8.   During the Bureau's investigation, which is outlined in this declaration and its attached exhibits, I learned that Sasson owned or operated the SFS entities, either directly or through affiliated and interrelated companies. For example:

a.   The StratFS, LLC website lists Sasson, as well as Relief Defendants Blumkin and Behar as founders of StratFS, LLC. I visited the Stratfs.com website on December 12, 2023 and saw that press materials show that SFS was founded in 2007 by Sasson, Blumkin, and Behar. The website provides that Sasson is the Chief Executive Officer. (Exhibit 11, p. 3.)

b.   Sasson's declaration filed in Briggs v. Strategic Financial Solutions, LLC, No. 22-cv-03705 (N.D. Ill.) includes the statement that he is "Chief Executive Officer of StratFS, LLC." (Exhibit 6, p. 15.)

9.      The New York Attorney General's Office provided documents from the Amherst Industrial Development Agency (AIDA) and the Amherst Development Corporation relating to Strategic Financial Solutions' application for a sales tax exemption. The application requests information about the company's ownership, including the names of owners and the percentage of the company that they own. The application is dated in 2017, before the formation of the ESOP, and it says that Sasson owned about 26% of Strategic Financial Solutions, LLC through Duke Enterprises, LLC (Duke Enterprises), Blumkin owned about 18% of Strategic Financial Solutions, LLC through Twist Financial, LLC (Twist Financial), and Behar owned about 26% of Strategic Financial Solutions, LLC through Blaise Investments, LLC (Blaise Investments). (Exhibit 8, pp. 1-6.)

10.     According to my research and records from Bank of America, Blumkin and Twist Financial share an address at 1 Greenwood Ln, Port Washington, New York 11050. Sasson and Duke Enterprises share an address at 205 East 59th St, PH, New York, New York 10022. Behar and Blaise Investments share an address at 50 West St., Apt. 22C, New York, New York 10016. Twist Financial, Duke Enterprises, Blaise Investments, and SFS share an address at 711 Third Avenue, 6th Fl., New York, New York 10017. (Exhibit 3, pp. 80, 85-95.)

11.     Some SFS customer service representatives who answer incoming calls to Façade Firms were supervised by the Senior Director of Client Services, who met weekly with SFS CEO Ryan Sasson. (Callahan Table 1, infra ¶ 19.)

## **SFS Reorganizations**

12.     During the Bureau's investigation, which is outlined in this declaration and its attached exhibits, I learned that SFS changed its organizational structure multiple times from January 1, 2016 forward. For example:

a.  Records from the New York Attorney General's Office include a copy of Strategic Employee Stock Ownership Plan (Strategic ESOP). The documents include the 2017 and 2018 Annual Report Forms 5500 and accompanying Independent Auditors' Reports, among other documents. These documents show that, in May 2017, Strategic Financial Solutions, LLC adopted the Strategic ESOP and became the ESOP's sponsor. (Exhibit 8, pp. 79-168.)

b.  In December 2017, the Strategic ESOP purchased all the shares of Strategic Family, Inc.'s common stock funded by the Strategic Employee Stock Ownership Trust (Strategic ESOT), thus becoming wholly employee owned. (Exhibit 8, pp. 124, 168.) The Strategic ESOT holds all the shares of SFS stock and possibly maintains funds held in trust, while the ESOP determines how the plan is administered, who participates in it, and who runs the day-to-day operations.

c.  The company received press coverage concerning its ESOP. An article in the Buffalo News, dated March 8, 2018, titled "Strategic Financial Solutions now employee owned," reported that the company "is now employee owned" and that it took steps "through an Employee Stock Ownership Plan at the end of 2017[.]" (Exhibit 9, pp. 1, 8.)

d. According to KeyBank documents, SFS completed another reorganization, which became effective on December 31, 2019. As of that date, Strategic Consulting, Inc. owned 100% of the membership interests in Strategic Consulting, LLC, Strategic Client Support, LLC, and Strategic CS, LLC. (Exhibit 2, pp. 25-28.)

### Façade Firms

13. The Ridder Declaration contains detailed information about the Façade Firms, including corporate records.

14. During the Bureau's investigation, which is outlined in this declaration and its attached exhibits, I learned that the Façade Firms appear to be connected to one another as follows:

a. Some of the Façade Firms used the same payment processors to hold client funds and to process consumer payments. Records that I reviewed from consumer declarants, the Wisconsin Attorney General's Office, and the North Carolina Attorney General's Office show that some of the Façade Firms used Global and RAM to create an escrow account for each consumer enrolled in the debt-relief service. Copies of some of these contracts are attached to the Declarations of I.B., S.E., and P.G.

b. Consumers paid into an escrow account each month, and Global and RAM withdrew fees and payments related to the debt-relief services and settlements from the escrow accounts. (See Declaration of Joanna Cohen as to RAM; see Declaration of S.E. as to Global.)

15.     Through the course of the investigation, which is outlined in this declaration and its attachments, I learned that SFS directed some of the activity of the Façade Firms. For example:

    a.  SFS processed the mail for at least some of the Façade Firms. I reviewed the testimony transcript of Lauren Montanile, a lawyer for SFS and many of the Façade Firms, from a January 2020 deposition in connection with arbitration in *Proulx v. Anchor Law Firm, et al*. Montanile explained that incoming mail addressed to Anchor Law Firm, at least, is scanned by a third party and then uploaded to the computer system for Anchor Client Services. (Exhibit 8, pp. 224-25.)

    b.  I reviewed transcripts of the testimony of Daniel Rufty, taken on November 16 and December 7, 2020, as part of an investigation by the North Carolina State Bar. According to the testimony transcript, Rufty, an attorney formerly associated with Carolina Legal Services, testified that mail addressed to Carolina Legal Services was processed by Carolina Client Services, LLC. (Exhibit 5, p. 8.)

    c.  SFS employees were responsible for handling the incoming calls related to at least some of the Façade Firms. I reviewed a declaration by former SFS employee Wagar that the Bureau collected as part of the SFS investigation. According to Wagar's sworn statement, when consumers call the Facade Firms, the calls are routed to SFS, where the computer system shows SFS employees the name of the Facade Firm listed on the consumer's paperwork, and an SFS customer service

representative answers the phone using the name of that Facade Firm.
(Exhibit 10, pp. 3-4.)

d.  SFS employees had access to the payment processing information for
some of the Façade Firms. In the RAM records that I reviewed I saw
that SFS employees were listed as "unrestricted users" in the RAM
Authorized User form that was used in the onboarding process at RAM
for certain Façade Firms. (Exhibit 16, pp. 1, 2.)

e.  On several occasions, SFS employees reached out to RAM employees
with questions about the Façade Firms' accounts with RAM. Those
communications suggest that SFS, not the Façade Firms, was directing
the operation. For example, I reviewed emails that show RAM
employees asking an SFS employee whether the SFS employee "knew
the ETA of when Whitestone Legal Group will be enrolling clients." The
SFS employee responded that they "were just waiting on a couple
things … to be completed prior to rolling this ou[t] to our team." In
another communication, the same SFS employee referenced "our
portfolio Harbor." And emails suggest that SFS employees could log
into accounts on the RAM system for the Façade Firms: in one
communication, a RAM employee told this same SFS employee that
they "should already have existing logins" for Bedrock Legal Group and
Rockwell Legal Group. (Exhibit 16, pp. 5, 7, 9.)

## Blust controls and is heavily involved with companies that are part of the scheme

16.     Through the course of the investigation, which is outlined in this declaration and its attachments, I learned that Jason Blust is heavily involved with the companies that are part of the scheme and actively participates in decisions concerning the Façade Firms and Corporate Defendants.

17.     Lauren Montanile, an attorney who worked for Strategic Financial Solutions, LLC, testified under oath that Blust recruited her to work at several Façade Firms and she knew of other attorneys at SFS who similarly were recruited by Blust to work for some of the Façade Firms.

> a. I reviewed the Montanile deposition transcript. According to the deposition transcript, Montanile was a lawyer for Strategic Financial Solutions, LLC from May 2017 to at least January 9, 2020, the date of the deposition. Montanile explained in her deposition that while she was employed by SFS, Jason Blust suggested she also work for Anchor Law Firm. At the time, her understanding was that Anchor Law Firm serviced clients that were enrolling in the debt resolution program. She did not interview with anyone for the Anchor job; instead, she was told that it was an opportunity to better service SFS's clients. According to the transcript, Montanile joined Anchor as a supervising attorney and began supervising employees of Anchor Client Services. Although she worked for Anchor for almost three years, she testified that she had never traveled to Anchor's home office in Arkansas and did not know whether any attorneys worked at the Arkansas office. She worked for

Anchor Law Firm and for SFS at the same time, from the same desk and computer at SFS's headquarters in Manhattan. She could not say how many Anchor employees she currently supervised. (Exhibit 8, pp. 171-82.)

b. According to the Montanile transcript, after Montanile joined Anchor, she joined at least 15 other law firms in SFS's network (at least 11 of which she does not get paid for), and Blust recruited her for at least some of these positions. Montanile's role for each law firm is to make sure that SFS's Client Services Subsidiary associated with the firm (e.g., Anchor Client Services, a subsidiary of SFS) follows the firm's policies and procedures. During the deposition, Montanile was unable to remember the complete list of firms for which she worked. (Exhibit 8, pp. 176-77, 179, 187-88, 191-209, 214-16.)

c. In Montanile's deposition she stated that other attorneys who work on the sixth floor of 711 Third Avenue, New York, New York are also supervising attorneys for other law firms associated with Jason Blust. Montanile noted that if she had questions about scripts used by the various firms or about malpractice insurance, she would ask Blust. She also explained that, when employees of SFS or its Client Services Subsidiaries are unable to resolve escalated consumer issues, they often consult with Blust or send the issue to him for resolution. (Exhibit 8, pp. 179-80, 217-20, 226.)

d. Montanile also testified that she discussed consumers' files, including escalated problems in consumers' cases, with Blust even though the

consumers had enrolled through different law firms, and she wasn't

sure if Blust was a member of each of the relevant firms. (Exhibit 8, pp.

209-11.)

Excerpts from the Montanile deposition transcripts are attached hereto as

Exhibit 8.

18.    Email communication obtained by the Wyoming Attorney General's Office

shows that Jason Blust worked behind the scenes to set up WyoLaw and coordinated

filings with the secretary of state and stock transfers:

a.    From October 17, 2017, to March 11, 2019, Blust corresponded multiple

times with Traci Mears, the Wyoming attorney who was listed as the

registered agent for WyoLaw in Wyoming. In these emails, Blust asked

Mears for an update on the new firm and then asked her to send the

address for the firm, suggesting they should use the empty office next

to hers. Later, he asked if she applied for a FEIN. They discussed

opening accounts for WyoLaw at US Bank. They both signed the

Membership Purchase Agreement and the Operating Agreement, and

then Blust asked her to correct a typo in the paperwork and send back

to him. Later, Mears asked him what next steps they should take. Blust

promised that "we" would cover the BBB invoice for this year and

asked Mears for her social "for K1 payments." (Exhibit 13, pp. 45-96.)

b.    On February 28, 2018, Timothy Burnette, an attorney who worked with

Blust, emailed Mears saying, "Jason asked me to change the name in

the Operating Agreement and Transfer Agreement for Wyolaw, LLC

d/b/a Summit Law Firm, LLC." On that same day, Mears sold 97% of

the shares in WyoLaw to Guillermo Geisse for $97, and they executed an LLC agreement showing that Geisse owned 97 shares and Mears owned 3 shares. (Exhibit 13, pp. 3-14, 97-98.)

19.     The New York Attorney General's Office obtained a contract between Strategic Financial Solutions, Inc. and Deepgram, a data analytics firm. In this contract, dated December 2018, Strategic Financial Solutions, Inc. hired Deepgram to analyze the Corporate Defendants' phone calls for sales and retention purposes. As part of this process, SFS sent recorded phone calls to Deepgram. I reviewed some of the phone calls from Deepgram. Callahan Table 1 provides the Bates numbers of the calls that I reviewed. (Exhibit 8, pp. 276-96.)

20.     In some of the call recordings from Deepgram, Blust actively participates in efforts by SFS, Client Services Subsidiaries, and Façade Firms to pressure consumers to take down negative reviews of Façade Firms and withdraw complaints to state bars. (Callahan Table 1.)

21.     Blust appears to have worked behind the scenes to manage the Façade Firms. For example, on September 4, 2018, Jason Blust emailed Traci Mears, the Wyoming attorney who owned 3% of WyoLaw, to ask for the mailing address of her office for purposes of "filing [the] report." She replied, copying Burnette. On that same day, WyoLaw filed its 2018 annual report with the Wyoming Secretary of State; Burnette signed the report. (Exhibit 13, p. 99; Declaration of Theresa Ridder.)

**The Corporate Defendants are operated as a common enterprise**

22.     I reviewed payroll records that the New York Attorney General's Office obtained from Automatic Data Processing, Inc. (ADP) that showed payments made by Strategic Client Support f/k/a Pioneer Client Services to individual employees at SFS.

Although individual employees' salaries were often paid by one of the Corporate Defendants, at least some of these employees perform work for all Client Services Subsidiaries without differentiating between them. (Exhibit 8, pp. 244-60.)

23.    In some of the call recordings from Deepgram, SFS customer service representatives who were paid by SFS answered phone lines on behalf of several Client Services Subsidiaries. For example:

      a.    In some instances, when consumers attempted to call the Façade Firm they believed represented them, they reached customer service representatives who were often paid by SFS. These employees answered phone lines associated with multiple Client Services Subsidiaries, changing the entity name they used when answering each call. (Callahan Table 1; Exhibit 10.)

      b.    One employee whose salary was paid by SFS answered consumer calls to phone lines associated with multiple Client Services Subsidiaries, including the Boulder Creditor Line, the Harbor Creditor Line, the Rockwell Creditor Line, the Royal Creditor Line, and the Summit Creditor Line. Another employee whose salary was paid by Strategic Client Support, LLC answered calls from consumers while holding himself out to be a representative of at least six different Façade Firms (i.e., Bedrock, Anchor, Rockwell, Boulder, Stonepoint, Harbor). (Callahan Table 1; Exhibit 8, pp. 244-60.)

24.    In addition to reviewing calls, I reviewed the metadata from those calls, which describes some calls as being to and from phone lines named Anchor Creditor Line, Bedrock Creditor Line, Boulder Creditor Line, Canyon Creditor Line, Carolina

Creditor Line, Great Lakes Creditor Line, Harbor Creditor Line, Pioneer Creditor Line, Rockwell Creditor Line, Royal Creditor Line, Stonepoint Creditor Line, and Summit Creditor Line. The metadata also shows a phone line named "Generic CS Creditor Line."

25.     The metadata from Deepgram show that the Corporate Defendants share a common set of extensions such that employees of the common enterprise can call each other without dialing outside of the system.

### Advertising for the Debt-Relief Services

26.     The Ridder Declaration contains detailed information about the mailers advertising a pre-approved loan.

27.     In some of the calls from Deepgram that I reviewed, SFS called consumers who had inquired about obtaining a pre-approved loan with third parties and gathered financial information from the consumers. Some of those consumers had received mailers advertising the loans. Consumers were regularly informed in the initial call or follow-up calls that they were not approved for loans but could sign up for a debt-relief program instead. (Callahan Table 1.) Based on my review of the metadata and publicly available information (e.g., LinkedIn, state Bar listings for New York, New Jersey, and Pennsylvania), I believe many of the SFS employees who participated in these calls are not attorneys.

28.     Consumers noted that, after they expressed interest in the debt-relief services, they were matched with one of the Façade Firms listed above. In some calls, consumers were allegedly transferred from SFS employees to representatives of the Façade Firms, but at least one of these alleged Façade Firm representatives was paid by "Strategic Client Sup," according to ADP records. (Exhibit 8, pp. 244-60.)

29.     Some consumer complaints and consumer declarants also suggested that consumers searched the Internet for debt-relief companies, contacted the first numbers that appeared, and then received solicitations via phone calls from someone purportedly affiliated with one of the Façade Firms. Plaintiffs obtained declarations from some of these consumers.

### Consumers' experiences before enrolling in the debt-relief service

30.     Based on my review of call recordings, the first substantive discussion between Corporate Defendants and consumers was known as the "Qualifying Call." An SFS call script obtained by the New York Attorney General's Office explains that the SFS employee should identify themselves as calling from "Finance Solutions" or another branch of SFS. When consumers ask where the employee works, they're directed to respond, "I work with Finance Solutions . . . **(the lender on your mailer)** shared information with us as we are a full-service financial firm and will likely have at least one option that will fit your needs." (Exhibit 8, pp. 57-62.)

31.     The same script includes the following example:

Q: The flyer said I was already approved for a loan. Why do I have to submit an application?

A: Many people take the term "pre-approved" to mean already approved and I apologize for that confusion. It actually means you have been pre-approved to go through our application process, but we do need some additional information to complete your application. . ." (Exhibit 8, p. 62.)

32.     An SFS call script titled "Closing Call" says, ". . . although your file was not approved for a debt consolidation loan (due to your credit score and/or debt to income ratio.) We have approved you for a great option which is perfectly in line with the goals

18

we previously discussed. I personally feel it is a lot better for your situation. . ." (emphasis in original). (Exhibit 8, p. 239.)

33.     The Closing Call script also directs the SFS employee to say that the company does not charge interest and that its fees are included in the monthly payment, which is lower than the combined minimum payments on all debts the consumer will enroll in the program. If the consumer decides to move forward, the script instructs the SFS employee to request enrollment documents in the online system and "[u]se the attorney firm specific enrollment documents script" to explain the documents to the consumer. (Exhibit 8, pp. 236-43.)

34.     As explained in the Closing Call script, the goal of the debt-relief service is to settle the consumer's debts for less than they owe. (Exhibit 8, pp. 239-40.)

35.     Another SFS call script, titled "Objection Handles," directs the SFS employee to tell consumers that creditors will settle the consumers' debts for 50% of the balance, and the consumers could become debt free after paying 50% of the balance plus the minimum payment each month. (Exhibit 8, pp. 63-78.)

36.     This explanation omits a discussion of the program's fees. If consumers ask about the fees, SFS employees are directed to respond: "All of our fees are included in your low monthly draft of ($655), as I mentioned earlier, which is ($300) less than what you are currently paying vs. your minimum monthly payments. How does that sound?" The script provides that if consumers continue to ask for specifics, the SFS employee can explain the fees in more detail.  (Exhibit 8, p. 78.)

37.     The Objection Handles script addresses how SFS employees should respond when consumers express concerns about being sued by creditors due to their participation in the debt-relief program. The script instructs the SFS employee to say,

"Because your program is managed by (Law Firm) you have full legal representation from the moment you sign on." (Exhibit 8, p. 74.)

38.     The Objection Handles script also instructs SFS employees to tell consumers not to pay their creditors. (Exhibit 8, pp. 64, 74.)

39.     As explained in the Objection Handles script, SFS employees promise that the Façade Firm will contact creditors on the consumers' behalf. SFS also promises to provide consumers with a new, free phone number that they can give to their creditors. Creditors who choose to call them will leave a voice message at that number, and the consumer can check the messages if they wish to do so. The clear implication is that consumers do not have to speak with any creditors after entering the program; SFS or the Façade Firms will handle all communications. (Exhibit 8, p. 73.)

40.     The Welcome Guides for Monarch Legal Group (provided by a consumer to the Illinois Attorney General's Office as part of a sworn declaration) and the Great Lakes Law Firm (provided by the Wisconsin Attorney General's Office) are extremely similar to each other. Both include phone scripts that consumers can use to discourage creditors from contacting them while they are participating in the debt-relief program. (Declaration of P.K., pp. 51-66; Exhibit 25, pp. 130-41.)

41.     The Welcome Guides for Monarch Legal Group and Great Lakes Law Firm also instruct consumers to stop paying their creditors:

[If you continue to pay your creditors it will negatively affect our ability to resolve your accounts.] Generally, a debt must be delinquent for at least 60 to 180 days before creditors will engage in any good faith negotiations to resolve your debts.

(Declaration of P.K., p. 65; Exhibit 25, p. 140.)

42.     The enrollment documents consumers signed were drafted in the name of the Façade Firm, not SFS.

43.     Most, if not all, of the enrollment documents list the fees that will be withdrawn from the consumer's escrow account. Generally, these fees included: (a) a service fee of about 17% of the consumer's total debt enrolled in the program, paid in installments over a certain period of time; (b) a monthly Legal Administrative Fee set at a fixed dollar amount (usually around $90); (c) a retainer fee set at a fixed dollar amount (usually around $900) and paid in installments over the first 8 months or so; (d) monthly service fees of about $11 to Global or RAM; and (e) miscellaneous other fees, possibly including settlement payment fees and disbursement fees. None of these fees are based on the individual amount of debt settled or the amount the consumer saved by using the debt-relief program. (Exhibit 8, pp. 18-48; Declaration of P.K, pp. 13-45.)

44.     Many, if not all, contracts contain a fee schedule showing when the fees would be withdrawn, starting immediately upon the consumer's first deposit into the escrow account. (Declaration of S.E., pp. 33-34; Declaration of I.B., pp. 32-33.)

**Consumers met with notaries to sign enrollment documents**

45.     After each consumer decided to enroll in the debt-relief program, an SFS employee arranged for the consumer to meet with a notary to sign the enrollment documents in the presence of the notary. (Callahan Table 1.)

46.     Each Façade Firm contracted with one or more notary provision companies that sent notaries to meet consumers in person. (Exhibit 17, pp. 1-39; Exhibit 25, pp. 142-51.)

47.     The notaries were not employees of SFS, a Client Services Subsidiary, or a Façade Firm but rather were independent contractors paid by third-party signing companies.

48.     Contracts between the notary provision companies and the Façade Firms required individual notaries to provide consumers an "in-person presentation," but the contracts did not require the notary to read the presentation prior to the meeting or otherwise have any knowledge about the product or the company providing the services or to be able to answer any questions posed by the consumers; rather, the contracts simply required the notaries to schedule appointments and oversee the execution of documents, including "getting all appropriate signatures from the client." (Exhibit 17, pp. 1-39; Exhibit 25, pp. 142-51.)

49.     At least one notary provision company may have required its notaries to pass an online test about debt-relief services. Plaintiffs do not know when the company instituted this test or how seriously it enforced this requirement. Written materials about the test, provided by the Minnesota Attorneys General's Office, suggest that notaries could take the test as many times as needed, and they were required to answer at least 22 questions correctly out of 27 total.

50.     Although the Façade Firm, not SFS, signed the contracts with the notary provision companies, calls I reviewed from Deepgram show that SFS controlled the notaries' practices. SFS regularly called the notary provision companies to confirm consumer appointments with notaries, to confirm whether signings had been completed and to confirm whether documents have been uploaded. (Callahan Table 1.) SFS told notaries to call SFS, not the Façade Firm, if they had questions about the signing. (Callahan Table 1; Exhibit 17, pp. 1-39.)

51.     In practice, the notaries and notary provision companies regularly called SFS if a consumer had questions or concerns. (Callahan Table 1.)

52.     Along the same lines, SFS call representatives regularly instructed consumers not to direct questions to the notary at the meeting but to call the SFS representative with questions instead. (Callahan Table 1.)

53.     The notary provision companies received nearly identical instructions for all signings, regardless of which Façade Firm was named in the documents. The instructions included a script and a PowerPoint presentation for notaries to show to the prospective enrollees. (Exhibit 5, pp. 38-62, 49-55, 56-62; Exhibit 8, pp. 232-35.) In at least some situations, SFS provided copies of the script, the presentation, and the consumer enrollment agreement to the notary provision companies. (Callahan Table 1.)

54.     According to the notary script, notaries should tell consumers that, as they continue to pay into the escrow accounts, money in the accounts will be used to settle their debts. (Exhibit 5, p. 57.)

55.     One notary who participated in signings for Great Lakes Law Firm testified that the notary company told him that his job was not to advise people; rather, his job was to get the consumers to sign the documents. (Exhibit 25, p. 5.)

56.     In the recorded phone calls obtained from Deepgram, some SFS employees told consumers that the notaries were meeting with them only to collect signatures; if consumers had questions, they should call the SFS employee. A Senior Vice President of Sales at SFS stated,

> All we do is just get these people to just kind of pencil whip and sign it . . . .
>
> It doesn't seem like it's as meaty as we make it sound. . . . I didn't realize that we don't give 'em a copy of the contract when they sign.

In the same conversation, a Senior Director of Negotiations replied,

> I agree with you, it's almost like you're pencil-whipped into signing . . . and
> I think they just made it more fluffy, you know, as far as the presentation, if
> you will, and they sign the presentation. So, I mean, it's almost like a, a CYA
> on our end. (Exhibit 26, pp. 19-20.)

57.    Consumer declarants also support this understanding. In a sworn statement, one consumer described the notary process as a "flyby presentation" and said that the notary, who made clear he could not explain things because he was just a notary and not an employee, seemed "like a robot going through a script." (Declaration of E.S., p. 2.)

58.    Many consumers complained that they were not given a copy of the enrollment contract that they signed. A former SFS employee told the Bureau that many consumers she spoke with over the phone said that the notary did not give them a copy of the contract. (Exhibit 10.)

59.    Some contracts between Façade Firms and notary provision companies say that notaries will be paid more for the meeting if the documents are fully signed, incentivizing the notaries to obtain the signatures. (Exhibit 25, p. 151; Exhibit 17, p. 1.)

60.    Most meetings between consumers and notaries occurred in person. But in an email dated March 23, 2020, Mark Guidubaldi, an attorney who worked with Blust, told RAM that Whitestone and Monarch were using a new system because of COVID-19. Documents attached to that email show that the in-person meeting with the notary could be replaced by an audio or video call with an attorney. Blust and Sasson were copied on the email. (Exhibit 16, p. 4.) I also reviewed a few recorded calls in which SFS

employees coordinated finalizing the enrollment documents using Docusign. (Callahan Table 1.)

### **Consumers' experiences after enrolling in the debt-relief service**

61.     The Wisconsin and North Carolina Attorney General's Offices obtained short scripts for attorneys from various assigned Façade Firms to read to consumers over the phone as a way of welcoming them to the program. The scripts, titled "Welcome Call," are remarkably similar to each other and suggest that this interaction would take place after the consumer signed the enrollment documents. (Exhibit 5, pp. 67-68; Exhibit 25, pp. 154-59, 246-47.)

62.     Consumers reported generally that, after this initial welcome call, they had little to no contact with attorneys. For example, consumer I. B. notes in his declaration that, after he signed up, made payments, and was sued multiple times, "whenever I called the customer service number for Great Lakes, I rarely found anyone answering the phone. When I left messages, the return calls were not consistent. I found this very frustrating." (Declaration of I.B., page 4.)

63.     In my review of calls from Deepgram, I listened to SFS employees negotiating with creditors on behalf of consumers. Based on my review of the metadata and publicly available information (e.g., LinkedIn, state Bar listings for New York, New Jersey, and Pennsylvania), I believe the SFS employees who negotiated these debts on behalf of consumers are not attorneys.

64.     In September 2021, a former SFS employee told the Bureau that when consumers called the Façade Firm after enrollment, the phone rang at SFS, and a computer program told the SFS employee the name of the Façade Firm to which the

consumer was assigned. Then the SFS employee used that information to answer the call using the name of the Façade Firm. (Exhibit 10.)

65.     The former SFS employee referenced in paragraph 64 is not an attorney. And several consumers, including E. K. and E. N., signed sworn statements noting that, when they called their Façade Firm after enrollment, the people they spoke with were not attorneys. (Declarations of E.K. and E.N.)

66.     Immediately after enrolling in SFS's debt-relief program, consumers begin depositing money each month into accounts held by Global or RAM. For example, consumer C.E.'s contract shows that he was obligated to make deposits to Global immediately after enrollment. Some consumers reported in consumer complaints that the Corporate Defendants instructed them they could pay even more into their escrow accounts so debts could be resolved more quickly. (Declaration of C.E.)

67.     Data obtained from RAM shows that the Façade Firms and Client Services Subsidiaries immediately began withdrawing fees on a monthly basis, without regard to whether SFS or the Façade Firm had settled any of the consumer's debts. (Declaration of Joanna Cohen.)

68.     The consumers' contracts with the Façade Firms contain a payment schedule that shows the amounts that will be deducted, the dates the deductions will be made, and what fees the payments cover. Because the payment schedule is set in advance before any potential settlement amount or timing can yet be known, the fees bear no relationship to results obtained for consumers.

69.     For example, one consumer, P.G., who enrolled in SFS's debt-relief services, was obligated to pay several fees, including a flat-rate monthly "service cost" of

$233.33 for the first 36 months of the program that was calculated based on the total amount of debt initially enrolled in the program. (Declaration of P.G., p. 17.)

    a.  The payment schedule also states that: (a) for the first 9 months, a bi-weekly "retainer" fee of $50-75 would be collected from the escrow account; and (b) for the entire 36 months of the contract, a bi-weekly "legal administrative" fee of $44.50 and a monthly "banking" fee of $10.95 would be collected from the escrow account.

    b.  These fees consumed the bulk of P.G.'s monthly deposits. For example, when P.G. made her first deposit of $438.34, only $74.56 was left in her escrow account after the fees were deducted.

    c.  P.G. was obligated to pay these fees every month, beginning in the first month of the contract, regardless of whether any of her debts had been settled. (Declaration of P.G., pp. 31-32.)

70.     P.G. entered into the contract with her Façade Firm, Carolina Legal Services, on June 26, 2020, and enrolled debts totaling $44,208.00 into the program. Beginning on July 5, 2020, P.G. made a deposit every two weeks in the amount of $438.34 into her escrow account. (Declaration of P.G., pp. 12-32 ___.)

71.     During the entire period that P.G. was enrolled in the debt-relief service, she paid roughly $8,328 into her escrow account. Approximately $5,358 (or 64% of that total) was deducted as fees, and approximately $544 (or 6.5% of the total) was paid to creditors on her behalf. (Declaration of P.G., pp. 50-54.) SFS eventually refunded $1,984, the remainder in her account, after Daniel Rufty, the attorney P.G. believed was representing her, had his law license suspended. (Declaration of P.G., p. 4.)

72.     Another consumer who enrolled in SFS's debt relief services, E.S., was also obligated to pay a flat-rate monthly service fee that was based on the total amount of debt initially enrolled in the program. The total of her scheduled service fees added up to 17% of the total debt. Like P.G., E.S. was obligated to pay this fee and many others beginning in the first month of the contract, regardless of whether any of her debts had been settled. Her contract did not provide for any contingencies or variance based upon outcomes obtained by Defendants or any Façade Firm. (Declarations of E.S. and P.G.)

73.     According to consumer complaints, many consumers were often surprised by how much they paid in fees. Given the amount of fees withdrawn from the account, consumers noted that it often took a long time for them to accumulate enough money in the account for debt settlements. For example, E.S.'s account statements show that she deposited approximately $2,114 into her escrow account during the first six months she was enrolled in the program, and neither SFS, nor a Façade Firm, nor any other entity made a settlement payment to E.S.'s creditors during these first six months. By the end of this first six-month period, however, approximately 90% of the funds she had deposited into her account (roughly $1900) had been withdrawn as fees. During the entire period E.S. was enrolled in the debt-relief service, approximately 84% of the funds she deposited into her account were deducted as fees, and only 16% of the funds were paid to creditors. (Declaration of E.S.) Other consumer complaints confirm similar experiences to those of P.G. and E.S. Until at least 2021, consumer declarations and attached documents show that the fees were either flat rate (administrative and retainer fees) or based on a percentage of the total amount of "enrolled debt" (service fees) that the consumer wanted settled; the fees bore no relation to individual debt settlements, if any, that Defendants negotiated. (Declarations of E.S. and P.G.)

**Façade Firms transferred significant amounts of money to companies owned by Jason Blust or the Blust Family Trust**

74.     In a deposition taken as part of a disciplinary investigation by the North Carolina Bar, attorney Daniel Rufty stated that he owns over 99% of Daniel Rufty Legal PLLC d/b/a Carolina Legal Services, but he has the right to less than 3% of the profits. Two companies, Lit Def Strategies, LLC and Sibert Legal Consulting (owned by another individual who works with Blust) had rights to the remaining 97% of the profits. According to Rufty, these two companies handled "quality control" for the firm, and they assigned cases to lawyers and steered the local lawyer to pay others for additional services. Rufty also noted that Blust and the other attorney set up the website for the Façade Firm. (Exhibit 5, pp. 10-12, 16-17.)

**Blumkin benefits from the loan from Twist Financial, LLC to the ESOP**

75.     A document from Bank of America indicates that Twist Financial, LLC holds a note for a loan to SFS for approximately $43 million with an interest rate of 3%. The loan was made in December 2017. The document shows that, between December 2017 and March 2020, SFS paid Twist Financial, LLC $1,982,819.86 in interest repayments and $16,219,563.25 in principal. (Exhibit 3, p. 84.)

**Other legal actions against Defendants or Façade Firms**

76.     I conducted searches for related litigation against SFS and the Façade Firms. A table summarizing my research is below. Summaries of select litigation follow.

| Plaintiff | Defendant(s) | Venue | Civil Action |
|---|---|---|---|
| Abante Rooter and Plumbing Inc. | Corporate Bailout LLC, Mark Guidubaldi & Associates LLC aka Protection Legal Group, American Funding LLC, and Does 1-10 | U.S. District Court, Northern District of California 4:17-cv-02559 | Telephone Consumer Protection Act |

| Plaintiff | Defendant(s) | Venue | Civil Action |
|---|---|---|---|
| Ahmed Motiwala | Mark Guidubaldi & Associates LLC d/b/a Protection Legal Group | U.S. District Court, Northern District of Illinois 1:17-cv-02445 | Telephone Consumer Protection Act |
| Allison Johnson | Strategic Financial Solutions LLC, Global Client Solutions LLC, Global Holdings LLC, WyoLaw LLC, Velsa Holdings LLC, Sunshine Signing Connection Inc, Guillermo Geisse, Brant Hodyno,Sara Flores, Jimmy Gleason, Inez Williams, Jason Blust, Timothy Burnette, Kimberly Celic, F Solutions LLC, Lauren Montanile, Ryan Sasson, Strategic Client Support, Summit Client Services LLC | Circuit Court for 18th Judicial Circuit, Brevard County, Florida 05-2019-057725-XXXX-XX | Racketeering Act, Fraud, Conspiracy to Commit Fraud, Violation of Credit Counseling Services Statute, Unlicensed Practice of Law, Legal Malpractice, Breach of Fiduciary Duty |
| Arkady Rayz | Progressive Ad Solutions LLC, Phoenix Legal Group LLC, Does 1-10 | U.S. District Court, Eastern District of Pennsylvania 2:14-cv-07147 | Telephone Consumer Protection Act |
| Craig Cunningham | Mark Guidubaldi & Associates d/b/a Protection Legal Group, and Corporate Bailout LLC | U.S. District Court, Northern District of Texas 3:17-cv-01238-L-BK | Telephone Consumer Protection Act |
| David Russell | WyoLaw LLC, Global Client Solutions LLC, Finance Solutions | Hawaii First Circuit Court, 21st Division 1CC191000868 | |
| Douglas Bohm | WyoLaw d/b/a Summit Law Firm | U.S. District Court, District of Colorado 1:23-cv-01198 | Credit Repair Organization Act, Colorado Credit Services Organization Act, Colorado Uniform Debt-Management Services Act |
| James Everett Shelton | Mark Guidubaldi & Associates LLC d/b/a Protection Legal Group, Mark Guidubaldi, Corporate Bailout LLC d/b/a Corporate Restructure LLC | U.S. District Court, Eastern District of Pennsylvania 2:17-cv-02367 | Telephone Consumer Protection Act |
| Julia Briggs | Strategic Financial Solutions LLC, Versara Lending LLC, Does 1-100 | U.S. District Court, Northern District of Illinois 1:22-cv-03705 | Illinois Debt Settlement Consumer Protection Act, Illinois Consumer Fraud Act, Unjust Enrichment |

| Plaintiff | Defendant(s) | Venue | Civil Action |
|---|---|---|---|
| Kenneth Lemieux | Strategic Client Solutions LLC, Anchor Client Services LLC | U.S. District Court, District of Connecticut 3:20-cv-00741 | Credit Repair Organizations Act, Electronic Funds Transfer Act, Connecticut Debt Negotiators Act, Connecticut Debt Adjusters Act, Connecticut Home Solicitation Sales Act, Connecticut Unfair Trade Practices Act |
| Kenneth Williams | Freedom Debt Relief, Turnbull Law Group LLC | Court of Common Pleas, Portage County, Ohio 2022cv00711 | Ohio Debt Adjustment Companies Act, Ohio Consumers Sales Practices Act |
| Mohamed Soliman | Spring Legal Group, Global Client Solutions LLC | Georgia Magistrate Court of Chatham County MGCV21-08045 | |
| Mouiz Makhloufi | Strategic Financial Solutions LLC, The Commonwealth Law Group, Law Offices of Amber Florio, Amber Florio, Thomas Rogus, Global Client Solutions LLC, Global Holdings LLC | U.S. District Court, District of Connecticut 3:21-cv-00009 | The Credit Repair Organizations Act, Connecticut Debt Negotiators Act, Connecticut Debt Adjusters Act, Connecticut Home Solicitations Act, Connecticut Unfair Trade Practices Act, Telemarketing Sales Rule, Statutory Theft |
| Monica Hughes, Daniel Hughes | Strategic Financial Solutions LLC, F Solutions LLC, Strategic Client Support LLC, Anchor Client Services LLC, Ryan Sasson, Kimberly Celic, Lauren Montanile, Daniel Camacho, Anchor Law Firm PLLC, Jason Blust, Thomas Rogus, Timothy Burnette, Stacy Robinson, Robin Lasky, Wendy Lee Bursey | U.S. District Court, District of Connecticut 3:20-cv-01096 | Racketeering Act, Fraud, Deceit, and Intentional Misrepresentation, Connecticut Unfair Trade Practices Act |
| Pedro Ramos Jr. | Law Office of Melissa Michel LLC d/b/a Spring Legal Group | Superior Court, Fourth Circuit, Connecticut | Connecticut Unfair Trade Practices Act |

| Plaintiff | Defendant(s) | Venue | Civil Action |
|---|---|---|---|
| Ramon Dejesus Cedeno | Argent Trust Company, Ryan Sasson, Daniel Blumkin, Ian Behar, Duke Enterprises LLC, Twist Financial LLC, Blaise Investments LLC, Strategic Financial, Solutions LLC | U.S. District Court, Southern District of New York 1:20-cv-09987 | Employee Retirement Income Security Act |
| City of Chicago | Burnette Legal Group LLC d/b/a Monarch Legal Group, Timothy Burnette, Strategic Financial Solutions LLC | Circuit Court of Cook County Illinois | Illinois Consumer Fraud and Deceptive Business Practices Act |
| North Carolina State Bar | Daniel Rufty | | Unauthorized Practice of Law and Debt Adjusting |
| State of Mississippi | Global Client Solutions LLC, Global Holdings LLC, US Legal Services Group P.C., Apex Legal Group P.C., American Financial Law Group LLC, Moore Legal Center P.C., The Law Offices of Robert Gitmeid & Associates, Robert Gitmeid, Timberline Financial LLC, GRT Financial LLC, Consumer Capital Advocates LLC, Assurance Consumer Services LLC | U.S. District Court, Southern District of Mississippi 3:18-cv-00280 | |

77.    In 2019, Allison Johnson sued Strategic Financial Solutions, LLC, Strategic Client Support, LLC, Summit Client Services, LLC, WyoLaw, LLC, Sasson, Montanile, Blust, Burnette, and others. The plaintiff's allegations included violations of RICO, common law fraud, and conspiracy to commit fraud, and the plaintiffs claimed that the enterprise "defrauds consumers by posing as lawyers and law firms . . ." The plaintiffs also claimed that the business structure "fraudulently mimics the 'attorney model' of debt settlement—a controversial structure in its own right—in order to evade the licensing and fee-limitation requirements for non-attorney settlement companies in various states and to project an aura of trustworthiness to lure unsuspecting consumers." (Exhibit 29, pp. 1-62.)

78.     A year later, the same law firm filed a very similar case on behalf of Daniel and Monica Hughes. The defendants in that case included Strategic Financial Solutions, LLC, Strategic Client Support, LLC, Anchor Client Services, LLC, Anchor Law Firm, Sasson, Montanile, Blust, and Burnette, among others. (Exhibit 29, pp. 63-110.)

79.     In 2022, the City of Chicago sued the Burnette Legal Group, LLC d/b/a Monarch Legal Group, Timothy Burnette, and Strategic Financial Solutions, LLC. The complaint alleges that "Monarch Legal and Strategic Financial Solutions jointly run a fraudulent 'debt resolution' program that preys on Chicagoans struggling with debt." The complaint alleges violations of municipal code arising out of violations of the Illinois Consumer Fraud and Deceptive Business Practices Act premised on violations of the TSR, including the prohibition against advance fees. (Exhibit 29, pp. 111-151.)

80.     In 2022, Julia Briggs, lead plaintiff for a purported class of consumers, sued Strategic Financial Solutions, LLC (SFS), Versara Lending, LLC and John Does 1-100 alleging common law fraud, violations of the Illinois Consumer Fraud Act, violations of the Illinois Debt Settlement Act, and Unjust Enrichment. The plaintiffs alleged that SFS recruits law firms and lawyers to draw consumers into SFS's debt-relief program without disclosing that SFS, not the law firms, does the work and collects most of the fees. (Exhibit 6, pp. 25, 32, 41.)

I declare under penalty of perjury that the foregoing is true and correct.

Date: December 29, 2023     in Washington D.C.

*Patrick Callahan*

Patrick Callahan

| Callahan Table 1 Deepgram Call Recordings | | |
|---|---|---|
| Callahan Paragraph Number | Call Bates Number* | Description |
| ¶11 | 000153499 (2:48), 000943647 | Senior Director of Client Services supervises about 90 call representatives and meets weekly with Sasson |
| ¶20 | 000921943, 000223457, 000270955, 000745078 | Blust active participation |
| ¶23 b. | 000661639 (Bedrock); 000308178 (Anchor); 000942384 (Rockwell); 000703376 (Boulder); 000506337 (Stonepoint); 000170717 (Harbor) | SFS Employee answered calls for Bedrock Legal Group, Anchor Law Firm, PLLC,  Rockwell Legal Group, Boulder Legal Group, Stonepoint Legal Group, LLC, Harbor Legal Group, LLC |
| ¶27 | 000973321, 000917886, 000190470 | Calls to Consumers for consumers' financial records |
| ¶27 | 000917886, 000190470, 000007776 | Consumers received mailers |
| ¶27 | 000007776, 000962293, 000068490, 000118930 | Consumers informed not approved for loan |
| ¶28 | 000413749, 000066821, 000167920, 000276176, 000279677, 000456683, 000478218, and 001075737. | SFS transfers consumers to representatives at Façade Firms |
| ¶45 | 000254592 (8:40); 000045743 (29:40); 000478218; 000605071; 000370014; 000489062; 000229140; 000394543; 000778831 | SFS arranged for consumers to meet with a notary |
| ¶50 | 000781117, 000914425, 000909342, 000858693, 000842172, 000859008, 000865049 | SFS calls notaries to confirm consumer appointments and signatures; and confirm whether documents have been uploaded. |
| ¶50 | 000614467, 000369373 | SFS tells notaries to call SFS to confirm consumers signatures |
| ¶51 | 000208350, 000290156, 000306212, 000388964, 000129919, 000099921, 000462689, 000650104, 001052277, 000751906, 000195958, 000162096, 000645975, 000025025, 000646277, 001073419, 000797114, 000186370, 000406502, 000092758, 000639030, 000101599, 000679537 | Notaries Calls with SFS |
| ¶52 | 000254592, 000349415, 000285796, 000013966, 000045743, 000826770, 000868443, 001031639, 000678070, 000495966, 000478218, 000370014, 000489062, 000229140 | SFS instructed consumers not to direct questions to notaries and to call SFS instead |
| ¶53 | 000917452; 000865049 | SFS providing copies of script, presentation, and the consumer enrollment agreement to the notary |
| ¶60 | 000456683 | SFS finalizing enrollment using Docusign |

*The Bates numbers relate to call recordings produced by the New York Attorney General's Office.

Transcripts can be made available related to specific recordings, upon request.