GLOBAL
Client Solutions

**THIS AGREEMENT** (this "Agreement") is entered into by and between Global Client Solutions, LLC ("Global") and Daniel Rufty Legal, PLLC (the "Company").

**WHEREAS**, Global is in the business of providing the processing services described in Section 1 of this Agreement (collectively, the "Services"), which Services relate to establishing dedicated accounts (the "Account(s)") that are owned, controlled and used by persons enrolled in debt settlement programs to accumulate and disburse funds in connection with the repayment of their debts; and

**WHEREAS**, the Company desires to provide debt settlement services (hereinafter, the "Program") to its clients (the "Client(s)") and desires to make the Services available to the Clients and/or other entities working in concert with or contracting with Company (hereinafter "Affiliate(s)"), if any, and Global desires to provide the Services, all in accordance with (i) the terms and conditions of this Agreement, and (ii) pursuant to the terms and conditions of the Dedicated Account Agreement and Application executed by the Client.

**NOW, THEREFORE**, for and in consideration of the promises and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Global and the Company agree as follows:

## SECTION I - SERVICES

**1(a) Establishing Dedicated Accounts**
Global will arrange for each Client who desires to utilize the Services to have an FDIC-insured Account that is maintained on the Global account management system (the "Global System"), with the funds in such Account held at bank of Global's choosing (the "Bank"). The Company may register Clients on the Global System, and will allow for Clients to submit a Dedicated Account Agreement and Application containing, among other things, the Client's name, physical address, social security number, date of birth and such other documentation as Global or the Bank may request from time to time, including, without limitation, any and all other information that may be necessary to verify the Client's identity as required under the USA Patriot Act and other applicable laws relating to banking regulations. Upon receiving the Dedicated Account Agreement and Application, Global will verify the Client's identity and perform such other due diligence with respect to the Client as Global deems appropriate. Assuming all such due diligence is satisfactory, an Account will be opened and Global will send each Client, via e-mail or U.S. mail, a letter welcoming the Client to Global and confirming the establishment of the Account directly with the Client (a "Welcome Letter"). The Account will be under the control of the Client at all times. All transactions involving the Account will be initiated by or otherwise authorized by the Client; and the Client may withdraw funds from the Account and/or close the Account at anytime.

**1(b) Deposits to Dedicated Accounts**
Each Client will provide instructions designating the amount he or she elects to deposit into his or her Account on a periodic basis; and Global, or its designee, will initiate the transfer of funds from the Client's primary bank account to his or her Account, typically by electronic transfer, i.e., an ACH from a Client's primary bank account is the preferred way for a Client to make a deposit. However, a deposit may also be made into an Account by sending funds to a lockbox, by wire transfer or by using the services of Money-Gram. All deposits will be treated as collection items for up to five banking days other than those made by certified check, wire transfer or MoneyGram, which deposits will be credited to the Account on the banking day following the date of receipt. Excessive ACH or other returns may result in a restriction on or an elimination of the availability of such services.

**1(c) Returned Deposit Items**
Any item deposited into an Account that is dishonored or otherwise returned for any reason at any time will be charged back against the Client's Account, along with a fee for processing the returned item, if applicable. In consideration for Global providing the Services to the Clients at the prices set forth on Exhibit A, the Company acknowledges and agrees that it will be responsible for promptly paying for any resulting deficiency in a Client Account via an offset to the account(s) on the Global System established for the Company (the "Company Account(s)") upon demand because such prices do not include a provision for Global absorbing the cost of returned items; provided, however, the Company will not be charged for any returned item processing fees that may be included in the deficiency. To help ensure that Global is reimbursed for such potential deficiencies, all Company Accounts will be required to have a minimum reserve of $500.00 (the "Minimum Reserve"). The Minimum Reserve may be increased at anytime based on (i) the level of unauthorized returns, (ii) a decline in the number of open Accounts established for Clients of the Company, and/or (iii) an increase in the number of open Accounts established for Clients of the Company that do not have sufficient balances to cover pending transactions.

**1(d) Disbursements from Dedicated Accounts**
Company warrants that all disbursements from the Accounts will be initiated or otherwise authorized by the Clients. Each Client will provide instructions designating the disbursements the Client elects to make from his or her Account and the manner in which such disbursements are to be made. Pursuant to such instructions, Global will then cause funds to be disbursed from the Account to a designated payee provided the Account contains sufficient funds to cover the amount of the requested disbursement. Global shall not be responsible for determining when a disbursement is due, nor shall Global be responsible for determining whether such disbursement is for the correct amount or otherwise proper. The sole obligation of Global in this regard will be to execute the Clients' disbursement instructions in a commercially reasonable manner as soon as practical after receipt of the instructions; and if Global performs in such manner, Global shall not be responsible for any late fee, penalty or other charge levied by a Client's designated payee, or for any other action taken or not taken by a Client's designated payee or any other party.

**1(e) Information / Customer Support**
Subject to the provisions of Section 6(d), Global will give the Company and Affiliates, as applicable, access to the Global System via the Internet to update Client information and review Client activity. Global will also provide electronic reports to supplement such access at mutually determined times and in mutually determined formats. Each Client will be given access to his or her Account via the Internet for the purpose of managing the Account, including, without limitation, checking his or her Account balance and Account activity and initiating deposits to and disbursements from the Account. Clients will also have access to their Accounts via an IVR to check their Account balances and their Account activity, as well as access to operator assisted customer support during normal business hours. For security purposes, Client access via the Internet and the IVR will require the Client to log into the Global System using a unique password/passcode. In addition to Internet and IVR access, Clients may contact Global Customer Support by mail, e-mail and facsimile; and Global will provide each Client with a statement, or access to an electronic statement, of his or her Account on a monthly basis.

**1(f) Banking Rules and Regulations**
Any account established and maintained on the Global System, and all transactions involving such accounts, shall be subject to such terms and conditions as may be established by the Bank from time to time, and to the rules and regulations of the Federal Reserve System, the National Automated Clearing House Association, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, any applicable state banking authority and/or any other applicable regulatory or governmental authority.

## SECTION II - GLOBAL LIABILITY

Global will exercise reasonable care in providing the Services, consistent with industry practices; provided, however, in addition to the limitations on Global's liability provided for elsewhere in this Agreement, neither Global, the Bank nor any service provider to Global or the Bank shall be liable to the Company, a Client or any other party for any reason other than their respective willful misconduct, bad faith or gross negligence; and provided further, however, without limiting the foregoing, neither Global, the Bank nor any such service provider shall be liable for any damage, loss, cost or expense to the Company, a Client or any other party arising out of the act or omission of any third party, including, but not limited to, those of ACH, check and other processors, the National Automated Clearing House Association, the Federal Reserve System, any other bank, or the directive of any regulatory authority. Moreover, neither Global, the Bank nor any such service provider makes any representation or warranty that the Services meet the regulatory requirements of any particular jurisdiction that may be applicable to the Company, Affiliates or the Program, or that the use of the Services will result in a determination by any regulatory authority that a particular licensing or regulatory scheme will not be applicable to the Company, Affiliates or the Program.

## SECTION III - FEES AND CHARGES

**3(a) Global Fees and Charges**
A schedule of the fees and charges for the Services is attached to this Agreement as Exhibit A. Global shall be entitled to increase such fees and charges for any increase in the cost of providing the Services. Any increase in the fees and charges shall become effective thirty (30) days after the date Global notifies the Company and/or the Clients of such increase.

**3(b) Payment of Global Fees and Charges**
The Global fees and charges provided for in Section 3(a) shall be deducted from the Accounts and, as applicable, from the Company Accounts. The monthly service charge for the first calendar month in which an Account is established on the Global System shall not be prorated. Such monthly service charge shall be deemed earned in full as of the day the Account is established, e.g., if an Account is established on the 15th day of a month, the monthly service charge for such month shall be earned as of that day. Thereafter, commencing with the following calendar month and each calendar month thereafter in which the Account remains open, the monthly service charge shall be deemed earned in full as of the first day of each such calendar month. Other fees and charges shall be deemed earned at the time of the transaction or the event that gives rise to the fee or charge.

**3(c) Program Fees**
If authorized by the Clients, Program fees payable by the Clients to the Company will be deducted from the Accounts and initially deposited into the Company Account(s). All Program fees processed by Global shall be transferred to the Company and, at the direction of the Company, to any Affiliate without any recourse to Global with respect to items that may be dishonored, otherwise returned or contested by the Clients or the Affiliates. Additionally, the Company shall be responsible for and promptly pay upon demand any deficiency resulting from the payment of a Program fee and the subsequent reversal of any such fee and/or the return of funds from which such fee was paid.

## SECTION IV - RELATIONSHIP, INDEMNIFICATION AND DISPUTE RESOLUTION

**4(a) Relationship**
Global is an independent contractor, and no agency, partnership, joint venture or similar relationship with the Company or any Affiliate is intended to be, or is, created as a result of the execution, delivery or performance of this Agreement.

**4(b) Indemnification**
Subject to the limitations on Global's liability provided for elsewhere in this Agreement and the limitation on each party's liability provided for below in this Section 4(b), Global and the Company, on behalf of itself and any Affiliates, each, hereby agree to indemnify the other, as well as the other's principals, directors, managers, officers, employees, agents, other representatives and, with respect to Global, the Bank (collectively, "Related Parties"), defend the other and its Related Parties and hold the other and its Related Parties harmless from and against any and all liabilities, claims, suits, other legal actions and proceedings, demands, damages, losses, costs and expenses of any kind or nature, including, without limitation, reasonable legal fees and expenses (collectively, "Claims and Damages"), arising out of or otherwise relating to (i) the conduct of the indemnifying party's business and affairs, and/or (ii) any material breach or violation of any representation, warranty, covenant or other provision of this Agreement by the indemnifying party; provided, however, any liability of Global or the Company hereunder shall be limited to actual Claims and Damages and, in no event, shall either of them ever be liable to the other for any incidental, consequential, punitive or other damages of any kind or nature other than actual money

damages (collectively, "Special Damages") unless the Special Damages are payable to a third-party due to the indemnifying party's actions or inactions. Without limiting the generality of the foregoing indemnification, the indemnification provided to Global and the Bank by the Company, on behalf of itself and any Affiliates, is expressly intended to cover any claim, demand, suit or other action whereby any regulatory or governmental authority, any Client or any group of Clients seeks rescission or cancellation, the refund of fees, charges or other amounts paid, restitution for damages sustained and/or any other form of compensation, penalty, fine or other payment with respect to any aspect of the Program. Without limiting any other rights or remedies of Global, any amounts owed to Global by the Company may be offset against any funds that are collected by Global on the Company's behalf or that are otherwise in the possession of Global.

**4(c) <u>Dispute Resolution / Binding Arbitration</u>**
If any dispute arising out of or relating to this Agreement, including, without limitation, any dispute regarding the breach or violation hereof or any dispute regarding the conduct of business pursuant to this Agreement, cannot be settled by direct negotiation between the parties, such dispute shall be settled by binding arbitration. Any such arbitration shall take place in Tulsa, Oklahoma by an arbitrator who is mutually selected by the parties or, if the parties cannot agree upon the arbitrator, by an arbitrator appointed by the American Arbitration Association. The decisions and awards determined in any such arbitration shall be final, non-appealable and expressly subject to the limitations on liability provided for in this Agreement. Judgment on any such decision or award may be entered in and enforced by any court of competent jurisdiction.

## SECTION V - TERM AND TERMINATION

**5(a) <u>Term</u>**
This Agreement shall have an initial term of three years (the "Initial Term"), commencing with the date Global signs this Agreement (the "Effective Date"). Upon expiration of the Initial Term, the term of this Agreement shall be automatically extended on a year-by-year basis, unless and until either party gives written notice to the other at least ninety (90) days prior to the expiration of the Initial Term, or any such extended term, that this Agreement shall not be so extended, in which case this Agreement shall terminate upon the expiration of the Initial Term or the applicable extended term, as the case may be.

**5(b) <u>Early Termination</u>**
Notwithstanding the term set forth in Section 5(a), Global or the Company, as the case may be, may terminate this Agreement for cause (i) upon thirty (30) days' prior written notice if the other party becomes the subject of a voluntary bankruptcy petition or any other voluntary proceeding relating to insolvency, (ii) upon sixty (60) days' prior written notice if the other party becomes the subject of an involuntary bankruptcy petition or any other involuntary proceeding relating to insolvency, and such involuntary petition or proceeding is not dismissed within such sixty (60)-day notice period, and (iii) upon ninety (90) days' prior written notice if the other party materially breaches or violates any representation, warranty, covenant or other provision of this Agreement and the breach or violation is not remedied in all material respects within such ninety (90)-day notice period; provided, however, a breach of any representation, warranty or covenant contained in Section VI shall be grounds for an immediate termination of this Agreement. In addition, Global may terminate this Agreement immediately (i) if any regulatory or governmental authority or any court of competent jurisdiction ever determines that any of aspect of the Program, the Services and/or any practice, process or procedure provided for in this Agreement, violates any applicable rule, regulation, ordinance or law, (ii) if Global reasonably believes that any such determination can or may be made, (iii) if Global discovers that the Company is not properly managing any material aspect of the Program, (iv) if Global determines that the Company has become inactive on the Global System, i.e., there are no open Accounts established for Clients of Company that have sufficient balances to cover pending transactions, and (v) as provided in Section 7(i). Any default notice shall describe the nature of the breach or violation with specificity and in reasonable detail.

**5(c) <u>Survival</u>**
The financial and indemnity obligations of the parties to one another, and any other provision of this Agreement that would by their nature continue beyond its termination, shall survive the expiration or any other termination of this Agreement.

## SECTION VI – CERTAIN COMPANY REPRESENTATIONS, WARRANTIES AND COVENANTS

**6(a) <u>Bona Fide Clients</u>**
The Company represents and warrants to Global that (i) each Client will be a bona fide customer, will be enrolled in the Program and will authorize all transactions in connection therewith that involve the Account established for the Client, (ii) the Company shall, upon Global's request, obtain documentation verifying the identity of each Client, and (iii) to the best of the Company's knowledge and belief, each Client will be the person that he or she claims to be in the Dedicated Account Agreement and Application.

**6(b) <u>Certain Program Materials</u>**
The Company shall provide Global, upon request, with true, accurate and complete copies of all materials the Company or any other party uses in connection with the Program that describes or mentions the Services or which names or otherwise refers to Global or the Bank; and the Company acknowledges that Global has the right to approve any and all such materials with respect to the description or mention of the Services or the reference to Global or the Bank.

**6(c) <u>Other Information</u>**
The Company shall provide such other information as Global or the Bank may reasonably request from time to time relating to the business that is the subject of this Agreement; and all such information shall be true, accurate and complete to the best of the Company's knowledge or belief.

**6(d) <u>Privacy and Other Laws</u>**
It will be necessary for the Company and/or Affiliates, if applicable, to have access to information regarding the Accounts from time to time to fulfill duties and obligations relating to the Program that have been authorized by the Clients. Accordingly, the Company represents and warrants to Global that the Company and Affiliates, if applicable, will comply with all applicable privacy laws, and with any and all other laws, ordinances, rules and regulations that are applicable to any aspect of the Company's business, including, without limitation, those applicable to the Program.

**6(e) Governmental Actions, Etc.**
The Company represents and warrants to Global that neither it nor any of its principals, directors, managers or executive officers (i) has ever been found guilty by any federal, state or local government of consumer fraud or misrepresentation, (ii) has ever had a license or bond of any kind refused, revoked or cancelled, or (iii) has ever been convicted of a felony of any kind. In addition, the Company represents and warrants to Global that it will promptly notify Global in writing if any such matter should ever occur in the future.

## SECTION VII - GENERAL PROVISIONS

**7(a) Confidentiality**
Global and the Company shall each hold the proprietary and confidential information of the other, as well as that of the Clients, in strict confidence by exercising at least the same degree of diligence and care that the party receiving such information uses to avoid disclosure or dissemination of its own highly confidential information, but in no event less than a reasonable standard of diligence and care. Without limiting the generality of the foregoing, Global and the Company agree that non-public personal information of the Clients shall be held in strict confidence and securely as required by applicable law; and that the transfer of such non-public personal information shall only be accomplished as permitted by applicable law. The terms and conditions of this Agreement, including, without limitation, the prices, and the practices, processes and procedures utilized by Global to provide the Services hereunder shall be deemed confidential information for purposes of this Section 7(a).

**7(b) Advertising and Publicity**
Neither Global, the Company nor any Affiliate shall use the name, trade names, trademarks, logos, service marks or other forms of unique identification of the other or the Bank in connection with any representation, solicitation, advertisement, promotion or press release, or for any other purpose, without the prior written consent of the other, and, if applicable, the Bank.

**7(c) Exercise of Rights and Waivers**
All rights, powers and privileges of the parties under this Agreement are separate, cumulative and exercisable concurrently or successively at the exercising party's discretion. Any waiver of any such right, power or privilege must be in a writing to be effective and shall not be construed as a continuing waiver unless expressly stated in such writing. No delay or failure to insist upon the strict adherence to and performance of the terms of this Agreement, nor any delay or failure in the exercise of any other right, power or privilege hereunder, shall operate as a waiver of the right to subsequently compel such adherence or performance, or to subsequently exercise any such other right, power or privilege, with respect to the matter in question or any other matter, including, without limitation, any continuing or subsequent breach or violation hereof.

**7(d) Notices**
All notices must be in writing to be effective and may be personally delivered or sent by certified mail or recognized courier (e.g., FedEx) to the applicable address noted on the signature page, in which event any such notice shall be deemed received if and when delivered personally or to such address, as the case may be. Either party may change its address for notice purposes by providing written notice of such change to the other party in the manner set forth above. Notwithstanding the foregoing, Global reserves the right to request the Company to complete a designated form provided by Global in order to change the Company's notice address.

**7(e) Construction**
If and when the context of this Agreement requires, all words used in the singular shall be construed to have been used in the plural, and vice versa, and a reference to a particular gender shall be deemed to include any other gender. All references herein to a party shall mean a party to this Agreement unless the context indicates otherwise. The order of the sections and paragraphs of this Agreement and the section and paragraph headings are only for convenience, and shall not be used to interpret any provision hereof.

**7(f) Governing Law, Jurisdiction and Venue**
This Agreement shall be governed and construed in accordance with the laws of the state of Oklahoma, without reference to choice of law or conflict of law statutes that would otherwise require reference to the laws of another jurisdiction. If Company or any other person or entity obtains a binding determination that the mandatory arbitration provision of this Agreement is unenforceable, then the parties agree that the federal and state courts located in Tulsa County, Oklahoma shall have exclusive jurisdiction to hear and determine any claims, disputes, actions, or suits, which may arise under or out of this Agreement.

**7(g) Review by Advisors**
The Company acknowledges that it has had the opportunity to have this Agreement reviewed by business, financial and legal advisors of its choosing prior to the execution hereof.

**7(h) Binding Effect and Assignment**
This Agreement shall inure to the benefit of and be binding upon the parties hereto and each of their respective successors and permitted assigns. Neither this Agreement, nor any of the rights or obligations of the parties hereunder, may be transferred or assigned by either party without the prior written consent of the other, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, should either party be acquired by a person or entity purchasing a majority share, and/or purchasing at least 51% of the assets of a party to this Agreement, then such assignment of the rights and obligations of the Agreement will be deemed a permitted assignment, not requiring further consent.

**7(i) Due Diligence**
The Company hereby authorizes Global and its designees to conduct due diligence with respect to the Company, as well as its principals, directors, managers and executive officers, and the Program; and in connection therewith, to investigate the background, business and financial affairs of the Company and any such other party to whatever extent and utilizing whatever means Global or its designees may determine appropriate. If permitted by law, Global will advise the Company of any objectionable matter that arises during any such due diligence; Global and the Company will then work in good faith to resolve such matter. However, if such matter is not resolved to Global's satisfaction, Global may elect to terminate this Agreement.

**7(j) Entire Agreement / Modifications**
This Agreement constitutes the entire agreement between the parties with respect to the subject matter and supersedes any and all prior or contemporaneous understandings relating thereto, whether written or oral as of the Effective Date of this Agreement; the Prior Agreement (the Agreement in place prior to the Effective Date of this Agreement), if any, remains effective for the Company and/or Clients who utilize the Company which are subject to the terms of the Prior Agreement. Modifications to this Agreement must be in writing and signed by each party to be effective; provided, however, if any provision of this Agreement is found to be invalid or unenforceable, to the extent permitted by law, such provision may be reduced in scope or otherwise modified to render the subject provision reasonable and enforceable. Otherwise, if any such invalid or unenforceable provision cannot be or is not so modified, such provision shall be deemed severed from this Agreement and all of the other provisions hereof shall remain in full force and effect as if such provision had never been included herein.

**7(k) Authority**
Each party hereby represents and warrants to the other that (i) its execution, delivery and performance of this Agreement has been duly authorized and approved in every respect, and (ii) neither its execution or delivery of this Agreement, nor its performance hereunder, will violate or conflict with any term or condition of its organizational or other governing documents, or any other agreement or directive of any kind or nature to which it is a party or by which it is otherwise bound.

**7(l) Counterparts / Electronic Copies**
This Agreement may be executed in counterparts and delivered electronically by e-mail or facsimile, and all such counterparts and electronic copies shall constitute one and the same document.

**IN WITNESS WHEREOF,** the parties have hereunto caused this Agreement to be executed by their duly authorized officers as of the date signed below.

**GLOBAL CLIENT SOLUTIONS, LLC**
4343 S 118th East Ave., Suite 220
Tulsa, Oklahoma 74146

By: Brent J Hampton

Title: V.P. & General Counsel

Date: 1/21/2020

**Daniel Rufty Legal, PLLC**
3440 Toringdon Way, Ste 2015
Charlotte, NC 28277

By: [signature]

Title: Member

Date: 1/17/2020

NORTH CAROLINA — BEFORE THE DISCIPLINARY HEARING COMMISSION OF THE

COUNTY OF WAKE — NORTH CAROLINA STATE BAR

20 DHC 17

THE NORTH CAROLINA STATE BAR,

**V-O-L-U-M-E 1**

Plaintiff,

vs

DANIEL S. RUFTY, Attorney,

Defendant.

Harris, Wiltshire & Grannis
1033 Wade Avenue, Suite 100
Raleigh, North Carolina 27605

Monday, November 16, 2020
10:00 a.m. 5:30 p.m.

**- - - - - - - -**

**DEPOSITION**

**OF**

**DANIEL S. RUFTY**

**- - - - - - - -**

Reported by:
Amy L. Poythress, CVR M

**A P P E A R A N C E S**

Appearing on Behalf of the Plaintiff:

Joshua T. Walthall
Deputy Counsel
The North Carolina State Bar
217 East Edenton Street (27601)
Post Office Box 25908 (27611)
Raleigh, North Carolina
(919)828 4620
jwalthall@ncbar.gov
bwilson@ncbar.gov

Appearing on behalf of the Defendant:

Amy E. Richardson
Grace Wynn
Harris, Wiltshire & Grannis, LLP
1033 Wade Avenue, Suite 100
Raleigh, North Carolina 27605
arichardson@hwglaw.com
gwynn@hwglaw.com

`

Also Present: Brittany Wilson, NCSB paralegal

Q And so you're supervising that whole negotiation process.
A Yes.
Q What happens when a client gets sued?
A Either the client sends the summons and complaint directly to me, or it goes they email or fax it to us. It's processed and then
Q Who processes it?
A There is an electronic software that we use that scans the emails and faxes for keywords and codes them accordingly.
Q And when are you alerted to the fact that one of your clients has been sued?
A When the clients contact me directly or I am contacted in the system that a client has submitted their summons and complaint.
Q Who would the client submit it to if not to you?
A They send it to Carolina Legal Services' fax and email.
Q And who at Carolina Legal Services would receive that and alert you to the fact that one of your clients has been sued?
A Carolina Client Services staff is who aids in processing those.

Q What is their role when they receive a summons or lawsuit on behalf or against one of your clients?
A The procedure is to enter in the information and send it to Lit Def Strategies. Lit Def Strategies then takes that particular summons and complaint and it enters in specific information about the summons and complaint into a file basically data entry, and then designates a North Carolina licensed attorney to handle it.
Q If these are your clients, why would they need to designate an attorney for them? Aren't you already the attorney?
A Just scheduling reasons. If I'm unavailable, then Shelia Huggins will get assigned to it, but I'm assigned or designated in over 90 percent of the litigation files.
Q Who designates them to you?
A There's nobody is doing an analysis of the designation. It's done strictly off of scheduling purposes. So legal secretary or paralegal at Lit Def Strategies.
Q How is Lit Def Strategies paid?
A I don't recall all the they're paid for that admin function and data entry of the litigation file.

associated with the program. They give that authority and direction to Global Client Solutions to pay for fees to Carolina Legal Services. Carolina Legal Services then pays people that provide services for the law firm legal, nonlegal, service providers, everyone included.

Q Got it. Crystal clear.

Just to clarify, does Carolina Legal Services have the agility to withdraw money from the client's GCS accounts, or pursuant to the retainer agreement GCS automatically pays that money to Carolina Legal Services?

A The approval is done between the client and Global Client Solutions. We do not dictate what goes from the Global Client Solutions account to anyone without client's approval.

Q We have the next section, Specific Responses to Information Requests. It says, "Attorney Rufty is the majority equity owner of CLS." I think we've covered that you own over 99 percent of the company.

A That's correct.

Q But you have the right to less than three percent of the profits.

A Yes. And that's reasonable considering how little in profit is there for the law firm.

Q And the right to the 97 percent of the profits rests in an out of state attorney?
A Yes.
Q Last part of that first response there indicates that you "review and approve, if appropriate, form client communications and advertising content; and supervises the work of nonattorney staff and contractors providing services in support of the firm's attorneys."
I know we've talked about a number of these third party service providers today. I just want to understand, you are personally responsible for the services that all of them provide to Carolina Legal Services' clients?
A Yes, my professional obligation, yes.
Q Next response, "CLS payments to Rufty were typically made to Rufty via ACH transfer on or about the dates listed on the schedule of payments." Who is in charge of that?
A Can you say that again? Can I take a break?
Q If you need a break, just in general?
A I asked for a break, I don't know, like 30 minutes ago, at least.
**MS. RICHARDSON:** Sorry.
Q I thought you wanted time to read it over. Do you need a break like for comfort purposes?

with this payment.

[Plaintiff's Deposition Exhibit 104 marked for identification.]

Q Let's look at Exhibit 104.
A I've got it up.
Q What is Exhibit 104?
A It appears to be CLS's website.
Q Are you responsible for this website?
A Yes.
Q Who made this website?
A Klipspringer Media, that's who we use for our website.
Q Where are they located?
A I want to say that their headquarters are in Florida, but I'm not a hundred percent sure.
Q How did you select them to make your website?
A The consultants helped me decide.
Q Jason Blust and Kelly Sibert?
A Yes.
Q Who is responsible for the website's content?
A I am.
Q Does Carolina Legal Services provide all the services listed there at the top of page 1 of Exhibit 104? Bankruptcy law, FDCPA, corporate law, wills and estates?

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN

**C E R T I F I C A T E**

I, Amy L. Poythress, notary public/court reporter, do hereby certify that **DANIEL S. RUFTY,** was duly sworn by me prior to the taking of the foregoing deposition; and that said deposition was taken and transcribed under my supervision; and that the foregoing pages, 6 245 inclusive, constitute a true and accurate transcription of the testimony of the witness.

I do further certify that the persons were present as stated in the caption.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 25th day of November, 2020.

*Amy L. Poythress*

Amy L. Poythress, Notary Public
Notary Number: 20003390065

STATE OF NORTH CAROLINA

WAKE COUNTY

BEFORE THE DISCIPLINARY HEARING COMMISSION OF THE NORTH CAROLINA STATE BAR
20 DHC 17

THE NORTH CAROLINA STATE BAR,
Plaintiff,

vs.

DANIEL S. RUFTY, Attorney,
Defendant.

# D E P O S I T I O N

# O F

# D A N I E L S. R U F T Y

(VOLUME II, Pages 248 through 422)

In the offices of Harris, Wiltshire & Grannis, LLP
1033 Wade Avenue, Suite 100
Raleigh, North Carolina

November 17, 2020
10:00 a.m.

A P P E A R A N C E S

JOSHUA T. WALTHALL, ESQ.
Deputy Counsel
The North Carolina State Bar
Post Office Box 25908
Raleigh, North Carolina 27611
Telephone: 919 828 4620
Fax: 919 834 8156
E mail: jwalthall@ncbar.gov
(For the Plaintiff)

AMY E. RICHARDSON, ESQ.
Harris, Wiltshire & Grannis, LLP
1033 Wade Avenue, Suite 100
Raleigh, North Carolina 27605
Telephone: 919 429 7386
E mail: arichardson@hwglaw.com
(For the Defendant)

Also Present:

BRITTANY WILSON

GRACE WYNN

A Correct.
Q Did Meg Wood ever own more than point one (0.1) percent?
A Yes.
Q How much did she own?
A Other than the Class B, I think she was a full owner.
Q When did she become the full owner?
A I think from the beginning, to my knowledge.
Q And did you buy full ownership from her?
A Yes.
Q How much did you pay for full ownership of Carolina Legal Services?
A Ten dollars.
Q And who decided that amount?
A We both did.
Q So the entire time that you've been an owner of Carolina Legal Services, you've owned 100 percent of it?
A No.
Q When did you not own 100 percent of it?
MS. RICHARDSON: Objection.
A When Class B partners were also owned part of it.
Q Is that still the case now?
A Yes. The remainder of the shares other than the

Class B partnership.

Q And what's your ownership percentage?

A Over 99 percent. Also I think I had made a statement earlier about the QC team I'd like to clarify for the record.

Q Go ahead.

A The QC team is not staff of Carolina Legal Services.

Q Who are the staff of?

A I think they're a staff of, to my recollection, Lit Def Strategies.

Q And Lit Def Strategies has the authority to assign cases to attorneys in North Carolina?

A Based off of my instruction.

Q And Lit Def Strategies is owned by Jason Blust and Kelly Sibert?

MS. RICHARDSON: Objection.

A To my knowledge.

Q It's still your statement and your testimony now under oath that you don't answer to Jason Blust or Kelly Sibert?

A Correct.

Q Do you know if they're involved in similar companies in any other states?

MS. RICHARDSON: Objection.

STATE OF NORTH CAROLINA
COUNTY OF ALAMANCE

C E R T I F I C A T E

I, G. Lynn Bodenheimer, Certified Verbatim Reporter and Notary Public, do hereby certify that I was present for the continuation of the deposition of Daniel S. Rufty in the date mentioned herein; that said deposition was reported by me and transcribed under my supervision; and that the foregoing pages 251 through 419 constitute a true and accurate transcription of the testimony of the witness.

I do further certify that the persons were present as stated in the caption.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

In witness whereof, I have hereunto subscribed my name this 24th day of November, 2020.

G. Lynn Bodenheimer

___________________________________

G. LYNN BODENHEIMER
Certified Verbatim Reporter/
Notary Public No. 19942140002

My Commission Expires:
August 3, 2024

NORTH CAROLINA | BEFORE THE DISCIPLINARY HEARING COMMISSION OF THE
COUNTY OF WAKE | NORTH CAROLINA STATE BAR
20 DHC 17

THE NORTH CAROLINA STATE BAR,

Plaintiff,

**V-O-L-U-M-E 3**

vs

DANIEL S. RUFTY, Attorney,

Defendant.

The North Carolina State Bar
217 E. Edenton Street
Raleigh, North Carolina 27601

Monday, December 7, 2020
10:00 a.m. 5:24 p.m.

**- - - - - - - -**

**DEPOSITION**

**OF**

**DANIEL S. RUFTY**

**- - - - - - - -**

Reported by:
Amy L. Poythress, CVR M

**A P P E A R A N C E S**

Appearing on Behalf of the Plaintiff:

Joshua T. Walthall
Savannah Perry
Deputy Counsels
The North Carolina State Bar
217 East Edenton Street (27601)
Post Office Box 25908 (27611)
Raleigh, North Carolina
(919)828 4620
jwalthall@ncbar.gov
sperry@ncbar.gov
bwilson@ncbar.gov

Appearing on Behalf of the Defendant:

Dudley A. Witt, Esquire
Crumpler, Freedman, Parker & Witt
860 West Fifth Street
Winston Salem, North Carolina 27101
(336)725 1304
(336)761 8845 fax
dudley@cfpwlaw.com
karen@cfpwlaw.com

Also Present: Brittany Wilson, NCSB paralegal

Q Why did you decide to leave Carolina Client Services?
A Why? Because I think I can do a better job. I've explained kind of in the last one. I want to create a law firm where it's a possibility that there will be no issues with clients. And I know mistakes will happen and things will issues will happen, but because that's reality. But I think that under the current circumstances with Carolina Client Services that's not a possibility. That there is going to be a certain amount of issues that happen, no matter what happens. And I tried to minimize those and eliminate those, but it's I've come to the point where I believe it's not possible.
Q What issues?
A I guess most notably and kind of the final straw was not receiving that letter from the Attorney General's office, that consumer complaint. I'm not sure what happened, I've investigated it, and it seemed to have been an issue with the they process mail electronically, and then it code reads the letter and it codes them appropriately and sends them out to the appropriate people. And for whoever no one can tell me why, but it was not brought to my attention. And that, to me, it was grounds for termination. For cause.

into it and is now ready for an attorney to review it efficiently and take particular action.

Q This email is from jmoy@relialit. Who is jmoy?

A She is nonlegal staff at inputs specific data into a particular file and sends it either to me or Shelia Huggins based off of our schedules.

Q And who is relialit.com?

A I think maybe relialit was before Lit Def Strategies. I think they're either part of the same they changed their emails. I want to say it was like a year ago or six months ago. I can't remember exactly, but it went from relialit to Lit Def Strategies.

Q That's Jason Blust's company?

A To my understanding, yes.

Q And here Jason Blust's company is telling you that you've been assigned a file?

A No, it's more like designated, but

Q It doesn't say "designated," it says, "This litigation file has been assigned for your review."

A Just like I went over a lot of explanations of what specific things and words mean in the file, I'm telling you that it's not no one can assign all litigation files are assigned to me unless I designate

them to go Shelia Huggins.

Q So this file hasn't been assigned to you?

A Designated to me from my own instructions.

Q So if you're in charge, how is someone else mailing you to tell you that a case has been assigned to you?

A Because I tell them how to designate them appropriately. If I say "All files go to Shelia Huggins for the next month; I'm tied up with other specific tasks," then they all get designated to Shelia Huggins.

Q But if you've been involved with this client, it's your client the entire time, you're supervising everything as you've stated under oath so far, you're involved the entire time, you're supervising everything, you're doing everything, why would you need a case assigned to you that's already yours?

A It's just the wording of the email. I can easily change it to "designate" if it bothers you.

Q Why would you need to be designated one of your client's cases if you've been involved the entire time?

A Because it requires an additional availability. If I'm not available due to other work load, that's why I hired Shelia Huggins was because I couldn't take on anymore litigation files. It was

Daniel S. Rufty, Vol 3 12/07/20 711

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN

**C E R T I F I C A T E**

I, Amy L. Poythress, notary public/court reporter, do hereby certify that **DANIEL S. RUFTY,** was duly sworn by me prior to the taking of the foregoing deposition; and that said deposition was taken and transcribed under my supervision; and that the foregoing pages, 429 710 inclusive, constitute a true and accurate transcription of the testimony of the witness.

I do further certify that the persons were present as stated in the caption.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 12th day of January, 2021.

Amy L. Poythress

Amy L. Poythress, Notary Public
Notary Number: 20003390065

# EXHIBIT A
## (SCHEDULE OF GLOBAL'S FEES AND CHARGES)

| | Fee: | Assessed to: Client | Assessed to: Company |
|---|---|---|---|
| **One-time Account Setup Fee** | $0.00 | X | |
| **Monthly Service Charge** | $10.95 | X | |
| **Dishonored/returned deposit item** | $0.00 | X | |
| ***Phone Pay Resolution Fee** | $15.00 | | X |
| **Transaction and Other Fees (Optional)** | | | |
| Premium Deposit Services: | | | |
| Incoming wire transfer | $10.00 | X | |
| Disbursement Fees: | | | |
| **ACH | $2.00 | X | |
| DirectPay | $2.00 | X | |
| **Manual Check (USPS) | $4.00 | X | |
| Pay by Phone | $1.50 | X | |
| 2nd Day Delivery (3:00 pm Central Time Cutoff) | $12.00 | X | |
| Overnight Delivery (3:00 pm Central Time Cutoff) | $20.00 | X | |
| Wire Transfer | $15.00 | X | |
| Stop payment order | $17.50 | X | |

*Phone pay payment processing has become increasingly complex, as a significant percentage of drafts are presented as ACH drafts versus paper drafts. Phone pay payments presented as ACH drafts typically lack identifying information, which negatively impacts the ability for the payment to clear. As a result, the labor intensive effort needed to clear phone pay payments has increased considerably over the past several years. Accordingly, Global charges a fee for excessive errors regarding phone pay transactions. A $15.00 Phone Pay Resolution Fee will be assessed for each such transaction that **exceeds a threshold of 10%** of all phone pay transactions presented to the bank during a given month. On or around the 15th day of the month, an e-mail notification will be sent to the management contacts of your organization indicating that an invoice for the previous month's phone pay transaction errors is available in the FTP folder titled "Global Docs". The invoice will be titled "Phone Pay Resolution Invoice". If the number of phone pay resolutions did not exceed the 10% threshold, the invoice amount will be $0.00. The invoice will be accompanied by a detailed monthly report reflecting each business day's phone pay transaction errors. The title of this report is '{*Account # & Company Name*} YYYY Invoice Details.xls'. The amount of the invoice will be deducted on or around the 20th day of the month from your Global account via a manual transfer. The memo of the transaction will display "Invoice: Phone Pay Resolution Fees – MM/YYYY".

Should Company desire to make phone pay payment processing an option to the Clients, a designated account will be established for such transactions and Global will provide Company with applicable instructions that will further describe potential errors that can occur with this type of payment processing.

**Not applicable for client withdrawals

GLOBAL
Client Solutions

**THIS AGREEMENT** (this "Agreement") is entered into by and between Global Client Solutions, LLC ("Global") and Meg Sohmer Wood, PLLC (the "Company").

**WHEREAS**, Global is in the business of providing the processing services described in Section 1 of this Agreement (collectively, the "Services"), which Services relate to establishing dedicated accounts (the "Account(s)") that are owned, controlled and used by persons enrolled in debt settlement programs to accumulate and disburse funds in connection with the repayment of their debts; and

**WHEREAS**, the Company desires to provide debt settlement services (hereinafter, the "Program") to its clients (the "Client(s)") and desires to make the Services available to the Clients and/or other entities working in concert with or contracting with Company (hereinafter "Affiliate(s)"), if any, and Global desires to provide the Services, all in accordance with (i) the terms and conditions of this Agreement, and (ii) pursuant to the terms and conditions of the Dedicated Account Agreement and Application executed by the Client.

**NOW, THEREFORE**, for and in consideration of the promises and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Global and the Company agree as follows:

## SECTION I - SERVICES

**1(a) Establishing Dedicated Accounts**
Global will arrange for each Client who desires to utilize the Services to have an FDIC-insured Account that is maintained on the Global account management system (the "Global System"), with the funds in such Account held at bank of Global's choosing (the "Bank"). The Company may register Clients on the Global System, and will allow for Clients to submit a Dedicated Account Agreement and Application containing, among other things, the Client's name, physical address, social security number, date of birth and such other documentation as Global or the Bank may request from time to time, including, without limitation, any and all other information that may be necessary to verify the Client's identity as required under the USA Patriot Act and other applicable laws relating to banking regulations. Upon receiving the Dedicated Account Agreement and Application, Global will verify the Client's identity and perform such other due diligence with respect to the Client as Global deems appropriate. Assuming all such due diligence is satisfactory, an Account will be opened and Global will send each Client, via e-mail or U.S. mail, a letter welcoming the Client to Global and confirming the establishment of the Account directly with the Client (a "Welcome Letter"). The Account will be under the control of the Client at all times. All transactions involving the Account will be initiated by or otherwise authorized by the Client; and the Client may withdraw funds from the Account and/or close the Account at anytime.

**1(b) Deposits to Dedicated Accounts**
Each Client will provide instructions designating the amount he or she elects to deposit into his or her Account on a periodic basis; and Global, or its designee, will initiate the transfer of funds from the Client's primary bank account to his or her Account, typically by electronic transfer, i.e., an ACH from a Client's primary bank account is the preferred way for a Client to make a deposit. However, a deposit may also be made into an Account by sending funds to a lockbox, by wire transfer or by using the services of Money-Gram. All deposits will be treated as collection items for up to five banking days other than those made by certified check, wire transfer or MoneyGram, which deposits will be credited to the Account on the banking day following the date of receipt. Excessive ACH or other returns may result in a restriction on or an elimination of the availability of such services.

**1(c) Returned Deposit Items**
Any item deposited into an Account that is dishonored or otherwise returned for any reason at any time will be charged back against the Client's Account, along with a fee for processing the returned item, if applicable. In consideration for Global providing the Services to the Clients at the prices set forth on Exhibit A, the Company acknowledges and agrees that it will be responsible for promptly paying for any resulting deficiency in a Client Account via an offset to the account(s) on the Global System established for the Company (the "Company Account(s)") upon demand because such prices do not include a provision for Global absorbing the cost of returned items; provided, however, the Company will not be charged for any returned item processing fees that may be included in the deficiency. To help ensure that Global is reimbursed for such potential deficiencies, all Company Accounts will be required to have a minimum reserve of $500.00 (the "Minimum Reserve"). The Minimum Reserve may be increased at anytime based on (i) the level of unauthorized returns, (ii) a decline in the number of open Accounts established for Clients of the Company, and/or (iii) an increase in the number of open Accounts established for Clients of the Company that do not have sufficient balances to cover pending transactions.

**1(d) Disbursements from Dedicated Accounts**
Company warrants that all disbursements from the Accounts will be initiated or otherwise authorized by the Clients. Each Client will provide instructions designating the disbursements the Client elects to make from his or her Account and the manner in which such disbursements are to be made. Pursuant to such instructions, Global will then cause funds to be disbursed from the Account to a designated payee provided the Account contains sufficient funds to cover the amount of the requested disbursement. Global shall not be responsible for determining when a disbursement is due, nor shall Global be responsible for determining whether such disbursement is for the correct amount or otherwise proper. The sole obligation of Global in this regard will be to execute the Clients' disbursement instructions in a commercially reasonable manner as soon as practical after receipt of the instructions; and if Global performs in such manner, Global shall not be responsible for any late fee, penalty or other charge levied by a Client's designated payee, or for any other action taken or not taken by a Client's designated payee or any other party.

**1(e) Information / Customer Support**
Subject to the provisions of Section 6(d), Global will give the Company and Affiliates, as applicable, access to the Global System via the Internet to update Client information and review Client activity. Global will also provide electronic reports to supplement such access at mutually determined times and in mutually determined formats. Each Client will be given access to his or her Account via the Internet for the purpose of managing the Account, including, without limitation, checking his or her Account balance and Account activity and initiating deposits to and disbursements from the Account. Clients will also have access to their Accounts via an IVR to check their Account balances and their Account activity, as well as access to operator assisted customer support during normal business hours. For security purposes, Client access via the Internet and the IVR will require the Client to log into the Global System using a unique password/passcode. In addition to Internet and IVR access, Clients may contact Global Customer Support by mail, e-mail and facsimile; and Global will provide each Client with a statement, or access to an electronic statement, of his or her Account on a monthly basis.

**1(f) Banking Rules and Regulations**
Any account established and maintained on the Global System, and all transactions involving such accounts, shall be subject to such terms and conditions as may be established by the Bank from time to time, and to the rules and regulations of the Federal Reserve System, the National Automated Clearing House Association, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, any applicable state banking authority and/or any other applicable regulatory or governmental authority.

## SECTION II - GLOBAL LIABILITY

Global will exercise reasonable care in providing the Services, consistent with industry practices; provided, however, in addition to the limitations on Global's liability provided for elsewhere in this Agreement, neither Global, the Bank nor any service provider to Global or the Bank shall be liable to the Company, a Client or any other party for any reason other than their respective willful misconduct, bad faith or gross negligence; and provided further, however, without limiting the foregoing, neither Global, the Bank nor any such service provider shall be liable for any damage, loss, cost or expense to the Company, a Client or any other party arising out of the act or omission of any third party, including, but not limited to, those of ACH, check and other processors, the National Automated Clearing House Association, the Federal Reserve System, any other bank, or the directive of any regulatory authority. Moreover, neither Global, the Bank nor any such service provider makes any representation or warranty that the Services meet the regulatory requirements of any particular jurisdiction that may be applicable to the Company, Affiliates or the Program, or that the use of the Services will result in a determination by any regulatory authority that a particular licensing or regulatory scheme will not be applicable to the Company, Affiliates or the Program.

## SECTION III - FEES AND CHARGES

**3(a) Global Fees and Charges**
A schedule of the fees and charges for the Services is attached to this Agreement as Exhibit A. Global shall be entitled to increase such fees and charges for any increase in the cost of providing the Services. Any increase in the fees and charges shall become effective thirty (30) days after the date Global notifies the Company and/or the Clients of such increase.

**3(b) Payment of Global Fees and Charges**
The Global fees and charges provided for in Section 3(a) shall be deducted from the Accounts and, as applicable, from the Company Accounts. The monthly service charge for the first calendar month in which an Account is established on the Global System shall not be prorated. Such monthly service charge shall be deemed earned in full as of the day the Account is established, e.g., if an Account is established on the 15th day of a month, the monthly service charge for such month shall be earned as of that day. Thereafter, commencing with the following calendar month and each calendar month thereafter in which the Account remains open, the monthly service charge shall be deemed earned in full as of the first day of each such calendar month. Other fees and charges shall be deemed earned at the time of the transaction or the event that gives rise to the fee or charge.

**3(c) Program Fees**
If authorized by the Clients, Program fees payable by the Clients to the Company will be deducted from the Accounts and initially deposited into the Company Account(s). All Program fees processed by Global shall be transferred to the Company and, at the direction of the Company, to any Affiliate without any recourse to Global with respect to items that may be dishonored, otherwise returned or contested by the Clients or the Affiliates. Additionally, the Company shall be responsible for and promptly pay upon demand any deficiency resulting from the payment of a Program fee and the subsequent reversal of any such fee and/or the return of funds from which such fee was paid.

## SECTION IV - RELATIONSHIP, INDEMNIFICATION AND DISPUTE RESOLUTION

**4(a) Relationship**
Global is an independent contractor, and no agency, partnership, joint venture or similar relationship with the Company or any Affiliate is intended to be, or is, created as a result of the execution, delivery or performance of this Agreement.

**4(b) Indemnification**
Subject to the limitations on Global's liability provided for elsewhere in this Agreement and the limitation on each party's liability provided for below in this Section 4(b), Global and the Company, on behalf of itself and any Affiliates, each, hereby agree to indemnify the other, as well as the other's principals, directors, managers, officers, employees, agents, other representatives and, with respect to Global, the Bank (collectively, "Related Parties"), defend the other and its Related Parties and hold the other and its Related Parties harmless from and against any and all liabilities, claims, suits, other legal actions and proceedings, demands, damages, losses, costs and expenses of any kind or nature, including, without limitation, reasonable legal fees and expenses (collectively, "Claims and Damages"), arising out of or otherwise relating to (i) the conduct of the indemnifying party's business and affairs, and/or (ii) any material breach or violation of any representation, warranty, covenant or other provision of this Agreement by the indemnifying party; provided, however, any liability of Global or the Company hereunder shall be limited to actual Claims and Damages and, in no event, shall either of them ever be liable to the other for any incidental, consequential, punitive or other damages of any kind or nature other than actual money

damages (collectively, "Special Damages") unless the Special Damages are payable to a third-party due to the indemnifying party's actions or inactions. Without limiting the generality of the foregoing indemnification, the indemnification provided to Global and the Bank by the Company, on behalf of itself and any Affiliates, is expressly intended to cover any claim, demand, suit or other action whereby any regulatory or governmental authority, any Client or any group of Clients seeks rescission or cancellation, the refund of fees, charges or other amounts paid, restitution for damages sustained and/or any other form of compensation, penalty, fine or other payment with respect to any aspect of the Program. Without limiting any other rights or remedies of Global, any amounts owed to Global by the Company may be offset against any funds that are collected by Global on the Company's behalf or that are otherwise in the possession of Global.

4(c) <u>Dispute Resolution / Binding Arbitration</u>
If any dispute arising out of or relating to this Agreement, including, without limitation, any dispute regarding the breach or violation hereof or any dispute regarding the conduct of business pursuant to this Agreement, cannot be settled by direct negotiation between the parties, such dispute shall be settled by binding arbitration. Any such arbitration shall take place in Tulsa, Oklahoma by an arbitrator who is mutually selected by the parties or, if the parties cannot agree upon the arbitrator, by an arbitrator appointed by the American Arbitration Association. The decisions and awards determined in any such arbitration shall be final, non-appealable and expressly subject to the limitations on liability provided for in this Agreement. Judgment on any such decision or award may be entered in and enforced by any court of competent jurisdiction.

## SECTION V - TERM AND TERMINATION

5(a) <u>Term</u>
This Agreement shall have an initial term of three years (the "Initial Term"), commencing with the date Global signs this Agreement (the "Effective Date"). Upon expiration of the Initial Term, the term of this Agreement shall be automatically extended on a year-by-year basis, unless and until either party gives written notice to the other at least ninety (90) days prior to the expiration of the Initial Term, or any such extended term, that this Agreement shall not be so extended, in which case this Agreement shall terminate upon the expiration of the Initial Term or the applicable extended term, as the case may be.

5(b) <u>Early Termination</u>
Notwithstanding the term set forth in Section 5(a), Global or the Company, as the case may be, may terminate this Agreement for cause (i) upon thirty (30) days' prior written notice if the other party becomes the subject of a voluntary bankruptcy petition or any other voluntary proceeding relating to insolvency, (ii) upon sixty (60) days' prior written notice if the other party becomes the subject of an involuntary bankruptcy petition or any other involuntary proceeding relating to insolvency, and such involuntary petition or proceeding is not dismissed within such sixty (60)-day notice period, and (iii) upon ninety (90) days' prior written notice if the other party materially breaches or violates any representation, warranty, covenant or other provision of this Agreement and the breach or violation is not remedied in all material respects within such ninety (90)-day notice period; provided, however, a breach of any representation, warranty or covenant contained in Section VI shall be grounds for an immediate termination of this Agreement. In addition, Global may terminate this Agreement immediately (i) if any regulatory or governmental authority or any court of competent jurisdiction ever determines that any of aspect of the Program, the Services and/or any practice, process or procedure provided for in this Agreement, violates any applicable rule, regulation, ordinance or law, (ii) if Global reasonably believes that any such determination can or may be made, (iii) if Global discovers that the Company is not properly managing any material aspect of the Program, (iv) if Global determines that the Company has become inactive on the Global System, i.e., there are no open Accounts established for Clients of Company that have sufficient balances to cover pending transactions, and (v) as provided in Section 7(i). Any default notice shall describe the nature of the breach or violation with specificity and in reasonable detail.

5(c) <u>Survival</u>
The financial and indemnity obligations of the parties to one another, and any other provision of this Agreement that would by their nature continue beyond its termination, shall survive the expiration or any other termination of this Agreement.

## SECTION VI – CERTAIN COMPANY REPRESENTATIONS, WARRANTIES AND COVENANTS

6(a) <u>Bona Fide Clients</u>
The Company represents and warrants to Global that (i) each Client will be a bona fide customer, will be enrolled in the Program and will authorize all transactions in connection therewith that involve the Account established for the Client, (ii) the Company shall, upon Global's request, obtain documentation verifying the identity of each Client, and (iii) to the best of the Company's knowledge and belief, each Client will be the person that he or she claims to be in the Dedicated Account Agreement and Application.

6(b) <u>Certain Program Materials</u>
The Company shall provide Global, upon request, with true, accurate and complete copies of all materials the Company or any other party uses in connection with the Program that describes or mentions the Services or which names or otherwise refers to Global or the Bank; and the Company acknowledges that Global has the right to approve any and all such materials with respect to the description or mention of the Services or the reference to Global or the Bank.

6(c) <u>Other Information</u>
The Company shall provide such other information as Global or the Bank may reasonably request from time to time relating to the business that is the subject of this Agreement; and all such information shall be true, accurate and complete to the best of the Company's knowledge or belief.

6(d) <u>Privacy and Other Laws</u>
It will be necessary for the Company and/or Affiliates, if applicable, to have access to information regarding the Accounts from time to time to fulfill duties and obligations relating to the Program that have been authorized by the Clients. Accordingly, the Company represents and warrants to Global that the Company and Affiliates, if applicable, will comply with all applicable privacy laws, and with any and all other laws, ordinances, rules and regulations that are applicable to any aspect of the Company's business, including, without limitation, those applicable to the Program.

**6(e) Governmental Actions, Etc.**
The Company represents and warrants to Global that neither it nor any of its principals, directors, managers or executive officers (i) has ever been found guilty by any federal, state or local government of consumer fraud or misrepresentation, (ii) has ever had a license or bond of any kind refused, revoked or cancelled, or (iii) has ever been convicted of a felony of any kind. In addition, the Company represents and warrants to Global that it will promptly notify Global in writing if any such matter should ever occur in the future.

## SECTION VII - GENERAL PROVISIONS

**7(a) Confidentiality**
Global and the Company shall each hold the proprietary and confidential information of the other, as well as that of the Clients, in strict confidence by exercising at least the same degree of diligence and care that the party receiving such information uses to avoid disclosure or dissemination of its own highly confidential information, but in no event less than a reasonable standard of diligence and care. Without limiting the generality of the foregoing, Global and the Company agree that non-public personal information of the Clients shall be held in strict confidence and securely as required by applicable law; and that the transfer of such non-public personal information shall only be accomplished as permitted by applicable law. The terms and conditions of this Agreement, including, without limitation, the prices, and the practices, processes and procedures utilized by Global to provide the Services hereunder shall be deemed confidential information for purposes of this Section 7(a).

**7(b) Advertising and Publicity**
Neither Global, the Company nor any Affiliate shall use the name, trade names, trademarks, logos, service marks or other forms of unique identification of the other or the Bank in connection with any representation, solicitation, advertisement, promotion or press release, or for any other purpose, without the prior written consent of the other, and, if applicable, the Bank.

**7(c) Exercise of Rights and Waivers**
All rights, powers and privileges of the parties under this Agreement are separate, cumulative and exercisable concurrently or successively at the exercising party's discretion. Any waiver of any such right, power or privilege must be in a writing to be effective and shall not be construed as a continuing waiver unless expressly stated in such writing. No delay or failure to insist upon the strict adherence to and performance of the terms of this Agreement, nor any delay or failure in the exercise of any other right, power or privilege hereunder, shall operate as a waiver of the right to subsequently compel such adherence or performance, or to subsequently exercise any such other right, power or privilege, with respect to the matter in question or any other matter, including, without limitation, any continuing or subsequent breach or violation hereof.

**7(d) Notices**
All notices must be in writing to be effective and may be personally delivered or sent by certified mail or recognized courier (e.g., FedEx) to the applicable address noted on the signature page, in which event any such notice shall be deemed received if and when delivered personally or to such address, as the case may be. Either party may change its address for notice purposes by providing written notice of such change to the other party in the manner set forth above. Notwithstanding the foregoing, Global reserves the right to request the Company to complete a designated form provided by Global in order to change the Company's notice address.

**7(e) Construction**
If and when the context of this Agreement requires, all words used in the singular shall be construed to have been used in the plural, and vice versa, and a reference to a particular gender shall be deemed to include any other gender. All references herein to a party shall mean a party to this Agreement unless the context indicates otherwise. The order of the sections and paragraphs of this Agreement and the section and paragraph headings are only for convenience, and shall not be used to interpret any provision hereof.

**7(f) Governing Law, Jurisdiction and Venue**
This Agreement shall be governed and construed in accordance with the laws of the state of Oklahoma, without reference to choice of law or conflict of law statutes that would otherwise require reference to the laws of another jurisdiction. If Company or any other person or entity obtains a binding determination that the mandatory arbitration provision of this Agreement is unenforceable, then the parties agree that the federal and state courts located in Tulsa County, Oklahoma shall have exclusive jurisdiction to hear and determine any claims, disputes, actions, or suits, which may arise under or out of this Agreement.

**7(g) Review by Advisors**
The Company acknowledges that it has had the opportunity to have this Agreement reviewed by business, financial and legal advisors of its choosing prior to the execution hereof.

**7(h) Binding Effect and Assignment**
This Agreement shall inure to the benefit of and be binding upon the parties hereto and each of their respective successors and permitted assigns. Neither this Agreement, nor any of the rights or obligations of the parties hereunder, may be transferred or assigned by either party without the prior written consent of the other, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, should either party be acquired by a person or entity purchasing a majority share, and/or purchasing at least 51% of the assets of a party to this Agreement, then such assignment of the rights and obligations of the Agreement will be deemed a permitted assignment, not requiring further consent.

**7(i) Due Diligence**
The Company hereby authorizes Global and its designees to conduct due diligence with respect to the Company, as well as its principals, directors, managers and executive officers, and the Program; and in connection therewith, to investigate the background, business and financial affairs of the Company and any such other party to whatever extent and utilizing whatever means Global or its designees may determine appropriate. If permitted by law, Global will advise the Company of any objectionable matter that arises during any such due diligence; Global and the Company will then work in good faith to resolve such matter. However, if such matter is not resolved to Global's satisfaction, Global may elect to terminate this Agreement.

**7(j) Entire Agreement / Modifications**
This Agreement constitutes the entire agreement between the parties with respect to the subject matter and supersedes any and all prior or contemporaneous understandings relating thereto, whether written or oral as of the Effective Date of this Agreement; the Prior Agreement (the Agreement in place prior to the Effective Date of this Agreement), if any, remains effective for the Company and/or Clients who utilize the Company which are subject to the terms of the Prior Agreement. Modifications to this Agreement must be in writing and signed by each party to be effective; provided, however, if any provision of this Agreement is found to be invalid or unenforceable, to the extent permitted by law, such provision may be reduced in scope or otherwise modified to render the subject provision reasonable and enforceable. Otherwise, if any such invalid or unenforceable provision cannot be or is not so modified, such provision shall be deemed severed from this Agreement and all of the other provisions hereof shall remain in full force and effect as if such provision had never been included herein.

**7(k) Authority**
Each party hereby represents and warrants to the other that (i) its execution, delivery and performance of this Agreement has been duly authorized and approved in every respect, and (ii) neither its execution or delivery of this Agreement, nor its performance hereunder, will violate or conflict with any term or condition of its organizational or other governing documents, or any other agreement or directive of any kind or nature to which it is a party or by which it is otherwise bound.

**7(l) Counterparts / Electronic Copies**
This Agreement may be executed in counterparts and delivered electronically by e-mail or facsimile, and all such counterparts and electronic copies shall constitute one and the same document.

**IN WITNESS WHEREOF,** the parties have hereunto caused this Agreement to be executed by their duly authorized officers as of the date signed below.

**GLOBAL CLIENT SOLUTIONS, LLC**
4343 S 118th East Ave., Suite 220
Tulsa, Oklahoma 74146

By: Brent J Hampton

Title: VP + General Counsel

Date: 5/8/18

**Meg Sohmer Wood, PLLC**
3440 Toringdon Way, Ste 205
Charlotte, NC 28277

By: [signature]

Title: Member-Manager

Date: 5/8/18

# EXHIBIT A
## (SCHEDULE OF GLOBAL'S FEES AND CHARGES)

| | Fee: | Assessed to: Client | Assessed to: Company |
|---|---|---|---|
| **One-time Account Setup Fee** | $0.00 | X | |
| **Monthly Service Charge** | $10.95 | X | |
| **Dishonored/returned deposit item** | $0.00 | X | |
| ***Phone Pay Resolution Fee** | $15.00 | | X |
| **Transaction and Other Fees (Optional)** | | | |
| Premium Deposit Services: | | | |
| Incoming wire transfer | $10.00 | X | |
| Disbursement Fees: | | | |
| **ACH | $2.00 | X | |
| DirectPay | $2.00 | X | |
| **Manual Check (USPS) | $4.00 | X | |
| Pay by Phone | $1.50 | X | |
| 2nd Day Delivery (3:00 pm Central Time Cutoff) | $12.00 | X | |
| Overnight Delivery (3:00 pm Central Time Cutoff) | $20.00 | X | |
| Wire Transfer | $15.00 | X | |
| Stop payment order | $17.50 | X | |

*Phone pay payment processing has become increasingly complex, as a significant percentage of drafts are presented as ACH drafts versus paper drafts. Phone pay payments presented as ACH drafts typically lack identifying information, which negatively impacts the ability for the payment to clear. As a result, the labor intensive effort needed to clear phone pay payments has increased considerably over the past several years. Accordingly, Global charges a fee for excessive errors regarding phone pay transactions. A $15.00 Phone Pay Resolution Fee will be assessed for each such transaction that **exceeds a threshold of 10%** of all phone pay transactions presented to the bank during a given month. On or around the 15th day of the month, an e-mail notification will be sent to the management contacts of your organization indicating that an invoice for the previous month's phone pay transaction errors is available in the FTP folder titled "Global Docs". The invoice will be titled "Phone Pay Resolution Invoice". If the number of phone pay resolutions did not exceed the 10% threshold, the invoice amount will be $0.00. The invoice will be accompanied by a detailed monthly report reflecting each business day's phone pay transaction errors. The title of this report is '*{Account # & Company Name}* YYYY Invoice Details.xls'. The amount of the invoice will be deducted on or around the 20th day of the month from your Global account via a manual transfer. The memo of the transaction will display "Invoice: Phone Pay Resolution Fees – MM/YYYY".

Should Company desire to make phone pay payment processing an option to the Clients, a designated account will be established for such transactions and Global will provide Company with applicable instructions that will further describe potential errors that can occur with this type of payment processing.

**Not applicable for client withdrawals

MW 5/8/18

GLOBAL Client Solutions

# AFFILIATE COMPANY INFORMATION AND AUTHORIZATION

Print Form

| Field | Value |
|---|---|
| Company Name (hereafter referred to as the "Company") | SUMMIT CLIENT SERVICES, LLC |
| Trade Names or DBAs | |
| Customer Support Phone | (646) 368-8761 |
| Address | 711 3RD AVENUE, 6TH FLOOR |
| City | NEW YORK |
| ST | NY |
| Zip | 10017 |
| Primary Contact/Title | Michael J. Mitchell |
| Phone | (646) 368-8761 |
| Fax | |
| Primary Contact E-Mail | MMitchell@stratfs.com |
| Business Entity Type: | ☐ Corporation ☒ LLC ☐ Partnership ☐ Sole Proprietorship |
| TIN | [redacted]5772 |
| Company Website URL | |
| Company Name on Website | |
| Brief Business Description | OUT SOURCE CLIENT SERVICING |

## Owners*, Directors, Managers, Executive Officers

| Name | Title | % Ownership |
|---|---|---|
| STRATEGIC FINANCIAL SOLUTIONS, LLC | MEMBER | 100 |
| **Home Address** | **SSN** | **Date of Birth** |
| 711 3RD AVENUE, 6TH FLOOR, NEW YORK NY 10017 | [redacted]8425 | 04/15/2015 |
| **Name** | **Title** | **% Ownership** |
| | | |
| **Home Address** | **SSN** | **Date of Birth** |
| | | |
| **Name** | **Title** | **% Ownership** |
| | | |
| **Home Address** | **SSN** | **Date of Birth** |
| | | |
| **Name** | **Title** | **% Ownership** |
| | | |
| **Home Address** | **SSN** | **Date of Birth** |
| | | |

* 10% Ownership or greater

Has the company or any listed person, or any other company in which any listed person is or was a 20% or greater owner, director, manager, or executive officer ever been:

- o Convicted of a crime (other than minor traffic violations)
- o Found guilty in a civil action relating to fraud or misrepresentation
- o The subject of a bankruptcy or other insolvency proceeding
- o Refused a bond or license of any kind, or had a bond or license revoked
- o The subject of a regulatory investigation of any kind

No — If Yes to any of the above please provide a complete explanation with this application.

## Company Contacts

Chief Executive Officer

| | |
|---|---|
| Name | RYAN SASSON |
| Phone | +1 (212) 810-4520 |
| E-mail | RSASSON@STRATFS.COM |

Chief Operations Officer

| | |
|---|---|
| Name | MICHAEL MITCHELL |
| Phone | +1 (646) 368-8761 |
| E-mail | MMitchell@stratfs.com |

Chief Risk Management Officer

| | |
|---|---|
| Name | DEAN RODRIGUES |
| Phone | +1 (212) 810-4549 |
| E-mail | drodrigues@stratfs.com |

Chief Technical Officer

| | |
|---|---|
| Name | CHRISTOPHER CLANTON |
| Phone | +1 (212) 810-4536 |
| E-mail | cclanton@stratfs.com |

Customer Service Contact

| | |
|---|---|
| Name | JESSICA TIGHE |
| Phone | +1 (646) 844-4239 |
| E-mail | jtighe@stratfs.com |

Backend Service Provider

### Banking Information and Authorization

Bank Name

Account Title

Bank Routing Number

Bank Account Number

**Please complete the following *if more than one* owner's signature is required when changing the banking information.**

| | | | |
|---|---|---|---|
| Owner Name | | Owner Name | |
| Owner E-Mail | | Owner E-Mail | |
| Owner Phone(s) | | Owner Phone(s) | |

### References

| Bank Reference | Contact Name | Telephone Number |
|---|---|---|
| | | |

### Authorization

As the duly authorized representative of the Company and its principals, directors, managers, and executive officers listed above (collectively, the "Applicants"), I hereby give permission for Global Client Solutions, LLC ("Global") and any of its designees, including, without limitation, any party related to or affiliated with Global and any bank with whom Global or any such related or affiliated party does business, to investigate the background, business, and financial affairs of the Applicants by using whatever means Global or any of its designees may determine appropriate.

**PLEASE INCLUDE A LEGIBLE COPY OF GOVERNMENT ISSUED ID FOR ALL (Drivers License/Passport/Social Security Card)**

Submission of this form indicates authorization to transfer funds to the bank account provided above.

**Your signature indicates (i) your agreement that your contractual relationship for new clients is with the Backend Service Provider, and that Global's contractual relationship is with the Backend Service Provider regarding all new clients obtained by the Company and entered onto the Global System; and (ii) your understanding that you will be required to have a minimum reserve of $500.00 which may be increased at anytime based on the level of Company's unauthorized returns.**

**Name/Title** Ryan Sasson, CEO

**Signature/Date** [signature]

IRS DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH 45999-0023

Date of this notice: 04-26-2018

Employer Identification Number:
[redacted]1499

Form: SS-4

Number of this notice: CP 575 B

CAROLINA CLIENT SERVICES LLC
RYAN SASSON MBR
711 3RD AVE FL 6
NEW YORK, NY 10017

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN). We assigned you EIN [redacted]1499. This EIN will identify you, your business accounts, tax returns, and documents, even if you have no employees. Please keep this notice in your permanent records.

When filing tax documents, payments, and related correspondence, it is very important that you use your EIN and complete name and address exactly as shown above. Any variation may cause a delay in processing, result in incorrect information in your account, or even cause you to be assigned more than one EIN. If the information is not correct as shown above, please make the correction using the attached tear off stub and return it to us.

Based on the information received from you or your representative, you must file the following form(s) by the date(s) shown.

Form 1065 03/15/2019

If you have questions about the form(s) or the due date(s) shown, you can call us at the phone number or write to us at the address shown at the top of this notice. If you need help in determining your annual accounting period (tax year), see Publication 538, *Accounting Periods and Methods*.

We assigned you a tax classification based on information obtained from you or your representative. It is not a legal determination of your tax classification, and is not binding on the IRS. If you want a legal determination of your tax classification, you may request a private letter ruling from the IRS under the guidelines in Revenue Procedure 2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue). Note: Certain tax classification elections can be requested by filing Form 8832, *Entity Classification Election*. See Form 8832 and its instructions for additional information.

A limited liability company (LLC) may file Form 8832, *Entity Classification Election*, and elect to be classified as an association taxable as a corporation. If the LLC is eligible to be treated as a corporation that meets certain tests and it will be electing S corporation status, it must timely file Form 2553, *Election by a Small Business Corporation*. The LLC will be treated as a corporation as of the effective date of the S corporation election and does not need to file Form 8832.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov. If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

(IRS USE ONLY) 575B 04-26-2018 CARO 3 9999999999 SS-4

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.** You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is CARO. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

Keep this part for your records. CP 575 B (Rev. 7-2007)

---

Return this part with any correspondence so we may identify your account. Please correct any errors in your name or address.

CP 575 B

9999999999

Your Telephone Number ( ) - Best Time to Call

DATE OF THIS NOTICE: 04-26-2018
EMPLOYER IDENTIFICATION NUMBER: [redacted]1499
FORM: SS-4 NOBOD

INTERNAL REVENUE SERVICE
CINCINNATI OH 45999-0023

CAROLINA CLIENT SERVICES LLC
RYAN SASSON MBR
711 3RD AVE FL 6
NEW YORK, NY 10017

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:25 PM 04/18/2018
FILED 02:25 PM 04/18/2018
SR 20182797510 - File Number 6850543

# CERTIFICATE OF FORMATION

# OF

# Carolina Client Services, LLC

**FIRST:** The name of the limited liability company is Carolina Client Services, LLC.

**SECOND:** The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:** Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation on April 18, 2018.

*/s/Taylor Lolya*
Taylor Lolya, Authorized Person

# MANAGEMENT RESOLUTION
# OF
# CAROLINA CLIENT SERVICES, LLC

The undersigned Organizer of Carolina Client Services, LLC a Delaware Limited Liability Company (the "Company")

DOES HEREBY CERTIFY:

At a general meeting of the member(s) and the organizer of the Company, duly called and held on April 20, 2018 at which a quorum was present and acted throughout, the member(s) unanimously adopted the following resolution, which has not been modified or rescinded:

RESOLVED, that the Company is to be managed by the members who shall have the power to manage the business and affairs of the Company as provided in the Operating Agreement.

The name(s) and address(es) of the initial Member(s) of the Company, and who shall serve until their successor(s) is/are elected and begin serving, is/are:

Strategic Financial Solutions, LLC, 711 3rd Avenue., 6th Floor, New York NY 10017

FURTHER RESOLVED, that the undersigned hereby resigns as organizer and terminates any and all involvement relative to any and all business activities.

IN WITNESS WHEREOF, the undersigned has hereto affixed their hands as of April 20, 2018.

Taylor Lolya, Organizer

****Script Paralegal Must Read To Client****
**THE DEBT RESOLUTION PROCESS**

[TURN TO SLIDE 2]

DEBT RESOLUTION IS A PROGRAM DESIGNED TO PAY OFF YOUR DEBTS THROUGH A NEGOTIATION STRATEGY. THE LAW FIRM NEGOTIATES WITH YOUR CREDITORS ON YOUR BEHALF TO PAY BACK YOUR DEBT, IN A LUMP SUM OR TERM PAYMENTS, LESS THAN THE AMOUNT OWED ON YOUR ACCOUNTS. YOUR INVOLVEMENT IN THESE NEGOTIATIONS AND CONVERSATIONS MAY BE NECESSARY AND IMPORTANT.

[TURN TO SLIDE 3]

THE DEBT RESOLUTION PROCESS, WHAT WE DO AND WHAT WE NEED FROM YOU

Generally, a debt must be delinquent for at least 60 to 180 days before creditors will engage in good faith negotiations to resolve your debts. It is our understanding that as a result of your financial hardship, your ability to make necessary payments has been impacted and therefore you have entered this program as the means to settling your debts. Make sure you forward any communications from your creditors to Heartland.

[TURN TO SLIDE 4]

WE NOTIFY YOUR CREDITORS

While Heartland is representing you, based on its prior experience with your creditors, its personnel will notify some or all your creditors that you are represented by an attorney and they should stop any communication with you regarding your debts. If Heartland has made the determination that sending LORs (Letters of Representation) to certain creditors will make them more aggressive, strategically, Heartland does not send LORs to them.

[TURN TO SLIDE 5]

SPECIAL PURPOSE SAVINGS ACCOUNT

After signing your enrollment paperwork to retain the law firm, you will be saving money in a Special Purpose Savings Account. As your funds are accumulating, we are working to resolve your debts through our negotiation process. The Special Purpose Savings Account is set up through an FDIC insured program separate from your checking account. Funds are drawn monthly from your specified bank account, in accordance with an agreed payment plan.

This account is a transparent online banking system and is strictly under your control. You may withdraw any funds that have not previously been earned by Heartland at any time.

[TURN TO SLIDE 6]

YOUR DEBT RESOLUTION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS

You hired our Law Firm to get your debts resolved as quickly and for as little money as possible. Our strategy is based on saving funds in your GCS Account, which is why sticking to your payment plan is so important. As the funds build in your account, we will contact your creditors to attempt to negotiate settlements on your behalf. When we reach an agreement with one of your creditors to resolve a debt, the local attorney will review and approve all settlements. We then present you with the details of the debt resolution offer in writing and either the attorney or the negotiator will contact you to confirm your authorization of the settlement and how you wish to proceed. If you approve, then you will provide your written or verbally recorded approval of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all of your debts are negotiated and resolved with your creditors.

It is important to understand that Heartland cannot force a creditor to negotiate your debt. Although Heartland will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with Heartland in the past will refuse to negotiate a debt. In such instances, the Heartland attorneys or negotiators may require your assistance in participating in the negotiation process. Heartland personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If Heartland cannot successfully negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

[TURN TO SLIDE 7]

WHAT YOU NEED TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors. As we mentioned on slide 4, we have measures in place to deter these calls (i.e. Google Voice and LOR's).

IN APPROPRIATE CASES, THE LAW FIRM CAN SEEK DAMAGES FOR YOU AS A RESULT OF ABUSIVE COLLECTION PRACTICES.

THE LAW FIRM CANNOT STOP INTEREST, LATE FEES, OR PENALTIES, BUT REDUCTION OF THESE EXPENSES IS TYPICALLY INCLUDED IN ANY SETTLEMENT NEGOTIATED ON YOUR BEHALF.

HEARTLAND ALSO CANNOT PREVENT CREDITORS OR COLLECTORS FROM FILING A LAWSUIT AGAINST YOU ARISING FROM YOUR DEBTS. HOWEVER, IF YOU ARE SUED, HEARTLAND ATTORNEYS WILL REPRESENT YOU IN COURT AND ASSERT ANY VALID DEFENSES ON YOUR BEHALF AS PROVIDED BY THE TERMS OF THE RETAINER AGREEMENT.

THE LAW FIRM DOES NOT CONTACT CREDIT BUREAUS TO CLEAN UP OR REPAIR YOUR CREDIT.

IT TYPICALLY TAKES THE LAW FIRM 6 TO 9 MONTHS TO REACH THE FIRST SETTLEMENT.

THE LAW FIRM DOES NOT PROVIDE ANY TAX ADVICE AND ANY REDUCTIONS IN DEBT MAY BE TAXABLE BY THE IRS.

YOUR CREDIT SCORE WILL LIKELY BE NEGATIVELY IMPACTED WHILE YOU ARE IN THE PROGRAM.

[TURN TO SLIDE 8]

HEARTLAND SUPPORTS YOU THROUGHOUT THE PROGRAM

The law firm is prepared to do what is necessary to represent you and, if appropriate, defend you against creditor or collector lawsuits. This may include work done on your behalf in or out of court. A local attorney in the state where the complaint was filed will represent you in asserting any reasonable defenses to the suit, or any other viable means of resolving the suit. This may include negotiations with the creditors' attorney, preparation of responsive documents and/or appearances at court hearings on your behalf. Although the legal fees for your defense are covered by your retainer payments, you would have to pay a $350 fee for trial costs if the action were to go to trial.

[TURN TO SLIDE 9]

IF CIRCUMSTANCES CHANGE, CONTACT US IMMEDIATELY TO DISCUSS ALL YOUR OPTIONS

If at any time your circumstances change, and you have more funds available to resolve your debt or you experience an increased hardship, such as loss of your job, please contact our client services team. If you have experienced increased hardships, we will discuss options with you, including our law firm representing you in bankruptcy.

[TURN TO SLIDE 10]

ONCE YOU BECOME OUR CLIENT

WE ARE AVAILABLE FOR QUESTIONS AND SUPPORT THROUGHOUT THE PROGRAM

Our client services team is available to answer any non-legal questions and help you throughout the debt resolution process

PLEASE MAKE SURE YOU ARE AVAILABLE TO SPEAK WITH OUR SUPPORT TEAM REGARDING YOUR PROGRAM WHEN WE CALL

Within a week of your enrollment with Heartland, a Heartland attorney, licensed to practice in your state, will reach out to confirm program details and review key aspects of your representation. The attorney will be able to answer any legal questions you may have during this presentation. Please remember that you must speak with your local attorney before you can be represented by the firm, so the attorney will continue to try and contact you until a conversation takes place.

The client support team will also reach out to you by phone to confirm your personal information and to answer any questions you have about the program. Your welcome package will be mailed to you within one week of Heartland receiving a copy of your executed agreement. A copy of your executed agreement will be e-mailed to you within twenty-four hours of enrollment.

Included in your welcome package will be some important documents such as creditor logs, information on the laws that protect you from collection agencies as well as what to do if you need help from Heartland's Litigation Department.

The client support team is always ready to assist you with any non-legal questions you have throughout your program. This is often the quickest way to get your questions answered, particularly when the question does not require legal advice. However, you are always welcome and encouraged to contact your local attorney directly, or ask the client services team to facilitate a conversation between you and the attorney.

[TURN TO SLIDE 11]

WHAT TO EXPECT FROM OUR ATTORNEYS

Your In-State Attorney will speak to you before you start. You will either meet face to face with an attorney in his office or have a face to face presentation with a paralegal to review the program. If you do not meet with the attorney face to face, the attorney will call you to review the program and answer any questions you may have. The attorney will also send a letter after the meeting or call to confirm what you discussed.

Our attorneys conduct quarterly reviews of your file to determine any changes or recommendations to your file. Our attorneys conduct yearly calls with you to review your case and its progress. Our attorneys can also be made available at any point to discuss your case.

Our attorneys also conduct exit Interviews with all clients whether they complete the program or not. We want to know about your experience. We also want to ensure that all of your questions and concerns are addressed as you exit the program.

[TURN TO SLIDE 12]

DOCUMENTS TO BE SIGNED TODAY

The Letter of Engagement is your agreement with our law firm which outlines the terms and conditions of the program.

The Power of Attorney (limited to this transaction only) permits us to act on your behalf to negotiate with your creditors.

The Compliance Affidavit acknowledges our legal staff's compliance with all federal and state regulations. Your signature confirms your attendance at this meeting today.

The Banking Platform Documents gives your consent to establish and authorize electronic payments to a Special Purpose Savings Account through GCS.

The In-Person Client Presentation is your acknowledgment that you have received this presentation in person.

# GREAT LAKES LAW FIRM, LLC

## **Script Paralegal Must Read To Client**

## THE DEBT RESOLUTION PROCESS

[BEGIN ON SLIDE 2]

MY NAME IS ______________ AND I AM A REPRESENTATIVE OF GREAT LAKES LAW FIRM, LLC (GREAT LAKES). MY JOB TODAY IS TO TELL YOU MORE ABOUT GREAT LAKES' DEBT RESOLUTION PROGRAM, AND ASSIST YOU IF YOU WANT TO ENROLL IN THE PROGRAM AT THE END OF THIS PRESENTATION. BEFORE WE BEGIN, PLEASE UNDERSTAND THAT I AM NOT AN ATTORNEY, AND AS SUCH, I AM NOT QUALIFIED TO PROVIDE LEGAL ADVICE TO YOU, OR TO ANSWER ANY LEGAL QUESTIONS OUTSIDE THE SCOPE OF THE PRESENTATION I AM ABOUT TO DELIVER.

IF YOU CHOOSE TO SIGN AND SUBMIT ENROLLMENT DOCUMENTS TODAY, A GREAT LAKES ATTORNEY, LICENSED TO PRACTICE IN WISCONSIN, WILL REVIEW YOUR FILE AND CONTACT YOU BY TELEPHONE WITHIN THE NEXT FEW DAYS. IT IS IMPERATIVE THAT YOU MAKE YOURSELF AVAILABLE TO SPEAK WITH THE ATTORNEY, EVEN IF YOU DO NOT HAVE ANY LINGERING QUESTIONS OR CONCERNS AFTER THIS PRESENTATION, AS THE ATTORNEY MAY HAVE IMPORTANT INFORMATION AND ADVICE FOR YOU. GREAT LAKES POLICIES REQUIRE THAT THIS CONVERSATION TAKE PLACE BEFORE YOU CAN AGREE TO THE FIRM'S REPRESENTATION OR MAKE ANY PAYMENTS, SO IT IS VERY IMPORTANT, AND GREAT LAKES THANKS YOU IN ADVANCE FOR YOUR COOPERATION.

[TURN TO SLIDE 3]

DEBT RESOLUTION IS A PROGRAM DESIGNED TO PAY OFF YOUR DEBTS THROUGH A NEGOTIATION STRATEGY. GREAT LAKES NEGOTIATES WITH YOUR CREDITORS ON YOUR BEHALF TO PAY BACK, IN A LUMP SUM OR TERM PAYMENTS, LESS THAN THE AMOUNT OWED ON YOUR ACCOUNTS. YOUR INVOLVEMENT IN THESE NEGOTIATIONS AND CONVERSATIONS MAY BE NECESSARY AND IMPORTANT.

As your attorneys, it's Great Lakes' job to notify your creditors that you seek to negotiate a reduction of your debt, instead of filing for bankruptcy.

[TURN TO SLIDE 4]

THE DEBT RESOLUTION PROCESS, WHAT GREAT LAKES DOES AND WHAT IT NEEDS FROM YOU

Generally, a debt must be delinquent for at least 60 to 180 days before creditors will engage in good faith negotiations to resolve your debts. It is our understanding that as a result of your financial hardship, your ability to make necessary payments has been impacted and therefore you have entered this program as the means to settling your debts. Make sure you forward any communications from your creditors to Great Lakes.

[TURN TO SLIDE 5]

GREAT LAKES NOTIFIES YOUR CREDITORS

While Great Lakes is representing you, based on its prior experience with your creditors, its personnel will notify some or all your creditors that you are represented by an attorney and they should stop any communication with you regarding your debts. If Great Lakes has made the determination that sending LORs (Letters of Representation) to certain creditors will make them more aggressive, strategically, Great Lakes does not send LORs to them.

[TURN TO SLIDE 6]

SPECIAL PURPOSE SAVINGS ACCOUNT

After signing your enrollment paperwork to retain Great Lakes, you will be savings money in a Special Purpose Savings Account. As you save sufficient funds, Great Lakes representatives will begin working to resolve your debts through its negotiation process. The Special Purpose Savings Account is an FDIC insured account separate from your checking account. Funds are drawn monthly from your checking account, in accordance with an agreed payment plan. It is a transparent online banking system and is strictly under your control.

The funds in your Special Purpose Savings Account belong to you, and you may withdraw any funds that have not previously been earned by Great Lakes at any time.

[TURN TO SLIDE 7]

YOUR DEBT RESOLUTION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS

You hired Great Lakes to get your debts resolved as quickly and for as little money as possible. Great Lakes' strategy is based on saving funds in your Special Purpose Savings Account, which is why sticking to your payment plan is so important. As the funds build in your account, Great Lakes will contact your creditors to attempt to negotiate settlements on your behalf. When Great Lakes reaches an agreement with one of your creditors to resolve a debt, the local attorney will review and approve the settlement before it is submitted for your approval. Great Lakes personnel will then present you with the details of the debt resolution offer in writing and either the attorney or the negotiator will contact you to confirm your authorization of the settlement and how you wish to proceed. If you approve, then you will provide your written or verbally recorded approval of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all your debts are negotiated and resolved with your creditors.

It is important to understand that Great Lakes cannot force a creditor to negotiate your debt. Although Great Lakes will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with Great Lakes in the past will refuse to negotiate a debt. In such instances, the Great Lakes attorneys or negotiators may require your assistance in participating in the negotiation process. Great Lakes personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If Great Lakes cannot successfully negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

[TURN TO SLIDE 8]

GREAT LAKES SUPPORTS YOU THROUGHOUT THE PROGRAM

The law firm is prepared to do what is necessary to represent you and, if appropriate, defend you against creditor or collector lawsuits. This may include work done on your behalf in or out of court. A local attorney in the state where the complaint was filed will represent you asserting any reasonable defenses to the suit, or any other viable means of resolving the suit. This may include negotiations with the creditors' attorney, preparation of responsive documents and/or appearances at court hearings on your behalf. Although the legal fees for your defense are covered by your retainer payments, you would have to pay a $350 fee for trial costs if the action were to go to trial.

[TURN TO SLIDE 9]

IF CIRCUMSTANCES CHANGE, CONTACT GREAT LAKES IMMEDIATELY TO DISCUSS ALL OF YOUR OPTIONS

If at any time your circumstances change, and you have more funds available to resolve your debt or you experience an increased hardship, such as loss your job, please contact the client services team. If you have experienced increased hardships, Great Lakes will discuss options with you, including the possibility of Great Lakes representing you in bankruptcy under a separate agreement and fee structure.

[TURN TO SLIDE 10]

WHAT YOU NEED TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors. As mentioned on slide 4, Great Lakes has measures in place to deter these calls (i.e. Google Voice and LOR's).

IN APPROPRIATE CASES, GREAT LAKES ATTORNEYS CAN SEEK DAMAGES FOR YOU AS A RESULT OF ABUSIVE COLLECTION PRACTICES

GREAT LAKES CANNOT STOP INTEREST, LATE FEES, OR PENALTIES, BUT WILL REDUCTION OF THESE EXPENSES IS TYPICALLY INCLUDED IN ANY SETTLEMENT NEGOTIATED ON YOUR BEHALF.

GREAT LAKES ALSO CANNOT PREVENT CREDITORS OR COLLECTORS FROM FILING A LAWSUIT AGAINST YOU ARISING FROM YOUR DEBTS. HOWEVER, IF YOU ARE SUED, GREAT LAKES ATTORNEYS WILL REPRESENT YOU IN COURT AND ASSERT ANY VALID DEFENSES ON YOUR BEHALF AS PROVIDED BY THE TERMS OF THE RETAINER AGREEMENT.

GREAT LAKES DOES NOT CONTACT CREDIT BUREAUS OR TAKE ANY OTHER STEPS TO CLEAN UP OR REPAIR YOUR CREDIT

IT TYPICALLY TAKES GREAT LAKES 7 TO 9 MONTHS TO REACH THE FIRST SETTLEMENT.

GREAT LAKES DOES NOT PROVIDE ANY TAX ADVICE AND ANY REDUCTIONS IN DEBT MAY BE TAXABLE BY THE IRS

YOUR CREDIT SCORE WILL LIKELY BE NEGATIVELY IMPACTED WHILE YOU ARE IN THE PROGRAM

[TURN TO SLIDE 11]

ONCE YOU BECOME GREAT LAKES' CLIENT

GREAT LAKES IS AVAILABLE FOR QUESTIONS AND SUPPORT THROUGHOUT THE PROGRAM

Great Lakes attorneys and the client services team are available to answer any questions and help you throughout the debt resolution process. It is important to understand that only a Great Lakes attorney can provide you with any legal advice or respond to any legal questions you may have. The client services team will assist you in arranging to speak with an attorney to address such issues.

PLEASE MAKE SURE YOU ARE AVAILABLE TO SPEAK WITH GREAT LAKES' ATTORNEYS AND SUPPORT TEAM REGARDING YOUR PROGRAM WHEN THEY CALL

Within a week of your enrollment with Great Lakes, a Great Lakes attorney, licensed to practice in Wisconsin, will reach out to confirm program details and review key aspects of your representation. The attorney will be able to answer any legal questions you may have during this presentation. Please remember that you must speak with your local attorney before you can be represented by the firm, so the attorney will continue to try and contact you until a conversation takes place.

The client support team will also reach out to you by phone to confirm your personal information and to answer any questions you have about the program. Your welcome package will be mailed to you within one week of Great Lakes receiving a copy of your executed agreement. A copy of your executed agreement will be e-mailed to you within twenty-four hours of enrollment.

Included in your welcome package will be some important documents such as creditor logs, information on the laws that protect you from collection agencies as well as what to do if you need help from Great Lakes' Litigation Department.

The client support team is always ready to assist you with any non-legal questions you have throughout your program. This is often the quickest way to get your questions answered, particularly when the question does not require legal advice. However, you are always welcome and encouraged to contact your local attorney directly, or ask the client services team to facilitate a conversation between you and the attorney.

[TURN TO SLIDE 12]

THE LETTER OF ENGAGEMENT

The Letter of Engagement and documents referenced in the Letter of Engagement ("LOE" in your slides) contain all of the terms of your relationship with Great Lakes, including all services Great Lakes provides to you, your agreed payments for those services, and all the responsibilities you and Great Lakes have to each other throughout your program.

The Letter of Engagement is an agreement between you and Great Lakes that forms and describes an Attorney-Client relationship, which secures Great Lakes' representation of you with respect to specific creditors regarding specific debts.

The Attorney-Client relationship is governed by the terms of the LOE, and is officially created only after ALL THREE of the following events have occurred;

1) You, the Client, and an authorized representative of Great Lakes have both signed the Letter of Engagement,

2) A Great Lakes attorney, licensed in Wisconsin, has reviewed and approved your file and has had a telephone conversation with you, or has met with you in person, AND

3) You have made your first payment to Great Lakes.

The Letter of Engagement lists and explains Great Lakes' services, which will be provided by professionals including attorneys, paralegals, negotiators, assistants, and other personnel. Services performed by non-attorney personnel will be directly authorized and supervised by Great Lakes attorneys.

[Please turn to slide 13]

THE LETTER OF ENGAGEMENT (CONTINUED)

The Letter of Engagement contains a section covering the fees and costs you agree to pay to Great Lakes for its services. The specific timing and amounts of your fees will be detailed in the Letter of Engagement, and are broken down into three distinct types of fees;

1) Retainer Fee – This is a flat $995.00 fee that compensates Great Lakes for many of the legal services it provides to you during the planning, formation and initial implementation of Great Lakes' strategy for resolution of your debts.

2) Monthly Administrative Fees – These fees compensate Great Lakes for legal services performed through the program to continually review, analyze, structure, and supervise the representation.

3) Service Cost - The Service Cost pays for non-legal work involved in the implementation, management, and maintenance of your representation. The Service Cost is a percentage of the total amount of debt you enroll in the program, and is paid in equal monthly installments specified in the Letter of Engagement.

The Arbitration of Disputes and Waiver of Class Action Rights section of the LOE governs how any potential disputes that could arise between you and Great Lakes would be resolved.

[Please turn to slide 14]

ADDITIONAL DOCUMENTS AFFECTING THE LETTER OF ENGAGEMENT

Notice of Right to Cancel – This is a form that you may fill out, sign, and send to Great Lakes to revoke this agreement within 5 days of its execution.

Authorization to Settle – This form explains circumstances under which Great Lakes may settle your enrolled debt(s) without your specific authorization to the terms of each particular settlement.

Power of Attorney – This form authorizes Great Lakes to represent you to your creditors, and is required by most creditors before any discussion of your personal information could take place. This form must be signed by all co-clients, and should be notarized either at this meeting or as soon as possible after.

Bankruptcy vs Debt Negotiation and Election of Services – It is important that you understand the benefits and risks involved with the debt negotiation process. Along with the disclosures and disclaimers in the LOE, this form provides vital knowledge for anyone entering into a debt restructure plan, and must be signed before representation can take place.

Credit Union Disclaimer – Great Lakes sometimes faces added challenges in the negotiation of Credit Union debts, and this form explains the how enrolling such debts may alter the performance standards Great Lakes otherwise provides to you in the LOE.

[Please turn to slide 15]

DOCUMENTS TO BE SIGNED TODAY

The documents requiring your signature today, which we just discussed, are:

Letter of Engagement – This is your contract with Great Lakes, which outlines the terms and conditions of the representation.

Payment Schedule – Outlines all payments of fees and savings funds.

Power of Attorney – Permits Great Lakes to act on your behalf to negotiate with your creditors.

Compliance Affidavit – Acknowledges Great Lakes' legal staff's compliance with all Federal and State regulations.

In-Person Client Presentation – Your acknowledgement that you have received this presentation in person.

Banking Platform Document – Provides your consent to establish and authorize electronic payments to a Special Purpose Savings Account through Global Client Solutions (GCS).

[Please turn to Slide 16]

SPECIAL PURPOSE SAVINGS ACCOUNT AND FINANCIAL INFORMATION

You will pay Great Lakes' fees and fund settlements through a Special Purpose Savings Account, provided and maintained by GCS. GCS will draw funds directly from your checking account, into the Special Purpose Savings Account, as agreed in the Electronic Payment Authorization form.

The funds in this account will remain under your control, and you will be able to access the account directly with the use of a Passcode / Password. You can withdraw any funds that have not been earned by Great

Lakes or are not subject to an executed settlement with your creditors at any time and you will receive the funds within seven (7) business days of your request.

This is a non-interest bearing account, and is only used to pay fees to Great Lakes and fund settlements that Great Lakes negotiates and pays on your behalf.

[Please turn to Slide 17]

Funds in your GCS account are FDIC insured. The amount of FDIC coverage may increase or decrease subject to changes in FDIC policy from time to time.

Fees associated with this account, as well as all other terms and conditions affecting your interactions with GCS are covered in your Account Servicing Agreement. Monthly fees include $10.95 / month for maintenance of the account, as well as other fees from time to time as listed in the Agreement. Please review the Account Servicing Agreement now, and initial once you have finished reviewing and understand its terms.

**Now that you have read and understand your Account Servicing Agreement, if you would like to proceed, I can take your financial information to assist you in completing the application.**

**CAROLINA LEGAL SERVICES**

**Services by: Meg Sohmer Wood, PLLC**

****Script Paraprofessional Must Read To Client****

**THE DEBT RESOLUTION PROCESS**

[BEGIN ON SLIDE 2]

MY NAME IS _______________ AND I AM A REPRESENTATIVE OF CAROLINA LEGAL SERVICES (CLS). MY JOB TODAY IS TO TELL YOU MORE ABOUT CLS'S DEBT RESOLUTION PROGRAM, AND ASSIST YOU IF YOU WANT TO ENROLL IN THE PROGRAM AT THE END OF THIS PRESENTATION. BEFORE WE BEGIN, PLEASE UNDERSTAND THAT I AM NOT AN ATTORNEY, AND AS SUCH, I AM NOT QUALIFIED TO PROVIDE LEGAL ADVICE TO YOU, OR TO ANSWER ANY LEGAL QUESTIONS OUTSIDE THE SCOPE OF THE PRESENTATION I AM ABOUT TO DELIVER.

IF YOU CHOOSE TO SIGN AND SUBMIT ENROLLMENT DOCUMENTS TODAY, A CLS ATTORNEY, LICENSED TO PRACTICE IN NORTH CAROLINA, WILL REVIEW YOUR FILE AND CONTACT YOU BY TELEPHONE WITHIN THE NEXT FEW DAYS. IT IS IMPERATIVE THAT YOU MAKE YOURSELF AVAILABLE TO SPEAK WITH THE ATTORNEY, EVEN IF YOU DO NOT HAVE ANY LINGERING QUESTIONS OR CONCERNS AFTER THIS PRESENTATION, AS THE ATTORNEY MAY HAVE IMPORTANT INFORMATION AND ADVICE FOR YOU. CLS POLICIES REQUIRE THAT THIS CONVERSATION TAKE PLACE BEFORE YOU CAN AGREE TO THE FIRM'S REPRESENTATION OR MAKE ANY PAYMENTS, SO IT IS VERY IMPORTANT, AND CLS THANKS YOU IN ADVANCE FOR YOUR COOPERATION.

[TURN TO SLIDE 3]

DEBT RESOLUTION IS A PROGRAM DESIGNED TO PAY OFF YOUR DEBTS THROUGH A NEGOTIATION STRATEGY. CLS NEGOTIATES WITH YOUR CREDITORS ON YOUR BEHALF TO PAY BACK, IN A LUMP SUM OR TERM PAYMENTS, LESS THAN THE AMOUNT OWED ON YOUR ACCOUNTS. YOUR INVOLVEMENT IN THESE NEGOTIATIONS AND CONVERSATIONS MAY BE NECESSARY AND IMPORTANT.

As your attorneys, it's CLS's job to notify your creditors that you seek to negotiate a reduction of your debt, instead of filing for bankruptcy. To do this, you must reduce the payments you are making to your creditors or stop paying them completely. This will allow you to save sufficient funds, which CLS will use to negotiate your debts.

[TURN TO SLIDE 4]

THE DEBT RESOLUTION PROCESS, WHAT CLS DOES AND WHAT IT NEEDS FROM YOU

Generally, a debt must be delinquent for at least 60 to 180 days before creditors will engage in good faith negotiations to resolve your debts. It is our understanding that as a result of your financial hardship, your ability to make necessary payments has been impacted and therefore you have entered this program as the means to settling your debts. Make sure you forward any communications from your creditors to CLS.

[TURN TO SLIDE 5]

CLS NOTIFIES YOUR CREDITORS

While CLS is representing you, based on its prior experience with your creditors, its personnel will notify some or all your creditors that you are represented by an attorney and they should stop any communication with you regarding your debts. If CLS has made the determination that sending LORs (Letters of Representation) to certain creditors will make them more aggressive, strategically, CLS does not send LORs to them.

[TURN TO SLIDE 6]

SPECIAL PURPOSE SAVINGS ACCOUNT

After signing your enrollment paperwork to retain CLS, you will be savings money in a Special Purpose Savings Account. As you save sufficient funds, CLS representatives will begin working to resolve your debts through its negotiation process. The Special Purpose Savings Account is an FDIC insured account separate from your checking account. Funds are drawn monthly from your checking account, in accordance with an agreed payment plan. It is a transparent online banking system and is strictly under your control.

The funds in your Special Purpose Savings Account belong to you, and you may withdraw any funds that have not previously been earned by CLS at any time.

[TURN TO SLIDE 7]

YOUR DEBT RESOLUTION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS

You hired CLS to get your debts resolved as quickly and for as little money as possible. CLS's strategy is based on saving funds in your Special Purpose Savings Account, which is why sticking to your payment plan is so important. As the funds build in your account, CLS will contact your creditors to attempt to negotiate settlements on your behalf. When CLS reaches an agreement with one of your creditors to resolve a debt, the local attorney will review and approve the settlement before it is submitted for your approval. CLS personnel will then present you with the details of the debt resolution offer in writing and either the attorney or the negotiator will contact you to confirm your authorization of the settlement and how you wish to proceed. If you approve, then you will provide your written or verbally recorded approval of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all your debts are negotiated and resolved with your creditors.

It is important to understand that CLS cannot force a creditor to negotiate your debt. Although CLS will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with CLS in the past will refuse to negotiate a debt. In such instances, the CLS attorneys or negotiators may require your assistance in participating in the negotiation process. CLS personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If CLS cannot successfully negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

[TURN TO SLIDE 8]

CLS SUPPORTS YOU THROUGHOUT THE PROGRAM

The law firm is prepared to do what is necessary to represent you and, if appropriate, defend you against creditor or collector lawsuits. This may include work done on your behalf in or out of court. A local attorney in the state where the complaint was filed will represent you asserting any reasonable defenses to the suit, or any other viable means of resolving the suit. This may include negotiations with the creditors' attorney, preparation of responsive documents and/or appearances at court hearings on your behalf. Although the legal fees for your defense are covered by your retainer payments, you would have to pay a $350 fee for trial costs if the action were to go to trial.

[TURN TO SLIDE 9]

IF CIRCUMSTANCES CHANGE, CONTACT CLS IMMEDIATELY TO DISCUSS ALL OF YOUR OPTIONS

If at any time your circumstances change, and you have more funds available to resolve your debt or you experience an increased hardship, such as loss your job, please contact the client services team. If you have experienced increased hardships, CLS will discuss options with you, including the possibility of CLS representing you in bankruptcy under a separate agreement and fee structure.

[TURN TO SLIDE 10]

WHAT YOU NEED TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors. As mentioned on slide 4, CLS has measures in place to deter these calls (i.e. Google Voice and LOR's).

IN APPROPRIATE CASES, CLS ATTORNEYS CAN SEEK DAMAGES FOR YOU AS A RESULT OF ABUSIVE COLLECTION PRACTICES

CLS CANNOT STOP INTEREST, LATE FEES, OR PENALTIES, BUT WILL REDUCTION OF THESE EXPENSES IS TYPICALLY INCLUDED IN ANY SETTLEMENT NEGOTIATED ON YOUR BEHALF.

CLS ALSO CANNOT PREVENT CREDITORS OR COLLECTORS FROM FILING A LAWSUIT AGAINST YOU ARISING FROM YOUR DEBTS. HOWEVER, IF YOU ARE SUED, CLS ATTORNEYS WILL REPRESENT YOU IN COURT AND ASSERT ANY VALID DEFENSES ON YOUR BEHALF AS PROVIDED BY THE TERMS OF THE RETAINER AGREEMENT.

CLS DOES NOT CONTACT CREDIT BUREAUS OR TAKE ANY OTHER STEPS TO CLEAN UP OR REPAIR YOUR CREDIT

IT TYPICALLY TAKES CLS 7 TO 9 MONTHS TO REACH THE FIRST SETTLEMENT.

CLS DOES NOT PROVIDE ANY TAX ADVICE AND ANY REDUCTIONS IN DEBT MAY BE TAXABLE BY THE IRS

YOUR CREDIT SCORE WILL LIKELY BE NEGATIVELY IMPACTED WHILE YOU ARE IN THE PROGRAM

[TURN TO SLIDE 11]

ONCE YOU BECOME CLS'S CLIENT

CLS IS AVAILABLE FOR QUESTIONS AND SUPPORT THROUGHOUT THE PROGRAM

CLS attorneys and the client services team are available to answer any questions and help you throughout the debt resolution process. It is important to understand that only a CLS attorney can provide you with any legal advice or respond to any legal questions you may have. The client services team will assist you in arranging to speak with an attorney to address such issues.

PLEASE MAKE SURE YOU ARE AVAILABLE TO SPEAK WITH CLS'S ATTORNEYS AND SUPPORT TEAM REGARDING YOUR PROGRAM WHEN THEY CALL

Within a week of your enrollment with CLS, a CLS attorney, licensed to practice in North Carolina, will reach out to confirm program details and review key aspects of your representation. The attorney will be able to answer any legal questions you may have during this presentation. Please remember that you must speak with your local attorney before you can be represented by the firm, so the attorney will continue to try and contact you until a conversation takes place.

The client support team will also reach out to you by phone to confirm your personal information and to answer any questions you have about the program. Your welcome package will be mailed to you within one week of CLS receiving a copy of your executed agreement. A copy of your executed agreement will be e-mailed to you within twenty-four hours of enrollment.

Included in your welcome package will be some important documents such as creditor logs, information on the laws that protect you from collection agencies as well as what to do if you need help from CLS's Litigation Department.

The client support team is always ready to assist you with any non-legal questions you have throughout your program. This is often the quickest way to get your questions answered, particularly when the question does not require legal advice. However, you are always welcome and encouraged to contact your local attorney directly, or ask the client services team to facilitate a conversation between you and the attorney.

[TURN TO SLIDE 12]

THE LETTER OF ENGAGEMENT

The Letter of Engagement and documents referenced in the Letter of Engagement ("LOE" in your slides) contain all of the terms of your relationship with CLS, including all services CLS provides to you, your agreed payments for those services, and all the responsibilities you and CLS have to each other throughout your program.

The Letter of Engagement is an agreement between you and CLS that forms and describes an Attorney-Client relationship, which secures CLS's representation of you with respect to specific creditors regarding specific debts.

The Attorney-Client relationship is governed by the terms of the LOE, and is officially created only after ALL THREE of the following events have occurred;

1) You, the Client, and an authorized representative of CLS have both signed the Letter of Engagement,

2) A CLS attorney, licensed in North Carolina, has reviewed and approved your file and has had a telephone conversation with you, or has met with you in person, AND

3) You have made your first payment to CLS.

The Letter of Engagement lists and explains CLS's services, which will be provided by professionals including attorneys, Paraprofessionals, negotiators, assistants, and other personnel. Services performed by non-attorney personnel will be directly authorized and supervised by CLS attorneys.

[Please turn to slide 13]

THE LETTER OF ENGAGEMENT (CONTINUED)

The Letter of Engagement contains a section covering the fees and costs you agree to pay to CLS for its services. The specific timing and amounts of your fees will be detailed in the Letter of Engagement, and are broken down into three distinct types of fees;

1) Retainer Fee – This is a flat $995.00 fee that compensates CLS for many of the legal services it provides to you during the planning, formation and initial implementation of CLS's strategy for resolution of your debts.

2) Monthly Administrative Fees – These fees compensate CLS for legal services performed through the program to continually review, analyze, structure, and supervise the representation.

3) Service Cost - The Service Cost pays for non-legal work involved in the implementation, management, and maintenance of your representation. The Service Cost is a percentage of the total amount of debt you enroll in the program, and is paid in equal monthly installments specified in the Letter of Engagement.

The Arbitration of Disputes and Waiver of Class Action Rights section of the LOE governs how any potential disputes that could arise between you and CLS would be resolved.

[Please turn to slide 14]

ADDITIONAL DOCUMENTS AFFECTING THE LETTER OF ENGAGEMENT

Notice of Right to Cancel – This is a form that you may fill out, sign, and send to CLS to revoke this agreement within 5 days of its execution.

Authorization to Settle – This form explains circumstances under which CLS may settle your enrolled debt(s) without your specific authorization to the terms of each particular settlement.

Power of Attorney – This form authorizes CLS to represent you to your creditors, and is required by most creditors before any discussion of your personal information could take place. This form must be signed by all co-clients, and should be notarized either at this meeting or as soon as possible after.

Bankruptcy vs Debt Negotiation and Election of Services – It is important that you understand the benefits and risks involved with the debt negotiation process. Along with the disclosures and disclaimers in the LOE, this form provides vital knowledge for anyone entering into a debt restructure plan, and must be signed before representation can take place.

Credit Union Disclaimer – CLS sometimes faces added challenges in the negotiation of Credit Union debts, and this form explains the how enrolling such debts may alter the performance standards CLS otherwise provides to you in the LOE.

[Please turn to slide 15]

DOCUMENTS TO BE SIGNED TODAY

The documents requiring your signature today, which we just discussed, are:

Letter of Engagement – This is your contract with CLS, which outlines the terms and conditions of the representation.

Payment Schedule – Outlines all payments of fees and savings funds.

Power of Attorney – Permits CLS to act on your behalf to negotiate with your creditors.

Compliance Affidavit – Acknowledges CLS's legal staff's compliance with all Federal and State regulations.

In-Person Client Presentation – Your acknowledgement that you have received this presentation in person.

Banking Platform Document – Provides your consent to establish and authorize electronic payments to a Special Purpose Savings Account through Global Client Solutions (GCS).

[Please turn to Slide 16]

SPECIAL PURPOSE SAVINGS ACCOUNT AND FINANCIAL INFORMATION

You will pay CLS's fees and fund settlements through a Special Purpose Savings Account, provided and maintained by (GCS). GCS will draw funds directly from your checking account, into the Special Purpose Savings Account, as agreed in the Electronic Payment Authorization form.

The funds in this account will remain under your control, and you will be able to access the account directly with the use of a Passcode / Password. You can withdraw any funds that have not been earned by CLS or

are not subject to an executed settlement with your creditors at any time and you will receive the funds within seven (7) business days of your request.

This is a non-interest bearing account, and is only used to pay fees to CLS and fund settlements that CLS negotiates and pays on your behalf.

[Please turn to Slide 17]

Funds in your GCS account are FDIC insured. The amount of FDIC coverage may increase or decrease subject to changes in FDIC policy from time to time.

Fees associated with this account, as well as all other terms and conditions affecting your interactions with GCS are covered in your Account Servicing Agreement. Monthly fees include $10.95 / month for maintenance of the account, as well as other fees from time to time as listed in the Agreement. Please review the Account Servicing Agreement now, and initial once you have finished reviewing and understand its terms.

**Now that you have read and understand your Account Servicing Agreement, if you would like to proceed, I can take your financial information to assist you in completing the application.**

**SUMMIT LAW FIRM, LLC**

****Script Paralegal Must Read To Client****

**THE DEBT RESOLUTION PROCESS**

[BEGIN ON SLIDE 2]

MY NAME IS _______________ AND I AM A REPRESENTATIVE OF SUMMIT LAW FIRM, LLC (SUMMIT). MY JOB TODAY IS TO TELL YOU MORE ABOUT SUMMIT'S DEBT RESOLUTION PROGRAM, AND ASSIST YOU IF YOU WANT TO ENROLL IN THE PROGRAM AT THE END OF THIS PRESENTATION. BEFORE WE BEGIN, PLEASE UNDERSTAND THAT I AM NOT AN ATTORNEY, AND AS SUCH, I AM NOT QUALIFIED TO PROVIDE LEGAL ADVICE TO YOU, OR TO ANSWER ANY LEGAL QUESTIONS OUTSIDE THE SCOPE OF THE PRESENTATION I AM ABOUT TO DELIVER.

IF YOU CHOOSE TO SIGN AND SUBMIT ENROLLMENT DOCUMENTS TODAY, A SUMMIT ATTORNEY, LICENSED TO PRACTICE IN YOUR STATE, WILL REVIEW YOUR FILE AND CONTACT YOU BY TELEPHONE WITHIN THE NEXT FEW DAYS. IT IS IMPERATIVE THAT YOU MAKE YOURSELF AVAILABLE TO SPEAK WITH THE ATTORNEY, EVEN IF YOU DO NOT HAVE ANY LINGERING QUESTIONS OR CONCERNS AFTER THIS PRESENTATION, AS THE ATTORNEY MAY HAVE IMPORTANT INFORMATION AND ADVICE FOR YOU. SUMMIT POLICIES REQUIRE THAT THIS CONVERSATION TAKE PLACE BEFORE YOU CAN AGREE TO THE FIRM'S REPRESENTATION OR MAKE ANY PAYMENTS, SO IT IS VERY IMPORTANT, AND SUMMIT THANKS YOU IN ADVANCE FOR YOUR COOPERATION.

[TURN TO SLIDE 3]

DEBT RESOLUTION IS A PROGRAM DESIGNED TO PAY OFF YOUR DEBTS THROUGH A NEGOTIATION STRATEGY. SUMMIT NEGOTIATES WITH YOUR CREDITORS ON YOUR BEHALF TO PAY BACK, IN A LUMP SUM OR TERM PAYMENTS, LESS THAN THE AMOUNT OWED ON YOUR ACCOUNTS. YOUR INVOLVEMENT IN THESE NEGOTIATIONS AND CONVERSATIONS MAY BE NECESSARY AND IMPORTANT.

As your attorneys, it's Summit's job to notify your creditors that you seek to negotiate a reduction of your debt, instead of filing for bankruptcy.

[TURN TO SLIDE 4]

THE DEBT RESOLUTION PROCESS, WHAT SUMMIT DOES AND WHAT IT NEEDS FROM YOU

Generally, a debt must be delinquent for at least 60 to 180 days before creditors will engage in good faith negotiations to resolve your debts. It is our understanding that as a result of your financial hardship, your ability to make necessary payments has been impacted and therefore you have entered this program as the means to settling your debts. Make sure you forward any communications from your creditors to Summit.

[TURN TO SLIDE 5]

SUMMIT NOTIFIES YOUR CREDITORS

While Summit is representing you, based on its prior experience with your creditors, its personnel will notify some or all your creditors that you are represented by an attorney and they should stop any communication with you regarding your debts. If Summit has made the determination that sending LORs (Letters of Representation) to certain creditors will make them more aggressive, strategically, Summit does not send LORs to them.

[TURN TO SLIDE 6]

SPECIAL PURPOSE SAVINGS ACCOUNT

After signing your enrollment paperwork to retain Summit, you will be savings money in a Special Purpose Savings Account. As you save sufficient funds, Summit representatives will begin working to resolve your debts through its negotiation process. The Special Purpose Savings Account is an FDIC insured account separate from your checking account. Funds are drawn monthly from your checking account, in accordance with an agreed payment plan. It is a transparent online banking system and is strictly under your control.

The funds in your Special Purpose Savings Account belong to you, and you may withdraw any funds that have not previously been earned by Summit at any time.

[TURN TO SLIDE 7]

YOUR DEBT RESOLUTION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS

You hired Summit to get your debts resolved as quickly and for as little money as possible. Summit's strategy is based on saving funds in your Special Purpose Savings Account, which is why sticking to your payment plan is so important. As the funds build in your account, Summit will contact your creditors to attempt to negotiate settlements on your behalf. When Summit reaches an agreement with one of your creditors to resolve a debt, the local attorney will review and approve the settlement before it is submitted for your approval. Summit personnel will then present you with the details of the debt resolution offer in writing and either the attorney or the negotiator will contact you to confirm your authorization of the settlement and how you wish to proceed. If you approve, then you will provide your written or verbally recorded approval of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all your debts are negotiated and resolved with your creditors.

It is important to understand that Summit cannot force a creditor to negotiate your debt. Although Summit will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with Summit in the past will refuse to negotiate a debt. In such instances, the Summit attorneys or negotiators may require your assistance in participating in the negotiation process. Summit personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If Summit cannot successfully

negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

[TURN TO SLIDE 8]

SUMMIT SUPPORTS YOU THROUGHOUT THE PROGRAM

The law firm is prepared to do what is necessary to represent you and, if appropriate, defend you against creditor or collector lawsuits. This may include work done on your behalf in or out of court. A local attorney in the state where the complaint was filed will represent you asserting any reasonable defenses to the suit, or any other viable means of resolving the suit. This may include negotiations with the creditors' attorney, preparation of responsive documents and/or appearances at court hearings on your behalf. Although the legal fees for your defense are covered by your retainer payments, you would have to pay a $350 fee for trial costs if the action were to go to trial.

[TURN TO SLIDE 9]

IF CIRCUMSTANCES CHANGE, CONTACT SUMMIT IMMEDIATELY TO DISCUSS ALL OF YOUR OPTIONS

If at any time your circumstances change and you have more funds available to resolve your debt or you experience an increased hardship, such as loss your job, please contact the client services team. If you have experienced increased hardships, Summit will discuss options with you, including the possibility of Summit representing you in bankruptcy under a separate agreement and fee structure.

[TURN TO SLIDE 10]

WHAT YOU NEED TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors. As mentioned on slide 4, Summit has measures in place to deter these calls (i.e. Google Voice and LOR's).

IN APPROPRIATE CASES, SUMMIT ATTORNEYS CAN SEEK DAMAGES FOR YOU AS A RESULT OF ABUSIVE COLLECTION PRACTICES

SUMMIT CANNOT STOP INTEREST, LATE FEES, OR PENALTIES, BUT WILL REDUCTION OF THESE EXPENSES IS TYPICALLY INCLUDED IN ANY SETTLEMENT NEGOTIATED ON YOUR BEHALF.

SUMMIT ALSO CANNOT PREVENT CREDITORS OR COLLECTORS FROM FILING A LAWSUIT AGAINST YOU ARISING FROM YOUR DEBTS. HOWEVER, IF YOU ARE SUED, SUMMIT ATTORNEYS WILL REPRESENT YOU IN COURT AND ASSERT ANY VALID DEFENSES ON YOUR BEHALF AS PROVIDED BY THE TERMS OF THE RETAINER AGREEMENT.

SUMMIT DOES NOT CONTACT CREDIT BUREAUS OR TAKE ANY OTHER STEPS TO CLEAN UP OR REPAIR YOUR CREDIT

IT TYPICALLY TAKES SUMMIT 7 TO 9 MONTHS TO REACH THE FIRST SETTLEMENT.

SUMMIT DOES NOT PROVIDE ANY TAX ADVICE AND ANY REDUCTIONS IN DEBT MAY BE TAXABLE BY THE IRS

YOUR CREDIT SCORE WILL LIKELY BE NEGATIVELY IMPACTED WHILE YOU ARE IN THE PROGRAM

[TURN TO SLIDE 11]

ONCE YOU BECOME SUMMIT'S CLIENT

SUMMIT IS AVAILABLE FOR QUESTIONS AND SUPPORT THROUGHOUT THE PROGRAM

Summit attorneys and the client services team are available to answer any questions and help you throughout the debt resolution process. It is important to understand that only a Summit attorney can provide you with any legal advice or respond to any legal questions you may have. The client services team will assist you in arranging to speak with an attorney to address such issues.

PLEASE MAKE SURE YOU ARE AVAILABLE TO SPEAK WITH SUMMIT'S ATTORNEYS AND SUPPORT TEAM REGARDING YOUR PROGRAM WHEN THEY CALL

Within a week of your enrollment with Summit, a Summit attorney, licensed to practice in your state, will reach out to confirm program details and review key aspects of your representation. The attorney will be able to answer any legal questions you may have during this presentation. Please remember that you must speak with your local attorney before you can be represented by the firm, so the attorney will continue to try and contact you until a conversation takes place.

The client support team will also reach out to you by phone to confirm your personal information and to answer any questions you have about the program. Your welcome package will be mailed to you within one week of Summit receiving a copy of your executed agreement. A copy of your executed agreement will be e-mailed to you within twenty-four hours of enrollment.

Included in your welcome package will be some important documents such as creditor logs, information on the laws that protect you from collection agencies as well as what to do if you need help from Summit's Litigation Department.

The client support team is always ready to assist you with any non-legal questions you have throughout your program. This is often the quickest way to get your questions answered, particularly when the question does not require legal advice. However, you are always welcome and encouraged to contact your local attorney directly, or ask the client services team to facilitate a conversation between you and the attorney.

[TURN TO SLIDE 12]

THE LETTER OF ENGAGEMENT

The Letter of Engagement and documents referenced in the Letter of Engagement ("LOE" in your slides) contain all of the terms of your relationship with Summit, including all services Summit provides to you, your agreed payments for those services, and all the responsibilities you and Summit have to each other throughout your program.

The Letter of Engagement is an agreement between you and Summit that forms and describes an Attorney-Client relationship, which secures Summit's representation of you with respect to specific creditors regarding specific debts.

The Attorney-Client relationship is governed by the terms of the LOE, and is officially created only after ALL THREE of the following events have occurred;

1) You, the Client, and an authorized representative of Summit have both signed the Letter of Engagement,

2) A Summit attorney, licensed in your state, has reviewed and approved your file and has had a telephone conversation with you, or has met with you in person, AND

3) You have made your first payment to Summit.

The Letter of Engagement lists and explains Summit's services, which will be provided by professionals including attorneys, paralegals, negotiators, assistants, and other personnel. Services performed by non-attorney personnel will be directly authorized and supervised by Summit attorneys.

[Please turn to slide 13]

THE LETTER OF ENGAGEMENT (CONTINUED)

The Letter of Engagement contains a section covering the fees and costs you agree to pay to Summit for its services. The specific timing and amounts of your fees will be detailed in the Letter of Engagement, and are broken down into three distinct types of fees;

1) Retainer Fee – This is a flat $995.00 fee that compensates Summit for many of the legal services it provides to you during the planning, formation and initial implementation of Summit's strategy for resolution of your debts.

2) Monthly Administrative Fees – These fees compensate Summit for legal services performed through the program to continually review, analyze, structure, and supervise the representation.

3) Service Cost - The Service Cost pays for non-legal work involved in the implementation, management, and maintenance of your representation. The Service Cost is a percentage of the total amount of debt you enroll in the program, and is paid in equal monthly installments specified in the Letter of Engagement.

The Arbitration of Disputes and Waiver of Class Action Rights section of the LOE governs how any potential disputes that could arise between you and Summit would be resolved.

[Please turn to slide 14]

ADDITIONAL DOCUMENTS AFFECTING THE LETTER OF ENGAGEMENT

Notice of Right to Cancel – This is a form that you may fill out, sign, and send to Summit to revoke this agreement within 5 days of its execution.

Authorization to Settle – This form explains circumstances under which Summit may settle your enrolled debt(s) without your specific authorization to the terms of each particular settlement.

Power of Attorney – This form authorizes Summit to represent you to your creditors, and is required by most creditors before any discussion of your personal information could take place. This form must be signed by all co-clients, and should be notarized either at this meeting or as soon as possible after.

Bankruptcy vs Debt Negotiation and Election of Services – It is important that you understand the benefits and risks involved with the debt negotiation process. Along with the disclosures and disclaimers in the LOE, this form provides vital knowledge for anyone entering into a debt restructure plan, and must be signed before representation can take place.

Credit Union Disclaimer – Summit sometimes faces added challenges in the negotiation of Credit Union debts, and this form explains the how enrolling such debts may alter the performance standards Summit otherwise provides to you in the LOE.

[Please turn to slide 15]

DOCUMENTS TO BE SIGNED TODAY

The documents requiring your signature today, which we just discussed, are:

Letter of Engagement – This is your contract with Summit, which outlines the terms and conditions of the representation.

Payment Schedule – Outlines all payments of fees and savings funds.

Power of Attorney – Permits Summit to act on your behalf to negotiate with your creditors.

Compliance Affidavit – Acknowledges Summit's legal staff's compliance with all Federal and State regulations.

In-Person Client Presentation – Your acknowledgement that you have received this presentation in person.

Banking Platform Document – Provides your consent to establish and authorize electronic payments to a Special Purpose Savings Account through Global Client Solutions (GCS).

[Please turn to Slide 16]

SPECIAL PURPOSE SAVINGS ACCOUNT AND FINANCIAL INFORMATION

You will pay Summit's fees and fund settlements through a Special Purpose Savings Account, provided and maintained by (GCS). GCS will draw funds directly from your checking account, into the Special Purpose Savings Account, as agreed in the Electronic Payment Authorization form.

The funds in this account will remain under your control, and you will be able to access the account directly with the use of a Passcode / Password. You can withdraw any funds that have not been earned by Summit or are not subject to an executed settlement with your creditors at any time and you will receive the funds within seven (7) business days of your request.

This is a non-interest bearing account, and is only used to pay fees to Summit and fund settlements that Summit negotiates and pays on your behalf.

[Please turn to Slide 17]

Funds in your GCS account are FDIC insured. The amount of FDIC coverage may increase or decrease subject to changes in FDIC policy from time to time.

Fees associated with this account, as well as all other terms and conditions affecting your interactions with GCS are covered in your Account Servicing Agreement. Monthly fees include $10.95 / month for maintenance of the account, as well as other fees from time to time as listed in the Agreement. Please review the Account Servicing Agreement now, and initial once you have finished reviewing and understand its terms.

**Now that you have read and understand your Account Servicing Agreement, if you would like to proceed, I can take your financial information to assist you in completing the application.**

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>WAKE COUNTY | BEFORE THE DISCIPLINARY<br>HEARING COMMISSION OF THE<br>NORTH CAROLINA STATE BAR<br>20 DHC 17 |

| | |
|---|---|
| THE NORTH CAROLINA STATE BAR,<br><br>Plaintiff<br><br>v.<br><br>DANIEL S. RUFTY, Attorney,<br><br>Defendant | DISCOVERY RESPONSES |

Pursuant to § .0114 of the State Bar Discipline & Disability Rules, and Rules 33 and 34 of the North Carolina Rules of Civil Procedure, Defendant Daniel S. Rufty responds to Plaintiff's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions.

**GENERAL OBJECTIONS**

1. Plaintiff objects to the discovery requests to the extent they are intended or could be interpreted to call for: (a) information protected by the attorney-client privilege as it applies to Mr. Rufty and his counsel; (b) information protected by the work product privilege; (c) information that is trial preparation material; and/or (d) information that is protected by any other applicable privilege or protection. Notwithstanding statements below that Mr. Rufty does not intend to withhold documents for particular document requests, Mr. Rufty will withhold any privileged material that would otherwise be responsive to a request.

2. Mr. Rufty objects to these discovery requests to the extent they seek information that is irrelevant to the specific allegations underlying the claims in this matter or to the extent they seek information that is outside the scope of discovery under North Carolina Rule of Civil

- Entities that supply trained paraprofessionals for face-to-face sales presentations:
  - Sunshine Signing Connection (6440 Ridge Rd, Port Richey, FL 34668),
  - National Paralegal and Notary (https://nationalparalegalnotary.com/; Info@NationalParalegalNotary.com), and
  - NotaryGo (1611 Pomona Rd, STE 102, Corona, CA 92880);
- Carolina Client Services, LLC, which provides administrative and customer service support for CLS, (711 3rd Ave., 6th Floor, New York, NY 10017);
- Lit Def Strategies, LLC, which provides administrative support for litigated matters on behalf of CLS clients (211 W. Wacker Dr., Ste. 300, Chicago, IL 60606);
- K2 Financial Management, LLC, which provides accounting and bookkeeping support to CLS (7250 Dallas Parkway, STE 400, Plano, TX 75024);
- Global Client Solutions, which enters into agreements with CLS clients with respect to their dedicated accounts (4343 S 118th East Ave., Suite 220, Tulsa, Oklahoma 74146);
- Klipspringer Media, LLC, which created the CLS website (1250 N. Dearborn, Suite 15A, Chicago, Illinois 60610);
- Kelly Sibert of Sibert Legal Consulting LLC, who consults with CLS regarding business management and administration (446 Des Plaines Ave., Apt 2N, Forest Park, IL 60130-1774); and
- Attorneys in Motion, which provides special appearance attorneys (https://www.attorneysinmotion.com/; info@attorneysinmotion.com); and

- Strategic Client Support, LLC, which serves as co-employer of negotiators (711 3rd Ave., 6th Floor, New York, NY 10017). CLS employs persons to negotiate with its clients' creditors. Those negotiators are also employed and/or by Strategic Client Support, LLC.

While CLS does not have a contractual relationship with Jason Blust, Mr. Blust also provides business management and administration support as a consultant for CLS. Mr. Blust's last known address is 211 W. Wacker Dr., Ste. 300, Chicago, IL 60606.

3. Identify by name each person you will or may call at trial as a fact, lay, expert, opinion, or rebuttal witness, and provide a brief summary of each witness' expected testimony in the above-captioned matter.

**ANSWER:** Mr. Rufty incorporates by reference each of the general objections listed above. Mr. Rufty also objects to Request No. 3 as premature. Mr. Rufty will identify testifying experts at the time required by Rule 26 of the North Carolina Rules of Civil Procedure. Further, Mr. Rufty does not yet have a list of fact witnesses but anticipates that he will be calling them and will supplement this response at the appropriate time.

4. Identify each witness from whom you intend to elicit opinion testimony in this case, including but not limited to, any lay or fact witness you intend to attempt to qualify as an expert, and the substance and basis of the witness' opinions.

**ANSWER:** Mr. Rufty incorporates by reference each of the general objections listed above. Mr. Rufty also objects to Request No. 4 as premature. Mr. Rufty will identify

August 31, 2020

Responses By:

Daniel S. Rufty

Objections By:

*/s/ Amy Richardson*
Amy E. Richardson
NC State Bar Number: 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 WADE AVE, SUITE 100
RALEIGH, NC 27605-1155
Telephone: (919) 504-9833
Facsimile: (202) 730-1301
arichardson@hwglaw.com

*Counsel for Defendant Rufty*

Hello, good morning / afternoon / evening, is this ______Beatriz [redacted]______?

Hi ______Beatriz [redacted]______, my name is ______Daniel Rufty______, how are you today?

The reason for my call today is I am the lawyer assigned to supervise your debt resolution program with Carolina Legal Services. I wanted to touch base to review your file with you, make sure you understand what our representation entails and welcome you to the program.

Before I continue I want to let you know this call maybe recorded for quality & assurance purposes and anything we discuss on this call will remain confidential. You, the client, also know that you are free to come see me in person at my office with an appointment anytime, but are choosing for convenience purposes to establish our attorney-client relationship through this (phone call/live video call) instead.

Also, you do understand that all legal advice we provide is based on the information you have given to us. Any incorrect information, such as payment history or debt balances can materially affect the advice or course of action we recommend. (Yes, if not discuss). (Information on Statute of Limitations is on the Creditor Worksheet Panel).

The first reason for my call today is to make sure everything went well for you when you had your in-person meeting and signed the enrollment paperwork with our paralegal. How did that go?

- *Answer good* (move on).
- *Answer badly* (please probe as to why and apologize to the client, let the client know you will circle back to talk with the paralegal).

Prior to our call today I had the opportunity to review your file including your creditor list, budget worksheet, hardship, proposed payment plan and retainer agreement. It appears we have all the documents needed to move forward. I just need to verify with you that we have everything set up properly on our end. I see you have a monthly payment of $ ______449.62______ and it's our goal to have you out of debt within a ______42______ month term.

Does that sound accurate?

- Yes (move on).
- No (please write down any discrepancies and let our team know).

Great, then it appears from my review of your file that you qualify for the program, and I just need to provide some additional information to make sure you're fully informed going forward.

As settlement funds accrue from your monthly payments, we will begin negotiating with your creditors to resolve each of your accounts individually. Typically, creditors are contacted in the first month unless determined that it's strategically best to hold off. Once negotiations begin we typically see the first settlement in months 7 to 9; this depends on your creditors as well as your savings, but if can occur before that time. All settlement activities will be supervised by me or one of the other local attorneys with Carolina Legal Services. As settlements are achieved they will be reviewed and, if appropriate, approved by me or one of the other local attorneys with Carolina Legal Services . You will then need to approve of the settlements as well.

Throughout your program, either I or another attorney with Carolina Legal Services, will conduct periodic reviews of your file to ensure it is progressing in accordance with the goals of your plan.

**[Check Box A in "Initial Case Review" Panel before continuing]**

______Beatriz [redacted]______, before you decided to engage Carolina Legal Services, to settle your debts, am I correct in understanding that you were made aware of alternative solutions to overwhelming debt, including the possibility of filing for Bankruptcy protection and you decided against that route?

- *If yes* (move on), if no, engage in discussion as needed.

**[Please check Box B in "Initial Case Review" Panel before continuing]**

Beatriz [redacted], Have any of the debts you plan to enroll in the program gone unpaid for more than three years?

- *If, yes, please note in the file responses that indicate old debts, which may implicate SOL defenses and any files that have pending litigation.*

**[Please check Box C in "Initial Case Review" Panel before continuing]**

Continuing along the same lines, you do understand that if any of your collectors continue to contact you without your permission, are belligerent with you or engage in other improper behavior, you should let us know as we may be able to bring a claim against them on your behalf under the FDCPA.

**[Please check Box D in "Initial Case Review" Panel before continuing]**

I'd like to take a minute to discuss Carolina Legal Services litigation services with you. You have been instructed to send us anything that looks like a legal or official document relating to your debts, correct? If answer no, discuss.

And you understand that the law firm will advise you of your rights should one of your creditors file a law suit, right? OK, and further, in accordance with the terms of our retainer agreement, you understand that our attorneys will provide a defense for you if necessary, correct? If answer no, discuss.

**[Please check Box E in "Initial Case Review" Panel before continuing]**

Before we wrap up the call, I would just like to confirm one more time you have reviewed your payment schedule, and you are comfortable with the amounts and timing of the payments as they are listed?

- *If Yes* (Move on)
- *If No* (Inquire as to what is wrong with the schedule as listed, have the client call customer support, and mark file for further review as necessary)

**[Please check Box F in "Initial Case Review" before continuing]**

Great, one last thing, it is very important that you make yourself available for contact by myself and our client support team continuously throughout your representation. Potential settlements are often time- sensitive, and we will need to contact you to discuss potential agreements as they are worked out for you. Will you make yourself available as necessary?

- *If Yes* (move on), if not discuss

**[Please check Box G in "Initial Case Review" before continuing]**

**[Please check Box H in "Initial Case Review" before continuing]**

Lastly, I wanted to know if you had any questions for me today?

- If so, please discuss.

Having reviewed and approved your file, and now having discussed with you the details of my law firms representation, I have determined you are a proper candidate for law firm representation. Further, unless you object, we agree that a proper attorney-client relationship has been established. At this time, my firm will begin the process of notifying your creditors of our relationship and begin the process of getting you out of debt.

That concludes our call for today, if you need anything do not hesitate to call our client support team at (855) 250-8343 and email address; cs@CarolinaLegalServices.com. You can also reach me in regards to any legal questions you may have at . (704) 302-7425 Have a great remainder of your day / evening.

Exhibit 05-0068

**From:** Caro na Lega Serv ces <CS@ema .caro na ega serv ces.com>
**Sent:** Thursday, June 04, 2020 9:40 AM CDT
**To:** [redacted]
**Subject:** Not ce: Your Sett ement Offer Cou d Not Be Processed

P ob em v ew ng ema ? C ck to v ew th s ema n a b owse

**Client ID:** P-40001

**NOTIFICATION**
**Your Settlement Offer Was Not Processed**

Dear Larry [redacted]

We regret to inform you that we were not able to process the settlement offer below that you previously had approved.

**Settlement Offer: UNABLE TO PROCESS**

| | |
|---|---|
| **Original Creditor:** | SYNCB/PAYPAL EXTRAS MC |
| **Current Creditor:** | Smith Debnam Narron Wyche Saintsing & Myers LLP |
| **Enrolled Debt:** | $8,117.00 |
| **Adjusted Debt*:** | $9,194.99 |
| **Settlement Offer Amount:** | $8,600.00 |
| **Number of Payments:** | 21 |
| **First Payment Date:** | March 6, 2020 |
| **Payment Method:** | Program Savings Account |
| **Offer #:** | 539320 |

**What Happens Next**

**Rest assured,** we will continue to work with your creditor to negotiate a new offer and we'll reach out to you as soon as its ready for your approval.

At Carolina Legal Services our goal is to help restore financial stability to your life. We appreciate the trust you've put in us to help you and if you have any questions, please do not hesitate to contact us.

Thank you,
**Your Team at Carolina Legal Services**

You en o ed deb s sub ec o change p o o each ng a se emen ag eemen Ad us ed deb s he amoun on f e a he me a se emen offe s made and may be h ghe han en o ed deb due o po en a a e fees and n e es cha ges f om you c ed o

Th s offe w no onge be ava ab e o v ew n he po a

O R-0220-CANX

**Have Questions? We're here to help you.**

**Visit the Client Portal 24/7:** my carolinalegalservices com

**Email:** cs@carolinalegalservices com

**Call Toll Free:** 855 250 8343

**Our Hours:** M F, 9am 8pm ET

**Download our app, powered by SETL Solutions**

You are receiving this email because you are a client of Carolina Legal Services

Copyright © 2019 Carolina Legal Services All rights reserved
Carolina Legal Services 3440 Toringdon Way Ste 205 Charlotte NC 28277
Unsubscribe Privacy Policy