AMHERST NEW YORK
Amherst Industrial Development Agency
Amherst Development Corporation

## Strategic Financial Solutions Amherst

## Section I: Applicant Background Information

Applicant Information - Company Receiving Benefit

| | |
|---|---|
| **Project Name** | Strategic Financial Solutions Amherst |
| **Applicant Name** | Strategic Financial Solutions |
| **Applicant Address** | 711 Third Avenue |
| **Applicant Address 2** | 6th Floor |
| **Applicant City** | New York |
| **Applicant State** | New York |
| **Applicant Zip** | 10017 |
| **Phone** | 2128104537 |
| **Fax** | 2128104537 |
| **E-mail** | stirabassi@stratfs.com |
| **Website** | www.stratfs.com |
| **Federal ID#** | [redacted] |
| **NAICS Code** | 5614 |
| **Will a Real Estate Holding Company be utilized to own the Project property/facility** | No |
| **What is the name of the Real Estate Holding Company** | |
| **Federal ID#** | |
| **State and Year of Incorporation/Organization** | |
| **List of stockholders, members, or partners of Real Estate Holding Company** | |

Individual Completing Application

| | |
|---|---|
| **Name** | Salvatore Tirabassi |
| **Title** | CFO |
| **Address** | 711 Third Avenue |
| **Address 2** | 6th Floor |
| **City** | New York |
| **State** | New York |
| **Zip** | 10017 |

**Phone** 212-810-4538

**Fax**

**E-Mail** stirabassi@stratfs.com

Company Contact (if different from individual completing application)

| | |
|---|---|
| **Name** | |
| **Title** | |
| **Address** | |
| **Address 2** | |
| **City** | |
| **State** | |
| **Zip** | |
| **Phone** | |
| **Fax** | |
| **E-Mail** | |

Company Counsel

| | |
|---|---|
| **Name of Attorney** | David Kimelberg |
| **Firm Name** | Kimelberg LLC |
| **Address** | 114 S. Cayuga Road |
| **Address 2** | |
| **City** | Williamville |
| **State** | New York |
| **Zip** | 14221 |
| **Phone** | 212-602-1021 |
| **Fax** | |
| **E-Mail** | dk@kimelberg.com |

Identify the assistance being requested of the Agency

| | |
|---|---|
| **Exemption from Sales Tax** | Yes |
| **Exemption from Mortgage Tax** | No |
| **Exemption from Real Property Tax** | No |
| **Tax Exempt Financing*** | No |

* (typically for not-for-profits & small qualified manufacturers)

Business Organization

| | |
|---|---|
| **Type of Business** | Limited Liability Company |
| **Type of Ownership** | |
| **Year Established** | 2009 |
| **State of Organization** | New York |

List all stockholders, members, or partners with % of ownership greater than 20%

Exhibit 08-0003

**Please include name and % of ownership.**

Twist Financial, LLC 17.99% Duke Enterprises, LLC 25.90% Blaise Investments, LLC 25.90% DL USA, LLC 27.91% PF Holdings, LLC 2.30%

## Section II: Eligibility Questionnaire - Project Description & Details

Project Location

**Municipality or Municipalities of current operations**

New York City

**Will the Proposed Project be located within a Municipality identified above?**

Yes

**In which Municipality will the proposed project be located**

Amherst, NY

**Address**

115 Lawrence Bell Drive, Amherst, NY

**Will the completion of the Project result in the removal of an industrial or manufacturing plant of the project occupant from one area of the state to another area of the state OR in the abandonment of one or more plants or facilities of the project occupant located within the state?**

No

**If the Proposed Project is located in a different Municipality than that Municipality in which current operations are being undertaken, is it expected that any of the facilities in any other Municipality will be closed or be subject to reduced activity?**

No

(If yes, you will need to complete the Retail Section of this application)

**SBL Number for Property upon which proposed Project will be located**

**What are the current real estate taxes on the proposed Project Site**

**Assessed value of land**

**Assessed value of building(s)**

**Are Real Property Taxes current?**

Yes

**If no please explain**

**Town/City/Village of Project Site**

**School District of Project Site**

**Does the Applicant or any related entity currently hold fee title to the Project site?**

No

**If No, indicate name of present owner of the Project Site**

**Does Applicant or related entity have an option/contract to purchase the Project site?**

No

**Describe the present use of the Proposed Project site**

**Please provide narrative of the proposed project and the purpose of the proposed project (new build, renovations, and/or equipment purchases). Identify specific uses occurring within the project. Describe any and all tenants and any/all end users: (This information is critical in determining project eligibility)**

Strategic Financial Solutions is a growing enterprise located in New York City and is in the process of expanding operations into the Buffalo area. We will be leasing 20,000 sq. ft. at the 115 Lawrence Bell Drive location and utilizing AIDA sales tax benefit to outfit

the space as well as for the purchase of machinery and equipment. This project represents Phase 1 of what we hope to be a multi-phase investment for our ever-growing debt consolidation business.

**If the Project could be undertaken without Financial Assistance provided by the Agency, then provide a statement in the space provided below indicating why the Project should be undertaken by the Agency:**

**Describe the reasons why the Agency's Financial Assistance is necessary and how the Financial Assistance enables the company to undertake the Project to facilitate investment, job creation and/or job retention. Focus on competitiveness issues, project shortfalls, etc... Your eligibility determination will be based in part on your answer (attach additional pages if necessary)**

The above mentioned benefits offered through AIDA's sales tax exemption will allow the company to establish an operation in Amherst and with it be in a position to offer good paying jobs to over 300 residents of the region. These benefits are vital in helping to offset the costs of establishing a local presence for our expanding operations.

**Please confirm by checking the box, below, if there is likelihood that the Project would not be undertaken but for the Financial Assistance provided by the Agency**

Yes

**If the Applicant is unable to obtain Financial Assistance for the Project, what will be the impact on the Applicant and Erie County?**

We are one of the fastest growing companies in New York City. We have been solicited for expansion in Georgia, Florida and New Jersey.

**Will project include leasing any equipment?**

No

**If yes, please describe equipment and lease terms.**

Site Characteristics

**Will the Project meet zoning/land use requirements at the proposed location?**

Yes

**Describe the present zoning/land use**

Class A office space to be retrofitted in an existing building

**Describe required zoning/land use, if different**

**If a change in zoning/land use is required, please provide details/status of any request for change of zoning/land use requirements**

No

**Is the proposed Project located on a site where the known or potential presence of contaminants is complicating the development/use of the property?**

No

**If yes, please explain**

**Has a Phase I Environmental Assessment been prepared, or will one be prepared with respect to the proposed Project Site?**

No

If yes, please provide a copy.

**Have any other studies, or assessments been undertaken with respect to the proposed Project Site that indicate the known or suspected presence of contamination that would complicate the site's development?**

No

If yes, please provide copies of the study.

**If you are purchasing new machinery and equipment, does it provide demonstrable energy efficiency benefits?**

You may also attach additional information about the machinery and equipment at the end of the application.

**Does or will the company or project occupant perform research and development activities on new products/services at the project location?**

No

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID SONG, et al.,

Plaintiffs,

v. 12 Cv. 6887 (AJN)

LHDR HELP, LLC, et al.,

Defendants.

------------------------------x

October 26, 2012
11:00 a.m.

Before:

HON. ALISON J. NATHAN

District Judge

APPEARANCES

XUE & ASSOCIATES, P.C.
Attorneys for Plaintiffs
BY: BRIAN J. SHENKER
THOMAS H.C. KUNG

SMITHAMUNDSEN LLC
Attorneys for Defendants
BY: MICHAEL F. HUGHES

acts, and we believe attachment should be denied out of hand based on that before we even get to whether or not these companies are interrelated.

Thank you, your Honor.

THE COURT: Thank you.

With that, let's proceed to witnesses.

Mr. Shenker, would you like to go first? We will bring up Mr. Blumkin.

MR. HUGHES: I didn't hear your Honor.

THE COURT: I was just saying we are going to get underway. Assuming Mr. Shenker goes first, we will call Mr. Blumkin to the stand.

Let me say something before you come up, Mr. Blumkin. We are going to swear folks in. There are very clear factual distinctions between the declarations submitted to me. It's my job to sort that out. It is the witness's job, as my deputy will say when she swears you in, at the risk of perjury for failure to state something true, it's your job to state the truth, the whole truth, and nothing but the truth.

Mr. Blumkin, come on up.

DANIEL BLUMKIN,

called as a witness by the defendants,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: State your first and last name and spell your last name.

THE WITNESS: Daniel Blumkin, B-L-U-M-K-I-N.

THE COURT: Please be seated.

Mr. Shenker, why don't you go to the podium for examination of the witness, please. Take your time setting up.

MR. HUGHES: I just wanted to ask a logistics question. We submitted two binders, one for the witness. Will he have a binder in front of him?

THE COURT: You're welcome to put a binder in front of the witness to facilitate any documents.

MR. SHENKER: I have extra copies of my exhibits as well.

THE COURT: Then you have to go back and forth.

We will put these in front of you, Mr. Blumkin. When you are directed by counsel to turn to a particular exhibit, please do so.

CROSS-EXAMINATION

BY MR. SHENKER:

Q. Good morning, Mr. Blumkin.

A. How are you?

Q. Is it true that you are currently a manager of LHDR Help, LLC?

A. I am the vice president of sales.

Q. Are you a manager as well?

A. I don't know what you mean by manager. I am the vice president of sales. I oversee all the sales that take place

day to day for the salespeople in the office.
Q. Because in paragraph 3 of your affidavit you state, "I am currently a manager of LHDR Help, LLC." Is that true or false?
A. I'm the vice president of sales.
Q. I will take that.
THE COURT: Counsel, ask questions. Your sum up time is later.
Q. Who hired you as the vice president of sales?
A. I wasn't hired. Actually, one of my entities owns part of LHDR Help.
Q. What entity is that?
A. That's Twist.
Q. What is the full name?
A. Twist Financial.
Q. Is that an LLC?
A. Correct.
Q. Where is that registered to do business?
A. I'm not quite sure.
Q. When was that company formed?
A. A little over a year ago, probably 14 months.
Q. Are you the only member of that company?
A. I own 99 percent. Ryan Sasson owns 1 percent.
Q. Do you own any other shares of any other companies that have an ownership interest in LHDR Help, LLC?
A. No.

A. No.
Q. Can you explain why you have -- strike that.
Does LHDR Help have any involvement with Credit Advocates Law Firm, LLC?
A. Repeat one more time. Does LHDR Help have any connection with Credit Advocates Law Firm you said?
Q. Yes?
A. They refer -- LHDR Help can refer a potential client over to the Credit Advocates Law Firm.
Q. Can you explain why you have sent an e-mail which contains creditadvocateslaw.com and the name of the law firm as part of your signature?
A. I can. While we were in the process of creating our marketing Web site creditadvo.com, we needed to be able to point a potential consumer in the direction of the law firm so they could at least read up and do their due diligence. Therefore, as the Web site was being created creditadvo.com, I had to put the actual law firm's Web site at the bottom of my signature.
Q. I believe you just said creditadvo.com. This says creditadvocateslaw.com. Is that also operated by LHDR Help, LLC?
A. I don't believe that's what I just said, but LHDR Help does not -- LHDR Help is not owned, if that's what you just asked me, by creditadvocateslaw.com.

stated, that they be given an opportunity to submit an affidavit.

THE COURT: Thank you.

MR. HUGHES: Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Mr. Blumkin, you were asked a series of questions related to Plaintiffs' Exhibits B and C. I believe they are in the binder in front of you, plaintiffs' binder, B and C.

B is a group exhibit containing commission reports for David Song, is that correct?

A. Yeah.

Q. And C is commission reports for Gerald Roger?

A. Correct.

Q. Who is responsible, to your knowledge, for preparing those reports?

A. Catherine Banks, our controller.

Q. To your knowledge, Catherine Banks, is she an employee of any other entity other than LHDR Help, LLC?

A. She is not.

Q. Do you know if she works for Legal Helpers Debt Resolution?

A. She does not.

Q. Do you know if she works for Macey, Aleman, Hyslip & Searns?

A. She does not.

Q. Do you know if she works for Credit Advocates Law Firm?
A. She does not.
Q. To your knowledge, what role does Credit Advocates Law Firm have in the preparation of the commission reports for the sales employees that are ultimately under your supervision?
A. Absolutely none.
Q. Has Catherine Banks ever discussed with you any influence that any of the other named defendants, other than LHDR Help or Mr. Sasson, had with respect to any commissions to be paid to LHDR Help employees?
A. No.
Q. You said you sit on the sales floor, I believe?
A. Correct. I have a desk that is directly in the middle of the sales floor.
Q. Explain to me the sales room.
A. It's a pretty much open room, similar to this. I sit pretty similar to where I am sitting right now so I can have a view of the whole room, and I sit out there with everybody to make sure that I have a good pulse of what is taking place on the sales floor.
Q. The sales consultants, what do they sell?
A. They are selling different credit card relief options, for instance, bankruptcy, debt consolidation, credit counseling, different ways to get out of financial distress with credit card debt.

Q. If somebody that they are talking to wants to take advantage of one of those programs, what happens next?
A. We will explain what the program is to them so the client has a good idea of what is taking place and what they are getting into. And then we refer that client over to either Legal Helpers Debt Resolution or to Credit Advocates Law Firm so they can meet with an attorney, have a face-to-face in their state, and make sure everything what they were speaking with over the phone is exactly what they are expecting.
Q. There were questions with respect to the branding that is on the commission report in the upper left-hand corner. It has what appears to be the logo for Legal Helpers Debt Resolution, LLC, is that correct?
A. It is correct.
Q. Do you know that to be the logo for Legal Helpers Debt Resolution?
A. That is the logo.
Q. The notation underneath by the law firm of Macey, Aleman, Hyslip & Searns, the nation's largest debt relief company, whatever that says, is that part of the logo?
A. I believe so.
Q. You were also shown some e-mails that you were a party to wherein under the signature block there is a logo for Credit Advocates Law Firm. Do you recall that?
A. Yes, I do.

INDEX OF EXAMINATION

Examination of: Page

DANIEL BLUMKIN

Cross By Mr. Shenker . . . . . . . . . . . . . . .18

Redirect By Mr. Hughes . . . . . . . . . . . . . .46

GERALD ROGER

Cross By Mr. Hughes . . . . . . . . . . . . . . .68

Redirect By Mr. Shenker . . . . . . . . . . . . .82

Recross By Mr. Hughes . . . . . . . . . . . . . .92

Redirect By Mr. Shenker . . . . . . . . . . . . .97

DAVID SONG

Cross By Mr. Hughes . . . . . . . . . . . . . . .99

Redirect By Mr. Shenker . . . . . . . . . . . . 105

DANIEL BLUMKIN

Redirect By The Court . . . . . . . . . . . . . 106

Recross By Mr. Shenker . . . . . . . . . . . . . 109

Better Business Bureau®



**CURRENT ALERTS FOR THIS BUSINESS**

**Pattern of Complaint:**
Boulder Legal Group developed a pattern of complaint in 2017 regarding dissatisfaction with service. The BBB received 28 complaints in 2017. Several complaints allege that customers pay between $4000-$8,000 to settle debts and Boulder Legal Group only settles between $400-700 in debt.

## Boulder Legal Group, LLC

Debt Relief Services

200 NE Missouri Rd Ste 200
Lees Summit, MO 64086-4722

http://www.boulderlegalgroup.com

Email this Business

(816) 524-4949

**Accreditation**

THIS BUSINESS IS NOT BBB ACCREDITED

**Years in Business:** 4

**BBB Rating**

D+

Customer Reviews are not used in the calculation of BBB Rating

**Customer Reviews**

Average of 33 Customer Reviews

**Customer Complaints**

114 complaints closed in last 3 years
39 complaints closed in last 12 months

View Complaints Summary

## Business Details

**Location of This Business**
200 NE Missouri Rd Ste 200, Lees Summit, MO 64086-4722
Email this Business

| | |
|---|---|
| **BBB File Opened:** | 9/15/2015 |
| **Years in Business:** | 4 |
| **Business Started:** | 9/13/2015 |
| **Business Incorporated:** | 9/13/2015 in MO |
| **Type of Entity:** | Limited Liability Company (LLC) |

**Related Businesses**
Law Office of Camron Hoorfar, P.C.

**Business Management**
Mr. Rick Gustafson, Member
Mr. Jason Blust, Member

**Contact Information**
Principal
Mr. Camron Hoorfar, Member
Mr. Rick Gustafson, Member
Mr. Jason Blust, Member
Customer Contact
Mr. Camron Hoorfar, Member

**Additional Contact Information**
Fax Numbers
(816) 524-4963

Phone Numbers
(888) 698-9733

## Customer Complaints

114 Customer Complaints

## Customer Reviews

33 Customer Reviews

## Business Categories

Debt Relief Services

## Local BBB

BBB of Greater Kansas City

More Info on Local BBB

BBB Business Profiles may not be reproduced for sales or promotional purposes

BBB Business Profiles are provided solely to assist you in exercising your own best judgment BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints

BBB Business Profiles generally cover a three-year reporting period BBB Business Profiles are subject to change at any time If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile

As a matter of policy, BBB does not endorse any product, service or business

## BBB Reports On

BBB reports on known marketplace practices.

See What BBB Reports On

© 2020, International Association of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US, Canada and Mexico and BBB Institute for Marketplace Trust, Inc. All rights reserved.

ANCHOR
LAW FIRM

Anchor Law Firm, PLLC
609 SW 8th St. Suite 600
Bentonville, Arkansas 72712

ANCHOR
LAW FIRM

# Anchor Law Firm Signature Pages

- ☐ Page 14 – Initial Required (co applicant initial if applicable)
- ☐ Page 16 – Initial Required (co applicant initial if applicable)
- ☐ Page 17 – Date and Signature Required (co applicant signature if applicable)
- ☐ Page ii – Date and Signature Required (co applicant signature if applicable)
- ☐ Page iii (POA) – Date and Signature Required (co applicant signature if applicable)
- ☐ Page iv (Electronic Payment Authorization) – Bank info, Routing #, Account #
- ☐ Page vi (Payment Schedule) – Date and Signature Required (co applicant signature if applicable)
- ☐ Page vii, if there is email – Initial Required (co applicant initial if applicable)
- ☐ Page x - Date and Signature Required (co applicant signature if applicable)
- ☐ Page xi – Signature Required
- ☐ GCS Pages
    - Initial Required on p. 1-3 (co applicant initial if applicable),
    - Signature Required on Pages 2 and 4
    - Banking information Required on Page 4

- ☐ EPA/Banking Info Page is optional
- ☐ Notice of Cancellation, only if client is cancelling (optional)

This document is a legally binding agreement confirming that you ("Client") and Anchor Law Firm, PLLC ("Anchor") wish to form an Attorney / Client relationship.

Pursuant to this agreement's terms, Anchor will assist you with the resolution of burdensome debt, and as such, the Representation contemplated in this Agreement is referred to as a Debt Resolution Program. In return for Anchor's services, you agree to pay specific amounts to Anchor, as specified in this Agreement and its enclosures.

Client is retaining Anchor to help resolve specific debts that Client cannot reasonably satisfy according to existing terms. These specific debts are listed in this agreement.

Client must pay as agreed for Anchor to operate as contemplated in this agreement. Anchor's ability to resolve the proposed debt load is projected to take a number of months and an amount of payments listed in this document, and any variance will directly affect Anchor's ability to perform as agreed.

Anchor guarantees certain results even though Creditors are under no obligation to negotiate with you, Anchor, or anyone else. Anchor takes this risk in exchange for Client's promise not to unreasonably withhold consent when presented with offers to settle debts.

The specifics of Anchor's and Client's responsibilities and expectations with regard to this relationship are discussed in this agreement in the following order:

*Section 1: SERVICES ANCHOR WILL PROVIDE*

*Section 2: ANCHOR'S STANDARD OF REPRESENTATION*

*Section 3: FEES AND COSTS CLIENT WILL PAY*

*Section 4: HOW AND WHEN REPRESENTATION WILL END*

*Section 5: ADDITIONAL TERMS AND DISCLOSURES*

*Section 6: ARBITRATION OF DISPUTES AND WAIVER OF CLASS ACTION RIGHTS*

***Following the Attorney / Client Agreement are various notices, disclosures, schedules, lists, and authorizations related to this agreement's terms. The contents of all documents enclosed are material to Anchor's representation of Client, and are incorporated into this agreement.***

# Client Information

| CLIENT | | |
|---|---|---|
| Full Name: | DOB: | SSN: |
| Address: | City | State, Zip Code: |
| Home Phone: | Cell Phone: | Email Address: |

| CO-CLIENT | | |
|---|---|---|
| Full Name: | DOB: | SSN: |
| Address: | City | State, Zip Code: |
| Home Phone: | Cell Phone: | Email Address: |

***PROPOSED PROGRAM INFORMATION***

| | |
|---|---|
| Total Unsecured Debt: | Program Length (months): 42 |
| Date of First Payment: | Program's Payment Amount: |
| Law Firm Contact: | |

## Section 1: Services Anchor Will Provide

**Anchor's services are performed by** a group of professionals, including attorneys, paralegals, negotiators, assistants, and others. Attorneys directly supervise the activities they do not directly perform. Anchor will perform the various services described in this section.

### 1.1. Debt Analysis

**Anchor will review Client's personal hardship and other debt circumstances and formulate a plan** to negotiate improved terms.

### 1.2. Negotiate and Resolve Client Debt

Anchor will undertake representation of Client regarding specific, unsecured debts listed in the Creditor List enclosed with this agreement. Representation related to any debt is governed by the promises and limitations discussed throughout this agreement.

### 1.3. Litigation Defense Services

Anchor will advise and represent Clients in their defense of litigation initiated by creditors or collectors to recover debts listed in this agreement. Anchor attorneys are immediately notified of litigation, and may be assigned to address any litigation served on Client after the effective date of this agreement. Litigation services are further conditioned and limited by other terms of this agreement, circumstances of practicality, and jurisdictional rules.

### 1.4. Services Not within Scope of Representation

**Anchor's services are limited to those specifically listed above. This means** that Anchor will not provide accounting, financial planning, or tax advice. Anchor does not engage in credit repair or credit reporting. Anchor does not attempt to resolve debts on which a judgment has been obtained. Bankruptcy services, and defense or prosecution of any debt not listed in this agreement are outside the scope of representation. Further, Anchor cannot guarantee that creditor or collector harassment will cease at any point in the representation. However, under some circumstances, Anchor may take appropriate legal action against creditors or collectors engaged in illegal activity.

### 1.5. Work Performed by Contracted Parties

Anchor may contract work relating to this Agreement to third parties for such tasks including, but not limited to customer service and debt negotiations. Anchor attorneys will supervise all third party entities to ensure contracted services comply with Anchor's rules and regulations.

## 1.6. Litigation Defense Services

Creditors and/or debt collectors may file lawsuit(s) against Client in order to collect non-payment of owed debt(s). Anchor will provide Litigation Defense Services in the event the client receives a Summons and Complaint. Anchors Litigation services and limitations include:

### Services

1. Anchor will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.
2. Anchor will evaluate potential legal defenses to the Plaintiff creditor's suit.
3. Anchor will review, analyze, and counsel Client regarding collection activity and debt restructuring associated with any litigated debt.
4. Anchor will engage with the Plaintiff or its hired legal counsel on Client's behalf to negotiate a resolution of the litigation.
5. Anchor's attorneys may determine that a valid defense exists to the law suit, or that the suit is defective in some way favorable to Client. This determination varies by jurisdiction, current legal trends, and the personal knowledge of the local attorney.
6. If Anchor's assigned attorney determines that Client is likely to gain a favorable result through continued defense of the litigation, he or she will prepare and file responsive pleadings on the Client's behalf, appear at subsequent court proceedings, and continue defense through various stages of litigation, including trial, if prudent.



### Conditions and Limitations

1. All pages of any summons, complaint, exhibits, petitions, and/or other pleadings served to the client must be submitted to Anchor.
2. All lawsuit paperwork must be submitted to Anchor no less than fifteen (15) days prior to the lawsuit response date, or immediately upon the client's receipt of lawsuit paperwork.
3. If the litigation is in a State that permits less than fifteen (15) days' notice, all lawsuit paperwork must be submitted no less than seven (7) days prior to lawsuit response date.
4. All lawsuit paperwork must be submitted to Anchor Law Firm, PLLC at their fax number (888) 337-3171 or email address cs@AnchorLawFirm.com
5. The "Retainer Fee," outlined in the enclosed Payment and Fee schedule, must be paid in full, or payments must be current on any agreed payment plan specific to the "Retainer Fee" in order for Anchor to provide Litigation services.
6. Anchor is not required to provide Litigation Services on any lawsuit of which the Client had knowledge prior the execution of this agreement with Anchor. Knowledge of a lawsuit is typically determined by service of process (delivery of a legal complaint to a party being sued).
7. Anchor will not provide Litigation Services related to debts which are not included in this agreement, or any attachments or amendments to this agreement made prior to Client's knowledge of the law suit.

Exhibit 08-0023

### 1.7. Conditions of this Agreement's Effectiveness

a. This Agreement does not take effect, and Anchor has no obligation to provide any services, until both Client and Anchor have executed a copy of this Agreement and such copy is delivered to both Parties.

b. Further, this agreement does not take effect until Client has paid the initial payment of the flat fee retainer as set forth in the payment schedule enclosed, and the payment has cleared.

# Section 2: Anchor's Standard of Representation

Anchor has a set standard of representation for each debt enrolled in the Debt Resolution Program. Anchor sets a target debt reduction of minimally thirty-five percent (35%) of amount owed on the debt at the time the Agreement is executed. If Anchor is unable to meet this target debt reduction, Anchor will refund the share of all Anchor fees & costs for work on this individual debt.

## 2.1. Terms and Conditions Affecting Standard of Representation:

a. Client must be in complete compliance and cooperation with Anchor under the terms of this agreement.

b. Client's payments must be current under the Service Cost obligations and cannot default on payments to Creditors pursuant to settlement of any listed debt.

c. Client may not be entitled to a refund if Client is unwilling or unable to accept a proposed settlement at a reduction of thirty-five percent (35%) of enrolled debt at time that settlement is secured by Anchor.

d. If Anchor is unable to settle Client's listed debts, the refund shall be calculated on a pro rata basis as to Service Cost paid per each individual debt.

e. The Standard of Representation does NOT apply to any enrolled debt that becomes subject to a lawsuit during representation. Client will be required to notify Anchor of any lawsuit, at which time the Standard of Representation will cease to apply, and Litigation Services will commence.



## 2.2. Standard of Representation Does Not Apply to the Following Types of Debt:

a. Any debt which is subject to a lawsuit at the time of this Agreement's execution;

b. Debts being garnished, or subject to voluntary garnishment are also excluded from this provision;

c. Any debt with a balance transfer or cash advance which occurs within six months of enrollment;

d. Any debt with a balance of less than one-thousand dollars ($1,000.00) at the time of this Agreement's execution;

e. Debts that are eliminated and/or discharged by creditor or become uncollectable as a result of Anchor's strategies shall be considered approved settlements, and will not be subject to any refund;

f. Client must complete all payments as listed and hereafter amended in order to provide Anchor with the opportunity to settle all enrolled debt on the Creditor Listing enclosed. Any refund may be disqualified if Client terminates representation prior to completion of payments contemplated in this Agreement.

g. Any debt with a credit union. ALF will endeavor to settle such debts on behalf of Client on the best terms possible, but cannot guarantee that such settlements will meet the Performance Standard.

Exhibit 08-0025

## 2.3. Bankruptcy and Other Alternatives

Anchor may discuss alternative legal routes in the event of changing circumstances on any enrolled debt(s), such as Chapter 7 & 13 Bankruptcies

## 2.4. Should Client Default on Negotiated Settlement Terms

Anchor is not required to renegotiate any debts that enter default after Anchor has arranged payment terms, and those terms were agreed to by Client. Client may request Anchor renegotiate such debt, and will be subject to an additional fee of two-hundred-ninety-nine dollars ($299.00) per renegotiation at the client's expense. Client must also comply with following terms for renegotiation(s):

a. The Representation Standard provision only applies to the balance of enrolled debt, not accounting for payments made on initial settlement prior to default.

b. Renegotiation may result in the settlement amount increasing.

**Client understands & agrees they are not entitled to any refunds under the Standard of Representation if any of the above terms are not met.**

ANCHOR LAW FIRM

# Section 3: Fees and Costs Client Will Pay

**Anchor's** fees are payable according to the following terms. All fees are charged on a flat fee basis according to the Payment Schedule enclosed with this Agreement.

## 3.1. Retainer Fee and Monthly Administration Fees

a. Client will initially pay Anchor $900 as a Retainer Fee.

b. The Retainer Fee shall be paid on a MONTHLY / WEEKLY BASIS over ________ months. The first ______ payments shall be $ _________, thereafter payments will be $ _________.

c. In addition, Client shall pay an ongoing monthly flat Legal Administration Fee of $ _________ for debt review, debt resolution plan analysis and structuring, supervision of and participation in creditor negotiations, pre-litigation settlement support, and the Litigation Defense Services described in Section 1.6 of this Agreement.

d. Client shall be responsible for Legal Administration Fees for all months until such time this Agreement terminates.

## 3.2. Service Cost – Related Services

In addition to the legal services provided by Anchor, there are non-legal services involved in the **implementation, management and maintenance involved in Client's representation. These** services are provided at a cost of (      ) of **the Client's total scheduled debt (hereinafter referred** to as Service Cost). The service cost shall be paid by Client to Anchor in equal consecutive monthly payments in the amount of $______ per month.

Anchor has a non-exclusive reciprocal referral agreement with independent contractors to provide these services under Anchor's direct supervision. Representatives of such independent contractors cannot and will not provide any legal advice to the Client, and any such advice will only be communicated to Client by Anchor. Although these services are performed under **Anchor's supervision, a court or courts might** determine that there is no attorney-client relationship between Client and the independent contractor representatives in regard to these services, and communications between Client and the independent contractor representatives might not be protected by attorney-client privilege.

## 3.3. Application of Funds Paid in Addition of Costs and Fees

All funds paid by Client which exceed the Costs and Fees listed above will **be saved in Client's** Dedicated Account (See Dedicated Account Agreement) for use in effecting payments toward settlements Anchor secures subject to **this Agreement. All such funds will remain under Client's** control at all times, and may be freely removed by Client at any time. It is strongly recommended that Client keep all funds available for settlement payments to allow Anchor the greatest ability to effectively represent Client under the terms of this Agreement.

### 3.4. Method of Payment

Under this Agreement, Client agrees:

a. to have Client's initial flat fee retainer and subsequent fees and costs as outlined above based on the attached Payment Schedule to be automatically drafted from Client's bank account into an authorized Federal Deposit Insurance Corporation ("FDIC") insured bank account held in Client's name (the "Dedicated Account") with Client's first payment to start on ___________ and thereafter each month on the ____ day; and

b. to have Client's payments of Service Cost and settlement savings fund payments based on the attached Payment Schedule to be automatically drafted from Client's bank account into the Dedicated Account held in Client's name with Client's first payment to start on ___________ and thereafter each month on the ____ day.

### 3.5. Early Program Completion and Pre-Payment of Program Fees

If Anchor resolves all debts listed in this Agreement before the scheduled date of Client's final Service Cost payment, Client must still pay the full Service Cost outlined in the attached Payment Schedule. However, Client will not be responsible for any Legal Administration Fees following the date that a settlement agreement is entered on the final listed debt.

### 3.6. Costs of Litigation Services – Court Costs and Trial Preparation Costs

a. Client must pay all costs associated with Litigation Services, including the payment of any court filing fees or any other court-imposed costs associated with the litigation. These costs vary by jurisdiction. Anchor will NOT advance such costs. Client acknowledges that failing to timely pay necessary costs may have adverse consequences, including but not limited to entry of judgment against Client in the litigation.

   If a litigated matter proceeds to trial, Client shall also be required to pay the costs associated with Anchor's trial preparation, which the parties hereby agree in advance shall be set at three hundred fifty dollars ($350.00) per trial (the "**Trial Costs**"). **Trial Costs** commonly include but are not limited to, photocopying and reproduction costs, notary fees, long distance telephone charges, messenger and other delivery fees, postage, travel costs including parking, mileage, transportation, meals, and hotel costs, investigation expenses, and other similar items. The Trial Costs must be paid sixty (60) days before the scheduled trial date unless otherwise agreed upon by Anchor and the Client. The Client shall not be responsible for, and shall be refunded the Trial Costs if the litigation is settled at least thirty (30) days before the trial date.

### 3.7. Additional Fees

Client may be responsible for additional processing fees. Such fees may include: Payment Plan Change Fees ($19.95), Adding/Removing Debts ($25.00), Renegotiation Fee ($299.00), Settlement Payment Fees ($10.00), and Banking Changes ($25.00).

### 3.8. Increases in Balances of Accounts Subject to Representation

a. Client acknowledges and agrees that Client will not continue to incur any additional debt on any accounts subject to this Agreement, other than late fees, interest, and penalties.

b. Client's program fees, program length, and draft amounts may increase due to any additional balance caused by Client.

Exhibit 08-0028

## Section 4: How and When Representation Will End

### 4.1. Termination by Client

Client may terminate this agreement at any time, and for any reason. Should Client terminate this Agreement before all debts subject to the representation are resolved, all Service Costs, Legal Administration Fees, and Additional Fees paid through the date of termination will be considered earned by Anchor, and will not be refunded to Client.

### 4.2. Termination by Anchor

This Agreement may be terminated by Anchor at any time for good cause, and upon reasonable notice to Client. In addition, subject to any applicable legal and ethical standards governing Anchor's right to withdraw representation, Anchor may withdraw from representing Client in any litigation under the terms of this Agreement either with Client's consent, or with the permission of the court in which such litigation is pending.

### 4.3. Definition of "Good Cause" for Termination by Anchor

a. **Client's Failure to Cooperate with Anchor.** Client must cooperate and comply with all reasonable requests by Anchor and its agents in connection with the services to be performed under this Agreement, including requests for information and documentation, responses to settlement offers, and matters related to any litigation. Client acknowledges and agrees that failure to cooperate with Anchor is grounds for Anchor to terminate this Agreement and/or to withdraw from representation of Client in any litigation associated with the Client's failure to cooperate.

b. **Failure to Pay Fees and Costs.** If Client fails to pay the legal fees and Service Costs required under the terms of this Agreement, Anchor may terminate this Agreement and withdraw from representation of Client in any litigation associated with this Agreement.

c. **Failure to Pay Costs of Litigation.** In the event that Client fails to pay any of the court filing fees or other fees or costs associated with the litigation of a listed debt, Anchor will not be responsible for acting in response to the lawsuit until such time as the fees or costs associated with the filing have been received by Anchor. Moreover, Client agrees and acknowledges that the failure to pay the three hundred fifty dollar ($350.00) Trial Costs associated with a trial in a timely manner shall constitute sufficient grounds for Anchor to withdraw from representing Client in connection with the lawsuit.

d. **Failure to Follow Anchor's Advice on Reasonable Settlements.** Client agrees and acknowledges that Anchor has an obligation to Client as both a counselor and as an advocate, and that the underlying purpose of the Representation is to negotiate settlement of Client's debts. In the event that Anchor negotiates a reasonable settlement offer and advises the Client to accept, Client agrees that he or she shall not unreasonably withhold consent to accept the offer. Client acknowledges and agrees that it is unreasonable to withhold consent on a settlement offer when Client has no valid

Exhibit 08-0029

defense to the litigation claims at issue or **when the settlement offer is within Anchor's** Standard of Performance. If Client refuses to consent to a reasonable settlement offer, Client agrees that Anchor may withdraw from representing the Client in any litigation associated with the settlement offer at issue.

## 4.4. Withdrawal from Representation of Client in Litigation

In the event that Anchor is entitled to withdraw from any litigation for whatever reason, Client agrees to execute any documents necessary to effectuate this withdrawal, including, without limitation, the execution of a substitution of attorney document that relieves Anchor as counsel in the litigation. If Client fails to execute any necessary documents, Anchor may request the court to **be relieved as Client's attorney** in that particular matter. Client acknowledges and agrees that **Anchor's withdrawal from any specific litigation does not necessarily terminate Client's entire** Agreement with Anchor for any other litigation or for any other services falling within the scope of **this Agreement. Notwithstanding Anchor's withdrawal** and without regard to the reasons for the withdrawal, Client will remain obligated to pay Anchor for any services performed up to and including when Anchor delivers its withdrawal notice to Client or Anchor receives a court order authorizing its withdrawal.

ANCHOR
LAW FIRM

# Section 5: Additional Terms and Disclosures

## 5.1. Client's Responsibilities to Anchor

a. In consideration of Anchor's experienced counselling, work out a feasible monthly payment plan based on the total amount of debt to be modified, which contemplates all fees and costs to Anchor as well as funds to deposit for use in settling debts on which Anchor represents Client. The Payment Schedule is enclosed;

b. Provide Anchor accurate and complete information and documents relating to any debts subject to Anchor's representation. These documents must identify each debt by creditor's name, current account balances, and account numbers. Anchor is under no obligation to verify the information supplied by Client;

c. Forward all correspondence from creditors and collection agencies as soon as possible, but no longer than five (5) days from receipt;

d. Make all payments according to the payment schedule;

e. Refrain from discussing debts with creditors or collection agencies when contacted;

f. Notify Anchor in writing of any settlement offers you receive, including all of the terms and conditions of the offer;

g. Be willing and able to aid in negotiations when necessary, and understand that your level of involvement will not affect the terms of this Agreement, but may affect the speed and effectiveness of Anchor's efforts;

h. Respond timely to all requests or communications from Anchor or its representatives, and promptly provide Anchor with any change of address or other contact information;

i. Make timely and complete payments on settlements negotiated by Anchor and approved by Client.



## 5.2. Client's Authorizations

Client Authorizes Anchor to:

a. To disclose information regarding Client's financial condition or status to any creditors and collectors in connection with effective representation;

b. To hold itself out as Client's representative to any party seeking to collect the debts listed in this Agreement's Creditor Listing;

c. To engage creditors and collectors to negotiate reduction of the debts listed in this Agreement's Creditor Listing;

d. To process debit entries from Client's Dedicated Account. This authority shall remain effective until cancelled by Client in writing, at least five (5) business days prior to the scheduled payment due date. Client understands that there will be a charge of twenty-five dollars ($25.00) to Client's Dedicated Account for any non-sufficient funds ("NSF") transactions ($20.00 of this charge is paid to Anchor and $5.00 is paid to the administrator of the Dedicated Account). Client will provide Anchor with a voided check or savings deposit slip.

## 5.3. Client Acknowledgments

Client Acknowledges and agrees that:

a. The payment schedule is based on previous settlement averages achieved and calculated *by Anchor. Accordingly, the actual amount* paid into the program may vary. More or less funding may be required to settle all represented debts;

Exhibit 08-0031

DSL 001170

b. The program's contemplated duration is an estimate based on full and timely payment each month as listed in the Payment Schedule. Any variation of payments, as well as many other factors, can affect the length of the program;

c. Anchor will deduct monthly Legal Administration fees through the duration of Client's participation in the debt resolution program;

d. The success of Anchor's representation on any particular debt may vary based on a number of factors, including your ongoing ability to make timely deposits to your Dedicated Account, the willingness of your creditors to negotiate settlements of your debt and other factors that are outside Anchor's control;

e. Creditors may still contact you regarding debts subject to this Agreement. However, you should notify Anchor of harassment, as there may be steps Anchor can take to prevent or rectify illegal harassment;

f. The discharge of indebtedness may be considered a taxable event. You should consult a tax professional to determine any tax obligations they may have as a result of any settlements negotiated on their behalf;

g. The fees and costs paid to Anchor are compensation for the services described in the Scope of Engagement and the funds deposited into your Dedicated Account are for the purpose of saving funds for settling your accounts with creditors. Until you authorize and approve any such settlements, no payments of any kind, including any monthly minimum payments, will be made to your creditors on the accounts, except those that are subject to Anchor's Settlement Pre-Authorization form which states that Anchor shall make all reasonable efforts to obtain your approval for any settlement offer obtained on your behalf. In the event Anchor cannot contact you after making reasonable efforts, you authorize Anchor to proceed with any settlement resulting in a savings of 50% or more of your debt;

h. Anchor will refund the entire portion of any unused retainer fees for services that have not yet been rendered in the event you to terminate Anchor's representation;

i. You may continue to incur late fees and penalties on the accounts while enrolled in the program;

j. Your participation in the program will likely have an adverse effect on Client's credit score;

k. You should not incur any new or additional debt and should refrain from using or obtaining credit during the Anchor debt resolution representation. You understand and agree that all credit cards or lines of credit shall be closed and that no additional credit cards or lines of credit should be applied for during the Anchor debt resolution representation. You understand and acknowledge that you may keep credit cards out for emergency use, not to be accepted in the program, open for emergency purposes only. These credit cards should not be from the same issuing bank as any accounts you entered into the Anchor debt resolution representation;

l. No debts listed in this agreement have been secured by any personal or real property.

m. Active, inactive, or former military personnel understand that his/her military rank, pay, and/or benefits may be adversely affected by delinquent debt accounts and/or a decreased credit rating and [portfolio name] shall not be held responsible for any negative consequences that may occur by such personnel by their enrollment into the Debt Resolution plan.

n. Individuals with, or who are seeking Security Clearance, including military members, contractors and consultants, understand that his or her Security Clearance may be adversely affected by delinquent debt accounts and/or a decreased credit rating and [portfolio name] shall not be held responsible for any negative consequences that may occur by such personnel by their enrollment into the Debt Resolution plan.

INITIAL HERE Initial: ________________

### 5.4. Voluntary Participation

Client understands that participation in Anchor's program is voluntary and you may, upon written request, cancel Anchor's services at any time

prior to the original estimated conclusion date of the program.

Client also agrees that:

a. Early termination may prevent Anchor from providing all services outlined herein and Anchor will not be responsible for any unresolved accounts upon cancellation.

b. In the event of any early termination of this Agreement, all Service Costs, Legal Administration Fees, Banking Fees, and Other Fees shall be considered earned and are non-refundable.

c. Upon termination of this Agreement, any funds held in your Dedicated Account, less any amounts paid or owed in the form of fees and settlement payments, shall be remitted to you by paper check or ACH transfer.

d. Anchor will not collect any additional fees that have not previously become due after the termination date.

e. With Anchor's permission, you may re-enroll Client Debts after termination. Any re-enrollment shall be at Anchor's sole discretion and is subject to a Reactivation Fee in the amount of two hundred ninety-nine dollars ($299.00).

### 5.5. Skipped Drafts

a. In the event Client requests to skip a monthly draft, Client shall notify Anchor at least five (5) business days prior to the scheduled draft.

b. Client will continue to be charged any applicable monthly Legal Administration service costs, retainer fees and any banking fees for any skipped months.

c. An additional month shall be added onto the Client's program to make up for each month Client skips a draft.

d. Anchor may deny a Skip Request and/or limit the number of approved Skipped Drafts if Anchor determines it is in the Client's best interest to continue drafting Client's monthly payment.

### 5.6. Extension of Representation

a. Subject to the terms of the Performance Standard, in the event Client's debts are not fully settled at the end of the estimated program timeframe, Anchor will automatically extend Client's program and continue to draft Client's monthly payment unless Client notifies Anchor in writing that Client does not wish to extend representation.

b. Client shall remain responsible for the monthly Legal Administration Fees during any extended representation period.

### 5.7. Additional Disclosures & Disclaimers

a. There are other remedies/solutions available for clients to relieve themselves of their debt burdens. Those remedies include bankruptcy and consumer credit counseling. (See Exhibit Disclosure and Election of Services in this Agreement for further information).

b. Declaring bankruptcy may discharge or allow a court imposed repayment plan for the majority of Client's debts. However, this will be reflected as a permanent record on a Client's credit report for up to 10 years. Anchor will discuss and advise Client as to the bankruptcy option, including fees and costs, at any time that Client's circumstances change or Client requests such consultation. There are no additional fees required from Client for such consultation and preliminary advice regarding bankruptcy.

c. Consumer credit counseling may have less impact on a Client's credit rating than bankruptcy and reduce interest rates on current debts, but it generally requires re-payment of most-to-all of Client's existing debt and will not likely provide significant monthly payment relief.

### 5.8. Confidentiality of Client Information

Anchor agrees that any information provided by Client will be kept confidential and only be used in providing the services delineated in this Agreement, which may include, among other things, disclosure of confidential information to appropriate third parties in order to (a) streamline the negotiation process, (b) enhance Client's opportunities for settlement offers with Client's various creditors, and (c) generally improve Client's financial hardship and wellbeing. Client agrees and acknowledges that such disclosures will be made with Client's express consent and will not require any additional consent or consultation by Client before such disclosures are made.

### 5.9. Full and Only Agreement

**This agreement is the full and only agreement between the parties. All prior negotiations and discussions are superseded by this Agreement. Anchor has made no representations other than those expressly set forth in this Agreement, and neither Party has relied upon any representations or promises other than those expressly set forth herein.**

## Section 6: Arbitration of Disputes and Waiver of Class Action Rights

In the event of any controversy, claim or dispute between the Parties arising out of or relating to this agreement or the breach, termination, enforcement, performance, interpretation or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in the county in which the Client, in accordance with the laws of the state of the Client's residence. The Parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") or JAMS, or in the event of their unavailability, an arbitration service with substantially similar rules and arbitrator rosters, pursuant to its rules and procedures, and a single arbitrator shall be selected to preside by the arbitration service. The arbitrator shall be neutral and independent and shall comply with the relevant code of ethics. Any award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the Parties. If either Party fails to comply with the arbitrator's award, the injured Party may petition the applicable court for enforcement.

The Parties agree that either Party may bring claims against the other only in his/her or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the Parties agree that the arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding.

The Parties shall share the cost of arbitration, including attorneys' fees, equally. If the Client's share of the costs is greater than $2,000.00 (Two-thousand dollars), Anchor will pay the Client's share of costs in excess of that amount.

**Binding arbitration means that both Parties give up the right to a trial by a jury and their rights to have a dispute resolved in a court of law. It also means that both Parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. In addition, under the terms of this Agreement, the parties also give up the right to bring any claims on a consolidated or class action basis. In addition, certain remedies, such as statutory injunctions and fee shifting, that may be available in a court of law may not be available in an arbitration.**

In the event a Party brings suit against the other Party in federal, state or local court instead of proceeding with arbitration, or unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other Party is entitled to costs of suit, including reasonable attorneys' and paralegals' fee and costs for having to compel arbitration or defend or enforce the award. This section and the requirement to arbitrate any dispute shall survive any termination.

INITIAL HERE *Initial:* ________ ________

Exhibit 08-0034

***I represent that I have read, understand and agree to be bound by the terms of this Client Representation Agreement as set forth above and in the documents incorporated in this Agreement. I further acknowledge that the terms and conditions of this Agreement have been explained to my satisfaction by a representative of Anchor and that I have no unanswered questions about the program or this Agreement. I confirm that I agree to arbitrate any claims and to waive any right to bring or participate in a class action against Anchor.***

*Agreed to this ____ day of ________________, 20_____*

SIGN HERE ______________________________

*Signature of Client*

SIGN HERE ______________________________

*Signature of Co-Client*

______________________________

*Signature of Anchor*

ANCHOR LAW FIRM

# Notice of Right to Cancel

Date of Transaction: ____________________

You may CANCEL this transaction, without Penalty or Obligation, including any agreements you signed at the in-person meeting with the Anchor attorney and/or paralegal, for up to FIVE BUSINESS DAYS from the above date. If you cancel, you will not be obligated to make any payments to the law firm and any agreements or other documents that you signed will be null and void. To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice to the address below NOT LATER THAN MIDNIGHT OF ____________________________ (five business days after the Date of Transaction).

I HEREBY CANCEL THIS TRANSACTION.

Client:

Date: __________________

Client's Signature: _______________________

Co-Client's Signature: ________________________

ANCHOR LAW FIRM

***Please send to:***

Anchor Law Firm, PLLC
609 SW 8th St. Suite 600
Bentonville, Arkansas 72712

***(Sign and return this document only if you decide to CANCEL this transaction within five business days of the Date of Transaction shown above.)***

## Client's Authorization for Settlement

Anchor shall make all reasonable efforts* to obtain Client's approval for any settlement offer obtained on Client's behalf. In the event Anchor cannot contact Client after making reasonable efforts, Client authorizes Anchor to proceed with any settlement resulting in a savings of 50% or more of the Client's debt at the time of settlement.

Furthermore, I/we permit Anchor to release the funds from my/our Special Purpose Savings Account to the creditor, per the terms of the settlement agreement, to fulfil the obligations of the pre-authorized settlement agreement.

SIGN HERE

Client Name ____________________ Date ____________

ANCHOR LAW FIRM

Co- Client Name ____________________ Date ____________

*Reasonable efforts can include phone call(s), email(s), fax(es), and standard mail.

**Client can revoke such authorization at any time before any settlement payments are processed.

This form may be revoked** by Client at any time upon written notice to Anchor.

# Power of Attorney

**I/We,** ______________________________, ______________________________,

**Located at** ________________________________________________________,

**In the City of** ______________________, **State of** ______________ **Zip** ___________,

hereby appoint the Anchor Law Firm, PLLC ("Anchor") as my/our attorney-at-law to do the acts described in this Power of Attorney. Anchor (and/or its designees) is hereby authorized to act as my/our attorney and to fully represent me/us in any litigation or negotiation of the modification, reduction, settlement, and payment on any and all debts allegedly due and owning in my/our name. Litigation representation includes attendance at required court hearings, if applicable.

I/We authorize Anchor to request and receive confidential credit and account information from creditors, credit bureaus, collection agencies, creditor attorneys, or any other third parties who may be in possession of such information and would be viewed by me/us personally.

This Power of Attorney revokes all earlier Power of Attorney given by, or on behalf of, me/us relating to all communications of creditors' claims and shall be effective and binding on me/us until revoked by an instrument in writing executed by me/us. I/We further authorize Anchor to release a copy of this Power of Attorney to my/our creditors or their agents. A copy of this Power of Attorney shall be deemed as effective as an original.

Executed on ______________

SIGN HERE

______________________________ ______________________________
Client Signature Client Social Security Number

SIGN HERE

______________________________ ______________________________
Co-Client Signature Co-Client Social Security Number

State of ______________________ County of ____________________

The foregoing instrument was acknowledged by me this __________ day of ____, 20___

by: ___________________________ who is/are personally known by me or who

has/have produced: ___________________ as identification and who did not take an oath.

Notary Public: ____________________________

Exhibit 08-0038

# Electronic Payment Authorization

By signing below, I authorize Anchor Law Firm, PLLC (Anchor) (or their designees) to process debit entries from my checking, savings, or other FDIC-insured bank account. This authority shall remain effective until cancelled by me in writing, at least five (5) business days prior to my scheduled payment due date. I understand there will be a twenty-five dollar ($25) cost automatically charged to my account for any non-sufficient funds (NSF) transactions. **I will provide Anchor with a voided check or savings deposit slip.**

Name on Account (Please Print):

Please transfer payments directly from my Checking account, Savings account, or Other account.

Bank Name: ______________________________________________

Bank Address: ____________________________________________

City: ____________________________ St: _____ Zip: ____________

Bank Phone #: ____________________________

**Routing # |___|___|___|___|___|___|___|___|___| Account # ____________________________

*Routing numbers are always 9 digits long and always start with 0, 1, 2, or 3.

____________________________ ________________________ _____________Authorized Signature on Account

Printed Name Date

Attach Voided Check or Savings Deposit Slip Here

Exhibit 08-0039

# Creditor Listing

| *Creditor / Collection Agency* | *Account Number* | *Balance* | *Account Holder(s)* | *Last Payment Date* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | *Total Debt Owed:* | $ |

# Payment Schedule

**DEBT RESOLUTION PROGRAM**

| Total Amount of Debt | | *Estimated Settlements:* | |
|---|---|---|---|
| Service Cost Percentage | | | |
| Estimated Total Fees & Settlements | | TOTAL ESTIMATED SAVINGS | |

| Month in Program | Retainer Fee | Service Cost | Settlement Reserves | Legal Administration Fee | Banking Fees | *Total Draft* | Draft Due Date |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |
| 21 | | | | | | | |
| 22 | | | | | | | |
| 23 | | | | | | | |
| 24 | | | | | | | |
| 25 | | | | | | | |
| 26 | | | | | | | |
| 27 | | | | | | | |
| 28 | | | | | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | | | | |
| 34 | | | | | | | |
| 35 | | | | | | | |
| 36 | | | | | | | |
| 37 | | | | | | | |
| 38 | | | | | | | |
| 39 | | | | | | | |
| 40 | | | | | | | |
| 41 | | | | | | | |
| 42 | | | | | | | |
| 43 | | | | | | | |
| 44 | | | | | | | |
| 45 | | | | | | | |
| 46 | | | | | | | |
| 47 | | | | | | | |
| 48 | | | | | | | |
| 49 | | | | | | | |
| 50 | | | | | | | |
| 51 | | | | | | | |
| 52 | | | | | | | |

**Settlement Reserves above is only an estimate of the amount needed for settlement.**

Client Signature ______________________ Co-Client Signature ______________________

Print Name ______________________ Print Name ______________________

Date ______________________ Date ______________________

Exhibit 08-0041

**DSL 001180**