# Electronic Communication Verification

Please print your email address on the line below:

________________________________________

You will receive an email of the Letter of Engagement and other documents executed today in the next three (3) business days. In case you do not receive an emailed copy, due to faulty address or lack of email address provided above, you will still receive copies of these documents with your Welcome Package. The Welcome Package will be mailed to you once your first payment has cleared.

**Anchor's Right to Conduct Business and to Contact You Electronically.** You agree, unless specifically requested otherwise, that by entering into transactions with Anchor, you consent to receive in an electronic format all information, copies of Agreements and correspondence from Anchor and to also send information in an electronic format unless previously agreed upon in writing with Anchor. You also consent and agree that Anchor may provide all disclosures, periodic statements, notices, receipts, modifications, amendments, and all other evidence of transactions electronically. All electronic communications will be deemed to be valid and authentic, and you intend and agree that those electronic communications will be given the same legal affect as written and signed paper communications. You have a right to receive a paper copy of any of these electronic records if applicable law specifically requires us to provide such documentation. Your consent may be withdrawn at any time upon Anchor's receipt of such withdrawal. However, your withdrawal of your consent to conduct business electronically can only occur if applicable law specifically requires Anchor to provide a paper copy of electronic documents. Withdrawal of consent will slow the speed at which Anchor can complete certain steps in transactions with you and providing representation on your behalf. To inform Anchor that you either withdraw your consent to receive future notices and disclosures in electronic format, would like to receive paper copies, or to update your information, you may send such request to the address listed below for Anchor. You acknowledge and agree that the internet is considered inherently insecure. Therefore, you agree that Anchor has no liability to you whatsoever for any loss, claim, or damages arising or in any way related to Anchor's responses to any electronic communication, upon which Anchor has in good faith relied. At all times, you maintain the sole obligation to ensure you can receive Anchor's electronic communications, and access them on a regular and diligent basis.

**Consent to Be Contacted By Telephone, Cellphone, Text or Email**. You also agree to be contacted by telephone on your landline and/or cell phone by Anchor irrespective of whether your telephone number appear on any state or federal "Do Not Call" lists. You further agree that Anchor may contact you using an automated or computerized dialing system to contact you via telephone, cellphone and/or SMS text, and Anchor may use pre-recorded messages when contacting you. You acknowledge that your consent to be contacted in these manners is not required as a condition of purchasing or receiving our services. You may inform Anchor at any time either that you withdraw your consent to receive communications from Anchor as described above or to update your contact information by sending such requests to the address listed below for Anchor. You agree that all calls to or from Anchor may be monitored and recorded. You acknowledge you may incur a charge by your telephone carrier for any calls or texts from Anchor. You verify that the email address and phone numbers you have provided to Anchor are yours. You agree that Anchor may contact you using other email addresses and/or landline or cell phone numbers provided by you directly or obtained through other lawful means. You agree to notify Anchor within 30 days of any change to your email address or phone numbers by writing to Anchor's address below.

**Please Initial on the line to indicate that you understand the above terms.** ________

Exhibit 08-0042

# Hardship and Budget Information

## *Reason for Hardship*

- ☐ *Temporary Loss of Work*
- ☐ *Loss of Job*
- ☐ *Medical Problems*
- ☐ *Personal Injury*
- ☐ *Divorce*
- ☐ *Company Reduced Hours*
- ☐ *Pay Cut*
- ☐ *Disability*
- ☐ *Loss of Spouses Income*
- ■ *Other* ____________

*Please Briefly Explain Hardship:* High interest and high minimum payments are making it difficult to keep up with obligations. - High interest and high minimum payments are making it difficult to

## *BUDGET ANALYSIS*

*(All information should be on a monthly basis)*

| | | | |
|---|---|---|---|
| *Client Net Monthly Income* | $ | *Funds Available* | $ |
| *Co-Client Net Monthly Income* | $ | | |
| *Total Income* | $ | | |

| | | | |
|---|---|---|---|
| *Mortgage/Rent* | $ | *Household Items* | $ |
| *Home Owners Insurance* | $ | *Clothing* | $ |
| *Life Insurance* | $ | *Laundry/Dry Cleaning* | $ |
| *Medical Care* | $ | *Utilities* | $ |
| *Child Care / Support / Alimony* | $ | *Telephone* | $ |
| *Cable TV / Satellite* | $ | *Auto Loans* | $ |
| *Charity / Donations* | $ | *Auto Other* | $ |
| *Entertainment* | $ | *Auto Insurance* | $ |
| *Gym / Health* | $ | *Education* | $ |
| *Personal Care* | $ | *Student Loans* | $ |
| *Back Taxes* | $ | *Misc / Other* | $ |
| *Food* | $ | *Total Expenses* | $ |

Exhibit 08-0043

# Bankruptcy vs Debt Negotiation and Election of Services

## Bankruptcy and Debt Negotiation

Anchor is a full service debt resolution law firm which provides services including debt negotiation and restructuring and bankruptcy services. The following provides information about these approaches to debt resolution for your review. Clients should fully understand the advantages and disadvantages of each to make an informed decision.

## Bankruptcy

Bankruptcy will usually discharge your unsecured debt and your creditors are not permitted to contact you once you have filed with the court. There are two kinds of bankruptcy: Chapter 13 bankruptcy where you are generally able to keep property that is mortgaged, such as your house or car, and are expected to repay debts in three to five years, and Chapter 7 bankruptcy where you must give up all non-exempt property and assets that you own in exchange for a discharge of most debt. Bankruptcy may be appropriate if you have pending foreclosures, collection litigation or wage garnishments; however, you will generally be unable to establish credit for up to ten years. In 2005, the bankruptcy law was changed to make it more difficult for some consumers to file Chapter 7 bankruptcy based on a financial means test and credit counseling requirements that may require a repayment of some of your debt.

Anchor is a debt relief agency under the United States Bankruptcy Code Sections 527 (a) and (b), and we are required to provide the following information and notice:

A debt relief agency providing bankruptcy assistance to an assisted person shall provide—

(1) The written notice required under section 342(b) (1); and

(2) To the extent not covered in the written notice described in paragraph (1), and not later than 3 business days after the first date on which a debt relief agency first offers to provide any bankruptcy assistance services to an assisted person, a clear and conspicuous written notice advising assisted persons that—

(A) All information that the assisted person is required to provide with a petition and thereafter during a case under this title is required to be complete, accurate, and truthful;

(B) All assets and all liabilities are required to be completely and accurately disclosed in the documents filed to commence the case, and the replacement value of each asset as defined in section 506 must be stated in those documents where requested after reasonable inquiry to establish such value;

(C) Current monthly income, the amounts specified in section 707(b) (2), and, in a case under chapter 13 of this title, disposable income (determined in accordance with section 707(b) (2)), are required to be stated after reasonable inquiry; and

(D) Information that an assisted person provides during their case may be audited pursuant to this title, and that failure to provide such information may result in dismissal of the case

under this title or other sanction, including a criminal sanction.

**IMPORTANT INFORMATION ABOUT BANKRUPTCY ASSISTANCE SERVICES FROM AN ATTORNEY OR BANKRUPTCY PETITION PREPARER**

If you decide to seek bankruptcy relief, you can represent yourself, you can hire an attorney to represent you, or you can get help in some localities from a bankruptcy petition preparer who is not an attorney. THE LAW REQUIRES AN ATTORNEY OR BANKRUPTCY PETITION PREPARER TO GIVE YOU A WRITTEN CONTRACT SPECIFYING WHAT THE ATTORNEY OR BANKRUPTCY PETITION PREPARER WILL DO FOR YOU AND HOW MUCH IT WILL COST. Ask to see the contract before you hire anyone.

The following information will help you to understand what must be done in a routine bankruptcy case and will help you to evaluate how much assistance you may need. Although bankruptcy can be complex, many cases are routine.

Before filing a bankruptcy case, either you or your attorney should analyze your eligibility for different forms of debt relief available under the Bankruptcy Code and which form of relief is most likely to be beneficial for you. Be sure you understand the relief you can obtain and its limitations. To file a bankruptcy case, documents called a Petition, Schedules and Statement of Financial Affairs, as well as in some cases a Statement of Intention need to be prepared correctly and filed with the bankruptcy court. You will have to pay a filing fee to the bankruptcy court. Once your case starts, you will have to attend the required first meeting of creditors where you may be questioned by a court official called a 'trustee' and by creditors.

If you choose to file a chapter 7 case, you may be asked by a creditor to reaffirm a debt. You may want help deciding whether to do so. A creditor is not permitted to coerce you into reaffirming your debts.

If you choose to file a chapter 13 case in which you repay your creditors what you can afford over 3 to 5 years, you may also want help with the preparation of your chapter 13 plan and with the confirmation hearing on your plan which will take place before a bankruptcy judge.

If you select another type of relief under the Bankruptcy Code (other than chapter 7 or chapter 13), you will want to find out what should be done from someone familiar with that type of relief.

Your bankruptcy case may also involve litigation. You are generally permitted to represent yourself in litigation in bankruptcy court, but only attorneys, not bankruptcy petition preparers, can give you legal advice.

Exhibit 08-0044

## Debt Negotiation

Debt Negotiation is a process where the law firm, based on your specific circumstances, develops a plan to manage your debt resolution with your creditors. In general terms, it is a process of negotiating with your creditors for a lower balance or forgiveness of debt, a reduced interest rate, a reduced monthly payment or other restructuring alternatives. To be successful in debt negotiation, you need to have sufficient cash flow to meet your living expenses each month and provide some funds towards resolution of your debt.

If appropriate for your situation, Anchor will contact your unsecured creditors in writing to notify them that you are represented by the law firm and that we are advising you as to all alternatives for debt resolution. As you have indicated in your compliance review, you prefer Anchor to attempt debt negotiation as an alternative to bankruptcy or other options. However, if your financial circumstances change, we will advise you as to other debt resolution alternatives, including those outlined above, so you can make an informed decision based on our advice.

If you have any questions regarding the above options, please contact us for further explanation. If you are ready to proceed, sign below your acknowledgement that you have reviewed the available debt resolution options and have determined that debt negotiation by Anchor is your preference, subject to your ability to request a different alternative if your circumstances change in the future.

**I have reviewed all debt resolution options available to me including doing nothing, filing for bankruptcy and consumer credit counseling, and elect to pursue debt negotiation services with Anchor, subject to my ability to request other alternatives, based on changes in my financial circumstances.**

Client ______________________________ SIGN HERE Date____________________

Co-Client ______________________________ SIGN HERE Date____________________

ANCHOR LAW FIRM

Exhibit 08-0045

# Affidavit of Compliance

I, ______________________________ as a representative affiliated with and under contract to the Anchor Law Firm, PLLC, in my role as a Representative, Member, Partner, Employee or Independent Contractor of said firm (Anchor), confirm that I have conducted a personal and face-to-face- meeting with __________________________________________ (Client's Full Legal Name) to review the Client's file and present all relevant information regarding our representation of said Client, as it relates to our Letter of Engagement to legal representation, including debt resolution and financial workout services, to Client. I have determined that no fees have been received from Client prior to the execution of the Letter of Engagement on this date and such execution has taken place in my presence following my in-person meeting with Client. This Affidavit of Compliance establishes a written record to verify compliance with any and all applicable local, state or federal laws or regulations (collectively the "Applicable Laws"), including, but not limited, to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-08, and the Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310; 75 Fed. Reg. 48458, 48522.

The following subjects were reviewed with Client in writing and, where appropriate, orally or in response to questions regarding such representation:

1) That debt resolution that alters the terms of payment of unsecured debt might have a negative effect on Client's credit and that Anchor does not clean up, fix, or repair credit.
2) That the scope of the representation is specifically limited to the following:
    a. Determine which specific debt resolution option is most appropriate for Client, including an initial review of their budget, income and debt;
    b. Review Client's current unsecured debt burden and thereafter negotiate and attempt to negotiate settlements with Client's creditors in an effort to modify or restructure Client's current unsecured debt;
    c. Provide litigation defense as outlined in the Letter of Engagement.
3) A full review of all fees and costs associated with the representation to the client.
4) That Anchor maintains a Minimum Performance Standard for each individual account entered by Client into the Anchor debt resolution plan, of a minimum of settlement debt reduction of thirty-five percent (35%) of the debt's face value at the time of settlement, including interest, penalties, cost and late fees, as outlined further in the Terms and Conditions of the Engagement Letter. In the event that Anchor does not meet this minimum standard for a particular account, it shall refund the pro rata share of all fees and costs paid to Anchor for such work and Anchor shall settle that individual account for Client at no additional cost.
5) The Client has been advised that the attorney or paralegal who conducted the initial meeting with Client limits their scope of representation or presentation to that initial meeting and review of the Client's file. The Client was made aware that the actual supervising attorney for their file may be a different attorney of the law firm who is licensed in their state.
6) A full review of the arbitration provision, including the fact that, by electing to go to arbitration, both parties were waiving certain rights, including the right to a trial in a court of law.

**Names of all attendees:** ____________________________________________________________

**Start Time:** __________________________ **End Time:** __________________________________

**Location of Meeting:** ______________________________________________________________

Have any materials been provided or presented to the attendees in addition to the Enrollment Documents, the Face to Face Script, and the Face to Face Power Point Presentation**?** _____NO_________YES_____ **(Circle One)**
If so, indicate here and scan/upload all such additional documents or materials: ______________________________

**I affirm the above statements are true and accurate.**

Executed on this Date:_____________________________________________

Representative on behalf of Anchor:

Name: _____________________________________________

Signature: _________________________________________

**Executed in my Presence**

Client Name: ______________________________ Signature: ______________________________ SIGN HERE

ANCHOR
LAW FIRM

**Disclaimer – Settlement of Credit Union Accounts**

This confirms my/our understanding and acknowledgement that, in Anchor Law Firm's (ALG) experience, credit union debt accounts are often resolved for higher settlement amounts, meaning that such debts may cost me/us more to settle and result in smaller reductions from the debt amounts at the time of enrollment. For this reason, credit union debt accounts are excluded from ALG's Performance Standard in Section 2 of the Agreement and ALG provides no assurance that such debts will be settled for any amount. I/we acknowledge that my current credit union account(s) that are to be enrolled into the program are NOT cross-collateralized with any other credit union obligation(s). I/we understand that in the event it is later determined that any enrolled credit union account is cross-collateralized with any other credit union obligation that any enrolled credit union account(s) would be removed from the program and become my sole obligation to be resolve in the manner I see fit.

Further, I/we acknowledge that ALG would thereby have no obligations to represent me regarding these accounts whether ongoing or in the future.

_______________________ _______________________________

Client Name Co-Client Name

Sign Here

_________________Date_____ __________________Date_________

Client Signature Co-Client Signature

# Disclaimer – Settlement of Private Student Loan Accounts

This confirms my/our understanding and acknowledgement that, in Anchor Law Firm experience, private student loan accounts may cost me/us more to settle and result in a smaller reduction from the debts at the time of enrollment. For this reason, private student loan accounts are excluded from Anchor Law Firm Performance Standard in Section 2 of the Agreement and Anchor Law Firm provides no assurance that such debts will be settled for any amount. I/we acknowledge that my private student loan account(s) that are to be enrolled into the program are NOT cross-collateralized with any other obligations with the same lending institution, are unsecured, and are not federally-backed loans. I/we understand that in the event it is later determined that any enrolled private student loan account does not meet the criteria above, Anchor Law Firm shall have the right to remove such account from the program and the removed account shall become my sole obligation to be resolved in the manner I see fit. I/we acknowledge that Anchor Law Firm would thereby have no obligations to represent me regarding any removed accounts whether ongoing or in the future.

Furthermore, I/we understand private student loan accounts tend to have significantly higher average enrolled balances than those of traditional unsecured credit obligations. Accordingly, I/we understand that private student loan accounts may require a longer period of time to resolve when compared to my/our other enrolled accounts.

Client Signature: Co-Client Signature:

Date:

Client Name: Co-Client Name:

GLOBAL
Client Solutions

## DEDICATED ACCOUNT AGREEMENT AND APPLICATION

I. **This Dedicated Account Agreement and Application ("Agreement")** contains the terms, conditions, and disclosures that apply to your dedicated account ("Account"). By signing this Agreement or using your Account, you agree that this Agreement shall apply; and you agree to abide by all of the terms and conditions set forth herein, including the requirement to arbitrate any dispute with Global Client Solutions, LLC ("Global') according to the terms of the "**ARBITRATION OF DISPUTE**" provision in paragraph XVII on page 2 of this Agreement. You are directed to read the "**ARBITRATION OF DISPUTE**" provision in paragraph XVII on page 2 of this Agreement carefully, as you are giving up your right to bring a lawsuit before a judge or jury in a court of law. If you have any questions that you do not believe are addressed in this Agreement, you can and should call, email, or write Global at the number or addresses shown at the end of this Agreement. Please review this Agreement carefully and keep it with your other important records. In this Agreement, the words, "I", "me", "mine", "my", "you" and "your" mean you and any other party who you authorize to use your Account.

II. **Purpose, Nature and Use of the Account:** Your Account is a dedicated account that you can use in connection with the debt settlement program you have undertaken. Global is not a party to your debt settlement program and does not participate in the negotiation of your debts. In general, you will be making periodic deposits to your Account from your primary bank account, and you will be periodically disbursing funds from your Account to repay your debts and the costs associated with your Account and your debt settlement program. Your Account is a Federal Deposit Insurance Corporation ("FDIC") insured sub-account within a master custodial account maintained at a bank designated or selected by Global. The bank is not a party to your debt settlement program and does not participate in the negotiation of your debts, and is an intended third-party beneficiary of this Agreement, including the "ARBITRATION OF DISPUTE" provision in paragraph XVII on page 2 of this Agreement. Additionally, you authorize Global to transfer your Account to another FDIC insured institution under the existing terms. Global will provide written notice to you of such change. Any such notice, and any other written notice that is provided for in this Agreement, will be sent to you at either the physical address you have provided in the application portion of this Agreement and/or the email address you establish with Global. If an email address is not provided to Global, all notices will be sent to you at the physical address you provided in the application portion of this Agreement. Your Account may not be used for any illegal purpose.

III. **Passcodes / Passwords:** You will be provided with a four-digit passcode (your "Passcode") that will enable you to access your Account via the telephone and to identify yourself when contacting a customer support representative. You will also be provided with an initial Internet password (your "Password") that will enable you to access your Account via the Internet. You may change your Password at any time for security purposes and you are encouraged to do so from time to time. You are responsible for the protection and use of your Passcode and Password. Do not disclose your Passcode or Password to anyone who does not have your permission to access your Account.

IV. **Telephonic / Electronic Communications:** You authorize Global to accept and act upon any instruction received from you or authorized by you under this Agreement concerning your Account, where you have communicated that instruction or authorization by telephone, facsimile, email or other electronic means using a telephone keypad or computer. Use of your Passcode, Password or any other form of identification designated by you in any transaction constitutes and will be accepted as your electronic signature, as that term is used in the federal Electronic Signatures in Global and National Commerce Act and other applicable laws.

V. **Authorizing and Initiating Transactions:** In this Agreement you authorize certain transactions involving your Account. Unless you direct otherwise in writing, Global may also act on those instructions that you conveyed to your Sponsor, as defined in the application portion of this Agreement, and such instructions may be acted on without further confirmation. From time to time, you may change those instructions and/or give other instructions to initiate deposits to or disbursements from your Account by contacting Global's Customer Support. In any event, you must always provide a reasonable period of time to act on your instructions. All deposits to your Account will be authorized and initiated pursuant to your instructions, and all disbursements from your Account will be authorized and initiated pursuant to your instructions provided your Account contains sufficient funds to cover the amount of the disbursement. However, neither Global, nor any service provider to Global shall be responsible for determining when a payment is actually due, nor shall they be responsible for determining whether a payment is for the correct amount or otherwise proper. Global's sole obligation in this regard will be to execute your payment instructions in a commercially reasonable manner as soon as practical after receipt of such instructions. Global shall not be responsible for any late payment fee, penalty or other charge levied by any of your creditors, for any failure of any of your creditors to accept a proposal for settlement or honor a settlement; or for any other adverse action taken by your creditor or any other party. Global shall not be liable for any consequences or damages you may claim resulting from Global acting on your instructions.

VI. **Fees and Charges:** The "SCHEDULE OF FEES AND CHARGES" identifies the fees and charges you are obligated to pay Global in connection with this Agreement and your Account; and you agree that these fees and charges may be deducted directly from your Account. The fees and charges in the "SCHEDULE OF FEES AND CHARGES" are the only fees associated with Global's services and your Account. The Monthly Service Charge for the first month in which your Account is established will not be prorated and will be deemed earned in full as of the day the Account is established, e.g., if your Account is established on the 15th day of a month, the Monthly Service Charge for such month shall be earned as of that day. Thereafter, the Monthly Service Charge will be deemed earned in full on the first day of each calendar month during which your Account remains open. Other fees will be deemed earned at the time of the transaction or the event that gives rise to the fee. You expressly acknowledge that Global may increase the fees and charges associated with your Account at any time, and that you will be provided with written notice at least thirty (30) days' prior to such increase. Global shall not be responsible for any other fees and/or charges that you may incur arising from or related to your debt settlement program.

VII. **Termination of Agreement / Account Closure:** You may terminate this Agreement and close your Account at any time by sending a written notice to Global's Customer Support. The written notice must provide Global with the following information:

1. Your full name and current address;
2. Your Account number;
3. The date of the request; and
4. Your request to close your Account.

Please provide Global with sufficient time to process the request. In addition, Global may suspend, cancel or terminate this Agreement and your Account at any time without notice for inactivity, or if your Program has been terminated or is no longer being managed, if your Account is improperly maintained or used, or if you otherwise violate any provision of this Agreement. If this Agreement is terminated for any reason, the collected balance in your Account will be sent to you by check within a reasonable period of time.

VIII. **Monthly Statements:** You will receive your first monthly statement by mail showing your Account activity and balance by mail. Thereafter, monthly statements will be available online, and may be accessed using your login information and Password. Should you desire to continue receiving a paper statement via the United States Postal Service, please contact Global's Customer Support and make a request to receive mailed paper statements. You may obtain balance and transaction information by using your Passcode to access your Account over the telephone, by using your Password to log into Global's website, or by calling Global's Customer Support. You agree to review each of your statements carefully and to report any erroneous, improper, or unauthorized transactions promptly.

IX. **Non-Interest Account:** Your Account is a non-interest bearing Account.

X. **Unauthorized Transactions and Customer Responsibility:** You should never share your Passcode or Password(s) with anyone and should keep your Account information and papers in a secure place. If you believe someone has transferred or may transfer money from your Account without your permission, contact Global's Customer Support immediately.



Exhibit 08-0049 Initial(s) SIGN HERE

DSL 001188

**XI. FDIC Insurance:** The funds in your Account will be FDIC insured up to a maximum of $250,000.00. The insured amount may increase or decrease and is subject to limits set and reset by the FDIC from time to time.

**XII. Incomplete Transactions:** Neither Global nor any service provider to Global shall be liable for failing to complete a transaction due to insufficient funds in your Account; or if circumstances beyond their control prevent the completion of the transaction, including, without limitation, the acts or omissions of any ACH, check or other processor, the National Automated Clearing House Association, the Federal Reserve System, any bank, or the directive of any regulatory authority.

**XIII. Error Resolution Procedures:** In the event of potential errors or questions concerning specific transactions involving your Account, you must call or write Global's Customer Support no later than sixty (60) days after the transaction in question appears on your monthly statement. Furthermore, at the very minimum you must provide Global with the following information:

1. Your full name and Account number;
2. The date and amount of the transaction;
3. The type of transaction and a description of the suspected error (please explain as clearly as possible why you believe there is an error or why you need additional information); and
4. The dollar amount of the suspected error.

If you provide the information over the phone, you may be asked and required to provide it again in writing within ten (10) business days. Global will inform you of the results of the investigation of the suspected error within ten (10) business days after you submit the information and any error will be promptly corrected. However, if Global requires more time to investigate the suspected error, it may take up to an additional thirty (30) days to complete the investigation. If Global determines that there is no error, you will be provided with a written explanation within three (3) business days of such determination; and you may ask for and receive copies of the documents used in making any such determination.

**XIV. Creditor Disputes:** ***You understand and agree that Global is not a party to your debt settlement program, and does not participate in the negotiation of your debts. This Agreement is separate and independent of any contractual obligations you may have with your creditors or debt settlement provider. Accordingly, you hereby expressly acknowledge that Global does not have any involvement in or responsibilities of any kind or nature with respect to your contractual agreement with your creditors or your debt settlement provider, your debt settlement program or the results that you may or may not achieve from your participation in a debt settlement program. Furthermore, you hereby expressly acknowledge that any representation, statement, or obligation made by your debt settlement provider or made in connection with your debt settlement program is not made on Global's behalf, and does not and cannot bind Global. Finally, you expressly acknowledge that Global shall not be liable for any actions taken by, or conduct of, your debt settlement provider in connection with your debt settlement program. You hereby agree to indemnify Global, and hold Global, its parent and subsidiaries, directors, officers, shareholders, and employees harmless from any damages (including attorneys' fees) resulting from the breach of any of the above warranties.***

**XV. Garnishment Acknowledgement:** In the event that a creditor of yours moves to garnish funds in your Account, ***you expressly acknowledge that Global will answer the garnishment and comply with any writ issued by the Court in accordance with the applicable state law. Furthermore, you expressly acknowledge that Global will not be responsible for challenging or raising a defense to the garnishment on your behalf.*** You specifically agree to indemnify and hold Global harmless from any loss, liability, obligation, damage, cost and expense resulting from a creditor's attempt to garnish and/or hold Global liable for any judgment against you.

**XVI. Governing Law:** This Agreement shall be governed by the laws of the state where you reside, except that the state's rules or statutes governing arbitration procedures shall not apply. If any part of this Agreement is declared void or unenforceable, such provision(s) shall be deemed severed from this Agreement, and the remainder of this Agreement shall remain in full force and effect. This Agreement may be modified to the extent necessary to give such force and effect to the remaining provisions. No delay or forbearance in the strict observance or performance of any provision of this Agreement, nor any failure to exercise a right or remedy hereunder, shall be construed as a waiver of such performance, right, or remedy, as the case may be.

**XVII. ARBITRATION OF DISPUTE – IMPORTANT NOTICE WAIVING YOUR RIGHT TO BRING A CLAIM BEFORE A JUDGE OR JURY IN COURT:** In the event of any controversy between the parties, including, but not limited, to any claim, dispute, suit, demand, cross claim, counterclaim, or third party complaint (whether contractual, statutory, in tort, or otherwise) arising out of or relating to this Agreement or its performance, breach, termination, enforcement, interpretation or validity, including the determination of the validity, scope or applicability of this provision to arbitrate, must be resolved by binding and confidential arbitration. This arbitration provision is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and not by any state rule or statute governing arbitration. Arbitration under this provision will be conducted in either the county in which the consumer resides or the closest metropolitan county. **THE PARTIES AGREE THAT ARBITRATION WILL BE BEFORE A SINGLE ARBITRATOR ON AN INDIVIDUAL BASIS AND NOT AS A CLASS OR MASS ACTION. FURTHERMORE, THE PARTIES AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS OF MORE THAN ONE PERSON'S CLAIMS.** The Arbitration will be administered by: The Judicial Arbitration Mediation Services ("JAMS"), 1920 Main Street, Suite 300, Irvine, CA 92614 (www.jamsadr.com); or the American Arbitration Association ("AAA"), 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org); or another nationally known consumer arbitration service on which the parties will agree to use. The Arbitration will be administered according to the arbitration service's fee schedule and the service's current applicable rules and procedures *except: 1) that the parties expressly waive the applicability of any rule governing class or mass action; 2) that the parties agree to have an in-person final hearing; and 3) that the parties agree that any specific arbitration procedure provided for herein will apply to the arbitration proceeding. The arbitrator – who must be either a retired judge or an experienced attorney - must be neutral and independent and must comply with the selected arbitration service's code of ethics. Additionally, the arbitrator will be guided by the Federal Rules of Evidence and "governing substantive" law.* The arbitrator's award is final and binding on all parties. The parties may move to confirm or vacate the award in a court of competent jurisdiction in accordance with the provisions of the FAA. The parties will bear their own attorneys' fees unless such fees are expressly provided for by applicable law. If the arbitrator determines that reasonable attorneys' fees are to be awarded under applicable law, the parties agree that the arbitrator will also determine the amount of reasonable attorneys' fees to be awarded. In the event a party fails to proceed with arbitration, fails to comply with the arbitrator's award or unsuccessfully challenges the arbitrator's award, the other party is entitled to any costs and expenses incurred, including a reasonable attorneys' fee for having to compel arbitration or defend or enforce the award.

***What is Binding Arbitration? Binding Arbitration is an alternative dispute resolution process where both parties give up certain legal rights to bring a claim in court. Binding Arbitration means: (1) that both parties give up their right to a trial in court before a judge or jury; (2) that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of appealable issues expressly provided for in the FAA, 9 U.S.C. § 16; and (3) that discovery may be severely limited by the arbitrator, and if the arbitrator allows full discovery, the arbitrator may not exceed the discovery limitations provided by the Federal Rules of Civil Procedure. I UNDERSTAND THAT I MAY OPT-OUT OF THE TERMS OF THE "ARBITRATION OF DISPUTE" PROVISION BY PROVIDING GLOBAL NOTICE IN WRITING WITHIN THIRTY (30) DAYS OF SIGNING THE AGREEMENT. I understand that the notice must be sent to Global's Customer Support using certified mail or sent by electronic mail to the addresses provided in this Agreement. If I do not timely opt-out, I agree to the terms of the "ARBITRATION OF DISPUTE" provision.***

***I acknowledge that I have read, understood, and agree to abide by the terms of the arbitration provision set forth above, and fully understand that arbitration replaces the right of either party to go to court and replaces the right to have a judge or jury hear of decide either party's dispute or claims.***

SIGNATURE: ______________________________

Exhibit 08-0050



Initials SIGN HERE

DSL 001189

**XVIII. PRIVACY POLICY:** Global may collect personal information that you provide: (1) in the application portion of this Agreement; (2) in any updated information you may provide from time to time; and (3) as part of the transactions processed through your Account. A description of the Privacy Policy applicable to your Account is provided below. If you have additional questions regarding this Agreement's Privacy Policy, please contact Global's Customer Support.

a. **Collection / Use of Personal Information:** Collection of your personal information is designed to protect access to your Account and to assist in providing you with the products and services you have requested. All personal information collected and stored by Global, or on its behalf, is used for specific business purposes: (1) to protect and administer your Account and initiate your authorized transactions; (2) to assist in the design or improvement of products and services; (3) to identify additional products or services offered by Global and/or its affiliated companies that may meet your needs; and (4) to comply with state and federal banking regulations. Only approved and authorized personnel will have access to such information. To further protect your information, auditing mechanisms are in place to identify anyone who may have accessed and in any way modified your personal information.

b. **Maintenance of Accurate Information:** You may update your personal information online, at any time, by using your Password to log into Global's website or by contacting Global's Customer Support. To ensure that Global is able to protect your Account and verify your information, it is in your best interests to maintain accurate and current any records concerning your personal information.

c. **Limited Access to Personal Information:** Access to your personal information is limited to only those personnel with a business reason for accessing such information. In addition, all personnel are trained and educated about the importance of confidentiality and customer privacy. Individual user names and passwords are used by approved personnel to access your personal information, providing audit trails to further safeguard the privacy of your personal information.

d. **Third-Party Disclosure Restrictions:** All third parties with a business need to access your personal information are required to adhere to stringent privacy policies. Your personal information may be supplied to a third party in order to process a transaction you have authorized or if the disclosure is allowed or required by law, e.g., the exchange of information with reputable reporting agencies in response to a subpoena, in connection with the investigation of fraudulent activity, etc.

e. **Sharing of Information:** You authorize Global to share certain information with your debt settlement provider and any third party to the extent necessary to administer your Account in accordance with your instructions and authorization. ***You expressly acknowledge that Global does not maintain records of any documents or information associated with your debt settlement program.***

**XIX. USA Patriot Act Compliance:** As required by the USA Patriot Act, you authorize Global to take reasonable and practical measures to verify the accuracy of the information you have provided in the application portion of this Agreement, as well as to verify your identity by, including and without limitation, securing or accessing your credit report, and/or obtaining any other information about you in order to assist in combating terrorism and preventing Global's system and the banking system from being used for money laundering or other impermissible, illegal purposes.

**XX. Limitation of Liability:** Under no circumstances shall Global ever be liable for any special, incidental, consequential, exemplary, or punitive damages, or an amount in excess of the fees and charges Global receives from you as set forth in this Agreement. Moreover, under no circumstances shall Global ever be liable for the conduct or contractual obligations of a third party, including, but not limited to, the debt settlement provider.

**XXI. English Language Governs:** The terms of this Agreement and the products and services we provide are governed by the English language. As a courtesy, Global has made this Agreement available in languages other than English. If there is any difference in meaning between the English and non-English version of any of our documents, including this Agreement, the English version will apply to your Account and is available to you upon request.

**XXII. Merger Clause:** This Agreement contains the complete and final understanding between the parties. Any prior oral statements, representations, or agreements are superseded by this Agreement.

**XXIII. Customer Support Information:**

**Correspondence Address:** 4343 S. 118th E. Avenue, Suite 220
Tulsa, OK 74146
**Telephone:** (800) 398-7191
**Fax:** (866) 355-8228
**Website Address:** www.globalclientsolutions.com
**Email:** customersupport@globalclientsolutions.com

Note: Global will provide you with a welcome packet subsequent to the execution of this Agreement that will contain deposit instructions applicable to those customers who choose to send in deposits.



Exhibit 08-0051

Initials: SIGN HERE

DSL 001190

# DEDICATED ACCOUNT AGREEMENT AND APPLICATION

I hereby apply for and agree to establish a non-interest bearing dedicated account ("Account") to be administered at a bank selected by Global Client Solutions LLC ("Global") for the purpose of accumulating funds to repay my debts in connection with a debt settlement program of my own choosing (my "Program") that is managed by the organization responsible for administering the Program ("Sponsor"). **I understand that Global is not a party to my Program and does not participate in the management of my Program.** I understand that this Agreement is subject to a customer identification program, as required by the USA Patriot Act and other applicable laws; and accordingly, I hereby represent that the following information is true and complete to the best of my knowledge and belief. In addition, I understand that I may be required to provide a copy of a driver's license and/or other information from time to time for use in connection with the verification of my identity and the administration of the Account. **Furthermore, I understand that the Account is governed by the terms of this Agreement and that I am bound by all of its terms and conditions, including the binding arbitration provision located in paragraph XVII on page 2 of this Agreement in which I expressly give up my right to bring an action in a court before a judge or jury.**

**ACCOUNT OWNERSHIP, CONTROL AND USE:** I understand that the Account, when established in accordance with this Agreement, will be my sole and exclusive property; that only I (or authorized contact, if any) may authorize deposits to and creditor payments from my Account; and that only I may withdraw funds from and/or close my Account at any time as provided for in the Agreement. I hereby authorize (a) periodic deposits to be made to my Account pursuant to the authorization provided below and (b) periodic disbursements to be made from my Account. In this regard, I hereby authorize payment from my Account of the fees and charges provided for in this Agreement. Should I designate an authorized contact, such designation allows for confirmation of Account information and for receipt of messages regarding my Account to the designee. **PERMISSION TO SHARE DATA:** I hereby grant permission for the bank, Global and the Sponsor to share information regarding my Account and my Program with one another and with any other party to the extent necessary to facilitate the transactions I authorize on my Account, and acknowledge that sharing information among these parties is essential to the administration of my Account. I understand that the Agreement provides additional information relating to my privacy rights.

| **Applicant: First Name** (Please print clearly) | **MI** | **Last Name** | **Social Security #** | **Date of Birth (mm/dd/yyyy)** |
|---|---|---|---|---|
| **Authorized Contact** (optional): **First Name** | **MI** | **Last Name** | **Social Security #** | **Date of Birth (mm/dd/yyyy)** |
| **Mailing Address** | **City** | | **State** | **Zip Code** |
| **Physical Address** (if different from mailing address) | **City** | | **State** | **Zip Code** |
| **Home Phone No.** | **Cell Phone No.** | **Email Address** | | |
| **Challenge Question / Answer** (for future ID purposes) | | | | |
| **Sponsor** | | | **Sponsor's Global Account Number** (if known) | |
| **Applicant's Signature** | | SIGN HERE | **Date** | |

## AUTHORIZATION TO DEBIT BANK ACCOUNT

### Applicant's Financial Institution Information

| **Bank Name** | **Routing Number**[1] | **Account Number**[2] | |
|---|---|---|---|
| Citizens Bank | | | |
| **Bank Address** | **City** | **State** | **Zip Code** |
| **Name** (as it appears on check) | | | |
| **Address** (as it appears on check) | **City** | **State** | **Zip Code** |
| 23 Liscomb Cir Unit 41 | | | |

*[1] Routing Number is the 9-digit number appearing in the bottom left corner of your check.*
*[2] Account Number is to the right of the Routing Number and before the Check Number.*

**Amount of Debit** $ ______ On or after the **Day of Debit** ______ day of each month until further notice.

I hereby authorize Global to initiate debit entries to my **checking account (or ☐ savings account)** at the financial institution named above (my "Primary Bank Account"), in the amount(s) and on or after the date(s) set forth above, for the purpose of transferring funds to my Account. I represent that my Primary Bank Account exists; that I own it; and that I will maintain sufficient funds in it to permit the debits to clear on the applicable dates. I understand that I may incur a charge as set forth in the Schedule of Fees and Charges if any attempted debit is not immediately honored when presented; and that the financial institution providing my Primary Bank Account may also assess a charge if this occurs. In addition, I understand that I may subsequently designate another account for this purpose by contacting Global's Customer Support; that I may also change the corresponding amounts and dates from time to time in that manner; and that the representations I made above about my Primary Bank Account will apply to any other account that I designate.

This authorization shall remain in full force and effect until I give a written termination notice to Global that affords it a reasonable period of time to act on it. Any such notice, and any other written notice that is provided for in this Agreement, shall be sent to Global's Customer Support at the addresses set forth in the Agreement.

**Applicant's Signature Authorizing Global to Debit Applicant's Primary Bank Account** SIGN HERE **Date**

### SCHEDULE OF FEES AND CHARGES

| | |
|---|---|
| Monthly Service Charge | $10.95 |
| **Premium Deposit Services** | |
| Incoming Wire Transfer | $10.00 |
| **Disbursement Fees** | |
| ACH Payment | $2.00 |
| Global Direct Pay Fee | $2.00 |
| Outgoing Wire Transfer | $15.00 |
| Manual Check Payment | $4.00 |
| 2nd Day Delivery | $12.00 |
| Overnight Delivery | $20.00 |
| Phone Pay Fee | $1.50 |
| Stop Pay | $17.50 |

*3:00 pm Central Time Cutoff

### CUSTOMER SUPPORT

Any questions or inquiries relating to your Account should be directed to Global's Customer Support. See paragraph XXIII of this Agreement for Global's correspondence address, Global's website address, and the toll-free number to Global's Customer Support. Please note that Global is not a party to your Program, and any questions relating to your Program should be addressed to your Sponsor, and not to Global.

Version 19 – GCS – B – S – 05.10.17

Exhibit 08-0052

STATE OF NEW YORK

COUNTY OF NEW YORK

**AFFIDAVIT OF RYAN SASSON**

I, Ryan Sasson, state as follows:

1. My name is Ryan Sasson. I am over 18 years of age and under no legal disability. The facts stated in this Affidavit are true and correct and are based upon my personal knowledge.

2. I make this Affidavit with respect to the lawsuit filed by David Song, Edwin Mosquera and Gerald Roger, on behalf of themselves and all others similarly situated, against LHDR Help, LLC, myself and other named defendants, in the United States District Court for the Southern District of New York and assigned Case Number 12 CV 6887.

3. I am currently the President of LHDR Help, LLC. I have served in that capacity since the inception of LHDR Help, LLC in October of 2010.

4. Since the inception of LHDR Help, LLC, its only members have been DL USA 1, LLC; Duke Enterprises, LLC; Blaise Investments, LLC and Twist Financial, LLC. I am a member of Duke Enterprises, LLC and Twist Financial, LLC.

5. At no time since the inception of LHDR Help, LLC have Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip or Jason E. Searns had any ownership interest in LHDR Help, LLC. At no time have Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip or Jason E. Searns been employed by LHDR Help, LLC, nor have any of them been managers of LHDR Help, LLC. Neither Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip nor Jason E. Searns has financed LHDR Help, LLC.

6. At no time have Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip or Jason E. Searns had any ownership interest in Duke Enterprises, LLC or Twist Financial, LLC; nor have

any of those individuals, to my knowledge, had any ownership interest in DL USA 1, LLC or Blaise Investments, LLC.

7. At no time since the inception of LHDR Help, LLC has Legal Helpers Debt Resolution, LLC had any ownership interest in LHDR Help, LLC, nor has it financed LHDR Help, LLC. Legal Helpers Debt Resolution, LLC has never had any ownership or financial interest in Duke Enterprises, LLC or Twist Financial, LLC or, to my knowledge, any ownership or financial interest in DL USA 1, LLC or Blaise Investments, LLC.

8. At no time since the inception of LHDR Help, LLC has any entity named Macey, Aleman, Hyslip & Searns had any ownership interest in LHDR Help, LLC, nor has it financed LHDR Help, LLC. Macey, Aleman, Hyslip & Searns has never had any ownership or financial interest in Duke Enterprises, LLC or Twist Financial, LLC or, to my knowledge, any ownership or financial interest in DL USA 1, LLC or Blaise Investments, LLC.

9. At no time since the inception of LHDR Help, LLC has Credit Advocates Law Firm, LLC had any ownership interest in LHDR Help, LLC, nor has it financed LHDR Help, LLC. Credit Advocates Law Firm, LLC has never had any ownership or financial interest in Duke Enterprises, LLC or Twist Financial, LLC or, to my knowledge, any ownership or financial interest in DL USA 1, LLC or Blaise Investments, LLC.

10. Neither Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip nor Jason E. Searns currently has, nor have they ever had, any authority over, or ability to influence, the day-to-day operations, finances, labor relations, compensation policies or methods, payroll practices, work schedules, terms or conditions of employment, human resources policies or practices, or hiring or firing decisions of LHDR Help, LLC (including as related to LHDR Help, LLC's members and management).

Case 1:12-cv-06887-AJN Document 21-3 Filed 10/22/12 Page 4 of 5

11. None of Legal Helpers Debt Resolution, LLC, Credit Advocates Law Firm, LLC or Macey, Aleman, Hyslip & Searns currently has, or ever has had, any authority over, or ability to influence, the day-to-day operations, finances, labor relations, compensation policies or methods, payroll practices, work schedules, terms or conditions of employment, human resources policies or practices, or hiring or firing decisions of LHDR Help, LLC (including as related to LHDR Help, LLC's members and management).

12. LHDR Help, LLC has no imminent plans to move office locations. The lease for LHDR Help, LLC's offices runs through October 2013. If we decide not to renew our lease at that time, it would only be because we have found office space on more favorable terms at another location in Manhattan. LHDR Help, LLC has no plans or intentions, imminent or otherwise, to conduct its operations anywhere other than New York.

13. LHDR Help, LLC is not planning to, and has not so much as discussed, ceasing operations, dissolving, or otherwise transferring its operations or assets to any other entity. In fact, within the past few weeks, LHDR Help, LLC has hired a Chief Financial Officer and a dedicated manager of Human Resources, a newly created position.

14. LHDR Help, LLC maintains the same bank accounts as when Plaintiffs filed the Lawsuit and has no plans of opening different bank accounts outside of New York.

15. On September 28, 2012, Daniel Blumkin ("Blumkin"), one of LHDR Help, LLC's Managers, contacted me by telephone (I was not in the office) to discuss Gerald Roger ("Roger"), one of LHDR Help LLC's sales consultants. Specifically, Blumkin called to discuss his opinion that Roger ought to be terminated due to his consistent lack of production.

16. I review the monthly sales numbers for each of LHDR Help, LLC's sales consultants. Moreover, LHDR Help, LLC maintains a 42" television monitor on its sales floor

Case 1:12-cv-06887-AJN Document 21-3 Filed 10/22/12 Page 5 of 5

that continuously displays the current month's sales figures for each of the sales consultants. I consistently noticed Roger's name displayed at the bottom of that monitor, indicating he was making among the lowest amount of sales as compared with his peers.

17. Because I knew Roger was a consistent low performer and Blumkin had informed me that he already had many meetings with Roger regarding his low production and warning Roger that his employment would be terminated if his production did not improve, I concurred with Blumkin's opinion that Roger's employment ought to be terminated.

18. Blumkin informed me that he would meet with Roger at the end of the work day, prior to a previously scheduled evening work function at a local restaurant, to inform Roger of his termination. I agreed with Blumkin that, based on his termination, Roger should not attend the work function that evening.

FURTHER AFFIANT SAYETH NOT

[signature]
Ryan Sasson

Subscribed and sworn to before me on this 22 day of October, 2012.

[signature]
Notary Public

My appointment expires:
8/1/13

LOIS ROTELLA
Notary Public - State of New York
NO. 01RO6131480
Qualified in New York County
My Commission Expires 8/1/13

STRATEGIC
FINANCIAL SOLUTIONS

# Qualifying Call Script

## Including Skills Guide

Understanding your prospect's entire financial situation, including his or her needs and goals just makes good sense. By doing so, you will position yourself as a professional that is genuinely concerned about understanding your prospect's requirements so you can present a solution that is valuable and relevant for them. Only when you have thoroughly qualified your customer can you present your solution in a way that resonates with their needs and desires.

Doing a complete, thoughtful job on your Qualifying Call also relieves many of the fears, concerns or reservations that prospects have in giving their Personal Information over the phone. An ideal Qualifying call should be between 10 – 15 minutes long.

# Qualifying Call Script

Hi, may I please speak with (**Mr./Mrs. Last Name**)?
Good Afternoon/Morning, my name is (**Your First and Last Name**) and I am calling in regard to your recent debt consolidation loan inquiry.
Do you have a couple of minutes to go over this with me?

**If client asks what company you are with:**
*I am with Finance Solutions/Timberline Financial: which is a full service financial firm. You responded to a mailer from our marketing partner _____________ and I am following up to get some information to submit your inquiry.*

Great! - Before we begin, I would like to let you know this call may be monitored or recorded. Once again, my name is (**Your First and Last Name**) with Finance Solutions/Timberline Financial and I will be the Financial Consultant assigned to your file. Do you have a pen and paper to take down my contact information? (*Provide First Name, Last Name and Phone Number*).

Moving right along, it's my job to confirm the information you provided and ensure everything was entered into our system correctly. I will then send this information to our Analysis Team who will run the numbers and conduct a credit pull.

Lastly, they will send me back your approved terms so that I can give you a call back whenever you have 10 minutes today or tomorrow and go through the approved terms with you, how does that sound?

## *Skills Guide*

Be professional and always introduce yourself. Introducing your company at this point may be confusing, as the prospect has not contacted us. You may prefer to reference the lead source, instead.

Always say your name again, and assure the prospect that you are working for him or her.

Don't ask the client for permission to ask questions. You already asked if s/he had time, so just set the pace for the call by moving straight into your questions.
Be sure to use your questioning skills to probe until you have the information you need. Use a combination of open and closed questions to get a lot of information and then zero in when needed.

These materials are CONFIDENTIAL, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, Inc. All Rights Reserved

Excellent! - In your file that I received, it says that you have about $_________ or so in unsecured debt which you're looking to consolidate. Is that an accurate total?

Ok, I have your current total household income at about $_______ annually, is that correct as well? Excellent, and is that your gross income or your net, after tax income?

And currently what do you do for a living? *(Take notes in Velocify.)*

Thank you! Now are all these debts under your name alone or are some of them joint with a spouse? *(Notate in Velocify and probe for joint applicant's name if applicable).*

Ok great! So I can better assist you, could you give me a brief history on how the debt accumulated?

*If they open up - Empathize and probe for more information, then summarize.*

******Insert reflective question here***

*If they don't open up:* Ok, to help me understand your situation better, was this debt built up gradually over time or was there a specific change in your life that caused you to take on the debt?

*(Sometimes it could be a Business venture, change of income, Large unexpected expense, Divorce, medical bills or Remodel) Empathize!*

Most of my clients have been in debt for 3-4 years, is this about the same for you or was it over a longer timeframe?

And is this the most debt you've had over that time? *(Find out if this is the highest peak of their debt accumulation or what was and when).*

So, it sounds like that's part of your motivation for doing this NOW then, right?

Great! Now that I understand what's been going on, can you tell me what your goals are and ideally what you'd like to accomplish with us today?

I completely understand. (*Empathize and relate to other clients whenever possible.*)

Besides getting out of debt are you looking to refinance or purchase a home in the near future? (*Notate in Velocify to use for credit rebuttal in Closing Call.*)

These materials are CONFIDENTIAL, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, Inc. All Rights Reserved

Moving right along, it also says your total monthly payment on these debts is around $_______per month? Is that a fairly accurate minimum payment? *(Pause for acknowledgement, then proceed.)*

Excellent! After making these payments are you left with extra money to save at the end of each month or has it become a bit of stretch for you? *(Empathize, listen and take notes in Velocify.)*

And if you don't mind me asking, do you have money in your savings right now or has this debt caused you to dip into your savings already?

I completely understand —so just to recap; for you, your main goal here is to make a lower and more effective monthly payment so you can have more money left over to save at the end of each month. And you're looking to resolve this debt in the next 3-4 years, does that sound about right? *(Tailor/elaborate when necessary and TAKE NOTES!)*

And are there any other goals you are looking to accomplish that I did not ask about?

Perfect! Now I just have to confirm your personal information to ensure it was entered correctly, I have your first name as (**First Name**), last name as (**Last Name**), your current address is (**Current Address**), your email address is (**Client Email - clientname@domain.com**) and I have the phone number you provided on file already but is there another number you'd like us to have on file just in case? (*Enter Number in Velocify*)

Ok thank you. Lastly, in order to pull your credit report, we need your date of birth please, whenever you're ready? *(Keep moving quickly.)*

As well as your Social.

## Skills Guide

• • •

Always uncover lifestyle goals and financial goals. You will need to know these in order to do a competent job relating benefits during your second call.

Summarize! Then probe to confirm you and your prospect are on the same page. A summary will also remind you of any information you need, but didn't get. Ask about it at the end of your summary.

Don't hesitate or change the tone or pace of your call when asking for the prospect's DOB or SSN. NEVER refer to the social security number as such. ALWAYS refer to it as **"your social."**

These materials are CONFIDENTIAL, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, Inc. All Rights Reserved

Thank you and so the very last item our Analysis Team needs from you is a quick Income/Expense report to evaluate your Debt-to-Income ratio.

So I have your annual income listed around **($XX,XXX)**, but if you could give me a quick ballpark estimate off the top of your head, how much is your take-home income each month after taxes?

1. Thank you. Now, roughly how much is your mortgage payment/rent?
2. And roughly how much is your car lease or loan payment each month if you have one?
3. Thank you and lastly if we did a rough estimate on all other bills including utilities, cell phone, cable, internet, food and gas would you say it's around $1500 per month? And do you have any other miscellaneous expenses? For instance, boat, alimony, child support, tuition, student loans to add or does that pretty much cover your bills?

So, (**Name**) thank you very much, your application is now complete for me to send to our backend and prepare the approved terms for you.

Now ideally you will need to be in front of a computer when I give you a call back in order for us to go through your personalized presentation together. Would later today or tomorrow work better for you? Excellent, and would morning, afternoon or evening work best?

Perfect, so I'm bringing up my calendar and I have open a **X:XX** or **X:XX** open, which time works better for you?
Excellent - Thank you so much, (**Name**), and I will talk to you at **X:XX**! Enjoy the rest of your day!

---

**Qualifying Call Q & A**

**Q:** What are the rates/terms?

**A:** Great question – The rates are contingent upon the state you live in, your credit score and financial information. Interest rates typically range from as low as 5.99% to as high as 29.99%. The terms depend on your qualifications and typically range anywhere between 1 to 4 years.

**Q:** Why do you need my social security number?

**A:** (Mr./Mrs. Client Name), I understand your concern to provide your social security number, however, to ensure we pull the right report, it helps to have both your date of birth and social. Does that make sense?

These materials are CONFIDENTIAL, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, Inc. All Rights Reserved

*If they refuse:*

I have an alternative option that we can use to move your file forward with only your date of birth. However, once we receive a conditional approval, I will need your social to complete your application. How does that sound.

**Q:** What is the name of your company?
**A:** I work with *Finance Solutions / Timberline Financial*, (**the lender on your mailer**) shared your information with us as we are a full service financial firm and will likely have at least one option that will fit your needs. May I proceed with the call?

**Q:** The flyer said I was already approved for a loan. Why do I have to submit an application?
**A:** Many people take the term "pre-approved" to mean already approved and I apologize for that confusion. It actually means you have been pre-approved to go through our application process, but we do need some additional information to complete your application. May I continue?"

**Q:** I didn't approve for my information to be shared. How did you get my information?
**A:** Great question, (**lender on mailer**) is the marketing company we outsource to and we work in conjunction with them to reach the clients we serve. At some point, you filled out this mailer which has allowed me to reach out to you and help find a solution for you today. Would it be okay if I proceed?

These materials are CONFIDENTIAL, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, Inc. All Rights Reserved

STRATEGIC
FINANCIAL SOLUTIONS

# Objection Handles

## Including Skills Guide

This document contains the structure and content needed to overcome the most common objections encountered in selling the Strategic Finance Solutions and Timberline Financial credit card modification services.

These materials are ***CONFIDENTIAL***, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, LLC.

# Objection Handles

**CREDIT SCORE**

**Concern:** Will this program cause my credit score to go down?

**Response:** Your creditors will not negotiate with us if you continue to pay them directly. This may result in a temporary negative impact on your credit score.

**Probe:** Are you OK with a temporary negative impact on your score?

**Objection:** No, I don't want my credit score to go down. This is not OK.

**Empathize:** Mr. Prospect, I completely understand your concern. In fact, a number of my clients that I've enrolled in the program had that same concern, but for different reasons.

**Probe:** Do you mind if I ask why you are concerned about the program having a temporary negative impact on your credit score?

**Proof:** Specific credit score objections and countering proofs are provided on the following pages.

## *Skills Guide*

•••

Most objections are preceded by a concern. Some concerns become objections, but not all do. Handle a concern by answering it and then probing for the prospect's attitude.

If the client is OK with your answer, continue with your pitch. If not, you have an objection. You can choose to defer it or handle it immediately.

The first step in handling an objection is to **Empathize.** This disarms the prospect and puts you in a more consultative and less "salesy" role.

Next, you MUST **Probe** to determine why the objection exists, if the client hasn't already volunteered that information.

Then, you **Provide Proof** to convince the prospect the objection is not an issue for him or her.

© 2016 Strategic Financial Solutions, LLC.

## CREDIT SCORE OBJECTION – EMOTIONAL

**Concern:** Will this program cause my credit score to go down?

**Response:** Yes, your credit score will be negatively impacted at the beginning of the program, however, your score should be on its road to a complete and full recovery as you graduate through the program. Is this something you would be ok with?

**If Yes:** Proceed with Presentation

**If No:**

**Empathize:** I completely understand your concern. In fact, a number of my clients that I've enrolled in the program had that same concern, but for different reasons.

**Probe:** Do you mind if I ask why you are concerned about the program adversely affecting your credit score?

**Client Response:** I've always kept my credit score as high as possible and don't want to throw away all those efforts by doing something to make it go down.

**Proof**: I'm really glad you're taking this decision seriously. Let's talk about your credit score and how it's going to be affected while in our program.

Now, when you enter this program, you will not be making the minimum payments to your creditors anymore. *(Optional: Remember, the payments you are making are being saved in your FDIC insured trust account instead of being paid to the creditors)*. This will cause creditors to mark the accounts as late which will initially have a negative effect on your credit score.

The good news is, your score should be on its road to recovery as you move through the program, and here's why:

Factors that are currently hurting your score right now, such as your high utilization levels and high dependency on revolving debt, will be removed as these accounts get closed and settled.

Also, under the most recently announced version of the FICO scoring method, any account that is paid off or settled immediately drops from the scoring calculation, even if an account has gone into collection. That means that your credit score should be well on its way to a complete recovery as you successfully complete the program and become debt free.

**Probe for acceptance:** How does that sound?

© 2016 Strategic Financial Solutions, LLC.

## CREDIT SCORE – EMOTIONAL II

**Probe:** Do you mind if I ask why you are concerned about the program adversely affecting your credit score?

**Answer:** I've always kept my credit score as high as possible and don't want to throw away all those efforts by doing something to make it go down.

**Proof**: I'm really glad you're taking this decision seriously. Let's talk about your credit score and how it's already being negatively affected by your current situation.

**Option 1:** The reason why your credit score is being negatively affected is because of the high utilization levels on your cards and your overall high reliance on revolving - or unsecured - debt are combining to overwhelm the positive effect of making your payments on time.

**Option 2**: I'm certain if we checked your credit score a few months ago, it would have been quite a bit higher than your current score of_______, wouldn't you agree? The reason for this gradual drop is the high utilization levels on your cards and your overall high reliance on revolving - or unsecured - debt are combining to overwhelm the positive effect of making your payments on time.

**Probe for acceptance**: Am I doing a good job explaining this so far?

© 2016 Strategic Financial Solutions, LLC.

## CREDIT SCORE – AUTO LOAN

**Probe:** Do you mind if I ask why you are concerned about the program adversely affecting your credit score?

**Answer:** I'm planning to purchase/lease a new car next year. If my score goes down, I won't be approved for a loan/lease.

**Proof:** When buying a car most people don't know their standard FICO score is not used to determine their car loan. Instead, a different score is used. It's something called an Auto Industry Option Score or FICO Auto Credit Score. This auto credit score is calculated by FICO exclusively for use by auto lenders to determine your loan qualification, down payment and interest rate.

The important thing is that almost 90% of auto lenders base their lending decision on your auto credit score. It is calculated primarily on your previous auto loan history and not your overall credit as would normally be the case for a mortgage or credit card. You would be surprised how many people can get a car loan and not a credit card.

**Probe for acceptance**: So, although your standard consumer FICO score may affect the interest rate of your loan/lease, it won't affect the financing decision. Of course, the program savings will far outweigh any small incremental cost in your loan/lease payment.

How does that sound?

### *Skills Guide*

If the prospect has not volunteered why the objection exists, you need to probe to find out. Now that you know the prospect is concerned about getting a new car, you can easily overcome the objection with solid proof.

There are different types of FICO reports/scores, tailored to specific lending decisions such as car loans or mortgages. In these reports/scores, the prospect's history with that specific type of credit is most heavily weighted. i.e., mortgage payment history is weighted very high for a mortgage, automotive loan payment history for a new car loan or lease.

© 2016 Strategic Financial Solutions, LLC.

## CREDIT SCORE – SECURITY CLEARANCE

**Probe:** Do you mind if I ask why you are concerned about the program adversely affecting your credit score?

**Answer:** I have a security clearance that I could lose if my credit score goes down. If that happens, I could lose my job.

**Proof:** There are a lot of misconceptions that relate to the effect of credit scores on security clearances. In reality, your credit score has no bearing on your security clearance. According to the Defense Office of Hearings and Appeals regulations, (DOHA), personnel with hefty debt loads can lose their security clearances if they don't do anything about resolving their debt – not by their credit score dropping. And, simply putting a plan together is not enough. Taking action on that plan, however, could make all the difference in keeping your clearance, and that's where our program can really help.

Many service members are afraid to admit a debt problem and seek help, for fear that acknowledging the problem may jeopardize security clearance. DOHA rulings, however, show that seeking help and taking action are considered positively. By the way, according to the regulations, your first meeting with your Security Officer to discuss the problem is strictly of the record.

If you are enrolled in a program like ours, you can show you've started a good-faith effort to repay or resolve debt, which is regarded as positive action.

**Probe for Acceptance: How does that sound?**

**Further proof source**: Typically, the way we proceed with clients that have a security clearance is to enroll you in the program, and you then take your enrollment documents to your security office to receive his or her approval. Our security clearance specialists are available to join that meeting over the phone to discuss the program with your SO and answer any questions.

*Skills Guide*

That credit scores directly affect security clearances has become a bit of an "Urban Legend" among those who hold them. You will need to discuss this issue in detail to convince many people.

This handle has a little "jargon" in it to convince the client that you are familiar with the issue. Some clients will be reluctant to even discuss the issue with their Security Officer. Assure them that the first meeting is "off-the-record" and that no measures may be taken against them as a result of it.

© 2016 Strategic Financial Solutions, LLC.

By the way, every time a client proceeded with that strategy, the program has been approved. If, on the off-chance, your security officer does not approve the program, you are free to cancel without penalty or any cost to you.

**How does that sound?**

**Additional Q&A**

**Question**: Are you sure my credit score isn't a factor?

**Answer**:

Absolutely. This is because the majority of your credit score is determined by factors that mean very little to nothing in determine your trustworthiness, reliability, or judgment. Those factors are the length or your credit history, the type of credit you're using and the amount of available credit you're taking advantage of. Those three factors account for 55% of your credit score.

As an example to demonstrate that credit score does not affect security, let's say an individual was transferred from Florida to Minnesota in January. The first thing he would do would be to purchase winter clothing for the entire family. Let's also say the store is offering a 20% discount if he gets a store card and put the purchases on that card. So, he gets the store card and loads it to the max with jackets, gloves, hats, scarves and boots for the family.

Should he lose his security clearance? Of course not. Yet he has over-utilized his card, which is a 30% negative factor; gotten a new line of revolving debt, which is a 15% negative factor; and increased his amount of revolving debt, which is a 10% negative factor. The combined effect is that his credit score is definitely going to drop.

Clearly, the factors that caused the drop do not draw into question your reliability, judgment, and trustworthiness.

**Probe for acceptance:** Did I do a good job explaining the facts of this issue for you?

© 2016 Strategic Financial Solutions, LLC.

## GUILT

**The GUILT OBJECTION usually begins with a prospect saying something similar to "I just don't think this is the type of program for me," but doesn't give a specific reason.**

Empathize: I understand sir, and wouldn't want you to enter a program you aren't comfortable with. We've enrolled thousands of satisfied clients that started out in very similar circumstances to yours.

Probe: So may I ask why you feel the program isn't a good fit for you?

**Possible Answers:**

"I did this to myself, I should have to pay it all back."

"I'm a religious person and this sounds like stealing."

"I'm not the type of person that walks away from my obligations."

**Proof:** I completely understand your desire to meet your obligations and I would never suggest that you do anything but what is fair in your dealings with your creditors. Please give me just a few minutes to review the complete facts of the situation you're in with your creditors and you can then make an informed decision if this program is right for you.

First, as we've discussed, your total credit card debt is about ($$$). Is that correct?

**Customer Response**: "*Yes, that sounds about right*"

Most of my clients have been paying on their debt three to four years. Are you in that range, or have you been in this situation even longer?

***Customer Response****: "Yes, I have been paying on these cards for about three years."*

I calculate the total of all your **monthly minimum payments** as (**use 2**%). Does that sound about right?

***Customer Response****: "Yes".*

### *Skills Guide*

•••

As with any objection, if the prospect hasn't volunteered the reason, you need to probe.

Don't hesitate in moving from your empathetic lead in to running the numbers. Don't ask if it's OK with the prospect, just make the statement and confirm the total credit card debt amount without pausing.

This is a directive question that prompts your client to agree to a length of payment that makes the numbers more powerful. The longer, the better!

If the length is 30 months or longer use 2% to calculate minimums. If it is less, use 3%.

© 2016 Strategic Financial Solutions, LLC.

Paying **($minimum payment (MP))** for your minimum monthly payments for the past three year means that you have already paid the credit card companies **($$$ MP x X months)**.

Because the deck is stacked against you in your arrangements with them, most of what you've paid has not gone to reduce the principal but taken as interest against your debt. As you know, when dealing with credit card companies, another word for interest is profit.

Let's estimate that we settle your debts for right around 50%, give or take a few points. That means you could expect the program to resolve your **($ principal balance (PB))** in credit card debt for around **($ ½ PB).**

Let's add that **($ ½ PB)** to the **($$$ MP x X months)** you've already paid and you can easily see that by the end of the program, you will be debt free after paying the credit card companies a total of **($ ½ PB + MP x X months**).

That's clearly more than the **($PB) you owe**. In fact it amounts to the **($PB) you owe**, plus (**$$$**) in additional profit! **(New $ amount – PB).** That's every penny you owe, plus **(xx) % interest**.

Now that you have a complete picture of the situation, are you comfortable that the program will allow you to meet your obligations?

### *Skills Guide*

You may use your on screen calculator to use precise numbers, but approximate numbers are perfectly OK to make the point of this proof source.

ALWAYS make a point of saying that the total occurs at the end of the program.

Running these numbers makes for an extremely compelling proof source.

If you are going to run the numbers, do a complete job. Telling the client, "Trust me, by the end of the program you will have paid every penny you owe plus interest" is not a compelling proof. Even though it's true, the prospect does not know you and has no reason to trust you. Numbers are easily understood, and inspire trust. Use them!

© 2016 Strategic Financial Solutions, LLC.

**How to "Run the Numbers":**

When you are formally on the phone, you will have a calculator that will do an exact calculation to handle this objection, but for the purposes of learning the process, we'll use the below calculations.

1. Determine the total debt load. For this example, $36,000.

2. Determine the months in debt. For this example 30 months.

3. Calculate monthly minimums by multiplying the total debt by 2% - 4%. In the example, we used 2%, as it is conservative and you won't look like you're artificially trying to inflate the numbers for your purposes. So, for a $36,000 debt total, the minimum monthly payment total would be $720.00. ($36,000 x .02)

4. Determine how much the prospect has already paid, by multiplying the monthly payment ($720) by the months in debt (30). In this example, the prospect has already paid $21,600.

5. Estimate the settlement at 50% of the total debt. In this case, that is $18,000.

6. Add the amounts from 4 and 5 to determine the total amount paid by the program end. ($21,600 + $18,000 = $39,600).

7. Subtract the total debt from 1 from 6 and you have the total interest paid. ($39,600 - $36,000 = $3,600).

8. Divide 7 by 1 and you have the percent interest paid by the end of the program. ($3,600/$36,000 = 10%).

**Important Note**:

The shorter amount of time the prospect has been in debt, the less chance you have of these numbers working.

The tipping point for this calculation to work in your favor is right around 24 months. So, if you're prospect answers that he has been in debt for less than 24 months, this rebuttal will **not** work.

© 2016 Strategic Financial Solutions, LLC.

**Creditor Calls**

**Concern:** Will the creditors call me demanding payment?
**Response:** Yes, you may receive some calls from your creditors during the first few months of the program. However, we have a couple of systems in place that greatly reduce the amount of creditor calls you'll receive from them.
Are you OK with receiving just a few calls from your creditors?

**Objection:** No, I don't want any creditor calls. This is not OK.

**Empathize:** I completely understand your concern. Nobody wants to deal with creditor calls.

**Probe: (No need to probe).**

**Proof Source:** The first thing we do to reduce the amount of creditor calls you'll receive is that your attorneys will send Letters of Representation to some of your creditors immediately upon receiving your first payment. This makes your creditors aware you are enrolled in our program and directs any further creditor correspondence or communication to our law firm, which greatly reduces the amount of creditor calls you'll receive from them.

In addition we provide all our clients with a new free phone # that does not ring on any of your phones, but provides an online digital voicemail that allows the creditors to leave voice messages that you can check at your leisure, if you wish to.

As soon as you enroll into our program, simply contact each creditor that you have entered into the program, and give them your new phone number that we assigned to you. This will filter out about 80% to 90% of all creditor calls associated with the program.

**Probe for Acceptance:** How does that sound?

© 2016 Strategic Financial Solutions, LLC.

**Litigation Finance Solutions ONLY**

**Concern**: Can I get sued by the credit card companies if I enter this program?

**Response**: Because the program will not succeed if you continue to make payments, you may be subject to litigation from your creditors or debt collectors. Historically, less than one percent of our clients' file ever makes it to court. Is that a concern of yours?

**Answer**: Yes, I am very concerned about being sued.

**Empathize**: I can certainly understand your concern about not wanting to get sued.

**Probe**: May I ask though, what is your main concern about the slight chance of getting sued?

*Typical Customer responses:*

*Debt becoming public record (A summons only becomes public record if it goes to trial and a judgement is made).*

*Hassle of going to court / taking time off of work.*

**Proof:** That's certainly understandable. Because your program is managed by (Law Firm) you have full legal representation from the moment you sign on. On the off chance you receive a letter, your obligation is simply to forward it to your legal representative and he or she will inform the creditor that you are enrolled in a modification program that is managed by their firm and that you fully intend to reach a fair settlement with them. That almost always quickly resolves the issue,

**So that.... (Address their specific concern)**

**Additional proof:**

If the creditor is insistent, we will prioritize their negotiations in order to reach a settlement with them more quickly. We may agree to begin making good faith payments as a precursor to a complete settlement, which almost always satisfies them and results in a withdrawal of the notice.

This is why less than 1% of our clients' file ever makes it to court.

**Probe for Acceptance**: Does that information make you feel more comfortable?

© 2016 Strategic Financial Solutions, LLC.

**Tax Liability**

**Concern**: Will I be taxed on the savings of this program?

**Answer:** Whenever $600 or more is forgiven in settling a debt, there may be certain tax consequences. However, the IRS has multiple exceptions and exclusions that may allow you to avoid being taxed on some, or all, of the cancelled debt.

We recommend that you immediately fill out an IRS Form 982, Reduction of Tax Attributes. This form is available for downloading on the IRS website. It's simple and only takes a few minutes to complete.

The IRS may allow exclusion of cancelled debt from taxable income if the current market value of your assets is less than your total debt.

Our clients or their tax preparers navigate through IRS tax reporting rules often to find there's no additional tax due from the cancelled debt.

**Probe for Acceptance**: Did that information put you at ease regarding taxes?

**Possible response: "what if I'm not exempt?":**

Okay, let's assume you are not exempt from paying taxes on your program savings. Now, if I can show you that even if you paid taxes on all of your savings at a tax rate of 30%, and you are still going to save thousands of dollars, can we go ahead and get your enrollment documents started? Great, let me show how…

**Run the numbers: Program savings x 30%; subtract from total savings = new savings amount.**

**Tips:**

If the prospect is a renter, it's likely they will qualify for an insolvency exclusion. According to the IRS: "You were insolvent immediately before the cancellation to the extent that the total of all of your liabilities was more than the FMV of all of your assets immediately before the cancellation. If this is the case, explain it to your prospect and tell your prospect to go to the IRS site, download and complete the IRS Insolvency Worksheet within a week or two of enrolling.

**We cannot predict the likelihood of the client receiving a 1099-C from any creditor.**

© 2016 Strategic Financial Solutions, LLC.

**"I want to think it over."**

Nothing is more frustrating than completing a great Closing Call, only to be met by the prospect saying, "I want to think it over."

Some of the reasons prospects say they want to think about it are:

1. They just need a little help. Perhaps making the commitment is emotionally traumatic for them. They may be uneasy because they are afraid of making a mistake.
2. They may have a "hidden objection" that needs to be dealt with.
3. They may be right on the verge of saying "yes" and just need a little more professional guidance.

If you accept the "I want to think it over" at face value and end the call, it's highly likely you will never get a chance to speak and sell to them again. So, you should always make three attempts to get your prospect past whatever is stopping him or her.

You will always treat this situation as an objection, so always start by empathizing.

**Prospect:** I want to think it over.

**Response:** Okay Mr. Prospect, I am glad you are taking this decision seriously.

**Attempt #1 – Probe**

Before we end the call would you share with me the one thing that is causing you the most concern?

If the probe reveals the hidden objection, deal with it as a normal objection and close the deal.

**Attempt #2 – Summarize Goals and Benefits**

To use a Summary to unstick your sale, you will step back to review the goals you uncovered during your Qualifying Call and relate program benefits to each. Obviously, you want to make this sound as attractive and compelling as possible. Don't be afraid to go into detail, including as many benefits for each goal as you can, without boring them with excessive detail.

**Response:** "Let's take a moment to review the important elements of the program, so they're fresh in your mind as you go on to think things over.

**At this stage you pile on program benefits as they relate to each goal.**

© 2016 Strategic Financial Solutions, LLC.

Now, as I mentioned, our program is going to save you ($15,500) off of the principle balance that you owe, so that you can begin to start saving for your retirement.....

You also mentioned that you felt a little guilty about your wife having to work part-time and that you want her to be able to quit that job as soon as possible, our program is going to save you (over $500) a month so she can begin to cut down on those hours starting right now....

Are those things all still important? Fantastic!

**The Summary of Benefit Close must lead into third closing attempt:**

"Mr. Prospect, I understand that you want to think things over, but when I look at all the ways the program is going to immediately increase the quality of life for you and those you love, it strikes me that we should get you started as soon as possible.

I just need to confirm a few pieces of information to complete your enrollment documents. I have your address as…"

© 2016 Strategic Financial Solutions, LLC.

**FEES**

**Concern:**

***"What are your fees?"***

"Great question. All of our fees are included in your low monthly draft of ($655) that I mentioned earlier, which is ($300) less than what you are currently paying vs. your minimum monthly payments. How does that sound?"

**More Specific**: "Keep in mind, the fees I am about to give you are all included in your monthly draft, and are spread throughout the course of the program. They include:

- A 17% service fee of your enrolled debt*.
- A $995 retainer fee.
- A monthly legal administration fee of $89
- A monthly savings account fee of $10.95

"Once again, these fees are all included in your monthly draft."

© 2016 Strategic Financial Solutions, LLC.

| Form 5500<br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Employee Benefits Security Administration<br>Pension Benefit Guaranty Corporation | **Annual Return/Report of Employee Benefit Plan**<br>This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).<br>▸ **Complete all entries in accordance with the instructions to the Form 5500.** | OMB Nos. 1210-0110<br>1210-0089<br>**2018**<br>**This Form is Open to Public Inspection** |
|---|---|---|

## Part I Annual Report Identification Information

For calendar plan year 2018 or fiscal plan year beginning 01/01/2018 and ending 12/31/2018

**A** This return/report is for:
- ☐ a multiemployer plan
- ☐ a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)
- ☒ a single-employer plan
- ☐ a DFE (specify) ____

**B** This return/report is:
- ☐ the first return/report
- ☐ the final return/report
- ☐ an amended return/report
- ☐ a short plan year return/report (less than 12 months)

**C** If the plan is a collectively-bargained plan, check here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▸ ☐

**D** Check box if filing under:
- ☒ Form 5558
- ☐ automatic extension
- ☐ the DFVC program
- ☐ special extension (enter description)

## Part II Basic Plan Information—enter all requested information

| | |
|---|---|
| **1a** Name of plan<br>STRATEGIC ESOP | **1b** Three-digit plan number (PN) ▸ 002<br>**1c** Effective date of plan<br>05/01/2017 |
| **2a** Plan sponsor's name (employer, if for a single-employer plan)<br>Mailing address (include room, apt., suite no. and street, or P.O. Box)<br>City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)<br>STRATEGIC FINANCIAL SOLUTIONS, LLC<br>711 3RD AVENUE<br>6TH FLOOR<br>NEW YORK, NY 10017 | **2b** Employer Identification Number (EIN)<br>[redacted]<br>**2c** Plan Sponsor's telephone number<br>212-810-4537<br>**2d** Business code (see instructions)<br>523900 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| | | | |
|---|---|---|---|
| **SIGN HERE** | Filed with authorized/valid electronic signature. | 10/15/2019 | KIMBERLY CELIC |
| | **Signature of plan administrator** | Date | Enter name of individual signing as plan administrator |
| **SIGN HERE** | Filed with authorized/valid electronic signature. | 10/15/2019 | KIMBERLY CELIC |
| | **Signature of employer/plan sponsor** | Date | Enter name of individual signing as employer or plan sponsor |
| **SIGN HERE** | | | |
| | **Signature of DFE** | Date | Enter name of individual signing as DFE |

| | | | |
|---|---|---|---|
| **3a** Plan administrator's name and address [X] Same as Plan Sponsor | | **3b** Administrator's EIN | |
| | | **3c** Administrator's telephone number | |
| **4** If the name and/or EIN of the plan sponsor or the plan name has changed since the last return/report filed for this plan, enter the plan sponsor's name, EIN, the plan name and the plan number from the last return/report: | | **4b** EIN | |
| **a** Sponsor's name | | | |
| **c** Plan Name | | **4d** PN | |
| **5** Total number of participants at the beginning of the plan year | | **5** | 516 |
| **6** Number of participants as of the end of the plan year unless otherwise stated (welfare plans complete only lines **6a(1)**, **6a(2)**, **6b**, **6c**, and **6d**). | | | |
| **a(1)** Total number of active participants at the beginning of the plan year | | **6a(1)** | 516 |
| **a(2)** Total number of active participants at the end of the plan year | | **6a(2)** | 311 |
| **b** Retired or separated participants receiving benefits | | **6b** | 0 |
| **c** Other retired or separated participants entitled to future benefits | | **6c** | 48 |
| **d** Subtotal. Add lines **6a(2)**, **6b**, and **6c** | | **6d** | 359 |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits. | | **6e** | 0 |
| **f** Total. Add lines **6d** and **6e** | | **6f** | 359 |
| **g** Number of participants with account balances as of the end of the plan year (only defined contr bution plans complete this item) | | **6g** | 357 |
| **h** Number of participants who terminated employment during the plan year with accrued benefits that were less than 100% vested | | **6h** | 111 |
| **7** Enter the total number of employers obligated to contribute to the plan (only multiemployer plans complete this item) | | **7** | |

**8a** If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristics Codes in the instructions:

2I 2P 2Q 3I

**b** If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristics Codes in the instructions:

| **9a** Plan funding arrangement (check all that apply) | **9b** Plan benefit arrangement (check all that apply) |
|---|---|
| (1) [ ] Insurance | (1) [ ] Insurance |
| (2) [ ] Code section 412(e)(3) insurance contracts | (2) [ ] Code section 412(e)(3) insurance contracts |
| (3) [X] Trust | (3) [X] Trust |
| (4) [ ] General assets of the sponsor | (4) [ ] General assets of the sponsor |

**10** Check all applicable boxes in 10a and 10b to indicate which schedules are attached, and, where indicated, enter the number attached. (See instructions)

| **a Pension Schedules** | **b General Schedules** |
|---|---|
| (1) [X] **R** (Retirement Plan Information) | (1) [X] **H** (Financial Information) |
| (2) [ ] **MB** (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information) - signed by the plan actuary | (2) [ ] **I** (Financial Information – Small Plan) |
| | (3) [ ] ___ **A** (Insurance Information) |
| | (4) [X] **C** (Service Provider Information) |
| (3) [ ] **SB** (Single-Employer Defined Benefit Plan Actuarial Information) - signed by the plan actuary | (5) [ ] **D** (DFE/Participating Plan Information) |
| | (6) [ ] **G** (Financial Transaction Schedules) |

## Part III Form M-1 Compliance Information (to be completed by welfare benefit plans)

**11a** If the plan provides welfare benefits, was the plan subject to the Form M-1 filing requirements during the plan year? (See instructions and 29 CFR 2520.101-2.) .................................... ☐ Yes ☐ No

If "Yes" is checked, complete lines 11b and 11c.

**11b** Is the plan currently in compliance with the Form M-1 filing requirements? (See instructions and 29 CFR 2520.101-2.) ........... ☐ Yes ☐ No

**11c** Enter the Receipt Confirmation Code for the 2018 Form M-1 annual report. If the plan was not required to file the 2018 Form M-1 annual report, enter the Receipt Confirmation Code for the most recent Form M-1 that was required to be filed under the Form M-1 filing requirements. (Failure to enter a valid Receipt Confirmation Code will subject the Form 5500 filing to rejection as incomplete.)

Receipt Confirmation Code____________________

| SCHEDULE C (Form 5500) | Service Provider Information | OMB No. 1210-0110 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA). | 2018 |
| Department of Labor Employee Benefits Security Administration | ▶ File as an attachment to Form 5500. | This Form is Open to Public Inspection. |
| Pension Benefit Guaranty Corporation | | |

For calendar plan year 2018 or fiscal plan year beginning 01/01/2018 and ending 12/31/2018

| | |
|---|---|
| **A** Name of plan<br>STRATEGIC ESOP | **B** Three-digit plan number (PN) ▶ 002 |
| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>STRATEGIC FINANCIAL SOLUTIONS, LLC | **D** Employer Identification Number (EIN)<br>[redacted] |

## Part I Service Provider Information (see instructions)

You must complete this Part, in accordance with the instructions, to report the information required for **each person** who received, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of monetary value) in connection with services rendered to the plan or the person's position with the plan during the plan year. If a person received **only** eligible indirect compensation for which the plan received the required disclosures, you are required to answer line 1 but are not required to include that person when completing the remainder of this Part.

### 1 Information on Persons Receiving Only Eligible Indirect Compensation

**a** Check "Yes" or "No" to indicate whether you are excluding a person from the remainder of this Part because they received only eligible indirect compensation for which the plan received the required disclosures (see instructions for definitions and conditions)... ☐ Yes ☒ No

**b** If you answered line 1a "Yes," enter the name and EIN or address of each person providing the required disclosures for the service providers who received only eligible indirect compensation. Complete as many entries as needed (see instructions).

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation



Exhibit 08-0082
DSL 005381

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on elig ble indirect compensation

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Exhibit 08-0085

**DSL 005384**

## Part I Service Provider Information (continued)

**3.** If you reported on line 2 receipt of indirect compensation, other than eligible indirect compensation, by a service provider, and the service provider is a fiduciary or provides contract administrator, consulting, custodial, investment advisory, investment management, broker, or recordkeeping services, answer the following questions for (a) each source from whom the service provider received $1,000 or more in indirect compensation and (b) each source for whom the service provider gave you a formula used to determine the indirect compensation instead of an amount or estimated amount of the indirect compensation. Complete as many entries as needed to report the required information for each source.

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

## Part II Service Providers Who Fail or Refuse to Provide Information

4 Provide, to the extent possible, the following information for each service provider who failed or refused to provide the information necessary to complete this Schedule.

| (a) Enter name and EIN or address of service provider (see instructions) | (b) Nature of Service Code(s) | (c) Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| (a) Enter name and EIN or address of service provider (see instructions) | (b) Nature of Service Code(s) | (c) Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| (a) Enter name and EIN or address of service provider (see instructions) | (b) Nature of Service Code(s) | (c) Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| (a) Enter name and EIN or address of service provider (see instructions) | (b) Nature of Service Code(s) | (c) Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| (a) Enter name and EIN or address of service provider (see instructions) | (b) Nature of Service Code(s) | (c) Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| (a) Enter name and EIN or address of service provider (see instructions) | (b) Nature of Service Code(s) | (c) Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

**Part III** **Termination Information on Accountants and Enrolled Actuaries (see instructions)**
(complete as many entries as needed)

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

**SCHEDULE H (Form 5500)**

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

# Financial Information

This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA), and section 6058(a) of the Internal Revenue Code (the Code).

▶ **File as an attachment to Form 5500.**

OMB No. 1210-0110

**2018**

**This Form is Open to Public Inspection**

For calendar plan year 2018 or fiscal plan year beginning 01/01/2018 and ending 12/31/2018

**A** Name of plan
STRATEGIC ESOP

**B** Three-digit plan number (PN) ▶ 002

**C** Plan sponsor's name as shown on line 2a of Form 5500
STRATEGIC FINANCIAL SOLUTIONS, LLC

**D** Employer Identification Number (EIN)
[redacted]

## Part I Asset and Liability Statement

**1** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines 1c(9) through 1c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. **Round off amounts to the nearest dollar.** MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, and 1i. CCTs, PSAs, and 103-12 IEs also do not complete lines 1d and 1e. See instructions.

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **a** Total noninterest-bearing cash | 1a | 0 | 0 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions | 1b(1) | 6000000 | 4152762 |
| (2) Participant contributions | 1b(2) | 0 | 0 |
| (3) Other | 1b(3) | 0 | 0 |
| **c** General investments: | | | |
| (1) Interest-bearing cash (include money market accounts & certificates of deposit) | 1c(1) | | |
| (2) U.S. Government securities | 1c(2) | | |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred | 1c(3)(A) | | |
| (B) All other | 1c(3)(B) | | |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred | 1c(4)(A) | | |
| (B) Common | 1c(4)(B) | | |
| (5) Partnership/joint venture interests | 1c(5) | | |
| (6) Real estate (other than employer real property) | 1c(6) | | |
| (7) Loans (other than to participants) | 1c(7) | | |
| (8) Participant loans | 1c(8) | | |
| (9) Value of interest in common/collective trusts | 1c(9) | | |
| (10) Value of interest in pooled separate accounts | 1c(10) | | |
| (11) Value of interest in master trust investment accounts | 1c(11) | | |
| (12) Value of interest in 103-12 investment entities | 1c(12) | | |
| (13) Value of interest in registered investment companies (e.g., mutual funds) | 1c(13) | | |
| (14) Value of funds held in insurance company general account (unallocated contracts) | 1c(14) | | |
| (15) Other | 1c(15) | | |



Exhibit 08-0089
**DSL 005388**

| | | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| 1d | Employer-related investments: | | | |
| | (1) Employer securities | 1d(1) | 111282300 | 101455200 |
| | (2) Employer real property | 1d(2) | | |
| e | Buildings and other property used in plan operation | 1e | | |
| f | Total assets (add all amounts in lines 1a through 1e) | 1f | 117282300 | 105607962 |
| | **Liabilities** | | | |
| g | Benefit claims payable | 1g | 0 | |
| h | Operating payables | 1h | 0 | |
| i | Acquisition indebtedness | 1i | 0 | |
| j | Other liabilities | 1j | 242052055 | 237744397 |
| k | Total liabilities (add all amounts in lines 1g through1j) | 1k | 242052055 | 237744397 |
| | **Net Assets** | | | |
| l | Net assets (subtract line 1k from line 1f) | 1l | -124769755 | -132136435 |

## Part II Income and Expense Statement

**2** Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

| | **Income** | | (a) Amount | (b) Total |
|---|---|---|---|---|
| a | **Contributions:** | | | |
| | (1) Received or receivable in cash from: **(A)** Employers | 2a(1)(A) | 8970981 | |
| | (B) Participants | 2a(1)(B) | 0 | |
| | (C) Others (including rollovers) | 2a(1)(C) | 0 | |
| | (2) Noncash contributions | 2a(2) | 0 | |
| | (3) Total contributions. Add lines **2a(1)(A), (B), (C),** and line **2a(2)** | 2a(3) | | 8970981 |
| b | **Earnings on investments:** | | | |
| | (1) Interest: | | | |
| | (A) Interest-bearing cash (including money market accounts and certificates of deposit) | 2b(1)(A) | 0 | |
| | (B) U.S. Government securities | 2b(1)(B) | 0 | |
| | (C) Corporate debt instruments | 2b(1)(C) | 0 | |
| | (D) Loans (other than to participants) | 2b(1)(D) | 0 | |
| | (E) Participant loans | 2b(1)(E) | | |
| | (F) Other | 2b(1)(F) | 0 | |
| | (G) Total interest. Add lines **2b(1)(A)** through **(F)** | 2b(1)(G) | | 0 |
| | (2) Dividends: **(A)** Preferred stock | 2b(2)(A) | 0 | |
| | (B) Common stock | 2b(2)(B) | 0 | |
| | (C) Registered investment company shares (e.g. mutual funds) | 2b(2)(C) | 0 | |
| | (D) Total dividends. Add lines **2b(2)(A), (B),** and **(C)** | 2b(2)(D) | | 0 |
| | (3) Rents | 2b(3) | | 0 |
| | (4) Net gain (loss) on sale of assets: **(A)** Aggregate proceeds | 2b(4)(A) | 0 | |
| | (B) Aggregate carrying amount (see instructions) | 2b(4)(B) | 0 | |
| | (C) Subtract line **2b(4)(B)** from line **2b(4)(A)** and enter result | 2b(4)(C) | | 0 |
| | (5) Unrealized appreciation (depreciation) of assets: **(A)** Real estate | 2b(5)(A) | 0 | |
| | (B) Other | 2b(5)(B) | -9827100 | |
| | (C) Total unrealized appreciation of assets. Add lines **2b(5)(A)** and **(B)** | 2b(5)(C) | | -9827100 |

| | Line | (a) Amount | (b) Total |
|---|---|---|---|
| (6) Net investment gain (loss) from common/collective trusts | 2b(6) | | 0 |
| (7) Net investment gain (loss) from pooled separate accounts | 2b(7) | | 0 |
| (8) Net investment gain (loss) from master trust investment accounts | 2b(8) | | 0 |
| (9) Net investment gain (loss) from 103-12 investment entities | 2b(9) | | 0 |
| (10) Net investment gain (loss) from registered investment companies (e.g., mutual funds) | 2b(10) | | 0 |
| **c** Other income | 2c | | 0 |
| **d** Total income. Add all **income** amounts in column (b) and enter total | 2d | | -856119 |

### Expenses

| | Line | (a) Amount | (b) Total |
|---|---|---|---|
| **e** Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers | 2e(1) | 0 | |
| (2) To insurance carriers for the provision of benefits | 2e(2) | 0 | |
| (3) Other | 2e(3) | 0 | |
| (4) Total benefit payments. Add lines **2e(1)** through **(3)** | 2e(4) | | 0 |
| **f** Corrective distr butions (see instructions) | 2f | | 0 |
| **g** Certain deemed distributions of participant loans (see instructions) | 2g | | |
| **h** Interest expense | 2h | | 6510561 |
| **i** Administrative expenses: (1) Professional fees | 2i(1) | 0 | |
| (2) Contract administrator fees | 2i(2) | 0 | |
| (3) Investment advisory and management fees | 2i(3) | 0 | |
| (4) Other | 2i(4) | 0 | |
| (5) Total administrative expenses. Add lines **2i(1)** through **(4)** | 2i(5) | | 0 |
| **j** Total expenses. Add all **expense** amounts in column (b) and enter total | 2j | | 6510561 |

### Net Income and Reconciliation

| | Line | (a) Amount | (b) Total |
|---|---|---|---|
| **k** Net income (loss). Subtract line **2j** from line **2d** | 2k | | -7366680 |
| **l** Transfers of assets: | | | |
| (1) To this plan | 2l(1) | | 0 |
| (2) From this plan | 2l(2) | | |

## Part III Accountant's Opinion

**3** Complete lines 3a through 3c if the opinion of an independent qualified public accountant is attached to this Form 5500. Complete line 3d if an opinion is not attached.

**a** The attached opinion of an independent qualified public accountant for this plan is (see instructions):

(1) [X] Unqualified (2) [ ] Qualified (3) [ ] Disclaimer (4) [ ] Adverse

**b** Did the accountant perform a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 103-12(d)? [ ] Yes [X] No

**c** Enter the name and EIN of the accountant (or accounting firm) below:

(1) Name: FREED MAXICK CPAS, P.C. (2) EIN: [redacted]

**d** The opinion of an independent qualified public accountant is **not attached** because:

(1) [ ] This form is filed for a CCT, PSA, or MTIA. (2) [ ] It will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

## Part IV Compliance Questions

**4** CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete lines 4a, 4e, 4f, 4g, 4h, 4k, 4m, 4n, or 5. 103-12 IEs also do not complete lines 4j and 4l. MTIAs also do not complete line 4l.

During the plan year:

| | Line | Yes | No | Amount |
|---|---|---|---|---|
| **a** Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? Continue to answer "Yes" for any prior year failures until fully corrected. (See instructions and DOL's Voluntary Fiduciary Correction Program.) | 4a | | X | 0 |
| **b** Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollect ble? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked.) | 4b | | X | 0 |

Exhibit 08-0091

DSL 005390

| | | | Yes | No | Amount |
|---|---|---|---|---|---|
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) | 4c | | X | 0 |
| d | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.) | 4d | | X | 0 |
| e | Was this plan covered by a fidelity bond? | 4e | X | | 1000000 |
| f | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? | 4f | | X | |
| g | Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? | 4g | | X | |
| h | Did the plan receive any noncash contributions whose value was neither readily determinable on an established market nor set by an independent third party appraiser? | 4h | | X | |
| i | Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements.) | 4i | X | | |
| j | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements.) | 4j | | X | |
| k | Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC? | 4k | | X | |
| l | Has the plan failed to provide any benefit when due under the plan? | 4l | | X | |
| m | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) | 4m | | X | |
| n | If 4m was answered "Yes," check the "Yes" box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3. | 4n | | | |

**5a** Has a resolution to terminate the plan been adopted during the plan year or any prior plan year? ☐ Yes ☒ No
If "Yes," enter the amount of any plan assets that reverted to the employer this year ____________________.

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| **5b(1)** Name of plan(s) | **5b(2)** EIN(s) | **5b(3)** PN(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**5c** If the plan is a defined benefit plan, is it covered under the PBGC insurance program (See ERISA section 4021.)? ☐ Yes ☐ No ☐ Not determined
If "Yes" is checked, enter the My PAA confirmation number from the PBGC premium filing for this plan year____________________. (See instructions.)

Exhibit 08-0092

**DSL 005391**

**SCHEDULE R (Form 5500)**

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

# Retirement Plan Information

This schedule is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code).

▶ **File as an attachment to Form 5500.**

OMB No. 1210-0110

**2018**

**This Form is Open to Public Inspection.**

For calendar plan year 2018 or fiscal plan year beginning 01/01/2018 and ending 12/31/2018

**A** Name of plan
STRATEGIC ESOP

**B** Three-digit plan number (PN) ▶ 002

**C** Plan sponsor's name as shown on line 2a of Form 5500
STRATEGIC FINANCIAL SOLUTIONS, LLC

**D** Employer Identification Number (EIN)
[redacted]

## Part I Distributions

**All references to distributions relate only to payments of benefits during the plan year.**

**1** Total value of distributions paid in property other than in cash or the forms of property specified in the instructions .......... **1** 0

**2** Enter the EIN(s) of payor(s) who paid benefits on behalf of the plan to participants or beneficiaries during the year (if more than two, enter EINs of the two payors who paid the greatest dollar amounts of benefits):

EIN(s): ____________________ ____________________

**Profit-sharing plans, ESOPs, and stock bonus plans, skip line 3.**

**3** Number of participants (living or deceased) whose benefits were distr buted in a single sum, during the plan year .......... **3**

## Part II Funding Information (If the plan is not subject to the minimum funding requirements of section 412 of the Internal Revenue Code or ERISA section 302, skip this Part.)

**4** Is the plan administrator making an election under Code section 412(d)(2) or ERISA section 302(d)(2)? .......... ☐ Yes ☐ No ☐ N/A

**If the plan is a defined benefit plan, go to line 8.**

**5** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions and enter the date of the ruling letter granting the waiver. **Date:** Month ________ Day ________ Year ________

**If you completed line 5, complete lines 3, 9, and 10 of Schedule MB and do not complete the remainder of this schedule.**

**6 a** Enter the minimum required contr bution for this plan year (include any prior year accumulated funding deficiency not waived) .......... **6a**

**b** Enter the amount contributed by the employer to the plan for this plan year .......... **6b**

**c** Subtract the amount in line 6b from the amount in line 6a. Enter the result (enter a minus sign to the left of a negative amount) .......... **6c**

**If you completed line 6c, skip lines 8 and 9.**

**7** Will the minimum funding amount reported on line 6c be met by the funding deadline? .......... ☐ Yes ☐ No ☐ N/A

**8** If a change in actuarial cost method was made for this plan year pursuant to a revenue procedure or other authority providing automatic approval for the change or a class ruling letter, does the plan sponsor or plan administrator agree with the change? .......... ☐ Yes ☐ No ☐ N/A

## Part III Amendments

**9** If this is a defined benefit pension plan, were any amendments adopted during this plan year that increased or decreased the value of benefits? If yes, check the appropriate box. If no, check the "No" box. .......... ☐ Increase ☐ Decrease ☐ Both ☐ No

## Part IV ESOPs (see instructions). If this is not a plan described under section 409(a) or 4975(e)(7) of the Internal Revenue Code, skip this Part.

**10** Were unallocated employer securities or proceeds from the sale of unallocated securities used to repay any exempt loan? .......... ☐ Yes ☒ No

**11 a** Does the ESOP hold any preferred stock? .......... ☐ Yes ☒ No

**b** If the ESOP has an outstanding exempt loan with the employer as lender, is such loan part of a "back-to-back" loan? (See instructions for definition of "back-to-back" loan.) .......... ☐ Yes ☒ No

**12** Does the ESOP hold any stock that is not readily tradable on an established securities market? .......... ☒ Yes ☐ No



Exhibit 08-0093

**DSL 005392**

## Part V Additional Information for Multiemployer Defined Benefit Pension Plans

**13** Enter the following information for each employer that contr buted more than 5% of total contr butions to the plan during the plan year (measured in dollars). See instructions. *Complete as many entries as needed to report all applicable employers.*

**a** Name of contributing employer

**b** EIN **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box* ☐ *and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

**e** Contr bution rate information *(If more than one rate applies, check this box* ☐ *and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ____________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify):

**a** Name of contributing employer

**b** EIN **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box* ☐ *and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month _______ Day _______ Year _______

**e** Contr bution rate information *(If more than one rate applies, check this box* ☐ *and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ____________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ______________________________

**a** Name of contributing employer

**b** EIN **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box* ☐ *and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

**e** Contr bution rate information *(If more than one rate applies, check this box* ☐ *and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ____________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ______________________________

**a** Name of contributing employer

**b** EIN **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box* ☐ *and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month _______ Day _______ Year _______

**e** Contr bution rate information *(If more than one rate applies, check this box* ☐ *and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ____________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ______________________________

**a** Name of contributing employer

**b** EIN **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box* ☐ *and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

**e** Contr bution rate information *(If more than one rate applies, check this box* ☐ *and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ____________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ______________________________

**a** Name of contributing employer

**b** EIN **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box* ☐ *and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

**e** Contr bution rate information *(If more than one rate applies, check this box* ☐ *and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ____________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ______________________________

**14** Enter the number of participants on whose behalf no contributions were made by an employer as an employer of the participant for:

| | | |
|---|---|---|
| **a** The current year | **14a** | |
| **b** The plan year immediately preceding the current plan year | **14b** | |
| **c** The second preceding plan year | **14c** | |

**15** Enter the ratio of the number of participants under the plan on whose behalf no employer had an obligation to make an employer contribution during the current plan year to:

| | | |
|---|---|---|
| **a** The corresponding number for the plan year immediately preceding the current plan year | **15a** | |
| **b** The corresponding number for the second preceding plan year | **15b** | |

**16** Information with respect to any employers who withdrew from the plan during the preceding plan year:

| | | |
|---|---|---|
| **a** Enter the number of employers who withdrew during the preceding plan year | **16a** | |
| **b** If line 16a is greater than 0, enter the aggregate amount of withdrawal liability assessed or estimated to be assessed against such withdrawn employers | **16b** | |

**17** If assets and liabilities from another plan have been transferred to or merged with this plan during the plan year, check box and see instructions regarding supplemental information to be included as an attachment. ☐

## Part VI Additional Information for Single-Employer and Multiemployer Defined Benefit Pension Plans

**18** If any liabilities to participants or their beneficiaries under the plan as of the end of the plan year consist (in whole or in part) of liabilities to such participants and beneficiaries under two or more pension plans as of immediately before such plan year, check box and see instructions regarding supplemental information to be included as an attachment ☐

**19** If the total number of participants is 1,000 or more, complete lines (a) through (c)

**a** Enter the percentage of plan assets held as:
Stock: _______% Investment-Grade Debt: _______% High-Yield Debt: _______% Real Estate: _______% Other: _______%

**b** Provide the average duration of the combined investment-grade and high-yield debt:
☐ 0-3 years ☐ 3-6 years ☐ 6-9 years ☐ 9-12 years ☐ 12-15 years ☐ 15-18 years ☐ 18-21 years ☐ 21 years or more

**c** What duration measure was used to calculate line 19(b)?
☐ Effective duration ☐ Macaulay duration ☐ Modified duration ☐ Other (specify):

**AUDITED**
**FINANCIAL STATEMENTS**

# STRATEGIC ESOP

---

**DECEMBER 31, 2018**

**STRATEGIC ESOP**

**CONTENTS**


| | Page |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| **Financial Statements:** | |
| Statement of Net Assets (Deficit) Available for Benefits | 3 |
| Statement of Changes in Net Assets (Deficit) Available for Benefits | 4 |
| **Notes to Financial Statements** | 5 - 11 |
| **Supplemental Schedule:** | |
| Schedule H, Line 4i - Schedule of Assets (Held at End of Year) | 12 |

FreedMaxick CPAs, P.C.

**INDEPENDENT AUDITOR'S REPORT**

To the Participants and Administrator of
Strategic ESOP

**Report on the Financial Statements**

We have audited the accompanying financial statements of Strategic ESOP (the Plan), which comprise the statements of net assets (deficit) available for benefits as of December 31, 2018 and 2017, and the related statements of changes in net assets (deficit) available for benefits for the year ended December 31, 2018 and the eight month period ended December 31, 2017 and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets (deficit) available for benefits of the Plan as of December 31, 2018 and 2017, and the changes in net assets (deficit) available for benefits for the year ended December 31, 2018 and the eight month period ended December 31, 2017, in accordance with accounting principles generally accepted in the United States of America.

**Other Matter - Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedule of Schedule h, line 4i - schedule of assets (held at end of year), as of December 31, 2018 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

Freed Maxick CPAs, P.C.

Buffalo, New York
October 15, 2019

**STRATEGIC ESOP**

**STATEMENTS OF NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**December 31,**

| | 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|
| | Allocated | Unallocated | Total | Allocated | Unallocated | Total |
| **Assets:** | | | | | | |
| Investment in Strategic Family, Inc. common stock, at fair value | $ 3,498,161 | $ 97,957,039 | $ 101,455,200 | $ 589,713 | $ 110,692,587 | $ 111,282,300 |
| **Receivables:** | | | | | | |
| Employer contributions | - | 4,152,762 | 4,152,762 | - | 6,000,000 | 6,000,000 |
| **Total assets** | 3,498,161 | 102,109,801 | 105,607,962 | 589,713 | 116,692,587 | 117,282,300 |
| **Liabilities:** | | | | | | |
| Interest payable | - | 1,537,104 | 1,537,104 | - | - | - |
| Notes payable | - | 235,052,055 | 235,052,055 | - | 240,276,655 | 240,276,655 |
| **Total liabilities** | - | 236,589,159 | 236,589,159 | - | 240,276,655 | 240,276,655 |
| **Net assets (deficit) available for benefits** | $ 3,498,161 | $ (134,479,358) | $ (130,981,197) | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.

**STRATEGIC ESOP**

**STATEMENTS OF CHANGES IN NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**For the Year Ended December 31, 2018 and the Eight Month Period Ended December 31, 2017**

| | 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|
| | Allocated | Unallocated | Total | Allocated | Unallocated | Total |
| **Sources of net assets:** | | | | | | |
| Dividend income | $ - | $ - | $ - | $ - | $ 1,972,121 | $ 1,972,121 |
| Employer contributions | - | 8,970,981 | 8,970,981 | - | 6,000,000 | 6,000,000 |
| Allocation of 1,602.015 (2018) and 290.929 (2017) shares of common stock of Strategic Family Inc., at fair value | 2,960,524 | - | 2,960,524 | 589,713 | - | 589,713 |
| Total sources of net assets | 2,960,524 | 8,970,981 | 11,931,505 | 589,713 | 7,972,121 | 8,561,834 |
| **Applications of net assets:** | | | | | | |
| Interest expense | - | 7,130,723 | 7,130,723 | - | 19,909 | 19,909 |
| Allocation of 1,602.015 (2018) and 290.929 (2017) shares of common stock of Strategic Family Inc., at fair value | - | 2,960,524 | 2,960,524 | - | 589,713 | 589,713 |
| Net depreciation in fair value of investments | 52,076 | 9,775,024 | 9,827,100 | - | 130,946,567 | 130,946,567 |
| Total applications of net assets | 52,076 | 19,866,270 | 19,918,347 | - | 131,556,189 | 131,556,189 |
| **Increase (decrease) in net assets (deficit) available for benefits** | 2,908,447 | (10,895,289) | (7,986,842) | 589,713 | (123,584,068) | (122,994,355) |
| **Net assets (deficit) available for benefits:** | | | | | | |
| Beginning of period | 589,713 | (123,584,068) | (122,994,355) | - | - | - |
| End of period | $ 3,498,161 | $ (134,479,358) | $ (130,981,197) | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.



Exhibit 08-0101

**DSL 005400**

## NOTE 1. DESCRIPTION OF PLAN

The following brief description of Strategic ESOP (the Plan) is provided for general information purposes only. Participants should refer to the Plan Document for complete information.

**General:** Strategic Financial Solutions, LLC (the Plan Sponsor) established the Strategic ESOP effective as of May 1, 2017. The Plan operates as a leveraged employee stock ownership plan (ESOP) and is designed to comply with Section 4975(e)(7) and the regulations thereunder of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan is administered by the Strategic ESOP Committee comprised of one or more persons appointed by the Plan Sponsor. The trust department of an independent third-party, Argent Trust Company, is the Plan's trustee.

On December 28, 2017, the Plan purchased 54,900 shares of Strategic Family, Inc.'s (the Company) common stock at a price of approximately $4,412 per share for an aggregate purchase price of $242,228,867. The stock is held in the Strategic Employee Stock Ownership Trust (the Trust), established by the Plan. The purchase was funded by the Trust signing notes payable to the former stockholders (the Lenders). In April 2018, the Plan refinanced these notes as more fully described in Note 7.

The notes payable are collateralized by the unallocated shares of common stock and are guaranteed by Strategic Family, Inc. The Lender has no rights against shares of common stock once they are allocated to participants in accordance with the terms of the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2018 and for the and eight month period ended December 31, 2017 present separately the assets and liabilities and changes therein pertaining to:

a) the accounts of employees with vested rights in allocated common stock (allocated), and
b) common stock not yet allocated to employees (unallocated).

**Eligibility:** Employees of the Plan Sponsor and its participating subsidiaries are generally eligible to participate in the Plan after one year of service, providing they worked at least 1,000 hours during such plan year, and are aged 21. Participants who do not have at least 1,000 hours of service during such plan year or are not employed on the last working day of a plan year are generally not eligible for an allocation of Company contributions for such year.

For the 2017 plan year, the first year of operation for the Plan, all employees who had attained age twenty-one and were employed on the last day of the plan year were eligible to enter the Plan as of the later of their date of employment or May 1, 2017, regardless of service requirement.

**Contributions:** The Company is obligated to make contributions in cash or company stock to the Plan which, when aggregated with the Plan's dividends, equal the amount necessary to enable the Plan to make its regularly scheduled payments of principal and interest due on its notes payable. Employee contributions are not permitted.

**Payment of Benefits**: Distributions on account of death, disability, or retirement are made in a lump sum in the plan year following the event. Distributions for other separations from service must commence no later than one year after the fifth plan year following the separation from service. The amount to be distributed is based upon the immediately preceding valuation date. Distributions are made in cash or, if a participant elects, in the form of Company common stock plus cash for any fractional share of common stock. Under the provisions of the Plan, the Company is obligated to repurchase participant shares which have been distributed under the terms of the Plan, if the shares are not publicly traded or if the shares are subject to trading limitations.

**Administrative Expenses:** As provided in the Plan agreement, administrative expenses may be paid either by the Plan or by the Company. The Company paid the operating expenses for the Plan in 2018 and 2017.

**NOTE 1. DESCRIPTION OF PLAN (CONTINUED)**

**Voting Rights:** Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified by the Trustee prior to the time that such rights are to be exercised. The Trustee is not permitted to vote any allocated share for which instructions have not been given by a participant. The Trustee is required, however, to vote any unallocated shares on behalf of the collective best interest of plan participants and beneficiaries.

**Participant Accounts:** The Plan is a defined contribution plan under which a separate individual account is established for each participant. Each participant's account is credited as of the last day of each plan year with an allocation of shares of the Company's common stock released by the Trustee from the unallocated account and forfeitures of terminated participants' non-vested accounts. Only those participants who are eligible employees of the Plan Sponsor and its subsidiaries as of the last day of the plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation. Plan earnings are allocated to each participant's account based on the ratio of the participant's account balance.

**Plan Termination:** The Plan Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions. Upon termination of the Plan, the Strategic ESOP Committee directs the Trustee to pay all liabilities and expenses of the ESOP and to sell shares of financed common stock held as collateral to the extent it determines such sale is necessary in order to repay the loan. Subsequently, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Internal Revenue Code.

**Vesting:** If a participant's employment with the Plan Sponsor and its subsidiaries ends for any reason other than retirement, permanent disability, or death, he or she will vest in the balances in his or her account based on total years of services with the company. Vesting of ownership benefits is based on the following schedule:

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

**Put Option:** Under Federal income tax regulations, the employer stock that is held by the Plan and its participants and is not readily tradable on an established market, or is subject to trading limitations, includes a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is a limited or no market. The put price is representative of the current appraised value of the stock. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately obtain cash.

**Diversification:** Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments that are more diversified. Participants who are at least age 55 with at least 10 years of participation in the Plan may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25% of his or her account. In the sixth year, the participant may diversify up to 50 percent of the undiversified balance. Participants who elect to diversify receive a cash distribution. The election to diversify is made subsequent to year end based upon the shares of employer stock in the participant's account at year end.

## NOTE 1. DESCRIPTION OF PLAN (CONTINUED)

**Forfeitures:** Plan forfeitures are held in a forfeiture account until the fifth anniversary of the participant's break in service. After this time, the forfeitures are allocated to current participants' account based on the ratio of the participant's compensation to total participants' compensation for the plan year. Participants with 0% vested balances are deemed to have received their full distribution and forfeitures are allocated on termination although the individual retains the right of reallocation for 5 years as above. Forfeited, non-vested accounts to be allocated to participant accounts in future years amounted to $206,622 as of December 31, 2018 ($0 - 2017). Forfeitures allocated to participants during the year ended December 31, 2018 amounted to $332,867 ($0 - 2017) in cash.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Accounting:** The financial statements of the Plan are prepared on the accrual basis of accounting.

**Use of Estimates:** The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, and changes therein, and disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

**Allocations:** The financial statements of the Plan present separately the assets and liabilities and changes therein pertaining to (a) the accounts of employees with rights in allocated stock ("allocated") and (b) stock not yet allocated to employees ("unallocated"), including shares that are committed to be released. Shares are released from collateral and become allocated generally in the period in which debt service is actually paid.

**Risks and Uncertainties**: The Plan investments consist solely of Strategic Family, Inc.'s common stock, which is exposed to various risks, such as interest rate, market, and credit risks, as well as valuation assumptions based on earnings, cash flows and/or other such techniques. Due to the level of risk associated with the investment in the common stock and to uncertainties inherent in estimates and assumptions, it is at least reasonably possible that changes in the value of the common stock will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

**Investment Valuation and Income Recognition:** The shares of Company common stock are reported at fair value. See Note 6 for a discussion of fair value measurements. Dividend income is accrued on the ex-dividend date. Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses from security transactions are reported on the average cost method. Net depreciation in fair value of investments includes the Plan's gains and losses on investments bought and sold as well as held during the year.

**Payment of Benefits:** Benefits are recorded when paid.

**Subsequent Events:** These financial statements have not been updated for subsequent events occurring after October 15, 2019, which is the date these financial statements were available to be issued.

## NOTE 3. CONTRIBUTION RECEIVABLE

In December 2018, the Plan Sponsor committed to making a contribution of $4,152,762 ($6,000,000 - 2017) to the Plan with payment to be within 9 ½ months of the Plan's year end. As a result, the Plan accrued a contribution receivable to the Plan at December 31, 2018 and 2017 which is presented as unallocated until paid. Upon payment in the following calendar year, the contribution was applied to the notes payable and released 617.8785 shares (885.125 shares – 2017) to participants. For financial reporting purposes, these shares are not released from serving as collateral for the Plan's debt until debt payment is actually made, and as such the shares are shown on the attached statement of net assets (deficit) available for benefits as unallocated. However, for participant accounting purposes, the shares are considered to be allocated to participants as the participants have a beneficial interest in the contribution receivable. This results in a difference between the amount reported on the financial statements as net assets allocated to participants and the participant records.

## NOTE 4. TAX STATUS

The Plan has been designed to be an employee stock ownership plan within the meaning of Section 4975(e) (7) of the IRC, and section 407(d) (6) of the ERISA. The Plan is in the process of applying for a determination letter from the Internal Revenue Service (IRS) to obtain approval that a) the Plan is qualified, under the IRC and, therefore, b) that the related trust is exempt from taxation. Once qualified, the Plan is required to operate in conformity with the IRC to maintain its qualification. The Strategic ESOP Committee believes that the Plan is currently designed, and being operated, in compliance with the applicable requirement of the Code. Therefore Strategic ESOP Committee believes that the Plan was qualified, and the related trust was tax-exempt as of the financial statement date.

Accounting principles generally accepted in the United States of America require plan management to evaluate tax positions taken by the plan and recognize a tax liability if the organization has taken a significant uncertain position that more likely than not would not be sustained upon examination by the IRS. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

## NOTE 5. INVESTMENTS

The Plan's investments, at December 31, are presented in the following table:

| | 2018 | | 2017 | |
|---|---|---|---|---|
| | Allocated | Unallocated | Allocated | Unallocated |
| Strategic Family, Inc. common stock: | | | | |
| Number of shares | 1,892,944 | 53,007,056 | 290,929 | 54,609,071 |
| Cost | $ 8,352,010 | $ 233,876,672 | $ 1,283,631 | $ 240,945,051 |
| Estimated fair value | $ 3,498,161 | $ 97,957,039 | $ 589,713 | $ 110,692,587 |

## NOTE 6. FAIR VALUE MEASUREMENTS

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

Level 1: Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

Level 2: Inputs to the valuation methodology include:

- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices for identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3: Inputs to the valuation methodology are unobservable and significant in the fair value measurement.

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

The following table sets forth by level, within the fair value hierarchy, the Plan's assets at fair value as of December 31, 2018 and 2017:

| | Assets at Fair Value as of December 31, 2018 | | | |
|---|---|---|---|---|
| | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 101,455,200 | $ 101,455,200 |
| Investments at fair value | $ - | $ - | $ 101,455,200 | $ 101,455,200 |

| | Assets at Fair Value as of December 31, 2017 | | | |
|---|---|---|---|---|
| | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 111,282,300 | $ 111,282,300 |
| Investments at fair value | $ - | $ - | $ 111,282,300 | $ 111,282,300 |

**Changes in Fair Value of Level 3 Assets and Related Gains and Losses**

The following table sets forth a summary of changes in the fair value of the Plan's level 3 assets for the year ended December 31, 2018 and the eight month period ended December 31, 2017;

| | Level 3 Assets Investment in Strategic Family, Inc. Common Stock | |
|---|---|---|
| | **2018** | **2017** |
| Balance at January 1, 2018 (May 1, 2017) | **$ 111,282,300** | $ - |
| Purchases | - | 242,228,867 |
| Net depreciation in fair value of investments | **(9,827,100)** | (130,946,567) |
| Balance at December 31, | **$ 101,455,200** | $ 111,282,300 |

Unrealized losses included in changes in net assets for the year and period above are reported in net depreciation in fair value of investments in the statements of changes in net assets (deficit) available for benefits.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2018 and 2017.

Strategic Family, Inc. common stock held by the Plan is valued at fair value based upon an independent appraisal. This appraised value was based upon using income based valuation techniques consistent with prior years as illustrated in the following table.

## NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)

| Instrument | Fair Value | Principal Valuation Technique | Unobservable Inputs |
|---|---|---|---|
| Strategic Family, Inc. common stock | $101,455,200 - 2018<br><br>$111,282,300 - 2017 | Income Approach<br><br>- Discounted Cash Flow Method | EBITDA<br>Net income<br>Weighted average cost of capital<br>Discount rate<br>Discount for lack of marketability |

The valuation process involves the selection of an independent appraiser. Plan management accumulates the data for the appraiser from the financial statements of the Company. The appraiser prepares a report of estimated per share value. Plan management, along with the ESOP trustee, reviews in detail, discusses and approves the appraiser's preliminary report.

The valuation methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

## NOTE 7. LOAN PAYABLE

In December 2017, the Plan entered into multiple loan note agreements with the former stockholders of Strategic Family, Inc. for an aggregate value of $242,228,867 in exchange for 75% (54,900 shares) of the Company's outstanding common stock. The Company repurchased and cancelled the remaining 25% of its outstanding common stock.

On April 30, 2018, under the terms of an Assumption Agreement signed by the Company in conjunction with the formation of the Plan, the Company unconditionally assumed all obligations of the ESOP Trust under the notes payable to former stockholders. In return, the ESOP Trust signed a refinanced (internal) note payable to the Company in the amount of $235,052,055 (the total amount of the notes payable to former stockholders at the date of signing). The terms of the refinanced (internal) note include a requirement to make 30 payments of principal and interest with certain minimum payments each year, with the balance of the notes being payable on December 31, 2046. Interest will accrue at 3.04% per annum.

Unallocated shares held by the Plan are collateral for the notes payable. Shares are released from collateral and allocated to participants as payments of principal and interest are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year principal and interest payments divided by the total of all current and future years' principal and interest payments.

This resulted in 1,602.015 shares being released and allocated for the plan year ended December 31, 2018 (290.929 - 2017).

**NOTE 7. LOAN PAYABLE (CONTINUED)**

The minimum required payment schedule for the notes is as follows:

| | |
|---|---|
| 2019 | **$ 9,500,000** |
| 2020 | **10,875,000** |
| 2021 | **12,000,000** |
| 2022 | **13,060,441** |
| 2023 | **13,060,441** |
| Subsequent to 2023 | **176,556,173** |
| | **$ 235,052,055** |

**NOTE 8. COMPANY DIVIDENDS**

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the eight month period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service. There were no dividends paid to the ESOP during the year ended December 31, 2018.

**NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS**

The Plan invests in Company common stock and as noted in Note 7 has indebtedness to the Company for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

**NOTE 10. RECONCILIATION TO 5500**

The following is a reconciliation of net assets available for benefit per the financial statements to the Form 5500:

| | **2018** | 2017 |
|---|---|---|
| Net deficit available for benefits per the financial statements | **$ (130,981,197)** | $ (122,994,355) |
| Differences in: Accrued interest expense payable | **(1,155,238)** | (1,775,400) |
| Net deficit available for benefits per the Form 5500 | **$ (132,136,435)** | $ (124,769,755) |

The following is a reconciliation of the change in net assets available for benefits per the financial statements to the Form 5500:

| | **2018** | 2017 |
|---|---|---|
| Decrease in net assets per financial statements | **$ (7,986,842)** | $ (122,994,355) |
| Differences in: Interest expense | **620,162** | (1,775,400) |
| Decrease in net assets per Form 5500 | **$ (7,366,680)** | $ (124,769,755) |

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
**EIN #: [redacted]**
**Plan #: 002**
**December 31, 2018**

| (a) | (b) Identity of Issuer | (c) Description of Investment | (d) Cost | (e) Fair Value |
|---|---|---|---|---|
| | Common Stock: | | | |
| * | Strategic Family, Inc. | 54,900 shares of common stock | $ 242,228,867 | $ 101,455,200 |
| | | | $ 242,228,867 | $ 101,455,200 |

* Represents party in interest.



Exhibit 08-0109
**DSL 005408**

**AUDITED**
**FINANCIAL STATEMENTS**

# STRATEGIC ESOP

---

**DECEMBER 31, 2018**

**STRATEGIC ESOP**

**CONTENTS**


| | Page |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| **Financial Statements:** | |
| Statement of Net Assets (Deficit) Available for Benefits | 3 |
| Statement of Changes in Net Assets (Deficit) Available for Benefits | 4 |
| **Notes to Financial Statements** | 5 - 11 |
| **Supplemental Schedule:** | |
| Schedule H, Line 4i - Schedule of Assets (Held at End of Year) | 12 |

FreedMaxick™ CPAs, P.C.

## INDEPENDENT AUDITOR'S REPORT

To the Participants and Administrator of
Strategic ESOP

### Report on the Financial Statements

We have audited the accompanying financial statements of Strategic ESOP (the Plan), which comprise the statements of net assets (deficit) available for benefits as of December 31, 2018 and 2017, and the related statements of changes in net assets (deficit) available for benefits for the year ended December 31, 2018 and the eight month period ended December 31, 2017 and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets (deficit) available for benefits of the Plan as of December 31, 2018 and 2017, and the changes in net assets (deficit) available for benefits for the year ended December 31, 2018 and the eight month period ended December 31, 2017, in accordance with accounting principles generally accepted in the United States of America.

**Other Matter - Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedule of Schedule h, line 4i - schedule of assets (held at end of year), as of December 31, 2018 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

Freed Maxick CPAs, P.C.

Buffalo, New York
October 15, 2019

**STRATEGIC ESOP**

**STATEMENTS OF NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**December 31,**

| | 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|
| | Allocated | Unallocated | Total | Allocated | Unallocated | Total |
| **Assets:** | | | | | | |
| Investment in Strategic Family, Inc. common stock, at fair value | $ 3,498,161 | $ 97,957,039 | $ 101,455,200 | $ 589,713 | $ 110,692,587 | $ 111,282,300 |
| **Receivables:** | | | | | | |
| Employer contributions | - | 4,152,762 | 4,152,762 | - | 6,000,000 | 6,000,000 |
| **Total assets** | 3,498,161 | 102,109,801 | 105,607,962 | 589,713 | 116,692,587 | 117,282,300 |
| **Liabilities:** | | | | | | |
| Interest payable | - | 1,537,104 | 1,537,104 | - | - | - |
| Notes payable | - | 235,052,055 | 235,052,055 | - | 240,276,655 | 240,276,655 |
| **Total liabilities** | - | 236,589,159 | 236,589,159 | - | 240,276,655 | 240,276,655 |
| **Net assets (deficit) available for benefits** | $ 3,498,161 | $ (134,479,358) | $ (130,981,197) | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.



Exhibit 08-0114

**DSL 005413**

**STRATEGIC ESOP**

**STATEMENTS OF CHANGES IN NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**For the Year Ended December 31, 2018 and the Eight Month Period Ended December 31, 2017**

| | 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|
| | Allocated | Unallocated | Total | Allocated | Unallocated | Total |
| **Sources of net assets:** | | | | | | |
| Dividend income | $ - | $ - | $ - | $ - | $ 1,972,121 | $ 1,972,121 |
| Employer contributions | - | 8,970,981 | 8,970,981 | - | 6,000,000 | 6,000,000 |
| Allocation of 1,602.015 (2018) and 290.929 (2017) shares of common stock of Strategic Family Inc., at fair value | 2,960,524 | - | 2,960,524 | 589,713 | - | 589,713 |
| Total sources of net assets | 2,960,524 | 8,970,981 | 11,931,505 | 589,713 | 7,972,121 | 8,561,834 |
| **Applications of net assets:** | | | | | | |
| Interest expense | - | 7,130,723 | 7,130,723 | - | 19,909 | 19,909 |
| Allocation of 1,602.015 (2018) and 290.929 (2017) shares of common stock of Strategic Family Inc., at fair value | - | 2,960,524 | 2,960,524 | - | 589,713 | 589,713 |
| Net depreciation in fair value of investments | 52,076 | 9,775,024 | 9,827,100 | - | 130,946,567 | 130,946,567 |
| Total applications of net assets | 52,076 | 19,866,270 | 19,918,347 | - | 131,556,189 | 131,556,189 |
| **Increase (decrease) in net assets (deficit) available for benefits** | 2,908,447 | (10,895,289) | (7,986,842) | 589,713 | (123,584,068) | (122,994,355) |
| **Net assets (deficit) available for benefits:** | | | | | | |
| Beginning of period | 589,713 | (123,584,068) | (122,994,355) | - | - | - |
| End of period | $ 3,498,161 | $ (134,479,358) | $ (130,981,197) | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.



Exhibit 08-0115

**DSL 005414**

## NOTE 1. DESCRIPTION OF PLAN

The following brief description of Strategic ESOP (the Plan) is provided for general information purposes only. Participants should refer to the Plan Document for complete information.

**General:** Strategic Financial Solutions, LLC (the Plan Sponsor) established the Strategic ESOP effective as of May 1, 2017. The Plan operates as a leveraged employee stock ownership plan (ESOP) and is designed to comply with Section 4975(e)(7) and the regulations thereunder of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan is administered by the Strategic ESOP Committee comprised of one or more persons appointed by the Plan Sponsor. The trust department of an independent third-party, Argent Trust Company, is the Plan's trustee.

On December 28, 2017, the Plan purchased 54,900 shares of Strategic Family, Inc.'s (the Company) common stock at a price of approximately $4,412 per share for an aggregate purchase price of $242,228,867. The stock is held in the Strategic Employee Stock Ownership Trust (the Trust), established by the Plan. The purchase was funded by the Trust signing notes payable to the former stockholders (the Lenders). In April 2018, the Plan refinanced these notes as more fully described in Note 7.

The notes payable are collateralized by the unallocated shares of common stock and are guaranteed by Strategic Family, Inc. The Lender has no rights against shares of common stock once they are allocated to participants in accordance with the terms of the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2018 and for the and eight month period ended December 31, 2017 present separately the assets and liabilities and changes therein pertaining to:

a) the accounts of employees with vested rights in allocated common stock (allocated), and
b) common stock not yet allocated to employees (unallocated).

**Eligibility:** Employees of the Plan Sponsor and its participating subsidiaries are generally eligible to participate in the Plan after one year of service, providing they worked at least 1,000 hours during such plan year, and are aged 21. Participants who do not have at least 1,000 hours of service during such plan year or are not employed on the last working day of a plan year are generally not eligible for an allocation of Company contributions for such year.

For the 2017 plan year, the first year of operation for the Plan, all employees who had attained age twenty-one and were employed on the last day of the plan year were eligible to enter the Plan as of the later of their date of employment or May 1, 2017, regardless of service requirement.

**Contributions:** The Company is obligated to make contributions in cash or company stock to the Plan which, when aggregated with the Plan's dividends, equal the amount necessary to enable the Plan to make its regularly scheduled payments of principal and interest due on its notes payable. Employee contributions are not permitted.

**Payment of Benefits**: Distributions on account of death, disability, or retirement are made in a lump sum in the plan year following the event. Distributions for other separations from service must commence no later than one year after the fifth plan year following the separation from service. The amount to be distributed is based upon the immediately preceding valuation date. Distributions are made in cash or, if a participant elects, in the form of Company common stock plus cash for any fractional share of common stock. Under the provisions of the Plan, the Company is obligated to repurchase participant shares which have been distributed under the terms of the Plan, if the shares are not publicly traded or if the shares are subject to trading limitations.

**Administrative Expenses:** As provided in the Plan agreement, administrative expenses may be paid either by the Plan or by the Company. The Company paid the operating expenses for the Plan in 2018 and 2017.

**NOTE 1. DESCRIPTION OF PLAN (CONTINUED)**

**Voting Rights:** Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified by the Trustee prior to the time that such rights are to be exercised. The Trustee is not permitted to vote any allocated share for which instructions have not been given by a participant. The Trustee is required, however, to vote any unallocated shares on behalf of the collective best interest of plan participants and beneficiaries.

**Participant Accounts:** The Plan is a defined contribution plan under which a separate individual account is established for each participant. Each participant's account is credited as of the last day of each plan year with an allocation of shares of the Company's common stock released by the Trustee from the unallocated account and forfeitures of terminated participants' non-vested accounts. Only those participants who are eligible employees of the Plan Sponsor and its subsidiaries as of the last day of the plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation. Plan earnings are allocated to each participant's account based on the ratio of the participant's account balance.

**Plan Termination:** The Plan Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions. Upon termination of the Plan, the Strategic ESOP Committee directs the Trustee to pay all liabilities and expenses of the ESOP and to sell shares of financed common stock held as collateral to the extent it determines such sale is necessary in order to repay the loan. Subsequently, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Internal Revenue Code.

**Vesting:** If a participant's employment with the Plan Sponsor and its subsidiaries ends for any reason other than retirement, permanent disability, or death, he or she will vest in the balances in his or her account based on total years of services with the company. Vesting of ownership benefits is based on the following schedule:

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

**Put Option:** Under Federal income tax regulations, the employer stock that is held by the Plan and its participants and is not readily tradable on an established market, or is subject to trading limitations, includes a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is a limited or no market. The put price is representative of the current appraised value of the stock. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately obtain cash.

**Diversification:** Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments that are more diversified. Participants who are at least age 55 with at least 10 years of participation in the Plan may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25% of his or her account. In the sixth year, the participant may diversify up to 50 percent of the undiversified balance. Participants who elect to diversify receive a cash distribution. The election to diversify is made subsequent to year end based upon the shares of employer stock in the participant's account at year end.

## NOTE 1. DESCRIPTION OF PLAN (CONTINUED)

**Forfeitures:** Plan forfeitures are held in a forfeiture account until the fifth anniversary of the participant's break in service. After this time, the forfeitures are allocated to current participants' account based on the ratio of the participant's compensation to total participants' compensation for the plan year. Participants with 0% vested balances are deemed to have received their full distribution and forfeitures are allocated on termination although the individual retains the right of reallocation for 5 years as above. Forfeited, non-vested accounts to be allocated to participant accounts in future years amounted to $206,622 as of December 31, 2018 ($0 - 2017). Forfeitures allocated to participants during the year ended December 31, 2018 amounted to $332,867 ($0 - 2017) in cash.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Accounting:** The financial statements of the Plan are prepared on the accrual basis of accounting.

**Use of Estimates:** The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, and changes therein, and disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

**Allocations:** The financial statements of the Plan present separately the assets and liabilities and changes therein pertaining to (a) the accounts of employees with rights in allocated stock ("allocated") and (b) stock not yet allocated to employees ("unallocated"), including shares that are committed to be released. Shares are released from collateral and become allocated generally in the period in which debt service is actually paid.

**Risks and Uncertainties**: The Plan investments consist solely of Strategic Family, Inc.'s common stock, which is exposed to various risks, such as interest rate, market, and credit risks, as well as valuation assumptions based on earnings, cash flows and/or other such techniques. Due to the level of risk associated with the investment in the common stock and to uncertainties inherent in estimates and assumptions, it is at least reasonably possible that changes in the value of the common stock will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

**Investment Valuation and Income Recognition:** The shares of Company common stock are reported at fair value. See Note 6 for a discussion of fair value measurements. Dividend income is accrued on the ex-dividend date. Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses from security transactions are reported on the average cost method. Net depreciation in fair value of investments includes the Plan's gains and losses on investments bought and sold as well as held during the year.

**Payment of Benefits:** Benefits are recorded when paid.

**Subsequent Events:** These financial statements have not been updated for subsequent events occurring after October 15, 2019, which is the date these financial statements were available to be issued.

## NOTE 3. CONTRIBUTION RECEIVABLE

In December 2018, the Plan Sponsor committed to making a contribution of $4,152,762 ($6,000,000 - 2017) to the Plan with payment to be within 9 ½ months of the Plan's year end. As a result, the Plan accrued a contribution receivable to the Plan at December 31, 2018 and 2017 which is presented as unallocated until paid. Upon payment in the following calendar year, the contribution was applied to the notes payable and released 617.8785 shares (885.125 shares – 2017) to participants. For financial reporting purposes, these shares are not released from serving as collateral for the Plan's debt until debt payment is actually made, and as such the shares are shown on the attached statement of net assets (deficit) available for benefits as unallocated. However, for participant accounting purposes, the shares are considered to be allocated to participants as the participants have a beneficial interest in the contribution receivable. This results in a difference between the amount reported on the financial statements as net assets allocated to participants and the participant records.



Exhibit 08-0118

**DSL 005417**

## NOTE 4. TAX STATUS

The Plan has been designed to be an employee stock ownership plan within the meaning of Section 4975(e) (7) of the IRC, and section 407(d) (6) of the ERISA. The Plan is in the process of applying for a determination letter from the Internal Revenue Service (IRS) to obtain approval that a) the Plan is qualified, under the IRC and, therefore, b) that the related trust is exempt from taxation. Once qualified, the Plan is required to operate in conformity with the IRC to maintain its qualification. The Strategic ESOP Committee believes that the Plan is currently designed, and being operated, in compliance with the applicable requirement of the Code. Therefore Strategic ESOP Committee believes that the Plan was qualified, and the related trust was tax-exempt as of the financial statement date.

Accounting principles generally accepted in the United States of America require plan management to evaluate tax positions taken by the plan and recognize a tax liability if the organization has taken a significant uncertain position that more likely than not would not be sustained upon examination by the IRS. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

## NOTE 5. INVESTMENTS

The Plan's investments, at December 31, are presented in the following table:

| | 2018 | | 2017 | |
|---|---|---|---|---|
| | Allocated | Unallocated | Allocated | Unallocated |
| Strategic Family, Inc. common stock: | | | | |
| Number of shares | 1,892,944 | 53,007,056 | 290,929 | 54,609,071 |
| Cost | $ 8,352,010 | $ 233,876,672 | $ 1,283,631 | $ 240,945,051 |
| Estimated fair value | $ 3,498,161 | $ 97,957,039 | $ 589,713 | $ 110,692,587 |

## NOTE 6. FAIR VALUE MEASUREMENTS

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

Level 1: Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

Level 2: Inputs to the valuation methodology include:

- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices for identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3: Inputs to the valuation methodology are unobservable and significant in the fair value measurement.



Exhibit 08-0119

DSL 005418

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

The following table sets forth by level, within the fair value hierarchy, the Plan's assets at fair value as of December 31, 2018 and 2017:

| | Assets at Fair Value as of December 31, 2018 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 101,455,200 | $ 101,455,200 |
| Investments at fair value | $ - | $ - | $ 101,455,200 | $ 101,455,200 |

| | Assets at Fair Value as of December 31, 2017 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 111,282,300 | $ 111,282,300 |
| Investments at fair value | $ - | $ - | $ 111,282,300 | $ 111,282,300 |

**Changes in Fair Value of Level 3 Assets and Related Gains and Losses**

The following table sets forth a summary of changes in the fair value of the Plan's level 3 assets for the year ended December 31, 2018 and the eight month period ended December 31, 2017;

| | Level 3 Assets Investment in Strategic Family, Inc. Common Stock | |
|---|---|---|
| | **2018** | **2017** |
| Balance at January 1, 2018 (May 1, 2017) | **$ 111,282,300** | $ - |
| Purchases | - | 242,228,867 |
| Net depreciation in fair value of investments | **(9,827,100)** | (130,946,567) |
| Balance at December 31, | **$ 101,455,200** | $ 111,282,300 |

Unrealized losses included in changes in net assets for the year and period above are reported in net depreciation in fair value of investments in the statements of changes in net assets (deficit) available for benefits.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2018 and 2017.

Strategic Family, Inc. common stock held by the Plan is valued at fair value based upon an independent appraisal. This appraised value was based upon using income based valuation techniques consistent with prior years as illustrated in the following table.

## NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)

| Instrument | Fair Value | Principal Valuation Technique | Unobservable Inputs |
|---|---|---|---|
| Strategic Family, Inc. common stock | $101,455,200 - 2018<br><br>$111,282,300 - 2017 | Income Approach<br><br>- Discounted Cash Flow Method | EBITDA<br>Net income<br>Weighted average cost of capital<br>Discount rate<br>Discount for lack of marketability |

The valuation process involves the selection of an independent appraiser. Plan management accumulates the data for the appraiser from the financial statements of the Company. The appraiser prepares a report of estimated per share value. Plan management, along with the ESOP trustee, reviews in detail, discusses and approves the appraiser's preliminary report.

The valuation methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

## NOTE 7. LOAN PAYABLE

In December 2017, the Plan entered into multiple loan note agreements with the former stockholders of Strategic Family, Inc. for an aggregate value of $242,228,867 in exchange for 75% (54,900 shares) of the Company's outstanding common stock. The Company repurchased and cancelled the remaining 25% of its outstanding common stock.

On April 30, 2018, under the terms of an Assumption Agreement signed by the Company in conjunction with the formation of the Plan, the Company unconditionally assumed all obligations of the ESOP Trust under the notes payable to former stockholders. In return, the ESOP Trust signed a refinanced (internal) note payable to the Company in the amount of $235,052,055 (the total amount of the notes payable to former stockholders at the date of signing). The terms of the refinanced (internal) note include a requirement to make 30 payments of principal and interest with certain minimum payments each year, with the balance of the notes being payable on December 31, 2046. Interest will accrue at 3.04% per annum.

Unallocated shares held by the Plan are collateral for the notes payable. Shares are released from collateral and allocated to participants as payments of principal and interest are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year principal and interest payments divided by the total of all current and future years' principal and interest payments.

This resulted in 1,602.015 shares being released and allocated for the plan year ended December 31, 2018 (290.929 - 2017).

## NOTE 7. LOAN PAYABLE (CONTINUED)

The minimum required payment schedule for the notes is as follows:

| | |
|---|---|
| 2019 | $ 9,500,000 |
| 2020 | 10,875,000 |
| 2021 | 12,000,000 |
| 2022 | 13,060,441 |
| 2023 | 13,060,441 |
| Subsequent to 2023 | 176,556,173 |
| | $ 235,052,055 |

## NOTE 8. COMPANY DIVIDENDS

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the eight month period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service. There were no dividends paid to the ESOP during the year ended December 31, 2018.

## NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS

The Plan invests in Company common stock and as noted in Note 7 has indebtedness to the Company for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

## NOTE 10. RECONCILIATION TO 5500

The following is a reconciliation of net assets available for benefit per the financial statements to the Form 5500:

| | 2018 | 2017 |
|---|---|---|
| Net deficit available for benefits per the financial statements | $ (130,981,197) | $ (122,994,355) |
| Differences in: | | |
| Accrued interest expense payable | (1,155,238) | (1,775,400) |
| Net deficit available for benefits per the Form 5500 | $ (132,136,435) | $ (124,769,755) |

The following is a reconciliation of the change in net assets available for benefits per the financial statements to the Form 5500:

| | 2018 | 2017 |
|---|---|---|
| Decrease in net assets per financial statements | $ (7,986,842) | $ (122,994,355) |
| Differences in: | | |
| Interest expense | 620,162 | (1,775,400) |
| Decrease in net assets per Form 5500 | $ (7,366,680) | $ (124,769,755) |

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
**EIN # [redacted]**
**Plan #: 002**
**December 31, 2018**

| (a) | (b) Identity of Issuer | (c) Description of Investment | (d) Cost | (e) Fair Value |
|---|---|---|---|---|
| | Common Stock: | | | |
| * | Strategic Family, Inc. | 54,900 shares of common stock | $ 242,228,867 | $ 101,455,200 |
| | | | $ 242,228,867 | $ 101,455,200 |

* Represents party in interest.

**Form 5500**

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

# Annual Return/Report of Employee Benefit Plan

This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).

▸ **Complete all entries in accordance with the instructions to the Form 5500.**

OMB Nos. 1210-0110
1210-0089

**2017**

**This Form is Open to Public Inspection**

## Part I Annual Report Identification Information

For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 and ending 12/31/2017

**A** This return/report is for:
- ☐ a multiemployer plan
- ☐ a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)
- ☒ a single-employer plan
- ☐ a DFE (specify) ____

**B** This return/report is:
- ☒ the first return/report
- ☐ the final return/report
- ☐ an amended return/report
- ☒ a short plan year return/report (less than 12 months)

**C** If the plan is a collectively-bargained plan, check here. . . . . . . . . . . . . . . . . . . . . . . . . ▸ ☐

**D** Check box if filing under:
- ☒ Form 5558
- ☐ automatic extension
- ☐ the DFVC program
- ☐ special extension (enter description)

## Part II Basic Plan Information—enter all requested information

| | |
|---|---|
| **1a** Name of plan<br>STRATEGIC ESOP | **1b** Three-digit plan number (PN) ▸ 002<br>**1c** Effective date of plan<br>05/01/2017 |
| **2a** Plan sponsor's name (employer, if for a single-employer plan)<br>Mailing address (include room, apt., suite no. and street, or P.O. Box)<br>City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)<br>STRATEGIC FINANCIAL SOLUTIONS, LLC<br><br>711 3RD AVENUE<br>6TH FLOOR<br>NEW YORK, NY 10017 | **2b** Employer Identification [redacted]<br>**2c** Plan Sponsor's telephone number<br>212-810-4537<br>**2d** Business code (see instructions)<br>523900 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| | | | |
|---|---|---|---|
| **SIGN HERE** | Filed with authorized/valid electronic signature. | 10/15/2018 | KIMBERLY CELIC |
| | **Signature of plan administrator** | Date | Enter name of individual signing as plan administrator |
| **SIGN HERE** | Filed with authorized/valid electronic signature. | 10/15/2018 | KIMBERLY CELIC |
| | **Signature of employer/plan sponsor** | Date | Enter name of individual signing as employer or plan sponsor |
| **SIGN HERE** | | | |
| | **Signature of DFE** | Date | Enter name of individual signing as DFE |

**For Paperwork Reduction Act Notice, see the Instructions for Form 5500.** **Form 5500 (2017)**
**v. 170203**

**3a** Plan administrator's name and address [X] Same as Plan Sponsor

**3b** Administrator's EIN

**3c** Administrator's telephone number

**4** If the name and/or EIN of the plan sponsor or the plan name has changed since the last return/report filed for this plan, enter the plan sponsor's name, EIN, the plan name and the plan number from the last return/report:

**a** Sponsor's name

**c** Plan Name

**4b** EIN

**4d** PN

| | | |
|---|---|---|
| **5** Total number of participants at the beginning of the plan year | **5** | 346 |
| **6** Number of participants as of the end of the plan year unless otherwise stated (welfare plans complete only lines **6a(1), 6a(2), 6b, 6c,** and **6d**). | | |
| **a(1)** Total number of active participants at the beginning of the plan year | **6a(1)** | 346 |
| **a(2)** Total number of active participants at the end of the plan year | **6a(2)** | 515 |
| **b** Retired or separated participants receiving benefits | **6b** | 0 |
| **c** Other retired or separated participants entitled to future benefits | **6c** | 0 |
| **d** Subtotal. Add lines **6a(2)**, **6b**, and **6c** | **6d** | 515 |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits. | **6e** | 0 |
| **f** Total. Add lines **6d** and **6e**. | **6f** | 515 |
| **g** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) | **6g** | 333 |
| **h** Number of participants who terminated employment during the plan year with accrued benefits that were less than 100% vested | **6h** | 0 |
| **7** Enter the total number of employers obligated to contribute to the plan (only multiemployer plans complete this item) | **7** | |

**8a** If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristics Codes in the instructions:

2I 2P 3I

**b** If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristics Codes in the instructions:

**9a** Plan funding arrangement (check all that apply)
- (1) [ ] Insurance
- (2) [ ] Code section 412(e)(3) insurance contracts
- (3) [X] Trust
- (4) [ ] General assets of the sponsor

**9b** Plan benefit arrangement (check all that apply)
- (1) [ ] Insurance
- (2) [ ] Code section 412(e)(3) insurance contracts
- (3) [X] Trust
- (4) [ ] General assets of the sponsor

**10** Check all applicable boxes in 10a and 10b to indicate which schedules are attached, and, where indicated, enter the number attached. (See instructions)

**a Pension Schedules**
- (1) [X] **R** (Retirement Plan Information)
- (2) [ ] **MB** (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information) - signed by the plan actuary
- (3) [ ] **SB** (Single-Employer Defined Benefit Plan Actuarial Information) - signed by the plan actuary

**b General Schedules**
- (1) [X] **H** (Financial Information)
- (2) [ ] **I** (Financial Information – Small Plan)
- (3) [ ] ___ **A** (Insurance Information)
- (4) [X] **C** (Service Provider Information)
- (5) [ ] **D** (DFE/Participating Plan Information)
- (6) [ ] **G** (Financial Transaction Schedules)

## Part III Form M-1 Compliance Information (to be completed by welfare benefit plans)

**11a** If the plan provides welfare benefits, was the plan subject to the Form M-1 filing requirements during the plan year? (See instructions and 29 CFR 2520.101-2.) .................................... ☐ Yes ☐ No

If "Yes" is checked, complete lines 11b and 11c.

**11b** Is the plan currently in compliance with the Form M-1 filing requirements? (See instructions and 29 CFR 2520.101-2.) ........... ☐ Yes ☐ No

**11c** Enter the Receipt Confirmation Code for the 2017 Form M-1 annual report. If the plan was not required to file the 2017 Form M-1 annual report, enter the Receipt Confirmation Code for the most recent Form M-1 that was required to be filed under the Form M-1 filing requirements. (Failure to enter a valid Receipt Confirmation Code will subject the Form 5500 filing to rejection as incomplete.)

Receipt Confirmation Code____________________

| SCHEDULE C (Form 5500) | Service Provider Information | OMB No. 1210-0110 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA). | 2017 |
| Department of Labor Employee Benefits Security Administration | ▶ File as an attachment to Form 5500. | This Form is Open to Public Inspection. |
| Pension Benefit Guaranty Corporation | | |

For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 and ending 12/31/2017

| | |
|---|---|
| **A** Name of plan<br>STRATEGIC ESOP | **B** Three-digit plan number (PN) ▶ 002 |
| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>STRATEGIC FINANCIAL SOLUTIONS, LLC | **D** Employer Identification Number (EIN)<br>[redacted] |

## Part I Service Provider Information (see instructions)

You must complete this Part, in accordance with the instructions, to report the information required for **each person** who received, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of monetary value) in connection with services rendered to the plan or the person's position with the plan during the plan year. If a person received **only** eligible indirect compensation for which the plan received the required disclosures, you are required to answer line 1 but are not required to include that person when completing the remainder of this Part.

### 1 Information on Persons Receiving Only Eligible Indirect Compensation

**a** Check "Yes" or "No" to indicate whether you are excluding a person from the remainder of this Part because they received only elig ble indirect compensation for which the plan received the required disclosures (see instructions for definitions and conditions).. . . . . . . . . . . . . . . ☐ Yes ☒ No

**b** If you answered line 1a "Yes," enter the name and EIN or address of each person providing the required disclosures for the service providers who received only eligible indirect compensation. Complete as many entries as needed (see instructions).

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

## Part I Service Provider Information (continued)

**3.** If you reported on line 2 receipt of indirect compensation, other than eligible indirect compensation, by a service provider, and the service provider is a fiduciary or provides contract administrator, consulting, custodial, investment advisory, investment management, broker, or recordkeeping services, answer the following questions for (a) each source from whom the service provider received $1,000 or more in indirect compensation and (b) each source for whom the service provider gave you a formula used to determine the indirect compensation instead of an amount or estimated amount of the indirect compensation. Complete as many entries as needed to report the required information for each source.

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

## Part II Service Providers Who Fail or Refuse to Provide Information

**4** Provide, to the extent possible, the following information for each service provider who failed or refused to provide the information necessary to complete this Schedule.

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |

**Part III** **Termination Information on Accountants and Enrolled Actuaries (see instructions)**
(complete as many entries as needed)

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| | |
|---|---|
| **a** Name: | **b** EIN: |
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| SCHEDULE H (Form 5500) | Financial Information | OMB No. 1210-0110 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA), and section 6058(a) of the Internal Revenue Code (the Code). | 2017 |
| Department of Labor Employee Benefits Security Administration | ▶ File as an attachment to Form 5500. | This Form is Open to Public Inspection |
| Pension Benefit Guaranty Corporation | | |

For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 and ending 12/31/2017

| | |
|---|---|
| **A** Name of plan<br>STRATEGIC ESOP | **B** Three-digit plan number (PN) ▶ 002 |
| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>STRATEGIC FINANCIAL SOLUTIONS, LLC | **D** Employer Identification Number (EIN)<br>[redacted] |

## Part I Asset and Liability Statement

**1** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines 1c(9) through 1c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. **Round off amounts to the nearest dollar.** MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, and 1i. CCTs, PSAs, and 103-12 IEs also do not complete lines 1d and 1e. See instructions.

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **a** Total noninterest-bearing cash | 1a | 0 | 0 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions | 1b(1) | 0 | 6000000 |
| (2) Participant contributions | 1b(2) | 0 | 0 |
| (3) Other | 1b(3) | 0 | 0 |
| **c** General investments: | | | |
| (1) Interest-bearing cash (include money market accounts & certificates of deposit) | 1c(1) | | |
| (2) U.S. Government securities | 1c(2) | | |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred | 1c(3)(A) | | |
| (B) All other | 1c(3)(B) | | |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred | 1c(4)(A) | | |
| (B) Common | 1c(4)(B) | | |
| (5) Partnership/joint venture interests | 1c(5) | | |
| (6) Real estate (other than employer real property) | 1c(6) | | |
| (7) Loans (other than to participants) | 1c(7) | | |
| (8) Participant loans | 1c(8) | | |
| (9) Value of interest in common/collective trusts | 1c(9) | | |
| (10) Value of interest in pooled separate accounts | 1c(10) | | |
| (11) Value of interest in master trust investment accounts | 1c(11) | | |
| (12) Value of interest in 103-12 investment entities | 1c(12) | | |
| (13) Value of interest in registered investment companies (e.g., mutual funds) | 1c(13) | | |
| (14) Value of funds held in insurance company general account (unallocated contracts) | 1c(14) | | |
| (15) Other | 1c(15) | | |



Exhibit 08-0134
DSL 005433

| | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **1d** Employer-related investments: | | | |
| **(1)** Employer securities | 1d(1) | 0 | 111282300 |
| **(2)** Employer real property | 1d(2) | | |
| **e** Buildings and other property used in plan operation | 1e | | |
| **f** Total assets (add all amounts in lines 1a through 1e) | 1f | 0 | 117282300 |
| **Liabilities** | | | |
| **g** Benefit claims payable | 1g | 0 | |
| **h** Operating payables | 1h | 0 | |
| **i** Acquisition indebtedness | 1i | 0 | |
| **j** Other liabilities | 1j | 0 | 242052055 |
| **k** Total liabilities (add all amounts in lines 1g through1j) | 1k | 0 | 242052055 |
| **Net Assets** | | | |
| **l** Net assets (subtract line 1k from line 1f) | 1l | 0 | -124769755 |

## Part II Income and Expense Statement

**2** Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

| Income | | (a) Amount | (b) Total |
|---|---|---|---|
| **a Contributions:** | | | |
| **(1)** Received or receivable in cash from: **(A)** Employers | 2a(1)(A) | 6000000 | |
| **(B)** Participants | 2a(1)(B) | 0 | |
| **(C)** Others (including rollovers) | 2a(1)(C) | 0 | |
| **(2)** Noncash contributions | 2a(2) | 0 | |
| **(3)** Total contributions. Add lines **2a(1)(A), (B), (C),** and line **2a(2)** | 2a(3) | | 6000000 |
| **b Earnings on investments:** | | | |
| **(1)** Interest: | | | |
| **(A)** Interest-bearing cash (including money market accounts and certificates of deposit) | 2b(1)(A) | 0 | |
| **(B)** U.S. Government securities | 2b(1)(B) | 0 | |
| **(C)** Corporate debt instruments | 2b(1)(C) | 0 | |
| **(D)** Loans (other than to participants) | 2b(1)(D) | 0 | |
| **(E)** Participant loans | 2b(1)(E) | | |
| **(F)** Other | 2b(1)(F) | 0 | |
| **(G)** Total interest. Add lines **2b(1)(A)** through **(F)** | 2b(1)(G) | | 0 |
| **(2)** Dividends: **(A)** Preferred stock | 2b(2)(A) | 0 | |
| **(B)** Common stock | 2b(2)(B) | 1972121 | |
| **(C)** Registered investment company shares (e.g. mutual funds) | 2b(2)(C) | 0 | |
| **(D)** Total dividends. Add lines **2b(2)(A), (B),** and **(C)** | 2b(2)(D) | | 1972121 |
| **(3)** Rents | 2b(3) | | 0 |
| **(4)** Net gain (loss) on sale of assets: **(A)** Aggregate proceeds | 2b(4)(A) | 0 | |
| **(B)** Aggregate carrying amount (see instructions) | 2b(4)(B) | 0 | |
| **(C)** Subtract line **2b(4)(B)** from line **2b(4)(A)** and enter result | 2b(4)(C) | | 0 |
| **(5)** Unrealized appreciation (depreciation) of assets: **(A)** Real estate | 2b(5)(A) | 0 | |
| **(B)** Other | 2b(5)(B) | -130946567 | |
| **(C)** Total unrealized appreciation of assets. Add lines **2b(5)(A)** and **(B)** | 2b(5)(C) | | -130946567 |

Exhibit 08-0135

DSL 005434

| | | (a) Amount | (b) Total |
|---|---|---|---|
| (6) Net investment gain (loss) from common/collective trusts | 2b(6) | | 0 |
| (7) Net investment gain (loss) from pooled separate accounts | 2b(7) | | 0 |
| (8) Net investment gain (loss) from master trust investment accounts | 2b(8) | | 0 |
| (9) Net investment gain (loss) from 103-12 investment entities | 2b(9) | | 0 |
| (10) Net investment gain (loss) from registered investment companies (e.g., mutual funds) | 2b(10) | | 0 |
| **c** Other income | 2c | | 0 |
| **d** Total income. Add all **income** amounts in column (b) and enter total | 2d | | -122974446 |
| **Expenses** | | | |
| **e** Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers | 2e(1) | 0 | |
| (2) To insurance carriers for the provision of benefits | 2e(2) | 0 | |
| (3) Other | 2e(3) | 0 | |
| (4) Total benefit payments. Add lines **2e(1)** through **(3)** | 2e(4) | | 0 |
| **f** Corrective distributions (see instructions) | 2f | | 0 |
| **g** Certain deemed distributions of participant loans (see instructions) | 2g | | |
| **h** Interest expense | 2h | | 1795309 |
| **i** Administrative expenses: **(1)** Professional fees | 2i(1) | 0 | |
| (2) Contract administrator fees | 2i(2) | 0 | |
| (3) Investment advisory and management fees | 2i(3) | 0 | |
| (4) Other | 2i(4) | 0 | |
| (5) Total administrative expenses. Add lines **2i(1)** through **(4)** | 2i(5) | | 0 |
| **j** Total expenses. Add all **expense** amounts in column (b) and enter total | 2j | | 1795309 |
| **Net Income and Reconciliation** | | | |
| **k** Net income (loss). Subtract line **2j** from line **2d** | 2k | | -124769755 |
| **l** Transfers of assets: | | | |
| (1) To this plan | 2l(1) | | 0 |
| (2) From this plan | 2l(2) | | |

## Part III Accountant's Opinion

**3** Complete lines 3a through 3c if the opinion of an independent qualified public accountant is attached to this Form 5500. Complete line 3d if an opinion is not attached.

**a** The attached opinion of an independent qualified public accountant for this plan is (see instructions):
(1) [X] Unqualified (2) [ ] Qualified (3) [ ] Disclaimer (4) [ ] Adverse

**b** Did the accountant perform a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 103-12(d)? [ ] Yes [X] No

**c** Enter the name and EIN of the accountant (or accounting firm) below:
(1) Name: FREEDMAXICK CPA'S P.C. (2) EIN: [redacted]

**d** The opinion of an independent qualified public accountant is **not attached** because:
(1) [ ] This form is filed for a CCT, PSA, or MTIA. (2) [ ] It will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

## Part IV Compliance Questions

**4** CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete lines 4a, 4e, 4f, 4g, 4h, 4k, 4m, 4n, or 5. 103-12 IEs also do not complete lines 4j and 4l. MTIAs also do not complete line 4l.

| During the plan year: | | Yes | No | Amount |
|---|---|---|---|---|
| **a** Was there a failure to transmit to the plan any participant contr butions within the time period described in 29 CFR 2510.3-102? Continue to answer "Yes" for any prior year failures until fully corrected. (See instructions and DOL's Voluntary Fiduciary Correction Program.) | 4a | | X | 0 |
| **b** Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollect ble? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked.) | 4b | | X | 0 |

Exhibit 08-0136

DSL 005435

| | | | Yes | No | Amount |
|---|---|---|---|---|---|
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) | 4c | | X | 0 |
| d | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.) | 4d | | X | 0 |
| e | Was this plan covered by a fidelity bond? | 4e | | X | 0 |
| f | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? | 4f | | X | |
| g | Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? | 4g | | X | |
| h | Did the plan receive any noncash contr butions whose value was neither readily determinable on an established market nor set by an independent third party appraiser? | 4h | | X | |
| i | Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements.) | 4i | X | | |
| j | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements.) | 4j | | X | |
| k | Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC? | 4k | | X | |
| l | Has the plan failed to provide any benefit when due under the plan? | 4l | | X | |
| m | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) | 4m | | X | |
| n | If 4m was answered "Yes," check the "Yes" box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3. | 4n | | | |

**5a** Has a resolution to terminate the plan been adopted during the plan year or any prior plan year? ☐ Yes ☒ No
If "Yes," enter the amount of any plan assets that reverted to the employer this year ____________.

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| **5b(1)** Name of plan(s) | **5b(2)** EIN(s) | **5b(3)** PN(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**5c** If the plan is a defined benefit plan, is it covered under the PBGC insurance program (See ERISA section 4021.)? ☐ Yes ☐ No ☐ Not determined
If "Yes" is checked, enter the My PAA confirmation number from the PBGC premium filing for this plan year____________. (See instructions.)

Exhibit 08-0137

**DSL 005436**

| SCHEDULE R (Form 5500) | Retirement Plan Information | OMB No. 1210-0110 |
|---|---|---|
| Department of the Treasury Internal Revenue Service<br>Department of Labor Employee Benefits Security Administration<br>Pension Benefit Guaranty Corporation | This schedule is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code).<br>▶ **File as an attachment to Form 5500.** | **2017**<br>**This Form is Open to Public Inspection.** |

For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 and ending 12/31/2017

**A** Name of plan
STRATEGIC ESOP

**B** Three-digit plan number (PN) ▶ 002

**C** Plan sponsor's name as shown on line 2a of Form 5500
STRATEGIC FINANCIAL SOLUTIONS, LLC

**D** Employer Identification Number (EIN)
[redacted]

## Part I Distributions

**All references to distributions relate only to payments of benefits during the plan year.**

**1** Total value of distributions paid in property other than in cash or the forms of property specified in the instructions .......... **1** 0

**2** Enter the EIN(s) of payor(s) who paid benefits on behalf of the plan to participants or beneficiaries during the year (if more than two, enter EINs of the two payors who paid the greatest dollar amounts of benefits):

EIN(s): ____________ ____________

**Profit-sharing plans, ESOPs, and stock bonus plans, skip line 3.**

**3** Number of participants (living or deceased) whose benefits were distr buted in a single sum, during the plan year .......... **3**

## Part II Funding Information (If the plan is not subject to the minimum funding requirements of section 412 of the Internal Revenue Code or ERISA section 302, skip this Part.)

**4** Is the plan administrator making an election under Code section 412(d)(2) or ERISA section 302(d)(2)? .......... ☐ Yes ☐ No ☐ N/A

**If the plan is a defined benefit plan, go to line 8.**

**5** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions and enter the date of the ruling letter granting the waiver. **Date:** Month ________ Day ________ Year ________

**If you completed line 5, complete lines 3, 9, and 10 of Schedule MB and do not complete the remainder of this schedule.**

**6 a** Enter the minimum required contribution for this plan year (include any prior year accumulated funding deficiency not waived) .......... **6a**

**b** Enter the amount contr buted by the employer to the plan for this plan year .......... **6b**

**c** Subtract the amount in line 6b from the amount in line 6a. Enter the result (enter a minus sign to the left of a negative amount) .......... **6c**

**If you completed line 6c, skip lines 8 and 9.**

**7** Will the minimum funding amount reported on line 6c be met by the funding deadline? .......... ☐ Yes ☐ No ☐ N/A

**8** If a change in actuarial cost method was made for this plan year pursuant to a revenue procedure or other authority providing automatic approval for the change or a class ruling letter, does the plan sponsor or plan administrator agree with the change? .......... ☐ Yes ☐ No ☐ N/A

## Part III Amendments

**9** If this is a defined benefit pension plan, were any amendments adopted during this plan year that increased or decreased the value of benefits? If yes, check the appropriate box. If no, check the "No" box. .......... ☐ Increase ☐ Decrease ☐ Both ☐ No

## Part IV ESOPs (see instructions). If this is not a plan described under section 409(a) or 4975(e)(7) of the Internal Revenue Code, skip this Part.

**10** Were unallocated employer securities or proceeds from the sale of unallocated securities used to repay any exempt loan? .......... ☐ Yes ☒ No

**11 a** Does the ESOP hold any preferred stock? .......... ☐ Yes ☒ No

**b** If the ESOP has an outstanding exempt loan with the employer as lender, is such loan part of a "back-to-back" loan? (See instructions for definition of "back-to-back" loan.) .......... ☐ Yes ☒ No

**12** Does the ESOP hold any stock that is not readily tradable on an established securities market? .......... ☒ Yes ☐ No



Exhibit 08-0138

**DSL 005437**

## Part V Additional Information for Multiemployer Defined Benefit Pension Plans

13 Enter the following information for each employer that contr buted more than 5% of total contr butions to the plan during the plan year (measured in dollars). See instructions. *Complete as many entries as needed to report all applicable employers.*

a Name of contributing employer

b EIN c Dollar amount contributed by employer

d Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

e Contr bution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify):

a Name of contributing employer

b EIN c Dollar amount contributed by employer

d Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month ______ Day ______ Year ______

e Contr bution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ____________

a Name of contributing employer

b EIN c Dollar amount contributed by employer

d Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month ______ Day ______ Year ______

e Contr bution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ____________

a Name of contributing employer

b EIN c Dollar amount contributed by employer

d Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

e Contr bution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ____________

a Name of contributing employer

b EIN c Dollar amount contributed by employer

d Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

e Contr bution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ____________

a Name of contributing employer

b EIN c Dollar amount contributed by employer

d Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month Day Year

e Contr bution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
(1) Contr bution rate (in dollars and cents) ________
(2) Base unit measure: ☐ Hourly ☐ Weekly ☐ Unit of production ☐ Other (specify): ____________

| | | |
|---|---|---|
| **14** Enter the number of participants on whose behalf no contributions were made by an employer as an employer of the participant for: | | |
| **a** The current year | **14a** | |
| **b** The plan year immediately preceding the current plan year | **14b** | |
| **c** The second preceding plan year | **14c** | |
| **15** Enter the ratio of the number of participants under the plan on whose behalf no employer had an obligation to make an employer contribution during the current plan year to: | | |
| **a** The corresponding number for the plan year immediately preceding the current plan year | **15a** | |
| **b** The corresponding number for the second preceding plan year | **15b** | |
| **16** Information with respect to any employers who withdrew from the plan during the preceding plan year: | | |
| **a** Enter the number of employers who withdrew during the preceding plan year | **16a** | |
| **b** If line 16a is greater than 0, enter the aggregate amount of withdrawal liability assessed or estimated to be assessed against such withdrawn employers | **16b** | |

**17** If assets and liabilities from another plan have been transferred to or merged with this plan during the plan year, check box and see instructions regarding supplemental information to be included as an attachment. ☐

## Part VI Additional Information for Single-Employer and Multiemployer Defined Benefit Pension Plans

**18** If any liabilities to participants or their beneficiaries under the plan as of the end of the plan year consist (in whole or in part) of liabilities to such participants and beneficiaries under two or more pension plans as of immediately before such plan year, check box and see instructions regarding supplemental information to be included as an attachment ☐

**19** If the total number of participants is 1,000 or more, complete lines (a) through (c)

**a** Enter the percentage of plan assets held as:

Stock: ______% Investment-Grade Debt: ______% High-Yield Debt: ______% Real Estate: ______% Other: ______%

**b** Provide the average duration of the combined investment-grade and high-yield debt:

☐ 0-3 years ☐ 3-6 years ☐ 6-9 years ☐ 9-12 years ☐ 12-15 years ☐ 15-18 years ☐ 18-21 years ☐ 21 years or more

**c** What duration measure was used to calculate line 19(b)?

☐ Effective duration ☐ Macaulay duration ☐ Modified duration ☐ Other (specify):

Exhibit 08-0140

**DSL 005439**

**AUDITED**
**FINANCIAL STATEMENTS**

# STRATEGIC ESOP

---

**DECEMBER 31, 2017**

**STRATEGIC ESOP**

**CONTENTS**


| | Page |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| **Financial Statements:** | |
| Statement of Net Assets (Deficit) Available for Benefits | 3 |
| Statement of Changes in Net Assets (Deficit) Available for Benefits | 4 |
| **Notes to Financial Statements** | 5 - 11 |
| **Supplemental Schedule:** | |
| Schedule H, Line 4i - Schedule of Assets (Held at End of Year) | 12 |

FreedMaxick™ CPAs, P.C.

# INDEPENDENT AUDITOR'S REPORT

To the Participants and Administrator of
Strategic ESOP

## Report on the Financial Statements

We have audited the accompanying financial statements of Strategic ESOP (the Plan), which comprise the statement of net assets (deficit) available for benefits as of December 31, 2017, and the related statement of changes in net assets (deficit) available for benefits for the eight month period then ended, and the related notes to the financial statements.

## Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

## Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets (deficit) available for benefits of the Plan as of December 31, 2017, and the changes in net assets (deficit) available for benefits for the period then ended, in accordance with accounting principles generally accepted in the United States of America.

**Other Matter - Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedule of Schedule H, Line 4i - Schedule of Assets (Held at End of Year), as of December 31, 2017 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

Freed Maxick CPAs, P.C.

Buffalo, New York
October 15, 2018



FreedMaxick CPAs, P.C.

**STRATEGIC ESOP**

**STATEMENT OF NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**December 31, 2017**

| | Allocated | Unallocated | Total |
|---|---|---|---|
| **Assets:** | | | |
| Investment in Strategic Family, Inc. common stock, at fair value | $ 589,713 | $ 110,692,587 | $ 111,282,300 |
| **Receivables:** | | | |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| **Total assets** | 589,713 | 116,692,587 | 117,282,300 |
| **Liabilities:** | | | |
| Notes payable | - | 240,276,655 | 240,276,655 |
| **Total liabilities** | - | 240,276,655 | 240,276,655 |
| **Net assets (deficit) available for benefits** | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.

**STRATEGIC ESOP**

**STATEMENT OF CHANGES IN NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**For the Eight Month Period Ended December 31, 2017**

| | Allocated | Unallocated | Total |
|---|---|---|---|
| **Sources of net assets:** | | | |
| Dividend income | $ - | $ 1,972,121 | $ 1,972,121 |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | 589,713 | - | - |
| Total sources of net assets | 589,713 | 7,972,121 | 7,972,121 |
| **Applications of net assets:** | | | |
| Interest expense | - | 19,909 | 19,909 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | - | 589,713 | - |
| Net depreciation in fair value of investments | - | 130,946,567 | 130,946,567 |
| Total applications of net assets | - | 131,556,189 | 130,966,476 |
| **Increase (decrease) in net assets available for benefits** | 589,713 | (123,584,068) | (122,994,355) |
| **Net assets (deficit) available for benefits:** | | | |
| Beginning of year | - | - | - |
| End of year | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.



Exhibit 08-0146

**DSL 005445**

## NOTE 1. DESCRIPTION OF PLAN

The following brief description of Strategic ESOP (Plan) is provided for general information purposes only. Participants should refer to the Plan agreement for complete information.

**General:** Strategic Financial Services, LLC (the Plan Sponsor) established the Strategic ESOP effective as of May 1, 2017. The plan operates as a leveraged employee stock ownership plan (ESOP) and is designed to comply with Section 4975(e)(7) and the regulations thereunder of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan is administered by the Strategic ESOP Committee comprising of one or more persons appointed by the Plan Sponsor. The trust department of an independent third-party is the Plan's trustee.

On December 28, 2017, the Plan purchased 54,900 shares of the Strategic Family, Inc.'s (the Company) common stock at a price of approximately $4,412 per share for an aggregate purchase price of $242,228,867. The stock is held in the Strategic Employee Stock Ownership Trust (the Trust), established by the Plan. The purchase was funded by the Trust signing notes payable to the former stockholders (the Lenders).

The notes payable are collateralized by the unallocated shares of common stock and are guaranteed by Strategic Family, Inc. The Lenders have no rights against shares of common stock once they are allocated to participants in accordance with the terms of the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2017 and for the period then ended, present separately the assets and liabilities and changes therein pertaining to:

a) the accounts of employees with vested rights in allocated common stock (allocated), and
b) common stock not yet allocated to employees (unallocated).

**Eligibility:** Employees of the Plan Sponsor and its participating subsidiaries are generally eligible to participate in the Plan after one year of service, providing they worked at least 1,000 hours during such Plan year, and are aged 21. Participants who do not have at least 1,000 hours of service during such Plan year or are not employed on the last working day of a Plan year are generally not eligible for an allocation of Company contributions for such year.

For the 2017 plan year, the first year of operation for the Plan, all employees who had attained age twenty-one and were employed on the last day of the plan year were eligible to enter the plan as of the later of their date of employment or May 1, 2017, regardless of service requirement.

**Contributions:** The Company is obligated to make contributions in cash or company stock to the Plan which, when aggregated with the Plan's dividends, equal the amount necessary to enable the Plan to make its regularly scheduled payments of principal and interest due on its notes payable. Employee contributions are not permitted.

**Payment of Benefits**: Distributions on account of death, disability, or retirement are made in a lump sum in the Plan year following the event. Distributions for other separations from service must commence no later than one year after the fifth Plan year following the separation from service. The amount to be distributed is based upon the immediately preceding valuation date. Distributions are made in cash or, if a participant elects, in the form of Company common stock plus cash for any fractional share of common stock. Under the provisions of the Plan, the Company is obligated to repurchase participant shares, which have been distributed under the terms of the Plan if the shares are not publicly traded or if the shares are subject to trading limitations.

**Administrative Expenses:** As provided in the Plan agreement, administrative expenses may be paid either by the Plan or by the Company. The Company paid the operating expenses for the Plan in 2017.

**NOTE 1. DESCRIPTION OF PLAN (CONTINUED)**

**Voting Rights:** Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified by the Trustee prior to the time that such rights are to be exercised. The Trustee is not permitted to vote any allocated share for which instructions have not been given by a participant. The Trustee is required, however, to vote any unallocated shares on behalf of the collective best interest of plan participants and beneficiaries.

**Participant Accounts:** The Plan is a defined contribution plan under which a separate individual account is established for each participant. Each participant's account is credited as of the last day of each Plan year with an allocation of shares of the Company's common stock released by the Trustee from the unallocated account and forfeitures of terminated participants' non-vested accounts. Only those participants who are eligible employees of the Plan Sponsor and its subsidiaries as of the last day of the Plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation. Plan earnings are allocated to each participant's account based on the ratio of the participant's account balance.

**Plan Termination:** The Plan Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions. Upon termination of the Plan, the Strategic ESOP Committee directs the Trustee to pay all liabilities and expenses of the ESOP and to sell shares of financed common stock held as collateral to the extent it determines such sale is necessary in order to repay the loan. Subsequently, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Internal Revenue Code.

**Vesting:** If a participant's employment with the Plan Sponsor and its subsidiaries ends for any reason other than retirement, permanent disability, or death, he or she will vest in the balances in his or her account based on total years of services with the company. Vesting of ownership benefits is based on the following schedule:

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

**Put Option:** Under Federal income tax regulations, the employer stock that is held by the Plan and its participants and is not readily tradable on an established market, or is subject to trading limitations, includes a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is a limited or no market. The put price is representative of the current appraised value of the stock. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately obtain cash.

**Diversification:** Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments that are more diversified. Participants who are at least age 55 with at least 10 years of participation in the Plan may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25 percent of his or her account. In the sixth year, the participant may diversify up to 50 percent of the undiversified balance. Participants who elect to diversify receive a cash distribution. The election to diversify is made subsequent to year end based upon the shares of employer stock in the participant's account at year end.

**Forfeitures:** Plan forfeitures are held in a forfeiture account until the fifth anniversary of the participant's break in service. After this time, the forfeitures are allocated to current participants' account based on the ratio of the participant's compensation to total participants' compensation for the Plan year. There were no forfeitures allocated to participants during December 31, 2017.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Accounting:** The financial statements of the Plan are prepared on the accrual basis of accounting.

**Use of Estimates:** The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, and changes therein, and disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

**Allocations:** The financial statements of the Plan present separately the assets and liabilities and changes therein pertaining to (a) the accounts of employees with rights in allocated stock ("allocated") and (b) stock not yet allocated to employees ("unallocated"), including shares that are committed to be released. Shares are released from collateral and become allocated generally in the period in which debt service is actually paid.

**Risks and Uncertainties**: The Plan investments consist solely of the Strategic Family, Inc.'s common stock, which is exposed to various risks, such as interest rate, market, and credit risks, as well as valuation assumptions based on earnings, cash flows and/or other such techniques. Due to the level of risk associated with the investment in the common stock and to uncertainties inherent in estimates and assumptions, it is at least reasonably possible that changes in the value of the common stock will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

**Investment Valuation and Income Recognition:** The shares of Company common stock are reported at fair value. See Note 5 for a discussion of fair value measurements. Dividend income is accrued on the ex-dividend date. Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses from security transactions are reported on the average cost method. Net depreciation in fair value of investments includes the Plan's gains and losses on investments bought and sold as well as held during the year.

**Payment of Benefits:** Benefits are recorded when paid.

## NOTE 3. CONTRIBUTION RECEIVABLE

In December 2017, the Plan Sponsor committed to making a contribution of $6,000,000 to the Plan with payment to be made on or before September 15, 2018. As a result, the Plan accrued a contribution receivable to the Plan at December 31, 2017 which is presented as unallocated until paid. Upon payment in 2018 the contribution was applied to the notes payable and released 885.125 shares to participants. For financial reporting purposes, these shares are not released from serving as collateral for the Plan's debt until debt payment is actually made, and as such the shares are shown on the attached statement of net assets (deficit) available for benefits as unallocated. However, for participant accounting purposes, the shares are considered to be allocated to participants as the participants have a beneficial interest in the contribution receivable. This results in a difference between the amount reported on the financial statements as net assets allocated to participants and the participant records.

## NOTE 4. TAX STATUS

The Plan has been designed to be an employee stock ownership plan within the meaning of Section 4975(e) (7) of the Internal Revenue Code of 1986, as amended (the Code), and section 407(d) (6) of the Employee Retirement Income Security Act of 1974, as amended (ERISA). The Plan is in the process of applying for a determination letter from the Internal Revenue Service (IRS) to obtain approval that a) the Plan is qualified, under the Code and, therefore, b) that the related trust is exempt from taxation. Once qualified, the Plan is required to operate in conformity with the Code to maintain its qualification. The Strategic ESOP Committee believes that the Plan is currently designed, and being operated, in compliance with the applicable requirement of the Code. Therefore Strategic ESOP Committee believes that the Plan was qualified, and the related trust was tax-exempt as of the financial statement date.

**NOTE 4. TAX STATUS (CONTINUED)**

Accounting principles generally accepted in the United States of America require plan management to evaluate tax positions taken by the plan and recognize a tax liability if the organization has taken a significant uncertain position that more likely than not would not be sustained upon examination by the IRS. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

**NOTE 5. INVESTMENTS**

The Plan's investments, at December 31, 2017 are presented in the following table:

| | Allocated | Unallocated |
|---|---|---|
| Strategic Family, Inc. common stock: | | |
| Number of shares | 290 929 | 54 609 071 |
| Cost | $ 1,283,658 | $ 240,945,209 |
| Estimated fair value | $ 589,713 | $ 110,692,587 |

**NOTE 6. FAIR VALUE MEASUREMENTS**

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

Level 1: Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

Level 2: Inputs to the valuation methodology include

- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices for identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3: Inputs to the valuation methodology are unobservable and significant in the fair value measurement.

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

## NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)

The following table sets forth by level, within the fair value hierarchy, the Plan's assets at fair value as of December 31, 2017:

| | Assets at Fair Value as of December 31, 2017 | | | |
|---|---|---|---|---|
| | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 111,282,300 | $ 111,282,300 |
| Investments at fair value | $ - | $ - | $ 111,282,300 | $ 111,282,300 |

**Changes in Fair Value of Level 3 Assets and Related Gains and Losses**

The following table sets forth a summary of changes in the fair value of the Plan's level 3 assets for the year ended December 31, 2017:

| | Level 3 Assets Investment in Strategic Family, Inc. Common Stock |
|---|---|
| Balance, May 1, 2017 | **$ -** |
| Purchases | **242,228,867** |
| Realized gains/losses | **-** |
| Unrealized (depreciation) in estimated fair value | **(130,946,567)** |
| Balance, December 31, 2017 | **$ 111,282,300** |

Unrealized losses included in changes in net assets for the period above are reported in net depreciation in fair value of investments in the Statements of Changes in Net Assets (Deficit) Available for Benefits.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2017.

Strategic Family, Inc. common stock held by the Plan is valued at fair value based upon an independent appraisal. This appraised value was calculated using income based valuation techniques as illustrated in the following table.

| Instrument | Fair Value | Principal Valuation Technique | Unobservable Inputs |
|---|---|---|---|
| Strategic Family, Inc. common stock | $111,282,300 | Income Approach<br><br>- Discounted Cash Flow Method (1/3 weighting)<br><br>- Discounted Cash Flow (modified) (2/3 weighting) | EBITDA<br>Net income<br>Weighted average cost of capital<br>Discount rate<br>Discount for lack of marketability |

## NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)

The valuation process involves the selection of an independent appraiser. Plan management accumulates the data for the appraiser from the financial statements of the Company. The appraiser prepares a report of estimated per share value. Plan management, along with the ESOP trustee, reviews in detail, discusses and approves the appraiser's preliminary report.

The valuation methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

## NOTE 7. LOAN PAYABLE

In December 2017, the Plan entered into multiple loan note agreements with the former stockholders of Strategic Family, Inc. for an aggregate value of $242,228,867 in exchange for 75% (54,900 shares) of the Company's outstanding common stock. The Company repurchased and cancelled the remaining 25% of its outstanding common stock. Unallocated shares held by the Plan are collateral for the notes payable. Shares are released from collateral and allocated to participants as payments of principal and interest are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year principal and interest payments divided by the total of all prior and future years' principal and interest payments.

This resulted in 290.929 shares being released and allocated for the Plan year ended December 31, 2017.

The loan note agreements provide for the loan to be repaid over 30 years and they bear interest at 3.00%.

The minimum required payment schedule for the notes is as follows:

| | |
|---|---|
| 2018 | $ **7,000,000** |
| 2019 | **9,500,000** |
| 2020 | **10,875,000** |
| 2021 | **11,000,000** |
| 2022 | **12,000,000** |
| Subsequent to 2022 | **189,901,655** |
| | **$ 240 276 655** |

## NOTE 8. COMPANY DIVIDENDS

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service.

## NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS

The Plan invests in Company common stock and has indebtedness to the former stockholders for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

## NOTE 10. RECONCILIATION TO 5500

| | 2017 |
|---|---|
| Net assets (deficit) available for benefits per the financial statements | **$ (122,994,355)** |
| Differences in: | |
| Accrued interest expense payable | **(1,775,400)** |
| Net assets (deficit) available for benefits per the Form 5500 | **$ (124,769,755)** |

The following is a reconciliation of the change in net assets available for benefits per the financial statements for the years ended December 31, 2017 Form 5500:

| | 2017 |
|---|---|
| Increase in net assets per financial statements | **$ (122,994,355)** |
| Less: | |
| Interest expense | **(1,775,400)** |
| Increase in net assets per Form 5500 | **$ (124,769,755)** |

## NOTE 11. SUBSEQUENT EVENTS

**Refinancing of notes payable to former stockholders**: On April 30, 2018, under the terms of an Assumption Agreement signed by the Company in conjunction with the formation of the Plan, the Company unconditionally assumed all obligations of the ESOP Trust under the notes payable to former stockholders. In return, the ESOP Trust signed a refinanced (internal) note payable to the Company in the amount of $235,052,055 (the total amount of the notes payable to former stockholders at the date of signing). The terms of the refinanced (internal) note include a requirement to make 30 payments of principal and interest with certain minimum payments each year, with the balance of the notes being payable on December 31, 2046. Interest will accrue at 3.04% per annum.

Also pursuant to the Assumption Agreement, the Company issued notes payable to the former stockholders in the amount of $235,052,055. These terms of these notes payable require interest to accrue daily at an annual rate of 3.04%. There is no defined repayment term, but the notes mature and are payable in full on December 31, 2028.

These financial statements have not been updated for subsequent events occurring after October 15, 2018, which is the date these financial statements were available to be issued.

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
**EIN #: [redacted]**
**Plan #: 002**
**December 31, 2017**

| (a) | (b) Identity of Issuer | (c) Description of Investment | (d) Cost | (e) Fair Value |
|---|---|---|---|---|
| | Common Stock: | | | |
| * | Strategic Family, Inc. | 54,900 shares of common stock | $ 242,228,867 | $ 111,282,300 |
| | | | $ 242,228,867 | $ 111,282,300 |

* Represents party in interest.

**AUDITED**
**FINANCIAL STATEMENTS**

# STRATEGIC ESOP

---

**DECEMBER 31, 2017**

**STRATEGIC ESOP**

**CONTENTS**


| | Page |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| **Financial Statements:** | |
| Statement of Net Assets (Deficit) Available for Benefits | 3 |
| Statement of Changes in Net Assets (Deficit) Available for Benefits | 4 |
| **Notes to Financial Statements** | 5 - 11 |
| **Supplemental Schedule:** | |
| Schedule H, Line 4i - Schedule of Assets (Held at End of Year) | 12 |

FreedMaxick CPAs, P.C.

**INDEPENDENT AUDITOR'S REPORT**

To the Participants and Administrator of
Strategic ESOP

### Report on the Financial Statements

We have audited the accompanying financial statements of Strategic ESOP (the Plan), which comprise the statement of net assets (deficit) available for benefits as of December 31, 2017, and the related statement of changes in net assets (deficit) available for benefits for the eight month period then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets (deficit) available for benefits of the Plan as of December 31, 2017, and the changes in net assets (deficit) available for benefits for the period then ended, in accordance with accounting principles generally accepted in the United States of America.

**Other Matter - Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedule of Schedule H, Line 4i - Schedule of Assets (Held at End of Year), as of December 31, 2017 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

Freed Maxick CPAs, P.C.

Buffalo, New York
October 15, 2018

**STRATEGIC ESOP**

**STATEMENT OF NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**December 31, 2017**

| | Allocated | Unallocated | Total |
|---|---|---|---|
| **Assets:** | | | |
| Investment in Strategic Family, Inc. common stock, at fair value | $ 589,713 | $ 110,692,587 | $ 111,282,300 |
| **Receivables:** | | | |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| **Total assets** | 589,713 | 116,692,587 | 117,282,300 |
| **Liabilities:** | | | |
| Notes payable | - | 240,276,655 | 240,276,655 |
| **Total liabilities** | - | 240,276,655 | 240,276,655 |
| **Net assets (deficit) available for benefits** | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.

**STRATEGIC ESOP**

**STATEMENT OF CHANGES IN NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**For the Eight Month Period Ended December 31, 2017**

| | Allocated | Unallocated | Total |
|---|---|---|---|
| **Sources of net assets:** | | | |
| Dividend income | $ - | $ 1,972,121 | $ 1,972,121 |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | 589,713 | - | - |
| Total sources of net assets | 589,713 | 7,972,121 | 7,972,121 |
| **Applications of net assets:** | | | |
| Interest expense | - | 19,909 | 19,909 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | - | 589,713 | - |
| Net depreciation in fair value of investments | - | 130,946,567 | 130,946,567 |
| Total applications of net assets | - | 131,556,189 | 130,966,476 |
| **Increase (decrease) in net assets available for benefits** | 589,713 | (123,584,068) | (122,994,355) |
| **Net assets (deficit) available for benefits:** | | | |
| Beginning of year | - | - | - |
| End of year | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.



Exhibit 08-0160

**DSL 005459**

## NOTE 1. DESCRIPTION OF PLAN

The following brief description of Strategic ESOP (Plan) is provided for general information purposes only. Participants should refer to the Plan agreement for complete information.

**General:** Strategic Financial Services, LLC (the Plan Sponsor) established the Strategic ESOP effective as of May 1, 2017. The plan operates as a leveraged employee stock ownership plan (ESOP) and is designed to comply with Section 4975(e)(7) and the regulations thereunder of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan is administered by the Strategic ESOP Committee comprising of one or more persons appointed by the Plan Sponsor. The trust department of an independent third-party is the Plan's trustee.

On December 28, 2017, the Plan purchased 54,900 shares of the Strategic Family, Inc.'s (the Company) common stock at a price of approximately $4,412 per share for an aggregate purchase price of $242,228,867. The stock is held in the Strategic Employee Stock Ownership Trust (the Trust), established by the Plan. The purchase was funded by the Trust signing notes payable to the former stockholders (the Lenders).

The notes payable are collateralized by the unallocated shares of common stock and are guaranteed by Strategic Family, Inc. The Lenders have no rights against shares of common stock once they are allocated to participants in accordance with the terms of the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2017 and for the period then ended, present separately the assets and liabilities and changes therein pertaining to:

a) the accounts of employees with vested rights in allocated common stock (allocated), and
b) common stock not yet allocated to employees (unallocated).

**Eligibility:** Employees of the Plan Sponsor and its participating subsidiaries are generally eligible to participate in the Plan after one year of service, providing they worked at least 1,000 hours during such Plan year, and are aged 21. Participants who do not have at least 1,000 hours of service during such Plan year or are not employed on the last working day of a Plan year are generally not eligible for an allocation of Company contributions for such year.

For the 2017 plan year, the first year of operation for the Plan, all employees who had attained age twenty-one and were employed on the last day of the plan year were eligible to enter the plan as of the later of their date of employment or May 1, 2017, regardless of service requirement.

**Contributions:** The Company is obligated to make contributions in cash or company stock to the Plan which, when aggregated with the Plan's dividends, equal the amount necessary to enable the Plan to make its regularly scheduled payments of principal and interest due on its notes payable. Employee contributions are not permitted.

**Payment of Benefits**: Distributions on account of death, disability, or retirement are made in a lump sum in the Plan year following the event. Distributions for other separations from service must commence no later than one year after the fifth Plan year following the separation from service. The amount to be distributed is based upon the immediately preceding valuation date. Distributions are made in cash or, if a participant elects, in the form of Company common stock plus cash for any fractional share of common stock. Under the provisions of the Plan, the Company is obligated to repurchase participant shares, which have been distributed under the terms of the Plan if the shares are not publicly traded or if the shares are subject to trading limitations.

**Administrative Expenses:** As provided in the Plan agreement, administrative expenses may be paid either by the Plan or by the Company. The Company paid the operating expenses for the Plan in 2017.

## NOTE 1. DESCRIPTION OF PLAN (CONTINUED)

**Voting Rights:** Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified by the Trustee prior to the time that such rights are to be exercised. The Trustee is not permitted to vote any allocated share for which instructions have not been given by a participant. The Trustee is required, however, to vote any unallocated shares on behalf of the collective best interest of plan participants and beneficiaries.

**Participant Accounts:** The Plan is a defined contribution plan under which a separate individual account is established for each participant. Each participant's account is credited as of the last day of each Plan year with an allocation of shares of the Company's common stock released by the Trustee from the unallocated account and forfeitures of terminated participants' non-vested accounts. Only those participants who are eligible employees of the Plan Sponsor and its subsidiaries as of the last day of the Plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation. Plan earnings are allocated to each participant's account based on the ratio of the participant's account balance.

**Plan Termination:** The Plan Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions. Upon termination of the Plan, the Strategic ESOP Committee directs the Trustee to pay all liabilities and expenses of the ESOP and to sell shares of financed common stock held as collateral to the extent it determines such sale is necessary in order to repay the loan. Subsequently, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Internal Revenue Code.

**Vesting:** If a participant's employment with the Plan Sponsor and its subsidiaries ends for any reason other than retirement, permanent disability, or death, he or she will vest in the balances in his or her account based on total years of services with the company. Vesting of ownership benefits is based on the following schedule:

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

**Put Option:** Under Federal income tax regulations, the employer stock that is held by the Plan and its participants and is not readily tradable on an established market, or is subject to trading limitations, includes a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is a limited or no market. The put price is representative of the current appraised value of the stock. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately obtain cash.

**Diversification:** Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments that are more diversified. Participants who are at least age 55 with at least 10 years of participation in the Plan may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25 percent of his or her account. In the sixth year, the participant may diversify up to 50 percent of the undiversified balance. Participants who elect to diversify receive a cash distribution. The election to diversify is made subsequent to year end based upon the shares of employer stock in the participant's account at year end.

**Forfeitures:** Plan forfeitures are held in a forfeiture account until the fifth anniversary of the participant's break in service. After this time, the forfeitures are allocated to current participants' account based on the ratio of the participant's compensation to total participants' compensation for the Plan year. There were no forfeitures allocated to participants during December 31, 2017.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Accounting:** The financial statements of the Plan are prepared on the accrual basis of accounting.

**Use of Estimates:** The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, and changes therein, and disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

**Allocations:** The financial statements of the Plan present separately the assets and liabilities and changes therein pertaining to (a) the accounts of employees with rights in allocated stock ("allocated") and (b) stock not yet allocated to employees ("unallocated"), including shares that are committed to be released. Shares are released from collateral and become allocated generally in the period in which debt service is actually paid.

**Risks and Uncertainties**: The Plan investments consist solely of the Strategic Family, Inc.'s common stock, which is exposed to various risks, such as interest rate, market, and credit risks, as well as valuation assumptions based on earnings, cash flows and/or other such techniques. Due to the level of risk associated with the investment in the common stock and to uncertainties inherent in estimates and assumptions, it is at least reasonably possible that changes in the value of the common stock will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

**Investment Valuation and Income Recognition:** The shares of Company common stock are reported at fair value. See Note 5 for a discussion of fair value measurements. Dividend income is accrued on the ex-dividend date. Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses from security transactions are reported on the average cost method. Net depreciation in fair value of investments includes the Plan's gains and losses on investments bought and sold as well as held during the year.

**Payment of Benefits:** Benefits are recorded when paid.

## NOTE 3. CONTRIBUTION RECEIVABLE

In December 2017, the Plan Sponsor committed to making a contribution of $6,000,000 to the Plan with payment to be made on or before September 15, 2018. As a result, the Plan accrued a contribution receivable to the Plan at December 31, 2017 which is presented as unallocated until paid. Upon payment in 2018 the contribution was applied to the notes payable and released 885.125 shares to participants. For financial reporting purposes, these shares are not released from serving as collateral for the Plan's debt until debt payment is actually made, and as such the shares are shown on the attached statement of net assets (deficit) available for benefits as unallocated. However, for participant accounting purposes, the shares are considered to be allocated to participants as the participants have a beneficial interest in the contribution receivable. This results in a difference between the amount reported on the financial statements as net assets allocated to participants and the participant records.

## NOTE 4. TAX STATUS

The Plan has been designed to be an employee stock ownership plan within the meaning of Section 4975(e) (7) of the Internal Revenue Code of 1986, as amended (the Code), and section 407(d) (6) of the Employee Retirement Income Security Act of 1974, as amended (ERISA). The Plan is in the process of applying for a determination letter from the Internal Revenue Service (IRS) to obtain approval that a) the Plan is qualified, under the Code and, therefore, b) that the related trust is exempt from taxation. Once qualified, the Plan is required to operate in conformity with the Code to maintain its qualification. The Strategic ESOP Committee believes that the Plan is currently designed, and being operated, in compliance with the applicable requirement of the Code. Therefore Strategic ESOP Committee believes that the Plan was qualified, and the related trust was tax-exempt as of the financial statement date.

## NOTE 4. TAX STATUS (CONTINUED)

Accounting principles generally accepted in the United States of America require plan management to evaluate tax positions taken by the plan and recognize a tax liability if the organization has taken a significant uncertain position that more likely than not would not be sustained upon examination by the IRS. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

## NOTE 5. INVESTMENTS

The Plan's investments, at December 31, 2017 are presented in the following table:

| | Allocated | Unallocated |
|---|---|---|
| Strategic Family, Inc. common stock: | | |
| Number of shares | 290 929 | 54 609 071 |
| Cost | $ 1,283,658 | $ 240,945,209 |
| Estimated fair value | $ 589,713 | $ 110,692,587 |

## NOTE 6. FAIR VALUE MEASUREMENTS

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

Level 1: Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

Level 2: Inputs to the valuation methodology include

- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices for identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3: Inputs to the valuation methodology are unobservable and significant in the fair value measurement.

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

## NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)

The following table sets forth by level, within the fair value hierarchy, the Plan's assets at fair value as of December 31, 2017:

| | Assets at Fair Value as of December 31, 2017 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 111,282,300 | $ 111,282,300 |
| Investments at fair value | $ - | $ - | $ 111,282,300 | $ 111,282,300 |

### Changes in Fair Value of Level 3 Assets and Related Gains and Losses

The following table sets forth a summary of changes in the fair value of the Plan's level 3 assets for the year ended December 31, 2017:

| | Level 3 Assets Investment in Strategic Family, Inc. Common Stock |
|---|---|
| Balance, May 1, 2017 | $ - |
| Purchases | 242,228,867 |
| Realized gains/losses | - |
| Unrealized (depreciation) in estimated fair value | (130,946,567) |
| Balance, December 31, 2017 | $ 111,282,300 |

Unrealized losses included in changes in net assets for the period above are reported in net depreciation in fair value of investments in the Statements of Changes in Net Assets (Deficit) Available for Benefits.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2017.

Strategic Family, Inc. common stock held by the Plan is valued at fair value based upon an independent appraisal. This appraised value was calculated using income based valuation techniques as illustrated in the following table.

| Instrument | Fair Value | Principal Valuation Technique | Unobservable Inputs |
|---|---|---|---|
| Strategic Family, Inc. common stock | $111,282,300 | Income Approach<br><br>- Discounted Cash Flow Method (1/3 weighting)<br><br>- Discounted Cash Flow (modified) (2/3 weighting) | EBITDA<br>Net income<br>Weighted average cost of capital<br>Discount rate<br>Discount for lack of marketability |

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The valuation process involves the selection of an independent appraiser. Plan management accumulates the data for the appraiser from the financial statements of the Company. The appraiser prepares a report of estimated per share value. Plan management, along with the ESOP trustee, reviews in detail, discusses and approves the appraiser's preliminary report.

The valuation methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

**NOTE 7. LOAN PAYABLE**

In December 2017, the Plan entered into multiple loan note agreements with the former stockholders of Strategic Family, Inc. for an aggregate value of $242,228,867 in exchange for 75% (54,900 shares) of the Company's outstanding common stock. The Company repurchased and cancelled the remaining 25% of its outstanding common stock. Unallocated shares held by the Plan are collateral for the notes payable. Shares are released from collateral and allocated to participants as payments of principal and interest are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year principal and interest payments divided by the total of all prior and future years' principal and interest payments.

This resulted in 290.929 shares being released and allocated for the Plan year ended December 31, 2017.

The loan note agreements provide for the loan to be repaid over 30 years and they bear interest at 3.00%.

The minimum required payment schedule for the notes is as follows:

| | |
|---|---|
| 2018 | **$ 7,000,000** |
| 2019 | **9,500,000** |
| 2020 | **10,875,000** |
| 2021 | **11,000,000** |
| 2022 | **12,000,000** |
| Subsequent to 2022 | **189,901,655** |
| | **$ 240 276 655** |

**NOTE 8. COMPANY DIVIDENDS**

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service.

**NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS**

The Plan invests in Company common stock and has indebtedness to the former stockholders for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

## NOTE 10. RECONCILIATION TO 5500

| | 2017 |
|---|---|
| Net assets (deficit) available for benefits per the financial statements | **$ (122,994,355)** |
| Differences in: | |
| Accrued interest expense payable | **(1,775,400)** |
| Net assets (deficit) available for benefits per the Form 5500 | **$ (124,769,755)** |

The following is a reconciliation of the change in net assets available for benefits per the financial statements for the years ended December 31, 2017 Form 5500:

| | 2017 |
|---|---|
| Increase in net assets per financial statements | **$ (122,994,355)** |
| Less: | |
| Interest expense | **(1,775,400)** |
| Increase in net assets per Form 5500 | **$ (124,769,755)** |

## NOTE 11. SUBSEQUENT EVENTS

**Refinancing of notes payable to former stockholders**: On April 30, 2018, under the terms of an Assumption Agreement signed by the Company in conjunction with the formation of the Plan, the Company unconditionally assumed all obligations of the ESOP Trust under the notes payable to former stockholders. In return, the ESOP Trust signed a refinanced (internal) note payable to the Company in the amount of $235,052,055 (the total amount of the notes payable to former stockholders at the date of signing). The terms of the refinanced (internal) note include a requirement to make 30 payments of principal and interest with certain minimum payments each year, with the balance of the notes being payable on December 31, 2046. Interest will accrue at 3.04% per annum.

Also pursuant to the Assumption Agreement, the Company issued notes payable to the former stockholders in the amount of $235,052,055. These terms of these notes payable require interest to accrue daily at an annual rate of 3.04%. There is no defined repayment term, but the notes mature and are payable in full on December 31, 2028.

These financial statements have not been updated for subsequent events occurring after October 15, 2018, which is the date these financial statements were available to be issued.

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
**EIN #:** [redacted]
**Plan #: 002**
**December 31, 2017**

| (a) | (b) Identity of Issuer | (c) Description of Investment | (d) Cost | (e) Fair Value |
|---|---|---|---|---|
| | Common Stock: | | | |
| * | Strategic Family, Inc. | 54,900 shares of common stock | $ 242,228,867 | $ 111,282,300 |
| | | | $ 242,228,867 | $ 111,282,300 |

* Represents party in interest.



Exhibit 08-0168
DSL 005467

JAMS ARBITRATION
JAMS CASE NO. 1400018052

| | | |
|---|---|---|
| CHRISANNE PROULX, | ) | |
| | ) | |
| Claimant, | ) | DEPOSITION OF: |
| | ) | |
| v. | ) | LAUREN MONTANILE |
| | ) | |
| ANCHOR LAW FIRM, PLLC, STACY ROBINSON, CORY MATTOCKS, | ) | |
| | ) | |
| Respondents. | ) | |

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter as taken by and before MARY ANN ADAMS, a Certified Court Reporter and Notary Public of the State of New Jersey, held at the office of SAUL, EWING, ARNSTEIN & LEHR, LLP, One Riverfront Plaza, Newark, New Jersey, on Thursday, January 9, 2020, commencing at 9:00 a.m.

LAUREN MONTANILE, having been duly sworn by the Notary Public, testified as follows:

MR. ICE: Could I guess everyone make their appearances, please.

Tom Ice on behalf of Plaintiff -- or Claimant, I should say. It's an arbitration.

MS. ICE: Yes. Ariane Ice on behalf of Chrisanne Proulx.

MS. SHUPE: Emily Shupe on behalf of the Respondents.

MR. ICE: Just so the court reporter knows, the exhibits are already pre-marked, so that should speed handing them over.

EXAMINATION BY MR. ICE:

Q. All right. I know you stated your name, but could you state your full name for the record, please?

A. Sure. Lauren Montanile.

Q. No middle name?

A. Ashley.

Q. Have you ever been deposed before?

A. No.

Q. Your business address is 711 3rd Avenue, 6th Floor, New York, New York 10017?

A. Yes.

Q. You're a member of the New Jersey bar as of December 1st, 2015?
A. Yes.
Q. You're a member of the New York bar as of January 21st, 2016?
A. Yes.
Q. You are employed by Strategic Financial Solutions, LLC?
A. Yes.
Q. When did you start there?
A. May of 2017.
Q. What was your title when you started?
A. I believe it was just attorney. My title has changed a couple times.
Q. How did you get that job?
A. I responded to an ad on -- I believe it was on Indeed.
Q. On I'm sorry?
A. On Indeed.
Q. Who interviewed you?
A. My former bosses at the time, it was Rendi Yamashuka (ph.), I'm not sure if that's how you pronounce his last name, and Shelby Tuszynski.
Q. Were you interviewed for a particular position?

now we're talking about the LLC?
A. Uh-hum.
Q. Okay.
MS. SHUPE: You have to answer with a yes or no.
A. Yes. Sorry.
Q. So in your first job, you were considered an in-house attorney at Strategic?
A. I believe -- as I stated, I believe the title was just attorney.
Q. Then were you promoted from that position?
A. Yes.
Q. Okay. When was that?
A. Well, I don't know if I would actually consider it a promotion. I had the opportunity to join Anchor Law Firm as a supervising attorney there.
Q. And how did that come about?
A. Okay. So I -- after I learned the business, was there for a few months, around May of 2017 it was presented to me that I can join Anchor Law Firm to better service our clients.
Q. When you say it was presented to you, who presented it?

A. Jason Blust and Shelby Tuszynski.
Q. Did you know Jason Blust before then?
A. I believe I had some interaction with him before then.
Q. And what did you know him to be, what was his function?
MS. SHUPE: Objection, form.
A. To my knowledge, he was counsel that Shelby often spoke with.
Q. Okay. And I know you said the last name, but I didn't catch it.
A. Tuszynski. She also goes by Shelby Katz now, her married name.
Q. Okay. Can you spell the Tuszynski?
A. Tuszynski?
Q. Yes.
A. I can try. T-U-S-Z-Y-N-S-K-I.
Q. What was -- is that a man or a woman?
A. Woman.
Q. What was her role?
A. Her role --
MS. SHUPE: Objection, form. You're talking about with Strategic?
MR. ICE: If she -- well, let's back up.
Q. She worked for Strategic?

A. Yes.
Q. Okay. What was her role at Strategic?
A. Her role at Strategic, to my knowledge, was making sure that they follow -- that Strategic employees follow policies and procedures.
Q. Do you remember her title?
A. I do not.
Q. And Jason Blust did not work for Strategic?
A. No.
Q. Okay. When he came to you, what did he say that -- who did he say he worked for?
A. I don't recall.
Q. Okay. But he presented you with the idea of working for Anchor?
A. Correct.
Q. Did you interview with him?
A. No.
Q. Did you interview with anyone else for the Anchor job?
A. No.
Q. What was your understanding of what Anchor was?
A. My understanding was that Anchor Law Firm serviced clients that were enrolling in their

debt resolution program.
Q. Anything else?
A. No.
Q. Did you do any kind of research to see what Anchor was?
A. I don't recall.
Q. Have you since that day done any research to see what Anchor was or is?
A. No.
Q. Do you know who owns Anchor?
A. Owns Anchor? No.
Q. Well, let me rephrase that. Do you know who the members of Anchor are?
A. I know the main member. Her name is Stacy Robinson.
Q. I'm sorry, say that again?
A. Stacy Robinson.
Q. Okay. And who else?
A. I don't know.
Q. When you say main member, is it your understanding that Stacy Robinson is the majority member of Anchor?
A. Yes.
Q. Are you also a member of Anchor?
A. Yes.

A. No.
Q. Who else is a member of Anchor?
A. That I can think of names right now, that's what comes to my head, but I know there are others.
Q. So -- I'm sorry, did you tell me when you joined Anchor?
A. May of 2017.
Q. Oh, yes. Okay.
A. Oh, I'm sorry, September. My apologies.
Q. May was when you started at --
A. Yes.
Q. -- Strategic.
So you became a supervising attorney at Anchor as your first job with Anchor.
A. Yes.
Q. You didn't start as an underling attorney.
A. No.
Q. Did Jason Blust say why he needed a supervising attorney?
A. Yes.
Q. Why?
A. To make sure that Anchor client support was following the policies and procedures that

Anchor Law Firm had vetted and approved.
Q. Are there any other supervising attorneys of Anchor?
A. Not that I'm aware of.
Q. Have you ever met Stacy Robinson?
A. No.
Q. Where is Anchor registered as a PLLC?
A. I believe it's in Arkansas.
Q. Have you ever been to Arkansas?
A. No.
Q. So you haven't seen their offices in Bentonville?
A. No.
Q. Is it your understanding that there are offices there?
A. Yes.
Q. Are there attorneys that work there?
A. I don't know.
Q. And you've worked continuously for Anchor since then.
A. Yes.
Q. And did there come a time when you were promoted at Strategic?
A. Yes.
Q. Okay. And when was that?

of the debt.

A. Yes.

Q. So you don't supervise anyone who settles debt for Anchor?

A. I do.

Q. Okay. What is that department called?

A. Anchor Client Services.

Q. When you first met with Jason Blust to talk about this job, did you and he discuss how you would be performing -- how you would be working for both Anchor and Strategic at the same time?

A. Yes.

Q. And how that would not represent a conflict for you?

MS. SHUPE: Objection, form.

A. I don't recall.

Q. Do you recall discussing the possibility of a conflict with anyone?

A. No.

Q. Did it strike you as being a conflict just to work for -- as in-house counsel for Strategic while at the same time working as an attorney for one of the people they -- one of the firms they deal with?

MS. SHUPE: Objection, form, calls for a

Q. What do you do to supervise that department?

A. Sure. So Anchor Law Firm provides Anchor Client Services with the law firm's policies and procedures that have been vetted by the firm. My job is to supervise the day-to-day to make sure those negotiators and client services representatives are following those rules. So while I personally cannot obviously be a part of every phone call or listen to every phone call, I do listen to the ones I can. I'm available if anyone needs me. I walk the floor. I'm a part of very regular meetings. And I do troubleshoot if a representative does need me to speak to a client. If I personally am not able to resolve it, I will either send that over to our office in Chicago or, if it's a state-specific issue, I will get that over to the appropriate attorney there.

Q. What is the office in Chicago?

A. That's where Jason Blust is located.

Q. Okay. So things that are escalated beyond you go to Jason Blust in Chicago?

A. Yes.

Q. And what is in Chicago, is that another Anchor office?

A. I don't know.
Q. Do you call him there?
A. Yes.
Q. And how do they answer the phone?
A. He just says his name.
Q. You have a direct line to --
A. Yes.
Q. -- Jason Blust?
A. Uh-hum.
Q. Is that a yes?
A. Yes. Sorry.
Q. Okay. On the sixth floor where you work, is there a section that is just Anchor Client Services?
A. No.
Q. Is there a section that's just the Timberline Financial?
A. Yes.
Q. And it's physically separated from the other group.
A. Yes.
Q. Is there an Anchor office on the sixth floor where you work?
A. Can you rephrase the question?
Q. You work on the sixth floor of your

building. Is there a separate office that's designated as Anchor?

A. No.

Q. You have one desk that you sit at when you're doing your job?

A. Yes.

Q. Whether you're doing that as an Anchor attorney or as a Strategic attorney?

A. Yes.

Q. Who pays the lease on the building where you work?

A. I don't know.

Q. Do you think it's Anchor?

A. I don't know.

Q. Who paid for the desk that you sit at?

A. I don't know.

Q. Who paid for the computer you work at?

A. I don't know.

Q. It's the same equipment and desk that you had before you started your job at Anchor. Correct?

A. Yes. I have moved locations a couple of times though.

Q. Okay. But when you got your job at Anchor, the discussion was, okay, now you're going

to move over here to this separate room and this is Anchor offices inside the sixth floor.

A. No.

Q. Okay. You continued to work the way you were working before. Correct?

MS. SHUPE: Objection.

Q. Same computer, same desk, same office?

MS. SHUPE: Objection, form.

A. Yes.

MR. ICE: Exhibit 2, please.

MS. SHUPE: Are you done with this?

MS. ICE: Yes.

MS. SHUPE: Okay.

MS. ICE: Are you done with 1?

MR. ICE: Yes. Well, you say done. I mean, we may go back to it.

MS. ICE: Well, she wants to give it to the court reporter.

MS. SHUPE: Yeah, I just want to hand this to the court reporter so we can keep the stuff together.

MR. ICE: Hopefully we're done.

MS. ICE: Thank you.

Q. Do you recognize that document?

A. Yes.

[redacted]

[redacted] [redacted] [redacted]

Q. Well, you were always hired as a supervising attorney, that was your first job. Correct?

A. Yes.

Q. Okay. I believe you said you don't know if there's any attorneys at the Bentonville office?

A. I don't know.

Q. Okay. So you don't supervise anybody there.

A. No.

Q. The only place you supervise people is on the sixth floor of your building.

A. No.

Q. Okay. Who else do you supervise?

A. We have an -- Anchor Client Services also has an office in Buffalo, New York.

Q. Now, the Buffalo office is also a Strategic Financial Solutions, LLC, office?

MS. SHUPE: Objection, form. You can answer if you know.

A. I don't know.

Q. Do you know if it's a Finance Solutions, LLC, office?

A. I don't know.
Q. What's the difference between Finance Solutions and Strategic Financial Solutions?
MS. SHUPE: Objection, form.
A. I don't know.
Q. What goes on in the Buffalo office?
MS. SHUPE: Objection, form.
A. Can you rephrase the question?
Q. Well, what are the -- let's start with Anchor. What functions are the Anchor employees in the Buffalo office doing?
A. Sure.
MS. ICE: Can I just clarify for a minute? Because we clarified Strategic, but we seem to be using Anchor Law Firm, LLC, and Anchor Client Services interchangeably now, and I think we need to be clear which Anchor we're talking about, because she testified that Anchor Client Services has an office in Buffalo.
MR. ICE: Correct. So let me rephrase the question.
Q. What work is being performed by people working for Anchor Client Services in Buffalo?
A. There's a team of negotiators there that negotiate on the phone with creditors on behalf of

clients, and there's also a client services function that answers the phone for general questions that clients may have.

Q. Is any of the debt negotiation done in the New York office?

A. Yes.

Q. So what is the distinction, why is some in Buffalo?

A. To my knowledge, it's just another location.

Q. Okay. Do both locations share the same phone system?

A. Yes.

Q. And when we were talking earlier about the Anchor offices in the New York location and the Strategic offices all on the sixth floor, those all share the same phone system?

A. I don't know.

Q. Where is the Anchor headquarters?

A. Arkansas.

Q. Where in Arkansas?

A. I don't know.

Q. How many employees work for Anchor Client Services?

A. I don't know.

Q. More than ten?
A. Yes.
Q. More than a hundred?
A. I don't know.
Q. But you supervise them.
A. Yes.
Q. All of them.
A. Yes.
Q. But you don't know how many there are.
A. No.
Q. You can't estimate how many there are?
A. No.
Q. Does Jason Blust work for Anchor?
A. I don't know.
MS. SHUPE: Objection, asked and answered.
Q. Why do you call him regarding escalated issues if you don't know if he works for Anchor?
A. In my opinion, he's just counsel I go to for issues that I can't resolve on my own.
Q. Do you think he's counsel for Anchor?
A. I don't know.
Q. Well, as an attorney, you're talking about your own clients. Right? Anchor clients. Your clients. Shouldn't you know who you're talking

A. No.
Q. Do you wish to change any of your testimony based on that conversation?
A. No.
Q. I want to jump back for a moment to how you get paid by Anchor and ask you if Anchor gives you a W-2?
A. Yes.
Q. Do you get -- when they make those electronic deposits, do you get a paper copy of that transaction, other than your bank statement?
A. It's available digitally, not actual paper form.
Q. I'm sorry?
A. It's available digitally, not actual paper form.
Q. And how do you retrieve that digitally?
A. Through ADP.
Q. So what was your W-2 salary for 2018 for Anchor?
A. I don't recall.
Q. But your W-2 would have that information on it. Correct?
A. Yes.
Q. Who is your supervisor at Anchor Law

Firm, PLLC?

A. I don't believe I have a direct supervisor.

Q. Who do you report to?

A. Jason Blust.

Q. What's Jason Blust's phone number?

A. I don't know off the top of my head.

Q. Is it in your phone or anything?

A. It should be.

MR. ICE: Does counsel have a problem with retrieving that?

MS. SHUPE: You guys can -- we're not going to do that here, but you can make a request.

MR. ICE: I'll make the request now informally.

Q. How about Mr. Rogus' phone number, do you remember that?

A. No.

Q. Is that also available for you to look up on your phone?

A. Not on my cell phone.

Q. Okay. You said earlier you didn't know if Rogus was an attorney with Anchor, [redacted] [redacted]?

[redacted]

Q. So your office on the sixth floor has people who work for Anchor Law Firm, PLLC, people who work for [redacted], people who work for Finance Solutions, people who work for Timberline, and people who work for Strategic Financial Solutions. Correct?

A. Yes.

Q. Do you all have little name tags that tell you who's working for who?

A. No.

Q. Are there separate areas on the sixth floor for all of these different organizations?

MS. SHUPE: Objection, asked and answered.

A. Finance Solutions is in a separate area.

Q. Does Finance Solutions share the same phone system with the other organizations we just

talked about?
A. I don't know.
Q. Do you know if there's more than one phone system on the sixth floor where you work?
A. I don't know.
[redacted]

A. Correct.
Q. Okay.
MS. ICE: When she says their approval, who is she talking about?
MR. ICE: Well, it has to be Anchor under this.
Q. Do you agree with that, when you say their approval, you're talking about somebody at Anchor Law Firm, PLLC?
A. Yes.
Q. And, in fact, you are an attorney at other law firms besides Anchor.
A. Correct.
Q. All of whom have some relationship with Strategic Financial Solutions.
MS. SHUPE: Objection, form.
A. I don't believe that's correct.
Q. Okay. All of whom are clients who are served by people on the sixth floor of your office.
MS. SHUPE: Objection, form.
A. Can you repeat the question?
Q. You work for other law firms.
A. Yes.
Q. Okay. Let's just go through them. Do you work for Bedrock Legal?

A. Yes.
Q. Okay. What is Bedrock Legal?
A. They are a law firm that provides similar services to Anchor Law Firm.
Q. It's actually a fictitious name of A. Florio & Associates, PLLC. Correct?
A. Yes.
Q. That's a Texas limited liability partnership, the A. Florio.
A. I don't recall.
Q. Okay. Have you ever met an attorney at A. Florio & Associates?
A. I don't recall.
Q. You have a contract that looks just like the one you produced here for Anchor.
A. Yes.
MS. SHUPE: Objection, form.
A. Yes.
[redacted].
A. Yes.
Q. When you get paid by Anchor, by the way, is that just a flat rate or is that based on some sort of performance criteria?
A. I believe it's a flat rate.

Q. You don't have to handle so many cases or so much debt to get paid by Anchor.

A. No.

Q. And is that the same with Bedrock?

A. Yes.

Q. Are you an attorney with Boulder Legal Group?

A. Yes.

Q. And that's a Missouri limited liability company.

A. I don't recall.

Q. Let's go back to Bedrock, 'cause you said you had a similar contract. [redacted]

[redacted] [redacted].

Q. But you have that contract around, you could take a look. Right?

A. Yes.

Q. Okay. Do you know of any of the other law firm contracts that are signed by somebody different [redacted]?

MS. SHUPE: Objection, form. You're talking about her contracts?

MR. ICE: Yes.

MS. SHUPE: Okay.

A. I don't recall.
Q. Are you an attorney with Canyon Legal Group, LLC?
A. I'm a Class B member, not a supervising attorney of Canyon, yes.
Q. So with Boulder and Bedrock, you're a supervising attorney?
A. Correct.
Q. Okay. Who signed that contract for Canyon?
A. I don't recall.
Q. Are you an attorney with Carolina Legal Services?
A. Yes.
Q. That's a fictitious name of Daniel Rufty Legal, PLLC?
A. Yes.
Q. Which is a North Carolina professional limited liability company?
A. Yes.
Q. Are you a supervising attorney or a regular attorney?
A. I'm a supervising attorney of Carolina.
Q. Who signed that contract?
A. I don't recall.

Q. When did you sign the contracts for -- with these other firms?

MS. SHUPE: Objection, form.

A. I don't recall.

MR. ICE: Because it's compound or what?

MS. SHUPE: Yeah, 'cause you just asked her about a bunch of different firms --

MR. ICE: Okay.

MS. SHUPE: -- and now you're asking her when she signed contracts.

MR. ICE: Okay. I'm just trying to speed things along, but we'll go on.

MS. SHUPE: I understand.

Q. Bedrock.

MS. SHUPE: I just want to make sure it's clear.

Q. Bedrock, when did you sign the contract with Bedrock?

A. I believe it was in 2017.

Q. Well, let me ask it this way. Which contract for the firms that you work for were signed first?

A. I know Anchor was first. Boulder and Bedrock were early on, I just don't remember the exact time.

Q. Okay. But in any event, they weren't all signed at the same time.

A. No.

Q. Okay. Who approached you to work for Bedrock?

A. Jason Blust and Shelby Katz.

Q. Okay. And there would be an e-mail that has when you signed that contract.

A. Yes.

Q. Who approached you to become an attorney with Boulder?

A. Jason Blust and Shelby Katz.

Q. And there would be an e-mail that would say when you signed that contract.

A. There should be.

Q. And each time you send the whole contract back, not just the signature page?

A. I don't recall.

Q. Who approached you with respect to working as an attorney with Canyon?

A. Jason Blust.

Q. Who approached you to be an attorney with Carolina Legal Services?

A. Jason Blust.

Q. Are you an attorney with the Chinn Legal

Group?
A. No.
Q. Have you ever heard of Chinn Legal Group?
A. Yes.
Q. Is that a firm whose clients -- strike that.
Is that a firm who retains through an intermediary but ultimately Strategic Financial Solutions' services for debt settlement?
MS. SHUPE: Objection, form, foundation.
A. I don't know.
Q. In what context did you hear about them?
A. I have spoken with I believe her name is Valerie Chinn via e-mail regarding -- I don't remember what it was regarding, but I know I've spoken to her via e-mail.
Q. Are you an attorney with Colonial Law Group?
A. No.
Q. Are you an attorney with The Commonwealth Law Group?
A. No.
Q. Do you know Amber Florio?
A. No.

Q. Are you an attorney with Cornerstone Legal Group?
A. No.
Q. Are you an attorney with Credit Advocates Law Firm?
A. Yes, I'm a Class B member.
Q. Again, you have a contract similar to the one in Anchor?
A. Yes.
Q. And there's --
A. Similar -- well, Anchor -- let me revise that. Anchor, the agreement I signed is for a supervising role, whereas that was a Class B.
Q. Okay. Who approached you to be an attorney there?
A. I don't recall.
Q. And when did you sign that?
A. I don't recall.
Q. Are you an attorney with Crimson Legal Group?
A. No.
Q. Are you an attorney with Dubin Legal Group?
A. No.
Q. Do you know anyone in your office that

is?
A. No.
Q. Are you an attorney with Frontier Consumer Law Group?
A. No.
Q. Do you know anyone in your office that is?
A. No.
Q. Are you an attorney with Gardner Legal, LLC?
A. I don't recall.
Q. You might be.
A. I might be.
Q. Okay. The truth is you're an attorney for so many firms you can't even remember them all while you're sitting here today.
MS. SHUPE: Objection, form.
A. There might be a trade name.
Q. What do you mean there might be a trade name?
A. Gardner may be the in-state attorney's name for that firm.
Q. For what firm?
A. For a firm.
Q. Okay. Do you know Lori Leigh?

A. No.
Q. Are you an attorney with Glacier Bay Law?
A. No.
Q. Or Heiser Legal Group?
A. No.
Q. Is anybody in your office an attorney for either of those firms?
A. Not to my knowledge.
Q. Are you an attorney with Great Lakes Law Firm?
A. Yes.
Q. Supervising attorney or regular attorney?
A. Class B attorney.
Q. Okay. Who approached you to become an attorney for them?
A. Jason Blust.
Q. And when did you sign with them?
A. I don't recall.
Q. But you have an e-mail that would establish that. Correct?
A. I should.
Q. Are you an attorney with Harbor Legal Group?

A. Yes, Class B attorney.

MR. ICE: Did I just ask that? I'm getting confused myself. Did I ask Harbor Legal?

MS. ICE: No.

Q. Okay. Then same questions, who approached you?

A. Jason Blust.

Q. And it's a contract -- except for the supervising part, it's a contract similar to what you have for Anchor?

A. Yes.

Q. Are you an attorney member of Heartland Legal Group?

A. Class B member, yes.

Q. And who approached you to be an attorney there?

A. Jason Blust.

Q. When did you sign with them?

A. I don't recall, but I -- to my knowledge, that was fairly recently.

Q. Have you ever asked Jason Blust why he needs a supervising attorney or an attorney for so many different law firms?

A. I don't recall.

Q. That didn't strike you as unusual?

A. No, because policies and procedures on the sixth floor, regardless of the servicing entity attached to the law firm, they need to make sure that the policies and procedures itself are followed.

Q. Why would Jason Blust need to be involved with so many law firms?

MS. SHUPE: Objection, form, foundation, calls for speculation.

A. I don't know.

Q. You never asked him that?

A. No.

Q. And do you get separate deposits in your account every month from each of these firms?

A. For the firms that I'm a supervising attorney for, yes.

Q. You don't get paid to be just a Class B -- regular Class B member?

A. No. My work for those firms are very limited, so no.

Q. Are you a member of Henry Legal Group, LLP?

A. No.

Q. Are you a member of Hinds Law, LLC?

A. No.

Q. Have you ever heard of Michelle Hinds?
A. I don't recall.
Q. Are you a member of Monarch Legal Group?
A. Yes, Class B member.
Q. Who asked you to be a member?
A. Jason Blust.
Q. When did you sign?
A. I don't recall.
Q. Do you still have that contract?
A. I should.
Q. And an e-mail that would date that contract?
A. I should.
Q. Is my assumption correct that just like the Anchor one, they don't have a date on the contracts?
MS. SHUPE: Objection, form. You can answer if you know.
A. I don't know.
Q. Are you a member of Phoenix Legal Group?
A. No.
Q. Are you a member of Pioneer Law Firm, P.C.?
A. Yes, Class B member.
Q. Who asked you to be a member?

A. I don't recall.
Q. Do you think it was somebody different than Mr. Rogus?
MS. SHUPE: Objection, form.
A. I don't recall.
Q. Let me rephrase that. Somebody different than Jason Blust?
MS. SHUPE: Same objection.
A. I don't recall.
Q. Are you -- I already know you're a member of Rockwell Legal Group. That's correct. Right?
A. Correct. Class B member.
Q. Okay. Who asked you to be a member?
A. I don't recall.
Q. And when did you sign that?
A. Don't recall.
Q. When you say you don't recall who asked you, is the contract the same though from firm to firm?
MS. SHUPE: Objection, form.
A. I don't recall.
Q. How about Royal Legal Group, are you a member of that?
A. I am a Class B member.

Q. Who asked you to be?
A. Jason Blust.
Q. And when did you sign that?
A. Actually, I revise that. I don't recall.
Q. Okay. And do you recall when you signed it?
A. I don't.
Q. When you say you don't recall who asked you, do you recall who signed the contract with you?
MS. SHUPE: Objection. Are you talking specifically about the Royal contract or are you talking about --
MR. ICE: Right now I'm talking about Royal.
MS. SHUPE: Okay.
MR. ICE: But we're going to go back and pick up all the others.
A. I don't. I believe I signed first, so I don't know who signed after.
[redacted]

[redacted]
Q. You may not have that.
A. I may or may not. I don't recall.
Q. For all the firms that we've talked about so far that you are a member, you have described it as a Class B membership or a supervising Class B membership. Correct?
A. Correct.
Q. So they're all using the same terminology.
A. Correct.
Q. But you don't recall whether all the ones where you're a supervising attorney are like the one in Anchor.
MS. SHUPE: Objection, form.
A. Can you repeat the question?
Q. Well, if I were to get all of these where you're a supervising attorney and lay them side by side with the Anchor one, would they all look the same?
MS. SHUPE: Same objection.
A. I don't recall.

Q. And all the ones that are just regular Class B, if I were to take all those and lay them side by side, would they all look the same?

MS. SHUPE: Objection, form.

A. I don't recall.

Q. Do you recall any that struck you as, wow, this one is really different than all the others.

A. No.

Q. Okay.

THE WITNESS: Can we just break so I can get some water?

MR. ICE: Sure.

(A break was taken at 11:10 a.m.)

(Resumed at 11:19 a.m.)

BY MR. ICE:

Q. Are you a member of Stonepoint Legal Group?

A. Yes.

Q. What kind of member?

A. I am a supervising attorney.

Q. Who asked you to be that?

A. I don't recall.

Q. Who signed your contract?

A. I don't know.

Q. When did you sign your contract?
A. I don't recall.
Q. Do you know who Donald Norris is?
A. Personally, no?
Q. What do you know of him?
A. That he's an attorney associated with Stonepoint.
Q. Are you an attorney with The Sands Law Group?
A. No.
Q. Are you an attorney with Whitestone Legal Group?
A. Yes, I'm a Class B member.
Q. Who asked you to be?
A. I don't recall.
Q. Who signed your contract?
A. I don't know.
Q. Is the contract similar to the other Class B contracts?
MS. SHUPE: Objection, form.
A. I don't recall.
Q. Are you an attorney with Wyolaw, LLC?
A. Yes, I'm a Class B member?
Q. Who asked you to be?
A. I don't recall.

Q. Who signed your contract?
A. I don't know.
Q. When did you sign the contract?
A. I don't recall.
Q. Is it similar to the other Class B contracts?
A. I don't recall.
[redacted]

[redacted] [redacted]

Q. In those meetings, is Jason Blust also there?

MS. SHUPE: Objection, form, asked and answered.

MR. ICE: Well, I was talking earlier about Anchor.

Q. I mean these meetings with the other firms, is Jason Blust also on the phone as well?

A. A lot of the ones that I'm a part of, yes.

Q. All right. And is he a member of all those firms?

A. I don't recall.

Q. Now, as an attorney, you know what attorney/client privilege is. Correct?

A. Yes.

Q. And in these meetings, you sometimes talk about escalated problems with clients. Correct?

A. Yes.

Q. So you as an attorney are talking to somebody on the other end of that phone who you don't know whether they're a member of the firm?

A. Yes.

MS. SHUPE: Objection, form.
Q. And you're discussing attorney/client privileged matters?
MS. SHUPE: Objection, form.
A. I don't recall.
Q. [redacted]
[redacted]
Q. The -- and is it true that for each of them, they're not paying you anything to be an attorney for those firms.
A. Correct.
Q. As opposed to when you're a supervising attorney, you do get paid for that.
A. Correct.
Q. How much do you get paid for that?
A. Are you asking the total or --
Q. Well, if you can remember individual, we'll start there.
A. I don't recall.

for 2018?
A. Yeah. For 2019?
Q. '18.
A. Oh, yes.
Q. Well, maybe not obviously. You could have gotten an extension. But you did file them. Correct?
A. Yes.
Q. And you don't recall what was on your return?
A. I don't.
Q. Would it be easier to recall if you put the gym back into the mix?
A. No.
Q. Okay. Earlier we talked about the people on your floor who worked for Anchor Law Firm, PLLC.
A. Yes.
Q. Do those same people work for Rockwell?
A. I don't know.
Q. Well, does Rockwell have any employees on your floor?
A. Yes.
Q. Okay. But you don't know if they're the same people?

A. I don't.
Q. Rockwell doesn't have a separate place in the building?
A. No.
Q. How about Bedrock?
A. No.
Q. Do any of the firms that we just talked about have a separate location in the building?
A. No.
Q. Can you -- for any of the firms that we talked about, can you identify someone who works for one firm but not the other?
MS. SHUPE: Objection, form.
A. No.
Q. Do you know whether these people are -- that are there in your building who work for Anchor also work for all of the firms that you've listed?
MS. SHUPE: Objection, form.
A. I don't know.
Q. Let me -- are there others like yourself who work for multiple law firms?
A. Yes.
Q. Who are you thinking of when you say that?
A. The attorneys I listed earlier in my

office.

Q. Okay. What about negotiators, do they work for multiple law firms?

A. I know some of them do. I'm not sure if all.

Q. Does it matter to you when you're supervising them what firms they're actually employed by?

A. I wouldn't say it doesn't matter; however, since a lot of the policies and procedures for each firm that I am a supervising attorney for are similar regarding the day-to-day, I do think there are certain things that would stand out if someone wasn't following that would be a red flag regardless to me.

Q. When someone -- an Anchor client calls in and wants to talk to an Anchor attorney, how -- and you are the one who is the lucky one who gets that call, how do you know whether that person is an Anchor client or a Rockwell client or one of the other firm client?

MS. SHUPE: Objection, form. Do you understand the question?

A. Can you rephrase the question?

Q. Well, somebody comes in and wants -- not

compliance calls?
A. Yes.
Q. But not every call.
A. I don't know.
Q. If it's not a compliance call, if it's just a client calling up and complaining, you may or may not have a recording of that?
MS. SHUPE: Objection, form.
A. Where is the client calling? Is the client calling me or --
Q. Well, let's start with --
MS. SHUPE: Do you understand the question?
THE WITNESS: No.
MS. SHUPE: Okay. If you don't understand the question, just say you don't understand the question.
Q. Let's say this kind of a call where you're calling a client back for Rockwell. Are those phone calls recorded?
A. I don't know.
Q. Would you have the same answer to the same question with respect to Anchor?
A. Yes. I don't know.
Q. And it's your job duty to make sure the

policies and procedures are followed?
A. Yes.
[redacted]
Q. Do you agree that William Harrington is not an attorney with Rockwell but is associated somehow with Rockwell through an attorney network?
MS. SHUPE: Objection, form, foundation.
A. I don't recall.
Q. Is William Harrington an in-state attorney for Rockwell?
A. I don't recall.
Q. Does Rockwell typically refer legal issues outside?
A. Can you rephrase the question?
Q. Does Rockwell attorneys, such as yourself, typically refer legal issues to outside attorneys?
A. I don't know.
Q. Is that something you would tell

A. Can you rephrase the question?
Q. Well, there's -- you're not the only supervising attorney that works on the sixth floor. Correct?
A. Correct.
Q. And you're not the only one who is a supervising attorney of a law firm.
A. Correct.
Q. And not the only one who's a supervising attorney in multiple law firms.
A. Correct.
Q. Are all the supervising attorneys supervising attorneys of all the same firms or do one of the other supervising attorneys have some firm -- are supervising attorneys of firms that you are not?
MS. SHUPE: Objection, form.
A. There are attorneys in my office that are supervising attorneys of other firms. In regards to if some of them are the same or not, I don't know.
Q. And do you know if those other firms that they are supervisors -- supervising attorneys for that you are not are also associated with Jason Blust?

A. Yes.
Q. Do you know why you weren't chosen to be the supervising attorney for those firms?
A. No.
Q. So if there's some rationale behind divvying up who's going to be the supervising attorney for a particular firm associated with Jason Blust, you don't know what that is.
A. No.
Q. Who is Chantel in the litigation department?
A. I don't recall.
Q. Do you know anybody named Chantel in the litigation department?
A. I believe I know a Chantol (ph.). I don't know if that's the same person.
Q. What's her last name?
A. I don't recall.
Q. Is that somebody you supervise?
A. She would be in the litigation support department, so indirectly supervise, yes.
Q. Who is Emily Butler?
A. I don't know.
Q. Never heard that name?
A. I don't recall.

Q. And Royal.
MS. SHUPE: Same objection.
A. I don't recall.
Q. Okay. Did Shelby Katz, who's now Katz, I guess --
A. Yes.
Q. -- did she have the relationship with these firms before you?
A. I don't know.
MS. SHUPE: Objection, foundation.
A. I don't know.
Q. Do you know whether you were groomed to basically take over what she was doing?
MS. SHUPE: Objection, form.
A. No.
Q. No, you don't recall?
A. I don't recall.
Q. Okay. We talked about whether you had malpractice insurance. You said you didn't have your own personal insurance, and you didn't know whether someone else -- some other entity had malpractice insurance for you. Do you recall that testimony?
A. Yes, that's correct.
Q. If the bar called and said, do you have

malpractice insurance, who would you talk to to find out?

A. Jason Blust.

Q. Do you get any K-1s?

A. I do not.

Q. So the only kind of documents you get for your tax return are the W-2s.

A. Correct.

MR. ICE: Okay. Go ahead with Exhibit -- whatever that is.

MS. ICE: 9?

MR. ICE: It is 9.

MS. ICE: Okay.

Q. And unless you've been on the Internet lately just searching people you don't know, I assume you don't recognize that document.

A. No.

Q. I will represent to you it is a LinkedIn for Emily Butler who you just testified before lunch that you did not know.

A. Correct.

Q. Does the picture there of Emily Butler refresh your recollection about her?

A. No.

Q. Okay. You see that she says down below

telemarketing sales rule?
A. Yes.
Q. Okay. What do you know about that?
MS. SHUPE: Objection, form.
A. I've heard of it in the rule. I don't know what it says.
Q. Okay. In your mind, you don't connect that with the hiring of a mobile notary?
MS. SHUPE: Objection, form.
A. Could you repeat the question?
Q. You don't connect what little you know of the face-to-face meeting requirement with the fact that a mobile notary is sent out to sign up Anchor clients.
MS. SHUPE: Objection, form.
A. I don't know.
Q. Are you aware that the FTC has specifically disapproved using mobile notaries for a face-to-face meeting?
A. No.
Q. That's never come up in any of your weekly or monthly meetings?
A. Not that I can recall.
Q. Now, the mobile notaries themselves have a script to follow. Correct?

A. I believe so.
Q. Have you seen that script?
A. I don't recall.
Q. So you had no input on what it says?
A. No.
MR. ICE: Exhibit 15, please.
Q. You've now been handed Exhibit 15. Do you recognize that document?
A. It appears to be the notary script.
Q. Okay. Now, that you see it, have you seen that one before?
A. I might have seen it in passing.
Q. Does that look familiar where they talk about slide 2 and slide 3, do you know what that's referring to?
A. From my understanding, it's referring to the presentation that is part of the in-person document signing.
Q. And by presentation, you mean that PowerPoint presentation?
A. Correct.
Q. Now, do you know whether this is an Anchor script -- or let me rephrase that.
Did the law firms have different paralegal scripts?

A. I don't know.
Q. Okay. Do you know whether this one is an Anchor script?
A. It appears to be based on the document.
Q. When you say based on the document, where are you referring to?
A. Under Turn to Slide 4, it mentions Anchor.
Q. Doesn't the document also mention Rockwell?
A. Where are you referring to?
Q. Well, I see one on page 4, second paragraph, next to the bottom line.
A. Yes.
Q. Okay. And the following paragraph talking about Rockwell's litigation department.
A. Yes.
Q. Do you have any explanation for why that says both Anchor and Rockwell?
A. No.
MR. ICE: All right. Let's move to Exhibit 16.
THE WITNESS: Can I just grab some water real quick?
MR. ICE: Yes.

that question several times and she's answered it, but you can answer it again.

MR. ICE: And she did know when it came to Rockwell that that was just a facade as well.

MS. SHUPE: I don't -- I'll object to that. I don't think that's what she said.

You can answer the question as to the Arkansas office.

Can you read the question back?

THE COURT REPORTER: "QUESTION: Well, you do know it's one of those virtual offices where there's a mailing address and nothing else. Correct?"

A. I do not know.

Q. Okay. You don't know that the standard procedure when you send something to the Bentonville office of Anchor is that Excela -- no, Regus, who rents the office space to Anchor, gathers up all the mail and forwards it to Excela to be scanned and sent to Strategic Financial Solutions. Correct?

A. I do know that Excela scans mail for Anchor Law Firm clients into the system. The process of how that's done I do not know.

Q. So you haven't read in any of our complaints that there are no attorneys at the

A. Yes.
Q. And do you know what API stands for, does it stand for application something? But it's when computer systems talk to each other, it's their way of talking, they use an API, are you familiar with that?
A. I'm not.
Q. Okay. Would you agree that from your knowledge of using this, that what that refers to is an upload of correspondence from Excela?
A. Correct.
Q. We talked about that before, that's the third-party company that's scanning things like creditor correspondence that was sent to Bentonville, Arkansas.
A. Correct.
Q. And this entry is at the end of that process where it finally gets into the system. And by system, would you characterize that as Anchor's system or Strategic Financial Solutions' system?
A. Anchor's system.
Q. Okay. And this is actually some sort of payment reminder from Santander?
A. It appears to be.
Q. Once it's in the system, who reads that?

Solutions is doing here.
A. Correct.
Q. But you as the supervising attorney have had no input in this script.
A. No.
Q. In fact, you don't even know about the script.
A. I haven't seen it, no.
Q. Okay. You know that there is a script.
A. Correct.
Q. Okay. But you don't know enough to say whether this is the script.
A. I don't know.
Q. Do you know if someone at Anchor approved of this script?
A. I don't know.
Q. Who would know that?
A. I don't know for sure, but if I needed the answer, I would start with Jason Blust.
Q. You see on page 35, the script requires the person reading it to say that the customer, the potential client they're talking to, was not approved for a debt consolidation loan?
A. Yes.
Q. And then they start talking about

J U R A T

I DO HEREBY CERTIFY that I have read the foregoing transcript of my deposition testimony and I certify that it is true and correct to the best of my knowledge.

________________________________________

LAUREN MONTANILE

SWORN AND SUBSCRIBED
BEFORE ME ON THIS _______
DAY OF __________2020

____________________________________

Notary Public of the State of

VERITEXT LEGAL SOLUTIONS
One Biscayne Tower, Suite 2250
2 South Biscayne Boulevard
Miami, Florida 33131
305-376-8800

1/27/2020

EMILY A. SHUPE, ESQ.
RATHJE WOODWARD, LLC
300 East Roosevelt Road, Suite 300
Wheaton, Illinois 60187
eshupe@rathjewoodward.com

Dear EMILY A. SHUPE, ESQ.,

With reference to the deposition of LAUREN MONTANILE taken on 1/9/2020 in connection with the above-captioned case, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please call to make an appointment so that the deponent can stop by our nearest office, for the the purpose of reading and signing the transcript.

If this is not taken care of, however, within the next 30 days, we shall conclude that the reading and signing of the deposition has been waived and the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court without further notice.

Sincerely,

Production Department
Veritext Florida

ATTACH TO DEPOSITION OF: LAUREN MONTANILE
IN THE MATTER OF: PROULX vs. ANCHOR LAW FIRM
DATE TAKEN: JANUARY 9, 2020

E R R A T A S H E E T

INSTRUCTIONS: After reading the transcript of testimony, please note any change, addition or deletion on this sheet. DO NOT make any marks or notations on the transcript itself.

Please sign and date this errata sheet and return it to the court reporter whose name is shown below.

PAGE LINE CHANGE

DATE and SIGNATURE: ______________________________

RETURN TO: MARY ANN ADAMS, C.C.R.
Veritext & Goldberg, Inc.
290 West Mt. Pleasant Avenue
Livingston

CERTIFICATE

I, MARY ANN ADAMS, a Certified Court Reporter and Notary Public of the State of New Jersey, License No. X101026, do hereby certify that prior to the commencement of the examination, LAUREN MONTANILE was duly sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Mary Ann Adams, C.C.R.

Notary Public of the State of New Jersey

My Commission expires August 10, 2024

J U R A T

I DO HEREBY CERTIFY that I have read the foregoing transcript of my deposition testimony and I certify that it is true and correct to the best of my knowledge.

Lauren Montanile

LAUREN MONTANILE

SWORN AND SUBSCRIBED

BEFORE ME ON THIS 12th

DAY OF February 2020

Notary Public of the State of New York

GARCELLE BELINDA ARTIS
Notary Public - State of New York
NO. 01AR6252252
Qualified in Kings County
My Commission Expires 12-5-2023

15

****Script Paralegal Must Read To Client****

**THE DEBT RESOLUTION PROCESS**

[TURN TO SLIDE 2]

DEBT RESOLUTION IS A PROGRAM DESIGNED TO PAY OFF YOUR DEBTS THROUGH A NEGOTIATION STRATEGY. THE LAW FIRM NEGOTIATES WITH YOUR CREDITORS ON YOUR BEHALF TO PAY BACK YOUR DEBT, IN A LUMP SUM OR TERM PAYMENTS, LESS THAN THE AMOUNT OWED ON YOUR ACCOUNTS. YOUR INVOLVEMENT IN THESE NEGOTIATIONS AND CONVERSATIONS MAY BE NECESSARY AND IMPORTANT.

As your attorneys, it's our job to notify your creditors that you seek to negotiate a reduction of your debt, instead of filing for bankruptcy. To do this, you must reduce payments to your creditors or stop paying them completely. This will allow you to save sufficient funds, which we will then use to negotiate your debts.

[TURN TO SLIDE 3]

THE DEBT RESOLUTION PROCESS, WHAT WE DO AND WHAT WE NEED FROM YOU

Upon signing your enrollment paperwork today you will stop making payments on the accounts you have enrolled in the program. We begin using the money building in the trust account to reach settlements with your creditors. Please make sure you forward any communication from your creditors directly to us. In addition, we set our clients up with a Google voice phone number to further deter any communication from your creditors.

[TURN TO SLIDE 4]

WE NOTIFY YOUR CREDITORS

While Anchor is representing you, based on its prior experience with your creditors, its personnel will notify some or all of your creditors that you are represented by an attorney and they should stop any communication with you regarding your debts. If the Law Firm has made the determination that sending LORs (Letters of Representation) to certain creditors will make them more aggressive, strategically, we do not send LORs to them.

[TURN TO SLIDE 5]

SPECIAL PURPOSE SAVINGS ACCOUNT

After signing your enrollment paperwork to retain the law firm, you will be saving money in a Special Purpose Savings Account. As your funds are accumulating, we are working to resolve your debts through our negotiation process. The Special Purpose Savings Account is set up through an FDIC insured

program separate from your checking account. Funds are drawn monthly from your specified bank account, in accordance with an agreed payment plan.

This account is a transparent online banking system and is strictly under your control. The funds in your Special Purpose Savings Account belong to you, and you may withdraw any funds that have not previously been earned by Anchor at any time.

[TURN TO SLIDE 6]

YOUR DEBT RESOLUTION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS

You hired our Law Firm to get your debts resolved as quickly and for as little money as possible. Our strategy is based on saving up funds in your GCS Account, which is why sticking to your payment plan is so important. As the funds build in your account, we will contact your creditors to attempt to negotiate settlements on your behalf. When we reach an agreement with one of your creditors to resolve a debt, the local attorney will review and approve all settlements. We then present you with the details of the debt resolution offer in writing and either the attorney or the negotiator will contact you to confirm your authorization of the settlement and how you wish to proceed. If you approve, then you will provide your written or verbally recorded approval of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all of your debts are negotiated and resolved with your creditors.

It is important to understand that Anchor cannot force a creditor to negotiate your debt. Although Anchor will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with Anchor in the past will refuse to negotiate a debt. In such instances, the Anchor attorneys or negotiators may require your assistance in participating in the negotiation process. Anchor personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If Anchor cannot successfully negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

[TURN TO SLIDE 7]

WHAT YOU NEED TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors. As we mentioned on slide 4, we have measures in place to deter these calls (i.e. Google Voice and LOR's).

IN APPROPRIATE CASES, ANCHOR ATTORNEYS CAN SEEK DAMAGES FOR YOU AS A RESULT OF ABUSIVE COLLECTION PRACTICES

THE LAW FIRM CANNOT STOP INTEREST, LATE FEES, OR PENALTIES, BUT REDUCTION OF THESE EXPENSES IS TYPICALLY INCLUDED IN ANY SETTLEMENT NEGOTIATED ON YOUR BEHALF.

ANCHOR ALSO CANNOT PREVENT CREDITORS OR COLLECTORS FROM FILING A LAWSUIT AGAINST YOU ARISING FROM YOUR DEBTS. HOWEVER, IF YOU ARE SUED, ANCHOR ATTORNEYS WILL REPRESENT YOU IN COURT AND ASSERT ANY VALID DEFENSES ON YOUR BEHALF AS PROVIDED BY THE TERMS OF THE RETAINER AGREEMENT.

THE LAW FIRM DOES NOT CONTACT CREDIT BUREAUS TO CLEAN UP OR REPAIR YOUR CREDIT

IT TYPICALLY TAKES THE LAW FIRM 6 TO 9 MONTHS TO REACH THE FIRST SETTLEMENT.

THE LAW FIRM DOES NOT PROVIDE ANY TAX ADVICE AND ANY REDUCTIONS IN DEBT MAY BE TAXABLE BY THE IRS

YOUR CREDIT SCORE WILL LIKELY BE NEGATIVELY IMPACTED WHILE YOU ARE IN THE PROGRAM

[TURN TO SLIDE 8]

WE SUPPORT YOU THROUGHOUT THE PROGRAM

The law firm is prepared to do what is necessary to represent you and, if appropriate, defend you against creditor or collector lawsuits. This may include work done on your behalf in or out of court. A local attorney in the state where the complaint was filed will represent you in asserting any reasonable defenses to the suit, or any other viable means of resolving the suit. This may include negotiations with the creditors' attorney, preparation of responsive documents and/or appearances at court hearings on your behalf. Although the legal fees for your defense are covered by your retainer payments, you would have to pay a $350 fee for trial costs if the action were to go to trial.

[TURN TO SLIDE 9]

IF CIRCUMSTANCES CHANGE, CONTACT US IMMEDIATELY TO DISCUSS ALL YOUR OPTIONS

If at any time your circumstances change and you have more funds available to resolve your debt or you experience an increased hardship, such as loss of your job, please contact our client services team. If you have experienced increased hardships, we will discuss options with you, including our law firm representing you in bankruptcy.

[TURN TO SLIDE 10]

ONCE YOU BECOME OUR CLIENT

WE ARE AVAILABLE FOR QUESTIONS AND SUPPORT THROUGHOUT THE PROGRAM

Our client services team is available to answer any non-legal questions and help you throughout the debt resolution process. It is important to understand that only an Anchor attorney can provide you with any legal advice or respond to any legal questions you may have. The client services team will assist you in arranging to speak with an attorney to address such issues.

PLEASE MAKE SURE YOU ARE AVAILABLE TO SPEAK WITH OUR SUPPORT TEAM REGARDING YOUR PROGRAM WHEN WE CALL

Within a week of your enrollment with Anchor, an Anchor attorney, licensed to practice in your state, will reach out to confirm program details and review key aspects of your representation. The attorney will be

able to answer any legal questions you may have during this presentation. Please remember that you must speak with your local attorney before you can be represented by the firm, so the attorney will continue to try and contact you until a conversation takes place.

The client support team will also reach out to you by phone to confirm your personal information and to answer any non-legal questions you have about the program. Your welcome package will be mailed to you within one week of Rockwell receiving a copy of your executed agreement. A copy of your executed agreement will be e-mailed to you within twenty-four hours of enrollment.

Included in your welcome package will be some important documents such as creditor logs, information on the laws that protect you from collection agencies as well as what to do if you need help from Rockwell's Litigation Department.

The client support team is always ready to assist you with any non-legal questions you have throughout your program. This is often the quickest way to get your questions answered, particularly when the question does not require legal advice. However, you are always welcome and encouraged to contact your local attorney directly, or ask the client services team to facilitate a conversation between you and the attorney.

[TURN TO SLIDE 11]

DOCUMENTS TO BE SIGNED TODAY

The Letter of Engagement is your contract with our law firm which outlines the terms and conditions of the program.

The Payment schedule clearly outlines all payments of fees and savings.

The Power of Attorney (limited to this transaction only) permits us to act on your behalf to negotiate with your creditors.

The Compliance Affidavit acknowledges our legal staff's compliance with all federal and state regulations. Your signature confirms your attendance at this meeting today.

The Banking Platform Documents gives your consent to establish and authorize electronic payment to a Special Purpose Savings Account with Global Client Solutions.

The In – Person Client Presentation is your acknowledgment that you have received this presentation in person.

**Now that you have read and understand your Account Servicing Agreement, if you would like to proceed, I can take your financial information to assist you in completing the application.**

42

# FS Closing Call Script 5.0

## Including Sales Tool References

This is the call guide for completing a successful second call, including a structure to present relevant benefits, effectively explain the logistics of the program and close your prospect to enter the program. It includes a skills guide to help reinforce the specific skills you will use to complete the call.

These materials are ***CONFIDENTIAL***, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, LLC.

# Intro/Review Goals (Discussion)

Hello, this is (Your First Name, Last Name), and I'm calling from Finance Solutions. Is (Mr. /Mrs. Last Name) available? Is this (still) a good time to speak? Great! How is your day/week going? (*Build rapport based on response*) As we discussed, I've emailed you a link; were you able to pull that up? Great! Once you've entered the meeting, you should see a slide with your name on it. Please let me know when you see it.

I'm happy to say that I have some great news for you! **We have approved** you for some great **terms**. You'll need to take down some numbers in a few minutes, so please have a pen and paper handy.

Before we go into the numbers, let me make you aware that this call may be monitored or recorded for quality assurance purposes.

**MOVE ON TO SLIDE TWO – YOUR OVERVIEW – AND CLICK "SHOW USER"**
**WHEN THE "SHOW USER" DOT TURNS GREEN, YOUR CLIENT WILL BE ABLE TO SEE THE SLIDE.**

Let's start by reviewing your income and expenses to ensure that we have all the correct information. *(Emphasize the high expense load resulting from the burden of the credit card payments)*

Next, let's discuss the goals you shared with me during our last call.

*Review the lifestyle and financial goals the prospect shared with you during your 'Qualification Call' and shown on "Your Overview." The goals in Velocify are generic. Personalize them by referencing back – in detail – to the previous call. For example:*
*Generic Velocify Goal = "You want to help a loved one."*
*Personalized Goal = "One of the goals you shared was that you want to help a loved one. You mentioned that your brother is experiencing poor health and you would love to be able to be there for him and help his family out with expenses during this difficult time."*
*The four financial goals that are consistent with all clients are:*

1. *Get out of debt in 3-4 years*
2. *Consolidate into 1 monthly payment*
3. *Pass less interest*
4. *Lower the monthly payment*

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team. 

© 2016 Strategic Financial Solutions All Rights Reserved 

I am excited to tell you about a few options that we have which will help you to greatly reduce your monthly expenses and accomplish your goals. Before I get into the terms of your offer, let me confirm that we have all your debt information correctly entered in our system. I understand you may still be using some of these cards and making payments on others, so this is just an estimate.

# Current Situation (Discussion)

*Go through the names of the creditors and verify all the information is correct and that no cards have been left out; also giving notice that we may have not included all their cards due to some of them not qualifying for the program.* Your total debt on all these accounts totals approximately $______. Does that sound, about right?

**If the client wishes to change amounts, remove cards, etc. proceed to the next page.**

1) Go to the client's record in Velocify and make the changes.
2) Activate the menu at the client's name.
3) Press the "REFRESH NOW" button
4) Click on the Your Overview slide.
5) The client's debt listing will instantly update.

**MOVE TO SLIDE THREE – MINIMUM PAYMENTS – AND CLICK "SHOW USER"**

We did an analysis of your current situation. As we can see, you are paying $________ in total every month on all your accounts. At that rate, it will take you over _______ years to pay off this debt.

This means that you will pay the credit card companies $_____________, while being in debt for _________years.

Were you aware of that? It certainly doesn't sound like the most ideal payment plan, wouldn't you agree? imagine this is the type of plan you are looking to avoid?

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.



© 2016 Strategic Financial Solutions All Rights Reserved

# DQ/Approval and Program Overview (Presentation)

**MOVE TO SLIDE FOUR –YOU ARE ALREADY APPROVED – AND CLICK "SHOW USER"**
That's great, because although your file was not approved for a debt consolidation loan (due to your credit score and/or debt to income ratio). **We have approved you for a great option** which is perfectly in line witl the goals we previously discussed. I personally feel it is a lot better for your situation. It's better because through this option…

- Our program will resolve your unsecured debt within two to four years – obviously up to 10 times faster than continuing to make just your minimum payments.
- It offers immediate significant savings each month versus your current payment
- It still involves that one convenient monthly payment you were looking for. So, no more scrambling around to write multiple checks to different creditors each month.
- There's absolutely no prepayment penalties
- Also, through our program, we do not charge our clients interest. There are fees involved which I will break down for you when we go through the payment terms.

This program is a popular option called Credit Card Modification. Are you familiar with this program? *(If not, brief explanation of program before showing client the video)*
*(IF client has heard of the program)* Great! What have you heard? *(Deal with concerns and/or objections, if any. Probe for acceptance to move on)*

Credit Card Modification is a restructuring of credit card debt. We partner with a law firm who specializes in working with creditors to reach agreements to reduce your principal balances. This program features one monthly payment that is a reduction to your current total monthly payments.

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team. 

© 2016 Strategic Financial Solutions All Rights Reserved 

**Show Video**

**MOVE TO SLIDE FIVE –PROGRAM OVERVIEW – AND CLICK "SHOW USER"**

We have put together a great 3 minute video that really helps our clients to understand this program, so I would like to play it for you now.

Grab a pen and paper so you can write down any questions that may come up which I will be more than happy to answer. Sound good? If you will just press the play arrow in the center of your screen; your videc will begin. Enjoy the show and I'll speak to you in three minutes.

*Once video is complete…*What did you think of the video? What questions do you have?

*Handle concerns by answering them and probing for acceptance. If a concern turns into an objection, use the appropriate Rebuttal at the left side of your screen (Sales Tool) to assist you in handling it.*

**MOVE TO SLIDE SIX – CREDIT CARD MODIFICATION – AND CLICK "SHOW USER"**

Credit Card Modification is a restructuring of your credit card debt, where you will work with (Law Firm Name). (Law Firm Name) is licensed and accredited in your state to represent you to your creditors and negotiate agreements to reduce your principal balances. This program features one monthly payment that is a reduction of your current total monthly payments.

In this program, you will no longer make monthly payments to each of your creditors. Instead, you will make one convenient monthly payment directly into a new savings account which is open in your name, only. This account is FDIC insured. We have no access to your savings other than for our fees, which are already included in your monthly payment.

**"How does everything sound so far?"**

## Program Terms (Discussion)

**MOVE TO SLIDE SEVEN –RECOMMENDATIONS – AND CLICK "SHOW USER"**

Great! Before I review your options let me emphasize two things about the figures I'm about to give you:

1. The term is an estimate based on our past results.
2. These are bottom line figures, so all costs – including our fees – are already built in and included in all the program monthly payments.

Great! Now your unsecured debt currently totals $_______ and through our program we estimate that we can have that reduced to around $__________. We can reach those significant savings through either of these 2 term options:

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.



© 2016 Strategic Financial Solutions All Rights Reserved 

Your first approved term is 48 months, which would require a monthly payment of $________. This would give you a monthly payment reduction of $______, compared to your current credit card payments.

However, if you would like a bit more payment relief, we do have a shorter 36-month program which requires a payment of $________. This would give you a monthly payment reduction of $______, compared to making your current credit card payments. And again, there are no prepayment penalties. But let me ask you, which option works best for you? *(Wait for client to pick a term.)*
Great! I think that's a smart decision. We'll go with the _____ month program.

## Program Basics (Presentation)

I am very excited about this program for you.
Before I move forward with getting you set-up, there are a few things you should understand about Credit Card Modification. As we discussed, you will stop making your regularly scheduled monthly payments or all the accounts you elect to enroll. This tactic allows us to secure the best possible settlements on your behalf. As a result of not making those payments, you may see your balances increase. Remember, we account for this in the agreements that we reach with your creditors and this should not impact your monthly payment.

Because of this you will experience a dip in your credit score while we are working to reach agreements with your creditors. I want you to be aware that the most recent FICO scoring method states that any debts that are settled will no longer be factored into the credit score. Our goal is to settle your accounts so that you can experience a rebound in your score as you progress through the program. Additionally, by paying your other obligations that are not included in the program on time, it should help offset some of the negative impact.
Lastly, the credit cards you include in the program will be closed. However, it is not all or nothing as you can hold onto a credit card. Is there a card you would like to remove from the program or are you looking to maximize the savings this program will allow and just enroll them all?
Perfect! Now I just need to verify some information in your file in order to generate your enrollment paperwork. You decided on the (36/48 Month) program, which requires a monthly payment of$______. I can set your payment date for the (Day) of the month. Does that day work for you?

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.



© 2016 Strategic Financial Solutions All Rights Reserved

## If client needs time to think, use these closing tactics:

1. Usually, when I've reviewed how well the program terms suit a client's needs and they want to think things over, it's because there's a misunderstanding or I haven't spent enough time on an issu to clarify it. Before you go, would you please share with me the one thing, more than anything else that is causing you to hesitate with moving forward? *(Handle objection or concern and close)*
2. *If there is no "one thing" than:* Before you go, let's take a moment to review the program terms so you have them fresh in your mind and can think them though. *(Review and summarize benefits and tie them to original needs shared during QC.)*
3. I will also follow up with an email so you have these terms as well as all the cards that are eligible for the program. Think about this tonight and I will give you a call back tomorrow to answer any additional questions and discuss next steps. Does tomorrow morning, afternoon, or evening work better for you?

"Thank you for that information, I am updating your information now so that we can review the enrollment documents together. This review should take about 10 minutes and we will discuss all the details of the program."

*Request enrollment documents in Velocify and review them with the client in sales tool. Use the attorney firm specific enrollment documents script.*

**If the client wishes to change amounts, remove cards, etc.:**

1) Go to the client's record in Velocify and make the changes.
2) Activate the menu at the client's name.
3) Press the "REFRESH NOW" button/
4) Click on the Your Overview slide.
5) The client's debt listing will instantly update.

- Again, this will reduce your monthly payment by_______and get you out of your enrolled debt in 4 years instead of_____years.
  **"Can you see how this would really help you out?"**

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.



© 2016 Strategic Financial Solutions All Rights Reserved

- Each month, your funds will accrue in your trust account and the attorneys will use those funds to complete the settlements.

- We typically work the lowest balance cards first and then move to the higher balance cards. If there is a situation where a creditor is being more aggressive than the others, we will move that creditor to the front of the list to work with them first.

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.



© 2016 Strategic Financial Solutions All Rights Reserved

MC

| PERSONNEL | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|
| **ABBASI,HARIS S** | Gross: 0.00 | Marital Status [redacted] | Direct Deposits | 1 285.20 Y Gross | 125.16 Y FIT |
| Mailing & Home Address | Hourly Rate: 18.0000 | Federal: | Acct #: XXXXXX6777 Code CK1 | 79.68 Y SS | 18.64 Y MED |
| [redacted] | Semi-Mon | 00 Exemptions | Tran/ABA: XXXXXXXX X Full Deposit | 26.74 Y State 1 | 2.60 Y SUI/DI |
| [redacted] . [redacted] | Rate Calc: 3 | 01 NY | | 1 285.20 Y NYMCT TXB | 4.37 Y NYMCT TAX |
| [redacted] NJ 07102 | LWW: 15 NWW: 06 | 00 Exemptions | | 4.34 Y TAXFRQCT | 1 285.20 Ac 20 ELIGI |
| eVoucher | | 19 NY SUI/DI | | 1 285.20 Ac 21 YTD G | 71.40 Ac 22 YTD T |
| **File: 003418** Status: TERM | | NY FLI | | 71.40 Ac 0E REGUL | 1 285.20 Ac 0G REGUL |
| Dept: 002241 Sex: M | | 3305 Local | | | |
| SSN: On File Race: 4 | | NY METRO - M | | | |
| Title: NEOGO | | | | | |
| Dates | | | | | |
| Hire: 03/20/2017 Birth: [redacted] | | | | | |
| Term: 04/05/2017 Date 5: 03/20/2017 | | | | | |
| Employee & Dependents Health Care Coverage | | | | | |
| **ABDELSALAM,CINDY T** | Gross: 0.00 | Marital Status [redacted] | Direct Deposits | 17 491.60 Y Gross | 2 264.46 Y FIT |
| Mailing & Home Address | Hourly Rate: 17.0000 | Federal: | Acct #: XXXXXX0938 Code CK1 | 1 084.48 Y SS | 253.63 Y MED |
| [redacted] | Semi-Mon | 00 Exemptions | Tran/ABA: XXXXXXXX X Full Deposit | 727.32 Y State 1 | 15.60 Y SUI/DI |
| [redacted] NY 11756 | Rate Calc: 3 | 01 NY | | 17 491.60 Y NYMCT TXB | 59.46 Y NYMCT TAX |
| eVoucher | LWW: 37 NWW: 28 | 00 Exemptions | | 26.04 Y TAXFRQCT | 35.37 Tkn 1 PTO |
| **File: 001032** Status: TERM | | 19 NY SUI/DI | | 17 491.60 Ac 20 ELIGI | 17 491.60 Ac 21 YTD G |
| Dept: 002240 Sex: F | | NY FLI | | 992.85 Ac 22 YTD T | 544.45 Ac 37 BONUS |
| SSN: On File Race: 1 | | 3305 Local | | 32.00 Ac 47 HOLID | 544.00 Ac 49 HOLID |
| Title: NEGADMIN | | NY METRO - M | | 8.00 Ac 55 SWING | 136.00 Ac 56 SWING |
| Dates | | | | 8.00 Ac 57 FMLA | 8.08 Ac 78 OVERT |
| Hire: 03/20/2017 Birth: [redacted] | | | | 206.06 Ac 91 OVERT | 35.37 Ac 0A PERSO |
| Term: 09/08/2017 Date 5: 03/20/2017 | | | | 601.29 Ac 0C PERSO | 909.40 Ac 0E REGUL |
| Employee & Dependents Health Care Coverage | | | | 15 459.80 Ac 0G REGUL | |
| **ABDUL-AZIM,MIKYLA** | Gross: 0.00 | Marital Status: [redacted] | Direct Deposits | 11 159.75 Y Gross | 1 369.70 Y FIT |
| Mailing & Home Address | Hourly Rate: 15.0000 | Federal: | Acct #: XXXXX0801 Code CK1 | 691.90 Y SS | 161.82 Y MED |
| [redacted] | Semi-Mon | 00 Exemptions | Tran/ABA: XXXXXXXX X Full Deposit | 422.58 Y State 1 | 11.70 Y SUI/DI |
| [redacted] NY 10566 | Rate Calc: 3 | 01 NY | | 11 159.75 Y NYMCT TXB | 37.95 Y NYMCT TAX |
| eVoucher | LWW: 52 NWW: 21 | 00 Exemptions | | 19.53 Y TAXFRQCT | 16.00 Tkn 1 PTO |
| **File: 004686** Status: ACTIVE | Paid 12 h of Mon h: 1 2 3 | 19 NY SUI/DI | | 7 281.26 Ac 20 ELIGI | 11 159.75 Ac 21 YTD G |
| Dept: 002240 Sex: F | Prior Qtr Mon h 3 | NY FLI | | 720.21 Ac 22 YTD T | 325.00 Ac 36 BONUS |
| SSN: On File Race: 2 | | 3305 Local | | 325.00 Ac 37 BONUS | 8.00 Ac 46 HOLID |
| Title: LITSUP | | NY METRO - M | | 16.00 Ac 47 HOLID | 120.00 Ac 48 HOLID |
| Dates | | | | 240.00 Ac 49 HOLID | 8.00 Ac 55 SWING |
| Hire: 08/21/2017 Birth: [redacted] | | | | 120.00 Ac 56 SWING | 8.00 Ac 57 FMLA |
| Date 5: 08/21/2017 | | | | 4.08 Ac 77 OVERT | 4.21 Ac 78 OVERT |
| Employee & Dependents Health Care Coverage | | | | 91.82 Ac 90 OVERT | 94.75 Ac 91 OVERT |

Additional Accumulations to Date

| | | | | | |
|---|---|---|---|---|---|
| 16.00 Ac 99 PERSO | 16.00 Ac 0A PERSO | 240.00 Ac 0B PERSO | 240.00 Ac 0C PERSO | 488.56 Ac 0D REGUL | 676.00 Ac 0E REGUL |
| 7 328.40 Ac 0F REGUL | 10 140.00 Ac 0G REGUL | | | | |

| PERSONNEL | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|
| **ABRAHAM,KESHIA** | Gross: 0.00 | Marital Status: [redacted] | 22.90 DEN DENTAL | 40 214.23 Y Gross | 4 006.23 Y FIT |
| Mailing & Home Address | Hourly Rate: 19.0200 | Federal: | | 2 473.41 Y SS | 578.46 Y MED |
| [redacted]E | Semi-Mon | 02 Exemptions | | 1 624.41 Y State 1 | 31.20 Y SUI/DI |
| [redacted] | Rate Calc: 3 | 01 NY | | 1 106.89 Y Local 2 | 39 893.63 Y NYMCT TXB |
| [redacted] NY 10475 | LWW: 52 NWW: 58 | 02 Exemptions | | 135.62 Y NYMCT TAX | 54.25 Y TAXFRQCT |



© 1999, Automatic Data Processing, Inc.

| PERSONNEL | | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|---|
| ABRAHAM,KESHIA<br>File: 007100<br>(continued) | | | | | | |
| | eVoucher | Paid 12 h of Mon h: 1 2 3 | 19 NY SUI/DI | | 308.00 Tkn 1 PTO | 35 689.00 Ac 20 ELIGI |
| **File: 007100** | Status: ACTIVE | Prior Qtr Mon h 3 | NY FLI | | 40 214.23 Ac 21 YTD G | 2 070.43 Ac 22 YTD T |
| Dept: 002240 | Sex: F | | 3301 Local 2 | | 100.00 Ac 36 BONUS | 1 025.00 Ac 37 BONUS |
| SSN: On File | Race: 2 | | NEW YORK CIT | | 8.00 Ac 46 HOLID | 64.00 Ac 47 HOLID |
| Title: LITSUP | | | 3305 Local | | 152.16 Ac 48 HOLID | 1 195.20 Ac 49 HOLID |
| Dates | | | NY METRO - M | | 8.00 Ac 55 SWING | 152.16 Ac 56 SWING |
| Hire: 04/24/2013 | Birth: [redacted] | | | | 8.00 Ac 57 FMLA | 16.47 Ac 77 OVERT |
| Date 5: 05/11/2017 | Date 7: 04/24/2013 | | | | 33.42 Ac 78 OVERT | 469.88 Ac 90 OVERT |
| No Health Care Coverage Available | | | | | 938.27 Ac 91 OVERT | 16.00 Ac 99 PERSO |

Additional Accumulations to Date

| | | | | | |
|---|---|---|---|---|---|
| 124.00 Ac 0A PERSO | 304.32 Ac 0B PERSO | 2 505.76 Ac 0C PERSO | 466.62 Ac 0D REGUL | 1 841.01 Ac 0E REGUL | 8 875.11 Ac 0F REGUL |
| 34 397.84 Ac 0G REGUL | 137.40 Ac 0U DENTA | 320.60 Ac 0V DENTA | | | |

| PERSONNEL | | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|---|
| **ACOFF,DOMONIQUE** | | Gross: 0.00 | Marital Status: [redacted] | 10.00 GYM GYM | 3 927.44 Y Gross | 154.83 Y FIT |
| Mailing & Home Address | | Hourly Rate: 12.5000 | Federal: | | 243.50 Y SS | 56.95 Y MED |
| [redacted] . | | Semi-Mon | 03 Exemptions | | 93.80 Y State 1 | 5.20 Y SUI/DI |
| [redacted] NY 14216 | | Rate Calc: 3 | 01 NY | | 8.68 Y TAXFRQCT | 999.06 Ac 20 ELIGI |
| | eVoucher | LWW: 52 NWW: 09 | 03 Exemptions | | 3 927.44 Ac 21 YTD G | 313.21 Ac 22 YTD T |
| **File: 006746** | Status: ACTIVE | Paid 12 h of Mon h: 2 3 | 01 NY (Lived in) | | 8.00 Ac 46 HOLID | 8.00 Ac 47 HOLID |
| Dept: 002801 | Sex: F | | 19 NY SUI/DI | | 100.00 Ac 48 HOLID | 100.00 Ac 49 HOLID |
| SSN: On File | Race: 2 | | NY FLI | | 1.97 Ac 77 OVERT | 1.97 Ac 78 OVERT |
| Title: ADMASTOP | | | | | 36.94 Ac 90 OVERT | 36.94 Ac 91 OVERT |
| Dates | | | | | 303.24 Ac 0D REGUL | 303.24 Ac 0E REGUL |
| Hire: 10/30/2017 | Birth: [redacted] | | | | 3 790.50 Ac 0F REGUL | 3 790.50 Ac 0G REGUL |
| Date 5: 10/30/2017 | | | | | 40.00 Ac 1M GYM M | 40.00 Ac 1N GYM M |
| Employee & Dependents Health Care Coverage | | | | | | |

| PERSONNEL | | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|---|
| **ACOSTA,RAINIERO** | | Gross: 0.00 | Marital Status: [redacted] | 2161.62 71 TAXLVY 13.07 GYM GYM | 46 142.79 Y Gross | 3 441.81 Y FIT |
| Mailing & Home Address | | Hourly Rate: 19.0000 | Federal: | Calc Factors | 2 860.85 Y SS | 669.07 Y MED |
| [redacted] | | Semi-Mon | 03 Exemptions | 013.0000 87 ROTH% 006.0000 88 401K% | 2 019.44 Y State 1 | 31.20 Y SUI/DI |
| [redacted] | | Rate Calc: 3 | 01 NY | Direct Deposits | 1 361.72 Y Local 1 | 46 142.79 Y NYMCT TXB |
| [redacted]K NY 10034 | | LWW: 52 NWW: 56 | 00 Exemptions | Acct #: XXXXXXXXXXX6488 Code CK1 | 156.90 Y NYMCT TAX | 2 201.96 Y 401K |
| | eVoucher | Paid 12 h of Mon h: 1 2 3 | 19 NY SUI/DI | Tran/ABA: XXXXXXXX X Full Deposit | 690.41 Y Special 1 | 52.08 Y TAXFRQCT |
| **File: 001122** | Status: ACTIVE | Prior Qtr Mon h 3 | NY FLI | | 117.88 Tkn 1 PTO | 891.51 Ac 19 CMP M |
| Dept: 002220 | Sex: M | | 3301 NEW YORK CIT | | 40 867.51 Ac 20 ELIGI | 46 142.79 Ac 21 YTD G |
| SSN: On File | Race: 3 | | 3301 Local 2 | | 2 214.99 Ac 22 YTD T | 1 100.00 Ac 36 BONUS |
| Title: CSRLEAD | | | NEW YORK CIT | | 3 734.25 Ac 37 BONUS | 8.00 Ac 46 HOLID |
| Dates | | | 3305 Local | | 64.00 Ac 47 HOLID | 152.00 Ac 48 HOLID |
| Hire: 05/02/2016 | Birth: [redacted] | | NY METRO - M | | 1 176.00 Ac 49 HOLID | 8.00 Ac 55 SWING |
| Date 5: 03/13/2017 | | | | | 152.00 Ac 56 SWING | 8.00 Ac 57 FMLA |
| No Health Care Coverage Available | | | | | 4 714.74 Ac 61 ROTH | 1 332.41 Ac 62 ROTH |

Additional Accumulations to Date

| | | | | | |
|---|---|---|---|---|---|
| 90.84 Ac 65 ER MA | 218.03 Ac 66 401K | 218.03 Ac 67 401K | 27.86 Ac 77 OVERT | 137.23 Ac 78 OVERT | 794.02 Ac 90 OVERT |
| 3 852.99 Ac 91 OVERT | 16.15 Ac 99 PERSO | 66.63 Ac 0A PERSO | 306.85 Ac 0B PERSO | 1 243.77 Ac 0C PERSO | 494.00 Ac 0D REGUL |
| 1 939.13 Ac 0E REGUL | 9 386.00 Ac 0F REGUL | 35 983.78 Ac 0G REGUL | 78.42 Ac 1M GYM M | 313.68 Ac 1N GYM M | 3 593.62 Ac 9B TAX L |



© 1999, Automatic Data Processing, Inc.

| PERSONNEL | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|
| **ZAPATA,MILAGROS**<br>File: 007664<br>(continued)<br>eVoucher<br>**File: 007664** Status: ACTIVE<br>Dept: 002220 Sex: F<br>SSN: On File Race: 3<br>Title: CSR<br>Dates<br>Hire: 09/28/2015 Birth: [redacted]<br>Date 5: 05/11/2017<br>No Health Care Coverage Available | Paid 12 h of Mon h: 1 2 3<br>Prior Qtr Mon h 3 | 01 NY (Lived in)<br>19 NY SUI/DI<br>NY FLI<br>3301 NEW YORK CIT<br>3301 Local 2<br>NEW YORK CIT<br>3305 Local<br>NY METRO - M | | 178.98 Tkn 1 PTO<br>35 819.13 Ac 21 YTD G<br>363.00 Ac 23 Commu<br>400.00 Ac 36 BONUS<br>8.00 Ac 46 HOLID<br>131.04 Ac 48 HOLID<br>20.85 Ac 77 OVERT<br>512.28 Ac 90 OVERT<br>9.43 Ac 99 PERSO | 31 510.70 Ac 20 ELIGI<br>2 068.75 Ac 22 YTD T<br>1 443.00 Ac 24 Commu<br>2 000.00 Ac 37 BONUS<br>64.00 Ac 47 HOLID<br>1 033.20 Ac 49 HOLID<br>50.06 Ac 78 OVERT<br>1 212.08 Ac 91 OVERT<br>81.43 Ac 0A PERSO |

Additional Accumulations to Date

| | | | | | |
|---|---|---|---|---|---|
| 154.47 Ac 0B PERSO | 1 303.59 Ac 0C PERSO | 503.93 Ac 0D REGUL | 1 873.26 Ac 0E REGUL | 8 254.36 Ac 0F REGUL | 30 270.26 Ac 0G REGUL |
| 363.00 Ac 1H COMMU | 1 443.00 Ac 1J COMMU | | | | |

| PERSONNEL | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE | |
|---|---|---|---|---|---|
| **ZEYNALI,DARIUS**<br>Mailing & Home Address<br>[redacted]T<br>[redacted]NY 11385<br>eVoucher<br>**File: 008164** Status: TERM<br>Dept: 002241 Sex: M<br>SSN: On File Race: 1<br>Title: NEGMGR<br>Dates<br>Hire: 08/26/2014 Birth: [redacted]<br>Term: 08/18/2017 Date 5: 04/10/2017<br>Date 7: 08/26/2014<br>No Health Care Coverage Available | Gross: 0.00<br>Salary: 2637.50<br>Semi-Mon<br>Rate 2: 30.4315<br>Rate Calc: 3<br>LWW: 35 NWW: 37 | Marital Status: [redacted]<br>Federal:<br>02 Exemptions<br>01 NY<br>02 Exemptions<br>19 NY SUI/DI<br>NY FLI<br>3301 Local 2<br>NEW YORK CIT<br>3305 Local<br>NY METRO - M | Calc Factors<br>006.0000 88 401K%<br>Direct Deposits<br>Acct #: XXXXXX3490 Code CK1<br>Tran/ABA: XXXXXXXX X Full Deposit | 47 555.68 Y Gross<br>2 942.62 Y SS<br>2 286.45 Y State 1<br>1 451.95 Y Local 2<br>161.40 Y NYMCT TAX<br>34.72 Y TAXFRQCT<br>1 188.91 Ac 19 CMP M<br>47 555.68 Ac 21 YTD G<br>4 514.00 Ac 37 BONUS<br>8.00 Ac 55 SWING<br>64.00 Ac 0A PERSO<br>40 404.18 Ac 0G REGUL | 6 662.74 Y FIT<br>688.19 Y MED<br>20.80 Y SUI/DI<br>47 461.59 Y NYMCT TXB<br>2 853.34 Y 401K<br>248.00 Tkn 1 PTO<br>47 555.68 Ac 20 ELIGI<br>120.00 Ac 22 YTD T<br>48.00 Ac 47 HOLID<br>8.00 Ac 57 FMLA<br>2 637.50 Ac 0C PERSO<br>94.09 Ac 0T STD-Y |
| **ZUBEROVIC,ARIANA**<br>Mailing & Home Address<br>[redacted]<br>[redacted]D NY 10302<br>eVoucher<br>**File: 008305** Status: TERM<br>Dept: 002510 Sex: F<br>SSN: On File Race: 1<br>Title: JRANLST<br>Dates<br>Hire: 06/20/2016 Birth: [redacted]<br>Term: 03/26/2017 Date 5: 03/27/2017<br>Employee & Dependents Health Care Coverage | Gross: 0.00<br>Salary: 2208.34<br>Semi-Mon<br>Rate 2: 25.4799<br>Rate Calc: 3<br>LWW: 13 NWW: 14 | Marital Status: [redacted]<br>Federal:<br>00 Exemptions<br>01 NY<br>00 Exemptions<br>19 NY SUI/DI<br>NY FLI<br>3301 NEW YORK CIT<br>3301 Local 2<br>NEW YORK CIT<br>3305 Local<br>NY METRO - M | 185.00 TRC COMMUT<br>Direct Deposits<br>Acct #: XXXXX3368 Code CK1<br>Tran/ABA: XXXXXXXX X Full Deposit | 10 545.05 Y Gross<br>619.38 Y SS<br>442.04 Y State 1<br>281.80 Y Local 1<br>33.96 Y NYMCT TAX<br>56.00 Tkn 1 PTO<br>10 545.05 Ac 21 YTD G<br>555.00 Ac 24 Commu<br>24.00 Ac 47 HOLID<br>10.23 Ac 78 OVERT<br>24.00 Ac 0A PERSO<br>472.66 Ac 0E REGUL<br>555.00 Ac 1J COMMU | 1 417.75 Y FIT<br>144.86 Y MED<br>7.80 Y SUI/DI<br>9 990.05 Y NYMCT TXB<br>13.02 Y TAXFRQCT<br>10 545.05 Ac 20 ELIGI<br>530.89 Ac 22 YTD T<br>267.12 Ac 37 BONUS<br>446.16 Ac 49 HOLID<br>313.45 Ac 91 OVERT<br>682.80 Ac 0C PERSO<br>8 835.52 Ac 0G REGUL |


© 1999, Automatic Data Processing, Inc.

| COMPANY TOTALS | |
|---|---|
| Hourly Rates (Active EE's): | 4 687.7400 |
| Salary Rates (Active EE's): | 71 822.3200 |
| Total Rates (All EE's): | 183 664.3600 |
| All Employees: | 484 |
| Active Employees: | 288 |
| New Hires: | 0 |
| Changes: | 12 |
| Entries: | 0 |
| Pays: | 45 |

| PAY | |
|---|---|
| Current Payroll: | |
| Hours 1: | 0.00 |
| Hours 2: | 0.00 |
| Hours 3: | 0.00 |
| Hours 4: | 0.00 |
| Earnings 1: | 0.00 |
| Earnings 2: | 0.00 |
| Earnings 3: | 0.00 |
| Earnings 4: | 0.00 |
| Earnings 5: | 0.00 |
| Federal Tax: | 0.00 |
| Soc. Sec. Tax: | 332.81- |
| Medicare Tax: | 77.63- |
| Medicare Surtax: | 0.00 |
| SUI/SDI Tax: | 0.00 |
| State Tax: | 0.00 |
| Local Tax: | 0.00 |
| EIC Advances: | 0.00 |
| Vol Deductions: | 5 367.86 |
| Gross: | 0.00 |
| Net: | 4 957.42- |
| Male Pays > 100: | 0.00 |
| Male Pays > 300: | 0.00 |
| Total Male Pays: | 15 |
| Female Pays > 100: | 0.00 |
| Female Pays > 300: | 0.00 |
| Total Female Pays: | 22 |

| SCHEDULED AMOUNTS | | | |
|---|---|---|---|
| 340.64 | R | 61.28 | VH |
| 3 344.32 | 71 | 6 281.36 | 73 |
| 2 072.14 | 75 | 42.00 | 76 |
| 250.25 | 77 | 2 220.00 | CK1 |
| 5 180.00 | CK2 | 1 200.00 | CK3 |
| 109.00 | CK4 | 1 093.00 | COM |
| 982.39 | DEN | 733.29 | GYM |
| 103.65 | LIF | 6 398.33 | LNR |
| 5 852.90 | MED | 55.00 | PAR |
| 77.49 | STD | 4 039.34 | SV1 |
| 19 008.10 | TRC | 48.00 | VIS |
| **Calc Factors** | | | |
| 64.0000 | 87 | 162.0000 | 88 |
| 40.0000 | 91 | 10.0000 | 92 |
| 10.0000 | 93 | | |
| **Goal Deductions** | | | |
| 40 205.91 | Goal 1 | 32 134.67 | Bal 1 |
| 3 239.69 | Goal 2 | 2 409.49 | Bal 2 |

| ACCUMULATIONS TO DATE | | | | | |
|---|---|---|---|---|---|
| 10 647 730.54 | Y | Gross | 1 147 496.95 | Y | FIT |
| 643 980.38 | Y | SS | 150 608.71 | Y | MED |
| 438 423.89 | Y | State 1 | 7 991.05 | Y | SUI/DI |
| 141 019.24 | Y | Local 1 | 44 856.95 | Y | Local 2 |
| 9 712 695.92 | Y | NYMCT TXB | 33 023.14 | Y | NYMCT TAX |
| 48 668.57 | Y | 401K | 4 882.75 | Y | Special 1 |
| 13 414.56 | Y | TAXFRQCT | 37 935.50 | Tkn | 1 PTO |
| 21 138.25 | Ac | 19 | 9 284 147.87 | Ac | 20 |
| 10 647 730.54 | Ac | 21 | 479 304.39 | Ac | 22 |
| 40 234.20 | Ac | 23 | 142 977.88 | Ac | 24 |
| 165.00 | Ac | 25 | 96.00 | Ac | 30 |
| 288.00 | Ac | 31 | 1 294.00 | Ac | 32 |
| 4 526.32 | Ac | 33 | 143 250.88 | Ac | 36 |
| 660 565.86 | Ac | 37 | 750.00 | Ac | 40 |
| 750.00 | Ac | 41 | 2 160.00 | Ac | 46 |
| 14 936.00 | Ac | 47 | 34 834.24 | Ac | 48 |
| 237 222.82 | Ac | 49 | 240.00 | Ac | 50 |
| 1 945.00 | Ac | 55 | 33 628.88 | Ac | 56 |
| 1 945.00 | Ac | 57 | 3 177.45 | Ac | 58 |
| 19 173.92 | Ac | 61 | 3 816.00 | Ac | 62 |
| 1 656.32 | Ac | 65 | 3 675.02 | Ac | 66 |
| 3 675.02 | Ac | 67 | 8.00 | Ac | 73 |
| 152.00 | Ac | 74 | 2 602.32 | Ac | 76 |
| 3 233.08 | Ac | 77 | 12 028.65 | Ac | 78 |
| 87 657.19 | Ac | 90 | 320 068.28 | Ac | 91 |
| 1 046.84 | Ac | 98 | 6 294.00 | Ac | 99 |
| 274.88 | Ac | V1 | 856.64 | Ac | V2 |
| 313.76 | Ac | V3 | 1 289.52 | Ac | V4 |
| 20 454.10 | Ac | 0A | 99 594.38 | Ac | 0B |

**Additional Accumulations to Date**

| | | | | | |
|---|---|---|---|---|---|
| 346 007.69 Ac 0C | 123 750.68 Ac 0D | 429 213.91 Ac 0E | 2 538 162.40 Ac 0F | 9 015 128.95 Ac 0G | 86.73 Ac 0J |
| 1 647.13 Ac 0K | 4 975.61 Ac 0L | 430.38 Ac 0R | 1 507.93 Ac 0T | 5 719.48 Ac 0U | 18 103.81 Ac 0V |
| 30 496.99 Ac 0Y | 88 670.92 Ac 1A | 592.10 Ac 1B | 2 519.50 Ac 1C | 1 075.50 Ac 1D | 7 304.62 Ac 1E |
| 165.00 Ac 1F | 240.00 Ac 1G | 40 234.20 Ac 1H | 142 977.88 Ac 1J | 3 000.00- Ac 1K | 9 600.00- Ac 1L |
| 3 171.41 Ac 1M | 12 260.06 Ac 1N | 361.00- Ac 1P | 39.55- Ac 1Q | 7 830.00 Ac 1R | 26 926.95 Ac 1T |
| 6 893.07 Ac 9B | 146.31 Ac 9C | 630.23 Ac 9D | 1 160.65 Ac 9E | 26 376.75 Ac 9F | 963.00 Ac 9G |
| 6 006.00 Ac 9H | | | | | |

**Next Available File Numbers:** **000054, 000055, 000056, 000057, 000058, 000059, 000060, 000061, 000062, 000063**
**Highest Available File Number:** **018992**



© 1999, Automatic Data Processing, Inc.

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BASDEO,AVINDRA** | 104.20 | 2.12 | | 2,156.94 | 65.83 | | | | | | | | |
| File: 003432 | | | | | | 1,225.00 BON | | | | | | | |
| Dept: 002220 | | | | | | 500.00 BLU | | | | | 98.69 N- EM ERMAT | | |
| Rate: 20.7000 | | | | | | | | | | | 13.42 N- M MCTTAX | | |
| | | | | | | | | 3,947.77 | 566.57 FIT | 197.22 NY 01 S1 | 2467.03 CK1 CHKCK1 | Voucher# | ** |
| | | | | | | | | | 244.76 SS | 1.30 NY 19 | 276.34 K 401K$ | **150001** | ☐ |
| | | | | | | | | | 57.25 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | 4.97 NY FLI | | | |
| | | | | | | | | | | 132.33 3301 L1 | | **.00** | |
| **BEAUBRUN, REGINALD** | 88.47 | .57 | | 1,459.76 | 14.11 | | | | | | | | |
| | | | | | | 50.00 BON | | | | | 5.18 N- M MCTTAX | | |
| File: 001187 | | | | | | | | 1,523.87 | 156.43 FIT | 63.92 NY 01 | 1139.73 CK1 CHKCK1 | Voucher# | ** |
| Dept: 002220 | | | | | | | | | 94.48 SS | 1.30 NY 19 | | **150002** | ☐ |
| Rate: 16.5000 | | | | | | | | | 22.09 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | 1.92 NY FLI | | | |
| | | | | | | | | | | 44.00 3301 L1 | | **.00** | |
| **BERRY,GERARD** | 101.80 | 3.72 | | 2,366.85 | 129.74 | | | | | | | | |
| File: 003549 | | | | | | 575.00 BON | | | | | | | |
| Dept: 002220 | | | | | | 500.00 BLU | | | | | 12.14 N- M MCTTAX | | |
| Rate: 23.2500 | | | | | | | | 3,571.59 | 354.42 FIT | 177.72 NY 01 | 2641.19 CK1 CHKCK1 | Voucher# | ** |
| | | | | | | | | | 221.44 SS | 1.30 NY 19 | | **150003** | ☐ |
| | | | | | | | | | 51.79 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | 4.50 NY FLI | | | |
| | | | | | | | | | | 119.23 3301 L2 | | **.00** | |
| **BLANDINO,CLARETT J** | 95.27 | 1.78 | 9.00 PTO | 1,612.92 | 45.20 | 152.37 PTO | | | | | | | |
| | | | | | | 100.00 BON | | | | | 6.50 N- M MCTTAX | | |
| File: 009327 | | | | | | | | 1,910.49 | 182.08 FIT | 85.76 NY 01 | 1434.48 CK1 CHKCK1 | Voucher# | ** |
| Dept: 002220 | | | | | | | | | 118.45 SS | 1.30 NY 19 | | **150004** | ☐ |
| Rate: 16.9300 | | | | | | | | | 27.70 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | 2.41 NY FLI | | | |
| | | | | | | | | | | 58.31 3301 L1 | | **.00** | |
| **BOWERS,ERIC** | 104.02 | .60 | | 1,776.66 | 15.37 | | | | | | | | |
| File: 007889 | | | | | | 200.00 BON | | | | | 6.29 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 1,992.03 | 154.13 FIT | 79.32 NY 01 | 1417.60 CK1 CHKCK1 141.52 MED MEDICA | Voucher# | ** |
| Rate: 17.0800 | | | | | | | | | 114.73 SS | 1.30 NY 19 | | **150005** | ☐ |
| | | | | | | | | | 26.83 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | 2.51 NY FLI | | | |
| | | | | | | | | | | 54.09 3301 L2 | | **.00** | |
| **BRAGTON,KWESI S** | | | | | | 45.00 BLU | | | | | | | |
| File: 005124 | | | 4.28 PTO | | | 66.34 PTO | | | | | .38 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 111.34 | 30.00 FIT | 40.00 NY 01 | 32.12 CK1 CHKCK1 | Voucher# | |
| Rate: 15.5000 | | | | | | | | | 6.90 SS | .56 NY 19 | | **150006** | ☐ |
| | | | | | | | | | 1.62 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | .14 NY FLI | | | |
| | | | | | | | | | | | | **.00** | |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS Reg | HOURS O/T | Hours 3&4 | EARNINGS Reg | EARNINGS O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | STATUTORY DEDUCTIONS State/Local | VOLUNTARY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CARTER,TONA** | 95.98 | .93 | | 1,487.69 | 21.62 | | | | | | | | | |
| File: 002073 | | | | | | 100.00 BON | | | | | | 5.47 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 1,609.31 | 125.19 FIT | 64.06 NY 01 | 1249.54 CK1 CHKCK1 | | Voucher# | ** |
| Rate: 15.5000 | | | | | | | | | 99.77 SS | 1.30 NY 19 | | | **150007** | ☐ |
| | | | | | | | | | 23.34 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.03 NY FLI | | | | |
| | | | | | | | | | | 44.08 3301 L1 | | | **.00** | |
| **CEPHUS,EDDIE** | 100.27 | 4.53 | 8.00 PTO | 1,979.33 | 134.13 | 157.92 PTO | | | | | | | | |
| File: 004881 | | | | | | 1,200.00 BON | | | | | | | | |
| Dept: 002220 | | | | | | 500.00 BLU | | | | | | 99.28 N- EM ERMAT | | |
| Rate: 19.7400 | | | | | | | | | | | | 13.50 N- M MCTTAX | | |
| | | | | | | | | 3,971.38 | 284.20 FIT | 188.00 NY 01 | 2046.44 CK1 CHKCK1 | 297.85 K 401K$ | Voucher# | ** |
| | | | | | | | | | 246.22 SS | 1.30 NY 19 | 397.14 71 TAXLVY | 18.72 75 SUPPRT | **150008** | ☐ |
| | | | | | | | | | 57.59 MED | SUI/DI | 42.00 76 SUPPRT | 250.25 77 SUPPRT | eVoucher | |
| | | | | | | | | | | 5.00 NY FLI | 10.45 GYM GYM | | | |
| | | | | | | | | | | 126.22 3301 L2 | | | **.00** | |
| **CHATELAIN-FLEMING** | | | 40.00 PTO | 2,912.54 | | | | | | | | 14.57 N- EM ERMAT | | |
| **,ISABEL C** | | | | | | | | | | | | 8.73 N- M MCTTAX | | |
| File: 006287 | | | | | | | | 2,912.54 | .00 FIT | 112.29 NY 01 | 1876.57 CK1 CHKCK1 | 29.13 K 401K$ | Voucher# | |
| Dept: 002220 | | | | | | | | | 159.16 SS | 1.30 NY 19 | 347.74 75 SUPPRT | 48.62 DEN DENTAL | **150009** | ☐ |
| Rate: 2912.54 | | | | | | | | | 37.22 MED | SUI/DI | 291.08 MED MEDICA | 5.76 VIS VISION | eVoucher | |
| | | | | | | | | | | 3.67 NY FLI | | | **.00** | |
| **CLARK,CODY** | 96.07 | .37 | | 1,537.12 | 8.88 | | | | | | | | | |
| File: 008456 | | | | | | 150.00 BON | | | | | | 5.77 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 1,696.00 | 135.59 FIT | 69.54 NY 01 | 1357.67 CK1 CHKCK1 | | Voucher# | ** |
| Rate: 16.0000 | | | | | | | | | 105.16 SS | 1.30 NY 19 | | | **150010** | ☐ |
| | | | | | | | | | 24.60 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.14 NY FLI | | | **.00** | |
| **CLARK,TIA S** | 101.92 | .63 | | 1,732.64 | 16.07 | | | | | | | | | |
| File: 000638 | | | | | | 200.00 BON | | | | | | 6.55 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 1,948.71 | 121.68 FIT | 81.45 NY 01 | 22.90 DEN DENTAL | | NY Check# | ** |
| Rate: 17.0000 | | | | | | | | | 119.40 SS | 1.30 NY 19 | | | [redacted] | ☐ |
| | | | | | | | | | 27.92 MED | SUI/DI | | | | |
| | | | | | | | | | | 2.46 NY FLI | | | **1,571.60** | |
| **DE LA CRUZ,JUAN** | 85.72 | | | 1,392.95 | | | | | | | | 4.74 N- M MCTTAX | | |
| File: 009371 | | | | | | | | 1,392.95 | 140.72 FIT | 55.63 NY 01 | | | NY Check# | ** |
| Dept: 002220 | | | | | | | | | 86.36 SS | 1.30 NY 19 | | | [redacted] | ☐ |
| Rate: 16.2500 | | | | | | | | | 20.20 MED | SUI/DI | | | | |
| | | | | | | | | | | 1.76 NY FLI | | | **1,048.42** | |
| | | | | | | | | | | 38.56 3301 L1 | | | | |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAMBERTO,ALISA | | | | 8.00 PTO | 5,000.00 | | | | | | | | 125.00 N- EM ERMAT | | |
| File: | 001789 | | | 8.00 SWG | | | | | | | | | 16.51 N- M MCTTAX | | |
| Dept: | 002290 | | | | | | | | 5,000.00 | 674.29 FIT | 218.52 NY 01 | 2537.13 CK1 CHKCK1 | 900.00 K 401K$ | Voucher# | |
| Rate: | 5000.00 | | | | | | | | | 301.01 SS | 1.30 NY 19 | 144.90 MED MEDICA | | 150178 | ☐ |
| | | | | | | | | | | 70.40 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | | 6.30 NY FLI | | | | |
| | | | | | | | | | | | 146.15 3301 L1 | | | .00 | |
| MIGNONE,KIMBERLY | | 105.33 | | | 2,106.60 | | | | | | | | 7.16 N- M MCTTAX | | |
| File: | 008397 | | | | | | | | 2,106.60 | 164.12 FIT | 92.90 NY 01 | 1684.48 CK1 CHKCK1 | | Voucher# | ** |
| Dept: | 002290 | | | | | | | | | 130.61 SS | 1.30 NY 19 | | | 150179 | ☐ |
| Rate: | 20.0000 | | | | | | | | | 30.54 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | | 2.65 NY FLI | | | | |
| | | | | | | | | | | | | | | .00 | |
| MITCHELL,MICHAEL | | | | | 8,500.00 | | | | | | | | 212.50 N- EM ERMAT | | |
| J | | | | | | | | | | | | | 28.90 N- M MCTTAX | | |
| File: | 000874 | | | | | | | | 8,500.00 | 1,284.74 FIT | 535.13 NY 01 | 5507.87 CK1 CHKCK1 | 510.00 K 401K$ | Voucher# | |
| Dept: | 002290 | | | | | | | | | 527.00 SS | 1.30 NY 19 | | | 150180 | ☐ |
| Rate: | 8500.00 | | | | | | | | | 123.25 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | | 10.71 NY FLI | | | | |
| | | | | | | | | | | | | | | .00 | |
| PYNE,ANDREW M | | | | | 6,250.00 | | | | | | | | 156.25 N- EM ERMAT | | |
| File: | 008453 | | | | | | | | 6,250.00 | 588.09 FIT | 312.66 NY 01 | 4004.78 CK2 CHKCK2 | 750.00 K 401K$ | Voucher# | |
| Dept: | 002290 | | | | | | | | | 380.31 SS | 1.30 NY 19 | 12.24 VH VISHIG | 103.80 DEN DENTAL | 150181 | ☐ |
| Rate: | 6250.00 | | | | | | | | | 88.94 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | | 7.88 NY FLI | | | | |
| | | | | | | | | | | | | | | .00 | |
| TIGHE,JESSICA | | | | | 6,345.83 | | | | | | | | 158.65 N- EM ERMAT | | |
| File: | 004015 | | | | | | | | | | | | 21.53 N- M MCTTAX | | |
| Dept: | 002290 | | | | | | | | 6,345.83 | 1,138.22 FIT | 366.59 NY 01 | 3884.58 CK1 CHKCK1 | 444.21 K 401K$ | Voucher# | |
| Rate: | 6345.83 | | | | | | | | | 392.61 SS | 1.30 NY 19 | 5.00 LIF LIFE | 13.50 STD STD | 150182 | ☐ |
| | | | | | | | | | | 91.82 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | | 8.00 NY FLI | | | | |
| | | | | | | | | | | | | | | .00 | |
| TUSZYNSKI,SHELBY | | | | | 3,729.17 | | | | | | | | 93.23 N- EM ERMAT | | |
| File: | 001085 | | | | | | | | | | | | 12.63 N- M MCTTAX | | |
| Dept: | 002290 | | | | | | | | 3,729.17 | 535.19 FIT | 188.19 NY 01 | 2309.33 CK1 CHKCK1 | 186.46 K 401K$ | Voucher# | |
| Rate: | 3729.17 | | | | | | | | | 230.35 SS | 1.30 NY 19 | 74.58 6 ROTH$ | 4.64 VH VISHIG | 150183 | ☐ |
| | | | | | | | | | | 53.87 MED | SUI/DI | 5.00 LIF LIFE | 9.29 STD STD | eVoucher | |
| | | | | | | | | | | | 4.70 NY FLI | | | | |
| | | | | | | | | | | | 126.27 3301 L1 | | | .00 | |
| WILSON,CHRIS | | | | 8.00 PTO | 3,013.70 | | | | | | | | 75.34 N- EM ERMAT | | |
| File: | 001901 | | | | | | | | | | | | 10.25 N- M MCTTAX | | |
| Dept: | 002290 | | | | | | | | 3,013.70 | 121.08 FIT | 129.51 NY 01 | 2310.64 CK1 CHKCK1 | 180.82 K 401K$ | Voucher# | |
| Rate: | 3013.70 | | | | | | | | | 186.85 SS | 1.30 NY 19 | 36.00 LIF LIFE | | 150184 | ☐ |
| | | | | | | | | | | 43.70 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | | 3.80 NY FLI | | | | |
| | | | | | | | | | | | | | | .00 | |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS (Reg / O/T / Hours 3&4) | EARNINGS (Reg / O/T / Earnings 3&4 / Earnings 5) | GROSS | STATUTORY DEDUCTIONS Federal | STATUTORY DEDUCTIONS State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **WEYMOUTH,JOANNA** | 104.97 2.43 | 1,784.49 61.97 | | | | | |
| **R** | | 70.00 BON | | | | | |
| File: 000837 | | | 1,916.46 | 182.80 FIT | 86.13 NY 01 S1 | | NY Check# ** |
| Dept: 002801 | | | | 118.82 SS | 1.30 NY 19 | | [redacted] ☐ |
| Rate: 17.0000 | | | | 27.79 MED | SUI/DI | | |
| | | | | | 2.41 NY FLI | | **1,497.21** |
| **DEPT TOTAL** | 3,081.95 REG | 54,770.30 REG 1,028.08 O/T | | 5,737.63 FIT | | 41,199.84 TOTAL DEDUCTIONS | **36** Pays ☐ |
| **002801** | 45.80 O/T | 4,651.06 EARNINGS 3 .00 EARNINGS 4 | | 3,701.86 SS | | | **6,284.59** |
| | 133.58 HOURS 3 | .00 EARNINGS 5 60,449.44 GROSS | | 865.77 MED | | | |
| | .00 HOURS 4 | | | 2,536.81 STATE | | | |
| | | | | 46.80 SUI/DI | | | |
| | | | | 76.14 FLI | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| HOURS ANALYSIS: | 117.58 | PTO PERSNL | 16.00 | SWG SWING | | | | |
| EARNINGS ANALYSIS: | 75.00 | BLU | 2,930.00 | BON BONUS | 1,423.66 | PTO PERSNL | 222.40 | SWG SWING |
| MEMO ANALYSIS: | 44.84 | EM ERMAT | | | | | | |
| STATUTORY DED. ANALYSIS: | 2,536.81 | 01 NY | | | | | | |
| | 46.80 | 01 NY SUI/DI | 76.14 | 01 NY FLI | | | | |
| VOLUNTARY DED. ANALYSIS: | 89.67 | K 401K$ | 35,532.91 | CK1 CHKCK1 | 3,016.53 | CK2 CHKCK2 | 1,773.82 | CK3 CHKCK3 |
| | 97.64 | DEN DENTAL | 40.00 | GYM GYM | 5.00 | LIF LIFE | 631.52 | MIH IHBUFM |
| | 5.71 | STD STD | 7.04 | VIS VISION | | | | |

| PERSONNEL | HOURS (Reg / O/T / Hours 3&4) | EARNINGS (Reg / O/T / Earnings 3&4 / Earnings 5) | GROSS | STATUTORY DEDUCTIONS Federal | STATUTORY DEDUCTIONS State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **CATALANO,** | 21.50 | 354.75 | | | | | |
| **RUSSELL** | | | 354.75 | 20.06 FIT | 1.86 NY 01 S1 | | NY Check# |
| File: 002889 | | | | 21.99 SS | 1.30 NY 19 | | [redacted] ☐ |
| Dept: 002803 | | | | 5.14 MED | SUI/DI | | |
| Rate: 16.5000 | | | | | .45 NY FLI | | **303.95** |
| **DANSER,CHRISTINA** | 22.50 | 371.25 | | | | | |
| File: 000791 | | | 371.25 | .00 FIT | 1.30 NY 19 | | NY Check# |
| Dept: 002803 | | | | 23.02 SS | SUI/DI | | [redacted] ☐ |
| Rate: 16.5000 | | | | 5.38 MED | .47 NY FLI | | |
| | | | | | | | **341.08** |
| **DIEDRICH,** | 21.50 | 354.75 | | | | | |
| **JOHNATHAN** | | | 354.75 | 20.06 FIT | 1.86 NY 01 S1 | | NY Check# |
| File: 002405 | | | | 21.99 SS | 1.30 NY 19 | | [redacted] ☐ |
| Dept: 002803 | | | | 5.14 MED | SUI/DI | | |
| Rate: 16.5000 | | | | | .45 NY FLI | | **303.95** |
| **FORPAHL,MICHAEL** | 104.62 1.35 | 1,778.54 34.43 | | | | | |
| File: 000501 | | 352.80 BON | | | | | |
| Dept: 002803 | | | 2,165.77 | 283.36 FIT | 114.55 NY 01 S1 | 1598.15 CK1 CHKCK1 | Voucher# ** |
| Rate: 17.0000 | | | | 134.28 SS | 1.30 NY 19 | | **150218** ☐ |
| | | | | 31.40 MED | SUI/DI | | eVoucher |
| | | | | | 2.73 NY FLI | | |
| | | | | | | | **.00** |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASDEO,AVINDRA | 79.00 | 1.47 | | 1,635.30 | 45.64 | | | | | | | 42.02 N- EM ERMAT | | |
| File: 003432 | | | | | | | | | | | | 5.72 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 1,680.94 | 140.41 FIT | 63.78 NY 01 S1 | | 1183.17 CK1 CHKCK1 | Voucher# | ** |
| Rate: 20.7000 | | | | | | | | | 104.22 SS | 1.30 NY 19 | 117.67 K 401K$ | | 170001 | ☐ |
| | | | | | | | | | 24.37 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.12 NY FLI | | | | |
| | | | | | | | | | | 43.90 3301 L1 | | | .00 | |
| BEAUBRUN, | 79.98 | .37 | | 1,319.67 | 9.16 | | | | | | | 4.52 N- M MCTTAX | | |
| REGINALD | | | | | | | | 1,328.83 | 133.03 FIT | 51.58 NY 01 | 1003.69 CK1 CHKCK1 | | Voucher# | ** |
| File: 001187 | | | | | | | | | 82.39 SS | 1.30 NY 19 | | | 170002 | ☐ |
| Dept: 002220 | | | | | | | | | 19.27 MED | SUI/DI | | | eVoucher | |
| Rate: 16.5000 | | | | | | | | | | 1.67 NY FLI | | | | |
| | | | | | | | | | | 35.90 3301 L1 | | | .00 | |
| BERRY,GERARD | 71.63 | | 8.00 PTO | 1,665.40 | | 186.00 PTO | | | | | | 6.29 N- M MCTTAX | | |
| File: 003549 | | | | | | | | 1,851.40 | 71.25 FIT | 68.83 NY 01 | 1518.86 CK1 CHKCK1 | | Voucher# | ** |
| Dept: 002220 | | | | | | | | | 114.78 SS | 1.30 NY 19 | | | 170003 | ☐ |
| Rate: 23.2500 | | | | | | | | | 26.84 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.33 NY FLI | | | | |
| | | | | | | | | | | 47.21 3301 L2 | | | .00 | |
| BLANDINO,CLARETT | 74.03 | | 7.00 PTO | 1,253.33 | | 118.51 PTO | | | | | | 4.66 N- M MCTTAX | | |
| J | | | | | | | | 1,371.84 | 117.44 FIT | 51.66 NY 01 | 1058.80 CK1 CHKCK1 | | Voucher# | ** |
| File: 009327 | | | | | | | | | 85.06 SS | 1.30 NY 19 | | | 170004 | ☐ |
| Dept: 002220 | | | | | | | | | 19.89 MED | SUI/DI | | | eVoucher | |
| Rate: 16.9300 | | | | | | | | | | 1.73 NY FLI | | | | |
| | | | | | | | | | | 35.96 3301 L1 | | | .00 | |
| BOWERS,ERIC | 80.07 | .12 | | 1,367.60 | 3.07 | | | | | | | 4.18 N- M MCTTAX | | |
| File: 007889 | | | | | | | | 1,370.67 | 79.57 FIT | 40.24 NY 01 | 983.77 CK1 CHKCK1 | 141.52 MED MEDICA | Voucher# | |
| Dept: 002220 | | | | | | | | | 76.21 SS | 1.30 NY 19 | | | 170005 | ☐ |
| Rate: 17.0800 | | | | | | | | | 17.82 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 1.73 NY FLI | | | | |
| | | | | | | | | | | 28.51 3301 L2 | | | .00 | |
| CARTER,TONA | 72.13 | .40 | | 1,118.02 | 9.30 | | | | | | | 3.83 N- M MCTTAX | | |
| File: 002073 | | | | | | | | 1,127.32 | 67.35 FIT | 34.24 NY 01 | 912.28 CK1 CHKCK1 | | Voucher# | |
| Dept: 002220 | | | | | | | | | 69.90 SS | 1.30 NY 19 | | | 170006 | ☐ |
| Rate: 15.5000 | | | | | | | | | 16.34 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 1.42 NY FLI | | | | |
| | | | | | | | | | | 24.49 3301 L1 | | | .00 | |
| CEPHUS,EDDIE | 74.02 | 3.70 | | 1,461.15 | 109.56 | | | | | | | 39.27 N- EM ERMAT | | |
| File: 004881 | | | | | | | | | | | | 5.34 N- M MCTTAX | | |
| Dept: 002220 | | | | | | | | 1,570.71 | 28.01 FIT | 47.43 NY 01 | 875.67 CK1 CHKCK1 | 117.80 K 401K$ | Voucher# | |
| Rate: 19.7400 | | | | | | | | | 97.39 SS | 1.30 NY 19 | 23.67 71 TAXLVY | 18.72 75 SUPPRT | 170007 | ☐ |
| | | | | | | | | | 22.77 MED | SUI/DI | 42.00 76 SUPPRT | 250.25 77 SUPPRT | eVoucher | |
| | | | | | | | | | | 1.98 NY FLI | 10.45 GYM GYM | | | |
| | | | | | | | | | | 33.27 3301 L2 | | | .00 | |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS<br>Reg O/T Hours 3&4 | EARNINGS<br>Reg O/T Earnings 3&4 Earnings 5 | GROSS | STATUTORY DEDUCTIONS<br>Federal State/Local | VOLUNTARY DEDUCTIONS | NET PAY ✔ |
|---|---|---|---|---|---|---|
| **WILLIAMS,TRAONNA**<br>File: 001587<br>Dept: 002803<br>Rate: 16.5000 | 80.00 .05 | 1,320.00 1.24 | 1,321.24 | 111.37 FIT 48.46 NY 01 S1<br>81.92 SS 1.30 NY 19<br>19.15 MED SUI/DI<br>1.66 NY FLI | | NY Check# **<br>[redacted] ☐<br>**1,057.38** |
| **DEPT TOTAL**<br>**002803** | 2,954.53 REG<br>14.29 O/T<br>15.00 HOURS 3<br>.00 HOURS 4 | 54,001.18 REG 361.91 O/T<br>497.50 EARNINGS 3 .00 EARNINGS 4<br>.00 EARNINGS 5 54,860.59 GROSS | | 3,754.51 FIT<br>3,386.78 SS<br>792.02 MED<br>2,004.01 STATE<br>53.30 SUI/DI<br>69.09 FLI | 38,512.83 TOTAL DEDUCTIONS | **41** Pays ☐<br>**6,288.05** |

HOURS ANALYSIS: 15.00 PTO PERSNL

EARNINGS ANALYSIS: 247.50 PTO PERSNL 250.00 REF REF

STATUTORY DED. ANALYSIS: 2,004.01 01 NY
53.30 01 NY SUI/DI 69.09 01 NY FLI

VOLUNTARY DED. ANALYSIS: 4.43 VH VISHIG 32,083.95 CK1 CHKCK1 4,245.62 CK2 CHKCK2 1,889.47 CK3 CHKCK3
97.64 DEN DENTAL 30.00 GYM GYM 28.05 LIF LIFE 119.30 MIH IHBUFM
11.01 STD STD 3.36 VIS VISION

| PERSONNEL | HOURS | EARNINGS | GROSS | STATUTORY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|
| **EMBRY,PAUL**<br>File: 009317<br>Dept: 002804<br>Rate: 16.5000 | 57.68 16.00 PTO | 951.72 264.00 PTO | 1,215.72 | 98.71 FIT 41.91 NY 01 S1<br>75.38 SS 1.30 NY 19<br>17.63 MED SUI/DI<br>1.53 NY FLI | 979.26 CK1 CHKCK1 | Voucher#<br>**260275** ☐<br>eVoucher<br>**.00** |
| **SURDEJ,KRISTA**<br>File: 007784<br>Dept: 002804<br>Rate: 16.5000 | 71.73 | 1,183.55 | 1,183.55 | 115.59 FIT 42.47 NY 01 S1<br>73.38 SS 1.30 NY 19<br>17.16 MED SUI/DI<br>1.49 NY FLI | 932.16 CK1 CHKCK1 | Voucher#<br>**260276** ☐<br>eVoucher<br>**.00** |
| **WALDHAUSER,CORY**<br>File: 006163<br>Dept: 002804<br>Rate: 16.5000 | 79.75 | 1,315.88 | 1,315.88 | 128.73 FIT 49.31 NY 01 S1<br>80.16 SS 1.30 NY 19<br>18.74 MED SUI/DI<br>1.66 NY FLI | 1013.08 CK1 CHKCK1<br>22.90 DEN DENTAL | Voucher# **<br>**260277** ☐<br>eVoucher<br>**.00** |
| **DEPT TOTAL**<br>**002804** | 209.16 REG<br>.00 O/T<br>16.00 HOURS 3<br>.00 HOURS 4 | 3,451.15 REG .00 O/T<br>264.00 EARNINGS 3 .00 EARNINGS 4<br>.00 EARNINGS 5 3,715.15 GROSS | | 343.03 FIT<br>228.92 SS<br>53.53 MED<br>133.69 STATE<br>3.90 SUI/DI<br>4.68 FLI | 2,947.40 TOTAL DEDUCTIONS | **3** Pays ☐<br>**.00** |

HOURS ANALYSIS: 16.00 PTO PERSNL

EARNINGS ANALYSIS: 264.00 PTO PERSNL

STATUTORY DED. ANALYSIS: 133.69 01 NY
3.90 01 NY SUI/DI 4.68 01 NY FLI

VOLUNTARY DED. ANALYSIS: 2,924.50 CK1 CHKCK1 22.90 DEN DENTAL



© 1996Automatic Data Processing, Inc.

| COMPANY TOTAL | HOURS | | EARNINGS | | | | STATUTORY DEDUCTIONS | | VOLUNTARY DEDUCTIONS | | NET PAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMPANY CODE | | | | | | | | | | | | |
| **WKS** | 20,926.60 | REG | 464,759.61 | REG | 12,827.51 | O/T | 37,733.52 | FIT | 358,196.82 | TOTAL DEDUCTIONS | **323** | Pays |
| | 482.85 | O/T | 20,513.67 | EARNINGS 3 | .00 | EARNINGS 4 | 29,081.87 | SS | | | **40,764.34** | |
| | 1,089.83 | HOURS 3 | .00 | EARNINGS 5 | 498,100.79 | GROSS | 6,920.85 | MED | | | | |
| | .00 | HOURS 4 | | | | | 18,449.48 | STATE | | | | |
| | | | | | | | 420.58 | SUI/DI | | | | |
| | | | | | | | 587.56 | FLI | | | | |
| | | | | | | | 5,945.77 | LOCAL | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| HOURS ANALYSIS: | 12.35 | BER BEREVE | 8.00 | BRE | 8.00 | JUR JURY | 1,037.48 | PTO PERSNL |
| | 24.00 | SWG SWING | | | | | | |
| EARNINGS ANALYSIS: | 224.15 | BER BEREVE | 900.00 | BLU | 150.00 | BON BONUS | 136.00 | JUR JURY |
| | 16,171.52 | PTO PERSNL | 2,500.00 | REF REF | 432.00 | SWG SWING | | |
| MEMO ANALYSIS: | 1,161.82 | M MCTTAX | 2,414.33 | EM ERMAT | | | | |
| STATUTORY DED. ANALYSIS: | 18,449.48 | 01 NY | | | | | | |
| | 420.58 | 01 NY SUI/DI | 587.56 | 01 NY FLI | | | | |
| | 5,917.00 | 3301 NEW YORK CIT | 28.77 | 3302 YONKERS | | | | |
| VOLUNTARY DED. ANALYSIS: | 6,380.50 | K 401K$ | 173.01 | R KLOAN | 568.51 | 6 ROTH$ | 60.39 | VH VISHIG |
| | 48.18 | 71 TAXLVY | 228.45 | 73 GARNSH | 1,463.34 | 75 SUPPRT | 42.00 | 76 SUPPRT |
| | 250.25 | 77 SUPPRT | 285,472.50 | CK1 CHKCK1 | 27,981.13 | CK2 CHKCK2 | 8,372.13 | CK3 CHKCK3 |
| | 274.00 | CK4 CHKCK4 | 50.00 | CK5 CHKCK5 | 1,383.44 | DEN DENTAL | 692.69 | GYM GYM |
| | 175.27 | LIF LIFE | 1,000.00 | LNR LOAN | 5,466.78 | MED MEDICA | 1,435.04 | MIH IHBUFM |
| | 160.00 | PAR PARK | 112.46 | STD STD | 4,225.12 | SV1 SAVSV1 | 12,129.10 | TRC COMMUT |
| | 52.53 | VIS VISION | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NET PAYROLL: | 40,764.34 | CHECKS: | 46 | FLAGGED: | 164 | STARTING CHECK NUMBER: | SEE BELOW |
| TOTAL DEPOSITS: | 326,374.88 | VOUCHERS: | 277 | NET CASH PAYS 1,000.00 OR MORE | 194 | ENDING CHECK NUMBER: | SEE BELOW |
| NET VOIDS: | 254.73 | ADJUSTMENTS: | 2 | | | eVOUCHERS: | 275 |
| NET CASH: | 366,884.49 | | | | | PAPER VOUCHERS PRINTED: | 2 |

ADP CHECK NUMBERS: STATE NY JPMORGAN CHASE STARTING CHECK NUMBER: [redacted] ENDING CHECK NUMBER: [redacted]



© 1999, Automatic Data Processing, Inc.

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JOSEY,OLIVIA | 79.98 | .50 | | 1,279.68 | 12.00 | | | | | | | | | |
| File: 007905 | | | | | | | | 1,291.68 | 82.04 FIT | 42.03 NY 01 | 1035.69 CK1 CHKCK1 | 28.94 DEN DENTAL | Voucher# | ** |
| Dept: 002260 | | | | | | | | | 78.08 SS | 1.30 NY 19 | 3.36 VIS VISION | | 410001 | ☐ |
| Rate: 16.0000 | | | | | | | | | 18.26 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 1.98 NY FLI | | | | |
| | | | | | | | | | | | | | .00 | |
| KOWALSKI, | 48.17 | | | 770.72 | | | | | | | | | | |
| SAMANTHA A | | .90 | | | 21.60 | | | | | | | | | |
| File: 007118 | | | | | | | | 792.32 | 67.99 FIT | 20.01 NY 01 | 641.20 CK1 CHKCK1 | | Voucher# | |
| Dept: 002260 | | | | | | | | | 49.12 SS | 1.30 NY 19 | | | 410002 | ☐ |
| Rate: 16.0000 | | | | | | | | | 11.49 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 1.21 NY FLI | | | | |
| | | | | | | | | | | | | | .00 | |
| OBERLANDER, | 80.00 | .60 | 8.00 PTO | 1,280.00 | 14.40 | 128.00 PTO | | | | | | | | |
| KELLY | | | | | | | | 1,422.40 | 67.30 FIT | 48.08 NY 01 | 1112.78 CK1 CHKCK1 | 73.94 DEN DENTAL | Voucher# | ** |
| File: 005221 | | | | | | | | | 83.05 SS | 1.30 NY 19 | 5.50 LIF LIFE | 8.85 VIS VISION | 410003 | ☐ |
| Dept: 002260 | | | | | | | | | 19.42 MED | SUI/DI | | | eVoucher | |
| Rate: 16.0000 | | | | | | | | | | 2.18 NY FLI | | | | |
| | | | | | | | | | | | | | .00 | |
| RICHARDSON, | 88.30 | 1.02 | | 1,501.10 | 26.01 | | | | | | | | | |
| TROSHELL | | | | | | | | 1,527.11 | 134.72 FIT | 70.92 NY 01 S1 | 965.12 CK1 CHKCK1 | 232.50 75 SUPPRT | Voucher# | |
| File: 009666 | | | | | | | | | 94.45 SS | 1.30 NY 19 | 3.67 STD STD | | 410004 | ☐ |
| Dept: 002260 | | | | | | | | | 22.09 MED | SUI/DI | | | eVoucher | |
| Rate: 17.0000 | | | | | | | | | | 2.34 NY FLI | | | | |
| | | | | | | | | | | | | | .00 | |

| DEPT TOTAL 002260 | Hours | | Earnings | | | | Statutory | | Voluntary | | Net Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DEPT TOTAL | 296.45 | REG | 4,831.50 | REG | 74.01 | O/T | 352.05 | FIT | 4,111.55 | TOTAL DEDUCTIONS | 4 Pays ☐ |
| 002260 | 3.02 | O/T | 128.00 | EARNINGS 3 | .00 | EARNINGS 4 | 304.70 | SS | | | .00 |
| | 8.00 | HOURS 3 | .00 | EARNINGS 5 | 5,033.51 | GROSS | 71.26 | MED | | | |
| | .00 | HOURS 4 | | | | | 181.04 | STATE | | | |
| | | | | | | | 5.20 | SUI/DI | | | |
| | | | | | | | 7.71 | FLI | | | |

| | | | | |
|---|---|---|---|---|
| HOURS ANALYSIS: | 8.00 PTO PERSNL | | | |
| EARNINGS ANALYSIS: | 128.00 PTO PERSNL | | | |
| STATUTORY DED. ANALYSIS: | 181.04 01 NY | | | |
| | 5.20 01 NY SUI/DI | 7.71 01 NY FLI | | |
| VOLUNTARY DED. ANALYSIS: | 232.50 75 SUPPRT | 3,754.79 CK1 CHKCK1 | 102.88 DEN DENTAL | 5.50 LIF LIFE |
| | 3.67 STD STD | 12.21 VIS VISION | | |

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PATRONEK,ALISON | 87.45 | | | 1,661.55 | | | | | | | | | | |
| ELIZABETH | | | | | | | | 1,661.55 | 172.29 FIT | 72.08 NY 01 | 1286.24 CK1 CHKCK1 | | Voucher# | ** |
| File: 027079 | | | | | | | | | 103.01 SS | 1.30 NY 19 | | | 410005 | ☐ |
| Dept: 002550 | | | | | | | | | 24.09 MED | SUI/DI | | | eVoucher | |
| Rate: 19.0000 | | | | | | | | | | 2.54 NY FLI | | | | |
| | | | | | | | | | | | | | .00 | |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS<br>Reg O/T Hours 3&4 | EARNINGS<br>Reg O/T Earnings 3&4 Earnings 5 | GROSS | STATUTORY DEDUCTIONS<br>Federal State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|
| **DEPT TOTAL**<br>**002550** | 87.45 REG<br>.00 O/T<br>.00 HOURS 3<br>.00 HOURS 4 | 1,661.55 REG .00 O/T<br>.00 EARNINGS 3 .00 EARNINGS 4<br>.00 EARNINGS 5 1,661.55 GROSS | | 172.29 FIT<br>103.01 SS<br>24.09 MED<br>72.08 STATE<br>1.30 SUI/DI<br>2.54 FLI | 1,286.24 TOTAL DEDUCTIONS | 1 Pays ☐<br>**.00** |

STATUTORY DED. ANALYSIS: 72.08 01 NY
1.30 01 NY SUI/DI 2.54 01 NY FLI

VOLUNTARY DED. ANALYSIS: 1,286.24 CK1 CHKCK1

| PERSONNEL | HOURS | EARNINGS | GROSS | STATUTORY DEDUCTIONS (Federal) | STATUTORY DEDUCTIONS (State/Local) | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **BILSON,ROBERT**<br>File: 007122<br>Dept: 003200<br>Rate: 5083.10 | | 5,083.10 2,000.00 REF | 7,083.10 | 717.27 FIT<br>438.37 SS<br>102.52 MED | 424.50 NY 01<br>1.30 NY 19<br>SUI/DI | 5372.90 CK1 CHKCK1<br>13.57 LIF LIFE<br>12.67 STD STD | Voucher# ** ☐<br>**410006**<br>eVoucher<br>**.00** |
| **DILGARD,BRYAN G**<br>File: 009665<br>Dept: 003200<br>Rate: 4668.03 | 8.00 BRE | 4,668.03 | 4,668.03 | 519.78 FIT<br>288.70 SS<br>67.52 MED | 244.88 NY 01<br>1.30 NY 19<br>SUI/DI | 116.70 N- EM ERMAT<br>15.83 N- M MCTTAX<br>1500.00 CK1 CHKCK1<br>1591.32 CK3 CHKCK3<br>200.00 CK4 CHKCK4<br>233.40 K 401K$<br>9.50 LIF LIFE<br>11.63 STD STD | Voucher# ☐<br>**410007**<br>eVoucher<br>**.00** |
| **DUGGAN,ROBERT**<br>File: 005413<br>Dept: 003200<br>Rate: 9583.33 | 8.00 PTO | 9,583.33 | 9,583.33 | 1,521.95 FIT<br>130.94 MED<br>81.28 MEDST | 622.59 NY 01<br>1.30 NY 19<br>SUI/DI | 239.58 N- EM ERMAT<br>6001.91 CK1 CHKCK1<br>383.33 K 401K$<br>287.50 6 ROTH$<br>73.94 DEN DENTAL<br>466.93 MIH BUFMED<br>11.66 VIS VISION | Voucher# ☐<br>**410008**<br>eVoucher<br>**.00** |
| **HABSCHIED,KAREN**<br>File: 006070<br>Dept: 003200<br>Rate: 5147.40 | | 500.00 BLU<br>5,147.40 2,500.00 REF | 8,147.40 | 1,215.06 FIT<br>505.13 SS<br>118.14 MED | 498.03 NY 01 S1<br>1.30 NY 19<br>SUI/DI | 203.69 N- EM ERMAT<br>5239.42 CK1 CHKCK1<br>570.32 K 401K$ | Voucher# ** ☐<br>**410009**<br>eVoucher<br>**.00** |
| **STUART,SEAN M.**<br>File: 000584<br>Dept: 003200<br>Rate: 2812.50 | 8.00 PTO | 2,812.50 | 2,812.50 | 458.65 FIT<br>145.42 SS<br>34.01 MED | 114.56 NY 01<br>1.30 NY 19<br>SUI/DI<br>4.30 NY FLI | 1573.76 CK1 CHKCK1<br>13.57 LIF LIFE<br>466.93 MIH BUFMED | Voucher# ☐<br>**410010**<br>eVoucher<br>**.00** |
| **WILSON,**<br>**CHRISTOPHER L**<br>File: 007878<br>Dept: 003200<br>Rate: 3284.62 | | 3,031.95 | 3,031.95 | 310.82 FIT<br>187.98 SS<br>43.96 MED | 140.01 NY 01<br>1.30 NY 19<br>SUI/DI<br>4.64 NY FLI | 75.80 N- EM ERMAT<br>2161.67 CK1 CHKCK1<br>151.60 K 401K$<br>29.97 GYM GYM | Voucher# ☐<br>**410011**<br>eVoucher<br>**.00** |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS (Reg / O/T / Hours 3&4) | EARNINGS (Reg / O/T / Earnings 3&4 / Earnings 5) | GROSS | STATUTORY DEDUCTIONS (Federal / State/Local) | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|
| DEPT TOTAL 003200 | .00 REG<br>.00 O/T<br>24.00 HOURS 3<br>.00 HOURS 4 | 30,326.31 REG<br>5,000.00 EARNINGS 3<br>.00 EARNINGS 5 | .00 O/T<br>.00 EARNINGS 4<br>35,326.31 GROSS | 4,743.53 FIT<br>1,565.60 SS<br>497.09 MED<br>81.28 MEDST<br>2,044.57 STATE<br>7.80 SUI/DI<br>8.94 FLI | 26,377.50 TOTAL DEDUCTIONS | 6 Pays<br>.00 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HOURS ANALYSIS: | 8.00 | BRE | | 16.00 | PTO | PERSNL | | | | | |
| EARNINGS ANALYSIS: | 500.00 | BLU | | 4,500.00 | REF | REF | | | | | |
| MEMO ANALYSIS: | 15.83 | M | MCTTAX | 635.77 | EM | ERMAT | | | | | |
| STATUTORY DED. ANALYSIS: | 2,044.57 | 01 NY | | | | | | | | | |
| | 7.80 | 01 NY | SUI/DI | 8.94 | 01 NY | FLI | | | | | |
| VOLUNTARY DED. ANALYSIS: | 1,338.65 | K | 401K$ | 287.50 | 6 | ROTH$ | 21,849.66 | CK1 CHKCK1 | 1,591.32 | CK3 | CHKCK3 |
| | 200.00 | CK4 | CHKCK4 | 73.94 | DEN | DENTAL | 29.97 | GYM GYM | 36.64 | LIF | LIFE |
| | 933.86 | MIH | BUFMED | 24.30 | STD | STD | 11.66 | VIS VISION | | | |

| PERSONNEL | HOURS | EARNINGS | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| PYNE,ANDREW M<br>File: 008453<br>Dept: 003210<br>Rate: 7291.67 | 8.00 PTO | 7,291.67 | 7,291.67 | 1,106.00 FIT<br>104.05 MED | 389.01 NY 01<br>1.30 NY 19 SUI/DI | 182.29 N- EM ERMAT<br>4700.85 CK2 CHKCK2<br>875.00 K 401K$<br>103.80 DEN DENTAL<br>11.66 VIS VISION | Voucher# 410012<br>eVoucher<br>.00 |
| RILEY,MELISSA M<br>File: 009313<br>Dept: 003210<br>Rate: 4759.14 | | 4,759.14<br>1,012.91 BON | 5,772.05 | .00 FIT<br>357.87 SS<br>83.70 MED | 342.64 NY 01<br>1.30 NY 19 SUI/DI | 63.50 N- EM ERMAT<br>4859.55 CK1 CHKCK1<br>126.99 K 401K$ | ** Voucher# 410013<br>eVoucher<br>.00 |
| TAYLOR,SARAH E<br>File: 027627<br>Dept: 003210<br>Rate: 4166.67 | 40.00 PTO | 4,166.67 | 4,166.67 | 643.33 FIT<br>249.56 SS<br>58.37 MED | 217.14 NY 01<br>1.30 NY 19 SUI/DI<br>6.38 NY FLI | 2849.09 CK1 CHKCK1<br>141.50 MIH BUFMED | Voucher# 410014<br>eVoucher<br>.00 |
| TIGHE,JESSICA<br>File: 004015<br>Dept: 003210<br>Rate: 6589.23 | | 6,589.23 SEV | 6,589.23 | 1,300.70 FIT<br>95.54 MED | 418.37 NY 01<br>1.30 NY 19 SUI/DI | 22.40 N- M MCTTAX<br>4773.32 CK1 CHKCK1 | Voucher# 410015<br>eVoucher<br>.00 |

| PERSONNEL | HOURS | EARNINGS | GROSS | STATUTORY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|
| DEPT TOTAL 003210 | .00 REG<br>.00 O/T<br>48.00 HOURS 3<br>.00 HOURS 4 | 16,217.48 REG<br>7,602.14 EARNINGS 3<br>.00 EARNINGS 5 | .00 O/T<br>.00 EARNINGS 4<br>23,819.62 GROSS | 3,050.03 FIT<br>607.43 SS<br>341.66 MED<br>1,367.16 STATE<br>5.20 SUI/DI<br>6.38 FLI | 18,441.76 TOTAL DEDUCTIONS | 4 Pays<br>.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| HOURS ANALYSIS: | 48.00 | PTO | PERSNL | | | |
| EARNINGS ANALYSIS: | 1,012.91 | BON | BONUS | 6,589.23 | SEV | SEVERA |



© 1996Automatic Data Processing, Inc.

| PERSONNEL | | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BAH,FATOUMATA** | | 93.22 | .57 | 8.00 PTO | 1,631.35 | 14.96 | 140.00 PTO | | | | | | | |
| File: | 002071 | | | | | | 200.00 BLU | | | | | 6.75 N- M MCTTAX | | |
| Dept: | 003220 | | | | | | | | 1,986.31 | 191.11 FIT | 92.25 NY 01 | 1546.66 CK1 CHKCK1 | Voucher# | ** |
| Rate: | 17.5000 | | | | | | | | | 123.15 SS | 1.30 NY 19 | | **440019** | ☐ |
| | | | | | | | | | | 28.80 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | | 3.04 NY FLI | | | |
| | | | | | | | | | | | | | **.00** | |
| **BARRY,RYAN M.** | | | | | 2,291.67 | | | | | | | | | |
| File: | 028377 | | | | | | | | 2,291.67 | 268.29 FIT | 121.21 NY 01 | 1722.05 CK1 CHKCK1 | Voucher# | |
| Dept: | 003220 | | | | | | | | | 142.08 SS | 1.30 NY 19 | | **440020** | ☐ |
| Rate: | 2291.67 | | | | | | | | | 33.23 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | | 3.51 NY FLI | | | |
| | | | | | | | | | | | | | **.00** | |
| **BAUGH,CHEVON** | | 83.07 | | 3.00 UNW | 1,412.19 | | 51.00 UNW | | | | | | | |
| File: | 007217 | | | | | | | | 1,463.19 | .00 FIT | 36.85 NY 01 | 1310.73 CK3 CHKCK3 | NY Check# | ** |
| Dept: | 003220 | | | | | | | | | 90.72 SS | 1.30 NY 19 | | [redacted] | ☐ |
| Rate: | 17.0000 | | | | | | | | | 21.22 MED | SUI/DI | | | |
| | | | | | | | | | | | 2.24 NY FLI | | **.13** | |
| **BEAVER,AQUILLE** | | 91.03 | .17 | 2.00 PTO | 1,456.48 | 4.08 | 32.00 PTO | | | | | | | |
| **S.** | | | | 3.00 UNW | | | 48.00 UNW | | | | | | | |
| File: | 027973 | | | | | | | | 1,540.56 | .00 FIT | 61.98 NY 01 | 1357.06 CK1 CHKCK1 | Voucher# | ** |
| Dept: | 003220 | | | | | | | | | 95.52 SS | 1.30 NY 19 | | **440021** | ☐ |
| Rate: | 16.0000 | | | | | | | | | 22.34 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | | 2.36 NY FLI | | | |
| | | | | | | | | | | | | | **.00** | |
| **BELAUNDE JR,JOSE** | | 95.72 | 2.03 | | 1,722.96 | 54.81 | | | | | | 6.04 N- M MCTTAX | | |
| **LUIS** | | | | | | | | | 1,777.77 | 144.25 FIT | 79.30 NY 01 | | NY Check# | ** |
| File: | 025873 | | | | | | | | | 110.22 SS | 1.30 NY 19 | | **19653215** | ☐ |
| Dept: | 003220 | | | | | | | | | 25.78 MED | SUI/DI | | | |
| Rate: | 18.0000 | | | | | | | | | | 2.72 NY FLI | | **1,414.20** | |
| **BELAUNDE,SHIRLEY** | | 87.00 | | | 1,566.00 | | | | | | | 5.32 N- M MCTTAX | | |
| **LUCERO** | | | | | | | | | 1,566.00 | 160.83 FIT | 66.15 NY 01 | | NY Check# | ** |
| File: | 026148 | | | | | | | | | 97.10 SS | 1.30 NY 19 | | **19653216** | ☐ |
| Dept: | 003220 | | | | | | | | | 22.71 MED | SUI/DI | | | |
| Rate: | 18.0000 | | | | | | | | | | 2.40 NY FLI | | **1,215.51** | |
| **BERRY,GERARD** | | 83.87 | 2.28 | 8.00 PTO | 2,215.85 | 90.36 | 211.36 PTO | | | | | 8.56 N- M MCTTAX | | |
| File: | 003549 | | | | | | | | 2,517.57 | 149.03 FIT | 109.72 NY 01 | 1986.21 CK1 CHKCK1 | Voucher# | ** |
| Dept: | 003220 | | | | | | | | | 156.09 SS | 1.30 NY 19 | | **440022** | ☐ |
| Rate: | 26.4200 | | | | | | | | | 36.51 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | | 3.85 NY FLI | | | |
| | | | | | | | | | | | 74.86 3301 L2 | | **.00** | |
| **BOHN,KEN** | | 93.47 | .62 | 3.25 UNW | 1,537.58 | 15.30 | 53.46 UNW | | | | | | | |
| File: | 000732 | | | | | | | | 1,606.34 | 150.68 FIT | 60.90 NY 01 S1 | 1152.75 SV1 SAVSV1 | Voucher# | ** |
| Dept: | 003220 | | | | | | | | | 91.85 SS | 1.30 NY 19 | 124.92 MIH BUFMED | **440023** | ☐ |
| Rate: | 16.4500 | | | | | | | | | 21.48 MED | SUI/DI | | eVoucher | |
| | | | | | | | | | | | 2.46 NY FLI | | | |
| | | | | | | | | | | | | | **.00** | |



© 1996 Automatic Data Processing, Inc.

| PERSONNEL | HOURS Reg | HOURS O/T | Hours 3&4 | EARNINGS Reg | EARNINGS O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | STATUTORY DEDUCTIONS State/Local | VOLUNTARY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY | ✓ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FLORES,JASON** | 80.77 | 1.17 | | 1,671.94 | 36.33 | | | | | | | 42.71 N- EM ERMAT | | |
| File: 009335 | | | | | | | | | | | | 5.81 N- M MCTTAX | | |
| Dept: 003230 | | | | | | | | 1,708.27 | 152.80 FIT | 70.27 NY 01 | 1216.68 CK1 CHKCK1 | 34.17 K 401K$ | Voucher# | ** |
| Rate: 20.7000 | | | | | | | | | 105.92 SS | 1.30 NY 19 | 51.25 6 ROTH$ | | **410229** | ☐ |
| | | | | | | | | | 24.77 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.61 NY FLI | | | | |
| | | | | | | | | | | 48.50 3301 L1 | | | **.00** | |
| **FORPAHL,MICHAEL** | | | | 2,291.66 | | 500.00 BLU | | | | | | 69.79 N- EM ERMAT | | |
| File: 000501 | | | | | | | | 2,791.66 | 331.81 FIT | 128.28 NY 01 S1 | | 1734.37 CK1 CHKCK1 | Voucher# | ** |
| Dept: 003230 | | | | | | | | | 166.44 SS | 1.30 NY 19 | 279.17 K 401K$ | 107.10 MIH BUFMED | **410230** | ☐ |
| Rate: 2291.66 | | | | | | | | | 38.92 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 4.27 NY FLI | | | | |
| | | | | | | | | | | | | | **.00** | |
| **FORREST,ALEXYS B** | 80.02 | .15 | 8.00 PTO | 1,423.56 | 4.00 | 142.32 PTO | | | | | | 5.34 N- M MCTTAX | | |
| File: 003710 | | | | | | | | 1,569.88 | 161.29 FIT | 66.39 NY 01 | 1172.50 CK1 CHKCK1 | | Voucher# | ** |
| Dept: 003230 | | | | | | | | | 97.33 SS | 1.30 NY 19 | | | **410231** | ☐ |
| Rate: 17.7900 | | | | | | | | | 22.76 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.40 NY FLI | | | | |
| | | | | | | | | | | 45.91 3301 L2 | | | **.00** | |
| **FREELAND,KIARA S** | | | | | | 180.00 BON | | | | | | | | |
| File: 029453 | 75.03 | | | 1,238.00 | | | | | | | | | | |
| Dept: 003230 | | | | | | | | 1,418.00 | 38.48 FIT | 44.02 NY 01 | 1223.56 CK1 CHKCK1 | | Voucher# | ** |
| Rate: 16.5000 | | | | | | | | | 87.91 SS | 1.30 NY 19 | | | **410232** | ☐ |
| | | | | | | | | | 20.56 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.17 NY FLI | | | | |
| | | | | | | | | | | | | | **.00** | |
| **FREENEY,TINA** | 87.03 | | 1.00 PTO | 1,182.74 | | 13.59 PTO | | | | | | | | |
| File: 002636 | | | | | | 200.00 BLU | | | | | | | | |
| Dept: 003230 | | | | | | | | 1,396.33 | 115.97 FIT | 51.21 NY 01 S1 | 941.80 CK1 CHKCK1 | 139.63 71 TAXLVY | Voucher# | |
| Rate: 13.5900 | | | | | | | | | 84.76 SS | 1.30 NY 19 | 22.90 DEN DENTAL | 10.50 LIF LIFE | **410233** | ☐ |
| | | | | | | | | | 19.82 MED | SUI/DI | 2.94 STD STD | 3.36 VIS VISION | eVoucher | |
| | | | | | | | | | | 2.14 NY FLI | | | | |
| | | | | | | | | | | | | | **.00** | |
| **FRENCH,ADAM** | | | | | | 115.00 BON | | | | | | | | |
| File: 029644 | 88.22 | .45 | | 1,569.43 | 12.01 | | | | | | | 5.77 N- M MCTTAX | | |
| Dept: 003230 | | | | | | | | 1,696.44 | 176.48 FIT | 74.25 NY 01 | 1312.03 CK1 CHKCK1 | | Voucher# | ** |
| Rate: 17.7900 | | | | | | | | | 105.18 SS | 1.30 NY 19 | | | **410234** | ☐ |
| | | | | | | | | | 24.60 MED | SUI/DI | | | eVoucher | |
| | | | | | | | | | | 2.60 NY FLI | | | | |
| | | | | | | | | | | | | | **.00** | |
| **FRIEDLINE,** | 85.05 | | | 1,318.28 | | | | | | | | | | |
| **COURTNEY LYNN** | | | | | | | | 1,318.28 | 131.10 FIT | 50.77 NY 01 | | | NY Check# | ** |
| File: 021332 | | | | | | | | | 81.73 SS | 1.30 NY 19 | | | [redacted] | ☐ |
| Dept: 003230 | | | | | | | | | 19.11 MED | SUI/DI | | | | |
| Rate: 15.5000 | | | | | | | | | | 2.02 NY FLI | | | **1,032.25** | |



© 1996 Automatic Data Processing, Inc.

| COMPANY TOTAL / COMPANY CODE | HOURS | EARNINGS | STATUTORY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| WKS | 33,386.83 REG<br>391.92 O/T<br>6,901.30 HOURS 3<br>.00 HOURS 4 | 703,659.65 REG 10,718.43 O/T<br>114,379.14 EARNINGS 3 .00 EARNINGS 4<br>.00 EARNINGS 5 828,757.22 GROSS | 72,836.17 FIT<br>48,592.44 SS<br>11,690.09 MED<br>81.27 MEDST<br>35,004.33 STATE<br>560.42 SUI/DI<br>1,162.00 FLI<br>7,696.86 LOCAL | 597,564.69 TOTAL DEDUCTIONS | **493** Pays<br>**53,568.95** |

| | | | | |
|---|---|---|---|---|
| HOURS ANALYSIS: | 53.50 BER BEREVE | 96.00 BRE | 3,440.00 HOL HOL | 8.00 JUR JURY |
| | 39.41 OTL OTLAW | 2,184.78 PTO PERSNL | 536.00 SWG SWING | 543.61 UNW |
| EARNINGS ANALYSIS: | 856.00 BER BEREVE | 7,850.00 BLU | 300.00 BON BONUS | 1,515.84 BRE |
| | 51,920.16 HOL HOL | 1,515.00 INC | 192.00 JUR JURY | 1,040.44 OTL OTLAW |
| | 30,816.75 PTO PERSNL | 1,000.00 REF REF | 50.00 SVB SavBon | 7,938.64 SWG SWING |
| | 9,384.31 UNW | | | |
| MEMO ANALYSIS: | 463,878.94 A HLTHVL | 1,209.68 M MCTTAX | 2,812.01 EM ERMAT | |
| STATUTORY DED. ANALYSIS: | 35,004.33 01 NY | | | |
| | 560.42 01 NY SUI/DI | 1,162.00 01 NY FLI | | |
| | 7,639.77 3301 NEW YORK CIT | 57.09 3302 YONKERS | | |
| VOLUNTARY DED. ANALYSIS: | 7,014.57 K 401K$ | 346.03 R KLOAN | 1,214.11 6 ROTH$ | 175.62 TL TAXLV |
| | 299.26 71 TAXLVY | 50.70 73 GARNSH | 59.54 74 GARNSH | 1,543.08 75 SUPPRT |
| | 150.00 76 SUPPRT | 496,033.39 CK1 CHKCK1 | 48,345.99 CK2 CHKCK2 | 7,287.00 CK3 CHKCK3 |
| | 304.00 CK4 CHKCK4 | 140.00 CK5 CHKCK5 | 2,500.82 DEN DENTAL | 59.04- EXP EXP RE |
| | 815.98 GYM GYM | 209.89 LIF LIFE | 325.00 LNR LOAN | 5,560.89 MED MEDICA |
| | 8,793.76 MIH BUFMED | 118.24 STD STD | 10,758.54 SV1 SAVSV1 | 5,348.00 TRC COMMUT |
| | 229.32 VIS VISION | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NET PAYROLL: | 53,568.95 | CHECKS: | 44 | FLAGGED: | 370 | STARTING CHECK NUMBER: | SEE BELOW |
| TOTAL DEPOSITS: | 562,868.92 | VOUCHERS: | 399 | NET CASH PAYS 1,000.00 OR MORE | 407 | ENDING CHECK NUMBER: | SEE BELOW |
| NET VOIDS: | 536.02 | ADJUSTMENTS: | 51 | | | eVOUCHERS: | 397 |
| NET CASH: | 615,901.85 | | | | | PAPER VOUCHERS PRINTED: | 2 |

ADP CHECK NUMBERS: STATE NY JPMORGAN CHASE STARTING CHECK NUMBER: [redacted] ENDING CHECK NUMBER: [redacted]



© 1999, Automatic Data Processing, Inc.

# INVOICE

ADP, Inc.
PO Box 842875
Boston MA 02284-2875

| | | |
|---|---|---|
| Client Name | : | STRATEGIC CS |
| Client Number | : | 1023197 |
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |
| Invoice Due Date | : | 03/18/2022 |
| Total Due This Invoice | : | $22,879.54 |

**Inquiries**
For Product/Service inquiries, please contact your Client Service Team.

MEGAN HARDY
STRATEGIC CS
711 3RD AVE
FL 6
NEW YORK, NY 10017-4029

## SUMMARY OF CURRENT CHARGES

| NAME | COMPANY CODE | PRODUCT | PROCESSING CHARGES | TAX | TOTAL |
|---|---|---|---|---|---|
| HODYNO & ASSOCIATES PLLC | 0020-10-8BB | ADP Payroll Services | $241.55 | $7.87 | $249.42 |
| DONALD NORRIS ASSOCIATES | 0020-10-8BF | ADP Payroll Services | $221.30 | $7.46 | $228.76 |
| Strategic Client Services | 0020-10-JG0 | ADP Payroll Services | $311.70 | $10.77 | $322.47 |
| Strategic Client Services | 0020-10-LZ6 | ADP Payroll Services | $173.38 | $5.64 | $179.02 |
| Strategic Client Services | 0020-10-LZK | ADP Payroll Services | $248.25 | $8.05 | $256.30 |
| Newport Legal Group | 0020-10-UBD | ADP Payroll Services | $326.60 | $10.66 | $337.26 |
| Spring Legal Group | 0020-10-V66 | ADP Payroll Services | $264.86 | $8.54 | $273.40 |
| Chinn Legal Grouop LLC | 0020-10-WKI | ADP Payroll Services | $266.71 | $9.32 | $276.03 |
| Pioneer Law | 0020-10-WKL | ADP Payroll Services | $322.80 | $3.98 | $326.78 |
| STRATEGIC CS LLC | 0020-10-WKS | ADP Payroll Services | $6,755.63 | $237.08 | $6,992.71 |
| Strategic Consulting | 0020-10-WKT | ADP Payroll Services | $6,672.43 | $228.81 | $6,901.24 |
| Strategic CS | 0020-10-WKV | ADP Payroll Services | $4,275.97 | $136.47 | $4,412.44 |
| Northstar Legal Group | 0020-10-WVC | ADP Payroll Services | $100.22 | $2.80 | $103.02 |
| Strategic CS | 0020-1W-WKV | ADP Workforce Now | $1,956.67 | $64.02 | $2,020.69 |

| | |
|---|---|
| Sub Total Current Charges | $22,138.07 |
| Tax | $741.47 |
| **Total Due This Invoice** | **$22,879.54** |

WE APPRECIATE YOUR BUSINESS!

- Send your payment with the return stub below in the enclosed return envelope.
- Include on your check, the client number and invoice number to ensure accurate payment processing.
- Make your check payable to ADP, Inc. and mail to the address listed below.

**Return Stub**

Mail check payment to:

ADP, Inc.
PO Box 842875
Boston, MA 02284-2875

| | | |
|---|---|---|
| Client Name | : | STRATEGIC CS |
| Client Number | : | 1023197 |
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |
| Invoice Due Date | : | 03/18/2022 |
| Total Due This Invoice | : | $22,879.54 |
| Amount Enclosed | | $ |

004087500102319730311226014774710022879545

Exhibit 08-0261

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-8BB | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for<br>Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - GA Addl State Jurisdiction - IL - NY | **2** | **$8.95 each** | | **$17.90** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for<br>Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | **10** | **$11.30 each** | | **$113.00** | **$4.14** |
| **Processing Charges for<br>Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | **9** | **$11.30 each** | | **$101.70** | **$3.73** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$241.55** |
| | **Tax** | **$7.87** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-8BB** | **$249.42** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-8BF | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for<br>Period Ending Date: 01/31/2022** | | | | | |

| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-8BF | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **State Jurisdiction Fee**<br>1st State No Charge - IL Addl State Jurisdiction - NY | **1** | **$8.95 each** | | **$8.95** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | **9** | **$11.30 each** | | **$101.70** | **$3.73** |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | **9** | **$11.30 each** | | **$101.70** | **$3.73** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$221.30** |
| | **Tax** | **$7.46** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-8BF** | **$228.76** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-JG0 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-JG0 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **State Jurisdiction Fee**<br>1st State No Charge - FL Addl State Jurisdiction - NY | 1 | $8.95 each | | $8.95 | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | 14 | $11.30 each | | $158.20 | $5.80 |
| **Processing Charges for Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | 12 | $11.30 each | | $135.60 | $4.97 |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$311.70** |
| | **Tax** | **$10.77** |
| TOTAL CHARGES FOR COMPANY CODE: | **0020-10-JG0** | **$322.47** |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-LZ6 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |

| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-LZ6 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.55% of the Per Pay Fee is Software | **8** | **$11.07 each** | | **$88.56** | **$3.21** |
| **Courier Delivery** | **1** | | | **$9.20** | |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.55% of the Per Pay Fee is Software | **6** | **$11.07 each** | | **$66.42** | **$2.43** |
| **Courier Delivery** | **1** | | | **$9.20** | |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$173.38** |
| | **Tax** | **$5.64** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-LZ6** | **$179.02** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-LZK | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - GA Addl State Jurisdiction - NY - PA | **2** | **$8.95 each** | | **$17.90** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-LZK | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.55% of the Per Pay Fee is Software | **11** | **$11.07 each** | | **$121.77** | **$4.44** |
| **Processing Charges for<br>Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.55% of the Per Pay Fee is Software | **9** | **$11.07 each** | | **$99.63** | **$3.61** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$248.25** |
| | **Tax** | **$8.05** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-LZK** | **$256.30** |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-UBD | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for<br>Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - FL Addl State Jurisdiction - NY | **1** | **$8.95 each** | | **$8.95** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for<br>Period Ending Date: 02/08/2022** | | | | | |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-UBD | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | **16** | **$10.29 each** | | **$164.64** | **$5.70** |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | **14** | **$10.29 each** | | **$144.06** | **$4.96** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$326.60** |
| | **Tax** | **$10.66** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-UBD** | **$337.26** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-V66 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - GA Addl State Jurisdiction - NY | **1** | **$8.95 each** | | **$8.95** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |

| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-V66 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | **13** | **$10.29 each** | | **$133.77** | **$4.62** |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | **11** | **$10.29 each** | | **$113.19** | **$3.92** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$264.86** |
| | **Tax** | **$8.54** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-V66** | **$273.40** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKI | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |

| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKI | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.34% of the Per Pay Fee is Software | **13** | **$10.74 each** | | **$139.62** | **$5.05** |
| **Processing Charges for<br>Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.34% of the Per Pay Fee is Software | **11** | **$10.74 each** | | **$118.14** | **$4.27** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$266.71** |
| | **Tax** | **$9.32** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WKI** | **$276.03** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKL | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for<br>Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - CO Addl State Jurisdiction - IL - NY - TN | **3** | **$8.95 each** | | **$26.85** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for<br>Period Ending Date: 02/08/2022** | | | | | |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKL | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.61% of the Per Pay Fee is Software | 5 | $10.96 each | | $54.80 | $1.99 |
| **Management Reports for**<br>**Period Ending Date: 02/08/2022** | | | | | |
| **Payroll Expenses And Liab** | 5 | | | $88.70 | |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.61% of the Per Pay Fee is Software | 5 | $10.96 each | | $54.80 | $1.99 |
| **Management Reports for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Payroll Expenses And Liab** | 5 | | | $88.70 | |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$322.80** |
| | **Tax** | **$3.98** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WKL** | **$326.78** |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKS | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - FL Addl State Jurisdiction - MA - NY - OR - TX - WA | 5 | $8.95 each | | $44.75 | |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKS | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Ltss,WA Addl Local Jurisdiction Mctm,NY Nyc ,NY Pfml,WA Pfml,MA | **4** | **$8.95 each** | | **$35.80** | |
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | **311** | **$11.32 each** | | **$3,520.52** | **$128.46** |
| **Management Reports for Period Ending Date: 02/08/2022** | | | | | |
| **Payroll Expenses And Liab** | **311** | | | **$88.70** | |
| **Processing Charges for Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | **263** | **$11.32 each** | | **$2,977.16** | **$108.62** |
| **Management Reports for Period Ending Date: 02/22/2022** | | | | | |
| **Payroll Expenses And Liab** | **263** | | | **$88.70** | |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$6,755.63** |
| | **Tax** | **$237.08** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WKS** | **$6,992.71** |

Exhibit 08-0271

| | |
|---|---|
| Invoice Number : | 601477471 |
| Invoice Date : | 03/11/2022 |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKT | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for<br>Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - AZ Addl State Jurisdiction - CA - CO - FL - GA - IL - MA - MI - NV - NJ - NM - NY - NC - OH - OK - OR - PA - SC - TN - TX - WI | **20** | **$8.95 each** | | **$179.00** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Wcpc,NM Nyc ,NY Pfml,MA Hill,OH Gira,PA | **5** | **$8.95 each** | | **$44.75** | |
| **Processing Charges for<br>Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | **291** | **$11.32 each** | | **$3,294.12** | **$120.19** |
| **Management Reports for<br>Period Ending Date: 02/08/2022** | | | | | |
| **Payroll Expenses And Liab** | **291** | | | **$88.70** | |
| **Processing Charges for<br>Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | **263** | **$11.32 each** | | **$2,977.16** | **$108.62** |
| **Management Reports for<br>Period Ending Date: 02/22/2022** | | | | | |
| **Payroll Expenses And Liab** | **263** | | | **$88.70** | |

**Sub Total Current Charges** **$6,672.43**

Exhibit 08-0272

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

| | | |
|---|---|---|
| | Tax | $228.81 |
| TOTAL CHARGES FOR COMPANY CODE: | 0020-10-WKT | $6,901.24 |

CURRENT CHARGES

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-WKV | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date: 01/31/2022** | | | | | |
| **Online Full Service Direct Deposit (FSDD) - Recall and Reversals** | 1 | $25.00 each | | $25.00 | |
| **State Jurisdiction Fee** 1st State No Charge - CA Addl State Jurisdiction - FL - GA - IL - MA - MI - MN - MO - NE - NJ - NY - NC - OH - OR - PA - SC - TX - UT - VA - WA | 19 | $8.95 each | | $170.05 | |
| **Local Jurisdiction Fee** 1st Lcl No Charge-Metr,OR Addl Local Jurisdiction Ltss,WA Mctm,NY Nyc ,NY Pfml,WA Pfml,MA Sole,PA | 6 | $8.95 each | | $53.70 | |
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>39.35% of the Per Pay Fee is Software | 222 | $10.96 each | $139.45 | $2,572.57 | $88.58 |
| **Processing Charges for Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>37.62% of the Per Pay Fee is Software | 120 | $10.96 each | $139.45 | $1,454.65 | $47.89 |

| | | |
|---|---|---|
| | Sub Total Current Charges | $4,275.97 |
| | Tax | $136.47 |
| TOTAL CHARGES FOR COMPANY CODE: | 0020-10-WKV | $4,412.44 |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

CURRENT CHARGES

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WVC | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - GA Addl State Jurisdiction - NY | **1** | **$8.95 each** | | **$8.95** | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | **1** | **$8.95 each** | | **$8.95** | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | **4** | **$10.29 each** | | **$41.16** | **$1.40** |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | **4** | **$10.29 each** | | **$41.16** | **$1.40** |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$100.22** |
| | **Tax** | **$2.80** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WVC** | **$103.02** |

CURRENT CHARGES

| ADP WORKFORCE NOW<br>COMPANY CODE 0020-1W-WKV | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 02/07/2022** | | | | | |

| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

CURRENT CHARGES

| ADP WORKFORCE NOW<br>COMPANY CODE 0020-1W-WKV | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Human Capital Management (HCM) Suite**<br>Includes:<br>Health and Welfare 3rd Party Carrier Con<br>ADP Data Bridge | 797 | $2.11 each | | $1,681.67 | $39.61 |
| **ADP Marketplace for**<br>**Period Ending Date: 03/23/2022** | | | | | |
| **Orgchart Now For Adp Workforce Now - Orgchart Now Team 750**<br>Salvatore Tirabassi / 119690616 / 23-Sep-2017 | 1 | | | $275.00 | $24.41 |

| | | |
|---|---|---|
| | **Sub Total Current Charges** | **$1,956.67** |
| | **Tax** | **$64.02** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-1W-WKV** | **$2,020.69** |

| | |
|---|---|
| **Total Current Charges** | **$22,138.07** |
| **Tax** | **$741.47** |
| **Total Due This Invoice** | **$22,879.54** |

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

**Overview**

Deepgram will provide the Deepgram Neural Speech Engine to Strategic Financial Solutions. This service will enable Strategic Financial Solutions to send Deepgram audio files and receive the associated keyword search term results and transcription results back from each file sent to Deepgram.

**Scope**

Deepgram will provide access to its "Brain for Business" Deep Search and Transcription products. If Strategic Financial Solutions executes this agreement before 12/31/2018, Deepgram will provide the consulting and professional services free of charge so that Strategic Financial Solutions can consume and display Deepgram's output in their environment. For the fees listed below, Deepgram agrees to process audio files from Strategic Financial Solutions and return keyword search term results and transcription results for each audio file sent to Deepgram.

**Timeline**

Services are available upon January 21, 2019 and shall remain available until January 20, 2020 as long as Strategic Financial Solutions continues to use the Deepgram platform in accordance to the terms of this agreement. After the first 90 days, Strategic Financial Solutions has the option to opt out of this agreement. If Strategic Financial Solutions gives notice to opt out, the agreement will terminate after 60 days of notification being received by Deepgram.

**Other Terms**

This Arrangement will operate under the standard Deepgram Terms of Service (https://www.deepgram.com/business/Business_TOS.pdf), Privacy Policy (https://www.iubenda.com/privacy-policy/88905781), and the Data Processing Agreement (Appendix 1 in this document).

**Fee Structure**

- Strategic Financial Solutions agrees to pay 12 monthly payments of $8,333.33 for up to 700,000 hours of audio processing during the term of this agreement.
- All payments will be billed monthly, starting January 21, 2019, and are due Net 30.

Exhibit 08-0276

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

- Overage beyond 700,000 hours of audio processing during this term will be billed at a rate of $.14 per hour of audio processed. If there is any overage during the term of this agreement, Strategic Financial Solutions will be notified. Overage payments will billed in arrears on the 21th of the month and are due Net 30.

**Acceptance**

**Strategic Financial Solutions Inc.**

Approved by: Sal Tirabassi Date: 12/30/2018

Approver's Name: S Tirabassi Approver's Title: CFO

**Deepgram, Inc.**

Approved by: Chris Dyer Date: 12/30/2018

Approver's Name: Chris Dyer Approver's Title: Head of Sales

Exhibit 08-0277

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

# Appendix 1

DEEPGRAM

## Data Processing Agreement Overview

Deepgram (the Processor) takes the security and privacy of data subjects (consumers) seriously. Deepgram leverages the Standard Contractual Clauses for data transfers outside the EU. Under the EU GDPR, data transfers can only be made to Processors who agree to the following controls and obligations:

- The Processor must have adequate information security in place, taking into account the sensitivity of the data to be received;
- The data received remains the property of the Controller at all times unless ownership is explicitly shared or transferred by a written agreement.
- The Processor must not use sub Processors without advanced notification or consent of the Controller; sub Processors must have equivalent security and privacy controls to those of Processor.
- The Processor shall cooperate with the relevant Data Protection Authorities in the event of an enquiry;
- The Processor must keep all received information confidential;
- The Processor must report data breaches to the Controller without delay;
- The Processor may need to appoint a mandatory Data Protection Officer. The processor must do its own due diligence in this matter and appoint a qualified individual, if appropriate;
- The Processor must keep records of all processing activities;
- The Processor must comply with EU trans-border data transfer rules;
- The Processor must help the Controller to comply with data subjects rights;
- The Processor must assist the Data Controller in managing the consequences of data breaches;
- The Processor must delete or return all personal data at the end of the contract at the choice of the Controller; and
- The Processor must inform the Controller if the processing instructions infringe GDPR. The processor must comply with security and privacy due diligence requirements placed on the Controller for the validation of the above.

If the data transfer is from the Controller to another Controller (Peer transfer), then the Peer must agree to all of the above controls and obligations, in addition to those required for EU GDPR compliance.

**Signed and Agreed (Exporter)**

Name: Sal Tirabassi

Position: CFO

Exhibit 08-0278

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

Company: Strategic Financial

Date: 12/30/2018

**Signed and Agreed (Importer)**

Name: Chris Dyer

Position: Head of Sales

Company: Deepgram

Date: 12/30/2018

Exhibit 08-0279

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

# SCHEDULE 1 – DETAILS OF THE PROCESSING

## Categories of Data Subjects

Customer may submit, and users may submit on behalf of Customer: Personal Data to the Services, the extent of which is determined and controlled by Customer in its sole discretion, and which may include, but is not limited to Personal Data relating to the following categories of data subjects:

- · Prospects, customers, business partners and vendors of Customer and Customer’s customers (who are natural persons)
- · Employees or contact persons of Customer’s prospects, customers, business partners and vendors
- · Employees, agents, advisors, freelancers of Customer (who are natural persons)
- · Customer’s Users authorized by Customer to use the Services

## Categories of Personal Data

Customer may submit Personal Data to the Services, the extent of which is determined and controlled by Customer in its sole discretion, and which may include, but is not limited to the following categories of Personal Data:

- · Customer’s Users authorized by Customer to use the Services
- · First and last name
- · Title
- · Position
- · Employer
- · Contact information (company, email, phone, physical business address)
- · Order data
- · Professional life data
- · Personal life data
- · Connection data
- · Localization data
- · Business requirements

Exhibit 08-0280

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

# SCHEDULE 2 – STANDARD CONTRACTUAL CLAUSES

## Standard Contractual Clauses (processors)

For the purposes of Article 26(2) of Directive 95/46/EC for the transfer of personal data to processors established in third countries which do not ensure an adequate level of data protection.

**Exporting organization:** Strategic Financial

Address: 711 3rd Ave NYC

Telephone: 2128104537

**Importing organization:** Deepgram Inc

Address: 83a Wiese St, San Francisco, CA 94103

Telephone: 9257834624

E-mail: scott@deepgram.c

Each "party"; together "the parties", HAVE AGREED on the following Contractual Clauses (the Clauses) in order to adduce adequate safeguards with respect to the protection of privacy and fundamental rights and freedoms of individuals for the transfer by the data exporter to the data importer of the personal data specified in Appendix 1.

### Clause 1

**Definitions**

For the purposes of the Clauses:

(a) 'personal data', 'special categories of data', 'process/processing', 'controller', 'processor', 'data subject' and 'supervisory authority' shall have the same meaning as in Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data;

(b) 'the data exporter' means the controller who transfers the personal data;

Exhibit 08-0281

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

(c) ‘the data importer’ means the processor who agrees to receive from the data exporter personal data intended for processing on his behalf after the transfer in accordance with his instructions and the terms of the Clauses and who is not subject to a third country’s system ensuring adequate protection within the meaning of Article 25[1] of Directive 95/46/EC;

(d) ‘the subprocessor’ means any processor engaged by the data importer or by any other subprocessor of the data importer who agrees to receive from the data importer or from any other subprocessor of the data importer personal data exclusively intended for processing activities to be carried out on behalf of the data exporter after the transfer in accordance with his instructions, the terms of the Clauses and the terms of the written subcontract;

(e) ‘the applicable data protection law’ means the legislation protecting the fundamental rights and freedoms of individuals and, in particular, their right to privacy with respect to the processing of personal data applicable to a data controller in the Member State in which the data exporter is established;

(f) ‘technical and organizational security measures’ means those measures aimed at protecting personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing.

## Clause 2

**Details of the transfer**

The details of the transfer and in particular the special categories of personal data where applicable are specified in Appendix 1 which forms an integral part of the Clauses.

## Clause 3

1. The data subject can enforce against the data exporter this Clause, Clause 4(b) to (i), Clause 5(a) to (e), and (g) to (j), Clause 6(1) and (2), Clause 7, Clause 8(2), and Clauses 9 to 12 as third-party beneficiary.
2. The data subject can enforce against the data importer this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where the data exporter has factually disappeared or has ceased to exist in law unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law, as a result of which it takes on the rights and obligations of the data exporter, in which case the data subject can enforce them against such entity.
3. The data subject can enforce against the subprocessor this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law as a result of which it takes on the rights and obligations of the

Exhibit 08-0282

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

data exporter, in which case the data subject can enforce them against such entity. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.

4. The parties do not object to a data subject being represented by an association or other body if the data subject so expressly wishes and if permitted by national law.

Clause 4

**Obligations of the data exporter**

The data exporter agrees and warrants:

(a) that the processing, including the transfer itself, of the personal data has been and will continue to be carried out in accordance with the relevant provisions of the applicable data protection law (and, where applicable, has been notified to the relevant authorities of the Member State where the data exporter is established) and does not violate the relevant provisions of that State;

(b) that it has instructed and throughout the duration of the personal data processing services will instruct the data importer to process the personal data transferred only on the data exporter's behalf and in accordance with the applicable data protection law and the Clauses;

(c) that the data importer will provide sufficient guarantees in respect of the technical and organizational security measures specified in Appendix 2 to this contract;

(d) that after assessment of the requirements of the applicable data protection law, the security measures are appropriate to protect personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing, and that these measures ensure a level of security appropriate to the risks presented by the processing and the nature of the data to be protected having regard to the state of the art and the cost of their implementation;

(e) that it will ensure compliance with the security measures;

(f) that, if the transfer involves special categories of data, the data subject has been informed or will be informed before, or as soon as possible after, the transfer that its data could be transmitted to a third country not providing adequate protection within the meaning of Directive 95/46/EC;

(g) to forward any notification received from the data importer or any subprocessor pursuant to Clause 5(b) and Clause 8(3) to the data protection supervisory authority if the data exporter decides to continue the transfer or to lift the suspension;

(h) to make available to the data subjects upon request a copy of the Clauses, with the exception of Appendix 2, and a summary description of the security measures, as well as a copy of any contract for

Exhibit 08-0283

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

subprocessing services which has to be made in accordance with the Clauses, unless the Clauses or the contract contain commercial information, in which case it may remove such commercial information;

(i) that, in the event of subprocessing, the processing activity is carried out in accordance with Clause 11 by a subprocessor providing at least the same level of protection for the personal data and the rights of data subject as the data importer under the Clauses; and

(j) that it will ensure compliance with Clause 4(a) to (i).

## Clause 5

**Obligations of the data importer[2]**

The data importer agrees and warrants:

(a) to process the personal data only on behalf of the data exporter and in compliance with its instructions and the Clauses; if it cannot provide such compliance for whatever reasons, it agrees to inform promptly the data exporter of its inability to comply, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(b) that it has no reason to believe that the legislation applicable to it prevents it from fulfilling the instructions received from the data exporter and its obligations under the contract and that in the event of a change in this legislation which is likely to have a substantial adverse effect on the warranties and obligations provided by the Clauses, it will promptly notify the change to the data exporter as soon as it is aware, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(c) that it has implemented the technical and organizational security measures specified in Appendix 2 before processing the personal data transferred;

(d) that it will promptly notify the data exporter about:

> (i) any legally binding request for disclosure of the personal data by a law enforcement authority unless otherwise prohibited, such as a prohibition under criminal law to preserve the confidentiality of a law enforcement investigation,
>
> (ii) any accidental or unauthorized access, and
>
> (iii) any request received directly from the data subjects without responding to that request, unless it has been otherwise authorized to do so;

Exhibit 08-0284

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

(e) to deal promptly and properly with all inquiries from the data exporter relating to its processing of the personal data subject to the transfer and to abide by the advice of the supervisory authority with regard to the processing of the data transferred;

(f) at the request of the data exporter to submit its data processing facilities for audit of the processing activities covered by the Clauses which shall be carried out by the data exporter or an inspection body composed of independent members and in possession of

(g) the required professional qualifications bound by a duty of confidentiality, selected by the data exporter, where applicable, in agreement with the supervisory authority;

(h) to make available to the data subject upon request a copy of the Clauses, or any existing contract for subprocessing, unless the Clauses or contract contain commercial information, in which case it may remove such commercial information, with the exception of Appendix 2 which shall be replaced by a summary description of the security measures in those cases where the data subject is unable to obtain a copy from the data exporter;

(i) that, in the event of subprocessing, it has previously informed the data exporter and obtained its prior written consent; that the processing services by the subprocessor will be carried out in accordance with Clause 11;

(j) to send promptly a copy of any subprocessor agreement it concludes under the Clauses to the data exporter.

## Clause 6

**Liability**

1. The parties agree that any data subject, who has suffered damage as a result of any breach of the obligations referred to in Clause 3 or in Clause 11 by any party or subprocessor is entitled to receive compensation from the data exporter for the damage suffered.

2. If a data subject is not able to bring a claim for compensation in accordance with paragraph 1 against the data exporter, arising out of a breach by the data importer or his subprocessor of any of their obligations referred to in Clause 3 or in Clause 11, because the data exporter has factually disappeared or ceased to exist in law or has become insolvent, the data importer agrees that the data subject may issue a claim against the data importer as if it were the data exporter, unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law, in which case the data subject can enforce its rights against such entity.

The data importer may not rely on a breach by a subprocessor of its obligations in order to avoid its own liabilities.

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

3. If a data subject is not able to bring a claim against the data exporter or the data importer referred to in paragraphs 1 and 2, arising out of a breach by the subprocessor of any of their obligations referred to in Clause 3 or in Clause 11 because both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, the subprocessor agrees that the data subject may issue a claim against the data subprocessor with regard to its own processing operations under the Clauses as if it were the data exporter or the data importer, unless any successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law, in which case the data subject can enforce its rights against such entity. The liability of the subprocessor shall be limited to its own processing operations under the Clauses.

## Clause 7

**Mediation and jurisdiction**

1. The data importer agrees that if the data subject invokes against it third-party beneficiary rights and/or claims compensation for damages under the Clauses, the data importer will accept the decision of the data subject:

(a) to refer the dispute to mediation, by an independent person or, where applicable, by the supervisory authority;

(b) to refer the dispute to the courts in the Member State in which the data exporter is established.

2. The parties agree that the choice made by the data subject will not prejudice its substantive or procedural rights to seek remedies in accordance with other provisions of national or international law.

The parties agree that the choice made by the data subject will not prejudice its substantive or procedural rights to seek remedies in accordance with other provisions of national or international law.

## Clause 8

**Cooperation with supervisory authorities**

1. The data exporter agrees to deposit a copy of this contract with the supervisory authority if it so requests or if such deposit is required under the applicable data protection law.
2. The parties agree that the supervisory authority has the right to conduct an audit of the data importer, and of any subprocessor, which has the same scope and is subject to the same conditions as would apply to an audit of the data exporter under the applicable data protection law.

Exhibit 08-0286

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

3. The data importer shall promptly inform the data exporter about the existence of legislation applicable to it or any subprocessor preventing the conduct of an audit of the data importer, or any subprocessor, pursuant to paragraph 2. In such a case the data exporter shall be entitled to take the measures foreseen in Clause 5 (b).

## Clause 9

**Governing Law**

The Clauses shall be governed by the law of the Member State in which the data exporter is established.

## Clause 10

**Variation of the contract**

The parties undertake not to vary or modify the Clauses. This does not preclude the parties from adding clauses on business related issues where required as long as they do not contradict the Clause.

## Clause 11

**Subprocessing**

1. The data importer shall not subcontract any of its processing operations performed on behalf of the data exporter under the Clauses without the prior written consent of the data exporter. Where the data importer subcontracts its obligations under the Clauses, with the consent of the data exporter, it shall do so only by way of a written agreement with the subprocessor which imposes the same obligations on the subprocessor as are imposed on the data importer under the Clauses [3]. Where the subprocessor fails to fulfill its data protection obligations under such written agreement the data importer shall remain fully liable to the data exporter for the performance of the subprocessor's obligations under such agreement.
2. The prior written contract between the data importer and the subprocessor shall also provide for a third-party beneficiary clause as laid down in Clause 3 for cases where the data subject is not able to bring the claim for compensation referred to in paragraph 1 of Clause 6 against the data exporter or the data importer because they have factually disappeared or have ceased to exist in law or have become insolvent and no successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.
3. The provisions relating to data protection aspects for subprocessing of the contract referred to in paragraph 1 shall be governed by the law of the Member State in which the data exporter is established.
4. The data exporter shall keep a list of subprocessing agreements concluded under the Clauses and notified by the data importer pursuant to Clause 5(j), which shall be updated at least once a year. The list shall be available to the data exporter's data protection supervisory authority.

Exhibit 08-0287

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

Clause 12

**Obligation after the termination of personal data processing services**

1. The parties agree that on the termination of the provision of data processing services, the data importer and the subprocessor shall, at the choice of the data exporter, return all the personal data transferred and the copies thereof to the data exporter or shall destroy all the personal data and certify to the data exporter that it has done so, unless legislation imposed upon the data importer prevents it from returning or destroying all or part of the personal data transferred. In that case, the data importer warrants that it will guarantee the confidentiality of the personal data transferred and will not actively process the personal data transferred anymore.

2. The data importer and the subprocessor warrant that upon request of the data exporter and/or of the supervisory authority, it will submit its data processing facilities for an audit of the measures referred to in paragraph 1.

**Signed and Agreed (Exporter)**

Name: Sal Tirabassi

Position: CFO

Company: Strategic Financial

Date: 12/30/2018

**Signed and Agreed (Importer)**

Name: Chris Dyer

Position: Head of Sales

Company: Deepgram

Date: 12/30/2018

Exhibit 08-0288

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

# APPENDIX 1 TO THE STANDARD CONTRACTUAL CLAUSES

This Appendix forms part of the Clauses and must be completed and signed by the parties

The Member States may complete or specify, according to their national procedures, any additional necessary information to be contained in this Appendix.

## Data exporter

*The data exporter is (please specify briefly your activities relevant to the transfer):*

Data Exporter is (i) the legal entity that has executed the Standard Contractual Clauses as a Data Exporter and, (ii) all Affiliates (as defined in the Agreement) of Customer established within the European Economic Area (EEA) and Switzerland that have purchased Services on the basis of one or more Order Form(s) or Subscriptions.

## Data importer

*The data importer is (please specify briefly activities relevant to the transfer):*

Deepgram is a speech analytics company that uses end-to-end deep learning techniques to provide its customers with state-of-the-art audio transcription, search capabilities, and business insight.

## Data subjects

*The personal data transferred concern the following categories of data subjects (please specify):*

Data exporter may submit Personal Data to the Services, the extent of which is determined and controlled by the data exporter in its sole discretion, and which may include, but is not limited to Personal Data relating to the following categories of data subjects:

- · Prospects, customers, business partners and vendors of data exporter (who are natural persons)
- · Employees or contact persons of data exporter's prospects, customers, business partners and vendors
- · Employees, agents, advisors, freelancers of data exporter (who are natural persons)
- · Data exporter's Users authorized by data exporter to use the Services

## Categories of data

*The personal data transferred concern the following categories of data (please specify):*

Exhibit 08-0289

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

Data exporter may submit Personal Data to the Services, the extent of which is determined and controlled by the data exporter in its sole discretion, and which may include, but is not limited to the following categories of Personal Data:

- · First and last name
- · Title
- · Position
- · Employer
- · Contact information (company, email, phone, physical business address)
- · Order data
- · Professional life data
- · Personal life data
- · Connection data
- · Localization data

Special categories of data (if appropriate)

*The personal data transferred concern the following special categories of data (please specify):*

Data exporter may submit special categories of data to the Services, the extent of which is determined and controlled by the data exporter in its sole discretion, and which is for the sake of clarity Personal Data with information revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, and the processing of data concerning health or sex life.

Processing operations

*The personal data transferred will be subject to the following basic processing activities (please specify):*

The objective of Processing of Personal Data by data importer is the performance of the Services pursuant to the Agreement.

**Signed and Agreed (Exporter)**

Name: Sal Tirabassi

Position: CFO

Company: Strategic Financial

Date: 12/30/2018

Exhibit 08-0290

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

**Signed and Agreed (Importer)**

Name: Chris Dyer

Position: Head of Sales

Company: Deepgram, Inc.

Date: 12/30/2018

Exhibit 08-0291

DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

# APPENDIX 2 TO THE STANDARD CONTRACTUAL CLAUSES

This Appendix forms part of the Clauses and must be completed and signed by the parties

*Description of the technical and organizational security measures implemented by the data importer in accordance with Clauses 4(d) and 5(c) (or document/legislation attached):*

Data importer will maintain administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Personal Data uploaded to the Services, as described in the Security, Privacy and Architecture Documentation applicable to the specific Services purchased by data exporter, and accessible via www.deepgram.com or otherwise made reasonably available by data importer. Data Importer will not materially decrease the overall security of the Services during a subscription term.

## GDPR Additions:

1. Data will only be processed as long as it is needed for business and legal reasons as envisioned when the data was submitted by the relevant parties.
2. All parties authorized to process the personal data covered by this contract are committed to protect the confidentiality of the data.
3. In the event of a request by a data subject, the processor will reasonably assist the controller to respond to the data subject in an accurate and timely manner.
4. The Service provider will cooperate with the controller in the event of a personal data breach, to GDPR standards.
5. Service provider will cooperate with controller in the event the controller initiates a data protection impact assessment.
6. The processor is not permitted to engage in onward transfers to additional countries outside of the EEA, without the explicit permission of the customer, in advance.

**Signed and Agreed (Exporter)**

Name: Sal Tirabassi

Position: CFO

Company: Strategic Financal

Date: 12/30/2018

**Signed and Agreed (Importer)**

Exhibit 08-0292

DG DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

Name: Chris Dyer

Position: Head of Sales

Company: Deepgram

Date: 12/30/2018

[1] Parties may reproduce definitions and meanings contained in Directive 95/46/EC within this Clause if they considered it better for the contract to stand alone.
[2] Mandatory requirements of the national legislation applicable to the data importer which do not go beyond what is necessary in a democratic society on the basis of one of the interests listed in Article 13(1) of Directive 95/46/EC, that is, if they constitute a necessary measure to safeguard national security, defense, public security, the prevention, investigation, detection and prosecution of criminal offences or of breaches of ethics for the regulated professions, an important economic or financial interest of the State or the protection of the data subject or the rights and freedoms of others, are not in contradiction with the standard contractual clauses. Some examples of such mandatory requirements which do not go beyond what is necessary in a democratic society are, *inter alia*, internationally recognized sanctions, tax-reporting requirements or anti-money-laundering reporting requirements.

[3] This requirement may be satisfied by the subprocessor co-signing the contract entered into between the data exporter and the data importer under this Decision.

---

Exhibit 08-0293

# Signature Certificate

Document Ref.: IM3E4-RLW9Z-XYWGK-WUOWW

Document signed by:

| | | |
|---|---|---|
| | **Sal Tirabassi**<br>Verified E-mail:<br>stirabassi@stratfs.com<br>IP: 67.82.104.172 Date: 30 Dec 2018 12:27:13 UTC | Sal Tirabassi |
| | **Chris Dyer**<br>Verified E-mail:<br>chris@deepgram.com<br>IP: 24.130.249.188 Date: 30 Dec 2018 19:27:39 UTC | Chris Dyer |

Document completed by all parties on:
30 Dec 2018 19:27:39 UTC

Page 1 of 1

Signed with PandaDoc.com

PandaDoc is the document platform that boosts your company's revenue by accelerating the way it transacts.

Deepgram, Inc. Dashboard Business Accounting Contacts JR

Contacts

# Strategic Financial Solutions, Inc.

New

## No invoices awaiting payment

They usually pay in 22 days - View recent invoices report

THEY OWE **0.00**

### Money in over last 12 months




Activity Notes Email Add a note

| ITEM | NUMBER | REFERENCE | DATE | ACTIVITY DATE | DUE | TOTAL |
|---|---|---|---|---|---|---|
| **Invoice paid** | 122119-1 | ervice Period 12/21/2019 - 1/20/2020 | Dec 21, 2019 | Paid Dec 31, 2019 | | 8,333.33 |
| **Invoice paid** | 112119-1 | Service Period: 11/21/2019 12/20/2019 | Nov 21, 2019 | Paid Dec 2, 2019 | | 8,333 33 |
| **Invoice paid** | 102119-1 | ervice Period 10/21/2019 - 11/20/2019 | Oct 21, 2019 | Paid Nov 5, 2019 | | 8,333.33 |
| **Invoice paid** | 092119 1 | Service Period: 9/21/2019 10/20/2019 | ep 21, 2019 | Paid Oct 28, 2019 | | 8,333 33 |
| **Invoice paid** | 082119-1 | ervice Period 8/21/2019 - 9/20/2019 | Aug 21, 2019 | Paid Aug 29, 2019 | | 8,333.33 |
| **Invoice paid** | 072119-1 | Service Period: 7/21/2019 - 8/20/2019 | Jul 21, 2019 | Paid Jul 30, 2019 | | 8,333.33 |
| **Invoice paid** | 062119-1 | Service Period: 6/21/2019 - 7/20/2019 | Jul 1, 2019 | Paid Jul 30, 2019 | | 8,333.33 |
| **Invoice paid** | 052119-1 | Service Period: 5/21/2019 - 6/20/2019 | Jun 1, 2019 | Paid Jun 11, 2019 | | 8,333.33 |
| **Edited** By Austin Bagby — Addi ional contact person's email address changed from no value to chris@deepgram.com. | | | May 29, 2019 | May 29, 2019 | | |
| **Invoice paid** | 040119-6 | Service Period: 4/21/2019 - | May 1, 2019 | Paid May 29, 2019 | | 8,333.33 |

Exhibit 08-0295

| | | | | | |
|---|---|---|---|---|---|
| | | 5/20/2019 | | | |
| **Invoice paid** | 012119-2 | Service Period: 1/21/2019-2/20/2019 | Feb 1, 2019 | Paid Apr 9, 2019 | 8,333.33 |
| **Invoice paid** | 022119-1 | ervice Period 2/21/19 - 3/20/19 | Mar 1, 2019 | Paid Apr 9, 2019 | 8,333.33 |
| **Invoice paid** | 032119 1 | Service Period: 3/21/19 4/20/19 | Apr 1, 2019 | Paid Apr 3, 2019 | 8,333 33 |
| **Edited**<br>By Austin Bagby<br>Addi ional contact person's email address changed from no value to ap@stratfs com | | | Mar 28, 2019 | Mar 28, 2019 | |
| **Invoice sent**<br>By Austin Bagby<br>This invoice has been sent to kbagby@vcpartners com | 012119 2 | | Mar 28, 2019 | Mar 28, 2019 | |
| **Invoice sent**<br>By Austin Bagby<br>This invoice has been sent to kbagby@vcpartners com | 022119 1 | | Mar 28, 2019 | Mar 28, 2019 | |
| **Invoice sent**<br>By Austin Bagby<br>This invoice has been sent to kbagby@vcpartners com | 032119 1 | | Mar 28, 2019 | Mar 28, 2019 | |
| **Note**<br>By Austin Bagby<br>tatement has been sent to stirabassi@stratfs com; chris@deepgram com | | | Mar 28, 2019 | Mar 28, 2019 | |
| **Edited**<br>By Austin Bagby<br>Primary contact person's email address changed from no value to stirabassi@stratfs com | | | Jan 21, 2019 | Jan 21, 2019 | |
| **Created**<br>By Austin Bagby<br>trategic Financial Solutions, Inc has been created | | | Jan 21, 2019 | Jan 21, 2019 | |

**100 items per page** 20 total items