Case 1:24-cv-00040-EAW-MJR   Document 9-32   Filed 01/10/24   Page 1 of 151

## IN THE CIRCUIT COURT FOR THE EIGHTEENTH JUDICIAL CIRCUIT
## IN AND FOR BREVARD COUNTY, FLORIDA

ALLISON JOHNSON,

        Plaintiff,

vs.

STRATEGIC FINANCIAL SOLUTIONS, LLC, a Nevada limited liability company; GLOBAL CLIENT SOLUTIONS, LLC, an Oklahoma limited liability company; GLOBAL HOLDINGS, LLC, an Oklahoma limited liability company; WYOLAW, LLC, a Wyoming limited liability company; VELSA HOLDINGS, LLC, a Nevada limited liability company; SUNSHINE SIGNING CONNECTION, INC a Florida corporation; GUILLERMO GEISSE, a California resident; BRANT HODYNO, an Arizona resident and Florida attorney; SARA FLORES, a Florida resident and attorney; JIMMY GLEASON, a New York resident; and INEZ WILLIAMS, a Florida resident,

        Defendants.

_____/

Case No._____

## COMPLAINT AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

GENERAL ALLEGATIONS ............................................................................................ 3

    A.     Introduction ........................................................................................... 3

    B.     Parties .................................................................................................... 4

    C.     Jurisdiction and Venue .......................................................................... 5

    D.     Background ............................................................................................ 5

        1.     The Telemarketing Sales Rule ................................................... 5

        2.     The Legal Helpers Progeny ........................................................ 8

        3.     The Facade Firms ..................................................................... 10

        4.     The Facade Firms' connections to each other ........................... 13

Filing 99890980          VS          05-2019-CA-057701-XXXX-XX          Exhibit 29-001

5.       The Facade Firms' connections to SFS ............................................. 17

6.       The Facade Firms' connections to the Legal Helpers Progeny ........................... 24

7.       The attorney network scheme posing as a "partnership" ...................................... 26

E.      Facts specific to Plaintiff ................................................................... 28

F.      The wrongful acts of SFS ................................................................... 32

G.      The wrongful acts of GCS ................................................................... 39

H.      The wrongful acts of the Notary Services and the notary ........................................ 42

I.      Wrongful acts of the other Defendants ........................................................ 44

COUNT I:       FRAUD, DECEIT AND INTENTIONAL MISREPRESENTATION .......... 45

COUNT II:      CONSPIRACY TO COMMIT FRAUD ........................................................ 46

COUNT III:     CIVIL RIGHT OF ACTION FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(c) ...................................................................... 47

A.      Conduct of the RICO enterprise's affairs .................................................... 48

B.      SFS Enterprise's pattern of racketeering activity ......................................... 48

C.      The SFS Enterprise's use of the U.S. mail and interstate wire facilities in violation of 18 U.S.C. §§ 1341 & 1343 ...................................................... 49

D.      The SFS Enterprise's interstate transportation of stolen property in violation of 18 U.S.C. § 2314 ...................................................................... 50

E.      The SFS Enterprise's commission of bank fraud under 18 U.S.C. § 1344 ................. 50

F.      Damages caused by the SFS Schemes ...................................................... 51

COUNT IV:     CIVIL RIGHT OF ACTION FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(d) ...................................................................... 52

COUNT V:      CIVIL REMEDY FOR CRIMINAL PRACTICES STATUTE ..................... 54

COUNT VI:     EXPRESS PRIVATE RIGHT OF ACTION FOR VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA) ...................................................................... 54

2

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

COUNT VII:      EXPRESS PRIVATE RIGHT OF ACTION FOR VIOLATION OF CREDIT COUNSELING SERVICES STATUTE.........................................55

COUNT VIII:     PRIVATE RIGHT OF ACTION FOR UNLICENSED PRACTICE OF LAW ............................................................................................ 56

COUNT IX:      LEGAL MALPRACTICE ............................................................. 59

COUNT X:       BREACH OF FIDUCIARY DUTY ............................................. 60

DEMAND FOR JURY TRIAL .......................................................................... 61

## GENERAL ALLEGATIONS

### A.    Introduction

1.    This is a case of fraud, conspiracy to commit fraud, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of Florida's Deceptive and Unfair Trade Practices Act, violation of Florida Credit Counseling Services statute, unlicensed practice of law, legal malpractice, breach of fiduciary duty and unjust enrichment in which the Plaintiff seek damages, attorneys' fees, and injunctive relief.

2.    This case involves a debt settlement scheme involving numerous entities that conspire to defraud Florida consumers.

3.    The scheme begins with bait-and-switch advertising through interstate mailings to initiate contact with the consumers. The mailers promise the consumer a low-interest loan, but upon calling the number on the mailer, they are pressured to instead enter into a debt settlement program.

4.    The enterprise further defrauds consumers by posing as lawyers and law firms and by enlisting real lawyers and law firms to provide their names for the scheme even though they do not—and generally, cannot—perform legal services themselves in Florida where the consumers reside.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                           VS                                         05-2019-CA-057003-XXXX-XX

5. The Defendants adopted a business structure that fraudulently mimics the "attorney model" of debt settlement—a controversial structure in its own right—in order to evade the licensing and fee-limitation requirements for non-attorney settlement companies in various states and to project an aura of trustworthiness to lure unsuspecting consumers.

**B.    Parties**

6. The Plaintiff, **Allison Johnson**, is a Florida resident and domiciliary.

7. Defendant, **Strategic Financial Solutions, LLC ("SFS")**, is a Nevada limited liability company whose managing member is eVestment, Inc., owned by Nasdaq, Inc. SFS does business throughout the United States, including the state of Florida. Its CEO is Ryan Sasson.

8. Defendants, **Global Client Solutions, LLC** and **Global Holdings LLC (**collectively **"GCS")**, are both Oklahoma limited liability companies in the business of creating and managing consumer depository accounts. Global Client Solutions, LLC is the subsidiary, agent, or alter ego of Global Holdings LLC. The two companies share a common board of directors, common officers, common office space, and common ownership, such that they constitute a single business enterprise. Global Client Solutions, LLC is thinly capitalized and is a separate corporate entity to avoid liability to consumers who incur damages because of the actions described in this Complaint. GCS does business throughout the United States, including the state of Florida.

9. Defendant **Wyolaw, LLC ("Wyolaw")**, a Wyoming limited liability company that does business throughout the United States, including the state of Florida;

10. Defendant, **Velsa Holdings, LLC ("Velsa")**, is a Nevada limited liability company which does business as **National Paralegal and Notary ("NPN")** throughout the United States, including the state of Florida.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                                    VS                                    05-2019-CA-057004-XXXX-XX
Exhibit 29-004

11. Defendant, **Sunshine Signing Connection Inc. ("Sunshine")**, is a Florida corporation that does business throughout the United States, including the state of Florida;

12. Defendant, **Guillermo Geisse**, a California resident whose tortious acts caused injury in the state of Florida;

13. Defendant, **Sara Flores**, a Florida resident and attorney whose tortious acts caused injury in the state of Florida; and

14. Defendant, **Inez Williams** is a Florida resident and notary whose tortious acts caused injury in the state of Florida;

## C.    Jurisdiction and Venue

15. This Court has subject matter jurisdiction as a court of general jurisdiction of controversies exceeding the sum of $15,000. § 26.012, Fla. Stat.

16. This Court has personal jurisdiction over the Defendants under § 48.193, Fla. Stat. because they: 1) committed tortious acts within the state and causing injury to property within the state while engaged in service activities; and 2) operated, conducted or engaged in, or carried on a business in this state.

17. This Court has jurisdiction over the federal RICO claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990).

18. Venue is proper in the Eighteenth Judicial Circuit, as Brevard County is the county of residence of the Plaintiff and Defendant, Inez Williams, and, except for Defendant Sara Flores, none of the defendants are residents of Florida.

## D.    Background

### 1.    The Telemarketing Sales Rule

19. The Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108, as amended, and as implemented by the Telemarketing Sales Rule, 16 CFR Part 310 ("TSR")

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

regulates telemarketing defined "a plan, program, or campaign . . . to induce the purchase of …services" involving more than one interstate telephone call.

20.    SFS, its portfolio of Facade Firms, and GCS are engaged in telemarketing under the TSR.

21.    The TSR prohibits misrepresentations, requires disclosure of specific information and prohibits unauthorized billing.

22.    According to the Federal Trade Commission ("FTC"), the agency who promulgated and enforces the TSR, it amended the TSR in October of 2010 "to add specific provisions to curb deceptive and abusive practices associated with debt relief services."[1]

23.    ***The advance fee ban***. Under the TSR, it is illegal to collect any fees for debt settlement services before having settled or otherwise resolved the consumer's debts.

24.    ***The rise of the "Purported Attorney Model."*** Following the issuance of the advance fee ban, many debt settlement companies began using an "attorney model" to evade both the FTC's advance fee ban and state laws that often exempt attorneys from their debt settlement regulations.[2]

25.    "Although the models differ across companies, in each, attorneys and non-attorneys are affiliated, but the attorneys are present only to provide a cover for collecting advance fees. In fact,

---

[1] Debt Relief Services & the Telemarketing Sales Rule: A Guide for Business, Federal Trade Commission, available at: https://www.ftc.gov/system/files/documents/plain-language/bus72-debt-relief-services-telemarketing-sales-rule-guide-business.pdf

[2] Caryn Becker & Ellen Harnick, *Debt Settlement Firms Adopt "Attorney Model" to Evade State & Federal Rules*, Center for Responsible Lending, Issue Brief, November 5, 2013, available at: https://www.responsiblelending.org/other-consumer-loans/debt-settlement/research-analysis/The-Rise-of-the-Attorney-Advance-Fee-Debt-Settlement-Model-FINAL-11-7-13.pdf; Elizabeth Ody, *Debt Firms Play 'Whack-a-Mole to Skirt Fee Ban*, Bloomberg News (Sept. 29, 2011) ("Debt settlement companies that offer to negotiate with creditors on behalf of consumers are switching tactics to skirt rules banning upfront fees by working with lawyers and charging retainers."), available at http://www.bloomberg.com/news/2011-09-30/debtfirms-play-whack-a-mole-to-skirt-fee-ban.html; archived at: https://perma.cc/FYM8-E2DM

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

the attorneys do not engage in any debt settlement activities; only non-attorneys perform any debt settlement work."[3]

26. "In this ['purported attorney model' of debt settlement], consumers are told that an attorney will represent them in negotiations with creditors to dramatically reduce their debts, but attorneys do not provide bona fide legal services."[4]

27. ***The face-to-face meeting exemption***. The TSR generally does not cover telephone transactions where the sale of services is not completed until after a face-to-face presentation by the seller and the consumer is not required to pay or authorize payment until then.

28. According to the FTC the agency who promulgated and enforces the TSR, "[t]he key to the face-to-face exemption is the direct and personal contact between the buyer and seller. The goal of the Rule is to protect consumers against deceptive or abusive practices that can arise when a consumer has no direct contact with an invisible and anonymous seller other than the telephone sales call."[5]

29. ***The use of mobile notaries for face-to-face meetings***. Some debt settlement companies (such as SFS) have resorted to hiring third-party mobile notaries for the "direct and personal contact between buyer and seller." The FTC has disapproved of such use of mobile notaries for

---

[3] Becker and Harnick, *supra*, at 1.

[4] Profiteering from Financial Distress: an Examination of the Debt Settlement Industry, New York City Bar, Civil Court Committee Consumer Affiaris Committee, May 2012, available at: https://www2.nycbar.org/pdf/report/uploads/DebtSettlementWhitePaperCivilCtConsumerAffairs ReportFINAL5.11.12.pdf

[5] Complying with the Telemarketing Sales Rules, Federal Trade Commission

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS                              05-2019-CA-070XXXX-XX

this purpose and specifically "warned businesses not to engage in sham face-to-face presentations."[6]

### 2.    The Legal Helpers Progeny

30.    The now infamous Legal Helpers Debt Resolution, LLC ("Legal Helpers") was a Nevada limited liability company founded by attorneys at the Chicago firm of Macey, Aleman, Hyslip and Searns.  It declared bankruptcy after being sued by the Attorneys General of Illinois, Wisconsin, and North Carolina—and after attorneys Macey and Aleman were suspended from the practice of law.[7]

31.    In those suits and bar grievances (as well as at least one class action),  the attorneys were accused of a fraudulent objective similar to that alleged here—that they "established Legal Helpers for the purpose of partnering with non-lawyer companies in the consumer debt settlement industry in order to take advantage of certain exemptions that new regulations governing the debt settlement industry allowed for attorneys."[8]

32.    The specific elements of Legal Helpers' business structure, the methods, and even the nomenclature (such as "Welcome Packet" and "Class B" partner) to accomplish what at least one court found to be fraudulent misrepresentation and a violation of 11 U.S.C. § 526 is nearly identical to that alleged here as still being used by the Defendants today.[9]

---

[6] FTC Reaches Settlement with Nationwide Debt Relief Provider, Press Release dated March 7, 2017, available at: https://www.ftc.gov/news-events/press-releases/2017/03/ftc-reaches-settlement-nationwide-debt-relief-provider.

[7] *In the Matter of Macey and Aleman*, Case No. 6238869, before the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission.

[8] *Id.*

[9] *See In re Huffman*, 505 B.R. 726 (Bankr. S.D. Miss. 2014).

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                     VS                     05-2019-CA-025708-XXXX-XX

33. SFS Chief Executive Officer, Ryan Sasson, was the Supervisor and Manager of Legal Helpers in 2012.[10]

34. Ryan Sasson was also president of LHDR Help, LLC in 2012.[11]

35. The other entities involved here have multiple connections to partners[12] and attorneys of Legal Helpers (collectively with Ryan Sasson, the "Legal Helpers Progeny"):

    a) Jason Blust (partner);

    b) James Agosto (partner);

    c) Lori Leigh (partner);

    d) Richard Gustafson (partner);

    e) Donald Norris (partner);

    f) Troy Morrison (partner );

    g) Thomas Rogus (attorney);

    h) Jerome Dubin (attorney);

    i) Guillermo Geiss (attorney)

    j) Adela Estopinan (attorney); and

    k) N. Craig Horvath (attorney).

---

[10] Declaration of Ryan Sasson in Support of Opposition to *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction, *JEM Group, Inc. v. Legal Helpers Debt Resolution, LLC*, Case No. 30-2-12-00557471-CU-CO-CJC, Superior Court of the State of California, County of Orange, dated April 3, 2012.

[11] Affidavit of Ryan Sasson, *Song v. LHDR Help, LLC*, Case 1:12-cv-06887-AJN, United States District Court for the Southern District of New York.

[12] *Harrison v. Legal Helpers Debt Resolution, LLC*, Case No. 0:12-cv-02145-ADM-TNL, Exhibit 2 to Defendants' Notice of Removal.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980

### 3. The Facade Firms

36. SFS, together with the help of the Legal Helpers Progeny creates and maintains a collection of entities being held out as law firms, which it calls its brand "portfolio" (collectively, "Facade Firms"). It does so with the complicity of lawyers in various states for the purpose of evading the TSR and state laws governing debt settlement companies and to falsely create an aura of trustworthiness that will attract and entrap consumers.

37. The key difference between the Facade Firm scheme and the Legal Helpers scheme is that the attorney network here is composed of a confusing and overlapping array of Facade Firms created for one or more of the following purposes: 1) obfuscating the identities of the members of the Legal Helpers Progeny and the conspiracy between them and SFS; 2) falsely creating additional "shelf space" for its internet advertising through the fiction of different law firm brands for a single enterprise; 3) creating the illusion of choice for consumers; and 4) "churning" the entities such that those with poor ratings and high customer complaints can be discarded for another entity that has not yet amassed negative reviews.

38. Specifically, the Facade Firms include, but may not be limited to:

a) Anchor Law Firm, PLLC ("Anchor"), an Arkansas professional limited liability company;

b) Bedrock Legal ("Bedrock"), a fictitious name of A. Florio & Associates, PLLC, a Texas limited liability partnership;

c) Boulder Legal Group, LLC ("Boulder"), a Missouri limited liability company;

d) Canyon Legal Group, LLC ("Canyon), an Indiana limited liability company also known as Jon Schulte & Associates, LLC and JMS Industries, LLC;

e) Carolina Legal Services ("Carolina"), a fictitious name of Daniel Rufty Legal, PLLC, a North Carolina professional limited liability company;

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

f)  Chinn Legal Group, LLC ("Chinn"), a Georgia limited liability company which also goes by the name of Halo Group and is managed by Valerie Chinn, also listed as associated with Frontier;

g)  Colonial Law Group, LLC ("Colonial"), a Pennsylvania limited liability company;

h)  The Commonwealth Law Group, PLLC ("Commonwealth"), a fictitious name of Law Offices of Amber Florio, LLC, a Texas limited liability company;

i)  Cornerstone Legal Group, LLC ("Cornerstone"), a Wisconsin limited liability company managed and owned by Jason Blust;

j)  Credit Advocates Law Firm, LLC ("Credit"), a Florida limited liability company, managed by Jason Blust;

k)  Crimson Legal Group, LLC, an Alabama limited liability company;

l)  Dubin Legal Group, LLC, a Missouri limited liability company;

m)  Frontier Consumer Law Group, LLC ("Frontier"), a Michigan limited liability company owned and managed by Lori Leigh;

n)  Gardner Legal, LLC ("Gardner"), a Maryland limited liability company;

o)  Glacier Bay Law ("Glacier"), a fictitious name of Law Officers of Heiser Legal Group, LLC, an Alaska limited liability company;

p)  Great Lakes Law Firm, LLC ("Great Lakes"), a Wisconsin limited liability company;

q)  Harbor Legal Group, LLC ("Harbor"), a Colorado limited liability company;

r)  Heartland Legal Group, LLC ("Heartland"), a Michigan limited liability company;

s)  Henry Legal Group, LLP ("Henry), a Michigan limited liability partnership;

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                              VS                              05-2019-CA-020701-XXXX-XX

t)  Hinds Law, LLC ("Hinds"), an Illinois limited liability company, also doing business as First America Law, LLC and Law Offices of Michelle Hinds, LLC;

u)  Monarch Legal Group ("Monarch"), a fictitious name of Burnette Legal Group, LLC, an Illinois limited liability company;

v)  Phoenix Legal Group, LLC ("Phoenix"), a Michigan limited liability company, managed by Lori Leigh;

w)  Pioneer Law Firm, P.C. ("Pioneer"), a Colorado professional corporation, in which Jason Blust serves as all officers;

x)  Rockwell Legal Group ("Rockwell"), a fictitious name of Hodyno & Associates, PLLC, an Arizona professional limited liability company;

y)  Royal Legal Group, LLC ("Royal"), a Kansas limited liability company;

z)  Stonepoint Legal Group ("Stonepoint"), a fictitious name of Donald Norris Associates, PLLC, a Nevada professional limited liability company;

aa)  The Sands Law Group, LLC ("Sands") a California limited liability company;

bb)  Whitestone Legal Group ("Whitestone"), a fictitious name of The Sands Law Group, LLP ("Sands"), a California limited liability company; and

cc)  Wyolaw, LLC ("Wyolaw"), a Wyoming limited liability company formerly known as Summit Law Firm, LLC.

39.  Former SFS employees confirm the existence of the Facade Firm network and its fraudulent purposes:[13]

---

[13] Direct quotes of former employee reviews at Glass Door.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS

> The debt settlement program is set up through a series of "law firms" (business licenses in MO, CO, and AR but with negotiators, customer service, and counsel all based in NYC) to circumvent FTC regulations in order to collect upfront fees (debt settlement companies are not allowed to collect fees until each debt is settled).

> The company takes absurd fees upfront and uses a series of fake lawfirms owned by the company itself to circumvent the FTC regulation of no fees are allowed to be taken up front.

40.   When the lawyer fronting a Facade Firm has their own practice, it is marketed separately from the Facade Firm itself.  For example, the principal of Boulder, Camron Hoorfar, maintains a different website and phone number for his firm "Law Office of Camron Hoorfar."

**4.    The Facade Firms' connections to each other**

41.   Jason Blust is the President, Secretary, Treasurer, and Director of Pioneer,[14] a 98 percent owner of Cornerstone,[15] a managing member of Credit,[16] a member of Boulder,[17] and the Law Offices of Jason Blust, LLC was or is the employer of Michelle Hinds, the manager of Hinds,[18] and N. Craig Horvath.[19]

42.   Timothy Burnette is the agent, contact person or authorized signor listed in the foreign registrations for most of these Facade Firms. He is a partner of Henry.[20]

---

[14] Corporations Division, Secretary of the Commonwealth of Massachusetts ("Mass Reg.").

[15] Alaska Department of Commerce, Community, and Economic Development, Division of Corporations, Business and Professional Licensing.

[16] Sunbiz.org, Division of Corporations, Florida Department of State.

[17] Better Business Bureau.

[18] Bankruptcy filing, Case No: 10 B 00577, Northern District of Illinois, Eastern Division, June 4, 2014 and current Avvo listing.

[19] LinkedIn profile of N. Craig Horvath.

[20] Vermont Secretary of State Corporations Division ("Vt. Reg.").

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                                    VS

43.    Timothy Burnette is the principal of Burnette Legal Group, LLC, d/b/a Monarch Legal Group, where phone calls from mail drop facilities for the Facade Firms are directed.

44.    John Schulte is a member of Canyon and associated with Dubin, Gardner, Hinds, and Sands. He is listed as a member of Frontier.[21]

45.    N. Craig Horvath is associated with Colonial, Dubin, Gardner, Heartland, Hinds, Phoenix, and Rockwell. He is listed as a member of Frontier.[22]

46.    Another principal for the Anchor registration in New Hampshire is Thomas Rogus whose address matches that of Blust and Burnette.

47.    Attorney Cory Mattocks is associated with Anchor, Dubin, Gardner, Hinds, and Sands. He is listed as a member of Frontier.[23]

48.    Attorneys Taylor Green, Daniel Ruggiero, Stephen Teel and Michael Hartley are all associated with Cornerstone, Harbor, Rockwell, and Phoenix. All four are listed as members of Frontier.[24]

49.    Attorney Taylor Green is also associated with Gardner, Hinds, and Sands.

50.    Attorney William Van Zyverden is a partner of Henry, a partner of Sands and is associated with Dubin, Gardner, Hinds, and Anchor. He is listed as a member of Frontier.[25]

51.    Attorney Camron Hoorfar is a minority owner of Boulder and is associated with Commonwealth. He is listed as a member of Frontier.[26]

---

[21] Michigan Department of Licensing and Regulatory Affairs ("Mich. Reg"); available at: https://www.icelegal.com/files/Frontier%20Certificate%20of%20Correction.pdf.

[22] Mich. Reg.

[23] Mich. Reg.

[24] Mich. Reg.

[25] Mich. Reg.

[26] Mich. Reg.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

52. Attorney Amber Florio is associated with Bedrock, Commonwealth, and Hinds. She is listed as a member of Frontier.[27]

53. Attorney Michael Heiser is associated with Glacier, Dubin and Hinds. He is listed as a member of Frontier.[28]

54. Attorney Brant Hodyno is a minority member of Rockwell and is listed as a member of Frontier.[29]

55. Attorney Phiona Gardner is the manager of Gardner and is listed as a member of Frontier.[30]

56. The websites of the Facade Firms have many conspicuous similarities. Nearly all use an email address of "cs" (customer service) followed by the domain of the site.

57. Many of the websites indicate that Andrew Carroll is the New Jersey attorney responsible for the site. In a telephone conversation, Mr. Carroll indicated his involvement with another SFS Facade Firm, Anchor, was limited to New Jersey clients and that the person who would have information relating to non-New Jersey clients was Jason Blust. He is listed as a member of Frontier.[31]

---

[27] Mich. Reg.

[28] Mich. Reg.

[29] Mich. Reg.

[30] Mich. Reg.

[31] Mich. Reg.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

58. The websites for Anchor, Canyon, Carolina, Harbor, Heartland, Royal, Stonepoint, and Wyolaw all provide redacted settlement letters as proof of their success. The settlement letters bear a striking resemblance:



ANCHOR SETTLEMENT LETTER



CAROLINA SETTLEMENT LETTER



ROYAL SETTLEMENT LETTER

59. Some settlement letters touted as Anchor successes on Anchor's website are actually settlement letters to Harbor, Pioneer, and Boulder, but these names are hidden by redactions.

60. Similarly, many letters claimed by Stonepoint to evidence its successes are actually Harbor, Boulder, Credit, and Pioneer letters disguised by the redactions.

61. Six of the Great Lakes settlement letters are the same as letters that Canyon's site claims are Canyon's successes. This is perhaps less surprising than the fact that these letters—and fourteen others on the Great Lakes website—are dated in 2017, even though Great Lakes was not formed until 2018.

62. Royal's alleged success-story letters are also peppered with Harbor, Pioneer, Credit, and Boulder letters.

63. Canyon's purported success-story letters include a Pioneer letter and a letter that is an exact duplicate of one posted on the Anchor website.

16

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

64. Commonwealth's purported success-story letter includes a Phoenix letter.

65. Although settlement letters have been removed from the Rockwell site, an archived version shows links with file names that follow the same naming conventions as the other sites.

66. Bryan Dilgard, Senior Director of Negotiations at SFS, appears on a settlement letter purportedly procured by Anchor as well as one purportedly procured by Boulder.

67. Colonial letterhead indicates that twenty-two of its attorneys are the same as those on Pioneer's letterhead.

68. The lengthy contracts used by several of these law firms for their clients are nearly identical.

69. Each of the Facade Firms provides their clients with a Client I.D. number which consists of one to three alphabetic characters—which matches one or all of the initials of the Facade Firm name—followed by eight digits in chronological sequence. This suggests that the Client I.D. numbers for the various Facade Firms are assigned by a single entity: SFS.

70. Nearly all have phone numbers on their websites that connect directly to the same SFS call center where employees answer by identifying themselves as being employees of the law firm being dialed.

**5.    The Facade Firms' connections to SFS**

71. The call center to which nearly all Facade Firms calls are directed is SFS.

72. The principal offices of the Facade Firms are maildrops that are not open to the public.

73. Mail sent to a Facade Firm mail drop is overnighted to Excela Technologies, Inc. which scans them and provides the digital data to SFS.

74. No matter what time zone the Facade Firm is in, the phone numbers are answered during Eastern Standard Time hours which apply to SFS operations in New York.

17

75.    The recorded message while on hold with SFS (no matter what Facade Firm is being called) states that "our team has successfully assisted 60,000 <u>clients</u>," and "our team settled more than 100,000 credit card accounts for <u>our clients</u> and reduced over 750 million dollars of consumer debt." (emphasis added).

76.    The SFS website claims that it—not a Facade Firm—successfully resolved more than $1 billion in debt and fund loans for over 100,000 "clients."

77.    Emails from Facade Firms to their clients claim that the individual firm settled close to $500 million in debt, which corresponds with the number touted by SFS in 2017.

78.    The Facade Firm contracts are sent to the clients by SFS.

79.    Newsletters and emails from Facade Firms contain links to a blog and videos by Finance Solutions (financesolutions.org) "an intermediary or referral agent between a debtor and an entity actually providing debt settlement services."

80.    The financesolutions.org website displays the address for "Finance Solutions" which is the same as the address of Finance Solutions, LLC. Ryan Sasson and Daniel Blumkin are the CEO and President respectively of both Finance Solutions, LLC and SFS.

81.    In addition to these law firms, SFS has created at least one related facade entity that is not a law firm: Timberline Financial, LLC ("Timberline"), a Nevada limited liability company. Timberline's address listed in the Nevada registration was the same as SFS's address at the time.

82.    Legal Helpers Progeny, Ryan Sasson, the CEO of SFS, is also the CEO of Timberline.

83.    Timberline has its own settlement letters that are virtually identical to those of the Facade Firms:

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530



| ANCHOR SETTLEMENT LETTER |
|---|



| TIMBERLINE SETTLEMENT LETTER |
|---|

84. The Anchor, Stonepoint, and Royal websites all include letters in their settlement successes that are actually Timberline letters.

85. Timberline associates itself with American Litigation Law Group, PLLC ("Amerilit"), a law firm of attorney, John Cloar.

86. SFS employees are trained that the "law groups" SFS "partners" with are: "Amerilit (Timberline), Anchor, and Royal (Financial Solutions)" as well as Stonepoint.

87. SFS, Pioneer, Timberline (Capital Ventures, Inc), Harbor, and Credit (Advocate Counseling Corp.) have been accused by their own employees of operating as a single enterprise.[32]

88. One former employee of SFS, who characterized her job as an "Attorney Model Negotiation Specialist," lists six Facade Firms as part of that job:

---

[32] *Jones v. Strategic Financial Solutions, L.L.C.*, Case No. 1:16-cv-04617-SN, S.D.N.Y. Complaint, dated June 17, 2016.

Filing 99890980     VS     05-XXXX-CA-205701-XXXX-XX     Exhibit 29-0019



**Attorney Model Negotiation Specialist**

**Strategic Financial Solutions NY**

Oct 2018 – Jun 2019 · 9 mos

Buffalo/Niagara, New York Area

- Negotiates debt on behalf of clients under credit card modification
- Strategizes account order using LeadTrac, SalesForce, GCS and RAM

Anchor Law Firm - October 2018
Rockwell Legal Group - November 2018-December 2019
Pioneer Law Firm January - 2019 - Current
Carolina Legal Services January - 2019 - Current
Great Lakes Law Firm January - 2019 - Current
Bedrock Legal Group February 2019 - Current See less

89.     Kimberly Celic, currently Senior Vice Present of SFS, was the Director of Human

Resources (of related company, Strategic CS, LLC) in 2014:





**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                          VS

90.  During that time, Ms. Celic hired an employee for Pioneer, using Pioneer letterhead:



*Consumers are sold on the SFS settlement program by SFS, not a law firm.*

91.  Consumers are directed to the SFS call center through various channels such as direct mail and Google ads.

92.  An SFS employee who is not an attorney persuades the consumer that debt settlement, rather than bankruptcy, is best legal solution for the consumer's situation.

93.  SFS teaches its employees various techniques for closing the sale with the consumer, such as the "trial close," the "assumptive close," the "alternative decision close," and the "summary close."

Ice Legal, P.A.
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS                    05-2019-CA-057021-XXXX-XX
Exhibit 29-002

94.   An SFS employee exam expects them to know about its "attorney model" in which "we" send letters of representation to some of the client's creditors upon receipt of the first payment.

95.   Once the SFS employee persuades the consumer to enter into the debt relief arrangement, the SFS employee refers the consumer to one of the Facade Firms in an email that states:

> The program is run through [Facade Firm]. Here is their website for reference: [Facade Firm website]. We recommend working with them because of their national presence, large clientele base, and A rating with the BBB

96.   The email may also contain a link to a YouTube video by Finance Solutions that states "…you will be represented by an attorney who oversees a team of skilled strategists and professional debt negotiators…" and that the attorney "can defend you in the unlikely event of litigation."[33]

97.   The YouTube video also states that "[s]ome of the benefits you will receive by working with a national law firm to represent your interest are: licensed experienced attorneys that will oversee the negotiating process. Performance standards to which they must adhere. A face-to-face meeting to begin the relationship and provide you with added confidence that you are in the right hands." (emphasis added).

98.   The SFS employee will then email the consumer the "Enrollment Documents" which consists of the Facade Firm agreement for legal services including debt relief services ("Facade

---

[33] Transcript of video available at: https://www.icelegal.com/files/Captions%20to%20Finance%20Solution%20Video.pdf

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS                    05-2013-CA-205702-XXXX-XX

Firm Contract") and an embedded agreement with GCS for the provisioning of a "Dedicated Account."

99. While the language is nearly identical for all Facade Firm Contracts, the one emailed to the consumer is modified to insert the name of the Facade Firm to which SFS referred that consumer, for example:

BOULDER LEGAL GROUP, LLC

1.6.   Litigation Defense Services

Creditors and/or debt collectors may file lawsuit(s) agai Boulder will provide Litigation Defense Services in the ev Litigation services and limitations include:

Services

1. Boulder will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Boulder will evaluate potential legal defenses to the Plaintiff creditor's suit.

ANCHOR LAW FIRM, PLLC

1.6. Litigation Defense Services

Creditors and/or debt collectors may file lawsui of owed debt(s). Anchor will provide Litigation I a Summons and Complaint. Anchors Litigation s

Services

1. Anchor will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Anchor will evaluate potential legal defenses to the Plaintiff creditor's suit.

SUMMIT LAW FIRM

1.6. Litigation Defense Services

Creditors and/or debt collectors may file lawsuit(s) ag debt(s). Summit will provide Litigation Defense Servi Complaint. The Litigation Defense Services will incluc Summit's Litigation Defense Services and limitations

Services

1. Summit will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Summit will evaluate potential legal defenses to the Plaintiff creditor's suit.

ROCKWELL LEGAL GROUP

1.6. Litigation Defense Services

Creditors and/or debt collectors may file lawsuit(s) ag debt(s). Rockwell will provide Litigation Defense Ser and Complaint. Rockwell's Litigation services and limitatio

Services

1. Rockwell will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Rockwell will evaluate potential legal defenses to the Plaintiff creditor's suit.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                          VS                          05-3041-2023

### 6.    The Facade Firms' connections to the Legal Helpers Progeny

100.    All Facade Firms are associated with SFS, the CEO of which (Ryan Sasson) is the former manager and supervisor of Legal Helpers.

101.    Legal Helpers Progeny, Jason Blust, is the President, Secretary, Treasurer, and Director of Pioneer,[34] a 98% owner of Cornerstone,[35] a managing member of Credit,[36] a member of Boulder,[37] an owner of Lighthouse[38] and Wyolaw, and the Law Offices of Jason Blust, LLC was or is the employer of Michelle Hinds, the manager of Hinds.[39] He was involved in the creation of Royal which violated a permanent injunction prohibiting him and Pioneer from providing debt-resolution services in Kansas.[40]

102.    Timothy Burnette (the agent, contact person or authorized signor listed in the foreign registrations for most of these Facade Firms and partner of Henry) has the same Chicago address as Jason Blust.

103.    Michelle Hinds of the Hinds Facade Firm lists her contact information on Avvo as "Law Office Jason Blust, LLC" at his Chicago, Illinois address.

---

[34] Corporations Division, Secretary of the Commonwealth of Massachusetts ("Mass. Reg.").

[35] Alaska Department of Commerce, Community, and Economic Development, Division of Corporations, Business and Professional Licensing ("Alaska Reg.").

[36] Sunbiz.org, Division of Corporations, Florida Department of State.

[37] Better Business Bureau.

[38] Deposition of Christopher Kesterson, July 14, 2015, p. 150, *Consumer Financial Protection Bureau v. The Mortgage Law Group, LLP*, Case No. 3:14-cv-00513-wmc (W.D. Wis.).

[39] Bankruptcy filing, Case No: 10 B 00577, Northern District of Illinois, Eastern Division, June 4, 2014.

[40] *In re Moore*, Case No. 15-22417, Bankruptcy Court, District of Kansas.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

104. Legal Helpers Progeny, Lori Leigh, is the manager and principal officer of Phoenix,[41] the owner of Frontier,[42] and a registered agent of Hinds.[43]

105. Legal Helpers Progeny, James Agosto, is a partner of Sands[44] and a signor for the Missouri registration of A. Florio & Associates, PLLC associated with Amber Florio of Commonwealth.

106. Legal Helpers Progeny, Adela Estopinan is listed as the Florida attorney on Pioneer letterhead and is the manager of the Law Office of Jason Blust—Florida.[45]  Estopinan is the "registered agent" (believed to be a "Class B partner") in Florida for Dubin,  Hinds, and Gardner.[46] She was the manager of Credit and her firm was its alter ego:



107. Legal Helpers Progeny, N. Craig Horvath, is the manager of Colonial, and is associated with Dubin, Gardner, Heartland, Hinds, and Phoenix.[47]

---

[41] Mass. Reg.; Michigan Department of Licensing and Regulatory Affairs ("Mich. Reg.").

[42] Better Business Bureau.

[43] Mich. Reg.

[44] Vt. Reg.

[45] Sunbiz.org, Division of Corporations, Florida Department of State.

[46] *Id.*

[47] Mass. Reg.; Colorado Secretary of State records.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                              VS                              05-2019-CA-025XXX-XX

108.  Legal Helpers Progeny, Richard Gustafson, is a member, a manager, and a 97% owner of Boulder;[48] and a manager of Canyon.[49]

109.  Legal Helpers Progeny, Donald Norris, is the principal of Donald Norris Associates, PLLC (Stonepoint)[50] and has or had a 97% interest in Royal.[51]

110.  Legal Helpers Progeny, Troy Morrison, is a member of Hinds[52]

111.  Legal Helpers Progeny, Thomas Rogus, is a principal of Anchor[53] and works for Credit.[54]

112.  Legal Helpers Progeny, Jerome Dubin is a principal of Dubin.[55]

113.  Legal Helpers Progeny, Guillermo Geisse is a member manager of Wyolaw and Lighthouse.

114.  One of Royal's alleged success-story letters was settled by D. Giacomo Vilella, P.C. whose principal worked for Macey & Aleman, the architects of Legal Helpers.

**7.    The attorney network scheme posing as a "partnership"**

115.  On information and belief, one or more of the Legal Helpers Progeny attorneys are the majority partners in each of the Facade Firms.

---

[48] Better Business Bureau; Mass. Reg.; Alaska Reg.

[49] Inbiz, Indiana Secretary of State, Department of Workforce Development and the Department of Revenue.

[50] Better Business Bureau.

[51] *In re Moore*, Case No. 15-22417, Bankruptcy Court, District of Kansas.

[52] Mass. Reg.

[53] New Hampshire Secretary of State records.

[54] Deposition of Daniel Goldsmith Ruggiero, July 8, 2015, p. 17, *Consumer Financial Protection Bureau v. The Mortgage Law Group, LLP*, Case No. 3:14-cv-00513-wmc (W.D. Wis.)

[55] Bankruptcy Filing, Western District of Missouri, Case 10-62666-abf7.

Ice Legal, P.A.
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

116. The attorneys recruited to create the Facade Firms are minority members of the Facade Firm. Although the Facade Firms are set up as LLCs, they are "fictitious names" under state bar rules because the name of the firm does not contain the name of an attorney. In states where such names are not permitted, the minority member uses the name of his own firm.

117. On information and belief these minority members are responsible, either under contract or SFS protocol, for making a "welcome call" to a newly signed client, although this rarely takes place.

118. Other attorneys are recruited for the purpose of making it appear that the Facade Firm is multi-jurisdictional. Such attorneys are recruited through advertisements such as posting on Craigslist and are referred to as "Class B" partners.[56]

119. Although the Class B partners serve as the Facade Firm's purported licensed attorney in that state, they do not oversee or manage any negotiations or other legal work for any clients in their state.

120. The Class B partners do not know the identity of the Facade Firm clients unless and until they are called on to appear in court for the client.

121. The Class B partners also often serve as the registered agent in their state for the other Facade Firms.

122. The network is not a bona fide "partnership" in that it lacks any indicia of a partnership (such as the sharing of ownership, profit, control) or a single-firm operation (such as conflict checking).

---

[56] *In re Moore*, Case No. 15-22417, Bankruptcy Court, District of Kansas; conversations with Defendant Brandt Hodyno, a minority partner of Rockwell and Defendant Sara Flores (according to Hodyno, a partner of Rockwell).

27

**E.   Facts specific to Plaintiff**

123.   The experiences of Plaintiff are illustrative of SFS's use of the Facade Firms to recruit consumers for its fraudulent and unlawful debt settlement services.

124.   The SFS contract states that the "Law Firm Contact" is Jimmy Gleason:

> *Law Firm Contact:*
> Jimmy Gleason

125.   In reality, Jimmy (James) Gleason is a Financial Sales Consultant with SFS in New York with an email address of jgleason@financesolutions.org:



126.   Gleason was the SFS employee in New York who persuaded the Plaintiff to sign the "legal services" contract.

127.   Based on information and belief, Gleason arranged the "face-to-face" meeting with the mobile notary through Velsa or Sunshine.

128.   The mobile notary was Inez Williams.

129.   The meeting took place January 17, 2019 at Plaintiff's home.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                                    VS                            05-2019-CA-XXXXXX-XX
Exhibit 29-0028

130. In addition to notarizing their signatures on the Power of Attorney, the mobile notary also signed an "Affidavit of Compliance" described above as a "Representative on behalf of Summit."

I affirm the above statements are true and accurate.

Executed on this Date: 1/17/2019

Representative on behalf of Summit:

Name: Inez Williams
Signature: Inez Williams

131. The notary has no direct relationship with the Facade Firm, Wyolaw (Summit).

132. The Facade Firm (Summit) Contract, by its terms, purports to be "a legally binding agreement confirming that you ('Client') and [Facade Firm] wish to form and Attorney/Client relationship."

133. Expressly incorporated and ensconced within the Facade Firm agreement was a separate agreement with GCS, the Dedicated Account Agreement and Application ("GCS Agreement"), for the establishment and maintenance of a "Dedicated Account" for Plaintiff.

134. Plaintiffs agreed to the contract with the Facade Firm specifically because they thought they were hiring an attorney.

135. The Facade Firm Contract, by its terms, purports to be "a legally binding agreement confirming that you ('Client') and [Facade Firm] wish to form and Attorney/Client relationship."

Ice Legal, P.A.
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

136. Because the Plaintiff never received a copy executed by Summit, the agreement never took effect:

> **1.7. Conditions of this Agreement's Effectiveness**
>
> a. This Agreement does not take effect, and Summit has no obligation to provide any services, until both Client and Summit have executed a copy of this Agreement and such copy is delivered to both Parties.

137. The Plaintiff never received a copy of the Facade Firm Contract executed by anyone on behalf of the Facade Firm.

138. The Facade Firm Contract includes a Power of Attorney that purports to appoint Facade Firm as the Plaintiff's "attorney-at-law" [sic] to represent the Plaintiff in, among other things, any litigation, that includes "attendance at required court hearings, if applicable."

139. Under the title "Litigation Defenses Services" in the Facade Firm Contract, the Plaintiff was lured by promises suggesting she was dealing with a real law firm with Florida licensed attorneys who would:

    a) review and analyze any summons, complaint, petition, application, or other pleading;

    b) "[e]ngage with the Plaintiff or its hired legal counsel on Client's behalf to negotiate a resolution of the litigation;"

    c) "determine that a valid defense exists to the law suit or that the suit is defective in some way favorable to Client;" and

    d) "prepare and file responsive pleadings on the Client's behalf, appear at subsequent court proceedings, and continue defense through various stages of litigation, including trial…" but only "if prudent" and only if the "assigned attorney determines that the Client is likely to gain a favorable result;"

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980          VS          Exhibit 29-0030 XXXX-XX

***Mail to the Facade Firms is automatically forwarded to New York, then scanned and delivered electronically to SFS.***

140.  Mail addressed to the Wyolaw's address of 5830 E. 2nd Street, Casper, WY 82609 arrives at Executive Suites of Casper, a partner of Davinci Virtual Office Solutions.

141.  According to Mindy, the office manager of Executive Suites of Casper, the mail is forwarded once a week to Excela Technologies, Inc. at 30 Wall St., Binghamton, New York.

142.  No attorney retrieves or reviews the mail before Executive Suites sends it to Excela in New York.

143.  Excela scans the mail, as well as mail from other firms associated with SFS, and delivers it electronically to SFS.

### The GCS agreement within an agreement.

144.  Ensconced within the Facade Firm agreement was a separate agreement with GCS, the Dedicated Account Agreement and Application ("GCS Agreement"), which establishes and maintains a "Dedicated Account" for the Plaintiff.

145.  After the Plaintiff enrolled in the debt-relief program, SFS/Facade Firm instructed the Plaintiff to stop making payments towards their unsecured debts and instead to make monthly payments to GCS for deposit into her Dedicated Account.

146.  These monthly payments were, according to the contract, to cover four things: 1) Contractual attorneys' fees SFS/Facade Firm; 2) GCS's "banking fee" for account-maintenance services; 3) "service costs" to SFS/Facade Firm; and 4) the Plaintiff's settlement reserves, which are to be set aside for future settlements of the Plaintiff's debts, as negotiated by SFS/Facade Firm.

147.  GCS conducted ACH (automated clearinghouse) transactions transferring money into and/or from the Plaintiff's account.

31
**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

148.    Contrary to federal law, GCS transmitted unlawful fees to itself and to SFS/Facade Firm before any settlement had been made.

149.    As is typically the case,[57] the Plaintiff's monthly payments were consumed by the costs of the debt management programs during the first several months of the program and were substantially consumed by such fees throughout the remainder of her participation in the program.

### Creditor Lawsuit

150.    On August 2, 2019, the Plaintiff was sued by Wells Fargo Bank, N.A., one of the creditors in the SFS/Facade Firm program.[58]

151.    Although the Plaintiff promptly notified SFS/Facade Firm of the suit, no attorney appeared in the case.

## F.    The wrongful acts of SFS

### 1.    Posing as various law firms to evade federal and state laws

152.    SFS holds itself out to consumers that it is a law firm or affiliated or associated with a law firm where the law firm is merely a syndicate of on-call attorneys created and managed by SFS.

153.    The Facade Firm Contracts contain the name of the SFS employee who closed the agreement with the consumer and refer to the SFS employee as the "Law Firm Contact."

154.    SFS misrepresents in the SFS/Facade Firm Contract and in the Facade Firm advertising and that an attorney will be overseeing the debt settlement process and appearing in any litigation filed against the purchaser of its services.

---

[57] *See, In re: Gerald: Lentz v. Global Client Solutions, LLC, et al.*, Case No. 17-51629-KMS, S.D. Miss., Complaint.

[58] *Wells Fargo Bank, N.A. v. Allison G. Johnson*, Case No. 052019CC040421XXXXXX (Brevard County).

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS                    05 2019 CC 040421XXXX-XX

155.  After the client signs the Facade Firm Contract, the consumer typically receives a letter on the letterhead of the Facade Firm enclosing a "Welcome Packet."  The phone number on the letter is answered by SFS.

156.  The Facade Firm Welcome Packet states that, when a client receives a summons, the Facade Firm "will work closely with you to guide you through the process. … We will handle it for you."

157.  Often, when a consumer is sued by a creditor enrolled with SFS, no attorney appears to defend the case.

158.  The Facade Firm Welcome Packet prepared by SFS also advises the client to breach their contracts with creditors (discontinue paying them) because it "would harm our argument that you are unable to pay what is owed and damages our ability to negotiate the best resolution on your account."

159.  When questioned, SFS attempts to obfuscate the fact that it is not the law firm that the consumer thinks he or she retained.

160.  For example, in May of 2019, when new counsel for a former Anchor client sought to contact Anchor, Lauren Montanile returned the call and held herself out as an attorney with that firm and represented that her paychecks came from that firm.  When challenged as to why her address matched that of SFS's New York office, she asserted that SFS had offices next door to Anchor, even though that firm is, according to the firm's website and contract, located in Arkansas.

161.  In correspondence with a Pennsylvania consumer, Lauren Montanile held herself out as a attorney with another Facade Firm, Rockwell, which is located in Arizona according to its website and its contracts:[59]

---

[59] Full email available at: https://www.icelegal.com/files/Lauren%20Montanile%20Email.pdf.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                         VS                              05 2019 CA 057033 XXXX XX



162. In that correspondence she asserted that "Our NY office answers the phone as 'Rockwell' as our client services department here assists with non-legal support." She also states that "I personally do have a Rockwell email address that I have included in this email. However, I prefer using the inhouse email for ease of use." The email address that she used for other correspondence was lmontanile@inhouseattorneyteam.com.

163. On LinkedIn, Lauren Montanile has held herself out as an in-house attorney with SFS:



164. In May of 2019, Ms. Montanile changed her LinkedIn profile to reflect her promotion to Senior Attorney and to more clearly state that—in contravention of the ethics rules of every

34

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

relevant state—she provides legal services to clients of her non-attorney employer, specifically "defending [clients] who have been sued for failing to pay their creditors":





**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                                   VS                                   05-2019-CA-057035-XXXX-XX
                                                                                       Exhibit 29-0035

165. According to the New York Unified Court System website, Ms. Montanile has reported to the New York courts that she works for Strategic Financial Solutions—not Anchor or Rockwell (or Boulder):[60]

```
Attorney Detail
                              as of 11/10/2019

    Registration Number:        5390414

                                LAUREN ASHLEY MONTANILE
                                STRATEGIC FINANCIAL SOLUTIONS
                                711 3RD AVE FL 6
                                NEW YORK, NY 10017-4029
                                United States
                                (New York County)
```

166. SFS advertised for a "Junior Attorney" to fill an in-house litigation team position for "helping clients that have received a summons from creditors."[61] Notably, a New York Bar license is a requisite for the position, but licenses in multiple states "is a plus, particularly any of the following states: Florida, California, Texas, Maryland, Minnesota, Pennsylvania, Georgia, Virginia, Ohio, and New Jersey."

167. Aside from practicing law as an entity that is not a law firm through its own in-house attorneys (who are often not even licensed in the states where their clients' lawsuits are pending), SFS is providing legal advice through non-attorneys.

168. For example, one SFS posting seeks a non-attorney whose job would include liaising with "Clients, Attorney Network and In-House Litigation Negotiation Team" and "educating the

---

[60] Available at: http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=z4hRt1ccv AGIk9je3_PLUS_ChOg%3D%3D

[61] Posting for "Junior Attorney (Buffalo, NY)" at: https://careers-stratfs.icims.com/jobs/1115/junior-attorney-%28buffalo%2c--ny%29/job?in_iframe=1.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                          VS

client on the legal and negotiation process…. This includes providing initial lit[igation] strategy [phone] call upon receipt of summons and complaint…"[62]

169.  One current employee, a Financial Consultant at Finance Solutions, describes his job duties there as "[r]eview debt relief options with clients and advise optimal solution," as well as "[d]etermine best course of action to alleviate unsecured debt i.e. consolidation loan, debt management, debt settlement, bankruptcy":



**Credit Analyst Consultant**
Finance Solutions
May 2016 – Present · 3 yrs 2 mos
Greater New York City Area

-Create tailored debt relief plans to suit client-specific needs by performing in-depth personal financial analysis.
-Review debt relief options with clients and advise optimal solution.
-Determine best course of action to alleviate unsecured debt i.e. consolidation loan, debt management, debt settlement, bankruptcy.

170.  SFS attempts to have the consumer confer upon it the status of "attorney-at-law" by way of a Power of Attorney.

171.  Specifically, the Facade Firm Contract includes a Power of Attorney that purports to appoint the SFS Facade Firm as the client's "attorney-at-law" [sic] to represent the client in, among other things, any litigation, that includes "attendance at required court hearings, if applicable."

2.  **The sham face-to-face contract signings using mobile notaries**

172.  An SFS employee, called a "New Client Enrollment Representative" makes a "compliance call" to the consumer.

---

[62] Posting for "Client Services-Legal Team" at: https://careers-stratfs.icims.com/jobs/1016/client-services--legal-team/job?in_iframe=1.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS                    05-2018-CA-057037XXXX-XX
Exhibit 29-0037

173. SFS trains these employees to suggest that the consumer will be meeting with a paralegal of the law firm. Specifically, they are trained to say "Do you understand you are under no obligation to become a client of the law firm and pay any fees until you have had an in-person meeting with a paralegal…" or words to that effect.

174. SFS, through the individual Facade Firms, contracts with Velsa (d/b/a NPN) or Sunshine to send a mobile notary to pose as a "Representative, Member, Partner, Employee or Independent Contractor" of the Facade Firm for the purpose of meeting with the consumer and obtaining the consumer's signature on the Facade Firm Contract.

175. The mobile notary will typically meet the consumer at their home, place of business or local restaurant to make a presentation which includes a "Face to Face Script"[63] and a "In-Person Client Presentation."[64]

176. These presentations do not cover all the contractual terms and, under instructions from SFS, the paper versions of the presentations are shredded by the mobile notary after the signing.

177. The mobile notary also signs an "Affidavit of Compliance" as a "Representative on behalf of [the Facade Firm]" although this contravenes the standards governing notaries.[65]

178. The Affidavit self-servingly declares that the notary service has complied with any and all local, state or federal laws or regulations "including, but not limited, to the Telemarketing and

---

[63] The Wyolaw version (partial) is available at: https://www.icelegal.com/files/Wyolaw%20Partial%20Script.pdf

[64] The Wyolaw version is available at: https://www.icelegal.com/files/Wyolaw%20Powerpoint%20Presentation.pdf

[65] Comment, § 5-5 Disqualifications, The Model Notary Act, National Notary Association, January 1, 2010 ("Model Notary Act"), p 32. ("Being named in the document impugns the notary's disinterest in the transaction and casts in doubt whether he or she impartially can meet the obligations imposed by law.)

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-08 and the Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310; 75 Fed. Reg. 48458, 48522."

179. The Affidavit also states that the mobile notary advised the consumer that "the attorney or paralegal who conducted the initial meeting with the Client limits their scope of representation or presentation to that initial meeting and review of the Client's file."

180. The consumer typically signs the contract believing that the mobile notary was an attorney or at least a paralegal.

181. The consumer does not receive a copy of the contract signed by anyone at SFS or the Facade Firm.

182. Accordingly SFS has defrauded the Plaintiff out of the protections afforded her by federal and state laws, including but not limited to the TSR.

## G.    The wrongful acts of GCS

### GCS's violation of the TSR—facilitating and assisting in the SFS violation of the TSR.

183. Ensconced within the Facade Firm agreement is a separate agreement with GCS, the Dedicated Account Agreement and Application ("GCS Contract"), which establishes and maintains a "Dedicated Account" for the Plaintiff.

184. After the consumer enrolls in the debt-relief program, SFS instructs the consumer to stop making payments towards his or her unsecured debts and instead to make monthly payments to GCS for deposit into his or her Dedicated Account.

185. Contrary to federal law, GCS transmits unlawful fees to itself and to SFS and/or the Facade Firm before any settlement had been made.

186. At the time GCS transmits these fees, it knows, based on its own account records, that it has not yet transmitted any funds to a creditor. GCS thus knows that it is transmitting fees to its

Ice Legal, P.A.
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

co-conspirators (SFS and the Facade Firms) even though no debts have been settled and that its co-conspirators are not entitled to an advance fee.

187. Based on information and belief, GCS has received hundreds of complaints from or on behalf of consumers concerning fees paid in connection with debt-relief services. Despite these complaints, GCS continued to transmit unlawful advance fees to debt-relief service providers, including SFS and/or the Facade Firm.

188. GCS has previously agreed to a Stipulated Final Judgment and Consent Order ("Consent Order") in settlement of claims brought against it by the Consumer Financial Protection Bureau for violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108, as amended, and as implemented by the Telemarketing Sales Rule, 16 CFR Part 310 ("TSR").[66]

189. The Consent Order enjoined GCS from providing substantial assistance to debt relief service providers such as SFS, including by providing account maintenance services or payment processing, when GCS knows or consciously avoids knowing that the provider is requesting or receiving unlawful advance fees or is engaged in any other act or practice that violates the TSR.

190. The Consent Order requires GCS to screen prospective debt relief service providers such as SFS, and screen and monitor current debt relief service providers by, among other things, obtaining from each, a list of all trade names and fictitious names and phone numbers, marketing materials, and information about who has ownership interests in the provider.

191. The Consent Order requires GCS to obtain the names of attorneys claiming to provide debt relief services and the states in which they are licensed to practice.

---

[66] *Consumer Financial Protection Bureau v. Global Client Solutions, LLC*, Case No. 2:14-cv-06643-DDP-JPR, C.D. Cal., Stipulated Final Judgment and Consent Order, dated August 27, 2014.

40

192. Where the debt service provider is claiming exemption for the TSR due to face-to-face meetings, the Consent Order requires GCS to obtain a detailed description of how the provider conducts the meetings.

193. The Consent Order requires GCS to create, for three years from the Effective Date of August 27, 2014, records necessary to demonstrate compliance with the Consent Order and to retain then for five years.

194. As a result, GCS knew or should have known of the SFS scheme using multiple Facade Firms, the violations of the TSR by the other Defendants, including the mobile notary artifice used to falsely claim compliance with the TSR.

195. GCS knew and assisted SFS in collecting illegal fees from the GCS Dedicate Account before settlements had occurred in violation of the TSR regarding debt settlement.

196. The amended TSR also prohibits the making of false or unsubstantiated claims about the services being provided.

197. GCS knew or should have known that SFS, through its Facade Firms, was making false or unsubstantiated claims about its services and yet continued to provide them the financial services needed to continue bilking consumers out of millions of dollars.

198. It is a violation of the TSR to substantially assist a seller or telemarketer while knowing, or consciously avoiding knowing, that the seller or telemarketer is violating the TSR.

199. GCS, therefore, violated the TSR by assisting and facilitating the TSR violations of SFS and its portfolio of firms.

200. The Plaintiff was harmed as a direct result of GCS's participation in the fraudulent SFS scheme to evade the purpose of the TSR—to curb deceptive and abusive practices associated with debt relief providers.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                                    VS

201. By assisting SFS in defrauding the Plaintiff from the protections of state and federal laws, including but not limited to the TSR, GCS is complicit in that fraud.

## H.    The wrongful acts of the Notary Services and the notary

### 1.    The Notary Services' knowledge and participation in the sham face-to-face meetings.

202. Sunshine markets "Debt Consolidation Services" "to sign off on your face to face agreement[, n]ot just to comply with state or local laws, but to protect the company and the validity of the agreement."[67]

203. Velsa also markets what it calls "Debt Settlement Signing Services" to provide "compliant Face-To-Face meetings."[68]

204. Velsa actually boasts "high client enrollment percentages" because it has "trained representatives" many of whom "are also paralegals or have other legal backgrounds" which enables them to review the important details of the program and enrollment process with the soon-to-be client:[69]



We provide trained representatives to meet with your clients to review the important details of the program and enrollment process. All of our representatives are certified notaries and many are also paralegals or have other legal backgrounds. In addition to high client enrollment percentages, the added legal experience and training our representatives possess is a key factor that separates NPN from other debt settlement signing companies.

---

[67] https://sunshinesigningconnection.com/debt-consolidation-services/

[68] https://nationalparalegalnotary.com/debt-settlement-signing-services/

[69] https://nationalparalegalnotary.com/debt-settlement-signing-services/

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                              VS                              05-2018-CA-020704-XXXX-XX

205.    Despite the obligation of notaries to play a neutral role and to refrain from influencing any party from participating in or eschewing a transaction requiring a notarial act,[70] the Notary Service tout that their notaries have the training and legal background to persuade customers to enroll and, in addition, carry off the deception that they are paralegals with actual law firms.

206.    The Notary Services knowingly contract with the SFS Facade Firm for the express purpose of providing mobile notaries for the purpose of posing as representatives of a law firm for a face-to-face meeting.

207.    The Notary Services know that the Federal Trade Commission disapproves of this use of their network of mobile notaries for a purported face-to-face meeting under the TSR.

208.    The Notary Services knowingly provide their contracted notaries with documentation to complete (such as the Affidavit of Compliance) that: 1) fraudulently represent that the notary is a representative of a law firm; and 2) fraudulently claim that the notary has, and is capable of, determining compliance with the TSR.

209.    The Notary Services knowingly assign their contracted notaries to jobs that contain an inherent conflict, insofar as the notary must sign the contract as a representative of one of the parties to the contract while also attesting to the consumers' signatures as an independent, disinterested quasi-governmental official.

### 2.    The notary, Inez Williams's, knowledge and participation in the sham face-to-face meeting

210.    The mobile notary, Inez Williams, knowingly executed the Affidavit of Compliance, falsely representing that: 1) she was a representative of Wyolaw, LLC; 2) she determined there

---

[70] Comment, § 5-7 Improper Influence, The Model Notary Act, National Notary Association, January 1, 2010 ("Model Notary Act"), pp. 34-35.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

was full compliance with applicable laws, including but not limited to the TSR; and 3) she reviewed certain subjects with respect to a purported legal services contract with the Plaintiff.

211. The mobile notary, Inez Williams, knowingly notarized the Plaintiff's acknowledgment of the Power of Attorney contained in the contract which gives the purported law firm (of which the notary claims to be a representative) the authority to act as…an attorney-at-law [sic].

212. The mobile notary, Inez Williams, knowingly took an acknowledgment in one section of the contract to the "law firm" while signing as a representative of the "law firm" in another which section contravenes notarial standards, even if the mobile notary was an attorney.[71]

213. The mobile notary, Inez Williams, knowingly failed to refuse to notarize documents if "the notary knows or has a reasonable belief that the notarial act or the associated transaction is unlawful."[72]

## I.    Wrongful acts of the other Defendants

### 1.    Wyolaw

214. Wyolaw through its members, assists SFS in holding itself out as a law firm entitled to the exceptions from certain federal and state laws, including but not limited to the TSR.

215. Wyolaw through its members, engages in the unlicensed practice of law by assisting SFS to perform tasks that the law reserves for licensed attorneys.

216. Wyolaw is liable for the intentional torts and negligence of its members.

---

[71] Model Notary Act, § 5-5(a) Disqualifications ("A notary is disqualified from performing a notarial act if the notary…is an attorney who has prepared, explained, or recommended to the principal the document that is to be notarized.").

[72] Model Notary Act, § 5-6(b)(1).

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980        VS

## 2.    Guillermo Geisse

217.  Geisse knowingly created and maintained the Facade Firm, Wyolaw, LLC, for the specific purpose of assisting SFS in its fraudulent scheme of inducing consumers such as the Plaintiff into the payment of fees to an entity they believed was a law firm.

## 3.    Brant Hodyno and Sara Flores

218.  Hodyno and Flores knowingly uses their Florida licenses to practice law to assist SFS in its fraudulent scheme of inducing consumers such as the Plaintiff into the payment of fees to an entity they believed was a law firm.

219.  Hodyno and Flores knowingly assists SFS engage in the unlicensed practice of law in Florida, by failing to supervise legal work performed, and advice given, by unlicensed SFS employees.

## 4.    Jimmy Gleason

220.  As the SFS employee who induced the Plaintiff to pay fees to a non-lawyer entity, Jimmy Gleason knowingly assisted SFS in its fraudulent scheme.

221.  Jimmy Gleason knowingly permitted SFS to use his name as a "Law Firm Contact" on contracts with consumers when he was not associated with a bona fide law firm.

## COUNT I:   FRAUD, DECEIT AND INTENTIONAL MISREPRESENTATION
### (All Defendants)

222.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

223.  One who fraudulently makes a misrepresentation for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to her by her justifiable reliance upon the misrepresentation. The tort of intentional misrepresentation or fraud is proven by showing the four elements of fraudulent

45

misrepresentation: 1) a false statement concerning a material fact; 2) the representor's knowledge that the representation is false; 3) an intention that the representation induce another to act on it; and 4) consequent injury by the party acting in reliance on the representation. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

224. Defendants, personally or by and through their agents, knowingly made false misrepresentations to the Plaintiff designed to make the Plaintiff believe that she was contracting with a bona fide law firm.

225. These misrepresentations by all Defendants were made intentionally for the purpose of inducing the Plaintiff to act or to refrain from action in reliance upon it.

226. The Plaintiff did act in reliance upon the misrepresentations by sending the Defendants money and refraining from action by discontinuing payments to their creditors.

227. The Plaintiff suffered financial and other harm as a result.

**WHEREFORE**, the Plaintiff demands the recovery of compensatory damages from the Defendants and all such other relief as may be granted by the court.

## COUNT II:  CONSPIRACY TO COMMIT FRAUD
### (All Defendants)

228. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

229. A civil conspiracy is compensable as a separate tort where there is: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. Such a tort is actionable "where a plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination,

46

which power an individual could not possess." *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993).

230. The Defendants conspired to the fraud detailed in COUNT I by agreeing to the Facade Firm scheme, by taking the overt acts of fraudulently inducing the Plaintiff to execute the SFS/Facade Firm Contract and GCS Contract and taking the Plaintiff's money.

231. The Plaintiff suffered damages as a proximate cause of the jointly committed fraudulent acts.

**WHEREFORE**, the Plaintiff demands the recovery of compensatory damages from the Defendants and all such other relief as may be granted by the court.

### COUNT III: CIVIL RIGHT OF ACTION FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(c) (All Defendants)

232. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

233. At all relevant times SFS, GCS, and NPN (including non-party Facade Firms, their principals and Class B "partners", and individual notaries) were members and associates of a fraudulent debt settlement enterprise, whose members and associates engaged in fraudulent and deceptive practices designed to enroll consumers in useless "debt settlement" plans and extract unearned fees from them ("SFS Scheme").

234. The Defendants, including their leadership, membership, and associates, constitute an association-in-fact (the "SFS Enterprise"). The SFS Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that associate for the common or shared purposes of advancing the SFS Scheme.

47

235. The activities of the SFS Enterprise affected and continues to affect interstate commerce.

236. In order to increase their revenue and profits, members of the SFS Enterprise need to enroll a continuous stream of customers into their debt relief programs. The SFS Enterprise provides that stream by fraudulently inducing consumers to enter into illegal contracts through which members of the SFS Enterprise extracted illegal fees directly from consumers' bank accounts.

237. The members of the SFS Enterprise share the common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through luring consumers into useless debt settlement plans and extracting unearned fees from them. Each of the members of the SFS Enterprise was rewarded financially based on its abilities to perform its role as a member of the SFS Enterprise.

## A.    Conduct of the RICO enterprise's affairs

238. The SFS Enterprise members have, in violation of Section 1962(c) of RICO, conducted or participated in the conduct of the affairs of the SFS Enterprise, directly or indirectly, by making false statements and promises in an attempt to encourage consumers to sign up for debt settlement programs through the SFS Enterprise, and by extracting and processing payments knowing that the underlying contracts provided for illegal fees and that consumers had signed those contracts based on the fraudulent and deceptive activities of the Enterprise's Facade Firms.

## B.    SFS Enterprise's pattern of racketeering activity

239. Defendants conducted and participated in the affairs of the above-referenced SFS Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 2314 (relating to the interstate transportation of stolen property); 18 U.S.C. § 1341

Ice Legal, P.A.
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530
Filing 99890980                              VS                              05-2018-CA-020704-XXXX-XX

(relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud); and 18 U.S.C. § 1344 (relating to bank fraud).

240. The pattern of racketeering likely involved thousands of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the SFS Scheme, as well as many instances involving the interstate transmission of potentially millions of dollars in fraudulently obtained fees, which were withdrawn from accounts under the custody and control of financial institutions.

241. Each of these instances constituted a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the SFS Enterprise intended to defraud Plaintiff, consumers, and other intended victims.

242. Defendant's racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud consumers. Each separate instance of racketeering employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same injurious results affecting the same victims, including Plaintiff and consumers.

243. Defendants engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the SFS Enterprise.

**C.    The SFS Enterprise's use of the U.S. mail and interstate wire facilities in violation of 18 U.S.C. §§ 1341 & 1343**

244. The illegal conduct and wrongful practices of the SFS Enterprise were carried out by an array of agents and members of the SFS Enterprise, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. mail and interstate wire facilities.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

245. The nature and pervasiveness of the SFS Scheme, which were orchestrated primarily out of the offices of SFS and the Facade Firms, necessarily required those offices to communicate directly and frequently with each other and with consumers by the U.S. mail and by interstate wire facilities.

246. Indeed, SFS's business model and the ensnarement of consumers in the SFS Scheme were predicated upon, and rely on, use of the interstate wire and postal facilities.

247. The bait-and-switch mailer was sent to consumers across state borders through the U.S. mail. Consumers were also lured by internet advertising and Facade Firm websites which transmit information through interstate wire facilities.

248. SFS's initial verbal contact with consumers was through interstate telephone calls.

249. SFS and GCS transmitted agreements to consumers and to NPN over the Internet for them to print on their home computers or were sometimes sent to consumers through the U.S. mail system. The Welcome Packet was delivered though the U.S. mail system.

**D.     The SFS Enterprise's interstate transportation of stolen property in violation of 18 U.S.C. § 2314**

250. The SFS Enterprise developed the SFS Scheme, described in the above paragraphs of this Complaint, to obtain money from consumers by fraudulent means.

251. In furtherance of this SFS Scheme, Defendants transmitted consumers' monthly payments and fees, in amounts exceeding $5,000, in interstate commerce. SFS did so despite knowing that the authorization for those payments and fees were obtained by fraud.

**E.     The SFS Enterprise's commission of bank fraud under 18 U.S.C. § 1344**

252. The SFS Enterprise knowingly executed the SFS Scheme to obtain money, by means of fraudulent pretenses, representations, and promises, from consumers' bank accounts, which were under the custody and control of federally chartered or insured financial institutions.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                          VS                          05-2015-CA-020570-XXXX-XX
Exhibit 29-0050

253. Specifically, as described above, the SFS Enterprise, obtained by fraudulent means the authorization of the Plaintiff to withdraw money from their banking accounts under the custody and control of various financial institutions, such as Publix Employees Federal Credit Union.

254. On information and belief, the same process involving fraud in obtaining authorization to withdraw money from consumers' federally chartered or insured bank accounts was repeated in a continuing and ongoing pattern with the ensnarement of each additional consumer victim.

255. The SFS Enterprise also violated 18 U.S.C. § 1344 by fraudulently obtaining authorization to withdraw money from the Plaintiff's and consumers' dedicated account management by GCS and held in an FDIC insured financial institution.

**F.      Damages caused by the SFS Schemes**

256. SFS's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiff to be injured in their business or property because Plaintiff:

    a)    paid fees in excess of legal limits and otherwise in violation of applicable state and federal law for their debt settlement programs;

    b)    would not have entered into those debt settlement programs if they had been aware of the illegality of the fees and/or the fraudulent nature of the schemes devised by the SFS Enterprise;

    c)    paid fees for services that were never intended to be performed; and

    d)    suffered continuing harm to her credit and creditworthiness as a result of the fraudulent and deceptive practices of the SFS Enterprise.

257. This count is brought under 18 U.S.C. § 1964(c) which provides that any person injured by violation of §1962 may sue and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                              VS

258. State courts have concurrent jurisdiction over RICO claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990).

**WHEREFORE**, the Plaintiff demands the recovery of compensatory damages, plus treble damages and attorneys' fees, from Defendants and all such other relief as may be granted by the court.

## COUNT IV: CIVIL RIGHT OF ACTION FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(d) (All Defendants)

259. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

260. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

261. The SFS Enterprise members violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

262. Each of the SFS Enterprise members conspired with the others in order to further and perfect the financial goals of the SFS Enterprise.

263. The SFS Scheme was constructed with overt written and oral agreements between the SFS Enterprise members to further the goals of the SFS Enterprise and to engage in the pattern of racketeering activity alleged herein. The nature of the acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that SFS and its affiliates not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate

52

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts were part of an overall pattern of racketeering activity.

264. As a direct and proximate result of the SFS Enterprise members' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and other consumers have been, and continue to be, injured in their business or property.

265. The members of the SFS Enterprise have engaged in the commission of, and continue to commit, overt acts, including the following unlawful racketeering predicate acts:

a) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

b) multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

c) multiple instances of transporting fraudulently obtained money in violation of 18 U.S.C. § 2314;

d) multiple instances of bank fraud in violation of 18 U.S.C. § 1344; and

e) multiple instances of unlawful activity in violation of 18 U.S.C. § 195.

266. This count is brought under 18 U.S.C. § 1964(c) which provides that any person injured by violation of §1962 may sue and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

267. State courts have concurrent jurisdiction over RICO claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990).

**WHEREFORE**, the Plaintiff demands the recovery of compensatory damages, plus treble damages and attorneys' fees from Defendants and all such other relief as may be granted by the court.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

## COUNT V: CIVIL REMEDY FOR CRIMINAL PRACTICES STATUTE
### (§ 772.104, Fla. Stat.).
### (All Defendants)

268.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

269.   The Defendants have, with criminal intent, committed two or more federal or state criminal offenses within a five-year period for which there is a relationship and continuity between those predicate acts.

270.   As a person injured by reason of any violation of §772.103, Fla. Stat., the Plaintiff is entitled to treble damages, attorney's fees and costs.  772.104, Fla. Stat.

**WHEREFORE**, the Plaintiff demands the entry of judgment in favor of the Plaintiff for compensatory damages, plus treble damages and attorneys' fees and costs, from the Defendants and all such other relief as may be granted by the court.

## COUNT VI: EXPRESS PRIVATE RIGHT OF ACTION FOR VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA)
### (All Defendants)

271.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

272.   FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). *See also Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So. 2d 602, 605-06 (Fla. 2d DCA 1997) A deceptive practice is one that is "likely to mislead" consumers. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). An unfair practice is "one that 'offends established public policy'

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                                    VS

and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Samuels v. King Motor Co. of Boca Raton*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

273. The Defendants violated FDUTPA as a result of the wrongful acts alleged above.

274. Additionally, the Defendants violated FDUTPA by violating the Credit Counseling Services statute (see COUNT VII and § 817.806(1)—any violation of Credit Counseling Services statute also a violation of FDUTPA).

275. The actions of the Defendants were a willful and knowing violation of the FDUTPA.

276. Private Right of Action: In any action brought by a person who has suffered a loss as a result of a violation of FDUTPA, such person may recover actual damages, plus attorney's fees and court costs. §§ 501.211, 501.2105, Fla. Stat.

**WHEREFORE**, the Plaintiff demands the entry of judgment in favor of the Plaintiff for compensatory damages, plus attorneys' fees and costs, from the Defendants and all such other relief as may be granted by the court.

### COUNT VII: EXPRESS PRIVATE RIGHT OF ACTION FOR VIOLATION OF CREDIT COUNSELING SERVICES STATUTE
#### (SFS, Facade Firm Defendants)

277. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

278. Chapter 817, Part IV ("Credit Counseling Services") applies to the Defendants because it applies to:

(4) "Debt management services" means services provided to a debtor by a credit counseling organization for a fee to:

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                    VS                    Exhibit 29-0053

(a) Effect the adjustment, compromise, or discharge of any unsecured account, note, or other indebtedness of the debtor; or

(b) Receive from the debtor and disburse to a creditor any money or other thing of value.

279. The exception for "services provided in the practice of law in this state" (§817.803(1)) is inapplicable because none of the Defendants are licensed to practice law in the Plaintiff's state.

280. The Defendants, individually and as an enterprise, violated one or more provisions of the Credit Counseling Services statute, including, but not limited to, the charging of fees in excess of the statutory limits and the failure to obtain the required annual audits and insurance policies.

281. The statute provides a private right of action for the recovery of damages, reasonable attorneys' fees, and costs. § 817.806, Fla. Stat.

**WHEREFORE**, the Plaintiff demands the entry of judgment in favor of the Plaintiff for compensatory damages from the Defendants and all such other relief as may be granted by the court.

## COUNT VIII: PRIVATE RIGHT OF ACTION FOR UNLICENSED PRACTICE OF LAW
### (All Defendants except Hodyno and Flores)

282. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

283. The unlicensed practice of law is a felony in Florida (§ 454.23, Fla. Stat.).

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

284. Plaintiff have standing to seek restitution of any damages by way of a civil action for damages caused by the unlicensed practice of law. *Goldberg v. Merrill Lynch Credit Corp.*, 35 So. 3d 905, 907 (Fla. 2010).

285. It constitutes the unlicensed practice of law for a nonlawyer to hold himself out as an attorney either expressly or impliedly. *The Fla. Bar v. DeToma*, 501 So. 2d 599 (Fla. 1987) (using the title Esquire); *The Florida Bar v. Catarcio*, 709 So. 2d 96 (Fla. 1998) (using the initials J.D. if they are being used to solicit legal services); *The Florida Bar v. Miravalle*, 761 So. 2d 1049 (Fla. 2000) (using "legal" in the name of your business); *The Florida Bar v. Gordon*, 661 So. 2d 295 (Fla. 1995) (using the title "attorney" or "lawyer"); and *The Florida Bar v. Borges-Caignet*, 321 So. 2d 550 (Fla. 1975) (using the title notario publico).

286. It also constitutes the unlicensed practice of law for a corporation to advertise to provide legal services even if the services are being performed by a member of The Florida Bar. *The Florida Bar v. Consolidated Business and Legal Forms*, 386 So. 2d 797 (Fla. 1980). This is due to the fact that a corporation may not practice law.

287. Rule 10-2.1(c) of the Rules Regulating The Florida Bar defines "nonlawyer" as including members of the bars of other states.

288. The Defendants engaged in the unlicensed practice of law by holding themselves out as an attorney either expressly or impliedly, by advertising (via websites, welcome packets, etc.) —and signing contracts—to provide legal services, even if the services are being performed by a member of The Florida Bar.

289. The Defendants also engaged in the unlicensed practice of law by:

    a)   giving legal advice to Florida citizens about:

Ice Legal, P.A.
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

1. **whether bankruptcy or debt settlement is the best solution to their particular financial situation;**

2. **which debts they should enroll in the debt settlement program;**

3. **entering into the contract with GCS, including but not limited to the consequences of: 1) agreeing to the waiver of rights embedded in the contract; 2) options and fees for using GCS's dedicated account rather than an attorney's trust account;**

4. **signing the power of attorney;**

5. **the consequences of waiving attorney-client privilege and confidential information; and**

6. **the consequences of blanket authorization for settlement;**

   b)   instructing Florida citizens not to pay their debts and advising them on the consequences thereof;

   c)   instructing Florida citizens how to respond to creditors when they call; and

   d)   making decisions about whether a case filed by a creditor against Florida citizens is defensible;

   e)   "educating the client on the legal and negotiation process.... This includes providing initial lit[igation] strategy [phone] call upon receipt of summons and complaint..."

290. The Defendants held, and continue to hold, themselves out as licensed attorneys capable of representing Florida residents like the Plaintiff, both in debt settlement negotiation and litigation.

   **WHEREFORE**, the Plaintiff demands the recovery of compensatory damages from the Defendants and all such other relief as may be granted by the court.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                              VS                              0XXX-XX

## COUNT IX:  LEGAL MALPRACTICE
### (Hodyno and Flores)

291.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

292.    A legal malpractice action has three elements: 1) the attorney's employment; 2) the attorney's neglect of a reasonable duty; and 3) the attorney's negligence as the proximate cause of loss to the client." *Larson & Larson, P.A. v. TSE Indus., Inc*., 22 So. 3d 36, 50 (Fla. 2009).

293.    The Facade Firm Contract purports to create an attorney-client relationship between the Plaintiff and the Defendants which placed a duty upon them to exercise reasonable professional care, skill and knowledge in providing legal services to the Plaintiff.

294.    The Defendants breached that duty by, among other things:

f)    Allowing non-lawyers to make legal decisions.

g)    Failing to supervise the activities of SFS, and instead, willingly allowing SFS to pose as the Defendants and to use their names in the creation of an artifice to aid in SFS's scheme to defraud consumers.

h)    Improperly advising the Plaintiff to discontinue paying her creditors which: 1) exposed the Plaintiff to additional fees, debt, lawsuits, and damage to her creditworthiness; and 2) constituted an interference with contract that diverted money from Plaintiff's creditors to Defendants.

i)    Charging illegal, prohibited or clearly excessive fees and costs in violation of R. Regulating Fla. Bar 4-1.5.

j)    Setting up a conflict with the client wherein the client's money set aside for settlement of enrolled debt is also used to pay the attorneys' fees, such that the

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

attorney has the incentive to negotiate payouts over time rather than lump sum payments such that the attorneys' fee may be collected immediately.

**WHEREFORE**, the Plaintiff demands the entry of judgment in favor of the Plaintiff for compensatory damages from the Defendants and all such other relief as may be granted by the court.

## COUNT X:  BREACH OF FIDUCIARY DUTY
### (All Defendants)

295.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

296.  The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a duty; 2) breach of that duty; and 3) damages flowing from the breach. *Cassedy v. Alland Investments Corp.*, 128 So. 3d 976, 978 (Fla. 5th DCA 2014).

297.  A fiduciary relationship may be implied in law based on the "specific factual situation surrounding the transaction and the relationship of the parties." *Crusselle v. Mong*, 59 So. 3d 1178, 1181 (Fla. 5th DCA 2011). Courts have found a fiduciary relationship implied in law when confidence is reposed by one party and a trust accepted by the other. *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994). A fiduciary owes to its beneficiary the duty to refrain from self-dealing, the duty of loyalty, the overall duty to not take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts. *Id* at 520.

298. SFS (and its agent, Jimmy Gleason), Wylow, and Geisse held themselves out as licensed attorneys' capable of representing residents of the Plaintiff's state, both in debt settlement negotiation and litigation.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                              VS

Ice Legal, P.A.

299. GCS had an additional fiduciary duty arising out of federal law and the Consent Order to monitor and report the activities of SFS and its Facade Firms. The Consent Order enjoined GCS from processing advance fees in violation of the TSR for the protection of consumers generally, and the Plaintiff particularly.

300. The Notary Services and the notary, as a position of public trust, had a fiduciary duty to their constituencies, the people they represent and serve, including a duty of impartiality.

301. The COUNT X Defendants induced the Plaintiff to entrust her with their money and their financial future.

302. The COUNT X Defendants had a duty of diligence and undivided loyalty to the Plaintiff either by way of express contract or implied by relationships surrounding the transaction.

303. The Defendants breached their fiduciary duty to the Plaintiff.

304. The COUNT X Defendants breached the above-mentioned fiduciary duties.

305. The COUNT X Defendants' breach of their fiduciary duties was deliberate or wanton and willful.

306. The Plaintiff has suffered monetary damages and emotional distress as a result of the Defendants' breach of fiduciary duty.

307. The COUNT X Defendants are liable to the Plaintiff for all damages caused by their conduct for their wanton and willful conduct.

WHEREFORE, the Plaintiff demands the recovery of compensatory damages from the Defendants and all such other relief as may be granted by the court.

## DEMAND FOR JURY TRIAL

308. The Plaintiff demands a trial by jury of all claims so triable by right.

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

Filing 99890980                            VS                            05-2018-CA-025708-XXXX-XX

Dated: December 4, 2019

**Ice Legal, P.A.**
Attorney for Plaintiff
6586 Hypoluxo Road, Suite 350
Lake Worth, FL 33467
(561) 729-0530
Designated emails:
      service@icelegal.com
      service1@icelegal.com
      service2@icelegal.com

By: _____
THOMAS ERSKINE ICE
FL Bar No. 521655

By: _____
ARIANE ICE
FL Bar No. 1015326

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

| No. _____ | Superior Court |
| Daniel Hughes and Monica Hughes, | Judicial District of New Haven |
| Plaintiffs | at New Haven |
| v. | |
| Strategic Financial Solutions, LLC; F Solutions, LLC Strategic Client Support, LLC; Anchor Client Services, LLC; Ryan Sasson; Kimberly Celic; Lauren Montanile; Daniel Camacho; Anchor Law Firm, PLLC, Jason Blust; Thomas Rogus; Timothy Burnette; Stacy Robinson; Robin Lasky; Velsa Holdings, LLC; Wendy Lee Bursey, | |
| Defendants | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### TABLE OF CONTENTS

GENERAL ALLEGATIONS ................................................................................................. 3

    A.    Summary of the Case ................................................................................................ 3

    B.    Parties ........................................................................................................................ 3

    C.    Jurisdiction and Venue .............................................................................................. 9

    D.    Introduction – laying the trap .................................................................................. 10

        1.    Whack-a-mole ............................................................................................... 12

        2.    The Facade Firms .......................................................................................... 13

        3.    The attorney network scheme posing as multiple firms ............................... 17

    E.    Springing the trap ................................................................................................... 19

    F.    The wrongful acts and misrepresentations of the Defendants. ............................... 22

        1.    The SFS Defendants ...................................................................................... 22

        2.    The Facade Firm Defendants ......................................................................... 26

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0063

3.    Montanile .................................................................................... 27

4.    Daniel Camacho ......................................................................... 28

5.    Jason Blust, Thomas Rogus, and Timothy Burnette ................. 28

6.    Robin Lasky ................................................................................ 28

7.    The Notary Services Defendant .................................................. 29

8.    The Notary Defendant ................................................................. 30

   G.     Damages........................................................................................... 31

   H.     Conspiracy and RICO Allegations................................................. 32

FIRST COUNT:     FRAUD, DECEIT AND INTENTIONAL MISREPRESENTATION .... 39

SECOND COUNT:     CONSPIRACY TO COMMIT FRAUD ..................................................... 41

THIRD COUNT:     CIVIL RIGHT OF ACTION FOR VIOLATION OF THE
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
ACT ("RICO") 18 U.S.C. § 1962(c) and(d) ............................................. 42

FOURTH COUNT:     PRIVATE RIGHT OF ACTION FOR VIOLATION OF THE
CONNECTICUT UNFAIR TRADE PRACTICES ACT  Conn. Gen.
Stat. § 42-110a, et seq. ............................................................................. 43

FIFTH COUNT:     LEGAL MALPRACTICE IN TORT......................................................... 44

SIXTH COUNT:     IMPLIED PRIVATE RIGHT OF ACTION FOR VIOLATION OF
THE CONNECTICUT UNAUTHORIZED PRACTICE OF LAW
STATUTE.................................................................................................. 45

DEMAND FOR JURY TRIAL .................................................................................... 47

DEMAND FOR RELIEF.............................................................................................. 47

NOTICE OF ACTION................................................................................................. 47

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0064

## GENERAL ALLEGATIONS

Plaintiffs, Daniel Hughes and Monica Hughes, for their Complaint allege:

### A.    Summary of the Case

1.    This is a case of fraud, conspiracy to commit fraud, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of the Connecticut Unfair Trade Practices Act, legal malpractice, and violation of Connecticut unauthorized practice of law statute in which the Plaintiffs seek damages, including compensatory damages, treble damages, punitive damages and attorneys' fees and costs.

2.    This case involves a debt settlement scheme involving numerous entities and individuals that conspire to defraud Connecticut consumers as a common enterprise.

3.    The enterprise defrauds consumers by posing as lawyers and law firms and by enlisting real lawyers and law firms to provide their names for the scheme even though they do not—and generally, cannot—perform legal services themselves in Connecticut where the consumers reside.

4.    The Defendants adopted a business structure that fraudulently mimics the "attorney model" of debt settlement—a controversial structure in its own right—in order to evade the licensing and fee-limitation requirements for non-attorney settlement companies in various states and to project an aura of trustworthiness to lure unsuspecting consumers.

### B.    Parties

#### *The Plaintiffs*

5.    The Plaintiffs, **Daniel Hughes and Monica Hughes**, are Connecticut residents and domiciliary and at all material times resided at 67 Idlewild Road., #6, Wolcott, Connecticut 06716.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0065

## *The Defendants*

6.      The SFS Defendants are conducting the business practices described below through an interrelated network of companies that have common officers, managers, business functions, employees, and office locations, and that have commingled funds.

a)  SFS Defendant **Strategic Financial Solutions, LLC ("SFS")**, is a Nevada limited liability company whose managing member is eVestment, Inc., owned by Nasdaq, Inc.  SFS does business throughout the United States, including the state of Connecticut.   It is the parent, affiliate, or alter ego of the SFS Defendants.

b)  SFS Defendant, **F Solutions, LLC ("FS")**, a New York limited liability company, (formerly named Elimadebt, LLC operating under the unregistered fictitious name of **Finance Solutions, LLC**).   FS does business throughout the United States, including the state of Connecticut.  FS shares principals and an office address with SFS and is operated together with SFS as one company.

c)  SFS Defendant, **Strategic Client Support, LLC ("SCS")**, is a Delaware limited liability company f/k/a Pioneer Client Services LLC f/k/a Fusion Processing, LLC f/k/a Fusion Client Services f/k/a Strategic Client Services that does business throughout the United States, including the state of Connecticut. SCS shares principals and an office address with SFS and is operated together with SFS as one company.

d)  SFS Defendant, **Anchor Client Services, LLC ("ACS")**, is a Delaware limited liability company that does business throughout the United States,

4
**Ice Legal Co.**

Exhibit 29-0066

including the state of Connecticut. ACS shares principals and an office address with SFS and is operated together with SFS as one company.

e) SFS Defendant, **Ryan Sasson ("Sasson")**, is or has been a *de facto* or *de jure* owner, officer, principal, manager, director, member, organizer, authorized representative, of SFS and the SFS Defendants. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Sasson resides in New York and through the SFS Defendants, conducts business throughout the United States, including the state of Connecticut.

f) SFS Defendant, **Kimberly Celic ("Celic")**, is a New York resident who, as an employee, part owner, and Chief People Officer of the SFS Defendants, facilitates Anchor's appearance of a law firm by falsely holding herself out as a bona fide Human Resource director of the Facade Firms. Through the Facade Firms and the SFS Defendants, Celic conducts business throughout the United States, including the state of Connecticut.

g) SFS Defendant, **Lauren Montanile ("Montanile")**, is a New York and New Jersey attorney and resident who, as an employee and part owner of the SFS Defendants, facilitates Anchor's appearance of a law firm by falsely holding herself out as a bona fide supervising attorney and member of, Anchor and other Facade Firms. Through the Facade Firms and the SFS Defendants, Montanile conducts business throughout the United States, including the state of Connecticut.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0067

h) SFS Defendant, **Daniel Camacho ("Camacho")**, is a New York resident who held himself out as a "Law Firm Contact" for various Facade Firms including Anchor and conducts telemarketing activities throughout the United States, including the state of Connecticut.

7. The Facade Firm Defendants are conducting the business practices described below through an interrelated network of Facade Firms that have common officers, managers, business functions, employees, or office locations, and that have commingled funds.

a) Facade Firm Defendant, **Anchor Law Firm, PLLC ("Anchor" or "Facade Entity" or "Shell Entity")**, is an Arkansas entity that the Defendants hold out to be a bona fide law firm in the business of representing clients for both debt relief and in-court legal litigation. Anchor operates throughout the United States, including the state of Connecticut.

b) Facade Firm Defendant, **Jason Blust ("Blust")**, is an Illinois attorney and is, or has been, a *de facto* or *de jure* owner, officer, principal, manager, director, member, organizer, authorized representative, of the Facade Firms and Anchor. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Blust resides in Illinois and through the Facade Firms, conducts business throughout the United States, including the state of Connecticut.

c) Facade Firm Defendant, **Thomas Rogus ("Rogus")**, is an Illinois attorney and is, or has been, a *de facto* or *de jure* owner, officer, principal, manager, director, member, organizer, authorized representative, of the Facade Firms and

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0068

Anchor. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Rogus resides in Illinois and through the Facade Firms, conducts business throughout the United States, including the state of Connecticut.

d) Facade Firm Defendant, **Timothy Burnette ("Burnette")**, is an Illinois attorney and is, or has been, a *de facto* or *de jure* owner, officer, principal, manager, director, member, organizer, authorized representative, of the Facade Firms and Anchor. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Burnette resides in Illinois and through the Facade Firms, conducts business throughout the United States, including the state of Connecticut.

e) Facade Firm Defendant, **Stacy Robinson ("Robinson")**, is an Arkansas attorney and resident who facilitates Anchor's appearance of a law firm by falsely holding herself out as a bona fide member of, Anchor and other Facade Firms. Through the Facade Firms, Robinson conducts business throughout the United States, including the state of Connecticut.

f) Facade Firm Defendant, **Robin Lasky ("Lasky")**, is a Connecticut attorney and resident who facilitates Anchor's appearance of a law firm by falsely holding himself out as a bona fide attorney with, and member of, Anchor and other Facade Firms. Through the Facade Firms, Lasky conducts business throughout the United States, including the state of Connecticut.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0069

8.      Notary Services Defendant, **Velsa Holdings, LLC ("Velsa" or "NPN")**, is a Nevada limited liability company which does business as **National Paralegal and Notary** throughout the United States, including the state of Connecticut.

9.      Notary Defendant, **Wendy Lee Bursey ("Bursey)**, is a Connecticut resident and mobile notary who facilitates Anchor's appearance as a law firm by falsely holding herself out as a bona fide paralegal or representative of Anchor who conducted and was capable of conducting a consultation with Plaintiffs.

10.     All Defendants, including their leadership, membership, and associates, constitute an association-in-fact (the "SFS Enterprise").



**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0070



## C.   Jurisdiction and Venue

11.   The Superior Court has subject matter jurisdiction over this case as it is the Court of general jurisdiction over claims for monetary damages in Connecticut. Conn. Gen. Stat §§ 51-164s.; 52-1.

12.   The damages claimed are within the jurisdictional limits of the court.

13.   The Court has personal jurisdiction over the non-resident Defendants because they committed tortious acts in Connecticut, and regularly transact business in the state of Connecticut, thereby availing themselves of Connecticut law and the benefit of conducting activities within the forum state. Conn. Gen. Stat. § 52-92b.

14.   Venue in this action properly lies in New Haven County because Plaintiffs live there, and Defendants conduct business there.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0071

**D. Introduction – laying the trap**

15. The SFS Defendants have built a business model designed to make it appear that it is merely a vendor performing debt negotiation services for various "law firms"—the Facade Firm Defendants.

16. In reality, however, it is the SFS Defendants that lure consumers by arranging referrals from marketing companies whose aggressively disseminated bait-and-switch advertising falsely promises guaranteed loans.

17. Using high-pressure, rehearsed sales tactics over the phone, salesmen employed by the SFS Defendants in New York, who are not attorneys, convince consumers to sign up for its illusory services, often by giving legal advice about other options such as bankruptcy.

18. Once a consumer is ensnared, the SFS Defendants arrange for them to execute a contract through one of its portfolio of shell law firms (the "Facade Firms" or "shell firms") set up by a shadowy group of Chicago lawyers associated with a prior similar operation—Legal Helpers Debt Resolution, LLC ("Legal Helpers")—that was discredited and shut down by government authorities.

19. The salesperson employed by the SFS Defendants chooses a firm based on the state where the consumer lives.

20. The salesperson arranges for a meeting with a mobile notary posing as a paralegal, or even a lawyer, of the shell firm for the "face-to-face meeting" required by the exception to the federal regulations which the SFS Enterprise seeks to exploit.

21. The SFS Defendants draft the purported legal services contract inserting the name of the chosen Facade Firm into the contract:

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0072

---

**ANCHOR LAW FIRM, PLLC**

**1.6. Litigation Defense Services**

Creditors and/or debt collectors may file lawsuit of owed debt(s). Anchor will provide Litigation I a Summons and Complaint. Anchors Litigation se

Services

1. Anchor will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Anchor will evaluate potential legal defenses to the Plaintiff creditor's suit.

---

**BOULDER LEGAL GROUP, LLC**

**1.6. Litigation Defense Services**

Creditors and/or debt collectors may file lawsuit(s) agai Boulder will provide Litigation Defense Services in the ev Litigation services and limitations include:

Services

1. Boulder will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Boulder will evaluate potential legal defenses to the Plaintiff creditor's suit.

---

**SUMMIT LAW FIRM**

**1.6. Litigation Defense Services**

Creditors and/or debt collectors may file lawsuit(s) ag debt(s). Summit will provide Litigation Defense Servi Complaint. The Litigation Defense Services will includ Summit's Litigation Defense Services and limitations

**Services**

1. Summit will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Summit will evaluate potential legal defenses to the Plaintiff creditor's suit.

---

**ROCKWELL LEGAL GROUP**

**1.6. Litigation Defense Services**

Creditors and/or debt collectors may file lawsuit(s) ag debt(s). Rockwell will provide Litigation Defense Ser and
Complaint. Rockwell's Litigation services and limitation

Services

1. Rockwell will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Rockwell will evaluate potential legal defenses to the Plaintiff creditor's suit.

---

22. The SFS Defendants insert the name of the salesman as the "Law Firm Contact."

23. The phone number for the Facade Firm on the contract and on the Facade Firm website actually rings in the New York offices of the SFS Defendants and is answered by the SFS Defendants' non-lawyer staff who identify themselves in a way that leads consumers to believe they are talking to a Facade Firm employee.

24. Mail sent to the shell law firm address on the legal services contract or website goes to a maildrop at a virtual space, usually maintained by Regus, PLC. The mail is overnighted to Excela Technologies in New York, scanned, and uploaded into the SFS Defendants' computer system.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0073

25. The SFS Defendants' program consists of telling the consumer to stop paying their creditors (to give "the law firm more leverage when negotiating"), and instead, pay them exorbitant up-front fees.

26. If one of these creditors brings suit against an "SFS client," the SFS Defendants will decide when and if an "in-state" attorney is assigned to defend the case.

27. Whether or not an "in-state" attorney is assigned, the SFS Defendants' staff will sometimes attempt to negotiate a consent judgment with the creditor's counsel and even instruct "clients" what to do and say in court.

28. The SFS Defendant's purpose in masquerading as a law firm is to evade various federal and state laws intended to curb deceptive and abusive practices of debt settlement companies, including the Telemarking Sales Rule "TSR"[1] and to project the aura of trustworthiness with a profession that is supervised by the courts and bar organizations

### 1. Whack-a-mole

29. The now infamous Legal Helpers Debt Resolution, LLC ("Legal Helpers") was founded by attorneys at the Chicago firm of Macey, Aleman, Hyslip and Searns. It declared bankruptcy after being sued by the Attorneys General of Illinois, Wisconsin, and North Carolina— and after attorneys Macey and Aleman were suspended from the practice of law.

30. In those suits and bar grievances (as well as at least one class action), the attorneys were accused of a fraudulent objective similar to that alleged here—that they "established Legal Helpers for the purpose of partnering with non-lawyer companies in the consumer debt settlement

---

[1] 16 CFR Part 310 regulates telemarketing defined "a plan, program, or campaign . . . to induce the purchase of …services" involving more than one interstate telephone call and was promulgated by the Federal Trade Commission ("FTC") to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0074

industry in order to take advantage of certain exemptions that new regulations governing the debt settlement industry allowed for attorneys."

31. Despite this regulatory action to end Legal Helpers' practices, the same players involved in the original scheme have re-created a nearly identical scheme that is the subject of this lawsuit.

32. For example, SFS Chief Executive Officer, Ryan Sasson, was the Supervisor and Manager of Legal Helpers in 2012 and president LHDR Help, LLC in 2012.

33. Facade Firm Defendants Blust and Rogus—as well as others connected to the Facade Firms—were partners or attorneys of Legal Helpers.

34. The specific elements of Legal Helpers' business structure, the methods, and even the nomenclature (such as "Welcome Packet" and "Class B" partner) to accomplish what at least one court found to be fraudulent misrepresentation and a violation of 11 U.S.C. § 526 is nearly identical to that alleged here as still being used by the Defendants today.

### 2. The Facade Firms

35. The SFS Defendants, together with the Facade Firm Defendants, create and maintain a collection of entities being held out as law firms, which SFS Defendants calls their brand "portfolio" or "programs."

36. The key difference between the current SFS Enterprise scheme and the Legal Helpers scheme is that the attorney network here is composed of a confusing and overlapping array of Facade Firms created for one or more of the following purposes: 1) obfuscating the identities of persons formerly involved in the Legal Helpers scheme and the conspiracy between them; 2) falsely creating additional "shelf space" for its internet advertising through the fiction of different law firm brands for a single enterprise; 3) creating the illusion of choice for consumers;

Exhibit 29-0075

and 4) "churning" the entities such that those with poor ratings and high customer complaints can be discarded for another entity that has not yet amassed negative reviews.

37. Aside from Anchor, the Facade Firms created by the Facade Firm Defendants include, but may not be limited to: Bedrock Legal ("Bedrock"); Boulder Legal Group, LLC ("Boulder"), Canyon Legal Group, LLC ("Canyon); Carolina Legal Services ("Carolina"); Chinn Legal Group, LLC ("Chinn"); Colonial Law Group, LLC ("Colonial"); The Commonwealth Law Group, PLLC ("Commonwealth"); Cornerstone Legal Group, LLC ("Cornerstone"); Credit Advocates Law Firm, LLC ("Credit"); Dubin Legal Group, LLC ("Dubin"); Frontier Consumer Law Group, LLC ("Frontier"); Gardner Legal, LLC ("Gardner"); Glacier Bay Law ("Glacier"); Great Lakes Law Firm, LLC ("Great Lakes"); Harbor Legal Group, LLC ("Harbor"); Heartland Legal Group, LLC ("Heartland"); Henry Legal Group, LLP ("Henry); Hinds Law, LLC ("Hinds"); Monarch Legal Group ("Monarch"); Phoenix Legal Group, LLC ("Phoenix"); Pioneer Law Firm, P.C. ("Pioneer"); Rockwell Legal Group ("Rockwell"); Royal Legal Group, LLC ("Royal"); Stonepoint Legal Group ("Stonepoint"); The Sands Law Group, LLC ("Sands"); Whitestone Legal Group ("Whitestone"); and Wyolaw, LLC ("Wyolaw").

38. Facade Firm Defendant, Jason Blust, operating out of a co-working space at 211 W. Wacker Dr., Ste. 300 Chicago, IL 60606, is the President, Secretary, Treasurer, and Director of Pioneer, a 98 percent owner of Cornerstone, a managing member of Credit, a member of Boulder, and the Law Offices of Jason Blust, LLC was or is the employer of Michelle Hinds, the manager of Hinds (operating out of the same address). He was involved in the creation of Royal which violated a permanent injunction prohibiting him and Pioneer from providing debt-resolution services in Kansas.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0076

39.     Facade Firm Defendant Thomas Rogus, who operates out of the same Chicago address as Blust, is the majority and controlling member of Anchor.

40.     Facade Firm Defendant, Timothy Burnette, operating out the same Chicago address as Blust and Rogus, is the principal of Burnette Legal Group, LLC, d/b/a Monarch Legal Group, where phone calls from mail drop facilities for Anchor are directed.  He is also a "partner" of a Facade Firm and an agent, contact person or authorized signer listed in the foreign registrations for most of these Facade Firms.

41.     Some of the websites for the Facade Firms provide redacted settlement letters as proof of their success.  The settlement letters bear a striking resemblance:



| ANCHOR SETTLEMENT LETTER | CAROLINA SETTLEMENT LETTER | ROYAL SETTLEMENT LETTER |

42.     Some settlement letters touted as Anchor successes on Anchor's website are actually settlement letters to Harbor, Pioneer, and Boulder, but these names are hidden by redactions.

43.     Similarly, many letters claimed by other Facade Firms as evidence of their individual success are actually letters sent to different Facade Firms.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0077

44.     Nearly all have phone numbers on their websites that connect directly to the same SFS call center where employees answer by identifying themselves as being employees of the law firm being dialed.

45.     In its marketing and public relations statements, SFS refers to Facade Firm clients, as their own and touts the number of clients and the dollar value of debt settled its own achievements rather than that of the Facade Firms.

46.     Similarly, the individual Facade Firms also take credit for the same number of clients and dollar value of debt settled as SFS.

47.     Similarly, Timberline Financial, LLC—of which SFS Defendant, Ryan Sasson, is the CEO, has settlement letters that are virtually identical to those of the Facade Firms:



| ANCHOR SETTLEMENT LETTER | TIMBERLINE SETTLEMENT LETTER |

48.     Timberline letters are included as the achievements on Facade Firm websites, including that of Anchor.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0078

### 3. The attorney network scheme posing as multiple firms.

49. Despite the use of approximately thirty different Facade Firm names, the SFS Enterprise uses a single network of the same attorneys. The network is managed by the Chicago attorneys which the SFS Enterprise falsely portrays as approximately thirty different firms.

50. Typically, each Facade Firm consists of a Majority Member (who was formerly associated with Legal Helpers), a Minority Member (who registers the entity in his or her state), a group of "In-State attorneys," (one or more in each state which the Facade Firm network actively enroll consumers), and "SFS attorneys" (who work at the New York offices of the SFS Defendants).

51. The Chicago attorneys recruit the Minority Members and the In-State attorneys, through advertisements (such as posting on Craigslist) and the SFS attorneys directly from the group of attorneys already employed by the SFS Defendants. The In-State attorneys and SFS attorneys are referred to as "Class B" members."

52. Here, the Majority Member is Thomas Rogus, the Minority Member is Stacy Robinson, the In-State in attorney in Connecticut is Robin Lasky (and possibly others), and the SFS attorney is Lauren Montanile.

53. Although the In-State attorneys serve as the Facade Firms' purported licensed attorney in that state, they do not oversee or manage any pre-litigation negotiations or other legal work for any clients in their state.

54. The "In-State attorneys" do not know the identity of the Facade Firm clients unless and until they are called on to appear in court or to perform tasks to further the false appearance of legitimacy and are not permitted to assist clients of the Facade Firm unless the case is assigned or referred to them by the SFS Defendants.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0079

55.     The SFS Defendants recruit and employ Facade Firm staff in the guise of the Facade Firms.

56.     For example, SFS Defendant Kimberly Celic, currently Senior Vice President of SFS, was the Director of Human Resources (of related company, Strategic CS, LLC) in 2014:



57.     During that time, Ms. Celic hired an employee for Pioneer, using Pioneer letterhead:



**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0080

## E. Springing the trap

### *The sham face-to-face meeting*

58.    On or around July 14, 2018, a Financial Consultant employed by the SFS Defendants induced the Plaintiffs to enroll in a debt settlement program and recommended its "partner," Anchor, as the law firm through which the program would run.

59.    The Financial Consultant was Daniel Camacho:



60.    Daniel Camacho passed the telephone call to another SFS Defendants employee who recorded a compliance call in which the employee, using a script, held themselves out as being "with Anchor" and told the Plaintiffs that the call was in preparation for an attorney meeting and that someone would be coming to their home for a "consultation."

61.    The SFS Defendants set up the face-to-face meeting through Velsa and prepared the Anchor legal services contract inserting "Anchor" in the fields for the Facade Firm and Daniel Camacho's name as the "Law Firm Contact":

Exhibit 29-0081

> **Law Firm Contact:**
>
> Daniel Camacho

62.    On July 14, 2018, a mobile notary, Wendy Lee Bursey, (as directed by Velsa) came to Plaintiffs' home with the contract and made a presentation which included a "Face to Face Script" and a "Face to Face Power Point Presentation" (or "In-Person Presentation").

63.    The Script and Presentation purposefully omit the provisions regarding arbitration and the class action waiver.

64.    The mobile notary, Wendy Bursey, also signed an unsworn "Affidavit of Compliance" in which she stated that she or "NPN Provider 5" (Velsa) was a representative of Anchor, and that she conducted a face-to-face meeting and presented all relevant information regarding "our" representation of the Plaintiffs:

---

### Affidavit of Compliance

I, _____ NPN Provider5 _____ as a representative affiliated with and under contract to the Anchor Law Firm, PLLC, in my role as a Representative, Member, Partner, Employee or Independent Contractor of said firm (Anchor), confirm that I have conducted a personal and face-to-face meeting with Daniel Hughes _____ (Client's Full Legal Name) to review the Client's file and present all relevant information regarding our representation of said Client, as it relates to our Letter of Engagement to legal representation, including debt

---

65.    Bursey represented that she verified "compliance with any and all applicable local. state or federal laws or regulations (collectively the 'Applicable Laws'). including. but not limited. to the Telemarketing and Consumer Fraud and Abuse Prevention Act."

66.    Bursey represented that "The Client has been advised that the <u>attorney or paralegal</u> who conducted the initial meeting with Client limits their scope of representation or presentation to that initial meeting and review or the Client's file." (emphasis added).

67.    Plaintiff Daniel Hughes signed the purported contract believing that the mobile notary was a paralegal of the law firm.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0082

68. Plaintiff Monica Hughes signed the paperwork on July 18, 2018 by Adobe Sign emailed to her from a domain of the SFS Defendants (missingdocs@stratfs.com). As pre-arranged by the Adobe Sign sender, the signed document was emailed to Daniel Camacho at another domain of the SFS Defendants (dcamacho@financesolutions.org).

69. As is typical for Facade Firms, no one sent the Plaintiffs a copy of the contract executed by anyone at Anchor:



70. Because the Plaintiffs never received a copy executed by Anchor, a condition precedent to the formation of the contract was never triggered:

**1.7. Conditions of this Agreement's Effectiveness**

   a. This Agreement does not take effect, and Anchor has no obligation to provide any services, until both Client and Anchor have executed a copy of this Agreement and such copy is delivered to both Parties.

71. Plaintiffs agreed to the contract with the Facade Firm specifically because they thought they were hiring a bona fide law firm.

72. The notary has no direct relationship with the Facade Firm and Wendy Lee Bursey disclaims that she is or was a representative of Anchor.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0083

*Creditor Lawsuits*

73.     Several creditors enrolled in the SFS program brought suit against the Plaintiffs.[2]

74.     Although Plaintiffs advised Anchor about the suits, the Defendants did nothing to defend them.

75.     No attorney appeared for the Plaintiffs in the cases brought by creditors that Anchor had promised to defend.

76.     As a result, a judgment in the amount of $3,191.65 was entered against plaintiff Monica Hughes in one case;[3] a judgment in the amount of $16,893.96 was entered against Ms. Hughes in another;[4] and a default was entered against plaintiff Daniel Hughes in the third.[5]

**F.     The wrongful acts and misrepresentations of the Defendants.**

**1.   The SFS Defendants**

77.     The SFS Defendants (together with the Facade Firm Defendants) created and manage a syndicate of referral attorneys which they market as approximately thirty different law firms for the purpose of evading federal and state laws and fraudulent inducing consumers to pay for a debt settlement program under the guise that it is a legal service.

78.     Recreating the Legal Helpers scheme that was discredited and shut down by state Attorneys General and Bar organizations.

---

[2] *Department Stores National Bank v. Hughes, Monica*, Docket No. UWY-CV-19-6050898-S; *Discover Bank v. Monica A. Hughes*, Docket No. UWY-CV196048463-S; and *Citibank, N.A. v. Hughes, Daniel, J.*, Docket No. UWY-CV-19-6049928-S.

[3] *Department Stores National Bank v. Hughes, Monica*, Docket No. UWY-CV-19-6050898-S.

[4] *Discover Bank v. Monica A. Hughes*, Docket No. UWY-CV196048463-S.

[5] *Citibank, N.A. v. Hughes, Daniel, J.*, Docket No. UWY-CV-19-6049928-S.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0084

79.     The SFS Defendants continued to hold themselves out to consumers, including the Plaintiffs, as a bona fide law firm or affiliated or associated with a law firm where the law firm is merely a network of attorneys participating in the sham. Its acts of misrepresentation include, but are not limited to:

a)  Allowing, instructing, and training Daniel Camacho to engage in scripted bait-and-switch and high-pressure sales tactics, to misrepresent the features and benefits of the debt settlement program and his employer's relationship to Anchor, to misrepresent the qualities of Anchor, to recommend Anchor, to withhold information about the legal services contract (such as arbitration clauses and class action waivers), to misrepresent that he is associated with Anchor by placing his name as a "Law Firm Contact," to evade questions about whether bankruptcy was a better alternative.

b)  Constructing the legal services contract in the name of the Facade Firm and inserting the name of the SFS Defendant's employee who closed the agreement with the consumer as the "Law Firm Contact."

c)  Allowing, instructing and training employees to misrepresent to consumers, including the Plaintiffs, during a recorded compliance call that the employees are "with Anchor" and that the consumers, including the Plaintiffs will be receiving a "consultation" from an attorney or paralegal at a face-to-face meeting.

d)  Arranging for the face-to-face meeting with a mobile notary—someone with scant knowledge, if any, of the contract or services in the contract—to show or

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0085

read a presentation and witness the signing process when such a face-to-face meeting is expressly disapproved by the Federal Trade Commission as a sham.

e) Misrepresenting in their advertising, marketing and promotional materials, as well as in contracts with consumers, that an Anchor attorney, licensed in their state, will be overseeing the debt settlement process and appearing in any litigation filed against the purchasers of its debt settlement services.

f) Communicating with the enrolled consumers, including the Plaintiffs, with emails, brochures and letters that contain headers, logos, addresses, domain names and other indicia making them appear to be communications from Anchor.

g) Having their employees identify themselves on calls as being employees or otherwise associated with Anchor.

h) Recording only those calls that are scripted to comply with federal and state laws and regulations (not those in which consumers, including the Plaintiffs are fraudulently induced to act on the misrepresentations).

i) Advising consumers, including the Plaintiffs, to breach contracts with creditors (discontinue paying them) because it "would harm our argument that you are unable to pay what is owed and damages our ability to negotiate the best resolution on your account."

j) Engaging in the unlicensed practice of law by providing legal advice to consumers, including the Plaintiffs, and negotiating settlements in litigated cases without supervision by an attorney or an attorney licensed in the Plaintiffs' state.

24

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0086

k) Having consumers, including the Plaintiffs confer upon them the status of "attorney-at-law" by way of a Power of Attorney.

l) Hiring staff for the Facade Firms to work in the New York offices of the SFS Defendants and doing so under the guise of the Facade Entity itself.

m) Permitting misrepresentations in Facade Firm marketing on websites and other lead generation communications, including those of the Facade Entity. Such misrepresentations include, but are not limited to:

    i. That Anchor was known by the name Law Offices of Stacy Robinson, PLLC—a name that is neither an entity nor a registered tradename.

    ii. That the settlement letters displayed there are exemplary of Facade Firm work when, in fact, they are representative of the work of other entities.

    iii. That Anchor is accredited by the Better Business Bureau with an A+ rating.

    iv. That Anchor's purported law practice is not primarily or exclusively debt settlement.

n) Misleading consumers, including the Plaintiffs, regarding the function of the dedicated account.

o) Defrauding consumers, including the Plaintiffs, out of the protections afforded by federal and state laws, including but not limited to the TSR.

p) The corporate SFS Defendants are liable for the intentional torts and negligence of their members and employees.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0087

## 2. The Facade Firm Defendants

80. The Facade Firm Defendants assist the SFS Enterprise by creating, managing and maintaining the Facade Firms so that the SFS Defendants may hold themselves out as a law firm entitled to the exceptions from certain federal and state laws, including but not limited to the TSR and entitled to the trustworthiness and legitimacy of a bona fide law firm.

81. Permitting the SFS Defendants to engage in the above-listed misrepresentations on their behalf.

82. The Facade Firm Defendants engage in the unlicensed practice of law by assisting the SFS Defendants to perform tasks that the law reserves for licensed attorneys.

83. Failing to comply with rules of professional conduct regarding explaining the legal services contract to clients and specifically hiding the arbitration and class action provisions from consumers, including the Plaintiffs.

84. Failing to maintain a trust account in the states in which they purportedly practice, including a trust account for the Plaintiffs in Connecticut.

85. Failing to account for costs allegedly paid on behalf of consumers, including the Plaintiffs.

86. Paying for "recommendations" from third party lead generation providers.

87. Impermissibly sharing fees with a non-attorney.

88. Improperly advising the Plaintiff to discontinue paying her creditors which: 1) exposed the Plaintiff to additional fees, debt, lawsuits, and damage to her creditworthiness; and 2) constituted an interference with contract that diverted money from Plaintiff's creditors to Defendants.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0088

89.     Charging illegal, prohibited or clearly excessive fees and costs in violation of Rule 1.5 of the Connecticut Rules of Professional Conduct.

90.     Setting up a conflict of interest with the client wherein the client's money set aside for settlement of enrolled debt is also used to pay the attorneys' fees, such that the attorney has the incentive to negotiate payouts over time rather than lump sum payments so the attorneys' fee may be collected immediately.

91.     Anchor is liable for the intentional torts and negligence of its members and "employees."

### 3.  Montanile

**(in addition to those listed above for SFS Defendants generally)**

92.     By posing as bona fide member or attorney of seventeen Facade Firms, including the Facade Entity, Montanile engaged in, and assisted the SFS Enterprise with their subterfuge to conceal that the Facade Entity is not a bona fide law firm, that no properly licensed attorneys were actually providing legal services, and that SFS Defendants' staff were practicing law without a license.

93.     Knowingly permitting the misrepresentations of the SFS Defendants and Facade Firm Defendants listed above to her clients in contravention of her professional responsibilities.

94.     Failing to advise consumers, including the Plaintiffs, that they could get the same services cheaper through a different Facade Firm.

95.     Simultaneously working as an in-house attorney for the SFS Defendants and an attorney for seventeen Facade Firms, all of which use the services of the SFS Defendants.

27

Exhibit 29-0089

### 4. Daniel Camacho

**(in addition to those listed above for Facade Firm Defendants)**

96.     As the SFS Defendant who fraudulently induced the Plaintiff to pay fees to a non-lawyer entity, Daniel Camacho knowingly assisted the SFS Enterprise in its scheme.

97.     Daniel Camacho knowingly permitted the SFS Enterprise to use his name as a "Law Firm Contact" on contracts with consumers when he was not associated with a bona fide law firm.

### 5. Jason Blust, Thomas Rogus, and Timothy Burnette

**(in addition to those listed above for Facade Firm Defendants)**

98.     Blust, Rogus, and Burnette knowingly created and maintained the Facade Firm portfolio or "programs," including the shell entity Anchor, for the specific purpose of assisting the SFS Defendants in the SFS Enterprise's fraudulent scheme of inducing consumers, including the Plaintiffs, into the payment of fees to an entity they believed was a bona fide law firm.

### 6. Robin Lasky

**(in addition to those listed above for Facade Firm Defendants)**

99.     By posing as a bona fide member or attorney of a majority of the approximately thirty Facade Firms, including the Facade Entity, Lasky engaged in, and assisted the SFS Enterprise with their subterfuge to conceal that the Facade Entity is not a bona fide law firm, that no properly licensed attorneys were actually providing legal services, and that SFS Defendants' staff were practicing law without a license.

100.     Misrepresenting that his relationship to Anchor is a bona fide membership rather than a referral relationship.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0090

101.    Knowingly permitting the misrepresentations of the SFS Defendants and Facade Firm Defendants listed above to his clients, including the Plaintiffs, in contravention of his professional responsibilities.

102.    Failing to advise consumers, including the Plaintiffs, that they could get the same services cheaper through a different Facade Firm.

### 7.  The Notary Services Defendant

103.    The Notary Services Defendant Velsa markets what it calls "Debt Settlement Signing Services" to provide "compliant Face-To-Face meetings."

104.    The Notary Services Defendant Velsa actually boasts "high client enrollment percentages" because it has "trained representatives" many of whom "are also paralegals or have other legal backgrounds" which enables them to review the important details of the program and enrollment process with the soon-to-be client.

105.     Despite the obligation of notaries to play a neutral role and to refrain from influencing any party from participating in or eschewing a transaction requiring a notarial act, the Notary Services Defendant Velsa touts that their notaries have the training and legal background to persuade customers to enroll and, in addition, carry off the deception that they are paralegals with actual law firms.

106.    The Notary Services Defendant Velsa knowingly contracts with the SFS Defendants in the guise of the Facade Firms for the express purpose of providing mobile notaries to pose as representatives of a law firm for a face-to-face meeting.

107.    The Notary Services Defendant knows that the Federal Trade Commission disapproves of this use of their network of mobile notaries for a purported face-to-face meeting under the TSR.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0091

108.    The Notary Services Defendant knowingly provides its  contracted notaries with documentation to complete (such as the Affidavit of Compliance) that: 1) fraudulently represent that the notary is a representative of a law firm; and 2) fraudulently claim that the notary has, and is capable of, determining compliance with the TSR.

109.    The Notary Services Defendant knowingly provides its contracted notaries with, and instruct them not to deviate, from scripts and presentations that provide legal advice and that omit important terms of the contract, such as the arbitration clause and class actions waiver.

110.    The Notary Services Defendant knowingly assigns its contracted notaries to jobs that contain an inherent conflict, insofar as the notary must sign the contract as a representative of one of the parties to the contract while also attesting to the consumers' signatures as an independent, disinterested quasi-governmental official.

111.    The Notary Services Defendant guides the notaries through the entire signing process, providing instructions for what to do and say at the signing, requiring the notary to call if there are any problems or questions and relaying such calls to the SFS Defendants.

112.    The Notary Services Defendant is responsible for the misrepresentations and breach of fiduciary duties of its agent, the Notary Defendant.

### 8.  The Notary Defendant

113.    The Notary Defendant executed an Affidavit of Compliance, falsely representing that: 1) she was a representative of Anchor; 2) she determined there was full compliance with applicable laws, including but not limited to the TSR; and 3) she reviewed certain subjects with respect to a purported legal services contract with the Plaintiffs.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0092

114.    The Notary Defendant knowingly notarized the Plaintiffs' acknowledgment of the Power of Attorney which gives the purported law firm (of which the notaries claim to be representatives) the authority to act as…an attorney-at-law [sic].

115.    The Notary Defendant knowingly took an acknowledgment in one section of the contract to the "law firm" while signing as a representative of the "law firm" in another which section contravenes notarial standards.

116.    The Notary Defendant knowingly failed to refuse to notarize documents if "the notary knows or has a reasonable belief that the notarial act or the associated transaction is unlawful."

## G.    Damages

117.    As a result of the wrongful acts and misrepresentations detailed above, the Plaintiffs suffered damages because of the fraudulent and deceptive practices of the SFS Enterprise, including, but not limited to:

a)  paying fees in excess of legal limits and otherwise in violation of applicable state and federal law for their debt settlement program;

b)  making monthly payments that were consumed by the impermissible advance fees during the first several months of the program and were substantially consumed by such fees throughout the remainder of their participation in the program;

c)  being subjected to lawsuits and judgments from creditors which Plaintiffs enrolled in the program and stopped paying at the direction of the SFS Enterprise;

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0093

d) incurring in the past and in the future, substantial legal fees in the defense or settlement of lawsuits by creditors brought about by their enrollment in the SFS Enterprise's debt settlement programs;

e) paying fees for services that were never performed and were never intended to be performed and were unable to get refunds for those fees;

f) suffering continuing harm to their credit and creditworthiness making it difficult or impossible to obtain loans or to find reasonable interest rates;

g) incurring in the past and in the future additional interest, late fees and other penalties resulting from the nonpayment of creditors at the SFS Enterprise's direction; and

h) as a result of the litigation with creditors, and creditworthiness damage, suffering extreme emotional distress, physical stress and anxiety.

## H.  Conspiracy and RICO Allegations

### *Criminal Conduct and Statutory Violations underlying RICO claims*

118.    Interstate transportation of stolen property (18 U.S.C. § 2314);

119.    Mail fraud (18 U.S.C. § 1341);

120.    Wire fraud (18 U.S.C. § 1343);

121.    Bank fraud (18 U.S.C. § 1344);

### *The Rico Enterprise and Scheme*

122.    At all relevant times Defendants were members and associates of a fraudulent debt settlement enterprise, whose members and associates engaged in fraudulent and deceptive practices designed to enroll consumers in useless "debt settlement" plans and extract unearned fees from them ("SFS Scheme").

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0094

123. The activities of the SFS Enterprise affected and continues to affect interstate commerce.

124. In order to increase their revenue and profits, members of the SFS Enterprise need to enroll a continuous stream of customers into their debt relief programs. The SFS Enterprise provides that stream by fraudulently inducing consumers to enter into purported legal services contracts through which members of the SFS Enterprise extracted illegal fees directly from consumers' bank accounts.

125. The members of the SFS Enterprise share the common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through luring consumers into useless debt settlement plans and extracting unearned fees from them. Each of the members of the SFS Enterprise was rewarded financially based on its abilities to perform its role as a member of the SFS Enterprise.

### *Conduct of the RICO enterprise's affairs*

126. The SFS Enterprise members have conducted or participated in the conduct of the affairs of the SFS Enterprise, directly or indirectly, by making false statements and promises in an attempt to encourage consumers to sign up for debt settlement programs through the SFS Enterprise, and by extracting and processing payments knowing that the underlying contracts provided for illegal fees and that consumers had signed those contracts based on the fraudulent and deceptive activities of the Enterprise's Facade Firms.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0095

### SFS Enterprise's pattern of racketeering activity

127. Defendants conducted and participated in the affairs of the above-referenced SFS Enterprise through a pattern of racketeering activity, including acts that are indictable under the above-mentioned statutes.

128. The pattern of racketeering likely involved thousands of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the SFS Scheme, as well as many instances involving the interstate transmission of potentially millions of dollars in fraudulently obtained fees, which were withdrawn from accounts under the custody and control of financial institutions.

129. Each of these instances constituted a "racketeering activity" and collectively, these violations constituted a "pattern of racketeering activity," in which the SFS Enterprise intended to defraud consumers, including the Plaintiffs.

130. The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud consumers. Each separate instance of racketeering employed by the SFS Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same injurious results affecting the same victims, including Plaintiffs.

131. The Defendants engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the SFS Enterprise. The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

132. Each of the SFS Enterprise members conspired with the others in order to further and perfect the financial goals of the SFS Enterprise.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0096

133.    The SFS Scheme was constructed with overt written and oral agreements between the SFS Enterprise members to further the goals of the SFS Enterprise and to engage in the pattern of racketeering activity alleged herein. The nature of the acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that SFS Enterprise members not only agreed to an illegal objective, but they were aware that their ongoing fraudulent acts were part of an overall pattern of racketeering activity.

134.    As a direct and proximate result of the SFS Enterprise members' overt acts and predicate acts by conspiring to violate the law, Plaintiffs and consumers have been, and continue to be, injured in their business or property.

135.    The members of the SFS Enterprise have engaged in the commission of, and continue to commit, overt acts, including the unlawful racketeering predicate acts mentioned above.

### The SFS Enterprise's use of the U.S. mail and interstate wire facilities in violation of 18 U.S.C. §§ 1341 & 1343

136.    The illegal conduct and wrongful practices of the SFS Enterprise were carried out by an array of agents and members of the SFS Enterprise, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. mail and interstate wire facilities.

137.    The nature and pervasiveness of the SFS Scheme, which was orchestrated primarily out of the offices of the SFS Defendants and the Facade Firm Defendants, necessarily required those offices to communicate directly and frequently with each other and with consumers by the U.S. mail and by interstate wire facilities.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0097

138.    Indeed, SFS Enterprise's business model and the ensnarement of consumers in the SFS Scheme were predicated upon, and rely on, use of the interstate wire and postal facilities.

139.    SFS Defendant's initial verbal contact with consumers was through interstate telephone calls and/or interstate mail.

140.    The SFS Enterprise members transmitted the legal services agreements to mobile notaries across state lines and over the Internet.

141.    The SFS Enterprise also transmitted the legal services agreements, including portions thereof directly to consumers over the Internet for them to sign or print on their home computers or sometimes sent them directly to consumers through the U.S. mail system.  The SFS Enterprise sent the Welcome Packet directly to consumers though the U.S. mail system.

### *The SFS Enterprise's interstate transportation of stolen property in violation of 18 U.S.C. § 2314*

142.    The SFS Enterprise developed the SFS Scheme, described in the above paragraphs of this Complaint, to obtain money from consumers by fraudulent means.

143.    In furtherance of this SFS Scheme, SFS transmitted consumers' monthly payments and fees, in amounts exceeding $5,000, in interstate commerce. SFS did so despite knowing that the authorization for those payments and fees were obtained by fraud.

### *The SFS Enterprise's commission of bank fraud under 18 U.S.C. § 1344*

144.    The SFS Enterprise knowingly executed the SFS Scheme to obtain money, by means of fraudulent pretenses, representations, and promises, from consumers' bank accounts, which were under the custody and control of federally chartered or insured financial institutions.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0098

145. Specifically, as described above, the SFS Enterprise obtained by fraudulent means the authorization of the Plaintiffs to withdraw money from their bank account under the custody and control of federally chartered and insured financial institutions.

146. On information and belief, the same process involving fraud in obtaining authorization to withdraw money from consumers' federally chartered or insured bank accounts was repeated in a continuing and ongoing pattern with the ensnarement of each additional consumer victim.

147. The SFS Enterprise also violated 18 U.S.C. § 1344 by fraudulently obtaining authorization to withdraw money from the Plaintiffs' dedicated account and held in an FDIC insured financial institution.

### *Other predicate acts*

148. As alleged above, the SFS Enterprise has victimized other consumers in the same way as they victimized the Plaintiffs. Other such consumers include, but are not limited to:

  a) Sharyn Pinkos who, on December 7, 2017, was also induced to enroll in the SFS Enterprise debt settlement scheme by a Financial Consultant employed by the SFS Defendants and a notary posing as a representative Anchor.

  b) Sheila Walters who, on October 5, 2018, was also induced to enroll in the SFS Enterprise debt settlement scheme by a Financial Consultant employed by the SFS Defendants and a notary sent by Velsa to pose as a representative of another Facade Firm, Wyolaw, created and maintained by the same SFS Enterprise.

  c) David Crook, who on December 27, 2017, was also induced to enroll in the SFS Enterprise debt settlement scheme by the same Financial Consultant,

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0099

Daniel Camacho, employed by the SFS Defendants and a notary posing as a representative of Anchor.

## *Damages caused by the SFS Schemes*

149.    SFS Enterprise's violations of federal and state law and its pattern of racketeering activity have directly and proximately caused Plaintiffs to be injured as alleged above in the Damages section.

150.    Damages section.

## *Section 1962(d) allegations*

151.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

152.    The SFS Enterprise members violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

153.    Each of the SFS Enterprise members conspired with the others in order to further and perfect the financial goals of the SFS Enterprise.

154.

155.    The SFS Scheme was constructed with overt written and oral agreements between the SFS Enterprise members to further the goals of the SFS Enterprise and to engage in the pattern of racketeering activity alleged herein. The nature of the acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that SFS and its affiliates not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0100

18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts were part of an overall pattern of racketeering activity.

156. As a direct and proximate result of the SFS Enterprise members' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and other consumers have been, and continue to be, injured in their business or property.

## FIRST  COUNT:
## FRAUD, DECEIT AND INTENTIONAL MISREPRESENTATION
### (All Defendants)

1-156. The Plaintiffs reallege and incorporate by reference paragraphs 1-156 of the Complaint as if fully set forth herein as paragraphs 1-156 of this Count.

157. One who represents as true that which is false with the intent to deceive the person to whom the representation is made is liable to that person if he/she, believing the representation to be true (acts, refrains from acting) in justifiable reliance upon it and suffers damage as a result. The specific elements of fraud/deceit are: 1) that a false representation was made as a statement of fact; 2) that it was untrue and known to be untrue by the party making it; 3) that it was made to induce the other party to act on it; and 4) that the latter did so act on it to his injury. *Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811, 813 (1981)

158. As detailed above, the members of the SFS Enterprise, by and through their agents, knowingly made false representations to the Plaintiffs as a statement of fact that were untrue and known to be untrue.

159. These misrepresentations by all Defendants were made intentionally for the purpose of inducing the Plaintiffs to act or to refrain from action in reliance upon it.

39

Exhibit 29-0101

160. The Plaintiffs did act in reliance upon the misrepresentations by sending the Defendants money and refraining from action by discontinuing payments to their creditors which damaged the Plaintiffs' credit and resulted in unnecessary collections efforts by creditors.

161. The Plaintiffs suffered financial and emotional harm as a result.

162. The injury, loss, or harm suffered by the Plaintiffs was the result of the Defendants' acts or omissions that were: 1) reckless indifference to Plaintiffs' rights; or 2) an intentional and wanton violation of those rights:

> Recklessness is a state of consciousness with reference to the consequences of one's acts.... It is more than negligence, more than gross negligence.... The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them.... Wanton misconduct is reckless misconduct.... It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.... Whether the defendant acted recklessly is a question of fact subject to the clearly erroneous standard of review.

*Wagner v. Our Lady of Mount Caritas, O.S.B., Inc.*, 157 Conn. App. 788, 802, 118 A.3d 103, 111 (2015).

163. There was a substantial likelihood, at the relevant time, that serious harm would arise from the Defendants' conduct.

164. The Defendants were aware of or recklessly disregarded the likelihood that such serious harm would arise from their conduct.

165. The Defendants showed callous indifference upon learning that their conduct was likely or actually causing harm.

166. Additionally, the duration of the Defendants' conduct and concealment of that conduct has spanned years.

**WHEREFORE**, the Plaintiffs demand the recovery of compensatory damages along with punitive damages from the Defendants and all such other relief as may be granted by the court.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0102

## SECOND COUNT:
## CONSPIRACY TO COMMIT FRAUD
### (All Defendants)

1-166 The Plaintiffs reallege and incorporate by reference paragraphs 1-166 of the Complaint as if fully set forth herein as paragraphs 1-166 of this Count.

167. A civil conspiracy is compensable where there 1) a combination between two or more persons; 2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means; 3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, 4) which act results in damage to the plaintiff. *Am. Diamond Exch., Inc. v. Alpert*, 101 Conn. App. 83, 99–100, 920 A.2d 357, 368 (2007).

168. The Defendants conspired to the fraud detailed above by agreeing to the Facade Firm scheme, by taking the overt acts of fraudulently inducing the Plaintiffs to allow Defendants to take their money.

169. The Plaintiffs suffered damages as a proximate cause of the jointly committed fraudulent acts.

**WHEREFORE**, the Plaintiffs demand the recovery of compensatory damages along with punitive damages from the Defendants and all such other relief as may be granted by the Court.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0103

## THIRD COUNT:
## CIVIL RIGHT OF ACTION FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
## 18 U.S.C. § 1962(c) and(d)
## (All Defendants)

1-169 The Plaintiffs reallege and incorporate by reference paragraphs 1-169 of the Complaint as if fully set forth herein as paragraphs 1-169 of this Count.

170.    As alleged above in the Conspiracy and RICO allegations section, at all relevant times Defendants were members and associates of a fraudulent debt settlement enterprise, whose members and associates engaged, by overt agreement, in an ongoing and continuing pattern of racketeering activity consisting of fraudulent and deceptive practices designed to enroll consumers in useless "debt settlement" plans and extract unearned fees from them in violation of 18 U.S.C. §§ 2314; 1341,1343, and 1344 and other federal and state laws.

171.    The Defendants conspired to commit the pattern of racketeering activity.

172.    The SFS Enterprise caused damages to the Plaintiffs as alleged above in the Damages section.

173.    This count is brought under 18 U.S.C. § 1964(c) which provides that any person injured by violation of §1962 may sue and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

174.    State courts have concurrent jurisdiction over RICO claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990).

**WHEREFORE**, the Plaintiffs demand the recovery of compensatory damages, plus treble damages and attorneys' fees jointly and individually from Defendants and all such other relief as may be granted by the court.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0104

# FOURTH COUNT:
## PRIVATE RIGHT OF ACTION FOR VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### Conn. Gen. Stat. § 42-110a, et seq.
### (All Defendants)

1-174. The Plaintiffs reallege and incorporate by reference paragraphs 1-174 of the Complaint as if fully set forth herein as paragraphs 1-174 of this Count.

175.    The Defendants in the operation of the unlawful SFS Scheme, and their individual actions as part thereof, have engaged in unconscionable commercial practices and fraudulent activity, made false promises and misrepresentations and knowingly omitted facts as described above in violation of the Connecticut Unfair Trade Practices Act ("CUTPA") which include, but are not limited to, those acts set forth above, which have damaged the Plaintiffs.

176.    The Defendants are liable under the CUTPA because: 1) the Defendants' engaged in unfair or deceptive acts or practices in the conduct of its trade or commerce; and 2) the Plaintiffs suffered an ascertainable loss. *Ulbrich v. Growth*, 310 Conn. 375, 410, 78 A.3d 76, 100 (2013).

177.    In determining whether a practice violates CUTPA, courts look to see: 1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; 3) whether it causes substantial injury to consumers, competitors, or other businesspersons.  All three criteria do not need to be satisfied to support a finding of unfairness. *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 880–81, 124 A.3d 847, 867 (2015)

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503
Exhibit 29-0105

178.    Conn. Gen. Stat. § 42-110g provides a private right of action for any person injured by a practice that is unlawful under the NJCFA.  The court may award actual damages, plus punitive damages, attorneys' fees and costs. Conn. Gen. Stat. § 42-110g(a), (d).

**WHEREFORE**, the Plaintiffs demand the recovery of compensatory damages, plus punitive damages and attorneys' fees jointly and individually from Defendants and all such other relief as may be granted by the court.

**FIFTH COUNT:**
**LEGAL MALPRACTICE IN TORT**
**(Anchor, Montanile, Blust, Rogus, Burnette, Robinson, Lasky)**

1-178. The Plaintiffs reallege and incorporate by reference paragraphs 1-178 of the Complaint as if fully set forth herein as paragraphs 1-178 of this Count.

179.    "Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . ." *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 649, 850 A.2d 145 (2004). The elements of legal malpractice are: "1) the existence of an attorney-client relationship; 2) the attorney's wrongful act or omission; 3) causation; and 4) damages." *Grimm v. Fox*, 303 Conn. 322, 329, 33 A.3d 205 (2012).

180.    As a result of their wrongful acts and misrepresentations, an attorney-client relationship existed between Plaintiffs and the Fifth-Count Defendants who provided inadequate or incomplete legal advice and supervision which was a substantial factor in bringing about the harm that occurred and that some harm to the Plaintiffs was foreseeable from the Fifth-Count Defendants' negligence.

44
**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0106

181.    Inadequate supervision includes, but is not limited to: 1) supervision of misrepresentations of lead generators designed to induce the Plaintiffs into thinking they paying a bona fide law firm; 2) supervision of representations made at, or with respect to, the face-to-face meeting with a mobile notary; 3) supervision of decisions regarding the defense of creditor lawsuits; 4) supervision of advertising, marketing and promotional materials that mislead consumers, including the Plaintiffs; and 5) supervision of non-litigation settlements.

182.    The Fifth-Count Defendants also breached their duty by committing the wrongful acts listed in the section entitled "The wrongful acts and misrepresentations of the Defendants."

183.    The breach of these duties was the proximate causes of the Plaintiffs' damages described above.

**WHEREFORE**, the Plaintiffs demand the recovery of compensatory damages along with punitive damages from the Fifth-Count Defendants and all such other relief as may be granted by the court.

## SIXTH COUNT:
## IMPLIED PRIVATE RIGHT OF ACTION FOR VIOLATION OF THE CONNECTICUT UNAUTHORIZED PRACTICE OF LAW STATUTE
### (SFS Defendants, Notary Services Defendant and Notary Defendant)

1-183.  The Plaintiffs reallege and incorporate by reference paragraphs 1-183 of the Complaint as if fully set forth herein as paragraphs 1-183 of this Count.

184.    The Sixth-Count Defendants held themselves out as licensed attorneys capable of representing Connecticut residents like the Plaintiffs, both in debt settlement negotiation and litigation.

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0107

185. Conn. Gen. Stat § 51-88 provides, in pertinent part, that no person may practice law in Connecticut unless that person has been admitted as an attorney under the provisions of section 51-80.

186. An implied right of action exists if the balance of the following three factors weighs in the plaintiff's favor: 1) plaintiff is a person for whose benefit the statute is created; 2) there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; and 3) whether consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff. *Wilson v. Jefferson*, 908 A. 2d 13, 20-21 (2006). Moreover, "stronger evidence in favor of one factor may form the lens…through which we determine whether the [plaintiff] satisf[ies] the other factors." *Provencher v. Town of Enfield*, 284 Conn. 772, 779,936 A.2d 625, 629–30 (2007).

187. All three factors clearly weigh in the Plaintiffs' favor. Both plaintiffs are plainly a person for whose benefit the Connecticut authorized practice of law statute was created for and it is therefore consistent with the purpose of the statutory scheme to imply a remedy for the Plaintiffs.

188. Moreover, there is either an explicit or implicit indication in the legislative intent to create such a remedy because Conn. Gen. Stat § 51-88(c) is clear that "the Superior Court shall have jurisdiction in equity upon the petition of any member of the bar of this state in good standing or upon its own motion to restrain such violation." The only way a member of good standing of the Connecticut Bar such as the Plaintiffs' counsel can "petition" for the Superior Court to "restrain such violation" is by doing what the Plaintiffs request, in part, here—an order enjoining the offender from further unauthorized practice of law.

**WHEREFORE**, the Plaintiffs demand the recovery of compensatory damages along with punitive damages from the Sixth-Count Defendants, an order enjoining the Sixth-Count

Ice Legal Co.
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503
Exhibit 29-0108

Defendants from further unauthorized practice of law, and all such other relief as may be granted by the court.

## DEMAND FOR JURY TRIAL

189.    The Plaintiffs demand a trial by jury of all claims so triable by right.

## DEMAND FOR RELIEF

190.    The Plaintiffs demand the recovery of compensatory damages along with punitive damages, treble damages, attorney's fees, and costs.  The amount in demand is fifteen thousand dollars or more, exclusive of interest and costs.

## NOTICE OF ACTION
## TO ATTORNEY GENERAL AND COMMISSIONER OF CONSUMER PROTECTION

191.    A copy of this complaint will be mailed to the Attorney General of the State of Connecticut and the Commissioner of Consumer Protection upon commencement of the action pursuant to Conn. Gen. Stat. § 42-110g(c).

47

Exhibit 29-0109

Dated: March 11, 2020

ICE LEGAL CO.
Attorney for Plaintiffs
20 Portsmouth Ave. Suite 1, No. 225
Stratham, NH 03885
(603) 242-1503

By: _____

ARIANE ICE
Connecticut Juris No. 440836

By: _____

THOMAS ERSKINE ICE
Connecticut Juris No. 440938

**Ice Legal Co.**
20 PORTSMOUTH AVE. SUITE 1, NO. 225, STRATHAM, NH 03885 | TELEPHONE: 603-242-1503

Exhibit 29-0110

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |
|---|---|
| City of Chicago, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. _____ |
| v. | ) |
| | ) |
| Burnette Legal Group, LLC d/b/a Monarch | ) |
| Legal Group, Timothy Burnette, and | ) |
| Strategic Financial Solutions, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT**

Exhibit 29-0111

Table of Contents

INTRODUCTION ................................................................................................................. 1

THE PARTIES ..................................................................................................................... 2

JURISDICTION AND VENUE ........................................................................................... 4

GENERAL ALLEGATIONS ............................................................................................... 5

    I.    The "Debt Resolution" Business Model ................................................................ 5

    II.   Defendants' Debt Resolution Program and Oppressive Fee Structure .............................. 7

    III.  Defendants' Debt Resolution Program is Designed to Mislead and Exploit Consumers. 12

    IV.  Defendants Create Payment Plans Without Regard for Consumers' Financial Status, Leading Consumers to Fail in Defendants' Program .................................................. 14

    V.    Monarch Lures Consumers Into Their Debt Resolution Programs with a Deceptive Refund Policy .......................................................................................................... 15

    VI.  Defendants Trick Consumers Into Believing that Attorneys Will Negotiate their Debt Settlements, When that Work is Actually Performed by Non-Lawyer Contractors. ................ 17

    VII.  Defendants Do Not Provide Contracted-For Litigation Defense Services, Leaving Chicago Consumers to Defend Themselves in Court .............................................................. 24

    VIII. Timothy Burnette Controlled and Directed Monarch's Conduct ...................................... 28

    IX.  Defendants Deceive Potential Customers by Posting Fake Reviews ................................. 29

    X.    Strategic Engages in Unfair and Deceptive Practices in its Debt Resolution Business Across the Country .................................................................................................. 31

COUNT 1 .......................................................................................................................... 35

COUNT 2 .......................................................................................................................... 37

JURY DEMAND ............................................................................................................... 39

Exhibit 29-0112

Plaintiff City of Chicago files this Complaint to seek relief for the City and its residents because Defendants have violated the Municipal Code of Chicago. In support, Chicago alleges as follows:

## INTRODUCTION

1.      Monarch Legal and Strategic Financial Solutions jointly run a fraudulent "debt resolution" program that preys on Chicagoans struggling with debt. Though the Defendants' program makes many consumers worse off, the companies succeed by collecting substantial fees, refusing to provide contracted-for services, and continually attracting new program participants by deceptive marketing tactics like fake reviews.

2.      Defendants promise that through negotiating with creditors, consumers will be able to settle their debts for less than the amount owed. But because Defendants provide inaccurate estimates and fail to consider consumers' financial situations, Defendants know that their representations are inaccurate and impossible for many consumers.

3.      Defendants also repeatedly fail to provide litigation defense services to consumers when creditors sue them. The City's investigation indicates that Defendants do not employ defense attorneys and often tell consumers to defend themselves. Despite paying significant fees for legal services, consumers are faced with default judgments, wage garnishments, and other negative consequences.

4.      To get away with Defendants' scam, Monarch structured itself as a "law firm" in an attempt to evade responsibility under consumer-protection laws and to leave consumers without meaningful redress. Monarch provides the law-firm façade while Strategic Financial Solutions carries out the debt resolution program. The City' investigation indicates that consumers do not have access to advice from attorneys, and many never receive any form of legal representation.

1

Exhibit 29-0113

The City therefore alleges that at least insofar as the practices at issue here are concerned, neither Defendants nor their employees engage in the practice of law.

5.      Through their unconscionable practices, Defendants have harmed Chicagoans seeking to get out of debt. Meanwhile Defendants collect thousands of dollars, money that consumers could have used to pay down their debts but for Defendants' unrealistic promises and reassurances.

6.      The City of Chicago brings this action to stop Defendants' unlawful conduct and to make them accountable for the harms they have brought upon City residents.

## THE PARTIES

7.      Plaintiff City of Chicago is a municipal corporation and a home-rule unit organized and existing under the laws of the State of Illinois.

8.      Defendant Burnette Legal Group, LLC, does business as Monarch Legal Group and is an Illinois limited liability corporation with its principal place of business at 211 West Wacker Drive, Unit 900B, in Chicago, Illinois. On its website, Monarch advertises that it is a law firm and debt relief agency. The home page states that "[t]he attorneys at Monarch Legal Group have the skill and experience to fight for your rights, mount a defense and protect your property." As described below, Monarch instead hires a variety of third-party non-lawyer contractors to perform debt settlement work and repeatedly fails to provide legal representation to consumers when they are sued by creditors despite contracting to do so.

9.      Defendant Timothy Burnette is on information and belief a resident of Illinois. Burnette has participated and continues to participate directly in Monarch's deceptive and unfair acts and practices and, as Monarch's leading executive, has the authority to control them directly

Exhibit 29-0114

and by nature of his supervisory authority over all other Monarch employees and contractors. By nature of his role, Burnette is aware of the company's deceptive and unfair practices.

10. Despite his leading role in Monarch, Burnette does not identify his affiliation with the firm on his page on the professional networking website LinkedIn. Instead, the page highlights his position as a real estate broker. He further obfuscates his role with Monarch Legal by listing his place of work in his state bar registration as the "Law Offices of Timothy F. Burnette."

11. Defendant Strategic Financial Solutions, LLC is a Nevada limited liability company. As described more fully below, Strategic Financial Solutions employees administer Monarch's debt settlement program and, on information and belief, recruit consumers to participate in it. Strategic employees also operate Monarch's customer service phone line and email address, but they claim to be working for Monarch so that consumers do not know that Monarch outsources those services. On information and belief, Strategic Financial Services performs some of these services and for others enlists subsidiaries, including Monarch Client Solutions, LLC and Finance Solutions, LLC.

12. Strategic Financial Solutions works with a number of fraudulent debt settlement outfits, including, for example, Carolina Legal Services, a debt settlement law firm that recently closed following an investigation by the North Carolina State Bar and the suspension of the attorney in charge of the law firm.[1] Strategic Financial Solutions also operates and/or works jointly

---

[1] Consent Order of Discipline, *The North Carolina State Bar v. Daniel S. Rufty*, 20 DHC 17 (Wake Cnty., N.C., Apr. 8, 2021), available at https://www.ncbar.gov/handlers/DisciplinaryOrderHandler.ashx?url=\Rufty,%20Daniel%20Consent%20Order%20of%20Discipline.pdf&keyword=; Report of the Office of Counsel to the N.C. State Bar Council, *Pending Discipline and Disability Cases* (January 15, 2021), at 6, available at https://www.ncbar.gov/media/730629/2021-january-report.pdf ("It is alleged that Rufty . . . aided in the criminal practice of debt adjusting . . . and made false statements to his clients."); FOX 46 Charlotte, *"It was just a con, and I fell for it." Carolina legal services lawyer suspended*, (Jul. 1, 2021), available at https://www.fox46.com/news/investigations/it-was-just-a-con-and-i-fell-for-it-carolina-legal-services-lawyer-suspended/.

Exhibit 29-0115

with Timberline Financial, LLC, which lists the same office addresses as Strategic Financial Solutions on its website.[2] Timberline entered into a consent agreement and order with the Commonwealth of Pennsylvania for violating Pennsylvania's Debt Settlement Services Act.[3]

13. On information and belief and as described more fully below, Strategic and Monarch jointly operate the debt settlement program. Defendants deceive vulnerable consumers in the process. While Strategic and its subsidiaries process consumers' substantial payments, provide ineffective customer service, and may negotiate with creditors, Monarch convinces consumers that a law firm is providing the debt resolution services. Monarch's status as a "law firm" also provides the basis for the companies to incorrectly claim that they are exempt from debt settlement regulations.

14. In fact, at least insofar as the practices at issue here are concerned, Monarch does not provide legal advice or representation. Moreover, the outside attorneys that Monarch contracts with repeatedly fail to appear in court and rubberstamp negotiated settlements even when a consumer could not possibly comply with the terms. Therefore, Monarch's attorneys—both in-house lawyers and those hired on a contract basis—are not engaged in the practice of law.

**JURISDICTION AND VENUE**

15. The Court has subject-matter jurisdiction under Article VI, Section 9 of the Illinois Constitution.

---

[2] Contact Us, Timberline Financial, https://timberlinefinancial.com/contact-us/.
[3] Consent Agreement and Order, *Commonwealth of Pennsylvania Department of Banking and Securities, Compliance Office v. Timberline Financial, LLC*, Dkt. No. 190011 (BNK-CAO), (Feb. 1, 2019), https://www.dobs.pa.gov/Documents/Enforcement%20Orders/2019/020119_Timberline.pdf.

4

Exhibit 29-0116

16.     The Court has personal jurisdiction over Defendants under 735 ILCS 5/2-209 because Defendants have conducted business in Illinois and have entered into contracts or made promises that are substantially connected to Illinois.

17.     Venue is proper under 735 ILCS 5/2-101 because part of the transactions underlying Chicago's claims occurred in Cook County.

## GENERAL ALLEGATIONS

### I.     The "Debt Resolution" Business Model

18.     Many debt resolution (also called debt settlement or debt negotiation) firms target consumers with significant credit card debt and promise to negotiate with their creditors to settle repayment obligations for less than the consumers owe.

19.     These firms push consumers to enroll in "programs" with significant advance fees.

20.     Participating in debt resolution programs carries significant risks. Typically, debt firms instruct consumers to stop paying unsecured creditors and begin saving money to settle those accounts. But when a consumer stops making payments to creditors, he or she is likely to face adverse effects, including (1) a sharp decrease in their credit score; (2) calls from collections agencies; (3) a rise in debt due to late fees and additional interest; and (4) lawsuits by creditors, who often seek to garnish wages and enforce judgments by other means.

21.     Acknowledging the harm that debt resolution programs create for consumers with debt and credit issues, governments have increased regulation in this area.

22.     In 2010, the Federal Trade Commission issued a final rule amending the Telemarketing Sales Rule, 16 CFR Part 310, to regulate debt relief companies that use telemarketing to contact potential consumers or receive calls in response to mailers and other advertisements. *See TSR Amended Rule 2010*, 75 Fed. Reg. 48457-523 (Aug. 10, 2010). The Rule

5

Exhibit 29-0117

prohibits debt relief companies from charging fees before settling or resolving a consumer debt. It also requires debt relief companies to make several disclosures about their services, including how long it will take to get results, how much it will cost, and the negative consequences that could result. The Rule applies to attorneys as well as non-lawyers, and prohibits businesses from knowingly providing "substantial assistance" to a company violating the Rule.

23.    Also in 2010, the State of Illinois passed the Illinois Debt Settlement Consumer Protection Act, 225 ILCS 429/1 *et seq*. That law requires debt settlement companies to register with the state and restricts practices likely to harm consumers. Violations of the DSCPA are also violations of the Illinois Consumer Fraud and Deceptive Business Practices Act. *See* 815 ILCS 505/2JJJ. The DSCPA excludes from regulation the services of an attorney "engaged in the practice of law." 225 ILCS 429/10.

24.    Many debt resolution businesses—like Strategic Financial Solutions—have not organized themselves as law firms. For good reason: a law degree is not needed to ask creditors to reduce someone's debt. By structuring its debt relief program as an offering from a supposed "law firm," however, Monarch purports to avoid the requirements and restrictions of the DSCPA and similar laws. These requirements include, for example:

    a. An obligation to make oral and written disclosures to prospective consumers, including a warning that debt settlement services "may not be suitable for all consumers" and that consumers "should inquire about other means of dealing with debt, including, but not limited to, nonprofit credit counseling and bankruptcy." 225 ILCS 429/115(a).

Exhibit 29-0118

b. A prohibition on advising consumers, expressly or by implication, to stop making payments to their creditors and to stop communicating with their creditors. 225 ILCS 429/145(2), (3).

c. Most significant to Defendants, complying with Illinois regulation would sharply curtail their abusive fee structure, discussed further in Section II below. The Act prohibits charging any type of fee other than "set up" or "enrollment" fee of no more than $50, and a settlement fee in certain circumstances. 225 ILCS 429/125(a). In total, those settlement fees cannot exceed 15% of the savings the debt settlement provider negotiated for the consumer. 225 ILCS 429/125(c).

25. As described more fully below, these state and federal restrictions would require Defendants to change their business practices and would likely result in diminished profit. Defendants have attempted to avoid these rules by operating under the name Monarch Legal.

**II.    Defendants' Debt Resolution Program and Oppressive Fee Structure**

26. Monarch refers to itself as a "debt relief agency" and "law firm" on its website, www.monarchlegalgroup.com. Monarch's website says that the company can assist people in debt by helping them file for bankruptcy or through its debt resolution program.

27. Monarch claims on its website that through its debt resolution program, it can often negotiate with creditors to settle "for pennies on the dollar." Monarch also tells consumers they will be "on [their] way to a future free of burdensome debt:"

7

Exhibit 29-0119

## Options for Managing Debt

When you're facing a mountain of debt, you might feel like you're at the end of your rope. You do still have options, however. Bankruptcy is one of the best-known options for eliminating excessive debt, but it isn't the only option. You might also be eligible for debt settlement.

With debt settlement, you will work with your creditor to negotiate your debts down to an amount you can afford. You can settle most kinds of unsecured debts, including credit cards, personal loans, medical bills and more. The process can be complex, but you don't have to go it alone. Monarch Legal Group has extensive experience in the debt settlement process, and we will work directly with your creditors to negotiate fair amounts, often for pennies on the dollar. Once we've negotiated a settlement and you've approved it, you'll be well on your way to a future free of burdensome debt.

28.     On information and belief, Monarch and Strategic Financial Solutions primarily or even exclusively steer clients to the debt resolution program for two reasons. First, that program is most profitable for Defendants. Second, Monarch attorneys apparently do not provide legal services or representation in bankruptcy cases. The City's investigation found no bankruptcy case filings by Monarch. None of the many publicly accessible consumer complaints filed against Monarch mention bankruptcy proceedings, even though one consumer inquired about it.

29.     In its "client retainer agreement," Monarch explains that bankruptcy is another option but discourages that option by stating that it "will be reflected as a permanent record on a Client's credit report for up to 10 years."

30.     A consumer that reviewed Monarch on the Better Business Bureau's website noted that he was unable to discuss bankruptcy with a Monarch attorney, contrary to statements in Monarch's agreement and on its website that Monarch provides bankruptcy representation:

8

Exhibit 29-0120



**Edward G**

⭐☆☆☆☆                                                    11/13/2019

Waited 3 months for a response. Had one call from an attorney to discuss the program and never heard from them again. The attorney I was assigned must be non existent because he wouldn't answer his phone or voicemail. I asked for a referral to file bankruptcy which I never received. I called to stop the program to file bankruptcy with $3100.00 dollars in my account. They returned $ 500.00 dollars. This place is a joke. My advice is don't get involved. Hire a real attorney and keep your money.

31.    On information and belief, Defendants find program participants by engaging in telemarketing, and Monarch outsources this telemarketing to Strategic Financial Solutions and related entities.

32.    After an initial phone call, Defendants send paralegals or notaries from third-party companies to prospective consumers' homes or those representatives conduct a presentation virtually. The representatives read from a script about Monarch's program and ask consumers to sign an agreement after the meeting. Consumers reported not understanding the terms of the program after these short appointments. According to the script that outside paralegals or notaries read at these short meetings, a "Monarch attorney" reviews the consumer's file after the meeting and calls the consumer within a "few days" of the meeting.

33.    Monarch consumers sign an agreement that says that the company will review the consumer's "personal hardship and other debt circumstances and formulate a plan to negotiate improved terms." As described further in Section IV below, the City's investigation indicates that Monarch does not conduct a meaningful financial review. The agreement also provides that Monarch "will advise and represent clients in their defense of litigation initiated by creditors or collectors[.]" As described in Section VI below, Monarch repeatedly fails to provide those services.

Exhibit 29-0121

34.    In exchange for the advertised services, Defendants charge significant up-front costs and monthly fees. Defendants charge a percentage of the consumer's total debt as a "Service Cost" to the "non-legal services…related [to the] debt resolution plan." In examples the City has seen, that cost has been as high as 19%. Defendants include in the total used to calculate their Service Costs not only the enrolled debt at the time that the consumer signs an agreement but also the additional debts and fees that accrue after the consumer heeds Defendants' instruction to stop making payments to creditors.

35.    Defendants begin collecting these fees immediately and on a monthly or bimonthly basis. In examples the City has seen, Defendants collected the entire Service Cost less than halfway into consumers' payment schedules. In one example, Defendants collected 19% of a consumer's total debt—or $6,771.60—during the first 22 months of a 48-month payment plan. After the first 22 months, over 53% of this consumer's payments were earmarked as going to the "Service Cost."

36.    Defendants charge a slew of other fees, including a Retainer Fee and a monthly "flat Legal Administration Fee." In the contracts viewed by the City, Defendants' Retainer Fee was $995 and the monthly Legal Administration Fee ranged from $55 to $89. When Defendants do negotiate a settlement payment plan, those payments typically last for many months, and for each payment Defendants charge the consumer an extra $10 ("Settlement Payment Fees"). Fees for changing banking information, payment plans, and adding new debts to the program vary from $19.95 to $299.

37.    Defendants do not hold consumer funds in a client trust account. Instead, Defendants require consumers to sign an Account Servicing Agreement with Reliant Account Management, LLC ("RAM"). RAM collects and deposits consumer payments. RAM charges a monthly fee of $10.75 to administer each account.

10

Exhibit 29-0122

38.     In some instances, Defendants require consumers to sign an agreement with Global Client Solutions to manage consumer payments and deposits.[4,5] GCS also charges a $10.75 monthly fee for "payment processing."

39.     Though they immediately begin collecting fees, Defendants inform prospective consumers that "it typically takes Monarch 7 to 9 months to reach the first settlement."

40.     After accounting for Defendants' various fees, consumers end up paying only a small amount into their reserves for settlement of their debts. For example, after 10 months in a program, only 4% of one consumer's payments went to settlements. This consumer had paid $3,616.80 to Defendants, but Defendants charged over 96% of these payments—or $3,476.21— as fees.

41.     This fee structure makes it difficult for consumers to save funds for potential settlements, increasing the amount of time that the consumer pays fees to Monarch and decreasing the likelihood that the consumer will be able to afford any settlements.

42.     The City's investigation indicates that even when Defendants' agents negotiate settlements with creditors on consumers' behalf, they do not act in consumers' best interest. In one case, Defendants settled a debt worth $3,943, agreeing to pay between 40-60% of the debt. The agreement included small monthly payments of $15 to $30 (to be allocated from the consumer's monthly payments to Defendants), but each payment accrued a Settlement Payment Fee of $10.

---

[4] In 2010, the Consumer Financial Protection Bureau sued GCS, alleging that GCS knowingly processed improper advance payments collected by debt settlement providers, in violation of the Telephone Sales Rule. GCS entered into an agreed consent order in 2014 and paid over $6 million in restitution to consumers and $1 million in fines to the Bureau. *See Consumer Financial Protection Bureau v. Global Client Solutions, LLC, et al.,* 2:14-cv-06643 (C.D. Cal. Aug. 27, 2014), Stipulated Final Judgment and Consent Order.

[5] When the North Carolina State Bar disciplined Daniel Rufty, the attorney who operated Carolina Legal Services in conjunction with Strategic, the disciplinary body concluded that Rufty's use of Global Client Solutions violated state professional rules and was inconsistent with the practice of law. *See Consent Order of Discipline* at 6-7, n.1, *supra.*

11

Exhibit 29-0123

After several payments, the consumer paid $75 to the creditor and $50 in fees. At the completion of the program the consumer would have paid between $500 to $800 in fees. Given those significant fees, the consumer's potential "savings" on the amount owed was far less than Monarch advertised and explained.

### III.    Defendants' Debt Resolution Program is Designed to Mislead and Exploit Consumers

43.    Defendants knowingly mislead consumers by misrepresenting how much they will save and how quickly their debts will get resolved. In consultations and written retainer agreements, Defendants promise that consumers will save an unrealistic amount of money and will finish the program in an infeasible amount of time. Defendants make these representations in order to secure consumers' participation in their debt resolution program.

44.    Both these promises appear in the Payment Schedule section of Monarch's retainer agreements. Defendants state that these two promises are "good faith estimates." But closer inspection of these estimates show that the estimates are often, if not always, improbable because of the high fees charged for Monarch's and Strategic's services. On information and belief, Defendants deliberately obscure the fee structure in these estimates to induce consumers to contract with them. Based on examples that the City has seen, the payment schedules include at least three omissions or deceptions.

45.    First, Defendants fail to incorporate their Settlement Payment Fees into the "good faith estimate" of consumer savings. In one example, a consumer paid $320 in Settlement Payment Fees. Defendants know that they charge these fees and that consumers cannot complete their program without paying them, and yet Defendants omit estimated fees when representing to consumers how much money they will save.

12

Exhibit 29-0124

46.    Consumers who are struggling with debt care very much about how much money they will be able to save, and Defendants knowingly overestimate those amounts.

47.    Second, Defendants predict that they will negotiate settlement agreements at around 40% of the debt consumers owe when they enter the payment plan. This assumption is unrealistic. In practice, Defendants cannot consistently negotiate such beneficial settlements, and information provided to the City by consumers suggests that many debts are settled for over 60% of the amount owed.

48.    Defendants also assume the same settlement rate for all consumers without regard to the amount or type of consumers' debts (for example, whether the bill has been sent to collections).

49.    Third, Defendants fail to factor in interest rates and estimated late fees into their payment schedule. This omission dramatically changes the savings and time estimates Defendants provide to consumers, because of the high interest rates applied to consumer debt.

50.    Defendants know or should know the impact of omitting interest. Defendants—a debt settlement company—know that debt accrues substantial interest and late fees. Defendants also know that consumers' debts will accrue interest because they instruct consumers to stop making payments on their debts. Defendants tell consumers that they will not begin settling debts until consumers have made at least seven to nine months of payments. Because so much of each payment goes to Defendants' fees (particularly at the beginning of the agreement), consumers with multiple accounts to settle continue accruing significant interest and late charges for months, if not years.

51.    In one example, a consumer owed $910 on a debt at the time the consumer signed a contract with Defendants. By the time Defendants began negotiating down the debt, the $910

13

Exhibit 29-0125

debt had risen to $1,827.01. Defendants ultimately settled this debt for $1,096, over 60% of the amount owed at the time the debt was settled. In fact, Defendants settled the debt for more than the consumer owed when the consumer contracted with them.

52.    Defendants structure their programs so that it is nearly impossible for some consumers to benefit. Defendants hide that reality from consumers through Defendants' misleading estimated payment schedules. Defendants dramatically misstate the consumer's estimated savings and program length. If Defendants provided more accurate estimates based on their fee structure, interest, and creditor fees, consumers would understand that Defendants' program does not provide a significant benefit and may in fact make consumers worse off.

### IV.    Defendants Create Payment Plans without Regard for Consumers' Financial Status, Leading Consumers to Fail in Defendants' Program

53.    The City's investigation indicates that Defendants do not act in consumers' best interest when creating a "customized" payment program. Specifically, Defendants ignore consumers' financial situations and seemingly do not care whether consumers can realistically finish their payment program.

54.    Defendants purport to collect consumers' income and expense information to determine their monthly payments. However, in at least one example the City has seen, Defendants recorded blatantly incorrect information about consumer's expenses to justify high monthly payments.

55.    For example, Defendants recorded and estimated a budget based on the fact that one Chicago consumer had only housing, food, and auto expenses. But the consumer informed Monarch of other expenses, including student loans. On information and belief, Defendants' estimates for other Chicago consumers contained similar inaccuracies.

Exhibit 29-0126

56.     Defendants' unrealistic expense estimates demonstrate their complete indifference to the welfare of their consumers. Income and expense information dictates consumers' capacity for monthly payments. This information is also relevant to determine whether bankruptcy—a service Defendants pretend to offer—is the right path for the consumer.

57.     On information and belief, Defendants do not care about consumers' successful completion of the plan because their up-front fee structure allows them to make most of their profit during the first year of the payment program.

58.     Indeed, Defendants might prefer for consumers to withdraw from the program after one year. In the first 12 months, Defendants collect their service costs and retainer fees. After collecting those fees, Defendants' revenue plummets. If consumers withdraw after one year, Defendants collect substantial sums without performing work.

**V.     Monarch Lures Consumers into Defendants' Debt Resolution Program with a Deceptive Refund Policy**

59.     Monarch markets the debt resolution program it operates with Strategic as having a generous refund policy. But on information and belief, most consumers cannot invoke that policy because the terms and conditions are restrictive and exclude most consumers.

60.     Monarch promises in the "Performance Standard" section of its contract to refund consumers for the "share of all Monarch fees & costs for work on [the] individual debt" if Monarch (through Strategic) fails to reduce that debt by more than 35% of the amount owed at the time of the agreement. In practice, the refund policy serves only as an advertising tool used to induce consumers into trusting Monarch even though most consumers will not be eligible to get a refund.

61.     The refund policy appears to exclude most aggrieved consumers. First, consumers who are behind on monthly payments to Defendants are not eligible for any refund.

15

Exhibit 29-0127

62.     Second, the policy relieves Defendants from refund obligations for any debts that "become[] subject to a lawsuit during representation." Many creditors sue Monarch consumers to recover money owed.

63.     Third, consumer debts with balances of less than $1,000 are ineligible for refunds.

64.     The policy, as written, does not provide consumers with adequate relief. More egregiously, Monarch mischaracterizes the refund policy and uses it to induce consumers into joining the debt resolution program when they otherwise would decline to do so.

65.     Consumer complaints to the Better Business Bureau show that many consumers do not understand the very limited circumstances in which Monarch will refund fees:

a.  One consumer wrote: "I would like at least a refund of 995.00 since I didn't receive legal representation." Defendants' refund policy provides no such right to be refunded legal fees.

b.  Another consumer wrote: "I requested a refund because no work had been done. I was told that I would only receive $200 left in my savings after they had withdrawn over $3500 in 'fees' from my account." In fact, Monarch will only refund fees if Monarch is unable to settle a debt for less than 35% of the amount owed. Consumers have no recourse if the program is taking more time than promised or, after relying on Defendants' misleading estimates, consumers find themselves unable to make their payments.

c.  Another consumer wrote: "I called and then they told me after I had paid them a little over $300 a month for 7-9 month period that there was nothing in my account just $100 and that the rest went to their 'fees', fees for providing no service. This is contrary to everything I was told on a monthly basis from them."

16

Exhibit 29-0128

    d.   One consumer requested that the company get a "[b]etter protocol explaining to clients how they assess fees and refunds."

66.    Dissatisfied consumers have further limited recourse because Defendants require consumers to sign arbitration agreements and class action waivers.

**VI.    Defendants Trick Consumers into Believing that Attorneys Will Negotiate their Debt Settlements, When that Work is Actually Performed by Non-Lawyer Contractors.**

67.    Monarch's "Client Retainer Agreement" states that "[t]he law firm puts in place a customized strategy based on the individual client and their debts[.]" In reality, the City's investigation indicates that Monarch attorneys are only superficially involved to trick consumers into thinking that lawyers are performing debt resolution services when the work is actually performed by non-lawyers at Strategic (if the work is performed at all).

68.    In the examples that the City has seen, and on information and belief in other instances too, Monarch lawyers do not perform debt settlement work. Monarch nevertheless tells consumers that they pay for legal services and will have the assistance of attorneys. Although one section of Monarch's nearly 40-page agreement states that third parties may perform some work related to the program, it later explains that Monarch has a "non-exclusive reciprocal referral agreement with independent contractors to provide" what it calls "non-legal services related to the implementation, management, and maintenance of Client's debt negotiation plan." Monarch's agreement and other promotional materials misrepresent the truth: non-lawyers at Strategic do not merely provide some administrative services, they carry out Monarch's debt resolution service.

69.    Monarch's agreement misleads consumers and contradicts other statements the company makes in prominent promotional materials that consumers rely on. For example,

Exhibit 29-0129

Monarch's homepage advertises that the "attorneys at Monarch Legal Group have the skill and experience to fight for your rights, mount a defense and protect your property:"





70.    In presentations with potential clients, Monarch "representatives" – who in fact do not work for Monarch – have explained that Monarch attorneys will provide representation and negotiate with the creditor's lawyers.

71.    Defendants' legal fees also reinforce the deception that attorneys will be performing the debt settlement work, including by representing consumers in court. As discussed in paragraph 36 above, customers pay a "Retainer Fee" (often around $1,000) and a monthly flat Legal Administration Fee (from $55 to $85).

72.    Though consumers sign agreements and make payments to Monarch, they rarely, if ever, speak with Monarch employees, let alone Monarch lawyers. Monarch tells consumers to

18

Exhibit 29-0130

call a customer service line or email a customer service address, both of which are operated by Strategic Financial Solutions and its related entities in New York.

73.    Current and former Strategic employees have noted that Monarch's and Strategic's practices confuse consumers. On information and belief, Strategic tells representatives to say they are calling from Monarch, not Strategic, so consumers do not realize that they aren't speaking to someone at Monarch. In a review on the professional website Glassdoor, one former employee explained that "if you say the real company name [Strategic] most people are confused as to why your [sic] are calling them." Another former employee implored Strategic to "[b]e honest about what you are doing. If you can't proudly tell clients the real name of your company, there is something seriously wrong."

74.    Monarch tells prospective consumers that its client services team (which, in reality, consists of Strategic employees located in another state) will "assist [customers] in arranging to speak with an attorney" to provide legal advice or respond to legal questions. But the City's investigation indicates that Strategic's customer service team does not make attorneys available for client calls.[6] Consumers reported to the City that they were unable to receive answers from the attorney identified on Monarch paperwork and instead were forced to direct questions to non-lawyers who were not familiar with their situations.

75.    For example, one person complained to the City that a customer service representative hung up on him when he called to ask why his wages were being garnished. In a previous phone call, a representative said Monarch would resolve the lawsuit to avoid garnishment.

---

[6] The North Carolina State Bar concluded that Carolina Legal Services attorney Daniel Rufty engaged in misrepresentations to clients and an unprofessional lack of communication by engaging in a similar, albeit not identical, arrangement with a Strategic subsidiary. *See Consent Order of Discipline* at 5-6, 7-8, n.1, *supra.*

Exhibit 29-0131

Another consumer called with a question about how the debt settlement process worked, and the customer service representative refused to connect her with a lawyer.

76.    Monarch retainer agreements identify "Law Firm Contacts." Those contacts are not employed by Monarch, and instead work for Strategic or a related entity. The two contacts excerpted below identify James Katayanagi, an employee of Strategic subsidiary Finance Solutions,[7] and Haider Salas, a former employee of Strategic Financial Solutions, as the consumers' "Law Firm Contact." Neither Katayanagi nor Salas are lawyers:

**PROPOSED PROGRAM INFORMATION**

| Total Unsecured Debt: | *Estimated Program Length (months): |
|---|---|
| $47,404.00 | 48 |
| Date of First Payment: | Program's Payment Amount: |
| 9/30/2019 | $722.91 |
| *Estimated Total Payments: | Law Firm Contact: |
| $34,699.44 | James Katayanagi |

**PROPOSED PROGRAM INFORMATION**

| Total Unsecured Debt: | *Estimated Program Length (months): |
|---|---|
| $16,370.00 | 36 |
| Date of First Payment: | Program's Payment Amount: |
| 1/9/2021 | $361.68 |
| *Estimated Total Payments: | Law Firm Contact: |
| $13,020.30 | Haider Salas |

---

[7] Before or concurrent with his employment at Finance Solutions, Katayanagi worked as a personal banker. From 2013 to 2014 he pled guilty to state criminal charges and settled with the Financial Industry Regulatory Authority ("FINRA")'s disciplinary body for creating ATM cards and withdrawing money from client accounts without authorization. *See* BrokerCheck by FINRA, *James M Katayanagi*, *available at* https://brokercheck.finra.org/individual/summary/4890437; Complaint, *Department of Enforcement v. James M. Katayanagi*, (FINRA Office of Hearing Officers, Proceeding No. 2013035572001), at 4, *available at* https://www.finra.org/rules-guidance/oversight-enforcement/finra-disciplinary-actions?search=2013035572001.

20

Exhibit 29-0132

## James Katayanagi
Senior Financial Consultant at Finance Solutions

-  Finance Solutions

- LIU Post

New York City Metropolitan Area · Contact info

57 connections

( 🔒 Message )  ( More )

### Experience



**Senior Financial Consultant**
Finance Solutions
Oct 2010 - Present · 11 yrs 5 mos
Greater New York City Area

In my role as a Senior Financial Consultant , I help my clients accomplish their financial objectives by gathering information regarding their financial and life goals and developing personalized strategies to help them accomplish those objectives.



## Haider Salas · 3rd
Account Executive at Indeed.com

- 🅘 Indeed.com

- 👑 Columbia University in the City of New York

Queens County, New York, United States · Contact info

417 connections

( 🔒 Message )  ( More )

### Experience

**Account Executive - Growth**
Indeed.com · Full-time
Mar 2021 – Present · 10 mos

**Financial Sales Consultant**
Strategic Financial Solutions NY · Full-time
Dec 2019 – Feb 2021 · 1 yr 3 mos
New York, New York

21

Exhibit 29-0133

77. The credentials of the person negotiating down debts is material to prospective clients. A reasonable consumer would conclude that Defendants' higher fee structure is warranted because the company offers legal expertise. But the City's investigation indicates that Defendants' services are not performed by lawyers, and lawyers do not actually supervise the non-attorneys settling debts.

78. A reasonable consumer likely would decline to contract with Monarch had she known that debt negotiation and customer service would be outsourced to another company in another state that is staffed by non-lawyers.

79. Reviews from current and former Strategic employees on the career website Glassdoor express similar concerns about the company's business model:

1.0 ★ ★ ★ ★ ★  ∨

Current Employee

**Debt Settlement**

Feb 24, 2022 - Sales

○ Recommend     — CEO Approval     ✗ Business Outlook

**Pros**
Great people. Good management, client-focused sale.

**Cons**
Ethics. Uses misleading mailers advertising rates that don't exist, with company letterhead that is made up and recycled every couple months. Advertises loans but pitches people into debt settlement. Debt settlement model is not contigency, but the so called "Attorney-model," which circumvents the law of several states by not technically being a debt-settlement company, but rather a law office, which allows Strategic to collect fees up front even if a client cancels and nothing has been negotiated.

22

Exhibit 29-0134



1.0 ★ ★ ★ ★ ★   ✓

Current Employee, more than 1 year

**Bait and Switch**

Dec 5, 2021 - Financial Advisor in New York, NY

✗ Recommend    ✗ CEO Approval    ✓ Business Outlook

Pros
The bonuses are great if you swindle enough customers (victims). The company will always exist as long is debt is a problem which translates to job security.

Cons
The hours, the benefits and taking advantage customers who are already in a financial disadvantage. The company is good at avoiding responsibility. However they're not the only ones that operate like this so I can't make them out to the only bad guys. Still, a poisonous culture and if you have morals then you will need to leave them at the door to work here.

Advice to Management
None, the way these folks work is predatory. There's no improving unless these guys go out of business.

80.    Even when Defendants do engage with creditors, non-attorney employees perform the negotiations. Defendants' documents reveal that attorneys approve settlements that non-attorney Strategic employees have negotiated without significant review. The City reviewed each of the three separate consumer files that Monarch provided to identify a clear pattern. The user "dev_team"—presumably a Strategic employee—negotiates a settlement and then creates a "debt settlement plan" in Defendants' database. Several days later, user "r-fakhouri," likely Ricky Fakhouri, an outside attorney who has contracted with Monarch on a case-by-case basis, approved the plan. On all seven occasions concerning settlements for three separate consumers, Ricky Fakhouri approved a settlement and wrote the same vague phrase: "Approved: Reviewed original amt, current amt, settlement amt. Settlement is within acceptable firm parameters. Atty Approved."

81.    In the documents reviewed by the City, Monarch attorneys never rejected a settlement proposed by Strategic employees. Based on information and belief, attorneys affiliated with Monarch rubberstamp all settlements, do not supervise the non-lawyer debt negotiators, and do not give reasoned legal advice to consumers about whether to accept a settlement.

23

Exhibit 29-0135

82.     The following example from a Chicago consumer illustrates Defendants' failure to provide legal advice related to a settlement. Defendants contracted with a local attorney, not employed by Monarch, to represent the consumer in a lawsuit by a creditor. The attorney did not appear in the proceeding and the creditor received a default judgment against the consumer. After the entry of judgment, Defendants negotiated a settlement. The consumer signed a settlement agreement requiring significant monthly payments, which the consumer understood would come from his account with Defendants. But Defendants settled the account for more than the consumer could possibly pay.

83.     Defendants have also completely neglected to administer the settlement. Defendants did not make any settlement payments from the consumer's account. The creditor filed a motion to reinstate and for default judgment for failure to pay the settlement payments, and the consumer was left vulnerable to wage garnishment and other negative consequences.

**VII.     Defendants Do Not Provide Contracted-For Litigation Defense Services, Leaving Chicago Consumers to Defend Themselves in Court**

84.     Monarch promises in promotional materials and in retainer agreements that it will "provide Litigation Defense Services in the event the client receives a Summons and Complaint" from a creditor or debt collector for non-payment. But Defendants repeatedly break this promise and leave consumers to defend themselves in court, even though consumers pay hundreds to thousands of dollars in legal fees. Defendants' failure to respond causes consumers to suffer all the adverse consequences of having a judgment against them, including having their wages garnished.

85.     In the scripted presentations that third-party notaries and paralegals make to prospective clients, the representatives state that "[t]he law firm is prepared to do what is necessary to represent you, and, if appropriate, defend you against creditor or collector lawsuits." The script

24

Exhibit 29-0136

also instructs representatives to state that "legal fees for your defense are covered by your retainer payments."

86.      Through its third party representatives and in its welcome materials, Defendants tell consumers how to contact the "Litigation Department." On information and belief, that department doesn't exist. The City's investigation indicates that in reality, Monarch employs only the few attorneys needed to complete rote and scripted check-in calls with clients to suggest that an attorney is involved in the consumer's program. Those attorneys do not litigate on behalf of consumers.

87.      Attorneys' rote notes demonstrate that they did not meaningfully interact with clients. Attorneys using Defendants' internal case management system copy and paste the same brief notes logging "Attorney Reviews" without mentioning any information specific to the client. Attorneys use scripts for these calls. Based on the foregoing and on information and belief, Monarch attorneys often if not always fail to provide individualized legal advice and therefore are not engaged in the practice of law.

88.      The City's investigation indicates that neither Monarch nor Strategic employ lawyers to handle "Litigation Defense." Instead, Monarch acts as a referral service by attempting to contract with outside lawyers to handle those matters for small flat fees. When, as is often the case, Defendants fail to refer the case to an outside lawyer, Defendants have refused to provide any representation. If a Strategic employee communicates with the consumer at all before a hearing date, the employee will instruct him or her to go to court alone. In other instances, Defendants assure consumers that Defendants will handle the litigation and, when an attorney fails to appear, the court enters a default judgment against the consumer.

25

Exhibit 29-0137

89.     To further reduce the likelihood of providing legal representation, Monarch's retainer agreements place severe restrictions on the provisions of those services. For example, Monarch reserves the right to refuse to provide legal defense services if the client does not submit all pages of the summons, complaint, exhibits, and pleadings to Monarch, and requires submission within 15 or 7 days, depending on the state. Monarch also requires that the client's account payments be current. Significantly, consumers pay legal fees even if Monarch refuses to provide those services.

90.     One consumer told the City that after making regular payments, he received a summons from a creditor and promptly contacted Monarch. The consumer did not hear from Monarch for two weeks. A customer representative then told the consumer that Monarch could not guarantee that a lawyer would be available to represent the consumer at the hearing. Despite paying a monthly retainer fee for a lawyer, the consumer responded to the summons and defended himself in court.

91.     Consumer complaints on the Better Business Bureau's website recount similar experiences:



David B

★☆☆☆☆                                                               07/28/2021

The worst customer service. They assigned me a lawyer for litigation. I never heard from the lawyer and called to complain, they gave me the lawyers phone number to make contact myself and when I do make contact I am told he does even represent Monarch Legal Group! This group is a fraud and we need to have a class action suit to get our money! Do yourself a favor and run away from Monarch Legal!

Exhibit 29-0138



**Bill K**
★☆☆☆☆          11/03/2021

Their idea of "negotiation" is a lien on my salary from Citibank. "Oh that's the only way they would take it." So WTF do they call negotiation? We have been paying $800 a month to these hucksters. And now a payroll lien on top of that? And our majority balance card has been paid ZERO in 18 months! I would be very surprised if the 5 star review **** actual customers.



**Riley N**
★☆☆☆☆          07/21/2021

Crooked, misleading and HORRIBLE customer service! STAY AWAY! Not worth a ***** saved! They will cost you thousands of dollars in fees! Your credit score will go down by at least 100 points. I got four summons in all. Had to represent myself twice. Communication SUCKS! Im completely embarrassed that I managed to get involved with this company and missed all of this! Be smarter than me find a different way. And someone please, BBB, AGs office, shut this s*** down and make them give people their money back. Its horrifying.

92.     Consumers may be unable to access the typical methods for reporting attorney misconduct. On information and belief, Defendants intended that result when structuring Monarch as a purported "law firm." Consumers who never receive representation cannot identify an attorney that has engaged in misconduct, but Illinois' Attorney Registration and Disciplinary Commission receives and adjudicates complaints about individual attorneys, not law firms.

93.     Consumers who receive deceptive and inaccurate information from Strategic are unable to report that conduct to any attorney regulatory bodies because the employees are not lawyers. Furthermore, consumers do not even know that they are talking to Strategic employees.

94.     Further evidencing Monarch's lack of responsiveness to customer concerns, the Better Business Bureau suspended Monarch's accreditation in 2021 for, among other things, failing to provide adequate responses to customer complaints. The Bureau revoked Monarch's

Exhibit 29-0139

accreditation less than a year after publishing an "alert" about Monarch's business practices and its failure to respond to a request for investigation:



### VIII. Timothy Burnette Controlled and Directed Monarch's Conduct

95.     Timothy Burnette holds himself out as the "owner" of Monarch Legal.

96.     Monarch's website states that Timothy Burnette is the "attorney responsible for the content of this Site."

97.     Timothy Burnette is, on information and belief, the sole member and manager of Burnette Legal Group, LLC d/b/a Monarch Legal Group.

98.     As the sole member and manager, Burnette has controlled and continues to control Defendant Monarch's conduct, including its arrangements with Strategic and other third-party vendors that carry out the debt resolution program.

28

Exhibit 29-0140

99.     Burnette is well aware of the harms his company causes through its deceptive and unfair practices. For example, Burnette has responded, albeit vaguely, to customer complaints on the BBB website:

**Business Response**                                        12/15/2021

Hello -

I am the owner of Burnette Legal Group, LLC D/B/A Monarch Legal Group.  Couple of things:

We received a complaint for  **********************.  I am happy to report that the issues raised in *********************** complaint have been resolved to the client's satisfaction.

Thanks,

Tim

--

***************** Burnette, Esq. ********************** Offices of **************** Burnette

******************************************************************************

************

## IX.     Defendants Deceive Potential Customers by Posting Fake Reviews

100.    The City's investigation indicates that Defendants attract additional customers by posting fake positive reviews in an attempt to obscure the honest negative reviews that the companies receive regularly. Defendants intend for prospective consumers to rely on falsified positive reviews so that they decide to participate in Defendants' program.

101.    Reviews of Defendants on various online platforms – like Glassdoor, Google, and Better Business Bureau – paint starkly different pictures. Defendants have a surprising range of

Exhibit 29-0141

exclusively 5-star and 1-star reviews, with no scores in the middle of the range. For example, on

the Better Business Bureau website, where Monarch has a 1.15/5-star rating, the company has 39

reviews: 1 5-star review, 1 3-star review, and 37 1-star reviews.

102.    Former and current employees have reported that this discrepancy is part of

Defendants' marketing agenda. According to employee reviews on Glassdoor, Strategic Financial

Services asks its employees to post falsified positive reviews to cover up the truthful negative ones:



Exhibit 29-0142



103. Reviewers on Better Business Bureau and Google also concluded that Defendants' positive reviews are inaccurate. One Google reviewer wrote that "all the good reviews [about Strategic] reviewer are FAKE. If you are in debt run far far away." As depicted in paragraph 91 above, one BBB reviewer expressed skepticism about Monarch's lone positive review.

104. Despite the overwhelmingly negative reviews, Defendants quote five positive consumer reviews in an advertising brochure titled: "Reducing Your Debt & Restoring Stability to Your Life: A Welcome Guide to a Fresh Start." These comments are quoted to Vanessa R., Richard D., Jack F., Amanda G., and Nick L. On information and belief, these five reviews are fake.

### X. Strategic Engages in Unfair and Deceptive Practices in its Debt Resolution Business Across the Country

105. Strategic's partnership with Monarch is not unique. Strategic has engaged in similar arrangements with sham law firms to defraud consumers across the country for years.

Exhibit 29-0143

106.    Strategic provided similar services, albeit operating under a different structure, to the now-shuttered Carolina Legal Services firm, as described in paragraph 12 above. Strategic created a wholly-owned subsidiary called Carolina Client Services, LLC to carry out the solo practitioner's debt settlement program.[8]

107.    Based on public legal filings and on information and belief, Strategic also worked with Legal Helpers Debt Resolution, a Chicago-based consumer debt company that operated nationally as a supposed law firm.[9] The State of Illinois sued Legal Helpers and its principals for similar consumer-protection violations in 2012. Illinois Attorney General Lisa Madigan said that Legal Helpers lawyers were "a 'front' to collect hefty fees from struggling consumers." Legal Helpers agreed to refund $2.1 million to Illinois consumers in a settlement.[10]

108.    In response to the City's subpoena, Monarch provided information from a limited number of consumer files. In one of those files, Monarch included a call script for a different legal entity, Option 1 Legal. The text of the call script for Option 1 Legal and for Monarch are the same, except for the law firm name. The presentation for prospective consumers is also substantially the same:

---

[8] Dkt. #8, Corporate Disclosure Statement of Carolina Client Services, LLC, *Daniel Rufty Legal, PLLC v. Carolina Client Services, LLC*, Case 3:21-cv-00054 (W.D. N.C. Feb. 18, 2021).

[9] Dkt. #8, Amended Complaint, *Dawn Jones v. Strategic Financial Solutions, LLC et al.*, Case 1:16-cv-04617 (S.D.N.Y. Jul. 5, 2016), at 10.

[10] Ameet Sachdev, "Chicago Law: Debt-settlement firm to wind down business," *Chicago Tribune* (Jul. 27, 2012), available at https://www.chicagotribune.com/business/ct-xpm-2012-07-27-ct-biz-0727-chicago-law-20120727-story.html.

Exhibit 29-0144

# HOW DOES DEBT RESOLUTION WORK?



Option 1's Debt Resolution program is designed to pay off your debts through a strategy in which Option 1 negotiates with your creditors on your behalf to pay back, in a lump sum or term payments, less than the amount owed on your accounts.

Your involvement in these negotiations and conversations may be necessary and important.

**OPTION**LEGAL    Client Initial:_____    In-Person Client Presentation    **3**

# HOW DOES DEBT NEGOTIATION WORK?



Monarch's Debt Negotiation program is designed to pay off your debts through a strategy in which Monarch negotiates with your creditors on your behalf to pay back, in a lump sum or term payments, less than the amount owed on your accounts.

Your involvement in these negotiations and conversations may be necessary and important.

In-Person Client Presentation    Client Initial:_____

33

Exhibit 29-0145

On information and belief, Strategic has a similar agreement with and also operates through Option 1 Legal. Strategic drives these unfair and deceptive programs but uses its supposed law firm partners as a front to avoid regulation.

109.    Employee and customer online reviews suggest that Strategic works with as many as ten law firms:





34

Exhibit 29-0146

## COUNT 1
### Violation of MCC § 2-25-090

110.    Chicago incorporates all preceding allegations as if they were set forth herein.

111.    MCC § 2-25-090 prohibits "any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "[a]ny conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or constituting a violation of any section of this Code relating to business operations or consumer protection."

112.    Defendants have violated and continue to violate MCC § 2-25-090 because their conduct offends public policy, is immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers.  Specifically, Defendants have violated and continue to violate MCC § 2-25-090 under this standard including by:

a.    Representing that consumers will be represented by attorneys for debt resolution services, when those services are provided by non-law firm third parties;

b.    Purporting to evaluate consumers' suitability for Defendants' debt resolution services without meaningfully reviewing consumers' finances and ability to pay Defendants' high fees;

c.    Providing baselessly optimistic estimates to consumers about how much money they can save through Defendants' debt resolution program;

d.    Failing to provide contracted-for Litigation Defense services for consumers who pay attorney's fees;

e.    Charging significant up-front fees before performing any work to settle consumers' debt in violation of the maximum up-front fees allowed in 225 ILCS 429/125(a);

f.    Failing to clearly and conspicuously disclose Defendants' refund policy; and

35

Exhibit 29-0147

g.  Soliciting and writing falsified positive online reviews.

113.    Defendants have engaged, and continue to engage, in deceptive acts and practices while conducting debt settlement business in Chicago. Specifically, Defendants have violated and continue to violate MCC § 2-25-090 including by:

a.  Representing expressly or by implication that consumers will be represented by a law firm for debt resolution services, when in fact all debt resolution and related services are provided by non-law firm third parties;

b.  Representing expressly or by implication that consumers control the money in their settlement accounts and will be able to receive a refund if they are dissatisfied with the program, when in fact Monarch considers most if not all money to be "earned" by Monarch when it is deposited and therefore not eligible for a refund under its policy;

c.  Representing expressly or by implication that the debt resolution program will save consumers more money than what Defendants know or should know to be possible given their experience conducting the program and their knowledge that savings estimates are based on faulty assumptions; and

d.  Soliciting and writing falsified positive online reviews with an intent that consumers rely on them and decide to contract with Defendants.

114.    Defendants have also engaged, and continue to engage, in unfair methods of competition while conducting debt settlement business in Chicago. Defendants have violated and continue to violate MCC § 2-25-090, including by falsely labeling their business as a "law firm" to evade the regulations that apply to other debt settlement service providers. *See*, *e.g.*, Illinois Debt Settlement Consumer Protection Act, 225 ILCS 429/1 *et seq.* Debt settlement companies that

36

Exhibit 29-0148

abide by the DSCPA are subject to fee limits and must disclose alternatives to debt settlement programs to consumers. Defendants foster unfair competition by evading these requirements, which may limit the revenues of law-abiding debt settlement firms.

115.   The MCC provides that any person "who violates any of the requirements of this section shall be subject to a fine of not less than $500 nor more than $10,000 for each offense. Each day that a violation continues shall constitute a separate and distinct offense to which a separate fine shall apply."  MCC § 2-25-090(f).  Chicago is therefore entitled to fines for each day that Monarch violated MCC § 2-25-090.

116.   The MCC also authorizes "injunctive" and "equitable" relief for violations of Section 2-25-090. MCC § 2-25-090(e)(4).  Chicago is therefore entitled to injunctive and equitable relief.

117.   WHEREFORE, the City respectfully requests that this Court enter an order (a) awarding judgment in the City's favor on Count 1; (b) declaring that Defendants violated MCC § 2-25-090; (c) enjoining Defendants from engaging in debt resolution activity in the City of Chicago; (d) enjoining Defendants from engaging in unfair methods of competition and business practices as described in this Complaint; (e) assessing Defendants a fine for each violation of MCC § 2-25-090, in the amount of $10,000 for each day such violation has existed and continues to exist; (f) requiring Defendants to pay restitution to Chicago consumers; (g) requiring Defendants to disgorge profits; (h) awarding such other injunctive and declaratory relief as is necessary; and (i) awarding such other relief as the Court deems reasonable and just.

## COUNT 2
### Violation of MCC § 4-276-470

118.   Chicago incorporates all preceding allegations as if they were set forth herein.

37

Exhibit 29-0149

119.    MCC § 4-276-470(a)(6) forbids any person "to represent that merchandise or services are those of another, when in fact they are not."

120.    MCC § 4-276-470(a)(7) forbids any person "to cause confusion or misunderstanding concerning the source, sponsorship, approval, or certification of merchandise or services."

121.    MCC § 4-276-470(a)(8) forbids any person "to cause confusion or misunderstanding or false or deceptive representation concerning affiliation, connection or association with, or certification by, another."

122.    Defendants have engaged, and continue to engage, in practices that violate the foregoing provisions of MCC § 4-276-470 by:

a.  Concealing, suppressing, and/or failing to disclose to consumers that debt settlement work will be performed by non-lawyers employed by another entity;

b.  Misrepresenting to consumers that debt settlement work will be performed by Monarch Legal lawyers; and

c.  Causing confusion and misunderstanding about the connection between Monarch and Strategic.

123.    The MCC provides that any person who violates "any of the provisions of Section 4-276-470 shall be fined not less than $50.00 nor more than $2,000.00 for each offense." MCC § 4-276-480. The City is therefore entitled to fines for each violation of MCC § 4-276-470.

124.    The MCC also authorizes the City's Corporation Counsel to bring an action for injunctive relief and other equitable relief. MCC § 2-25-090(e)(4). The City is entitled to injunctive and equitable relief as described below.

38

Exhibit 29-0150

125.   WHEREFORE, the City respectfully requests that this Court enter an order (a) awarding judgment in the City's favor on Count 2; (b) declaring that Defendants violated MCC § 4-276-470; (c) enjoining Defendants from engaging in further deceptive practices in violation of MCC § 4-276-470; (d) assessing Defendants a fine for each violation of MCC § 4-276-470, in the amount of $2,000 for each day such violation has existed and continues to exist; (e) awarding such other injunctive and declaratory relief as is necessary; and (f) awarding such other relief as the Court deems reasonable and just.

## JURY DEMAND

Chicago requests a trial by jury of all claims.

Dated: July 26, 2022

Celia Meza
Corporation Counsel of the City of Chicago

By: /s/ Rachel F. Granetz

Stephen J. Kane (stephen.kane@cityofchicago.org)
Rachel F. Granetz (rachel.granetz@cityofchicago.org)
Peter H. Cavanaugh (peter.cavanaugh@cityofchicago.org)
Rebecca A. Hirsch (rebecca.hirsch@cityofchicago.org)
City of Chicago Department of Law
Affirmative Litigation Division
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel:    312-744-6934

Exhibit 29-0151