# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.,<br><br>Plaintiff,<br><br>v.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al.<br><br>Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>Relief Defendants. | Case No. 24-CV-40-LJV |

## MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

Defendants (hereinafter collectively "Moving Defendants"), respectfully move this Court, pursuant to Federal Rule of Civil Procedure 65(b)(4), to dissolve the temporary restraining order entered on January 11, 2024.  In support thereof, Moving Defendants state as follows:

## INTRODUCTION

The American legal system is adversarial. And for good reason: left to their own devices, litigants (including the government) may present arguments that are so one-sided as to be misleading. That has happened here. Last week, Plaintiffs approached this Court *ex parte* and submitted a complaint and moving papers that distorted many material facts and omitted many other material facts. The truth is

1

very different from what this Court was told last week.  This Court entered a sweeping TRO order, including the takeover of numerous companies, freezing of personal bank accounts (including an account belonging to a defendant's teenaged son), based on representations by the government that will be proved untrue at an adversarial setting.

Indeed, the very foundation of this lawsuit is flawed.  Plaintiffs' case rests on the assertion that defendants accepted fees from customers before settling debts and without regard to the amount of debt settled.  Plaintiffs assert that the TSR forbids a telemarketing act or practice that accepts fees in this manner. That is a half-truth. The TSR has an exemption directly applicable in this case: The Rule exempts "Telephone calls in which the sale of goods or services…is not completed, and payment or authorization of payment is not required, until after a face-to-face sales…presentation by the seller..." 16 C.F.R. 310.6(b).  As plaintiffs' well-know, that exemption applies here.

No sale is made during the telephone call.  *See* Declaration of Richard K. Gustafson II, dated January 16, 2024 ("Gustafson Aff."), at ¶¶ 5-7. Each sale is preceded by a lengthy presentation by an agent of the law firm to settle the customer's debt. *Id.*, at ¶¶ 7, 16. That presentation includes a PowerPoint that describes the process of debt settlement, the fees involved, and the expected extended time frame. *Id.*, at ¶ 16(c)-(d). This face-to-face presentation typically takes between 45 minutes to an hour.  *Id.*, at ¶ 16(f). The presenter and the customer sign an affidavit – the presenter as affiant and the customer as witness – that sets forth the start and finish

time of the presentation. *Id.* No sale was made until the presentation has concluded. *Id.*, at ¶¶ 6-7; 16.

Plaintiffs were fully aware of this fatal flaw in their claim when they filed their *ex parte* application. Pursuant to investigative subpoenas, the CFPB was provided with copies of these presentations and affidavits from presenters. That is why the allegations in the Complaint regarding this critical fact are either vague or misleading. ¶ 69 (referring to notaries' alleged knowledge, not their interaction with the customer); ¶¶ 79, 83-84 (referring to contract and not presentation); ¶ 80 (describing COVID-19 restrictions). In fact, as noted above, the presenters had a uniform, extensive, substantive and detailed presentations with potential customers before they contracted for debt relief. Gustafson Aff., at ¶¶ 5-7, 16. Plaintiffs' case collapses when these critical facts are corrected.

The balance of the equities requires dissolution of the TRO. Unless this Court acts now, Defendants may never have a chance to present their side of the story. The Strategic companies (collectively "Strategic") employ nearly 1000 people, support over 20 law firms, and provide critical assistance to over 75,000 consumers. *See* Declaration of Mary Lynn Clark, dated January 16, 2024 ("Clark Aff."), at ¶ 4. It is a substantial enterprise. But it may not still exist when the TRO expires. Last week, this Court appointed a Receiver to manage Strategic's affairs. Presumably, the Court did this with the expectation that the Receiver would preserve the status quo and proceed carefully with a due regard for the interests of Strategic, Strategic's

3

employees, the law firms that utilize Strategic's administrative support functions, and the 75,000 consumers who need Strategic to provide critical services.

But the Receiver has not done that. Instead, he is doing the opposite. On day one, the Receiver completely shut down Strategic. He has shut down bank accounts, frozen employees out of Strategic's IT systems, cut off all access to email, refused to provide service to Strategic's law firm clients. In general, the Receiver has taken every step possible to ensure that Strategic cannot function.  In short, the Receiver is not managing Strategic, he is killing it. Unless this Court acts quickly, he will succeed. And that will happen before Strategic (or any of the other interested parties) have any opportunity to defend themselves in this Court.

But that is not all. The Receiver appears to be actively trying to undercut the Defendants' ability to defend themselves in this lawsuit. He has refused to give Defendants access to data and information they need to mount their defense, which is wholly unrelated to the Receiver's duty to preserve Strategic's assets. Moreover, the Receiver (based on a 2016 engagement agreement he found in Strategic's legal files) has suggested that Defendants' counsel has a conflict. The Receiver is tasked with managing a $1 billion company and protecting the interests of employees, consumers and other interested parties.  Instead of doing that, he is spending his time pouring through legal files in an effort to disqualify counsel.

This Court should dissolve the existing TRO and dismiss the Receiver. Strategic (and the other Defendants) are entitled to their day in court. They cannot have the legal process circumscribed by a Receiver who acts as judge, jury and

executioner. Injunctive relief is not the death penalty and Receivers are not executioners. The "primary purpose" of appointing a Receiver is to "conserve the existing estate," and asset-freeze injunctions are similarly intended to "facilitate monetary recovery by preserving the status quo pending litigation of statutory violations." *Esbitt v. Dutch-Am. Mercantile Corp.,* 335 F.2d 141, 143 (2d Cir. 1964). ; *Fed. Trade Commision v. Campbell Cap. LLC*, 2018 WL 5781458, at \*4 (W.D.N.Y. Oct. 24, 2018). Strategic has existed for many years. It is a substantial enterprise that employs approximately 1000 people. *See* Clark Aff., at ¶ 4. Strategic's principals are well-established in their communities. They are not flight risks and there is no evidence to suggest they will abscond with money or destroy documents is allowed to continue to manage their company.

The TRO is also harming numerous third parties. Strategic is a vendor to over 20 different law firms. *See* Clark Aff., at ¶ 4. Those law firms have 65,000 current clients who are depending on those firms to negotiate credit card settlements and defend them in court proceedings. Each of those law firms has contracted with Strategic to provide administrative, logistical and customer support services. *Id.* at ¶¶ 8-9. In short, all of the services typically provided to law firms by legal secretaries, claims representatives, accounting personnel and the like have been outsourced to Strategic. *Id.* The Receiver is now refusing to provide those services. That puts Strategic in potential breach of its contracts with those law firms. More importantly (at least for present purposes), it leaves those law firms unable to effectively represent their clients. In a typical month, Strategic employees have 30,000-40,000

communications with law firm clients. *Id*. at ¶ 13. That includes emails, phone calls and mail (which is scanned through Strategic). *Id.* All of that has now stopped. Those clients cannot secure relief and the law firms, Strategic (and, by extension, the Receiver, who posted a paltry $50,000 bond for a billion dollar company) face mounting liability.

In addition, Strategic operates businesses that have nothing to do with advance fee debt settlement. For example, Strategic owns and operates two firms (Timberline and Atlas) that are contingent fee firms. *Id*. at ¶ 5. In other words, Timberline and Atlas function precisely the way Plaintiffs say they should. But the Receiver has shut them down as well. Those firms have 10,000 clients who now lack representation and who are in the middle of obtaining debt settlement relief. *Id*. There is no justification for shutting those firms down. And yet the Receiver did so on Day One of his administration – apparently without any thought or analysis whatsoever.

Further, the actual owners of Strategic are its employees, who beneficially own approximately 100% of the outstanding shares as participants in the Strategic ESOP, a retirement plan governed by ERISA. To date, Defendants are unaware that either the ESOP trustee, the ESOP plan participants, or the Board of Directors, as ESOP Plan sponsor, have been given an opportunity to understand, assess or provide input regarding the likely material adverse impact of the Receiver's proposed actions, and the resulting material modification of the company's business on their ERISA plan assets.

Finally, the TRO creates tremendous disruption for many persons that should not be parties in this case. The TRO stretches the bounds of "relief parties" beyond the breaking point. One example makes the point. Jaclyn Blust is the wife of Jason Blust. Under the Court's TRO, her accounts were frozen and she is barred from even using her credit card. In addition, the accounts of her minor children were frozen as well. The sole basis for this relief? The Plaintiffs allege that she took $8.3 million out of the Blust family trust. But as the government almost certainly knows, that was a withdrawal to cover tax liability (and was paid to the taxing authorities). The Plaintiffs' failure to mention that point in its Complaint is purposefully deceiving.

## FACTUAL BACKGROUND

### The Parties

For the past decade, a group of attorneys based largely (but not exclusively) out of Chicago have been involved in forming and operating law firms to assist people who are saddled with credit card debt. That is a historically underserved population for the simple reason that people with large debts typically cannot afford a "traditional" law firm. To provide legal services to those people, the attorneys have created a law firm structure that relies on outside vendors to provide many of the administrative and client support functions necessary to serve clients in these situations. Gustafson Aff., at ¶¶ 2-4.  There are several vendors that can provide such services. Many of those law firms have chosen to use Strategic as their administrative and client support vendor. In general, Strategic (though a specially formed support entity) will handle routine client communications and administration. The law firm's own employees and attorneys will handle debt negotiations, litigation defense and

more complex client interactions. *Id.* at ¶ 3. In short, Strategic (though its affiliates, typically an entity with " ------- Client Services, LLC" in its corporate name for administrative convenience) is an outsourced service provider, which is typically know in business as a Business Process Outsourcer, or "BPO."  This is a common service provided to companies in areas like IT, Human Resources, manufacturing, call centers, and document management.

In each instance, the law firms signed written agreements with the appropriate Strategic support entity wherein the law firm agreed to pay that entity and, in return, that entity agreed to provide administrative and support services, such as correspondence and file management, document collection, customer service, and other administrative and logistical tasks associated with representation of clients. *See* Gustafson Aff., at ¶ 4; Clark Aff., at ¶ 8. All the Strategic companies are subsidiaries of StratFS, LLC ("StratFS"), whose ultimate parent entity is Strategic Family, Inc. ("Family").  The Strategic Entities employ nearly 1,000 people in various capacities. *See* Clark Aff., at ¶ 4.

### The Client Enrollment Process

The law firms receive potential client leads through various sources. When such a lead is provided to a firm, the firm's support entity (in this case, a Strategic affiliate) downloads the prospective client's basic personal and financial information into the firm's electronic system. Once the prospective client's information is entered into the system, the firm will send a mobile notary to that person to conduct a face-to-face presentation. Importantly, the firms – not Strategic – are the entities to

contract with the notary companies and arrange the face-to-face presentations. *See* Gustafson Aff., at ¶ 5.

The firms provide all of the materials to be presented to the client, the scripts and presentations that the notaries use during those meetings, and training materials and examinations that the notaries must pass before they may meet with clients. In a typical situation, a notary meets with the prospective client in person, reviews the firm-prepared presentation with the client, answers any non-legal questions that the client has (and refers any legal or program-specific questions back to the firm), and obtains the prospective client's signatures on the retainer agreement. The typical face-to-face presentation meeting is about 45 minutes long. *See* Gustafson Aff, at ¶ 6.

After the face-to-face presentation, an attorney from the firm then reviews the prospective client's information and places a telephone call to the client for further discussion. The attorney is responsible for explaining the debt resolution process to the prospective client, reviewing the terms of the firm's retainer agreement (including the fees that the firm charges), and answering any questions that the client has about the process or alternative methods of resolving his/her debt. If, after that telephone conference, the attorney believes that the firm's services are beneficial to the client, the attorney countersigns the retainer agreement and the client makes his/her first payment pursuant to the terms of the retainer agreement to the firm. *See id*, at  ¶ 7.

Thereafter, the law firms work with their respective clients and creditors in an effort to restructure or compromise those debts, and they defend clients in collection

actions in court. Attorneys at the law firms conduct frequent reviews of the files, analyze settlements, and handle litigation defense.  The clients pay the contracted-for fees to the law firms, and the law firms in turn pay their attorneys, employees, and respective vendors (which include, *inter alia*, the firm's support entity, and notary vendors). Importantly, Strategic does not collect fees from consumers – advance or otherwise. The support entities perform non-legal support services, such as addressing non-legal customer service issues, answering clients' non-legal questions, handling client's requests to modify or change their payments to their dedicated account, basic interfacing with clients' creditors,[1] answering clients' non-legal questions, gathering documents from clients, maintaining client files, and handling similar administrative tasks. *See id.*, at ¶ 8.

The various law firms were established using an ethically-compliant structure wherein the attorneys (who often work remotely and may be spread across several states) provide legal services to the clients in their particular states while the administrative and client support functions are centrally housed with Strategic. *See id.*, at ¶ 2. One of the key tasks that the support entities handle is the receipt of communications and documents from the law firms' clients.

At present, the law firms at issue have at least 65,000 clients. Those clients have been instructed to direct routine email, mail, and telephone communications to Strategic. Strategic currently handles over 200,000 client requests each month,

---

[1] The support entities' employees do not negotiate debts. All non-lawyer negotiators are employees of the respective law firm.

including: (1) 40,000-45,000 phone calls; (2) 30,000-35,000 emails; (3) 25,000-30,000 documents received (summonses, statements, collection notices); and (4) 5,000-6,000 draft adjustment requests. *See* Clark Aff., at ¶ 13. Law firm clients contact the various Strategic entities on a host of matters, including payment issues (inability to fund their account, need to reschedule a funding), collection activities from creditors (including creditors communicating with them directly), the filing of litigation, etc. *Id.*, at ¶¶ 8-9. In addition, creditors daily communicate with the law firm via mail (which is sorted and scanned through Strategic) or email.

Some of the most important communications from law firm clients are those that contain summonses and complaints for cases in which the client's creditor has filed suit. Here, again, the clients are instructed to send any summonses to the staff at Strategic, who then log the filing and then upload the information to allow the firms' attorneys to respond to the lawsuits. *Id.* at ¶ 19. On average, the law firms (which defend clients in litigation) receive 1,000 new litigation cases each month (840 were received in December 2023 alone). *See* Gustafson Aff., at ¶ 9; Clark Aff., at ¶ 19. Needless to say, delays associated with the processing of those summonses will cause harm to the clients. One obvious harm is the potential for default judgments, garnishments, and other adverse consequences. Beyond that, experience has shown that creditor lawsuits are more easily settled at the early stages. Thus, securing the best settlement value for the client is dependent on timely notice and processing of the summons and complaint.

The law firms cannot do these functions on their own (particularly on the turn of dime), as none of the firms employs in-house staff in numbers sufficient to handle the volume of routine, non-legal client inquiries. While the law firms have attorneys and some employees to handle the legal services, they simply do not have the necessary staff to handle the volume of clients represented above.

### Current Status Of The Law Firms

Many of the law firms mentioned in the complaint are not currently taking on new clients. The vast majority are simply continuing to provide service to existing clients. That continued service includes efforts to negotiate remaining debts, defense of pending litigation, and the administration of payment plans reached pursuant to settlement with the clients' creditors. *See* Gustafson Aff., at ¶ 10.

That is not to say that the support entities involvement and work is over. Just the opposite. The law firms have thousands of clients in active settlement repayment plans, all of which require monitoring, customer support, and administrative work. At present, the law firms collectively have about 129,000 active payment plans for about 65,000 different clients (meaning, such clients have at least one more payment to be made before a particular debt is considered settled in full). *See* Clark Aff., at ¶ 15. Another roughly 4,900 settlements have been reached with clients' creditors, but the payment instructions have not yet been finalized. Under those settlements, $29 million in debt is to be compromised for $16 million (paid over time in installments). *Id.* at ¶ 17.  In short, if the administrative work to set up the payments via the payment processor (where the clients' funds are held) is not completed, thousands of

clients risk being in immediate default of those recently-achieved settlements – with a risk of loss of $13 million to consumers. Notably, nearly 500 of those settlements are for litigated debts. *Id.* at ¶ 18.  In addition, there are another 24,000 client debts where it appears that clients may have sufficient funds in their dedicated accounts to fund a term settlement. *Id.* at ¶ 16. Even if negotiated by the firms, those settlements cannot be finalized without client approval and instruction to the payment processors (functions handled by Strategic).

**The Receiver Is Appointed**

On Friday, January 13, Strategic and the law firms were surprised by the appointment of the Receiver. The Receiver did not take long to conduct due diligence. Rather, he made the immediate decision to shut down all operations of the company and freeze all employees out of the company's databases and IT. The Receiver has advised Strategic personnel that he will not re-open the company or provide services to law firms without a court order.

**ARGUMENT**

## I.    Legal Standard

"In the Second Circuit, the appointment of a receiver is considered to be an extraordinary remedy" that "is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *JDP Mortg. LLC v. Gosman,* No. 19-CV-5968 (JS)(SIL), 2020 WL 8082390, at *2 (E.D.N.Y. Dec. 21, 2020).  Courts recognize that this is a "drastic and intrusive

remedy to be used sparingly and with extreme caution," and that "the burden is on the moving party to show by clear and convincing evidence that such relief is necessary." *Meisels v. Meisels*, No. 19CV4767RRMRML, 2020 WL 7000903, at *5 (E.D.N.Y. May 12, 2020). The "primary purpose of appointing a receiver is to conserve the existing estate." Esbitt v. Dutch-Am. Mercantile Corp., 335 F.2d 141, 143 (2d Cir. 1964). The appointment of a receiver "must not unduly harm the defendants by putting them out of business" (*F.T.C. v. Ross*, 897 F. Supp. 2d 369, 387 (D. Md. 2012)), and should not be used to "liquidate" the estate. *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008).

In the same vein, a party seeking preliminary injunctive relief must demonstrate:

> (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction.

*Red Earth LLC v. U.S.*, 657 F.3d 138, 143 (2d Cir. 2011). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (noting that "the preliminary injunction is one of the most drastic tools in the arsenal of judicial remedies.").

## II.  *Ex Parte* Injunctive Relief Was Not Proper And Should Not Have Issued.

"Ex parte relief by way of a temporary restraining order is an emergency procedure." *Rodo Inc. v. Guimares*, No. 22-CV-9736 (VSB), 2023 WL 2734464 (S.D.N.Y. Mar. 30, 2023). The purpose of a temporary restraining order is limited to "preserving the *status quo* and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer," so that a court may hear and determine final relief. *Id.*  Courts have characterized *ex parte* TROs as "appropriate only where irreparable injury will be caused absent prompt judicial intervention in circumstances where the adversary cannot be contacted, or where advance contact with the adversary would itself be likely to trigger irreparable injury." *Id.*; *see also Little Tor Auto Center v. Exxon Co., USA*, 822 F.Supp. 141 (S.D.N.Y. 1993) (noting that "*ex parte* practice in seeking substantive interim relief is contrary to the Due Process Clauses of the Fifth and Fourteenth Amendments."). Here, no such emergency existed.

## III.  The Government Has No Chance Of Success On The Merits.

Plaintiffs' central claim is that Strategic is violating the Telemarketing Sales Rule ("TSR"). In a nutshell, the TSR prohibits companies from providing debt settlement representation **unless** the company conducts a face-to-face presentation with client prior to engagement. If a company conducts a face-to-face presentation, it may charge advance fees. 16 C.F.R. § 310.6.  If it does not conduct a face-to-face presentation, it may not charge advance fees. Plaintiffs allege that Strategic violates

the TSR by charging advance fees without conducting a meaningful face-to-face presentation.

Every part of Plaintiffs' claim is wrong. And what's more, Plaintiffs **know** they are wrong. For starters, Plaintiffs know full well that Strategic does not charge any advance fees to anyone. *See* Declaration of Richard K. Gustafson II, ⁋9.  Rather, the **law firms** – not Strategic – charge fees to clients.  And the **law firms** – not Strategic – are the entities that conduct the face-to-face presentations. Thus, Strategic does not even engage in the wrongful conduct of which it is accused. That, by itself, merits dissolving of the TRO.

Plaintiffs also know that their claims about the quality of the law firms' presentations are flatly false. The CFPB looked into this issue in 2020. In early 2020, the CFPB issued CIDs to five of the law firms that contract with Strategic (Monarch, Whitestone, Bedrock, Rockwell and Harbor). The CFPB demanded interrogatory responses and documents. Those five firms provided both. In May 2020, those firms advised the CFPB of the following:

- The law firms conduct face-to-face presentations through a network of notaries.

- The law firms require the notaries to undergo specialized training and take (and pass) an online test before they are allowed to handle face-to-face presentations. Thus, only trained and knowledgeable notaries handle presentations.

- When the face-to-face presentation occurs, the notary reads from a script that is drafted and vetted by the firm's compliance counsel and has been reviewed for compliance with the TSR. That eight-page single-spaced script explains virtually every aspect of the firm's representation.

- In addition, the notary walks through a 20+ page powerpoint presentation. The client initials each page of the powerpoint presentation to confirm that he/she reviewed and understands the material on that page. Like the script, the powerpoint presentation explains virtually every aspect of the firm's representation in clear language.

- The notary also reviews the firm's retention agreement with the client and highlights various aspects of that agreement.

- At the conclusion of the face-to-face presentation, the notary signs an affidavit attesting to the fact that the notary covered all of the required material and noting the length of the presentation. The client signs the affidavit as well. On average, the face-to-face presentations run 44 minutes.

- After the face-to-face presentation, an attorney from the law firm will call the client to confirm that the presentation went well and that the client understands the firm's services. The attorney will then answer any questions the client may have.

*See* Gustafson Aff., ¶16.

In short, the law firms' face-to-face presentations are far more structured and robust than is alleged by Plaintiffs. *See* Declaration of Emily J. Gay, dated January 16, 2024.  And Plaintiffs know this because it was disclosed to them in 2020. The CFPB followed up on those disclosures by contacting various notaries to make sure the processes disclosed by the law firms were actually followed. That occurred in 2020 as well.

 All of this information was omitted from the CFPB's complaint and moving papers. It simply shocking that the CFPB would obtain those disclosures in 2020, and then (after sitting on that information for nearly four years and never contacting the CID respondents or Strategic) come running into this Court in 2024 and declare that

an emergency exists. It is also shocking that the CFPB would not include the facts disclosed by the law firms in its complaint.

One additional point merits mention; the law firms work with two companies (Global and RAM) that regularly audit the law firms' compliance with the TSR. Those regular audits have not turned up any issues.

## III.    Balance Of Irreparable Harm Favors Defendants.

Courts have noted that "[i]ssuance of a court order without prior notice to the party to be enjoined may cause irreparable injury to that party." *Little Tor Auto*, 822 F. Supp. at 143. The *Little Tor* court also noted the potential for abuse and unintended consequences of *ex parte* injunctions:

> The phenomenon of *ex parte* applications has long been a matter of concern…Attention to the problem is important, in part because of the increasingly intricate nature of statutes and implementing regulations affecting transactions which have become more and more sophisticated. Another factor is the increasingly nationwide character of much economic activity….***In the context of nationwide economic activity, ex parte interim relief may have far-reaching consequences affecting distant parties or events.***

*Id.* at 143 (emphasis added).

In this case, it is difficult to see what irreparable harm – if any – caused entry of the TRO. Strategic has operated in an above-board fashion for many years. It is a well-established company with strong ties to New York and which employs many people, many of whom are Strategic's owners through the ESOP There is no evidence (nor could there by) that any Defendant posed a flight risk or was about to move assets.

On the contrary, the appointment of the Receiver is creating irreparable harm to Strategic.  Receivership is not meant to be a corporate death sentence, and the Second Circuit has specifically instructed that Receivers are not properly used to liquidate a business. *Eberhard,* 530 F.3d at 132. If the CPFB's chosen receiver proceeds in this case, he will impermissibly "unduly harm the defendants by putting them out of business," the exact opposite of a receiver's intended purpose.

As set forth above, there are 129,000 existing term settlements that need to be administered and thousands of additional settlements that could be affected (thus saving clients millions of dollars) if the law firms can continue to operate. But closing down the law firms' support entities (and cutting of IT and data) without any notice or opportunity to allow the law firms to transition effectively makes them unable to provide services. In addition, thousands of law firm clients may face litigation and the law firms will be hampered in responding without their administrative staffs.

In addition, Strategic faces the prospect of breaching its agreements and losing its employees. Thus, even if it can defend itself in this lawsuit (given the hampering effect of the Receiver) any victory may ultimately prove Pyrrhic.

## IV.    Bond

This Court has ordered the Receiver to post a $50,000 bond. That is woefully inadequate. Strategic is a billion dollar company and the Receivers' actions pose an existential threat to Strategic, its clients, and its employee owners. If the Court does not dissolve the TRO, Defendants seek a $500 million bond.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' motion to dissolve the Temporary Restraining Order together with any further relief the Court deems just and proper.

Alternatively, if the Court does not dissolve the Temporary Restraining Order, Defendants respectfully requests that the Order must be modified so that Strategic can continue to provide support to the law firm as they serve their client's needs. Specifically, Strategic proposed that the TRO must be modified to allow Strategic: (1) controlled and supervised access to the various consumer accounts that it believes either the Receiver or the CFPB has taken steps to impede; (2) access to certain IT infrastructure, including various Microsoft accounts, Salesforce, 8X8 and workchat/workplace to communicate; and (3) sufficient support personnel for Strategic to provide the required and necessary services to the law firms and the law firms' clients.

DATED:      January 16, 2024
            Buffalo, New York

                              Respectfully submitted,

                              s/ *Dennis C. Vacco*
                              Dennis C. Vacco
                              LIPPES MATHIAS LLP
                              *Attorneys for Moving Defendants*
                              50 Fountain Plaza, Suite 1700
                              Buffalo, New York 14202
                              T:  716.853.5100
                              dvacco@lippes.com