UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

        Plaintiffs,

  v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.

        Defendants, and

DANIEL BLUMKIN, et al.,

        Relief Defendants.

**DECLARATION OF RICHARD K. GUSTAFSON II**

Case No. 24-CV-40-LJV

---

I, Richard K. Gustafson, II, hereby declare as follows:

1. My name is Richard K. Gustafson, II. I am over 21 years of age. The statements in this declaration are made based on my personal knowledge and I would be competent to testify to them if called upon to do so.

2. I am an attorney licensed to practice law in Illinois, Indiana and California. I am currently the managing member of several consumer advocacy law firms. Those law firms were established using an ethically-compliant structure wherein the attorneys (who often work remotely and may be spread across several states) provide legal services to the clients in their particular states while the administrative and client support functions are centrally housed with a third-party support services vendor. The firms of which I am a managing-member (or, in some instances a managing partner) include:

   a. Boulder Legal Group, LLC ("Boulder");

   b. JMS Industries, LLC ("Canyon");

   c. Hailstone Legal Group, LLC ("Hailstone");

   d. Harbor Legal Group, LLC ("Harbor");

   e. Moore Legal Group, LLC ("Meadowbrook");

   f. Royal Legal Group, LLC ("Royal");

   g. Chinn Legal Group, LLC ("Slate");

   h. Donald Norris & Associates, PLLC ("Stonepoint");

   i. Sands Law Group, LLP ("Whitestone");

   j. Gustafson Consumer Law Group, LLC ("White Oak"),

(collectively, the "Gustafson Firms").

   3.   The Gustafson Firms are all consumer advocacy law firms that represent clients with significant debt who are looking for ways to reduce their debt burdens. Each of the Gustafson Law Firms has members (or, in the case of Whitestone, partners) who are licensed attorneys in the states in which the particular firm provides services. Each of the Gustafson Firms has its own staff, such as attorneys, paralegals, and negotiators, who handle debt negotiations, litigation defense, legal questions, and more complex client interactions.

   4.   However, the relatively large number of clients serviced by each Gustafson Firm, coupled with the nature of the representation, results in an extremely high volume of administrative tasks and paperwork. Accordingly, the Gustafson Firms have opted to outsource certain administrative and support

functions to vendors. The Gustafson Firms have contracted with certain entities to provide certain of those services to facilitate their representation of clients.

| Firm | Support Entity |
| --- | --- |
| Boulder | Boulder Client Services, LLC |
| Canyon | Canyon Client Services, LLC |
| Hailstone | CSStorm1121, LLC |
| Harbor | Harbor Client Services, LLC |
| Meadowbrook | CS0821Creek, LLC |
| Royal | Royal Client Services, LLC |
| Slate | Slate Client Services, LLC |
| Stonepoint | Stonepoint Client Services, LLC |
| Whitestone | Whitestone Client Services, LLC |
| White Oak | Acorn21, LLC |

All those support entities (collectively, the "Support Entities") are affiliates of StratFS, LLC. While there are several qualified vendors who provide similar support services throughout the country, I opted to retain Strategic with respect to these firms because it is one of the larger companies in the industry and offers a robust range of services. In each instance, the respective Gustafson Firm signed a written agreement with the Support Entity wherein the firm agreed to pay that entity, and, in return, the entity agreed to provide administrative and support services such as correspondence and file management, document collection, customer service and other administrative and logistical tasks associated with representation of clients.

5.     When a Gustafson Firm receives a potential client lead, the Firm's Support Entity downloads the prospective client's basic personal and financial

information into the Firm's electronic system. Once the prospective client's information is entered into the system, the Firm will send a mobile notary to that person to conduct a face-to-face presentation. The Gustafson Firms contract with the notary companies and pay them for services rendered.

6. The Gustafson Firms provide the notary companies with all the materials to be presented to the prospective client, the scripts and presentations that the notaries use during those meetings, and training materials and examinations that the notaries must pass before they may meet with clients. In a typical situation, a notary meets with the prospective client in person, reviews the firm-prepared presentation with the client, answers any non-legal questions that the client has (and refers any legal or program-specific questions back to the firm), and obtains the prospective client's signatures on the retainer agreement. The typical face-to-face presentation meeting averages about 44 minutes long.

7. After the face-to-face presentation, an attorney from the firm then reviews the prospective client's information and places a telephone call, or, if the client prefers, a video call, to the client for further discussion. The client can also request that the attorney meet with him/her in person as opposed to a call. The attorney is responsible for explaining the debt resolution process to the prospective client, reviewing the terms of the firm's retainer agreement (including fee schedules), and answering any questions that the client has about the process or alternative methods of resolving his/her debt. If, after that conference, the attorney believes that the firm's services are beneficial to the client, the attorney countersigns the retainer

agreement, and the client makes his/her first deposit into their dedicated account pursuant to the retainer agreement's schedule. The client retains complete control over that dedicated account.

8. Thereafter, the Gustafson Firms work with their respective clients and creditors in an effort to restructure or compromise debts, and they defend clients in collection actions in court. Attorneys at the Gustafson Firms conduct frequent reviews of the clients' files, analyze settlements, and handle litigation defense. The clients pay the contracted-for fees to the Gustafson Firms, and the Gustafson Firms in turn pay their respective vendors (which include, *inter alia*, the Gustafson Firms' respective Support Entity and notary vendors).

9. One of the key tasks that the Support Entities handle for the Gustafson Firms is the receipt of communications and documents from the Gustafson Firms' clients. The volume of clients, the nature of the representation (*i.e.*, assisting individuals with matters that are both personal and financial in nature), and the directives of the Gustafson Firms to their clients (*i.e.*, to immediately deliver to the Firms all creditor statements, creditor communications, and legal process) yields an exceptionally high volume of communications and paper. At retention, the Gustafson Firms' clients are instructed to direct routine email, mail, and telephone communications to Support Entities. The Support Entities currently handle hundreds (and sometimes thousands) of client requests each month, including phone calls, emails, documents received (summonses, statements, collection notices), and draft adjustment requests. Gustafson Firm clients contact the various Support

Entities on a host of matters, including payment issues (inability to fund their account, need to reschedule a funding), collection activities from creditors (including creditors communicating with them directly), the filing of litigation, and requests for updates. In addition, creditors communicate daily with the Gustafson Firms via mail (which is sorted and scanned through Support Entities) or email. Some of the most important communications from Gustafson Firm clients are those that contain summonses and complaints for cases in which the client's creditor has filed suit. Here, again, the clients are instructed to send any legal process to the staff at the Support Entities, who then log the filing and then upload the information to allow the firms' attorneys to respond to the lawsuits.

10. The Gustafson Firms cannot perform these functions on their own (particularly effective immediately), as none of the Gustafson Firms employ in-house staff in numbers sufficient to handle the volume of routine, non-legal client inquiries. It would take some time for the Gustafson Firms to locate a new provider and transition services to that provider (even if one were available). While the Gustafson Firms have attorneys and some employees to handle the legal services, they simply do not have the necessary staff to handle the volume of routine administrative work associated with the clients represented.

11. If the Support Entities with which the Gustafson Firms contract (and on which they rely for day-to-day administrative support) are not operating, the consequences for the Gustafson Firms and their respective clients are grave. Four immediate consequences come to mind.

12. ***First,*** as noted above, the Gustafson Firms are not equipped or staffed to immediately begin handling all routine client communications and documents. Even if they were so equipped, the Gustafson Firm clients are instructed, at the outset of the representation, to direct all routine communications and documents to the Support Entity in the first instance. In addition, clients' creditors often direct routine communications to the Support Entities for processing and delivery to the Firms' attorneys. If the Support Entities are not operating, the Gustafson Firms clients are left without adequate administrative support, and that is likely to result in confusion and other ramifications. While the Gustafson Firm clients can always reach out to their assigned attorney, the attorneys are not always in a position to answer immediately and/or respond to routine administrative questions.

13. ***Second,*** delays associated with the processing of summonses and legal process will undoubtedly cause harm to the Gustafson Firm clients. One obvious harm is the potential for default judgments, garnishments, and other adverse consequences. Beyond that, experience has shown that creditor lawsuits are more easily settled at the early stages. Thus, securing the best settlement value for the client can be dependent on timely notice and processing of the summons and complaint.

14. ***Third,*** based on the information available to me, there are approximately 14,000 Gustafson Firm clients who are in various stages of payment on term settlements reached by those firms with the clients' creditors. Lack of administrative support and monitoring threatens the clients' success on those

settlements and increases the risk of client default – which leads to judgment orders being entered, garnishments, and other adverse consequences.

15. ***Fourth,*** based on the information available to me, there are approximately 3,000 Gustafson Firm clients who are either in the final stages of finalizing a settlement, or who have accumulated sufficient funds in their dedicated accounts to potentially resolve approximately 4,500 debts in the very near term. Lack of administrative support threatens the Firms' ability to ensure that appropriate payment instructions are provided to the payment processing vendors and timely payments towards any such settlements are made by the client.

16. In early 2020, the Consumer Financial Protection Bureau issued Civil Investigative Demands to two of the Gustafson Firms (Harbor and Whitestone) that demanded interrogatory responses and documents. Harbor and Whitestone responded to those CIDs and advised the CFPB that:

   a. Harbor and Whitestone conduct face-to-face presentations with prospective clients through a network of notaries.

   b. Harbor and Whitestone require the notaries to undergo specialized training and take (and pass) an online test before they are allowed to conduct face-to-face presentations. Thus, only trained and knowledgeable notaries are permitted to conduct face-to-face presentations.

   c. At the face-to-face presentations, the notary reads from a lengthy script that is drafted and vetted by the firms' compliance counsel, specifically

with an eye towards compliance with the Telemarketing Sales Rule, and that explains virtually every aspect of the firm's representation.

d. The notary also walks the prospective client through a PowerPoint presentation, and the prospective client initials each page of that presentation to confirm that he/she has reviewed and understands the material. Like the script, the PowerPoint explains virtually every aspect of the firm's representation in plain language.

e. The notary also reviews the firm's retention agreement with the prospective client and highlights various aspects of the agreement.

f. At the conclusion of the face-to-face presentation, the notary signs an affidavit attesting to the fact that the notary covered all required material and the length of the meeting. The client signs the affidavit as well. On average, the face-to-face presentation takes 44 minutes.

g. After the face-to-face presentation, an attorney from the law firm calls the client to confirm that the presentation went well, and that the client understands the firm's services. The attorney also answers any questions that the client may have.

17. The following documents are attached to this Declaration: (1) Exhibit 1 is a true and accurate copy of a template Retainer Agreement for Whitestone clients; (2) Exhibit 2 is a true and accurate copy of the Paralegal Script that Whitestone uses for the face-to-face meeting with its prospective clients; (3) Exhibit 3 is a true and accurate copy of the Paralegal Powerpoint Presentation that Whitestone uses for the

face-to-face meeting with its prospective clients; (4) Exhibit 4 is a true and accurate copy of a sample Affidavit of Compliance that Whitestone requires from all notaries who meet with prospective clients for the face-to-face presentation; (5) Exhibit 5 is a true and accurate copy of Whitestone's response to the Civil Investigative Demand that it received from the Consumer Financial Protection Bureau in early 2020 (without the exhibits).

18. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct.

Dated: 1/16, 2024

Richard K. Gustafson, II