UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>                Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>                Defendants. | Case No. 24-cv-00040-JLS-MJR |

**REPORT OF TEMPORARY RECEIVER
RE: STATUS OF CLIENT SERVICES**

       Thomas W. McNamara, as Court-appointed temporary receiver ("Receiver"), submits this report regarding the status of Defendants' client services operations.

**I.    INTRODUCTION**

       On January 11, 2024, this Court entered a Temporary Restraining Order ("TRO," ECF No. 12) and appointed Thomas W. McNamara as temporary receiver for the Receivership Defendants.[1]  Atlas Debt Relief, LLC ("Atlas") and Timberline Financial, LLC ("Timberline

---

[1] "Receivership Defendants" means the Corporate Defendants (Stratfs, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC; Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Strategic Consulting, LLC; Versara Lending, LLC; Strategic Family, Inc.; Anchor Client Services, LLC; Bedrock Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Carolina Client Services, LLC; Great Lakes Client Services, LLC; Guidestone Client Services, LLC; Harbor Client Services, LLC; Heartland Client Services, LLC; Monarch Client Services, LLC; Newport Client Services, LLC; Northstar Client Services, LLC; Option 1 Client Services, LLC; Pioneer Client Servicing, LLC; Rockwell Client Services, LLC; Royal Client Services, LLC; Stonepoint Client Services, LLC; Summit Client Services, LLC; Whitestone Client Services, LLC) and their subsidiaries, affiliates, divisions, successors, and assigns, as well as any other business related to the Defendants' debt-relief services and which the temporary Receiver has reason to believe is owned or controlled in whole or in part by any of the Defendants, and includes fictious names under which they do business, as well as Relief Defendants Strategic ESOP; Strategic ESOT; Twist Financial, LLC; Duke Enterprises, LLC; Blaise Investments, LLC; the Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee; Lit Def Strategies, LLC; and Relialit, LLC; and their subsidiaries, affiliates, divisions, successors, and assigns, as well as any other business related to the Defendants' debt-

Financial") were later determined to be Receivership Defendants by the Receiver and included as Receivership Defendants. Since gaining immediate access, the Receiver has performed the court-ordered tasks of the Receivership Estate, as will be set forth more fully in the Receiver's Preliminary Report, which will be filed in advance of the Court's hearing beginning February 1st. In the interim, the Receiver files the following report to update the Court, the parties, and other affected parties of his decisions regarding resumption of limited business activities.

A primary focus of the Receiver through this entire process has been to ensure that consumers are protected and to minimize harm caused by the necessary pause in business operations and other consequences created by the issuance of a Temporary Restraining Order against Receivership Defendants. The Receiver's concern is particularly acute with respect to clients that have been sued by creditors, either prior to or during the pendency of the Receivership, and are currently in litigation.

At the January 18th Status Hearing, the Court encouraged the parties to engage in discussions regarding potentially resuming some of Receivership Defendants' business operations during the pendency of the Receivership. Since that time, the Receiver and his counsel have had extensive discussions with counsel for Plaintiffs, counsel for the Defendants, counsel for the law firms which filed the Motion to Intervened on January 16, 2024 [Dkt. No. 34] (collectively, the "Intervenor Law Firms"), and employees of the Receivership Defendants in order to come up with a path forward that protects consumers to the maximum extent possible, while balancing that objective against the need to protect the limited assets presently in the Receivership Estate. The Receiver has fully taken into account the suggestions and concerns of

---

relief services and which the temporary Receiver has reason to believe is owned or controlled in whole or in part by the Relief Defendants included in this definition, and includes fictious names under which they do business. (TRO, Definitions, pages 4-8.)

both the Receivership Defendants and the Plaintiffs regarding what business tasks are necessary to be taken in advance of the PI Injunction hearing set to begin on February 1st.

**RECEIVERSHIP DEFENDANTS' CASH ON HAND**

On January 12, 2024, the Receiver served notice of the TRO and Asset Freeze upon the Receivership Defendants' banks, CIBC and Valley Bank, and requested copies of all account-related documents. The Receiver understands that CIBC provides banking services to Receivership Defendants in connection with their debt relief operations, and that Valley Bank services the Versara Lending side of the business. On January 16, 2024, CIBC produced a spreadsheet containing the account name, number, and frozen balance of all accounts belonging to Defendants and Relief Defendants, as well as other related entities. The Receiver is awaiting Valley Bank's response to his January 12, 2024 letter.

CIBC's spreadsheet identifies a total of fifty-nine accounts, of which thirty-five belong to Receivership Defendants (with the remaining twenty-four belonging to other related entities and individuals). Receivership Defendants' cash balances, as set forth on CIBC's spreadsheet, are disturbingly low for a business of this size. At present, based on a preliminary analysis of the information provided by CIBC, the Receiver believes that the Receivership Defendants may have no more than **$3,376,868.85** cash on hand for payment of payroll, vendors, and other expenses.

In making the decisions discussed below, the Receiver has taken into account that there appears to be less than $3.4 million in cash on hand at this time. The Receiver has been mindful that the limited amount of cash on hand for a group of companies of this size creates a perilous position for the resumption of business operations. While the Receiver listened to the initial recommendation by Defendants to bring back more than 250 employees, the Receiver could not

justify a projected payroll expense of almost $800,000 for the reasons identified below. In numerous conversations and email exchanges over the weekend with executives of the Receivership Defendants, the Receiver's team carefully reviewed a number of proposals. Among other things, the proposal by Defendants' counsel would have included the return of employees who are tasked with negotiating consumer debts that have not yet been completed.

Ultimately, the Receiver determined that the Receiver could not justify that substantial depletion of the limited resources currently available in the Receivership Estate, nor could the Receiver determine yet that negotiation of debts could be resumed in light of the allegations by the Plaintiffs that such negotiations may be unlawful. That issue will be ultimately addressed more fully in the Receiver's preliminary report that will be filed for the Court's consideration at its February 1st and 2nd hearing. Instead, the Receiver authorized bringing back 78 employees at a cost estimated to be approximately $160,000 through the PI hearing and approximately $240,000 until February 8th, as described more fully below.

## II.     LIMITED RESUMPTION OF BUSINESS OPERATIONS FOR PURPOSES OF CONSUMER PROTECTION

### A. Background

Since his appointment, the Receiver has focused on protection of the consumers, including immediately working with the dedicated account providers (payment processors RAM and Global Client) to ensure that (1) scheduled creditor settlement payments would continue to be made from the consumer's accounts, and (2) consumer payments into those dedicated accounts to fund negotiated settlements can also continue. That alleviated what the Receiver understood to be the most significant risk to consumers – failure to abide by settlement agreements with creditors (which could result in avalanche clauses being invoked by the creditor

4

to assert all amounts due and owing).  Accordingly, as to the approximately 129,000 active payment plans for 65,000 clients have previously been settled, those payments can continue to be made.

A temporary pause in business operations was necessary for the Receiver to take possession of business operations and perform the tasks ordered by the Court in the TRO.[2] However, the Receiver, after substantial consultation with Receivership Defendant's counsel and management over the last several days, has instructed Receivership Defendants' personnel to resume customer service functions necessary to protect consumers through the Court's hearing. In extensive discussions with Receivership Defendants' management, the Receiver has focused on identifying the reasonable level of staff to continue operations necessary to protect consumers in need of continued services, while at the same time preserving the limited Assets of the Receivership Estate.  To that end, 78 employees will return to work today, Monday, January 22, 2024.  The large majority of these employees are in the Client Services department and the others support that mission, *e.g.*, information technology and human resources.

The Client Services department has the most direct contact with consumers and can identify and address urgent consumer problems, and the Receiver believes these employees will minimize the potential for consumer harm.  The Receiver understands that Receivership Defendants' systems and personnel in its Client Services Department provide many services to

---

[2]  Among other things, the Receiver was ordered to do the following: (1) "[take] exclusive custody, control, and possession of all Assets, Documents, and Electronically Stored Information of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situation… (*Id.* ¶IX(B); inventory the Assets (¶ IX(C)(1)); "secur[e] each location by changing locks and alarm codes and disconnecting any internet access to the computers, servers, internal networks, or other records maintained at that location." (TRO Section IX.C.4); and "be responsible for maintaining the chain of custody of all of Defendants' records in the Receiver's possession" (Para. IX (U)).

clients of Intervenor Law Firms, including administrative litigation support and communications with clients on behalf of the law firms. In addition, Receivership Defendants' Client Services group handles and processes client requests that are received via email messages sent to client portals and documents received via mail.

The Client Services staffing plan is intended to facilitate limited business operations for consumer protection purposes for a period of two weeks, beginning January 22, 2024 through February 5, 2024 (the "Resumption Period"). The plan is based on the Receiver's assessment, after significant consultation with Receivership Defendants' executives, of the reasonable minimum staffing necessary to carry out essential client-services functions, with input from key Receivership Defendant management. For organizational purposes, the essential personnel can be divided into six groups: (1) Client Services Representatives; (2) Representatives/Liaisons with Litigation Attorneys; (3) Payment Team; (4) Versara Lending Service Employees; (5) Technical Personnel; and (6) Key Department Leaders. In particular, the Versara Lending Services Employees will perform essential client service functions relating to the Receivership Defendants' Versara Lending arm.

B. **Payment of Essential Vendors**

The Receiver asked Receivership Defendants' management personnel to identify the most crucial vendors necessary to continue to operate the business in a manner that will best protect both current customers of Receivership Defendants and the assets of the Receivership Estate. The two essential vendors needed to be maintained in the short term are: 1) Lloyd, the vendor for Microsoft 365 licenses (which the Receiver understands will cost approximately $150,000); and 2) Exela, the vendor managing the massive flow of mail and identification of priority mail (*e.g.*, legal summons) that must be handled on a more urgent basis (estimated cost

of $140,000). Receivership Defendants' management also identified the following third-party expenses, including employees' health insurance through Blue Cross Blue Shield:

| **Blue Cross Blue Shield** | Health Benefits | $274,000 |
| **Ameritas** | Life Insurance | $25,000 |
| **Orenda** | 401K Vendor | $125,000 |
| **New Benefits** | Teledoc and mental health services | $1,000 |

The Receiver is seeking some additional details on the timing and necessity of these expenses, but subject to further review and discussion, believes that at least a portion of these are justifiable business expenses.

The Receiver also understands that the monthly rent for StratFS, LLC's New York City office is approximately $260,000, and that February rent will come due during the pendency of the Receivership. The Receiver understands the Buffalo office rent is roughly $60,000 per month. The Receiver advises the Court that these February rents could potentially become additional financial obligations of the Receivership estate. The Receiver reserves all rights with respect to any potential claims asserted by the landlords.

In the interim, the Receiver will be actively monitoring Receivership Defendants' operations and expenses and receiving regular reports from management, mindful of protecting the assets in the Receivership Estate, while at the same time authorizing necessary payments to vendors. Where possible, the Receiver will continue to look for ways to prorate expenses through the hearing.

C. **Remaining Issues.**

The Receiver is still assessing, and has had discussions with counsel for Defendants and Plaintiffs regarding, a limited category of settlements that are apparently close to completion (*e.g.*, where payment instructions have not yet been finalized). While discussions remain ongoing with counsel for both Defendants and Plaintiffs, the Receiver has not gained comfort

7

that the completion of these settlements would be lawful, in light of the process used to obtain them.  Thus, absent further investigation and resolution of his concerns, the Receiver is not yet in a position to recommend that staff be brought in to work on these items.  When the Receiver specifically asked SFS's President about these pending settlements and the potential harm to consumers from a pause of them, she indicated the potential harm was that the negotiations could be revisited and/or settlements finalized with the consequence being be a limited amount of additional interest.  In light of the lawfulness concerns and the lack of material harm, the Receiver will continue to evaluate the situation and may return to the Court as necessary.

### III.     CONCLUSION

The Receiver has in good faith determined that the above-described steps are necessary business expenses to minimize harm to consumers. The Receiver is still in the process of completing the tasks required by the TRO, including determining which aspects and segments among the Receivership Estate businesses can be operated lawfully and profitably, and he will report to the Court with his recommendations in advance of the February 1st hearing.

Dated: January 22, 2024

                                             **HODGSON RUSS LLP**

                                                  */s/ James C. Thoman*
                                             James C. Thoman, Esq.
                                             140 Pearl Street, Suite 100
                                             Buffalo, New York 14202
                                             Telephone:  (716) 856-4000
                                             Facsimile:  (716) 849-0349
                                             Email:  jthoman@hodgsonruss.com

                                             **MCNAMARA SMITH LLP**

                                                 */s/ Alexander D. Wall*
                                             Alexander D. Wall (*Pro Hac Vice*)
                                             McNamara Smith LLP

655 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 269-0400
Facsimile: (619) 269-0401
Email: awall@mcnamarallp.com

*Attorneys for Court-appointed Receiver,
Thomas W. McNamara*

17116215v2