UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> STRAFTS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, *et al.* <br><br> Defendants, and <br><br> DANIEL BLUMKIN, *et al.* <br><br> Relief Defendants. | Case No. 24-cv-00040-EAW-MJR |

**DEFENDANTS STRATEGIC EMPLOYEE STOCK OWNERSHIP PLAN'S AND STRATEGIC EMPLOYEE STOCK OWNERSHIP TRUST'S STATEMENT IN SUPPORT OF DISSOLVING THE TEMPORARY RESTRAINING ORDER**

The Strategic Employee Stock Ownership Plan[1] and the related Strategic Employee Stock Ownership Trust ("ESOT"), through undersigned counsel, as represented by independent trustee James Urbach (the "ESOP Trustee"), submit this Statement in Support of Dissolving the Temporary Restraining Order. The TRO is harming the Plan and its participants and beneficiaries, all of whom are separate and independent from other Defendants named in this action. The TRO also is preventing the ESOP Trustee[2] from fulfilling his legal obligations under ERISA, the Internal Revenue Code, and the Plan document.

---

[1] The Strategic Employee Stock Ownership Trust ("ESOT") is a part of the Plan, and they both are referred to collectively as the "Plan," unless otherwise indicated.

[2] James Urbach is an individual who serves as trustee of the Plan and Trust. He is acting on behalf of the Plan and Trust for purposes of this filing.

1

I.      **Introduction**

The Court's January 11, 2024 *Ex Parte* Temporary Restraining Order With an Asset Freeze, Appointment of a Receiver, and Other Equitable Relief ("TRO," Dkt. No. 12), names the Plan and ESOT as among "Relief Defendants" and the broader category of "Receivership Defendants." TRO, pp. 7-8. The TRO generally suspends the corporate activity of the company whose stock the Plan owns (referred to herein generally as "Strategic"), freezes the company's and related entities' assets, and prevents employees from doing work.

The Receiver has been granted the full control of not only the Defendant[3] companies, but also the Plan, and the Receiver has the right to remove any independent contractor or agent of the Plan from any participation in affairs of the Plan. TRO, § IX(A). The TRO also grants the Receiver exclusive custody, control, and possession of all assets, documents, and ESI of the Plan and ESOT. TRO, § IX(B).

The ESOP Trustee—who is not a named defendant in this case—is the trustee of the Plan. The ESOP Trustee is required by the Employee Retirement Income Security Act ("ERISA") to act as a fiduciary, solely in the interests of the Plan's participants and beneficiaries, *see* 29 U.S.C. § 1104(a), and in that capacity, the ESOP Trustee is gravely concerned with the irreparable harm the TRO is causing and will cause to the approximately 1,000 Strategic employees/participants whose benefits have been and will be affected. To be

---

[3] "Defendants" refers to StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Versara Lending, LLC, and Strategic Family, Inc. (collectively, SFS) and Individual Defendants Ryan Sasson and Jason Blust (Individual Defendants).

clear, the ESOP Trustee takes no position on the merits of the claims asserted by Plaintiffs[4]; however, the ESOP Trustee notes that there are material factual issues and arguments raised in the Motion to Dissolve Temporary Restraining Order (the "Motion to Dissolve," Dkt. No. 36) that require Court resolution and certainty and undermine the appropriateness of a TRO. Moreover, the Plan and its participants and beneficiaries have interests that were not adequately addressed by Plaintiffs' filings or the Court in the TRO. If the injunction remains, ***the benefits of approximately 1,000 participants will be completely lost***, the ESOP Trustee will be unable to fulfill his statutory and contractual obligations, and the participants will lose ERISA-protected rights.

## II. Nature of the Plan and the Trust

An ESOP is a type of optional employee-benefit plan that is governed by ERISA, and ERISA preempts other laws. 29 U.S.C § 1144. An ESOP is a legal entity separate from the employer/plan sponsor, and it exists for eligible employees of the employer and certain affiliated entities. 29 U.S.C. § 1132(d)(1).

Unlike traditional retirement plans, ESOPs are required by ERISA to invest primarily in the stock of the employer. *See Fish v. Greatbanc Tr. Co.*, No. 09 C 1668, 2016 WL 5923448, at *3 (N.D. Ill. Sept. 1, 2016); *see also Keach v. U.S. Tr. Co., N.A.*, 313 F. Supp. 2d 818, 862 (C.D. Ill. 2004), *aff'd*, 419 F.3d 626 (7th Cir. 2005). ESOPs are meant to "serve as an incentive for corporations to structure their financing in such a way that employees can gain an ownership

---

[4] "Plaintiffs" refers to The Consumer Financial Protection Bureau (Bureau), the People of the State of New York by Letitia James, Attorney General of the State of New York (NYAG), the State of Colorado ex rel. Philip J. Weiser, the State of Delaware ex. rel. Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney General Keith Ellison, the State of North Carolina ex rel. Joshua H. Stein, Attorney General, and the State of Wisconsin.

US.361679085.03

stake in the company for which they work." 129 Cong. Rec. S16629, 16637. ESOPs benefit employees by making them "beneficial" owners of stock, and "linking the day-to-day performance of work by employees and the day-to-day growth and operation of business enterprise." ERISA-LH 30-C, 1972 WL 136948 (A.&P.L.H.), 104, 105. The employees/participants contribute nothing to an ESOP, but through their "labor power," they potentially grow the company and enjoy the benefits of that growth in the form of increased stock value. *Id*. at 106.

An ESOP obtains employer stock typically by means of a transaction whereby former shareholders sell their stock to the ESOP, and the ESOP 'pays' for that stock with funds it borrows from the employer or by issuing a note to the selling shareholders, which the employer then assumes.[5] In such a "leveraged" ESOP transaction, the ESOP is obligated to pay down an internal note to the employer; again, the ESOP does not raise funds from employees to pay for the stock it purchased. An ESOP receives tax-deductible funds from the employer,[6] either in the form of required contributions or dividends, and sends those funds back to the employer to pay down the internal loan (which the employer uses to pay down external amounts due). Thus, to enable an ESOP to repay funds borrowed from the employer or make payments on notes issued to selling shareholders, **the employer must make annual contributions to the ESOP**.

An ESOP's stock is held in a trust; initially, all shares are held in a suspense account, and as the loans are paid down, stock is released from the suspense account and eligible employees

---

[5] *See* ESOPs and TRASOPs, An Explanation for Employees, Committee on Finance, United States Senate, at p. 2 (November 1978) (available at https://www.finance.senate.gov/imo/media/doc/sprt95-31.pdf) (last visited January 19, 2024); *see also* Vaughn Gordy, et al., National Center for Employee Ownership, *Leveraged ESOPs and Employee Buyouts* 5-9 (6th ed. 2017).

[6] *See Start Here: ESOP Transactions*, Nat'l Ctr. Emp. Ownership (available *at* http://www.nceo.org/article/start-here-esop-transactions) (last visited January 19, 2024).

receive beneficial interests in shares that are allocated to their ESOP accounts.[7] For shares to be released from the suspense account, the ESOP must pay down the internal loan from the employer, which, again, is done with funds the ESOP obtains from annual employer contributions. As the ESOP pays down the internal loan, shares of stock held in the suspense account are released to ESOP participant accounts in proportion to the amount of the amortized debt.[8] The internal loan spreads out the allocation period over many years—in the case of the Strategic ESOP, 30 years.[9] . This structure motivates several generations of employees—not just those who were employed at the time of the initial stock acquisition—to maximize a company's performance and value, because they share in the company's growth and prosperity.

*If the employer does not make contributions to enable an ESOP to pay an internal loan, no shares can be released from the suspense account, and eligible employees will not be allocated additional stock to which they are entitled*.[10]

Once an ESOP participant receives stock in her ESOP account, it then vests over a period of years. The longer an employee stays with the employer, the greater his/her vested interest.[11] Employees in a company with an ESOP can build wealth by working, because the value of their accounts depends on whether the company succeeds.[12] When a participant dies or otherwise

---

[7] 26 U.S.C. § 409(b).

[8] Vaughn Gordy, et al., National Center for Employee Ownership, *Leveraged ESOPs and Employee Buyouts* 5-9 (6th ed. 2017).

[9] *Id*.

[10] *See* Employee Stock Ownership Plans, An Employer Handbook, Committee on Finance, United States Senate, at p. 23. (April 1980) (available at https://www.finance.senate.gov/imo/media/doc/prt96-25.pdf) (As the ESOP loan is repaid to the lender through annual employer contributions . . .shares of stock are allocated to accounts of participating employees.") (last visited January 19, 2024).

[11] *Id.* at p. 3.

[12] *See ESOP Nuts and Bolts*, Nat'l Ctr. Emp. Ownership, http://www.esopinfo.org/how-esops-work/, last visited Apr. 21, 2022 ("*ESOP Nuts and Bolts*").

separates from the company, the participant is entitled to the vested shares of stock in his/her account. The employer is then obligated to purchase those shares from the participant, as the participant demands. Participants are entitled to have their benefits distributed over a period that cannot exceed five years for most balances. I.R.C. § 409(o)(1)(C)(ii). ***Thus, participants do not obtain any benefits if the employer cannot pay them in cash, and they already received cannot vest if they are not employed***.[13]

The price at which the employer is obligated to purchase shares is determined by a "fair market value" valuation that ERISA requires an ESOP's trustee to obtain at least annually.[14] To perform this valuation, an ESOP's trustee retains an independent appraisal firm, and the appraisal firm does due diligence into the company.[15] An ESOP's trustee and/or the appraisal firm will review company records, financial statements, and other documents, and speak with company representatives about business and financial issues.[16] The annual value is then used to determine the value of participants' shares that have been allocated to their ESOP accounts, and participants who become entitled to distributions are entitled to be paid at the value determined by the most-recent annual valuation. 26 U.S.C. § 401(a)(28).

Congress views employee stock ownership as an important goal and, since ERISA's passage in 1974, Congress has consistently encouraged employers to create ESOPs. *See, e.g.*, *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014) (describing congressional

---

[13] *Id.* at p. 4; *see also* 26 U.S.C. § 409(h).

[14] *See* Employee Stock Ownership Plans, An Employer Handbook, Committee on Finance, United States Senate, at p. 4. (April 1980) (available at https://www.finance.senate.gov/imo/media/doc/prt96-25.pdf); 26 C.F.R. § 54.4975-11(d)(5); *see also* 29 U.S.C. § 1108(e); 29 USC § 1108(b)(17); and Rev. Rul. 59-60

[15] Declaration of James Urbach ("Urbach Decl.") ¶ 14.

[16] *Id*.

interest in encouraging ESOPs); *Grindstaff v. Green*, 133 F.3d 416, 422 (6th Cir. 1998) ("Congress has repeatedly expressed its intent to encourage the formation of ESOPs by passing legislation granting such plans favorable treatment, and has warned against judicial . . . action that would thwart that goal.") (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1466 (5th Cir. 1983)). Organizations that have spent years studying ESOPs have found they have benefits in addition to equity ownership, including improved corporate performance, employee retention, and job satisfaction.[17]

### III. The TRO Severely Impacts Participants' and Beneficiaries' Interests.

To obtain a TRO, Plaintiffs had to establish, among other things, that "the balance of equities" tips in their favor and "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("the balance of equities and consideration of the public interest . . .are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent"). Not only are the Plan and ESOT named in this action, but this Court also can consider the effect the TRO has on them because they are the primary stakeholders in Strategic. *See, e.g., KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, No. 20 CIV. 3274 (VM), 2020 WL 2554382, at *9 (S.D.N.Y. May 20, 2020) (denying TRO that sought to prevent defendant companies from transacting business, because it would have placed assets of all investors in

---

[17] *See, e.g.*, Nancy Wiefek, *Employee Ownership and Economic Well-Being*, National Center for Employee Ownership at 4 (May 15, 2017), www.ownershipeconomy.org (study finding that employees of ESOP companies had higher median tenure with employer than non-ESOP companies); Fidan Kurtulus & Douglas Kruse, *How Did Employee Ownership Firms Weather the Last Two Recessions? Employee Ownership, Employment Stability, and Firm Survival: 1999-2011*, W.E. Upjohn Institute for Employment Research at 60 (Jan. 1 2017) (study finding that during two previous economic recessions, companies with no employee ownership cut jobs by 3% for each 1% increase in the unemployment rate while companies with ESOPs cut by just 1.7%); Michael Quarrey & Corey Rosen, *How Well is Employee Ownership Working?*, Harvard Business Review (Sept. 1987) (study finding that employees were more committed to their company and less likely to leave their jobs the more shares in their company they owned).

peril). Although Plaintiffs argued in their Memorandum that the TRO required the Court to "(1) determine that Plaintiffs have a fair and tenable chance of ultimate success on the merits and (2) balance the equities," that is not accurate. P's Memo, p. 20. The Second Circuit explained that plaintiffs must show that "the balance of hardships tips in [their] favor," and "that the public interest would not be disserved by the issuance of a preliminary injunction." *Mendez v. Banks*, 65 F.4th 56, 63–64 (2d Cir. 2023), *cert. denied*, No. 23-431, 2024 WL 71980 (Jan. 8, 2024).

The Plan and ESOT are named as Relief Defendants and as part of the broader category of Receivership Defendants. In their Memorandum,[18] Plaintiffs alleged that in 2017, the Plan purchased all of the common shares of Strategic Family, Inc., and that the ESOT "holds all of the shares of SFS stock and possibly maintains funds held in trust." P's Memo, p. 11. Plaintiffs argued that the Plan and ESOT were appropriate Relief Defendants on the basis that if "SFS holds money in any accounts under these names, that money should be frozen to preserve the possibility of effective relief for victimized consumers." P's Memo, p. 44.

The TRO then states that Twist Financial, LLC (allegedly Blumkin's company) sold its stock to the Plan in December 2017, and Twist "loaned" the Plan about $43 million at 3% interest in lieu of the Plan paying a lump-sum to Twist for its stock. TRO, ¶¶ 158-59. The TRO states that the Plan has paid Twist over $16 million in principal and $2 million in interest. TRO, ¶¶ 158. The TRO states that the Plan and ESOT received funds from Defendants that are "traceable to funds obtained from consumers through Defendants [sic] unlawful practices." TRO, ¶ 170. The TRO not only appoints a Receiver for the companies and freezes their assets

---

[18] "Memorandum" refers to Plaintiffs' Memorandum in Support of Their *Ex Parte* Application for a Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should not Issue."

activities, **but also appoints a Receiver for the Plan and ESOT and freezes their assets and activities**. See TRO § IX.B (granting power to Receiver to "[t]ake exclusive custody, control, and possession of all Assets Documents, and Electronically Stored Information of…the Receivership Defendants").

Neither Plaintiffs' submissions to this Court nor the Court's TRO accurately or adequately discuss the interests of the Plan or the affect the TRO has on the public interest.

## IV. The Plan's History.

On December 28, 2017, the Plan, Strategic, and Strategic's shareholders at the time engaged in a series of transactions that resulted in the Plan acquiring 100% of Strategic's stock. Urbach Decl. ¶ 7. Although the Plan had no assets at the time, the employee-participants did not contribute any money to finance the Plan's acquisition of the stock. Urbach Decl. ¶ 8. Instead, the Plan issued a note to the selling shareholders in exchange for the stock. Shortly after the 2017 transaction, the Plan, Strategic, and the selling shareholders refinanced, and Strategic assumed from the Plan all the obligations to make payment to the selling shareholders for their stock. *Id*. Strategic extended a new internal loan to the Plan, at a below-market interest rate (2.64% long-term AFR), with a long repayment period (30 years). Urbach Decl. ¶ 9.

Strategic stock was placed in a suspense account held by the ESOT. In each year since the initial transaction, Strategic paid to the Plan annual contributions or dividends, and the Plan used those funds to pay down the internal loan. Urbach Decl. ¶ 10. **Once Strategic makes a contribution to the Plan, that money becomes ERISA-protected Plan assets, not assets of Strategic**. See, e.g., Cline v. Industrial Maint. Eng'g & Contracting Co., 200 F.3d 1223 (9th Cir. 2000) (once an employer contributes to an ERISA plan, the contributions become plan assets, over which ERISA attaches fiduciary obligations); *see also* 29 C.F.R. § 2510.3-101 (the "Plan

9

Asset Regulation").[19] To this end, Plaintiffs' assertion that the Plan might hold assets of Strategic is false and infringes on matters that are governed exclusively by ERISA.

Shares in the suspense account have been released and allocated to participant accounts according to allocation formulas in the Plan document. *See* Urbach Decl. Ex. C, Plan Document, § 7.04; Urbach Decl. ¶ 10. Since the 2017 transaction, the Plan has received millions of dollars (approximately $9.9 million in 2022 alone) in ERISA-required contributions from Strategic, which the Plan used to pay down the internal loan, resulting in the allocation of Strategic shares to hundreds of eligible employees' individual ESOP accounts. Urbach Decl. ¶ 11.

Per the Plan document, Employees who work 1,000 hours in a year, and are employed the last day of the year, are entitled to participate in the Plan and have stock allocated to their accounts annually. Ex. C, § 4.01(b). Since the 2017 transactions, shares have been allocated to participants, with unallocated shares remaining in the ESOT suspense account for future allocations. Urbach Decl. ¶ 11.

Pursuant to the 2022 IRS Form 5500 (Annual Return/Report of Employee Benefit Plan), 235 participants, including three beneficiaries of deceased participants, were entitled to distributions in excess of $500,000 in the aggregate. Pursuant to the Plan document, those participants are entitled to have their allocated shares purchased by Strategic at the price determined in the most-recent valuation, relative to the year they became eligible for distribution. Ex. C, § 7.08 (incorporating IRC § 401(a)(28)).

V. **The TRO Effectively Ends the Plan and Irreparably Harms Participants.**

The ESOP Trustee has been the independent trustee of the Plan and the ESOT since

---

[19] Pursuant to the Plan Asset Regulation, when a Plan owns stock of an entity, the Plan owns the stock, but not any underlying assets of the entity.

October 29, 2019.[20] *See* Urbach Decl. Ex. A; BOD Resolution Appointing Trustee; Urbach Decl. Ex. B, Engagement Letter. He was appointed as independent trustee by the Strategic Board of Directors, after an interview process. *See* Ex. A. At the time of this appointment, Urbach had no previous relationship with Strategic or any affiliated entity. Urbach Decl. ¶ 3. Per the written Trust Agreement that established the ESOT, as the ESOP Trustee, Urbach has the powers and responsibilities to, among other things, hold all contributions and distributions paid to the ESOT, make distributions from the ESOT at the direction of the ESOP's administrator, enter into transactions at his discretion, and, as of the last day of the plan year, report on the net worth of the ESOT. *See* Urbach Decl. Ex. D, ESOP Trust Agreement, § 2.3. He also has the right and duty, as a fiduciary, to represent interests of the Plan and its participants and beneficiaries.[21] *See* 29 U.S.C. § 1104(a)(1)(A) (ERISA fiduciaries have duty to act solely in interests of plan and its participants and beneficiaries); *see also* 29 U.S.C. § 1132(a)(2)-(3) (fiduciaries can bring causes of action under ERISA).

Urbach's independent appraiser has begun working on the valuation that ERISA and the Code require annually for ERISA governed plans. Urbach Decl. ¶ 14. This annual valuation is used for administrative purposes, it is required for annual disclosures filed with the Internal Revenue Service, and it is used for employees who become entitled to distributions. Urbach Decl. ¶ 13. In order to prepare the annual valuation, the ESOP Trustee works with an independent appraiser, and they engage in a lengthy process that involves interviewing Strategic

---

[20] Urbach was not the trustee at the time of the initial December 28, 2017 transactions.

[21] As the trustee, Urbach had fiduciary responsibilities over those matters for which he was a fiduciary. Strategic has consented to Urbach representing the Plan and ESOT in this litigation. Urbach is not assuming any additional fiduciary responsibilities beyond those as trustee and the authority he has to represent the Plan and ESOT in this action.

management and personnel, analyzing current and past financial statements and business records, conferring with personnel about projected performance, and considering other information from Strategic. Urbach Decl. ¶ 14. It is Urbach's understanding that the Receiver has cut off all Receivership and Relief Defendants from accessing any of Strategic's books and records. *Id*. Without access to Strategic's books, records, financial statements, and personnel, Urbach cannot value the Plan's stock and cannot fulfill his ERISA, Code, and contractual obligations. *Id*.

More importantly, for the Plan's stock to have any meaningful value (if any value at all), ***Strategic has to be an operating company with cash flows***. Because Strategic is a business valued primarily on its cash flows,[22] if Strategic is not operating, the value of the stock that Plan participants have earned through their hard work falls, potentially to $0/share. It is Urbach's understanding that the Receiver has caused all operations at Strategic to cease and has "shut down bank accounts, frozen employees out of Strategic's IT systems, cut off all access to email, and refused to provide service to Strategic's law firm clients." Motion to Dissolve, at p. 4. Strategic, in turn, cannot generate cash. Employees are without jobs, they cannot earn additional share allocations to their accounts, and the value of stock they already have earned through work they did in the past is becoming worthless. There are approximately 1,000 employees who are being affected by the TRO. By shutting down Strategic's operations, the Receiver has possibly reduced the value of Strategic's stock to zero, effectively wiping out Strategic's employees' savings.

At the same time, Plan participants who already are entitled to distributions have a right to be paid for their stock at valuations that already have been concluded. ***This means that former***

---

[22] There are multiple ways to appraise a privately held entity. Some companies are asset-based, but most are valued based on their expected future cash flows.

12

*employees, including the 235 participants and beneficiaries identified above, for example, whom Strategic has to pay for their stock will receive nothing if Strategic is shut down.*

Urbach notes that Plan participants and beneficiaries have other ERISA rights that are being trampled by the TRO. ERISA requires Plan Administrators to disclose certain information to participants and beneficiaries and make other information available for examination, as well as supplying copies at a reasonable charge upon written request. 29 U.S.C.A. § 1024(b)(2), (4). Plan Sponsors must provide benefit statements to participants. 29 U.S.C. § 1025(a). There are other administrative requirements for ESOPs that the Plan and Strategic cannot perform with the TRO in place.

Currently, the Receiver, who has discretionary control over the Plan, ESOT, and the stock that they own, is saddled with broad ERISA fiduciary responsibilities to act solely in the interests of the participants and beneficiaries. 29 U.S.C. § 1104(a)(1). The Receiver also is prohibited from making any fiduciary decisions for the purpose of benefitting anyone other than the participants and beneficiaries, *id.*, and is prohibited from causing or engaging in prohibited transactions under ERISA and the Code, unless exempt. 29 U.S.C. § 1106. The shutdown of the company, the freezing of assets, and other actions are harming participants.

**VI.    The Court Should Consider the Plan's Interests and Dissolve the TRO.**

Although the ESOP Trustee takes no position on the merits of the underlying disputes, those disputes should be resolved in the normal course of litigation. The interests of the Plan, the ESOT, and participants and beneficiaries are being severely impacted by the injunction, and further injunctive relief is not appropriate and harms the interests of approximately 1,000 employees who have been accused of no wrongdoing whatsoever.

US.361679085.03

## VII. Conclusion

For all of the foregoing reasons, the Court should dissolve the TRO, or alternatively, modify the TRO so as to maintain the status quo of Strategic immediately prior to the entry of the TRO to preserve value of the Plan and ESOT – i.e. the value of the stock of Strategic – and permit funding from Strategic to allow the ESOP Trustee to comply with his duties under ERISA and the Plan.

FAEGRE DRINKER BIDDLE & REATH LLP

By:    /s/ Andrew B. Joseph

Andrew B. Joseph
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
andrew.joseph@faegredrinker.com

Richard J. Bernard (*pro hac vice pending*)
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
richard.bernard@faegredrinker.com

Richard J. Pearl (*pro hac vice pending*)
3200 South Canal Street, Suite 3300
Chicago, IL 60606
Telephone: (312) 569-1907
richard.pearl@faegredrinker.com

*Attorneys for James Urbach, Trustee of Defendants the Strategic ESOP and Strategic ESOT*

Dated: January 23, 2024
New York, New York