EXHIBIT A

*Consumer Financial Protection Bureau, et al. v. StratFS, LLC*
*(f/k/a Strategic Financial Solutions, LLC), et al.*
U.S. District Court (WDNY) Case No. 1:24-cv-00040-EAW-MJR


**PRELIMINARY REPORT OF TEMPORARY RECEIVER**


Thomas W. McNamara
Regulatory Resolutions
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
tmcnamara@regulatoryresolutions.com
*Temporary Receiver*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................... 1
        A.      Overview ...................................................................................... 1
                1.      Structure ........................................................................... 1
II.     STEPS TAKEN TO IMPLEMENT TRO ................................................. 3
        B.      Immediate Access ...................................................................... 3
                1.      New York City – 711 3rd Avenue, Suite 600 ................ 3
                2.      Buffalo – 115 Lawrence Bell Drive ................................ 5
        C.      Documents/Information/Electronic Data ..................................... 7
        D.      Asset Freeze ............................................................................... 7
        E.      Compliance with the TRO .......................................................... 8
        F.      Notice to Consumers and Efforts to Protect Consumers ............ 9
                1.      Notice to Consumers ........................................................ 9
                2.      Efforts to Protect Consumers ........................................... 9
                3.      Efforts to Pay Employees .............................................. 11
        G.      Bond ......................................................................................... 11
        H.      Additional Receivership Entities ............................................. 12
III.    ASSETS AND LIABILITIES OF RECEIVERSHIP DEFENDANTS ......... 12
        A.      Bank Accounts .......................................................................... 12
        B.      Other Assets ............................................................................. 14
        C.      Liabilities ................................................................................. 14
        D.      Accounting ............................................................................... 14
        E.      Future Steps to Preserve and Pursue Assets ............................ 14
IV.     SUMMARY OF RECEIVERSHIP DEFENDANTS' BUSINESS PROCESS ... 14
        A.      StratFS "Products" ................................................................... 15
                1.      The Law Firm Debt Relief Model (referred to at StratFS as
                        "Platform-as-a-Service Model" or "PAAS") ................... 15
                2.      Direct to Consumer Model (DTC) .................................. 15
                3.      Debt Negotiation Loan Model ........................................ 15
        B.      Law Firm Debt Relief Model .................................................... 16
                1.      StratFS Sales/Enrollment Process ................................... 16
                2.      The Role of Law Firms ................................................... 25
                3.      StratFS Client Services ................................................... 30
                4.      Debt Negotiators ............................................................ 31
                5.      Litigation by Creditors versus Clients - Lit Def Strategies ... 35
                6.      Salesforce Data Findings and Analysis ........................... 35
V.      OTHER  RECEIVERSHIP DEFENDANTS and RELIEF DEFENDANTS ... 36
        A.      Versara Lending ....................................................................... 36
        B.      Timberline Financial ................................................................ 38
        C.      Atlas Debt Relief ...................................................................... 38
        D.      Lit Def Strategies, LLC ............................................................ 39
        E.      Relialit, LLC ............................................................................ 40
        F.      The Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee ... 40
        G.      Strategic ESOP/Strategic ESOT ............................................... 40
        H.      Individual Defendants' LLCs .................................................... 40

VI.     CAN THE BUSINESS BE OPERATED LAWFULLY AND PROFITABLY
        USING THE ASSETS OF THE RECEIVERSHIP ESTATE .......................................... 40

## I.      INTRODUCTION

I was appointed temporary receiver ("Receiver") for the business activities of Receivership Defendants[1] by the Temporary Restraining Order entered January 11, 2024 ("TRO").  I submit this Preliminary Report pursuant to Section XVI of the TRO to report on the steps taken to implement the TRO, the status of the receivership estate, and whether, as required by TRO Section IX.N, the Receivership Defendants' "businesses can be lawfully operated at a profit using the Assets of the receivership estate."

At the outset, the challenge of this receivership has been to drill down on the very complex business we found onsite and presented in the Plaintiffs' filings.  The complexity is not inherent to the debt relief business, but the Byzantine structure conceals components of the business and creates an opaqueness which appears to be purposeful.

### A.      Overview

#### 1.      Structure

The Receivership Defendants operate through three business lines, two of which likely can be operated lawfully (profitability may be an open question).  The third line, the law firm debt relief model ("Law Firm Debt Relief Model") which accounts for the vast majority of the Receivership Defendants' revenue, cannot in my good faith determination be operated lawfully based on issues unrelated to the face-to-face exemption issue which the parties will be addressing with the Court.

---

[1] The Receivership Defendants are defined in TRO Definition N to include the Corporate Defendants and the Relief Defendants and their subsidiaries, affiliates, divisions, successors, and assigns, as well as any other business related to the Defendants' debt-relief services and which the temporary Receiver has reason to believe is owned or controlled in whole or in part by any of the Defendants, and includes fictious names under which they do business.

a.     *First Line – Atlas Debt Relief*

Atlas does not take advance fees and can likely operate lawfully (if its fees are proportional) though it is less clear it is profitable presently and may not be profitable as a stand-alone business line absent a dramatic reduction of operational support.  This line accounts for 16% of the Relief Defendants' revenue.

b.     *Second Line – Versara Lending, LLC*

Versara Lending, LLC provides debt negotiation loans to consumers who are customers of Atlas or the Law Firm Debt Relief Model.  It can be operated lawfully and likely profitably, but it's operations presently are entirely derivative to Atlas and the Law Firm Debt Relief Model – as those lines source all of Versara's customers.  Versara accounts for 4% of the Receivership Defendants' revenue.

c.     *Third Line – Law Firm Debt Relief Model*

StratFS describes its third line of business as a "platform as a service (PAAS)" to law firms, which the President explained is like an outsourced "help desk" for the law firms.  This line accounts for 80% of the Receivership Defendants' revenue.  As detailed below, the evidence does not support the PAAS/help desk claim.  Our review leads us to conclude that StratFS is an expansive sales and client services operation which contracts with a constantly rotating series of law firms controlled by Defendant Jason Blust.  Customers are promised a "national law firm" with specific expertise in dealing with creditors will represent them, but, in fact as described below, there is almost no substantive attorney involvement in the debt settlement process.  The structure of the Law Firm Debt Relief Model also raises serious questions of the unauthorized practice of law and fee splitting.

## II.     STEPS TAKEN TO IMPLEMENT TRO

### B.     Immediate Access

As directed by TRO Section IX.C and X-XII,[2] we secured access to the two business premises identified in the TRO (one in New York City and one in Buffalo).

1.     <u>New York City – 711 3rd Avenue, Suite 600</u>

We first appeared at this location at 10:00 a.m. on Friday, January 12, 2024, accompanied by two New York State troopers.  Security at the lobby reception advised that Strategic Financial Solutions' ("StratFS") Sixth floor offices were closed on Fridays, and no one was upstairs, but we were refused entry.  After nearly three hours of skirmishing with the landlord's security director and general counsel, Magistrate Judge Roemer issued an order directing the landlord to provide access, which was ultimately provided at 1:15 p.m.  Thereafter, building personnel have been cooperative.

The building itself is a 20-story Class B office building in midtown, recently renovated with high-end amenities.  StratFS occupies the entire 6th floor (42,000 square feet) at a monthly rent of approximately $260,000.  Until 2020, StratFS had also leased the entire 7th floor.

---

[2] TRO IX.C directs the Receiver to: "Take all steps necessary to secure the business premises of the Receivership Defendants" with such steps expressly including:  .. complete a written inventory; obtain pertinent information from all employees, including "all computer hardware and software passwords"; secure each location by changing the locks and alarm codes and disconnecting any internet access or other means of access to the computers, servers, internal networks, or other records maintained at the location; requiring any persons present on the premises to provide the Receiver proof of identification and leave the premises after demonstrating they are not removing from the premises Documents or Assets of the Receivership Defendant. TRO X-XII titled "Immediate Access to Business Premises and Records for Receiver" confirms further that the Receiver be permitted immediate access, and that Receivership Defendants cooperate in the process.

Once admitted, we found a spacious facility which was eerily empty, but for one assistant sales manager who had come in to get his phone charger.[3]

The premises are professional.  A prominent "Strategic Financial Solutions" sign dominates the well-appointed reception area.  About 50% of the space is a state-of-the art call room with 375 individual sales cubicles, each equipped with a monitor – there are no desktop computers, as sales personnel are all issued laptops which can be used for remote work.  The current active population of salespeople, remote and onsite, is approximately 450, operating in teams under various sales managers.  Infrastructure and IT supporting this call room include all the advanced tools commonly seen in high-tech sales operations.

The call room is surrounded by numerous big screen monitors with rolling electronic leader boards that appear to track sales production in real time with salespeople identified by location (Buffalo, New York or remote) and ranked by various metrics, including number of deals closed and the amount of debt involved.  Some monitors include team results.  The walls are also adorned with various motivational messages highlighting the good work being done for consumers.

Two other areas are equipped with similar cubicles.  These include 96 cubicles in an area where HR and the Chief People Officer are officed, which appear to be unoccupied, and an additional 14 cubicles in an area dedicated to Defendant Versara Lending, LLC ("Versara"), includes an office for StratFS's Chief Financial Officer.  These cubicles were partially occupied.

The remainder of the space includes 12 different conference rooms of various sizes, a banquet-type room with eight tables, multiple training rooms, a spacious employee lunchroom

---

[3] Unfortunately, the assistant sales manager misrepresented that the laptop computer he stashed in his backpack was his personal property, but ultimately admitted it was StratFS property and spoke with us briefly about his role with the company.

with adjoining game room and quiet room with two electronic massage chairs, another small kitchen, and a large and well-appointed corner office for Individual Defendant Ryan Sasson. Relief Defendant Ian Behar's large office is next door but appeared essentially vacant.  A less opulent office in the sales area is allocated to Relief Defendant and company Chief Sales Officer Daniel Blumkin.  More functional individual offices were occupied by the Director of Sales, Senior Director of Sales, Director of Facilities, Chief People Officer, HR-Recruiting, and Director of Analytics.  Most rooms were equipped with at least one big screen TV and security cameras.

We used the building locksmiths to change all external locks.  A schematic of these New York offices and an inventory of the property on site is attached as Exhibit 1.

While the ambiance of this office is professional and the build-out high-end, the core capabilities reflect a functional telemarketing call room.

2.      <u>Buffalo – 115 Lawrence Bell Drive</u>

This location is a large single-story building (approximately 57,000 square feet) in an industrial park.  A large "Strategic Financial Solutions" sign is posted across the entrance. StratFS leases the entire premises for a monthly rent of approximately $60,000 but occupies less than half the space and is seeking to sublease the other half. On our arrival, all the doors were locked and only a janitor was onsite – he advised that the office is typically closed on Fridays and provided us access.  The Individual Defendants were not present.

The occupied portion of the premises is built-out to primarily support a large telemarketing sales operation.  The main call center area has an open floor plan with approximately 370 individual workstations, each equipped with monitors to be connected to company laptops issued to employees.  Approximately 220 workstations appeared to be

5

unoccupied.  We later learned that approximately 110 salespeople work from this location Monday through Thursday.  The onsite sales representatives work in five separate teams, each led by a sales manager, with 15-16 sales representatives (with titles of "Financial Consultant" and "Sr. Financial Consultant") on each team.  The remote sales representatives are assigned to "remote teams," led by remote managers.  Mounted on the walls are 18 big screen televisions housing electronic rotating leaderboards tracking and ranking sales production by salesperson. Various motivational sayings are painted on the walls, including multiple versions of "Our Purpose – We empower people to live financially healthy lives."

The reception area to the East of the sales floor contains a reception desk, a large conference room, a large office with Defendant Ryan Sasson's nameplate (who we were told only visits the Buffalo office once or twice a year), a waiting area, several guest offices and smaller conference rooms – one with a "Versara Lending" sign.

To the West of the sales floor are two large breakrooms (one with eight big screen televisions and arcade-style games), a large kitchen area, a massage chair room, multiple small conference rooms, and guest offices.

Two employees appeared on the day of our arrival – the Senior Director of Facilities and a Systems Engineer for the Buffalo office.  Both were cooperative, but wanted StratFS counsel present for their interviews, which we permitted.  On Tuesday, January 16, 2024, two sales employees arrived for work – they were cooperative, responded to our questions, completed questionnaires and turned over their company laptops.

A schematic of the Buffalo office and an inventory of the property on site is attached as Exhibit 2.

### C.       Documents/Information/Electronic Data

TRO Section IX.B directs and authorizes me to "Take exclusive custody, control, and possession of all Assets, Documents, and Electronically Stored information of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situated …".

At both sites, we confirmed that the limited hard copy documents were secure. Through data security and computer forensic vendors hired by the Receiver, the electronic data was first secured, and much of the data has been imaged.

Receivership Defendants deployed very large scale modern tech software, including Microsoft Office 365 and two distinct customer relationship management systems ("CRMs") (one for the sales function and a second for "client services" and Versara), numerous applications, and multiple database environments in the cloud. The data includes some 3,441 email boxes and huge amounts of CRM, call recordings, and storage totaling well more than 30 terabytes. *See* Exhibit 3. We ultimately secured control and obtained the necessary administrative passwords for these systems.

### D.       Asset Freeze

At the time we made immediate access, the Plaintiffs and my office served the notice of asset freeze entered by the Court (TRO II) on banks and other financial institutions where Defendants and Receivership Defendants were known to maintain accounts.[4]

---

[4] American Express; Associated Bank; Bank of America, N.A.; Barrington Bank & Trust Company, N.A., a Wintrust Community Bank; BMO Bank, N.A.; Capital One, N.A.; CIBC Bank USA; Citibank, N.A.; Coinbase, Inc.; ConnectOne Bank; Flagstar Bank; Global Holdings LLC f/k/a Global Client Solutions, LLC; JP Morgan Chase Bank, N.A.; KeyBank; Merrill/Bank of America, N.A.; Old National Bank; RAM Payment, LLC dba Reliant; Stifel Financial Corporation; TD Ameritrade/Charles Schwab & Co. Inc.; TD Bank, N.A.; US Bank; Valley National Bank; Wells Fargo Advisors; and Wells Fargo Bank, N.A.

### E.    Compliance with the TRO

The TRO directs the Receiver to "determine and implement the manner in which the Receivership Defendants will comply with, and prevent violations of this Order, including all other applicable laws, including but not limited to revising sales materials and implementing monitoring procedures."  TRO IX.K.

Section I of the TRO (titled "Prohibited Fee-Collection Activities") specifically prohibits Defendants from three categories of activities:

> **Advance Fees**. Cannot request or receive fees until a settlement agreement is executed by consumer <u>and</u> consumer has made at least one payment.

> **Fees Not Proportionate to Amount of Debt**.  Cannot request or receive fees that are not tethered to actual results, specifically two types: (i) the fee for each settled debt must be in the same proportion to the total fee as the debt bears to the total debt; (ii) the fee must be a percentage of the amount of debt reduction.

> **Engage in any conduct that violates the Telemarketing Sales Rule ("TSR") or the Telemarketing Act**.  Cannot take advance fees or make material omissions of material fact or misrepresentations in connection with telemarketing sales.  *See* 16 C.F.R. Part 310.3(a)(2)(iii).[5]

A related provision is IX.B which provides that the Receiver "shall not attempt to collect or receive any amount from a Consumer if the Receiver believes that the Consumer was a victim of the unlawful conduct alleged in the Complaint in this matter."

The steps taken to implement these prohibitions of the TRO are: Operations were paused immediately to ensure unlawful advance fees, disproportionate fees and misrepresentations in the

---

[5] It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: . . . .Misrepresenting, directly or by implication, in the sales of goods or services any of the following material information: . . . Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer[.]  16 C.F.R. Part 310.3(a)(2)(iii).

sales process prohibited by the TRO were not occurring and to conduct a review of the business to determine which, if any, portions of the business were not violating the TRO and could continue some level of operations.

     **F.**     **Notice to Consumers and Efforts to Protect Consumers**

          1.     <u>Notice to Consumers</u>

Once we received notice that the Court had unsealed the case and the TRO, we took steps to notify consumers, including posting a notice on the customer portals noting the pause in operations, the existence of the lawsuit, and particulars about dedicated consumer accounts while the pause in operations was in place.  Now that Client Services is again answering phones and responding to consumer inquiries, the notice has been taken down from the portals.

          2.     <u>Efforts to Protect Consumers</u>

A primary focus of the Receivership has been to protect consumers to the maximum extent possible in light of the existence and terms of the TRO.

Immediately after appointment, the Receiver's team contacted the dedicated account providers, which are payment processing companies RAM Payment, LLC ("RAM" and Global Holdings, LLC ("Global"), to ensure scheduled consumer settlement payments to creditors would continue from consumers' dedicated accounts and that consumer drafts (deposits) into the accounts to fund negotiated settlements could also continue.  Ensuring that the payment processors would continue to process payments and accept client funds largely alleviated a primary risk to consumers: failing to fund existing settlements, which could potentially cause creditors to invoke avalanche clauses and assert that all remaining amounts are immediately due and owing.

Second, as set forth in the Receiver's interim Report re: Client Services (ECF No. 56), after consulting with StratFS Management, Defendants' counsel, and Plaintiffs' counsel, the Receiver brought back personnel to continue client service functions and protect consumers through the Preliminary Injunction ("PI") decision. The Receiver attempted to find a balance between the level of staff necessary to protect consumers, while at the same time preserving the limited assets of the Receivership Estate. The Receiver authorized the return of 78 employees as of January 22, 2024, the majority of whom are in the Client Services department and other support roles (information technology and human resources). The staff immediately began answering consumer calls and addressing a backlog of consumer emails. These are understandably stop-gap measures, aimed to mitigate consumer harm balanced against the cost to the estate in the time between the TRO and the PI, and therefore are imperfect; for example, consumer call wait times are substantially longer than normal.

Based on input from StratFS's management, the Client Services team identified for return included Litigation Attorney Representatives and Attorney Liaisons who were to address urgent legal filings, *e.g.*, summons and complaints against consumers to be forwarded to litigation law firms. StratFS management and counsel identified this as an area of particular risk for clients. As we understand it, the StratFS litigation representatives/liaisons do not forward urgent filings to the law firm listed on the clients' engagement letters, but instead generally send them to Relief Defendant Lit Def Strategies, LLC ("Lit Def"). Lit Def acts as a hub and sends filings on to contracted litigation or appearance attorneys. Unfortunately, Lit Def has utterly failed to abide by any of its obligations in the TRO, and we only learned from its counsel on Thursday, January 25, 2024 that Lit Def "ceased operations upon entry of the TRO (all employees laid off)." As such, our efforts to return StratFS litigation employees to mitigate harm to consumers sued by

creditors is futile.  Without the Lit Def hub to receive and distribute summonses and complaints to contracted counsel, clients have no representation and are not protected.

Lit Def is owned or controlled by Defendant Jason Blust; Defendant Blust also appears to control all the law firms.  His decision to not cooperate and to shutter Lit Def will be the primary cause of harm to sued consumers during the TRO period.  Further, Blust's decision not to comply with the TRO and cooperate with the Receiver prevented the Receiver from accessing the necessary Lit Def systems to contact the law firms, or the appearance attorneys who were providing litigation services.

### 3.  Efforts to Pay Employees

StratFS has hundreds of employees, caught in an uncertain and stressful situation.  Upon recognizing employees were not paid between January 9th and January 12th, the day the receivership team gained access to office sites and temporarily paused operations to evaluate the business, the Receiver recommended that non-executive employees be paid their base pay for this pre-Receivership period.  In light of the TRO provision which prohibits the Receiver from paying pre-Receivership obligations, the Receiver decided to seek Court permission to pay the employees.  Prior to filing, the Receiver sought input from the parties.  Plaintiffs did not object to the motion and defense counsel supported the motion but also requested that previously-earned commissions be paid, which the Receiver did not support.  On January 25, 2024, the Receiver filed an emergency motion to authorize back-pay for employees, which the Court granted the next day.

### G.   Bond

As required by TRO Section XVIII, on January 23, 2024, a bond in the sum of $50,000 was filed with the Court.  (ECF No. 65.)

H.      **Additional Receivership Entities**

TRO Section IX.S empowers the Receiver to designate additional Receivership

Defendants if they fall within the TRO's extended definition of Receivership Defendants

(Definitions, ¶ N).  To date, we have identified Atlas Debt Relief, LLC and Timberline Financial,

LLC as additional Receivership Defendants – the required notices were sent to both on January

15, 2024.  We continue to evaluate all other entities related to Defendants.

III.   **ASSETS AND LIABILITIES OF RECEIVERSHIP DEFENDANTS**

A.      **Bank Accounts**

To date, we have received the following information as to frozen accounts:

| Account Name | Fin'l Institution | Account No. | Balance Frozen |
|---|---|---|---|
| Atlas Debt Relief | CIBC | 5152 | $34,775.71 |
| BCF Capital LLC | CIBC | 8690 | $202.50 |
| Bedrock Client Services | CIBC | 0855 | $6,248.77 |
| Blaise Investments, LLC | TD Bank | 0638 | $764,823.69 |
| Boulder Client Services LLC | CIBC | 3639 | $3,833.35 |
| Canyon Client Services LLC | CIBC | 1598 | $3,076.26 |
| Carolina Client Services LLC | CIBC | 2433 | $978.39 |
| CS 1 PAAS Services | CIBC | 7228 | $229,328.99 |
| CS 2 PAAS Services | CIBC | 6383 | $105,135.49 |
| CS 3 PAAS Services | CIBC | 8126 | $92,844.08 |
| Great Lakes Client Services | CIBC | 5319 | $8,866.15 |
| Guidestone Client Services | CIBC | 8448 | $55,356.57 |
| Harbor Client Services | CIBC | 9364 | $2,212.69 |
| Heartland Client Services | CIBC | 2180 | $69,336.02 |
| Lit Def Strategies, LLC | Wintrust | 0296 | $79.50 |
| Lit Def Strategies, LLC | Wintrust | 9073 | $1,050,034.31 |
| Newport Client Services | CIBC | 1577 | $28,728.27 |
| Northstar Client Services | CIBC | 3654 | $34,655.14 |
| Option 1 Client Services | CIBC | 6887 | $55,270.90 |
| Pioneer Client Servicing | CIBC | 7114 | $3,822.14 |
| Rockwell Client Services | CIBC | 5140 | $14,908.47 |
| Royal Client Services | CIBC | 6099 | $37,634.75 |
| Stonepoint Client Services | CIBC | 4192 | $35,965.62 |

| Account Name | Fin'l Institution | Account No. | Balance Frozen |
|---|---|---|---|
| Strategic Client Support | CIBC | 0601 | $3,731.02 |
| Strategic Client Support | CIBC | 0596 | $44,717.82 |
| Strategic Consulting LLC | CIBC | 6207 | $6,925.23 |
| Strategic Consulting LLC | CIBC | 8711 | $108,264.99 |
| Strategic CS LLC | CIBC | 0180 | $3,520.33 |
| Strategic CS LLC | CIBC | 2687 | $66,413.33 |
| Strategic Employee Stock Ownership Plan | CIBC | 3195 | $372.29 |
| Strategic Family Inc. | CIBC | 0577 | $5,509.34 |
| Strategic Family Inc. | CIBC | 2064 | $2,081,662.38 |
| Strategic FS Buffalo LLC | CIBC | 0202 | $11,830.84 |
| Strategic NYC LLC | CIBC | 2128 | $10,161.50 |
| Stratfs, LLC | CIBC | 3439 | $9,643.10 |
| T Fin LLC | CIBC | 7047 | $104,333.43 |
| Timberline Financial | CIBC | 2406 | $78,245.01 |
| Twist Financial, LLC | TD Bank | 3428 | $1,375.27 |
| Versara Lending, LLC | Valley Nat'l Bank | 9100 | $29,409.52 |
| Versara Lending, LLC | Valley Nat'l Bank | 4800 | $50,851.10 |
| Versara Lending, LLC | Valley Nat'l Bank | 7000 | $1,769,577.65 |
| Versara Lending, LLC (*CFT Funding)* | Valley Nat'l Bank | 3201 | $311.96 |
| Versara Lending, LLC (*CFT Repayment*) | Valley Nat'l Bank | 0900 | $39,123.66 |
| Versara Lending, LLC (*CL Funding Account)* | Valley Nat'l Bank | 2300 | $909.59 |
| Versara Lending, LLC (*DNL Repayment Account*) | Valley Nat'l Bank | 7500 | $86,988.63 |
| Versara Lending, LLC (*VCL Near Prime Lending*) | Valley Nat'l Bank | 0602 | $10.00 |
| Versara Lending, LLC (*VCL Near Prime Repayments*) | Valley Nat'l Bank | 6601 | $468.82 |
| Versara Lending, LLC (*VCL Prime Funding*) | Valley Nat'l Bank | 7400 | $10.00 |
| Versara Lending, LLC (*VCL Super Prime Funding*) | Valley Nat'l Bank | 8695 | $10.00 |
| Versara Lending, LLC (*VCL Super Prime Repayments*) | Valley Nat'l Bank | 3001 | $4,295.89 |
| Whitestone Client Services LLC | CIBC | 8572 | $18,317.98 |
| **TOTAL** | | | $7,175,108.44 |

13

### B.      Other Assets

Payment processors RAM Payment LLC is currently holding $7,627 and Global

Holdings, LLC is currently holding $156,499.

### C.      Liabilities

Our financial review is ongoing, but our accountant's initial report, Exhibit 4, indicates

long-term liabilities of $456,597,725.

### D.      Accounting

Our forensic accountant, Mercadien, is in the process of reviewing available financial

records, which include voluminous records, bank statements, and merchant account statements.

### E.      Future Steps to Preserve and Pursue Assets

At this stage, the Asset Freeze is the primary tool to preserve liquid assets.  We intend to

investigate whether Receivership Defendant funds were improperly deployed or transferred, as

appropriate.

## IV.      SUMMARY OF RECEIVERSHIP DEFENDANTS' BUSINESS PROCESS

TRO Section IX.N directs and authorizes the Receiver to do the following: "Continue and

conduct the business of the Receivership Defendants in such manner, to such extent, and for such

duration as the Receiver may in good faith deem to be necessary or appropriate to operate the

business profitably and lawfully, if at all; *provided, however*, that the continuation and conduct

of the business shall be conditioned upon the Receiver's good faith determination that the

businesses can be lawfully operated at a profit using the Assets of the receivership estate[.]"  *See

also* XVI.E which requires the Receiver to provide a report to the Court prior to the preliminary

injunction "[w]hether the business of the Receivership Defendants can be operated lawfully and

profitably[.]"

To comply with this direction, I have conducted as thorough a review as possible in the time and circumstances permitted. I report here my preliminary observations.

A.      StratFS "Products"

StratFS's marketing materials identify three debt-related "product offerings:"

        1.      <u>The Law Firm Debt Relief Model (referred to at StratFS as "Platform-as-a-Service Model" or "PAAS")</u>

This is the primary business of Receivership Defendants, accounting for roughly 80% of revenues.  It offers debt relief services with upfront fees and claims a national network of attorneys will negotiate and settle debts on behalf of consumers.  *See* detailed description at IV.B.

        2.      <u>Direct to Consumer Model (DTC)</u>

The DTC Model is StratFS's internal terminology for its contingency debt relief program which accounts for 16% of revenue.  Fees are charged only upon settlement of one or more client debts and at least one client payment on the debt.  This model is presented in Timberline Financial and Atlas Debt Relief affiliates described at Section V.B and C., respectively, and is used in states such as California, where there are greater restrictions on taking advance fees.

        3.      <u>Debt Negotiation Loan Model</u>

Versara Lending accounts for approximately 4% of StratFs's overall revenues.  Its primary product is a Debt Negotiation Loan (DNL) offered to selected well-performing consumers currently in StratFs's Law Firm Debt Relief Model or DTC Model.  *See* Section V.A.

B.       **Law Firm Debt Relief Model**

1.       StratFS Sales/Enrollment Process

In marketing and selling the Law Firm Debt Relief Model, StratFS operates a comprehensive and highly automated sales operation that drives consumers to its telemarketing call centers in Buffalo, New York, or to agents who operate remotely where Financial Consultants ("FC")[6] are trained and incentivized to sell.  Based on our review of sales scripts we discovered onsite in New York and Buffalo and conversations with FCs in both cities, we can summarize the main components of that sales process.

a.       *Solicitation - "Pre-approval" Letters to Debt-Stressed Consumers*

Personalized letters (sometimes including fake checks payable to the consumer) are sent to debt-distressed consumers from a third-party tribal mail house[7] via direct mail in the name of a rotating cast of "white label" "funding" companies.  The letters claim the consumers are "pre-approved" for a debt consolidation loan at attractive rates, *e.g.*, 3.11% APR.  The letters include a unique Offer Code or Personal Reservation Code (PRC).  Consumers are directed to call a phone number or submit a request to a designated website using the unique PRC.

StratFS is the invisible orchestrator of the solicitations, and the rotating list of "funders" used in the mailers appear to be inventions of its marketing vendor and exist only on the face of the letters; there is no actual lender and no actual pre-approval.[8]

---

[6] Although the job title is "Financial Consultant", these employees are pure sales. Their role does not include financial advice, accounting, or negotiation. FCs we spoke with described their roles as "sales guy" or "sales rep."

[7] Direct mail campaigns are run by Mandaree Enterprises LLC, which is a tribal entity.  *See* Exhibit 5, Invoices.  Plaintiffs' financial expert identified $135 million paid to Mandaree Enterprises LLC by the Receivership Defendants.

[8] We reviewed communications from a company called Lucky Marketing in the StratFS records. Lucky Marketing appears to run the marketing campaigns in exchange for a fee, which is

The direct mail solicitation campaign is extremely aggressive, often sending 2 to 3 million pieces each week to consumers.  StratFS projects the mailers will generate between 12,000 and 16,000 leads per week.  The results of the mail campaigns are closely monitored and each week a "Marketing Analytics" report is circulated to company executives.  *See e.g.*, Marketing Analytics report of January 12, 2024, attached as Exhibit 6.  The reports describe a dizzying array of data, from mailed pieces, to projected leads per week, to the number of expected leads by the hour.  *Id*.

We did not locate an example of the mailers at either of the StratFS sites or in the electronic data we reviewed.  StratFS President ML Clark claimed to know nothing about the solicitation process or letters.[9]  FCs we spoke with said they had never seen the flyers, but their impression was that they were styled as pre-approval letters because consumers, in the first call, typically say they are calling because they have been pre-approved for a a loan at a certain APR.

b.  *Leads are assigned to Financial Consultants*

Once consumers respond to the pre-approval letter (by call or website), they become generic leads to be allocated out to FCs.  StratFS utilizes Velocify as its CRM for sales, including lead management.  Incoming calls are answered at the call centers by an advanced Interactive Voice Response (IVR) system that prompts the consumer to provide background information.  Consumers responding via website provide the same information in an inquiry

---

included on Mandaree's invoice.  A former executive of Lucky Marketing noted that she managed 26 "white label" marketing campaigns for a company which appears to be StratFS. This "white label" campaign may explain the rotating list of "funding" companies, *e.g.*, Patriot Funding, Golden Eagle Lending, Brice Capital, and Polo Funding – none of which appear to have actual lending capabilities.  We also observed weekly "Lucky Marketing and Strategic Weekly Touchbase" meetings on Sasson's calendar.

[9] Ms. Clark pointed us to Defendant Ryan Sasson, whom she said was solely in charge of marketing.

form.  Each system then matches the offer code to the loan offer and prospective customer and this information appears on the FC's screen when they speak to the consumer.

FCs operating from the Buffalo and New York Call Centers (onsite and remote) are compensated on commission in a very competitive environment – large monitors ranking them on various metrics (number of deals and dollar amount of the debt involved) line the walls of both Call Centers.

The FC's job is to sell – specifically to contact leads and enroll the consumer.  Leads are secured and/or assigned to FCs via intricate protocols.  All incoming calls that have cleared IVR appear on all FC screens and get assigned to the first FC to respond.  All other leads (website inquiries and any call-ins not yet responded to) are placed in the "Lead Tank" and are categorized depending on how long they have been in the system.  Management loads leads into separate queues for each FC (usually 60 per day), and FCs access their assigned leads by hitting a "Get Leads" button on their screen.  FCs cannot poach leads in another FC's queue, but at 1:00 p.m. every day the Lead Tank opens up and FCs can claim leads from the tank, usually trying to pick leads in categories they think are most ripe.[10]  If an FC does not make initial contact with an assigned lead within a designated time frame, the lead is "bounced" to be claimed by other FCs.  After a designated number of bounces, the system kicks in a series of follow up scripted voice mails, texts, and emails to be activated after a specific number of days and/or call backs.

c.    *Financial Consultants Sell the Law Firm Debt Relief Model*

Once a lead is secured, the FC's sales mission appears to be to immediately dissuade the consumer from the supposedly pre-approved consolidation loan that led them to StratFS in the

---

[10] One FC told us they even pursue consumers in the "External Loan Offered" (but not yet funded) and attempt to talk them out of the loan option and into debt settlement.

first place.  This sales process is dictated by tightly choreographed scripts that include rebuttal responses to every possible consumer push back.  Exhibit 7 is a 71-page booklet of these scripts found in both Call Centers.

The FC politely leads the call with "I am calling on a recorded line regarding your debt consolidation loan inquiry with [MARKETING PARTNER]" – the fictional "funder" who sent the direct mail piece.  *Id*. at 7.  With that introduction, the FC, who already has basic financial information up on his or her screen,[11] immediately sends an email or text to the consumer with a link to StratFS's internal Touchstone program which will enable the FC and consumer to review the assembled financial information together via a shared screen.  The FC then proceeds with an application process (which the initial mailer claimed had been pre-approved) via a scripted series of steps that culminates in "Your Personalized Options" – referred to internally as the "offer wall" listing the options available to the consumer.  In limited instances, a consolidation loan brokered to a third-party vendor is offered, but in every instance the Law Firm Debt Relief Model – the "0% interest" – will also be offered.[12]

Our review of Velocify data, together with a sampling of 100 sales calls that took place on January 9 and 10, 2024, indicates that consumers were referred out to third parties less than 1% of the time, and we have no indications that referral of loans to third parties represents a business priority or generates significant revenue stream for StratFS.  In addition, in the 100 sales calls sampled, we observed that consolidated loans were *offered* as an option to just five

---

[11] FCs already have access to the consumer's name, address, approximate debt level, and other information from the online inquiry form.  In some cases (with the consumer's permission), they also run a "soft" credit check.

[12] FCs will offer a different debt relief option – a no-advance-fee debt settlement offer via Atlas Debt Relief – in states where the Law Firm Debt Relief Model is illegal, *e.g.*, California, or where StratFS -associated law firm attorneys have been disciplined, *e.g.*, North Carolina.

consumers (and never at interest rates even close to approaching what was promised in the pre-approval letter), while the Law Firm Debt Relief Model was offered all 100 times.  But even when the consolidation is offered, FCs are instructed to downplay the loan option and use financial information from the loan application as ammunition in favor of the Law Firm Debt Relief option which they routinely refer to as the "0% interest option."[13]

We identified many examples of aggressive efforts to maneuver consumers away from the loan consolidation option:

- A Senior FC we spoke with confirmed the entire sales process is geared towards selling clients the debt settlement program.  He typically informs clients, "You can do [the program] at 0% or take a loan at 15%."

- FCs are told "it is important to vilify the interest" associated with loans throughout their sales call.  Ex. 7 at 10.

- The scripts urge FCs to inform consumers "that consolidation loans don't get [consumers] out of debt" and that consumers "can't borrow [their] way out of debt."  *Id.* at 8.

- FCs are urged to "tieback [to the consumer's] goals…to how the interest is holding them back and how the [debt settlement] program savings can allow [the consumer] to reach their goal."  *Id.* at 10.

- The scripts contain a section entitled "If A Client Wants A Loan" with a detailed rebuttal for FCs to give to any consumer who desires a consolidation loan.  *Id.* at 16.

When a consumer does select the loan consolidation option (and cannot be dissuaded), StratFS brokers the loan to outside lenders.

Once the consolidation loan option has been discarded, the FC is directed to follow detailed scripts describing and selling Law Firm Debt Relief:

---

[13] This constant refrain of "zero interest" is a clever but false claim.  The consumers' debts continue to accrue interest while they remain outstanding and accumulate until a settlement is reached which may be several years later.

- The consumer is told that a national law firm with an established record will be representing them to settle the debt.  Scripts extol the quality of these law firms and describe their services (*id*. at 20).

- The FCs are scripted to say: "I would like to introduce you to [XYZ LAW FIRM], they are an established law firm that specializes in helping clients resolve their own personal debt and have a great proven track record over the course of the years in doing so."

- FCs describe what the law firms do as follows: "So, the way it works is [XYZ LAW FIRM] will look into your payment history along with your creditors and they will calculate how much interest you've already paid over the last few years.  What they're able to do is take a portion of those interest payments and credit it back to your balances owed today."  *Id*. at 22

- Upon entry to the Buffalo site, we also located boxes of glossy promotional "Welcome Guides" for 17 distinct StratFS-affiliated law firms[14] and one box of similar guides for StratFS affiliate Timberline Financial.  The footer of each interior page includes the firm name, a toll free number and a generic email (cs@[lawfirm].com) along with "Confidential – Attorney-Client Communication and Work Product," despite the fact the guides are generic, glossy advertising with nearly identical content.  *See* Exhibit 8, three of the 17 guides.

- The script describes the debt settlement option as follows: "This program will still provide you the convenience factor of one single lower monthly payment, it will allow you to get all of this debt taken care of in in an average of just 3-4 years, while saving you a significant amount of money off of your principal balance, but most importantly this option will be charging *zero interest throughout the entire length and duration of this option*."  Ex.7 at 21 (emphasis added).

- FCs are instructed to tell clients the Law Firm Debt Relief option will allow clients to "pay off the entire balance but also save thousands of dollars in the process by doing so.  Sound good?"  *Id*. at 22.

---

[14] Only three of these law firms appear on the map and roster of current Law Firms being assigned consumers by StratFS; presently 14 of the law firms are no longer enrolling.  The 17 law firms include: Anchor Law Firm; Canyon Legal Group; Great Lakes Law Firm; Greenstone Legal Group; Guidestone Law Group; Hallock & Associates, LLC; Heartland Legal Group, LLC; Monarch Legal Group LLC; Northstar Legal Group; Option 1 Legal; Rockwell Legal Group; Royal Legal Group; Slate Legal Group; Spring Legal Group; Summit Law Firm, LLC; and Whitestone Legal Group.

- Scripts emphasize savings on interest: "On a monthly basis this will save you a total of [MONTHLY SAVINGS] every single month, over the course of one single year you will be saving yourself a total of [ANNUAL SAVINGS] on an annual basis!  This means that over the course of the approximate [X YEAR TIMEFRAME] you would be able to save yourself a total of [TOTAL SAVINGS].  This savings would allow you to [TIE IN PERSONAL GOALS], which will allow you to kill two birds with one stone, how does that sound?"  *Id*. at 23.

- For clients who qualify only for the Law Firm Debt Relief option, the FC is told to state: "Congratulations!  Immediately I can see that you've been approved for one of our most popular options.  Based on our conversation, this option is the best fit for you because this is going to accomplish all your specific goals.  I'm excited to talk more about this option!"  *Id*. at 15.

FCs explain the logistics as follows: consumers will open FDIC-insured accounts solely in their names, where monthly payments will be deposited, and which will remain under their control; they are told to stop payments to creditors and stop using any cards to be settled; and consumers are asked to sign Powers of Attorney to enable the Law Firms to represent the consumers in negotiations with their creditors.

Once a consumer is sold on the Law Firm Debt Relief option, the FC generates "Enrollment Documents" and the "Attorney Docs Call Script" (*id*. at 32) kicks in with scripted language for the FC to review the enrollment documents with the consumer.  Once that review is completed, the FC sets up time/place for a meeting with the notary "for today or tomorrow" which consumers are told "only takes 20-30 minutes."[15]  The final step is Compliance: the FC previews the questions that will be posed, and then transfers the consumer to an automated compliance program which asks 15 yes/no questions.  Once compliance is cleared, a notary meeting is scheduled.

---

[15] When consumers balk about the quick timing, the script instructs the FC to close one more time or "pump fake" the client.

d.      *Notaries/Enrollment*

We understand the parties will present evidence about the notary meetings and argue their legal effect at the upcoming evidentiary hearings.  As such, we offer only what we observed related to this topic.

The notaries themselves are third party mobile notary vendors whose business is to travel to specified locations and notarize signatures on documents.[16]  The FCs (not the law firms) are responsible for scheduling the time/place of the notary appointment with the consumer just after they complete the enrollment documents review.  Scripts include an explanation that due to federal regulations, the enrollment documents must be signed face-to-face with a local notary, who is presented as a "representative of the law firm."[17]  FCs can set notary meetings within four hours after the compliance call and are urged to schedule it for the same day.[18]

Our review of scripts and onsite interviews has confirmed StratFS's internal descriptions and directives about the Notary Meetings:

- Sales scripts direct FCs to tell clients that the notary meeting is "pretty quick" and "only takes 20-30 minutes."  *Id*. at 37.

- FCs are instructed to tell clients "We can meet you anytime…" when describing the notary meeting, to refer to the notaries as "one of our local notaries," and to state "I will have that notary reach out to you."  *Id*. at 28, 37, 40.

---

[16] *See* Complaint at ¶ 78.

[17] *See* Exhibit 9.  "We are federally regulated, so we do need to have you sign your paperwork face-to-face with a representative of the law firm, a local notary representative"; *see also* Exhibit 10.  "This is a heavily regulated industry by the CFPB (Consumer Financial Protection Bureau) and we actually have to get everything finalized in person."

[18] *See* Exhibit 9.  "Note: Always try to schedule same day signing . . . This may not always be possible due to the 3-hour minimum scheduling requirement.  However, best practice is to strive for the signing to take place on the same day you put them through Compliance."

- FCs inform the notaries that the client "understand[s] the program really well so [the meeting] should be very easy" but that the FC will be available during the meeting if there are any questions about the program. *Id*. at 42.

- The FCs we spoke with stated they (not the notary) answer any client questions about the debt settlement program which arise during the notary meetings and frequently get calls from clients and/or notaries during such meetings.

- The presentation the notary provides is described by the FC to the client as being "just like [the one] we are going through now," without any new or different information.  *Id*. at 28.

- The FCs are instructed to tell both the notary and the client to call them directly with any questions during the notary visit.[19]

The enrollment forms themselves are formidable.  *See* example at Exhibit 11.  They are generated by the FC through Leadtrac software and reviewed with the consumer, but the FC review is limited to only some of the documents (Client Retainer Agreement, the Creditor Listing, the Payment Schedule, and the Power of Attorney).  While the consumer is directed to bring a voided check bank routing/account number information as needed for monthly ACH withdrawals, many of the enrollment documents at the notary meeting are new to the consumer.

After the client has completed the Enrollment forms, the notary uploads the completed forms into Leadtrac and sends a confirmation to the FC.  The FC then calls the client and informs them that their in-state attorney will call within 48 hours to go over the next steps.  A copy of the signed retainer agreement is then sent to the Law Firm.  The electronic receipt of the client-signed engagement letter is the first contact the law firm or "welcome attorney" has with this

---

[19] *See* Exhibit 9 at 3.  "If you have any questions during your [notary] signing, or at any point down the road – feel free to reach out to me directly.  I will continue to be your main point of contact throughout the entire process"; *see also* Exhibit 7 at 42.  "They understand the program really well so it should be very easy but if either of you have any questions, I'll be available during the meeting just give me a call."

"client."  Retainer agreements that we located in Salesforce client data were signed by the client but were not counter-signed by the Law Firm.

We located documents which support the importance of notaries to the business model and the close working relationship between notaries with the sales team:

- StratFS Relief Defendant Daniel Blumkin apparently researching notary vendors.  Ex. 12, August 18, 2020 email to self.

- StratFS employee forwarding feedback from our notaries to Defendant Jason Blust.  Ex. 13, April 17, 2019 email.

- StratFS sales group email about working with notaries.  Ex. 14, November 14, 2022 email.

- Email from Ryan Sasson to Notary Principal and Jason Blust.  Ex. 15, March 24, 2020.

    2.    The Role of Law Firms

Our review has included an effort to identify the actual services performed by the Law Firms in the Law Firm Debt Relief Model.  Are the Law Firms performing attorney-led debt settlement services with marketing and administrative services subcontracted out to StratFS?[20] Or is StratFS a large-scale sales and client services organization in the debt relief business which promotes Law Firm involvement to make sales, but in which the Law Firms' services are not substantive?  Focusing on this question is required by my obligation in TRO to report to the Court "[w]hether the business of the Receivership Defendants can be operated lawfully and profitably[.]"  TRO XVI.E; *see also* TRO IX.N.

The StratFS sales representations to consumers about the significant role and expertise of the Law Firms in the debt settlement process is not consistent with what we have observed on

---

[20] As StratFS's President described it, StratFS offers a platform of administrative support services, a "virtual help desk" to the law firms.

site.  Rather, the Law Firms appear to play a minimal role in the debt negotiation and settlement process, with the debt relief services driven by StratFS.

a.   <em>Who Are the Law Firms</em>

Defendants Ryan Sasson and Jason Blust are apparently long-time associates having both worked with Legal Helpers.  They began their present arrangement in at least April of 2013, when Blust on behalf of Pioneer Law Firm and Sasson on behalf of Pioneer Client Services, LLC first entered into a service agreement.  In 2015, they entered into an Amended and Restated Service Agreement with Blust signing again for Pioneer Law Firm and Sasson signing on behalf of a new entity, Pioneer Client Servicing, LLC.  <em>See</em> Exhibit 16.

At some point, the parties appear to have entered into a Business Restriction Agreement with "exclusivity restrictions" which prohibited Blust-related law firms from using a different servicer and StratFS from working with other law firms.  The date of entry is unclear.  We located an <em>unexecuted</em> Amended and Restated Business Restriction Agreement Blust forwarded Sasson on September 12, 2022 which suggests, by the title, that an earlier agreement was entered.  <em>See</em> Exhibit 17.

Based on all that we reviewed, Defendant Jason Blust appears to own, control, or have an interest in every Law Firm StratFS works with (which would be consistent with the exclusivity restrictions of a Business Restriction Agreement).  We see frequent email exchanges between Blust and Sasson on business issues and discussions of risks.  Blust's true role – as owner, manager, control person or interested party of the law firms – is apparently opaque to even some senior executives below Sasson.  For example, when asked, StratFS's President claimed not to know who owned the law firms StratFS was servicing.  But she later said that any time it is

26

necessary to address a law firm issue involving any law firm she speaks to Blust; she did not recall ever talking to another lawyer at the law firms.

The law firms controlled by Blust are virtual operations using Regus mail drops.  Mail sent to the law firms at Regus is periodically forwarded to a StratFS vendor which scans and uploads it to StratFS for processing.

There has been a long and rotating cast of law firms.  It appears the law firms are launched primarily through the efforts of StratFS employees.  *See* Exhibit 18.[21]  In some instances it appears that StratFS finances or subsidizes law firm operations.[22]  Once a firm is active, complaints to the BBB, AG, and CFPB are closely monitored, and the amounts needed to settle the claims tabulated.  *See* Exhibit 20, 2023 Tracker of BBB complaints.  Despite best efforts, the firms are routinely shuttered, often after operating for just a short time.[23]

Despite the turnover and the complaints, the arrangement is very lucrative for StratFS.  Based on communications between Blust and Sasson, they have an understanding that StratFS will receive 80% of the client fees, while the Blust Law Firms are targeted to receive 20%.  In a November 9, 2022 email, Blust wrote to Sasson about a fee increase for clients under consideration at the time.  After summarizing the increased nets revenues both parties could

---

[21] On at least one occasion, Blust offered a list of possible names for a new law firm to Defendants Sasson and Blumkin.  *See* Exhibit 19.  Blumkin made the decision of what name to choose.

[22] We see numerous outgoing wires from StratFS client services accounts to Law Firms some have memo notes reflecting "payroll," or "law firm payment".  When asked, a StratFS accounting employee indicated that, at times, StratFS funds Law Firm payroll account if they're not able to cover it.  We have not had an opportunity to fully explore this issue but see substantial evidence that StratFS is subsidizing the Law Firms.

[23] The day this lawsuit was filed StratFS's President suggested two more law firms were needed because of enrollments and identified another two law firms which would be closing enrollments in the near future.  Exhibit 21, ML email.

expect from an increase, Blust referenced what appears to be a fundamental agreement between the two.  He wrote:

> Based on the above fee increases this get us closer to the 80/20 "bedrock principal [sic]," which, post these fee changes, will be 82.3% to [StratFS] and 17.7% to the Law Firm.
>
> After you have had a chance to digest this I am happy to hop on a call to review. You can also have Sal [StratFS CFO] reach out to [Blust's accountant] as needed . . . .

Exhibit 22.

### b.   *Assigning the Law Firms*

During enrollment, the consumer is assigned a Law Firm and attorney based on state of residence and the amount of debt at issue via an automated process.  There is a U.S. Map in the Script Book and posted in many sales cubicles (Exhibit 23), and this map color codes which Law Firms function in which states.[24]  California, North Carolina, and South Dakota are excluded but assigned to Atlas Debt Relief instead of a Law Firm.  Other states are excluded altogether.  New law firms are rolled out periodically and older law firms rolled up based on the number of BBB, Attorney General, and other complaints a law firm has received.

### c.   *Retainer Agreement with the Law Firm*

Included in the mountain of Enrollment Documents reviewed with the FC and submitted to the client at the notary meeting[25] is a very complex and long Client Retainer Agreement,

---

[24] Because the Law Firm roster routinely changes, the law firm map must also change.  An FC in Buffalo told us that the law firm map had been updated two weeks prior to our entry in order to substitute Sandstone Law Firm for Clear Creek Law Firm which had, in turn, recently replaced the Level One Law Firm.  The FC stated that the most recent change was due to a terrible profile on the BBB website.

[25] The Law Firms themselves do not schedule or oversee the Notary Meeting – Notaries are directed and scheduled through StratFS's automated processes.

which identifies the legal services provided and breaks down the fees and costs estimated for the Law Firm's services.[26]  The Client Retainer Agreement is ultimately signed by the client during the notary meeting, and the client signs an acknowledgement form provided by StratFS that the terms of the agreement have been "explained to [their] satisfaction by a representation of [law firm]" and that they "have no unanswered questions about the program" or the Client Retainer Agreement.

d.    *Law Firm and StratFS Advance Fees*

The standard Client Retainer Agreement identifies the following fees and costs: retainer fee ($650-995); monthly legal administration fee ($49-99); and non-legal services cost (16-27% of the clients total enrolled debt) payable in monthly installments.[27]  The variation in fixed fees is based on location and the total amount of debt.  These fees are, as explained in the Client

---

[26] The specific enumerated legal services to be provided by the law firm include: *Debt analysis* – The formulation of a plan to negotiate better terms; *Negotiation/Resolution of Debt* – The law firm will represent the client and negotiate/resolve the client's unsecured debt with the listed creditors; and *Litigation Defense* – The law firm will advise/represent clients in lawsuits initiated by creditors or debt collectors to recover listed debts.  This section also contains various disclaimers and a disclosure that the law firm may contract work relating to the retainer agreement to 3rd parties but will "supervise" all such work.

[27] Total estimated fees for the Law Firm's services are specifically broken down as follows: *Retainer and Monthly Administration Fee*.  The retainer is to be paid monthly over a specified number of months.  The Legal Administration Fee (covering debt review/analysis, negotiations, and legal defense services) is a monthly flat fee to be paid "for all months Client remains active with [law firm]."; *Service Cost/Related Services*.  These purport to be non-legal services related to various acts "performed under the supervision of [law firm] attorneys."  The fee for such services is a percentage of the client's total debt (e.g. 19%) and is paid in equal consecutive monthly payments.  The agreement warns that such services may be performed by independent contractors (under the law firm's "direct supervision") and that communications between clients and the contractors may not be protected by the attorney-client privilege*; and Additional Fees*.  Sets forth a list of additional fees that may be charged by the law firm.  This section also dictates that all fees will be paid from the client's Dedicated Account and that such account is to be under the client's control at all times**.**

Retainer Agreement, paid in installments in advance, prior to any debt settlement or consumer payment on any debt settlement agreement.

e.   *Attorney Welcome Calls*

Once the Notary obtains signed copies of the Enrollment Documents, an Attorney Welcome Call is scheduled.  The welcome attorneys' calls with clients confirm the Law Firms will be directly involved in negotiating their debts, as the attorneys are scripted to promise "to supervise your debt resolution program."  *See* Exhibit 24.  We located a recent version of an Attorney Welcome script which reads, "I want to make sure that everything went well when you had your in-person meeting and signed the enrollment paperwork with our representative."[28] Attorneys are instructed to tell clients, "Throughout your program, either I or another attorney will conduct periodic reviews of your file, to ensure it is progressing in accordance with the goals of your plan."

3.   StratFS Client Services

The next outreach with clients is with personnel from StratFS Client Services ("Client Services"), what we understand to be a large entirely remote team.  Client Services is a robust, technologically advanced all-purpose customer service center for all clients.  It appears to be well staffed and professionally managed.  It benefits from advanced systems, fulsome analytics, and excellent infrastructure.  As best we can tell, the client service function of the Law Firm Debt Relief Model is excellent.

Once a client is enrolled in the Law Firm Debt Relief Model, nearly all their interactions with their "Law Firm" are not with the Law Firms, but with StratFS's Client Services

---

[28] Prior versions of this script in use referred to an in-person meeting "with our paralegal."  *See* Exhibit 25.

representatives, many of whom are more junior personnel who handle emails, answer phones, and perform other administrative tasks following written scripts and directions contained in a host of Standard Operating Procedures located in StratFS's Salesforce database.

Each Law Firm is assigned a separate tollfree phone number, which rings directly to StratFS – where Client Services representatives can immediately identify the client and the assigned Law Firm, so they can answer "Heartland Legal Group" in one call, "Level One Law" for the next call, "Clear Creek Legal" for the following one, and so on.  When calls are unanswered, clients are be met by voicemail messages in the name of the Law Firm the client was attempting to reach but otherwise identical.

    4.   <u>Debt Negotiators</u>

The heart of the sales pitch is the national law firm's ability to negotiate consumers' debts.  Our review suggests that since at least 2016, debt settlements have been negotiated by Debt Negotiators and Debt Negotiator Managers ("Negotiators") under the supervision of StratFS.  The negotiation process includes the following:

- Negotiators are instructed which debts to be settled with the help of a proprietary AI-driven algorithm, the Strategic Account Manager ("SAM"), the most recent iteration of which was deployed in 2021.  SAM was developed by StratFS's Data Analytics team, which reports to the CFO.  The SAM algorithm utilizes a variety of inputs to determine which debts to settle and in what order.

- Using the input from SAM, the Negotiator negotiates the debt with the selected creditor.  Once agreement is reached on the settlement amount, the Negotiator inputs that information in Salesforce, then Compliance reviews the settlement, and Salesforce auto-generates an e-mail letter to the client advising of the settlement.  The settlement must be approved by the client if the debts are being settled for more than 50% of the total debt.  If the settlement is for less than 50% of the debt, a letter is auto-generated to the client confirming the settlement, and that ends the process.

- Only after the client has accepted the settlement proposal is it sent to a lawyer for review and sign-off.

From 2016 to 2020, the Negotiators were direct employees of StratFS – they officed at StratFS (or remotely, with link to StratFS), took all directions from StratFS, were paid by StratFS, and received W-2s from StratFS.  In late 2020, Defendants pivoted, and Negotiators were re-classified as employees of the Law Firms.[29]  Our review indicates that this was a form-over-substance change – the Negotiators continued to operate in the StratFS ecosystem as functionally StratFS employees: they are hired and fired by StratFS; paid through StratFS, even if they receive W-2s from multiple Law Firms; they report to StratFS personnel; they take direction from StratFS; the work in and rely upon the StratFS Salesforce.com CRM; their job performance is evaluated by StratFS personnel; and some are even housed at the StratFS Buffalo Call Center.  Even though W-2s may now identify the Law Firm as the "employer," StratFS HR staff coordinates with the payroll provider, ADP, to confirm compensation levels at the Law Firms.

Records from ADP also indicated that employees whose "Payroll Companies" are identified as one of the Law Firms still have reporting chains within StratFS.  For example, StratFS CEO Sasson oversees President ML Clark who oversees the VP of Law Firm Negotiations and Litigation Operations, who oversees StratFS's Senior Director of Negotiations, who oversees a handful of "Managers of Negotiations."  These Negotiation Managers are on the payrolls of multiple Law Firms, with records indicating that some are paid by seven separate law firms, despite reporting to StratFS's Senior Director of Negotiations.[30]

---

[29] We understand that the impetus for this transition was in response to a legal action, likely the series of cases brought by the ICE firm in Florida, where allegations were made that the Law Firms were not negotiating the debts in any meaningful sense.

[30] Bonus structures for Negotiators are created and implemented by StratFS.  Indeed, just a little over two weeks before this lawsuit was filed, the VP of Law Firm Negotiators and Litigation at StratFS circulated a 2024 bonus structure for Negotiators.  He noted the plan had been approved by StratFS HR and its President.  The VP sent it to attorney Darlene Karaszewski to "review it

Based on an internal StratFS chart we found, titled "ADP Reporting Structure," several compliance attorneys (with titles like "Senior Counsel") also received W-2s from Law Firms but had reporting lines within StratFS and, in at least one instance we observed, were also paid by StratFS. This attorney who was listed as a Senior Counsel role at three separate law firms and received W-2s from each of those firms, also received a W-2 from Strategic Client Support and oversaw several "Junior Attorneys." StratFS's VP of Law Firm Negotiations made clear to us in our interview with him that the 60 or so front-line Negotiators, who were considered Law Firm employees, had reporting chains to, and received daily and performance evaluations from, StratFS personnel. He indicated that he understood the W-2 changes were in response to allegations made against the company in a lawsuit.[31]

The affiliation of the Negotiators with the various Law Firms and StratFS's ultimate coordination and control over the Negotiators was also confirmed in our review of emails belonging to a Senior Negotiator, who maintained three separate email boxes from which he conducted debt negotiation with outside creditors, each bearing different law firm domains. It appears that the Negotiators, who all supposedly work at different law firms, were sent listings of other Negotiators' various debt settlement statistics, case statuses and "points," as if they were all on a single "team" and in competition with one another. *See* Exhibit 27. Further, review of Negotiators' emails indicates that notes from their calls with creditors were input into StratFS's

---

with the law firms" – as Ms. Karaszewski is a W-2 employee for several law firms. But she is also a StratFS employee, paid by StratFS, and the address the VP sent the email was Ms. Karaszewski's StratFS email. Exhibit 26, December 28, 2023 email.

[31] While it is clear that Senior Management was well aware that the lawfulness of the Law Firm Debt Relief Model stood on shaky foundations (indicated by a raft of consumer complaints, state AG investigations, lawsuits, and State Bar investigations and actions, among other things), Senior Management appears not to have shared these issues with lower level employees who were instead lead to believe that the Byzantine corporate structure had been fully vetted and the company had a first-class compliance department.

Salesforce system, and their calls to creditors were routinely analyzed, graded, and coached for quality control, not by the Law Firms themselves, but by StratFS using its Allego coaching tool. *See*, *e.g.*, Exhibit 28.

Additional confirmation that Negotiators were functionally StratFS employees was provided by the Receiver's team's direct interactions with employees in the last week. These Law Firm employees wanted to be paid for past work, but had nowhere to turn, since they could not contact their own purported employers (the Law Firms). As context, the Receiver filed an Emergency Motion for employees to be paid their base pay for pre-Receivership time worked (between January 9th and 12th), but the Receiver also made clear that he was unable to pay Law Firm employees since they were purportedly not StratFS employees. Several Law Firm employees then reached out to the Receiver to reconsider and, incredibly, requested the contact information for the Law Firms employing them. For instance, one Negotiation Manager, who indicated she worked with six different Law Firms,[32] emailed the Receiver the following:

> I am a manager for 6 law firm portfolios within the Strategic umbrella. I recently saw your update to the website regarding pay and unemployment benefits. I am extremely concerned as you directed us to contact the law firm directly about our pay, however all payroll was handled through Strategic. There is no direct number for me to contact any of the six law firms that I've managed other than the 800 number that is fielded through Strategic CS. I have worked hard for this company for six years, dedicated to resolving as many debts as possible for our clients and obtaining the best possible terms….
>
> I ask that you also include the law firm employees in your request to pay us at least for the hours we worked as we are legally entitled to that. Also, if you have a direct phone number for the law firms that do not go to strategic – I will gladly contact them as well.

---

[32] This Negotiation Manager's ADP records showed that she was paid by a total of six different Law Firms.

a.    *Settlement Approvals by Lawyers*

Based on our observations and input from StratFS staff, the local Law Firm that makes the Welcome Call and is listed in the Engagement Agreement is asked to approve the debt settlement *after* the debt has been fully negotiated *and* the client has already approved the settlement.  Mechanically, StratFS's Salesforce system sends information to the Law Firm through NDS, a system we believe is controlled by Mr. Blust.  Since Mr. Blust and his companies have not yet complied with the terms of TRO, we have not been able to review the data contained within NDS.

5.    Litigation by Creditors versus Clients - Lit Def Strategies

If a creditor files a lawsuit against a StratFS client, Client Services generally handles the first-level communications.  Various StratFS staff (called Litigation Attorney Representatives and Attorney Liaisons) work with employees at Receivership Defendant Lit Def Strategies ("Lit Def"), controlled and owned by Jason Blust.  We understand that Mr. Blust and Lit Def then arrange for and hire lawyers to represent Law Firm clients in creditor lawsuits.

6.    Salesforce Data Findings and Analysis

StratFS utilizes Salesforce as its CRM for client service.  This data includes a wealth of information regarding StratFS's current and historical customer base and business operations.  With assistance from members of StratFS's Analytics Department, we reviewed and analyzed available Salesforce data on a number of important operational and financial metrics.  The detailed charts are included in Exhibit 29.  Because most of the reports were prepared by StratFS's Analytics employees utilizing complex data aggregation techniques, we are unable to independently verify the accuracy of all data provided but have no reason to doubt the information.  A number of topline datapoints are worth noting.

35

Clients graduating from the Law Firm Debt Relief Model totaled 32,777 since January 1, 2017 and, after fees, they are reported to have saved $485 million off the face amount of the debt.  On the flip side, nearly 70% of enrollees cancel over time; these cancelled enrollees paid $401 million to StratFS and the total refunds issued by StratFS was just $16 million, resulting in cancelled enrollees paying $385 million and not graduating. Not graduating does not mean that StratFS did not settle debts for cancelling enrollees, however – in fact, Analytics reports that for the 107,185 enrollees identified as having cancelled in the Law Firm Debt Relief Model saved $225 million off the face amount of the debt.  But this still results in cancelled enrollees paying StratFs $160 million more than the face savings.

The Timberline and Atlas DTC models also experience high enrollee cancelation rates. Over time, they too approach 70% cancellations.

As reflected in Table 4 of Exhibit 29, the number of clients assigned to individual lawyers is staggering.  In 2023, one attorney had 1,554 clients assigned to him/her and has a current caseload of 2,778 clients.

## V.   OTHER  RECEIVERSHIP DEFENDANTS and RELIEF DEFENDANTS

### A.   Versara Lending

Versara Lending accounts for approximately 4% of StratFS's overall revenues.  Its primary product is a Debt Negotiation Loan ("DNL") which is offered to selected well-performing consumers currently in the StratFS programs (either in the Law Firm Debt Relief Model or the DTC Model).[33] Target consumers are selected by an AI analytic process based on high debt levels and how they have performed in the debt relief programs.  The sales process

---

[33] We saw Wall Street pitch materials in the New York City office describing plans to significantly expand Versara's product offerings in 2024.

begins with a call not from sales, but instead from a member of a small Client Services team (known as "pre-sales") within StratFS; the caller claims to be calling from the Law Firm to make a special offer: a loan to "settle all your debts" within 60-90 days.  Interested consumers are elevated to a "Loan Officer."[34][35]

Once the loan is funded, proceeds are deposited not into the consumer's Dedicated Account (controlled by the consumer) but instead into a restricted account.  The consumer remains a client of the Law Firm and is serviced by StratFS Client Services, while negotiators work to settle outstanding debts quickly.  The loan not only provides money for quick settlements but also funds 100% of any remaining fees payable to StratFS and the Law Firm.

The Versara business is fundamentally lawful.  On January 21, 2024, employees were brought back to work to service the existing loan portfolio.  We have attempted to understand the profitability of the business, but have not resolved the issue given the press of other obligations and the complexity of the financial records.  Once this report is filed, we will make this a priority.[36]

---

[34] Based on reports run by StratFS's Senior Manager of Analytics for the period May 4, 2020 through the present, the success of DNL pitch is remarkable. Of 43,213 DNL leads pitched 9,495 were converted to loans.

[35] The DNL terms are not cheap for the consumer. A Q4 2023 Versara slide deck describes the DNL terms as follows: Loan Amount: $5,000 to $75,000 (avg. $20,000); Term: 12mo to 72mo (avg. 54mo); Origination Fee: up to 5.00%; and Targeted Interest Rate: ~23%.

[36] The sales process does raise some concerns in connection with the Law Firm Debt Relief Model, but they are not fatal to the lawfulness of the business.  These concerns include: the loan being pitched is essentially the same consolidation loan that FCs discouraged in the sales process for the Debt Relief Law Firm Model; StratFS falsely represents that they are calling from the Law Firm; StratFS and/or the Law Firm may have a conflict of interest in charging new fees for a loan to help pay off debts and/or settlements covered by earlier fees; if the Law Firms are doing the actual selling, they may be breaching fiduciary duties to their clients; and, proceeds from the new loan may go toward payment of StratFS fees from the Law Firm Debt Relief Model which may not be lawful.  The DNL process undermines the claim that SratFS's Client Services is

DNL consumers in the Atlas/Timberline DTC program are not based on any representations about the Law Firm and do not pose any lawfulness issues as long as the original DTC product was sold lawfully.  The profitability of the DNL program limited to DTCs is something which needs to be examined.

**B.    Timberline Financial**

Receivership Defendant Timberline Financial, LLC was the vehicle for the DTC Model debt relief product from approximately 2014-2022. It ceased enrolling new clients in January 2022, and the DTC model was transitioned to Atlas Debt Relief.  StratFS continues to service existing Timberline clients enrolled prior to the transition.  The operations and fee structure of Timberline are very similar to its successor Atlas Debt Relief, as described below.

StratFS Salesforce data indicates that active clients in Timberline total 2,703. My team also analyzed Salesforce data regarding the status of all historical Timberline enrollments, and found that of 27,389 total Timberline enrolled clients, 6,433 (23.49%) had graduated the program, while 18,253 (66.64%) cancelled prior to graduation.  The remaining 2,703 (9.87%) remain listed as active.

**C.    Atlas Debt Relief**

Receivership Defendant Atlas Debt Relief LLC is the current vehicle for the DTC Model which began operations in December 2021 as StratFS transitioned away from the Timberline Financial brand.

---

acting a "virtual help desk" to the law firm; the "help desk" is affirmatively marketing loans to a law firm's clients on behalf of a related business.

The Atlas Model does not take advance fees or rely on the Law Firm Debt Relief Model. It is generally offered in states where state regulations prevent the Law Firm Debt Relief Model, principally California, North Carolina, and South Dakota.

The fee structure includes three components: a service fee, processor fee, and litigation fee. Atlas service fees are calculated on a per-debt basis at 25% of the total amount of enrolled debt that has been settled, regardless of the savings achieved for the client. StratFS's standard DTC Client Contract specifies that "our fee for the settlement of any Debt is earned, and is charged in full, at the time you make the first payment to a Creditor on an agreed-upon settlement of that Debt." The processor fee is paid to a third party as is the litigation fee (though we don't know whether Atlas gets a portion of the monthly litigation fee).

The DTC Model also utilizes the SAM algorithm used in the Law Firm Debt Relief Model, but with variations. We understand that the DTC version schedules creditor negotiations to take place more quickly than in the Law Firm Debt Relief Model, prioritizing settling as much consumer debt in the current month as possible. This difference may be explained by fact that DTC earns fees only when settlements are reached.

Salesforce data indicates that StratFS currently has 9,619 active clients in the Atlas DTC Model program. Per the Salesforce data, it has enrolled a total of 16,257 clients in the Atlas program, with all but 27 of them having enrolled since January 2022. In addition to the 9,619 (59.17%) who remain active in the program, 6,014 (36.99%) cancelled, and 624 (3.84%) graduated from the program.

### D.    Lit Def Strategies, LLC

As described above, Lit Def Strategies has failed to abide by the TRO.

### E.      Relialit, LLC

Counsel for Defendant Jason Blust indicated Relialit is defunct, but has not offered any support for this claim.

### F.      The Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee

The Trust has failed to abide by the TRO.

### G.      Strategic ESOP/Strategic ESOT

After learning that Strategic ESOP/Strategic ESOT have no assets aside from Strategic stock, we moved to modify the TRO to remove them as Receivership Defendants, which the Court did on January 30, 2024.  (ECF No. 106.)

### H.      Individual Defendants' LLCs

Counsel for the LLCs (Twist Financial, LLC; Duke Enterprises, LLC; and Blaise Investments, LLC) has been unresponsive, and the LLCs have not complied with the TRO.

## VI.      CAN THE BUSINESS BE OPERATED LAWFULLY AND PROFITABLY USING THE ASSETS OF THE RECEIVERSHIP ESTATE

The TRO expressly directs the Receiver to evaluate whether and to what the extent the business can be operated lawfully and profitably:

- Para IX.N:[the Receiver is directed and authorized to] "Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; *provided*, *however*, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the business can be lawfully operated at a profit using the Assets of the receivership estate[.]"

- Section XVI identifies six topics to be reported in the Receiver's report to be file before the preliminary-injunction hearing, including: "Whether the business of the Receivership Defendants can be operated lawfully and profitably."

This is a complex business with many interrelated moving parts.  As a temporary receiver, I shall provide the Court with my observations based on my review to date.  I will address the issue in three parts: the Law Firm Debt Relief Model; the Atlas/Timberline contingency fee Model; and the Versara consumer loans model.

To begin, I note that  the Court's determination on the issue of whether the business is exempt from the TSR's advance fee prohibitions will  impact the lawfulness of the business going forward.  Based on my observations to date as detailed in this report, I provide here the good faith determinations I can make pursuant to the directives of TRO IX.N as to whether the businesses can be operated lawfully at a profit using the Assets of the receivership estate unrelated to the Face-to-Face exemption.

My good-faith determination is that the Law Firm Debt Relief Model as currently constructed is reliant upon misrepresentations about the Law Firms' roles in negotiations and settling of debts.  The model also raises concerns about the unauthorized practice of law as well as ethical concerns about fee splitting with non-lawyers.  Overall, these issues would impact the lawfulness of the venture going forward, and I cannot presently recommend that Law Firm Debt Relief Model can be operated lawfully.

As indicated above, my review suggests that the Law Firms listed in retainer agreements do not negotiate and resolve debts, or oversee that process; rather, the program is instead implemented by StratFS and Negotiators operating in the StratFS ecosystem who select the debts to be settled with the help of StratFS's proprietary "SAM" algorithm.  Our review supports the negotiation process takes place without any meaningful supervision or involvement by the Law Firms' attorneys – who ultimately approve the settlements.

This reality of how the debts are actually negotiated and settled seems important in my role as a Receiver making recommendations about whether the business can continue to be operated lawfully. It is clear to me that the Law Firm Debt Relief Model has been developed to try to fit within the TSR's Face-to-Face exception, with a heavy emphasis on using local state-based lawyers to do so. StratFS Leadership is well aware of the regulatory risk inherent in the Law Firm Debt Relief Model and regularly makes tweaks to the model (most notably, housing "Negotiators" and compliance counsel as employees of the Law Firms when these personnel generally consider themselves to be StratFS employees) to try to maintain the appearance that a Law Firm is settling the debts.

The evidence I have reviewed makes clear that contrary to the representations made to clients during the sales process, the Law Firms who ultimately approve the settlements and supposedly "supervise" them do not appear to have a substantial role in negotiating or settling the debts; StratFS does the lifting. An obvious and key fact in this regard is that the Law Firms are not brought into the settlement process until *after* the client has already approved the settlement. This structure means that the debt settlement process is not reliant upon the skill, judgment, or legal training of an actual attorney; rather, what is being relied upon is the experience and AI-driven insights of StratFS's Data Analytics team reporting to StatFS's CFO.

This raises serious concerns that clients are deceived by misrepresentations from inception because clients are not being provided the legal services they are promised, as their debts are not being negotiated or settled by Law Firms.

There is also a serious issue of whether the Law Firm Model involves the "practice of law" in any meaningful respect. That the key decisions in the negotiation and settling of the debts (which to negotiate, how and when, etc.) are based on the top-down directives of StratFS's

42

CFO and his analytics team aided by the SAM algorithm and Negotiators who operate in the StratFS ecosystem follow these directives.  In most instances, it appears that the Law Firm quickly reviews and approves the settlement in what may amount to an after-the-fact rubber-stamp.[37]

We have not undertaken to review exactly how the proprietary SAM algorithm works. We were told that the SAM algorithm is set up differently for the Atlas DTC Model and Law Firm Debt Relief Model: specifically, for Atlas, the model is apparently set up so that more debts are settled faster.  Based on conversations with multiple StratFS personnel, we understand that the outputs from SAM's algorithm for Atlas instruct Negotiators to settle two debts in a month if sufficient money is in the Dedicated Account to do so, whereas the outputs for SAM algorithm would only require Negotiators for the Law Firm Debt Relief Model to settle one of those accounts per month and would leave the rest of the money in the account to settle the debt at a later date.  The reason for this difference in the outputs of the models, as explained to us by StratFS employees, was the financial motivations of StratFS, and not the consumers' interests. We were told that this was because while the Law Firm Debt Relief Model allows advance fees to be taken, the Atlas Model does not.  Thus, the change in the outputs of the SAM algorithm is set up to speed up StratFS's ability to collect fees and make money.  While StratFS employees also assured us that the SAM algorithm was set up in the best interests of consumers, there are concerns that it might also take into account and prioritize financial interests over consumers;

---

[37] The ABA's Model Rules of Professional Conduct, adopted in general by most states, define the "practice of law" as "the application of legal principles and judgment with regard to the circumstances or objectives of a person that require knowledge and skill of a person trained in the law."  The types of things that qualify as practicing law are, among other things, giving advice or counsel to people as to their legal rights or responsibilities, drafting or completing legal documents or agreements that affect a person's legal rights, and negotiating legal rights and responsibilities as a person.

while that is perhaps something that a regulated for-profit debt relief company might take into account, doing that is anathema to any law firm, in light of attorneys' fiduciary duties owed to their clients.[38]

I have considered StratFS's and the Law Firms' anticipated response that the Negotiators and their Managers are "Law Firm Employees" paid in W-2s by the Law Firms. As noted above, we have little comfort that the Negotiators or Senior Counsel are actually Law Firm Employees or are supervised in any meaningful respect by the Law Firms. Persuasive evidence of this reality came from many sources, including the fact the Negotiators do not generally appear to know the names of anyone at their Employer Law Firms or to even have their phone numbers, and the Law Firms do not appear to know the names or locations of the personnel they purportedly employ to negotiate.

Additionally, the strained effort to re-classify Negotiators and others as W-2 employees of individual Law Firms (and not StratFS) raises concerns of committing or aiding and abetting the unauthorized practice of law. Here, StratFS and Negotiators reporting to StratFS purportedly negotiate and prepare legal documents and review them with the prospective clients.

Several State Bars have raised similar concerns about StratFS's Law Firm Debt Relief Model. One recent matter involved a former owner of one of the Law Firms. In 2022, the North Carolina State Bar condemned the Law Firm Debt Relief Model employed by StratFS and Jason

---

[38] Under the law, "a fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith – in fact to treat the principal as well as the agent would treat himself. The common law imposes that duty when the disparity between the parties in knowledge or power relevant to the performance of an undertaking is so vast that it is a reasonable inference that had the parties in advance negotiated expressly over the issue they would have agreed that the agent owed the principal the high duty that we have described, because otherwise the principal would be placing himself at the agent's mercy…." *Burdett v. Miller*, 957 F.2d 1375 (7th Cir. 1992) (Posner, J.).

Blust, having determined that the law firms started and operated by Blust "are engaged in the unauthorized practice of law and debt adjusting in multiple states."  The North Carolina State Bar suspended the "owner" attorney (who owned the law firm on paper, even though he held 3% of the firm and Blust controlled 97% of the revenue) for 5 years (who had only recently graduated law school and had no experience or expertise as a debt settlement attorney).  It also held that the nonlawyers, including notaries, were not hired by the lawyer or his law firm, the lawyer did not determine how they were to be paid, the nonlawyers did not report to the lawyer or his law firm, the lawyer never spoke with nor met many of the nonlawyers, the lawyer was not a party to the conversations the nonlawyers had with consumers, the lawyer did not review the communications the nonlawyers had with the consumers, and these nonlawyers worked for numerous other entities, to name a few.  All of this was the basis for the North Carolina State Bar concluding the nonlawyers were engaged in the unauthorized practice of law and the lawyer failed to supervise the nonlawyers, among multiple other violations.[39]

In summary, the misrepresentations about law firm involvement and the grave practice of law issues which attach to the Law Firm Debt Relief Model preclude me from concluding this business line can operate lawfully.

Dated:  January 31, 2024                    By: _____
                                                 Thomas W. McNamara
                                                 Temporary Receiver

---

[39] We also note there is a disciplinary action pending in New Jersey against Lauren Smaldon, formerly known as Lauren Montanile, following its investigation, which began on March 17, 2020.  Ms. Smaldon was previously a StratFS employee and is now paid by three law firms.  The proceeding arises out of Ms. Smaldon's relationship with numerous law firms and StratFS.