

Ronald S. Safer
312.471.8736
rsafer@rshc-law.com

February 4, 2024

*Via ECF*

Hon. Michael J. Roemer
United States Magistrate Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, New York 14202
(716) 551-1630

  Re: *CFPB et al. v. StratFS, LLC et al.*, Case No. 24-cv-00040 - Response to Preliminary Receiver Report

  This letter responds to the Receiver's Preliminary Report. There are various misstatements, misinterpretation of events, and material omissions. We do not opine on whether the issues with the Preliminary Report are intentional or the necessary circumstance of trying to draw conclusions from incomplete information and without input from the people with actual knowledge of the operations gained over many years.

  Regardless, the government's "shock-and-awe" approach was clearly not justified by the facts we now know they relied on to convince the judge, with misleading, inaccurate, and five-year-old allegations, to allow the government to seize Strategic and impose a receiver who has all but ignored the Court's order to run the company. Instead, he has sought to run the company into the ground, putting almost a thousand people out of work, while ignoring both State and Federal WARN Acts, without any concern about the implications for them or their families, and put more than 65,000 law firm clients at risk with little concern about the impact on their personal finances. Strip away the assertions in the Complaint and Motion for TRO that were unsupported and contradicted by the evidence, combined with the novel legal theory advanced by the CFPB – one that directly contradicts the position they have taken in the past – and it becomes clear this is a case of government overreach at its worst.

  This letter addresses three issues in the Receiver's Preliminary Report: First, the damage consumers are suffering and would continue to suffer, as a result of the Receiver's actions. Second, the damage the Receiver has done to Strategic's former employees. Third, the unauthorized practice of law – an issue the Receiver injected into this matter for the first time – is specious and has been addressed repeatedly by all disciplinary committees that have reviewed it.

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 2

## I. The Receiver Has Harmed Countless Clients and Prevented Strategic From Limiting the Damage He Caused

As the Court has heard, Strategic provides all back-office operations for the law firms and its own contingency debt settlement companies that service approximately 80,000 clients in their debt resolution efforts. The TRO placed the Receiver in control of Strategic and ordered him to evaluate whether the Companies could be run lawfully and profitably.  Without any analysis, the receiver took control of the company and immediately unplugged its servers.  The Receiver terminated all operations and kept the Companies completely closed for 11 days.  During that time he provided communication to only a very small fraction of the approximately 1,000 employee owners. The Receiver provided no communication to the ESOP Trustee or the critical vendors of the business. On January 23rd, the Receiver posted the following website, https://regulatoryresolutions.com/case/consumer-financial-protection-bureau-et-al-stratfs-llc-et-al-stratfs-receivership/, which essentially fired 900 employees with no notice and no access to health insurance. They could not even access COBRA (discussed below).  The Receiver left the law firms without any access to Strategic's system that allows them to access their clients' files.  Strategic processes, uploads, and distributes mail sent from clients to law firms.  Summonses from the courts, communications from creditors, written communications from clients – including emails – went unreceived.  The highlights of the damage caused by the Receiver's actions are set forth below.

In the first week alone, over 22,000 calls and 27,000 requests from clients went completely unanswered. Clients were thrown into crisis.  The intervenor law firms do a volume business.  Without Strategic to handle the back office for them, they have been buried under an avalanche of communications.  Imagine the chaos in a traditional law firm if all administrative assistants, billers, mail room, copy centers, receptionists and every other critical member of the support staff were immediately terminated with no warning.  The lawyers and the law firm would be unable to function.  It could not service clients.  This scenario is exacerbated when most of those back office operations are off-site.

Plaintiffs poignantly demonstrated at the hearing (in testimony by Ms. Barsch) the pain that is caused when the system fails, even when it is operating at full strength.  (Unfortunately, the best-designed systems fail at times.  That is not a reason to shut down a company).  The Receiver's actions caused that pain, economic and personal anguish not in a few isolated cases, but for 100% of the almost 80,000 clients.  One example is a client who contacted Strategic's President, ML Clark on Linkedin:

> I have a major issue and need help and he is no where to be found. When I call the main number it hangs up on me and when I call his number it says it is disconnected. Can you please have someone call me so I can get the help I need. It is an urgent issue as it has to do with a draft in error from my bank account.

The number of clients in similar situations is incalculable.

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 3

Had operations been reopened at full capacity after 11 days, it would have taken a herculean effort to work through the backlog created by those messages. Law firms would have been inundated with messages from the prior week as well as the new messages, summonses, etc. But they, and Strategic, are completely committed to client service (notwithstanding isolated failures to execute on that commitment), and they would have worked 24/7 to accomplish that goal. Unfortunately, the Receiver did not allow anything remotely close to full operations. After extensive negotiations with the President of Strategic and the undersigned lawyers, and despite being fully apprised of the chaos he created for clients, the Receiver committed to bring back only a "skeletal" – his word – crew to do the absolute bare minimum. The Receiver's description in his report of the service resumption he allowed is disingenuous. He informed the Court only that "Receiver brought back personnel to continue client service functions and protect consumers through the Preliminary Injunction ('PI') decision." (Report at 10) What he chose not to tell the Court was that he allowed a mere 76 employees to go back to work. This skeletal staff could handle only a fraction of the incoming communications from and for clients. That choice exacerbated the backlog and forced clients to endure an average of 4-5 hour wait times, rising to as long as 7 hours and 30 minutes, which he deemed "acceptable" and has allowed to continue for over 2 weeks even though he has received reports and statistics every day. The Receiver's statement in his report that "Client Services is again answering the phone and responding to consumer inquiries" (Report at 9) is, at best, a half-truth and at worst designed to mislead the Court. The normal average speed of answer before the Receiver shut operations down was under one minute. His statement that "consumer call wait times are substantially longer than normal" (Report at 10) is a gross understatement. A client could remain on hold for more than half of a full workday and the Receiver deemed that "acceptable" is remarkable. A small sample of emails received in response to survey emails[1] shows that the clients have a different view of what is acceptable:

> I can't get a hold of a human to talk to...starting to wonder if you guys are a scam. I asked several questions to a bot and when I call I'm told your closed even during regular business hours. Seriously considering ending my payments to you and calling the Better Business Bureau and filing a complaint about you scamming people out of thousands of dollars. I can't even get anyone to return a phone call.

> I have been calling for two weeks and still have not been able to speak to a human. I have many concerns with my account. Our next step is to fire this company and report their lack of performance in our case.

---

[1] The following is a link to surveys done in the second half of 2023 and into 2024: https://docs.google.com/spreadsheets/d/1hiV7K-dTEnIXlDjgKsktwG8wRUU3pNJq2ve_EhYjrF4/edit?usp=sharing

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 4

> Yes I received a summons and have no one to talk with me. I'm to go to any portals and a. Now so frustrated that I'm considering canceling payments. I need to talk with a person ASAP.
>
> No one contacted me back. I've sent in documents emails. No one has contacted, I spent way over an hour on phone nobody answered. If someone doesn't call me I am going to cancel. I am starting to think I am being scammed.
>
> No has been answering the phones all week so please ANSWER YOUR PHONES.
> Dealing with this firm has been the worst experience of My Life. I have done all you asked. You won't answer my calls, process my money or work with me in any way.
>
> If someone could answer the phone, that would be great!
>
> The wait times are excessive and most of the time I can't even get through after being on hold for more than an hour
>
> I changed my bank info several times, no money has been taken out!!! No one calls me back. I can NEVER speak to a person!!!!
>
> I've requested a payoff letter for the settlement I paid in full four times and still haven't received it. I am now being hindered from buying a home because I can't call the credit bureau to restore my credit score.

This is a small sample of the thousands of frustrated clients who are being damaged every day.  The Receiver has caused this damage and has done next to nothing to repair it.  He promises to continue to do nothing.  Each day the Receiver controls Strategic the harm to these clients multiplies exponentially.  The Receiver soon will destroy the Company and wreak havoc on the clients it services through the law firms.

     The Receiver ordered staff not to respond to client emails.  As of February 3, 2024, the only outbound communication the Receiver has authorized is when a draft has failed. His Report's attempt to shift the blame to Lit Def Strategies is revealing.  He maintains that harm to consumers was caused by Lit Def Strategies' "decision" to shut down. (Report at 10-11).  The Receiver provided that Company no money to operate.  It is against New York state and federal law to require employees to work without pay.  That the Receiver has repeatedly ignored state and federal employment laws may not be a surprise.  But he cannot expect other companies to follow suit.

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 5

Incredibly, the Receiver resisted opening the system that allows the law firms to communicate with Strategic even though it was a no-cost item. The Receiver still, to this day, has not approved access to the LeadTrac system that is used to process litigation for the law firms. As a result, the approximately 1,000 clients who have new lawsuits filed each month will not get the legal assistance they need. This will cause them to experience default judgments, potential wage garnishments, and make settlements for these clients significantly more difficult. On top of that, current clients that are in process with litigated files are being impacted with no document updates and/or proper support for the Litigation attorneys.

The Receiver has insisted that no negotiation of debt settlements be done for the clients. No negotiation staff was allowed to return for the contingency business to support the law firm negotiators. The law firm negotiators, of course, were blind without access to their files. Thus, unless the matter was in litigation, no settlements occurred. That means that no one was available to respond to the 4,900 proposals that required review for accuracy and compliance as well as setting up outgoing creditor payments. **Those proposals represented $13 million in savings for clients.** Can those savings be salvaged? Perhaps, if operations are reopened in the next few days. If not, they will wither on the vine. This is just the most immediate example of how the precipitous cessation of any negotiation function by Strategic personnel has harmed clients. There are many more.

We are at a point in the year when these negotiations are most fruitful. There is always a spike in settlements in February and March because clients often receive tax refunds from amounts withheld on their payroll checks. Recognizing this, creditors provide extraordinary settlements if tax refunds are applied to settlements. Because of this, February and March are always two of the most productive months for client settlements. Part of that window has been missed. If the Receiver is allowed to continue, that window will be closed.

Strategic has received 41,840 documents that have not been processed. Those documents include statements, settlement offers, approvals, summonses, and other court documents. It is impossible to gauge accurately the extent of the damage the Receiver has caused by failing to allow adequate staffing to deal with this incoming mail, email, and document uploads.

There were over 2,300 cases where a client's payments failed for insufficient funds since the Receiver took over the Companies. The law firms do not expel clients when this happens. Strategic follows up with the client, inquires as to the client's situation, and works with them. The payments can be rescheduled. If a client's situation has changed for the worst, Strategic will work with them and the law firm to ensure that the client can stay in the program. At times, a client can suspend its payments so that it might recover financially and not lose the benefit of the investment it has already made in the program. Once the client is able to resume payments, the program continues. None of that can happen because the Receiver has restricted the staff so severely. The only contact the Receiver has allowed is informing the client of the failed draft.

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 6

  In a related problem, clients submitted over 1,550 requests to change their bank accounts in the system. These requests could not be effected and thus clients missed payments.

  The Receiver compounded problems with client personal savings accounts held by Global Holdings and Reliant Account Management. The Receiver carelessly posted messages on the Law Firm and Client Portals telling clients to contact their payment processors:

> If you have questions about those settlement payments, representatives at RAM and Global Client Solutions may be able to assist you with some of your questions.

The Receiver not only failed to provide contact information for these companies – something that would have taken little effort – he affirmatively misdirected those clients. RAM is Reliant. Global Client Solutions is Global Holdings. This was no oversight. On January 20, 2024, the head of IT told the Receiver of the problems of his proposed communication with clients. He wrote, among other things:

> 1. I am not sure whether the names of the payment processors are correct? I believe Global Client Solutions should be Global Holdings and RAMS should be Reliant? I have attached copies of the payment processor account agreements for reference.
>
> 2. I would also like to ask if we should include the payment processors' contact information (website and/or phone) in the document, since we are directing clients to these processors for assistance during this time?

In response, with full knowledge that he was supplying clients with incorrect information and ignoring the suggestion of providing contact information that would help clients, the Receiver chastised the head of IT for not posting the incorrect information immediately and ordered him to do so.

  Clients often miss payments for negotiated settlements. Strategic immediately contacts the creditors in an attempt to maintain the previously negotiated settlement and is generally successful in doing so. In the last weeks, countless settlements have been upset by missed payments and Strategic is powerless to help the clients. The creditors will pocket the money already paid but the debt will remain and interest and penalties will resume. Law firms will not know about this because Strategic is not there to communicate with them. All the hard work done on behalf of the clients went for naught and the clients are the ones who suffer. The Receiver has caused this harm and has done absolutely nothing to ameliorate it in any way.

  Finally, it is noteworthy that the Receiver shut down two businesses that had nothing to do with the Complaint. Timberline and Atlas are businesses that service approximately 10,000

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 7

clients taking only contingency fees. The Receiver was made aware of this in the early days of his takeover of the Company. Nonetheless, and despite his conclusion that those businesses could be run lawfully, those two businesses remain, inexplicably, shut down.

The Receiver's report, unsurprisingly, raises none of these issues with the Court. Instead of showing concern for the clients, instead of reporting on the depth of their issues and how he intends to help the consumers, the Receiver's report reads like that of a prosecutor – one who bends the evidence to fit his conclusion. That is not his role and this Court should not tolerate it. For example, the Receiver launches into a lengthy and pejorative description of Strategic's sales process. That description is as inaccurate as it is inappropriate - as we will establish when the issue comes before the Court. With regard to the issue that is before the Court, the Receiver references a script that describes the face-to-face meeting as only requiring 20-30 minutes. (Report at 22). What he fails to tell the Court is that the script used today, **is completely different from the tape-recorded 2018 calls that were played by Plaintiffs in Court.** That script does not say anything about the meeting with the notary being a formality. Consistent with the testimony of witnesses that the program is constantly being refined and improved, those representations are found nowhere in the script used today which the Receiver apparently examined.

### II. The Receiver Harmed Hundreds of Strategic and Law Firm Employees

The Receiver showed even less regard for Strategic's Employees. He precipitously, and unlawfully, dismissed approximately 900 employees without the statutory notice. He did not pay those terminated employees their accrued PTO and other time to which they were entitled.

The Receiver was contacted about employees' health insurance for February. No response. The Receiver was told that if Strategic did not pay insurance providers, insurance for employees would be terminated. No response. The Receiver was asked whether COBRA notices were provided to the dismissed employees. No response. Some of these 900 employees are pregnant and about to deliver without any assurance that their medical bills will be covered by insurance. Employees with chronic conditions are panicked and facing physical or financial ruination.

Because of the callous treatment of these employees, Strategic supervisors arranged wellness checks on several employees who indicated they would self-harm.

Once again, this is but the tip of the iceberg. The harm the Receiver has done to Strategic employees and their families is indescribable. Once again, the Receiver's report to the Court makes absolutely no mention of his abhorrent behavior towards these employees or his plans for mitigating the profound damage caused by his conduct. That behavior could not possibly be what the Court expected when it ordered a Receiver to take control of the Company.

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 8

**III.   The Receiver's Accusations Concerning Lit Def Strategies and Jason Blust Are Based On A Blatant Mischaracterization of Events**

The TRO froze Lit Def Strategies accounts. With no funds, no access to its files, no promise of being able to pay its employees, Lit Def Strategies ceased operations shortly after receiving notice of the TRO. Nonetheless, the Receiver's Report contains a number of indefensible accusations about its failure to abide by the TRO.

As the Court can appreciate, the TRO threw Lit Def Strategies into chaos. The government planned for this day for years; defendants had their worlds turned upside down without any notice. The shock and awe campaign launched by plaintiffs and the Receiver had its intended effect. There were literally hundreds of urgent matters to which defendants had to respond. The Receiver's claim that under the circumstances Lit Def Strategies did not act on his timetable is irresponsible.

On January 25, 2024, Mr. Personius, counsel for Lit Def Strategies, was fully engaged in communications with the Receiver and his counsel. Mr. Personius requested a telephone call with the Receiver's counsel the following day. Mr. Personius told Receiver's counsel that he was available for a call at any time on January 26. Neither the Receiver nor his counsel responded to Mr. Personius' email. Neither the Receiver nor his counsel ever called Mr. Personius, on the 26th, the 27th or any time before the issuance of a report that repeatedly asserts a lack of cooperation. Neither the Receiver nor his counsel ever hinted to Mr. Personius that his client was in violation of the TRO.

Indeed, Relialit and Lit Def Strategies have been fully cooperative. They submitted their financial disclosures on Friday, January 19, and Sunday, January 21, respectively. Counsel also produced other financial data for Jason and Jaclyn Blust, a related Trust, and Hedgewick Consulting, Inc. The latter was not named in the pleadings.

The Receiver's assertion that after having their professional and personal lives destroyed with no notice, Defendants did not jump high enough or quickly enough for his taste is, at best, ironic. Lit Def Strategies and all related companies complied with the TRO and counsel's offer to cooperate further met with no response. Once again, the Receiver painted a one-sided and distorted picture.

**IV.   The Receiver's Accusations of Unlawful Practice of Law Are Specious And Only One Tribunal Qualified to Assess These Issues Has Disapproved And That Was a Unique Circumstance**

Perhaps the most egregious portion of his report replete with egregious misstatements is the Receiver's foray into the world of legal ethics. Plaintiffs failed to justify the TRO it secured *ex parte* at the preliminary injunction hearing despite having years to plan for that hearing. Accordingly, Plaintiffs and the Receiver now assert that Defendants may be engaged in the

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 9

unauthorized practice of law ("UPL"). That claim is specious and has no place in this proceeding.

      The Receiver's new claim has nothing to do with the motion pending before this Court or the Order that placed him in control of the companies. The TRO was not based on any type of UPL claim. The complaint does not raise that issue, and the Government's motion for TRO and supporting materials do not address that issue. During the two-day evidentiary hearing, the parties did not present any evidence on this issue. Indeed, Plaintiffs opposed the introduction of defendants' legal ethics expert (Professor Wendy Muchman) who would have testified that the law firms properly supervised the non-lawyers who acted at their direction on the ground that her testimony was irrelevant. Moreover, the Law Firms (presumably the targets of any such claim) have not even been named as defendants in this case. In short, there is no legal nor evidentiary basis to sustain a TRO or preliminary injunction on the basis of a UPL claim. And the Receiver was not charged with opining about legal ethics.

      Plaintiffs' decision not to bring a UPL claim was not an oversight. Plaintiffs had years to craft their complaint; they did not overlook this claim. Indeed, the CFPB has no authority to bring such a claim, and it is not clear whether the individual state attorneys general do, either. And a claim brought by one or more individual states could hardly justify nationwide relief (much less the type of drastic relief contemplated by Plaintiffs). In addition, any attempt to assert, in essence, nationwide claims by individual states based on state law raises significant subject matter and personal jurisdiction issues.

      This Court cannot abide the Receiver's decision to not operate the company, let alone grant a preliminary injunction, based on a claim that is nowhere in this case. No UPL claim has been asserted, and thus, it is impossible to know the specific factual allegations and legal claims that might be asserted. No factual support has been offered for this absent claim. Nor is the legal basis for a claim present in any pleading. The Receiver asks this Court to close a business on an unasserted claim with no stated legal or factual basis. This Court should decline that extraordinary invitation.

      Perhaps most importantly, the Law Firms and Defendants are not engaged in the unauthorized practice of law. The attorney model now before this Court has been crafted and reviewed by numerous legal ethics attorneys across the country. It fully complies with the ABA Model Rules of Professional Responsibility as well as the rules of the many states in which they operate. As the Court knows, various of the Law Firms have been operating continuously since 2014, without any material adverse action by the bar authorities of the states in which they operate (with one exception addressed below).

      The assertions in the Receiver's report are vague and without merit. It is also unclear what credentials, if any, the Receiver has to offer opinions on matters of legal ethics. If specific factual allegations are ever put into a Complaint, Defendants and the Law Firms are confident the evidence will demonstrate he is wrong. His statements that the law firms misrepresent their role in negotiating debt is inaccurate and irresponsible. **Law Ffirm employees negotiate the**

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 10

**debt reduction.** Lawyers approve all settlements. The Receivers' statement that "[i]n most instances, it appears that the Law Firm quickly reviews and approves the settlement in what may amount to an after-the-fact rubber stamp" is, once again, false. He has talked to exactly zero lawyers - as far as we know. He accuses lawyers of misrepresentation and fraud without a single interview and with a deeply flawed understanding of the model. This is emblematic of the Receiver's Report – shoot first, look at the facts later.

In 2020, the North Carolina bar authorities disciplined Daniel Rufty, an attorney who owned a law firm known as Carolina Legal Services. In its findings, the North Carolina regulators were critical of both Mr. Rufty and the structure of Carolina Legal Services. The evidence will show, if this assertion is included in a Complaint, that the bar's findings were based almost entirely on statements by Mr. Rufty that are false and are flatly contradicted by Mr. Rufty's sworn testimony given in the same and different matters.

Finally, although not in the Receiver's report, the Government proffered the affidavit of Nicole Hallett as an offer of proof to rebut Professor Muchman's offer of proof. Ms. Hallett contends she is an expert on legal ethics. Perhaps, but her CV suggests otherwise. Her focus is on immigration law, and she teaches clinical courses on that subject at the University of Chicago Law School. A review of her publications does not reveal any articles on the subject of legal ethics. Moreover, Ms. Hallett's opinions are based almost entirely on the Plaintiffs' version of events and assumes the truth of those allegations. For example, she repeatedly refers to the law firms as "façade firms" and contends that the attorneys at the law firms do not provide meaningful representation. Respectfully, Ms. Hallett may have benefited from observing the evidence during the two-day hearing in this case (particularly the testimony of Joanna Hughes, an alleged "façade" lawyer).

The Receiver's attempt to insert this issue into the case at the eleventh hour speaks more to his motivations than any issue relevant to this case. Action must be taken based on facts asserted in an operative pleading. The Receiver's report is not that place. This issue has no place in this case.

Sincerely,

*/s/ Ronald S. Safer*
Ronald S. Safer (*pro hac vice*)
Rodney Perry (*pro hac vice*)
Matthew Kennison (*pro hac vice*)
Maegan McAdam
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 11

Tel: (312) 471-8700
rsafer@rshc-law.com
rperry@rshc-law.com
mkennisioin@rshc-law.com
mmcadam@rshc-law.com

*Attorneys for Individual Defendant Ryan Sasson and Relief Defendants Daniel Blumkin and Ian Behar, and related Relief Defendant entities*

Terrence M. Connors, Esq.
CONNORS LLP
1000 Liberty Building
Buffalo, New York 14202
(716) 852-5533
tmc@connorsllp.com

*Attorneys for Intervenor Law Firms*

Dennis C. Vacco, Esq.
Scott S. Allen, Jr., Esq.
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 853-5100
dvacco@lippes.com
sallen@lippes.com

*Attorneys for StratFS, LLC (f/k/a Strategic Financial Solutions, LLC) and subsidiary entities*

Rodney O. Personius, Esq.
PERSONIUS MELBR LLP
2100 Main Place Tower
350 Main Street
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com

Response Letter to Preliminary Receiver Report
February 4, 2024
Page 12

*Attorneys for Defendant*
*JASON BLUST*
*and Relief Defendants*
*JACLYN BLUST*
*THE BLUST FAMILY IRREVOCABLE TRUST*
*LIT DEF STRATEGIES, LLC*
*RELIALIT, LLC*