UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.* | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| STRAFTS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, *et al.* | ) Case No. 24-cv-00040-EAW-MJR<br>)<br>) |
| Defendants, and | )<br>) |
| DANIEL BLUMKIN, *et al.* | )<br>) |
| Relief Defendants. | ) |

**DEFENDANTS STRATEGIC EMPLOYEE STOCK OWNERSHIP PLAN AND STRATEGIC EMPLOYEE STOCK OWNERSHIP TRUST STATEMENT IN OPPOSITION TO A CONTINUING INJUNCTION**

Defendants Strategic Employee Stock Ownership Plan and Strategic Employee Stock Ownership Trust (collectively the "Plan"), through undersigned counsel, and as represented by independent trustee James Urbach, respectfully submit this statement in opposition to a continuing injunction.

I. **Introduction**

In its January 30, 2024 Statement (Dkt. No. 69), the Plan requested that this Court consider the effect the TRO is having on Plan participants and beneficiaries, who are approximately 1,000 employees of Strategic whose ERISA-protected benefits are being rendered worthless by the cessation of Strategic's business. Further, the TRO has frozen assets that are necessary for Strategic to honor its ERISA obligations to the Plan and for the Plan to comply

1

with its legal duties, including payment of vested benefits to participants who are already entitled to distributions. In order to obtain an annual distribution of some shares of Strategic stock, Plan participants and beneficiaries have to work a year, and that stock has value only if Strategic can continue doing business. Shutting down Strategic means that these approximately 1,000 participants stand to lose everything they have earned through their years of service.

Although the Plan takes no position on the merits of Plaintiffs' principal claims, the Plan strongly opposes injunctive relief that would effectively end Strategic and the Plan. During the preliminary injunction ("PI") hearing, the uncontroverted evidence established that consumers generally benefitted from the debt-relief services that the intervenor law firms, supported by Strategic, provided. Although the FTC Act grants a court the authority to order restitution, such restitution must be *equitable* in nature. *F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006) (a court may only award "equitable restitution" under the FTC Act). There is no basis whatsoever to conclude, as Plaintiffs asserted in Dkt. No. 101, that every dollar Strategic obtained (or will obtain) from consumers is ill-gotten and must be returned; to the extent consumers who benefitted from the debt-relief services may be entitled to restitution, such restitution must be equitable, and not a windfall.

Continuing injunction of the same scope as the TRO would essentially be a finding that Strategic is not entitled to any revenue whatsoever, and that the Plan's participants should have the value of their shares reduced to $0. This Court should reject such a harsh and irreversible result, given the evidence at the PI hearing.

II.   **The Nature of Consumer Debt**

During the PI hearing, there was testimony and discussion about the extent to which the law firms' debt-relief services benefitted the average consumer. It is important to understand that

debt-relief services are not the cause of consumer debt problems, and they are not a substitute for Congressional action that is needed to address the consumer-debt problems in this country.

Strategic did not cause, and cannot solve, the consumer-debt problems in this country. Congress repeatedly has decided to permit the types of situations that cause unmanageable debt – e.g. interest rates that are so high that it would take an "infinite" number of years to pay down debt making only minimum payments, and a credit-reporting system that punishes consumers for years if consumers miss payments. Strategic has no ability to force creditors to accept ten cents on every dollar of consumer debt. Strategic has no ability to force creditors not to report adverse information to credit agencies, and Strategic has no ability to prevent a creditor from suing consumers if that creditor is intent on doing so.

What the law firms, supported by Strategic, offer consumers is relief – not total relief, not absolution, but relief. That relief takes time, and it can benefit consumers in several ways. Among other things: consumers can have their principal debt reduced; consumers will not incur additional exorbitant interest charges; calls and letters from creditors can stop; creditors can forgo legal action; and creditors can forgo collections actions, including wage-garnishment.

During the hearing, there was testimony and discussion about the effect debt-relief services have on consumers' credit scores. Importantly, *without debt-relief services, consumers who cannot make payments will have their credit score significantly impacted.* It is not as if consumers' credit scores would have been unaffected if they did not obtain debt-relief services from the law firms. Consumers engaged the law firms because they could not make payments, and missed payments typically are reported to credit agencies after 30 days.[1] Multiple missed

---

[1] *See* https://www.equifax.com/personal/education/credit-cards/articles/-/learn/when-late-credit-card-payments-post/ (last accessed 2/5/24).

US.361900937.04

payments, from multiple creditors, compound on credit reports and worsen credit scores. This has nothing to do with debt-relief services, it is the result of unpaid consumer debt.

There also was discussion and testimony about bankruptcy as a better alternative to debt-relief services. During an open bankruptcy, a consumer generally cannot apply for any new credit.[2] A Chapter 13 bankruptcy remains on a credit report for seven years, and a Chapter 7 remains for 10 years.[3] Not every consumer is eligible for bankruptcy (e.g. the means test limits eligibility for Chapter 7 (11 U.S.C. § 707(b)) and debt ceilings apply to limit eligibility for Chapter 13 (11 U.S.C. § 109(e))), and not all debt is eligible for discharge (11 U.S.C. § 727(a)). And, according to the government's statistics, debtors in only 56% of Chapter 13 cases that were closed in 2022 received a discharge – i.e. 44% of the Chapter 13 cases were dismissed in 2022 and the debtor received no discharge.[4]

The Plan makes these points to highlight that problems with consumer debt and the limitations on viable ways to handle consumer debt are not Strategic's fault. There is no perfect solution, short of a legislative overhaul, but the law firms, supported by Strategic, provide a path to reducing debt, including the accrual of onerous interest penalties, and managing payments. Since the uncontroverted evidence has shown that the law firms, supported by Strategic, provide legal services to consumers that results in relief for consumers, the decision of *which method* of

---

[2] *See* https://www.experian.com/blogs/ask-experian/score-didnt-improve-after-bankruptcy-removed/ (last accessed 2/5/24).

[3] *Consumer Financial Protection Bureau,* "How does a bankruptcy affect my credit score?" located at http://www.consumerfinance.gov/ask-cfpb/how-does-a-bankruptcy-affect-my-credit-score-en-1233/ (last visited 2/5/24) (observing that bankruptcies have a "very negative effect on your credit score" and will do so "for up to 10 years").

[4] *See* https://www.uscourts.gov/statistics-reports/bapcpa-report-2022 (2022 Report of Statistics Required by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005).

relief consumers choose is best a decision for consumers and market forces to determine – not by fiat outside of legislation or legitimate rulemaking processes.  Should Plaintiffs feel otherwise, they may pursue litigation in a manner that affords due process to the interests of the multiple stakeholders who may be impacted.

**III.     The Court Can Fashion Various Forms of Relief that Do Not Result in Destroying Strategic, the Plan, and Participants' ESOP Accounts.**

As the Plan explained in its January 30, 2024 Statement (Dkt. No. 69), participants in the Plan have stock allocated to their Plan accounts. The value of that stock is determined annually by an independent appraiser, and absent an operating business with cash flow, the value of that stock likely is, or will be, $0. This means that the approximately 1,000 employees who have worked to earn stock allocations will have their account balances reduced to nothing, if the injunction continues.

If this Court ultimately were to find in Plaintiffs' favor, there are a number of ways the Court can fashion relief equitably, without causing undue harm to Plan participants or resulting in a windfall to consumers. If the law firm's outsourcing model is defective under the applicable law at issue in this case, the Court can address that. If there were instances of violations of that particular law the Court determines warrant some relief, the Court can fashion relief that does not destroy the business entirely but protects consumers. Strategic has expended considerable efforts to operate legally and provide significant benefit to the law firms' clients for five or more years after the time of many of the facts alleged by Plaintiffs in their complaint, and the declarations and exhibits offered at the PI hearing. The Court should take care in applying the facts adduced at the PI hearing to the legal framework within which a PI must be assessed. The injunctive relief that Plaintiffs seek assumes that every dollar Strategic receives is ill-gotten, but that is flatly

false. The uncontroverted testimony established that consumers generally benefitted from the debt-relief services, an average of around 20-30% in principal reduction, net of fees paid to the law firms, and, even more significant, additional savings in interest that consumers did not and will not in the future have to pay creditors.

The Plan thus respectfully requests that this Court lift the TRO and deny entry of a PI that would effectively end Strategic and the Plan.

### IV. The Plan Has Concerns with the Receiver's Actions as a Fiduciary of the Plan.

When the TRO was issued, the Receiver was given discretionary control of both Strategic and the Plan. As Receiver of Strategic, it appears the Receiver has assumed ERISA fiduciary obligations that the company previously had. Under ERISA, those with discretionary authority over a Plan's administration, management, or assets are fiduciaries, and fiduciaries have ERISA obligations to act solely in the interests of participants, with prudence, and to avoid prohibited transactions unless an exemption applies. Failure of a fiduciary to meet their obligations under ERISA may leave the person open to personal liability to losses the Plan participants and their beneficiaries may incur. The Receiver exercised direct control over Plan assets by freezing the bank account held by the Plan and thus on its face seems to fit the definition of a fiduciary under ERISA. The Receiver did not take into consideration the effect his actions would have on the Plan or its participants. Indeed, the receiver appears to have acted, and continues to act, in a manner adverse to the Plan and its participants.[5]

At the very least, the Receiver and this Court should give due consideration to how Plaintiffs' requested injunctive relief will affect the Plan and its participants. The broad

---

[5] *See, e.g.,* February 4, 2024 letter Response to Preliminary Receiver Report {Dkt. No. 124) filed by Individual Defendants (Section II harm to Strategic employees).

injunctive relief that Plaintiffs have requested is not justified by the evidence adduced at the PI hearing or by the best interests of the Plan and its participants.

Dated: February 6, 2024
       New York, New York

Respectfully submitted,

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Richard J. Bernard*
Andrew B. Joseph
600 Campus Drive
Florham Park, New Jersey 07932
andrew.joseph@faegredrinker.com
Telephone: (973) 549-7000
Facsimile: (973) 360-9831

-and-

**FAEGRE DRINKER BIDDLE & REATH LLP**

Richard J. Bernard (admitted *pro hac vice*)
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
richard.bernard@faegredrinker.com
Telephone: (212) 248-3140
Facsimile: (212) 248-3141

Richard Pearl (admitted *pro hac vice*)
320 South Canal Street, Suite 3300
Chicago, IL 60606
rick.pearl@faegredrinker.com
Telephone: (312) 569-1000
Facsimile: (312) 556-3000

*Counsel for Relief Defendants*
*Strategic Employee Stock Ownership Plan*
*and Strategic Employee Stock Ownership Trust*