**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | ) ) |
| Plaintiffs, | ) ) |  CASE NO. 24-CV-40-EAW-MJR
| v. | ) ) |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al. | ) ) ) |
| Defendants, and | ) ) |
| DANIEL BLUMKIN, et al. | ) ) |
| Relief Defendants. | ) ) |

---

**DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants[1] submit the following Findings of Fact and Conclusions of Law following the

evidentiary hearing that occurred on February 1 and 2, 2024.

**FINDINGS OF FACT**

I. **THE RELATIONSHIP BETWEEN INTERVENING LAW FIRMS AND SFS**

A. **The Intervening Law Firms**

---

[1] Defendants include: StratFS, LLC (F/K/A Strategic Financial Solutions, LLC), Strategic Client Support, LLC (F/K/A Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, Bcf Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Versara Lending, LLC, Strategic Family, Inc., Anchor Client Services, LLC (Now Known As Cs 1 Paas Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (Now Known As Cs 2 Paas Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (Now Known As Cs 3 Paas Services, LLC), Whitestone Client Services, LLC, Ryan Sasson, and Jason Blust.

1.      The Intervening Law Firms are consumer advocacy firms that represent clients with significant debt who are looking for ways to reduce their debt burdens. (J. Hughes P.I. Hearing, 215:20-24; 216:18-217:4; Regan P.I. Hearing 262:16-25 (the typical Monarch Legal Group client enrolls $40,000 in debt across an average of 8 creditors); DX63 at DX63-0001 (reciting that the law firm engages the client services entity to assist "its consumer debt negotiation legal representation business."); *see also, e.g.,* DX53, DX55, DX57, DX59, DX61 (same).)

2.      Each Intervening Law Firm employs attorneys and negotiators. (R. Gustafson P.I. Hearing 146:5-11; DX64 (Sample agreement between law firms and their individual lawyers); DX65 (individual attorney Brian Moore's acknowledgement of receipt of Meadowbrook Legal Group procedures and protocols); *id.* at DX65-0005 ("[Meadowbrook] is a law firm that provides legal products and services to clients in multiple states, including, but not limited to debt negotiation and defense of clients in legal actions brought by their creditors."); DX66 (individual attorney Johnny Lok's acknowledgement of receipt of Hailstone Legal Group procedures and protocols).)

3.      The relatively large number of clients serviced by each Intervening Law Firm, coupled with the nature of the representation, results in an extremely high volume of administrative tasks and paperwork. (*See* DX127 ¶13.) Therefore, while the Intervening Law Firms provide legal services to the clients, these firms contract with various third-party vendors to provide support functions. (*Id.* At ¶8; J. Hughes P.I. Hearing 218:11-219:2; DX53, DX55, DX57, DX59, DX61, and DX63 (agreements between individual intervenor Law Firms and respective client service provider entities).)   The outsourcing of these functions allows the law firms to provide legal services efficiently despite having large caseloads. (J. Hughes P.I. Hearing 218:11-15, 230:17-21

(attorney explaining that outsourcing administrative work is critical as it allows her "to do [her] job and focus on legal work" and handle a large caseload).)

### B. The Strategic Companies (collectively "Strategic")

4.      The Intervening Law Firms' administrative and client service support functions are housed with the vendor Strategic. (DX127, ML Clark Decl. ¶ 8; DX53, DX55, DX57, DX59, DX61, and DX63 (agreements between individual intervenor Law Firms and respective client service provider entities).)

5.      Each Intervening Law Firm enters into a contract with a Strategic support entity wherein the Intervening Law Firm agrees to pay the Strategic entity. In return, that Strategic entity agrees to provide administrative and support services, such as correspondence and file management, document collection, customer contact center services, and other administrative and logistical tasks associated with the Intervening Law Firm's representation of its clients. (*Id.*; M.L. Clark P.I. Hearing 234:18-20 (Strategic is "the admin back-of-the-house support for all the clients and the attorneys"); C. Horvath Dep. Tr. 77:6-16 (attorney explaining that client service teams provide customer service, administrative tasks, and answer basic questions from clients about their accounts).)

6.      The Strategic client service team is available to the consumer to answer non-legal questions and address non-legal customer service issues. (M.L. Clark P.I. Hearing 234:18-20; C. Horvath Dep. Tr. 77:6-16; DX84-0001 (SFS subsidiary "is contracted with [the law firm] to provide administrative and support services."); DX85-0001; DX86-0001; DX87-0001; DX127; ML Clark Decl. ¶ 9; M. Thurman P.I. Hearing 63:13-20; DX45-0006.)

7.      Prior to the TRO, Strategic handled over 200,000 Intervening Law Firm requests each month, including (i) 40,000-45,000 phone calls; (ii) 30,000-35,000 emails; (iii) 25,000-

30,000 documents received (summonses, statements, collection notices); and (iv) 5,000-6,000 draft adjustment requests. (DX127, M.L. Clark Decl., ¶ 13.)

8.      Strategic employs nearly 1,000 people, supports over 20 law firms, and provides critical assistance to over 75,000 consumers (65,000 through law firms [most, but not all of which, use the advance fee model] and 10,000 in the contingent model). (DX127, ML Clark Decl. ¶ 4.) Two law firms, Royal and Hailstone, use a contingent fee model.

## II.   THE DEBT SETTLEMENT PROGRAM AND APPLICABLE REGULATIONS

9.      The Intervening Law Firms provide legal services to persons who want help reducing their debt. (*See, e.g.,* DX65-0005 ("[Meadowbrook] is a law firm that provides legal products and services to clients in multiple states, including, but not limited to debt negotiation and defense of clients in legal actions brought by their creditors.").) The idea was that non-lawyers could negotiate with credit card companies and achieve settlements approved by lawyers, and lawyers would be more effective battling creditors who sued to recover their debts. (*Id.*)  Lawyers could achieve more favorable settlements in these situations.  In order to execute that model, fees had to be collected up front to pay the lawyers.  This is no different than traditional retainers with law firms, where lawyers are paid before results are delivered.  The questions were: (i) Could law firms be constructed in a way that allowed them to operate profitably while keeping fees at a level that is affordable to the prospective clientele, *i.e.*, so that the total of fees plus a fund for settlement was lower than their minimum monthly credit card debt; and (ii) Could they construct a model that was compliant with the TSR. (Thurman P.I. Hearing 53:9-54:10; Gustafson P.I. Hearing 179:20-180:3.)

10.     The Intervening Law Firms devised a system where the Law Firms provided the legal work and Strategic, as well as other vendors, provided all of the administrative functions. (Gustafson P.I. Hearing 183:19-184-13; DX127 ¶¶7-9.)

11.     Because the clients were paying more fees up front, it was important that they understand all of the fees they were paying, what those fees were for, and that they needed to stay with the program in order to achieve the benefit of the program. (Thurman PI Hearing 70:18-71:25; 73:8-74:22. *See also* Regan PI Hearing 271:11-13 (clients who stay in the program until "graduation" – *i.e.,* the entirety of their programs estimated at the time of signing their respective client retainers – have on average settled 99% of their enrolled debt).)

12.     Although these clients had a risk of dropping out of the program, the program was designed to lower the monthly payments to a more manageable amount. (Regan P.I. Hearing 274:11-14; 285:8-20 (average monthly payments made to Monarch Legal Group are less than a minimum credit card payment - $800 in monthly minimum credit card payments vs. $667 in monthly program fees/settlement payments).)

13.     The TSR prohibits advanced fees if a sale is completed, or payment is authorized, in a telephone call.  If the sale is completed, or payment was authorized after an in-person presentation then the telemarketing rules do not apply, and the sale is exempt. (Thurman P.I. Hearing 54:13-55:2.)

14.     The Intervening Law Firms sought to set up a process that was compliant with the TSR's face-to-face presentation exemption. (*Id.* at 51:19-22.)

15.     The TSR, however, does not provide much guidance regarding the nature of the presentation. For instance, it does not tell companies how long the in-person presentation must be, nor the content required to be included in such presentation. (Thurman P.I. Hearing 55:1-7.)

16.     An attorney from Pioneer Law Group, one of the Intervening Law Firms, contacted a compliance and consumer protection expert, Michael Thurman, for guidance. (*Id.* at 51:19-22.)

17.     At the time, Michael Thurman was a critic of the "law firm" model and even steered many clients away from this model. One of his main critiques of this model was that, to the extent companies decided to use one of the TSR exemptions, such as the face-to-face presentation exemption to avoid the advanced-fee ban, these companies were not doing a credible job. (*Id.* at 52:10-19.)

18.     Pioneer Law Group knew that Thurman was a critic of the law firm model and asked him if a compliant face-to-face presentation model could be devised. (*Id.* at 52:4-10-52:20-24.) Thurman told the Intervening Law Firms he believed it could, but it would have to have very stringent procedures and compliance, and the Intervening Law Firms would have to ensure the processes were implemented and followed. (*Id.* at 52:20-54:5.)

19.     At various times from 2014 to the present, Thurman was engaged as a consultant by the Intervening Law Firms to provide guidance on how to design a TSR-compliant face-to-face presentation model. (*Id.* at 53:2-15; 90:22-23.)

20.     Thurman advised the Intervening Law Firms that they would need to have a substantive sales presentation, quality control measures for documenting that the presentation had taken place, independent contractors (notaries) to deliver the law firms' sales message, and a training program for the independent contractors conducting the meetings. (*Id.* at 53:18-24.)

21.     The Intervening Law Firms submitted proposed documents to Thurman in response to his guidance, including draft sales presentations, draft training materials for the notaries who would provide the presentations, draft scripts that would accompany the presentations, and draft affidavits of compliance/face-to-face acknowledgment forms. (*Id.* at 53:16-18; 55:12-18.)

22.     Throughout the years, Thurman made significant revisions to these documents to ensure compliance with the TSR, to ensure the Intervening Law Firms are being effectively represented by the notaries, and to ensure compliance with other applicable state and federal rules. (*Id.* at 55:21-56:5.)

23.     This face-to-face presentation model has been an iterative process; reviews of and improvements to the Intervenor Law Firms' face-to-face model have continued from at least September 2014 to the present, including a recent substantive revision to the notary training made in the Fall 2023. (*Id.* at 56:6-9; 67:9-15; 90:14-18.)

24.     The Intervening Law Firms did not retain Mr. Thurman to provide a minimally compliant program.  They retained him to design a presentation from the point of view of the consumer that disclosed all aspects of the program completely.  (*Id.* at 58:2-17.)

25.     For instance, the disclosures contained in materials presented to potential clients are explicitly highlighted as "IMPORTANT THINGS TO KNOW." (DX117-0048.) Furthermore, a payment schedule in the materials initially presented to the potential clients and in the retainer agreement clearly demonstrates that the fees are front-loaded. (*Id.* at DX117-0031-32.) The Intervening Law Firms do not hide that there are potential negative ramifications that may occur if the consumer enrolls in the program or that the consumer will initially be paying more money in fees than they are saving. (*See, e.g., id* at 0048, 0046, 0013.)

26.     To the contrary, the Intervening Law Firms want the consumer to understand how the program works before signing the contract so the consumer can make an informed decision about whether the program is right for them. (Thurman P.I. Hearing 62:19-63:11; Gustafson P.I. Hearing 160:9-16; *see also* M. Bonito Dep. Tr. 24:8-18 (notary testified at his deposition that the law firms included certain information in the presentation because the consumers were "obviously

… having financial troubles" and the law firms "wanted to make sure the people could stay in the program").)

27.     Furthermore, the notaries and attorneys also explicitly tell the consumer there are other options and provide information to the consumer concerning such options such as credit counseling or filing for bankruptcy. (D. McKay Dep. Tr. 39:3-12 ("Part of the presentation was to tell them there are other options. [They] can go file bankruptcy or … there [is] a public or a local thing that people can go to help them finance."); Gustafson P.I. Hearing 159:22-160:5; DX18-0005, 00021; DX20-0007, 0025; DX24-0007, DX24-0025 (describing the "Bankruptcy vs Debt Negotiation and Election of Services" form, which provides "Useful information about the various options available to address" overwhelming debt that must be signed before representation begins); DX25-0028-29 (sample Bankruptcy vs Debt Negotiation and Election of Services" form); DX117-0025-27.)

28.     In exchange for their agreement to negotiate down unsecured debts and defend against lawsuits brought by their clients' creditors, the Intervening Law Firms collect fees and costs from clients enrolled in the debt settlement program. Specifically, the client typically pays a retainer fee, a legal administration fee, and service costs. (DX117-0007-08.)

29.     With the exception of Royal and Hailstone, which have contingent fee models, the fees and costs charged to the clients by the Intervening Law Firms are front-loaded. That is, as the client continues their enrollment in the program, over time, they pay less fees and costs. (DX117-0031-32.). If there are unresolved debts at the end of the consumer's program term, the Intervening Law Firm continues to work on resolving the client's remaining debt. But the client will not have to pay any additional retainer fees, legal administration fees, or service costs. (*Id.*; Thurman P.I. Hearing 73:8-15.)

### III.  NOTARIES ARE TRAINED TO AND DO PROVIDE SUBSTANTIVE FACE-TO-FACE PRESENTATIONS TO PROSPECTIVE CONSUMER CLIENTS

#### A.  Notaries Conduct the Face-to-Face Meetings as Agents and Representatives of the Intervening Law Firms

30.     During the initial call with the consumer, *i.e.*, the potential client, a Strategic representative provides details regarding the debt settlement program. (DX84-0001; DX65-0007 (describing procedures for initial phone call(s) with prospective clients); Howell Dep. Tr. 70:9-20, 81:18-21 (discussing that the consumer already received the information in the presentation prior to the face-to-face meeting); M. Bonito Dep. Tr. 28:7-9 (testified that by the time he met the consumer at the face-to-face presentation "the company had already gone over this with them" and "they already knew most everything."); Fountain Dep. Tr., pp. 30:12-15 (the consumers "always seem to say" that "so-and-so has read this to me two or three times" prior to the face-to-face presentation).)

31.     Though the consumer receives an explanation (and often, a detailed explanation) about the debt settlement program during this initial call, the consumer is not enrolled in the debt settlement program during this initial telephone conversation.  (*See e.g.,* DX19-006, § 1.7 ("This Agreement does not take effect, and [Intervening Law Firm] has no obligation to provide any services, until both Client and Canyon have executed a copy of this Agreement . . . Further, this agreement does not take effect until Client has paid the initial payment of the flat fee retainer."))

32.     Furthermore, there is no is no payment for the program requested from or authorized by the consumer during that initial telephone call.  (Thurman P.I. Hearing 76:17-24.) To avoid any possibility of confusion, no payment information is even collected on this initial call. (*Id.*) In recent years, the in-person presentation explicitly says that the payment information is not taken until the program is completely explained *in person*. (Thurman P.I. Hearing 64:23-65:7,

76:17-21; DX117-0060 (at the end of the face-to-face presentation, the notary states "[n]ow that you have read and understand your Account Servicing Agreement, I can take your financial information to assist you in completing the application."))

33.     Because payment is neither requested, authorized, nor taken during the initial phone call, no "sale" has been conducted for purposes of the TSR. (Thurman P.I. Hearing 76:3-24; 16 CFR § 310.6(b)(3) (the face-to-face exemption applies if the initial telephone call prior to the face-to-face meeting does not result in a "completed" sale and "payment or authorization of payment is not required" on the initial telephone call).)

34.     Following this initial call, the Strategic support entity for the relevant Intervening Law Firm schedules the consumer's face-to-face presentation to be conducted by a notary on behalf of the Intervening Law Firm.  (Gustafson P.I. Hearing 13-18.)

35.     The Intervening Law Firms enter into contracts with notary companies in connection with these face-to-face meetings and, pursuant to those agreements, the notary companies assign notaries to conduct the face-to-face presentations on behalf of the Intervening Law Firms. (Munyon P.I. Hearing 15:22-25; DX1-6; C. Willis Dep. Tr. 20:1-22:7, (confirming that Sunshine Signing Connection, Inc. entered into individual agreements with numerous Intervening Law Firms but had no contractual relationship with any Strategic entities); D. Strengberg Winkelman Dep. Tr. 45:8-47:22, 48:22-50:22 (NotaryGo's COO and Rule 30(b)(6) witness identifying service agreements between NotaryGo and Intervening Law Firms whereby NotaryGo agreed to provide notaries to the law firms to conduct "a face-to-face meeting with the client's client to give an in-person presentation and oversee execution of documents" and indicating that scope of work is beyond NotaryGo's scope of work in its typical contracts.); J. Stone Dep. Tr. 30:14-33:19, 35:22-37:15, 38:19-42:11, 42:2-14 (NotaryGo's president and Rule 30(b)(6) witness

identifying service agreements between NotaryGo and Intervening Law Firms whereby NotaryGo agreed to provide the same scope of services to the law firms).)

36.     In recent years, the vast majority of the face-to-face presentations have been handled by a single provider, NPN. Prior to early 2021, other providers, including NotaryGo, Inc.[2] and Sunshine Signing Connection, Inc.[3] also provided these services as well.

37.     Contracts between the notary company and the Intervening Law Firm generally provide that the notary companies require notaries to act as representatives of the law firm(s) in presenting face-to-face sales presentations to prospective law firm clients. (*See e.g.,* DX1-0001 ("the parties seek to enter into a relationship whereby [the notary company] will provide in-person face-to-face presentation services to [the Intervening Law Firms] in order to refer representatives who will meet with [the Intervening Law Firm's] clients, provide an in-person presentation, and oversee the proper execution of legal documents issued by the [Intervening Law Firm]"); *see also* DX7-0004.)[4].)

38.     The notaries act as representatives and agents of the Intervening Law Firms during these face-to-face presentations. (DX8-0001 ("I understand that I am *also* acting as an agent of Monarch Legal Group to provide an in-person presentation by reading the provided script, answering basic questions and assisting the client in completing the provided paperwork."); DX11-0004 ("You ***ARE*** there to act on behalf of NPN as a sales presentation agent, and in doing so; you are acting as a representative of the Debt Settlement Law Firm. You are not employed by NPN or

---

[2] NotaryGo stopped providing notaries to the Intervening Law Firms in 2020.  (J. Stone Dep. Tr. 11:15-21.)
[3] Sunshine stop providing notaries to the Intervening Law Firms in March 2021. (C. Willis Dep. Tr. 16:22-24.)
[4] Some of the contracts also provide that the notary company is not the agent of the law firm and the notary company cannot bind the law firm. (DX001-0004, ¶ 13.) That is a common term between organizations. It has no relevance to whether the notaries themselves are representatives and agents of the law firms whose material they present to the prospective clients. (Munyon P.I. Hearing 41:22-42:2.)

Debt Settlement Law Firm, but you are there as an extension to assist their clients…"); D. McKay Dep. Tr. 64:23-65:2 ("I'm a representative in that I'm supposed to present the information that they have for the program and explain it as best I can with help if I need it and then [the consumer] can say yes or no."); Munyon P.I. Hearing 23:1-3; Lyon P.I. Hearing 105:22-25; E. Howell Dep. Tr. 19:4-16 (testified that he understood his role was to act as an agent of the law firm during face-to-face presentations he was assigned to); R. Fountain Dep. Tr., 43:18-21 (agreeing he was an agent of the law firm); J. Stone Dep. Tr. 19:24-20:6 (testifying that the notaries represented NotaryGo *and* the law firms during face-to-face meetings.); C. Willis Dep. Tr. 25:17-26:15, 34:19-35:2 (Sunshine's vice president and Rule 30(b)(6) witness testifying that its notaries "were representing the law firm to provide a face-to-face presentation that they read via a script and a presentation that they printed out, and that they had the responsibility of making sure the documents were properly executed.").)[5]

39. At the face-to-face meeting, the notaries conduct a substantive and detailed presentation that has been developed, revised, and improved over the past 10 years. (DX17, DX18, DX20, DX22, DX24 (sample recent face-to-face presentation materials from Intervenor Law Firms); Thurman P.I. Hearing 56:6-9, 67:9-15, 90:14-18; Brooks-Ward P.I. Hearing 318:18–319:8, 332:13–334:5, 335:10-18, 337:21–338:11, 338:19-23, 339:4–340:4).)

40. All of the face-to-face sales presentation meetings conducted by notaries on behalf of the Intervening Law Firms take place in-person, with the exception of a handful of meetings

---

[5] Some notaries would testify at the deposition they were not "affiliated" with or "agents" of the law firm but would then later clarify that they did follow the instructions and script provided by the law firms, which required them to identify as a representative of the law firm. (*See, e.g.* L. Soule Dep. Tr. 18:12-14, 42:14, 43:1:4 (testified that she never said she was "affiliated" with the law firm, but later repeatedly stated that she would read the required PowerPoint presentation "verbatim" and "would not have gone off-script" from the script provided by the law firm.)) As discussed *infra* ¶¶ 43-56, the PowerPoint presentation and script both begin with the notary introducing themselves as a representative of the law firm. (*See, e.g.,* DX18-0001; DX117-00042.)

conducted within a few days immediately following the issuance of the COVID-19 lockdown orders in March 2020. (Callahan P.I. Hearing 596:4-7, 606:9-607:12; Brooks-Ward P.I. Hearing 324:12-14 ("Every last one of them [has been] in person."); Accardo P.I. Hearing 358:6-13; M. Roberts Dep. Tr. 78:6-8; E. Howell Dep. Tr. 79:20-23; R. Fountain Dep. Tr., 26:25-27:2; D. Strengberg Winkelman Dep. Tr. 20:24:1-9; *see also* DX26-43 (containing thousands of client-executed affidavits of compliance/face-to-face acknowledgment forms).)

### B. The Face-to Face Sales Presentation

41.     Once a notary is assigned to a face-to-face sales presentation on behalf of the Intervening Law Firms, but prior to conducting the face-to-face presentation, they receive a set of documents for the presentation, including a script, a printed PowerPoint sales presentation, the retainer agreement, and numerous other documents drafted and provided by the Intervening Law Firms. (Munyon P.I. Hearing 21:1-4; 22:20-24; 25:21-25; Lyon P.I. Hearing 102:9-11; Thurman P.I. Hearing 57:15-20; Brooks-Ward P.I. Hearing 318:18–319:8, 327:14-19, 329:10-12, 329:16-22; 331:7-9, 339:11–340:4; Accardo P.I. Hearing 373:15–374:19, 375:5-12; DX144; DX18-0001-0007; M. Roberts Dep. Tr. 38:22-24; C. Horvath Dep. Tr. 52:9-15.)

42.     The notary also receives instructions from the notary company that provides the requirements for conducting the face-to-face meeting. (Munyon P.I. Hearing 20:20-21; DX8-0001 ("I understand that my role in this debt settlement signing is as follows: I will act as a licensed notary to verify the client's identity and provide notarizations. I understand that I am also acting as an agent of [the Intervening Law Firm] to provide an in-person presentation by reading the provided script, answering basic questions, and assisting the client in completing the provided paperwork.")(emphasis added); Lyon P.I. Hearing 101:6-17; Gustafson P.I. Hearing 164:6-14; Brooks-Ward P.I. Hearing 328:3–329:3; D. Strengberg Winkelman Dep. Tr. 20:14-23, 42:24-43:5,

43:15-20 (stating NotaryGo would pass along instructions to the notaries from its law firm customers and would expect the notaries to follow those instructions unless it was outside NotaryGo's scope of work; C. Willis Dep. Tr. 25:9-12 (Sunshine provided the notaries instructions that came from the law firms when they would go out on debt relief assignments).)

### *i.* The Script and PowerPoint Presentation

43.     At the face-to-face meeting, the notary reads from a script, reviews each page of the PowerPoint sales presentation prepared by the Intervening Law Firm with the potential client and has the potential client initial each page of the PowerPoint to acknowledge that the information has been presented during the meeting. (Lyon P.I. Hearing 106:8-14; Brooks-Ward P.I. Hearing 319:3-8, 331:7-12, 334:3–335:4; D. McKay Dep. Tr. 43:7-8 ("I would print [the PowerPoint] off and then go page by page because they would have to initial it."); C. Willis Dep. Tr. 34:19-35:5 (Sunshine notaries were supposed to review the presentation while reading a script, and they were not permitted to deviate from the script); C. Horvath Dep. Tr. 54:3-19, 55:1-7).)[6]

44.     The purpose of the script and the PowerPoint sales presentation is to ensure that each potential client of the Intervening Law Firms is presented with the same information about the program and to provide the consumer complete information, including complete information about some potential downsides of the program, so they can make a reasonable choice and fully understand the program in which they might enroll. (M. Thurman P.I. Hearing 57:4-20 ("That's why we had the script. Because the goal was to make sure that you didn't have someone doing a sloppy job."); DX11-0004 ("These written instructions include steps to perform before, during,

---

[6] Danielle Strengberg Winkelman, NotaryGo's Chief Operating Officer who oversees the day-to-day work of the notaries, testified that NotaryGo would pass along to its notaries the documents received from the Intervening Law Firms but rarely reviewed the documents, and therefore she did not know and/or could not recall whether the law firms provided scripts for the notaries to read or training materials on how to conduct presentations during the face-to-face meetings. (D. Strengberg Winkelman Dep. Tr. 11:1-11, 43:15-44:7, 51:2-53:14.)

and after the presentation. All these instructions are included with the client's documents and must be read and followed exactly.").)  Through this process, the notaries present virtually verbatim the law firm's message that has been reviewed, vetted, and refined for over a decade. (Thurman P.I. Hearing 57:4-20.)

45.     The PowerPoint sales presentation contains the Intervening Law Firm's company logo and information (*See, e.g.*, DX117-0041; DX18-0008; DX20-0010; DX22-0004; DX24-0009; M. Roberts Dep. Tr. 49:20-25.) Additionally, the first line of the presentation states: "My name is [NAME OF NOTARY] and I am a representative of the [Intervening Law Firm]." (DX117-0042; DX18-0009; DX20-0011; DX22-0005; DX24-0010.)  This introduction is designed to inform the consumer that the person appearing before them is acting as a representative of the law firm.[7] (Thurman P.I. Hearing 79:16-22.)

46.     The PowerPoint sales presentation is approximately 20 pages long. It includes clear language and graphics. There is no fine print. (*See, e.g.*, DX20; DX24l; DX117; Thurman P. I. Hearing 62:19-63:11 (These presentations do not have "fine print" because "the goal is to make sure consumers fully understand the program that they're signing up for.").)

47.     The PowerPoint sales presentation includes a slide titled "IMPORTANT THINGS TO KNOW." (DX20-0017; DX22-0010; DX24-0019; DX117-0048.)  This slide contains disclosures required by the TSR, plus more. (*Id.*; Thurman P.I. Hearing 79:16-22.)

48.     This slide informs the consumer that (ii) they may experience creditors contacting them; (ii) their credit score will likely be negatively impacted; (iii) the law firm cannot stop interest

---

[7] There is deposition testimony that some notaries were uncomfortable with the idea that they were representatives of the law firms. (*See e.g.*, PX-006, S. Pavlow Dep. Tr. 43:24-44:6.) It is unclear exactly why they were uncomfortable, but their discomfort is irrelevant.  What is important is what the consumer understood. (*See* Defendants' Conclusions of Law, ¶ 28 (courts consider "whether consumers believed that they were speaking to a "representative of the entity when dealing with the purported agent" in determining if an agency relationship exists for purposes of the TSR).)

penalties or late fees; and (iv)) the typical client will not see even their first settlement for 7-9 months. (DX20-0017; DX22-0010; DX24-0019; Thurman P.I. Hearing 61:25-62:18.)  Not only is that slide highlighted by its title – something not required by the TSR – it is not put at the very end of the presentation; rather, it is in the middle of the presentation. (DX20-0017; DX22-0010; DX24-0019.)  The notaries review and even "emphasize" these disclosures to the consumers during the face-to-face meetings. (Lyon P.I. Hearing 107:7-108:13; M. Roberts Dep. Tr. 19:8-20:12 (a notary that testified he "emphasized" the Important Information slide because "those are very important points that I think that, once the signer, if they understand those points and they're still willing to go forward, they have a pretty good understanding"); E. Howell Dep. Tr. 92:23-10 (testified that the face-to-face presentation went over disclosures such as the program may result in the client being sued by creditors, that the program will likely adversely affect the client's creditworthiness, that the program may increase the amount that the client owes due to the accrual of late fees and interest); R. Fountain Dep. Tr. 50:24-51:2 (agreed the presentation included some of the risks of the debt resolution process).)

49.     In the written scripts given to notaries, those disclosures are written in large case to stress their importance.  (*See, e.g.,* DX18-0003-4.)

50.     The notaries can and are instructed to answer basic questions related to the debt settlement program during the face-to-face meeting. (Munyon P.I. Hearing 33:10-11; DX11-0004 ("You **ARE** there to answer questions about the program. If you are not able to answer a question, you are there [sic] to reach the client's representative in order to get and provide answers to the client's questions."); DX8-0001 ("I understand that I am *also* acting as an agent of [Intervenor Law Firm] to … answer[] basic questions…."); DX13-0004 ("When going through the steps with a client, the client may have questions. You MAY: po[i]nt out answers that are on the appropriate

slide; offer answers from the enrollment documents; offer clarifications; repeat information you have read in these materials."); Lyon P.I. Hearing 120:22-20; DX90 ¶2 ("I retained Monarch Legal Group ('Monarch') on April 2020 after meeting with a Monarch representative at my home. I discussed the program with the Monarch representative and was able to ask questions. Those questions were answered to my satisfaction."); DX107 ¶2 ("I retained Monarch Legal Group in September 2019 after meeting with a Monarch representative at my home. The representative reviewed the retainer agreement with me and answered my questions about the program."); Brooks-Ward P.I. Hearing 320:15-18, 340:25–341:18; Accardo P.I. Hearing 359:4-12; 377:9-20.)

51. The notaries use the documents provided by the law firm, such as the printed PowerPoint sales presentation, to explain the program and answer questions.  (M. Roberts Dep. Tr. 28:3-25; P. Fountain Dep. Tr. 35:12-21; DX13-0004; Lyon P.I. Hearing 101:6-17; DX13-0004 ("When going through the steps with a client, the client may have questions. You MAY: po[i]nt out answers that are on the appropriate slide; offer answers from the enrollment documents; offer clarifications; repeat information you have read in these materials."); Brooks-Ward P.I. Hearing 318:18–319:8, 332:13-24, 333:16-22,334:3-5, 335:1018, 337:21–338:11, 340:25–341:18; 359:4-12; Accardo P.I. Hearing 359:4-12, 377:9-22, 378:16-23; *see also* M. Bonito Dep. Tr. 28:4-6 (explained that he did not receive questions because "everything was laid out" in the presentation).) For instance, the notaries answer questions about the types of fees the consumer will pay if they enroll in the program and about how much time it will likely take before receiving their first settlement. (M. Roberts Dep. Tr. 19:6-25, 20:2-21:5; R. Fountain Dep. Tr., 50-52; E. Howell Dep. Tr. 93:17-22; DX11-0004; DX8-0001; DX13-0004).

52. The notary informs the consumer that the client services representative is available during their meeting to answer any questions that the notary cannot answer. (Lyon P.I. Hearing

109:13-16; DX11-0004; Brooks-Ward P.I. Hearing 320:15-20 (testifying that, if someone has a question about a contract, "[t]hey have to call the representative" and she gets questions "[p]robably 10 percent of the time"), 340:20-24; Accardo P.I. Hearing 359:4-18; C. Willis Dep. Tr. 32:2-9, 33:14-34:4, 65:7-66:2 (if a consumer had questions during the face-to-face presentations the notaries could refer to the documents, but if the notary was unable to answer, he or she was supposed to call the law firm contact with those questions or call Sunshine to assist with contacting the law firm).) Accordingly, if the consumer has a question that the notary is unable to answer, the notary can reach out to the client services representative during the face-to-face meeting.

53.     The client services representative will either answer the consumer's question or make an appointment for the consumer to speak to an attorney. (Munyon P.I. Hearing 33:12:22; Lyon P.I. Hearing 112:9-14; M. Roberts Dep. Tr. 22:10-12.) Notaries give consumers the opportunity to ask questions and repeat certain portions of the presentation if the consumer requested. (*See, e.g.*, M. Bonito Dep. Tr. 33:17-34:2 (testified that if a consumer needed to have him read something again at any time during the face-to-face presentation he would read it again, go at the consumer's pace, and told the consumer "[s]top me at any time if I need to read this again. I'm here for you. I'm not here for anything else."); M. Roberts Dep. Tr. 27:25-28:6 (gave the consumer an opportunity to ask questions during the face-to-face meeting and "[gave] them as much time as they need").)

54.     The notaries are not permitted to answer questions (i) about whether the program is "good" for the consumer (M. Roberts Dep. Tr. 87:16-22); (ii) that would require the notary to share their personal views (M. Roberts Dep. Tr. 66:10-16, 67:21-25, 68:2-6; Howell Dep. T., p. 80:1-8; Fountain Dep. Tr. 35:6-8.); or (iii) that require legal advice. (E. Howell Dep. Tr. 67:1-10; *see also* DX11-0005 (describing for notaries "What You Are *NOT* There To Do," which includes

not "try[ing] to talk the client into enrolling in the program"; not "to provide legal advice of any kind"; and not "to give personal advice or opinions."); DX13-0004 ("Any questions that you may not answer (including but not limited to the specifics of negotiations, references to bankruptcy, litigation, or the effects of debt resolution programs) must be given to the Law Firm for an ATTORNEY to address.").)

55.     As a quality control measure to ensure that the sales presentation is conducted by the notary as prepared by the Intervening Law Firm, the consumer must initial every page of the PowerPoint. (Thurman P.I. Hearing 66:13-24; Brooks-Ward P.I. Hearing 318:18-319:8, 334:3–335:4 ("I read it and have them initial it, basically, to say that I did give it to them."); M. Roberts Dep. Tr. 18:6-10; E. Howell Dep. Tr. 95:1-3; C. Willis Dep. Tr. 34:19-35:2, 39:10-16, 40:5-15 (the potential clients had to initial each page of the presentation and Sunshine relied on the initialed presentation and signed documents to verify that its notaries had followed the script and instructions provided to them by the law firms).)  There is no way to ensure every notary complies with all of the instructions at every sales presentation, but this quality control measure ensures that each client has to look at and has the opportunity to read every single page. *Id.*

56.     At the end of the PowerPoint sales presentation, and only after that sales presentation is completed, the notary will collect the prospective client's financial information, which is the first time that the consumer provides any banking information from which a payment may be drawn.  (DX117-00060 ("[n]ow that you have read and understand your Account Servicing Agreement, I can take your financial information to assist you in completing the application."); Thurman P.I. Hearing 76:17-21).)

### *ii.*   **The Retainer Agreement**

57.     The notary also reviews each page of the retainer agreement with the consumer and obtains the consumer's signature at numerous places within the agreement, including, but not limited to, the Payment Schedule section, the Arbitration Disclosure, and the Client's Authorization for Settlement form (M. Roberts Dep. Tr. 22:2-12; E. Howell Dep. Tr. 95:1-3; Thurman P.I. Hearing 66:13-24; DX116; DX117; DX122; Brooks-Ward P.I. Hearing 320:7-14, 338:14-23, 339:11-12.)

58.     The notary reviews with the consumer Section 2.2 of the retainer agreement (entitled, "Fees and Costs Provided"), which sets out in detail the estimated total fees. (DX117-007; Lyon P.I. Hearing 110:18-111;4.) In this case, because the law firms do not know the amount of the future settlements, these fees are estimated consistent with the debt relief provisions of the TSR. (Thurman P.I. Hearing 68:2-10).

59.     Section 2.2 contains a breakdown of the individual fees the client will pay: retainer fee, flat legal administration fees, and service costs for related services (DX117-007; 68:9-69:2; Thurman P.I. Hearing 68:9-69:2.)

60.     Furthermore, the notary reviews the retainer's Payment Schedule with the consumer, which provides a complete overview of the payments that the consumer will be making into the program. (DX117-00031-32; Lyon P.I. Hearing 110:18-111:4.) An example of a portion of a Payment Schedule is shown below:

## PAYMENT SCHEDULE

| | Total Amount of Debt | $ 49,788.00 | | | | Estimated Settlements: | $23,400.36 |
|---|---|---|---|---|---|---|---|
| | Service Cost Percentage | 21% | | | | | |
| | Estimated Total Fees & Settlements | $40,695.84 | | | TOTAL ESTIMATED SAVINGS | $9,092.16 | |
| Month in Program | Retainer Fee | Service Cost | Settlement Reserves | Legal Admin Fee | Banking Fees | Total Draft | Draft Due Date |
| 1 | $150.00 | $475.25 | $77.77 | $99.95 | $10.95 | $813.92 | 1/21/2024 |
| 2 | $150.00 | $475.25 | $77.77 | $99.95 | $10.95 | $813.92 | 2/21/2024 |
| 3 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 3/21/2024 |
| 4 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 4/21/2024 |
| 5 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 5/21/2024 |
| 6 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 6/21/2024 |
| 7 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 7/21/2024 |
| 8 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 8/21/2024 |
| 9 | $100.00 | $475.25 | $127.77 | $99.95 | $10.95 | $813.92 | 9/21/2024 |
| 10 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 10/21/2024 |
| 11 | $25.00 | $475.25 | $202.77 | $99.95 | $10.96 | $813.92 | 11/21/2024 |
| 12 | $25.00 | $475.25 | $202.77 | $99.95 | $10.96 | $813.92 | 12/21/2024 |
| 13 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 1/21/2025 |
| 14 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 2/21/2025 |
| 15 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 3/21/2025 |
| 16 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 4/21/2025 |
| 17 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 5/21/2025 |
| 18 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 6/21/2025 |
| 19 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 7/21/2025 |
| 20 | $25.00 | $475.25 | $202.77 | $99.95 | $10.95 | $813.92 | 8/21/2025 |
| 21 | $20.00 | $475.25 | $207.77 | $99.95 | $10.95 | $813.92 | 9/21/2025 |
| 22 | | $475.23 | $227.79 | $99.95 | $10.95 | $813.92 | 10/21/2025 |
| 23 | | | $703.02 | $99.95 | $10.95 | $813.92 | 11/21/2025 |
| 24 | | | $703.02 | $99.95 | $10.95 | $813.92 | 12/21/2025 |
| 25 | | | $703.02 | $99.95 | $10.95 | $813.92 | 1/21/2026 |
| 26 | | | $703.02 | $99.95 | $10.95 | $813.92 | 2/21/2026 |

(DX117-00031.)

61.     This type of detailed chart is not required by the TSR.  The Payment Schedule provided to the prospective client at the face-to-face sales presentation explicitly states the amount of debt the consumer is enrolling, the estimated amount of settlement, estimated total fees, and an estimate of total estimated savings. It also sets forth the fees and the amount of money that will come from the consumer's bank account, to be deposited into their personal savings account maintained by Reliant or Global Holdings. (Thurman P.I. Hearing 71:1-7, 73:24-74:7, DX117-0031 (shown in the "Settlement Reserves" column, which is the amount sent to the client's Global/RAM account for use in negotiating future settlements.).

62.     The notaries are explicitly told that they may not (and they do not) pressure any consumer to execute the retainer agreement. (DX11-0005 ("You are ***NOT*** there to try to talk the client into enrolling in the program."); *id.* ("You are ***NOT*** there to give personal advice or opinions. This is often a trying and emotional time for the client. Stress surrounding money matters can make people feel very vulnerable."); Lyon P.I. Hearing 126:18-20; M. Roberts Dep. Tr. 83:4-8; P. Fountain Dep. Tr. 91:2-9; DX88; J. Aguilera Decl. ¶ 2 (consumer noted that during the face-to-face presentation "[t]here was no pressure to sign up.").)[8]

63.     Notably, some consumers elect not to sign the retainer agreement and, therefore, decline to enroll in the debt settlement program at the face-to-face presentation, and approximately a quarter of those that *do* sign the client retainer following the face-to-face presentation cancel their enrollment prior to making their first payment. (Lyon P.I. Hearing 135:10-12; D. McKay Dep. Tr. 15:19 (notary that testified at her deposition that 25-30% of the consumers did not sign the documents after her presentation).)[9]

64.     Once the Intervening Law Firm countersigns the retainer agreement, the Intervening Law Firm sends a copy of the fully executed agreement to the consumer. (Gustafson P.I. Hearing 200:2-7; DX19-0039 ("In addition to your Initial Consultation Call, you will receive an email with a copy of the executed retainer agreement that we reviewed today, and an email with our Welcome Guide and an introduction to your client services team.").)

---

[8] This is a sales presentation notwithstanding the instruction that notaries should not be selling or pressuring prospective clients into enrolling in the program.

[9] Today, the notaries are not paid different amounts based *solely* on whether a client signs or does not sign the documents. (DX158; Munyon Decl., ¶ 6.) If the consumer is a no-show the notary is paid a reduced rate (as compared to the regular fee) to account for the fact the notary incurred time and expense to travel to the location, but not the same amount of time and expense had they conducted the full presentation. (*Id.* ¶ 7.) But if the notary completes the full presentation and the consumer elects to not sign the documents, NPN would evaluate the circumstances and pay either the full amount or some lesser figure depending on the situation. (*Id.* at ¶ 8.)

65.    The notaries also leave a document with the consumer at the conclusion of the face-to-face meeting informing the consumer that they have a right to cancel the agreement within a certain number of days. (Lyon P.I. Hearing 134:14-20; Brooks-Ward P.I. Hearing 339:4-17, 349:7–350:5; Accardo P.I. Hearing 362:14-23, 379:16-20; M. Roberts Dep. Tr. 26:17-25; 27:2-16; DX118.)

66.    The notaries also leave a document with the consumer containing information about the Intervening Law Firm and the next contact with the Intervening Law Firm. (DX19-0039; Lyon P.I. Hearing 135:1-5.)

### *iii.*   **The Affidavit of Compliance/Face-to-Face Acknowledgment Form**

67.    As an additional quality control measure, both the notary and the consumer execute an Affidavit of Compliance, sometimes referred to as the "Face-to-Face Presentation Acknowledgment," at the end of the face-to-face meeting. (*See. e.g.* DX122-0056; DX26-43; Brooks-Ward P.I. Hearing 341:23–342:6, 343:6-25; Accardo P.I. Hearing 382:5-383:16.) This affidavit or acknowledgment confirms the consumer received the sales presentation in-person. The affidavit also memorializes the location of the face-to-face meeting, the participants, the date, the time, and the length of time the presentation took, as it requires the notary to log the start time and the end time of the face-to-face meeting. (DX122-0056; Brooks-Ward P.I. Hearing 342:2-6; DX141 (Plaintiffs' witness Brooks-Ward signed affidavit of compliance); DX145 (Plaintiffs' witness Accardo signed affidavit of compliance; Thurman P.I. Hearing 77:3-9; 78:18-24; DX26-43.)

68.    The face-to-face sales presentations take on average 45 minutes. (Munyon P.I. Hearing 39:10-18; Lyon P.I. Hearing 112:6-9 (testified that in her experience conducting approximately 200 face-to-face presentations, the average presentation takes "thirty to sixty

minutes"); D. McKay Dep. Tr. 39:20-21 ("I'd say most of the time I was there probably an hour.");
Brooks-Ward P.I. Hearing 338:14-18 (A presentation "usually takes anywhere from an hour to an
hour and a half because I permit the individuals to read each document before signing."); *see also*
DX26-43 (including thousands of completed compliance affidavits).)

69.     Many of the notary deposition transcripts included as Plaintiffs' exhibits confirm
that the notaries all spent a significant amount of time going through the sales presentation with
the consumers. (*See, e.g.*, PX-51, O. Vrzhezhevska Dep. Tr. 38:18-20, 55:18-24 (the in-person
meeting took about an hour, and the longest one was two hours); PX-48, L. Soule Dep. Tr. 26:20-
22 (presentations took 45 minutes to an hour); PX-50, E. Howell Dep. Tr. 61:13 (30 minutes to an
hour); PX-52, M. Roberts Dep. Tr., pp. 36: 9-10 (average presentation would take 45 minutes);
PX-68, K. Brown Dep. Tr. 53:5-21 (testified it takes about 20 minutes to go through the
presentation and 20-30 minutes to go through the retainer); PX-70, R. Fountain Dep. Tr. 45:18-19
("I allocate an hour, but on average it's about thirty minutes."). [10]

### C. The Notaries Are Trained

70.     Before a notary can be assigned to a face-to-face sales presentation as described
above, they must complete online training developed by the Intervening Law Firms. (DX8-0001
(describing the "Required Training"); *id.* at 0002 ("this training is required and must be completed
prior to your scheduled appointment"); DX12; DX17; Munyon P.I. Hearing 25:21-26:7, 28:1; Lyon
P.I. Hearing 102:1-8; Thurman P.I. Hearing 83:20-84:4; Brooks-Ward P.I. Hearing 324:9-17; PX

---

[10] While there may be a small number of notaries who testified at their deposition that the face-to-face
meetings were much shorter than 45 minutes, those notaries had typically conducted only a handful of debt
settlement face-to-face sales presentations and/or had not been assigned to a face-to-face sale presentation
for years, , causing these notaries to acknowledge at their deposition that they could not recall much about
these sales presentations. (*See, e.g.*, PX 45, D. Tsui Dep. Tr. 141:1-6 (testifying that he conducted less than
ten face-to-face meetings since 2017, therefore, he could not recall details about these presentations because
"it's been so long.").

52, M. Roberts Dep. Tr. 10:12-14; PX 50, E. Howell Dep. Tr. 15:3-4; PX 51, O. Vrzhezhevska Dep. Tr. 7:14-8:10; PX 68, K. Brown Dep. Tr., 28:3-11; PX 70, R. Fountain Dep. Tr. 24:5-14; M. Bonito Dep. Tr. 41:9-25; *see also* C. Willis Dep. Tr. 46:9-47:9 (recalling the notary training required by the law firms as a "PowerPoint or some sort of presentation".).)

71.     As part of the training, the notary must watch a 25-minute training video. (DX8-0001 (describing the "Required Training"); *id.* at DX8-0002 ("This training is required and must be completed prior to your scheduled appointment."); DX12 (training video); Brooks-Ward P.I. Hearing 324:15-19, 325:20–326:6.)

72.     The notary must also pass a quiz developed by the Intervening Law Firms. The notary must answer 22 out of 27 questions, or 80%, correctly. (DX8-002; DX14; M. Bonito Dep. Tr. 23:8-11 (testified that he was required to take a quiz to ensure he could convey the instructions to the consumer); Brooks-Ward P.I. Hearing 326:16-327:6, 342:9-22; Munyon P.I. Hearing 25:21-26:7, 47:16-20, M. Roberts Dep. Tr. 11:4-14; E. Howell Dep. T. 24:15-17; C. Willis Dep. Tr. 47:11-13.)

73.     There is also refresher training. (DX15; Munyon P.I. Hearing 29:10-13; E. Howell Dep Tr. 17:16-19.)

74.     The notary companies track who completes the training. (DX9; Munyon P.I. Hearing 30:17-19.)

**D. Intervening Law Firms Address Non-Compliant Notary Issues**

75.     The notary companies frequently follow-up with the notaries and regularly communicate with the notaries to ensure they are complying with all of their duties. (Munyon P.I. Hearing 33:23-34:3; Gustafson P.I. Hearing 211:21-212:6.)

76.     If there are issues with the notaries, the notary company speaks with the notary and obtains details concerning the issue. Based on the information provided, the notary company determines whether to use that notary again. (Munyon P.I. Hearing 19:3-10; Gustafson P.I. Hearing 211:21-212:6.)

77.     The Intervening Law Firms previously ended their relationship with a notary company, Sunshine, because the Sunshine notaries did not live up to the Intervening Law Firms' standards in conducting the face-to-face sales meetings. (Gustafson P.I. Hearing 154:23-155:1; 197:7-10; C. Horvath Dep. Tr. 102:2-7; C. Willis Dep. Tr. 16:22-24 (Sunshine stop providing notaries to the Intervening Law Firms in March 2021).)

## IV.   THE SUBSEQUENT ATTORNEY WELCOME CALL IS AN ADDITIONAL QUALITY CONTROL

78.     Even after the face-to-face presentation is complete and a retainer agreement has been signed by the consumer, the consumer is not a client of the Intervening Law Firm or enrolled in the debt settlement program until after an attorney reviews the consumers information and the consumer speaks to an attorney in their state in a "Welcome Call." (*See, e.g.*, DX117-0006 (Section 1.7 "This agreement does not take effect, and Level One has no obligation to provide any services, until both Client and Level One have executed a copy of this Agreement and such copy is delivered to both Parties. Further, this Agreement does not take effect until Client has paid the initial payment of the flat fee retainer as set forth in the payment schedule enclosed, and the payment has cleared."); Thurman P.I. Hearing 64:11-65:7; C. Horvath Dep. Tr. 55:19-56:4, 56:15-18.)

79.     Once the face-to-face meeting is complete and the initialed PowerPoint sales presentation, the signed retainer agreement, and the executed affidavit of compliance are uploaded, an attorney from an Intervening Law Firm will review all the documents from the face-to-face meeting to ensure everything is initialed and/or signed and the affidavit of compliance is

completed. (DX65-0009 (Section 2.1B); DX65-0112 (system checklist for attorneys, including "consultation call – file review"); Gustafson P.I. Hearing 147:24:148:6; 148:17-21.) If any signatures or initials are missing, the attorney must reject the file and the face-to-face presentation will need to be re-done. (Gustafson P.I. Hearing 169:14-17.)

80.     If all the face-to-face meeting paperwork has been properly completed, the attorney will next conduct the required Welcome Call with the consumer. (*Id.* at 148:2-3; DX65-0112-116.) Although this Welcome Call typically takes place on the phone, the attorney offers to conduct the Welcome Call-in person or by video chat if the client prefers. (*Id.* 148:3-6; Elkins P.I. Hearing 431:7-12.)

81.     The attorney is provided with an electronic script or outline to use during the Welcome Call to ensure they hit on all the major points. (DX44; DX65-0008; Gustafson P.I. Hearing 150:1-3.)

82.     The Attorney Welcome Call provides another quality control opportunity to monitor the compliance of the notaries in the face-to-face meeting. (Gustafson P.I. Hearing 140:15-18; Thurman P.I. Hearing 64:11-22.) The attorney asks the consumer whether "everything went well when you had your in-person meeting and signed the enrollment paperwork" with the notary. (DX44-0001; Gustafson P.I. Hearing 154:1-8; DX152 (recording of consumer Elkins Welcome Call where the attorney tells Elkins: "For starters, I wanted to see how everything went for you guys at your appointment when you signed your paperwork; how was that?"); Barsch P.I. Hearing 533:13-18 (consumer Barsch told attorney from Monarch Law Group that the face-to-face presentation with the notary went "just great.").) This provides the Intervening Law Firm with an opportunity to double-check and ensure that the face-to-face process was adhered to, and the presentation was a meaningful presentation. (Gustafson P.I. Hearing 154:18-22.)

83.     If the consumer reports that the face-to-face meeting did not go well or says something about the presentation that concerns the attorney, the attorney will create an entry in the software program documenting this issue of concern and someone from the Intervening Law Firm will then discuss the issue with the notary company. (*Id.* 154:11-17; Munyon P.I. Hearing 19:3-10.)

84.     In addition to asking about the face-to-face presentation on the Welcome Call, the attorney will also discuss various topics, including, but not limited to, the program, fees and costs, the provisions in the consumer's retainer agreement, when to expect the first settlement, how to handle creditor correspondence, and the power of attorney, *etc.* (Gustafson P.I. Hearing 148:22-149:1, 157:25-158-2; 161:11-13; DX65-0008-09.)

85.     While most of these topics were previously discussed at the face-to-face sales presentation, the attorney will nonetheless review them again on the call. (Gustafson P.I. Hearing 159:3-7; DX65-0008-09). The Welcome Call also provides the consumer an opportunity to discuss any questions they have, including any legal questions that the notary could not answer during the face-to-face meeting. (Gustafson P.I. Hearing 153:23-154:4; DX65-0008-09.)

86.     On this call, the attorney also double-checks the identity of the accounts the consumer is enrolling in the program both for accuracy and to see if there are any debts that have gone unpaid past the statute of limitations. In that event, the creditor cannot collect on it. Therefore, the attorney can remove that account from the consumer's creditor listing and reduce the consumer's payment. (Gustafson P.I. Hearing 160:5-12; DX65-0008-9.)

87.     As the attorney continues addressing the major points included in the Welcome Call script, they must check boxes in the electronic software indicating the topic has been addressed on the call with the consumer. If any issues come up during this call, the attorney will create an entry

in the system to ensure the issue is addressed. (Gustafson P.I. Hearing 162:5-12.) The length of the Welcome Call is logged by the electronic software. (*Id.* at 195:18:20)

88.     After the call has been completed, and provided the attorney is satisfied the prospective client is a good fit, the attorney will countersign the retainer agreement. While the consumer is at this point "approved" by the Intervening Law Firm, they still do not become an actual client unless and until the initial payment of the retainer fee has been made. (*Id.* 157:16-18; *see also, e.g.*, DX19-0006, § 1.7; DX84-0003.)

89.     The attorneys get paid by the Intervening Law Firms to defend the consumer clients if they are sued by a creditor for unpaid debts. (Hughes P.I. Hearing 219:3-7; DX65-0016-18 (describing Meadowbrook Legal Group's "Litigation Procedures.")

90.     The attorneys advocate for and defend their clients; handle litigation, including court appearances on behalf of the consumer to obtain a settlement and keep judgments off the consumer's records; participate in arbitrations; submit pleadings and engage in motion practice when necessary. (DX67-68; Hughes P.I. Hearing 216:25-217:3; 220:13-18; 220:25-221:9; DX65-0016-18 (describing Meadowbrook Legal Group's "Litigation Procedures".).)

91.     For example, Christopher Elkins (one of Plaintiffs' witnesses) retained Canyon Law Firm, one of the Intervening Law Firms, in 2019 because he had $103,000 in debt on 21 different credit cards. Four years later, Canyon had settled $85,000 of that debt (all but $18,000). (PX-009, Elkins Decl. ¶ 17.) Canyon settled that $85,000 in debt for $42,000 (a savings of 50.33% of *enrolled debt*, not including interest and penalties that accrued since enrollment) and Elkins paid those settlements over time. (DX157; Gustafson Decl. ¶¶ 7-8.) In addition, Canyon represented Elkins in at least two lawsuits (DX150; DX151.) For those services – *i.e.*, savings of at least

$43,000 as well as litigation defense in multiple lawsuits – Elkins paid $26,000 in fees. (PX-009, Elkins Decl. ¶ 17; DX157; Gustafson Decl. ¶ 4.)

92.     All settlements must be approved by an attorney. (Gustafson P.I. Hearing 159:15-16; DX65-0020 ("Each proposed settlement must be reviewed and approved by a locally licensed attorney in the respective state.").)

93.     The Intervening Law Firms also employ supervisory attorneys to work on-site at Strategic, who ensure non-lawyers are not providing legal advice, work processes are being handled correctly, and to oversee the negotiators. (Gustafson P.I. Hearing 176:10-16; DX65-0001; DX66-0001.)

## V.     CLIENTS BENEFIT FROM THE DEBT SETTLEMENT PROGRAM

94.     In 2022 and 2023, approximately 27,000 Intervening Law Firm clients successfully completed the Law Firms' settlement program. (DX127; M.L. Clark Decl., ¶ 10.)

95.     From 2021 through 2023, the Intervening Law Firms have collectively settled over $1.9 billion of the clients' debt, resulting in approximately $1 billion in client savings. (DX127; M.L. Clark Decl., ¶ 10.)

96.     Greg Regan is an expert in calculating the benefit that consumers experience from debt reduction programs. (Regan P.I. Hearing 260:6-23.) His methodology has been peer reviewed and has been used by the CPFB. (*Id.* at 261:1-9.)

97.     Regan analyzed the results achieved for clients of the Monarch Law Firm from 2019 through 2023.  He reviewed the entire population of clients: those who graduated from the program, those still in process and those who canceled.  Regan had that complete data set before the Receiver seized control of the Companies and locked Strategic (and the Intervening Law

Firms) out of its data. (*Id.* at 262:16-25 (analyzed Monarch clients from 2019-2023, and typical client had approximately $40k original debt enrolled, across an average of 8 creditors).)

98.     A consumer with credit card debt faces massive interest rates.  Regan found that clients with fair credit were paying approximately 26% interest.  Plaintiffs' witness, Mr. Elkins, testified that he was paying 28-34% interest on his debt. (Elkins P.I. Hearing 487:24-488:2.)

99.     If consumers can only afford the minimum payments, they will never get out of debt. (Regan P.I. Hearing 283;13-16.)  Many consumers do not want to declare bankruptcy. (Hughes P.I. Hearing 222;13-17.)  It is revealing that the number of people who do not successfully complete a Chapter 13 plan is approximately the same as the number of people who fail to complete the Law Firms' program – between 40-44%. (*see* https://www.uscourts.gov/data-table-numbers/bapcpa-6?order=field_date_updated&sort=desc)[11] The success of this program must be judged against those alternatives.

100.     Regan provided an example of the benefit provided by the law firm model drawn from the data gathered from actual customers.  A law firm client paid $34,313 to retire her debt in the law firm model.  That included all fees and settlements. (*See* Regan P.I. Hearing at 286:16-287:8.) The client paid a lower amount per month than the minimum credit card payment. (*Id.* at 274:11-14; 285:8-20.) The alternative case is extremely conservative and unrealistically favorable

---

[11] Table 6 in this link, which is based on data compiled by the federal courts, shows the number of cases in which Chapter 13 plans were completed in Chapter 13 consumer cases, the number of modifications made to the plans, the number of Chapter 13 consumer cases dismissed, the number dismissed for failure to make payments under the plan, and the number refiled after dismissal. For purposes of Table 6, a Chapter 13 consumer case is counted as "refiled after dismissal" if the case was filed during the reporting period by one or more debtors who were party to a separate Chapter 13 consumer case that was dismissed no more than 180 days prior to the filing date of the current case. Cases that are reopened are not included in the total for cases refiled after dismissal. As shown in Table 6, in 2022, the most recent year available, of the 197,587 Chapter 13 consumer cases closed by dismissal or plan completion, 44% (86,222) of these cases were dismissed before completing a repayment their repayment plan and 56 percent (111,365 cases) of those cases closed because the debtors received a discharge after completing repayment plans, down from 58 percent in 2021.  Nationwide, failure to make plan payments was cited in 54 percent of cases as the reason for dismissal, a decrease of 5 percent from 2021.

to the consumer. (*Id.* at 284:23-24.) It assumed that the consumer was paying 20% interest on the credit card debt, not 26% for fair credit or 28-34% as Mr. Elkins was paying.  (*See* Elkins P.I. Hearing 487: 24-488:2.) It also assumed that the consumer was making a monthly payment that was significantly higher than the minimum payments (if they were able to do that, they would probably not be in this financial bind). (Regan P.I. Hearing 286:16-287:8.) Even with that unrealistically favorable alternative case, the law firm model produced a result that was 43% better than the alternative.



(Regan Testimony Demonstrative, p. 14.)

101.    Although the above example provides the most relevant comparison for calculating the benefit to law firm clients, Regan broke down the population of clients into those who completed the program, those who were still participating in the program, and those who had withdrawn from the program.  The following are the results from that analysis:



(Regan Testimony Demonstrative, p. 8.)

102.     As the analysis demonstrates, people who complete the program – and a majority do – receive a significant financial advantage. (Regan P.I. Hearing 280:7-20 (for clients who complete (or "graduate" their programs, they saved a total of over $22M).) The second group is in process and are poised to see increased benefits.  (*Id.* at 271:13-16; 280:7-20.) In the coming months and years – absent the Receiver's cessation of the program – the clients in the middle column are likely to see the results similar to those who have completed the program. (*Id.*)

103.     Approximately 44% of the people who enter the program do not complete it. (*Id.* at 270:22-23.)  As noted above, that is approximately the same percentage of people who fail to complete Chapter 13 bankruptcy plans, and those people presumably pay significantly higher lawyers' fees and other costs as well. (*See* ¶ 99, *supra*.)  Even that population received benefits, *i.e.*, they had significant debt reduction. (Regan P.I. Hearing 271:19-272:1, 273:24-274:14.) They paid more in fees and settlements than the debt reduction but not by a material amount per person. (Regan Testimony Demonstrative, p. 8.)

104. Mr. Elkins' experience illustrates the point.  He entered the program with over $103,000 in debt.  He was paying 28-34% interest on his debt. (*See* ¶ 98, *supra*.)  He clearly was offended that he paid $26,000 in fees.  But the alternative was far worse.  Because of the size of his debt, he would have paid over $36,000 in one year's interest.  When he left the program four years later, he only had $18,000 in remaining debt.  As Regan explained, the relevant comparison to the debt that is settled is not the original debt, because that ignores the interest and penalties that would have accrued, i.e., the time value of money.  (Regan P.I. Hearing 277:6-19; 283:6-16.) Mr. Elkins received an enormous net benefit even though he was dissatisfied with the program.

105. This program produced significant net benefits to the Intervening Law Firm clients. (Regan Testimony Demonstrative, p. 11.)  Because the early fees are higher, those who stayed with the program the longest benefitted the most.  (Regan P.I. Hearing 271:11:13 (clients who stay in the program until "graduation" – i.e. approximately the entirety of their programs estimated at the time of signing their respective client retainers – have on average settled 99% of their enrolled debt.) The risks are fully described to the potential clients both in the PowerPoint sales presentation and in the fee schedule that the clients sign. (*See, e.g.,* DX20-0017; DX117-0013.)

## VI.   PLAINTIFFS' PROOF AT TRIAL DOES NOT SUPPORT A PRELIMINARY INJUNCTION AND DID NOT MATCH THE REPRESENTATIONS MADE TO THE COURT IN OBTAINING THE TRO

### A.  The Evidence Presented to the Court Is Old

106. The evidence presented by the Plaintiffs to the Court is dated and does not reflect current conditions.  Plaintiffs attached 22 declarations from clients to their pleadings in support of a TRO. (Callahan P.I. Hearing 598:4-599:4.) They described their face-to-face sales presentations. (*Id.* at 603:21-605:19.) The most recent sales presentation was in 2021, nearly three years ago. (*Id.*

at 598:4-599:4, 593:2-594:8.) In light of the evidence that this process has materially evolved and is being improved, that evidence has little relevance and cannot justify a prospective injunction.

107.    Plaintiffs played tape recordings of the initial sales calls with potential clients that indicated the notary meetings were brief.  Although those calls were submitted to Judge Vilardo with a cover page bearing a date of June 8, 2023, this represented the date of transcription. (*See* PX 33; Callahan P.I. Hearing 584:12-585:20.) **Those conversations actually took place in 2018, almost six years ago.**  (*Id.*) Only a handful of these declarations reflect face-to-face meetings that took place in the 2020's. (*Id.* at 593:2-594:8.) There is no evidence that these were anything but aberrations that do not reflect current conditions, nor do they support a conclusion that the underlying process is materially deficient.

108.    Even the witnesses that Plaintiffs presented to the Court recounted stale information.  Mr. Elkins had his person-to-person interview in October 2019. (Elkins P.I. Hearing 431:2-3.) Ms. Barsch had her person-to-person interview in September 2020. (DX 157-0052.)[12] Mr. Accardo, a notary who conducted a "handful of interviews" did so more than four years ago. (DX 146.) It is revealing that the only other notary whom Plaintiffs called to testify swore that she read through every page of the sales presentation and that her presentation lasted an average of an

---

[12] Ms. Barsch's testimony demonstrates why the Court should not rely on testimony from consumers who do not remember all the details of their face-to-face meeting due to the passage of time. While Ms. Barsch testified that she electronically signed her PowerPoint presentation in 2020 (Barsch P.I. Hearing 545:9-13), this is not possible as the notary that conducted her face-to-face meeting was employed by NPN, and this company did not have or utilize the technology required for electronically signing documents in 2020. (DX158, Munyon Decl., ¶ 9.) It appears the only reason why Ms. Barsch believed she did not receive the PowerPoint in person was because she has "two manila envelopes of everything we ever received. There is no PowerPoint presentation in there. If I had received it on paper, it would be in there." (Barsch P.I. Hearing 537:17-21.) But this assumption is incorrect as the notaries take the initialed PowerPoints with them to scan and send to the Intervening Law Firms, (*see* M.L. Clark P.I. Hearing 246:21-24), which explains why it is not in Ms. Barsch's envelope.

hour to an hour and a half. (Brooks-Ward P.I. Hearing 319:3-8; 338:16-18.)  That was the only relatively recent evidence the plaintiffs presented.

### B.  The Evidence Presented Did Not Meet The Representations Made In Plaintiffs' TRO Pleadings

109.    In an *ex parte* application, Plaintiffs told Judge Vilardo essentially three things about the face-to-face sales presentations – the primary issue that they believe supports their motion for a TRO.  First, they represented that "Sometimes these meetings were in person; sometimes they occurred over the phone or virtually." (TRO Motion at 14).  What Plaintiffs did not tell the Court was that this was a reference to the few days following the initial nationwide shutdown due to COVID-19 in March 2020. (Callahan P.I. Hearing 596:25-597:16, 606:9-607:12.) The representation to the Court in the TRO pleadings was misleading.  Twenty-one of the twenty-two declarations Plaintiffs submitted to the Court, as well as the four live witnesses called by Plaintiffs, all acknowledged that the meetings took place in person. (*Id.* at 596:4-7.)  The only declarant who testified that she did not recall the notary coming to her home was recalling events that took place in 2017. (*Id.*)

110.    The second representation made to the Court was that the "notary meetings were formulaic, brief and non-substantive.  The notaries read to consumers from a script prepared by SFS…" (TRO Motion at 14.)  Those representations were untrue. (*Id.* at 603:21-605:19.) The evidence established that the notaries read from a script that was **prepared by the law firms** and was constantly reviewed and revised by a consultant who was an expert in this area of the law. (Thurman P.I. Hearing 56:6-9, 67:9-15; 90:14-18.) The PowerPoint sales presentation was detailed and described every aspect of the program. (*Id.* at 57:6-14.)  By creating a written script and a written PowerPoint presentation, the law firms could convey their sales presentation to the consumer through a neutral representative and without pressure. (*Id.* at 15-20; DX11-0005 ("You

36

are **NOT** there to try to talk the client into enrolling in the program; *id.* ("You are **NOT** there to give personal advice or opinions. This is often a trying and emotional time for the client. Stress surrounding money matters can make people feel very vulnerable."); Lyon P.I. Hearing 126:18-20; M. Roberts Dep. Tr. 83:4-8; P. Fountain Dep. Tr. 91:2-9; DX 88, J. Aguilera Decl. ¶ 2 (consumer noted that during the face-to-face presentation "[t]here was no pressure to sign up.").) The thousands of compliance affidavits demonstrate that presentations typically lasted about 45 minutes. (*See* DX26-43.)

111.    Plaintiffs attempted to support the assertion that the notary presentations were inadequate by quoting a tape-recorded conversation between "SFS executives." (*See* PX 33.) They noted that a "Senior Vice President of Sales at SFS and Senior Director of Negotiations" talked about these presentations as "pencil whipping." (TRO Motion at 14.)  Plaintiffs place great emphasis on this conversation, quoting an isolated portion of that later in their Motion. (*Id.* at 30.) The Plaintiffs failed, however, to tell Judge Vilardo that this conversation took place in 2018.  (*See* Callahan P.I. Hearing 584:12-585:20; DX149; Dilgard Decl. ¶ 3.) A transcript of the conversation that was prepared – not recorded – in June 2023, with the transcription date prominently displayed on the first page of the transcript (*see* PX 33), was relied upon by Plaintiffs, but without any clarification in the Investigator's Declaration that the conversation was in reality five years old. They also failed to tell the Court that, even though one of these persons was in "sales," the context of the call made it clear they were analyzing data and that neither of the participants in the call had any first-hand knowledge of the face-to-face meetings. (Callahan P.I. Hearing 586:6-25; DX149; Dilgard Decl., ¶ 4 ("In that tape recorded call, Bob Duggan and I were guessing about why some clients were removing debts …"); *id.* at ¶ 5 ("I have no knowledge of what is said or done at the

meetings between notaries and prospective clients at which the debt settlement program is explained.")[13]

112.    The third assertion made to the Judge Vilardo by plaintiffs about the face-to-face sales presentations was that the "contracts between the law firms and the notary companies required face-to-face presentations but did not "require the notary to read the presentation prior to the meeting or otherwise have any substantive knowledge of SFS's debt-relief services." (TRO Motion at 14.)  Plaintiffs did not disclose that the only notary whose full interview was attached as an exhibit had stated that he prepared for twenty minutes before each presentation, refamiliarizing himself with the documents. (PX-006; S. Pavlow Dep. Tr. 25:16-18.) Plaintiffs concealed the fact that, before notaries were allowed to conduct these face-to-face sales presentations, they had to participate in a video and written training and pass a test on the material. (Callahan P.I. Hearing 608:2-609:12.)

113.    Plaintiffs placed great emphasis on the notaries not answering substantive questions that could not be answered by the written materials.  But this feature was intentional. The system was designed so that the notaries delivered a message crafted by the law firms. (*See e.g.*, DX13 - 0004 ("When going through the steps with a client, the client may have questions. You MAY: po[i]nt out answers that are on the appropriate slide; offer answers from the enrollment documents; offer clarifications; repeat information you have read in these materials. *You may NOT go any further in providing answers.*") (emphasis added).) If the notaries freelanced in the person-to-person meetings, the law firms lost control of the message. DX11-0005 ("You are **NOT** there to give personal advice or opinions").)  If the potential clients had legal questions, they asked the law

---

[13] The one part of the conversation that was revealing of the true ethos of Strategic was not quoted for the Court: "If we screw one customer, that is one customer too many."  (PX 33 at 18:20-22.) The organization's mission was to make sure all people were treated fairly.

firm. (*Id.*, DX13-0004; Lyon P.I. Hearing 134:10-13.) If they had other questions the notaries could not or would not answer, they called customer service where the responses were tape recorded and could be reviewed for quality control. (Lyon P.I. Hearing 109:13-16.)

### C. The CFPB Has Been Aware for Years that the Intervening Law Firms Use Notaries to Conduct the Face-to-Face Presentations and Qualify for the Exemption

#### i. CFPB v. Global Client Solutions, LLC Consent Order

114.    Global Client Solutions, LLC ("Global") is a third-party payment processor used by the Intervening Law Firms to process payments for consumers. (Gustafson P.I. Hearing 181:3-4.)

115.    In 2014, the CFPB initiated an action for injunctive relief against Global, alleging "Global processed payments for tens of thousands of consumers who were charged tens of millions of dollars in unlawful advanced fees for debt-relief services" because the debt settlement processors Global was processing payments for, such as the Intervening Law Firms, "improperly claimed to be exempt from the TSR based on unsubstantiated exemptions" such as the face-to-face presentation exemption. *See CFBP v. Global et al.*, Case No. 2:14-cv-06643-DDP-JPR (C.D. Ca. 2014), Dkt. No. 10 (Complaint), ¶¶ 15-17.

116.    The parties entered into a Stipulated Final Judgment and Consent Order ("Consent Order"), which requires Global to perform a "reasonable screening" of materials and information used by debt settlement providers, including law firms, claiming to be exempt from the TSR. With respect to debt settlement providers claiming to be exempt under the face-to-face presentation exemption, such as the Intervening Law Firms, the Consent Order requires Global to obtain from them, *inter alia*, the following:

- "A detailed description of how the [debt settlement provider conducts meetings with consumers which includes information as to whether the [debt service provider] *__uses employees__ or independent contractors to conduct face-to-face sales presentations*;"

- "For [debt service providers] which use *independent contractors*, a list of all *independent contractors* and current contract templates with the *independent contractors hired to conduct face-to-face meetings with consumers*";

- "Representative examples of the materials relating to the training of [debt service providers], *whether employees or independent contractors, meeting face-to-face with consumers* to provide the sales presentations, including training materials, scripts, guidance documents, or other similar materials[.]

(DX67, Consent Order, ¶ 29(c) (emphasis added).)

117. No distinction is made by the CFPB between employees and independent contractors in this Consent Order. (*See* DX69.)

118. Thurman reviewed the Consent Order as a guide when developing the Intervenor Law Firms' face-to-face presentation model. (M. Thurman P.I. Hearing 80:10-14; 80:25-81:5.) The constant and repeated recognition from the CFPB that companies would be using or were using independent contractors for face-to-face presentations informed Thurman and the Intervening Law Firms that there is no requirement that a person doing a face-to-face presentation must be an employee of the law firm. (*Id.* at 82:17-24.)

### *ii.* CFPB's Civil Investigative Demands to Intervening Law Firm

119. Moreover, in 2020 four of the Intervening Law Firms had to respond to Civil Investigative Demands ("CIDs") issued by the CFPB. (DX84-87.)

120. One of the interrogatories required the four Intervening Law Firms to "[l]ist and describe each step that a consumer must take to enroll in the Debt Relief Services that You offer, sell or provide, including Each step that must occur during any … face-to-face sales presentation." (DX84-87, Interrogatory 1.)

121. The Intervening Law Firms responded that the face-to-face presentation was typically done by a "state-licensed notary." (*Id.*) The Intervening Law Firms provided full details concerning the full face-to-face process involving the notaries, including, but not limited to, details concerning (i) the training materials provided to the notary; (ii) the retention agreement, script, and PowerPoint sales presentation provided to the notary; (iii) the instruction to the notary that if the consumer had a question that "went well beyond the notary's training or scripted materials," or "if the question involved a legal question" the notary must contact the Intervening Law Firm; (iv) the affidavit of compliance to be completed by both the notary and the consumer; and (v) the Welcome Call by an attorney after the notary's face-to-face presentation. (*Id.*).

122. The Intervening Law Firms' response to this Interrogatory explicitly mentioned that notaries were part of the face-to-face process 15 times. (*Id.*)

123. Additionally, the Intervening Law Firms attached as an exhibit to the CIDs lists of "persons who have conducted face-to-face presentations." These lists included hundreds of names of notaries. (*See, e.g.* DX85-0010-69 (a 60-page list of names of notaries).) Significantly, the first column of the list set forth the notary company with which each notary was contracted. (*Id.*) Just by quickly glancing at the first page of this list it would have been obvious to the CFPB that the face-to-face meetings were being conducted by independent contractors rather than Intervening Law Firm employees.

## VII.    THE TRO HAS SIGNIFICANTLY HARMED CONSUMERS

124.    The notary sales meetings took place in person, with the exception of a few days immediately after COVID. (Callahan PI Hearing 606:9-607:12; Exhibit 16 in support of Motion for TRO at RAM_12.4.20_CID_010397.)

125.    The notary person-to-person sales meetings were substantive and described the program in detail. (*See, e.g.,* DX18; DX20; DX22; DX24; DX116; DX117; DX122.) Plaintiffs have never alleged (much less proven) that the written materials crafted by the law firms for the face-to-face presentations were inaccurate or incomplete. Nor have Plaintiffs alleged (much less proven that any part of those materials was false or misleading. Those materials contained disclosures that went beyond those required by law. (*Id.*; Thurman PI Hearing 58:2-17.) The fees were described in the written material and provided in a detailed chart that had to be signed by the clients. (*See, e.g.,* DX122-0052-53.)

126.    The remaining question is whether the notaries, who told potential clients that they were representatives of the law firm, were in fact "sellers" under the applicable regulations. (They were agents of the seller as discussed in the conclusions of law).  From the point of view of the consumer, there would have been no difference if the presenter of this material would have been a part-time employee of the law firm or a notary.  If a part-time employee had read the same script and presented the same material, they would have indisputably been a "seller" under the Rules. There is no evidence that the potential clients were harmed in any way by a presentation delivered by a notary rather than a part-time employee.  Indeed, it stands to reason that the potential clients' interests are far better served by having the person-to-person sales meetings conducted by a notary than by a part-time employee who is paid by commission.  The "harm" to be addressed by any injunctive relief, therefore, is at most technical.

127.    On the other hand, consumers have been severely harmed by the TRO. (J. Hughes PI Hearing 228:9-23, 229:23-25; DX127; Declaration of ML Clark.)  Thousands of clients were thrown into chaos by the TRO. (*Id.*) The back-office function of the operation was stopped entirely. (*Id.*) Negotiations in process were upset. (*Id.*) Settlements that were negotiated already were derailed. (*Id.*) If a Preliminary Injunction were issued, these harms would continue. (*Id.*)

128.    Attorneys cannot service their clients because they have no access to recent information and cannot receive client correspondence. (Gustafson 178:2-6; J. Hughes PI Hearing 228:9-23.) For instance, one client called and said she mailed a summons three weeks ago and the attorney missed the appearance date. (Gustafson 177:20-24.)

129.    For settlements that were being processed or scheduled to be processed at the time the TRO was issued, no processing occurred due to the TRO. (DX127, Declaration of ML Clark.) All those settlements have been breached and will have to be re-negotiated. (J. Hughes P.I. Hearing 230:2-12; Gustafson P.I. Hearing 179:8-15.)

## CONCLUSIONS OF LAW

## I.    STANDARD FOR OBTAINING PRELIMINARY INJUNCTIVE RELIEF

1.    A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).

2.    Nor should preliminary injunctive relief be "routinely granted." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021).

3.    A plaintiff seeking a preliminary injunction must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without preliminary injunctive relief; (3) the balance of equities are in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

4.     "A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id.* at 22.

A. **Plaintiffs incorrectly propose a two-factor test for injunctive relief.**

5.     In their Motion for TRO, Plaintiffs suggest that the Court need only analyze two factors when determining whether to grant preliminary injunctive relief. (Dkt. #5, p. 20). Specifically, Plaintiffs claim that the Court must: (1) determine that Plaintiffs "have a fair and tenable chance of ultimate success on the merits;" and (2) balance the equities. (Dkt. #5, p. 20).

6.     Plaintiffs' suggestion that a two-factor standard applies is inappropriate because it is premised on a statutory provision of the FTC Act that outlines a modified injunction standard. But that provision of the FTC Act is neither applicable to this case nor procedurally allowed under the circumstances. Similarly, as explained below, to utilize that two-factor standard would require this Court to impose a modified injunction standard that has no basis in the relevant statute. Furthermore, the United States Supreme Court has reiterated on multiple occasions that the traditional four-factor injunction test applies to claims for injunctive relief premised on alleged statutory violations.

7.     Plaintiffs — the Consumer Financial Protection Bureau and several states' Attorneys General — rely on caselaw that analyzed requests by the Federal Trade Commission for preliminary injunctive relief under section 13(b) of the FTC Act (15 U.S.C. § 53(b)), which instructs courts to consider only (1) the "likelihood of ultimate success" and (2) a balancing of "equities." *Id. See, e.g., FTC v. Verity Intern., Ltd.*, 124 F.Supp. 2d 193, 198 (S.D.N.Y. 2000) ("It promptly sought injunctive and other relief pursuant to Section 13(b) of the Act."); *FTC v. Cuban Exchange, Inc.*, 2012 WL 6800794, at *1 (E.D.N.Y. Dec. 19, 2012) (citing section 13(b) to explain that the "FTC Act authorizes the FTC to obtain a preliminary injunction upon a showing that,

weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest.").

8.      But the FTC Act – and particularly section 13(b) of the FTC Act – is inapplicable to the present matter. Not only do Plaintiffs not rely upon the FTC Act as the basis for the relief they seek in the Complaint, but only the FTC itself can utilize the procedural enforcement scheme outlined under the FTC Act. The Telephone and Consumer Fraud and Abuse Prevention Act ("TCFPA"), on the other hand, explicitly sets forth the enforcement schemes for state attorney generals (15 U.S.C. § 6103(a)); private citizens (15 U.S.C. § 6104); the FTC (15 U.S.C. § 6105(a)-(b)); and the CFPB (15 U.S.C. § 6105(d)). With respect to the FTC, the TCFPA explicitly provides that it shall "be enforced *by the Commission* under the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*)." 15 U.S.C. § 6105(a) (Emphasis added). It goes on to state that "*The Commission shall prevent any person from violating a rule of the Commission* under section 6102 of this title in the same manner, *by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act* (15 U.S.C. § 41 *et seq.*) were incorporated into and made a part of this chapter." 15 U.S.C. § 6105(b) (Emphasis added).

9.      Conversely, with respect to the CFPB, the TCFPA explicitly provides that the TCFPA "*shall be enforced by the Bureau of Consumer Financial Protection under subtitle E of the Consumer Financial Protection Act of 2010*, with respect to the offering or provision of a consumer financial product or service subject to that Act." 15 U.S.C. 6105(d) (Emphasis added). Hence, the CFPB can only enforce alleged violations of the TCFPA through the express enforcement procedures set forth in the Consumer Financial Protection Act (12 U.S.C. §§ 5561-5567). The TCFPA also explicitly dictates the enforcement scheme for states, which is limited to

45

filing a "civil action on behalf of its residents" in federal court to, among other things, "enjoin such telemarketing." 15 U.S.C. § 6103(a).

10.     Based on the plain language of the TCFPA, Congress explicitly granted only the "*Commission*" (*i.e.,* the FTC) – and *not* the CFPB or the states – the express authority to enforce potential violations of the TCFPA (and the TSR) through the FTC Act (*i.e.*, section 13(b) or section 19). The omission of any reference to the FTC Act in the enforcement schemes set forth for the CFPB (15 U.S.C. § 6105(d)) and the state attorney generals (15 U.S.C. § 6103(a)) compels this result. *See Federal Trade Commission v. Credit Bureau Center, LLC*, 937 F.3d 764, 774 (7th Cir. 2019) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); see also *id.* at 780 ("The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."). Accordingly, Plaintiffs are procedurally foreclosed from invoking or otherwise relying on the FTC Act and its modified injunctive standards set forth in section 13(b) in this case. To find otherwise would require this Court to negate the plain language of the TCFPA and the express Congressional intent that only the FTC itself can enforce the TCFPA through the FTC Act. See *id.* at 782 ("[T]he Court now recognizes that the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").

11.     Plaintiffs' reliance on authority involving the lesser two-factor standard for injunctive relief under section 13(b) of the FTC Act is misplaced for the additional reason that the lesser standard is only appropriate when the FTC seeks injunctive relief in conjunction with parallel administrative proceedings. Indeed, the lesser two-factor standard under Section 13(b)

may only be used (by the FTC) "to obtain injunctive relief *while administrative proceedings are foreseen or in progress*, or when it seeks only injunctive relief." *AMG Capital Management, LLC v. Federal Trade Commission*, 593 U.S. 67, 78 (2021) (Emphasis added) ("to read those words as allowing what they do not say, namely, as *allowing the Commission to dispense with administrative proceedings* to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter."); *see also Federal Trade Commission v. National Urological Group, Inc.*, 80 F.4th 1236, 1244 (11th Cir. 2023) ("[T]he Supreme Court in AMG emphasized that the FTC's traditional administrative proceedings must not be circumvented."); *Credit Bureau Center*, 937 F.3d at 778 ("Recall that the statute's [section 13(b)] express authorization for temporary restraining orders and preliminary injunctions is tied to the eventual initiation of an administrative proceeding."); *Federal Trade Commission v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) ("When Congress added Section 13(b), the provision was expected to be used for obtaining injunctions against illegal conduct pending completion of FTC administrative hearings.").

12. Accordingly, the lesser two-factor standard for injunctive relief under section 13(b) is only appropriate when the FTC (and not the CFPB or state attorney generals) seeks immediate injunctive relief to prevent imminent or ongoing harm pending the completion of administrative proceedings. *See Federal Trade Commission v. AbbVie Inc.*, 976 F.3d 327, 376 (3d Cir. 2020) ("Section 13(b) was added in 1973 because the FTC's administrative regime moved slowly. But it is slow-moving for a reason: it affords defendants valuable procedural protections. For example, Section 5 conditions relief to defendants on an administrative proceeding and a case-and-desist order … By contrast, Section 13(b) does not incorporate these same protections: it grants the FTC a cause of action to seek a preliminary injunction in federal court without first pursuing

administrative adjudication or rulemaking[.]"); see also S. Rep. No. 93-151, at 30 (1973) ("The purpose of [section 13(b)] is to permit the [FTC] to bring an immediate halt to unfair or deceptive acts or practices when … at the present time such practices might continue for several years until agency action is completed."). .

13.     Because Plaintiffs are not seeking any administrative remedies in conjunction with the present action, the lesser two-factor standard for injunctive relief is inapplicable for this additional reason. Nor should it be, as the imposition of such a standard here would not further the Congressional purpose behind implementation of that standard.

14.     Furthermore, Plaintiffs cannot rely on the lesser two-factor standard in section 13(b) of the FTC Act for the additional reason that they seek remedies that the Supreme Court determined are inappropriate under that standard. Specifically, Plaintiffs seek, among other things, the imposition of a receivership and an asset freeze. Such injunctive relief cannot be rewarded under the lesser two-factor standard. *See*, *e.g.*, *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1328 (11th Cir. 2023) ("[A]fter *AMG Capital* the Commission cannot rely solely on § 13(b) to support the preliminary injunction here because it includes measures preserving assets for monetary relief. Now that monetary relief is no longer available under § 13(b), there is no need to preserve resources for a future judgment."); *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1078 (11th Cir. 2021) ("As monetary relief is no longer available under § 53(b), there is no need to preserve resources for a future judgment. Consequently, the imposition of an asset freeze or receivership premised solely on § 53(b) is inappropriate[.]").

15.     Finally, even if the lesser two-factor standard was somehow applicable, Plaintiffs' suggestion that irreparable harm is presumed is simply wrong. As several recent federal appellate courts have held, to obtain injunctive relief under the lesser two-factor standard, a plaintiff "must

show there is a cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *AbbVie*, 976 F.3d at 379; see also *Credit Bureau Center*, 937 F.3d at 774 ("Section 13(b) serves a different, forward-facing role: enjoining ongoing and imminent future violations. This authority aligns with the predicate requirements it imposes – notably, a reasonable belief that a violation is ongoing or imminent and that stopping the violation is in the public interest."); *Shire ViroPharma*, 917 F.3d at 156 ("Simply put, Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

**B.  Plaintiffs must meet the traditional 4-factor test to obtain preliminary injunctive relief under the Telemarketing and Consumer Fraud Prevention Act.**

16.     Plaintiffs here proceed under section 6103(a) and 6105(d) of the TCFPA. (See Dkt. #1, ¶¶ 3-12). As explained above, Section 6103(a) provides only that state attorney generals may file a civil action "to *enjoin*" telemarketing practices that violate any FTC rules or regulations. 15 U.S.C. § 6103(a) (Emphasis added).

17.     Also as explained above, section 6105(d) provides that the CFPB can enforce the TCFPA (and, therefore, the TSR) through its enforcement mechanisms in the Consumer Financial Protection Act. See 15 U.S.C. § 6105(d). Relevant here, the Consumer Financial Protection Act provides that the CFPB may "commence a civil action" against any person who "violates" the TCFPA to "impose a civil penalty or to seek all appropriate legal and equitable relief including a *permanent or temporary injunction* as permitted by law." 12 U.S.C. § 5564(a). Similarly, the Consumer Financial Protection Act further provides that courts may grant "appropriate legal and equitable relief with respect to a violation of Federal consumer financial law[.]" 12 U.S.C. § 5565(a). The Consumer Financial Protection Act explicitly defines the "relief" that courts may

award under that provision, and includes, rescission or reformation of contracts; refund of money or return of property; restitution; disgorgement; damages or money relief; public notification; limits on activities or functions; and civil money penalties. 12 U.S.C. § 5565(b).

18.     Neither section 6103(a) of the TCFPA, nor sections 5564 and 5565 of the Consumer Financial Protection Act, provide any modified or lesser standard applicable to requests for injunctive relief pursuant to those provisions.  Indeed, the law does not suggest or otherwise permit any alternative standards to be applied to claims for injunctive relief brought under those sections, so no presumptions apply to Plaintiffs' claim for injunctive relief. Unlike section 13(b) of the FTC Act – which explicitly sets forth the two standards to be applied to claims of injunctive relief brought pursuant to that section (which should be used in conjunction with administrative proceedings) – section 6103(a) of the TCFPA provides only that the states may seek to "enjoin" telemarketing acts that violate rules of the FTC. *See* 15 U.S.C. § 6103(a). Similarly, unlike section 13(b) of the FTC Act, sections 5564 and 5565 of the Consumer Financial Protection Act only provide that the CFPB may seek a "permanent or temporary injunction" against any person who "violates" the TCFPA. *See* 12 U.S.C. § 5564(a). Had Congress intended for a modified standard of injunctive relief to apply to those enforcement provisions, it would have explicitly provided such language in the sections (like it had done in section 13(b) of the FTC Act). *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) ("We have therefore been especially reluctant to tamper with the enforcement scheme embodied in the statute by extending remedies not specifically authorized by its text."); *Credit Bureau Center*, 937 F.3d at 774 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

19.     Because the language in section 6103(a) of the TCFPA and sections 5564 and 5565 of the Consumer Financial Protection Act is silent on and does not authorize the imposition of an alternative test to be applied to claims for injunctive relief, courts should not read a presumption of irreparable harm (or any other lesser standard) into the plain language of the TCFPA (or the Consumer Financial Protection Act) that Congress did not envision. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) ("This Court explained in *Hecht Co. v. Bowles*, 321 U.S. 321 (1944), that a major departure from the long tradition of equity practice should not be lightly implied. As we did there, we construe the statute at issue in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect."); *Griffith v. Steiner Williamsburg, LLC*, 760 F.Supp. 2d 345, 355 (S.D.N.Y. 2010) ("The Court must interpret a statute as it is, not as it might be, since courts must presume that a legislature says in a statute what it means and means in a statute what it says."); *Life Receivables Trust v. Syndicate 102 at Lloyd's of London*, 549 F.3d 210, 216 (2d Cir. 2008) ("A statute's clear language does not morph into something more just because courts think it makes sense for it to do so.").

20.     The Supreme Court has also recently reiterated the principle that courts should apply traditional standards to claims for injunctive relief brought pursuant to other statutory provisions and should not presume irreparable harm. *See*, *e.g.*, *eBay Inc. v. MerxExchange, LLC*, 547 U.S. 388, 394 (2006) ("Because we conclude that neither court below correctly applied the traditional four-factor framework that governs the award of injunctive relief, we vacate the judgment of the Court of Appeals, so that the District Court may apply that framework in the first instance."); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (rejecting a

"lenient" standard of irreparable harm because "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

21.     Furthermore, while both *Winter* and *eBay* dealt with different statutes than the one at issue here, subsequent decisions have explained that the holdings in those Supreme Court cases extend to other statutes. For example, the Second Circuit explained that "nothing in the text or logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in *any* context." *Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010). Similarly, the Third Circuit followed *Winter* and *eBay* in holding that, "[b]ecause a presumption of irreparable harm deviates from the traditional principles of equity, which require a movant to demonstrate irreparable harm, we hold that there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases." *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 216 (3d Cir. 2014); see also *United States Securities and Exchange Commission v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (explaining that a party seeking preliminary or permanent injunction must "demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.").

22.     Accordingly, Plaintiffs' reliance on the lesser two-factor standard set forth in section 13(b) of the FTC Act is inappropriate and creates an exception that swallows the general

rule. To find otherwise would require this Court to violate basic principles of statutory interpretation by imposing standards neither expressed nor envisioned in the plain language of the TCFPA. This Court is thus required to apply the traditional elements to analyze whether preliminary relief is warranted here, including the requirement of a showing of irreparable harm. *See eBay*, 547 U.S. at 391 ("As this Court has long recognized, a major departure from the long tradition of equity practice should not be lightly implied.").

23.     To be entitled to injunctive relief, therefore, Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without preliminary injunctive relief; (3) the balance of equities are in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

## II.     PLAINTIFFS HAVE THE BURDEN TO ESTABLISH THAT A PRELIMINARY INJUNCTION IS NECESSARY, AND, THEREFORE HAVE THE BURDEN TO ESTABLISH THE INAPPLICABILITY OF THE FACE-TO-FACE EXEMPTION.

### A.  The Telemarketing Sales Rule and the advance-fee ban.

24.     The TCFPA directed the FTC to prescribe rules "prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). The FTC thus enacted the Telemarketing Sales Rules ("TSR") to prohibit various specified deceptive (16 C.F.R. § 310.3) and abusive (16 C.F.R. § 310.4) telemarketing acts and practices.

25.     Under the TSR, it is an "abusive telemarketing act or practice" for "any seller or telemarketer" to, among other things, request or receive payment of any fee or consideration for any "debt relief service" unless and until two conditions are met. 16 C.F.R. § 310.4(a)(5)(i).

26.     Specifically, the TSR prohibits a "seller" of debt relief services from "requesting or receiving payment of any fee or consideration" until and unless (1) the seller renegotiates,

settles, reduces, or alters the terms of at least one debt pursuant to a settlement agreement, debt plan, or other valid contractual agreement executed by the customer; and (2) the customer made at least one payment to the creditor pursuant to the settlement agreement, debt plan, or other valid contractual agreement. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

27.     The TSR also provides that fees must be proportional either to the fee charged for the entire debt relief service (flat fee structure) or a percentage of the savings achieved (contingency fee structure). 16 C.F.R. § 310.4(a)(5)(i)(C).

28.     Despite the above rules governing the collection of fees, a "seller" may request or require a customer to place funds in an account to be used for the seller's fees when they become due and for payments to creditors in connection with the renegotiation or settlement of any debts. 16 C.F.R. § 310.4(a)(5)(ii).

### B. The purpose of the advance-fee ban.

29.     The FTC enacted the advance fee ban to address consumer injury in the form of "abusive" telemarketing acts and practices. Specifically, the FTC explained that the advance fee ban was enacted to ensure that (i) consumers understand all fees, terms, and risks associated with their enrollment in debt relief services and (ii) consumers receive a benefit or service before fees are charged. *See* Fed. Reg. 48458, at 48432, 48483-84, 48487.

30.     The FTC enacted the advance fee ban in response to the "manner in which debt relief services have been sold[.]" 75 Fed. Reg. 48458, at 48485. Specifically, the FTC explained that debt relief services "frequently take place in the context of high-pressure sales tactics, contracts of adhesion, and deception." 75 Fed. Reg. 48458, at 48485. The FTC further stated that telemarketers of debt relief services "exhorted consumer to fill out the enrollment documents and return the papers as quickly as possible." 75 Fed. Reg. 48458, at 48485.

31.     Furthermore, the FTC noted that the sale of debt relief services via telemarketing calls has "impeded the free exercise of consumer decision making." 75 Fed. Reg. 48458, at 48485. In other words, the "paradigm of telemarketing fraud involves an interstate telephone call in which the customer has no other direct contact with the caller." 60 Fed. Reg. 43842, at 43860.

### C. The face-to-face sales presentation exemption under the TSR.

32.     Under the TSR, advance fees are permitted in certain situations.. 16 C.F.R. § 310.6.

33.     Among those situations are "telephone calls in which the sale of goods or services … is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller[.]" 16 C.F.R. § 310.6(b)(3).

34.     In that context, a face-to-face sales "presentation" means something "more than some type of de minimis or ancillary face-to-face contact or communication between the consumer and seller is required." *FTC v. Nudge, LLC*, 2022 WL 2132695, at *37 (D.Utah June 14, 2022). In other words, "some *thing* … must be presented, shown, displayed, or explained by the seller" and a "presentation must have a subject." *Id.* (Emphasis in original). Specifically, the term "presentation" means "the action of presenting to sight or view, or that by which something is presented, such as a display, show, or exhibition; a demonstration or display of a product or idea; or something, such as a lecture or speech, that is set forth for an audience." *Id.*

35.     A face-to-face presentation is sufficient regardless of whether the telephone call precedes the face-to-face presentation or vice versa. *Nudge*, 2022 WL 2132695, *38 ("In other words, the specific transaction starts with a face-to-face presentation and is completed on the phone: the seller begins the sale by meeting with the prospective buyer about the offered good or service and then completes the sale of that good or service on the phone (or vice versa)."); Complying   with   the   Telemarketing   Sales   Rule,   Federal   Trade   Commission,

https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#facetoface ("This exemption is for transactions that begin with a face-to-face sales presentation and are completed in a phone call, as well as those that begin with a phone call and are completed in a face-to-face sales presentation."). "The fact that the presentations preceded the telephone call does not matter." *Nudge*, 2022 WL 2132695, at *36.

36.     Although the order is immaterial, the telephone call and the "presentation" must relate to the "same subject." *Id.* at * 38. Specifically, the presentation and the telephone call must both be about the "goods or services and terms of a specific 'sale.'" *Id.*  The call cannot refer to a different transaction to the one presented in the face-to-face presentation. *Id.*

37.     Ultimately, "whether a particular telemarketing transaction qualifies for the face-to-face exemption will depend on the facts of each case." FTC, *Debt Relief Services & the Telemarketing Sales Rule: What People are Asking*, p.2.

### D. Plaintiffs have the burden to establish that a preliminary injunction is warranted, regardless of whether Defendants claim that the face-to-face exemption applies.

38.     Plaintiffs have argued that Defendants bear the burden of showing they conducted a sufficient face-to-face presentation to permit advance fees under the TSR. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("The burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can be fairly characterized as affirmative defenses or exemptions.").

39.     Here, however, Plaintiffs are incorrect to suggest that Defendants have the burden in these proceedings. For starters, when the FTC enacted 16 C.F.R. 310.6, it crafted an express limitation on liability thereunder, *i.e.*, the dictates of the advance fee ban would not apply to persons who conducted a face-to-face sales presentation. Having crafted that limitation on its own

regulatory authority, the Government must bear the burden of providing that Defendants (or, in this case, the Intervenor Law Firms) fall within that limitation. It is powerless to expand its own authority by saddling Defendants with the burden of proof to show they complied with the requirements of 16 C.F.R. 310.6. *See EEOC v. Chicago Club*, 86 F.3d 1423, 1429-31 (7th Cir. 1996) ("It seems to us that the rule allocating the burden of proof to one seeking the benefit of a statutory exception has been allowed to mutate to its present form in which the rule has escaped the confines of its basis in reason.")

40. The procedural posture of this matter dictates the same result. The burden of establishing that a preliminary injunction is warranted always rests with the moving party. *See*, *e.g.*, *Main Street Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F.Supp. 3d 244, 253 (N.D.N.Y. 2015) ("Preliminary injunction should not be granted unless the movant, by a clear showing, carries the burden of persuasion."); *Biosafe-One, Inc. v. Hawks*, 524 F.Supp. 2d 452, 461 (S.D.N.Y. 2007) ("A preliminary injunction is an extraordinary and drastic remedy that will not be granted absent a clear showing that the moving party has met its burden of proof."); *Dorsett v. County of Nassau*, 762 F.Supp. 2d 500, 534 (E.D.N.Y. 2011) ("[A] party seeking preliminary injunctive relief has a 'heavy burden' to sustain.").

41. The fact that the proposed preliminary injunction concerns the TSR has no bearing as to which party has the burden to show that a preliminary injunction is necessary. Indeed, the parties have not identified any caselaw that suggests that a defendant somehow carries the burden of proof to resist a motion for preliminary injunctive relief. Hence, to the extent that Defendants presented evidence showing that face-to-face meetings and presentations occurred under the applicable exemption in section 310.6(b)(3) of the TSR, Plaintiffs still carry the ultimate burden to establish a likelihood of success on the merits by a clear showing that the exemption does not

apply.

42.     Furthermore, Plaintiffs have an even higher burden under the circumstances because they seek a mandatory injunction that alters, rather than maintains, the status quo. "A mandatory injunction may be granted only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 296 F.Supp. 3d 442, 456 (E.D.N.Y. 2017). This heightened standard also applies if the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Id.*

43.     Plaintiffs thus must show that they are entitled to injunctive relief by a "clear showing" that they are entitled to the relief. Specifically, Plaintiffs seek to alter the status quo, because the last, peaceable status between the parties was the ongoing operations of the law firms and client service companies without the imposition of a receivership or asset freeze. Similarly, the status quo prior to the injunctive proceedings here was that the law firms and the client service companies were able to service their clients, utilize their technology and office resources, and have all employees report to work for purposes of effectuating those services. Now, however, Plaintiffs seek to continue to disrupt the operations of those businesses by continuing to impose a receiver who has largely shut down the operations of the client service companies, prevented the law firms from being able to communicate with clients, and frozen all assets available to the client services companies, thus effectively crippling the business operations.

## III.   PLAINTIFFS FAIL TO CARRY THEIR BURDEN ON ANY OF THE INJUNCTIVE RELIEF FACTORS.

### A.  Plaintiffs cannot establish a likelihood of success on the merits.

44.     Based on the applicable law and the evidence presented at the evidentiary hearing,

Plaintiffs are unable to establish a likelihood of success on the merits of their claim that Defendants violated the advance-fee ban in the TSR. Specifically, Defendants presented evidence establishing that the law firms conducted face-to-face presentations before requesting or receiving fees or consideration from consumers. Indeed, one thing seems very clear: Plaintiffs have sued the wrong parties. The evidence at the two-day hearing shows that Defendants did not take any advance fees. Nor did they conduct face-to-face sales presentations. Those actions were undertaken by the law firms – not by Defendants. That is fatal to Plaintiffs' claims and obviates any likelihood of success on the merits for Plaintiffs. In any event, as set forth below, the law firms have complied with the face-to-face requirement, and Plaintiffs do not have a likelihood of success against them, either.

> ***i.*** **A principal and its independent contractor agents are considered a single, collective "seller" under the TSR and the face-to-face exemption.**

45. Under the TSR, a "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). A "person" is "any individual, group, unincorporated association, limited or general partnership, or other business entity." 16 C.F.R. § 310.2(y).

46. Also, under the TSR, an agent and its principal are "collectively one 'seller whose goods or services are being offered.'" *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020).

47. Under the TSR, "sellers" are responsible for the actions of third-party agents acting within the scope of their authority to sell or telemarket goods and services. *See, e.g., FTC v. Medical Billers Network, Inc.*, 543 F.Supp. 2d 283, 319 (S.D.N.Y. 2008); *FTC v. Five-Star Auto Club, Inc.*, 97 F.Supp. 2d 502, 527 (S.D.N.Y. 2000); *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th

Cir. 2009). An entity may have liability pursuant to the TSR, for example, even if another "person" was "acting as an independent contractor" on behalf of the "seller." *See Medical Billers Network*, 543 F.Supp. 2d at 319; *Five-Star Auto Club, Inc.*, 97 F.Supp. 2d at 527 ([I]t does not matter whether Mr. Cole and Brewley would be considered at law as employees of the company or independent contractors.").

48.     The FTC has acknowledged that a "seller" under the TSR can encompass more than one entity with respect to a single transaction. For example, the FTC explained:

> In response to a suggestion from a commenter, the Commission has modified the definition of "seller" to clarify that the term includes not only persons who, in connection with a telemarketing transaction, provide or offer to provide goods and services to the customer in exchange for consideration, but also persons who, in connection with a telemarketing transaction, arrange for others to provide goods or services to the customer. The Commission made this change in order to clarify that the Rule's coverage cannot be avoided by structuring a sale so that someone other than the seller actually provides the goods or services directly to the customer.

60 Fed. Reg. 43842, 43845 (1995); see also 68 Fed. Reg. 4580-4588 (2003) ("The Commission believes that this definition makes clear that, for purposes of the Rule, a 'seller' is not necessarily the manufacturer of a product, nor the sole financial beneficiary from its sale. Rather, the definition of 'seller' is predicated upon a person's provision of goods or services – whether consummated, merely offered, or even simply 'arranged for' – to the customer.").

49.     The CFPB has likewise acknowledged that sellers can use independent contractors to conduct face-to-face presentation and qualify for the exemption under the TSR. *See* Stipulated Final Judgment and Consent Order, Case No. 2:14-cv-06643, U.S. District Court for the Central District of California, p. 10 ("For a DRSP claiming it is exempt from the TSR because its business practices involve only Face-to-Face Transactions, such reasonable screening shall also include obtaining: *** A detailed description of how the DRSP conducts meetings with consumers which includes information as to whether the DRSP uses employees or independent contractors to

conduct face-to-face sales presentations[] *** Representative examples of the materials relating to the training of DRSP representatives, whether employees or independent contractors, meeting face-to-face with consumers to provide the sales presentations, including training materials, scripts, guidance documents, or other similar materials[.]").

50.     Hence, multiple entities can be considered a single "seller" under the TSR when a third-party "person" acts with the actual or apparent authority to engage in the actions at issue on behalf of the seller. *See Dish Network,* 954 F.3d at 975 (Dish Network and its third-party order-entry contractors were "collectively one 'seller whose goods or services are being offered'" under the TSR); *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438 (9th Cir. 1986) ("A principal is bound by the acts of his salesperson if those acts are within the scope of his apparent or actual authority, unless the third party has actual notice that the acts are unauthorized."); *Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir. 1957) ("[T]he courts take the view that the principal is bound by the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized."); *FTC v. Stefanchik*, 2007 WL 1058579, at *8 (W.D. Wash. April 3, 2007) ("It is well-settled that a principal is liable under the FTC Act for misrepresentation made by its agents, even if those agents do not fall within the traditional definition of agency.").

51.     In their Complaint and Motion for injunctive relief, Plaintiffs define every (or nearly every) actor in the chain of this debt settlement program as a "seller" under the TSR. But Plaintiffs conveniently omit the notaries from the definition.

52.     Actual authority may be either express or implied, and it exists where the agent "may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *CFPB v. Manseth*, 2023 WL 5400235, at *13 (W.D.N.Y. Aug. 22, 2023). In other words, actual authority exists when the principal's "verbal or

other acts" give the "appearance of authority" to the agent. *Id.* Hence, two key elements are required for agency: (1) the principal and agent agree that the agent acts for the principal; and (2) the agent is subject to the control of the principal. *United States v. Dish Network LLC*, 256 F.Supp. 3d 810, 921 (C.D. Ill. 2017), *aff'd in part, rev'd on other grounds by Dish Network*, 954 F.3d 970 ("*Dish Network I*"). "The principal need only have the right to control the agent; the agency exists even if the principal does not exercise that right." *Id.*

53.     Additionally, multiple independent entities can constitute a single "seller" under the TSR based on agency principles, regardless of any purported disclaimers or attempted legal classifications assigned by the parties in contractual agreements. *See Dish Network*, 954 F.3d at 975 ("The contract asserts that it does not create an agency relation, but parties cannot by ukase negate agency if the relation the contract creates is *substantively* one of agency."); *Goodman*, 244 F.2d at 593 ("[R]egardless of the manner in which these salespersons may have been designated in contracts between them and the petitioner or were carried on his books, so far as the public was concerned, they were his authorized agents and acted not only within the apparent but also within the actual scope of authority."); *Medical Billers Network*, 543 F.Supp. 2d at 319 ("Moreover, MBN may be liable for representations made by CQD even if, as Defendants claim, CQD was acting as an 'independent contractor.'"); *Five-Star Auto Club, Inc.*, 97 F.Supp. 2d at 527 ([I]t does not matter whether Mr. Cole and Brewley would be considered at law as employees of the company or independent contractors … Indeed, it would be inappropriate for Defendants to hold out Mr. Cole and Mr. Brewley as Five Star representative and to reap the fruits from their acts and doings without incurring such liabilities as attached thereto."); *Dish Network I*, 256 F.Supp. 3d at 923 ("The Court agrees that the Order Entry Retailers were separate, independent companies. An independent company, however, can be an agent with respect to work performed for a principal.");

*United States v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) ("Thomas argues that Mukes was an independent contractor and not an agent. This argument is unavailing because the two terms are not mutually exclusive; an independent contractor may also be an agent.").

54.     Whether an agency relationship exists under the TSR is a question of fact. *Dish Network LLC*, 954 F.3d at 975.

55.     To determine if an agency relationship exists for purposes of the TSR, courts will generally consider, among other factors, the following: (i) whether the entity retained authority to review and approve materials to be used by the purported agent[14]; (ii) whether the entity created the materials to be used by the purported agent[15]; (iii) whether the entity's picture, logos, or other identifying characteristics were included in the materials presented to the consumer by the purported agent[16]; (iv) whether consumers believed that they were speaking to a "representative" of the entity when dealing with the purported agent[17]; (v) whether the purported agent was required to comply with "sales scripts" or was otherwise instructed as to what to say or discuss with consumers[18]; (vi) whether the purported agent was required to comply with the entity's policies or procedures[19]; (vii) whether the entity controlled the products or services that were sold[20]; and (viii) whether the purported agent was acting pursuant to the specific act to which he or she agreed to

---

[14] *Goodman*, 244 F.2d at 592-93; *FTC v. Stefanchik*, 2007 WL 1058579, *7 (W.D. Wash. April 23, 2007); *Five-Star Auto Club, Inc.*, 97 F.Supp. 2d at 527; *Stefanchik*, 559 F.3d at 930-931; and *MacGregor*, 360 Fed. Appx. at 893-94.

[15] *Medical Billers Network*, 543 F.Supp. 2d at 319; *Goodman*, 244 F.2d at 592-93; *MacGregor*, 360 Fed. Appx. at 893-94; *Dish Network LLC*, 954 F.3d at 975-76; *Southwest Sunsites*, 785 F.2d at 1438-39.

[16] *Goodman*, 244 F.2d at 592-93; *Stefanchik*, 559 F.3d at 930-931; *Southwest Sunsites*, 785 F.2d at 1438-39.

[17] *Medical Billers Network*, 543 F.Supp. 2d at 319; *Goodman*, 244 F.2d at 592-93; *Five-Star Auto Club, Inc.*, 97 F.Supp. 2d at 527; *Stefanchik*, 559 F.3d at 930-931; *MacGregor*, 360 Fed. Appx. at 893-94; *Southwest Sunsites*, 785 F.2d at 1438-39.

[18] *Medical Billers Network*, 543 F.Supp. 2d at 319; *FTC v. Stefanchik*, 2007 WL 1058579, *7 (W.D. Wash. April 23, 2007).

[19] *Medical Billers Network*, 543 F.Supp. 2d at 319; *Dish Network LLC*, 954 F.3d at 975-77.

[20] *Stefanchik*, 559 F.3d at 930-931; *Dish Network LLC*, 954 F.3d at 975-76; *MacGregor*, 360 Fed. Appx. at 893-94; *Dish Network LLC*, 954 F.3d at 975-77.

perform on behalf of the principal.[21] All of those factors are present here.

56.     In addition, there is no principled reason to accept Plaintiffs' argument that only an employee (or presumably a member or partner) of the "seller" may conduct a face-to-face sales presentation. Nothing in the TSR creates that limitation, and to impose that limitation would elevate form over substance. It would create a situation in which an employee and an "agent" could provide exactly the same presentation in the exactly the same manner to the same consumer, but the former would be acceptable under the TSR while the latter would not – based solely on the employment status of the person delivering the material. That would be highly arbitrary.

### *ii.* **The notaries were agents of the law firms for purposes of the face-to-face meetings.**

57.     Here, the notaries who conducted the face-to-face meetings and sales presentations were agents of the law firms for purposes of conducting the presentations.

58.     Specifically, the law firms explicitly authorized the notaries to conduct the face-to-face sales presentations, and the notaries were acting on that authority when they did, in fact, conduct the face-to-face sales presentations.

59.     The law firms created the training materials at issue, and no other entities were allowed to modify the materials.

60.     The notaries were not allowed to conduct face-to-face meetings on behalf of the law firms until they passed an examination designed by the law firm.

61.     The law firms dictated the form and substance of, and controlled, all aspects of the notaries' behavior and interaction with prospective clients at the face-to-face meetings, which included, but was not limited to, the information notaries could present at those meetings, the script

---

[21] *Medical Billers Network*, 543 F.Supp. 2d at 319; *Goodman*, 244 F.2d at 592-93; *Five-Star Auto Club, Inc.*, 97 F.Supp. 2d at 527; *Stefanchik*, 559 F.3d at 930-931; *MacGregor*, 360 Fed. Appx. at 893-94; *Dish Network LLC*, 954 F.3d at 975-77; *Southwest Sunsites*, 785 F.2d at 1438-39.

that notaries were required to follow, what the notaries could say and what the notaries could not say, the documents that the notaries were required to provide the prospective client, how and where each document was to be signed and/or initialed by the prospective client and the notary, and even the nature of the attire that notaries could wear to the face-to-face in-person presentation meetings.

62.     Similarly, the law firms created the materials to be presented to the prospective clients at the face-to-face sales presentation meetings, which included the 20-page printed PowerPoint sales presentation and the retainer agreement and the accompanying documents. The notaries were not allowed to alter any of the documents or the information contained in those documents.

63.      Everything the notary did at the face-to-face presentation was done on behalf of and for the benefit of the law firms and the written materials contained the law firms' logos, names, and other identifying characteristics.

64.     The materials presented at the face-to-face presentation informed the prospective clients that the notaries were "representatives" of the law firms for purposes of the meeting and presentation, and the notaries told the prospective clients they were there as "representatives" of the law firms.

65.     Furthermore, both the notaries and the prospective clients executed Face-to-Face Acknowledgements after the presentation and face-to-face meeting expressly stating that the notaries were "representatives" of the law firms for purposes of the meeting and acknowledging the content that was presented, the location, and the duration of the meeting.

66.     The notaries were required to comply with the instructions of the law firms during the face-to-face meetings and presentations, and failure to do so could result in the law firms unilaterally choosing not to work with the notaries or their firms in the future.

67.     All documents executed by the prospective clients after the face-to-face meetings were uploaded by the notaries to the law firm, and the law firm controlled the documents at all times after they were executed and uploaded.

68.     That a particular notary testified at deposition that he or she might have felt uncomfortable being called a representative of the law firm has no relevance.  The test for agency has no place for the agent's "feelings."  The question is whether the person had actual or apparent authority to act for the principle.  Here, the notaries had both.

69.     Within a week of uploading the executed client retainer agreement and the initialed PowerPoint sales presentation slide deck, an attorney from the relevant law firm would review the documents to ensure they were properly completed, and would also conduct an "attorney welcome call" with the prospective client during which the attorney would ask the prospective client how the face-to-face interaction went. If the face-to-face presentation was not conducted properly or if the presentation materials were not properly executed, the face-to-face presentation would be repeated.

70.     It is immaterial to the Court's analysis whether the notaries were classified as independent contractors because independent contractors may also be agents under the TSR. *See Goodman*, 244 F.2d at 593 ("[R]egardless of the manner in which these salespersons may have been designated in contracts between them and the petitioner or were carried on his books, so far as the public was concerned, they were his authorized agents and acted not only within the apparent but also within the actual scope of authority."). *See also* Stipulated Final Judgment and Consent Order, Case No. 2:14-cv-06643, U.S. District Court for the Central District of California, p. 10.

71.     Based on the foregoing, the notaries were agents of the law firms for purposes of conducting the face-to-face meetings. *See Dish Network L.L.C.*, 954 F.3d at 975 ("Because the

order-entry retailers were DISH's agents, DISH and the order-entry retailers were collectively one 'seller whose goods or services are being offered.'").

> ### iii.   The law firms complied with the face-to-face meeting exemption.

72.    Defendants' did not conduct face-to-face meetings and presentations with prospective clients. The law firms did. Thus, any TSR claim against Defendants must fail on its face. But even assuming Plaintiffs' claims were stated against the law firms, it is clear that they complied with the face-to-face exemption under section 310.6(b)(3) of the TSR.

73.    Before the face-to-face meeting between a consumer and a notary, the consumer receives details about the debt settlement program. But during this initial call, the consumer is not enrolled in the program, nor is any payment information requested, collected, or provided. (M. Thurman P.I. Hearing, 64:23-65:7;76:17-21).

74.    Even if consumers had decided after this call that they wanted to enroll in the program – and there is no evidence that any consumer did so – the face-to-face exemption still applies.  The person-to-person exemption applies to "telephone calls in which the sale of goods or services … is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller[.]" 16 C.F.R. § 310.6(b)(3).  The mental state of the consumer after the telephone call has no place in the analysis.  No banking information from which a payment could be made or authorized is taken during the telephone call.  M. Thurman P.I. Hearing, 64:23-65:7;76:17-21.  That payment information is only taken during the face-to-face sales presentation. DX117-0060.

75.    After the initial call, the appropriate Strategic support entity schedules the consumer's face-to-face meeting on behalf of the law firm  to which its contracted through its automated software and the sales presentation is conducted by a notary on behalf of the law firm.

(R. Gustafson P.I. Hearing 13-18.).

76.     Before conducting a face-to-face meeting, the notaries receive a script, a PowerPoint sales presentation, and the retainer agreement, all of which are provided by the law firms. The notaries also receive instructions that explain the requirements for conducting the face-to-face meeting. For example, the instructions to the notaries provide: "I understand that my role in this debt settlement signing is as follows: I will act as a licensed notary to verify the client's identify and provide notarizations. **I understand that I am also acting as an agent of [the Law Firm]** to provide an in-person presentation by reading the provided script, answering basic questions, and assisting the client in completing the provided paperwork." (L. Munyon P.I. Hearing 20:20-21; DX 8-0001).

77.     At the face-to-face meetings, the notaries conduct a substantive and detailed presentation that has been developed, revised, and improved over the course of 10 years. (*See, e.g.,* DX17, DX18, DX20, DX22, DX24).

78.     For example, during the face-to-face meeting, Defendants provided clients with a 20-page PowerPoint printed sales presentation that details the debt settlement program. The notary reads from a script and reviews each page of the PowerPoint presentation prepared by the law firms with the client. (H. Lyon P.I. Hearing 106:8-14).

79.     The purpose of the script and the PowerPoint sales presentation is to ensure that each potential client is presented with the same information about the program and to provide the client with complete information, including information about the potential downsides of the program. The purpose is to allow the client to make a fully informed and reasonable choice as to whether to enroll in the debt settlement program. (*See* M. Thurman P.I. Hearing 57:4-14; DX11-0004 ("These written instructions include steps to perform before, during, and after the

presentation. All these instructions are included with the client's documents and must be read and followed exactly.")).

80.    As a "quality control measure," clients initial each page of the presentation to indicate they read and understood the information.

81.    Defendants' PowerPoint sales presentation included an express slide titled "IMPORTANT THINGS TO KNOW" that included all the disclosures required by the TSR, and then some. Specifically, that slide of the PowerPoint sales presentation explicitly informed the clients that (a) the debt relief services would negatively affect their credit score; (b) the debt relief services may result in their being subject to collections; (c) the debt relief services may result in their being sued by creditors or debt collectors; (d) the debt relief services may increase the amount owed due to the accrual of late fees and interest; (e) the law firm could not prevent interest penalties or late fees; and (f) the typical client would not see their first settlement for 7-9 months.

82.    The notaries reviewed these disclosures and even "emphasized" the disclosures to clients at the face-to-face meetings.

83.    In addition to the PowerPoint sales presentation, the notary also reviews each page of the retainer agreement with the client. The notary obtains the client's signature in numerous places in the retainer agreement.

84.    As part of that retainer agreement, the notary explicitly discusses and shows the client Section 2.2 of the agreement that is entitled "Fees and Costs Provided." That section of the agreement sets out in detail the types of fees, the amounts of fees, and the estimated total fees the client will incur if he or she enrolls in the program. Specifically, it includes a breakdown of the retainer fee, legal administration fees, and service costs.

85.    Similarly, the notary explicitly discusses, shows, and obtains the client's signature

on a standalone section of the agreement entitled "Payment Schedule." That document provides a complete overview of the payments and fees the client will make during the program – including banking fees to a third party – that the client will incur. While not required by the TSR, the Payment Schedule explicitly states the amount of debt the consumer is enrolling, the estimated amount of settlement, estimated total fees, and estimates total estimated savings. It also sets forth the fees and the savings amount that will come from the consumer's draft each month.

86.     That type of sales presentation goes well above and beyond the requirements of the TSR and amply fulfills the purpose of the face-to-face meeting under the TSR.  The rules do not specify how long a sales presentation must be.  Certainly, a meeting of twenty minutes – the shortest time anyone has attributed to a notary meeting – or longer, discussing the specifics of the services being sold satisfies the presentation.  The average person-to-person meetings was 45 minutes. (Munyon PI Hearing 38:16; Lyon PI Hearing 112:9.)  Indeed, one of the two notaries called by plaintiffs testified that her meetings with potential clients took an hour to an hour and a half. (R. Brooks-Ward PI Hearing 338:16-17.)

87.     The other notary called by Plaintiffs, John Accardo, and many of the interactions cited by Plaintiffs in the client declarations, recounted events that happened many years ago. Indeed, Mr. Accardo conducted "a handful" of face-to-face meetings, six or seven years ago. (Accardo PI Hearing 255:2-12; DX146 (showing that he completed only 4 sales presentations).) None of the interactions described in declarations happened less than two-and-a-half-years ago. (Callahan PI Hearing 593:2-594-8.) Evidence in the relatively distant past cannot justify an injunction, particularly when there is evidence that the process was continually changing and improving. *Federal Trade Commission v. Shire ViroPharma, Inc.* 917 F.3d 147, 160 (3d Cir. 2019) (affirming the denial of preliminary injunctive relief where the FTC "failed to plausibly suggest

[the defendant] is 'about to violate' any law enforced by the FTC, particularly when the alleged misconduct ceased almost five years before filing of the complaint.")

88.     Nor does the TSR specify the substance of the sales presentation.  The fulsome description of the program contained in the PowerPoint sales presentation satisfies any conceivable standard.  Potential risks are highlighted in the presentation.  Fees are broken down month-by-month and by category.

89.     That notaries do not believe they are "selling" is of no consequence. They are using the term in the colloquial sense, not with the regulatory definition in mind. Indeed, the use of an independent contractor to deliver the sales presentation avoids the danger that the telemarketing rule protects against: sales of debt relief services "frequently take place in the context of high-pressure sales tactics, contracts of adhesion, and deception." 75 Fed. Reg. 48458, at 48485.

90.     The notaries, agents of the seller, are presenting a detailed description of the program, including: the cost of the program, the benefits of the program, the details of the program. They present the transactional documents for review and signature.  That is the essence of selling. That they do not *advocate* for a sale – what people traditionally think of as "selling" – is a salutary, not disqualifying aspect of the use of notaries.  The lack of pressure does not mean this is not a sales presentation.

91.     As an additional quality control, after the presentation and at the end of the face-to-face meeting, the clients execute either a Face-to-Face Acknowledgment or an Affidavit of Compliance.  These documents confirm that the clients received the presentation in-person. The documents also explicitly identify and record (1) the participants at the face-to-face presentation; (2) the location of the face-to-face presentation; (3) the time of the face-to-face presentation (which is handwritten by the notary in front of the prospective client); (4) the subject matter of the face-

to-face presentation, including the discussion of applicable fees; and (5) the length of time the face-to-face presentation took to complete.

92.    The face-to-face meetings lasted, on average, about 45 minutes, and the clients were allowed to ask questions concerning any aspect of the debt relief services. The notaries were trained and instructed to answer basic questions related to the debt settlement program during the face-to-face meetings. The notaries used the documents provided by the law firms – such as the PowerPoint presentation or the retained agreement – to answer questions about the program. For example, notaries can answer questions about the types and amounts of fees the clients will pay if they enroll in the program, as well as answering questions about the time it would likely take before receiving their first settlement.

93.    Furthermore, client service representatives are available during the meeting to answer any questions that the notary is unable to answer. Specifically, if the notary is unable to answer a client question (which Plaintiffs' witness, Ms. Brooks-Ward, testified occurred only about 10% of the time), the notary and client will contact the client-services representative during the face-to-face meeting to have the question answered. If the client services representative is unable to answer the question, the representative will make an appointment for the client to speak to an attorney.

94.    Similarly, that the notaries do not answer more than basic questions does not mean they are not agents of the seller.  A novice vacuum cleaner salesman might have to call back to the office if asked a question beyond the sales presentation he was trained to give.  Does that make his presentation anything less than a sales presentation?  The same is true with respect to attorneys. As ABA Opinion 506 (DX126) makes clear, non-lawyers can assist in intake, provided the prospective client has access to an attorney before retention to answer legal questions. The system

was designed so the notaries delivered only the law firm's message and did not deviate from that script.  That ties the notaries closer to the law firms and does not diminish their status as an agent of the seller.

95.     If a client does execute the retainer agreement, the notaries leave a document with the client at the end of the face-to-face meeting informing the client that they have a right to cancel the agreement within five days.  The notaries also leave a document with the client containing information about the law firm, including the direct phone number and email for the in-state attorney from the firm who will be conducting the attorney initial consultation with the client.

96.     Additionally, the notaries upload the executed client documents electronically into a portal that connects directly to the law firm's system.

97.     The prospective clients are not pressured to execute the retainer agreement and are expressly allowed to cancel the agreement within five days of executing the agreement and after having the opportunity to consult independent legal counsel.  Indeed, the notaries are explicitly instructed that they are "not there to try to talk the client into enrolling in the program." (DX11-0005). The notaries are also instructed they are "not there to give personal advice or opinions. This is often a trying and emotional time for the client. Stress surrounding money matters can make people feel very vulnerable." (DX11-0005).

98.     To that end, some prospective clients choose not to sign the retainer agreement. Those individuals thus decline to enroll in the debt settlement program at the end of the face-to-face presentation. (H. Lyon P.I. Hearing 135:10-12).

99.     Finally, even after a client executes the presentation and retainer document at the face-to-face meeting, that individual is still not enrolled in the debt settlement program. Specifically, once the face-to-face meeting is complete and the documents (initialed PowerPoint

presentation, executed retainer agreement, and executed acknowledgement or affidavit), an attorney from the law firm will review all the documents from the meeting to ensure that everything is complete. If any information is missing or not properly executed, the attorney rejects the file and the face-to-face presentation is required to be re-done. (Gustafson P.I. Hearing 147:24:148:6; 148:17-21). The attorney also reviews the prospective client's information to ensure the client is a good fit for the firm's representation.

100.    If all the documentation from the face-to-face meeting is properly completed, the attorney will conduct a required "Welcome Call" with the client. The Welcome Call ordinarily occurs via telephone but the attorney does offer to conduct that call in-person or by videoconferencing if the client so prefers. The attorney follows a script during that call, and the call serves as yet another quality control opportunity to monitor compliance of the notaries in the face-to-face meeting.

101.    During the Welcome Call, the attorney asks about the face-to-face meeting to ensure that required process was adhered to and that the presentation was substantive and meaningful. (DX44-0001; Gustafson P.I. Hearing 154:1-17). The attorney will also discuss various topics, including, but not limited to, the program, the fees and costs, the provisions in the client's retainer agreement, when the client can expect the first settlement, how the client can handle creditor correspondence, and the power of attorney that the client executed. Although these topics were discussed at the face-to-face presentation, the attorney reviews these topics again and allows the client the opportunity to answer questions, including legal questions that the notary could not answer during the face-to-face meeting (*Id.* 148:22-149:1, 153:23-154:3, 157:25-158:2; 161:11-13.)

102.    Further during the Welcome Call, the attorney will confirm the accounts the client

is enrolling in the program for accuracy and for purposes of checking applicable statute of limitations. As the attorney addresses major points in the Welcome Call script, he or she must make electronic notations to confirm that required topics are addressed on the call with the client. If any issues come up during this call, the attorney will create an entry in the system so that issue can be addressed. The length of the Welcome Calls are recorded by the software. (Gustafson P.I. Hearing 162:5-12).

103.    After the Welcome Call, the attorney will countersign the retainer agreement, at which point the client is officially enrolled in the debt settlement program and a client of the law firm. Once the law firm countersigns the retainer agreement, the law firm sends a copy of the fully executed agreement to the consumer.

104.    Based on the foregoing, no engagement letters are fully executed, and no payments are made, authorized, requested or received until after a face-to-face presentation between the client and Defendants occurred. Hence, no "sale" occurs until after the face-to-face meeting and presentation. See 16 C.F.R. § 310.6(b)(3) (exempts telephone calls in which the sale of services "is not completed, and payment or authorization of payment is not required" until after a face-to-face presentation").

105.    Furthermore, the face-to-face meetings and presentations qualify for the exemption here, as they contain substantive, direct, and personal contact between the client and the "seller." The face-to-face meetings and presentations include significant, substantive interaction between Defendants and the prospective clients and allow for direct, substantive conversations about the debt relief services and its potential consequences. The face-to-face meetings, together with prior and subsequent phone calls also provide ample opportunities for the clients to ask any questions about the program and its potential downfalls, including fees, and the law firms provide required

disclosures multiple times to the clients.  This interaction obviates the concerns of the FTC that the sale of debt relief services can occur in a high-pressure environment that eliminates client free-will. Indeed, the use of independent contractors – notaries – rather than commissioned salespersons furthers the interest of lowering the temperature on the consumer. Thus, the face-to-face meetings and presentations satisfy the purpose behind the exemption. *See* Complying with the Telemarketing Sales Rule, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#facetoface. ("The key to the face-to-face exemption is the direct, substantive and personal contact between the consumer and seller … A face-to-face meeting provides the consumer with more information about — and direct contact with — the seller and helps limit potential problems the TSR is designed to remedy.").

106.    The face-to-face exemption applies, and the order in which the law firms called the prospective clients (before the face-to-face meetings or after the face-to-face meetings or both) is irrelevant. *See* Complying with the Telemarketing Sales Rule, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#facetoface ("This exemption is for transactions that begin with a face-to-face sales presentation and are completed in a phone call, as well as those that begin with a phone call and are completed in a face-to-face sales presentation.").

107.    Based on the above, the face-to-face meetings and presentations complied with the exemption in section 310.6(b)(3), as it was far more than a *de minimis* presentation. The law firms provided extensive, substantive presentation materials in the form of a PowerPoint presentation to the client; the presentations lasted, on average, 45 minutes; and all required information was disclosed to the client in multiple forms, including, but not limited to, the types and amount of any fees to be charged to the client. *Cf Fed. Trade Comm'n v. Nudge, LLC*, 2022 WL 2132695 (D.

Utah June 14, 2022) (finding that the defendants did not qualify for the face-to-face exemption where the presentation was a "welcome letter" that merely "referenced" the program at issue without including any information about "the good or service offered, its price, terms and conditions of the sale[.]").

### iv. Plaintiffs made no showing that they are likely to succeed against the individual defendants, Ryan Sasson and Jason Blust.

108.    To obtain an injunction against the individual defendants, Ryan Sasson and Jason Blust, Plaintiffs must not only show a likelihood of success on the merits of their claim that the Defendants violated the TSR, but also a likelihood of success on the merits of the claim that Sasson and Blust "either participated directly or had authority to control the deceptive practice," ***and*** the claim that each "knew or should have known of the alleged deceptive misrepresentation." *F.T.C. v. Washington Data Res.*, 856 F. Supp. 2d 1247, 1276 (M.D. Fla. 2012), *aff'd sub nom. F.T.C. v. Washington Data Res., Inc.,* 704 F.3d 1323 (11th Cir. 2013).

109.    Proof of knowledge of a TSR violation is likewise required under a "substantial assistance" theory. To succeed under this theory, Plaintiffs must not only establish an underlying violation of the TSR by a seller or telemarketer, *FTC v. Walmart Inc.*, 664 F.Supp. 3d 808, 824 (N.D. Ill. 2023), but ***also*** that the individual "knows or consciously avoids knowing" about the underlying TSR violation. 16 C.F.R. § 310.3(b); *Walmart*, 664 F.Supp. 3d at 826.

110.    Plaintiffs did not even attempt to make any of these showings during the 2-day evidentiary hearing. They neither identified on their witness list nor called to the stand Sasson or Blust, despite the fact both were present in the courtroom on both days. They elicited no testimony about either individual's alleged knowledge of any violation of the TSR, actual or constructive. They provided no evidence or testimony about any prior complaints regarding the face-to-face sales presentation and, indeed, their own witnesses – including their own investigator – confirmed

there were no such complaints. (*See* Callahan PI Hearing 612:6-613:8 (admitting that not a single person he spoke with told him that a notary tried to put a false time on any affidavit of compliance); 603:21-605:19 (admitting that he told Judge Vilardo the notary meetings were "formulaic, brief, and non-substantive," even though several of the declarations submitted were to the contrary).) Even the Declaration of Investigator Callahan – attached to the Motion for TRO – provided only vague references to consumer complaints "***after enrolling*** in the debt-relief service" (TRO Ex. at 25) (emphasis added)) but contains no factual allegations regarding a single consumer complaint about the face-to-face sale presentation which occurred ***before enrollment***. And even Mr. Elkins, during a recorded telephone conversation with his Canyon Law Group attorney days after his face-to-face sales presentation meeting, acknowledged without reservation that "everything went fine" with his presentation. (Elkins PI Hearing 431:15-22.)

111.    The evidence and testimony that *was* elicited demonstrates that not only did the individual defendants not have *actual* knowledge, they did not have *constructive* knowledge (*i.e.,* "should have known" or "consciously avoids knowing") of a violation of the TSR. The evidence and testimony demonstrated that both individual defendants went to great lengths to *comply* with the TSR, including specifically the face-to-face sales presentation requirements. Mike Thurman testified that, as early as 2014, Jason Blust hired him, on multiple occasions, to help him develop and design a TSR-compliant law firm model. Mr. Thurman did so in 2014 and has continued to do so to this day. (M. Thurman PI Hearing 86:1-5). Mr. Sasson also engaged Mr. Thurman for the same purpose on behalf of Strategic. (*Id.* at 86:10-16.) In total, Mr. Thurman was hired over *ten different times* to ensure the continuing compliance of the Defendants' face-to-face sales model with the TSR. (*Id.* at 85:10:15). They asked Mr. Thurman at the outset if he "had an opinion on whether a compliant model could be devised." Responding that he "believe[d] it could" with the

proper procedures, they have relied upon his expertise regarding TSR compliance over the past decade. (*Id.* at 52:20-54:10.). With his capable oversight, the Defendants carefully crafted scripts (*e.g.,* DX18), PowerPoint sales presentations (*id.*), a protocol for the training of notaries (*e.g.,* DX12, DX16), and related policies and procedures to ensure the proper utilization of fully compliant face-to-face sales presentations (*e.g.,* DX65-007-08.)[22]

## B. Plaintiffs cannot establish irreparable harm.

112.   To establish irreparable harm, Plaintiffs must "demonstrate injury that is both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Soundboard Association v. U.S. Federal Trade Commission*, 254 F.Supp. 3d 7, 13 (D.D.C. 2017) (analyzing a request for injunction brought by a private citizen under the TCFPA).

113.   "A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 24. Indeed, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

114.   "[C]ourts in this Circuit 'typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.'" *199 Delaware Ave., Inc. v. Lake Effect Artisan Ice Cream*, 1:19-CV-00224 EAW, 2019 WL 1723588, at *4 (W.D.N.Y. Apr. 18, 2019)

---

[22] Plaintiffs have failed to prove that the Trust received any assets with any knowledge of any wrongdoing or that the assets that the Trust received were part of an effort to hinder, delay, or defraud Blust's [or the other defendants'] creditors.  The Trust was a completely different and separate party from the other defendants.  Indeed, the Trust was managed by an independent trustee (Paul Hull).  The Government makes no showing that the independent trustee had any knowledge of any alleged wrongdoing and certainly makes no showing that he was operating in anything other than in good faith and in compliance with his fiduciary duties.

(Wolford, J.); *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("A district court should generally consider delay in assessing irreparable harm.").  This is because "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

115.    A years-long delay "strongly militate[s] against the granting of injunctive relief." *See City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 173 (S.D.N.Y. 2010), *aff'd in part, appeal dismissed in part*, 406 Fed. Appx. 557 (2d Cir. 2011) (quoting *Weinberger*, 456 U.S. at 320).

116.    Here, Plaintiffs cannot establish irreparable harm.

117.    Plaintiffs have been aware of Defendants' practice of using notaries to conduct face-to-face meetings with prospective clients since as early at least 2014, and received detailed information from some of the intervening law firms in 2020, but failed to seek injunctive relief (or otherwise proceed with administrative proceedings) until 2024. *See, e.g.,* Stipulated Final Judgment and Consent Order, Case No. 2:14-cv-06643, U.S. District Court for the Central District of California, p. 10; DX84-87 (four law firms' 2020 CID responses); DX78 (Global audit responses sent by Boulder Law Group in July 2020).

118.    No evidence was presented concerning any potential consumer complaints about the programs at issue in the last three years, which is the statute of limitations for a TSR violation. 15 U.S.C. § 75b(d); 15 U.S.C. § 6104(a).

119.    Plaintiffs' years-long delay in seeking preliminary injunctive relief and the lack of any plausible or imminent or future violations militate against a finding of imminent harm. *See, e.g.*, See *Shire ViroPharma, Inc.* 917 F.3d at 159-160 (declining a claim for injunctive relief

because "the FTC waited until five years after Shire had stopped its allegedly illegal conduct before seeking an injunction under Section 13(b). Viewed under the correct standard, the FTC's complaint fails to allege that Shire 'is violating' or 'is about to violate' the law. The FTC does not contest that Shire is not currently violating the law."); *Sarna*, 690 F.Supp. at 173 ("Now, after years of inaction – and after an eighteen-month period in which only two incidents of excessive sediment discharge are alleged – Plaintiff moves this Court for the 'extraordinary remedy' of a preliminary injunction. [Citation]. Plaintiff's delay seriously undermines its attempt to convey any sort of urgency; it indicates the lack of a truly immediate threat of irreparable harm, and weighs against granting preliminary relief."); *199 Delaware Ave., Inc.*, 2019 WL 1723588, at *6 (W.D.N.Y. Apr. 18, 2019) (noting various delays, including delays as short as three months, that precluded irreparable harm and therefore preliminary injunctive relief); *Occhipinti v. Annucci*, 19-CV-6651-FPG, 2022 WL 1152842, at *2 (W.D.N.Y. Apr. 19, 2022) (31-month delay sufficient to deny motion for preliminary injunction) (collecting cases).

**C.      The equities do not weigh in Plaintiffs' favor.**

120.     Similarly, Plaintiffs cannot establish that the equities weigh in their favor.

121.     Granting the "extraordinary remedy" of injunctive relief here would not advance the purpose of the TCFPA. *See Sarna*, 690 F. Supp. 2d at 165 ("in determining whether a plaintiff has shown that irreparable harm is imminent, a court must look to the underlying purpose of the [statute]"); *see also United States v. City of Niagara Falls*, 706 F.Supp. 1053, 1059 (W.D.N.Y. 1989) (A court "[r]etains the full measure of its equitable discretion in fashioning appropriate enforcement relief, including the power to deny an injunction where its issuance would not further the substantive policies underlying the Act."); *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 544 (1987) (overturning preliminary injunction where "the Ninth Circuit

erroneously focused on the statutory procedure rather than on the underlying substantive policy the process was designed to effect[.]"); *Weinberger*, 456 U.S. at 314 (district court properly denied preliminary injunction for alleged statutory violation ancillary to the purpose of the statute at issue); *Sarna*, 690 F. Supp. 2d at 165 ("The lessons of [the *Weinberger* and *Amoco*] decisions are clear: The [Plaintiff] must prove more than procedural permit violations in order to secure an injunction.").

122.     Plaintiffs argue that Defendants violated the TSR by collecting fees from clients before settlements are negotiated, despite contracting with notaries to conduct face-to-face meetings and presentations on the law firms' behalf for purposes of complying with the face-to-face exemption available under the TSR. Specifically, Plaintiffs claim that Defendants are not entitled to the benefit of the statutory face-to-face exemption under the TSR because the notaries – as independent contractors – do not fall within the definition of the term "seller" under the TSR.

123.     But as explained above, Defendants did not conduct face-to-face presentations – the law firms did. Moreover, the independent contractors here qualify as "agents" under the law, and an agent and its principal are "collectively one 'seller whose goods or services are being offered'" under the TSR. *See Dish Network,* 954 F.3d at 975.

124.     The TCFPA was not designed to protect consumers from face-to-face presentations by an independent contractor as opposed to an employee of a "seller" under the Act.  *See* 67 Fed.Reg. at 4497 ("The purpose of the Act was to combat telemarketing fraud"); *Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 338 (4th Cir. 2005) (TSR enacted "for the purpose of preventing fraud and protecting the home.").

125.     To grant preliminary injunctive relief on the sole basis that the notaries were independent contractors – as opposed to part-time employees – would require the Court to elevate

form over substance. Specifically, Plaintiffs ask this Court to grant the "extraordinary remedy" of injunctive relief – and in this case the extraordinary injunctive relief of taking over and essentially shutting down a business with over 75,000 active clients – on a technicality concerning the employment status of those delivering the face-to-face presentations – employee vs. independent contractor. Indeed, if the notaries were part-time employees of the law firms – rather than notaries – the exact same presentation with the exact same words in the exact same form would be permissible, per the CFPB. In other words, from the consumers' perspective, nothing would be different, regardless of the legal title ascribed to the messenger.

126.    This Court is not required to grant injunctive relief based on such technicalities in the interpretation of the statute by the CFPB, especially when there is no ongoing or imminent harm to the consumer. See, *e.g.*, *City of New York v. Anglebrook Ltd. Partnership*, 891 F. Supp. 908, 925 (S.D.N.Y. 1995) ("Injunctive relief, however, is not automatically available upon a finding of technical statutory violations, assuming *arguendo*, ones occurred."); *Sarna*, 690 F. Supp. 2d at 173 ("Yet these and the several other similarly secondary CWA violations alleged in the Complaint are the sort of procedural and/or technical violations that do not warrant preliminary injunctive relief, as the Supreme Court has made clear."); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) ("Rather than requiring a district court to issue an injunction for any and all statutory violations, the FWCPA permits the district court to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation. The exercise of equitable discretion, which must include the ability to deny as well as grant injunctive relief, can fully protect the range of public interests at issue at this stage in the proceedings."); *Winter*, 555 U.S. at 32 ("A federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") (quoting *Weinberger*).

127.     The balance of equities do not weigh in Plaintiffs' favor.  *See Amoco*, 480 U.S. at

544; *Weinberger*, 456 U.S. at 314; *Sarna*, 690 F. Supp. 2d at 165; *Essex Cnty. Pres. Ass'n v.*

*Campbell*, 536 F.2d 956, 962 (1st Cir. 1976) (affirming denial of request for preliminary injunction

where, "although a 'technical noncompliance' with [statute] had been established, appellants failed

to demonstrate that this violation resulted in or would cause any [related] harm"); *SEC v. Phillip*

*A. Michael Sec., Inc*., 74 CIV. 2158, 1974 WL 416, at *2 (S.D.N.Y. June 26, 1974) ("The interests

of fairness and equity require that an injunction be denied where there has not been a proper

showing despite the existence of a technical violation," and "the only effect would be punitive, not

remedial"); *Consumers Union of U. S., Inc. v. Hobart Mfg. Co.*, 189 F. Supp. 275, 279 (S.D.N.Y.

1960) ("The harm possible to plaintiff by circulation of defendants' Sales Bulletins among

distributors and dealers is so trivial that, even if it involved a technical violation of copyright, it

would not warrant a preliminary injunction.").

> **D.      Injunctive relief is injurious to the public interest.**

128.     Injunctive relief is contrary to the public interest here.

129.     The scope of injunctive relief sought here stops Defendants from servicing the debts

of tens of thousands of consumer clients. Such a drastic restriction to the legitimate debt relief

services for so many consumers before an adjudication on the merits for a technical violation is

contrary to the public interest.

130.     Indeed, the widescale imposition of a receivership on Defendants and the freezing

of assets of all Defendants and the intervening law firms has already caused clients to lose access

to information and to prohibit innocent consumers from receiving additional information

(including about continuing legal representation and settlements they are relying on) from their

attorneys. (Gustafson 178:2-6.)

131.    The injunctive relief here would cause harm to the public and innocent consumers because it prevents those consumers from engaging in attorney-client communications with their attorneys. (Gustafson 178:2-6.)

132.    Additionally, the intervening law firms and the client service companies are unable to receive client correspondence, which includes summonses sent to clients and other important information concerning their debts. As explained at the evidentiary hearing, the shutdown of services has already harmed innocent consumers as one consumer was prevented sending a summons to her attorney thus causing the attorney to miss the appearance date. (Gustafson 177:20-24.)

133.    The public would be injured, because the service companies handle over 200,000 law firm client requests each month, including (1) 40,000-45,000 phone calls; (2) 30,000-35,000 emails; (3) 25,000-30,000 documents received (summonses, statements, collection notices); and (4) 5,000-6,000 draft adjustment requests. (DX127, M.L. Clark Decl., ¶ 13.). In the event of injunctive relief, the service companies would be unable to handle those communications, documents, and requests.

134.    Furthermore, injunctive relief here prevents settlement from being processed or scheduled, thus causing creditors to not be paid *anything* and debtors failing to satisfy obligations under settlement terms and thus breaching those agreements. (J. Hughes P.I. Hearing 230:2-12; Gustafson P.I. Hearing 179:8-15.)

135.    The public interest would be harmed because consumers' debts, interest, and fees will continue to negatively spiral in exponential form because no negotiations will occur on behalf of the consumers. This may lead to an increase in bankruptcy, judgments, wage garnishments, and other adverse effects that the consumers are actively trying to avoid through their participation in

the debt relief services. (Gustafson PI Hearing 177:20-24.)

136.    Moreover, injunctive relief would be against the public interest because it would eliminate beneficial debt relief services for tens of thousands of consumers who have benefited from the program. Indeed, in 2022 and 2023, alone, approximately 27,000 clients of the law firms successfully completed the law firms' settlement program. (DX127, M.L. Clark Decl., ¶ 10.)

137.    And from 2021 through 2023, the law firms have collectively settled over $1.9 billion of the clients' debt, resulting in approximately $1 billion in savings for such clients. (DX127, M.L. Clark Decl., ¶ 10.)

138.    Ultimately, to grant injunctive relief here would be to punish the public, as opposed to protecting the public. As explained, the injunctive relief requested here would cause a cessation of business for tens of thousands of clients by the service companies who support the law firms, thus jeopardizing legitimate debt relief services to those individuals who properly received all necessary disclosures before enrolling in the programs and who were informed in a face-to-face presentation about the fees that would be charged.

139.    Injunctive relief would cause over 1,000 individuals to be at risk of losing their jobs, the potential cessation of over 20 law firms, and the disruption of critical debt relief service assistance to over 75,000 consumers. (DX127, ML Clark Decl. ¶ 4.)

## IV.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW THAT THE DRASTIC REMEDY OF RECEIVERSHIP IS NECESSARY.

140.    The Court finds, in light of the factors, burden, and purposes of appointing a receiver, that Plaintiffs have not met their heavy burden to justify the appointment of a receiver to manage all of the affairs of the Receivership Defendants' businesses before a final adjudication on the merits.  As set forth above, there are no grounds to interfere in the Strategic business.

A.     **Legal Standard.**

141.    The receivership analysis is similar to, but distinct from, the preliminary injunction analysis.  *Compare* Fed. R. Civ. P. 65 and case law *supra* at 2-11 (injunctive relief) *with* Fed. R. Civ. P. 66 (receivers); *see also Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 364 (S.D.N.Y. 2000) (granting preliminary injunction and denying receiver); *Haggiag v. Brown*, 728 F. Supp. 286, 290 (S.D.N.Y. 1990) (same).

142.    Because appointing "a temporary receiver is an extraordinary remedy which results in the taking and withholding of possession of property from a party without an adjudication on the merits," it is a "'drastic' remedy" that should be "considered 'only where no lesser relief will be effective.'"  *Baliga v. Link Motion Inc*., 18CV11642 (VM) (DF), 2022 WL 2531535, at *17 (S.D.N.Y. Mar. 9, 2022), *report and recommendation adopted*, 18 CIV. 11642 (VM), 2022 WL 3699339 (S.D.N.Y. Aug. 25, 2022) (quoting *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961)); *see also F.T.C. v. Crescent Pub. Group, Inc*., 129 F. Supp. 2d 311, 326 (S.D.N.Y. 2001) ("Particularly on a preliminary injunction motion, when the evidence is incomplete, the Court should not grant relief beyond what is needed.").

143.    In reviewing Plaintiffs' request for a temporary receiver, the Court considers the following factors: (1) whether a defendant's conduct is fraudulent; (2) "the imminent danger of property being lost, concealed, injured, diminished in value, or squandered"; (3) the inadequacy of available legal remedies; (4) "the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment"; and (5) the plaintiff's "probable success in the action and the possibility of irreparable injury to his interests in the property." *Baliga*, 2022 WL 2531535, at *16–17 (quoting *Ramgoolie v. Ramgoolie*, No. 16cv3345 (VEC) (SN), 2016 WL 11281385, at *7 (S.D.N.Y. Dec. 20, 2016)).

144.    Plaintiffs' burden to justify the appointment of a receiver is "heavy." *Baliga*, 2022 WL 2531535, at *17.  Indeed, "the courts have required the party seeking the remedy to make a clear showing that the appointment is necessary to prevent irreparable injury to the property interests at stake." *Id.* (citing *Altissima Ltd. v. One Niagara, LLC*, No. 08-CV-756-JTC, 2009 WL 1322319, at *1 (W.D.N.Y. May 8, 2009); *Gordon v. Washington,* 295 U.S. 30, 39 (1935) (appointment of a receiver is a remedy that "should be resorted to only on a plain showing of some threatened loss or injury to the property, which the receivership would avoid")); *see also Republic of Philippines v. New York Land Co*., 852 F.2d 33, 36 (2d Cir. 1988) ("the appointment of a receiver is an extraordinary remedy, which "should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests") (internal quotation omitted). "In the absence of clear proof of the danger of irreparable loss or damage, and proof that a receiver is necessary for the protection of the parties to the action and their interests, a temporary receiver should not be appointed."  *Altissima Ltd. v. One Niagara, LLC*, 08-CV-756-JTC, 2009 WL 1322319, at *1 (W.D.N.Y. May 8, 2009) (citation omitted).

### B.    Irreparable Harm and Danger of Property Loss.

145.    Plaintiffs argue that, absent a receiver to maintain the status quo, Receivership Defendants' corporate assets will be subject to diversion and waste.  *See* Ex Parte Application for TRO, ECF No. 5-001, at 46–47.  Plaintiffs' primary contention for this proposition is that Receivership Defendants operate using a lot of entities, addresses, and bank accounts.  *Id.* Plaintiffs also argue that some individual defendants' "history of recidivism" suggests a concern that all Receivership Defendants may seek to conceal property and evidence.

146.    There is no recidivism.  No court has ever found any wrongdoing by the entity with which some of the defendants were previously affiliated.  *See also* Fed. R. Evid. 404(b).

147.    Plaintiffs have not made any showing (let alone met their heavy burden to show)

that Receivership Defendants' corporate assets will be subject to diversion or waste. This factor does not support the appointment of a temporary receiver before an adjudication on the merits of Plaintiffs' claims.

### C. Balance of Harms.

148.     With respect to Plaintiffs' request to appoint a temporary receiver, the balance of harm inquiry centers on the assets that may or may not be available to satisfy any disgorgement or civil penalties at the conclusion of this lawsuit. *See Baliga*, 2022 WL 2531535, at *17. On Plaintiffs' side of the ledger is the general risk that Defendants dissipate assets in advance of any judgment. *See* Ex Parte Application for TRO, ECF No. 5-001, at 46–47.

149.     The harm to Receivership Defendants, its clients and employees of keeping the Receiver in place, on the other hand, is catastrophic. If a temporary receiver opts to operate Receivership Defendants' businesses, "there is an appreciable risk that a receiver, if appointed, would do more harm than good," since "any change in management will result in a loss of institutional knowledge, and may prevent the company from conducting business as usual." *Fimbel v. Fimbel Door Corp*., CV141915FLWDEA, 2016 WL 1379788, at *7 (D.N.J. Apr. 7, 2016). Here, the risk has been realized. The Receiver has thrown the law firm's clients into chaos and has perhaps irreparably injured the clients.

150.     Plaintiffs do not argue that Receivership Defendants' businesses are not profitable. Quite the contrary. *See, e.g.*, Complaint ¶ 14. Allowing the businesses to operate during the pendency of this lawsuit would preserve the status quo and ensure sufficient funds for any judgment. *See Republic of Philippines*, 852 F.2d at 37.

### D. Fraudulent Conduct and Success on the Merits.

151.     Plaintiffs have put forth no evidence whatsoever of fraud. Instead, as set forth above, Plaintiffs laid out a case centering on a technical violation of the TSR—that the notaries

who made the in-person presentation are not, technically, "sellers" under the rule (the TSR, meant to prevent fraud, was not designed to protect consumers from presentations by independent contractors).

152.    There is no fraud here.  The consumers received complete, fulsome, and candid disclosures before entering into a relationship with the law firm.  That they received face-to-face presentations by an independent contractor of the law firm is of no moment—the substance, time, and documents are the same.  The notary's employment status does not imbue the presentation with fraud, and it certainly does not justify the extraordinary remedy of shutting down the Receivership Defendants' businesses before an adjudication on the merits of Plaintiffs' claims— businesses which, until a temporary receiver was appointed weeks ago, served tens of thousands of consumers, many of whom are now in limbo on debts with high interest rates, litigation, and worse.

153.    For these reasons and the reasons in Section III(A), above, these factors do not support the appointment or continuation of a temporary receiver.

## IV.    AN ASSET FREEZE IS BOTH UNNECESSARY AND COUNTERPRODUCTIVE.

154.    An asset freeze is appropriate only where there is a significant risk of the dissipation of defendants' assets during the litigation.  *Fed. Trade Commission v. Campbell Capital LLC*, 18-CV-1163-LJV-MJR, 2018 WL 5781458, at *4 (W.D.N.Y. Oct. 24, 2018), *report and recommendation adopted sub nom. Fed. Trade Comm'n v. Campbell Capital LLC*, 18-CV-1163, 2018 WL 5776354 (W.D.N.Y. Oct. 25, 2018) (asset freeze justified by operation "permeated" by fraud and prior dissipation of assets).

155.    In addition to assessing the risk of dissipation of assets, "[i]n determining whether to order a freeze of assets, the court must [also] weigh 'the disadvantages and possible deleterious effect of a freeze' against 'the considerations indicating the need for such relief.'"  *S.E.C. v. Zubkis*,

97 CIV. 8086 (JGK), 2003 WL 22118978, at *5 (S.D.N.Y. Sept. 11, 2003) (cited case abrogated on other grounds); *see also Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. Of Va., L.L.C.*, 144 F.Supp.2d 241, 250 n.10 (S.D.N.Y. 2001) (finding that the "most prudent course" was to order money deposited with court rather than asset freeze because of defendant's actions to make judgments uncollectible).

156.    For the reasons discussed in Sections III(C) and II, above, a continued asset freeze is not warranted in this case.  The risk of Asset Freeze Defendants dissipating assets is low and any profits Defendants accumulate during the pendency of the litigation will be available for any possible judgment on the merits.  *See Unifund SAL*, 910 F.2d at 1042 (noting that Defendants are "as anxious to see their account balances grow as is the" plaintiff); *F.T.C. v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311, 326 (S.D.N.Y. 2001) (profits derived from the defendant's business "will be accumulated during the pendency of the litigation to help create a fund from which the corporate defendants may pay any monetary liability.").

## DECISION

Based on the foregoing, the decision of the Court is as follows:

1.  The Plaintiffs' motion for preliminary injunction, with temporary receiver and asset freeze is DENIED.

Dated: February 6, 2024                    */s/ Ronald S. Safer*
                                            Ronald S. Safer (*pro hac vice*)
                                            Rodney Perry (*pro hac vice*)
                                            Matthew Kennison (*pro hac vice*)
                                            Maegan McAdam
                                            RILEY SAFER HOLMES & CANCILA LLP
                                            70 W. Madison Street, Suite 2900
                                            Chicago, Illinois 60602
                                            Tel: (312) 471-8700
                                            rsafer@rshc-law.com

rperry@rshc-law.com
mkennison@rshc-law.com
mmcadam@rshc-law.com

*Attorneys for Individual Defendant Ryan Sasson and Relief Defendants Daniel Blumkin and Ian Behar*

Terrence M. Connors, Esq.
CONNORS LLP
1000 Liberty Building
Buffalo, New York 14202
(716) 852-5533
tmc@connorsllp.com

*Attorneys for Intervenor Law Firms*

Dennis C. Vacco, Esq.
Scott S. Allen, Jr., Esq.
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 853-5100
dvacco@lippes.com
sallen@lippes.com

*Attorneys for StratFS, LLC (f/k/a Strategic Financial Solutions, LLC) and subsidiary entities*

Rodney O. Personius, Esq.
PERSONIUS MELBR LLP
2100 Main Place Tower
350 Main Street
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com

*Attorneys for Defendant*
*JASON BLUST*
*and Relief Defendants*
*JACLYN BLUST*
*THE BLUST FAMILY IRREVOCABLE*
*TRUST*

*LIT DEF STRATEGIES, LLC*
*RELIALIT, LLC*