**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | |
| Plaintiffs, | |
| v. | CASE NO.  24-CV-40-EAW-MJR |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al. | |
| Defendants, and | |
| DANIEL BLUMKIN, et al., | |
| Relief Defendants. | |

**PLAINTIFFS' POST-HEARING MEMORANDUM OF LAW**

Plaintiffs CFPB and seven states seek to enjoin Defendants from collecting exorbitant and unlawful fees from cash-strapped consumers. Plaintiffs allege, among other claims, that Defendants have collected advance and non-proportional fees from their telemarketing customers for a debt relief service, in violation of the federal Telemarketing Sales Rule (TSR).

The TSR applies to telemarketing and contains an exemption for sales made face-to-face where there is "direct, substantive and personal contact between the consumer and the seller." (DX114). There is no dispute that Defendants sell their debt-relief program by telemarketing, nor that Defendants take both advance fees and fees that are not proportional to the amount of debt settled. The issue before the Court is simple: whether Defendants' use of independent-contractor notaries—through third-party notary companies—to read a scripted presentation to the consumer constitutes an "face-to-face sales presentation" by the "seller" that would allow Defendants to continue taking advance and non-proportional fees.[1] The answer to this question, based on the evidence presented by both sides and on well-recognized legal principles, is a resounding no. A preliminary injunction is therefore needed to halt Defendants' illegal conduct.

## I.      RELIEF REQUESTED

Plaintiffs request that this Court issue a preliminary injunction continuing the relief in the TRO granted by United States District Judge Lawrence J. Vilardo on January 11, 2024. The TRO enjoined Defendants from engaging in the illegal practices highlighted in the complaint, froze Defendants' assets, and appointed a temporary receiver with immediate access to the Receivership Defendants'[2] businesses. A continuation of these measures is necessary to prevent

---

[1] Notably, a finding that the notaries are acting as a "seller" would necessarily entail liability for the notaries.

[2] The Receivership Defendants include SFS and its Client Services Subsidiaries (collectively the Corporate Defendants) along with the following Relief Defendants: Twist Financial, LLC, Duke

ongoing harm to consumers and to protect against the risk of asset dissipation, thereby preserving this Court's ability to provide effective final relief for consumers who have paid over $100 million in unlawful advance fees.

Relief against all of the Defendants is appropriate. SFS and the Client Services Subsidiaries operate as a common enterprise as they maintain officers and employees in common, operate under common control, share offices, and commingle funds. And as described below, SFS and the Client Services Subsidiaries carry out many, if not most, of the functions of the intervenor law firms (Intervenors),[3] thereby violating the TSR and providing substantial assistance to those firms' violations of the TSR.

## II.    LEGAL STANDARDS

### A. Preliminary Injunction Standard.

In the Second Circuit, when a governmental agency seeks a statutorily authorized injunction it is required to show: (1) a reasonable likelihood that the wrong will be repeated; (2) a likelihood of success on the merits; and (3) that the injunction is in the public interest. *See City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010).

First, it is "the 'well-established rule' that agencies 'need not prove irreparable injury or the inadequacy of other remedies as required in private litigation suits, but only that there is a

---

Enterprises, LLC, Blaise Investments, LLC, the Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee, Lit Def Strategies, LLC, and Relialit, LLC.

[3] The Intervenors include Anchor Law Firm, Bedrock Legal Group, Boulder Legal Group, Canyon Legal Group, Chinn Legal Group, Clear Creek Legal, Great Lakes Law Firm, Greenstone Legal Group, Gustafson Consumer Law Group, Hailstone Legal Group, Hallock & Associates, Hallock & Associates, Harbor Legal Group, Heartland Legal Group, Leigh Legal Group, Level One Law, Meadowbrook Legal Group, Michel Law, Monarch Legal Group, Moore Legal Group, Newport Legal Group, Northstar Legal Group, Option 1 Legal, Pioneer Law Firm, Rockwell Legal Group, Royal Legal Group, Slate Legal Group, Spring Legal Group, Stonepoint Legal Group, The Law Firm of Derek Williams, The Law Office of Melissa Michel, and Whitestone Legal Group.

reasonable likelihood that the wrong will be repeated.'" *Id*. at 121 (quoting *CFTC v. British Am. Commodity Options Corp*., 560 F.2d 135, 141 (2d Cir. 1977)). This is because "[w]here Congress expressly provides for Government enforcement of a statute by way of injunction, and the Government has satisfied the statutory conditions of the statute, irreparable harm to the public is presumed." *FTC v. Verity Int'l, Ltd*., 124 F. Supp. 2d 193, 199 (S.D.N.Y. 2000); *see also United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972) ("The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained."). Where the defendant "maintain[s] that its activities are legitimate" and "persisted" in the conduct "right up to the day of the hearing . . . the likelihood of future violations, if not restrained, is clear." *British Am. Commodity*, 560 F.2d at 142.

Second, governmental agencies are required to show a likelihood of success on the merits, meaning that "the probability of . . . prevailing is better than fifty percent." *N.Y. by James v. Rescue*, No. 23-cv-4832, 2023 WL 8472727, at *9 (S.D.N.Y. Dec. 7, 2023) (citation omitted).

Third, on the balance of equities, "if the Government establishes that the defendant is violating [the law], the balance of hardships likely weighs in the Government's favor." *United States v. Narco Freedom, Inc*., 95 F. Supp. 3d 747, 755 (S.D.N.Y. 2015).

Plaintiffs bear the burden of meeting this standard. However, as discussed below, because it is uncontested that Plaintiffs have established that Defendants take advance and unlawful fees in violation of the TSR, the principal remaining question is whether Defendants have proven that their conduct qualifies under the face-to-face exemption, an issue on which Defendants have the burden of proof.

**B. The "Face-to-Face Exemption" to the TSR**

To prevail in this action, Plaintiffs need to show that : (i) Defendants are sellers or

telemarketers subject to the TSR; and (ii) they "request or receive payment of any fee or consideration for any debt relief service" either (a) before renegotiating, settling, reducing, or otherwise altering the terms of at least one debt ("advance fees"), or (b) that is not tethered to the percentage of the enrolled debt that is settled or reduced, or the amount saved ("unlawful fees"), as a result of individual debt settlements. 16 C.F.R. § 310.4(a)(5)(i).

To the extent Plaintiffs make such a showing, Defendants are liable unless they meet the so-called "face-to-face exemption." 16 C.F.R. § 310.6(b)(3). The exemption is discussed below.

## III. PLAINTIFFS HAVE MET THE BURDEN FOR A PRELIMINARY INJUNCTION

### A. Plaintiffs have demonstrated a likelihood of success on the merits.

#### 1. It is undisputed that Defendants and Intervenors are "telemarketers" and "sellers" as defined by the TSR.

Pursuant to a campaign to induce consumers to purchase its services, SFS[4] initiates and receives interstate telephone calls to and from consumers. (*See, e.g.*, PX37-40.) During these calls, SFS offers to renegotiate, settle, or alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors. Thus, SFS is a "telemarketer" offering "debt-relief services" under the TSR.[5] In addition, SFS and Intervenors provide, offer to provide, or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, SFS and Intervenors are also "sellers" offering "debt-relief services" under the TSR.[6]

#### 2. It is undisputed that Defendants take advance fees in connection with debt relief services.

The evidence clearly demonstrates that SFS charges monthly fees *immediately* after consumers enroll in the debt-relief service, regardless of whether and when a consumer's

---

[4] "SFS" includes all Corporate Defendants, as set out in the TRO. Dkt. 12 at 4-5 (Definition D).
[5] *Id.* § 310.2(o), (ff).
[6] *Id.* § 310.2(o), (dd).

enrolled debts are reduced, in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A), (B). The timing of such fees is beyond dispute. Mary Lynn Clark, President of SFS, testified that SFS takes advance fees under its "law firm model." (2/1/24 Tr. 249:4-6.) Indeed, the contract documents that the consumers signed to enroll in Defendants' debt-relief services explicitly state that consumers will be charged a service fee immediately after enrolling in the program, and this fee is based on a percentage of the total amount of debt enrolled. (*See, e.g.*, PX10 at 31-32 (dated "6/26/2020" with first payment draft date of "7/5/2020").) Consumers are also charged additional fixed fees, such as a retainer fee, a legal administration fee, and a banking fee, on a recurring basis beginning immediately upon entering the debt-services program, regardless of whether any settlements have been reached. (*See, e.g.*, PX9 at 48 (Global Holdings statement for Christopher Elkins dated 10/19/2019).)

Sample payment data from RAM for approximately 34,000 consumers enrolled in SFS's program between approximately January 1, 2016 and March 15, 2021, shows that this subset of consumers collectively paid over $104,000,000 in fees (including service fees, retainer fees, and legal admin fees) to Defendants and Intervenors *before* any debt-relief payments were made to creditors. (PX73, Cohen Dec. ¶¶ 27-28.)[7]

### 3. Defendants' sale of debt-relief services does not meet the requirements of the face-to-face exemption.

Defendants cannot escape liability based by way of the TSR's exemption for situations involving a "face-to-face sales ... presentation by the seller" prior to the completion of the sale. 16 C.F.R. § 310.6(b)(3). As the party invoking an affirmative defense to liability, Defendants

---

[7] This figure does *not* account for fees collected from consumers with accounts managed by GCS, nor does it include fees that were collected after a consumer had made at least one debt-relief payment to a creditor.

bear the burden to show that they likely qualify for this exemption. They fail to meet that burden. First, the brief and non-substantive meetings between consumers and third-party notaries—the purpose of which is to witness the consumer's signature in order to complete a transaction, not to convince the consumer to enter into that transaction in the first place—do not involve a "sales presentation." Second, the meeting does not involve any presentation "by the seller" because the independent contractor notaries are not employees or agents of Defendants or Intervenors, nor do they themselves qualify as "sellers" under the TSR.

> **a.** **Defendants bear the burden of proof for the face-to face exemption.**

To avoid TSR liability, Defendants contend that their debt-relief services are exempt from the TSR's prohibitions on advance fees and unlawful fees under 16 C.F.R. § 310.6(b)(3). The TSR exempts transactions where the sale of services is not completed until after a face-to-face sales presentation by the seller. *Id.* An exemption is an affirmative defense, and Defendants therefore bear the burden of proof as to this issue. *United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 937 (C.D. Ill. 2014) (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an exemption)). Here, the provision is an exemption in the plain language of the regulation: 16 C.F.R. § 310.6 is titled "Exemptions." Further, the regulation states "[t]he following acts or practices are **exempt** from this Rule: . . . [t]elephone calls in which the sale of goods or services . . . is not completed . . . until after a face-to-face sales or donation presentation by the seller." 16 C.F.R. § 310.6(b)(3) (emphasis added).

> **b.** **Defendants do not provide consumers with a substantive "face-to-face sales ... presentation"**

The face-to-face exemption applies only where there has been a "face-to-face sales … presentation." *Id.* But the meetings between consumers and the mobile notaries were not for the

purpose of providing a sales presentation; they were held to witness consumer signatures in order to formalize an agreement the consumer had already been induced to enter into via telemarketing. Not surprisingly, the meetings were non-substantive and brief. Consistent with the ordinary meaning of "sales presentation," one of the few courts to look at the face-to-face exemption noted that the "adjective 'sales' means only … that the presentation must be 'relat[ed] to[ ] or used in selling.'" *FTC v. Nudge, LLC*, No. 2:19-cv-867, 2022 WL 2132695, at *38 (D. Utah June 14, 2022). Defendants' own witness, Mr. Thurman, agreed, testifying that to qualify for the exemption, "it has to be a sales presentation." (2/1/24 Tr. 54:24-55:2).

Consumers, notaries, and SFS employees all understood that the purpose of a notary is to verify the identity of the consumer executing the documents, not to sell the product. One notary company, Sunshine Signing, specifically instructed its notaries "[y]ou are not there to sell them this product." (PX62 at 2.) The notaries uniformly acknowledge that the presentation is not a sales presentation, and they are not selling anything to the consumer. (*See, e.g.*, Accardo, 2/2/24 Tr. 360:11-25; Brooks-Ward, 2/2/24 Tr. 319:13-18.)

Defendants' own notary witness, Heather Lyon, testified that she was in no way giving a sales presentation when she conducted approximately 200 signings for Defendants and Intervenors. She testified that "I do not do or suggest anything to sway the client to do – make any decision." (*Id*. 125:2-7.) Indeed, Ms. Lyon agreed that "the decision about enrolling in this program was made before you arrive in their home," testifying that "It is, and it was" made before the in-person meeting. (*Id*. 126:18-25.)

Similarly, notary Ruth Brooks-Ward testified "I have never sold debt settlement services. I wouldn't even know how to go about selling debt settlement services." (2/2/24 Tr. 319:9-18.) Ms. Brooks-Ward explained that "as a notary, I can not explain to them anything about the

7

documents. I can only witness their signature of their initials." (*Id*. 320:4-6.) If there were any questions, she instructed the signer to contact their representative with Defendants. (*Id*. 320:15-18.) Ms. Brooks-Ward explained that she was not trained to be a salesperson. (*Id*. 327:10-13.)

When asked if he would describe his meeting with a consumer as a "sales presentation," notary John Accardo testified, "Absolutely not. … I'm not selling anything." (*Id*. 360:13-17.) Accardo would identify himself to consumers as a notary, not as a representative of a law firm, and testified that he would not read the provided script to consumers. (*Id*. 375:13-24.) )

Rather than sales, the notaries, consumers, and SFS employees viewed the meetings to be for the purpose of witnessing the consumers' signatures. (*See, e.g.*, Lyon, 2/1/24 Tr. 127:1-15 ("I'm there for execution of the document, and to verify their identity and understanding in doing so.").) Consumers have the same understanding. (Elkins, 2/2/24 Tr. at 393:4-7 (stating notary said the meeting "is a formality" and "[y]ou've already spoken with Canyon. We just want to sign the contract, and we'll be about our business."); Barsch, 2/2/24 Tr. at 509:23 – 510:3 ("[H]e stood on the other side of the table while we reviewed everything he pointed out, where we needed to initial or sign, and that was really it.").) SFS employees understood themselves to be the experts in the product, and they routinely directed consumers to come to them with questions, and discouraged them from asking the notaries. (*See, e.g.*, PX23 (transcript of call from Sunshine Signing to SFS); PX25 (same); PX27 (same); PX34 (same); PX36 (same).) At least two of Defendants' notary companies—Sunshine Signing Connection and NotaryGo—specifically instructed the notaries handling signings for Defendants not to answer questions from the consumers. (PX18, Willis (Sunshine) Dep. 32:24-33:18; PX15, Winkelman (NotaryGO) Dep. 25:9-13, 26:21-23.)

That the meetings between consumers and notaries were not "sales presentations" is further shown by the fact that they were often brief—sometimes less than 10 minutes, to get through about 50 pages of documents—and lacking in substance. Based solely on the documents Defendants submitted that purport to show the length of the meetings, the average in-person meeting across the Intervenor firms lasted approximately 38 minutes, and 1,670 of 3,152 notary meetings—*i.e.* the majority of meetings—lasted 30 minutes or less. (K. Davis Declaration ¶¶ 11-18.)  Some meetings were shockingly short, with lengths of under 10 minutes, and one meeting lasted only 5 minutes. (*Id*. ¶ 17.) Consumers received an approximately 40-page retainer agreement and the notaries were told to read aloud an 8-page script and review a 20-page PowerPoint with the consumer. Even setting aside the time for initialing, signing, and notarizing, it is essentially impossible for this all to have occurred in a half hour. Three New York OAG investigators read the retainer agreement and it took each of them over a half hour just to read the retainer . (K. Davis Dec. ¶¶ 5-8; Terranova Dec. ¶¶ 5-8; Lewis Dec. ¶¶ 5-8.) In this time frame it is not possible that consumers received a substantive face-to-face sales *presentation*.

Defendants did not implement any meaningful audit or quality control measures to ensure that the notary meetings actually occurred as planned. Consumers consistently testified that the meetings with notaries were brief. (*See, e.g.*, Barsch, 2/2/24 Tr. 506:10-13 ("It was maybe 15, 20 minutes..."); PX11 at 2 (describing the meeting as a "flyby presentation").) Defendants' own exhibits confirm that the meetings frequently last less than 30 minutes, and sometimes as little as 15 minutes. (*See, e.g.*, DX-029 (15 min); DX-042 (18 min); DX-036 (20 min); DX-041 (25 min); DX-039 (25 min).) Sometimes, there was no face-to-face meeting at all, and Defendants simply began taking fees from the consumer. (*See, e.g.*, PX12 at 100, Decl. of Ronald Davis, Sr.; DX97 at 1, Decl. of Annie Cole; DX110 at 1, Decl. of Dante Servin.)

Nor were the notaries in a position to give a meaningful "sales presentation." Not all notaries were trained on the product, and the trainings were cursory for those that were. Ms. Munyon testified that the "training was rolled out to us almost three years ago" (2/1/24 Tr. 29:10-12), so any clients enrolled prior to that date were, by Defendants' own admission, enrolled by a notary with no training whatsoever. Defendants still have many consumers in their four-year debt relief program paying illegal advance fees who had their meeting with a notary over three years ago.

Both notaries and consumers testified that the notaries did not read aloud the scripts or the presentation to the consumers. (PX52, Roberts Dep. 35:2-4; Brooks-Ward, 2/2/24 Tr. 327 (explaining that she did not read the script).) Those that did, typically read verbatim from the presentation. (*See, e.g.*, PX46 at 23, Shirkey Dep. (explaining that the notary would read the script, which was a PowerPoint, and the consumer would initial each page of the presentation); PX51 at 10, Howell Dep. (stating that notary read from the script while showing the page of the presentation indicated by the script); PX-018.) At least one notary company, NotaryGO, did not train the notaries about debt relief prior to notaries meeting with consumers. (PX15, Stone Dep. 20:24-21:3.) Nor did Defendants train notaries from NotaryGO. (*Id.* at 21:4-7.)

And to the extent any notaries were trained at all, the training was superficial.  Although there is a PowerPoint and a video posted on the website, there is no enforceable requirement that any notary actually review these materials. All the notaries must do is pass a multiple-choice quiz in which the questions never change, and the quiz taker is given the correct answers the first time they fail. (Munyon, 2/1/24 Tr. 44:11-17.) Indeed, notaries are able to retake the quiz as many times as needed to pass. (PX18, Willis (Sunshine Signing 30(B)(6)) Dep. 56:13-24;

Munyon, 2/1/24 Tr. 28:19-23.) Moreover, Ms. Munyon admitted that some notaries took the training only *after* completing a signing. (*Id*. 45:6-13.)

This lack of quality control in the training of notaries extends to the notary meetings themselves. For example, notary company NPN has no way to confirm that the notary is actually providing a substantive sales presentation in any given meeting. (Munyon, 2/1/24 Tr. 48:16-25.) Similarly, SFS does not conduct any physical verification that notaries actually provide substantive sales presentations to consumers. The only step SFS takes to check whether the sales presentations occurred is reviewing the documents signed at a meeting. (PX19, Sasson Dep. 156:21-157:13.) This meant that regardless of any training the notaries receive, Defendants had no way to identify or cure defects in how the meetings actually happened.

While Defendants claim that the payment processors audited the face-to-face meeting process, deposition testimony from RAM revealed that RAM fundamentally misunderstood the meetings between notaries and consumers. No one from RAM ever witnessed a face-to-face meeting. (RAM 30(b)(6) Dep. 36:1-8.) RAM believed that the meetings were conducted by attorneys, not by notaries. (*Id*. 36:9-16.) RAM relied solely on Intervenors' submissions when evaluating the sufficiency of the face-to-face meetings. (*Id*. 45:7-12.) Similarly, payment processor Global Client Solutions (GCS) relied solely on Defendants' proclamations and Intervenors' submissions when evaluating the sufficiency of the meetings. (*See* PX19, Sasson Dep. 145:3-18; PX 72.) Indeed, even when relying solely on Intervenors' submissions, GCS found the presentation lacking and required Intervenors to remove their instructions to consumers to stop paying their creditors. (PX 72.) Despite Global's requirement, Defendants and Intervenors did not do so. (*See* PX19, Sasson Dep. 148:16-149:11.)

### c. Consumers did not receive a "face-to-face sales ... presentation by the seller."

The face-to-face exemption also requires that the face-to-face sales presentation be performed "by the seller." 16 C.F.R. § 310.6(b)(3). But the independent contractor notaries Defendants used for the meetings with consumers were not employees or even agents of Defendants or Intervenors, did not understand themselves to be selling debt-relief services, and do not qualify as "sellers" under the TSR. Thus, even if the meetings between notaries and consumers had involved anything that could qualify as a "sales presentation" (it didn't), the face-to-face exemption still would not apply because the presentation was not given "by the seller."

Guidance for the TSR promulgated by the Federal Trade Commission explains that:

> The key to the face-to-face exemption is the direct, substantive and personal contact between the consumer and seller. The goal of the TSR is to protect consumers against deceptive or abusive practices that can arise when a consumer has no direct contact with an invisible and anonymous seller other than the telephone sales call. A face-to-face meeting provides the consumer with more information about — and direct contact with — the seller, and helps limit potential problems the TSR is designed to remedy.

(DX115 at 17.) Meetings with a random mobile notary, who is contracted through a third party and never speaks to or communicates with anyone at an Intervenor firm, does not accomplish this goal. The notaries shred their documents ten days after the meeting, per their instructions from SFS. (Brooks-Ward, 2/2/24 Tr. 349:3-6.) The notary will never see or speak to the consumer again. The consumer is left with only an email and phone number that both route to the SFS Defendants; the welcome packet contains no contact information for Intervenors or any lawyer. (PX19, Sasson Dep. 87:2-88:20.) Meeting a random mobile notary fails to "provide the consumer with more information about – and more direct contact with – the seller," and therefore fails to comply with the face-to-face exemption.

### i.   It is undisputed that mobile notaries are independent contractors and not employees of Defendants or Intervenors.

It is undisputed that none of the Intervenors or Defendants send their own employees to conduct in-person signings. This work is all done by mobile notaries who contract with a notary service that then in turn contracts with one of the Intervenor firms. Ms. Munyon testified that notaries sent out by NPN "are independent contractors of NPN," who go out "on behalf of the law firm as a contractor of NPN." (2/1/24 Tr. 42:3-12.) Jeff Stone, president of NotaryGo, confirmed that the notaries he assigned to signing jobs were independent contractors. (PX13, Stone Dep. at 15). And Defendant's witness, Mr. Thurman, also testified that the notaries are independent contractors. (2/1/24 Tr. 83:21-22.)

### ii.   Mobile Notaries are not agents of Defendants or Intervenors

Defendants claim that the notaries are the agents of the law firms for purposes of conducting a sales presentation. As the party asserting the existence of an agency relationship, Defendants bear the burden of proof on this issue. *Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc*., No. 3:17-cv-00135, 2023 U.S. Dist. LEXIS 117634, at *11 (D. Conn. July 10, 2023) (collecting cases).

"At common law, an agency relationship is created when . . . the agent manifests assent," to the creation of the agency relationship. *Kirschner v. Robeco Cap. Growth Funds - Robeco BP US Premium Equities (In re Nine W. LBO Sec. Litig.)*, 87 F.4th 130, 148 (2d Cir. 2023). Even if the notaries were limited purpose agents—something Defendants have failed to establish—**none** of the notaries understood selling or giving a *sales presentation* to be part of their duties. They are clearly not agents for that purpose. The fact that the notaries performed a service for Defendants—by reading a script and obtaining signatures—does not make them an agent. Indeed:

> The fact that one party performs a service that facilitates the other's business does not constitute such a manifestation. For example, by clearing securities trades for another firm, a securities broker does not make a manifestation to customers of the firm sending the orders that it acts with the authority of the clearing firm.

*Restatement (Third) of Agency*, § 3.03. Similarly, "setting standards in an agreement for acceptable service quality does not of itself create a right of control." *Id.* § 1.01.

The undisputed facts in the record demonstrate that the mobile notaries were not Defendants' or Intervenors' agents. The notaries find an assignment on Snapdocs or a similar online platform, they are sent documents, they print them, and have them signed. (*See, e.g.*, Winkelman (NotaryGO) Dep. 17:6-9, 17:14-18.) Defendants do not control when the notaries work or what assignments they take. (Lyon, 2/1/24 Tr. 118:10-11 ("I negotiate my rate and take on the assignment"); Accardo, 2/2/24 Tr. 356:7-8 ("if you're available at that time and that date, and you would accept it, or you know, reject it").)

*FTC v. Neora LLC* is instructive. *See* No. 3:20-cv-01979-M, 2023 U.S. Dist. LEXIS 217429, at *54 (N.D. Tex. Sep. 28, 2023). There the court held that defendant did "not control and has no right to control how much [the alleged agents] work (if at all), how much they spend on their pursuit of the business opportunity, or how they exercise their choice of work activities." *Id.* And "although [defendant] provides guidelines and instructions to [the alleged agents] on how to conduct their businesses in a legally compliant manner, it cannot control whether, how, or when [the alleged agents] choose to conduct business, weighing against a finding of control." *Id.* Further the court found no apparent authority because the alleged agents had "considerable flexibility in conducting their businesses, if they choose to do so at all." *Id.* at 57.

Here, Defendants allege that the notaries are agents of Intervenors, but none of the notaries have ever spoken to anyone at the Intervenor firms. Indeed, it is SFS that arranges the

notary appointments, and it is SFS employees and sales managers who determine whether to send a notary out at all. (Loft, 2/2/24 Tr. 552:15-20.)  The notaries are sent a packet of material purportedly drafted by or for Intervenors, but all interactions are with "Financial Consultants," the name SFS gives its salespersons. (Clark, 2/1/24 Tr. 244:17-25, 246:17-20.) Once the notary assignment is sent out to the notary, neither Intervenors nor Defendants have any further power to control the notary. The notary meets the customer and the customer either signs the documents or does not. "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Restatement (Third) of Agency*, § 1.01. The notaries are clearly the latter.

Defendants' own witnesses as to the role of the notary gut Defendants' claim that the notaries are sales agents. Ms. Munyon, the owner of National Paralegal & Notary (NPN), agreed that "the notary's job was not to sell debt relief services discussed in the contracts during the signings with consumers" because "[t]he notary representatives do not act as sales agent." (2/1/24 Tr. 42:14-18.) It bears repeating that less than an hour after Ms. Munyon testified, Defendants' next witness, Mr. Thurman, testified that "it has to be a sales presentation" for the face-to-face exemption to apply. (2/1/24 Tr. 54:24-55:2.)

### iii. The notaries are not themselves "sellers" under the TSR and do not consider themselves responsible for the content of the presentations or for "selling" the program.

Under the TSR, "**Seller** means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd) (emphasis in original). The record is undisputed that the mobile notaries do not provide or offer to provide debt-relief services. Nor do the notaries receive consideration from consumers who become clients of

Intervenors. By definition, they are not "sellers." Instead, the notaries are paid by Defendants or Intervenors for reading a script and then obtaining the customer's signatures and initials on a lengthy stack of documents. To the extent the notaries are selling anything, they are selling their notarial services to Defendants.

As explained above, none of the notaries who testified—including Defendants' own witnesses—understood their role to be that of a salesperson. The notaries know nothing about the telemarketing sales process that has occurred between Defendants and the debt-relief customers. They are sent out to simply read a script. If the consumer asks any substantive questions, the notaries are instructed to put the consumer back in touch with the telemarketing representative in one of the SFS Defendants' call centers who will answer their questions.

The TSR imposes liability on a seller even then they "arrange for others to provide goods or services." Defendants make the facially ridiculous argument that the mobile notaries arrange for Defendants to provide debt relief services. But to "fit the TSR's description of . . . one who 'arranges for others to provide' a product," the arranging party must "maintain[] control over the product, scripts and quality assurance." *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009). Here it is undisputed that the notaries provide neither goods nor services to the consumers, nor do they control the debt relief services or scripts provided by Defendants or Intervenors. They simply provide notary signing services to Defendants.

### iv.   The Affidavits of Compliance do not make the notary a "seller"

Defendants make much of the "Affidavit of Compliance" that certain notaries were required to sign in order to be paid. But this document is not an affidavit, nor could it be because the notary could not administer an oath to themselves and verify their own identity. Nor does the document satisfy the declaration requirements of 28 U.S.C. § 1746.

16

Ironically, Defendants attempt to argue around the "no agency" clause in their own contracts with notary companies by arguing that the parties "cannot by ukase," or mere edict, negate an agency relationship where one exists. (Def's Pre-Hrg. Br. at 5) (citation omitted). But the converse is also true: Defendants cannot simply foist a title upon a notary in a document—stuck in a stack of over 50 pages of other documents—that claims that the notary is a "Representative, Member, Partner, Employee or Independent Contractor of said firm." (DX26.) No member, partner, or employee of Intervenors signed this document, it was used solely by independent notaries who were paid to obtain signatures. Other versions claim that the notary is "an attorney or paralegal affiliated with and under contract to" the law firm. (DX32.) Both statements are patently untrue. The notary is under contract with a third-party notary agency not a law firm, is not an attorney or paralegal of the law firm, and has no affiliation with the law firm other than that they were paid a nominal fee to get documents signed. Where one "was not described or given the function of an agent, partner or coventurer" applying such a title by "ukase earns small jurisprudential profit." *Ne. Gen. Corp. v. Wellington Advert.*, 82 N.Y.2d 158, 162 (N.Y. Ct. App. 1993).

Defendants and Intervenors also misrepresent the "Affidavit of Compliance" to the notaries. The signing instructions given to notaries include a sample "Face-to-Face Presentation Acknowledgement" which says that the notary will be asked to simply state that they are a "representative." (DX123.) But as discussed above, the actual forms notaries are required to sign to get paid went far beyond this statement. Indeed, upon reading the form more closely, multiple notaries expressed regret at having signed the document. (Brooks-Ward, 2/2/24 Tr. 347:19-348:7 (testifying that it "was just a grave mistake on my part for even signing that document"); Accardo, 2/2/24 Tr. 384:10-11 ("[I]f I had read this document more carefully, I probably wouldn't have signed it.").)

In any event, the Affidavit of Compliance requires a "face-to-face meeting" but states that "subjects were reviewed with the Client in writing. . . ." (DX26 at 1.) Nowhere does this document establish that a face-to-face sales presentation was conducted.

### v.    Finding notaries are "sellers" would expose notaries to liability

A finding that the notaries are "sellers" would have profound implications for the notaries. Defendants argue that "[a]s the hired agents of the law firms, the notaries – together with the law firms that hire them – are 'collectively one 'seller whose goods or services are being offered'' under the TSR." (ECF No. 118-1, Def's Pre-Hrg. Br. at 11) (quoting *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020)). If Defendants are correct, the notaries have statutory liability for Defendants' actions. Indeed, Defendants' witness, Michael Thurman, said that the notaries are "probably" liable for violations of the TSR. (2/1/24 Tr. 87:17-23.)

Defendants' theory, if accepted, would mean that Defendants' telemarketers could defraud and deceive consumers and the notaries—who are paid a nominal fee to go out and collect signatures—would be liable because, according to Defendants, they are "collectively one seller." Notaries like Ms. Brooks-Ward and Mr. Accardo would be sellers with statutory liability for Defendants' conduct. This argument is as preposterous at it sounds. Indeed, a finding that the notaries are "sellers" under the TSR would lead to unintended and illogical consequences. The 3,000 plus notaries working for NPN alone would now be liable under the TSR and other laws, including for their "principals'" deceptive practices.

Indeed, Defendants' own witnesses as to the role of the notary contradict Defendants' characterization. Ms. Munyon agreed that "the notary's job was not to sell debt relief services discussed in the contracts during the signings with consumers" because "[t]he notary representatives do not act as sales agent." (2/1/24 Tr. 42:14-18.) She also agreed that her contract

with notaries provides that the notaries are "in no way liable or responsible for anything associated with the client's debt settlement program." (2/1/24 Tr. 43:6-16; DX8.)

But if the Court accepts Defendants' claims that the notary is the law firm's agent and that the notary and the law firm are "collectively one seller" (Def's Pre-Hrg. Br. at 11), then Ms. Munyon's contract is wrong; both claims cannot be correct. And in any event, nowhere in the contract with the notaries does it suggest that the notaries will be a seller or a sales representative or that they will deliver a sales presentation. (DX8.)[8]

### d.  The rote attorney "welcome call" does not cure deficiencies

Intervenors hire attorneys whose job is to simply read a "welcome call" script to consumers after they meet with the notary. (Gustafson, 2/1/24 Tr. 141.) One attorney who was employed doing these calls, Michael Duhn, described the process: he worked in a co-working space, received no training, and was provided with no information about the company other than a script he was supposed to read. (PX53.) He would read the script, which took seven minutes, and that was his first and typically only interaction with the consumer. (*Id.*) Even after this welcome call, there is no guarantee that the consumer will have contact information for an attorney. (PX19, Sasson Dep. 88:21-89:19.)

---

[8] A finding that the mobile notaries are "sellers" would create other uncertainty for them as well. Laws governing notaries in a number of states prohibit non-attorney notaries from discussing or explaining a document or transaction, including legal documents. *See, e.g.*, CRS § 24-21-504(1); CRS § 24-21-502(6) (Colorado); Del. Code Ann. tit. 29, § 4336 (West 2023); 5 ILCS 312/6-104(k) (Illinois); N.C. Gen. Stat. Sect. 10B-20(k)(2023). Likewise, notaries in many states are prohibited from having a beneficial or financial interest in the transaction. *See, e.g.* Colo. Rev. Stat. Ann. § 24-21-504 (West 2018) ; Minn. Stat. § 358.54, subd. 2 ; N.C. Gen. Stat. Sect. 10B-20(c)(2023); Wis. Stat. section 140.04(2). Plaintiffs' position is that notaries are *not* sellers of debt-relief services and thus are *not* interested parties to the transaction. But a finding that they are sellers might put them in legal jeopardy.

In response to questions from the Court, Mr. Gustafson contended that if a notary meeting was "deficient" the "welcome call" could "make up for that." (2/1/24 Tr. 210:20-211:8.) The problem with this position is that it finds no support in the TSR whatsoever and FTC Guidance is directly to the contrary, providing that: "Webcam conversations and other online interactions don't count as face-to-face meetings. To qualify for the exemption, face-to-face sales presentations have to be in person." (DX114 at 2.) Where a substantive in-person sales presentation has not occurred, a phone call will not permit Defendants to qualify for the face-to-face exemption.

### e.   Accepting Defendants' arguments would effectively gut the TSR.

The FTC made clear in guidance issued to the debt-relief industry that hiring third parties for perfunctory meetings with consumers will not meet the face-to-face exemption. (PX76 ("You can't get around the Rule by hiring representatives just to hold cursory pre-enrollment meetings with potential customers.").) Accepting Defendants' arguments requires ignoring this guidance and would allow routine evasion of the TSR. A Utah district court recently rejected an interpretation of the face-to-face exemption that would have made the exemption "elephantine" by exempting all future transactions. *FTC v. Nudge LLC*, No. 2:19-cv-867, 2022 WL 2132695, at *38 (D. Utah June 14, 2022). Defendants' interpretation here would have the same effect. Were the ministerial task of notarizing a contract allowed to satisfy the face-to-face exemption, the exception would swallow the rule to the detriment of consumers across the country.

### B.   The Balance of Equities Favors Plaintiffs.

Allowing Defendants to continue to collect unlawful advance fees in violation the TSR during the course of litigation will cause irreparable harm to consumers. Although Plaintiffs do not need to make a showing of irreparable injury in cases like this one, it is clear that allowing Defendants to continue collecting advance and non-proportional fees will cause consumers

irreparable harm. Even if Defendants were correct that they help some consumers, they admit that their services actually *hurt* 44% of their customers. (Regan, 2/1/24 Tr. 271:19-20.) This harm could easily be avoided by enjoining Defendants from taking advance and unlawful fees.

### 1.  Consumers are harmed by the collection of unlawful fees as a matter of law.

Ultimately, whether Defendants help some consumers some of the time is meaningless if their conduct violates the law. Defendants did not call a single consumer to testify at the preliminary injunction hearing. Defendants instead offered written statements from twenty-six consumers. (DX88–DX113.) None of these statements discuss the notary meeting or the face-to-face exemption at issue in this proceeding. And in any event, "[t]he existence of some satisfied customers does not constitute a defense . . ." *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 530 (S.D.N.Y. 2000).[9]

Defendants operate a portion of their business that appears not to take advance fees, their contingent fee debt relief services offered by Atlas Debt Relief. They do so in the states where, for one reason or another, they cannot operate their advance-fee "attorney model" of debt relief services. Plaintiffs have not sued Atlas and have not objected to this business line being operated subject to sufficient oversight to ensure that the fees are still calculated and charged proportionally. The reason Defendants prefer their advance-fee model is not difficult to discern: it provides more profits for Defendants.

---

[9] None of these documents qualify as declarations pursuant to 28 U.S.C. § 1746 and they are not properly sworn subject to the penalties of perjury. "Numerous courts, however, have found the certification provided for in Section 1-109 does not meet the requirements of § 1746." *Smith v. Frazier*, No. 20 CV 2868, 2022 U.S. Dist. LEXIS 202209, at *5 (N.D. Ill. Nov. 4, 2022); *Johnke v. Espinal-Quiroz*, No. 14-cv-6992, 2017 U.S. Dist. LEXIS 134769, at *5 (N.D. Ill. Aug. 23, 2017) (same)  Moreover, these statements all relate only to Monarch.

Many states have regulations regarding debt relief services, including caps on fees and other consumer protections. These statutes exempt attorneys because attorneys are supposed to be fiduciaries putting the best interest of their clients first.[10] This is another reason why Defendants have adopted their advance-fee model: they wrongly believe it will allow them to avoid debt-settlement regulations and hide behind their purported fiduciary duty while operating a program that is contrary to their clients' best interests.

Defendants' unlawful advance-fee model transfers millions of dollars from consumers who are already mired in debt to line the pockets of Defendants Sasson and Blust and the Relief Defendants, who have obtained tens of millions of dollars from this scheme.

### 2. Participation in Defendants' debt-settlement program leaves most consumers economically worse-off

By Defendants' own admission, at least 44% of their customers lost money by hiring Defendants for debt relief services. Defendants and Intervenors—which purport to be operated by attorneys bound by ethical and fiduciary duties to their clients—continue to enroll new clients knowing that it is, at best, a coinflip as to whether they will help them or merely plunge them even deeper into debt.

And that is under the overly optimistic view presented by Defendants' own expert. The Receiver's Report, based on a data from SFS as a whole rather than a single Intervenor firm, reflects that a startling **70%** of customers do not graduate from Defendants' law firm debt relief program. (Rec. Rep. at 36.) Consumers who do not graduate—i.e., 70% of Defendants' customers—have lost an aggregate amount of **$64,682,005.19**; that is, they paid that much more

---

[10] *See, e.g.*, C.R.S. § 5-19-202(8)(A) (regulating "debt-management services" but excluding "[l]egal services provided in an attorney-client relationship by an attorney licensed to practice law in this state"); Del. Code Ann. tit. 6 § 2402A.(9)(A) (same); 225 ILCS 429 (same); Minn. Stat. section 332B.02, subd. 13a (same).

in fees than they obtained in debt reduction. (ECF No. 131-1, Sup. Rec. Rep. at 3.) For most consumers already drowning in debt, Defendants do not represent a lifeline but instead a push farther under water.[11]

And for many consumers, bankruptcy would be a far better option that Defendants' unlawful advance-fee debt relief services. Defendants' witness told the Court that a consumer can lose their home in a bankruptcy, but most states and the federal Bankruptcy Code have a homestead exemption that makes it more likely that debtors will be able to keep their homes. *See, e.g.*, 11 U.S.C. § 522(d)(1). Ms. Hughes testified that clients will chose not to file for bankruptcy because "some have pensions, some have 401ks." (2/1/24 Tr. 222:10-16.) Ms. Hughes failed to note that pensions, 401ks, and other common retirement plans are generally exempt under the bankruptcy code and debtors may keep the assets in such accounts whether filing for Chapter 7 or Chapter 13. 11 U.S.C. § 522(d)(10)(E) and (12). Moreover, New York regulates Budget Planners, which are required to be licensed non-profits, that provide similar services to Defendants for a nominal fee.

### 3. The potential loss of jobs funded by illegally collected fees is not a legally cognizable hardship.

Neither the TRO granted by Judge Vilardo nor the preliminary injunction now sought by Plaintiffs seeks to shut down Defendants in toto. The principal injunctive relief Plaintiffs seek is to require Defendants to comply with the TSR and to stop taking advance and non-proportional fees in violation of the law. "There is no oppressive hardship in requiring Defendants to comply

---

[11] Defendants, through their expert Greg Regan, present a false dichotomy: they claim that debt-burdened consumers can either choose Defendants' and Intervenors' advance-fee debt relief services, or they can keep making minimum credit card payments for decades. (Def's Dem. 1 at 13-14.) Yet, many of the myriad contingent-fee debt-relief service providers currently operating would be a better option than Defendants' advance-fee model. Consumers also can call their creditors to work out a payment plan on their own. *See, e.g.* (Barsch, 2/4/24 Tr. 523:18-19.)

with the law." *FTC v. Am. Fin. Benefits Ctr.*, No. C 18-00806 SBA, 2018 U.S. Dist. LEXIS 244903, at *36 (N.D. Cal. Nov. 29, 2018) (citation omitted).

Plaintiffs do not dispute that Defendants' contingent-fee model business could in theory be operated lawfully. To the extent that Defendants bemoan that they cannot operate their business profitably without collecting illegal advance fees, they have no one to blame but themselves. The Receiver's Report notes that "StratFS Leadership is well aware of the regulatory risk inherent in the Law Firm Debt Relief Model. . ." (Rec. Rep. at 42.) Where "business activities have succeeded through . . . unlawful [activities, the business] has been acting at its own peril. A court of equity is under no duty 'to protect illegitimate profits or advance business which is conducted [illegally].'" *British Am. Commodity*, 560 F.2d at 143 (citation omitted).

Granting the preliminary injunction that Plaintiffs seek would not be an inequitable result. "Because the injunction will preclude only harmful, illegal behavior, the public equities supporting the proposed injunctive relief outweigh any burden imposed by such relief on Defendants." *FTC v. Universal Premium Servs., Inc.*, No. 06-cv-0849, 2006 U.S. Dist. LEXIS 111121, at *24 (C.D. Cal. Mar. 14, 2006).

### 4. Alleged impacts on Intervenors do not change the calculus

Intervenors claim that an injunction against the SFS Defendants has caused them and their clients harm. The fact that Intervenors are entirely dependent upon SFS further underscores what have Plaintiffs have alleged all along: the law firms are a Potemkin Village. While the firms may hire appearance attorneys to represent some consumers in court, that does not change the fact that they are a veneer over SFS, which does essentially all the actual debt relief work.

Multiple witnesses made clear that Intervenors are controlled by Jason Blust. (Munyon, 2/1/24 Tr. 14:21 (stating Blust is contact at law firm); Gustafson, 2/1/24 Tr. 197:15-17 (stating Blust is business manager).) The Receiver's Report notes that Mr. Blust failed to cooperate and

rather than turning over operations of Receivership Defendant Lit Def Strategies LLC (Lit Def) to the Receiver, Blust shuttered the doors, preventing the Receiver from mitigating consumer harm. (Rec. Rep. 10-11.) And while Defendants now claim that the company shut down because there was no money to pay employees, that is simply false given that Lit Def maintains a sizable balance in its bank account. Granting a preliminary injunction will cause no further harm since Blust already made the unilateral decision to shut down Lit Def.

### 5. Equity should not permit Defendants to operate an unlawful business

Defendants take umbrage at the fact that the Receiver's Report addressed Defendants' misrepresentations about the extent of attorney involvement and concerns regarding the unauthorized practice of law. The unauthorized practice of law concerns present in Defendants' business are staggering and are entirely consistent with Plaintiffs' allegations that the vast majority of debt-relief services in Defendants' program are provided by Defendants, not Intervenors.[12] Defendants cannot be allowed to resume business as usual.

## CONCLUSION

The evidence in the record strongly supports the conclusion that Defendants are telemarketers who take advance fees in connection with debt-relief services, and they do so without providing consumers with a face-to-face sales presentation. Plaintiffs are thus likely to succeed on their TSR claims against Defendants. The balance of the equities, and in particular the grave consumer harm caused by Defendants' advance fee business, also favors enjoining Defendants from taking exorbitant and illegal advance fees.

---

[12] Both the President and the CEO testified that SFS has no written policy regarding attorney supervision and no written policy regarding attorney-client privilege (2/1/24 Tr. 247:9-18 (Clark); PX19, Sasson Dep. 25:13-19). No one at SFS had any knowledge of the existence of any attorneys actually supervising anyone. (PX19, Sasson Dep. 45:8-49:8.) Indeed, Defendants have in the past represented SFS to be a law firm in hiring ads. (PX19, Sasson Dep. 23:22-24:16 (discussing prior add for that referred to SFS as "a consumer advocacy law firm").)

Dated: February 6, 2024

Respectfully submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau

ERIC HALPERIN
Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

TIMOTHY M. BELSAN
Assistant Litigation Deputy

  /s/ Vanessa Buchko
Vanessa Buchko
E-mail: vanessa.buchko@cfpb.gov
Phone: 202-435-9593
Monika Moore
E-mail: monika.moore@cfpb.gov
Phone: 202-360-5905
Joseph Sanders
E-mail: joseph.sanders@cfpb.gov
Phone: 202-377-9846
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

LETITIA JAMES
Attorney General of the State of New York

  /s/ Christopher L. Boyd
Christopher L. Boyd
Genevieve S. Rados
Assistant Attorneys General
350 Main Street, Suite 300A
Buffalo, NY 14202
Phone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov

PHILIP J. WEISER
Attorney General
State of Colorado

  /s/ Kevin J. Burns
Kevin J. Burns, CO Reg. No. 44527

*Pro hac vice*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

KATHLEEN JENNINGS
Attorney General State of Delaware

*/s/ Marion M. Quirk*
Marion M. Quirk (*pro hac vice*)
Director of Consumer Protection
Kevin D. Levitsky (*pro hac vice*
forthcoming, if required)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov
Kevin.Levitsky@delaware.gov

KWAME RAOUL
Attorney General
State of Illinois

By: */s/ Greg Grzeskiewicz*
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau
*Pro hac vice application forthcoming, if
required*
Daniel Edelstein, Supervising Attorney,
Consumer Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Amanda E. Bacoyanis, Assistant Attorney
General, Consumer Fraud Bureau
*Pro hac vice*
Matthew Davies, Assistant Attorney
General,
Consumer Fraud Bureau
*Pro hac vice*

Office of the Illinois Attorney General
115 S. LaSalle St., 26th Floor
Chicago, Illinois 60603
312-814-2218
Greg.Grzeskiewicz@ilag.gov
Daniel.Edelstein@ilag.gov
Amanda.Bacoyanis@ilag.gov
Matthew.Davies@ilag.gov

KEITH ELLISON
Attorney General of Minnesota

*/s/ Evan Romanoff*
Evan Romanoff
Assistant Attorney General (*pro hac vice*)
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

JOSHUA H. STEIN
Attorney General of North Carolina

 */s/  M. Lynne Weaver*
M. Lynne Weaver (*pro hac vice*)
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Lewis W. Beilin*
Assistant Attorney General (*pro hac vice*)
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
beilinlw@doj.state.wi.us