## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | CASE NO. 1:24cv00040 EAW-MJR |
| Plaintiffs, | |
| v. | PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al. | |
| Defendants, and | |
| DANIEL BLUMKIN, et al., | |
| Relief Defendants. | |

On January 10, 2024, Plaintiffs Consumer Financial Protection Bureau ("the Bureau"), the People of the State of New York, by Letitia James, Attorney General of the State of New York, the State of Colorado *ex rel.* Philip J. Weiser, Attorney General, the State of Delaware *ex rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney General Keith Ellison, the State of North Carolina *ex rel.* Joshua H. Stein, Attorney General, and the State of Wisconsin (collectively, Plaintiffs), filed a Complaint alleging Defendants have been and are violating the the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310 which implements the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6102(c), 6105(d);; New York Executive Law § 63(12); New York General Business Law (GBL) Article 22-A; Wis. Stat. § 218.02; and Wis. Admin. Code § DFI-Bkg ch. 73. Dkt. 1.

On January 10, Plaintiffs also filed a Motion for a TRO, which the Honorable Lawrence J. Vilardo issued on January 11, 2024. On February 1-2, 2024, the Court held an evidentiary hearing on Plaintiffs' motion for a preliminary injunction. (Dkts. 129, 130.) In accordance with the Court's order (Dkt. 133), Plaintiffs now submit their proposed Findings of Fact and Conclusion of Law.

## Findings of Fact

### I.    Background

1.    Defendant Strategic Family, Inc. is the parent company of other corporate defendants, including: StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Versara Lending, LLC; and Strategic Consulting, LLC (collectively, SFS).

2.     SFS's principal offices are located at 115 Lawrence Bell Drive, Buffalo, NY 14221 and 711 Third Avenue, 6th Floor, New York, NY 10017.

3.    SFS offers debt-relief services to consumers where consumers pay monthly fees.

4.    SFS owns and controls various Client Services Subsidiaries including Defendants Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services,

LLC (now known as CS 3 PAAS Services, LLC), and Whitestone Client Services, LLC (collectively, Client Services Subsidiaries).

5.      These Client Services Subsidiaries work with law firms that purport to provide debt-relief services to consumers who pay multiple types of fees, including a retainer fee, administrative fee, and service fee, in exchange for these services.

6.      A number of these law firms have filed a motion to intervene in this case including Anchor Law Firm, Bedrock Legal Group, Boulder Legal Group, Canyon Legal Group, Chinn Legal Group, Clear Creek Legal, Great Lakes Law Firm, Greenstone Legal Group, Gustafson Consumer Law Group, Hailstone Legal Group, Hallock & Associates, Hallock & Associates, Harbor Legal Group, Heartland Legal Group, Leigh Legal Group, Level One Law, Meadowbrook Legal Group, Michel Law, Monarch Legal Group, Moore Legal Group, Newport Legal Group, Northstar Legal Group, Option 1 Legal, Pioneer Law Firm, Rockwell Legal Group, Royal Legal Group, Slate Legal Group, Spring Legal Group, Stonepoint Legal Group, The Law Firm of Derek Williams, The Law Office of Melissa Michel, and Whitestone Legal Group (Intervenor Law Firms, or Intervenors), and the Court has allowed these firms to participate in the evidentiary hearing. Dkt. 50.

7.      SFS was founded by Individual Defendant Ryan Sasson, among others. Sasson currently serves as SFS's Chief Executive Officer.

8.      Individual Defendant Jason Blust performs various supervisory tasks for the Intervenors including hiring attorneys, addressing consumer complaints, and serving as a liaison between Intervenors and SFS.

II.     **Defendants engage in telemarketing with respect to the sale of debt relief services.**

9.      SFS markets its debt-relief services to consumers through mechanisms such as direct mail solicitations and websites. PX-020, Clark Dep. 43:8-25; PX-019, Sason Dep. 60:4-25; PX-012 at 57, Sheehan Decl.; *id.* at 100, Davis Decl.; *id.* at 111-12, Nickles Decl.; *id.* at 122, Sundlov Decl.; *id.* at 128, Rodriguez Decl.; PX-009 at 1-2, Elkins Decl.

10.     Consumers that are interested in the debt-relief services call a phone number listed on the mailer or website and reach an SFS representative, who is not an attorney, and this representative gathers additional information from the consumer. PX-012 at 57, Sheehan Decl.; *id.* at 100, Davis Decl.; *id.* at 111-12, Nickles Decl.; *id.* at 122, Sundlov Decl.; *id.* at 128, Rodriguez Dec.; PX-009 at 1-2, Elkins Dec.; PX-002 at 57-78 (FS Qualifying Script and Objection Handles).

11.     The sales representatives go over the structure of the program and the paperwork by phone. PX-009 at 1-2, Elkins Decl.; PX-010 at 1-2, Griffiths Decl.; PX-012 at 57, Sheehan Decl.; *id.* at 111-12, Nickles Decl.; *id.* at 122, Sundlov Decl.; *id.* at 128, Rodrigez Decl.; PX-022, Phone Call between Andrew Terrell (SFS) and Scott Graves (consumer); PX-029 at 11, Phone Call between Andrew Terrell (SFS) and Barbara Jordan (consumer) (reviewing the documents page by page over the phone in advance of the meeting with the notary).

12.     For those who enroll in the program, the decision concerning whether to enroll in the debt-relief service is made by phone. PX-010 at 2, Griffiths Dec. (after speaking with the SFS representative on the phone, "we trusted that they were trying to help us, so my husband and I agreed to sign up for the program"); PX-011 at 1, Salva Dec. ("[a]fter [the SFS representative] described the program, I expressed a desire to sign up and the [SFS representative] employee scheduled an appointment for us to meet with a notary and sign the required documents"); PX-

012 at 2, Edgar Dec. ("After I agreed to enroll in the program over the phone, I met with a notary in person at my home to sign paperwork"); *id.* at 57, Sheehan Dec. ("Based on the information we received from the person on the phone, we thought the [debt-relief] program would help us, so we decided to sign up"); *id.* at 100, Davis Dec. ("based on what [the SFS representative] told me, I agreed over the phone to enroll in [the] debt settlement program"); *id.* at 112 (after speaking with an SFS sales representative, "I agreed to enroll in the program, and someone came to my house the next day so that I could sign the contract"); Testimony of Heather Lyon, 2/1/24 Tr. 126:18-25 ("Q. And is it your sense that the decision about enrolling in this program was made before you arrive in their home? A. It was. Q. It was? A. It was. It is, and it was.").

13.     If the consumer agrees to enroll in the debt-relief program, then the SFS representative arranges for one of the Intervenors to provide debt-relief services for the consumer, in exchange for the consumer paying fees for these debt-relief services. PX-028 at 13-15, Phone Call between SFS employee and Vincent Ovegu (consumer) (informing consumer that SFS picks the law firm and consumer will pay fees for the program including a service fee, retainer fee, and administrative costs); PX-029, Phone Call between Andrew Terrell (SFS) and Barbara Jordan (consumer) (discussing that consumer was entering a program by Carolina Legal to negotiate the consumer's debt with her creditors and explaining the fees that consumer would pay for services).

14.     Consumers are also charged additional fixed fees, such as a retainer fee, a legal administration fee, and a banking fee, on a recurring basis beginning immediately upon entering the debt-services program, regardless of whether any settlements have been reached. PX-012 at 33, Sabil Decl. "Payment Schedule"; at 81 "Payment Schedule" (Payment schedule showing that beginning in month 1 of the program, the retainer fee, service cost, and legal amin fee is charged

to the consumer); PX-09, Elkins Decl. "Global Holdings Account Activity Statement" (statement showing retainer fee, service cost, and legal admin fee being taken from consumer's bank account the same month he enrolled in Defendants' program.).

15.     At the conclusion of the notary meeting, the customer is left with a "Welcome Packet" that contains only an email and phone number, which both route to the SFS Defendants, and does not contain contact information for the Intervenors or any lawyer. PX-019, Sasson Dep. 87:2-88:20.

**III**. **Defendants take advance fees in connection with debt relief services.**

16.     Defendants operate two different debt settlement models: a "direct-to-consumer model" and a "law firm model." Testimony of Mary Lynn Clark, 2/1/24 Tr. 248:11-25.

17.     According to the Preliminary Report by the Temporary Receiver, the law firm model is "the primary business" of Defendants and "account[s] for roughly 80% of [their] revenues," while the direct-to-consumer model "accounts for 16% of revenue." PX-076 (Dkt. 115-1) at 15.

18.     Consumers enrolled in the "direct-to-consumer model" do not pay a fee until Defendants actually settle a debt for them. Testimony of Mary Lynn Clark, 2/1/24 Tr. 248:21 - 249:3.

19.     For the "law firm model," however, Defendants and Intervenors take advance fees. *Id*. 249:4-6 ("Q. On the law firm model, however, advanced fees are taken, correct. A. That is correct."); *see also* Testimony of Greg Regan, 2/1/24 Tr. 292:25 – 293:1 ("Q. Does Monarch Legal Group take advanced fees? A. That's my understanding."); PX-076 (Dkt. 115-1) at 15 (stating that Defendants' law firm model "offers debt relief services with upfront fees").

6

20.     According to M.L. Clark, President of SFS, Defendants' schedule of fees "heavily" front-loads the advance fees for the advance fee law-firm model. Testimony of Mary Lynn Clark, 2/1/24 Tr. 249:7-9 ("Q. In fact, in the schedule of fees, those fees are heavily front loaded, correct? A. Correct."); *see also* PX-049, Riley Dep. 71:3-17 ("Q. And does that contract reflect that the fees are typically front loaded? . . . A. Yes. Q. Yes they're front loaded? A. It says in the contract, yes.").

21.     Indeed, the paperwork provided to consumers includes a "payment schedule" that indicates the consumer will begin paying a "retainer fee," "service costs," "legal administrative fee," and "banking fees" within a few weeks of enrolling in Defendants' debt-relief program. *See, e.g.*, PX-010 at 31-32 (dated "6/26/2020" with first payment draft date of "7/5/2020"); PX-011 at 48 (paperwork signed "5/13/2020" with first payment draft date of "5/28/2020"); PX-012 at 33-34 (paperwork signed "6/18/21" with first payment draft date of "7/15/2021"); PX-012 at 70 (paperwork signed "2/1/19" with first payment draft date of "2/15/2019").

22.     The contracts consumers sign to enroll in the debt settlement program likewise acknowledge the foregoing fees. *See, e.g.*, PX-010 at 17-18; PX-011 at 35-36; PX-009 at 44-45; PX-012 at 11-12, 70-71; PX-067 at 24-25; DX-019 at 7-9; DX-021 at 7-9; DX-025 at 7-8; DX-117 at 7-8.

23.     The contracts expressly provide that the "fees are charged on a flat fee basis according to the Payment Schedule." *See, e.g.*, PX-009 at 44; PX-010 at 17; PX-011 at 35; PX-009 at 44; PX-012 at 11, 70; PX-067 at 24; DX-019 at 7; DX-021 at 7; DX-025 at 7; DX-117 at 7.

24.     Other documents provided to consumers acknowledge that Defendants are unlikely to obtain settlements for consumers for at least six months. *See, e.g.*, PX-007 at 8; PX-012 at 19; PX-065 at 7.

25.     For example, the PowerPoint slides created by Defendants and Intervenors expressly state that the first settlement "typically" occurs "6-9 months after enrolling in the program." *See, e.g.*, PX-007 at 8 ("Clients typically see their first settlement in 6-9 months after enrolling in the program."); DX-116 at 8 (same); DX-122 at 8 (same); PX-012 at 19 ("[A] typical client sees their first settlement in the first 7 to 9 months.").

26.     Consumer testimony confirms that fees are taken before any debts have been settled. Testimony of Anne Barsch, 2/2/24 Tr. 203:23-25 – 204:1-3, 23-24 (testifying that fees were assessed approximately one week after enrolling in the program); Testimony of Christopher Elkins, 2/2/24 Tr. 416:3-417:24.

27.     Both Defendants and Intervenors take or receive some portion of the fees collected from consumers. *See, e.g.*, PX-019, Sasson Dep. 38:3 – 39:24.

28.     According to Ryan Sasson, CEO of SFS, 100% of the "service fee" collected from a consumer by a law firm is "paid" to SFS's client service subsidiary. PX-019, Sasson Dep. 38:3 – 39:24 ("Strategic receives – the client service company receives the entirety of that service fee.").

29.     A sample of payment data from Reliant Account Management (RAM) for approximately 34,000 consumers enrolled in SFS's program between approximately January 1, 2016 and March 15, 2021, shows that this subset of consumers collectively paid over $104,000,000 in fees to Defendants and Intervenors (including service fees, retainer fees, and

legal administrative fees) *before* any debt-relief payments were made to creditors. PX-073,

Cohen Decl. ¶ 28.

### III.   Defendants' sale of debt relief services does not meet the requirements of the TSR's face-to-face exemption.

   A. Notaries do not function as salespersons when meeting with consumers

30.      SFS's "financial consultants" (i.e. salespersons) schedule the consumer meetings

with the notaries. Testimony of Mary Lynn Clark, 2/1/24 Tr. 244:17-22 ("Are you -- you're

familiar with employees with the title financial consultant, correct? A. That is correct. Q. And

that's the title given to salesmen and salespersons that work for Strategic, correct? A. That is

correct."), 246:17-20 ("Q. And those salespersons, when someone is eventually interested in

pursuing that settlement, they schedule a meeting with a notary company, correct? A. That is

correct.").

31.      Another team at SFS then takes into consideration the cost of using a particular

notary and how much SFS would make in fees from the debts the consumer meeting with that

notary would enroll. Testimony of Stephen Loft, 2/2/24 Tr. 553:24-554:6 ("Q. So there was a

calculation made of how much is the notary cost versus how much is Strategic going to make in

fees from this customer as to whether or not the notary would go out? A. Right. Q. And that

decision was made by Strategic? A. Right.").

32.      The team would then decide whether to approve the use of that particular notary

to meet with that particular consumer, and whether to continue with enrolling the consumer.

Testimony of Stephen Loft, 2/2/24 Tr. 552:10-553:8 ("my job to say like this person didn't enroll

enough debt with us, we're not going to make enough money. And I would ask the sales

department on that, and I would e-mail it's not enough for us to make a profit off of, we're not

going to continue on with this client.").

33.     SFS would provide the notary company any documents that Intervenors wanted to put before the consumer for the consumer to sign, and the notary company would make those documents available for the notary who would be meeting with the consumer. PX 015, Winkelman (NotaryGO) Dep. 17:6-9 ("Q. So Strategic would provide any documents it wanted presented or given or to be signed by the customer to you, correct? A. Correct."), 17:14-18 ("Q. And then you would send that, forward that on to the notary? A. It would be uploaded to our secure system. The notary would download those documents from their profile.").

34.     According to the notary companies through which Defendants schedule notaries to meet in-person with consumers, the notaries' job is not to sell debt-relief services when conducting such meetings for Defendants or Intervenors. Testimony of Lisa Munyon (NPN), 2/1/24 Tr. 42:14-18 ("Q. ... Ms. Munyon, the notary's job was not to sell debt relief services discussed in the contracts during the signings with consumers; is that correct? A. That is correct. The notary representatives do not act as sales agent."); PX-15, Winkelman (NotaryGO 30(b)(6)) Dep. 24:21-23 ("Q. When the notaries are there, to your understanding, were they making a sales presentation? A.  No."), 25:3-7 ("Q. …[A]re they encouraging the customer to sign the documents? A. No."); PX-018, Willis (Sunshine 30(b)(6)) Dep. 26:16-18 ("Q. Were the notaries there to sell the debt relief product to the consumer? A. No."); PX-062 (Instructions to Notary) at 2 ("You are not there to sell them this product.").

35.     Notaries who previously performed work for Defendants or Intervenors testified that they were not selling debt relief services to consumers. Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 319:13-18 ("Q. Do you sell debt settlement services? A. I do not sell debt settlement services. Q. Have you ever sold debt settlement services? A. I have never sold debt settlement services. I wouldn't even know how to go about selling debt settlement services."); Testimony of

John Accardo, 2/2/24 Tr. 360:17-19 ("I'm not selling anything. I, you know, tell the people that I'm there with -- that I'm not there to sell them anything or make them do anything."); PX-070, Fountain Dep. 14:5-6 ("Q. Do you sell debt relief services? A. No."); PX-046, Shirkey Dep. 30:14-16 ("Q. ... What, if any services, were you selling to the consumers that you met with? A. None. Nothing."); PX-045, Tsui Dep. 32:7-16 ("I do not sell them the content of the documents, I do not market them, and I'm specifically told that I do not provide any legal, financial, or accounting advice. I do not represent the credit card company. I do not represent the law firm. I do not represent the requester. My job is simply a notary. I get the documents, and I show them the instructions, and they initial and they sign, and I notarize. That's what I do. I don't do anything else.").

36.     Lisa Munyon, the principal of National Paralegal & Notary, a notary company that receives a significant amount of work from the Intervenors, testified that her company's "Signing Terms, Requirements, & Instructions" for notaries provides that the notaries are "in no way liable or responsible for anything associated with the client's debt settlement program." Testimony of Lisa Munyon, 2/1/24 Tr. 43:6-16; DX-008 at 1 ("I also understand that I am in no way liable or responsible for anything associated with the client's debt settlement program").

B.  Notaries' meetings with consumers are not substantive sales "presentations"'

37.     The notary meetings are formulaic, brief, and non-substantive. *See, e.g.*, PX-011 at 2, Salva Decl. (describing the notary process as a "flyby presentation" and that the notary seemed "like a robot going through a script"); PX-012 at 58, Sheehan Decl. ("[the notary] did not go over the contract with us; he simply showed my husband and me where on the contract to sign"); PX-012 at 112, Nickles Decl. ("When I signed the contract, [the notary] and I did not

discuss anything substantive related to the program."); K. Davis Decl. at 2-3 (noting that out of 3,152 presentations, 1,670 lasted 30 minutes or less).

38.     One notary testified that he did not consider his meetings with the consumers to be sales presentations because he was "not selling anything." Testimony of John Accardo, 2/2/24 Tr. 360:11-25 ("Q. Okay. I'm going to speak a phrase, Mr. Accardo, and then ask you what you think of it. Face-to-face sales presentation, would you describe this as a sales presentation? A. Absolutely not. Q. Why not? A. I'm not selling anything. I, you know, tell the people that I'm there with -- that I'm not there to sell them anything or make them do anything.").

39.     When meeting with consumers, the notaries do not say anything about the debt settlement program beyond the words contained in their script or presentation, if they were provided one. Testimony of Heather Lyon, 2/1/24 Tr. 127:1-15 ("Q. Okay. So the process of the visit with the client in the home, it's really about getting the signatures on the paperwork, yes? A. It's my notarization position is to get the signatures on the paperwork if they are in agreement to what they're reading, and the program itself… I'm there for execution of the document, and to verify their identity and understanding in doing so. I am not there to discuss the program."); Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 319:9-12 ("Q. And do you tell them anything about settlement beyond what's in those pages? A. I tell them nothing; that is not my responsibility").

   i.   *Defendants' and Intervenors' training for notaries is not always required prior to an in-person meeting, and Intervenors had little to no involvement in the training.*

40.     Prior to a notary's in-person meeting with a consumer, Defendants and Intervenors offer notaries limited training concerning the process to notarize the consumer enrollments documents, which sometimes consists of reviewing a script and PowerPoint presentation to use during the signing, watching a video, and taking a quiz. Testimony of Lisa

Munyon, 2/1/24 Tr. 25:21 – 26:7, 29:10-12 ("training was rolled out to us almost three years ago."); PX15, Stone Dep. 21:4-7 (Defendants did not train notaries from NotaryGO).

41.     That training, however, is not always required or may occur *after* the in-person meeting has already been completed. Testimony of Lisa Munyon, 2/1/24 Tr. 45:6-13 ("Q. Have the notaries ever been required to take a training after the signings, before NPN would pay them? A. There have been instances where we've had notaries that have worked for us in the past, and we had signing on short notice, and because they had done work for us in the past, we excused them from doing the training. And then if they wanted to continue to do work for us after, they would be required to complete the training, yes."); PX15, Stone Dep. 20:24-21:3 (NotaryGO, did not train the notaries about debt relief prior to notaries meeting with consumers).

42.     At least one notary company testified that the Defendants did not require extra training for notaries. PX-015, Stone (NotaryGO 30(b)(6)) Dep. 47:3-12, 18:20-24.

43.     Even where notaries take the training quiz and fail, they can retake the quiz as many times as needed to obtain a passing score. Testimony of Lisa Munyon, 2/1/24 Tr. 28:19-23 ("Q. And what happens if an NPN notary fails this quiz? A. They are instructed to repeat the quiz, to continue to take it. They can reenter it, review the materials, look over the questions that they missed, and then take the quiz again."); PX-018, Willis (Sunshine Signing 30(b)(6)) Dep. 56:18-24 ("Q. Do you know what would happen if the notaries failed the test that was associated with that training? A. They could retake it. Q. Did they retake it as many times as they wanted to pass the test? A. They could.").

44.     Indeed, the notaries who failed the quiz the first time could technically write down the correct answers after failing and retake the quiz using the answers they obtained. Testimony of Lisa Munyon, 2/1/24 Tr. 44:13-17 ("Q. So the notary could write down the correct

answers after they failed the quiz the first time, retake the quiz, and pass using the answers that they -- that they got after they failed the quiz the first time? A. Technically, yes.").

45. The Intervenor lawyers had little to no involvement in the testing process for notaries. PX-054, Agosto Dep. 150:7-12 (Q. How is that tracked? How do you know which notaries have done what in terms of training? A. I don't keep track of that, to be honest. I believe that the Client Services might do, Hedgewick might also have that because they are the ones who facilitate the training."), 157:13-23 ("Q. So Hedgewick provides the training materials to the notary companies and then the notary companies conduct the training -- A. Exactly. Q. -- and tell Hedgewick who passed; is that right? A. No, they don't have to tell Hedgewick who passed. They -- they just put it on their roster of Strategic Consulting. You know, I don't know how it goes, okay?"); PX-055, Horvath Dep. 43:9-15 ("Q. So how many questions are on the quiz? A. I haven't taken the quiz. Q. Have you ever seen the quiz? A. I haven't."), 49:16-18 ("Q. What records do you keep [on whether or not notaries have completed the training]? A. I believe the notary company maintains the quiz results. I'm not sure that we have them.").

46.    The Intervenor lawyers had little to no involvement in the notaries' training. PX-055, Horvath Dep. 42:16-20 ("Q. Do you know who created the training? A. I believe we had compliance counsel for that. Q. What's that person's name? A. I don't have that at the moment."), 43:9-15 ("Q. So how many questions are on the quiz? A. I haven't taken the quiz. Q. Have you ever seen the quiz? A. I have not."), 49:16-18 ("Q. What records do you keep [on whether or not notaries have completed the training]? A. I believe the notary company maintains the quiz results. I'm not sure that we have them.").

47. Outside consultants (including Hedgewick, a company owned by Jason Blust) draft the scripts and tests for the notaries; Intervenor attorneys have little to no involvement. PX-055, Horvath Dep. 42:16-20 ("Q. Do you know who created the training? A. I believe we had compliance counsel for that. Q. What's that person's name? A. I don't have that at the moment."); PX-054, Agosto Dep. 149:7-9 ("Q. Earlier you mentioned the training that the notaries receive. Who created that training? A. Hedgewick."), 123:15-17 (Q. If you have a concern about a notary or about a notary company, who do you call? A. I will call Hedgewick. . . ").

48. James Agosto, one of the Intervenor law firm lawyers, testified that Hedgewick has the final say on changes to the scripts. PX-054, Agosto Dep. 131:23-132:1 (discussing what happens when he suggests edits to a script) (A. I mean, just because I say so doesn't mean that [Hedgewick has] to do it, or maybe I think it's a good idea, but they say, you know, don't do that because we believe that it will be this problem and this.")

    *ii.   Notaries often do not read any documents or script to consumers and hand the documents to consumers to review and sign.*

49.    Regardless of any guidance the notaries received, the notaries often did not read the script to the consumer or make any type of presentation to the consumer. PX-012 at 148, Hulbert Decl. ("Most of the time I did not read the script to the consumer. Instead, I provided the printed script to the consumer to read. I was told that my job was not to answers questions"); PX-052; Roberts Dep. 35:2-4 (stating that sometimes the notary would give the consumer the script to read for themselves before signing the documents); Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 327:25 ("I don't use a script."), 329:23-25 ("Q. Now, you said you don't follow the script. Did I understand you correctly? A. You did understand me correctly."); Testimony of John Accardo, 2/2/24 Tr. 358-59 ("Q. And do you read [the documents] to them? A. No, I let them

review the documents. Q. Do you turn the pages one after another for them? A. No, they review them on their own."), 375:13-24 ("Q. And did you read from the script? A. No, I did not.").

50.     Other notaries simply read the script or presentation verbatim to the consumers, and some were told that they could not deviate from the script. PX-046 at 23, Shirkey Dep.. (explaining that the notary would read the script, which was a PowerPoint, and the consumer would initial each page of the presentation); PX-051 at 10, Howell Dep. (stating that notary read from the script while showing the page of the presentation indicated by the script); PX-018, Willis (Sunshine 30(b)(6)) Dep. 34:19-35:5 (stating that the notaries were supposed to read from a script that got initialed by the consumer); ); PX-062 at 2 ("You will literally just be reading verbatim the script provided."); Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 332:7-8 (I don't have to understand what I'm reading. I just have to read it.").

   iv.   *Notaries cannot or do not answer questions from consumers during the in-person meeting.*

51.     At least two notary companies utilized by Defendants—Sunshine Signing Connection and NotaryGo—specifically instructed the notaries not to answer questions from the consumers during in-person meetings related to Defendants' debt-relief services. PX-018, Willis (Sunshine) Dep. 32:24-33:18 ("Q. When you -- when Sunshine provided instructions to the notaries, did Sunshine tell the notaries that they were not permitted to answer questions from the consumers? A. Correct."); PX-15, Winkelman (NotaryGO) Dep. 25:9-13 ("Q. If the consumers had questions about the terms of the contract, what were they supposed to do, do you know? A. We would ask them to contact their rep, whomever they were dealing with at Strategic."), 26:21-23 ("They were there to simply have the document signed. So any follow-up or concern or questions would go directly to Strategic.").

52.     Individual notaries testified that they were instructed not to answer questions from consumers during the in-person meeting. *See, e.g.*, Testimony of Heather Lyon, 2/1/24 Tr. 124:23 – 125:1 ("If -- if they had a question about it, they would definitely -- I would revert them back to the representative from the law firm . . .  As I'm instructed to do."); PX-012 at 149, Hulbert Decl. ("I was told that if the consumer had any questions to have them call the representative of the debt relief company"); PX-046, Shirkey Dep. 25:8-10 ("[I]f I was asked a question, I was to call number X because I am not authorized to answer any questions."); PX-048, Soule Dep. 13:19-25 ("Q. Okay. What were you told when you received the assignment? What were you instructed to do? A. ... If there were questions, there was a number to call.").

53.     If a consumer had questions or concerns, the notary companies or the individual notaries regularly directed the consumer to call the SFS sales representative. Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 340-41 ("Q. If you get questions from the potential client … you said you would have them call the representative; is that right? A. Exactly. Q. If you get questions that you can answer based on the presentation materials that you have in front of you, don't you answer those questions? A. I do not. That is not my job."), 320:15-18 ("Q. And if someone has a question, says to you, Ms. Brooks-Ward, what is this all about in a contract, what do you do with that? A. They have to call their representative."); Testimony of John Accardo, 2/2/24 Tr. 359:17-18 ("if something … needs to be clarified, I have them call whoever they work with at the company."); Testimony of Heather Lyon, 2/1/24 Tr. 120:21-25 ("I let the signor know right away that I don't manage this program. I don't … have training, experience to understand the program, … I don't answer their questions regarding the program."); PX-051, Howell Dep. 28:16-24, 29:1-15; PX-012 at 149, Hulbert Decl. ("I was told that if the consumer had any questions to have them call the representative of the debt relief company"); PX-048, Soule Dep.

13:19-25 ("If there's questions, I would call. I did not answer anything if there were questions."),

20:7-9 ("Did you answer any questions about the program yourself? A. No.); PX-045, Tsui Dep.

31:20-25 ("... the instructions will tell me that if the signer has any questions, they will call such

-- they will call such-and-such a number, and a representative will explain or answer the signer's

questions. I do not do any of that...")

54.     Phone calls from Sunshine Signing to SFS regarding consumers having questions

during signing were frequent and during them SFS employees did not express surprise at

receiving a call. *See, e.g.*, PX-023 (transcript of call from Sunshine Signing to SFS); PX-025

(same); PX-027 (same); PX-034 (same); PX-036 (same).

55.     Heather Lyon, a notary who handled approximately 200 signings for Defendants

and the Intervenor Law Firms, testified she did not "do anything or suggest anything to sway the

client to do -- make any decision." Testimony of Heather Lyon, 2/1/24 Tr. 125:2-4.

56.     Lyon further testified that if a consumer "has a question that would sway their

decision on signing the program or otherwise, I always revert their question back to the

representative from the law firm." Testimony of Heather Lyon, 2/1/24 Tr. 125:4-7.

57.     Consumers also have confirmed that the notaries did not answer their direct

questions and instead often advised the consumer to call the SFS representative with whom the

consumer had previously spoken. *See, e.g.*, PX-012 at 2, Edgar Decl. ("I remember finding the

meeting odd because I had questions, but [the notary] did not have any answers and simply

referred me back to [the SFS representative]"); PX-012 at 117, Kovein Decl. ("The documents

were tabbed with the places that I was supposed to sign. I asked the notary questions about the

program, but the notary advised me to direct my questions to the company"); Testimony of

Christopher Elkins, 2/2/24 Tr. 394:20-24 ("And she said, well, I'm not familiar with the

particulars of the contract. If you have any questions after we're done signing, you can contact

Canyon Legal Group and they will be sure to answer any questions you have."); Testimony of

Annie Barsch, 2/2/24 Tr. 510:15-511:2 ("Q. Did you ask him any questions about the document?

A. I believe I asked him one question about -- there was a part about prepayment, and my -- and

it said something about like if you prepaid there are still certain fees that you have to pay and

things like that...And I asked a question about that because my husband, being a teacher, stipend

sometimes...and he was like if you have any questions about anything, someone from the

company will talk to you later"); PX-029 at 37, Phone Call between Andrew Terrell (SFS) and

Barbara Jordan (advising the consumer that the notary is not a financial consultant so if the

consumer has any questions, she should call the SFS representative).

58.    SFS employees understood themselves to be the experts in the product, and they

routinely directed consumers to come to them with questions, and discouraged them from asking

the notaries. *See, e.g.*, PX23 (transcript of call from Sunshine Signing to SFS); PX25 (same);

PX27 (same); PX34 (same); PX36 (same).

   *v. Notaries' in-person meetings with consumers are often brief*

59.    Lisa Munyon, principal of National Paralegal & Notary, testified that she had

reviewed "thousands" of documents purporting to show the duration of the in-person meetings

between notaries and consumers, and that the average appointment lasts "around 45 minutes."

Testimony of Lisa Munyon, 2/1/24 Tr. 38:13-16.

60.    Consumers testified that some of these meetings were as short as 15 to 20

minutes. *See, e.g.*, Testimony of Annie Barsch, 2/2/24 Tr. 506:10-13 ("He checked our drivers'

licenses, verified who we were, kind of walked us through, like we got to go through the

documents and signed everything. And then he left. It was maybe 15, 20 minutes...").

19

61.     One consumer testified that the meeting with the notary took a total of ten minutes from the time she arrived at his house until the time she left, of which "four or five minutes" was spent on signing the documents. Testimony of Christopher Elkins, 2/2/24 Tr. 400:18-25 ("Q. From beginning to end, how long would you say this meeting lasted? A. Ten minutes or less. The longest amount of time that we spent was, I would say the four or five minutes signing the documents... But from the time she entered my house, I'd say the whole thing was ten minutes.").

62.     Affidavits of Compliance submitted by Defendants demonstrate that a number of consumers had meetings that lasted twenty minutes or less and thousands had meetings that lasted thirty minutes or less.  K. Davis Decl. (noting that out of 3,152 presentations, 1,670 lasted 30 minutes or less and 373 lasted 20 minutes or less); *see also* DX-26–DX-43.

63.     The Affidavits of Compliance confirm that the meetings frequently last less than 30 minutes and sometimes as little as 15 minutes. *See, e.g.*, DX-029 (15 min); DX-042 (18 min); DX-036 (20 min); DX-041 (25 min); DX-039 (25 min).

64.     Some meetings with consumers were very short, with lengths under 10 minutes, and one meeting lasted only 5 minutes. K. Davis Declaration ¶ 17.

65.     In fact, SFS's script for sales representatives directed them to tell consumers that the notary meetings were "pretty quick" and "only take[] 20-30 minutes." PX-076 (Dkt. 115-1) at 23.

66.     During the in-person meeting, consumers review and sign around 50 pages of documents. *See, e.g.*, PX-011 at 9-58 (Elizabeth Salva documents totaling 50 pages); DX-122 (documents totaling 61 pages).

67.     These documents include a so-called "Affidavit of Compliance" in which the notary was to attest that they had met with the consumer and reviewed a "letter of engagement to legal representation," the scope of legal representation, the standard of representation to be provided by the law firm, fees and costs of the program, and an overview of the contract's arbitration provision. *See, e.g.*, DX-021 at 26; PX-011 at 57; DX-26–DX-43.

68.     Multiple notaries expressed regret at having signed the "Affidavit of Compliance." Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 347:19-348:7 (testifying that it "was just a grave mistake on my part for even signing that document"); Accardo, 2/2/24 Tr. 384:10-11 ("[I]f I had read this document more carefully, I probably wouldn't have signed it.").

69.     Investigators from the New York Attorney General's Office read Defendants' Exhibits 24, 25, and 44. *See* Decl. of K. Davis; Decl. of J. Lewis; Decl. of J. Terranova.

70.     Defendants' Exhibit 24, a script the notary is to read to the consumer, took investigators between 16 and 20 minutes to read aloud. *Id.*

71.     Defendants' Exhibit 25, a legal retainer packet, took investigators between 31 and 43 minutes to read to themselves. *Id.*

72.     Defendants' Exhibit 44, the Monarch Legal Attorney Initial Consultation Call Script, which an attorney reads during the "Attorney Welcome Call," took investigators between 6 and 8 minutes. *See* Decl. of K. Davis; Decl. of J. Lewis; Decl. of J. Terranova.

73.     Reviewing and signing 50 pages of documents, even in 45 minutes, would allow for less than 1 minute per page; reviewing 50 pages in 25 minutes allows only 30 seconds per page.

vi.    *There is little to no quality control over the notary meetings*

74.    The notary provision companies do not have quality control measures to physically check that notaries provide substantive sales presentations to consumers. *See, e.g.*, Testimony of Lisa Munyon, 2/1/24 Tr. 48:16-25; PX-015 Winkelman (NotaryGO 30(b)(6)) Dep. 28:3-12 ("Q. And you wouldn't be able to -- would you have a way to confirm whether presentations, extra information, extra instructions were followed? A. That is not something we did. That was beyond our scope."); PX-018 Willis Dep. 40:5-15 (the company only had notaries confirm that "the script and presentation was initialed by each consumer.").

75.    The only step SFS takes to check whether the sales presentation by a notary took place is reviewing the documents signed at the notary meeting with a consumer. PX-019, Sasson Dep. 156:21-157:13.

76.    The notaries shred their documents 10 days after their meeting with the consumer, per the directions they receive from SFS. Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 349:3-6.

77.    Payment processor Global Client Solutions (GCS) relied solely on Defendants' proclamations and Intervenors' submissions when evaluating the sufficiency of the meetings. *See* PX-019, Sasson Dep. 145:3-18; PX-072. Even when relying solely on Intervenors' submissions, Global found the presentation lacking and required Intervenors to remove calls to action that instruct consumers to stop paying their creditors. PX-072. Defendants and Intervenors did not stop telling consumers to discontinue payments to creditors. *See* PX-019, Sasson Dep. 148:16 – 149:11.

78.    Similarly, RAM testimony demonstrates that RAM fundamentally misunderstood the meetings between notaries and consumers, and no one from RAM ever witnessed a face-to-face meeting. RAM 30(b)(6) Dep. 36:1-8.

79.     RAM believed that the meetings were conducted by attorneys, not by notaries. *Id*.
36:9-16.

80.     RAM relied solely on Intervenors' submissions when evaluating the sufficiency
of the face-to-face meetings. *Id*. 45:7-12.

81.     The notaries used by the Defendants or Intervenor Law Firms had no interactions
with attorneys from Defendants or Intervenors. PX-045, Tsui Dep. 37:24:38:3 ("Q. Did an
attorney ever supervise the notary work that you did relating to debt relief? … A. I don't recall
any interactions with the attorney."); PX-046, Shirkey Dep. 26:10-14 ("Q. How often did you
speak with an attorney that -- at any of these law firms? A. Never. Q. Did any attorney ever
supervise your work? A. No.").

C.   Both notaries and consumers understand the in-person meeting to be all about getting the
     paperwork signed

82.     The notary companies that assigned work to their independent contractor notaries
understood the role of the notaries to be obtaining the consumers' signatures on the paperwork
provided by Intervenors.; PX-015, Winkelman Dep. 17:19-23 ("Q. Do you remember what kinds
of services SFS companies were asking for notaries to perform for them?  A. They were
presenting the documents to the customer, having them signed, and then returned.").

83.     Notaries described their role at the meetings with consumers to simply present
documents for the consumers to sign. Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 322:12-14
("my role is only to get their signature"), 320:4-6 (as a notary, I can not explain to them anything
about the documents. I can only witness their signature of their initials."); PX-50, Howell Dep.
13:1-9 ("Q. When you say debt resolution services, can you explain generally exactly what that
entailed, what work you did? A. So my job was to witness the signatures of the documents when
a client signs up for debt resolution services."); PX-046, Shirkey Dep. 22:10-17 ("Q. And when

you contacted the consumer, how did you identify yourself? A. As a notary that's going to be providing the documentation for their debt relief. I do not represent the company. I do not represent any type of legal representation. I'm just bringing them documents and witnessing their signature, verifying their identification.")

84.     According to one consumer, the notary who came to his home told him "this is a formality" and that "[w]e just want to sign the contract, and we'll be done about our business." Testimony of Christopher Elkins, 2/2/24 Tr. 393:4-7 ("She came in and we sat down and she pulled out the contract and said this is a formality. You've already spoken with Canyon. We just want to sign the contract, and we'll be about our business."); Testimony of Annie Barsch, 2/2/24 Tr. 509:23 – 510:3 ("And my husband and I kind of came around and sat side by side with the paperwork, and he stood on the other side of the table while we reviewed everything he pointed out, where we needed to initial or sign, and that was really it.").  In fact, at least one notary testified that he did not know the contents of the documents the consumers signed, and that his job is "simply to notarize the individual's signature." PX-045, Tsui Dep. 12:13-16.

85.     According to the terms of the contracts between at least one notary company (NPN) and Defendants or Intervenors, the notary company is paid a smaller fee if the consumer does not sign the documents that the notary brings to the meeting with the consumer. DX001 at 1 ¶¶ 1-2; DX002 at 1 ¶¶ 1-2; DX003 at 1 ¶¶ 1-2; DX004 at 1 ¶¶ 1-2; DX005 at 1 ¶¶ 1-2; DX006 at 1 ¶¶ 1-2 (Company will pay NPN a fee of $115 to oversee execution of documents, but only $65 if the consumer does not sign the documents.)

86.     Some notaries would receive less money for the meeting if the consumer did not sign the documents. Testimony of John Accardo, 2/2/24 Tr. 361:8-18 ("Q. Why would they sometimes only pay the trip fee and not a full amount? A. If the customer refused to sign. Q. So,

you receive less money? A. Yes. ...Q. You receive less money for the visit if the client does not sign? A. Correct."); PX-050, Howell Dep. 83:15-19 ("Q. And do you receive the same amount of pay whether the consumer signed or they didn't sign? A. No. If they did not sign, the pay was typically less."); PX-051, Vrzhezhevska Dep. 50:16-19 ("Q. And did you get paid -- Did the compensation change depending on if the consumer signed documents or not? A. Yes."), 51:5-9 ("Q. So could you give me the dollar amount, roughly, to the best of your recollection, for when the customer didn't sign versus -- A. When they sign, $50. If they didn't sign, $40.")

D.  In some instances, consumers did not meet anyone in-person prior to signing up for Defendants' and Intervenor Law Firms' debt relief services.

87.  In March 2020, during the COVID-19 pandemic, Defendants and Intervenor Law Firms transitioned from conducting the "face-to-face" meetings in person to conducting them via video. PX-004 at 4.

88.  SFS's Chief Executive Officer, Ryan Sasson, was copied on an email discussing this change in practice. *Id*. (noting that "the presentation slides and script" "have been somewhat modified to replace references to the paralegal face-to-face presentation with references to the attorney video presentation.").

89.  Jason Blust also was copied on that email. *Id*.

90.  The email indicates that the change in practice from in-person meetings with notaries to video presentations was "developed by Mark [Guidubaldi] and Mike Thurman." *Id*.

91.  Mike Thurman testified that he is a consultant retained by the Intervenor Law Firms who has "constantly" reviewed and tweaked the documents the law firms used "from about September 2014 all the way through the present. Testimony of Mike Thurman, 2/1/24 Tr. 56:6-9.

92.     Even apart from the pandemic, some consumers report never having met in person with anyone in connection with enrolling in Defendants' debt relief program. *See, e.g.*, PX-012 at 100, Decl. of Ronald Davis, Sr. (stating an individual emailing from a @financesolutions.org email address "said someone would meet with me to discuss the program, but I never met with anyone from CLS, or anyone connected with CLS, at any time. Shortly afterwards, CLS began drafting my bank account bi-monthly..."); DX-097 at 1, Decl. of Annie Cole (stating she "retained Monarch Legal Group . . . during 2018 or 2019 after a call with a Monarch attorney."); DX-110 at 1, Decl. of Dante Servin (stating only that he "retained Monarch Legal Group … after signing the Retainer Agreement and receiving a phone call from a Monarch attorney," omitting any reference to an in-person meeting).

93.     Notary Lorie Soule conducted some meetings over Zoom from her car, and watched the consumer sign the documents over Zoom. PX-048, Soule Dep. 22:10 – 23:4.

## V.    Notaries who met with consumers are not "sellers" of debt relief services

A. Mobile notaries used by Defendants are independent contractors and not employees of Defendants or the Intervenor Law Firms

94.     The notaries who the Defendants or Intervenor Law Firms used to meet with consumers "do not work for Strategic." Testimony of Mary Lynne Clarke, 2/1/24 Tr. 256:6-11.

95.     Notaries used by the Defendants or Intervenor Law Firms are independent contractors of the notary companies that assign them work. Testimony of Lisa Munyon, 2/1/24 Tr. 42:3-5 ("Q. That the notary representatives are independent contractors of NPN; is that correct? A. That is correct."); PX-013, Stone (NotaryGo 30(b)(6)) Dep. 15 ("Q. What's the relationship [of notaries] to you? A. They're independent contractors. Q. You send them a 1099? A. Yes.").

96. Notaries choose when they want to work and what assignments they accept. Lyon 2/1/2 Tr. 118:10-11 ("I negotiate my rate and take on the assignment"); Accardo 2/2/24 Tr. 356:7-8 ("if you're available at that time and that date, and you would accept it, or you know, reject it."); PX-045 Tsui Dep. 18:10-23 ("That's how the assignments would come in, just like DoorDash or Uber. It's whoever is available, whoever wants to grab it."); PX-046 Shirkey Dep. 15:23-16:2 ("They would send me a text; are you available to do an assignment in Annandale at 6:00 on Thursday evening, yes or no.").

97.     Mike Thurman, an attorney who Defendants represent specializes in regulatory compliance and risk mitigation in the financial services industry testified that the notaries the Intervenors or Defendants use are not sellers under the Telemarketing Sales Rule. Testimony of Mike Thurman, 2/1/24 Tr. 87:17-20 ("Q. Are the notaries in -- that are used for the enrollment documents, are they sellers under the Telemarketing Sales Rule? A. I don't believe so.").

98.     Defendants have presented no evidence that the notaries are employees of Intervenors or Defendants.

B.  Notaries are not agents of Defendants or the Intervenor Law Firms

99.     Contracts between at least one notary company that receives 90% of its revenue from the Intervenors and several Intervenors state that "no relationship is created by this Agreement that could any way imply … (b) an authorization for either party to act as agent or representative of the other..." DX-001 at 4; DX-002 at 4; DX-003 at 4; DX-005 at 4; DX-006 at 4; PX-017, Munyon (Velsa/NPN 30(b)(6)) Dep. 17:22-25; PX-021 (Notary Express Contract) at 5 ¶ 16.

100.     Defendant Jason Blust testified that he steered as much of the Intervenor Law Firms' business as possible to Velsa/NPN. PX-056, Blust Dep. 68:17-20 ("[Lisa Munyon] does

the lion's share of the business. She's the one who will get the notaries – I'm sorry, the assignments if she can handle them").

101.    Some of the contracts between the notary companies and the Intervenors expressly prohibit the law firms from "seek[ing] to independently contract for similar services with any of the … notaries with whom it has come into contact directly through [the notary company]." *See, e.g.*, DX-007 at 2.

102.    Notaries do not have any contact with attorneys or employees of the Intervenor Law Firms before their consumer meetings. PX-051, Vrzhezhevski Dep. 26:12-14 ("Q. So you never talked with anybody at the law firm? A. No."); PX-006, Pavlow Sworn Interview 29:17-20 ("Q. Have you ever had any direct contact with those counselors that the clients have spoken to before they meet you? A. I have not."); PX-048, Soule Dep. 28:12-20 ("Q. Were you ever supervised by a lawyer in providing your notary services? A. No. Q. Did you have any communication with any lawyer from any law firm on Exhibit 1 during any part of this process? A. No.").

103.    Notaries receive a packet of documents from Defendants or the Intervenor Law Firms via a third-party platform. PX-48, Soule Dep. 13-14 ("you will click the link and it opens up the order and it gives you more details."); PX-050, Howell Dep. 11:16-18 ("Once I accepted the job, they would e-mail the documents or they would upload the documents via the Snapdocs portal."); Winkelman (NotaryGO) Dep. 17:6-9 ("Q. So Strategic would provide any documents it wanted presented or given or to be signed by the customer to you, correct? A. Correct."), 17:14-18 ("Q. And then you would send that, forward that on to the notary? A. It would be uploaded to our secure system. The notary would download those documents from their profile.").

104.    One document provided to notaries states: "it is very important that you represent the law firm in an organized and professional manner. To protect the Law Firm's professional image, please, obey the following rules: 'dress professionally; be courteous and respectful; be organized; be patient with the clients; repeat yourself when necessary; clarify points as you are allowed to; tell the client an attorney can answer legal questions." DX-013 at 4.

105.    The document further instructs the notary: "When client has questions you may "pont [sic] out answers that are on the appropriate slide; offer answers from the enrollment documents; offer clarifications; repeat information you have read in these materials.  You may NOT go any further in providing answers." DX-013 at 4.

106.    Notaries who conducted meetings with consumers for the Intervenors do not understand themselves to be sellers of debt relief services. Testimony of John Accardo, 2/2/24 Tr. 360:13-17 ("Q. Would you describe this as a sales presentation? A. Absolutely not. Q. Why not? A. I'm not selling anything."); Testimony of Ruth Brooks-Ward, 2/2/24 Tr. at 319:13-14 ("Q. Do you sell debt settlement services? A. I do not sell debt settlement services."), 327:10-13 ("Q. And that training, it didn't train you to go out to be a hard-core salesperson, did it? A. It doesn't train me to go out and be a salesperson period."); PX-048 at 10 ("Q. Do you sell debt relief services? A. No.").

107.    When contacting consumers to set up meetings, notaries do not introduce themselves as representatives of the law firms. Testimony of John Accardo, 2/2/24 Tr. at 357:2-6 ("Q. How do you identify yourself. [when calling the consumer]? A. As a Notary Public. Q. Do you identify yourself as a representative of Great Lakes Law Firm or Northstar? A. No, sir.").

108.    Notaries who conducted meetings with consumers do not introduce themselves to consumers as representatives of the law firms. Testimony of John Accardo, 2/2/24 Tr. 358:2-4

("Q. And when you arrive, ...how do you identify yourself when you get there? A. Again, my name, you know, I'm the Notary Public."); PX-050, Howell Dep. 34:14-18 ("Q. When providing this in-person presentations, would you explain your name and that you were a representative of Monarch Group? A. No.").

109.    Notaries who conducted meetings with consumers for Intervenors do not view themselves as agents of the law firms. Testimony of Ruth Brooks-Ward, 2/2/24 Tr. 322:10 ("you don't try to act as the lawyer or you don't try to explain the documents because that is not my role. My role is only to get their signature and verify who they are."), 322:17-18 ("Q. Are you an agent of any of these law firms? A. I am not an agent for anybody other than myself."); PX-045, Tsui Dep. Tr. at 41:1-7 ("Q. Did you ever consider yourself an agent of any of the companies offering debt relief services that you actually provided notary work for? . . . A. I'm not an agent for these companies; I'm the notary public."); PX-050, Howell Dep. 85:14-20 ("Q. How about as an agent? Were you okay being referred to as an agent in these documents? A. No. Q. And why is that? A. Because I wasn't an agent. I was only the notary.");

110.    Consumers testified that the notaries who conducted the meetings did not identify who they worked for or what company they were with. Testimony of Christopher Elkins, 2/2/24 Tr. at 393:10-12 ("Q. Did the notary say who she worked for? A. She did not. She just identified herself as the notary."); Testimony of Annie Barsch, 2/2/24 Tr. 511:13-15 ("Q. Did he say what company he was with? A. He didn't. He had a notary stamp. I believe he said he was sent by Monarch Legal to sign our paperwork.").

C. Intervenors' attorney welcome calls do not cure deficiencies.

111.     Intervenors represent that they utilize attorneys to conduct

"welcome calls" with consumers after the consumers meet with the notary. Testimony of Richard

Gustafson, 2/1/24 Tr. 141:6-12 ("There are … attorneys that do the – some refer to it as welcome

call. The initial client consultation with the clients, and the periodic file reviews, the settlement

reviews, those sorts of activities.), 147:21-149:14 (Gustafson describes the welcome call as

taking place after the in person meeting with the notary, and talking with the consumer about the

debt relief program and legal services.)

112.     Intervenor attorney, Richard Gustafson testified that if a notary meeting was

"deficient" the "welcome call" could "make up for that." Testimony of Richard Gustafson,

2/1/24 Tr. 210:20-211:8.

113.     However, at least one attorney was hired by Intervenors as an "onboarding

Attorney," stated that he did not receive any training before starting in his role, working in a

shared workspace, and reading a three-page script to consumers when they called, which took

about 7 minutes. PX-053, Duhn Decl. ¶¶ 4-8.

114.     The onboarding attorney also noted that after completing the call with the

consumer, that consumer would be "assigned to another individual" and that he "typically did

not have further contact with the consumers after the initial onboarding phone call." PX-053,

Duhn Decl. ¶¶ 9-10.

115.      After the welcome call, consumers did not always have contact information for

an attorney. PX-053, Duhn Decl. ¶ 9 ("I never gave out my contact information to

consumers…"); PX-019, Sasson Dep. 88:21-89:19 ("Q. And how do you know that the

consumer is given contact information during that call? Do you have any personal knowledge

that that happens? A. I mean, I've spoken to attorneys who tell me they do that, but I'm not on

those calls. It's attorney-client calls. Q. So you don't know for sure that every client of the law

firm is given contact information for a lawyer? A. I couldn't know that, no.").

## VI.   Balance of the Equities

116.        Consumers paid Defendants thousands of dollars while enrolled in Defendants'

debt relief program. Testimony of Christopher Elkins, 2/2/24 Tr. 425:17-20 ("Q. Mr. Elkins, in

total how much did you pay Canyon Legal Group for their -- to do debt settlement services for

you? A. $80,000."); PX-011, Salva Decl. ¶ 15 ("In total, we paid $10,039.60 into the RAM

account while participating in the Monarch program. Of that amount, $7,805.07 was taken by

Monarch and $639.25 was taken by RAM. Only $1,590.28 was actually used to pay our

creditors."); PX-012 page 3, Edgar Decl. ¶ 9 ("I was enrolled in the Newport debt settlement

program for about 13 months ... At that point, I had paid Newport $5,035.92, nearly half of the

amount of the debt I owed Wells Fargo.").

117.        The amounts that consumers paid Defendants were significantly greater than the

actual amounts of debt that Defendants settled for the consumers. Testimony of Christopher

Elkins, 2/2/24 Tr. 413:25-414:16 ("Q. So at the time you had paid the $24,838.52 -- actually,

how far out into the program was that by the time you paid that amount? A. That was -- it was

right around the 20-month mark, 21 months... Q. Okay. So, at that point in time, do you know

how many debts of yours were settled? A. One, 18 months in and I had one debt settled. The

again it was one of my wife's credit cards in the amount of $500, and I think they settled -- it was

like 50 or $75. I don't remember the exact amount, but it was not much."); PX-010, Griffiths

Decl. ¶ 10 ("From July 2020 through April 2021, we made 21 payments of $438.34 to CLS

totaling $9,205.14. During that time, CLS only paid off one of our creditors. Specifically, CLS

settled with Citibank for $544.53 down from $1,055.80, and we understand from CLS's record that Citibank was paid $544.53 on that account.").

118.    Most of the amounts consumers paid were applied by Defendants to pay fees, rather than towards building reserves to pay consumers' creditors. PX-010, Griffiths Decl. ¶ 12 ("On or about May 5, 2021, we received a check from Global of $1,984.76, which was all that was left in our account after having paid in $9,205 into the program. Thus, in summary, after being in CLS's program for almost a year, we lost approximately $6,675 of our money (specifically, the $9,205 we paid in, less the amount paid to Citibank, and the refund of $1,984 we received from Global). We now assume all that lost money went to fees, since none of our creditors were paid, with the exception of the one settlement with Citibank."); PX-011, Salva Decl. ¶ 15 ("In total, we paid $10,039.60 into the RAM account while participating in the Monarch program. Of that amount, $7,805.07 was taken by Monarch and $639.25 was taken by RAM. Only $1,590.28 was actually used to pay our creditors. That means of the $10,039.60 we paid over the course of more than a year and a half in the program, over 84% of the payments were taken by either Monarch or RAM with very little to show for all these fees."); PX-012 at 113, Nickles Decl. ¶ 9 ("Once I enrolled in the program, I immediately was charged monthly fees such as a $10.95 banking fee, a $150 retainer fee, a $89 administration fee, and a $248.27 service fee ... After these fees were assessed, approximately $17 was left of the $515 that I paid each month."); PX-012 at 118, Kovein Decl. ¶ 5 ("To the best of my recollection, every month I paid approximately $366.67 into my account that was managed by Global. According to my contract, Heartland charged me the following fees every month: a service fee in the amount of $155.90, a retainer fee in the amount of $100, a legal administration fee in the amount of $59, and banking fees in the amount of $10.95. After these fees were paid, I had approximately

$41.02 left in my account each month to pay my creditors. This amount was referred to as 'settlement reserves' in the contract.").

119.    At least one consumer who paid fees and left Defendants' program early did not have any debts settled before exiting the program. PX-012 at 101, Davis Decl. ¶ 4 ("From June 2019 through August 2019, Global drafted my bank account six (6) times for a total of $1,459.74. After being in CLS's program for a few months, I checked my Global account statement online and discovered that most of my money was being paid to CLS for its fees, and nothing had been paid to my creditors. In addition, I received nothing indicating that CLS had contacted any of my enrolled creditors, much less settled any of my debts.").

120.    According to Greg Regan, a Certified Professional Accountant who testified for Defendants, 44% of consumers who enroll in Defendants' debt relief program cancel. Testimony of Greg Regan, 2/1/24 Tr. 271:19-20 ("In the last bucket is clients who have canceled. So approximately 44 percent, as you said."). For those 44% of consumers, their fees exceed the amount of their debt reduction. *Id*. 273:24-274:6 ("...their fees exceed what their debt reduction was because they have left the program on average after 20 months").

121.    The Receiver's Report indicates that 70% of consumers who enroll do not graduate from Defendants' law firm debt relief program. Receiver's Report at 36. This group of consumers has lost an aggregate amount of $64,682,005.19. They paid that much more in fees than they obtained in debt reduction. ECF No. 131-1, Sup. Rec. Rep. at 3.

122.    Defendants told some consumers in the program that they would need to stay in the program longer, and pay more than they initially agreed, for the Defendants to continue to negotiate consumers' debts with creditors. Testimony of Christopher Elkins, 2/2/24 Tr. 420:7-12 ("I paid them -- at that point, it was 20-some-odd thousand dollars to do a job they had not done

34

yet. I wasn't getting that money back. They still had a job to do, so there was no choice but to continue to pay into this program so they can resolve my still $100,000 worth of debt."); PX-012 at 145, Boliche Decl. ¶ 9 ("However, after making three years of payments, Harbor informed me they needed to extend the contract because three creditors still had not been paid off. Harbor explained that they tried to negotiate with these creditors, but the creditors would not negotiate, so I would have to pay more than what was initially agreed upon ... In total, I had paid around $12,500.").

123.     Consumers who enrolled in Defendants' program suffered from negative impacts to their credit scores, wage garnishments, or frozen bank accounts. Testimony of Christopher Elkins, 2/2/24 Tr. 419:14:420:3 ("Q. Mr. Elkins. How, if at all, was your credit score impacted after you enrolled in services with Canyon Legal Group? A... When I found out a year and a half after I signed the contract and that's when I really started digging in, because my credit went from almost 720, it was 716 to 520. It was a disaster."); Testimony of Annie Barsch, 2/2/24 Tr. 516:11-517:21 (consumer's bank account was frozen after a judgement was entered against her when her Inventor-affiliated attorney failed to attend court hearing).

124.     Consumers who enrolled in Defendants' program and who were sued by their creditors after enrollment were often not represented by Intervenors' attorneys in their lawsuits, resulting in default judgments entered against them or the consumers having to represent themselves in court. Testimony of Anne Barsch, 2/2/24 Tr. 515:12-516:25 (testifying that Monarch-affiliated attorney failed to settle litigation with a creditor, lied about it, and failed to show up for all court dates, resulting in a judgment entered against her husband), 527:20-24 (Defendants' counsel apologizes "on behalf of Monarch" for having "dropped the ball" on Ms. Barsch's lawsuit); PX-012 at 3, Edgar Decl. (after being sued by Wells Fargo, Newport did not

represent consumer in his lawsuit and Wells Fargo obtained a default judgment against him); PX-012 at 58, Sheehan Decl. (consumer informed the Intervenor law firm that she was being sued by Target, the law firm faxed over a document for her to take to court and represent herself, and no attorney showed up to represent the consumer at the courthouse); PX-012 at 136, Brannan Decl. (consumer was served with lawsuits filed by four creditors and provided the legal documents to the law firm, but received no response and all her loans "went into default and the court issued judgments" against her for the four debts).

**Conclusions of Law**

## I. Introduction

1.      This case primarily presents a question of statutory interpretation regarding the TSR and the "face-to-face substantive sales presentation" exemption thereto.

2.      The parties do not dispute that the Intervenors take, and Defendants receive, advance and non-proportional fees for debt relief services.

3.      The question for this Court is whether the use of third-party mobile notaries by Defendants and Intervenors makes them exempt from the TSR.

4.      For the reasons discussed below, I conclude that Plaintiffs have shown a likelihood of success on the merits of their claim that the TSR's face-to-face exemption does not apply to Defendants, and that Defendants have therefore violated, and are likely to continue to violate, the TSR.

5.      As a result, and having considered the balance of the equities, I conclude that Plaintiffs are entitled to a preliminary injunction continuing the relief granted by Judge Vilardo in the TRO he entered on January 11, 2024.

## II.  **Jurisdiction and Venue**

6.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

7.      This Court has supplemental jurisdiction over the States' state law claims because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

8.      Venue is proper in this district because SFS is located, resides, and does business here and because a substantial part of the events or omissions giving rise to the claims occurred in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(2).

9.      The Consumer Financial Protection Bureau has the authority to bring civil actions against persons violating federal consumer financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a). These consumer financial protection laws include the Telemarketing and Consumer Fraud and Prevention Act (TCFPA), 15 U.S.C. §§ 6101-6108, which targets deceptive and abusive acts in telemarketing, and the Telemarketing Sales Rule, which is an implementing regulation of the TCFPA, 16 C.F.R. Part 310.

10.      Pursuant to the TCFPA, 15 U.S.C. §§ 6103(a) and (f)(2), Plaintiff States are authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

### III.  Legal Standard for the Requested Preliminary Injunction

11.     In this case Plaintiffs are an agency of the federal government and the attorneys general of seven states.

12.     When a governmental agency seeks a statutorily authorized injunction it is required to show: (1) a reasonable likelihood that the wrong will be repeated; (2) a likelihood of success on the merits; and (3) that the injunction is in the public interest. *See City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010).  It is "the 'well-established rule' that agencies 'need not prove irreparable injury or the inadequacy of other remedies as required in private litigation suits, but only that there is a reasonable likelihood that the wrong will be repeated.'"  *Id*. (quoting *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977))

13.     Plaintiffs must show a likelihood of success on the merits, meaning that their "probability of . . . prevailing is better than fifty percent." *N.Y. by James v. Rescue*, No. 23-cv-4832, 2023 WL 8472727, at *9 (S.D.N.Y. Dec. 7, 2023) (citation omitted).

14.     As to the balance of equities, "if the Government establishes that the defendant is violating [the law], the balance of hardships likely weighs in the Government's favor." *United States v. Narco Freedom, Inc*., 95 F. Supp. 3d 747, 755 (S.D.N.Y. 2015).

### IV.  Defendants Are Sellers and Telemarketers Under the Telemarketing Sales Rule

15.     The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). I conclude that Defendants are telemarketers under the TCFPA.

16.     The TSR defines a "debt-relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other

terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector offers to renegotiate, settle, or alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors." 16 C.F.R. § 310.2(o). I conclude that Defendants are offering debt-relief services under the TSR.

17.     The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). I conclude that Defendants are "sellers" of "debt-relief services" under the TSR.

18.     The TSR bars a telemarketer or seller from "[r]equesting or receiving payment of any fee or consideration for any debt relief service until and unless: (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer, (B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and (C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or (2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged

cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt." 16 C.F.R. § 310.4(5)(i).

19.     Taking advance fees or non-proportional fees constitutes an abusive telemarketing act or practice under the TSR. 16 C.F.R. § 310.4(5)(i).

20.     Further, the TSR provides that, "[i]t is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates . . . § 310.4 of this Rule." 16 C.F.R. § 310.3(b).

21.     It is undisputed that Intervenors take advance fees from consumers for debt relief services provided through Defendants and share a portion of such fees with Defendants.

22.     I conclude that Defendants are sellers and telemarketers who take advance and non-proportional fees under the TSR.

23.     I further conclude that Defendants provide substantial assistance to Intervenors who also qualify as sellers under TSR and who also take advance and non-proportional fees.

**V.   The Face-to-Face Sales Presentation Exemption**

24.     The TSR includes certain exemptions. 16 C.F.R. § 310.6.

25.     Defendants assert that their conduct is exempt from the TSR based on the "face-to-face sales presentation exemption."

26.     An exemption is an affirmative defense, and Defendants therefore bear the burden of proof as to this issue. *United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 937 (C.D. Ill. 2014) (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005).

27.     The TSR exempts—and thus does not prohibit advance or non-proportional fees

for—transactions involving "[t]elephone calls in which the sale of goods or services or charitable

solicitation is not completed, and payment or authorization of payment is not required, until after

a face-to-face sales or donation presentation by the seller or charitable organization . . . ." 16

C.F.R. § 310.6(b)(3).

28.     Guidance on the face-to-face exemption promulgated by the Federal Trade

Commission (FTC) and submitted as an exhibit by both Defendants and Plaintiffs provides that

"[a] telemarketing transaction qualifies for the exemption if: (1) the face-to-face meeting takes

place before the sale is completed and before the consumer is required to pay or authorize

payment; and (2) the meeting includes an actual sales presentation to the buyer.  The key to the

face-to-face exemption is the direct and personal contact between the buyer and seller.  You

can't get around the Rule by hiring representatives just to hold cursory pre-enrollment meetings

with potential customers." PX76; DX114; Federal Trade Commission, *Debt Relief Services &*

*the Telemarketing Sales Rule: What People Are Asking,*

www.ftc.gov/system/files/documents/plain-language/bus73-debt-relief-services-telemarketing-

sales-rule-what-people-are-asking.pdf.

29.     Guidance on complying with the TSR promulgated by the FTC submitted as an

exhibit by Defendants explains "[t]he goal of the TSR is to protect consumers against deceptive

or abusive practices that can arise when a consumer has no direct contact with an invisible and

anonymous seller other than the telephone sales call. A face-to-face meeting provides the

consumer with more information about — and direct contact with — the seller, and helps limit

potential problems the TSR is designed to remedy." DX115 at 17; Federal Trade Commission,

*Complying with the Telemarketing Sales Rule*, www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.

30.     Defendants contend that Intervenors' use of third-party notaries qualifies them for the face-to-face exemption. For the reasons that follow, I conclude that Defendants do not qualify for the face-to-face exemption.

## VI. The Notaries Do Not Provide a Substantive Sales Presentation

31.     I conclude that the notaries did not provide a substantive sales presentation sufficient to meet Defendants' burden to qualify for the face-to-face exemption.

32.     None of the notaries who testified at the preliminary injunction hearing claimed to have provided a sales presentation.

33.     None of the notaries understood their role to be that of a salesperson.

34.     The notaries who testified understood their role to be primarily to obtain the consumers' initials and signatures on the relevant documents, which is the typical role of a notary.

35.     The notaries had varying levels of familiarity of what debt relief services entail, but none knew more than was in the materials they were provided. They therefore could not answer any but the most basic of questions, which supports my conclusion that they were not providing a substantive sales presentation.

36.     Many of the notaries testified that they did not read materials out loud, but instead allowed the consumers to review and then sign the materials, which further supports my conclusion that the notaries were not providing a substantive sales presentation.

37.     That the majority of the meetings lasted under a half hour further leads me to conclude that these meetings did not constitute a substantive sales presentation.

38.     Several hundred of the meetings were under twenty minutes in length which leads me to conclude that they constitute the type of cursory meeting that FTC guidance states does not comply with the TSR.

### VII.   The Notaries Are Not "Sellers" Under the TSR

39.     The face-to-face exemption under the TSR requires that the face-to-face sales presentation be "by the seller." 16 C.F.R. § 310.6(b)(3).

40.     I conclude that the notaries do not qualify as "sellers" under the TSR.

41.     The definition of "seller" in the TSR specifies that a seller is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

42.     The notaries do not provide, offer to provide, or arrange for others to provide debt relief services for consideration.

43.     The notaries provide no services to consumers and receive no consideration from consumers.

44.     The notaries provide notarial signing services to Defendants and Intervenors for a small fee, which is paid by Intervenors. The notaries receive no consideration that is in any way related to the provision of debt relief services.

45.     I conclude that the debt relief services offered by Defendants and Intervenors are sold via telemarketing from call centers operated by Defendants.

46.     The notaries do not "arrange for" Defendants or Intervenors to provide debt relief services. To "fit the TSR's description of . . . one who 'arranges for others to provide' a product," the arranging party must "maintain[] control over the product, scripts and quality assurance." *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009). I conclude that the

notaries do not control the debt relief services offered by Defendants and Intervenors in any manner and therefore do not qualify as sellers on this basis.

47.     A conclusion by this Court that the use of third-party mobile notaries was sufficient to qualify for the substantive face-to-face sales presentation exemption would severely undermine the TSR. Telemarketers intent on abusive practices would have an easy and affordable tool to exempt themselves from the consumer protections of the TSR. The Court declines to adopt an interpretation that would render the TSR a toothless tiger. *See FTC v. Nudge LLC*, No. 2:19-cv-867, 2022 WL 2132695, at *38 (D. Utah June 14, 2022) (rejecting interpretation of the face-to-face exemption that would have made the exemption "elephantine").

## VIII.   The Notaries Are Not Agents of the Seller

48.     The notaries are independent contractors who contract with Defendants and Intervenors though third-party notary service companies. It is undisputed that the notaries are not employees of Defendants or Intervenors.

49.     Defendants contend that the notaries are their agents for the purpose of providing a substantive face-to-face sales presentation. I conclude that they are not.

50.     As the party asserting the existence of an agency relationship, Defendants bear the burden of proof on this issue. *Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, No. 3:17-cv-00135, 2023 U.S. Dist. LEXIS 117634, at *11 (D. Conn. July 10, 2023) (collecting cases).

51.     "At common law, an agency relationship is created when . . . the agent manifests assent," to the creation of the agency relationship. *Kirschner v. Robeco Cap. Growth Funds - Robeco BP US Premium Equities (In re Nine W. LBO Sec. Litig.)*, 87 F.4th 130, 148 (2d Cir.

2023). "The fact that one party performs a service that facilitates the other's business does not constitute such a manifestation. *Restatement (Third) of Agency*, § 3.03.

52.     I conclude that Defendants have not provided evidence to establish that the notaries manifested assent to be an agent for the purpose of giving a sales presentation.

53.     The notaries testified that they decided when to work, and what assignments to take and at what rate, which leads me to conclude that Defendants and Intervenors did not have a right to control the notaries. *FTC v. Neora LLC,* No. 3:20-cv-01979-M, 2023 U.S. Dist. LEXIS 217429, at *54 (N.D. Tex. Sep. 28, 2023) (finding no agency relationship where "defendant did "not control and has no right to control how much [the alleged agents] work (if at all), how much they spend on their pursuit of the business opportunity, or how they exercise their choice of work activities"). In this case, the notaries had "considerable flexibility in conducting their businesses, if they choose to do so at all," which cuts against concluding that an agency relationship exists. *Id*.

54.     The fact that the notaries were provided with instructions for how to conduct the meetings with consumers is not determinative because, providing "guidelines and instructions . . . on how to conduct their businesses in a legally compliant manner" does not establish an agency relationship. *Id*. at *57; *see also Restatement (Third) of Agency*, § 1.01 ("setting standards in an agreement for acceptable service quality does not of itself create a right of control")

55.     The notaries were simply contracted to provide notarial services for Defendants and Intervenors, which does not create an agency relationship. *Restatement (Third) of Agency*, § 1.01 ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.").

56.     While not determinative, the fact that many of the third-party notary companies included an express "no agency" clause in their contracts further leads me to conclude that no agency relationship exists between the notaries and Defendants or Intervenors.

57.     I conclude that the so-called "Affidavit of Compliance" signed by the notaries is not an affidavit because a notary cannot self-administer an oath. Further, these documents reflect only that the notaries reviewed topics "in writing" and do not specify that the notary is required to give a substantive sales presentation.

58.     Defendants have argued that "[a]s the hired agents of the law firms, the notaries – together with the law firms that hire them – are 'collectively one 'seller whose goods or services are being offered' under the TSR." (ECF No. 118-1, Def's Pre-Hrg. Br. at 11) (quoting *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020)).

59.     A conclusion that the notaries qualify as a statutory seller under the TSR would necessarily make them liable for Defendants' violations of law in connection with their telemarketing activity. None of the notaries understood themselves to be taking on such liability when they agree to obtain consumers' signatures for a nominal fee. This further leads me to conclude that the notaries are not "sellers" under the TSR.

## IX.   Defendants Have Not Met Their Evidentiary Burden as to the Notary Meetings

60.     Defendants provide notaries with a packet of documents and then check the returned documents to ensure that they were signed. Because the Defendants do not take any steps to independently audit and verify the work of the notaries, they have failed to meet their burden of proving that substantive face-to-face sales presentations occurred.

61.     Several of the notary witnesses testified that they did not follow Defendants' instructions and did not read the provided script to consumers. Defendants' documents reflect

that several of the notary meetings were minutes in length. This leads me to conclude that Defendants' documents regarding the notary presentations are not sufficient to meet their burden of proof as to the face-to-face exemption.

62.     Testimony at the preliminary injunction hearing established that if there was a problem with a notary meeting, Intervenors believed a subsequent phone call could cure this issue and did not send another notary out to have another meeting. I conclude that the TSR does not provide for the possibility of a telephone conversation to substitute for the required substantive face-to-face sales presentation.

## X.   The Balance of Equities Favors Plaintiffs

63.     Based on the above conclusions, Plaintiffs have shown a likelihood of success on the merits. I now turn to the balance of the equities.

64.     "Where Congress expressly provides for Government enforcement of a statute by way of injunction, and the Government has satisfied the statutory conditions of the statute, irreparable harm to the public is presumed." *FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 199 (S.D.N.Y. 2000). Although not a necessary factor to grant a preliminary injunction here, it is clear that allowing Defendants to continue to collect unlawful advance fees in violation the TSR during the course of litigation will cause irreparable harm to consumers.

65.     Similarly, when "the Government establishes that the defendant is violating [the law], the balance of hardships likely weighs in the Government's favor." *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 755 (S.D.N.Y. 2015).

66.     Defendants concede that at least 44% of their customers are worse off for having participated in their debt relief services. And the Preliminary Receivers Report suggests that almost 70% of consumers drop out of Defendants' program costing such consumers a total of

$64,682,005.19 more in fees than debt reduction obtained by Defendants. I conclude that the equities therefore weigh in favor of preliminarily enjoining Defendants from engaging in the collection of advance and unlawful fees.

67.    The Court is mindful that some consumers may have benefited from Defendants' debt relief program.  However, "[t]he existence of some satisfied customers does not constitute a defense," when the law has been violated.  *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 530 (S.D.N.Y. 2000).

68.    The Court is also mindful that enjoining Defendants from collecting advance fees may cause some of those employed by Defendants to lose their jobs. However, as to the balance of the equities, "[t]here is no oppressive hardship in requiring Defendants to comply with the law." *FTC v. Am. Fin. Benefits Ctr.*, No. C 18-00806 SBA, 2018 U.S. Dist. LEXIS 244903, at *36 (N.D. Cal. Nov. 29, 2018) (citation omitted).

69.    The Court has also considered disruption to Defendants' existing customers and to clients of Intervenors. Some of this disruption has been caused by a lack of cooperation with the Receiver by certain Defendants and their associated entities. And the Receiver has taken steps to minimize harm to the extent possible. The Court encourages the parties and the Receiver to cooperate to attempt to minimize consumer harm.

70.    Ultimately, while much of Defendants' business appears to be predicated on taking advance fees, this Court is under no duty "to protect illegitimate profits or advance business which is conducted [illegally]." *British Am. Commodity Options Corp.*, 560 F.2d at 143 (citation omitted).

71.    Finally, in the TRO issued by Judge Vilardo the Receiver was instructed to determine whether Defendants' business can be operated lawfully and profitably. The Receiver

has made the "good faith determination" that Defendants' "Law Firm Debt Relief Model as currently constructed is reliant upon misrepresentations about the Law Firms' role in negotiations and settling of debts." (ECF No. 115-1 at 41.) The Receiver also noted that the "model also raises concerns about the unauthorized practice of law as well as ethical concerns about fee splitting with non-lawyer." (ECF No. 115-1 at 41.) The Court concludes that those concerns must be addressed.

72.     Given the foregoing, I conclude that the balance of equities favors Plaintiffs.

## XI.  A Preliminary Injunction with Continuation of an Asset Freeze, Receiver and Other Equitable Relief Is Warranted

73.     Defendants are currently subject to the TRO issued by Judge Vilardo on January 11, 2024. I conclude that continuing this relief by granting a preliminary injunction enjoining Defendants from taking advance and unlawful fees during the pendency of this litigation is necessitated by the public interest.

74.     I conclude that the preliminary injunctive relief proposed by Plaintiffs is narrowly tailored to prevent ongoing consumer injury by prohibiting Defendants from engaging in collecting advance and unlawful fees in violation of the TSR.

75.      The conduct provisions in the proposed Preliminary Injunction will ensure that Defendants will not continue to profit from the unlawful collection of advance fees.

76.     The Second Circuit has "characterized the freezing of assets as ancillary relief that facilitates monetary recovery by preserving the status quo pending litigation of statutory violations." *FTC v. Strano*, 528 Fed. App'x 47, 49 (2d Cir. 2013). I conclude that an asset freeze as to Defendants is essential to preserve the possibility of effective final relief for consumers. *See Campbell Capital*, 18-cv-1163-LJV-MJR, 2018 WL 5781458, at *4 (W.D.N.Y. Oct. 24,

2018) (noting that an asset freeze is appropriate "where there is a significant risk of the dissipation of defendants' assets during the course of the litigation").

77.     To obtain an asset freeze against a relief defendant, the government must show that the person has received ill-gotten funds and does not have a legitimate claim to those funds. *SEC v. Cavanaugh*, 155 F.3d 129, 136 (2d Cir. 1998). Alternatively, a court may freeze a relief defendant's assets where the government can demonstrate that the defendant exercises complete control over that third party. *See SEC v. Zubkis*, No. 97-cv-8086, 2003 WL 22118978, at *5 (S.D.N.Y. Sept. 11, 2003). I conclude that an asset freeze as to the Relief Defendants is essential to preserve the possibility of effective final relief for consumers.

78.     I also conclude that a continuation of the Receiver's authority over Defendants is warranted. A receiver is "particularly necessary" where "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste." *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981). Continuation of the receiver is necessary here to assist this Court, to ensure compliance with its order, to disentangle the companies and bank accounts, and to protect consumers who may have a current debt settlement contract with Defendants.

## XII.   Conclusion

79.     For these reasons, this Court recommends that Plaintiffs' motion be granted and that a preliminary injunction issue barring Defendants from taking advance and unlawful fees in violation of the TSR, among other relief.

80.     I hereby RECOMMEND, that Plaintiffs' motion for a Preliminary Injunction be GRANTED.

81.     Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ORDERED that these proposed Findings of Fact and Conclusions of Law be filed with the Clerk of Court.

82.     Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections within fourteen days.

Dated: February 6, 2024                     Respectfully submitted,

                                            Attorneys for Plaintiff
                                            Consumer Financial Protection Bureau

                                            ERIC HALPERIN
                                            Enforcement Director

                                            RICHA SHYAM DASGUPTA
                                            Deputy Enforcement Director

                                            TIMOTHY M. BELSAN
                                            Assistant Litigation Deputy

                                             */s/ Vanessa Buchko*
                                            Vanessa Buchko
                                            E-mail: vanessa.buchko@cfpb.gov
                                            Phone: 202-435-9593
                                            Monika Moore
                                            E-mail: monika.moore@cfpb.gov
                                            Phone: 202-360-5905
                                            Joseph Sanders
                                            E-mail: joseph.sanders@cfpb.gov
                                            Phone: 202-377-9846
                                            1700 G Street NW
                                            Washington, DC 20552
                                            Facsimile: (202) 435-7722

                                            LETITIA JAMES
                                            Attorney General of the State of New York

                                             */s/ Christopher L. Boyd*
                                            Christopher L. Boyd
                                            Genevieve S. Rados
                                            Assistant Attorneys General
                                            350 Main Street, Suite 300A

51

Buffalo, NY 14202
Phone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov

PHILIP J. WEISER
Attorney General
State of Colorado

 /s/ Kevin J. Burns
Kevin J. Burns, CO Reg. No. 44527
*Pro hac vice*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

KATHLEEN JENNINGS
Attorney General State of Delaware

/s/ Marion M. Quirk
Marion M. Quirk (*pro hac vice*)
Director of Consumer Protection
Kevin D. Levitsky (*pro hac vice*
forthcoming, if required)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov
Kevin.Levitsky@delaware.gov

KWAME RAOUL
Attorney General
State of Illinois

By: /s/ Greg Grzeskiewicz
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau
*Pro hac vice application forthcoming, if
required*
Daniel Edelstein, Supervising Attorney,

Consumer Fraud Bureau
*Pro hac vice application forthcoming, if required*
Amanda E. Bacoyanis, Assistant Attorney General, Consumer Fraud Bureau
*Pro hac vice*
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau
*Pro hac vice*
Office of the Illinois Attorney General
115 S. LaSalle St., 26th Floor
Chicago, Illinois 60603
312-814-2218
Greg.Grzeskiewicz@ilag.gov
Daniel.Edelstein@ilag.gov
Amanda.Bacoyanis@ilag.gov
Matthew.Davies@ilag.gov

KEITH ELLISON
Attorney General of Minnesota

/s/ Evan Romanoff
Evan Romanoff
Assistant Attorney General (*pro hac vice*)
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

JOSHUA H. STEIN
Attorney General of North Carolina

 /s/  M. Lynne Weaver
M. Lynne Weaver (*pro hac vice*)
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Lewis W. Beilin
Assistant Attorney General (*pro hac vice*)
Wisconsin Department of Justice

17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
beilinlw@doj.state.wi.us