

1700 G Street NW, Washington, D.C. 20552

February 8, 2024

Hon. Michael J. Roemer
United States Magistrate Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, NY 14292

Re:     *CFPB et al. v. StratFS LLC et al.*, No. 24-cv-40

Dear Judge Roemer:

Plaintiffs submit this letter identifying the portions of Defendants' Proposed Findings of Fact (Def. FOF) [Dkt. 137] that Plaintiffs disagree with, as directed by the Court at the February 7, 2024 hearing. Plaintiffs disagree with many of the 129 paragraphs of Def. FOF and are unable to address them all in a three-page letter. Rather than rebutting every aspect of Def. FOF with which we disagree, Plaintiffs identify below the proposed findings of fact with which we have the strongest disagreement and that we believe are most relevant to the Court's decision.[1]

Paragraphs 15, 63 FN 8: Plaintiffs disagree that the TSR "doesn't provide much guidance regarding the nature of the presentation." In fact, Defendants' own witness, Mr. Thurman, testified that the regulation's language specifically provides that "it has to be a *sales* presentation" (2/1/24 Tr. 54:24-55:7) (emphasis added), and the regulation expressly requires that it be "by the "seller," 16 C.F.R. § 310.6(b)(3). Defendants have not carried their burden on either of these elements and incorrectly suggest in Def. FOF at 63 n.8 that the signing meeting "is a sales presentation notwithstanding the instruction that notaries should not be selling . . . ." *But see FTC v. Nudge, LLC*, 2022 WL 2132695, at *38 (D. Utah 2022) ("presentation must be 'relat[ed] to[ ] or used in selling").

Paragraph 37: Plaintiffs disagree that the contracts Defendants quote required notaries to provide a face-to-face sales presentation. The quotations provided simply refer to "face-to-face presentation services" and do not mention sales or a "sales presentation."

Paragraph 38: Plaintiffs disagree that notaries acted as agents of the Intervenors during the face-to-face meetings. Several notary witnesses testified/affirmed that they did not consider themselves to be *sales* agents of the law firms in conducting the signings.

---

[1] Plaintiffs also disagree with several of Defendants' unsupported and inaccurate conclusions of law. Consistent with the Court's directions during the February 7 hearing, however, this letter only addresses Def. FOF.

consumerfinance.gov

- Brooks-Ward, 2/2/24 Tr. 322:10 ("I am not an agent for anybody other than myself."); PX-045, Tsui Dep. Tr. at 41:1-7 ("I'm not an agent for these companies; I'm the notary public."); PX-050, Howell Dep. 85:14-20 ("I wasn't an agent. I was only the notary.").
- Lisa Munyon, the owner of NPN, agreed that "the notary's job was not to sell debt-relief services discussed in the contracts during the signings with consumers" because "[t]he notary representatives do not act as sales agent." 2/1/24 Tr. 42:14-18. Notably, NPN does the "lion's share" of notary work for Intervenors, according to Jason Blust. PX-056, Blust Dep. 68:17-20.

Paragraphs 39, 68, 124, 125: Plaintiffs disagree that notaries presented a *substantive* and *detailed* sales presentation, that the meetings were *sales* meetings, and that they took 45-min on average.

- *See, e.g.*, Barsch, 2/2/24 Tr. 506:10-13 ("It was maybe 15, 20 minutes..."); PX-11 at 2, Salva Decl. (describing the notary process as a "flyby presentation" and that the notary seemed "like a robot going through a script"); PX-12 at 58, Sheehan Decl. ("[the notary] did not go over the contract with us; he simply showed my husband and me where on the contract to sign"); PX-12 at 112, Nickles Decl. ("When I signed the contract, [the notary] and I did not discuss anything substantive related to the program.").
- One notary testified that he did not consider his meetings with the consumers to be sales presentations because he was "not selling anything." Accardo, 2/2/24 Tr. 360:11-25 ("Q. . . . [W]ould you describe this as a sales presentation? A. Absolutely not. Q. Why not? A. I'm not selling anything. I, you know, tell the people that I'm there with -- that I'm not there to sell them anything or make them do anything.").
- *See* Dkt. 138-1, K. Davis Decl. (out of 3,152 presentations submitted by Defendants in DX-26 – DX-43, 1,670 lasted 30 minutes or less and 373 lasted 20 minutes or less; the average meeting length recorded was 38 min).

Paragraph 43, 57, 58, 60: Plaintiffs disagree that the mobile notaries all read from scripts and reviewed each page of the PowerPoint printout and retainer at the signing meetings. Both notaries and consumers testified that the notaries did not read aloud the scripts or the presentation to the consumers. (PX-52, Roberts Dep. 35:2-4; Brooks-Ward, 2/2/24 Tr. 327 (explaining that she did not read the script).) The documents total 50-60 pages and there is evidence that over 50% of the meetings lasted 30 minutes or less. *See, e.g.*, PX-11 at 9-58 (Elizabeth Salva documents totaling 50 pages); DX-122 (61 pages); Dkt. 138-1, K. Davis Decl. at 2-3. The notaries could not possibly have "reviewed" every page with the consumers in this time frame.

Paragraph 50: Plaintiffs disagree that all notaries were instructed to answer questions (or did answer them).

- At least two of Defendants' notary companies—Sunshine Signing Connection and NotaryGo—specifically instructed the notaries handling signings for Defendants not to answer questions from the consumers. PX18, Willis (Sunshine) Dep. 32:24-33:18; PX15, Winkelman (NotaryGO) Dep. 25:9-13, 26:21-23.
- Individual notaries testified that they were instructed not to answer questions from consumers during the in-person meeting. *See, e.g.*, Lyon, 2/1/24 Tr. 124:23-125:1 ("[I]f they had a question about it … I would revert them back to the representative from the law firm . . . As I'm instructed to do."); PX-12 at 149, Hulbert Decl. ("I was told that if the consumer had any

questions to have them call the representative of the debt relief company"); PX-46, Shirkey Dep. 25:8-10 ("[I]f I was asked a question, I was to call number X because I am not authorized to answer any questions.").

Paragraph 67: Plaintiffs disagree with Defendants' description of the so-called Affidavit of Compliance. This document is not an "affidavit," and notaries testified that it did not accurately describe the substance of in-person meetings and it was a "grave mistake" to have signed it. Brooks-Ward, 2/2/24 Tr. 347:19-348:7 (testifying that it "was just a grave mistake on my part for even signing that document"); Accardo, 2/2/24 Tr. 384:10-11 ("[I]f I had read this document more carefully, I probably wouldn't have signed it."). The document does not mention a "sales" presentation and states only that consumers reviewed documents "in writing." DX 26 at 1.

Paragraphs 70, 74: Plaintiffs disagree that notaries are always required to complete training before a signing meeting and that all notary companies track who took training. Ms. Munyon admitted she sometimes assigns training *after* a signing. Munyon, 2/1/24 Tr. 45:6-13. And other notary companies did not require training. PX15, Stone Dep. 20:24-21:3 (NotaryGO did not train the notaries about debt relief before signings).

Paragraph 91: Plaintiffs disagree with Defendants' representations of numbers as to Mr. Elkins. Defendants are supporting their claims with exhibits they used in court that were not provided to Plaintiffs, that Plaintiffs still do not have despite asking, and which Plaintiffs have never seen.

Paragraphs 100-05: Plaintiffs disagree with Defendants' characterization of Mr. Regan's analysis. The analysis was based on a flawed model, and Plaintiffs disagree with the conclusions he reached about the impact on consumers. The Receiver's Report, which is based on more robust and complete data, and was written by an officer of the court, has more reliable numbers. It details that 70%—not 44%—of consumers leave the program and identifies the extensive net harm to consumers. Dkt. 115-1 at 36. This group of consumers has lost an aggregate amount of $64,682,005.19. Dkt. 131-1 at 2. This is not their total fees; rather, it's the amount of fees *above and beyond any debt reduction*.

Paragraphs 106-08: Plaintiffs disagree that our evidence is stale. Defendants' practices remain materially unchanged, and evidence regarding notary meetings from years ago is relevant to whether *ongoing* fees are legal. Once enrolled, consumers can pay fees for four or more years. If the notary meeting did not satisfy 16 C.F.R. § 310.6(b)(3), all advance fees Defendants take are illegal.

Paragraphs 109-112: Plaintiffs did not mislead or conceal information from the Court. The information Defendants point to was either (a) included in the TRO submissions, or (b) amounts to cherry picking by Defendants of non-material facts they would have liked Plaintiffs to feature to distract from the clear picture of the TSR violations Defendants committed.

Paragraph 126: Plaintiffs disagree that there would be no difference for consumers if the presentation was made by an employee. Defendants do not cite any evidence to support this self-serving proposition.

Respectfully,
/s/
Vanessa Buchko
Joseph Sanders
Monika Moore
Shirley Chiu
Consumer Financial Protection Bureau

Christopher L. Boyd
State of New York