

Ronald S. Safer<br>
312.471.8736<br>
rsafer@rshc-law.com

February 8, 2024

*Via ECF*

Hon. Michael J. Roemer
United States Magistrate Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, New York 14202
(716) 551-1630

> Re: *CFPB et al. v. StratFS, LLC et al.*, Case No. 24-cv-00040 - Response to Plaintiffs' Proposed Findings of Fact

Dear Judge Roemer,

On behalf of all Defendants and the Intervening Law Firms, we submit this letter to address several of Plaintiffs' inaccurate proposed findings of fact.

*First,* Plaintiffs' assertion that notaries were instructed to and could not answer questions about the presentations is contextually misleading, factually incorrect, and belied both by the documentary evidence and testimony from Plaintiffs' own witnesses. *See* ECF No. 139, ¶¶51-58. As is their tactic, Plaintiffs exaggerate their conclusions based on markedly limited evidence. What the Plaintiffs mischaracterize as the notaries' supposed inability to answer client questions was in fact part of a carefully designed system to ensure that all of the program's important disclosures (including all of the disclosures required by the TSR) were uniformly delivered to prospective clients. As Mike Thurman explained, the goal was to "make sure that every consumer was seeing the same presentation, every notary was presenting the same presentation, and for similar reasons, that's why we had the script. **Because the goal was to make sure that you didn't have someone [i.e., notaries] doing a sloppy job.**" Thurman P.I. Hearing 57:15-20 (emphasis added). The Court should view the notaries' presentations and approach to answering questions against that critically important backdrop.

Moreover, it is simply factually incorrect that the notaries could not and did not answer questions. The notary training expressly instructs the notaries to answer basic questions. *See* DX13 - 0004 ("When going through the steps with a client, the client may have questions. You MAY: po[i]nt out answers that are on the appropriate slide; offer answers from the enrollment documents; offer clarifications; repeat information you have read in these materials."). *See also* DX8-0001 ("I understand that I am *also* acting as an agent of [Intervenor Law Firm] to … answer[] basic questions…."). The notaries were even given a "Top Questions Asked By Clients" cheat sheet, DX11, which recited common questions asked by clients and, importantly, how to answer them. *See* DX11-0002 ("Below are the most common and important questions asked by clients. Your ability to both understand and answer them will solidify your understanding of Debt Settlement and help you to perform these presentations with confidence."). What the notaries were ***not*** permitted to do, however,

Response to Plaintiffs' Proposed Findings of Fact
February 8, 2024
Page 2

for the reasons explained by Mike Thurman, was to freelance and go beyond the comprehensive presentation materials. *See* DX11-0005 ("You are **NOT** there to give personal advice or opinions").

The notaries were therefore not only empowered and instructed to answer basic questions – within the above parameters – but the testimony from the notaries proves they actually did so. For example, Diane McKay (one of the notaries Plaintiffs noticed for deposition), was asked the following by Plaintiffs' counsel: "Do you recall ever answering any substantive questions about the terms of the program with these folks?" And she answered, "*Yes*. The biggest question people had when it was -- now that I recall was about their credit because it said in there during this whole time of negotiation that it may affect their credit … negatively." And when asked how she responded to those substantive questions, she testified: "I just confirmed that, yeah, basically the program stated that they were supposed to stop making any payments; and if they stopped making payments, then it's going to affect their credit." *See* McKay Dep. Tr. 24:3-18. Plaintiffs unsurprisingly ignore this.

And they ignore many other witnesses they deposed. Several other notaries (most of whom were called by Plaintiffs) testified similarly to Ms. McKay:

| Judith Korff | "Q: And if you are asked questions during those meetings that were based on the documents that you had, would you answer those questions? A. If -- yeah, if they were based on the documents in front of me that I could explain them, yes." *See* Korff Dep. Tr. 56:19-24. |
|---|---|
| Mary Beth Brown | "Common questions that I would get is they don't understand the difference between the special purpose savings account and their checking account…so it's just like, well, the money's coming out of here and it's going in there." And if they ask what the difference is between the two accounts, she answers them: "well, basically I say to them that's still your account. It's in your control. They give you a password. You can deposit or withdraw from that at any time." She also sometimes gets the question, "why is it taking seven months?" And, again, she answers them: "And I'll say, we have to build up money in your special purpose savings account to actually get to pay off those bills." *See* Brown Dep. Tr. 62:9-63:15. |
| Michelle Pennington | Questions sometimes came up, such as "what am I looking at for monthly payments?" Pennington testified: "A lot of the questions are something I could easily pull up in the documents and say, oh, here we go. Let's go to this page. Let me show you everything that we're about." *See* Pennington Dep. Tr. 36:9-37:4. |
| Peter Fountain | "Literally ninety percent" of people ask him during the presentation if their credit will be hurt by participating in the program, and he "actually flip[s] through to the page where it says it's going to damage your credit." Fountain Dep. Tr. 35:9-21. |
| Brian Anderson | If he got questions that were answerable with the documents, he would flip back to that page and point out the answer. Anderson Dep. Tr. 45:14-19. |
| Michelle Rena | If clients had substantive questions, answering them "depends on the question. If it's something simple that we know we just hit, we can reread it." Rena Tr. 37:19-38:6. |
| Eric Howell | If he was asked a question, if it was something that was covered in the presentation (such as, "how much are the fees?"), he would take them back to that page and point it out to them. Howell Dep. Tr. 66:8-15. |

Response to Plaintiffs' Proposed Findings of Fact
February 8, 2024
Page 3

| | |
|---|---|
| **Mark Roberts** | "[T]he questions I answer I can always point to in the documents because everything is clearly stated in the documents, and if it's beyond the documents, they can speak to someone or one of us will call their rep." 27:25-28:20; 29:2-7. |

*Second,* Plaintiffs mischaracterize the findings of Greg Regan, specifically the lack of benefit to the approximately 44% of consumers who drop out of the debt settlement program before completion. *See* ECF No. 139, ¶¶120-121. But this number is virtually identical to the number of people who do not successfully complete a Chapter 13 plan. *See* https://www.uscourts.gov/data-table-numbers/bapcpa-6?order=field_date_updated&sort=desc). Table 6 in the above link shows the number of cases in which Chapter 13 plans were completed in consumer cases. In 2022, of the 197,587 Chapter 13 consumer cases closed by dismissal or plan completion, 44% (86,222) of these cases were dismissed before completing their repayment plan and 56% (111,365 cases) of those cases closed because the debtors received a discharge after completing repayment plans. Nationwide, failure to make plan payments was cited in 54% of cases as the reason for dismissal. It is against the success of this alternative that the debt settlement program must be judged.

*Third,* Plaintiffs' claim that "consumers did not meet anyone in-person prior to signing up" for the debt settlement program is easily disproven. ECF No. 139 at 25. Section 1.7 of the Client Retainer expressly refutes Plaintiffs' argument. *See, e.g.,* DX122-0027. And even Plaintiffs' own investigator conceded that *all* of the sales presentations took place in person. *See* Def. Prop. Findings, ¶40.

*Fourth*, throughout their proposed findings, Plaintiffs cite the Receiver's report as evidence. *See id.* at ¶¶17, 66, 69, 71, 121. It is no such thing. The Receiver never testified, nor was he subjected to cross-examination on any of the issues upon which he's opining. These references should be disregarded by the Court.

*Fifth*, Plaintiffs also exaggerate the proposed findings of "fact" regarding the notaries' supposed lack of training. *See* ECF No. 139, ¶¶40-48. They rely on two pieces of testimony: a cherry-picked excerpt from Lisa Munyon's hearing testimony, and out-of-context citations to NotaryGo's 30(b)(6) deposition testimony. What Plaintiffs fail to tell the Court, however, is that Defendants *stopped using NotaryGo in 2020*, more than 4 years ago (and outside the applicable 3-year limitations period). *See* J. Stone Dep. Tr. 11:15-21. Moreover, NotaryGo's president and vice president had limited (if any) personal knowledge regarding either their notaries' training or the documents used for the sales presentations during that early timeframe. *See* J. Stone Dep. Tr. 26:24-27:18; 42:25-43:5; 45:2-10, 46:22-47:2; D. Strengberg Winkelman Dep. Tr. 11:1-11, 43:15-44:7, 51:2-53:14. And as the Court heard form Ms. Munyon at trial, *all* of the NPN notaries (who now perform nearly all of the debt settlement presentations) are required to be trained and tested. Munyon P.I. Hearing 45:8-25 (noting that in limited circumstances NPN allowed experienced notaries who had debt settlement experience to be excused from training for presentations done "on short notice," but "if they wanted to continue to do work for us after, they would be required to complete the training.").

Defendants and Intervenors wish to emphasize the above are just examples (provided in this limited space) illustrating the Plaintiffs' tactic of relying on mischaracterized and threadbare portions of evidence and testimony to draw unsupported conclusions. There are many more.

Response to Plaintiffs' Proposed Findings of Fact
February 8, 2024
Page 4

    Sincerely,

    */s/ Ronald S. Safer*
    Ronald S. Safer (*pro hac vice*)
    Rodney Perry (*pro hac vice*)
    Matthew Kennison (*pro hac vice*)
    Maegan McAdam
    RILEY SAFER HOLMES & CANCILA LLP
    70 W. Madison Street, Suite 2900
    Chicago, Illinois 60602
    Tel: (312) 471-8700
    rsafer@rshc-law.com
    rperry@rshc-law.com
    mkennison@rshc-law.com
    mmcadam@rshc-law.com

    *Attorneys for Individual Defendant Ryan Sasson and Relief Defendants Daniel Blumkin and Ian Behar, and related Relief Defendant entities*


    */s/ Terrence M. Connors*
    Terrence M. Connors, Esq.
    CONNORS LLP
    1000 Liberty Building
    Buffalo, New York 14202
    (716) 852-5533
    tmc@connorsllp.com

    *Attorneys for Intervenor Law Firms*


    */s/ Dennis C. Vacco*
    Dennis C. Vacco, Esq.
    Scott S. Allen, Jr., Esq.
    50 Fountain Plaza, Suite 1700
    Buffalo, New York 14202
    (716) 853-5100
    dvacco@lippes.com
    sallen@lippes.com

Case 1:24-cv-00040-EAW-MJR   Document 142   Filed 02/08/24   Page 5 of 5

Response to Plaintiffs' Proposed Findings of Fact
February 8, 2024
Page 5

        *Attorneys for StratFS, LLC (f/k/a Strategic Financial Solutions, LLC) and subsidiary entities*

        */s/ Rodney O. Personius*
        Rodney O. Personius, Esq.
        PERSONIUS MELBR LLP
        2100 Main Place Tower
        350 Main Street
        Buffalo, NY 14202
        (716) 855-1050
        rop@personiusmelber.com

        *Attorneys for Defendant*
        *JASON BLUST*
        *and Relief Defendants*
        *JACLYN BLUST*
        *THE BLUST FAMILY IRREVOCABLE TRUST*
        *LIT DEF STRATEGIES, LLC*
        *RELIALIT, LLC*