UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>                Plaintiffs,<br><br>vs.<br><br>STRAFTS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>                Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>                Relief Defendants. | Case No. 24-cv-00040-EAW-MJR |

**RECEIVER'S REPLY TO DEFENDANTS' LETTER SUBMISSION
DATED FEBRUARY 9, 2024**

      Thomas W. McNamara, Court-appointed temporary receiver ("Receiver") in the instant action, hereby submits this response to Defendants' letter to the Court dated February 9, 2024 (Dkt. 149).

      Defendants have presented another sweeping, inaccurate, and sloppy attack on the Receiver. This appears to be another of several efforts to relitigate Defendants' motion to dissolve the receivership [Dkt No. 36] which the Court denied several weeks ago. Defendants' time would be better spent working collaboratively with the Receiver, particularly as the TRO has been extended at their request and StratFS' financial duress become more acute because the

company is thinly capitalized. Instead, aside from the periodic broadsides the Defendants file with Court, the Receiver hears almost nothing from Defendants.

Each of the latest grievances is addressed below:

Critical Vendors

Defendants claim critical vendors set out in their Exhibit A are not being paid as follows:

- Salesforce contract is "overdue." That is false. The $1.8 million annual payment is due February 15, 2024. StratFS SVP Brian Reiss has indicated that Salesforce has been flexible during negotiations in the past. Given the temporary nature of the receivership, the Receiver has not engaged with Salesforce so as to leave Defendants' options open; had he acted otherwise, the Defendants would have claimed it was another instance of the Receiver attempting to "destroy" the business.[1]

- Excela contract, "[w]e need to contact them and let them know what's going on . . . and figure out a way to cancel services that are no longer necessary." The Receiver spoke with Excela Friday morning, confirmed they were paid into January (a recent invoice for January has been sent), and the contract is based on per-piece handling so the drop in volume will be apparent in the next invoice. As the contract is based on volume there is no need to "cancel."

- The 8x8 monthly fee should and will be prioritized.

- The Box invoice was past due as of December 30, 2023 before the Receiver was appointed, and the payment exigency is therefore of Defendants' making.

- Microsoft 365 and Azure: StratFS's Microsoft 365 and Azure services, and a very large suite of others, is provided by the Lloyd Group. Last Monday, February 5, Lloyd was paid $92k for the last three weeks of January. Additionally, the Receiver has been in discussions with Brian Reiss about how to reduce Lloyd costs. Reiss supplied a proposal Friday morning to deactivate 709 Microsoft licenses, which is under review.

- FreedMaxick – Invoices for over $230,000 for accounting work done related to 2022 and 2023 tax preparation. Beyond the temporary nature of the receivership and the meager resources of the estate, it seems highly

---

[1] Immediate payment of the entire balance for the annual fees to Salesforce would render the receivership estate insolvent.

>inappropriate for a temporary receiver to pay invoices that the Defendants themselves apparently did not care to pay.

As the TRO has been continued at Defendants' requests, the extensions have created a financial squeeze. Confronted with a meager estate in light of the scale of the business, balancing estate resources to mounting expenses and invoice obligations has become acute. The TRO directs the Receiver to prevent the inequitable distribution of Assets, and he has acted accordingly. [TRO IX, G]

After the status conference on Friday, February 9th, the Receiver asked the StratFS President to identify an accounts payable person to assist in light of the extension of the PI hearing to February 14 – some 20 days later than initially set. The President identified controller Cameron Ball. It seems disingenuous for Defendants to hours later demand the Receiver be "direct[ed]" to hire Mr. Ball without noting that the steps had already been undertaken by the Receiver to do exactly that.

Staffing

Defendants have once again requested additional customer services employees be brought back to work. As explained in previous reports, the Receiver must balance the cost to provide staffing to protect consumers against the modest funds Defendants left in operating accounts. On January 22, the Receiver authorized 78 Customer service and support staff to return to work; and 35 DTC employees restarted on Monday, February 5. On Tuesday, February 6, after discussions with the customer services manager, the Receiver authorized 15 more customer services representatives (5 immediate; 10 who needed training) and 2 leaders to begin (bringing this staff to 95) to address customer wait times.

Defendants state the company "President has recommended the addition of 150 more staff" be brought in. While that might be ideal, it is not economically feasible given the limited funds in the receivership estate. During previous exchanges among the parties and the Receiver prior to January 22, the President proposed returning 264 employees at a cost of $796,000+ every three weeks (or $1.061 million per month). The President's present suggestion would take the total customer service staff to 245 (and 35 DTC staff), so presumably the cost would exceed $1.6 million a month.

If the estate had additional liquidity, the Receiver would support bringing in 150 more staff to assist with customer service. But that is not the reality with which we are dealing. Defendants simply ignore that economic reality. We asked counsel for StratFS Defendants, Mr. Vacco, how they propose to fund the 150 additional staff. We await their response.

<u>WARN Notice</u>

On Thursday, February 8, the Receiver began mailing Conditional Notices of Reduction in Force to those employees who had not been called back to work. In an effort to keep employees informed as soon as possible, the Receiver immediately posted a website update explaining the Conditional Notices of Reduction were being placed in the mail. The update included excerpts of the Conditional Notice of Reduction in Force letter, and explained, among other things:

> The Court is currently considering the CFPB's and the attorneys generals' request that it issue a Preliminary Injunction that would effectively prohibit the Company from engaging in significant aspects of its pre-TRO business. The hearing on this request has been held and we expect a decision shortly. We understand that the parties are in discussions which could potentially mitigate the impact on the Company's business operations. If a settlement is not reached and the Court grants the governments' request

> for a Preliminary Injunction, the Company anticipates it will need to undertake a reduction in force that will impact employees . . . .

The Receiver believes based on advice of counsel that the Conditional Notices of Reduction in Force were required given the facts described above (and others set forth in the letters).

Predictably, Defendants claim the Conditional Notices are an example of "the Receiver [] doing everything in his power to destroy the Company." But only five days earlier, they excoriated the Receiver for not having given the notice and claimed he was not complying with his obligations to employees. They wrote the Receiver put "almost a thousand people out of work, while ignoring both State and Federal WARN Acts, without any concern about the implications for them or their families." Defendants' new claims are false; so were their earlier claims.

LeadTrac and Lit Def Strategies, LLC

1. Lit Def Ignored the TRO:

As noted in the Preliminary Report, Lit Def failed to comply with its TRO obligations as a Receivership Defendant. The TRO is not a self-executing document; it imposes requirements of affirmative cooperation. *See e.g.,* TRO XI, XIII (Cooperation with Receiver), and XIV (Delivery of Receivership Property). Lit Def is owned by Defendant Jason Blust, an attorney, and Lit Def is represented by counsel. Nevertheless, Lit Def took no steps to comply with the TRO.[2]

Ten days after Defendant Blust became aware of the TRO, on January 22, the Receiver left a message for Lit Def's counsel. The following day, counsel for the Receiver and Lit Def spoke. On January 24, Receiver's counsel followed up twice on

---

[2] Apparently, Lit Def did provide financial disclosure documents to the Plaintiffs. The Receiver has not seen these disclosures.

requests made to Lit Def.  Receiver's counsel noted, "[t]he most pressing concerns are what we discussed yesterday, regarding (1) accessing and gaining insight into the assets, documents, and ESI of the Receivership Defendants and also (2) gaining an understanding of Relialit and Lit Def Strategies's current business operations."  Later that day, Receiver's counsel wrote, "[i]n particular, we are also interested in understanding and gaining access to LeadTrac, which we understand to be a third-party system built by National Data Systems https://www.ndssite.com/.  We understand that no one at StratFS has access to it and that requests for access to NDS have typically been made through Mr. Blust.  Could you inquire with your client and find out who owns LeadTrac and whether we could gain access to it?"  Receiver's counsel continued, "[t]he Receiver is considering whether it is necessary to bring back any such operations in the short term (i.e., before the PI hearing next week) to minimize harm to consumers, and also the receiver will be making recommendations regarding whether the business of Receivership Defendants can be done lawfully and profitably."

Having heard nothing back, Receiver's counsel followed up again the next day, January 25.  He noted "there may be services that companies related to Mr. Blust's companies were performing that could help the consumer.  We have brought back to work certain personnel at SFS to minimize harm to consumers and want to make sure that any urgent litigation needs of consumers in the near term are identified and handled appropriately.  Additionally, we still wish to gain an understanding of the documents, ESI, and assets of the Receivership Defendants related to Mr. Blust."

Later that afternoon, Lit Def counsel revealed that the company had been shut down since the entry of the TRO and staff laid off.  He did not answer any of the

questions posed in the emails, apologized for the delay in responding, and invited another call the following day.

The unilateral decision to terminate operations upon the entry of the TRO and disabling Leadtrac access prevented StratFS staff from forwarding litigation documents (complaints, summons, etc.), which Defendants stressed was crucial to protect clients during the January 18 hearing. These two actions affirmatively ensured that StratFS could not forward litigation documents to appearance attorneys (those attorneys working on litigation matters) and greatly prejudiced clients.

2. Lit Def Remains in Violation of the TRO

Lit Def took no further steps to comply with the TRO. After the February 7 hearing, the Receiver and counsel once again raised concerns about the inability of StratFS employees to forward legal filings to appearance attorneys. In particular, they noted the inability to access Leadtrac and Lit Def (which acts as a hub between StratFS and appearance attorneys) and requested assistance in getting access. Defense counsel agreed to speak to their client. In a separate effort on the same day, Brian Reiss of StratFS reached out to Defendant Blust and the Leadtrac vendor to understand why access was unavailable. Defendant Blust indicated that access had been "disabled" but agreed to enable the access, which we understand has been done.

Defendants appear to argue the asset freeze somehow excused Lit Def from the TRO obligations. Not so. Now, Lit Def requests the Receiver be "directed" to "reopen[]" Lit Def while at the same time it thumbs its nose at the TRO. Assuming that Lit Def does come into compliance with the TRO and wishes to reopen, its funding must come from the Intervenor Law

Firms; Lit Def is providing a services to those firms, and they should pay for the services – not the receivership estate.[3]

Dated: February 11, 2024

                                        **HODGSON RUSS LLP**

                                        */s/ James C. Thoman*
James C. Thoman, Esq.
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone: (716) 856-4000
Facsimile: (716) 849-0349
Email: jthoman@hodgsonruss.com

**MCNAMARA SMITH LLP**

By: */s/ Logan D. Smith*
Logan D. Smith (*Pro Hac Vice*)
Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 269-0400
Facsimile: (619) 269-0401
Email: lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Court-appointed Receiver, Thomas W. McNamara*

---

[3] In this regard, it is helpful to remember that Defendant Blust owns Lit Def and owns, manages, or controls the Intervenor Law Farms.