

1700 G Street NW, Washington, D.C. 20552

February 16, 2024

*Via ECF*

Hon. Judge Michael J. Roemer
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, NY 14202

Dear Judge Roemer,

We write in response to Intervenors' Letter Regarding Plaintiffs' Proposed Preliminary Injunction. Dkt. 143. Despite Intervenors' contention otherwise, the Court should issue a Preliminary Injunction consistent with the TRO issued by Judge Vilardo. Indeed, the additional evidence submitted to the Court since Judge Vilardo's decision to issue a TRO has shown both the importance and necessity of each aspect of relief in his order.

In their letter to the Court, Intervenors contend both that the preliminary injunction sought by Plaintiffs is not justified, and that if the Court does enter a preliminary injunction, it should contain the modifications set forth in their letter. As explained below, Intervenors are wrong on both counts.

### I.   The record evidence establishes that a preliminary injunction is warranted.

In the Second Circuit, when a governmental agency seeks a statutorily authorized injunction it is required to show: (1) a reasonable likelihood that the wrong will be repeated; (2) a likelihood of success on the merits; and (3) that the injunction is in the public interest. *See City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010). Here, the evidence submitted in connection with the evidentiary hearing and attached to Plaintiffs' motion for a temporary restraining order and preliminary injunction establishes that Defendants are telemarketers who take advance fees in connection with debt-relief services, and they take these fees without providing consumers with a "face-to-face sales … presentation by the seller." *See generally* Dkt. 5-1, 138. As such, Plaintiffs have established that they are likely to succeed on the merits. The record is also clear that the only reason Plaintiffs have ceased engaging in the illegal conduct is because of the entry of the TRO. And Plaintiffs have shown that entry of a preliminary injunction is in the public interest – particularly given the grave consumer harm resulting from Defendants' and Intervenors' illegal business practices. Thus, a preliminary injunction should be entered in this case.

Furthermore, contrary to Defendants' arguments that the Court should narrowly tailor any injunctive relief, in cases seeking relief for consumers "[t]he Court may provide broader injunctive relief than the illegal or fraudulent practices at issue because an increased scope helps

to prevent similar and related violations from occurring in the future." *New York v. Debt Resolve, Inc.*, 2021 WL 1200217, at *4 (S.D.N.Y. Feb. 4, 2021) (quotation marks omitted). Similarly, an asset freeze is a well-established "provisional remedy that serves to preserve the status quo and to ensure that, in the event the [government] obtains a judgment, money will be available to satisfy that judgment." *S.E.C. v. Ahmed*, 123 F. Supp. 3d 301, 307–08 (D. Conn. 2015), *aff'd sub nom. SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53 (2d Cir. 2016).

## II. A preliminary injunction is warranted against Sasson and Blust and a Receiver is needed to manage Receivership Defendants.

The evidence belies Defendants' contentions that Ryan Sasson and Jason Blust engaged in no wrongdoing and that pre-TRO SFS management is suited to run the company. Because Sasson and Blust controlled the Corporate Defendants[1] and Intervenors, respectively, and they knew or consciously avoided knowing of the conduct that violated the TSR, a preliminary injunction against both is warranted. *See People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 368 (S.D.N.Y. 2019).

First, there is no dispute Sasson controlled SFS and Blust controlled Intervenors. Plaintiffs have presented undisputed evidence that Sasson and Blust controlled those companies as they continuously violated federal consumer protection law for years. *See, e.g.*, PX-56, Blust Dep. 82:10 – 84:7; PX-19, Sasson Dep. 8:12-25. Second, it is undisputed that both Sasson and Blust knew that SFS and Intervenors were selling debt-relief services by phone and providing debt-relief services for consideration, and that both companies were receiving consumer fees.[2] *See, e.g.,* PX-19, Sasson Dep. 38:3 – 39:24 ("Strategic receives – the client service company receives the entirety of that service fee."); Dkt. 8-6, Ridder Decl. ¶ 18(a); Thurman, 2/1/24 Tr. 67:4-15, 85:19-86:3 (Blust retained Thurman to update retainer agreements); PX-54, Agosto Dep. 37:8-40:18 (Blust emails Intervenor firms updated retainer agreements); PX-11, Salva Decl. at 35 (retainer agreement, Section 2 detailing monthly fee payments regardless of when a settlement is reached). Plaintiffs' evidence shows that the Corporate Defendants and Intervenors were requesting or receiving advance fees from consumers and that those fees went into accounts controlled by Sasson. *See, e.g.,* PX-73, Cohen Decl. ¶ 28; Dkt. 8-7, Hanson Decl. ¶ 11. Indeed, Plaintiffs established that Sasson and Blust were personally and actively involved in designing the notary meeting protocol under which they took illegal advance fees. PX-4 at 4 (email copying Sasson and Blust); PX-56, Blust Dep. 63:18-77:11. Moreover, Sasson was the administrator on an account with Global Holdings, a payment processor, where Global communicated to SFS employees deficiencies with the meetings that went uncorrected. *See* Sasson Dep. 142:24-152:22; PX-72.

In light of the undisputed evidence of Sasson's and Blust's direct involvement in violations of federal law, Defendants' suggestion that the foxes should be put back in charge of the hen house is alarming. Sasson and Blust put in place the illegal business model that Corporate Defendants used to extract more than $100 million in illegal fees from cash-strapped consumers, and which they would have kept running had Judge Vilardo not entered the TRO. Indeed, Blust's willful, month-long noncompliance with the Court's TRO is further evidence that neither of them should be involved in

---

[1] The Corporate Defendants include the SFS entities, along with the Client Services Subsidiaries.
[2] Defendants' and Intervenors' focus on which entity "charged" the illegal advances fees (Dkt. 143 at 1 n.1) is a red herring. The TSR prohibits "requesting or receiving" such fees. *See* 16 C.F.R. § 310.4(a)(5)(i). There is no dispute that, at a minimum, Corporate Defendants "received" such fees.

the operation of these entities or business going forward. *See, e.g.*, Dkt. 150 at 5-7 (Receiver report detailing that Blust and his company Lit Def "remain in violation of the TRO" and that Blust's refusal to comply "greatly prejudiced clients"). Given the troubling history of leadership at SFS, a Receiver should remain in place to ensure Defendants operate in compliance with the law.

### III.   Asset Freezes must be left in place to ensure there are resources available for consumer restitution.

Defendants' argument that the preliminary injunction should not include an asset freeze is unsupported and meritless. Based on the asset freeze issued by Judge Vilardo, Dkt. 12, banks have frozen approximately $12 million of funds held by Corporate Defendants, their affiliates, and subsidiaries, and approximately $51 million held by Individual Defendants and Relief Defendants, their affiliates, and subsidiaries. Yet the Receiver's Report and accompanying letter filed on January 31, 2024, suggest that consumer restitution for Law Firm Debt Relief Model clients is likely to exceed $64 million. If this Court orders restitution, all of the assets held by the Individual Defendants and Relief Defendants will be essential and still may not fully redress harmed consumers; thus, it is imperative that those assets remain frozen.

Defendants' contention that the asset freeze must be lifted so they can pay legal costs and living expenses and to support the business operations of SFS and the law firms are unfounded. Pursuant to the Court's existing order, Dkt. 64, Plaintiffs have worked diligently to release funds when requested by Defendants for living expenses and to cover legal costs. Defendants have not shown a reasonable basis for the Court to terminate the asset freeze.

### IV.   Defendants' purported "contingency-fee model" is irrelevant to the proposed preliminary injunction.

Despite Defendants' and Intervenors' focus on the possibility of lawfully operating a contingency-fee model moving forward, the Court's preliminary injunction order need not address such issues. Plaintiffs have pursued claims based solely on Defendants' and Intervenors' illegal advance-fee business. *See* Dkts. 1, 5-1, 138. That is the only conduct addressed in Judge Vilardo's TRO, *see* Dkt. 12, and it is the only conduct the Court needs to enjoin when issuing a preliminary injunction.

### V.   Relief Defendant Lit Def Strategies should remain subject to the preliminary injunction.

Defendants' suggestion that the Court terminate Lit Def Strategies (Lit Def) as a Receivership Defendant and restore its former management (i.e. Jason Blust) is shocking. The Receiver has identified grave concerns about the conduct of Blust and Lit Def in publicly filed reports. Most notably, the Receiver alleged five days ago that Lit Def "[r]emains in [v]iolation of the TRO," despite the fact that is both owned and run by an attorney (Blust) and is represented by counsel in this matter. Dkt. 150 at 5. According to the Receiver, rather than comply with Judge Vilardo's order, a unilateral decision was made, presumably by Blust, to shut down Lit Def and disable the software that permits Corporate Defendants' staff to forward documents to attorneys representing consumers about active litigations. *Id*. In addition to violating the TRO, these actions by Blust and Lit Def appear to have "greatly prejudiced" consumers. *Id.* at 7.

Such recalcitrance should not be blessed by relieving Lit Def of court-ordered obligations it has flaunted. Indeed, the initial inclusion of Lit Def was clearly warranted, given that between

December 30, 2019 and March 30, 2021, Lit Def received over $30,000,000 from 18 of the Intervenor law firms associated with Corporate Defendants. Dkt. 5-1 at 43. As such, the Court should not terminate Lit Def as a Receivership Defendant, but rather should make clear that Lit Def is subject to and must comply with any preliminary injunction that is entered.

Respectfully submitted,

*/s/ Vanessa Buchko*
Vanessa Buchko
Joseph Sanders
Monika Moore
Shirley Chiu
Consumer Financial Protection Bureau

*/s/ Christopher Boyd*
Christopher L. Boyd
State of New York