EXHIBIT 8

| | |
|---|---|
| **From:** | Salvatore Tirabassi[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E9CC5A5C9743427AB641264C6EAAD6FB-STIRABASSI_] |
| **Sent:** | Thur 3/24/2022 1:42:16 PM (UTC-04:00) |
| **To:** | Marc Lemberg[MLemberg@stratfs.com]; Cameron Ball[cball@stratfs.com] |
| **Subject:** | Re: February Invoice |

You can land the plane with Blust then as you see fit. Thanks!

**From:** Marc Lemberg <MLemberg@stratfs.com>
**Date:** Thursday, March 24, 2022 at 1:35 PM
**To:** Salvatore Tirabassi <stirabassi@stratfs.com>, Cameron Ball <cball@stratfs.com>
**Subject:** Re: February Invoice

If there is no critical work going on - just the basic retainer for services - then I am fine leaving it on invoices. I would dumb it down to a simple email:

"You guys agree that for $750K retainer paid this way, you will make resources available to consult Strategic Client Support for next X months."

"Agreed"

Done and file it with the invoices.


**Marc Lemberg**

General Counsel

**O:** (212) 810-4522 //ext 7061 //**E:** MLemberg@stratfs.com


This e-mail may contain information that is confidential and/or privileged. If you are not the intended recipient of this e-mail, you must not disseminate, copy or take any action with respect to any information contained in it. If you have received this e-mail in error, please notify the sender immediately by e-mail and immediately destroy it and its attachments.

---

**From:** Salvatore Tirabassi <stirabassi@stratfs.com>
**Sent:** Thursday, March 24, 2022 6:28:33 AM
**To:** Marc Lemberg <MLemberg@stratfs.com>; Cameron Ball <cball@stratfs.com>
**Subject:** Re: February Invoice

Marc

Freed moved on from this. I am not sure we need to go through this now. What do you think?

ST

Get Outlook for iOS

**Salvatore Tirabassi**

Chief Financial Officer

ext 7035 //**E:** stirabassi@stratfs.com

This e-mail may contain information that is confidential and/or privileged. If you are not the intended recipient of this e-mail, you must not disseminate, copy or take any action with respect to any information contained in it. If you have received this e-mail in error, please notify the sender immediately by e-mail and immediately destroy it and its attachments.

---

**From:** Marc Lemberg <MLemberg@stratfs.com>
**Sent:** Wednesday, March 23, 2022 7:32:31 PM
**To:** Cameron Ball <cball@stratfs.com>
**Cc:** Salvatore Tirabassi <stirabassi@stratfs.com>
**Subject:** RE: February Invoice

Attached is a form of Technology Services Agreement that describes broad technology consulting services.  It is an appropriate basic procurement agreement for tech services.

Date of the agreement should reflect first month services were provided.

Please confirm that the structure of the compensation is correct:

2. **Compensation:**
   a. Client will pay Company a fixed retainer fee of $750,000 (the "Retainer") as follows: (i) monthly payment for Services in seven monthly installments of $100,000; followed by (b) one final payment of $50,000.

   a. In addition to the Retainer, Client will pay Company fees, and will reimburse Company for any disbursements, in accordance with the terms and payment schedule set forth in one or more duly executed SOWs relating to specific additional projects.

   [AS OF TODAY THERE ARE NO SOWs - THIS IS A STD TECH FRAMEWORK SO IF THERE IS ADDITIONAL WORK IN FUTURE, ONE WOULD ADD A SOW – IF THERE ARE SPECIFIC DELIVERABLES EXPECTED OF FIDELIS, WE SHOULD INCLUDE THOSE]

Rest is typical tech agreement stuff.

**Marc Lemberg**

General Counsel

**O:** (212) 810-4522 //ext 7061 //**E:** MLemberg@stratfs.com

This e-mail may contain information that is confidential and/or privileged. If you are not the intended recipient of this e-mail, you must not disseminate, copy or take any action with respect to any information contained in it. If you have received this e-mail in error, please notify the sender immediately by e-mail and immediately destroy it and its attachments.

**From:** Cameron Ball <cball@stratfs.com>
**Sent:** Wednesday, March 16, 2022 4:43 PM
**To:** Marc Lemberg <MLemberg@stratfs.com>
**Cc:** Salvatore Tirabassi <stirabassi@stratfs.com>
**Subject:** FW: February Invoice

These are the invoices we receive for the technology fee of $750k.

Cameron

**Cameron Ball**

Controller

**O:** (646) 844-4242 //ext 7039 //**E:** cball@stratfs.com

**From:** CAMERON CHRISTO <cchristo@fidelissupport.com>
**Sent:** Tuesday, March 8, 2022 11:03 AM
**To:** AP - StratFS <ap@stratfs.com>; Cameron Ball <cball@stratfs.com>; Ryan Sasson <rsasson@stratfs.com>
**Subject:** February Invoice

AP Team,
Please find the latest invoice (1094) for February.
Best,
Cameron

**CAUTION** This email originated from outside the organization. Do not click on links or open attachments unless you recognize the sender's **email** address and know that the content is safe.

# TECHNOLOGY SERVICES AGREEMENT

This Technology Services Agreement (this "Agreement") is effective as of _____, 2021, by and between Strategic Client Support, LLC, with its principal place of business at 115 Lawrence Bell Drive, Buffalo, NY 14221 ("Client") and Fidelis Legal Support Services LLC, with its principal place of business at 400 S 4th St Ste 500, Las Vegas, NV 89101 ("Company").

In consideration of the mutual covenants and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Scope.**

    **(a)** Company will perform and deliver technology consulting services relating to optimizing Client's technology and process interfaces ("Services").

    **(b)** Specific services, scope, duration and/or fees may be described in a Statement of Work duly executed by both parties (each, a "SOW"). Each SOW is incorporated into this Agreement. In the event of a conflict between a SOW and this Agreement, the terms of this Agreement will control.

2. **Term/Termination:**

    (a) This Agreement is effective as of the date first written above and continues until the completion of the Services, or until earlier terminated in accordance with this Agreement ("Term").

    (b) Client may terminate this Agreement or any SOW then in effect at any time, in whole or in part, by giving ten (10) days' written notice to Company. Company may terminate this Agreement upon written notice to Client, provided that there is no SOW then in effect. In the event of termination, unless otherwise described in any applicable SOW, (i) Client will pay Company for deliverables delivered and accepted as well as approved travel and living expenses reasonably incurred by Company providing Services up to date of termination, less any pre-paid amounts; or (ii) Company will refund any pre-paid amounts for Services not performed, including deliverables not yet delivered and accepted by Client.

3. **Compensation:**

    (a) Client will pay Company a fixed retainer fee of $750,000 (the "Retainer") as follows: (i) monthly payment for Services in seven monthly installments of $100,000; followed by (b) one final payment of $50,000.

    (b) In addition to the Retainer, Client will pay Company fees, and will reimburse Company for any disbursements, in accordance with the terms and payment schedule set forth in one or more duly executed SOWs relating to specific additional projects.

    (c) Unless otherwise specified in the SOW, payment of all amounts not subject to good faith dispute will be payable thirty (30) days after Client's receipt of an invoice. Client will notify Company in writing of amounts subject to good faith dispute and provide reasonable detail as to the reasons for the disputed amounts. If Client disputes a portion of an invoice, Client will timely pay the undisputed portion. Client and Company will negotiate in good faith to quickly resolve invoice disputes.

    (d) Company travel and related expenses ("T&E") will be incurred only subject to prior written approval by Client.

1

4. **Confidential Information:**

    (a) "<u>Confidential Information</u>" means any and all technical, financial, customer, proprietary, or business data or information (including third party information), and/or software furnished, in whatever form or medium, by either party to the other regardless of whether such data or information is marked or identified as "confidential" or "proprietary."

    (b) Each party receiving Confidential Information will: (i) treat as confidential, and preserve the confidentiality of, the Confidential Information of the disclosing party; (ii) use the Confidential Information solely for the purposes of this Agreement; (iii) other than in connection with performing or using the Services, not copy such Confidential Information unless specifically authorized by the disclosing party; and (iv) limit dissemination of the Confidential Information to personnel to whom disclosure is necessary for the purposes of this Agreement.

    (c) The receiving party will, as requested by the disclosing party, either (i) promptly return all Confidential Information, together with all copies or any other form of reproduction; or (ii) certify destruction of the Confidential Information or a portion thereof to the extent only a portion is specified by the disclosing party.

    (d) The obligations imposed by this Agreement will not apply to any information that: (i) is already in the possession of the receiving party as shown by documentation; or (ii) is or becomes publicly available through no fault of the receiving party; or (iii) is obtained from a third person without breach by such third person of an obligation of confidence with respect to the Confidential Information disclosed; or (iv) is expressly required to be disclosed pursuant to a valid order of any governmental body or regulatory agency having the legal right to compel such disclosure or court of competent jurisdiction, provided that the receiving party will provide reasonable notice to the disclosing party, if legally allowed, and provide reasonable cooperation, at the disclosing party's expense, to procure a protective order, redaction or similar assurance that confidential treatment will be accorded to the disclosing party's Confidential Information.

5. **Ownership; License**.

(a) Definitions

    (i) "<u>Background IP</u>" means Intellectual Property developed, obtained, or licensed from third parties by Company prior to entering into this Agreement or independent from the provision of the Services or Deliverables under this Agreement, that were not conceived or first produced in the performance of the Services or creation of Deliverables under this Agreement.

(ii) "<u>Deliverables</u>" means the deliverables that constitute the Services and that are created or developed by Company and delivered to Client pursuant to this Agreement, including a SOW.

(iii) "<u>Intellectual Property</u>" means all systems, applications, software code (in any form, including source code, executable or object code), original works of authorship (whether registered copyrights or not), algorithms, tool-kits, technology, widgets, formulae, programs, concepts, work-arounds, databases, designs, diagrams, documentation, drawings, charts, ideas, inventions (whether or not such inventions are patentable), know-how, trademarks (whether registered or not), brand names, logos, slogans, methods, techniques, models, procedures, and processes.

(iv) "<u>Licensed Material</u>" means Intellectual Property contained in Work Product that is of general purpose use, consisting of systems, applications, software code (including source code, executable or object code), algorithms, tool-kits, technology, widgets, formulae, programs, concepts, work-arounds, database architecture, designs, diagrams, documentation, drawings, charts, ideas, inventions (whether or not such inventions are patentable), know-how, methods, techniques, models, procedures, and processes. However, any Intellectual Property will *be*

*excluded* from the definition of "Licensed Material" to the extent it includes any proprietary or confidential information about the Client's business (including, without limitation, the Client's business improvements, processes, internal queuing, storage and distribution of sales leads, service priorities or service assignments, marketing and selling ideas, business plans, financial and / or tax information), clients and customers.

(v) "Work Product" means any and all Deliverables and related Intellectual Property arising out of or resulting from the provision of Services under this Agreement and each SOW.

(b)   Client will own all Intellectual Property rights in Work Product other than Background IP.

(c)   To the extent Work Product includes Background IP, Company grants to Client a perpetual, worldwide, royalty free, paid-up, irrevocable, non-exclusive, non-transferable (except pursuant to Section 13) license to use, copy, modify, distribute, display, perform, have made, commercialize (either alone or packaged in conjunction with other technology or systems for others), assign, transfer and sublicense such Background IP solely to the extent it is incorporated in any Work Product delivered to Client.  In addition, Client may sublicense the Background IP, solely to the extent it is incorporated in any Work Product (and not separable from such Work Product).

(d)   Nothing herein will be interpreted to grant to either Party any right, title or interest of any type in any Intellectual Property Rights owned by the other except as expressly stated in this section.

**6.   Injunctive Relief.** The parties acknowledge that a breach, actual or threatened, of Sections 4, 14-16 will cause irreparable harm to the non-breaching party, the amount of which may be extremely difficult to estimate, thus making any remedy at law inadequate. The parties will therefore be entitled to seek immediate injunctive relief and any other relief they deem appropriate from a court of competent jurisdiction without having to post a bond or other security. This right is in addition to any other remedy available in law or equity.

**7.   Warranties.** CLIENT AND COMPANY ACKNOWLEDGE AND AGREE THAT BECAUSE OF THE COMPLEX NATURE OF SOFTWARE AND THE INTERNET, COMPANY DOES NOT WARRANT THAT THE SERVICES AND/OR WORK PRODUCT UNDER THIS AGREEMENT WILL BE COMPLETELY ERROR FREE. FURTHER, COMPANY MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Company represents and warrants that, to the best of its knowledge: (a) the Services and Work Product provided hereunder do not infringe any third party patent, copyright, trademark, trade secret or other proprietary rights; (b) Company's performance of the Services and all terms of this Agreement will not breach any agreement that Company has with another party; (c) in performing the Services, Company will not use any third party confidential or proprietary information, nor will Company disclose to Client, or bring onto Client's premises, or induce Client to use any third party confidential or proprietary information; (d) Company will abide by all applicable laws and regulations in the course of performing the Services; (e) no disabling code or other devices will be incorporated or present within the Work Product; and (f) Deliverables taking the form of code will not contain any software that is subject to an open source license if such license: (i) requires that the Deliverables be licensed separately or incrementally for Client to pursue any permitted uses under this Agreement; (ii) grants or purports to grant to any third party any rights to such Deliverables; or (iii) requires disclosure or furnishing of source code for any portion of such Deliverables or other code in which it is incorporated or with which it is used to any third party.

**8.   Indemnification:** Company will indemnify, defend at its expense and hold harmless, Client, its officers, directors, affiliates, agents and employees from any and all out-of-pocket losses, liabilities, damages, claims, demands, litigation, expenses and liabilities (including related costs and reasonable attorneys' fees) of every nature (collectively, "Liabilities") arising or resulting, directly or indirectly, from: (a) any claim that Services or any Deliverable used in the manner authorized under the SOW infringes any third-party intellectual property rights; (b) any failure by Company to comply with any applicable laws or regulations in the provision of the Services; (c) any breaches by Company of its confidentiality obligations under Section 3 of this Agreement; (d) physical damage to Client's physical premises or network caused by the gross negligence or wilful misconduct of

Company; or (e) physical injury or death caused by the gross negligence or wilful misconduct of Company employees or contractors while on Client's premises. Client will indemnify, defend at its expense and hold harmless, Company, its officers, members, managers, affiliates, agents and employees from any and all Liabilities arising or resulting, directly or indirectly, from: (x) any breaches by Client of its confidentiality obligations under Section 3 of this Agreement; or (y) physical damage to Company's property, or the physical injury or death of any person, caused by the gross negligence or wilful misconduct of Client employees or contractors while Company personnel are on Client's premises.

**9. Limitation of Liability:** Neither party is liable to the other for consequential, incidental, indirect, punitive or special damages, including commercial loss and lost profits, however caused and regardless of legal theory or foreseeability, directly or indirectly arising under this Agreement. Notwithstanding the foregoing, this limitation of liability does not apply to any breach of the obligations set forth in Sections 3, 4 or 7 of this Agreement.

**10. Independent Contractor:** Company hereby declares and agrees that it is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as the agent or employee of Client; that Company does not have the authority to act for Client or to bind Client in any respect whatsoever, or to incur any debts or liabilities in the name of or on behalf of Client (other than disbursements made by Company on Client's behalf in connection with the Services); and that any personnel provided by Company will be the employees, agents or contractors of Company operating under its direction. Company and its personnel are not entitled to unemployment insurance benefits as a result of performing under this Agreement. Company is solely responsible for all matters relating to payment of its personnel, including compliance with worker's Compensation, unemployment, disability insurance, social security withholding, and all other federal, state and local laws, rules and regulations. Company will indemnify and hold Client harmless from any causes of action arising out of Company's liability to its personnel.

**11. Deadlines:** Company acknowledges that any deadlines set forth in a SOW are important, and will make commercially reasonable efforts to meet such deadlines. Failure to produce any particular Work Product by a particular deadline will not, unless specifically set forth in the SOW, be grounds for cancellation of this Agreement or any SOW. Client agrees that, in all circumstances, any deadline will be adjusted forward to the extent that Client is delayed in providing Company with information necessary for Company to perform the Services.

**12. Assignment:** Neither this Agreement nor any rights or interests in this Agreement is assignable or transferable without written permission of the other party; except that either party may assign or transfer without the consent of the other party to an affiliate or as part of a merger, acquisition or sale of substantially all of the assets of such party.

**13. No publicity or Press Release**. Neither party will issue any press release or publicity, nor make use of the logo or marks of the other for advertising or marketing purposes without the prior, written consent of the other party, which may be withheld or delayed for any reason.

**14. Insurance. [RESERVED]**

**15. General Provisions.**

**(a)** Neutral Reading. It is the intent of the parties that this Agreement be deemed to have been prepared by all parties hereto and that the language used in this Agreement be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any party.

(b) Relationship of Parties. Neither party may assume, either directly or indirectly, any liability of or for the other party. Neither party has the authority to bind or obligate the other party and neither party may represent that it has such authority.

(c) Amendment; Waiver. This Agreement may not be altered or modified, except by written amendment which expressly refers to this Agreement and which is duly executed by authorized representatives of both parties. The

waiver or failure by either party to exercise or enforce any right provided for in this Agreement will not be deemed a waiver of any further right under this Agreement.

(d) <u>Interpretation</u>. The preamble and recitals contained in this Agreement are incorporated herein by reference and made a part hereof. Headings are inserted herein for convenience of reference only and are to be ignored in construing this Agreement.

(e) <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without reference to the conflicts of law principles thereof.

(f) <u>Arbitration</u>. Each signatory hereto hereby agrees that in the event of any dispute arising out of or by reason of this Agreement or the Services rendered or contemplated hereunder, or any other disagreement of any nature, type or description regardless of the facts or legal theories which may be involved, such dispute will be resolved by confidential binding arbitration before the American Arbitration Association ("AAA"), pursuant to the Federal Arbitration Act (9 U.S.C. § 1, et seq.). Such dispute will be submitted to confidential binding arbitration only in Atlanta, Georgia. Arbitration proceedings may be commenced by any signatory to this Agreement by giving the other parties hereto written notice thereof, and the proceedings will be governed by the Expedited Rules of the AAA. A single arbitrator will be appointed by the AAA pursuant to its rules to preside over the dispute. Any dispute regarding the arbitrability of any element of the dispute, including without limitation any dispute relating to the interpretation, applicability, enforceability, conscionability or formation of this Agreement and agreement to arbitrate, will be resolved exclusively by the arbitrator. Depositions will be limited to two per party. The arbitrator's award in any such proceeding will be final and binding, and a judgment upon such award may be enforced by any court of competent jurisdiction. Each signatory hereto hereby agrees to submit to the jurisdiction of any state or federal court sitting in Atlanta, Georgia in any action or proceeding arising out of or relating to the enforcement of the arbitration provisions of this Agreement. Each signatory hereto hereby agrees to waive any defense of inconvenient forum to the maintenance of any action or proceeding so brought in Atlanta, Georgia, and each signatory hereto waives any bond, surety, or other security that may be required of any other signatory with respect thereto.

(g) <u>Costs and Expenses</u>. The party prevailing in any arbitration or other proceeding under this Agreement will be entitled to recover the reasonable costs and expenses incurred in connection therewith, including, but not limited to, reasonable attorneys' and paralegals' fees, costs and expenses.

(h) <u>Severability</u>. The various terms, provisions and covenants herein contained will be deemed to be separable and the invalidity and unenforceability of any of them will in no manner affect or impair the validity or enforceability of the remainder thereof.

(i) <u>Further Assurances</u>. Each of parties will execute and deliver all such other instruments and take all such other actions as such other party may reasonably request from time to time in order to effectuate the purposes of this Agreement.

(j) <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties for the transactions contemplated hereby, and there are no other prior or contemporaneous written or oral communications, agreements, undertakings, provisions, warranties, or covenants not contained or expressly incorporated herein.

(k) <u>Binding Agreement</u>. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns; provided, however, that neither party may assign this Agreement or any of its rights, benefits or obligations hereunder without the prior written consent of the other party.

(l) <u>Survival</u>. The rights and obligations contained in Sections 2 through 13 as well as 15 will survive any termination of this Agreement.

(m) <u>Notices</u>.  All notices and other communications will be sufficiently given and effective for any purpose only upon delivery by personal service or prepaid overnight delivery with return receipt or signature upon delivery, in each case to the persons and addresses first written above.

    If to Company: Attn: Manager

    If to Client:    Attn:  General Counsel

(n) <u>Counterparts; Delivery</u>.  This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, when taken together, will be deemed to be one Agreement.  This Agreement and any amendment hereto, to the extent signed and delivered by means of a facsimile machine or by electronic mail, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed and effective as of the date first above written This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original, but all of which together will constitute one instrument.

| **STRATEGIC CLIENT SUPPORT, LLC** | **FIDELIS LEGAL SUPPORT SERVICES LLC** |
|---|---|
| _____ <br> (Authorized Signature) <br> _____ <br> Ryan Sasson <br> _____ | _____ <br> (Authorized Signature) <br> _____ <br> (Print or Type Name of Signatory) <br> _____ <br> (Title) |