UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CONSUMER FINANCIAL PROTECTION,                    24-CV-40-EAW-MJR
BUREAU, *et al.*,

              Plaintiffs,                    DECISION AND
                                                  ORDER

    v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), *et al.*,

              Defendants, and

DANIEL BLUMKIN, *et al.*,

              Relief Defendants.

_____

Plaintiffs, which include the Federal Consumer Financial Protection Bureau and various state attorneys general offices, claim that defendants, a telemarketing business and related entities providing debt-relief services, are violating the Federal Trade Commission's Telemarking Sales Rules by collecting advance fees from consumers. Defendants contend that they are exempt from the prohibition against advance fees pursuant to a "face-to-face" exception which allows advance fees if the seller provides a face-to-face sales presentation to the consumer before collecting any payment for their services. The Court finds that plaintiffs have made a preliminary showing that the face-to-face exception likely does not apply here.

The face-to-face presentations are conducted by notaries, who are independent contractors and not sellers of defendants' debt-relief services. The evidence introduced over the course of a two-day hearing demonstrated that these notaries (1) have no substantive knowledge of the debt-relief program; (2) cannot and will not answer any

substantive questions by consumers about the program; and (3) have as their primary purpose the signing of the contract for debt-relief services. The contracts signed in the presence of the notaries require consumers to execute several waivers of important rights, such as agreeing to arbitration and waiving the right to participate in any class-action lawsuits. The presentation lists multiple potential negative consequences of the debt-relief program, such as the likelihood that the consumer's credit score will be negatively impacted and that they will experience an increase in collection activity from debt-collectors. This essential information is presented to individuals drowning in debt and desperate for any lifeline, without the ability to have their questions answered in-person, by an individual with substantive knowledge who is actually affiliated with the program. Instead, if there are questions, the consumers are given a phone number to call, which goes back to the telemarketing company. Thus, the face-to-face presentations do not result in consumers being more informed about the program and do not limit the potential problems the TSR was designed to remedy.

Accordingly, plaintiffs' motion for a preliminary injunction is granted, defendants are preliminarily enjoined from charging and/or collecting advance fees, and the Court will enter plaintiffs' proposed preliminary injunction order.

## ***BACKGROUND***

On January 10, 2024, plaintiffs Consumer Financial Protection Bureau ("the CFPB"), the People of the State of New York, by Letitia James, Attorney General of the State of New York, the State of Colorado *ex rel.* Philip J. Weiser, Attorney General, the State of Delaware *ex rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney

General Keith Ellison, the State of North Carolina *ex rel.* Joshua H. Stein, Attorney

General, and the State of Wisconsin (collectively "plaintiffs"), filed a complaint alleging

defendants have been and are violating the Telemarketing Sales Rule ("TSR"), 16 C.F.R.

pt. 310, which implements the Telemarketing and Consumer Fraud and Abuse Prevention

Act (Telemarketing Act), 15 U.S.C. §§ 6102(c), 6105(d); New York Executive Law §

63(12); New York General Business Law (GBL) Article 22-A; Wis. Stat. § 218.02; and

Wis. Admin. Code § DFI-Bkg ch. 73.[1] (Dkt. No. 1)

Also on January 10, 2024, plaintiffs filed an *ex parte* motion for a temporary

restraining order ("TRO") with asset freeze, appointment of a receiver, and other equitable

relief, as well as a request for defendants to be ordered to show cause as to why a

preliminary injunction should not issue. (Dkt. No. 5) The Honorable Lawrence J. Vilardo

granted plaintiffs' request for a TRO on January 11, 2024. (Dkt. No. 12) On February 1

and 2, 2024, this Court held an evidentiary hearing to address plaintiffs' motion for a

preliminary injunction. (Dkt. Nos. 129, 130)

---

[1] The corporate defendants named in this case are Stratfs, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC, Stratfs, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Strategic Family, Inc., Versara Lending, LLC, Anchor Client Services, LLC (Now Known As CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (Now Known As CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LL, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (Now Known As CS 3 PAAS Services, LLC), Whitestone Client Services, LLC. The individual defendants are Ryan Sasson and Jason Blust. The relief defendants are Daniel Blumpkin, Albert Ian Behar, Strategic ESOP, Strategic ESOT, Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments LLC, the Blust Family Irrevocable Trust, Jaclyn Blust, Lit Def Strategies, LLC, and Relialit, LLC.

## *FINDINGS OF FACTS AND CONCLUSIONS OF LAW*

### *Credibility*

The Court's factual findings discussed herein are based primarily on the witness testimony, documentary evidence, and audio/video evidence introduced over the course of the preliminary injunction hearing on February 1 and 2, 2024. During that time, the Court had the opportunity to listen to and observe the demeanor of the witnesses. Based on these observations, the Court finds witnesses Lisa Munyon, Heather Lyon, Michael Thurman, Mary Lynn Clark, Ruth Brooks-Ward, John Accardo, Christopher Elkins, Annie Barsch, Stephen Loft, and Patrick Callahan to be fully credible and to have provided testimony that was consistent with the testimony of the other witnesses as well as with the other evidence in the record.[2]

The Court finds witness Richard Gustafson not to be credible. Not only was Mr. Gustafson's testimony self-serving and inconsistent with other evidence in the record, but Mr. Gustafson made statements, for his own benefit, that defy credulity.[3]

---

[2] The Court is not relying on the testimony of Joanna Cohen or Carly Richardson, and therefore does not make a credibility finding as to these witnesses. Greg Regan, a certified professional accountant, was called as a witness by defendants to testify regarding the economic benefit to consumers who participate in defendants' debt-relief program. While the Court does not find that Regan lacks credibility, the Court, for the reasons stated later, was not persuaded by Regan's testimony that enrollment in defendants' debt-relief program provides a significant or appreciable economic benefit to consumers.

[3] For example, Mr. Gustafson, a lawyer, testified that he practiced bankruptcy law before starting various law firms specializing in debt settlement and debt litigation for consumers. When asked why retaining one of his law firms is preferable to bankruptcy, he testified that consumers "may have their house sold [in bankruptcy]" and "[t]here's very few states that have a complete exemption for a residence." *See* Tr. 139-140; 207-208. However, most states and the federal Bankruptcy Code have a homestead exemption that makes it more likely that debtors will be able to keep their homes. *See, e.g.,* 11 U.S.C. § 522(d)(1). When asked about the average savings a consumer retaining his law firm may realize in debt-relief, Gustafson testified "it's around 50, 52 percent." *See* Tr. 208. However, it became clear to the Court, after hearing all of the other testimony and evidence presented, that this estimation of savings did not take into account any of the fees consumers actually paid to defendants and Gustafson's law firms, and that the actual savings to consumers is far lower.

### ***Preliminary Injunction Standard***

Typically, a party seeking a preliminary injunction must establish: (1) "irreparable harm"; (2) "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party"; and (3) "that a preliminary injunction is in the public interest.". *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (*accord Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)).

However, in the Second Circuit, it is "the 'well-established rule' that agencies 'need not prove irreparable injury or the inadequacy of other remedies as required in private litigation suits, but only that there is a reasonable likelihood that the wrong will be repeated.'" *City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010) (*quoting CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977)). This is because "[w]here Congress expressly provides for Government enforcement of a statute by way of injunction, and the Government has satisfied the statutory conditions of the statute, irreparable harm to the public is presumed." *United States v. Schmitt*, 734 F. Supp. 1035 (E.D.N.Y. 199). *See also FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 199 (S.D.N.Y. 2000); *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972) ("The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained."). Where the defendant "maintain[s] that its activities are legitimate" and "persisted" in the conduct "right up to the day of the hearing . . . the likelihood of future violations, if not restrained, is clear." *British Am. Commodity*, 560 F.2d at 142.

A likelihood of success on the merits means that the government must show that "the probability of . . . prevailing is better than fifty percent." *N.Y. v. Rescue*, 23-CV-4832, 2023 U.S. Dist. LEXIS 218143 (S.D.N.Y. Dec. 7, 2023) (citation omitted).

"The final consideration in the preliminary injunction analysis concerns [both] whether the balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 86 (2d Cir. 2021). As to the balance of equities, "if the Government establishes that the defendant is violating [the law], the balance of hardships likely weighs in the Government's favor." *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 755 (S.D.N.Y. 2015).[4]

### ***Likelihood of Success on the Merits***

Taking advance fees in connection with a debt-relief service constitutes an abusive telemarketing act or practice under the TSR. *See* 16 C.F.R. § 310.4(5)(i). Specifically, the TSR bars a telemarketer or seller from "[r]equesting or receiving payment of any fee or consideration for any debt relief service until and unless: (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16

---

[4] Defendants maintain that plaintiffs are still required to prove irreparable harm in order to be entitled to injunctive relief. The Court need not specifically address this argument because, for the reasons stated later, the Court finds that plaintiffs have shown a likelihood of irreparable harm absent injunctive relief.

C.F.R. § 310.4(5)(i).[5] The TSR further provides that, "[i]t is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates . . . § 310.4 of this Rule." 16 C.F.R. § 310.3(b).

However, the TSR exempts—and thus does not prohibit advance fees for—transactions involving "[t]elephone calls in which the sale of goods or services…is not completed, and payment or authorization of payment is not required, until after a face-to-face sales…presentation by the seller[.]" 16 C.F.R. § 310.6(b)(3). An exemption is an affirmative defense, and therefore a defendant bears the burden of proof as to this issue. *See United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 937 (C.D. Ill. 2014) (*citing Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an exemption)).

Thus, in order to prevail in this action, plaintiffs must prove that (1) defendants are telemarketers or sellers subject to the TSR; and (2) that they request or receive advance fees in connection with providing debt-relief services. Provided plaintiffs make this threshold showing, defendants are liable under the TSR unless they are able to demonstrate that they meet the face-to-face exception. For the following reasons, the

---

[5] The TSR further provides that, to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration must either "(1) bear[] the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or (2) [represent] a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt." 16 C.F.R. 310.4(a)(5)(i).

Court finds that plaintiffs are likely to succeed on the merits of their claim that defendants are charging and receiving advance fees in violation of the TSR, and that the face-to-face exception does not apply here.

### Defendants are Telemarketers and Sellers as Defined by the TSR

The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). The TSR defines a "debt-relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o). The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

Strategic Family, Inc. is the parent company of other corporate defendants, including: StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Versara Lending, LLC; and Strategic Consulting, LLC. *See* Dkt. No. 8, at ¶ 11(e)-(g). Strategic also owns and controls various client services subsidiaries including defendants Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services,

LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC), and Whitestone Client Services, LLC. *See* Dkt. No. 8-6, at ¶ 14. Strategic Family Inc. and all of the affiliated entities just described are referred to herein as "Strategic" or "defendants."[6]

Strategic markets debt-relief services to consumers through mechanisms such as direct mail solicitations and websites. *See* PX-020, Clark Dep. 43:8-25; PX-019; Sason Dep. 60:4-25; PX-012 at 57; Sheehan Decl. at 100; Davis Decl. at 111-12; Nickles Decl. at 12; Sundlov Decl. at 128; Rodriguez Decl.; PX-009 at 1-2, Elkins Decl.[7] Consumers who are interested in the debt-relief services advertised call a phone number listed on the mailer or website and reach a Strategic representative, and this representative gathers additional information from the consumer. *See* PX-012 at 57, Sheehan Decl. at 100; Davis Decl. at 111-12; Nickles Decl. at 22; Sundlov Decl. at 128, Rodriguez Dec.; PX-009 at 1-2, Elkins Dec.; PX-002 at 57-78 (Strategic Qualifying Script and Objection Handles). The Strategic representative reviews the structure of the debt-relief program by phone and also reviews paperwork explaining the program by phone. *See* PX-009 at 1-2, Elkins Decl.; PX-010 at 1-2, Griffiths Decl.; PX-012 at 57, Sheehan Decl. at 111-12, Nickles Decl. at 122, Sundlov Decl. at 128, Rodrigez Decl.; PX-022, Phone Call between Andrew Terrell (Strategic) and Scott Graves (consumer); PX-029 at 11, Phone Call between

---

[6] Strategic was founded by defendant Ryan Sasson, among others. *See* Dkt. No. 8-4, at ¶ 8(a). Sasson currently serves as CEO of Strategic. *Id.*

[7] The deposition transcripts and declarations referred to herein were entered as exhibits during the preliminary injunction hearing.

Andrew Terrell (Strategic) and Barbara Jordan (consumer) (reviewing the documents page by page over the phone in advance of the meeting with the notary).

If the consumer expresses interest in enrolling in the program, the Strategic representative arranges for one of the many law firms affiliated with defendants to provide debt-relief services to the consumer, including debt settlement and debt litigation, in exchange for the consumer paying fees for these services. *See* PX-028 at 13-15, Phone Call between Strategic employee and Vincent Ovegu (consumer) (informing consumer that Strategic picks the law firm and consumer will pay fees for the program); PX-029, Phone Call between Andrew Terrell (Strategic) and Barbara Jordan (consumer) (discussing that consumer was entering a program by Carolina Legal to negotiate the consumer's debt with her creditors and explaining the fees that consumer would pay for services). These law firms are hereinafter referred to as the "intervenor law firms."[8] According to defendants, Strategic's role is to provide the intervenor law firms with administrative and support services, such as correspondence and file management, document collection, and a customer call center. *See* Tr. 234:18-20. Strategic refers to this model of debt-relief as a "law firm model." *See* Tr. 248:11-25.

---

[8] A number of the Strategic affiliated law firms filed a motion to intervene in this case including Anchor Law Firm, Bedrock Legal Group, Boulder Legal Group, Canyon Legal Group, Chinn Legal Group, Clear Creek Legal, Great Lakes Law Firm, Greenstone Legal Group, Gustafson Consumer Law Group, Hailstone Legal Group, Hallock & Associates, Hallock & Associates, Harbor Legal Group, Heartland Legal Group, Leigh Legal Group, Level One Law, Meadowbrook Legal Group, Michel Law, Monarch Legal Group, Moore Legal Group, Newport Legal Group, Northstar Legal Group, Option 1 Legal, Pioneer Law Firm, Rockwell Legal Group, Royal Legal Group, Slate Legal Group, Spring Legal Group, Stonepoint Legal Group, The Law Firm of Derek Williams, The Law Office of Melissa Michel, and Whitestone Legal Group. The Court allowed these firms to intervene and to participate in the evidentiary hearing. *See* Dkt. No. 50. Individual defendant Jason Blust performs various supervisory tasks for these law firms including hiring attorneys, addressing consumer complaints, and serving as a liaison between the intervenor law firms and Strategic. *See* Dkt. No. 8-44, ¶¶ 16-21; Dkt. No. 8-6, ¶¶ 19-20; Dkt. No. 8-7, ¶ 16.

Because Strategic receives interstate phone calls from consumers for purposes of selling debt-relief services on behalf of itself and/or the intervenor law firms, Strategic is a telemarketer or seller offering debt-relief services under the TSR.

*Defendants Receive Advance Fees*

Once consumers enroll in defendants' debt-relief program involving one of the intervenor law firms, they are immediately charged monthly fees, regardless of whether and when the consumer's debts are reduced or settled. Indeed, Mary Lynn Clark, President of Strategic, testified that Strategic takes advance fees under its law firm model of debt settlement.[9] *See* Tr. 249: 4-6. In addition, contract documents that consumers sign to enroll in the debt-relief program explicitly state that consumers will be charged a service fee immediately after enrolling in the program, and that this fee is based on a percentage of the total amount of debt they enroll. *See* PX-10 at 31-32. Consumers are also charged additional fixed fees, such as a retainer fee, a legal administration fee, and a banking fee, on a recurring basis beginning immediately upon entering the debt-relief program, regardless of whether any settlements have been reached. *See* PX-012 at 33; PX-09, Elkins Decl. "Global Holdings Account Activity Statement" (statement showing retainer fee, service cost, and legal administration fee being taken from consumer's bank account the same month he enrolled in defendants' program.). Credible testimony from consumers Christopher Elkins and Annie Brasch further confirms that fees were taken

---

[9] Strategic also offers a "direct-to-consumer model" of debt-relief services, separate and apart from the law firm model of debt relief that is at issue in this lawsuit. *See* Tr. 248:11-25. The direct-to-consumer model is also referred to by the parties as a contingency fee model of debt relief. Consumers enrolled in the contingency fee model do not pay a fee until defendants actually settle a debt for them. *See* Tr. 248:21-249:3. According to the Preliminary Report by the temporary receiver appointed pursuant to the TRO, the law firm model is "the primary business" of defendants and "account[s] for roughly 80% of [their] revenues," while the direct-to-consumer model "accounts for 16% of revenue." *See* PX-076; Dkt. 115-1 at 15.

immediately after they enrolled in the debt-relief program, before any of their debts were settled or reduced. *See* Tr. 203:23-25; 204:1-3, 23-24; 416:3; 417:24.[10]

Pursuant to the law firm model of debt-relief marketed by Strategic, both defendants and the intervenor law firms take or receive some portion of the advance fees collected from consumers. *See* PX-019, Sasson Dep. 38:3–39:24. According to defendant Sasson, 100% of the "service fee" collected from a consumer by a law firm is paid to Strategic. *See* PX-019, Sasson Dep. 38:3 – 39:24 ("Strategic receives – the client service company receives the entirety of that service fee."). In fact, a sample of payment data from Reliant Account Management (RAM), a third party payment processor used by the intervenor law firms to process consumer payments, shows that approximately 34,000 consumers enrolled in the debt-relief program between approximately January 1, 2016 and March 15, 2021 collectively paid over $104,000,000 in fees to defendants and the intervenor law firms (including service fees, retainer fees, and legal administrative fees) before any debt-relief payments were made to creditors. *See* PX-073, Cohen Decl. ¶ 28.

*The Face-to-Face Exemption Does Not Apply*

Because it is clear that defendants request and receive advance fees in exchange for debt-relief services, they may only avoid liability under the TSR if they can demonstrate that the debt-relief services they offer involved "[t]elephone calls in which the sale of goods or services...[was] not completed...until after a face-to-face sales...presentation by the seller." 16 C.F.R. § 310.4(5)(i). The Court finds that, at this stage of the litigation, defendants have failed to show that this exception applies. Thus, plaintiffs are likely to

---

[10] Consumer contracts provide that the "fees are charged on a flat fee basis according to the Payment Schedule." *See, e.g.,* PX-009 at 44; PX-010 at 17; PX-011 at 35; PX-009 at 44; PX-012 at 11, 70; PX-067 at 24; DX-019 at 7; DX-021 at 7; DX-025 at 7; DX-117 at 7.

prevail on their claim that defendants are in violation of the TSR.[11] The Court reaches this conclusion because the evidence shows that (1) consumers do not receive a face-to-face presentation by the seller of the debt-relief services and (2) the presentations that are given to consumers are insufficient to qualify as face-to-face sales presentations under the meaning of the TSR.

<u>*Consumers do not receive a face-to-face presentation by the seller*</u>.

As stated above, in order to qualify for the face-to-face sales exception, the presentation must be performed "by the seller of the debt-relief services." 16 C.F.R. § 310.6(b)(3). The TSR defines a seller as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). Here, the face-to-face presentations to consumers are conducted by notaries who are not sellers of defendants' debt-relief services.

If, during the initial call with a Strategic representative, the consumer expresses an interest in retaining one of the intervenor law firms to provide debt-relief services, the Strategic employee schedules a face-to-face meeting between the consumer and a notary. *See* Tr. 244:17-22. It is undisputed that neither defendants nor the intervenor law firms send their own employees to conduct these in-person meetings with consumers. *See* Tr. 42:3-12; PX-13, Stone Dep. at 15; Tr. 83:21-22. Instead, the meetings are

---

[11] In order for a preliminary injunction to be granted, plaintiffs must show that they are likely to succeed on their claim that defendants are in violation of the TSR. However, it is defendants' burden to show that the face-to-face exemption to the TSR applies. Upon considering all of the record evidence put before it at this stage of the litigation, the Court finds it unlikely that defendants will meet their burden in showing that the face-to-face exemption applies here and that plaintiffs have put forth substantial evidence that it does not apply. Thus, the Court concludes that plaintiffs are likely to succeed on the merits of their claim.

conducted by notaries who independently contract with a notary service that in turn contracts with one of the intervenor law firms. *Id.*

After the meeting is scheduled, Strategic provides the notary company any documents that the intervenor law firm wants either presented to the consumer or signed by the consumer during the meeting, and the notary company makes those documents available to the notary conducting the in-person meeting with the consumer. *See* PX-015, Winkelman (NotaryGO) Dep. 17:6-9 ("Q. So Strategic would provide any documents it wanted presented or given or to be signed by the customer to you, correct? A. Correct."), 17:14-18 ("Q. And then you would send that, forward that on to the notary? A. It would be uploaded to our secure system. The notary would download those documents from their profile."). To that end, the notaries receive a printed PowerPoint presentation and a script, as well as a retainer agreement between one of the intervenor law firms and the consumer that was to be signed by the consumer in the presence of the notary. *See* Tr. 21:1-4; 102:9-11. The notaries are instructed that their role during the in-person meeting is to "act as a licensed notary to verify the [consumer's] identity and provide notarizations." *See* Tr. 20;20-21; DX-8. The notaries are also instructed that they are "acting as an agent of the [intervenor law firm] to provide an in-person presentation by reading the provided script, answering basic questions, and assisting the client in completing the provided paperwork." *See* DX-8.

Notwithstanding the fact that the notaries are provided a script to read as well as a PowerPoint presentation to present to consumers, and are told to answer consumers' basic questions, all of the credible evidence and testimony in the record demonstrates that the notaries' purpose in meeting with consumers is to facilitate the signing and

notarization of the contracts between consumers and the intervenor law firms, and not to sell debt-relief services on behalf of defendants or the intervenor law firms.[12]

Defense witness Lisa Munyon testified at the hearing that she owns National Paralegal & Notary ("NPN"), and that NPN regularly contracts with the intervenor law firms to provide notaries to conduct in-person meetings with consumers. *See* Tr. 42:14-18. Munyon credibly testified that "the notary's job was not to sell debt relief services discussed in the contracts during the signings with consumers" because "[t]he notary representatives do not act as sales agent." *See* Tr. 42:14-18. *See also* PX-15, Winkelman (NotaryGO 30(b)(6)) Dep. 24:21-23 ("Q. When the notaries are there, to your understanding, were they making a sales presentation? A. No."), 25:3-7 ("Q. …[A]re they encouraging the customer to sign the documents? A. No."); PX-018, Willis (Sunshine 30(b)(6)) Dep. 26:16-18 ("Q. Were the notaries there to sell the debt relief product to the consumer? A. No."); PX-062 (Instructions to Notary) at 2 ("You are not there to sell them this product.").

Munyon's assertion that the notaries do not act as sales agents or sales representatives for either defendants or the intervenor law firms is consistent with the testimony of the notaries themselves. Plaintiffs introduced testimony from Ruth Brooks-Ward and John Accardo, both notaries who conducted in-person meetings with consumers on behalf of defendants and the intervenor law firms. Both witnesses credibly and unequivocally testified that their role during the in-person meetings was to facilitate the signing of documents and not to sell debt-relief services. Brooks-Ward testified that

---

[12] The significance of the script, the PowerPoint presentation, and the notaries' abilities to answer basic questions about defendants' and the intervenor law firms' debt-relief services is discussed by the Court, in detail, later in this decision.

she has "never sold debt settlement services" and that her role during the meetings with consumers is "only [to] get their signature [and] verify who they are." *See* Tr. 319:13-18; 322:11-14. Likewise, when asked if he would characterize his in-person meetings with consumers as a "sales presentation", notary Accardo testified "absolutely not." *See* Tr. 360:17-19 ("I'm not selling anything. I, you know, tell the people that I'm there with -- that I'm not there to sell them anything or make them do anything.").

Heather Lyon, a notary who testified on behalf of defendants, corroborated the testimony of Brooks-Ward and Accardo that the notaries meet with consumers to witness the signing of the documents and not to sell debt-relief services. *See* Tr. 125: 4-7 ("I do not do anything or suggest anything to sway the client" as to whether they should enroll in the debt-relief program.). In fact, defense witness Lyon expressly testified that she does not discuss defendants' debt-relief program with the consumer during the meetings. Instead, she is there to get the paperwork processed and signed. Lyon stated, "I'm there for execution of the document, and to verify their identity and understanding in doing so. I am not there to discuss the program." *See* Tr. 127:11-5.

Declarations of other notaries who contracted with the intervenor law firms to conduct in-person meetings with consumers also confirm that the notary's purpose in meeting with consumers is to facilitate the signing of documents, not to sell debt-relief services. *See* PX-070, Fountain Dep. 14:5-6 ("Q. Do you sell debt relief services? A. No."); PX-046, Shirkey Dep. 30:14-16 ("Q. ... What, if any services, were you selling to the consumers that you met with? A. None. Nothing."); PX-045, Tsui Dep. 32:7-16 ("I do not sell them the content of the documents, I do not market them, and I'm specifically told that I do not provide any legal, financial, or accounting advice. I do not represent the credit

16

card company. I do not represent the law firm. I do not represent the requester. My job is simply a notary. I get the documents, and I show them the instructions, and they initial and they sign, and I notarize. That's what I do. I don't do anything else."); Howell Dep. 13:1-9 ("Q. When you say debt resolution services, can you explain generally exactly what that entailed, what work you did? A. So my job was to witness the signatures of the documents when a client signs up for debt resolution services.").

Representations from notaries that they are not sellers of debt-relief services is also consistent with evidence in the record that, for those who enroll in defendants' debt-relief program, the decision to enroll is made on the phone with the Strategic employee, before the notary is sent to meet with them. Consumer Christopher Elkins credibly testified that he was "drowning in debt" when he received a flyer in the mail from Canyon Legal Group, one of the intervenor law firms. *See* Tr. 388-89. Elkins testified that he called the number on the flyer and spoke with a representative about Canyon's debt-relief services for twenty to twenty-five minutes, including how long it would take to get his debt resolved. *See* Tr. 390. Elkins testified that they "agreed on a four year term" and that the representative informed him that a notary would contact him to set up a date and time to sign the contract. *See* Tr. 391. Elkins testified that when the notary arrived at his home the next day, she took out the contract and stated "[t]his is a formality…[y]ou've already spoken with Canyon…[w]e just want to sign the contract, and we'll be about our business." See Tr. 393:4-7.  Elkins' assessment of the process was corroborated by defense witness Lyon. When asked if it was her sense that the decision to enroll in the debt-relief program was made by consumers before she met with them to notarize their signature on the contract, she testified: "It was. It is, and it was." *See* Tr. 126:18-25

Declarations of consumers further demonstrate that consumers make the decision to enroll in the debt-relief program on the phone with a Strategic representative before the in-person meeting with the notary, and that the purpose of the notary meeting is only to facilitate the signing of the enrollment documents. *See* PX-010 at 2, Griffiths Dec. (after speaking with the Strategic representative on the phone, "we trusted that they were trying to help us, so my husband and I agreed to sign up for the program"); PX-011 at 1, Salva Dec. ("[a]fter [the Strategic representative] described the program, I expressed a desire to sign up and the [Strategic representative] scheduled an appointment for us to meet with a notary and sign the required documents"); PX-012 at 2, Edgar Dec. ("After I agreed to enroll in the program over the phone, I met with a notary in person at my home to sign paperwork"); Sheehan Dec. at 57 ("Based on the information we received from the person on the phone, we thought the [debt-relief] program would help us, so we decided to sign up"); Davis Dec. at 100 ("based on what [the Strategic representative] told me, I agreed over the phone to enroll in [the] debt settlement program"); *id.* at 112 (after speaking with a Strategic sales representative, "I agreed to enroll in the program, and someone came to my house the next day so that I could sign the contract").

Moreover, the notaries are paid by Strategic and/or the intervenor law firms specifically to obtain the consumer's signatures and initials on documents. To be sure, the testimony and evidence revealed that if a meeting between a notary and a consumer did not result in a signed and notarized contract for services, the notary's fee for conducting the meeting was reduced. *See* DX-001 at 1, ¶¶ 1-2; DX-002 at 1, ¶¶ 1-2; DX-003 at 1, ¶¶ 1-2; DX-004 at 1, ¶¶ 1-2; DX-005 at 1, ¶¶ 1-2; DX-006 at 1 ¶¶ 1-2 (Company will pay NPN a fee of $115 to oversee execution of documents, but only $65 if the

consumer does not sign the documents.); *Accardo*, Tr. 361:8-18 ("Q. Why would they sometimes only pay the trip fee and not a full amount? A. If the customer refused to sign. Q. So, you receive less money? A. Yes. ...Q. You receive less money for the visit if the client does not sign? A. Correct."); PX-050, Howell Dep. 83: 15-19 ("Q. And do you receive the same amount of pay whether the consumer signed or they didn't sign? A. No. If they did not sign, the pay was typically less."); PX-051, Vrzhezhevska Dep. 50: 16-19 ("Q. And did you get paid -- Did the compensation change depending on if the consumer signed documents or not? A. Yes."). Thus, to the extent the notaries are selling anything, they are selling their notarial services to defendants, not debt-relief services.[13]

The TSR imposes liability on a seller when then they "arrange for others to provide goods or services." To the extent defendants are contending that the notaries used here arrange for defendants and/or the intervenor law firms to provide debt-relief services, the Court rejects this argument. In *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009), a party who "maintain[ed] control over the product, scripts and quality assurance" used when another company made telemarketing calls, "fit the TSR's description of . . . one who 'arranges for others to provide' a product." It is undisputed that the notaries here do not provide debt-relief services to consumers, and it is further undisputed that the notaries do not control the creation or content of the scripts, PowerPoint presentations, or the retainer agreements presented to consumers. Thus, the notaries are not "arranging" for defendants and/or the intervenor law firms to provide debt-relief services.

---

[13] Mike Thurman, an attorney called by defendants who specializes in regulatory compliance and risk mitigation in the financial services industry testified that the notaries used by the defendants and/or the intervenor law firms are not sellers under the TSR. *See* Tr. 87:17-20 ("Q. Are the notaries in -- that are used for the enrollment documents, are they sellers under the Telemarketing Sales Rule? A. I don't believe so.").

The Court also rejects defendants' argument that the notaries are sellers within the meaning of the TSR because they acted as third-party agents of the intervenor law firms to sell debt-relief services. *See FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 319 (S.D.N.Y. 2008). As the party asserting the existence of an agency relationship, defendants bear the burden of proof on this issue. *See Found. Capital Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, 3:17-cv-00135, 2023 U.S. Dist. LEXIS 117634, at *11 (D. Conn. July 10, 2023) (collecting cases). Here, all of the credible evidence and testimony discussed above shows that when notaries meet with consumers, they are in no way attempting to sell the debt-relief services on behalf of intervenor law firms. Instead, their intentions and their actions during the meetings is focused on obtaining signatures on documents.[14]

In support of their agency argument, defendants point to written instructions provided to the notaries which describe their assigned role during the in-person meetings with consumers. *See* DX 8-0001. To be sure, those documents indicate that notaries are to "verify the [consumer's] identity and to provide notarizations." *Id.* The instructions further state that the notaries were to "act[] as an agent of [the intervenor law firm] to provide an in-person presentation by reading the provided script, answering basic questions, and assisting the client in completing the provided paperwork." *Id.* However,

---

[14] The Court finds it notable that defendants and/or the intervenor law firms use notaries to conduct in-person meetings with consumers. There is no requirement in the TSR, or elsewhere in the law, that retainer agreements to provide debt-relief services must be notarized. If defendants and/or the intervenor law firms sought to use agents or representatives for the purpose of *selling* their debt-relief services, it would seem most logical and effective that they would have contracted with individuals with training in sales, or who identified themselves as salespeople, to conduct these meetings with consumers. Instead, they contracted with notaries, many of whom expressly testified or declared that they are, in no way, shape, or form, salespersons.

to the extent that the notaries read from materials prepared by the intervenor law firms or answer consumers' basic questions about those materials, these functions do not make the notaries agents of the intervenor law firms for purposes of actually selling debt-relief services. Indeed:

> The fact that one party performs a service that facilitates the other's business does not constitute such a manifestation. For example, by clearing securities trades for another firm, a securities broker does not make a manifestation to customers of the firm sending the orders that it acts with the authority of the clearing firm.

Restatement (Third) of Agency, § 3.03.

In furtherance of their agency argument, defendants point to the facts that they control the information the notary presents at the meeting; direct how the documents are to be signed and notarized; mandate that the notaries watch a training video and take a quiz; and require that the notaries dress and otherwise present themselves in a professional manner. However, "setting standards in an agreement for acceptable service quality does not of itself create a right of control." *Id.* § 1.01. As the Court will discuss further later, the totality of evidence here indicates that the notaries have no substantive knowledge of the debt-relief program beyond what is contained in the materials, and do not answer any of consumers' substantive questions about the debt-relief program. These facts are consistent with the evidence discussed above that the decision to enroll has already been made over the telephone and that the notaries are present at the meetings to facilitate the paperwork and signing of the contract. They do not sell the debt-relief program nor do most notaries discuss the program with consumers in any meaningful way. Thus, while the intervenor law firms may have controlled what materials the notaries presented to the consumers as well as the manner in which the documents were signed,

the record lacks sufficient evidence that would support a finding that the notaries are agents of the intervenor law firms for the purpose of actually *selling* debt-relief services, as contemplated by the TSR.

*FTC v. Neora LLC* 3:20-cv-01979, 2023 U.S. Dist. LEXIS 217429, at *54 (N.D. Tex. Sep. 28, 2023) further supports a finding that the notaries are not agents of the intervenor law firms. There, the court held that defendant did "not control and has no right to control how much [the alleged agents] work (if at all), how much they spend on their pursuit of the business opportunity, or how they exercise their choice of work activities." *Id.* And "although [defendant] provides guidelines and instructions to [the alleged agents] on how to conduct their businesses in a legally compliant manner, it cannot control whether, how, or when [the alleged agents] choose to conduct business, weighing against a finding of control." *Id.* Further the court found no apparent authority because the alleged agents had "considerable flexibility in conducting their businesses, if they choose to do so at all." *Id.* at 57.

Likewise here, the intervenor law firms do not control when the notaries work or what assignments they take. *See* Tr. 118:10-11 ("I negotiate my rate and take on the assignment"); *Accardo*, Tr. 356:7-8 ("if you're available at that time and that date, and you would accept it, or you know, reject it"). Further, evidence in the record suggests that none of the notaries speak with anyone at the intervenor law firms before their consumer meetings. *See* PX-051, Vrzhezhevski Dep. 26:12-14 ("Q. So you never talked with anybody at the law firm? A. No."); PX-006, Pavlow Sworn Interview 29:17-20 ("Q. Have you ever had any direct contact with those counselors that the clients have spoken to before they meet you? A. I have not."); PX-048, Soule Dep. 28:12-20 ("Q. Were you ever

supervised by a lawyer in providing your notary services? A. No. Q. Did you have any communication with any lawyer from any law firm on Exhibit 1 during any part of this process? A. No."). Instead, it is Strategic that arranges the notary appointments, and it is Strategic employees and sales managers who determine whether to send a notary out at all. *See* Tr. 552:15-20. The notaries are sent a packet of material purportedly drafted by or for intervenor law firms, but all interactions are with "Financial Consultants," the name Strategic gives its salespersons. *See* Tr. 244:17-25; 246:17-20.

"At common law, an agency relationship is created when . . . the agent manifests assent," to the creation of the agency relationship. *See Kirschner v. Robeco Cap. Growth Funds - Robeco BP US Premium Equities (In re Nine W. LBO Sec. Litig.)*, 87 F.4th 130, 148 (2d Cir. 2023). Here, defendants make much of the "Affidavit of Compliance" that notaries must sign in order to be paid, which require the notary and the consumer to aver that the notary is a representative of the intervenor law firm. *See* DX 26-0001.[15] Regardless, the totality of the evidence in the records shows that, in practice, neither most notaries themselves, nor the consumers they meet with, typically view the notaries as agents or representatives of the law firms for purposes of selling debt-relief services.

For example, testimony from notaries indicates that they do not view themselves as agents of the intervenor law firms and therefore do not identify themselves as such when contacting consumers to set up meetings. *See Accardo*, Tr. at 357:2-6 ("Q. How do you identify yourself. [when calling the consumer]? A. As a Notary Public. Q. Do you identify yourself as a representative of Great Lakes Law Firm or Northstar? A. No, sir."); *Brooks-Ward*, Tr. 322:17-18 ("Q. Are you an agent of any of these law firms? A. I am not

---

[15] Defendants also point to the fact that the script provided to the notaries instructs them to identify themselves as agents or representatives of the intervenor law firm.

an agent for anybody other than myself."); PX-045, Tsui Dep. Tr. at. 41:1-7 ("Q. Did you ever consider yourself an agent of any of the companies offering debt relief services that you actually provided notary work for? . . . A. I'm not an agent for these companies; I'm the notary public."). *See also* PX-046, Shirkey Dep. 22:10-17 ("Q. And when you contacted the consumer, how did you identify yourself? A. As a notary that's going to be providing the documentation for their debt relief. I do not represent the company. I do not represent any type of legal representation. I'm just bringing them documents and witnessing their signature, verifying their identification.").[16]

Consistent with this evidence, consumers testified that the notaries who conducted the meetings sometimes did not identify who they worked for or what company they were with. *See Elkins*, 393:10-12 ("Q. Did the notary say who she worked for? A. She did not. She just identified herself as the notary."); *Barsch*, Tr. 511:13-15 ("Q. Did he say what company he was with? A. He didn't. He had a notary stamp. I believe he said he was sent by Monarch Legal to sign our paperwork.").

Further, upon reading the Affidavit of Compliance more closely, multiple notaries expressed regret at having signed the document. *See Brooks-Ward*, Tr. 347:19-348:7 (testifying that it "was just a grave mistake on my part for even signing that document"); *Accardo*, Tr. 384:10-11 ("[I]f I had read this document more carefully, I probably wouldn't have signed it."). *See also* PX-050, Howell Dep. 85:14-20 ("Q. How about as an agent?

---

[16] Defendants submit depositions from a handful of notaries who testified that it was their understanding that they were acting as agents or representatives of the intervenor law firms during their face-to-face to meetings with consumers. However, the Court has considered all of the testimony and evidence as a whole, including the credible, live testimony by notaries and consumers, and concludes, for purposes of this preliminary finding, that the notaries used here generally did not consider themselves to be agents of the intervenor law firms for purposes of actually *selling* debt-relief services.

Were you okay being referred to as an agent in these documents? A. No. Q. And why is that? A. Because I wasn't an agent. I was only the notary.").

Lastly, finding that the notaries are "sellers" within the meaning of the TSR would lead to illogical and seemingly unintended consequences. Defendants argue that "[a]s the hired agents of the law firms, the notaries – together with the law firms that hire them – are 'collectively one 'seller whose goods or services are being offered'' under the TSR." *See* Dkt. No. 118-1, Def's Pre-Hrg. Br. at 11; *quoting United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020)). If defendants are correct, the notaries have statutory liability for defendants' actions. Indeed, defense witness Michael Thurman, an attorney who specializes in regulatory compliance and risk mitigation in the financial services industry, testified that the notaries are "probably" liable for violations of the TSR. *See* Tr. 87:17-23. Defendants' theory, if accepted, would mean that defendants' could violate the TSR and the notaries would be liable because, according to defendants, they are "collectively one seller." The Court is skeptical that the drafters of the TSR would have intended to impose such statutory liability on the notaries involved here who, as demonstrated by credible evidence in the record, are paid a fee for the collection of signatures and, for all practical purposes, do not seem to be actually selling debt-relief services to consumers on anyone's behalf.[17]

---

[17] Lisa Munyon, the principal NPN, testified that her company's "Signing Terms, Requirements, & Instructions" for notaries provides that the notaries are "in no way liable or responsible for anything associated with the client's debt settlement program." Tr. 43:6-16; DX-008 at 1 ("I also understand that I am in no way liable or responsible for anything associated with the client's debt settlement program.").

For all of these reasons, the Court finds it likely that the notaries are not sellers within the meaning of the TSR, and therefore the meetings they conducted with consumers likely do not qualify for the face-to-face sales exception.

### The Face-to-Face Presentations Are Insufficient Under the TSR

Even if the notaries qualified as sellers of debt-relief services under the TSR, which the Court has found they likely do not, the face-to-face exception likely still does not apply here. Under the TSR, the face-to-face exemption applies only where there has been a "face-to-face *sales* … presentation." 16 C.F.R. § 310.6(b)(3) (emphasis added). *See* Tr. 54:24-55:2 (defense witness Thurman testifying that, to qualify for the exemption, "it has to be a sales presentation."). Guidance for the TSR, promulgated by the Federal Trade Commission ("FTC"), likewise dictates that the face-to-face meeting must include "an actual sales presentation to the buyer." *See* DX-114. The FTC explains:

> The key to the face-to-face exemption is the direct, substantive, and personal contact between the consumer and seller. The goal of the TSR is to protect consumers against deceptive or abusive practices that can arise when a consumer has no direct contact with an invisible and anonymous seller other than the telephone sales call. A face-to-face meeting provides the consumer with more information about — and direct contact with — the seller, and helps limit potential problems the TSR is designed to remedy.

*See* FTC; *Complying with the Telemarketing Sales Rule*.[18] FTC guidance has further made clear that "[y]ou can't get around the [face-to-face sales presentation] Rule by hiring representatives just to hold cursory pre-enrollment meetings with potential customers." *See* DX-114. One of the only courts to opine on the face-to-face exemption to the TSR has reiterated that "[t]he key to the face-to-face exemption is the direct, substantive, and

---

[18] https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#facetoface.

personal contact between the consumer and the seller." *See FTC v. Nudge, LLC*, 2:19-CV-867, 2022 U.S. Dist. LEXIS 107548, *97 (D. Utah June 14, 2022).

According to defendants, before a notary can receive an assignment to conduct an in-person meeting with a consumer, they must complete an online training developed by the intervenor law firms. *See* DX-8-0001; DX-12. The training video is approximately 25-minutes long and contains a rudimentary explanation of the debt-relief program that the consumer is agreeing to enroll in. *Id.* The notary must also pass a quiz by answering 22 out of 27 questions, or 80%, correctly. *See* DX-8-0002; DX-14.

Also according to defendants, at the face-to-face meeting, the notary reads from a script and reviews, with the consumer, each page of a 20-page PowerPoint presentation prepared by the intervenor law firm. *See Lyon* Tr. 106:8-14; McKay Dep. Tr. 43:7-8 ("I would print [the PowerPoint] off and then go page by page because they would have to initial it."); Willis Dep. Tr. 34:19-35:5 (Sunshine notaries were supposed to review the presentation while reading a script, and they were not permitted to deviate from the script); PX-051 at 10, Howell Dep. (stating that notary read from the script while showing the page of the presentation indicated by the script). The notary has the consumer initial each page of the PowerPoint presentation to acknowledge that the information has been presented to the consumer during the meeting. *Id.*

Defendants submit that the purpose of the script and the PowerPoint presentation is to ensure that each consumer is presented with the same information about the debt-relief program, and to provide the consumer with complete information about the program, including its potential downsides, so that the consumer may make a reasonable choice and fully understand the program before they enroll. *See* Tr. 57:4-20. In fact, the

PowerPoint presentation includes a slide entitled "IMPORTANT THINGS TO KNOW." *See* DX-20-0017; DX-22-0010; DX-24-0019; DX-117-0048. This slide informs consumers that, by enrolling in the debt-relief program: (1) they may experience an increase in collection activity, including calls or letters from creditors or collectors; (2) the intervenor law firm cannot stop interest, penalties or late fees from accruing as to their outstanding debts; (3) the intervenor law firm does not contact credit bureaus to clean up or repair their credit; (4) they typically will not see a debt settlement for the first 6 to 9 months after enrollment; (5) the intervenor law firm does not provide tax advice; and (6) their credit score will likely be negatively impacted. *Id.* The consumer is also informed that the fees for the program are front-loaded, and that they will initially pay more in fees to the intervenor law firm than they are saving through debt settlement or debt reduction. *See* DX-13, DX-46, DX-48. The PowerPoint presentation also informs consumers that there are alternatives to enrolling in the debt-relief program, such as credit counseling or filing for bankruptcy. *See* DX-18-0005, 00021; DX-20-0007, 0025; DX-24-0007; DX-24-0025.

According to defendants, the notary also reviews each page of the retainer agreement between the consumer and the intervenor law firm, and obtains the consumer's signature at numerous places within the agreement. *See* Roberts Dep. Tr. 22:2-12; E. Howell Dep. Tr. 95:1-3; *Thurman* Tr. 66:13-24; DX-116; DX-117; DX-122; *Brooks-Ward* Tr. 320:7-14; 338; 14-23, 339:11-12. The retainer agreement contains, *inter alia*, a schedule of fees that the consumer will pay over the course of the debt-relief program, an arbitration clause, and a waiver of rights to file a class action lawsuit against the intervenor law firm. *See* DX-116-17.

Also according to defendants, the notaries can and are instructed to answer consumers' basic questions related to the debt-relief program during the face-to-face meeting. *See* Tr. 33:10-11; DX-11-0004. To that end, notaries are specifically instructed that when a consumer asks questions during the presentation, they may "[point] out answers that are on the appropriate slide; offer answers from the enrollment documents; offer clarifications; [and] repeat information [they] have read in these materials." *See* DX-013 at 4. Notaries are specifically told that they "may NOT go any further in providing answers" to consumers. *Id.* Thus, according to defendants' own instructions, notaries may not answer questions that require information beyond what is contained in the presentation materials. If the consumer asks a question, during the face-to-face meeting, that the notary is unable to answer by referencing information in the documents, the notary will call a representative from Strategic to answer the consumer's question over the telephone. *See* Tr. 109:13-16; Tr. 340:20-24; Tr. 359:4-18; Willis Dep. Tr. 32:2-9, 33:14-34:4, 65:7-66:2 (if a consumer had questions during the face-to-face presentations the notaries could refer to the documents, but if the notary was unable to answer, he or she was supposed to call the law firm contact with those questions or call [the notary company] to assist with contacting the law firm).

At the end of the face-to face meeting, the notary will collect the consumer's financial information. *See* Tr. DX-1117-00060. After the meeting is complete and all of the documents have been signed, an attorney from one of the intervenor law firms will conduct a "welcome call" on the telephone with the consumer. *See* Tr. 148: 2-3. Following this call, the attorney will countersign the agreement and the initial payment of fees will be taken from the consumer. *See* Tr. 157:16-18; DX-19-0006; DX-84-0003.

Even if the face-to-face meetings between the notaries and the consumers proceed exactly in the manner described by defendants, the Court finds that they are insufficient to constitute face-to-face sales presentations as contemplated by the TSR. The notaries are instructed to read from a prepared script and PowerPoint presentation. To be sure, these materials are detailed and contain a great deal of important information, both positive and negative, for the consumer to consider regarding the debt-relief program. However, the totality of testimony and evidence before the Court shows that the notaries have no substantive knowledge of the debt-relief program beyond what is contained in the presentation documents, and that they cannot and will not answer consumers' substantive questions about the debt-relief program. In fact, any time a consumer has a question that cannot be answered by reading from either the retainer agreement or referring to a page in the PowerPoint presentation, the notary is instructed to have the consumer call a representative from Strategic to obtain the answer. This is the case even when the notary has completed all of the required training and has conducted the in-person meeting exactly as instructed by defendants and/or the intervenor law firms.

For example, defendants' own notary witness, Heather Lyon, credibly testified that she does not have knowledge of the debt-relief program that "goes even slightly beyond" the documents provided by defendants and/or the intervenor law firm. *See* Tr. 121;15-18. Lyon testified that if a consumer has a question about the "IMPORTANT THINGS TO KNOW" slide during the presentation, she calls the sales representative on the telephone, during the meeting, and that individual answers those questions for the consumer. *See* Tr. 116:17-24. Likewise, if a consumer is concerned about how big an impact the debt-

relief program may have on their credit score, Lyon testified that she does not answer the question and will instead "revert [the consumer] immediately back to the representative from the law firm." *See* Tr. 123:14-19.[19] Lyon likewise testified that she would not be comfortable answering a consumer's question about the differences between bankruptcy and debt settlement and that if a consumer asked her a question in that regard, she will "revert them back to the representative from the law firm." *See* 124:20-25. She further explained that "[i]f the [consumer] is in a position or has a question that would sway their decision on signing the program or otherwise, I always revert their question back to the representative from the law firm...*as I am instructed to do*." *See* Tr. 125:4-7 (emphasis added). Notably, Lyon testified: "I let the [consumer] know right away that I don't manage this program. I don't ... have training, experience to understand the program, ... I don't answer their questions regarding the program." *See* Tr. 120:21-25.

Likewise, notary John Accardo credibly testified that if, during an in-person meeting, a consumer asked him a question that called for information beyond what was contained in the documents, he would instruct the consumer to call a representative from the debt-relief company. *See* Tr. 359:13-18. Moreover, Accardo testified that he would have "no idea" how to answer a consumer's questions regarding (1) how long it would take them to get their debt settled; (2) whether the program was preferable to bankruptcy; or (3) the impact the program would have on their credit rating. *See* Tr. 359:23-25; 360:2-10. Accardo further explained that "if something ... needs to be clarified, I have [the consumer] call whoever they work with at the company." *See* Tr. 359:17-18.

---

[19] Evidence in the record shows that when a representative was called during the in-person meeting to answer a consumer's questions, that individual was an employee of Strategic and not one of the intervenor law firms. See e.g., PX-023; PX-025; PX-027; PX-34; PX-036.

Notary Brooks-Ward similarly testified credibly that if a consumer has a question concerning what is stated in the retainer agreement with the law firm, she directs them to "call their representative." *See* Tr. 320:15-18; 320:15-18 ("Q. And if someone has a question, says to you, Ms. Brooks-Ward, what is this all about in a contract, what do you do with that? A. They have to call their representative."). Likewise, when asked if she tells consumers anything beyond what is contained in the presentation documents, Brooks-Ward testified: "I tell them nothing: that is not my responsibility. *See* Tr. 319:9-12.[20]

According to the TSR, the FTC guidance, and the case law discussed above, the face-to-face exception requires a *sales presentation* involving direct, *substantive*, and personal contact between the consumer and the *seller*. FTC guidance specifically states that a face-to-face meeting "provides the consumer with *more information about—and direct contact with—the seller*." The phrase "face-to-face presentation" itself connotes some type of personal interaction between individuals. Thus, it seems axiomatic that a "face-to-face sales presentation" would provide a consumer the ability to personally interact with, and ask questions of, a person who is knowledgeable about the goods or services being sold to them. The in-person meetings between the consumers and the notaries fail to achieve this goal.

As noted previously, the evidence clearly shows that consumers made an initial decision to enroll in the debt-relief program while on the phone with a telemarketer, namely the Strategic representative. The purpose of the in-person meeting with the notary

---

[20] The credible testimony of notaries Lyon, Accardo, and Brooks-Ward that they cannot and do not answer substantive questions about the debit-relief program beyond what is contained in the materials, and that they do not substantively discuss the debt-relief program with consumers, is consistent with the Court's previous finding that the notaries are not selling debt-relief services to consumers during these meeting nor are they agents of the intervenor law firms for purposes of selling debt-relief services.

was to finalize or memorialize that decision, in writing, by initialing documents and signing a retainer agreement with one of the intervenor law firms. Evidence submitted by both plaintiffs and defendants further shows that the notaries have no substantive knowledge of the debt-relief program beyond what is contained in the materials provided, and therefore possess no ability or inclination to answer the consumers' substantive questions. Instead, if a consumer has substantive questions, including questions about alternatives to resolve their debt or the potential downsides of defendants' debt-relief program, the notary places the consumer on the phone with a telemarketer. Thus, any time a consumer seeks additional explanation of the presentation or the retainer agreement, or more substantive information about the debt-relief program in general, they must ask their questions to an "invisible and anonymous seller." This exchange is the exact scenario the face-to-face exemption seems designed to avoid. *See* DX-115 at 17 ("The goal of the TSR is to protect consumers against deceptive or abusive practices that can arise when a debt consumer has no direct contact with an invisible and anonymous seller other than the telephone sales call.").

Defendants point to the fact that the notaries receive training on the debt-relief program; that the in-person presentations provide extensive information, both positive and negative, to consumers; and that the notaries are instructed to answer consumers' basic questions by referring to the materials provided by defendants and/or the intervenor law firms. Defendants' system for meeting the face-to-face exemption to the TSR, while carefully and thoughtfully designed, is "too cute by half." While the notaries may read from comprehensive presentation materials, the facts remain that (1) these notaries are not salespersons; (2) they have no ability to answer questions beyond what is already

contained in the printed materials; and (3) they have no affiliation of any kind with the debt-relief program.[21] Indeed, defendants' system is no different than if a consumer read through the presentation materials online themselves, checked or initialed a box after reading each page, and was instructed to call a sales representative if they had any questions or sought additional clarification. Stated another way, while the notaries may conduct some type of "face-to-face presentation" to consumers, the actual sale is done over the phone. For these reasons, the in-person meeting with the notary likely does not qualify as a "face-to-face sales presentation" under the TSR.

The FTC enacted the advance fee ban in response to the "manner in which debt relief services have been sold[.]" *See* 75 Fed. Reg. 48458, at 48485. Specifically, the FTC explained that debt relief services "frequently take place in the context of high-pressure sales tactics, contracts of adhesion, and deception." *See* 75 Fed. Reg. 48458, at 48485. Testimony from the hearing and other evidence in the record shows that consumers responding to defendants' advertisements for debt-relief services are, most often, individuals drowning in debt and searching for any manner of escape or relief. Defendants and the intervenor law firms not only charge advance fees for providing debt-relief services, but they also require consumers to agree to arbitration, waive their rights to class action lawsuits, and forego other options of relieving their debt, such as filing for bankruptcy or pursuing debt-counseling or debt-consolidation. Defendants' debt-relief program is almost certain to result in consumers experiencing both an increase in collection activity and a negative impact on their credit score. The totality of evidence

---

[21] Defendants submit declarations from notaries indicating that they could, and did, answer "substantive" question by consumers. However, a close reading of those declarations shows that the notaries' answers generally did not go beyond the information contained in the written materials. (Dkt. No. 142)

before the Court demonstrates that when a consumer has substantive questions about these and other important facts before committing to the program, they are directed to call a telemarketer. Such inquiries may likely and logically be giving already vulnerable consumers pause before enrolling in the debt-relief program, and there is no ability for these consumers to have their concerns addressed, face-to-face, by an individual with actual, substantive knowledge of the program. This cannot be the intention of the face-to-face exemption to the TSR.

Moreover, even if, in theory, the meetings between the consumers and the notaries satisfied the face-to-face exemption to the TSR, which the Court has found they do not, the evidence here demonstrates that the face-to-face meetings were often not executed in the manner put forth by defendants. For this additional reason, the Court finds it likely that plaintiffs will prevail on their claim that defendants cannot show that the face-to-face exception to the TSR applies here.

Evidence in the record demonstrates that, regardless of any guidance the notaries received from defendants and/or the intervenor law firms, some notaries did not read the script to the consumers or make any type of presentation to the consumers. Notary Brooks-Ward testified that she does not use a script when meeting with consumers. *See* Tr. 327:25; 329:23-25 ("Q. Now, you said you don't follow the script. Did I understand you correctly? A. You did understand me correctly."). Likewise, notary Accardo testified that he neither reads from a script nor does he read the presentation materials to the consumer. *See* Tr. 358-59 ("Q. And do you read [the documents] to them? A. No, I let them review the documents. Q. Do you turn the pages one after another for them? A. No, they review them on their own."); 375:13-24 ("Q. And did you read from the script? A. No,

I did not.").[22] *See also* PX-012 at 148, Hulbert Decl. ("Most of the time I did not read the script to the consumer. Instead, I provided the printed script to the consumer to read. I was told that my job was not to answers questions"); PX-052; Roberts Dep. 35:2-4 (stating that sometimes the notary would give the consumer the script to read for themselves before signing the documents).

It also appears that, in practice, the meetings between consumers and notaries were often not nearly as lengthy, fulsome, or thorough as described by defendants. The PowerPoint presentation and retainer agreement are at least 50 pages in length combined, and contain extensive and important information for consumers to be aware of before enrolling in the debt-relief program. *See, e.g.*, PX-011 at 9-58 (Elizabeth Salva documents totaling 50 pages); DX-122 (documents totaling 61 pages). However, plaintiffs have submitted evidence showing that some meetings with consumers were so brief that it would have been virtually impossible for the notaries to have thoroughly and carefully read and reviewed all of this material with consumers. For example, consumer Annie Barsch credibly testified that her meeting with the notary lasted approximately 15 to 20 minutes. *See* Tr. 506:10-13 ("He checked our drivers' licenses, verified who we were, kind of walked us through, like we got to go through the documents and signed everything. And then he left. It was maybe 15, 20 minutes..."). Likewise, consumer Christopher Elkins credibly testified that his meeting with a notary lasted only a total of ten minutes, of which only about "four or five minutes" were spent on signing the documents. Tr. 400:18-25 ("Q. From beginning to end, how long would you say this meeting lasted? A. Ten minutes or less. The longest amount of time that we spent was, I would say the four or five minutes

---

[22] Accardo also testified that he did not undergo any training before meeting with consumers. Tr. 533:17-22.

signing the documents... But from the time she entered my house, I'd say the whole thing was ten minutes.").

Documents provided by the intervenor law firms to the notaries include an "Affidavit of Compliance," in which the notary is to attest, at the end of each meeting, that they have conducted a face-to-face meeting with the consumer and have reviewed certain material. *See, e.g.,* DX-021 at 26; PX-011 at 57; DX-26–DX-43. The Affidavits of Compliance are filled out by the notary, signed by both the notary and the consumer, and include a notation as to the start time and end time of the in-person meeting. *Id.* Affidavits of Compliance maintained by defendants confirm that notary meetings frequently last less than 30 minutes and sometimes as little as 15 minutes. *See, e.g.,* K. Davis Decl. (noting that out of 3,152 presentations, 1,670 lasted 30 minutes or less and 373 lasted 20 minutes or less and that some meetings with consumers were very short, with lengths under 10 minutes, and one meeting lasted only 5 minutes); DX-26–DX-43; DX-029 (15 min); DX-042 (18 min); DX-036 (20 min); DX-041 (25 min); DX-039 (25 min). The Court finds it difficult to imagine that, during a meeting lasting 30 minutes or less, a notary could fully and effectively (1) read the provided script; (2) present the PowerPoint presentation in a manner that ensured the consumer read and understood all of the information; (3) review the retainer agreement; (4) facilitate the signing and notarization of all required documents; and (5) take the consumer's payment information.

Evidence about the brief duration of many in-person meetings corroborates other evidence in the record that meetings with the notaries are often formulaic and do not allow for direct, substantive conversations about the debt-relief program and its potential consequences. Indeed, plaintiffs have produced evidence tending to show that notary

meetings are held solely for the purpose of obtaining consumer signatures on enrollment documents, during which time little to no information is actually communicated to the consumer regarding the debt-relief program. Consumer Christopher Elkins testified that when the notary arrived to meet with him and his wife, the notary described their meeting as "a formality" and further stated "[y]ou've already spoken with Canyon. We just want to sign the contract, and we'll be about our business." Tr. 393:4-7. Elkins further testified that the notary placed the documents on the table with stickers on the pages that he and his wife were to sign or initial. Tr. 394-95. Elkins stated that the notary "flipped" through the documents at an extremely quick pace and that she was "very distracted", "very rushed", and "checked her cell phone often." Tr. 475:3-13. Elkins testified that he signed "a lot of documents" and "did not have a chance to read or understand what any of them were until after the fact." Tr. 396:3-5.[23]

Consumer Annie Barsch testified similarly that when she and her husband met with the notary, he "stood on the other side of the table while we reviewed everything he pointed out, where we needed to initial or sign, and that was really it." Tr. 509:23–510:3. When asked if the notary told her and her husband anything about the retainer agreement, she answered "[n]o…[h]e was there to get our signature." Tr. 511:20-21. *See also* PX-

---

[23] On cross-examination, Elkins was presented with the "Affidavit of Compliance" signed by him and the notary at the conclusion of the face-to-face meeting, which contained written statements, pre-printed by the intervenor law firm, that certain topics regarding the debt-relief program were reviewed with him. Tr. 472:3-5. In addition, the notary indicated, on the affidavit, that the meeting lasted thirty minutes. *Id.* Elkins testified that while he signed the Affidavit of Compliance, he signed many documents that day in a rushed manner, without understanding what many of them meant, in large part because his "back was against the wall" with respect to his large and unmanageable amount of credit card debt. Tr. 475:3-13. The Court finds that Elkins was a credible and forthright witness, and the Court credits his testimony about the nature and length of the in-person meeting with the notary over the statements in the Affidavit of Compliance.

011 at 2, Salva Decl. (describing the notary process as a "flyby presentation" and that the notary seemed "like a robot going through a script"); PX-012 at 58, Sheehan Decl. ("[the notary] did not go over the contract with us; he simply showed my husband and me where on the contract to sign"); PX-012 at 112, Nickles Decl. ("When I signed the contract, [the notary] and I did not discuss anything substantive related to the program.").

    Statements by Strategic employees further indicate that, even though defendants and the intervenor law firms describe the notary meetings as sales presentations, during which time the consumer is able to learn more about all aspects of the debt-relief program, the meetings often do not, in reality, result in consumers being more informed about the program prior to their enrollment. Instead, Strategic employees have described the meetings largely as formalities for purposes of getting the contracts signed. At the hearing, plaintiffs introduced a recorded phone call between Bob Duggan, the former Senior Vice President of Sales at Strategic, and Bryan Dilgard, the current Senior Director of Negotiations at Strategic. Tr. 569, 72; PX-30; DX-149.[24] During that call, Duggan states the following, with regard to the meetings between the notaries and the consumers:

> All we do is just get these people to kind of pencil whip and sign [the contract]…It doesn't seem like it's as meaty as we make it sound[.]

*Id.* Dilgard responds:

> I agree with you, its almost like [the consumer is] pencil whipped into signing that day because, since you already came all the way here, you know, just let's get through this. And I think they just made it more fluffy, you know, as

---

[24] Deepgram is a data analytics company that provides audio transcription and key word search functions for companies. Tr. 568. Strategic contracted with Deepgram to record calls for quality control purposes. *Id.* 568:71-72 It appears that the recordings consist of both calls between Strategic employees and consumers as well as internal calls between Strategic employees themselves. *Id.* It appears that the New York State Attorney General's office obtained these recordings in the course of their investigation of defendants for the conduct at issue in this lawsuit. *Id.*

far as the presentation, if you will, and they sign the presentation. So I mean, it's almost like a, a CYA on our end[.]

*Id.*[25]

Plaintiffs also offered evidence that belies defendants' claim that notaries routinely answered either (1) basic consumer questions regarding the program or (2) questions that could be answered by referencing the PowerPoint presentation and/or the retainer agreement. *See* PX-012 at 2, Edgar Decl. ("I remember finding the meeting odd because I had questions, but [the notary] did not have any answers and simply referred me back to [the Strategic representative]"); PX-012 at 117, Kovein Decl. ("The documents were tabbed with the places that I was supposed to sign. I asked the notary questions about the program, but the notary advised me to direct my questions to the company"). In fact, notary Brooks-Ward testified that even when consumers ask questions that she could answer based on the presentation materials in front of her, she does not answer those questions because "that is not [her] job." *See* Tr. 340-41 ("Q. If you get questions from the potential client … you said you would have them call the representative; is that right? A. Exactly. Q. If you get questions that you can answer based on the presentation materials that you have in front of you, don't you answer those questions? A. I do not. That is not my job.").

---

[25] At the hearing, defendants presented an affidavit from one of the employees that participated in the phone call. DX-149. Therein, the employee states that, during the call, he and the other employee were "analyzing data" and that neither have personal knowledge as to what occurs during the face-to-face meetings between notaries and consumers. *Id.* Regardless, the Court finds the comments on the call probative as to how certain employees of defendants viewed the notary presentations. The comments on the call are also corroborated by other evidence and testimony in the record as to how meetings between the consumers and notaries often proceeded.

In fact, consumers who testified at the hearing indicated that not only were the notaries they met with unable to answer their questions about the debt-relief program, but also that the notaries informed them that their questions would be answered by a sales representative *after* they had signed all of the documents required for enrollment in the program. Indeed, Christopher Elkins testified that he asked the notary conducting his face-the-face meeting a question about the payment schedule and she responded "well, I'm not familiar with the particulars of the contract. If you have any questions *after* we're done signing, you can contact Canyon Legal Group and they will be sure to answer any questions you have." *See* Tr. 394:20-24 (emphasis added). Likewise, Annie Barsch testified that when she asked her notary a question about the prepayment of certain fees, he responded "if you have *any questions* about anything, someone from the company will talk to you *later*." *See* Tr. 510:15-511:2 (emphasis added).

Other evidence shows that the notaries themselves were often discouraged from answering consumer questions during the in-person meetings and instead were specifically instructed that they were to call a Strategic representative, on the telephone, to obtain an answer. As noted above, defense witness Lyon repeatedly testified that if she was asked questions regarding the debt-relief program she would always "revert [the consumer] back to the representative…as [she was] instructed to do." *See also* PX-012 at 149, Hulbert Decl. ("I was told that if the consumer had any questions to have them call the representative of the debt relief company"); PX-046, Shirkey Dep. 25:8-10 ("[I]f I was asked a question, I was to call number X because I am not authorized to answer any questions."); PX-048, Soule Dep. 13:19-25 ("If there's questions, I would call. I did not answer anything if there were questions."); PX-045, Tsui Dep. 31:20-25 ("… the

instructions will tell me that if the signer has any questions, they will call such -- they will call such-and-such a number, and a representative will explain or answer the signer's questions. I do not do any of that...").[26]

Evidence also reflects that phone calls from notary companies to Strategic representatives regarding consumer questions during signings were routine and that Strategic employees did not express surprise at receiving such calls. *See, e.g.,* PX-023 (transcript of call from Sunshine Signing to SFS); PX-025 (same); PX-027 (same); PX-034 (same); PX-036 (same). Indeed, evidence was presented that Strategic representatives directed consumers to call them with questions rather than asking the notaries, who were, in the view of Strategic employees, only there to have the documents signed. *See, e.g.*, PX-24 at 22 (Strategic representative informing consumer that "I'm the financial consultant...[t]hey're just notaries...[t]hey don't really have, you know, the information and that's my job."); PX-029 at 37 (Strategic employees advising the consumer that the notary is not a financial consultant so if the consumer has any questions, she should call the Strategic representative). During a recorded call introduced at the hearing, a Strategic employee can be heard telling a consumer the following regarding the consumer's upcoming meeting with the notary:

> If you have any questions during the meeting, specifically a representative
> of the law firm is going to give me a call as I specialize in this product
> whereas they are just a notary for the law firm. So, you know, they are not

---

[26] Evidence in the record indicates that at least two notary companies utilized by defendants—Sunshine Signing Connection and NotaryGo—specifically instructed the notaries not to answer questions from the consumers during in-person meetings related to defendants' debt-relief services. *See* PX-018, Willis (Sunshine) Dep. 32:24-33:18 ("Q. When you -- when Sunshine provided instructions to the notaries, did Sunshine tell the notaries that they were not permitted to answer questions from the consumers? A. Correct."); PX-15, Winkelman (NotaryGO) Dep. 25:9-13 ("Q. If the consumers had questions about the terms of the contract, what were they supposed to do, do you know? A. We would ask them to contact their rep, whomever they were dealing with at Strategic.").

going to know a whole lot about the product, but…they are skilled in how to help you sign the paperwork, like, you know, initial here, sign here, so on and so forth, so I will be available tomorrow or today any time you choose to sign the paperwork."

*See* Tr. 576; PX-33.

Defendants point to certain quality control measures implemented to ensure that the notaries were conducting lengthy, substantive, and fulsome face-to-face presentations with consumers in the manner prescribed by Strategic and/or the intervenor law firms. However, the Court finds these measures inadequate. For example, the notary companies themselves take no steps to confirm that the notaries are actually providing a substantive sales presentation in any given meeting. *See, e.g., Munyon*, Tr. 48:16-25; PX-015 Winkelman (NotaryGO 30(b)(6)) Dep. 28:3-12 ("Q. And you wouldn't be able to -- would you have a way to confirm whether presentations, extra information, extra instructions were followed? A. That is not something we did. That was beyond our scope."); PX-018 Willis Dep. 40:5-15 (the company only had notaries confirm that "the script and presentation was initialed by each consumer.").

Similarly, defendants and/or the intervenor law firms do not conduct any physical verifications, such as in-person audits, to ensure that the notaries are performing face-to-face presentations in the manner expected. Instead, Strategic only reviews the documents initialed and/or signed at the meeting. *See* PX-19; Sasson Dep.156: 21-157: 13. Thus, regardless of any training the notaries receive, defendants have failed to show that they have any reliable or comprehensive way to identify or cure defects in how the

meetings actually take place.[27]

Defendants claim that third party payment processors of the intervenor law firms, specifically Global Client Solutions (Global) and Reliant Payment (RAM), audited the face-to-face meeting process. However, evidence in the record shows that both Global and RAM relied solely on representations and submissions made by defendants and/or the intervenor law firms when evaluating the sufficiency of the meetings. See PX-19, Sasson Dep. 145:3-18; PX-72; RAM 30(b)(6) Dep., 45:7-12. Indeed, it appears that no representative from RAM ever witnessed a face-to-face meeting. See RAM 30(b)(6) Dep. 36:1-8. In fact, RAM's representative believed that the meetings were conducted by attorneys, not by notaries. Id. 36: 9-16.[28]

The Court also rejects defendants' contention that a preliminary injunction should not issue here because the evidence introduced by plaintiffs is stale. Defendants point to the fact that the recorded phone calls, including calls involving Strategic sales representatives, occurred in 2018. Defendants also emphasize that the most recent notary presentation referenced in the declarations submitted by plaintiffs occurred in

---

[27] Defendants point to the "attorney welcome call," whereby an attorney affiliated with one of the intervenor law firms will call the consumer following the completion of a notary meeting. Defendants submit that the attorney will reiterate much of the important information about the debt-relief program contained in the notary's presentation. To the extent that defendants contend that the attorney welcome call remedies any deficiencies in the face-to-face presentation, that argument is rejected because the attorney calls do not occur in-person. Further, while there was testimony and evidence that the attorney will ask the consumer how the meeting with the notary went, the totality of evidence in the record suggests that these inquiries are largely perfunctory and that the attorneys do not regularly seek out specific or detailed information from consumers as to the substantive nature of the notary meetings during these calls.
[28] Moreover, even when relying solely on defendants and/or the intervenor law firms submissions, Global found the face-to-face presentations lacking and required the intervenor law firms not to instruct consumers to stop paying their creditors. See PX-072. Despite this instruction, defendants and/or the intervenor law firms did not stop telling consumers to discontinue payments to creditors. See PX-019, Sasson Dep. 148:16–149:11.

2021. Most consumers who enroll in the debt-relief program agree to a multi-year term. For example, consumer Elkins testified that he agreed to a four-year term beginning in 2019. Thus, many consumers who enrolled in the debt-relief program a number of years ago, and who were given face-to-face presentations by notaries, are presumably still enrolled in the program and paying advance fees. Indeed, there is no dispute that defendants and the intervenor law firms were both facilitating face-to-face meetings with notaries and collecting advance fees for debt-relief services up until the TRO was issued. Moreover, while defendants have shown evidence of refresher trainings for notaries or other minor changes to the notary presentation and instructions, defendants have not presented any significant evidence showing that their practices, with regard to the face-to-face notary meetings, are substantially or appreciably different than they were in 2018 through 2021, such that it would alter the Court's findings herein.

Upon consideration of the entire record, including all of the evidence submitted over the course of the hearing, the Court finds that the meetings between the consumers and the notaries, as designed and described by defendants, are likely insufficient to constitute face-to-face sales presentations under the TSR. Moreover, plaintiffs have introduced evidence showing that the meetings between consumers and the notaries often did not occur in the manner designed by defendants, and instead were conducted solely for the purpose of signing enrollment documents with little to no substantive information actually communicated to the consumer about the debt-relief program by the notary. Thus, the Court finds that plaintiffs are likely to succeed on their claim that defendants are in violation of the TSR.

## ***Individual Defendants***

In order to obtain injunctive relief against an individual for corporate violations of the TSR, an individual will be liable "if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with intentional avoidance of the truth." *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461 (S.D.N.Y. Jan. 17, 2014). To establish substantial assistance under the TSR, courts require (1) an underlying TSR violation; (2) substantial assistance or support to the seller or marketer violating the TSR; and (3) that the person knew or consciously avoided knowing that the seller or telemarketer violated the TSR. *See FTC v. Consumer Health Benefits Ass'n*, 10 CV-3551, 2011 U.S. Dist. LEXIS 92389 (E.D.N.Y. Aug. 18, 2011). Courts can infer knowledge or conscious avoidance of knowledge when the person providing substantial assistance received complaints about the violations. *Id.*

Here, plaintiffs have put forth sufficient evidence to show that they are likely to succeed on a claim that individual defendant Ryan Sasson participated in the taking of advance fees and/or controlled the corporate entities who took advanced fees, and that he had knowledge that advance fees were being taken from consumers. Sasson is the CEO of Strategic and is one of its founders. *See* Callahan Decl. ¶ 8(a). He controls Strategics' client service subsidiaries that work with the intervenor law firms in providing debt-relief services to consumers. *Id.*; Ridder Decl. ¶¶ 12-13. He opened and has controlled Strategic's bank accounts. *See* Hanson Decl. ¶¶ 9-11. Sasson also testified regarding his knowledge of defendants' fee structure. *See* PX-019, Sasson Dep. 38:3–39:24.

Defendant Blust performs various supervisory tasks for the intervenor law firms including hiring attorneys, addressing consumer complaints, and serving as a liaison between the intervenor law firms and Strategic. *See* Dkt. No. 4, ¶¶ 16-21; Dkt. No. 6, ¶¶ 19-20; Dkt. No. 7, ¶ 16. Evidence in the record shows that Blust controls the intervenor law firms and actively participates in business decisions concerning the intervenor law firms and Strategic. *See* Callahan Decl. ¶¶ 16-21. When employees of Strategic are unable to resolve certain consumer complaints or issues, they often consult with Blust or send the matter to him for resolution. *Id.* Hedgewick, an outside consulting company owned by Blust, drafted the scripts and tests for the notaries. *See* PX-055, Horvath Dep. 42:16-20 PX-054, Agosto Dep. 149:7-9 123:15-17 (Q. If you have a concern about a notary or about a notary company, who do you call? A. I will call Hedgewick. . . "). Thus, there is sufficient evidence, at this stage of the litigation, to find that the preliminary injunction should also be applied to Sasson and Blust.

### *Repetition of the Wrong and Irreparable Harm*

As explained previously, when a government agency seeks a preliminary injunction as a result of a statutory violation by a defendant, the agency need not show irreparable harm, but only the likelihood that the wrong will be repeated. Absent the continuation of the TRO in the form of a preliminary injunction, defendants will continue to take advance fees, likely in violation of the TSR, from the thousands of consumers currently enrolled in their law firm model of debt-relief. Moreover, without a preliminary injunction that continues the TRO's prohibition on advance fees, defendants are likely to begin enrolling new consumers in their debt-relief program, and are likely to immediately begin collecting advance fees from these individuals as well. Thus, the Court finds that,

absent a preliminary injunction, there is a likelihood that the harm will be repeated and will continue into the future.

Further, even though plaintiffs are not required to prove irreparable harm here, the Court finds that, absent a preliminary injunction prohibiting defendants from collecting advance fees for their debt-relief services, consumers are likely to suffer irreparable harm.

Strategic has enrolled approximately 65,0000 consumers in its law firm model of debt-relief. *See* DX-127; Clark Decl. ¶4. Evidence shows that these consumers have paid defendants thousands of dollars in fees while enrolled in the debt-relief program. *See* Elkins, Tr. 425: 17-20 ("Q. Mr. Elkins, in total how much did you pay Canyon Legal Group….to do debt settlement services for you? A. $80,000."); PX-011, Salva Decl. ¶ 15 ("In total, we paid $10,039.60 into the RAM account while participating in the Monarch program. Of that amount, $7,805.07 was taken by Monarch and $639.25 was taken by RAM. Only $1,590.28 was actually used to pay our creditors."); PX-012 page 3, Edgar Decl. ¶ 9 ("I was enrolled in the Newport debt settlement program for about 13 months ... At that point, I had paid Newport $5,035.92, nearly half of the amount of the debt I owed Wells Fargo.").

Evidence further shows that much of the funds consumers paid were applied to pay fees to defendants and/or the intervenor law firms, rather than towards building reserves to pay consumers' creditors. *See* PX-010, Griffiths Decl. ¶ 12 ("On or about May 5, 2021, we received a check from Global of $1,984.76, which was all that was left in our account after having paid in $9,205 into the program. Thus, in summary, after being in [Strategic's] program for almost a year, we lost approximately $6,675 of our money (specifically, the $9,205 we paid in, less the amount paid to Citibank, and the refund of

$1,984 we received from Global). We now assume all that lost money went to fees, since none of our creditors were paid, with the exception of the one settlement with Citibank."; PX-011, Salva Decl. ¶ 15 ("In total, we paid $10,039.60 into the RAM account while participating in the Monarch program. Of that amount, $7,805.07 was taken by Monarch and $639.25 was taken by RAM. Only $1,590.28 was actually used to pay our creditors. That means of the $10,039.60 we paid over the course of more than a year and a half in the program, over 84% of the payments were taken by either Monarch or RAM with very little to show for all these fees."); PX-012 at 113, Nickles Decl. ¶ 9 ("Once I enrolled in the program, I immediately was charged monthly fees such as a $10.95 banking fee, a $150 retainer fee, a $89 administration fee, and a $248.27 service fee ... After these fees were assessed, approximately $17 was left of the $515 that I paid each month."); PX-012 at 118, Kovein Decl. ¶ 5 ("To the best of my recollection, every month I paid approximately $366.67 into my account that was managed by Global. According to my contract, Heartland charged me the following fees every month: a service fee in the amount of $155.90, a retainer fee in the amount of $100, a legal administration fee in the amount of $59, and banking fees in the amount of $10.95. After these fees were paid, I had approximately $41.02 left in my account each month to pay my creditors. This amount was referred to as 'settlement reserves' in the contract.").

For a number of these consumers, the amounts paid to defendants were significantly greater than the actual amounts of debt that defendants settled for them. *See* Elkins, Tr. at 413: 25-414: 16 ("Q. So at the time you had paid the $24,838.52 -- actually, how far out into the program was that by the time you paid that amount? A. That was -- it was right around the 20-month mark, 21 months... Q. Okay. So, at that point in time, do

you know how many debts of yours were settled? A. One, 18 months in and I had one debt settled. [It] was one of my wife's credit cards in the amount of $500, and I think they settled -- it was like 50 or $75. I don't remember the exact amount, but it was not much."); PX-010, Griffiths Decl. ¶ 10 ("From July 2020 through April 2021, we made 21 payments of $438.34 to CLS totaling $9,205.14. During that time, CLS only paid off one of our creditors. Specifically, CLS settled with Citibank for $544.53 down from $1,055.80, and we understand from CLS's record that Citibank was paid $544.53 on that account.").[29]

Evidence from specific consumers that they paid more in fees than they achieved in debt-settlement or debt-reduction was corroborated by the testimony of Greg Regan, a Certified Professional Accountant, who testified on behalf of defendants. Ryan testified that 44% of consumers who enroll in defendants' debt-relief program leave the program before their debts have been fully settled. *See* Tr. 271:19-20 ("In the last bucket is clients who have canceled. So approximately 44 percent, as you said."). Indeed, this is not surprising, since consumers enroll in the debt-relief program offered by defendants and the intervenor law firms because they are unable to pay back large amounts of unsecured debt. Thus, it is logical that many of these consumers would be unable to make regular, monthly payments to defendants and/or the intervenor law firms in order to remain in the debt-relief program for the lengthy period of time necessary for its completion. Because of the nature of defendants' advance and front-loaded fee structure, for those 44% of

---

[29] Plaintiffs have submitted evidence that at least one consumer who paid fees and left defendants' program early did not have any debts settled before exiting the program. *See* PX-012 at 101, Davis Decl. ¶ 4 ("From June 2019 through August 2019, Global drafted my bank account six (6) times for a total of $1,459.74. After being in CLS's program for a few months, I checked my Global account statement online and discovered that most of my money was being paid to CLS for its fees, and nothing had been paid to my creditors. In addition, I received nothing indicating that CLS had contacted any of my enrolled creditors, much less settled any of my debts.").

50

consumers, their fees exceed the amount of their debt reduction. *Id.* 273:24-274: 6 ("…their fees exceed what their debt reduction was because they have left the program on average after 20 months").[30]

Further, a report from the temporary receiver, appointed pursuant to the TRO, indicates that 70% of consumers who enroll do not graduate from defendants' law-firm model of debt-relief. *See* Dkt. No. 115-1; Rec. Rep. at 36. According to the receiver, canceled clients of the law firm debt-relief program lost an aggregate amount of $64,682,005.19. *See* Dkt. No. 131-1, Sup. Rec. Rep. at 3.

Testimony and evidence also shows that defendants told some consumers that they would need to stay in the program longer, and pay more than they initially agreed, for defendants and/or the intervenor law firms to continue to negotiate their debts with creditors. *See Elkins*, Tr. 420:7-12 ("I paid them -- at that point, it was 20-some-odd thousand dollars to do a job they had not done yet. I wasn't getting that money back. They still had a job to do, so there was no choice but to continue to pay into this program so they can resolve my still $100,000 worth of debt."); PX-012 at 145, Boliche Decl. ¶ 9 ("However, after making three years of payments, [Strategic] informed me they needed to extend the contract because three creditors still had not been paid off. [Strategic] explained that they tried to negotiate with these creditors, but the creditors would not

---

[30] Defense expert Greg Regan testified that, in measuring benefits to consumers, a realistic comparison of savings cannot be made by comparing the settled debt amount to the amount of the consumer's original debt, because this comparison does not factor in the interest or penalties a consumer would pay if they took many years to repay their debt and/or made only the minimum monthly payments. However, this theory assumes that consumers must choose between advance-fee debt-relief services, or making minimum credit card payments for decades. Regan does not consider the other options that may be available, and more beneficial, to many consumers, including bankruptcy, debt-consolidation or debt-counseling, contingent fee debt-relief plans, or even calling creditors to work out a payment plan on their own. *See, e.g.* (Barsch, 2/4/24 Tr. 523:18-19.)

negotiate, so I would have to pay more than what was initially agreed upon ... In total, I had paid around $12,500.").

Other evidence in the record demonstrates that some consumers who enrolled in the debt-relief program suffered from negative impacts to their credit scores, wage garnishments, or frozen bank accounts. *See Elkins*, Tr. 419:1-4; 420:3 ("Q. Mr. Elkins. How, if at all, was your credit score impacted after you enrolled in services with [one of the intervenor law firms]? A... When I found out a year and a half after I signed the contract and that's when I really started digging in, because my credit went from almost 720, it was 716 to 520. It was a disaster."); *Barsch*, Tr. 516:11-517:21 (consumer's bank account was frozen after a judgement was entered against her when an attorney from one of the intervenor law firms failed to attend court hearing); Edgar Decl. ¶ 12 (after being sued by Wells Fargo, [intervenor law firm] did not represent consumer in his lawsuit and Wells Fargo obtained a default judgment against him); PX-012 at 58, Sheehan Decl. ¶ 8 (consumer informed the [Intervenor Law Firm] that she was being sued by Target, the law firm faxed over a document for her to take to court and represent herself, and no attorney showed up to represent the consumer at the courthouse); PX-012 at 136, Brannan Decl. ¶ 11 (consumer was served with lawsuits filed by four creditors and provided the legal documents to the law firm, but received no response and all her loans "went into default and the court issued judgments" against her for the four debts).

Considering all of this evidence, in totality, the Cout cannot make a finding that the debt-relief program operated by defendants and/or the intervenor law firms provides an appreciable economic benefit to consumers. Moreover, the Court finds that there is evidence in the record showing that many consumers who enroll in this program are

negatively impacted, either because they do not graduate and/or they pay more money in fees than they save in the form of debt settlement or debt relief. This evidence, combined with the fact that the Court finds it likely that defendants are violating the TSR by collecting advance fees, indicates a likelihood of irreparable harm in the absence of an injunction.

### *Balance of Equities/Public Interest*

As to the balance of equities, "if the Government establishes that the defendant is violating [the law], the balance of hardships likely weighs in the Government's favor." *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 755 (S.D.N.Y. 2015). Further, "[t]here is no oppressive hardship in requiring [d]efendants to comply with the law." *FTC v. Am. Fin. Benefits Ctr.*, 18-00806 SBA, 2018 U.S. Dist. LEXIS 244903, at *36 (N.D. Cal. Nov. 29, 2018) (citation omitted). As noted above, the Court finds little evidence of an obvious and appreciable benefit to consumers enrolled in the debt-relief program, and has found evidence that many consumers leave the program economically worse off than when they enrolled. These findings, combined with the likelihood that defendants' practices violate the TSR, show that the public interest and balance of the equities favor a preliminary injunction.

To the extent that defendants have produced declarations of consumers who completed the debt-relief program and were satisfied with the results, "[t]he existence of some satisfied customers does not constitute a defense," when the law has been violated. *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 530 (S.D.N.Y. 2000). Defendants note that a preliminary injunction will result in the loss of jobs; an inability of the intervenor law firms to function; and consumers already enrolled in the program to be left unserved.

However, these concerns do not justify the continued operation of a business that is likely operating in violation of the law. *See Commodity Futures Trading Com. V. British American Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977) (A court is under no duty "to protect illegitimate profits or advance business which is conducted [illegally]." (citation omitted)).

### *Continuation of Asset Freeze, Receiver and Other Equitable Relief is Warranted*

The Second Circuit has "characterized the freezing of assets as ancillary relief that facilitates monetary recovery by preserving the status quo pending litigation of statutory violations." *FTC v. Strano*, 528 Fed. App'x 47, 49 (2d Cir. 2013). *See FTC v. Campbell Capital*, 18-CV-1163, 2018 WL 5781458, at *4 (W.D.N.Y. Oct. 24, 2018) (noting that an asset freeze is appropriate "where there is a significant risk of the dissipation of defendants' assets during the course of the litigation"). To obtain an asset freeze against a relief defendant, the government must show that the person has received ill-gotten funds and does not have a legitimate claim to those funds. *See SEC v. Cavanaugh*, 155 F.3d 129, 136 (2d Cir. 1998). Alternatively, a court may freeze a relief defendant's assets where the government can demonstrate that a defendant exercises complete control over that third party. *See SEC v. Zubkis*, 97-CV-8086, 2003 WL 22118978, at *5 (S.D.N.Y. Sept. 11, 2003).

Based upon all of the evidence in the record, including the evidence submitted by plaintiffs in support of the motion for the TRO (Dkt. Nos. 4, 5, 7, 8, 9) and for all of the reasons stated in the TRO issued by Judge Vilardo (Dkt. No. 12), the Court concludes that an asset freeze as to defendants and relief defendants is necessary to preserve the status quo and the possibility of effective final relief for consumers.

A receiver is "particularly necessary" where "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste." *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981). Based upon all of the evidence in the record, including the evidence submitted by plaintiffs in support of the motion for the TRO (Dkt. Nos. 4, 5, 7, 8, 9), and for all of the reasons stated in the TRO issued by Judge Vilardo (Dkt. No. 12), the Court concludes that a continuation of the receiver's authority over defendants is warranted. Continuation of the receiver is necessary here to assist this Court, to ensure compliance with its order, to disentangle the companies and bank accounts, and to protect consumers who are currently enrolled in the debt-relief program operated by defendants and the intervenor law firms.

## **CONCLUSION**

For the foregoing reasons, plaintiffs' motion for a preliminary injunction (Dkt. No. 5) is granted and the proposed order submitted by plaintiffs (Dkt. No. 139-1) will be signed and entered by this Court.


**SO ORDERED.**


Dated:        March 4, 2024
              Buffalo, New York


MICHAEL J. ROEMER
United States Magistrate Judge

55