UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,<br><br>      Plaintiffs,<br><br>   v.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), *et al.*,<br><br>      Defendants, and<br><br>DANIEL BLUMKIN, *et al.*,<br><br>      Relief Defendants. | 24-CV-40 (EAW) (MJR) |

# **DECLARATION OF CAMERON CHRISTO**

CAMERON CHRISTO, pursuant to 28 U.S.C. § 1746, states and declares under penalty of perjury that the following is true and correct:

1. I am the founder and chief executive of Fidelis Legal Support Services, LLC ("Fidelis").

2. On February 26, 2024, Fidelis received a letter from Thomas W. McNamara, Esq. (the "Receiver").

3. The Receiver's letter asserts that Fidelis is beneficially owned or controlled by Jason Blust, and is a proxy for Lit Def Strategies, LLC ("Lit Def"), making it a "Receivership Defendant" by the terms of the Temporary Restraining Order entered in *Consumer Financial Protection Bureau v. StratFS, LLC*, No. 24-CV-40 (W.D.N.Y.) on January 11, 2024 (the "TRO").

4. The Receiver is mistaken. Fidelis is my company. I created it, I funded it, my trust owns it, and I oversee and direct its operations. Jason Blust has no ownership interest in Fidelis, he does not receive any money or other benefit from Fidelis, he is not employed by Fidelis, he does not make decisions for Fidelis, and while I've had professional contact with him over the years, we don't regularly speak. To the

best of my recollection, I have not talked to Blust in more than a year.

5. I respectfully request that the Court (i) issue an order declaring that the Receiver lacks authority over Fidelis, either because he lacks jurisdiction or because Fidelis is not a Receivership Defendant; and (ii) award any other or additional relief that the Court deems appropriate.

## Background

6. I am 53 years old. I graduated from college in 1992 with degrees in International Business and Economics and Japanese.

7. I have spent the past 25 years in technology and management consulting. Early in my career, I worked with partners for Microsoft, Google, and Citrix building their computing architecture. Since then, I have helped schools, hospitals, law firms, and other organizations use computer technology to improve the quality and efficiency of their work. My particular expertise lies in learning the details of employees' daily tasks, and developing technological system improvements to simplify and streamline their workflow, allowing fewer people to do more and better work in less time.

8. I was fortunate in my timing, having developed advanced skills in computing and database construction just as those skills were coming into high demand. As a result, I have enjoyed considerable success in my consulting work. I presently own several businesses and privately invest in start-up companies.

## Fidelis's formation

9. My work in the legal field included a great deal of consulting for debt-settlement law firms. Through these engagements, I came to understand the different players in the debt-settlement ecosystem. I knew what litigation-support companies were, and how and why debt-settlement firms rely on them. I knew who Jason Blust was, and met him. And I knew that Blust ran a litigation-support company called Lit Def Strategies.

10. Sometime around 2020, I learned that Blust was planning to wind

down Lit Def. I did not hear, and still do not know, why he made this decision.

11. Litigation support is the kind of business that suits my strengths, as the essential functions are repetitive tasks that can be performed in a virtual environment. I began exploring the possibility of creating a litigation-support company of my own, but based on a more efficient virtual platform.

12. On January 25, 2021, I created Fidelis, a single-member LLC. The Receiver has previously filed Fidelis's business-information report, obtained from the Nevada Secretary of State. (Dkt. 179-3.) A copy of Fidelis's Operating Agreement is attached as **Exhibit A**.

13. Fidelis's bank accounts are located in Illinois.

14. On the advice of counsel, I registered Fidelis in Nevada and created the Bush Lake Trust (a Nevada trust) to serve as Fidelis's sole member. A copy of the ownership transfer to the Bush Lake Trust is attached as **Exhibit B**. A copy of the Bush Lake Trust Agreement is attached as **Exhibit C**.

15. Timothy Miller is the Trustee of the Bush Lake Trust. (Ex. C, Art. 1.) The beneficiaries of the Bush Lake Trust are my two children and their descendants. (*Id*. §§ 2.01, 2.02.)

16. Jason Blust has no ownership interest in the Bush Lake Trust or Fidelis, and he has never received any benefit of any kind from either entity.

### Fidelis's services

17. Consumers trying to negotiate their debts are sometimes sued by their creditors. The debt-settlement law firm representing the consumer defends those suits. Fidelis provides those firms with administrative support.

18. Specifically, when a consumer is served with a creditor's summons and complaint, the consumer sends the papers to customer services. Customer services creates a litigation file for that lawsuit. The litigation file comes to Fidelis, where a Fidelis legal assistant reviews the file to ensure it has everything an attorney will need to defend the suit. If so, the legal assistant assigns the file to a litigation attorney within the

consumer's law firm. If not, the legal assistant assembles the necessary material and then assigns the file.

19. Once a settlement is reached, the Fidelis legal assistant double-checks that the consumer has saved enough money to make the agreed-upon payments. If so, the legal assistant submits the settlement for processing. Customer services then arranges to make the necessary settlement payments from the consumer's account. If issues arise post-settlement, such as a missed payment, Fidelis will assist as needed and notify the assigned attorney.[1]

20. Fidelis does not enroll consumers in debt-settlement programs or touch consumer money. It just helps law firms defend consumers who have been sued by creditors.

21. Fidelis provides its services pursuant to month-to-month agreements with its law-firm clients. Fidelis charges a per-litigation-file rate, which varies depending on the complexity of the litigation. An example of a Fidelis invoice is attached as **Exhibit D**.

22. Presently, Fidelis provides litigation-support services to the following firms: The Brandon Ellis Law Firm LLC; Castro Law, LLC; Chabner Legal Group; Clear Creek Legal, LLC; Great Lakes Law Firm; Greenstone Legal Group; Guidestone Law Group; Hailstone Legal Group; Hallock & Associates LLC; Heartland Legal Group; Level One Law; Meadowbrook Legal Group; Newport Legal Group, LLC; Option 1 Legal; Regency Legal Group; Slate Legal Group; Spring Legal Group; Stonepoint Legal Group; Summit Law Firm; The Law Firm of Derek Williams, LLC; Turnbull Law Group, LLC; Turnbull Law Group NJ, LLC; Turnbull Law Group SC, LLC;

---

[1] This is a general description of the litigation-support workflow. There are minor variations from firm to firm, and from file to file. Some firms might use a different label for the "customer services" function. Some files are created in error and so are never assigned. Similarly, when the TRO halted the operations of customer services affiliated with Strategic, the workflow changed accordingly. For example, post-TRO, Fidelis legal assistants spent a great deal of time explaining to attorneys that they needed to arrange for their clients to manually remit agreed-upon settlement payments, since customer services was not available to perform this task.

White Oak Law Group; and Whitestone Legal Group.

23. Approximately 40% of Fidelis's revenue comes from firms not involved in the CFPB litigation (Castro, Chabner, Regency, Turnbull LLC, Turnbull NJ, and Turnbull SC).

### Fidelis's operations

24. Fidelis's legal assistants are Shirley Saavedra, Jean Komis, Jennifer Moy, Ana Macey, Peggy Slivka, Kristen Powers, and Katherine Rosenberg. They are managed by Hayfa Zayed and Michelle Hinds, both of whom report to me.

25. In my day-to-day work for Fidelis,[2] I receive reports from Zayed and Hinds, make all executive decisions regarding personnel, payroll, purchasing, contracting, and the like, and work to grow Fidelis's business.

26. When Fidelis was just starting out, I needed to assemble a capable staff. I hired Hayfa Zayed and Kristen Powers, and also offered several Lit Def employees the opportunity to add some Fidelis work to their existing work at Lit Def. Essentially, I was asking these Lit Def employees to moonlight for Fidelis. Because legal assistants work remotely, this meant simply having Fidelis software open alongside Lit Def software, and, throughout a given workday, performing for Fidelis's client-firms the same functions they were already performing for Lit Def's client-firms.

27. Shirley Saavedra, Jean Komis, Jennifer Moy, Peggy Slivka, Katherine Rosenberg, and Michelle Hinds agreed to join me at Fidelis while continuing to work at Lit Def.

28. The software used to transmit litigation files to Fidelis was configured to reflect this dual employment. Legal assistants working for Lit Def and Fidelis were given two profiles: one labelled with just the assistant's name (*e.g.*, "Jean

---

[2] I do not devote all of my working time to Fidelis. Throughout any given day, I toggle between my various companies. So, for example, I might start the day with a status report from Zayed and Hinds, then meet with a company seeking an investment from me, then pitch Fidelis's services to a potential client, then step into another investment meeting, then call Hinds to answer a question about sick leave, and so on.

Komis"), for Lit Def files, and one labelled with the assistant's name plus the prefix "Fidelis" (*e.g.*, "Fidelis Jean Komis"), for Fidelis files.

29. As time went on, I added to Fidelis's roster of client-firms, and I needed to expand my staff. I hired Ana Macey, and three part-time employees (Katherine Rosenberg, Peggy Slivka, and Jennifer Moy) joined Fidelis fulltime.

30. When Lit Def closed, following the issuance of the TRO, the three remaining part-time employees (Michelle Hinds, Jean Komis, and Shirley Saavedra) joined Fidelis fulltime.

31. Though Fidelis's employees did, for a time, partially overlap with Lit Def's, Fidelis's *work* did not overlap with Lit Def's. When Fidelis began providing services to a new law-firm client, its agreement with the firm fixed a transition date, and that date was incorporated into Fidelis's management system. Litigation initiated after the transition date would be supported by Fidelis, while Fidelis's predecessor would continue to support litigation initiated before the transition date.[3]

32. Likewise, after the TRO was issued, Fidelis did not begin supporting litigations previously supported by Lit Def.

**The Receiver's assertion that Fidelis is a Receivership Defendant**

33. On February 25, 2024, the Receiver sent me a letter asserting that Fidelis is a Receivership Defendant. I received it on February 26 and promptly retained counsel. Counsel immediately informed the Receiver that his letter was in error. Counsel's February 26 response, which annexes the Receiver's February 25 letter, is attached as **Exhibit E**.

34. The Receiver's February 25 letter says only that certain unspecified documents suggest that Fidelis is owned or controlled by Jason Blust, and is a proxy for Lit Def. The Receiver's recently filed contempt motion (Dkt. 179), which counsel brought to my attention, appears to set forth the Receiver's rationale.

---

[3] If the client was a newly created law firm, no transition date was needed.

- 6 -

35. *The technology payments.* The contempt motion asserts that because someone named Salvatore Tirabassi used the phrase "land the plane with Blust" while discussing payments to Fidelis, Blust owns or controls Fidelis. (Dkt. 179-1 at 7.) That is not correct.

36. In fall 2021, Strategic Client Support, LLC hired me to vet a new software platform. I was to determine whether the software would integrate with existing systems, and ensure that it was stable, reliable, and functional. I have been handling these sorts of large-scale, multi-month consulting projects throughout my career.

37. According to emails attached to the Receiver's contempt motion, certain Strategic executives wanted a written contract to document this expense. (Dkt. 179-7, 179-10.) On March 24, 2022, attorney Marc Lemberg wrote that the invoices themselves, combined with an email memorializing the arrangement, were sufficient documentation. (Dkt. 179-10 at 2.) Salvatore Tirabassi responded: "You can land the plane with Blust then as you see fit." (*Id.*) The Receiver says these "emails reveal that Fidelis is, in fact, beneficially owned or controlled by [Jason] Blust." (Dkt. 179-1 at 6.)

38. I have not seen these emails outside the contempt motion, I have never heard of Salvatore Tirabassi, and I do not know what he meant by "land the plane with Blust." I do know that the fee I earned has nothing to do with litigation support; that Blust did not receive a penny of it; and that Blust does not own or control Fidelis.

39. *Websites.* The contempt motion asserts that "[a] comparison of the Lit Def and Fidelis websites shows striking similarities." (*Id.* at 5.) I agree there are similarities (and differences) in the descriptions of the services offered. The services Fidelis offers are similar to the services Lit Def offered.

40. *Fidelis and Lit Def email traffic.* The contempt motion asserts that, beginning in 2022, Michelle Hinds, Katherine Rosenberg, Peggy Slivka, and Jennifer Moy used Lit Def email accounts and Fidelis email accounts to perform "identical functions"—namely, "liaising between clients and law firms on litigation matters." (*Id.* at

- 7 -

7-8.) That is true. As discussed above, at various times, Hinds, Rosenberg, Slivka, Moy, and Shirley Saavedra worked at both Fidelis and Lit Def, performing the same tasks for both companies. Hayfa Zayed and Kristen Powers worked for Fidelis only, not Lit Def. As Fidelis grew and Lit Def contracted, some, and then all, of Fidelis's part-time employees joined Fidelis fulltime, and I hired Ana Macey, who, like Zayed and Powers, had never worked at Lit Def.

41. Because certain Fidelis employees also worked at Lit Def for a time, and because, with respect to certain law firms, Fidelis replaced Lit Def as the firm's litigation-support company, crossed wires were bound to occur. For example, an attorney at Great Lakes Law Firm might email Peggy Slivka at her Lit Def address, not realizing that the suit in question was commenced after the transition date to which Great Lakes and Fidelis had agreed, meaning that emails regarding that litigation should have gone to Peggy Slivka at her Fidelis address. Or the attorney might have intended to use Slivka's Fidelis address, but his email's auto-populate function grabbed her Lit Def address instead, and he sent the email without noticing the error. Slivka might recognize the issue and switch to her Fidelis email before replying, or she might miss it and respond from the address the sender used.

42. The email discussed at the beginning of the Receiver's contempt motion provides a concrete example. The chain begins with an attorney asking a question about litigation formerly supported by Lit Def. He emailed his question to three different recipients at three different addresses. Peggy Slivka (using her Fidelis address) forwarded the message to Michelle Hinds (at her Fidelis address), and Hinds forwarded the question to Melissa Riley (a customer-services executive) without checking whether this litigation was supported by Fidelis. (Dkt. 179-1 at 3-5.)

43. In another email cited in the Receiver's contempt motion, attorney Taylor Robinson sent an email regarding a Fidelis-supported litigation, but copied Michelle Hinds at her Lit Def address. (Dkt. 179-1 at 8-9.) Hinds later responded from her Fidelis address. (*Id.* at 9; Dkt. 179-13 at 2.)

44. Legal assistants and client-firms were periodically cautioned to be mindful of such issues. (Exemplar reminders are attached as **Exhibit F**.) But given the volume of email traffic that litigation-support entails—in 2023, Fidelis averaged 1,596 new litigation files every month—occasional mistakes were inevitable. These mistakes, when they occurred, had no impact on the services Fidelis provided or the compensation it received.

45. *Post-TRO operations*. The contempt motion asserts that Fidelis continued to operate after the TRO. (Dkt. 179-1 at 8-9.) That is true. Neither the CFPB complaint nor the TRO said anything about Fidelis and we continued to do our work. So, as the contempt motion points out, when attorney Jean Duncombe sent an email about a Fidelis-supported litigation to Michelle Hinds at her Fidelis address, Hinds appropriately followed up. (Dkt. 179-14.) When Hinds was asked to update Melissa Riley on attorney retention post-TRO, Hinds correctly answered that litigation attorneys at Fidelis's client-firms continue to work on files. (Dkt. 179-1 at 11.)

## Conclusion

46. Fidelis is my company. I'm proud of the work we do helping law firms defend their clients. I respectfully request that the Court (i) issue an order declaring that the Receiver has no authority over Fidelis, either because he lacks jurisdiction or because Fidelis is not a Receivership Defendant; and (ii) award any other or additional relief that the Court deems appropriate.

Dated:   Chicago, Illinois
         March 4, 2024

_____
CAMERON CHRISTO