UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., <br><br> Plaintiffs, <br><br> v. <br><br> STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al., <br><br> Defendants, and <br><br> DANIEL BLUMKIN, et al., <br><br> Relief Defendants. | Case No. 24-CV-40-EAW-MJR |

**INTERVENOR LAW FIRMS' MOTION TO COMPEL**

Intervenors Clear Creek Legal, LLC; Credit Advocates Law Firm, LLC; Greenstone Legal Group; Bradon Ellis Law Firm LLC; Hailstone Legal Group; Hallock and Associates; Harbor Legal Group; Anchor Law Firm, PLLC; Bedrock Legal Group; Boulder Legal Group; Canyon Legal Group, LLC; Great Lakes Law Firm; Heartland Legal Group; Level One Law; Meadowbrook Legal Group; Monarch Legal Group; Newport Legal Group, LLC; Northstar Legal Group; Option 1 Legal;

Pioneer Law Firm P.C.; Rockwell Legal Group; Spring Legal Group; Royal Legal Group; Slate Legal Group; Stonepoint Legal Group; The Law Firm of Derek Williams, LLC; Whitstone Legal Group; Wyolaw, LLC,; Chinn Legal Group, LLC; Leigh Legal Group, PLLC; Hallock & Associates LLC; Gustafson Consumer Law Group, LLC; Michel Law, LLC; The Law Office of Melissa Michel LLC; and Moore Legal Group, LLC (collectively, "Law Firms"), respectfully move this Court to: (1) direct the Receiver to instruct Global Client Solutions to resume fee payments to Hailstone and Royal; and (2) direct the Receiver to increase staffing levels and provide the Law Firms with access to certain services, personnel, systems, and information as more fully described herein.  In support of their motion, the Law Firms state as follows:

## INTRODUCTION

On January 11, 2024, this Court entered an *ex parte* TRO that appointed a Receiver, Thomas McNamara, to operate StratFS and its various affiliates (collectively "SFS"). The Receiver has remained in control of SFS since that date. Shortly after his appointment, the Receiver seized control of SFS's facilities, locked out its employees and sent them home, figuratively (and perhaps literally) unplugged its servers, and froze SFS (and, by extension, the Law Firms) out of its systems, emails, phone lines, and other functions – all without notice or any sort of transition plan.

The upshot of that was that the Law Firms effectively went "dark." They lost all their support staff, much of their technology, and much of their data in one fell

swoop.[1] They were (and remain) severely impaired in their ability to effectively represent their 65,000 clients.

Over the past several weeks, various persons (including SFS executives, counsel representing the Law Firms and counsel representing SFS) have asked the Receiver to provide an adequate level of support to assist the Law Firms in representing their 65,000 clients. Those efforts have largely been ignored. The Receiver (who shows great interest in protecting his own authority by filing contempt motions and seeking out new receivership targets) has shown little interest in actually managing the billion-dollar enterprise entrusted to him. The Receiver has not only placed SFS (and its 1,000 employees) in jeopardy, but he is also jeopardizing the 65,000 clients of the Law Firms.

As present, tens of thousands of clients continue to hang in the balance while mail piles up, telephone calls go unanswered, potential settlements are lost, and creditors bring lawsuits against consumers. This must end. If the Receiver will not actually manage the company that this Court entrusted to his care, then the Court should step in and direct the Receiver to properly manage the business and honor SFS's contractual and legal obligations.

---

[1] Imagine the impact at the Robert Jackson Courthouse if the judges and their law clerks were suddenly tasked with handling all the courthouse business (including filings, interactions with the public, financial transactions, scheduling, technology, and the myriad other aspects of judicial business) without any court staff, any assistance from the Clerk's office, or any access to Pacer, or email. The effect would be immediate and dramatic.

## FACTUAL BACKGROUND

### The Law Firms And Their Vendors

The Law Firms are consumer advocacy law firms that represent clients in various states across the country who are looking for ways to reduce their debt burden. The Law Firms are comprised of attorneys who provide legal services to the firms' clients, including file reviews and client communications, settlement negotiation and analysis, and litigation defense. At the time the TRO was entered, the Law Firms had, collectively, approximately 65,000 active clients.

Each of the Law Firms has contracted with certain support entities to provide certain non-legal and administrative support functions to facilitate its representation of clients (the "Servicing Entities").[2] The Law Firms cannot do this on their own. While the Law Firms have attorneys and some employees, they simply do not have the necessary staff to handle the workload associated with the high volume of clients they represent. The Servicing Entities perform valuable support services, such as addressing non-legal customer service issues, answering clients' non-legal questions, handling client's requests to modify or change their payments to their dedicated account, basic interfacing with clients' creditors,[3] answering clients' non-legal questions, gathering documents from clients, maintaining client files, and handling similar administrative tasks.

---

[2] "Servicing Entities" is defined as the Client Services, LLC Defendants in this case.

[3] The support entities' employees do not negotiate debts. All non-lawyer negotiators are employees of the respective law firm.

One of the key tasks handled by the Servicing Entities is receipt of communications and documents relating to the Law Firms' clients. This includes documents forwarded by clients, communications from creditors, settlement demands from creditors, summons filed by creditors, changes of address, and the like. Typically, the Servicing Entities receive and process such mail, and ensure that it is uploaded to the clients' files. Similarly, the Servicing Entities handle email and telephone inquiries from Law Firm clients, and they upload notes regarding those telephone calls to the client's file.

Another major task handled by the Servicing Entities is processing settlements on behalf of the clients of the Law Firms' clients. As of January 2024, there were approximately 129,000 active settlements that must be monitored and adjusted depending on the clients' particular circumstances. Further, there were approximately 1,000 settlements in progress that required new payment plans.

The Law Firms also use payment processors to facilitate their clients' accumulation of funds for settlements and payment of fees. Reliant Account Management ("RAM") and Global Client Solutions ("Global") are two such payment processors. When a client retains a Law Firm, the client establishes an account with RAM or Global (depending on which processor is used by the particular Law Firm). The client then makes monthly payments into that account. When the Law Firm reaches a settlement with the client's creditor, the Servicing Entity provides payment instructions for that settlement to the payment processor. The settlement

payments (usually on a term basis) and the Law Firm's fees are disbursed from the RAM or Global account.

## The Receiver's Actions And Impact On Consumers

Immediately after the TRO was entered, the Receiver entered SFS's facility, unplugged the servers, sent all employees home, and shut down all services to the Law Firms and their respective clients. The Receiver kept the SFS entities completely shuttered for *eleven days.* Over 22,000 client calls and 27,000 email requests went completely unanswered. (*See* Dkt. 124 at p. 2.) The Law Firms and their clients were thrown into chaos without the back-office support.

After the Servicing Entities and Law Firms pointed out the harm that would befall consumers if the shutdown continued, the Receiver finally agreed to allow a 76-person "skeleton staff" to operate within SFS and provide some limited services to the Law Firms. (*See* Dkt. 68 at p. 2.) However, that "skeleton staff" was nowhere near sufficient, and mail piled up, emails went unanswered, and law firm clients experienced 6+ hour telephonic hold times. On January 23, 2024, the Receiver posted a notice on his website that effectively fired 900 employees and further demonstrated his lack of willingness to ensure adequate service to existing clients.[4]

Accordingly, on January 23, 2024, the Servicing Entities and the Law Firms filed a letter with this Court seeking a hearing on, *inter alia*, the Receiver's refusal

---

[4] https://regulatoryresolutions.com/case/consumer-financial-protection-bureau-et-al-stratfs-llc-et-al-stratfs-receivership/

to provide systems access and adequate staffing levels to the Law Firms. Those parties advised the Court:

> [T]he various law firms that have contracts with SFS are currently not taking fees from clients. Despite that, the law firms want to continue providing service to their clients, including litigation defense, settlement administration, document processing, and debt negotiation. Continuing those services is critical to the law firms' representation of those clients. Unfortunately, the law firms' negotiators are not currently able to negotiate debts for consumer clients because they lack access to data housed at SFS (including access to SFS's Salesforce and SAM systems) and a backlog of document processing, client call inquiry management and litigation support continues to grow. Law firm clients are now experiencing hold times of nearly six hours and a backlog of nearly 27,000 unprocessed notices from creditors and other documents relating to litigation. This directly harms the law firms' consumer clients because they will miss settlement opportunities. And missed settlements will lead to additional litigation against those same clients.

(Dkt. 68 at p. 2.) The Servicing Entities noted that they had asked the Receiver to provide the Law Firms with access, but the Receiver had refused to do so. (*Id.*) After a hearing, the Court declined to modify the TRO. (Dkt. 78.)

The Receiver did not change course, electing to keep the skeleton staff in place and provide the Law Firm clients with the bare minimum of service. (Dkt. 124.) Telephone hold times continued to exceed 5 hours (and, in some cases, over 7 hours) and the backlog of unprocessed mail continued to grow – to the tune of nearly 42,000 unprocessed documents. Accordingly, on February 4, 2024, Defendants submitted a letter response to the Receiver's Report to the Court. (Dkt. 124.) Therein, Defendants noted those backlogs and advised the Court that the Law Firms' clients were complaining about the lack of service in large numbers. (Dkt. 124 at pp. 3-4.) Defendants also advised the Court that the Receiver had refused to

7

provide the Law Firms with access to SFS's systems (an item of little-to-no cost) that would allow the Law Firms to negotiate, review and approve settlement payments and litigation processing. (Dkt. 124.) Still, the Receiver remained steadfast in his refusals.

On February 8, 2024, the Receiver issued a conditional reduction in force to all SFS employees who had not been called back to work (*i.e.*, approximately 900 employees). That same day, the Law Firms advised the Court that the Receiver was severely affecting services to consumers by, *inter alia*, failing to allow the Law Firms access to data and information, failing to provide adequate staffing levels, and refusing to provide services to Law Firms, Hailstone and Royal, (which operate on TSR-compliant contingent fee models). (Dkt. 143 at pp. 2-3.)

In addition, since his appointment, the Receiver has interfered with the Law Firms' relationships with the payment processors, RAM and Global. For one, the Receiver has issued a cease-and-desist order to Global, barring Global from processing fee payments for Hailstone and Royal – two firms that operate ***only*** on a contingent fee model. For another, the Receiver misconstrued a Law Firm request for information from RAM as a violation of the TRO. That action resulted in a flurry of fruitless discovery. The Law Firms that use RAM as a payment processor require access to RAM's API so that they may access information necessary to facilitate settlement negotiations and client representation. The Receiver has never addressed the Law Firms' request to resolve either issue.

On March 4, 2024, this Court entered a preliminary injunction order. (Dkt. 184.) That Preliminary Injunction order, *inter alia*, bars Defendants from taking advance fees and continues the asset freeze and receivership.  (*Id.*)  On March 11, 2024, the Law Firms advised the Receiver that it continued to have concerns over the Receiver's refusal to provide adequate staffing levels, access to information and systems, and flow of fee payments for the contingent fee firms, Royal and Hailstone. *See* Declaration of Terrence M. Connors, Esq., dated March 20, 2024, Exhibit A. On Wednesday, March 13, the Receiver's counsel indicated a response might be forthcoming by that Friday.  *See* Declaration of Terrence M. Connors, Esq., dated March 20, 2024, Exhibit B.  But despite the passage of several days, no response has been forthcoming. Accordingly, the Law Firms now bring this motion.

## ARGUMENT

### I. This Court Should Compel The Receiver To Instruct Global To Resume Processing Hailstone And Royal Fee Payments.

Two of the Law Firms – Hailstone and Royal – have always operated on a contingent fee model. Section I(A) of the Preliminary Injunction bars Defendants from requesting or receiving advance fees. (Dkt. 184 at § I(A).) **Nothing** in the Preliminary Injunction order precludes any Defendant or Law Firm from charging or collecting TSR-compliant contingent fees. Inexplicably, however, the Receiver has instructed Global to cease and desist from processing fee payments to Hailstone and Royal. Despite numerous requests, the Receiver has never provided an explanation for this action, which clearly exceeds his authority under the Preliminary Injunction. The Receiver should be directed to immediately retract his prior

9

communication and instruct Global to resume processing fee payments for Hailstone and Royal.

## II. This Court Should Compel The Receiver To Provide Adequate Staffing Levels And Access To Systems And Information.

Under Section IX of the Preliminary Injunction order, the duties with which the Receiver is charged include: (1) managing and administering the business of SFS; (2) continuing and conducting the business of SFS; (3) protecting the interests of consumers and third-party creditors who have transacted business with SFS; and (4) performing all acts necessary to preserve the value of SFS in order to prevent any irreparable harm, loss, or injury to Consumers. (*See, e.g.,* Dkt. 184 at §§ IX(D), (G), (H), (N).) Here, the focus on protecting consumers and preventing harm (in the form of lost settlements and creditor litigation) must be paramount. To that end, the Receiver should be directed to take several actions, immediately.

*First,* the Receiver must provide the Law Firms' attorneys and negotiators with access to SFS's IT infrastructure to allow them to negotiate, review, and approve client settlements, and to manage client settlement payment information with Global and RAM, pursuant to Sections IX(G) and (H) of the Preliminary Injunction. That access has been requested from the Receiver on several occasions, with no meaningful response. And that access is critical to allowing the Law Firms to continue to negotiate settlements and represent their clients. In addition, the Law Firms require access to those client files and SFS personnel to properly supervise the non-legal services provided by SFS. There is little to no cost to SFS associated with this access.

10

*Second,* the Receiver should be directed to instruct RAM to provide API access to the appropriate Law Firms to allow those firms to properly represent their clients, pursuant to Sections IX(G) and (H) of the Preliminary Injunction. For the Law Firms to be able to negotiate settlements on behalf of their clients, they must have insight into the amounts clients have accrued in their RAM accounts. This access can also be accomplished at no cost to SFS.

*Third,* the Receiver should be directed to increase staffing levels. The current SFS skeleton staff is wildly insufficient to properly service the Law Firms' clients. Despite the passage of several weeks, SFS is still not timely processing mail, which means that important notices regarding lawsuits, settlement proposals, creditor communications, and the like are going unopened. Similarly, additional resources are needed to respond to the backlog of client telephone inquiries, emails, cancellations, program graduations, payment draft adjudgments, complaint resolution, and litigation file processing. As noted above, the backlog in the first week of the receivership alone was 22,000 calls and 27,000 requests – a number that surely continues to grow. While there is a cost associated with increased service levels, the cost of not increasing service levels is far, far greater. Clients are being harmed through missed settlement opportunities, litigation by their creditors, and general delays. And clients who incur such harm are likely to seek refunds or bring their own claims against those involved. Failure to do so violates Sections IX(D), (G), (H), and (N) of the Preliminary Injunction.

11

*Fourth,* along the same lines, the Receiver should be directed to devote additional payment processing resources to setting up client settlement payment plans. Currently, the Law Firms have approximately 1,000 client settlements that need payment plans set up with the appropriate payment processor. Delay in doing so directly harms consumers and may result in those consumers defaulting on the terms of settlements reached with their creditors by the Law Firms. Moreover, it is a violation of Sections IX(G), (H), and (N) of the Preliminary Injunction.

## CONCLUSION

For the reasons set forth herein, Intervenor Law Firms respectfully request that this Court order that the Receiver:

>(1) direct Global to resume processing fee payments for Hailstone and Royal;
>
>(2) provide the Law Firms with immediate access to the SFS IT infrastructure components necessary to negotiate, review, and approve client settlements and manage settlement payment plans;
>
>(3) instruct RAM to provide the appropriate Law Firms with access to the information in RAM's API for purposes of client representation;
>
>(4) increase SFS staffing levels and timely address all Law Firm client and creditor communications and implementation of settlement payment plans; and

(5) permit the Law Firms' supervising attorneys to access client files and SFS personnel for the purpose of supervising non-legal services.

DATED:    Buffalo, New York
          March 20, 2024

                                    */s/ Terrence M. Connors*
                                    Terrence M. Connors, Esq.
                                    Andrew M. Debbins, Esq.
                                    CONNORS LLP
                                    *Attorneys for the Law Firms*
                                    1000 Liberty Building
                                    Buffalo, New York 14202