UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al. | |
| Plaintiffs, | Case No. 1:24-cv-00040-EAW-MJR |
| vs. | |
| STRAFTS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al. | |
| Defendants, and | |
| DANIEL BLUMKIN, et al., | |
| Relief Defendants. | |

**DECLARATION OF THOMAS W. MCNAMARA IN SUPPORT OF
RECEIVER'S FIRST INTERIM APPLICATION
FOR ORDER APPROVING FEES AND EXPENSES OF
THE RECEIVER AND PROFESSIONALS**

I, Thomas W. McNamara declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an attorney licensed in the state of California and the Court-appointed receiver ("Receiver") in this matter.  I have personal knowledge of the facts set forth in this declaration except where, as noted, those facts have been obtained by staff acting at my direction.  If called as a witness, I could and would competently testify to the facts stated herein.

2.      By this First Interim Fee Application, I seek approval for the payment of fees and expenses through February 29, 2024, as detailed below.

3.      I was initially appointed temporary receiver of the Receivership Defendants by the Temporary Restraining Order entered January 11, 2024 ("TRO," Dkt. No. 12).  The appointment was confirmed, and the temporary designation removed, by the Preliminary Injunction ("PI") entered March 4, 2024 (Dkt. No. 184).

1

4.      The TRO and PI authorize the Receiver to "[c]hoose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order[.]"  PI, Section IX.I., page 19.

5.      The TRO and PI also provide that the "Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in the possession or control of, or which may be received by the Receivership Defendants.  The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation."  PI, Section XV, pages 29-30.

**Receivership Activities**

6.      At the outset, I must note that the businesses subject to this receivership are large and complex, with nearly 1,000 employees, 65,000 enrolled consumers, revenues of more than $1 billion in the last seven years, and 2023 revenues of $154 million in service income as reported in the trial balance.  Getting to an understanding of the relationships and interplay between the dozens of Receivership Defendant entities, and further their relationships with a rotating cast of associated law firms, was a difficult and complex process given the byzantine structure and the purposely opaque and siloed operations.  The difficulty was exacerbated by the lack of meaningful cooperation from Defendants.  These realities have substantially increased the time and cost of what was already a complicated and extensive receivership.

7.    Receivership activities during the time covered by this Application have been detailed in multiple reports to the Court.[1]  Those activities have included: securing immediate access to, and control of, Receivership Defendants' business premises and business records (paper and electronic) in Buffalo and New Yok City; implementation of the TRO and related efforts to notify and protect consumers in the process; identify, secure, and commence an accounting of Receivership Defendant assets and liabilities; partially re-start client services (and supporting operations, *e.g.*, IT and human resources) in an effort to protect enrolled consumers; conduct a comprehensive review and examination of the businesses including a determination as to whether they (or discrete business lines) could continue lawfully at a profit using the Assets of the Receivership Estate; after making that determination, returning some employees to re-start the direct to consumer (no advance fee) operations; identify and resolve, to the extent possible, multiple issues relating to employees of the Receivership Defendants; identify any additional Receivership Defendants not initially identified in Plaintiffs' Complaint;[2] the general

---

[1] Report of Temporary Receiver re: Status of Client Services (Dkt. No. 56, filed January 22, 2024); Receiver's Emergency Motion for the Release of Funds to Pay Pre-Receivership Payroll Expenses (Dkt. No. 85, filed January 25, 2024 and granted Dkt. No. 87, January 26, 2024); Receiver's Motion to Modify TRO to Remove Strategic ESOP and Strategic ESOT as Receivership Defendants and Relief Defendants (Dkt. No. 102, filed January 29, 2024, granted Dkt. No. 106, January 30, 2024); Preliminary Report of Temporary Receiver (Dkt. No. 115, filed January 31, 2024); Supplement to Preliminary Report and Emergency Motion to Pay February Employee Benefit Insurance Premiums for All Employees of Corporate Defendants (Dkt. No. 131, filed February 5, 2024); Receiver's Reply to Defendants' Response to Preliminary Report (Dkt. No. 135, filed February 6, 2024); Receiver's Reply to Defendants' Letter Submission dated February 9, 2024 (Dkt. No. 150, filed February 11, 2024); Receiver's Reply to Defendants' Letter Submission dated February 16, 2024 (Dkt. No. 170, filed February 20, 2024); Receiver's Emergency Motion for Order to Show Cause Why Receivership Defendant Lit Def Strategies, LLC and Individual Defendant Jason Blust Should Not be Held in Contempt (Dkt. No. 179, filed February 26, 2024).

[2] Following my initial determination that Atlas Debt Relief, LLC and Timberline Financial, LLC qualified as additional Receivership Defendants (*see* Preliminary Report, § II(H), p. 12), I also identified Acorn 21 Services, LLC; Atlas Client Services, LLC; Chinn Client Services, LLC; Cs0621Jade, LLC; Cs0821Creek, LLC; Cseternal1121, LLC; Csstorm1121, LLC; Gardner Client

administration of the Receivership Estate; and filing reports and responses to the court as required and/or needed, including reports and responses necessary to respond to filings by Defendants.

**Asset Freeze and Receivership Estate**

8.      According to one of Plaintiffs' filings, funds frozen by the TRO and PI totaled approximately $12 million held by Corporate Defendants, their affiliates, and subsidiaries, and approximately $51 million held by Individual Defendants and Relief Defendants, their affiliates, and subsidiaries (Dkt. No. 165 CFPB Letter filed on February 16, 2024).   At present, the receivership account at Bank of America ("BOA account") holds $3,718,824.16.[3]   Receivership Defendants' accounts at CIBC and Valley National Bank hold approximately $6,600,000.[4]   This amount does not include $16,376,696.82 in the Versara Trust Collection account or the $1,116,606 in the Versara Collateral Reserve account, both held at Valley National Bank which are subject to the liens of Credit Suisse and Zais Group, LLC.

**Professional Fees and Expenses**

9.      The receivership company, counsel, and accountants agreed to discount normal rates in this receivership as reflected in our Statement of Interest and Qualification filed with the

---

Services, LLC; Hallock Client Services, LLC; Spring Client Services, LLC; and Fidelis Legal Support Services, LLC and notified them of my determination.

[3] Transfers from Receivership Defendants Blaise Investments, LLC, Lit Def Strategies, LLC, The Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee, and Twist Financial, LLC to the BOA account were initiated on February 12, totaling $3,798,928.16.  On March 1, at the request of the Plaintiffs and Relief Defendant Behar, $79,974.00 was transferred from the BOA account to Receivership Defendant Blaise Investments account at TD Bank for Relief Defendant Behar's monthly living expenses.

[4] As noted in other pleadings, these accounts are subject to a senior lien held by the CIBC and Valley National Bank.

Court (Dkt. No. 4-1).[5]   In addition, as part of my obligation to maximize the value of the Receivership Estate, I have examined my bills, and the bills of counsel and professional vendors very carefully.  I cut a significant amount of charges of the receivership team and counsel prior to presenting this fee application to the Court.  While the time and fees were properly incurred and recorded, I excised these amounts from this request to assure that the fees were congruent with the tangible benefits realized by the Receivership Estate for the time entries.

### Fees and Expenses of the Receiver and Staff

10.     The total fees for my time as Receiver and professional staff during January are $205,882.00 as set forth in the invoice from Regulatory Resolutions which is attached as **Exhibit A**.  As expected, after the completion and filing of the Preliminary Report, fees dropped substantially in February to $143,927.50 as detailed in **Exhibit A**.  During this two-month period, receivership and law firm administrators and staff spent enormous amounts of time addressing numerous StratFS issues which were not billed.  These unbilled services included staff review of hundreds of employee questions, researching answers with Receivership Defendant payroll, insurance, and fringe benefit vendors, responding to and posting employee updates on the website about pay, health insurance, 401k, and COBRA, among others.  Staff also compiled employee information, coordinated with labor counsel, prepared information for State authorities and issued two rounds of WARN notices (and rescissions to the same when employees returned to work).[6]

---

[5] Although not noted in the Statement of Interest (Dkt. No. 4-1), Hodgson Russ LLP also agreed to discount Mr. Thoman's rate in this receivership matter.  Similarly, data forensics firm, Ankura, discussed below, agreed to discount its standard rates.

[6] Staff also needed to become familiar with the companies' ADP system and database to execute roughly $1,773,000 (aggregate) in employee payroll and benefit payments when the companies' human resources official in charge of payroll was reluctant to assist.

Similarly, staff worked closely with StratFS IT and the companies' banks (CIBC and Valley National Bank) to get critical IT payments to vendors during the pendency of the TRO.[7]

11.     The invoice from Regulatory Resolutions also includes expenses totaling $12,021.97, in January and $15,003.22 in February, as detailed in **Exhibit A**.

**Fees and Expenses of the Receiver's Counsel, McNamara Smith LLP**

12.     In January, fees for counsel McNamara Smith LLP ("McNamara Smith") are $246,205.50, as detailed in **Exhibit B**.  After filing of the Preliminary Report on January 31, the February fees dropped by more than 90% to $22,084.00, as detailed in **Exhibit B**.  The firm has been directly involved in all receivership activities and their services are more thoroughly described in the invoices in **Exhibit B**.

13.     The McNamara Smith attorneys have substantial experience with regulatory receiverships.   As reflected in the invoices, the attorneys' fees were incurred primarily in immediate access, interview of employees, review of voluminous electronic and paper records, and the preparation of the Preliminary Report (Dkt. No. 115).

14.     The invoice from McNamara Smith also includes expenses totaling $10,225.46 in January and $332.92 in February, as detailed in **Exhibit B**.

**Fees and Expenses of the Receiver's Counsel, Hodgson Russ LLP**

15.     Fees for Hodgson Russ LLP ("Hodgson Russ") in January are $135,168.50, detailed in **Exhibit C**.  As reflected in the invoices, the attorneys' fees were incurred primarily in immediate access, the interview of employees, the review of voluminous electronic and paper records, and assisting in the preparation of sections of the Preliminary Report.  The Hodgson Russ fees in February dropped to $64,975.00, as detailed in **Exhibit C**.  The firm has been involved in

---

[7] This involved roughly 11 wires involving $580,000 in critical IT payments to vendors.

nearly all receivership activities, including labor issues, and their services are more thoroughly described in the invoices in **Exhibit C**.

16.     The invoice from Hodgson Russ also includes expenses of $1,479.50, in January and $104.59 in February as detailed in **Exhibit C**.

### Fees and Expenses of the Receiver's Counsel, Ballard Spahr LLP

17.     For this period, fees for counsel, Ballard Spahr LLP ("Ballard Spahr"), are $10,067.85, detailed in **Exhibit D**.  The firm was retained to initially address labor issues (this responsibility was later shifted to Hodgson Russ) and to provide expert legal analysis and advice regarding the proper handling of the Strategic ESOP and Strategic ESOT.

### Fees and Expenses of the Receiver's Forensic Accountants, Mercadien, P.C.

18.     For this period, fees for forensic accountants Mercadien, P.C. ("Mercadien"), are $87,003.25, as detailed in **Exhibit E**.  The firm was retained to provide a comprehensive and sophisticated forensic analysis of Receivership Defendants' complex and intertwined finances.

19.     The invoice from Mercadien also includes expenses of $286.60, as detailed in **Exhibit E**.

### Fees and Expenses of the Receiver's Data Forensic Consultants, Bright Labs Services, LLC

20.     Fees and expenses for data forensic consultants Bright Labs Services, LLC ("Ankura") in January are $137,774.57, as detailed in **Exhibit F**.  Ankura has extensive data forensic expertise and was retained the second day after immediate access when it became apparent the initial data forensics vendor retained did not have the expertise or scale necessary to fully identify, collect, and preserve the vast amounts of data in the Receivership Defendants' operations (which amounted to tens of terabytes).  The IT systems necessary to support the sprawling debt

relief operations with so many siloed businesses were very intricate. The incredible volume of data, involving so many separate systems, made the task of preserving the data and maintaining a chain of custody an extensive and time-consuming task. Hence, the time and costs of Ankura were substantial. Ankura's February invoice for fees and expenses is $14,566.82. The expenses reflected on these invoices are associated with the collection, creation, and maintenance costs of a searchable electronic database in Relativity for certain high-level StratFS employees.

**The Fees and Expenses Requested are Reasonable and Necessary**

21.     I submit to the Court that the identified services provided by me, as Receiver, and by the other designated professionals, were reasonable, necessary, and appropriate and brought significant value to the receivership. I have monitored the efforts of the team and have reviewed and approved the invoices which are the subject of this First Interim Fee Application. I request that the Court approve immediate payment of these invoices.

Executed this 24th day of March, 2024, in San Diego, California.


_____
Thomas W. McNamara

8

17200322v2