UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>      Plaintiffs,<br><br>vs.<br><br>STRAFTS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>      Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>      Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**RECEIVER'S OPPOSITION TO
INTERVENOR LAW FIRMS' MOTION TO COMPEL**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1
II. BACKGROUND ............................................................................................................. 2
    A. The Law Firms' Demands ................................................................................... 3
III. DISCUSSION .................................................................................................................. 5
    A. Royal and Hailstone ............................................................................................. 5
    B. Nothing Has Changed – The Motion to Compel Should be Denied ....................... 7
    C. The Law Firms' Engagement Agreements are Void ............................................... 8
    D. The Receiver is Entitled to Deference Under the Business Judgment Rule ......... 11
IV. CONCLUSION .............................................................................................................. 12

# **TABLE OF AUTHORITIES**

**Cases**

*Bond v. Koscot Interplanetary, Inc.*,
    246 So. 2d 631 (Fla. Dist. Ct. App. 1971) .................................................................. 9

*Christensen v. Eggen*,
    577 N.W.2d 221 (Minn. 1998) ............................................................................. 10, 11

*Columbus Life Ins. Co. v. Wilmington Tr.*, N.A.,
    532 P.3d 757 (Ariz. 2023) ........................................................................................ 9

*Espinoza v. Dimon*,
    2014 WL 1303507 (S.D.N.Y. 2014),
    *aff'd*, 790 F.3d 125 (2d Cir. 2015) ........................................................................... 12

*Fed. Deposit Ins. Co. v. Am. Cas. Co. of Reading*,
    843 P.2d 1285 (Colo. 1992) ..................................................................................... 9

*Frazier v. Goudschaal*,
    296 Kan. 730 (2013) ............................................................................................... 10

*Gamboa v. Alvarado*,
    407 Ill. App. 3d 70 (2011) ...................................................................................... 10

*Golden Pac. Bancorp v. F.D.I.C.*, No. 95-cv-9281 (NRB),
    2002 WL 31875395 (S.D.N.Y. Dec. 26, 2002) ...................................................... 11

*Golden Pac. Bancorp. v. F.D.I.C.*,
    375 F.3d 196 (2d Cir. 2004) ................................................................................... 12

*Gulfco of La., Inc. v. Brantley*,
    2013 Ark. 367 (2013) ............................................................................................... 9

*Lawsky v. Condor Cap. Corp,*
    154 F. Supp. 3d 9, 22 (S.D.N.Y. 2015) .................................................................. 11

*N.Y. State Corr. Officers & Police Benevolent Ass'n v. State*,
    94 N.Y.2d 321 (1999) ............................................................................................... 9

*Off. Secured Creditor's Comm. of Amfesco Indus., Inc. v. Greenblatt*,
    156 A.D.2d 215,
    548 N.Y.S.2d 476 (1989) ....................................................................................... 12

*O'Hara v. Ahlgren, Blumenfeld & Kempster*,
    127 Ill. 2d 333 (1989) ............................................................................................ 11

*Peltz v. Long*,
    40 Mo. 532 (1867) .................................................................................................. 10

*State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*,
    307 Md. 631 (1986) .................................................................................................... 10

*Stockton v. Shadwick*,
    362 Ga. App. 779 (2022) .......................................................................................... 10

*Sylver v. Regents Bank*, Nat'l Ass'n,
    129 Nev. 282 (2013) .................................................................................................. 11

*Szerdahelyi v. Harris*,
    67 N.Y.2d 42 (1986) .................................................................................................... 9

*Trotter v. Nelson*,
    684 N.E.2d 1150 (Ind. 1997) ..................................................................................... 11

*Vasquez v. Glassboro Serv. Ass'n, Inc.*,
    83 N.J. 86 (1980) ....................................................................................................... 10

*Weaver v. Am. Oil Co.*,
    257 Ind. 458 (1971) ................................................................................................... 10

Thomas W. McNamara, as the Court-appointed receiver ("Receiver") submits this Opposition to Intervenor Law Firms' Motion to Compel (Dkt. No. 225) ("Motion to Compel").

## I. INTRODUCTION

The intervenor law firms ("Law Firms"), which are controlled by Defendant Jason Blust, present an audacious request: an order compelling the Receiver to put them back into full operation because "[t]hey [are] severely impaired in their ability to effectively represent their 65,000 clients." Motion to Compel at 3. The Law Firms recite arguments and requests which have been rejected several times by the Court; there are no new facts or circumstances presented suggesting the arguments have any more merit now than when they were previously rejected. Indeed, just the opposite is true.

After holding an extensive evidentiary hearing, the Court has now entered a Preliminary Injunction Order, and the Court specifically found the Defendants and the Law Firms took unlawful advance fees from 65,000 consumers. (Dkt. No. 183 at 11-12, 48). The Court further held the debt-relief program did not provide an appreciable economic benefit to consumers. *Id.* at 52. And it rejected analogous defense arguments opposing the Preliminary Injunction because it "will result in a loss of jobs; an inability of the intervenor law firms to function; and that enrolled consumers will be left unserved." *Id.* at 53-54. As the Court concluded "these concerns do not justify the continued operation of a business that is likely operating in violation of the law." *Id.*

In short, there is nothing to justify the extraordinary and inappropriate actions that the Law Firms now seek to compel the Receiver to undertake. Perhaps most significantly, the Law Firms' request also ignores the consequences which flow from finding the Law Firms took unlawful advance fees: the engagement agreements are void under state law, as discussed more fully below.

1

The Receiver respectfully asks that the Court deny the Motion to Compel.

## II.    BACKGROUND

The Motion to Compel is based on a fictional factual presentation in which the Law Firms portray themselves as "consumer advocacy law firms that represent clients in various states . . . The Law Firms are comprised of attorneys who provide legal services . . . including file reviews and client communications, settlement negotiations and analysis, and litigation defense."  Motion to Compel at 4.  In fact, these Law Firms are all controlled by Defendant Jason Blust, have no physical offices (Receiver's Preliminary Report, Dkt. No. 115-1, at 27), have no or little involvement in settlement negotiations or analysis (*id*. at 41-43), have almost no contact with their clients (*id.* at 30-31, 42), and when litigation is filed, Blust's companies, Relialit, Lit Def, and Fidelis, arrange a "1099 attorney" to represent the clients.  (Declaration of Katherine Rosenberg, Dkt. No. 212-1, at ¶ 5.)

The man behind the curtain is, as the Court preliminarily found, Defendant Jason Blust, who "controls the intervenor law firms and actively participates in business decisions concerning the intervenor law firms and Strategic."  (Dkt. 183 at 47.)[1]  So, while this motion is being presented as if offered by an aggregation of supposedly independent intervening Law Firms, the reality, as a matter of fact, is that it is Jason Blust who is the one bringing this Motion to Compel.  This is the very same Jason Blust, who has falsely claimed that he immediately terminated operations of Lit Def Strategies upon the entry of the TRO, and who only recently admitted in

---

[1]  In its Decision and Order (Dkt. No. 183), the Court specifically held: "Defendant Blust performs various supervisory tasks for the intervenor law firms including hiring attorneys, addressing consumer complaints, and serving as a liaison between the intervenor law firms and Strategic. . . . Evidence in the record shows that Blust controls the intervenor law firms and actively participates in business decisions concerning the intervenor law firms and Strategic. . . . When employees of Strategic are unable to resolve certain consumer complaints or issues, they often consult with Blust or send the matter to him for resolution." *Id.* at 47.

response to an Order to Show Cause re Contempt that he continued to operate Lit Def in direct violation of the TRO.  Mr. Blust has also submitted a demonstrably false sworn declaration to this Court regarding an obvious successor entity, named Fidelis Legal Support Services, LLC, and he generally has thumbed his nose at this Court and its orders in this case.

A.  **The Law Firms' Demands**

The Law Firms raise the issue of payment processing for Royal Legal Group and Hailstone Legal Group (discussed below), but the crux of the Law Firms' Motion to Compel is a request for an order commanding the Receiver to do the following:

- First, the Receiver must provide the Law Firms' attorneys and negotiators with access to the SFS IT infrastructure . . . . allowing the Law Firms to continue to negotiate settlements and represent their clients.  (Dkt. No. 225 at 10);
- Two, the Receiver should be directed to instruct Ram [a payment processor] to provide API access to appropriate Law Firms.  *Id.* at 11;
- Third, the Receiver should be directed to increase staffing levels.  *Id.*; and
- Fourth, . . . . the Receiver should be directed to devote additional payment processing resources to setting up client settle payment plans.  *Id.* at 12.

Taken together, these requests seek to compel the Receiver to return all StratFS operations that supported the Law Firm Debt Relief Model that the Court preliminarily determined to be unlawful.

B.  **Efforts to Protect Consumers While Case Has Progressed**

Since the inception of the Receivership in January 2024, the Receiver has made it a priority to protect consumers and minimize harm to consumers to the maximum extent possible. Initially, on January 22, the Receiver authorized 78 Customer service and support staff to return to work to answer inquiries from consumers.  On Tuesday, February 6, after discussions with the customer services manager, 15 more customer services representatives (5 immediate; 10 who

3

needed training) and 2 leaders were authorized to resume work (bringing authorized staff positions to 95).

Providing customer service, and collecting the related unlawful advance fees, had been quite profitable for StratFS and the Law Firms. But no fees have been taken from consumers since the issuance of the TRO. The Receivership Estate has expended more than $2.58 million to bring back employees to assist consumers.[2] Defendant Blust, the Receivership Defendants, and the Intervening Law Firms have offered little to no cooperation, even though they benefited from the resumption of the customer service operations. Nor did the Law Firms offer any financial contribution for the resumed customer service operations – and none is offered in the Motion to Compel.

If the Law Firms wish to fund the estate's continuation of the customer protection efforts (aside from the demands made in the Motion to Compel), the estate is open to financial contributions so long as they are not sourced through unlawful advance fees.

C.     **Report and Request for Instruction on Path to Protect Consumers**

The Receiver will shortly be filing a report and request for instruction on how to best to protect consumers. Efforts have been made to identify and investigate paths forward for consumers which maximize their protection given the circumstances. The report will identify external options, including nonprofit alternatives. We also recently received a proposal from the Defendants to transition/migrate law firm debt relief consumers to a Direct to Consumer (DTC) model. The Receiver's accountants are reviewing and evaluating the assumptions and financial projections included in the proposal and have had several calls with the architect of the financial

---

[2] These efforts have been primarily funded by the revenues generated by returning the no-advance-fee operations of Timberline and Atlas on February 5, 2024.

model underlying the DTC programs.  Once the Receiver's team has a full understanding of the contours of the proposal and its financial underpinnings, we anticipate that calls with the banks, Plaintiffs and Defendants will be necessary to understand their positions.  We note that beyond the questions of the profitability of the proposal, there are serious questions of lawfulness, and whether and how to obtain informed consent from consumers to transition them to a DTC debt settlement program run by the same Defendants whom the Court preliminarily found have charged illegal advance fees to these same consumers.

## III.     DISCUSSION

### A.     Royal and Hailstone

The Receiver learned that two of the Law Firms service Kansas consumers under a contingent-fee arrangement, Royal Legal Group ("Royal") which was later succeeded by Hailstone Legal Group ("Hailstone").  Between the two firms, there are approximately 1,300 active clients.  Because these firms do not take unlawful advance fees, prior to the filing of the Motion to Compel, the Receiver contacted the payment processor Global and informed Global that the Receiver had no objections to processing for these Law Firms.  Thus, the requested relief as to Royal and Hailstone is moot**.**

The Receiver does note that the continuing operation of these firms in Kansas may present an issue to the extent Mr. Blust is involved in any way in the firms' operations.  In August 2016, Mr. Blust entered into a stipulated permanent injunction with the U.S. Trustee for the District of Kansas, which prohibited Blust "from directly or indirectly providing any debt resolution services in the District of Kansas."[3]  Almost immediately after agreeing to the

---

[3] *See*, *In re: Ida Moore*, Bankr. No. 15-22417 (D. Kan. 2015), at Dkt. No. 63, Agreed Order on United States Trustee Samuel K. Crocker's Motion to Examine Debtor's Transactions with Attorney, dated Aug. 12, 2016, at ¶ 3.

permanent injunction, in the fall of 2016, Mr. Blust placed an advertisement on Craigslist seeking a Kansas attorney and located David Graham, with whom he then formed Royal on November 7, 2016 in Kansas, with Graham acting as the firm's local Kansas attorney.[4] Blust also arranged for Graham to sell 97% of his interest in Royal to Blust's associate, Donald Norris, who also operates Intervenor Law Firm Stonepoint Legal Group, for $97.[5]  The US Trustee learned of Mr. Blust's evasion of the permanent injunction and in June 2018, filed an adversary proceeding against Mr. Blust and Royal alleging causes of action for (1) unlawful debt relief practices under 11 U.S.C. § 526, and (2) violation of the August 2016 permanent injunction prohibiting Mr. Blust from operating debt relief services in Kansas.[6]  Blust resolved the adversary proceeding, in part, by stipulating to an order prohibiting him from "directly or indirectly providing any debt resolution services in the District of Kansas" or "recruiting, soliciting, forming, or assisting with forming any debt resolution service business or debt relief agency that will be incorporated in the state of Kanas."[7]  The injunction does not prohibit Mr. Blust from "participating in a multi-jurisdictional law firm, attorney network, or reciprocal referral network (even those that represent Kansas-based clients) provided that Blust himself does not provide any services to any Kansas-based clients."[8]

---

[4] *See*, *United States Trustee, Ilene J. Lashinsky v. Jason Blust and Royal Legal Group, LLC*, Adv. Pro. No. 18-06046 (D. Kan. 2018), at Dkt. No. 1, Complaint, dated June 27, 2018, at ¶¶ 30-35.

[5] *Id.* at ¶ 38.

[6] *See*, *id.*

[7] *United States Trustee, Ilene J. Lashinsky v. Jason Blust and Royal Legal Group, LLC*, Adv. Pro. No. 18-06046 (D. Kan. 2018), at Dkt. No. 17, Stipulated Judgment, dated August 17, 2018, at ¶¶ 12-13.

[8] *Id.* at ¶ 14.

In light of this permanent injunction prohibiting Mr. Blust from "directly or indirectly" providing debt relief services in Kansas, and given Mr. Blust's known oversight and direction of all of the Intervenor Law Firms including Royal and Hailstone, additional scrutiny of Royal and Hailstone will be required to ensure that Mr. Blust has no "direct or indirect" involvement with those firms' debt relief activities in Kansas.

**B.      Nothing Has Changed – The Motion to Compel Should be Denied.**

Because the Motion to Compel offers no new facts or arguments, while at the same time ignoring the crucial Court rulings, it should be denied.  The Motion to Compel offers a rehash of arguments and requests that were previously rejected by the Court after holding extensive evidentiary hearings.  The Motion to Compel purposely ignores the interim rulings by the Court and then the significant implications of the factual findings and legal holdings in the Court's Preliminary Injunction Order.  These include significant holdings as follows: that the Defendants and the Law Firms took unlawful advanced fees from 65,000 consumers (Dkt. No. 183); that Law Firms' debt-relief program did not provide an appreciable economic benefit to consumers; and that the inability of the intervenor Law Firms to function do not justify the continued operation of a business likely operating in violation of the law.  *Id.* at pp. 53-54.

Beyond failing to point to any changes in circumstances justifying a different ruling, and also failing to acknowledge the Court's actual findings in its Preliminary Injunction Order, there are other serious concerns about the Law Firms, which remain under the control of Defendant Blust.  Blust has ignored and disrespected Orders of this Court.  He has not complied with the TRO, and he has not been transparent with the Court, the Receiver, the parties, or his own counsel about his conduct; Blust has recently even admitted that he violated the TRO; and he also submitted a perjurious declaration concerning Fidelis to the Court.  He has a history of violating court orders, such as in the Kansas matter discussed above.  Moreover, bar

7

investigations have concluded that Blust engaged in and/or aided and abetted the unlawful practice of law.[9]  *See*, *e.g.*, *The North Carolina State Bar v. Daniel S. Rufty*, Consent Order of Discipline, Apr. 8, 2021[10]; *id*. at 7 ("The Blust Law Firms are engaged in the unauthorized practice of law and debt adjusting in multiple states.")  As indicated in the Preliminary Report, the Receiver's investigation also revealed Blust fee splitting with non-lawyers and confirmed the evidence of unlawful practice of law.  (Receiver's Preliminary Report, Dkt. No. 115-1, at 41.)  These concerns must also weigh heavily against the Law Firms' demand that the Receiver expand operations and give access to StratFS systems to the Law Firms.

C.   **The Law Firms' Engagement Agreements are Void**

The Law Firms' various requests – *e.g.*, provide access to StratFS IT infrastructure which is "critical to allowing the Law Firms to continue to negotiate settlements and represent their clients" (Dkt. No. 225 at 10) – are grounded in the notion that the engagement letters remain intact and the 65,000 consumers who entered engagement letters with the Law Firms remain clients.  But that is not the case.  The findings that the Defendants took unlawful fees, which underpin the PI and are detailed in the Court's extensive Decision and Order (Dkt. No. 183), have significant consequences for the Law Firms.

---

[9] Defendant Blust claims to have turned over the "day to day" operations to Richard Gustafson. But given Blust submitted a false declaration to the Court and he has spent years developing methods to have others "own" law firms and legal support companies while he maintained true control and the benefits of ownership, there is really no assurance he has relinquished control. Additionally, this Court specifically found Gustafson not credible in his testimony at the evidentiary hearing, "[n]ot only was Mr. Gustafson's testimony self-serving and inconsistent with other evidence in the record, but Mr. Gustafson made statements, for his own benefit, that defy credulity." (Dkt. No. 183 at 4 & n.3.  Thus, even if Blust really ceded control to Gustafson it provides no comfort.

[10] A copy of the Consent Order is available at https://www.ncbar.gov/handlers/DisciplinaryOrderHandler.ashx?url=/Rufty,%20Daniel%20Consent%20Order%20of%20Discipline.pdf&keyword.

The TSR advance fee prohibition for debt relief services protects consumers and reflects a strong public policy against allowing the taking of advanced fees except in very limited circumstances. This Court closely examined the Defendants' claim they fell within an exemption to the advance fee prohibition and held, after a two-day evidentiary hearing and substantial associated briefing, that the Defendants' use of notaries to meet with consumers and witness the execution of the Law Firms' engagement agreements did not fall within the "face-to-face" exemption. Therefore, the fees paid by the clients under those engagement agreements are unlawful advance fees.

As a result of the Law Firms' receipt of unlawful advance fees in violation of public policy, the engagement agreements are void. *See e.g., N.Y. State Corr. Officers & Police Benevolent Ass'n v. State*, 94 N.Y.2d 321, 327 (1999) (under New York Law, "[t]he public policy exception has its roots in common law, where it is well settled that a court will not enforce a contract that violates public policy."); *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48 (1986) ("illegal contracts, or those contrary to public policy, are unenforceable and that the courts will not recognize rights arising from them" in New York); *Gulfco of La., Inc. v. Brantley*, 2013 Ark. 367, ¶ 12 (2013) (Arkansas Supreme Court refused to enforce a mortgage, where doing so "would contravene the public policy of this State."); *Columbus Life Ins. Co. v. Wilmington Tr.*, N.A., 532 P.3d 757, 759 (Ariz. 2023) (finding the agreement at issue was not void, but noting that in Arizona "contracts that contravene public policy are generally void ab initio."); *Fed. Deposit Ins. Co. v. Am. Cas. Co. of Reading*, 843 P.2d 1285, 1290 (Colo. 1992) (Colorado court states that "[i]t is a long-standing principle of contract law that a contractual provision is void if the interest in enforcing the provision is clearly outweighed by a contrary public policy."); *Bond v. Koscot Interplanetary, Inc.*, 246 So. 2d 631, 634 (Fla. Dist. Ct. App. 1971) (Florida court

9

noting that "an agreement which violates a statute or is contrary to public policy is illegal, void and unenforceable as between the parties"); *Stockton v. Shadwick*, 362 Ga. App. 779, 785 (2022) ("Georgia courts will not enforce a contract that is illegal and against public policy"); *Gamboa v. Alvarado*, 407 Ill. App. 3d 70, 75 (2011) (*citing Kim v. Citigroup, Inc.*, 368 Ill. App. 3d 298, 307 (2006)) (Illinois appellate court states that "[c]ourts will not enforce an illegal contract, a contract that expressly contravenes either Illinois or Federal law and thus violates public policy"); *Weaver v. Am. Oil Co.*, 257 Ind. 458, 464-65 (1971) (under Indiana law, "unjust contract provisions have been found unenforceable, in the past, on the grounds of being contrary to public policy, where a party has a greater superior bargaining position."); *Frazier v. Goudschaal*, 296 Kan. 730, 749 (2013) (although Kansas court found contract at issue to not violate public policy, court stated that public policy forbids enforcement of an illegal or immoral contract); *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643 (1986) (under Maryland law, "[a] contractual provision that violates public policy is invalid, but only to the extent of the conflict between the stated public policy and the contractual provision"); *Michelson v Voison*, 254 Mich App 691, 694 (2003) ("[c]ontracts founded on acts prohibited by a statute, or contracts in violation of public policy, are void" under Michigan law); *Christensen v. Eggen*, 577 N.W.2d 221, 225 (Minn. 1998) (holding fee-splitting agreement between two attorneys was unenforceable because it violated public policy and did not comply with Minnesota Rule of Professional Conduct 1.5(e)); *Peltz v. Long*, 40 Mo. 532, 537 (1867) (under Missouri law, all contracts "contrary to public policy . . . are void and incapable of enforcement"); *Vasquez v. Glassboro Serv. Ass'n, Inc.*, 83 N.J. 86, 98 (1980) (noting New Jersey Supreme Court has "refused to enforce contracts that violate the public policy of the State" or are "inconsistent with the public interest or detrimental to the common good"); and *Sylver v. Regents*

10

*Bank*, Nat'l Ass'n, 129 Nev. 282, 290 (2013) (finding the contract at issue was enforceable, but noting "[u]nder existing Nevada law, a contract is unenforceable on public policy grounds where the policy against enforcement of a contract clearly outweighs the interest in its enforcement").

The Law Firms' motion also wholly ignores the fact that the consumers are now potentially or actually adverse to the Law Firms themselves, as these "clients" may have viable damages claims against the Law Firms for the illegal advance fees that were taken from them. There may also be any number of legal malpractice claims, for the work performed – and if the engagement agreements are void so too are the arbitration provisions in the agreements.[11]

### D.   The Receiver is Entitled to Deference Under the Business Judgment Rule

Finally, the Law Firms' Motion to Compel ignores the business judgment rule, which entitles the Receiver to deference in his determinations relating to the management of the receivership entities. *See*, *Lawsky v. Condor Cap. Corp*, 154 F. Supp. 3d 9, 22 (S.D.N.Y. 2015) (where sound business reasons for receiver's decisions exist, receiver entitled to judicial deference under business judgment rule) "[R]eceivers, just like corporate directors, are entitled to the deference of the business judgment rule in their decision-making concerning the management of a corporation." *Golden Pac. Bancorp v. F.D.I.C.*, No. 95-cv-9281 (NRB), 2002 WL 31875395, at *8–9 (S.D.N.Y. Dec. 26, 2002), aff'd sub nom. *Golden Pac. Bancorp. v.*

---

[11] Additionally as reported in the Preliminary Report, the Law Firms (via Blust) appeared to be fee splitting with StratFS. This an independent ground to determine the engagement agreements are void. *See e.g Christensen v. Eggen*, 577 N.W.2d 221, 225 (Minn. 1998) (fee-splitting agreement between two attorneys was unenforceable because it violated public policy and did not comply with Minnesota Rule of Professional Conduct 1.5(e)); *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 342 (1989) (finding a fee-splitting provision between attorney and non-attorney, if allowed, would be "harmful to the public interest" and was therefore void under Illinois law); *Trotter v. Nelson*, 684 N.E.2d 1150, 1155 (Ind. 1997) ("a court may declare an otherwise valid contract unenforceable if it contravenes the public policy of Indiana" and "fee-splitting agreements with a nonlawyer are contrary to Indiana public policy and unenforceable.").

11

*F.D.I.C.*, 375 F.3d 196 (2d Cir. 2004);  Where the business judgment rule applies, the receiver's decisions may only be overridden by the Court upon a showing of bad faith.  *See*, *Espinoza v. Dimon*, 2014 WL 1303507, at *4 (S.D.N.Y. 2014), *aff'd*, 790 F.3d 125 (2d Cir. 2015); *see also*, *Off. Secured Creditor's Comm. of Amfesco Indus., Inc. v. Greenblatt*, 156 A.D.2d 215, 216, 548 N.Y.S.2d 476, 477 (1989) (holding business judgment rule under New York law requires party challenging receiver to show "demonstrable bad faith").

The Receiver has carefully exercised his judgment in this matter so as to balance consumer protection concerns – which are themselves fraught with complexity, given both the unlawful engagement agreements at issue and the press of new or ongoing litigation matters filed by creditors against consumers – against the very limited cash available to the receivership. (*See*, Receiver's Preliminary Report, ECF No. 115-1, at 17.)  Intervenors have failed to make any showing of bad faith and have otherwise failed to establish that the Court should overrule the Receiver's business judgment.  As such, the Court must deny the Motion to Compel on grounds of the business judgment rule.

### IV.  CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court deny Intervenor Law Firms' Motion to Compel.

Dated: April 1, 2024                              **MCNAMARA SMITH LLP**

By:   /s/ Logan D. Smith
Logan D. Smith  (*Pro Hac Vice*)
Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Tel.:  (619) 269-0400; Fax:  (619) 269-0401
Email:  lsmith@mcnamarallp.com;
awall@mcnamarallp.com
*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*