UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>      Plaintiffs,<br><br>vs.<br><br>STRAFTS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>      Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>      Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**RECEIVER'S OPPOSITION TO INTERVENOR LAW FIRMS'
MOTION TO MODIFY THE PRELIMINARY INJUNCTION TO ALLOW PAYMENT
OF LEGAL FEES FROM A CAPTIVE INSURANCE POLICY**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DISCUSSION | 2 |
| | A. The Funds for the Cell Gramercy 2 Policy Are an Asset of the Receivership | 2 |
| | B. Even if the Law Firms Can Establish Claims to the Cell Gramercy 2 Funds, They Would Merely Be an Unsecured Creditor and Their Claims Against Receivership Assets Should Remain Stayed | 4 |
| | C. The Law Firms Have Not Established a Right to Indemnification or Contribution of Any Third-Party Claims | 5 |
| | D. Under the Plain Language of the Cell Gramercy 2 Policy, the Law Firms Do Not Have Valid Claims to Insurance Coverage | 7 |
| | E. The Law Firms Have Not Established a Right to Reimbursement of Legal Fees Relating to This Litigation | 9 |
| III. | CONCLUSION | 11 |

# **TABLE OF AUTHORITIES**

**Cases**

*American Guarantee and Liability Ins. Co. v. Chicago Ins. Co.*,
    105 A.D.3d 655 (1st Dep't 2013) .................................................................... 7, 8

*F.T.C. v. Vantage Point Servs., LLC*,
    2019 WL 1567521 (W.D.N.Y. 2019) .................................................................. 4

*Fillip v. Centerstone Linen Servs.*,
    2013 WL 6671663 (Del. Ch. 2013) ................................................................... 10

*Laughlin v. Delmarva Power & Light Co.*, No. CIV. A. 89-C-AU-213,
    1991 WL 269893 (Del. Super. Ct. Nov. 20, 1991) .............................................. 6

*Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*,
    654 A.2d 403 (Del. 1995) .................................................................................... 6

*S.E.C. v. Byers*,
    609 F.3d 87 (2d Cir. 2010) .................................................................................. 4

*S.E.C. v. Credit Bancorp, Ltd.*,
    2000 WL 1752979 (S.D.N.Y. 2000) ................................................................... 5

*Winshall v. Viacom Int'l, Inc.*,
    76 A.3d 808 (Del. 2013) .................................................................................... 10

**Other Authorities**

Utah Code § 31A-1-301(21)(a) ..................................................................................... 2

Utah Code § 31A-37-102(29) ....................................................................................... 3

Utah Code § 31A-37-102(9)(b) .................................................................................... 3

Utah Code § 31A-37-104 .............................................................................................. 3

Utah Code § 31A-37-204(1)(a)(iv) ............................................................................... 3

Utah Code § 31A-37-401 .............................................................................................. 3

Thomas W. McNamara, as the Court-appointed receiver ("Receiver") submits this Opposition to Intervenor Law Firms' Motion to Modify the Preliminary Injunction to Allow Payment of Legal Fees from a Captive Insurance Policy (Dkt. No. 234) (the "Motion").

## I.    INTRODUCTION

The resolution of the Law Firms' Motion must be denied for several reasons. First, the Cell Gramercy 2 policy funds are indeed a receivership Asset, and so any claims to those funds by the Law Firms constitute creditor claims against the Receivership Estate, which are subject to equitable principles and should remain stayed; second, the Law Firms have not come close to establishing present claims for indemnification under the applicable Service Agreements; third, the Law Firms' claims are excluded by the plain language of the Cell Gramercy 2 insurance policy; finally, the Law Firms have not and cannot establish any right to reimbursement of legal fees in the instant litigation.

Moreover, even if the Law Firms possessed valid claims (they do not), they would fall into the category of litigation by third parties that is, and should remain, stayed. And, because the Receivership Defendants contest payment of the Law Firms' purported claims, even if the Court were to lift the stay, the Law Firms' claims would then proceed to JAMS arbitration in Atlanta, Georgia, as called for under the Service Agreements. As discussed below, under the terms of the Service Agreements, the Receivership Defendants may even have their own indemnification claims *against the Law Firms*. Forcing the Receivership Defendants to adjudicate the Law Firms' claims to these funds at this time would needlessly waste Receivership Defendants' Assets and incur unnecessary expense.

As such, the Receiver respectfully asks that the Court deny the Motion.

1

II.     DISCUSSION

    A.     **The Funds for the Cell Gramercy 2 Policy Are an Asset of the Receivership**

The Law Firms seek to take for themselves nearly a million dollars held in a claims-made captive insurance policy fully funded by StratFS and its affiliates. However, the funds in that policy, and that policy itself, fall under the broad definition of "Asset"[1] of the Receivership Estate, because any funds not paid on valid claims revert to Receivership Defendant StratFS and its affiliates, in addition to the fact that StratFS has competing rights to draw upon the funds in the policy.

Cell Gramercy 2 of Contego Insurance, Inc. is a captive insurance company organized under the laws of Utah. "A captive insurance company is an insurance company organized to cover the insurable risks of the parent organization and/or its affiliates."[2] In this arrangement, the "[i]nsured entities have the opportunity to control the operations and tailor the [captive insurance] company to their own needs."[3]

Under the Utah Captive Insurance Companies Act, the insurance company can take one of seven forms: a branch captive insurance company, a pure captive insurance company, an

---

[1] The Preliminary Injunction defines as, in pertinent part, as follows: "'Asset' means any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property owned or controlled by, or held, in whole or in part for the benefit of, or subject to access by any Defendant or Relief Defendant…[including] accounts; cash; funds…." (Preliminary Injunction, Dkt. No. 184, at p. 3.)

[2] Utah Insurance Department, "What is a Captive Insurance Company?," available at https://insurance.utah.gov/captive/research/captives-rrgs/ [last visited April 2, 2024]; *see also* Utah Code § 31A-1-301(21)(a) ("'Captive insurance company' means: an insurer: owned by a parent organization and whose purpose is to insure risk of the parent organization and other risks as authorized under [the Captive Insurance Companies Act or the Special Purpose Financial Captive Insurance Company Act").

[3] *Id.*

association captive insurance company, a sponsored captive insurance company, an industrial insured captive insurance company, a special purpose captive insurance company, or a special purpose financial captive insurance company.  Utah Code § 31A-37-102(9)(b).  The type of captive insurance company determines the amount of paid-in capital the insurance company must maintain to satisfy claims made against insurance policies issued by the captive insurance company; for instance, a sponsored captive insurance company must maintain a minimum paid-in capital amount of $500,000.  Utah Code § 31A-37-204(1)(a)(iv).  The company for whose benefit the captive insurance company exists funds the reserves necessary to satisfy claims.

      Cell Gramercy 2 of Contego Insurance, Inc. is a cell captive insurance company, which is considered a sponsored captive insurance company under Utah law.  Utah Code § 31A-37-102(29).  Utah Code § 31A-37-401.  A sponsored captive insurance company has a parent captive insurance company (here, ERS Insurance, Inc.) with distinct subsidiaries or cells that belong to specific companies.  Here, the distinct subsidiary or cell is Cell Gramercy 2 of Contego Insurance, Inc., which insures various Strat-FS affiliated entities and Law Firms.  (*See*, Law Firms' Exhibit 4, Dkt. No. 234-5, at p. 2, "Schedule of Insureds".)

      The Law Firms cite Utah's Captive Insurance Companies Act, Utah Code § 31A-37-104, for the proposition that the Cell Gramercy 2 funds "must be used to pay claims against the policy."  (Motion, Dkt. 234-6, at p. 3) (emphasis omitted).  But this misconstrues Section 31A-37-104, which merely provides that the assets of one cell cannot be used to satisfy claims under a different cell.  That provision has no bearing on whether the Law Firms have a claim under the subject policy, whether the policy constitutes an asset of the Receivership subject to the stay, or the disposition of funds when no valid claims are made under a claims-made captive insurance

policy.  Upon closure of a captive insurance company, once all proper claims have been satisfied, the residual paid-in capital reverts to the company that funded it—here, StratFS, LLC.[4]

Consequently, the $1,000,000 in Cell Gramercy 2 funds is an Asset of the Receivership Estate, and there is a direct conflict between the Law Firms and the Receivership Estate about the use of this Asset for claims, since the Asset will otherwise be available for return to the Receivership Estate.  Although the Law Firms have not yet established any right to payment of the funds, even if they are able to do so, they will stand, at most, as creditors of the Receivership Estate.

> **B. Even if the Law Firms Can Establish Claims to the Cell Gramercy 2 Funds, They Would Merely Be an Unsecured Creditor and Their Claims Against Receivership Assets Should Remain Stayed**

As discussed below, the Law Firms have not established any present right to payment from the Cell Gramercy 2 funds (Section II.C., *infra*), and do not have valid coverage claims under the language of the policy (Section II.D., *infra*).  However, even to the extent the Law Firms can establish valid claims to the Cell Gramercy 2 funds , their claims are subject to equitable principles regarding the payment of victim and creditor claims.

A receivership is an equitable proceeding, and the court in a receivership maintains equitable control over all claims made against receivership assets.  *S.E.C. v. Byers*, 609 F.3d 87, 91 (2d Cir. 2010); *see also*, *F.T.C. v. Vantage Point Servs., LLC*, 2019 WL 1567521, at *3 (W.D.N.Y. 2019) ("[r]eceivership courts have the general power to use summary procedure in allowing, disallowing, and subordinating the claims of creditors"); *S.E.C. v. Credit Bancorp,*

---

[4] *See*, International Risk Management Institute, Inc., "Captive Insurance Exit Strategy" (Nov. 1, 2007), available at https://www.irmi.com/articles/expert-commentary/captive-insurance-exit-strategy [last visited April 2, 2024]; Captive International, "Time to exit your 831(b) captive?" (Mar. 27, 2020), available at https://www.captiveinternational.com/services/accounting-and-tax/time-to-exit-your-831-b-captive  [last visited April 2, 2024].

*Ltd.*, 2000 WL 1752979, at *13-*15 (S.D.N.Y. 2000), aff'd, 290 F.3d 80 (2d Cir. 2002) (all claims to receivership assets are subject to equitable principles, which supersede any claims to specific assets).

If the Law Firms have valid claims, they are effectively creditors making claims against the Receivership Estate, their claims are subject to the Court's equitable power to allow, disallow, or subordinate those claims, and it is exceedingly premature for the Court to consider individual creditor claims to receivership Assets. At this point, the most pressing use of the receivership Assets is in the Receiver's ongoing efforts to protect consumers, not the payment of the Law Firms' lawyers. The Court should decline to exercise its equitable powers and give the Law Firms' claims against receivership Assets priority.

### C. The Law Firms Have Not Established a Right to Indemnification or Contribution of Any Third-Party Claims

The Law Firms have not established any right to recover from the Cell Gramercy 2 funds. More particularly, nothing the Law Firms have submitted to the Receiver or the Court establishes a present right of the Law Firms to indemnification from or contribution by the Receivership Defendants as to any third-party claims arising outside this litigation.[5]

Importantly, the Law Firms' purported right to indemnification and/or contribution under the Service Agreements is not absolute or irrespective of fault. On the contrary, a given Law Firm is entitled to indemnification from its respective StratFS-affiliated servicing company (referred to in the Service Agreements as the "Servicer") only for damages arising from the Servicer's breach of the Service Agreement (§ 7(b)(i)) or from the Servicer's "conduct of its

---

[5] The Law Firms vaguely describe these third-party claims as "lawsuits, governmental investigations, and/or disciplinary actions filed by governmental agencies or private parties." (Motion, Dkt. No. 234-6, at p. 5.)

5

operations or business before the date of this [Servicing] Agreement" (§ 7(b)(ii)). (Law Firms' Exhibit 3, Dkt. No. 234-4, at p. 12.)  Conversely, the *Servicer* is entitled to indemnification from the *Law Firm* for any damages that arise from the *Law Firm*'s breach of the Service Agreement (§ 7(c)(i)) or the Law Firm's "conduct of its operations or business before the date of this [Servicing] Agreement" (§ 7(c)(ii)).  (*Id.* at pp. 12-13.)  If neither party has a right to indemnification from the other under Sections 7(b) or 7(c), then, and only then, is each party responsible for contribution in the amount of its "Proportionate Share," which is based upon the Law Firm and Servicer's proportionate revenue relating to the matter of the claim.  (*Id.* at pp. 14-15.)

Moreover, under Delaware law, an indemnification provision may only indemnify a party for its *own negligence* if the language of the governing indemnification provision shows "a clear and unequivocal intention that the indemnitee was intended to be indemnified against its own negligence."  *Laughlin v. Delmarva Power & Light Co.*, No. CIV. A. 89-C-AU-213, 1991 WL 269893, at *1 (Del. Super. Ct. Nov. 20, 1991); *see also*, *Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*, 654 A.2d 403, 409 (Del. 1995) ("unless expressly and clearly indicated in contractual language, an indemnitee cannot indemnify itself for its own negligence").  The exemplar Service Agreement demonstrates no "clear and unequivocal intention."

Given the above, any claim for indemnification by a Law Firm against a Servicer requires the Law Firm to establish that the Servicer breached the applicable Service Agreement, or caused damages to the Law Firm by its conduct prior to entering a Service Agreement, and further requires that the Law Firm itself not be at fault for the damages.  Contribution applies only if neither party breached the applicable Service Agreement.  But the Law Firms' Exhibit 1 does not include *any* information about the nature of the claims at issue, beyond the amounts that the Law

6

Firms are demanding and the bare fact that they relate to legal invoices.  The Law Firms have not submitted any facts or evidence sufficient to support a claim for either indemnification or contribution under the Service Agreements.

To establish a disputed claim under a Service Agreement, a Law Firm must proceed to JAMS arbitration in Atlanta, Georgia (Law Firms' Exhibit 3, Dkt. No. 234-4, at p. 16), and prove a right to indemnification or contribution under the applicable Service Agreement.  To the extent a claim involves an allegation of misconduct by the Law Firm – and given the nature of the third-party litigations at issue, this appears to be the case – it is unlikely it will be entitled to indemnification; indeed, the Law Firm may owe indemnification if the Servicer incurred a loss in connection with the claim.  If contribution applies, the Law Firm's and Servicer's "Proportionate Share," calculated on the proportionate revenue from the underlying matter, must be determined.  Thus, each purported claim listed in the Law Firms' Exhibit 1 will not be ripe until a full arbitration proving up a right to payment has taken place – and even *after* establishing a claim, it will still be subject to the Court's equitable control over payment of claims against receivership Assets.  In short, lifting the stay to permit a long series of claim arbitrations in Atlanta, Georgia would be profoundly wasteful of the receivership Assets, and the Court should decline to so lift the stay at this time.

> **D.   Under the Plain Language of the Cell Gramercy 2 Policy, the Law Firms Do Not Have Valid Claims to Insurance Coverage**

The insurance policy is a claims-made policy.  (*See*, Law Firms' Exhibit 4, Dkt. No. 234-5, at p. 1, Coverage Type.)  "A claims-made policy is designed to protect the policyholder during the life of the policy upon 'notice to the carrier within the policy period.'" *American Guarantee and Liability Ins. Co. v. Chicago Ins. Co.*, 105 A.D.3d 655, 656 (1st Dep't 2013) (quoting *American Home Assur. Co. v. Abrams,* 69 F. Supp. 2d 339, 346 (D. Conn. 1999).  "The policy

provides 'the distinct advantage for the insurer of providing certainty that, when the policy period ends without a claim having been made, the insurer will be exposed to no further liability.'" *Id.* "This certainty permits an insurer, in calculating premiums, to 'discount the risk of a claim [being] filed long after the policy period has ended, with the attendant dangers of unexpected inflation, changes in applicable law, and upward trends in jury awards,' and to pass those savings on to the insured in the form of lower premiums. *Id*. (quoting *Calocerinos & Spina Consulting Engineers, P.C. v. Prudential Reins. Co.,* 856 F. Supp. 775, 777-78 (W.D.N.Y. 1994). In other words, in order for a claim to be covered by a claims-made policy, the claim must be submitted during the policy period or extended reporting period, and must fall within the Insuring Agreement.

The insurance policy here runs from January 1 to January 1 each year. The extended reporting period is 60 days from the end of the policy period. (*See,* Law Firms' Exhibit 4, Dkt. No. 234-5, at p. 1, Extended Reporting Period.) According to the Law Firms, Richard Gustafson, II, Esq., submitted a claim on behalf of "all" Law Firms on March 15, 2024, which is beyond the 60-day extended reporting period for the January 1, 2023 to January 1, 2024 policy period. As such, the only potentially applicable insurance policy would be one that runs from January 1, 2024 to January 1, 2025. The Receivership Defendants have not been provided an effective 2024 policy, and none is attached to the Law Firms' Motion.[6] Further, none of the laundry list of "Law Firms" bringing the Motion together establishes that it is specifically covered under the policy.

---

[6] The Receiver Defendants' financial records indicate that premiums of $294,762 were paid in December 2023.

Assuming that a policy has been issued for 2024 and its terms are the same as the 2022-2023 policy, the Law Firms have not established any claims against the policy at this time, as discussed in Section II.C., *supra*.  But even if the Law Firms had established claims falling within the policy's Insuring Agreement, they would be excluded under the policy.  Specifically, the policy provides:

> SECTION III - Exclusions
>
> A. This coverage does not apply to:
>
> 1. Costs associated with or arising out of criminal actions or punitive damages.
>
> 2. Expenses incurred as a result of litigation for which the Insured was served a complaint or summons prior to the effective date of this coverage.

The effective date of the policy is identified on the first page as January 1 of the year it was issued.  According to the Law Firms' submission, it appears that most, if not all, of the expenses they are seeking reimbursement for are as a result of a summons or complaint that was served prior to the January 1, 2024 effective date of the presumed 2024 policy.  (Law Firms' Exhibit 1, Dkt. No. 234-2, at pp. 14-19.)  For example, the Law Firms seek $157,599.02 for November 2023 payments, $179,177.96 for December 2023 payments, and $360,564.81 for January 2024 payments, with no indication as to when the summons and complaint were served in each action.  (*See*, *id.*)  It appears, however, that those payments were for "[e]xpenses incurred as a result of litigation for which the Insured was served a complaint or summons prior to the effective date of" the coverage.  The claims would, therefore, be excluded.

E.   **The Law Firms Have Not Established a Right to Reimbursement of Legal Fees Relating to This Litigation**

Beyond the third-party claims, the Law Firms also seek $150,000 paid to Connors LLP in January and February of 2024, presumably for this action.  (*See*, Law Firms' Exhibit 1, Dkt. No. 234-2, at pp. 14-15; Motion, Dkt. No. 234-6, at p. 5.)  This claim is also without merit.  First, to

9

reiterate, the Law Firms have not established the legal fees and expenses arise from a Servicer's breach of the respective Service Agreement.  On the contrary, the Law Firms may ultimately be liable to indemnify *the Servicers* under the terms of the Service Agreements, given that the Court found the notary meetings did not satisfy the face-to-face exemption, the notaries contracted with the Law Firms, and the notaries were held out to consumers as Law Firm representatives.  (*See*, Decision and Order, Dkt. No. 183, at pp. 13-26.)

Moreover, the parties' respective indemnity obligations do not include a duty to defend. The terms of the Service Agreement provide that the Servicer and Law Firm are each required to "indemnify," "save and hold…harmless" the other, but do not include an express duty to defend. (Law Firms' Exhibit 3, Dkt. No. 234-4, at p. 12.)  The exemplar Service Agreement is governed by Delaware law, which provides that the duty to defend is distinct from the duty to indemnify or hold harmless.  *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 820 (Del. 2013) ("where, as here, the contract expressly imposes only a duty to 'indemnify,' as opposed to 'indemnify and defend,' the courts generally hold that there is no duty to defend"); *Fillip v. Centerstone Linen Servs.*, 2013 WL 6671663, at *6 (Del. Ch. 2013)  ("the word 'defend' has meaning distinct from the phrase 'indemnify and hold harmless'").  Because there is no duty to defend, the Servicer is not obliged to pay the Law Firms' legal fees or expenses until the claim is resolved: "no duty to defend means no duty to pay for the outlays of defense on a current basis."  *Winshall*, 76 A.3d at 820.

Finally, the Law Firms are not defendants in this action, but have rather voluntarily intervened and, as a result, incurred fees.  The voluntary intervention does not give rise to a right to indemnification or constitute a "Claim" under the meaning of the Cell Gramercy 2 policy.

### III. CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court deny Intervenor Law Firms' Motion to Modify the Preliminary Injunction to Allow Payment of Legal Fees From a Captive Insurance Policy.

Dated: April 3, 2024                  **MCNAMARA SMITH LLP**

                                           By:   /s/ Logan D. Smith
                                           Logan D. Smith  (*Pro Hac Vice*)
                                           Alexander D. Wall (*Pro Hac Vice*)
                                           McNamara Smith LLP
                                           655 West Broadway, Suite 900
                                           San Diego, California 92101
                                           Tel.:  (619) 269-0400; Fax:  (619) 269-0401
                                           Email:  lsmith@mcnamarallp.com;
                                           awall@mcnamarallp.com
                                           *Attorneys for Court-appointed Receiver,*
                                           *Thomas W. McNamara*