# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | ) ) ) |
| Plaintiffs, | ) ) Case No. 24-cv-00040-EAW-MJR |
| v. | ) ) |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al. | ) ) ) |
| Defendants, | ) ) |
| and DANIEL BLUMKIN, et al. | ) ) |
| Relief Defendants. | ) ) |

## LAW FIRMS' COMBINED REPLY IN SUPPORT OF THEIR MOTION TO COMPEL RECEIVER TO TAKE CERTAIN ACTIONS

## INTRODUCTION

Regardless of any shortcomings that may exist with the Law Firms' pre-existing fee structure,[1] the Law Firms still represent 65,000 clients, and Strategic is vital to that representation. This motion has significant consequences for 65,000 clients. In their haste to say "no" to everything that might help the Law Firms, Plaintiffs and the Receiver utterly ignore those consequences. Three aspects of the Plaintiffs' and Receiver's responses merit mention at the outset of this reply.

***First***, Plaintiffs and the Receiver give a litany of excuses for why the Receiver should not be compelled to do anything. ***Neither*** offers any solution to the ongoing problem that caused the Law Firms to file their motion, the indisputable fact that 65,000 Law Firm clients are not being properly serviced by Strategic:

- Law firm clients are still experiencing long hold times (sometimes hours) when they call with even basic questions. Obviously, such hold times impede communication and dissuade clients from even calling.

- Mail is still not getting properly processed (which means that important communications such as summonses are not being timely handled).

- Law Firm client data that is maintained at Strategic is being withheld from the Law Firms (making it very difficult for the Law Firms to settle debts).

This cannot continue. Those 65,000 clients depend on the Law Firms to represent them vis-a-vis their creditors. The Law Firms have contracts that require Strategic to provide very significant support functions and services. The Law Firms cannot

---

[1] The Law Firms acknowledge, but respectfully disagree with, this Court's findings regarding their fee structure. That issue is currently on appeal to the Second Circuit. Importantly, however, the Law Firms are not waiting for an appellate ruling. They have already begun transitioning clients to a TSR-compliant contingent fee model.

fully perform their duties unless Strategic performs *its* duties. Since January 12, that has not happened. In short, the Receiver's actions are directly harming the very consumers that he and Plaintiffs are supposed to be protecting.

**Second**, the Receiver resorts to *ad hominem* attacks and unsupported innuendo, almost all of which is directed at Jason Blust (and is employed whenever the Receiver is faced with facts or arguments for which he otherwise has no response). The Receiver's invective is misplaced. The Law Firms' motion did not even mention Blust. And for good reason: Blust has stepped away from involvement with the Law Firms. The Receiver's disdain for Blust is not a valid response to the Law Firms' arguments, and it is not a principled basis for making decisions that impact 65,000 consumers. This Court should focus on solutions that will protect the 65,000 consumers – not misplaced personal attacks.

**Third**, the Receiver is essentially ignoring the provisions in the TRO and PI that call for him to operate Strategic and preserve its assets. Three months ago, Strategic had over 1,000 employees. The Receiver did nothing to protect those jobs, laying off hundreds of Buffalo employees. Indeed, the Receiver is acting like a liquidating receiver. This should be seen for what it is: an attempt to place Strategic (and the Law Firms) in a position where they cannot mount a meaningful defense of any claims asserted against them.

## ARGUMENT

### I. The Law Firms Have Complied With The Local Rules.

Plaintiffs argue that the Law Firms' motion should be denied because the Law Firms have "failed to state the grounds for the relief they seek." (Dkt. 254 at 2-3.) The Law Firms' motion is based on the terms of the preliminary injunction order. That is clear on the face of the Law Firms' motion. And, as Plaintiffs concede, this Court has broad discretion to modify the terms of its own orders. Plaintiffs also criticize the Law Firms for failing to provide affidavit support for the assertion that Royal and Hailstone are contingent fee firms. (*Id.* at 3.) But that argument is moot because the Receiver concedes that point. (Dkt. 256 at 5.)

### II. Royal And Hailstone Must Be Permitted To Operate.

Royal and Hailstone have always been TSR-compliant contingent fee firms. The Receiver admits as much and has now advised Global to process fees for those two firms. (Dkt. 256 at 9.) The Receiver's admission underscores the fact that Royal and Hailstone should never have been shut down at all. But for over two months, they were –as a direct result of the Receiver's actions. And while the Law Firms appreciate the Receiver's belated action, his action does not go far enough.

The Receiver's recent instruction to Global to begin processing fees for Royal and Hailstone does not materially help Royal and Hailstone. Royal and Hailstone can only collect fees if they settle debts. But the Receiver is preventing Royal and Hailstone from doing just that, because the Receiver is refusing to give Royal and Hailstone's debt negotiators access to their clients' information. For years, Strategic

has collected and maintained data regarding Royal and Hailstone clients. The client data that is housed at Strategic belongs to Royal and Hailstone and has historically been made available to their attorneys and negotiators to allow them to settle debts and represent clients. Since January 12, the Receiver has withheld that information.

The Receiver's response does not offer any principled reason why Royal and Hailstone should be deprived of access to their own information. The Receiver will not incur any material cost to provide such access. Moreover, there is considerable benefit to consumers in providing the Law Firms with this access, and considerable harm in *not* doing so. Instead of providing the Court with a principled discussion of the costs and benefits for consumers, the Receiver's response on this point consists mostly of a diatribe about Blust (with some insults directed at Gustafson for good measure). However, Blust is not involved in those firms, and "Blust associate" Donald Norris (whom the Receiver asserts "operates" Royal) passed away years ago.

### III.  The Law Firms Should Be Given Access To Their Information.

As set forth above, Strategic collects and maintains data regarding Law Firm clients. It maintains this data at the direction of the Law Firms as a contract vendor to the Law Firms. This information includes records memorializing discussions with clients, financial information, instructions regarding fee and settlement payments, and the like. Historically, such data has been shared with the Law Firms via an IT infrastructure that permits the Law Firms' attorneys and employees access to these records in real time.  That allows the Law Firms to have up-to-date information that permits them to timely respond to lawsuits, address client concerns, and (perhaps

4

most important of all) negotiate settlements of client debts. Such settlement negotiations are very difficult unless the Law Firm negotiators have current and accurate information regarding the clients and their financial circumstances.

Since January 12, 2024, Strategic (at the Receiver's behest) has withheld that information from the Law Firms. That materially hampers the Law Firms' ability to provide services to the 65,000 clients. To be clear: this is not a cost-driven decision by the Receiver (and the Receiver does not contend otherwise). There is little-to-no cost to provide the Law Firms with access to this electronic information. In his response, the Receiver does not engage in any discussion about the impact of his decision on 65,000 consumers. Instead, the Receiver: (1) points out that the Law Firms previously collected advance fees; and (2) launches yet another attack on Blust, accusing him of a wide range of wrongful conduct, including fee-splitting, flouting court orders and the unauthorized practice of law. Suffice it to say, there is not a shred of evidence offered to support the claims against Blust. More importantly, such attacks are beside the point because Blust is no longer involved with the Law Firms. And the Law Firms are no longer charging advance fees. This request for relief should be granted.

## IV. The Business Judgment Rule Does Not Shelter The Receiver.

Plaintiffs and the Receiver both urge deference to the Receiver under the business judgment rule. But they do not provide this Court with any factual basis to support such deference. The business judgment rule does not give blanket immunity to corporate fiduciaries to do as they wish. Rather, the business judgment rule has boundaries, and requires fiduciaries to articulate some rational basis for corporate

5

decision-making in response to challenges. *In re J.P. Stevens & Co., Inc. Shareholders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988).[2]

Here, the Receiver's actions do not fall within the scope of the business judgment rule. The Receiver offers a cursory explanation for his actions:

> The Receiver has carefully exercised his judgment in this matter so as to balance consumer protection concerns – which are themselves fraught with complexity, given both the unlawful engagement agreements at issue and the press of new or ongoing litigation matters filed by creditors against consumers – against the very limited cash available to the receivership.

(Dkt. 256 at 16) That is vague and conclusory in the extreme. And it raises more questions than it answers. Nothing in that single sentence rationally explains how the Receiver is protecting consumers by depriving them of service. And it does not explain why the Receiver cannot provide IT access to the Law Firms, process the mail, or support Royal or Hailstone. Moreover, it is completely silent regarding the "elephant in the room," *i.e.*, the Receiver's own significant fees.

Indeed, it is not clear that the business judgment rule even applies here. The business judgment rule applies only where a fiduciary is disinterested and has no conflicts of interest. *Schreiber v. Pennzoil Co.*, 419 A.2d 952 (Del. Ch. 1980). The Receiver has a very direct conflict of interest. The Receiver is urging this Court to avoid spending money to provide service to consumers on the grounds that there is "very limited cash" at Strategic. (Dkt. 256 at 16.) But the Receiver is currently asking this Court to award him (and his colleagues) nearly ***one million dollars*** from those

---

[2] The Law Firms cite Delaware law as StratFS is a Delaware entity. New York law is in accord. *See, e.g., Wolf v. Rand*, 685 N.Y.S. 708, A.D.2d 401 (N.Y. App. Div. 1999).

very same "limited" resources. Thus, he has a direct interest in maintaining available cash to pay himself.

And there is more. The Receiver has long been a "go to" receiver for the government. By his own admission, the Receiver has been appointed as a receiver in at least 40 matters brought by the CFPB and other regulatory agencies.[3] (Dkt. 4.) That has been highly lucrative for the Receiver. The publicly available records for certain receivership matters show his receivership firm and his law firm have had at least $4 million and $11 million in fees, respectively, approved by various courts in matters brought by federal authorities. Several of those engagements are ongoing. The Receiver's reliance on the government for future work creates at least a doubt as to whether his primary focus is on preserving Strategic (and its jobs in Buffalo) or in

---

[3] *F.T.C. v. Intercontinental Solutions LLC,* 8:23-cv-01495-SB-JDE (C.D. Cal. 2023); *F.T.C. v. SL Fin. LLC*, 8:23-cv-00698-JWH-ADS (C.D. Cal. 2023); *F.T.C. v. BCO Consulting Serv., Inc.*, 8:23-cv-00699-JWH-ADS (C.D. Cal. 2023); *U.S. v. Internet Transaction Serv. Inc.*, 2:21-cv-06582-JFW-KS (C.D. Cal. 2021); *F.T.C. v. OTA Franchise Corp.*, 8:20-cv-00287-JVS-KES (C.D. Cal. 2020); *F.T.C. v. Lead Express, Inc.*, 2:20-cv-00840-JAD-NJK (D. Nev. 2020); *F.T.C. v. Am. Fin. Support Serv., Inc.*, 8:19-cv-02109-JWH-ADS (C.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. Consumer Advocacy Center*, 8:19-cv-01998-MWF-KS (C.D. Cal. 2019); *F.T.C. v. Elegant Solutions, Inc.*, 8:19-cv-01333-JVS-KES (C.D. Cal. 2019); *F.T.C. v. Am. Fin. Benefits Center*, 4:18-cv-00806-SBA (N.D. Cal. 2018); *F.T.C. v. Apex Capital Gr., LLC*, 2:18-cv-09573-JFW-JPR (C.D. Cal. 2018); *F.T.C. v. Triangle Media Corp.*, 3:18-cv-01388-LAB-LL (S.D. Cal. 2018); *F.T.C. v. Consumer Defense, LLC*, 2:18-cv-00030-JCM-BNW (D. Nev. 2018); *F.T.C. v. Alliance Document Preparation, LLC*, 2:17-cv-07048-SJO-KS (C.D. Cal. 2017); *F.T.C. v. Kutzner*, 8:16-cv-00999-DOC-AFM (C.D. Cal. 2016); *S.E.C. v. PLCMGMT LLC*, 2:16-cv-02594-TJH-FFM (C.D. Cal. 2016); *F.T.C. v. Telestar Consulting, Inc.*, 2:16-cv-00555-SJO-SS (C.D. Cal. 2016); *Consumer Fin. Prot. Bureau v. Moseley*, 4:14-cv-00789-SRB (W.D. Mo. 2014); *F.T.C. v. Tatto, Inc.*, 2:13-cv-08912-DSF-FFM (C.D. Cal. 2013); *F.T.C. v. AMG Serv., Inc.*, 2:12-cv-00536-GMN-VCF (D. Nev. 2012); *S.E.C. v. Khanna*, 3:09-cv-01784-BEN-WVG (S.D. Cal. 2009); *S.E.C. v. Global Money Mgmt. LP*, 3:04-cv-00521-BTM-WMC (S.D. Cal. 2004); *F.T.C. v. Seasilver*, 2:03-cv-00676-RLH-LRL (D. Nev. 2003).

augmenting Plaintiffs' litigation efforts. At a minimum, that record of dealing with Strategic's litigation adversary justifies greater scrutiny.

## V. The Receiver's Argument That The Law Firms' Agreements Are Void Misses The Mark.

The Receiver tries to justify his record of failing to provide service to the Law Firms and their 65,000 clients by arguing that the Law Firms' engagement agreements are void. The Receiver is wrong, and his arguments are misplaced.

*First*, at a bare minimum, the Receiver's argument is premature. There is no final judgment on the merits yet, and the issue of advance fees is on appeal.

*Second*, the Receiver overlooks two critical points: (1) the Law Firms stopped collecting fees in January 2024; and (2) the Law Firms are currently amending their fee agreements to provide for TSR-compliant contingent fees. Thus, even if the Law Firms' fee arrangements were previously improper (and the Law Firms dispute that point), the fact remains that the Law Firms' current clients have not paid fees in months and are now moving to a different fee model. Put simply, the Receiver cannot justify his current and future inaction by pointing to past fee disputes.

*Third*, the Receiver is grossly misstating the law. There is no blanket rule to the effect that any contract that violates any type of "public policy" is deemed void. The law is state specific and much more nuanced. The definition of "public policy," the degree to which a contract must violate public policy before voidness becomes an issue, and the available remedies all differ from state to state. And the analysis is fact-specific. Indeed, most of the decisions cited by the Receiver stand for the unremarkable proposition that where a provision in a contract violates public policy

8

only that particular provision may be voided.[4] In those few instances where courts have voided an entire contract, it is because the underlying purpose of the contract was itself offensive to public policy.[5] That is a far cry from the facts here where only a single provision in the clients' agreements is alleged to violate the TSR. Moreover, the decisions cited by the Receiver are factually and legally distinguishable. Most arise in factual circumstances far removed from this case and virtually none of them have anything do with attorney fee agreements.[6]

*Fourth*, the Receiver's argument proves too much. Even assuming *arguendo* that the Receiver is correct that the Law Firms' agreements are all void *ab initio* (and he is not), it does not necessarily follow that the correct course of action is to drop the 65,000 consumers and refuse to appear in court, defend lawsuits, settle debt, and provide services of any kind. And yet that appears to be what the Receiver is proposing. His solution for the allegedly-void contracts is to simply stop work and leave consumers to their own fate. That is not consistent with his duties to protect

---

[4] *See Fed. Deposit Ins. Co.*, 843 P.2d 1285 (Colo. 1992); *Columbus Life Ins. Co.*, 532 P.3d 757 (Ariz. 2023); *State Farm Mut. Auto. Ins. Co.*, 307 Md. 631 (1986); *Weaver*, 257 Ind. 458 (1971); *Vasquez*, 83 N.J. 86 (1980).
[5] *See Szerdahelyi*, 67 N.Y.2d 42 (1986) (usurious note); *Gulfco of La., Inc.* 2013 Ark.367 (2013) (predatory loans); *Bond* 246 So. 2d 631 (Fla. Dist. Ct. App. 1971) (pyramid scheme); *Stockton* 362 Ga. App. 779 (2022) (operate without a license); *Gamboa* 407 Ill. App. 3d 70 (2011) (fraudulent naturalization scheme); *Peltz* 40 Mo. 532 (1867) (sales contract to be paid in Confederate dollars).
[6] Only one case cited by the Receiver, *Christensen v. Eggen*, 577 N.W.2d 221, 225 (Minn. 1998), involved legal fees. But that case did not involve an agreement between attorney and client, it involved a fee splitting agreement between two attorneys.

consumers and mitigate harm or Strategic's contractual obligations. It is also the opposite result from what state law commands.[7]

## CONCLUSION

For the reasons set forth herein and in their motion, the Intervenor Law Firms respectfully ask this Court to grant their motion.

Dated:     Buffalo, New York
           April 8, 2024

>                                    /s/ Terrence M. Connors
>                                    Terrence M. Connors, Esq.
>                                    Andrew M. Debbins, Esq.
>                                    **CONNORS LLP**
>                                    *Attorneys for Intervenor*
>                                     *Law Firms*
>                                    1000 Liberty Building
>                                    424 Main Street
>                                    Buffalo, New York 14202

---

[7] *Gamboa v. Alvarado,* 407 Ill. App. 3d 70, 75 (2011) (Under Illinois law, a contract may not be voided where the person who paid for the services was not *in pari delicto* with the offender and the public policy in question is designed to protect the person who paid for the services).

10