UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.

                         Plaintiffs,

vs.

STRATFS, LLC f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC, et al.

                       Defendants, and

DANIEL BLUMKIN, et al.,

                       Relief Defendants.

Case No. 1:24-cv-00040-EAW-MJR

---

**RECEIVER'S REPORT RE: PROTECTION OF CONSUMERS
AND EMERGENCY REQUEST FOR INSTRUCTION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1
        A.      Efforts to Protect Consumers ............................................................. 1
        B.      Request for Instruction ....................................................................... 2
II.     THE COURT'S FACTUAL FINDINGS AND LEGAL RULINGS ............................... 3
III.    DISCUSSION ............................................................................................... 7
        A.      The Universe of Law Firm Debt Relief Model Enrolled Consumers .................... 7
        B.      The Proposal to Migrate Consumers to a Contingent Fee Model is Not
                Profitable, Particularly After Factoring in Consumer Refunds .............................. 8
        C.      Lawfulness of the Proposed Migration to Law Firm Contingent Fee Model ....... 13
        D.      The Law Firms Recently Sought to Amend the Engagement Agreements
                Without Proper Disclosure and Created the Need for This Emergency
                Request for Instruction .......................................................................... 15
IV.     REQUEST FOR INSTRUCTION: OUTREACH TO CONSUMERS
        ENROLLED IN LAW FIRM DEBT RELIEF MODEL ................................................. 18
        A.      Contents of Communications – Options for Consumers ...................................... 18
V.      CONCLUSION ............................................................................................. 20

Thomas W. McNamara, as Court-appointed receiver ("Receiver"), respectfully submits this report to provide an update on recent events and to present an Emergency Request for Instruction and authorization from the Court regarding a proposed course of action to protect consumers.

## I.    INTRODUCTION

### A.    Efforts to Protect Consumers

The Court instructed the Receiver to "protect consumers who are currently enrolled in the debt-relief program operated by defendants and the intervenor law firms[.]"  Decision and Order (Dkt. No. 183 at p. 55).  Over the last several weeks, the Receiver's team has been evaluating how to best protect consumers now that the Preliminary Injunction has been entered.  This has included exploring third-party nonprofit organizations and trade associations to determine if they may be feasible alternatives to which consumers can be referred.  The biggest expenditure of time, however, has involved an extensive review, analysis, evaluation, discussion, and meetings focused on economic projections of the proposal by Defendants and the Law Firms to migrate the law firm debt relief model consumers to a contingency fee model with attorney involvement. The outcome of the analysis is as follows: if consumer fees are 25% of enrolled debt, the proposal is not profitable absent additional liquidity.  And, if expected and necessary refunds to consumers, who have been charged unlawful advance fees and who do not want to migrate, are included in the model, the projected deficit balloons to more than $50 million.[1]

---

[1] This analysis has focused on the profitability of the proposal.  But the proposed business model change must also be lawful and, as indicated below, the Receiver cannot in good faith conclude it is.

### B.        Request for Instruction

A Request for Instruction is sought on an emergency basis because of the Law Firms' frantic solicitations over the last week and one-half to approximately 60,000 consumers, in which they requested the consumers immediately enter amended engagement agreements.  The Law Firms acted without notice to this Court or the Receiver (even though the Receiver's team was in active discussions with the Defendants and Law Firms about a potential migration away from the law firm debt relief model at the time).  As discussed more fully below, the Law Firms' cover letter to the consumers claimed to provide an "exciting update" about representation stating, "[e]ffective immediately, we are modifying the Firm[s'] free structure" to one which "has upside for you but no downside."  *See* **Exhibit 1**, Letter re: Law Firm Fee Amendment, at p. 1.  Included in the "update" were purported amendments to the client engagement agreements, which the firms asked the consumers to sign electronically "as soon as you can."  *Id.*

The Law Firms' communication failed to provide any of the information necessary for clients to enter amendments with informed consent.  No mention is made of the existence of this lawsuit, the TRO, the PI, or the findings that Defendants and Law Firms had charged the consumers unlawful advance fees.  The Receiver thus has serious concerns that the Law Firms, in this instance led by Blust's purported replacement Richard Gustafson, are misleading the consumers.

As set forth below, the Receiver respectfully requests instructions to guide the Receiver's compliance with the Court's directive to protect consumers.  To that end, the Receiver has presented a proposed order for the Court's consideration, which would permit the Receiver to communicate available options to the consumers and information relevant to their rights.

## II.      THE COURT'S FACTUAL FINDINGS AND LEGAL RULINGS

When issuing its Preliminary Injunction (Dkt. Nos. 183 & 184), and more recently when denying Defendants' request for a stay pending appeal (Dkt. No. 281), the Court made a number of factual findings and legal rulings (summarized below).  These findings and rulings guide the Receiver's recommendations in this report:

•      <u>Advance Fees Taken in Violation of the Telemarketing Sales Rule.</u>  In the law firm debt relief model, which accounts for 80% of the defendants' business, both Defendants and the Intervenor Law Firms receive advance fees collected from consumers.  Dkt. No. 183 at p. 12.

•      Taking advance fees in connection with a debt-relief service constitutes an abusive telemarketing act or practice under the Telemarketing Sales Rule ("TSR"), and "[i]t is a deceptive telemarketing act or practice . . . to provide substantial assistance or support to any seller" violating the rule when done with knowledge (or consciously avoiding knowledge of the violation).  *Id.* at pp. 6-7.

•      <u>The Face-to-Face Exemption Not Met.</u>  The Court rejected the Law Firms' arguments that the notary meetings satisfied the "face-to-face" exemption to the TSR advance fee prohibition and ruled that the notaries were not sellers under the TSR and the consumer meetings did not constitute a face-to-face meeting with a seller.  *Id.* at pp. 33-34.

"Defendants' system for meeting the face-to-face exemption to the TSR, while carefully and thoughtfully designed, is 'too cute by half.'  While the notaries may read from comprehensive presentation materials, the facts remain that (1) these notaries are not salespersons; (2) they have no ability to answer questions beyond what is already contained in the printed materials; and (3) they have no affiliation of any kind with the debt-relief program." *Id.*

• <u>Blust in Control of Law Firms.</u>  The Court determined preliminarily that Individual Defendants Ryan Sasson and Jason Blust are responsible for the corporate violations of the TSR.  Defendant Jason Blust performs "supervisory tasks for [the] law firms including hiring attorneys, addressing consumer complaints, and serving as a liaison between the intervenor law firms and Strategic." *Id.* at fn. 8; *see also* p. 47.  Further, the Court determined: "Blust controls the intervenor law firms and actively participates in business decisions concerning the intervenor law firms and Strategic…  When employees of Strategic are unable to resolve certain consumer complaints or issues, they often consult with Blust or send the matter to him for resolution." *Id.* at p. 47 (citations omitted).  Moreover, documentary evidence shows Blust discussing how the law firms and Strategic will divide the fees collected from consumers. Dkt. No. 281 at p. 6 (citing Dkt. No. 116-3 at pp. 3-4).

• <u>Irreparable Harm to Consumers.</u>  The Court found that, absent a preliminary injunction prohibiting defendants from collecting advance fees for their debt-relief services, consumers are likely to suffer irreparable harm.  Dkt. No. 183 at pp. 47-48.

• <u>Consumer Payments Went to Defendants and Law Firms</u>.  Strategic has enrolled approximately 65,0000 consumers via the law firm debt relief model.  *Id*. at p. 48.  These consumers have paid Defendants thousands of dollars in fees while enrolled, and "[e]vidence further shows that much of the funds consumers paid were applied to pay fees to defendants and/or the intervenor law firms, rather than towards building reserves to pay consumers' creditors." *Id.*

• <u>Little Evidence of Obvious and Appreciable Benefit to Consumers.</u>  Considering the totality of evidence, the Cout did not find that the debt-relief program operated by Defendants and/or the Law Firms provides an appreciable economic benefit to consumers.  *Id*. at

p. 52.  Instead, the Court found many consumers who enroll in the program are negatively

impacted, because they do not graduate and/or they pay more money in fees than they save in the

form of debt settlement or debt relief.  *Id.* at pp. 48-52.  "[E]vidence presented during the

preliminary injunction hearing showed that many consumers who enroll in defendants' debt

relief program are negatively impacted, either because they do not complete the program or

because they pay more money in fees than they save in the form of debt settlement or debt

relief.... Indeed, the Court found 'little evidence of an obvious and appreciable benefit to

consumers enrolled in the debt-relief program, and [found] evidence that many consumers leave

the program economically worse off than when they enrolled.'…Thus, there is no reason to

believe that granting a stay would serve the public interest."  Dkt. No. 281 at pp. 9-10 (citations

omitted).

•      Defendants' and Law Firms' Injury Claims Do Not Justify Continued Operation.

The Court considered Defendants' claims "that a preliminary injunction will result in a loss of

jobs; an inability of the intervenor law firms to function; and that enrolled consumers will be left

unserved."  Dkt. No. 183 at p. 53.  The Court found "these concerns do not justify the continued

operation of a business that is likely operating in violation of the law."  *Id.* at 54; *see also* Dkt.

No. 281 at pp. 8-9 ("Defendants further argue that, absent a stay, they, as well as their consumer

clients will suffer irreparable harm.  Defendants claim the receiver has essentially 'shut down the

business' and that a continuation of the preliminary injunction will result in the loss of jobs and

will leave unserved approximately 65,000 consumers already enrolled in the defendants' debt

relief program.  These concerns do not justify the continued operation of a business that the

Court has found likely to be in violation of the law.").

5

•    <u>Receiver Necessary</u>.  The Court determined the continuation of the receiver is necessary "to assist this Court, to ensure compliance with its order, to disentangle the companies and bank accounts, and to protect consumers who are currently enrolled in the debt-relief program operated by defendants and the intervenor law firms."  Dkt. No. 183 at p. 55.  "In fact, evidence submitted to this Court following entry of the TRO and the PI Decision tends to support the Court's finding that a receiver is necessary here to maintain the status quo and ensure compliance with the preliminary injunction."  Dkt. No. 281 at p.7 and fn. 4 (discussing the OSC filed against Blust and Lit Def Strategies).

•    <u>Order on Request to Stay PI</u>.  When the Court recently denied Defendants' request for a stay, it reiterated, among other things, its determination that "absent a preliminary injunction, there is a likelihood that the harm will be repeated and will continue into the future." Dkt. No. 281 at p. 8.  The Court also expressly addressed Defendants' two claims the receiver has essentially "shut down the business" and "that a continuation of the preliminary injunction will result in the loss of jobs and will leave unserved approximately 65,000 consumers already enrolled in defendants' debt-relief program."  *Id.* at pp. 8-9.  In response, the Court reiterated that, "These concerns do not justify the continued operation of a business that the Court has found likely to be in violation of the law."  *Id.*

The Court again highlighted that evidence presented during the PI hearing showed "many consumers who enroll in defendants' debt relief program are negatively impacted, either because they do not complete the program or because they pay more money in fees than they save in the form of debt settlement or debt relief…  Indeed, the Court found 'little evidence of an obvious and appreciable benefit to consumers enrolled in the debt-relief program, and [found] evidence that many consumers leave the program economically worse off than when they enrolled.'"  *Id.*

(citing Dkt. No. 183 at pp. 52-53).  In the last footnote in the Order denying the stay, the Court also discussed that Plaintiffs' amended allegations and the information presented in the Receiver's Preliminary Report raise a number of concerns about the debt relief business which go beyond illegal advance fees, including other TSR violations, fee splitting, the unauthorized practice of law, and prior misrepresentations to consumers about the role of the Law Firms.  *Id.* at p. 10, fn.6.

## III.    DISCUSSION

The Court has directed the Receiver to "[c]ontinue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; provided, however, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the businesses can be lawfully operated at a profit using the Assets of the receivership estate."  PI § IX.N.  Consistent with this directive, the Receiver has evaluated both the profitability and lawfulness of Defendants' and Law Firms' proposal to operate the debt relief business on a law firm contingent fee model.

### A.    The Universe of Law Firm Debt Relief Model Enrolled Consumers

In order to evaluate the Defendants' and Law Firms' proposal, StratFS's Director of Revenue Analytics & Data Governance and the companies' Controller generated a 2024-2025 Forecast and Model ("Forecast Model").  The Forecast Model went through a number revisions over the course of the evaluation and analysis of the proposal with the Receiver's team as data was refined and assumptions modified.

The model separates the law firm debt relief customers into three categories.  First is a small number of consumers from whom no unlawful advance fees have been taken: 2,326 consumers with a total enrolled debt of just over $68 million.  The second category are

consumers who had unlawful advance fees taken but had not paid *all* Defendants' and Law

Firms' front-loaded fees at the time of this lawsuit: 34,895 consumers with almost $1.1 billion in

enrolled debt who, as a group, have paid roughly 13% of the enrolled debt in unlawful advance

fees.  The third category of consumers are those who have paid more in unlawful advance fees

than the amount which can be charged in the proposal: 18,954 consumers with $235 million in

enrolled debt; these consumers have already paid unlawful advance fees to Defendants and Law

Firms exceeding the 25% fee cap used in the proposal.

> **B.   The Proposal to Migrate Consumers to a Contingent Fee Model is Not Profitable, Particularly After Factoring in Consumer Refunds**

The Receiver's team has devoted substantial efforts over the last several weeks reviewing

and analyzing the financial aspects of the Defendants' and Law Firms' proposal.  The Receiver,

counsel, and accountants engaged with StratFS's Director of Revenue Analytics & Data

Governance and the companies' Controller to understand the underlying assumptions and

projections contained in the complex Forecast Model.

The Receiver's accountants led the analysis and evaluation for his team.  In all, there

were seven iterations of documents provided in connection with the Forecast Model that varied

based on conversion rate (40% to 70%), service fee (25%, 30%, and actual contracted rates), and

expenses.  Beyond the initial meeting with the Receiver and counsel, the Director of Revenue

Analytics & Data Governance had two review calls with the Receiver's accountants to analyze

calculations and underlying assumptions, which, in turn, resulted in several updated versions of

the Forecast Model.  The underlying MS Excel workbook containing the Forecast Model

currently contains 70+ tabs with supporting debt payment schedules going out 100 months;

however, the financial forecast only goes out 21 months.  The debt amounts and client counts are

populated from Salesforce, and the settlement curves and client cancelations rates are based on

StratFSs historical results.  As the analysis and conversations with Director of Revenue Analytics & Data Governance proceeded, the original cash flow projection contained in the Defendants' and Law Firms' proposal of $57 million at the end of the 21-month period was revised and is now at a cumulative negative $2 million cash flow over the period.

The review culminated in a presentation meeting led by the Director of Revenue Analytics & Data Governance with a number of relevant parties.  The Receiver, his counsel and accountants, CIBC and Valley Banks, their counsel, StratFS defense counsel, and Defendant Sasson participated.

The Defendants' and Law Firms' proposal is grounded on the continued participation of the Law Firms, which as discussed below has disabling lawfulness issues.  The reason Law Firm involvement is essential to the operation is because of the belief by Defendants and the Law Firms that lawyer-directed debt relief operations are generally not subject to state licensing laws which govern non-attorney debt relief operations or the associated stringent fee caps imposed under those laws.  In other words, by using the law firm debt relief model, the Defendants and Law Firms hope to avoid state licensing and associated fee caps; these caps are dramatically lower than the fees they have been charging – and also lower than the 25% (of enrolled debt) fee used in the Forecast Model.  For example, Defendants and Law Firms have generally charged a percentage of enrolled debt fees in the mid-thirty percent range, and proposed a 34% rate in the model, while, in contrast, non-lawyer debt relief in many states cap fees at less than one half of those rates.[2]

---

[2] The Uniform Debt Management Services Act ("UDMSA") suggests a fee of 30% of the *amount saved by the consumer.*  Some states offer alternative fees.  For example, in Nevada and Tennessee, the debt relief company may charge either 17% of the enrolled debt or 30% of the amount saved by the consumer.

Defendants are unable to pivot away from the Law Firms at this point because they are not licensed in all necessary states (and it is also unlikely states would now approve licenses given this lawsuit).  It appears that as of Fall 2023, neither Atlas nor Timberline direct-to-consumer ("DTC") operations had licenses in the majority of states that required them, including Idaho, Virginia, Washington, DC, New Hampshire, Iowa, Maryland, Pennsylvania, Montana, Texas, Rhode Island, Delaware, Tennessee, Nevada, Utah, Kentucky, Minnesota, Connecticut, Georgia, Kansas, Maine, South Carolina, Ohio, Vermont, Oregon, and Wisconsin.  In the years prior to this lawsuit, Defendants faced challenges obtaining licenses and, for instance, decided to abandon the efforts to obtain licensing from Virginia.  And, of course, obtaining licenses on a state-by-state basis would take time.

Based on review of StratFS internal records, as of the time the TRO was entered, Atlas was enrolling DTC consumers in only 11 states (Alabama, Arizona, California, Florida, Indiana, Michigan, Nebraska, New Mexico, New York, North Carolina, and South Dakota).  The records reflect DTC consumers were not being enrolled in other states, but StratFS was attempting to obtain licenses in several other states at the time the TRO was entered, with the applications in various stages (Connecticut, Georgia, Illinois, Kansas, Kentucky, Maryland, Missouri, Nevada, Tennessee, Texas, and Utah).

But even if licensing at the state level was somehow available, the Defendants' cost structure is so high it seems highly unlikely they could operate the DTC model profitably under the low fee caps imposed by many states.  While states calculate and impose fee caps in various ways, by any calculation the fees allowed under states with caps are significantly lower than those included in Defendants' and Law Firms' proposal.  For instance, Ohio prohibits a fee

adjuster from charging more than 8.5% of the amount paid by consumer each month or $30;[3] Vermont has a 10% cap of amounts paid to creditors;[4] Minnesota,[5] New Hampshire,[6] and Washington[7] cap fees at 15% of enrolled debt; Iowa,[8] 18% of enrolled debt; and Idaho,[9] Virginia,[10] and Montana,[11] 20% of enrolled debt.  Washington State's 15% cap includes additional charges and support services, such as fees paid to payment processors like RAM and Global.[12]

Defendants and Law Firms presented an initial Forecast Model proposal with a fee of 34% of enrolled debt.  In other words, they are aggressively proposing to migrate this captive group of consumers, whom the Court has determined have already had illegal advance fees taken from them, into a debt settlement program charging fees that will be far higher – and possibly

---

[3] Ohio Rev. Code § 4710.02(B)(3).

[4] 8 Verm. Stat. § 2762.

[5] Minn. Stat. § 332B.09, Subd. 2.

[6] N.H. Rev. Stat. § 399-D:15, D:16.

[7] Rev. Code Wash. § 18.28.080.

[8] Iowa Code § 533A.9.

[9] Idaho Stat. § 26-2229.

[10] VA Code Ann. § 6.2-2041. Virginia alternatively permits a fee of up to 30% of the amount saved.

[11] MT Code Ann. § 30-14-2103.

[12] Rev. Code Wash. § 18.28.080.

even double – the market rate for such services.[13]  The Receiver simply cannot in good faith

support to the Court the extraordinarily high fees proposed by the Defendants and Law Firms.[14]

The Receiver instead insisted that the Forecast Model employ a 25% of enrolled debt

figure.  StratFS defense counsel has filed a declaration claiming this figure is arbitrary.  (Dkt.

No. 276-1 ¶ 12).[15]  It is not.  The 25% fee is the same as charged in the DTC model used by

Timberline/Atlas.  Moreover, it is the same fee used by Royal Legal Group, which purports to be

the exact contingent fee law firm model Defendants and Law Firms seek to employ; even

Royal's successor, Hailstone Legal Group, the other non-advance fee law firm among the Blust-

controlled law firms, charges 27%.

The Forecast Model has now been through numerous revisions as the Receiver's team

has worked with the Director of Revenue Analytics & Data Governance to probe assumptions

and sharpen projections.  The Director of Revenue Analytics & Data Governance has confirmed

there has been little consumer attrition since the case was filed,[16] and he believes for purposes of

---

[13] *See, e.g,* https://www.cnbc.com/select/what-is-debt-settlement/ ("Debt settlement can be expensive.  Often, debt settlement companies charge between 15% and 25% of the resolved debt; https://www.forbes.com/advisor/debt-relief/debt-settlement-how-it-works-and-risks/) (companies typically charge a 15% to 25% fee to tackle your debt);  https://www.cbsnews.com/news/how-much-does-a-debt-relief-program-cost/https://www.experian.com/blogs/ask-experian/debt-settlement-risks/ (debt settlement companies typically charge 15% to 25% of the amount settled).

[14] This is particularly true because there is very little law firm involvement in the debt settlement process.  The debts to negotiate are identified by the SAM algorithm, the negotiators are supervised by StratFS staff, and the proposed settlements are only presented to lawyers for approval after the client has signed the settlement.

[15] Defense counsel's attachment to his declaration of the initial proposal offered by Defendants and Law Firms showing $57 million in cash flow (see attachments A and B to Dkt. No. 276 (276-2 and 276-3)) is puzzling, as he is aware of numerous Forecast Model revisions and was present at the bank presentation where the final model was presented demonstrating a $2 million negative cash flow after 21 months.

[16] The lack of attrition to date suggests the Receiver's efforts to protect consumers while allowing the parties to proceed through the PI (which was extended for weeks by the parties'

the Forecast Model that 70% of the consumers would agree to be migrated to the law firm contingent fee model.[17]  Even after using this proposed migration rate and sharpening assumptions in the numerous iterations of the Forecast Model, there is a negative cash flow of $2 million at the end of 21 months.

The Forecast Model is also missing a crucial component.  It does not make allowance for refunds to consumers who refuse to go to the law firm contingent fee model or otherwise request a refund when they become aware the Defendants and Law Firms took unlawful advance fees. The Director of Revenue Analytics & Data Governance projected the refund requests would be $52 million.[18]  If refunds were included in the projections, the results would be dramatically worse – presumably, a $54 million shortfall.

The Receiver has seriously analyzed and considered the proposal of Defendants and the Law Firms.  But the Forecast Model indicates the business cannot be operated profitably using the Assets of the receivership estate with a 25% of enrolled debt fee structure.

### C.  Lawfulness of the Proposed Migration to Law Firm Contingent Fee Model

Beyond profitability issues, there are also fatal questions of lawfulness regarding the proposed migration to a law firm contingent fee model.  The Court preliminarily found that the Defendants and Law Firms (which it concluded are controlled by Individual Defendant Blust)

---

extended settlement discussions) were successful.  It also starkly contrasts with the constant hyperbolic defense and Law Firms' claims that the Receiver was destroying the business.

[17] The Receiver believes the 70% figure overestimates the likely migration of consumers (during the analysis, the assumptions varied from 40% to 70%).  Even using this higher migration assumption, the model is not profitable, and if 40%, or 50%, or 60% assumptions were used the results would be substantially worse.

[18] This figure has a direct relationship to how many consumers decline the Defendants' and Law Firms' offer and ask for a refund of the unlawful advance fees. The more consumers request the unlawful advance fees be refunded, the greater the loss figure.

took unlawful advance fees, which likely means that the engagement agreements are void as a matter of state contract law. *See* Receiver's Opposition to Motion to Compel (Dkt. No. 256 at pp. 9-11) (collecting state cases finding contracts which are unlawful and/or violate public policy void).

The Receiver also found evidence of the unlawful practice of law and fee splitting between the Law Firms (via Blust) and StratFS (via Sasson). Dkt. No. 256 at p. 11. fn. 11. These findings must be considered in the Receiver's analysis of whether the business can be operated lawfully. And it is clear Defendants and Law Firms intend to perpetuate the fee splitting in their modified business. The Forecast Model assumes an 80/20 split – 80% to StratFS and 20% to the Law Firms. This is the same split that the Defendants and Law Firms employed before this lawsuit. Indeed, Blust explained in an email to Sasson that this 80/20 split was a "bedrock" principle between StratFS and Law Firms. The inclusion of the same split in Defendants' and Law Firms' proposal demonstrates an intent to continue improper fee splitting, and the Receiver is unable to conclude in good faith that the business can operate lawfully.[19]

---

[19] The Court's findings also indicate the law firms themselves had a largely ceremonial role in acquiring these clients and only interfaced with their clients after the retainer agreement had been signed with an "Attorney Welcome Call." Dkt. No. 183 at p. 29 and fn. 27. As detailed in the Receiver's Preliminary Report, the law firms were touted in sales pitches as a national network of lawyers to settle consumer debts, but in reality StratFS identified the debts to be settled via a proprietary algorithm known as SAM, and StratFS then supervised and carried out the negotiation process; the law firms largely rubber-stamped the settlements only after they had been negotiated and approved by the client. Dkt. No. 115-1 at pp. 41-43. This leads to the question of whether the lawyers are actually engaged in the practice of law or whether StratFS was engaged in the unlawful practice of law.

**D.      The Law Firms Recently Sought to Amend the Engagement Agreements Without Proper Disclosure and Created the Need for This Emergency Request for Instruction**

While conversations were active among and between the Defendants and Law Firms, the Receiver, and the Secured Creditors (CIBC and Valley Bank), the Law Firms, without providing notice, contacted the consumers and requested they immediately enter into amended engagement letters containing contingent fee terms.  The Law Firms' sales pitch began: "We have an exciting update to share regarding the Firm's representation of you!"  *See* **Exhibit 1**, Letter re: Law Firm Fee Amendment.  *Id*.  The letter further exudes, "We believe that the change in the fee arrangement has upside for you with no downside."  *Id*.  The consumers were encouraged to sign the amendments "as soon as you can" via the attached electronic link.  *Id*.

Incredibly, this communication to roughly 60,0000 consumers enrolled in the law firm debt settlement program made no mention whatsoever of this lawsuit, the TRO, the PI, or the Court's March 4, 2024 findings that consumers had paid Defendants and Law Firms unlawful advance fees.  Nor did the Law firms mention the engagement agreements are likely void under state law and the consumers might be entitled to refunds.  Without that information, a consumer or any attorney consulted by a consumer would not be able to make an informed decision about whether to enter the proposed amendment.

The Law Firms' frantic initial request for amendment was sent to consumers less than 24 hours after the Receiver's Opposition to the Motion to Compel was filed, which argued the engagement agreements were void under state law and raised the possibility of referring the consumers to third-party nonprofits and trade organizations.  *See* Dkt. No. 256 at pp. 4, 8-10. The haste with which the Law Firms' letters were produced (they were undated and contained no return contact information) and sent suggests they were created as a result of the Receiver's opposition.

Only after the consumer letters were delivered did Richard Gustafson write the Receiver to "apprise you of a development in our client representation" and, without providing the actual communications with the clients, vaguely noted that the "Law Firms have been in contact with their clients to apprise them of this development and to obtain client consent to this change in fee structure." (*See* **Exhibit 2**, Email from R. Gustafson, Apr. 2, 2024.)  The Receiver later received a copy of the letter to consumers from StratFS customer service and then contacted the Law Firms' counsel and Gustafson (who apparently orchestrated the affair) to identify serious concerns about the lack of disclosure to the consumers.  (*See* **Exhibit 3**, Email from Receiver, Apr. 2, 2024.)  As of the date of this filing, the Receiver has received no response from counsel for the Law Firms or Gustafson to this email.

The Law Firms continue to send reminders to consumers who have not signed the amendment, touting "great updates happening with your debt relief program," and asking for consumers to sign.  (*See* **Exhibit 4**, Reminder Email to Consumers, Apr. 4, 2024.).

Consistent with Court's Order requiring the Receiver "to protect consumers who are currently enrolled in the debt-relief program operated by defendants and intervenor law firms," (Dkt. No. 183 at p. 56), the Receiver sent a notice, dated April 10, 2024, via StratFS's customer services emails to consumers ("Consumer Notice").  (See **Exhibit 5**, Updated Notice to Consumers.)  Among other things, the Consumer Notice is a factual recitation of the status of the lawsuit, the implementation of the TRO and PI, and the consumers' rights to their money in the dedicated accounts and settlement payments.  The Consumer Notice indicated that the "defendants" would not settle debts.  The Consumer Notice also made clear that the Law Firms are not defendants in the lawsuit.  The Receiver also indicated that he would be seeking instructions from the Court and providing a further update upon receipt of those instructions.

In response to this, the Law Firms once again reached out to consumers.  *See* **Exhibit 6**. The Receiver was provided a copy of the Law Firm's email by a consumer who reached out to him for a copy of the Consumer Notice, and stated, among other things:

> I am a "client" of Slate Legal Group and have been subject to all the issues and problems outlined in the Complaint against the other companies in case 1:24-cv-00040-JLS-MJR.

*See* **Exhibit 6**.

In this email to consumers, the Law Firms claim the Receiver's Notice is "misleading and false."  The Consumer Notice speaks for itself – and contains only facts that the consumers are obviously entitled to know.  *See* **Exhibit 5**.  Indeed, the Receiver is ordered to protect the consumers.  The latest email from the Law Firms again risks confusing and misleading the consumers.  While the email accurately states that the "Law Firm is NOT being sued in New York[,]" the Law Firms then claim: "Rather, in that lawsuit, the government is suing ***the vendor that Mr. McNamara is associated with***.  To repeat, the government has not brought any claims against our firm."  *See* **Exhibit 6** (emphasis added).  The desperate and strained attempt to distance the Law Firms from StratFS contradicts the Court's detailed findings about how the businesses in Receivership propped up "Strategic affiliated law firms" (*see* Dkt. No. 183 at p. 10 fn. 8) in an effort to qualify for the TSR's Face-to-Face exemption.  The Court specifically made findings about the law firms, their close relationship with Strategic, and their own improper conduct, including that the law firms themselves had taken illegal advance fees.  *See id.* at p. 45. Taken individually, and taken together, the Law Firms' communications requesting consumers execute amendments, at a minimum, fail to provide the necessary information which will allow the consumers to make informed decisions and create substantial risk of further victimization.

Counsel for the Law Firms then emailed the Receiver's counsel, claiming, among other things, that the Receiver was not to contact consumers directly, the Receiver's update contained

false statements, and the Receiver was tortiously interfering with the Law Firms' relationships with their clients.  *See* **Exhibit 7**.  In response, Receiver's counsel pointed out that the Receiver had appropriately contacted consumers to provide basic factual information consistent with his court-ordered duty to protect consumers and that the Receiver's provision of such information was neither false not tortious interference.  *See* **Exhibit 8**.

## IV.     REQUEST FOR INSTRUCTION: OUTREACH TO CONSUMERS ENROLLED IN LAW FIRM DEBT RELIEF MODEL

The Receiver respectfully seeks the Court's instruction on further protective steps.

The Receiver has evaluated potential options to protect consumers.  Of course, the Receiver is not in a position to give consumers specific advice on their debt settlement circumstances or provide legal advice.  Instead, he seeks the Court's permission to identify resources which may be able to assist the consumers.  At present, the Receiver has identified two third-party organizations which may be able to offer assistance to the consumers and have expressed interest in doing so.

### A.     Contents of Communications – Options for Consumers

First, the Receiver recommends he be allowed to provide consumers the contact information for an accredited nonprofit counselor, National Foundation of Credit Counselors ("NFCC") (*see* https://www.nfcc.org/).  After several discussions with the organization's leadership, NFCC has agreed to set up a 1-800 hotline as well as website landing page specific to the StratFS consumers.  NFCC will refer consumers to nonprofit credit counselors in the consumers' geographic areas and will commit to providing at least one credit counseling session at no charge.  NFCC has indicated that nonprofit counselors are very likely to steer consumers away from Law Firm Debt Relief Models and DTC models.  It is likely they will recommend options that will settle debts at far lower fees than the amounts charged by Defendants and Law

Firms.  NFCC has indicated there are potentially additional steps it can take in support of consumers (*e.g.*, negotiating with creditors on a bulk basis across clients), although some options may have some additional operational costs associated with them.

The Receiver also recommends that he be allowed to provide consumers the contact information to a consumer bankruptcy trade association, the National Association of Consumer Bankruptcy Attorneys (NACBA) as another resource.  (*See* https://nacba.org/.)  Based on discussions with several members of NACBA's Board, NACBA will agree to set up a dedicated phone number and refer consumers to bankruptcy attorneys in their geographic area.  NACBA has committed that its members will offer an initial consultation at no charge; board members also indicated that in this first session the lawyer will be able to determine if bankruptcy or some other path is appropriate for the consumer.[20]

Finally, the Receiver also recommends he be allowed to provide a letter to consumers explaining the background and existence of the lawsuit should they wish to approach their creditors directly.

In a separate, but related fashion, instruction is requested on whether the Receiver should provide any information to consumers to address the Law Firms' recent outreach to request consumers sign amendments converting to a contingent fee model.  As discussed above, this disclosure was grossly incomplete by failing to apprise consumers of this lawsuit and relevant rulings which should be considered before agreeing to the requested amendment.  If so

---

[20] The Receiver recognizes that the referral options are imperfect, but unfortunately, there is no elegant solution for the consumers here.  If consumers choose, after free initial consultations, to engage NFCC credit counselor to create and supervise a debt management plan, there will be some cost associated with the assistance.  Similarly, if consumers choose, after the free initial consultations, to engage with a NACBA lawyer to file bankruptcy, there will be a charge.  But the Receiver has not identified a no-fee solution, aside from consumers contacting creditors directly.

instructed, the Receiver would inform consumers of the Court's finding that they paid unlawful advance fees and recommend they consult counsel to determine the impact of the ruling on their potential rights and options, including the right to decline the amendment and the right to request a refund of fees previously paid from the Law Firms.  Obtaining informed consent from consumers is, of course, a fundamental precondition to valid amendments.

The Law Firms and the Defendants have indicated a strong desire to transition the business to a  lawyer debt relief contingent fee model.  The Receiver anticipates they will vigorously contest providing alternatives to the consumers.  But, as discussed above, the Receiver is unable to conclude in good faith that the migration proposal is either lawful or profitable and therefore cannot recommend the proposal.

## V.    CONCLUSION

The Receiver recommends the above steps in an effort to mitigate harm to the consumers, fully recognizing that these steps will be incomplete and imperfect at best.

Dated: April 15, 2024

**MCNAMARA SMITH LLP**

By:    /s/ *Alexander D. Wall*
Alexander D. Wall (*Pro Hac Vice*)
Logan D. Smith  (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email: awall@mcnamarallp.com;
lsmith@mcnamarallp.com

*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*