UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>      Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>      Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>      Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**RECEIVER'S OPPOSITION TO INTERVENING LAW FIRMS'
MOTION FOR AN ORDER TO SHOW CAUSE WHY THE RECEIVER
SHOULD NOT BE COMPELLED TO PROVIDE
SUPPORT SERVICES TO INTERVENING LAW FIRMS**

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1
II. DISCUSSION .......................................................................................................... 2
    A. Defendants' Contingent Fee Migration Proposal Is Not Profitable or Lawful ............................................................................................................ 2
    B. Strategic's Other "Evidence" Offered in Support of the OSC Motion Omits Key Information and Inaccurately Portrays Other Information ................... 3
III. CONCLUSION ........................................................................................................ 8

i

Thomas W. McNamara, as the Court-appointed receiver ("Receiver") submits this Opposition to Intervening Law Firms' Motion for an Order to Show Cause Why the Receiver Should Not be Compelled to Provide Support Services to Intervening Law Firms (Dkt. No. 276).

## I.     INTRODUCTION

The Receiver respectfully writes to oppose the latest filing by the Strategic group of Defendants ("Strategic" or "Defendants"), which is styled as a "Motion for Order to Show Cause" (hereinafter, the "OSC Motion") and seeks to compel the Receiver to provide support services to the intervening law firms ("Law Firms"). The Court has not set a date for the Receiver to respond but has indicated this matter will be addressed at the conference on April 22, 2024. Accordingly, in the interest of judicial efficiency, the Receiver provides the following brief response to provide the Court with additional context for the conference discussion.

No matter the name, Defendants' motion is simply more of the same. Essentially, this OSC Motion seeks relief similar to that requested by the Law Firms in their recent motion to compel; in reality, it is also just a variation on StratFS's and Law Firms' constant efforts over the past three months to restart the Law Firm Debt Relief model in the face of a TRO and now PI.[1] The Receiver respectfully requests the Court deny the OSC Motion and not order further show cause briefing, which would entail further time and resources be unnecessarily expended.

---

[1] Defendants acknowledge (s*ee* Dkt. No. 276-6, at p. 2) that the issues discussed in their OSC Motion largely overlap with the substance of the Law Firms' pending Motion to Compel, which the Receiver has opposed. (Dkt. No. 256.) The Receiver's recently-filed Report re: Protection of Consumers and Emergency Request for Instruction ("Request for Instruction") also covers much of the substance of the OSC Motion, particularly Defendants' client conversion proposal and its attendant lawfulness and profitability problems. (*See* Dkt. No. 292-1.)

1

## II.     DISCUSSION

### A.     Defendants' Contingent Fee Migration Proposal Is Not Profitable or Lawful

The Court specifically ordered that the Receiver could return to operations only those aspects of the debt settlement businesses that can be operated lawfully at a profit.  PI § IX.N.  Over the course of the last three months, that is exactly what the Receiver has done, with limited operations resuming where the Receiver determined they could be performed lawfully at a profit *i.e.*, the Atlas direct-to-consumer ("DTC") model and where the return of Customer Service and IT personnel was necessary to protect consumers and allow them to continue to make debt relief payments.

Defendants and Law Firms seek to compel the Receiver to implement a plan to migrate a existing unlawful advance-fee model consumers to a contingency-fee model.  The "evidence" offered by Defendants in support of the OSC Motion – a declaration by counsel (Dkt. No. 276-1) – is both incomplete and inaccurate.  The bulk of counsel's declaration (¶¶ 3-13) is a listing of contacts with Receiver's counsel.  Despite offering 11 full paragraphs about telephone messages, Defense counsel offers only one sentence about the meeting with the banks, where the financial aspects of the proposal were discussed in detail.  It is hardly a fair and accurate description.  And there is little discussion of the fact that at the time Defendants filed the OSC Motion, the Receiver and his team were still conducting a comprehensive review and analysis of a Financial Model to assess its profitability.

The Receiver recently filed a Request for Instruction (Dkt. No. 292) which addresses in detail the issues of profitability and lawfulness of the Defendants' and Law Firms' proposal.  As such, rather than reiterate that discussion, the Receiver respectfully refers the Court to the Request for Instruction and incorporates the information presented there.

### B. Strategic's Other "Evidence" Offered in Support of the OSC Motion Omits Key Information and Inaccurately Portrays Other Information

The remainder of the defense counsel's declaration (Dkt. No.276-1) misrepresents and omits facts that are material to the OSC Motion. Among other things, the Receiver's efforts to date are grossly distorted by defense counsel, who claims the Receiver's "modus operandi in this case is to delay in an apparent effort to run Strategic financially into the ground." (Dkt. No. 276-1 ¶ 16).[2] The facts belie this.

The Receiver has made determined efforts to run the Strategic businesses in a way, which balances the need to preserve Receivership estate assets, while protecting the interests of thousands of consumers, and to restart operations that could be done lawfully and profitably. To that end, on January 22nd, after only four intervening business days since the Receiver's initial entry, the Receiver authorized a total of 78 employees to be brought back. *See generally* Dkt. No. 26 (Report of Temporary Receiver re: Status of Client Services) at 4-6. Since that time, under the leadership of StratFS's Vice President of Client Services, Melissa Riley – who has acted with utmost professionalism under stressful and challenging circumstances – Client Services personnel have handled approximately 75,000 phone calls, reviewed/responded to more than 86,000 emails, and addressed more than 3,000 summonses/litigation documents according to Ms. Riley's reports to the Receiver. As to payments processed for consumers since implementation of the TRO, under the leadership of StratFS's Vice President of Technology and

---

[2] The Court has repeatedly heard Defendants' and the Law Firms' prior claims to this effect. *See, e.g.*, Dkt. No. 281 at pp. 8-9 ("Defendants further argue that, absent a stay, they, as well as their consumer clients will suffer irreparable harm….Defendants claim the receiver has essentially 'shut down the business' and that a continuation of the preliminary injunction will result in the loss of jobs and will leave unserved approximately 65,000 consumers already enrolled in the defendants' debt relief program…These concerns do not justify the continued operation of a business that the Court has found likely to be in violation of the law").

3

Security, Brian Reiss – who like Ms. Riley has performed admirably and professionally under very challenging circumstances – StratFS has continued to ensure that payments are being processed for consumers since the implementation of the TRO.  Specifically, there have been 195,328 settlement payments made to creditors, with 147,779 draft payments systematically[3] scheduled and 215,367 payments systematically cleared through April 17, 2024.  There were also 6,453 clients who requested and were assisted to modify drafts or payments through April 17, 2024.  The reports from Mr. Reiss confirm that consumers have been able to make payments for previously reached settlements, thus avoiding the consequences of failing to abide by settlement agreements with creditors, such as avalanche clauses being invoked to claim that all amounts are due immediately.  Ensuring this been a major priority for the Receiver since the beginning of the Receivership.

What has not been done, however, is to turn back on those aspects of the business that the Receiver could not conclude could be operated lawfully.  In other words, there was no way for the Receiver to return to work anyone associated with the negotiation or settling of new debts, given that the Law Firm Debt Relief Model was alleged (and has now been preliminarily found) to have taken advance fees.  The Receiver did promptly return to work Atlas and Timberline's DTC businesses that do not take advance fees and do not involve the Law Firms.  Despite the existence of a TRO and now PI which prohibited the Receiver from doing so, Defendants and

---

[3] Use of the word "systematically" refers to StratFS's IT systems, through Salesforce, which serve as the "brain" that connects to the payment processors (Global and RAM) to indicate when Drafts and Settlement Payments should occur and also that receives data back from the payment processors on the status of these payments.  StratFS runs a daily batch process using Salesforce that interfaces with the payment processors to ensure that money can first be scheduled to be moved from consumers' individual bank accounts to their accounts at the payment processors, and then can be scheduled to be moved from the payment processors to various creditors in support of previously reached settlements.

Law Firms have constantly criticized the Receiver's failure to restart the Law Firm Debt Relief Model aspects of the business.  But Defendants' and Law Firms' belligerent disagreement with these good-faith decisions is entitled to no deference – particularly in light of the TRO and PI which directed the Receiver's actions.

The specific examples offered in defense counsel's declaration provide Defendants with no support.  First, counsel for Defendants faults the Receiver for the decision not to pay rent on Strategic's offices, prompting issuance of a notice to lift the stay and motion to lift the stay.  Dkt. No. 276-1 at ¶ 15.  This criticism is astonishing.  While the TRO was in place and parties were still negotiating towards a settlement, the Receiver reached out to Strategic's President on February 22, 2024, with the approval of Strategic's counsel.[4]  The express purpose of the call was to determine whether Strategic wanted the Receiver to pay the rent for the sites (which the Receiver assumed might be used depending on the contours of a settlement).  During that call, the Receiver and the President discussed monthly rent ($335,000 per month for the two sites), and that neither location was being used by the roughly 130 staff brought back to work.  The Receiver inquired whether Strategic wanted the rent paid and stated that if it did, he would raise the issue with CIBC.  The President's initial reaction was that she did not believe the rent should be paid but wanted to discuss it with others at the company.  A short time later, she called back to indicate that Strategic did not want the Receiver to pay the rent.  The Receiver honored this request. For defense counsel to now attack the Receiver for Strategic's decision is beyond frustrating, but emblematic of Defendants' constant stream of baseless accusations against the Receiver.

---

[4] In fact, the President was specifically asked to confirm with Mr. Vacco that she could speak directly with the Receiver.  The President confirmed that she had Mr. Vacco's permission prior to the call.  *See* Exhibit 1.

5

Next, in response to defense counsel's criticism that certain tax forms have not been filed (Dkt. No. 276-1 at ¶ 15), the Receiver's staff has confirmed that all necessary tax forms are in the process of being filed or have already been filed. What's more, Defendants nowhere explain how the filing of tax returns relates in any way to their proposal to revive the Defendants' and Law Firm's debt relief operation.

Lastly, as to the criticism regarding employee compensation (*id.*), the Receiver has exercised his judgment to set compensation for customer service and Atlas and Timberline employees appropriately. Indeed, staff who returned are paid the same base salaries they were paid prior to the lawsuit. And defense counsel's claim that negotiators are needed "to service clients of Atlas, Timberline, **and the Law Firm clients through the Conversion Plan**" is wrong but quite revealing. *Id.* (emphasis added). Defendants and Law Firms have vigorously contended that "Negotiators" for the Law Firm Debt Relief Model are Law Firm employees, not Strategic employees. If that is the case (and it is subject to some doubt given the reporting structure and overlapping pay), then the Receiver does not have the power to hire these "Law Firm employees." While defense counsel's criticism is again off-base here, it does suggest that even he recognizes the divide between Strategic and Law Firm employees was a split on paper only.

In sum, there is simply no substance to the Defendants' and Law Firms' claims, oft repeated but nevertheless wrong, that the Receiver is intent upon running the Strategic business into the ground. These claims are essentially the same arguments Defendants have been making almost immediately since learning about the Court's issuance of the TRO on January 12th, and they appear to be part of a litigation strategy. Some background facts are worth noting to highlight the outlandish inaccuracy of these complaints.

6

The Receiver was appointed on Thursday, January 11, 2024 and gained access to Strategic's New York City and Buffalo offices the very next day. Since that time, he, along with a team including attorneys, accountants, and specialists, has worked methodically and promptly to carry out the tasks required by the Court. These immediate tasks began on Friday January 12th, and continued over the Martin Luther King Jr. holiday weekend. During that time, the Receiver was sensitive to the fact that this was a complex web of businesses with thousands of consumer customers and hundreds of employees and wanted to minimize the harm caused to consumers and the disruption to lawful and profitable aspects of the business as much as possible. To that end, the Receiver began outreach at once to Strategic's counsel to fulfill the immediate priorities on an expedited basis of identifying, talking to, and obtaining cooperation from numerous Strategic employees. After only limited discussions with defense counsel on Sunday of the holiday weekend, it became increasingly difficult for the Receiver and his counsel to reach defense counsel over the coming days. While the unresponsiveness was puzzling at the time, the reason soon became clear – Defendants filed a rapid motion to dissolve the TRO and terminate the Receivership grounded on, among other things, wildly inaccurate claims about the Receiver.[5]

---

[5] In their Motion to the TRO and terminate the Receiver, Defendants wrongly claimed:

> On day one, the Receiver completely shut down Strategic. He has shut down bank accounts, frozen employees out of Strategic's IT systems, cut off access to all email, refused to provide service to Strategic's law firm clients. In general, the Receiver has taken every step possible to ensure Strategic cannot function. In short, the Receiver is not managing Strategic, he is killing it. Unless the Court acts quickly, he will succeed… This Court should dissolve the existing TRO and dismiss the Receiver. Strategic (and the other Defendants) are entitled to their day in court. They cannot have the legal process circumscribed by a Receiver who acts as judge, jury, and executioner. Injunctive Relief is not the death penalty and Receivers are not executioners.

The Receiver's ability to understand the business and protect consumers quickly was made much more difficult, time consuming, and expensive, because of Defendants' conduct. Over the last three months, unfortunately not much has changed. Defendants' inaccurate claims and criticisms of the Receiver have continued in a variety of forms, including this latest OSC Motion.

### III. CONCLUSION

For the foregoing reasons and in other related briefings (*see* Dkt. Nos. 256 & 292-1), the Receiver respectfully requests that the Court deny Intervening Law Firms' Motion for an Order to Show Cause Why the Receiver Should Not be Compelled to Provide Support Services to Intervening Law Firms.

Dated: April 18, 2024

**MCNAMARA SMITH LLP**

By: ‎ /s/ Logan D. Smith
Logan D. Smith  (*Pro Hac Vice*)
Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email:  lsmith@mcnamarallp.com;
awall@mcnamarallp.com
*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*

---

Dkt. No. 36-1 at pp. 4-5.  The reality was quite different: in those immediate four days, the Receiver had been doing what the Court had not only asked, but ordered, him to do.  The Receiver was in the process of conducting his initial investigation and accomplishing the many tasks the Court ordered the Receiver to complete in Sections VIII – XVII of the TRO.  Indeed, the things that Defendants criticized the Receiver for doing had been expressly required by the Court.  Put another way, if the Receiver had done what Defendants sought he would have violated the Court's orders and failed to perform his assigned duties.  For instance, as to the claim that the Receiver has "frozen employees out of Strategic's IT systems" (*id.*), the Court specifically ordered the Receiver to "***secur[e] each location*** by changing locks and alarm codes and ***disconnecting any internet access to the computers, servers, internal networks, or other records maintained at that location***."  TRO Section IX.C.4 (emphasis added).