UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

                Plaintiffs,

v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.,

                Defendants

and

DANIEL BLUMKIN, et al.,

                Relief Defendants.
_____

**SUPPLEMENTAL DECLARATION OF COUNSEL FOR JASON BLUST AND LIT DEF STRATEGIES, LLC**

Civ. No. 24-CV-40-JLS-MJR

RODNEY O. PERSONIUS, ESQ. declares under the penalty of perjury pursuant to 28 U.S.C. §1746 the truth of the following:

    1.    I am a member of Personius Melber LLP, attorneys for defendant Jason Blust and Relief Defendant Lit Def Strategies, LLC ("LDS"), who are the subjects of a contempt motion filed by the Receiver.

    2.    The purpose of this Supplemental Declaration is to respond to arguments and misplaced allegations of the Receiver set forth in a reply pleading, with exhibit, filed on March 21, 2024 (Doc. Nos. 232 and 232-1), a set of sur-reply pleadings filed on March 25, 2024 (Doc. Nos. 237-1 to 237-18), a pleading described as a further filing in support of an application to hold Mr. Blust in contempt, dated April 8, 2024 (Doc. No. 269), and a set of pleadings described as

further filings in opposition to a motion filed by Fidelis Legal Support Services, LLC, dated April 8, 2024 (Doc. Nos. 270 to 270-9).

3. Below, two principal contentions on the part of the Receiver are addressed.

## I. THE INTERTWINED ACCUSATION THAT JASON BLUST HAS NOT COOPERATED WITH THE RECEIVER, WHICH HAS CAUSED SUBSTANTIAL HARM TO CONSUMERS, IS INCORRECT

4. In a pleading described as a "Reply" (Doc. No. 232), at page 5, the assertion is made that "the Receiver and his counsel reached out to the Relief Defendants, including Lit Def and Blust, a number of times."

5. As will be demonstrated below, the occasions when either the Receiver or his representative has "reached out" to Declarant to request the assistance of Mr. Blust and LDS has been limited to the following three instances: January 23-25, 2024; February 7, 2024; and March 15, 2024.

6. On each of these occasions, Declarant responded to the Receiver's inquiries on behalf of Mr. Blust and LDS. Stated in a different way, we have cooperated with the Receiver.

7. By comparison, as outlined in the above-referenced reply pleading (Doc. No. 232), at pages 5-6, and in the Receiver's Preliminary Report (Doc. No. 115), at page 11, it is claimed that Mr. Blust and LDS have not been cooperative, which gave rise to litigation-related workflow issues between StratFS and the law firms. The corollary claim is made that these issues have harmed consumers.

8. If in fact consumers have been harmed due to the nonparticipation of LDS as a conduit between StratFS and the law firms, the cause of that nonparticipation has been the

Receiver's dereliction in failing to follow through in his outreach to Mr. Blust and LDS through Declarant.

A.  **January 23-25, 2024 inquiry**

9.  Annexed as **Exhibit A**, is an annotated calendar for January 2024. After the TRO was entered on January 11, the Receiver then temporarily shut down the operations of StratFS on the following day, January 12, 2024.

10. As this calendar demonstrates, it was not until 10 days later that the Receiver first made any effort to resume StratFS's operations. In doing so on January 22, 2024, the Receiver only returned 78 employees.

11. Stated in a different way, inactivity over the 10 day period between January 12 and January 22, 2024 in addressing the needs of the law firms and consumers had nothing whatsoever to do with LDS or Mr. Blust. It was the Receiver who shuttered operations during that period.

12. This calendar next shows that the first contact by the Receiver with Declarant, as counsel for Mr. Blust and LDS, did not occur until the following day, January 23, 2024. The contact consisted of an introductory telephone conversation between a representative of the Receiver, Logan Smith, Esq., and Declarant.

13. Over the next two days, January 24 and January 25, 2024, a series of emails were exchanged between Mr. Smith and Declarant. This email thread is annexed as **Exhibit B**.

14. This thread discloses that Mr. Smith sent two emails to Declarant on January 24, and then a follow-up email on the afternoon of January 25, 2024. Within an hour of that third email, Declarant sent an email explaining that, for professional and family reasons, Declarant had not been available that day and would not be available until the following morning.

3

15. Declarant specifically inquired in the January 25th email as follows: "Can we set a time tomorrow to talk? I will be drafting a submission that is due by the close of business all day. So, I am available." In addition to apologizing for the delay in responding, Declarant also informed Mr. Smith of Declarant's understanding that, on entry of the TRO, LDS had ceased operations.

16. It is now known that this was an inaccurate representation; however, what is more important is that neither Mr. Smith nor anyone else representing the Receiver thereafter reached out to Declarant on January 26, 2024, or at any later time in January, regarding the status of LDS or any assistance that could be offered by Mr. Blust with respect to the Receiver's belated and abbreviated efforts to restart StratFS's operations.

17. To be clear, the decision as of January 25, 2024 to not at that time pursue any details regarding the operations of LDS or the capacity of Mr. Blust to be helpful was made by the Receiver.

B. **February 7, 2024 inquiry by the Receiver and his counsel**

18. Following oral argument regarding the Preliminary Injunction issue on February 7, 2024, Declarant and counsel for the intervening law firms, Terrence Connors, Esq., were approached outside the courtroom by the Receiver and his attorney.

19. In a general way, the two topics of conversation concerned gaining access to a software system known as NDS, which is used by the law firms, and the prospects for reopening LDS.

20. Salient in this regard is the fact that, rather than addressing this topic on January 26, 2024, or in the days that followed, the Receiver waited another 13 days before once again inquiring about LDS.

21. In any event, the details of this interaction are summarized in a letter sent to the Court by defense counsel, dated February 9, 2024 (Doc. No. 149), at pages 2-3, which is annexed as **Exhibit C**.

22. Included in this correspondence are statements advocating in favor of reopening LDS, subject only to resolving the issue of employee compensation.

23. The Receiver, as well as members of his staff, and his local counsel were all copied on this correspondence.

24. Once more, the Receiver took no action of any kind after receiving a copy of this letter to investigate either the feasibility of reopening LDS or whether, in any fashion, Mr. Blust could offer assistance to the Receiver regarding the operations of StratFS or the law firms.

C. **The Receiver's March 15, 2024 correspondence**

25. Annexed as **Exhibit D** is a copy of a letter directed by Mr. Smith, on behalf of the Receiver, to Declarant. The letter enumerates, at page 2, five specific categories of requested information.

26. Annexed as **Exhibit E** is an email thread covering the period March 18, 2024 through March 25, 2024. This thread consists of email exchanges between Mr. Smith and Declarant regarding compliance with the requests set forth in the March 15, 2024 correspondence.

27. Annexed as **Exhibit F** are three emails dated March 20, 2024, which are associated with the forwarding of responsive information to Mr. Smith between 9:04 pm and 9:08 pm on that date.

28. Annexed as **Exhibit G** is an email thread covering the period March 25 through March 26, 2024, reflecting the production by Declarant of further information responsive to the

above-referenced correspondence. Included in this email is a request that Mr. Smith notify Declarant with respect to any questions or concerns regarding compliance with the requests outlined in the March 15, 2024 letter.

29.     In fact, limited issues arose with respect to the provided data, giving rise to a further exchange of emails between the Receiver and Declarant between March 27 and March 29, 2024. This set of emails is annexed as **Exhibit H**.

30.     Upon information and belief, compliance on the part of Mr. Blust and LDS with the enumerated requests set forth in the correspondence dated March 15, 2024 was, at the conclusion of this process, found to be fully satisfactory by the Receiver.

### D.     The Receiver's fingerpointing is baseless

31.     As demonstrated above, and by the accompanying exhibits, the continual complaint on the part of the Receiver with respect to alleged non-cooperation on the part of Mr. Blust and LDS, and his unsubstantiated attribution of blame to Jason Blust for difficulties experienced by him in coordinating workload responsibilities between StratFS and the law firms, are unfounded.

### II.    JASON BLUST'S SUPERVISORY OVERSIGHT OF THE LAW FIRMS MOTIVATED HIS FIDELIS-RELATED REMARKS IN THE RECENTLY DISCLOSED EMAILS FROM THE LDS DATABASE

32.     The focal point of the Receiver's arguments in both his sur-reply pleading filed on March 25, 2024 (Doc. Nos. 237-1 to 237-18), and his later filed set of pleadings described as further filings in opposition to a motion filed by Fidelis Legal Support Services, LLC, dated April 8, 2024 (Doc. Nos. 270 to 270-9), are a small set of emails harvested from an LDS database,

which had been disclosed in response to one of the requests set forth in the Receiver's March 15, 2024 letter, referred to above.

33. Upon information and belief, the total body of emails contained within this database exceeds 550,000. By comparison, the emails relied upon in the Receiver's pleadings number 80 in all, which are embedded in 22 different threads. Each thread is summarized and analyzed below.

34. It is noteworthy that none of these recently discovered emails lend support to the Receiver's as yet uncorroborated contention that Fidelis in a legal sense is a successor to LDS, that Mr. Blust financially supported the formation or operation of Fidelis, or that he at this point has any financial interest in Fidelis.

35. All that these emails reveal is that, over the period 2021-2022, Mr. Blust had an interest in the staffing and operation of Fidelis. That this interest stemmed from his oversight of the law firms, rather than the status of Fidelis as a clandestine successor to LDS, is the critical point missed in the Receiver's analysis of these emails.

36. While the emails do reflect isolated instances when Mr. Blust commented upon the division of work between LDS and Fidelis, or the payment of bonuses or the award of a raise to a Fidelis employee, the genesis of these infrequent comments was his interest in Fidelis from the standpoint of his supervision of the law firms, whose efficient operations during the time period of these emails depended upon the competence and industry of the litigation support personnel working for both LDS and Fidelis.

37. As recognized in the Decision and Order (Doc. No. 183), filed on March 4, 2024, at page 47:

> Defendant Blust performs various supervisory tasks for the intervenor law firms including hiring attorneys, addressing consumer complaints, and serving as a liaison between the intervenor law firms and Strategic. Evidence in the record shows

7

that Blust controls the intervenor law firms and actively participates in business decisions concerning the intervenor law firms and Strategic. When employees of Strategic are unable to resolve certain consumer complaints or issues, they often consult with Blust or send the matter to him for resolution.

(Citations omitted.)

38. It is in this capacity, coordinating the interface between the law firms and its litigation support, embodied by the personnel working for LDS and/or Fidelis, that Mr. Blust engaged in the limited email communications cited in the Receiver's pleadings.

39. By comparison, statements in his own Declaration, (Doc. No. 211), denying that he exercised control over Fidelis (¶¶ 7, 15), had an interest in Fidelis (¶¶ 9, 11), supervised Fidelis personnel (¶¶ 11, 12, 13), or played any role in the compensation of Fidelis employees (¶¶ 12, 13), were based upon his role as the person who controlled LDS's operations.

40. The following is a summary of the emails from the LDS database relied upon in the Receiver's pleadings:

| Exhibit Reference | Doc. No. | Date | Subject Matter |
|---|---|---|---|
| A | 237-3 | 1/11/22 | Discussion of staffing needs of Fidelis at the outset of being assigned new litigation files by certain law firms. |
| B | 237-4 | 1/12/22 | Continuing discussion of Fidelis's staffing needs at the outset of being assigned new litigation files. |
| C | 237-5 | 12/05/22, 12/18/23, 1/8/24 | Sample of weekly file submission tracking summaries for LDS and Fidelis. |
| D | 237-6 | 4/18 & 19/22 | Discussions with respect to transitioning personnel to Fidelis based upon evidence of LDS's declining workload. |
| E | 237-7 | 5/16-20/22 | Ongoing communications regarding transitioning personnel due to LDS's declining workload. |
| F | 237-8 | 1/18/22 | Discussion of awarding a raise to an employee (Rosenberg) of LDS. |

| Exhibit Reference | Doc. No. | Date | Subject Matter |
|---|---|---|---|
| G | 237-9 | 8/5/22 | Discussion of awarding raise to the employee (Hinds) who supervised personnel at both LDS and Fidelis. |
| H | 238-10 | 12/12-13/22 | Discussion of awarding bonuses to different personnel working at both LDS and Fidelis. |
| I | 237-11 | 12/16/22 | Evidence of bonus awarded to Fidelis employee (Rosenberg). |
| J | 237-12 | 12/14/22 | Ongoing discussion of moving additional employees from LDS to Fidelis based upon workload assessment. |
| K | 237-13 | 2/22/23 | Issue raised by employee (Rosenberg) then working for both LDS and Fidelis regarding her pay scale. |
| L | 237-14 | 12/8/23 | Discussion of awarding bonuses to both LDS and Fidelis employees. |
| M | 237-15 | 11/28/23 | Jason Blust requests and is provided with a summary of employees then working for LDS and for Fidelis. |
| N | 237-16 |  | Evidence of 12/20/23 payment to Fidelis employee (Rosenberg). |
| O | 237-17 | 5/8/22 – 12/13/23 | Fidelis invoices for its services are forwarded to Javier Avila as the law firms' point of contact, using his Client First Bankruptcy email address. |
| P | 237-18 | 1/14/24 | Email from Mr. Blust regarding cessation of sending "emails to them at all." |
| Q | 270-2 | 4/2/21 | Jason Blust expresses a preference Charles (Connors) not know about Fidelis. |
| R | 270-3 | 2/9-15/22 | Employee (Komis) questioning apportionment of her compensation between LDS and Fidelis, and being advised purpose was to ensure her eligibility for health insurance as a full-time LDS employee. |
| S | 270-4 | 1/20 & 1/21/22 | Employee of Fidelis (Zayed) is shown also assisting Jason Blust with review of law firm applicant resumes. |
| T | 270-5 | 3/14/22 | Jason Blust raises overstaffing concern based upon reduced "touches" of law firm files by employees working at both LDS and Fidelis. |
| U | 270-6 | 12/1/22 | Discussion of need to add Fidelis staff and training of its personnel to service law firms. |

| Exhibit Reference | Doc. No. | Date | Subject Matter |
|---|---|---|---|
| V | 270-7 | 12/13/22 | Proposed bonus for Fidelis employee (Zayed). |
| W | 270-8 | 2/10/23 | Discussion of raise in compensation for employee (Saavedra), who was then working for both LDS and Fidelis. |
| X | 270-9 | 4/5/23 | Human Resources informs LDS/Fidelis employee (S. Saavedra) and Fidelis employee (A. Macey) that HR is awaiting receipt of winter holiday scheduling for LDS and for Fidelis from Mr. Blust and Ms. Hinds. |

41.    **Exhibits A**, **B**, **D**, **E**, **J**, **M**, **T**, and **U** reflect Mr. Blust's interest on behalf of the law firms in the transition of litigation support from LDS to Fidelis. It would stand to reason that, in fulfilling his supervisory role, he wanted to ensure adequate litigation support coverage from a manpower perspective for every law firm file.

42.    **Exhibit C** shows his weekly receipt of reports regarding the handling of litigation files by personnel at both LDS and Fidelis, which would have been directly associated with his oversight of the law firms.

43.    Mr. Blust would be interested in knowing that an employee (Rosenberg) performing essential services for both LDS and Fidelis, who each provided litigation support to the law firms he supervised, was adequately compensated, as reflected in references to that employee's compensation in **Exhibits F**, **I**, **K**, and **N**.

44.    With respect to **Exhibit G**, addressing a request for a raise by the individual (Hinds) responsible for supervising personnel at both LDS and Fidelis, Mr. Blust's input would be expected from the perspectives of both LDS and the law firms.

45. As the day-to-day supervisor of the law firms, Mr. Blust would have understood the relationship between bonuses and the productivity of both LDS's and Fidelis' litigation support staff, as reflected in **Exhibits H**, **L**, **V**, and **W**.

46. The Adobe software used by Javier Avila in rendering his accounting and financial services for the law firms was originally linked to his Client First Bankruptcy email. When he began his work for the law firms, he did not bother to change this arrangement, which explains why his performance of services for the law firms involved his continued use of that same CFB email address, as shown in **Exhibit O**.

47. **Exhibit P** constitutes an instance when Mr. Blust was providing instruction based upon his control of the operations of LDS. His direction that communications by LDS with StratFS be discontinued following issuance of the TRO was wholly appropriate.

48. Charles Connors is the owner of the NDS software used and paid for by the law firms. Mr. Blust's suggestion that Mr. Connors not be informed of the increasing role of Fidelis in providing litigation support services, as shown in **Exhibit Q**, represented an attempt to control the cost paid for use of the NDS software by the law firms. His comment had nothing to do with the finances of LDS or Fidelis.

49. With respect to **Exhibit R**, Mr. Blust is not shown as having played any role in the decision to attribute more of the hours worked by J. Komis to LDS, as opposed to Fidelis, in order to ensure her continued receipt of health insurance coverage.

50. **Exhibit S**, reflecting that a Fidelis employee (H. Zayed) was also assisting her former employer, Mr. Blust, regarding the review of resumes for the law firms as of January 2022 is of no consequence.

51. That, as shown in **Exhibit X**, Jason Blust's name is mentioned in connection with holiday scheduling for LDS and Fidelis personnel does not mean he had anything to do with actually setting the schedule. On behalf of the law firms, he would have been interested in ensuring there was adequate litigation support coverage for the law firms year round.

52. Jason Blust's recognized role throughout the time period in question in overseeing the operations of all of the law firms, which included their receipt of competent litigation support services, provides a wholly legitimate explanation for his participation in the decidedly small number of emails selected by the Receiver from the over 550,000 database of emails made available to him.

## CONCLUSION

53. Mr. Blust acknowledges that, on a limited basis, LDS did continue to operate after the issuance of the TRO.

54. Continuing to assist the limited number of law firms still serviced by LDS regarding litigation-related matters in mid to late January, 2024 during a period when the Receiver had shut down all activities on the part of StratFS has not been shown to have caused any harm to consumers. To the contrary, the aim was to help the law firms in their representation of consumers.

55. Nor did these activities have anything to do with Fidelis or the law firms it was then servicing.

56. The findings on the part of the Receiver substantiate the fact LDS's post-TRO activities concerned the law firms and nothing else. At pages 1-2 of the Receiver's further filing seeking to hold Mr. Blust in contempt (Doc. No. 269), the description of the activities of LDS's employees over the latter part of January 2024 all involve interfacing with the law firms, including

the receipt and transmission of engagement letters. There is no evidence these activities harmed consumers. The whole point of the exercise was to attempt to keep the law firms operational.

57. The Receiver's unsupported argument that Mr. Blust and LDS were responsible for the delay in re-establishing the operations of StratFS is contradicted by the evidence.

58. It was the Receiver who shut down operations between January 12 and January 22, 2024. At that point, he only brought back 78 StratFS employees. It was then the Receiver who decided, as of January 25, 2024, to discontinue any further discourse with Declarant regarding the operations of LDS.

59. Over the next 16 days, between January 26 and February 7, 2024, there was no communication between the Receiver and Declarant regarding LDS.

60. After an in-person conversation with the Receiver and his counsel on February 7th, the Receiver once more discontinued any discussions with Declarant regarding LDS despite the offer to explore reopening LDS.

61. The evidence further shows that, on the only other occasion when contact was made by the Receiver with Declarant regarding either Mr. Blust or LDS, as embodied in the correspondence from the Receiver dated March 15, 2024, a full and complete response was timely provided to the Receiver.

62. The further allegations of the Receiver regarding any type of financial or other secret arrangement between LDS and Fidelis are not supported by the record.

63. In addition, the 22 email threads recently extracted by the Receiver from the LDS database of over 550,000 emails illustrate actions that were taken by Jason Blust on behalf of the law firms, rather than in his role as the party responsible for the operations of LDS.

64. These emails in no fashion support the unsubstantiated contention of the Receiver that Fidelis in any legal sense is a successor to LDS.

65. For all of these reasons, the application to hold Jason Blust in contempt should be denied.

Dated: Buffalo, New York
April 19, 2024.

/s/ **Rodney O. Personius**
Rodney O. Personius, Esq.
PERSONIUS MELBR LLP
*Attorneys for Defendant*
 JASON BLUST
and
*Attorneys for Relief Defendant*
 LIT DEF STRATEGIES, LLC
2100 Main Place Tower
350 Main Street
Buffalo, NY  14202
(716)  855-1050
rop@personiusmelber.com

TO: James C. Thoman, Esq.
Hodgson Russ LLP
*Attorneys for Receiver*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202
jthoman@hodgsonruss.com

Vanessa Buchko, Esq.
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC  20552
(202) 377-9846
Vanessa.buchko@cfpb.gov

Christopher L. Boyd, Esq.
NYS Attorney General's Office
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY  14202
(716) 856-8457
Christopher.boyd@ag.ny.gov