UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>      Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>      Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>      Relief Defendants. | Case No. 24-cv-00040-EAW-MJR |

**MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S
EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE WHY
INTERVENOR LAW FIRMS SHOULD NOT BE HELD IN CIVIL CONTEMPT**

I.         FACTS

In April 2024, without notifying the Court or the Receiver, the intervenor law firms ("Law Firms") unilaterally sent solicitations to approximately 60,000 consumers requesting they electronically sign amended engagement agreements. The initial Law Firm solicitations (which failed to mention this lawsuit, the TRO, the PI, or the Court's preliminary finding that the Law Firms had taken unlawful advance fees) were followed only two days later by mass emails to consumers encouraging them to enter the amendments via an email with a "Subject: [Client Name] Urgent Matter Reminder" heading, which continued "This is [name of law firm] again, we have sent you an email recently about some important changes and see that you have yet to review your new program agreement, there are some great updates happening with your current debt relief program." *See* Exhibit 4 to Request for Instruction (Dkt. No. 292-5), attached as **Exhibit 1** hereto. The Law Firms' actions prompted the Receiver to bring the issues to the Court's attention in the Report re: Protection of Consumers and Emergency Request for Instruction (Dkt. No. 292-1).

The Court addressed the matter at length during its April 22nd hearing. Specifically, the Court found the Law Firms' solicitations were "misleading" and "inaccurate" (Tr. 4/22/2024 at 114:5-7, excerpts of transcript attached as **Exhibit 2**). The Court asked: "Why did you guys send out this e-mail without telling me or asking me? And you didn't tell anybody else. Why did you do that? I'm flabbergasted that you guys did that… I can't believe it. I can't believe after all we've been through in this case, you unilaterally decided to send out that notice." *Id.* at 111:1-8. Counsel for the Law Firms (Timothy Elliott) stated that, "We were trying to come into compliance with Your Honor's," (*id.* at 111:9-10). The Court responded: "I think that's bologna. I think that's bologna… I'm flabbergasted that you guys sent that out without telling anybody.... It was not appropriate for you to do that, to send out that notice without letting anybody know,

especially the Court." (*Id.* at 111:11-13 & 111:22-24.)  Throughout the hearing, the Court made clear its serious concerns with how the Law Firms had handled their unilateral outreach; among other things, the Court stated:

- "That thing you sent out was a bunch of bologna.  You are trying to trick them into signing on with you again.  Yet again.  The same people that have already been victimized, sign them up again." (*Id.* at 112:11-15);

- "That notice that you sent out was very misleading.  It was misleading. It was inaccurate. It was inappropriate.  What possessed you to send that out?... You are trying to capture clients that you are already have had and were accepting advanced fees from…." (*Id.* at 114:5-13); and

- "I think you are out of line with it…. I think you are already going after people who have already been victimized in the initial setup.  Now, you want to switch to a different setup and go back to the same people.. [I] t's flabbergasting to me... I don't know what else to say." (*Id.* at 122:11-17.)

In light of the Court's concerns with the Law Firms' prior communications with consumers, the Court expressly ordered that "no other communications be made with any of the consumers by anybody regarding this case" (Tr. 4/22/2024 (**Exhibit 2**) at 156:6-7).  The Court was clear that no party was permitted to send communications to consumers without notifying the parties and the Court (*id.* at 157:1-2, 157:10-11): "Nobody should have any communications with… consumers about anything. Period.  Okay?" *Id.* at 157:1-2.  In additional discussions with Mr. Elliott, the Court stated, "I want no general statement like the one you sent out without notifying everybody before.  Do you understand that, sir?"  Counsel for the Law Firms responded, "I do understand it, Your Honor."  The Court then stated: "That's what I want…. I think it's clear.  I don't think I need to expand on it any more." *Id.* at 157:10-19.

Despite the Court's clear directive, the Law Firms have continued to solicit the consumers via mass emails several times per week; additionally, the Law Firms are contacting consumers via telephone apparently through a call center.  This outreach does not appear to be in response to consumer inquiries or in relation to the Law Firms' representation.  Instead, the Law

2

Firms are contacting consumers – generally, every other day via email and periodically via telephone – to solicit them to execute the amended engagement agreements. These communications have continued without leave of the Court and, indeed, without notifying the Court or the Receiver of these contacts.

The Receiver only became aware of the unauthorized emails and telephone contacts by the Law Firms to consumers on Friday, May 3rd when he was notified about Law Firm communications by Joseph O'Donnell, Strategic's Vice President of Operations and Human Resources. As detailed below, once they became aware of the issue, Strategic personnel conducted a brief investigation which revealed the Law Firms' mass communications and phone calls.

### A. The Law Firms' Outreach to Consumers

On Friday, May 3, 2024, Joseph O'Donnell notified the Receiver that he was monitoring Strategic's Customer Services team chat when a Customer Service agent posted a question about how to handle a call from a client who had received a voicemail purportedly from someone at one of the Law Firms. (Declaration of Joseph O'Donnell ["O'Donnell Dec."] ¶ 4.) The client had called Strategic's Customer Service line to return the call and find out what it was about. (*Id.*) Additional Customer Service agents indicated that they had received similar client calls regarding the same issue, prompting Mr. O'Donnell to investigate. (*Id.*)

Mr. O'Donnell proceeded to look up the clients who had received calls in Strategic's customer service system, Salesforce, to ensure that no Strategic service agent had attempted to reach out to the clients, and he confirmed that Strategic had no documentation of the outreach. (*Id.* ¶ 5.) He then proceeded to the next, upstream system, NDS Leadtrac Fusion, where Strategic personnel have access to additional activity and system notes of Strategic activities, as well as activities of the Law Firms. (*Id.*) Mr. O'Donnell reviewed the logs of Law Firm activity

3

and discovered notes reflecting Law Firm telephone outreach to consumers. (*Id.* ¶ 6.) In particular, he reviewed call notes created by several agents from a vendor identified as "CCU1" who had reached out to Law Firm clients via telephone calls. (*Id.*) CCU1 is not unaffiliated with Strategic. The call notes are labeled "Action: Call Center attempt 1" and "Contingency Sign Up changed to Call Center attempt 1." **Exhibi**t **1** to O'Donnell Declaration at 1. The log notes regarding these calls – *i.e.*, "Contingency Sign Up" – suggest the calls were made to urge consumers to sign the amended engagement agreements. *Id.*

After discovering these call notes, Mr. O'Donnell contacted the Receiver, who asked Mr. O'Donnell to conduct a limited search to determine whether the calls appear to be part of general outreach efforts or were in response to client inquiries to Law Firms. (*Id.* ¶ 7.)[1] Mr. O'Donnell and three Customer Service associates undertook a one-hour review of the NDS Leadtrac Fusion notes, in which they found instances of more than 30 clients receiving similar law firm telephone outreach between April 29, 2024 and May 3, 2024. (*Id.*) The call notes indicate that this client contact was initiated by the Law Firms (apparently through a call center) and was not in response to client calls. (*Id.*) Strategic is unable to run a system-wide report on the NDS data to identify all the consumers receiving these communications; the 30 clients identified by Strategic staff were located via "hunt-and-peck" style searching and likely represent only a small portion of the consumers who have been receiving these communications. (*Id.* ¶ 8.) It is likely many more Law Firm clients have been receiving these outreach calls. (*Id.*)

---

[1] If the call notes reflected the outreach calls were in response to consumer inquiries or contacts between Law Firm attorneys with the consumer, those would not be problematic.

4

B. **Law Firm Emails to Clients**

In the course of reviewing NDS data, Strategic staff also observed log notes indicating that in addition to the outreach calls, the Law Firms have been sending email blasts to clients multiple times per week with the heading "Subject: [Client name] Urgent Matter Reminder." (*Id.* ¶ 9.)  Based on the notes in NDS, these emails do not appear to be in response to client-initiated contact. (*Id.*)  Mr. O'Donnell's declaration includes several examples of the NDS client logs reflecting the consumer outreach by the Law Firms.  In one example, Consumer #1 received emails with the subject line "Consumer #1 Urgent Matter Reminder" were sent to the consumer on April 9th, April 11th, April 12th, April 13th, April 15th, April 17th, April 19th, April 21st, April 23rd, April 26th, April 27th, April 29th, May 1st, and May 3rd. (*Id.*)  The logs reflect the law firms are sending email these "Urgent Reminder" emails to consumers roughly every two days. (*Id.*)

The subject line of these emails – "[client name] Urgent Matter Reminder" – suggests that they are identical to the sample email the Receiver attached to the Report Re: Protection of Consumers and Emergency Request for Instruction (Dkt. No. 292-5) as Exhibit 4, attached hereto as **Exhibit 1**.  The content of this sample email is as follows:

> Hi [client name],
>
> This is [Law Firm] again, we have sent you an email recently about some important changes and see that you have yet to review your new program agreement, there are some great updates happening with your current debt relief program.
>
> Please take the time NOW to look for the email you should have received from digisign@leadtrac.net, they are our email service provider.

(*See id.*)  Given the newly-discovered Law Firms' emails have precisely the same subject line as this sample email, it appears that the Law Firms' solicitation campaign to sign the amended engagement agreements continues unabated, and in direct violation of the Court's April 22nd order.

Again, Strategic staff are unable to run a system-wide search of the NDS logs due to limitations on Strategic's access to NDS, but in very short order, they discovered an ongoing email campaign by the Law Firms. (*Id*.)

## II.     ARGUMENT

### A.     Legal Standard

Obedience with a court order is required unless and until it has been vacated or reversed, except in only the rarest of situations. *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967). Federal courts have inherent power to enforce their lawful orders through contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990); *see also*, *Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (federal courts possess inherent power to sanction for violation of order and need not issue warning before imposing sanctions).

The nature of contempt "turns on the character and purpose of the sanction" issued in response to the contemptuous conduct. *New York State Nat'l Org. for Women v. Terry,* 159 F.3d 86, 93 (2d Cir. 1998). "Civil contempt fines seek one of two objectives. One is coercion—to force the contemnor to conform his conduct to the court's order. The second is compensation. Where the contumacious conduct has caused injury to the beneficiary of the court's order, a civil fine may be imposed on the contemnor to compensate the victim for the loss or harm caused by the unlawful conduct." *Id*.

A court may hold a party in contempt for violation of an order "if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner". *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). "It need not be established that the violation was willful." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc*., 369 F.3d 645, 655 (2d Cir. 2004). "Reasonable diligence, at the very least,

requires a party to develop reasonably effective methods of compliance . . . [a] party does not act with reasonable diligence in obeying a court order if it complied reluctantly or after a contempt motion had been filed." *Id*. (internal citations and quotations omitted).

Where the petitioner on a motion for contempt has established that the alleged contemnor failed to comply with the order in question, the burden shifts to the alleged contemnor to prove an inability to comply. *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995); *see also*, *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 638 n. 9 (1988). However, "the alleged contemnor's burden is to establish his inability [to comply with the order] clearly, plainly, and unmistakably." *Huber*, 51 F.3d at 10; *see also Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984) ("the burden is on defendants to substantiate their claimed inability 'plainly and unmistakably'") (citations omitted).

Where contempt is found, the Court may consider several factors in calculating a fine, including "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about [compliance], and the contemnor's ability to pay." *Paramedics*, 369 F.3d at 658 (internal quotations omitted); *see also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir 1989) ("monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience."). Courts are authorized to assess attorney's fees where the contempt was willful. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citations omitted).

**B.     Discussion**

The Law Firms' continued consumer contact constitutes an obvious violation of the Court's express order not to communicate with consumers without the Court's permission. The

7

Court could not have been clearer: "Nobody should have any communications with… consumers about anything. Period. Okay?" (**Exhibit 2** at 157:1-2.)

The unauthorized consumer outreach was not made to protect consumers or answer their inquiries, but rather, it was to solicit them; more specifically it appears it is to urge the consumers again and again to sign the amended engagement agreements. The Court made very clear its displeasure with the Law Firms' prior communication to consumers, finding that it was "misleading," "inaccurate," and "inappropriate." (*Id.* at 114:5-13). The Law Firms' counsel affirmed he understood the Court's explicit and repeated prohibition of general communications with the consumers. The Court allowed one exception: where consumers were reaching out to the Law Firms, the Law Firms could "deal with [their] individual clients." *Id.* at 157:23-24. The emails and telephone calls discovered by Strategic staff last Friday clearly do not fall within this narrow exception. Instead, they fall within the prohibited category of general communications like the blasts sent to all clients touting "the important changes" and "great updates happening with your current debt relief program," (**Exhibit 1**) which are not allowed in any way, shape, or form.

The recently-discovered evidence also reveals the scope and extent of the outreach by the Law Firms to the consumers have been far more widespread than previously known or disclosed to the Court. The Receiver had previously been aware of the April 2nd email blast sent by the Law Firms, as well as two follow-up emails that had been sent to consumers. This activity had prompted the Receiver to make an emergency request to send a supplemental consumer notice. (Dkt. No 292-1.)

At the time of the Receiver's emergency motion, and also at time of the April 22nd hearing, the Receiver did not know that the Law Firms had engaged in a massive campaign to

8

have consumers sign the new engagement agreements in an attempt to convert the consumers to a contingent-fee model. The Receiver was not aware the Law Firms were sending their email blasts every other day and had hired a call center to make outbound calls to urge consumers sign their amended engagement agreements. Despite the obvious relevance of this activity, the Law Firms nowhere mentioned any of this activity in response to the Receiver's emergency motion or during the April 22nd hearing.

The Receiver does not raise the present matter with the Court casually; the fact that the Law Firms continue to disregard the Court's directives in such brazen and obvious ways has forced the Receiver to bring this to the Court's attention immediately and to request that the Court issue an OSC, so that the Law Firms might explain why they should not be held in contempt.

### III. CONCLUSION

Based on the foregoing, the Receiver respectfully requests that the Court issue an Order to Show Cause affording the Intervening Law Firms an opportunity to respond and be heard at an in-person hearing prior to any finding of contempt. If a finding of contempt is upheld, the Receiver respectfully requests that the Court order what it views to be the appropriate sanction to deter the conduct for *each* of the Intervening Law Firms, which have been operating as a monolithic entity, but are separate and independent LLCs in different individuals' names. The Receiver suggests that each Law Firm be sanctioned $1,000 per day until the contempt is purged, but respectfully defers to the Court. The Receiver also requests the Law Firms be ordered to pay the Receivership Estate for the attorneys' fees necessary to bring this motion.

Dated: May 6, 2024                                         **MCNAMARA SMITH LLP**

                                                                               By:   /s/ Logan D. Smith
                                                                               Logan D. Smith  (*Pro Hac Vice*)
                                                                               Alexander D. Wall (*Pro Hac Vice*)

McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email: lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Court-appointed Receiver,
Thomas W. McNamara*

10