# EXHIBIT 2

```
                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| CONSUMER FINANCIAL<br>PROTECTION BUREAU,<br>THE PEOPLE OF THE<br>STATE OF NEW YORK,<br>By Letitia James,<br>Attorney General of the<br>State of New York,<br>STATE OF COLORADO,<br>Ex rel, Philip J. Weiser,<br>Attorney General,<br>STATE OF DELAWARE,<br>Ex rel. Kathleen Jennings,<br>Attorney General,<br>State of Delaware,<br>THE PEOPLE OF THE<br>STATE OF ILLINOIS,<br>Through Attorney General<br>Kwame Raoul,<br>THE STATE OF MINNESOTA,<br>By its Attorney General<br>Keith Ellison,<br>THE STATE OF NORTH CAROLINA,<br>Ex rel. Joshua H. Stein,<br>Attorney General,<br>THE STATE OF WISCONSIN,     *<br>                             *<br>        Plaintiffs,          *<br>                             *<br>                             *           Buffalo, New York<br>              v.             *           April 22, 2024<br>                             *           11:12 a.m.<br>                             *<br>STRATFS, LLC,                            ORAL ARGUMENT<br>Formerly known as Strategic<br>Financial Solutions, LLC.,<br>STRATEGIC CLIENT SUPPORT,<br>LLC, formerly known as<br>Pioneer Client Services, LLC,<br>STRATEGIC CS, LLC,<br>STRATEGIC FS BUFFALO, LLC,<br>STRATEGIC NYC, LLC,<br>BCF CAPITAL, LLC,<br>T FIN, LLC,<br>STRATEGIC CONSULTING, LLC,<br>VERSARA LENDING, LLC,<br>STRATEGIC FAMILY, INC., | Docket Number:<br>1:24-cv-00040-EAW-MJR |

1   that's the whole point of avoiding the conflict.

2       The law firms are adequately represented by
3   Mr. Connors and there is no need for Mr. Elliott to be here,
4   particularly when we have a claim of a conflict that's been
5   raised.

6       **THE COURT:**  I understand.  It's on the record.  Go
7   ahead Mr. Elliott.  We don't need for Mr. Brady.  Mr. Elliott
8   can go ahead and argue.

9       **MR. BRADY:**  Thank you, Judge.

10      **MR. ELLIOTT:**  Thank you, Your Honor.  In the last few
11  minutes you've heard a lot about Mr. McNamara's concerns and
12  Mr. Boyd's great skepticism about the law firms.

13      You've heard a lot of rocks thrown at them, the law
14  firms are unethical.  They are fee splitting.  They are
15  misleading their clients.  They are a facade, an alter ego for
16  us, at best.

17      I will remind the Court that despite those concerns
18  and despite that skepticism, there is not a single claim that
19  has been asserted against the law firms.

20      So this isn't an example of claims that have been made
21  above, not been proven.  They haven't even asserted those
22  claims.

23      **THE COURT:**  Well, they assert the law firms and the
24  defendants are all one in the same.  It's -- it's difficult to
25  even separate them.

1              Why did you guys send out this e-mail without telling
2     me or asking me?
3              And you didn't tell anybody else.  Why did you do
4     that?  I'm flabbergasted that you guys did that.
5              **MR. ELLIOTT:**  Your Honor, we --
6              **THE COURT:**  I can't believe it.  I can't believe after
7     all we've been through in this case, you unilaterally decided to
8     send out that notice.
9              **MR. ELLIOTT:**  We were trying to come into compliance
10    with Your Honor's --
11             **THE COURT:**  I think that's bologna.  I think that's
12    bologna.  I'm -- I'm flabbergasted that you guys sent that out
13    without telling anybody.
14             **MR. ELLIOTT:**  Your Honor, the law firms rendered an
15    opinion.  We consulted with ethics counsel in two different
16    states.
17             **THE COURT:**  Well, you better get new ethics counsel,
18    because I don't think you were on the straight and narrow with
19    that.
20             **MR. ELLIOTT:**  We -- we did what we thought was
21    appropriate.
22             **THE COURT:**  Yeah?  Well, it wasn't.  It was not
23    appropriate for you to do that, to send out that notice without
24    letting anybody know, especially the Court.
25             **MR. ELLIOTT:**  I apologize, Your Honor.  It was not

1  our --
2       **THE COURT:**  Well, apologies don't cut it.  You
3  shouldn't have done it.
4       **MR. ELLIOTT:**  It was not our intent to be
5  disrespectful to the Court.  But, Your Honor --
6       **THE COURT:**  Well, that was the result.  After
7  everything that we've worked on in this case, you went out
8  unilaterally and sent out that notice to these consumers.
9       And this case is all about protecting these consumers.
10      **MR. ELLIOTT:**  And we are trying to do that.
11      **THE COURT:**  I don't think so.  Not at all.  That thing
12 you sent out was a bunch of bologna.
13      You are trying to trick them into signing on with you
14 again.  Yet again.  The same people that have already been
15 victimized, sign them up again.
16      **MR. ELLIOTT:**  We don't believe they have been
17 victimized.
18      **THE COURT:**  I do.  And that's what I said in the
19 preliminary injunction.  You should have came to the Court and
20 asked to send out any notices or whatever to the consumers.
21      **MR. ELLIOTT:**  Your Honor, on behalf of the law firms,
22 I apologize again.
23      **THE COURT:**  Well, that don't cut it.  That don't cut
24 it.
25      **MR. ELLIOTT:**  Your Honor, from the law firms

1  perspective, here's where we are.

2  We have 65,000 clients. Since January, they have been
3  treading water. The law firms cannot effectively settle debts.
4  They cannot effectively defend them in litigation.

5  **THE COURT:** As far as I can tell, the law firms were
6  never settling the debts. It was the defendants, Strategic,
7  that was settling the debts. All you guys did was rubber stamp
8  it.

9  **MR. ELLIOTT:** Your Honor --

10 **THE COURT:** That's the information that I have and
11 everything that I've seen.

12 **MR. ELLIOTT:** And -- and when we get to a point,
13 because that was really not part of the preliminary injunction
14 hearing, which focused on the face-to-face -- but when we get to
15 that part of the case, we will be prepared to show that every
16 settlement negotiation is properly supervised by attorneys.

17 If we had known that was going to be a concern, Your
18 Honor, we would have put that case on during the preliminary
19 injunction hearing.

20 We didn't --

21 **THE COURT:** Well, it's a concern now, because you want
22 to start this new program, right?

23 **MR. ELLIOTT:** No.

24 **THE COURT:** Right?

25 **MR. ELLIOTT:** No. We want to provide to our

1   clients -- we want to get our clients off the dime.  We have
2   65,000 clients who are effectively treading water.
3           The receiver has said that our vendor is Strategic,
4   who is a vendor -- by the way, a very important vendor.
5           **THE COURT:**  That notice that you sent out was very
6   misleading.  It was misleading.  It was inaccurate.  It was
7   inappropriate.
8           What possessed you to send that out?
9           **MR. ELLIOTT:**  We are trying to move our clients into a
10  new fee structure, so that they can get service.
11          **THE COURT:**  Yeah.  You are trying to move them into a
12  new fee structure.  You are trying to capture clients that you
13  are already have had and were accepting advanced fees from.
14          **MR. ELLIOTT:**  And offsetting the advanced fees against
15  the future contingent fees.
16          **THE COURT:**  Go ahead.
17          **MR. ELLIOTT:**  Your Honor, I -- again, I apologize.  I
18  know you say that doesn't cut it.
19          That was not the intent, but I want to explain to you
20  where the law firms are.  We have to get our clients serviced.
21          If we can't, they are going to be in an incredibly
22  vulnerable situation.  The receiver had made it very clear that
23  Strategic was not going to service anyone under an advanced fee
24  model.
25          Very clear.  You had made it very clear that advanced

1  fee model is not going to cut it.  In order to get service, we
2  had to get them over to a contingent model, which is exactly
3  what the TSR requested.
4          It's exactly what the order required.  And hopefully
5  Strategic can service them.  If Strategic can't serve them, the
6  law firms may be in a position to have to come before Your Honor
7  and request permission to go to a different vendor.
8          But we have 65,000 clients -- or whoever are left
9  right now, that need to get off the dime because they are not
10 receiving service, because essentially the outsourced
11 administrative services provider that -- that does the lion
12 share of the administrative work paperwork, everything else
13 is -- is in a shut down.
14         And for us to provide value to those clients, we have
15 to move forward so again.
16         I apologize on behalf of that.  I read Your Honor loud
17 and clear.  We did not believe and do not --
18         **THE COURT:**  Well, I was definitely loud.  I don't know
19 if I was clear, but --
20         **MR. ELLIOTT:**  We understand it.  But the step that the
21 receiver is talking about is not going to be curative.
22         It's going to create further issues.  We think it's
23 wrong.  As a matter of law, we think it's unsupported by
24 evidence and we think it's going to be incredibly
25 counterproductive.

1            And that last point I want to hit, because I think it
2   dovetails with what you heard -- with what you heard from the
3   banks earlier, as I said, the law firms have a duty to their
4   clients.
5            They are not receivership defendants.  They are not
6   parties in this case.  There are no claims against them.
7            **THE COURT:**  Well, they are interveners in this case.
8            **MR. ELLIOTT:**  It's because --
9            **THE COURT:**  You asked to get in and now you're in --
10           **MR. ELLIOTT:**  Right.
11           **THE COURT:**  -- right?
12           **MR. ELLIOTT:**  But there is no question --
13           **THE COURT:**  And you have to follow everything that
14   everybody else follows, right?
15           **MR. ELLIOTT:**  Correct.
16           **THE COURT:**  You can't intervene when you want to and
17   then jump out when you don't want to.
18           **MR. ELLIOTT:**  I misspoke.  My point is there are no
19   claims against them.  And I -- and the Government has not
20   brought any claims against them.
21           We understand that the receiver wants to send an
22   e-mail to our clients.  He wants to effectively substitute his
23   judgment.
24           **THE COURT:**  No.  I don't view it that way.  He wants
25   to send a letter to correct the misimpression that you put on to

1   these people with the notice that you sent.
2           **MR. ELLIOTT:**  The --
3           **THE COURT:**  That's the way I view it.
4           **MR. ELLIOTT:**  But they are already aware of that, what
5   the receiver --
6           **THE COURT:**  They are already aware of your misleading
7   statements?  That they are misleading?
8           **MR. ELLIOTT:**  They are aware --
9           **THE COURT:**  That they are inappropriate and that they
10  mischaracterize what was going on?  They already know that?
11          **MR. ELLIOTT:**  They've already got full information on
12  this lawsuit.  It's been on the portal from -- for months.
13          **THE COURT:**  That's not good enough.  We need that
14  notice.
15          **MR. ELLIOTT:**  Well --
16          **THE COURT:**  If that's your argument, if all you are
17  going argue about is whether or not I'm sending that notice,
18  okay.
19          So move on to point B, if you have got a point B.
20          **MR. ELLIOTT:**  So my point B is simply this, Your
21  Honor, what you are grappling with today -- I think what we are
22  all grappling with today is where do we go from here?
23          The bank stood before you this morning.  I watched
24  that argument.  They want to come in and they want to
25  essentially foreclosure on the collateral.

1          But what I also heard the bank saying is there might
2   be a path forward and they are willing to talk to people about a
3   path forward.
4          I heard Mr. Thoman say on behalf of the receiver that
5   he is interested -- and I wrote this down -- in protecting the
6   growing concern value of Strategic having some value there.
7          So some jobs are maintained, so some money comes in to
8   this estate for everyone's benefit.  Right now there is a small
9   fraction of Strategic's foreign business that is operating.
10         It is what they call the DTE.  It's Atlas and
11  Timberline.  It's the nonattorney inhouse contingent model.
12         Allowing Strategic to service the law firms' business
13  will dramatically increase the money coming into the estate.
14         That's the way to create value here and to protect an
15  in -- inevitable -- against an inevitable liquidation.
16         Our clients are converting the law firms clients are
17  converting to a contingent model.  It addresses the fee issue
18  that was in the -- in the preliminary injunction.
19         If they are going to stay with Strategic as a
20  vendor -- and that is absolutely our hope, Strategic has to be
21  able to service them.
22         If that's --
23         **THE COURT:**  I'd advise you to go out and get a new
24  vendor.
25         **MR. ELLIOTT:**  Pardon me?

1            **THE COURT:**  Why don't you go out and get a new vendor?

2            **MR. ELLIOTT:**  We need -- we need Court approval to get

3    a new vendor.  We don't want to do that.  If we can't get this

4    real property filing at -- with you, Your Honor.

5            **THE COURT:**  Mr. Boyd.

6            **MR. BOYD:**  So, Your Honor, part of the preliminary

7    injunction -- and I think we pointed this out in our response to

8    Mr. Connors, but it includes a prohibition on -- on benefiting

9    from or using consumer information that was obtained prior to

10   entry of the TRO or the PI.

11           So -- you know, to the extent that these law firms --

12   and the evidence I think is clear, that Strategic generated all

13   of these clients, right?

14           It pays to send out these mailers.  It gets people in

15   the door and then it picks what law firms, actually, they are

16   going to go to based on their debt and state.

17           And, in fact, we saw evidence that Strategic creates

18   new law firms, so, you know, in our view, even if these law

19   firms got a new vendor, I'm not sure that they continue -- could

20   continue to take fees from these folks in a lawful manner, given

21   the existing preliminary injunction.

22           Now, look, again, if a consumer, having full

23   disclosure, getting what the receiver said and says, I want to

24   go and sign out sign up with a contingent fee debt relief

25   company, you know, they can do that.

1                 And if, you know, one of these lawyers wants to go
2    form another contingent fee debt relief company, and they -- and
3    the consumer still wants to sign up, that's fine.
4                 But as far as this existing customer base, I don't
5    know even if the law firms hiring a new vendor would be
6    allowable under the existing preliminary injunction.
7                 **MR. ELLIOTT:**  There is a lot packed in there for us.
8                 **THE COURT:**  Okay.
9                 **MR. ELLIOTT:**  There is just no evidence and there is
10   no support.  But the bottom --
11                **THE COURT:**  Does the preliminary injunction allow you
12   to go out and get a new vendor at this point?
13                **MR. ELLIOTT:**  We -- we believe it does, Your Honor.
14   We -- there is a stay and we read the stay to say that we need
15   Your Honor's permission to terminate the contract with Strategic
16   and to go find a new vendor.
17                We have not sought relief from that stay, because we
18   are trying, I think, with Strategic and with the banks and with
19   the receiver to find a way to make this work within Strategic.
20                We are trying to find that path forward and to bring
21   some value in -- you read our papers.  I can tell.
22                We think the 25 percent is -- well, I think
23   Mr. McNamara admitted how he came up with it.  There is no legal
24   requirement for 25 percent.
25                He chose that number because it seemed fair.  That the

1  company he is using -- it's not as if --

2  **THE COURT:** Am I wrong? Didn't Mr. Vacco run and

3  didn't he use a 25 percent?

4  **MR. ELLIOTT:** I don't believe so. I think the -- what

5  came in was the existing percentages, from the existing clients,

6  which I think is 30, winds up being 32, doesn't it? Or

7  something like that?

8  **MR. VACCO:** The DTC model is 25 percent.

9  **THE COURT:** The DTC model is 25 percent, so why

10 wouldn't it be 25 percent?

11     You are already using that percentage in the same type

12 of a -- of a business.

13 **MR. ELLIOTT:** No. It's not. It's different. The DTC

14 model is two inhouse nonlawyer firms. They don't provide

15 litigation defense.

16     The law firms provide litigation defense. That's the

17 component. So the people at Atlas and Timberline, if they want

18 someone to defend them, they pay out some kind of an add on, a

19 rider. It's a hundred dollars a month or something.

20 **THE COURT:** I think you are better off with that then

21 this 34 percent is way, way -- that's way out of line. Way out

22 of line.

23     And you are only charging 25 percent in the other one.

24 Did you make it clear in that notice that you sent out that

25 there is other options available, that you could switch over and

1  do the 25 percent?

2  **MR. ELLIOTT:** Your Honor, it's absolutely not out of
3  line.  If -- if we were to hear evidence on what other law firms
4  charge out there in terms of -- of the overall amount, it's
5  absolutely not out of line.

6  **THE COURT:** All right.  Keep going, Mr. Elliott.  Keep
7  going.

8  **MR. ELLIOTT:** I mean, I -- we're prepared to present
9  evidence on this, if you think that there is a some concern that
10 we're out of line with the market for people providing --

11 **THE COURT:** I think you are out of line with it.

12 **MR. ELLIOTT:** Okay.

13 **THE COURT:** I think you are already going after people
14 who have already been victimized in the initial setup.

15         Now, you want to switch to a different setup and go
16 back to the same people.  It's -- it's flabbergasting to me.
17 I'm -- I don't know what else to say.

18 **MR. ELLIOTT:** Your Honor, it's our desire to do
19 something with Strategic.

20         If Your Honor's position is that is just not going to
21 happen, then we can seek relief from the stay and move
22 elsewhere.

23         Again, that is not our preference, but --

24 **THE COURT:** But you've got all these other issues, the
25 unauthorized practice of law, the fee, the fee splitting.  I

1   can't -- that's, to me, right on its face, that's wrong,
2   80/20 percent fee splitting between Strategic and the law firms.
3           **MR. ELLIOTT:**  It's not a fee split, Your Honor, and
4   this -- this goes to my other point, which is --
5           **THE COURT:**  Well --
6           **MR. ELLIOTT:**  -- there are a lot of rocks being
7   thrown, but no claims.
8           Mr. McNamara told you that there is fee splitting
9   going on and when you asked him --
10          **THE COURT:**  He's got -- he's got a document by
11  Mr. Blust saying that that's what's going on.
12          **MR. ELLIOTT:**  It's not what that document says, but if
13  I could finish what he said --
14          **THE COURT:**  I'm sorry.  Go ahead and finish.
15          **MR. ELLIOTT:**  I'm sorry, Your Honor.
16          **THE COURT:**  And you will be finished here pretty soon.
17          **MR. ELLIOTT:**  I apologize, Your Honor.  You asked him
18  what's the law in fee splitting.  I wrote down what he said --
19  he said, I don't know that exactly, as I stand here right now.
20          We can't be accused of fee splitting without the
21  analysis of State law and it's not a fee split.
22          What -- what the client pays, that's called a service
23  charge, is a cost lawyers charge with fees and costs.  That
24  particular component is a cost component.
25          And, again, we've cleared this with the ethics counsel

1  around the country.  These firms have operated for years.  Not a
2  single State bar has ever raised a fee splitting issue with
3  them, because it is not a fee split.
4          Like any other law firm, mine included, they have
5  vendors.  In this particular case, because of the volume of work
6  that the vendor does, it's an enormous amount of money.
7          The admin, the tracking, the software, all of that,
8  that's done, that's a large amount of money.  That's what makes
9  us different, perhaps, than -- than other costs that most law
10 firms use, but it is not a fee split.
11         We're happy to brief that -- we're happy to brief the
12 UPI.
13         **THE COURT:**  I don't need any more briefing on it.
14 Thank you.
15         **MR. ELLIOTT:**  Okay.  Thank you, Your Honor.
16         **THE COURT:**  Anybody else?
17         Mr. Vacco.
18         **MR. VACCO:**  Good afternoon, Your Honor.  I just wanted
19 to address a couple of points that have been raised by the
20 receiver.
21         The -- as has been pointed out already, the 25 percent
22 of percentage that's embedded in the plan initially came from, I
23 believe, from Joe O'Donnell, who works for the receiver.
24         And it does indeed reflect the percentage that's being
25 presently charged by the two contingent fee entities, Atlas and

```
 1           MR. PERSONIUS:  I may be excused?
 2           THE COURT:  Yes, sir.
 3           MR. PERSONIUS:  Thank you, Judge.
 4           THE COURT:  Okay.
 5
 6      (Recess commenced at 2:29 p.m., until 3:22 p.m.)
 7
 8           THE COURT:  Have a seat.
 9           MR. McNAMARA:  Your Honor, if I may approach the
10   podium?
11           THE COURT:  Sure.  Well, let's wait.  Make sure
12   we're -- we're on the record.
13           Just for the record, we're back on the record.
14           Would you like to go off the record or do you want
15   to --
16           MR. McNAMARA:  I would prefer to go off the record.
17           THE COURT:  We will now go off the record.
18           MR. McNAMARA:  That was quick.
19
20      (Recess commenced at 3:22 p.m., until 3:37 p.m.)
21
22           THE CLERK:  Back on the record.
23           THE COURT:  Okay.  We're back on the record.  We just
24   set a report back date that we're going to have a conference
25   here scheduled for May 29th to report back on the consultant
```

1  report.

2          I do want to put on the record that the -- I don't
3  know -- receiver's going to redraft paragraph four of his
4  requested order and bounce it off the parties and hopefully I'll
5  have that signed by next Thursday.

6          I also want to order that no other communications be
7  made with any of the consumers by anybody regarding this case.

8          Is that clear?  Does everybody understand that?  Okay.

9          Mr. McNamara.

10         **MR. ELLIOTT:**  Your Honor, we have consumers reaching
11  out.  We --

12         **THE COURT:**  You can respond to their --

13         **MR. ELLIOTT:**  Thank you.

14         **THE COURT:**  I mean, a general statement to everybody.

15         Mr. Boyd, do you want to put something on the record,
16  sir?

17         **MR. BOYD:**  Just briefly, Your Honor, just because I
18  don't want the law firms to hear about this case and view that
19  narrowly, right?

20         So I would think that they would view that their last
21  communication about converting clients was not, quote, unquote,
22  about this case.

23         So just --

24         **THE COURT:**  Right.

25         **MR. BOYD:**  -- make the scope.

1           **THE COURT:**  Nobody should have any communications with
2  a consumers about anything.  Period.  Okay?
3           **MR. BOYD:**  That works, Judge.
4           **THE COURT:**  Okay.
5           **MR. ELLIOTT:**  Your Honor, may I be heard on that?  May
6  I be heard on that?
7           On behalf of the law firms, we have clients we
8  communicate -- the lawyers communicate with them every day.  The
9  paralegals communicate with them every day.
10          **THE COURT:**  I want no general statement like the one
11 you sent out without notifying everybody before.
12          Do you understand that, sir?
13          **MR. ELLIOTT:**  I do understand it, Your Honor.  And --
14          **THE COURT:**  Okay.
15          **MR. ELLIOTT:**  -- and I've been trying to -- to --
16          **THE COURT:**  That's what I want.
17          **MR. ELLIOTT:**  Okay.
18          **THE COURT:**  I think it's clear.  I don't think I need
19 to expand on it any more.
20          **MR. ELLIOTT:**  May I just for clarification ask the
21 same question Mr. McNamara did, which is in light of the back
22 and forth that's gone on, some of the --
23          **THE COURT:**  Yes.  You can deal with your individual
24 clients.
25          **MR. ELLIOTT:**  Thank you.