UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), *et al.*,<br><br>　　　　　　　　　Defendants, and<br><br>STRATEGIC ESOP, *et al.*,<br><br>　　　　　　　　　Relief Defendants. | CASE NO. 1:24-cv-00040-EAW-MJR<br><br>PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER TO SHOW CAUSE WHY THE RECEIVER SHOULD NOT BE COMPELLED TO PROVIDE SUPPORT SERVICES TO INTERVENING LAW FIRMS |

**INTRODUCTION**

CFPB and NYAG oppose Strategic[1] or the Intervenor Law Firms moving Consumers[2] to a new debt-relief model, as proposed in Strategic's Motion for an Order to Show Cause Why the Receiver Should Not Be Compelled to Provide Support Services to the Intervening Law Firms (OSC Motion). Dkt. 276.[3] Strategic seeks to compel the Receiver to implement the Intervenor Law Firms transition to a "contingent fee" debt-relief model. *See* Dkt. 278-1 at ¶ 17. But the Receiver has already determined that such a model is not profitable or lawful, and his business judgment is entitled to deference.

---

[1] "Strategic" has the same meaning as the Preliminary Injunction Decision, Dkt. 183 at 8-9.
[2] "Consumer" has the same meaning as the Preliminary Injunction, Dkt. 184.
[3] While the Court has not set a briefing schedule for the OSC Motion, Plaintiffs wish to apprise the Court that they firmly oppose Defendants or Intervenor Law Firms providing any Consumer with debt-relief services. Plaintiffs have previously made this position known to Defendants, the Intervenor Law Firms and CIBC.

Plaintiffs agree with the Receiver's determination that the proposed transition is not lawful. Plaintiffs allege that Strategic has already deceived the Consumers about material aspects of the advanced fee debt-relief model. The Court should not condone these unlawful actions by allowing Strategic and the Intervenor Law Firms to simply move Consumers over to a new model run by the same people and entities that previously deceived them.

Continued deception by Strategic and the Intervenor Law Firms is not conjecture. As noted by the Court at the April 22, 2024 hearing, the deception has in fact continued with the Intervenor Law Firms' recent unsanctioned communications soliciting Consumers to a new debt-relief model with no mention of the lawsuit or the PI. On April 22, the Court ordered the Intervenor Law Firms to stop these solicitations, apparently to no effect. Despite the Court's clear order that day, the Intervenor Law Firms have continued sending solicitations, resulting in the pending contempt motion against them. Dkt. 292-1.

Intervenor Law Firms have taken these actions despite the Preliminary Injunction (PI). The PI bars "[e]ngaging in any other conduct that violates the TSR" (PI, Dkt. 184 at 9) and the TSR prohibits "[m]isrepresenting, directly or by implication, … [a]ny material aspect of any debt relief service." 16 CFR § 310.3(a)(2)(x). The PI thus clearly bars Consumer solicitations that fail to mention that the advance fees Strategic took from Consumers are likely to be found unlawful.

The PI also bars "using, or benefitting from Consumer information . . . that any Defendant or Relief Defendant obtained prior to entry of this Order in connection with any Debt-Relief Services." PI Dkt. 184 at 32. Given that all Consumer information in this case emanated from leads generated by Strategic, the PI bars any efforts to recruit Consumers to a new model using that information.

Finally, a revised debt-relief model that allows Defendants and the Intervenor Law Firms to retain previously taken illegal advance fees is not lawful under the TSR. If Defendants and the Intervenor Law firms keep the fees they took prior to obtaining debt settlements, Consumers will continue to improperly bear the risk in the event that the debts are not settled. Should Plaintiffs prevail on the advance fee claims, as the Court has indicated is likely, these fees are proceeds of illegal activity and must be refunded, not retained.

## DISCUSSION

### I. The Receiver's Business Judgment Is Entitled to Deference.

As with the Response to the Intervenor's Motion to Compel the Receiver (Dkt. 254), Plaintiffs urge the Court to leave intact the Receiver's business judgment regarding the lawfulness and profitability of the businesses he has been directed to run. Strategic asks the Court to compel the Receiver "to implement the plan to transition the Intervening Law Firms' clients from an advance fee payment structure to a contingent fee structure." Vacco Decl., Dkt. 276-1 at ¶ 17. Whether to implement such a plan is within the Receiver's business judgment. While Strategic is free to communicate its preferences to the Receiver, it has no basis to petition the Court for an order requiring the Receiver to take its preferred course of action.

"[R]eceivers, just like corporate directors, are entitled to the deference of the business judgment rule in their decision-making concerning the management of a corporation." *Golden Pac. Bancorp v. F.D.I.C.,* No. 95-cv-9281 (NRB), 2002 WL 31875395, at *8–9 (S.D.N.Y. Dec. 26, 2002), *aff'd sub nom. Golden Pac. Bancorp. v. F.D.I.C.*, 375 F.3d 196 (2d Cir. 2004) (*citing Citibank, N.A. v. Nyland (CF8), Ltd.*, No. 86 Civ. 9181(WK), 1990 U.S. Dist. LEXIS 12338, at *8 (S.D.N.Y. Sept. 19, 1990)). Whether to implement a specific business plan falls within

3

Receiver's discretion, and the Receiver is entitled to the use of business judgment as he balances the many obligations the PI Order confers upon him.

Defendants have made no showing that the Receiver is using anything but his best business judgment in making decisions regarding the Receivership Defendants. The only basis Defendants give for overriding the Receiver's decisions is a difference of opinion; they would prefer him to make different decisions. But a difference in opinion about the best course of action is "precisely the situation that the business judgment rule was designed to prevent." *SEC v. Platinum Mgmt. (NY) LLC*, No. 16-CV-6848 (BMC), 2018 WL 9801132, at *2 (E.D.N.Y. Sept. 12, 2018) (finding no violation of business judgment rule where receiver opted to sell a valuable asset instead of investing in it, over objection of investors who stood to lose future revenues from the asset).

Here, the Receiver is balancing many priorities, including a limited amount of liquid cash, a duty to protect consumers, and an obligation to operate the business both profitably and lawfully, if possible. Indeed, the Receiver has made a careful study of whether the "contingent fee" model that Defendants propose is lawful and profitable. Receiver's Report RE Protection of Consumers (RRPC), Dkt. 292-1 at 1 ("The biggest expenditure of time . . . has involved an extensive review, analysis, evaluation, discussion, and meetings focused on economic projections of the proposal by Defendants and the Law Firms to migrate the law firm debt relief model consumers to a contingency fee model."). Pursuant to the PI, the Receiver's continuation of the business is subject to his "good faith determination that the businesses can be lawfully operated at a profit using the Assets of the receivership estate." PI, Dkt. 184 at IX. N. In his Report RE: Protection of Consumers, the Receiver finds that the "proposal is not profitable absent additional liquidity." RRPC, Dkt. 292-1 at 1. He also finds that "the proposed business

4

model change must also be lawful and, as indicated below, the Receiver cannot in good faith conclude it is." *Id.* at n.1. The Court should not overrule the Receiver's proper exercise of business judgment that Strategic's proposed transition is neither profitable nor lawful.

**II.     Strategic's Proposed Model Deceptively "Transitions" Already-Deceived Consumers.**

Plaintiffs agree with the Receiver's conclusion that the proposed transition is not lawful. Strategic deceived Consumers who signed up for its debt-relief program about the services being offered, who was offering them, and who would be providing them. Consumers subjected to these unlawful practices should not simply be moved over into a new debt-relief program run by the same people and entities that deceived them in the first instance.

Strategic signed up Consumers based on a pattern and practice of deception. Strategic regularly solicited Consumers with an offer of a pre-approved debt consolidation loan at a low interest rate (*e.g.*, 3.11% APR) from a rotating cast of companies. First Amended Complaint (FAC), Dkt. 249 ¶ 13; Dec. Denying Stay (DDS), Dkt. 281 at 10 n.6. But in reality there was no pre-approval and the lenders referenced in the mailers existed only on the face of the letters; Strategic was the invisible orchestrator of the solicitations. FAC, Dkt. 249 ¶ 14; *see also* Receiver's Preliminary Report (RPR), Dkt. 115-1 at 20.

Similarly, Strategic employees told Consumers that the debt-relief program was the "0% interest" option, in accordance with a script provided by Strategic. RPR, Dkt. 115-1 at 20; FAC, Dkt. 249 ¶ 20. This is false and misleading. While Defendants do not charge interest for their debt-relief program, they do charge exorbitant fees and Consumers continue to accrue interest on their outstanding debts while enrolled in Defendants' program. *See* RPR, Dkt. 115-1 at 20; DDS, Dkt. 281 at 10 n.6. The role of the Intervenor Law Firms in this scheme is also deceptive. As noted by the Court, "Plaintiffs allege that when Consumers would attempt to call one of these

5

law firms, their calls were routed to a non-lawyer Strategic employee who falsely held themselves out to be a representative of the law firm." DDS, Dkt. 281 at 10 n.6; *see also* RPR, Dkt. 115-1 at 6; 4/22/24 Tr. at 113:4-10 ("THE COURT: As far as I can tell, the law firms were never settling the debts. It was the defendants, Strategic, that was settling the debts. All [the law firms] did was rubber stamp it . . . That's the information that I have and everything that I've seen.").

      a.  **The Intervenor Law Firms Continue to Deceive Consumers through Their Attempted "Transition" to a New Debt-Relief Service.**

Strategic "pencil-whipped" Consumers into signing up for the debt-relief program. PI Dec., Dkt. 183 at 39. The Intervenor Law Firms are continuing this practice, deceptively hounding Consumers to sign up for the new debt-relief model without full knowledge of the reasons for the new model.

As discussed at length at the April 22, 2024 hearing and detailed in the Receiver's Report Re: Protection of Consumers and Emergency Request for Instruction (Dkt. 292-1), on or about April 1, 2024, the Intervenor Law Firms sent over 60,000 Consumers a misleading letter encouraging them to sign up for a new debt-relief model. That letter blatantly omitted any reference to the Plaintiffs' lawsuit, the limitations imposed by the Court in its PI (including on the Intervenor Law Firms themselves), or the Court's finding that all the fees Consumers previously paid to Defendants and the Intervenor Law Firms are likely to be found illegal. *See* Dkt. 292-2.

      The Court acknowledged that the Intervenor Law Firms communications were deceptive:

> THE COURT: . . . That thing you sent out was a bunch of bologna. You are trying to trick [Consumers] into signing on with you again. Yet again. The same people that have already been victimized, sign them up again.
>
> MR. ELLIOTT: We don't believe they have been victimized.

6

> THE COURT: I do. And that's what I said in the preliminary injunction….

4/22/24 Tr. at 112:11-18

> THE COURT: That notice that you sent out was very misleading. It was misleading. It was inaccurate. It was inappropriate. What possessed you to send that out?
>
> MR. ELLIOTT: We are trying to move our clients into a new fee structure, so that they can get service.
>
> THE COURT: Yeah. You are trying to move them into a new fee structure. You are trying to capture clients that you are already have had and were accepting advanced fees from.

*Id.* at 114:5-13.

The TSR bars "[m]isrepresenting, directly or by implication, … *[a]ny material aspect* of any debt relief service." *Id.* § 310.3(a)(2)(x) (emphasis added). "Material" is defined as "likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution." *Id.* § 310.2(t). Section I. C. of the PI provides "Defendants' officers, agents, servants, employees, and attorneys, and those Persons or entities in active concert or participation with any of them . . . are hereby preliminarily restrained and enjoined from . . . C. Engaging in any other conduct that violates the TSR." PI, Dkt. 184 at 9. The Intervenor Law Firms are bound by the PI both as parties to the matter and due to their deeply entangled business arrangements with Defendants. They are therefore bound by the TSR's bar on misrepresentation.

The Intervenor Law Firms' misrepresentations are numerous. Their initial letter purports to give Consumers an "exciting update . . . regarding the firm's representation." Dkt. 292-2 at 2. The Intervenor Law Firms suggest that this was a benevolent decision with "upside for you with no downside." Dkt. 292-1 at 2. However, the Intervenor Law Firms failed to inform their clients that the Court had found that "both defendants and the intervenor law firms take or receive some portion of the advance fees collected from Consumers," PI Dec., Dkt. 183 at 12, and found "it likely that defendants are violating the TSR by collecting advance fees". *Id.* at 53.

7

The fact that the Court found it likely that Strategic and the Intervenor Law Firms took illegal advance fees is material to any Consumer's choice to continue doing business with that firm. Further, the presumption that the Intervenor Law Firms are entitled to retain their previously collected advance fees is misleading: it suggests that this conduct is lawful, despite the Court's finding to the contrary. These misrepresentations are compounded by the fact that the Intervenor Law Firms at least purport to be operated by lawyers ethically obligated to act as fiduciaries and in their clients' best interests.

The Intervenor Law Firms' follow-up messages double down on their misleading and deceptive rhetoric. First, they claim that the Receiver "is not associated with our law firm," which is demonstrably false since he is operating the entity that effectively performs the debt-relief service for each Intervenor Law Firm and by any reasonable understanding is "associated." Dkt. 292-7. Next, they claim that the Intervenor Law Firm will "continue to negotiate and settle debts" despite the fact that all of the negotiation infrastructure is housed within Strategic. *Id.* They also claim that "the government is suing the vendor that Mr. McNamara is associated with," either implying that the Receiver is somehow complicit in Defendants' unlawful activity or continuing to minimize Strategic's role in providing the debt-relief service. *Id.* Either reading is misleading. Finally, the Intervenor Law Firms continued to send Consumers reminder emails, encouraging them to sign up for the new debt-relief model. Dkt. 292-5.

      b. **The Intervenor Law Firms Have Shown No Willingness to Comply with Court Orders.**

CPFB and NYAG oppose allowing Intervenor Law Firms to move Consumers to a revised debt-relief program when the Intervenor Law Firms refuse to follow Court Orders designed to protect Consumers. At the April 22, 2024 hearing on the Receiver's Request for Instruction, the Court clearly ordered the Intervenor Law Firms to stop soliciting consumers:

> THE COURT: Nobody should have any communications with . . . consumers about anything. Period. Okay?
>
> . . .
>
> MR. ELLIOTT: Your Honor, may I be heard on that? May I be heard on that? On behalf of the law firms, we have clients we communicate -- the lawyers communicate with them every day. The paralegals communicate with them every day.
>
> THE COURT: I want no general statement like the one you sent out without notifying everybody before. Do you understand that, sir?
>
> MR. ELLIOTT: I do understand it, Your Honor. And --
>
> THE COURT: Okay.

Dkt. 353-3, 4/22/24 Tr. at 157:1-15.

As alleged in the Receiver's contempt motion, the Intervenor Law Firms continued their mass-outreach to Consumers, badgering them to sign new engagement letters with revised fee agreements, *despite the express order from the Court to stop soliciting Consumers*. *See* Dkt. 353-4 ¶ 9 (noting instances where the reminder emails to Consumers continued unabated after the April 22 Court Order, with emails to at least one consumer on April 21, 23, 26, 27, 29, May 1, 3). The Intervenor Law Firms even expanded their communications to Consumers, engaging a new call center that is proactively calling Consumers to convince them to sign up to for the purported "contingent fee" model. *See* Dkt. 353-4 ¶ 9 (referencing attached call logs that show telephone calls to Consumers referencing "Contingency Sign Up"). This despite counsel for the Intervenor Law Firms acknowledging they need Court approval before engaging a new vendor to handle contact with Consumers on their behalf. Dkt. 353-3, 4/22/24 Tr. at 119:2-4 ("We need -- we need Court approval to get a new vendor."), 120:14-16 ("There is a stay and we read the stay to say that we need Your Honor's permission to terminate the contract with Strategic and to go find a new vendor.").

Plaintiffs strongly oppose allowing entities that have deceived and continue to deceive Consumers—and refuse to comply with orders designed to protect consumers—to have any further business dealings with those Consumers.

### III. Strategic's Proposed New Servicing Model Would Violate the PI by Profiting from Consumer Information.

Any attempt to sign Consumers up and collect fees for a new product using consumer information that came from Strategic is barred by the PI. The Confidentiality provision of the PI prevents "all third parties or other Persons in active concert or participation with any Defendant" from "disclosing, using, or benefitting from Consumer information . . . that any Defendant or Relief Defendant obtained prior to entry of this Order in connection with any Debt-Relief Services." PI, Dkt. 184 at 33. There is no dispute that the Intervenor Law Firms are bound by the PI both as intervening parties to this matter and due to their deeply entangled business arrangements with Defendants. Nor is there a dispute that the consumer information originated from Strategic, whose salespeople signed Consumers up. As the Court found in the PI decision:

> Strategic markets debt-relief services to consumers through mechanisms such as direct mail solicitations and websites. Consumers who are interested in the debt-relief services advertised call a phone number listed on the mailer or website and reach a Strategic representative, and this representative gathers additional information from the consumer.

PI Dec., Dkt. 183 at 10 (citations omitted).

The Service Agreement between Strategic and each Intervenor Law Firm provides that it applies to "clients generated by SERVICER," which is defined as the relevant Strategic client services subsidiary. Dkt. 234-4 at 2. And one of the Servicer's jobs is "the development and management of qualified leads to generate potential Applicable Clients for LAW FIRM." *Id.* Strategic then provided the customer data it gathered to the Intervenor Law Firms' system

10

automatically using an API (Application Programming Interface) that allowed them to "funnel information back and forth." M.L. Clark Dep. at 36:6-8.

### IV. Strategic's Proposed New Servicing Model Does Not Satisfy the TSR.

The new contingent-fee model proposed in the OSC Motion presumes that Strategic and the Intervenor Law Firms get to keep the illegal advance fees they previously took from Consumers. *See* Dkt. 276-2 at 3. In other words, their model requires Consumers to continue to bear the risk that their debts may not ultimately be settled. The point of the contingent fee model permitted under the TSR, however, is that the firms should bear the risk, not the Consumers. *See* Telemarketing Sales Rule, 75 Fed. Reg. 48,458 at 48,485 (Aug. 10, 2010); *see also* Testimony of Greg Regan, 2/1/24 Tr. at 294:1-9.

So long as Strategic or the Intervenor Law Firms retains these illegal advance fees, any conversion program is fundamentally coercive; continued participation would be the only way for Consumers to receive any value for the fees they already paid.

The Court has found that Plaintiffs have a substantial likelihood of success on their advance-fee claims. Strategic and the Intervenor Law Firm's proposal implies that the already-collected advance fees can now be legitimately "earned" through a model that keeps the funds in the hands of Strategic and the Intervenor Law Firms while they "earn" them. But any model allowing Strategic and the Intervenor Law Firms to retain possession of the advance fees going forward is a house of cards, built on advance fees illegally-obtained from Consumers. Strategic's proposed model fails to rectify this fundamental flaw.

## CONCLUSION

Under the PI, the Receiver may continue to conduct the business subject to his "good faith determination that the businesses can be lawfully operated at a profit." PI, Dkt. 184 at § IX

(N). The Receiver has determined that the proposed transition to the "contingent fee" model is neither profitable nor lawful, and his business judgment is entitled to deference. Plaintiffs agree that the proposed transition is not lawful; rather, it is deceptive. It is harmful to Consumers who have already been victimized by Defendants and the Intervenor Law Firms. For the reasons laid out above, the Court should deny Strategic's OSC Motion.

Dated: May 20, 2024

Respectfully submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau

ERIC HALPERIN
Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

TIMOTHY M. BELSAN
Assistant Litigation Deputy

*/s/ Joseph Sanders*
Joseph Sanders
E-mail: joseph.sanders@cfpb.gov
Phone: 202-377-9846
Vanessa Buchko
E-mail: vanessa.buchko@cfpb.gov
Phone: 202-435-9593
Shirley Chiu
E-mail: shirley.chiu@cfpb.gov
Phone: 202-435-7592
Monika Moore
E-mail: monika.moore@cfpb.gov
Phone: 202-360-5905
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7722

And

LETITIA JAMES
Attorney General of the State of New York

*/s/ Christopher L. Boyd*
Christopher L. Boyd
Phone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov
Genevieve Rados
Phone: (716) 853-8485
Email: Genevieve.Rados@ag.ny.gov
Assistant Attorneys General
350 Main Street, Suite 300A
Buffalo, NY 14202

Attorneys for State of New York