UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CONSUMER FINANCIAL PROTECTION,
BUREAU, et al.,

          Plaintiffs,

v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), et al.,

          Defendants, and

STRATEGIC ESOP, et al.,

          Relief Defendants.
_____

24-CV-40-EAW-MJR

DECISION AND ORDER

On March 26, 2024, the Court-appointed receiver Thomas W. McNamara (the "Receiver") filed a "First Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals" that have rendered services on the Receiver's behalf from January 11, 2024 through February 29, 2024 ("First Fee Application"). (Dkt. No. 241) Specifically, the Receiver asks the Court to approve the payment of (1) January fees of $205,882.00 and expenses of $12,021.97 and February fees of $143,927.50 and expenses of $15,003.22 for the Receiver and staff to be paid to TWM Receiverships Inc. d/b/a Regulatory Resolutions; (2) January fees of $246,205.50 and expenses of $10,225.46 and February fees of $22,084.00 and expenses of $332.92 for the Receiver's counsel, McNamara Smith LLP; (3) January fees of $135,168.50 and expenses of $1,479.50 and February fees of $64,975.00 and expenses of $104.59 for the Receiver's counsel, Hodgson Russ LLP; (4) fees of $10,067.85 for the Receiver's counsel, Ballard

Spahr LLP; (5) fees of $87,003.25 and expenses of $286.60 for the Receiver's forensic accountants, Mercadien, P.C.; and (6) January fees and expenses of $137,774.57 and February fees and expenses of $14,566.82 for the Receiver's data forensic consultants Bright Labs Services, LLC ("Ankura"). (*Id.*)

Defendant StratFS, LLC and its affiliated entities (collectively "Strategic" or "defendants"), the intervenor law firms, and the Blust Family Irrevocable Trust filed responses in opposition to the Receiver's First Fee Application. (Dkt. Nos. 293, 294, 295)[1] On April 22, 2024, the Receiver filed a reply in further support of his First Fee Application. (Dkt. No. 319) For the following reasons, the Court grants the Receiver's First Fee Application in its entirety.

"A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred. The amount of the compensation is to be determined by the court in the exercise of its reasonable discretion." *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008) (citations omitted). "This presumption of reasonable compensation extends to a receiver's counsel and professionals." *SEC v. Platinum Mgmt. (NY) LLC*, No. 16-CV-6848, 2018 U.S. Dist. LEXIS 165797 (E.D.N.Y. Sept. 26, 2018).

The Court considers several factors in determining a reasonable fee, including "(1) the complexity of problems faced, (2) the benefits to the receivership estate, (3) the quality of the work performed, and (4) the time records presented." *Id.* (quotations omitted). The Court may also consider "the reasonableness of the hourly rate charged and the

---

[1] The Blust Family Irrevocable Trust indicates that it "does not object to the Receiver being paid for his Court-appointed services" (Dkt. No. 295, pg. 4) Instead, it submits a "limited objection only to the extent Trust funds are used to pay the receiver's fees and expenses." (*Id.*)

2

reasonableness of the number of hours billed." *SEC v. Amerindo Inv. Advisors Inc.*, No. 05 Civ. 5231, 2015 U.S. Dist. LEXIS 197890 (S.D.N.Y. Sept. 14, 2015) (citations omitted).

The Court first notes that the Receiver has faced extremely complex factual, legal, and administrative issues in performing his duties under the Temporary Restraining Order ("TRO") and the Preliminary Injunction ("PI").[2] This lawsuit was brought against twenty-nine corporate defendants, two individual defendants, and eleven relief defendants. The scope of the matter then grew to include numerous intervenor law firms that operated in conjunction with Strategic to take advance fees from consumers in the course of providing debt-relief services to consumers. The role of the law firms and their connection to the corporate and individual defendants was not entirely clear at the onset of this lawsuit, due in large part to the excessively complicated and confusing business structure designed, seemingly on purpose, by defendants and the intervenor firms.

Defendants' debt-relief business, which is subject to the receivership, operates on a large and complex scale. It encompass three different types or models of debt-relief services, which operate separately from one another but are under common control. The businesses involve nearly 1,000 employees; roughly 65,000 consumers enrolled as customers; and revenues of over $1 billon dollars in the last seven years. (Dkt. No. 241-2, ¶ 6) As noted by the Receiver in his First Fee Application, the entities subject to receivership maintain an "excessively complicated structure with purposefully opaque and siloed operations of dozens of business entities." (Dkt. No. 241-1, pg. 4) Having devoted substantial time to understanding the facts and issues involved here, including

---

[2] The Receiver was initially appointed by Judge Vilardo, pursuant to the TRO, on January 11, 2024. (Dkt. No. 12) The Receiver's appointment was confirmed, and the temporary designation removed, by this Court, pursuant to the PI entered on March 4, 2024. (Dkt. No. 184)

3

holding a two-day evidentiary hearing and adjudicating numerous motions related to the PI and the receivership, the Court agrees with the Receiver's assessment of defendants' business structure. Indeed, the Court credits the Receiver's representation that gaining the necessary understanding of the relationships and interplay between the many receivership defendants and corporate entities, as well as their relationship with the numerous intervenor law firms and individual defendants, has been a difficult, complicated, and time-consuming process.[3]

Moreover, the Receiver was assigned extensive and substantial duties and responsibilities under the TRO and the PI. (Dkt. Nos. 12, 184) These included, among many other things, (1) assuming full control of all receivership defendants; (2) taking exclusive custody, control, and possession of all assets, documents, and electronically stored information; (3) conserving, holding, and managing all receivership assets; (4) identifying additional receivership defendants not already named in the lawsuit; (5) managing the business, including the potential hiring and dismissing of employees, as well as making disbursements from the receivership estate as necessary; and (6) maintaining a chain of custody of all defendants' records. (Dkt. Nos. 12, 184, Section IX)

The Receiver was also tasked with continuing to "conduct [defendants'] business as necessary and appropriate but only if the Receiver makes a good faith determination that the business can be operated lawfully at a profit using the assets of the receivership estate." (*Id.*) To that end, the TRO required the Receiver to file a report, including a section

---

[3] The Receiver notes that his ability to understand defendants' business and carry out his duties under the TRO and the PI was made more difficult due to a lack of cooperation by some receivership defendants and their employees. In light of the contentious nature of this litigation and the numerous motions filed by defendants, relief defendants, and the intervenor law firms challenging various aspects of the PI as well as the Receiver's administration of the receivership estate, the Court has no reason to doubt the Receiver's representation in this regard.

4

addressing whether defendants' business could be operated lawfully and profitably. (Dkt. No. 12, Section XVI) In accordance with this directive, on January 31, 2024, the Receiver filed a comprehensive, 45-page report, with 29 exhibits, that explained, *inter alia*, the complexity of defendants' business, its multiple business lines, and its complicated structure. (Dkt. No. 115) The detailed report, which included a thorough analysis as to which of defendants' debt-relief services could continue to be offered legally and profitably, clearly required extensive research, investigation, and effort by the Receiver, his counsel, and the other professionals retained by the Receiver.[4]

Next, the Court finds that the Receiver, his counsel, and the other professionals retained by the Receiver have performed high quality work which has benefited the receivership estate. Within a week of the Receiver receiving access to the business, he brought back 78 customer relations staff, as well as supporting IT and human resources employees. (Dkt. No. 241-1, pg. 6) Additional employees were later returned to work, bringing the total number of customer service staff to 92. (*Id.*) Once the Receiver determined that Atlas and Timberline, sections of defendants' business that provide debt-relief services without taking advance fees, could be operated lawfully and profitably, those operations were resumed and continued with 35 staff members. (*Id.*) In addition, with regard to defendants' third business line, Versara Debt Negotiation Loans, the

---

[4] The intervenor law firms contend that the Receiver's fees are excessive because the Receiver was "behaving more like a litigant" than a Court-appointed receiver and "the Receiver's own law firm, McNamara Smith, spent many hours…engaging in discovery for the Government." By way of examples, the law firms note that substantial time was billed by the Receiver and his counsel for (1) reviewing emails related to Richard Gustafson, an owner of a number of the intervenor firms; (2) listening to recorded phone calls; and (3) conducting electronic searches regarding the individual defendants. However, the Court finds that these tasks were relevant and necessary for the Receiver and his counsel to understand how defendants and law firms were connected; which individuals controlled the business and the law firms; and whether the business could be operated not only profitably, but also lawfully.

5

Receiver returned employees to work to assist with servicing existing consumer loans. During the course of the receivership, at least $4,176,000 has been collected as a result of the Receiver's operation of the lawful arms of defendants' business. (Dkt. No. 266-1, ¶ 16) Moreover, the Receiver has presented information to defendants' secured creditors demonstrating the business' ability to generate positive cash flow through the week ending June 29, 2024. (*Id.* at ¶ 14) Thus, the work performed by the Receiver, along with his counsel and other professionals, has (1) allowed certain portions of defendants' business to continue to operate lawfully and profitably; (2) permitted some of defendants' employees to return to work; and (3) continued to provide services and information to thousands of consumers still enrolled in defendants' debt-relief services.[5]

Lastly, the Court has considered the time records of the Receiver, his counsel, and the other professionals that have rendered services on the Receiver's behalf. The PI authorizes the Receiver to "[c]hoose, engage, and employ attorneys, accountants,

---

[5] The Court rejects defendants' contention that the Receiver's fees should be reduced because he has failed to operate the business profitably. Prior to the issuance of the TRO, the model of debt-relief service provided by defendants and the intervenor law firms, which took advance fees from consumers, accounted for 80% of defendants' revenue. (Dkt. No. 183, pg. 11) Defendants' other debt-relief services, which did not take advance fees, accounted for roughly 16% of defendants' revenue. (*Id.*) On March 4, 2024, this Court found that defendants' collection of advance fees in the course of providing debt-relief services is likely a violation of the federal Telemarketing Sales Rules, and issued a PI prohibiting defendants from, *inter alia*, collecting advance fees during the pendency of this lawsuit. (Dkt. Nos. 183, 184) Thus, it appears clear to the Court that the decrease in profitability of defendants' business is the result of defendants' inability to continue collecting advance fees from consumers, and not the result of mismanagement or inaction on the part of the Receiver. While defendants complain that the Receiver has failed to approve their plan to convert to a contingency fee-based model of debt-relief, the Receiver has raised significant concerns about the about both the profitably and lawfulness of defendants' proposed conversion plan. (Dkt. Nos. 256, 292, 306) Defendants also note that when the Receiver initially took control, the business went "dormant" for 11 days, during which time consumer emails and calls went unanswered. However, during this time, the Receiver was assessing this large scale and complex business. Given all the circumstances here, it appears to the Court that the Receiver exercised sound business judgment in returning an appropriate number of employees to fulfil the lawful functions of the business as soon as possible, in light of the PI's prohibition on the collection of advance fees.

appraisers, and other independent contractors and technical specialists as the Receiver deems advisable or necessary in the performance of duties and responsibilities[.]" (Dkt. No. 184, Section IX.X) The Court finds the nature and extent of the work performed by the Receiver, his counsel, and others to be reasonable and necessary here, in order to take control of, and continue to operate, the large receivership estate and all of its attendant issues. The McNamara Smith attorneys appear to be experienced in regulatory receiverships, and the work they performed included immediate access to the business, interviews of employees, reviews of voluminous electronic and paper records, and the preparation of the Receiver's preliminary report. (Dkt. No. 241-2, ¶ 13) Hodgson Russ was likewise involved in nearly all receivership activities, including labor issues affecting hundreds of employees.[6] (*Id.* at ¶ 15) Ballard Spahr provided expert legal advice and analysis as to the proper handling of Strategic ESOP and ESOT. (*Id.* at ¶ 17) Mercadien, an accounting firm, was retained to provide a comprehensive and sophisticated forensic analysis of receivership defendants' complex and intertwined finances. (*Id.* at ¶ 18)

The Court notes that the Receiver incurred significant fees and expenses for the use of data forensic consultants Bright Labs Services LLC ("Ankura"). However, the Receiver explains that very shortly after his appointment, it became apparent that the data forensics vendor initially retained did not have the expertise or ability to fully identify,

---

[6] The intervenor law firms argue that the Receiver's fees should be reduced because the Receiver has failed to provide any detail regarding the identity or qualifications of certain billers who appear on the invoices of TWM Receiverships, McNamara Smith, and Hodgson Russ. (Dkt. No. 294) In response, the Receiver has submitted a chart identifying each biller along with their title, firm, and hourly rate. (Dkt. No. 319, Exh. A) The intervenor firms also contend that there was a "massive amount of overbilling and duplication of efforts," particularly among TWM Receiverships, McNamara Smith, and Hodgson Russ. However, in light of the massive amount of work that had to be completed in a compressed amount of time, and the highly complex nature of the issues presented, it was reasonable for the Receiver to hire multiple attorneys to would work together in assisting him to fulfill the mandates of the TRO and the PI.

7

collect, and preserve the vast amounts of data involved here. (Dkt. No. 241-1, ¶ 20) The Receiver explains that the defendants' IT and data collection systems were sophisticated and immense, and were further complicated by defendants' excessively complex structure. (*Id.*) As a result, the Receiver retained Ankura, a company with extensive data forensic expertise, to preserve defendants' electronic data and maintain a chain of custody, for the benefit of the parties and the Court. (*Id.*) Indeed, the process was expensive and time consuming. (*Id.*) Based on these representations, the Court finds the fees and expenses incurred by Ankura to be reasonable and justified.[7]

Lastly, the Court finds the hourly rates and hours billed by the Receiver, McNamara Smith, Hodgson Russ, Ballard Spahr, Mercadien, and Ankura to be reasonable.[8] The hourly rates of the Receiver, his counsel, and his accountants were presented to the Court in a Statement of Interest and Qualification prior to Judge Vilardo's appointment of Receiver pursuant to the TRO. (Dkt. No. 4-1) The receivership company, counsel, and accountants agreed to discount their normal rates in this receivership as reflected in the

---

[7] The intervenor law firms note that a significant portion of Ankura's expenses were associated with the "collection, creation, and maintenance costs of a searchable electronic database in Relativity for certain high-level StratFS employees." The law firms claim that such an expense was unnecessary, and that it serves as another example of the Receiver's actions in conducting discovery for the Government. The Court disagrees. The costs associated with Relativity were reasonable and necessary here in order for the Receiver to (1) understand the relationships between the individual defendants and the businesses they ran, which were not at all clear based on the way the businesses were structured on paper; and (2) determine whether the business, or any parts of it, could be operated lawfully.

[8] The PI provides that the "Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in possession or control of, or which may be received by the Receivership Defendants." (Dkt. No. 184, Section XV)

Statement of Interest and Qualification. (Dkt. No. 241-2, ¶ 9)[9] Further, the Receiver affirms that he closely examined his bills, and the bills of his counsel and other professionals, and that he agreed to cut a significant amount of charges of the receivership team and counsel prior to presenting the fee application to the Court, as part of his obligation to maximize the value of the receivership estate. (Dkt. No. 241-2, ¶ 9). The time records submitted by the Receiver, his counsel, and the other professionals that provided services to the receivership estate are extremely detailed. The Court finds that the entries justify the fees, costs, and expenses incurred.[10] Moreover, much of the work here had to be performed immediately, including taking over the business; investigating the structure, assets, and records; and preparing the preliminary report. Thus, the first month of the receivership generated the most fees and expenses, and the time entries reflect that fees and expenses dropped significantly thereafter.

For all of these reasons, the Court grants the Receiver's First Fee Application in its entirety.

---

[9] Although not reflected in the Statement of Interest, Hodgson Russ agreed to discount their typical rate in this matter. (Dkt. No. 241-2, ¶ 9, n. 5) Similarly, Ankura, the data forensics firm, also agreed to discount its standard rates. (*Id.*)

[10] The intervenor law firms take issue with certain expenses and costs incurred by the Receiver, his counsel, and staff, including, *inter alia*, vendor payments, reproduction costs, and postage incurred in sending WARN notices to Strategic employees who were laid off as a result of the shut-down of defendants' advance-fee debt-relief business. (Dkt. No. 294, pgs. 8-11) The Receiver has responded to the intervenor firms' objections, and the Court finds the costs and expenses at issue to be reasonable and directly related to the Receiver's duties under the TRO and/or the PI. (Dkt. No. 319, pgs. 7-9) Defendants contend that the Court should reject the Receiver's request for expenses associated with travel. They reason that Strategic should not "be held financially responsible because the Government elected to hire a California-based receiver." The Court rejects this argument. When the Receiver was initially appointed, by Judge Vilardo and pursuant to the TRO, it was with the understanding that the Receiver and his company were located in San Diego, California. (Dkt. No. 4-1) While defendants occupy physical office space in Buffalo and New York City, their debt-relief business operates nationwide. The PI permits the Receiver to be compensated for his actual out-of-pocket expenses incurred in the performance of his duties, which includes his travel costs.

**SO ORDERED.**

Dated:      May 22, 2024
               Buffalo, New York

                                                        _____
                                                          MICHAEL J. ROEMER
                                                          United States Magistrate Judge