UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>     Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al.<br><br>     Defendants, and<br><br>DANIEL BLUMKIN, et al.,<br><br>     Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**RECEIVER'S REPORT RE: OPERATIONS OF RECEIVERSHIP ENTITIES, CONSUMER PROTECTION EFFORTS, AND REQUEST FOR FURTHER INSTRUCTION**

**TABLE OF CONTENTS**

I.   Efforts to Protect Consumers ................................................................................................. 1
    A.   Proposed Next Steps ...................................................................................................... 5
        1.   Consumers without Active Payment Plans (29,902) ................................. 7
        2.   Consumers with Active Payment Plans (28,091) ....................................... 8
II.  CONCLUSION ................................................................................................................. 13

Thomas W. McNamara, as Court-appointed receiver ("Receiver"), respectfully submits this report to provide an update on recent events and to present an Emergency Request for Instruction and authorization from the Court for a proposed course of action to protect consumers and implement a wind down of certain of the law firm debt relief operations at Strategic.

I.   **Efforts to Protect Consumers**

In issuing its Preliminary Injunction, the Court instructed the Receiver to "protect consumers who are currently enrolled in the debt-relief program operated by defendants and the intervenor law firms[.]" (*See* PI Decision and Order (Dkt. No. 183) at 55.)  On April 15, 2024, to carry out that task, the Receiver sought the Court's permission to communicate with more than 50,000 consumers who are in Strategic-affiliated debt relief programs ("April 15 Request for Instruction").  (*See* Dkt. No. 292-1.)  On May 3, 2024, the Court authorized the Receiver to send an approved supplemental notice to consumers via email, in an effort to provide them with additional information relevant to their circumstances.  (*See* Dkt. No. 352.)  On May 7, 2024, StratFS's Client Services sent out more than 58,000 of the supplemental notices (the "May 7th Notice").  (*See* **Exhibit 1**) (sample email to consumer).  The May 7th Notice was a stop-gap, and admittedly imperfect, measure necessitated by recent unauthorized and misleading communications the intervenor law firms ("Law Firms") sent their "clients" encouraging them to sign "amended" law firm engagement agreements which purported to convert the representation to a contingent-fee model.

The May 7th Notice was, among other things, designed to provide basic information about this lawsuit, encourage consumers to seek independent legal advice concerning their relationship with the Law Firms and identify potential alternative resources (namely the National Foundation for Credit Counseling and the National Association of Consumer Bankruptcy Attorneys) with which to discuss their debt circumstances.  It was intended to mitigate the consumer confusion,

1

harm, and lack of informed consent caused by the Law Firms' ***three*** unauthorized communications of which the Court and Receiver were aware. But the effect and benefit of the May 7th Notice was blunted by something the Court and Receiver did not know: the Law Firms had not sent these few communications to consumers but were deploying a massive communication campaign. Beyond the *three* known communications, the Law Firms were using a call center and sending emails every other day to persuade consumers to execute amendments.

The Law Firms did not reveal they were engaged in an extensive consumer campaign in their many filings leading up to or at the April 22, 2024 hearing despite the fact the issue was discussed extensively with defense counsel.[1] Nor did the Law Firms mention the campaign when they offered edits to the May 7th Notice. Had the Law Firms been candid at any of these times about the extent of their massive campaign, the contours of the May 7th Notice could and would have been modified to take into account the Law Firms' unauthorized and misleading consumer bombardment which sowed consumer confusion. But the Law Firms were content to leave the Court and Receiver in the dark – apparently because doing so meant that more of the consumers would sign the amendments without the benefit of appropriate disclosure.

And to be clear, the Law Firms have never come clean. Their actions only came to light when Strategic staff discovered the campaign, which forced the Receiver to file Order to Show Cause re Contempt against the Law Firms. (Dkt. No. 353.) Even though the Court had made especially clear that the no parties were to communicate with consumers absent further Court

---

[1] At the April 22nd hearing, Strategic's defense counsel cryptically discussed his understanding that tens of thousands of consumers had apparently signed the amendments. *See* Apr. 22 Tr. at 140:17-22 (Defense counsel stated, "… anecdotally, I've been informed that already tens of thousands have indicated in some fashion -- again, I don't know exactly how they have indicated this, but what I've been told is there is already thousands of people that have indicated their willingness to do this conversion.").

2

approval, the Law Firms continued to violate this order by sending thousands and thousands of emails to consumers and employing a call center to make phone calls, soliciting clients to sign amended engagement agreements.  (Dkt. No. 353-1 at 3-6.)

The existence and contents of the Law Firms' solicitation campaign are particularly troubling because consumers are not bound to the terms of the initial engagement agreements and the amendments signed without informed consent should also be considered void.  As indicated in the Receiver's prior filings, there are several reasons the engagement agreements are not valid: the Court preliminarily found Defendants and Law Firms took unlawful advance fees in violation of the Telemarketing Sales Rule; there is evidence of illegal fee-splitting; and there is evidence of the unlawful practice of law (both of which were reported in the Preliminary Report).  (*See* Dkt. No. 115.)  As such, the engagement agreements are almost certainly void.  (*See* Dkt. No. 292-1 at 11 & 15-16; Dkt. No. 256 at 9-11) (gathering state law cases finding unlawful or contracts against public policy void).[2]

If the Law Firms had provided appropriate disclosure when they sought amendments – that is, disclosing the existence of this lawsuit, the TRO, the PI, and the finding that the Defendants and Law Firms took illegal advance fees – then perhaps executed amendments could have created a valid engagement agreement.  But that is not what happened.  Instead, the Law Firms went out of their way to mislead the consumers and lure them into the amendments by

---

[2] The plaintiffs have alleged in their initial complaint that the law firms are "façade firms" serving as strawmen, while StratFS is the party that has carried out all meaningful debt settlement on behalf of consumers.  (*See* First Amended Complaint, Dkt. No. 249 ¶ 25 ("Individual Defendants Sasson and Blust created façade law firms (the "Façade Firms") that correspond to each Client Services Subsidiary.  These law firms serve as a façade for SFS's debt-relief operation and perform little to no work on behalf of consumers.").  The Strategic Defendants, as well as a group collectively referring to itself as the "intervening Law Firms," and jointly represented by the same counsel ("Intervening Law Firms") dispute these allegations and also claim that engagement agreements are not void.  (*See* Dkt. No. 312 at 12-14).

3

presenting the amendments as a favorable development that was good news for their clients – and essentially a no-brainer decision that all clients should make. The letters began: "We have an exciting update to share regarding the Film's representation of you!" (Dkt. No. 292-1) (Exclamation mark in original). In the letters, the Law Firms promised, "This new fee arrangement should allow you to save money faster and as such, allow us the opportunity to settle your debt(s) quicker." The letters continued, "We believe that the change in the fee arrangement has upside for you with no downside." (*Id.*).

The Law Firms' latest deceptive actions to lure consumers into amendments must be evaluated in the context of the preliminary findings of the Court, which included numerous findings specific to the Law Firms. *See generally* PI Decision and Order (Dkt. No. 183). These findings included, among other things, the Court's findings that: Mr. Gustafson, the lawyer supposedly in charge of one of the law firms specializing in debt settlement (and now the supposed representative of *all* of the Law Firms), had offered testimony that "def[ied] credulity" and was unaware of basic information in his supposed legal field (like the availability in most states and under federal law of a homestead exemption in bankruptcy) (*id.* at 4 & n.2); the Law Firms, as well as Strategic, take advance fees (*id*. at 12) and do not control the notaries in any respect (*id.* at 22-23); the Law Firms do not participate in the face-to-face meetings with their "client" (*id.* at 26-45); and the attorney's role is limited to having a brief "welcome call" and countersigning the agreement so that the initial payment of fees from the consumer can begin (*id.* at 29). *See also* Dkt. No. 281 at 10 n.6 (discussing allegations of complaint relating to the Law Firms as well as findings regarding the Law Firms in Receiver's Preliminary Report).

### A. Proposed Next Steps

As discussed at the April 22nd hearing (*see generally* Transcript at 96-98), the May 7th Notice was only an interim step to protect consumers. It is now time to implement more permanent steps, and there are two main alternatives.

First, the Defendants and Law Firms have proposed migrating the consumers to a contingent model in which the Law Firms would remain involved. As previously reported, after substantial review and study, the Receiver concluded the migration of the consumers would not be profitable or lawful. (Dkt. No. 292-1 at 9-14.) At the April 22nd hearing, CIBC and Valley Bank requested the opportunity to further evaluate the financial projections of the migration alternative, and the Receiver is working with the banks to complete that evaluation.

The banks' evaluation of the financial projections will be addressed at a hearing on May 29, 2024. But to be clear, it is not anticipated that the banks will address the lawfulness concerns which, as the Receiver concluded, are equally disabling to implementing the proposal. And, in the interim, the Plaintiffs have made clear they vigorously oppose further Law Firm involvement in a contingency arrangement. (*See* Dkt. No. 257 at 10-11). In their recent filing, the Plaintiffs take the position that the proposed model would violate the TSR and the PI. (*Id.*)

Given the above, it is time to provide an alternative path to protect consumers. The Receiver requests an instruction to wind down certain of Strategic's operations in the law firm debt relief model. *See* April 22 Tr. at 95:17-21. (The Court: "[I]f this plan that they have isn't profitable? Isn't lawful? And we're not going to follow it? Are you going to wind the business down or do I wind the business? What – what's going to happen then?"); *see also id.* at 97:12-98:8.[3]

---

[3] "THE COURT: Well, to help the consumers you're talking about sending out another notice, right? The one that you propose, right? Anything more in that regard? I think it probably needs

5

Absent different instruction from the Court, the Receiver does not believe the law firm debt relief model consumers (whether a list of their names or access to their data held by Strategic) is an "asset" of the Receivership Estate that can be monetized for a number of reasons. These consumers were initially obtained by Strategic via a process rife with misrepresentations, beginning with the mailing of millions of false flyers guaranteeing approval of consolidation loans at an extremely low interest rate from phantom lenders created and orchestrated by Strategic.  Once lured to call the telephone numbers listed on the flyers, consumers encountered a sales process centered on the fundamental falsehood, the involvement of a national law firm with special expertise to negotiate with the consumers' creditors.  Consumers were "promised" a "national law firm" with specific expertise in dealing with creditors would "represent them, but, in fact…there is almost no substantive attorney involvement in the debt settlement process." (Dkt. No. 115-1 (Receiver's Preliminary Report) at 6; *see also id.* at 45-49 (noting that structure of law firm debt relief program and use of the Law Firms were "reliant upon misrepresentations about the Law Firms' roles in negotiations and settling of debts" and raised "serious questions of the unauthorized practice of law [and] fee splitting.").  *See also generally* Dkt. No. 281 at 10 n.6 (Court's discussion of Receiver's findings as well as certain of Plaintiffs' allegations regarding misrepresentations to consumers).  There is also the added complication that these consumers have already had advance fees taken from them.[4]

---

to be done sooner rather than later, because if they are not going to go forward with this, then the business has to be laying down or whatever.  I mean, in a sense that protects the consumers, right?  Or at least from these defendants, but should we wait for that to happen, if it's going to happen, or send a notice out now and then send some follow-up notice about what's going to happen to the business."  (*Id.*)

[4] Despite the Law Firms' claims that the consumers are "their clients," if the engagement agreements are void (because of the reasons discussed above or because of the misrepresentations by which the "clients" were acquired), then it is possible a subset of the consumers could be offered the services of Atlas/Timberline (without Law Firm involvement) in

6

Based on recent information provided by Strategic personnel, there are presently approximately 57,000 Strategic consumers with roughly 285,000 debts that are not settled.[5] These consumers fall into the following two categories: Consumers without Active Payment Plans; and Consumers with Active Payment Plans.[6]

      1.      <u>Consumers without Active Payment Plans (29,902)</u>

Strategic personnel report that 29,902 law firm debt relief consumers (with 148,024 unsettled debts) have no active payment plans. This means that Strategic can bring an end to servicing these consumers without negatively impacting any active settlements.

The Receiver's recommendation for this group is that each consumer be provided with a notice indicating that:

    1)    Strategic will be winding down its customer support services for most law firm debt relief services;

    2)    Please access your customer portal for a list of debts, including those previously settled and those that remain outstanding;

---

the limited number of states where they have licensed operations. Of course, this option will only address a smaller number of consumers out of the 58,000 (estimated to be approximately 10,000) and would not remedy the unlawful advance fees already taken by Defendants and the Law Firms. Should the Court wish the Receiver to pursue some sort of monetization of the list of consumers (such as by a sale of the consumer list or otherwise), the Receiver will of course follow that path, but given the concerns discussed above, the Receiver is loath to recommend it.

[5] This does not include Atlas or Timberline consumers, which are not part of the law debt relief mode. Similarly, Versara loan servicing will continue (the servicing function is in the process of being transferred to the secondary servicer).

[6] As to the latter category, there is a further possible subgroup – those who presently have enough money in their direct deposit accounts to fully pay settled debts on which payments are being made (in other words, the consumers' accounts have grown over the last four months because fees have not been taken and they are in a position to fully fund the agreed settlement rather than continue payments).

7

  3)  Access to customer portals and customer service personnel will continue to be available for the next 60 days. After 60 days, the portals and customer service will no longer be available;

  4)  Going forward, including during the 60-day wind down period, Strategic will NOT settle any debts;

  5)  Strategic and the Law Firms have not taken fees from your dedicated account since the lawsuit by the Consumer Protection Financial Bureau and the state Attorneys General was filed. The money in the dedicated account belongs to you and may be used as you choose;

  6)  All outstanding debts remain your responsibility to resolve; they have not been affected by the lawsuit;

  7)  Consumers may be eligible for reimbursement of some amount of the unlawful advance fees paid to the Law Firms depending on the outcome of the lawsuit; and

  8)  Regular updates on the lawsuit will be available on this webpage [StratFS Receivership].

  2.  <u>Consumers with Active Payment Plans (28,091)</u>

Strategic personnel report that 28,091 consumers have active payment plans. Because no Strategic or Law Firm fees have been taken since the TRO, 10,133 consumers presently have enough money in their accounts at Global and RAM to make a lump sum pay off their previously reached settlements. To be clear, these consumers may have additional enrolled debts for which settlements have not been reached. (For example, the payment plan may be for the third of five enrolled debts, and debts four and five have not been settled and remain outstanding.) Some 17,958 consumers do not have enough money to pay off their previously reached settlements in a lump sum. As discussed below, the ability of the first group to make full payment dictates a slightly different request for instruction as to them.

Both categories of consumers are making regular payments to creditors from their dedicated accounts at payment processors RAM and Global. This process requires regular draws

8

from consumer bank accounts which are then deposited into the dedicated accounts.  The creditor payments are then made from the dedicated accounts.

Strategic continues to play an active role servicing these consumers to ensure creditor payments are made on schedule – and for many consumers have been paid through advance fees to service these accounts.  It handles the scheduling of transfers made from consumers' bank accounts to their dedicated accounts and then schedules the payments from consumers' dedicated accounts to their creditors.  While the transfer process is automated, Strategic is frequently approached by consumers and asked not to make a draw for one reason or another, often because the consumer is unable to fund the draw for some reason.[7]  Strategic staff must then reach out to creditors to request a payment extension, and, once the creditor accommodation is obtained, coordinate with the consumer to get the payments back on track for the extended schedule. Consumers routinely contact Strategic customer service representatives with other requests which could impact creditor payments, for example, a change of bank accounts which requires the draw information and payment process to be changed.

      a.    <u>Recommendation for Consumers Who Can Fund a Lump Sum Settlement</u>

As to the group of 10,313 who have the funds available to pay off previously reached settlements, the Receiver recommends sending a notice with much of the same information as provided above:

    1)    Strategic will be winding down most of its customer support services for law firm debt relief services in 60 days;

---

[7] Essentially, if a consumer does not want a draft to occur, they have two options:  the consumer can reschedule the draft to occur later in the same month or the consumer can skip the draft so it will occur in the next month (often this has the effect of adding a month to the program or can result in two drafts being taken in the same month).  On average, about 5% of the consumers make these requests every month.

2)      Please access your customer portal for a list of debts, including those previously settled, those in active payment plans, and those that remain outstanding;

3)      Going forward, including during the 60-day wind down period, Strategic will NOT settle any debts;

4)      Strategic and the Law Firms have not taken fees from your dedicated account since the lawsuit by the Consumer Protection Financial Bureau and the state Attorneys General was filed.  The money in your dedicated account belongs to you and may be used as you choose;

5)      You presently have at least one active payment plan which will extend more than 60 days;

6)      You have sufficient funds in your dedicated account to fund a lump sum settlement of the existing payment plan(s).  If you want Strategic to contact the creditor to determine if it will accept a lump sum to complete the settlement, please contact us immediately;

7)      If you do not want Strategic to provide customer service and assist with an existing payment plan(s), please let us know.  You will then be responsible for ensuring that current settlement payments continue to be timely made from your dedicated account;

8)      If we do not hear from you, the active payment plan will continue as scheduled;

9)      All outstanding debts remain your responsibility to resolve; they have not been affected by the lawsuit;

10)      Consumers may be eligible for reimbursement of some amount of the unlawful advance fees paid to the Law Firms depending on the outcome of the lawsuit; and

11)      Regular updates on the lawsuit will be available on this webpage [StratFS Receivership].

Upon instruction by a consumer, Strategic staff will contact the payment plan creditor and confirm it will agree to a lump sum payment of the settlement.  Once a creditor confirms it will accept early payment in full to resolve that debt, Strategic staff will implement the payment

to the creditor.[8]  Strategic personnel believe they will be able to act upon all consumer requests within 60 days.  To the extent Strategic is unable to act on a consumer request or obtain creditor approval within 60 days, efforts to obtain the approval will continue until all requests have been acted upon.  During this period, monthly creditor payment plan payments will continue, and no fees will be charged by Strategic.

If a consumer does not instruct Strategic or the creditor refuses the lump sum, then the payment plan will continue and be paid as scheduled.  The goal, however, would be to attempt to move as many consumers as possible to a situation where they have no further debts with active payment plans, so that services to these consumers can be wound down without causing additional harm to them.

      b.  Recommendation for Consumers Who Have Active Payment Plans and Cannot Presently Fund Lump Sum Settlements

According to Strategic personnel, there are approximately 18,000 consumers in active payment plans, where the consumers are not able to offer a lump sum settlement.  These plans generally conclude over the next two years.  By the end of 2024, 4,162 consumers will have completed their payment plans (assuming their payment schedules are followed); 9,656 by the end of 2025; 3,358 by the end of 2026; and 345 with the last settlement dates after that.

For these consumers, two paths are available.  A consumer can elect to have Strategic continue to provide customer support after the 60-day window through the completion of the payment plan.  Alternatively, the consumer can take responsibility for the payment plan going forward.

---

[8] Strategic personnel stressed this step is necessary to avoid misunderstanding or a creditor taking advantage of the situation and receiving more than the settlement amount.

11

For this cohort of consumers, the Receiver recommends sending a notice with much of the same information as provided above:

1) Strategic will be winding down most of its customer support services for law firm debt relief services in 60 days;

2) Please access your customer portal for a list of debts, including those previously settled, those in an active payment plan, and those that remain outstanding;

3) Going forward, including during the 60-day wind down period, Strategic will NOT settle any debts;

4) Strategic and the Law Firms have not taken fees from your dedicated account since the lawsuit by the Consumer Protection Financial Bureau and the state Attorneys General was filed. The money in the dedicated account belongs to you and may be used as you choose;

5) You presently have at least one active payment plan which will extend more than 60 days;

6) You do not currently have sufficient funds in your dedicated account to fund a lump sum settlement of the existing payment plan(s). If you want to add funds sufficient to make a lump sum payment so that Strategic can contact the creditor to determine if it will accept a lump sum to complete the settlement, please contact us.

7) If you do not want Strategic to provide customer service and assist with an existing payment plan(s), please let us know. You will then be responsible for ensuring that current settlement payments continue to be timely made;

8) If we do not hear from you, the active payment plan will continue as scheduled, and you should continue to make payments into your Global or RAM accounts;

9) All outstanding debts remain your responsibility to resolve; they have not been affected by the lawsuit;

10) Consumers may be eligible for reimbursement of some amount of the unlawful advance fees paid to the Law Firms depending on the outcome of the lawsuit; and

11) Regular updates on the lawsuit will be available on this webpage [StratFS Receivership].

## II.     CONCLUSION

The Receiver recommends the above steps be taken and seeks the Court's permission to do so.

Dated: May 22, 2024

                           **MCNAMARA SMITH LLP**

                           By:     /s/ *Logan D. Smith*
                           Logan D. Smith (*Pro Hac Vice*)
                           Alexander D. Wall (*Pro Hac Vice*)
                           McNamara Smith LLP
                           655 West Broadway, Suite 900
                           San Diego, California 92101
                           Telephone: (619) 269-0400
                           Facsimile: (619) 269-0401
                           Email: lsmith@mcnamarallp.com;
                           awall@mcnamarallp.com

                           *Attorneys for Court-appointed Receiver,*
                           *Thomas W. McNamara*