## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU, THE PEOPLE OF THE STATE OF
NEW YORK, BY LETITIA JAMES,
ATTORNEY GENERAL OF THE STATE OF
NEW YORK, STATE OF COLORADO, ex rel.
PHILIP J. WEISER, ATTORNEY GENERAL,
STATE OF DELAWARE ex rel. KATHLEEN
JENNINGS, ATTORNEY GENERAL,STATE
OF DELAWARE, THE PEOPLE OF THE
STATE OF ILLINOIS, through ATTORNEY
GENERAL KWAME RAOUL, THE STATE OF
MINNESOTA, by its ATTORNEY GENERAL,
KEITH ELLISON, THE STATE OF NORTH
CAROLINA , ex rel. Joshua H. Stein, Attorney
General, and THE STATE OF WISCONSIN,

Plaintiffs,

v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), STRATEGIC
CLIENT SUPPORT, LLC (f/k/a PIONEER
CLIENT SERVICES, LLC), STRATEGIC CS,
LLC, STRATEGIC FS BUFFALO, LLC,
STRATEGIC NYC, LLC, BCF CAPITAL, LLC,
T FIN, LLC, STRATEGIC CONSULTING,
LLC, VERSARA LENDING, LLC, STRATEGIC
FAMILY, INC., ANCHOR CLIENT
SERVICES, LLC (NOW KNOWN AS CS 1
PAAS SERVICES, LLC), BEDROCK CLIENT
SERVICES, LLC, BOULDER CLIENT
SERVICES, LLC, CANYON CLIENT
SERVICES, LLC, CAROLINA CLIENT
SERVICES, LLC, GREAT LAKES CLIENT
SERVICES, LLC, GUIDESTONE CLIENT
SERVICES, LLC, HARBOR CLIENT

CASE NO.  24-cv-40-EAW-
MJR

**SECOND AMENDED
COMPLAINT FOR
INJUNCTIVE RELIEF,
RESTITUTION, AND CIVIL
MONEY PENALTIES**

SERVICES, LLC, HEARTLAND CLIENT
SERVICES, LLC, MONARCH CLIENT
SERVICES, LLC (NOW KNOWN AS CS 2
PAAS SERVICES, LLC), NEWPORT CLIENT
SERVICES, LLC, NORTHSTAR CLIENT
SERVICES, LLC, OPTION 1 CLIENT
SERVICES, LLC, PIONEER CLIENT
SERVICING, LLC, ROCKWELL CLIENT
SERVICES, LLC, ROYAL CLIENT SERVICES,
LLC, STONEPOINT CLIENT SERVICES,
LLC, SUMMIT CLIENT SERVICES, LLC
(NOW KNOWN AS CS 3 PAAS SERVICES,
LLC), WHITESTONE CLIENT SERVICES,
LLC, RYAN SASSON, JASON BLUST,
RICHARD K GUSTAFSON II, TIMOTHY F.
BURNETTE, MICHELLE GALLAGHER,
DANIEL BLUMKIN, ALBERT IAN BEHAR,
TWIST FINANCIAL, LLC, DUKE
ENTERPRISES, LLC, BLAISE
INVESTMENTS, LLC, LIT DEF
STRATEGIES, LLC, RELIALIT, LLC,
FIDELIS LEGAL SUPPORT SERVICES, LLC,
HEDGEWICK CONSULTING, LLC, and
UNIDENTIFIED JOHN DOES 1-50,

                    Defendants, and

STRATEGIC ESOP, STRATEGIC ESOT, THE
BLUST FAMILY 2019 IRREVOCABLE
TRUST THROUGH PAUL HULL, JR.,
TRUSTEE, JACLYN BLUST, CAMERON
CHRISTO, and THE BUSH LAKE TRUST
THROUGH TIMOTHY MILLER, TRUSTEE,

                    Relief Defendants.

## Introduction

1.      The Consumer Financial Protection Bureau (Bureau) and the State of New York, the State of Colorado, the State of Delaware, *ex rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois, the State of Minnesota, the State of North Carolina, and the State of Wisconsin (collectively, the States) file this Complaint against

StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Support, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Versara Lending, LLC, Strategic Family, Inc. (collectively, SFS), Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC), Whitestone Client Services, LLC (collectively, Client Services Subsidiaries), Ryan Sasson, Jason Blust, Richard K. Gustafson II, Timothy F. Burnette, Michelle Gallagher, Daniel Blumkin, Albert Ian Behar (collectively, Individual Defendants), Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments, LLC (collectively, Holding Companies), Lit Def Strategies, LLC, Relialit, LLC, Fidelis Legal Support Services, LLC, and Hedgewick Consulting, LLC (collectively, Blust Companies), and Unidentified John Does 1-50, which are additional SFS companies and Client Services Subsidiaries that are currently unknown.

2.    The Bureau and the States (collectively Plaintiffs) file this Complaint against Strategic ESOP, Strategic ESOT, the Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee, Jaclyn Blust, Cameron Christo, and the Bush Lake Trust Through Timothy Miller, Trustee, as Relief Defendants.

3.     The Bureau brings this action under the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6102(c), 6105(d); the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310; and Sections 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, and 5565, in connection with the marketing and sale of debt-relief services.

4.     The State of New York, by its Attorney General (NYAG), is authorized to take action to enjoin repeated and persistent fraudulent and illegal conduct under New York Executive Law § 63(12) and deceptive business acts and practices under New York General Business Law (GBL) Article 22-A.

5.     Pursuant to the Telemarketing Act, 15 U.S.C. §§ 6103(a) and (f)(2), the NYAG is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of New York residents, or to obtain such further and other relief as the court may deem appropriate. The NYAG is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

6.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Colorado, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Colorado residents, or to obtain such further and other relief as the court may deem appropriate. The State of Colorado is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

7.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2),
Kathleen Jennings, Attorney General of Delaware, is authorized to initiate federal
district court proceedings to enjoin telemarketing activities that violate the TSR, to
enforce compliance with the TSR, and in each such case, to obtain damages, restitution,
and other compensation on behalf of Delaware residents, or to obtain such further and
other relief as the court may deem appropriate. The State of Delaware is also authorized
to enforce the CFPA. 12 U.S.C. § 5552(a).

8.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the
State of Illinois, by its Attorney General Kwame Raoul, is authorized to initiate federal
district court proceedings to enjoin telemarketing activities that violate the TSR, to
enforce compliance with the TSR, and in each such case, to obtain damages, restitution,
and other compensation on behalf of Illinois residents, or to obtain such further and
other relief as the court may deem appropriate. The State of Illinois is also authorized to
enforce the CFPA. 12 U.S.C. § 5552(a).

9.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the
State of Minnesota, by its Attorney General, is authorized to initiate federal district
court proceedings to enjoin telemarketing activities that violate the TSR, to enforce
compliance with the TSR, and in each such case, to obtain damages, restitution, and
other compensation on behalf of Minnesota residents, or to obtain such further and
other relief as the court may deem appropriate. The State of Minnesota is also
authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

10.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the
State of North Carolina, by its Attorney General, is authorized to initiate federal district
court proceedings to enjoin telemarketing activities that violate the TSR, to enforce

compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of North Carolina residents, or to obtain such further and other relief as the court may deem appropriate. The State of North Carolina is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

11.     The State of Wisconsin, by its Attorney General and Department of Justice (WIAG), is authorized under Wis. Stat. §§ 165.25(1m), 220.04(10), and 220.12 to take action to enforce compliance with the State's adjustment service company law, Wis. Stat. § 218.02, and the administrative rule promulgated thereunder, Wis. Admin. Code § DFI-Bkg. Ch. 73, and to seek a permanent or temporary injunction or restraining order, appointment of a receiver, and order for recission of any acts determined to be unlawful.

12.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the WIAG is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Wisconsin residents, or to obtain such further and other relief as the court may deem appropriate. The WIAG is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

### Overview

13.     Since at least January 2016, Defendants have operated a debt-relief scheme that collects exorbitant, illegal advance fees from vulnerable consumers suffering financial difficulties. SFS employs third parties to mail personalized letters to debt-distressed consumers in the name of a rotating cast of companies (e.g., Lucky Marketing, Patriot Funding, and Pebblestone Financial). The letters claim the consumers are "pre-approved" for a debt-consolidation loan at attractive rates, e.g.,

3.11% APR. The letters include a unique Offer Code or Personal Reservation Code (PRC). Consumers are directed to call a phone number or submit a request to a designated website using the unique PRC. Sometimes the packages sent to consumers also include fake checks payable to the consumer.

14.     SFS is the invisible orchestrator of the solicitations, and the rotating list of companies used in the mailers exists only on the face of the letters; in reality, there is no actual lender and no actual pre-approval.

15.     SFS often causes 2-3 million direct-mail solicitation letters to be sent to consumers each week. SFS projects the mailers will generate between 12,000 and 16,000 leads per week.

16.     When consumers respond to the pre-approval letters (by calling or by visiting the website and entering the PRC), their information is captured by SFS's computer systems and is sent to SFS's sales employees as "leads."

17.     SFS's sales employees then contact the consumer and almost always advise them that they do not qualify for the loan. After reviewing a sampling of 100 sales calls from January 9 and 10, 2024, the court-appointed Receiver of SFS found that consolidated loans were offered as an option to just five consumers (and never at interest rates similar to what was advertised in the pre-approval letter), while the debt-relief service was offered to all 100 consumers.

18.     SFS's sales employees encourage the consumers to enroll in SFS's debt-relief service by promising that Defendants' network of lawyers will negotiate reduced payoff amounts with consumers' creditors and defend consumers in the event of a creditor lawsuit. This sales process is dictated by tightly choreographed scripts that include rebuttal responses to every possible consumer push back.

19.     At least one of the scripts used by SFS's sales employees presumes that the loan was not provided to the consumer and directs the SFS sales employee to say, "although your file was not approved for a debt consolidation loan (due to your credit score and/or debt to income ratio) . . . we have approved you for a great option which is perfectly in line with the goals we previously discussed."

20.     Another SFS sales script includes the following scripted question and answer:

> Q. The flyer said I was already approved for a loan. Why do I have to submit an application?
>
> A: Many people take the term "pre-approved" to mean already approved and I apologize for that confusion. It actually means you have been pre-approved to go through our application process, but we do need some additional information to complete your application.

21.     SFS sales employees routinely refer to the debt-relief service as the "0% interest option." SFS provides a script for its sales employees that describes the debt-relief service as follows:

> This program will still provide you the convenience factor of one single lower monthly payment, it will allow you to get all of this debt taken care of in an average of just 3-4 years, while saving you a significant amount of money off of your principal balance, but most importantly this option will be charging *zero interest throughout the entire length and duration of this option*. (emphasis added).

22.     Immediately after consumers enroll in the debt-relief service, Defendants begin collecting substantial fees from them, despite admitting to consumers that any settlements with creditors will take months to secure. Meanwhile, consumers' debts continue to accrue interest while they remain outstanding.

23.     Defendants' front-loaded fees leave the consumers with little money for any such potential settlements. As a result, consumers regularly pay into the debt-relief

service for months before Defendants reach a settlement with even one creditor, and Defendants collect a significant amount of fees in the interim. Some consumers exit the program having paid substantial fees but with none of their debts settled or reduced. Many consumers end up with more debt than they started with, see their credit scores decrease substantially, and end up getting sued by creditors. Already-vulnerable consumers often end up in a worse financial situation than before, while Defendants profit. Since at least January 2016, Defendants have collected over $84,000,000 in unlawful fees from consumers through these schemes.

24.     The Individual Defendants conduct this operation using a web of interrelated companies they have created. Individual Defendants Sasson, Blumkin, and Behar founded SFS. Each of them created a single-member shell Holding Company (Duke Enterprises LLC (Duke Enterprises), Twist Financial LLC (Twist Financial), and Blaise Investments LLC (Blaise Investments), respectively) that funneled money from SFS's businesses to Sasson, Behar, and Blumkin. Until 2017, each of these Holding Companies owned a percentage of Strategic Financial Solutions, LLC. Collectively, their ownership constituted a majority, which allowed them to control Strategic Financial Solutions, LLC. Their ownership interests were converted to stock, and then the Holding Companies sold their stock to the Strategic ESOT in 2017. Defendants Sasson, Blumkin, and Behar currently serve as directors on Strategic Family's Board of Directors.

25.     Individual Defendant Sasson also created the Client Services Subsidiaries.

26.     Individual Defendants Sasson and Blust created façade law firms (the Façade Firms) that correspond to each Client Services Subsidiary. These law firms serve as a façade for SFS's debt-relief operation and perform little to no work on behalf of

consumers. Individual Defendants Gustafson, Burnette, and Gallagher each own and control multiple Façade Firms.

27.     In addition, Individual Defendants Sasson, Blust, Blumkin, and Behar created shell companies and consulting firms that funnel money back to each of them.

## Jurisdiction

28.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

29.     This Court has supplemental jurisdiction over the States' state law claims because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

## Venue

30.     Venue is proper in this district because SFS is located, resides, and does business here and because a substantial part of the events or omissions giving rise to the claims occurred in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(2).

## The Parties

31.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent

litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§ 6102(c)(2), 6105(d).

32.     Letitia James, Attorney General of New York, is authorized to bring this action on behalf of the State of New York and its citizens to enforce New York law, the TSR, and the CFPA.

33.     Philip J. Weiser, Attorney General for Colorado, is authorized to bring this action on behalf of the State of Colorado and its citizens to enforce the TSR and CFPA.

34.     Kathleen Jennings, Attorney General of Delaware, is authorized to bring this action on behalf of the State of Delaware and its citizens to enforce the TSR and CFPA.

35.     Kwame Raoul, Illinois Attorney General is authorized to bring this action on behalf of the People of the State of Illinois to enforce the TSR and CFPA.

36.     Keith Ellison, Attorney General of Minnesota, is authorized to bring this action on behalf of the State of Minnesota and its citizens to enforce the TSR and CFPA.

37.     Joshua H. Stein, Attorney General of the State of North Carolina, is authorized to bring this action on behalf of the State of North Carolina and its citizens to enforce the TSR, and the CFPA.

38.     Joshua L. Kaul, Attorney General of Wisconsin, is authorized to bring this action on behalf of the State of Wisconsin to enforce Wisconsin law, the TSR, and the CFPA.

*SFS*

39.     Strategic Family, Inc. is the parent company of other SFS defendants, including StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS

Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Versara Lending, LLC, and Strategic Consulting, LLC (collectively, SFS, as defined above).

40.    SFS maintains its principal place of business at 115 Lawrence Bell Drive, Buffalo, NY 14221. SFS's website (stratfs.com) says that its main office is located at this address. SFS offers and provides "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

41.    In connection with a campaign to induce consumers to purchase its services, SFS initiates and receives interstate telephone calls to and from consumers. During these calls, SFS offers to renegotiate, settle, or alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors. Thus, SFS is a "telemarketer" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (ff).

42.    SFS provides, offers to provide, or arranges for others to provide debt-relief services to consumers in exchange for consideration. Thus, SFS is also a "seller" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

*Non-Party Façade Firms*

43.    On paper, SFS partners with purported law firms around the country, and the firms offer and promise to provide services, including debt-relief services, to consumers owing unsecured debts to creditors. Each firm is paired with an SFS-owned Client Services Subsidiary that usually has a name similar to the firm, and non-attorney negotiators from SFS and its Client Services Subsidiaries are the ones tasked with renegotiating a consumer's debt – if such negotiations happen at all. Because most or all

of the services are carried out by non-attorneys who are not employees of the firm, the firms are referred to herein as "Façade Firms."

44.    Many of the Façade Firms appear not to have physical offices, and instead utilize virtual offices and mailboxes, like UPS Store-rented mailboxes. For at least some of the Façade Firms, incoming mail is scanned by a third party and then uploaded not to the law firm but rather to SFS.

45.    The Façade Firms work on behalf of SFS to offer and provide "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

46.    In connection with SFS's telemarketing transactions, the Façade Firms offer to provide or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, the Façade Firms are "sellers" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

47.    The Façade Firms include but are not limited to:

- A. Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio & Associates, PLLC;

- Anchor Law Firm, PLLC;

- Boulder Legal Group, LLC;

- The Brian A Moore Law Firm LLC d/b/a Guidestone Law Group;

- Brandon Ellis Law Firm LLC;

- Burnette Legal Group, LLC d/b/a Monarch Legal Group;

- Chinn Legal Group, LLC d/b/a Slate Legal Group and Halo Law Group;

- Credit Advocates Law Firm, LLC;

- Dakis Legal Group LLC d/b/a Clear Creek Legal, LLC;

- Daniel Rufty Legal PLLC d/b/a Carolina Legal Services;

- Donald Norris Associates PLLC d/b/a Stonepoint Legal Group;

- Gardner Legal LLC d/b/a Option 1 Legal;

- Great Lakes Law Firm, LLC;

- Greene Legal Group LLC d/b/a Newport Legal Group;

- Gustafson Consumer Law Group, LLC d/b/a White Oak Law Group;

- Hallock and Associates, LLC;

- Harbor Legal Group, LLC;

- Henry Legal Group, PLLC d/b/a Heartland Legal Group;

- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

- JMS Industries, LLC d/b/a Canyon Legal Group;

- The Law Firm of Derek Williams, LLC f/k/a Infinite Law Firm;

- The Law Office of Melissa Michel LLC d/b/a Spring Legal Group;

- Leigh Legal Group, PLLC d/b/a Greenstone Legal Group;

- Michel Law, LLC d/b/a Level One Law;

- Moore Legal Group, LLC d/b/a Meadowbrook Legal Group;

- Northstar Legal Group, LLC;

- Pioneer Law Firm, P.C., f/k/a John B. Dougherty P.C.;

- The Sands Law Group, LLP d/b/a Whitestone Legal Group; and

- WyoLaw, LLC d/b/a Summit Law Firm.

*Client Services Subsidiaries*

48.    The SFS-owned Client Services Subsidiaries perform services to facilitate the scheme. Each SFS-owned Client Services Subsidiary corresponds to one or more

Façade Firms, and most of the Client Services Subsidiaries share a name with a Façade Firm. For example, Anchor Client Services, LLC corresponds to Anchor Law Firm, PLLC. SFS uses the Client Services Subsidiaries to siphon money from consumers' accounts and profits from the Façade Firms and to mask SFS's involvement in the debt-relief operation.

49.     The Client Services Subsidiaries work on behalf of SFS and the Façade Firms to offer and provide "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

50.     In connection with SFS's telemarketing transactions, the Client Services Subsidiaries offer to provide or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, the Client Services Subsidiaries are "sellers" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

51.     As discussed below, the Client Services Subsidiaries are in a common enterprise with SFS. The Client Services Subsidiaries involved in the common enterprise include:

- Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC);

- Bedrock Client Services, LLC;

- Boulder Client Services, LLC;

- Canyon Client Services, LLC;

- Carolina Client Services, LLC;

- Great Lakes Client Services, LLC;

- Guidestone Client Services, LLC;

- Harbor Client Services, LLC;

- Heartland Client Services, LLC;

- Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC);

- Newport Client Services, LLC;

- Northstar Client Services, LLC;

- Option 1 Client Services, LLC;

- Pioneer Client Services, LLC;

- Rockwell Client Services, LLC;

- Royal Client Services, LLC;

- Stonepoint Client Services, LLC;

- Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC); and

- Whitestone Client Services, LLC.

*Defendants Ryan Sasson, Albert Ian Behar,*
*Daniel Blumkin, and the Holding Companies*

52.     Ryan Sasson is one of the founders and was the Chief Executive Officer of SFS. Sasson and Blumkin were the two initial members of Encore Capital USA, LLC (Encore) in 2010; Encore later became Strategic Financial Solutions, LLC. Along with Blumkin and Behar, Sasson was also a "Common Manager" at Strategic Client Support, LLC and Strategic Financial Solutions, LLC. According to Strategic Financial Solutions' Second Amended and Restated Operating Agreement, Sasson, along with Blumkin and Behar, was a manager of SFS, and managers have authority to act on behalf of and bind the company. Sasson is currently a director on Strategic Family's Board of Directors and is listed as an officer of SFS on corporate tax filings.

53.     Sasson is a former employee of Legal Helpers Debt Resolution, LLC (Legal Helpers), a debt-relief firm that was sued and eventually shut down as a result of actions by the Attorneys General of Illinois, Wisconsin, North Carolina, and West Virginia. The Attorneys General alleged that Legal Helpers charged unlawful up-front fees, failed to reduce consumers' debts as promised, and attempted to avoid advance-fee bans by recruiting attorneys to act as fronts for the business. Compl., *Illinois v. Legal Helpers Debt Resol., LLC*, No. 2011 CH 00286 (Sangamon Cty., Ill. Mar. 2, 2011); Compl., *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis. June 12, 2013); Compl., *North Carolina v. Legal Helpers Debt Resol., LLC*, No. 14CV006409 (Wake Cty., N.C. May 15, 2014); Compl., *West Virginia v. Legal Helpers Debt Resol., LLC*, No. 13-C-2330 (Kanawha Cty., W. Va. Dec. 20, 2013). The Illinois and North Carolina Attorneys General actions resulted in consent judgments enjoining Legal Helpers from engaging in debt relief in their respective states. Judgment*, Illinois v. Legal Helpers Debt Resol., LLC*, No. 2011 CH 00286 (Sangamon Cty., Ill. July 2, 2012); Judgment*, North Carolina v. Legal Helpers Debt Resol., LLC*, No. 14CV006409 (Wake Cty., N.C. Sept. 29, 2014). The North Carolina consent judgment also enjoined the principals of the firm from engaging in debt relief and entered judgments in the amounts of $1,533,000 and $122,000 against Legal Helpers and the individual defendants, respectively. *Id*. The Wisconsin Attorney General's action and the West Virginia Attorney General's action resulted in judgments for $12,272,000 and $135,000, respectively, and settlement agreements enjoining Legal Helpers and the principals of the firm from engaging in debt relief in Wisconsin and West Virginia. Judgment, *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis. Feb. 15, 2016); Settlement Agreement, *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013

CX 11 (Dane Cty., Wis. May 13, 2016); Judgment, *West Virginia v. Legal Helpers Debt Resol., LLC,* No. 13-C-2330 (Kanawha Cty., W.Va. June 2, 2014).

54.     In October 2010, LHDR Help, Inc. (LDHR Help) was formed. Sasson was the President at inception and remained in that role until 2012, at least. LDHR Help referred clients to Legal Helpers and Credit Advocates Law Firm, LLC (owned by Blust).

55.     Sasson knows or should know, based on the matters discussed in Paragraphs 53 and 54, that it is illegal to charge up-front fees for telemarketer-sold debt-relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.

56.     Sasson is the sole owner and sole member of Duke Enterprises, LLC. Duke Enterprises owned 25.69% of Strategic Financial Solutions, LLC. In 2017, those ownership shares converted to an ownership stake in Strategic Family, Inc. Duke Enterprises owned 25.22% of Strategic Family's voting stock before the sale of the stock to the Strategic ESOT in 2017. Duke Enterprises was also a member of LHDR Help. Defendants use Duke Enterprises to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Ryan Sasson.

57.     At all times material to this Complaint, acting alone or in concert with others, Sasson has exercised substantial control over and involvement in the establishment of business policies and practices described in this Complaint for SFS, the Client Services Subsidiaries, and Duke Enterprises. At all times material to this Complaint, Sasson has exercised managerial responsibility for these companies and has materially participated in the conduct of their affairs.

58.     Daniel Blumkin lives in Port Washington, NY and New York City, NY. He is one of the founders of SFS. Blumkin and Sasson were the two initial members of SFS's

predecessor, Encore. Along with Sasson and Behar, Blumkin was also a "Common Manager" at Strategic Client Support, LLC and Strategic Financial Solutions, LLC. Blumkin was Chief Sales Officer of SFS and head of sales at Strategic Consulting, LLC. He is listed as an officer of SFS on corporate tax filings and previously served as President of Strategic Financial Solutions, LLC. A Credit Agreement with CIBC Bank lists Blumkin and Sasson as "Key Men" to SFS. According to Strategic Financial Solutions' Second Amended and Restated Operating Agreement, Blumkin, along with Sasson and Behar, was a manager of SFS, and managers have authority to act on behalf of and bind the company. From approximately 2008 until recently, Blumkin oversaw all sales operations at Strategic Family, Inc. Blumkin is currently a director on Strategic Family's Board of Directors. Blumkin had an office in the sales portion of SFS's Manhattan office suite as of January 2024.

59.     Blumkin is a former employee of LHDR Help, and in 2012, at least, Blumkin served as the Vice President of Sales for that company.

60.     Blumkin is the sole owner and sole member of Twist Financial, LLC. Twist Financial owned 17.85% of Strategic Financial Solutions, LLC. In 2017, those ownership shares converted to an ownership stake in Strategic Family, Inc. Twist Financial owned 17.13% of Strategic Family's voting stock before the sale of the stock to the Strategic ESOT in 2017. Blumkin and Twist Financial share an address: 1 Greenwood Ln, Port Washington, NY 11050. Twist Financial and SFS share an address: 711 3rd Avenue, 6th Fl., New York, NY 10017. Twist Financial was also a member of LHDR Help. Defendants use Twist Financial to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Daniel Blumkin.

61.    At all times material to this Complaint, acting alone or in concert with others, Blumkin exercised substantial control over and involvement in the business policies and practices described in this Complaint for SFS and Twist Financial. At all times material to this Complaint, Blumkin has exercised managerial responsibility for SFS and has materially participated in the conduct of its affairs.

62.    Albert Ian Behar is one of the founding members of SFS. Along with Blumkin, Behar signed his name as a "Common Manager" on the Operating Agreement of Encore. Along with Sasson and Blumkin, Behar was also a "Common Manager" at Strategic Client Support, LLC and Strategic Financial Solutions, LLC. Behar is currently a director on Strategic Family's Board of Directors. According to Strategic Financial Solutions' Second Amended and Restated Operating Agreement, Behar, along with Sasson and Blumkin, was a manager of SFS, and managers have authority to act on behalf of and bind the company. Behar signed account agreements with large financial institutions on behalf of various SFS entities, including Strategic Financial Solutions and Strategic, Family Inc. Behar had an office next to Sasson's office in SFS's Manhattan office suite as of January 2024.

63.    Behar is the sole owner and sole member of Blaise Investments, LLC. Blaise Investments owned 25.69% of Strategic Financial Solutions, LLC. In 2017, those ownership shares converted to an ownership stake in Strategic Family, Inc. Blaise Investments owned 25.22% of Strategic Family's voting stock before the sale of the stock to the Strategic ESOT in 2017. Blaise Investments was also a member of LHDR Help. Defendants use Blaise Investments to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Albert Ian Behar. At all times material to this Complaint, acting alone or in concert with others, Behar exercised substantial

control over the business policies and practices described in this Complaint for SFS and Blaise Investments. At all times material to this Complaint, Behar has exercised managerial responsibility for SFS and has materially participated in the conduct of its affairs.

64.     Through their combined voting stock ownership in Strategic Family, Inc., the Holding Companies were able to control Strategic Family, Inc. Through their owners, Sasson, Behar, and Blumkin, the Holding Companies controlled Strategic Family Inc.'s business.

65.     Sasson, Blumkin, and Behar know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

*Common Enterprise*

66.     SFS, its Client Services Subsidiaries, and the Holding Companies operate as a common enterprise controlled by Sasson, Behar, and Blumkin.

67.     SFS, Client Services Subsidiaries, and holding companies Twist Financial and Blaise Investments share addresses at 711 3rd Ave, 6th Floor, New York, NY 10017. The Client Services Subsidiaries do not have distinct spaces within that address.

68.     The same people control the bank accounts for SFS, its Client Services Subsidiaries, and the Holding Companies. For example, account-opening documents from Valley Bank show that Individual Defendant Sasson, SFS's CEO, opened accounts for Strategic Client Support, LLC, Atlas Client Services, LLC (related to a company that may be another façade firm), Strategic Financial Solutions, LLC, Strategic LD, LLC (another company likely owned by SFS), Versara Lending, Strategic CS, LLC, Anchor Client Services, LLC, and Duke Enterprises.

69.     Behar opened a bank account for Blaise Investments, and Blumkin opened a bank account for Twist Financial.

70.     As of January 2024, Ryan Sasson and Albert Ian Behar were also signers for the bank accounts of Strategic Family, Inc. and Versara Lending, LLC at CIBC Bank USA, and Sasson was the only signer for the bank accounts of Strategic Financial Solutions, LLC and Strategic NYC, LLC.

71.     Similarly, Ryan Sasson was the signer for the bank accounts of nineteen Defendants at Key Bank. Sasson was the signer for Strategic Financial Solutions, LLC, Anchor Client Services, LLC, BCF Capital, LLC, Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Harbor Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Strategic Client Support, LLC, Strategic Consulting, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC , Strategic NYC, LLC, and Summit Client Services, LLC.

72.     SFS commingles funds with the Client Services Companies and the Holding Companies.

73.     For example, records for bank accounts held by three Client Services Subsidiaries show that they each transferred millions of dollars to various companies in the common enterprise, including Strategic Client Support, LLC, Strategic NYC, LLC, Strategic CS, LLC, and Strategic Consulting, LLC. The following chart shows the transfers into and out of an account held by Strategic NYC, LLC between October 2017 and December 2020. This SFS entity received money from multiple Client Services Subsidiaries and distributed that money throughout the common enterprise.

| Account 7645 - STRATEGIC NYC, LLC | | | |
|---|---|---|---|
| **Account / Activity** | **Account Name** | **Incoming** | **Outbound** |
| 3931 | BEDROCK CLIENT SERVICES, LLC | 20,961,075.22 | - |
| 7076 | BOULDER CLIENT SERVICES LLC | 17,787,737.97 | - |
| WIRE IN | | 17,584,963.27 | - |
| 9379 | ANCHOR CLIENT SERVICES LLC | 13,353,426.79 | - |
| 2687 | ROCKWELL CLIENT SERVICES, LLC | 10,532,106.15 | - |
| 3847 | TIMBERLINE FINANCIAL, LLC | 8,711,564.85 | - |
| 5085 | HARBOR CLIENT SERVICES, LLC | 4,499,204.86 | - |
| 9557 | PIONEER CLIENT SERVICING, LLC | 3,114,446.29 | - |
| 5128 | STONEPOINT CLIENT SERVICES, LLC | 1,128,877.69 | - |
| 7649 | CANYON CLIENT SERVICES, LLC | 843,238.61 | - |
| 8385 | ROYAL CLIENT SERVICES, LLC | 786,341.94 | - |
| 1538 | CELL GRAMERCY OF CONTEGO INSURANCE LLC | 400,000.00 | - |
| 7514 | BCF CAPITAL, LLC | 39,402.70 | - |
| 3206 | ATLAS DEBT RELIEF, LLC | 4,378.34 | - |
| 3458 | ATLAS CLIENT SERVICES LLC | 4,300.00 | - |
| 1294 | VERSARA LENDING LLC | - | 34,251,717.68 |
| 7922 | STRATEGIC CS, LLC | - | 17,736,230.06 |
| 9204 | STRATEGIC CONSULTING, LLC | - | 16,962,610.30 |
| 1894 | STRATEGIC FINANCIAL SOLUTIONS, LLC | - | 13,010,883.31 |
| 1286 | STRATEGIC CLIENT SUPPORT LLC | - | 12,978,297.03 |
| 5354 | PEERFORM INC. | - | 2,398,698.15 |
| 9490 | STRATEGIC FS BUFFALO, LLC | - | 952,219.15 |
| 3204 | STRATEGIC LD, LLC | - | 723,384.53 |
| WIRE OUT | | - | 701,262.47 |
| 5847 | F SOLUTIONS LLC | - | 24,257.72 |
| 5269 | STRATEGIC FAMILY, INC. | - | 10,250.00 |
| **Grand Total** | | **99,751,064.69** | **99,749,810.40** |

74.     In addition, records from another bank show that Anchor Client Services, LLC, Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, and Whitestone Client

Services, LLC, at least, sent millions of dollars to T Fin, LLC and Strategic NYC, LLC between approximately 2018 and 2021.

75.     Additionally, Strategic Financial Solutions, LLC transferred funds from its account at Valley Bank to the Holding Companies from October 2016 through at least September 2017. Strategic Family Inc. transferred funds from its account at KeyBank to the Holding Companies from May 2018 through at least January 2021.

76.     SFS and its Client Services Subsidiaries share a phone system. The phone system has a common set of extensions across SFS and its Client Services Subsidiaries such that employees of the common enterprise can call each other without dialing outside of the system.

77.     In December 2018, SFS contracted with a data analytics firm to analyze the common enterprise's phone calls for sales and retention purposes. As part of this process, SFS sent recorded phone calls to the data analytics firm. The calls included those from phone lines named Anchor Creditor Line, Bedrock Creditor Line, Boulder Creditor Line, Canyon Creditor Line, Carolina Creditor Line, Great Lakes Creditor Line, Harbor Creditor Line, Pioneer Creditor Line, Rockwell Creditor Line, Royal Creditor Line, Stonepoint Creditor Line, and Summit Creditor Line. SFS also shared call recordings from a phone line named "Generic CS Creditor Line," which exemplifies the internal interchangeability of the Client Services Subsidiaries.

78.     SFS and its Client Services Subsidiaries also share employees. Although individual employees' salaries may be paid by SFS or a Client Services Subsidiary, such employees perform work for all of the Client Services Subsidiaries. In some instances, the same employees answer phone lines associated with multiple Client Services Subsidiaries. For example, one employee whose salary was paid by SFS answered

consumer calls to multiple phone lines associated with Client Services Subsidiaries, including the Boulder Creditor Line, the Harbor Creditor Line, the Rockwell Creditor Line, the Royal Creditor Line, and the Summit Creditor Line.

79.    Similarly, when consumers enrolled in the debt-relief service try to call the law firm they believe is representing them, the call is routed to SFS where SFS employees answer the phone using the name of the Client Services Subsidiary or Façade Firm associated with each consumer. The entity name under which an SFS employee answers a consumer phone call can change with each call. Thus, a single SFS employee will answer dozens of consumer calls in any given day, representing themselves as an employee of numerous different Client Services Subsidiaries or Façade Firms. One employee who answers calls from consumers holds himself out to be a representative of at least six different Façade Firms, although his salary is paid by Strategic Client Support, LLC.

80.    SFS and the Holding Companies do not appear to share employees as the Holding Companies have no employees. Sasson, Blumkin, and Behar are the sole owner, member, and manager of their respective Holding Company.

81.    SFS, its Client Services Subsidiaries, and the Holding Companies also share leadership. Consumers who attempt to call the Façade Firm they believe represents them reach customer service representatives who are often paid by SFS. Ryan Sasson has represented that these customer service representatives work for SFS's Client Services Subsidiaries. The customer service representatives report to the Senior Director of Client Services and Senior Director of Customer Services. Both of these Senior Directors report to the Vice President of Client Service Operations who directly reports to SFS CEO Ryan Sasson. Sasson, Blumkin, and Behar are each the sole owner,

member, and manager of their respective Holding Company and also serve as Directors on SFS's Board. Sasson and Blumkin have also served as officers of SFS.

82.     Because the Client Services Subsidiaries and the Holding Companies are in a common enterprise with SFS, they are liable for SFS's actions under the TSR. *See infra* ¶¶ 66-81.

*Individual Defendants Blust, Gustafson, Burnette, and Gallagher*

83.     Jason Blust is an attorney who created and maintains multiple Façade Firms designed to conceal SFS's involvement in the debt-relief service. He controls and oversees the operations of all of the Façade Firms and the Blust Companies. He directs consumer funds to himself through some of the Blust Companies, at least, including Relialit, LLC (Relialit) and Lit Def Strategies, LLC (Lit Def). Jason Blust resides in Lake Barrington, Illinois. He entered into a stipulated judgment with the United States Bankruptcy Trustee for the District of Kansas regarding numerous violations of bankruptcy law arising from the scheme alleged in this complaint. Judgment, *U.S. Trustee Lashinsky v. Blust,* No. 18-06046, Doc #17 (Bankr. D. Kan. 2018). Jason Blust knows or should know that the conduct alleged herein is illegal. He is also a former attorney at Legal Helpers. Jason Blust knows or should know, based on the Legal Helpers matters discussed in Paragraph 53, that it is illegal to charge up-front fees for telemarketer-sold debt-relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.

84.     At all times material to this Complaint, acting alone or in concert with others, Jason Blust has exercised substantial control over and involvement in the establishment of the Façade Firms' business policies and practices described in this Complaint. Jason Blust recruited attorneys to help run, or serve as figureheads for, the

Façade Firms, including at least one SFS employee who simultaneously serves as a member of multiple Façade Firms while working for SFS. At all times material to this Complaint, Jason Blust has exercised managerial responsibility for the Façade Firms and has materially participated in the conduct of their affairs, in part through the Blust Companies. He also has responded to consumer complaints regarding the Façade Firms and acts as a liaison between the Façade Firms and SFS.

85.     Richard K. Gustafson II is an attorney who owns and manages nine Façade Firms. He formed Boulder Legal Group in 2015, Canyon Legal Group in 2017, Gustafson Consumer Law Group, LLC d/b/a White Oak Law Firm in 2020 (registered in New York as a foreign corporation), and Meadowbrook Legal Group in 2021. He also owns Hailstone Legal Group, which was founded in 2022. In approximately 2022 he became owner of Stonepoint Legal, Harbor Legal Group, Royal Legal Group, and Slate Legal Group. According to Gustafson, of those nine firms, only White Oak Law Firm, Meadowbrook Legal Group, and Hailstone Legal Group were actively enrolling clients in the beginning of 2024; the other six firms purportedly continued to represent consumers that were previously assigned to them by SFS. Royal Legal Group and Hailstone Legal Group purportedly offer or offered only deferred-fee debt-settlement products, while the other firms offer or offered advance-fee debt-settlement products. Gustafson is also a minority member or Class B member of Golden Law, the Brandon Ellis Law Firm, and Whitestone Legal.

86.     On March 15, 2024, various Façade Firms submitted an insurance claim for attorney's fees; that claim lists Gustafson as the current contact person for every one of those firms, including the following:

- Anchor Law Firm, PLLC d/b/a Law Offices of Stacy Robinson and Associates;

- Florio & Associates, PLLC d/b/a Bedrock Legal Group;

- Boulder Legal Group, LLC;

- Jon Schulte & Associates, LLC d/b/a Canyon Legal Group;

- Henry Legal Group, PLLC d/b/a Heartland Legal Group;

- Burnette Legal Group, LLC d/b/a Monarch Legal Group;

- Law Office of Mercedes Gustafson, d/b/a Northstar Legal Group, LLC;

- Law Offices of Gardner Legal LLC d/b/a Option 1 Legal;

- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

- Donald Norris & Associates, LLC d/b/a Royal Legal Group, LLC;

- Law Office of Melissa Michel LLC d/b/a Spring Legal Group;

- Gustafson Consumer Law Group, LLC d/b/a White Oak Law;

- Law Offices of the Sands Law Group, LLP d/b/a Whitestone Legal Group;

- Law Office of Guillermo Geisse, d/b/a WyoLaw, LLC;

- Brandon Ellis Law Firm, LLC;

- Dakis Legal Group LLC d/b/a Clear Creek Legal, LLC;

- The Law Firm of Derek Williams, LLC d/b/a Infinite;

- Hallock and Associates, LLC;

- Michel Law, LLC d/b/a Level One; and

- Pioneer Law Firm, PC.

87. Gustafson is a former partner of Legal Helpers. Gustafson was also a former Class B member (i.e. local attorney) at The Mortgage Law Group (TMLG), a

mortgage-assistance relief services provider that the CFPB sued for taking up-front fees, failing to make required disclosures, and making deceptive statements. Similar to SFS, TMLG used Class B attorneys. The district court in the TMLG case found that the Class B attorneys' involvement consisted primarily of "pro forma document review" and that their relationship to the defendants was an "obvious, even cynical, attempt to avoid the Bureau's ability to regulate practices that have otherwise been deemed illegal for many years." *CFPB v. The Mortgage Law Group*, 366 F. Supp. 3d 1039, 1050 (W.D. Wis. 2018). The Court, in finding that the role of the Class B attorney was "by design almost always perfunctory, rather than substantive," further explained that "apart from responding to simple questions posed by a national attorney from a checklist during a 15-minute phone call, clients did not have a substantive discussion, if any at all, with any attorney until after they had been informed (or in many cases, misinformed) about the scope of the defendants' services, signed a retainer agreement, paid a sizable advance fee, and submitted their financial documentation." *Id.* at 1051. The court awarded restitution and penalties to the Bureau while also banning several of the principals from participating in mortgage-assistance relief services.

88.    At all times material to this Complaint, acting alone or in concert with others, Gustafson has exercised substantial control over and involvement in White Oak Law Firm, Meadowbrook Legal Group, Hailstone Legal Group, Boulder Legal Group, and Canyon Legal Group. Since 2022, he has exercised substantial control over and involvement in Stonepoint Legal, Royal Legal Group, Harbor Legal Group, and Slate Legal Group. On behalf of these nine Façade Firms, Gustafson signs the tax returns, approves the expenses, reviews metrics, and communicates with all of the service providers.

89.     Timothy F. Burnette is an attorney. As of 2018, he was the sole owner of bank accounts for Gardner Legal LLC; as of 2019, he was the sole owner of bank accounts for Burnette Legal Group, d/b/a Monarch Legal Group (registered in New York as a foreign corporation); and as of 2020, he was the sole owner of bank accounts for Henry Legal Group LLP. Burnette was also involved with WyoLaw: he is listed on the LLC formation paperwork as a party to receive notices on behalf of WyoLaw, and in 2019 he signed a document filed with the Florida Secretary of State on behalf of WyoLaw, LLC. In 2019, he filed a document with the Wyoming Secretary of State on behalf of The Sands Law Group, LLP and he signed contracts with a notary-provision company on behalf of Henry Legal Group LLP d/b/a Heartland Legal Group and Gardner Legal LLC d/b/a Option 1 Legal. In 2020, Burnette signed an affidavit claiming that he was outside counsel for Anchor Law Firm, PLLC. Burnette also responded to consumer complaints on behalf of Boulder Legal Group, LLC, Gardner Legal LLC d/b/a Option 1 Legal, Northstar Legal Group, LLC, and WyoLaw, LLC, and in his responses he identified himself as the attorney for those firms. Moreover, the 2024 insurance claim document described in Paragraph 86 lists Burnette as the current contact person (along with Gustafson) for the Law Offices of Gardner Legal LLC d/b/a Option 1 Legal, Burnette Legal Group, d/b/a Monarch Legal Group, and Henry Legal Group PLLC d/b/a Heartland Legal Group.

90.     At all times material to this Complaint, acting alone or in concert with others, Burnette has exercised substantial control over and involvement in various Façade Firms, including Gardner Legal LLC d/b/a Option 1 Legal, Burnette Legal Group, d/b/a Monarch Legal Group, and Henry Legal Group PLLC d/b/a Heartland Legal Group.

91.    Michelle Gallagher (née Hinds) is an attorney who owns Façade Firms Chabner Legal Group, LLC and Hinds Law LLC a/k/a First America Law (registered in New York as a foreign corporation). As of 2020, she was the sole owner of bank accounts for Façade Firms Hallock & Associates, LLC, the Brian A Moore Law Firm LLC, and the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group. In March 2020, Gallagher signed a contract with a notary-provision company on behalf of the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group. Between approximately 2020 and 2024, she helped manage the day-to-day operations at Lit Def and Fidelis Support Services, LLC (Fidelis). In the past, she also worked for Client First Bankruptcy, owned by Jason Blust.

92.    At all times material to this Complaint, acting alone or in concert with others, Gallagher has exercised substantial control over and involvement in Lit Def, Fidelis, Chabner Legal Group, LLC, Hinds Law LLC a/k/a First America Law, Hallock & Associates, LLC, the Brian A Moore Law Firm LLC, and the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group.

93.    Blust, Gustafson, Burnette, and Gallagher know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

*Blust Companies*

94.     Lit Def and Fidelis provide substantial assistance to SFS's debt-relief operations by purportedly facilitating litigation support on behalf of the Façade Firms. SFS markets this litigation support to consumers as an additional benefit of the debt-relief products.

95.     When SFS receives notice that creditors have sued a consumer enrolled in the law firm debt-relief service, SFS does not send the filings to the law firm listed on the consumer's engagement letter. Instead, SFS forwards those filings to Lit Def and Fidelis. Lit Def and Fidelis perform data entry for these lawsuits. Then Lit Def or Fidelis acts as a hub and purportedly sends filings to contracted litigation or appearance attorneys. Lit Def also coordinates payments from consumers' escrow accounts at RAM and Global to pay any litigation-related expenses such as filing fees and attorney appearance fees, although many consumers complained that the promised litigation defense was not provided. Jason Blust owns Lit Def and controls Lit Def and Fidelis.

96.     In approximately 2021, Lit Def began transitioning into Fidelis; Fidelis is Lit Def's successor. Fidelis hired many of the same people who worked for Relialit and Lit Def, and, for a period of time, those employees performed the same litigation support roles for both Fidelis and Lit Def. The operations of the two companies are interwoven. The companies lack formal boundaries and share a single set of staff, management, customers, procedures, instrumentalities, and work.

97.     Relialit was a predecessor to Lit Def and, like Lit Def and Fidelis, provided litigation support to the Façade Firms. Relialit was owned and controlled by Jason Blust and is, according to Blust, now defunct.

98.     Hedgewick Consulting, LLC (Hedgewick) is a consulting company owned and controlled by Jason Blust that provides services to the Façade Firms in exchange for consulting fees. One of the Façade Firm attorneys described Hedgewick as providing a "team of experts" who arranged the partnership between his Façade Firms and SFS, designed and set up the firms' websites, drafted the client enrollment forms, recommends lawyers to join the firms, and coordinates contracts between Façade Firms and service providers. The Blust Companies know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

*Relief Defendants*

99.     Relief Defendant Strategic Employee Stock Ownership Trust (Strategic ESOT) holds all the shares of SFS stock. In May 2017, Strategic Financial Solutions, LLC adopted the Strategic Employee Stock Ownership Plan (Strategic ESOP) and became the ESOP's sponsor. SFS companies reorganized in December 2017 and Strategic Family, Inc. became the parent company. In December 2017, the Strategic ESOP purchased all the shares of Strategic Family, Inc.'s common stock funded by the Strategic ESOT, thus making Strategic Family, Inc. wholly employee owned. The Strategic ESOT may

maintain funds held in trust, while the ESOP determines how the ESOT is administered, who participates in it, and who runs the day-to-day operations.

100.    Relief Defendant the Blust Family 2019 Irrevocable Trust is controlled by Paul Hull, Jr., Trustee. Hull was a partner in TMLG and Legal Helpers. The trust owns Lit Def. Jason Blust funnels consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS into the Blust Family 2019 Irrevocable Trust via Lit Def.

101.    Jason Blust funnels consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Relief Defendant Jaclyn Blust via Lit Def and the Blust Family 2019 Irrevocable Trust.

102.    Relief Defendant Cameron Christo is purportedly the founder and chief executive of Defendant Fidelis, but, in reality, Jason Blust controls Fidelis. Many of the debt-settlement law firms that Fidelis claims to service are controlled by or related to Jason Blust.

103.    Emails suggest that Blust was involved in management decisions for Fidelis as recently as late 2023. For example, in November 2023, Blust sent emails to employees of Lit Def or Fidelis directing them to gather documents for an ongoing litigation. Christo was not on the email.

104.    On March 1, 2021, Christo established the Bush Lake Trust, an irrevocable trust for the benefit of Christo's children. Timothy Miller is the Trustee. On the same day, Christo transferred his ownership of Fidelis to the trust.

105.    From May 2021 to October 2023, Fidelis paid more than $15.7 million to Christo (including payments to an LLC formed by Christo) and more than $3.6 million to the Bush Lake Trust.

### Overview of Defendants' Debt-Relief Services Scheme

106.    Since at least January 2016, SFS has marketed and sold debt-relief services to consumers.

107.    Defendants operate two different debt-relief programs: (a) a deferred-fee model in which consumers often do not pay fees until Defendants settle a debt for them, and (b) an advance-fee model that generally takes advance fees before the relevant debt has been settled. According to the court-appointed Receiver, the advance-fee model is the primary business of SFS and, prior to January 2024, "account[ed] for roughly 80% of their revenues," while the deferred-fee model "account[ed] for 16% of revenue."

108.    Through at least late 2022, SFS marketed its debt-relief services via the U.S. Mail, the Internet, and outbound or inbound telephone calls to or from consumers, including via interstate phone calls. One way that SFS attracted financially-distressed consumers is through direct mail solicitations suggesting that the consumers had been pre-approved for a debt-consolidation loan or might be eligible for such a loan. These solicitations encouraged the consumer to "apply" and provided a phone number to call for more information.

109.    Most or all of these solicitations were sent by MEC Distribution, LLC (formerly known as Mandaree Enterprises, LLC). This company claims to be owned by the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara Nation) of the Fort Berthold Reservation in North Dakota. From November 2016 to March 2021, SFS paid at least $135 million to MEC Distribution and its subsidiaries.

110.    When a consumer called the number provided on the solicitation, an SFS sales employee who was not an attorney answered the phone and gathered additional information from the consumer. In the end, the consumer who was trying to apply for a

loan was typically told that they did not qualify for the debt-consolidation loan, and the SFS sales representative tried to convince the consumer to enroll in the debt-relief service instead.

111.    The SFS sales employees go over the structure of the debt-relief service and the paperwork with consumers by phone. For those consumers who enroll in the program, the decision concerning whether to enroll in the debt-relief service is made by phone.

112.    If the consumer agreed to enroll in the debt-relief service, then SFS connected the consumer with a Façade Firm and arranged for the Façade Firm to provide debt-relief services for the consumer in exchange for the consumer paying fees.

113.    Generally, once a consumer agreed to sign up for the debt-relief service, a team at SFS decided which notary would be assigned to the enrollment and then considered the cost of using that particular notary against the projected amount that SFS would likely make in fees from the debt that consumer would enroll. If SFS decided to move forward with enrolling the consumer, SFS (not the Façade Firm) arranged a meeting between the consumer and a third-party notary, who was not an employee of SFS, a Client Services Subsidiary, or a Façade Firm. The notary was typically paid a nominal fee simply to get the documents signed, had limited knowledge about the contents of the documents being signed, and could not answer any questions about their content. Some notaries were paid more for the meeting if the documents were fully signed.

114.    Once a consumer signed the enrollment documents, an attorney from the assigned Façade Firm contacted the consumer and read a short script welcoming the

37

consumer to the program. This rote "attorney welcome call" was often the only time the consumer spoke to an attorney in connection with the SFS debt relief program.

115.    Upon enrollment, SFS representatives instructed consumers to stop paying debts they enrolled in the program. The SFS representatives also told some consumers that creditors were more likely to settle debts when their accounts were delinquent.

116.    SFS representatives also instructed consumers not to speak with their creditors if the creditors contacted the consumers, and SFS sometimes gave consumers a script to follow during calls with creditors.

117.    Upon enrolling in the program, consumers enrolled in the advance-fee model were required to immediately begin making monthly payments into an escrow account managed by either RAM or Global, two payment processors with which SFS or the Façade Firms have contracted.

118.    Representatives of SFS or the Client Services Subsidiaries told consumers that once they had saved enough money in those escrow accounts, the money would be used to settle the consumers' debts for less than they owe.

119.    Some consumers reported that when they started to complain about the fact that their debts were not being settled or their creditors were not being paid, SFS or the Client Services Subsidiaries instructed them that they could pay even more into their escrow accounts so that the debts could be resolved.

120.    To the extent that debts are settled for consumers enrolled in the debt-relief service, these negotiations were carried out under the supervision of SFS. From 2016 to 2020, the negotiators were employees of SFS. In late 2020, the negotiators were re-classified as employees of the Façade Firms, but they continued to operate

38

functionally as SFS employees. These negotiators were hired and fired by SFS, they were paid through SFS (even if they also received W-2s from the Façade Firms), they reported to SFS personnel, and some of them worked from SFS's Buffalo office. Once a consumer was enrolled in the debt-relief service, nearly all their interactions with their assigned law firm were not with law firm employees but with SFS employees. In fact, the Façade Firm attorneys were assigned to huge numbers of clients: in 2023, one attorney was assigned to 1,554 clients and had a current caseload of 2,778 clients.

121.    When consumers tried to call their designated Façade Firm after they enrolled in the program, their calls were typically routed to SFS representatives who were not attorneys but who held themselves out as representatives of the Façade Firm the consumer believed was representing them. In reality, these representatives were employed by SFS-controlled entities, including the Client Services Subsidiaries. These representatives are primarily located in a call center in Buffalo, NY or New York, NY.

122.    During the enrollment process, SFS representatives often told consumers that enrollment in the program included litigation defense services and that a lawyer would represent them in any lawsuit related to non-payment of enrolled debts. Similarly, the retainer agreements consumers signed with Façade Firms promised that the firm lawyers would provide litigation defense if the consumer was sued by creditors while participating in the debt-relief service. But each contract also contained a loophole provision allowing the Façade Firm to avoid participating in the litigation if the assigned lawyer determined that the consumer is not likely to gain a favorable result. Indeed, consumers reported that Façade Firm lawyers almost never represented them when they were sued by creditors even after the consumers paid the retainer fee.

### Notary Meetings as Part of the Enrollment Process

123.    As noted in Paragraph 113 above, as part of the enrollment process the Façade Firms contracted with third party notary-provision companies, including Sunshine Signing Connection, Inc., NotaryGO, and National Paralegal & Notary (collectively Notary Companies), to send independent contractor notaries to obtain signatures on the enrollment paperwork and the retainer agreement.

124.    The contracts required the notaries to confirm appointments with the consumers and to oversee the execution of documents, including "getting all appropriate signatures from the client."

125.    The notaries operated as independent contractors of the notary-provision companies. The notaries chose when they wanted to work and which assignments they accepted.

126.    The notaries met with consumers at locations convenient for the consumer, including coffee shops and restaurants. The meetings did not all occur in person, however. In particular, during the COVID-19 pandemic, many of these notary meetings took place through Zoom or over the phone without any in-person meeting at all. Even apart from the pandemic, some consumers report never having met in person with anyone in connection with enrolling in the debt-relief service.

127.    According to representatives from and owners of the notary companies, the notaries' job during these meetings was *not* to sell debt-relief services for SFS or the Façade Firms. Rather, the notaries were present to notarize the consumer's signature.

128.    Notaries also did not consider themselves to be sales agents. One notary testified: "I do not sell them the content of the documents, I do not market them, and I'm specifically told that I do not provide any legal, financial, or accounting advice. I do

not represent the credit card company. I do not represent the law firm. I do not represent the requester. My job is simply a notary. I get the documents, and I show them the instructions, and they initial and they sign, and I notarize. That's what I do. I don't do anything else."

129.     The notary meetings were typically brief, formulaic, and non-substantive. For instance, one consumer described the notary process as a "flyby presentation" and said that the notary, who made clear he could not explain things because he was just a notary and not an employee, seemed "like a robot going through a script."

130.     SFS executives have acknowledged that the notary meetings are cursory and non-substantive. According to a Senior Vice President of Sales at SFS:

> [A]ll we do is just get these people to just kind of pencil whip and sign [the contract] . . . . It doesn't seem like it's as meaty as we make it sound. . . I didn't realize we don't give 'em a copy of the contract when they sign.

In the same conversation, a Senior Director of Negotiations replied:

> I agree with you, it's almost like you're pencil-whipped into signing that day because since you already came all the way here, you know just let's get through this – and I think they just made it more fluffy you know as far as the um presentation, if you will, and they sign the presentation – so I mean it's almost like a CYA on our end.

131.     The contracts between the Façade Firms and the Notary Companies did not require the individual notaries to have any substantive knowledge of the product or the company or to be able to meaningfully interact with consumers on behalf of the company about the product. While the contracts required the notaries to give an "in-person presentation," they did not require the notary to have any understanding of the presentation or to even read it beforehand. Although SFS sometimes provided a script for notaries to read, the notaries often did not read the script or make any type of presentation to the consumer. Moreover, some notaries testified that even when they

received the script or presentation and read that document to the consumer, they simply read the document verbatim and did not tell the consumer anything about the debt-relief service beyond the words contained in that document.

132.    The contracts between Façade Firms and the Notary Companies also did not require the individual notaries to answer consumers' questions about the product or the company. And at least two notary companies used by SFS specifically instructed the notaries *not* to answer questions from consumers during in-person meetings related to the debt-relief services.

133.    In practice, if a consumer had a question or concerns while signing the contract, the Notary Companies or the individual notaries called SFS by phone so that the consumer could direct their question or concerns to someone from SFS.

134.    Consumers also reported that when they asked the notaries substantive questions, the notaries often advised the consumer to direct their questions to the sales representative (an employee of SFS or the Client Services Subsidiary) with whom the consumer previously spoke or referred the consumer to the documents they were signing.

135.    Neither the notaries nor the notary-provision companies were agents of the Façade Firms. In fact, the contracts between several Façade Firms and at least one notary company that receives 90% of its revenue from the Façade Firms stated that "no relationship is created by this Agreement that could any way imply . . . (b) an authorization for either party to act as agent or representative of the other . . . ."

136.    The meetings between these third-party contractors and consumers were brief and perfunctory and did not provide the consumers with direct or substantive interaction with the seller of the product the consumer was purchasing; the only direct

or substantive interaction consumers could have with anyone from SFS before they signed the contract was by phone.

137.   At the conclusion of the notary meeting, the consumer was generally left with a "Welcome Packet" that contained only an email and phone number, which both routed to SFS. The Welcome Packet generally did not contain contact information for the assigned Façade Firm or any lawyer.

138.   At times, SFS offered notaries limited training concerning the process to notarize the consumer enrollment documents, which sometimes consisted of reviewing a script and PowerPoint presentation to use during the signing, watching a video, and taking a quiz. But the training was not always required or may have occurred after the in-person meeting with the consumer. Moreover, when notaries were required to take a quiz, they could retake that quiz as many times as needed to obtain a passing score. Although training documents often listed the names of the Façade Firms, in reality the Façade Firms had little to no involvement in the notaries' training.

139.   Outside consultants, including Hedgewick, drafted the scripts and tests for the notaries. Hedgewick had the final say on changes to the scripts. Hedgewick also coordinated contracts between Façade Firms and notary companies and maintained signed copies of the contracts.

140.   Defendants Sasson, Blumkin, and Blust, at least, were involved with the notary process. In 2020, the head of a notary company emailed Sasson and Blust and expressed concerns about how shelter-in-place rules during the pandemic (and a resulting decline in in-person notary meetings) would affect her business. Sasson responded, copying Blust, and said "[g]ive us some time to talk to the law firms and come back to you." Also in 2020, Blumkin emailed himself a list titled "Notary

Companies Reached Out To." In 2020, Sasson and Blust received an email about the switch from in-person meetings to video presentations due to COVID-19. And in 2019, an SFS employee forwarded feedback from notaries about the retainer agreements to Jason Blust.

### Fees Defendants Charge Consumers

141.    Individual Defendants Sasson, Behar, and Blumkin controlled SFS and oversaw development of the company's debt-relief products, including the practice under the advance-fee model of taking advance fees prior to any settlement, and each of these Individual Defendants was aware that SFS took these advance fees.

142.    A PowerPoint presentation submitted to CIBC bank in Q3 2017 seeking financing for SFS identifies Sasson, Behar, and Blumkin as owners and founders of Strategic Financial Solutions. The report states that Strategic Financial Solutions "developed the sales and servicing process to offer a compliant advance fee product . . . [t]he decision to operate sales and servicing functions in house allows the Company to exercise complete control over the sales and servicing process."

143.    The documents that consumers signed often included information about the fees the consumers would be charged and advised that such fees would begin at the outset of the arrangement, regardless of whether any settlements had been reached with the consumers' creditors. One example provided by a consumer included fees such as a "retainer fee," "a service cost," "a legal admin fee," and "a banking fee."

144.    According to M.L. Clark, President of SFS, SFS's schedule of fees "heavily front-loaded the advance fees for the advance-fee model.

145.    Consistent with Defendants' direction, RAM and Global: (i) withdrew funds from a consumer's bank account through ACH transfer and deposited them into

the consumer's escrow account; and (ii) transmitted funds for processing and servicing fees from the consumer's escrow account to themselves, the Client Services Subsidiaries, the Façade Firms, and sometimes SFS.

146.    Immediately after a consumer enrolled in the advance-fee service, fees were deducted from their escrow accounts with RAM or Global. This deduction occurred before SFS, the Client Services Subsidiaries, or the Façade Firms settled any debts. These fees included retainer fees, service fees, and legal administrative fees. Consumer testimony confirms that fees were withdrawn from their escrow accounts before any debts were settled.

147.    The fees Defendants charged consumers as part of this debt-relief service were substantial. A sample of payment data from RAM for approximately 34,000 consumers enrolled in SFS's advance-fee program over an approximately five-year period shows that these consumers collectively paid over $104,000,000 in fees to Defendants and the Façade Firms (including retainer fees, legal admin fees, and service fees) before any debt-relief payments were made to creditors. This figure does not include fees collected from Global. As explained below, a large portion of the fees collected through RAM and Global was ultimately funneled to SFS or the Individual Defendants.

148.    During the five-year period of time covered by the sample, no one working on behalf of SFS (including representatives for the Client Services Subsidiaries and Façade Firms) settled any debt for approximately one-third of consumers who paid into the advance-fee program.

149.    Furthermore, the service fee that Defendants charge for the debt-relief program was often based solely on a percentage of the consumer's enrolled debt; the fee

was not based on the individual debt settlements that the program achieves. In particular, when the consumer had multiple debts that were eventually settled one at a time, the service fee was not proportional to the amount of debt actually settled or based on a fixed percentage of the amount saved. Likewise, the retainer fee, administrative fees, and other fees were not based on individual debt amounts or the debt settlements that the program achieved.

150.    Charging consumers these high fees and withdrawing them from their accounts on the front-end, before settling any of their debts, hindered Defendants' ability to settle consumers' debts at all. For instance, some advance-fee consumer contracts advised that individuals often needed to accumulate approximately 25% of the "then-current balance of a debt" in their account (e.g., $2,500 for a $10,000 debt) before a good-faith offer could be made to settle a debt with a creditor. But it was difficult for a consumer to accumulate a balance that high in their escrow account when SFS, the Client Services Subsidiaries, and the Façade Firms were withdrawing large fees from it each month, leaving only a small amount to fund potential settlements.

151.    According to account statements for one consumer who enrolled in the debt-relief service, E.S., she paid approximately $2,114 into her account before the first payment was made to a creditor. Prior to this payment being made, approximately 91% of the funds the consumer paid into her account (roughly $1,900) were withdrawn as fees. During the entire period this consumer was enrolled in the debt-relief service, approximately 84% of the funds she paid into her account were deducted as fees and only 16% of the funds were paid to creditors.

152.    Similarly, another consumer, P.G., paid approximately $7,452 into her account before the first payment was made to a creditor. Before that payment was made,

roughly 68% of the funds the consumer paid into her account had been deducted to cover fees. During the entire period the consumer was enrolled in the debt-relief service, roughly 64% of the funds she paid into her account were deducted as fees and only 6.5% of the funds were paid to creditors. The remainder was refunded after the attorney that she believed had been representing her, Daniel Rufty, was suspended by the North Carolina State Bar.

**Allocation of Fees Among Defendants**

153.    Despite the labels associated with each fee charged to consumers enrolled in the debt-relief service, the money was not always distributed consistent with its described purpose. For example, records from RAM show that at times, the Client Services Subsidiaries—which purportedly did not provide legal services—received legal retainer fees, in addition to service fees and legal administrative fees.

154.    Similarly, records from RAM show that the Façade Firms received not just legal retainer fees, but also sometimes received service fees and legal administrative fees.

155.    The lack of concern about which entities received which fees demonstrates the interrelatedness of SFS, the Client Services Subsidiaries, and the Façade Firms.

156.    An analysis of bank records further demonstrated that SFS and its Client Services Subsidiaries operated as a common enterprise.

157.    Although the Façade Firms typically signed the contracts with RAM and Global, RAM and Global directly paid the Client Services Subsidiaries substantial amounts of money. For example, from September 2016 to July 2018, bank records showed that Global paid Boulder Client Services approximately $46,000,000 and paid

Anchor Client Services approximately $21,000,000. Similarly, from February 2017 to July 2018, RAM paid Bedrock Client Services approximately $30,000,000.

158.    Bank records show that shortly after receiving money from RAM and Global, the Client Services Subsidiaries transferred nearly all of the money to SFS. For example, between October 2016 and August 2018, Boulder Client Services transferred approximately $46,000,000—the same amount it received from Global—to various SFS accounts, including accounts held by Strategic Client Support, LLC, Strategic Financial Solutions, LLC, Strategic NYC, Inc., Strategic CS, LLC, and Strategic Consulting, LLC. Similarly, between November 2016 and August 2018, Anchor Client Services transferred approximately $20,000,000—around 95% of what it received from Global— to various SFS accounts, and between February 2017 and August 2018, Bedrock Client Services transferred approximately $29,000,000—around 96% of what it received from RAM— to various SFS accounts.

159.    RAM records show that Defendant Versara Lending, LLC, ostensibly a lender, received fees from debt-relief consumers. Records from Valley Bank show that, from October 2016 through August 2022, Versara Lending, LLC received over $177 million in incoming wires and net transfers from various SFS entities. Records from Valley Bank also show that Versara Lending, LLC wired over $85 million to Versara DNLFA, LLC, which may be another name for Versara Lending, LLC.

160.    Indeed, Defendants Blust and Sasson had an agreement that overall, SFS would receive 80% of all client (or consumer) fees while the Façade Firms would receive 20%.

**SFS's Model Evolves Over Time**

161.    Consumer complaints, bank records, and website records suggest that SFS currently operates through additional companies, many of which purport to be law firms. Based on Defendants' practice of regularly changing company names or establishing new entities, Plaintiffs believe that there are additional Client Services Subsidiaries and Façade Firms that Plaintiffs have yet to identify. Façade Firm attorney James Agosto testified in January 2024 that he was in the process of creating a new debt-settlement firm when the Temporary Restraining Order was issued. Dkt. 12.

162.    Bank records also show that Law Offices of Amber Florio, LLC d/b/a The Commonwealth Law Group, PLLC received money from the following Façade Firms:

- Florio & Associates, PLLC, d/b/a Bedrock Legal Group, f/k/a Raggio & Associates, PLLC;

- Boulder Legal Group, LLC;

- Greene Legal Services, LLC d/b/a Newport Legal Group;

- Harbor Legal Group, LLC;

- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

- JMS Industries, LLC d/b/a Canyon Legal Group;

- Royal Legal Group, LLC;

- The Sands Law Group d/b/a Whitestone Legal Group; and

- Wyolaw d/b/a Summit Law Firm.

163.    In addition, the following companies are affiliated with Blust or made payments to Relialit or Lit Def:

- Chinn Legal Group d/b/a Slate Legal Group;

- Colonial Law Group;

- Crimson Legal Group, LLC d/b/a Fontana Law Group, LLC;

- Dubin Legal Group d/b/a Ascend Legal Group;

- Frontier Consumer Law Group a/k/a Leigh and Laruwe Law Firm;

- The Law Office 554;

- Law Office of Melissa Michel LLC d/b/a Spring Legal;

- Law Offices of Arne Skatrud & Associates d/b/a Cornerstone Legal Group LLC;

- Law Offices of Brandon S Chabner d/b/a Golden Law LLP;

- Lori Leigh & Associates d/b/a Phoenix Legal;

- Northstar Legal Group , LLC;

- Strong Law Group PLLC;Turnbull Law Group, LLC f/k/a Turnbull & Associates; and

- Watson Law d/b/a Corporate Legal Network.

**Consumer harm**

164.    Regardless of how SFS changes its corporate form, consumers continue to be harmed. For example, consumer C.E. was still paying fees to the common enterprise in September 2023. After being enrolled in the common enterprise's debt relief program for nearly four years and paying around $26,000 in fees, he still owed approximately $18,000 to four creditors for debts that he had enrolled in the debt-relief program.

165.    The amounts that consumers paid Defendants were significantly greater than the actual amounts of debt that Defendants settled for the consumers. In fact, most

of the amounts consumers paid were applied by Defendants to pay fees, rather than towards building reserves to pay consumers' creditors.

166. Many consumers enrolled in SFS's debt-relief service received zero or little benefit in the form of settled debts and, instead, ended up owing creditors more money than when they started.

167. The data sample from RAM referenced above in Paragraph 147 indicates that, on average, consumers participated in the program for eight months before Defendants settled any of their debts. It also suggests that Defendants do not settle *any* debts for many consumers enrolled in their program.

168. The court-appointed Receiver found that approximately 70% of consumers who enrolled in the advance-fee program later cancelled their service. From January 2017 to January 2024, approximately 107,185 enrollees in the advance-fee service who later cancelled paid SFS $64.7 million more than the amount they saved off the face value of their debts.

169. In addition, when consumers stopped paying their debts (as directed by Defendants), creditors often added interest and fees to their accounts and were likely to, and did in fact, sue them for nonpayment. If the creditors obtained judgments, they could garnish consumers' wages or freeze their bank accounts. Consumers' credit scores often plummeted.

170. Many consumers were understandably concerned about the potential adverse impact of stopping payment on their credit cards. When consumers asked direct questions about these issues SFS's salespersons routinely told consumers that they were very unlikely to be sued and that their credit scores would only suffer a small reduction, that the reduction would be temporary, and that their score would increase substantially

once their debts were settled through the program. These representations were misleading and deceptive.

171.    Defendants also routinely describe their programs as having a "zero percent" interest rate, since the amount of their payments were fixed at the time of enrollment. These representations were misleading and deceptive because Defendants were not offering consumers enrolled in in their debt-relief program a loan and many creditors did in fact add interest and fees once consumers stopped paying. Many consumers ended up exiting Defendants' debt relief program owing creditors more than when they began the program.

172.    When attempting to enroll consumers in the SFS debt-relief program, salespersons often made misleading, deceptive, and fraudulent statements to encourage consumers to enroll. Defendants were aware of hardball sales tactics and encouraged such behavior. SFS paid bonuses to sales representatives that successfully sold their debt-relief scheme, which resulted in substantial fees to Defendants, while promptly terminating those that failed to do so.

173.    Consumers often learned from creditors that neither Defendants nor the Façade Firms ever contacted them. Unaware that this could occur, consumers often stopped communicating with their creditors based on Defendants' instruction. For example, one consumer, K.L., enrolled in the debt-relief service in October 2019. After a default judgment was entered against the consumer with regard to one debt in June 2021, the consumer reached out to two other creditors with whom Defendants were supposed to be negotiating. The consumer learned from these creditors that nothing had been paid on these debts since she enrolled in the debt-relief service twenty months

prior and no one from any of the Defendants or the Façade Firms had contacted the creditors.

174.   Consumers were led to believe that they had an attorney and law firm to represent them should their creditors sue, but many consumers received no such representation, despite having paid significant retainer and legal fees. These representations by Defendants were misleading and deceptive. When consumers relied on these false representations, sometimes courts entered default judgments against them or the consumers had to represent themselves in court.

175.   Even when consumers withdrew early from the program, the amount of money in their escrow account had been substantially drained by fees, regardless of whether any enrolled debts have been settled.

176.   For example, one consumer, S.M., was in the program for approximately four years, during which his Global account statements show he made net payments into his escrow account of approximately $19,841 and only one debt was settled in the amount of approximately $8,524. Yet when the consumer withdrew from SFS's program, his escrow account contained only $666. The remaining $10,651 had been deducted from his account to cover fees.

177.   A Senior Director of Client Services acknowledged this problem in a call with a Senior Director of Customer Service:

> I gave him [VP of Client Service Operations] the scenario I've given him 1200 times, which is[:] a client's been in the program four months, wants to cancel. Can't save, [consumer] I want my money back. [SFS rep] Here's your $20. [consumer] Where is the other $900 I gave you? [SFS rep] Oh, sorry, that was service fees.' [consumer] Well I want it back. What do they [SFS reps] do? What do they do? Do we give them the authority to refund the $900 or is it going to Tier 2? So he's like well no, I think it needs to go to Tier 2.

The Senior Director of Client Services went on to explain that Tier 2 was not adequately staffed to handle the volume of calls in which consumers request refunds: "[a]lmost every single call, people want refunds."

178.    SFS designed its program to extract more fees from consumers early in the debt-relief program. SFS worked to keep consumers in the program while SFS was collecting fees, but, as fees declined later in the program, SFS often would not invest resources in attempting to settle the consumers' debts. A Vice President of Client Service Operations described the situation: "I know this sounds terrible, but if [a consumer] just wants to pay us and then leave to save us money, then OK."

179.    Consumer complaints suggest that SFS, working through the Façade Firms, continued until January 2024, at least, to collect fees (a) before resolving any debt for consumers; (b) that do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (c) that are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. In 2023 alone, there were approximately 127 consumer complaints in the FTC's Sentinel database involving the Façade Firms. These consumers were harmed by Defendants' ongoing unlawful conduct.

180.    For example, one consumer, R.O., complained that he was charged nearly $10,000 in advance fees between July 2020 and June 2023, and none of his debts were settled. All of those fees were prohibited by the TSR.

181.    Since January 2016, SFS and the Façade Firms have taken at least $100,000,000 in fees from consumers before any of the consumers' debts were renegotiated, settled, reduced, or otherwise altered.

**The Façade Firms Are Controlled by Ryan Sasson and Jason Blust and Act as Cover for SFS**

182.    Individual Defendants Ryan Sasson and Jason Blust created the Façade Firms to provide consumers with the sense that SFS's debt-relief service is professional and trustworthy, and to conceal the role of SFS from consumers and the public.

183.    SFS and Sasson benefit from the concealment of SFS as the primary actor in the debt-relief service. When consumers complain to regulators, prosecutors, or the Better Business Bureau, they complain about the Façade Firm (whose name they have), not SFS (whose name they do not have). This shields SFS from scrutiny and could make it more difficult for consumers to bring lawsuits against the SFS operation.

184.    Despite Defendants' efforts to present Façade Firms as separate from SFS, Ryan Sasson and Jason Blust maintain and control the Façade Firms as part of their debt-relief scheme.

*Sasson's Role in the Façade Firms*

185.    As the CEO of SFS, Ryan Sasson coordinates with Jason Blust and other Façade Firm attorneys to conceal SFS's role in providing debt-relief services. Sasson created and controls the Client Services Subsidiaries that correspond to each Façade Firm.

186.    Sasson also created and owns Façade Firm websites, including websites for Northstar Legal Group, Atlas Law Group, Anchor Law Firm, Harbor, Boulder, Bedrock, Royal, Stonepoint, Rockwell, Canyon, Summit, Great Lakes, Heartland, Whitestone, Monarch, Option 1, and WyoLaw. SFS pays the domain bills for these websites and for the websites of Hallock & Associates, Law Office of Melissa Michel LLC d/b/a Spring Legal, and Moore Legal Group, LLC d/b/a Meadowbrook Legal Group.

*Jason Blust Controls the Façade Firms*

187.    Jason Blust coordinates the web of Façade Firms and exercises extensive control over them. He also helped create several of the Façade Firms. For example, Jason Blust orchestrated the creation of WyoLaw. He advised Traci Mears, a figurehead attorney, on setting up bank accounts, Employer Identification Numbers and the firm's mailing address, among other decisions.

188.    In 2021, the North Carolina State Bar Disciplinary Hearing Commission held a hearing regarding the license of Daniel Rufty, an attorney at Carolina Legal Services, which is one of the Façade Firms. The Commission issued a finding of fact that Jason Blust "started or helped start various law firms . . . in multiple states with the goal of convincing debtors struggling to pay their bills to hire one of the [Façade Firms] to negotiate reduced payoff amounts with the debtor's creditors."

189.    In its ruling, the Commission referred to various Façade Firms as the "Blust Law Firms."

190.    The Commission concluded that "[Jason] Blust was in charge of the operations of [Carolina Legal Services] and regularly told [Rufty] what to do."

191.    In addition to his role in the creation of numerous Façade Firms, Jason Blust plays a continuing role in the management and oversight of many of them.

192.    Jason Blust directly manages some of the Façade Firms' operations. For example, he stated in 2020 in a sworn affidavit that he began managing the operations of the Anchor Law Firm, PLLC in 2016, including managing Anchor Law's attorneys and Anchor Law's non-attorney support services, which consist primarily of SFS and Client Services Subsidiary employees. Blust stated in the affidavit that he was still managing the firms at the time of the affidavit.

193.    Jason Blust also holds official positions in some Façade Firms. For example, he is a Vice President at Pioneer Law Firm, P.C.

*Jason Blust Recruits Attorneys for Façade Firms*

194.    Jason Blust also recruits attorneys for several of the Façade Firms, including Bedrock, Boulder, Carolina, Canyon, Harbor, Heartland, Rockwell, and Royal.

195.    For example, he recruited an SFS employee, Lauren Smaldon (née Montanile), to become a member or supervising attorney of multiple Façade Firms, including Bedrock, Boulder, Carolina, Canyon, Harbor, and Heartland. She is also a member-owner of Great Lakes. Smaldon still works at SFS but also reports to Jason Blust pursuant to her position at certain Façade Firms.

196.    As SFS CEO, Ryan Sasson also exercises control over Smaldon, an SFS employee. Smaldon's business address on file with the New York Bar is one of SFS's addresses: 711 3rd Avenue, 6th Floor, New York, New York 10017.

*Jason Blust Is a Conduit Between Façade Firms and SFS*

197.    Jason Blust also serves as a conduit between the Façade Firms, SFS, and the Client Services Subsidiaries, facilitating communications between the Façade Firms, on one hand, and SFS and its Client Services Subsidiaries, on the other hand.

198.    Jason Blust regularly emails and talks on the phone with employees of SFS and its Client Services Subsidiaries about consumers in SFS's debt-relief service.

199.    When employees of SFS or its Client Services Subsidiaries, including Smaldon, are unable to resolve escalated consumer issues, they often consult with Jason Blust or send the issue to him for resolution.

200.    Jason Blust consults with employees of SFS, Client Services Subsidiaries, and Façade Firms regarding consumer complaints against Façade Firms, including

complaints to state bars and the Better Business Bureau (BBB). Blust coordinates efforts by SFS, Client Services Subsidiaries, and Façade Firms to pressure consumers to take down negative reviews of Façade Firms to keep BBB ratings higher. The BBB ratings are used by SFS as a sales pitch, with SFS representatives suggesting that high BBB ratings are a reason that consumers should sign up for SFS's debt-relief service.

201.   Jason Blust controls when Façade Firm attorneys are allowed to work on client files. When SFS receives notice that creditors have sued a consumer enrolled in the program, SFS forwards those filings to Lit Def. Then Lit Def, controlled by Jason Blust, acts as a hub and sends filings to contracted litigation or appearance attorneys. SFS does not send litigation filings to the law firms listed on clients' engagement letters.

202.   Jason Blust also participates in meetings between SFS, Client Services Subsidiaries, and many of the Façade Firms, including Anchor Law Firm, PLLC, Bedrock Legal, LLC, Boulder Legal Group, LLC, Carolina Legal Services, LLC, Canyon Legal Group, LLC, Great Lakes Law Firm, LLC, Harbor Legal Group, LLC, Heartland Legal Group, LLC, Monarch Legal Group, LLC, and Royal Legal Group, LLC. At least one of the meetings between Blust and an attorney from Carolina Legal Services, LLC took place in New York State. Notably, Jason Blust participates regardless of whether he holds an official position with each firm.

*Jason Blust Provides Websites for, and Shares an Address with, Multiple Façade Firms*

203.   Jason Blust also registered domain names for Façade Firms, including Pioneer Law Firm, P.C., Harbor Legal Group, LLC, and Phoenix Legal Group, PLLC. Jason Blust controls the Façade Firm websites by selecting the vendor that creates the websites. Entities that Jason Blust controls or is the beneficiary of, including the Law

Office of Jason Blust, LLC, Lit Def, and Relief Defendant Blust Family 2019 Irrevocable Trust, use addresses in a co-working space at 211 W Wacker Drive, Chicago, IL 60606.

204.    Numerous Façade Firms use addresses in the same co-working space at 211 W. Wacker Dr. Chicago, IL 60606. At least ten Façade Firms have used addresses in that building:

- Anchor Law Firm, PLLC;

- Boulder Legal Group, LLC;

- Burnette Legal Group, LLC, a/k/a Monarch Legal Group;

- Credit Advocates Law Firm, LLC;

- Great Lakes Law Firm, LLC;

- Gustafson Legal, P.C.;

- Hallock & Associates;

- Harbor Legal Group;

- Henry Legal Group LLP;

- Hinds Law LLC d/b/a First America Law;

- Law Offices of Timothy F. Burnette;

- Option 1 Legal;

- Pioneer Law Firm, P.C.; and

- Wyolaw, LLC, d/b/a Summit Law Firm, LLC.

**Transfer of Assets to Individual Defendants and Relief Defendants**

205.    The Individual Defendants and Relief Defendants received funds obtained from consumers through the unlawful practices described in this Complaint.

*The Façade Firms and Client Services Subsidiaries*
*Benefit Jason Blust Financially*

206.   Individual Defendant Jason Blust benefits financially from the Façade Firms and the Client Services Subsidiaries. Specifically, Blust has control over bank accounts for certain Façade Firms which receive substantial funds from Client Services Subsidiaries, and Blust funnels money from the Façade Firms to his consulting companies.

207.   Jason Blust is the beneficial owner and signatory on bank accounts for Pioneer Law Firm, P.C. As such, he has control over and entitlement to the funds in those accounts. Bank account records show that in May and June 2018 alone, these accounts received over $51,000 in payments from Pioneer Client Services, LLC, the related Client Services Subsidiary.

208.   Jason Blust also uses consulting companies to direct consumer funds from the Façade Firms to himself. Jason Blust directs and controls Lit Def and Relialit. He is the sole beneficial owner for bank accounts for those two entities. As of June 2021, Jason Blust was the sole member and manager of Relialit and the manager of Lit Def.

209.   Jason Blust and his various companies received significant payments from Façade Firms. For example, the following Façade Firms regularly sent payments to Lit Def:

- A. Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio & Associates, PLLC;

- Anchor Law Firm, PLLC;

- Burnette Legal Group, LLC d/b/a Monarch Legal Group;

- Daniel Rufty Legal d/b/a Carolina Legal Services;

- Gardner Legal LLC d/b/a Option 1 Legal;

- Great Lakes Law Firm, LLC;

- Green Legal Services, LLC d/b/a Newport Legal Group;

- Harbor Legal Group, LLC;

- Henry Legal Group, LLP d/b/a Heartland Legal Group;

- Northstar Legal Group, LLC;

- The Sands Law Group d/b/a Whitestone Legal Group; and

- WyoLaw d/b/a Summit Law Firm.

From December 2019 to April 2021, payments from the foregoing Façade Firms to Lit Def totaled over $37 million.

210. In December 2021, Fidelis began receiving payments from Hallock and Associates, Brian Moore Law Firm, LLC d/a/a Guidestone Law, and the Gustafson Consumer Law Group, LLC d/b/a White Oak.

211. From March or April 2022 through at least October 2023, Fidelis received payments from the following Façade Firms:

- Chinn Legal Group;

- Donald Norris Associates PLLC d/b/a Stonepoint Legal;

- Gardner Legal, LLC d/b/a Option 1 Legal;

- Great Lakes Law Firm, LLC;

- Greene Legal Group, LLC d/b/a Newport Legal;

- Henry Legal Group, LLP d/b/a Heartland Legal Group;

- JMS Industries, LLC;

- Leigh Legal Group, PLLC d/b/a Greenstone Legal;

- The Law Firm of Derek Williams, LLC d/b/a Infinite Law Group;

- Moore Legal Group, LLC d/b/a Meadowbrook Legal Group;

- The Sands Law Group, LLP d/b/a Whitestone Law;

- Spring Legal Group, LLC; and

- WyoLaw, LLC d/b/a Summit Law Firm, LLC.

From April 2022 to October 2023, these firms paid a total of approximately $16.4 million to Fidelis. Consumer complaints suggest that the following firms, at least, provided debt-relief services to consumers in New York: Gardner Legal, LLC, d/b/a Option 1 Legal; Dakis Legal Group d/b/a Clear Creek Legal, LLC; The Law Firm of Derek Williams, LLC d/b/a Infinite Law Group; and WyoLaw, LLC d/b/a Summit Law Firm, LLC.

212.   The following Façade Firms regularly sent payments to Relialit: Anchor Law Firm, PLLC; Boulder Legal Group, LLC; Burnette Legal Group, LLC; Chabner Legal and Associates, LLP; Daniel Rufty Legal, PLLC; Donald Norris Associates PLLC; Gardner Legal Group LLC; Great Lakes Law Firm, LLC; Harbor Legal Group, LLC; Henry Legal Group LLP; Hodyno & Associates, PLLC; JMS Industries, LLC; Law Office of Amber Florio, PLLC; Lighthouse Tax & Financial, LLC; Meg Sohmer Wood, PLLC; Pioneer Law Firm, P.C.; Raggio and Associates PLLC; The Sands Law Group, LLP; and WyoLaw, LLC. From March 2019 to January 2020, these payments to Relialit totaled over $258,000.

213.   The following Façade Firms sent payments to Hedgewick: Anchor Law Firm, PLLC; Boulder Legal Group, LLC; Burnette Legal Group, LLC; Chabner Legal and Associates, LLP; Chinn Legal Group d/b/a Slate Legal Group; Donald Norris Associates PLLC d/b/a Stonepoint Legal Group; Gardner Legal LLC d/b/a Option 1 Legal; Great

Lakes Law Firm, LLC; Greene Legal Services, LLC d/b/a Newport Legal Group; Harbor Legal Group, LLC; Henry Legal Group, PLLC d/b/a Heartland Legal Group; Hodyno & Associates, PLLC d/b/a Rockwell Legal Group; JMS Industries, LLC d/b/a Canyon Legal Group; Law Office of Amber Florio, PLLC; Moore Legal Group, LLC d/b/a Meadowbrook Legal Group; Northstar Legal Group, LLC; Raggio and Associates PLLC; The Sands Law Group d/b/a Whitestone Legal Group; Spring Legal Group, LLC; and Wyolaw d/b/a Summit Law Firm. From February 2021 to December 2023, these payments to Hedgewick totaled over $920,000.

214.     Façade Firms also pay both Jason Blust personally and the Law Office of Jason Blust. For example, from January 2019 to May 2021, Monarch Legal Group paid Jason Blust $18,311 and the Law Office of Jason Blust $215,000. From at least December 2020 to at least January 2021, Blust received payments in a personal bank account from Anchor Law Firm, PLLC, Boulder Legal Group, LLC, Burnette Legal Group, LLC d/b/a Monarch Legal Group, Chabner Legal and Associates, LLP, Henry Legal Group, PLLC d/b/a Heartland Legal Group, JMS Industries, LLC d/b/a Canyon Legal Group, and Raggio and Associates PLLC.

215.     Similarly, Daniel Rufty, the local attorney for Façade Firm Carolina Legal Services referenced above in Paragraphs 188-90, testified in a 2021 North Carolina State Bar investigation that his firm paid consultants including Jason Blust and that Global sent payments from consumers' escrow accounts to Carolina Client Services, LLC (an SFS-owned entity).

216.     Rufty further testified that although he owned 99% of Carolina Legal Services, he had rights to only 3% of its profits. The remaining 97% of profits were sent to Jason Blust and his associates, either directly or through his companies. Rufty

testified that the payments were ostensibly for consulting work, data entry, and administrative services.

217.    The North Carolina State Bar ultimately found that consumer funds were used to pay Lit Def, Jason Blust, and SFS.

*Transfer to the ESOP Benefits Blumkin*

218.    Prior to the formation of Strategic ESOP and Strategic ESOT, Twist Financial, LLC (Blumkin's company) owned 17.99% of SFS.

219.    When SFS formed Strategic ESOP and Strategic ESOT, Twist (i.e., Blumkin) loaned Strategic ESOT approximately $43,000,000 at 3% interest rather than taking a lump sum payout for its ownership stake. Between December 2017 and March 2020, Strategic ESOT paid Twist (i.e., Blumkin) over $1,900,000 in interest payments and over $16,200,000 in principal repayments on the loan. Blumkin receives regular payments of interest and principal on this loan.

*Transfer of Assets to Shell Holding Companies Owned by the Individual Defendants*

220.    Defendant Sasson, Blumkin and Behar direct and control the Holding Companies.

221.    Between October 2016 and September 2017, SFS transferred almost $9,000,000 to the Holding Companies. Ryan Sasson was the signatory on the SFS account that transferred the funds. As such, Sasson had control over the flow of money into and out of the account.

222.    Between October 2016 and September 2017, SFS transferred over $3,200,000 to Blaise Investments, LLC.

223.    Between October 2016 and September 2017, SFS transferred over $3,400,000 to Duke Enterprises, LLC.

224.    Between October 2016 and September 2017, SFS transferred over $2,200,000 to Twist Financial, LLC.

225.    Paul Hull, Jr. is the trustee of the Blust Family 2019 Irrevocable Trust. Jason Blust's family is the beneficiary of the Blust Family 2019 Irrevocable Trust.

226.    Between March 2020 to April 2021, Lit Def paid $36,000,000 to the Blust Family 2019 Irrevocable Trust.

227.    Defendant Jason Blust directs and controls Lit Def and Relialit. Jason Blust is the sole beneficial owner on bank accounts for these entities at Associated Bank, at least.

228.    Relief Defendant Jaclyn Blust received millions of dollars from the debt-relief enterprise involving SFS and the Façade Firms. For example, between July 2020 and April 2021, the Blust Family 2019 Irrevocable Trust transferred at least $8,300,000 to Relief Defendant Jaclyn Blust.

229.    Relief Defendants the Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee, Jaclyn Blust, Strategic ESOP, Strategic ESOT, Christo, and the Bush Lake Trust have received, directly or indirectly, funds and other assets from Defendants that were obtained from consumers through Defendants' unlawful practices.

**Count 1**
*By the Bureau and the States*
*Charging Advance Fees in Violation of the TSR By Collecting Money Before the Consumer Has Made At Least One Payment Under a Settlement Plan*

(Against SFS, the Client Services Subsidiaries,
the Holding Companies, Sasson, Blumkin, and Behar)

230.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

231.    It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service to request or receive payment of any fee or consideration for any debt-relief service until and unless: (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment under that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

232.    From at least January 2016 through the present, SFS, the Client Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar have engaged in ongoing conduct to request and receive fees from consumers in connection with enrolled debts even though Defendants had not yet renegotiated, settled, reduced, or otherwise altered the terms of these debts under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the consumers. Indeed, as noted above, Defendants have frequently requested and received fees from consumers for whom they have not renegotiated, settled, or reduced any debt.

233.    In addition, as discussed above, from at least January 2016 and continuing through the present, Defendants have requested and received fees from consumers in connection with enrolled debts even though consumers had not yet made any payments under a settlement agreement, debt-management plan, or other valid contractual agreement between the consumers and the creditor or debt collector and relating to those enrolled debts.

234.    As discussed above, Individual Defendants Sasson, Blumkin, and Behar participated in this practice of requesting and receiving fees (including but not limited to retainer fees, service fees, and administrative fees) before consumers made the first debt-relief payment to a creditor. Sasson, Blumkin, and Behar were on the Board of Directors of Strategic Family, Inc. Sasson also controlled SFS and its Client Services Subsidiaries and had authority to control the manner and timing of their requests for and receipt of fees and SFS's use of telemarketing. Sasson, Blumkin, and Behar either knew or consciously avoided knowing that SFS was selling debt-relief services by phone, including through interstate calls, and the manner and timing of SFS's and its Client Services Subsidiaries' requests for and receipt of fees.

235.    Defendants' practice of requesting or receiving payment of fees (including but not limited to service fees, administrative fees, and retainer fees) from consumers under the circumstances described in Paragraphs 141-52 is an abusive act or practice in telemarketing that violates the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

236.    Individual Defendants Sasson, Blumkin, and Behar control SFS, its Client Services Subsidiaries, and the Holding Companies and have authority to control practices regarding telemarketing and fees. Sasson, Blumkin, and Behar also know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls and that they request or receive fees from consumers before consumers made the first debt-relief payment to a creditor. Thus, Sasson, Blumkin, and Behar are individually liable for these violations of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

237. The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

238. The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

### Count 2
*By the Bureau and the States*
*Charging Advance Fees in Violation of the TSR by Collecting Fees After Settling Some But Not All of a Consumer's Debts When the Fees Are Not Proportional to the Amount of Debt Actually Settled or Based on a Fixed Percentage of the Amount Saved*

(Against SFS, the Client Services Subsidiaries,
the Holding Companies, Sasson, Blumkin, and Behar)

239. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

240. To the extent a seller or telemarketer renegotiates, settles, reduces, or otherwise alters a consumer's enrolled debts individually over time, the TSR prohibits the seller or telemarketer from requesting or receiving any fee or consideration unless such fee or consideration: (1) bears the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i)(C).

241. From at least January 2016 through the present, SFS, its Client Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar have settled

consumers' debts individually over time and after doing so, have requested or received fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

242.   As discussed above, Individual Defendants Sasson, Blumkin, and Behar participated in settling consumers' debts individually over time and while doing so, requesting or receiving fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

243.   Defendants' practice of requesting or receiving fees described in Paragraphs 141-52 constitutes an abusive act or practice in telemarketing that violates the TSR. 16 C.F.R. § 310.4(a)(5)(i)(C).

244.   Individual Defendants Sasson, Blumkin, and Behar control SFS, its Client Services Subsidiaries, and the Holding Companies and have authority to control practices regarding telemarketing and fees. Sasson, Blumkin, and Behar also know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a

result of the renegotiation, settlement, reduction, or alteration. Thus, Sasson, Blumkin, and Behar are individually liable for these violations of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(C).

245.    The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

246.    The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**Count 3**
*By the Bureau and the States*
*Substantial Assistance in Violation of the TSR*

(Against SFS, the Client Services Subsidiaries,
the Holding Companies, and the Blust Companies)

247.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

248.    The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

249.    As explained above, the Façade Firms constitute "sellers" in connection with their provision of, or arranging for others to provide, debt-relief services. 16 C.F.R. § 310.2(o), (dd), (ff).

250.    As explained above, in the course of offering to provide or providing debt-relief services to consumers, the Façade Firms have engaged, and continue to engage in, abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

251.    SFS, the Holding Companies, and the Client Services Subsidiaries provided, and continue to provide, substantial assistance or support to the Façade Firms by, among other things: creating and controlling the Façade Firms; handling all (or almost all) of the negotiation work on behalf of the Façade Firms; handling all (or almost all) consumer interactions while holding themselves out as Façade Firms; interacting with RAM and Global on behalf of the Façade Firms; and participating in the day-to-day business operations of the Façade Firms.

252.    The Blust Companies provided, and continue to provide, substantial assistance or support to the Façade Firms by, among other things: controlling the Façade Firms and participating in the day-to-day business operations of the Façade Firms.

253.    SFS, the Holding Companies, the Client Services Subsidiaries, and the Blust Companies knew or consciously avoided knowing that the Façade Firms were requesting or receiving fees from consumers before consumers made the first debt-relief payment to a creditor; and knew or consciously avoided knowing that the Façade Firms were settling consumer debts one at a time and taking fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

254.    SFS, the Holding Companies, the Client Services Subsidiaries, and the Blust Companies have violated, and continue to violate, the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

255.    The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

256.    The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**Count 4**
*By the Bureau and the States*
*Substantial Assistance in Violation of the TSR*

(Against Individual Defendants )

257.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

258.    As explained above, SFS constitutes a "telemarketer" and SFS, the Client Services Subsidiaries, and the Façade Firms constitute "sellers" in connection with their provision of, or arranging for others to provide, debt-relief services. 16 C.F.R. § 310.2(o), (dd), (ff).

259.    In the course of offering to provide or providing debt-relief services to consumers, the Façade Firms, the Client Services Subsidiaries, and SFS (largely acting through the Façade Firms and its Client Services Subsidiaries) have engaged, and continue to engage in, abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

260.    The Individual Defendants provided, and continue to provide, substantial assistance or support to SFS, the Façade Firms, and the Client Services Subsidiaries.

261.    Ryan Sasson oversees all employees at SFS. He participated in the creation of the Façade Firms, the Client Services Subsidiaries, and Duke Enterprises; he exerts control over them all. Sasson interacted with RAM and Global on behalf of SFS, the Façade Firms, and the Client Services Subsidiaries. He participates in the day-to-day business operations of SFS, the Façade Firms, and the Client Services Subsidiaries.

262.    Daniel Blumkin was Chief Sales Officer of Strategic Financial Solutions, LLC and head of sales at Strategic Consulting, LLC. Blumkin is on the Board of Directors of Strategic Family, Inc. His company, Twist Financial, owned voting stock in Strategic Family, Inc. Blumkin was also a manager at Strategic Financial Solutions, LLC and Strategic Client Support, LLC.

263.    Albert Ian Behar is a member of Strategic Financial Solutions, LLC and also on Strategic Family's Board of Directors. His company, Blaise Investments, LLC, owned voting stock in Strategic Family, Inc. Behar was also a manager at Strategic Financial Solutions, LLC and Strategic Client Support, LLC.

264.    Blumkin, Behar, and Sasson controlled the business of Strategic Family, Inc. through their collective ownership in Strategic Family's stock, by way of their respective Holding Companies in which they are the sole owner, manager, and member.

265.    Jason Blust supervises all of the Façade Firms. He hires attorneys for the firms, addresses consumer complaints, serves as a liaison between the firms and SFS (at least partly through the Blust Companies), and actively participates in business decisions concerning the firms and SFS. More specifically, he is a vice president for one Façade Firm, a member of another, and was involved in the creation of yet another. He

also registered the domains for two of the Façade Firms. Jason Blust recruited attorneys to the Façade Firms and managed the operations of Anchor Law Firm, PLLC from 2016 until at least 2020.

266. Gustafson owns and manages nine Façade Firms and, according to insurance paperwork, is the current contact person for 20 Façade Firms.

267. Burnette has been the sole owner of bank accounts for three Façade Firms and has signed documents on behalf of other firms. According to insurance paperwork, he is the current contact person for three Façade Firms.

268. Gallagher owns two Façade Firms and has been the sole owner of bank accounts for three additional Façade Firms. Since 2020, she has worked directly for Blust as a manager at Lit Def, and in approximately March 2021 she began performing the same work for Fidelis.

269. The Individual Defendants knew or consciously avoided knowing: (1) that SFS was selling debt-relief services by phone, including through interstate calls; (2) that following the phone sales, SFS, the Façade Firms, and the Client Services Subsidiaries were providing debt-relief services for consideration; (3) that SFS, the Façade Firms, and the Client Services Subsidiaries were requesting or receiving fees from consumers before consumers made the first debt-relief payment to a creditor; and (4) that SFS, the Façade Firms and the Client Services Subsidiaries were settling consumer debts one at a time and taking fees that: (a) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (b) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

270.    The Individual Defendants have violated, and continue to violate, the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

### Count 5
*By the Bureau and the States*
*Deception in Violation of the TSR*

(Against SFS, the Client Services Subsidiaries,
the Holding Companies, Sasson, and Blumkin)

271.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

272.    The TSR prohibits a seller or telemarketer from engaging in deceptive acts or practices which include "[m]aking a false or misleading statement to induce any person to pay for goods or services . . ." 16 C.F.R. § 310.3(a)(4).

273.    SFS made several false or misleading statements to induce persons to pay for debt-relief services in violation of the TSR.

274.    SFS employs third parties to mail personalized letters to debt-distressed consumers that claim the consumers are "pre-approved" for a debt-consolidation loan at attractive rates. Sometimes the packages sent to consumers also include fake checks payable to the consumer. In reality, there is no actual lender and no actual pre-approval.

275.    When consumers respond to the pre-approval letters, SFS's sales employees almost always advise them that they do not qualify for the loan. Instead, they follow choreographed scripts that encourage the consumers to enroll in SFS's debt-relief service. The scripts assume that the consumer was not approved for the loan and explain

that "pre-approved" means the consumer has been pre-approved to go through the loan application process.

276.    Individual Defendants Sasson and Blumkin, in their roles as Chief Executive Officer and Chief Sales Officer, respectively, control the processes of selling the debt-relief service, including the practice described above. They also knew or consciously avoided knowing that: (1) SFS misrepresented the availability of consumer loans in order to sell debt-relief services and (2) SFS was selling debt-relief services by phone, including through interstate calls.

277.    By telling consumers they are "pre-approved" for a loan but then rescinding that offer and pushing them into the debt-relief service instead, Defendants made false or misleading statements to induce those consumers to pay for the debt-relief service. 16 C.F.R. § 310.3(a)(4). As such, this practice constitutes a deceptive act or practice in telemarketing that violates the TSR.

278.    The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

279.    The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**Count 6**
*By the Bureau and the States*
*Deception in Violation of the TSR*

(Against SFS, the Client Services Subsidiaries,
the Holding Companies, Sasson, and Blumkin)

280.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

281.    The TSR prohibits a seller or telemarketer from engaging in deceptive acts or practices which include "[m]isrepresenting, directly or by implication, . . .[a]ny material aspect of any debt relief service . . ." 16 C.F.R. § 310.3(a)(2)(x).

282.    SFS made several misrepresentations about material aspects of the debt-relief services offered by Defendants and the Façade Firms in violation of the TSR.

283.    During the sales process, SFS employees routinely refer to the debt-relief service as the "0% interest option" while speaking with consumers.

284.    Referring to the debt-relief service as the "0% interest option" creates confusion for consumers, particularly in light of the mailers many consumers received claiming they were "preapproved" for a debt-consolidation loan.

285.    In truth, the debt-relief service is not a loan. So while SFS does not charge consumers interest for using this service, SFS charges exorbitant fees to consumers who enroll. Further, SFS's debt-relief program is not interest-free: while consumers are enrolled in the debt-relief service, they continue to accrue interest on their outstanding debts.

286.    Individual Defendants Sasson and Blumkin, in their roles as Chief Executive Officer and Chief Sales Officer, respectively, control the processes of selling the debt-relief service, including the practice described above. Sasson and Blumkin

knew or consciously avoided knowing that: (1) SFS employees made deceptive statements about the accrual of interest while consumers were in the debt-relief program; and (2) SFS was selling debt-relief services by phone, including through interstate calls.

287.    Defendants' practice of referring to the law firm debt-relief service as the "0% interest option" is a misrepresentation of a material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(x). As such, this practice constitutes a deceptive act or practice in telemarketing that violates the TSR.

288.    The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

289.    The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

### Count 7
*By the People of the State of New York*
*Repeated Fraudulent Acts in Violation of Exec. Law § 63(12)*

(Against SFS, the Client Services Subsidiaries,
the Blust Companies and the Individual Defendants)

290.    The NYAG incorporates by reference the allegations contained in Paragraphs 1-229 of the Complaint.

291.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting, or transaction of business. Statutory

fraud under Executive Law § 63(12) is broader than common law fraud and includes any acts that have a tendency to deceive.

292.    Defendants have engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of their debt-relief business.

293.    Individual Defendants Sasson, Blumkin, and Behar participated in, had the ability to control, were aware of, or should have been aware of, these fraudulent acts of SFS and the Client Services Subsidiaries.

294.    Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, both directly and through the Façade Firms, engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of business in support of the debt-relief business of SFS and the Client Services Subsidiaries.

295.    Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, participated in, had the ability to control, were aware of, or should have been aware of, these fraudulent acts.

### Count 8
*By the People of the State of New York*
*Engaging in Deceptive Acts or Practices in Violation of GBL § 349*

(Against SFS, the Client Services Subsidiaries,
the Blust Companies and Individual Defendants)

296.    The NYAG incorporates by reference the allegations contained in Paragraphs 1-229 of this Complaint.

297.    New York General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business . . . in this state are hereby declared unlawful."

298.    In numerous instances, Defendants have violated GBL § 349 by engaging in deceptive acts or practices in connection with conducting their debt-relief business.

299.    Individual Defendants Sasson, Blumkin, and Behar participated in, had the ability to control, were aware of, or should have been aware of, the deceptive acts and practices of SFS and the Client Services Subsidiaries.

300.    Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, both directly and through the Façade Firms, engaged in deceptive acts or practices in connection with the debt-relief business of SFS and the Client Services Subsidiaries.

301.    Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, participated in, had the ability to control, were aware of, or should have been aware of, these deceptive acts.

### Count 9
*By the Bureau and the States*
*Funds and Assets Obtained Through Unlawful Practices Held in Constructive Trust*

(Relief Defendants)

302.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of the Complaint.

303.    Relief Defendants have received, directly or indirectly, funds or other assets from Defendants that were obtained from consumers through the unlawful practices described in this Complaint.

304.    Relief Defendants are not bona fide purchasers with legal or equitable title or other legitimate claim to the funds or other assets received from Defendants.

305.    Relief Defendants would be unjustly enriched if not required to disgorge, compensate consumers for, or provide restitution with respect to the funds or the value of the benefits received as a result of Defendants' unlawful acts or practices.

306.    The Relief Defendants hold funds and assets in constructive trust for the benefit of affected consumers.

**Count 10**
*By the State of Wisconsin*
*Operating as Adjustment Service Company in Wisconsin Without License*

(SFS, Great Lakes Client Services, LLC,
the Holding Companies, and the Individual Defendants)

307.    The State of Wisconsin incorporates by reference the allegations contained in Paragraphs 1-229 of this Complaint.

308.    Wisconsin Stat. § 218.02(1)(a) defines "adjustment service company," in relevant part, as a "corporation, limited liability company, association, partnership or individual engaged as principal in the business of prorating the income of a debtor to the debtor's creditor or creditors . . . in return for which the principal receives a service charge or other consideration."

309.    Defendants SFS, Great Lakes Client Services, LLC, the Holding Companies, and the Individual Defendants are each "adjustment service companies" within the scope of Wis. Stat. § 218.02(1)(a).

310.    Wis. Stat. § 218.02(2)(a)1. requires every adjustment service company to "apply to the division [of banking] for a license to engage in such business."

311.    None of Defendants has ever applied for an adjustment service company license as required by Wis. Stat. § 218.02(2)(a)1.

**Count 11**
*By the State of Wisconsin*
*Violations of Wisconsin Adjustment Service Company Rules*

(SFS, Great Lakes Client Services, LLC,
the Holding Companies, and the Individual Defendants)

312.   The State of Wisconsin incorporates by reference the allegations contained in Paragraphs 1-229 of this Complaint.

313.   Wisconsin Stat. § 218.02(7) provides that "It shall be the duty of the division [of banking] and the division shall have the power, jurisdiction and authority . . . [t]o issue general or special orders in execution of or supplementary to this section, but not in conflict therewith, to protect debtors from oppressive or deceptive practices of licensees." Subsection (7)(d) further authorizes the division "[t]o determine and fix by general order the maximum fees or charges that such companies may make."

314.   The division has promulgated Wis. Admin. Code § DFI-Bkg chapter 73 pursuant to the preceding legislative authorizations.

315.   Defendants SFS, Great Lakes Client Services, LLC, the Holding Companies, and the Individual Defendants have violated Wis. Admin. Code § DFI-Bkg 73 by: (a) charging fees far in excess of what is permitted under the rule, and (b) charging fees before any of the debtors' funds are remitted to the debtors' creditors as part of settlement.

**DEMAND FOR RELIEF**

Plaintiffs request that the Court:

a.   Award the Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, including but not limited to a temporary restraining order and

preliminary injunction on taking advance fees prior to the settlement of a consumer debt, an order freezing assets, directing the preservation of records, and allowing expedited discovery and financial reporting, and appointment of a temporary receiver;

b.  Permanently enjoin Defendants from committing future violations of the Telemarketing Act, 15 U.S.C. §§ 6102(c), 6105(d); the TSR, 16 C.F.R. pt. 310; and the CFPA, 12 U.S.C. § 5536(a), and any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14), as well as New York General Business Law Articles 22-A and 28-B, New York Executive Law § 63(12), and Wis. Stat. § 218.02 and Wis. Admin. Code § DFI-Bkg. Chapter 73;

c.  Permanently enjoin Defendants from the advertisement, marketing, promotion, offering for sale, or selling of any consumer financial product or service, including but not limited to any debt-relief service, and prohibit SFS, the Façade Firms, the Client Services Subsidiaries, and the Individual Defendants from having an ownership stake in any company that provides a debt-relief service;

d.  Award damages and other monetary relief against Defendants and Relief Defendants as the Court finds necessary to redress consumer injury resulting from Defendants' violations of the TSR, New York state law, and Wisconsin state law, including but not limited to rescission or reformation of contracts, refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, payment of damages, civil penalties pursuant to New York General Business Law § 350-d, and prejudgment interest;

e.  Award the Bureau and the States civil money penalties;

f.  Order Defendants to pay Plaintiffs' costs incurred in connection with

prosecuting this action; and

g.  Award additional relief as the Court may determine to be just and proper.

Dated: May 28, 2024

Respectfully submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau

ERIC HALPERIN
Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

TIMOTHY M. BELSAN
Assistant Litigation Deputy

  _/s/ Vanessa Buchko_
Vanessa Buchko
E-mail: vanessa.buchko@cfpb.gov
Phone: 202-435-9593
Monika Moore
E-mail: monika.moore@cfpb.gov
Phone: 202-360-9505
Joseph Sanders
E-mail: joseph.sanders@cfpb.gov
Phone: 202-377-9846
Shirley Chiu
E-mail: shirley.chiu@cfpb.gov
Phone: 202-435-7592
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7722

And


LETITIA JAMES
Attorney General of the State of New
York

_/s/ Christopher L. Boyd_
Christopher L. Boyd
Genevieve S. Rados
Assistant Attorneys General
350 Main Street, Suite 300A
Buffalo, NY 14202
Phone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov

*Attorneys for State of New York*

PHILIP J. WEISER
Attorney General
State of Colorado

_/s/ Kevin J. Burns_
Kevin J. Burns, CO Reg. No. 44527
*(pro hac vice)*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

*Attorney for Plaintiff State of Colorado,*
*ex rel. Philip J. Weiser, Attorney*
*General*

KATHLEEN JENNINGS
Attorney General State of Delaware

_/s/ Marion M. Quirk_
Marion M. Quirk (*pro hac vice*)
Director of Consumer Protection
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810

Marion.Quirk@delaware.gov

*Attorney for State of Delaware*

KWAME RAOUL
Attorney General
State of Illinois

By: */s/ Greg Grzeskiewicz*
Greg Grzeskiewicz, Chief, Consumer
Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Daniel Edelstein, Supervising Attorney,
Consumer Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Amanda E. Bacoyanis, Assistant
Attorney
General, Consumer Fraud Bureau
*(pro hac vice)*
Matthew Davies, Assistant Attorney
General,
Consumer Fraud Bureau
*(pro hac vice)*
Office of the Illinois Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601
312-814-2218
Greg.Grzeskiewicz@ilag.gov
Daniel.Edelstein@ilag.gov
Amanda.Bacoyanis@ilag.gov
Matthew.Davies@ilag.gov

*Attorneys for the People of the State of
Illinois*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Evan Romanoff*

86

Evan Romanoff *(pro hac vice)*
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

*Attorney for the State of Minnesota*


JOSHUA H. STEIN
Attorney General of North Carolina

 */s/  M. Lynne Weaver*
M. Lynne Weaver *(pro hac vice)*
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

*Attorney for the State of North Carolina*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Lewis W. Beilin*
Lewis W. Beilin *(pro hac vice)*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
beilinlw@doj.state.wi.us

*Attorney for State of Wisconsin*