UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al._____Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC, et al._____Defendants, and<br><br>DANIEL BLUMKIN, et al.,_____Relief Defendants. | Case No. 24-cv-00040-EAW-MJR |

**RECEIVER'S REPLY IN SUPPORT OF
EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE WHY
INTERVENOR LAW FIRMS SHOULD NOT BE HELD IN CIVIL CONTEMPT**

**I.       INTRODUCTION**

The opposition by the Intervening Law Firms ("Law Firms") confirms that they should be held in civil contempt. They planned and undertook a series of actions – in secret and without the Court's knowledge or authorization – that were specifically designed to circumvent the Court's PI. The actions are yet another callous effort to profit from the consumers, while otherwise sowing confusion and keeping consumers in the dark about this case and their rights.

As the Court is aware, the Receiver was forced to file an emergency request for instruction to send a consumer notice after the consumers received misleading solicitations requesting they sign amended engagement agreements from the Law Firms. (Dkt. No. 292-1.) The Law Firms' solicitations claimed there was "no downside" to signing the new agreement but nowhere revealed to consumers crucial facts, including the existence of this lawsuit, the TRO, the PI, or the fact that the Court had specifically concluded that Strategic *and* the Law Firms had taken illegal advance fees. (Dkt. No. 292-2.)

At the April 22 hearing, the Court made crystal clear that it viewed the Law Firm's consumer solicitations and communications as unacceptable.[1] The Court engaged in an extensive colloquy with Mr. Elliott regarding the contours of further consumer outreach by the Law Firms:

---

[1] Among other things, the Court ordered the Law Firms to stop soliciting consumers: "I also want to order that no other communications be made with any of the consumers by anybody regarding this case. Is that clear? Does everybody understand that?" April 22 Tr. at 156:6-8 (attached as Dkt. No. 353-3 at 19). In response, counsel for the Law Firms (Mr. Elliott) stated, "Your Honor, we have consumers reaching out," and the Court indicated that Law Firms can "respond" to consumer inquiries. *Id.* at 156:12. Counsel for the New York Attorney General's Office then raised the concern, "I don't want the law firms to hear about this case and view that narrowly, right? So I would think that they would view that their last communication about converting clients was not, quote, unquote, about this case." (*Id.* at 156:17-22.) The Court clarified: "Nobody should have any communications with . . . consumers about anything. Period. Okay?" (*Id.* at 157:1-2) (emphasis added).

```
 1          THE COURT:  Nobody should have any communications with
 2   a consumers about anything.  Period.  Okay?
 3          MR. BOYD:  That works, Judge.
 4          THE COURT:  Okay.
 5          MR. ELLIOTT:  Your Honor, may I be heard on that?  May
 6   I be heard on that?
 7          On behalf of the law firms, we have clients we
 8   communicate -- the lawyers communicate with them every day.  The
 9   paralegals communicate with them every day.
10          THE COURT:  I want no general statement like the one
11   you sent out without notifying everybody before.
12          Do you understand that, sir?
13          MR. ELLIOTT:  I do understand it, Your Honor.  And --
14          THE COURT:  Okay.
15          MR. ELLIOTT:  -- and I've been trying to -- to --
16          THE COURT:  That's what I want.
17          MR. ELLIOTT:  Okay.
18          THE COURT:  I think it's clear.  I don't think I need
19   to expand on it any more.
20          MR. ELLIOTT:  May I just for clarification ask the
21   same question Mr. McNamara did, which is in light of the back
22   and forth that's gone on, some of the --
23          THE COURT:  Yes.  You can deal with your individual
24   clients.
25          MR. ELLIOTT:  Thank you.
```

II.     ARGUMENT

    A.     **The Law Firms' Contemptuous Conduct Is Rooted in an Extensive Communications Campaign Involving a Call Center They Did Not Disclose to the Court**

Despite the Court's directives, the Law Firms now admit they did not heed the Court's orders in two significant ways: first, they continued to send out solicitation emails urging consumers to sign the amendments; and second, they continued an outbound solicitation call campaign to consumers urging them to sign the amendments.

The Law Firms claim that thousands of emails continued to consumers because their vendor "forgot one feature": "the fact that simple, non-substantive reminders would be automatically generated and sent to those clients who had already received an initial email." (Dkt. No. 363 at 9.)  A declaration from Steven Crosby of Crosby Financial Services, an outside vendor for more than 30 Law Firms, is offered.  Crosby was hired *in March* to set up the massive consumer communications campaign for the Law Firms.[2]  Even accepting Mr. Crosby's statement that sending continued solicitation emails to consumers was inadvertent, it is still troubling because it highlights the lack of seriousness with which the Law Firms treated the issue.  It is astounding that Mr. Elliott did not follow up carefully with the vendor to confirm ALL communications ceased after the vigorous colloquy and order from the Court at the April 22 hearing.

But much more troubling is that the Law Firms never stopped, and never intended to stop, the call center's efforts.  The Law Firms made a conscious and intentional decision to continue to make *outbound* solicitations from a call center to consumers after the April 22

---

[2] This mass communications campaign was never mentioned in any of the Law Firms' filings prior to the April 22 hearing.  Nor was it mentioned at the hearing.  And it was not mentioned when the Law Firms offered edits to the consumer notice.

3

hearing.[3]  Beyond blaming the vendor, the Law Firms minimize and excuse their conduct by casting blame at the Court.  They claim they "anticipated receiving a written ruling that would clarify the precise contours of the Court's Order."  Dkt. No. 363 at 4.  This is an unbelievable assertion, given the existence of the PI and the clarity of the Court on April 22.  There simply was no ambiguity.

The existence of an extensive communication campaign with an active call center was obviously relevant information that the Law Firms should have volunteered in the context of the April 22 hearing.[4]  The entire purpose of the Law Firms' expansive outreach campaign was to get consumers to sign the amended contingent fee engagement agreements – and it was that consumer outreach which had necessitated the request for instruction.  At the time of the hearing, the Receiver was only aware of far more limited communications (three in total) from the Law Firms, and those were sufficiently troubling to prompt the Receiver to file his emergency request for instruction to inform the Court; the Receiver wasn't aware the Law Firms were engaged in the far more extensive communications campaign detailed now by Mr. Crosby, which featured a call center and follow-up emails every other day.  Had the Law Firms disclosed any of this, it would have affected the contours of the May 7 Notice.

The fact that the Law Firms made a conscious decision ***after*** April 22 to maintain the undisclosed call center solicitations to consumers to sign amendments is particularly concerning

---

[3] Mr. Crosby described the solicitation campaign protocols: consumers who did not respond to emails were funneled to and contacted by call center employees. (Dkt. No. 363-2 ¶ 7.) Consumers contacted by phone were then sent further reminder emails every other day.  (*Id.* ¶ 8.)

[4] In raising this, the Receiver is mindful that it is entirely possible and perhaps likely that the Law Firms hid their ongoing email solicitations and call-center campaign from one or both of their counsel who were representing them at the hearing.  If that is the case, that is all the more reason to find the Law Firms in contempt, given their continuous intentional conduct in violation of the Court's orders.

4

in light of the Court's unequivocal concerns with the Law Firms' prior conduct. *See, e.g.*, Apr. 22 Tr. at 111:1-19.[5]  The Law Firms claim that they should be excused from a finding of contempt because they did not have the "benefit" of a written order or a copy of the hearing transcript.  But this offers no defense because the Court had made clear that no party was to send out general statements like the prior solicitations.  If the Law Firms had any doubts, they could have and should have gone back to the Court for clarity, especially given the Court's hands-on, proactive role in providing the parties with instructions, including when it gave all of the parties, including the Law Firms, the opportunity to weigh in on the contents of the notice sent by the Receiver to consumers.

The Law Firms' argument centers on the Court's statement that "the [Law Firms] can deal with [their] individual clients" (Dkt. No. 363 at 11) (quoting Dkt. No. 353-3 at 157.)  The Law Firms contort this statement as a justification to maintain the call center solicitation campaign (that had never been disclosed).  The Law Firms contend in their opposition that:

> There was no distinction between in-bound and outbound communications.  Nor would that make sense: it is important for attorneys and clients to freely communication with one another without regard to who initiated the communication.  That free communication must include all subjects of the attorneys' representation, including a discussion of fees.  Nothing in the April 22 transcript suggests that the Law Firms were barred from having individualized, outbound communications with individual clients, ***including by continued operation of a call center***.

Dkt. No. 363 at 12 (emphasis added).

---

[5] "**THE COURT:**  Why did you guys send out this e-mail without telling me or asking me?  And you didn't tell anybody else. Why did you do that? I'm flabbergasted that you guys did that.
**MR. ELLIOTT**: Your Honor, we –
**THE COURT:** I can't believe it. I can't believe after all we've been through in this case, you unilaterally decided to send out that notice.
**MR. ELLIOTT**: We were trying to come into compliance with Your Honor's –
**THE COURT:** I think that's bologna. I think that's bologna. I'm – I'm flabbergasted that you guys sent that out without telling anybody." (*Id.*)

This argument is not supportable in the slightest. First, there is no evidence the calls were ever made by actual attorneys consulting with their clients.[6] These were sales calls made by non-attorney call-center employees to entice consumers to sign the amended engagement agreements that the Court found had been presented to consumers under misleading circumstances. Is there any doubt that the Court would have prohibited this call center activity had Mr. Elliott raised the question at the hearing? Making phone calls from a call center to solicit consumers is no different than sending them mass emails; indeed, individual calls are made to specific phone numbers, just like individual emails are sent to specific email addresses. These are both obvious forms of a mass solicitation campaign and are exactly the type of generalized consumer outreach that the Court prohibited. And, contrary to the Law Firms' purported public policy arguments (Dkt. No. 363 at 12), prohibiting mass call-center solicitations will not hinder the "free communication" necessary to maintain robust attorney-client relationships here or elsewhere.

B.  **The Law Firms' collection of legal arguments lacks merit**

First, the Law Firms argue that the Court's injunction must be reduced to a written order, with findings of fact and conclusions of law, particularly where the injunction imposes a restraint on speech. (*See* Dkt. No. 363 at 13.) The Law Firms' argument ignores the fact that there already was a written order in this case – the Preliminary Injunction – which the Court entered consistent with its broad discretionary authority to craft equitable remedies. *See, e.g.*, *S.E.C. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) & *S.E.C. v. Unifund Sal*, 910 F.2d 1028,

---

[6] There is the additional question of whether there is evidence that these "Law Firms" provide actual legal services to their clients. Even assuming there is an existing attorney-client relationship here (a questionable proposition), these call center communications are not communications between lawyers and their clients about their fees.

6

1035 (2d Cir. 1990); *cf. S.E.C. v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) (discussing "the inherent power of a court of equity to fashion effective relief").

Here, the PI enjoined the Law Firms as "entities in active concert" with the Defendants from engaging in unlawful conduct, including the TSR's ban on misrepresenting material aspects of debt relief services. (*See* Dkt. No. 184 at 9; 16 C.F.R. § 310.3(a)(2)(x).) The PI also enjoined the Law Firms from "using[] or benefiting from Consumer information … that any Defendant or Relief Defendant obtained prior to entry of this Order in connection with any Debt-Relief Services." (Dkt. No. 184 at 33.) The PI also specifically identified the need to protect consumers as one of the Receiver's primary tasks. (*See* Dkt. No. 183 at 55; TRO, Dkt. No. 12 at 21.) Taken together, the Law Firms' continued conduct, particularly maintaining call center solicitations which was never disclosed to the Court, runs afoul of its obligations under the PI and directly interferes with the Receiver's ability to protect consumers. That is the conduct that the Court was prohibiting the Law Firms from engaging in.

Furthermore, none of the cases cited by the Law Firms supports their overbroad position. The Receiver disagrees with the Law Firm's assertion that the "colloquy at the April 22 hearing… leaves 'a fair ground of doubt as to the wrongfulness of the defendant's conduct' such that the 'potent weapon' of contempt is not warranted." (Dkt. No. 363 at 10) (citing *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009) & *Chevron Corp. v. Donziger*, 990 F.3d 191, 212 (2d Cir. 2021)). Under the test in *Chevron Corp.* – "whether someone in [the Law Firms'] position could reasonably conclude that the sanctioned conduct was allowed" – there is no doubt. The Court prohibited making outbound solicitations to consumers; and this prohibition was not limited to emails but covered all solicitations – including call center solicitations. The PI itself also prohibited the Law Firms from

7

misrepresenting material aspects of debt relief services, and the solicitation campaign did exactly that. There is clear and convincing evidence (from the admissions contained in Mr. Crosby's declaration alone) that the Law Firms violated the court's edict through their intentional conduct. *See, e.g.*, *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995).

There is also no evidence that the Law Firms were reasonably diligent in attempting to follow the Court's directions. The Law Firms' continuation of a call center campaign after April 22 is not the conduct of a party attempting in good faith to comply with the Court's PI or the Court's Order setting limits on consumer communications by all parties. Instead, the actions exude contempt of the Court's orders. Even accepting the proposition that it was enough for the Law Firms to "advise" their vendor Mr. Crosby that "a Court had ordered all general communications from the Law Firms to clients needed to cease immediately" (Dkt. No. 363-2 ¶ 10), it was never a reasonable step under the PI to operate a call center solicitation campaign in secret, and it became contemptuous of the Court's order and authority to keep it operating after the April 22 hearing.

Nor are the Law Firms correct in their hyper-technical argument that the Court cannot find contempt here under 28 U.S.C. § 636(b)(1). This is essentially a duplicate of their argument that the Court must memorialize its order to writing. The Law Firms' pattern of conduct is in contempt of the PI, and all of the parties, as well as the Law Firms, consented to this Court's determination and entry of the PI.

The Law Firms' final legal argument – that the April 22 transcript is not "clear enough to permit a party to understand what would generate a contempt finding" (Dkt. No. 363 at 14) – is, again, a repeat of its earlier argument and fares no better. The Court was very specific in the PI itself and in the April 22 hearing. The Law Firms' conduct in setting up a call center in stealth

8

and then continuing to operate it despite the Court's clear directions not to make generalized outreach to consumers is the exact type of intentional conduct for which contempt is necessary.

### C. Imposing Sanctions on *Each* of the Law Firms is Appropriate

The Receiver respectfully defers to the Court on what would be appropriate sanction to rein in the Law Firms and ensure that they abide by the Court's Orders, including the PI. The Receiver suggests that awarding a specific amount of sanctions against each of the Law Firms is appropriate. The Law Firms argue this to be improper because the Law Firms "are not similarly situated." (Dkt. No. 363 at 14.)

While each law firm is technically an individual legal entity, to date, the Law Firms have aggressively intervened in this case and have repeatedly made arguments to the Court in a strident singular voice. It is not clear, however, who exactly is now in charge of each of these Law Firms and who is the authorizing lawyer for each of the Law Firms to participate in this case. Previously, Defendant Jason Blust had controlled these Law Firms; however, in this lawsuit, the recently-added Defendant, Richard Gustafson, has represented that he is authorized to speak on behalf of all of the Law Firms. Operating as a collective whole, the Law Firms have been some of the most active participants in this case. *See, e.g.*, Dkt. Nos. 68, 124, 143, 225, 271, 276, 279 & 312. As confirmed by the Crosby declaration, the Law Firms have also taken actions hidden from the Court, including starting up a massive outreach campaign to consumers in March 2024, operating a call center, sending misleading communications to consumers in an effort to keep their business, and continuing to contact consumers despite a clear and specific order from the Court not to do so. Finding *each* individual Law Firm in contempt for participating in this collective behavior will hold each accountable for their participation and serve to curb such behavior in the future.

Lastly, the Law Firms argue that the Receiver should not be entitled to an award of his legal fees to prepare this motion, because the Law Firms' conduct was not willful. Even when giving the Law Firms every benefit of the doubt (including accepting that the continued email solicitations were inadvertent), opening and maintaining a call center – and failing to disclose that conduct to the Court despite a myriad of opportunities to do so – is willful.

## CONCLUSION

For the reasons set forth in the Receiver's motion and this reply brief, and all supporting evidence referenced therein, the Receiver respectfully requests that each of the Law Firms be held in contempt based on the Law Firms' pattern of conduct in this case.

Dated: May 31, 2024

**MCNAMARA SMITH LLP**

By: ___/s/ Logan D. Smith___
Logan D. Smith  (*Pro Hac Vice*)
Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email: lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Court-appointed Receiver,
Thomas W. McNamara*