# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | ) ) ) |
| Plaintiffs, | ) ) Case No. 24-cv-00040-EAW-MJR |
| v. | ) ) ) |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al. | ) ) ) |
| Defendants, | ) ) ) |
| and DANIEL BLUMKIN, et al. | ) ) ) |
| Relief Defendants. | ) ) ) |

## INTERVENOR LAW FIRMS' RESPONSE TO RECEIVER'S "REQUEST FOR INSTRUCTION"

The Intervenor Law Firms ("Law Firms") respectfully submit this response to the Receiver's "Request for Instruction."

## INTRODUCTION

On May 22, 2024, the Receiver filed a document with the benign title of "request for further instruction." The Receiver might as well have called his submission "a modest proposal." The relief he is requesting is dramatic and irrevocable. The document is long on unsupported conclusions but devoid of supporting evidence, and the Receiver asks this Court to deliver the *coup de grace* to the Defendant entities and, in all likelihood, the Intervenor Law Firms as well.

Incredibly, the Receiver makes this request without providing any evidence to support it, and before even a single claim against any Defendant has been proven, much less finally adjudicated. Indeed, the only dispositive ruling in the case thus far (this Court's March 4, 2024 preliminary injunction) is on appeal. Both that appeal and the actual adjudication of the plaintiff's claims will have little meaning if the Receiver may destroy the Defendants' businesses in the meantime.

This is completely backwards. Fundamental fairness and due process dictate that Defendants and the Law Firms be given their day in Court **before** such winding down by Court order. *See U.S. v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 903-05 (2d Cir. 1992). In addition, due process and fundamental fairness preclude such sweeping (and dispositive) relief without the benefit of an evidentiary hearing and full briefing. The Defendants are entitled to due process. So are Law Firms. So are the 65,000 clients of the Law Firms. The entire judicial process cannot be subverted by a Receiver making self-proclaimed "factual findings" and "conclusions of law" without any support for either, whatsoever.

At present, all the Court has before it is the Receiver's unsubstantiated recommendation (and a vague one at that). The Receiver has not provided this Court with any financial analysis, feasibility study, or any other analysis to show the likely outcomes for 65,000 clients if Defendants simply close up shop. The Receiver's proposed action will impact tens of thousands of consumers and must be based on factual findings supported by admissible evidence and well-reasoned legal conclusions – not a "request for instruction" with a single exhibit.

Several additional points merit mention.

***First***, although it is titled a "request for instruction," the Receiver's submission is a motion for injunctive relief, wholly separate and apart from the Plaintiffs' previous motion for preliminary injunction. Dkt. 5. Indeed, the relief requested by the Receiver is the opposite of the relief granted by this Court in its March 4, 2024 preliminary injunction. Dkt. 183. That preliminary injunction called for a managing Receiver to operate Defendants' businesses. No good faith effort to operate the businesses has been undertaken. The Receiver now wants to do the opposite and become a liquidating Receiver.

***Second***, the Receiver's submission unquestionably seeks dispositive relief. For starters, 28 U.S.C. § 636(b)(1)(A) includes motions for injunctive relief among the enumerated matters that must be adjudicated by an Article III judge. *Id.* Moreover, the list in Section 636(b)(1)(A) is not exhaustive. Courts are instructed to examine the "practical effect" of a motion (rather than its label) in assessing whether it is dispositive for purposes of Federal Rule of Civil Procedure 72. *See Williams v. Beemiller*, 527 F.3d 259, 264-65 (2d Cir. 2008). Here, the Receiver's motion calls for the liquidation and wind-up of StratFS and all its affiliates. In all likelihood, that will result in the liquidation of the Law Firms as well. That is clearly dispositive.

***Third***, as set forth above, the Receiver's motion is devoid of evidentiary support. The Receiver did not testify at the preliminary injunction hearing. He has never been placed under oath in this case and has not been cross-examined. Instead, he has chosen to proceed through a series of unverified reports. The Law Firms (and

3

other interested parties) should be given leave to propound discovery on the Receiver (including depositions) to understand the bases and assumptions incorporated into his suggested course of action.

## ARGUMENT

### I.   The Receiver's "Request" Is A Dispositive Motion.

What the Receiver couches as a "request for instruction" is far more consequential than that label suggests. The Receiver is asking this Court to use its equitable powers to compel the liquidation of dozens of Defendant entities. Regardless of its caption, that is a request for an injunctive order. *See United States ex rel Lutz v. United States*, 853 F.3d 131, 1339 (4th Cir. 2020) ("To determine whether an order amounts to an injunction, we first look at the practical effect of the order rather than the label ascribed to it.").

The definition of an injunction is a "court order commanding or preventing an action." Black's Law Dictionary 904 (10th ed. 2014); *see also Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n,* 389 U.S. 64, 75 (1967) (Injunction as simply "an equitable decree compelling obedience under the threat of contempt."); *Alabama v. U.S. Army Corp. of Eng'r*, 424 F.3d 1117, n.14 (11th Cir. 2005) (same); 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2–3 (1909) ("In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing.").The common thread is that

4

an injunction has two core elements: (1) an exercise of judicial coercion to compel parties to refrain from action or take certain action; and (2) enforcement via contempt. Both are present here. Compulsion is present because Defendants and their employees will be required to cooperate with the wind down. And the threat of contempt is also present because the Receiver's tool for enforcing cooperation with the wind down will be further contempt motions before this Court. Thus, this is an injunctive order.

Moreover, even if not a request for injunctive relief (and it is), the Receiver's motion is dispositive under 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72. The Second Circuit has made it clear that "[g]iven the possible constitutional implications of delegating Article III judges' duties to magistrate judges, we have generally "avoided constitutional issues in this area by construing the Federal Magistrates Act narrowly 'in light of its structure and purpose." *Williams*, 527 F.3d at 264-65 (internal citations omitted). In *Williams*, the Second Circuit considered whether a remand order qualified as dispositive and held that the enumerated list of matters set forth in 28 U.S.C. § 636(b)(1)(A) was non-exhaustive. *Id.* at 265. The Second Circuit followed its "sister circuits" in determining whether an action was "dispositive" by "analyz[ing] the practical effect of the challenged action on the instant litigation." *Id.* (collecting cases). The *Williams* court concluded that a state court remand was the functional equivalent of a motion to dismiss for lack of subject matter jurisdiction and was, therefore, dispositive. *Id.* at 266.

Courts assessing whether district court orders are "injunctive" for purposes of appeal under 28 U.S.C. § 1292(a)(a) apply a more stringent test. "An order has the practical effect of granting injunctive relief within the meaning of section 1292(a)(1) if it is directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632 (2d Cir. 1995); *see also Positano Place at Naples I Condominium Assoc., Inc. v. Empire Indemnity Insur. Co.*, 84 F.4th 1241, 1250 (11th Cir. 2023); *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988).

Regardless of which test is used, though, the conclusion is the same: the Receiver's motion is injunctive in nature. The "practical effect of the challenged action on the instant litigation" of the Receiver's motion will be the equivalent of a permanent injunction with respect to Defendants. That is one of the ultimate remedies sought in Plaintiffs' Second Amended Complaint and allowing the relief sought by the Receiver will certainly "accord or protect some or all of the substantive relief" sought therein. Dkt. 366 at 83. In addition, the relief will result in a complete liquidation of a family of companies previously valued at $1 billion. It will terminate employment relationships, trigger defaults in banking relationships, and result in breaches of numerous vendor contracts. It will also have a domino effect on the Law Firms and likely compel them to find another vendor (a process made difficult by the Receiver's refusal to provide client data to the Law Firms). Indeed, the practical effect of this order will be the equivalent of a *permanent* injunction.

Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72, dispositive motions (including, but not limited to, injunctions) must be decided by Article III judges unless the parties have consented otherwise. The Law Firms' prior consent was limited to a single motion (Dkt. 5) which has long since been adjudicated. The Law Firms respectfully stand on their right to have this motion decided by a District Court Judge. Similarly, to the best of the Law Firms' knowledge, none of the newly named Defendants in this case have consented to a Magistrate Judge making a final ruling on this issue. Accordingly, any dispositive order must be entered by a District Court Judge. *See* 28 U.S.C. § 636(b)(1)(C).

## II. The Most Important Part Of The Receiver's Plan (*i.e.*, His Claim That His Proposed Solution Will "Protect Consumers") Is Not Supported By Any Evidence.

During the preliminary injunction hearing, Defendants and the Law Firms presented evidence regarding the services provided by the Law Firms. The performance of one Law Firm, Monarch, is illustrative. Monarch represented 6,500 clients in Illinois. Dkt. 123 at 262. The average Monarch client had eight different credit cards and $40,000 in debt. *Id.* at 262-263. Monarch was able to settle debt for 85% of its clients, and multiple debts for 75% of its clients. *Id.* For Monarch clients as a whole: (1) the average reduction on settled debts was approximately 50%; and (2) the average savings (net of fees) on settled debt was 16%. *Id.* at 265-268, 280-281. Monarch clients also realized a significant benefit: they did not continue to pay 20-26% interest rates on term settlements. *Id.* at 277-278. Clients who remained with Monarch for over eight months had dramatically better outcomes than if they had

7

continued making minimum payments on their debts. *Id.* at 274-275, 283-286. But that is not all. Monarch attorneys also defended Monarch clients in lawsuits brought by their creditors.[1] *Id.* at 215-228; Dkt. 262-11. That evidence (not rebutted by Plaintiffs at trial) is significant because the Receiver does not address any part of it.

***First***, as the Court knows, the vast majority of Law Firm clients stopped paying their creditors when they retained the Law Firms (many others were already in default before they retained the Law Firms). Dkt. 123 at 58-59. By stopping payments, they put themselves in position to accumulate savings and put the Law Firms in a position to negotiate steep discounts in settlement, either directly with the clients' credit card creditors or through debt collectors who acquired the debts after charge-off. *Id.* In short, the Law Firm clients have already taken the risk of non-payment in the expectation of realizing the benefit of favorable settlements. The Receiver's plan would deprive those clients of that benefit.

***Second***, because none of the Law Firms have taken new clients since January 2024, virtually all the Law Firms' clients have now been with the Law Firms for over eight months. What's more, to the extent those clients have been transferring money into their Global or RAM accounts since January 2024, but not paying fees during that time, many of them likely have accumulated significant savings and may be in

---

[1] Canyon client Christopher Elkins got much better results. He retained Canyon because he had 21 credit cards and over $100,000 in debt. He paid Canyon only $26,000 in fees. Dkt. 128 at 437-439. Canyon settled 19 of his 21 debts. Dkt. 264-23. The original balance of those 19 debts was $84,833, which Canyon settled for $42,718. *Id.* Thus, Elkins obtained a $42,000 savings (not including savings of accrued interest) for just $26,000. Canyon also represented him in two lawsuits. Dkt. 128 at 480-482; Dkt. 264-19; Dkt. 264-20.

8

a strong position to settle a significant amount of debt. The Receiver seeks to throw that benefit away and does not offer any analysis (or offer any evidence) on this issue. He does not analyze, for example, how many consumers are in a position to negotiate additional settlements based on the funds now available in their Global or RAM accounts. Nor does the Receiver attempt to assess whether consumers would benefit more from remaining with Law Firms (using a contingent fee structure) than if the Receiver simply drops them altogether. There should be open discussion between the Receiver and the parties to implement the true nature and intent of the Preliminary Injunction.

***Third***, the analysis offered by the Receiver relates only to ***existing*** settlements. Dkt. 359-1 at 9-14. But that covers one small aspect of a client's overall picture. As set forth above, a typical client has eight different accounts and $40,000 in debt. Dkt. 123 at 262-63. The Receiver is not examining a client's overall situation. He is only looking at those debts that are currently in settlement (*i.e.*, a settlement was reached prior to January 10, 2024 for which a funding plan was established). Dkt. 359-1 at 9-15. That is hardly a comprehensive picture.

Assume, for example, that: (1) a particular client had eight accounts and $40,000 in debt; (2) prior to January 10, 2024, a Law Firm had reached term settlements on two of those debts; and (3) the Law Firm was representing the client in litigation. The Receiver is considering only the two debts that were already in settlement before he took over. The Receiver wants to declare victory with respect to the two previously-reached settlements. But that ignores the client's ongoing lawsuit

9

and the other six debts. If (as is likely the case), the client has amassed significant funds in his or her Global account between January 2024 and the present, it is highly likely that some of the remaining six debts can be settled. None of that is considered by the Receiver in his sweeping plan, to the consumer's detriment.

***Finally***, the Receiver seeks to reassure the Court by reciting a list of agencies and support services with whom he has spoken. Dkt. 359-1 at 1. That is all well and good, but nothing in his report suggests those agencies have the capacity to handle 65,000 clients (assuming, of course, the clients are even interested in such services). And there is no analysis of the geographic distribution of the 65,000 clients or whether the agencies with whom the Receiver has spoken have offices in those areas. The assertion that charitable organizations can adequately and capably represent consumers free of charge sounds lofty, indeed. But that is just hollow posturing if those agencies cannot actually and effectively serve the Law Firms' clients.

### III. The Balance Of The Receiver's Motion Is Similarly Unsupported By Evidence.

There is not a single affidavit attached to Receiver's motion. Despite his sweeping claims, the Receiver's factual and legal assertions are not supported by sufficient evidence or citation. For example, the Receiver contends that ongoing operations at StratFS will not be "profitable or legal." Dkt. 359-1 at 7. But where is the data to support his profitability conclusion? He does not attach it. Nor does he provide the Court with relevant excerpts. The Receiver should be required to present that analysis to the Court and allow the parties to test the assumptions and projections therein. On an issue of such importance, the parties and Court should not

be required to accept the Receiver's word at face value. Likewise, the Receiver is not charged with deciding issues of law; the Court is. If the Receiver believes there is a violation of law, he should bring that to the Court's attention so it may be briefed and argued.

Similarly, the Receiver asserts the Law Firms are engaged in unlawful fee splitting and the unauthorized practice of law. That is a very serious allegation. But in support, the Receiver cites only his own prior report. He does not cite any evidence or provide this Court with detailed argument or discussion regarding state law on the issue of fee-splitting or standards for the practice of law. In addition, the Receiver's "concerns" on this point are misplaced. The Law Firms have operated for over a decade. During that time, no state bar regulator has brought (much less prevailed upon) any type of fee-splitting claim against them. That is for good reason: the Law Firms are not splitting fees with SFS. If the Receiver or Government truly believe there is fee-splitting, they may bring an appropriate claim and the Law Firms will respond in kind.

In addition, the Receiver utterly disregards the Law Firms' separate legal existence. The Receiver discusses the Law Firms in a manner that suggests their lack of independent existence is an already-established fact. It is not. This Court has not made any such finding. Nor could it. Plaintiffs have yet to present any evidence showing the Law Firms are controlled or directed by StratFS. The Receiver similarly fails to present any such evidence. In his submission, he contends that the Law Firms

have little involvement with their clients. For support on that point, he cites only his own previously-filed unsworn report. Dkt. 359-1 at 6.

The ***evidence*** thus far shows the Receiver is wrong. The witnesses who have testified under oath in this case (the Receiver has not) have made it clear that Law Firm attorneys are heavily involved in representing their clients. Joanna Hughes testified that she represents Monarch clients in litigation on a daily basis. Dkt. 123 at 215-228; Dkt. 262-11.

Previously, the Receiver asserted the Law Firms' contracts were "likely" void under various state laws. Dkt. 292-1 at 16. Now, the Receiver contends they are "almost certainly" void. Dkt. 359-1 at 5. Either way, the Receiver is wrong on the law. There is no blanket rule to the effect that any contract that violates any type of "public policy" is deemed void. The law is state specific and much more nuanced. The definition of "public policy," the degree to which a contract must violate public policy before voidness becomes an issue, the available remedies all differ from state to state. And that state-specific legal analysis is also ***fact***-specific.

Most of the decisions previously cited by the Receiver stand for the unremarkable proposition that where a provision in a contract violates public policy only that particular provision may be voided.[2] In those few instances where courts have voided an entire contract, it is because the underlying purpose of the contract

---

[2] *See Fed. Deposit Ins. Co.*, 843 P.2d 1285 (Colo. 1992); *Columbus Life Ins. Co.*, 532 P.3d 757 (Ariz. 2023); *State Farm Mut. Auto. Ins. Co.*, 307 Md. 631 (1986); *Weaver*, 257 Ind. 458 (1971); *Vasquez*, 83 N.J. 86 (1980).

was itself offensive to public policy.³ That is a far cry from the facts here where only a single provision in the clients' agreements is alleged to violate the TSR. Moreover, the decisions cited by the Receiver are factually and legally distinguishable. Most arise in factual circumstances far removed from this case, and virtually none have anything do with attorney fee agreements.⁴

In addition, the Receiver's naked assertion that a contract is "likely void" or "almost certainly void" is hardly a basis on which to justify the extraordinary measure sought by the Receiver. Here again, if the Receiver (or Government) believes the Law Firms' contracts are void, they are required to bring an appropriate claim and submit it to the Court for resolution in a setting that affords full due process to the Law Firms. Thus far, no such claim has been brought.

## IV. The Receiver's Motion Cannot Be Decided Without An Evidentiary Hearing.

Given the nature of the Receiver's motion, and the gravity of the proposed relief, an evidentiary hearing is required. Due process and fundamental fairness (not only to the parties, but also to third parties such as StratFS's lenders and the 65,000 consumers) dictate that this decision be evidence-based, with all parties having ample

---

³ *See Szerdahelyi*, 67 N.Y.2d 42 (1986) (usurious note); *Gulfco of La., Inc.* 2013 Ark.367 (2013) (predatory loans); *Bond* 246 So. 2d 631 (Fla. Dist. Ct. App. 1971) (pyramid scheme); *Stockton* 362 Ga. App. 779 (2022) (operate without a license); *Gamboa* 407 Ill. App. 3d 70 (2011) (fraudulent naturalization scheme); *Peltz* 40 Mo. 532 (1867) (sales contract to be paid in Confederate dollars).

⁴ Only one case cited by the Receiver, *Christensen v. Eggen*, 577 N.W.2d 221, 225 (Minn. 1998), involved legal fees. But that case did not involve an agreement between attorney and client, it involved a fee splitting agreement between two attorneys.

13

time to conduct discovery (including discovery directed to the Receiver) and present evidence. The evidence thus far strongly suggests the Receiver's proposed solution is ***not*** in the best interests of consumers. However, the District Court should refrain from making any decision until the evidence is presented and carefully considered, and, again, after dialogue between the Receiver and the parties. *See S.E.C. v. Torchia*, 922 F.3d 1307, 1316 (2d Cir. 2019) (Due process afforded when affected parties are permitted to "present evidence when the facts are in dispute and to make arguments regarding those facts.") (internal citations omitted).

## CONCLUSION

For the reasons set forth above, the Law Firms respectfully oppose the Receiver's request for instruction and ask this Court: (1) to require the Receiver to bring a formal motion before seeking the relief requested in his request for instruction; (2) to find that the request for instruction raises dispositive questions as set forth in Rule 72; (3) for expedited discovery, including expert discovery and the ability to take discovery from the Receiver (including depositions); and (4) to set an evidentiary hearing for adjudication of the Receiver's motion; and (5) to instruct the

Receiver to engage in good faith discussion with the parties regarding the goals and the objectives of the Preliminary Injunction.

Dated:      Buffalo, New York
            June 7, 2024

>                             */s/ Terrence M. Connors*
>                             Terrence M. Connors, Esq.
>                             Andrew M. Debbins, Esq.
>                             CONNORS LLP
>                             1000 Liberty Building
>                             Buffalo, New York 14202
>                             (716) 852-5533
>                             tmc@connorsllp.com
>                             amd@connorsllp.com