UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al.*,

              Plaintiffs,

    v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), *et al.*,

              Defendants, and

STRATEGIC ESOP, *et al.*,

              Relief Defendants.

24-CV-40 (EAW) (MJR)

---

# COMBINED MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS FILED BY DEFENDANT FIDELIS LEGAL SUPPORT SERVICES, LLC AND RELIEF DEFENDANTS CAMERON CHRISTO AND THE BUSH LAKE TRUST

**HOOVER & DURLAND LLP**
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*

*Attorneys for Defendant Fidelis
Legal Support Services, LLC, and for
Relief Defendants Cameron Christo
and The Bush Lake Trust*

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

FACTS ............................................................................................................... 2

    A.   The entities involved. ............................................................... 2

    B.   The front-end sales operation that resulted in consumers paying
         advance fees for debt-relief services. ......................................... 3

    C.   The back-end services operation that reduced consumers' debt
         burden and defended consumers against creditors' lawsuits. ................. 5

    D.   The claims against Fidelis, Christo, and Bush Lake. ................................ 6

ARGUMENT ..................................................................................................... 7

   I.   THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST
       FIDELIS. ................................................................................. 8

    A.   The Complaint does not plausibly allege that Fidelis substantially
         assisted the Law Firms' TSR violations. .................................... 8

    1.   The relevant portion of the TSR is invalid because it exceeds Congress's
         delegation of rulemaking authority. ......................................... 10

    2.   When Fidelis helped the Law Firms defend their clients against creditors'
         lawsuits, it was not substantially assisting the Firms' earlier collection of
         unlawful advance fees. ............................................................ 12

        a.   "Substantial assistance" means aiding in wrongdoing, not aiding
            a company engaged in wrongdoing. ................................... 12

        b.   The routine administrative services that Fidelis provided the Law
            Firms were remote from, and incidental to, the Firms' collection
            of advance fees. ........................................................... 17

    3.   Fidelis did not know, or consciously avoid knowing, that the Law Firms
         were collecting advance fees without an adequate face-to-face sales
          presentation. ......................................................................... 21

        a.   Substantial-assistance liability requires knowledge of a TSR
            violation, not knowledge of an act that happens to violate the
            TSR. ....................................................................... 21

        b.   Only Christo's knowledge can be imputed to Fidelis, and the
            Complaint does not allege scienter on his part. ......................... 25

         c.   Even if Blust's and Gallagher's knowledge could be imputed to
            Fidelis, the Complaint does not charge them with the type of
            knowledge required. ..................................................... 28

B.    The Complaint does not plausibly allege that Fidelis violated the New York Executive Law or General Business Law.................................29

II.    THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST CAMERON CHRISTO OR THE BUSH LAKE TRUST.....................................33

CONCLUSION.................................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
   671 F.3d 140 (2d Cir. 2011) ................................................................................7

*Apollo Fuel Oil v. United States,*
   195 F.3d 74 (2d Cir. 1999) ................................................................................26

*Armstrong v. McAlpin,*
   699 F.2d 79 (2d Cir. 1983) ...................................................................15, 16, 19

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..............................................................2, 7, 18, 26, 30

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) .....................................................................................10, 11

*Bureau of Consumer Fin. Prot. v. Chou Team Realty LLC,*
   No. 20-CV-00043, 2021 WL 4077110 (C.D. Cal. Aug. 10, 2021) ................23

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
   511 U.S. 164 (1994) ...........................................................................................14

*Cleary v. Perfectune, Inc.,*
   700 F.2d 774 (1st Cir. 1983) ............................................................................23

*Commodity Futures Trading Comm'n v. Walsh,*
   618 F.3d 218 (2d Cir. 2010) .......................................................................33, 34

*Consumer Fin. Prot. Bureau v. Daniel A. Rosen, Inc.,*
   No. 21-CV-07492, 2022 WL 1514439 (C.D. Cal. Apr. 5, 2022)...............17, 23

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
   144 S. Ct. 2440 (2024)........................................................................................10

*Douyon v. N.Y. Med. Health Care, P.C.,*
   894 F. Supp. 2d 245 (E.D.N.Y. 2012) ...........................................................27, 32

*F.D.I.C. v. Mortg. Zone, Inc.,*
   No. 08-CV-3369, 2010 WL 4000158 (E.D.N.Y. Oct. 12, 2010) ...................26

*F.T.C. v. Chapman,*
   714 F.3d 1211 (10th Cir. 2013) .......................................................................23

*F.T.C. v. Consumer Health Benefits Ass'n,*
   No. 10-CV-3551, 2011 WL 13254502 (E.D.N.Y. Oct. 12, 2011) .................16

*F.T.C. v. Day Pacer LLC,*
   689 F. Supp. 3d 609 (N.D. Ill. 2023)...............................................................16

*F.T.C. v. Genius Techs. LLC*,
   No. 18-CV-03654, 2019 WL 12872865 (N.D. Cal. Feb. 20, 2019) ............................ 25

*F.T.C. v. Lake*,
   181 F. Supp. 3d 692 (C.D. Cal. 2016) ...................................................... 23

*F.T.C. v. LeadClick Media, LLC*,
   838 F.3d 158 (2d Cir. 2016)............................................................... 33, 34

*F.T.C. v. Partners In Health Care Ass'n, Inc.*,
   189 F. Supp. 3d 1356 (S.D. Fla. 2016)....................................................... 16

*F.T.C. v. Quincy Bioscience Holding Co.*,
   389 F. Supp. 3d 211 (S.D.N.Y. 2019)......................................................... 31

*F.T.C. v. Walmart Inc.*,
   No. 22-CV-3372, 2024 WL 3292800 (N.D. Ill. July 3, 2024) ............................ 24, 25

*F.T.C. v. Walmart Inc.*,
   664 F. Supp. 3d 808 (N.D. Ill. 2023).................................14, 16, 17, 23, 25

*F.T.C. v. WV Universal Mgmt., LLC*,
   877 F.3d 1234 (11th Cir. 2017) .......................................................14, 23, 25

*Fennell v. TLB Kent Co.*,
   865 F.2d 498 (2d Cir. 1989).................................................................. 26

*Flores-Figueroa v. United States*,
   556 U.S. 646 (2009) .......................................................................... 21

*Francis v. Kings Park Manor, Inc.*,
   992 F.3d 67 (2d Cir. 2021).................................................................... 7

*Greco v. Qudian Inc.*,
   No. 20-CV-577, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ................................ 28

*Grijalva v. Kevin Mason, P.A.*,
   No. 18-CV-02010, 2019 WL 8221076 (C.D. Cal. Dec. 30, 2019)........................... 16, 20

*Halo v. Yale Health Plan*,
   819 F.3d 42 (2d Cir. 2016)................................................................11, 12

*In Re: Nine W. LBO Sec. Litig.*,
   87 F.4th 130 (2d Cir. 2023)..............................................................27, 29

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ................................................................ 26

*L & M Indus., Inc. v. Kenter*,
   458 F.2d 968 (2d Cir. 1972).................................................................. 10

*Life Techs. Corp. v. Promega Corp.*,
   580 U.S. 140 (2017) .......................................................................... 13

*Modrey v. Am. Gage & Mach. Co.*,
   478 F.2d 470 (2d Cir. 1973) ..................................................................... 13

*Moore v. Fenex, Inc.*,
   809 F.2d 297 (6th Cir. 1987) .................................................................... 23

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ................................................................................. 15

*S.E.C. v. Ahmed*,
   72 F.4th 379 (2d Cir. 2023) ...................................................................... 33

*S.E.C. v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) ............................................................... 33, 34

*S.E.C. v. McKnight*,
   No. 23-CV-641, 2023 WL 8000294 (N.D. Tex. Oct. 17, 2023) .................. 22

*Schatz v. Rosenberg*,
   943 F.2d 485 (4th Cir. 1991) ............................................................... 14, 15

*Spano v. V & J Nat'l Enterprises, LLC*,
   264 F. Supp. 3d 440 (W.D.N.Y. 2017) ...................................................... 26

*Stokes v. Lokken*,
   644 F.2d 779 (8th Cir. 1981) .......................................... 15, 18, 22, 23, 29

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008) ..................................................................... 25

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen*
   *& Helpers of Am., AFL-CIO*,
   986 F.2d 15 (2d Cir. 1993) ....................................................................... 26

*United States v. Kahn*,
   5 F.4th 167 (2d Cir. 2021) ........................................................................ 10

*United States v. Manny*,
   645 F.2d 163 (2d Cir. 1981) ..................................................................... 26

*Valencia ex rel. Franco v. Lee*,
   316 F.3d 299 (2d Cir. 2003) ..................................................................... 30

*Van Wade v. St. Paul Boulevard Fire Dist.*,
   No. 21-CV-06218-EAW, 2022 WL 486911 (W.D.N.Y. Feb. 17, 2022) ....... 30

*Woodward v. Metro Bank of Dallas*,
   522 F.2d 84 (5th Cir. 1975) ...................................................................... 22

**State Cases**

*In re Amerco Derivative Litig.*,
   252 P.3d 681 (Nev. 2011) ......................................................................... 26

*Keenan v. Ace Legal Corp.*,
527 P.3d 973, 2023 WL 3028689 (Nev. App. 2023) ..................................................26

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) ...............................................................................................26

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
85 N.Y.2d 20 (1995) .................................................................................................30

*Peralta v. Figueroa*,
17 Misc. 3d 1128(A), 2007 WL 4104122 (N.Y. Sup. Ct. Nov. 14, 2007) ....................32

*Van Ostrand v. Nat'l Life Assur. Co. of Canada*,
82 Misc. 2d 829 (N.Y. Sup. Ct. 1975)......................................................................26

*Weinberg v. Mendelow*,
113 A.D.3d 485 (N.Y. App. Div. 2014).....................................................................26

**Federal Statutes**

5 U.S.C. § 553(c).........................................................................................................11

15 U.S.C. § 6101(4) ....................................................................................................10

15 U.S.C. § 6101(5) ....................................................................................................10

15 U.S.C. § 6102(a)(1) ............................................................................................8, 10

15 U.S.C. § 6102(a)(2) .................................................................................9, 10, 11, 17

15 U.S.C. § 6102(a)(3) ................................................................................................11

15 U.S.C. § 6102(d)(1)(A) ...........................................................................................10

15 U.S.C. § 6102(d)(1)(B)(i) .......................................................................................10

Telemarketing and Consumer Fraud and Abuse Prevention Act,
Pub. L. 103-297, 108 Stat 1545 (Aug. 16, 1994)..........................................................8

**State Statutes**

N.Y. Gen. Bus. Law § 349 ....................................................................................7, 30, 32

N.Y. Gen. Bus. Law § 349(a) .................................................................................30, 31

N.Y. Exec. Law § 63(12)...........................................................................................7, 30

**Regulations**

16 C.F.R. § 310.3 ..........................................................................................................9

16 C.F.R. § 310.3(a)(2)(x)..............................................................................................9

16 C.F.R. § 310.3(a)(4) .................................................................................. 9

16 C.F.R. § 310.3(b) .................................. 9, 10, 11, 14, 16, 17, 21, 22, 23, 24, 25, 28, 29

16 C.F.R. § 310.4 .................................................................................. 9, 11

16 C.F.R. § 310.4(a)(5)(i) ........................................................................ 9, 12, 29

16 C.F.R. § 310.4(a)(5)(i)(A) .......................................................................... 9

16 C.F.R. § 310.4(a)(5)(i)(B) .......................................................................... 9

16 C.F.R. § 310.4(a)(5)(i)(C) .......................................................................... 9

16 C.F.R. § 310.6(b)(3) .............................................................................. 9, 29

60 Fed. Reg. 43842-01 (Aug. 23, 1995) ............................... 11, 12, 13, 14, 17, 21, 22, 24

68 Fed. Reg. 4580-01 (Jan. 29, 2003) ................................................................ 24

75 Fed. Reg. 48458-01 (Aug. 10, 2010) ............................................................... 13

80 Fed. Reg. 77520-01 (Dec. 14, 2015) ............................................................ 22, 24

**Other Authorities**

F.T.C., *Complying with the Telemarketing Sales Rule*,
   https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-
   rule ......................................................................................... 9, 13, 18, 20, 22, 24

## INTRODUCTION

We have previously noted (Dkt. 320 at 7-9), and Plaintiffs evidently agree, that Fidelis Legal Support Services, LLC cannot be sued as a relief defendant, since it performed services in exchange for the payments it received from the intervenor law firms ("Law Firms"). To get their hands on Fidelis's money, and, in turn, on the money Fidelis distributed to its founder (Cameron Christo) and its owner (The Bush Lake Trust), Plaintiffs must somehow portray Fidelis as a wrongdoer. The Second Amended Complaint ("Complaint") tries to do that, but to no avail.

The Complaint's central allegation is that the Law Firms violated the Telemarketing Sales Rule ("TSR") by charging advance fees for debt-relief services sold over the telephone. Fidelis is alleged to have knowingly and substantially assisted in this misconduct because it helped the Law Firms defend their clients against creditors' lawsuits. This claim fails because (i) the relevant portion of the TSR's substantial-assistance rule is invalid; (ii) the administrative support Fidelis provided to the Law Firms had nothing to do with the Law Firms' collection of advance fees; and (iii) no one whose knowledge can be imputed to Fidelis knew (or consciously avoided knowing) that the Law Firms were violating the TSR.

The two state-law claims against Fidelis are also infirm, both because Circuit precedent requires pendant state-law claims to be dismissed whenever the federal claims against a defendant are dismissed pre-discovery, and because the Complaint fails to identify any fraudulent or deceptive business practice in which Fidelis took part. And without any valid claim against Fidelis, the derivative claims against Christo and The Bush Lake Trust ("Bush Lake") fall as well. Thus, as to Fidelis, Christo, and Bush Lake, the Complaint must be dismissed in its entirety.[1]

---

[1] This combined memorandum, jointly submitted in support of three separate motions to dismiss, complies with W.D.N.Y. LOCAL R. CIV. P. 7(a)(2)(C), which authorizes a memorandum up to 25 pages long in support of each motion filed. The notation "Dkt. ___" refers to documents electronically filed in this matter.

**FACTS**

Solely for purposes of this motion to dismiss, we assume the truth of the Complaint's concrete factual allegations, while disregarding bare conclusions and labels. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-81 (2009).

**A.     The entities involved.**

The Complaint's primary focus is the "Strategic" family of entities. We will follow Plaintiffs' lead in defining the corporate entities[2] as "SFS" and the client-services entities[3] as the "Client-Services Subsidiaries." (Dkt. 366 ("Compl.") ¶ 1.) SFS provided, and arranged for others to provide, debt-relief services to consumers. (*Id.* ¶ 42.)

Ryan Sasson, Daniel Blumkin, and Albert Ian Behar founded SFS no later than January 2016. (*Id.* ¶¶ 13, 24, 52, 58, 62.) Each man received SFS profits through a dedicated shell company—Duke Enterprises, LLC (for Sasson), Twist Financial, LLC (for Blumkin), and Blaise Investments, LLC (for Behar). (*Id.* ¶¶ 24, 56, 60, 63.) The Complaint (¶ 1) defines these shell companies as the "Holding Companies," and we will do so as well.

Ryan Sasson, along with Jason Blust, also created various law firms, which, in partnership with SFS and the Client-Services Subsidiaries, provided debt-relief services to consumers. (*Id.* ¶¶ 26, 43, 45, 182-200.) Though the Complaint (¶ 43) defines the law firms as "Façade Firms," we will use the less argumentative term "Law

---

[2]      The corporate entities are StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Support, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Strategic Consulting, LLC; Versara Lending, LLC; and Strategic Family, Inc. (Compl. ¶ 1.)

[3]      The client-services entities are Anchor Client Services, LLC; Bedrock Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Carolina Client Services, LLC; Great Lakes Client Services, LLC; Guidestone Client Services, LLC; Harbor Client Services, LLC; Heartland Client Services, LLC; Monarch Client Services, LLC; Newport Client Services, LLC; Northstar Client Services, LLC; Option 1 Client Services, LLC; Pioneer Client Servicing, LLC; Rockwell Client Services, LLC; Royal Client Services, LLC; Stonepoint Client Services, LLC; Summit Client Services, LLC; and Whitestone Client Services, LLC. (Compl. ¶ 1.)

Firms."[4] Blust oversaw Law Firm operations. (*Id.* ¶¶ 83-84, 187, 191.) Richard
Gustafson, Timothy Burnette, and Michelle Gallagher owned and controlled multiple
Law Firms. (*Id.* ¶¶ 26, 85, 88-92.)

Many of the Law Firms utilized virtual offices and outsourced support and
administrative functions to third parties. (*E.g.*, *id.* ¶ 44 (asserting that Law Firm mail
often came to a rented mailbox and was "scanned by a third party").) Three vendors that
provided services to the Law Firms—Hedgewick Consulting, LLC, Relialit, LLC, and Lit
Def Strategies, LLC—were founded and owned by Jason Blust. (*Id.* ¶¶ 94-98.) A fourth
Law Firm vendor, Fidelis, was founded by Cameron Christo (*id.* ¶ 102) and is owned by
The Bush Lake Trust (*id.* ¶ 104).[5]

## B. The front-end sales operation that resulted in consumers paying advance fees for debt-relief services.

Between January 2016 and January 2024, SFS operated two debt-relief
models: "a deferred-fee model" in which consumers paid fees only after their debt was
settled, and "an advance-fee model" in which consumers paid fees before their debt was
settled. (*Id.* ¶ 106-07.) The advance-fee model, developed and overseen by Sasson,
Behar, and Blumkin (*id.* ¶ 141), is the focal point of this litigation.

SFS devised a multi-step sales process to recruit consumers to its advance-
fee program. The process began with direct mailings informing debtors that they had
been pre-approved, or might be eligible, for a debt-consolidation loan. (*Id.* ¶¶ 13, 108.)

---

[4]    The intervenor Law Firms are Anchor Law Firm, PLLC; Bedrock Legal
Group; Boulder Legal Group; Brandon Ellis Law Firm LLC; Canyon Legal Group, LLC;
Chinn Legal Group, LLC; Clear Creek Legal, LLC; Credit Advocates Law Firm, LLC;
Great Lakes Law Firm; Greenstone Legal Group; Gustafson Consumer Law Group, LLC;
Hailstone Legal Group; Hallock & Associates LLC; Harbor Legal Group; Heartland Legal
Group; The Law Firm of Derek Williams, LLC; The Law Office of Melissa Michel LLC;
Leigh Legal Group, PLLC; Level One Law; Meadowbrook Legal Group; Michel Law,
LLC; Monarch Legal Group; Moore Legal Group, LLC; Newport Legal Group, LLC;
Northstar Legal Group; Option 1 Legal; Pioneer Law Firm P.C.; Rockwell Legal Group;
Royal Legal Group; Slate Legal Group; Spring Legal Group; Stonepoint Legal Group;
Whitestone Legal Group; and Wyolaw, LLC.

[5]    The Complaint (¶ 1) defines Fidelis, Relialit, Lit Def, and Hedgewick
Consulting as the "Blust Companies," but here too we decline to adopt Plaintiffs'
argumentative label.

SFS arranged for a third-party vendor—MEC Distribution, LLC—to mail millions of these letters each week. (*Id.* ¶¶ 15, 109.) Consumers interested in a debt-consolidation loan were directed to call a designated phone number or visit a designated website. (*Id.* ¶¶ 13, 108.)

When consumers responded to SFS's direct-mail solicitations, their contact information was captured and transmitted as a "lead" to SFS sales staff (*id.* ¶ 16), who then contacted the consumers via interstate telephone lines (*id.* ¶ 17, 41, 110). Guided by comprehensive scripts, sales staff typically told consumers that while they did not actually qualify for a debt-consolidation loan, they were eligible for SFS's debt-relief program. (*Id.* ¶¶ 17-20, 110.) In that program, sales staff promised, lawyers would negotiate with creditors for reduced payoff amounts and defend against creditors' lawsuits. (*Id.* ¶¶ 18, 94, 122, 174.) Sales staff touted SFS's debt-relief program as a "0% interest option" (*id.* ¶ 21), because the participants' payments were fixed at the time of enrollment, though in reality many creditors charged interest and fees when consumers stopped making payments on their debts (*id.* ¶ 171).

Consumers who wished to enroll in SFS's debt-relief program were scheduled for a face-to-face meeting with a notary. (*Id.* ¶ 113.) To facilitate these face-to-face meetings, the Law Firms contracted with three notary-provision companies. (*Id.* ¶ 123.) Notaries supplied by these three companies were expected to deliver an in-person presentation on the debt-relief program, using a script and other materials provided by SFS (*id.* ¶ 131), and SFS trained and tested the notaries on the presentation they were to deliver (*id.* ¶ 138). In practice, however, some notaries did not give the required presentation (*id.* ¶ 131), and some notaries did not complete the required training (*id.* ¶ 138). In addition, most notaries knew little about the debt-relief program beyond the information contained in their materials, so when consumers had questions not answered by those materials, the notaries turned to SFS staff for an answer. (*Id.* ¶¶ 129, 131, 133-34, 136.)

Consumers who received the face-to-face notary presentation and signed the necessary documents were enrolled in SFS's debt-relief program, and got a brief "attorney welcome call" from one of the Law Firms. (*Id.* ¶ 114.) SFS instructed new enrollees to stop paying and communicating with their creditors. (*Id.* ¶¶ 115-16.) Instead, participants were to begin making payments into an escrow account maintained by RAM or Global—payment processors hired by SFS or the Law Firms. (*Id.* ¶¶ 117, 157.[6]) The payment processors promptly withdrew various fees and distributed this money to themselves, the Client-Services Subsidiaries, the Law Firms, and SFS. (*Id.* ¶¶ 143-46.) These fees were either taken before any of the consumer's debts were settled (*id.* ¶¶ 22, 146, 179), or they were taken after some debt was settled, but were not proportional to the total fee charged or the amount the consumer saved (*id.* ¶¶ 149, 179).

C.   **The back-end services operation that reduced consumers' debt burden and defended consumers against creditors' lawsuits.**

As noted above, the services that consumers purchased with their advance fees were (i) negotiation of reduced debt-payoff amounts and (ii) litigation defense.

Because consumers paid fees up front, it took some time for them to accumulate enough money in their escrow accounts for debt-reduction negotiations to begin. (*Id.* ¶¶ 150-52.) Some consumers exited the program before doing so (*id.* ¶ 23), but most ultimately obtained debt reductions (*id.* ¶ 148). Those debt reductions were typically negotiated by SFS and the Client-Services Subsidiaries, on behalf of the Law Firms, not by Law Firm attorneys themselves. (*Id.* ¶¶ 43, 49, 120.)

When a program participant was sued by a creditor, SFS sent the legal filing to one of the litigation-support vendors hired by the Law Firms—Relialit, Lit Def, or Fidelis. (*Id.* ¶¶ 94-95, 97.) These vendors would "perform data entry for the[] lawsuits" and then transmit the filings "to contracted litigation or appearance attorneys"

---

[6]      The Complaint does not give full names for RAM and Global, but we assume it is referring to RAM Payment, LLC and Global Client Solutions, LLC.

who would represent the consumer in the litigation. (*Id.* ¶ 95; *accord id.* ¶ 201.) However, the Law Firms' retainer agreements permitted them "to avoid participating in the litigation if the assigned lawyer determined that the consumer [wa]s not likely to gain a favorable result" (*id.* ¶ 122), and in many cases the Law Firms did not defend suits brought against program participants (*id.* ¶¶ 122, 174).

> **D.    The claims against Fidelis, Christo, and Bush Lake.**

The Complaint consists of 229 substantive paragraphs, followed by 11 formulaic "counts." Four of these counts (marked below in boldface type) pertain to Fidelis, Christo, or Bush Lake.

Count 1 alleges that SFS, the Client-Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar violated the TSR by collecting fees from consumers before settling any debt. (*Id.* ¶¶ 230-38.)

Count 2 alleges that SFS, the Client-Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar violated the TSR by collecting fees from consumers after some debt was settled, where the fees collected were disproportionate to the total fee charged or to the amount the consumer saved. (*Id.* ¶¶ 239-46.)

**Count 3** alleges that SFS, the Client-Services Subsidiaries, the Holding Companies, Hedgewick Consulting, Relialit, Lit Def, and **Fidelis** violated the TSR by knowingly and substantially assisting in TSR violations committed by the Law Firms. (*Id.* ¶¶ 247-56.) As to Fidelis in particular, Count 3 alleges substantial assistance through "participati[on] in the day-to-day business operations of the [Law] Firms." (*Id.* ¶ 252.)

Count 4 alleges that Sasson, Blust, Blumkin, Behar, Gustafson, Burnette, and Gallagher knowingly and substantially assisted in TSR violations committed by SFS, the Client-Services Subsidiaries, and the Law Firms. (*Id.* ¶¶ 257-70.)

Counts 5 and 6 allege that SFS, the Client-Services Subsidiaries, the Holding Companies, Sasson, and Blumkin violated the TSR by making deceptive and misleading statements to consumers. (*Id.* ¶¶ 271-89.)

**Count 7** alleges that SFS, the Client-Services Subsidiaries, Hedgewick Consulting, Relialit, Lit Def, **Fidelis**, Sasson, Blust, Blumkin, Behar, Gustafson, Burnette, and Gallagher violated New York Executive Law § 63(12) by engaging in repeated fraud or persistent fraudulent acts. (*Id.* ¶¶ 290-95.)

**Count 8** alleges that SFS, the Client-Services Subsidiaries, Hedgewick Consulting, Relialit, Lit Def, **Fidelis**, Sasson, Blust, Blumkin, Behar, Gustafson, Burnette, and Gallagher violated New York General Business Law § 349 by engaging in deceptive acts or practices. (*Id.* ¶¶ 296-301.)

**Count 9** alleges that Strategic ESOP, Strategic ESOT, the Blust Family 2019 Irrevocable Trust, Jaclyn Blust, **Cameron Christo**, and **The Bush Lake Trust** received, lack any legitimate claim to, and must disgorge, funds obtained through unlawful means. (*Id.* ¶¶ 302-06.) As to Christo and Bush Lake in particular, the Complaint asserts that they must disgorge the money they received from Fidelis. (*Id.* ¶¶ 105, 303.)

Counts 10 and 11 allege that SFS, Great Lakes Client Services, LLC, the Holding Companies, Sasson, Blust, Blumkin, Behar, Gustafson, Burnette, and Gallagher violated Wisconsin licensing and regulatory requirements. (*Id.* ¶¶ 307-15.)

## **ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Concrete factual allegations are presumed true. *Id.* at 680. Conclusory allegations and statements of law are disregarded, *see id.* at 680-81; *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc), as are general allegations belied by more specific allegations, or by documents properly before the Court, *see Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).

I.   **THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST FIDELIS.**

According to the Complaint itself, Fidelis took no part in the front-end sales process which culminated in the Law Firms' receipt of advance fees. Fidelis had nothing to do with the direct-mail campaign SFS used to generate leads; it had nothing to do with the sales pitch SFS used to convert leads into program participants; it had nothing to do with those participants' payment of advance fees; and it did not know, or consciously avoid knowing, that despite the face-to-face notary presentations consumers received, collecting advance fees violated the TSR. Fidelis's role was confined to the back-end provision of debt-relief services to program participants who were sued by their creditors. And the rote administrative support that Fidelis provided the Law Firms—data entry and circulation of legal filings—tended only to help consumers obtain the litigation defense they had paid for (in advance). This is not the illicit assistance proscribed by the TSR. (In fact, the portion of the TSR that Plaintiffs rely on is invalid.) Nor is it the deceptive business activity proscribed by New York law. Counts 3, 7, and 8 must be dismissed as against Fidelis.

A.   **The Complaint does not plausibly allege that Fidelis substantially assisted the Law Firms' TSR violations.**

In 1994, Congress passed the Telemarketing and Consumer Fraud and Abuse Prevention Act, Pub. L. 103-297, 108 Stat 1545 (Aug. 16, 1994) (the "Telemarketing Act"). The Telemarketing Act directed the Federal Trade Commission (the "Commission" or "F.T.C.") to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). In response, the Commission promulgated the Telemarketing Sales Rule. *See* F.T.C., *Complying with the Telemarketing Sales Rule*,

https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (last visited Sept. 30, 2024).[7]

One section of the TSR, codified at 16 C.F.R. § 310.4, prohibits abusive telemarketing practices. Abusive telemarketing practices include charging advance fees for a debt-relief service sold over the telephone, *id.* § 310.4(a)(5)(i), unless the fee is not paid "until after a face-to-face sales . . . presentation by the seller," *id.* § 310.6(b)(3).[8]

Another section of the TSR, codified at 16 C.F.R. § 310.3, prohibits deceptive telemarketing practices. Deceptive telemarketing practices include misrepresenting "[a]ny material aspect of any debt relief service," *id.* § 310.3(a)(2)(x), and "[m]aking a false or misleading statement to induce any person to pay for goods or services," *id.* § 310.3(a)(4).

The Telemarketing Act also authorized the Commission to create a species of aiding-and-abetting liability, by outlawing acts "that assist or facilitate deceptive telemarketing." 15 U.S.C. § 6102(a)(2). The corresponding portion of the TSR reads as follows:

> Assisting and facilitating. It is a deceptive telemarketing act or practice and a violation of this part for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this part.

16 C.F.R. § 310.3(b).

---

[7]    This guidance document, cited throughout our motion, is the same document the Court relied on in its Decision & Order granting a preliminary injunction. (Dkt. 183 at 26, 32.)

[8]    The Complaint addresses two types of advance fees: fees taken before any debt is settled (Compl. ¶¶ 230-38 (citing 16 C.F.R. § 310.4(a)(5)(i)(A)-(B))), and fees taken after some debt has been settled, where the size of the fee is disproportionate to the total fee charged or the amount the consumer saved (*id.* ¶¶ 239-46 (citing 16 C.F.R. § 310.4(a)(5)(i)(C))). Because this distinction is immaterial to our motion, we refer to any fee defined in 16 C.F.R. § 310.4(a)(5)(i) as an "advance fee," and we refer to any advance fee not subject to the face-to-face exemption set forth in 16 C.F.R. § 310.6(b)(3) as an "unlawful advance fee."

The Complaint alleges that Fidelis violated § 310.3(b) by substantially assisting the Law Firms. (Compl. ¶¶ 247-54.) But the relevant portion of § 310.3(b) is invalid, and in any event, the Complaint's well-pleaded factual allegations do not satisfy § 310.3(b)'s conduct element (substantial assistance) or its scienter element (knowledge or conscious disregard)—even assuming that the Law Firms' collection of advance fees violated the TSR.

### 1. The relevant portion of the TSR is invalid because it exceeds Congress's delegation of rulemaking authority.

"Regulated parties may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2458 (2024) (cleaned up). Courts presented with such a challenge must measure the relevant regulation against the statutory grant of rulemaking authority from which the regulation derives. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also id.* at 215-16 (holding that a regulation which exceeded Congress's delegation of rulemaking authority was "invalid"); *United States v. Kahn*, 5 F.4th 167, 174 (2d Cir. 2021) ("[A] regulation that contravenes the plain language of the statute is invalid." (cleaned up)); *L & M Indus., Inc. v. Kenter*, 458 F.2d 968, 971 (2d Cir. 1972) ("Whenever administrative action exceeds the authority delegated to it by Congress, it is appropriate for an aggrieved person to obtain judicial relief from the impingement of such excess.").

As noted above, the Commission's authority to promulgate the TSR derives from the Telemarketing Act. The Act begins by directing the Commission to prescribe rules prohibiting two types of misconduct: "deceptive telemarketing acts or practices" and "other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).[9] The next two subsections narrow and particularize the Commission's authority to promulgate "rules respecting deceptive telemarketing," *id.* § 6102(a)(2), and "rules

---

[9]     The distinction between deceptive telemarketing and abusive telemarketing runs throughout the Telemarketing Act. *See* 15 U.S.C. §§ 6101(4), 6101(5), 6102(d)(1)(A), 6102(d)(1)(B)(i).

respecting other abusive telemarketing," *id.* § 6102(a)(3). Subsection 6102(a)(2)—the provision concerning deceptive telemarketing—decrees that the Commission must define deceptive telemarketing, that its definition of deceptive telemarketing "shall include fraudulent charitable solicitations," and that its definition of deceptive telemarketing "may include acts or practices of entities or individuals that assist or facilitate *deceptive* telemarketing." *Id.* § 6102(a)(2) (emphasis added). (This "assist or facilitate" clause is the basis for the TSR's substantial-assistance rule. *See* 1995 Preamble, 60 Fed. Reg. 43842-01, 43852 n.98 (Aug. 23, 1995).[10]) Subsection 6102(a)(3)—the provision concerning abusive telemarketing—does not similarly authorize the Commission to outlaw acts or practices that facilitate *abusive* telemarketing. Nor does any other provision of the Telemarketing Act.

When the Commission wrote the TSR's substantial-assistance rule, however, it did not confine itself to "acts or practices . . . that assist or facilitate *deceptive* telemarketing," 15 U.S.C. § 6102(a)(2) (emphasis added). Instead, the Commission sought to prohibit assisting or facilitating an "act or practice that violates [either] §§ 310.3(a), (c) or (d) [proscribing deceptive telemarketing], *or § 310.4* [proscribing abusive telemarketing]." 16 C.F.R. § 310.3(b) (emphasis added).

This latter cross-reference to the abusive telemarketing practices proscribed by § 310.4 exceeds the rulemaking authority conferred in the Telemarketing Act. *See* 15 U.S.C. § 6102(a)(2); *compare Bowen*, 488 U.S. at 209-16 (where statute expressly authorized agency to retroactively adjust Medicare reimbursements in certain circumstances, "retroactive cost-limit rules" falling outside the express authorization were "invalid"). And it is this latter cross-reference to § 310.4 that Plaintiffs rely on here. Fidelis is accused of substantially assisting in the Law Firms' collection of unlawful

---

[10]    Whenever a federal agency promulgates a regulation, it must incorporate within the regulation a "general statement of [the regulation's] basis and purpose." 5 U.S.C. § 553(c). This statement is commonly known as a preamble. *Halo v. Yale Health Plan*, 819 F.3d 42, 52 (2d Cir. 2016). The TSR was promulgated in 1995 and amended in 2003, 2008, 2010, 2015, and 2024. We refer to the corresponding preambles as the "1995 Preamble," the "2003 Preamble," and so on.

advance fees. (Compl. ¶¶ 247-54.) Collecting unlawful advance fees is an abusive telemarketing practice, not a deceptive telemarketing practice. 16 C.F.R. § 310.4(a)(5)(i).

### 2. When Fidelis helped the Law Firms defend their clients against creditors' lawsuits, it was not substantially assisting the Firms' earlier collection of unlawful advance fees.

Banks vetted and financed SFS's advance-fee business. (Compl. ¶¶ 58, 142.) A direct-mail company disseminated the solicitations that brought consumers into contact with SFS sales staff. (*Id.* ¶¶ 13-16, 108-09.) Notaries delivered the face-to-face presentations thought to justify the collection of advance fees. (*Id.* ¶¶ 123-40.) And payment processors disbursed those advance fees to themselves, SFS, the Client-Services Subsidiaries, and the Law Firms. (*Id.* ¶¶ 117, 145-47, 157-58.) These vendors did not, as far as the Complaint is concerned, substantially assist in the Law Firms' collection of unlawful advance fees, whereas Fidelis did, because, long after the advance fees were collected, Fidelis performed routine administrative tasks designed to help the Law Firms defend consumers against creditors' lawsuits. (*Id.* ¶¶ 94-95, 252.) This upside-down take on "substantial assistance" is untenable.

### a. "Substantial assistance" means aiding in wrongdoing, not aiding a company engaged in wrongdoing.

As the TSR's original preamble explains, § 310.3(b) makes a person liable for "redress or civil penalties" based "upon the wrongdoing of another person." 1995 Preamble, 60 Fed. Reg. at 43852 (cleaned up).[11] Naturally, then, this provision "received substantial attention" during the TSR's notice-and-comment period. *Id.* at 43851. As a result, the Court has exceptionally clear insight on the otherwise ambiguous term "substantial assistance." *E.g.*, *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140,

---

[11] Second Circuit precedent holds that courts interpreting a regulation must "examine the regulation's text in light of its purpose, as stated in the regulation's preamble." *Halo*, 819 F.3d at 52; *see also id.* at 52-56 (relying on a regulation's preamble to identify the appropriate standard of judicial review, even though the regulation's text said nothing about a standard of review); (Dkt. 183 at 34 (citing the 2010 Preamble).)

146 (2017) (finding the qualifier "substantial" to be inherently ambiguous); *Modrey v. Am. Gage & Mach. Co.*, 478 F.2d 470, 472 (2d Cir. 1973) (declaring "'substantial'" to be the quintessential "ambiguous term[]").

Though an early draft of the TSR required "that the requisite substantial assistance or support be 'related to the commission or furtherance' of a core rule violation," the Commission agreed with objectors that this was "an unnecessary additional element of proof." 1995 Preamble, 60 Fed. Reg. at 43851. A "related to" requirement was superfluous, the Commission explained, because "the ordinary understanding of the qualifying word 'substantial' encompasses the notion that the requisite assistance must consist of more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to a violation of the Rule." *Id.* at 43852. Thus, assistance bearing some relation to the primary violation—such as "provid[ing] sellers or telemarketers with mailing lists," "help[ing] in creating sales scripts or direct mail pieces," or "provid[ing] services that help telemarketers receive payments from consumers"—could qualify as substantial assistance. F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.[12] Assistance "with little or no relation to the conduct that violates the TSR," such as "cleaning a telemarketer's office" or "delivering lunches to the telemarketer's premises," "would not be enough to support liability as an assistor or facilitator." *Id.*

---

[12]    *See also* 1995 Preamble, 60 Fed. Reg. at 43852 (examples of substantial assistance include "[p]roviding lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel related services; providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered"); 2010 Preamble, 75 Fed. Reg. 48458-01, 48467 n.133 (Aug. 10, 2010) (stating that "lead generators for debt relief services" may come within the TSR's "assisting and facilitating provision").

The Commission felt confident that the phrase "substantial assistance," standing alone, adequately cabined secondary liability, because the substantial-assistance concept had been fully developed in aiding-and-abetting cases brought under the Securities and Exchange Act. *See* 1995 Preamble, 60 Fed. Reg. at 43851. The Commission even compiled a list of leading securities cases to illustrate the substantial-assistance principle that it sought to capture in § 310.3(b). *Id.* at 43851 n.97 (the "Securities Cases"); *see also F.T.C. v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1241 (11th Cir. 2017) (analogizing to aiding-and-abetting principles developed under federal securities law because the Commission "specifically invoke[ed] securities law in explaining the TSR's substantial assistance rule" (citing 1995 Preamble, 60 Fed. Reg. at 43851 & n.97)); *F.T.C. v. Walmart Inc.*, 664 F. Supp. 3d 808, 828 (N.D. Ill. 2023) ("Aiding and abetting principles (as seen in tort and securities case law) are relevant in understanding substantial assistance under the TSR.").[13]

The Securities Cases hold that secondary liability requires "substantial assistance by the aider and abettor in the achievement or consummation of the primary violation." *Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th Cir. 1991). "In other words, a plaintiff must prove that a defendant rendered 'substantial assistance' to the primary securities law violation, not merely to the person committing the violation." *Id.* at 497.

In the *Schatz* case, the plaintiffs had entered into an ill-fated securities transaction based upon misleading financial documents supplied by the counterparty, Mark Rosenberg. *Id.* at 488. The plaintiffs sued not only Rosenberg himself, but also the law firm that represented him in the deal. *Id.* The law firm, plaintiffs alleged, had substantially assisted Rosenberg's violations by "participating in negotiations," drafting

---

[13]     As the 1995 Preamble explained, the Supreme Court overruled many of the Securities Cases when it "held that there is no private cause of action for aiding and abetting under Rule 10(b)." 60 Fed. Reg. at 43852 & n.98 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). But because "[t]he Court's decision did not address the soundness of the rationale for the elements of aiding and abetting as developed in the [Securities] [C]ases," those cases remained a valid justification for, and illustration of, the doctrine codified in § 310.3(b). *Id.*

documents that contained Rosenberg's misrepresentations, and "conducting the [c]losing at its offices." *Id.* at 496. The district court held, and the Fourth Circuit agreed, that these allegations failed to state a claim, *id.* at 487, 495-96, even under the permissive pre-*Twombly* pleading regime then in effect. The law firm "did no more than 'paper the deal,'" the court held; it did not actively participate in Rosenberg's fraud. *Id.* at 497. This ministerial function did not qualify as rendering "'substantial assistance' to the primary securities law violation." *Id.*

Another of the Securities Cases, *Stokes v. Lokken*, 644 F.2d 779 (8th Cir. 1981), *abrogated on other grounds by*, *Pinter v. Dahl*, 486 U.S. 622 (1988), is similarly instructive. In *Stokes*, a marketer of precious metals (Continental) was found to have sold unregistered securities. *Id.* at 781-82. The plaintiffs sued Continental's attorney, Lokken, on a substantial-assistance theory. *Id.* at 781. Lokken had written a letter to Continental's auditor opining that Continental was not engaged in the sale of securities. *Id.* at 782. The auditor had given Continental a favorable audit, and this audit (but not Lokken's opinion) was referenced in Continental's marketing materials. *Id.* at 784. The court concluded that "the amount of assistance rendered by Lokken is minimal at most." *Id.* The auditor "may have relied on [Lokken's] opinion letter to some extent when giving its clean audit report," and that audit report was referenced in materials soliciting unlawful securities transactions, but this "tangential" connection between Lokken and the primary violation did not qualify as substantial assistance. *Id.*

The Second Circuit held similarly in another of the Securities Cases, *Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983). After an SEC enforcement action led to the appointment of a receiver, the receiver filed suit against the former trustee of an investment trust. *Id.* at 84-85. The receiver alleged that the former trustee had substantially assisted others in "churning"—conducting excessive trading "for the purpose of increasing the amount of commissions." *Id.* at 90. After noting that "a broker who merely executes an investment manager's orders for improper purchases or sales" does not render substantial assistance, *id.* at 91, the court found that the allegations

against the former trustee were weaker still, and "fail[ed] to state a cause of action," *id.*
at 92. By the terms of the trust deed, the former trustee was simply a depository for cash
and investments; it had no role in deciding "the merit or frequency of investments." *Id.*
Though the churning could not have occurred without a depository to hold the churned
investments, the complaint did not allege that the trustee "associated itself with the
churning," "wished to bring [it] about[,]" or sought to make it "succeed." *Id.*

For the most part, courts applying the TSR's substantial-assistance
concept have followed the text of § 310.3(b), the Commission's preambles and guidance,
and the example set by the Securities Cases. *See, e.g.*, *F.T.C. v. Day Pacer LLC*, 689 F.
Supp. 3d 609, 642 (N.D. Ill. 2023) (holding that § 310.3(b) requires the plaintiff to
"show a connection between the assistance provided and the resulting violations of the
core provisions of the TSR" (cleaned up)), *appeal filed*, No. 24-1273 (7th Cir.).[14] Courts
have held, for example, that "[p]rocessing routine transactions isn't substantial
assistance," *Walmart*, 664 F. Supp. 3d at 828, whereas "review[ing] sales materials"
that contain deceptive marketing, or "responding to consumer complaints regarding
[deceptive] marketing," could qualify as substantial assistance, *Consumer Health
Benefits*, 2011 WL 13254502, at *4.[15]

---

[14]    *See also Walmart*, 664 F. Supp. 3d at 827 (holding that § 310.3(b)
requires "some link[,] . . . but not necessarily a direct connection[,]" between the
substantial assistance and the primary TSR violation); *Grijalva v. Kevin Mason, P.A.*,
No. 18-CV-02010, 2019 WL 8221076, at *4 (C.D. Cal. Dec. 30, 2019) (activities "with
little or no relation to the conduct that violates the Rule would not be enough to support
liability as an assistor or facilitator" (cleaned up)); *F.T.C. v. Partners In Health Care
Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1369 (S.D. Fla. 2016) (citing the 1995 Preamble, 60
Fed. Reg. at 43852, for the meaning of substantial assistance); *F.T.C. v. Consumer
Health Benefits Ass'n*, No. 10-CV-3551, 2011 WL 13254502, at *4 (E.D.N.Y. Oct. 12,
2011) (substantial assistance requires "more than mere casual or incidental dealing with
a seller or telemarketer that is unrelated to the violation of the Rule" (cleaned up)).

[15]    *See also Partners In Health Care*, 189 F. Supp. 3d at 1369 (finding
substantial assistance where the defendants "handled the processing of all payments,"
"sent the handbook and materials to the customers," "opened merchant accounts for
marketers," "reviewed marketers' materials," and "dealt with any complaints to the
Better Business Bureau").

One district court has held that in applying § 310.3(b), "reliance on aider-abettor principles under securities laws is misplaced." *Consumer Fin. Prot. Bureau v. Daniel A. Rosen, Inc.*, No. 21-CV-07492, 2022 WL 1514439, at \*4 (C.D. Cal. Apr. 5, 2022). The court acknowledged that "the [Commission] invoked securities law in promulgating the TSR," but dismissed this invocation as irrelevant because the Commission "also rejected any requirement that the assistance be 'related to the commission or furtherance' of a core rule violation.'" *Id.* (citing 1995 Preamble, 60 Fed. Reg. at 43851 & n.97). This reasoning is faulty. *See Walmart*, 664 F. Supp. 3d at 828 n.21 ("I disagree with *Rosen*'s conclusion that [aiding-and-abetting] principles aren't relevant."). The Commission deemed a separate "related to" element *unnecessary* because, as the Securities Cases demonstrate, the phrase "substantial assistance," by itself, *already requires* that the assistance bear some relation to the primary TSR violation. *See* 1995 Preamble, 60 Fed. Reg. at 43851-52.

At any rate, even if the Commission had wanted to create a secondary-liability rule of the sort *Rosen* envisions—one that punishes mere assistance of a wrongdoer, however unrelated to the wrongdoing itself—it lacked authority to do so. The Telemarketing Act authorized the Commission to prohibit acts "that assist or facilitate deceptive *telemarketing*," 15 U.S.C. § 6102(a)(2) (emphasis added), not acts that assist or facilitate *entities engaged in* deceptive telemarketing.

### b. The routine administrative services that Fidelis provided the Law Firms were remote from, and incidental to, the Firms' collection of advance fees.

Count 3 generically alleges that Fidelis provided "substantial assistance or support to the [Law] Firms" by "participating in the[ir] day-to-day business operations." (Compl. ¶ 252.) Elsewhere, Fidelis is alleged to have provided "substantial assistance to SFS's debt-relief operations by purportedly facilitating litigation support on behalf of the

[Law] Firms." (*Id*. ¶ 94.[16]) Labeling Fidelis's work "substantial assistance" is meaningless, *see Iqbal*, 556 U.S. at 678-81, and the facts pled fall short: the support Fidelis allegedly provided the Law Firms has "little or no relation to the conduct that violates the TSR," F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.

Like the attorney in *Stokes*, whose opinion letter influenced the audit that was, in turn, touted in the primary violator's marketing materials, Fidelis's services were tangential to the Law Firms' collection of advance fees. Those fees were the product of a multi-step sales process conducted "on the front-end" of the Law Firms' relationship with consumers. (Compl. ¶ 150.) Specifically, SFS orchestrated a direct-mail campaign offering debt-consolidation loans (*id*. ¶¶ 13-15, 108-09); consumers who responded to the mailers were pitched on SFS's debt-relief program (*id*. ¶¶ 16-21, 110-11); consumers who expressed interest were scheduled for a face-to-face presentation by a notary (*id*. ¶¶ 112-13, 123-40); consumers who received the notary presentation and signed the requisite documents were enrolled in the debt-relief program, and started making payments into an escrow account managed by a payment processor (*id*. ¶¶ 114, 117); and the payment processor distributed advance fees to itself, SFS, the Client-Services Subsidiaries, and the Law Firms (*id*. ¶¶ 22, 145-47, 153-54).

Fidelis had nothing to do with this front-end sales operation. It was involved only in the back-end provision of services to consumers, and then only when the consumer was sued by a creditor. Thus, Fidelis was much further removed from the

---

[16]     Caught between their desire to portray the Law Firms as mere façades and their desire to portray Fidelis's litigation-support services as "substantial assistance," Plaintiffs confusingly allege that Fidelis provided "substantial assistance . . . by *purportedly* facilitating litigation support" (Compl. ¶ 94 (emphasis added)), and that Fidelis "perform[ed] data entry" on legal filings forwarded by SFS and then "*purportedly* sen[t] [the] filings to contracted litigation or appearance attorneys" (*id*. ¶ 95 (emphasis added)). If "purportedly" means "supposedly but not really," then the substantial-assistance claim necessarily fails: doing nothing is not assistance, let alone substantial assistance. Because this is a motion to dismiss, however, we will read the Complaint to allege that Fidelis did in fact facilitate litigation defense by performing data entry and sending legal filings to litigation attorneys.

primary violation than, say, "a broker who merely executes an investment manager's orders for improper purchases or sales." *Armstrong*, 699 F.2d at 91. And like the trustee in *Armstrong*, who held the churned investments but did not direct or facilitate the churning, *id.* at 92, Fidelis had no role in, or authority over, either the collection of unlawful advance fees or the sales process that led up to it. Nor did Fidelis do anything to "bring about" the collection of unlawful advance fees, or "to make the [collection of unlawful advance fees] succeed." *Id.* Fees were collected from the consumer long before Fidelis entered the picture, and the services Fidelis performed for the Law Firms tended only to ensure that the consumer actually received the litigation defense she had (prematurely) paid for.

Straining to tie Fidelis's back-end litigation support to the front-end collection of unlawful advance fees, Plaintiffs allege that SFS marketed litigation defense "to consumers as an additional benefit of the debt-relief products." (Compl. ¶ 94.) But this allegation simply draws a (tenuous) connection between SFS's sales pitch and the *Law Firms*. SFS did not pitch consumers on the administrative support that *Fidelis provided to the Law Firms*, any more than it pitched consumers on the third-party scanners who digitized the Law Firms' incoming mail (*id.* ¶ 44).[17]

Besides, remoteness is not the only reason why Fidelis's administrative support does not qualify as substantially assisting a TSR violation.

First, like the law firm that drafted the misleading deal documents in *Schatz*, Fidelis's work was rote and ministerial. According to the Complaint, litigation-support vendors served as a "hub" for lawsuits brought against Law Firm clients. (Compl. ¶ 95.) Fidelis received legal filings from SFS, performed some "data entry," and

---

[17]    The Complaint does allege that SFS's promises of litigation defense were misleading, because the Law Firms often used a loophole in their retainer agreements to decline representation. (Compl. ¶¶ 122, 174.) But Fidelis is not accused of substantially assisting in this deception (*cf. id.* ¶¶ 94, 247-56), nor could it be. Fidelis simply processed litigation filings and distributed them to litigation attorneys (*id.* ¶¶ 94-95); it had nothing to do with the promises made to consumers or the Law Firms' decisions about which litigations to defend.

then "sen[t] [the] filings to contracted litigation or appearance attorneys." (*Id*.); *compare Grijalva*, 2019 WL 8221076, at *5 ("[I]n merely acting as a payment processor and accepting, for a fee, monthly payments before remitting them to the other Defendants, RAM has not substantially assisted in violations of the TSR[.]").

Second, the Complaint itself dismisses Fidelis's work as inconsequential. Though the Complaint alleges that Fidelis facilitated litigation defense (Compl. ¶ 94), it also insists that "[Law] Firm lawyers almost never represented [consumers] when they were sued by creditors" (*id*. ¶ 122; *accord id*. ¶ 26 (alleging that the Law Firms "perform[ed] little to no work on behalf of consumers"); *id*. ¶ 174 (alleging that the Law Firms often failed to defend consumers against creditors' lawsuits).) Plaintiffs cannot contend that Fidelis's facilitation of litigation defense meaningfully advanced the Law Firms' scheme when their own Complaint claims that the Law Firms "almost never" provided the litigation defense that Fidelis tried—apparently unsuccessfully—to facilitate.

In sum, the Complaint alleges that the Law Firms violated the TSR by taking advance fees for debt-relief services without providing an adequate face-to-face sales presentation. (*Id*. ¶¶ 45-46, 125, 136, 145, 249-54.) Fidelis's back-end support of litigation defense bears "little or no relation" to such misdeeds, F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule. Fidelis did not supply "mailing lists," write "sales scripts," or "receive payments from consumers." *Id*. Its sole function, according to Plaintiffs themselves, was to help Law Firms provide the litigation defense that consumers had purchased in advance. Indeed, the Complaint insists that defending consumers against creditors' lawsuits was a *good* thing, and that the Law Firms should have done more of it. (Compl. ¶¶ 122, 174.) Fidelis's attempts to facilitate this litigation defense did not, as a matter of law, substantially assist the Law Firms' earlier collection of unlawful advance fees.

### 3. Fidelis did not know, or consciously avoid knowing, that the Law Firms were collecting advance fees without an adequate face-to-face sales presentation.

On top of its failure to allege facts constituting "substantial assistance," the Complaint fails to allege facts showing that Fidelis "[knew] or consciously avoid[ed] knowing" that the Law Firms were "engaged in an[] act or practice that violates [the TSR]," 16 C.F.R. § 310.3(b). The only agent whose knowledge could be imputed to Fidelis is Cameron Christo, and the Complaint does not say anything about his knowledge (or conscious avoidance). Furthermore, even if knowledge acquired by Jason Blust and Michelle Gallagher could be imputed to Fidelis—despite the fact that they acquired the relevant knowledge long before Fidelis existed—the Complaint alleges only that (i) Blust and Gallagher knew the Law Firms were collecting advance fees, and (ii) the notary presentations arranged by the Law Firms did not satisfy the face-to-face exemption. The Complaint does not allege that Blust or Gallagher knew, believed, or even suspected that the notary presentations failed to satisfy the face-to-face exemption. Liability under § 310.3(b) requires conscious wrongdoing. A mistaken belief about the legality of advance fees does not suffice.

### a. Substantial-assistance liability requires knowledge of a TSR violation, not knowledge of an act that happens to violate the TSR.

"As a matter of ordinary English grammar," a knowledge requirement applies "to all the subsequently listed elements." *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). So when § 310.3(b) requires the defendant to "know[] or consciously avoid[] knowing that the seller or telemarketer is engaged in any act or practice that violates [the TSR]," it is saying that the defendant must (i) know or consciously avoid knowing that a seller or telemarketer is engaged in a given practice and (ii) know or consciously avoid knowing that the practice violates the TSR.

This is how the Commission itself has always construed its rule. The 1995 Preamble, for example, defines the requisite scienter as "knowledge of a violation of [16 C.F.R.] §§ 310.3(a) or (c) or § 310.4." 60 Fed. Reg. at 43852. The Commission's current

guidance says the same thing. *See* F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (to violate § 310.3(b), a person must "know[]—or consciously avoid[] knowing—that the seller or telemarketer is violating Sections 310.3(a), (c), or (d), or 310.4 of the TSR by engaging in deceptive or abusive telemarketing practices").[18] And in 2015, when the Commission proposed amending the TSR to ban the use of remotely created checks in telemarketing transactions, *see* 2015 Preamble, 80 Fed. Reg. 77520-01, 77521 (Dec. 14, 2015), it dismissed the concern that "banks will cease processing all remotely created checks" for fear of substantial-assistance liability, *id.* at 77540, because a bank would only incur substantial-assistance liability if it "knew or consciously avoided knowing that the telemarketer was *violating the TSR prohibitions against remotely created checks*," *id.* (emphasis added).

Also instructive are the Securities Cases, which the 1995 Preamble cites to illustrate the scienter necessary for liability under § 310.3(b), *see* 60 Fed. Reg. at 43852. These cases too require "[k]nowledge of wrongful purpose," not merely knowledge of an act that happens to be unlawful. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975) (cleaned up), *superseded by statute as stated in*, *S.E.C. v. McKnight*, No. 23-CV-641, 2023 WL 8000294, at *4 n.4 (N.D. Tex. Oct. 17, 2023), *report and recommendation adopted*, 2023 WL 8097078 (N.D. Tex. Nov. 21, 2023). For example, in the *Stokes* case discussed above, where an attorney's opinion letter influenced an audit that was, in turn, cited in the primary violator's marketing materials, the court found the allegations of scienter insufficient. The attorney had merely given a legal opinion that the marketer was not engaged in the sale of securities. 644 F.2d at 782.

---

[18]     *See also* F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (advising that "sellers and telemarketers that receive payment by methods other than credit or debit cards are responsible for obtaining verifiable authorization in those transactions," and that third-party payment processors "can be held liable for violating the TSR if the third party substantially assists a seller or telemarketer and knows—or consciously avoids knowing—that the seller or telemarketer is violating the TSR by failing to obtain verifiable authorization").

Though this opinion proved incorrect, *id.*, there was no allegation that "he knew his legal advice was incorrect" or that he knew a "fraud was afoot." *Id.* at 784.[19]

Most courts applying the TSR's scienter requirement have followed the text of § 310.3(b), the Commission's preambles and guidance, and the example set by the Securities Cases. *See, e.g.*, *WV Universal Mgmt.*, 877 F.3d at 1242 ("Liability for substantial assistance under the TSR can attach only if the defendant knows or consciously avoids knowing that the person to whom the defendant renders such assistance is engaged in telemarketing violations."); *Walmart*, 664 F. Supp. 3d at 826 ("[T]he FTC hasn't alleged enough about the circumstances of the money transfers at issue to show that Walmart knew or consciously avoided knowing about TSR violations."); *Bureau of Consumer Fin. Prot. v. Chou Team Realty LLC*, No. 20-CV-00043, 2021 WL 4077110, at *3 (C.D. Cal. Aug. 10, 2021) (finding knowing, substantial assistance where a defendant who was "familiar with the provisions of the TSR governing the collection of [advance] fees" directed the primary violator to "collect[] advance fees in violation of the TSR"), *aff'd*, 2022 WL 17958636 (9th Cir. Dec. 27, 2022).

One district judge—in the same outlier decision discussed above—said "it is sufficient to establish knowledge, or conscious avoidance, of the prohibited practice, and not of the TSR violation." *Rosen*, 2022 WL 1514439, at *5. But the two cases cited for this proposition point the other way. *See F.T.C. v. Chapman*, 714 F.3d 1211, 1218 (10th Cir. 2013) ("Ms. Chapman knew or consciously avoided knowing that the Kansas defendants were violating the Telemarketing Sales Rule."); *F.T.C. v. Lake*, 181 F. Supp. 3d 692, 701 (C.D. Cal. 2016) ("Lake knew or consciously avoided knowing that the

---

[19] Other Securities Cases hold similarly. *See, e.g.*, *Moore v. Fenex, Inc.*, 809 F.2d 297, 304 (6th Cir. 1987) (ordering a directed verdict as to one of the defendants because the plaintiffs "failed to make any showing that [this defendant] consciously intended to aid a securities fraud violation"); *Cleary v. Perfectune, Inc.*, 700 F.2d 774, 778 (1st Cir. 1983) (rejecting substantial-assistance liability where the plaintiffs "failed to offer any indication that the defendants had any actual awareness of the impropriety of [the underlying] activity," or that "the defendants consciously intended to further" the illegality).

HOPE Defendants were violating the TSR."). And requiring only knowledge of an act that happens to be illegal, rather than knowledge of the act's illegality, would turn § 310.3(b) into a negligence or strict-liability rule—something the Commission has repeatedly refused to do, *see* 1995 Preamble, 60 Fed. Reg. at 43852 (rejecting a "'should know' standard" as unduly lax); 2003 Preamble, 68 Fed. Reg. 4580-01, 4611-12 (Jan. 29, 2003) (same); 2015 Preamble, 80 Fed. Reg. at 77540 ("The TSR prohibition against assisting and facilitating violations of the TSR is not a strict liability standard.").

That said, *actual* knowledge of a TSR violation is not necessarily required; a person who "consciously avoids" obtaining knowledge of a TSR violation may be liable as well. 16 C.F.R. § 310.3(b). Conscious avoidance means "taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's TSR violations." F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule. Thus, conscious avoidance requires "*deliberate* ignorance," not mere negligence or a mistaken belief. 1995 Preamble, 60 Fed. Reg. at 43852 (emphasis added); *see also* 2003 Preamble, 68 Fed. Reg. at 4611-12 (rejecting calls for a "'knew or should have known' standard," and opting to retain the "heightened knowledge requirement" reflected in "the 'conscious avoidance' standard"). To consciously avoid actual knowledge, a person must intentionally ignore signs of illegality, as when, for example, "a fulfillment house . . . ships only inexpensive prizes on behalf of a telemarketer about whom it receives numerous complaints." 2003 Preamble, 68 Fed. Reg. at 4612; *see also F.T.C. v. Walmart Inc.*, No. 22-CV-3372, 2024 WL 3292800, at *14 (N.D. Ill. July 3, 2024) ("[T]here is nothing inherently deceptive or unfair about processing money transfers. To show that Walmart's processing of money transfers provided substantial assistance to the wrongdoers, the FTC must allege that there were enough warning signs about the specific money transfers to show that Walmart knew or consciously avoided knowing

that the transfers were payment for telemarketing or connected to fraudulent telemarketing schemes, and Walmart proceeded with the transactions anyway.").[20]

In sum, to plead scienter under § 310.3(b), the Complaint must plausibly allege that Fidelis knew, or deliberately ignored red flags indicating, that the Law Firms were charging advance fees for debt-relief services sold over the telephone, without delivering a face-to-face sales presentation.

### b. Only Christo's knowledge can be imputed to Fidelis, and the Complaint does not allege scienter on his part.

To assess whether the Complaint successfully ascribes guilty knowledge to Fidelis, we must first determine whose knowledge matters. Business organizations necessarily think and act through their human agents. To prove that a corporation has acted with scienter, a plaintiff "must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *See, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

The basic rules on imputing an agent's knowledge to her principal are well-settled. When an agent "acquires knowledge material to [his] duties, the agent's knowledge is imputed to the principal." *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76

---

[20]    *Accord WV Universal Mgmt.*, 877 F.3d at 1239 ("Universal violated [§ 310.3(b)] by providing two merchant accounts to TYS despite a slew of red flags indicating TYS was engaged in a fraudulent telemarketing scheme."); *Walmart*, 2024 WL 3292800, at *15 (holding that certain red flags, though indicative "of fraud generally," did not support an "inference that Walmart knew . . . the transfers were related to telemarketing," and so were "insufficient to show Walmart's knowledge of the underlying TSR violations"); *Walmart*, 664 F. Supp. 3d at 827 (holding that "[w]ithout more information about why Walmart should have suspected specific transactions," the complaint failed to allege "conscious avoidance of TSR violations"); *F.T.C. v. Genius Techs. LLC*, No. 18-CV-03654, 2019 WL 12872865, at *6 (N.D. Cal. Feb. 20, 2019) (finding that the complaint sufficiently alleged knowledge or conscious avoidance where it listed notices received from the Better Business Bureau and Michigan police, and various red flags "that strongly indicated fraud"), *report and recommendation adopted*, 2019 WL 12872782 (N.D. Cal. Mar. 14, 2019).

(2d Cir. 1999) (per curiam).[21] When an agent acquires knowledge outside the scope of the agency, that knowledge is not imputed to the principal. *See, e.g.*, *F.D.I.C. v. Mortg. Zone, Inc.*, No. 08-CV-3369, 2010 WL 4000158, at *6 (E.D.N.Y. Oct. 12, 2010); *see also Keenan v. Ace Legal Corp.*, 527 P.3d 973, 2023 WL 3028689, at *3 n.2 (Nev. App. 2023) (agent's knowledge of service not imputed to principal where agency relationship created after agent received notice); *Weinberg v. Mendelow*, 113 A.D.3d 485, 486 (N.Y. App. Div. 2014) (no imputation where the purported "principal" did not exist when the purported "agent" performed the relevant act); *Van Ostrand v. Nat'l Life Assur. Co. of Canada*, 82 Misc. 2d 829, 834 (N.Y. Sup. Ct. 1975) (bank employee's knowledge of plaintiff's divorce not imputed to the bank where the employee learned of the divorce outside the scope of her employment).

Count 3 alleges that Fidelis "knew or consciously avoided knowing" that the Law Firms were receiving advance fees (Compl. ¶ 253), but this bare recital of a legal element must be disregarded under *Iqbal*. And the Complaint's concrete factual allegations do not establish that Michelle Gallagher, Jason Blust, or Cameron Christo—the three potential sources of imputed scienter—acquired illicit knowledge while acting as Fidelis's agent.

---

[21]    To the extent the Court is exercising federal-question jurisdiction, it would resolve agency issues by applying federal common law. *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 986 F.2d 15, 20 (2d Cir. 1993); *but see United States v. Manny*, 645 F.2d 163, 166 (2d Cir. 1981) (applying New York agency law where not inconsistent with federal law). To the extent the Court is exercising supplemental jurisdiction, it would resolve agency issues by applying state law. *See Spano v. V & J Nat'l Enterprises, LLC*, 264 F. Supp. 3d 440, 448 (W.D.N.Y. 2017). This distinction is academic here, however, because "federal common law incorporates general principles of contract and agency law," *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003), and state courts in New York (the forum state) and Nevada (Fidelis's home state) apply the same rule stated in *Apollo*, *see, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("[T]he acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals."); *In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011) (holding that a corporation is charged with any knowledge its agent acquired "while acting in the course of his employment and within the scope of his authority" (cleaned up)); *see also Fennell v. TLB Kent Co.*, 865 F.2d 498, 501 (2d Cir. 1989) (applying federal law of agency, but finding New York law instructive, and identical, on "what is at root a fairly general question of agency law").

Michelle Gallagher was Fidelis's agent insofar as the company employed her to manage its day-to-day operations (*id.* ¶ 91). But the Complaint does not allege that she learned of the Law Firms' advance-fee practices while managing Fidelis. On the contrary, the Complaint makes clear that Gallagher was operating her own Law Firms and managing Lit Def before Fidelis existed. (*Id.* ¶¶ 26, 91-92, 268.) The only plausible inference is that, whatever knowledge Gallagher possessed regarding the Law Firms' collection of advance fees, she did not acquire it in her capacity as a Fidelis employee.

Jason Blust was not an employee or officer of Fidelis, but he allegedly "control[led] Fidelis" because (i) he controlled or was affiliated with the Law Firms that hired Fidelis, and (ii) "in November 2023, Blust sent emails to employees of Lit Def or Fidelis directing them to gather documents for an ongoing litigation." (*Id.* ¶¶ 102-03.) These allegations do not make Blust an agent of Fidelis whose knowledge can be imputed to the company, for two reasons.

First, the *sine qua non* of an agency relationship is the agent's submission to the principal's control. *See In Re: Nine W. LBO Sec. Litig.*, 87 F.4th 130, 148 (2d Cir. 2023); *see also Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 270 (E.D.N.Y. 2012) ("The key inquiry in determining the existence of an agency relationship is whether the principal exercised control over the agent with respect to the matters entrusted to the agent."), *amended on other grounds by*, 2013 WL 5423800 (E.D.N.Y. Sept. 25, 2013). The fact that Blust oversaw the Law Firms that hired Fidelis, and once told "employees of Lit Def or Fidelis . . . to gather documents for an ongoing litigation" (Compl. ¶ 102-03), does not even justify the conclusion Plaintiffs wish to draw—that "Jason Blust controls Fidelis" (*id.* ¶ 102). Still less do these allegations justify the conclusion that *Fidelis* controls *Blust*.

Second, even if Blust were Fidelis's agent, he did not learn about the Law Firms' advance-fee practices while acting in that capacity. According to the Complaint, Blust knew that charging advance fees is illegal from his time at Legal Helpers (*id.* ¶ 83), a debt-relief law firm dating back to 2011 at least (*id.* ¶ 53). And Blust knew about the

Law Firms' receipt of advance fees because, since at least 2016 (*id.* ¶¶ 13, 23, 106, 120), he controlled and oversaw the Law Firms' operations (*id.* ¶¶ 83-84, 182, 187-204) and served as a liaison between the Law Firms and SFS (*id.* ¶ 84). As with Gallagher, whatever knowledge Blust possessed regarding the Law Firms' collection of advance fees was acquired long before Fidelis was created in 2021 (*id.* ¶¶ 96, 104-05).

That leaves Cameron Christo. Christo was and is Fidelis's chief executive officer (*id.* ¶ 102), so his knowledge could, in theory, be imputed to the company. *See, e.g.*, *Greco v. Qudian Inc.*, No. 20-CV-577, 2022 WL 4226022, at *26 (S.D.N.Y. Sept. 13, 2022) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." (cleaned up)). But Plaintiffs do not make any allegations about Christo's knowledge or conscious avoidance of knowledge. (*Cf.* Compl. ¶¶ 2, 102, 104-05, 229.) Thus, Count 3 fails to allege scienter as to Fidelis, regardless of whether merely "knowing that the [Law] Firms were requesting or receiving [advance] fees" (*id.* ¶ 253) would qualify as scienter under § 310.3(b)—an issue we turn to now.

### c. Even if Blust's and Gallagher's knowledge could be imputed to Fidelis, the Complaint does not charge them with the type of knowledge required.

As discussed above, 16 C.F.R. § 310.3(b) does not subject secondary actors to crushing financial liability merely because they mistakenly conclude that the activity they are supporting complies with the TSR. Conscious wrongdoing—specifically, knowledge or deliberate ignorance of a TSR violation—is required. *See supra* § I.A.3.a. The Complaint, by contrast, alleges only that Blust was familiar with the TSR's advance-fee prohibition (Compl. ¶ 83), and that Blust and Gallagher both knew the Law Firms were collecting advance fees (*id.* ¶¶ 93, 269). Such knowledge, even if it were imputed to Fidelis, does not suffice under § 310.3(b) because knowing that the Law Firms were collecting advance fees is not the same as knowing that the Law Firms were wrongfully collecting advance fees in violation of the TSR.

There is nothing inherently improper about a service-provider taking payment in advance, and this routine practice is *malum prohibitum* under the TSR *only*

in the absence of a face-to-face sales presentation, *see* 16 C.F.R. §§ 310.4(a)(5)(i), 310.6(b)(3). As the Complaint makes abundantly clear, the Law Firms engaged notaries to deliver a face-to-face sales presentation to each prospective client. (Compl. ¶¶ 89, 91, 113, 123-40.) Plaintiffs contend, of course, that these notary presentations were too "brief and perfunctory" to qualify as a face-to-face sales presentation within the meaning of § 310.6(b)(3). (*Id.* ¶ 136.) But the Complaint does not allege any facts suggesting that Blust or Gallagher *knew* the notary presentations were inadequate, or that they deliberately ignored clear signs that the notary presentations were inadequate. *Compare Stokes*, 644 F.2d at 784 ("[N]o one claims that he knew his legal advice was incorrect."). Without such allegations, the Complaint fails to charge Blust and Gallagher with the conscious wrongdoing that § 310.3(b) requires.

Plaintiffs may respond that the face-to-face exemption is an affirmative defense (Dkt. 183 at 7), which the Complaint need not anticipate, *see, e.g.*, *Nine W. LBO Sec. Litig.*, 87 F.4th at 144. And this point might be apt if we were citing the notary presentations to defeat the primary TSR violations alleged in Counts 1 and 2. But we are concerned with Count 3, which alleges secondary liability under § 310.3(b). Knowledge of a TSR violation is one of § 310.3(b)'s elements. Taking advance fees after delivering a face-to-face sales presentation does not violate the TSR. And the Complaint does not allege that Blust or Gallagher knew (or consciously avoided knowing) that the notary presentations failed to qualify as face-to-face sales presentations.

Accordingly, even if Blust's and Gallagher's knowledge about the Law Firms' advance-fee practices could be imputed to Fidelis, the Complaint still fails to allege the scienter that § 310.3(b) requires.

### B.   The Complaint does not plausibly allege that Fidelis violated the New York Executive Law or General Business Law.

Once the Court dismisses the federal claim against Fidelis, Circuit precedent requires the Court to dismiss pendant state claims as well. *See, e.g.*, *Van Wade v. St. Paul Boulevard Fire Dist.*, No. 21-CV-06218-EAW, 2022 WL 486911, at *6

(W.D.N.Y. Feb. 17, 2022) ("[W]here 'federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)).

Dismissal on the merits is warranted too. Count 7, which alleges that Fidelis violated New York Executive Law § 63(12), and Count 8, which alleges that Fidelis violated New York General Business Law ("GBL") § 349, are materially identical. The Executive Law proscribes "repeated fraudulent or illegal acts" or other "persistent fraud or illegality in the carrying on, conducting or transaction of business," with fraud defined as "deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." N.Y. EXEC. LAW § 63(12). The GBL proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW § 349(a). A prima facie case under GBL § 349(a) requires "a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).

The allegations contained in Counts 7 and 8 are just "a formulaic recitation of the elements," *Iqbal*, 556 U.S. at 678 (cleaned up), aimed in blunderbuss fashion at undifferentiated groups of defendants. (Compl. ¶¶ 290-301.[22]) And the

---

[22]    Specifically, Count 7 alleges that "Defendants have engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of their debt-relief business" (Compl. ¶ 292); that "Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, both directly and through the [Law] Firms, engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of business in support of the debt-relief business of SFS and the Client Services Subsidiaries" (*id.* ¶ 294); and that "Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, participated in, had the ability to control, were aware of, or should have been aware of, these fraudulent acts" (*id.* ¶ 295). Count 8 alleges that "[i]n numerous instances, Defendants have violated GBL § 349 by engaging in deceptive acts

paragraphs that Counts 7 and 8 incorporate by reference (¶¶ 1-229) do not accuse Fidelis of participating in any fraudulent or deceptive practice. *Compare F.T.C. v. Quincy Bioscience Holding Co.*, 389 F. Supp. 3d 211, 221 (S.D.N.Y. 2019) ("[T]he Complaint does not adequately allege that Mr. Beaman participated in the alleged deceptive acts or had knowledge of them.").[23]

The Complaint alleges the following deceptions:

- SFS orchestrated a direct-mail campaign in which consumers were told they had been pre-approved for a debt-consolidation loan, when in truth there was no lender, there was no pre-approval, and most of the consumers who responded to the offer were told that they did not qualify for a loan after all. (Compl. ¶¶ 13-17, 108, 110, 274-75, 277.)

- SFS sales staff pitched consumers on a debt-relief service in which attorneys would negotiate reduced payoff amounts and defend against creditors' lawsuits, when in reality the debt-reduction negotiations were typically performed by non-lawyers and many consumers were not defended against creditors' suits. (*Id.* ¶¶ 18, 43, 81, 94, 114, 120-22, 174.)

- SFS sales staff referred to SFS's debt-relief service as a "0% interest option," when in truth SFS was not offering a loan, and creditors often charged interest once consumers stopped making debt payments. (*Id.* ¶¶ 21, 171, 283-85.)

---

or practices in connection with conducting their debt-relief business" (*id.* ¶ 298); that "Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, both directly and through the [Law] Firms, engaged in deceptive acts or practices in connection with the debt-relief business of SFS and the Client Services Subsidiaries" (*id.* ¶ 300); and that "Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, participated in, had the ability to control, were aware of, or should have been aware of, these deceptive acts" (*id.* ¶ 301).

[23] We focus on fraud and deception because GBL § 349(a) is concerned only with deceptive practices, and although the Executive Law proscribes both persistent fraud and persistent illegality, Count 7 alleges only persistent fraud (Compl. ¶¶ 292-95).

- SFS sales staff falsely told consumers that once they halted their debt payments, their credit scores would suffer only a small reduction and they were very unlikely to be sued. (*Id*. ¶ 170.)

- Ryan Sasson and Jason Blust created the Law Firms to conceal SFS's involvement in the debt-relief program. (*Id*. ¶ 182.)

Fidelis is not alleged to have had any role in the direct-mail campaign, or in the sales pitch delivered by SFS and the Client-Services Subsidiaries, or in the formation of the Law Firms. Rather, the Complaint alleges that Sasson, Behar, and Blumkin developed SFS's products and practices (*id*. ¶¶ 141-42, 276), and that Sasson and Blust devised the Law Firm "façade" (*id*. ¶ 182).

Granted, a principal can be liable for an agent's statutory violations, if the agent was acting within the scope of the agency. *See, e.g.*, *Douyon*, 894 F. Supp. 2d at 270; *cf. Peralta v. Figueroa*, 17 Misc. 3d 1128(A), 2007 WL 4104122, at *8 (N.Y. Sup. Ct. Nov. 14, 2007) (dismissing a GBL § 349 claim because "plaintiffs do not allege that the moving defendants engaged in any deceptive acts," and "deceptive acts by Figueroa cannot be imputed to any of the moving defendants since Figueroa and the defendant brokers were not agents of any of the moving defendants"). But this rule is immaterial here.

Blust was not Fidelis's agent, *see supra* § I.A.3.b, and even if he were, the only deception attributed to him—using façade law firms to shield SFS from regulatory scrutiny—was not carried out within the scope of the purported agency, or otherwise on Fidelis's behalf. Again, when Sasson and Blust launched their debt-relief venture in 2016 (Compl. ¶ 13), Fidelis did not exist (*id*. ¶¶ 96, 104).

As for Cameron Christo and Michelle Gallagher, while both were agents of Fidelis, *see supra* § I.A.3.b, neither is alleged to have played any part in the misrepresentations made to consumers. Indeed, the two counts alleging "Deception in Violation of the TSR" are directed only at SFS, the Client-Services Subsidiaries, the

Holding Companies, Sasson, and Blumkin. (Compl. ¶¶ 271-89.) Still less is there an allegation that Christo or Gallagher deceived consumers while acting in their capacity as Fidelis employees. Fidelis's work was limited to receiving legal filings from SFS, performing data entry, and relaying the filings to litigation attorneys (*id.* ¶¶ 94-95, 201); its employees did not interact with consumers at all.

Accordingly, Counts 7 and 8 should be dismissed as against Fidelis.

## II.   THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST CAMERON CHRISTO OR THE BUSH LAKE TRUST.

The Complaint (¶ 2) names Cameron Christo and The Bush Lake Trust as Relief Defendants—individuals who have not themselves done wrong, but have received funds derived from wrongdoing, *see S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). Count 9 seeks a judgment requiring Christo and Bush Lake to disgorge sums received from Fidelis, which sums are, according to Plaintiffs, held in constructive trust. (Compl. ¶¶ 305-06.) Because these demands depend on Fidelis being a wrongdoer—which it is not for the reasons given above—Count 9 must be dismissed as against Christo and Bush Lake.

Claims against relief defendants rely on the principle that "[a] court of equity will wrest property fraudulently acquired, not only from the perpetrator of the fraud, but from his children and his children's children," and from others to whom he has "parceled out the fruits of his fraud." *S.E.C. v. Ahmed*, 72 F.4th 379, 408 (2d Cir. 2023) (cleaned up). In applying this principle, however, courts draw a vital distinction: while equitable remedies may be deployed against *gratuitous transfers* of funds derived from illegality, no such relief is available where the recipient of tainted funds obtained a "legitimate claim" to those funds by giving something of value in exchange. *F.T.C. v. LeadClick Media, LLC*, 838 F.3d 158, 177-78 (2d Cir. 2016); *see also Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010) (noting that a relief defendant has a legitimate claim to, and cannot be forced to disgorge, money received "as payment for services rendered" (cleaned up)).

The Complaint adequately alleges that the Law Firms paid Fidelis for litigation-support services (Compl. ¶¶ 210-11), and that Fidelis, in turn, transferred money to Christo and Bush Lake (*id.* ¶¶ 105, 229). If Fidelis were a wrongdoer, these transfers to Christo and Bush Lake might be subject to disgorgement. But Fidelis is not a wrongdoer for the reasons given above. And because Fidelis provided services in exchange for the money it received from the Law Firms (*id.* ¶¶ 94-95), it had a "legitimate claim" to those sums, *LeadClick Media*, 838 F.3d at 177-78. Once Fidelis obtained a legitimate claim to the money it received from the Law Firms, it passed "beyond the reach of the district court's disgorgement remedy," *Walsh*, 618 F.3d at 226, and its use of that money was unrestricted. As downstream transferees, Christo and Bush Lake received no fewer rights than the transferor, Fidelis, possessed at the time of the transfer. *See Cavanagh*, 155 F.3d at 137 (agreeing with the district court that a relief defendant "stands in the shoes of [the transferor] with respect to any rights she has to the [transferred property]").

Accordingly, the Court should dismiss Count 9 as to Christo and Bush Lake.

## **CONCLUSION**

The Court should (i) issue an order dismissing the Complaint as against Fidelis Legal Support Services, LLC, Cameron Christo, and The Bush Lake Trust; and (ii) award any other or additional relief that the Court deems appropriate.

Dated:      Buffalo, New York
              September 30, 2024

Respectfully submitted,

**HOOVER & DURLAND LLP**
*Attorneys for Defendant Fidelis Legal*
*Support Services, LLC, and for Relief Defendants*
*Cameron Christo and The Bush Lake Trust*

By: <u>s/Spencer L. Durland</u>
       Timothy W. Hoover
       Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*