UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU, ET AL.

      Plaintiffs,

v.

      Case No.: 24-cv-00040

STRATFS, LLC, ET AL.

      Defendants.

_____

**REPLY MEMORANDUM OF LAW IN SUPPORT OF LIPPES MATHIAS'
MOTION TO UNFREEZE ASSETS AND COMPEL PAYMENT OF LEGAL FEES**

In their opposition to Lippes Mathias LLP's motion to unfreeze assets and compel payment of legal fees (Dkt. 446, "Opposition"), Intervenors CIBC Bank USA and Valley National Bank ("Intervenors") emphasize that the Eleventh Circuit opines that "[b]ankruptcy law is highly instructive for cases involving federal receiverships." Dkt. 446 at 4 (*citing SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017). Intervenors then argue that Lippes Mathias LLP's fee application (Dkt. 433, the "Fee Application") should be denied because Intervenors have not received any benefit from their legal services. *See generally*, Dkt. 446.

Intervenors' arguments should be rejected. First, Second Circuit case law specifically authorizes the Court to unfreeze assets to pay attorney's fees, and equity demands as much here. Second, if bankruptcy law is indeed instructive, it also supports the Fee Application, and Intervenors' logic concerning bankruptcy law is otherwise flawed. And lastly, Intervenors' argument concerning a benefit to Intervenors is both misleading and inconsistent. Accordingly, and for reasons originally argued (Dkt. 433), this Court should grant the Fee Application.

**STATEMENT OF FACTS**

Intervenors filed their motion to intervene on March 15, 2024. Dkt. 213.  Prior to that motion for intervention, attorneys of Lippes Mathias LLP ("Lippes Mathias")  had already worked 528.9 hours for a total of $242,525.08 in legal fees, which is approximately 65% of the total Fees Owed (see Dkt. 433).  Indeed, Plaintiffs' Motion for a Temporary Restraining Order (Dkt. #5) and Motion for an Expedited Hearing (Dkt. #6) in particular required approximately fourteen attorneys to focus their attention on this matter in January 2024 alone, by, among other tasks, researching the Telemarketing Sales Rule- 16 CFR § 310.6(b)(3) ("TSR"), preparing for and/or participating in over seventy-five (75) depositions noticed by Plaintiffs, and preparing for a two-day hearing that took place in early February 2024 (see Dkt. 129).  After the hearing, the work continued with, for instance, Mr. Vacco alone working approximately 134.75 hours in February 2024 to negotiate a stipulated Preliminary Injunction.  Those 528.9 hours (along with all hours billed thereafter) were worked in an effort to defeat Plaintiffs' preliminary injunction, keep the business alive, and negotiate a stipulation that would allow Strategic to continue to generate revenue that would, *inter alia*, pay back Intervenors' loans.  *But see* Dkt. 446 ("[T]he Secured Lenders … have not requested, nor received, any benefit from Lippes Mathias' legal services.").

Lippes Mathias specifically  agreed not to object to the motion for intervention because Intervenors were communicating with Strategic and Lippes Mathias about the viability of Strategic's proposed Client Program Transition Plan. *See* Dkt. 276-2.  Intervenors indicated that continued operation of Strategic would increase Strategic's chances of being able to repay some or all of the indebtedness owed to the banks. Dkt. 374-1 at 2.  Notwithstanding the prior collaboration, and the obvious attempt by Lippes Mathias to benefit the Intervenors through

continued revenue, the Intervenors now disingenuously argue that they "have not requested, nor received, any benefit from Lippes Mathias' legal services." Dkt. 446 at 1.

Meanwhile, Intervenors were silent when the Uniland Partnership of Delaware L.P. ("Uniland") filed its motion to lift the stay for office space rent (Dkt. 253) and when the Receiver filed his first (Dkt. 241) and second fee applications (Dkt. 432); Intervenors are seemingly cherry-picking when their alleged priority should apply.

Notably, not all funds associated with Strategic were generated through a business model that allegedly violates the Telemarketing Sales Rule. Rather, some funds were indisputably generated through lawful contingent fee models.

**ARGUMENT**

**I.    Second Circuit case law supports the Fee Application.**

As originally argued (Dkt. 433), in making its determination whether to order the release of assets, the Court must weigh the disadvantages and possible deleterious effect against the considerations indicating the need for such relief. *Sec. & Exch. Comm'n v. Gryphon Holdings, Inc.,* No. 10CV1742JBWJO, 2010 WL 11623063, at *1 (E.D.N.Y. June 28, 2010) *(citing S.E.C. v. Unifund SAL,* 917 F.2d 98 (2d Cir. 1990) ("In fashioning preliminary relief, district courts retain ample discretion to assess all the relevant circumstances and, in those cases where the Commission has demonstrated entitlement to a freeze order, to determine the coverage, terms, and duration of that order."). The *Gryphon Holdings* Court noted, "where the Commission has done no more than assert its claims in a Complaint and the defendants contest liability – the defendants' right to due process weighs heavily against the kind of unrestricted deprivation of property that would render them unable to mount a defense." *Id.* (determining that the defendant was owed due process through legal representation); *Cf. Duclaud Gonzalez de Castilla*, 170 F.

Supp. 2d 427, 429 (SDNY 2001) (granting carve-out for attorneys' fees where freeze order was granted based on inference that may be rebutted and significant legal fees would accrue before case's resolution); *S.E.C. v. Shiffer*, 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998) (permitting carve-out for attorneys' fees substantiated by court).

As these Second Circuit cases indicate, courts routinely unfreeze assets for defendants' legal fees and Strategic respectfully submits that equity demands as much here. Defendants are entitled to zealous representation, and attorneys are entitled to fair compensation for their services. *See Crout v. Haverfield Intl., Inc.*, 348 F. Supp. 3d 219, 229 (W.D.N.Y. 2018) (an "attorney is entitled to receive compensation from the client measured by the fair and reasonable value of the services rendered …"). In addition, courts outside the Second Circuit recognize a court's discretion to unfreeze assets for the payment of reasonable attorney fees. *See FTC v. U.S. Mortgage Funding, Inc.,* 2011 WL 2293377, at *2 (S.D. Fla. June 9, 2011) (granting defendants' motion to unfreeze assets to pay reasonable attorneys' fee in a civil action brought by the Federal Trade Commission); *U.S. v. Petters*, 2009 WL 803482, at * 4-5 (D. Minn. Mar. 25, 2009) (unfreezing assets "in excess of a half million dollars" for the payment of the defendant's attorneys' fees); *see also*, *FTC v. IAB Marketing Associates, LP*, 2013 WL 2433214 (S.D. Fla. 2013) (unfreezing assets for defendants to pay attorneys' fees incurred through the defense of an preliminary injunction hearing).

In the present matter, Lippes Mathias has provided essential services in defending Strategic and should be granted priority in the release of funds to cover its fees.[1] Stated plainly,

---

[1] As Intervenors are aware, the Strategic principals' assets have also been frozen. *But see* Dkt. 446 at 7.

4

the equity scale tips in favor of Strategic's right to representation, and therefore the payment of the Fees Owed.

## II. The Opposition's logic concerning bankruptcy law is flawed.

The Opposition uses an Eleventh Circuit case to argue that "[b]ankruptcy law is highly instructive for cases involving federal receiverships" so that it can cite to *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1998) and its holding that a secured creditor's interest in the bankruptcy context may only be diminished to the extent the expense granted priority directly confers a benefit on the secured creditor. Dkt. 446, § II. The entire argument depends on the Court accepting that bankruptcy law should control here. But there are several issues with the Opposition's logic.

First, this is not a bankruptcy matter and therefore, there is a disconnect between the application of bankruptcy law, particularly concerning lien priority, and the present case. Contrarily, the Second Circuit cases cited above in Section I, *supra*, in support of the Fee Application's argument that equity demands payment of attorney's fees are directly on-point and authoritative.

Second, and as originally argued (Dkt. 433), if we were to accept Intervenors' argument that bankruptcy principles should apply, Strategic's attorneys would still be entitled to a priority carve-out for its legal fees because in bankruptcy proceedings, administrative expenses, including attorney's fees for services rendered in connection with the administration of the estate, are given priority status under 11 U.S.C. § 503(b). *See also In re Roman Catholic Diocese of Syracuse*, N.Y., 628 B.R. 571, 578-79 (Bankr. N.D.N.Y. 2021) (the court approved the retention of a law firm under 11 U.S.C. § 327(e) to defend the debtor against Child Victims Act ("CVA") claims, and awarded attorney's fees roughly amounting to $87,000, which were granted

first priority payment from the debtor's estate under 11 U.S.C. § 507). In *In re Roman Catholic Diocese of Syracuse*, the court recognized the importance of ensuring that the debtor had access to necessary legal representation, particularly in defending complex litigation claims related to the bankruptcy.[2] The Court should do the same here.

Third, Intervenors are peacocking as if there has already been a determination that they have first priority on any funds available,[3] a contention that Plaintiffs have already asserted will be contested since they filed their action seeking consumer restitution. Notably, Plaintiffs do not object to the Fee Application.

And lastly, and as argued in more detail below, the work of Lippes Mathias has been done in an effort to keep the business viable, which in turn would benefit the Intervenors.

### III. Intervenors' argument concerning a benefit to Intervenors is misleading and inconsistent.

Since the beginning of this matter, Lippes Mathias has worked tirelessly in an effort to keep the Strategic business alive so that operations could continue and Strategic would continue to generate revenue.[4] More specifically, all attorney hours dedicated to the defense of this matter were worked in an effort to defeat Plaintiffs' preliminary injunction, keep the business alive, and negotiate a stipulation that would allow Strategic to continue to generate revenue that would, *inter alia*, pay back Intervenors' loans. Indeed, since inception, Lippes Mathias has endeavored to modify the Preliminary Injunction and convert Strategic's business model fully to a contingent

---

[2] The Opposition attempts to dismiss this case because it does not involve secured lenders.
[3] For instance, Intervenors cite to *S.E.C. v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd sub nom. S.E.C. v. Est. of Hirshberg*, 101 F.3d 109 (2d Cir. 1996) ("with respect to the attorneys' fees, it is well-established that there is no right to use the money of others for legal services.") There has been no determination that the subject money belongs to Intervenors.
[4] Strategic disagrees with Plaintiffs' allegation that its business model violates the TSR and is not beneficial to consumers.

fee model. *See* Dkts. 276 & 374. Accordingly, Intervenors' arguments concerning a benefit to Intervenors is simply wrong, and Intervenors know as much because they were previously communicating with Strategic and Lippes Mathias about the viability of Strategic's proposed Client Program Transition Plan. *See* Dkt. 276-2. Intervenors indicated that continued operation of Strategic would increase Strategic's chances of being able to repay some or all of the indebtedness owed to the banks. Dkt. 374-1 at 2. But now, they inexcusably claim no benefit.

What's more, Intervenors position regarding the Fee Application is inconsistent. Intervenors were silent when Uniland filed its motion to lift the stay for office space rent (Dkt. 253) and when the Receiver filed his first (Dkt. 241) and second fee applications (Dkt. 432), which call for substantially more fees than the present Fee Application.[5] There was no opposition then, but Intervenors inexplicably object to Lippes Mathias' Fee Application now. There is no logical excuse for the inconsistency.

Intervenors' position is misleading, inconsistent, and most importantly, inequitable. Lippes Mathias respectfully requests that the Court reject the Opposition and grant the Fee Application.

## CONCLUSION

Lippes Mathias LLP has provided essential services in defending Strategic and should be paid accordingly. The equity scale tips in favor of Strategic's right to representation and the payment of Fees Owed. Simply stated, equity demands payment. For these reasons, Strategic hereby respectfully requests an Order from this Court directing the unfreezing of assets, and

---

[5] For comparison purposes, the Receiver submitted a fee application of his own seeking $618,099.00 for his work in this case. *See* Dkt. # 241, "First Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals". Similarly, the "Second Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals" requested $701,401.50. *See* Dkt. # 432.

ordering Plaintiffs, the Receiver, and any interested banks to facilitate immediate payment of the legal fees already billed, along with a standing order to pay future invoices within thirty (30) days of receipt.

Dated: Buffalo, New York
October 14, 2024

Respectfully submitted,

/s/ *Dennis C. Vacco*
Dennis C. Vacco, Esq.
LIPPES MATHIAS LLP
*Attorneys for Defendants*
50 Fountain Plaza
Buffalo, New York 14202
(T) 716.853.5100
(E) dvacco@lippes.com