## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 24-cv-00040-EAW-MJR |
| v. | ) ) ) | |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al., | ) ) ) | |
| Defendants, | ) ) | |
| and STRATEGIC ESOP, et al., | ) ) | |
| Relief Defendants. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RICHARD GUSTAFSON'S MOTION TO DISMISS

Defendant Richard Gustafson respectfully submits this memorandum in support of his Rule 12(b)(6) motion to dismiss all claims brought against him, namely Counts 4, 7, 8, 10 and 11 of the Second Amended Complaint ("SAC"). Dkt. 366.

## INTRODUCTION

The SAC's central allegation is that the Intervenor Law Firms violated the Telemarketing Sales Rule ("TSR") by charging advance fees for debt-relief services without conducting TSR-compliant face-to-face sales presentations. But the Government is not suing the Law Firms (*i.e.*, the entities that contracted with clients, conducted face-to-face presentations, and collected advance fees). Instead, the Government has brought claims against numerous others, whom the Government

asserts are, in essence, "stand-ins" for the Law Firms. In its effort to cast the net wide, however, the Government has overreached by including certain individuals. The TSR and state statutes cited by the Government do not create causes of action against individual attorneys here like Richard Gustafson.

## FACTUAL BACKGROUND

Solely for purposes of this motion to dismiss, we assume the truth of the SAC's concrete factual allegations, while disregarding bare conclusions and labels. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-81 (2009).

According to the SAC, StratFS and its affiliates (collectively "SFS") were formed by three individuals (Ryan Sasson, Daniel Blumkin, and Albert Ian Behar), with Sasson functioning as SFS's CEO. *Id.* ¶¶ 13, 24, 52, 58, 62. The SAC alleges that, between January 2016 and January 2024, SFS developed a marketing strategy to attract clients into one of two different debt-relief programs: (1) "a deferred-fee model" in which consumers paid fees only after their debt was settled; and (2) "an advance-fee model" in which consumers paid fees before their debt was settled. *Id.* ¶ 106-07. The former was handled by two SFS entities: Timberline and Atlas. The latter was operated by various Law Firms (which the SAC refers to as "façade firms").[1]

The SAC alleges that SFS solicited consumers via direct mailings that advised consumers they had been pre-approved, or might be eligible, for debt-consolidation

---

[1] As the SAC acknowledges, two of the Law Firms (Royal and Hailstone) did **not** charge advance fees. Dkt. 366 at ¶ 85.

loans. *Id*. ¶¶ 13, 108. Consumers interested in a debt-consolidation loan were directed to call a designated phone number or visit a designated website. *Id*. ¶¶ 13, 108. When consumers responded to the direct-mail solicitations, their contact information was transmitted as a "lead" to SFS sales staff, *id*. ¶ 16, who then contacted the consumers via telephone. *Id*. ¶ 17, 41, 110. Sales staff advised consumers who did not qualify for loans that they had other options, including a debt-relief program. *Id*. ¶¶ 17-20, 110. Depending on the state where the consumer resided and the type and amount of their debt, the debt-relief program may be a contingent program operated by SFS, or an advance fee program operated by a Law Firm.[2]

The SAC alleges that approximately 29 different law firms (the "Law Firms") were created to represent consumers vis-à-vis their credit card creditors. *Id*. ¶¶ 26, 43, 45, 182-200. Jason Blust oversaw Law Firm operations. *Id*. ¶¶ 83-84, 187, 191. Gustafson, Timothy Burnette, and Michelle Hinds Gallagher are all attorneys who are alleged to have owned and managed various of the Law Firms. *Id*. ¶¶ 26, 85, 88-92. The Law Firms employed a lean staffing model and outsourced support and administrative functions to third parties. *See id*. ¶ 44. Three such vendors (Hedgewick Consulting, Relialit, and Lit Def Strategies) were founded and owned by Blust. *Id*. ¶¶ 94-98.

---

[2] There was also a third option for Kansas residents: two Law Firms (Royal and Hailstone) charged contingent fees for clients in Kansas. Dkt. 366 at ¶ 85.

Consumers who expressed a desire to engage a Law Firm were transferred to representatives of a Law Firm to schedule a face-to-face meeting with a notary. *Id*. ¶ 113. To facilitate these face-to-face meetings, the Law Firms contracted with various notary-provision companies. *Id*. ¶ 123. Notaries supplied by those companies were expected to deliver in-person presentations using scripts and other written materials. *Id*. ¶ 131. The notaries underwent training and testing before they delivered presentations. *Id*. ¶¶ 129-38. After the face-to-face presentation, consumers who wanted to retain a Law Firm signed a retainer agreement and then got an "attorney welcome call" from one of the Law Firms. *Id*. ¶ 114. Law Firm clients received two general services: (1) negotiation of reduced credit card debt-payoff amounts and (2) litigation defense.

Clients were instructed to stop paying their creditors and instead make monthly payments into a dedicated account maintained by RAM or Global and controlled by the client. *Id*. ¶¶ 115-17, 157. The money in those client accounts was used to fund settlements and pay fees associated with the debt-relief representation. *Id*. ¶¶ 143-46. After a few months, enough money accumulated in the client's account to allow the Law Firm to negotiate settlements. However, withdrawals of fees began shortly after retention and were not dependent on whether a client's debts had been settled (hence, the term "advance fee"). *Id*. ¶¶ 22, 146, 179.

When a client was sued by a creditor, the legal filing was sent to a litigation-support vendor hired by the Law Firms: Relialit, Lit Def, or Fidelis. *Id*. ¶¶ 94-95, 97. Those vendors would "perform data entry for the[] lawsuits" and then transmit the

4

filings "to contracted litigation or appearance attorneys" who would represent the consumer in the litigation. *Id.* ¶ 95; *accord id.* ¶ 201.

### The Allegations And Claims Regarding Gustafson

The SAC alleges the Law Firms were simply "facades" for SFS which performed "little to no work" for their clients. *Id.* at ¶ 26. The SAC further alleges that Sasson and Blust created the Law Firms and controlled virtually every aspect of their operations. *Id.* at ¶¶ 26, 83-84, 182, 185-204. If those allegations are accepted as true (and they must be on a Rule 12(b)(6) motion), then Richard Gustafson was little more than a peripheral pawn.

Indeed, the SAC alleges little about Gustafson other than: (1) he owned several of the Law Firms prior to the filing of this lawsuit; (2) he was a former Legal Helpers attorney; and (3) he assumed a larger managerial role for the Law Firms after this lawsuit was filed. *Id.* at ¶¶ 26, 85-88. The SAC alleges that Gustafson knew the Law Firms charged advance fees. *Id.* at ¶ 93. ***However, the SAC does not allege, and, in fact, avoids any allegation, that Gustafson "kn[ew] or consciously avoid[ed] knowing" that the collection of advance fees violated the TSR, i.e., that the face-to-face presentations were not compliant.*** 16 C.F.R. § 310.3(b).

Five counts in the SAC are stated against Gustafson. Count 4 alleges that Gustafson knowingly and substantially assisted in the collection of advance fees in violation of the TSR. *Id.* ¶¶ 257-70. Counts 7 and 8 allege that Gustafson violated New York Executive Law § 63(12) and New York General Business Law § 349 by engaging in deceptive acts or practices. *Id.* ¶¶ 290-301. Counts 10 and 11 allege that

Gustafson violated the Wisconsin Adjustment Service Company Act, WIS. STAT. §
218.02 ("ASCA"), and its underlying regulations. *Id.* ¶¶ 307-15.

## ARGUMENT

## I.    The Applicable Legal Standard.

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint.
*Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). To survive a Rule 12(b)(6)
motion, a complaint "must contain sufficient factual matter, accepted as true, to state
a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A claim is facially
plausible when it contains sufficient "factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*
Pleadings that contain "labels or conclusions" or "formulaic recitation[s] of the
elements of a cause of action" are insufficient to survive a Rule 12(b)(6) motion. *Id.*

## II.    Count 4 Fails Because The Government Has Not Alleged – And Cannot Allege – A Claim For "Assisting" In The Collection Of Advance Fees.

In Count 4, the Government asserts that Gustafson faces personal liability
because, as an owner of nine Law Firms, he provided "assistance" when those Law
Firms violated the TSR by collecting advance fees without conducting TSR-compliant
face-to-face presentations. *See* 16 C.F.R. § 310.3(b). Count 4 fails as a matter of law.

***First***, when Congress enacted the Telemarketing and Consumer Fraud and
Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101, *et seq.*, it limited
liability for "assisting" or "facilitating" another's TSR violation to instances where
someone assists or facilitates a *deceptive* TSR violation. That statutory limitation is

6

dispositive because Count 4 does not allege a deceptive TSR violation. *See* Dkt. 366 at ¶259 (referring to "abusive" practices).

***Second***, liability under Section 310.3(b) of the TSR, 16 C.F.R. § 310.3(b), attaches only to those who "know or consciously avoid knowing" that the conduct they are assisting is, in fact, violative of the TSR. Put another way, the Government cannot state a claim simply by alleging that Gustafson knew the Law Firms were charging advance fees. Rather, the Government must go further and allege that Gustafson "knew or consciously avoided knowing" that the collection of advance fees was done in violation of the TSR, *i.e.*, because the face-to-face presentations were inadequate. There are no such allegations in the SAC.

***Third***, Count 4 fails to the extent it is based on Gustafson's involvement with Royal Legal Group and Hailstone Legal Group. There is no allegation those Law Firms collected advance fees. In fact, the SAC alleges the opposite. Dkt. 366 at ¶ 85.

## A. The Government Cannot Sustain A Claim For "Assisting" An "Abusive" Telemarketing Practice.

### 1. The History Of The Telemarketing Act And The TSR.

Congress enacted the Telemarketing Act, 15 U.S.C. § 6101, *et seq.*, in 1994. The Telemarketing Act was not directed at law firms or debt relief companies. It was designed to protect consumers against an emerging problem: sophisticated telemarketing. In the 1990s, new technologies made it possible for fraudsters to target vulnerable consumers and induce them into sales via remote means. Congress recognized that the remote, anonymous nature of such transactions dramatically

increased the possibility for deceptive and abusive practices that were less likely to occur during in-person transactions. *See* 15 U.S.C. § 6101.

The Telemarketing Act was directed at two distinct types of conduct: (1) deceptive conduct (including credit card laundering); and (2) abusive conduct (*e.g.*, calling late at night, multiple calls, robocalls). In the Telemarketing Act, Congress specifically addressed those two types of conduct: "deceptive" and "abusive." *See* 15 U.S.C. § 6101. Congress gave the FTC rulemaking authority to regulate both types of conduct. *See* 15 U.S.C. § 6102. However, Congress did not give the FTC a blank check to promulgate regulations. Rather, Congress provided specific instructions with respect to the FTC's authority to craft rules for "deceptive" telemarketing practices, *see id.* at § 6102(a)(2), and "abusive" telemarketing practices. *Id.* at § 6102(a)(3).

In the Telemarketing Act, Congress delineated the circumstances under which a person or entity might face liability for another's wrongful conduct. Congress took a narrow approach to such third-party liability and authorized the FTC to prescribe rules as follows:

> The Commission shall include in such rules respecting deceptive telemarketing acts or practices a definition of deceptive telemarketing acts or practices which shall include fraudulent charitable solicitations, and ***which may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing,*** including credit card laundering.

15 U.S.C. § 6102(a)(2) (emphasis added).

Section 6102(a)(2) places two important limitations on liability for "assisting" or "facilitating" another's actions. ***First***, a person may be liable for another's

misconduct only if the person "assists" or "facilitates" another's wrongful act. Providing assistance unrelated to a wrongful act will not create liability. ***Second***, Congress only authorized "assisting or facilitating" liability with respect to *deceptive* telemarketing. It did not authorize similar liability with respect to *abusive* telemarketing. Importantly, the language highlighted above appears in Section 6102(a)(2), which deals with "deceptive" telemarketing. It does ***not*** also appear in Section 6102(a)(3) that addresses "abusive" telemarketing. *Compare* 15 U.S.C. § 6102(a)(2) *and* § 6102(a)(3).

The FTC published the proposed TSR in February 1995. 60 Fed. Reg. 8,313 (Feb. 14, 1995). The FTC followed Congress' lead and distinguished between conduct that was "deceptive" (addressed in Section 310.3) and "abusive" (addressed in Section 310.4). However, the FTC disregarded Congress' instruction to limit "assisting and facilitating" liability to *deceptive* TSR violations. Instead, the proposed TSR created liability for persons who "substantially assisted or supported" deceptive or abusive TSR violations. *See* 60 FR 8317. The FTC offered no comment or explanation regarding its decision to expand "assisting" liability beyond the limits set by Congress. *Id.* The final TSR rule was published in August 1995. Like the proposed rule, the final TSR created liability for "substantially assisting and supporting" both deceptive and abusive TSR violations.

In 2009, the FTC published a proposed amendment to expand the TSR to cover telemarketing associated with "debt relief services." 74 Fed. Reg. 41,988 (Aug. 19, 2009). The final amended TSR was published on August 10, 2010. 75 Fed. Reg. 48,458

(Aug. 10, 2010). The FTC acted *sua sponte* with respect to the 2010 amendment. There was no corresponding Congressional action to direct the FTC to expand the TSR to cover debt relief services or deem certain fee structures as "abusive."

Among other things, the 2010 amendments barred debt relief providers from charging advance fees **except** where a provider conducts a "face-to-face sales presentation" with a potential client.[3] 16 C.F.R. § 310.4(a)(5); 16 C.F.R. § 310.6(b)(3). Providers who conduct face-to-face meetings may charge advance fees; those who do not can charge only contingent fees. Importantly, the FTC classified the improper collection of advance fees as an abusive act – not a deceptive act. *Id.* at § 310.4(a)(5).

### 2.      The TSR's Substantial-Assistance Provision As Applied Here Exceeds The FTC's Rulemaking Authority.

"Regulated parties may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them[.]" *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2458 (2024) (internal citations and quotations omitted); *accord* 5 U.S.C. § 706(2)(C). To resolve such challenges, the Court must measure the relevant regulation against the statutory grant of rulemaking authority from which the regulation derives. *See, e.g.*, *United States v. Kahn*, 5 F.4th 167, 174 (2d Cir. 2021) ("[A] regulation that contravenes the plain

---

[3] The Telemarketing Act and TSR are both intended to address abuses and deceptive practices that are prevalent when transactions occur anonymously and remotely, *i.e.*, via telephone or internet. The idea behind the "face-to-face" exemption is that those abuses (and deceptions) are much less likely to happen when a face-to-face meeting occurs. *See* 60 Fed. Reg. 43,860 (Aug. 23, 1995).

language of the statute is invalid[.]" (internal citation omitted)); *L & M Indus., Inc. v. Kenter*, 458 F.2d 968, 971 (2d Cir. 1972).

As set forth above, the Telemarketing Act authorized the FTC to promulgate a rule with respect to persons who "assist or facilitate ***deceptive*** telemarketing." 15 U.S.C. § 6102(a)(2) (emphasis added). However, the FTC promulgated a rule that created liability for persons who assist or facilitate ***deceptive or abusive*** telemarketing practices. *See* 16 C.F.R. § 310.3(b). That expansion was unilateral; Congress did not authorize it. Accordingly, to the extent it creates liability for assisting or facilitating another's abusive telemarketing practice, Section 310.3(b) was promulgated without Congressional authority and must be deemed invalid. That is dispositive with respect to Count 4, because the only TSR violation alleged therein, *i.e.*, the charging of advance fees, is alleged to be on an "*abusive* act[] or practice[] in violation of the TSSR." Dkt. 366 at ¶¶ 259 (emphasis added).

### B.  The SAC Does Not Allege That Gustafson Had The Requisite Knowledge Of Wrongdoing.

Section 310.3(b) of the TSR creates liability only for a person who "knows or consciously avoids knowing that the seller is engaged in any act or practice that violates §§ 310.3(a) or (c), or § 310.4 of this Rule." 16 C.F.R. § 310.3(b). That means that the person rendering "substantial assistance or support" must either know, or "consciously avoid knowing," that the other is violating the TSR. Put another way, liability attaches only where an "assistor" knew (or "consciously disregarded") that a

seller's action violated the law. *See* 60 Fed. Reg. 43,851-52 (Aug. 23, 1995); *see also* 60 Fed. Reg. 8,317 (Feb. 14, 1995).

When the FTC promulgated Section 310.3(b) in 1995, it deliberately set a high bar with respect to the requisite state of mind for liability under that provision. The FTC received significant opposition to that decision.

> Law enforcement and consumer groups also generally opposed the "knows or consciously avoids knowing" standard in this Section, arguing that it imposed a higher burden of proof on law enforcement than the "knows or should know" standard in the initially proposed Rule.

60 Fed. Reg. 43852 (Aug. 23, 1995). Despite that opposition, the FTC stuck to its guns. It retained the higher standard, finding "in a situation where a person's liability to pay redress or civil penalties for a violation of this Rule depends upon the wrongdoing of another person, the 'conscious avoidance' standard is correct." *Id.* (internal citation omitted).[4] On this issue, Gustafson adopts the arguments set forth by Fidelis and its co-defendants and incorporates them herein by reference. *See* Dkt. 443 at 29-33.

The SAC does not allege that Gustafson "knew or consciously avoided knowing" the Law Firms were violating the TSR. The SAC alleges only that Gustafson knew

---

[4] The FTC has repeatedly adhered to this position despite pushback from law enforcement agencies that desire more expansive third-party liability under Section 310.3(b). *See* 67 Fed. Reg. 4,508-09 (Jan. 30, 2002) ("The Commission…believes the 'conscious avoidance' standard is appropriate because the Rule creates potential liability to pay redress or civil penalties based on another person's violation of the Rule.") 68 Fed. Reg. 4,610 (Jan. 29, 2003) ("The Commission declines, on the record evidence, to lower the standard for assisting and facilitating under the Rule.").

several Law Firms were charging advance fees. *See*, *e.g.*, Dkt. 366 at ¶¶ 93. That allegation is insufficient, however, because collecting advance fees is not *per se* illegal under the TSR. Rather, a debt relief provider may collect advance fees where it provides a face-to-face sales presentation to a prospective customer. 16 C.F.R. § 310.6(b)(3). Here, the SAC alleges that the Law Firms did precisely that: they established a model wherein prospective clients had face-to-face presentations, and which included notary training, testing and scripts. *See* Dkt. 366 at ¶¶ 123-40. In light of those allegations, to state a claim against Gustafson, the Government must allege that Gustafson "knew or consciously avoided knowing" that the face-to-face presentations were insufficient to trigger the TSR's "face-to-face" exemption. No such allegation exists in the SAC.[5] Thus, Count 4 must be dismissed.

### C.    Count 4 Fails To The Extent It Is Based On Royal Or Hailstone.

The SAC alleges that Gustafson was an owner of nine Law Firms. Dkt. 366 at ¶ 85. The SAC does not allege that two of those Law Firms, Royal and Hailstone, charged advance fees. To the contrary, the SAC alleges that Royal and Hailstone "purportedly offer or offered only deferred-fee debt-settlement products." *Id*. To the extent Count 4 is based on any conduct by Royal or Hailstone, it must be dismissed.

---

[5] On this point, the Government vaguely points to other cases involving Legal Helpers and Mortgage Law Group (but pointedly fails to attach copies of the complaints or settlement agreements in those cases). That is all a smoke screen. There is no allegation that Gustafson was a party in those cases. More importantly, there is no allegation – ***nor could there be a truthful allegation*** – that those cases involved claims under the Telemarketing Act or the TSR, much less claims that any firm's face-to-face presentations were non-compliant.

## III.   Counts 7 And 8 Should Be Dismissed.

In Counts 7 and 8, the State of New York asserts claims under New York Executive Law § 63(12) and New York General Business Law § 349. Counts 7 and 8 are hardly a model of clarity and it is difficult to discern precisely what "deceptive conduct" forms the basis of those claims. It appears, however, those claims are based on allegations (stated earlier in the SAC) that SFS deceived consumers through misleading mail pieces and sales pitches. *See* Dkt. 366 at ¶¶ 13-17, 120-22, 171.

However, there is not a single allegation that ties Gustafson to any of that alleged conduct. Indeed, the SAC alleges such conduct occurred before consumers were even referred to Law Firms. *Id.* Thus, Counts 7 and 8 should be dismissed as to Gustafson. In addition, to the extent the federal claims against him are dismissed, the state law claims against Gustafson must be dismissed as well. On these issues, Gustafson incorporates by reference the arguments and authorities provided by Fidelis and its co-defendants. *See* Dkt. 443 at 37-41.

## IV.   Counts 10 And 11 Fail As A Matter Of Law.

In Counts 10 and 11, the State of Wisconsin asserts that Gustafson has violated ASCA, WIS. STAT. § 218.02, and its supporting regulations. Counts 10 and 11 should be dismissed for two main reasons.

### A.   The SAC Does Not Allege That Gustafson Acted As An "Adjustment Service Company" In Wisconsin.

The State of Wisconsin's claim against Gustafson is puzzling. There is not a single allegation in the SAC that ties Gustafson to Wisconsin or establishes that he

represented clients in Wisconsin or did business there. One Law Firm (Great Lakes
Law Firm) represented clients in Wisconsin. That is presumably why Great Lakes
Client Services, LLC is named as a defendant in Counts 10 and 11. However, the SAC
does not allege that Gustafson had anything to do with Great Lakes. *See* Dkt. 366 at
¶¶ 85-88. In the absence of any allegation tying Gustafson to Wisconsin, Counts 10
and 11 must fail.

But Counts 10 and 11 would fail against Gustafson even if he were a manager
or owner of Great Lakes. ASCA is the "Adjustment Service ***Company*** Act." It
regulates "adjustment service ***companies***." The Wisconsin legislature did not intend
for ASCA to reach further and create liability for a company's employees, officers,
directors, shareholders, members, etc. in their individual capacities. ASCA defines
"adjustment service company" as follows:

> Adjustment service company, hereinafter called company, shall mean a
> corporation, limited liability company, association, partnership or
> individual engaged as principal in the business of prorating the income
> of a debtor to the debtor's creditor or creditors, or of assuming the
> obligations of any debtor by purchasing the accounts the debtor may
> have with the debtor's several creditors, in return for which the principal
> receives a service charge or other consideration.

WIS. STAT. § 218.02(1)(a). Nothing therein extends the definition of "adjustment
service company" to a company's employees, members, managers, officers or
directors. Nor does it create liability for vendors of an "adjustment service company"
or persons or entities that do business with, or provide assistance to, an "adjustment
service company." Put simply, an action under ASCA lies against the "adjustment
service company" – and ***only*** the "adjustment service company."

Here, the only proper defendant in an ASCA claim would be a Law Firm (or other business) that provided qualifying debt resolution services to Wisconsin residents. But the State of Wisconsin is not suing Great Lakes (or any other Law Firm). Instead, the State of Wisconsin is pursuing claims against Gustafson. *See* Dkt. 366 at ¶¶ 307-11. In a tacit admission that it cannot pursue claims against Gustafson in his capacity as an employee, officer or owner of an "adjustment service company," the State of Wisconsin tries a different route. It offers a conclusory allegation that Gustafson is himself an "adjustment service company." *Id.* at ¶ 309. But there is not a single allegation to support that incredible (and, quite frankly, frivolous) assertion.

- There is no allegation – nor could there be – that Gustafson has personally represented Wisconsin residents.

- There is no allegation – nor could there be – that Gustafson had any involvement with Great Lakes Law Firm (which operated in Wisconsin).

- There is no allegation – nor could there be – that Gustafson was "engaged as principal in the business of prorating the income of a debtor to the debtor's creditor or creditors,"

- There is no allegation – nor could there be – that Gustafson "assum[ed] the obligations of any debtor by purchasing the accounts the debtor may have with the debtor's several creditors, in return for which the principal receives a service charge or other consideration."

Thus, Counts 10 and 11 against Gustafson must be dismissed.

## B.     Counts 10 And 11 Fail Because ASCA Cannot Be Lawfully Applied To Persons Engaged In The Practice Of Law.

Applying ASCA to attorneys (and to others engaged in the practice of law) would violate the separation of powers under the Wisconsin Constitution. This Court should decline to apply ASCA in such a manner.

16

1. **The Wisconsin Supreme Court Has The Exclusive Power To Regulate And Define The Practice Of Law.**

Since 1847, the Wisconsin Supreme Court has been exclusively vested with the power to determine what constitutes "the practice of law" and has "supervisory authority over the practice of law in Wisconsin." *Seitzinger v. Community Health Network*, 676 N.W.2d 426, 436 (Wis. 2004); *Sands v. Menard, Inc.*, 787 N.W.2d 384, 397 (Wis. 2010). "[T]he practitioner in or out of court, licensed lawyer or layman, is subject to such regulation" by the Supreme Court. *See State ex rel. Reynolds v. Dinger*, 109 N.W.2d 685, 692 (1961). With respect to the Supreme Court's authority to regulate attorneys,

> [t]he legal profession is unique in that it is mostly self-regulating with ultimate authority vested largely in the courts. SCR ch. 20 Preamble (10). As part of our [the Supreme Court's] oversight, we have adopted Rules of Professional Conduct to guide attorney conduct. See SCR ch. 20.

*Sands*, 787 N.W.2d at 397. The Wisconsin Rules of Professional Conduct demonstrate the extent of the Supreme Court's authority in this area and comprehensively address virtually every aspect of an attorney's professional conduct. *See generally*, Wis. Sup. Ct. R. 20:1.4, 1.5, 1.15, 5.3, 5.5, 7.1-7.3, 8.4. The Wisconsin Supreme Court has repeatedly defended its exclusive authority to define and regulate the practice of law.

> For more than a century, [the Wisconsin Supreme Court] has been called upon to resist attempts by other branches of government to exercise authority in an exclusively judicial area. These have included . . . an attempt to regulate . . . bar admission and regulation of attorneys, *In re Cannon*, 206 Wis. 374, 240 N.W. 441 (1932), *Integration of Bar Cases*, 244 Wis. 8, 11 N.W.2d 604 (1943), 249 Wis. 523, 25 N.W.2d 500 (1946), 273 Wis. 281, 77 N.W.2d 602 (1956). In each of these cases [the

court] recognized [an area] of authority exclusive to the judicial branch and, therefore, free from intrusion by another branch of government.

*Complaint Against Grady*, 348 N.W.2d 559, 567 (1984).  The Supreme Court has also reserved unto itself:

the power to make appropriate regulations concerning the practice of law in the interest of the administration of justice, and ***to modify or declare void any such rule, law or regulation by whomever promulgated, which appears to the court to interfere with the court's control of such practice for such ends***.

*Reynolds*, 1109 N.W.2d at 692 (emphasis added).

Though a separation of powers doctrine is not explicitly expressed in the Wisconsin Constitution, the Wisconsin Supreme Court has "recognized that it is implicit in that document's language dividing governmental powers among the executive, legislative and judicial branches. Under the doctrine, each branch is prohibited from intruding upon another's 'core zone of exclusive authority.'" *Joni B. v. State*, 549 N.W.2d 411, 413-14 (1996). When the legislature enacts a statute that may violate the separation of powers, the Supreme Court follows a multi-step analytical framework to evaluate the constitutional challenge.

***First***, a court must "consider whether the subject matter of the statute in question falls within the power constitutionally granted to the legislature." *State ex rel. Friedrich v. Cir. Ct. for Dane Cty.*, 531 N.W.2d 32, 36 (1995). ***Second***, if the subject matter does so, the court "must then inquire whether the subject matter of the statute also falls within the judiciary's constitutional grant of power." *Id.* at 36. ***Third***, when the answer to the first and second steps of the analysis is "yes," the

18

court then considers whether the statute falls within "the judiciary's core zone of exclusive authority" or whether it falls within "the area of power shared by the two branches." *Id.*

If the statute falls within the judiciary's "core zone of exclusive authority," the statute cannot be a valid exercise of legislative power. However, the court may elect to abide by the statute as a matter of "comity or courtesy" as long as "the policy aids but does not obstruct the court in its own exclusive sphere." *Id.* (internal citations omitted). If the statute falls within the "shared area" of power, a statute is "constitutional only if it does not unduly burden or substantially interfere with the judiciary." *Id.* at 37; *see also Flynn v. Dept. of Admin.*, 576 N.W.2d 245, 255 (1998); *State ex rel. Fiedler v. Wis. Senate*,  454 N.W.2d 770 (1990).

### 2.   ASCA Was Not Intended To Apply To Attorneys And Cannot Be Constitutionally Applied To Attorneys.

Nothing in ASCA suggests it is intended to apply to attorneys. ASCA does not make any mention of attorneys or the practice of law. Moreover, nothing in the statute's legislative history suggests a legislative intent that it be applied to attorneys. ASCA was promulgated in 1935 and was borne out of a report of the State Banking Commission. *See* Ex. 1. That Report does not mention predatory practices by attorneys. Instead, it addresses certain "bureaus" that were engaged in predatory practices. That speaks volumes about the legislature's intent. Then, as now, attorneys routinely represented clients in negotiating settlements of liability and debt. If the legislature wanted ASCA to apply to attorneys, it would have stated as much.

19

Similarly, the regulations promulgated by the Wisconsin Department of Financial Institutions ("DFI") to enforce ASCA do not contemplate that ASCA could (or should) be applied to attorneys. In fact, it would be impossible for an attorney to comply with those regulations.

- DFI's regulations provide that "[t]he office of an adjustment service company shall not be shared or have a common waiting room with a practicing attorney." WIS. ADMIN. CODE § DFI-Bkg. 73.03(1)(a). It would be impossible for a lawyer to comply.

- "All agreements, contracts, form letters or any other form whatsoever to be used by licensee in conducting its business shall be submitted in duplicate to the administrator of the division of banking for approval." WIS. ADMIN. CODE § DFI-Bkg. 73.03(2). It would be impractical, if not impossible, for lawyers to satisfy this requirement. It would require non-lawyers at DFI to pre-screen all contracts and similar legal documents used by attorneys.

Moreover, even if ASCA was intended to apply to attorneys, the separation of powers under the Wisconsin Constitution would preclude that result. The only reported Wisconsin decision (at least to Defendants' knowledge) to consider whether ASCA can be applied to practicing attorneys is *JK Harris Fin. Recovery Sys., LLC v. Dep't of Fin. Inst.*, 718 N.W.2d 739 (Wis. Ct. App. 2006). There, the Wisconsin Appellate Court voiced concern over applying ASCA against attorneys but did not rule on the issue:

> As for JK Harris's assertion that the [State's] interpretation will bring attorneys and other service providers within the reach of WIS. STAT. § 218.02, we note first that the other professions JK Harris specifically points to are already subject to licensing and regulatory oversight of dealings with clients or customers. . . . Should the [DFI] someday travel down JK Harris's posited slippery slope by attempting to require other regulated professionals and service providers to be licensed under § 218.02, a court may then have to decide whether it may do so despite the legislature's (or supreme court's) creation of distinct regulatory schemes for those occupations. That day has not arrived with the facts before us, however.

20

*Id.* at 746. In this case, the State of Wisconsin is inviting this Court to venture down the "slippery slope" discussed in *JK Harris*. *Id.* at 739. If ASCA were to apply to every attorney and law firm in Wisconsin that represents clients with consumer debt issues, those attorneys would need to register with DFI, pay fees to DFI, and submit to the regulatory authority of DFI.

Because the regulation of attorneys is firmly committed to the Supreme Court, that would create a conflict of constitutional proportions. *See Sands*, 787 N.W.2d 384. If applied to attorneys, ASCA would allow DFI to regulate the very core of the practice of law: the scope of legal services that attorneys provide to clients (and the terms upon which those legal services may be provided). A few examples are illustrative:

- An attorney representing a consumer in a collection lawsuit brought by a credit card company could attempt to secure a favorable judgment in court but ***could not*** negotiate an out-of-court settlement. To do so would violate ASCA (unless the attorney was registered with DFI).

- A bankruptcy attorney representing chapter 7, 11 or 13 debtors could not negotiate reductions or restructurings of consumer debt (even if it were necessary for a plan of reorganization). Such negotiations would violate ASCA (unless the attorney was registered with DFI)
.
- It would be difficult (if not impossible) for practicing attorneys to comply with DFI's regulations. Among other things, DFI's regulations require ASCs to post a bond with DFI; bar ASCs from sending letters to adverse parties that are not pre-approved by DFI; bar ASCs from sharing office space with attorneys; and require ASCs to keep certain office hours. *See, e.g.*, Wis. Stat. § 218.02(2)(c); Wis. Admin. Code. §§ DFI-Bkg 73.03(1)(b), (2)

One can hardly imagine all the bankruptcy attorneys in Wisconsin (and other lawyers representing clients in negotiating settlements of debts) submitting every settlement

agreement, pleading, and piece of correspondence to DFI for pre-approval.  And yet that is the practical consequence of applying ASCA to attorneys.

Moreover, if ASCA applied to attorneys, then DFI – not the Wisconsin Supreme Court – would dictate whether (and on what terms) a Wisconsin attorney may (or may not) negotiate a client's credit card debt, how much a lawyer can charge for such services (and what types of compensation arrangements are appropriate), and whether an attorney's settlement agreements and contracts are appropriate. That would severely limit the exercise of professional judgment and create conflict with the Rules of Professional Conduct. *Compare* Wis. Sup. Ct. R. 20:1.5 *with* WIS. ADMIN. CODE § DFI-Bkg. 73.01. It would also invade the judiciary's "core zone of exclusive authority." *Friedrich*, 531 N.W.2d at 36. That would not be a valid exercise of legislative power, and there is no basis for the exercise of comity to permit such invasive regulation. *Id.*

It bears mention that other state supreme courts have addressed the issue of whether (and to what extent) attorneys are subject to "consumer protection" statutes and regulations. Two cases, in particular, are instructive.

*Persels & Assoc., LLC v. Banking Commissioner*, 122 A.3d 592 (Conn. 2015) ("*Persels*"), involved an enforcement proceeding by the Connecticut Department of Banking against Persels, a law firm that represented clients with consumer debts. The statute at issue in *Persels*, like ASCA, was a state debt-settlement statute. Persels asserted that it was exempt from the Department's regulatory authority because it was a law firm. The Department rejected that argument and proceeded

22

with an administrative action that resulted in Persels being found liable for violations of the Connecticut debt settlement statute. However, the Department's victory was short-lived. In 2015, the Connecticut Supreme Court found the Department had improperly intruded on the Supreme Court's exclusive right to regulate the practice of law. *Id.* at 606. "It is clear then, that the judiciary wields the sole authority to license and regulate the general practice of law in Connecticut." *Id.* at 604. The Supreme Court found that Persels' representation of clients constituted the "practice of law" and, therefore, fell beyond the Department's regulatory reach. *Id.* at 606. The Supreme Court also found that the exemption also covered non-attorneys, *e.g.*, paralegals, working under the direction of attorneys. also fell within the exclusive jurisdiction of the Judicial Branch.

In *Beyers v. Richmond*, 937 A.2d 1082 (Pa. 2007), the plaintiff alleged that her former attorney violated Pennsylvania's deceptive trade practices statute by absconding with certain settlement funds. The Pennsylvania Supreme Court found the defendant attorney was not subject to the statute. The court noted that "[t]he majority of jurisdictions that have addressed this issue have held that the regulation of attorneys does not fall within the ambit of consumer protection laws." *Id.* at 1086. The supreme court found that it had exclusive authority to govern the conduct of attorneys and had exercised that authority by adopting (like Wisconsin) Rules of Professional Conduct. *Id.* at 1089-91. It concluded:

> The General Assembly has no authority under the Pennsylvania Constitution to regulate the conduct of lawyers in the practice of law. Thus, we conclude that any application of the UTPCPL to the facts of

> this case would purport to regulate the conduct of attorneys and would
> be an impermissible encroachment upon the power of this Court.  We
> hold Pennsylvania's Rules of Professional Conduct and Rules of
> Disciplinary Enforcement exclusively address the conduct complained of
> in this case.

*Id.* at 1091-93. Connecticut and Pennsylvania are not isolated examples. Many states have judicially excluded attorneys from the ambit of consumer protection statutes.[6] Other states have protected the practice of law by permitting legislative regulation only for the "non-professional" aspects of an attorneys' practice. *See Short v. Demopolis*, 691 P.2d 163 (Wash. 1984).[7] Virtually all the states that fall in the latter category have "weaker" separation of powers doctrines that does Wisconsin.[8]

---

[6] *See Preston v. Stoops*, 285 S.W.3d 606 (Ark. 2008); *Jamgochian v. Prousalis*, 2000 WL 1610750 (Del. Super. Ct. 2000); *Thibaut, Thibaut, Garrett and Bacot v. Smith & Loveless, Inc.*, 576 So.2d 532, 537 (La. Ct. App. 1991); *Rousseau v. Eschleman*, 519 A.2d 243 (1986); *Macedo v. Dello Russo*, 840 A.2d 238, 242 (N.J. 2004); *Vort v. Hollander*, 607 A.2d 1339 (N.J. Super. Ct. App. Div. 1992); *Cripe v. Leiter*, 703 N.E.2d 100 (Ill. 1998); *but see Coffmann v. Williamson*,348 P.3d 929, 942 (Colo. 2015); *WyoLaw, LLC v. Office of Attorney Gen., Consumer Prot. Unit*, 486 P.3d 964, 975-76 (Wyo. 2021).

[7] *See also State v. Frederick J. Hanna & Assoc.*, 695 S.E.2d 612 (Ga. 2010); *Hays*, 313 P.3d 782; *Tetrault v. Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189 (Mass. 1997); *Reid v. Ayers*, 531 S.E.2d 231 (N.C. Ct. App. 2000); *Kessler v. Loftus*, 994 F. Supp. 240, 243 (D. Vt. 1997).

[8] States have different standards for determining whether a statute violates the separation of powers.  Some (unlike Wisconsin) are very deferential to the legislature. *See, e.g., Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 10s24-25 (Alaska 2009); *Hays v. Ruther*, 313 P.3d 782 (Kan. 2013); *Short*, 691 P.2d 163 (Wash. 1984).

24

## **CONCLUSION**

For the reasons set forth herein, Richard Gustafson respectfully moves the Court pursuant to Federal Rules of Civil Procedure 12(b)(6) to dismiss all claims against him.

Dated: October 14, 2024           Respectfully submitted,

<u>s/ Terrence M. Connors</u>
Terrence M. Connors
Andrew M. Debbins
CONNORS LLP
1000 Liberty Building
Buffalo, NY 14202
Ph: (716) 852-5533
Fax: (716) 852-5649
tmc@connorsllp.com
amd@connorsllp.com


Timothy D. Elliot, Esq.
Emily Shupe, Esq.
Rathje Woodword LLC
300 E. Roosevelt Road
Suite 220
Wheaton, Illinois 60187
(630) 510-4910
telliott@rathjelaw.com
eshupe@rathjelaw.com

## CERTIFICATE OF SERVICE

I, Terrence M. Connors, an attorney, certify that I caused a true and correct copy of the foregoing to be served via ECF on all counsel of record this 14th day of October, 2024.

<u>s/ Terrence M. Connors</u>
Terrence M. Connors