

**Exhibit 1**

# PREFACE

This report, made necessary from the investigation pursuant to resolutions herein set forth, is concerned largely with the abuses in the operations and practices of individuals and organizations known as finance companies operating in the State of Wisconsin. Inasmuch as the majority of these companies are engaged in financing automobiles, the investigation was chiefly concerned with finance companies handling automobile paper and security. It became apparent, however, that no report could be complete without a study of automobile dealer methods which are so intimately connected with the subject. Therefore, this report attempts not only to discuss the field of consumer credit advanced by finance companies, but the field of automobile time merchandising as well.

Under the requirements of the resolutions, the investigation was thrown open to complaints of consumers entering into merchandise and cash credit transactions. The testimony received to a large extent, therefore, necessarily dwelt on the abuses in the practices and operations in this branch of consumer credit, and the volume of testimony received regarding its benefits was slight. That more testimony regarding the benefits of the business was not heard, was in no way the fault of the Committee, which at all times was ready and willing to receive testimony bearing upon all phases of the finance business. Complaints were numerous and the interest of the investigation at its several meetings naturally centered around them.

One of the worst abuses is the practice of allowing reserves, rebates and packs, which not only add to the cost of consumer credit but have an insidious influence on the business as a whole. From this abuse no company financing automobiles under present conditions is able to protect itself.

The Committee wishes to make it plain, however, that outside of the abuse of allowing reserves, rebates and packs, it is of the opinion that probably eighty-five per cent of the people engaged in the finance business and sales of auto-

Exhibit 1

# REPORT

### OF THE

## STATE BANKING COMMISSION AND INTERIM ADVISORY LEGISLATIVE COMMITTEE TO INVESTIGATE FINANCE COMPANIES



Constituting a Committee created and appointed pursuant to Joint Resolution No. 48, A., introduced by Assemblymen Grassman and Murray, January 5, 1934, and Joint Resolution No. 61, S., introduced by Senator Carroll, February 1, 1934, Special Session 1933–34.

———

*To the Honorable Members of the Legislature of the State of Wisconsin in the 1935 Session thereof:*

The Committee, consisting of the State Banking Commission and Interim Advisory Committee created in conformity with the above named joint resolutions, No. 48, A., and No. 61, S., having made an extended investigation of those consumer credit agencies operating in the State of Wisconsin, usually known as finance companies, respectfully submit the following report and recommendations:

The personnel of said Committee is as follows:

**STATE BANKING COMMISSION**
PETER A. CLEARY, *Chairman*
H. F. IBACH, *Commissioner*
STANLEY N. SCHAFER, *Secretary*

**SENATE MEMBERS**
Senator WILLIAM D. CARROLL, *Chairman*, Prairie du Chien
Senator G. ERLE INGRAM, *Vice-Chairman*, Eau Claire

**ASSEMBLY MEMBERS**
Assemblyman JAMES T. CAVANAUGH, Antigo
Assemblyman WARREN D. LEARY, Rice Lake
Assemblyman MILTON T. MURRAY, *Secretary*, Milwaukee

**STAFF ASSISTANTS**
JOHN F. DOYLE, *Small Loans Division*
JOHN E. MARTIN, *Attorney*
LEO E. PACKARD, *Official Reporter*,

<u>Exhibit 1</u>

— 4 —

mobiles, conduct their work otherwise upon a high and ethical plane. The Committee is pleased to state that from its investigation, it believes this large majority of the individuals concerned in financing and selling automobiles on time payments are doing so efficiently and under high standards. Furthermore, that the fifteen per cent of the individuals engaged in these lines of business who are responsible for probably ninety-five per cent of all the abuses, outside of the abuse of allowing reserves, rebates and packs, and concealment of rates, do not handle over ten per cent of the total volume of the entire business transacted.

The Committee wishes, therefore, to emphasize the fact, in order that there may be no erroneous impressions conveyed by the report which follows, that the criticisms and abuses pointed out and the remarks made are in the main, and with exceptions of said reserves, rebates and pack abuse, and concealment of rates, directed against the fifteen per cent of the individuals and concerns engaged in the automobile finance business and the selling of automobiles on time payments, who are responsible for ninety-five per cent of the abuses, (outside of the exceptions noted) which came to the attention of the Committee. That said report is not directed against the eighty-five per cent of individuals who are carrying on said lines of business in a legitimate and ethical manner, and who handle at least ninety per cent of the total volume of business.

The Committee believes that the eighty-five per cent of the individuals and concerns who are dealing to the best of their ability ethically with said lines of business, recognize the menace to the industry of the abuses mentioned in this report and that they will wholeheartedly lend themselves to the support of necessary legislation which will bring such abuses in the State of Wisconsin to the irreducible minimum.

The Committee feels that there is no better place than this to give a brief resume of the large benefits of the automobile industry and finance business. That the benefits greatly out-weigh the abuses is plainly evident, and the Committee feels due credit should be given thereto.

In the earlier part of the twentieth century, manufacturers in this country began to bring within the reach of

Exhibit 1

the common people, luxuries heretofore undreamed of by reason of perfection in mass production. Mass production was followed by mass distribution. However, mass production and mass distribution would have been of no moment were it not for the fact that coincident with such mass production and mass distribution came mass finance. In the early part of the nineteenth century, articles of furniture were sold on installments and from about 1850 to the present time, there has been a steady increase in installment purchasing and cash credit in the United States. Thereafter objects for the household were manufactured in quantities and sold in installments, but with the advent of the automobile, the refrigerator and other articles which entailed considerable cost to the consumer, there came a new impetus to mass finance.

According to Mr. Evans Clark in "Financing the Consumer", the expansion of installment credit grew from a volume of six hundred million dollars to four billion dollars a year in twenty years, and the volume of business done in the field of mass finance today is about six billion six hundred million dollars a year, or 17.4 per cent of the total volume of retail sales.

Therefore, it should be borne in mind in considering the reasonableness of consumer credit charges that the production, distribution and sale of articles in installments was only made possible for the mass of consumers because of adequate mass financing. This mass financing has brought within reach of the average individual a wealth of articles which were never thought of in previous years, has raised the standard of living of the common people, and has reduced the price of thousands of articles until they are within the reach of the average individual. Prior to the evolution of mass finance, an ordinary automobile cost approximately three times as much as it does today and this holds true with many other articles which are now considered in the realm of necessities for the average family.

The automobile finance and loan companies are a recent development, practically within the past thirty years. As before stated, due to this rapid growth, it is only natural that abuses have crept in. The Committee, however, has been agreeably surprised to find that a large portion of this

Exhibit 1

— 6 —

business is handled upon a rather high plane, and with the elimination of certain abuses as herein pointed out, the Committee feels certain the consumer will not have much cause for complaint.

Consumer credit is a highly specialized business, which requires special organization and highly specialized methods of operation. This has been generally recognized, particularly by commercial banking institutions who consider consumer credit companies among their best risks. The finance companies of the United States are today probably the largest borrowers from the commercial banking system, second only to investments made in United States Government bonds.

It is conceded that the automobile industry has come through a great depression employing thousands of people at substantial wages and without increasing the price of their product. This industry might well have been prostrated during the depression in the same manner as hundreds of other industries, were it not for the fact that dealers and purchasers of automobiles have been at all times adequately financed. Had consumer credit in this line not been available, the automobile and other merchandise sales would have been paralyzed, additional thousands would have been thrown out of work and the prices of merchandise would have materially increased to a point out of reach of the average consumer.

Exhibit 1

— 8 —

The Legislative Acts creating said committee are as follows:

STATE OF WISCONSIN

IN ASSEMBLY

Jt. Res. No. 48, A.

January 5, 1934—Introduced by Messrs. Grassman and Murray

JOINT RESOLUTION

Directing the state banking commission to investigate finance companies operating in this state and to report its findings and recommendations to the 1935 legislature and providing for an advisory legislative committee.

WHEREAS, Installment buying has developed since the World War to such an extent that there is now scarcely an article that cannot be bought on the installment plan; and

WHEREAS, Investigation by the federal government shows that in some of the larger cities as many as fifty per cent of the families having lower scale income practice installment buying; and

WHEREAS, In most cases such buying is financed by organizations known as "finance companies" which, free from any state regulatory law, charge the installment buyer a certain amount for their services and demand the right of repossession, in case of default in payment; and

WHEREAS, Many complaints are being made that some of these companies, while charging the legal rate of interest, impose charges for investigation, collection, delinquent interest, and other purposes, making the total cost charge very high, and that illegal and high-handed methods are being used to repossess articles not fully paid for, all of which indicate the necessity for a state regulatory law; now, therefore, be it

*Resolved by the assembly, the senate concurring,* That:

1. The state banking commission, at or about the time of conducting its investigations for the fixing of a maximum rate on small loans, be requested and directed to investigate the operation and practices in this state of individuals or organizations known as "finance companies", which finance installment buying, particularly the charges made for such services and the methods and practices followed by such individuals and companies in dealing with the installment buyer.

2. An advisory legislative committee be created consisting of two senators and three assemblymen to be appointed

Exhibit 1

as are standing committees in the respective houses to advise with said commission in its said investigation of finance companies and to participate in any or all hearings and proceedings held by said commission in connection with such investigation of finance companies.

3. Said commission report its findings and recommendations to the 1935 regular session of the legislature.

## IN SENATE

Jt. Res. No. 61, S.

February 1, 1934—Introduced by Senator CARROLL

### JOINT RESOLUTION

Granting certain powers to the advisory legislative committee appointed by Joint Resolution No. 48, A., Special Session 1933–34.

WHEREAS, An advisory legislative committee has been appointed pursuant to Joint Resolution No. 48, A., Special Session 1933–34; and

WHEREAS, Said committee has not been granted the customary powers usually granted investigating committees; now, therefore, be it

*Resolved by the senate, the assembly concurring,* That the advisory legislative committee created pursuant to Joint Resolution No. 48, A., Special Session 1933–34, be granted the following powers: Said committee shall hold such meetings at such times, and at such places within the state, as it may deem advisable. Any member shall have the power to administer oaths to persons testifying before the committee. By subpoena, issued over the signature of its chairman or acting chairman, and served in the manner in which circuit court subpoenas are served, it may summon and compel the attendance of witnesses, and the production of all books, papers, documents, and records necessary or convenient to be examined and used by them in their investigation. If any witness, subpoenaed to answer inquiries propounded, or shall fail or refuse to produce books, papers, documents, or records, within his control when the same are demanded, the committee shall report the facts to the circuit court of Dane County, and it shall be the duty of such court to compel obedience to the committee's subpoena by attachment proceedings for contempt, as in the case of disobedience to the requirements of a subpoena issued from such court or a refusal to testify therein.

*Resolved Further,* That the members of said committee shall receive no compensation for their services, but may be reimbursed their actual and necessary expenses by the banking commission or the emergency board.

Exhibit 1

— 10 —

## IN ASSEMBLY

Jt. Res. No. 29, A.
January 29, 1935—Introduced by Mr. HOWARD

### JOINT RESOLUTION

Authorizing the advisory legislative committee on finance companies to investigate the importation and sale of stolen or mortgaged automobiles.

WHEREAS, A number of used car dealers in Wisconsin go out of the state to buy used cars, especially in Michigan and Illinois, when we have sufficient used cars in this state to supply normal demands; and

WHEREAS, A large number of used cars so brought into this state are cars which have been stolen, are mortgaged or are subject to conditional sales contracts; and

WHEREAS, The sale of such cars to innocent purchasers in this state often results in summary dispossession as well as annoyance and inconvenience to the buyers; therefore, be it

*Resolved by the assembly; the senate concurring,* That the advisory legislative committee appointed pursuant to joint resolutions No. 48, A., and No. 61, S., special session 1933–34, be and it is hereby authorized and directed to investigate the general subject of purchase of used cars outside of this state for sale in Wisconsin, the proportion thereof that are stolen, mortgaged or subject to conditional sales contracts and the supply of used cars in Wisconsin to meet normal demands. For the purpose of such investigation the said committee shall enjoy all of the powers granted under the resolutions creating said committee and said committee is directed to proceed with such investigation forthwith and report to this legislature its findings and recommendations at the earliest possible moment. The duties of the committee mentioned in this resolution are hereby extended to April 1st, 1935.

Exhibit 1

IN ASSEMBLY

Jt. Res. No. 29, A.
January 29, 1935—Introduced by Mr. HOWARD

JOINT RESOLUTION

Authorizing the advisory legislative committee on finance companies to investigate the importation and sale of stolen or mortgaged automobiles.

WHEREAS, A number of used car dealers in Wisconsin go out of the state to buy used cars, especially in Michigan and Illinois, when we have sufficient used cars in this state to supply normal demands; and

WHEREAS, A large number of used cars so brought into this state are cars which have been stolen, are mortgaged or are subject to conditional sales contracts; and

WHEREAS, The sale of such cars to innocent purchasers in this state often results in summary dispossession as well as annoyance and inconvenience to the buyers; therefore, be it

*Resolved by the assembly; the senate concurring,* That the advisory legislative committee appointed pursuant to joint resolutions No. 48, A., and No. 61, S., special session 1933–34, be and it is hereby authorized and directed to investigate the general subject of purchase of used cars outside of this state for sale in Wisconsin, the proportion thereof that are stolen, mortgaged or subject to conditional sales contracts and the supply of used cars in Wisconsin to meet normal demands. For the purpose of such investigation the said committee shall enjoy all of the powers granted under the resolutions creating said committee and said committee is directed to proceed with such investigation forthwith and report to this legislature its findings and recommendations at the earliest possible moment. The duties of the committee mentioned in this resolution are hereby extended to April 1st, 1935.

Exhibit 1

## INTRODUCTION

As a preliminary to this report, it is perhaps necessary to define some of the terms common to the finance business. In this way, it is hoped the reader will gain a better understanding of what follows:

*Finance Companies:* The term finance companies, as hereinafter used means those companies who purchase conditional sales contracts or receivables and/or who make direct loans secured by chattel mortgages on automobiles or other security, and if licensed in this state, operate under Section 115.07 or 115.09 with a flat charge distributed over a given period of months in equal monthly payments. (Those finance companies who purchase conditional sales contracts and receivables only, insist that the term "finance companies" should be applied to them, while the companies making direct loans should be designated "loan companies".

*Small Loan Companies:* By s m a l l loan companies is meant that branch of consumer credit which loan an amount up to $300 on household furniture or other personal property, and who figure interest monthly on unpaid balances at a certain fixed rate per cent. These companies operate in 26 states under what is known as the "Uniform Small Loans Act" and in this state are under the regulation of the Banking Commission.

*Open Accounts:* This is credit usually allowed customers for a limited period of time without interest. Consumption goods, such as groceries, meats, etc. are in a large majority of cases paid for at the end of 30 days, during which time no interest is charged. These accounts are then said to be open, or are called open accounts. Most people who have established credit of this nature have a continuous account and make payments thereon every 30 or 60 days.

*Receivables:* By receivables is meant, in the strict sense of the term, promissory notes which are signed by the purchaser or mortgagor at the time of buying the article or borrowing the money. However, in a broader sense, it means any contract wherein anyone is obligated to pay a certain sum of money at a given time under given conditions.

*Conditional Sales Contracts:* A conditional sales contract is defined to be a written agreement between a seller and a customer or consumer, wherein the seller agrees to sell and the customer to buy, a certain article or articles

Exhibit 1

of merchandise and the seller agrees that upon all payments being made and all conditions of the contract fulfilled, he will transfer to the customer a good title to the merchandise.   In most cases, the buyer or customer has possession of the merchandise, but the title remains in the seller until all payments and conditions of the contract are completed.

*Chattel Mortgages:*  By chattel mortgage is meant an agreement by and between a loaner or mortgagor who wishes to borrow money and a loanee or mortgagee who lends the money.   Under a chattel mortgage, the loaner or mortgagor puts up his automobile or other personal property as security, but usually retains possession of said property until dispossessed by the loanee or mortgagee for default.   In this instance, the title remains in the loaner or mortgagor, but in default of payments or other conditions of the chattel mortgage, the loanee or mortgagee has the right to sell the property under foreclosure and secure title to himself.

It should be understood in regard to conditional sales contracts and chattel mortgages that in either case, in the event of non-payment of installments or breach of other conditions of the contract, a sale is usually had and the theory is that if the article sold brings more than the amount of the indebtedness, the buyer or mortgagor will be paid the amount in excess of his liability, but in the event the sale does not produce sufficient to meet the liability, a judgment, known as a deficiency judgment, for the difference between the amount realized and the liability will be taken against the buyer or mortgagor and may be enforced against him by execution and sale of other property of the buyer or mortgagor if he has any property subject to execution.

While the rights of the buyer and mortgagor are somewhat similar under the two instruments, there are some advantages in favor of the owner of a conditional sales contract over the owner of a chattel mortgage in regard to title and the right of repossession.

*Reserves, Rebates, and Packs:*   These a r e certain amounts either added by the dealer of merchandise to the cash price of the article sold at the time of sale or allowed him by the finance company out of the finance charges. This is more fully explained in the chapter on "Reserves, Rebates, and Packs".

*Floor Planning:*  This is the term used in the finance business to designate the plan of financing the dealer's display cars and automobile stock in trade which he wishes to sell to his customers.   This is also more fully explained in the chapter on "Floor Planning".

*Coercion:*  By coercion in this connection is meant the power which the finance companies, by reason of floor plan-

Exhibit 1

ning the dealer, have to compel him to finance his sales in the particular finance company doing the floor planning, or the forcing of dealers by factories or distributors to do business with factory owned or affiliated finance companies either directly or indirectly.

*Skip Tracing:*  It is customary for many finance companies to have employees who make it a business to follow up past due paper, locate any installment buyer who has changed his location, and sieze the cars in default.  These cars, in many cases, are seized without the consent of the purchaser and often without any notice whatever.  The search and seizure of automobiles from purchasers who have changed their address is known as skip tracing.

*Rate Charts:*  Automobile finance companies, both buyers of conditional sales contracts and receivables, and those who loan direct on chattel mortgage security on automobiles have printed finance charge statements which include the charge for financing the sale of the merchandise or the loan, whichever the case may be, and also include insurance charges.  These printed rates are known in the trade as rate charts.

*Innocent Purchaser:*  An innocent purchaser is any individual, firm or corporation who, in the regular course of business, purchases promissory notes or other receivables without notice of any defenses as between the original obligor, or the party who signed said receivables and the obligee to whom said receivables are made payable.  Special agreements between the obligor and the obligee not contained in the receivable but made at the time of the transaction, are no defense in a suit by the one who purchased the receivable in good faith.  The innocent purchaser may compel payment and fulfillment of the other conditions in the receivable, as against the obligor.  The obligor's only remedy being for damages against the obligee.

*Dealer:*  For the purpose of this article, the dealer is one who purchases automobiles at wholesale and sells them to customers or consumers either for cash or on time.

*Consumer:*  Any individual who purchases goods or merchandise either for cash or credit for consumption use either by himself or his family.

*Producer:*  By producer is meant one who manufactures goods.

*Producer Loans:*  By the term producer loan is meant a loan for the purpose of manufacturing or producing goods.  These are usually made in comparatively large amounts from banks or other institutions equipped to make these kind of loans at a comparatively low rate of interest.

*Consumer Loans:*  By the term consumer loan is meant

Exhibit 1

— 14 —

a loan made by an individual for the purpose of obtaining cash for necessitous purposes or to buy or purchase merchandise. These are made for consumption purposes as distinguished from producer loans, and are made in small amounts at a relatively high rate of interest. Merchandise sales on deferred payments are known as consumer credit, but in effect are nothing more or less than consumer loans.

*Prepayments:* Payments prior to due date.

*Delinquencies:* Past due installments of payments or interest.

It has long been recognized as a truism of economics that there must be suitable credit facilities for the financing of merchandise production. During the past few years, however, the necessity of credit facilities for the financing of merchandise consumption is becoming generally recognized. This Committee, in its investigation and deliberations, has been interested in the question of financing the consumer from the standpoint of merchandise consumption commonly known as consumer credit, and has attempted to study particularly those agencies of consumer credit known as finance companies. These companies, both licensed and unlicensed, are engaged in making loans on automobiles and/ or in purchasing conditional sales contracts and receivables as part of the purchase price for same.

The Committee has attempted more particularly to study this branch of consumer credit, but has, however, made some study of other branches of consumer credit, such as institutions selling household furniture and utensils, and has included in its study some investigation of so-called adjustment service bureaus.

It was not within the scope of the purpose of the above named resolutions to make any study of licensed small loan companies, and although some testimony regarding small loans was received, such testimony was usually only incidental to the main purposes expressed in the resolutions creating this Committee, although as some finance companies had small loan departments, a consideration of their set-up, financial and otherwise, was found necessary.

Fourteen hearings were held at points where studies could be made most conveniently and where abuses were likely to be the most prevalent, namely: Milwaukee, Janesville, Beloit, Kenosha, Racine, Green Bay and Madison.

Exhibit 1

— 15 —

The Committee subpoenaed and invited people who felt aggrieved, as well as others, to appear at these hearings and give testimony. Many complaints by various people in different parts of the state were considered, and while the Committee had no power to correct abuses, many complaints were adjusted voluntarily when the complainants and other interested parties were brought together. A record of such complaints will be found recorded in the bound volumes of testimony. (See Index of Testimony, pages 5, 6, 7, and 8 and appendix).

No Wisconsin Legislative Committee has ever before attempted an exhaustive survey of this field, and while the Committee wishes to acknowledge some outside assistance, particularly from reports of the recent federal code hearings, and other printed matter, the obtainable written material bearing directly upon this branch of credit was meager, and therefore, the conclusions of your Committee are based largely upon the testimony taken in its hearings.

The Committee finds that up to the present time there has been little attempt by legislative bodies to consider the relationships which various branches of consumer credit bear to each other, and there has been, apparently, no attempt to legislate on these matters with a comprehensive view of the entire field. The result has been a strange mass of conflicting laws relating to this subject. Hence, much confusion has arisen, not only in the minds of the people engaged in different branches of consumer credit, but in the minds of the public as well.

Your Committee believes, however, that a constructive job can be done in the state of Wisconsin by an intelligent legislative program, comprehending the whole field of consumer credit, which will go a long way toward correcting the evils and abuses brought out in this study, and which will likewise educate the general public as to the necessity of a reasonable amount of consumer credit, and disabuse its mind from prejudice.

Exhibit 1

— 16 —

## NECESSITY FOR CONSUMER CREDIT

When dealing with the subject of consumer credit, it must be understood that any intelligent study thereof should take cognizance of the fact that consumer credit is divided into two branches, i.e., cash credit and merchandise credit. When an individual goes into debt to buy merchandise and obligates himself to pay for such merchandise in installment payments in order to become the owner thereof, he is a participant in merchandise credit. When he secures cash to pay his debts, such as the doctor, the groceryman, the interest on his home, or to become the owner of merchandise, he is a participant in cash credit. Open accounts are not usually considered in the consumer credit field unless they are financed, and interest or a carrying charge is added.

The Committee was forcibly impressed with the growth and present volume of consumer credit. Most of the members, being men of middle age, recall that in their boyhood, the pioneer family was nearly self-sustaining. That is to say, the family in that day raised their own supplies, manufactured most of their own equipment and needed very little cash for the necessities of life. Today, however, it appears that cash is required to provide families with practically every necessity. Society, while making considerable advance in social legislation, has failed to provide families with any regularity of income or with any insurance against catastrophe, while their ability to raise their own food or manufacture their own equipment has almost disappeared.

*Banks not Consumer Credit Solution:*   The argument is often made by those who do not understand the necessity nor appreciate the volume of consumer credit, that banks should accommodate the general public by extending sufficient credit to take care of consumer needs and thus prevent them from patronizing cash or merchandising credit agencies.

While banks are more liberal in extending consumer credit at certain times than at others, the Committee finds

Exhibit 1

that this class of loans is not usually made by the banks. In the first place, they do not find them profitable. Testimony taken by the legislative committee investigating the Banking Commission of the State of Wisconsin in 1931, was to the effect that it cost a bank from $1.75 to $2.50 to carry a note for $100.00 through the bank to its ultimate conclusion. Therefore, at ordinary rates of interest banks would operate at a loss on this class of business. Then, too, the moral hazard in handling this class of paper in the banks has increased tremendously during the past decade. This has been due in no small degree to the fact that with the advent of the automobile, the population is constantly shifting, and shifting population adds materially to credit cost.

Your Committee further finds that while certain banks do make occasional small accommodations to consumers, fairly high rates are often charged. The rate, however, is usually disguised under the name of service charges. In the urban banks, $1.00 is the usual service charge on a $100.00 note for thirty or sixty days and there are instances of $1.50 charge on a $50.00 note for thirty days. The true interest rates in some instances on consumer credit in banks has been known to equal or exceed the rate charged by finance and small loan companies. If the service charge for a $100.00, sixty day, 6% note is $1.00, the true rate of interest is 12%, if a thirty day note, it is 18%. If the charge is $1.50 on a thirty day 6% note the rate is 36% to 42% depending upon whether or not interest is charged in addition to the service charge. Testimony of the Wisconsin Banking Commission is to the effect that the interest rate on many small bank loans range from 8% to 40%. There is no doubt in these instances that the banks in question have violated the spirit, if not the letter, of the Wisconsin usury law and have charged more than ten per cent per annum, simple interest.

Banks are in the main concerned with the handling of producer credit rather than consumer credit. They must of necessity make loans which will assist those in their particular localities in carrying on business activities. When business is good, the bank funds are employed in business and industry, and on the other hand, when depressions occur, heavy withdrawals which deplete reserves must be ex-

Exhibit 1

— 18 —

pected. Inasmuch as the banks are handling depositors' money, they must of necessity try to keep funds intrusted to them in a liquid condition, and therefore, even if lucrative, could not loan their money in long time notes which would be slow, or at best paid in a long series of instalments. Furthermore, in extending credit, banks must take into consideration that periods of unemployment result in inability to pay.

The Committee finds that since 1928, it has been increasingly difficult for the average individual to secure consumer credit accommodations from the banks. This has been due not only to the necessity of keeping depositors funds in a liquid state but also to withdrawal of deposits during the depression.

Furthermore, it seems quite apparent that the federal insurance deposit law has caused bankers generally to be more conservative than ordinarily in regard to consumer credit. This is probably due to fear that such receivables will not come within the rules of satisfactory loans as required by that law.

It should also be borne in mind that any set-up for extending credit, if it is to be for a long period of time, must of necessity depend upon invested capital which cannot be withdrawn at any time, as can deposits in a bank. It is estimated that 90% of the adult population of the United States today are unable to obtain banking credit.

It follows, therefore, as a logical conclusion, that the large proportion of the public, being without banking credit, must have some form of cash and merchandise credit facilities. If the present day public is to partake to any large extent in the product of industries which provide employment for those who earn wages, it can readily be seen that a reasonable amount of consumer credit, both cash and merchandise, is indispensable to social and industrial development.

<u>Exhibit 1</u>

## CREDIT UNIONS

*Credit Unions do not replace other consumer credit agencies:*  Twenty-two years ago the credit union movement began to take root in America.  Under the credit union plan, employees of a particular factory or business, or members of particular groups form an association, the members of which deposit their savings with the treasurer of their particular credit union and loans are made to members of each particular association out of these savings. Credit unions are purely cooperative and are not organized for profit.

Under able supervision and management in Wisconsin this branch of consumer credit has grown very rapidly in our state in a comparatively few years, and we now have 305 credit unions in the state with total assets of $1,786,-000.  Probably due to this excellent supervision and consequent healthy growth of credit unions in this state, the National Association of Credit Unions of the United States has decided to make its headquarters at Madison, Wisconsin.

The credit union movement is a very worthy one.  Thousands of people throughout the state and country have been assisted very materially by this organization, not only in securing loans at a low rate of interest, but have been assisted in liquidating their obligations.

The advantage of credit unions is the opportunity of the members to secure loans from these institutions for necessitous purposes at a very low rate of interest, inasmuch as there are no operating expenses, officers volunteering their services gratis.

The disadvantage of the credit union is the limited amount of loans which can be made, inasmuch as they are made only to members of a particular group, such as a certain company, and not to the public at large.  Usually employees are not eligible for loans until they have been employed for a time with the company.  Therefore, it often happens that when an employee first begins to work after a long period of unemployment he is beset by many bills,

<u>Exhibit 1</u>

— 20 —

and this is the time he most needs money.  However, as stated, not being able to obtain loans at the beginning of employment, he must necessarily secure credit from other sources.

A further disadvantage is the feeling which many employees have of not wishing to disclose their financial embarrassment to their fellow workers.  It is customary many times for one to interview many credit agencies before obtaining a desired loan.   Therefore it is the thought of the Committee that everyone should have the opportunity to seek credit from many sources.

It is doubtful, therefore, if credit unions will ever be able to replace other credit agencies for handling the vast volume of consumer credit now demanded by consumers. From present indications, while credit unions are a great assistance and should be encouraged in every way possible, there is no likelihood that they will ever replace other consumer credit agencies.

Exhibit 1

— 20 —

and this is the time he most needs money.  However, as stated, not being able to obtain loans at the beginning of employment, he must necessarily secure credit from other sources.

A further disadvantage is the feeling which many employees have of not wishing to disclose their financial embarrassment to their fellow workers.  It is customary many times for one to interview many credit agencies before obtaining a desired loan.  Therefore it is the thought of the Committee that everyone should have the opportunity to seek credit from many sources.

It is doubtful, therefore, if credit unions will ever be able to replace other credit agencies for handling the vast volume of consumer credit now demanded by consumers. From present indications, while credit unions are a great assistance and should be encouraged in every way possible, there is no likelihood that they will ever replace other consumer credit agencies.

**Exhibit 1**

## POSITION OF FINANCE COMPANIES IN
## CREDIT FIELD

The Committee is impressed with the fact that finance companies occupy an important position in the field of consumer credit. It is estimated that automobile finance companies do over one-half of all the installment credit business in the world. In 1934, the amount of credit advanced by them in Wisconsin approximated $75,000,000 and during the same year in the United States probably exceeded $2,-500,000,000. This great volume of business, which staggers the imagination, is handled by two distinct groups of auto finance companies. First: What may be termed the investment installment group, which buys conditional sales contracts and receivables directly from the dealer and which has no immediate contact with the public in the initial transaction, but merely purchases and collects installments payable under these conditional purchase agreements. Second: What may be termed the direct loan group which makes loans direct to the public on automobiles, or other security. This group deals with the public before as well as after the loan is made. Many of these consumer credit agencies act in a dual capacity, and have transactions which fall in both groups.

*Classification of Receivables:* In order to get a clearer picture of the position of these two groups it is also necessary to have some understanding of the classification into which automobile and other merchandise, and cash credit contracts are divided, i.e., conditional sales contracts and chattel mortgages. In the Wisconsin Revised Statutes, as in most states of the Union, there is a distinct difference between the chapter on uniform conditional sales act and the chapter on chattel mortgages. While there is considerable distinction between the legal methods of obtaining possession under the two contracts, the underlying theory of the law primarily relates to the fact that under a conditional sales contract the buyer does not have title until he has completely paid for the automobile or other merchandise which he is purchasing, and that therefore the title to the

<u>Exhibit 1</u>

merchandise remains intact in the seller, and is divested only upon the purchaser completing the payments and other conditions set forth in the contract. Under the chattel mortgage, however, the title to the merchandise or security pledged remains in the mortgagor, and the agency advancing the cash for the mortgage has no title in the merchandise or security pledged except as security until the mortgagor has been divested by the proper legal proceedings.

*Loans or Sales:* In order to gain further enlightenment on this question, the character of service offered by finance companies must be considered.

Many who testified before the Committee advanced the theory that inasmuch as installments for merchandise represent delayed payments in the price of goods sold, this constitutes a sale and not a loan. It was urged before the Committee that the seller has the constitutional right to charge whatever price he can induce the consumer to pay, and can collect this price at any time he sees fit. In other words, that merchandise credit is a sale and not a loan. This view apparently has been used by merchandise credit agencies for the purpose of avoiding restrictions of the usury law and to conceal from the consumer, the true finance charge, although of course it must be conceded that credit agencies who purchase receivables do not deal with the consumer but purchase directly from the seller.

The further objection was also raised by certain groups handling low-priced used automobiles that while they sold their auto merchandise in installments, the cash and installment price were exactly the same, and therefore such dealers did not do a loan business. The Committee finds, however, that such class of merchandise is very often sold at an exorbitant price and the finance charge is concealed in the sales price.

The Committee is fully aware that there is considerable authority in favor of these contentions. Briefs sustaining this view have been presented to the Committee, citing decisions of the courts, both state and federal. One very able brief, dated February 21, 1935, by Mr. P. W. Haberman, General Counsel of the C. I. T. Corporation to Robert

Exhibit 1

— 28 —

R. Batton, Esquire, Chairman of the Committee for Financial Institutions on Indiana House Bill 377, has been before this Committee for consideration.

The Committee feels, however, that when the magnitude of the entire field of merchandise credit is considered, which, according to the best available information, exceeded, in 1934, $6,000,000,000, and when it is further considered that service charges to the consumer on this great volume of business ranged from 12% to 30% or more on automobile receivables and from 12% to 100% and even more on furniture and other merchandise sold on time, the theory that the public has no legal right to be heard on the question of the charges to which they are subjected, cannot long be held tenable. The Committee believes, from the investigation made, that it is entirely justified in making and reiterating the statement that the additional price charged for deferred payments on merchandise makes these transactions in effect loans and not sales, and that due to concealment of charges and evasion of the usury laws, the charge for this credit is sometimes so exorbitant that the consumer would be better off had he not purchased the merchandise. By attempting to evade all legal restrictions on merchandise credit, together with the insidious abuses of packs, rebates and reserves, charges for automobile merchandise and cash credit by those agencies operating on a flat charge basis have often reached the point where it is the proverbial "straw that breaks the camel's back".

One of the things most forcibly brought home to this Committee, after weeks and months consumed in this investigation is that the exorbitant charges which in merchandise, automobile, and direct loan transactions are quite often loaded upon the ignorant consumer should and by right ought to be a matter of public policy and that regulation of these charges is well within the police power of the State and Federal Government. Certainly an industry as large as this, which has permitted so large a differential between the cash price of merchandise and the time price thereof, to be paid out of the earnings of the struggling masses of consumers, who constitute the great majority of our population, cannot long continue to evade the penal-

<u>Exhibit 1</u>

ties of the usury laws by legal technicalities without cleaning house and coming into court with clean hands. Back of all jurisprudence in this country lies the predominant principles of "natural justice". The position of the public and of the courts during the past few years is undergoing a decided change. Perhaps, it is changing too rapidly. That is not for the Committee to say, but it would certainly be the purest principles of "natural justice" to sustain supervision and regulation of charges for merchandise and cash credit which so vitally concern the vast proportion of our people.

Practices herein outlined which are inimicable to the best interests of so large a portion of our population make the protection of the state necessary. In the exercise of police power, the state has the right and it is its duty to regulate the differential between the cash and time price of merchandise. This is not an infringement or curtailment of the right of contract, but is an exercise of the inherent police power of the state. In numerous instances laws affecting sales have been upheld. Furthermore, the regulation of interest rates on loans stands on practically the same ground, to-wit: that in making laws, the regulation of practices inimicable to the interests of the public is a valid exercise of the police power.

The Committee is confident that when the practices herein set forth and the load carried by the millions who avail themselves of consumer credit, are brought before the courts of last resort for a review of findings and conclusions of a commission founded upon sufficient evidenciary facts which determines in the interest of public policy that charges for merchandise credit payments are in effect loans and not sales and that public policy demands regulation and supervision thereof, such findings and conclusions will undoubtedly be sustained.

It is the belief of the Committee that a Commission or body legally established for the purpose of regulating and supervising consumer credit can be given the power of determining whether or not any institution is merchandising or extending credit.

The Real Estate Brokers Board in the State of Wisconsin has already been given the power to determine the classification of certain people who claim to be selling their own

Exhibit 1

real estate.   By taking testimony, the commission is given power to determine by the facts presented, as for instance: the number of sales, maintenance of offices and other evidenciary matters, whether or not an individual or company is really selling his or its own property or is using it as a subterfuge, and is actually engaged in the real estate business. The Committee feels, therefore, that while an automobile or other merchandise may be sold on a deferred payment plan, a commission may legally be given the authority to make findings and determine whether or not such individual or corporation is not actually in the merchandise credit field.

The Committee has given considerable thought to the above arguments and believes, from a common sense point of view, that all of these merchandise sale transactions which obligate the buyer to make a series of monthly payments, placing him in exactly the same position as though he borrowed cash, should be classified as loans and not as sales.

Many restrictions and regulations have been wisely thrown around the lender of money and any agency of consumer credit which proposes to mortgage the future income of consumers has a very vital relationship to the family budget and to the public.   The purchaser of installment paper enters into an agreement wherein the buyer mortgages his future income.   The seller usually requires a down payment which is ordinarily more than the depreciation.   He has a lien under his conditional sales contract wherein his rights are particularly reserved as to possession, and he has a contract in which his investment is thoroughly protected.   Under these circumstances, a purchaser entering into a contract of this nature stands in exactly the same position as a borrower obtaining cash from a loan agency.

Public interest demands that such a purchaser have as much protection thrown around him as if he were a borrower.

The argument was also raised that consumer loan transactions require more supervision than installment credit transactions, because the loans are made to those in distress, while installment sales are often a luxury wherein the buyer need not purchase unless he chooses.   However, your

**Exhibit 1**

Committee is of the opinion that this is not a true statement of fact, for the reason that merchandise credit is often the very instrument which, under high-pressure salesmanship, has caused the undoing of the consumer. The disastrous consequences of purchasing unwisely will never of itself correct the abuse of unwise purchases. If this were true, we would have no need of laws, such as the "Blue Sky Laws" to protect investors.

A great many abuses which the Committee found, resulted from the fact that agencies were not careful in the selection of risks and that individuals became indebted for more than their income would allow them to pay. While the Committee realizes the vast need of well regulated consumer credit, it deprecates the tendency of such agencies in urging people to unwisely purchase more merchandise under installment plans or otherwise than they can conveniently take care of. Overloading the buyer is a social as well as an individual problem, because when a family has over-purchased and becomes insolvent, it is usually crowded by one creditor to the detriment of the family, other creditors and employers. When an individual has his future income mortgaged for many installment paying periods in the future, whether for luxuries or necessities, he is faced with the possible loss of security in tangible assets. For this reason particularly the public is vitally interested in all branches of consumer credit, and your Committee feels that all agencies operating in this field should be under the most careful public supervision and regulation.

The objection was also raised by that group of finance companies who purchase receivables that, because they made no direct loans to individuals personally, but merely bought conditional sales contracts and receivables they were not in the loan business and had, therefore, the constitutional right to buy these contracts or receivables at any price they saw fit.

The Committee, however, was unable to differentiate between the effect upon the consumer when his paper was sold by the dealer to an investment house, or when said consumer received a direct loan from the dealer or borrowed personally from a loan agency. In any instance the pay-

Exhibit 1

— 27 —

ments had to be made in the same manner. The Committee can see no reason why an investor in installment paper and conditional sales contracts should have any privileges over those who deal directly with the consumer by extending merchandise credit or by direct loans.

*Inter-relation of Finance Companies:* Inasmuch as it has some bearing on concealed charges, packs, rebates and reserves, hereinafter to be discussed, some comment on the relative position of finance companies as between themslves is perhaps necessary.

The first group, known as investment purchase concerns, herein referred to, have some advantages over the direct loan group, as follows:

1. The decisions which have to a certain extent sustained the contention that they have the constitutional right to purchase receivables at any discount or price they see fit. (It must be conceded that there are authorities in accord with this line of reasoning.)

2. The claim of "innocent purchaser" when disputes arise between the dealer and the customer.   (The consumer under such circumstances, cannot legally refuse payment to the finance company, but must pay the contract in accordance with its terms, his only recourse being against the dealer for damages.)

3. The benefit of operating under the advantages of holding as security for the receivables purchased, conditional sales contracts under which title remains in the holder of the contract until fully paid, as distinguished from the direct loaner, who must rely on chattel mortgage security.

It should be mentioned, however, that this group is under the disadvantage of being compelled, under present day practices, to give packs, rebates and/or reserves, and of the necessity of floor planning their dealers' merchandise with little or no profit. It should also be mentioned that there is the further disadvantage of a certain degree of coercion by the dealers which compels this group to accept a certain amount of hazardous paper.

The advantages of the direct loan companies are as follows:

Exhibit 1

— 28 —

1. Close contact with their customers.

2. More opportunity to inspect collateral or security offered.

3. Less inspection costs due to restricted field and acquaintance with their customers.

4. No necessity of giving packs, rebates or reserves.

5. Better opportunity for the selection of risks, being free from coercion.

From the standpoint of the investment purchase companies as between themselves, there are certain decided advantages possessed by the large national companies over the smaller individual concerns. Chief among these nationals are the General Motors Acceptance Corporation, Commercial Credit Companies, Commercial Investment Trust, commonly known as C. I. T. Corporation and the Universal Credit Company, which is owned and controlled by the Commercial Investment Trust. These companies are either factory-owned or factory affiliated and are national in scope.

Their advantages are as follows:

1. The relative small cost of money. (Most of these large national companies are able to borrow money at a very low rate of interest, from $\frac{3}{4}$ of 1% to $2\frac{1}{2}$%, as distinguished from 5% to 6% paid by the smaller independents.)

2. Ability to borrow without security. (As distinguished from the necessity for smaller companies to place collateral in trust which makes additional costs to them of 6/10 of 1% to 1% of the amount of paper held in trust against which collateral notes are outstanding.)

3. The opportunity to add a certain proportion of finance charges to the manufacturer's cost. (The Committee has no positive evidence of this, but although denied by the large national companies, it seems to be the opinion of everyone interested in the finance business who is not connected with these large companies.)

4. The ability to control the placing of receivables, especially with the large dealers and distributors because of floor planning.

5. The advantage of first hand information and the opportunity to get in on the ground floor with new dealers,

Exhibit 1

— 29 —

due to close affiliation with factory new-dealerships and cancellations.

One of the reasons why factories wish their dealers to do business with the factory-owned or affiliated companies is that they are able to control what the finance company will do for the dealer and extend large lines of credit when the manufacturers are loading their dealers. Also, in case of a dealer cancellation, the factory owned or affiliated finance companies can cooperate with the factory and seize the floor planned automobiles on the dealer's floor the instant his contract has been cancelled by the factory.

It should be understood that the usual contract of the factory with the dealer now provides that the dealer cannot charge a higher rate for financing than the rate of the factory owned or factory affiliated company. This often forces the dealer to dispose of his paper on a repurchase agreement when in reality he would prefer to sell his paper on a non-recourse basis. Thus he is forced to do business with the factory-owned or factory affiliated concerns.

6. Ability to secure clear title to floor-planned automobiles direct from the factory.

7. Simplifying floor plan operation by paying for car at factory and eliminating drive-to-boat expense.

It has been customary for some factories to place an additional charge on the automobiles secured by the dealer when they have not been paid for at the factory, and the factories have made it very simple for their own affiliated companies to pay for the cars at the time they left the factory.

8. Better opportunity to evade state income taxes by charging off excessive amounts for general overhead. It appears from an examination of tax commission reports that not all national companies made a full segregation of Wisconsin business for the purposes of taxation. In many instances tax reports appear to be incomplete.

9. Savings on advertising and promotional sales work, necessarily done for the large national companies by factory representatives and dealers.

Exhibit 1

## PRESENT LEGAL REQUIREMENTS

*The Committee finds that the group of finance companies engaged in the purchase of installment paper are without regulation in this state except under the laws which have to do with requirements under the uniform conditional sales act and the usual requirements of any other legal instruments used in the business.*

On the other hand, the direct loan companies, or those engaged in cash credit, fall into the following groups:

1. The small loan companies operating under Chapter 214, R. S. Wis.   These companies make loans which are usually secured by chattel mortgages on household furniture, automobiles and other personal property.   This group must operate without any charges except interest figured on deferred balances at a rate fixed by the Banking Commission and are under its strict regulation.   The rates recently set by this Commission on loans are 2½ per cent on the loan balance under $100.00, 2 per cent on that portion of the loan balance between $100.00 and $200.00, and 1 per cent on that portion of the loan balance between $200.00 and $300.00.

2. The finance group which loans on chattel mortgage security, on automobiles and other personal property, and makes a flat charge therefor which is either deducted as a discount at the time of making the loan or is added to the amuont financed.   In either case, however, the payments to be made over the installment period of 10, 12, or 18 months, as the case may be, are the same with the possible exception of the final one.   It should be noted that although the amount of the loan is being reduced monthly, the consumer pays the same interest or a proportion of the finance charge the final month as he did at the end of the first month when he owed the entire amount.

To illustrate:  Suppose A borrows 150.00 on his used car, payable in 12 months and the finance charge is $25.00; the combined amount which he must pay therefore is $175.00, which divided into 12 payments equals $14.58 as the monthly payment.   The final installment is, of

Exhibit 1

## PRESENT LEGAL REQUIREMENTS

*The Committee finds that the group of finance companies engaged in the purchase of installment paper are without regulation in this state except under the laws which have to do with requirements under the uniform conditional sales act and the usual requirements of any other legal instruments used in the business.*

On the other hand, the direct loan companies, or those engaged in cash credit, fall into the following groups:

1. The small loan companies operating under Chapter 214, R. S. Wis. These companies make loans which are usually secured by chattel mortgages on household furniture, automobiles and other personal property. This group must operate without any charges except interest figured on deferred balances at a rate fixed by the Banking Commission and are under its strict regulation. The rates recently set by this Commission on loans are 2½ per cent on the loan balance under $100.00, 2 per cent on that portion of the loan balance between $100.00 and $200.00, and 1 per cent on that portion of the loan balance between $200.00 and $300.00.

2. The finance group which loans on chattel mortgage security, on automobiles and other personal property, and makes a flat charge therefor which is either deducted as a discount at the time of making the loan or is added to the amuont financed. In either case, however, the payments to be made over the installment period of 10, 12, or 18 months, as the case may be, are the same with the possible exception of the final one. It should be noted that although the amount of the loan is being reduced monthly, the consumer pays the same interest or a proportion of the finance charge the final month as he did at the end of the first month when he owed the entire amount.

To illustrate: Suppose A borrows 150.00 on his used car, payable in 12 months and the finance charge is $25.00; the combined amount which he must pay therefore is $175.00, which divided into 12 payments equals $14.58 as the monthly payment. The final installment is, of

Exhibit 1

course, $14.58 and the proportionate charge is the same as it was the first month when the whole $175.00 amount was owing.

In order to determine the true rate of interest on this loan, the following plan, for all practical purposes, may be adopted: Inasmuch as monthly payments are being made, one-half of the amount will be paid in six months, or, in other words, the consumer has the use of the full amount of $150.00 for only six months. Therefore the charge for the use of $150.00 for a year would be twice $25.00, or $50.00. 50 divided by 150 gives approximately the yearly rate, which in this case would be 33 1/3 per cent. Inasmuch as the finance charge is not all received before the end of the year the true interest rate would be slightly less or approximately 32 per cent.

The direct loan companies classified under paragraph "2", page 29, are as follows:

A. Companies registered under Section 115.07. These companies, merely by registering with the Banking Department, may obtain permission to operate, and inasmuch as no rules or regulations are provided in the law, and no provision for expenses of investigation is contained therein, they are not under any supervision.

These companies are presumed to loan on the basis of 10% per annum, simple interest, plus 7% on the first $100.00 and 4% thereafter. (See Attorney General's opinion, February 19, 1935. Appendix)

Under this ruling their charges are equivalent to 24% per annum on loans under $100.00, 21% on loans of $200.00, 19% on loans of $500.00 and 18½% on loans of $1,000.00. The evidence before the Committee, however, shows that companies operating under this section have been discounting the 10% instead of using it as simple interest with the result that the annual rates under this plan are as high as 39%.

B. Companies registered under Section 115.09 which are presumed to make loans on the basis of 10 per cent discounted in advance. By adopting the rule of determining true interest as hereinbefore explained, the true interest rate on discounts if made on this basis, is 22.64 per cent.

At the present time there are in the State of Wisconsin

Exhibit 1

— 32 —

54 licensed small loan companies operating under Chapter 214, 36 discount companies operating under the provisions of Section 115.09 and 12 companies operating under Section 115.07, making a total of 102 licensed companies in the State. However, there are a vast number of individuals and concerns engaged in handling consumer credit on automobiles, making direct loans or purchasing conditional sales contracts, who are not licensed under any provision of the statutes.

Questionnaires were sent to the Registers of Deeds of all counties of the State in order to list as nearly as possible the approximate number of unlicensed lenders, and while, of course, no exact statement can be made, in the opinion of the Committee, the approximate number of unlicensed lenders in the State of Wisconsin, not subject to any regulation whatsoever would probably exceed 800. However, your Committee wishes to make it plan that this number does not include other branches of consumer credit which relate more particularly to household furniture, clothing, radios and branches other than automobile financing. If these were included the estimated number of unlicensed lenders and dealers in installment purchase agreements would be increased to approximately 3,000.

Finance charges and true interest rates will be discussed more in detail under the Chapter entitled "Finance and Interest Charges".

Exhibit 1

## ABUSES

Due to the rapid changes from the pioneer who was largely self-sustaining to the present day individual who is dependent on the inter-relation of society as a whole, companies engaged in financing installment sales or in loaning money to the millions who have no banking credit have grown rapidly with little or no public regulation or restriction.  It is only natural under such conditions that evils and abuses should develop.  That those evils and abuses have aroused much adverse criticism is generally recognized.  The Committee feels, however, that much of this criticism is unwarranted, and is made by those who do not understand the hazards and cost analysis of consumer credit agencies, or who, understanding, have an axe to grind.  Your Committee feels that intelligent regulation and supervision will go a long way toward eliminating the evils and abuses of the finance business as hereinbefore discussed.

*Reserves, Rebates and Packs:*  In order to get a clear conception of what is meant by "Reserves, Rebates and Packs", it is necessary to understand something of the contractual relationship existing between the dealer and the finance company when receivables are sold and transferred. Automobile conditional sales contracts, chattel mortgages, and receivables are classified under three main heads by reason of the agreement between the dealer and the finance company at the time of transfer, as follows:

1. With recourse:  wherein the dealer guarantees the contract absolutely, and in the event same is not paid in accordance with its terms, the finance company may call upon the dealer to make good and take up the contract.  With the exception of old makes of cars, or new cars sold with a small down payment, very little paper is handled under this plan.

2. Contracts transferred without recourse:  Under this plan the dealer is under no obligation whatever to make good on receivables sold unless it be for fraud or misrepresentation.

Exhibit 1

3. Contracts sold with repurchase agreements: Under this plan it usually is incumbent upon the finance company to return the automobile financed to the dealer within 90 days from the date of default. Usually the finance company protects the dealer against collision, with the exception of the first fifty dollars, and likewise protects the dealer against confiscation. If the automobile is returned within 90 days after default, the dealer must then make good on the unpaid balance of the contract. The repurchase agreement is quite often modified or added to, and in some cases the dealer is protected by the finance company from large losses due to repossessions in any one calendar year. Probably sixty-five per cent of all automobiles financed today are financed under this plan of repurchase agreement.

*Dealer's Reserve:* The dealer's reserve is an allowance out of the charge set forth in the printed discount chart. This amount is a certain percentage allowed the dealer on receivables transferred by him by reason of a special understanding or agreement between the dealer and the finance company.

The amount of reserve allowed is usually from one to three per cent of the receivables on new cars and two to five per cent of the receivables on used cars. Hence, if the balance on a new car is $300, the dealer's reserve would range from $3.00 to $9.00, while the same balance on a used car would net the dealer as a reserve from $6.00 to $15.00. The theory underlying the larger reserves, rebates and packs allowed on used car deals over new is that the hazards of the used car business, repossession sales, etc., are from two to two and one-half times that of new car deals.

While installment financing of automobiles began in 1914 or 1915, the Committee finds that somewhere during the period between 1923 and 1925 it really got under way and there were operating in the finance field several large national companies which purchased conditional sales contracts, chattel mortgages, and receivables from the dealers, with recourse. At the same time there were developing many individual and independent companies, who, seeking a larger share of this branch of consumer credit business, began to purchase contracts without recourse and therefore

Exhibit 1

— 35 —

diverted a large amount of automobile receivables into these channels.

To counteract this trend, the large national companies began the practice of allowing reserves to their dealers, and the independent companies, in order to offset this likewise began the practice of allowing rebates on non-recourse paper. Keen competition then developed between all finance companies, whether independent or nationals, to secure the dealer's business. The result has been to enhance the evils of reserves, rebates and packs. Today, when a dealer makes arrangements to finance his paper, his first question is, "How much do I get and when do I get it?"

In regard to reserves, rebates and packs, the Committee is of the opinion that the business has developed along this line where the proverbial slogan is in order: "Everyone for himself and the Devil take the hindmost." Inasmuch as the reserve, rebate, or pack must necessarily be paid by the consumer it logically follows that he is the "hindmost".

The Committee finds that quite often rebates are concealed in reserve allowances, and while excessive dealer's reserve is set up and paid as such, a portion of the said amount is in reality a rebate.

The argument was made before the Committee that reserves were necessary for the reason that under repurchase agreements the dealer is subject to a loss hazard, and that inasmuch as he could not tell in advance what the expense would be for reconditioning or what price might be realized, it was necessary to secure additional revenue as a contingent reserve to protect the dealer against a possible loss on the resale of repurchased merchandise. The Committee finds, however, that while there may be some merit to this contention and a small reserve might be justifiable under certain conditions, the net result of allowing dealer's reserves, rebates and packs operates in a vicious circle, and that under the present mode of operation in the important field of automobile merchandising and credit finance, the original purpose of the dealer's reserve, rebate and pack has been lost sight of, and that said items are used to make additional profit not legitimately earned.

It is significant that no N.R.A. code for finance companies was ever adopted, although a meeting for that purpose was

Exhibit 1

— 36 —

held at Washington, D. C., on October 26, 1933.   The principal reason for no action was apparently the question of reserves, rebates and packs, although coercion of dealers came in for discussion.   From information obtained by this Committee, it appears that independent companies desire dealers to be free from coercion, and the majority of these companies likewise desire the elimination of reserves, rebates and packs.   While national companies claim to be against rebates and packs, they are accused of using the reserve proposition, which they seem to favor, as a screen to conceal payment of rebates and packs.

*Rebates:*   An evil which is not quite so common as the dealer's reserve or pack is what is known as a rebate.   Under the rebate plan, the finance company, by special agreement with the dealer, furnishes him with their regularly authorized charges as set forth in their printed chart, but agrees to and pays said dealer a certain amount in cash on each deal accepted by them, at specified intervals, usually monthly, which goes to the dealer without any restriction whatever.

*Packs:*   Your Committee finds one of the problems existent in the auto finance field is what is know as the "dealer's pack".   Apparently during the last few years a practice has grown up among dealers under which there is added to the dealer's charge or interest for financing the balance due on the sale (but not the expense of repossession), together with insurance charges, an additional amount known in the trade as a "pack".   The consumer is not informed of this and is led to believe that the finance company receives the total, which is unfair to the finance company.   This additional amount is received by the dealer from the finance company which is willing to be a party to such transactions at the time of the sale of the receivable to them or at the time same has been fully paid, or is credited to a reserve account in favor of the dealer, payable as the dealer's outstandings with the finance company decrease.

To gain a clear understanding of the dealer's pack, it should be understood that this abuse was not common until 1930.   Apparently prior to that time there were comparatively few repossessions, but about 1930 the dealer's pack originated, probably from the desire to recoup losses on ac-

Exhibit 1

— 37 —

count of increased repossessions and sales.  At the beginning, therefore, the necessity of the dealer's pack was perhaps founded on good intentions, although it must not be forgotten that increased competition by finance companies for dealer's business accelerated this evil.

In line with the general practice of extending installment credit, the customer is usually kept in ignorance not only as to the amount charged for financing but also as to the amount of pack.  In many instances, the Committee found a larger amount had been financed than had been agreed upon by the dealer with the consumer.  The Committee also found that frequently it was a practice among dealers to have more than one rate chart, and that customers are often sold on the basis of a high rate chart while they are actually financed by a company whose chart gives a relatively lower one; the difference in the two rates being the dealer's additional profit.

In this connection also, it might be stated that the Committee found considerable difference in insurance plans offered by finance companies and a corresponding difference in insurance rates.  The consumer is very often under the impression that he is getting full coverage insurance when as a matter of fact he is getting insurance that is very much restricted and of a deductible nature.  This makes considerable difference in the quoted chart rate, inasmuch as the rate expressed in the chart includes a certain amount for insurance.  As the quoted rate, including the insurance, is a lump sum charge, it may often happen that the supposedly lower rate is actually the higher rate, when the difference in the plans of insurance protecting the customer is taken into consideration.  However, by using the lower rate with the restricted amount of insurance, when the customer believes he is securing full coverage, the dealer is able to likewise add materially by this subterfuge to his pack.  Instances came to the Committee's attention where insurance was charged the consumer but none was written.

One of the most common and vicious examples of adding a dealer's pack was found to be the habit of quoting the consumer a certain unpaid balance, with considerable vagueness as to finance charges, and having the conditional sales contract and note signed by the purchaser before being com-

Exhibit 1

— 38 —

pletely filled. Later, without the knowledge and consent of the consumer, an additional amount was inserted in the contract and note.

The Committee finds that with very few exceptions there is no breakdown of charges to the consumer at the time he makes his purchase or his loan. Only too often the customer is given the impression that a considerable portion charged him for financing the deal or in making the loan is necessitated by insurance charges, and therefore the actual cost of financing the proposition is relatively low. This, however, is contrary to fact.

It is quite a common occurrence in the selling of used cars when a supposedly shrewd buyer has reduced the purchase price of a deal to find the reduction has been added to the finance charge in the form of an additional pack.

The Committee finds that the most common pack is approximately ten dollars and usually ranges from $10.00 to $25.00 although instances were found, particularly in the larger urban centers, where the pack was as high as $40.00 or more.

The practice of adding packs in automobile sales financing, once begun, injected into the business unmitigated evil, due to the fact that the shrewd dealer learned to shop around, and now places his business with the finance company who will give him the largest pack and reserve. Therefore, finance companies who dislike to allow reserves and packs are obliged to do so in order to meet competition. This practice, of course, fluctuates somewhat with the change in credit conditions or the money market, but generally speaking, since its inception in 1930, it has grown to be a common practice and has placed the finance companies in a position from which they would like to extricate themselves but are unable to do so.

*Floor Planning:* One evil that the Committee found has more or less to do with the question of fair trade practices between finance companies and hence has some effect upon charges, is what is known as "floor planning".

A majority of the dealers in automobiles are not financially strong enough to finance their purchases of cars for display and sale purposes. Therefore, the practice has grown up among finance companies, particularly the group

Exhibit 1

— 39 —

which purchase receivables from the dealers, to finance the dealers' cars on a plan whereby a small rate of interest is paid by the dealer to the finance company until the automobiles are sold. In most cases the finance company makes little or no profit in floor planning the dealers. In fact, in many instances, it would appear that finance companies even floor plan at a loss.*

The Committee realizes, of course, the necessity for this branch of service if dealers are to engage extensively in the automobile business, but the evil of floor planning is the general tendency to coerce dealers into financing sales through the finance company who does the floor planning. Consequently, a dealer not being free to place his merchandise sales contracts where he chooses, is under the necessity of turning the contracts of his customers over to his floor planning finance company. The Committee might mention in this connection, also, that as between the finance companies themselves, due to the rapid growth of the large national companies and the influence which they have upon the business through this system of floor planning, there is grave danger of individual companies being driven out of business.

Individual companies fill an important place in this field and are rendering a distinct service. From the testimony received, it very often appeared that consumers who were unable to meet their payments with an investment purchase company, particularly the larger concerns, and who were in danger of losing their equity by reason of repossession, were refinanced through the smaller independent concerns, particularly those making cash loans, such as finance companies who loan directly by chattel mortgages on automobiles and small loan companies. It is, furthermore, the thought of the Committee, that if such practices are allowed to continue unrestricted and individual concerns are driven out of the field, there will be less competition resulting in increased rates and other costs.

---

(* NOTE—The Committee wishes to distinguish between "floorplanning" as herein used and the plan adopted by some finance companies to handle sales through dummy operators. These operators, while ostensibly dealers, have no money invested and are merely employees of the finance companies which absorb all the profits.)

<u>Exhibit 1</u>

— 40 —

*Concealed Charges:* While the question of rates and charges will be discussed in another chapter, it was thought not amiss to discuss in connection with abuses, the evils of concealed charges in the matter of consumer credit.

In financing merchandise credit outside of the cash credit granted by small loan companies, the consumer has little or no knowledge of what it costs to finance his time payments. As a matter of fact, the majority of the dealers selling automobiles do not understand finance charges themselves. The customer is often led to believe that the lump sum finance charge which is quoted the purchaser at the time of purchase, or when he makes a loan on his automobile, is small for the reason that insurance charges are included in the total amount and constitute a large portion of the lump sum charge. In many instances the consumer is led to believe that the finance charge is about 8 per cent. However, most people are unable to differentiate between smiple interest and discount in advance. They do not know that 8 per cent discount in advance is equivalent to approximately 14.77 to 17 per cent true interest, depending on whether or not discount is carried or received in advance; that 10 per cent in advance is equivalent to 18.86 to 22.64 per cent; that 12 per cent in advance is equivalent to approximately 22.66 to 24 per cent; and that 15 per cent in advance is approximately 28 to 30 per cent.

Because of this ignorance of true interest comparisons, the concealed charge has been, in a great many instances, the instrument causing the consumer to pay exorbitant rates; the greatest abuse in merchandising and cash credit.

The Committee found many instances, and believes it can state without fear of contradiction, that the majority of consumers when entering into merchandise sales contracts or making direct loans on a flat charge basis are under the impression that they are paying from 8 to 12 per cent interest. As a matter of fact, however, their true interest rate ranges from 17 to 40 per cent, and in many cases considerable more.

From information obtained by the Committee, it appears that the true interest rates of finance companies making flat rate charges, are usually not understood by the consumer and often are actually misrepresented to him.

Exhibit 1

— 40 —

*Concealed Charges:* While the question of rates and charges will be discussed in another chapter, it was thought not amiss to discuss in connection with abuses, the evils of concealed charges in the matter of consumer credit.

In financing merchandise credit outside of the cash credit granted by small loan companies, the consumer has little or no knowledge of what it costs to finance his time payments. As a matter of fact, the majority of the dealers selling automobiles do not understand finance charges themselves. The customer is often led to believe that the lump sum finance charge which is quoted the purchaser at the time of purchase, or when he makes a loan on his automobile, is small for the reason that insurance charges are included in the total amount and constitute a large portion of the lump sum charge.   In many instances the consumer is led to believe that the finance charge is about 8 per cent.   However, most people are unable to differentiate between smiple interest and discount in advance.   They do not know that 8 per cent discount in advance is equivalent to approximately 14.77 to 17 per cent true interest, depending on whether or not discount is carried or received in advance; that 10 per cent in advance is equivalent to 18.86 to 22.64 per cent; that 12 per cent in advance is equivalent to approximately 22.66 to 24 per cent; and that 15 per cent in advance is approximately 28 to 30 per cent.

Because of this ignorance of true interest comparisons, the concealed charge has been, in a great many instances, the instrument causing the consumer to pay exorbitant rates; the greatest abuse in merchandising and cash credit.

The Committee found many instances, and believes it can state without fear of contradiction, that the majority of consumers when entering into merchandise sales contracts or making direct loans on a flat charge basis are under the impression that they are paying from 8 to 12 per cent interest.   As a matter of fact, however, their true interest rate ranges from 17 to 40 per cent, and in many cases considerable more.

From information obtained by the Committee, it appears that the true interest rates of finance companies making flat rate charges, are usually not understood by the consumer and often are actually misrepresented to him.

Exhibit 1

— 41 —

It is interesting in this connection to note that in the recent hearing on Code of Fair Practices and Competition presented by the Finance Company Industry in the National Industrial Recovery Administration, under date of October 26, 1933, the Consumers Advisory Board, in touching upon this question, asked to have the following written into the finance companies' code:

> "No finance corporation shall accept installment paper from any retailer unless the price differential between cash and deferred payment price be expressed not only as money but as a percentage computed on the basis of the current unpaid monthly balance.   This percentage differential, like the present money differential, may properly include the cost of insurance, where the seller has an insurable interest in the merchandise for which credit is extended".

The Consumers Advisory Board bases its request on the following four points:

1. Whenever goods are sold on deferred payment the seller performs two distinct and separate functions—the sale of merchandise, and the extension of credit for which a charge is made.

2. Whenever a charge is made for the extension of credit this charge, like the price of merchandise, should be stated in terms which make it readily comparable with all prices for the use of money repayable in monthly installments.

3. There is only one accurate way to express the price of the use of money—by a given percentage on a given principal for a given time.   Any other method of statement permits juggling with one of the two variables—principal and time.

4. In installment credit the outstanding amount of credit declines from month to month.   Therefore, the only accurate and outspoken way to express the charge for this type of credit is in terms of a given percentage on the current unpaid monthly balance.

This request was not accepted at the code hearing and probably is not considered authoritative.   It brings out however the necessity of a measuring stick in order that the prices for the use of money may be correctly compared. It has been urged that the measuring stick should be expressed in actual dollars rather than as a percentage, as it is claimed this method is more easily understood by the

Exhibit 1

— 42 —

consumer.   While there is some merit to this contention, it is by no means as simple as it seems and the percentage measuring stick if accurately applied would undoubtedly give correct comparisons with the least amount of effort. The deferred interest plan as the Committee understands, has been adopted under the uniform small loans act and is now in use by companies operating under that act in twenty-six states in the extension of cash credit.

However, while this method is undoubtedly the fairest way of acquainting the consumer with the exact amount of interest he is to pay, he being charged only on the amount remaining due and unpaid each month, still it might not be the best plan to inaugurate at this time on all lines of consumer credit.   Automobile companies and other merchandise credit agencies have been financing sales and making direct loans for many years under the flat charge, with equal monthly payments.   While this plan has many abuses, as has been outlined in this report, still it has become a custom in a great volume of merchandising and cash credit business.   In fairness to the consumer the plan of figuring the interest on monthly unpaid balance should eventually be adopted.   Certainly, no plan should be allowed to continue in existence which has a tendency to conceal charges and mislead the consumer as to what he pays for financing the purchase of merchandise or for making a cash loan.   It is hoped, therefore, that finance companies will voluntarily begin to adopt a deferred interest plan, or some plan easily understood, so that the consumer may know in all cases exactly what he is paying for financing his time payment or in making a loan.

However, the Committee does not wish to work an injury to the finance business.   It realizes that the whole financial structure of these institutions is now founded upon the flat rate plan; that books and rate charts are based thereon; and that any immediate radical change would be costly, expensive and likely to work irreparable damage to the business.

It is necessary, however, that some plan be adopted which will bring all hidden charges into the light.   The Committee believes that it would be no hardship upon auto finance companies, and in fact any consumer credit agency

<u>Exhibit 1</u>

— 43 —

which operates on the flat rate plan, to give the consumer at the time of his purchase or within a relatively short time thereafter, a detailed statement of the entire transaction, giving the cash price, the time price, the insurance cost, and the exact finance charge including dealers reserve, rebate and pack, expressed in dollars and cents and as an annual percentage on the average amount of credit granted. In the event of a dealers reserve, rebate and pack, or any of them, it might be well to have the amount stated separately but the stated finance charge should include the amount of reserve, rebate and pack, or any of them. At the same time the policy or certificate of insurance should be given to the consumer, together with a statement of the amount of insurance, nature of the policy and protection afforded.

*Prepayments:* When a consumer has entered into a contract for making payments on merchandise purchased, or for making payments on a secured loan, he occasionally is able to pay off said contract or loan prior to the specified installment payment dates. The finance companies apparently have no set rules in regard to refunds in such cases. From the testimony received by the Committee, very little is refunded, and because of this fact, a consumer who liquidates his obligation quickly pays an enormous rate of interest. One of the principal reasons why a larger refund is not paid to the consumer is because a portion of the finance charge has already been paid to the dealer in the form of a pack, rebate and reserve. It is usually a difficult matter and rather embarrassing for the finance company to request the dealer to pay back money which he has already received. Therefore, the practice is to settle with the consumer for as little as possible in order not to have a loss on the transaction.

While prepayments are the exception to the rule, still they are of sufficient frequency to justify attention. There is no abuse in the finance business which gives a greater amount of unfavorable criticism to the entire business than failure to make equitable refunds. Assume, for instance, that on a $150.00 loan for twelve months, with $30.00 finance charge exclusive of insurance cost, the consumer is able to pay same at the end of two months. If he received

Exhibit 1

no refund, he has had the use of $150.00 for the first month and $135.00 for the second month, for which he has paid $30.00, or in other words, he has paid $15.00 per month to finance the average amount of $142.50. The true interest rate on this transaction is approximately 126 per cent. This is but an example of what often happens in regard to prepayments computed on the flat charge, and very little can be said by finance companies who refuse to make equitable refunds, to criticism of this practice.

On the other hand, assume this loan had been made from a loan agency such as a small loan company which figures interest only on deferred payments. The consumer, having had credit for $150.00 the first month and $138.50 the second month, is charged for interest during the time he had the use of the money $3.50 the first month, $3.27 the second month, or a total of $6.77. The true interest rate is approximately 23 per cent as compared to 126 per cent; a saving in interest charges of $23.23 to the consumer.

*Delinquencies:* The Committee finds that finance companies have no set rule in regard to charges for delinquencies. Some companies appear to charge very little or nothing, while others charge penalties or a large rate of interest on deferred payments, or both. Without question, in many finance companies these charges for delinquency add very materially to the purchaser's cost of financing. In many instances, an added charge is made for calling upon the consumer to collect. It is the thought of the Committee that some reasonable charge for delinquency is justifiable. Otherwise, it can readily follow that rates would be increased and the consumer who pays promptly would thus be discriminated against in favor of the delinquent. Well regulated, reasonable charges for delinquency would no doubt reduce such delinquencies and the cost of doing business.

*Repossessions:* In case of default of the payment when due, or for breach of other conditions in the sales contract, receivables or chattel mortgage, the finance company is entitled, if it proceeds in the proper legal manner, to possession of the automobile or other security. Security taken in this manner is known as repossession. In many instances, repossessions are necessary and justifiable, but the

Exhibit 1

Committee found many abuses under this heading. In many instances the repossessions were not justifiable, but were apparently used for the purpose of augmenting by penalties and otherwise the amount payable by the consumer under his contract.

In many instances when the installment was slightly overdue, cars have been seized from off the street or from the owners garage and taken by the finance companies usually without any notice whatever. In some instances the owner of the car not knowing what had become of his car, reported the loss to the police thinking his car had been stolen.

In a great many instances when the owner of the car reported at the finance company's office to redeem his car he was subjected to considerable additional charges and found to obtain possession of his automobile he must pay, in addition to his installment or installments due, together with delinquent interest or penalties on deferred payments, a further sum usually ranging from $5.00 to $15.00 which was claimed to be a repossession charge. In some instances this repossession charge has run as high as $40 to $50.

*Skip Tracing:* Many of the finance companies have among their list of employees, either on part time or full time, someone who is known as a skip-tracer. This skip-tracer is supposed to locate individuals who have moved not leaving any address or who have absconded with the automobile, and an extra charge is made for his services. The Committee found instances however where consumers had filed notices of their new addresses with the finance companies but nevertheless skip-tracers were sent out and an extra charge made.

In fairness to skip tracing, the Committee wishes to state that there are instances when this class of service is necessary. Many people will take advantage of allowing their payments to run past due when they have changed their residence and feel they are out of reach of the finance company for the time being. In many cases, however, this has been used by certain concerns who call themselves finance companies as a racket or a means for adding additional costs upon the consumer.

Exhibit 1

*Illegal Sales:*  One of the very common abuses, particularly among finance companies dealing in used cars, is that of illegal sales of the automobiles repossessed. Automobiles were advertised for sale and notices sent out. However, in many instances, no sale was held, but affidavits and papers were made to the effect that said sale had been held. In some cases, it was found that when the owner of the car had procured the necessary money and appeared at the company's place of business to redeem his automobile he was informed that he was late and the car had already been sold. Usually the finance company or dealer bids the automobile in at a ridiculously low price, then sells the automobile to someone else and after making a large profit thereby, secures a deficiency judgment against the consumer.

The number of illegal sales coming to the attention of the Committee was surprising. These instances were not only reported to the Committee, but many of them were verified by first hand evidence from representatives of the Committee who appeared at the finance company's place of business when the sales were supposed to be held.

*"Finance Kiting":*  One of the most vicious abuses was what the Committee would term as "finance kiting". The consumer calling upon the finance company to which he was making payments was told that his contract had been sold to some other agency. Upon inquiry at this agency, the consumer found that his paper had been sold to another. By the time he finally caught up with the concern which actually owned his paper, he was in default and penalties and additional costs were added. Usually an attempt was then made by that finance company to refinance the transaction in the company which then owned the paper.

It seems reasonably certain to the Committee that in some instances there exists a concerted attempt among rings of finance companies, particularly in urban centers, to place the consumer in default in order to secure his refinancing, or a reinstatement fee. In some instances, the consumer, under the efforts of this refinancing ring, actually paid during a single year as much for refinancing charges as his unpaid balance amounted to at the beginning of the year. That is to say, if the consumer financed $300, by the end of the year he had paid $300.00 for finance

Exhibit 1

charges and still owed the initial $300.  This means, of course, that the financing of the $300.00 had cost him from 100 per cent to 200 per cent, depending upon the amount he had reduced his principal.  In fairness, however, to the finance companies, it should be stated that this abuse is not the practice of the higher types of finance companies but is of sufficient frequency in certain localities to require comment.  It is one of the first abuses which should be eliminated, inasmuch as this abuse brings a great deal of adverse criticism, not only against the concerns and individuals who are guilty of indulging in this racket, but on companies who are doing business on a reasonable basis as well.

Under this heading, it may be noted that in some instances it seems apparent that consumers are financed for higher amounts than they can possibly pay.  Apparently this is done deliberately by an occasional finance company for the purpose of securing possession of the automobile, through inability of the consumer to meet his obligations.

*Insurance Misrepresentation:*  The Committee finds that the consumer is very often under the impression when financing his unpaid balance or in making a direct loan on his automobile, when as a matter of fact it is very much restricted and is of a deductible nature.  Some plan should be adopted whereby the consumer would receive a policy or a certificate of insurance in which the exact kind of coverage carried is clearly stated.  Furthermore, the memorandum of cash price, time price, and finance charges should also include the cost of the insurance (manual rates maximum) together with a statement of the exact kind and amount of insurance.

The Committee finds that in case of prepayment, when the entire credit or loan is paid up within a short period, there seems to be no definite arrangement for refunding of unearned premiums on the insurance.  Letters of complaint to the Insurance Commissioner from those who have complained that they receive no refund from the cancellation of insurance with many finance companies have been presented to the Committee.  Many of these letters state that they were unable to get any statement from the com-

Exhibit 1

panies in regard to the amount of refund due them on insurance policies.

*Misleading advertising:* Advertising either by newspaper, letters, or otherwise, which misleads the public, should be eliminated. Instances are common of advertisements by dealers and finance companies, containing misleading statements among which are the following: "No down payment required." "Buy now, Easy Payments." "Repossession Sales Held Here.", etc. The "No Down Payment" ad nearly always means that the consumer pays the down payment in installments before he has really made a purchase and is thus at the dealer's mercy. The autos are not sold without a down payment, but deposits are held until the consumer has enough paid in to purchase and then finds he has agreed to buy a car, usually to be selected by the dealer. "Easy Payments" is a misnomer to catch the unwary and Repossession Sales are advertised to make the public think bargains are being offered, when as a matter of fact no repossessed cars are actually on hand for sale.

The tendency of soliciting by letter, students just completing school and others who should not purchase merchandise or make necessitous loans, should be discouraged.

*Fraudulent sales of mortgaged, wrecked and stolen motor vehicles:* The Committee finds that it is the practice of certain unscrupulous individuals to buy wrecked motor vehicles, have them repaired, and then offer them for sale as new cars or as good as new. Furthermore, it appears that many wrecked cars have been purchased by such persons for the purpose of obtaining title thereto. These individuals having obtained other cars of similar models either by fraudulent means or by actually stealing the same, then exchange the motors or change the serial numbers to correspond to the titles of the wrecked cars. This is a convenient and common method for these unscrupulous persons to obtain apparently legal titles to stolen cars which they offer for sale.

The Committee finds that over 24,000 used motor vehicles, formerly licensed or used in another state or country, were licensed in Wisconsin during 1934. While no exact statement can be made, it is believed that a large num-

Exhibit 1

— 49 —

ber of these motor vehicles were subject to chattel mortgages, conditional sales contracts, or were stolen.

The Committee feels that some method should be adopted to have a more complete check upon all such motor vehicles applying for licenses in this state and that before any such motor vehicle is offered for sale in Wisconsin, it should have a Wisconsin license.

Apparently many of the states have certificates of title to motor vehicles similar to Wisconsin, while other states only require registration cards. It would seem, therefore, under all of the circumstances, that the purported owner of a motor vehicle which has been used and licensed in another state or country, applying for a Wisconsin license should be required by the Secretary of State to give a sworn affidavit, stating among other things, the title status of the automobile and should be further required to have the physical description of the vehicle given in the application checked and certified by either a sheriff, deputy sheriff, police officer, or other reliable person.

Exhibit 1

## FINANCE AND INTEREST CHARGES

While volumes have been written on the subject of finance and interest charges for consumer credit, the subject is very little understood. This is no doubt due to the fact that under the flat rate charge of finance companies in the automobile and other merchandising fields, the rate has not been expressed in terms of true interest, but in a lump sum. Furthermore, most of what has been written on this subject has been of such a technical nature that only the most experienced individual in consumer credit finance or an expert in mathematics would be able to absorb the same, much less to pass on the information to the average individual.

The Committee feels, from the investigation, that a great many carrying charges are too high and some even exorbitant; that they would like to see these carrying charges or interest rates lower than they are at the present time. However, it must be taken into consideration that cash and merchandise credit can never be handled under regular commercial bank rates of interest. It must be understood that consumer credit in all its branches is highly specialized and while charges to the consumer should be as low as possible, they should not be so low as to prevent capital from entering the consumer credit field. Otherwise, competition will be stifled, and interest rates instead of decreasing will increase. Furthermore, there is grave danger when finance charges and interest rates are too low of driving the smaller individual companies out of business and turning such business over to the national companies. This result would likewise eventually cause increased rates to consumers.

It should be further realized that a small item of consumer credit entails as much detail as a large extension of credit in a bank. There are investigations, reports, follow up correspondence, and a multitude of things necessary to furnish this service. There is much less overhead of this kind in regular commercial banking. Finance companies must keep a large reserve of cash on hand, and the cost of money has to be considered as a factor in the business. Therefore, a portion of the high cost of consumer

Exhibit 1

## FINANCE AND INTEREST CHARGES

While volumes have been written on the subject of finance and interest charges for consumer credit, the subject is very little understood. This is no doubt due to the fact that under the flat rate charge of finance companies in the automobile and other merchandising fields, the rate has not been expressed in terms of true interest, but in a lump sum. Furthermore, most of what has been written on this subject has been of such a technical nature that only the most experienced individual in consumer credit finance or an expert in mathematics would be able to absorb the same, much less to pass on the information to the average individual.

The Committee feels, from the investigation, that a great many carrying charges are too high and some even exorbitant; that they would like to see these carrying charges or interest rates lower than they are at the present time. However, it must be taken into consideration that cash and merchandise credit can never be handled under regular commercial bank rates of interest. It must be understood that consumer credit in all its branches is highly specialized and while charges to the consumer should be as low as possible, they should not be so low as to prevent capital from entering the consumer credit field. Otherwise, competition will be stifled, and interest rates instead of decreasing will increase. Furthermore, there is grave danger when finance charges and interest rates are too low of driving the smaller individual companies out of business and turning such business over to the national companies. This result would likewise eventually cause increased rates to consumers.

It should be further realized that a small item of consumer credit entails as much detail as a large extension of credit in a bank. There are investigations, reports, follow up correspondence, and a multitude of things necessary to furnish this service. There is much less overhead of this kind in regular commercial banking. Finance companies must keep a large reserve of cash on hand, and the cost of money has to be considered as a factor in the business. Therefore, a portion of the high cost of consumer

Exhibit 1

— 51 —

credit is caused from extra service necessary in this branch of business.

The Committee believes that were it not for a few of the abuses now existent on unregulated business such as dealer's reserves, rebates and packs, concealed rates, etc., the majority of the automobile finance business would be on a fair and reasonable basis, and at a rate which under all of the circumstances, would not be unfair to the consumer. However, by the addition of extra charges to the consumer, through outside influences which have grown up in the trade, there are practices which should and must be eventually eliminated if this business is to continue and have a healthy existence.

The Committee believes that a clearer picture of finance and interest rates and the insidious influences which tend in most cases to make them exorbitant can be better explained by giving some concrete examples of instances whch the committee finds is common to the business:

Mr. A. purchases a new Plymouth automobile, and the agreed balance after down payment or trade-in is $400.00. The finance charge for a period of 12 months, including insurance, is $63.44. Fire and theft insurance, including physical accessary damage and $50.00 deductible collision, costs approximately $17.70 in the City of Madison, upon which the finance company makes a profit of about 25 per cent. The actual finance charge therefore is $45.74. Inasmuch as monthly payments are being made, the consumer has ths use of $400.00 for six months only, or the yearly cost for financing $400.00 is twice $45.74, or $91.48. $91.48 divided by 400 gives approximately the true annual interest rate or 23 per cent. In the example just given, it should be noted that a break down of the finance company's charges in this respect is as follows:

| | |
|---|---|
| Dealer's Reserve (repurchase basis) | $ 8.00 |
| Cost of money—6% (approximate) | 12.00 |
| Finance Company's Loss Reserve | 4.00 |
| General Administrative Expense per Contract | 17.50 |
| Balance for Profit, State and Federal Taxes | 4.24 |
| | $45.74 |
| Insurance | $17.70 |
| Total | $63.44 |

Exhibit 1

— 52 —

Therefore, in this instance, the finance company made $4.24 on this transaction, plus $4.42 commission on the insurance. Out of this, of course, they must pay state and federal taxes.

It should be noted that if there were no dealer's reserve to pay, and the contract was on a repurchase agreement, the finance charges could be reduced by $8.00, leaving a balance of $37.74, or in other words, the true interest rate would then be approximately 19 per cent. In the event the paper were sold on a non-recourse basis, this reserve could be reduced approximately $5.00, making the true interest rate 20.37 per cent.

Now let us examine the proposition from the standpoint of what the consumer pays when the finance charges are augmented, as they are in a great many cases, not only by reserves but the addition of a pack. Assume that a pack is included of $10.00 which is quite an ordinary amount. The net finance charge in this instance would be $55.74, and the rate would be approximately 28 per cent.

Let us now assume that a pack of $25.00 is added, as is frequently the case in the larger urban centers. The net finance charge is now $80.74, or the true interest rate is approximately 40.37 per cent.

Let us assume Mr. A's balance on the foregoing purchase is $250.00, and the ordinary finance charge for 12 months would be $30.44, the true interest rate on a 12 months' basis would be approximately 24 per cent. Included in this is a dealer's reserve of $5.00. If this could be eliminated, the true interest rate would be approximately 20 per cent. On the other hand, assume that in addition to the quoted rate a $10.00 pack is added. The rate would then be approximately 32 per cent. Assume that a $20.00 pack is added, the rate is then approximately 40 per cent.

In used automobiles, it is usually customary to furnish collision insurance ($50.00 deductible) only with the lighter makes of cars, such as the Ford, Chevrolet, Plymouth and Terraplane. 65 per cent of the used car business appears to be written on these makes of cars.

Mr. A. purchases a 1933 used Plymouth automobile with an unpaid balance of $250.00. The finance charge is $59.35 on a 12 months' basis, $10.75 fire and theft and

Exhibit 1

$50.00 deductible collision insurance (manual rates), leaving the net finance charge $48.61. The true interest rate is approximately 39 per cent. The ordinary dealer's reserve under this would be $10.00 on a repurchase agreement and $5.00 non-recourse. It can readily be seen that if this reserve could be eliminated, there would be a considerable reduction in the rate. Assume that a $15.00 pack is added, the true interest rate would then be approximately 51 per cent.

In this connection, it should be noted that all the above rates are given on a basis of twelve monthly payments. If, however, the payments are made over a longer period, such as fourteen or eighteen months, the service charge and true interest rate are correspondingly higher. (For instance in the example first made of financing $400.00 on a new Plymouth, the true interest rate instead of being 23 per cent on a 12 months basis is approximately 30 per cent on an 18 months basis.)

*Other Merchandising Charges:* It should be understood that finance companies handling merchandise and cash credit loans do not charge as high a rate of interest, even under all of the abuses mentioned, as do other merchandising agencies. The Committee found in its investigation and in particular, testimony from one large chain organization which sold washing machines, household furniture and household utensils either on cash or on time, that the differential between the cash price and the time price ordinarily ranged from 30 per cent to 70 per cent. One large chain organization in selling furniture, after thirty days adds an additional charge which in some instances makes the true interest rate on the same if paid shortly after the thirty day period range from 75 per cent to 150 per cent.

It should also be taken into consideration that this was not merchandise with a standard price, but was merchandise in which the concerns handling the same had the opportunity to increase the price materially.

A table of comparative charges and true interest rates of two large chain department stores operating in the state of Wisconsin might be interesting. It will be noted that where there is a difference between these two it is indicated

Exhibit 1

— 54 —

by parentheses.   It should also be noted that the annual rate can be obtained by multiplying the per cent per month by twelve, as for instance, the first item of $20 the true annual interest rate is approximately 58 per cent.

| Cash Price Bill of Goods | Down Payment | Amount Financed | Total Amt. Repaid Monthly | No. of Months to Repay | Total Carrying Charge | Av. Int. Rate on Unpaid Bal. Corresponding to Total Carrying Charge % Per Month |
|---|---|---|---|---|---|---|
| $20.00 | $3.00 | $17.00 | $4.00 | 5 | $2.50 | 4.84 |
| 25.01 | 3.00 | 22.01 | 5.00 | 6 | 3.00 | 4.42 |
| 30.01 | 4.00 | 26.01 | 5.00 | 6 | 3.50 | 3.78 |
| 35.01 | 4.00 | 31.01 | 5.00 | 8 | 4.00 | 3.13 |
| 40.01 | 5.00 | 35.01 | 5.00 | 9 (8) | 5.00 (4.50) | 3.07 (2.80) |
| 50.01 | 5.00 | 45.01 | 6.00 | 9 | 5.50 | 2.51 |
| 60.01 | 6.00 | 54.01 | 7.00 | 9 | 6.50 | 2.42 |
| 70.01 | 7.00 | 63.01 | 7.00 | 11 | 7.50 | 2.09 |
| 80.01 | 8.00 | 72.01 | 8.00 | 11 | 8.50 | 2.07 |
| 90.01 | 9.00 | 81.01 | 8.00 | 12 | 9.50 | 1.85 |
| 100.01 | 10.00 | 90.01 | 9.00 | 12 | 10.50 (11.00) | 1.86 (1.94) |

The Committee found instances, however, where the finance charge was considerably greater than that quoted in this table.   In one case particularly an article of merchandise was handled through finance companies under a plan wherein the total charge for financing after allowing a fair profit for the manufacturer, cost the consumer an interest rate of 326 per cent.

In this connection, the Committee wishes to state that it would be of great benefit to the consumer if banking facilities were extended more liberally on manufacturer's receivables.   When goods are sold on credit, either wholesale or retail, the cash on these accounts is expected to be received shortly by the company; bank loans can usually be obtained to assist in replacing capital thus invested.

However, in many instances, banking credit has not been forthcoming for this business and consequently, the companies selling goods on credit have to resort to finance and discount companies to assist them.   The practice is to assign accounts and receive from 70 to 80 per cent of the face amount of the accounts in cash until such time as the accounts have liquidated, or the loan has been paid off.   Assuming that these accounts run thirty days, the companies selling these goods will pay approximately 24 per cent for the use of the money loaned on these receivables.

Exhibit 1

— 55 —

It is well to note in this instance that it is very vital to the industrial life of the country as well as to the consumer to have money free in the banks for the purpose of loaning on these receivables.   Not only will business be accelerated if this is the case, but the price of goods to the consumer can be materially reduced if the cost factor of higher finance charges in handling receivables can be eliminated.

Exhibit 1

## ADJUSTMENT SERVICE BUREAUS

Considerable testimony was taken by the Committee on what is known as "Adjustment Service Bureaus". While this business has not been given the amount of study which it should have, it appears that the object of these bureaus is to attempt to adjust the debts of individuals by making agreements with all the creditors of any particular debtor, whereby his creditors are either paid proportionally or his debts are reduced by compromise and liquidated for a smaller amount. It appears to be the practice among these bureaus to assist the debtor by cash or by financing, to liquidate his entire indebtedness. In the event the company's cash is used to reduce claims, the amount of the reduction is usually prorated, the company receiving 75 per cent and the debtor 25 per cent thereof.

The Committee feels, from the short time it has had to study this proposition, that there may be merit in well regulated adjustment service bureaus. Very often the debtor is bankrupt and is unable to prevent his creditors from closing in on him by suits or garnishments. If he has some earning capacity, however, the bureau attempts to liquidate his debts without recourse to bankruptcy. The assistance given him by this class of service may, in some cases, be beneficial.

However, certain abuses seem to be obvious from the testimony taken; contracts seemed to be indefinite, and the rates for the service appeared many time to be very high. This class of service directly affects the public in many ways, and therefore regulation and supervision are necessary to prevent abuses.

Exhibit 1

## NECESSITY FOR REGULATION AND SUPERVISION

One of the things most forcibly impressed upon the committee as a result of this investigation is that consumer credit, in all its branches, should be placed under regulation and supervision. Concealed charges, influences such as unreasonable "packs", rebates and reserves, which tend to make exorbitant rates, misrepresentation and fraud must eventually be eliminated if the consumer and the finance business are to be benefited. Unless this is done, antagonistic public opinion against finance companies and merchandising sales agencies will sweep the country and be disastrous in the extreme.

If the dealers and salesmen handling merchandise credit and operators of finance companies are required to have a license from a commission of this state, said commission having power to revoke licenses for abuses, and there were no concealed charges, consumer credit will soon be upon a higher plane. Increased public confidence, which will result from this program, will redound not only to the benefit of the consumer but of the consumer credit agencies as well. The fact that such agencies are under the regulation and supervision of the state, guaranteeing protection to the consumer, will be a great factor for healthy, legitimate business.

The best argument for regulation and supervision is probably in the vicious abuses which flourish in their absence. While there has been little written material available, particularly on automobile companies and credit agencies, the committee has attempted to bring out in this report the evils which now exist when such concerns are under no regulation and supervision.

One striking example where rates are concealed and other abuses prevalent was brought out in the testimony received by the committee. This was to the effect that in the cities of St. Paul and Minneapolis, where there is no regulation or supervision, consumers are paying on credit loans from 100 to 180 per cent annually, and in many instances 20 per cent per month. The opinion was advanced that regulation

Exhibit 1

and supervision of loan agencies in these cities making charges public, would be of inestimable benefit to the consumer therein.

One case out of many unlicensed loans coming to the attention of the committee is as follows:

A borrowed $20.00 from an unlicensed company. He agreed to pay $3.75 per month, but the unlicensed loan company refused to accept any partial payments on the $20.00. It had to be all paid at one time, or it could not be paid. A, up to the time the complaint was brought to the attention of the committee, had paid $3.75 a month for eight months, or $30.00, and still owed the original $20.00. At this rate, A was paying $45.00 per year for the use of $20.00, or in other words, he was paying an annual interest rate of 225 per cent.

The committee heard many complaints which brought to light the vicious consequences when consumer credit is not supervised. One unregulated loan in the higher brackets, approximately $600.00, drew a true interest rate at one period of the loan approximating 402 per cent. A certain class of these loans, which were characterized by erratic charges and a rapid rise in the amount the consumer owed, were designated as "balloon" loans.

The committee believes that regulation and supervision of dealers, salesmen, finance and loan companies, and their officials, should be inaugurated as soon as possible; further, that licensing power should be vested in a state commission, preferably the banking commission, with authority to consider and regulate abuses and complaints and at all times compel complete disclosure of all rates and charges.

It is felt by the Committee that if unreasonable dealer's "packs", rebates, and reserves could be disclosed and eliminated, together with other abuses mentioned in this report, merchandise and cash credit would then be upon a fair and reasonable basis. Charges and rates should be as low as possible to the consumer, but high enough to attract capital into the field. If abuses are eliminated, and consumer charges and interest rates are not concealed, competition between finance agencies will reduce charges and rates to the lowest possible point consistent with good business.

In this connection it should be noted that all direct loan

Exhibit 1

— 59 —

companies herein mentioned who operate by taking chattel mortgage security are already under the operation of either section 115.07 or 115.09, and that these sections limit the amount which companies operating thereunder can charge.

The Committee gave careful consideration to the question of fixing maximum rates to be charged for automobile and merchandise credit financing, by those finance companies who do not deal directly with the consumer but who purchase automobile and other merchandise receivables directly from the dealer or seller. It seems that such prerogative could, under the police power of the state, be properly delegated to a commission.

However, after thorough deliberation on this subject, the Committee is of the opinion that such a plan would not be practicable at this time. It would appear to be a stupendous, if not an impossible task for any rate fixing authority at this time to arrive at the rates on the various types of security when the different lengths of time and the different balances are taken into consideration.

When carrying charges are clarified and insurance costs are separated therefrom, uniform systems of bookkeeping and reporting developed, oppressive collection methods done away with, and a basis of fact developed upon which a fair and equitable charge might be predicated, rate fixing might be practicable. Until this is done, it is the opinion of the Committee that open and competitive methods in this branch of financing will eliminate the necessity of rate fixing.

Furthermore, the Committee feels that there are reasons in requiring a maximum rate on cash loans which do not exist under merchandise installment credit. In a great many instances, cash loans are predicated upon emergencies which are so urgent that the borrower will make almost any sacrifice to make a loan. This makes him an especially easy subject for exploitation.

Furthermore, when it is considered that capital for cash loans is subject to the law of supply and demand and may be very difficult to obtain at times and over long periods, therefore capital used for this purpose very often may charge exorbitant rates and the consumer needs protection against situations of this kind. On the other hand, of course, as has been herein stated, the consumer may,

Exhibit 1

— 60 —

under the pressure of salesmanship, obligate himself to make payments for more than his income will allow, but at least he is not under the same degree of stress circumstances in purchasing as he would be in making the loan upon emergency.

The method of assigning problems of the maximum rates for cash loans to a commission is probably a very good plan. However, inasmuch as capital is invested in goods offered for sale and it is necessary to sell such goods before they depreciate too much by age, the big manufacturers of merchandise which is sold on installment credit have provided themselves funds for the financing of merchandise credit as a necessary part of their selling program.

Therefore the Committee feels that the keen competition between automobile finance companies who are interested in time payment purchases will, when the public has full knowledge of all charges including reserves, rebates and "packs", reduce installment credit rates and charges to the lowest possible point. Furthermore, the supervising authority which is suggested in this report for the regulation of this great business, will be in a position to make a complete check upon the charges made and profits earned, and may therefore, if desired, make recommendation for further legislation at some future session of the legislature for the establishment of maximum rates.

Exhibit 1

— 60 —

under the pressure of salesmanship, obligate himself to make payments for more than his income will allow, but at least he is not under the same degree of stress circumstances in purchasing as he would be in making the loan upon emergency.

The method of assigning problems of the maximum rates for cash loans to a commission is probably a very good plan.  However, inasmuch as capital is invested in goods offered for sale and it is necessary to sell such goods before they depreciate too much by age, the big manufacturers of merchandise which is sold on installment credit have provided themselves funds for the financing of merchandise credit as a necessary part of their selling program.

Therefore the Committee feels that the keen competition between automobile finance companies who are interested in time payment purchases will, when the public has full knowledge of all charges including reserves, rebates and "packs", reduce installment credit rates and charges to the lowest possible point.  Furthermore, the supervising authority which is suggested in this report for the regulation of this great business, will be in a position to make a complete check upon the charges made and profits earned, and may therefore, if desired, make recommendation for further legislation at some future session of the legislature for the establishment of maximum rates.

Exhibit 1

— 61 —

## RECOMMENDATIONS

1. That a law be enacted for the regulation and supervision of dealers and salesmen of motor vehicles; that said law shall provide among other things:

   a. That every such dealer and salesman shall obtain a license from the State Banking Commission under such terms and conditions as the said Commission in the proper carrying on of such business shall find necessary.

   b. That an annual license fee shall be as follows: $5 for dealers and $2 for salesmen.

   c. That said Commission shall have power to adjust all consumer complaints, and hold hearings thereon, which said hearings shall be subject to appeal as in any other Commission rulings.

   d. Said Commission shall have power to correct abuses in the business such as fraud, misrepresentation, and unconscionable practices, and shall have power in its discretion to revoke licenses, such action being subject to judicial review.

   e. Said Commission shall have power to make and compel definite requirements in the method of handling business by dealers and salesmen to the end that the differential between the cash and the sale price be clearly stated in a memorandum to the consumer as well as finance charges, including any "pack", rebate, or reserve, and a separate statement of insurance charges.

   f. Said Commission shall have power to make other necessary rules regarding unethical practices by the dealers and such rules and regulations as they deem necessary for the proper regulation and supervision of the business.

2. That a law be enacted for the regulation of all finance and loan companies, not operating under chapter 214, either those who loan directly upon chattel mortgage

<u>Exhibit 1</u>

— 62 —

security on motor vehicles or those who buy motor vehicle conditional sales contracts, chattel mortgages, or motor vehicle receivables in the open market.

a. That all of such finance and loan companies have licenses from the State Banking Commission under such terms and conditions as said Commission shall require.

b. That said license fee shall be $25 for either a loan or finance company, but said license fee so paid by loan companies shall be in lieu of the present license fee now paid by them.

c. That Sections 115.09 and 115.07 will not be repealed except that said companies operating thereunder shall be under the regulations and supervision of the Banking Commission under the proposed law to the same extent for all intents and purposes as finance companies. That companies doing both finance business and loan business shall be required to have a license in each department.

d. That said Commission shall have the power to adjust and hear complaints made by consumers in their dealings with finance and loan companies; shall have the power to correct abuses in said dealings and shall have further power in its discretion of revoking licenses for cause. All of such decisions, however, shall be subject to judicial review as appeals in the manner of other commissions.

e. Said Commission shall have the authority to establish such additional rules necessary for the full disclosure of charges and the proper regulation and supervision of such finance and loan business as in its discretion shall seem advisable.

3. The uniform conditional sales contract and chattel mortgage law shall be amended to provide that in the event of repossession and sale of any motor vehicle, the mortgagee or owner of the security shall at the time of serving notice of sale of said motor vehicle upon the owner or purchaser thereof, include in said notice a statement that he intends to sell said property and ask for a deficiency judgment in the event the sale

Exhibit 1

— 63 —

thereof does not equal or exceed the indebtedness. Said law shall provide that in the event no such notice of intention of taking deficiency judgment is given, that then and in that event the sale of said motor vehicle shall be considered a satisfaction of the debt and no deficiency judgment shall be obtained.

4. That a law be enacted making it unlawful for any concern who floor plans motor vehicles for dealers and salesmen to coerce in any manner or compel such dealer to carry his paper with said floor planning finance company or enter into any agreement or understanding with a manufacturer to that end. Said law shall further provide that any dealer who shall allow himself to be so coerced by any such finance company, individual, or other concern shall be equally guilty as any such finance company so attempting to coerce.

5. That a law shall be enacted making it unlawful for any individual, firm or corporation to offer to sell to any resident of the state of Wisconsin any motor vehicle that has been used or licensed in another state or country without first making application for and/or receiving a Wisconsin license therefore.

   a. That the purported owner of any motor vehicle that has been used or licensed in another state or country, in applying for a Wisconsin license, be required by the secretary of state to give a sworn affidavit pertaining to the title status of said motor vehicle.

   b. Such owner should be further required to furnish a certificate by a sheriff, deputy sheriff, police officer or other reliable person, stating that the physical description of said motor vehicle had been checked with the description given in the application for such license.

6. That a law shall be enacted requiring the owner of any motor vehicle less than two years old which has been wrecked, and the cost of such repairs is $250 or over, to so notify the secretary of state who shall have such information noted on the title.

   a. The law shall further provide that any individual, firm or corporation selling such a wrecked motor vehicle

Exhibit 1

— 64 —

shall plainly mark on the sales slip, the words "Wrecked Car—cost of repairs $250 or over", before being signed by the purchaser.

7. That a law shall be enacted regulating and supervising the so-called Adjustment Service Bureaus, which said law shall require said concern to secure a permit from the State Banking Commission and pay an annual fee therefor of $50 per office.   It should also provide that the Banking Commission shall have the power to correct any abuses of said business, hold hearings in regard to same, and make decisions thereof, such decisions to be subject to judicial review.

------

We, the undersigned, members of the State Banking Commission and the Interim Advisory Legislative Committee, created pursuant to Joint Resolutions Nos. 48, A. and 61, S. of the Special Session of 1933–34, having read the REPORT OF THE COMMITTEE in executive session on March 26th, 1935, and approved the same, hereby likewise state that we have read and noted all corrections and interlineations, including the Preface, together with any and all additions to said report, and hereby approve the same.

Signed:

PETER A. CLEARY,
*Chairman, State Banking Commission,*
H. F. IBACH,
*Commissioner, State Banking Commission,*
STANLEY N. SCHAFER,
*Secretary, State Banking Commission,*
WILLIAM D. CARROLL,
*Senator, Chairman,*
G. ERLE INGRAM,
*Senator, Vice Chairman,*
JAMES T. CAVANAUGH,
*Assemblyman,*
WARREN D. LEARY,
*Assemblyman,*
MILTON T. MURRAY,
*Assemblyman, Secretary.*

<u>Exhibit 1</u>

— 65 —

# APPENDIX

❧

## COMPLAINTS

Following will be found a few of the many complaints received by the Committee. Time would not permit a complete check of details of said complaints. Therefore, in fairness to the individuals and companies involved, their real names are not given. These Complaints are fair samples of the various kinds of complaints coming before the Committee.

_____

M. R. LOUIS, Milwaukee.

*Dealer:*   Blank Street Auto Sales, Milwaukee.

| | | |
|---|---|---|
| 3/13/34 | Bought Auburn Sedan _____ | $85.00 |
| | Allowed on Chevrolet Sedan _____ | 10.00 |
| | | _____ |
| | BALANCE _____ | $75.00 |
| | 3/13/34 Cash _____ | 15.00 |
| | | _____ |
| | BALANCE DUE _____ | $60.00 |

3/16/34   Cash Paid $10.00 Balance to be paid at the rate of $5.00 per week, from date the car is sold.

| | | | |
|---|---|---|---|
| 3/20/34 | Cash | _____$10.00 | |
| 4/13/34 | Cash | _____ 10.00 | |
| 4/27/34 | Cash | _____ 10.00 | |
| 5/11/34 | Cash | _____ 10.00 | |
| 5/25/34 | Cash | _____ 10.00 | $60.00 Total Payments. |

_____

Dealer refused to release chattel mortgage until an additional carrying charge of $15.00 is paid.

6/25/34   Reporter called on dealer to obtain chattel and note. He promised to have it the following day. However, within an hour after Reporter called on dealer the chattel mortgage and note marked paid was delivered to Mr. Louis. The title was also marked paid.

**Exhibit 1**

K. W. ALFRED

*Dealer:*  Blank Auto Company.

*Finance Co.:*  Blank Finance Corporation, Milwaukee.

1/22/34   Bought a used Nash sedan.
Sales Price _____$150.00
Allowed on old Buick _____  40.00

BALANCE DUE _____$110.00

*Finance Charge _____  30.88

$140.88

12 notes of $11.74 each payable on 22nd of each month.

* The deal included:

Service _____$14.88
Insurance _____  6.00
Reserve _____ 10.00

Total _____$30.88

2/22/34   Paid to Finance Company in full _____ $128.21

Receiving a rebate for prepayment of__  $12.67
(Including only a credit for Finance
Service)

When the matter was brought to the attention of the Committee, the reporter, after calling on the Finance Company and Automobile Dealer, was able to procure additional refunds of:

From Finance Company—Insurance re-
bate _____$  3.21
From Automobile Dealer—Dealer's Re-
serve or Pack _____  10.00

Making a total refund of _____$ 25.88
The total cost to Mr. Alfred for the use of
$110 for one month, instead of $18.21 was
reduced to _____$  5.00

When the additional refund was turned over to Mr. Alfred, he went away rejoicing over the efforts of the assistance rendered him by the Committee.

Exhibit 1

— 67 —

MR. AND MRS. M. G. EDWARD, Milwaukee.

*Dealer:*  Blank Motor Co., Milwaukee.

*Finance Co.:*  Blank Finance Co., Milwaukee.
        Attorney:  Mr. Blank, Milwaukee.

| | | |
|---|---|---|
| 12/27/33 | Purchased Whippet sedan _____ | $150.00 |
| | Allowance on used Oldsmobile _____ | 50.00 |
| | BALANCE _____ | $100.00 |
| | *Carrying Charge _____ | 33.00 |
| | *(Figured as simple interest equals nearly 100%) | |
| | TOTAL _____ | $133.00 |

This was divided in eight notes, $16.63 each, due on the 27th of January and each month thereafter, and paid as follows:

| | | | |
|---|---|---|---|
| 2/ 1/34 _____ | $16.63 | 5/28/34 _____ | $16.63 |
| 3/ 1/34 _____ | 16.63 | 6/21/34 _____ | 16.63 |
| 3/30/34 _____ | 16.63 | 8/ 3/34 _____ | 16.63 |
| 4/27/34 _____ | 16.63 | 9/22/34 _____ | 17.00 |

On September 18 the following letter was written to the buyer by the finance company:

Sept. 18, 1934.

"Dear Sir:  At this time your account is past due since Aug. 27th, in the amount of $16.63.  As this is all that is still due on your car, certainly you do not want to lose it now.

"It is imperative at this time that you send this payment so as to reach our office no later than Sept. 22nd, or we will be forced to repossess your car.

"Kindly govern yourself according to this letter."

On September 22, 1934, when Mrs. M. G. Edward was preparing to go downtown to the finance company to make her last payment, a Mr. Blank called on her representing himself as from the finance company.  She told him that she was going down to make her last payment and he asked her why she couldn't pay him.  She said that was all right and that it would save her a trip downtown.  She handed him $17.00 expecting to receive thirty-seven cents in change.  Instead he gave her a receipt as follows:

9/22/34.

"Received of M. G. Edward Ten Dollars on acct., $7.00 for atty. fees & coll. chges.

N. P. BLANK,
Per A. BLANK.

Exhibit 1

— 68 —

The reporter took this matter up with Mr. Blank of the Blank Finance Co. and asked why they charged $7 for collecting $16.63. The finance company was anything but courteous in endeavoring to straighten this matter out. However, after several attempts the Reporter communicated with the attorney for the finance company and told him that it is the wish of the Committee that the borrower receive the cancelled note and contract marked paid as well as the thirty-seven cents in change.

On October 11, 1934, the Reporter received the cancelled note and contract from the attorney, which has been turned over to the borrower. However, the thirty-seven cents has not been refunded to date.

---

CLARENCE ROGERS, Milwaukee.

*Dealer:*  High Motor Car Co., Milwaukee.

*Finance Co.:*  Blank Finance Co., Milwaukee.

| | | |
|---|---|---:|
| 2/15/34 | Bought a Ford V-8, 1933 Tudor | $475.00 |
| | Allowance on 1930 Tudor Ford | 100.00 |
| | BALANCE | $375.00 |
| | Finance charges | 89.00 |
| | BALANCE DUE | $464.00 |

Sold paper to Blank Finance Co., Milwaukee

Made two payments, 4/15/34 and 5/15/34, totaling _____$ 50.00
Made third payment of $25.00 on 7/8/34  25.00

BALANCE _____$389.00

6/29/34  Would only allow him $14.00 to settle in full. The finance company wanted an extra charge of $15.00 to transfer the papers from Mr. Rogers to the party who was buying his car, making a total of $104.00 for the use of $375.00 for eighteen months.

8/10/34  Sold the car for cash, $400.00. The finance company originally promised a $14.00 rebate if the balance was paid up in cash. Now the finance company offered to take $365.00, or a $24.00 rebate, which still leaves a finance charge of $65.00 for the financing of $375.00 for six months.

Reporter's Note: After considerable effort the Reporter was able to procure an additional $10.00 rebate from the finance company for Mr. Rogers.

Exhibit 1

— 69 —

Mr. Paul Thomas, Green Bay, Wisconsin.

*Finance Co.:*   Blank Investment Co., Marinette.
    Blank Service Co., Milwaukee.

October 3, 1934.

Hon. Senator William D. Carroll,
Prairie du Chien, Wisconsin.

Dear Sir:   I am informed that you are in charge of the Interim Investigating Committee on banking, and herewith wish to file a complaint with you on the Blank Investment Company of Marinette, and the Blank Service Company of Milwaukee.

On August 14, 1933, I borrowed from the Blank Investment Company of Marinette $150.00, for which I signed a note for $165.00, payable monthly.   Last payment was due the latter part of last July, at which time I owed a balance of $60.00.   The note was secured by a chattel mortgage on my automobile and a clothes press machine which is located at Green Bay, Wisconsin.   On August 7, last, I was on the road with my car selling cattle feed to farmers in the neighborhood of Pulaski in Brown County.   Two men, claiming to represent the Blank Service Company of Milwaukee, Wisconsin, came to me in the neighborhood of Pulaski and told me they wanted to take my car on the mortgage.   I asked them why they didn't give me notice first.   They said they didn't give notice before taking cars. I told them that it wouldn't be necessary to take the car— that I would drive to Green Bay and get the balance of the money.   I accordingly drove my car to Green Bay, and they followed me.   They requested that I put the car in the Beaumont Garage, which I did, and then I asked them what the balance was which I had to pay.   They told me that it was $60.00 balance with $3.00 interest on top, and $30.00 to repossess the car, making a total of $93.00.   I told them that the repossession charge was unreasonable.   They had not yet taken the car in their possession, and I offered to pay them $63.00 plus a $10.00 reasonable repossession charge.   They refused this and took the car away.   I then communicated with the Blank Investment Company and proposed to pay them the balance of their contract of $63.00 as they claimed, plus $10.00 reasonable repossession charge. They refused to accept it.   They demanded $93.00.   In order to get my car I wired them that amount on or about August 14, 1934.   I was then informed that my car was in the garage at Duck Creek, four miles out of Green Bay.   It had been there for two weeks and I had to pay $4.00 storage charge on top to get the car.

One of the men that represented the Blank Adjustment Service was E. H. Blank—the other I didn't get his name.

<u>Exhibit 1</u>

— 70 —

The men, in the course of a talk I had with them, boasted that they picked one car up of a fellow from Oconto while he was up north, and that they charged him $90.00 on top of the balance owing just to hold his car about one-half hour, and that the fellow paid.

It appears to me that this Blank Adjustment Service Company, in connection with this Blank Investment Company, is operating a racket on repossession and charging more than is lawful and reasonable. It would have cost me as much money to have a lawyer fight the case for me as to pay the amount, and I needed my car. That is why I had to pay that outrageous repossession charge.

I thought it probable that in your position you undoubtedly would be able to bring this Blank Investment Company, and the Blank Adjustment Service of Milwaukee to accounting on their tactics so as to protect other people who are circumstanced like myself, from being victimized by such tactics.

I thank you for whatever you can do in this matter to see that justice be done.

Yours very truly,

(Signed) PAUL THOMAS.

---

FRED KRAMER, Milwaukee.

*Finance Co.:* Blank Finance Co., Milwaukee.

Purchased auto from Blank Car Sales Co., Milwaukee.

| | |
|---|---|
| 8/18/34 | Sold transaction to the Blank Finance Co. Price of car _____$210.00 |
| | In selling the car the Blank Car Sales Co. had the buyer sign a blank paper which stipulated that this car would be paid for in eighteen notes of $17.60 each. This made a total of _____$316.80 |
| | The Reporter called Mr. Samson of the finance company and within twenty-two minutes after the Reporter took the borrower to his office, he had the manager of the Blank Car Sales Co., in his office and the account was straightened out to what it should be, eighteen notes of $15.75 each or a total of _____$283.50 |
| | Through the efforts of the committee we saved the borrower _____$ 33.30 |

<u>Exhibit 1</u>

— 70 —

The men, in the course of a talk I had with them, boasted that they picked one car up of a fellow from Oconto while he was up north, and that they charged him $90.00 on top of the balance owing just to hold his car about one-half hour, and that the fellow paid.

It appears to me that this Blank Adjustment Service Company, in connection with this Blank Investment Company, is operating a racket on repossession and charging more than is lawful and reasonable. It would have cost me as much money to have a lawyer fight the case for me as to pay the amount, and I needed my car. That is why I had to pay that outrageous repossession charge.

I thought it probable that in your position you undoubtedly would be able to bring this Blank Investment Company, and the Blank Adjustment Service of Milwaukee to accounting on their tactics so as to protect other people who are circumstanced like myself, from being victimized by such tactics.

I thank you for whatever you can do in this matter to see that justice be done.

Yours very truly,

(Signed) PAUL THOMAS.

———————

FRED KRAMER, Milwaukee.

*Finance Co.:*   Blank Finance Co., Milwaukee.

Purchased auto from Blank Car Sales Co., Milwaukee.

| | | |
|---|---|---|
| 8/18/34 | Sold transaction to the Blank Finance Co. Price of car _____ | $210.00 |
| | In selling the car the Blank Car Sales Co. had the buyer sign a blank paper which stipulated that this car would be paid for in eighteen notes of $17.60 each. This made a total of _____ | $316.80 |
| | The Reporter called Mr. Samson of the finance company and within twenty-two minutes after the Reporter took the borrower to his office, he had the manager of the Blank Car Sales Co., in his office and the account was straightened out to what it should be, eighteen notes of $15.75 each or a total of _____ | $283.50 |
| | Through the efforts of the committee we saved the borrower _____ | $ 33.30 |

Exhibit 1

Name of Purchaser—M. MILLS, Racine, Wisconsin.

Complaint against Blank Corporation, Milwaukee.

Bought _____1929 LaSalle Sedan—List price $90.00.

Date of Purchase__September 20, 1934.

Traded in _____Whippet and Ford, plus $50.00.
                   Allowed $40.00 for two cars traded in.
                   Paid $5.00 down.
                   Paid $5.00 for second installment later.

Cash price listed $100.00—on Sales Contract.

No finance charge listed, but Kamp, the dealer, stated orally that the charge for financing and insurance was $15.00.

Mr. Mills who is uneducated and practically illiterate went to the Blank Corp. to get a car. He made a deal trading in two cars, a Ford and a Whippet, for which they allowed him forty dollars. They agreed to trade him a Lincoln which they represented to be a 1930 model, but which turned out to be a 1926 model for fifty dollars besides the two cars.

Instead of writing down the original price of the car at $90.00 which it actually was, they put down the cash price of the car as $100.00 in the sale contract. Mr. Mills paid five dollars down and found a balance of $60.00 instead of $45.00 on his contract. They told him the fifteen dollars was for financing and insurance. The amount actually due was forty-five dollars after his trade-in, plus the original five dollars down payment. They promised to repay the financing charges if the money was paid in within six months, but to prevent any possibility of Mr. Mills being able to force them to repay it, they make the sales contract out so that original price of the car is $100.00 and no financing charges are listed either on Mills contract or their contract with the Blank Finance Company which handles some of their financing business. They protect themselves from any possibility of enforcement of their oral agreement to repay the financing costs by an express statement on their sales contract which does away with any liability for verbal agreements by the salesman.

In this case they promised to repair the car, which they new refuse to do. Mr. Mills' letter explains in his well-meaning way just how they treated his efforts to have them repair the car. Once more they fell back on their statement in the contract relieving them of liability for the promises of their agents.

After Mr. Mills had the car a couple of weeks, it caught fire and partially burned. I reported the loss to the Blank

Exhibit 1

Finance Company, and I find that no insurance was taken out on the car, despite the fact that the dealer stated that part of the fifteen dollars they represented to be for financing was to have been for insurance.

I call your attention to the conditions stated on the copy of the original sales contract in this deal, which states that in the case of this transaction, the agent made agreements and representations contrary to the first three conditions, and then asked the unsuspecting buyer to sign it, which he did.

I called the auto dealer and questioned their business tactics. In return, I was called a shyster by a Mr. Kamp who answered the phone, for taking such a small suit in which Mills had obviously signed away his rights, and he called other names, the use of which is unbecoming to a member of the Wisconsin Bar.

My belief is that the members of the Blank Corp. are unscrupulous in their dealings, and I am ready, willing and able to co-operate with the Legislative Interim Committee in any manner possible to assist in straightening out their business policy.

I had the Blank Finance Company, which discounts the dealers paper, call Mr. Kamp and ask him what finance charge was made on this transaction, and Kamp said there was no finance charge so Mr. Mills efforts to pay within six months will apparently be futile.

Submitted by

E. W. BLANK,
Attorney-at-Law.

---

MR. T. F. DORE, Milwaukee.

*Against:*   Blank Finance Company.

8/29/32   Mr. Dore borrowed $325 to which was added $66 carrying charge covering fire and theft, pilferage, hail and cyclone insurance. Gave as security chattel mortgage on 1931 Auburn Brougham. This was divided into eleven notes of $32.60 each and one note of $32.40; all notes due on the 29th of each succeeding month.

His receipts show payments of $32.60 due and paid on 9/29/32 and $10.00 due 10/29/32 and paid on 11/7/32.

Misfortune overtook Mr. Dore in November, 1932 and he was not able to make the balance of the November payment or the December payment. He was offered $500 for his car on December 15th, 1932 but rather than to make this sacrifice he made arrangements to borrow money on his insurance policy. On December 28, 1932, when he found he

Exhibit 1

— 73 —

could not obtain his money on his insurance policy until
after January 15th, 1933, he drove the car to the garage of
the Blank Finance Company and talked with Mr. Blank
and told him to keep the car for about 30 days and he would
positively be able to make up all back payments and possibly
the entire amount within two to four weeks.  Mr. Blank
told him that he was a gentleman for bringing his car in
and that it was perfectly all right.

On January 3rd or 4th he received NOTICE OF SALE
which was to take place on January 11th, 1933 at 10:30
A. M.

On January 11, 1933 Mr. Dore was sick and unable to
leave him home, but his two brothers did go to the garage
at 10:00 A. M. one-half hour before the sale of this car was
advertised to be held.  They asked the elevator man what
floor the auction was on and showed him the notice of sale.
The elevator man told them the auction was over with.
When they got on the second floor, they were told by vari-
ous persons that the auction was over with and that the
auctioneer had left already.  These men did not leave the
garage until 10:45 A. M. and during the time they were
there, there was no auction held.

About two or three months later Mr. Dore received a no-
tice from the attorney for the Blank Finance Company that
they had taken out a deficiency judgment against him for
approximately $200.

3/2/35  Reporter is very happy to report that a settle-
ment has been arranged between Mr. Dore and
the secretary of the finance company wherein the
latter agrees to issue a satisfaction of judgment
to Mr. Dore.   This settlement is considered very
satisfactory to Mr. Dore.

---

MR. D. LEON.

*Against:*  Blank Car Sales Company, Milwaukee.

*Finance Company:*  Blank Finance Company, Milwaukee.

8/10/34  Mr. Leon bought 1929 Oakland Sedan.

Purchase Price _____$195.00
Allowance on 1 9 2 9
    Ford _____$95.00
    Less payment due 60.00      35.00
                             ——— ———
Balance _____      $160.00

Exhibit 1

— 74 —

|  |  |
|---|---|
| Plus extra payment due on Ford ------------------- | (16.96) |
|  | $176.96 |
| Finance charges ----------- | 59.00 |
|  | $219.00 |
| 15 notes of $14.60 each------ | |

Record of payments: 9/16/34__$14.60; 10/16/34__$7.30; 10/26/34__$7.30 ----------------------------- $29.20

December 29, 1934. Mr. Leon was promised thirty days free service as indicated on order. The car was not in working condition. They promised to take up bearings and put in rings. Car is using more oil than ever. Mr. Leon feels that he has been gyped on car and wants to give the car back. He cannot get the car started without towing. Mr. Leon got back on his payments when he was out of work. Mr. Blank of the Blank Car Sales Company told Mr. Leon he could have another car just as good if the 1929 Oakland was not satisfactory. The Oakland did not run satisfactory after they tried to fix it. Another Company offered Mr. Leon $85.00 for the Oakland Sedan which he had paid $195 for. One dealer had offered Leon $135 for his old Ford after he had made the deal with the Blank Car Sales Company, but they would not let him back out of the deal.

January 4, 1935. Leon received NOTICE OF SALE to be held on January 14, 1935. This sale was attended by your Reporter and Mr. Leon but Mr. Blank was not present and no sale was held.

January 14, 1935. Leon received another NOTICE OF SALE to be held on January 24, 1935 at 11:30 A. M. Your Reporter was unable to be present at this sale on account of duties in Madison and arranged to have another party of Milwaukee attend the sale. This party was in the office and salesrooms of the Blank Car Sales Company from 11:08 A. M. until 12:04 P. M. His affidavit states that he was told by a gentleman who said he was Mr. Blank's brother, that Mr. Blank was out of town in Chicago; he further states that during the time between the hours of 11:08 A. M. and 12:04 P. M. that Mr. Blank was not present at the Blank Car Sales Company and that he did not witness any auction or sale of any automobile.

<u>Exhibit 1</u>

— 75 —

L. ALFRED, Racine.

*Dealer:*  Blank Auto Co., Milwaukee.

*Finance Co.:*  Blank Finance Co., Milwaukee.

10/27/34   Purchased used 1933 Chevrolet Sedan.

| | |
|---|---|
| Purchase price _____ | $325.00 |
| Down Payment _____ | 200.00 |
| BALANCE _____ | $125.00 |
| **Finance charges _____ | 36.00 |

Making 11 payments of $13.41 each and
one of $13.49 _____ $161.00

**Differential in the finance charge
of $36 is as follows:

| | | |
|---|---|---|
| Fire and Theft Insurance Premium _____ | $ 3.65 | |
| Dealers Reserve _____ | 9.00 | |
| Undivided Profit account _____ | 23.35 | $36.00 |

Note—It will be observed that Dealers Pack is 25% and Insurance is 10% of the finance charge.

12/11/34   Mr. Alfred paid up the finance
company in full and received a
credit or refund of _____ $ 7.35

12/19/34   Mr. Alfred made complaint to the Banking
Commission.

12/31/34   Blank Finance Company gave the Banking
Commission the following differential in the
transaction of $36.00.

| | | |
|---|---|---|
| Fire and Theft Insurance Premium _____ | $ 3.65 | |
| Dealers Reserve _____ | 9.00 | |
| Refund to Mr. Alfred _____ | 7.35 | |
| Retained by Blank Finance Co.__ | 16.00 | $36.00 |

1/ 4/35   Reporter arranged with the Blank Finance
Co. for a further refund of

| | |
|---|---|
| Dealers Reserve _____ | $ 9.00 |
| Cancelling Insurance-rebate of premium _____ | 1.65 |
| Total additional rebate of _____ | 10.65 |
| Former rebate _____ | 7.35 |
| Making total rebate of _____ | $18.00 |

Exhibit 1

Blank Finance Co. retained $18 which after deducting insurance of $2.00 shows $16.00 for the use of $125.00 for 45 days. If this was figured at true interest rates, it amounts to 102.336% per annum.

1/ 5/35   Check for $10.65 was delivered to Mr. Alfred who writes: "Your handling of this matter pleases me very much, and if there is ever anything I can do for you, do not hesitate to call on me."

———————

By MR. P. HERBERT, Milwaukee, Wisconsin.

*Dealer:* Blank Auto Finance Company, Milwaukee, Wis.

*Finance Co.:* Blank Finance Company, Milwaukee, Wis.

10/17/34   Bought 1931 Willys Sedan.

| | |
|---|---|
| Price on sales slip | $185.00 |
| Cash payment on sales slip | 20.00 |
| Balance | $165.00 |
| Financing Charge | 54.00 |
| 15 Notes @ $14.60 each | $219.00 |

Mr. Herbert signed Chattel Mortgage in blank. This was filled in later by dealer.

| | |
|---|---|
| Purchase Price | $245.00 |
| Cash Payment | 85.00 |
| Balance Due | $160.00 |
| Financing Charge | 59.00 |
| 15 Notes @ $14.60 each | $219.00 |

Note—This shows the abuse of filling in chattel mortgage after being signed by purchaser. Dealer added $60 to selling price and $65 to cash payment and $5 to the finance charge, however, the net result is the same in the balance due of $219.00.

Mr. Herbert reports that the car was represented to be in A–1 shape. When he got home it only had three brakes instead of four. Motor was in terrible shape.

11/28/34   Reporter took up the matter with dealer who promised to go into the matter. Mr. Herbert had left the car with the dealer as being unusable, and later took the Certificate of Title back to the dealer.

Exhibit 1

— 77 —

Reporter is of the impression that Mr. Herbert is through with the deal as he has been told by an attorney that the dealer will no doubt drop the transaction as a closed deal and will not endeavor to obtain a deficiency judgment.

———————

January 4, 1932.

John Jones, Milwaukee, borrowed $300.00 on April 9, 1930, on his 1929 Oldsmobile. At present, after having made payments totaling $490.72, he still owes $166.80. This would indicate that the original loan of $300, made less than nineteen months ago, has cost him $657.52, including principal and interest.

The original loan was granted by the A Company. He paid this company four monthly instalments of $31.04 and then refinanced on December 6, 1930, the new note being to pay the B Company $234.01, including balance still due and remaining interest. (Total payments of $71.82 interest and $65.99 on the principal.)

The new loan was granted by the C Company. Jones made payments of $30 a month for January and each month thereafter to and including April, a total of $120.

On May 17, the May 6 payment being overdue, the car was taken from in front of Jones's home, on a Sunday. Jones says he had received no notice that this would be done and that he had notified the C Company by telephone, that he would be late, and that his excuse was accepted.

Jones was required to pay $25 to get the car back. The money was paid to the C Company representative, at the D Acceptance Co., with whom Jones was required to refinance. The $25 was accounted for as for "searching, seizing and storage of car." D Acceptance Company refinanced the car May 19, for six months, the loan being $280.26, representing amount due the C Finance Company, and the new financing charges.

Jones paid $46.71 on June 22, 1931. The next payment was due July 19, a Sunday. Jones left town Monday on business, returning Wednesday.

E Finance Company sent a man at 6 P.M., Monday to get the car. The man returned Tuesday and again on Wednesday. Early Thursday Richard Roe of the company came and said the D Acceptance Company wanted the car.

Exhibit 1

He took Jones to the E. Company office and said he would arrange refinancing through another company. He required of Jones that the amount of the note first be reduced by $50 and Jones gave him $50 by check.

Roe persuaded Jones to sign a note in blank, explaining that he couldn't give the name of the finance company that would take the paper, nor the amount of the charges. August 5 Jones got a letter signed by Isaac Scheloski reading as follows: "Please take notice that your note, dated July 24, 1931, payable to E Company, together with mortgage on your Oldsmobile car securing same, have been transferred to the undersigned at whose office the same is payable at the rate of $27.80 on the 24th day of each month hereafter, in accordance with the provisions of said note."

There was nothing to indicate the amount of the note nor the number of months that payments must be made.

Jones made payments in August, September, October and November, ($111.20). In November, after three payments ($83.40) Jones visited Isaac and asked what the balance was. Isaac said the original note had been $278. Jones had estimated that the original note with Scheloski should have been $183, plus Scheloski's carrying charges.

Now, having paid Scheloski four installments of $27.80 (August, September, October, November) a total of $111.20 on Scheloski's note of $278. Jones still owes $166.80, although he already has paid $490.72 on a $300 loan.

None of the loaners except A Company gave the debtor a copy of the chattel mortgage, or copy of the fire and theft insurance policy which was represented as having been issued.

---

## AFFIDAVIT

State of Wisconsin Sheboygan County—SS.

Elwood Eckhorn and Gerry Eckhorn his wife being duly sworn each for himself deposes and says that he is a resident of the City of Sheboygan, Sheboygan County, Wisconsin, residing at Blank Avenue in said City.

That on or about the 1st day of June, 1934, these deponents, needing money to meet expenses to be incurred in connection with the expectant arrival of a child in the fam-

Exhibit 1

— 79 —

ily, applied to the Blank Brokerage Company, a firm having an office in the City of Sheboygan, for a loan. At that time affiants were informed that a loan of 25.00 would call for a monthly interest payment of $5.00, but being unable to afford said $5.00 monthly payment affiants secured a loan of $20.00, which loan called for a monthly interest payment of $3.75.

That upon completing negotiations for the loan affiants transferred title to Mrs. Eckhorn's diamond engagement ring to the Blank Brokerage Company and received from said company a memorandum containing an agreement by the said company to retransfer title to affiants at the end of thirty days upon receipt of the sum of $23.75. At the time negotiations were completed it was stipulated that no part payments on principal amount of the loan could be made but that full amount of principal must be paid at one time. It was further agreed that said company would retain the ring in their possession and that affiants could exercise the right to repurchase at any time provided that interest payments of $3.75 per month were paid and that full amount was paid at the time the ring was redeemed.

Deponents further state that since June 1, 1934, eight payments of $3.75 have been made to the Blank Brokerage Company and that at the time of making such payments said company encouraged the practice of payment of interest and renewal of option to repurchase rather than payment of the principal. Deponents further state that at the time of payment of each interest payment, the agent of the Blank Brokerage Company demanded and received the memorandum then in possession of the affiants and issued a new memorandum on each date of interest payment.

Deponents further state that it was distinctly understood and made a part of the original agreement that failure to make any interest payment at the time such payment was due would result in the loss of the right to redeem the ring.

This affidavit is made for the purpose of revealing the circumstances surrounding and conditions controlling the herebefore described loan and is made at our instance and executed as our own free acts.

Dated this 8th day of March, 1935.

Exhibit 1

## AFFIDAVIT

State of Wisconsin Outagamie County—SS.

Mrs. Lena Kramer, being first duly sworn, on oath, deposes and says that she is at present a resident of the City of Appleton; that on June 5, 1934, your affiant was a resident of the City of Sheboygan, Wisconsin, that on June 5, 1934, your affiant made a loan from the Blank Brokerage Co. located at Sheboygan, Wisconsin; that in the course of making said loan, your affiant signed an agreement which read as follows:

> "I, Mrs. Kramer, hereby sell to Blank Brokerage Co. One Diamond Ring, and One Wedding Ring (3 diamond set) for the sum of $5.00, with privilege of repurchasing same for the sum of $6.25 on or before July 5, 1934.      (Signed)   MRS. LENA KRAMER."

That on the 5th day of July, 1934, your affiant went to the Blank Brokerage Co. and informed them that she was unable to pay the $6.25 according to the above agreement, and at that time, the owners of the Blank Brokerage Co. extended the time for paying the said above obligation for one additional month; subsequently, on the 5th day of August, 1934, your affiant again went to the Blank Brokerage Co. and informed them that she was still unable to pay the $6.25 according to the above agreement and at that time the owners of the Blank Brokerage Co. extended the time for paying said above obligation for one more additional month; that in and during the last week in August, 1934, your affiant went to the said Blank Brokerage Co. and offered them the $6.25 plus any additional charges in accordance with the above agreements and requested the return of her rings which she had left with said company as security; that at that time the owners of the Blank Brokerage Co. refused to accept said sums of money and refused to return the rings which they held as security for said loan and informed your affiant that they had sold said rings at an earlier date; that your affiant is informed and believes that the value of the rings offered as security for the loan above described is and was in excess of One Hundred ($100) Dollars.

<u>Exhibit 1</u>

— 80 —

## AFFIDAVIT

State of Wisconsin Outagamie County—SS.

Mrs. Lena Kramer, being first duly sworn, on oath, deposes and says that she is at present a resident of the City of Appleton; that on June 5, 1934, your affiant was a resident of the City of Sheboygan, Wisconsin, that on June 5, 1934, your affiant made a loan from the Blank Brokerage Co. located at Sheboygan, Wisconsin; that in the course of making said loan, your affiant signed an agreement which read as follows:

> "I, Mrs. Kramer, hereby sell to Blank Brokerage Co. One Diamond Ring, and One Wedding Ring (3 diamond set) for the sum of $5.00, with privilege of repurchasing same for the sum of $6.25 on or before July 5, 1934.      (Signed)   MRS. LENA KRAMER."

That on the 5th day of July, 1934, your affiant went to the Blank Brokerage Co. and informed them that she was unable to pay the $6.25 according to the above agreement, and at that time, the owners of the Blank Brokerage Co. extended the time for paying the said above obligation for one additional month; subsequently, on the 5th day of August, 1934, your affiant again went to the Blank Brokerage Co. and informed them that she was still unable to pay the $6.25 according to the above agreement and at that time the owners of the Blank Brokerage Co. extended the time for paying said above obligation for one more additional month; that in and during the last week in August, 1934, your affiant went to the said Blank Brokerage Co. and offered them the $6.25 plus any additional charges in accordance with the above agreements and requested the return of her rings which she had left with said company as security; that at that time the owners of the Blank Brokerage Co. refused to accept said sums of money and refused to return the rings which they held as security for said loan and informed your affiant that they had sold said rings at an earlier date; that your affiant is informed and believes that the value of the rings offered as security for the loan above described is and was in excess of One Hundred ($100) Dollars.

Exhibit 1

## REQUESTING OPINION OF ATTORNEY GENERAL ON 115.07 AND 115.09

### RESOLUTION NO. 11, S.

### STATE OF WISCONSIN

Senate Journal—Pages 110, 111, 112
Sixty-Second Session

TUESDAY, January 29, 1935.
10:00 o'clock A.M.

Res. No. 11, S.,
Requesting an opinion from the attorney-general.

*Resolved by the Senate,* That the attorney-general be and he is hereby respectfully requested to render to the senate an official opinion on each of the following questions arising under sections 115.07 and 115.09 of the statutes:

(1) As to section 115.07:

(a) If a loan is made in excess of one hundred dollars under this section, is the allowable charge in addition to interest to be seven per cent on the first one hundred dollars and four per cent on the balance, or is the four per cent on the entire loan?

(b) Can a company operating under this section charge the maximum allowable interest rate of ten per cent in any way other than as a simple interest charge, namely: can this charge be deducted at the time the loan is made or added on at the time the loan is made?

(c) Can a company operating under this section of the statutes impose charges for delinquency, and if so, would these charges be computed on the original amount of the loan, or on the original amount plus accrued interest?

(d) Has the banking commission the power to assess applicants for permits under this section a fee for investigation and for the issuance of the permit?

(e) Must the permit issued under this section be issued annually?

(f) How often can the banking commission examine the affairs of these licensees, and is the commission authorized to charge the licensees for the actual expenses of these examinations?

(g) Has the banking commission the right to exercise discretion in issuing and refusing such permits?

(h) To what extent has the banking commission the right to supervise these licensees?

Exhibit 1

(i) If the interest charge is added to or deducted from the principal of the loans made under this section, what portion of interest must be refunded in the case of pre-payments?

(2) As to section 115.09:

(a) Are companies operating under this section authorized to take collateral and if so, are any of the following excluded: namely, real estate mortgages, chattel mortgages or wage assignments, as security?

(b) Has the banking commission the right to examine the books and records of such companies as often as it deems it advisable? Is it limited in the number of examinations it may make, or must a complaint be filed with the district attorney before an examination can be made?

(c) In the event any loan under this section is prepaid, what percentage must be refunded, and can deduction be made for expenses of investigation and the recording and filing of mortgages?

(d) In the case of delinquent loans, what charge can be made on delinquent installments, and is a minimum charge of ten cents permissible?

(e) Is the borrower chargeable with the expense of recording or filing loans, or the release or satisfaction of such mortgages? Be it further

*Resolved,* That a copy of this resolution be sent to the attorney-general.

By Senator G. Erle Ingram, by request of interim committee on investigation of finance companies.

Exhibit 1

— 83 —

## OPINION OF ATTORNEY GENERAL ON 115.07 & 115.09

### STATE OF WISCONSIN

Senate Journal—Pages 248–255.
Sixty-Second Session

THURSDAY, February 21, 1935.
9:00 o'clock A.M.

STATE OF WISCONSIN
OFFICE OF ATTORNEY GENERAL

February 19, 1935.

Lawrence R. Larsen,
Chief Clerk, Senate,
Senate Chamber,
Madison, Wisconsin.

Dear Sir: We are in receipt of a copy of Resolution No. 11, S., requesting an opinion from this office on fourteen questions arising under secs. 115.07 and 115.09, Stats. These questions and our answers are as follows:

"(1) As to section 115.07:

"(a) If a loan is made in excess of one hundred dollars under this section is the allowable charge in addition to interest to be seven per cent on the first one hundred dollars and four per cent on the balance, or is the four per cent on the entire loan?"

A. It is our opinion that the allowable charge in addition to interest is 7% on the first $100.00, and 4% on the balance.

The material part of the statute to which reference is made, sec. 115.07, subsection. (3), reads as follows:

"* * * Any person who, * * * shall ask, demand, or receive, take, accept or charge, in addition to the interest aforesaid, more than an amount equal to seven per centum per annum of the original sum actually loaned for the time of such loan, on sums of a hundred dollars or less, nor more than four per cent per annum of the original sum actually loaned for time of such loan, on sums over one hundred dollars, * * * in full for all examinations, views, fees, appraisals, commissions, renewals and charges of any kind or description whatsoever in the procuring, making and transacting of the business connected with such loan, shall be guilty of a misdemeanor * * *."

The language in question is somewhat ambiguous and it becomes necessary to resort to statutory rules of construc-

<u>Exhibit 1</u>

tion.   One rule is that statutes are not to be construed so as to result in an absurdity.   Price v. State, 168 Wis. 603.

The result here would be absurd if the law were to be construed as to permit a seven dollar charge on a one hundred dollar loan, but which would limit the charge to four dollars twenty cents on a one hundred five dollar loan. This would be the result if the 4% figure applied to the entire loan in case of sums over one hundred dollars.   It must be presumed that the legislature intended to arrive at a reasonable, rather than an unreasonable result.

"(b)  Can a company operating under this section charge the maximum allowable interest rate of ten per cent in any way other than as a simple interest charge, namely:   can this charge be deducted at the time the loan is made or added on at the time the loan is made?"

A.   We do not believe that under the statute a company can directly or indirectly charge more than the maximum allowable rate of ten per cent in addition to appraisals, etc. Sec. 115.05 is quite express on this point, and in part, provides as follows:

"No person,   *   *   *   shall, directly or indirectly, take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forebearance of money, goods, or things in action, than at the rate of ten dollars upon one hundred dollars for one year;   *   *   *."

If interest were deducted at the time the loan was made, and the rate were ten per cent, the effect would be to indirectly charge more than ten per cent and our supreme court has expressed the opinion that if interest at the highest legal rate is taken out at the time of the loan, the contract is usurious.   Tallman v. Truesdell, 3 Wis. 443.   Although the question was not squarely before the court in that case, and its opinion must be considered as obiter.   In considering the question of usury in Wisconsin, the court will disregard the form of the transaction and will look to the substance and will condemn it if usurious, despite any disguise it may wear.   Friedman v. Wisconsin Acceptance Corporation, 192 Wis. 58.

"(c)  Can a company operating under this section of the statutes impose charges for delinquency, and if so, would these charges be computed on the original amount of the loan, or on the original amount plus accrued interest?"

A.   It is generally held that an agreement by a borrower for the payment of a sum, in excess of lawful interest, as liquidated damages in case the principal of the loan is not paid at maturity is not usurious.   Fisher v. Otis (Wis.) 3 Pinn. 78, 66 C. J. 232, 49 L.R.A. 554 Note.   The principle

Exhibit 1

— 85 —

seems to be that excessive interest payable on a contingency under the debtor's control is not usury, although there may be circumstances under which such an agreement might be unenforceable as being a provision for a penalty.  66 C. J. 234.  Furthermore, this general rule may not apply unless the parties in making the contract act in good faith, and without intent of evading the usury law.  82 A.L.R. 1214, Note.  It was held in State M.R.F. Ins. Co. v. Randall, 232 Mich. 210, 41 A.L.R. 973, 205 N.W. 165, than an agreement by one becoming a member of a mutual insurance company to pay 10% a month upon overdue assessments was not usurious, because the excessive rate is not absolutely payable, but could be avoided by paying the assessment when due.  It should be pointed out, however,, that three of the judges considered that while the 10% charged would not be usurious, it was a penalty, and, therefore, not recoverable.  What the attitude of the Wisconsin Supreme Court today would be on the question presented here is, of course, a matter for conjecture.

"(d) Has the banking commission the power to assess applicants for permits under this section a fee for investigation and for the issuance of the permit?"

A.   We are of the opinion that the banking commission does not have the power to assess applicants for permits under this section a fee for investigation and for issuance of the permit.

Sec. 115.07 (3a) provides:

"Before any person, or any association, copartnership, or corporation, heretofore or hereafter created, shall do business under the provisions of section 115.07 of the statutes, such person, association, copartnership, or corporation shall first obtain a permit from the commissioner of banking, who is hereby invested with the supervision of said organizations."

As was pointed out in X Op. Atty. Gen. 1022, and XIII Op. Atty. Gen. 296, the powers of the banking commission under this section, subsec. (4a), are quite limited.  The statute does not give the banking commissioner the discretionary power to issue or refuse permission to such a company to do business.  We believe that if an applicant could show that he had complied with the statutory requirements, the banking commissioner would have to issue the permit, even though the applicant were unwilling to pay such fee as the banking commissioner might see fit to assess. The banking commissioner in such matters has only the power that the legislature has seen fit to give him, and the right to charge a fee for permits under this section is not among such powers.

Exhibit 1

— 86 —

"(e)  Must the permit issued under this section be issued annually?"

A.  No.  The section of the statutes above quoted (115.07) (3a) does not limit the permits issued thereunder to one year or any other period of time.  In the absence of such statutory limitation there would be no authority for requiring permits to be renewed annually.

"(f)  How often can the banking commission examine the affairs of these licensees, and is the commission authorized to charge the licensees for the actual expenses of these examinations?"

A.  The statute is exceedingly vague as to the kind and amount of supervision that is to be exercised, (X Op. Atty. Gen. 1022) and there is no statutory authority for charging for such examinations.  As was pointed out in X Op. Atty. Gen. 1022, the only guide that is given on the subject of supervision is found in subsec. (4a) which provides:

"The books of account of such person, association, co-partnership, or corporation, doing business under the aforesaid section, shall at all times be open to the inspection and examination by the commissioner of banking."

In construing this section, this department said in the above opinion, at p. 1024:

"*  *  *  The fact that the legislature deemed it necessary to set forth thus specifically your power to examine the books, indicates that the general clause investing you with supervision does not go as far as to authorize such an examination. If it does not go that far, it is, of course, of very limited import.  It authorizes you simply to grant permits to these concerns, and the supervision given you would appear to be limited to such supervision as you must exercise in issuing the permits.  As I read the statute, the language 'who is hereby invested with the supervision of such organizations' amounts to but little more than if the legislature had said 'who is hereby designated as the officer to issue such permits.' "

"(g)  Has the banking commission the right to exercise discretion in issuing and refusing such permits?"

A.  No.  See XIII Op. Atty. Gen. 296.

"(h)  To what extent has the banking commission the right to supervise these licensees?"

A.  See answer to question (f) above.

"(i)  If the interest charge is added to or deducted from the principal of the loans made under this section, what portion of interest must be refunded in the case of pre-payments?"

A.  Sec. 115.07 is silent as to pre-payments and such situations must therefore be governed by the contract by

Exhibit 1

the parties and the principles of law applicable thereto. The lender of money is not bound to accept payment in whole or in part before it is due and adjust the interest accordingly. Consequently, he is under no obligation to refund any interest where there is a voluntary prepayment, as the borrower has no right to insist upon changing the contract of the parties. (We would note, however, at this point, that the rule in the case of loans under sec. 115.09, would be otherwise.)

"(2) As to section 115.09:

"(a) Are companies operating under this section authorized to take collateral and if so, are any of the following excluded: namely, real estate mortgages, chattel mortgages or wage assignments, as security?"

A. This section of the statutes apparently contemplates the taking of collateral for loans and does not exclude real estate mortgages, chattel mortgages or wage assignments, as security. Sec. 115.09 (8) (a) provides:

"(8) Every licensee shall:

"(a) Deliver to the borrower at the time a loan is made, a statement in the English language showing in clear and distinct terms the amount and date of the loan and of its maturity, *the nature of the security, if any,* for the loan, the name and address of the borrower and of the licensee, and the rate of interest charged."

And subsec. (d) further provides:

"(d) Upon repayment of the loan in full mark indelibly, every paper signed by the borrower with the word 'Paid' or 'Canceled' and *release any mortgage, restore any pledge,* cancel and return any note, and cancel and *return any assignment* given by the borrower as security."

"(b) Has the banking commission the right to examine the books and records of such companies as often as it deems it advisable?"

A. In our opinion, the banking commission has the right to examine the books and records of such companies as often as it deems advisable and it is not limited in the number of examinations it may make, or to cases where complaints have been filed with the district attorney.

The banking commissioner is given very broad powers in this respect under sec. 115.09 (5) and (6), which read, in part, as follows:

"(5) The commissioner of banking for the purpose of discovering violations of this chapter may cause an investigation to be made of the business of the licensee transacted under the provisions of subsection (1) of this section, and shall cause an investigation to be made of convictions reported to him by any district attorney for viola-

Exhibit 1

tion by a licensee of any of the provisions of this chapter. The cost of such investigation and actual expenses of any examination made in connection therewith shall be paid by said licensee. The place of business, books of account, papers, records, safes and vaults of said licensee shall be open to inspection and examination by the commissioner of banking or his representative for the purpose of such investigation and said commissioner shall have authority to examine under oath all persons whose testimony he may require relative to said investigation. * * *."

"(6) The licensee shall keep such books and records in his place of business as in the opinion of the commissioner of banking will enable him to determine whether the provisions of this chapter are being observed. * * *."

"(c) In the event any loan under this section is prepaid, what percentage must be refunded, and can deduction be made for expenses of investigation and the recording and filing of mortgages?"

A. Here the statutes specifically provide that in case of prepayment the lender shall refund to the borrower the unearned portion of the interest deducted at the time of making the loan and further provide that all fees and charges must be included in the maximum rate of ten per cent. The language of the statute is as follows:

"115.09 *Loan associations regulated.* (1) It shall be lawful to loan money directly to any person, persons, co-partnership, or corporation in sums not to exceed one thousand dollars, repayable in equal weekly, semimonthly or monthly instalments and in lieu of interest, to deduct therefrom at the time of making such loan a sum not to exceed ten dollars upon each one hundred dollars for each year including all fees and charges, or a discount in the same proportion on fractional parts or multiples thereof; provided, that in the event of prepayment of said loan by the borrower the lender shall refund to the borrower the unearned portion of said discount."

"(d) In the case of delinquent loans, what charge can be made on delinquent installments, and is a minimum charge of ten cents permissible?"

A. This section of the statutes makes no provision as to charges on delinquent instalments, and we refer you to our answer to (1) (c) to the effect that the general rule is that imposing charges for delinquency does not constitute usury.

"(e) Is the borrower chargeable with the expense of recording or filing loans, or the release or satisfaction of such mortgages?"

Exhibit 1

A.   In the absence of contract, the expense of recording or filing mortgages, etc. is usually paid by the lender.   The recording is primarily for his protection, and if he wants the instrument recorded it is up to him to pay the fees. The rule is stated in 41 C. J. 604, as follows:

"The recording of a mortgage being exclusively for the benefit and protection of the mortgagee, he cannot require the mortgagor to pay the fees, or hold him liable for the amount thereof, unless it has been expressly so agreed, in which case the amount paid for such fees becomes a part of the debt secured by the mortgage."

On the other hand, fees for recording releases or satisfactions are usually paid by the borrower in the absence of contract, since the recording of such releases or satisfactions is for his benefit.

Sec. 115.09 (8) (d) hereinbefore quoted provides for the release of a mortgage upon payment, but does not provide that the lender is to pay the fee for recording the release. After receiving the release or satisfaction, the borrower can record it or not as he chooses, and if he chooses to record, he must pay the fee.

In the case of real estate mortgages, we would also call your attention to sec. 235.64, Stats., which provides:

"If any mortgagee, his assignee or the personal representative of either, after a full or partial performance of the conditions of the mortgage, whether before or after a breach thereof, shall, for the space of seven days after being thereto requested, and a satisfaction piece in due form being to him or them tendered for execution, after tender of legal charges, refuse or neglect to wholly or partially discharge the same as provided in this chapter, or to execute and acknowledge a certificate of discharge or release thereof in accordance with the fact, or to record all assignments transferring such mortgage to such assignee or personal representative, he shall be liable to the mortgagor, his heirs or assigns, in the sum of one hundred dollars damages, and also for actual damages occasioned by such neglect or refusal, to be recovered in an action."

Yours very truly,

J. E. FINNEGAN,
*Attorney General.*

Exhibit 1