**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

---

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al*.,

  Plaintiffs,

  v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), *et al*.,

  Defendants, and

STRATEGIC ESOP, *et al*.,

  Relief Defendants.

---

**CASE NO. 24-cv-40 EAW-MJR**

**PLAINTIFFS' MEMORANDUM OF
LAW IN OPPOSITION TO
MOTIONS TO DISMISS OF
DEFENDANT FIDELIS LEGAL
SUPPORT SERVICES, LLC AND
RELIEF DEFENDANTS CAMERON
CHRISTO AND THE BUSH LAKE
TRUST**

## <u>INTRODUCTION</u>

This case is about a group of people who ran a debt-relief operation designed to evade the law and squeeze money from desperate consumers. Many times, they operated in the shadows, controlling the scheme behind front men and women who were publicly tasked with operating the businesses. One of the orchestrators pulling the strings in the background was defendant Jason Blust.

As Plaintiffs have alleged, Blust not only controlled and oversaw the Façade Firms that collected unlawful advance fees, but he also controlled the entities that were critical to the operation of the Façade Firms, including Defendant Fidelis Legal Support Services ("Fidelis"). Although Cameron Christo is purportedly the founder and chief executive of Fidelis, he is simply a strawman; Blust is the one running the operation. Because the Complaint alleges that Fidelis provided substantial assistance to the Façade

Firms and was run by Blust, who knew of the illegal scheme, the Complaint states a substantial-assistance claim against Fidelis. And because the Complaint alleges that Christo and the Bush Lake Trust do not have a legitimate claim to the millions of dollars in ill-gotten funds they received from Fidelis, they should not be dismissed as relief defendants.[1]

## **FACTUAL BACKGROUND**

Fidelis was one of several entities Blust operated to orchestrate the debt-relief operation. Second Amended Complaint ("SAC"), Dkt. 366, at ¶ 83-84, 94-98, 102-103. Blust is a central character in the scheme. Blust, along with SFS founder and former CEO Ryan Sasson, created several Façade Firms to conceal SFS's involvement in the debt-relief operation. *Id*. ¶¶ 52, 83, 95, 102, 182-84. Blust also supports and controls the firms on an ongoing basis. *Id*. ¶¶ 52, 83, 95, 102, 182-84. The SAC details the extensive degree to which Blust controls all the Façade Firms, including their management, operations, recruitment, responses to complaints, and coordination with SFS and SFS's Client Services Subsidiaries. *Id*. ¶¶ 83-84, 187-204. The SAC also details how Blust controlled several companies that he used to support the Façade Firms, including Fidelis. *Id*. ¶¶ 94-98, 102-103.

Blust used Fidelis, as part of the broader operation, to provide the litigation services promised to consumers by the Façade Firms and SFS, including identifying attorneys to represent consumers who were sued by their creditors. *Id*. ¶¶ 94-95. Fidelis's services were particularly important given that SFS advised consumers to stop

---

[1] This combined memorandum in opposition to three separate motions to dismiss complies with W.D.N.Y. Local R. Civ. P. 7(a)(2)(C) because the rule authorizes a memorandum up to 25 pages long in opposition to each motion filed.

paying their creditors. *Id.* ¶¶ 95, 115. SFS marketed the litigation support to consumers as an additional benefit of the debt-relief service, *id.* ¶ 122, which likely gave consumers peace of mind and contributed to their willingness to enroll in the program and pay the unlawful advance fees.

Cameron Christo is purportedly the founder and chief executive of Fidelis. *Id.* ¶ 102. He created the Bush Lake Trust, with his children as beneficiaries, and transferred his ownership of Fidelis to the trust. *Id.* ¶ 104. Christo is paid handsomely by Fidelis, receiving over $15 million while his trust receives millions more. *Id.* ¶ 105. But in reality, Blust controls Fidelis, with Christo acting as a strawman. *Id.* ¶ 102-103.

In addition to controlling Fidelis, Blust owns its two predecessors, Lit Def Strategies, LLC ("Lit Def") and Relialit, LLC ("Relialit"), both of which also arranged litigation support for the Façade Firms.[2] *Id.* ¶¶ 94-95, 97. Relialit preceded Lit Def and is now defunct, according to Blust. *Id.* ¶ 97. Around 2021, Lit Def began transitioning into Fidelis, and the two companies are interwoven. *Id.* ¶¶ 96-7. They employ many of the same people and share management, customers, procedures, instrumentalities, and work. *Id.* ¶ 96. Defendant Michelle Gallagher, who owns several Façade Firms, helped Blust manage Lit Def and Fidelis. *Id.* ¶ 91. Emails from as late as November 2023 show Blust directing employees of Lit Def and Fidelis to gather documents for an ongoing litigation. *Id.* ¶ 103. Notably, Christo is absent from those emails. *Id.*

Blust has a history of taking illegal fees in violation of the TSR. He and Sasson were both previously employed by Legal Helpers Debt Resolution, LLC, a debt-relief

---

[2] Blust ran another company, Hedgewick Consulting, LLC, that operated as part of the debt-relief operation, as well, by arranging for partnerships between the Façade Firms and SFS. SAC ¶¶ 94, 138.

firm that was shuttered after several Attorneys General brought actions alleging conduct similar to that described in the SAC. *Id*. ¶¶ 53, 83. Specifically, they alleged that Legal Helpers charged unlawful advance fees, failed to reduce consumers' debts as promised, and tried to circumvent advance-fee bans by recruiting attorneys to serve as fronts for the business. *Id*. ¶ 53. Further, in 2018, Blust agreed to a stipulated judgment with the United States Trustee in Kansas for violations of bankruptcy law arising from a scheme virtually identical to that alleged in the SAC. *Id*. ¶ 83.

## LEGAL STANDARD

Plaintiffs' claims are subject to the pleading requirements in Rule 8 of the Federal Rules of Civil Procedure.[3] Rule 8 requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."[4] On a motion to dismiss, "a court must accept all material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."[5] A claim should be dismissed only where the facts alleged fail to establish a "plausible" claim for relief.[6] A claim is plausible if the plaintiff alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7] This liberal pleading standard does not require

---

[3] Defendants do not argue otherwise, and courts in the Second Circuit have declined to apply Rule 9(b) to the consumer-protection claims at issue. *See CFPB v. Manseth*, No. 22-cv-29, 2023 WL 5400235, at *15-16 (W.D.N.Y. Aug. 22, 2023) (holding that Rule 9(b) does not apply to substantial-assistance claims under the CFPA and noting that other courts in the Second Circuit "have declined to apply Rule 9(b)'s requirements in the context of consumer protection claims") (citation omitted); *F.T.C. v. Medical Billers Network, Inc.*, 543 F.Supp. 2d 283, 314 (S.D.N.Y.2008) (expressing doubt that Rule 9(b) applies to TSR claims).

[4] Fed. R. Civ. P. 8(a)(2).

[5] *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 751 (S.D.N.Y. 2018).

[6] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

detailed factual allegations but merely notice.[8] It is satisfied if a complaint alleges some facts that plausibly support the elements of the claim.[9]

## ARGUMENT

Plaintiffs brought this action against numerous defendants, including Fidelis, and multiple relief defendants, including Christo and Bush Lake Trust, alleging violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3(b). As alleged in Count 3 of the SAC, Fidelis provided substantial assistance to the Façade Firms when Fidelis knew or consciously avoided knowing that the Façade Firms were charging and collecting advance and disproportionate fees. Plaintiffs name Christo and the Bush Lake Trust as relief defendants and allege in Count 9 that they received millions of dollars in illegal fees from Fidelis that they do not have a legitimate claim to.

Fidelis, Christo, and the Bush Lake Trust do not dispute that the Façade Firms and SFS violated the TSR. Rather, they argue only that (1) the relevant portion of the TSR is invalid, (2) Fidelis's conduct constituted routine administrative services rather than substantial assistance, (3) Fidelis lacked knowledge or conscious disregard of the Façade Firms' violations, (4) the SAC fails to state a claim under New York law, and (5) Christo and the Bush Lake Trust are not proper relief defendants because Fidelis is not a wrongdoer. For the reasons set forth below, these arguments lack merit.

## I.    THE COMPLAINT ALLEGES ACTIONABLE FEDERAL AND STATE CLAIMS AGAINST FIDELIS

### A.  The Complaint adequately alleges that Fidelis substantially assisted violations of the TSR by the Façade Firms.

The TSR prohibits a person from "provid[ing] substantial assistance or support to

---

[8] *Sulaiman v. Laram*, No. 16-cv-8182, 2017 WL 11659746, at *4 (S.D.N.Y. Apr. 4, 2017).
[9] *Id.*

any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates," among other things, the TSR's advance-fee provision.[10] For a substantial-assistance claim: (1) there must be an underlying TSR violation; (2) the person must provide substantial assistance or support to the violator; and (3) the person must know or consciously avoid knowing that the seller or telemarketer is engaged in any act that violates the TSR.[11]

Fidelis does not argue that Plaintiffs have failed to adequately plead the first element, implicitly conceding the point. Rather, Fidelis argues that the relevant portion of the TSR is invalid and Plaintiffs failed to adequately allege the second and third elements of substantial assistance. These arguments are meritless.

### 1. The TSR's prohibition on substantially assisting violations of the advance-fee provision falls within the FTC's statutory authority.

The TSR's substantial-assistance provision fits comfortably within the Telemarketing Act's grant of authority to the Federal Trade Commission (FTC). Fidelis is thus mistaken to argue that Congress authorized the FTC to outlaw substantial assistance only of deceptive—not abusive—telemarketing conduct.

The Telemarketing Act instructs the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."[12] The TSR's prohibition on conduct that provides substantial assistance or support to others engaged in deceptive or abusive telemarketing acts or practices is such a rule. It is itself

---

[10] 16 C.F.R. § 310.3(b).

[11] *F.T.C. v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012).

[12] 15 U.S.C. § 6102(a)(1); *see also CFPB v. Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d 202, 209 (D. Mass. 2021) (recognizing the breadth of FTC's authority to create rules addressing telemarketing "at its discretion").

an abusive practice to, for example, knowingly provide substantial assistance to someone engaged in an abusive practice, just as it is itself a deceptive practice to knowingly provide substantial assistance to someone engaged in a deceptive practice. The Rule's substantial-assistance provision prohibits those assisting-and-facilitating types of abusive and deceptive practices and thus is a straightforward exercise of the overarching authority Section 6102(a)(1) gave the FTC in this domain.

Fidelis nonetheless insists that the FTC is implicitly barred from prohibiting substantial assistance of abusive telemarketing conduct. According to Fidelis, this is so because the statute provides, in Section 6102(a)(2), that the "rules respecting deceptive telemarketing acts or practices" should include a definition of that term, which "may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing," *id.* § 6102(a)(2), but Section 6102(a)(3) includes no parallel statement about what must be included in "rules respecting abusive acts or practices." *See* Dkt. 443 at 11. Fidelis is incorrect. Subsections (2) and (3) undoubtedly spell out provisions that Congress instructed "shall" be included in the Rule, but these provisions do not limit the broad authority conferred in subsection (1). Indeed, to read subsections (2) and (3) to limit the scope of the FTC's rulemaking authority would render (1) mere surplusage.

Fidelis's *expressio unius* type of reasoning "applies only when it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."[13] Here, the context does not make it "fair to suppose" that Congress meant to "say no" to a prohibition on substantially assisting abusive telemarketing acts and practices by not mentioning it in (a)(3)'s list of abusive practices that Congress instructed must be

---

[13] *Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) (internal citations and quotation marks omitted).

addressed in the Rule.

For one, Fidelis misreads Section 6102(a)(2)'s reference to facilitation and assistance as the exclusive source of FTC authority for rules prohibiting substantial assistance. But that cannot be squared with the provision's language, which shows that Section 6102(a)(2) is providing further detail about rules the FTC promulgates under Section 6102(a)(1). In particular, Section 6102(a)(2) simply provides that the "rules respecting deceptive acts or practices"—rules otherwise authorized by Section 6102(a)(1)—should include a definition of that term, which "may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing." *Id*. § 6102(a)(2). By its terms, that just identifies a particular type of conduct Congress wanted the FTC to consider addressing as it promulgated rules under Section 6102(a)(1). Far from limiting the general grant of authority in Section 6102(a)(1), Section 6102(a)(2)'s reference to assisting-and-facilitating rules only confirms that such rules are already authorized under Section 6102(a)(1)'s general grant of authority.

The different formulations of Section 6102(a)(2) and (a)(3) reinforce the conclusion that Congress's mention of assisting and facilitating deceptive conduct cannot fairly be read to imply that Congress intended to foreclose the FTC from addressing assisting and facilitating abusive conduct. Section 6102(a)(2) discusses assisting and facilitating when outlining potential aspects of a "definition of deceptive telemarketing" that the statute requires the FTC to include in its rulemaking.[14] Section 6102(a)(3), by contrast, doesn't require the FTC to craft a similar definition of abusive telemarketing, nor does it say what such an (unmentioned) definition must or may

---

[14] *See* 15 U.S.C. § 6102(a)(2).

include. The provisions' lack of parallelism is further evidence rebutting Fidelis's suggestion that Congress considered and rejected the possibility that rules authorized under Section 6102(a)(1) could prohibit assisting and facilitating others' abusive conduct.[15]

Moreover, the TSR provision at issue here—the advance-fee prohibition for debt-relief services—was designed to address conduct that was both abusive *and deceptive*. So even under Fidelis's own theory—under which the only authority for the FTC to promulgate assisting-and-facilitating rules is Section 6102(a)(2), which focuses on deceptive telemarketing—prohibiting substantial assistance of violations of this advance-fee provision is within the FTC's statutory power. In promulgating the advance-fee prohibition, the FTC continually emphasized that charging advance fees was an abusive practice that "ha[d] been an integral part of the widespread deception and abuse in the debt settlement industry."[16] As the FTC explained, "[i]n the context of debt relief transactions, advance fees create incentives for providers" to, among other things, "deceive consumers about fundamental aspects of the program in order to entice them to enroll."[17] The FTC banned the abusive practice of charging advance fees in order to rein in the deceptive telemarketing of debt-relief services. As a result, the FTC's regulations prohibiting substantial assistance of violations of the advance-fee prohibition fall within the FTC's authority to prohibit conduct "that assist[s] or facilitate[s] deceptive telemarketing"—an authority even Fidelis concedes the FTC has.

---

[15] *Cf. United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) ("[I]f the language of the two provisions at issue is not parallel, then Congress may not have envisioned that the two provisions would be closely compared in search of terms present in one and absent from the other.").

[16] Telemarketing Sales Rule, 75 Fed. Reg. 48484 (Aug. 10, 2010).

[17] *Id.*

### 2. Plaintiffs adequately plead the second element: substantial assistance.

Under the TSR, the "threshold for what constitutes 'substantial assistance' is low."[18] The assistance in question must be "more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule."[19] Put differently, while there must be some link between the actions of the assister and the actions of the telemarketer, plaintiffs do not need to prove a direct connection or causal relationship between the two.[20] Ultimately, as noted with regard to an identically-worded regulation, "[t]he substantial assistance inquiry focuses on assisting the business and not on assisting the . . . violation."[21]

Here, the Plaintiffs have clearly met the requirements for pleading substantial assistance under the TSR through the following allegations:

- SFS's sales employees encouraged consumers to enroll in the debt-relief service by promising that Defendants' network of lawyers would defend consumers in the event of a creditor lawsuit. SAC ¶ 18.

- During enrollment, consumers signed retainer agreements with Façade Firms that promised the firm lawyers would provide litigation defense if the consumer was sued by creditors while participating in the debt-relief service. *Id*. ¶ 122.

- After enrollment, SFS representatives instructed consumers to stop paying debts they enrolled in the program and to not speak with their creditors if the creditors contacted the consumers. *Id*. ¶¶ 115, 116.

- When creditors sued a consumer enrolled in the debt-relief service, Fidelis,

---

[18] *Consumer Health Benefits*, 2012 WL 1890242, at *6. *See also F.T.C. v. HES Merch. Servs. Co.*, No. 12-cv-1618, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014), ("The threshold for substantial assistance [under the TSR] is not nearly as high as [Defendants] seem to believe."), *aff'd*, 652 F. App'x 837 (11th Cir. 2016).

[19] *Consumer Health Benefits*, 2011 WL 3652248, at *10.

[20] *F.T.C. v. Walmart Inc.*, 664 F. Supp. 3d 808, 827 (N.D. Ill. 2023) (citing *F.T.C. v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013)).

[21] *New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C.*, 401 F. Supp. 3d 1229, 1334−35 (D.N.M. 2019) (analyzing identically-worded language in the MARS rule).

not the Façade Firm listed on the enrollment paperwork, was notified of the lawsuit. *Id.* ¶ 95.

- Fidelis then facilitated litigation support on behalf of the Façade Firms by acting as a hub and sending the lawsuit paperwork to contracted litigation or appearance attorneys. *Id.* ¶¶ 94-95.[22]

- Many of the Façade Firms sent payments to Fidelis. *Id.* ¶¶ 210-211. From April 2022 to October 2023, the Façade Firms listed in the SAC paid approximately $16.4 million to Fidelis. *Id.* ¶ 211.

- Jason Blust controls and oversees Fidelis and the Façade Firms. *Id.* ¶¶ 83, 95, 102-103.

In sum, Plaintiffs allege that Blust used Fidelis, as part of the broader operation, to provide litigation services promised to consumers by the Façade Firms and SFS when they enrolled in the debt-relief program. This is certainly "more than mere casual or incidental dealing" with the Façade Firms. Indeed, the assigning of attorneys was instrumental to the scheme because SFS told consumers to stop paying their creditors and said the program included litigation defense. *Id.* ¶¶ 115, 122, 174. This promise of litigation defense was part of a sales pitch to give consumers peace of mind and likely contributed to their willingness to enroll in the program and pay the advance fees.

Fidelis downplays its role in the debt-relief scheme, arguing that it provided only "ministerial services" to the "back-end services operation" rather than the "front-end sales operation." Dkt. 443 at 18-20. But Fidelis was far more than an unrelated provider

---

[22] Plaintiffs do not allege that Fidelis sent the lawsuit paperwork to the Façade Firms; rather, Fidelis sent the paperwork to *other* contracted litigation or appearance attorneys. SAC ¶ 95. Fidelis argues that Plaintiffs cast its work as ministerial when they allege that the Façade Firms did very little work and did not often represent consumers, Dkt. 443 at 20, but this is far from the truth. Plaintiffs allege that the Façade Firms did very little work, and the Façade Firms often failed to defend consumers against creditors' lawsuits. SAC ¶ 26, 122. But Plaintiffs also allege that when creditors sued consumers and Defendants provided the agreed-upon litigation defense, that defense was coordinated by Fidelis, Lit Def, or Relialit. SAC ¶¶ 95, 97.

of ministerial services. Fidelis is the successor of Lit Def and Relialit, both of which were owned by Jason Blust, Blust controls Fidelis, and the operations of Lit Def and Fidelis are interwoven. SAC ¶¶ 95-97. Moreover, Michelle Gallagher, who owns several Façade Firms, helped manage both Lit Def and Fidelis. *Id*. ¶ 91. Rather than being a separate, unrelated entity providing ministerial services, Fidelis is one of several tools Blust and the other Façade Firm lawyers operated to carry out the larger scheme.

Even if Fidelis could be viewed as supporting only the "back-end" of the operation, it would still be liable for its assistance. In *F.T.C. v. Lake*, the defendant sought dismissal for substantially the same reason Fidelis advances here, arguing "that so long as he was only doing 'back-end work'—i.e., not marketing directly to consumers or asking them for advance fees himself—he was shielded from liability under state and federal laws regulating mortgage-relief services."[23] The court disagreed, finding that because this back-end work "played an integral part" in the defendants' scheme, there was "no question" that the defendant could be held liable on a substantial-assistance theory.[24]

Fidelis's argument is based on the faulty premise that, under the TSR, the substantial assistance must be "related to" the underlying violation. But this language is not in the text of the TSR. In fact, as Fidelis admits, the rule's drafters specifically rejected proposed language that said substantial assistance must be "related to the commission or furtherance" of the underlying violation.[25] According to the rule history, the FTC did so because it determined that the "related to" requirement might allow

---

[23] 181 F. Supp. 3d 692, 696 (C.D. Cal. 2016).
[24] *Id*.at 700
[25] *Chapman*, 714 F.3d at 1216 (quoting Telemarketing Sales Final Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995)).

some people to evade liability "on the ground that their assistance was not 'related to' an unlawful act, even where required showings of knowledge and substantial assistance could be made."[26] The FTC made a conscious choice to exclude the phrase "related to" in the final rule; had it wanted to include this requirement, it would have done so.

Finding no support in the text, Fidelis dives into the regulatory history of the TSR in an attempt to expand the plain language of the rule. It points to one sentence in the legislative history comparing substantial assistance under the TSR to tort cases and cases brought under the Securities and Exchange Act of 1934, and it concludes that the standard for aiding-and-abetting in securities cases should apply to substantial assistance under the TSR. But the cases Fidelis cites for this proposition are not on point,[27] whereas decisions that actually consider the issue have rejected the idea that the aiding-and-abetting standard should apply to the TSR.[28]

Plaintiffs' allegations readily meet the correct standard of "more than casual or incidental dealing" that need not be related to the violation. Indeed, even if the Court

---

[26] Telemarketing Sales Rule, 60 FR 43842, 43851.

[27] Fidelis cites to two cases for the proposition that aiding-and-abetting principles should apply and so the substantial assistance must be related to the underlying violation. In one of those cases, the court applied these principles only to determine whether to impose joint and several liability for TSR violations. *F.T.C. v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240-41 (11th Cir. 2017). In the other, the court said aiding-and-abetting principles were "relevant in understanding substantial assistance," but it did not apply that standard to the facts at issue, instead dismissing the claim because the plaintiffs failed to show underlying TSR violations or the assistor's knowledge of the fraudulent conduct. *Walmart Inc.*, 664 F. Supp. 3d at 828.

[28] *See CFPB v. Daniel A. Rosen, Inc.*, No. 21-cv-07492, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) ("Defendants' reliance on aider-abettor principles under securities laws is misplaced."). Three recent cases cite favorably to *Rosen* in describing substantial assistance under the TSR and do not reference aiding-and-abetting principles. *See CFPB v. Commonwealth Equity Group, LLC,* No. 20-cv-10991, 2024 WL 4362126, at *9 (D. Mass. Sept. 30, 2024); *CFPB. v. Consumer Advoc. Ctr. Inc.*, No. 19-cv-1998, 2023 WL 5162392, at *9 (C.D. Cal. July 7, 2023); *Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC*, No. 1:21-cv-610, 2022 WL 20699258, at *6 (E.D. Va. Sept. 21, 2022).

were to apply the standard from securities law, Plaintiffs' claims easily survive. To allege substantial assistance, the SEC must allege that an aider and abettor "in some sort associate[d] himself with the venture, that [he] participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed."[29] Courts have noted that this standard is not a demanding one.[30] Here, Plaintiffs allege that Blust used Fidelis to provide services that were promised to consumers to induce them to enroll in the program and pay the illegal fees. This is more than enough to show that Fidelis participated in the venture and wished it to succeed.

### 3. Plaintiffs sufficiently allege the third element: that Fidelis knew or consciously avoided knowing that the Façade Firms were collecting advance fees.

To state a substantial-assistance claim, the SAC must also allege that Fidelis knew or consciously avoided knowing that the Façade Firms engaged in the acts or practices that violated the TSR.[31] Fidelis presents two arguments why the SAC fails to adequately allege knowledge. *First*, it contends that Plaintiffs must allege that Fidelis knew that the collection of advance and disproportionate fees for debt-relief services violated the TSR. *See* Dkt. 443 at 21-25, 28-29. *Second*, Fidelis crafts a myopic view of corporate liability that homes in on the knowledge of the company's purported chief executive, Christo, while sidelining the knowledge of Blust and Gallagher, who actually controlled and ran the company. Both of these arguments are flawed.

---

[29] *S.E.C. v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012).

[30] *CFPB v. D & D Mktg.*, No. 15-cv-9692, 2016 WL 8849698, at *12 (C.D. Ca. Nov. 17, 2016) (applying *Apuzzo* standard to a substantial assistance claim arising under the CFPA, 12 U.S.C. § 5536(a)(3)).

[31] *See* 16 C.F.R. § 310.3(b).

### a. Plaintiffs must allege only that Fidelis knew or consciously avoided knowledge of the facts constituting TSR violations.

Fidelis argues it can be liable only if it knew or consciously avoided knowing that the practices of the Façade Firms were illegal. *See* Dkt. 443 at 21. But this Court considered and rejected the same argument when it was previously brought by Defendants Sasson and Blust. As this Court explained, "defendants confuse factual knowledge with legal knowledge; only the former is required to establish a knowing statutory violation."[32] "Whether a defendant has 'legal knowledge,' e.g. [knowledge] about whether a certain statutory exception exempted his conduct from a clearly stated bar on conduct, is not relevant to this inquiry."[33]

This well-supported ruling constitutes the law of the case, and Fidelis offers no compelling justification for the Court to revisit it.[34] Fidelis's reliance on the text of the TSR is unpersuasive because it wholly ignores the Supreme Court and Second Circuit cases, cited by this Court, that held that similar language did not require knowledge of illegality. The TSR prohibits substantial assistance when a person "knows or consciously avoided knowing" that the telemarketer "is engaged in any practice that violates the TSR."[35] In *Bryan v. United States*, the high court held that comparable language— "knowingly violates" a statutory provision and "knowingly imports. . . any firearm or ammunition in violation of" a statutory provision—did not override the "background presumption" that "the knowledge requisite to [a] knowing violation . . . is factual

---

[32] Dkt. 281 at 4 (citing *In re Axa Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d. 196 236 (S.D.N.Y. 2022)).

[33] *Id*. at 5 (citing *Bryan v. United States*, 524 U.S. 184, 192-93 (1998)).

[34] *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise") (cleaned up).

[35] 16 C.F.R. § 310.3(b).

knowledge as distinguished from knowledge of the law."[36] Similarly, in *United States v. Int'l Mins. & Chem. Corp.*, the Supreme Court held that "knowingly violates any such regulation" "does not signal an exception to the rule that ignorance of the law is no excuse."[37] Following the Supreme Court's direction, the Second Circuit has held that, while "knowing" language may "appear[] to suggest that the government must prove that the defendant knew that he was violating the law," that interpretation is precluded by the Supreme Court's conclusion that such language does not "abrogate the bedrock common law principle that ignorance of the law is not a defense."[38]

Fidelis cites no authority that alters this precedent. Fidelis first cites to out-of-circuit securities cases which are inapposite because they describe common-law aiding-and-abetting principles rather than interpret statutory or regulatory text like that at issue here. *See* Dkt. 443 at 22-23. Fidelis's citations to out-of-circuit district-court cases evaluating claims under the TSR are equally unhelpful to it. One such case, *CFPB v. Rosen*, wholly supports this Court's holding, explaining that "[c]ourts have found it is sufficient to establish knowledge, or conscious avoidance, of the prohibited practice, and not of the TSR violation."[39] The other cases do not analyze the language of the TSR or even expressly rule that knowledge of illegality is required for a knowing violation, and to the extent they can be interpreted as having imposed such a requirement, they do not alter the Supreme Court and Second Circuit precedent that holds otherwise.[40]

---

[36] 524 U.S. 184, 192 (1998),

[37] 402 U.S. 558, 562 (1971).

[38] *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001).

[39] No. 21-cv-07492, 2022 WL 1514439, at *5 (C.D. Cal. Apr. 5, 2022).

[40] *See WV Universal Mgmt.*, 877 F.3d at 1240 (analyzing the TSR's substantial-assistance provision for the sole purpose of establishing that joint and several liability may be appropriate); *F.T.C. v. Walmart, Inc.*, No. 22-cv-3372, 2024 WL 3292800, at *15 (N.D.

In short, Fidelis does not offer any compelling reason to disturb the Court's prior, well-supported ruling on the requisite knowledge for a substantial-assistance claim under the TSR.[41] Accordingly, its argument should be rejected.[42]

### b. Plaintiffs sufficiently allege that individuals controlling and managing Fidelis knew that the Façade Firms charged advance fees for a debt-relief service involving telemarketing.

The SAC contains several allegations describing Fidelis's knowledge of the advance fees collected by Defendants. In particular, the SAC alleges that the individual defendants who controlled Fidelis (Jason Blust and Michelle Gallagher) knew about the conduct constituting the TSR violations and were extensively involved in the debt-relief scheme. Because the knowledge of a person who controls a company may be imputed to that company,[43] Plaintiffs' allegations regarding Blust and Gallagher plausibly support the inference that Fidelis knew or consciously avoided knowing about the collection of advance fees.

---

Ill. July 3, 2024) (dismissing a substantial-assistance claim against Walmart because the plaintiffs did not adequately allege that Walmart knew its money transfer services were being used in support of a fraudulent *telemarketing* scheme); *CFPB v. Chou Team Realty LLC*, No. 20-CV-00043, 2021 WL 4077110, at *3 (C.D. Cal. Aug. 10, 2021) (finding a substantial-assistance violation without any analysis of what the regulation requires).

[41] In any event, the SAC alleges adequate facts even to meet Fidelis's incorrect legal standard, as it alleges "Jason Blust knows or should know that the conduct alleged herein is illegal" given his previous role in a different advance-fee scheme that led to a stipulated judgment. SAC ¶ 83.

[42] Fidelis advances a similar argument on pages 28-29 of its brief. *See* Dkt 443 at 28-29 (arguing that neither Blust's nor Gallagher's knowledge may be imputed to Fidelis because the SAC fails to charge them with knowing that the collection of advance fees was illegal). The Court should reject that argument for the same reasons.

[43] *Baker v. Latham Sparrowbush Assoc.*, 72 F.3d 246, 255 (2d Cir. 1995); *S.E.C. v. Ballesteros Franco*, 253 F.Supp.2d 720, 728-29 (S.D.N.Y. 2003) (stating that "a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take" and that a person's knowledge is imputed to the corporation that the person controlled).

### 1. Jason Blust

While Cameron Christo is purportedly the founder and chief executive of Fidelis, the company is actually controlled by Blust. SAC ¶¶ 95-96, 102. Blust is a central character in the debt-relief scheme depicted in the SAC. As explained above, Blust created and maintains the Façade Firms and owns or runs several other companies that support the broader debt-relief operation, including Lit Def, Relialit, and Hedgewick. *Id.* ¶¶ 83-84, 94-98. And Blust's past employment with Legal Helpers Debt Resolution, LLC, along with the stipulated judgment against him for a similar scheme, show his familiarity with the TSR and the prohibition against taking advance or disproportionate fees. These facts adequately allege that Blust knew or consciously avoided knowing of the advance fees here. (In fact, this Court has already found that Blust knew of the unlawful conduct in this case.[44]) Given his control of the company, Blust's knowledge is imputed to Fidelis.[45]

Fidelis disputes the SAC's depiction of Blust's control of the company. *See* Dkt. 443 at 27 ("The fact that Blust oversaw the Law Firms that hired Fidelis, and once told employees of Lit Def or Fidelis . . . to gather documents for an ongoing litigation . . . does not even justify the conclusion Plaintiffs wish to draw – that Jason Blust controls Fidelis") (cleaned up). But the SAC amply describes how Blust controlled a host of entities involved in the Defendants' debt-relief scheme, alleges Fidelis is a successor to one of those entities (Lit Def) with whom it shared staff and customers, and avers that Blust controlled Fidelis and directed its employees to perform litigation-related activities. Viewed in the light most favorable to Plaintiffs, these facts adequately allege

---

[44] *See* Dkt. 281 at 5-6; Dkt. 183 at 46-47.
[45] *Baker*, 72 F.3d at 255.

that Blust was the one who controlled Fidelis.

### 2.  Michelle Gallagher

Plaintiffs allege that Michelle Gallagher exercised substantial control, helped manage daily operations, and worked directly under Blust at Lit Def and Fidelis between 2020 and 2024. SAC ¶¶ 91-92, 268. Like Blust, Gallagher also owns two Façade Firms and controls three others through her sole ownership of their bank accounts. *Id.* ¶ 9. Additionally, Gallagher signed a contract in March 2020 with a notary-provision company on behalf of one of the Façade Firms she controls. *Id.*

Given the role the Façade Firms played in the Defendants' debt-relief services scheme, it is reasonable to infer that Gallagher knew or consciously avoided knowing the Façade Firms engaged in the acts that violated the TSR. And that is precisely what the SAC alleges. *Id.* ¶¶ 93, 269. Because Gallagher exercised substantial control over Fidelis, SAC ¶ 92, her knowledge is imputed to the company.[46]

### c.  Fidelis misapplies agency principles to glide past the SAC's allegations about Blust and Gallagher's involvement and control.

Despite the foregoing, Fidelis attempts to invoke agency principles to assert that only Christo's knowledge may be imputed to the company. Dkt. 443 at 25-28. It asserts that because the SAC fails to allege that Christo possessed any knowledge about the Defendants' practices, Fidelis similarly lacked such knowledge. *Id.* at 28. Effectively, Fidelis seeks to fence itself off from the cast of interconnected players like Blust and Gallagher that lie at the center of the debt-relief scheme. It further argues that neither Blust's nor Gallagher's knowledge of the debt-relief scheme can be imputed to Fidelis

---

[46] *Baker*, 72 F.3d at 255.

because that knowledge was acquired before Fidelis was created. *Id*. at 26-27. Fidelis cites no case law and provides no explanation as to why the timing of such knowledge matters.

Indeed, the issue of precisely when Blust and Gallagher acquired their knowledge about the advance fees is irrelevant because the SAC alleges that both of them exercised control over Fidelis at the outset of its operations. From the allegations of the SAC, it is reasonable to infer that the knowledge that each of them acquired about the debt-relief services at issue in this litigation necessarily permeated Fidelis's decision-making and alleged conduct. Both Blust and Gallagher were integral parts of the debt-relief scheme alleged to violate the TSR.

For all of the foregoing reasons, the SAC sufficiently alleges that Fidelis possessed the requisite scienter to state a substantial-assistance claim under the TSR.

**B. The Complaint adequately alleges that Fidelis violated the New York Executive Law and General Business Law.**

Fidelis's motion to dismiss the Office of the New York State Attorney General's (NYAG) claims of statutory fraud and deceptive business practices is premised entirely on their misreading of the Complaint. Fidelis alleges that the Complaint does "not accuse Fidelis of participating in any fraudulent or deceptive practice." Dkt 443 at 31. The Complaint alleges that Fidelis received tens of millions of dollars—money consumers paid to Façade Firms—to coordinate and provide litigation defense for consumers. This promise of litigation defense was a feature touted to convince consumers to sign up for the debt-relief service. SAC ¶ 94. Despite being promised this service, many consumers did not receive the litigation defense that they paid for. SAC ¶¶ 95, 122. A business failing to provide a service a consumer paid for is a quintessential

fraud and deceptive business practice subject to redress under Executive Law § 63(12) and General Business Law (GBL) § 349.

1. **The meaning of "fraud" under § 63(12) is broad and applies to "any person" engaged in such conduct.**

"It is well-settled that the definition of fraud under subdivision 12 of section 63 of the Executive Law is extremely broad."[47] The term "fraud" as used in Executive Law § 63(12) expressly includes "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."[48] "[T]he test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud."[49] The NYAG need not plead the traditional elements of common law fraud such as reliance, actual deception, knowledge of deception, and intent to deceive.[50]

Executive Law § 63(12) permits the NYAG to seek relief against "any person" who has engaged in repeated fraud. "Executive Law § 63 (12) claims have been applied to a wide array of respondents, including persons with knowledge of fraudulent schemes, individuals who perpetrated those schemes, and pass-through entities and knowing recipients of fraudulently obtained proceeds."[51] The statute authorizes relief as to

---

[47] *Lefkowitz v. Bull Inv. Grp.*, 360 N.Y.S.2d 488, 491 (N.Y. 3d Dep't. 1974) *app. denied*, 35 N.Y.2d 647 (1975).

[48] Exec. L. § 63(12).

[49] *People v. Gen. Elec. Co.*, 302 A.D.2d 314, 756 N.Y.S.2d 520 (1st Dep't 2003).

[50] *People v. Greenberg*, 95 A.D.3d 474, 483, 946 N.Y.S.2d 1 (1st Dep't 2012), aff'd, 21 N.Y.3d 439, 994 N.E.2d 838 (2013); *People v. Coventry First LLC*, 52 A.D.3d 345, 346 (1st Dep't 2008), *aff'd*, 13 N.Y.3d 108 (2009); *People v. Apple Health & Sports Clubs, Ltd., Inc.*, 206 A.D.2d 266, 267, 613 N.Y.S.2d 868 (1st Dep't 1994), *appeal denied*, 84 N.Y.2d 1004 (1994); *State v. Ford Motor Co.*, 136 A.D.2d 154, 158 (3d Dep't 1988), *aff'd*, 74 N.Y.2d 495 (1989).

[51] *People v. Abraham Operations Assocs. LLC*, 2024 NY Slip Op 32976(U), ¶ 15 (Sup. Ct. N.Y. Cnty. Aug. 23, 2024).

corporate entities as well as directors, officers and owners who participated in or were aware of the fraud.[52] Corporations may be held liable for the fraudulent acts of others when they act in concert.[53]

### 2. The standard for liability under GBL § 349 is similar to § 63(12).

New York General Business Law Article 22-A, § 349, provides that "[d]eceptive acts or practices in the conduct of any business [...] in this state are hereby declared unlawful." To plead a claim under GBL § 349, the NYAG must allege that the conduct "'was misleading in a material way' and 'the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"[54] The meaning of deceptive practices under GBL § 349 is often given parallel construction to that of fraud under § 63(12).[55]

### 3. NYAG adequately pleads that Fidelis participated in a fraudulent and deceptive scheme.

Consumers paid the Façade Firms for a litigation defense to be provided when they were sued by creditors. The Façade Firms paid Fidelis to provide this service. But in many cases, consumers did not receive any litigation defense, despite paying for the service. These facts, as alleged, plainly state a claim for statutory fraud under Executive Law § 63(12) and a deceptive business practice under GBL § 349. Failing to deliver

---

[52] *People v. One Source Networking, Inc.*, 3 N.Y.S.3d 505, 509 (N.Y. 4th Dep't 2015.)

[53] *People v. Apple Health & Sports Clubs*, 80 N.Y.2d 803, 807 (N.Y. 1992) (defendants "were interlocking corporations and acted in concert in operating the [business] subjecting [one corporation] to liability for the fraudulent and illegal activities pursued by" the defendant's other corporation).

[54] *Gen. Elect. Co.*, 302 A.D.2d at 315 (internal citations omitted).

[55] *See State v. Colorado State Christian College*, 76 Misc.2d 50 (Sup. Ct. N.Y. Cnty. 1973). While there are sometimes differing standards for liability between the two statutes, for example GBL § 349 is limited to consumer-oriented conduct, while Executive Law § 63(12) is not, none of those differences are implicated here.

goods or services promised and paid for is classic consumer fraud actionable under these statutes.[56]

### 4. Fidelis's attempts to evade liability are unavailing.

Fidelis claims that because the false promises were made by SFS and the Façade Firms, not Fidelis, "it has nothing do with the promises made to consumers." Dkt. 443 at 19 n.17. Fidelis further claims that "SFS did not pitch consumers on the administrative support that Fidelis provided to the Law Firms," so it can't be held liable. *Id*. at 19. In short, Fidelis claims that because SFS and the Façade Firms were the front-end consumer-facing arm of the fraudulent and deceptive scheme, Fidelis, as a part of the "back-end" of the scheme is immunized from liability. Fidelis is wrong on the law.[57]

As explained in section I.A.2, *supra*, "back-end" service providers are not immunized from liability under the TSR.[58] In *New York v. Debt Resolve, Inc.*, the NYAG sued an entity that "provided the financing to consumers to allow them to purchase debt relief services of dubious value peddled by the other Defendants, who affirmatively misrepresent various attributes of the services."[59] Like Fidelis here, the defendant in

---

[56] *See, e.g.*, *Apple Health*, 206 A.D.2d at 267 (failure to provide health club services); *People v. Empyre Inground Pools, Inc.*, 227 A.D.2d 731 (3d Dept. 1996) (failure to complete pool installation projects); *People v. Helena VIP Pers. Introductions Serv. of New York, Inc.*, NYLJ, 1/17/92, p. 26, col. 3 (Sup. Ct. N.Y. Co), *aff'd*, 199 A.D.2d 186, 608 N.Y.S.2d 58 (1st Dept. 1993) (failure to provide personal introduction services); *People v. Lipsitz*, 174 Misc.2d 571, 582 (Sup. Ct. N.Y. Co. 1997) (failure to deliver magazines); *State of New York v. Bevis Indus., Inc.*, 63 Misc.2d 1088, 1091-92 (Sup. Ct. N.Y. Co. 1970) (failure to provide merchandise ordered within a reasonable time).

[57] It is easy to image SFS and the Façade Firms arguing that they are not liable for the failure of consumers to receive a litigation defense since they paid Fidelis to provide this service.

[58] The claims in *Lake* were brought under the FTC Act and "interpretations of the Federal Trade Commission Act (see 15 USC § 45 et seq.) are useful in determining the aforementioned violations under both the Executive Law and General Business Law." *People v. Applied Card Sys.*, 805 N.Y.S.2d 175, 178 (N.Y. 3d Dep't. 2005).

[59] 387 F. Supp. 3d 358, 369 (S.D.N.Y. 2019).

*Debt Resolve* argued that because they did not deliver the sales pitch to consumers, they were not liable. The Court disagreed, holding that:

> [E]ven if Equitable did not itself create the deceptive content used by Marketing Defendants to lure borrowers to enter into the credit plans, Plaintiff can still establish liability for the deceptive scheme by showing that Equitable "engage[d] in deceptive acts or practices that are injurious to customers with at least some knowledge of the deception."[60]

Fidelis's failure to provide paid-for litigation defense was plainly injurious to consumers. Fidelis was aware that it was being paid to provide litigation defense that was in fact routinely not being provided.

Fidelis also elides the fact that the Complaint pleads that Fidelis is controlled by Jason Blust. SAC. ¶¶ 83, 95. Blust controlled the Façade Firms, meaning the law firms that promised consumers a litigation defense. So, Fidelis's claim that other entities, not it, are responsible for the deception here rings even more hollow. The fact that Blust used multiple corporate entities to perpetrate his fraudulent and deceptive scheme does not insulate Fidelis from liability since Executive Law § 63(12) permits relief against "any person" who participates in a fraudulent scheme.

At base, Fidelis is in possession of monies paid by consumers for a promised service—litigation defense—which Fidelis failed to provide to many consumers. These allegations adequately plead a cause of action for fraud and deception under Executive Law § 63(12) and GBL § 349.[61]

---

[60] *Id.* (quoting *F.T.C. v. LeadClick Media, LLC*, 838 F.3d 158, 169-70 (2d Cir. 2016).

[61] Fidelis's argument that the NYAG's claims are "blunderbuss" ignores the fact that these counts incorporate by reference specific factual allegations pleading fraudulent and deceptive conduct by Fidelis. While Fidelis claims that the SAC's allegations "do not accuse Fidelis of participating in any fraudulent or deceptive practice," Dkt. 443 at 31, that is simply false, as explained above.

## II.    CAMERON CHRISTO AND THE BUSH LAKE TRUST ARE PROPER RELIEF DEFENDANTS

In the SAC, Plaintiffs name Christo and the Bush Lake Trust, among others, as relief defendants who hold funds received from Fidelis in constructive trust for affected consumers. Plaintiffs meet the standard for including them as relief defendants.

Federal courts may order equitable action against a relief defendant who is not accused of wrongdoing when "that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds."[62]

Plaintiffs allege sufficient facts here. First, Plaintiffs allege that Fidelis violated the law by assisting in the collection of illegal advance fees from consumers, SAC ¶¶ 94-96, 146, 154, 252-53, obtained some of those illegal fees, *id*. ¶¶ 210-211, and then transferred almost $19 million to Christo and the Bush Lake Trust, *id*. ¶ 105.[63] Thus, Plaintiffs have alleged that Christo and the Bush Lake Trust received ill-gotten funds from Fidelis.

Second, Defendants do not dispute that neither Christo nor the Bush Lake Trust have a legitimate claim to the funds. Plaintiffs allege that Christo does very little or no work for Fidelis, and that Blust, not Christo or the Bush Lake Trust, controls Fidelis. *Id*. ¶ 102-4. These facts support an inference that Christo and the Bush Lake Trust do not have a legitimate claim to the funds because they received them without any consideration or are simply holding Fidelis and its assets in trust for Blust.[64]

---

[62] *S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).

[63] Plaintiffs do not concede that payments from the Façade Firms to Fidelis were bona fide payments for work performed.

[64] *See F.T.C. v. Grand Teton Pros., LLC*, No. 19-cv-933, 2019 WL 4439501, at *2 (D. Conn. June 18, 2019) (no legitimate claim if the relief defendant holds the money as a trustee for the benefit of a defendant); *S.E.C. v. China Energy Sav. Tech., Inc*., No. 06-

Indeed, Defendants' brief makes clear that Christo and the Bush Lake Trust are proper relief defendants. Defendants argue only that Count 9 should be dismissed because it "depend[s] on Fidelis being a wrongdoer." Dkt. 443 at 33. Defendants concede that, "[i]f Fidelis were a wrongdoer, these transfers to Christo and Bush Lake might be subject to disgorgement." *Id*. at 34. As discussed above, this is precisely what the SAC alleges: Fidelis is a wrongdoer because it substantially assisted the illegal debt-relief scheme. Taking the foregoing as true, Plaintiffs have plausibly alleged that Fidelis's proceeds were ill-gotten. Because Fidelis transferred those ill-gotten proceeds to Christo and the Bush Lake Trust for no consideration, they have no legitimate claim to them and are properly included as relief defendants.

## CONCLUSION

For the foregoing reasons, the motions by Fidelis, Christo, and the Bush Lake Trust should be denied in their entirety.

Dated:        October 18, 2024          Respectfully submitted,


                                        Attorneys for Plaintiff
                                        Consumer Financial Protection Bureau

                                        ERIC HALPERIN
                                        Enforcement Director

                                        RICHA SHYAM DASGUPTA
                                        Deputy Enforcement Director

                                        MICHAEL POSNER
                                        Assistant Litigation Deputy

                                        /s/ Vanessa Buchko
                                        Vanessa Buchko

---

cv-6402, 2008 WL 11570543, at *6 (E.D.N.Y. Mar. 18, 2008), *report and recommendation adopted*, No. 06-cv-6402, 2008 WL 11570544 (E.D.N.Y. Mar. 31, 2008) (no legitimate claim if relief defendant received the asset as a gift).

E-mail: vanessa.buchko@cfpb.gov
Phone: (202) 435-9593
Joseph Sanders
E-mail: joseph.sanders@cfpb.gov
Phone: (202) 377-9846
Shirley Chiu
E-mail: shirley.chiu@cfpb.gov
Phone: (202) 435-7592
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7722

And

LETITIA JAMES
Attorney General of the State of New York

/s/ Christopher L. Boyd
Christopher L. Boyd
Genevieve S. Rados
Assistant Attorney General
350 Main Street, Suite 300A
Buffalo, NY 14202
Phone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov


PHILIP J. WEISER
Attorney General State of Colorado

 /s/ Kevin J. Burns
Kevin J. Burns, CO Reg. No. 44527
*(pro hac vice)*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

*Attorney for Plaintiff State of Colorado, ex rel.
Philip J. Weiser, Attorney General*

KATHLEEN JENNINGS
Attorney General State of Delaware

*/s/ Marion M. Quirk*
Marion M. Quirk (*pro hac vice*)
Director of Consumer Protection
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov

*Attorney for State of Delaware*


KWAME RAOUL
Attorney General
State of Illinois

By: */s/ Greg Grzeskiewicz*
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau
*Pro hac vice application forthcoming,*
*if required*
Amanda E. Bacoyanis, Assistant Attorney
General, Consumer Fraud Bureau
(*pro hac vice*)
Matthew Davies, Supervising Attorney,
Consumer Fraud Bureau
(*pro hac vice*)
Office of the Illinois Attorney General
115 S. LaSalle St., 26th Floor
Chicago, Illinois 60603
(312) 814-2218
Greg.Grzeskiewicz@ilag.gov
Amanda.Bacoyanis@ilag.gov
Matthew.Davies@ilag.gov

*Attorneys for the People of the State of Illinois*


KEITH ELLISON
Attorney General of Minnesota

*/s/ Evan Romanoff*
Evan Romanoff (*pro hac vice*)

28

Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2130
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

*Attorney for the State of Minnesota*

JOSHUA H. STEIN
Attorney General of North Carolina

 */s/  M. Lynne Weaver*
M. Lynne Weaver (*pro hac vice*)
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

*Attorney for the State of North Carolina*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Lewis W. Beilin*
Lewis W. Beilin *(pro hac vice)*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
beilinlw@doj.state.wi.us

*Attorney for State of Wisconsin*