UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al.*,

                   Plaintiffs,

    v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), *et al.*,

                  Defendants, and

STRATEGIC ESOP, *et al.*,

                  Relief Defendants.

24-CV-40 (EAW) (MJR)

---

**COMBINED REPLY MEMORANDUM IN FURTHER SUPPORT OF
MOTIONS TO DISMISS FILED BY DEFENDANT FIDELIS LEGAL
SUPPORT SERVICES, LLC AND RELIEF DEFENDANTS
CAMERON CHRISTO AND THE BUSH LAKE TRUST**

**HOOVER & DURLAND LLP**
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*

*Attorneys for Defendant Fidelis
Legal Support Services, LLC, and for
Relief Defendants Cameron Christo
and The Bush Lake Trust*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.   THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST
     FIDELIS. ................................................................................................................. 3

     A.   The Complaint does not plausibly allege that Fidelis substantially
          assisted the Law Firms' TSR violations. ..................................................... 3

     1.   The relevant portion of the TSR is invalid because it exceeds Congress's
          delegation of rulemaking authority. ............................................................ 3

     2.   When Fidelis helped the Law Firms defend debtors against creditors'
          lawsuits, it was not substantially assisting the Firms' earlier collection
          of advance fees. ............................................................................................. 7

          a.   "Substantial assistance" means aiding a TSR violation, not aiding
               a company that is violating the TSR. .................................................. 7

          b.   The routine administrative services that Fidelis provided the Law
               Firms were remote from, and incidental to, the Firms' collection
               of advance fees. ................................................................................... 9

     3.   Fidelis did not know, or consciously avoid knowing, that the Law Firms
          were collecting advance fees without an adequate face-to-face sales
          presentation. ............................................................................................... 12

          a.   Substantial-assistance liability requires knowledge of a TSR
               violation, not knowledge of an act that happens to violate the
               TSR. .................................................................................................... 12

          b.   Blust's and Gallagher's knowledge cannot be imputed to Fidelis,
               and even if it could the Complaint does not charge them with
               conscious wrongdoing. ....................................................................... 16

     B.   The Complaint does not plausibly allege that Fidelis violated
          state-law prohibitions on deceptive business practices. ......................... 18

II.  THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST
     CAMERON CHRISTO OR THE BUSH LAKE TRUST ...................................... 21

CONCLUSION .................................................................................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. Garland,*
    33 F.4th 626 (2d Cir. 2022)..................................................................................................3

*Apollo Fuel Oil v. United States,*
    195 F.3d 74 (2d Cir. 1999)................................................................................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .........................................................................................................18

*Baker v. Latham Sparrowbush Associates,*
    72 F.3d 246 (2d Cir. 1995)...............................................................................................16

*Bittner v. United States,*
    598 U.S. 85 (2023) .............................................................................................................5

*Bloom v. Azar,*
    976 F.3d 157 (2d Cir. 2020)...........................................................................................5, 6

*Bowen v. Georgetown University Hospital,*
    488 U.S. 204 (1988) ...........................................................................................................5

*Bryan v. United States,*
    524 U.S. 184 (1998) ...................................................................................................14, 15

*C.F.P.B. v. Commonwealth Equity Grp., LLC,*
    No. 20-CV-10991, 2024 WL 4362126 (D. Mass. Sept. 30, 2024)..................................9

*C.F.P.B. v. Consumer Advoc. Ctr. Inc.,*
    No. 19-CV-1998, 2023 WL 5162392 (C.D. Cal. July 7, 2023) .......................................9

*C.F.P.B. v. Daniel A. Rosen, Inc.,*
    No. 21-CV-07492, 2022 WL 1514439 (C.D. Cal. Apr. 5, 2022).................................8, 9

*Citizens Against Casino Gambling v. Chaudhuri,*
    802 F.3d 267 (2d Cir. 2015)...............................................................................................5

*Discover Growth Fund v. 6D Glob. Techs. Inc.,*
    No. 15-CV-7618, 2015 WL 6619971 (S.D.N.Y. Oct. 30, 2015)....................................17

*F.T.C. v. Lake,*
    181 F. Supp. 3d 692 (C.D. Cal. 2016) ............................................................................11

*F.T.C. v. Walmart Inc.,*
    664 F. Supp. 3d 808 (N.D. Ill. 2023)................................................................................9

*F.T.C. v. WV Universal Mgmt., LLC,*
    877 F.3d 1234 (11th Cir. 2017) ................................................................................14, 15

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009) .................................................................................. 12, 15

*Halo v. Yale Health Plan*,
    819 F.3d 42 (2d Cir. 2016) .................................................................................. 8

*Homaidan v. Sallie Mae, Inc.*,
    3 F.4th 595 (2d Cir. 2021) .................................................................................. 3

*In re Air Crash Near Clarence Ctr.*,
    No. 09-CV-1043-S, 2012 WL 13184308 (W.D.N.Y. Jan. 24, 2012) ........................... 14

*In re AXA Equitable Life Insurance Co. COI Litigation*,
    595 F. Supp. 3d 196 (S.D.N.Y. 2022) .............................................................. 14, 15

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
    589 U.S. 178 (2020) .................................................................................. 4

*John Wiley & Sons, Inc. v. DRK Photo*,
    882 F.3d 394 (2d Cir. 2018) .................................................................................. 6

*Liparota v. United States*,
    471 U.S. 419 (1985) .................................................................................. 12, 14

*Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC*,
    No. 21-CV-610, 2022 WL 20699258 (E.D. Va. Sept. 21, 2022) ................................... 9

*Milligan v. GEICO Gen. Ins. Co.*,
    No. 20-3726, 2022 WL 433289 (2d Cir. Feb. 14, 2022) ......................................... 14, 20

*New York v. Debt Resolve, Inc.*,
    387 F. Supp. 3d 358 (S.D.N.Y. 2019) .................................................................................. 20

*Polselli v. Internal Revenue Serv.*,
    598 U.S. 432 (2023) .................................................................................. 3

*Rehaif v. United States*,
    588 U.S. 225 (2019) .................................................................................. 13, 15

*Riley v. MEBA Pension Tr.*,
    452 F. Supp. 117 (S.D.N.Y. 1978) .................................................................................. 14

*Russello v. United States*,
    464 U.S. 16 (1983) .................................................................................. 7

*S.E.C. v. Ballesteros Franco*,
    253 F. Supp. 2d 720 (S.D.N.Y. 2003) .................................................................................. 17

*Stokes v. Lokken*,
    644 F.2d 779 (8th Cir. 1981) .................................................................................. 11

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008) .................................................................................. 16

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023) ...................................................................................... 9, 15, 16

*United States v. Councilman,*
    418 F.3d 67 (1st Cir. 2005) ...................................................................................... 6

*United States v. International Minerals & Chemical Corp.,*
    402 U.S. 558 (1971) ...................................................................................... 14, 15

*United States v. Weintraub,*
    273 F.3d 139 (2d Cir. 2001) ...................................................................................... 14, 15

**Federal Statutes**

15 U.S.C. § 6101(4) ...................................................................................... 3

15 U.S.C. § 6101(5) ...................................................................................... 3

15 U.S.C. § 6102(a)(1) ...................................................................................... 3, 4, 6

15 U.S.C. § 6102(a)(2) ...................................................................................... 3, 4, 5, 6, 7, 8

15 U.S.C. § 6102(a)(3) ...................................................................................... 4, 6, 7

15 U.S.C. § 6102(d)(1)(A) ...................................................................................... 3

15 U.S.C. § 6102(d)(1)(B)(i) ...................................................................................... 3

**State Statutes**

N.Y. Exec. Law § 63(12) ...................................................................................... 18

N.Y. Gen. Bus. Law § 349 ...................................................................................... 18, 20

**Regulations**

16 C.F.R. § 310.3(b) ...................................................................................... 4, 6, 12, 13, 14, 15, 17

16 C.F.R. § 310.4(a)(5)(i) ...................................................................................... 7, 18

16 C.F.R. § 310.4(b)(1)(v)(B)(i) ...................................................................................... 15

16 C.F.R. § 310.4(c) ...................................................................................... 15

16 C.F.R. § 310.6(b)(3) ...................................................................................... 18

60 Fed. Reg. 43842-01 (Aug. 23, 1995) ...................................................................................... 6, 8, 13

68 Fed. Reg. 4580-01 (Jan. 29, 2003) ...................................................................................... 13

75 Fed. Reg. 48458-01 (Aug. 10, 2010) ...................................................................................... 7

80 Fed. Reg. 77520-01 (Dec. 14, 2015) ...................................................................................... 13, 14

**Other Authorities**

F.T.C., *Complying with the Telemarketing Sales Rule*,
https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-
rule ........................................................................................................................8, 11

# INTRODUCTION[1]

We agree with Plaintiffs that the claims against Cameron Christo and The Bush Lake Trust depend on the claims against Fidelis Legal Support Services, LLC. We disagree with much of what Plaintiffs say in defense of their claims against Fidelis.

Though Plaintiffs have sued Fidelis separately, their opposition memorandum is allergic to individualized analysis. Time and again, Plaintiffs' arguments devolve into general contentions about "the scheme," or what Jason Blust did or knew. That tactic might make sense if this were a RICO conspiracy case, or if Fidelis were alleged to be Blust's alter ego, or if Fidelis were alleged to be part of a common enterprise. But because the Complaint does not even try to satisfy those demanding legal doctrines, the claims against Fidelis must rise or fall on the allegations aimed at Fidelis itself. Those allegations fail to state a claim under the TSR or New York law.

Plaintiffs' defense of the TSR claim skates by the rule's partial invalidity and preaches an extremist vision of substantial-assistance liability. In Plaintiffs' telling, "substantial assistance" of a TSR violation includes nominal assistance unrelated to the TSR violation, and "knowledge" of a TSR violation includes awareness of facially innocuous conduct that the TSR happens to prohibit (such as collecting advance fees without a face-to-face sales presentation). If that's right, CIBC Bank better brace itself for a billion-dollar judgment, since it financed Strategic's operation and knew Strategic was collecting advance fees. (Compl. ¶¶ 58, 142.) Also on the hook are the consultants and lawyers who advised Strategic on its advance-fee program, the notaries who walked consumers through the advance fees Strategic would charge, the payment processors who disbursed advance fees, every Strategic executive and employee, and so on *ad infinitum*.

---

[1]    This combined reply memorandum, jointly submitted in further support of three separate motions to dismiss, complies with W.D.N.Y. Local R. Civ. P. 7(a)(2)(C), which authorizes a reply memorandum up to 10 pages long in support of each motion filed. Defined terms and citation conventions used in the movants' principal memorandum (Dkt. 443 ("Mem.")) are carried forward here.

This notion of liability without limit is CFPB fantasyland. In preambles and guidance that Plaintiffs conspicuously ignore, the TSR's author has repeatedly confirmed what is apparent from the text: "substantial assistance" does not include rote tasks with little or no relation to a TSR violation, and "knowledge" means knowledge of wrongdoing, not simply knowledge of an act the TSR happens to prohibit. The allegations against Fidelis fall short on both fronts. The back-end litigation-support services Fidelis provided to the Law Firms did not facilitate the Firms' earlier collection of advance fees, but simply helped the Firms supply the litigation defense the consumer had paid for in advance. And Fidelis did not know, or ignore red flags indicating, that the Law Firms' receipt of advance fees violated the TSR.

Plaintiffs' defense of the state-law claims features another bout of wishful thinking. According to Plaintiffs, the Complaint alleges that Fidelis conned consumers by failing to deliver the litigation defense it was paid to provide. What the Complaint actually says is that *SFS* promised consumers that *the Law Firms* would provide litigation defense; that consumers paid *the Law Firms* for litigation defense; that *the Law Firms* often declined to provide litigation defense pursuant to a loophole in their engagement letters; that when the Law Firms *did* provide litigation defense, Fidelis was called upon to *relay paperwork and perform data entry*; and that Fidelis provided the services the Law Firms paid it to provide. (Compl. ¶¶ 94-95, 122, 174.) Assuming, as we must, that the Law Firms sometimes kept and sometimes broke the promise of litigation defense, Fidelis's ministerial contribution to the promises kept is not participation in the promises broken.

Accordingly, the Complaint should be dismissed as against Fidelis, Christo, and Bush Lake.

## ARGUMENT

### I. THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST FIDELIS.

#### A. The Complaint does not plausibly allege that Fidelis substantially assisted the Law Firms' TSR violations.

The relevant portion of the TSR exceeds the rulemaking authority conferred in the Telemarketing Act, and Plaintiffs' conception of "knowing" and "substantial" assistance is cartoonishly overbroad.

#### 1. The relevant portion of the TSR is invalid because it exceeds Congress's delegation of rulemaking authority.

The parties agree that the Telemarketing Act divides prohibited conduct into two categories: deceptive telemarketing and abusive telemarketing. (Mem. at 10; (Dkt. 460 ("Opp.") at 6.) As to deceptive telemarketing, Congress directed the Commission to identify the practices that qualify as "deceptive," and specified that the definition of deceptive telemarketing "*may* include acts or practices . . . that assist or facilitate *deceptive* telemarketing." 15 U.S.C. § 6102(a)(2) (emphasis added). Neither this clause nor any other portion of the Telemarketing Act authorizes secondary liability for facilitating *abusive* telemarketing. Given the Telemarketing Act's clear dichotomy between deceptive telemarketing and abusive telemarketing, and the number of provisions that explicitly reference both categories, *see id.* §§ 6101(4), 6101(5), 6102(a)(1), 6102(d)(1)(A), 6102(d)(1)(B)(i), Congress is presumed to have acted "intentionally and purposely" when it authorized secondary liability only as to deceptive telemarketing, *Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) (cleaned up).[2] When the Commission drafted the TSR, however, it read § 6102(a)(2) to include the very category of conduct that Congress intentionally omitted: the TSR makes it a

---

[2]    *See also Alvarez v. Garland*, 33 F.4th 626, 641 (2d Cir. 2022) (where "conviction" appeared in several subsections of a statute but was omitted from "a closely adjacent" subsection, "well-established principles of statutory construction" required the court to assume the omission was deliberate); *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 602 (2d Cir. 2021) ("Congress used the word 'loan' several times in § 523(a)(8) but left it out of § 523(a)(8)(A)(ii), signaling that the omission was intentional.").

deceptive practice to knowingly and substantially assist in *either* deceptive telemarketing *or* abusive telemarketing. 16 C.F.R. § 310.3(b).

To reconcile § 310.3(b) with the Telemarketing Act, Plaintiffs principally rely on the general rulemaking authority conferred in 15 U.S.C. § 6102(a)(1). (Opp. at 6-9.) According to Plaintiffs, the specific directives regarding deceptive telemarketing and abusive telemarketing found in subsections (a)(2) and (a)(3) are just something "Congress wanted the [Commission] to consider" (*id.* at 8); they "do not limit the broad authority conferred in subsection [(a)](1)" (*id.* at 7). Treating (a)(2) and (a)(3) as more than suggestions, Plaintiffs say, "would render [(a)](1) mere surplusage." (*Id.*) This argument fails for three reasons.

First, if (a)(2) and (a)(3) were just something for "the [Commission] to consider" (*id.* at 8), Congress knew how to say so. *See* 15 U.S.C. § 6102(a)(3) (directing the Commission to "consider recordkeeping requirements").

Second, it is Plaintiffs' reading, not Fidelis's, that violates the canon against surplusage. Telling the Commission that it "may" impose secondary liability for deceptive telemarketing (and deceptive telemarketing only) is meaningless if the Commission "may" also formulate secondary liability as broadly as it likes.[3] Fidelis's reading, meanwhile, does not leave (a)(1) without a purpose; the general delegation of rulemaking authority operates in full wherever Congress has not given more specific direction.

Third, Plaintiffs' reading contravenes the *expressio unius* canon by negating Congress's choice to authorize secondary liability only with respect to deceptive telemarketing. *See, e.g.*, *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 186 (2020) (where statute "repeatedly [drew] a linguistic distinction between" two types of

---

[3] Plaintiffs mischaracterize (a)(2) and (a)(3) as "spell[ing] out provisions that Congress instructed 'shall' be included in the Rule." (Opp. at 7.) The relevant portion of (a)(2) tells the Commission what type of secondary liability it "may include" in the TSR. 15 U.S.C. § 6102(a)(2). Telling the Commission what it "may" do with respect to secondary liability necessarily indicates that it may not do any more.

knowledge, and "included both forms of knowledge" in other provisions, a provision referencing just one type of knowledge could not be read as implicitly including the other (cleaned up).[4] And the means by which Plaintiffs accomplish their end-run—resort to (a)(1)'s general rulemaking authority—is the very device the Supreme Court rejected in *Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988). The enabling statute at issue in *Bowen* generally authorized the agency to promulgate rules regarding Medicare payments, *id.* at 205-06, and specifically authorized "a mechanism for making retroactive corrective adjustments" on a case-by-case basis, *id.* at 210. Like Plaintiffs here, the agency contended that Congress's explicit authorization of *some* retroactive action meant that the agency could take *other* retroactive action under its "general rulemaking power." *Id.* at 213. The Supreme Court held the opposite: Congress had evidently "considered the need for retroactive agency action," and by approving one form of retroactive action it necessarily disapproved all others. *Id.* at 213-14.

Plaintiffs inexplicably ignore *Bowen*. And the two cases they do cite (Opp. at 7-9) are of no help to them. In *Bloom v. Azar*, 976 F.3d 157 (2d Cir. 2020), the court held that the *expressio unius* canon applies when "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Id.* at 161 (cleaned up). That condition is easily met. Congress expressly divided prohibited conduct into two categories (deceptive telemarketing and abusive telemarketing); it expressly considered the possibility of secondary liability; and it expressly authorized secondary liability for only one of the two categories it had created (deceptive telemarketing). 15 U.S.C. § 6102(a)(2). And whereas the *Bloom* court identified contextual and historical evidence powerfully rebutting any negative implication arising from the statute's text, 976 F.3d at

---

[4]    *See also Bittner v. United States*, 598 U.S. 85, 93-94 (2023) (statute that recognized two types of misconduct—willful violations and non-willful violations—and explicitly authorized per-account penalties for willful violations was assumed to disapprove per-account penalties for non-willful violations); *Citizens Against Casino Gambling v. Chaudhuri*, 802 F.3d 267, 287 (2d Cir. 2015) (where statute recognized two types of lands—"trust lands and restricted fee lands"—a provision explicitly referring to "trust lands" without "any reference to restricted fee lands" was read "as intentionally confining [the provision]'s application to trust lands").

162-64, Plaintiffs here offer no reason to doubt that Congress was acting deliberately when it authorized secondary liability only as to deceptive telemarketing.

Plaintiffs also cite *United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005) (en banc), in the hope of minimizing Congress's choice to authorize secondary liability in (a)(2) (which addresses deceptive telemarketing) but not in (a)(3) (which addresses abusive telemarketing). (Opp. at 9.) Preliminarily, the contrast between (a)(2) and (a)(3) is hardly our main point. Subsection (a)(2) is the source for § 310.3(b), *see* 1995 Preamble, 60 Fed. Reg. 43842-01, 43852 n.98 (Aug. 23, 1995), and it authorizes secondary liability only with respect to deceptive telemarketing. The fact that (a)(3) does not include a parallel provision authorizing secondary liability with respect to abusive telemarketing simply underscores what is apparent from (a)(2) itself.

In any event, *Councilman* cuts against Plaintiffs. *Councilman* holds that the *expressio unius* canon is most powerful when (i) Congress adds specifications to a general enactment; and (ii) "Congress enacts a new, self-contained statute, and two provisions of that act, drafted with parallel language, differ in that one provision uses a term, but the other provision, where it would be equally sensible to use that term if Congress desired it to apply, conspicuously omits it." 418 F.3d at 74-75. The statute at issue in *Councilman* satisfied neither condition, *id.* at 75-76, but the Telemarketing Act satisfies both. Subsection (a)(2) adds specifications to the general rulemaking authority conferred in (a)(1), and (a)(2) and (a)(3) are neighboring provisions of a single statute, each giving further direction as to one half of the deceptive/abusive dichotomy running throughout the Telemarketing Act. If Congress had wanted deceptive telemarketing to include facilitation of both deceptive and abusive telemarketing, (a)(2) would not have said that the definition of deceptive telemarketing "may include" facilitation of deceptive telemarketing only. *See John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 405 (2d Cir. 2018) ("[B]y identifying who may bring suit under the Act, Congress signaled that others may not."). If Congress had wanted abusive telemarketing to include facilitation of "an abusive practice, just as" deceptive telemarketing includes facilitation of "a

deceptive practice" (Opp. at 6-7), it would have authorized secondary liability in (a)(3), just as it did in (a)(2). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Had Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done so expressly as it did in the immediately following subsection (a)(2).").

As a last resort, Plaintiffs argue that because advance fees "'*create incentives*'" for misleading sales pitches and other deceptive practices, facilitating the collection of advance fees qualifies as facilitating a deceptive practice. (Opp. at 9 (quoting 2010 Preamble, 75 Fed. Reg. 48458-01, 48484 (Aug. 10, 2010)) (emphasis added).) That doesn't follow. Whether or not advance fees were thought to *incentivize* deceptive practices, taking advance fees is not *itself* a deceptive practice. The TSR defines it as an abusive practice, 16 C.F.R. § 310.4(a)(5)(i), and the Complaint alleges that Fidelis violated the TSR's prohibition on substantially assisting "abusive acts or practices" (Compl. ¶¶ 250-54). Because that prohibition is invalid, Count 3 fails as against Fidelis.

### 2. When Fidelis helped the Law Firms defend debtors against creditors' lawsuits, it was not substantially assisting the Firms' earlier collection of advance fees.

Earlier this year, the Court rejected an interpretation of the TSR that would lead to "the notaries hav[ing] statutory liability for defendants' [collection of unlawful advance fees]." (Dkt. 183 at 25.) That "illogical and seemingly unintended consequence[]" (*id.*) is just the tip of the iceberg if Plaintiffs' vision of substantial-assistance liability prevails.

### a. "Substantial assistance" means aiding a TSR violation, not aiding a company that is violating the TSR.

Plaintiffs insist that "substantial assistance" means any nominal assistance rendered to an entity that is violating the TSR, even if the assistance is unrelated to the TSR violation. (Opp. at 10-13.) But they offer little support for this permissive construction.

- 7 -

To start, Plaintiffs ignore the text of the Telemarketing Act, which authorizes the Commission to prohibit acts "that assist or facilitate deceptive *telemarketing*," 15 U.S.C. § 6102(a)(2) (emphasis added), not acts that assist or facilitate *entities engaged in* deceptive telemarketing. Plaintiffs also ignore the agency guidance explaining that assistance "with little or no relation to the conduct that violates the TSR" does not qualify. F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (last visited Nov. 6, 2024).

Moreover, while Plaintiffs seemingly accept the Court's obligation to read the text of the TSR in light of its preambles, *Halo v. Yale Health Plan*, 819 F.3d 42, 52-56 (2d Cir. 2016), they distort what the preambles say. Like the outlier decision in *C.F.P.B. v. Daniel A. Rosen, Inc.*, No. 21-CV-07492, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022), Plaintiffs assert that the Commission "rejected proposed language that said substantial assistance must be 'related to the commission or furtherance' of the underlying violation" (Opp. at 12 (citing the 1995 Preamble))—as though the Commission deemed a related-to requirement *unwarranted*. In reality, the Commission deemed a separate related-to requirement *superfluous*, because "the ordinary understanding of the qualifying word 'substantial' encompasses the notion that the requisite assistance must consist of more than mere casual or incidental dealing with a seller or telemarketer that is *unrelated to a violation of the Rule*." 1995 Preamble, 60 Fed. Reg. at 43852 (emphasis added).[5]

Plaintiffs also lack any meaningful response to the Securities Cases cited in the 1995 Preamble, which likewise require assistance of the violation itself, not just the

---

[5]    Determined to obscure this direct repudiation of their position, Plaintiffs first quote the 1995 Preamble's "more than mere casual or incidental dealing" language while omitting the crucial clause that follows (Opp. at 11), and later claim that substantial assistance is "'more than casual or incidental dealing' *that need not be related to the violation*" (*id.* at 13 (emphasis added)), whereas the Preamble itself says the exact opposite: "the requisite assistance must consist of more than mere casual or incidental dealing with a seller or telemarketer *that is unrelated to a violation of the Rule*," 1995 Preamble, 60 Fed. Reg. at 43852 (emphasis added).

entity doing the violating (Mem. at 14-15). All Plaintiffs offer in this regard is *Rosen*. (Opp. at 13.[6]) But *Rosen* simply misreads the 1995 Preamble (Mem. at 17), as one of Plaintiffs' own cases explains, *F.T.C. v. Walmart Inc.*, 664 F. Supp. 3d 808, 828 n.21 (N.D. Ill. 2023).[7]

In short, the Telemarketing Act, the 1995 Preamble, the Securities Cases, the Commission's guidance, and the weight of the case law all point in the same direction: "substantial assistance" means assistance of the primary TSR violation itself. (Mem. at 12-17.) Indeed, in a recent opinion distilling two centuries of secondary-liability jurisprudence—including the very securities and tort doctrines invoked by the 1995 Preamble—the Supreme Court unanimously held that liability for "knowingly providing substantial assistance" necessarily requires not just assistance of the primary wrongdoer, but assistance in the "specific wrongful acts" themselves. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 494-95 (2023).

### b. The routine administrative services that Fidelis provided the Law Firms were remote from, and incidental to, the Firms' collection of advance fees.

To portray Fidelis's services as "substantial assistance," Plaintiffs proceed on two tracks: tying Fidelis to other defendants and tying Fidelis to the Firms' receipt of advance fees. The first point is a non-sequitur; the second defies the Complaint.

Plaintiffs first assert that Fidelis substantially assisted the Law Firms' collection of advance fees because it was controlled by Jason Blust, managed by

---

[6]      The other three cases that Plaintiffs cite are not, as Plaintiffs claim, "decisions that actually consider the issue." (Opp. at 13 & n.28.) Each case cites *Rosen* in passing and says not a word about the Securities Cases. *See C.F.P.B. v. Commonwealth Equity Grp., LLC*, No. 20-CV-10991, 2024 WL 4362126, at \*9 (D. Mass. Sept. 30, 2024); *C.F.P.B. v. Consumer Advoc. Ctr. Inc.*, No. 19-CV-1998, 2023 WL 5162392, at \*9 (C.D. Cal. July 7, 2023); *Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC*, No. 21-CV-610, 2022 WL 20699258, at \*6 (E.D. Va. Sept. 21, 2022).

[7]      Plaintiffs suggest that *Walmart*'s discussion is dictum (Opp. at 13 n.27), but they are mistaken. *Walmart* discussed the meaning of "substantial assistance" at length, and expressly invoked securities and tort cases to inform its holding that "[p]rocessing routine transactions isn't substantial assistance." *Walmart*, 664 F. Supp. 3d at 827-29.

Michelle Gallagher, and interwoven with Lit Def Strategies, LLC. (Opp. at 11-12.) But guilt-by-association is not a viable legal theory. Fidelis is not alleged to be an alter ego of Blust, Gallagher, or the Law Firms, and it is not alleged to be part of a common enterprise (*cf.* Compl. ¶¶ 66-82 (alleging a common enterprise as to SFS, the Client-Services Subsidiaries, and the Holding Companies)). To maintain a substantial-assistance claim against *Fidelis*, Plaintiffs must reckon with what *Fidelis* allegedly did—relay legal filings and perform data entry (*id.* ¶¶ 94-95).

Tacitly conceding this point, Plaintiffs strive to tie Fidelis's administrative services to the payment of advance fees. Their reasoning runs as follows: (i) SFS pitched prospective customers on litigation defense; (ii) the promise of litigation defense "likely gave consumers peace of mind and contributed to their willingness to enroll in the program and pay the unlawful advance fees"; and (iii) "Blust used Fidelis . . . to provide [the] litigation services promised to consumers." (Opp. at 2-3; *accord id.* at 10-11, 14.) This argument is not grounded in the Complaint.

The Complaint does not implicate Fidelis in the front-end sales pitch that resulted in consumers paying advance fees. Fidelis entered the picture only on the back end, well after advance fees had been paid. (Compl. ¶¶ 22-23, 94-95, 117, 150.) Nor does the Complaint allege that the front-end promise of litigation defense gave consumers the "peace of mind" they needed to pay advance fees (Opp. at 3, 11 (citing nothing)). Nor does the Complaint allege that *Fidelis* provided the litigation defense that SFS promised to consumers. Rather, Fidelis performed paperwork and data entry to support *the Law Firms'* provision of litigation defense. (Compl. ¶¶ 94-95.) Nor does the Complaint allege that by delivering on SFS's promise of litigation defense, the Law Firms somehow facilitated past or future advance-fee payments. Just the opposite, the Complaint alleges that consumers rarely received the litigation defense they were promised. (*Id.* ¶¶ 122, 174.)

At most, the Complaint hints that the *promise* of litigation defense might have been one reason why some consumers enrolled in the advance-fee program. It fails

to allege facts showing that *delivering* on the promise of litigation defense was somehow related to the payment of advance fees. Fidelis's administrative support of the litigation defense that was provided—yet another step removed from the payment of advance fees—is the epitome of assistance bearing "little or no relation to the conduct that violates the TSR," F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule; *compare Stokes v. Lokken*, 644 F.2d 779, 781-84 (8th Cir. 1981) (opinion letter that influenced an audit which was, in turn, touted by the primary violator found too "tangential" to the primary violation to constitute substantial assistance), *abrogated on other grounds by*, *Pinter v. Dahl*, 486 U.S. 622 (1988). What "Fidelis participated in" (Opp. at 14) was litigation defense, not the earlier collection of advance fees.

Plaintiffs cite *F.T.C. v. Lake*, 181 F. Supp. 3d 692 (C.D. Cal. 2016), for the proposition that back-end services can qualify as substantial assistance. (Opp. at 12.) But Lake worked directly with consumers, and the mortgage-negotiation services he provided were not "back end" at all. When Lake arrived on the scene, the consumers had made only one of three advance-fee payments. 181 F. Supp. 3d at 697. Lake's services constituted substantial assistance, the court held, because the reassurances he gave to consumers "kept consumers making '[advance-fee] payments' . . . for months longer than they would have otherwise," and he "conceal[ed] the fact that the clients' advance fees were *not* being held in trust for the clients' banks, as the [primary violators] had represented." *Id.* at 697, 700. Here, by contrast, Fidelis did not interact with consumers, the ministerial services it provided the Law Firms came after advance fees were already paid, and the Complaint does not identify any way in which those services facilitated advance-fee payments. *Lake* thus serves only to highlight the Complaint's deficiencies.

### 3. Fidelis did not know, or consciously avoid knowing, that the Law Firms were collecting advance fees without an adequate face-to-face sales presentation.

Not content with gutting § 310.3(b)'s conduct element, Plaintiffs take aim at scienter as well. (Opp. at 14-17.) Here too, though, § 310.3(b) is more exacting than Plaintiffs allow, and the Complaint's allegations against Fidelis do not suffice.

### a. Substantial-assistance liability requires knowledge of a TSR violation, not knowledge of an act that happens to violate the TSR.

Substantial-assistance liability attaches only when the defendant "knows or consciously avoids knowing" that the person he is assisting "is engaged in any act or practice that violates [the TSR]." 16 C.F.R. § 310.3(b). Touting the maxim that ignorance of the law is no excuse, Plaintiffs read § 310.3(b) to require no knowledge of a TSR violation, nor even knowledge of wrongdoing, but simply knowledge of an act the TSR happens to prohibit. (Opp. at 15-16.) They are wrong; § 310.3(b) requires scienter.

The word "knowingly" typically modifies every subsequent element, *see Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009), and this interpretive precept will operate to require knowledge of illegality "despite the legal cliche 'ignorance of the law is no excuse,'" especially where a contrary reading would penalize facially benign conduct, *id.* at 648-52 (statute proscribing act knowingly taken without lawful authority required knowledge that act was unlawful). In *Liparota v. United States*, 471 U.S. 419 (1985), for instance, the Supreme Court considered a food-stamp statute that punished anyone who "'knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations.'" *Id.* at 420 (alteration in original). The Court held that "knowingly" modified every subsequent element, meaning that a defendant must "kn[o]w his conduct to be unauthorized by statute or regulations." *Id.* at 425. Dispensing with a "knowledge-of-illegality requirement," the Court explained, would penalize "apparently innocent conduct" such as "tearing [food stamps] up" or "throwing them away." *Id.* at 426-27.

- 12 -

More recently, in *Rehaif v. United States*, 588 U.S. 225 (2019), the Supreme Court read "knowingly" to require knowledge of unlawful presence in the United States. *Id.* at 228-32. The Court rejected the government's reliance on the "maxim that 'ignorance of the law' . . . is no excuse," explaining that the maxim means only that a person who engages in wrongdoing cannot escape liability by "claim[ing] to be unaware of the existence of a statute proscribing his conduct." *Id.* at 234 (cleaned up). The maxim does not apply where a defendant's mistake of law "results in his misunderstanding the full significance of his conduct, thereby negating an element of the offense." *Id.* (cleaned up). In the statute at issue, knowledge of unlawful presence was what "separat[ed] innocent from wrongful conduct." *Id.* at 233.

In keeping with these settled principles, the Commission's preambles and guidance read § 310.3(b) to require knowledge of a TSR violation. (Mem. at 21-22.) The 1995 Preamble, for example, likens § 310.3(b) to secondary liability in tort, and makes a point of noting that a defendant is liable for another's tort only if he "knows that the other's conduct constitutes a breach of duty." 60 Fed. Reg. at 43851 & n.96 (quoting Restatement (Second) of Torts § 876(b)). The 2015 Preamble observes that a bank which processes remote checks for a telemarketer is not liable under § 310.3(b) unless it knows "that the telemarketer [i]s violating the TSR prohibitions against remotely created checks," 80 Fed. Reg. 77520-01, 77540 (Dec. 14, 2015). The preambles likewise reject calls to dilute § 310.3(b)'s scienter requirement, explaining that actions taken with a reckless, negligent, or innocent mind are not sufficiently blameworthy to warrant harsh penalties based "upon the wrongdoing of another person." 1995 Preamble, 60 Fed. Reg. at 43852; *accord* 2003 Preamble, 68 Fed. Reg. 4580-01, 4611-12 (Jan. 29, 2003); 2015 Preamble, 80 Fed. Reg. at 77540.

Sidestepping text, history, guidance, Supreme Court precedent, and the example set by the Securities Cases, Plaintiffs contend that the "law of the case" forecloses Fidelis's construction of § 310.3(b). (Opp. at 15.) The allegedly preclusive prior ruling is this Court's decision denying a stay of the preliminary injunction. (*Id.*)

There, the Court stated that § 310.3(b) does not require knowledge of wrongdoing, but only knowledge of acts the TSR happens to prohibit. (Dkt. 281 at 4-5.)

The law of the case does not apply to a litigant who "was not a party to the previous . . . motion." *In re Air Crash Near Clarence Ctr.*, No. 09-CV-1043-S, 2012 WL 13184308, at *1 (W.D.N.Y. Jan. 24, 2012). Nor does it foreclose arguments not previously raised. *See Riley v. MEBA Pension Tr.*, 452 F. Supp. 117, 120 (S.D.N.Y. 1978), *aff'd*, 586 F.2d 968 (2d Cir. 1978). Nor does it prevent a court from reconsidering an erroneous decision. *Milligan v. GEICO Gen. Ins. Co.*, No. 20-3726, 2022 WL 433289, at *6 (2d Cir. Feb. 14, 2022). Here, Fidelis, Bush Lake, and Christo were not parties to the prior stay motion, their arguments go well beyond the two sentences previously put before the Court (Dkt. 204-1 at 5; Dkt. 218 ¶ 7), and the result the Court previously reached—that § 310.3(b) does not require knowing malfeasance—is incorrect, *see, e.g.*, *F.T.C. v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1242 (11th Cir. 2017) (holding that § 310.3(b) requires "a culpable mind"—namely, knowledge that the primary actor "is engaged in telemarketing violations"); 2015 Preamble, 80 Fed. Reg. at 77540 (warning that § 310.3(b) does not create "strict liability").

The Court's prior stay denial did not consider the authorities cited above. It rested exclusively—and Plaintiffs rest primarily—on *In re AXA Equitable Life Insurance Co. COI Litigation*, 595 F. Supp. 3d 196 (S.D.N.Y. 2022), and the three cases *AXA Equitable* cites: *Bryan v. United States*, 524 U.S. 184 (1998); *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558 (1971); and *United States v. Weintraub*, 273 F.3d 139 (2d Cir. 2001). These cases are inapposite for three reasons.

First, the *AXA Equitable* cases construed statutes imposing penalties for anyone who "knowingly violates" a given statute. Section 310.3(b) does not use this term of art. It requires the defendant to "know[] . . . that the seller or telemarketer is engaged in any act or practice that violates [the TSR]." 16 C.F.R. § 310.3(b); *compare Liparota*, 471 U.S. at 420 (requiring knowledge of illegality where statute punished anyone who "'knowingly uses . . . coupons or authorization cards in any manner not

authorized by [the statute] or the regulations.'" (alteration in original)); *Flores-Figueroa*, 556 U.S. at 651 ("If a child knowingly takes a toy that belongs to his sibling, we assume that the child not only knows that he is taking something, but that he also knows that what he is taking is a toy *and* that the toy belongs to his sibling.").

Second, dispensing with knowing illegality in the *AXA Equitable* cases did not create strict liability for seemingly innocuous conduct. *Int'l Mins.*, 402 U.S. at 563-65 (knowledge of "dangerous or deleterious devices" avoided the imposition of "strict liability"); *Weintraub*, 273 F.3d at 149 (knowledge of dangerous chemical "separat[ed] legal innocence from wrongful conduct" (cleaned up)); *AXA Equitable*, 595 F. Supp. 3d at 237 (knowing misrepresentation); *see also Bryan*, 524 U.S. at 193 & n.15 (citing *Liparota* to illustrate this distinction); *Rehaif*, 588 U.S. at 233 (distinguishing statutes targeting inherently culpable or dangerous conduct).

Here, by contrast, as in *Liparota* and *Rehaif*, knowledge of illegality is what makes substantial assistance blameworthy. Taking payment in advance is not inherently culpable. Neither is much of the other conduct covered by the TSR. *See, e.g.*, 16 C.F.R. § 310.4(b)(1)(v)(B)(i) (waiting less than 15 seconds for someone to answer the phone); *id.* § 310.4(c) (calling someone after 9:00 pm). If a person need only know that a telemarketer is engaging in an act, but not that the act is wrongful, then there is nothing culpable about rendering substantial assistance, and the difference between no penalties and ruinous penalties is mere happenstance. The Commission has repeatedly explained that § 310.3(b) uses a heightened scienter to avoid this result. (Mem. at 24); *see also WV Universal*, 877 F.3d at 1242 (holding that § 310.3(b) avoids penalizing "innocent third parties" by requiring that the defendant act with "a culpable mind").

Third, whereas the *AXA Equitable* cases all concern primary liability, § 310.3(b) concerns secondary liability. For two centuries and counting, secondary liability for "knowing and substantial assistance" has attached only when a person acts with a culpable mind. *Taamneh*, 598 U.S. at 491; *see also id.* at 486 (case law requires defendant to know he is "part of an overall illegal or tortious activity" (cleaned up);

*accord id.* at 489 ("truly culpable conduct"); *id.* ("blameworthiness"); *id.* at 490 ("culpable conduct"); *id.* at 492 ("culpable assistance"); *id.* ("scienter").

Thus, to plead secondary liability under § 310.3(b), the Complaint must allege facts showing that Fidelis knew the Law Firms were collecting advance fees *and* knew the Firms' conduct was unlawful.

### b. Blust's and Gallagher's knowledge cannot be imputed to Fidelis, and even if it could the Complaint does not charge them with conscious wrongdoing.

Plaintiffs agree that Fidelis possesses only the knowledge imputed to it, (Opp. at 17-19), and the basic rules on imputed scienter are well settled. The plaintiff "must prove that an agent of the corporation," such as a board member, executive, or manager, acted "with the requisite scienter," *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), and where the requisite scienter is "knowledge," the agent must have acquired his knowledge while acting within the scope of his agency, *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) (per curiam). The Complaint satisfies these strictures, Plaintiffs contend, because it alleges that Jason Blust and Michelle Gallagher controlled Fidelis and knew the Law Firms were collecting advance fees. (Opp. at 18-19.) We see three problems here.

First, Plaintiffs have agency backwards. Agency is defined by the principal's control over the agent. (Mem. at 27.) If Blust and Gallagher controlled Fidelis, that makes them the principals and Fidelis the agent.

The two cases Plaintiffs cite to excuse their inversion of the standard agency structure are both inapposite. In *Baker v. Latham Sparrowbush Associates*, 72 F.3d 246 (2d Cir. 1995), the court imputed to a company knowledge that the company's "president and counsel" acquired while acting in his official capacity. *Id.* at 255. That holding, like the holdings of the cases *Baker* cites, applies ordinary agency principles. *Baker*'s passing quotation of a District of Nevada opinion that uses the phrase "controlling person," *id.*, is not part of *Baker*'s reasoning or holding.

- 16 -

In *S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720 (S.D.N.Y. 2003), the district court agreed with the plaintiff that two trusts "were controlled and dominated by Jorge Ballesteros to such a large extent that the illicit activities and knowledge of Jorge Ballesteros should be imputed to them." *Id.* at 728. Imputing knowledge to trusts with "no autonomous and separate existence outside of Jorge Ballesteros," *id.* at 730, is essentially an application of the alter-ego doctrine, which holds that an individual's knowledge is imputed to a company he wholly dominates, *see, e.g.*, *Discover Growth Fund v. 6D Glob. Techs. Inc.*, No. 15-CV-7618, 2015 WL 6619971, at *7 (S.D.N.Y. Oct. 30, 2015). The Complaint does not contend that Fidelis is Blust's alter ego or that Fidelis has no autonomous and separate existence outside of Blust. Indeed, the Complaint does not even sufficiently allege that Blust controlled Fidelis. (Mem. at 27.)

Second, even if Blust and Gallagher were Fidelis's agents, Fidelis would be charged only with the knowledge they acquired while acting within the scope of the agency. As Plaintiffs confirm (Opp. at 18-19), Blust and Gallagher did not learn that the Law Firms were collecting advance fees while acting as "agents" of Fidelis. (Mem. at 27-28.) Plaintiffs have no answer to this problem, other than to say that Fidelis "cites no case law" for the scope-of-the-agency restriction on imputed knowledge. (Opp. at 19-20.) That's plainly incorrect. (Mem. at 25-26 (citing five illustrative cases)); *see also*, *e.g.*, *Discover Growth*, 2015 WL 6619971, at *7 ("[E]ven assuming *arguendo* that Wei was an agent . . . , Discover presented no evidence showing that Wei's knowledge . . . was obtained while acting within the scope of that agency.").

Third, even if Fidelis were charged with all the knowledge Blust and Gallagher ever possessed, the Complaint does not allege that Blust and Gallagher knew the Law Firms' receipt of advance fees violated the TSR or was otherwise wrongful.

On this point, Plaintiffs barely disagree. In their lone attempt to satisfy the scienter § 310.3(b) actually demands, Plaintiffs cite the allegation that "'Jason Blust knows or should know that the conduct alleged herein is illegal,'" given his prior role at Legal Helpers. (Opp. at 17 n.41 (quoting Compl. ¶ 83).) "Should know" is not the

standard, however, and a conclusory allegation of knowing illegality must be disregarded, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-81 (2009). As for Blust's time at Legal Helpers, the Complaint says only that he learned about the TSR's advance-fee prohibition. (Compl. ¶ 83; *accord id.* ¶ 269 (alleging that Gallagher knew the Law Firms took advance fees).) Knowledge of the TSR's advance-fee prohibition is not knowledge that the Law Firms were doing wrong by taking advance fees, because the TSR does not prohibit advance fees where consumers receive a face-to-face sales presentation. 16 C.F.R. §§ 310.4(a)(5)(i), 310.6(b)(3). The Complaint concedes that SFS's advance-fee program included face-to-face presentations (Compl. ¶¶ 113, 123-40), and it alleges no facts even suggesting that Blust (or Gallagher) knew these presentations were deficient.

### B. The Complaint does not plausibly allege that Fidelis violated state-law prohibitions on deceptive business practices.

Executive Law § 63(12) and GBL § 349 proscribe deceptive business practices. As far as the Complaint alleges, Fidelis never interacted with consumers, never made any false or misleading statement, and never failed to provide the services it was paid to provide. (Mem. at 3-6, 30-32.) Plaintiffs turn Fidelis's services into consumer fraud only by reimagining the Complaint.

According to Plaintiffs, the Complaint alleges that "[c]onsumers paid the [Law] Firms for a litigation defense to be provided when they were sued by creditors," and the "[Law] Firms paid Fidelis to provide this service," but "in many cases, consumers did not receive any litigation defense." (Opp. at 22.) "Failing to deliver goods or services promised and paid for," Plaintiffs conclude, "is classic consumer fraud." (*Id.* at 22-23; *see also id.* at 20 (claiming that Fidelis was paid "to coordinate and provide litigation defense for consumers"); *id.* at 20-21 ("A business failing to provide a service a consumer paid for is a quintessential fraud and deceptive business practice . . . ."); *id.* at 23 n.57 (claiming that the Law Firms "paid Fidelis to provide [litigation defense]"); *id.* at 24 ("Fidelis was aware that it was being paid to provide litigation defense that was in fact routinely not being provided."); *id.* ("Fidelis is in possession of monies paid by

consumers for a promised service—litigation defense—which Fidelis failed to provide to many consumers.").)

This is pure fiction. The Complaint does indeed allege that consumers paid the Law Firms for litigation defense (Compl. ¶¶ 122, 143-46), but it never alleges that the Law Firms outsourced this task to Fidelis. Rather, the Complaint alleges that the Law Firms hired Fidelis to provide *administrative* services to *the Law Firms themselves*. (*Id.* ¶¶ 94-95.) Specifically, when a consumer was sued by a creditor, Fidelis received the pleadings from SFS, performed some "data entry," and then forwarded the pleadings to a litigation attorney. (*Id.* ¶ 95.) The Complaint does not allege any instance in which Fidelis failed to provide the Law Firms with these litigation-support services. Nor does it allege that the litigation-support services Fidelis provided the Law Firms somehow contributed to the Law Firms' failure to defend litigation brought against consumers. On the contrary, the Complaint specifies that the Law Firms themselves declined litigation defense using a loophole in their engagement letters. (*Id.* ¶ 122.)

Plaintiffs' distortions are especially transparent because, when discussing substantial-assistance liability under the TSR, they took pains to *distance* Fidelis from the Law Firms' denial of litigation defense. Having apparently misunderstood Fidelis to be saying that its work was ministerial because consumers rarely received litigation defense, Plaintiffs clarified that although "the [Law] Firms often failed to defend consumers against creditors' lawsuits," when the Law Firms "provided the agreed-upon litigation defense, that defense was coordinated by Fidelis." (Opp. at 11 n.22 (citing Compl. ¶¶ 95, 97).) "Coordinated" is another misstatement—the Complaint says only that Fidelis relayed documents and performed data entry (Compl. ¶¶ 95, 97). But the basic point holds: in a more candid moment, Plaintiffs' own opposition concedes that (i) it was the Law Firms, not Fidelis, who failed to provide consumers with litigation defense, and (ii) Fidelis's work for the Law Firms was directed only at supporting the litigation defense the Law Firms elected to provide.

- 19 -

Tacitly acknowledging that Fidelis did not engage in any deception, Plaintiffs contend that an entity need not engage in deception to be liable for deceptive business practices. (Opp. at 23-24.) The case Plaintiffs cite, however, and indeed the very passage they quote, requires the defendant to have "engaged in deceptive acts or practices that are injurious to customers with at least some knowledge of the deception." *New York v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 369 (S.D.N.Y. 2019) (cleaned up).[8] The injurious deception at issue here is *the Law Firms'* failure to deliver on *SFS*'s promise of litigation defense. (Compl. ¶¶ 122, 174.) Fidelis, meanwhile, provided administrative support to the litigation defense the Firms elected to provide. (*Id.* ¶¶ 94-95; Opp. at 11 n.22.) That is the opposite of participating in a deceptive practice.[9]

Lastly, Plaintiffs claim that Fidelis is liable as one of the "multiple corporate entities" Blust used "to perpetrate his fraudulent and deceptive scheme." (Opp. at 24.) Again, though, while we grant that "any person" who violates Executive Law § 63(12) and GBL § 349 may be held liable (Opp. at 21-22, 24), and that Blust's alleged use of "multiple corporate entities" to perpetrate a "deceptive scheme" does not insulate *him* from liability, individual liability for *Fidelis* only attaches if *Fidelis* engaged in a deceptive practice (Mem. at 30-32); *Milligan*, 2022 WL 433289, at *6 (summary order) (affirming district court's dismissal of GBL § 349 claims "because Plaintiff failed to allege that [defendant] engaged in any materially misleading conduct"). Fidelis had no part in SFS's promise of litigation defense or in the Law Firms' periodic failure to deliver on SFS's promise.

---

[8]    The *Debt Resolve* defendant referenced in Plaintiffs' papers engaged in deceptive conduct by offering consumers misleading financing plans that charged usurious interest, despite having "received hundreds of complaints from the BBB, the CFPB, and other sources." 387 F. Supp. 3d at 369 (cleaned up).

[9]    Likewise, a mechanic hired by a dealership to repair Car A is not liable for a deceptive practice if the dealership rolls back the odometer on Car B.

## II.   THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST CAMERON CHRISTO OR THE BUSH LAKE TRUST.

As Plaintiffs seem to acknowledge (Opp. at 25-26), the claims against Christo and Bush Lake cannot survive without a viable claim against Fidelis. (Mem. at 33-34.) Accordingly, Count 9 must be dismissed as against Christo and Bush Lake.

## CONCLUSION

The Court should (i) issue an order dismissing the Complaint as against Fidelis Legal Support Services, LLC, Cameron Christo, and The Bush Lake Trust; and (ii) award any other or additional relief that the Court deems appropriate.

Dated:     Buffalo, New York
           November 6, 2024

Respectfully submitted,

**HOOVER & DURLAND LLP**
*Attorneys for Defendant Fidelis Legal*
*Support Services, LLC, and for Relief Defendants*
*Cameron Christo and The Bush Lake Trust*

By:  s/Spencer L. Durland
      Timothy W. Hoover
      Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*