```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


CONSUMER FINANCIAL                         Docket Number:
PROTECTION BUREAU,                   1:24-cv-00040-EAW-MJR
THE PEOPLE OF THE
STATE OF NEW YORK,
By Letitia James,
Attorney General of the
State of New York,
STATE OF COLORADO,
Ex rel, Philip J. Weiser,
Attorney General,
STATE OF DELAWARE,
Ex rel. Kathleen Jennings,
Attorney General,
State of Delaware,
THE PEOPLE OF THE
STATE OF ILLINOIS,
Through Attorney General
Kwame Raoul,
THE STATE OF MINNESOTA,
By its Attorney General
Keith Ellison,
THE STATE OF NORTH CAROLINA,
Ex rel. Joshua H. Stein,
Attorney General,
THE STATE OF WISCONSIN,      *
                             *
Plaintiffs,                  *
                             *
                             *            Buffalo, New York
            v.               *            November 20, 2024
                             *
                             *            11:06 a.m.
                             *
STRATFS, LLC,                             MOTION HEARING
Formerly known as Strategic
Financial Solutions, LLC.,
STRATEGIC CLIENT SUPPORT,
LLC, formerly known as
Pioneer Client Services, LLC,
STRATEGIC CS, LLC,
STRATEGIC FS BUFFALO, LLC,
STRATEGIC NYC, LLC,
BCF CAPITAL, LLC,
T FIN, LLC,
STRATEGIC CONSULTING, LLC,
VERSARA LENDING, LLC,
```

```
 1   STRATEGIC FAMILY, INC.,
     ANCHOR CLIENT SERVICES, LLC,
 2   Now known as CS1 PAAS
     Services, LLC,
 3   BEDROCK CLIENT SERVICES, LLC,
     BOULDER CLIENT SERVICES, LLC,
 4   CANYON CLIENT SERVICES, LLC,
     CAROLINA CLIENT SERVICES,
 5   LLC,
     GREAT LAKES CLIENT SERVICES,
 6   LLC,
     GUIDESTONE CLIENT SERVICES,
 7   LLC,
     HARBOR CLIENT SERVICES, LLC,
 8   HEARTLAND CLIENT SERVICE,
     LLC,
 9   MONARCH CLIENT SERVICES, LLC,
     Now known as CS2 PAAS
10   Services, LLC,
     NEWPORT CLIENT SERVICES, LLC,
11   NORTHSTAR CLIENT SERVICES,
     LLC,
12   OPTION 1 CLIENT SERVICES,
     LLC,
13   PIONEER CLIENT SERVICING,
     LLC,
14   ROCKWELL CLIENT SERVICES,
     LLC,
15   ROYAL CLIENT SERVICES, LLC,
     STONEPOINT CLIENT SERVICES,
16   LLC,
     SUMMIT CLIENT SERVICES, LLC,
17   Now known as CS3 PAAS, LLC,
     WHITESTONE CLIENT SERVICES,
18   LLC,
     RYAN SASSON,
19   JASON BLUST,
     JOHN DOES 1-50,
20   DANIEL BLUMKIN,
     Relief Defendant,
21   ALBERT IAN BEHAR,
     Relief Defendant,
22   STRATEGIC ESOP,
     Relief Defendant,
23   STRATEGIC ESOT,
     Relief Defendant,
24   TWIST FINANCIAL, LLC,
     Relief Defendant,
25   DUKE ENTERPRISES, LLC,
     Relief Defendant,
```

```
 1   BLAISE INVESTMENTS, LLC,
     Relief Defendant,
 2   THE BLUST FAMILY
     IRREVOCABLE TRUST THROUGH
 3   DONALD J. HOLMGREN, TRUSTEE,
     Relief Defendant,
 4   JACLYN BLUST,
     Relief Defendant,
 5   LIT DEF STRATEGIES, LLC,
     Relief Defendant,
 6   RELIALIT, LLC,
     Relief Defendant,
 7   CLEAR CREEK LEGAL, LLC,
     CREDIT ADVOCATES LAW FIRM,
 8   LLC,
     GREENSTONE LEGAL GROUP,
 9   BRANDON ELLIS LAW FIRM,
     LLC,
10   HAILSTONE LEGAL GROUP,
     HALLOCK AND ASSOCIATES,
11   HARBOR LEGAL GROUP,
     ANCHOR LAW FIRM, PLLC,
12   BEDROCK LEGAL GROUP,
     BOULDER LEGAL GROUP,
13   CANYON LEGAL GROUP,
     GREAT LAKES LAW FIRM,
14   HEARTLAND LEGAL GROUP,
     LEVEL ONE LAW,
15   MEADOWBROOK LEGAL GROUP,
     MONARCH LEGAL GROUP,
16   NEWPORT LEGAL GROUP, LLC,
     NORTHSTAR LEGAL GROUP,
17   OPTION 1 LEGAL,
     PIONEER LAW FIRM P.C.,
18   ROCKWELL LEGAL GROUP,
     SPRING LEGAL GROUP,
19   ROYAL LEGAL GROUP,
     SLATE LEGAL GROUP,
20   STONEPOINT LEGAL GROUP,
     THE LAW FIRM OF
21   DEREK WILLIAMS, LLC,
     WHITSTONE LEGAL GROUP,
22   WYOLAW, LLC,
     CHINN LEGAL GROUP, LLC,
23   LEIGH LEGAL GROUP, PLLC,
     HALLOCK & ASSOCIATES LLC,
24   GUSTAFSON CONSUMER LAW GROUP,
     LLC,
25   MICHEL LAW, LLC,
     THE LAW OFFICE OF
```

```
 1    MELISSA MICHEL, LLC,
      MOORE LEGAL GROUP, LLC.     *
 2                                *
      Defendants.                 *
 3                                *
      *  *  *  *  *  *  *  *  *  *  *  *  *
 4
                  FTR TRANSCRIPT OF PROCEEDINGS
 5          BEFORE THE HONORABLE MICHAEL J. ROEMER
              UNITED STATES CHIEF MAGISTRATE JUDGE
 6

 7    APPEARANCES:

 8

      For Consumer Financial
 9    Protection Bureau:          CONSUMER FINANCIAL PROTECTION
                                  BUREAU,
10                                By JOSEPH M. SANDERS, ESQ.,
                                  1700 G. Street N.W.,
11                                Washington, DC  20552.

12
      For The People of the
13    State of New York:

14                                OFFICE OF THE NEW YORK STATE
                                  ATTORNEY GENERAL,
15                                By CHRISTOPHER L. BOYD, ESQ.,
                                     GENEVIEVE S. RADOS, ESQ.,
16                                Main Place Tower
                                  350 Main Street,
17                                Suite 300A,
                                  Buffalo, New York  14202.
18

19    For Defendants:
      Stratfs, LLC,
20    Formerly known as
      Strategic Financial
21    Solutions, LLC.,
      Strategic Client Support, LLC,
22    Formerly known as
      Pioneer Client Services, LLC
23    Strategic CS, LLC,
      Strategic FS Buffalo, LLC,
24    Strategic NYC, LLC,
      BCF Capital, LLC,
25    T FIN, LLC,
      Strategic Consulting, LLC,
```

```
 1   Versara Lending, LLC,
     Strategic Family, INC.,
 2   Anchor Client Services, LLC,
     Now known as CS1 PAAS
 3   Services, LLC,
     Bedrock Client Services, LLC,
 4   Boulder Client Services, LLC,
     Canyon Client Services, LLC,
 5   Carolina Client Services, LLC,
     Great Lakes Client Services, LLC,
 6   Guidestone Client Services, LLC,
     Harbor Client Services, LLC,
 7   Heartland Client Service, LLC,
     Monarch Client Services, LLC,
 8   Now known as CS2 PAAS
     Services, LLC,
 9   Newport Client Services, LLC,
     Northstar Client Services, LLC,
10   Option 1 Client Services, LLC,
     Pioneer Client Servicing, LLC,
11   Rockwell Client Services,
     LLC,
12   Royal Client Services, LLC,
     Stonepoint Client Services,
13   LLC,
     Summit Client Services, LLC,
14   Now known as CS3 PAAS, LLC,
     Whitestone Client Services, LLC:
15
                              LIPPES MATHIAS WEXLER FRIEDMAN, LLP,
16                            By DENNIS  C. VACCO, ESQ.,
                              50 Fountain Plaza,
17                            Suite 1700,
                              Buffalo, New York  14202.
18

19   For Defendants
     Jason Blust,
20   Jaclyn Blust,
     Lit Def Strategies, LLC,
21   Relialit, LLC:
                              PERSONIUS MELBER LLP,
                              By RODNEY O. PERSONIUS, ESQ.,
22                            2100 Main Place Tower,
                              350 Main Street,
23                            Buffalo, New York  14202.

24

25
```

```
 1   For Defendants
     Clear Creek Legal, LLC,
 2   Credit Advocates Law Firm,
     LLC,
 3   Greenstone Legal Group,
     Brandon Ellis Law Firm,
 4   LLC,
     Hailstone Legal Group,
 5   Hallock and Associates,
     Harbor Legal Group,
 6   Anchor Law Firm, PLLC,
     Bedrock Legal Group,
 7   Boulder Legal Group,
     Canyon Legal Group,
 8   Great Lakes Law Firm,
     Heartland Legal Group,
 9   Level One Law,
     Meadowbrook Legal Group,
10   Monarch Legal Group,
     Newport Legal Group, LLC,
11   Northstar Legal Group,
     Option 1 Legal,
12   Pioneer Law Firm P.C.,
     Rockwell Legal Group,
13   Spring Legal Group,
     Royal Legal Group,
14   Slate Legal Group,
     Stonepoint Legal Group,
15   The Law Firm of
     Derek Williams, LLC,
16   Whitstone Legal Group,
     Wyolaw, LLC,
17   Chinn Legal Group, LLC,
     Leigh Legal Group, PLLC,
18   Hallock & Associates, LLC,
     Gustafson Consumer Law Group,
19   LLC,
     Michel law, LLC,
20   The Law Office of
     Melissa Michel, LLC,
21   Moore Legal Group, LLC.:      CONNORS, LLP,
                                   By TERRENCE M. CONNORS, ESQ.,
22                                 1000 Liberty Building,
                                   424 Main Street,
23                                 Buffalo, New York  14202.

24

25
```

```
 1   For Defendants
     Albert Ian Behar and
 2   Blaise Investments, LLC:

 3                               DUKE, HOLZMAN,
                                 PHOTIADIS & GRESENS, LLP,
 4                               By GREGORY P. PHOTIADIS, ESQ.,
                                 700 Seneca Street,
 5                               Suite 750,
                                 Buffalo, New York  14210.
 6

 7   For Defendants
     Jason Blust and
 8   Jaclyn Blust,
     Hedgewick Consulting, LLC,
 9   Lit Def Strategies, LLC,
     Relialit, LLC:
10                               PERSONIUS MELBER LLP,
                                 By RODNEY O. PERSONIUS, ESQ.,
11                               2100 Main Place Tower,
                                 350 Main Street,
12                               Buffalo, New York  14202.

13
     For Receiver:              McNAMARA SMITH, LLP,
14                               By THOMAS W. McNAMARA, ESQ.,
                                 655 West Broadway,
15                               Suite 900,
                                 San Diego, California, 92101,
16                               And
                                 HODGSON RUSS, LLP.,
17                               By JAMES C. THOMAN, ESQ.,
                                 The Guaranty Building,
18                               Suite 100,
                                 140 Pearl Street,
19                               Buffalo, New York  14202.

20
     On behalf of
21   CIBC Bank USA,
     Valley National Bank:      PHILLIPS LYTLE LLP,
22                               By JACOB S. SONNER, ESQ.,
                                 One Canalside,
23                               125 Main Street,
                                 Buffalo, New York  14203-2887
24

25
     The Courtroom Deputy:      ROSALIE A. ZAVARELLA
```

1

2

3    The FTR transcriber/
     Court Reporter:                    BONNIE S. WEBER, RPR,
                                        Notary Public,
4                                       Robert H. Jackson Courthouse,
                                        2 Niagara Square,
5                                       Buffalo, New York  14202,
                                        Bonnie_Weber@nywd.uscourts.gov.
6

7

8                Proceedings recorded by mechanical stenography,
                      transcript produced by computer.
9

10

11

12                   (Proceedings commenced at 11:06 a.m.)

13

14

15           **THE CLERK:**  All rise.

16           The United States District Court for the Western

17   District of New York is now in session.  The Honorable Michael

18   J. Roemer presiding.

19           We're here on the matter of Consumer Financial

20   Protection Bureau, et al, versus Strategic Financial Solutions,

21   et al.  Case Number 24-CV-40, for a motion hearing.

22           Start with the plaintiffs.  Plaintiff for the --

23   counsel for the plaintiff, please state your name for the

24   record.

25           **MR. SANDERS:**  Joe Sanders on behalf of Consumer

1    the welcome call.

2         And so we certainly believe that they will need some

3    other third party to come in and take this consumer information.

4         And we don't think that's a viable option, given --

5    given how their the previous parties operated.

6         **THE COURT:**  Well, Mr. Connors says they are not going

7    to -- that's not the way they are going to do it.

8         **MR. SANDERS:**  Terry, are you guys -- you're not going

9    to hire any third parties?

10         **MR. CONNORS:**  No.  It's going to be done inhouse.

11         **THE COURT:**  I assume they will hire more employees to

12    handle it.

13         **MR. CONNORS:**  Well, there are some that have been

14    released by the Receiver.  We will probably need a few more of

15    those lawyers.

16         **MR. BOYD:**  Well, hold on.  Are you looking for current

17    employees of the Receiver to provide services for Royal and

18    Hailstone?

19         **MR. CONNORS:**  No.  Right now, our plan is to do

20    everything inhouse.

21         **MR. BOYD:**  Okay.  And with attorneys supervising the

22    attorney work?

23         **MR. CONNORS:**  Yes.

24         **MR. BOYD:**  Okay.  I -- and, Judge, I think we should

25    talk and see if we -- I mean, we were able to do it last time,

 1    but I think see if we can come up with a stipulated order.

 2           **THE COURT:**  You weren't -- what about last time?

 3           **MR. BOYD:**  That we were able to reach a stipulated

 4    order.

 5           As you recall, last hearing, on the law firm

 6    withdrawal for all of the other firms.

 7           So I think perhaps seeing if we can reach an agreement

 8    as well with respect for Royal and Hailstone makes some sense.

 9           **MR. CONNORS:**  In order to do that, Judge, do you have

10    any bullet points that you think need to be included that would

11    help us?

12           Because we would start -- I know you talked about the

13    doing it inhouse, doing it with the lawyers, not taking new

14    clients.

15           I think you mentioned --

16           **THE COURT:**  I brought those up because you brought

17    them up.

18           **MR. CONNORS:**  Yes.

19           **THE COURT:**  Those are in your papers.

20           **MR. CONNORS:**  They are.  Yeah.  I thought there was

21    one other thing you mentioned that you were concerned about.

22           **MR. BOYD:**  Not selling the data maybe.

23           **MR. CONNORS:**  Yes.  That's fine.

24           **THE COURT:**  Yeah.  Yeah.  How the data -- that's I

25    think critical to the plaintiff's concerns, right?

1          They are worried about how this data is going to be

2    used.

3          **MR. CONNORS:**  Protection of the data.

4          **THE COURT:**  Yeah.

5          **MR. CONNORS:**  Okay.  That's helpful.

6          **THE COURT:**  You know, if you want to, I'll send

7    everybody an e-mail with bullet points, how about that?

8          I -- and then --

9          **MR. CONNORS:**  Great.

10         **THE COURT:**  -- you can do with them as you see fit, I

11   guess.

12         **MR. CONNORS:**  Thank you.

13         **MR. BOYD:**  Thank you, Judge.

14         **THE COURT:**  All right.  Anything else on that point?

15         **MR. CONNORS:**  No, Your Honor.

16         **THE COURT:**  Mr. McNamara, you looked like you wanted

17   to the scene something.

18         **MR. McNAMARA:**  No, Your Honor.  I'm fine.  We'll see

19   how the parties work it out and we'll go from there.

20         **THE COURT:**  Okay.

21         All right.  Mr. Vacco, you are up.

22         **MR. VACCO:**  Thanks, Judge.  Good morning.

23         **THE COURT:**  Good morning.

24         **MR. VACCO:**  So the prior discussion is somewhat

25   informative, I think, to our motion.

1          Although, as I -- I, you know, preparing for this

2     argument, you know, I recognize that there is -- there has been

3     a lot of shifting sands since we made our first application back

4     in June, I believe.

5          And in some fashion, I'm definitely fighting a rear

6     guard action here, trying to keep up with the changing

7     landscape.

8          I just want to make sure, as I tried to indicate the

9     last time we were here, that our present application is not

10    related to the advanced fee model.

11         As a matter of fact, Mr. McNamara had sent me an

12    e-mail over the weekend.  I belatedly, because I was away on

13    vacation, responded to it yesterday, wherein he asked me if

14    statements that I made in Court at our last appearance, whether

15    he could rely on them.

16         Those weren't his exact words.  But I had mentioned to

17    him in my responsive e-mail that our position is that your

18    present motion does not apply to the advanced fee model.

19         Having said that, our -- our motion is designed, much

20    as Mr. Connors' motion on behalf of the law firms, to separate

21    from the expansive nature of the preliminary injunction.

22         Both Atlas and Timberline, the -- you know, contingent

23    fee debt relief services and Versara.

24         At the core of it -- and I'm happy to hear the judge

25    say -- Court say at the outset Mr. Connors' presentation that

1  the Court does believe it has jurisdiction to modify the

2  preliminary injunction.

3        At the core of my position, our position on behalf of

4  Atlas and Timberline and Versara, is that they are entitled to

5  due process here.

6        A due process that they have not -- notwithstanding,

7  you know, all of the assertions, all of the allegations made by

8  the Government, they have -- those three entities, which as the

9  Court has recognized are still operating today.

10        And because the Receiver's mandate is to operate these

11  businesses, if he thinks that he can do so, both compliantly and

12  profitably -- put aside the profitable piece for a moment.

13        It seems that the threshold of consideration for the

14  Receiver is whether or not they -- they are compliant.

15        As the Court is well aware, that Atlas and Timberline

16  has been servicing the contingent fee clients since the -- the

17  imposition of the PI.

18        The Court is probably not as well aware, but cognisant

19  of the fact that Versara continues to operate to service the

20  loans that it had previously made.

21        And -- and that's what -- why I think that, you know,

22  the concept the due process here for those three intensity is

23  critically important.

24        You know, just to rewind to where we were almost a

25  year ago, you know, the Government comes in with an ex parte

1    application based upon information that was three or four, five

2    years old.

3            Ex parte application to -- to -- Judge Vilardo grants

4    the TRO.  It was the Government that decided the -- the content

5    and the theme and the course of the hearing that took place over

6    two days.

7            We didn't tell the Government what evidence to

8    produce.  We didn't tell, you know, the Government what they

9    should focus on in terms of -- of all of the various

10   allegations.

11           **THE COURT:**  Well, in fairness, I'm not sure the

12   plaintiffs -- I decided that, I think.

13           Somebody can correct me if I'm wrong, but I said the

14   hearing is going to be about the --

15           **MR. VACCO:**  TSR.

16           **THE COURT:**  -- the TSR.

17           **MR. VACCO:**  Sure.

18           **THE COURT:**  And that's what it was about.

19           **MR. VACCO:**  But that -- but that is -- certainly goes

20   to my point.

21           Whether, you know, you directed it or that was their

22   strategy, at the end of the day -- that hearing over two days, I

23   mean, you sat here and you listened to it -- even in your

24   decision.

25           You know, I can remember that day that you came out

1  and rendered your decision, you were reading from the

2  transcript, so you paid close attention to -- you know, what was

3  the evidence that was introduced at that hearing.

4       Not a scintilla of evidence -- I'm not talking about

5  what they put in their papers.  I'm talking about what they

6  educed from the witness stand of referenced a common enterprise.

7       And it's not just enough to say that there is a common

8  enterprise.  They have to show that -- you know, entities that

9  have commonality were also participating in the unlawful conduct

10  and they haven't shown that.

11       And that's why I go back to the premise that these

12  three entities today are still operating.

13       So while they say, oh, common enterprise, they haven't

14  connected the dots to show how the involvement of Atlas,

15  Timberline and Versara advanced the violation of the TSR.

16       So we -- we here today --

17       **THE COURT:**  Well, I don't -- I don't know that that's

18  the theory that they are operating under.

19       It's more these entities that you are representing,

20  they are assets.  They were created with money raised by the

21  individual defendants by charging advanced fees.

22       That that's why they are in.

23       **MR. VACCO:**  But they haven't proved any of that,

24  Judge.

25       **THE COURT:**  Well --

1          **MR. VACCO:**  They -- they have -- those are their

2    allegations.  They have not proved -- so, for instance, in the

3    context of Versara, the Government --

4          **THE COURT:**  We're not at trial.  We're only at -- they

5    asked for a preliminary injunction.

6          **MR. VACCO:**  But as I -- I understand the Receiver's

7    application, the Receiver's application is -- the requests for

8    instructions essentially is to wind down the entire business.

9          I'm not so sure how -- how he winds down Versara.  And

10   it's in the context that we bring our application -- in the

11   context of the Receiver's application to wind the businesses

12   down.

13         We think that it's just fundamentally unfair,

14   certainly, with the denial of due process to wind down these --

15   these compliant businesses.

16         There is --

17         **THE COURT:**  Who would -- who would -- if we let them

18   out from under the Receiver, who would run these businesses?

19         **MR. VACCO:**  I -- that -- that's a -- that's a question

20   I'm not prepared to respond to today.

21         There are stakeholders, you know, certainly in Versara

22   that conceivably who are not participating, who are not subject

23   to the preliminary injunction, that might step forward to

24   operate Versara.

25         Versara is distinguishable, in my estimation, from

1    Atlas and Timberline.  Not that I want to give up on Atlas and

2    Timberline, but I recognize that Atlas and Timberline are

3    further encumbered by virtue of the bank debt.

4          So when the Receiver has charges to operate it

5    compliantly and profitably, so -- and, again, I'm not conceding

6    the point.

7          But I understand that it's more logical to me that

8    Atlas and Timberline would be subject to the Receiver's power to

9    wind down, given the debt, because that's the profitability

10   piece, but that's -- those -- those the considerations don't

11   apply to Versara.

12         So I'm not prepared to name an individual today,

13   although -- and I don't want to inflame the Court or the

14   Government, but I've taken a look at the PI and I'm not sure

15   that the PI prohibits, for instance, even Ryan Sasson from

16   operating a lawful enterprise.

17         And I'm not suggesting that it's Ryan Sasson at the

18   moment, but I don't -- I don't necessarily believe that the PI

19   prohibits him from running a lawful enterprise, for that matter.

20         So my -- my concern here is the Receiver's

21   application, essentially, as I interpret it, to wind these

22   businesses down.

23         And wind these businesses down, while the ultimate

24   decision as to whether or not the TSR was -- was violated --

25   and, Judge, look it, you put a lot of time and energy into this.

1  had an outstanding loan balance to UBS and credit Sies

2  (phonetic) of about $83 million.

3           During the period of time where we've overseen the

4  operations, we brought in a new servicer, we've done all of

5  those things, we paid down principal of $43 million.

6           We paid interest of another $6.25 million.  In other

7  words, we've paid about $50 million of that UBS debt down in the

8  secondary debt from the company called Sies.

9           So we have operated these businesses.  We -- you know,

10  as you know, because we had the bank here and we were talking

11  about running out Atlas and Timberline.

12           Not getting a new customers, but running it out over

13  the next two years, which is something that we continue to talk

14  to the banks about.

15           And that way, the banks continue to be paid.  At the

16  end of the day, Your Honor, based upon everything I've seen, the

17  banks are never going to be made whole.

18           And we aren't going to generate enough income from the

19  operation of the business to give any consumers relief from

20  this.

21           I think the banks' have a senior lien of more than 30

22  million.  I heard Mr. Beltz say at one point during a hearing 42

23  million.

24           We're -- we're never going to generate that through

25  Atlas and Versara, but we have been able to operate those

 1    businesses.

 2         We're going to continue to operate those businesses,

 3    when it -- while it makes sense to continue to negotiate debts.

 4         We are not seeking new customers and don't intend to

 5    seek new customers.  And, frankly, I'm not sure if we didn't

 6    have that loan consolidation, the phony loan consolidation

 7    letter that we could generate customers at a -- at a level

 8    necessary to continue to operate.

 9         So I haven't addressed any of Mr. Vacca's legal

10    points.  I think we do that in our papers and I'm not concerned

11    about any of the points that he raised.

12         **THE COURT:**  Where -- where are you with the settlement

13    with the bank?

14         **MR. SANDERS:**  We continue -- we still have a draft.

15    It's gone back and forth several times.  We are still in

16    discussions.

17         I would like to have moved them more quickly, but we

18    are still talking to them.  I think if our request for

19    instruction, which is I know not on the calendar, but is a

20    separate issue, now that the law firms withdrawing, our request

21    for instruction has no opposition.

22         As Mr. Vacco indicated, he doesn't oppose that law

23    firm debt relief model.  Mr. Connors, I believe, does not object

24    to that.

25         And given that the law firms are now reaching out to

1    consumers and saying we're withdrawing, now it's time for us to

2    reach out to those consumers.

3         And you may recall about half of the consumers, we

4    have no active payment plan, right?

5         So what we do is we reach out to them and say the next

6    60 days, we're going to continue to provide you customer

7    service.

8         Go to your portal.  Get all the information you -- you

9    need about your debts.  Any of your outstanding debts remain

10   your responsibility.

11        We're not negotiating any debts, but we're going to

12   send you back the money -- we're going to contact Global and

13   Graham, the payment processors, and we're going to ask them to

14   return the money in your account.

15        So that whatever funds are there, you get back right

16   away.  That's our -- that's our thinking on the RFI.  So that's

17   one half of the consumers on the law firm debt relief model.

18        The other half of the consumers of the law firm debt

19   relief model about 28,000, at least as of a few months ago, they

20   have got a payment plan.

21        So our intention is to continue to provide customer

22   service to those folks until their payment plan ends.

23        And so how do we fund that?  Well, we're funding that

24   through Atlas and Timberline.  And that will be how we will

25   continue to fund it.

1          We should be able to shrink down the customer service

2    after 60 days, after this first big group, we return their

3    money.

4          But we're still going to have an obligation to

5    remaining consumers over the life of their payment plan.

6          So that, again, is what Atlas and Timberline can allow

7    us to do.  It will also allow us to pay the banks and that's --

8    that's our plan.

9          You know, in our request for instruction, Judge, which

10   I know is not on the calendar today, but is very well related to

11   the withdrawal issue.

12         Have I answered the your questions, Judge?

13         **THE COURT:**  Yes.

14         **MR. McNAMARA:**  Thank you.

15         **THE COURT:**  Mr. Sanders.

16         **MR. SANDERS:**  I'll be brief, Judge.  Our position is

17   that the Receiver should be running these business that are

18   subject to the SFS's latest motion.

19         Versara is a named defendant.  We have submitted

20   evidence that they took unlawful fees.

21         We submitted evidence that they were actually involved

22   in the deception.  They paid millions of dollars to a lead

23   generator.

24         The due process arguments that Mr. Vacco mentioned

25   were raised only in reply.  We don't think that we think the

1   caselaw here is clear -- you know, we didn't get a chance to put

2   it in our papers that an evidentiary -- evidentiary hearing is

3   not required in every instance to satisfy --

4        **THE COURT:**  Do you want to reply to Mr. Vacco's

5   papers?

6        **MR. SANDERS:**  No, Judge.  We don't feel it's necessary

7   at this point, but we don't think that a hearing is required in

8   every instance.

9        And to your point, Judge, we think that the parameters

10  for the hearing were set by Your Honor.  We presented what you

11  wanted to hear.

12       And we think that it got to the heart of the issue, so

13  I don't have anything further, unless you have questions for me.

14       **THE COURT:**  Well, I'll have you file something in

15  response.

16       So if he didn't raise that until the reply brief, I

17  want to hear from you.  You say there is lots of cases.  I'm not

18  going to go out and find them that's your job, okay?

19       **MR. SANDERS:**  Okay, Judge, I can -- I can give you one

20  now on the record, if you want.

21       **THE COURT:**  No.  You can lay it out for me all in your

22  papers, okay?

23       **MR. SANDERS:**  Thank you, Judge.

24       **THE COURT:**  All right.

25       **MR. BOYD:**  If I could very, very briefly, Judge?

1          **THE COURT:**  Sure.

2          **MR. BOYD:**  So, I mean -- I think Mr. Vacco has

3    conceded that -- that Atlas/Timberline, they are -- I mean, they

4    were part of this enterprise, right?

5          You had the -- you had the client service

6    subsidiaries.  You had Atlas/Timberline.  They were serviced by

7    the same staff, worked out of the same office, had the same

8    owners, supervisors.  All of the common enterprise elements were

9    there.

10         As to Versara, it's named as a defendant.  You

11   don't -- you don't need a common enterprise allegation as to

12   that.

13         And, frankly, all Versara did was it provided loans to

14   customers of the law firm model, right?

15         So customers of the law firm model would go, they

16   would make their payments on time.  Strategic would realize that

17   these were people -- that these were people who were going to

18   pay regularly.

19         So they would send them over to Versara, so they could

20   get the advanced fees front-loaded and they could also make

21   money on the loan.

22         That's all Versara did.  It was part and parcel of the

23   enterprise.  Another way to make them money.  That's why Versara

24   was named in the complaint.

25         So Versara was certainly properly enjoined and

1    shouldn't be let out of the receivership.

2         But Atlas/Timberline, it is extremely common in a case

3    like this, in a receivership case, where there is other smaller

4    entities.

5         You know, you have an accounting entity.  You have an

6    entity that -- that handled the mail.  That were all -- when a

7    common enterprise is alleged and the factors are met, they are

8    all put in the receivership properly together.

9         That happens all the time in these types of cases and

10   that caselaw was cited in our TRO and PI application and that's

11   why these entities were properly included.

12        And I will say although I know Your Honor said you've

13   already you already think that you have jurisdiction to modify

14   the PI and I won't dispute that, but I will note that Atlas and

15   Timberline are specifically named as receivership defendants by

16   name in the PI, which is not true of Royal and Hailstone.

17        And I think it is a distinguishing factor.  I mean,

18   that order is.

19        **THE COURT:**  I -- I think so, too.  I -- if there

20   was -- if there was a clearcut basis where they shouldn't be in

21   the case, I would let them go, but I don't think that's the

22   case, right?

23        So --

24        **MR. BOYD:**  That's all I had, Judge, unless you have

25   any questions.

1          **THE COURT:**  Something you just said I was going to ask

2    you, Mr. Vacco.

3          **MR. VACCO:**  Your Honor, just two points of

4    clarification.  I think Mr. Boyd overstates my position.  I am

5    not conceding that Atlas and Timberline are part of the common

6    enterprise to violate the TSR.

7          **THE COURT:**  I didn't think you were, because that

8    would -- that would be the end of your argument, right?  So --

9          **MR. VACCO:**  And the other point -- so as I mentioned

10   when I got to the podium, you know, the circumstances have --

11   have shifted from the time of our original application, which is

12   Docket 374-1, which we filed on June 7th.

13         And in that application, where we indeed do also

14   address Versara and the contingent fee businesses, we do raise

15   in our papers the due diligence -- I'm sorry -- the due process

16   argument.

17         So we have previously raised that in the context of

18   these three entities.

19         **THE COURT:**  Okay.  Now, Mr. Vacco, is your argument

20   that you also argue that you don't want Versara DST 2019-2,

21   Strategic LD and Celgramacy 2 (phonetic) to be brought in by the

22   Receiver, as receivership entities, I guess.

23         **MR. VACCO:**  Correct.

24         **THE COURT:**  Now, is that just an extension of the

25   argument you've already made?

1          **MR. VACCO:**  Yes, sir.

2          **THE COURT:**  Okay.  All right.  There is nothing --

3          **MR. VACCO:**  Except that -- except that the nuance for

4    the Strategic -- the one with the -- the -- so there is two

5    Strategic/Versara related entities.

6          One is totally separate and distinct from a corporate

7    perspective of the Strategic families.  And that's the entity

8    where the proceeds -- the lending proceeds that came from the

9    lender went into this -- this entity.

10         Which then provided those resources up the chain to

11   Versara.  The Versara entity that was actually then loaning the

12   money to the -- to the debtors.

13         **THE COURT:**  And is that entity, the Versara DST?

14         **MR. VACCO:**  Yes, sir.

15         **THE COURT:**  Okay.

16         **MR. VACCO:**  So it's only purpose -- it's only function

17   was to be the receptacle of the proceeds that came from the

18   lender.  And there were two lenders in -- that are implicated

19   there.

20         **THE COURT:**  The two banks.

21         **MR. VACCO:**  Two banks, correct.  And then the other

22   Strategic-related entity is the payroll entity that was covering

23   payroll for Versara the Gramacy (phonetic) and --

24         **THE COURT:**  Is that Strategic LD?

25         **MR. VACCO:**  Yes, sir.

1          **THE COURT:**  And what did they do again?  I'm sorry.

2          **MR. VACCO:**  Payroll provider to Versara.  They were --

3  they were --

4          **THE COURT:**  The -- they paid the Versara employees?

5          **MR. VACCO:**  Correct.  And they and Gramacy.  And the

6  Court is somewhat familiar with Gramacy, I think, by virtue of a

7  motion that was made months ago.

8          I think it was Mr. Connors' motion for portions of --

9  of it's -- Gramacy is essentially the captive insurance policy.

10         And Mr. Connors, on behalf of the law firms, had

11  previously made an application for the law firms to be repaid --

12  you know, their legal fees to be paid out of that captive

13  policy.

14         That policy is not an asset that's subject to the

15  liens of the banks.

16         **THE COURT:**  You say it's not an asset that's subject

17  to the lien of the banks?

18         **MR. VACCO:**  Of -- of --

19         **THE COURT:**  Not that it's not an asset, period?

20         **MR. VACCO:**  It's not an asset that's -- that's subject

21  to the liens of Valley and --

22         **THE COURT:**  Right.  Okay.  I got you.

23         **MR. VACCO:**  Yes.

24         **THE COURT:**  Okay.

25         **MR. VACCO:**  Well, Mr. Connors is saying it might not

1    be an asset.  It -- it is a captive insurance policy, so I -- I

2    don't know exactly where the proceeds came from just -- so you

3    know, as the Court is aware.

4         **THE COURT:**  You don't know where the money came from

5    for this insurance -- policy, where the money would be paid out

6    of -- well, if to get out of the insurance company, you don't

7    know who funded it?

8         **MR. VACCO:**  I -- I -- I don't with clarity, but it --

9    it is conceivable that it was funded by Strategic.

10        It was -- it was -- the policy -- the -- it's a

11   captive insurance policy designed --

12        **THE COURT:**  I -- I don't -- I guess it would be it's

13   not only conceivable.  That is where the money came from, right?

14        **MR. VACCO:**  I'm -- I'm only hedging --

15        **THE COURT:**  -- and that --

16        **MR. VACCO:**  -- my bets --

17        **THE COURT:**  -- and I think that --

18        **MR. VACCO:**  -- because I don't know --

19        **THE COURT:**  -- because I think that would clearly make

20   it a Strategic-related entity, that's subject to receivership.

21        **MR. VACCO:**  Again, I don't -- I can't -- I'm hedging

22   my comments, only because I don't know precisely where the money

23   came from.

24        It does make sense to me that it was -- that the

25   resources did emanate from a Strategic-related entity.

1      **THE COURT:**  How much -- how much money is in that pot?

2      **MR. VACCO:**  Well --

3      **THE COURT:**  Do you know?  I'm assuming it's millions.

4      **MR. VACCO:**  It's over -- it's over a million and a

5   half dollars.  It's a substantial -- it's a substantial sum.

6          And frankly, Judge, as I mentioned somewhat

7   gratuitously the last time we were here, because that's not a --

8   an asset of the enterprise that's subject to the banks' liens,

9   you know, frankly, I think that, as the Court is still

10  contemplating my fee application, it's conceivable that our fees

11  can be paid out of that pot of money.

12     **MR. BOYD:**  I'll -- I'll just briefly, Judge.  I mean,

13  I think some of this is -- is making the point.

14         When we bring these cases, you have different

15  subsidiaries that do different functions, but they all -- right,

16  one is providing payroll.

17         One is an insurance policy that's funded by the

18  enterprise.  They are all there to do one thing, which is

19  support the overall business, right?

20         And I think -- I don't think there is any question

21  that all of these entities meet the definition of receivership

22  defendant.  These three entities we're talking about.

23         What Mr. Vacco wants you to do now is to go back to

24  the PI that's up on appeal with the Second Circuit and rewrite

25  the definition of receivership entity.

 1          Because these entities were all owned, controlled by

 2    Strategic and their affiliates.  And that's the test that's in

 3    the preliminary injunction.

 4          So you basically have to go back and modify a

 5    substantial provision that was put there for a reason, which is

 6    to sweep up, right?

 7          So that the DST entity that has all the money -- well,

 8    obviously, if we're trying to get consumer restitution, we would

 9    certainly like the entity that has all of the money to be part

10    of the receivership estate, right?

11          Not just the one who is actually providing the

12    business services, but the entity who is getting the money.

13          And the caselaw makes it pretty clear that the Court

14    has jurisdiction to do that.  And that's why those entities are

15    properly named as and made part of the receivership estate.

16          **MR. VACCO:**  So, Your Honor --

17          **THE COURT:**  Well, they weren't named in the complaint

18    or anything.  The Receiver wants to bring them in.

19          **MR. BOYD:**  Named by the Receiver, Judge.

20          **THE COURT:**  Yeah.

21          **MR. BOYD:**  Sorry.

22          **THE COURT:**  Right.  Yeah.  Okay.

23          **MR. VACCO:**  So I don't -- I don't mean to open up

24    another can of worms here, but why not.

25          So I was somewhat impressed by the summary that was

1   provided by Mr. McNamara in terms of financial performance of

2   not only the contingent Atlas and Timberline, but also of

3   Versara.

4           And what's somewhat staggering to me to understand

5   that nearly $50 million -- so the receivership has only been in

6   place since -- you know, through the TRO since January, but

7   pursuant to the PI, since March.

8           I mean, $50 million is a staggering amount of money.

9   So he's paid down debt 43 million and paid interest of

10  $7 million.

11          He doesn't articulate, you know, what other proceeds

12  were generated as a result of servicing -- of servicing those

13  loans.

14          And perhaps this is an argument to be made by, you

15  know, others who -- you know, whether it's Mr. -- Mr. Photiadis

16  or Mr. Personius or even the law firms.

17          But from the perspective of a settlement and the

18  perspective of a resolution, if this is -- if Versara is a -- a

19  lawfully -- is a lawful enterprise that was not implicated in

20  the TSR, despite what the Government -- you know, the Government

21  continues to -- to spew their allegations and summarily say

22  evidence, but it's just their allegations.

23          There has been no evidence educed about these

24  allegations that they raise about the interconnectiveness of the

25  common enterprise.

1           So from -- from my perspective, why are -- shouldn't

2   the people who own the lawful enterprise, IE Versara, be able to

3   control it, so that maybe the 50 or 60 or $70 million or

4   whatever is generated from the operation of that -- that

5   enterprise could be part and parcel to the negotiations and the

6   discussions about how to sell -- settle this case?

7           But I sense that what the Government now wants to do,

8   they want to take the proceeds of that lawful enterprise and

9   pocket it after they have paid all their expenses and paid the

10  banks and pocket all -- all the rest.

11          And in the process, they would still be demanding

12  hundred plus million dollars from -- from the other defendants

13  in this case.

14          And I think that -- again, I keep coming back to

15  the --

16          **THE COURT:**  Well, that -- that money that the Receiver

17  paid, that was -- that wasn't your money or your clients money.

18          **MR. VACCO:**  No, no.

19          **THE COURT:**  That money belonged to the bank.  All he

20  was doing was paying off the bank.

21          **MR. VACCO:**  Well --

22          **THE COURT:**  It's not like you would have had that

23  money or should have had that money or --

24          **MR. VACCO:**  But, Judge, what we're -- what we're

25  missing here is, you know, the full picture.

1          So I'm surprised that in a ten month period that the

2    banks were paid -- the underlying debt was only in the $90,

3    $95 million range.

4          So in a ten month period, he's paid he's paid off half

5    of the debt.  I'm pretty sure that that's in acceleration of

6    paying -- paying that debt.

7          And my point is that to continue to service those

8    loans will continue to generate fees that are either going to

9    paying down the debt -- and at some point, that's finite.

10          And there is going to be chicken left on the bone and

11   the interest is going to go away, why shouldn't the owners be

12   able to control those assets so that they could use those assets

13   as part of their negotiations to settle this case?

14          But what they are looking to do, they want to sweep

15   those proceeds and still turn to the other defendants and say

16   we're demanding $140 million from you.

17          And that's the fundamental unfairness for a lawful

18   enterprise.

19          **MR. BOYD:**  I wish that were true, Judge.  The Receiver

20   can speak to this, but the money he's talking about is going to

21   a secured lender.

22          On the Versara end is UBS and CIBC counsel is here and

23   they can speak to this, but I think for most entities, whatever

24   is left after UBS gets paid, for a lot of them CIBC has a

25   lien -- a backup lien basically after UBS gets paid.

1          So I wish that -- I mean, the reason we brought this

2     case is to have consumer restitution.  So my sincere hope is

3     that there is money left over in these enterprises for consumer

4     restitution.

5          But looking at the numbers, I certainly don't think

6     that's the case sitting here right now.

7          **THE COURT:**  And depending on how things go, you are

8     going to have to fight with the bank --

9          **MR. BOYD:**  Absolutely --

10         **THE COURT:**  -- at the --

11         **MR. BOYD:**  -- Judge.

12         **THE COURT:**  Right.

13         **MR. BOYD:**  Just briefly, to Mr. Vacco's point, I would

14    point him back to paragraph 159 in the complaint, where we

15    allege that Versara Lending LLC received fees from debt relief

16    consumers.

17         That's according to records from Ram, which is

18    Reliant, one of these processors.

19         Versara also received 177 million in incoming wires

20    and that transfers from various SFS entities.

21         It got -- it got fees and it received 100 -- 177

22    million from other SFS entities.  So it's named in the

23    complaint.

24         They had their hearing.  I mean, these due process

25    arguments, Versara was named as a defendant at the time of the

1    hearing.

2          We had the hearing.  The Court made its ruling on the

3    TSR issue and there is an allegation in the complaint that they

4    got fees from debt relief customers, just like any of these

5    other entities.

6          Which is why they are named and which is why they are

7    part of the receivership.  So, you know, as to Versara, I

8    don't -- it's not like Atlas/Timberline, where it's named as a

9    receivership defendant solely.

10          Versara is a defendant.  I mean -- I mean, we sued

11    them.  So I don't think there is any due process issue as to

12    Versara.

13          They are properly subject to the preliminary

14    injunction.

15          **THE COURT:**  Okay.

16          **MR. VACCO:**  Judge, I'm happy that he makes my argument

17    for me.  He's making my argument.

18          The mound of papers that they presented to Judge

19    Vilardo and -- and the 65 depositions that they did in the month

20    of January, leading up to the -- to the preliminary injunction

21    hearing, they got one paragraph -- one paragraph in the amended

22    complaint that mentions Versara.

23          And -- and Mr. Boyd, you know, talks about the -- you

24    know, fees.  So, you know, he makes no connection to the

25    illegality of those fees.

1          So now all of a sudden, because Versara was -- was

2   accepting fees from other Strategic enterprises, that those fees

3   are inherently unlawful.

4          He hasn't connected the dots.  One paragraph in the

5   entire complaint that mentions Versara.  That's why I'm asking

6   for due process here.

7          **MR. SANDERS:**  Judge, the -- the evidence that we

8   submitted here, we had one of our data scientists go through the

9   payments that Ram received and $180,000 of those payments went

10  directly to Versara.

11         So these are not loan payments.  These are debt relief

12  payments that went directly to Versara.

13         Now the -- the fee schedules, which are part of the

14  evidence that was submitted at the hearing, show that those fees

15  were collected from day one from the consumers.

16         So these are unlawful fees.  The fee schedules also

17  show that they are not proportional to any settlement, right?

18         They are just, here's your monthly amount.  You pay it

19  each month.  It's not proportional to any kind of a settlement

20  that was negotiated.

21         So those fees are unlawful.  We have submitted

22  evidence as to that -- the legality.  And in addition,

23  Versara -- we submitted evidence showing that Versara made a

24  large payment.

25         We submitted bank records showing that Versara made a

1    payment of millions of dollars to a Lee Generat (phonetic).  So

2    Versara is implicated in the deception that drew the consumers

3    in in the first place.

4         The Receiver made mention of the fact that with --

5    without the deceptive claims about the -- the loans in the first

6    instance, that Versara wouldn't be able to operate lawfully and

7    profitably.

8         So the idea that Versara hasn't had due process or

9    that there wasn't evidence submitted is just wrong.

10        **MR. VACCO:**  Your Honor, I don't -- I don't mean to

11   have the last word here -- well, I do, but, respectfully, and

12   they can respond all they want to it, but, you know, at -- at

13   the end -- at the end of the day, what we're what we're talking

14   about here is -- you know, to hold Versara responsible for

15   conducting the lawful business.

16        I mean, at the end of the day, all of these dastardly

17   deeds that Mr. Boyd and Mr. Sanders are pointing to, the

18   Receiver has had an obligation since jump street here to operate

19   the business.

20        If he decided that these factors -- that these factors

21   that they raise rose to the level of making the operation of the

22   company unlawful, then he would be here telling the Court that

23   they can't lawfully operate Versara.

24        We have not heard the Receiver talk about the

25   inability to operate Versara lawfully.  Notwithstanding their

1    allegations.

2          And they can, you know, couch it as evidence all they

3    want.  But at the end of the day, they have made no -- they have

4    made no evidentiary connection to Versara operation.

5          Even -- even the -- you know, paying for the lead

6    generation, why is that inherently unlawful?

7          They are creating the impression to the Court that all

8    of that -- that these legitimate business steps, because of the

9    violation of the TSR, make everything else that flows inherently

10   unlawful.

11         And to me, that's why I think we need a due process

12   hearing.

13         The Court -- we still don't fully understand -- the

14   Court doesn't fully understand, respectfully, exactly how

15   Versara operates.

16         You are -- you are relying on what I'm saying, what

17   the Government is saying and what the Receiver is saying, but

18   there has been no evidence in terms of how Versara operates.

19         So they can say that they have taken fees, but they

20   have not tied the timing of those fees to settlements.

21         And whether or not those fees then, therefore, were

22   truly advanced fees.  Contingent fee is not unlawful.

23         **MR. BOYD:**  It's undisputed, Judge, that Versara made

24   loans to advanced fee customers.

25         I don't -- I don't think Mr. Vacco would even dispute

1    that.  I mean, that's what they did.

2          Since the Receiver has been operating the company,

3    they haven't been making any loans.

4          What's been happening, the people have been paying

5    back their existing loans.  That's what -- when you say the

6    Receiver is operating Versara, that's what he means.

7          Basically, is that they are collecting loan payments

8    and paying them over to UBS, who is the learned who financed

9    them.

10          He's not going out and making new loans to advanced

11    fee debt relief clients, which is what we claim was the

12    problematic conduct here, right?

13          Making these loans in the first place.  The

14    allegations are there.  Versara been named as a defendant since

15    jump street.

16          They had a hearing.  The fact that Mr. Vacco wants a

17    do-over, frankly, he's not entitled to it.

18          And the order that came out of that hearing is up on

19    appeal with the Second Circuit right now.  They are named as a

20    defendant.  The order is up on appeal.

21          To give them another hearing basically redoing the PI

22    that's up on appeal with the Second Circuit, just doesn't make

23    any sense to me.

24          **THE COURT:**  Anybody else have anything you want to

25    say?

1          Mr. McNamara brought up about his -- about his

2     notice -- what you --

3          **MR. SANDERS:**  Request for instruction, Judge.

4          **THE COURT:**  Request for instruction.  I think he said

5     nobody objects.

6          Does anybody object at this point or --

7          **MR. CONNORS:**  I do not.

8          **MR. VACCO:**  To make the record clear, I don't.  I

9     don't either, as it relates to the advanced fee model.

10         **THE COURT:**  Mr. Personius?

11         **MR. VACCO:**  I need to be refreshed on what the

12    instruction is that's being requested.

13         I apologize for not knowing, but I can't sit here and

14    say I don't object, because I don't recall what it is.

15         **MR. BOYD:**  It's essentially to wind down the advanced

16    fee side -- side of the business.

17         **THE COURT:**  Well, it's not fair to corner

18    Mr. Personius.

19         **MR. BOYD:**  Sure.  Sure.  Yeah.

20         **THE COURT:**  This wasn't on the -- this week -- we --

21    this wasn't on the -- but --

22         **MR. BOYD:**  Yeah.  No.  I just thought I would help

23    him.

24         **THE COURT:**  If we can --

25         **MR. SANDERS:**  Your Honor, if I might --

1          **THE COURT:**  I'm trying to think of an efficient way --

2     if everybody is going to go in the tank on that, if we could

3     just get it resolved, so we can send out this instruction.

4          **MR. SANDERS:**  Your Honor, if you like, I can reach out

5     to Mr. Personius and the other parties and make sure that they

6     don't have an objection.

7          I can tell you that when we filed our request for

8     instruction some time ago, only two parties objected,

9     Mr. Connors and Mr. Vacco.

10          Both of them now indicated that they don't, which is

11     why I wanted to raise it to the Court.

12          I -- at the time we filed our request for

13     instruction --

14          **THE COURT:**  I don't know if anybody -- would anybody

15     else have standing to object to the --

16          **MR. SANDERS:**  I don't think so.

17          **THE COURT:**  -- to the --

18          **MR. SANDERS:**  I don't believe, so because --

19          **THE COURT:**  Okay.  Why don't you double check because

20     I would like to get that -- because, Mr. McNamara, you do your

21     job diligently and you bring it up every time you come into

22     Court, so I want -- I would like to get that off my plate, if I

23     could, okay?

24          **MR. PERSONIUS:**  Judge, if it's helpful, I don't expect

25     we will object.  I just --

```
 1              THE COURT:  Okay.  Yeah.  Well, Mr. McNamara will

 2   contact everybody and just make sure that's true and come back

 3   to me and let me know, all right?

 4              MR. SANDERS:  I will, Your Honor.

 5              THE COURT:  Okay.  I want a brief from the Government

 6   on this new process argument which you said they raised in their

 7   reply.

 8              Not -- Mr. Vacco says he raised it earlier, but, so --

 9              MR. SANDERS:  And, Judge, just for the record, we did

10   address to the extent he's talking about 374, we did address

11   that in 380, so --

12              THE COURT:  I'll keep that in mind when I'm reviewing

13   your new brief --

14              MR. SANDERS:  That's fine, Judge.

15              THE COURT:  -- on the -- on the issue, okay?

16              What's -- are we scheduled -- when's the next time

17   we're scheduled to come in?

18              We're going to start having a weekly Wednesday

19   meeting --

20              MR. BOYD:  I think, it's the tenth.

21              THE COURT:  -- on this case I think.

22              MR. BOYD:  The 10th, Judge.

23              THE COURT:  I'm sorry?

24              THE CLERK:  December 10.

25              THE COURT:  Okay.  Can I get a report back on this
```