

DEC 19 2024
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CONSUMER FINANCIAL PROTECTION,                    24-CV-40-EAW-MJR
BUREAU, *et al.*,

                 Plaintiffs,                    REPORT AND
                                               RECOMMENDATION

    v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), *et al.*,

                 Defendants, and

STRATEGIC ESOP, *et al.*,

                 Relief Defendants.

_____

Currently before the Court are defendant Fidelis Legal Support Services, LLC and relief defendants Cameron Christo and Bush Lake Trust's motions to dismiss the second amended complaint. (Dkt. Nos. 440, 441, 442) For the following reasons, it is recommended that the motions to dismiss be denied.

## **BACKGROUND**

On January 10, 2024, plaintiffs Consumer Financial Protection Bureau ("the CFPB"), the People of the State of New York, by Letitia James, Attorney General of the State of New York, the State of Colorado *ex rel.* Philip J. Weiser, Attorney General, the State of Delaware *ex rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney General Keith Ellison, the State of North Carolina *ex rel.* Joshua H. Stein, Attorney General, and the State of Wisconsin (collectively "plaintiffs"), filed a complaint alleging that defendants were violating the Telemarketing Sales Rule (the "TSR"), 16 C.F.R. pt.

310, which implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c), 6105(d); New York Executive Law § 63(12); New York General Business Law (GBL) Article 22-A; Wis. Stat. § 218.02; and Wis. Admin. Code § DFI-Bkg ch. 73. (Dkt. No. 1) Defendants named in the complaint included StratFS, LLC and its related entities as well as Ryan Sasson and Jason Blust. (*Id.*) The complaint named Daniel Blumpkin, Albert Ian Behar, Strategic ESOP, Strategic ESOT, Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments LLC, the Blust Family Irrevocable Trust, Jaclyn Blust, Lit Def Strategies, LLC, and Relialit, LLC as relief defendants. (*Id.*)

Also on January 10, 2024, plaintiffs filed an *ex parte* motion for a temporary restraining order ("TRO") with asset freeze, appointment of a receiver, and other equitable relief, as well as a request for defendants to be ordered to show cause as to why a preliminary injunction should not issue. (Dkt. No. 5) The Honorable Lawrence J. Vilardo granted plaintiffs' request for a TRO on January 11, 2024. (Dkt. No. 12) On February 1 and 2, 2024, this Court held an evidentiary hearing to address plaintiffs' motion for a preliminary injunction. (Dkt. Nos. 129, 130) On March 4, 2024, this Court issued a decision granting plaintiffs' motion for a preliminary injunction.[1] (Dkt. Nos. 183, 184)

Plaintiffs filed an amended complaint on March 27, 2024, which, among other things, added Daniel Blumpkin, Albert Ian Behar, Twist Financial, LLC, Duke Enterprises, LLC, and Blaise Investments, LLC as defendants. (Dkt. No. 249) A second amended complaint, the operative pleading here, was filed on May 28, 2024. (Dkt. No. 366) The

---

[1] Strategic, Sasson, Blust, and the Blust Family Irrevocable Trust filed appeals of this Court's preliminary injunction order with the Second Circuit Court of Appeals. (Dkt. Nos. 192-93, 198, 203, 206) These defendants also moved before the Second Circuit for a stay of the preliminary injunction pending the adjudication of their appeal, which was denied on September 9, 2024. *See* Case No. 24-697, Dkt. 118-1. The appeal remains pending.

second amended complaint added Fidelis Legal Support Services LLC, Lit Def Strategies, LLC, Relialit, LLC, Hedgewick Consulting, Richard Gustafson, Timothy Burnette, and Michelle Gallagher as defendants. (*Id.*) The second amended complaint ("SAC") also added Cameron Christo and Bush Lake Trust as relief defendants. (*Id.*)

## SECOND AMENDED COMPLAINT ALLEGATIONS[2]

### Overview

Since at least January 2016, through the granting of the preliminary injunction by this Court on March 4, 2024, the individual and corporate defendants operated an elaborate and complicated scheme to collect exorbitant, illegal advance fees for debt-relief services from consumers facing significant financial difficulty. (Dkt. No. 366, ¶ 13) This scheme violated the TSR, which, *inter alia*, (1) prohibits a telemarketer or seller from taking a fee from a consumer for providing debt-relief services before the seller or telemarketer has renegotiated, settled, or reduced at least one of the consumer's debts and the consumer has made at least one payment under the new terms; (2) prohibits a seller or telemarketer from taking a fee from a consumer for debt-relief services that is not proportional to the amount of debt actually settled or based on a fixed percentage of the amount saved by the consumer; and (3) prohibits a seller or telemarketer from making false statements and/or material misrepresentations as to any aspect of a debt-relief service. (*Id.* at ¶¶ 230-89) The scheme also violated various New York state and Wisonsin state laws, including licensing laws and laws prohibiting fraudulent and deceptive business practices. (*Id.* at ¶¶ 290-315)

---

[2] For purposes of evaluating the motions to dismiss, the Court accepts as true all allegations in the second amended complaint.

## The Individual and Corporate Defendants

The individual defendants operated this scheme to charge illegal advance fees for debt-relief services through a complicated web of interrelated companies and law firms.

### *Strategic*

StratFS, LLC (f/k/a Strategic Financial Solutions, LLC) was founded by defendants Ryan Sasson, Albert Ian Behar, and Daniel Blumpkin. (Dkt. No. 366, ¶ 24) Strategic Family, Inc. is the parent company of other corporate defendants, including: StratFS, LLC; Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Versara Lending, LLC; and Strategic Consulting, LLC. (*Id.* at ¶ 39) StratFS, LLC and Sasson also owned and controlled numerous client services subsidiaries (the "Client Services Subsidiaries").[3] (*Id.* at ¶ 25, ¶ 51). StratFS, LLC, Strategic Family, Inc., their related corporate entities, and their affiliated Client Services Subsidiaries are all referred to collectively herein as "Strategic."

Defendants Sasson, Blumpkin, and Behar each created a single-member shell-holding company, namely defendants Duke Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC, respectively (the "Holding Companies"). (*Id.* at ¶ 24) These shell companies funneled money from Strategic's business to Sasson, Blumpkin, and Behar.

---

[3] The Client Services Subsidiaries included defendants Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC), and Whitestone Client Services, LLC. (Dkt. No. ¶ 51)

(*Id.*) Until 2017, each of these holding companies owned a percentage of Strategic Financial Solutions, LLC. (*Id.*) Those ownership interests were converted to stock, and the Holding Companies sold their stock to relief defendant Strategic ESOP in 2017. (*Id.*)

Since at least January of 2016, Strategic marketed and sold debt-relief services to consumers. (*Id.* at ¶ 106) Strategic operated an advance-fee model of debt-relief that took fees from consumers before the consumers' debts were settled.[4] (*Id.* at ¶ 107) Strategic marketed its debt-relief services via U.S. mail, the internet, and outbound or inbound calls both to and from consumers, including via interstate phone calls. (*Id.* at ¶ 41, ¶ 108)

*The Law Firms and Hedgewick*

Ryan Sasson, together with defendant Jason Blust, an attorney, created a number of law firms around the country. (Dkt. No. 366, ¶ 26, ¶ 45, ¶ 83) These law firms worked together with Strategic's Client Services Subsidiaries to provide advance-fee debt-relief services, as well as litigation assistance, to consumers.[5] (*Id.* at ¶ 45) Each Strategic-owned Client Services Subsidiary corresponded to one or more of the law firms created by Blust and Sasson, and most of the Client Services Subsidiaries shared a name with their corresponding law firm.[6] (*Id.* at ¶¶ 47-48)

Blust controlled and oversaw all law firm operations, and he exercised substantial control over, and involvement in, the law firms' policies and practices. (*Id.* at ¶ 83-84, ¶

---

[4] Strategic also operated a deferred-fee model of debt-relief where consumers did not pay a fee until their debt was settled. (Dkt. No. 366, ¶ 107) While the deferred-fee model accounted for approximately 16% of Strategic's revenue, the advance-fee model accounted for roughly 80% of Strategic's revenue. (*Id.*) It is Strategic's advance-fee model of debt relief only that is relevant to the violations charged in the SAC and the instant motions.

[5] Both Strategic and the law firms qualify as "sellers" offering "debt-relief services" under the TSR. (*Id.* at ¶ 42, ¶ 46)

[6] For example, Boulder Client Services, LLC, a Client Services Subsidiary, corresponded with Boulder Law Group, LLC, a law firm, and Great Lakes Client Services, LLC, a Client Services Subsidiary, corresponded with Great Lakes Law Firm, LLC, a law firm. (Dkt. No. 366, ¶ 47, ¶ 48)

187, ¶ 191-192) Blust acted as a liaison between the law firms and Strategic, facilitating communications between the law firms and Strategic's Client Services Subsidiaries. (*Id.* at ¶ 84, ¶ 197) Blust also recruited attorneys to help run, or serve as figureheads for, the law firms. (*Id.* ¶ 84, ¶ 194-95) To that end, defendants Richard Gustafson, Timothy Burnette, and Michell Gallagher each owned and controlled multiple law firms. (*Id.* at ¶ 85, ¶ 89, ¶ 91) The Blust-controlled law firms that worked in conjunction with Strategic to facilitate the advance-fee debt-relief operation are hereinafter referred to as the "law firms." (*Id.* at ¶ 47)[7]

Hedgewick Consulting, LLC ("Hedgewick") is a consulting company owned and controlled by Blust that provided services to the law firms in exchange for consulting fees. (*Id.* at ¶ 98) Hedgewick designed and set-up the law firms' websites, drafted the client enrollment forms, recommended lawyers to join the firms, and coordinated contracts between the law firms and service providers. (*Id.*)

*Lit Def and Fidelis*

Lit Def Strategies, LLC ("Lit Def") and Fidelis Legal Support Services, LLC ("Fidelis") provided substantial assistance to Strategic and the law firm's debt-relief operations by participating in the day-to-day business operations of the law firms. (Dkt. No. 366, ¶ 252) Specifically, Lit Def and Fidelis provided litigation support on behalf of the law firms. (*Id.* at ¶ 94)

---

[7] A number of the law firms filed a motion to intervene in this case. (Dkt. Nos. 34, 50) This Court granted the motion and the law firms have participated throughout the case, including during the preliminary injunction hearing. The law firms also appealed this Court's preliminary injunction order to the Second Circuit Court of Appeals and their appeal also remains pending. (Dkt. No. 194)

Lit Def is owned and controlled by Blust. (*Id.* at ¶ 95) Around 2021, Lit Def began transitioning into Fidelis, and Fidelis ultimately became the successor company of Lit Def. (*Id.* at ¶¶ 95-96) Fidelis hired many of the same people who worked for Lit Def and, for a period of time, those employees performed the same litigation support roles for the law firms at both Fidelis and Lit Def. (*Id.* at ¶ 96, ¶ 102) The operations of Lit Def and Fidelis were interwoven. (*Id.* at ¶ 96) The companies lacked formal boundaries and shared a single set of staff, management, customers, procedures, instrumentalities, and work. (*Id.*) Gallagher, who owns two of the law firms, helped manage the day-to-day operations at both Lit Def and Fidelis between 2020 and 2024.[8] (*Id.* at ¶ 91)

Cameron Christo is purportedly the founder and chief executive of Fidelis, but, in reality, Blust controls Fidelis. (*Id.* at ¶ 95, 102) Many of the law firms serviced by Fidelis are controlled by or related to Blust. (*Id.* at ¶ 102) Emails indicate that Blust was involved in management decisions for Fidelis through late 2023. (*Id.* at ¶ 103) In November 2023, Blust sent emails to employees of Fidelis or Lit Def directing them to gather documents for an ongoing litigation. (*Id.*) Christo was not included on the email. (*Id.*)

### The Debt-Relief Services Scheme

*Solicitation of Consumers*

Strategic employed third parties to mail personalized letters to consumers claiming that they were "pre-approved" for a debt consolidation loan at attractive interest rates,

---

[8] Relialit, LLC ("Relialit") was a predecessor to Lit Def and, like Lit Def and Fidelis, provided litigation support to the law firms. (Dkt. No. 366, ¶ 97) Relialit was owned by Blust and, according to Blust, is now defunct. (*Id.*) Many of the same people who worked for Lit Def and Fidelis previously worked for Relialit. (*Id.* at ¶ 96)

*e.g.,* 3.11% APR.[9] (Dkt. No. 366, ¶ 13, ¶ 108) The letters cited a rotating list of companies that ostensibly offered the debt consolidation loans, but, in reality, these lenders did not exist and the consumers had not been pre-approved for any loan. (*Id.* at ¶ 14) The letters included a unique offer code or personal reservation code ("PRC"), and consumers were instructed to call a phone number or submit a request to a designated website using the PRC. (*Id.* at ¶ 13)

When the consumer responded by calling the number or vising the website advertised on the letter, their information was sent to Strategic salespeople as "leads." (*Id.* at ¶ 16) Strategic salespeople would then contact the consumer and would almost always inform the consumer that they did not qualify for the debt-consolidation loan as advertised. (*Id.* at ¶ 17, ¶ 110) Strategic salespeople would then encourage the consumer to enroll in Strategic's advance-fee debt-relief program by promising that a network of lawyers would negotiate reduced payoff amounts with the consumer's creditors and would also defend the consumer in the event they were sued by a creditor. (*Id.* at ¶ 18, ¶ 110) Strategic marketed litigation support services as an additional benefit of its debt-relief services. (*Id.* at ¶ 94) Also during the sales calls, Strategic salespeople would routinely refer to its debt-relief services as the "zero percent interest option." (*Id.* at ¶ 21)

*Notary Meetings*

When a consumer agreed to enroll in the program, Strategic salespeople connected the consumer with a law firm to provide the debt-relief services in exchange

---

[9] Strategic often caused 2-3 million direct-mail solicitation letters to be sent to consumers each week. (Dkt. No. 366, ¶ 15) Most or all of these solicitations were sent by MEC Distribution, LLC, a company that claimed to be owned by Three Affiliated Tribes of the Fort Berthold Reservation in North Dakota. (*Id.* at ¶ 109) Between November 2016 and March 2021, Strategic paid at least $135 million to MEC Distribution and its subsidiaries. (*Id.*)

for fees. (*Id.* at ¶¶ 111-12) Strategic would then arrange a meeting between an independent contractor notary and the consumer, for purposes of the consumer signing the enrollment paperwork and the retainer agreement with the assigned law firm. (*Id.* at ¶ 113, ¶ 123) The notaries met with consumers at locations convenient for the consumer. (*Id.* at ¶ 126) The notaries were neither employees nor agents of Strategic or the law firms. (*Id.* at ¶ 125, ¶¶ 135-36) The notaries were typically paid a nominal fee to get the enrollment documents signed. (*Id.* at ¶ 113) The notaries did not consider themselves to be sales agents for Strategic or the law firms. (*Id.* at ¶ 128) The notaries had limited knowledge about the contents of the enrollment documents and could not answer consumers' questions about the documents. (*Id.* at ¶ 127, ¶¶ 131-32) The meetings between consumers and the notaries were typically brief, formulaic, and non-substantive. (*Id.* at ¶ 129)

Contracts between the notaries and the law firms required the notaries to provide an "in-person presentation" to consumers. (*Id.* at ¶ 131) However, the notaries were not required to have substantive knowledge of the debt-relief services nor were they required to meaningfully interact with the consumer about the program. (*Id.*) For example, if a consumer had a question or concern about the debt-relief program before signing the enrollment documents, the notaries called a Strategic employee on the telephone to discuss the issue with the consumer. (*Id.* at ¶¶ 132-33) Thus, the consumer had no in-person, substantive interaction with a seller of the debt-relief service before enrolling in the program. (*Id.* at ¶ 136) Instead, their only substantive interaction was with a Strategic salesperson over the telephone. (*Id.*) And sometimes, not even that. (*Id.* at ¶ 126, ¶¶ 133-36)

Blust, Sasson, and Blumpkin were involved with the notary process. (*Id.* at ¶ 139-40) Hedgewick, owned by Blust, drafted the scripts and training materials for the notaries. (*Id.*) Hedgewick had the final say with regard to changes of the notary script. (*Id.*) Hedgewick also coordinated and maintained copies of contracts between the law firms and the notaries. (*Id.*)

<u>How the Debt-Relief Program Functioned</u>

After a consumer signed the enrollment documents, an attorney from the law firm assigned to that consumer contacted the consumer and read a short script welcoming the consumer to the program. (Dkt. No. 366, ¶ 114) However, this attorney-welcome call was often the only time a consumer spoke with an attorney about the debt-relief program. (*Id.*) When a consumer tried to call their assigned law firm after they were enrolled in the program, their calls were routed to employees of Strategic. (*Id.* at ¶ 121) These employees were primarily located in call centers in Buffalo, New York or New York City. (*Id.*) These employees were not attorneys but held themselves out to be representatives of whichever law firm had been assigned to represent that consumer.[10] (*Id.*)

Although consumers were promised that attorneys would negotiate with creditors on their behalf to settle their debts, the law firms actually performed little to no work on behalf of consumers. (*Id.* at ¶ 26) Instead, the law firms acted as a façade for Strategic's debt-relief operation. (*Id.*) Many of the law firms did not have physical offices and some utilized mailboxes rented though a UPS store. (*Id.* at ¶ 44) For some of the law firms,

---

[10] Specifically, consumer calls were routed to Strategic customer service representatives who would use the name of the Client Services Subsidiary or law firm associated with that consumer. (Dkt. No. 366, ¶ 79) Thus, the entity name under which a Strategic employee answered a consumer call could change with each call. (*Id.*) For example, a Strategic employee who answered calls from consumers held themselves out to be a representative of at least six different law firms, although their salary was paid by Strategic. (*Id.*)

incoming mail was scanned by a third-party and uploaded to Strategic rather than the law

firm. (*Id.*) Further, nearly all of consumers' interactions with their assigned law firms were

with employees of Strategic rather than employees of the law firm.[11] (*Id.* at ¶ 120) To the

extent that any debts were settled for consumers enrolled in the program, the settlements

were negotiated by non-attorney employees of Strategic and not law firm attorneys. (*Id.*

at ¶ 43, ¶ 120)

Upon enrollment, Strategic representatives instructed consumers to stop paying

their debts. (*Id.* at ¶ 115) Some consumers were told that creditors were more likely to

enter into settlements when the consumer's account became delinquent. (*Id.*) When

Strategic received notice that a creditor sued a consumer enrolled in the debt-relief

program, Strategic did not send the filings to the law firm assigned to represent the

consumer. (*Id.* at ¶ 95) Instead, Strategic forwarded those filing to Lit Def and/or Fidelis.

(*Id.*) Lit Def and Fidelis performed data entry for the lawsuits. (*Id.*) Then, Lit Def and Fidelis

acted as hubs in the course of the litigations by sending filings to contracted litigation and

appearance attorneys. (*Id.*)

During the enrollment process, consumers were told that the debt-relief program

included litigation defense services and that a lawyer would represent them in the event

they were sued by their creditors, for non-payment of their enrolled debts, while

participating in the program. (*Id.* at ¶ 122) These representations were misleading and

deceptive. (*Id.* at ¶ 174) Each contract contained a loophole provision allowing the

assigned law firm to avoid participating in litigation if the assigned lawyer determined that

the consumer was unlikely to gain a favorable result. (*Id.* at ¶ 122) Consumers reported

---

[11] The law firms were assigned huge numbers of clients. (Dkt. No. 366, ¶ 120) For example, in 2023, one attorney was assigned to 1,554 clients and had a caseload of 2,778 clients. (*Id.*)

that the law firms almost never represented them when they were sued by creditors, even though the consumers paid the retainer fee. (*Id.*) As a result, consumers sometimes had to represent themselves in court or face default judgments entered against them. (*Id.* at 174)

### *Fees*

Upon enrolling in the debt-relief program, consumers were required to begin making monthly payments into an escrow account. (Dkt. No. 366, ¶ 117) Defendants immediately began collecting substantial fees from consumers through these accounts, including "service fees," "retainer fees," "legal admin fees," and "banking fees." (*Id.* at ¶ 143, ¶ 146) The fees were heavily front-loaded and were charged upon enrollment, before any of the consumer's debts were settled. (*Id.* at ¶ 144, 146) The service fees were not based on the individual debt settlements achieved by the program, and, likewise, the retainer fees, administrative fees, and other fees were not based on the amount of debt actually enrolled or the savings realized by consumers through debt settlements actually achieved. (*Id.* at ¶ 149) Because defendants were withdrawing substantial fees from consumers' escrow accounts every month, consumers were left with little money in their accounts to fund potential settlements. (*Id.* at ¶ 150) In the meantime, consumers' debts continued to accrue interest as they remained outstanding. (*Id.* at ¶ 22) The amounts that consumers paid in fees were significantly greater than the amounts of debts actually settled. (*Id.* at ¶ 165)

Since January of 2016, Strategic and the law firms have taken over $100,000,000 in fees from consumers before any of the consumers' debts were renegotiated, settled,

reduced, or otherwise altered.[12] (*Id.* at ¶ 181) Blust and Sasson had an agreement whereby Strategic received 80% of all consumer fees and the law firms received 20% of all consumers fees. (*Id.* at ¶ 160) Blust's companies, including Hedgewick, Lit Def, and Relialit, all received significant payments from the law firms. (*Id.* at ¶¶ 208-213) From December 2019 through April 2021 specifically, Lit Def received over $37,000,000 from the law firms. (*Id.* at ¶¶ 208-09) Blust also personally received funds from the law firms. (*Id.* at ¶¶ 214-216)

Fidelis, together with Christo and Bush Lake Trust, also received funds obtained from consumers through the advance-fee debt relief scheme. (*Id.* at ¶ 205, ¶ 229) From April 2022 to October 2023, Fidelis received a total of $16.4 million from the law firms. (*Id.* at ¶ 211) From May 2021 to October 2023, Fidelis paid more than $15.7 million to Christo, and more than $3.6 million to Bush Lake Trust.[13] (*Id.* at ¶ 105)

*Consumer Complaints*

Consumer complaints reflect that Strategic and the law firms collected advance and non-proportional fees. (Dkt. No. 366, ¶ 179) In 2023, there were approximately 127 complaints in a Federal Trade Commission database involving the law firms. (*Id.*) One consumer complained that he was charged nearly $10,000 in advance fees between July 2020 and June 2023, and that none of his debts were settled. (*Id.* at ¶ 180)

---

[12] Specifically, sample payment data for approximately 34,000 consumers enrolled in defendants' debt-relief program over an approximately five-year period shows that the enrolled consumers paid a total of $104,000,000 to Strategic and the law firms before any debt-relief payments were made to creditors. (Dkt. No. 366, ¶ 147) During this same five-year period, no one working for Strategic or the law firms settled any debt for approximately one-third of the consumers who paid into the program. (*Id.* at ¶ 148)

[13] On March 1, 2021, Christo established Bush Lake Trust, an irrevocable trust for the benefit of his children. (Dkt. No. 366, ¶ 104) That same day, Christo transferred his ownership interest of Fidelis to Bush Lake Trust. (*Id.*)

Blust responded to consumer complaints about the law firms.[14] (*Id.* at ¶ 84) Blust often consulted with Strategic employees and law firm employees regarding consumer complaints against the law firms, including complaints to various state bar associations and the Better Business Bureau. (*Id.* at ¶¶ 199-200) Likewise, when Strategic employees were unable to resolve escalated consumer issues, they often consulted with Blust. (*Id.*) Blust also coordinated efforts by Strategic and the law firms to pressure consumers to take down negative reviews of the law firms. (*Id.*)

### *Individual Defendants' Prior Involvement in the Debt-Relief Business*

Blust and Sasson are former employees of Legal Helpers Debt Resolution, LLC ("Legal Helpers"). (Dkt. No. 366, ¶ 53, ¶ 83) Legal Helpers is a debt-relief firm that was sued and eventually shut-down as a result of actions by the Attorneys General of Illinois, Wisconsin, North Carolina, and West Virginia. (*Id.* at ¶ 53) It was alleged that Legal Helpers charged unlawful up-front fees, failed to reduce consumers' debt as promised, and attempted to avoid advance-fee bans by recruiting attorneys to act as "fronts" for the business. (*Id.*) These lawsuits resulted in consent judgments enjoining Legal Helpers from engaging in debt-relief in certain states. (*Id.*) In 2018, Blust entered into a stipulated judgment with the United States Bankruptcy Trustee for the District of Kansas regarding numerous violations of bankruptcy law arising from the same facts as alleged in the SAC. (*Id.* at ¶ 83) Plaintiffs allege that, based on his former employment and these lawsuits,

---

[14] Sasson and Blust created the law firms to conceal Strategic's involvement in the debt-relief operation. (Dkt. No. 366, ¶ 183) Thus, when consumers complained to various government entities about the debt-relief program, they complained about their assigned law firm, whose name they had been provided, and not about Strategic, whose name they had not been provided. (*Id.*) This structure also made it more difficult for consumers to sue Strategic. (*Id.*)

Blust knew, or should have known, that it is illegal to charge advance fees for debt-relief. (*Id.*)

### *The Federal and State Charges*

Counts 1 and 2 of the SAC allege that Strategic, Sasson, Behar, and Blumpkin committed abusive practices, in violation of the TSR, by charging advance fees for debt-relief services and by charging fees that were not proportional to the amount of debt settled or based on a fixed percentage of the amount saved by consumers as a result of a debt settlement.[15] (Dkt. No. 366, ¶ 230-46) Count 3 of the SAC alleges that, by controlling the law firms and/or participating in their day-to-day operations, defendants Strategic, Relialit, Lit Def, Hedgewick, and Fidelis provided substantial assistance to the abusive telemarketing practices committed by the law firms, including the taking of advance and non-proportional fees from consumers for debt-relief services, in violation of the TSR.[16] (*Id.* at ¶¶ 247-56) Count 4 likewise charges individual defendants Sasson, Behar, Blumpkin, Blust, Gustafson, Burnette, and Gallagher with violating the TSR by providing substantial assistance to abusive telemarketing practices committed by Strategic and the law firms.[17] (*Id.* at ¶¶ 257-70)

Count 7 of the SAC charges Strategic, Relialit, Lit Def, Hedgewick, Fidelis, and the individual defendants with fraudulent acts in support of their debt-relief business, in

---

[15] Counts 1 and 2 also name the Holding Companies. (Dkt. No. 366, ¶ 230-46)

[16] The Holding Companies are also named in Count 3. (Dkt. No. 366, ¶¶ 247-256)

[17] Counts 5 and 6 charge Strategic, Sasson, Blumpkin, and the Holding Companies with engaging in deceptive practices in violation of the TSR. (Dkt. No. 366, ¶¶ 271-89) These charges involve the allegedly false and deceptive claims made to consumers regarding the debt-relief services, including telling consumers they were "pre-approved" for a low interest loan when they had not been approved for any loan and there was no lender, as well as referring to the debt-relief services as the "zero percent interest option," even though the program involved advance fees and the continued accrual of interest on consumers' outstanding debts. (*Id.*)

violation of New York Executive Law § 63(12). (*Id.* at ¶¶ 290-95) Count 8 charges Strategic, Relialit, Lit Def, Hedgewick, Fidelis, and the individual defendants with engaging in deceptive acts or practices in support of their debt-relief business, in violation of New York General Business Law § 349 .[18] (*Id.* at ¶¶ 296-301) Count 9 of the SAC alleges that the relief defendants, including Christo and Bush Lake Trust, received funds or assets from defendants that were obtained from consumers through the unlawful practices alleged in the SAC; that relief defendants have no legitimate claims to the funds; and that the funds are subject to disgorgement. (*Id.* at ¶¶ 302-06)

## **LEGAL STANDARD**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

When evaluating a motion to dismiss, a court must accept as true the factual allegations contained in a complaint and draw all inferences in plaintiff's favor. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 662. "Determining whether a complaint

---

[18] Counts 10 and 11 allege that Strategic, Great Lakes Client Services, LLC, the Holding Companies, and the individual defendants violated various Wisconsin state statutes governing licenses and fees in providing debt-relief services. (Dkt. No. 366, ¶ 307-15)

states a plausible claim for relief...requires the...court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Plaintiffs allege that Fidelis violated the TSR by providing substantial assistance to the law firms in collecting unlawful advance fees from consumers for debt-relief services. A substantial assistance claim requires (1) an underlying TSR violation; (2) proof that defendant provided substantial assistance or support to the seller or telemarketer responsible for the violation; and (3) proof that defendant knew, or consciously avoided knowing, that the seller or telemarketer engaged in the TSR violation. *See* 16 C.F.R. § 310.3(b); *FTC v. Consumer Health Benefits Ass'n*, 10 Civ. 3551, 2012 U.S. Dist. LEXIS 72161 (E.D.N.Y. May 23, 2012).

Fidelis argues, in the first instance, that it must be dismissed from the lawsuit because the substantial assistance provision of the TSR is invalid insofar as it seeks to prohibit providing substantial assistance to abusive telemarketing practices. Fidelis next argues that, even if the relevant TSR provision is valid, plaintiffs have failed to state a claim because the allegations in the SAC are (1) insufficient to show that Fidelis provided substantial assistance to the debt-relief operation and (2) insufficient to show that Fidelis knew, or consciously avoided knowing, that the law firms were violating the TSR. Lastly, Fidelis argues that the SAC fails to state any valid claims under New York state law.[19] The Court addresses defendants' arguments in turn below.

---

[19] Christo and Bush Lake Trust contend that because the SAC does not sufficiently allege that Fidelis engaged in any TSR violation, they cannot be said to have received ill-gotten funds and must be dismissed as relief defendants.

*The Substantial Assistance Provision of the TSR is Valid*

The Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Act") granted the Federal Trade Commission (the "FTC") the power to prescribe rules prohibiting certain conduct by telemarketers and sellers. *See* 15 U.S.C § 6102. These rules make up the Telemarketing Sales Rule, or the TSR. To that end, Sections 310.3(a), (c) and (d) of the TSR prohibit a telemarketer or seller from engaging in certain "deceptive telemarketing acts or practices," while Section 310.4 of the TSR prohibits a telemarketer or seller from engaging in certain "abusive telemarketing acts or practices." *See* 16 C.F.R. § 310.3; § 310.4. Section 310.3(b) of the TSR prohibits anyone from providing substantial assistance to any telemarketer or seller engaged in *either* deceptive or abusive telemarketing acts or practices. *See* 16 C.F.R. § 310.3(b) ("It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.").

Here, Fidelis is alleged to have violated Section 310.3(b) of the TSR by providing substantial assistance to the law firms in taking advance and non-proportional fees for debt-relief, both of which are defined as abusive telemarketing practices under the TSR. *See* 16 C.F.R. § 310.4(a)(5)(i). Fidelis maintains, however, that these allegations cannot stand because the FTC exceeded its authority under the Act by including abusive telemarking acts in Section 310.3(b), the substantial assistance provision of the TSR.

Fidelis' argument is premised on the specific language of the Act itself. Section 6102(a)(1) of the Act generally states that the FTC "shall prescribe rules prohibiting

deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." *See* 15 U.S.C. § 6102(a)(1). Section 6102(a)(2), the following subsection, directs the FTC to define deceptive telemarking and further states that such definition "may include acts or practices of entities or individuals *that assist or facilitate* deceptive telemarketing[.]" *Id.* at § 6102(a)(2) (emphasis added). Section 6102(a)(3), the very next subsection, provides a list of prohibited conduct the FTC "shall include in [its] rules respecting other abusive telemarketing acts or practices." *Id.* at § 6102(3). Unlike Section 6102(a)(2), which mentions the assistance and facilitation of *deceptive acts*, Section 6102(a)(3) does not expressly state that the FTC may prohibit the assistance and facilitation of *abusive acts*. Fidelis posits that because Congress did not expressly include language addressing assistance and facilitation in Section 6102(a)(3)'s discussion of abusive acts, like it did in Section 6102(a)(2)'s discussion of deceptive acts, Congress only authorized the FTC to outlaw the assistance and facilitation of deceptive telemarketing. Stated another way, Fidelis argues that the Act permits the FTC to create a rule prohibiting substantial assistance of deceptive telemarketing but does not permit the FTC to create a rule prohibiting substantial assistance of abusive telemarketing. Thus, according to Fidelis, the provision of the TSR charged here is invalid.

The Court does not read the Act so narrowly. To begin, Section 6102(a)(1) of the Act, which appears *before* the more specific discussion of deceptive and abusive acts found in Sections 6102(a)(2) and 6102(a)(3) respectively, provides broad authorization to the FTC to create rules "prohibiting deceptive telemarketing acts or practices *and other abusive telemarketing acts or practices.*" 15 U.S.C. § 6102(a)(1) (emphasis added). *See CFPB v. Commonwealth Equity Grp., LLC*, 554 F. Supp.3d 202, 209 (D. Mass. 2021)

(recognizing the breath of FTC's authority to create rules addressing telemarketing "at its discretion"). Section 310.3(b) of the TSR, the provision charged here, prohibits an entity, like Fidelis, from providing substantial assistance to a telemarketer or seller engaged in abusive conduct. This provision of the TSR appears to fall squarely within the plain and general grant of authority given to the FTC, in Section 6102(a)(1) of the Act, to create rules prohibiting both "deceptive telemarketing acts or practices and *other abusive telemarketing acts or practices*." *See* 15 U.S.C. § 6102(a)(1) (emphasis added).

Fidelis is correct that Sections 6102(a)(2) and 6102(a)(3) of the Act list certain rules and requirements that the FTC either "may include" or "shall include" in its rules governing deceptive and abusive telemarketing practices. However, these lists do not appear to limit the FTC's general authority, under Section 6102(a)(1), to restrict a wide variety of *other* abusive telemarketing conduct. In fact, a reading of Sections 6102(a)(2) and 6102(a)(3) that limits the ability of the FTC to promulgate rules against other abusive acts or practices in telemarketing would seem to render Section 6102(a)(1) mere surplusage.

Fidelis argues that because Congress expressly stated, in Section 6102(a)(2), that the FTC "may" include rules against assistance of deceptive practices, but did not similarly state, in Section 6102(a)(3), that the FTC may include rules against assistance of abusive practices, Congress must have intended to prohibit the FTC from attaching secondary liability to abusive conduct. Fidelis contends that telling the FTC that it may impose secondary liability for deceptive telemarketing is meaningless if the FTC "may also impose secondary liability as broadly as it likes." The Court disagrees.

Section 6102(a)(2) of the Act does not appear to provide any additional authority to the FTC that is not *already granted* under Section 6102(a)(1)'s general mandate to

write rules prescribing deceptive and abusive telemarketing. Instead, the language of Section 6102(a)(2) provides guidance to the FTC in writing those rules as they pertain to deceptive telemarketing. To that end, Section 6102(a)(2) instructs the FTC to define deceptive telemarking and suggests that such a definition may include the assistance and facilitation of deceptive acts. Contrary to defendants' interpretation, this language does not suggest, to this Court, that assistance and facilitation of abusive acts cannot *also* be prohibited under the general and broad mandate found in Section 6102(a)(1). *See Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d at 209 ("Although Congress directed the FTC to create rules regarding specific telemarketing activities (for example, calls that are made late at night or that are coercive), Congress also authorized the FTC to create additional rules addressing 'deceptive telemarketing acts or practices' at its discretion. 15 U.S.C. § 6102(a)(1). Defendants have not demonstrated that Congress intended the FTC to exclusively address unsolicited telemarketing calls that would cause the TSR to exceed the Commission's authorized scope of rulemaking."). In fact, the Court finds such an interpretation, namely that Congress meant to allow for a rule against assisting with deceptive acts but to specifically prohibit a rule against assisting with abusive acts, to be illogical. *See Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) (a presumption that expressly including one matter excludes other matters "applies only when it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").

Like Section 6102(a)(2) of the Act accomplishes with regard to deceptive acts, Section 6102(a)(3) provides the FTC with guidance in writing the rules against abusive acts that it is already empowered to create pursuant to Section 6102(a)(1). To that end, Section 6102(a)(3) provides a list of certain abusive telemarketing conduct that the FTC

"shall include" in the TSR, including restrictions on the hours of the day and night that unsolicited phone calls can be made and requirements that telemarketers disclose the purpose and nature of the call. *See* 15 U.S.C. § 6102(a)(3)(A)-(D). But the list of abusive practices found in Section 6102(a)(3) was clearly not meant to be exhaustive or limiting. To be sure, Section 310.4 of the TSR outlaws myriad additional abusive telemarketing acts that, like the substantial assistance rule at issue here, are not expressly mentioned in Section 6102(a)(3).[20] *See* 16 C.F.R. § 310.4. Thus, it is apparent that the abusive practices which Congress specifically listed in Section 6102(a)(3) were to be treated by the FTC as a floor, and not a ceiling, in writing rules prohibiting "other abusive telemarketing acts." The non-limiting nature of Section 6102(a)(3) serves as further proof that the assistance and facilitation of abusive telemarketing conduct is itself an "other abusive telemarketing act[] or practice" that the FTC can prohibit pursuant to the broad and general mandate given to the FTC in Section 6102(a)(1) of the Act.[21]

Finally, the different formulations of Sections 6102(a)(2) and 6102(a)(3) of the Act further indicate that Congress' mention of assisting and facilitating deceptive conduct should not be read to suggest that Congress intended to foreclose the FTC from

---

[20] Indeed, the charging of advance fees for debt-relief services, the main subject of this lawsuit, is an abusive practice pursuant to Section 310.4(a)(5)(1) of the TSR that is not also specifically listed in Section 6102(a)(3) of the Act's discussion of abusive practices.

[21] Fidelis appears to concede that Section 6102(a)(3) of the Act does not prohibit the FTC from addressing other abusive telemarketing conduct not specifically listed therein, and that Section 310.4 of the TSR does, in fact, limit a whole host of additional abusive conduct not expressly enumerated by the Act. But Fidelis points to the fact that the provision addressing substantial assistance of abusive acts is found in Section 310.3 of the TSR (addressing deceptive acts) and not in Section 310.4 of the TSR (addressing abusive acts). The Court does not find the placement of the substantial assistance rule to change the analysis here. Indeed, the plain language of Section 6102(a)(1)'s directive, to the FTC, to prescribe rules prohibiting "deceptive telemarketing acts or practices *and other abusive telemarketing acts or practices*" appears to combine both deceptive and abusive acts into a large, general category of wrongful telemarketing conduct that the FTC has broad power to both identify and prohibit.

addressing the assistance and facilitation of abusive conduct. Section 6102(a)(2) requires the FTC to define deceptive telemarketing and suggests that such a definition may include assistance or facilitation of deceptive acts. In contrast, Section 6102(a)(3) does not require the FTC to define abusive telemarketing and instead provides a non-exhaustive list of abusive conduct the FTC shall include in its rules regarding abusive acts. This lack of parallelism between Sections 6102(a)(2) and 6102(a)(3) belies Fidelis' argument that if Congress wanted to permit the FTC to promulgate a rule against substantially assisting abusive conduct, like it did with regard to deceptive conduct, Congress would have so stated. *See United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) ("[I]f the language of the two provisions at issue is not parallel, then Congress may not have envisioned that the two provisions would be closely compared in search of terms present in one and absent in the other.").

For these reasons, the Court rejects Fidelis' argument that the substantial assistance provision of the TSR charged in Count 3 is invalid.

### *The SAC Sufficiently Alleges Substantial Assistance by Fidelis*

Fidelis next argues that even if the substantial assistance provision of the TSR is valid, the SAC must still be dismissed because it does not sufficiently allege that Fidelis provided substantial assistance to the underlying TSR violation charged here. For the following reasons, the Court disagrees.

The threshold for what constitutes substantial assistance is low. *See Consumer Health Benefits Ass'n*, 2012 U.S. Dist. LEXIS 72161 at *17. It requires only a "connection between the assistance provided and the resulting violations of the core provisions of the TSR." *Id.*; *United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009).

Plaintiffs must identify something more than "casual or incidental" help to the telemarketer that is unrelated to the TSR violation, but plaintiffs do not have to show a "direct connection" between the assistance and the alleged violation. *See F.T.C. v. HES Merch. Servs., Co.*, 6:12-CV-1618, 2014 U.S. Dist. LEXIS 171292 (M.D. Fla. Nov. 18, 2014), *aff'd* 652 F. App'x 837 (11th Cir. 2016); *accord FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013). For example, "cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or facilitator." *Chapman*, 714 F.3d at 1216-17 (internal citations omitted). However, "[p]roviding lists of contacts to a seller or telemarketer that identify persons over the age of 55" could be sufficient to constitute substantial assistance. *See FTC v. Capital Choice Consumer Credit, Inc.*, 02-21050 CIV, 2004 U.S. Dist. LEXIS 32306 (S.D. Fla. Feb. 20, 2004) (quoting *Telemarketing Sales Rule Statement of Basis and Purpose*, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995)).

Thus, the question before the Court is not whether Fidelis directly engaged in the alleged unlawful collection of advance fees from consumers, but instead whether there are sufficient facts stated to make it plausible that Fidelis provided something more than "casual or incidental dealing with [the law firms] that [was] unrelated to [the] violation of the Rule." *See FTC v. Nudge, LLC*, 2:19-CV-867, 2021 U.S. Dist. LEXIS 139831 (D. Utah July 26, 2021). That standard is met here. The totality of allegations in the SAC, which the Court assumes to be true, and the reasonable inferences to be drawn therefrom, sufficiently connect Fidelis' activities with the alleged abusive telemarketing practices of the law firms.

Here, it is alleged that the debt-relief program was marketed and sold to consumers with the promise that each consumer was retaining the services of a law firm. Consumers were assured that attorneys would both negotiate their debt settlements and provide them with legal representation in the event they were sued by creditors. Immediately upon enrollment, consumers were instructed to stop paying their debts and start paying significant advance fees that were shared between Strategic and the law firms. It is alleged that when Strategic received notice that a creditor sued a consumer enrolled in the debt-relief program, Strategic did not notify that consumer's assigned law firm. Instead, Strategic notified Fidelis of the lawsuit. It is further alleged that Fidelis then facilitated litigation support by acting as a "hub" over the course of the litigation, and that it sent legal documents and paperwork to other contract attorneys and litigation attorneys. In sum, it is alleged that litigation services were an essential part of the advance fee debt-relief program sold to consumers by Strategic and the law firms, and that Fidelis played a major role in the facilitation of those litigation services. Moreover, the reasonable inferences to be drawn from the allegations indicate that the law firms could not have provided their promised litigation support services to consumers without Fidelis' assistance.[22]

These allegations are sufficient, at this early stage of the lawsuit, to state a claim that the assistance Fidelis rendered to the debt-relief program was more than mere

---

[22] The Court rejects Fidelis' argument that it cannot have provided substantial assistance based on facilitating litigation support to the law firms where the SAC also alleges that the law firms did not actually deliver on their promise of litigation defense. First, the plaintiffs do not allege that a litigation defense was never provided to consumers but instead allege that a defense was often not provided. Regardless, the promise of litigation support was marketed to consumers when they enrolled in the program and began paying fees, and Fidelis' role in the operation helped facilitate that service in the manner sold to consumers.

incidental or casual dealing, unrelated to the underlying TSR violation. *See Chapman*, 714 F.3d at 1211 (rejecting defendant's claim that she did not provide substantial assistance to the underlying TSR violation where "she was the one who provided the services and products [the telemarketers] marketed to consumers in misleading ways."); *FTC v. Partner in Health Car Ass'n*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016) (substantial assistance found where, *inter alia*, multiple telemarketers testified that they could not have done business without defendants).[23]

Fidelis argues that it cannot be liable because it provided "back-end" services and ministerial work that was tangential to the underlying TSR violation, namely the collection of advance fees. Fidelis emphasizes that (1) the work it performed consisted mainly of data entry and forwarding documents; (2) it had no direct interaction with consumers; (3) it was not involved in the "front-end" sales pitch to persuade consumers to enroll in the program, and (4) any advance fees were paid before Fidelis provided any services.[24] But

---

[23] Fidelis cites aiding and abetting cases brought under the Securities and Exchange Act, which hold that secondary liability requires that a defendant render assistance to the primary violation, not merely to the person committing the violation. *See Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991). Assuming *arguendo* that the SEC cases apply here, the allegations in the SAC are still sufficient. Here, plaintiffs allege that by playing an essential role in providing the litigation services promised to consumers at the time they enrolled in the debt-relief service and began paying fees, Fidelis rendered assistance not just to the law firms generally, but specifically to the generation of advance fees by Strategic and the law firms.

[24] The Court notes that while it is not alleged that Fidelis directly took advance fees from consumers, the SAC alleges that Fidelis profited significantly from the advance fee debt-relief operation. For example, it is alleged that from April 2022 to October 2023, the law firms paid Fidelis approximately $16.4 million. Moreover, the SAC indicates that consumers remained in the program for months, if not years, during which time they regularly paid advance fees. The SAC alleges that if a consumer was sued during this time, they were purportedly entitled to receive legal representation and that the accompanying litigation support services were facilitated by Fidelis. Thus, drawing all reasonable inferences from the SAC allegations, it cannot be said that any advance fees paid by consumers were paid before Fidelis entered the picture. Instead, it appears that the ongoing advance fees paid by consumers, during their enrollment in the program, were supposedly funding the continued services of the law firms, who in turn relied on the services of, and rendered payment to, Fidelis.

even assuming all this to be true, such direct connections to the initial sale of the debt-relief program and the actual taking of advance fees are not necessary to plausibly allege a claim of substantial assistance under the TSR. *See Chapman,* 714 F.3d at 1216 (rejecting defendant's argument that she did not provide substantial assistance to the TSR violation because "she was not involved in the marketing efforts and thus her assistance was not directly connected to the misrepresentations made to consumers" [because] "this type of direction connection is not required."); *F.T.C. v. Lake,* 181 F. Supp. 3d 692, 696 (C.D. Cal 2016) (where "back-end work" played an "integral part" in defendant's scheme to collect fees, there was no question that defendant could be held liable on a substantial assistance theory).

Moreover, the allegations here, which the Court must assume to be true, reflect that Fidelis did not exist or operate in a vacuum. It was not a wholly separate business, contracted to provide ancillary support services to the law firms, like a cleaning company or copier service. Instead, it is alleged that Fidelis is the successor company to Lit Def and Relialit, entities owned and operated by Blust. It is alleged that Blust controlled the law firms, and that Sasson and Blust created the law firms to obfuscate Strategic's involvement in the debt-relief program as well as to help facilitate the collection of heavily front-loaded advance fees from consumers. It is alleged that Blust also controlled Fidelis; that the operations of Lit Def and Fidelis were interwoven; and that Lit Def and Fidelis provided critical support to Blust-controlled law firms in the ongoing advance-fee debt-relief operation. Thus, the allegations, read in totality, indicate that Fidelis existed as one

part of a large and complicated scheme created by Strategic and the law firms to circumvent the TSR and collect illegal advance fees from consumers.[25]

Lastly, the Court notes that this matter is at the pleading stage. Discovery will likely bear out greater factual detail as to exactly how the litigation services were marketed and provided to consumers; the extent of Fidelis' involvement in the litigation services provided by the law firms; and Fidelis' specific connections to the debt-relief operation as a whole. Depending on the information learned, it may be the case that Fidelis is able to successfully raise this argument at the dispositive motion stage. However, the SAC allegations and all reasonable inferences to be drawn therefrom, viewed in a light most favorable to plaintiffs, are sufficient to state a claim of substantial assistance.

### The SAC Sufficiently Alleges Knowledge by Fidelis

Fidelis next argues that the SAC fails to allege facts showing that Fidelis knew that the law firms were violating the TSR. To that end, Fidelis contends that the SAC does not allege that Cameron Christo, the chief executive of Fidelis, knew, or consciously avoided knowing, about the alleged TSR violation. The Court disagrees and finds, for the following reasons, that the SAC sufficiently alleges that (1) Blust's knowledge can be imputed to Fidelis; and (2) Blust knew, or consciously avoided knowing, of the alleged TSR violation.

The Second Circuit has held that "a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take." *S.E.C. v. Franco*, 253 F. Supp. 2d 720 (S.D.N.Y. 2003). Thus, an

---

[25] Fidelis counters that it is not alleged to have been an alter-ego of Blust or the law firms, nor is it alleged to have been part of a common enterprise with Strategic or other corporate defendants. Nevertheless, the allegations regarding Fidelis' relationship with, and connection to, the law firms, Blust, Strategic, and the other defendants tend to show that Fidelis' role in the debt-relief operation went beyond casual or incidental assistance that was unrelated to the underlying TSR violation.

individual's knowledge "is imputed to the corporation which he controlled." *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096 n. 17 (2d Cir. 1972) (two corporate defendants were liable for violations of securities law because they were "corporate embodiments" of an individual defendant, "and [the individual's] awareness of the securities law violations [is] imputed to them."). *See also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246 (2d Cir. 1995) ("The knowledge of a director, officer…*or controlling person* of a corporation is imputable to that corporation.") (emphasis added).

Here, plaintiffs allege that Blust owned and controlled Lit Def. It is further alleged that, around 2021, Lit Def began transitioning into Fidelis, and that Fidelis ultimately became the successor company to Lit Def. To that end, Fidelis hired many of the same people who worked for Lit Def and, for a period of time, those employees performed the same litigation support services, on behalf of the law firms, for both companies. It is alleged that the operations of Lit Def and Fidelis were interwoven, with no formal boundaries, and that the companies shared a single set of staff, management, customers, procedures, and work. Michelle Gallagher, who owned two of the law firms, worked directly under Blust and managed the daily operations of both Fidelis and Lit Def from 2020 to 2024. The SAC alleges that while Christo was named founder and chief executive of Fidelis, it was, in reality, Blust who controlled Fidelis.[26]

The SAC further alleges that emails show Blust's involvement in management decisions for Fidelis up until November 2023. For example, in November 2023, it was Blust, and not Christo, who sent an email to Fidelis or Lit Def employees directing them

---

[26] Plaintiffs also contend that because Gallagher exercised substantial control over Fidelis through her management responsibilities, her knowledge of the advance fee operation, which she gained through her ownership of two law firms, can also be imputed to Fidelis.

to gather information for an ongoing litigation. These allegations and the reasonable inferences to be drawn from them are minimally sufficient to state a claim that Blust controlled Fidelis, and that, as a result of this control, Blust's knowledge can be imputed to Fidelis. *See SEC v. Watermark Fin. Servs. Group*, 08-CV-361, 2012 U.S. Dist. LEXIS 18436 (W.D.N.Y. Feb. 10, 2012) (individual's knowledge and misconduct imputed to corporate defendants because he was principal, president, and ran the day-to-day operations); *Manor Nursing Crs., Inc.*, 458 F.2d at 1089 n. 3 (imputing individual's awareness of securities laws violations to corporations over which he had "blanket control").[27]

The TSR prohibits a seller or telemarketer from receiving advance fees for debt relief services. *See* 16 C.F.R. § 310.4(a)(5)(i). Here, the SAC clearly alleges that the law firms were sellers of debt relief services who took advance fees from consumers in violation of the TSR. It is alleged that Blust created the law firms for the purpose of working together with Strategic to provide debt-relief to consumers. It is alleged that Blust owned and controlled the law firms; that he recruited attorneys to run the law firms; and that he acted as liaison between Strategic and the law firms. It is alleged that since 2016, Strategic and the law firms have received at least $100,000,000 from consumers in advance fees for debt-relief and that, pursuant to an agreement between Blust and Sasson, Strategic received 80% of those fees and the law firms received 20% of those fees. It is alleged that Blust personally received funds from the law firms and that

---

[27] The Court notes that plaintiffs have not pled robust or detailed facts about Blust's control over Fidelis. However, after drawing all reasonable inferences in plaintiffs' favor, the Court finds the allegations minimally sufficient to state a claim. In order to ultimately prevail on a theory that Blust's knowledge may be imputed to Fidelis, plaintiffs will need to produce credible and detailed evidence showing that Blust controlled Fidelis.

Hedgewick, Lit Def, and Relialit, companies owned by Blust and intimately involved in the debt-relief operation, all received significant payments from the law firms. Indeed, it is alleged that between December 2019 and April 2021, the law firms paid Lit Def over $37,000,000. Thus, it is plainly alleged that Blust knew the law firms were collecting advance fees for debt-relief, and that he himself received a significant portion of those fees.

The SAC also alleges that Blust knew, or consciously avoided knowing, that charging advance fees for debt-relief was a violation of the TSR. It is alleged that Blust and Sasson created the law firms to conceal Strategic's involvement in the debt-relief operation. It is alleged that consumers complained about the fees charged by the law firms. "Knowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations." *Consumer Health Benefits Ass'n*, 2011 U.S. Dist. LEXIS 92389 at *18 (citing *Dish Network, L.L.C.*, 667 F. Supp. 2d at 961). Here, Blust is alleged to have not only responded to consumer complaints, but also to have coordinated efforts by Strategic and the law firms to pressure consumers to withdraw their complaints about the law firms. *See Nudge, LLC*, 2021 U.S. Dist. LEXIS 139831 (FTC plausibly alleged that defendants knew or consciously avoided knowing that other defendants were violating the TSR, where defendants received or were made aware of consumer complaints regarding the conduct charged).

The SAC also alleges that Blust was a former employee of Legal Helpers, a company that was sued, and ultimately shutdown, for charging up-front fees for debt-relief. Even if these lawsuits did not specifically involve the TSR's advance-fee ban, they are alleged to have involved the wrongful collection of advance fees for debt-relief. To

that end, it is reasonable to infer that Blust's involvement with Legal Helpers would have served as a "red flag" to him regarding the conduct charged here. *See FTC v. Walmart*, 22 CV 3372, 2024 U.S. Dist. LEXIS 117532 (N.D. Ill. July 3, 2024) (A person consciously avoids knowing about a TSR violation when "there are facts and evidence that support an inference of deliberate ignorance.") (quoting *Telemarketing Sales Rule*, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995); *Chapman*, 714 F.3d at 1219 (actual knowledge is not necessary under the conscious avoidance standard); *Consumer Fin. Prot. Bureau v. Daniel A. Rosen, Inc.*, 21-CV-07492, 2022 U.S. Dist. LEXIS 91254 (C.D. Cal. April 5, 2022) ("Courts have found it is sufficient to establish knowledge, or conscious avoidance of the prohibited practice, and not of the TSR violation."); *Lake*, 181 F. Supp. 3d at 701 (describing the defendant's knowledge of prohibited conduct and not discussing defendant's specific knowledge of the TSR).

Moreover, the TSR exempts—and thus does not prohibit advance fees for—transactions involving "[t]elephone calls in which the sale of goods or services…is not completed, and payment or authorization of payment is not required, until after a face-to-face sales…presentation by the seller[.]" *See* 16 C.F.R. § 310.6(b)(3). Here, the SAC alleges that the law firms contracted with notaries to provide "in person presentations" to consumers before the consumers formally enrolled in the debt-relief program.[28] It is alleged that Blust, Sasson, and Blumpkin were involved in the notary process. It is further alleged that Hedgewick, Blust's consulting company, drafted the scripts and training materials for the notaries. It is also alleged that Hedgewick coordinated and maintained

---

[28] The SAC further alleges that the meetings between the notaries and the consumers were brief, perfunctory, and did not provide the consumers with any direct or substantive interaction with the actual sellers of the debt-relief services, *i.e.*, the law firms and Strategic.

copies of contracts between the law firms and the notaries. These allegations, considered in totality, also lead to a reasonable inference that Blust knew that the collection of advance fees was prohibited under the TSR and that he attempted to use the notary presentations to avoid or circumvent the advance fee ban.[29]

Fidelis contends that while it is plaintiffs' position that the notary presentations to consumers did not satisfy the face-to-face exemption to the TSR's ban on advance fees, the SAC does not allege any facts suggesting that Blust knew, or consciously avoided knowing, that the notary presentations failed to qualify for the exemption. Thus, according to Fidelis, the SAC fails to charge Blust with the knowledge necessary to state a claim of substantial assistance. This argument misconstrues both the knowledge requirement under the law and what is required of plaintiffs at the pleading stage.

To begin, Fidelis "confuses factual knowledge with legal knowledge; only the former is required to establish a knowing statutory violation." *In re Axa Equitable Life Ins. Co., COI Litig.*, 595 F. Supp. 3d 196, 236 (S.D.N.Y. 2022). Whether a defendant has "legal knowledge," *e.g.*, about whether a statutory exception exempted his conduct from a clearly stated bar on such conduct, is not relevant to this inquiry. *See Bryan v. United States*, 524 U.S. 184, 192-93 (1998) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."). Fidelis' argument is premised on the theory that a mistaken belief about the legality of its conduct is sufficient to establish lack of knowledge of the violation. But ignorance of the law is not a defense. To that end, the Second Circuit has held that "the

---

[29] The Court again notes that this is a motion to dismiss. Plaintiffs are not required to definitively prove the knowledge element at the pleading stage. Assuming the facts alleged to be true, and drawing all reasonable inferences in plaintiffs' favor, it is sufficiently alleged that Blust knew, or consciously avoided knowing, that the law firms collected advance fees in violation of the TSR.

phrase 'knowingly violates' requires knowledge of the facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001). Stated another way, the fact that defendant may have tried to comply with a law and failed does not demonstrate that defendant did not have the requisite knowledge of the acts constituting the violation, sufficient to state a claim against it at the pleading stage.[30]

Moreover, the TSR expressly prohibits the taking of advance fees for debt-relief. The face-to-face presentation is an exemption to that prohibition. Exemptions are an affirmative defense, and defendant bears the burden of proof as to this issue. See *Dish Network*, 75 F. Supp. 3d at 937 (noting that an exemption under Section 310.6 of the TSR is an affirmative defense for which defendant bears the burden of proof); *In re Stock Exchs. Options Trading Antitrust Litigation*, 317 F.3d 134, 151 (2d Cir. 2003) (affirmative defenses have been found to include exemption under a statute or regulation). By that same token, plaintiffs are not required to plead facts negating an affirmative defense in the complaint. *See In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 144 (2d Cir. 2023). *See also Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1987 n.9 (2017) (An affirmative defense to a plaintiff's claim for relief "is not something the plaintiff must anticipate and negate in her pleading.").

Plaintiffs are not obligated, at this stage of the litigation, to plead facts demonstrating that the face-to-face exemption to the TSR's ban on advance fees did not

---

[30] The Court notes that Fidelis does not seem to contest that the SAC alleges that Blust knew, or consciously avoided knowing, of the law itself, namely that the TSR prohibits charging advance fees for debt-relief. Instead, Fidelis seems to argue that the SAC fails to allege that Blust did not know that an exemption from this law did not apply to the debt-relief services offered here. This is certainly a bridge too far.

apply to the debt-relief operation perpetuated by Strategic and the law firms. Likewise, it is not plaintiffs' obligation to plead facts showing that defendants, including Fidelis, were aware, or were likely aware, that this exemption did not apply. The applicability of the exemption here, and whether any good faith defense may exist based on that exemption, is to be determined later.

### The New York State Claims are Sufficiently Pled

Fidelis argues that Counts 7 and 8 must be dismissed because the SAC fails to allege that they engaged in any fraud or deceptive business practices under New York law. The Court disagrees.

Section 63(12) of the New York Executive Law defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." N.Y. Exec. Law § 63(12). The definition of fraud under the Executive Law is very broad. *See Lefkowitz v. Bull Inv. Grp.*, 360 N.Y.S.2d 488, 491 (N.Y. 3d Dep't 1974). Under Section 63(12), the test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud. *See People v. Gen. Elec. Co.*, 302 A.D.2d 314 (1st Dep't 2003).

Section 349 of the New York General Business Law prohibits deceptive acts or practices in business. *See* N.Y. Gen. Bus. Law § 349. Pursuant to Section 349, plaintiffs must show (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way; and (3) that the consumer suffered an injury as a result of the deceptive act. *See People v. One Source Networking, Inc.*, 125 A.D.3d 1354 (4th

Dep't 2015). The deceptive act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gen. Elec. Co.*, 302 A.D.2d at 315.

Here, the SAC alleges that consumers paid the law firms for, *inter alia*, litigation defense in the event they were sued by their creditors. In turn, the law firms allegedly paid Fidelis millions of dollars, generated from consumer funds, to help coordinate and facilitate this litigation defense. Moreover, the promise of this purported litigation defense was marketed to consumers when they enrolled in the debt-relief program and began paying fees, including a retainer. It is alleged that despite being promised, and paying for, this service, consumers often did not receive a defense when they were sued by their creditors, resulting in consumers having to represent themselves or default judgments entered against them. Simply put, it is alleged that the law firms and Fidelis failed to provide consumers with a service that was promised at the time of their enrollment in the debt-relief program.

Drawing all reasonable inferences in plaintiffs' favor and assuming the facts stated in the SAC to be true, the allegations here are minimally sufficient to state a claim for fraud under Section 63(12) of the Executive Law as well as deceptive business practices under Section 349 of the General Business Law. *See People v. Apple Health & Sports Clubs*, 206 A.D.2d 266 (1st Dept. 1994) (broadly construing the definition of fraud under Section 63(12) so as to include acts characterized as dishonest or misleading and eliminating the necessity for proof of an intent to defraud); *People by Koppell v. Empyre Inground Pools*, 227 A.D.2d 731 (3d Dep't 1996) (repeatedly offering contracts to consumers containing extended warranties and then failing to fulfill these warranties constituted deceptive practices in violation of Section 349).

Fidelis argues that it cannot be liable for fraud or deceptive business practices because it was not involved in the "front-end" sale of debt-relief services to consumers and instead only provided "back-end" vendor services to the law firms. Fidelis again fails to recognize the forest for the trees. Corporations can be liable for the fraudulent actions of others when they act in concert. *See People v. Apple Health & Sports Clubs*, 80 N.Y.2d 803, 807 (N.Y. 1992). Here, the SAC alleges that Blust controlled both the law firms and Fidelis, and further alleges that these entities acted together, with the other individuals and businesses named in the SAC, to facilitate the advance fee debt-relief operation. *Id.* at 807 ("[T]here was a substantial likelihood that the Attorney-General could prove that the corporations were interlocking and acted in concert, thereby subjecting [one corporation] to liability for the fraudulent and illegal activities pursued by" the other corporation). And while Fidelis did not market the debt-relief and litigation defense services to consumers, it is alleged to have acted together with the law firms in failing to provide those services in a manner that was injurious to consumers. *New York v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 369 (S.D.N.Y. 2019) (even if defendant did not participate in the deceptive marketing to consumers, plaintiffs could still establish liability for the deceptive scheme by showing that defendant "engage[d] in deceptive acts or practices that are injurious to consumers with at least some knowledge of the deception.") (internal citations omitted).

As the case moves forward, defendant may certainly raise factual arguments regarding Blust's control of Fidelis, the services actually provided by Fidelis, and Fidelis' level of involvement in the overall debt-relief operation. However, the allegations in Counts 7 and 8 are sufficient to state claims at the pleading stage.

*Cameron Christo and Bush Lake Trust*

Federal courts may order an equitable action against a relief defendant who is not accused of wrongdoing when "that person [or entity] (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).

Here, Fidelis is alleged to have provided substantial assistance to the law firms in collecting unlawful advance fees for debt-relief. It is alleged that the law firms paid a portion of those fees to Fidelis, and that Fidelis transferred $19 million to Christo and Bush Lake Trust. Thus, it is alleged that Christo and Bush Lake received ill-gotten gains. Assuming the facts in the SAC to be true, and drawing all reasonable inferences therefrom, it is further alleged that Christo performed little to no work for Fidelis, and that it was Blust, and not Christo or Bush Lake Trust, who controlled Fidelis. Thus, it is also sufficiently alleged that neither Christo nor Bush Lake Trust have a legitimate claim to the funds. While Christo and Bush Lake Trust may present evidence to dispute these allegations as the case proceeds, they have been properly named as relief defendants at the pleading stage, and there is no basis to dismiss them at this time.

## CONCLUSION

For the foregoing reasons, it is recommended that Fidelis Legal Support Services, LLC, Cameron Christo, and Bush Lake Trust's motions to dismiss the second amended complaint be denied. (Dkt. Nos. 440, 441, 442)

An evidentiary hearing addressing (1) plaintiff's motion for a preliminary injunction against Fidelis Legal Support Services, LLC, Cameron Christo, and the Bush Lake Trust (Dkt. No. 477) and (2) the receiver's motion for an order to show cause why Lit Def

Strategies, LLC and Jason Blust should not be held in civil contempt (Dkt. No. 179) is scheduled for **January 23, 2025 and January 24, 2025, beginning at 9:30 a.m. each day**. **On or before January 16, 2025, the parties are to file hearing briefs, witness lists, and exhibit lists.**

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Wolford.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988)*.

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall*

*be supported by legal authority."*  **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

      **SO ORDERED.**


Dated:       December 19, 2024
                Buffalo, New York


MICHAEL J. ROEMER
United States Magistrate Judge