UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al.<br><br>Defendants, and<br><br>STRATEGIC ESOP, et al.,<br><br>Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**RECEIVER'S HEARING BRIEF**

# TABLE OF CONTENTS

I.    RELEVANT PROCEDURAL BACKGROUND ............................................................ 2

II.   ARGUMENT ........................................................................................................ 15

    A.    Legal Standard ................................................................................................ 16

    B.    The Blust Defendants Admit Violating the TRO Regarding Lit Def .................. 18

    C.    Evidence Plainly Establishes That Blust Also Controls Fidelis, in Whole
        or in Part ......................................................................................................... 21

        1.    Blust was the mastermind of setting up Fidelis to succeed and take
            over all of the business of Blust-controlled law firms.  He made
            key decisions from inception and then directed Hinds and Christo
            to follow his dictates. ............................................................................. 22

        2.    Blust controlled the entire business relationship with Fidelis's
            Litigation Management Portal, a key software platform called NDS
            or LeadTrac. ........................................................................................... 25

        3.    StratFS reimbursed Blust $750,000 through Fidelis. ................................ 25

    D.    Remedies ........................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
    814 F.3d 91 (2d Cir. 2016) ................................................................. 16

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .............................................................................. 17

*Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*,
    951 F.2d 1357 (2d Cir. 1991) ............................................................ 16

*Donovan v. Sovereign Sec., Ltd.*,
    726 F.2d 55 (2d Cir. 1984) ................................................................. 17

*Hicks on Behalf of Feiock v. Feiock*,
    485 U.S. 624 (1988) ............................................................................ 17

*Huber v. Marine Midland Bank*,
    51 F.3d 5 (2d Cir. 1995) ..................................................................... 17

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
    885 F.2d 1 (2d Cir 1989) .................................................................... 17

*New York State Nat'l Org. for Women v. Terry*,
    159 F.3d 86 (2d Cir. 1998) ................................................................. 16

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.*,
    369 F.3d 645 (2d Cir. 2004) ......................................................... 16, 17

*S.E.C. v. Hardy*,
    803 F.2d 1034 (9th Cir. 1986) ............................................................ 18

*Spallone v. United States*,
    493 U.S. 265 (1990) ............................................................................ 16

*Walker v. City of Birmingham*,
    388 U.S. 307 (1967) ............................................................................ 16

The court-appointed receiver, Thomas W. McNamara ("Receiver"), presents this Hearing Brief  as required by the December 19, 2024 Scheduling Notice in connection with the Receiver's Order to Show Cause why Lit Def Strategies, LLC ("Lit Def") and Jason Blust ("Blust" and collectively with Lit Def "Blust Defendants") ("OSC Motion") should not be held in civil contempt.  As the Court is well aware, the parties have filed many pleadings related to Blust's contempt – his continued operation of Lit Def and Fidelis post-TRO and the related filing of false sworn declarations by Blust and Defendants Michelle Hinds Gallager ("Hinds") and Cameron Christo ("Christo").  The Receiver respectfully submits a summary of information relevant to the hearing.

As discussed below, there are certain overlapping factual issues regarding these two motions scheduled for hearing.  The Receiver defers to the Court on how to organize the hearing.

On May 23, 2024, the Court held a hearing on the motion for contempt and Fidelis's challenge to being named a Receivership Defendant (at the time, Plaintiffs had not filed a PI Motion against the Fidelis Parties but subsequently did so – should that be granted the Fidelis parties will become Receivership Defendants).  The Court scheduled an evidentiary hearing for July 10-11 and directed that the following witnesses appear: Jason Blust, Cameron Christo, Michelle Hinds, Javier Avila, and Katherine Rosenberg.  *See* Dkt. No. 361; *see also* Dkt. No. 477-47, at 10.  The Court specifically identified the following topics it wanted the witnesses to discuss:

1. The background of Fidelis's formation;
2. The nature and extent of Blust's involvement after its formation.
3. How employees, files and work were shared when employees were both working for both Lit Def and Fidelis;
4. What law firms Fidelis served and how Fidelis received this business;
5. How work was assigned at Fidelis and by whom;
6. How compensation and hiring were determined and by whom; and
7. Preparation of the Invoice from Fidelis to Law Firms.

1

*See* Dkt. No. 477-47, at 10.

## I.    RELEVANT PROCEDURAL BACKGROUND

On January 11, 2024, the Court entered the Temporary Restraining Order (TRO), which identified Lit Def as a Receivership Defendant and its principal, Blust, as an Individual Defendant.  Dkt. No. 12.  The TRO imposed cooperation requirements on Blust and Lit Def.  *See e.g.*, TRO Sections XI, XIII (Cooperation with Receiver), and XIV (Delivery of Receivership Property).

Thereafter, the Receiver and his counsel reached out to Lit Def's counsel several times to request cooperation with the TRO and presenting questions concerning the company's assets, documents, and operations.  *See* Receiver's Reply to Defendants' Letter Submission Dated February 9, 2024, Dkt. No. 150, at 5-7.  This was a priority for the Receiver out of a concern not only to identify and gain control over all assets, but also to ensure that consumers were protected in any ongoing litigation.  Finally, on January 25, Lit Def's counsel indicated that Lit Def had ceased operations and laid off all of its staff upon entry of the TRO.  *Id.*  Relying upon this representation, the Receiver reported Lit Def's claim to the Court in his Preliminary Report.  *See* Preliminary Report, Dkt. No. 115-1, at 10-11.  Defendants, including Blust and Lit Def, also represented to the Court that Lit Def has shut down following entry of the TRO.  *See* Defendants' Letter Submission Dated February 9, 2024, Dkt. No. 149, at 2-3.

What was not known to the Receiver at that time – and what was not known even to Blust's counsel at that time –  was that Blust was not telling the truth.  He had not shut down Lit Def upon entry of the TRO.  In fact, he continued to run it and to access its email and computer systems throughout January; and he continued to operate a related litigation services company, Fidelis, that was not owned by Blust on paper.  Despite the TRO, Lit Def and Fidelis employees continued to  conduct business.

And at his deposition in January, Blust carefully avoided any mention of Fidelis and gave an incomplete and inaccurate answer as to why Lit Def's income dropped precipitously from 2020 to 2023.  *See* Transcript of Deposition of Blust, attached hereto, at 108:19-109:24.  When asked why Lit Def's income had decreased from more than $10 million in 2020 to $340,000 in 2023, Blust nonsensically claimed that this was a result of "front-loading" of client fees. *Id.* When asked, "Wouldn't firms continue to take in funds over time as they brought in new clients?," *id.*, Blust answered, "Potentially, but we had discussed the arrangement that I laid out for you." *Id.*  Blust carefully avoided telling Plaintiffs the truth during his deposition: he had replaced Lit Def with Fidelis, and the reason that Lit Def's income dropped was because Blust – who controlled the law firms – had routed all of the new business since February of 2022 to Fidelis, which he conveniently did not own on paper.

Despite Blust's efforts to hide Fidelis's existence and operations, the truth began to emerge.  On Friday, February 23, 2024, the Receiver became aware that Lit Def was continuing to operate and that Fidelis (an entity which was previously unknown to the Receiver) was operating in tandem with Lit Def.  *See* Receiver's Memorandum in Support of Motion for OSC, Dkt. No. 179-1, at 3.  Specifically, StratFS's VP of client relations forwarded an email exchange to the Receiver, asking whether the issue identified in the email could be addressed by StratFS staff.  *Id.*  The email concerned "LitDef file #CS0031210376" and had been forwarded to the VP by Defendant Hinds, an attorney and manager of Lit Def and Fidelis.  *Id.*  While Hinds used a Fidelis email address to forward the email, she also sent copies to two individuals with Lit Def email addresses, indicating that Lit Def's email system was operational and employees were active.  *Id.*

3

Upon receiving the email, the Receiver began investigating Fidelis. Fidelis is a Nevada limited liability company formed on January 25, 2021, for which Defendant Christo was listed as Manager *See* Wall Dec., Ex. 1, Dkt. No. 179-3. Fidelis's website was remarkably similar to Lit Def's website and appeared to perform the same function as Lit Def of liaising between StratFS consumers and the Intervenor Law Firms. *See id.*, Exs. 2 & 3, Dkt. No. 179-4 & 179-5. The Receiver's team reviewed StratFS email boxes and CRM, Salesforce, for emails to and from the "Fidelissupport.com" domain and discovered numerous emails going back to at least February 2022 showing employees using both Lit Def and Fidelis email addresses, apparently interchangeably. *See id.*, Ex. 4, Dkt. No. 179-6.

The Receiver also discovered an email thread from October 2021 between StratFS's Controller, Cameron Ball ("Ball"), and Blust's accountant, Chris Kesterson ("Kesterson"), concerning a transfer of $750,000 from StratFS to the law firms – controlled by Blust – for a "technology spend" supposedly made by the law firms. *Id.*, Ex. 5, Dkt. No. 179-7. But rather than paying the law firms, Kesterson told Ball the payment should be paid to Fidelis – "$100k for 7 mos, $50k for 1 month." *Id.* at 5. In a later email exchange in March 2022, Ball forwarded one of Fidelis' monthly invoices for the "technology spend" to StratFS's General Counsel, Marc Lemberg ("Lemberg") and CFO, Salvatore Tirabassi ("Tirabassi") of StratFS. *Id.*, Ex. 8, 179-10. Discussing whether to prepare a written contract to memorialize this supposed "technology spend" payments to Fidelis, Tirabassi told Ball, "You can land the plane with Blust as you see fit," further suggesting that Fidelis was under Blust's control. *See id.*

4

Based on this investigation, on February 25, the Receiver notified[1] Fidelis and the parties that Fidelis qualified as a Receivership Defendant because it is a "business related to the Defendants' debt-relief services and which the Receiver has reason to believe is owned or controlled in whole or in part by any of the Defendants." TRO, Dkt. No. 12, Definition "N" at 7-8.  Furthermore, in light of both Blust's ongoing unauthorized operation of Lit Def and his evident control of Fidelis, on February 26, the Receiver filed the OSC Motion, which explained Lit Def's ongoing operation on its own and/or through the operation of Fidelis.  Dkt. No. 179-1.

In response to the OSC Motion, Blust filed a declaration admitting that he kept operating Lit Def after the TRO, despite what he had told his own counsel, the Receiver, and the Court to the contrary.  However, Blust adamantly denied he had control or ownership of Fidelis and submitted his ***own*** sworn statement, which included the following assertions:

> 7.  The Receiver's assertion that I own and/or control a company called Fidelis Legal Support Services, LLC ("Fidelis") is flatly false. **I do not control or own Fidelis, and have never owned or controlled Fidelis.** Nor did I divert assets or resources of [Lit Def] to Fidelis.
>
> 10.  Over the period 2021 through 2023, as [Lit Def] took on less and less business, and by comparison the business taken on by Fidelis grew, **I became aware that a few employees of [Lit Def] began simultaneously working for Fidelis.** I approved of their doing so provided their work performance for [Lit Def] was not affected….
>
> 11.  This arrangement in no fashion involved an interest of any kind on my part, including financial or supervisory, in the operation of Fidelis.
>
> 15.  The conclusory allegations in the Receiver's Memorandum of Law, at pages 2 and 6, that Fidelis is "beneficially owned or controlled" by me is false, as is the claim at page 2 of this pleading that Fidelis is "operating in parallel with, as a proxy of, or as successor to" LDS.

---

[1] Pursuant to Section IX.S of the TRO "[i]f the Receiver identifies a non party entity as a Receivership Entity," the Receiver is authorized and directed to "promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court."   TRO, Dkt. No. 12, at 24.

17. The assertions at page 16 of the Receiver's Memorandum of Law that [Lit Def] and I are "transacting Lit Def business via Lit Def itself and/or through Fidelis" and that "Fidelis is handling some or perhaps, all, of the work relating to the Intervenor Law Firm clients' matters, which had previously been handled by Lit Def" are also inaccurate.

20. Based upon the statements set forth above, and those contained separately in the filed Declaration of Counsel for LDS and me, as well as the statements and arguments outlined in the motion pleadings of Fidelis [Doc. Nos. 190-10], I respectfully request that the pending motion to hold both LDS and me in contempt be, in all respects, denied.

Blust Declaration, Dkt. No. 211 (emphasis added).

For its part, Fidelis filed its Motion Challenging the Receiver's Determination That Fidelis is a Receivership Defendant (the "Fidelis Motion"). Dkt. No. 190. In its extensive motion, Fidelis denied without any reservation that Blust exercised **ANY** control over Fidelis, and specifically denied that Blust has **ANY** influence over Fidelis's "business-development, personnel, and purchasing decisions[.]" Dkt. No. 191, at 9. With smug certainty, Fidelis characterized itself and Lit Def as arm's-length competitors in the litigation-support sector, "much like McDonald's and Burger King … and Nike and Reebok[.]" Dkt. No. 190-1, at 4. Regarding Tirabassi's instruction to "land the plane with Blust as you see fit" as regards to the $750,000 StratFS payment to Fidelis, Fidelis simply denied knowing why Tirabassi wrote this, suggesting "he might have simply misspoken[.]" *Id.* at 9.

Defendant Christo also submitted the first of three sworn declarations in this lawsuit, in which he asserted under oath and without any reservation that Blust "does not make decisions for Fidelis[.]" 1st Christo Dec., Dkt. No. 190-4, at 4. Regarding the $750,000 StratFS payment to Fidelis, Christo claimed it was compensation from Strategic for his "vet[ting] a new software platform" and denied knowing what Tirabassi's instruction to "land the plane with Blust" referred to. *Id.* at ¶¶ 36-38.

6

In opposition to Fidelis's motion, the Receiver offered the declaration of Katherine Rosenberg, a former employee of Lit Def and Fidelis. Ms. Rosenberg only learned of the TRO in this case around January 31, 2024. Dkt. No. 212-1 ¶¶ 17-18.. After reading the complaint, Defendant Hinds asked her to undertake tasks with which she was not comfortable, she went on administrative leave and contacted enforcement agencies. The Receiver's office reached out to Ms. Rosenberg who revealed, in direct contradiction to Blust's, Christo's and Hinds' claim that Lit Def and Fidelis were competitors, that Fidelis was Lit Def's successor entity. *See* Receiver's Opposition to Fidelis Motion, Dkt. No. 212; Rosenberg Dec., Dkt. No. 212-1. Fidelis and Lit Def shared a common staff, management, customers, procedures, equipment, log-ins, and software access. *See generally* ¶¶ 4-14. Although she was contacted for a job interview by a Fidelis representative, when she was hired, Ms. Rosenberg was initially "put on Lit Def" (i.e., assigned to service Lit Def files) by her manager, Defendant Hinds; Rosenberg was later transitioned over to servicing Fidelis along with Lit Def files and still later over to only Fidelis files. Receiver's Opposition to Fidelis Motion, Dkt. No. 212, at 5-7; Rosenberg Dec., Dkt. No. 212-1, ¶¶ 6-8. Rosenberg never applied to work at Fidelis; she and other Lit Def staff were simply transitioned from Lit Def over to Fidelis – a process that Hinds referred to as a "merger" of Lit Def and Fidelis. *Id.*

On March 21, the Receiver filed a Reply in support of the OSC Motion, explaining the harm to the receivership estate caused by Blust and Lit Def's failure to cooperate with the TRO. Dkt. No. 232. On the same day, Fidelis also filed a Reply in support of its Receivership Defendant motion, in which Fidelis claimed again without any reservation that Christo "exercises complete control" over Fidelis. Dkt. No. 233. In support of its Reply, Fidelis

submitted a second declaration by Christo, in which he claimed unequivocally that Blust does

not have any supervision over Fidelis whatsoever:

> 7. Jason Blust is not a consultant for Fidelis and he does not control it in any
> respect. He does not set policy, he does not prescribe strategy, he does not make
> decisions, he does not direct operations—in short, he has no role in the running of
> Fidelis's business.

2nd Christo Dec., Dkt. No. 233-1, at ¶ 7.  Christo also reiterated his claim that the $750,000 in

payments from Strategic were compensation for "vetting software" for Strategic, although he

was unable to produce any written contract, work product, or other documentation to support the

claim.  *See id.* at ¶ 12.

In addition to Christo's second declaration, Fidelis offered Hinds' sworn declaration, in

which she too claimed without reservation that Blust had nothing to do with Fidelis.  She swore

under oath, among other things, that "Christo makes all executive decisions with regard to

personnel, payroll, purchasing, and contracting" (Hinds Dec., Dkt. No. 233-5, at ¶ 29) and that

Blust "has no role in Fidelis's operations and exercises no control over the running of Fidelis's

business" (*Id.* at ¶ 4).

Moreover, Christo – in an effort to blunt the revelation that Lit Def and Fidelis employees

were assigned contemporaneous duties for the companies – declared under oath that there was a

Fidelis employee who worked for Fidelis from the beginning and never worked for Lit Def,

named Hayfa Zayed ("Zayed").  Christo Dec., Dkt. 190-4, ¶ 40.  But the Receiver's investigation

discovered that Zayed reported directly to Blust and had her own "Clientfirstbankruptcy.com"[2]

email address.  Receiver's Opposition to Fidelis Motion, Dkt. No. 212, at 7-8; *see also* Wall

Dec., Ex. 2, Dkt. No. 212-5.  Furthermore, in its motion, Fidelis claimed that it serviced several

---

[2] Client First Bankruptcy is Jason Blust's law firm.

law firms unconnected with Strategic, but the Receiver's investigation revealed that these firms are all owned or controlled by Blust, and that all of Fidelis's revenue appears to derive from Blust-controlled law firms.  Receiver's Opposition to Fidelis Motion, Dkt. No. 212, at 14-20.

On March 20, the Receiver was finally provided Lit Def's email passwords.  This happened only after the Receiver had moved for contempt.  This allowed the Receiver to begin reviewing Lit Def's internal communications.  *See* Receiver's Sur-Reply to Fidelis, Dkt. No. 237-1, at 1.  The Receiver's team began reviewing the communications and soon discovered additional evidence that directly contradicted the sworn declarations offered to this Court by Blust, Christo, and Hinds .  *Id.* at 2-7.

Both Blust and Christo declared under oath that Christo independently created Fidelis after Blust casually told Christo that he "wanted to wind up LDS and move away from the debt settlement business."  Blust Dec., Dkt. No. 211, ¶ 8.  According to Blust: "Aside from this informal conversation in late 2020, I [Blust] played no role whatsoever in Mr. Christos formation of Fidelis."  *Id.* ¶ 9.  Blust also claimed in his declaration  that over the period 2021 through 2023, he "became aware" that some employees of Lit Def began simultaneously working for Fidelis, and claims to have exercised no supervision over this arrangement.  *Id.* ¶¶ 10-11.  Blust also claimed not to have determined Fidelis staff's compensation.  *Id.* ¶ 13.  Christo similarly has claimed that Blust "does not make decisions for Fidelis" (1st Christo Dec., Dkt. No. 190-4, at ¶ 4), does not control Fidelis (2nd Christo Dec., Dkt. No. 233-1, ¶ 4), is not a consultant for Fidelis, does not set policy, and does not direct operations (*id.* ¶ 7).  For her part, Hinds swore under oath that Christo is the "boss" of Fidelis and that Blust "has no role in Fidelis's operations and exercises no control over the running of Fidelis's business."  Hinds Dec., Dkt. No. 233-5, ¶ 4.

However, the Receiver's initial Lit Def email review discovered additional evidence, which demonstrates the sworn statements were false:

- In January 2022, just before Fidelis was assigned law firm files, Blust instructed Hinds on which employees to switch from Lit Def to Fidelis and how their weekly compensation should be split between Lit Def and Fidelis (Christo was not included in the discussion) (*id.* at 3-4; *see also* Wall Dec., Ex. A, Dkt. No. 237-3);

- Blust instructed Hinds to conceal the migration from Lit Def to Fidelis from the companies' vendor LeadTrac and its principal, Charles Connors, writing "get everyone moving over [to Fidelis] new logins/passwords for lit def software so they can continue to work just under Fidelis, etc. ***Should be that simple. I don't want Charles asking for a contract for Fidelis – so, same people different name if he asks***" (*id.* at 4; *see also* Wall Dec., Ex. B, Dkt. No. 237-4) (emphasis added);

- Hinds thereafter sent Blust a weekly employee productivity report for both Lit Def and Fidelis employees (*id.* at 4-5; *see also* Wall Dec., Ex. C, Dkt. No. 237-5), and there is no indication that a similar report was provided to Christo;

- Blust periodically instructed Hinds to "move" employees between Lit Def and Fidelis payrolls (*id.* at 5; *see also* Wall Dec., Ex. D, Dkt. No. 237-6; Wall Dec., Ex. J, Dkt. No. 237-12);

- Blust set the 2022 and 2023 bonus amounts for all Lit Def ***and Fidelis employees***, without Christo's involvement (*id.* at 5-6; *see also* Wall Dec., Ex. H, Dkt. No. 237-10; Wall Dec., Ex. L, Dkt. No. 237-14);

- After the Court issued the TRO and the Receiver was in Strategic's offices, Blust instructed Hinds to make sure there would be no communication with Strategic, and

Hinds passed this along to Fidelis's employees, including Ms. Rosenberg (*id.* at 7; *see also* Wall Dec., Ex. M, Dkt. No. 237-15).

On March 25, the Court set a further briefing schedule on the OSC Motion and Fidelis Motion and scheduled a hearing for May 23rd. The Receiver was able to continue his investigation and review of Lit Def's emails and discovered additional communications contradicting the sworn declarations of Christo, Hinds, and Blust and demonstrating Blust's control of Fidelis. *See* Receiver's Further Reply in Opposition to Fidelis Motion, Dkt. No. 270. These emails, which the Receiver discussed in his Further Filing in Opposition to the Fidelis Motion, included, among others:

- Blust instructing Hinds to conceal the fact that they were setting up a "second team" (referring to Fidelis) from a software vendor (*id.* at 3; *see also* Wall Dec., Ex. Q, Dkt. No. 270-2);

- Zayed – who was employed only by Fidelis, not Lit Def – discussing the amount of work Blust had assigned her (*id.* at 4; *see also* Wall Dec., Ex. S, Dkt. No. 270-4);

- Blust complaining to Hinds that Fidelis employees Zayed and Kristen Powers's productivity had declined (*id.*; *see also* Wall Dec., Ex. T, Dkt. No. 270-5);

- Blust and Hinds discussing hiring a new Fidelis employee to work only on Fidelis, not Lit Def, files (without including Christo in the conversation) (*id.*; *see also* Wall Dec., Ex. U, Dkt. No. 270-6);

- Hinds instructing HR manager Lisette Alvarez to pay Zayed a bonus "from Fidelis," and including Blust on the email but not Christo (*id.* at 5; *see also* Wall Dec., Ex. V, Dkt. No. 270-7); and

- Blust setting Fidelis's holiday schedule (*id.*; *see also* Wall Dec., Ex. X, Dkt. No. 270-9).

In response to this plethora of documents plainly showing Blust exercising control over Fidelis – which flatly contradict Blust's, Christo's and Hinds' sworn statements to the Court – on April 22, Blust's counsel filed a declaration (Dkt. No. 318), which attempted to mitigate his client's previous adamant sworn denial of any control whatsoever of Fidelis.  Counsel acknowledged that "Mr. Blust had an interest in the staffing and operation of Fidelis," but claimed that "this interest stemmed from his oversight of the law firms, rather than the status of Fidelis as a clandestine successor to LDS[.]"  Supplemental Personius Dec., Dkt. No. 318, ¶ 35.[3]  In other words, counsel attempted to mitigate his clients' perjury by spinning Blust's supervision of Fidelis as motivated by his ownership of the Intervenor Law Firms rather than from a financial interest in Fidelis.  For instance, regarding the numerous emails showing Blust controlling Fidelis's staffing, counsel explained: "It would stand to reason that, in fulfilling his supervisory role [over the law frms], he wanted to ensure adequate litigation support coverage from a manpower perspective for every law firm file."  *Id.* ¶ 41.  Similarly, regarding Blust's control over Fidelis's employee compensation, counsel opined that as owner of the law firms, "Mr. Blust would be interested in knowing" that Fidelis's employees were adequately compensated.  *Id.* ¶ 43.  While counsel's claims are facially defective and unpersuasive, they essentially concede that Blust has exercised at least partial control over Fidelis.  It confirmed what the emails between Blust and Hinds had already made obvious: Fidelis is owned on paper by Christo's trust but is controlled by Blust for the purposes of servicing the law firms Blust controls – which constitute the entire universe of Fidelis customers.

---

[3] Although styled as a declaration of counsel, it seems highly improper for counsel to declare as to matters over which he has no personal knowledge.  Frankly, the pleading is nothing more than argument dressed-up under a declaration caption.

As the Receiver addressed in his Opposition to the Fidelis Motion: "It appears that Fidelis has no revenues other than from Blust-controlled or related law firms… [t]his suggests that Fidelis, rather than being an independently-maintained business enterprise, is another cog in the ecosystem of entities overseen by Blust." Dkt. No. 212, at 10.

On April 22, Fidelis filed a further response (Dkt. No. 320), with additional supporting declarations from Christo (his third) (Dkt. No. 321-1) and Hinds (her second) (Dkt. No. 320-3). The smug certainty and adamant black and white claims vanished. Like Blust and Lit Def, Fidelis was at a loss to explain away the Receiver's evidence of Blust's control. Fidelis wrote:

> The eight email threads in which Blust and Hinds discuss Fidelis staffing and compensation (Dkt. 237-3; Dkt. 237-4; Dkt. 237-6; Dkt. 237-10; Dkt. 237-12; Dkt. 237-14; Dkt. 270-6; 270-7), though troubling on their face, are in truth simply an artifact of Blust's dual roles and chaotic habits…. We cannot say why Blust sent three emails discussing Fidelis employees' compensation. Maybe he was angling to keep payroll low and allocated to Fidelis as much as possible. Maybe he was too chaotic, too sloppy, and too used to barking out orders on everything in front of him to consider what he was doing. Maybe it was something else.

Dkt. No. 320, at 20-21. Christo began his third sworn declaration to the Court with the excuse that he "was not cognizant of the exhibits attached to [the Receiver's March 25 and April 8] submissions when I gave my prior declarations[.]" Christo Dec., Dkt. No. 320-1, ¶ 2. Notably, while Christo's prior declarations emphatically asserted that Blust does not control Fidelis, in his third declaration, Christo did not repeat that claim and instead asserted that Blust "does not receive any compensation from Fidelis." *Id.* ¶ 4. Christo also tried to explain away Blust's setting of compensation and bonuses, stating: "I approve and disburse every dollar of ordinary and bonus compensation for every Fidelis employee, using software called SurePayroll. No Fidelis employee can be paid without my personal authorization." *Id.* ¶ 8.

Hinds was similarly forced to retreat from her prior false sworn statements to the Court. In the face of the contemporaneous emails, reports and orders by Blust, Hinds could only muster:

"I did not recall these exchanges, out of the thousands I've had over the years, when I gave my prior declaration." Dkt No. 320-3, ¶ 2.

On April 29th, the Receiver filed Further Replies to the Fidelis Motion (Dkt. No. 346) and in support of the OSC Motion (Dkt. No. 347), which, among other things, addressed how Blust, Christo, and Hinds's repeated self-serving sworn declarations to the Court evolved in response to the Receiver's discoveries of inculpatory evidence. Dkt. No. 346, at 8-10. Without these discoveries, Blust, Christo and Hinds would have happily misled this Court with false sworn testimony on a material matter.

On May 23rd, the Court held its hearing on the Motion for Contempt and Fidelis's challenge to being named a Receivership Defendant. After argument, the Court set a July 10-11 evidentiary hearing (which was subsequently taken off calendar) to hear testimony relating to the formation of Fidelis and Blust's role.

At the hearing, the Court also ordered Fidelis to produce relevant emails to the Receiver. Over the summer, Fidelis made a limited production of new materials, which further confirmed Blust's operational control of Fidelis. Some are identified on the exhibit list, including texts between Christo and Hinds.[4] Noticeably, there are major gaps, where there are no texts at all between the two, including during the very relevant period of time here when Fidelis was operational and Lit Def was only handling legacy clients. The reason why there are no texts is unknown, but it suggests Christo had little operational involvement.

On November 1, 2024, Plaintiffs moved for a Preliminary Injunction as to several entities and individuals, including Fidelis, Cameron Christo, The Bush Lake Trust, and Michelle Hinds

---

[4] Fidelis inappropriately used a blanket Confidentiality designation for all the materials it produced. Out of an abundance of caution, the Receiver is not discussing the substance of these materials here.

Gallagher. Dkt. No. 477-1. If granted, Fidelis and the Bush Lake Trust would be brought into the Receivership. *Id.* at 34.

## II.    ARGUMENT

The continuing conduct of the Blust Defendants is worthy of contempt on several grounds. The Blust Defendants have hindered the Receiver in performing his Court-ordered mandates set forth in the TRO and PI and caused substantial harm.[5] The present motion for contempt relates to Blust's violations of the TRO and PI by continuing to run Lit Def and the company that replaced it, Fidelis. The Receiver's investigation confirms that Blust, in active coordination with Defendants Hinds and Christo, has failed to cooperate with the Receiver and

---

[5] And this conduct cannot be viewed in a vacuum, given that Mr. Blust also stands at the center of dozens of law firms, the Blust Trust, Relialit, Lit Def, and Fidelis, all of which Blust controls. *See* Receiver's Further Report ISO Contempt Motion (Dkt. No. 347) at 3. The record indicates that Mr. Blust has had control over these entities and used them to transfer millions of dollars in advance fees from Strategic's Law Firm Debt Relief Model to himself in a variety of ways. The Court has made numerous findings regarding Blust and his role with the Law Firms. (*See, e.g.*, PI Dec., Dkt. No. 183, at 10 & 47.) Mr. Blust's continued involvement on so many fronts has essentially meant that he has had a behind-the-scenes hand in scores of legal briefs in this case that are hundreds of pages long.

Mr. Blust is an Individual Defendant. He owns and controls Receivership Defendants Relialit and Lit Def Strategies ("Lit Def"). Mr. Blust also transferred $36,000,000 to the Blust Trust, an entity that is not in his name but which has received millions of dollars of advance fee proceeds. (*See* Dkt. No. 281 at 7-8.) Based on the Court's findings and Blust's own recent admissions, Blust controls the supposedly separate Law Firms. (*See, e.g.*, PI Dec., Dkt. No. 183, at 10 & 47; Dkt. No. 281 at 5-6.) Through the Law Firms, which are not listed in his name as owner, Mr. Blust routinely receives the overwhelming share of their revenues (up to 97%). The Law Firms have intervened and actively participated in this case. The Law Firms also sent out, without the Court's knowledge or permission, a misleading letter to more than 60,000 consumers soliciting these consumers to electronically sign amended engagement agreements. (*See* Dkt. No. 292-2.) (The letter begins: "We have an exciting update to share regarding the Firm's representation of you!") The letter to consumers omitted numerous material facts, including the fact that the Court had entered a Preliminary Injunction and had specifically held that the Law Firms and StratFS collected advance fees from the consumers in violation of the TSR, and thus gave the consumers no opportunity to provide informed consent to the amendment. *Id.* (The Law Firms are separately represented by Mr. Connors and recently by Mr. Elliott and Ms. Shupe.)

then submitted a false and misleading declaration, as did Hinds and Christo, in an effort to conceal the extent of the contempt. *See generally* Dkt. No. 347 at 6-8.

### A.    Legal Standard

Obedience with a court order is required unless and until it has been vacated or reversed, except in only the rarest of situations. *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967). Federal courts have inherent power to enforce their lawful orders through contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990); *see also*, *Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (federal courts possess inherent power to sanction for violation of order and need not issue warning before imposing sanctions). The nature of contempt "turns on the character and purpose of the sanction" issued in response to the contemptuous conduct. *New York State Nat'l Org. for Women v. Terry,* 159 F.3d 86, 93 (2d Cir. 1998). "Civil contempt fines seek one of two objectives. One is coercion—to force the contemnor to conform his conduct to the court's order. The second is compensation. Where the contumacious conduct has caused injury to the beneficiary of the court's order, a civil fine may be imposed on the contemnor to compensate the victim for the loss or harm caused by the unlawful conduct." *Id*.

A court may hold a party in contempt for violation of an order "if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner". *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). "It need not be established that the violation was willful." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004). "Reasonable diligence, at the very least, requires a party to develop reasonably effective methods of compliance . . . [a] party does not

16

act with reasonable diligence in obeying a court order if it complied reluctantly or after a contempt motion had been filed." *Id*. (internal citations and quotations omitted).

Where the petitioner on a motion for contempt has established that the alleged contemnor failed to comply with the order in question, the burden shifts to the alleged contemnor to prove an inability to comply. *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995); *see also*, *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 638 n. 9 (1988). However, "the alleged contemnor's burden is to establish his inability [to comply with the order] clearly, plainly, and unmistakably." *Huber*, 51 F.3d at 10; *see also Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984) ("the burden is on defendants to substantiate their claimed inability 'plainly and unmistakably'") (citations omitted).

Where contempt is found, the Court may consider several factors in calculating a fine, including "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about [compliance], and the contemnor's ability to pay." *Paramedics*, 369 F.3d at 658 (internal quotations omitted); *see also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir 1989) ("monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience."). Courts are authorized to assess attorney's fees where the contempt was willful. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citations omitted).

These contempt proceedings here are taking place in the context of an equitable receivership. The district court has "extremely broad" authority "to supervise an equity

receivership and to determine the appropriate action to be taken in [its] administration[.]"  *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986).[6]

The Receiver specifically moved for contempt for the Blust Defendants' violations of the TRO's requirements (which were extended by the PI).  The Blust Defendants were required, among other things, to turn over all Assets to the Receiver and to cooperate fully with the Receiver in the identification and recovery of Assets.  *See generally* Dkt. No. 184 §XIII ("Cooperation with the Receiver").[7]

### B.      The Blust Defendants Admit Violating the TRO Regarding Lit Def

The Blust Defendants have already admitted violating the TRO by continuing to operate Lit Def after implementation of the TRO through the end of January.  This violation was knowing and flagrant.  The Court will need to determine the appropriate sanction.[8]

---

[6] As the *Hardy* court wrote: "The basis for broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions…we have acknowledged that a primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court[.]"  *Id.* at 1037-38.

[7] *See id.* § XIII(B)(5) & (B)(7) (restraining and enjoining the Blust Defendants from "Failing to notify the Receiver of any Asset, including accounts, of a Receivership Defendant held in any name other than the name of the Receivership Defendant, or by a Person or entity other than the Receivership Defendant, or failing to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such Assets;" and "Doing any act or refraining from any act whatsoever to interfere with the Receiver's taking custody, control, possession, or managing of the Assets or Documents subject to this Receivership; or to harass or to interfere with the Receiver in any way; or to interfere in any manner with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Defendants; or to refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any Order of this Court."

[8] The Blust Defendants admitted contempt in the declarations (Dkt. Nos. 210 & 211) in that Mr. Blust and Lit Def knowingly violated the TRO by continuing to operate Lit Def after implementation of the TRO and continuing to access Lit Def emails and use Lit Def resources.

The Blust Defendants' additional violations of the TRO and later the PI via continued operation of Fidelis are not mere technical violations; rather, they can only be viewed as part of a conscious pattern by the Blust Defendants not only to avoid cooperating with the Receiver and the TRO and PI's obligations, but also to actively mislead the Receiver and, more importantly, this Court.

The Receiver's initial contempt motion gave clear notice to the Blust Defendants how they were in contempt. *See, e.g.*, Dkt. No. 179-1 at 15 (specifically referencing Section XIII(B) of the TRO, enjoining the Blust Defendants from "Transacting any of the business of the Receivership Defendants"; "Failing to notify the Receiver of any Asset… of a Receivership Defendants held in any name other than the name of the Receivership Defendant"; and "Doing or refraining from any act whatsoever to interfere with the Receiver's taking custody, control, possession, or managing of the Assets or documents subject to this Receivership."). The OSC Contempt Motion clearly embraced Blust's furtive efforts to operate ***both*** Lit Def and Fidelis after the implementation of the TRO. *See* Dkt. No. 179-1 at 1 ("But based upon information receiver this past Friday, February 23, it appears that Lit Def has continued operating; ***so too has a related company, Fidelis Legal Support Services, LLC …, which is beneficially owned or controlled by Defendant Blust. It appears Fidelis is operating in parallel with, as a proxy of, or as a successor to Lit Def***.") (Emphasis added).

The prior briefing makes especially clear that the Blust Defendants' contemptuous conduct extends well beyond operating just Lit Def and relates to the continued operation of Fidelis. *See* Dkt. No. 179-1 at 5-7 (Section I.A ("Fidelis Legal Support Services is Controlled by Defendant Blust"); *id.* at 7-9 Section I.B ("Fidelis/Lit Def Employees Continued to Operate After the TRO"); Dkt. No. 232 at 8 (Section II.D ("Lit Def and Blust Concealed the Existence

19

of Fidelis and Provided Contradictory Testimony Under Oath."); & Dkt No. 347 at 1 ("Mr. Blust's non-compliance with the TRO and PI became a significant problem for the Receiver in the performance of his duties. This became abundantly clear when it was discovered that a Blust-controlled entity named Fidelis, which was not a defendant, was continuing to operate without the knowledge or involvement of the Receiver of the Court."); *id* at 5-8 (discussing Blust's perjurious testimony and the harm caused).

Any notion that there is somehow a procedural defect because the Blust Defendants lack notice of their violations is meritless. The Blust Defendants have had a year now to come into compliance, cease transacting business, cooperate with the identification and turnover of assets, and refrain from interfering with the Receiver's efforts to take custody of Assets and Documents.

A contempt citation of the Blust Defendants is necessary to stop the ongoing conduct by the Blust Defendants in violation of the Court's orders (first the TRO and then the PI). The contempt appears to have been a carefully coordinated effort between Blust, an attorney, and two others: Hinds, an attorney who was Blust's top lieutenant over many years acted as the nominal owner of several of the law firms, and managed both Lit Def and Fidelis simultaneously, and submitted two declarations with false statements; and Christo, who is the nominal manager and owner through his trust (Bush Lake Trust) of Fidelis, and submitted three declarations containing false statements.

Some of the contempt may be remedied if Fidelis and Bush Lake Trust are brought into the Receivership as Receivership Defendants. That will be determined based on the outcome of the PI motion.

A contemporaneous – and growing – body of evidence paints a very different picture of the reality of Fidelis's formation and Blust's direct control than presented by Blust, Hinds, and

Christo.  The Receiver brought the OSC contempt motion in the earliest days of the

Receivership – within six weeks of initially being appointed in the TRO and named Fidelis as a

new Receivership Defendant at the same time.  What should have happened, given the Court-

ordered obligations to turn over assets and cooperate, is that Mr. Blust should have admitted his

obvious and uncontestable role in controlling, contributing assets and IT systems to, and

operating Fidelis, and otherwise stepped aside.  Similarly, Fidelis and the Bush Lake Trust

should have fulfilled their obligations as new Receivership Defendants, provided transparency

and access to Fidelis records, and handed the business over to the Receiver for its oversight.

That is not what happened.  Instead, Mr. Blust admitted only to knowingly violating the

TRO by running Lit Def for the month of January 2024, but otherwise denied any involvement

with Fidelis.

### C.     Evidence Plainly Establishes That Blust Also Controls Fidelis, in Whole or in Part

The contemporaneous evidence, which Blust, Hinds and Christo desperately tried to keep

hidden, confirms that Blust had an extensive level of operational control over Fidelis from

inception.  The Receiver does not know, and presently has no way of knowing, the exact

financial arrangement between Blust and Christo.  That is hardly surprising given Blust's

experience with using fronts.[9]  It is not necessary to find contempt – Blust's control is more than

enough.

---

[9] Despite the troubling pattern of conduct and lack of candor and cooperation here, the Blust
Defendants will undoubtedly claim there should be no contempt finding because Blust's
financial interest in Fidelis has not been demonstrated.  But Fidelis was likely set up for the
purpose of being able to make that very argument – much like Blust's role in the law firms he
controls but does not own.  As the Receiver has responded before (*see, e.g.*, Dkt. No. 212 at 13),
it is hardly surprising that the exact financial arrangement between Christo and Blust remains
undiscovered.  There  is substantial evidence already in the record that behind-the-scenes
financial arrangements are commonplace in many of Blust's operations.  Blust has a history of

But Blust would have the Court believe he simply walked away from Lit Def as a business generating millions of dollars because he wanted "to move away from the debt settlement business."  Blust Decl. ¶ 8.  But that is not true.  He did not leave the debt settlement business in 2020 – and, indeed, by November of 2022, he sought to increase his share of the Law Firm Debt Relief Model revenues.  *See* Dkt No. 347, at 9 (citing Dkt. No 115-1 at 27-28).  Rather, the move to the Fidelis model with Christo as the front was executed when Blust was facing serious accusations of misconduct, including in the Daniel Rufty litigation brought by the North Carolina State Bar and then in a lawsuit filed by Mr. Rufty.  Blust decided to set up a new entity with a clean record nominally owned by someone else.  He wanted to distance his name from the operation hoping that millions of dollars that had previously flowed through Lit Def could be channeled through Fidelis and thereby be insulated from future litigation (such as this regulatory enforcement lawsuit).

The evidence of Blust's operational control of Fidelis includes the following:

1.     Blust was the mastermind of setting up Fidelis to succeed and take over all of the business of Blust-controlled law firms.  He made key decisions from inception and then directed Hinds and Christo to follow his dictates.

Contrary to their declarations,[10] the contemporaneous evidence shows that Blust and his long-time lieutenant Hinds began shifting  Blust-related law firms to Fidelis in early 2022, while

---

using nominal owners of business entities as fronts; in those situations, the money trail has ultimately led back to Blust.

[10] Mr. Blust claimed that in "late 2020" he casually mentioned to Christo that he "intended to gradually step away from the debt settlement business, which would include winding down Lit Def."  Blust Dec., Dkt. No. 211, at ¶ 8.  According to Blust, "Mr. Christo responded that he might consider forming his own litigation support services operation.  I know he subsequently formed Fidelis.  I did not mind that he did so, because (as I had previously told him) I wanted to wind up LDS and move away from the debt settlement business." *Id.*  According to Blust, "[a]side from that informal conversation in late 2020, I played no role whatsoever in Mr. Christo's formation of Fidelis, ***I did not participate in any way in funding the formation of***

keeping in place Lit Def for legacy clients. These were, after all, nearly identical businesses, providing the same services to the same Blust-controlled law firms, with the same employees, the same day-to-day manager, the same relationship with StratFS, the same IT systems, the same Lit Def software contract, and nearly identical websites.

Significantly, the evidence establishes that Blust was the architect of the transition of the law firms' business from Lit Def to Fidelis. For example, on January 11, 2022, Blust sent an email to Hinds setting the initial pay for Fidelis employees and explaining how their staff would be divided between the two entities:

---

*Fidelis, nor in funding its operation following its formation*. I hold no direct or indirect interest of any kind, financial or otherwise in the operation of Fidelis." *Id.* at ¶ 9 (emphasis added).

Christo tells a similar story of how he had lucked into this multi-million dollar business based on a casual conversation with Blust. But Christo and Blust provide no contemporaneous support for their story of how Christo serendipitously formed Fidelis out of the blue and immediately reaped millions of dollars – all from the Blust-controlled law firms. Christo has also provided no contemporaneous documentation of Fidelis's beginnings, beyond the Nevada Secretary of State Operating Agreement naming Bush Lake Trust as its owner.

From:        Jason Blust on behalf of Jason Blust <jason.blust@clientfirstbankruptcy.com>
To:          M Hinds
Subject:     Follow Up
Date:        Tuesday, January 11, 2022 6:15:46 PM

Going forward - starting 2/1/22 any new file coming in is worked by this new
team for these firms

Second, they will continue to work any existing files they have with LDS,
they just won't get any new files - so, they will need to work both their
email accounts

Third, their pay needs to be based on file count they are working for both
Fidelis and LDS - to start put them on Fidelis for a nominal amount.  Talk to
Lisette about what that looks like.  Ideally, it's $1000 a month from Fidelis
and rest of their salary from LDS, eventually it moves to 100% for Fidelis -
the people on insurance needed to be handled properly so there is no lapse,
etc.

Fourth, now is the time to get rid of anyone that isn't as productive as they
need to be or is a PIA

As for the logistical nightmare you'll just have to think thru it....

Have to message it to the locals a few times that emails are changing - new
company working files but same personnel, etc.

Have to have employees still access and review their old email accounts for
attys who make this mistake - then copy and paste the email they get from the
atty into the new email and then email the attorney back on the new email
that they got the email but please use this new one going forward

Eventually, once the mistakes are a trickle, you should have auto responses
set up for each of her employee's email that is moving over.  If you are
trying to email me on a file accepted by you after 2/1/22, please email me
at mary@fidelis.com. etc.

Dkt. No. 237-3.  This email makes clear that Blust, not Christo (who was not included on the email), made the decisions regarding: (1) which Law Firm client files would stay with Lit Def and which would transfer to Fidelis (which he calls the "new team"); (2) Fidelis employees' compensation; and (3) employee assignments between Lit Def and Fidelis.

As other examples of operational control, Blust also set pay and bonuses for Fidelis employees, specifically determining every Fidelis bonus in 2022 and 2023.  This included bonuses for Fidelis employees who, according to Christo, **never** worked for Lit Def and **only** worked at Fidelis.  "Hayfa Zayed ... worked for Fidelis only, not Lit Def . . . .  As Fidelis grew and Lit Def contracted, some, and then all, of Fidelis's part-time employees joined Fidelis fulltime, and I hired Ana Macey, who, like Zayed and Powers, had never worked at Lit Def."  1st

Christo Dec., Dkt. No. 190-4, at ¶ 40.  Similarly, in 2023, without any involvement from Christo, Blust directed Hinds as follows: "Get me a list of LDS and Fidelis Employees and if hired during 2023 when please."  Dkt. No. 237-15.  After Hinds did so, Blust then set all of the bonuses for Fidelis's paralegals.  Dkt No. 237-14.

2.    Blust controlled the entire business relationship with Fidelis's Litigation Management Portal, a key software platform called NDS or LeadTrac.

Blust wanted NDS and its principal, Charles Connors, to believe that Fidelis was merely Lit Def's new name and not a new entity under his control (which would necessitate a new agreement with NDS).  He carefully instructed Hinds on this point, telling her "I don't want Charles asking for a contract for Fidelis – so, same people different name if he asks," and "[I] [d]on't really want Charles knowing about Fidelis…  Just tell him setting up second 'team' for Turnbull and maybe new firms coming on in future."  This is not the conduct of arms-length competitors.

3.    StratFS reimbursed Blust $750,000 through Fidelis.

Fidelis and Christo have repeatedly claimed the $750,000 Fidelis invoiced Strategic between October 2021 and July 2022 was compensation for "vetting" a new software program for StratFS.  *See* Dkt. No. 190-1, at 9.  This is false.  And Christo's sworn claims (which he has failed to support in any manner) are a shocking effort to mislead the Court.  Dkt. No. 190-4 ¶¶ 35-36.

The Receiver's investigation of StratFS's internal business records confirms that Strategic did not hire Fidelis to perform any work in 2021 or after.  A search across all of StratFS's business emails for the words "Cameron Christo" or "cchristo@fidelissupport.com" (using the Microsoft EDiscovery platform) generated a mere seven email threads, all of which were invoices for the $750,000.  **That is it.**  There is no evidence of a contract with Fidelis or

any actual work done by Christo to earn that money.  There are no emails about "vetting" software, deliverables, the scope of work, systems analysis, etc.

Christo's only relationship was with StratFS's accounting personnel when he submitted the vaguest of invoices for "Support Services" or "Technology Support Services."  Furthermore, the former Senior Vice President of Technology at StratFS (Brian Reiss), who oversaw StratFS IT systems in 2020 and 2021, had no recollection of Cameron Christo or Fidelis, and he had no knowledge of StratFS ever hiring Fidelis or any other IT contractor to perform the work Christo claims he did for StratFS.  *See* Declaration of Brian Reiss, attached hereto.  *Compare with* 1st Christo Decl. (Dkt. No. 190-4) ¶ 36 (attesting that Strategic Client Services LLC hired me to vet a new software platform" or describing the work as a "large-scale multi-month consulting project.").  Moreover, on November 30, 2021, Strategic CEO Ryan Sasson emailed his controller, instructing him that Fidelis was "in no rush for payment."  No new arms-length vendor like Fidelis would ever operate in such a casual manner if three quarter of a million dollars of work had just been earned under an entirely new business relationship.

Additional documents reviewed and discussions with former StratFS employees have revealed the $750,000 payment was not related to any IT consulting work that Christo performed for Strategic, but was rather Strategic's convoluted method of reimbursing the law firms (Blust) for one-half of a $1.5 million settlement with former Blust network attorney Daniel Rufty.[11]

---

[11] In 2020, Blust network attorney Daniel Rufty was suspended from the practice of law by the North Carolina State Bar for, *inter alia*, aiding and abetting the unauthorized practice of law by Carolina Client Services, LLC ("CCS"), a Strategic subsidiary. The Bar found that while Blust arranged for Rufty to be the owner of the law firm, he had also arranged for 97% of the profits received by Rufty to be transferred to Blust and another out-of-state attorney as "consultant fees."  In 2021, Rufty and his firm filed an arbitration demand against CCS alleging, *inter alia*, that CCS was engaging in the unauthorized practice of law.  Rufty later filed a lawsuit in the Western District of North Carolina against Blust and Lit Def.  *See Daniel Rufty Legal, PLLC v.*

Strategic's Sasson insisted on distancing StratFS from the settlement and masked reimbursement as a "technology spend." This enabled Sasson to deny any relationship between the litigation and the $750,000 payment to Strategic's auditors.

On August 31, 2021, Strategic, Carolina Client Services (a Strategic subsidiary), Blust, Lit Def, and Relialit reached a global settlement with Rufty and his firm. The settlement amount was $1,500,000 – and released both the Blust Defendants and Strategic. *See* Wall Dec., Ex. 5. The settlement was paid to Rufty via a single lump sum payment from Lit Def. *See* Wall Dec., Ex. 7, at 2. While Strategic paid nothing directly toward the Rufty settlement (which Strategic referred to as the "Carolina Settlement"), Sasson had agreed on behalf Strategic to reimburse the Blust Defendants for one-half of the settlement through payment of other expenses. More specifically, Sasson and Blust agreed that Strategic would reimburse the law firms $750,000. However, to distance StratFS from paying a settlement reimbursement, Strategic characterized it as payment of a "technology spend" for the law firms and insisted to StratFS's auditors that the payment was unrelated to the Carolina Settlement.

A short time after the settlement was completed, in October 2021, StratFS's Controller emailed Blust's accountant, Chris Kesterson, to ask for information about the $750,000 "technology spend" that that the law firms were going to bill Strategic for. Dkt. No. 179-7. Kesterson knew nothing about this, but after inquiring with his client Blust, Kesterson told Ball that the amount should be paid to Fidelis Legal Support Services at a Chicago residential address – "$100k for 7 mos, $50k for 1 month." *Id.* at 5. Kesterson did not know a start date and was

---

*Jason Blust, et al.*, W.D.N.C., Case No. No. 3:21-cv-191. These various actions were globally settled by Rufty, the Blust Defendants, and Strategic in 2021.

not aware of an agreement to support the payment and referred Ball to Strategic's CFO or Sasson for further information.  Shortly thereafter, Christo began to submit Fidelis invoices for payment.

In a December 27, 2021 email exchange between Ryan Sasson and Strategic's general counsel Marc Lemberg, Sasson noted that the law firms ***"took 50% of the [Carolina] settlement***," meaning although the Law Firms had paid the full settlement via Lit Def, they were responsible for only 50% of the $1.5 million settlement (leaving Strategic responsible to reimburse the other $750,000).

On March 17, 2022, in a thread with Strategic's auditor Freed Maxick, Strategic's CFO emailed Freed accountants regarding the "Carolina settlement," attempting to correct information that was supposedly communicated improperly about the settlement:

> "Cameron told me that you got conflicting information about the Carolina settlement. It's not the right information. The law firm's back-end technology connections to our systems is not related to the settlement. Ryan took the lead on negotiating the settlement so you should talk to him about how that worked and why we did not pay anything."

*See* Wall Dec., Ex. 6.  The following day, March 18, 2022, Freed Maxick followed up with Sasson regarding the Carolina settlement:

> "We understand that Jason Blust may have paid all or part of the settlement but that Strategic may be reimbursing him a portion? Any information including additional agreements between you and Jason Blust would be appreciated."

*Id.*  Sasson responded that same day to Freed Maxick, stating that:

> "I think you are mis-informed or have the information wrong. The law firms paid ALL of that settlement and Strategic is not reimbursing them."

*Id.*  On March 17, 2022, the same day Freed Maxick asked about the Carolina settlement, Kesterson, Blust's accountant, sent an email to Strategic's CFO showing a screenshot of a wire transaction from Lit Def to Rufty's counsel for the full amount of $1,500,000.00.  The CFO

forwarded this to Sasson, who forwarded the same thread to the Freed Maxick accountants on March 23, 2022. *See* Wall Dec., Ex. 7.

On March 23, 2022, Lemberg emailed the CFO and the Controller the body of a basic Technology Services Agreement that "describes broad technology consulting services. It is an appropriate basic procurement agreement for tech services." It included the tech fees for the $750,000 retainer for tech services. But then CFO Tirabassi informed Lemberg: "Freed moved on from this. I am not sure we need to go through this now. What do you think?" Lemberg responded that he was fine with foregoing a written contract, to which Tirabassi responded, "[y]ou can land the plane with Blust then as you see fit." Dkt. No. 212-08.

Regarding the "land the plane with Blust as you see fit" comment, Fidelis offers only that Tirabassi "might have simply misspoken[.]" *Id.* at 9. Christo has claimed in his sworn declarations that he was hired by Strategic to "vet a new software platform," and that the $750,000 was his compensation for this "vetting." Dkt. No. 190-4 ¶¶ 36-38. But Christo has offered nothing whatsoever to substantiate his claim. He has not produced a contract for this "vetting" work, nor any scope of work, work product, time sheets, or other documents relating to his "vetting," nor any communications whatsoever with anyone at Strategic referencing the "vetting." There is no description regarding any of the work performed, what software Christo "vetted," when he did this work, whom he worked with at Strategic, or what deliverables were involved. Christo has not explained how this work and fees were negotiated, or by whom. The invoices themselves contain no information, simply stating that the charge is for "Support Services" or "Technology Support Services." All of the documentation and detail one would expect for a contract of that size is lacking. Christo has not even explained how he came into contact with Strategic in the first place.

29

**D.    Remedies**

Blust has admitted contempt, but only a small part of his actual contempt.  At this stage, he seeks to minimize the sanction for his conduct – and wishes to frame his conduct as a technical violation which has been corrected.  Despite the best efforts of the Blust Defendants to conceal, including coordination with Hinds and Christo, the scope of contempt has been revealed.  While the Blust Defendants' contempt begins with the admitted and knowing violations operating Lit Def, it goes well beyond that, embracing, among other things, Blust's continuing to run Fidelis in stealth; testifying falsely in his deposition; submitting a false declaration about his role with Fidelis; and coordinating this false story with two other witnesses who also submitted false testimony about Blust's role at Fidelis.[12]

Based on the foregoing, the Receiver respectfully requests that the Court find the Blust Defendants in contempt and order them to come into compliance with the Court's Order in all respects.  *See S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 146 (2d Cir. 2010).  Further, the Blust Defendants should be required to pay all of the Receiver's legal fees in

---

[12] The Receiver's sole focus has been on compliance with the Court's Order (the TRO and the PI that replaced it with the same obligations), but the Receiver notes that the Court itself has the inherent authority to investigate and address perjurious testimony or fraud on the court as it sees fit.  *See McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("when a party lies to the court and his adversary intentionally, repeatedly, and about issues central to the truth-finding process, it can fairly be said that he has forfeited his rights to have his claim decided on the merits."); *cf. CDR Creances S.A.S. v. Cohen,* 23 N.Y.3d 307, 318 (N.Y. 2014) (citing, *inter alia*, *Anderson v. Dunn*, 19 U.S. 204, 227 (1821) and discussing federal case law) ("Fraud on the court involves willful conduct that is deceitful and obstructionistic, which injects misrepresentations and false information into the judicial process 'so serious that it undermines . . . the integrity of the proceeding.'"

connection with the Blust Defendants and the Fidelis motion challenging the Receiver's determination that Fidelis is a Receivership Defendant, since that motion is premised on the coordinated false testimony of Blust, Hinds, and Christo.

Dated: January 16, 2025

**MCNAMARA SMITH LLP**

By: ___ /s/ Logan D. Smith ___
Logan D. Smith  (*Pro Hac Vice*)
Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email:  lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*