UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.

                       Plaintiffs,

vs.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.

                       Defendants, and

STRATEGIC ESOP, et al.,

                       Relief Defendants.

Case No. 1:24-cv-00040-EAW-MJR

---

**MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION FOR AN ORDER TO SHOW CAUSE WHY RECEIVERSHIP DEFENDANT FIDELIS LEGAL SUPPORT SERVICES, LLC AND RELIEF DEFENDANT CAMERON CHRISTO SHOULD NOT BE HELD IN CIVIL CONTEMPT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................. 1
II.   FACTS ................................................................................................ 3
      A.    The TRO and PI ................................................................................ 3
      B.    Receiver Learns of Fidelis, Investigates, and Identifies Fidelis as a
            Receivership Defendant ................................................................ 5
      C.    The Fidelis Motion and Initial False Statements by Christo ................................... 6
      D.    Lit Def's Documents Further Reveal Blust's Control Over Fidelis and the
            Falsity of Blust's, Christo's, and Hinds's Sworn Declarations ........................... 8
      E.    Blust and the Fidelis Defendants Attempt Damage Control ................................ 10
      F.    Fidelis's Document Production to the Receiver .............................................. 12
      G.    Fidelis Received Payment of $750,000 Due Lit Def and Covered It Up ............. 13
      H.    Blust, Christo, and Hinds Invoke the Fifth Amendment at January 2025
            Evidentiary Hearing .......................................................................... 16
III.  ARGUMENT ........................................................................................ 19
      A.    Legal Standard .................................................................................. 19
      B.    Discussion ........................................................................................ 21
            1.    The Fidelis Defendants Intentionally Misled the Court and the
                  Receiver ..................................................................................... 21
            2.    A Finding of Contempt, Award of Attorneys' Fees, and Imposition
                  of a Fine is Appropriate ............................................................... 23
IV.   CONCLUSION ..................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
  421 U.S. 240 (1975) .......................................................................................... 20, 21

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ................................................................................................ 20

*Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991) ............................................................................... 20

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
  885 F.2d 1 (2d Cir 1989) ...................................................................................... 20

*S.E.C. v. Hardy*,
  803 F.2d 1034 (9th Cir. 1986) ............................................................................... 20

*Spallone v. United States*,
  493 U.S. 265 (1990) ............................................................................................... 20

*Walker v. City of Birmingham*,
  388 U.S. 307 (1967) ............................................................................................... 19

## I.    PRELIMINARY STATEMENT

For almost one year, relief defendant Cameron Christo ("Christo") has refused to turn over Fidelis Legal Support Services, LLC's ("Fidelis") in violation of the Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI").  To justify this refusal, Fidelis has presented a seemingly endless stream of hyper-aggressive, but ultimately false, pleadings, underpinned by coordinated, false sworn declarations offered by defendant Jason Blust (one), Christo (three), and defendant Michelle Hinds (two), in which they swore to this Court that Blust did not control Fidelis.  In the course of responding to Fidelis's pleadings and pursuing an Order to Show Cause against Blust and his company Lit Def Strategies, LLC ("Lit Def") (the "Blust Contempt Motion,") (Dkt. No. 179), the Receiver located and presented contemporaneous evidence to the Court conclusively demonstrating that Blust controls Fidelis, that Christo is the front owner, and that sworn declarations presented by Blust, Christo and Hinds are perjurious.

Finally, at the evidentiary hearing held on January 23-24, 2025, in the face of overwhelming evidence, the charade by Blust, Christo and Hinds came to an ignominious end. All three invoked their Fifth Amendment right and refused to answer each and every question put to them on the witness stand during the evidentiary hearing on the Blust Contempt Motion and Plaintiffs' Motion to extend the Preliminary Injunction to Christo, Fidelis and Bush Lake Trust. [1]

Blust, Hinds, and Christo (acting on behalf of Fidelis) have imposed extraordinary costs and unnecessary delays on the receivership estate, all of which would and should have been

---

[1] The hearing also essentially addressed the subject matter of Fidelis's Motion Challenging the Receiver's Determination that Fidelis is a Receivership Defendant (Dkt. No. 190) (the "Fidelis Motion") and related filings, as the PI motion requests appointment of a Receiver over Fidelis and Bush Lake Trust.

avoided had Blust, Christo, and Fidelis simply complied with their obligations under the TRO and PI. Christo and Fidelis had numerous opportunities to remedy their violations of the TRO and then PI at points over the past year in the face of mounting and indisputable evidence that Blust controlled Fidelis. That is particularly so following the evidentiary hearing in which Christo invoked his Fifth Amendment rights. Yet, despite the undeniable demonstration of a fraud on the Court by Blust, Christo, and Hinds and the irrebuttable evidence that Blust controls Fidelis, Christo still has not turned over Fidelis to the Receiver as required by the PI. As has been the case for the last year, Christo and Fidelis continue to disrespect the authority of the Court and the commands of the injunction.[2]

It is hard to fathom a more blatant contempt of the Court's TRO and PI than the contempt demonstrated by Christo and Fidelis (along with Blust and Hinds). As a result, the Receiver is forced to file this motion seeking contempt against Christo and Fidelis. As an appropriate sanction, the Receiver requests an order: (1) holding both Christo and Fidelis in contempt of the TRO and PI; (2) requiring Christo and Fidelis to cooperate immediately and completely with the Receiver, including turning over to the Receiver all Assets and corporate records of Fidelis and the Bush Lake Trust, turning over control of all business operations of Fidelis to the Receiver (so he can determine which operations can continue to be operated lawfully and profitably), and providing a complete financial accounting of Fidelis and Bush Lake Trust, including all financial transactions by Fidelis and Bush Lake Trust, including all transfers to or from third parties up to the present day; (3) imposing a fine on Christo individually of $1,000 per day for every day of noncompliance; (4) holding Christo individually and jointly responsible, along with Blust, for all

---

[2] Given that Blust, Christo and Hinds were willing to present false sworn declarations to the Court, there is extraordinary risk that Blust and Christo have and continue to dissipate Fidelis Assets, destroy or falsify records, and destroy evidence.

fees and costs incurred by the Receiver in connection with the Fidelis motion; and (5) holding Christo individually and jointly responsible, along with Blust, for costs and fees incurred by the Receiver in connection with the Blust contempt motion.

As Christo, as well as Blust and Hinds, have already invoked their Fifth Amendment rights with respect to every matter at issue, the Receiver respectfully submits no further evidentiary hearing on this motion is necessary, and the record is fully developed to find contempt. The relief sought is based on the evidence already before the Court, including the sworn testimony at the evidentiary hearing and Receiver's and parties' submissions in connection with the Fidelis Motion and the related Blust Contempt Motion.[3]

## II.    FACTS

### A.    The TRO and PI

On January 11, 2024, the Court entered the TRO, which defines Receivership Defendant as "the Corporate Defendants and their subsidiaries, affiliates, divisions, successors, and assigns, as well as any other business related to the Defendants' debt-relief services and which the Receiver has reason to believe is owned or controlled in whole or in part by any of the Defendants…"Receivership Defendants" also includes Relief Defendants…and their subsidiaries, affiliates, divisions, ***successors, and assigns, as well as any other business related to the Defendants' debt-relief services and which the Receiver has reason to believe is owned or controlled in whole or in part by the Relief Defendants included in this definition***, and

---

[3] *See* Dkt. Nos. 190, 190-1 to 190-10, 209, 209-1 to 209-9, 212, 212-1 to 212-20, 233, 233-1 to 233-22, 237, 237-1 to 237-18, 270, 270-1 to 270-9, 320, 320-1 to 320-15, and 346 (parties' and Receiver's submissions relating to Fidelis Motion); and Dkt. Nos. 179, 179-1 to 179-16, 210, 210-1, 211, 232, 232-1, 269, 318, 318-1, 323, 323-1, 347, 572, and 576 (parties' and Receiver's submissions relating to Blust Contempt Motion).

includes fictious names under which they do business." Dkt. No. 12, at 7-8 (emphasis added).

Lit Def is named as a Receivership Defendant in the TRO.

The TRO specifically directed the Receiver to assume full control of Receivership

Defendants (Section IX.A) and take exclusive control of all Assets, Documents, and ESI of the

Receivership Defendants (Section IX.B). The TRO also directed "Defendants, Relief

Defendants, and their officers…subsidiaries, affiliates, successors, and assigns, and all other

Persons or entities in active concert or participation with them" to "fully cooperate with and

assist the Receiver." *Id.* at 29, Section XIII.A. Moreover, the TRO specifically prohibited

"Defendants, Relief Defendants, and their officers…subsidiaries, affiliates, successors, and

assigns, and all other Persons or entities in active concert or participation with them" from

"[d]oing any act or refraining from any act whatsoever to interfere with the Receiver's taking

custody, control, possession, or managing of the Assets or Documents subject to this

Receivership; or to harass or to interfere with the Receiver in any way… or to refuse to

cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their

duties or authority under any Order of this Court[.]" *Id.* at 33, Section XIII.B.7. From the entry

of the TRO, Fidelis was obligated to comply with these obligations as a Receivership Defendant,

a "successor and assign" of Receivership Defendant Lit Def (which is owned and controlled by

defendant Blust), and also as a "Persons or entit[y] in active concert or participation with" the

Defendants and Relief Defendants. The duties of the Receiver and the cooperation obligations of

the parties (and successor entities like Fidelis and persons in active concert like Christo)

remained the same in the PI, which the Court issued on March 4, 2024.

B.    **Receiver Learns of Fidelis, Investigates, and Identifies Fidelis as a Receivership Defendant**

Following service of the TRO upon Lit Def and Blust, the Receiver's counsel corresponded with their counsel regarding cooperation with the TRO.[4]  However, on Friday, February 23, 2024, the Receiver became aware of another Blust-related company called "Fidelis" that appeared to be operating as a proxy or successor to Lit Def.  *See* Memorandum in Support of Blust Contempt Motion, Dkt. No. 179-1, at 6-8.  Specifically, StratFS's VP of client relations forwarded to the Receiver an email exchange showing Hinds and other Lit Def employees responding to a matter involving a "LitDef file" using ClientFirstBankruptcy.com,[5] LitDefStrategies.com, and FidelisSupport.com email addresses.  *Id.*

Upon receiving this email exchange, the Receiver began investigating Fidelis.  Fidelis is a Nevada limited liability company formed on January 25, 2021, with Christo listed as Manager.  *See* Wall Decl., Ex. 1, Dkt. No. 179-3.[6]  The Receiver's team reviewed Strategic's email boxes and CRM, Salesforce, for emails to and from the "Fidelissupport.com" domain and discovered numerous emails going back to at least February 2022 showing the same employees using both Lit Def and Fidelis email addresses, apparently interchangeably.  *See id.*, Ex. 4, Dkt. No. 179-6.

---

[4] As admitted by Blust in the contempt proceeding against him, Blust falsely claimed to the Receiver and this Court that Lit Def operations ceased upon the issuance of the TRO.  In fact, he continued to operate Lit Def in violation of the TRO.  Blust and Lit Def also failed to inform the Receiver about the existence of Fidelis.  And at his deposition by the plaintiffs on January 29, 2024, Blust carefully avoided any mention of Fidelis and gave a misleading answer as to why Lit Def's income dropped precipitously from 2020 to 2023, apparently to avoid revealing the existence of Fidelis.  *See* Transcript of Deposition of Blust, Dkt. No. 232-1, at 108:19-109:24.

[5] The Law Offices of Jason Blust, LLC dba Client First Bankruptcy, LLC is the name of Blust's law firm.

[6] Fidelis's website was found to be nearly identical to Lit Def's website, and Fidelis appeared to be performing the exact same functions as Lit Def of liaising between Strategic consumers and the law firms controlled by Blust.  *See id.*, Exs. 2 & 3, Dkt. No. 179-4 & 179-5.

The Receiver also discovered an email thread from October 2021 between Strategic's controller and Blust's accountant concerning a transfer of $750,000 from Strategic to the Intervenor Law Firms ("Law Firms") – controlled by Blust – for a "technology spend" supposedly made by the Law Firms. *Id.*, Ex. 5, Dkt. No. 179-7. But rather than paying the Law Firms, Blust's accountant told the controller the payment should be paid to Fidelis – "$100k for 7 mos, $50k for 1 month." *Id.* at 5. In a later email exchange in March 2022, the controller forwarded one of Fidelis' monthly invoices for the "technology spend" to Strategic's General Counsel ("GC") and the company's CFO. *Id.*, Ex. 8, 179-10. Addressing the need to prepare a written contract to memorialize this supposed "technology spend" payments to Fidelis, the CFO told the controller and GC, "You can land the plane with Blust as you see fit," further suggesting that Fidelis was under Blust's control. *See id.* Based on this investigation, on February 25, the Receiver notified[7] Fidelis and the parties that Fidelis qualified as a Receivership Defendant under the TRO.[8] *See* TRO, Dkt. No. 12, Definition "N" at 7-8.

## C.    The Fidelis Motion and Initial False Statements by Christo

On March 4, 2024, Fidelis filed the Fidelis Motion, in which it unreservedly denied that Blust exercised ***any*** control over Fidelis whatsoever, and specifically denied that Blust has any influence over Fidelis's "business-development, personnel, and purchasing decisions[.]" Dkt.

---

[7] Pursuant to Section IX.S of the TRO "[i]f the Receiver identifies a non party entity as a Receivership Entity," the Receiver is authorized and directed to "promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court." TRO, Dkt. No. 12, at 24.

[8] Also, on February 26, the Receiver filed the Blust Contempt Motion. Dkt. No. 179-1. In response to the motion, Blust filed a declaration in which he adamantly denied having any control over or ownership interest in Fidelis. Dkt. No. 211. Blust's declaration contained numerous statements that have since been revealed as false. *See generally* Receiver's Hearing Brief, Dkt. No. 576, at 5-6, 10-12, 25-29.

No. 190, at 9.  Fidelis characterized itself and Lit Def as arm's-length competitors in the litigation-support sector, "much like McDonald's and Burger King … and Nike and Reebok[.]"  Dkt. No. 190-1, at 4.  In support, Christo submitted the first of his three sworn declarations, in which he asserted under oath and without any reservation that Blust "does not make decisions for Fidelis[.]"  1st Christo Decl., Dkt. No. 190-4, at 4.  Christo claimed the $750,000 from Strategic was compensation for "vet[ting] a new software platform" and denied knowing what the CFO's instruction to "land the plane with Blust" referred to.  *Id.* ¶¶ 36-38.  In opposition to the Fidelis Motion, the Receiver submitted the declaration of  Katherine Rosenberg, a former employee of Lit Def and Fidelis.  Ms. Rosenberg contradicted Fidelis and Christo's claims that Lit Def and Fidelis were competitors, and established Fidelis was Lit Def's successor and shared Lit Def's management, staff, customers, procedures, equipment, log-ins, and software access.  *See* Receiver's Opposition to Fidelis Motion, Dkt. No. 212; Rosenberg Decl., Dkt. No. 212-1.

On March 21, Fidelis filed a Reply in support of its motion, in which it again claimed without reservation that Christo "exercises complete control" over Fidelis.  Dkt. No. 233.  In support of its Reply, Fidelis submitted a second declaration by Christo, in which he stated unequivocally that Blust does not have any supervision over Fidelis whatsoever:

> 7. Jason Blust is not a consultant for Fidelis and he does not control it in any respect. He does not set policy, he does not prescribe strategy, he does not make decisions, he does not direct operations—in short, he has no role in the running of Fidelis's business.

2nd Christo Decl., Dkt. No. 233-1, ¶ 7.  Christo reiterated his claim that the $750,000 from Strategic to Fidelis was his compensation for "vetting software" for Strategic, but was unable to produce any supporting written contract, work product, or other documentation.  *See id.* ¶ 12.

Fidelis also offered a sworn declaration from Hinds, in which she too claimed without reservation that Blust had nothing to do with Fidelis.  Hinds stated under oath, among other

things, that "Christo makes all executive decisions with regard to personnel, payroll, purchasing, and contracting" (Hinds Decl., Dkt. No. 233-5, ¶ 29) and that Blust "has no role in Fidelis's operations and exercises no control over the running of Fidelis's business." *Id.* ¶ 4.[9]

### D.    Lit Def's Documents Further Reveal Blust's Control Over Fidelis and the Falsity of Blust's, Christo's, and Hinds's Sworn Declarations

On March 20, as a result of the Receiver's contempt motion[10], the Receiver was finally provided access to Lit Def's email boxes, and promptly began reviewing internal communications. *See* Receiver's Sur-Reply to Fidelis, Dkt. No. 237-1, at 1. These communications directly contradicted the sworn declarations submitted to this Court by Blust, Christo, and Hinds. *Id.* at 2-7.

Christo claimed under penalty of perjury that Blust "does not make decisions for Fidelis" (1st Christo Decl., Dkt. No. 190-4, ¶ 4), does not control Fidelis (2nd Christo Decl., Dkt. No. 233-1, ¶ 4), is not a consultant for Fidelis, does not set policy, and does not direct operations (*id.* ¶ 7). Hinds similarly swore that Christo is the "boss" of Fidelis and that Blust "has no role in Fidelis's operations and exercises no control over the running of Fidelis's business." 1st Hinds

---

[9] Moreover, in an effort to blunt the revelation from Ms. Rosenberg that Lit Def and Fidelis shared a common staff, Christo declared under oath that there was a Fidelis employee who worked for Fidelis from the beginning and never worked for Lit Def, named Hayfa Zayed ("Zayed"). Christo Decl., Dkt. No. 190-4, ¶ 40. But the Receiver's investigation quickly revealed that Zayed reported directly to Blust and had a "Clientfirstbankruptcy.com" email. Receiver's Opposition to Fidelis Motion, Dkt. No. 212, at 7-8; *see also* Wall Decl., Ex. 2, Dkt. No. 212-5. In a further effort to distance itself from Strategic and demonstrate Fidelis as a "competitor" of Lit Def, Fidelis claimed it serviced several law firms unconnected with Strategic. But investigation revealed these law firms are all owned or controlled by Blust, meaning ***all*** of Fidelis's revenue derives from law firms owned or otherwise controlled by Blust. Receiver's Opposition to Fidelis Motion, Dkt. No. 212, at 14-20.

[10] If the Receiver had not moved for contempt against Blust and Lit Def, which forced Lit Def to provide access to Lit Def emails, the scope of Blust's, Christo's, and Fidelis's deception may have never been uncovered.

Decl., Dkt. No. 233-5, ¶ 4. But the Receiver's initial Lit Def email review showed these sworn statements were false:

- In January 2022, before Fidelis was assigned any Strategic law firm files, Blust instructed Hinds which employees to switch from Lit Def to Fidelis and how their weekly compensation should be split between the two entities (Christo was not included in the discussion) (*id.* at 3-4; *see also* Wall Decl., Ex. A, Dkt. No. 237-3);

- Blust told Hinds to conceal the transition from Lit Def to Fidelis from a vendor, LeadTrack, and its principal, Charles Connors, writing "get everyone moving over [to Fidelis] new logins/passwords for lit def software so they can continue to work just under Fidelis, etc. ***Should be that simple. I don't want Charles asking for a contract for Fidelis – so, same people different name if he asks***" (*id.* at 4; *see also* Wall Decl., Ex. B, Dkt. No. 237-4) (emphasis added);

- Hinds sent Blust an employee productivity report for both Lit Def and Fidelis employees every week from 2022 until the TRO was entered in January 2024 (*id.* at 4-5; *see also* Wall Decl., Ex. C, Dkt. No. 237-5), and there is no indication that a similar report was provided to Christo;

- Blust periodically instructed Hinds to "move" employees between Lit Def and Fidelis payrolls (*id.* at 5; *see also* Wall Decl., Ex. D, Dkt. No. 237-6; Wall Decl., Ex. J, Dkt. No. 237-12);

- Blust set the 2022 and 2023 bonus amounts for all Lit Def ***and Fidelis employees***, without Christo's involvement (*id.* at 5-6; *see also* Wall Decl., Ex. H, Dkt. No. 237-10; Wall Decl., Ex. L, Dkt. No. 237-14);

- After the Court issued the TRO and the Receiver was in Strategic's offices, Blust instructed Hinds to make sure there was no communication with Strategic, and Hinds passed this along to Fidelis's employees (*id.* at 7; *see also* Wall Decl., Ex. M, Dkt. No. 237-15).

At a March 25, 2024 hearing, the Court, in light of the Lit Def email revelations, set a further briefing schedule on the Blust Contempt Motion and Fidelis Motion and set a hearing for May 23. In the meantime, the Receiver's team continued their review of Lit Def's emails and discovered additional communications contradicting the sworn declarations of Christo, Hinds, and Blust and demonstrating Blust's control of Fidelis. *See* Receiver's Further Reply in Opposition to Fidelis Motion, Dkt. No. 270. These emails included, among others:

- Blust instructing Hinds to conceal the fact that they were setting up a "second team" (referring to Fidelis) from LeadTrack (*id.* at 3; *see also* Wall Decl., Ex. Q, Dkt. No. 270-2);

- Zayed – who was employed only by Fidelis, not Lit Def – discussing the amount of work Blust had assigned her (*id.* at 4; *see also* Wall Decl., Ex. S, Dkt. No. 270-4);

- Blust complaining to Hinds that Fidelis employees Zayed and Kristen Powers's productivity had declined (*id.*; *see also* Wall Decl., Ex. T, Dkt. No. 270-5);

- Blust and Hinds discussing hiring a new Fidelis employee to work only on Fidelis, not Lit Def, files (without including Christo in the decision) (*id.*; *see also* Wall Decl., Ex. U, Dkt. No. 270-6); and

- Hinds instructing HR manager Lisette Alvarez to pay Zayed a bonus "from Fidelis," and copying Blust on the email but not Christo (*id.* at 5; *see also* Wall Decl., Ex. V, Dkt. No. 270-7).

### E.    Blust and the Fidelis Defendants Attempt Damage Control

Following these revelations, Blust did not file a further declaration. Blust's counsel instead filed a document entitled "declaration" (Dkt. No. 318) that was nothing more than an argument to moderate Blust's previous adamant sworn denial of any control whatsoever of Fidelis. In contrast to Blust's muted response, on April 22, Fidelis doubled down once again, offering additional declarations from Christo (his third) (Dkt. No. 321-1) and Hinds (her second) (Dkt. No. 320-3). Gone were the hyper-aggressive, adamant black-and-white claims that were the hallmark of Fidelis's prior filings.[11] Nevertheless, Christo and Hinds submitted more false

---

[11] Up to this point, Fidelis routinely attacked the motivations and judgment of the Receiver to distract the Court from the evidence. *See e.g.*, "Forty-eight hours later, the Receiver had convinced himself that Jason Blust is secretly using Fidelis to help defend consumers against creditors' lawsuits . . . ." (Dkt. No. 190-1, p. 1); "[T]he Receiver's case rests on his hypothesis that Fidelis funnels money to Blust. Fidelis and Blust categorically deny that claim, however, and the Receiver has not one shred of real evidence to support it. . . . Amateur psychology and superficial connections are a far cry from . . . proof that Blust does, in fact, secretly control Fidelis." (Dkt. No. 233, p. 1); "We gather that the Receiver detests Jason Blust and is eager to assume the worst of him . . . Our problem is that the suspicion and hysteria surrounding Jason Blust have precipitated an effort to seize Cameron Christo's business based on runaway conjecture. . . . [T]he Receiver has fixated on commandeering Christo's company because he

and misleading sworn testimony and failed to recant their previous deceptions.  Fidelis was at a

loss to explain away the Receiver's evidence of Blust's control.  Fidelis wrote:

> The eight email threads in which Blust and Hinds discuss Fidelis staffing and
> compensation (Dkt. 237-3; Dkt. 237-4; Dkt. 237-6; Dkt. 237-10; Dkt. 237-12;
> Dkt. 237-14; Dkt. 270-6; 270-7), though troubling on their face, are in truth
> simply an artifact of Blust's dual roles and chaotic habits…. We cannot say why
> Blust sent three emails discussing Fidelis employees' compensation. Maybe he
> was angling to keep payroll low and allocated to Fidelis as much as possible.
> Maybe he was too chaotic, too sloppy, and too used to barking out orders on
> everything in front of him to consider what he was doing. Maybe it was
> something else.

Dkt. No. 320, at 20-21.  Christo began his third sworn declaration to the Court with the excuse

that he "was not cognizant of the exhibits attached to [the Receiver's March 25 and April 8]

submissions when I gave my prior declarations[.]"[12]  3rd Christo Decl., Dkt. No. 320-1, ¶ 2.

Hinds was similarly forced to retreat from her prior false sworn statements.  In the face of the

contemporaneous emails, the Fidelis employee productivity reports she sent every week to Blust

for years, and the personnel orders issued by Blust, Hinds could only muster:  "I did not recall

these exchanges, out of the thousands I've had over the years, when I gave my prior declaration."

Dkt. No. 320-3, ¶ 2.

---

suspects that somehow, some way, Jason Blust is pulling the strings and reaping the profits. This
side show has yielded nothing but an appalling waste of time . . . ." (Dkt. No. 233, pp. 2-3); "The
Receiver cannot identify a single thing that Jason Blust has ever done to exercise control over
Fidelis."  (Id. at p. 9 (heading)); "*Six degrees of Jason Blust*. As yet another stand-in for real
evidence of control, the Receiver and CFPB emphasize the links between Blust and Fidelis
employees . . . ." (Id. at p. 11).

[12] Christo also tried to explain away Blust's setting of compensation and bonuses by stating: "I
approve and disburse every dollar of ordinary and bonus compensation for every Fidelis
employee, using software called SurePayroll. No Fidelis employee can be paid without my
personal authorization."  *Id.* ¶ 8.  But this is a misleading claim (although not starkly false like
many other Christo sworn claims).  Christo enters the salary and bonus decisions made by Blust
in the payroll software.  But this ministerial task hardly demonstrates Christo's control or
authority over Fidelis.  *See* Wall Decl., Ex. 3.  In fact, this is consistent with the reality that
Christo was nothing but the "front" owner of the business.

On April 29, the Receiver filed Further Replies to the Fidelis Motion (Dkt. No. 346) and in support of the Blust Contempt Motion (Dkt. No. 347), which, among other things, addressed how the repeated self-serving sworn declarations to the Court evolved in response to the Receiver's discoveries of inculpatory evidence.  Dkt. No. 346, at 8-10.

### F.    Fidelis's Document Production to the Receiver

During the May 23 hearing, the Court ordered Fidelis to produce relevant emails to the Receiver.[13]  Over the summer, Fidelis made a limited production, which further confirmed Blust's operational control of Fidelis.  A few of the documents produced were later identified on the Receiver's Exhibit List for the evidentiary hearing on January 23-24, 2025, including:

- REC091 (submitted herewith as Wall Decl., Exhibit 1) is a collection of text messages between Christo and Hinds.[14]  On April 13, 2021, Hinds texted Christo regarding a call with Charles Connors of NDS: "Charles doesn't know about fidelis because JB doesn't want him to…Essentially the messaging is that we want to create 2 separate paralegal teams," to which Christo agreed he would not join the call.  Wall Decl., Ex. 1, at 2.

- REC092 (submitted herewith as Wall Decl., Exhibit 2) is an email from Hinds to Christo, in which Hinds states she needs to check with Blust regarding Fidelis work assignments.

- REC093 (submitted herewith as Wall Decl., Exhibit 3) is an email exchange showing Blust setting Fidelis's December 2022 employee bonuses and communicating them to Hinds; Hinds then asked Christo to enter the bonuses Blust set "on website," referring to Fidelis's payroll account.

---

[13]  During the same hearing, the Court described the Lit Def emails showing Blust's control of Fidelis as "pretty damning"; however, even this pointed comment did not spur Fidelis and Christo to come clean and cooperate with the Receiver.

[14]  There are also large gaps in the text messages between the two, including during the very relevant period of time here when Fidelis was operational and Lit Def was only handling legacy clients.  The reason for the lack of texts is unknown but suggests Christo had little operational involvement.

### G.    Fidelis Received Payment of $750,000 Due Lit Def and Covered It Up

Christo claimed in two declarations that the $750,000 Strategic paid to Fidelis between October 2021 and July 2022 was compensation for Christo's "vetting" of a new software program for Strategic. *See* Dkt. No. 190-4, ¶¶ 35-38; Dkt. No. 233-1, ¶ 12.   This claim is false, and these sworn statements represent a brazen attempt to mislead the Court.[15]   An examination of Strategic's records confirmed that Strategic did not engage Fidelis for any work in 2021 or after.  A comprehensive search of Strategic's emails for "Cameron Christo"/ "cchristo@fidelissupport.com" yielded only ***seven*** email threads, all of which were emails transmitting the invoices for the $750,000 in payments.  No evidence of a Fidelis contract, work performed by Christo, or correspondence about deliverables, scope of work, reports, etc. were found.  Nor have Fidelis or Christo produced any related documentation.

Moreover, Brian Reiss, the former Senior Vice President of Technology at Strategic who managed the company's IT systems, states in his sworn declaration that he has no recollection of Christo or Fidelis, or of Strategic hiring any IT contractor for the work Christo claims to have performed.  *See* Declaration of Brian Reiss, Dkt. No. 576-11.  This contradicts Christo's sworn declaration describing his engagement as a "large-scale multi-month consulting project" to "vet a new software platform."  1st Christo Decl., Dkt. No. 190-4, ¶ 36.

---

[15] Incredibly, in these same declarations in which offered numerous false statements, Christo preached his earnestness.  *See e.g.*, "From the moment I first heard the Receiver's allegation, it has mystified me.  Jason Blust simply does not own or control Fidelis in any way, and Fidelis is not, and never was, Lit Def's successor or alter ego.  On behalf of myself and my staff, I earnestly hope that this matter can be promptly put to rest, and Fidelis can again devote its full attention to helping law firms defend consumers sued by their creditors." (Dkt. No. 233-1, ¶ 19); "The present dispute is doing significant damage to my company. . . . I earnestly hope, and very respectfully request, that the Court grant Fidelis's motion and allow it to return its full attention to helping law firms defend consumers sued by their creditors."  (Dkt. No. 320-1, ¶ 11.)

Documents and discussions with former Strategic employees has instead revealed that the $750,000 payment was not compensation for any consulting work, but was rather Strategic's convoluted method of reimbursing Blust for half of a $1.5 million settlement with former Blust network attorney Daniel Rufty.[16]  Strategic's Sasson insisted on distancing Strategic from the settlement and disguised the reimbursement as a "technology spend," allowing him to conceal the $750,000 payment from Strategic's auditors, Freed Maxick P.C.

On August 31, 2021, Strategic, Carolina Client Services (a Strategic subsidiary), Blust, Lit Def, and Relialit reached a global $1,500,000 settlement with Rufty, releasing both the Blust defendants and Strategic.  Dkt. No. 576-7.  The settlement was paid to Rufty in a single lump sum by Lit Def.  Dkt. No. 576-9, at 2.  Although Strategic made no direct payment toward the settlement (referred to as the "Carolina Settlement" in Strategic's correspondence), Sasson agreed that Strategic would reimburse Blust for half of the settlement, but Strategic characterized the reimbursement as a "technology spend" for Blust's law firms.  In a December 27, 2021 email exchange between Sasson and Strategic's GC, regarding truing-up with Blust's law firms, Sasson confirmed that the law firms "took 50% of the [Carolina] settlement," meaning although Blust's law firms had paid the full settlement via Lit Def , they were responsible for only 50% of the

---

[16] In 2020, Blust network attorney Daniel Rufty was suspended from the practice of law by the North Carolina State Bar for, *inter alia*, aiding and abetting the unauthorized practice of law by Carolina Client Services, LLC ("CCS"), a Strategic subsidiary.  The Bar found that while Blust arranged for Rufty to be the owner of the law firm, he had also arranged for 97% of the profits received by Rufty to be transferred to Blust and another out-of-state attorney as "consultant fees."  In 2021, Rufty and his firm filed an arbitration demand against CCS alleging, *inter alia*, that CCS was engaging in the unauthorized practice of law.  Rufty later filed a lawsuit in the Western District of North Carolina against Blust and Lit Def.  *See Daniel Rufty Legal, PLLC v. Jason Blust, et al.*, W.D.N.C., Case No. No. 3:21-cv-191.  These various actions were globally settled by Rufty, the Blust Defendants, and Strategic in 2021.

$1.5 million settlement (leaving Strategic responsible to reimburse the other $750,000).  Dkt. No. 576-10, at 2-3.

Shortly after the settlement, Strategic's controller contacted Blust's accountant in October 2021 requesting information about the $750,000 "technology spend" that the law firms were to bill Strategic.  Dkt. No. 179-7.  Blust's accountant, initially unaware of this arrangement, consulted with Blust and then informed the controller that the amount should be paid to "Fidelis" at a Chicago residential address – "$100k for 7 mos, $50k for 1 month."  *Id.* at 5.  Blust's accountant did not know the start date or have a supporting agreement; he directed the controller to Strategic's CFO or Sasson for details regarding the "technology spend."  *Id.* at 4.  On March 17, 2022, Strategic's CFO emailed Freed Maxick the following about "Carolina settlement":

> "[The controller] told me that you got conflicting information about the Carolina settlement.  It's not the right information.  The law firm's back-end technology connections to our systems is not related to the settlement. Ryan took the lead on negotiating the settlement so you should talk to him about how that worked and why we did not pay anything."

Dkt. No. 576-8.

Freed Maxick reached out to Sasson on March 18:

> We understand that Jason Blust may have paid all or part of the settlement but that Strategic may be reimbursing him a portion?  Any information including additional agreements between you and Jason Blust would be appreciated.

*Id.*  Sasson responded: "I think you are mis-informed or have the information wrong. The law firms paid ALL of that settlement and Strategic is not reimbursing them" (*id.*) –directly contradicting Sasson's statement to Strategic's GC that the Law Firms were responsible for 50% of the settlement.  Dkt. No. 576-10, at 2-3.

On March 23, the GC emailed the CFO and controller a draft Technology Services Agreement designed to cover the $750,000 payment, describing it as an agreement for "broad technology consulting services…[i]t is an appropriate basic procurement agreement for tech

services." Dkt. No. 179-10, at 3.  But the CFO responded: "Freed moved on from this. I am not sure we need to go through this now.  What do you think?"  *Id.* at 2.  The GC agreed, to which the CFO responded, "[y]ou can land the plane with Blust then as you see fit."  *Id.*

Fidelis has downplayed the "land the plane with Blust" comment, arguing that the CFO "might have simply misspoken[.]"  Dkt. No. 190-1, at 9.  Christo has repeatedly sworn that the payment was compensation for "vetting a new software platform" for Strategic.  *See* Dkt. No. 190-4 ¶¶ 36-38 & Dkt. No. 233-1 ¶ 12.  But as discussed above, he has produced no contract, scope of work, timesheets, deliverables, work product, or related communications.  Fidelis's invoices only state that Fidelis performed "Support Services" or "Technology Support Services." Dkt. No. 212-7.  And Christo has not explained how he came into contact with Strategic.

### H.    Blust, Christo, and Hinds Invoke the Fifth Amendment at January 2025 Evidentiary Hearing

At the January 23-24 evidentiary hearing, Plaintiffs and the Receiver questioned Christo in detail regarding Fidelis's relationship with Strategic, Lit Def, and Blust, Blust's control over Fidelis, Christo's corresponding lack of control, and the $750,000 Rufty settlement reimbursement.  Among many others, Christo invoked his Fifth Amendment rights in response to the following material questions concerning Blust's control of Fidelis:

- "Fidelis is the successor to Lit Def; isn't that true?" (Wall Decl., Exhibit 4, Hearing Tr., Day 2, at 17:22 – 18:1);

- "Fidelis did not compete with Lit Def for potential debt settlement law firm clients; did it?" (*id.* at 20:18-22);

- "And you actually did not bring in any new law firm clients to Fidelis; correct?" (*id.* at 20:23 – 21:2);

- "All of Fidelis's law firm clients are those are controlled are Jason Blust; is that correct?" (*id.* at 21:3-7);

- "Jason Blust controlled whether former Lit Def employees worked at Fidelis; is that right, Mr. Christo?" (*id.* at 26:17-19);

- "In fact, you were not involved in overseeing Fidelis's day-to-day litigation support operations; is that correct?" (*id.* at 30:10-12; *see also id.* at 30:13 – 32:24);

- "Jason Blust controls Fidelis; is that correct?" (*id.* at 40:24 – 41:2);

- "Indeed, you are the head of Fidelis in name only; is that correct, Mr. Christo?" (*id.* at 41:3-7);

- "The only work you did for Fidelis was routine administrative tasks designed to uphold the appearance that Fidelis was a company independent from Lit Def; is that right?" (*id.* at 41:8-14);

- "You agreed to be the front owner for Fidelis; right?" (*id.* at 54:24 – 55:3)

Plaintiffs' and the Receiver's questioning also established the following adverse inferences, among others, regarding Blust's control of Fidelis and Christo's false sworn statements to the Court:

- That Blust and Hinds oversaw Fidelis's daily operations, not Christo (*id.* at 32:25 – 34:10);

- That Blust, not Christo, directed Hinds regarding Fidelis's operations (*id.* at 34:11 – 35:9);

- That Blust made all "compensation decisions" and hiring/staffing decisions for Fidelis (*id.* at 37:22 – 38:16);

- That Fidelis obtained its law firm clients from Blust, not through its own client development, and Christo did not engage in any business development for Fidelis (*id.* at 39:16 – 40:1);

- That Blust provided Fidelis with all of its clients, most of its employees, and the "infrastructure for Fidelis to operate" (*id.* at 60:19 – 61:14);

- That Paragraph 7 of Christo's March 21, 2024 Declaration – which stated that "Jason Blust is not a consultant for Fidelis and he does not control it in any respect. He does not set policy. He does not described strategy, he does not make decisions. He does not direct operations. In short, he has no role in the running of Fidelis's business" – is false (*id.* at 71:13 – 72:1);

17

- That Paragraph 10 of the same Declaration – which stated "Lit Def never transferred any asset, right, duty, obligation or liability to Fidelis" – is false (*id.* at 72:2-12);

- That Paragraph 19 of the same Declaration – which stated "Jason Blust simply does not own or control Fidelis in any way, and Fidelis is not and never was Lit Def's successor alter ego" – is false (*id.* at 72:13 – 73:2);

- That Christo's statement in his April 22, 2024 Declaration – "Fidelis is my company. I founded it. I funded it. I run it and my trust and the trust I created receives the profits from it" – is false (*id.* at 73:13 – 74:2).

Specifically regarding the $750,000 in payments from Strategic to Fidelis, Christo

invoked his Fifth Amendment rights in response to the following questions, among others:

- "In fact, you were never hired by Strategic to perform work vetting the software platform, were you?" (*id.* at 63:19-23);

- "And in fact, sir, you never performed any work for Strategic in exchange for the $750,000 that was transferred to Fidelis; correct?" (*id.* at 64:10-12);

- "The only communications you ever had with Strategic were the seven invoices you sent to Strategic's accounting department every month; correct?" (*id.* at 64:16-22);

- "At Blust's direction in October of 2021, [Blust's accountant] instructed Strategic to pay $750,000 which Strategic owed to Lit Def[,] to Fidelis; isn't that true?" (*id.* at 62:7-12).

Plaintiffs' and the Receiver's questioning also established the following adverse

inferences relating to the $750,000 in payments:

- Christo understands that the $750,000 was actually owed to Blust or Lit Def when he received it (*id.* at 64:23 – 65:5);

- Christo knew this when he offered his sworn statements to the contrary (*id.* at 65:6-12);

- Christo's statement that he was hired by Strategic to "vet a new software program" was not true (*id.* at 41:20 – 42:5, 62:19 – 63:3);

- There is no written contract and no documentation for the supposed "vetting" work (*id.* at 42:6 – 43:9);

- The $750,000 was not compensation for technology consulting (*id.* at 43:10-21);

- Christo's assertion, in Paragraph 12 of his March 21, 2024 Declaration – "My $750,000 fee paid in installments was compensation arranged between myself and my client" – is false (*id.* at 63:4-18);

- Christo did not fund Fidelis's operation (*id.* at 70:7-10).

Finally, questioning of Christo established the following adverse inferences regarding his knowledge of his obligations under the TRO/PI and his breach of those obligations:

- That at the time he filed his declarations, he understood that "as an individual in active concert or participation with the defendants in this case [he was] restrained and [enjoined] from [transacting] any business of any receivership defendant" (*id.* at 67:13-21);

- That he was restrained and enjoined from "interfere[ing] with the receivers taking custody, control, possession or managing the assets of the receivership defendants, in this case Fidelis" (*id.* at 67:22 – 68:7);

- That he knowingly violated TRO and PI by interfering with Receiver's ability to take custody, control and possession of assets and documents of Fidelis, by submitting false testimony to the Court (*id.* at 68:21 – 69:5).

In sum, Christo's invocation of his Fifth Amendment rights after nearly a year of obfuscation and misrepresentation reveals the Fidelis Motion to have been a charade.[17]  Christo's invocation, in combination with the independent contemporaneous Lit Def and Fidelis emails and documents presented to the Court, amply supports all relevant adverse inferences.

## III.    ARGUMENT

### A.    Legal Standard

Obedience with a court order is required unless and until it has been vacated or reversed, except in only the rarest of situations.  *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967). Federal courts have inherent power to enforce their lawful orders through contempt.  *Spallone v.*

---

[17] Note that while the above focuses on Christo, Blust and Hinds were similarly questioned regarding Blust's control of Fidelis and the $750,000 transfer, and they similarly invoked their Fifth Amendment rights and refused to answer any questions during the January 23-24 hearing.

*United States*, 493 U.S. 265, 276 (1990); *see also*, *Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (federal courts possess inherent power to sanction for violation of order and need not issue warning before imposing sanctions).  As the contempt proceedings here are taking place in the context of an equitable receivership, the district court has "extremely broad" authority "to supervise an equity receivership and to determine the appropriate action to be taken in [its] administration[.]" *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986).[18]

Where contempt is found, the Court may consider several factors in calculating a fine, including "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about [compliance], and the contemnor's ability to pay." *Paramedics*, 369 F.3d at 658 (internal quotations omitted); *see also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir 1989) ("monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience").  Courts are authorized to assess attorneys' fees where the contempt was willful.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citations omitted).

The Court also possesses inherent power to sanction bad faith and vexatious conduct. *Chambers*, 501 U.S. at 46.  "A court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Id.*, citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258 (1975).  "[I]f a court finds that fraud has been practiced

---

[18] As the *Hardy* court wrote: "The basis for broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions…we have acknowledged that a primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court[.]"  *Id.* at 1037-38.

upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party[.]" *Id.* (citations omitted).  It is also appropriate to award attorneys' fees "when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order…mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy." *Id.* (citations omitted).

      **B.**    **Discussion**

            1.    <u>The Fidelis Defendants Intentionally Misled the Court and the Receiver</u>

Christo and Fidelis had very straightforward cooperation obligations imposed by the TRO and PI.  Fidelis, as a successor entity to Lit Def, and Christo, as a third party in concert or participation with Blust, were required to cooperate and were restrained from taking actions to interfere with the Receiver's effort to gain control of Assets of the Receivership Estate.  Blust's, Christo's and Hinds's multiple sworn declarations contained material falsehoods designed to obscure Blust's operational control of Fidelis.  This constituted a deliberate effort to mislead the Court – and a calculated and concerted plan to keep assets outside of the receivership estate.  Christo's initial declaration categorically asserted that Blust "does not make decisions for Fidelis" (1st Christo Decl., Dkt. No. 190-4, ¶ 4) and lacks any supervisory role over its operations.  This claim quickly unraveled under scrutiny.  Internal communications revealed that Blust unilaterally set employee bonuses for Fidelis staff in 2022 and 2023, directing Hinds to have Christo mechanically approve predetermined amounts via SurePayroll – in other words, Blust decided the bonus amounts and informed Hinds, and Christo rubber-stamped them.  Further, Blust orchestrated the transfer of Lit Def employees to Fidelis payroll in January 2022, dictating compensation splits without Christo's involvement.  Christo's participation in concealing Fidelis's ties to Blust is equally damning: when Hinds alerted him in April 2021 to

Blust's directive to hide Fidelis's existence from vendor NDS, Christo compliantly avoided the call, enabling the deception.

Hinds's declarations similarly crumble under the weight of contradictory evidence. She swore Christo was Fidelis's sole decision-maker on personnel and payroll matters (Hinds Decl., Dkt. No. 233-5, ¶ 29), yet internal emails show Hinds routinely reported directly to Blust on employee productivity and executed his staffing orders. She sent weekly productivity reports for Fidelis employees only to Blust for years. Blust's micromanagement extended to details like Fidelis's holiday schedule, while Hinds facilitated his efforts to mask Fidelis as Lit Def's "second team" in dealings with Fidelis's software vendor. Her belated claim of forgetting these exchanges (*see* 2nd Hinds Decl., Dkt. No. 320-3, ¶ 2) strains all credulity given the frequency of her communications with Blust about Fidelis and the routine orders Blust gave her concerning Fidelis operations for years.

Blust's, Christo's and Hinds's declarations transcend mere inconsistency; they reflect a pattern of intentional deception. They initially denied Blust's involvement in absolute terms, only retreating to implausible claims of forgetfulness and chaotic habits when confronted with irrefutable evidence. These evolving narratives were forced on them by contemporaneous documents discovered by the Receiver's team. The record leaves no doubt: Fidelis operates, or has operated, under Blust's control as a proxy or successor for Lit Def, and Christo is the front owner. Blust, Christo and Hinds systematically lied to the Court in an effort to preserve that fiction. And they did all of this for the purpose of interfering with the Receiver's ability to gain control of Receivership Assets.

2.    <u>A Finding of Contempt, Award of Attorneys' Fees, and Imposition of a Fine is Appropriate</u>

As a result of Fidelis and Christo's egregious conduct, the Receiver has been forced to engage in extensive – and altogether unnecessary – rounds of motions practice and has had to participate in multiple hearings that were focused on proving that Fidelis is a Receivership Defendant. Indeed, the Receiver has been forced to expend substantially more than $100,000 in receivership funds to investigate Christo's and Fidelis's false claims and litigate their motion. This entire exercise was caused by Christo's and Fidelis's decisions to dig a deeper hole by refusing to obey the TRO and PI and turn over obvious Receivership Assets; instead, Christo submitted not one false sworn statement but a staggering three (*see* Dkt. Nos. 190-4, 233-1 & 320-1). Fidelis relied on these false and misleading declarations as the basis to pursue an aggressive litigation strategy designed to insulate millions of dollars flowing to Fidelis from the Receivership.

The receivership has also been forced to expend funds to disprove Christo's false claims in the context of the related Blust Contempt Motion. All of this immensely wasteful litigation would and should have been avoided had Fidelis and Christo been honest with the Receiver and the Court from the outset. Christo and Fidelis could also have opted to remedy the situation and halt their false campaign at many inflection points throughout the year, in the face of mounting additional evidence. Christo has understood all along that his conduct and the pressing of the meritless Fidelis Motion interfered with the Receiver's ability to do his job. Despite this, Christo and Fidelis have stubbornly maintained their bogus challenge to being named a Receivership Defendant. And, when given the opportunity to explain his conduct – and the positions he had

taken in three declarations – Christo invoked his Fifth Amendment rights. Yet, despite surrendering on the witness stand, Christo still has not turned over Fidelis.[19]

A fine of $1,000 per day should be imposed on Christo individually until he brings Fidelis into compliance with the PI. This amount takes into account the magnitude of the harm his continued contumacy threatens to impose on the receivership estate (particularly the risk of Asset dissipation and records and evidence destruction). This amount is also necessary to bring Christo into compliance in light of his claimed wealth and ability to pay. *See* Dkt. No. 190-4 ¶ 4, "I have enjoyed considerable success in my consulting work. I presently own several businesses and privately invest in start-up companies."

## IV.     CONCLUSION

In light of the foregoing, the Receiver respectfully requests that the Court issue an Order to Show Cause why the Court should not issue an order (1) holding both Christo and Fidelis in contempt of the TRO and PI; (2) requiring Christo and Fidelis to cooperate immediately and completely with the Receiver, including turning over to the Receiver all Assets and corporate records of Fidelis and the Bush Lake Trust, turning over control of all business operations of Fidelis to the Receiver (so he can determine which operations can continue to be operated lawfully and profitably), and providing a complete financial accounting of Fidelis and Bush Lake Trust, including all financial transactions by Fidelis and Bush Lake Trust, including all transfers to or from third parties; (3) imposing a fine on Christo individually of $1,000 per day for every day of noncompliance; (4) holding Christo individually and jointly responsible, along with Blust, for all fees and costs incurred by the Receiver in connection with the Fidelis motion; and (5)

---

[19] Again, given that Christo and Blust have resorted to perjury to protect Fidelis, the risk that he and Blust have dissipated Fidelis assets, destroyed or modified records, and destroyed evidence over the last year, and continue to do so now, is extreme.

holding Christo jointly and severally liable, along with Blust, for costs and fees incurred by the

Receiver in connection with the Blust contempt motion.

Dated: February 5, 2025

**MCNAMARA SMITH LLP**

By:  ___/s/ Logan D. Smith_____
Logan D. Smith  (*Pro Hac Vice*)
Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email:  lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*