# EXHIBIT 4

1

1                UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF NEW YORK

3
    - - - - - - - - - - - - X        24-CV-0040
4   CONSUMER FINANCIAL
    PROTECTION BUREAU ET AL,
5               Plaintiff

6          Vs.                    Buffalo, New York
    STRATFS, LLC (f/k/a STRATEGIC
7   FINANCIAL SOLUTIONS LLC et al    January 24, 2025
                Defendants
8
    STRATEGIC ESOP, et al
9               Relief Defendants
    - - - - - - - - - - - - X
10

11            TRANSCRIPT OF EVIDENTIARY HEARING
         BEFORE THE HONORABLE MICHAEL J. ROEMER
12            UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23        COURT REPORTER:Brandi A. Wilkins
             scalisba@gmail.com
24           Kenneth B. Keating Federal Building
             100 State Street, Room 1250A
25           Rochester, New York 14614

2

```
1                    A P P E A R A N C E S

2              CONSUMER FINANCIAL PROTECTION BUREAU
               BY: AKASH DESAI, ESQ.
3                  VANESSA BUCHKO, ESQ.
                   JOSEPH SANDERS, ESQ.
4                  NICOLE CABANEZ, ESQ.
               1700 G Street, NW
5              Washington, DC 20552
               Appearing on behalf of the Plaintiff
6
          OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
7              BY: GENEVIEVE RADOS, ESQ.
               350 Main Street
8              Buffalo, New York 14202
               Appearing on behalf of the Plaintiff
9
               MCNAMARA SMITH LLP
10             BY: THOMAS MCNAMARA, ESQ.
                   LOGAN SMITH, ESQ.
11             655 West Broadway Suite 900
               San Diego, California 92101
12             Appearing on behalf of the Receiver

13             PERSONIUS MELBER LLP
               BY: RODNEY PERSONIUS, ESQ.
14             2100 Main Place Tower
               350 Main Street
15             Buffalo, New York 14202
               Appearing on behalf of the Defendants
16
               HOOVER & DURLAND LLP
17             BY: TIMOTHY HOOVER, ESQ.
                   SPENCER DURLAND, ESQ.
18             561 Franklin Street
               Buffalo, New York 14202
19             Appearing on behalf of the Defendants

20             DELAWARE DEPARTMENT OF JUSTICE
               CONSUMER PROTECTION BUREAU
21             BY: MARYANNE DONAGHY, ESQ.
               820 N. French Street
22             5th Floor
               Wilmington, Delaware 19801

23

24

25
```

```
1              W I T N E S S E S
   Name               Examined By          Page
2  Cameron Christo    Mr. Desai (DX)       6
                      Mr. McNamara (DX)    52
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

1           THE CLERK:  United States District Court for
2    the Western District of New York is now in session.
3    The Honorable Michael J. Roemer residing.  We are here
4    on the matter of Consumer Financial Protection Bureau
5    et al. Versus Strategic case number 24-CV-40 for
6    continuation of an evidentiary hearing.  Counsel,
7    please state your name and who you represent.  We'll
8    start with plaintiff's front table.
9           MR. SANDERS:  Morning, Judge.  Joe Sanders
10    on behalf of the CFPB.
11           MS. RADOS:  Good morning, Your Honor.
12    Assistant Attorney General Genevieve Rados on behalf
13    of the People of the State of New York.
14           MR. DESAI:  Morning, Your Honor.  Akash
15    Desai on behalf of the CFPB.
16           MR. SMITH:  Morning, Your Honor.  Logan
17    Smith on behalf of the receiver.
18           MR. MCNAMARA:  Good morning, Your Honor.
19    Tom McNamara on behalf of the receiver.
20           MS. BUCHKO:  Morning, Your Honor.  Vanessa
21    Buchko from the CFPB.
22           MS. CABANEZ:  Good morning, Your Honor.
23    Nicole Cabanez from the CFPB.
24           MS. DONAGHY:  Good morning, Your Honor.
25    Mary Ann Donaghy for the State of Delaware.

5

```
 1              MR. ROMANOFF:  Good morning, Your Honor.
 2    Evan Romanoff for the State of Minnesota.
 3              MR. PERSONIUS:  Good morning, Judge.  Rodney
 4    Personius for Lit Def Stategy.
 5              MR. HOOVER:  Tim Hoover and Spencer Durland
 6    with Mr. Christo from Fidelis.
 7              MR. CONNORS:  Terry Connors for the
 8    individual law firms.  Just under the wire.
 9              THE COURT:  Were you at the rally?  The
10    Bills rally?
11              MR. CONNORS:  I take the fifth.
12              THE COURT:  All right.  Are we ready to go?
13              MR. SANDERS:  We're ready, Judge.
14              THE COURT:  Do you want to call your first
15    witness?
16              MR. SANDERS:  Plaintiffs call Cameron
17    Christo an adverse witness.
18              THE CLERK:  If I could just swear you in
19    please raise your right hand.
20              C A M E R O N   C H R I S T O, after having
21    been duly called and sworn, testified as follows:
22              THE CLERK:  Thank you.  Please have a seat.
23    When seated, please state your name and spell it for
24    the record.  Thank you.
25              MR. HOOVER:  Judge, I should have asked but
```

6

1   okay to be up here?

2            THE COURT:  Yes.

3            MR. HOOVER:  Thank you.

4            THE COURT:  Do you want to pull a chair up?

5            MR. HOOVER:  Thank you.

6            THE COURT:  Whatever you want to do.

7            THE WITNESS:  Cameron Christo, C-A-M-E-R-O-N

8    C-H-R-I-S-T-O.

9            DIRECT EXAMINATION BY MR. DESAI:

10   Q.   Well, Good morning, Mr. Christo.  My name is

11   Akash Desai.  I'm an attorney with the CFPB.  Mr.

12   Christo, you formed Fidelis legal support services;

13   correct?

14   A.   On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.   You currently hold the title chief executive of

18   Fidelis; is that correct?

19   A.   On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.   You created Fidelis on January 25, 2021; correct?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

7

1    Q.    Fidelis is a limited liability company?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    And Fidelis provides litigation support services;

6    correct?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    Mr. Christo, you created the Bush Lake Trust; is

11   that correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    Mr. Christo, for Fidelis Legal Support, I'm going

16   to refer to that here on forward as Fidelis, and for

17   Bush Lake Trust, I'm going to refer to that entity as

18   Bush Lake from here on out.  Mr. Christo, Bush Lake is

19   registered in Nevada; correct?

20   A.    On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.    And Timothy Miller is a trustee of Bush Lake; is

24   that correct?

25   A.    On the advice of my counsel, I invoke the fifth

8

1    amendment privilege and respectfully decline to answer
2    the question.
3    Q.    Your descendant -- your children and their
4    descendants were the beneficiaries of the Bush Lake
5    Trust; is that correct?
6    A.    On the advice of my counsel, I invoke the fifth
7    amendment privilege and respectfully decline to answer
8    the question.
9    Q.    Fidelis's corporate documents previously listed
10    you as the owner of the company; is that correct?
11    A.    On the advice of my counsel, I invoke the fifth
12    amendment privilege and respectfully decline to answer
13    the question.
14    Q.    And you transferred all of your ownership stake
15    from Fidelis to Bush Lake; is that correct?
16    A.    On the advice of my counsel, I invoke the fifth
17    amendment privilege and respectfully decline to answer
18    the question.
19    Q.    Bush Lake is presently the sole owner of Fidelis;
20    is that correct, Mr. Christo?
21    A.    On the advice of my counsel, I invoke the fifth
22    amendment privilege and respectfully decline to answer
23    the question.
24    Q.    Okay.  Mr. Christo, I'm going to ask you some
25    questions about Fidelis's work flow.  Fidelis provides

9

1   litigation support services to debt settlement law
2   firms that report consumers for credit law suits; is
3   that correct?
4   A.   On the advice of my counsel, I invoke the fifth
5   amendment privilege and respectfully decline to answer
6   the question.
7   Q.   And many of these debt settlement law firms offer
8   services as part of a debt relief program promoted by
9   Strat FS; is that correct?
10  A.   On the advice of my counsel, I invoke the fifth
11  amendment privilege and respectfully decline to answer
12  the question.
13  Q.   Mr. Christo, I'm going to refer to the debt
14  settlement law firms from here on out as the
15  intervener law firms, and I'm going to refer to Strat
16  FS as SFS from here on out.  Mr. Christo, you know
17  that SFS is a debt relief company; correct?
18  A.   On the advice of my counsel, I invoke the fifth
19  amendment privilege and respectfully decline to answer
20  the question.
21  Q.   And after consumers are sued by a creditor, SFS
22  sends the litigation file to a litigation support
23  company; is that correct?
24  A.   On the advice of my counsel, I invoke the fifth
25  amendment privilege and respectfully decline to answer

10

1    the question.

2    Q.   In many cases after consumers have been sued by a

3    creditor, SFS sends their litigation files to Fidelis;

4    is that correct?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   And after Fidelis receives a litigation file,

9    Fidelis employees review the file and compile

10   documents; is that correct?

11   A.   On the advice of my counsel, I invoke the fifth

12   amendment privilege and respectfully decline to answer

13   the question.

14   Q.   After reviewing the litigation file, Fidelis

15   employees sign a file to a litigation attorney;

16   correct?

17   A.   On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.   And the litigation attorneys I just referenced

21   are sometimes also referred to as 1099 attorneys; is

22   that right?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

11

1    Q.   And these attorneys are referred to as 1099

2    attorneys because they're independent contractors;

3    correct?

4    A.   On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.   And the litigation attorneys I just referenced

8    are also sometimes called local counsel or appearance

9    attorneys; is that correct?

10   A.   On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.   From this point forward, Mr. Christo, when I

14   refer to those attorneys, I'm going to use the term

15   litigation attorney.  Mr. Christo, the litigation

16   attorneys acted on behalf of the intervener law firms;

17   is that correct?

18   A.   On the advice of my counsel, I invoke the fifth

19   amendment privilege and respectfully decline to answer

20   the question.

21   Q.   And Fidelis managed communications between the

22   litigation attorney and SFS; is that correct?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

12

1    Q.    Litigation attorneys are only supposed to
2    communicate with SFS through Fidelis; is that correct?
3    A.    On the advice of my counsel, I invoke the fifth
4    amendment privilege and respectfully decline to answer
5    the question.
6    Q.    And Fidelis helped facilitate settlements in
7    creditor lawsuits; is that right?
8    A.    On the advice of my counsel, I invoke the fifth
9    amendment privilege and respectfully decline to answer
10   the question.
11   Q.    Now, Mr. Christo, prior to the entry of the
12   temporary restraining order in this case you knew that
13   consumers paid fees to the intervener law firms
14   reporting to represent them before the firms reached a
15   settlement with a creditor; is that correct?
16   A.    On the advice of my counsel, I invoke the fifth
17   amendment privilege and respectfully decline to answer
18   the question.
19   Q.    And before the entry of a temporary restraining
20   order in this case, you knew that those consumer fees
21   were placed in an escrow account; is that correct?
22   A.    On the advice of my counsel, I invoke the fifth
23   amendment privilege and respectfully decline to answer
24   the question.
25   Q.    And prior to the entry of the temporary

13

1    restraining order in this case, you knew that the

2    intervener law firms representing consumers were

3    collecting fees before consumers started making

4    payments on settlements; is that correct?

5    A.    On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.    And prior to the entry of a temporary restraining

9    order in this case, Fidelis knew that the intervener

10   law firms were collecting fees from consumers before

11   they reached settlements from creditors; is that

12   correct?

13   A.    On the advice of my counsel, I invoke the fifth

14   amendment privilege and respectfully decline to answer

15   the question.

16   Q.    SFS is one of the debt relief companies to whom

17   Fidelis sends its settlement for processing; is that

18   right?

19   A.    On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.    Indeed, the vast majority of settlements are sent

23   by Fidelis to SFS for processing; is that correct?

24   A.    On the advice of my counsel, I invoke the fifth

25   amendment privilege and respectfully decline to answer

14

1    the question.

2    Q.   And Fidelis provided substantive settlement

3    recommendations to litigation counsel; is that

4    correct, Mr. Christo?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   And Fidelis transmitted settlement proposals; is

9    that correct?

10   A.   On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.   Fidelis handled litigation -- sorry.  Let me

14   rephrase that question.

15            Fidelis handled complaints about litigation

16   counsel; is that correct?

17   A.   On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.   For example, Fidelis handled complaints from

21   consumers about litigation counsels not returning

22   their calls; is that correct?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

15

1    Q.   Fidelis handled complaints about the SFS debt
2    relief program operated by SFS; is that correct?
3    A.   On the advice of my counsel, I invoke the fifth
4    amendment privilege and respectfully decline to answer
5    the question.
6    Q.   Fidelis also handled complaints from consumers
7    believing that they had been misled by SFS regarding
8    the cost of the debt relief program; is that correct?
9    A.   On the advice of my counsel, I invoke the fifth
10   amendment privilege and respectfully decline to answer
11   the question.
12   Q.   And Fidelis also handled complaints from
13   consumers upset that there were insufficient funds in
14   their escrow accounts to pay for their settlements
15   despite the amount of fees they had already sent to
16   participate in the SFS debt relief program; is that
17   correct, Mr. Christo?
18   A.   On the advice of my counsel, I invoke the fifth
19   amendment privilege and respectfully decline to answer
20   the question.
21   Q.   The intervener law firms retained Fidelis for the
22   litigation support services the company provides; is
23   that right, Mr. Christo?
24   A.   On the advice of my counsel, I invoke the fifth
25   amendment privilege and respectfully decline to answer

16

1    the question.

2    Q.   Fidelis does not enter into any written contracts

3    with the intervener law firms that retain its

4    services; correct?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   Fidelis helps the intervener law firms manage

9    their day-to-day business; is that correct?

10   A.   On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.   Indeed the intervener law firms themselves do not

14   appear in court to represent consumers, do they?

15   A.   On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.   And instead, any attorney that might appear on

19   behalf of the consumers reportedly represented by the

20   intervener law firms is a litigation attorney that is

21   assigned by Fidelis; is that correct?

22   A.   On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.   You are familiar with Lit Def Strategies;

17

1    correct?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    From this point forward, I'll refer to Lit Def

6    Services LLC as Lit Def.  Mr. Christo, you are also

7    familiar with a person named Jason Blust; right?

8    A.    On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.    Jason Blust owned Lit Def; is that correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    Before the entry of the temporary restraining

16   order in this case, Lit Def provided litigation

17   support services to intervener law firms; is that

18   correct?

19   A.    On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.    Fidelis is the successor to Lit Def; isn't that

23   true?

24   A.    On the advice of my counsel, I invoke the fifth

25   amendment privilege and respectfully decline to answer

18

1    the question.

2    Q.   Fidelis performs the same substantive litigation

3    support services for intervener law firms that Lit Def

4    previously provided; is that correct?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   Fidelis employs individuals who previously worked

9    for Lit Def; is that correct?

10   A.   On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.   Some Fidelis employees worked for Lit Def and

14   Fidelis concurrently; is that true, Mr. Christo?

15   A.   On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.   Mr. Christo, employees that concurrently worked

19   at Lit Def and Fidelis toggled between profiles within

20   the same software application to differentiate their

21   Lit Def work and their Fidelis work; is that correct?

22   A.   On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.   Indeed, employees that concurrently worked at Lit

19

1    Def and Fidelis used the same software; is that right?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    On April 5, 2021, Mr. Christo, you declined to

6    schedule a call with Leadtrack with Ms. Gallagher

7    after she told you that she and Jason Blust were

8    already scheduled to have an earlier call with

9    Leadtrack; is that correct?

10   A.    On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.    In fact, in declining to have that call, you

14   remarked that it was unnecessary because it would

15   be -- because it would amount to a "duplication of

16   effort"; is that correct?

17   A.    On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.    Employees performed work for both Lit Def and

21   Fidelis on the same computer equipment; is that

22   correct, Mr. Christo?

23   A.    On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

20

1    Q.    After Fidelis was created, Jason Blust began

2    moving Lit Def's intervener law firm client roster to

3    Fidelis; is that correct?

4    A.    On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.    Jason Blust controlled which intervener law firms

8    migrated to Fidelis; is that correct?

9    A.    On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.    And Jason Blust controlled when certain

13   intervener law firms would migrate to Fidelis; is that

14   correct?

15   A.    On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.    Fidelis did not compete with Lit Def for

19   potential debt settlement law firm clients; did it?

20   A.    On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.    And you actually did not bring in any new law

24   firm clients to Fidelis; correct?

25   A.    On the advice of my counsel, I invoke the fifth

21

1    amendment privilege and respectfully decline to answer
2    the question.
3    Q.    All of Fidelis's law firm clients are those are
4    controlled are Jason Blust; is that correct?
5    A.    On the advice of my counsel, I invoke the fifth
6    amendment privilege and respectfully decline to answer
7    the question.
8    Q.    And Jason Blust determined that those law firms
9    would retain Fidelis to handle work that was
10    previously handled by Lit Def; is that correct?
11    A.    On the advice of my counsel, I invoke the fifth
12    amendment privilege and respectfully decline to answer
13    the question.
14    Q.    Mr. Christo, Fidelis shared employees with Lit
15    Def; is that correct?
16    A.    On the advice of my counsel, I invoke the fifth
17    amendment privilege and respectfully decline to answer
18    the question.
19    Q.    Lisette Alvarez provided human resource services
20    to Lit Def and Fidelis; is that correct?
21    A.    On the advice of my counsel, I invoke the fifth
22    amendment privilege and respectfully decline to answer
23    the question.
24    Q.    Fidelis used essentially the same employee
25    handbook as Lit Def; correct?

22

1   A.   On the advice of my counsel, I invoke the fifth

2   amendment privilege and respectfully decline to answer

3   the question.

4   Q.   Mr. Christo, Shirley Saavedra is a current

5   Fidelis employee; is that correct?

6   A.   On the advice of my counsel, I invoke the fifth

7   amendment privilege and respectfully decline to answer

8   the question.

9   Q.   Prior to working at Fidelis, Ms. Saavedra worked

10  at Lit Def; is that correct?

11  A.   On the advice of my counsel, I invoke the fifth

12  amendment privilege and respectfully decline to answer

13  the question.

14  Q.   And after she joined Fidelis, Ms. Saavedra has

15  worked concurrently at Fidelis and Lit Def through at

16  least the entry of the temporary restraining order in

17  this case; is that correct?

18  A.   On the advice of my counsel, I invoke the fifth

19  amendment privilege and respectfully decline to answer

20  the question.

21  Q.   When Ms. Saavedra worked at Lit Def, she

22  performed the same litigation support services that

23  she performed at Fidelis; is that correct?

24  A.   On the advice of my counsel, I invoke the fifth

25  amendment privilege and respectfully decline to answer

23

1    the question.

2    Q.    Jean Comis is a current Fidelis employee; is that

3    true?

4    A.    On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.    And before working at Fidelis, Ms. Comis worked

8    at Lit Def; is that correct?

9    A.    On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.    After she joined Fidelis, Ms. Comis worked

13   concurrently at Fidelis and Lit Def for at least the

14   entry of the temporary restraining order in this case;

15   correct?

16   A.    On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.    When Ms. Comis worked at Lit Def, she performed

20   the same litigation support tasks that she performed

21   at Fidelis; is that correct?

22   A.    On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.    Jennifer Moye is a current Fidelis employee; is

24

1    that correct?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    Before working at Fidelis, Ms. Moye worked at Lit

6    Def; is that correct?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    And after she joined Fidelis, Ms. Moye has worked

11   con currently at Fidelis and Lit Def for at least the

12   entry of the temporary restraining order in this case;

13   is that correct?

14   A.    On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.    When Ms. Moye worked at Lit Def, she performed

18   the same litigation support tasks that she performed

19   at Fidelis; is that correct?

20   A.    On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.    Peggy Slivka is a current Fidelis employee; is

24   that correct?

25   A.    On the advice of my counsel, I invoke the fifth

25

1   amendment privilege and respectfully decline to answer

2   the question.

3   Q.   Before working at Fidelis, Ms. Slivka worked at

4   Lit Def; is that right?

5   A.   On the advice of my counsel, I invoke the fifth

6   amendment privilege and respectfully decline to answer

7   the question.

8   Q.   After joining Fidelis, Ms. Slivka worked

9   concurrently at Fidelis and Lit Def for at least the

10   entry of the temporary restraining order in this case;

11   is that correct?

12   A.   On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.   When Ms. Slivka worked at Lit Def, she performed

16   the same litigation support tasks as she performed at

17   Fidelis; is that right, Mr. Christo?

18   A.   On the advice of my counsel, I invoke the fifth

19   amendment privilege and respectfully decline to answer

20   the question.

21   Q.   Katherine Rosenberg is a former Fidelis employee;

22   is that correct?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

26

1    Q.   Before working at Fidelis, Ms. Rosenberg worked
2    at Lit Def; is that correct?
3    A.   On the advice of my counsel, I invoke the fifth
4    amendment privilege and respectfully decline to answer
5    the question.
6    Q.   And after joining Fidelis, Ms. Rosenberg worked
7    con currently at Fidelis and Lit Def; is that right?
8    A.   On the advice of my counsel, I invoke the fifth
9    amendment privilege and respectfully decline to answer
10   the question.
11   Q.   When Ms. Rosenberg worked at Lit Def, she
12   performed the same litigation support tasks that she
13   performs at Fidelis; is that correct?
14   A.   On the advice of my counsel, I invoke the fifth
15   amendment privilege and respectfully decline to answer
16   the question.
17   Q.   Jason Blust controlled whether former Lit Def
18   employees worked at Fidelis; is that right, Mr.
19   Christo?
20   A.   On the advice of my counsel, I invoke the fifth
21   amendment privilege and respectfully decline to answer
22   the question.
23   Q.   And Jason Blust controlled when former Lit Def
24   employees would transition over to become Fidelis
25   employees; is that right?

27

1    A.    On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.    And Fidelis employees used Lit Def email accounts

5    to perform the same litigation support functions that

6    they completed for Fidelis; is that correct?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    After Fidelis began servicing intervener law

11   firms that previously retained Lit Def, attorneys from

12   those law firms continued to send emails to Fidelis

13   employees at their Lit Def email addresses; is that

14   correct?

15   A.    On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.    Michelle Hinds, I'm going to refer to her as

19   Michelle Gallagher, was previously a manager at

20   Fidelis; is that correct?

21   A.    On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.    Before she worked at Fidelis, Ms. Gallagher

25   worked at Lit Def; is that right?

28

1    A.   On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.   And after joining Fidelis, Ms. Gallagher worked

5    concurrently at Fidelis and Lit Def through at least

6    the entry of the temporary restraining order in this

7    case; is that correct, Mr. Christo?

8    A.   On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.   When Ms. Gallagher worked at Lit Def, she

12   performed the same litigation support tasks that she

13   performed at Fidelis; is that correct?

14   A.   On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.   While at Lit Def, Ms. Gallagher reported to Mr.

18   Blust; is that right?

19   A.   On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.   Ms. Gallagher over saw Fidelis's day-to-day

23   litigation support operations; is that correct, Mr.

24   Christo?

25   A.   On the advice of my counsel, I invoke the fifth

29

1    amendment privilege and respectfully decline to answer

2    the question.

3    Q.    In fact, Ms. Gallagher over awe day-to-day

4    litigation support operations until she recently left

5    Fidelis; is that correct, Mr. Christo?

6    A.    On the advice of my counsel, I invoke the fifth

7    amendment privilege and respectfully decline to answer

8    the question.

9    Q.    You relied on Ms. Gallagher to operate Fidelis's

10   litigation support operations; correct?

11   A.    On the advice of my counsel, I invoke the fifth

12   amendment privilege and respectfully decline to answer

13   the question.

14   Q.    When Ms. Gallagher made recommendations to you

15   about Fidelis's litigation support operations you

16   generally followed her recommendations; correct?

17   A.    On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.    And Mr. Christo, you don't devote your entire

21   working day to Fidelis matters; is that right?

22   A.    On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.    You owned various companies aside from Fidelis;

30

1    is that correct?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    And during the working day, you handle matters

6    pertaining to their various companies; is that right?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    In fact, you were not involved in overseeing

11   Fidelis's day-to-day litigation support operations; is

12   that correct?

13   A.    On the advice of my counsel, I invoke the fifth

14   amendment privilege and respectfully decline to answer

15   the question.

16   Q.    You did not provide any substantive directions as

17   to how Fidelis should conduct its litigation support

18   entries; is that correct?

19   A.    On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.    You did not direct how Fidelis employees should

23   review incoming litigation files; correct?

24   A.    On the advice of my counsel, I invoke the fifth

25   amendment privilege and respectfully decline to answer

31

1    the question.

2    Q.    You did not direct who Fidelis should hire as

3    litigation attorneys to handle a client file; correct?

4    A.    On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.    You did not respond to complaints Fidelis

8    received about issued attorneys; correct?

9    A.    On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.    You did not respond to complaints Fidelis

13   received about the SFS debt relief program; is that

14   correct?

15   A.    On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.    Mr. Christo, you were not made aware of any

19   complaints Fidelis received about litigation

20   attorneys; correct?

21   A.    On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.    You were not made aware of any complaints Fidelis

25   received about SFS; is that correct?

32

1    A.   On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.   You did not provide any direction as to how

5    Fidelis employees should respond to complaints the

6    company received about litigation attorneys; is that

7    correct?

8    A.   On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.   You did not provide any direction as to how

12   Fidelis employees should respond to complaints the

13   company received about the SFS debt relief program;

14   did you?

15   A.   On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.   You did not provide any direction as to how

19   Fidelis employees should respond to any recommendation

20   or litigation counsel regarding a creditor lawsuit;

21   correct?

22   A.   On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.   Ms. Gallagher communicated with Fidelis's

33

1    intervener law firm clients on behalf of Fidelis; is

2    that correct?

3    A.   On the advice of my counsel, I invoke the fifth

4    amendment privilege and respectfully decline to answer

5    the question.

6    Q.   And you weren't included in those communications

7    with Fidelis's law firm clients; were you?

8    A.   On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.   Ms. Gallagher communicated with SFS on behalf of

12   Fidelis; is that correct?

13   A.   On the advice of my counsel, I invoke the fifth

14   amendment privilege and respectfully decline to answer

15   the question.

16   Q.   Ms. Gallagher had regularly scheduled calls with

17   SFS; is that correct?

18   A.   On the advice of my counsel, I invoke the fifth

19   amendment privilege and respectfully decline to answer

20   the question.

21   Q.   And you didn't join those calls; is that right?

22   A.   On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.   You left communications between Fidelis and SFS

34

1    to Ms. Gallagher Jason Blust; is that correct?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    You deferred to Ms. Gallagher's decisions

6    concerning Fidelis's litigation support operations; is

7    that correct?

8    A.    On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.    Ms. Gallagher sought Jason Blust's approval on

12   matters relating to Fidelis's litigation support

13   operations; is that correct?

14   A.    On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.    Jason Blust directed Ms. Gallagher on how to

18   handle matters relating to Fidelis's litigation

19   support operations; is that correct?

20   A.    On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.    And Ms. Gallagher did not seek your approval on

24   matters relating to Fidelis litigation support

25   operations; is that correct, Mr. Christo?

35

```
1    A.   On the advice of my counsel, I invoke the fifth
2    amendment privilege and respectfully decline to answer
3    the question.
4    Q.   And you defer to Jason Blust's directions on
5    matters relating to Fidelis's litigation support
6    operations; is that correct?
7    A.   On the advice of my counsel, I invoke the fifth
8    amendment privilege and respectfully decline to answer
9    the question.
10   Q.   In the past, Mr. Christo, Michelle Gallagher's
11   communicated with you about Charles Connors; is that
12   correct?
13   A.   On the advice of my counsel, I invoke the fifth
14   amendment privilege and respectfully decline to answer
15   the question.
16   Q.   Charles Connors works for a software company
17   called National Data Systems; is that correct?
18   A.   On the advice of my counsel, I invoke the fifth
19   amendment privilege and respectfully decline to answer
20   the question.
21   Q.   And National Data Systems maintains a software
22   called Leadtrack; is that correct?
23   A.   On the advice of my counsel, I invoke the fifth
24   amendment privilege and respectfully decline to answer
25   the question.
```

36

1    Q.    Lit Def used Leadtrack; is that right?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    And Fidelis uses Leadtrack; is that correct?

6    A.    On the advice of my counsel, I invoke the fifth

7    amendment privilege and respectfully decline to answer

8    the question.

9    Q.    In April of 2021, Ms. Gallagher told you that

10   Jason Blust wanted to conceal Fidelis from Charles

11   Connors; is that correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    In fact, when you asked to be included on a call

16   with Mr. Blust, Ms. Gallagher and Mr. Connors, Ms.

17   Gallagher texted you that "Charles doesn't know about

18   Fidelis because JB doesn't want him to"; is that

19   correct?

20   A.    On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.    And when Ms. Gallagher used the initials JB she

24   was referring to Jason Blust; is that right?

25   A.    On the advice of my counsel, I invoke the fifth

37

1    amendment privilege and respectfully decline to answer

2    the question.

3    Q.    And in that text chain, Ms. Gallagher further

4    texted you that the messaging Jason Blust was going to

5    provide to Charles Connors was that "we want to create

6    two separate paralegal teams"; correct?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    And that would be two separate paralegal teams

11   within Lit Def; is that correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    And after receiving that information, Mr.

16   Christo, you texted Ms. Gallagher back to inform her

17   that you would not attend the call with Mr. Connors

18   after all; correct?

19   A.    On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.    Jason Blust made compensation decisions at

23   Fidelis; is that correct?

24   A.    On the advice of my counsel, I invoke the fifth

25   amendment privilege and respectfully decline to answer

38

1    the question.

2    Q.   Jason Blust set annual bonuses for Fidelis

3    employees in 2023; is that correct?

4    A.   On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.   Jason Blust decided whether to hire additional

8    personnel at Fidelis; is that correct?

9    A.   On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.   Jason Blust controlled staffing levels at

13   Fidelis; is that correct?

14   A.   On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.   On January 3, 2022, you asked Ms. Gallagher how

18   many people would be needed for Fidelis to staff

19   incoming intervener law firm clients; is that correct?

20   A.   On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.   In fact, you not only asked Ms. Gallagher to give

24   you the number of people needed but you also asked you

25   to provide you with their names so that you could move

39

1    them over to Fidelis's payroll on February 1, 2022; is

2    that correct?

3    A.    On the advice of my counsel, I invoke the fifth

4    amendment privilege and respectfully decline to answer

5    the question.

6    Q.    Now, those employees would be coming to Fidelis

7    from Lit Def; is that correct?

8    A.    On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10    the question.

11    Q.    And the intervener law firms were also coming

12    from Fidelis to Lit Def; is that correct?

13    A.    On the advice of my counsel, I invoke the fifth

14    amendment privilege and respectfully decline to answer

15    the question.

16    Q.    Fidelis did not get those law firms business

17    through any client development of your own; right, Mr.

18    Christo?

19    A.    On the advice of my counsel, I invoke the fifth

20    amendment privilege and respectfully decline to answer

21    the question.

22    Q.    You did not engage in any business development

23    for Fidelis; did you, Mr. Christo?

24    A.    On the advice of my counsel, I invoke the fifth

25    amendment privilege and respectfully decline to answer

40

1    the question.

2    Q.   Mr. Blust decided to move those law firms'

3    business over to Fidelis; is that right?

4    A.   On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.   Now, when Ms. Gallagher responded to your

8    question on January 3, 2022 about staffing this new

9    business, she told you that she had no idea how to do

10   so "without running this down with JB"; is that

11   correct?

12   A.   On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.   And JB referred to Jason Blust; is that correct?

16   A.   On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.   Jason Blust directed that Ms. Gallagher work at

20   Fidelis; is that right?

21   A.   On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.   Jason Blust controls Fidelis; is that correct?

25   A.   On the advice of my counsel, I invoke the fifth

41

1   amendment privilege and respectfully decline to answer
2   the question.
3   Q.   Indeed, you are the head of Fidelis in name only;
4   is that correct, Mr. Christo?
5   A.   On the advice of my counsel, I invoke the fifth
6   amendment privilege and respectfully decline to answer
7   the question.
8   Q.   The only work you did for Fidelis was routine
9   administrative tasks designed to uphold the appearance
10  that Fidelis was a company independent from Lit Def;
11  is that right?
12  A.   On the advice of my counsel, I invoke the fifth
13  amendment privilege and respectfully decline to answer
14  the question.
15  Q.   But Fidelis is in fact Lit Def; right.  Mr.
16  Christo?
17  A.   On the advice of my counsel, I invoke the fifth
18  amendment privilege and respectfully decline to answer
19  the question.
20  Q.   Mr. Christo, you assert in paragraph 36 of your
21  March 4, 2024 declaration in this case that in the
22  fall of 2021 you were hired by SFS "to vet a new
23  software program"; is that correct?
24  A.   On the advice of my counsel, I invoke the fifth
25  amendment privilege and respectfully decline to answer

42

1  the question.

2  Q.   That statement wasn't true though, was it?

3  A.   On the advice of my counsel, I invoke the fifth

4  amendment privilege and respectfully decline to answer

5  the question.

6  Q.   There is no executed written agreement describing

7  the terms of software consulting services you were to

8  provide to SFS; is that correct?

9  A.   On the advice of my counsel, I invoke the fifth

10  amendment privilege and respectfully decline to answer

11  the question.

12  Q.   There's no written statement of work describing

13  the services you intended to provide SFS; is that

14  correct?

15  A.   On the advice of my counsel, I invoke the fifth

16  amendment privilege and respectfully decline to answer

17  the question.

18  Q.   There is no written work product documenting any

19  of the work you provided to SFS is that correct?

20  A.   On the advice of my counsel, I invoke the fifth

21  amendment privilege and respectfully decline to answer

22  the question.

23  Q.   There is no written report you provided SFS upon

24  the completion of your work documenting any

25  recommendations you gave SFS; is that correct?

43

1    A.   On the advice of my counsel, I invoke the fifth
2    amendment privilege and respectfully decline to answer
3    the question.
4    Q.   There's no written report that you provided SFS
5    upon completion of your work; is that correct, Mr.
6    Christo?
7    A.   On the advice of my counsel, I invoke the fifth
8    amendment privilege and respectfully decline to answer
9    the question.
10   Q.   You were paid in total $750,000 from SFS to
11   perform these reported technology consulting services;
12   is that correct?
13   A.   On the advice of my counsel, I invoke the fifth
14   amendment privilege and respectfully decline to answer
15   the question.
16   Q.   But the $750,000 you received from SFS was not in
17   fact for any technology consulting services you
18   provided; correct?
19   A.   On the advice of my counsel, I invoke the fifth
20   amendment privilege and respectfully decline to answer
21   the question.
22   Q.   Mr. Christo, Fidelis was operating as a business
23   in January of 2024; is that correct?
24   A.   On the advice of my counsel, I invoke the fifth
25   amendment privilege and respectfully decline to answer

44

1    the question.

2    Q.   And it was operating as a business in February of

3    2024; is that correct?

4    A.   On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.   Fidelis was operating as a business in March of

8    2024; is that correct?

9    A.   On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.   Fidelis was operating as a business in April of

13   2024; correct?

14   A.   On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.   Fidelis continued to operate as a business

18   throughout 2024; is that correct, Mr. Christo?

19   A.   On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.   Fidelis is still operating as a business; is that

23   correct?

24   A.   On the advice of my counsel, I invoke the fifth

25   amendment privilege and respectfully decline to answer

45

1    the question.
2    Q.   Fidelis continues to offer litigation support
3    services and creditor litigation; is that correct?
4    A.   On the advice of my counsel, I invoke the fifth
5    amendment privilege and respectfully decline to answer
6    the question.
7    Q.   Fidelis continues to pay its employees; correct?
8    A.   On the advice of my counsel, I invoke the fifth
9    amendment privilege and respectfully decline to answer
10   the question.
11   Q.   Fidelis continues to pay its vendors; correct?
12   A.   On the advice of my counsel, I invoke the fifth
13   amendment privilege and respectfully decline to answer
14   the question.
15   Q.   And it continues to pay its independent
16   contractors; is that right?
17   A.   On the advice of my counsel, I invoke the fifth
18   amendment privilege and respectfully decline to answer
19   the question.
20   Q.   Fidelis continues to build its law firm clients;
21   is that correct?
22   A.   On the advice of my counsel, I invoke the fifth
23   amendment privilege and respectfully decline to answer
24   the question.
25   Q.   Fidelis helped its law firm clients convert

46

1   consumers to a contingent fee model representation; is
2   that correct, Mr. Christo?
3   A.   On the advice of my counsel, I invoke the fifth
4   amendment privilege and respectfully decline to answer
5   the question.
6   Q.   And some consumers have converted to a contingent
7   fee model representation; is that correct, Mr.
8   Christo?
9   A.   On the advice of my counsel, I invoke the fifth
10  amendment privilege and respectfully decline to answer
11  the question.
12  Q.   And those law firms that have successfully
13  converted consumers to a contingency fee model of
14  representation are still using Fidelis for litigation
15  support services; is that correct?
16  A.   On the advice of my counsel, I invoke the fifth
17  amendment privilege and respectfully decline to answer
18  the question.
19  Q.   Previously, many of Fidelis's law firm clients
20  charge consumers up front fees before settling any
21  debt; correct?
22  A.   On the advice of my counsel, I invoke the fifth
23  amendment privilege and respectfully decline to answer
24  the question.
25  Q.   In May of 2024, Mr. Christo, you petitioned a

47

1    state court in New York for a certain by copy of your

2    grandmother's birth certificate; is that correct?

3    A.    On the advice of my counsel, I invoke the fifth

4    amendment privilege and respectfully decline to answer

5    the question.

6    Q.    You sought your grandmother's birth certificate

7    because you were filing an application to obtain

8    Italian citizenship; is that correct?

9    A.    On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.    Indeed you used the services of a company called

13   Global Residency and Citizenship Group to obtain

14   Italian citizenship; is that correct?

15   A.    On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.    Global Residency and Citizenship Group helps its

19   clients secure secondary citizenship as a means to

20   protect their financial security amidst changing

21   conditions in their own country; is that correct?

22   A.    On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.    And Global Residency and Citizenship Group helps

48

1    its clients to protect their citizenship as a means to
2    protect their wealth; is that correct, Mr. Christo?
3    A.   On the advice of my counsel, I invoke the fifth
4    amendment privilege and respectfully decline to answer
5    the question.
6    Q.   Mr. Christo, in 2022 and 2023, you transferred
7    assets from Bush Lake to the Viteras Capital; right?
8    A.   On the advice of my counsel, I invoke the fifth
9    amendment privilege and respectfully decline to answer
10   the question.
11   Q.   And in 2023, you transferred assets from Bush
12   Lake Trust to SRG Main Ranch LLC Properties; is that
13   correct?
14   A.   On the advice of my counsel, I invoke the fifth
15   amendment privilege and respectfully decline to answer
16   the question.
17   Q.   In 2023, you transferred assets from Bush Lake
18   Trust to Fidelis; right?
19   A.   On the advice of my counsel, I invoke the fifth
20   amendment privilege and respectfully decline to answer
21   the question.
22   Q.   And the transfer to Fidelis was to pay off a line
23   of credit; is that correct?
24   A.   On the advice of my counsel, I invoke the fifth
25   amendment privilege and respectfully decline to answer

49

1    the question.

2    Q.   Between 2001 and 2023, you transferred assets

3    from Bush Lake Trust to other entities; right?

4    A.   On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.   Mr. Christo, do you have any assets in foreign

8    bank accounts?

9    A.   On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.   Since January 2024, have you moved assets from

13   U.S. accounts to foreign bank accounts?

14   A.   On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.   Are you currently in the process of moving assets

18   from U.S. accounts to foreign bank accounts?

19   A.   On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.   Do you intend in the future to move assets from

23   U.S. accounts to foreign accounts?

24   A.   On the advice of my counsel, I invoke the fifth

25   amendment privilege and respectfully decline to answer

50

1    the question.

2    Q.   Since 2021, you and the Bush Lake Trust have

3    received significant sums of money from Fidelis's

4    intervener law firm clients; is that correct?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   From December 2021 to October 2023, law firms

9    associated with SFS transferred at least $22 million

10   to Fidelis; is that correct?

11   A.   On the advice of my counsel, I invoke the fifth

12   amendment privilege and respectfully decline to answer

13   the question.

14   Q.   Between May 2021 and October 2023, Fidelis

15   transferred more than three and a half million dollars

16   to the Bush Lake Trust; is that correct?

17   A.   On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.   That $3.5 million is money that was paid to

21   Fidelis by law firms associated with SFS; is that

22   correct?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

51

1    Q.    Between May 2021 and September 2023, Fidelis

2    transferred more than $14 million to you personally;

3    is that correct?

4    A.    On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.    That $14 million is money that was paid to

8    Fidelis by law firms associated with SFS; is that

9    correct?

10   A.    On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.    Between May 2023 and September 2023, Fidelis

14   transferred at least 7 million dollars to Viteras

15   Capital LLC; is that correct?

16   A.    On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.    That $7 million was money paid to law firms

20   associated with SFS; is that correct?

21   A.    On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.    You controlled the Viteras Capital LLC including

25   its bank accounts; is that correct?

52

1    A.    On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.    Between March 2023 and October 2023, Fidelis

5    transferred at least $550,000 to BBC Group LLC; is

6    that correct?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    That $550,000 is money that was paid to Fidelis

11   by law firms associated with SFS; is that correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    And you control BBC Group LLC including its bank

16   accounts; is that correct?

17   A.    On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20            MR. DESAI:  I have no further questions.

21   Thank you.

22            THE COURT:  Mr. McNamara?

23            MR. MCNAMARA:  Yes, Your Honor.

24            DIRECT EXAMINATION BY MR. MCNAMARA:

25   Q.    Good morning, Mr. Christo.  My name is Tom

53

1    McNamara.  I'm the receiver in this case, and I'm
2    going to ask you questions related to Fidelis's motion
3    challenging the receivers determination that Fidelis
4    is a receivership defendant and the related order to
5    show cause for contempt against defendants Jason Blust
6    and Lit Def.  Mr. Christo, you filed in corporation
7    documents for Fidelis legal support services Fidelis
8    in 2021; correct?
9    A.   On the advice of my counsel, I invoke the fifth
10   amendment privilege and respectfully decline to answer
11   the question.
12   Q.   And Fidelis provides the same services that Lit
13   Def Strategies LLC or Lit Def provides; correct?
14   A.   On the advice of my counsel, I invoke the fifth
15   amendment privilege and respectfully decline to answer
16   the question.
17   Q.   And you knew Jason Blust owned Lit Def; right?
18   A.   On the advice of my counsel, I invoke the fifth
19   amendment privilege and respectfully decline to answer
20   the question.
21   Q.   You have contended sort of that Lit Def and
22   Fidelis were competitors in the legal services space;
23   isn't that true?
24   A.   On the advice of my counsel, I invoke the fifth
25   amendment privilege and respectfully decline to answer

54

1    the question.

2    Q.    In fact, sir, they are not competitors.  You

3    agreed with Mr. Blust to establish Fidelis for the

4    express purpose of replacing Lit Def as the service

5    company which worked with debt relief law firms which

6    Mr. Blust controlled; isn't that true?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10    Q.    And the reason Mr. Blust asked you to establish

11    Fidelis in your name as a replacement for Lit Def is

12    because Blust was personally sued, his law firm was

13    sued, Lit Def was sued, Relialit was sued numerous

14    times in 2019 and 2020; correct?

15    A.    On the advice of my counsel, I invoke the fifth

16    amendment privilege and respectfully decline to answer

17    the question.

18    Q.    Mr. Blust wanted to get the legal services

19    company out of his name and you agreed to be the owner

20    on paper of Fidelis; right?

21    A.    On the advice of my counsel, I invoke the fifth

22    amendment privilege and respectfully decline to answer

23    the question.

24    Q.    You agreed to be the front owner for Fidelis;

25    right?

55

1    A.    On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.    And in 2021 and 2022, after you established

5    Fidelis as the front owner, Mr. Blust began to

6    transfer the legal work that was previously at Lit Def

7    for the law firms he controlled over to Fidelis isn't

8    that true?

9    A.    On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.    In 2021, Blust directed the Turnbull,

13   T-U-R-N-B-U-L-L, law firms which he controlled to

14   begin using Fidelis; right?

15   A.    On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.    In January of '22, plans were made to transfer

19   the Strategic related law firm debt relief law firms

20   to Fidelis; correct?

21   A.    On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.    And it was Mr. Blust who identified which law

25   firms would be transferred from Lit Def to Fidelis in

56

1    January of '22; correct?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    And he instructed you and defendant Michelle

6    Hinds Gallagher while referred to as Hinds which of

7    these law firms would terminate with Lit Def and begin

8    with Fidelis; didn't he?

9    A.    On the advice of my counsel, I invoke the fifth

10   amendment privilege and respectfully decline to answer

11   the question.

12   Q.    And at the same time, January of 2022, Blust

13   ordered Hinds to begin assigning Lit Def employees to

14   Fidelis work to assist with the Strategic related law

15   firms Blust had migrated to Fidelis beginning in

16   February of 2022; isn't that true?

17   A.    On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.    And he coordinated with Hinds and his payroll

21   company to put these Lit Def employees on Fidelis

22   payroll as well; didn't he?

23   A.    On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

57

1    Q.    And you weren't consulted or involved in any of

2    these actions with which Mr. Blust ordered; were you?

3    A.    On the advice of my counsel, I invoke the fifth

4    amendment privilege and respectfully decline to answer

5    the question.

6    Q.    And after he began to transfer his law firm

7    clients which he controlled and the employees from Lit

8    Def to Fidelis, he continued to monitor and control

9    Fidelis through weekly production reports which were

10   known as file submission reports which Hinds provided

11   Blust every week and which included productivity

12   metrics for Fidelis employees; isn't that right?

13   A.    On the advice of my counsel, I invoke the fifth

14   amendment privilege and respectfully decline to answer

15   the question.

16   Q.    And Blust continued to receive and review these

17   Fidelis productivity reports and make operational

18   decisions for Fidelis until at least January of 2024

19   when this lawsuit was filed; isn't that true?

20   A.    On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.    And you, sir, were not provided the weekly

24   productivity reports that Ms. Hinds generated for you?

25   A.    On the advice of my counsel, I invoke the fifth

58

1    amendment privilege and respectfully decline to answer

2    the question.

3    Q.   And based on these productivity reports and the

4    metrics contained therein, Blust periodically directed

5    Hinds to transfer employees from Lit Def to Fidelis

6    without any consultation or involvement of you; isn't

7    that true?

8    A.   On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.   And Blust also set the bonuses for Fidelis

12   employees in December of '22 and December of '23 just

13   weeks before this lawsuit was filed and instructed

14   Hinds to inform the employees of those bonuses;

15   correct?

16   A.   On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.   For example, in December of 2022, Blust

20   instructed Hinds to pay Hayfa Zayed then a Fidelis

21   employee and Client First Bankruptcy law firm employee

22   a bonus of $2,000 from Fidelis; correct?

23   A.   On the advice of my counsel, I invoke the fifth

24   amendment privilege and respectfully decline to answer

25   the question.

59

1    Q.   And Blust set these bonuses and asked Hinds to

2    inform the employees of these bonuses for Fidelis

3    employees without any consultation or involvement of

4    you; correct?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   And indeed, sir, to the extent you approved these

9    2022 and 2023 bonuses for Fidelis employees as you

10   claim that there were declarations, that approval

11   consists only of authorizing payments using Sure

12   Payroll after Blust had already determined the amounts

13   and Hinds had already told the employees of their

14   bonuses; isn't that correct?

15   A.   On the advice of my counsel, I invoke the fifth

16   amendment privilege and respectfully decline to answer

17   the question.

18   Q.   Similarly, Blust increased the salaries for

19   Fidelis employees without any of your involvement;

20   correct?

21   A.   On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.   Indeed, sir, at the outset of 2021 when you

25   established Fidelis, you and Blust had agreed to move

60

1    all of the law firm clients that Mr. Blust controlled

2    and the Lit Def employees to Fidelis; isn't that true?

3    A.    On the advice of my counsel, I invoke the fifth

4    amendment privilege and respectfully decline to answer

5    the question.

6    Q.    I'm going to talk for a minute about the transfer

7    of assets from Lit Def to Fidelis.  Blust or Lit Def

8    provided all the computers used by the employees at

9    Fidelis; correct?

10   A.    On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.    You also had Lit Def transfer the software, the

14   interface to Strategic and the law firms from Lit Def

15   to Fidelis employees; correct?

16   A.    On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.    So Blust provided all of Fidelis's clients;

20   correct?

21   A.    On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.    Blust through Lit Def also provided most of

25   Fidelis's employees; correct?

61

1    A.    On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.    And Blust through Lit Def provided the

5    infrastructure for Fidelis to operate; isn't that

6    true?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10   Q.    And Blust and Lit Def also provided the funds to

11   Fidelis directly and indirectly; correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    I want to talk for a minute about the $750,000

16   paid by Strategic to Fidelis that you provided

17   declaration statements twice in your declarations.

18   First, you're aware that Christopher Kesterson of K2

19   Financial Management is Blust's long time accountant;

20   correct?

21   A.    On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.    Mr. Kesterson is not your accountant; correct?

25   A.    On the advice of my counsel, I invoke the fifth

62

1    amendment privilege and respectfully decline to answer

2    the question.

3    Q.    And he is not Fidelis's accountant; correct?

4    A.    On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.    At Blust's direction in October of 2021,

8    Kesterson instructed Strategic to pay $750,000 which

9    Strategic owed to Lit Def to Fidelis; isn't that true?

10   A.    On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.    And then you for the next number of months

14   submitted Fidelis invoices to Strategic totaling

15   $750,000, and Strategic paid Fidelis in full; correct?

16   A.    On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.    In your March for 2024 sworn declaration to this

20   Court which is Docket 190-4 at Paragraph 36, you state

21   in Fall of 2021, Strategic Client Support LLC hired me

22   to vet a new software platform.  I was to determine

23   whether the software would integrate with existing

24   systems and ensure that it was stable, reliable and

25   functional.  That was a lie; wasn't it, sir?

63

1    A.   On the advice of my counsel, I invoke the fifth

2    amendment privilege and respectfully decline to answer

3    the question.

4    Q.   And then you state in your second declaration,

5    your second sworn statement to this Court dated March

6    21, 2024, which is at Docket 233-1 at Paragraph 4, you

7    state -- or Paragraph 12, you state as follows.

8              Paragraphs 35 through 38 of my March 4

9    declaration fully address the work I performed vetting

10   software for Strategic Client Support LLC.  I

11   performed that work myself and billed it through

12   Fidelis to fund Bush Lake Trust.  My $750,000 fee paid

13   in installments was compensation arranged between

14   myself and my client.  Again, that sworn testimony to

15   this Court was false; wasn't it, sir?

16   A.   On the advice of my counsel, I invoke the fifth

17   amendment privilege and respectfully decline to answer

18   the question.

19   Q.   In fact, you were never hired by Strategic to

20   perform work vetting the software platform, were you?

21   A.   On the advice of my counsel, I invoke the fifth

22   amendment privilege and respectfully decline to answer

23   the question.

24   Q.   You had no written contract with Strategic

25   relating to this alleged vetting work for $750,000,

64

1    did you?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    Nor did you have a scope of work for this alleged

6    vetting work; correct?

7    A.    On the advice of my counsel, I invoke the fifth

8    amendment privilege and respectfully decline to answer

9    the question.

10    Q.    And in fact, sir, you never performed any work

11    for Strategic in exchange for the $750,000 that was

12    transferred to Fidelis; correct?

13    A.    On the advice of my counsel, I invoke the fifth

14    amendment privilege and respectfully decline to answer

15    the question.

16    Q.    Yeah.    The only communications you ever had with

17    Strategic were the seven invoices you sent to

18    Strategic's accounting department every month;

19    correct?

20    A.    On the advice of my counsel, I invoke the fifth

21    amendment privilege and respectfully decline to answer

22    the question.

23    Q.    And it's true that you fully understand still

24    that at the time you received that money that that

25    $750,000 being paid by Strategic to Fidelis was

65

1    actually owed to Blust or Lit Def at the time that you
2    received those payments; correct?
3    A.    On the advice of my counsel, I invoke the fifth
4    amendment privilege and respectfully decline to answer
5    the question.
6    Q.    And more importantly, sir, you knew the time you
7    offered testimony to this Court not once but twice
8    that the $750,000 Strategic payment to Fidelis was
9    Blust's or Lit Def's funds; correct?
10   A.    On the advice of my counsel, I invoke the fifth
11   amendment privilege and respectfully decline to answer
12   the question.
13   Q.    I'm going to move on to Hayfa Zayed.  Mr.
14   Christo, you stated in your declaration on March 4
15   that you hired Ms. Zayed and that she reports to you
16   and that she was not a Lit Def employee; correct?
17   A.    On the advice of my counsel, I invoke the fifth
18   amendment privilege and respectfully decline to answer
19   the question.
20   Q.    What you failed to note in your declaration is
21   Zayed also reported to Blust during her time of
22   employment with Fidelis; didn't you?
23   A.    On the advice of my counsel, I invoke the fifth
24   amendment privilege and respectfully decline to answer
25   the question.

66

1    Q.    And you were aware, sir, at the time you

2    submitted that declaration Zayed had worked for Blust

3    at his law firm, Client First Bankruptcy; right?

4    A.    On the advice of my counsel, I invoke the fifth

5    amendment privilege and respectfully decline to answer

6    the question.

7    Q.    And you state in that same declaration on March 4

8    that Michelle Gallagher, Ms. Hinds, reports only to

9    you; correct?

10   A.    On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.    But you understood at the time you filed your

14   declaration Ms. Hinds was a long time employee of Mr.

15   Blust and was a front attorney in her own right;

16   correct?

17   A.    On the advice of my counsel, I invoke the fifth

18   amendment privilege and respectfully decline to answer

19   the question.

20   Q.    Sir, just to summarize, Blust owns or controls

21   all of Fidelis's law firm clients; correct?

22   A.    On the advice of my counsel, I invoke the fifth

23   amendment privilege and respectfully decline to answer

24   the question.

25   Q.    And that includes the Turnbull Law Group and all

67

1    of the associated Turnbull firms; correct?

2    A.    On the advice of my counsel, I invoke the fifth

3    amendment privilege and respectfully decline to answer

4    the question.

5    Q.    At the time you filed your declarations in this

6    case and there were three of them March 4, March 21

7    and April 22, 2024, you understood, sir, that you had

8    a number of obligations to cooperate with the

9    receiver; correct?

10   A.    On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.    Indeed, at the time you filed your three

14   declarations in this case, you understood that as an

15   individual in active concert or participation with the

16   defendants in this case that you were restrained and

17   adjoined from trance acting any business of any

18   receivership defendant; correct?

19   A.    On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.    And at the time you filed your three

23   declarations, you understood that as an individual in

24   active concert or participation with the defendants in

25   this case, you were restrained and enjoined from doing

68

1    any act or refraining from doing any act whatsoever to

2    interfere with the receivers taking custody, control,

3    possession or managing the assets of the receivership

4    defendants, in this case Fidelis; correct?

5    A.    On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.    And you knowingly violated the temporary

9    restraining order by continuing to violate or

10   continuing to operate Fidelis which was controlled by

11   Blust after you had knowledge of the TRO; correct?

12   A.    On the advice of my counsel, I invoke the fifth

13   amendment privilege and respectfully decline to answer

14   the question.

15   Q.    And you continued to knowingly violate the

16   preliminary injunction that replaced the TRO by

17   knowingly operating Fidelis; correct?

18   A.    On the advice of my counsel, I invoke the fifth

19   amendment privilege and respectfully decline to answer

20   the question.

21   Q.    And you knowingly violated the TRO and the PI by

22   interfering with the receiver's ability to take

23   custody, control and possession of assets and

24   documents of Fidelis by submitting false testimony to

25   this Court designed to give the appearance that

69

1    Fidelis was owned -- was not owned or controlled by
2    Blust; isn't that true?
3    A.   On the advice of my counsel, I invoke the fifth
4    amendment privilege and respectfully decline to answer
5    the question.
6    Q.   Mr. Blust, I want to talk for a minute about your
7    March 4 declaration to this court, the sworn testimony
8    you provided on that date.
9         MR. PERSONIUS:  Your Honor, just to correct
10   the record, it's Mr. Christo.
11        MR. MCNAMARA:  Oh, I'm sorry.  Did I say Mr.
12   Blust?
13        MR. PERSONIUS:  Yes.
14        MR. MCNAMARA:  I'm sorry.
15   Q.   Mr. Christo, I want to talk about the declaration
16   you provided to the Court on March 4, 2024.  At
17   paragraph 4 you claim Fidelis is my company.  I
18   created it.  I funded it.  My trust owns it and I over
19   see and direct the operations.  Jason Blust has no
20   ownership interest of Fidelis.  He does not receive
21   any money or other benefit from Fidelis and he's not
22   employed by Fidelis and he does not make decisions for
23   Fidelis.  That's what you said in that declaration;
24   correct?
25   A.   On the advice of my counsel, I invoke the fifth

70

1   amendment privilege and respectfully decline to answer
2   the question.
3   Q.    And those claims were false; weren't they?
4   A.    On the advice of my counsel, I invoke the fifth
5   amendment privilege and respectfully decline to answer
6   the question.
7   Q.    You did not fund Fidelis's operation; did you?
8   A.    On the advice of my counsel, I invoke the fifth
9   amendment privilege and respectfully decline to answer
10  the question.
11  Q.    And we've also already gone through it, but in
12  this declaration, you also claim that you were hired
13  to vet software platform by Strategic for $750,000;
14  correct?
15  A.    On the advice of my counsel, I invoke the fifth
16  amendment privilege and respectfully decline to answer
17  the question.
18  Q.    And you told this Court I've been handling these
19  sorts of large scale multi million consulting projects
20  throughout my career; didn't you?
21  A.    On the advice of my counsel, I invoke the fifth
22  amendment privilege and respectfully decline to answer
23  the question.
24  Q.    In your March 21, 2024, declaration, which is
25  Docket 233-1, in Paragraph 4, you state again "In my

71

1    March 4, 2024, declaration, I stated as clearly and
2    absolutely as possible that Jason Blust does not own
3    or control Fidelis."  That's what you said to this
4    Court; correct?
5    A.    On the advice of my counsel, I invoke the fifth
6    amendment privilege and respectfully decline to answer
7    the question.
8    Q.    And that was a false statement to this Court;
9    wasn't it?
10   A.    On the advice of my counsel, I invoke the fifth
11   amendment privilege and respectfully decline to answer
12   the question.
13   Q.    At Paragraph 7 of that same declaration you state
14   Jason Blust is not a consultant for Fidelis and he
15   does not control it in any respect.  He does not set
16   policy.  He does not described strategy, he does not
17   make decisions.  He does not direct operations.  In
18   short, he has no role in the running of Fidelis's
19   business; isn't that what you said?
20   A.    On the advice of my counsel, I invoke the fifth
21   amendment privilege and respectfully decline to answer
22   the question.
23   Q.    And that was false; wasn't it?
24   A.    On the advice of my counsel, I invoke the fifth
25   amendment privilege and respectfully decline to answer

72

1    the question.

2    Q.   At Paragraph 10, sir, of that same declaration,

3    you say Lit Def never transferred any asset, right,

4    duty, obligation or liability to Fidelis.  You said

5    that to this Court; didn't you?

6    A.   On the advice of my counsel, I invoke the fifth

7    amendment privilege and respectfully decline to answer

8    the question.

9    Q.   And that was false; wasn't it?

10    A.   On the advice of my counsel, I invoke the fifth

11    amendment privilege and respectfully decline to answer

12    the question.

13    Q.   And at Paragraph 19 of that same declaration, you

14    began as follows.  From the moment I first heard the

15    receivers allegation, it has mystified me.  Jason

16    Blust simply does not own or control Fidelis in any

17    way, and Fidelis is not and never was Lit Def's

18    successor alter ego.  On behalf of myself and my

19    staff, I earnestly hope that this matter can be

20    promptly put to rest.  Isn't that what you said?

21    A.   On the advice of my counsel, I invoke the fifth

22    amendment privilege and respectfully decline to answer

23    the question.

24    Q.   And that statement was false; wasn't it?

25    A.   On the advice of my counsel, I invoke the fifth

73

1    amendment privilege and respectfully decline to answer

2    the question.

3    Q.   In particular, Jason Blust controlled Fidelis;

4    didn't he?

5    A.   On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.   And Fidelis was indeed assessor to Lit Def;

9    wasn't it?

10   A.   On the advice of my counsel, I invoke the fifth

11   amendment privilege and respectfully decline to answer

12   the question.

13   Q.   Sir, I want to move to your third declaration

14   which was filed on April 22, 2024, in this matter

15   which is a Docket 320-1.  Again, sir, for the third

16   time under oath to this Court, you state Fidelis is my

17   company.  I founded it.  I funded it.  I run it and my

18   trust and the trust I created receives the profits

19   from it.  Isn't that what you said?

20   A.   On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23   Q.   And that was a false statement to this Court;

24   wasn't it?

25   A.   On the advice of my counsel, I invoke the fifth

74

1    amendment privilege and respectfully decline to answer

2    the question.

3    Q.    You filed three declarations in support of the

4    pleadings in this matter; right?

5    A.    On the advice of my counsel, I invoke the fifth

6    amendment privilege and respectfully decline to answer

7    the question.

8    Q.    And these three declarations supported a number

9    of pleadings that you filed related to Fidelis's

10   motion challenging the receiver's determination that

11   Fidelis is a receivership defendant and the related

12   OSC motion for contempt as to Jason Blust and Lit Def;

13   right?

14   A.    On the advice of my counsel, I invoke the fifth

15   amendment privilege and respectfully decline to answer

16   the question.

17   Q.    And you read these pleadings in the declarations

18   before you filed them with the Court; didn't you, sir?

19   A.    On the advice of my counsel, I invoke the fifth

20   amendment privilege and respectfully decline to answer

21   the question.

22   Q.    And your declaration, your sworn statements to

23   this Court and your pleadings contain numerous false

24   arguments, claims and factual statements; isn't that

25   true?

75

1    A.   On the advice of my counsel, I invoke the fifth
2    amendment privilege and respectfully decline to answer
3    the question.
4    Q.   And in fact, it's in one of your pleadings you
5    contended prior to our receipt of the Lit Def emails
6    that the receiver cannot identify a single thing that
7    Jason Blust has ever done to exercise control over
8    Fidelis.  Isn't that what you said in your pleadings,
9    sir?
10   A.   On the advice of my counsel, I invoke the fifth
11   amendment privilege and respectfully decline to answer
12   the question.
13   Q.   And that same pleading, you claimed the evidence
14   uniformly establishes that you exercise complete
15   control over Fidelis.  Isn't that what you said?
16   A.   On the advice of my counsel, I invoke the fifth
17   amendment privilege and respectfully decline to answer
18   the question.
19   Q.   And that same pleading, you claim that suspicion
20   hysteria surrounding Jason Blust has precipitated an
21   effort to seize your business based on run away
22   conjecture.  Isn't that what you said?
23   A.   On the advice of my counsel, I invoke the fifth
24   amendment privilege and respectfully decline to answer
25   the question.

76

1    Q.   In that same pleading you claim the receiver has

2    fixated on commandeering your company because he

3    suspects that someone somehow some way Jason Blust is

4    pulling the strings and reaping profits, and that

5    Fidelis is a receivership defendant and all of this is

6    yielded is nothing but an appalling waste of time.

7    Isn't that what you said?

8    A.   On the advice of my counsel, I invoke the fifth

9    amendment privilege and respectfully decline to answer

10   the question.

11   Q.   I just saw you smiling, Mr. Christo.  Is

12   something funny?

13          MR. HOOVER:  Objection.

14          MR. MCNAMARA:  No, I --

15          MR. HOOVER:  Don't answer that.

16          MR. MCNAMARA:  He's smiling.

17          THE COURT:  Let's go onto the next question.

18   Q.   And none of those claims that I just read to you

19   were true; were they?

20   A.   On the advice of my counsel, I invoke the fifth

21   amendment privilege and respectfully decline to answer

22   the question.

23          MR. MCNAMARA:  Thank you, sir.

24          THE COURT:  Mr. Hoover, are you going to ask

25   anything?

77

```
 1                    MR. HOOVER:  No questions Judge.
 2                    THE COURT:  Mr. Personius.
 3                    MR. PEROSNIUS:  Thank you.  No, Your Honor.
 4                    THE COURT:  You can step down.
 5                    MR. MCNAMARA:  Your Honor, I think the only
 6         one of the things that Mr. Smith reminded me is we
 7         need to move the exhibits in, and I think all parties
 8         agreed to do that.
 9                    MR. HOOVER:  Can Mr. Christo be excused
10         Judge.
11                    THE COURT:  Sure.
12                    MR. HOOVER:  Thank you.  No objection to the
13         receiver's exhibits that were marked.
14                    MR. SANDERS:  No objection.
15                    THE COURT:  Where are we on the -- well, is
16         there anymore witnesses from the plaintiff?
17                    MR. SANDERS:  Nothing further from the
18         plaintiffs, Judge.
19                    THE COURT:  Mr. McNamara?
20                    MR. MCNAMARA:  Nothing, Your Honor.
21                    THE COURT:  Mr. Personius?
22                    MR. PERSONIUS:  No.  Thank you, Your Honor.
23                    THE COURT:  Mr. Hoover?
24                    MR. HOOVER:  No other than I will get a link
25         to our exhibits to the Court, the electronic.
```

78

 1              THE COURT:  Okay.

 2              MR. HOOVER:  They're admitted.  We just have

 3    to send them over.

 4              THE COURT:  What about the exhibits, Ms.

 5    Rados, related to the preliminary injunction?

 6              MS. RADOS:  The first preliminary injunction

 7    hearing?

 8              THE COURT:  Yes.

 9              MS. RADOS:  We can --

10              THE COURT:  It's my understanding you wanted

11    those exhibits admitted?

12              MS. RADOS:  We would ask that those not need

13    to be readmitted.  I believe Mr. Hoover did not agree

14    with that.  I'm willing to give you some reasons as to

15    why we think it would be appropriate to admit them.

16              THE COURT:  It's still in dispute is what

17    you are telling me?

18              MS. RADOS:  I believe it's still in dispute.

19              THE COURT:  I'll hear from you.

20              MS. RADOS:  First of all, they were admitted

21    upon asking at the first hearing, and I think you were

22    cognizant of the fact that at a preliminary injunction

23    stage there is a lower evidentiary standard.  Even

24    hearsay can be admitted, and the Court is fully

25    capable of determining the weight to give even hearsay

79

1    evidence that goes more to the weight than the

2    preclusion issues.

3         You incorporated certain findings of fact

4    from that evidence into the decision in Docket Number

5    183.  Plaintiffs I believe are arguing it's not fair

6    to them because they weren't present.  That argument

7    doesn't really hold water for a couple of reasons.

8    First, their theory is so far as we understand it is

9    that Fidelis is a back room administrative support

10   service.

11        The scope of the first preliminary

12   injunction hearing was clearly limited to the notary

13   process and whether the face-to-face exemption

14   applied.  If Fidelis is indeed far removed from that

15   process, then there can be no prejudice to them by

16   having those exhibits submitted, but under our theory,

17   we think that that evidence is important because our

18   theory is that Fidelis is controlled by Blust.

19   Therefore is going to be with Blust.  Blust was

20   present, fully able to defend himself and raise any

21   objections at that first preliminary injunction

22   hearing, so we don't see any prejudice to Fidelis to

23   any of those exhibits and we see it prejudicial to us

24   not to admit them.  Thank you.

25        THE COURT:  Mr. Hoover?

80

```
1              MR. HOOVER:  Yes, Judge.  Plaintiffs reached
2    out to us Wednesday night at 9 and gave us all of
3    those exhibits and said we'd like to admit them, and
4    all the arguments I made yesterday hold.  Fidelis,
5    first of all, this preliminary injunction motion is
6    not about Blust.  Right?  So the fact that Blust was
7    there is irrelevant.  Fidelis and the relief
8    defendants were not parties at that time.  They didn't
9    have a chance to participate, and honestly, if any of
10   that was important, and those documents as far as I
11   look on a quick scan are ripe with different levels of
12   hearsay, but that was a different hearing, different
13   issues, different parties, and if the plaintiffs
14   wanted to admit them, they should have put them on
15   their exhibit list at least a week out that the Court
16   set.  My suggestion, Judge, unless you feel compelled
17   to rule on it right now that parties can brief whether
18   those should be admitted.
19              THE COURT:  Ms. Rados?
20              MS. RADOS:  I think the question of whether
21   this is about Blust, I think we're alleging an
22   interconnected scheme where everything is in issue
23   with this current preliminary junction.  Blust is a
24   fundamental part of our case, and he was fully able to
25   defend himself at that hearing.  I just note that
```

81

1    Fidelis did actually use one of our preliminary
2    injunction Exhibits, 67, in their evidence, so they
3    had a chance to look through it.  You know, that's it.
4    Thank you.
5              MR. HOOVER:  May I respond briefly, Judge?
6              THE COURT:  Sure.
7              MR. HOOVER:  Yes.  I had a chance to scan
8    them between Wednesday night and now, and we did use
9    one exhibit related to a witness who testified.  You
10   can actually search in Acrobat names.  That's what I
11   did.  We looked at it.  It was admitted.  I understood
12   I looked at the transcript of that hearing and I had a
13   client testify first at the hearing that it was about
14   the face-to-face exemption, and I did a word search on
15   the transcript of the hearing and Fidelis wasn't
16   mentioned at all.  Litigation support services on
17   lawsuits weren't mentioned at all.  I just don't see
18   the relevant for a mass admission.  We like
19   streamlining too.  That's why we agreed to the
20   exhibits that were marked for this, but it seems a
21   little too far, Judge.
22             THE COURT:  All right.  I don't think I can
23   hold off ruling on it because you guys are going to
24   have to brief this issue, and they're going to refer
25   to the exhibits.  So I will overrule your objection.

82

1    They'll file it and you can put in your papers that

2    they referred to this exhibit and you shouldn't

3    consider that for whatever reason.  Okay?

4              MR. HOOVER:  Can we just -- may I, Judge?

5              THE COURT:  Yes.

6              MR. HOOVER:  Can we just reserve our right

7    to offer once those are in anything additional in

8    writing to -- or submission based on those?  It's 68

9    exhibits or 67 exhibits.

10             THE COURT:  No because we're done.  This is

11   the close of the hearing.  All right?  So we'll put a

12   briefing schedule in place.  I guess we're on two

13   different brief schedules or two different issues.

14   Right?  There's the preliminary injunction by the

15   plaintiffs, and then there's the contempt motion by

16   Mr. McNamara.  Mr. Hoover, I assume you'll respond to

17   the preliminary injunction motion.  Mr. Personius will

18   respond to the contempt.

19             MR. Personius:  Yes, Your Honor.

20             MR. HOOVER:  Yes.

21             THE COURT:  Okay.  I'll give you -- we'll do

22   simultaneous briefing.  I'll give two weeks for the

23   initial briefs.

24             THE CLERK:  That would take us to February

25   7.

83

```
 1              THE COURT:  We'll do one week to reply.
 2              THE CLERK:  February 14.
 3              THE COURT:  And we'll set a date for oral
 4    argument for the next one.
 5              THE CLERK:  February 25, it's a Tuesday at
 6    10:30.
 7              MR. CONNORS:  What was the first date, the
 8    initial date for the first date?
 9              THE CLERK:  February 7.
10              MR. CONNORS:  7.
11              THE CLERK:  Yes.
12              MR. PERSONIUS:  I know you always accuse me
13    of having the last word so hopefully this isn't the
14    last word.  The jurisdictional issue that we raised
15    should in their submissions on February 7, Judge, if
16    they choose to, probably mostly the receivers, should
17    that jurisdictional issue be addressed by them --
18              THE COURT:  Sure.
19              MR. PERSONIUS:  -- in their original
20    submission?
21              THE COURT:  Sure.  Mr. McNamara, do you
22    understand that?
23              MS. MCNAMARA:  I think so, and I will talk
24    to Mr. Personius after if I don't.
25              MR. HOOVER:  Could I make one request,
```

84

1   Judge?  Without changing the date, could the initials

2   be due February 10 and the replies February 17,

3   please?

4            THE COURT:  You started not switching the

5   dates and then you ask me to switch the date.

6            MR. HOOVER:  I'm sorry.

7            THE COURT:  Can you go back to those dates?

8            MR. HOOVER:  I meant the argument date

9   without switching the argument date.  Just three

10  additional days for each for everyone.

11           THE COURT:  Any objection?

12           MR. SANDERS:  No objection, Judge.

13           THE COURT:  February 10 and February 17.

14           MR. HOOVER:  Thank you, Judge.

15           THE COURT:  Okay.  Anything else?

16           MR. SANDERS:  Just want the record to know

17  Mr. Hoover raised the last, not me.

18           THE COURT:  Mr. Hoover had one more thing.

19  All right.  Everybody have a safe trip back, and of

20  course, the last word of the day is Go Bills.

21           MR. SANDERS:  Go Bills.

22           (Proceeding concluded at 10:58 A.M.)

23

24

25

85

1                **CERTIFICATE OF COURT REPORTER**

2                I certify that this is a true and accurate

3    record of proceedings in the United States Magistrate

4    Court for the Western District of New York before the

5    Honorable Michael J. Roemer on January 24, 2025.

6

7    S/ Brandi A. Wilkins

8    Brandi A. Wilkins

9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25