## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al.*,

      Plaintiffs,

      v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), *et al.*,

      Defendants, and

STRATEGIC ESOP, *et al.*,

      Relief Defendants.

**CASE NO. 24-cv-40 EAW-MJR**

**PLAINTIFFS' MEMORANDUM[1] OF LAW IN OPPOSITION TO CROSS-MOTION OF DEFENDANTS RYAN SASSON, DANIEL BLUMKIN, ALBERT IAN BEHAR, TWIST FINANCIAL LLC, DUKE ENTERPRISES, LLC, and BLAISE INVESTMENTS, LLC DIRECTING THE CFPB AND RECEIVER TO DISBURSE FUNDS**

## INTRODUCTION

In their opposition to non-party Clover Management, Inc.'s ("Clover") Motion, Defendants Sasson, Blumkin, Behar, Twist Financial, LLC, Duke Enterprises, LLC, and Blaise Investments, LLC (together, the "Moving Defendants") cross-move to modify the Preliminary Injunction's asset freeze and order the CFPB and Receiver to unfreeze assets to meet capital commitments, sell real property, pay late fees and interest, and pay for legal expenses that even their insurers refuse to cover. Dkt. No. 533. Too restless to abide the existing court-approved process directing the parties to work together on requests to unfreeze assets, the Moving Defendants rush to Court seeking immediate relief.

---

[1] This Memorandum is submitted on behalf of the State Plaintiffs only.

But there is no true exigency underlying the Moving Defendants' requests. Indeed, upon closer analysis, there is no compelling reason for the Court to intervene here. Throughout this litigation, Plaintiffs have collaboratively and expeditiously worked to maintain the value of the assets within the scope of the asset freeze. Sometimes, Plaintiffs have sought further information from Defendants before approving requests. Sometimes, the Moving Defendants have not responded timely to those requests. But in all cases, Plaintiffs have worked in good faith to preserve the assets and ensure that redress is possible for the victims of Defendants' illegal debt-relief scheme. The Court should let the collaborative process between the parties unfold, as it has done in the past. *See* Dkt. 282 (order directing parties to work together in resolving request to modify the asset freeze to release certain funds).[2]

Finally, to the extent Defendants Sasson and Behar are asking this Court to modify the Preliminary Injunction to allow uninterrupted access to frozen assets, they should be precluded from doing so due to their own unclean hands.[3] Specifically, they have failed to disclose and repatriate at least $2 million in foreign assets that should be frozen for potential redress to consumers under the Preliminary Injunction.

---

[2] Plaintiff CFPB has recently moved to stay certain deadlines in this case. *See* Dkts. 598, 609. To the extent CFPB is unable to fulfill the asset-unfreezing role it has performed to date, the State Plaintiffs have stepped in to fill that role and continue the timely and orderly processing of asset-unfreezing requests.

[3] Defendants Sasson, Behar, and Blumkin have also appealed the Preliminary Injunction Order, and as such, this Court arguably lacks the ability to modify the terms of that Order, particularly to the broad extent sought by the Moving Defendants. *See* Dkt. 224 at 8 (discussing this argument in Plaintiffs' Resp. to Sasson, Behar, and Blumkin's Emerg. Mot. To Modify the Asset Freeze).

## LEGAL STANDARD

Where, as here, a party seeks to unfreeze assets, "[t]he touchstone of the Court's inquiry is 'equity.'" *S.E.C. v. Ahmed*, 123 F. Supp. 3d 301, 313 (D. Conn. 2015). The moving party must show that the funds they seek "to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *See id.* (cleaned up). "Courts also consider evidence of the moving party's overall assets or income and will deny such requests where parties are found to have other sources of income or were requesting funds for luxuries, not necessities." *Id.* at 313-14 (cleaned up).

## ARGUMENT

1. **An order requiring the Receiver and Plaintiffs to fund all present and future capital calls is unwarranted.**

   A. **The Receiver's non-opposition to Clover diluting the Moving Defendants' interests is entitled to deference.**

After reviewing Clover's motion to lift the stay to dilute the Moving Defendants' membership interests in Funds V and VI, the Receiver notified Clover's counsel that he did not oppose Clover's motion. Dkt. 501-7, ¶ 8. Before that, the Receiver notified Clover's counsel that he would "not be making additional capital contributions to Fund V on behalf of Blaise investments LLC based upon his review of the receivership assets available [to that entity] and his business judgment." Dkt. 501-9. That decision is entitled to deference.

 "[R]eceivers, just like corporate directors, are entitled to the deference of the business judgment rule in their decision-making concerning the management of a corporation." *Golden Pac. Bancorp v. F.D.I.C.*, No. 95-cv-9281 (NRB), 2002 WL 31875395, at *9 (S.D.N.Y. Dec. 26, 2002), *aff'd sub nom. Golden Pac. Bancorp. v.*

*F.D.I.C.*, 375 F.3d 196 (2d Cir. 2004) (*citing Citibank, N.A. v. Nyland (CF8), Ltd.*, No. 86 Civ. 9181(WK), 1990 U.S. Dist. LEXIS 12338, at *8 (S.D.N.Y. Sept. 19, 1990)). Under the Preliminary Injunction, the Receiver has discretion to oppose dilution of receivership assets, and the Receiver's decisions on such matters are entitled to deference under the business judgment rule as he executes these and the many other obligations the PI order places on him. The Preliminary Injunction also gives the Receiver authority to designate entities as receivership defendants and the Receiver's decision on which entities meet that definition should also be given weight. *See Sec. and Exch. Comm'n v. Qin*, No. 20-CV-10849 (JGLC), 2024 WL 5183167, at *4 (S.D.N.Y. Dec. 20, 2024) (granting deference to the Receiver's proposed claims administration and determination procedures in a securities case).

**B.  Plaintiffs are considering Defendant Sasson's request to release funds to pay the capital call from BX Strategic, and the Court should allow this process to unfold.**

Defendant Sasson does not offer a compelling reason to order Plaintiffs to fund the capital call from BX Strategic Partners Secondaries IX Fund, L.P. ("BX Strategic"). While it is true that Sasson received a notice of default dated October 16, 2024, in connection with a $22,500 capital call notice due on September 23, 2024, he does not describe any imminent consequence of that default. *See* Dkt. 533-2. Plaintiffs have serious concerns about releasing additional frozen funds to pay BX Strategic. Sasson's counsel represents that Sasson has honored only $97,500 of his $250,000 capital commitment to BX Strategic, *see* Dkt. 533 at 17, which means that even if Plaintiffs were to release $22,500 to pay the current capital call, Sasson may still ask to unfreeze an additional $130,000 for future capital calls. Because this is such a large amount, Plaintiffs are carefully evaluating the information Sasson provided about his interest in

BX Strategic to determine whether paying this capital call—and thus potentially tying up liquid assets in a less-liquid investment—is in the best interest of the harmed consumers. The Court should allow that process to unfold between the parties, as it has done previously. *See* Dkt. 282 (order denying Defendant Sasson's and Relief Defendants Behar's and Blumkin's motion to modify the asset freeze and directing the parties to collaborate in providing information sought by Plaintiffs to evaluate Defendants' request to release certain funds).

### C.  It would be unjust and premature to order Plaintiffs to pay all future capital commitments.

Not resting with the two specific capital call requests made by Clover and BX Strategic, the Moving Defendants seek an expansive order from the Court requiring the Receiver and Plaintiffs to release funds for all future capital commitments as they arise. Dkt. 533 at 20. But the Moving Defendants offer no details to support such a broad request – *e.g.*, how much capital each has committed for various investments, when those commitments are likely to be called, how much of those respective commitments are outstanding, how seamlessly the Moving Defendants could liquidate the investments if needed to compensate harmed consumers, and, relatedly, whether the investments contain any penalties for such a liquidation.[4] In short, the Moving Defendants fail to justify the broad relief they seek here.

---

[4] Similarly, while the Moving Defendants contend that an Order requiring the payment of all capital calls will allow distributions to be made so that they can pay unspecified tax liabilities, neither Sasson nor Behar identifies any particular tax liabilities. To the extent any tax liabilities exist, Sasson and Behar should first bring them to Plaintiffs' attention before immediately rushing to Court.

**2. The Court should let the parties work out the proposed sale of the 603 Central Avenue property.**

Defendants Sasson and Behar next ask the Court to order the sale of their interests in the real property located at 603 Central Avenue, Union City, New Jersey. Plaintiffs are not opposed to Sasson and Behar selling their stake in the 603 Central Avenue property, as long as they commit that: (1) the sale will be accomplished through an arms-length transaction for fair market value; (2) the property will be independently appraised by someone mutually acceptable;[5] and (3) the sale proceeds will go to and remain in an interest-bearing account subject to the asset freeze pending the outcome of this litigation.

**3. Moving Defendants do not substantiate their sweeping request for payment of all expenses to avoid late fees and interest.**

**A. Exhibit C to Defendants' motion should be disregarded.**

The Moving Defendants implore the Court to order the approval of <u>all</u> payments for the Individual Defendants when due. Dkt. 533 at 18, 22; Dkt. 533-1 ¶ 7; Dkt, 533-4. They submit as Exhibit C a broad summary of late fees and interest that they claim were incurred because of delay by the CFPB and the Receiver, but this summary lacks any account numbers or dates to substantiate when the Moving Defendants incurred these

---

[5] Plaintiffs understand that an appraisal of the 603 Central Avenue property was previously completed at the behest of Tony Theodore, who owns the other 50% stake in the property. Dkt. 533-3 at 29. However, the person retained by Theodore to perform that appraisal, Stephen P. Dougherty of Dougherty & Associates, LLC, was accused by the City of Mahwah, New Jersey in 2022 of illegally renting affordable housing for premium rents in violation of certain city ordinances. *See* Complaint, *Twp. Of Mahwah v. Stephen Dougherty*, BER-L-004858-22 (N.J. Super. Ct. Sept. 7, 2022). Given the nature of those allegations, Plaintiffs believe an appraisal should be redone by another individual.

expenses. *See* Dkt. 533-4. Without those details, the data in this summary cannot be verified by Plaintiffs or the Court and should be disregarded.

Nevertheless, when reviewing the Moving Defendants' cryptic accounting, it appears that many of the late fee and interest expenses are associated with accounts subject to a May 2024 stipulation relating to Sasson, Behar, and Blumkin's investment of a portion of the proceeds from their 2017 sale of Strategic interests into Birds and Timberline. *See* Dkt. 349. Under that stipulation, the parties agreed to unfreeze certain accounts on an automated basis, including those cited by the Moving Defendants here, to pay expenses and service debt. *Id.* at 6-7. More specifically, Plaintiffs suspect that over $1.1 million of the expenses the Moving Defendants note in their accounting as "additional interest" is actually the interest that accrues monthly from the various personal loans used to capitalize the stock of Birds and Timberline 1042 that is paid monthly under the stipulation. *Id.* at 5-6. Put differently, this interest would have accrued regardless, and is being timely paid. Indeed, on February 13, 2025, Plaintiffs received an email from Chase's counsel that confirmed Plaintiffs' impression that the outstanding interest payment due to Chase was a $5,571.19 interest payment owed by Blumkin, a payment which Plaintiffs have already approved. Peters Decl., ¶ 6.

What is more, the late fees listed in the Moving Defendants' accounting seem to have been incurred before May 2024 and the Moving Defendants appear to have ceased incurring additional fees since that time. And future obligations relating to those businesses are being paid through automatic debits from the impacted accounts. *See* Dkt. 349 at 6-7. To be sure, prior to the May 2024 stipulation, there was an initial delay in making payments from the affected accounts. But that is because Plaintiffs needed to ascertain the purpose and ownership of Birds and Timberline 1042, assets that Moving

Defendants failed to disclose in their financial disclosures, and that were associated with real property investment vehicles established by Sasson, Behar, and Blumkin when they sold their interests in StratFS, LLC as part of the employee stock ownership plan (ESOP). Dkt. 349 at 2.

The Moving Defendants do not provide any post-stipulation examples of Plaintiffs or the Receiver unreasonably delaying legitimate payment requests to third parties. That by itself is sufficient reason to deny this aspect of their motion. And to the extent there have been slight delays in acting upon a request to unfreeze assets, those delays have been caused by Plaintiffs' legitimate requests for further information to ensure that any particular release of previously frozen assets is in the best interests of consumers. That type of reasonable delay does not warrant the relief the Moving Defendants seek here and is contemplated by the Court's prior orders in this case. *See* Dkt. 184 § XIII (requiring Defendants and Relief Defendants to provide any information the Receiver deems necessary to discharge duties under the preliminary injunction); Dkt. 282 (denying Sasson, Behar, and Blumkin's motion to modify the Preliminary Injunction's asset freeze and directing the Defendants to provide the Plaintiffs with information requested to facilitate payments of mortgages and other operating costs). Contrary to the Moving Defendants' protestations otherwise, there is nothing manifestly unjust about this court-ordered framework.[6]

---

[6] The Moving Defendants claim in a footnote that the late fee and interest expenses listed in their accounting document constitute excessive fines and penalties in contravention of the Eighth Amendment. Dkt. 533 at 17 n.4. Tellingly, they offer no legal authority holding that late fees and interest owed to third-parties because of an asset freeze constitute excessive fines and penalties under the Eighth Amendment. Their argument is also undermined by the purpose of the asset freeze, which is to preserve the Defendants' assets so that the Court could provide monetary restitution and/or disgorgement of ill-gotten

8

**B. Defendants Sasson, Behar, and Blumkin habitually ask for the release of large sums of money, and Plaintiffs must gather information to make prudent decisions.**

The asset freeze in this case exists to preserve the status quo and the ability for this Court to issue effective final relief for consumers. Dkt. 183. In evaluating requests by Sasson, Behar, and Blumkin to unfreeze assets, Plaintiffs have worked in good faith to pay reasonable expenses while also ensuring that they preserve the frozen assets to effectuate relief for impacted consumers should it ultimately prevail.

But Defendants Sasson and Behar have continuously requested funds to maintain their lavish lifestyles. Their spending patterns suggest that both maintain residences in New York and Miami Beach. Defendant Sasson has requested funds for, among other things, an expensive ski trip to Colorado, fees for a luxury condominium in South Florida, and fees to a club that, in its own words, caters itself to a globally elite clientele. Indeed, Sasson has regularly requested over $50,000/month in living expenses. Defendant Behar has requested funds for trips to the Caribbean and thousands of dollars for pool expenses. Behar has regularly requested over $40,000/month in living expenses.

---

gains to consumers should Plaintiffs ultimately prevail. *See* Dkt. 184, Findings of Fact, ¶¶ 4, 6. The preservation of assets to provide compensatory relief to consumers is "remedial" in nature and thus the late fees and interest expenses incurred because of the asset freeze cannot be characterized as a "fine" actionable under the Eighth Amendment. *See United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016) (noting that forfeitures intended to compensate the government for a loss or to restore property to its rightful owner are outside the scope of the Eighth Amendment's excessive fines clause). And even if the late fees and interest expenses could be characterized as "fines," the Moving Defendants fail to explain how they are excessive here under the prevailing factors that guide this inquiry in the Second Circuit. *See id.* at 110 (identifying factors to analyze whether a forfeiture is unconstitutionally excessive). For all of these reasons, this argument should be rejected.

Requiring Plaintiffs to unfreeze funds to pay all of the Defendants' expenses, regardless of their types or amounts, would undermine the asset freeze and essentially give the Defendants a blank check—a situation in which they have shown they would not hesitate to take full advantage. Indeed, given the protracted nature of this litigation and the extravagance of Defendants' personal expenses that continue to reduce funds available for consumer redress, more—not less—scrutiny is warranted for the expenses claimed by each Defendant.

### C. Moving Defendants should first work with Plaintiffs and the Receiver on requests to unfreeze funds for their legal defense.

As the Moving Defendants readily acknowledge, this is a civil case. And in a civil case, defendants have no constitutional right to counsel, much less an unfettered right to use frozen assets to secure counsel of their own choosing. *See Ahmed*, 72 F.4th at 395 (recognizing that a defendant "has no constitutional right to counsel in [a] civil enforcement action" and "has no right to use tainted assets for his legal defense"); *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) ("A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney.").

The Moving Defendants are not arguing that they lack access to counsel here. They acknowledge that they readily have had such access by drawing on insurance policies to cover their attorneys' fees and legal expenses to date. *See* Dkt. 533 at 18. But recently the Moving Defendants have sought new, and apparently pricier, counsel. Seemingly dissatisfied with their insurers' refusal to pay the rates and retainers of this new counsel, the Moving Defendants have sprinted to Court for relief. Given the foregoing authority, the Court should deny this effort.

Setting the legal authority aside, Plaintiffs have unfrozen assets to pay other Defendants' reasonable legal expenses and are amenable to similar requests from the Moving Defendants so long as they provide redacted invoices and demonstrate that the legal fees are reasonably expended and reflect a reasonable rate in comparison to the prevailing market rates in the Western District of New York. But instead of submitting a request to Plaintiffs with the appropriate documentation, as other defense attorneys in this matter have done thus far, the Moving Defendants prematurely sought the Court's aid to compel Plaintiffs to unfreeze funds. In doing so, the Moving Defendants circumvented a process that this Court approved months ago, when the Blust Family Irrevocable Trust filed a similar motion to no avail. Dkt. 354, at 8-9. The Court should deny the Moving Defendants' attempt to make an end-run.

### 4. Defendants Sasson and Behar are barred from seeking modifications of the asset freeze because they have unclean hands.

Defendants Sasson and Behar should be precluded from modifying the Preliminary Injunction to unfreeze assets because they have failed to comply with the requirements of that order. Specifically, Section VI requires the Asset-Freeze Defendants (which includes Sasson and Behar) to, among other things, provide a full accounting of assets outside the United States and transfer those assets to the United States. Dkt. 184 at § VI. Neither Sasson nor Behar disclosed any such assets in their accounting. Peters Decl. ¶ 10. Yet Plaintiffs recently discovered that Sasson and Behar previously transferred substantial assets to an overseas entity shortly before this lawsuit.

This transfer was made by T.C.I.G., LLC ("T.C.I.G."), an entity in which Sasson and Behar each hold a 50% ownership stake. Peters Decl. ¶¶ 12-14. Specifically, T.C.I.G. transferred $2 million to Yetti Enterprises OU ("Yetti") on July 18, 2023. *Id.* ¶ 16. Yetti

is a company engaged in "sea and coastal passenger water transport" and organized under the laws of Estonia. *Id.* ¶¶ 17-18. The $2 million transfer by T.C.I.G. went to an account at Nordea Bank, AB in Finland, which, on August 27, 2024, entered into a consent order with the New York Department of Financial Services for helping its customers set up "hundreds of offshore accounts for tax-sheltered companies." *Id.* ¶ 21.

A cardinal rule of equity is that a person "who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see also S.E.C. v. Callahan*, 103 F. Supp. 3d 296, 304 (E.D.N.Y. 2015) ("New York courts have long applied the maxim that one who comes to equity must come with clean hands.") (cleaned up). This rule "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co.*, 324 U.S. at 814; *see also Callahan*, 103 F. Supp. 3d at 304 ("Under this doctrine, a party is estopped from making an equitable claim . . . where that party has committed some unconscionable act that is directly related to the subject matter in litigation and injured the party attempting to invoke the doctrine") (cleaned up). Defendants Sasson and Behar have failed to disclose and repatriate $2 million in assets that should be frozen under the Preliminary Injunction Order.

Nor is this the only time that the individual Defendants omitted information from their financial disclosures. For instance, Defendants Sasson, Behar, and Blumkin failed to disclose the fair market value of their interests in the Birds and Timberline entities in their financial disclosures. Plaintiffs later learned that this value was at least in the tens of millions of dollars. *See* Dkt. 224 at 4. Defendants fully disclosed the nature of this asset only after repeatedly making only partial disclosures or explanations. *See* Dkt.

12

224-1, ¶¶ 5-17. This is but another instance in a troubling pattern of individual Defendants failing to fully disclose the nature of their financial interests until and unless Plaintiffs identify the omissions. In any event, Sasson and Behar's nondisclosure here should preclude them from seeking an equitable modification of the asset freeze to obtain additional funds. *See S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1366-67 (S.D. Fla. 2006) (applying doctrine of unclean hands to bar defendant who failed to disclose and diverted assets from an asset freeze from seeking modification of the asset freeze).

## **CONCLUSION**

For the foregoing reasons, the Moving Defendants' cross-motion should be denied.

Dated: February 14, 2025            Respectfully submitted,


                                    LETITIA JAMES
                                    Attorney General of the State of New York

                                    /s/ Christopher L. Boyd
                                    Christopher L. Boyd
                                    Genevieve S. Rados
                                    Assistant Attorneys General
                                    350 Main Street, Suite 300A
                                    Buffalo, NY 14202
                                    Phone: (716) 853-8457
                                    Email: Christopher.Boyd@ag.ny.gov