UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

                             Plaintiffs,          Civ. No. 24-CV-40-EAW-MJR

v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.,

                             Defendants

and

STATEGIC ESOP, et al.,

                             Relief Defendants.
_____

# POST-HEARING MEMORANDUM BY DEFENDANT JASON BLUST AND RELIEF DEFENDANT LITDEF STRATEGIES, LLC

Dated:  Buffalo, New York
          February 24, 2025.

                                        Rodney O. Personius, Esq.
                                        PERSONIUS MELBER LLP
                                        *Attorneys for Defendant*
                                         JASON BLUST
                                        *and Relief Defendant*
                                         LITDEF STRATEGIES, LLC
                                        2100 Main Place Tower
                                        350 Main Street
                                        Buffalo, NY  14202
                                        (716)  855-1050
                                        rop@personiusmelber.com

I. **THE LIMITED CONTEMPT JURISDICTION OF U.S. MAGISTRATE JUDGES**

In our Pre-Hearing Memorandum (Doc. 572), at pages 7-9, the limited contempt jurisdiction of U.S. Magistrate Judges under 28 U.S.C. §636 is discussed. Objection is raised in that pleading to this Court presiding over a hearing addressing the contempt application by the Receiver directed against both Mr. Blust and LitDef Strategies, LLC (LitDef). Further research on this subject has disclosed that this limited jurisdiction does not prevent conducting a hearing to assist the Court in its certification of facts to accompany the referral of the contempt application to the district court pursuant to §636(e). We withdraw our stated objection to the fact-finding undertaken by the Court with the understanding its purpose is limited to assisting the Court's determination of whether the Receiver has adduced sufficient evidence to establish a prima facie case of contempt. We understand the Court's sensitivity to this jurisdictional issue to be reflected in its comments at the close of the oral argument conducted on May 23, 2024. *See* **Exhibit A**, at pages 84-85.

The contempt jurisdiction of a U.S. Magistrate Judge pursuant to §636 is comprehensively outlined in *Church v. Steller*, 35 F.Supp.2d 2015 (N.D.N.Y. 1999). This decision recognizes that, "on a motion for contempt, a magistrate judge functions only to 'certify the facts.'" 35 F. Supp.2d at 217. As referenced above, performance of this responsibility "serves to determine whether the moving party can adduce sufficient evidence to establish a prima facie case of contempt." *Id.* It is in this context that a Magistrate Judge may conduct a factfinding hearing. As part of its performance of this function, "a magistrate judge may recommend that certain sanctions be imposed by the district court upon a finding of contempt." *Id*. On the other hand, "[o]nly a district court may resolve issues of credibility and fact." *Id*. "Whether the conduct of the parties constitutes contempt and any sanctions therefor are committed to the discretion of the district court." *Id.* It has

1

been stated that the jurisdiction of a magistrate judge "with respect to contempt motions is extremely limited." *Tenen v. Winter*, 1996 WL947560 *8 ( W.D.N.Y. No. 94-934S decided July 23, 1996).

The leading circuit court case on this subject is *Taberer v. Armstrong World Industries, Inc.*, 954 F.2d 888 (3d Cir. 1992). Notwithstanding that the factual backdrop consisted of a criminal, as opposed to civil, contempt motion, the *Taberer* decision is recognized as authoritative with respect to the jurisdictional authority of a magistrate judge with respect to this sanction. *See, e.g., Wallace v. Kmart Corp.*, 687 F.3d 86, 90 (3d Cir. 2012). The certification by a magistrate judge "notifies the district court judge of the alleged contempt." 954 F.2d at 903. It is "designed to serve the function of a charging instrument or pleading for a trial to be held before the district judge." *Id*. (footnote omitted).

The *Taberer* decision discusses at length the important difference between a magistrate judge's report and recommendation function pursuant to §636(b)(1)(B), and certification function pursuant to §636(e). "Whereas §636(b)(1)(B) requires the district judge to make a de novo *determination*, §636(e) requires a district judge to conduct a de novo *hearing*." *Id*. at 904 (italics in original). Citing *United States v. Raddatz*, 447 U.S. 667, 675 (1980), the Court explains that a de novo determination requires a district judge to "'consider the record which has been developed before the magistrate and make his own determination on the basis of that record, without being bound to adopt the findings and conclusions of the magistrate.' H.R.Rep. No. 94-1609, 94th Cong, 2d Sess. 3 in 1976 U.S. Code Cong. & Admin. News 6163." *Id*. By comparison, "a de novo hearing entails a new proceeding at which the decision is based solely on the evidence freshly presented at the new proceeding." *Id*. Expanding upon this concept, the Court provides the following explanation:

> In other words, when making a de novo determination, the district court reviews the record before the magistrate judge, but owes no deference to the magistrate judge's findings and conclusions. When holding a de novo hearing, however, the district court acts as a trial court. Because §636(e) specifies that the district judge "shall hear the evidence," albeit "in a summary manner," thereby indicating that a de novo hearing is required (citation), the district judge's de novo determination was not sufficient to comply with this requirement, although it would have satisfied §636(b)(1)(C).

*Id.* (footnotes omitted). Stated in a different way, the de novo hearing procedure required by §636(e)(6) differs substantially from the more customary report and recommendation procedure contemplated by §636(b)(1)(B).

On the subject of consent to proceed before a magistrate judge, the parties to this action did formally agree that, with respect to the original preliminary injunction motion by Plaintiffs (Doc. 5), this court was empowered to "conduct any and all proceedings and enter a final order" with respect to this motion. A copy of this Notice, Consent, and Reference of a Dispositive Motion to a Magistrate Judge (Doc. 158), filed February 13, 2024, is annexed as **Exhibit B**. A determination of that motion was formalized by the Court in a Decision and Order filed on March 4, 2024 (Doc. 184). By comparison, the original contempt application on the part of the Receiver was filed on February 26, 2024 (Doc. 179). In the Memorandum of Law (Doc. 179-1) supporting this application, the contempt violation is framed, at pages 1-2 and 16, as being based upon a violation of the previously issued Temporary Restraining Order (Doc. 12). The Consent filed on February 13, 2024, was expressly limited to the Motion for a Preliminary Injunction. At no point was it proposed, much less agreed, that the later filed contempt motion of the Receiver would be handled on a consent basis. Accordingly, the procedures outlined in §636(e)(6) apply to the disposition of the Receiver's pending contempt application.

3

## II.     THE RECEIVER'S DECLARATION – BASED CONTEMPT ALLEGATION IS PROCEDURALLY DEFECTIVE

As stated above, the Receiver's contempt motion directed against Mr. Blust and LitDef (Doc. 179-1) is solely based upon alleged violations of the Temporary Restraining Order [TRO] (Doc. 12). It springs from the continued operation of LitDef following the issuance of the TRO on January 11, 2024, coupled with Mr. Blust's alleged beneficial ownership and control of Relief Defendant Fidelis Legal Support Services, LLC ("Fidelis"). The motion avers that Fidelis operated "in parallel with, as a proxy of, or as the successor to LitDef." Doc. 179-1 at page 1. The Motion specifically contends that TRO paragraph XIIIB.1 was violated by transacting the business of LitDef after issuance of the TRO through both LitDef and/or Fidelis. *Id*. at 16. It is also claimed that paragraph XIIIB.2 & 3 was violated as a result of the transfer of ESI and assets of LitDef to Fidelis. *Id*.

In responding to this motion, a Declaration signed by Mr. Blust, dated March 14, 2024 (Doc. 211), was filed. In a later submission, the Receiver took the position that this Declaration is perjurious and, without so stating specifically, has argued that it constitutes a second basis for a finding of civil contempt against Mr. Blust. Doc. 347 at pages 1, 2 and 6-8. At no point, however, has the Receiver filed a separate pleading seeking to hold Mr. Blust in civil contempt upon the basis of the contents of this Declaration, nor has the Receiver otherwise identified any order that has been violated by the execution and filing of this Declaration. All that has been alleged is to repeatedly assert that the statements in the Declaration are false, rising to the level of perjury. These procedural shortcomings are fatal to the Receiver's attempt to have Mr. Blust held in civil contempt based upon his March 14, 2024 Declaration.

As noted above, the Receiver first suggested that the Blust Declaration constitutes a separate basis for a finding of civil contempt in a pleading filed on April 29, 2024 (Doc. 347). Since that filing, he has restated this position both in later pleadings and at court appearances; however, a formal motion on the subject has never been filed. Federal Rule of Civil Procedure 7(b)(1) provides that a request for a court order <u>must</u> be made by motion and state "with particularity the grounds for seeking the order" and "the relief sought." (Underlining added for emphasis.) The National Court Rules Committee has linked this motion requirement to considerations of both efficiency and fairness: "By requiring motions and other papers to clearly state their grounds and the relief sought, the rule promotes efficient processing of cases and fairness in proceedings, ensuring that all parties have a clear understanding of what is being requested from the court." (A link to this statement by the National Court Rules Committee may be found at the following: https://www.federalrulesofcivilprocedure.org/frcp/title-iii-pleadings-and-motions/rule-7-pleadings-allowed-form-of-motions-and-other-papers/.)

Under the facts of this case, this dereliction is more than a technical oversight. The failure to file a separate motion seeking sanctions, pursuant to both 28 U.S.C. § 1927 and the Court's inherent authority, was addressed by the Fourth Circuit in *Harvey v. Cable Newscast Network, Inc.*, 48 F.4th 257 (4th Cir. 2022). Instead, this sanction application had been cited by defense counsel in the footnote of a legal memorandum supporting a motion to dismiss. In its opinion, the Court discusses the unfairness to a litigant of having to respond to a request for relief that does not comply with the mandate of Rule 7, citing *Cozzarelli v. Inspire Pharmaceuticals*, 549 F.3d 618 (4th Cir. 2008), and *Sanders v. Callender*, No. CV DKC 17-1721, 2018WL337756, at *7 (D. Md. Jan. 9, 2018). 48 F.4th at 278. In nonetheless concluding that the failure to abide by the dictates of Rule 7 was not fatal, the Court principally relied upon the fact that the sanctions relief being sought

5

rested within the inherent power of the district court, as well as the fact both parties had otherwise been given a full opportunity to brief the underlying issue. *Id.*

Unlike the sanctions application underlying the *Harvey* opinion, there are very specific pleading requirements that attach to an application seeking to hold a party in civil contempt. These requirements distinguish the present case from the holding in *Harvey*, while preserving for consideration the Fourth Circuit's separate recognition of the importance of complying with the motion pleading protocol set forth in Rule 7. In particular, the Receiver explicitly recognizes in his original contempt application that "[a] court may hold a party in contempt for a violation of an order 'if (1) the order the party failed to comply with is clear and unambiguous[.]'" Doc. 179-1 at 12, citing *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Referring to the sanction of civil contempt, the Second Circuit has cautioned that this "power may properly be exercised <u>only if</u> the order is clear and unambiguous [.]" *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir. 1981) [underlining added for emphasis].

At oral argument held on May 23, 2024, the following colloquy regarding the contempt violation associated with the Blust Declaration took place:

> The Court: But that's apart from violating the TRO?
>
> Receiver: It is.
>
> The Court: Right? This is a whole other topic?
>
> Receiver: Right. I think his Declaration relates more to the Fidelis matter, that we're going to have to address.

**Exhibit A** at pages 76-77. Since announcing that the basis for seeking contempt in connection with this Declaration is not the TRO, the Receiver has not identified the clear and unambiguous term of any other order that has been violated.

6

Simply, the alleged falsity of the Declaration notwithstanding, the Receiver has failed to properly frame his contempt application in a pleading as required by Rule 7, and to identify with certainty the clear and unambiguous order which has been violated. The nebulous procedural state of the current record is disqualifying as it relates to any consideration of a contempt sanction with respect to the Blust Declaration. To proceed with an adjudication of this issue would violate the pleading requirements of Rule 7, Mr. Blust's due process rights to fair notice, as well as the well-established requirement that it be proven by the requisite evidentiary standard that the Declaration violated a clear and unambiguous order.[1]

### III.  FACTORS TO WEIGH IN ASSESSING THE QUANTUM OF EVIDENCE OF MATERIAL FALSITY

There is no question that, based upon retrieved emails, the Receiver has shown that Mr. Blust participated with Michelle Hinds in determining the work assignments of employees between LitDef and Fidelis, as well as their compensation. The subject matter of these emails is summarized at pages 10-11 of the Receiver's Hearing Brief (Doc 576). The explanation that has been provided for this level of participation by Mr. Blust in the activities of Fidelis is that, in addition to then being in charge of the day-to-day operations of LitDef, he also had overall supervisory authority over the quality of litigation support offered by both LitDef and Fidelis to

---

[1] Equally objectionable, for the same reasons, as well as its lack of timeliness, is the attempt in the Receiver's Hearing Brief, filed one week before the scheduled hearing, to reframe the contempt issue as it relates to Mr. Blust as "embracing, among other things, Blust's continuing to run Fidelis in stealth; testifying falsely in his deposition; submitting a false declaration about his role with Fidelis; and coordinating this false story with two other witnesses who also submitted false testimony about Blust's role at Fidelis." Doc. 576 at page 30. Also wholly inappropriate is the further invitation in a supporting footnote, again without proper pleading practice, fair notice, or regard for timeliness, that the Court *sua sponte* exercise its "inherent authority to investigate and address perjurious testimony or fraud on the Court as it sees fit." *Id*. n.12. The two decisional authorities cited in this footnote are, as well, factually inapposite to the record in this case. This misguided attempt to unfairly expand Mr. Blust's exposure in a pre-hearing submission is an embodiment of the risk of undue prejudice that is avoided by compliance with Rule 7's motion pleading requirements.

the law firms who participated in offering legal services to clients then participating in the debt settlement program offered by StratFS.

The crux of the Receiver's allegation of falsehood with respect to the Blust Declaration, however, implicates far more than the high-level of employee oversight demonstrated by the Blust/Hinds emails relied upon by the Receiver. The articulated core of his allegation is that Fidelis is beneficially owned and controlled by Jason Blust and, in reality, constitutes a proxy of or a successor to LitDef, much in the way that LitDef was a successor entity to an earlier Blust entity, Relialit, LLC. This allegation is set forth on the first page of the Receiver's original contempt pleading. Doc. 179-1 at page 1.

It is acknowledged by the Receiver that no direct evidence has been identified showing that Mr. Blust has any ownership or other financial interest in Fidelis. Doc. 576 at pages 2 and 12. The Receiver takes this dereliction in his proof head-on later in his pre-hearing submission, contending that he "does not know, and presently has no way of knowing, the exact financial arrangement between Blust and Christo. That is hardly surprising given Blust's experience with using fronts." *Id*. at page 21. Continuing in a supporting footnote, the Receiver relies upon an *ad hominem* attack on Mr. Blust to justify the hole in his evidence, claiming "it is hardly surprising that the exact financial arrangement between Christo and Blust remains undiscovered. There is substantial evidence already in the record that behind-the-scenes financial arrangements are commonplace in many of Blust's operations." *Id*. n.9. All of which is to say that no evidence has been put forward that Jason Blust contributed financially to the formation or operation of Fidelis, or that he derived a financial benefit from its existence. It is these important facts that are the essence of the statements made in the Blust Declaration, none of which have been shown by the evidence unearthed by the Receiver to be inaccurate.

Illustrative of the weakness of the ownership and control claims of the Receiver is the now disproven allegation, characterized in the pleadings as fact, "that Blust's accountant prepared Fidelis's invoices to the Law Firms[.]" Doc. 347 at page 8. When this allegation was disputed, the Receiver responded that the denial constituted a "severe distortion of the facts." *Id.* It was further contended that "Blust has not offered, and cannot offer, an explanation as to why the Law Firms' own accountant, using the email domain of Blust's personal law firm, was creating Fidelis's invoices *to* the Law Firms without admitting the self-evident truth – the Law Firms and Fidelis are under Blust's common control." *Id.* (italics in original).

In a different pleading, filed in connection with the application by Fidelis challenging its characterization as a Receivership Defendant, the Receiver charged that Mr. Blust was "ultimately having his own accountant create and distribute Fidelis invoices to law firms using a clientfirstbankruptcy.com email which is owned by Blust." Doc. 237-1 at page 3. Later in that same pleading, the following statement is made: "Incredibly, these envelope approval pages reflect that the Fidelis invoices were generated by Blust's accountant, Javier Avila, using a Client First Bankruptcy (Blust's law firm) email address (Javier.avila@clientfirstbankruptcy.com)." *Id*. at 7.

The documentation supporting these inaccurate accusations is included in a Declaration of Alexander D. Wall (Doc. 237-2) as **Exhibit "O"** (Doc. 237-17). It was demonstrated during oral argument on May 23, 2024 that the documents included with **Exhibit "O"** had been placed in an incorrect order, which created a misleading impression as to their significance. **Exhibit A** at pages 37-50. When correctly organized, these documents reflect that the Fidelis invoices to the law firms had in fact been prepared by Fidelis, were then reviewed for approval by Michelle Hinds in her

9

capacity as an owner of several law firms, and thereafter paid with the oversight of Mr. Avila, who played no role in their creation.

During the hearing conducted on January 23, 2025, the Receiver directly acknowledged that these documents had been misinterpreted, and the allegations on this subject set forth in two separate pleadings (Doc. 237-1 and 347) are, in all respects, incorrect. *See* **Exhibit C** at pages 168-169. The Receiver's claims associated with Mr. Avila graphically illustrate the need to exercise caution when evaluating the inferences forcefully advocated by him based upon the available evidence. Again, the undisputed fact that Mr. Blust participated in the activities of the employees of LitDef and Fidelis does not by any stretch mean he holds any financial or ownership interest in, or has ever exercised further control over, Fidelis beyond that shown by these emails.

During the January 23, 2025 hearing, Jason Blust did rely upon his Fifth Amendment privilege in response to all questions posed to him. He did so based upon the repeated characterization of his Declaration as perjurious. **Exhibit A** at pages 74 and 76; Receiver's Hearing Brief (Doc. 576) at 30 n.12, and Receiver's Memorandum of Law Supporting Civil Contempt Application Against Christo and Fidelis (Doc. 606-1) at 1. At the May 23, 2024 oral argument, both the Receiver and the Court discussed the prospect of a criminal referral to the United States Attorney's Office based upon the content of this Declaration. **Exhibit A** at pages 76-77. Mr. Blust has also been accused by the Receiver of being a participant in a conspiracy to conceal assets, mislead the Receiver, and commit a fraud on the Court. Receiver's Hearing Brief (Doc. 576) at pages 19, 20, and 30; Receiver's Memorandum of Law Supporting Civil Contempt Application Against Christo and Fidelis (Doc. 606-1) at pages 21 and 22. Faced with these allegations, and upon the recommendation of counsel, he asserted his Fifth Amendment privilege during his January 23, 2025 hearing testimony. Without regard to the merit of the Receiver's repeated

allegations and accusations, a good faith basis for electing to assert the privilege existed. *See Hoffman v. United States*, 341 U.S. 479, 486-487 (1951); *Estate of Fisher v. C.I.R.*, 905 F.2d 645, 649-650 (2d Cir. 1990); *United States v. Miranti*, 253 F.2d 135, 138-139 (2d Cir. 1958).

While Mr. Blust's reliance on his Fifth Amendment privilege does leave open the door to drawing an adverse inference, the underlying purpose for allowing that inference to be drawn in a civil case bears consideration: "The allowance of an adverse inference in civil cases is equitable, not punitive, and serves to vitiate the prejudice to the party denied discovery by invocation of the privilege." *Willingham v. County of Albany*, 593 F.Supp.2d 446, 452 (N.D.N.Y. 2006). In this instance, it can hardly be said that the Receiver has been denied access to discovery. His entire argument is premised upon the substantiated amount of evidence made available to him through the discovery process.

Nor is the drawing of an adverse inference automatic. It should be reserved solely for those instances when it is justified by considerations of equity and fairness:

> Although a Court is entitled to draw an adverse inference against a party to a civil action that refuses to testify under the Fifth Amendment (citation), there is no requirement for the Court to do this. In fact, the drawing of an adverse inference against a litigant who invokes the Fifth Amendment is a harsh remedy that is normally employed to counter a defendant's desire to obstruct discovery or abuse the privilege against self-incrimination.

*Sampson v. City of Schenectady*, 160 F.Supp.2d 336, 351 (N.D.N.Y. 2001).

The finding of liability against a litigant requires more than the drawing of an adverse inference based upon the assertion of the Fifth Amendment: "However, it is equally well-established that an adverse inference drawn from a defendant's invocation of the Fifth Amendment may not be the sole basis for a finding of liability. Independent corroborative evidence of wrong-doing must be shown." *United States v. Nagelberg*, 772 F.Supp. 120, 123 (E.D.N.Y. 1991).

11

In this instance, as the Receiver recognizes (Doc. 179-1 at pages 12-13), the requisite standard of proof required to establish a civil contempt is clear and convincing evidence, which "requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002); *accord, Cricut, Inc. v. APA Technology, Ltd. Co.*, 698 F.Supp.3d 538, 547 (E.D.N.Y. 2023).

It is a respectful position of Mr. Blust that, in order to find his Declaration materially false, more must be proven, whether by direct or circumstantial evidence, than that he participated in determining the work assignments and compensation of Fidelis's employees.[2]

## IV. <u>CONSIDERATIONS AFFECTING RECOMMENDED SANCTION</u>

Should the Court certify the Receiver's contempt application, in whole or in part, to Chief Judge Wolford, and elect to exercise its discretion to recommend a sanction, we respectfully request the following considerations be weighed.

The original basis of the Receiver for seeking the sanction of contempt focused upon the continued operation of LitDef following the issuance of the TRO and Mr. Blust's alleged beneficial ownership and control of Fidelis, which was characterized as "operating in parallel with, as a proxy of, or as a successor to LitDef." Doc. 179-1 at page 1. At page 16 of this pleading, specific paragraphs of the TRO that had been purportedly violated were identified; that is, XIIIB.1 and

---

[2] Aside from perhaps raising question with respect to the bookkeeping practices of StratFS, Fidelis and Mr. Blust, the Receiver's "land the plane with Blust" argument adds nothing to his allegation that the Blust Declaration is materially false. This argument is detailed in the Receiver's Hearing Brief (Doc. 576) at pages 25-29. What is shown by the Receiver's commendably thorough investigation of the matter is simply that Ryan Sasson devised a means to conceal from auditors of Strategic the true purpose of a $750,000 expenditure. In the words of the Receiver, Mr. Sasson hatched a "convoluted method of reimbursing the law firms (Blust) for one-half of a $1.5 million settlement with former Blust network attorney Daniel Rufty. Strategic's Sasson insisted on distancing StratFS from the settlement and masked reimbursement as a 'technologies spend.' This enabled Sasson to deny any relationship between the litigation and the $750,000 payment to Strategic's auditors." *Id*. at pages 26-27. The comment by Strategic's CFO in an email dated March 23, 2022 that "You can land the plane with Blust then as you see fit [,]" has absolutely no bearing on whether Mr. Blust owned or ever held any financial interest in Fidelis. If the Receiver's version of the facts is accepted as true, it speaks solely to the *bona fides* of the parties' bookkeeping practices, and nothing else.

12

XIIIB.2 & 3. In a Declaration of Counsel that was filed on March 14, 2024, at paragraphs numbered 29 and 30, and in the Declaration of Mr. Blust filed on the same date, at paragraph 5, it has been acknowledged that LitDef did continue to operate for a period of time after issuance of the TRO. Doc. 210 and Doc. 211.

Then, at oral argument of the contempt motion on May 23, 2024, it was acknowledged on behalf of Mr. Blust and LitDef that the terms of the TRO were violated from the date of its issuance on January 11, 2024 through the end of the month. **Exhibit A** at page 64. The Receiver later acknowledged at the appearance that this concession had been made and, in doing so, stated that an appropriate sanction would be the award of attorney fees for the cost of having to bring the contempt motion. *Id*. at page 70. Several minutes later, the Receiver made the following two statements: "I believe the contempt has been remedied, right?" and "So there is no longer any ongoing contempt." *Id*. at page 74. The Court then caused the Receiver to reaffirm these acknowledgments, as follows:

> **THE COURT**: They have admitted to running LitDef when they weren't supposed to.
>
> **MR. MCNAMARA**: Right.
>
> **THE COURT**: Right? You say that that's ended, so there is really – so you're not asking for any type of penalty or anything based on what happened with that?
>
> **MR. MCNAMARA**: No. I'm asking for the remedy that you are allowed to provide which is –
>
> **THE COURT**: Attorney's Fees.
>
> **MR. MCNAMARA**: – attorney's fees for having to bring the motion to actually get their attention.

*Id*. at page 76.

Based upon these statements by the Receiver, and provided it is found that the violation of the TRO was willful (*Manhattan Industries, Inc. v. Sweater B by Banff, Ltd*., 855 F.2d 1, 8 [2d Cir. 1989]), the calculation of the Receiver's attorney's fees with respect to the contempt motion filed on February 26, 2024 (Doc. 179) would have a cutoff date of May 23, 2024.

With respect to the issue of the sanction of civil contempt associated with the Blust Declaration, a different consideration applies.[3] In particular, as set forth in the Declaration of Counsel (Declaration) separately filed herewith, attempts on behalf of Mr. Blust and LitDef to settle all issues associated with the Receiver's contempt claims began at the conclusion of the oral argument on May 23, 2024, and continued through February 19, 2025. Following a discussion in the courtroom at the conclusion of argument on May 23rd, an email was sent to the Receiver and his counsel, dated May 23, 2024, which proposed that the feasibility of a stipulated resolution of the contempt issues be explored. Declaration ¶¶6-7. This led to a telephone conversation between counsel on May 31, 2024. Rather than discussing settlement, the discussion focused upon the completion of documentary and e-discovery required by the Receiver. *Id*. ¶¶8-10.

At the conclusion of the two-day hearing on January 24, 2025, outside the courtroom, the topic of settlement was again broached with the Receiver. *Id*. ¶11. A follow-up email on this point was then sent on February 10, 2025. *Id*. ¶¶12-13. The Receiver answered this email nine days later on February 19, 2025, taking the position for the first time that settlement of the contempt issues with Mr. Blust was not feasible unless, based upon the Receiver's position that Mr. Blust has the authority to do so, Fidelis was "turned over." *Id.* ¶14. At no point on or after oral argument on May 23, 2024, had the Receiver ever taken the position that a settlement of the contempt issues associated with Mr. Blust and LitDef required that he "turn over" Fidelis, which is interpreted to

---

[3] The argument which follows is only relevant if the points outlined above regarding both procedural and evidentiary deficiencies associated with using that Declaration as a basis for sanctions are found to lack merit.

14

mean causing Cameron Christo and his counsel to concede that Mr. Christo, Fidelis, and the Bush Lake Trust are all properly named as parties to this proceeding. This belated demand constitutes neither a fair nor reasonable condition to settlement of the Blust and LitDef contempt issues.

If the Court does recommend a sanction regarding these issues as part of its certification of this matter to Chief Judge Wolford, it is respectfully requested that this chronology be taken into consideration and responsibility for the legal fees and expenses of the Receiver in relation to his contempt claims against Mr. Blust and LitDef be cut off as of the date of oral argument on May 23, 2024.

Dated: Buffalo, New York
      February 24, 2025

                                          **/s/ Rodney O. Personius**
                                          Rodney O. Personius, Esq.
                                          PERSONIUS MELBER LLP
                                          *Attorneys for Defendant*
                                             JASON BLUST
                                          *and Relief Defendant*
                                             LITDEF STRATEGIES, LLC
                                          2100 Main Place Tower
                                          350 Main Street
                                          Buffalo, NY  14202
                                          (716)  855-1050
                                          rop@personiusmelber.com