UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al. | |
| Plaintiffs, | Case No. 1:24-cv-00040-EAW-MJR |
| vs. | |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al. | |
| Defendants, and | |
| STRATEGIC ESOP, et al., | |
| Relief Defendants. | |

**RECEIVER'S POST-HEARING BRIEF ON ORDER TO SHOW CAUSE CONTEMPT MOTION RE: JASON BLUST AND LIT DEF STRATEGIES**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF RELEVANT BACKGROUND ................................................. 3

       A.    Blust's Admitted Violation of the PI Regarding Lit Def's Post-TRO
             Operation................................................................................................ 4

       B.    Pre-Hearing Evidence of Blust's Control of Fidelis and Diversion of
             $750,000 Asset to Fidelis........................................................................ 5

             1.    Fidelis and Its Relationship to Blust and Lit Def is Discovered;
                   Blust and Christo Respond............................................................ 5

             2.    Blust Personally Controls Fidelis's Operations ........................... 7

             3.    The StratFS $750,000 Payment to Fidelis as a Reimbursement for
                   Blust ............................................................................................ 10

       C.    Blust's False Declaration of March 14, 2024 ....................................... 11

       D.    Blust's Hearing Testimony and Adverse Inferences Therefrom .......... 13

             1.    Blust Set Up and Generally Controls Fidelis............................. 13

             2.    Fidelis is Lit Def's Proxy or Successor..................................... 14

             3.    Blust Controls Fidelis Employee Hiring and Compensation.................... 14

             4.    Christo is the Front Owner of Fidelis ........................................ 15

             5.    The $750,000 StratFS Paid to Fidelis Was a Diverted Lit Def
                   Asset, Not Compensation for "Vetting" Software..................... 15

             6.    Blust Failed and/or Refused to Cooperate with the TRO ......... 16

       E.    Hinds and Christo's Hearing Testimony and Adverse Inferences
             Therefrom ............................................................................................. 16

             1.    Blust Set Up Fidelis and Controls Its Personnel, Employee
                   Compensation, and Hiring/Firing ............................................. 17

             2.    Fidelis is Lit Def's Proxy or Successor..................................... 19

             3.    All of Fidelis's Business Derives from Jason Blust................... 20

             4.    Blust, Not Christo, Controls Fidelis........................................... 21

             5.    Fidelis Has Received Lit Def Assets ......................................... 22

III.   DISCUSSION .................................................................................................... 24

       A.    Legal Standard for Contempt................................................................ 24

       B.    The Court May Draw Adverse Inferences Against Blust and Lit Def Based
             on the Invocations of the Fifth Amendment by Blust, Hinds, and Christo.......... 25

       C.    Blust and Lit Def Are in Contempt...................................................... 29

             1.    The TRO and PI's court-ordered requirements are clear and
                   unambiguous. ............................................................................. 29

             2.    Clear and convincing evidence establishes that Blust and Lit Def
                   violated the TRO and PI – and continue to violate the PI to this
                   very day...................................................................................... 30

             3.    Blust and Lit Def fail to meet their burden to show they have
                   diligently attempted to comply in a reasonable manner. ......... 31

       D.    Blust and Lit Def Consented to the Magistrate Judge Hearing the
             Contempt Motion .................................................................................. 32

       E.    The Court Should Impose Monetary Sanctions against Lit Def and Blust to
             Compel Cooperation ............................................................................. 34

IV.    CONCLUSION ............................................................................................................. 37

## TABLE OF AUTHORITIES

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
    421 U.S. 240 (1975)..................................................................................... 35

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)..................................................................................... 26

*Bowens v. Atlantic Maintenance Corp.*,
    546 F. Supp. 2d 55 (E.D.N.Y. 2008) ......................................................... 34

*Brinks' Inc. v. City of New York*,
    717 F.2d 700 (2d Cir. 1983) ....................................................................... 27

*Burton v. Northern Dutchess Hosp.*,
    106 F.R.D. 477 (S.D.N.Y. 1985)................................................................ 33

*CFTC v. Emerald Worldwide Holdings*,
    2005 WL 77048 (C.D. Cal. January 3, 2005)............................................ 37

*CFTC v. Skorupskas*,
    605 F. Supp. 923 (E.D. Mich. 1985) .......................................................... 37

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)....................................................................................... 35

*Commissioner of Public Health v. Colandrea*,
    221 Conn. App. 631 (2023) ........................................................................ 37

*Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*,
    951 F.2d 1357 (2d Cir. 1991) ..................................................................... 24

*Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
    2006 WL 1148110 (S.D.N.Y. Apr. 28, 2006) ................................... 25, 29

*Huber v. Marine Midland Bank*,
    51 F.3d 5 (2d Cir. 1995) ..................................................................... 25, 32

*In re Marc Rich & Co.*,
    736 F.2d 864 (2d Cir. 1984) ....................................................................... 25

*Int'l Bus. Machines Corp. v. United States*,
    493 F.2d 112 (2d Cir. 1973) ....................................................................... 36

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
    2006 WL 1148110 (S.D.N.Y. Apr. 28, 2006) ................................... 25, 29

*Lee v. City of New York*,
    2002 WL 1722810 (E.D.N.Y. July 22, 2002)........................................... 33

*LiButti v. United States,*
    107 F.3d 110 (2d Cir. 1997) ............................................................ 17, 26

*Maggio v. Zeitz,*
    333 U.S. 56 (1948).............................................................................. 25

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,*
    885 F.2d 1 (2d Cir 1989) ................................................................... 35

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.,*
    191 F. Supp. 2d 440 (S.D.N.Y. 2002) ............................................... 34

*Paramedics Electromedicina Comercial, LTDA v. GE Med. Sys. Info. Techs., Inc.,*
    369 F.3d 645 (2d Cir. 2004) .............................................. 25, 29, 31, 35

*Perfect Fit Indus., Inc. v. Acme Quilting Co.,*
    673 F.2d 53 (2d Cir. 1982) ................................................................ 35

*Powell v. Ward,*
    643 F.2d 924 (2d Cir. 1981) .............................................................. 35

*Rad Services, Inc. v. Aetna Casualty and Surety Co.,*
    808 F.2d 271 (3d Cir. 1986) .............................................................. 27

*Roell v. Withrow,*
    538 U.S. 580 (2003)............................................................................ 33

*S. New England Tel. Co. v. Global NAPs Inc.,*
    624 F.3d 123 (2d Cir. 2010) .............................................................. 34

*S.E.C. v. Elmas Trading Corp.,*
    824 F.2d 732 (9th Cir. 1987) ............................................................ 37

*S.E.C. v. Hardy,*
    803 F.2d 1034 (9th Cir. 1986) ..................................................... 24, 25

*SEC v. Faulkner,*
    2019 WL 277621 (N.D. Tex. Jan. 22, 2019) .................................... 35

*SEC v. Martino,*
    255 F. Supp. 2d 268 (S.D.NY. 2003) ............................................... 26

*Spallone v. United States,*
    493 U.S. 265 (1990)............................................................................ 24

*United States v. Baroody,*
    2008 WL 4470001 (D. Ariz. June 11, 2008) .................................... 34

*United States v. District Council of New York City,*
    832 F. Supp. 644 (S.D.N.Y. 1993) .................................................... 26

iv

*United States v. Inc. Village of Island Park*,
    888 F. Supp. 419 (E.D.N.Y. 1995) .................................................................. 26, 28

*United States v. International Bhd. of Teamsters*,
    816 F. Supp. 864 (S.D.N.Y. 1992) ...................................................................... 33

*Vuitton et Fils S.A. v. Carousel Handbags*,
    592 F.2d 126 (2d Cir. 1979) ................................................................................ 35

*Walker v. City of Birmingham*,
    388 U.S. 307 (1967)............................................................................................ 24

*Willingham v. County of Albany*,
    593 F. Supp.2d 446 (N.D.N.Y. 2006)........................................................ 26, 27, 28

## I.    INTRODUCTION

Clear and convincing evidence demonstrates that Individual Defendant Jason Blust ("Blust") and the company he controls, Lit Def Strategies LLC ("Lit Def"), are in contempt of Court in numerous ways.  Blust and Lit Def have admitted they intentionally violated the TRO by operating Lit Def after the TRO was issued, while falsely claiming to their own counsel, the Receiver, and this Court the company had been shut down.  But the contemptuous conduct goes well beyond running Lit Def after the TRO; indeed, the most egregious aspects of contempt continue *to this day* – Blust's efforts to keep Lit Def's obvious successor entity, Fidelis Legal Support Services, LLC ("Fidelis"), out of the Receivership.[1]  Blust's desperation to keep Fidelis out of the Receivership drove him to hide his relationship, activity, and assets from the Plaintiffs and Receiver and ultimately to present a false declaration to this Court in an effort to sell a lie: that he had absolutely nothing to do with Fidelis.

The deception was multi-faceted, as not only did Blust submit a false declaration, but his top lieutenant Michelle Hinds and frontman Cameron Christo also submitted a combined total of five false declarations to this Court, offering numerous claims to support the falsehood that Blust had nothing to do with Fidelis.  The lengths to which the three went to sell the false story are extraordinary; Christo and Blust even invented the fanciful story that Christo serendipitously

---

[1] It is important to recall that Blust personally owns and/or controls a broad swath of the various Defendants, Relief Defendants, and Intervenors in this action.  He owns and controls Defendants Lit Def, Relialit, and Fidelis.  He transferred $36,000,000 to Receivership Defendant Blust Trust, an entity that received millions of dollars of advance fee proceeds.  *See* Dkt. No. 281 at 7-8. Based on the Court's findings and Blust's own admissions, he controls the supposedly separate Intervenor Law Firms.  *See, e.g.*, Dkt. No. 183 at 10 & 47; Dkt. No. 281 at 5-6.  Through the Law Firms, which are not listed in his name as owner, Blust routinely received the overwhelming share of their revenues (up to 97%).  All told, Blust and the entities he controls have been responsible for a massive share of the motion practice – especially contempt motions and the Fidelis filings – in this action, with consequent expense to the receivership estate.

started Fidelis, which he was able to do because of his "data wizard" skills and start-up acumen, after fortuitously running into Blust.

For his part, Christo, in obvious coordination with Blust, falsely presented himself to the Court as the owner, operator, and controller of Fidelis and mounted a hyperbolic, aggressive – and utterly false – defense to challenge the Receiver's determination that Fidelis was a Receivership Defendant. And for her part, defendant Michelle Hinds supported this canard by offering her own false testimony that Christo was her "boss" and going so far as to claim Blust would have gotten upset with her if she asked him about a Fidelis matter. But the contemporary documents and the testimony of a former employee make it clear that at the heart of Blust, Hinds, and Christo's testimony lie utter falsehoods. Such flagrant deception, coupled with a refusal to this day to provide access to Fidelis's financial records and turn over control of its business operations, bank accounts, and access, necessitated this OSC Motion.

After all parties had extensively briefed the matter of Blust's contempt, and numerous rounds of briefing on the companion issue of Fidelis's challenge to being named a Receivership Defendant had been received, the Court held a hearing May 23, 2024. At the May 2024 hearing, the Court, after expressing concerns about the evidence in the record confirming that Blust, in fact, controlled Fidelis, and that Christo was the front owner, scheduled an evidentiary hearing and ordered Blust, Hinds, and Christo to appear in court to testify under oath. That evidentiary hearing was ultimately held in January 2025.

Instead of offering evidence to support their claims at the January 2025 hearing, Blust, Hinds, and Christo invoked their Fifth Amendment rights not to testify in response to every question. At the hearing, a former employee of Lit Def and Fidelis testified and established beyond doubt that Fidelis was a successor to Lit Def. The contemporaneous evidence offered in

the record by the Receiver (and by the Plaintiffs in their questioning of the same witnesses) established by clear and convincing evidence the factual predicate for finding Blust and Lit Def in contempt. In civil cases such as this, the Court has broad authority to fashion the appropriate remedy (setting daily fines, awarding attorneys' fees, even imprisonment, if necessary) to coerce compliance with the Court's orders.

As for Blust and Lit Def's recently raised jurisdictional argument that under 28 U.S.C. § 636 that the Magistrate Judge cannot issue a contempt order, the Court need not spend much time on the issue. Blust and Lit Def raised this for the first time in their Pre-Hearing Memorandum in January 2025 – more than ten months after they had already consented to the Magistrate Judge's authority to hear the Receiver's contempt motion – and eight months after they participated in and made lengthy arguments in the OSC hearing in May 2024. In short, the Magistrate Judge is on solid footing to rule on the OSC Contempt Motion.

## II.    SUMMARY OF RELEVANT BACKGROUND

The relevant facts have already been extensively briefed,[2] in particular, for a detailed discussion of the facts and evidence supporting the Blust Contempt Motion, the Receiver refers the Court to his Hearing Brief filed on January 16, 2025 (Dkt. No. 576). The following is

---

[2] For the parties' and Receiver's submissions relating to Blust Contempt Motion, *see generally* Dkt. Nos. 179, 179-1 to 179-16, 210, 210-1, 211, 232, 232-1, 269, 318, 318-1, 323, 323-1, 347, 572, and 576.

Moreover, in light of Blust's control over Fidelis, the Fidelis Receivership Defendant challenge pleadings share significant factual overlap with the Blust OSC Motion. *See, e.g.*, Fidelis's Motion Challenging the Receiver's Determination that Fidelis is a Receivership Defendant (Dkt. No. 190, "Fidelis Receivership Motion"); Receiver's Motion for an Order to Show Cause Why Receivership Defendant Fidelis and Relief Defendant Cameron Christo Should Not Be Held in Civil Contempt (Dkt. No. 606, "Fidelis OSC Motion"); *see also generally* Dkt. Nos. 190-1 to 190-10, 209, 209-1 to 209-9, 212, 212-1 to 212-20, 233, 233-1 to 233-22, 237, 237-1 to 237-18, 270, 270-1 to 270-9, 320, 320-1 to 320-15, and 346 (parties' and Receiver's submissions relating to Fidelis Receivership Motion).

intended to summarize the essential facts necessitating an Order of Contempt against Blust and Lit Def.

### A. Blust's Admitted Violation of the PI Regarding Lit Def's Post-TRO Operation

On January 11, 2024, the Court issued the Temporary Restraining Order ("TRO") identifying Lit Def as a Receivership Defendant. Dkt. No. 12. The TRO imposed a number of cooperation obligations on both Lit Def and on Blust. *See, e.g.*, TRO Sections XI, XIII (Cooperation with Receiver), and XIV (Delivery of Receivership Property). After entry of the TRO, the Receiver and his counsel repeatedly contacted Lit Def's counsel to request compliance and to address questions about Lit Def's Assets, Documents, and operations. *See* Dkt. No. 150 at 5-7. On January 25, 2024, Lit Def's counsel told the Receiver that Lit Def had ceased all operations and laid off all employees upon entry of the TRO. *Id.* Relying on these representations, the Receiver included this information in his Preliminary Report to the Court. *See* Dkt. No. 115-1 at 10-11. Moreover, Defendants, including Blust and Lit Def, jointly represented to the Court that Lit Def had shut down following entry of the TRO. *See* Dkt. No. 149 at 2-3.

These representations to the Receiver and the Court were false. Blust and Lit Def have admitted that Blust did not, in fact, shut down Lit Def or lay off staff upon entry of the TRO, and instead deliberately and flagrantly violated the TRO by continuing to clandestinely operate the company through at least the end of January. Lit Def emails continued to be accessed well after January as well by its former employees working via Fidelis.

While Blust and Lit Def admitted Lit Def continued to operate in violation of the TRO until at least the end of January (*see* Blust Defendants' Pre-Hearing Memorandum, Dkt. No. 572 at 2), this admission was an attempt to hide and minimize the scope and extent of the ongoing

contempt.  The much more egregious contempt involved the continued secretive operations of Fidelis[3] and then the choreographed submission of false sworn testimony designed to keep Fidelis from ever becoming a Receivership Defendant.  The perjurious and coordinated efforts of Blust, Hinds, and Christo to mislead the Court is an affront to the Court and harmed the Receivership by keeping Fidelis out of the estate and precluding access to Fidelis's corporate records and Assets.[4]

**B.      Pre-Hearing Evidence of Blust's Control of Fidelis and Diversion of $750,000 Asset to Fidelis**

      1.      <u>Fidelis and Its Relationship to Blust and Lit Def is Discovered; Blust and Christo Respond</u>

Once alerted to the existence of Fidelis on February 23, 2024, the Receiver's team quickly began investigating the company.  The Receiver's initial investigation was inherently limited, as he did not yet have access to either the email accounts of Lit Def or Fidelis, but the review nevertheless discovered significant evidence that Fidelis was a proxy or successor entity for Lit Def, performing the same functions and under Blust's common control, since at least February of 2022.

---

[3] As reported to the Court, on February 23, 2024, the Receiver discovered that Lit Def was still operational and that Fidelis, an entity previously unknown to the Receiver, was functioning in tandem with Lit Def.  See Dkt. No. 179-1 at 3.

[4] Given the conduct to date (flagrant violations of the PI, coordinated submission of perjurious testimony, and a stubborn refusal to cooperate with the requirements of the PI), there is a significant risk that Fidelis's Assets have been dissipated or its records destroyed.  We are aware the millions of dollars have flowed to and through Fidelis, but we have been stymied in the ability to trace that money.  The first step is getting control of Fidelis, which incredibly continues to be operated to this day in violation of the PI.  By the time it is turned over to the Receiver, however, we have every reason to expect that its active business operations will be non-existent, and Fidelis will have been replaced by another new entity to service currently-operating Blust-related law firms (like Turnbull and Castro) – just as ReliaLit was replaced by Lit Def, and Lit Def was replaced by Fidelis.

Importantly, the Receiver located an October 2021 email thread between StratFS's Controller and Blust's accountant, Chris Kesterson, ostensibly concerning a transfer of $750,000 from StratFS to Blust's Law Firms for a "technology spend." *See* Dkt. No. 179-7. But rather than paying the law firms, Kesterson told Ball the payment should be paid to a company called Fidelis, at "$100k for 7 mos, $50k for 1 month." *Id.* at 5. In a later email exchange between StratFS executives in March 2022 discussing the Fidelis payments, the CFO told the others on the email chain, "You can land the plane with Blust as you see fit," further suggesting that Fidelis was under Blust's control. *See id.* Based on this initial investigation, on February 25, the Receiver notified Fidelis and the parties that Fidelis qualified as a Receivership Defendant.[5]

On February 26, the Receiver filed this OSC Motion. Dkt. No. 179-1. In response, Blust filed a sworn declaration admitting he operated Lit Def after the TRO, directly contradicting what he had told the Receiver and the Court. But he also made a series of false sworn statements adamantly denying that he exercised any control over Fidelis or had ever diverted any assets to the company. Blust's false sworn statements are discussed at Section II.E, below.

On March 4, 2024, Fidelis filed the Fidelis Receivership Motion, in which it denied without reservation that Blust exercised any control over Fidelis and specifically denied that Blust has any influence over Fidelis's "business-development, personnel, and purchasing decisions[.]" Dkt. No. 191, at 9. In support of the Fidelis filing, Christo submitted the first of three sworn declarations in this lawsuit, in which he asserted under oath and without any reservation that Blust "does not make decisions for Fidelis" (Dkt. No. 190-4 at 4) and claimed

---

[5] Pursuant to Section IX.S of the TRO "[i]f the Receiver identifies a non party entity as a Receivership Entity," the Receiver is authorized and directed to "promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court." TRO, Dkt. No. 12, at 24.

the $750,000 payment was his compensation to "vet a new software platform" for StratFS. *Id.* at ¶¶ 36-38.[6]

### 2.    Blust Personally Controls Fidelis's Operations

As the investigation continued, Blust and Christo's story began to unravel. The Receiver's team spoke with former Lit Def and Fidelis employee Katherine Rosenberg, who revealed – in direct contradiction to the story of Blust and Christo that Lit Def and Fidelis were arm's-length competitors – that Fidelis was, in fact, Lit Def's successor entity, with the companies sharing their employees, management, customers, procedures, equipment, and software accounts. *See generally* Dkt. No. 212-1 ¶¶ 4-14. She stated that when she was initially hired, she was contacted by Fidelis but was "put on Lit Def" (*i.e.*, assigned to service Lit Def files), was later transitioned over to servicing Fidelis along with Lit Def files, and was eventually assigned only Fidelis files. *Id.* ¶¶ 6-8. Rosenberg and other Lit Def staff never separately applied to work for Fidelis; they were simply transitioned from Lit Def over to Fidelis while continuing to report to the same manager, Michelle Hinds. *Id.* Hinds told Rosenberg that this transition was a "merger" of Lit Def and Fidelis. *Id.*

On March 20, 2024, Lit Def finally provided the passwords for its email accounts, but only after the OSC had been filed. *See* Dkt. No. 237-1 at 1. The Receiver's team quickly discovered numerous internal communications showing that Blust was directly involved in establishing Fidelis's business operations and personally dictating Fidelis's employee compensation and work assignments, and vendor contracts (directly contradicting the sworn declarations offered to this Court by Blust, Hinds, and Christo). *Id.* at 2-7. For example:

---

[6] Christo's own involvement in this coordinated deception is discussed more fully in the context of the Fidelis OSC Motion. *See* Dkt. No. 606-1 at 7, 13-16, 18-19.

- In January 2022, before Fidelis was assigned any Strategic-related law firm files, Blust told Hinds which employees to switch from Lit Def to Fidelis (which Blust called the "new team") and what their weekly compensation from each company should be.[7] Christo was not included in the discussion.  Dkt. No. 237-3.

- Blust had Hinds conceal the migration from Lit Def to Fidelis from the companies' vendor NDS/LeadTrac.

- Hinds sent Blust (but not Christo) weekly employee productivity reports for both Lit Def and Fidelis for years.  Dkt. No. 237-5.

- Blust periodically instructed Hinds to "move" employees between Lit Def and Fidelis payrolls.  Dkt. Nos. 237-6 & 237-12.

- Blust determined the 2022 and 2023 bonus amounts for all Lit Def *and Fidelis employees*, without Christo's involvement.  Dkt. No. 237-10 & 237-14.

- After the Court issued the TRO and the Receiver had entered StratFS's offices, Blust instructed Hinds to make sure there would be no communication with Strategic, and Hinds passed this along to Fidelis's employees, including Ms. Rosenberg.  *See* Dkt. No. 237-15.

- In his first declaration, Christo insisted that he had personally hired two Fidelis employees, Hayfa Zayed and Kristen Powers, who had never been employed by Lit Def. *See* Dkt. No. 190-4 ¶¶ 26 & 40.  But an email from Zayed discussing the amount of work Blust had assigned her was uncovered.  *See* Dkt. No. 270-4.

- Blust also complained to Hinds that Zayed and Powers's work productivity had declined. Dkt. No. 270-5.

- Blust and Hinds also discussed hiring a new Fidelis employee to work *only* on Fidelis files, not Lit Def files (without including Christo in the conversation).  Dkt. No. 270-6.

- Hinds also told HR manager Lisette Alvarez to pay Zayed a bonus "from Fidelis," and included Blust on the email but not Christo.  *See* Dkt. No. 270-7.

- Blust personally set Fidelis's holiday schedule.  Dkt. No. 270-9.

---

[7] Specifically, Blust told Hinds to pay the transitioned employees "a nominal amount" from Fidelis, "[i]deally…$1,000 a month," and to pay the remainder from Lit Def but gradually increase the proportion of their pay that Fidelis would cover ("eventually it moves to 100% for Fidelis").  Dkt. No. 237-3.

Thus, the Lit Def emails alone demonstrated that Blust and Christo's narrative that Lit Def and Fidelis were independent arm's-length competitors was false and revealed Blust to be in personal control of Fidelis's employee roster, payroll, and workflow. [8]

On April 22, 2024, Fidelis filed a further brief in the related Fidelis Challenge to the Receivership Determination (Dkt. No. 320), accompanied by additional declarations from Christo (his third) (Dkt. No. 321-1) and Hinds (her second) (Dkt. No. 320-3). In their new declarations, both attempted to downplay the contradictions between their prior statements and the Lit Def email evidence.

On May 23, 2024, the Court heard oral argument on the Blust OSC Motion and Fidelis Receivership Motion. After argument, the Court determined an evidentiary hearing was necessary and ordered Fidelis to produce emails to the Receiver. In response, Fidelis made a limited production of emails and text messages that further confirmed Blust's operational control of Fidelis.[9] For example, this production included:

- A text message from Hinds to Christo regarding a falsehood they agreed to tell the NDS/LeadTrac vendor: "[NDS] doesn't know about fidelis because [Blust] doesn't want him to… Essentially the messaging is that we want to create 2 separate paralegal teams." *See* Dkt. No. 606-3 at 3;

- An email from Hinds to Christo, in which Hinds stated she needed to check with Blust regarding Fidelis work assignments. *See* Dkt. No. 606-4; and

- An email exchange showing Blust determined Fidelis's December 2022 employee bonuses and communicating them to Hinds; Hinds then asked Christo to enter the

---

[8] It appears that Fidelis has no revenues other than those from Blust-controlled or related laws firms. Dkt. No. 212, at 10.

[9] Notably, there are major gaps, where there are no texts at all between the two, including during the very relevant period of time here when Fidelis was operational and Lit Def was only handling legacy clients. The reason why there are no texts is unknown, but it suggests Christo had little operational involvement.

bonuses Blust set "on website," referring to Fidelis's payroll account.  *See* Dkt. No. 606-5.

The last item is particularly telling as it reveals Christo as a mere front owner for Fidelis, with Blust unilaterally setting employee bonuses for Fidelis staff and directing Hinds to have Christo mechanically approve the amounts by pushing a button on SurePayroll.[10]

        3.     <u>The StratFS $750,000 Payment to Fidelis as a Reimbursement for Blust</u>

The Receiver's team also eventually uncovered the truth about the $750,000 "technology spend" payment from StratFS to Fidelis: it was a disguised means of reimbursing Blust for half of a $1.5 settlement in litigation involving a former Blust front attorney, Daniel Rufty.  This transaction was discussed in detail in the Receiver's Pre-Hearing Brief (Dkt. No. 576 at 28-32) and the Fidelis OSC Motion (Dkt. No. 606-1 at 16-19).

Briefly, between October 2021 and July 2022, SratFS paid Fidelis $750,000, which Christo claimed in two sworn declarations was compensation for his "vetting" of a new software program for StratFS.  *See* Dkt. No. 190-4 ¶¶ 35-38; Dkt. No. 233-1 ¶ 12.  This claim is demonstrably false.  StratFS records show no evidence of any engagement with Fidelis for work during this period or earlier.  A search of StratFS emails for "Cameron Christo" or "cchristo@fidelissupport.com" revealed only seven threads, all relating to the invoices for the $750,000, with no evidence of a contract, scope of work, deliverables, or correspondence about any consulting services or software "vetting."  Additionally, Brian Reiss, StratFS former Senior Vice President of Technology, stated in a sworn declaration that he had no knowledge of Christo,

---

[10] Christo had attempted to explain away Blust's setting of compensation and bonuses by stating: "I approve and disburse every dollar of ordinary and bonus compensation for every Fidelis employee, using software called SurePayroll.  No Fidelis employee can be paid without my personal authorization."  *Id.* ¶ 8.  But the evidence shows that Christo's "approval" was a mere rubber stamp after Blust actually made the decisions.  *See* Dkt. No. 606-5.

Fidelis, or any IT contractor performing the work Christo described as a "large-scale multi-month consulting project."  *See* Dkt. No. 576-11.  Instead, evidence establishes the $750,000 payment was intended to reimburse Blust for half of the $1.5 million settlement reached with former Blust front attorney Daniel Rufty.  *See* Dkt. No. 576-7; Dkt. No. 576-9 at 2.  The bottom line is that Blust and Sasson conspired to divert a $750,000 asset owed to Lit Def to Fidelis instead.  Christo gladly sent seven false invoices to StratFS to collect the money.  Then, Christo repeated this "vetting" falsehood in his legal briefs and declarations.

### C.    Blust's False Declaration of March 14, 2024

Blust committed perjury when he submitted his declaration (Dkt. No. 211) in his initial response to the Blust OSC Motion.  Notably, this was before the Receiver had spoken with former Lit Def/Fidelis employee Katherine Rosenberg or examined the emails of Lit Def and Fidelis.  Blust's conduct was consistent with his pattern of dishonesty towards the Receiver, the Court, and even his own counsel, dating back to the Receiver's initial efforts to gain control of Lit Def.  In his declaration, Blust stated the following under penalty of perjury:

> 7.  The Receiver's assertion that I own and/or control a company called Fidelis Legal Support Services, LLC ("Fidelis") is flatly false. **I do not control or own Fidelis, and have never owned or controlled Fidelis. Nor did I divert assets or resources of [Lit Def] to Fidelis.**

Dkt. No. 211 ¶ 7 (emphasis added).  On the contrary, the evidence submitted establishes that Blust, not Christo, received weekly productivity reports for Fidelis employees, controlled Fidelis's hiring/firing, employee work assignments, employee compensation, holiday schedule, and relationships with vendors, and provided Fidelis's computers.  Blust also directed a $750,000 reimbursement owed to him by StratFS be diverted to Fidelis.  Blust, Hinds, and Christo all invoked the Fifth Amendment when asked about these matters.  When asked whether this

paragraph of his declaration was false, Blust invoked the Fifth Amendment. *See* Ex. 1 at 51:10-25.

> Over the period 2021 through 2023, as [Lit Def] took on less and less business, and by comparison the business taken on by Fidelis grew, **I became aware that a few employees of [Lit Def] began simultaneously working for Fidelis.** I approved of their doing so provided their work performance for [Lit Def] was not affected….

*Id.* ¶ 10. Far from merely "becoming aware" that a Lit Def employees had begun working for Fidelis, Blust personally decided which Lit Def employees to switch to Fidelis and how much Fidelis would pay them, then instructed Hinds to make it happen. Again, when asked whether this paragraph was false, Blust invoked the Fifth Amendment. *See* Ex. 1 at 51:10-25.

> 11. This arrangement in no fashion involved an interest of any kind on my part, including financial or supervisory, in the operation of Fidelis.

*Id.* ¶ 11. Blust controlled Fidelis's hiring/firing, employee work assignments, employee compensation, holiday schedule, and relationships with vendors, and even received weekly employee productivity reports from Hinds. Once again, when asked whether this paragraph was false, Blust invoked the Fifth Amendment. *See* Ex. 1 at 54:1-12.

> 15. The conclusory allegations in the Receiver's Memorandum of Law, at pages 2 and 6, that Fidelis is "beneficially owned or controlled" by me is false, as is the claim at page 2 of this pleading that Fidelis is "operating in parallel with, as a proxy of, or as successor to" LDS.

*Id.* ¶ 15. Aside from the evidence of Blust's control of the company, Ms. Rosenberg's testimony reveals that Fidelis was in fact "a proxy of, or as successor to" Lit Def. Among other things, the employees of Lit Def were simply switched over to Fidelis and reassigned to work Fidelis files by Blust and Hinds, apparently with little or no involvement by Christo. According to Ms. Rosenberg, Hinds described the transition as a "merger." The employees took their computers with them and maintained the same account and software logins and performed the very same

work.  Blust also invoked the Fifth Amendment when asked about this paragraph.  *See* Ex. 1 at 54:13 – 55:2.

### D.    Blust's Hearing Testimony and Adverse Inferences Therefrom

At the evidentiary hearing on January 23-24, 2025, Plaintiffs and the Receiver examined Blust in detail regarding his relationship with Fidelis, StratFS's $750,000 payment to Fidelis, his sworn declaration, and his cooperation (or lack thereof) with the TRO and PI.  Blust proceeded to invoke his Fifth Amendment privilege in response to every question posed.  As a result, and in light of the inculpatory documentary evidence discussed above, the Court should take an adverse inference with respect Blust's refusal to answer any of the following questions posed to him:

### 1.    Blust Set Up and Generally Controls Fidelis

- "Q. And you controlled Fidelis employees as of January 1, 2024?"  (Transcript of Evidentiary Hearing [Day 1], submitted herewith as **Exhibit 1**, at 12:5-9.)

- Blust was questioned regarding the fact that he controlled which law firms were are assigned to work with Lit Def and which ones were assigned to work with Fidelis.  (*Id.* at 17:16-25.)

- "Q. And you controlled Fidelis on January 1, 2024; correct?"  (*Id.* at 20:18-22.)

- "Q. And you controlled Fidelis on February 23, 2024; correct?"  (*Id.* at 20:23 – 21:2.)

- "Q. After Fidelis was formed, you began shifting litigation defense work from Lit Def to Fidelis; correct?"  (*Id.* at 21:4-18.)

- "Q. You arranged with Cameron Christo to establish Fidelis in 2021 to replace Lit Def Strategies as the entity to service the law firms under your control; isn't that correct?"  (*Id.* at 40:14-21.)

- "Q. And the reason that you asked Christo to establish Fidelis in his name as a replacement to Lit Def is because you personally and your law firm Client First Bankruptcy and your companies Lit Def and Relialit had been sued numerous times in 2019 and 2020.  Isn't that correct?"  (*Id.* at 40:22 – 41:2.)

- "Q. [I]n January of '22 before Fidelis was assigned any Strategic related law firm files, you instructed Hinds …, you determined which law firms were going to terminate with Lit Def and which were going to move to Fidelis; didn't you?"  (*Id.* at 42:17 – 43:1.)

- "Q. [I]n January of 2022, you ordered Hinds to begin assigning Lit Def employees to roles at Fidelis to assist with the Strategic related law firm files that you had transferred to Fidelis; isn't that correct?"  (*Id.* at 43:2-9.)

- Blust was questioned regarding his intent from the outset to move all the Law Firms from Lit Def to Fidelis to insulate himself from future consumer and regulatory lawsuits.  (*Id.* at 46:4-19.)

- "Q. At all times from Fidelis's establishment in 2021 until the entry of the TRO in this case and even after you exercise control of Fidelis; isn't that correct?"  (*Id.* at 46:20-25.)

### 2. Fidelis is Lit Def's Proxy or Successor

- "Q. And most employees of Lit Def and Fidelis worked for both companies?"  (*Id.* at 12:10-14.)

- Blust was questioned regarding his control over whether employees worked for Fidelis or Lit Def, and when they worked for each entity.  (*Id.* at 12:15 – 13:2.)

- "Q. And Fidelis and Lit Def had the same employee handbook with superficial differences; correct?"  (*Id.* at 15:18-22.)

- "Q. And Fidelis is the successor to Lit Def; correct?"  (*Id.* at 20:9-12.)

- Blust was questioned regarding the fact that he or his law firm, Client First Bankruptcy, provided the Surface tablet computers for Lit Def employees, which they retained when they transferred to Fidelis, using the same clientfirstbankruptcy.com login credentials. (*Id.* at 47:20 – 48:14.)

### 3. Blust Controls Fidelis Employee Hiring and Compensation

- Blust was questioned regarding his control over compensation for Lit Def and Fidelis, including annual bonuses for both in 2022-23 and employee raises.  (*Id.* at 15:23 – 17:6.)

- "Q. And you made the final decision on when to hire a new employee at Fidelis; correct?"  (*Id.* at 17:11-15.)

- Blust was asked to confirm that Hinds sent him, but not Christo, weekly production reports ("file submission reports") for Fidelis employees until January 2024.  (*Id.* at 43:10 – 44:4.)

- Blust was asked to confirm that, based on these reports, he would have Hinds transfer employees from Lit Def to Fidelis without consulting Christo.  (*Id.* at 44:5-11.)

- Blust was asked to confirm that he established the bonuses for Fidelis employees in December 2022 and December 2023, without Christo's involvement.  (*Id.* at 44:12 – 45:13.)

14

- "Q. Indeed to the extent that Mr. Christo approved in 2022 or 2023 the bonuses for Fidelis employees that approval consisted only of authorizing the payment using this [SurePayroll] … after you had already determined the amounts and instructed Hinds as to those amounts to it; isn't that correct?"  (*Id.* at 45:14-22.)

- "Q. Similarly, you increased salaries for Fidelis employees without involvement of Christo; isn't that correct?"  (*Id.* at 45:23 – 46:3.)

        4.    <u>Christo is the Front Owner of Fidelis</u>

- "Q. And you have a similar arrangement [to the Rufty arrangement] with Cameron Christo in that Cameron Christo is the owner of Fidelis in name only; correct?"  (*Id.* at 18:21 – 19:1.)

- "Q. And you have a similar arrangement [to the Rufty arrangement] with Cameron Christo and Fidelis in that you received things of value from Cameron Christo and Fidelis; correct?"  (*Id.* at 19:8-13.)

- "Q. And at all times consistent with your arrangement with him Christo acted as a front owner of Fidelis; isn't that correct?"  (*Id.* at 47:1-6.)

        5.    <u>The $750,000 StratFS Paid to Fidelis Was a Diverted Lit Def Asset, Not Compensation for "Vetting" Software</u>

- "Q. The North Carolina Bar investigation made numerous factual findings regarding your involvement of Carolina Legal Services and the front attorney Daniel Rufty; correct?"  (*Id.* at 41:24 – 42:5.)

- "Q. And in turn, Mr. Rufty sued you and Lit Def and Relialit following that investigation; correct?"  (*Id.* at 42:6-10.)

- Blust was asked to confirm that Lit Def funded the $1.5 million settlement with Rufty. (*Id.* at 49:11-18.)

- "Q. But you had an agreement with Ryan Sasson of Strategic that Strategic would reimburse Lit Def for one half of the settlement; isn't that correct?"  (*Id.* at 49:19-24.)

- "Q. Strategic's payment was falsely portrayed as a tech spend … to the law firms; correct?"  (*Id.* at 49:25 – 50:4.)

- "Q. Strategic and Sasson were to disguise the payment in order to conceal the settlement from Strategic's auditors; isn't that true?"  (*Id.* at 50:5-10.)

- "Q. At your direction in October of 2021, Kesterson instructed Strategic to pay the $750,000 reimbursement not to Lit Def but instead to Fidelis; isn't that correct?"  (*Id.* at 50:11-17.)

- "Q. Fidelis through Christo then submitted invoices to [S]trategic and was ultimately paid the full $750,000; isn't that true?" (*Id.* at 50:18-23.)

- "Q. [A] Lit Def asset of $750,000 was thereby transferred to Fidelis; wasn't it?" (*Id.* at 50:24 – 51:3.)

- "Q. Although he submitted invoices Christo provided no services, consultation or 'vetting' of software for Strategic; isn't that true?" (*Id.* at 51:4-9.)

6.    Blust Failed and/or Refused to Cooperate with the TRO

- "Q. You attempted to conceal the existence of your control of Fidelis from the parties in this case and the receiver; isn't that correct?" (*Id.* at 47:7-12.)

- Blust was asked to confirm that on or around January 12, 2024, he received and read the TRO and understood he had obligations to cooperate with the Receiver. (*Id.* at 56:9 – 57:9.)

- "Q. You knowingly violated the TRO by continuing to operate Lit Def after you had knowledge of the temporary restraining order; isn't that true?" (*Id.* at 57:10-15.)

- "Q. And you knowingly violated the temporary restraining order and later the preliminary injunction in this case by knowingly operating Fidelis; isn't that true?" (*Id.* at 57:24 – 58:5.)

- "Q. And you knowingly violated the TRO and the preliminary injunction that replaced it by interfering in the receiver[']s taking the custody, control, possession or managing the assets and documents of this receivership by submitting false testimony designed to give the appearance that Fidelis was not owned or controlled by you; isn't that true?" (*Id.* at 58:6-15.)

With Blust's invocation of his Fifth Amendment rights, along with Christo and Hinds's similar invocations, their coordinated fiction regarding Fidelis collapsed. These invocations, in combination with the extensive emails and documents presented to the Court, amply support all relevant adverse inferences.

**E.    Hinds and Christo's Hearing Testimony and Adverse Inferences Therefrom**

Blust and Hinds also testified at the evidentiary hearing on January 23-24, 2025, and like Blust, both invoked the Fifth Amendment in response to all questioning by Plaintiffs and the Receiver. As discussed in detail below, due to the relationship between Blust, Hinds, and

16

Christo, the Court is entitled to draw adverse inferences against Blust and Lit Def based on the invocations of the Fifth Amendment by Hinds and Christo. *See LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997).

        1.   <u>Blust Set Up Fidelis and Controls Its Personnel, Employee Compensation, and Hiring/Firing</u>

Christo and Hinds were asked numerous questions regarding Blust's control over Fidelis's formation and its staff, including hiring and firing decisions and employee productivity monitoring. They invoked the Fifth Amendment and refused to answer in each instance. Christo was asked the following:

- "Q. Jason Blust controlled whether former Lit Def employees worked at Fidelis; is that right, Mr. Christo?" (Transcript of Evidentiary Hearing [Day 2], submitted herewith as **Exhibit 2**, at 26:17-19).

- Christo was asked to confirm that Blust made all "compensation decisions" and hiring/staffing decisions for Fidelis. (*Id.* at 37:22 – 38:16).

- Christo was asked to confirm that that Paragraph 7 of his March 21, 2024 Declaration – which stated "Jason Blust is not a consultant for Fidelis and he does not control it in any respect. He does not set policy… he does not make decisions. He does not direct operations. In short, he has no role in the running of Fidelis's business" – is false. (*Id.* at 71:13 – 72:1.)

For her part, Hinds was examined extensively regarding Blust's control, including via the following questions, and invoked the Fifth Amendment in response to each one:

- "Q. You answered to Mr. Blust at both Lit Def and Fidelis; correct?" (Ex. 1 at 87:11-15.)

- "Q. You and Mr. Blust jointly made hiring and firing decisions at Fidelis; correct?" (*Id.* at 87:16-20.)

- "Q. Isn't it true that you sent Mr. Blust these [Fidelis and Lit Def file submission] reports up until January 8, 2024 at least?" (*Id.* at 88:9-13.)

- "Q. You sent these reports to Mr. Blust at his request; correct?" (*Id.* at 99:14-18.)

- "Q. Mr. Blust used those reports in part to decide whether to move certain Lit Def staff to Fidelis; correct?" (*Id.* at 89:5-10.)

- "Q. Mr. Blust had the authority to move people from Lit Def to Fidelis; correct?"  (*Id.* at 89:11-15.)

- "Q. Ms. Gallagher, Mr. Blust decided how to compensate Fidelis employees; didn't he?" (*Id.* at 89:21-25.)

- "Q. Mr. Blust instructed you how much of a bonus to pay specifically to Fidelis staff; isn't that right?"  (*Id.* at 90:1-5.)

- "Q. And in addition to just bonuses Mr. Blust controlled Fidelis employees salary including yours; correct?"  (*Id.* at 90:16-21.)

- "Q. At Fidelis when you thought a Fidelis employee was entitled to a raise[,] you asked Blust not Christo for approval; right?"  (*Id.* at 90:22 – 91:2.)

- "Q. Ms. Gallagher, you are aware that Mr. Blust continued to be involved in the operation of Fidelis after entry of the TRO in this matter; correct?"  (*Id.* at 91:3-8.)

- "Q. Mr. Blust emailed you account login information for Fidelis employees after entry of the TRO; correct?"  (*Id.* at 91:9-13.)

- "Q. Mr. Blust directed you on messaging to send to Fidelis employees after this litigation began and after the TRO was entered; right?"  (*Id.* at 91:14-19.)

- "Q. And Mr. Blust instructed you how Fidelis not Lit Def can continue to work with SFS after issuance of the TRO; correct?"  (*Id.* at 91:20-25.)

- "Q. Isn't it true that Mr. Blust regularly made business decisions for Fidelis?"  (*Id.* at 95:16-20)

- "Q. Isn't it true that you knew Mr. Blust had set-up Fidelis to replace Lit Def in 2021 as the entity that would be servicing law firms that were controlled by Mr. Blust?"  (*Id.* at 95:21 – 96:2.)

- "Q. In your declaration[,] you stated under oath that Lit Def and Fidelis were separate companies and that as far as you knew Jason Blust has no role in Fidelis's operation and exercises no control over the running of Fidelis's business; correct? … Q. And that wasn't a truthful statement, was it?"  (*Id.* at 100:22 – 101:8.)

- "Q. And Mr. Blust generally decided on the salaries and raises for all Lit Def and Fidelis employees including you; correct?"  (*Id.* at 102:15-20.)

- "Q. And Mr. Blust decided in 2022 and 2023 bonus amounts for all employees of both Lit Def and Fidelis; correct?"  (*Id.* at 102:21 – 103:1.)

18

        2.    <u>Fidelis is Lit Def's Proxy or Successor</u>

Christo was asked the following regarding Fidelis's status as a proxy or successor of

Lit Def, and he invoked the Fifth Amendment in response to each question:

- "Q. Fidelis is the successor to Lit Def; isn't that true?" (Ex. 2 at 17:22 – 18:1.)

- "Q. Fidelis did not compete with Lit Def for potential debt settlement law firm clients; did it?"[11] (*Id.* at 20:18-22.)

- Christo was asked to confirm that Blust provided Fidelis with all of its clients, most of its employees, and the "infrastructure for Fidelis to operate." (*Id.* at 60:19 – 61:14.)

- Christo was asked to confirm that Paragraph 19 of his March 21, 2024 Declaration – which stated "Jason Blust simply does not own or control Fidelis in any way, and Fidelis is not and never was Lit Def's successor alter ego" – is false. (*Id.* at 72:13 – 73:2.)

For her part, Hinds invoked the Fifth Amendment in response to numerous questions

material to Fidelis's status as Lit Def's proxy or successor:

- Hinds was asked to confirm that Fidelis and Lit Def provided the same services and used the same software to provide those services. (Ex. 1 at 76:3-12.)

- "Q. The services that Lit Def and Fidelis provided were done largely by the same employees; correct?" (*Id.* at 82:24 – 83:3.)

- "Q. When Fidelis was getting underway, Mr. Blust directed you that you should tell assigned attorneys that Fidelis will have the same personnel as Lit Def; right?" (*Id.* at 83:12-18.)

- "Q. And Mr. Blust directed you that when attorneys email Fidelis employees at their Lit Def email account the employee should copy and paste the email into a new email and send it using the Fidelis account; correct?" (*Id.* at 83:19 – 84:1.)

- "Q. Mr. Blust instructed you to conceal the existence of Fidelis from Charles Connor the managing director of National Data Systems; isn't that right?" (*Id.* at 84:2-7.)

- "Q. Mr. Blust directed you to instead tell Mr. Connors that you were setting up a second team instead; correct?" (*Id.* at 84:8-13.)

---

[11] This question, and Christo's refusal to answer, are particularly relevant to the notion that Lit Def and Fidelis are arm's length competitors, a fiction promoted by Blust and Christo that has now entirely collapsed.

- "Q. Mr. Blust also directed you to tell Mr. Connors that Fidelis was the 'same people different name' as Lit Def; right?"  (*Id.* at 84:14-19.)

- "Q. Isn't it true that the two companies Fidelis and Lit Def were interchangeable?"  (*Id.* at 96:3-7.)

- "Q. Isn't it true that the network attorneys or 1099 attorneys as they were called for the law firms that Mr. Blust controlled were the same ones for both Fidelis and Lit Def?"  (*Id.* at 96:8-14.)

- "Q. These companies have the same business operations, same employees, use the same company[] computers, use the same software, had the same customers and worked with all the law firms that were the same controlled by Mr. Blust; correct?"  (*Id.* at 101:14-21.)

### 3. All of Fidelis's Business Derives from Jason Blust

Independent evidence submitted by the Receiver in litigating this motion establishes that all of Fidelis's business derives from law firms that Blust owns or controls.[12]  Christo invoked the Fifth Amendment with respect to the following questions on this topic:

- "Q. And you actually did not bring in any new law firm clients to Fidelis; correct?"  (Ex. 2 at 20:23 – 21:2.)

- "Q. All of Fidelis's law firm clients are those are controlled are Jason Blust; is that correct?"  (*Id.* at 21:3-7.)

- Christo was asked to confirm that Fidelis obtained its law firm clients from Blust, not through its own client development, and that he did not engage in any business development for Fidelis.  (*Id.* at 39:16 – 40:1.)

- Christo was asked to confirm that Blust provided Fidelis with all of its clients, most of its employees, and the "infrastructure for Fidelis to operate."  (*Id.* at 60:19 – 61:14.)

Hinds was also examined regarding the sources of Fidelis's business, and she invoked the Fifth Amendment with respect to the following questions:

- "Q. Mr. Blust decided which law firms were moving from Lit Def to Fidelis; correct?"  (Ex. 1 at 84:20-24.)

---

[12] For a discussion of the Blust's ownership and control of Fidelis's law firm customers, *see* Dkt. No. 209 at 5 (Plaintiffs' Response to Fidelis Motion Challenging Receiver) and Dkt. No. 212 at 14-20 (Receiver's Opposition to Fidelis Receivership Motion).

- "Q. Fidelis's business was entirely generated through Mr. Blust; isn't that right?" (*Id.* at 84:25 – 85:4.)

- "Q. Cameron Christo didn't have any role in getting business for Fidelis, did he?" (*Id.* at 85:5-9.)

- "Q. The entirety of Fidelis's revenue is through law firms controlled or owned by Mr. Blust; isn't that right?" (*Id.* at 85:21 – 86:1.)

    4.    Blust, Not Christo, Controls Fidelis

The evidence before the Court demonstrates that Blust, via his instructions to Hinds, runs Fidelis, while Christo acts as a front owner and has comparatively little involvement in actually overseeing the company.  Christo was asked the following questions about this, and he invoked the Fifth Amendment in response:

- "Q. In fact, you were not involved in overseeing Fidelis's day-to-day litigation support operations; is that correct?" (Ex. 2 at 30:10-12; *see also id.* at 30:13 – 32:24.)

- "Q. Jason Blust controls Fidelis; is that correct?" (*Id.* at 40:24 – 41:2.)

- "Q. Indeed, you are the head of Fidelis in name only; is that correct, Mr. Christo?" (*Id.* at 41:3-7.)

- Christo was asked to confirm that Blust and Hinds, not he, oversaw Fidelis's daily operations.  (*Id.* at 32:25 – 34:10.)

- Christo was asked to confirm that Blust, not he, directed Hinds regarding Fidelis's operations.  (*Id.* at 34:11 – 35:9.)

- "Q. The only work you did for Fidelis was routine administrative tasks designed to uphold the appearance that Fidelis was a company independent from Lit Def; is that right?" (*Id.* at 41:8-14.)

- "Q. You agreed to be the front owner for Fidelis; right?" (*Id.* at 54:24 – 55:3.)

- Christo was asked to confirm that the statement in his April 22, 2024 Declaration – "Fidelis is my company. I founded it. I funded it. I run it and my trust and the trust I created receives the profits from it" – is false.  (*Id.* at 73:13 – 74:2.)

Hinds's refusal to answer questions on this topic further confirms that Blust, not Christo, controls Fidelis.  She was asked:

- "Q. And isn't it true that in January of 2022, before Fidelis was assigned any law firm files, Mr. Blust told you which Lit Def employees to switch over to Fidelis files and Fidelis payroll?" (Ex. 1 at 101:22 – 102:3.)

- "Q. And Mr. Blust told you how to split those employees compensation between Lit Def and Fidelis; correct?" (*Id.* at 102:4-9.)

- "Q. And Mr. Cameron Christo wasn't involved in those conversations; was he?" (*Id.* at 102:10-14.)

- "Q. In fact[,] after Mr. Blust told you what the amounts of the 2022 bonuses would be[,] you informed Fidelis's employees of those bonus amounts before Mr. Christo was even informed of the amounts; is that correct?" (*Id.* 103:4-11.)

- "Q. And Mr. Blust didn't consult Mr. Christo when he decided the 2023 bonuses either; correct?" (*Id.* at 103:12-16.)

- "Q. Isn't it true that Mr. Blust periodically directed you to transfer employees from Lit Def to Fidelis without consulting or involving Mr. Christo?" (*Id.* at 103:24 – 104:4.)

- "Q. Isn't it true that Mr. Christo's entire role regarding bonuses involved simply pushing an approval button at the end of the process?" (*Id.* at 104:5-10.)

- "Q. In Paragraph 28 of your declaration[,] you stated that in your Fidelis work …you would bring matters to Mr. Christo and not Jason Blust; is that correct? … Q. And that wasn't an accurate statement, was it?" (*Id.* at 104:17 – 105:2.)

- "Q. You regularly brought Fidelis matters to Mr. Blust; correct?" (*Id.* at 105:3-7.)

- "Q. You state [in] your declaration that if you had ever asked Mr. Blust for help with a Fidelis matter[,] Blust would have asked you in colorful terms why you were bothering him with a Fidelis matter; correct? … Q. But that wasn't a true statement, was it?" (*Id.* at 105:8-18.)

- "Q. You didn't provide these [file submission] reports to Christo; did you?" (*Id.* at 88:19-23.)

- "Q. Mr. Blust made these [employee] compensation decisions without Christo's involvement; isn't that right?" (*Id.* at 90:11-15.)

    5.    Fidelis Has Received Lit Def Assets

Evidence establishes that Fidelis is in possession of Assets of Lit Def, including, but not limited to, a $750,000 reimbursement and the Microsoft Surface computers utilized by Fidelis

22

staff.  Christo was asked the following questions, and he invoked his Fifth Amendment rights in response:

- Christo was asked to confirm that Paragraph 10 of his March 21, 2024 Declaration – which stated "Lit Def never transferred any asset, right, duty, obligation or liability to Fidelis" – is false.  (Ex. 2 at 72:2-12).

    Specifically, regarding the $750,000 in payments from StratFS to Fidelis, Christo was asked:

- "Q. In fact, you were never hired by Strategic to perform work vetting the software platform, were you?"  (*Id.* at 63:19-23.)

- "Q. And in fact, sir, you never performed any work for Strategic in exchange for the $750,000 that was transferred to Fidelis; correct?"  (*Id.* at 64:10-12.)

- "Q. The only communications you ever had with Strategic were the seven invoices you sent to Strategic's accounting department every month; correct?"  (*Id.* at 64:16-22.)

- "Q. At Blust's direction in October of 2021, [Blust's accountant] instructed Strategic to pay $750,000 which Strategic owed to Lit Def[,] to Fidelis; isn't that true?"  (*Id.* at 62:7-12.)

- Christo was asked whether he understands that the $750,000 was actually owed to Blust or Lit Def when he received it.  (*Id.* at 64:23 – 65:5.)

- Christo was asked whether his statement that he was hired by Strategic to "vet a new software program" was true.  (*Id.* at 41:20 – 42:5, 62:19 – 63:3.)

- Christo was asked to confirm that there is no written contract and no documentation for the supposed "vetting" work.  (*Id.* at 42:6 – 43:9.)

- Christo was asked to confirm that the $750,000 was not compensation for technology consulting.  (*Id.* at 43:10-21.)

- Christo was asked whether his assertion, at Paragraph 12 of his March 21, 2024 Declaration – *i.e.*, "My $750,000 fee paid in installments was compensation arranged between myself and my client" – is false.  (*Id.* at 63:4-18.)

- Christo was asked to confirm that he did not fund Fidelis's operation.[13]  (*Id.* at 70:7-10.)

Hinds was asked the following regarding the Microsoft Surface computers transferred

from Lit Def to Fidelis, and Hinds refused to answer:

- Hinds was asked to confirm that Lit Def and Fidelis employees were provided computers associated with Client First Bankruptcy, that they kept the same computers when they moved from Lit Def to Fidelis, and that "those computers were an asset of Lit Def that were transferred to Fidelis; correct?"  (Ex. 1 at 105:24 – 106:16.)

- "Q. And Fidelis didn't pay anything for [the computers], did it?"  (*Id.* at 106:20-23.)

## III.    DISCUSSION

### A.    Legal Standard for Contempt

Obedience with a court order is required unless and until it has been vacated or reversed,

except in only the rarest of situations.  *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967).

Federal courts have inherent power to enforce their lawful orders through contempt.  *Spallone v.*

*United States*, 493 U.S. 265, 276 (1990); *see also*, *Daval Steel Prod., a Div. of Francosteel Corp.*

*v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (courts possess inherent power to sanction

violations of orders and need not issue warnings before imposing sanctions).  As the contempt

proceedings here are taking place in the context of an equitable receivership, the district court

also has "extremely broad" authority "to supervise an equity receivership and to determine the

appropriate action to be taken in [its] administration[.]"  *S.E.C. v. Hardy*, 803 F.2d 1034, 1037

(9th Cir. 1986).[14]

---

[13] The inference here is that StratFS's $750,000 in payments to Fidelis in October 2021 to July 2022 – the time period when Fidelis was being brought online – provided the initial funding for the company.

[14] As the *Hardy* court wrote: "The basis for broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions… we have acknowledged that a primary purpose of equity

A civil contempt order is designed to be coercive rather than punitive. *See Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir. 1995). A party may be held in civil contempt for failing to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 2006 WL 1148110, at *5 (S.D.N.Y. Apr. 28, 2006) (quoting *Paramedics Electromedicina Comercial, LTDA v. GE Med. Sys. Info. Techs., Inc.,* 369 F.3d 645, 655 (2d Cir. 2004) (internal quotation marks omitted)); *see also Huber,* 51 F.3d at 10.

Once clear and convincing evidence of noncompliance with a clear and unambiguous court order is demonstrated, "the alleged contemnor bears the burden of producing evidence of his inability to comply." *Id.* (gathering cases); *see also In re Marc Rich & Co.,* 736 F.2d 864, 866 (2d Cir. 1984) ("[t]he burden of proving *plainly and unmistakably* that compliance is *impossible* rests with the contemnor") (emphasis added). The alleged contemnor must provide evidence that he has "diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina,* 369 F.3d at 655. If the alleged contemnor "offers no evidence as to his inability to comply ... or stands mute," he has not met his burden. *Id.* (quoting *Maggio v. Zeitz,* 333 U.S. 56, 75-76 (1948)).

## B. The Court May Draw Adverse Inferences Against Blust and Lit Def Based on the Invocations of the Fifth Amendment by Blust, Hinds, and Christo

Where parties or material witnesses invoke their Fifth Amendment rights against self-incrimination in response to questions, the Court has broad discretion to draw adverse inferences

---

receiverships is to promote orderly and efficient administration of the estate by the district court[.]" *Id.* at 1037-38.

that the testimony the witnesses would have offered would not be favorable to them. *See Baxter v. Palmigiano*, 425 U.S. 308 (1976); *LiButti*, 107 F.3d at 121; *SEC v. Martino*, 255 F. Supp. 2d 268, 282 (S.D.NY. 2003) (drawing negative inference from assertion of Fifth Amendment in summary judgment context). Adverse inferences are properly admitted against parties where they are supported by other independent corroborative evidence. *See, e.g.*, *United States v. Inc. Village of Island Park*, 888 F. Supp. 419, 432 (E.D.N.Y. 1995).

The Court may also draw adverse inferences against parties based on the invocations of the Fifth Amendment by other parties in the case or non-parties. To impute a witness's Fifth Amendment invocation to another person or entity, there must be some relationship or loyalty established between the witness and the other party. *LiButti*, 107 F.3d at 122. There are no bright-line rules to do this. Whether to impute an adverse inference will be based on the particular circumstances of each case, including consideration of the following: the nature of the relevant relationships; the degree of control of the party over the non-party witness; the compatibility of interests; and the role of the non-party witness in the litigation. *Id.* at 122-23. However, "[w]hether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Willingham v. County of Albany,* 593 F. Supp.2d 446, 452-53 (N.D.N.Y. 2006) (quoting and discussing *LiButti*); *see also United States v. District Council of New York City*, 832 F. Supp. 644, 651-52 (S.D.N.Y. 1993).

In *LiButti*, the Second Circuit held that the district court did not abuse its discretion when giving considerable weight to an adverse inference based on the invocation by the plaintiff's father, a non-party. 178 F.3d at 120. The Second Circuit held: "An adverse inference may be

given significant weight because silence when one would be expected to speak is a powerful persuader." *Id; see also Brinks' Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (adverse inference based on former employee's Fifth Amendment assertion); *Rad Services, Inc. v. Aetna Casualty and Surety Co.*, 808 F.2d 271, 275-76 (3d Cir. 1986) (adverse inference based on assertion by party's present and former employees); *Willingham*, 593 F. Supp.2d at 453 (extending logic of *LiButti* to adverse inferences against party based on invocation by another party in the case).

Here, the decisions of Blust, Hinds, and Christo to invoke prevented the Receiver from discovering the facts relevant to this OSC Contempt proceeding and have deprived the Receiver and the Parties from being able to cross-examine them regarding their prior sworn false statements to the Court. They invoked the Fifth Amendment and remained silent only ***after*** they had offered a defense based on falsehoods, which was based on a staggering six false and misleading declarations submitted to the Court (one by Blust, two by Hinds, and three by Christo).

In light of Blust's invocation of the Fifth Amendment during the January 23-24 evidentiary hearing, the Court is permitted to take numerous adverse inferences regarding his control of Fidelis. These include, among other things, that:

- Blust set up Fidelis as a proxy or successor to Lit Def in light of mounting litigation against Lit Def;
- Blust's various law firms constitute Fidelis's entire customer base;
- Blust provided the employee computers for Lit Def, which were subsequently transferred to Fidelis when Lit Def's staff was switched to Fidelis;
- Blust controlled Fidelis's relationships with vendors and arranged for Fidelis to take over Lit Def's NDS/LeadTrac contract;
- Blust decided on Fidelis's initial staffing and payroll and has personally controlled its staffing and payroll since;
- Blust personally monitored Fidelis's employee work and made all decisions regarding employee compensation, via instructions to Hinds, without Christo's involvement; and

- Christo has comparatively little involvement in Fidelis's operations, has no involvement in generating its business, and is a front owner of the company.

Further, based on the refusal of Blust and Christo to answer questions regarding the $750,000 payment from StratFS to Fidelis, and the documentation submitted by the Receiver indicating that it is a disguised reimbursement actually owed to Lit Def, the Court should also adversely infer that Blust arranged for this Lit Def asset to be transferred to Fidelis and fraudulently concealed the transfer with Christo's assistance. These inferences are supported by substantial independent corroborative evidence and by pointed questioning during the evidentiary hearing. *See Village of Island Park*, 888 F. Supp. at 432.

These adverse inferences against Blust and Lit Def are further supported by the invocations of both Christo and Hinds at the January 23-24 evidentiary hearing. The Court may properly draw these adverse inferences under *LiButti* based on a consideration of the relevant factors. *See* 178 F.3d at 120; *Willingham*, 593 F. Supp. 2d at 453. In this case, Blust, Hinds, and Christo obviously share an interest in preventing Fidelis from becoming a Receivership Entity. The hearing testimony of Christo and Hinds was relevant to Fidelis's opposition to Plaintiffs' PI Motion and also the Fidelis Receivership Motion. Thus, they were incentivized, like Blust, to deny that Blust controls Fidelis. It is therefore beyond reasonable dispute that adverse inferences against Blust can also be drawn from the invocations of the Fifth Amendment by Hinds and Christo.

The specific adverse inferences arising from Christo and Hinds's testimony largely overlap those arising from Blust's testimony. They include at least the following:

- Blust established Fidelis as a proxy or successor for Lit Def;
- Fidelis inherited Lit Def's customers, staff, management, computer equipment, software accounts, and vendor relationships;
- Blust supervised Fidelis's operations and dictated its employee roster and compensation;

28

- Blust and Hinds jointly made the hiring and firing decisions for Fidelis;
- Hinds approached Blust, not Christo, regarding employee compensation matters;
- Blust continued to instruct Hinds regarding Fidelis's relationship with StratFS even after entry of the TRO;
- All of Fidelis's business comes from Blust-related law firms,
- Christo does not independently generate business for Lit Def;
- Christo is mostly uninvolved in Fidelis's day-to-day operations and serves as the company's front owner for Blust's benefit;
- Lit Def transferred its employee computers to Fidelis without receiving compensation;
- Blust arranged for StratFS to pay $750,000 due Lit Def to Fidelis instead under false pretenses;
- Christo participated in fraudulently characterizing the $750,000 payment as compensation for "vetting" some unknown software; and
- Christo did not otherwise fund Fidelis's operations.

### C.    Blust and Lit Def Are in Contempt

Blust and Lit Def's contempt is established by more than clear and convincing evidence. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 2006 WL 1148110, at *5 (S.D.N.Y. Apr. 28, 2006). They failed to comply with the clear and unambiguous requirements of the TRO and the PI and have not diligently attempted to comply in a reasonable manner. *Id.*; *Paramedics Electromedicina*, 369 F.3d at 655.

      1.    <u>The TRO and PI's court-ordered requirements are clear and unambiguous.</u>

First, the requirements of the TRO and the PI imposed on Blust and Lit Def were clear and unambiguous. In short, they were required to assist the Receiver in carrying out his court-

mandated tasks under the TRO[15] and the PI.[16]  Blust and Lit Def were well aware of these

obligations to cooperate and turn over the operations of Lit Def and its successor entity Fidelis to

the Receiver.  These obligations also clearly applied not only to Individual Defendant Blust and

Defendant Lit Def, but also they applied equally to Fidelis, Christo, and Hinds, as Fidelis was a

"successor and assign" of Lit Def, and Christo and Hinds were "Persons … in active concert or

participation with" the Defendants and Relief Defendants.

> 2.    Clear and convincing evidence establishes that Blust and Lit Def violated
>        the TRO and PI – and continue to violate the PI to this very day.

Clear and convincing evidence demonstrates Blust and Lit Def knowingly violated the

TRO and PI.  In fact, they have failed miserably to comply with the TRO and the PI.

First, as detailed above, Blust secretly operated Lit Def after the TRO until at least the

end of January, while lying to the Receiver that it had been shuttered.  They have admitted this.

*See*, *supra*, Section II.A.

---

[15] The TRO entered on January 11, 2024 specifically directed the Receiver to assume full control of Receivership Defendants (Section IX.A) and take exclusive control of all Assets, Documents, and ESI of the Receivership Defendants (Section IX.B).  The TRO also directed "Defendants, Relief Defendants, and their officers…subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them" to "fully cooperate with and assist the Receiver."  *Id*. at 29, Section XIII.A.  Moreover, the TRO specifically prohibited "Defendants, Relief Defendants, and their officers…subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them" from "[d]oing any act or refraining from any act whatsoever to interfere with the Receiver's taking custody, control, possession, or managing of the Assets or Documents subject to this Receivership; or to harass or to interfere with the Receiver in any way… or to refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any Order of this Court[.]"  *Id*. at 32, Section XIII.B.7.

[16] The PI was entered on March 4, 2024.  Dkt. Nos. 183 & 184.  All of TRO's duties required of the Receiver and all of the cooperation obligations required of third parties and successor entities were continued in the PI.

Second, Blust then hid the existence of Fidelis, lied about its obvious ties to Blust in testimony in a sworn declaration submitted to this Court. *See*, *supra*, Section II.E.

Third, Blust coordinated the contents of his false declaration about Fidelis with Hinds and Christo, who submitted five false declarations of their own, seeking to sell the fiction that Blust had nothing to do with Fidelis. *See*, *supra*, Section II.B. To this day, Blust has refused to cooperate in any respect in turning over control of Fidelis, its Documents, and Assets, to the Receiver. The factual record here establishes contempt, even before the Court considers the adverse inferences it is permitted to take here based not only on Blust's own invocation, but also on invocations of both Hinds and Christo at the evidentiary hearing. *See*, *supra*, Section II.D.

       3.    <u>Blust and Lit Def fail to meet their burden to show they have diligently attempted to comply in a reasonable manner.</u>

The final element of contempt is met: Lit Def and Blust have "not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina,* 369 F.3d at 655. This is obvious. The evidence confirms that Blust and Lit Def, in concert with Fidelis, Hinds, and Christo, have done the opposite: they have actively resisted the Receiver's efforts to bring them into compliance and done so by repeatedly submitting false testimony and refusing to turn over obvious Assets that should be protected within the receivership and controlled by the Receiver.

This pattern of conduct dates back more than a year ago. Blust flouted the TRO by knowingly operating Lit Def long after the TRO was implemented. Blust then hid the existence of Fidelis, to which they had diverted Lit Def's business assets. Blust has actively stymied persistent efforts by the Receiver to bring Fidelis into the Receivership over the past year. The only "cooperation" that Blust and Lit Def provided (turning over email passwords and some documents) occurred *after* the Receiver filed this OSC Contempt Motion. And, of course, at the same time, he, Hinds, and Christo coordinated to file perjurious declarations with the Court to

distance Fidelis. And, when given a chance to explain themselves to the Court in the evidentiary

hearing, Blust, Hinds, and Christo said nothing and invoked the Fifth Amendment. In short, the

pattern of conduct by Blust and Lit Def grossly fails to meet ***their burden*** that they must

"clearly, plainly, and unmistakably" produce evidence of their inability to comply with the

Court's orders. *See Huber*, 51 F.3d at 10. Their burden was to establish inability to comply with

the PI, and they have not met that burden.

### D.    Blust and Lit Def Consented to the Magistrate Judge Hearing the Contempt Motion

Blust and Lit Def incorrectly argue that Magistrate Judge Roemer lacks jurisdiction to

determine civil contempt. *See* Dkt. No. 602 ¶ 7. This argument is unavailing and based on both

a misreading of Section 636(e) and a selective presentation of the relevant history of Blust and

Lit Def's involvement on the contempt issue. Most critically, Blust and Lit Def long ago

consented to the Magistrate Judge's jurisdiction by filing briefing on the contempt issue in

March and April of last year (*see* Dkt. Nos 210 & 323). They even participated in the May 23,

2024 hearing on this exact contempt motion. *See* Dkt. No. 361 & Exhibit A (transcript of

proceedings with counsel for Lit Def and Blust's arguments). A review of Blust's briefing

(offered primarily through two declarations by counsel) and the May 23, 2024 hearing transcript

confirms that Blust and Lit Def never raised a jurisdictional challenge at any time. Instead, they

fully participated by making factual arguments on the OSC contempt request. Blust and Lit Def

offered no objections whatsoever at the May 23, 2024 hearing or when the Magistrate Judge set

the evidentiary hearing on the contempt motion.

The first time that Blust or Lit Def ever raised this issue was in their Pre-Hearing

Memorandum filed on January 16, 2025 (nearly one year after the Blust Contempt Motion was

filed). *See* Dkt. No. 572 at 7-9. Blust and Lit Def's course of conduct prior to that January 2025

filing demonstrates consent for the Magistrate Judge to hear the contempt motion under 28

U.S.C. § 636(e)(4) and/or a knowing waiver by Blust and Lit Def of any arguments to the

contrary. *See* 28 U.S.C. § 636(e)(4) (expressly permitting a magistrate judge, in any case where

the judge is presiding with the consent of the parties, "to exercise civil contempt authority of the

district court").

A party's action can establish implicit consent to a magistrate judge's authority under 28

U.S.C. § 636(e). In *Roell v. Withrow*, the Supreme Court held that consent under Section 636(e)

did not have to be in writing but instead a party could signal "consent to the magistrate judge's

authority through actions rather than words." *Roell v. Withrow*, 538 U.S. 580, 590 (2003).[17]

The absurdity of Blust and Lit Def's present argument goes beyond its obvious consent

and waiver. Are Blust and Lit Def proposing to this Court that the witnesses at the Court's

evidentiary hearing in this case who invoked their Fifth Amendment rights (Blust, Hinds, and

Christo) must appear again in a hearing now before the District Court, and do the very same

thing on identical questions? That would serve no purpose other than burdening the Court and

causing additional delay. Also, the process under 28 U.S.C. § 636(e)(6) would not be different

---

[17] *Roell* concerned a magistrate judge overseeing a trial, but the same logic applies here to these civil contempt proceedings, where Blust and Lit Def have consented through their actions – filing briefs and declarations and actively participating in a hearing before Magistrate Judge Roemer on this very issue, all the while remaining silent (for almost a year) on their supposed objection to the Magistrate Judge's authority. *See id.* The Court held: "We think the better rule is to accept implied consent where, as here, the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the Magistrate Judge." *Id.; cf. Lee v. City of New York*, 2002 WL 1722810, at *4 (E.D.N.Y. July 22, 2002) (extensive participation in discovery waived insufficiency of service of process defense); *United States v. International Bhd. of Teamsters*, 816 F. Supp. 864, 870 (S.D.N.Y. 1992) (waiver where defendants appeared at evidentiary hearing and engaged in settlement negotiations but failed to object to defective service for over one year after evidentiary hearing); *Burton v. Northern Dutchess Hosp.*, 106 F.R.D. 477, 481 (S.D.N.Y. 1985) (waiver where defendant actively participated in case and waited to raise defective service defense).

from what has already occurred, with the exception that the District Court would issue the order of contempt. Under Section 636(e)(6), the District Court's contempt hearing would occur after the Magistrate Judge has made a report and recommendations certifying that the moving party can adduce sufficient evidence to establish a prime facie case of contempt, with the District Court then hearing the relevant evidence and determining the appropriate punishment. *See*, *e.g.*, *United States v. Baroody*, 2008 WL 4470001, at *2-*3 (D. Ariz. June 11, 2008); *Bowens v. Atlantic Maintenance Corp.*, 546 F. Supp. 2d 55, 71-72 (E.D.N.Y. 2008).[18]

### E.    The Court Should Impose Monetary Sanctions against Lit Def and Blust to Compel Cooperation

Based on the facts identified above, the Receiver respectfully requests that the Court find Blust and Lit Def in contempt and order them to come into compliance with the Court's Order forthwith.[19]  *See S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 146 (2d Cir. 2010). Significant sanctions are necessary to achieve compliance here, given the history of non-compliance, the pattern of delay and obfuscation, and the willingness to submit false testimony coordinated with others.

---

[18] When the District Court reviews the Magistrate Judge's determination, it can simply use the record from the underlying hearing before the Magistrate Judge and the evidence submitted in connection therewith in lieu of holding another in-person hearing before the District Court.

[19] The Receiver's sole focus has been on compliance with the Court's Order (the TRO and the PI that replaced it with the same obligations), but the Receiver notes that the Court itself has the inherent authority to investigate and address perjurious testimony or fraud on the court as it sees fit.  *See McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("when a party lies to the court and his adversary intentionally, repeatedly, and about issues central to the truth-finding process, it can fairly be said that he has forfeited his rights to have his claim decided on the merits."); *cf. CDR Creances S.A.S. v. Cohen*, 23 N.Y.3d 307, 318 (N.Y. 2014) (citing, *inter alia*, *Anderson v. Dunn*, 19 U.S. 204, 227 (1821) and discussing federal case law) ("Fraud on the court involves willful conduct that is deceitful and obstructionistic, which injects misrepresentations and false information into the judicial process 'so serious that it undermines . . . the integrity of the proceeding.'").

Where, as here, contempt sanctions are coercive, "the district court has broad discretion to design a remedy that will bring about compliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981) (per curiam)). The broad range of sanctions available includes ordering conditional fines to compel the contemnor to comply with the Court's orders, requiring contemnors to pay reasonable attorney's fees, and imposing fixed terms of imprisonment, under the condition that contemnors will be released upon compliance with the court orders. *See, e.g.*, *SEC v. Faulkner*, 2019 WL 277621, at *5 (N.D. Tex. Jan. 22, 2019) (discussing potential remedies available in context of contempt motion by court-appointed equity receiver).

The Court may consider several factors when calculating a fine, including "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about [compliance], and the contemnor's ability to pay." *Paramedics Electromedicina*, 369 F.3d at 658 (internal quotations omitted); *see also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir 1989) ("monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience"). Courts are authorized to assess attorneys' fees where the contempt was willful. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citations omitted).

The Court also possesses inherent power to sanction bad faith and vexatious conduct. *Chambers*, 501 U.S. at 46. "A court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.*, citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258 (1975). "[I]f a court finds that fraud has been practiced

35

upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party[.]" *Id.* (citations omitted).  It is also appropriate to award attorneys' fees "when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order…mak[ing] the prevailing party whole for expenses caused by his opponent' s obstinacy." *Id.* (citations omitted).

As demonstrated above, Blust and Lit Def (and for that matter Hinds and Christo) have engaged in egregious conduct.  They have failed to take the Court's orders seriously and without question have acted in contempt of the Court.

It is unclear under these circumstances what exactly will be necessary to achieve compliance.  In the first instance, we respectfully request that the Court impose significant monetary sanctions in the form of (1) a $1,000 daily fine during the period of non-compliance, which dates back to shortly after January 11, 2024, and (2) paying the significant legal fees incurred bringing the Blust OSC Contempt Motion and defending against the related Fidelis Motion Challenging Receiver, as that motion is similarly premised on the coordinated false testimony of Blust, Hinds, and Christo.  *See, e.g., Int'l Bus. Machines Corp. v. United States*, 493 F.2d 112, 116 (2d Cir. 1973) (finding district court properly coerced compliance by imposing daily fine of $150,000 per day for large corporation, taking into account the contemnor's resources and ability to pay).  This will permit Blust and Lit Def yet another opportunity to purge their compliance, which can only be accomplished through fulsome cooperation related to fellow contemnor Fidelis and the immediate identification and the turnover of Fidelis's Assets. [20]

_____

[20] We are not requesting a sanction of imprisonment at this time, hoping instead that the monetary sanctions will be sufficient incentive for Lit Def and Blust to purge their contempt; however, if a daily fine does not spur compliance from Blust and Lit Def, the Court could appropriately increase the sanctions.  For instance, after a period of 30 days of further non-compliance after the Order, the Court could either increase the daily fine (*cf. Commissioner of*

## IV.    CONCLUSION

In light of the foregoing, the Receiver respectfully requests that the Court allow the Receiver's motion and issue an order (1) holding Lit Def and Blust in contempt of both the TRO and PI; (2) requiring Lit Def and Blust to cooperate immediately and completely with the Receiver, including turning over to the Receiver all Assets and corporate records of Fidelis and turning over control of all business operations of Fidelis to the Receiver, and providing a complete financial accounting of Fidelis, including all transfers to or from third parties; (3) imposing a fine on Lit Def and Blust of $1,000 per day for every day of noncompliance; (4) holding Lit Def and Blust responsible for all fees and costs incurred by the Receiver in

---

*Public Health v. Colandrea*, 221 Conn. App. 631, 651-52 (2023) (citing *Int'l Bus. Machines Corp.,* 493 F.2d at 116 (2d Cir. 1973)), or impose incarceration to coerce compliance.

Frankly, the Court would be well within its discretionary power to impose incarceration now until Blust complies, in light of his history of noncompliance and the orchestrated fraud perpetrated on the Court.  *See, e.g., S.E.C. v. Elmas Trading Corp.,* 824 F.2d 732 (9th Cir. 1987) ("The district court ordered Attarian incarcerated for his failure to obey its order to account for funds and to produce records relating to assets. From the court's order, it is clear that its purpose in incarcerating Attarian is to coerce him to produce the demanded documents that are needed in the litigation and investigation or to provide credible evidence as to his inability to comply."); *cf. CFTC v. Emerald Worldwide Holdings,* 2005 WL 77048, at *1 (C.D. Cal. January 3, 2005) (escalating daily fine converted to imprisonment after defendant failed to deliver books and records or provide accounting); *CFTC v. Skorupskas*, 605 F. Supp. 923, 945 (E.D. Mich. 1985) ("If [Defendant] fails to indicate either the location and amount of these funds or that the funds do not exist within 14 days of the entry of this Order, then she is to be taken into custody by the United States Marshal and incarcerated until she complies. This remedy, although seemingly harsh is absolutely necessary to insure compliance with the Order, halt [Defendant's] fraudulent operations, and protect the public.").

connection with the Blust OSC Motion; and (5) holding Lit Def and Blust liable for fees and

costs incurred by the Receiver in connection with the Fidelis Motion Challenging Receiver.


Dated: February 24, 2025                    **MCNAMARA SMITH LLP**

                                            By:  ___/s/ Logan D. Smith_____
                                            Logan D. Smith  (*Pro Hac Vice*)
                                            Alexander D. Wall (*Pro Hac Vice*)
                                            McNamara Smith LLP
                                            655 West Broadway, Suite 900
                                            San Diego, California 92101
                                            Telephone:  (619) 269-0400
                                            Facsimile:  (619) 269-0401
                                            Email:  lsmith@mcnamarallp.com;
                                            awall@mcnamarallp.com

                                            *Attorneys for Court-appointed Receiver,*
                                            *Thomas W. McNamara*