# EXHIBIT 1

1

```
 1                  UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF NEW YORK

 3
        - - - - - - - - - - - - X        24-CV-0040
 4      CONSUMER FINANCIAL
        PROTECTION BUREAU ET AL,
 5                      Plaintiff

 6              Vs.                       Buffalo, New York
        STRATFS, LLC (f/k/a STRATEGIC
 7      FINANCIAL SOLUTIONS LLC et al     January 23, 2025
                        Defendants
 8
        STRATEGIC ESOP, et al
 9                      Relief Defendants
        - - - - - - - - - - - - X
10

11              TRANSCRIPT OF EVIDENTIARY HEARING
           BEFORE THE HONORABLE MICHAEL J. ROEMER
12              UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23          COURT REPORTER:Brandi A. Wilkins
                   scalisba@gmail.com
24                 Kenneth B. Keating Federal Building
                   100 State Street, Room 1250A
25                 Rochester, New York 14614
```

```
 1                    A P P E A R A N C E S

 2              CONSUMER FINANCIAL PROTECTION BUREAU
                BY: AKASH DESAI, ESQ.
 3                  VANESSA BUCHKO, ESQ.
                    JOSEPH SANDERS, ESQ.
 4                  NICOLE CABANEZ, ESQ.
                1700 G Street, NW
 5              Washington, DC 20552
                Appearing on behalf of the Plaintiff
 6
          OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
 7              BY: GENEVIEVE RADOS, ESQ.
                350 Main Street
 8              Buffalo, New York 14202
                Appearing on behalf of the Plaintiff
 9
                MCNAMARA SMITH LLP
10              BY: THOMAS MCNAMARA, ESQ.
                    LOGAN SMITH, ESQ.
11              655 West Broadway Suite 900
                San Diego, California 92101
12              Appearing on behalf of the Receiver

13              PERSONIUS MELBER LLP
                BY: RODNEY PERSONIUS, ESQ.
14              2100 Main Place Tower
                350 Main Street
15              Buffalo, New York 14202
                Appearing on behalf of the Defendants
16
                HOOVER & DURLAND LLP
17              BY: TIMOTHY HOOVER, ESQ.
                    SPENCER DURLAND, ESQ.
18              561 Franklin Street
                Buffalo, New York 14202
19              Appearing on behalf of the Defendants

20              DELAWARE DEPARTMENT OF JUSTICE
                CONSUMER PROTECTION BUREAU
21              BY: MARYANNE DONAGHY, ESQ.
                820 N. French Street
22              5th Floor
                Wilmington, Delaware 19801
23

24

25
```

3

W I T N E S S E S

| Name | Examined By | Page |
|------|-------------|------|
| Jason Blust | Mr. Sanders (DX) | 10 |
| | Mr. McNamara (DX) | 40 |
| Jewel Hewett | Ms. Rados (DX) | 60 |
| | Mr. Hoover (CX) | 66 |
| Michelle Gallagher | Mr. Romanoff (DX) | 71 |
| | Mr. Smith (DX) | 94 |
| Katherine Rosenberg | Ms. Buchko (DX) | 110 |
| | Mr. Smith (DX) | 156 |
| | Mr. Hoover (CX) | 161 |

4

```
1                THE COURT:  Have a seat, please.
2                THE CLERK:  United States District Court for
3    the Western District of New York is now in session.
4    The Honorable Michael J. Roemer presiding.  We're here
5    on the matter of Consumer Financial Protection Bureau
6    et al. Versus Strategic case number 24-CV-0040 for an
7    evidentiary hearing.  Counsel, please state your name
8    and who you represent, and we'll start with the
9    plaintiff's front table.
10               MS. BUCHKO:  Morning.  Vanessa Buchko, CFPB.
11               MR. SANDERS:  Joe Sanders on behalf of CFPB.
12               MS. RADOS:  Good morning.  Genevieve Rados
13   from the Attorney General on the half of the People of
14   the State of New York.
15               MR. MCNAMARA:  Morning, Your Honor.  Tom
16   McNamara for the receiver.
17               MR. SMITH:  Morning, Your Honor.  Logan
18   Smith on behalf of the receiver.
19               MR. THOMAN:  James Thoman, local counsel for
20   the receiver.
21               MR. PERSONIUS:  Morning, Your Honor.  Rodney
22   Personius -- sorry.  Go ahead.
23               MR. DESAI:  Sorry, Your Honor.  Akash Desai
24   on behalf of CFPB as well.
25               MR. ROMANOFF:  Morning, Your Honor.  Evan
```

1    Romanoff on behalf of the State of Minnesota.

2           MS. DONAGHY:  Morning, Your Honor.  Maryanne

3    Donaghy on behalf of the State of Delaware.

4           MS. CABANEZ:  Nicole Cabanez on behalf of

5    CFPB.

6           MR. PERSONIUS:  Good morning, Judge.  Rodney

7    Personius for Jason Blust.  Mr. Blust, Your Honor, is

8    in the front row in the checkered shirt.  Judge, if I

9    may, sitting to my right your left is Olivia Proya who

10   was admitted by Judge Vilardo to Federal Court last

11   Thursday.  She just got admitted in New York State the

12   day before that.  She's here to observe.  She's not

13   going to participate.  She'll be taking notes, but

14   with your permission, may she sit next to me and help

15   me out?

16           THE COURT:  Absolutely.

17           MR. PERSONIUS:  Thank you, Judge.

18           THE COURT:  She's a new lawyer.

19           MR. PERSONIUS:  Yes.  Thank you, Judge.

20           MR. HOOVER:  Judge, Good morning.  Tim

21   Hoover and Spencer Durland for the Fidelis entities

22   and Cameron Christo.

23           MR. CONNORS:  Morning, Your Honor.  Terry

24   Connors for the law firms.

25           THE COURT:  Anybody else?

6

1           MR. MOLLOY:  Morning, Judge.  Mark Molloy is
2    here.  I'm not a party to the hearing, but I represent
3    Mrs. Gallagher who is present.
4           THE COURT:  Okay.
5           MR. SANDERS:  Judge, we'll got Anila Pronti
6    with us.  She's going to be our IT.
7           THE COURT:  She's going to be what?
8           MR. SANDERS:  She's going to put up the
9    exhibits for us, Judge.
10          THE COURT:  Oh, put up the exhibits.  All
11   right.  I apologize in advance I'm going to be sucking
12   on cough drops throughout the hearing because I'm
13   battling a cough.  Mr. Malloy, I did get your motion
14   for reconsideration, but your client is here so we're
15   ready to go.
16          MR. MOLLOY:  My client is here, Your Honor.
17   She's not here voluntarily.  She did comply with the
18   Court's order.
19          THE COURT:  Very good.  I'm glad she
20   complied the Court's order.  Very good.  Okay.  First
21   witness.
22          MR. PERSONIUS:  Your Honor, may I raise an
23   issue?
24          THE COURT:  Quickly.  Let's get going.  I
25   don't want to get stuck in the mud.  What is it?

1          MR. PERSONIUS:  In our submission, docket

2    572 starting at Page 7, we raised a point regarding

3    the whether the Court has jurisdiction regarding

4    the civil --

5          THE COURT:  We'll cover that in the post

6    briefing, post hearing briefing.  Okay?

7          MR. PERSONIUS:  Okay.

8          THE COURT:  All right.

9          MR. PERSONIUS:  I just is want to make sure

10   it was preserved.

11         THE COURT:  It's definitely preserved.

12         MR. PERSONIUS:  Thank you, Judge.

13         MS. RADOS:  Judge, if I could make a quick

14   motion, it might actually make the proceedings more

15   effective.  Plaintiffs would like to move all the

16   exhibits from plaintiff's receiver and Fidelis into

17   evidence.  We think that that would make this a more

18   efficient hearing.  We would stipulate to the

19   admissibility of all of their evidence.

20         THE COURT:  You would stipulate to all of

21   defendant's exhibits?

22         MR. SANDERS:  To Fidelis and the receiver's

23   exhibits.  We think that our exhibits are

24   authenticated because for the most part they were

25   produced by the defendants.  They're admissible as

8

1    evidence for a number reasons I can go over if you
2    would like or you have --
3            THE COURT:  Is there any objection?
4            MR. HOOVER:  Can I have a moment, Judge?
5            THE COURT:  Sure.
6    (There was a discussion off the record.)
7            MR. HOOVER:  Can the plaintiffs state what
8    exhibits specifically so we just have clarity?  The
9    exhibits they marked for this hearing?
10           MS. RADOS:  I would like to move both the
11   exhibits we marked for this hearing and the previous
12   hearing if Your Honor was amendable to that.
13           THE COURT:  The previous hearing in the --
14           MS. RADOS:  The preliminary injunction last
15   end of --
16           THE COURT:  Last February?
17           MS. RADOS:  Yes, it was January and
18   February.
19           MR. HOOVER:  So, Judge, we can agree to --
20   and I want to make sure I have this right --
21   Plaintiff's 79 through 216A.  Those are the exhibits
22   they marked for this hearing.  And I understand that
23   the plaintiffs are saying they'll stipulate to Fidelis
24   Exhibits FX 1 through 68.  We do -- well, we can't
25   stipulate and we do object to the concept of either

9

1    the transcript or the exhibits from the February 2014

2    hearing coming in on moss.  We weren't part of it.

3    The legal issues there were different, different

4    entities, et cetera, and look, I know there's --

5    everyone is working hard, but they were all given to

6    us last night about 9 p.m.  So we haven't had a

7    reasonable chance to review those.

8                THE COURT:  Ms. Rados?

9                MS. RADOS:  Well, I think that at the last

10   hearing the parties did stipulate but you did admit

11   all of the exhibits into evidence and I think that was

12   proper at the preliminary injunction hearing.  I think

13   that the evidence --

14               THE COURT:  All right.  We will discuss this

15   later.

16               MS. RADOS:  Okay.

17               THE COURT:  You're not using those today.

18   The ones for today everybody stipulates to.

19               MS. RADOS:  Okay.  Thank you, Your Honor.

20               THE COURT:  I don't want to get backed up.

21   Who is the first witness?

22               MR. SANDERS:  Your Honor, the plaintiffs

23   call Jason Blust as an adverse witness.

24               MR. PERSONIUS:  Your Honor, with respect to

25   Mr. Blust, we've informed the Court that where

1    appropriate he will rely upon his fifth amendment

2    privilege, and to ensure that he gets proper counsel

3    as to when to invoke that, may I be up next to the

4    witness while he testifies?

5            THE COURT:  Sure.

6            MR. PERSONIUS:  Thank you, Your Honor.

7            THE CLERK:  Mr. Blust, just raise your right

8    hand.

9            THE COURT:  Do you want a chair up there,

10   Mr. Personius?  You can get a chair.

11           MR. PERSONIUS:  Thank you, Judge.

12           THE CLERK:  You can just pull one from the

13   jury box.  How's that?

14           MR. PERSONIUS:  Thank you.

15           J A S O N  B L U S T, after having been duly

16   called and sworn, testified as follows:

17           THE CLERK:  Thank you.  Please have a seat.

18   When seated, please state your name and spell it for

19   the record.

20           THE WITNESS:  Jason Blust, B-L-U-S-T.

21           DIRECT EXAMINATION BY MR. SANDERS:

22   Q.   Mr. Blust, you're familiar with Lit Def

23   Strategies LLC?

24   A.   On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

1   question.

2           THE COURT:  Mr. Blust, could you do me a

3   favor?  Just pull the microphone down a little bit.

4           THE WITNESS:  Sure.

5           THE COURT:  And talk into it.  Rosalie, can

6   you turn him up?

7           THE CLERK:  Uh-huh.

8   Q.   And Blust, are you familiar with an entity named

9   Fidelis Legal Support Services LLC?

10  A.   On the advice of counsel, I invoke the fifth

11  amendment and respectfully decline to answer your

12  question.

13  Q.   Mr. Blust, just to set the record in terms of

14  some terms I'm going to use today, when I refer to

15  facade firms, I mean the law firms that intervened in

16  this matter, and when I refer to SFS, I mean Strat FS

17  LLC.  The two entities I just asked you about, Lit Def

18  Strategies LLC, I'm going to refer to as Lit Def and

19  Fidelis Legal Support Services LLC I'm going to refer

20  to as Fidelis.

21          MR. HOOVER:  I'm sorry.  I just didn't hear

22  that.

23          MR. SANDERS:  I'm going to refer to Fidelis

24  Legal Support Services LLC as Fidelis.

25  Q.   Mr. Blust, you controlled Lit Def employees as of

12

1    January 1, 2024; correct?

2    A.    On the advice of counsel, I invoke the fifth

3    amendment and respectfully decline to answer your

4    question.

5    Q.    And you controlled Fidelis employees as of

6    January 1, 2024?

7    A.    On the advice of counsel, I invoke the fifth

8    amendment and respectfully decline to answer your

9    question.

10    Q.    And most employees of Lit Def and Fidelis worked

11    for both companies?

12    A.    On the advice of counsel, I invoke the fifth

13    amendment and respectfully decline to answer your

14    question.

15    Q.    You control whether they worked for Fidelis or

16    Lit Def on given files; correct?

17    A.    On the advice of counsel, I invoke the fifth

18    amendment and respectfully decline to answer your

19    question.

20    Q.    You controlled when they worked for Fidelis?

21    A.    On the advice of counsel, I invoke the fifth

22    amendment and respectfully decline to answer your

23    question.

24    Q.    And you controlled when they worked for Lit Def?

25    A.    On the advice of counsel, I invoke the fifth

13

1    amendment and respectfully decline to answer your

2    question.

3    Q.    In fact, some employees worked for both companies

4    at the same time; correct?

5    A.    On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.    And for example, Michelle Gallagher worked for

9    both companies at the same time?

10    A.    On the advice of counsel, I invoke the fifth

11    amendment and respectfully decline to answer your

12    question.

13    Q.    And Shirley Saavedra worked for both companies at

14    the same time; correct?

15    A.    On the advice of counsel, I invoke the fifth

16    amendment and respectfully decline to answer your

17    question.

18    Q.    Jean Comis worked for both companies at the same

19    time; correct?

20    A.    On the advice of counsel, I invoke the fifth

21    amendment and respectfully decline to answer your

22    question.

23    Q.    Katherine Rosenberg worked for both companies at

24    the same time?

25    A.    On the advice of counsel, I invoke the fifth

14

1   amendment and respectfully decline to answer your

2   question.

3   Q.   Jennifer Moye worked for Fidelis; correct?

4   A.   On the advice of counsel, I invoke the fifth

5   amendment and respectfully decline to answer your

6   question.

7   Q.   And Jennifer Moye also worked for Lit Def; is

8   that correct?

9   A.   On the advice of counsel, I invoke the fifth

10   amendment and respectfully decline to answer your

11   question.

12   Q.   Margaret Peggy Slivka worked for Lit Def;

13   correct?

14          THE COURT:  Can you spell that?

15          MR. PERSONIUS:  Yes.  The last name is

16   spelled S-L-I-V-K-A.

17   A.   On the advice of counsel, I invoke the fifth

18   amendment and respectfully decline to answer your

19   question.

20   Q.   And Margaret Peggy Slivka worked for Fidelis and

21   Lit Def; correct?

22   A.   On the advice of counsel, I invoke the fifth

23   amendment and respectfully decline to answer your

24   question.

25   Q.   Hayfa Sayed worked for Fidelis?

1  A.   On the advice of counsel, I invoke the fifth
2  amendment and respectfully decline to answer your
3  question.
4  Q.   And she worked for a Client First Bankruptcy as
5  well; correct?
6  A.   On the advice of counsel, I invoke the fifth
7  amendment and respectfully decline to answer your
8  question.
9  Q.   And you own Client First Bankruptcy?
10  A.   On the advice of counsel, I invoke the fifth
11  amendment and respectfully decline to answer your
12  question.
13  Q.   Lizette Alvarez did human resources for both
14  companies; correct?
15  A.   On the advice of counsel, I invoke the fifth
16  amendment and respectfully decline to answer your
17  question.
18  Q.   And Fidelis and Lit Def had the same employee
19  handbook with superficial differences; correct?
20  A.   On the advice of counsel, I invoke the fifth
21  amendment and respectfully decline to answer your
22  question.
23  Q.   You controlled compensation at Lit Def?
24  A.   On the advice of counsel, I invoke the fifth
25  amendment and respectfully decline to answer your

16

1    question.

2    Q.   And you also controlled compensation at Fidelis;

3    correct?

4    A.   On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.   You set annual bonuses for Lit Def employees in

8    2022?

9    A.   On the advice of counsel, I invoke the fifth

10   amendment and respectfully decline to answer your

11   question.

12   Q.   And you also set annual bonuses for Fidelis

13   employees in 2022; correct?

14   A.   On the advice of counsel, I invoke the fifth

15   amendment and respectfully decline to answer your

16   question.

17   Q.   You set annual bonuses for Lit Def employees in

18   2023?

19   A.   On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.   And you also set the annual bonus for Fidelis

23   employees in 2023; correct?

24   A.   On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

17

1    question.

2    Q.   Both Fidelis and Lit Def employees came to you to

3    request raises; correct?

4    A.   On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.   You controlled hiring at Lit Def?

8    A.   On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10    question.

11    Q.   And you made the final decision on when to hire a

12    new employee at Fidelis; correct?

13    A.   On the advice of counsel, I invoke the fifth

14    amendment and respectfully decline to answer your

15    question.

16    Q.   You controlled which facade firms are assigned to

17    work with Lit Def?

18    A.   On the advice of counsel, I invoke the fifth

19    amendment and respectfully decline to answer your

20    question.

21    Q.   And you controlled which facade firms are

22    assigned to work with Fidelis; correct?

23    A.   On the advice of counsel, I invoke the fifth

24    amendment and respectfully decline to answer your

25    question.

18

1    Q.    In April, 2021, the disciplinary hearing

2    commission of the North Carolina state bar entered the

3    finding against Carolina Legal Services; correct?

4    A.    On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.    Going forward, I'm going to refer to the

8    disciplinary hearing commission of the North Carolina

9    State Bar as the North Carolina State Bar.  Carolina

10   was a -- Carolina Legal Services was a law firm

11   associated with SFS; correct?

12   A.    On the advice of counsel, I invoke the fifth

13   amendment and respectfully decline to answer your

14   question.

15   Q.    And the North Carolina State Bar found that you

16   arranged for Daniel Rufty to be the majority owner of

17   Carolina Legal Services in name only; correct?

18   A.    On the advice of counsel, I invoke the fifth

19   amendment and respectfully decline to answer your

20   question.

21   Q.    And you have a similar arrangement with Cameron

22   Christo in that Cameron Christo is the owner of

23   Fidelis in name only; correct?

24   A.    On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

19

1    question.

2    Q.    And the North Carolina State Bar found that you

3    received 97% of the profits from Carolina Legal

4    Services; correct?

5    A.    On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.    And you have a similar arrangement with Cameron

9    Christo and Fidelis in that you received things of

10   value from Cameron Christo and Fidelis; correct?

11   A.    On the advice of counsel, I invoke the fifth

12   amendment and respectfully decline to answer your

13   question.

14   Q.    Fidelis is a litigation support company; correct?

15   A.    On the advice of counsel, I invoke the fifth

16   amendment and respectfully decline to answer your

17   question.

18   Q.    And Lit Def is a litigation support company;

19   correct?

20   A.    On the advice of counsel, I invoke the fifth

21   amendment and respectfully decline to answer your

22   question.

23   Q.    And Relialit LLC is a litigation support company;

24   correct?

25   A.    On the advice of counsel, I invoke the fifth

20

1    amendment and respectfully decline to answer your
2    question.
3    Q.    I'm going to refer to Relialit LLC as Relialit
4    going forward.  Lit Def is the successor to Relialit;
5    correct?
6    A.    On the advice of counsel, I invoke the fifth
7    amendment and respectfully decline to answer your
8    question.
9    Q.    And Fidelis is the successor to Lit Def; correct?
10   A.    On the advice of counsel, I invoke the fifth
11   amendment and respectfully decline to answer your
12   question.
13   Q.    You controlled Lit Def on January 1, 2024;
14   correct?
15   A.    On the advice of counsel, I invoke the fifth
16   amendment and respectfully decline to answer your
17   question.
18   Q.    And you controlled Fidelis on January 1, 2024;
19   correct?
20   A.    On the advice of counsel, I invoke the fifth
21   amendment and respectfully decline to answer your
22   question.
23   Q.    And you controlled Fidelis on February 23, 2024;
24   correct?
25   A.    On the advice of counsel, I invoke the fifth

21

1   amendment and respectfully decline to answer your

2   question.

3   Q.   And you controlled Lit Def on February 23, 2024;

4   correct?

5   A.   On the advice of counsel, I invoke the fifth

6   amendment and respectfully decline to answer your

7   question.

8   Q.   And you controlled Relialit while it was in

9   existence; correct?

10   A.   On the advice of counsel, I invoke the fifth

11   amendment and respectfully decline to answer your

12   question.

13   Q.   After Fidelis was formed, you began shifting

14   litigation defense work from Lit Def to Fidelis;

15   correct?

16   A.   On the advice of counsel, I invoke the fifth

17   amendment and respectfully decline to answer your

18   question.

19        MR. SANDERS:  I'm going to get some water.

20   Mr. Blust, do you need water?

21        THE WITNESS:  That would be great.

22        MR. SANDERS:  Yeah.

23        THE CLERK:  There's water up there.

24   (There was a pause in the proceeding.)

25        MR. SANDERS:  Are you ready to proceed?

22

1              THE WITNESS:  All set.

2              MR. SANDERS:  Okay.

3    Q.   Consumers ceasing payments to their creditors was

4    central to SFS's debt release program; correct?

5    A.   On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.   And consumers in SFS's debt relief program were

9    often sued when they stopped paying their creditors;

10   correct?

11   A.   On the advice of counsel, I invoke the fifth

12   amendment and respectfully decline to answer your

13   question.

14   Q.   And the facade firms were responsible for any

15   legal defense provided to consumers enrolled in SFS's

16   debt relief program.  Correct?

17   A.   On the advice of counsel, I invoke the fifth

18   amendment and respectfully decline to answer your

19   question.

20   Q.   You controlled the facade firms; correct?

21   A.   On the advice of counsel, I invoke the fifth

22   amendment and respectfully decline to answer your

23   question.

24   Q.   You helped the facade firms manage their

25   day-to-day operations; correct?

23

```
 1    A.    On the advice of counsel, I invoke the fifth
 2    amendment and respectfully decline to answer your
 3    question.
 4    Q.    When consumers were sued they contacted SFS;
 5    correct?
 6    A.    On the advice of counsel, I invoke the fifth
 7    amendment and respectfully decline to answer your
 8    question.
 9    Q.    And SFS's policy was to hold themselves out to
10    consumers as the facade firm assigned to consumer's
11    case; correct?
12    A.    On the advice of counsel, I invoke the fifth
13    amendment and respectfully decline to answer your
14    question.
15    Q.    And after a consumer alerted SFS to a creditor
16    lawsuit, SFS contacted one of the litigation support
17    companies that's Relialit, Lit Def or Fidelis;
18    correct?
19    A.    On the advice of counsel, I invoke the fifth
20    amendment and respectfully decline to answer your
21    question.
22    Q.    When I refer to litigation support companies
23    moving forward, I'm referring to Relialit, Lit Def and
24    Fidelis.  The facade firms retained Relialit to
25    compile consumer litigation documents; correct?
```

24

```
 1    A.    On the advice of counsel, I invoke the fifth
 2    amendment and respectfully decline to answer your
 3    question.
 4    Q.    The facade firms retained Lit Def to compile
 5    consumer litigation documents; correct?
 6    A.    On the advice of counsel, I invoke the fifth
 7    amendment and respectfully decline to answer your
 8    question.
 9    Q.    And the facade firms retain Fidelis to compile
10    consumer litigation documents; correct?
11    A.    On the advice of counsel, I invoke the fifth
12    amendment and respectfully decline to answer your
13    question.
14    Q.    The facade firms retained Relialit to hire
15    appearance attorneys; correct?
16    A.    On the advice of counsel, I invoke the fifth
17    amendment and respectfully decline to answer your
18    question.
19    Q.    And when I refer to appearance attorneys or
20    litigation attorneys, I'm referring to attorneys who
21    appeared on behalf of consumers of creditor losses.
22    The facade firms retained Lit Def to hire appearance
23    attorneys; correct?
24    A.    On the advice of counsel, I invoke the fifth
25    amendment and respectfully decline to answer your
```

25

1   question.

2   Q.   The facade firms retained Fidelis to hire --

3   retained Fidelis to hire appearance attorneys;

4   correct?

5   A.   On the advice of counsel, I invoke the fifth

6   amendment and respectfully decline to answer your

7   question.

8   Q.   The facade firms retain Relialit to manage

9   communications between litigation attorneys and SFS;

10  correct?

11  A.   On the advice of counsel, I invoke the fifth

12  amendment and respectfully decline to answer your

13  question.

14  Q.   The facade firms retain Lit Def to manage

15  communications between litigation attorneys and SFS;

16  correct?

17  A.   On the advice of counsel, I invoke the fifth

18  amendment and respectfully decline to answer your

19  question.

20  Q.   The facade firms retained Fidelis to manage

21  communications between litigation attorneys and SFS;

22  correct?

23  A.   On the advice of counsel, I invoke the fifth

24  amendment and respectfully decline to answer your

25  question.

26

1    Q.    Relialit helped the facade firms manage their

2    day-to-day operations; isn't that right?

3    A.    On the advice of counsel, I invoke the fifth

4    amendment and respectfully decline to answer your

5    question.

6    Q.    And Lit Def helped the facade firms manage their

7    day-to-day operations; correct?

8    A.    On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10   question.

11   Q.    And Fidelis helped the facade firms manage their

12   day-to-day operations; correct?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    Lit Def recruited litigation attorneys; correct?

17   A.    On the advice of counsel, I invoke the fifth

18   amendment and respectfully decline to answer your

19   question.

20   Q.    And Fidelis recruited litigation attorneys;

21   correct?

22   A.    On the advice of counsel, I invoke the fifth

23   amendment and respectfully decline to answer your

24   question.

25   Q.    And these litigation attorneys, they were

1    recruited by Lit Def and Fidelis, they acted on behalf

2    of the facade firms; correct?

3    A.    On the advice of counsel, I invoke the fifth

4    amendment and respectfully decline to answer your

5    question.

6    Q.    Relialit managed communications between

7    litigation attorneys and SFS; correct?

8    A.    On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10   question.

11   Q.    Lit Def also managed communications between

12   litigation attorneys and SFS; correct?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    And Fidelis managed communications between

17   litigation attorneys and SFS as well; correct?

18   A.    On the advice of counsel, I invoke the fifth

19   amendment and respectfully decline to answer your

20   question.

21   Q.    Relialit helped facilitate consumer settlements;

22   correct?

23   A.    On the advice of counsel, I invoke the fifth

24   amendment and respectfully decline to answer your

25   question.

28

1    Q.    Lit Def also helped facilitate consumer
2    settlements; correct?
3    A.    On the advice of counsel, I invoke the fifth
4    amendment and respectfully decline to answer your
5    question.
6    Q.    And Fidelis also helped facilitate consumer
7    settlements; correct?
8    A.    On the advice of counsel, I invoke the fifth
9    amendment and respectfully decline to answer your
10    question.
11    Q.    Relialit provided substantive settlement
12    recommendations for litigation counsel.  Correct?
13    A.    On the advice of counsel, I invoke the fifth
14    amendment and respectfully decline to answer your
15    question.
16    Q.    Lit Def also provided substantive settlement
17    recommendations to litigation counsel; correct?
18    A.    On the advice of counsel, I invoke the fifth
19    amendment and respectfully decline to answer your
20    question.
21    Q.    And Fidelis also provided substantive settlement
22    recommendations to litigation counsel; correct?
23    A.    On the advice of counsel, I invoke the fifth
24    amendment and respectfully decline to answer your
25    question.

29

1    Q.    Relialit transmitted settlement proposals between
2    litigation attorneys and SFS; correct?
3    A.    On the advice of counsel, I invoke the fifth
4    amendment and respectfully decline to answer your
5    question.
6    Q.    Lit Def also transmitted settlement proposals
7    between litigation attorneys and SFS; correct?
8    A.    On the advice of counsel, I invoke the fifth
9    amendment and respectfully decline to answer your
10   question.
11   Q.    And Fidelis transmitted settlement proposals
12   between litigation attorneys and SFS; correct?
13   A.    On the advice of counsel, I invoke the fifth
14   amendment and respectfully decline to answer your
15   question.
16   Q.    Relialit helped SFS and the facade firms address
17   consumer complaints; correct?
18   A.    On the advice of counsel, I invoke the fifth
19   amendment and respectfully decline to answer your
20   question.
21   Q.    Lit Def also helped SFS and the facade firms
22   respond to consumer complaints; correct?
23   A.    On the advice of counsel, I invoke the fifth
24   amendment and respectfully decline to answer your
25   question.

30

1    Q.    And Fidelis helped SFS and facade firms address

2    consumer complaints; correct?

3    A.    On the advice of counsel, I invoke the fifth

4    amendment and respectfully decline to answer your

5    question.

6            MR. SANDERS:  I'm going to take another

7    water break, Mr. Blust, if you want to do the same.

8    (There was a pause in the proceeding.)

9            MR. SANDERS:  Ready?

10   Q.    You knew that SFS and the facade firms were

11   collecting fees prior to consumer settlements;

12   correct?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    And you knew this in part because you helped SFS

17   and the facade firms address consumer complaints;

18   correct?

19   A.    On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.    And some of those complaints involve consumers

23   who were unhappy that they were charged fees prior to

24   settlements; correct?

25   A.    On the advice of counsel, I invoke the fifth

31

1    amendment and respectfully decline to answer your

2    question.

3    Q.    And part of the reason these consumers were

4    unhappy with fees being charged prior to settlements

5    is that they did not have enough money in their escrow

6    accounts to settle their debts; correct?

7    A.    On the advice of counsel, I invoke the fifth

8    amendment and respectfully decline to answer your

9    question.

10   Q.    You knew that SFS and the facade firms were

11   collecting fees prior to consumers making payments on

12   settlements; correct?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    And you knew this in part because you helped SFS

17   and the facade firms address consumer complaints;

18   correct?

19   A.    On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.    And some of those complaints involved consumers

23   who were unhappy because they were charged fees prior

24   to making payments on their settlements; correct?

25   A.    On the advice of counsel, I invoke the fifth

32

1    amendment and respectfully decline to answer your
2    question.
3    Q.    And part of the reason these consumers were
4    unhappy with fees being charged prior to making
5    payments on settlements is that they could not settle
6    all of their debts because they did not have enough
7    money in their escrow accounts; correct?
8    A.    On the advice of counsel, I invoke the fifth
9    amendment and respectfully decline to answer your
10   question.
11   Q.    You knew that fees collected by SFS and the
12   facade firms after a debt was settled did not bear the
13   same proportional relationship to the total fee as the
14   individual debt amount or to the entire debt amount at
15   the time of enrollment; correct?
16   A.    On the advice of counsel, I invoke the fifth
17   amendment and respectfully decline to answer your
18   question.
19   Q.    And you knew this in part because the fees, the
20   facade firms and SFS charged consumers were determined
21   at the time of enrollment and charged monthly;
22   correct?
23   A.    On the advice of counsel, I invoke the fifth
24   amendment and respectfully decline to answer your
25   question.

1    Q.    You knew that fees collected by SFS and the

2    facade firms after a debt was settled were not a

3    percentage of the amount saved as a result of the

4    renegotiation settlement reduction or alteration of

5    the debt; correct?

6    A.    On the advice of counsel, I invoke the fifth

7    amendment and respectfully decline to answer your

8    question.

9    Q.    And you knew this in part because the fees the

10   facade firms and SFS charged consumers were determined

11   at the time of enrollment and charged monthly;

12   correct?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    Relialit knew that facade firms were collecting

17   fees prior to consumer settlements; correct?

18   A.    On the advice of counsel, I invoke the fifth

19   amendment and respectfully decline to answer your

20   question.

21   Q.    Lit Def knew that the facade firms were

22   collecting fees prior to consumer settlements;

23   correct?

24   A.    On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

34

1    question.

2    Q.    And Fidelis knew that the facade firms were

3    collecting fees prior to consumer settlements;

4    correct?

5    A.    On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.    Relialit knew that SFS was collecting fees prior

9    to consumer settlements?

10   A.    On the advice of counsel, I invoke the fifth

11   amendment and respectfully decline to answer your

12   question.

13   Q.    Lit Def knew that SFS was collecting fees prior

14   to consumer settlements?

15   A.    On the advice of counsel, I invoke the fifth

16   amendment and respectfully decline to answer your

17   question.

18   Q.    And Fidelis knew that SFS was collecting fees

19   prior to consumer settlements?

20   A.    On the advice of counsel, I invoke the fifth

21   amendment and respectfully decline to answer your

22   question.

23   Q.    Fidelis was operating in January 2024; correct?

24   A.    On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

35

1    question.

2    Q.    Fidelis was operating in February 2024 as well;

3    correct?

4    A.    On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.    Fidelis was operating in March of 2024?

8    A.    On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10   question.

11   Q.    Fidelis was operating in June of 2024; correct?

12   A.    On the advice of counsel, I invoke the fifth

13   amendment and respectfully decline to answer your

14   question.

15   Q.    Fidelis was operating in September of 2024?

16   A.    On the advice of counsel, I invoke the fifth

17   amendment and respectfully decline to answer your

18   question.

19   Q.    And Fidelis is still operating; correct?

20   A.    On the advice of counsel, I invoke the fifth

21   amendment and respectfully decline to answer your

22   question.

23   Q.    And Fidelis has access to consumer information

24   obtained by a defendant or defendants in this case

25   prior to the entry of the TRO; correct?

36

1    A.    On the advice of counsel, I invoke the fifth

2    amendment and respectfully decline to answer your

3    question.

4    Q.    And Fidelis uses that information; doesn't it?

5    A.    On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.    And Fidelis benefits from that information; isn't

9    that right?

10   A.    On the advice of counsel, I invoke the fifth

11   amendment and respectfully decline to answer your

12   question.

13   Q.    And Fidelis was involved in efforts to convert

14   consumers enrolled in SFS's debt relief program to the

15   contingency model in 2024; correct?

16   A.    On the advice of counsel, I invoke the fifth

17   amendment and respectfully decline to answer your

18   question.

19   Q.    And some of those consumers were converted;

20   correct?

21   A.    On the advice of counsel, I invoke the fifth

22   amendment and respectfully decline to answer your

23   question.

24   Q.    And those consumers are being Billed; correct?

25   A.    On the advice of counsel, I invoke the fifth

1    amendment and respectfully decline to answer your

2    question.

3    Q.    And Fidelis is paid using those funds; correct?

4    A.    On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.    Fidelis is still supporting litigation involving

8    SFS consumers; correct?

9    A.    On the advice of counsel, I invoke the fifth

10   amendment and respectfully decline to answer your

11   question.

12   Q.    Fidelis is still paying its employees?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    Fidelis is still paying litigation attorneys?

17   A.    On the advice of counsel, I invoke the fifth

18   amendment and respectfully decline to answer your

19   question.

20   Q.    Fidelis is using fees obtained prior to consumer

21   settlements to pay employees; correct?

22   A.    On the advice of counsel, I invoke the fifth

23   amendment and respectfully decline to answer your

24   question.

25   Q.    Fidelis used fees obtained prior to consumer

1    settlements to pay employees in 2024; correct?

2    A.    On the advice of counsel, I invoke the fifth

3    amendment and respectfully decline to answer your

4    question.

5    Q.    Fidelis is using fees obtained prior to consumer

6    settlements to pay litigation attorneys; correct?

7    A.    On the advice of counsel, I invoke the fifth

8    amendment and respectfully decline to answer your

9    question.

10   Q.    And Fidelis used fees obtained prior to consumer

11   settlements to pay litigation attorneys in 2024;

12   correct?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    Fidelis is using fees obtained prior to consumers

17   making payments on settlements to pay employees;

18   correct?

19   A.    On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.    And Fidelis is using fees obtained prior to

23   consumers making payments on settlements -- strike

24   that.

25          Fidelis used fees obtained prior to

39

1    consumers making payments on settlements to pay

2    employees of 2024; correct?

3    A.   On the advice of counsel, I invoke the fifth

4    amendment and respectfully decline to answer your

5    question.

6    Q.   Fidelis is using fees obtained prior to consumers

7    making payments on settlements to pay litigation

8    attorneys; correct?

9    A.   On the advice of counsel, I invoke the fifth

10   amendment and respectfully decline to answer your

11   question.

12   Q.   And Fidelis used fees obtained prior to consumers

13   making payments on settlements to pay litigation

14   attorneys in 2024; correct?

15   A.   On the advice of counsel, I invoke the fifth

16   amendment and respectfully decline to answer your

17   question.

18   Q.   And your assets are frozen under this matter;

19   correct?

20   A.   On the advice of counsel, I invoke the fifth

21   amendment and respectfully decline to answer your

22   question.

23   Q.   So you cannot use those funds to pay any Fidelis

24   employees; correct?

25   A.   On the advice of counsel, I invoke the fifth

40

1    amendment and respectfully decline to answer your

2    question.

3              MR. PERSONIUS:  I have no further questions.

4              THE COURT:  Mr. McNamara?

5              DIRECT EXAMINATION BY MR. MCNAMARA:

6    Q.   Good morning, Mr. Blust.

7    A.   Good morning.

8    Q.   Focus of my questions will be on order to show

9    cause regarding the contempt we're seeking against you

10   but there may necessarily be some overlap between my

11   questions and the questions just posed to you.  Do you

12   understand that?

13   A.   Yes, sir.

14   Q.   Sir, I want to focus initially on Fidelis.  You

15   arranged with Cameron Christo to establish Fidelis in

16   2021 to replace Lit Def Strategies as the entity to

17   service the law firms under your control; isn't that

18   correct?

19   A.   On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.   And the reason that you asked Christo to

23   establish Fidelis in his name as a replacement to Lit

24   Def is because you personally and your law firm Client

25   First Bankruptcy and your companies Lit Def and

1   Relialit had been sued numerous times in 2019 and
2   2020.  Isn't that correct?
3   A.   On the advice of counsel, I invoke the fifth
4   amendment and respectfully decline to answer your
5   question.
6   Q.   In fact, you say as much in Paragraph 4 of your
7   sworn declaration presented to this Court at Docket
8   211 where you state "throughout much of 2020 I was
9   involved in litigation in which I was named as a
10  defendant in part because my involvement in LDS" which
11  is litigation defense or Lit Def.  "As a result of
12  that litigation, I decided to wind down LDS which
13  began to reduce its work load in early 2021."  That's
14  what you stated; correct?
15  A.   On the advice of counsel, I invoke the fifth
16  amendment and respectfully decline to answer your
17  question.
18  Q.   These multiple lawsuits in referring to included
19  lawsuits filed by Ice Legal, a North Carolina Bar
20  investigation of one of your front law firms and the
21  front attorney and then a lawsuit by Carolina Legal
22  Services and Daniel Rufty against you which made
23  numerous findings -- let me backup.
24          The North Carolina Bar investigation made
25  numerous factual findings regarding your involvement

42

1    of Carolina Legal Services and the front attorney

2    Daniel Rufty; correct?

3    A.   On the advice of counsel, I invoke the fifth

4    amendment and respectfully decline to answer your

5    question.

6    Q.   And in turn, Mr. Rufty sued you and Lit Def and

7    Relialit following that investigation; correct?

8    A.   On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10   question.

11   Q.   And in 2021, you directed the Turnbull law firms

12   which you controlled to begin using Fidelis; isn't

13   that correct?

14   A.   On the advice of counsel, I invoke the fifth

15   amendment and respectfully decline to answer your

16   question.

17   Q.   And it's true, isn't it, that in January of '22

18   before Fidelis was assigned any strategic related law

19   firm files, you instructed Ms. Michelle Hinds

20   Gallagher, which I'll refer to as Hinds in my

21   questions, you determined which law firms were going

22   to terminate with Lit Def and which were going to move

23   to Fidelis; didn't you?

24   A.   On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

43

1    question.

2    Q.   And at the same time in January of 2022, you

3    ordered Hinds to begin assigning Lit Def employees to

4    roles at Fidelis to assist with the strategic related

5    law firm files that you had transferred to Fidelis;

6    isn't that correct?

7    A.   On the advice of counsel, I invoke the fifth

8    amendment and respectfully decline to answer your

9    question.

10   Q.   And it's true that you then continued to monitor

11   and control the Fidelis activity via weekly production

12   reports which are called file submission reports

13   provided to you by Hinds which reflected the

14   productivity of Lit Def and Fidelis employees isn't

15   that true?

16   A.   On the advice of counsel, I invoke the fifth

17   amendment and respectfully decline to answer your

18   question.

19   Q.   And you continued to receive and review these

20   productivity reports for Fidelis employees until

21   January of 2024; isn't that correct?

22   A.   On the advice of counsel, I invoke the fifth

23   amendment and respectfully decline to answer your

24   question.

25   Q.   And Mr. Christo was not provided these

44

1  productivity reports; correct?

2  A.    On the advice of counsel, I invoke the fifth

3  amendment and respectfully decline to answer your

4  question.

5  Q.    And based on these productivity reports you

6  periodically directed Hinds to transfer employees from

7  Lit Def to Fidelis without any consultation or

8  involvement in Mr. Christo; isn't that correct?

9  A.    On the advice of counsel, I invoke the fifth

10  amendment and respectfully decline to answer your

11  question.

12  Q.    You also established the bonuses for Fidelis

13  employees in December of '22 and December of '23 and

14  instructed Hinds to inform the employees of those

15  bonuses; correct?

16  A.    On the advice of counsel, I invoke the fifth

17  amendment and respectfully decline to answer your

18  question.

19  Q.    And Mr. Christo had no involvement in your

20  discussions with Ms. Hinds or your determination of

21  those bonuses; correct?

22  A.    On the advice of counsel, I invoke the fifth

23  amendment and respectfully decline to answer your

24  question.

25  Q.    For example, in December of 22, you instructed

45

1    Hinds to pay Hayfa Zayed, Z-A-Y-E-D, a Fidelis

2    employee and previously a Client First Bankruptcy law

3    firm employee a bonus of $2,000 from Fidelis isn't

4    that correct?

5    A.   On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.   And again, you set these bonuses for all the

9    Fidelis employees without any consultation with Mr.

10   Christo; isn't that correct?

11   A.   On the advice of counsel, I invoke the fifth

12   amendment and respectfully decline to answer your

13   question.

14   Q.   Indeed to the extent that Mr. Christo approved in

15   2022 or 2023 the bonuses for Fidelis employees that

16   approval consisted only of authorizing the payment

17   using this sure payroll one word after you had already

18   determined the amounts and instructed Hinds as to

19   those amounts to it; isn't that correct?

20   A.   On the advice of counsel, I invoke the fifth

21   amendment and respectfully decline to answer your

22   question.

23   Q.   Similarly, you increased salaries for Fidelis

24   employees without involvement of Christo; isn't that

25   correct?

46

1    A.   On the advice of counsel, I invoke the fifth

2    amendment and respectfully decline to answer your

3    question.

4    Q.   And it is true, sir, that you intended from the

5    out set in 2021 when Fidelis was established to

6    ultimately move all of the Lit Def law firm clients

7    which you controlled to the Fidelis entity; correct?

8    A.   On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10    question.

11    Q.   And again, you took steps to move the law firms

12    and the Lit Def employees from Lit Def to Fidelis

13    which Christo owned on paper in order to insulate

14    yourself and your companies from future lawsuits by

15    consumers, state agencies or the federal government;

16    isn't that true?

17    A.   On the advice of counsel, I invoke the fifth

18    amendment and respectfully decline to answer your

19    question.

20    Q.   At all times from Fidelis's establishment in 2021

21    until the entry of the TRO in this case and even after

22    you exercise control of Fidelis; isn't that correct?

23    A.   On the advice of counsel, I invoke the fifth

24    amendment and respectfully decline to answer your

25    question.

1   Q.   And at all times consistent with your arrangement

2   with him Christo acted as a front owner of Fidelis;

3   isn't that correct?

4   A.   On the advice of counsel, I invoke the fifth

5   amendment and respectfully decline to answer your

6   question.

7   Q.   You attempted to conceal the existence of your

8   control of Fidelis from the parties in this case and

9   the receiver; isn't that correct?

10  A.   On the advice of counsel, I invoke the fifth

11  amendment and respectfully decline to answer your

12  question.

13  Q.   And isn't it true sir that the declaration you

14  submitted to this court under oath on March 14, 2024,

15  contained numerous false statements regarding your

16  involvement with and control of Fidelis?

17  A.   On the advice of counsel, I invoke the fifth

18  amendment and respectfully decline to answer your

19  question.

20  Q.   So you or Client First Bankruptcy which is your

21  law firm provided Lit Def employees with Surface

22  tablets computers to work remotely; isn't that

23  correct?

24  A.   On the advice of counsel, I invoke the fifth

25  amendment and respectfully decline to answer your

48

1    question.

2    Q.    And these service computers were retained by

3    those employees as and when you transfer or

4    transitioned them from Lit Def to Fidelis; correct?

5    A.    On the advice of counsel, I invoke the fifth

6    amendment and respectfully decline to answer your

7    question.

8    Q.    And it's true, sir, that Fidelis employees

9    maintain the same log in credentials for their tablet

10   computers that utilized a clientfirstbankruptcy.com

11   domain when you moved them from Lit Def to Fidelis.

12   A.    On the advice of counsel, I invoke the fifth

13   amendment and respectfully decline to answer your

14   question.

15   Q.    I want to talk for a minute about the $750,000

16   payment to Fidelis if we could.   Christopher

17   Kesterson, K-E-S-T-E-R-S-O-N of K2 Financial

18   Management is your long time accountant; correct?

19   A.    On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.    He or his firm have assisted the law firms you

23   control at your request; isn't that correct?

24   A.    On the advice of counsel, I invoke the fifth

25   amendment and respectfully decline to answer your

49

1    question.

2    Q.    He or his firm assisted Lit Def at your request;

3    correct?

4    A.    On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.    And prior to that he assisted Relialit; correct?

8    A.    On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10   question.

11   Q.    When you reached a settlement in August of 2021

12   with Daniel Rufty, the Carolina Legal Services front

13   attorney who sued the strategic entity Relialit, Lit

14   Def and you personally, it was Lit Def that funded the

15   $1.5 million settlement; isn't that correct?

16   A.    On the advice of counsel, I invoke the fifth

17   amendment and respectfully decline to answer your

18   question.

19   Q.    But you had an agreement with Ryan Sasson of

20   Strategic that Strategic would reimburse Lit Def for

21   one half of the settlement; isn't that correct?

22   A.    On the advice of counsel, I invoke the fifth

23   amendment and respectfully decline to answer your

24   question.

25   Q.    Strategic's payment was falsely portrayed as a

50

1    tech spend in quotes to the law firms; correct?

2    A.   On the advice of counsel, I invoke the fifth

3    amendment and respectfully decline to answer your

4    question.

5    Q.   Strategic and Sasson were to disguise the payment

6    in order to conceal the settlement from Strategic's

7    auditors; isn't that true?

8    A.   On the advice of counsel, I invoke the fifth

9    amendment and respectfully decline to answer your

10   question.

11   Q.   At your direction in October of 2021, Kesterson

12   instructed Strategic to pay the $750,000 reimbursement

13   not to Lit Def but instead to Fidelis; isn't that

14   correct?

15   A.   On the advice of counsel, I invoke the fifth

16   amendment and respectfully decline to answer your

17   question.

18   Q.   Fidelis through Christo then submitted invoices

19   to strategic and was ultimately paid the full

20   $750,000; isn't that true?

21   A.   On the advice of counsel, I invoke the fifth

22   amendment and respectfully decline to answer your

23   question.

24   Q.   Lit Def asset of $750,000 was thereby transferred

25   to Fidelis; wasn't it?

51

1    A.    On the advice of counsel, I invoke the fifth

2    amendment and respectfully decline to answer your

3    question.

4    Q.    Although he submitted invoices Christo provided

5    no services, consultation or "vetting" of software for

6    Strategic; isn't that true?

7    A.    On the advice of counsel, I invoke the fifth

8    amendment and respectfully decline to answer your

9    question.

10   Q.    I'm going to focus, sir, for a minute on the

11   declaration you submitted in this case which is Docket

12   211.  At Paragraph 7 you state "the receiver's

13   assertion that I own and/or control a company called

14   Fidelis Legal Services LLC is flatly false.  I do not

15   control or own Fidelis.  I have never owned or

16   controlled Fidelis nor did I diverse assets or

17   resources of LDS to Fidelis."  That's your statement.

18   Correct?

19   A.    On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.    Those statements are false; correct?

23   A.    On the advice of counsel, I invoke the fifth

24   amendment and respectfully decline to answer your

25   question.

52

1    Q.    In Paragraph 18 of that same sworn declaration

2    submitted to this Court, you state "the references at

3    Pages 16 to 17 of the receiver's memorandum to the

4    improper transfer of ESI in assets of the

5    receiver/defendants or of LDS are baseless.  Any ESI

6    or other assets handled by LDS during its operation

7    belonged to the law firms not LDS"; isn't that what

8    you said?

9    A.    On the advice of counsel, I invoke the fifth

10   amendment and respectfully decline to answer your

11   question.

12   Q.    And that was false; wasn't it?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    At Paragraph 9 of that same declaration, you

17   state "aside from this informal conversation in late

18   2020, I played no role whatsoever in Mr. Christo's

19   formation of Fidelis.  I did not participate in any

20   way of funding the formation of Fidelis nor in funding

21   its operation following its operation.  I hold no

22   direct or indirect interest of any kind financial or

23   otherwise in the operation of Fidelis".  That's what

24   you said; correct?

25   A.    On the advice of counsel, I invoke the fifth

53

1    amendment and respectfully decline to answer your

2    question.

3    Q.   And those statements are false; aren't they?

4    A.   On the advice of counsel, I invoke the fifth

5    amendment and respectfully decline to answer your

6    question.

7    Q.   At Paragraph 10 of that same declaration

8    submitted to this Court, you stated "over the period

9    of 2021 through 2023, as LDS took less and less

10   business and by comparison of the business taken by

11   Fidelis grew, I became aware that a few employees of

12   LDS began simultaneously working for Fidelis.  I

13   approved of their doing work so provided their work

14   permission with for LDS was not affected.  Over time

15   the amount of work performed by the shared employees

16   for Fidelis increased and in turn a portion of their

17   work on behalf of LDS decreased".  That's what you

18   stated; correct?

19   A.   On the advice of counsel, I invoke the fifth

20   amendment and respectfully decline to answer your

21   question.

22   Q.   And those statements were false; weren't they?

23   A.   On the advice of counsel, I invoke the fifth

24   amendment and respectfully decline to answer your

25   question.

54

1    Q.   At Paragraph 11 of your sworn declaration

2    submitted to this Court, you state "this arrangement

3    in no fashion involved any interest of any kind on my

4    part including financial or supervisory in the

5    operations of Fidelis" that's what you said; correct?

6    A.   On the advice of counsel, I invoke the fifth

7    amendment and respectfully decline to answer your

8    question.

9    Q.   And those statements are false?

10   A.   On the advice of counsel, I invoke the fifth

11   amendment and respectfully decline to answer your

12   question.

13   Q.   In Paragraph 15 of the same sworn declaration

14   submitted to this Court, you state "the conclusory

15   allegations in the receiver's memorandum of law at

16   Pages 2 that Fidelis's beneficially owned or

17   controlled" by me is false as is the claim on Page 2

18   of the that Fidelis is "operating in parallel with has

19   proxy of or successor to LDS" you made that statement

20   under oath; correct?

21   A.   On the advice of counsel, I invoke the fifth

22   amendment and respectfully decline to answer your

23   question.

24   Q.   And those statements are false?

25   A.   On the advice of counsel, I invoke the fifth

1    amendment and respectfully decline to answer your

2    question.

3    Q.    Paragraph 16 of that same declaration you state

4    "repeated statements in the receiver's memorandum of

5    law at Pages 1, 2, 3 and 14 that either I or LDS has

6    failed to comply with the TRO or that we have been

7    uncooperative for the receiver's efforts to implement

8    the TRO is incorrect with the exception of LDS's

9    limited operations for a brief period after the TRO

10   was?"

11   A.    On the advice of counsel, I invoke the fifth

12   amendment and respectfully decline to answer your

13   question.

14   Q.    And those statements were false?

15   A.    On the advice of counsel, I invoke the fifth

16   amendment and respectfully decline to answer your

17   question.

18   Q.    And in Paragraph 17 of that same sworn

19   declaration submitted with this Court, you state "the

20   assertions at Page 16 of the receiver's memorandum of

21   law that LDS and I are "transacting Lit Def business

22   via Lit Def itself and/or through Fidelis" and that

23   "Fidelis is handling some or perhaps all of the

24   work-related to interviewing law firm client matters

25   which had previously been handled by Lit Def are also

56

1    incorrect".  That's what you stated; correct?

2    A.    On the advice of counsel, I invoke the fifth

3    amendment and respectfully decline to answer your

4    question.

5    Q.    And those statements are false?

6    A.    On the advice of counsel, I invoke the fifth

7    amendment and respectfully decline to answer your

8    question.

9    Q.    Mr. Blust, on or around January 12, 2024, you

10   received a copy of the temporary retraining order in

11   this case which was filed on January 11, 2024; isn't

12   that true?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    And on that same date January 12, 2024, you read

17   that TRO; didn't you?

18   A.    On the advice of counsel, I invoke the fifth

19   amendment and respectfully decline to answer your

20   question.

21   Q.    And on or around that date you understood that

22   pursuant to the terms of the TRO you had numerous

23   obligations that include cooperating with the

24   receiver; isn't that true?

25   A.    On the advice of counsel, I invoke the fifth

1    amendment and respectfully decline to answer your

2    question.

3    Q.    And around that same date you understood that as

4    a defendant in this case you were restrained and

5    enjoined from "transacting any of the business of the

6    receivership defendants"; isn't that true?

7    A.    On the advice of counsel, I invoke the fifth

8    amendment and respectfully decline to answer your

9    question.

10   Q.    You knowingly violated the TRO by continuing to

11   operate Lit Def after you had knowledge of the

12   temporary restraining order; isn't that true?

13   A.    On the advice of counsel, I invoke the fifth

14   amendment and respectfully decline to answer your

15   question.

16   Q.    In fact, after receiving and reading the TRO you

17   instructed Hinds to tell all of the Lit Def and

18   Fidelis employees including employees of Fidelis that

19   were not simultaneously employed at Lit Def to cease

20   all communications with Strategic; isn't that true?

21   A.    On the advice of counsel, I invoke the fifth

22   amendment and respectfully decline to answer your

23   question.

24   Q.    And you knowingly violated the temporary

25   restraining order and later the preliminary injunction

58

1    in this case by knowingly operating Fidelis; isn't
2    that true?
3    A.    On the advice of counsel, I invoke the fifth
4    amendment and respectfully decline to answer your
5    question.
6    Q.    And you knowingly violated the TRO and the
7    preliminary injunction that replaced it by interfering
8    in the receivers taking the custody, control,
9    possession or managing the assets and documents of
10    this receivership by submitting false testimony
11    designed to give the appearance that Fidelis was not
12    owned or controlled by you; isn't that true?
13    A.    On the advice of counsel, I invoke the fifth
14    amendment and respectfully decline to answer your
15    question.
16            MR. MCNAMARA:  Thank you, Your Honor.  I
17    have no further questions.
18            THE COURT:  Mr. Hoover?
19            MR. HOOVER:  No questions, Judge.
20            THE COURT:  Mr. Personius?
21            MR. PERSONIUS:  Thank you for asking, Judge.
22    I have none.
23            THE COURT:  Okay.  Thank you.  You can step
24    down.
25            THE WITNESS:  Thank you, Judge.

59

```
 1              THE COURT:  Mr. Sanders, next witness.
 2              MR. SANDERS:  Your Honor, the plaintiffs
 3   call Cameron Christo as an adverse witness.
 4              MR. HOOVER:  Judge, may I be heard?
 5              THE COURT:  Is Mr. Christo here?
 6              MR. HOOVER:  He's not.
 7              THE COURT:  Why not?  I ordered him to be
 8   here.
 9              MR. HOOVER:  Yes, Judge.  We received your
10   order yesterday.
11              THE COURT:  Okay.  I'm going to give him one
12   day grace.  He's to be here tomorrow morning at 9:30
13   a.m.
14              MR. HOOVER:  Understood, Judge.
15              THE COURT:  Okay?  Thank you.  Next witness.
16              MR. SANDERS:  Your Honor, we are getting our
17   next witness, Jewel Hewett from SFS consumer.
18              THE COURT:  Okay.
19              BY MS. RADOS:
20              THE CLERK:  Ms. Hewett, right this way,
21   please.
22              THE WITNESS:  Thank you.
23              THE CLERK:  If you would raise your right
24   hand, I'll swear you in.
25              J E W E L   H E W E T T, after having been
```

60

1  duly called and sworn, testified as follows:

2         THE CLERK:  Thank you.  Please have a seat.

3  When seated please, state and spell your name for the

4  record and speak clearly into the microphone.

5         THE WITNESS:  My name is Jewel Hewett.

6  J-E-W-E-L H-E-W-E-T-T.

7         DIRECT EXAMINATION BY MS. RADOS:

8  Q.   Thank you.  Good morning, Ms. Hewett.  How are

9  you today?

10 A.   I'm doing all right.  Thank you.

11 Q.   For a little bit of background for the Court, can

12 you tell us where you live?

13 A.   I live in Tonawanda right now.

14 Q.   Okay.  And can you tell us a little bit about

15 your education?

16 A.   Yes.  So I graduated high school in 2018.

17 Q.   So how old are you right now?

18 A.   I'm 25.

19 Q.   Okay.  Are you currently employed?

20 A.   I am not.

21 Q.   Where were you last employed?

22 A.   I was at the end of August of this year.

23 Q.   Where were you employed?

24 A.   Walgreens.

25 Q.   And how did that job end if you could tell us?

61

1     A.    So unfortunately, it was a choice between my

2     health, and it didn't seem like a good choice at all

3     at that point.

4     Q.    What were the circumstances?

5     A.    So I was diagnosed with a form of (inaudible).

6     It effects my heart rate, my blood pressure.  I have

7     episodes of compulsive syncope, so I was struggling

8     quite a bit with symptoms.

9     Q.    Okay.  And so that led to your job ending?

10    A.    Yes.

11    Q.    You referenced medical issues.  You are facing

12    some medical issues right now?

13    A.    Yes.

14    Q.    Do you have any medical conditions right now that

15    might impact your ability to remember things?

16    A.    I do have ADHD.  I'm medicated for that.  I'm

17    medicated today for that.

18    Q.    So you did take your medication today?

19    A.    I did.

20    Q.    And does that help you remember?

21    A.    It does.

22    Q.    Okay.  Jewel, have you ever been sued?

23    A.    I have.  Yes.

24    Q.    Can you tell the Court about the circumstances of

25    that lawsuit?

62

1    A.    Yes.  So I was sued by Chase Bank right around

2    the time of the lawsuit began with the law firm.

3    Q.    You were sued by Chase Bank, it was a creditor?

4    A.    Yes.

5    Q.    Okay.  And why did they sue you?

6    A.    For nonpayment.

7    Q.    Okay.  And why hadn't you been paying your bill

8    your credit card bills?

9    A.    That was after I had become unemployed due to

10    different medical issues.  I had a series of blood

11    clots in 2022 and I was advised not to go back to

12    work.  I was working in the restaurant industry and I

13    was unable to do that kind of overhead work and the

14    physical demand of it, so I was unemployed for quite a

15    bit after that.

16    Q.    So while you were unemployed, you racked up some

17    credit card debt?

18    A.    Yes.  There was some dental procedures mostly and

19    then just general expenses.

20    Q.    And did there come a time when it was hard for

21    you to pay all of your credit card bills?

22    A.    Yes.

23    Q.    And at some point, did you receive a flyer that

24    was promising you a loan to consolidate your debt?

25    A.    Yes.  It was for a consolidation loan.

63

1    Q.   Do you remember approximately when you got that

2    flyer?

3    A.   So that would have been around September of 2022

4    maybe.

5    Q.   Okay.  And did the offer of a credit

6    consolidation loan appeal to you?

7    A.   It did.

8    Q.   Do you remember approximately what your credit

9    card debt was when you got that flyer?

10   A.   About $15,000.

11   Q.   And after reading the flyer, did you call the

12   company?

13   A.   Yes.

14   Q.   Do you remember who answered the phone when you

15   called?

16   A.   I do not, no.  I don't remember.

17   Q.   And did you speak with this person about the

18   debt -- the credit card consolidation loan?

19   A.   Yes.

20   Q.   Did they offer you a loan?

21   A.   No.

22   Q.   What did -- how did that conversation go?  What

23   did they offer you?

24   A.   So I ended up in a credit consolidation program.

25   I would pay $336 and some change every month.

64

1    Contributing to it was a fund to pay the creditors.

2    Q.   And as part of the program, you were paying into

3    this fund was another element of the program that you

4    were to stop paying your credit card bills?

5    A.   Yes.  That was what I was advised to do.

6    Q.   Was that a requirement for participating in this

7    program?

8    A.   Yes.  After it was signed by a notary, I was told

9    to stop paying my credit cards.

10   Q.   And what was the name of -- was there a company

11   that was offering this program?  What was the name of

12   the company?

13   A.   So the offer was for Infinite Law, but that was

14   the program I started with.  I was working with the

15   law firm of Derek Williams.

16   Q.   Okay.  And so did the salesperson -- were they

17   working for Infinite Law as you understood it?

18   A.   Yes.

19   Q.   Okay.  Did this person that you spoke with

20   mention that you might get sued if you stop paying

21   your credit card bills?

22   A.   They did.

23   Q.   Was this a concern to you?

24   A.   Not as much because they -- they did assure me

25   that I would have attorneys on my side that they

65

1    would -- they would be handling any lawsuit that came

2    up.

3    Q.   Did they -- so they told you that you would be

4    represented by Infinite Law?

5    A.   Yes.

6              MR. HOOVER:  Objection.  Leading.

7              THE COURT:  Overruled.

8    Q.   So would you say that you felt reassured when

9    they told you that a law firm would be representing

10   you?

11   A.   Yes.

12             MR. HOOVER:  Objection.  Leading.

13             THE COURT:  Overruled.  Try not to lead, Ms.

14   Rados.

15             MS. RADOS:  Sorry, Your Honor.

16   Q.   How did you feel when you heard that the Infinite

17   Law firm would be representing you?

18   A.   Relieved, like I had protection.

19   Q.   And why did you -- can you talk more about the

20   feeling of relief, like what kind of things were you

21   going through before you talked to the salesperson?

22   A.   Yes.  So prior to my medical issues, I had a good

23   credit score.  I had savings accounts.  And really I

24   was just trying to get back on track.  I wanted to pay

25   my debts and anyway that I could and it was pretty

66

1    much my last option.

2    Q.   So did you -- how did you -- how would you

3    characterize how you felt when you were discussing the

4    fact that you might be sued?

5    A.   Concerned obviously, but again, I was assured

6    that I would have attorneys on my side.  So --

7    Q.   Would you -- would you say that this promise that

8    you would have Infinite representing you was one of

9    the reasons that you signed up for this program?

10   A.   Absolutely, yes.

11          MS. RADOS:  Thank you, Your Honor.  No

12   further questions.

13          THE COURT:  Mr. McNamara, do you have any

14   questions?

15          MR. MCNAMARA:  I do not, Your Honor.

16          THE COURT:  Mr. Hoover?

17          CROSS EXAMINATION BY MR. HOOVER:

18   Q.   Morning, ma'am.

19   A.   Good morning.

20   Q.   I'm really sorry to hear about your medical

21   issues?

22   A.   I appreciate that.

23   Q.   Where were you sued?  What was the court?

24   A.   I believe it was Niagara County.

25   Q.   Yeah, like in city court or county?

67

1    A.   I do not recall.  I'm so sorry.

2    Q.   Okay.  And that suit was before you enrolled in

3    this program or after?

4    A.   No, it was after.

5    Q.   Okay.  And that suit you reached a settlement; is

6    that correct?

7    A.   I don't recall.  I don't believe so.  So I had

8    enrolled three different creditors with the program.

9    I'm so sorry.  I'm losing my train of thought.  Could

10   you repeat that?

11   Q.   Would you like a glass of water or -- actually,

12   was that yours?

13            THE CLERK:  Yes.

14            THE COURT:  That's for you.

15            THE WITNESS:  Okay.

16            THE CLERK:  That's for you, yes.

17            THE WITNESS:  I'm so sorry.  Do you mind

18   repeating the question?

19   Q.   No problem.  Let's go back one.  Where was the

20   suit, if you remember?

21   A.   I don't recall.  I was never -- I never actually

22   got to the courtroom.  I haven't heard anything about

23   it since.  I tried to contact my attorneys at the law

24   firm, but unfortunately, by that time, they had

25   already begun the lawsuit and all customer service was

68

1   halted.

2   Q.   So my question, and I'll ask it a little

3   differently, were there any of the debts that you

4   enrolled settled or none of the debts were settled?

5   A.   I don't recall.

6   Q.   And your contact was with you said Derek

7   Williams?

8   A.   Yes.

9   Q.   His law firm?

10  A.   Yes.

11  Q.   And the Infinite Law firm or that was just the

12  initial outreach?

13  A.   That was the initial outreach.  I was under the

14  impression that the law firm of Derek Williams was

15  working with Infinite Law maybe under them.

16  Q.   Sure.

17  A.   A larger group.

18  Q.   And do you know the status of the lawsuit today?

19  A.   I do not.

20  Q.   Okay.  And is Mr. Williams still representing

21  you?

22  A.   No.

23  Q.   And when did that terminate?

24  A.   So that was shortly after I stopped being able to

25  communicate with the law firm.  I closed the account

69

1   and removed any funds that I had in the account which

2   was significantly less than I had paid into the

3   program.

4   Q.   And do you remember when that was?  You said

5   after but do you have a specific date or do you

6   remember a specific date?

7   A.   I do not recall a specific date.

8   Q.   Can we pull up Fidelis 68, please?  So I'm

9   showing you an exhibit that's been admitted in

10  evidence marked as Fidelis Exhibit 68.  Spencer, can

11  we just slowly scroll through for the witness so she

12  can just take a look generally?

13  A.   Yes.  I do recall this.

14  Q.   So --

15  A.   So --

16  Q.   Well, if I could?

17  A.   Yes, absolutely.

18  Q.   Okay.  This is a packet of documents you provided

19  to the Government?

20  A.   Yes.

21  Q.   When did you provide that to them?

22  A.   I don't recall the date.  I apologize.

23  Q.   And this relates to your contact from the law

24  firm of Derek Williams; correct?

25  A.   Yes.

70

1    Q.    And your enrollment or engagement in the debt
2    resolution program; is that correct?
3    A.    Yes.
4    Q.    And there's no other documents related to that,
5    this is all of them?
6    A.    This is everything from -- everything I received
7    from the law firm.
8    Q.    Okay.  No further questions.  Thank you.
9              THE COURT:  Mr. Personius?
10             MR. PERSONIUS:  Thank you, Judge.  No
11   questions.
12             MS. RADOS:  Nothing further.  Thank you.
13             THE COURT:  Anything further?
14             MS. RADOS:  Nothing further.  Thank you.
15             THE COURT:  You can step down.  Thank you
16   very much.
17             THE WITNESS:  Thank you.
18             MR. SANDERS:  Ready for the next witness,
19   Judge?
20             THE COURT:  Who is the next witness?
21             MR. SANDERS:  We plan to call Michelle
22   Gallagher next as an adverse witness.
23             THE COURT:  Hang on one second.  Okay.  Go
24   ahead and call the witness.
25             MR. SANDERS:  Okay.  Judge, plaintiffs call

71

1    Michelle Gallagher as an adverse witness.

2            THE CLERK:  I'll swear you in, please.

3            M I C H E L L E   G A L L A G H E R, after

4    having been duly called and sworn, testified as

5    follows:

6            THE CLERK:  Thank you.  Please have a seat,

7    and once you do, please state your name and spell it

8    for the record.  Thank you.

9            THE WITNESS:  Michelle Gallagher,

10   G-A-L-L-A-G-H-E-R.

11           THE COURT:  Just for the record, Mr. Molloy,

12   you are going to sit up here with counsel?

13           MR. MOLLOY:  Yes, Your Honor.

14           THE COURT:  Okay.

15           MR. MOLLOY:  His chair is right here, but if

16   it's all right with you, Your Honor, I may stand.

17           THE COURT:  Okay.

18           DIRECT EXAMINATION BY MR. ROMANOFF:

19   Q.   Good morning, Ms. Gallagher.  My name is Evan

20   Romanoff.  I'm an Assistant Attorney General at the

21   Minnesota Attorney General's Office.  I represent the

22   State of Minnesota in this action.  I want to make

23   sure I address you properly.  Do you prefer Ms.

24   Gallagher?

25   A.   Sure.  That's fine.

72

1    Q.   Okay.  Ms. Gallagher, you own and are the

2    managing editor of Chabner Legal Group LLC; correct?

3    A.   On the advice of counsel, I invoke my fifth

4    amendment privilege against self-incrimination and

5    respectfully decline to answer you question.

6    Q.   You also own and manage Hinds Law LLC also known

7    as First America Law; right?

8    A.   On the advice of counsel, I invoke my fifth

9    amendment privilege against self-incrimination and

10   respectfully decline to answer you question.

11   Q.   You are also the managing member of the Brian A.

12   Moore Law Firm LLC doing business as Guidestone Law

13   Firm; is that right?

14   A.   On the advice of counsel, I invoke my fifth

15   amendment privilege against self-incrimination and

16   respectfully decline to answer you question.

17   Q.   Same question as to Halleck and Associates LLC,

18   you are the managing member of that firm?

19   A.   On the advice of counsel, I invoke my fifth

20   amendment privilege against self-incrimination and

21   respectfully decline to answer you question.

22   Q.   And same question as to the Law Office of Melissa

23   Michele, LLC?

24   A.   On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

73

1    respectfully decline to answer you question.

2    Q.   Ms. Gallagher, you're the sole owner of bank

3    accounts for those three firms; correct?

4    A.   On the advice of counsel, I invoke my fifth

5    amendment privilege against self-incrimination and

6    respectfully decline to answer you question.

7    Q.   Those three firms worked with and relied on

8    Strategic and Strategic entities as part of the debt

9    relief operations in this matter; correct?

10   A.   On the advice of counsel, I invoke my fifth

11   amendment privilege against self-incrimination and

12   respectfully decline to answer you question.

13   Q.   And those firms were paid fees for their services

14   as part of that operation; correct?

15   A.   On the advice of counsel, I invoke my fifth

16   amendment privilege against self-incrimination and

17   respectfully decline to answer you question.

18   Q.   As the owner and operator of those law firms, you

19   knew that clients paid fees before their debts were

20   settled; correct?

21   A.   On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer you question.

24   Q.   As owner and manager of those law firms, you knew

25   clients paid advance fees; correct?

74

1    A.   On the advice of counsel, I invoke my fifth
2    amendment privilege against self-incrimination and
3    respectfully decline to answer you question.
4    Q.   And you knew the law firms were collecting
5    advance fees for their services; right?
6    A.   On the advice of counsel, I invoke my fifth
7    amendment privilege against self-incrimination and
8    respectfully decline to answer you question.
9    Q.   Ms. Gallagher, isn't it true that you signed
10   retainers or engagement agreements with clients that
11   included information on the fee structure?
12   A.   On the advice of counsel, I invoke my fifth
13   amendment privilege against self-incrimination and
14   respectfully decline to answer you question.
15   Q.   Ms. Gallagher, you also worked for Jason Blust's
16   law firm Client First Bankruptcy; is that right?
17   A.   On the advice of counsel, I invoke my fifth
18   amendment privilege against self-incrimination and
19   respectfully decline to answer you question.
20   Q.   Okay.  Moving on.  In addition to the law firms,
21   you own and manage you also manage Lit Def's
22   operations from 2020 to 2024; is that correct?
23   A.   On the advice of counsel, I invoke my fifth
24   amendment privilege against self-incrimination and
25   respectfully decline to answer you question.

75

1    Q.    You also managed Fidelis's operations from 2021
2    to 2024; correct?
3    A.    On the advice of counsel, I invoke my fifth
4    amendment privilege against self-incrimination and
5    respectfully decline to answer you question.
6    Q.    Okay, and I want to make clear going forward when
7    I say Fidelis I'm referring to Fidelis Legal Services
8    LLC?
9    A.    Understood.
10    Q.    Thank you.  You simultaneously managed both Lit
11    Def and Fidelis; right?
12    A.    On the advice of counsel, I invoke my fifth
13    amendment privilege against self-incrimination and
14    respectfully decline to answer you question.
15    Q.    Both Lit Def and Fidelis provided litigation
16    support services for SFS and the law firms in this
17    matter; correct?
18    A.    On the advice of counsel, I invoke my fifth
19    amendment privilege against self-incrimination and
20    respectfully decline to answer you question.
21    Q.    And when I say litigation support services, I
22    mean in part that the companies found and assisted
23    attorneys in representing consumers who were sued by
24    their creditors; correct?
25    A.    On the advice of counsel, I invoke my fifth

76

1    amendment privilege against self-incrimination and
2    respectfully decline to answer you question.
3    Q.    Both Lit Def and Fidelis provided the same
4    services; isn't that right?
5    A.    On the advice of counsel, I invoke my fifth
6    amendment privilege against self-incrimination and
7    respectfully decline to answer you question.
8    Q.    Both Fidelis and Lit Def used the same software
9    to provide their services; isn't that right?
10   A.    On the advice of counsel, I invoke my fifth
11   amendment privilege against self-incrimination and
12   respectfully decline to answer you question.
13   Q.    Okay.  We talked about your role as the law firm
14   manager and operator, but also as manager of Lit Def
15   and Fidelis you were aware that consumers paid advance
16   fees; isn't that right?
17   A.    On the advice of counsel, I invoke my fifth
18   amendment privilege against self-incrimination and
19   respectfully decline to answer you question.
20   Q.    Fidelis provided services beyond just finding
21   attorneys to represent consumers in creditor suits;
22   didn't it?
23   A.    On the advice of counsel, I invoke my fifth
24   amendment privilege against self-incrimination and
25   respectfully decline to answer you question.

1    Q.   For instance, in addition to assigning the

2    attorney that would represent the consumer, Fidelis

3    provided attorneys with substantive suggestions on the

4    litigation sometimes; isn't that right?

5    A.   On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer you question.

8    Q.   Fidelis also received proposed settlements from

9    these assigned attorneys that had been negotiated by

10   those attorneys and forwarded them to the Strategic

11   entities; correct?

12   A.   On the advice of counsel, I invoke my fifth

13   amendment privilege against self-incrimination and

14   respectfully decline to answer you question.

15   Q.   And Fidelis worked with the assigned attorneys as

16   well as Strategic to handle the settlements and

17   resolve any issues; correct?

18   A.   On the advice of counsel, I invoke my fifth

19   amendment privilege against self-incrimination and

20   respectfully decline to answer you question.

21   Q.   For instance, Fidelis arranged for settlements to

22   be paid on time or make sure the assigned attorneys

23   handle them correctly; is that right?

24   A.   On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

78

1   respectfully decline to answer you question.

2   Q.   Handling the settlements wasn't just a matter of

3   forwarding them to Strategic.  Fidelis reviewed the

4   settlements; correct?

5   A.   On the advice of counsel, I invoke my fifth

6   amendment privilege against self-incrimination and

7   respectfully decline to answer you question.

8   Q.   Fidelis made sure that the settlements worked

9   within the attorney's escrow accounts; correct?

10  A.   On the advice of counsel, I invoke my fifth

11  amendment privilege against self-incrimination and

12  respectfully decline to answer you question.

13          MR. ROMANOFF:  Do you need a break, Ms.

14  Gallagher?

15          THE WITNESS:  Yes, please.

16          MR. MOLLOY:  She just needs a minute to

17  compose herself, Your Honor.

18          THE COURT:  We'll take whatever time.

19          THE WITNESS:  Five minutes.

20          THE COURT:  Okay.  We'll come back at five

21  after 11.  That's ten minutes.

22          MR. MOLLOY:  I appreciate it, Your Honor.

23  Thank you.

24          THE WITNESS:  Thank you.

25  (The proceeding recessed at 10:57 a.m.)

79

1    (The proceeding reconvened at 11:08 a.m.; appearances

2    as before noted.)

3              CONTINUED EXAMINATION BY MR. ROMANOFF:

4              THE COURT:  Ready to go?

5              MR. MOLLOY:  We are, Your Honor.  Thank you.

6              MR. ROMANOFF:  Are we on the record?

7    Q.   So Ms. Gallagher, before we get back, sorry,

8    please let me know if we need to take any more breaks

9    or get some water.

10    A.   Thank you.

11    Q.   We were discussing some of Fidelis's role and you

12    had answered that Fidelis did more than just review

13    settlements, they made sure they work within escrow;

14    is that right?

15    A.   On the advice of counsel, I invoke my fifth

16    amendment privilege against self-incrimination and

17    respectfully decline to answer your question.

18    Q.   Fidelis also responded to attorney questions;

19    correct?

20    A.   On the advice of counsel, I invoke my fifth

21    amendment privilege against self-incrimination and

22    respectfully decline to answer your question.

23    Q.   Fidelis made sure that the attorney notated the

24    Leadtrack software properly; is that right?

25    A.   On the advice of counsel, I invoke my fifth

80

1    amendment privilege against self-incrimination and

2    respectfully decline to answer your question.

3    Q.    Isn't it true that Fidelis did more than just

4    administrative work for the debt relief enterprise?

5    A.    On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer your question.

8    Q.    Fidelis was also involved in recommending refunds

9    for consumers when settlements couldn't be negotiated;

10   correct?

11   A.    On the advice of counsel, I invoke my fifth

12   amendment privilege against self-incrimination and

13   respectfully decline to answer your question.

14   Q.    Fidelis also fielded complaints from consumers

15   who were upset about the debt relief services and

16   litigation services that they were entitled to; isn't

17   that right?

18   A.    On the advice of counsel, I invoke my fifth

19   amendment privilege against self-incrimination and

20   respectfully decline to answer your question.

21   Q.    Fidelis received and handled complaints from

22   consumers who were upset about the advanced fees that

23   they paid; correct?

24   A.    On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

81

1    respectfully decline to answer your question.
2    Q.    Fidelis often referred complaints to the
3    Strategic entities; correct?
4    A.    On the advice of counsel, I invoke my fifth
5    amendment privilege against self-incrimination and
6    respectfully decline to answer your question.
7    Q.    Fidelis didn't just refer complaints it also
8    played a role in trying to resolve them with
9    consumers; correct?
10   A.    On the advice of counsel, I invoke my fifth
11   amendment privilege against self-incrimination and
12   respectfully decline to answer your question.
13   Q.    Ms. Gallagher, isn't it true that as Fidelis's
14   manager you participated in weekly litigation calls
15   with Strategic?
16   A.    On the advice of counsel, I invoke my fifth
17   amendment privilege against self-incrimination and
18   respectfully decline to answer your question.
19   Q.    You'd agree wouldn't you that Fidelis provided an
20   important service for the debt relief program as a
21   whole?
22   A.    On the advice of counsel, I invoke my fifth
23   amendment privilege against self-incrimination and
24   respectfully decline to answer your question.
25   Q.    In fact, the litigation support where provided by

82

1    Fidelis was essential to the debt relief operation;
2    wasn't it?
3    A.    On the advice of counsel, I invoke my fifth
4    amendment privilege against self-incrimination and
5    respectfully decline to answer your question.
6    Q.    As the manager of Lit Def and Fidelis, were you
7    aware that SFS and the law firms were collecting
8    advance fees?
9    A.    On the advice of counsel, I invoke my fifth
10   amendment privilege against self-incrimination and
11   respectfully decline to answer your question.
12   Q.    When Fidelis work increased some Lit Def staff
13   members started working with Fidelis at the same time
14   that they were working for Lit Def; correct?
15   A.    On the advice of counsel, I invoke my fifth
16   amendment privilege against self-incrimination and
17   respectfully decline to answer your question.
18   Q.    And over time some Lit Def employees stopped
19   working at Lit Def all together and started working at
20   Fidelis full-time; right?
21   A.    On the advice of counsel, I invoke my fifth
22   amendment privilege against self-incrimination and
23   respectfully decline to answer your question.
24   Q.    The services that Lit Def and Fidelis provided
25   were done largely by the same employees; correct?

83

1    A.   On the advice of counsel, I invoke my fifth

2    amendment privilege against self-incrimination and

3    respectfully decline to answer your question.

4    Q.   Ms. Gallagher, Jason Blust directed you how

5    employees including Fidelis employees should be paid

6    for their work; correct?

7    A.   May I have just one second?

8    Q.   Of course.

9    A.   Thank you.

10   (There was a pause in the proceeding.)

11   A.   All right.  I'm fine.  Thank you.

12   Q.   When Fidelis was getting underway, Mr. Blust

13   directed you that you should tell assigned attorneys

14   that Fidelis will have the same personnel as Lit Def;

15   right?

16   A.   On the advice of counsel, I invoke my fifth

17   amendment privilege against self-incrimination and

18   respectfully decline to answer your question.

19   Q.   And Mr. Blust directed you that when attorneys

20   email Fidelis employees at their Lit Def email account

21   the employee should copy and paste the email into a

22   new email and send it using the Fidelis account;

23   correct?

24   A.   On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

84

1    respectfully decline to answer your question.

2    Q.    Mr. Blust instructed you to conceal the existence

3    of Fidelis from Charles Connor the managing director

4    of National Data Systems; isn't that right?

5    A.    On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer your question.

8    Q.    Mr. Blust directed you to instead tell Mr.

9    Connors that you were setting up a second team

10   instead; correct?

11   A.    On the advice of counsel, I invoke my fifth

12   amendment privilege against self-incrimination and

13   respectfully decline to answer your question.

14   Q.    Mr. Blust also directed you to tell Mr. Connors

15   that Fidelis was the "same people different name" as

16   Lit Def; right?

17   A.    On the advice of counsel, I invoke my fifth

18   amendment privilege against self-incrimination and

19   respectfully decline to answer your question.

20   Q.    Mr. Blust decided which law firms were moving

21   from Lit Def to Fidelis; correct?

22   A.    On the advice of counsel, I invoke my fifth

23   amendment privilege against self-incrimination and

24   respectfully decline to answer your question.

25   Q.    Fidelis's business was entirely generated through

85

1  Mr. Blust; isn't that right?

2  A.   On the advice of counsel, I invoke my fifth

3  amendment privilege against self-incrimination and

4  respectfully decline to answer your question.

5  Q.   Cameron Christo didn't have any role in getting

6  business for Fidelis, did he?

7  A.   On the advice of counsel, I invoke my fifth

8  amendment privilege against self-incrimination and

9  respectfully decline to answer your question.

10  Q.   I'm more than halfway through.

11  A.   Thank you.

12  Q.   Mr. Blust controlled the law firms; correct?

13  A.   On the advice of counsel, I invoke my fifth

14  amendment privilege against self-incrimination and

15  respectfully decline to answer your question.

16  Q.   And in operating his control he simply routed new

17  business to Fidelis; correct?

18  A.   On the advice of counsel, I invoke my fifth

19  amendment privilege against self-incrimination and

20  respectfully decline to answer your question.

21  Q.   The entirety of Fidelis's revenue is through law

22  firms controlled or owned by Mr. Blust; isn't that

23  right?

24  A.   On the advice of counsel, I invoke my fifth

25  amendment privilege against self-incrimination and

86

1    respectfully decline to answer your question.

2    Q.    Fidelis and Lit Def serviced the same customers;

3    isn't that right?

4    A.    On the advice of counsel, I invoke my fifth

5    amendment privilege against self-incrimination and

6    respectfully decline to answer your question.

7    Q.    And both Lit Def and Fidelis shared the same

8    procedures to perform those services; isn't that

9    right?

10   A.    On the advice of counsel, I invoke my fifth

11   amendment privilege against self-incrimination and

12   respectfully decline to answer your question.

13   Q.    Employees for Lit Def and Fidelis used the same

14   equipment; correct?

15   A.    On the advice of counsel, I invoke my fifth

16   amendment privilege against self-incrimination and

17   respectfully decline to answer your question.

18   Q.    Ms. Gallagher, you testified in your March 21,

19   2024, declaration that as far as you knew Jason Blust

20   has no role in Fidelis's operations and exercises no

21   control over the running of Fidelis's business; isn't

22   that right?

23   A.    On the advice of counsel, I invoke my fifth

24   amendment privilege against self-incrimination and

25   respectfully decline to answer your question.

87

1   Q.   That testimony was false; wasn't it?

2   A.   On the advice of counsel, I invoke my fifth

3   amendment privilege against self-incrimination and

4   respectfully decline to answer your question.

5   Q.   You knew at the time you signed that declaration

6   that Mr. Blust had a role in Fidelis's operations;

7   didn't you?

8   A.   On the advice of counsel, I invoke my fifth

9   amendment privilege against self-incrimination and

10  respectfully decline to answer your question.

11  Q.   You answered to Mr. Blust at both Lit Def and

12  Fidelis; correct?

13  A.   On the advice of counsel, I invoke my fifth

14  amendment privilege against self-incrimination and

15  respectfully decline to answer your question.

16  Q.   You and Mr. Blust jointly made hiring and firing

17  decisions at Fidelis; correct?

18  A.   On the advice of counsel, I invoke my fifth

19  amendment privilege against self-incrimination and

20  respectfully decline to answer your question.

21  Q.   As part of your work at both Lit Def and Fidelis

22  you emailed Mr. Blust weekly reports called file

23  submission reports which tracked employee activity at

24  both companies; correct?

25  A.   On the advice of counsel, I invoke my fifth

1    amendment privilege against self-incrimination and

2    respectfully decline to answer your question.

3    Q.    These reports identified the number of files

4    worked on by both Lit Def and Fidelis staff isn't that

5    right?

6    A.    On the advice of counsel, I invoke my fifth

7    amendment privilege against self-incrimination and

8    respectfully decline to answer your question.

9    Q.    Isn't it true that you sent Mr. Blust these

10   reports up until January 8, 2024 at least?

11   A.    On the advice of counsel, I invoke my fifth

12   amendment privilege against self-incrimination and

13   respectfully decline to answer your question.

14   Q.    You sent these reports to Mr. Blust at his

15   request; correct?

16   A.    On the advice of counsel, I invoke my fifth

17   amendment privilege against self-incrimination and

18   respectfully decline to answer your question.

19   Q.    You didn't provide these reports to Christo; did

20   you?

21   A.    On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer your question.

24   Q.    And in your experience, Mr. Blust didn't just

25   passively accept these reports he engaged with them;

89

1   correct?

2   A.   On the advice of counsel, I invoke my fifth

3   amendment privilege against self-incrimination and

4   respectfully decline to answer your question.

5   Q.   Mr. Blust used those reports in part to decide

6   whether to move certain Lit Def staff to Fidelis;

7   correct?

8   A.   On the advice of counsel, I invoke my fifth

9   amendment privilege against self-incrimination and

10   respectfully decline to answer your question.

11   Q.   Mr. Blust had the authority to move people from

12   Lit Def to Fidelis; correct?

13   A.   On the advice of counsel, I invoke my fifth

14   amendment privilege against self-incrimination and

15   respectfully decline to answer your question.

16   Q.   Mr. Blust also tracked Fidelis employees

17   performance; isn't that right?

18   A.   Just need to blow my nose.

19   Q.   Sure.

20   A.   Thank you.  I appreciate it.

21   Q.   Ms. Gallagher, Mr. Blust decided how to

22   compensate Fidelis employees; didn't he?

23   A.   On the advice of counsel, I invoke my fifth

24   amendment privilege against self-incrimination and

25   respectfully decline to answer your question.

90

1    Q.    Mr. Blust instructed you how much of a bonus to
2    pay specifically to Fidelis staff; isn't that right?
3    A.    On the advice of counsel, I invoke my fifth
4    amendment privilege against self-incrimination and
5    respectfully decline to answer your question.
6    Q.    And Mr. Blust directed that employees should be
7    paid via Fidelis; correct?
8    A.    On the advice of counsel, I invoke my fifth
9    amendment privilege against self-incrimination and
10   respectfully decline to answer your question.
11   Q.    Mr. Blust made these compensation decisions
12   without Christo's involvement; isn't that right?
13   A.    On the advice of counsel, I invoke my fifth
14   amendment privilege against self-incrimination and
15   respectfully decline to answer your question.
16   Q.    And in addition to just bonuses Mr. Blust
17   controlled Fidelis employees salary including yours;
18   correct?
19   A.    On the advice of counsel, I invoke my fifth
20   amendment privilege against self-incrimination and
21   respectfully decline to answer your question.
22   Q.    At Fidelis when you thought a Fidelis employee
23   was entitled to a raise you asked Blust not Christo
24   for approval; right?
25   A.    On the advice of counsel, I invoke my fifth

1    amendment privilege against self-incrimination and

2    respectfully decline to answer your question.

3    Q.    Ms. Gallagher, you are aware that Mr. Blust

4    continued to be involved in the operation of Fidelis

5    after entry of the TRO in this matter; correct?

6    A.    On the advice of counsel, I invoke my fifth

7    amendment privilege against self-incrimination and

8    respectfully decline to answer your question.

9    Q.    Mr. Blust emailed you account log in information

10   for Fidelis employees after entry of the TRO; correct?

11   A.    On the advice of counsel, I invoke my fifth

12   amendment privilege against self-incrimination and

13   respectfully decline to answer your question.

14   Q.    Mr. Blust directed you on messaging to send to

15   Fidelis employees after this litigation began and

16   after the TRO was entered; right?

17   A.    On the advice of counsel, I invoke my fifth

18   amendment privilege against self-incrimination and

19   respectfully decline to answer your question.

20   Q.    And Mr. Blust instructed you how Fidelis not Lit

21   Def can continue to work with SFS after issuance of

22   the TRO; correct?

23   A.    On the advice of counsel, I invoke my fifth

24   amendment privilege against self-incrimination and

25   respectfully decline to answer your question.

92

1    Q.    Ms. Gallagher, you testified in your March 21,
2    2024, declaration that Katherine Rosenberg did her job
3    at Fidelis adequately; correct?
4    A.    On the advice of counsel, I invoke my fifth
5    amendment privilege against self-incrimination and
6    respectfully decline to answer your question.
7    Q.    That testimony is a bit of an under statement;
8    isn't it?
9    A.    On the advice of counsel, I invoke my fifth
10   amendment privilege against self-incrimination and
11   respectfully decline to answer your question.
12   Q.    You previously characterized Rosenberg as awesome
13   talked about all the compliments you got from her from
14   SFS and said you didn't want anyone else doing the
15   work she was doing; correct?
16   A.    On the advice of counsel, I invoke my fifth
17   amendment privilege against self-incrimination and
18   respectfully decline to answer your question.
19   Q.    And in January 2022, you sent Mr. Blust an
20   efusive email about Rosenberg lobbying for him to give
21   her a raise; correct?
22   A.    On the advice of counsel, I invoke my fifth
23   amendment privilege against self-incrimination and
24   respectfully decline to answer your question.
25   Q.    Isn't it true that you thought Ms. Rosenberg had

93

1    one of if not the most important position and you

2    received multiple compliments about her from SFS and

3    assigned attorneys?

4    A.   On the advice of counsel, I invoke my fifth

5    amendment privilege against self-incrimination and

6    respectfully decline to answer your question.

7    Q.   Ms. Gallagher in February 2024, you requested

8    that Wade at Client First Bankruptcy disable

9    Rosenberg's ability to log into her work system;

10   correct?

11   A.   On the advice of counsel, I invoke my fifth

12   amendment privilege against self-incrimination and

13   respectfully decline to answer your question.

14   Q.   Wade had access to Rosenberg's log in credentials

15   and could have remotely accessed her system; correct?

16   A.   On the advice of counsel, I invoke my fifth

17   amendment privilege against self-incrimination and

18   respectfully decline to answer your question.

19   Q.   Ms. Gallagher, are you familiar with the name

20   Devin Campbell?

21   A.   On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer your question.

24   Q.   Campbell worked at Strategic; isn't that right?

25   A.   On the advice of counsel, I invoke my fifth

94

1    amendment privilege against self-incrimination and

2    respectfully decline to answer your question.

3    Q.   Are you familiar with someone named George

4    Michael?

5    A.   On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer your question.

8    Q.   George Michael also worked at Strategic; correct?

9    A.   On the advice of counsel, I invoke my fifth

10   amendment privilege against self-incrimination and

11   respectfully decline to answer your question.

12   Q.   Ms. Gallagher, did Mr. Blust instruct you to make

13   false statements in your March 2024 declaration?

14   A.   On the advice of counsel, I invoke my fifth

15   amendment privilege against self-incrimination and

16   respectfully decline to answer your question.

17   Q.   Did Mr. Christo instruct you to make false

18   statements in your March 2024 declaration?

19   A.   On the advice of counsel, I invoke my fifth

20   amendment privilege against self-incrimination and

21   respectfully decline to answer your question.

22   Q.   Thank you, Ms. Gallagher.  I have nothing else,

23   Your Honor.

24        DIRECT EXAMINATION BY MR. SMITH:

25   Q.   Good morning, Ms. Gallagher.  My name is Logan

95

1    Smith and I represent the receiver in this case.  I

2    know there will be some overlap but I'll try to get

3    through this as quickly as I can.  I appreciate your

4    time today.

5    A.   Good morning.

6    Q.   You serve as the day-to-day manager of Fidelis

7    and Lit Def; correct?

8    A.   On the advice of counsel, I invoke my fifth

9    amendment privilege against self-incrimination and

10   respectfully decline to answer your question.

11   Q.   And isn't it true that you went to Jason Blust

12   your team leader about Fidelis's business operations?

13   A.   On the advice of counsel, I invoke my fifth

14   amendment privilege against self-incrimination and

15   respectfully decline to answer your question.

16   Q.   Isn't it true that Mr. Blust regularly made

17   business decisions for Fidelis?

18   A.   On the advice of counsel, I invoke my fifth

19   amendment privilege against self-incrimination and

20   respectfully decline to answer your question.

21   Q.   Isn't it true that you knew Mr. Blust had set-up

22   Fidelis to replace Lit Def in 2021 as the entity that

23   would be servicing law firms that were controlled by

24   Mr. Blust?

25   A.   On the advice of counsel, I invoke my fifth

1    amendment privilege against self-incrimination and

2    respectfully decline to answer your question.

3    Q.   Isn't it true that the two companies Fidelis and

4    Lit Def were interchangeable?

5    A.   On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer your question.

8    Q.   Isn't it true that the network attorneys or 1099

9    attorneys as they were called for the law firms that

10   Mr. Blust controlled were the same ones for both

11   Fidelis and Lit Def?

12   A.   On the advice of counsel, I invoke my fifth

13   amendment privilege against self-incrimination and

14   respectfully decline to answer your question.

15   Q.   I'm going to talk a little bit about cooperation

16   obligations under the TRO and the preliminary

17   injunction.  In January 2024 you received a copy of

18   the temporary restraining order which was filed on

19   January 11; correct?

20   A.   On the advice of counsel, I invoke my fifth

21   amendment privilege against self-incrimination and

22   respectfully decline to answer your question.

23   Q.   And around that time you read the TRO; correct?

24   A.   On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

1    respectfully decline to answer your question.

2    Q.   And you understood that under the TRO Mr. Blust

3    was required by a court to shut down the operations of

4    Lit Def and Fidelis; correct?

5    A.   On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer your question.

8    Q.   But he didn't do that; did he?

9    A.   On the advice of counsel, I invoke my fifth

10   amendment privilege against self-incrimination and

11   respectfully decline to answer your question.

12   Q.   And you assisted in violating the court order by

13   keeping both Lit Def and Fidelis open; correct?

14   A.   On the advice of counsel, I invoke my fifth

15   amendment privilege against self-incrimination and

16   respectfully decline to answer your question.

17   Q.   And you told staff not to communicate with people

18   at Strategic; correct?

19   A.   On the advice of counsel, I invoke my fifth

20   amendment privilege against self-incrimination and

21   respectfully decline to answer your question.

22   Q.   And you knew that you were prevented from opening

23   Lit Def emails and systems; correct?

24   A.   On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

1    respectfully decline to answer your question.

2    Q.    And you were aware that you personally had

3    numerous court ordered obligations under the TRO as

4    both an employee of Lit Def and as an individual in

5    active concert in participation with Mr. Blust and Lit

6    Def; correct?

7    A.    On the advice of counsel, I invoke my fifth

8    amendment privilege against self-incrimination and

9    respectfully decline to answer your question.

10   Q.    And you learned on or about March 4 that the

11   court had entered a preliminary injunction extending

12   the obligations of the TRO; correct?

13   A.    On the advice of counsel, I invoke my fifth

14   amendment privilege against self-incrimination and

15   respectfully decline to answer your question.

16   Q.    And since January 2024 and at the time that you

17   filed your declarations in this case you understood

18   you had numerous obligations to cooperate with the

19   receiver in this case; correct?

20   A.    On the advice of counsel, I invoke my fifth

21   amendment privilege against self-incrimination and

22   respectfully decline to answer your question.

23   Q.    And you understood that you were restrained and

24   enjoined from assisting and transacting any of the

25   business of the receivership defendants; correct?

99

1    A.    On the advice of counsel, I invoke my fifth
2    amendment privilege against self-incrimination and
3    respectfully decline to answer your question.
4    Q.    And that included Lit Def and Fidelis; correct?
5    A.    On the advice of counsel, I invoke my fifth
6    amendment privilege against self-incrimination and
7    respectfully decline to answer your question.
8    Q.    You understood that you were restrained and
9    enjoined from doing any act or refraining from any act
10   whatsoever to interfere with the receivers taking
11   custody, control, possession or managing of the assets
12   or documents subject to the receivership; correct?
13   A.    On the advice of counsel, I invoke my fifth
14   amendment privilege against self-incrimination and
15   respectfully decline to answer your question.
16   Q.    And you knowingly violated the TRO and the PI
17   that replaced it by interfering with the receiver's
18   ability to take custody control and possession or
19   management of assets and documents of the
20   receivership; correct?
21   A.    On the advice of counsel, I invoke my fifth
22   amendment privilege against self-incrimination and
23   respectfully decline to answer your question.
24   Q.    And you did so by submitting false and misleading
25   testimony that was designed to give the appearance

100

1    that Fidelis was not owned or controlled by Mr. Blust;

2    correct?

3    A.    On the advice of counsel, I invoke my fifth

4    amendment privilege against self-incrimination and

5    respectfully decline to answer your question.

6    Q.    And you took steps to conceal and obscure Mr.

7    Blust's role in Fidelis; correct?

8    A.    On the advice of counsel, I invoke my fifth

9    amendment privilege against self-incrimination and

10    respectfully decline to answer your question.

11    Q.    In your testimony in this submission of

12    declaration made it appear that Mr. Blust had no role

13    at Fidelis; correct?

14    A.    On the advice of counsel, I invoke my fifth

15    amendment privilege against self-incrimination and

16    respectfully decline to answer your question.

17              MR. MCNAMARA:  Can we take one second?

18              MR. ROMANOFF:  Please.

19    (There was a pause in the proceeding.)

20    Q.    Whenever you are ready.

21    A.    You can go ahead.  Thank you.

22    Q.    In your declaration you stated under oath that

23    Lit Def and Fidelis were separate companies and that

24    as far as you knew Jason Blust has no role in

25    Fidelis's operation and exercises no control over the

1    running of Fidelis's business; correct?

2    A.    On the advice of counsel, I invoke my fifth

3    amendment privilege against self-incrimination and

4    respectfully decline to answer your question.

5    Q.    And that wasn't a truthful statement, was it?

6    A.    On the advice of counsel, I invoke my fifth

7    amendment privilege against self-incrimination and

8    respectfully decline to answer your question.

9    Q.    Mr. Blust had a very significant role in running

10   Fidelis's business; correct?

11   A.    On the advice of counsel, I invoke my fifth

12   amendment privilege against self-incrimination and

13   respectfully decline to answer your question.

14   Q.    These companies have the same business

15   operations, same employees, use the same company,

16   computers, use the same software, had the same

17   customers and worked with all the law firms that were

18   the same controlled by Mr. Blust; correct?

19   A.    On the advice of counsel, I invoke my fifth

20   amendment privilege against self-incrimination and

21   respectfully decline to answer your question.

22   Q.    And isn't it true that in January of 2022, before

23   Fidelis was assigned any law firm files, Mr. Blust

24   told you which Lit Def employees to switch over to

25   Fidelis files and Fidelis payroll?

1   A.   On the advice of counsel, I invoke my fifth

2   amendment privilege against self-incrimination and

3   respectfully decline to answer your question.

4   Q.   And Mr. Blust told you how to split those

5   employees compensation between Lit Def and Fidelis;

6   correct?

7   A.   On the advice of counsel, I invoke my fifth

8   amendment privilege against self-incrimination and

9   respectfully decline to answer your question.

10   Q.   And Mr. Cameron Christo wasn't involved in those

11   conversations; was he?

12   A.   On the advice of counsel, I invoke my fifth

13   amendment privilege against self-incrimination and

14   respectfully decline to answer your question.

15   Q.   And Mr. Blust generally decided on the salaries

16   and raises for all Lit Def and Fidelis employees

17   including you; correct?

18   A.   On the advice of counsel, I invoke my fifth

19   amendment privilege against self-incrimination and

20   respectfully decline to answer your question.

21   Q.   And Mr. Blust decided in 2022 and 2023 bonus

22   amounts for all employees of both Lit Def and Fidelis;

23   correct?

24   A.   On the advice of counsel, I invoke my fifth

25   amendment privilege against self-incrimination and

103

1    respectfully decline to answer your question.

2    Q.    In fact --

3    A.    Sorry.

4    Q.    Take your time.  In fact after Mr. Blust told you

5    what the amounts of the 2022 bonuses would be you

6    informed Fidelis's employees of those bonus amounts

7    before Mr. Christo was even informed of the amounts;

8    is that correct?

9    A.    On the advice of counsel, I invoke my fifth

10   amendment privilege against self-incrimination and

11   respectfully decline to answer your question.

12   Q.    And Mr. Blust didn't consult Mr. Christo when he

13   decided the 2023 bonuses either; correct?

14   A.    On the advice of counsel, I invoke my fifth

15   amendment privilege against self-incrimination and

16   respectfully decline to answer your question.

17   Q.    And even though this was a Fidelis matter Mr.

18   Blust didn't come to you at the time and say why are

19   you bothering me with a Fidelis matter because that's

20   not my company, did he?

21   A.    On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer your question.

24   Q.    Isn't it true that Mr. Blust periodically

25   directed you to transfer employees from Lit Def to

104

1    Fidelis without consulting or involving Mr. Christo?

2    A.   On the advice of counsel, I invoke my fifth

3    amendment privilege against self-incrimination and

4    respectfully decline to answer your question.

5    Q.   Isn't it true that Mr. Christo's entire role

6    regarding bonuses involved simply pushing an approval

7    button at the end of the process?

8    A.   On the advice of counsel, I invoke my fifth

9    amendment privilege against self-incrimination and

10   respectfully decline to answer your question.

11   Q.   More generally speaking isn't it true that Mr.

12   Blust never gave you any push back when you came to

13   him with Fidelis only matters?

14   A.   On the advice of counsel, I invoke my fifth

15   amendment privilege against self-incrimination and

16   respectfully decline to answer your question.

17   Q.   In Paragraph 28 of your declaration you stated

18   that in your Fidelis work if you brought matters --

19   that you would bring matters to Mr. Christo and not

20   Jason Blust; is that correct?

21   A.   On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer your question.

24   Q.   And that wasn't an accurate statement, was it?

25   A.   On the advice of counsel, I invoke my fifth

105

1   amendment privilege against self-incrimination and

2   respectfully decline to answer your question.

3   Q.   You regularly brought Fidelis matters to Mr.

4   Blust; correct?

5   A.   On the advice of counsel, I invoke my fifth

6   amendment privilege against self-incrimination and

7   respectfully decline to answer your question.

8   Q.   You state your declaration that if you had ever

9   asked Mr. Blust for help with a Fidelis matter Blust

10  would have asked you in colorful terms why you were

11  bothering him with a Fidelis matter; correct?

12  A.   On the advice of counsel, I invoke my fifth

13  amendment privilege against self-incrimination and

14  respectfully decline to answer your question.

15  Q.   But that wasn't a true statement, was it?

16  A.   On the advice of counsel, I invoke my fifth

17  amendment privilege against self-incrimination and

18  respectfully decline to answer your question.

19  Q.   And Mr. Blust and you on a day-to-day basis

20  discussed Fidelis matters; correct?

21  A.   On the advice of counsel, I invoke my fifth

22  amendment privilege against self-incrimination and

23  respectfully decline to answer your question.

24  Q.   Both Lit Def and Fidelis employees were given

25  same Surface tablet computers so that they could work

106

1    remotely; correct?

2    A.    On the advice of counsel, I invoke my fifth

3    amendment privilege against self-incrimination and

4    respectfully decline to answer your question.

5    Q.    And when employees moved from Lit Def to Fidelis

6    they kept using those same computers; right?

7    A.    On the advice of counsel, I invoke my fifth

8    amendment privilege against self-incrimination and

9    respectfully decline to answer your question.

10   Q.    And those computers were associated with Client

11   First Bankruptcy; correct?

12   A.    On the advice of counsel, I invoke my fifth

13   amendment privilege against self-incrimination and

14   respectfully decline to answer your question.

15   Q.    And those computers were an asset of Lit Def that

16   were transferred to Fidelis; correct?

17   A.    On the advice of counsel, I invoke my fifth

18   amendment privilege against self-incrimination and

19   respectfully decline to answer your question.

20   Q.    And Fidelis didn't pay anything for them, did it?

21   A.    On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer your question.

24   Q.    And isn't it true that Fidelis and Lit Def

25   employees were given logging credentials for their

1    tablet computers to utilize the

2    clientfirstbankruptcy.com domain?

3    A.   On the advice of counsel, I invoke my fifth

4    amendment privilege against self-incrimination and

5    respectfully decline to answer your question.

6    Q.   And those log ins remain the same when employees

7    switched from Lit Def to Fidelis; right?

8    A.   On the advice of counsel, I invoke my fifth

9    amendment privilege against self-incrimination and

10   respectfully decline to answer your question.

11   Q.   Isn't it true that your declaration contained

12   numerous false statements regarding your understanding

13   of Mr. Blust's control of Fidelis?

14   A.   On the advice of counsel, I invoke my fifth

15   amendment privilege against self-incrimination and

16   respectfully decline to answer your question.

17   Q.   Isn't it true you understood Mr. Blust had the

18   right to hire employees and set salaries?

19   A.   On the advice of counsel, I invoke my fifth

20   amendment privilege against self-incrimination and

21   respectfully decline to answer your question.

22   Q.   You testified in your declaration Christo makes

23   all executive decisions with regard to personnel

24   payroll purchasing and contracting; correct?

25   A.   On the advice of counsel, I invoke my fifth

108

1    amendment privilege against self-incrimination and

2    respectfully decline to answer your question.

3    Q.    And that was not an accurate description of how

4    Fidelis operated, was it?

5    A.    On the advice of counsel, I invoke my fifth

6    amendment privilege against self-incrimination and

7    respectfully decline to answer your question.

8    Q.    Mr. Blust regularly made decisions about

9    Fidelis's personnel and payroll; correct?

10   A.    On the advice of counsel, I invoke my fifth

11   amendment privilege against self-incrimination and

12   respectfully decline to answer your question.

13   Q.    And Mr. Blust regularly directed Fidelis to use

14   assets that belonged to Lit Def; correct?

15   A.    On the advice of counsel, I invoke my fifth

16   amendment privilege against self-incrimination and

17   respectfully decline to answer your question.

18   Q.    And you understood that Fidelis provided rubber

19   stamp on operational decisions that Mr. Blust made;

20   correct?

21   A.    On the advice of counsel, I invoke my fifth

22   amendment privilege against self-incrimination and

23   respectfully decline to answer your question.

24   Q.    Thank you for your time.  I have nothing further.

25              THE COURT:  Mr. Hoover?

1            MR. HOOVER:  No questions, Your Honor.

2            THE COURT:  Mr. Personius?

3            MR. PERSONIUS:  Thank you.  No, Judge.

4            MR. MOLLOY:  Judge, if I may ask the Court's

5    permission to allow Ms. Gallagher to return home to

6    Chicago.  I know she's subject to your order tomorrow

7    but --

8            THE COURT:  No.  She can go home.

9            MR. MCNAMARA:  Okay.  Thank you, Your Honor.

10           THE WITNESS:  Thank you.

11           MR. SANDERS:  All right, Judge.  We are

12   prepared to present our next witness if the Court is

13   ready.

14           THE COURT:  Go ahead.

15           MR. SANDERS:  Thank you, Judge.  Plaintiffs

16   call Katherine Rosenberg.

17           THE CLERK:  If you raise your right hand

18   I'll swear you in.

19           K A T H E R I N E  R O S E N B E R G, after

20   having been duly called and sworn, testified as

21   follows:

22           THE CLERK:  Thank you.  If you would have a

23   seat when seated state your name and spell it for the

24   record and here's some water for you if you need it.

25           THE WITNESS:  Katherine Rosenberg,

110

1    R-O-S-E-N-B-E-R-G.

2            DIRECT EXAMINATION BY MS. BUCHKO:

3    Q.   Good morning, Ms. Rosenberg.

4    A.   Good morning.

5    Q.   Before we start, I want to say if you need to

6    take a break at any point, just let us know.  We're

7    not in a hurry.  We're happy to give you some time if

8    you need it.

9    A.   Okay.

10   Q.   To start off, I have some questions about your

11   background.

12           THE COURT:  I'm going to have to ask you to

13   keep your voice up.

14           MS. BUCHKO:  Yes, Your Honor.

15           THE CLERK:  Move the microphone closer to

16   you because I got it up as high as I can.

17           MS. BUCHKO:  I will, sorry.

18           THE CLERK:  Thank you.

19   Q.   What do you do for a living?

20   A.    I'm a paralegal, a law paralegal.

21           MR. HOOVER:  I'm sorry.  Could that be read

22   back or repeated?  I just didn't hear it.

23           THE COURT:  Ma'am, do me a favor try to pull

24   the microphone closer to you and speak into the

25   microphone.

111

1              THE WITNESS:  I'm a family law paralegal.

2    Q.    What kind of education do you have?

3    A.    I have my associate's degree in paralegal studies

4    and bachelor's in interdisciplinary studies with a

5    minor in criminal justice.

6    Q.    Who do you live with?

7    A.    Me and my three children.

8    Q.    Are you married?

9    A.    No.

10   Q.    Where do you live?

11   A.    In Illinois.

12   Q.    General is fine.  How did you get here today?

13   A.    I drove.

14   Q.    When did you leave?

15   A.    At about 1:00 in the morning two nights ago.

16   Q.    And how was your drive?

17   A.    It was about ten hours.  It wasn't too bad until

18   I was getting off the interstate here in New York, but

19   other than that, it was pretty clear.

20   Q.    Did you stop for the night?

21   A.    Not for the night but I had like naps about 30 to

22   45 minute naps.

23   Q.    Why did you leave your house so late, was it,

24   Tuesday night; is that right?

25   A.    Yeah, right.

112

1    Q.   Why did you leave your house so late?

2    A.   I had to work until 5.  I planned to take a nap

3    and then hit the road, but then I had a last second

4    change in where kids were going so I had to figure

5    that out and had to skip the nap and leave to get here

6    at a decent time.

7    Q.   Ms. Rosenberg, why was it so important for you to

8    be here that you drove through the night?

9             MR. HOOVER:  Objection, irrelevant.

10            THE COURT:  Overruled.

11   A.   I felt like it was important for me to be here.

12   There's a lot I had to say about what was going on.

13   Q.   Has anyone paid you to be here today?

14   A.   What was that?

15   Q.   Has anyone paid you to be here today?

16   A.   No.

17   Q.   Has anyone promised to pay you anything or give

18   you anything of value for your testimony today?

19   A.   Just reimbursement.

20   Q.   Where were you working in 2021?

21   A.   At Lit Def.

22   Q.   How did you hear about that job?

23   A.   I found a job posting on indeed.

24   Q.   Do you remember approximately when that was?

25   A.   I think it was August of 2021.

113

1   Q.   And you applied for the job?

2   A.   I did.

3   Q.   When did you hear back from them?

4   A.   Pretty soon after I applied.

5   Q.   How did you hear back?

6   A.   I had a voicemail from Heyfa Seyad saying that

7   she was calling to interview me for a position at

8   Fidelis.

9   Q.   How do you know she said Fidelis?

10  A.   I still have the voicemail recording.

11  Q.   When is the last time you listened to it?

12  A.   I've listened to it a few times.

13  Q.   Recently?

14  A.   Recently, yeah.  Within the last couple days.

15  Q.   Did you interview for the position?

16  A.   I did.

17  Q.   Who did you interview with?

18  A.   Michelle Hinds.

19  Q.   Is that also Michelle Gallagher?  Does she go by

20  Gallagher as well?

21  A.   Not then, no.

22  Q.   Okay.  Should I refer to her as Michelle Hinds

23  then during our talk today?

24  A.   That's fine.

25  Q.   Okay.  So you interviewed with Michelle Hinds.

114

1    Anyone else?

2    A.    Shirley Saavedra.  I think I interviewed with her

3    too or at least she told me where I was going to be

4    assigned to and she told me my work hours and let her

5    know and that stuff.

6    Q.    Which company hired you?

7    A.    Lit Def.

8    Q.    How do you know that?

9    A.    That's where I was -- that's where I was working

10   for that period.  That was in our email signatures.

11   That was my employer as far as I knew.

12   Q.    What was your position?

13   A.    I think it was support specialist or legal

14   assistant.

15   Q.    Who were your managers?

16   A.    Shirley Saavedra and Michelle Hinds.

17   Q.    What were their positions in the company?

18   A.    Michelle was an attorney.  She was the boss of us

19   and then I think Shirley was like the managing

20   paralegal.  She was -- she would tell us what to do.

21   Q.    What type of training did you receive for your

22   job at Lit Def if any?

23   A.    I was training for about two weeks and then the

24   girl that was training me left the company.

25   Q.    Was your position remote or in person?

115

1    A.    Remote.

2    Q.    Did you ever meet your co-workers in person?

3    A.    No.

4    Q.    Have you ever met Michelle Hinds in person?

5    A.    No.

6    Q.    Did you use technology for your job at Lit Def?

7    A.    Yes.

8    Q.    What did you use?

9    A.    Just a Microsoft Surface tablet and regular like

10   keyboard mouse and then two screens.

11   Q.    Did you buy the tablet?

12   A.    No.

13   Q.    How did you receive it?

14   A.    It was shipped to me.

15   Q.    Do you remember what your log it was for the

16   tablet?

17   A.    The log in was under Client First Bankruptcy.

18   Q.    What do you know about Client First Bankruptcy?

19   A.    Nothing really.

20   Q.    Did you ever have an email address for Client

21   First Bankruptcy?

22   A.    No.

23   Q.    Did anyone you worked with have an email address

24   for Client First Bankruptcy?

25   A.    Michelle did.

116

1    Q.    Michelle Hinds?

2    A.    Michelle Hinds, yes.

3    Q.    What did she use it for?

4    A.    It -- it seemed like it was for if like there was

5    quality control people that would contact her through

6    that or chronic complaints and then toward the end

7    there that was what she was using to communicate.

8    Q.    What do you mean towards the end there?

9    A.    When I had basically said that I wasn't

10   comfortable doing what she was asking me to do the

11   email address she was using at the time was the Client

12   First Bankruptcy.  There was other attorneys reaching

13   out asking if she or if they sent agreements directly

14   to us if we could get them paid and that was the email

15   that she was using.

16   Q.    We'll talk about that more in a minute.  I want

17   to hear about your duties at Lit Def.  What were you

18   supposed to do as part of your position?

19   A.    I reviewed settlement agreements that the network

20   attorneys would get for clients.  They would send it

21   to me and I would basically review it for what the

22   servicer needed to get payment sent and then if it

23   didn't have everything that they needed then I would

24   go back and tell the attorney or I would send it to --

25   send it through Happy Fox the program that we used on

117

1    the ticket to Fusion for them to process it.  And then

2    if they had any issues with it they would send it back

3    on a settlement issue ticket and I'd have to reach out

4    to the attorney again to try and resolve the issue.

5    Q.    What are network attorneys?

6    A.    They were the attorneys that worked for the law

7    firms that were I guess they would try to get

8    settlements for clients if things went to court.

9    Q.    What law firms are you talking about?

10   A.    Like do you want me to list the names or -- it

11   was like the law firms that were doing work for I

12   guess Lit Def in the settlements.

13   Q.    Did you have any other names for the network

14   attorneys?

15   A.    1099 attorneys I would refer to them as or we

16   would refer to them as sometimes.

17   Q.    Did you ever have local counsel?

18   A.    Yes.

19   Q.    You mentioned Fusion what is that?

20   A.    Fusion is the servicer that we would send the

21   tickets to for them to process the payments.

22   Q.    Do you know anything else about Fusion where it

23   was located who worked there?

24   A.    We would refer to Fusion as New York a lot.  As

25   far as who worked there it was I had a few contacts

118

1    that I would like regularly send tickets to or

2    communicate with for those and then there was a

3    manager that we would have to bring in sometimes if

4    there was big issues we would CC him on it.

5    Q.   What were the names of people you worked with at

6    Fusion?

7    A.   Joelle Hill, Angel Martinez and Omar Graves.

8    Q.   You also mentioned a settlement ticket.  What is

9    that?

10   A.   It's like a ticket that was created in Happy Fox.

11   I would have to make the ticket and put all the

12   settlement information in there and then like attach

13   the PDF of the settlement and send it to New York for

14   them to process.  If there was an issue with that

15   whole thing on their side they would send me back a

16   ticket that was a settlement issue ticket that would

17   say whatever the issue is and I would forward that to

18   the attorneys so that they can reach out to the client

19   let them know to call New York to add funds or if they

20   needed to reach out to get a later date from opposing

21   counsel it was things like that.

22   Q.   When you say New York in this context what are

23   you talking about?

24   A.   Fusion.

25   Q.   The servicer?

119

1    Q.    The one that Joelle Hill and Omar Graves work

2    for?

3    A.    Yes.

4    Q.    So is it easier to refer to them as New York?

5    A.    That's fine.

6    Q.    And Happy Fox tell us more about what that is?

7    A.    It was a program that we use to communicate with

8    New York or Fusion for any of the -- at least what I

9    did I did the settlements that's what I used to

10   communicate with them and that's what the other team

11   members would use to communicate with them.

12   Q.    So a software program?

13   A.    Uh-huh.

14   Q.    And after you sent the settlement tickets to the

15   servicer in New York would they respond to you?

16   A.    Yes.

17   Q.    What would they say typically?

18   A.    There wouldn't be a response if it was just

19   processed.  We would eventually like close those files

20   we'd get a report but if there was an issue with

21   something that's when they would send me back a

22   ticket.

23   Q.    Can you give me an example of some of the issues

24   that arose back then?

25   A.    Like if I when I would have to review the

120

1    agreement when it comes in I would have to look at

2    their escrow account and see if the account was able

3    to make payments just based off of what we can see in

4    that link and if it looked like they weren't able to

5    make those payments then before even sending it to the

6    servicer I would have to go back to the attorney and

7    tell them that they need to talk to the client and get

8    them to contact the law firm to add funds because the

9    payments can't even be made from the account.

10   Q.   When you say the agreements, you mean settlement

11   agreements?

12   A.   Uh-huh.

13   Q.   Are those the settlement agreements that the

14   attorneys reached with creditors?

15   A.   Yes.

16   Q.   And when you say the client you mean the consumer

17   that had enrolled in the program?

18   A.   Right.

19   Q.   How were you able to see the amount in escrow?

20   A.   It was a link that was given to us from Fusion.

21   They would have to create the escrow link and give it

22   to us for our files so we could see that.

23   Q.   Did you ever speak to the consumers?

24   A.   No never.

25   Q.   Did the litigation attorneys or 1099 attorneys

1   ever talk to the servicer in New York?

2   A.   As far as I know they weren't supposed to.

3   Q.   Why not?

4   A.   I don't know.  It was they just didn't need to

5   reach out to the servicer they were supposed to go

6   through us.

7   Q.   How did you correspond with the litigation

8   attorneys or 1099 attorneys?

9   A.   Through email.

10  Q.   What email address did you use?

11  A.   When I worked for Lit Def I would use my Lit Def

12  email address and when I was doing work for Fidelis I

13  would use my Fidelis email address.

14  Q.   So I want to talk to you about moving to Fidelis.

15  How did that come about?

16  A.   We were told that there was a new company like at

17  the beginning I think Michelle explained it to me as

18  like a merger and then after that it was just a new

19  company that we were going to be moving over to.

20  Q.   Do you remember when that happened when you were

21  told that?

22  A.   I don't remember exactly when we were told about

23  it.  I want to say it was maybe at the end of -- I

24  can't remember exactly when we were told about it.

25  The transition date that we were given though was

122

1    February 1.  Anything before February 1 would have

2    been a Lit Def file and then after February 1 if it

3    was affirm that was going to Fidelis then it would

4    need to be assigned as a Fidelis firm or a Fidelis

5    file.

6              MR. PERSONIUS:  Excuse me, Your Honor.

7    Could we have the year please?

8              THE WITNESS:  I think it would have been

9    2022.  I started in '21, so yeah.  It would have been

10   February 1 of 2022.

11   Q.   Do you remember anything specific that Ms. Hinds

12   told you about the merger between -- or about the

13   transfer to Fidelis and the relationship between Lit

14   Def and Fidelis?

15   A.   We were told that everything was basically going

16   to stay the same like day-to-day stuff really wasn't

17   going to change and everything did pretty much just go

18   exactly as it did before.

19   Q.   Do you remember any specific words she used to

20   describe the change?

21   A.   I remember at the very beginning merger was used

22   and then I think they were buying our company but

23   there was never really like a clear explanation.  I

24   tried getting clear explanations a few times and

25   wasn't really ever given one.

123

1    Q.    Who used the term merger?

2    A.    Michelle Hinds.

3    Q.    And you said they were buying our company, do you

4    mean Fidelis was buying Lit Def?

5    A.    Right.

6    Q.    How do you remember this so specifically because

7    it was in 2022 you said?

8    A.    I'm sorry.  I don't know how to answer that

9    question.

10   Q.    That's okay.

11   A.    I just remember at the time when I was trying to

12   get an explanation of what was going on those were the

13   things that were said and it just didn't make sense at

14   the time.  And I felt like a lot of -- I spent a lot

15   of time trying to make sense of things.  When I worked

16   there trying to get an explanation from the people

17   that were above me or from HR about things like my pay

18   and everything like that.  It's just nothing was ever

19   clearly explained.

20   Q.    How did you learn that you were going to be

21   working on Lit Def -- on Fidelis files?

22   A.    I was told that I would -- that there wasn't

23   going to be a whole lot of files coming in for Fidelis

24   at first so most of my work was going to still be done

25   for Lit Def so most of my pay was going to be coming

124

1    from Lit Def and then like the remainder I was getting

2    paid $1,000 from Lit Def the first part of my check

3    and then the remainder was just from Fidelis but then

4    after a while there was definitely more Fidelis files

5    and not as many Lit Def files so I actually got ready

6    to meet with Michelle with the numbers to say this is

7    not equal it's not a fair according to how you guys

8    are saying it because there's a lot more on the other

9    side now.

10   Q.   That was a concern about your pay; right?

11   A.   Yeah.

12   Q.   Were you given a choice whether you wanted to

13   stay with Lit Def or start taking Fidelis files?

14   A.   No.

15   Q.   Was anybody given a choice as far as you know?

16   A.   No.

17   Q.   I think you said that you started taking -- you

18   were working for Lit Def and then you started taking

19   files for Fidelis; is that right?

20   A.   It was like as of that transition date there was

21   just more files coming in that were getting assigned

22   to Fidelis.

23   Q.   And I think we were talking about the February 1,

24   2022 date you said anything before that date would be

25   Lit Def.  Can you explain what you mean by anything?

125

1    A.   There were like litigation files that we would

2    have for a law firm and if they had like if it was

3    with heartland is one of the names that comes to mind

4    for one of the firms but if they had like a heartland

5    file with Lit Def and after February 1 of 2022 I think

6    if it was a new like debt that came in after that date

7    then it would be a Fidelis file or it was like some

8    firms like it might not have been heartland

9    specifically because there were certain firms that

10   were staying with Lit Def and then there was other one

11   aides that would transfer to Fidelis and then there

12   was new firms coming in for Fidelis like brand-new

13   firms.

14   Q.   So from your perspective anything that came in

15   any new files that came in before February 1, 2022

16   went to Lit Def?

17   A.   Right.

18   Q.   And then you said after this date February 1,

19   2022?

20   A.   Right, transitioning over.

21   Q.   Some went to Lit Def and some went to Fidelis?

22   A.   Uh-huh.

23   Q.   The new files that came in?

24   A.   I can't remember exactly how we figured where

25   they would go at that time because I think there was

126

1    something where some clients would have Lit Def and

2    Fidelis files just depending on the date I don't

3    remember exactly how we split it but I just know after

4    that date was more when more people came with Fidelis.

5    Q.    More new files?

6    A.    Uh-huh.

7    Q.    When you start taking all these new Fidelis files

8    how did your job duties change?

9    A.    I was doing a lot more work.

10   Q.    Did the actual tasks that you did change?

11   A.    No.

12   Q.    Earlier when you were speaking about Lit Def, you

13   said you handled income litigation files.  Did you do

14   the same with Fidelis?

15   A.    Just the settlement part I would handle, but

16   yeah.

17   Q.    Earlier when you were speaking about Lit Def you

18   said that you corresponded with Joelle Hill and Omar

19   Graves?

20   A.    And Angel Martinez.

21        MR. HOOVER:  I'm sorry.  I didn't hear.

22   Q.    I'm sorry.  Earlier when you were speaking about

23   Lit Def you said you corresponded with Joelle Hill,

24   Omar Graves and Angel Martinez; is that right?

25   A.    Uh-huh.

127

1    Q.    Was that the same when you worked for Fidelis?

2    A.    Yes.

3    Q.    When you started working with Fidelis files was

4    there any change in the 1099 attorneys or litigation

5    attorneys?

6    A.    No.

7    Q.    You said earlier when you communicated with the

8    1099 attorneys working for Lit Def you used a Lit Def

9    email address.  What did you use after you moved to

10   Fidelis?

11   A.    I was given a Fidelis email address for those

12   files.

13   Q.    Did it matter which email address you used?

14   A.    Yes.  It seemed like it was a bigger deal to

15   everybody else than I kind of took it I guess.  We

16   were told that if an email came in for Fidelis to our

17   Lit Def email address to basically copy and paste it

18   over to the Fidelis and make it a clean email and send

19   it from that one and let the attorney know we don't

20   work for that firm anymore and they can just contact

21   us at that email.  For if I had attorneys contacting

22   me for an old settlement issue once I was full-time

23   Fidelis if they were contacting me on an issue from

24   when I was working for Lit Def I would have to forward

25   that to Victor who was handling those files for him to

128

1    handle.

2    Q.    When did you change to work full-time at Fidelis?

3    A.    I don't remember exactly when it was.

4    Q.    When you changed from Lit Def and started taking

5    on Fidelis files was there any change in where you did

6    your work?

7    A.    No.

8    Q.    You mentioned earlier Happy Fox did you still use

9    Happy Fox software when you worked for Fidelis?

10   A.    Yes.  I think at some point we got like a

11   different version a more secure version that we had to

12   log into but it was still the same.

13   Q.    What is Leadtrack?

14   A.    Like the I guess middle work program that we used

15   like where all the information would be stored for a

16   file all of the agreements the pleadings all that

17   stuff would be stored in there all of our notes would

18   be in there too so it's like all the information for

19   the case.

20   Q.    Did you use that for Lit Def?

21   A.    Yes.

22   Q.    Did you use it for Fidelis?

23   A.    Yes.

24   Q.    Did you have any new software when you switched

25   over to start working for Fidelis?

129

1    A.    Other than the email being gmail and the other

2    was Outlook but that's it.

3    Q.    The Outlook?

4    A.    Lit Def was Outlook yeah.

5    Q.    What type of training did you receive for your

6    new job at Fidelis if any?

7    A.    None.

8    Q.    You mentioned earlier that you received a tablet

9    when you started working at Lit Def.  Did Fidelis send

10   you any new technology or computers?

11   A.    No.

12   Q.    How did switching to Fidelis files effect your

13   pay?

14   A.    It at first I was -- it was a lower pay that I

15   was getting paid at for the majority of my check but

16   then the more files I took on for Fidelis it was like

17   uneven how I was being paid so eventually I tried to

18   get more clarification on that from everybody like

19   them doing more work on these I should be getting a

20   look at my pay here.  I was working around the clock a

21   lot of times too.

22   Q.    How could you tell that you were getting more

23   money for one company than another?

24   A.    I was getting paid I think $1 less from Lit Def

25   there was like a dollar difference in my hourly pay

130

```
1    and then the majority of my check was coming from Lit
2    Def and then the remainder would come from Fidelis.
3    Q.   Was it all in the same check?
4    A.   Uh-huh -- no, two separate.
5    Q.   Two separate checks?
6    A.   Two separate deposits.
7    Q.   One for Lit Def and one for Fidelis?
8    A.   Yes.
9    Q.   Did you have to keep track of your time between
10   Fidelis and Lit Def?
11   A.   No.
12   Q.   Was there any change to your time sheet or the
13   way you filled it out when you started taking on
14   Fidelis files?
15   A.   No.
16   Q.   Did you ever apply to work at Fidelis?
17   A.   No.
18   Q.   Did you interview with Cameron Christo for your
19   job at Fidelis?
20   A.   We didn't do an interview.  We did like a meeting
21   where we all introduced ourselves.
22   Q.   How many times did you meet him?
23   A.   Just that meeting.
24   Q.   Was that in person?
25   A.   No.  It was I think Zoom or Teams.
```

131

1    Q.   So on February 1, 2022, when you started taking

2    on Fidelis files what was that transition like for

3    you?

4    A.   Like what do you mean?

5    Q.   How did you feel?

6    A.   Confused.  I was confused about what was going on

7    but I just kept working on my files.  When it was

8    mostly Victor that was having to do the Lit Def files

9    they were contacting me a lot to try to help him to

10   figure out how to process the settlement issues so

11   that he wasn't getting behind on stuff but it seemed

12   like he was having kind of a hard time and I

13   personally I don't know it -- I feel bad if I can't --

14   if I have files that are just sitting there like that.

15   Not getting done so I would -- I would help him as

16   much as I could but I wasn't allowed to touch any of

17   the files so I couldn't like reach out to the attorney

18   or you know really help him on any of the files but we

19   tried doing meetings a couple of times like weekly

20   meetings to try and help Victor with just the amount

21   of files that he had to work on but then he stopped

22   showing up to those meetings.

23   Q.   You said you felt bad the files weren't being

24   worked on.  Why?

25   A.   There was a lot of files that I got I guess

132

1    handed when I started working for Lit Def from the
2    previous person that was doing those settlement issues
3    so there was a lot of cases or a lot of open tickets
4    that were still left over from like even before I
5    worked there that I was still trying to get closed and
6    resolved and there was still you know a chunk of those
7    that then Victor had to deal with after I got moved
8    over so just knowing what I had to try and figure out
9    and accomplish when that was handed to me I was like I
10   was still there to help him so I was still trying to
11   help as much as I could because it was a lot to learn.
12   It was a lot for me to even just try to get done.
13   Q.   I guess what I mean is why did you feel bad about
14   that?
15            MR. HOOVER:   Objection, irrelevant.
16            THE COURT:   Overruled.
17   A.   I'm not used to files just sitting like that and
18   nobody getting it resolved I guess.
19   Q.   What would happen if the files just sat there?
20   A.   We would get I think reports from New York on
21   certain files that needed to like get something going
22   on them you know reach out to the attorney just to do
23   something to get the case moving again.
24   Q.   Would you put up 170, please?  Can you see that,
25   Ms. Rosenberg?

1    A.    Yup.

2    Q.    It's a little fuzzy unfortunately.  Is there any

3    way to make it clearer?

4    A.    Yeah.  I think that was when I was trying to feel

5    out my pay thing because it was -- I was like being

6    told when there's more work on that side and like when

7    we have officially transitioned over so I was like

8    trying to find out when is this transition going to

9    happen when are we fully going to move over.

10    Q.    Let me back you up.  What is this exhibit what

11    does that show?

12    A.    That is I took a picture of my tablet the chat

13    conversations.

14    Q.    Who was in this conversation?

15    A.    It's me, Shirley, Peggy and Jean, the Fidelis

16    team.

17        MR. PERSONIUS:  Excuse me, Judge.  Can this

18    be magnified at all or not so we can see it a little

19    better?

20        MS. BUCHKO:  We have paper copies.

21        MR. PERSONIUS:  That's better.

22        MS. BUCHKO:  Oh, great.

23    Q.    And you said you took this picture?

24    A.    Yeah.

25    Q.    Why did you take a picture?

134

1    A.    To preserve what was there, I guess.

2    Q.    When did you take the picture approximately?

3    A.    Well it looks like in the corner it was February

4    5 of last year I was trying to get ahold of the CFPB

5    and Attorney Generals and anybody and I was trying to

6    take as many pictures as I could of what was on my

7    computer.

8    Q.    When you asked are we transitioning completely to

9    just Fidelis at some point to this year why did you

10   put transitioning in quotes?

11   A.    Because it just didn't -- it didn't seem like

12   there was a real like I don't know -- there was a lot

13   of things that didn't make sense to me.

14   Q.    Could you put up 171, please?  Ms. Rosenberg, do

15   you recognize this?

16   A.    Yup.

17   Q.    What is this?

18   A.    It's another picture of the chat conversation.

19   Q.    Is it a continuation of the previous exhibit?

20   A.    It looks like it is.

21   Q.    And when you made comments into this chat where

22   did your comments appear?

23   A.    Mine would be the blue on the right side.  Yeah

24   that was on that February 1 when the signing file is

25   created after today please use your Fidelis username.

135

1    Q.    Who said that?

2    A.    Shirley.

3    Q.    Why did she say that?

4    A.    I think we were all really kind of confused.

5              MR. HOOVER:  Move to strike, nonresponsive.

6              THE COURT:  I don't know if it's

7    nonresponsive.  I'm not sure of the relevance.  What

8    are we looking at leer trying to show?

9              MS. BUCHKO:  Looking at Shirley's comment

10   when assigning files created after today pleas use

11   your Fidelis user name talking about the transition

12   from Lit Def to Fidelis and what they were instructed

13   to do.

14             THE COURT:  I'm going to sustain the

15   objection on not exactly sure what we are doing but if

16   I'm understanding right you are offering for the truth

17   of the matter and that would be hearsay.

18             MS. BUCHKO:  Well, also -- well, I'm

19   offering it to show the effect it had on Ms. Rosenberg

20   and what she understood about what she was supposed to

21   do in the transition and how Lit Def and Fidelis were

22   essentially the same thing to her.

23             MR. HOOVER:  I think the Court has my

24   objection but that wasn't the question.  The question

25   was what did the and why did she say that.

136

1           THE COURT:  Right.  Ask her what you want

2      the answer to not a different question.

3           MS. BUCHKO:  Yes.  All right.

4           THE COURT:  Okay.

5      Q.   When you read Shirley's comment when assigning

6      files created after today please use your Fidelis user

7      name, what did that mean to you?

8      A.   We needed to be logged into our Fidelis like log

9      in and work on those files.

10     Q.   And what's the date there?

11     A.   February 1.

12     Q.   2022?

13     A.   2022, sorry.

14     Q.   Farther down the page Peggy Slivka said this may

15     be a dumb question but I am processing files and have

16     one for the client created 1/26/22 and on created

17     today do I assign the 2/1 file with my Fidelis and

18     1/26 with my Lit Def and Jean Comis said I think

19     that's how it works question mark?

20     A.   Right.

21     Q.   What did that exchange mean to you?

22     A.   I had that exact same question we were all

23     looking at files and the created date and trying to

24     figure out how the whole creating files is going to

25     work so we were asking Shirley, is this right, is this

1  how we are supposed to do it that type of thing but I

2  had the same question she had.

3  Q.   Would you please move to 169?

4        MR. HOOVER:  What number?  I'm sorry.

5        MS. BUCHKO:  169.

6  Q.   Ms. Rosenberg, do you recognize this?

7  A.   Yup.  That's part of that conversation.

8  Q.   The same conversation as the other two exhibits?

9  A.   Uh-huh.

10  Q.   Did you take this picture?

11  A.   Yup.

12  Q.   When Shirley Saavedra said in response to the

13  question about assigning files to Lit Def and Fidelis

14  which is essentially how initially was handled

15  anything before 2022 has to be handled by the old firm

16  what did that mean to you?

17  A.   Initiative was a term that was never clearly

18  explained to me and Shirley kind of made at least I

19  felt she made me feel like I was kind of dumb for not

20  knowing what it was.  And it's still a term I've never

21  really heard of but from what I could -- what I could

22  understand it was they told me I couldn't work on

23  those files I was never allowed to touch initiative

24  files and it was somebody else that had to work on

25  those.

138

1    Q.    Why not?

2    A.    I think it was because they weren't supposed to

3    be doing this in those states so those states were

4    considered initiative.  We were given like certain

5    dates exact dates for when states turned initiative.

6    Q.    And would you please put up 172?  Do you

7    recognize this, Ms. Rosenberg?

8    A.    Yup.

9    Q.    Is this a photo you took?

10   A.    Yup.

11   Q.    Is it the same chat al be it a few days later?

12   A.    Yeah that's still the chat program.

13   Q.    What did it mean to you when Shirley Saavedra

14   said if it's not a Fidelis firm you have to switch

15   accounts and use your Lit Def account and email?

16   A.    I think she's referring to the Leadtrack program

17   where you'd have to use the right log in for it

18   depending on if you were working on a Lit Def file or

19   a Fidelis file.

20   Q.    And when she says I would just start with

21   searching the file and refer to creating the date to

22   determine which account to use?

23   A.    Uh-huh.

24   Q.    What did that mean to you?

25   A.    Basically opening the electronic file scrolling

139

1    all the way to the bottom and seeing what the first
2    date was from when the file was created.
3    Q.    What significance would the date have?
4    A.    That was referring back to if it was before or
5    after the February 1, 2022 date.
6    Q.    After February 1, 2022, did you sometimes receive
7    emails sent to your Lit Def email account?
8    A.    Yes.
9    Q.    What happened to those emails?
10   A.    Like what do you mean?
11           THE COURT:  I'm sorry.  I couldn't hear you.
12           THE WITNESS:  I just asked what she meant.
13   Q.    How did you see those e-mails?
14   A.    Like on my own those were throughout look I don't
15   understand what you are asking.
16   Q.    That's fine.  After February 1, 2022, did you
17   sometimes receive emails sent to your Lit Def email
18   account that were about Fidelis files?
19   A.    Yes.
20   Q.    And what did you do?
21   A.    I was told that I was supposed to tell -- well
22   copy whatever the email was put it into a Fidelis so
23   like on the Google account like I was responding to it
24   tell the attorney that I no longer work for that firm
25   and that they can contact me at the Fidelis email

140

1    address.

2    Q.   Were you told to do that?

3    A.   Uh-huh.

4    Q.   What was that called?

5    A.   Making it a clean email.

6             MR. PERSONIUS:  I didn't -- I'm sorry,

7    Judge.  I apologize.  I didn't hear that.

8             THE WITNESS:  Making it a clean email.

9             THE COURT:  Clean.

10            MR. PERSONIUS:  Clean?  Thank you.

11   Q.   Ms. Rosenberg, who is the owner of Fidelis?

12   A.   Cameron Christo is what we were told.

13   Q.   Who made the big decisions about the company as

14   far as what you saw?

15   A.   I only communicated with Michelle Hinds and

16   Shirley for what to do.

17   Q.   You mentioned earlier I think that you only met

18   with Christo once; right?

19   A.   Uh-huh.

20   Q.   That was the video meeting?

21   A.   Right.

22   Q.   Did you have any other correspondence with him?

23   A.   There was a couple emails.  I think it was right

24   before the transition was supposed to happen where he

25   was trying to set-up my accounts and they were like

141

1    sending it to the wrong email address so I wasn't

2    getting it.  But that was -- that was about it.  It

3    was he forwarded me try this to log in type thing and

4    that was it.

5    Q.    And when was that?

6    A.    I think it would have been right around February

7    because he would have been like creating our gmail

8    accounts and stuff they said the link was sent to our

9    email but I didn't see it in any of my emails so then

10   I had to speak right with him through email.

11   Q.    February of what year?

12   A.    2022.

13   Q.    Would you put up 155, please?  Ms. Rosenberg, do

14   you recognize Exhibit 151?

15   A.    Yes.

16   Q.    What's the date of this?

17   A.    January 10 of 2024.

18   Q.    What is this?

19   A.    It looks like --

20   Q.    It's an email; right?

21   A.    Yeah.  It's an email between it looks like it's

22   the manager in New York Omar Graves and then Victor.

23   Q.    Omar Graves was the manager in New York?

24   A.    Uh huh.

25   Q.    Manager of Fusion?

142

1   A.   Yeah.

2   Q.   And Victor I believe you said earlier worked only

3   on Lit Def files; is that right?

4   A.   Right.  Yeah.  He took over settlement processing

5   after I went to Fidelis full-time.

6   Q.   In this email, I notice that about one-third of

7   the way down the page Michelle Hinds is using her Lit

8   Def strategies email; right?

9   A.   Right.

10   Q.   Why was that if you know?

11   A.   I think it would have been because it was a Lit

12   Def issue that they were dealing with and then I would

13   have been CCed on it I guess just for awareness or if

14   there was something that I could chime in to help with

15   I was CCed but it was mostly Victor had to handle

16   those Lit Def files then.

17   Q.   Why were you added in for awareness had you

18   worked on this issue before?

19   A.   It was probably an issue that I had worked on at

20   some point like if I had any emails that had to do

21   with it when he started working on something I'd have

22   to forward it to him so he'd have like all the

23   information that he needed so it was probably

24   something that I worked on when I was at Lit Def and

25   he was at Fidelis.

143

1    Q.   I know you are using your Fidelis email in this
2    chain; is that right?
3    A.   Uh-huh.
4    Q.   Why did you use that?
5    A.   By that date I would have been completely with
6    Fidelis I wouldn't have been working on Lit Def files.
7    Q.   Was that a problem that you used your Fidelis
8    email address?
9    A.   It would come up as a problem.  I was like told
10   to do the clean emails a few times but I just didn't
11   see it as a big deal so I wasn't that worried about
12   doing it.
13   Q.   From your perspective was Michelle Hinds mindful
14   about whether she used the Lit Def e-mails or Fidelis
15   e-mails?
16   A.   Yes.
17   Q.   From your perspective what --
18   A.   To the point we would be told to correct it.
19   Q.   I'm sorry?
20   A.   They were mindful to the point we would be told
21   to correct it if they saw the wrong emails being used.
22            MR. HOOVER:  Move to strike, nonresponsive.
23            THE COURT:  No overruled.
24   Q.   What do you mean the wrong emails?
25   A.   If you were using the wrong email address when

144

1    working on a Lit Def file using a Fidelis email

2    address or if it got mixed it was supposed to be that

3    way.

4    Q.   The separate email addresses?

5    A.   Yeah.

6    Q.   Would have to correspond to the type of file?

7    A.   Right.

8    Q.   Who told you that?

9    A.   Michelle and Shirley were both telling us to do

10   that.

11   Q.   And would you put up 165, please?  Ms. Rosenberg,

12   do you recognize this?

13   A.   Yes.

14   Q.   What is that?

15   A.   That's the chat program that we use.  It's a list

16   of employees at the time that I was on chat with.

17   Q.   Do you remember when you took this picture or did

18   you take this picture?

19   A.   Yes.

20   Q.   Do you remember when?

21   A.   When I was trying to take as many pictures as I

22   could with my tablet.

23   Q.   Approximately when was that?

24   A.   January -- I think it was January of last year.

25   Q.   2024?

145

1    A.    Yeah.

2    Q.    And you said this is a list of people in your

3    company.  Which company do you mean?

4    A.    This would have been everybody that I was like

5    working with at the time not everybody was Fidelis on

6    that list like Edgar was just Lit Def and he would

7    handle files that were even before Lit Def too.

8    Victor was just Lit Def and then the others were

9    Fidelis.

10   Q.    As far as you know is this a complete list of all

11   the people who worked at Fidelis or Lit Def in January

12   and February of 2024?

13   A.    I think so.

14   Q.    I want to talk to you for a few minutes about

15   consumer complaints if a consumer had issue with a

16   settlement or if a consumer filed a complaint what was

17   your role in that if any?

18   A.    I didn't really have a role in it.  But like if

19   we had -- if I would like get a complaint from the

20   attorney would forward it in saying like they're upset

21   they're threatening to call these people and I would

22   need to like do a settlement ticket and forward that

23   settlement ticket to the managers to get them involved

24   and then they would just take it where they needed to

25   to be resolved.

146

1    Q.   Which managers would you forward the settlement

2    ticket to?

3    A.   Usually Michelle and Omar were the ones that I

4    would tag in on it and then they would I don't know

5    talk discuss it with whoever they needed to talk to to

6    resolve it.

7    Q.   Did they send a response back to you?

8    A.   I would stay CCed usually.

9    Q.   As far as you can remember was there ever a time

10   you received a complaint from a consumer and you

11   didn't send it to Ms. Hinds?

12   A.   Not that I -- I mean stuff like that would

13   sometimes come in through her but I would -- she would

14   usually be copied on it if I had to bring it to that

15   level.

16   Q.   What did consumers complain about?

17   A.   What was that?

18   Q.   What did they complain about?

19   A.   Not hearing from their attorneys, having to add

20   more funds when they just added funds, usually why

21   hasn't payment been sent things like that.

22   Q.   So I'm going to move on and talk about January

23   2024.  What happened in that month from your

24   perspective working at Fidelis?

25   A.   As far as I know like it just kind -- they kind

1    of told us about it as like there was a like something

2    big going on in New York.  I know at one point I tried

3    to check the payment status of a couple files and I

4    was yelled at for checking on those.  I was told not

5    to send anything because someone's going through

6    everything in New York right now and then I was told

7    to log what work I would have done on spreadsheets

8    which I didn't -- didn't do because that didn't make

9    sense either to me if we were going to just start

10   working again then I would just do the work that I was

11   going to do and I didn't need to make a log of that.

12   Q.   Who told you someone was going through everything

13   in New York?

14   A.   Michelle.

15   Q.   And you said that you were told to make a

16   spreadsheet showing what you would have done on files?

17   A.   Uh huh.

18   Q.   If you had been working?

19   A.   Yeah, if I would have been like actually

20   processing them to make a list of what I would have

21   done.

22   Q.   Why?

23   A.   I don't know.

24   Q.   Who told you that?

25   A.   Michelle and Shirley.

148

1    Q.   Would you put up 166 please?  Ms. Rosenberg, does
2    Exhibit 166 look familiar to you?
3    A.   Yup.
4    Q.   What is it?
5    A.   That's an email from Shirley telling me to check
6    my gmail where they would have sent the spreadsheets.
7    Q.   What spreadsheets?
8    A.   The spreadsheets that we were supposed to log
9    that stuff on.
10   Q.   That stuff meaning?
11   A.   The work.
12   Q.   The work you would have done?
13   A.   The work I would have been doing.
14   Q.   Did you do that?
15   A.   I think I did it for a couple of files but then I
16   was Googling trying to find out what was going on and
17   I eventually found the TRO after it was unsealed.
18   Q.   Did anyone tell you why this was sent to you and
19   why this instruction was given?
20   A.   No.  I don't think so.  It was just I got to
21   check your gmail and I didn't even know what email
22   they were talking about.  I checked my personal ones
23   and I checked my Fidelis because that was the gmail
24   and then it occurred to me they were talking about the
25   gmail they had me create when I started there that was

149

1    tied to the chat messages so when I got logged into

2    that one that's where I found the spreadsheets and

3    stuff that they had sent to me.

4    Q.   And you mentioned you found the TRO by Googling;

5    is that right?

6    A.   Uh-huh.

7    Q.   About when was that, do you know?

8    A.   I want to say it was -- it was in like within

9    three days of it being unsealed I think that's what it

10   said on the site that I was looking at but I don't

11   remember the exact date.

12   Q.   Did Michelle Hinds give you any instructions

13   about how to -- about what to do after the TRO was

14   entered aside from what you just said about entering

15   work you would have done into the spreadsheets?

16   A.   She told me that they were waiting for the result

17   of a hearing to see what tweaks they needed to make to

18   the program to continue on.

19   Q.   Do you remember when that was?

20   A.   All I remember was it was while the hearings were

21   going on.

22   Q.   Did she ever give you any specific instructions

23   with regard to the litigation attorneys, 1099

24   attorneys?

25   A.   After having a meeting she asked me if I felt

150

1    comfortable reaching out to the attorneys and like

2    asking or telling them that they can tell the client

3    to contact global directly and remove their funds that

4    way and I said I wasn't comfortable doing any of that.

5    Q.    Did you say that back to her?

6    A.    Uh-huh.

7    Q.    Did you say why?

8    A.    Because of the TRO.  I told her I thought she was

9    asking me to do something that was against the TRO.

10   Q.    What happened next?

11   A.    Um.

12   Q.    What did she say in response?

13   A.    She said that since I didn't agree to do it that

14   she would do it and I think that was a Friday so like

15   starting that Monday she would do it and she would CC

16   me but that Monday I wasn't CCed on anything.  I got

17   one like maybe two emails that day like not many at

18   all compared to the huge volume I used to get.  I got

19   one email from one of the network attorneys to her

20   Client First Bankruptcy email asking if he sent the

21   settlement directly to us if we could get it processed

22   and she just responded that she would call him.

23   Q.    So let's unpack that.  A 1099 attorney sent an

24   email to you?

25   A.    To Michelle with me CCed.

151

1    Q.    Okay.  What email address did you use for

2    Michelle or?

3    A.    Client First Bankruptcy.

4    Q.    And what did the 1099 attorney ask?

5    A.    He asked if they sent the agreement straight to

6    us if we could get them processed.

7    Q.    Was that after the TRO?

8    A.    Uh-huh.

9    Q.    Was that after you had told her that you knew

10   about the TRO?

11   A.    I can't -- I can't remember.  It was a very

12   stressful couple of days with trying to get in contact

13   with Attorney Generals and CFPD and everything else

14   and trying to keep my job for the moment while trying

15   to get ahold of someone.

16   Q.    How did Michelle respond to the request from the

17   1099 attorney?

18   A.    She said that she would call them.

19   Q.    Would you put up 178, please?  Ms. Rosenberg,

20   does Exhibit 178 look familiar to you?

21   A.    Yup.

22   Q.    Is this a picture you took?

23   A.    Yeah that's a screen shot of the chats on my

24   phone instead of the tablet.

25   Q.    Why is it on your phone instead of the tablet?

152

1    A.    I think that would have been after the tablet was

2    wiped but I still had teams on my phone.

3    Q.    Did you wipe the tablet?

4    A.    No.

5    Q.    Who wiped the tablet?

6    A.    I still don't know.

7    Q.    What do you mean by wiped?

8    A.    I sat there and recorded it resetting over and

9    over and over again.  My youngest was actually in the

10   room too and he still remembers it.  It was pretty

11   upsetting.  I've never had a piece of technology

12   function like that right in front of me and it was

13   pretty upsetting.

14   Q.    And then after that could you use the tablet?

15   A.    It was like acting weird after that but it needed

16   to like be completely you had to like relog in and it

17   was like a new like if you would take it out of the

18   box type tablet.

19   Q.    Were you able to access all of your Fidelis and

20   Lit Def materials?

21   A.    No.

22   Q.    But you still had teams on your phone you said?

23   A.    Uh-huh.

24   Q.    Do you remember approximately when you took this

25   screen shot of teams on your phone?

153

1    A.    I don't remember exactly when but that would have

2    been I guess Shirley telling us that we can't access

3    any of our pay information any of that stuff.

4    Q.    When Shirley says no one is able to access any

5    LDS emails what does LDS mean to you?

6    A.    Lit Def strategies emails.

7    Q.    So if you receive an email from an attorney and

8    they email an LDS address does that mean Lit Def

9    strategies?

10   A.    Jess.

11   Q.    Please reply remove the LDS email and include the

12   FDLS email, what does that mean?

13   A.    Fidelis.

14   Q.    Were you a part of that chat?

15   A.    I think I was still in the group.  It looks like

16   most of the team is still in there it says eight

17   members but I wasn't responding at that point.

18   Q.    Do you know if anyone did what Shirley instructed

19   them to do?

20   A.    I'm not sure.  That was kind of the end and I

21   wasn't really paying attention to any of that anymore.

22   Q.    What happened after all of this came to ahead

23   what happened with your employment with Fidelis?

24   A.    I once I got in contact with someone I did a

25   whistle blower complaint and then I turned around and

154

1    told Michelle that that's what I had done so they put

2    me on paid administrative leave for a while and I was

3    on that for a couple months until I think it was I

4    don't know if it was the receiver or if it was CFPD

5    somebody contacted me to discuss this stuff and to

6    speak with them I had to quit so I told them I would

7    love to speak with you and got off the phone with them

8    sent an email that I quit and called them back and

9    told them I was happy to hear from them.

10   Q.   Had you ever been on administrative leave before

11   at any other job?

12   A.   No.

13   Q.   Approximately when did you quit Fidelis?

14   A.   I think it would have been March of 2024.

15   Q.   How long were you unemployed after that?

16   A.   A couple of months I ended up finding a job that

17   was I guess good enough because I was also trying to

18   buy a house at the time.  I'd waited four years to buy

19   a house for me and the kids and right when my paycheck

20   didn't show up when I was supposed to I guess that's

21   when stuff was frozen that was when I was supposed

22   to -- that was the day I had to put my money check

23   down or else I would have breached the contract and

24   lost the house.

25   Q.   Did you have any other sources of income during

155

1   this time that you were unemployed?

2   A.   I was doing editing for, what was the name of it,

3   a website it was an attorney had a website and he did

4   like news articles or articles about legal stuff so I

5   would edit those articles and like my spare time but

6   other than that no.

7   Q.   Were you making enough from that second job?

8   A.   No.

9   Q.   To cover your bills?

10   A.   No.   It was more just I enjoyed doing it.

11   Q.   How did that happen in pay how did that effect

12   you?

13          MR. HOOVER:  Objection, irrelevant.

14          THE COURT:  What is the relevance?

15          MS. BUCHKO:  Goes to her lack of bias that

16   she is not biassed at all towards Fidelis in fact she

17   stood up and did the right thing even though it was

18   harming her personally.

19          THE COURT:  What was the question again?

20          MS. BUCHKO:  How did the gap in pay affect

21   her after she quit Fidelis?

22          THE COURT:  Sustained.  I'm not sure that's

23   relevant.

24          MS. BUCHKO:  Nothing further.  Oh, I'm

25   sorry.  I did have a couple quick questions.  Can I

1    ask them very quickly?

2             THE COURT:  Okay.

3    Q.   I want to go over a few abbreviations in your

4    emails to make sure it's all clear.

5    A.   Uh-huh.

6    Q.   You say LT?

7    A.   Leadtrack.

8    Q.   OPC?

9    A.   Opposing counsel.

10   Q.   And OC?

11   A.   Opposing counsel.

12   Q.   What do you mean by LPA?

13   A.   Late payment agreement.

14   Q.   And what do you mean?

15   A.   Or late approval I think it was.

16   Q.   Sorry?

17   A.   Approval.

18   Q.   And what do you mean by HF?

19   A.   Happy Fox.

20           MS. BUCHKO:  Nothing further.

21           THE COURT:  Are you guys going to ask

22   questions?

23           MR. SMITH:  Yes, Your Honor.  I'll be quick

24   though.

25           THE COURT:  Okay.  Quick is the operative

157

1    word.

2            DIRECT EXAMINATION BY MR. SMITH:

3    Q.    Ms. Rosenberg, my name is Logan Smith.  I

4    represent the receiver.  I appreciate you being here

5    and we'll try to keep this quick.  You testified

6    earlier that Ms. Sayed contacted you from Fidelis but

7    you were hired by Lit Def was there any explanation

8    provided to you as to why you were hired by Lit Def

9    and not Fidelis?

10   A.    That was actually the only time I had heard of

11   Fidelis was when that voicemail was left everything

12   after that was Lit Def.

13   Q.    And what was the difference on a day-to-day basis

14   between your work at Lit Def and your work at Fidelis?

15   A.    What do you mean?

16   Q.    Was there any difference if any between the

17   substance of your work?

18   A.    No.  Everything was the same.

19   Q.    Who managed your work while you were at Fidelis?

20   A.    My managing paralegal was Shirley Saavedra and

21   the attorney was Michelle Hinds.

22   Q.    And who managed your work while you were at Lit

23   Def?

24   A.    The same people.

25   Q.    How many time sheets would you turn in?

158

1    A.   I think I would have to turn one in a few days

2    before pay day but it was basically just listing

3    Monday through Friday my work hours because it wasn't

4    even an accurate time sheet I was working outside of

5    my work hours but they wouldn't approve over time.

6    Q.   And you said it was one time sheet for both of

7    your work at Fidelis and Lit Def?

8    A.   Yeah.  There was no split for what office or firm

9    I was working for.  It was just it was 6:30 to 3:30

10   Monday through Friday is what it said.

11   Q.   When you said that Ms. Hinds was in your

12   supervisory chain what was your relationship like with

13   her?

14   A.   It seemed like it was fine.  She seemed like she

15   was a good managing attorney.  She was really helpful

16   when we needed her to be.

17   Q.   And what feedback did you receive as to your

18   performance?

19   A.   I was always very good things about what I was

20   doing.

21   Q.   Did you receive any salary raises or bonuses?

22   A.   I received Christmas bonuses and I did I don't

23   know if I actually got a raise but when I was doing

24   the work for Fidelis it was $1 more an hour.

25   Q.   And who informed you about your bonus or increase

159

1    of pay?

2    A.    Michelle.

3    Q.    What software did you use for Fidelis?

4    A.    We would use Leadtrack gmail for emails and then

5    Happy Fox.

6    Q.    And what software would you use for Lit Def?

7    A.    The same but the emails were Outlook.

8    Q.    And what log in did you use for Fidelis to log

9    into your computer?

10   A.    The computer itself.

11   Q.    Yes.

12   A.    Was Client First Bankruptcy.

13   Q.    And then what -- and that was for Fidelis is that

14   correct?

15   A.    It never changed.

16   Q.    And was that also the same you used for Lit Def?

17   A.    It never changed.

18   Q.    Just my last question do you recall a declaration

19   in this case?

20   A.    Yes.

21   Q.    And why did you do that?

22   A.    I felt like it was pertinent information.

23   Q.    Thank you.  I have nothing further, Your Honor.

24   Thank you.

25              THE COURT:  I assume you are going to cross.

160

1          MR. PERSONIUS:  I'm not.

2          THE COURT:  Okay.  Mr. Hoover?

3          MR. HOOVER:  I am, Judge, and if we're not

4    going to break for lunch, could I have five minutes?

5          THE COURT:  We're going to break for lunch.

6    We're going to come back at quarter after.  While

7    we're here though, Mr. McNamara, Mr. Connors, have you

8    guys worked out that contempt thing?

9          MR. MCNAMARA:  I sent over a stipulation and

10   settlement agreement regarding last weekend I got some

11   comments back and I think we're very close.

12         THE COURT:  So the answer is no.

13         MR. MCNAMARA:  The answer is no but I think

14   we're close.

15         THE COURT:  You're still working on it.

16         MR. MCNAMARA:  Yes.

17         THE COURT:  Okay.  Quarter after.  You can

18   step down ma'am but you're going to have to come back.

19   Sorry.

20   (The proceeding recessed at 12:46 p.m.)

21   (The proceeding reconvened at 1:24 p.m.; appearances

22   as before noted.)

23         THE WITNESS:  Okay.

24         THE COURT:  Have a seat please.  We had to

25   send somebody out to Walmart to get more water.  Just

161

1    kidding.

2            THE CLERK:  United States District Court for

3    the Western District of New York is now in session.

4    The Honorable Michael J. Roemer presiding we are

5    continuing on our evidentiary proceeding in 24-CV-40.

6            THE COURT:  Mr. Hoover, are you ready?

7            MR. HOOVER:  Yes Judge.

8            THE COURT:  Okay.  Ma'am, just a reminder

9    you are still under oath.  Okay.

10            THE WITNESS:  Uh-huh.

11            CROSS EXAMINATION BY MR. HOOVER:

12    Q.   Good afternoon.

13    A.   Good afternoon.

14    Q.   You mentioned a whistle blower complaint that you

15    made.  Can you tell us what that is what was that?

16    A.   Like what do you mean?

17    Q.   I'm asking you what you meant when you said you

18    made a whistle blower complaint on your direct

19    testimony?

20    A.   When I reached out to the CFPB after looking at

21    their website that was the number that I was like

22    repeatedly trying to call through on for the

23    information that I had to find.

24    Q.   And you left a voicemail with them or you spoke

25    to someone?

162

1    A.   I left voicemails.  I spoke to people.  I called

2    numerous times.  I called the Attorney General's same

3    thing.  I was trying to get in contact with anybody at

4    the time.

5    Q.   What Attorney Generals did you speak to?

6    A.   The Illinois Attorney General.  There was someone

7    in their office that I had spoke to.  They took a

8    message and they also told me to contact the FBI

9    because I wasn't sure who remoted into my computer and

10   wiped it.

11   Q.   Okay.  And who did you speak -- who was the name

12   of the people -- name of the person or people you

13   spoke to at the CFPB?

14   A.   I'm not sure.  It would have been like whoever

15   was answering the phone.

16   Q.   Did you know who you were spoking to?

17   A.   No.

18   Q.   What was the name of the person you spoke to at

19   the "Attorney General's"?

20   A.   Whoever was answering the phone at the time I

21   tried giving them like a quick explanation of what I

22   was -- the information I was trying to get to someone.

23   I just knew the Attorney General was one of the like

24   people who signed onto it so at the time I was just

25   trying to get information to anybody that was on the

163

1    case.

2    Q.   What did they sign onto?

3    A.   I don't know, the lawsuit.

4    Q.   Oh, and who was that person you spoke to?

5    A.   They were just like general people at the

6    offices.  I don't know who it was.

7    Q.   And how many calls did you make?

8    A.   I'm not even sure it was a lot of phone calls.

9    Q.   Thousands?

10   A.   I don't think I was capable of thousands but a

11   lot.

12   Q.   Well, I mean hundreds?  You tell me.  If you know

13   the exact number, that would be great.

14   A.   I'm not sure, but I know I was frantically calling

15   trying to get the information to someone.

16   Q.   And did you send anything in writing in support

17   of your whistle blower complaint?

18   A.   I think I sent an email I think I had to fill out

19   I don't know something.  There was a lot of things I

20   was doing at that time I'm not exactly sure.

21   Q.   And who did you provide that by email or that

22   written?

23   A.   It was to the CFPB like whistle blower email that

24   they have on the website.

25   Q.   And you still have that email?

164

1    A.    I should, yeah.

2    Q.    And you took photos of certain things you

3    provided that to the CFPB?

4    A.    I was taking pictures of as much as I could on my

5    tablet.

6    Q.    All right and the things that you took photos of

7    on your tablet did you provide those to the CF?

8    A.    Yeah I was given when I was doing my declaration

9    I was given a drop box link to put all of those things

10   into.

11   Q.    And you wrote that declaration yourself?

12   A.    I like told them what happened and they put it to

13   words for me and I reviewed it and signed off on it.

14   Q.    Signed it and that was that?

15   A.    Uh-huh.

16   Q.    Thank you very much.

17            THE COURT:  Nothing, Mr. Personius?

18            MR. PERSONIUS:  Thank you, Judge.  No.

19            THE COURT:  Any redirect?

20            MS. BUCHKO:  Just one minute, Your Honor.

21   (There was a discussion off the record.)

22            MS. BUCHKO:  Nothing from us, Your Honor.

23            THE COURT:  You can step down, ma'am.  Thank

24   you for coming.

25            THE WITNESS:  Yup.

1    MR. SANDERS:  Judge, we -- our next witness

2    is en route.  We had him set for the afternoon, so we

3    had told him to be here at 1:45, but we let him know

4    that the time has moved up so he's en route right now.

5    THE COURT:  You have a witness or you don't

6    have a witness?

7    MR. SANDERS:  We have a witness who is on

8    his way.

9    THE COURT:  That's the last one for today?

10    MR. SANDERS:  We could potentially wrap up

11    today, Judge.

12    THE COURT:  Wrap up with the whole hearing

13    today?

14    MR. SANDERS:  Well, we could potentially

15    wrap up with our side other than Cameron Christo who

16    we called this morning but is now I guess scheduled

17    for tomorrow.  If you give us a couple minutes to

18    confirm, we could try to get a timeframe on when we

19    could finish it up.  Thanks, Judge.

20    THE COURT:  Mr. McNamara?  Where is he

21    going?  Does he have other witnesses?

22    MR. SMITH:  He's coming back.  I don't

23    believe we have any other witnesses, Your Honor.

24    THE COURT:  Who are we waiting on?

25    MR. SANDERS:  So our next witness is Tim

166

1   Hanson but given the -- and we'll put him on the stand
2   given the stipulation on the exhibits we just want to
3   talk and see whether we need anybody beyond Mr. Hanson
4   some of those witnesses were in case we needed them to
5   put exhibits in so if you can give us a minute we can
6   figure that out.
7           THE COURT:  Well, apparently we have at
8   least 15 minutes because there's no witness.  I hate
9   down time when I'm having a hearing.  I like to get
10  the witnesses in and get them out.
11          MR. SANDERS:  Apologies, Judge.
12          THE COURT:  Talk among yourselves I guess
13  then.
14          MR. SANDERS:  Okay.  Thank you.  We'll get
15  this done thank you.
16          THE COURT:  Mr. Personius?
17          MR. PERSONIUS:  Your Honor, if I may,
18  please.  I've spoken to the counsel for the CFPB and
19  the receiver Mr. McNamara.  They don't object.  My
20  question is if Mr. Blust was able to get out-of-town
21  at some point today would you excuse him from being
22  present tomorrow for the hearing?
23          THE COURT:  Yeah.  Do you guys need him for
24  anything?
25          MR. SANDERS:  No, Judge.

167

1              THE COURT:  That's fine.

2              MR. PERSONIUS:  Thank you, Judge.

3              THE COURT:  Yup.

4              MS. RADOS:  Judge, I have one piece of

5     housekeeping if you don't mind or just to confirm the

6     parties have agreed to stipulate to moving all of our

7     exhibits into evidence and just want to confirm that

8     you so ordered that stipulation.

9              THE COURT:  Okay.  Why don't you come on up

10    here and coordinate with Rosalie all of that?

11             MS. RADOS:  Okay.

12    (There was a discussion off the record.)

13    (There was a pause in the proceeding.)

14             THE COURT:  Mr. Sanders, do you want to call

15    your witness?

16             MR. SANDERS:  Yeah, Judge.  We took some

17    time to confer with counsel regarding the remaining

18    witnesses for today.  Three of the witnesses Tim

19    Hanson, Nick Walker and Patrick Callahan are bureau

20    employees.  They all -- Mr. Hanson and Mr. Callahan

21    have declarations that are -- have been stipulated to

22    and are in the record.  We asked counsel if they

23    wanted to cross examine them or Mr. Walker.  They

24    indicated that they did not.  So for those three

25    witnesses given that counsel doesn't want to question

168

1    them we're happy to stand on the declarations and the

2    exhibits that are already there.  I've also spoken

3    with the receiver about Mr. Avila and I'll let the

4    receiver explain about the status of Mr. Avila.

5            THE COURT:  Mr. McNamara?

6            MR. MCNAMARA:  You may remember that Mr.

7    Avila was an accountant and when we were here in May

8    we found these documents reflected that cutting to the

9    chase I think I now understand what happened.  Fidelis

10   through Cameron Christo would beginning of the month

11   create invoices for Fidelis.

12           They would be forwarded to Avila who was

13   using a Client First Bankruptcy email address and then

14   Avila would send it to the law firm managers what I'll

15   call the front attorneys to sign off and to say okay

16   yeah this bill is fine.  We weren't sure what was

17   going on because we saw you know when we were here in

18   May we first filed all of this happening pretty

19   quickly we weren't sure exactly what was happening but

20   we have now confirmed that that was the case.

21           I thought that it was different and I think

22   I probably made that argument to the court but now

23   we've cleared it up that the process was like this

24   Christo issued invoices every month to different law

25   firms sent them to Avila.  Avila then sent them out to

1    those managers.  They had to sign them and then they

2    would be sent back to Avila so they had a paper trail

3    and what we had seen in the Lit Def files we had seen

4    those come in to Ms. Hinds and Ms. Hinds as it turns

5    out is one of the front attorneys for like three of

6    the firms.

7            So we were seeing them come into her as the

8    manager of one of those firms and we weren't sure

9    exactly what was going on so for what it's worth and I

10   probably should have got to the court earlier I don't

11   think Mr. Avila we won't need to call them I talked to

12   the CFPB and I don't think they need to call them and

13   I think we cleared up that concern.

14           THE COURT:  All right.  So we're done with

15   Mr. Avila?

16           MR. MCNAMARA:  We are.

17           THE COURT:  And it sounds like we are done

18   with witnesses other than Mr. Christo.

19           MR. SANDERS:  Other than Mr. Christo, yes.

20   Like I said, we agreed to counsel that neither side

21   needs to question Hanson, Walker or Callahan.

22           THE COURT:  All right.  So we're done from

23   today?

24           MR. SANDERS:  From the Bureau's perspective,

25   Judge, I think we can wrap up today.

170

1           THE COURT:  Okay, but we are going to be

2   back at 9:30 tomorrow for Mr. Christo.

3           MR. SANDERS:  That sounds right to me,

4   Judge.

5           THE COURT:  Correct, Mr. Hoover.

6           MR. HOOVER:  Yes, Judge.

7           THE COURT:  Everybody looks at me with

8   puzzled faces.

9           MR. HOOVER:  We're done for today, Judge.

10           THE COURT:  We're done for today?

11           MR. HOOVER:  Yes.

12           THE COURT:  We're going to be back here at

13   9:30 tomorrow.

14           MR. SANDERS:  That sounds right.

15           MR. PERSONIUS:  If you want to spend the

16   rest of the afternoon, we could go back up and talk

17   settlement.

18           THE COURT:  Yeah, we could.  All right.  Go

19   Bills.

20           MR. SANDERS:  Go Bills.

21           (Proceeding concluded at 1:52 P.M.)

22

23

24

25

171

1                    **CERTIFICATE OF COURT REPORTER**

2              I certify that this is a true and accurate

3    record of proceedings in the United States Magistrate

4    Court for the Western District of New York before the

5    Honorable Michael J. Roemer on January 23, 2025.

6

7    S/ Brandi A. Wilkins

8    Brandi A. Wilkins

9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25