UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

      Plaintiffs,       Case No.: 1:24-cv-40-EAW-MJR

v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), et al.,

      Defendants,

and

STRATEGIC ESOP, et al.,

      Relief Defendants.
-------------------------------------------------------- X

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF THEIR CROSS-MOTION

**REED SMITH LLP**
Gregory D. Speier
599 Lexington Ave
New York, New York 10022
Tel.: 212-521-5400

*Attorneys for Defendants Ryan Sasson, Daniel Blumkin, Albert Ian Behar, Twist Financial LLC, Duke Enterprises, LLC, and Blaise Investments, LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ............................................................................................. 4

II.    THE CAPITAL CALLS SHOULD BE MADE TO PREVENT DILUTION AND PRESERVE THE STATUS QUO; AND THE RECEIVER'S BUSINESS JUDGMENT IS NOT ENTITLED TO DEFERENCE WHEN SUCH JUDGMENT IS COUNTER TO THE PURPOSE OF THE PRELIMINARY INJUNCTION ................ 6

III.   THE CFPB AND INDIVIDUAL DEFENDANTS WERE CONFERRING ON THE 603 CENTRAL AVENUE PROPERTY, BUT NOW, IT IS NOT CLEAR WHO IS IN CHARGE AND THERE HAVE BEEN NO ADDITIONAL DISCUSSIONS ................................................................................................. 9

IV.    THE NYAG'S EXCUSES FOR THE CFPB NOT PAYING INDIVIDUAL DEFENDANTS' EXPENSES IN A TIMELY MANNER DO NOT HOLD WATER ...................................................................................................... 10

V.     THE NYAG AND THE RECEIVER FAIL TO PRESENT ANY CREDIBLE ARGUMENT AGAINST THE UNFREEZING OF FUNDS SO THAT INDIVIDUAL DEFENDANTS CAN PAY FOR COUNSEL OF THEIR CHOOSING ................................................................................................... 14

VI.    THE NYAG'S CLAIM THAT INDIVIDUAL DEFENDANTS HAVE UNCLEAN HANDS IS BASELESS AND IS BELIED BY THE FACTS ......................................... 15

VII.   CONCLUSION ................................................................................................ 18

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adm'r of U.S. Small Bus. Admin. v. Contessa*,
  2023 U.S. Dist. LEXIS 54104 (E.D.N.Y. 2023).......................................................................17

*Avail Holding, LLC v. Nanda*,
  2017 U.S. Dist. LEXIS 5026 (E.D.N.Y. 2017)...........................................................................7

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984)....................................................................................................................3

*Goldstein v. Hochul*,
  No. 22-CV-8300, 2023 U.S. Dist. LEXIS 124737 (S.D.N.Y. July 19, 2023) ...........................7

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369, 144 S. Ct. 2244 (2024)....................................................................................3, 5

*SEC v. Pittsford Capital Income Partners, L.L.C.*,
  No. 06 Civ 6353 T(P), 2007 U.S. Dist. LEXIS 1241, at *6 (W.D.N.Y. Jan. 5,
  2007) ...........................................................................................................................................6

Individual Defendants Ryan Sasson, Daniel Blumkin, Albert Ian Behar, Twist Financial LLC, Duke Enterprises, LLC, and Blaise Investments, LLC (the "Individual Defendants") respectfully submit this reply memorandum of law in further support of their Cross-Motion Requesting an Order Directing the CFPB and the Receiver to Take Certain Actions ("Individual Defendants' Cross-Motion") (ECF 533), and in response to the oppositions[1] filed by The State of New York ("NYAG") (ECF 614), and the Receiver (ECF 615)[2]. For the below reasons, as well as those set forth in Individual Defendants' moving submission, Individual Defendants' Cross-Motion should be granted.

At the outset, we call attention to the fact that the driver behind this case – the CFPB – did not file an opposition to Individual Defendants' Cross-Motion. That is because the CFPB is experiencing extraordinary and unprecedented changes, and new leadership at the CFPB has issued multiple directives mandating that the CFPB must not act in any litigation, except for seeking continuances or extensions of time – as the CFPB recently sought, without success, before this very Court in this very case.

Since the beginning of this case, the CFPB's administration of the Preliminary Injunction (and first, the TRO) has been dysfunctional, and for over a year, Individual Defendants have suffered real and serious consequences due to the CFPB's stonewalling and foot-dragging. And that was when the CFPB was a "functional" entity within our government's bureaucracy. Now, with the CFPB sidelined, the administration of the Preliminary Injunction has become entirely

---

[1] In this one reply brief submitted on behalf of Individual Defendants, Individual Defendants are replying to two oppositions – one from the NYAG and one from the Receiver, with each containing different arguments. For this reason, Individual Defendants respectfully submit that they should be excused for exceeding the 10-page reply limit. Instead of filing two separate replies (each with a 10-page limit), Individual Defendants are jointly responding to both oppositions in this one reply brief. On February 25, 2025, we informed the Court of this combined reply and the fact that it exceeds 10-pages: the Court approved the same.

[2] Individual Defendants acknowledge that the Receiver filed, along with his opposition, a cross-motion seeking to name additional receivership defendants. On February 24, 2025, the Court set March 4, 2025 as the deadline for Individual Defendants to respond to that cross-motion (ECF 618). Accordingly, Individual Defendants do not address that cross-motion here.

unworkable.  The NYAG's attempt to sub-in for the CFPB – now in year two of this case – will only result in additional irreparable harm caused to Individual Defendants.  This is supported, in part, by the NYAG's and the Receiver's oppositions to Individual Defendants' Cross-Motion, where the NYAG and the Receiver – either intentionally or unintentionally – materially misstate facts in some places and are flat out wrong in others.  That may be understandable, because they have both taken a backseat in this case, riding on the CFPB's coattails.

Indeed, since the beginning, the CFPB has been the sole party approving expenses and dictating what Defendants can or cannot do.  And while the NYAG's opposition tries to paint a rosy picture that the parties have worked well together with respect to the administration of the Preliminary Injunction (perhaps in its last-ditch effort to save the asset freeze), nothing could be further from the truth.  It has been a grueling, adversarial, and absurdly unfair process from the very beginning.  The NYAG and the Receiver do not know the complicated processes and procedures required to properly administer the Preliminary Injunction, nor the ineptitude on the part of the CFPB to date.  But that is exactly Individual Defendants' point, and there is only one right answer here now that the CFPB has been sidelined for the indefinite future.

This Court has the inherent power, *sua sponte*, to stay the Preliminary Injunction pending the outcome of the Individual Defendants' fully briefed appeal to the Second Circuit.  Argument on that appeal is scheduled for the week of April 7, 2025, and balancing the relative harms and benefits to the Individual Defendants versus Plaintiffs, a stay of the Preliminary Injunction as to Individual Defendants is appropriate.  Individual Defendants cannot and should not endure the consequences of the NYAG trying – but failing – to administer the Preliminary Injunction during the short period between now and the hearing before the Second Circuit.  Paying all due respect to the CFPB's previously articulated position (before it was sidelined), the proper outcome at the Second Circuit is clear.

2

When this Court held evidentiary hearings on the Preliminary Injunction, the law of the land was simply different than it now stands. The U.S. Supreme Court's landmark decision in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) was overturned fully by its June 28, 2024 decision in *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 144 S. Ct. 2244 (2024). Retroactivity of the *Loper Bright* decision for all presently pending cases is clear, and the Preliminary Injunction must be vacated and sent back to this Court for new findings of fact and conclusions of law now under the law of the land. The certitude of *Loper Bright*'s applicability is such that neither the CFPB nor any of the attorneys general here argued otherwise in responsive Second Circuit submissions. Consequently, but for procedural arguments that will fail, Individual Defendants' efforts to bring the Preliminary Injunction back here to this Court, for new findings of fact and conclusions of law, is most likely to succeed – and in its substantively unopposed state, to succeed promptly following argument during the week of April 7, 2025.

Moreover, there should be no confusion that administering the abusive and complex Preliminary Injunction is no easy task. To the contrary, the CFPB had at least 7 attorneys, multiple investigators, accountants, and other staff assigned to this case, who, despite their efforts, were still unable to appropriately manage the complex finances of Individual Defendants or prevent Individual Defendants from sustaining numerous (yet unnecessary and avoidable) harms.

Individual Defendants are not aware of any legitimate reason for this Court to wait until April to hold a hearing on Individual Defendants' Emergency Renewed Motion for a Stay of the Preliminary Injunction (ECF 613). During the interim, Individual Defendants will, among other things, be exposed to the dilution of their rightfully owned assets, cannot sell property in New Jersey, cannot pay for the attorneys of their choosing, and remain subjected to interest, fees, and penalties for which they are responsible. And in this exigent situation, the Court can and should consider, expeditiously, the unprecedented nature of what is occurring here, and the real and direct

3

consequences on Individual Defendants as a result of the CFPB's inability to act. The fact that the CFPB has disappeared from this case is, in and of itself, a violation of the Preliminary Injunction.

Individual Defendants, however, remain compelled to respond to the NYAG's and the Receiver's oppositions on the merits, and assume that the relief Individual Defendants have requested from the CFPB in their moving submission now applies to the NYAG.

I. <u>**INTRODUCTION**</u>

Incredibly, in their opposition filings, the NYAG and the Receiver admit that they: (i) are intent on diluting investments that the Individual Defendants rightfully had prior to the entry of the Preliminary Injunction; (ii) do not think it is a big deal that they continually fail to authorize the Individual Defendants to use their own money to pay for their expenses in a timely manner, resulting in interest, fees, and penalties being assessed against the Individual Defendants; and (iii) have no problem with the Individual Defendants being unable to pay for the lawyers of their choosing.

These outcomes are unacceptable and should be concerning to the Court. Yet, the NYAG and the Receiver felt compelled to oppose the reasonable relief requested by Individual Defendants in their Cross-Motion. This demonstrates that the NYAG and the Receiver are – as the CFPB has done – weaponizing the Preliminary Injunction in an improper manner. With all of the NYAG's and the Receiver's attempts to mischaracterize, blur, and twist what Individual Defendants are seeking in their Cross-Motion, it is now clearer than ever that the NYAG and the Receiver seek – with this Court's blessing – the complete destruction of the Individual Defendants' financial, professional, and personal livelihoods.

What the Individual Defendants have been and continue to be subjected to in this case is typically reserved for the most heinous white-collar criminals, *after* an indictment. But this is not a criminal case. This is a civil case, and there has been no final adjudication that Individual

Defendants did anything wrong.  To the contrary, and among other things, the former Attorney General of the State of New York, Dennis Vaco, Esq., told Mr. Sasson in a memorandum that his business operated in compliance with the TSR.  *See* Def. Cross-Motion, Ex D.  The Court entered the TRO and the Preliminary Injunction without this evidence before it, but a conclusion now, that Plaintiffs have a likelihood of success on the merits, would be incorrect (even without regard to the now controlling precedent of *Loper Bright*).

With the intervening decision of *Loper Bright*, Individual Defendants have asked the Second Circuit to vacate the Preliminary Injunction and remand back to this Court in light of *Loper Bright*'s holding.  Oral argument on the motion to vacate and remand, and the merits of this Court's March 4, 2024 Preliminary Injunction, is set for the week of April 7, 2025.  With these appellate issues pending, it would constitute error to allow rightfully owned investments of Individual Defendants to disappear, for Individual Defendants to continue to be subjected to interest, fees, and penalties, and to preclude them from paying for the lawyers of their choosing.

The NYAG's accusation that Individual Defendants have unclean hands is incorrect.  It is evident that the NYAG does not know the full story of what has occurred in this case, and resultingly, it is distorting the truth to fit its narrative.  In reality, due to improper tactics, the CFPB has caused Individual Defendants to sustain unnecessary and avoidable harms – for instance, late fees, penalties, and interest, as well as direct and severe consequences from freezing assets that are not Receivership Assets.  Perhaps the Receiver mistakenly froze non-Receivership Assets. Whether intentional or not, the Court should order all non-Receivership Assets to be unfrozen.

The NYAG's mischaracterizations demonstrate that it is unfamiliar with the procedural and factual history of this case or the processes and procedures that have taken place to date with respect to the approval process of Individual Defendants' expenses.  Since January 10, 2024, Plaintiffs have slowly dripped bits and pieces of information to this Court, rather than present the

whole story, in an effort to vilify Individual Defendants. And now, instead of learning the history of this case and presenting the Court with a complete picture of what has been occurring, the NYAG asserts – wrongly – that Individual Defendants have "unclean hands." As demonstrated below, this accusation from the NYAG is without merit and is easily refuted.

Accordingly, Individual Defendants' Cross-Motion should be granted.

## II. THE CAPITAL CALLS SHOULD BE MADE TO PREVENT DILUTION AND PRESERVE THE STATUS QUO; AND THE RECEIVER'S BUSINESS JUDGMENT IS NOT ENTITLED TO DEFERENCE WHEN SUCH JUDGMENT IS COUNTER TO THE PURPOSE OF THE PRELIMINARY INJUNCTION

The NYAG argues in its opposition that because the Receiver did not oppose Clover's request to dilute Individual Defendants' interests in the Clover fund investments, this Court should defer to the Receiver and allow dilution to proceed. The Receiver conveniently, yet incorrectly, argues that there is no money to make the capital calls, and in any event, his business judgment suggests dilution should occur. These arguments should be rejected, and the Court should order the payment of the requested capital calls to maintain the status quo.

Maintaining the status quo is essential here and the applicable standard that the Court must apply. The objective of the receivership is to protect the receivership property to ultimately return it to the proper parties. *SEC v. Pittsford Capital Income Partners, L.L.C.*, No. 06 Civ 6353 T(P), 2007 U.S. Dist. LEXIS 1241, at *6 (W.D.N.Y. Jan. 5, 2007). The Receiver was appointed to preserve the status quo and avoid diversion and waste of receivership assets (ECF 183, p. 54). Payment of the capital calls is necessary to preserve Individual Defendants' membership interests in their investments and protect any further distribution and benefits. Dilution of Individual Defendants' membership interests is a violation of the status quo and will result in diminishment in the property rights that will be returned to Individual Defendants. It is also telling that the NYAG and the Receiver do not argue that the Clover investments were made at any time other

6

than prior to this case being instituted, and there is no allegation presented that these Clover investments were made using ill-gotten gains.

In addition, there is persuasive precedent that this Court cannot allow dilution of Individual Defendants' assets to occur while the appeal is pending with the Second Circuit. The filing of the Notice of Appeal significantly limits the jurisdiction of this Court to relief "necessary to preserve the status quo." *Goldstein v. Hochul*, No. 22-CV-8300, 2023 U.S. Dist. LEXIS 124737, at *3 (S.D.N.Y. July 19, 2023). Clover's request to dilute Individual Defendants' interest in the Funds, and the Receiver's willingness to allow such dilution, is far from preserving the status quo. This Court issued the Stay Order freezing Individual Defendants' assets as "necessary to preserve the status quo and the possibility of effective final relief." (ECF 183, p. 54). Dilution of Individual Defendants' membership interests eradicates the status quo, and with the appeal pending, this Court does not have jurisdiction to allow dilution to proceed.

Similarly, the Receiver's "business judgment" should be afforded no deference here. The individual assets of the Individual Defendants are highly unlikely to be available to the Receiver in any manner, at any time. So, in exercising his business judgment here, it is the definition of "playing with the house's money" (but perversely, in this instance, "the house" is the suffering and to be personally diluted Individual Defendants).

The NYAG makes conclusory and speculative statements that it is concerned that the release of funds will cause harm to the recovery of consumers. They are wrong, and the opposite is true. Funding the Clover investments will *help* consumers, not hurt them, in the event Plaintiffs are successful in this case. Put differently, maintaining the overall equity in the Clover investments will *exceed* the contributions that Individual Defendants are required to make, providing *more* funds for consumers, not less. In fact, there is no dispute that since the granting of the Preliminary

7

Injunction, Individual Defendants' overall equity and investment portfolios have increased despite Plaintiffs' argument that there is a diminishment of available funds.

The Receiver incorrectly claims that there is no money available to make the Clover-related capital calls. The Receiver fails to acknowledge that he applied a blanket freeze on all of Individual Defendants' bank accounts, not just Receivership Assets. The overly broad freeze has prohibited Individual Defendants from gaining access to funds that are not under the Receivership to make the capital calls. By way of example only, an account owned by Axel – which is under a freeze – has north of $400,000 available to fund the capital calls. And there are other accounts that can do the same. In the grand scheme of things, the requested funding to maintain the Clover investments and prevent dilution constitutes a mere fraction of a percentage of the funds frozen by the Preliminary Injunction. When weighing the equities, and the importance of maintaining the status quo, the unfreezing of a few hundred thousand dollars to prevent dilution of Individual Defendants' assets is appropriate.

As it concerns Mr. Sasson's investments in BX Strategic, the NYAG claims that it is considering it and that the process should "unfold" without Court intervention. Tellingly, since Individual Defendants filed their Cross-Motion, there have been no efforts by Plaintiffs to confer with defense counsel on this investment. Lead Plaintiff (now the NYAG rather than the CFPB), is dragging its feet, while exposing Mr. Sasson to dilution of a rightfully held asset. In addition, such argument ignores the reality that the CFPB has administered the Preliminary Injunction in a dysfunctional manner since the start, and things will only get worse with the CFPB sidelined. The NYAG's calls for collaboration, instead of the Court's intervention, is a mere guise to allow it to weaponize its power of position over Individual Defendants' budgets and financial investments.

Indeed, all future capital calls should be paid for the simple reason of maintaining the status quo, and persevering resources to limit the need to respond to every non-party motion to intervene

in this matter to request a capital call to be made.  Indeed, since Individual Defendants filed their Cross-Motion, Mr. Behar received two additional requests for capital calls from Irving Investors OSC Secondaries Fund, LLC ("Irving") and Third Pine Alpha Fund III-A, L.P. ("Third Pine"). Speier Decl., Ex. E.  On January 6, 2025, Irving announced a capital call requiring Mr. Behar to contribute $30,000 by January 17, 2025.  Additionally on January 6, 2025, Third Pine announced a capital call requiring Mr. Behar to contribute $50,000 by January 17, 2025.  On February 20, 2025, Irving Investors has threatened to pursue remedies against Mr. Behar for non-payment, including divestment.  Speier Decl., Ex. F.  Mr. Behar is precluded from making these capital calls, and the Receiver has unfortunately (and wrongly) made it clear that his business judgment will lead to the denial of these payments.  Eventually, these non-parties will seek intervention with this Court, or worse, move to dilute without further notice.

The Court should order the funding of the requested capital calls.

## III.    THE CFPB AND INDIVIDUAL DEFENDANTS WERE CONFERRING ON THE 603 CENTRAL AVENUE PROPERTY, BUT NOW, IT IS NOT CLEAR WHO IS IN CHARGE AND THERE HAVE BEEN NO ADDITIONAL DISCUSSIONS

The NYAG is correct that after Individual Defendants filed their Cross-Motion, attorneys from the CFPB and attorneys for Individual Defendants began conferring in an effort to resolve the issue at the center of the 603 Central Avenue property.  A set of conditions were proposed by the CFPB, and Individual Defendants began considering those conditions.  Individual Defendants obtained a list of alternative appraisers and are considering these appraisers now.  With the CFPB sidelined, however, it is not clear who is in charge, and Individual Defendants have not heard anything further regarding the proposal.  In the meantime, the arbitration instituted against Mr. Behar and Mr. Sasson by the other owner of 603 Central Avenue is getting underway, with a response to the demand for arbitration due on March 21, 2025.  Speier Decl., Ex. G.  And there is risk that Mr. Behar and Mr. Sasson are to be found in breach of their agreement, since they are

prevented by the Preliminary Injunction from taking any action with respect to this property.  The Court should allow Mr. Behar and Mr. Sasson to sell their interests in this property, as they agreed to do, without baseless accusations from the NYAG getting in the way.

## IV.    THE NYAG'S EXCUSES FOR THE CFPB NOT PAYING INDIVIDUAL DEFENDANTS' EXPENSES IN A TIMELY MANNER DO NOT HOLD WATER

Rather than take any responsibility or offer to do better, the NYAG tries to excuse the CFPB's late payments and blame it all on Individual Defendants.[3]  In addition to the NYAG's total lack of involvement in any aspects of payment to date, it is false to claim that the CFPB's late payments and approval of expenses is excusable conduct.

The fact remains that, month after month, the CFPB dragged its feet in approving expenses and authorizing payment of those expenses.  Despite having at least 7 CFPB attorneys, multiple investigators, accountants, and other staff working on the case, the CFPB continually delayed and would ask for explanations of expenses at the eleventh hour (or even later).  Then, when Individual Defendants would provide proper explanations for their expenses, and stress that payments needed to be made right away to avoid the imposition of fees, interest, and penalties, the CFPB would go radio silent.  The government has used this "allowance process" to assert leverage over the Individual Defendants, and the CFPB, as we highlight below, *admitted* that it was using the process to assert pressure on the Individual Defendants to settle.  And the government *admitted* that because no settlement was reached, it would be making the allowance process *more difficult* for the Individual Defendants.

In its opposition, the NYAG admits – but does not apologize for – Mr. Blumkin being subjected to over $5,000 in interest as a result of the government's delays.  That is an unjust penalty

---

[3] Plaintiff inappropriately exaggerates the Individual Defendants' expenses and lifestyle to paint them as guilty of some crime.  Mr. Sasson does not have a personal residence in New York and his requests for living expenses for his permanent residence in Florida are unavoidable expenses and fees that Plaintiffs have always been aware of.  Nor has Mr. Sasson asked Plaintiffs to pay for any vacations.

that Mr. Blumkin is responsible for, simply because he is a named defendant in the government's witch-hunt. The Court certainly did not assess this penalty against Mr. Blumkin, but he has been subjected to a financial penalty without due process and all stemming from the CFPB's inability to timely approve expenses. Speier Decl., Ex. H.

Further, on February 10, 2025, counsel for Mr. Blumkin requested – as is required – Mr. Blumkin's monthly allowance for March 2025, which would require a transfer from one frozen account to another. Despite continual follow up, there has been no response whatsoever and no stop-gap procedure in place with the CFPB now unable to act. This is true not only for Mr. Blumkin, but Mr. Sasson and Mr. Behar as well. This is a completely unfair situation to put Individual Defendants in, as they need money to pay for the most basic living expenses – for food, medical care, and the like. Speier Decl., Ex. I.

The lack of responsiveness from the government has been ongoing for over a year. When the government does finally respond, they will arbitrarily deny certain expenses and approve others. This often leaves Individual Defendants with having to make difficult decisions – in Mr. Blumkin's case, either heating his home (as the government refused to pay for propane costs) or using the funds for other living expenses. Speier Decl., Ex. J. Time and time again, the CFPB will deny expenses in an improper effort to punish Individual Defendants and their families.

Incredibly, the government admitted in an email to Mr. Blumkin's counsel that because the government thought a settlement could be reached in the case, the government was more flexible in paying for his expenses; but since the case was now in a "very different posture," the CFPB unilaterally "change[d] approaches with expenses as the litigation evolves." Speier Decl., Ex. K. This is clear coercion, underhandedness, and gamesmanship by the government, and the Court should be appalled at such behavior.

Attached by way of further example, for the Court's consideration, are true and correct copies of emails between Mr. Behar's counsel and the government, demonstrating the CFPB's routine practice of untimely responses, if they choose to respond at all. Speier Decl., Ex. L. While Mr. Behar diligently sought approval of expenses and complied with requests for information, he still faced delay in receiving approvals. Plaintiffs are inappropriately using their leverage of approving the Individual Defendants' budgets as an opportunity to coerce them to provide them information and control the "collaboration" between Plaintiffs and Individual Defendants.

Another example is when Mr. Behar tried to obtain approval of his January 2025 budget and submitted his credit card statements as required. Speier Decl., Ex. M. For the first time, Mr. Behar was denied the approval of the full amount of his budget on the grounds that his trip to the Bahamas was not a permissible personal expense. Despite initial confusion, we represent to the Court that this was a business expense incurred by Mr. Behar related to one of his businesses, Claudio's Restaurant.

But it should not matter whether this was a personal or business expense, because Mr. Behar's expenses fell within his allotted monthly budget. Speier Decl. Ex. N. Never before had Plaintiffs informed Individual Defendants of limitations of the type of expenses that can be made. There were no prior agreements or practices between the parties that delineate what would be a permissible personal expense or not. Rather, for the prior months of approvals, Individual Defendants relied on the CFPB's practices, that there were no such categories of permissible personal expenses, as long as their expenses were within the boundaries of their allocated budget. Now, only after the fact, and without notice or any so-called "collaboration" claimed by Plaintiffs, Mr. Behar was denied the payment of his monthly expenses, despite the *de minimis* at-issue charges, that fell within the boundaries of Mr. Behar's monthly expense limit. Plaintiffs'

actions are arbitrary and unfair.  And his January expenses have still not been approved, leaving him exposed to interest, fees, and penalties.

Moreover, Mr. Sasson has diligently submitted his expenses to the CFPB every month and provided the Bureau with a specific date on which his payments were due.  Typically, however, the CFPB delays approval of the budget by requesting more information and waiting weeks to review once provided.  The CFPB, by subjecting Individual Defendants to a line-by-line review of account statements, creates unnecessary delay and accrual of penalties, late fees, and interest during the delay.  If this Court determines the NYAG can and should administer the Preliminary Injunction with the CFPB sidelined – which Individual Defendants reject – the Court should impose strict guidelines upon the NYAG, requiring it to review and approve expenses on dates certain within a given month.

The NYAG also suggests that the $1.1 million in extra penalties and interest simply occurred in the normal course of business, and pertains to agreement by the parties (referring to ECF 349).  This is not true.  In fact, of the $1.1 million, many hundreds of thousands of dollars were the result of late fees, late mortgage penalties, and interest upon late interest, as a direct result of the CFPB's foot-dragging and the Receiver causing non-receivership bank accounts to be frozen.  In addition, Individual Defendants then had to incur legal costs (in excess of six-figures) to resolve this, resulting in additional unfair costs to them.  The freezing of non-Receivership Assets should be reversed immediately by this Court.  The NYAG is evidently not fully up to speed on the facts and circumstances as it relates to the Individual Defendants' assets, and this demonstrates that the NYAG cannot effectively administer this Preliminary Injunction.

Throughout this case, Plaintiffs have relied heavily on the argument that they are only doing what is right to preserve the interests of judgment creditors (consumers) in the event that they prevail in this case.  But such an argument has no merit when the actions (or inactions) of the

CFPB actually results in the accrual of many thousands of dollars of fees, penalties, and interest, leaving less money for consumers, not more. Indeed, the NYAG is ignoring the fact that such accumulated penalties will only work to reduce the available pool of relief available to consumers.

Finally, the NYAG tries to excuse the CFPB's delays by blaming the Individual Defendants for having "lavish lifestyles." Is requesting permission to buy groceries, pay mortgages, fix broken heating systems, and seek medical care a lavish lifestyle? Individual Defendants were successful businessmen before the Preliminary Injunction, earning money in businesses unrelated to Strategic. And now, Plaintiff unfairly tries to paint them as "elite" while at the same time precluding them from living in a way in which they were prior to the Preliminary Injunction. This Court should not be swayed by the NYAG's irrelevant argument.

## V. THE NYAG AND THE RECEIVER FAIL TO PRESENT ANY CREDIBLE ARGUMENT AGAINST THE UNFREEZING OF FUNDS SO THAT INDIVIDUAL DEFENDANTS CAN PAY FOR COUNSEL OF THEIR CHOOSING

The NYAG argues that Defendants' request for the release of funds for attorney fees is due to an inability on the part of insurers to pay the rates of newly obtained counsel. Respectfully, the NYAG has no idea what it is talking about. Individual Defendants' request has absolutely nothing to do with an insurance company not paying certain rates. The issue is that the applicable insurance policy is close to being depleted (if not already depleted at the time of this filing), after having to spend more than a year fighting against the CFPB's baseless claims. Beyond this initial coverage, Individual Defendants do not have access to additional coverage at this time.

Now, with their assets frozen, the Individual Defendants are left with no ability to pay for counsel. Plaintiffs, the Receiver, and this Court cannot possibly think that is right or fair. Plaintiffs are intent, it seems, on using the asset freeze as both a sword and a shield – destroying Individual Defendants' lives while at the same preventing Individual Defendants from retaining lawyers to fight back and defend their interests. Individual Defendants are entitled to counsel of their

choosing, particularly with so much at stake.  The NYAG seeks to choke Individual Defendants'
access to lawyers, and this attempt should be rejected.  And there is no basis provided by the
NYAG in its opposition to support that any release of funds to pay lawyers should be restricted by
what is a reasonable rate in the W.D.N.Y.

## VI.    THE NYAG'S CLAIM THAT INDIVIDUAL DEFENDANTS HAVE UNCLEAN HANDS IS BASELESS AND IS BELIED BY THE FACTS

The NYAG argues that Individual Defendants have unclean hands.  To support this,
however, the NYAG has made conclusory allegations in some places and is outright wrong in
others.

First, Individual Defendants did not willingly or intentionally fail to make any disclosure.
When Individual Defendants were required to respond to the 40-page disclosures, within a week
upon receiving them, they did so to the best of their ability under the circumstances[4], with the
advisement of counsel, and without the ability to rely on any documents or systems that were
seized.[5]  Plaintiffs were then able to weaponize the chaos created by their *ex parte* TRO and deny
Individual Defendants access to the information they needed for the disclosure forms.  Just because
Plaintiffs disagree with the method and order of the disclosures made in the forms, under extremely
difficult circumstances created by the CFPB, does not mean that Individual Defendants failed to
make the disclosures.  It is unfair that the CFPB and the Receiver can weaponize their monopoly
on Individual Defendants' documents and files and cherry pick the facts that enable them to

---

[4] Individual Defendants were working with the CFPB to provide full disclosure.  Individual Defendants' and their
counsel have requested files and emails from the CFPB but continue to be roadblocked.  The NYAG's accusations of
unclean hands, despite Individual Defendants' attempts to obtain information and collaborate with the CFPB on all
disclosure, is thus baseless.

[5] The NYAG unnecessarily and prejudicially brings up an unrelated consent order entered by Nordea Bank, AB in
Finland in an attempt to impute the actions of a non-party bank to Defendants.  Just like other banks who have also
had enforcement actions against them, the actions of the bank in which Defendants use has no consequence to the
actions of Defendants.

villainize Individual Defendants.  Indeed, since the beginning, Individual Defendants have asked for their emails and files from Strategic, which remain in the possession of the Receiver, but they are continually roadblocked from such access.  Individual Defendants are entitled to these documents.

Individual Defendants highlight that the Receiver overstepped by attaching attorney-client privileged communications between Individual Defendants and their attorneys, filed on the public docket in this matter, despite Individual Defendants never waiving such privilege[6].

Second, the NYAG's allegation that Individual Defendants failed to disclose interest in foreign entities is false.   Plaintiffs cannot credibly argue that they were unaware of T.C.I.G., when it was disclosed to them more than a year ago.  Individual Defendants refer the NYAG to Behar_66, 67, 70, 71; Blaise_22, 24; and Duke 21, 22, 23, 27, all of which clearly identify T.C.I.G. by name. For example, at Behar_71:



In addition, Mr. Behar's and Mr. Sasson's disclosures also identify Timberline, which owns T.C.I.G., which should have been known to the government.  Obviously, the NYAG did not take

---

[6] The Receiver's actions will be further addressed in Individual Defendants' opposition motion to his Cross-Motion.

the time to review these disclosures before making baseless allegations to the Court. Individual Defendants demand that the NYAG withdraw its allegation that somehow Individual Defendants have unclean hands.

In any event, the "foreign asset" which Plaintiffs are so concerned about is an investment in a boat, which they could have easily discovered had they asked. On July 21, 2023, Mr. Sasson and Mr. Behar, through their entity YCM 120 LLC, purchased a motor ship, "Hooligan 2" and renamed it "YCM 2." Speier Decl., Ex. O. It is registered under the Malta Flag. *Id*. at p. 3. The boat was purchased from previous owners, Yetti Enterprises. *Id*. at pp. 13-19. The boat was purchased as part of their business of hard money lending. The money to purchase the boat was wired from T.C.I.G. LLC's bank account to the seller's account. *Id.* at p. 4. Mr. Sasson and Mr. Behar, through YCM 120 LLC, entered into a leaseback agreement, with an option purchase price. *Id.* at pp. 5-9. Simply, the allegation of unclean hands should be rejected by the Court. The NYAG's attempt to use this theory as a defense to the relief sought by Individual Defendants in their Cross-Motion is without merit.

In any event, Plaintiffs' disagreement with the way the disclosures were completed is insufficient in justifying any unclean hands theory when the disclosures were made and there was no wrongful conduct by Individual Defendants. *See Adm'r of U.S. Small Bus. Admin. v. Contessa*, 2023 U.S. Dist. LEXIS 54104, at *32 (E.D.N.Y. 2023) (holding there was no application of the unclean hands doctrine where defendants failed to satisfy their burden as they did not provide a showing of "immoral, unconscionable conduct" that the affirmative defense requires); *Avail Holding, LLC v. Nanda*, 2017 U.S. Dist. LEXIS 5026, at * 14 (E.D.N.Y. 2017) (holding that courts are "reluctant to apply the . . . doctrine [of unclean hands] in all but the most egregious situations.").

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, as well as those contained in their moving submission,

Individual Defendants respectfully request that the Court grant Defendant's Cross-Motion.

Dated:    New York, New York            Respectfully submitted,
          February 25, 2025

**REED SMITH LLP**
Gregory D. Speier
599 Lexington Ave
New York, New York 10022
Tel.: 212-521-5400

*Attorneys for Defendants Ryan Sasson, Daniel Blumkin, Albert Ian Behar, Twist Financial LLC, Duke Enterprises, LLC, and Blaise Investments, LLC*

## **CERTIFICATE OF SERVICE**

I, Gregory D. Speier, hereby certify that on February 25, 2025, a true and correct copy of the forgoing was served via CM/ECF on all counsel of record in this matter.


*/s/ Gregory D. Speier*
Gregory D. Speier