UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, | |
| Plaintiffs, | |
| v. | |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), *et al.*, | 24-CV-40 (EAW) (MJR) |
| Defendants, and | |
| STRATEGIC ESOP, *et al.*, | |
| Relief Defendants. | |

# JOINT REPLY IN FURTHER SUPPORT OF OBJECTIONS TO REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS FILED BY DEFENDANT FIDELIS LEGAL SUPPORT SERVICES, LLC AND RELIEF DEFENDANTS CAMERON CHRISTO <u>AND THE BUSH LAKE TRUST</u>

**HOOVER & DURLAND LLP**
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*

*Attorneys for Defendant Fidelis
Legal Support Services, LLC, and for
Relief Defendants Cameron Christo
and The Bush Lake Trust*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION .............................................................................................................. 1

REPLY ARGUMENT ......................................................................................................... 3

I.    THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST FIDELIS. ......................................................................................................... 3

    A.    The Complaint does not plausibly allege secondary liability under the TSR. ................................................................................................ 3

        1.    The relevant portion of the TSR is invalid because it exceeds Congress's delegation of rulemaking authority................................... 3

            a.    Plaintiffs' affirmative case for their interpretation of the Telemarketing Act is almost non-existent. ................................ 4

            b.    Congress's limited authorization of secondary liability in (a)(2) must be given effect, not blithely dismissed as a meaningless "suggestion." ................................................................. 5

            c.    The specific directive in (a)(2) governs the general grant of rulemaking authority found in (a)(1). ....................................... 10

        2.    When Fidelis helped the Law Firms defend their clients against creditors' lawsuits, it was not substantially assisting the Firms' earlier collection of unlawful advance fees........................................ 14

            a.    "Substantial assistance" means aiding in wrongdoing, not aiding a company engaged in wrongdoing. ............................... 14

            b.    Plaintiffs cannot identify any way in which Fidelis's back-end assistance with litigation defense facilitated the Law Firms' earlier collection of advance fees. ............................................... 16

        3.    Fidelis did not know, or consciously avoid knowing, that the Law Firms were collecting advance fees without an adequate face-to-face sales presentation. ............................................................................ 17

            a.    Plaintiffs reject the R&R's novel compromise and double down on their extreme position—that § 310.3(b) imposes strict liability. ........................................................................................ 18

            b.    Plaintiffs' imputed-knowledge argument rests on the same three inapposite cases cited in the R&R..................................... 21

    B.    The Complaint does not plausibly allege that Fidelis violated the New York Executive Law or General Business Law................................. 21

II.    THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST CAMERON CHRISTO OR THE BUSH LAKE TRUST..................................... 23

III.    PLAINTIFFS' REQUEST TO AMEND MUST BE DENIED. ........................... 23

CONCLUSION.......................................................................................................... 24

CERTIFICATION ................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Air Transport Ass'n of Am., Inc. v. U.S. Dep't of Agriculture,*
   37 F.4th 667 (D.C. Cir. 2022) .................................................................................. 12

*Baker v. Latham Sparrowbush Associates,*
   72 F.3d 246 (2d Cir. 1995) ..................................................................................... 21

*Bloate v. United States,*
   559 U.S. 196 (2010) ............................................................................................... 11

*Bowen v. Georgetown University Hospital,*
   488 U.S. 204 (1988) ......................................................................................... 10, 13

*C.F.P.B. v. Commonwealth Equity Grp., LLC,*
   No. 20-CV-10991, 2024 WL 4362126 (D. Mass. Sept. 30, 2024) .............................. 15

*C.F.P.B. v. Consumer Advoc. Ctr. Inc.,*
   No. 19-CV-1998, 2023 WL 5162392 (C.D. Cal. July 7, 2023) .................................. 15

*C.F.P.B. v. Daniel A. Rosen, Inc.,*
   No. 21-CV-07492, 2022 WL 1514439 (C.D. Cal. Apr. 5, 2022) ................................ 15

*Cooper Industries Inc. v. Aviall Services, Inc.,*
   543 U.S. 157 (2004) ................................................................................................. 6

*F.T.C. v. Quincy Bioscience Holding Co.,*
   389 F. Supp. 3d 211 (S.D.N.Y. 2019) ...................................................................... 23

*F.T.C. v. Walmart Inc.,*
   664 F. Supp. 3d 808 (N.D. Ill. 2023) ................................................................. 15, 16

*F.T.C. v. WV Universal Mgmt., LLC,*
   877 F.3d 1234 (11th Cir. 2017) .............................................................................. 16

*Flores-Figueroa v. United States,*
   556 U.S. 646 (2009) ......................................................................................... 19, 20

*Halo v. Yale Health Plan,*
   819 F.3d 42 (2d Cir. 2016) ..................................................................................... 15

*John Wiley & Sons, Inc. v. DRK Photo,*
   882 F.3d 394 (2d Cir. 2018) ..................................................................................... 6

*Liparota v. United States,*
   471 U.S. 419 (1985) ............................................................................................... 19

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024) .......................................................................................... 4, 14

*Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC,*
  No. 21-CV-610, 2022 WL 20699258 (E.D. Va. Sept. 21, 2022) ................................... 15

*MC Mgmt. of Rochester LLC v. Biden,*
  680 F. Supp. 3d 278 (W.D.N.Y. 2023) .......................................................................... 24

*Milligan v. GEICO Gen. Ins. Co.,*
  No. 20-3726, 2022 WL 433289 (2d Cir. Feb. 14, 2022) .............................................. 22

*New York v. Debt Resolve, Inc.,*
  387 F. Supp. 3d 358 (S.D.N.Y. 2019) ........................................................................... 23

*Photopaint Technologies, LLC v. Smartlens Corp.,*
  335 F.3d 152 (2d Cir. 2003) .............................................................................................. 6

*Pulsifer v. United States,*
  601 U.S. 124 (2024) ........................................................................................................... 7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) ......................................................................................................... 11

*Rehaif v. United States,*
  588 U.S. 225 (2019) ......................................................................................................... 19

*S.E.C. v. Ballesteros Franco,*
  253 F. Supp. 2d 720 (S.D.N.Y. 2003) ........................................................................... 21

*S.E.C. v. Manor Nursing Centers, Inc.,*
  458 F.2d 1082 (2d Cir. 1972) .......................................................................................... 21

*Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.,*
  132 F.3d 775 (D.C. Cir. 1998) ................................................................................. 12, 13

*Twitter, Inc. v. Taamneh,*
  598 U.S. 471 (2023) ................................................................................................... 16, 17

*United States v. Chase,*
  135 U.S. 255 (1890) ......................................................................................................... 11

*United States v. Councilman,*
  418 F.3d 67 (1st Cir. 2005) ............................................................................................... 9

*United States v. International Minerals & Chemical Corp.,*
  402 U.S. 558 (1971) ......................................................................................................... 19

*United States v. Morton,*
  467 U.S. 822 (1984) ........................................................................................................... 5

**State Cases**

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.,*
  85 N.Y.2d 20 (1995) ........................................................................................................ 23

*People v. Apple Health & Sports Clubs, Ltd.*,
    80 N.Y.2d 803 (1992) ........................................................................................23

*People v. Northern Leasing Systems, Inc.*,
    142 N.Y.S.3d 36 (N.Y. App. Div. 2021) ..........................................................23

**Statutes**

12 U.S.C. § 5514(b)(7)(C) .........................................................................................7

15 U.S.C. § 80a-17(j) .................................................................................................7

15 U.S.C. § 6101(4) ...................................................................................................8

15 U.S.C. § 6101(5) ...................................................................................................8

15 U.S.C. § 6102 ..................................................................................3, 11, 13, 14

15 U.S.C. § 6102(a)(1) .....................................................................................*passim*

15 U.S.C. § 6102(a)(2) .....................................................................................*passim*

15 U.S.C. § 6102(a)(3) .....................................................................................*passim*

15 U.S.C. § 6102(c)(2) ................................................................................................8

15 U.S.C. § 8343(a) ....................................................................................................7

N.Y. Exec. Law § 63(12) ...........................................................................................21

N.Y. Gen. Bus. Law § 349(a) .....................................................................................21

**Regulations**

16 C.F.R. § 310.3(b) ..........................................................................................*passim*

16 C.F.R. § 310.4(a)(5)(i) ..............................................................................4, 18, 20

16 C.F.R. § 310.6(b)(3) ...............................................................................................18

60 Fed. Reg. 43842-01 (Aug. 23, 1995) .............................................................5, 9, 15

**Other Authorities**

F.T.C., *Complying with the Telemarketing Sales Rule*,
    https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-
    rule ..............................................................................................................15

## **INTRODUCTION**

We agree with Plaintiffs that the claims against Cameron Christo and The Bush Lake Trust rise or fall with the claims against Fidelis Legal Support Services, LLC. We disagree with most of what Plaintiffs say about their claims against Fidelis.

Plaintiffs' defense of the TSR claim founders first and foremost on the principal issue presented: validity of the TSR's substantial-assistance rule. Agencies possess only those powers which Congress delegates in an enabling statute. The enabling statute at issue here, the Telemarketing Act, tells the Federal Trade Commission that it may define deceptive telemarketing to include acts that facilitate *deceptive* telemarketing but not acts that facilitate *abusive* telemarketing. When the Commission wrote the TSR's substantial-assistance rule, however, it defined deceptive telemarketing to include *both* acts that facilitate deceptive telemarketing *and* acts that facilitate abusive telemarketing. Plaintiffs say the Commission was free to ignore Congress's specific definitional directive because the Telemarketing Act also gives the Commission general authority to make rules. But Plaintiffs cannot cite a single judicial opinion (apart from the R&R) blessing this facile solution, they cannot cite a single interpretive canon supporting it either, and they have no credible answer to the many canons and cases that condemn the Commission's power-grab.

On the merits, Plaintiffs justify their TSR claim by preaching an extremist vision of substantial-assistance liability. In Plaintiffs' telling, "substantial assistance" of a TSR violation includes nominal assistance to a violator that is unrelated to the violation, and "knowledge" of a TSR violation includes awareness of facially benign conduct that the TSR happens to prohibit (such as collecting advance fees without a face-to-face sales presentation). If that's right, CIBC Bank better brace itself for a ruinous money judgment, since it financed SFS's operation and knew SFS was collecting advance fees. (Compl. ¶¶ 58, 142.) Also on the hook are the consultants and lawyers who advised SFS on its advance-fee program (*e.g.*, Dkt. 533-5 (Buffalo law firm's compliance

audit)), the notaries who walked consumers through the advance fees SFS would charge, and so on *ad infinitum*.

This notion of liability without limit is enforcement-lawyer fantasyland. In preambles and guidance that Plaintiffs conspicuously ignore, the TSR's author has repeatedly conceded what is apparent from the text: "substantial assistance" means acts that actually facilitate a TSR violation, and "knowledge" means knowledge of illegality, not simply knowledge of an act the TSR happens to prohibit. The allegations against Fidelis fall short on both fronts. The back-end litigation-support services Fidelis provided to the Law Firms did not facilitate the Firms' earlier collection of advance fees, and Fidelis did not know, or ignore red flags indicating, that the Law Firms' receipt of advance fees violated the TSR.

Plaintiffs' position on the state-law claims, which accuse Fidelis of deceptive business practices, is downright surreal. Suppose a car dealership promises new customers free repairs for the first 100,000 miles. When customers need repairs, the dealership sometimes keeps its promise, and pays a broker to find a local mechanic who will do the necessary work, while other times the dealership refuses, citing a loophole in the purchase contract. Whatever one thinks about the *dealership's denials*, surely the *broker* isn't deceiving customers when it facilitates those repairs that the dealership *agrees* to pay for. But swap "Law Firms" for "dealership," "Fidelis" for "broker," and "litigation defense" for "repairs," and that is precisely Plaintiffs' theory here.

The Court should reject the R&R—a step the lead plaintiff in this case has not even opposed—and dismiss the Complaint as against Fidelis, Christo, and Bush Lake.[1]

---

[1] This combined reply memorandum, jointly submitted on behalf of three separate parties and in further support of three separate motions to dismiss (Dkts. 440, 441, 442), complies with W.D.N.Y. LOCAL R. CIV. P. 7(a)(2)(C), which authorizes a reply memorandum up to 10 pages long in support of each motion filed. Abbreviations and citation conventions used in the Objections (Dkt. 542 ("Obj.")) are carried forward here,

## REPLY ARGUMENT

### I.   THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST FIDELIS.

#### A.   The Complaint does not plausibly allege secondary liability under the TSR.

The relevant portion of the TSR exceeds the rulemaking authority conferred in the Telemarketing Act, and Plaintiffs' conception of "knowing" and "substantial" assistance is cartoonishly overbroad.

#### 1.   The relevant portion of the TSR is invalid because it exceeds Congress's delegation of rulemaking authority.

The parties agree that their interpretive dispute keys on the section of the Telemarketing Act—15 U.S.C. § 6102—delegating rulemaking authority to the Federal Trade Commission. Of particular importance are subparagraphs (a)(1) and (a)(2). Subparagraph (a)(1) generally authorizes the Commission to make rules prohibiting deceptive telemarketing and abusive telemarketing. Subparagraph (a)(2) says that the Commission's definition of deceptive telemarketing may include acts that facilitate deceptive telemarketing (but not acts that facilitate abusive telemarketing). The rule the Commission promulgated, however, defines deceptive telemarketing to include *both* acts that facilitate deceptive telemarketing *and* acts that facilitate abusive telemarketing. 16 C.F.R. § 310.3(b).

Plaintiffs contend that when an enabling statute begins with a general grant of rulemaking authority—as most enabling statutes do—followed by a specific provision authorizing the agency to do X to Y extent, the "Y extent" part is a meaningless suggestion that courts and bureaucrats are free to ignore; in reality, the agency can do X to *any* extent simply by invoking its general authority to make rules. Accordingly, Plaintiffs urge the Court to do what Judge Roemer did: read (a)(1)'s general grant of

except that "Plaintiffs" now refers only to the State plaintiffs, who are the only plaintiffs opposing these Objections.

rulemaking authority in isolation, confirm that it is broad enough to capture § 310.3(b), and end the analysis there. (Dkt. 600 ("Opp.") at 6-18.)

Fidelis, by contrast, asks the Court to analyze § 6102 using the "traditional tools of statutory construction" that "courts use every day." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 401 (2024). These traditional tools yield two key insights about § 6102. First, when Congress said the Commission may define deceptive telemarketing to include acts that facilitate *deceptive* telemarketing, but not acts that facilitate *abusive* telemarketing, *see* 15 U.S.C. § 6102(a)(2), it was consciously choosing to cabin its delegation of authority. Second, (a)(2)'s specific directive, precisely addressing how secondary liability may be incorporated within the definition of deceptive telemarketing, trumps (a)(1)'s general grant of rulemaking authority, since otherwise (a)(2)'s deliberately limited authorization would be negated. The TSR's substantial-assistance rule undeniably exceeds the authority conferred in (a)(2), and it is invalid to that extent.[2]

### a. Plaintiffs' affirmative case for their interpretation of the Telemarketing Act is almost non-existent.

Plaintiffs spend the bulk of their brief on the defensive, reminding the Court that interpretive canons are not necessarily binding, and straining to distinguish some of the cases Fidelis cites. (Opp. at 8-18.) Plaintiffs cannot name a single interpretive canon that *supports* their reading of the Telemarketing Act, or a single judicial decision (other than the R&R) doing what they ask the Court to do here. Their affirmative case boils down to this: "Congress's initial grant of general authority in § 6102(a)(1) is broad enough to authorize the FTC rule that Fidelis challenges here, so

---

[2] In a lone footnote, Plaintiffs say that even if Congress only authorized the Commission to ban acts that facilitate *deceptive* telemarketing, § 310.3(b)'s ban on acts that facilitate *abusive* telemarketing is still valid because abusive practices are related to deceptive practices. (Opp. at 11 n.3.) That is plainly incorrect. Under the TSR, collecting unlawful advance fees is an abusive telemarketing practice. 16 C.F.R. § 310.4(a)(5)(i) ("It is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to . . . . (5)(i) Request[] or receiv[e] [advance fees] . . . ."). If Congress did not authorize the Commission to ban acts that facilitate abusive telemarketing, then Fidelis cannot be sued under the TSR for facilitating the collection of advance fees.

the Court should . . . hold that the FTC was fully authorized to promulgate the TSR's substantial assistance provision." (Opp. at 17-18; *accord* Opp. at 6.) But of course, courts do not "construe statutory phrases in isolation"; they "read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984). To answer the interpretive question presented, the Court must first look at the actual source for the substantial-assistance rule—the text of § 6102(a)(2)[3]—and then consider (a)(2)'s relationship to (a)(1) and the other provisions of the Telemarketing Act.

### b. Congress's limited authorization of secondary liability in (a)(2) must be given effect, not blithely dismissed as a meaningless "suggestion."

The Telemarketing Act tells the Commission that its definition of deceptive telemarketing "may include acts . . . that assist or facilitate deceptive telemarketing." 15 U.S.C. § 6102(a)(2). Read with the aid of the *expressio unius* canon, this "may" clause also tells the Commission that its definition of deceptive telemarketing may *not* include acts that facilitate *abusive* telemarketing. (Obj. at 10-12.) That negative implication is all the stronger given the Telemarketing Act's consistent distinction between deceptive telemarketing and abusive telemarketing, and the contrast between the two subparagraphs—(a)(2) and (a)(3)—corresponding to each category. (*Id.* at 10-11, 16-19.) Plaintiffs respond that (a)(2) does not carry any negative implication because (i) the "may" clause in (a)(2) is just a suggestion; (ii) "deceptive telemarketing" and "abusive telemarketing" are not entirely distinct terms; and (iii) (a)(2) and (a)(3) are not sufficiently parallel to warrant the application of *expressio unius*. They are wrong.

**(i)** Plaintiffs' principal argument is that when (a)(2) tells the Commission that its definition of deceptive telemarketing "may include" acts that facilitate deceptive

---

[3]    Though Plaintiffs say that the authority for § 310.3(b) "resides in § 6102(a)(1)" (Opp. at 6), that is a description of their own post-hoc rationalization, not a description of what the Commission actually did in 1995. As Plaintiffs concede (*id.* at 8), the 1995 Preamble identifies (a)(2) as the source for § 310.3(b). 60 Fed. Reg. 43842-01, 43852 n.98 (Aug. 23, 1995). And this identification is confirmed by the substantial-assistance rule's placement in § 310.3, the portion of the TSR corresponding to § 6102(a)(2).

telemarketing, it is simply inviting the Commission to "consider" that limited definition, not making a delegation of limited definitional authority. (Opp. at 10; *see also id.* at 16 (urging the Court to read (a)(2) "as a suggestion for how the FTC should consider crafting its definition of deceptive telemarketing—not an authorization to craft such a prohibition only in limited circumstances"); *accord id.* at 10, 14, 16, 17.) But Plaintiffs cite no case exempting statutory "suggestions" from the ambit of *expressio unius*. Nor, more importantly, do Plaintiffs support their oft-repeated assertion that (a)(2)'s treatment of secondary liability is a mere "suggestion" rather than a limited authorization. No text. No case. No canon. No logical syllogism. Nothing but unadulterated *ipse dixit*.

Fidelis, meanwhile, has cited binding legal authority establishing that "may" clauses just like (a)(2)'s are indeed limited authorizations which carry the usual negative implication. (Obj. at 12-13 (citing *Cooper Industries Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004) and *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003); *id.* at 18 (citing *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394 (2d Cir. 2018)).)

And Plaintiffs *concede* as much. Their riposte to *Cooper* and *Photopaint* (they ignore *John Wiley*) is not that the "may" clauses at issue in those cases carried no negative implication, but that *Cooper* and *Photopaint* do not say how the "may" clause interacts with an earlier, more general grant of authority. (Opp. at 15 (asserting that *Cooper* and *Photopaint* "in no way support[] Fidelis's contention that § 6102(a)(2) limits the broad grant of authority in § 6102(a)(1)").) That misses the point. The relationship between the limited authorization found in (a)(2) and the general grant of rulemaking authority found in (a)(1) is resolved by the general/specific canon and the canon against surplusage. *See infra* § I.A.1.c. What cases like *Cooper* and *Photopaint* show is that (a)(2)'s "may" clause is not an empty suggestion, as Plaintiffs contend (Opp. at 10, 14, 16, 17), but a limited delegation that tells the Commission how secondary

liability may—and, by necessary implication, may not—be incorporated within the definition of deceptive telemarketing.

In addition to this binding case law, Fidelis noted that when Congress wanted to suggest rules the Commission might consider, it said so explicitly. (Obj. at 12 (citing 15 U.S.C. § 6102(a)(3) ("In prescribing the rules described in this paragraph, the Commission shall also consider recordkeeping requirements.")).) Plaintiffs counter that this type of meaningful-variation argument "is 'mostly applied to terms with some heft and distinctiveness.'" (Opp. at 10 (quoting *Pulsifer v. United States*, 601 U.S. 124, 149 (2024)).) But in *Pulsifer*, the Court questioned whether a meaningful-variation argument could be applied to words as generic as "and" and "or," and went on to assume that it *could*. 601 U.S. at 149. The case has nothing to do with Congressional "suggestions," and certainly does not support the notion that "[t]here's no heft and distinctiveness to how Congress directs agencies to consider certain rules" (Opp. at 10).

Changing tacks, Plaintiffs cast about for examples of statutes that use a "may" clause like (a)(2)'s to make a bare suggestion. But all they come up with is a list of three statutes that generally authorize rulemaking, and then use "may" to specify what the rulemaking could include. (Opp. at 10-11 (citing 12 U.S.C. § 5514(b)(7)(C), 15 U.S.C. § 80a-17(j), 15 U.S.C. § 8343(a).[4]) Plaintiffs do not cite, and we have not found, any judicial opinion reading these three "may" clauses as mere suggestions. The fact that other statutes include "may" clauses like (a)(2)'s simply begs the interpretive question before the Court—a question definitively answered by the authority Fidelis cites.[5]

---

[4]    Plaintiffs' memorandum cites 12 U.S.C. § 5514(a)(7)(C), 15 U.S.C § 80a-17, and 15 U.S.C. § 8343 (Opp. at 10), but their quotations make clear they are relying on 12 U.S.C. § 5514(b)(7)(C), 15 U.S.C § 80a-17(j), and 15 U.S.C. § 8343(a).

[5]    We see nothing in the text of the cited statutes that enhances Plaintiffs' argument. By way of example, one of the statutes authorizes the CFPB to "prescribe rules regarding [providers of consumer-financial products]," and adds that these rules "may include background checks for principals, officers, directors, or key personnel." 12 U.S.C. § 5514(b)(7)(C). We would say that this "may" clause precludes the CFPB from extending background checks to, say, line employees or independent contractors. Plaintiffs would say that Congress's limited authorization of background checks is a

**ii.** The negative implication emanating from (a)(2) is especially strong because the Telemarketing Act repeatedly distinguishes between deceptive telemarketing and abusive telemarketing. Given this established linguistic dichotomy, Congress's decision to authorize a definition of deceptive telemarketing that includes acts that facilitate *deceptive* telemarketing, but not acts that facilitate *abusive* telemarketing, must be understood as an expression of Congressional will and enforced accordingly (Obj. at 11 & n.10 (collecting cases); *id.* at 16 & n.13 (collecting cases)), not dismissed as a meaningless "suggestion."

Plaintiffs deny that there is a "strict dichotomy between deceptive and abusive telemarketing, as the statute makes clear that the categories overlap." (Opp. at 11.) That observation is largely inaccurate, and what little overlap Plaintiffs identify does not help their argument or hurt ours.

The Telemarketing Act clearly makes deceptive telemarketing and abusive telemarketing two distinct concepts, it structures (a)(1), (a)(2), and (a)(3) in accordance with this dichotomy, and its linguistic formulations generally reflect two parallel categories, *see* 15 U.S.C. § 6101(4) ("telemarketing deception and abuse"); *id.* § 6101(5) (same); *id.* § 6102(c)(2) ("deceptive[] or abusive acts or practices"). And while it is also true that some provisions refer to "deceptive telemarketing . . . and *other* abusive telemarketing," *id.* § 6102(a)(1) (emphasis added), this variation does not change the analysis. We assume Plaintiffs would read "*other* abusive telemarketing" to suggest that deceptive telemarketing is a *type* of abusive telemarketing. But that would only matter if (a)(2) authorized secondary liability for acts that facilitate *abusive* telemarketing, since in that case Plaintiffs could say the term "abusive telemarketing" includes the subset of "deceptive telemarketing." Instead, (a)(2) is confined to what Plaintiffs would regard as

---

meaningless suggestion that the CFPB is free to ignore as it wields its general rulemaking authority. In this debate, as in the one now before the Court, we would be adhering to the standard principles of statutory construction, while Plaintiffs would be insisting that the general governs the specific, and that the expression of the one is *not* the exclusion of the other, but is instead an empty gesture that the agency may disregard as it pleases. We like our position better than Plaintiffs'.

the subset—deceptive telemarketing. The omission of "abusive telemarketing" (or "other abusive telemarketing") from (a)(2)'s authorization of secondary liability must be understood as a conscious choice and given effect. (Obj. at 11, 6-17.[6])

        **iii.** The deliberate choice Congress made in (a)(2) is echoed in (a)(3). Just as (a)(2) authorizes a definition of deceptive telemarketing that includes acts that facilitate deceptive telemarketing, but *not* acts that facilitate abusive telemarketing, (a)(3) does *not* authorize a definition of abusive telemarketing that includes acts that facilitate abusive telemarketing. (Obj. at 11, 17-19.[7])

        Plaintiffs counter that (a)(2) and (a)(3) are not exactly parallel, so "[e]*xpressio unius* therefore has no role to play." (Opp. at 12 (citing *United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005) (en banc)).) But they make no effort to engage with *Councilman*'s analysis or to rebut Fidelis's point that applying *Councilman*'s analysis here shows this to be the paradigmatic *expressio unius* case (Obj. at 18).

---

      [6]    Plaintiffs add that *the Commission* confirmed the overlapping nature of deceptive telemarketing and abusive telemarketing when it found that "advance fees create incentives" for deceptive practices. (Opp. at 11 (cleaned up).) But the issue here is whether *the language of the Telemarketing Act* distinguishes deceptive telemarketing from abusive telemarketing, not whether the Commission thinks one type of conduct can influence another. And to the extent the Commission's interpretation of the Telemarketing Act matters, it only supports Fidelis's position. The opening lines of the 1995 Preamble explicitly recognize the Telemarketing Act's division between deceptive telemarketing and abusive telemarketing, 60 Fed. Reg. at 43842, and the TSR is structured accordingly, with one section prohibiting "[d]eceptive telemarketing acts or practices," 16 C.F.R. § 310.3, and another prohibiting "[a]busive telemarketing acts or practices," *id.* § 310.4.

      [7]    For some reason, Plaintiffs continue to insist that Fidelis is relying primarily on the contrast between (a)(2) and (a)(3). (Opp. at 9, 12 n.4.) That is not correct. The contrast between (a)(2) and (a)(3) would be the main issue if § 310.3(b) simply tracked § 6102(a)(2), and defined deceptive telemarketing to include acts that facilitate deceptive telemarketing, while a separate rule in § 310.4 defined abusive telemarketing to include acts that facilitate abusive telemarketing. In that case, § 6102(a)(3)'s silence as to secondary liability would take center stage. What the Commission did, however, was define *deceptive* telemarketing to include *both* acts that facilitate deceptive telemarketing—which (a)(2) authorizes—*and* acts that facilitate abusive telemarketing—which (a)(2) intentionally does not authorize. Because Fidelis is objecting to the Commission's definition of *deceptive* telemarketing, and it is (a)(2) that addresses the Commission's definition of deceptive telemarketing, Fidelis's *expressio unius* point has always focused on the language of (a)(2) itself. (Dkt. 443 at 10-12; Dkt. 480 at 3-7; Obj. 9-12.) The contrast between (a)(2) and (a)(3) is yet another reason why Fidelis is right, but it is hardly essential.

Indeed, Plaintiffs concede the very parallelism they wish to deny when they argue that because assisting a deceptive practice is itself a deceptive practice, "[b]y the same token, assisting and facilitating abusive conduct is itself an abusive practice." (Opp. at 7.) The claim itself is irrelevant to the issue before the Court—the TSR does not define abusive telemarketing to include acts that facilitate abusive telemarketing; it defines deceptive telemarketing to include acts that facilitate either deceptive or abusive telemarketing. 16 C.F.R. § 310.(b). But the underlying logic depends on the parallel between defining deceptive practices to include *facilitation* of deceptive practices— which is what Congress authorized in (a)(2), the subparagraph addressing deceptive telemarketing—and defining abusive practices to include *facilitation* of abusive practices—which Congress did *not* authorize in (a)(3), the subparagraph addressing abusive telemarketing. This conspicuous omission is further proof that Congress decided not to authorize secondary liability for acts that facilitate abusive telemarketing.

### c. The specific directive in (a)(2) governs the general grant of rulemaking authority found in (a)(1).

With (a)(2)'s meaning established, we turn to its relationship with (a)(1) and the rest of the Telemarketing Act. Here too, standard principles of statutory construction supply a ready answer. Specific provisions like (a)(2) trump general provisions like (a)(1), because otherwise the statutory language that makes the specific provision more specific is rendered mere surplusage. (Obj. at 12-16.) Plaintiffs respond that (i) some of Fidelis's general/specific cases are inapposite; (ii) Plaintiffs' reading leaves work for (a)(2); and (iii) *Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988) is distinguishable.[8] Here again, Fidelis has the better arguments.

**i.** Plaintiffs do not deny that the general/specific canon exists, and they concede that (a)(1) is a general grant of rulemaking authority, whereas (a)(2) specifically addresses how the definition of deceptive telemarketing may (and may not)

---

[8]    Plaintiffs do not defend Judge Roemer's conclusion that *Fidelis*'s reading of the Telemarketing Act violates the canon against surplusage (Obj. at 12).

incorporate secondary liability. (Opp. at 17 (stating that § 6102 "includes one general grant of authorization for rulemaking [*viz.*, (a)(1)] followed by two sections providing detail on what that rulemaking must or could include [*viz.*, (a)(2) and (a)(3)]"); *id.* at 15 (describing (a)(1) as a "broader authorization" than (a)(2)).) These concessions are reason enough to bar Plaintiffs from using (a)(1) to circumvent the limit imposed by (a)(2).

In any event, the arguments Plaintiffs do make are unconvincing. Plaintiffs say that two of Fidelis's general/specific cases construed statutes which "contain[ed] lists of independent authorizations," rather than a single broad provision followed by a narrower one. (Opp. at 16.) But they do not explain how this distinction would alter the application of the general/specific canon. And most of Fidelis's cases construed a statute structured the same way as § 6102, with a general provision followed by a narrower one. In each case, a party who could not satisfy the specific provision fell back, as Plaintiffs do here, on broad language contained in the general provision. And in each case, the court rejected this maneuver as a violation of the general/specific canon and a nullification of the thing that made the specific provision more specific. *See, e.g., Bloate v. United States*, 559 U.S. 196, 205-09 (2010) (applying the general/specific canon and holding that because the Speedy Trial Act automatically excludes time devoted to pretrial motions, but only from the filing of the motion to the issuance of a decision, courts could not use a "generic opening clause" governing "'proceedings concerning the defendant'" to automatically exclude time spent *preparing* pretrial motions, as this would nullify "the more specific (and restrictive) language" contained in the provision squarely addressing pretrial motions).[9]

---

[9]    *See also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (applying the general/specific canon and explaining that where a bankruptcy statute prescribed specific procedures for issuing arrest warrants, a general clause authorizing a bankruptcy judge to issue all necessary orders could not be used to issue an arrest warrant without satisfying the specific procedures); *United States v. Chase*, 135 U.S. 255, 256-60 (1890) (applying the general/specific canon and holding that where an obscenity statute proscribed obscene letters "whose indecent matter is

**ii.** Plaintiffs claim that their reading gives (a)(2) a job to do, because (a)(2) "serves to suggest one type of conduct the FTC might include in the required definition of deceptive telemarketing." (Opp. at 14.) But again, (a)(2) is not an empty suggestion; it is a specific directive authorizing the Commission to define deceptive telemarketing in a way that imposes a certain degree of secondary liability. *See supra* § I.A.1.b. The definition of deceptive telemarketing that the Commission adopted undeniably exceeds the limited authority contained in (a)(2). Upholding the Commission's overreach by resorting to the general language in (a)(1) would, by definition and design, vitiate the limit built into (a)(2).

As though to underscore this point, Plaintiffs say that Fidelis's surplusage argument fails because (a)(2) "is not some standalone authorization," but is instead preceded by (a)(1), "where Congress already granted the FTC a general mandate to write rules." (Opp. at 14 (cleaned up).) A reading that dismisses (a)(2) as a needless particularization of something (a)(1) already said presents the quintessential surplusage problem, and, insofar as it uses the general language in (a)(1) to evade the more specific language in (a)(2), does exactly what the general/specific canon forbids.

Acknowledging these problems, Plaintiffs say that surplusage is not such a bad thing after all, if it appears Congress simply wished "'to make assurance double sure.'" (Opp. at 14 (quoting *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998).) Plaintiffs then declare that (a)(2)'s limited authorization of secondary liability "is, at a minimum, a way of making double sure." (*Id.*) As with their attempt to dismiss (a)(2) as a mere "suggestion," however, this idea that (a)(2) might be mere "confirmation" of the authority included within (a)(1) is not

---

exposed on the envelope," a general clause prohibiting obscene "writings" could not be read to cover letters whose indecent matter is *not* exposed on the envelope); *Air Transport Ass'n of Am., Inc. v. U.S. Dep't of Agriculture*, 37 F.4th 667, 671-73 (D.C. Cir. 2022) (applying the general/specific canon and holding that where one statutory provision specifically authorized an agency to collect "reserve fees" until 2002, the agency could not use more general fee-collection provisions to collect reserve fees beyond 2002).

grounded in text, law, or logic. As in the one case Plaintiffs cite, "[i]t is unlikely that Congress drafted" (a)(2) simply "to reassure doubters that" (a)(1) includes the power to impose secondary liability, *Shook*, 132 F.3d at 782. Indeed, this suggestion is absurd. It is plain from the text, and Plaintiffs elsewhere admit, that (a)(2) and (a)(3) exist to specify "what [the Commission's] rulemaking must or could include" (Opp. at 17), not to allay imagined doubts about the meaning of (a)(1).

      **iii.** In *Bowen v. Georgetown University Hospital*, the Supreme Court rejected an agency's attempt to do exactly what Plaintiffs aim to do now—circumvent a limitation embedded within a specific grant of rulemaking authority by falling back on the agency's general authority to make rules. (Obj. at 11, 16-17.) The rule challenged in *Bowen* retroactively adjusted certain Medicare cost limits. 488 U.S. at 205-06. According to Plaintiffs, *Bowen*'s result rests entirely on the background principle that retroactivity is disfavored. (Opp. at 13.) But that background principle, recited early on in the Court's opinion, 488 U.S. at 208-09, does not explain the discussion Fidelis cites. After first concluding that the challenged rule did not come within the only portion of the statute authorizing retroactive action—just as § 310.3(b) does not come within the only portion of § 6102 authorizing secondary liability—the Court turned to the agency's second argument—identical to the one Plaintiffs make here—that Congress's explicit authorization of *some* retroactive action meant that the agency could take *other* retroactive action under its "general rulemaking power." *Id*. at 213.[10] In rejecting this argument, the Supreme Court did not rely on a general aversion to retroactivity, but on the same line of reasoning that Fidelis applies here. Congress had "considered the need for retroactive agency action" and authorized only a limited form of it. *Id*. at 213-14. The agency could not circumvent Congress's limited delegation by claiming that the same

---

[10]     (*Compare* Opp. at 13 ("By indicating that acts assisting or facilitating a primary violation could be incorporated into the definition of deceptive telemarketing, Congress suggested that such regulations were already encompassed in its broader grant of rulemaking authority.").)

power, minus the limitation, resided in the agency's "general rulemaking power." *Id.* at 213.

*    *    *    *

Throughout the extensive briefing on this most vital issue, Plaintiffs have mustered not one judicial opinion or interpretive precept supporting their construction of § 6102. Reading between the lines of Plaintiffs' briefs, and some actual lines of the R&R (at 21), the real objection to Fidelis's arguments seems to be that broader secondary liability is a good thing, and courts should find a way to protect it. But "[c]ourts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright*, 603 U.S. at 403. The Telemarketing Act does not authorize the Commission to define deceptive telemarketing to include acts that facilitate *abusive* telemarketing, the substantial-assistance rule does precisely that, and it is invalid to that extent.

### 2. When Fidelis helped the Law Firms defend their clients against creditors' lawsuits, it was not substantially assisting the Firms' earlier collection of unlawful advance fees.

Plaintiffs' discussion of § 310.3(b)'s elements fares no better than their discussion of its validity.

#### a. "Substantial assistance" means aiding in wrongdoing, not aiding a company engaged in wrongdoing.

Judge Roemer agreed, at least in theory, that § 310.3(b) requires substantial assistance in the primary TSR violation itself, not merely assistance of the entity doing the violating. (R&R at 23-24.) And at first Plaintiffs accept defeat on this point, conceding that assistance is not "substantial" if it "is unrelated to the underlying TSR violation." (Opp. at 18.) Two pages later, though, Plaintiffs say: "Fidelis is incorrect that the assistance must be 'related to' the underlying violation." (*Id.* at 20.) They were right the first time.

To start, Plaintiffs ignore the text of the Telemarketing Act, which authorizes the Commission to prohibit acts "that assist or facilitate deceptive

- 14 -

telemarketing," 15 U.S.C. § 6102(a)(2) (emphasis added), not deceptive *telemarketers*. Plaintiffs also ignore the agency guidance explaining that assistance "with little or no relation to the conduct that violates the TSR" does not qualify. F.T.C., *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (last visited Feb. 28, 2025).

Moreover, while Plaintiffs seemingly accept the Court's obligation to read the text of the TSR in light of its preambles, *Halo v. Yale Health Plan*, 819 F.3d 42, 52-56 (2d Cir. 2016), they distort what the preambles say. Like the outlier decision in *C.F.P.B. v. Daniel A. Rosen, Inc.*, No. 21-CV-07492, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022), Plaintiffs assert that the Commission "specifically rejected" a related-to requirement (Opp. at 20 (citing the 1995 Preamble)), as though the Commission deemed a related-to requirement *unwarranted*. In reality, the Commission deemed a separate related-to requirement *superfluous*, because "the ordinary understanding of the qualifying word 'substantial' encompasses the notion that the requisite assistance must consist of more than mere casual or incidental dealing with a seller or telemarketer that is *unrelated to a violation of the Rule*." 1995 Preamble, 60 Fed. Reg. at 43852 (emphasis added).

Plaintiffs also lack any meaningful response to the tort principles and Securities Cases cited in the 1995 Preamble, which likewise require assistance of the violation itself, not just the entity doing the violating (Obj. at 21-23). Their main rebuttal is *Rosen*. (Opp. at 21-22.[11]) But *Rosen* simply misreads the 1995 Preamble (Obj. at 24), as one of Plaintiffs' own cases explains, *F.T.C. v. Walmart Inc.*, 664 F. Supp. 3d 808, 828 n.21 (N.D. Ill. 2023); *accord F.T.C. v. WV Universal Mgmt., LLC*,

---

[11]    The three cases Plaintiffs list to bolster their reliance on *Rosen* (Opp. at 22) cite *Rosen* in passing and say not a word about the Securities Cases. *See C.F.P.B. v. Commonwealth Equity Grp., LLC*, No. 20-CV-10991, 2024 WL 4362126, at *9 (D. Mass. Sept. 30, 2024); *C.F.P.B. v. Consumer Advoc. Ctr. Inc.*, No. 19-CV-1998, 2023 WL 5162392, at *9 (C.D. Cal. July 7, 2023); *Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC*, No. 21-CV-610, 2022 WL 20699258, at *6 (E.D. Va. Sept. 21, 2022).

877 F.3d 1234, 1240-41 (11th Cir. 2017).[12] Plaintiffs further claim that the Securities Cases "are all distinguishable in that, unlike with Blust here, they do not include a defendant with knowledge of the fraudulent scheme controlling the entity providing substantial assistance." (Opp. at 22.) But this comment conflates the conduct requirement with the scienter requirement and does nothing to illuminate the legal meaning of "substantial assistance."

Substantial assistance "is inherently a rule of secondary liability *for specific wrongful acts*." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 494 (2023) (emphasis added). To state a claim against Fidelis, the Complaint must allege not just that Fidelis substantially assisted the Law Firms in some way, but that it substantially assisted the Law Firms "*in the commission of the actionable wrong*," *id.* at 495 (emphasis added)— namely, the Firms' collection of unlawful advance fees. (Obj. at 20-24.)

### b. Plaintiffs cannot identify any way in which Fidelis's back-end assistance with litigation defense facilitated the Law Firms' earlier collection of advance fees.

Though Plaintiffs purport to "show that Fidelis assisted in the collection of advance fees" (Opp. at 22), what they actually show is that, according to the Complaint, the Law Firms collected advance fees and Fidelis provided administrative support to the Law Firms. In other words, Plaintiffs' opposition simply replicates the R&R's errors.

Like Judge Roemer (Obj. at 27), Plaintiffs rely on the following chain of events to tie Fidelis to the payment of advance fees: SFS pitches litigation defense to consumer → consumer enrolls in SFS's debt-relief program and pays advance fees → consumer is later sued by a creditor → Law Firm elects to provide litigation defense →

---

[12] Plaintiffs suggest that *Walmart*'s discussion is dictum (Opp. at 21), but they are mistaken. *Walmart* discussed the meaning of "substantial assistance" at length, and expressly invoked securities and tort cases to inform its holding that "[p]rocessing routine transactions isn't substantial assistance." *Walmart*, 664 F. Supp. 3d at 827-29. As for *WV Universal*, Plaintiffs say only that the question before the Court of Appeals was whether § 310.3(b) creates joint and several liability. (Opp. at 21.) They cannot deny that in answering this question, the Court of Appeals looked to the tort and securities principles on which § 310.3(b) is based, just as Fidelis does here.

Fidelis performs administrative services to help Law Firm provide litigation defense. (Opp. at 19-20, 22-23). Even when Plaintiffs are doing their best to shrink the distance between Fidelis and advance fees, the attenuation is hard to miss: "Fidelis [w]as a critical part of the broader debt-relief operation that coordinated the litigation defense SFS and the [Law] Firms promised to consumers when they enrolled in the debt-relief program and started paying the illegal fees" (Opp. at 20).

Plaintiffs round out their argument with some Fidelis-themed free association. (*E.g.*, *id.* at 19 ("Fidelis was functionally interwoven with Blust-owned Lit Def"); *id.* at 23 ("Fidelis is the successor of Blust-owned Lit Def and Relialit, Blust controls Fidelis, and the operations of Lit Def and Fidelis are interwoven."); *id.* (the Law Firms paid Fidelis $16.4 million); *id.* ("Gallagher, who owns several [Law] Firms that collected advance fees, helped manage both Lit Def and Fidelis."). None of this brings Plaintiffs any closer to alleging that Fidelis participated in the "specific wrongful acts" attributed to the Law Firms, *Taamneh*, 598 U.S. at 494—namely, their collection of unlawful advance fees. (Obj. at 29 (identifying the same error in the R&R).)

### 3. Fidelis did not know, or consciously avoid knowing, that the Law Firms were collecting advance fees without an adequate face-to-face sales presentation.

Plaintiffs agree that Fidelis has only the knowledge imputed to it, and they accept that the three potential sources of imputed knowledge—Jason Blust, Michelle Gallagher, and Cameron Christo—did not know or consciously avoid knowing that the Law Firms were violating the TSR. (Obj. at 30, 35, 38-39, 44-45; *cf.* Opp. at 23-29.) Plaintiffs also accept that Christo is not alleged to have possessed any illicit knowledge. (Obj. at 38; *cf.* Opp. at 23-29.) Their position is that under § 310.3(b), Fidelis need only know that the Law Firms were collecting advance fees; that Blust and Gallagher knew the Law Firms were collecting advance fees; and that Blust's and Gallagher's knowledge can be imputed to Fidelis. (Opp. at 23-29.) Accordingly, Count 3 must be dismissed if § 310.3(b) requires knowledge of illegality, or if Blust's and Gallagher's knowledge cannot be imputed to Fidelis.

### a. Plaintiffs reject the R&R's novel compromise and double down on their extreme position—that § 310.3(b) imposes strict liability.

By its terms, the TSR imposes substantial-assistance liability only when the defendant "knows or consciously avoids knowing" that the person he is assisting "is engaged in any act or practice that violates [the TSR]." 16 C.F.R. § 310.3(b). The quoted text, the 1995 Preamble, the 2015 Preamble, the Commission's guidance, the vast majority of TSR cases, the tort and securities law on which § 310.3(b) is based, and a long line of Supreme Court precedent all establish that the knowledge § 310.3(b) requires is not merely knowledge of an act that happens to violate the TSR, but knowledge *that* the act violates the TSR. (Obj. at 30-35.)

The R&R accepts that the substantial-assistance rule requires knowledge of illegality, but then inexplicably limits this requirement to the part of the TSR that bans advance fees, 16 C.F.R. § 310.4(a)(5)(i), rather than applying it equally to the part of the TSR that exempts transactions preceded by a face-to-face sales presentation, *id*. § 310.6(b)(3). (Obj. at 41.) According to the R&R, then, Blust possessed the requisite knowledge of *illegality* as long as he knew the Law Firms were receiving advance fees, even though receiving advance fees after a face-to-face sales presentation *is not illegal*. (*Id*.)

We find no precedent for the R&R's view on scienter, and Plaintiffs do not defend it. (Opp. at 24-25.[13]) Instead, they contend that § 310.3(b) does not require knowledge of a TSR violation, or knowledge of illegality, or even knowledge of wrongdoing, but simply knowledge of an act the TSR happens to prohibit. (*Id*. at 24-27.) They are wrong; § 310.3(b) requires scienter.

---

[13]    Rather than admit their partial rejection of the R&R, Plaintiffs discretely invoke a prior decision in which Judge Roemer endorsed their extremist view—a decision made without *any* briefing on the many points and authorities Fidelis raised in its motion to dismiss (Obj. at 41)—and treat that as the ruling under review. (Opp. at 24-25 (citing the decision rendered at Dkt. 281 to explain why "Judge Roemer is correct").)

Side-stepping text, history, preambles, guidance, tort principles, securities principles, and TSR cases (Obj. at 30-35, 38-39), Plaintiffs invoke a line of Supreme Court precedent holding that "knowledge" generally means knowledge of a fact rather than knowledge of a law, because ignorance of the law is no excuse (Opp. at 24-25). But Fidelis has thoroughly distinguished these cases (Obj. at 30-31, 41-43), and Plaintiffs do not even attempt a response.[14]

Plaintiffs also do little to reconcile their position with the Supreme Court cases holding that a "knowledge" requirement typically modifies "'all the subsequently listed elements,'" and that this interpretive precept will operate to require knowledge of illegality "'*despite the legal cliche 'ignorance of the law is no excuse,'*'" especially where a contrary reading would penalize facially benign conduct. (Obj. at 30-31 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 648-52 (2009) (emphasis added)); *see also id.* at 31, 42 (citing *Rehaif v. United States*, 588 U.S. 225 (2019) and *Liparota v. United States*, 471 U.S. 419 (1985)).)

Plaintiffs' lone response is this: "[t]he proposition that a knowledge requirement typically applies to each element of an offense further reflects that Fidelis' position is incorrect," because "Section 310.3(b) of the TSR plainly states that the knowledge requirement applies only to a single element—that is, knowledge of the *practice* that constitutes the primary violation." (Opp. at 26.) This "rebuttal" is incoherent. Section 310.3(b) requires knowledge of an "act or practice that violates [the TSR]." The interpretive question is whether the knowledge requirement stops at "act or practice," or includes "violates [the TSR]" as well. If the bare text "plainly states"

---

[14]    The one additional case Plaintiffs cite, *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558 (1971), carries the same three defects that Fidelis identified in the cases Judge Roemer cited (Obj. at 41-43). Specifically, *International Minerals* construes a statute that uses the "knowingly violates" term of art, 402 U.S. at 559; the statute imposes primary liability, not secondary liability, *id.*; and dispensing with knowing illegality did not create strict liability for seemingly innocuous conduct, *id.* at 563-65 (knowledge of "dangerous or deleterious devices" avoided the imposition of "strict liability"). Plaintiffs are aware of these points, because Fidelis raised them the last time Plaintiffs cited *International Minerals*. (Dkt. 480 at 14-16.) As ever, Plaintiffs are unable to muster any response.

anything, it is the latter interpretation. *See Flores-Figueroa*, 556 U.S. at 650 ("As a matter of ordinary English grammar," a knowledge requirement typically modifies "all the subsequently listed elements"). Reading "knowledge" to modify both of the subsequently listed elements—"act or practice" and "violates [the TSR]"—is especially important in cases like this one, where a contrary reading creates strict liability for violations punished by grievous penalties. (Obj. at 30-34, 38-39, 42-43.)

Plaintiffs are also wrong to say that *Taamneh* undermines "Fidelis's argument that knowledge of illegality is required" (Opp. at 26). *Taamneh* expressly holds that secondary liability for knowing and substantial assistance attaches only when a person acts with a culpable mind. (Obj. at 33 (citing *Taamneh*, 598 U.S. at 486, 489-91).) Equally, *Taamneh* does *not* hold that "strong linkages between the assistor and the primary violator will necessarily demand a lesser showing of knowledge" (Opp. at 26). It simply observes that in traditional tort law, "less substantial assistance required more scienter *before a court could infer conscious and culpable assistance*." 598 U.S. at 492 (emphasis added). Here, Plaintiffs' substantial-assistance allegations are not "direct and extraordinary," *id.*, but feeble and attenuated, *see supra* § I.A.2, and Plaintiffs cite *nothing* in the Complaint suggesting that Blust, Gallagher, or anyone else believed the Law Firms were acting illegally.

Finally, Plaintiffs join Judge Roemer in dismissing the face-to-face exemption as irrelevant on the ground that it is an affirmative defense, which the Complaint need not anticipate. (Opp. at 27.) But this argument is specious for the reason Fidelis previously gave (Obj. at 44), which Plaintiffs entirely ignore. The face-to-face exemption may well be an affirmative defense for a defendant accused of collecting advance fees in violation of 16 C.F.R. § 310.4(a)(5)(i). But Fidelis is not accused of collecting unlawful advance fees; it is accused of substantially assisting the Law Firms. Knowledge that the Law Firms were violating the TSR is an *element* of substantial-assistance liability, which Plaintiffs must plausibly plead. If Fidelis believed the activity it was assisting complied with the TSR—regardless of whether its belief rested on its

understanding of the advance-fee ban or its understanding of the face-to-face exemption—then it lacked the scienter that § 310.3(b) requires.

### b. Plaintiffs' imputed-knowledge argument rests on the same three inapposite cases cited in the R&R.

Even if Plaintiffs were right that § 310.3(b) imposed strict liability, the Complaint does not support imputing Blust's and Gallagher's knowledge of advance fees to Fidelis. (Obj. at 35-38.) The one basis Plaintiffs invoke is Blust's and Gallagher's (supposed) control over Fidelis. (Opp. at 27-29.) But as Fidelis previously explained (Obj. at 39-40 & n.26), the three cases Plaintiffs cite—which are the same three cases Judge Roemer cited—are inapposite. The Second Circuit's decision in *Baker v. Latham Sparrowbush Associates*, 72 F.3d 246, 255 (2d Cir. 1995) does not authorize imputation based on control, and both *S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 728, 730 (S.D.N.Y. 2003) and *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972), *abrogated on other grounds by*, *S.E.C. v. Ahmed*, 72 F.4th 379, 406 (2d Cir. 2023), hold only that an individual's knowledge can be imputed to his alter egos. The Complaint does not allege that Blust and Gallagher so dominated Fidelis as to render it a corporate embodiment of themselves. And Plaintiffs do not say otherwise. For this reason too, the TSR claim against Fidelis must be dismissed.

### B. The Complaint does not plausibly allege that Fidelis violated the New York Executive Law or General Business Law.

The claims brought under New York Executive Law § 63(12) and New York General Business Law § 349(a) allege deceptive business practices. Specifically, the Complaint alleges that SFS promised consumers litigation defense, and the Law Firms executed engagement letters promising litigation defense, but when litigation defense was required, the Law Firms sometimes declined to provide it citing a loophole in their engagement letters. (Compl. ¶¶ 94-95, 122; Obj. at 45-48.) Judge Roemer found these allegations sufficient to state a claim against Fidelis because Fidelis "is alleged to have acted together with the law firms in *failing* to provide [litigation-defense] services." (R&R at 37 (emphasis added); *accord id.* at 36.) But that is simply untrue; all the

- 21 -

Complaint says is that when the Law Firms *did* provide the promised litigation defense, Fidelis helped it to do so. (Compl. ¶¶ 94-95; Obj. at 45-47.)

Plaintiffs essentially concede that Fidelis is not alleged to have done anything deceptive, that Fidelis is not alleged to have acted together with SFS in promising litigation defense, that Fidelis is not alleged to have acted together with the Law Firms in declining to provide litigation defense, and that Fidelis is not alleged to have done anything that contributed to either SFS's promises or the Law Firms' declinations. (*Cf.* Opp. at 29-32.) Indeed, Plaintiffs describe Fidelis's role as "arranging the litigation defense promised" to consumers (*id.* at 32), which, of course, is the exact *opposite* of the deception alleged.[15]

Unable to identify any way in which Fidelis participated in deceptive conduct, Plaintiffs say it is enough "that Fidelis was an integral part of the overall debt relief scheme." (*Id.* at 31; *see also id.* at 30 ("Fidelis served as a hub and support servicer in the overall debt relief scheme"); *id.* ("Fidelis was an integral part of Defendants' scheme").) To justify this expansive theory of deception, Plaintiffs ridicule the notion that "liability for 'acting together' only arises if a company acts with another in carrying out every specific deceptive act that makes up the scheme." (*Id.* at 31; *see also id.* (deriding "the proposition that two corporations must take every single fraudulent step in tandem in order to be held liable for each other's conduct").) But Fidelis is not arguing that companies must jointly undertake *every single* deceptive act to be held jointly liable. Fidelis is invoking the settled rule that to be liable for deceptive business practices under New York law, a defendant must have participated in *some* deceptive act. (Obj. at 45-46 (citing *Milligan v. GEICO Gen. Ins. Co.*, No. 20-3726, 2022 WL 433289, at *6 (2d Cir. Feb. 14, 2022) (summary order); *Oswego Laborers' Loc. 214*

---

15    At one point, Plaintiffs say that Fidelis "failed to provide the litigation defense consumers were promised" (Opp. at 32), but they cite no supporting allegation in the Complaint and the rest of their memorandum rightly concedes that it was the Law Firms that (allegedly) failed to provide litigation defense.

*Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995); *F.T.C. v. Quincy Bioscience Holding Co.*, 389 F. Supp. 3d 211, 221 (S.D.N.Y. 2019)).)

None of Plaintiffs' cases say otherwise. In *New York v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358 (S.D.N.Y. 2019), the court explicitly held that a defendant is not liable for deceptive business practices unless it "engaged in deceptive acts or practices that are injurious to customers." *Id.* at 369 (cleaned up). In *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803 (1992), a defendant was liable for aiding in the operation of several health clubs because the (unbonded) operation *was itself* the deceptive practice. *Id.* at 805-08. And in *People v. Northern Leasing Systems, Inc.*, 142 N.Y.S.3d 36 (N.Y. App. Div. 2021), the court stated that related defendants were liable for fraudulent business practices "*if they participated in the fraud,*" *id.* at 43 (emphasis added)—which they did, by training sales representatives to make misleading sales pitches, *id.* at 39, frustrating attempts to cancel fraudulent contracts, *id.* at 40, and extorting payments through harassing litigation, *id.*

New York law does not prohibit advance fees; it prohibits deceptive business practices. The only deception alleged is the Law Firms *declining* to supply litigation defense to consumers. What Fidelis did—help the Law Firms *provide* litigation defense—is the exact opposite.

## II.    THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST CAMERON CHRISTO OR THE BUSH LAKE TRUST.

The parties agree that the claims against Christo and Bush Lake depend on the claims against Fidelis. (Obj. at 48-49; Opp. at 32.) Because the claims against Fidelis fail, the derivative claims against Christo and Bush Lake do as well.

## III.    PLAINTIFFS' REQUEST TO AMEND MUST BE DENIED.

Plaintiffs close their opposition by asking the Court for leave to amend the Complaint. (Opp. at 33.) But making such a request in opposition papers "is not a proper motion for leave to amend, and fails to comply with the Local Rules of Civil

Procedure." *MC Mgmt. of Rochester LLC v. Biden*, 680 F. Supp. 3d 278, 287 (W.D.N.Y. 2023) (cleaned up), *aff'd*, 2024 WL 2350505 (2d Cir. May 23, 2024) (summary order). The impropriety is amplified here, where the parties making the request do not even represent all the signatories to the Complaint.

More fundamentally, the amendments Plaintiffs envision do not address the Complaint's defects. Better pleading will not save a regulation promulgated without statutory authority. And the additional facts Plaintiffs identify—all of which go to Fidelis's supposed importance to the debt-relief operation, and the degree of control exercised by Jason Blust and Michelle Gallagher (Opp. at 33)—do not tie Fidelis more closely to the Law Firms' collection of advance fees, or tend to show that Fidelis knew that the Law Firms' collection of advance fees was illegal, or tend to show that Fidelis participated in any deception. Accordingly, Plaintiffs' request to amend should be denied.

## CONCLUSION

The Court should issue an order (i) rejecting the Report and Recommendation (Dkt. 532); (ii) dismissing the Complaint as against Fidelis Legal Support Services, LLC, Cameron Christo, and The Bush Lake Trust; and (iii) awarding any other or additional relief that the Court deems appropriate.

Dated:     Buffalo, New York
           February 28, 2025

                              Respectfully submitted,

                              **HOOVER & DURLAND LLP**
                              *Attorneys for Defendant Fidelis Legal*
                              *Support Services, LLC, and for Relief Defendants*
                              *Cameron Christo and The Bush Lake Trust*

                              By:  s/Spencer L. Durland
                                   Timothy W. Hoover
                                   Spencer L. Durland
                              561 Franklin Street
                              Buffalo, New York 14202
                              (716) 800-2600
                              *thoover@hooverdurland.com*
                              *sdurland@hooverdurland.com*

- 24 -

**CERTIFICATION**

Pursuant to W.D.N.Y. Local R. Civ. P. 72(c), I hereby certify that the foregoing objections do not raise new factual or legal arguments.

**HOOVER & DURLAND LLP**
*Attorneys for Defendant Fidelis Legal*
*Support Services, LLC, and for Relief Defendants*
*Cameron Christo and The Bush Lake Trust*

By: s/Spencer L. Durland
       Timothy W. Hoover
       Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*