UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

                        Plaintiffs,

                                                                             Civ. No. 24-cv-40-EAW-MJR

v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.,

                        Defendants,

and

STRATEGIC ESOP,

                        Relief Defendant.
_____


# RESPONSE OF DEFENDANT JASON BLUST
# AND RELIEF DEFENDANT LITDEF STRATEGIES, LLC
# TO RECEIVER'S POST-HEARING BRIEF


Dated: Buffalo, New York
       March 4, 2025.

                                                          Rodney O. Personius, Esq.
                                                          PERSONIUS MELBER LLP
                                                          *Attorneys for Defendant*
                                                            JASON BLUST
                                                               and
                                                           *Relief Defendant*
                                                          LITDEF STRATEGIES, LLC
                                                         2100 Main Place Tower
                                                         350 Main Street
                                                         Buffalo, NY  14202
                                                         (716)  855-1050
                                                         rop@personiusmelber.com

## I. LIMITED CONTEMPT JURISDICTION OF A MAGISTRATE JUDGE

In our Post-Hearing Memorandum, we outline the limited jurisdiction of a magistrate judge with respect to the adjudication of a civil contempt application pursuant to 28 U.S.C. §636(e). Doc. 619 at pages 1-3. The Receiver's Post-Hearing submission takes a different view with respect to the operation of §636(e). Doc 622 at pages 33-34. In particular, the Receiver argues that the procedure contemplated by §636(e) is the same as the report and recommendation protocol provided for in §636(b)(1)(B). He is mistaken.

Relying upon *Taberer v. Armstrong World Industries, Inc.*, 954 F.2d 888 (3d Cir. 1992), we explain in our submission that these two procedures are very different. Doc. 619 at pages 2-3. Based upon the legislative history to §636(e), the *Taberer* opinion observes that the report and recommendation procedure calls upon the district court to make a de novo <u>determination</u>, whereas §636(e), in the case of a contempt application, mandates that the district judge conduct a de novo <u>hearing</u>. For this reason, the assertion by the Receiver that Chief Judge Wolford is authorized to use the "record from underlying hearing before the Magistrate Judge" as the basis for her determination is misinformed. Doc. 622 at page 34 n.18.

In fact, in one of the two decisional authorities relied upon by the Receiver in support of his argument, *Bowens v. Atlantic Maintenance Corp.*, 546 F.Supp.2d 55 (E.D.N.Y. 2008), the *Taberer* opinion is specifically cited as the basis for the statement that the "district court, upon certification of the facts supporting a finding of contempt, is then required to conduct a de novo hearing at which issues of fact and credibility determinations are to be made." 546 F.Supp.2d at 71. In other words, the holding in *Bowens* is directly contradictory to the argument set forth in the Receiver's submission. The second primary authority relied upon by the Court in the *Bowens* decision in its discussion of the procedure under §636(e) is *Church v. Steller*, 35 F.Supp.2d 2015 (N.D.N.Y. 1999), which is also cited at length in our Pre-Hearing submission. Doc. 619 at page 1.

The second decisional authority relied upon by the Receiver in support of his report and recommendation argument is *United States v. Baroody*, No. CV-08-910-PHX-ROS (LOA), 2008WL447001 (D.Ariz. 2008). While the opinion does make reference to the use of a Report and Recommendation, it also reflects that the Court followed the certification procedure contemplated by the statute. *Baroody* is non-authoritative in any event as it contains no meaningful discussion of the procedure to be followed by a magistrate judge in the case of a civil contempt application. That the defendant who was the object of the contempt application in that case had not appeared before the Court at the appointed time – he had defaulted -- likely explains the perfunctory approach taken by the Magistrate Judge.

The Receiver's characterization of the procedure to be followed pursuant to 28 U.S.C. §636(3) in the case of a civil contempt application is erroneous and should be disregarded.

## II. THE PROCEDURAL REQUIREMENTS OF 28 U.S.C. §636(e) HAVE NOT BEEN WAIVED

At the conclusion of oral argument conducted on May 23, 2024, as the Court was leaving the bench, the following comment was made: "I'm looking for help as to what you think should be done, OK?" Doc. 619-1, **Exhibit A**, excerpt of transcript of 5/23/24 proceedings at page 85. This comment was made in reference to the procedure to be followed by the Court with respect to handling the alleged TRO violation on the part of Mr. Blust and LitDef. In response to this observation, the limited jurisdiction of the Court pursuant to 28 U.S.C. §636(e) was addressed in our Pre-Hearing Memorandum. Doc. 572 at pages 7-11. As this issue was raised one week prior to the commencement of the hearing on January 23, 2025, there was no waiver on the part of Mr. Blust and LitDef regarding the jurisdictional issue.

3

Notwithstanding, the Receiver contends that, because this issue was not raised either during the course of briefing his contempt application, nor at the oral argument conducted on May 23, 2024, it was waived. Doc. 622 at pages 3, 32-33. The case authorities relied upon by the Receiver to support this novel argument are inapposite. No authority has been cited that would support a finding that the procedural safeguards outlined in §636(e) can in fact be waived.

The principal opinion cited by the Receiver in support of his position is *Roell v. Withro*, 538 U.S. 580 (2003). Doc. 622 at page 33. Aside from the fact the decision did not concern a waiver of the jurisdictional rules set forth in §636(e), the facts of *Roell* disclose that the Petitioner had actually agreed both orally and in writing to the jurisdiction of the presiding magistrate judge. 538 U.S. at 582-583. In attempting to overturn an adverse jury verdict presided over by the Magistrate Judge, the Petitioner argued unsuccessfully that several of the Respondents had not consented to the Court's jurisdiction. This contention was rejected. The *Roell* decision lends no support whatsoever to the Receiver's waiver argument.

The other three decisions cited by the Receiver all concern the issue of personal jurisdiction and whether or not improper service of process had been waived. Unlike §636(e), Fed.R.Civ.P.12(h)(1) explicitly recognizes that the defenses listed in Rule 12(b)(2)-(5) may be waived. This includes a claim of lack of personal jurisdiction, which is set forth at Rule 12(b)(2). While one of the three cases, *United States v. International Broth. of Teamsters, Chauffeurs, Warehouseman and Helpers of America*, 816 F.Supp. 864 (S.D.N.Y. 1992), did involve a scheduled contempt hearing that was never conducted, the issue addressed by the Court had nothing to do with the Magistrate Judge's jurisdiction. The question in the case involved whether the Respondents had waived any objection to the adequacy of service of process. Unlike the facts now before the Court in the instant case, the Respondents in the *Teamsters* decision did not raise

the jurisdictional issue prior to the scheduled contempt hearing, and had actually assured the Court at that time that the parties had reached a settlement without ever mentioning any issue with service of process. The question of personal jurisdiction was not even raised for another year until Respondents filed a memorandum opposing the attempt on the part of the Government to enforce the settlement that had been announced at the time of the scheduled hearing. 816 F.Supp. at 870. The Court found there had been a waiver. No tortured reading of this decision, nor any of the others cited by the Receiver, supports the claim that Mr. Blust and LitDef have waived the jurisdictional mandate of §636(e).

### III. ADVERSE INFERENCES MUST BE SHOWN TO BE TRUSTWORTHY AND REQUIRE CORROBORATION

At the hearing conducted on January 23 and 24, 2025, Mr. Blust, Cameron Christo, and Michelle Hinds relied upon their Fifth Amendment privilege in response to questions posed by counsel for Plaintiff CFPB and the Receiver. Based upon leading questions asked during the questioning of each witness, giving rise to the invocation of the Fifth Amendment, the Receiver now seeks to have the Court draw more than 100 adverse inferences. Doc. 622 at pages 13-24. The subject matter of these proposed adverse inferences is then summarized at pages 27-29 of the Receiver's Post-Hearing Brief.

As recognized by the Receiver, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." Doc. 622 at page 26, citing *Willingham v. County of Albany*, 593 F.Supp.2d 446, 452-453 (N.D.N.Y. 2006). One required safeguard to ensure trustworthiness of an adverse inference is the requirement of corroborating evidence: "independent corroborative evidence of wrongdoing must be shown." *United States v. Nagelberg*, 772 F.Supp. 120, 123 (E.D.N.Y. 1991). A significant

5

segment of the Receiver's proposed adverse inferences does not meet this fundamental requirement. Those proposed adverse inferences that are objected to by Mr. Blust and LitDef are set forth in the schedule annexed to this submission as **Exhibit A**.

Before setting forth the Receiver's list of proposed adverse inferences, his brief provides the following summary of the evidence:

1. Access to emails of LitDef has disclosed "that Blust was directly involved in establishing Fidelis's business operations and personally dictating Fidelis's employee compensation and work assignments, and vendor contracts." Doc. 622 at page 7.

2. These emails "revealed Blust to be in personal control of Fidelis's employee roster, payroll, and workflow." *Id.* at page 9 (footnote omitted).

3. "Fidelis made a limited production of emails and text messages that further confirmed Blust's operational control of Fidelis." *Id.* (footnote omitted).

Discussing the alleged false statements in the Declaration of Mr. Blust, dated March 14, 2024, the Receiver makes the following claims (*Id.* at pages 11-13):

1. In ¶7 of his Declaration, Mr. Blust denied controlling or owning Fidelis or diverting its assets or resources. According to the Receiver, the "evidence establishes" it was Mr. Blust, not Mr. Christo, who received monthly productivity reports, controlled the hiring and firing of Fidelis's employees, as well as their work assignments, compensation, and holidays, oversaw Fidelis's relationships with its vendors, and supplied the computers used by its employees.

2. With respect to ¶10 of the Declaration, the Receiver disputes that Mr. Blust "became aware that a few employees of [LitDef] began simultaneously working for Fidelis." According to the Receiver, Mr. Blust personally decided "which LitDef employees to switch to Fidelis and how much Fidelis would pay them, then instructed Hinds to make it happen."

3. With respect to ¶11 of the Declaration, the Receiver disputes the statement that Mr. Blust had neither financial nor supervisory involvement in the operation of Fidelis. According to the Receiver, this statement is false because "Blust controlled Fidelis's hiring/firing, employee work assignments, employee compensation, holiday schedule, and relationships with vendors, and even received weekly employee productivity reports from Hinds."

4. Finally, with respect to ¶15 of the Declaration, the Receiver asserts that Mr. Blust falsely denied that Fidelis is "beneficially owned or controlled" by him and is

"operating in parallel with, as a proxy of, or as a successor to" LitDef. In support of his claim that these statements are untruthful, the Receiver solely relies upon hearing testimony provided by Katherine Rosenberg, who characterized Fidelis as a "proxy of, or successor to" LitDef, claimed that employees were switched between the two companies by Mr. Blust and Ms. Hinds, "apparently with little or no involvement by Christo[,]" testified that Ms. Hinds had described the transition as a "merger[,]" and reported that employees used the same computers and software logins for both companies.[1]

The Receiver's summary of the evidence fails to provide the requisite corroboration for many of the adverse inferences he proposes be drawn from the testimony of Mr. Blust, Mr. Christo, and Ms. Hinds. In particular, the proposed adverse inferences that relate to (1) ultimate control of the operations of Fidelis, (2) Mr. Christo as a shell owner of Fidelis, (3) that Mr. Blust had complete control of the operations of Fidelis and its staff to the exclusion of Mr. Christo, (4) that all of the business of Fidelis was derived from Mr. Blust, (5) that Mr. Christo is not responsible for any of the business of Fidelis, (6) that Mr. Christo had nothing to do with the funding of Fidelis's operations, and (7) that Fidelis was formed as a proxy or a successor to LitDef due to mounting litigation against LitDef unfairly extend well beyond the actual evidence identified by the Receiver, and constitute no more than his biased supposition or surmise.

As stated above, the touchstone for accepting any proposed adverse inference based upon an assertion of the Fifth Amendment is trustworthiness. This precondition is not only recognized in the *Willingham* opinion, cited above, but also by the Second Circuit in *LiButti v. United States*, 107 F.3d 110, 124 (1997). The leading decision within the Circuit on this subject is *Mirlis v. Greer*, 952 F.3d 36 (2d Cir. 2020). The Court recognized that, in the calculus used to determine whether a proposed adverse inference is to be accepted, Fed.R.Evid. 403 comes into play: "Relevant evidence, however, may be excluded 'if its probative value is substantially outweighed by danger

---

[1] To the extent the Receiver relies upon the hearing testimony of Ms. Rosenberg on issues of succession and control, her testimony consisted of unsupported conclusions or was based upon hearsay, and should be given limited weight.

of . . . unfair prejudice . . . or needlessly presenting cumulative evidence.'" 952 F.3d at 46 (citing Rule 403). While recognizing that an adverse inference is not foreclosed simply because an assertion of the Fifth Amendment may be "damning," "'invocations that cross the line to 'inflammatory' are more likely to fail under Rule 403.'" *Id.*, citing *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 171 (2d Cir. 2019).

The *Mirlis* opinion then addresses one of the decisions cited in the Receiver's brief, *Brinks' Inc. v. City of New York*, 717 F.2d 700 (2d Cir. 1983), but not for the opinion of the majority. Doc. 622 at page 27. The Court, instead, focuses upon the dissenting opinion in *Brinks'* by Judge Winter, who objects to a rule "permitting the systematic interrogation of witnesses on direct examination by counsel who knows they will assert the privilege against self-incrimination. [The majority's] holding allows juries to draw prejudicial inferences from leading questions, put to witnesses, denies parties the right to cross-examine, and is an invitation to sharp practice." 717 F.2d at 715. Judge Winters observes that "the prejudicial impact of allowing juries to draw inferences against parties from assertions of the privilege by witnesses clearly outweighs any probative value." *Id.* (citing Rule 403).

Judge Winters also relies upon the following statement by Judge Learned Hand: **"[I]n [the prosecution's] summation it referred to [the witness'] refusal in a context that could only have been understood as arguing that, if he had not refused, his answer would have been in the affirmative. Such refusals have been uniformly held not to be a permissible basis for inferring what would have been the answer, although logically they are very persuasive."** *United States v. Maloney*, 262 F.2d 535, 537 (2d Cir. 1959) [bold type added for emphasis]. Yet, this very technique of relying upon a parade of leading questions and presuming that a substantive answer, but for the assertion of the Privilege, would have been in the affirmative, is exactly the ill

8

that infects the Receiver's recitation of more than 100 proposed adverse inferences.[2] In the *Mirlis* opinion, the Court, echoed this concern in referring to the following additional observation of Judge Winter from his dissent in the *Brinks'* decision: "One principal concern was that a party would ask fact-specific, leading questions 'designed to suggest to the jury that but for the privilege the answer in each case would have been 'yes" and 'inevitably invite [] jurors to give evidentiary weight to questions rather than answers.'" 952 F.3d at 46, citing *Brinks'*, 717 F.2d at 716.

In the present case, not only does the Receiver rely upon a series of leading questions, and the presumption a substantive response would have been in the affirmative, as support for the majority of his proposed adverse inferences, he also has not, in his brief, cited meaningful corroborative evidence for the inferences he proposes to draw, save for that evidence summarized above. In comparison, in the *Mirlis* decision, the Court sustained the adverse inference that had been permitted below, but only after finding that "there was substantial independent evidence to corroborate the inference." 952 F.3d at 47. No such corroborating evidence has been cited by the Receiver.

Another decision relied upon by the Receiver that recognizes this same concern is *Rad Services, Inc. v. Aetna Cas. and Sur. Co.*, 808 F.2d 271 (3d Cir. 1986). Although not cited in the Receiver's brief for the following proposition, and notwithstanding that the *Brinks'* decision addressing this issue was from a dissenting opinion in a different Circuit, the Court in *Rad Services* observed as follows:

> We recognize, of course, the need to guard against "sharp practices" which some might twist our holding to invite. *See Brinks' Inc.*, 717 F.2d at 715 (Winter, J., dissenting). The trial judge maintains discretion under Fed.R.Evid. 403 to control the way in which non-party claims of privilege reach the jury. Judge Winter's dissent in *Brinks' Inc.* rightly decries "the systematic interrogation of

---

[2] To the degree the Court finds that the Receiver has handled the issue of adverse inferences in the fashion disapproved by the Second Circuit, we request the Court consider striking all proposed adverse inferences.

> witnesses on direct examination by counsel who knows they will assert the privilege against self-incrimination," *Id.*, and properly disapproves of fact specific questions by which the examining attorney effectively testifies for the invoking witness. *See Id.* at 716.

808 F 2d at 277-78. For a further generalized discussion of this principle, *see In re W. Wesley Drummon*, Adv. Pro. No. 19-01211 (JLG), 2023 WL8291564*26-27 (Bk. Ct. S.D.N.Y. 2023).

It is imperative that, with respect to each of the proposed adverse inferences identified by the Receiver at pages 13-24 and 27-29 of his brief, the considerations set forth above be evaluated; that is, the repeated use of leading questions as the basis for a proposed adverse inference, reliance on the unfounded presumption that, but for the assertion of Privilege, the substantive response would have been in the affirmative, and the absence of corroborative evidence to support the proposed inference. Upon a proper application of Fed.R.Evid. 403 to the scant showing of corroboration by the Receiver, as well as the unduly prejudicial reliance upon leading questions, the conclusion is inescapable, at minimum, that the proposed inferences set forth in **Exhibit A** should not be approved.

### IV. THE RECEIVER'S ATTEMPT TO SALVAGE HIS DECLARATION-BASED CONTEMPT ALLEGATION IS GROUNDLESS

We discuss in our Post-Hearing Memorandum the procedural flaws with the attempt by the Receiver to formulate a contempt application based upon Mr. Blust's Declaration, dated March 14, 2024 (Doc. 211). *See* Doc. 619 at pages 4-7. We point out that this aspect of his contempt argument has never been properly framed in the form of a motion as required by Fed.R.Civ.Proc. 7. We additionally argue that the necessary elements to be shown in support of a finding of civil contempt, specifically that "the order the party failed to comply with is clear and unambiguous," as recognized by the Receiver in his own filing (Doc. 179-1 at page 12), has not been satisfied. In fact, at the May 23, 2024 oral argument of his contempt application, the Receiver specifically

acknowledged that his contempt allegation based upon the Blust Declaration did not arise from a violation of the TRO. Doc. 619-1, **Exhibit A** to our Post-Hearing Memorandum, excerpt of proceedings held on 5/23/24, at pages 76-77.

In the face of these procedural deficiencies, the Receiver has now chosen in his Post-Hearing Memorandum to frame entirely new theories in support of his contempt application premised on the Blust Declaration. In addition to the factual deficiencies in these new arguments, which are discussed below, these newly minted theories continue to not comply with Rule 7 nor the proof requirements for a finding of civil contempt.

The Receiver opens his Post-Hearing Brief by introducing the first of his two previously unarticulated theories of contempt: "the most egregious aspects of contempt continue *to this day* – Blust's efforts to keep LitDef's obvious successor entity, Fidelis Legal Support Services, LLC ("Fidelis"), out of the receivership." Doc. 622 at page 1 (italics in original). In a supporting footnote, he asserts that Mr. Blust "owns and controls defendants LitDef, Relialit, and Fidelis." *Id*. n.1. The repeated assertion by the Receiver that Fidelis is a "successor entity" which is owned and controlled by Jason Blust is not supported by the record. As discussed in our Post-Hearing Memorandum (Doc. 619 at page 8), the Receiver has acknowledged having no direct evidence regarding Mr. Blust's ownership or holding of a financial interest in Fidelis. He has conceded that he doesn't know, and has no means of knowing, whatever financial arrangement, if any, exists between Mr. Blust and Cameron Christo. He instead attempts to support this allegation by pointing to Mr. Blust's bad character, alleging that he has "experience with using fronts" and that "behind-the-scenes financial arrangements are commonplace in many of Blust's operations." *See* Doc. 576 at pages 2, 12 and 21, including n.9.

11

Without at any point in his Post-Hearing Brief citing to actual evidence which substantiates his ownership and control allegation, the Receiver tacks on to his new theory the following additional assertion: "To this day, Blust has refused to cooperate in any respect in turning over control of Fidelis, its Documents, and Assets, to the Receiver." Doc. 622 at page 31. The fallacy in this accusation is the absence of actual evidence that Jason Blust has the capacity to "turn over control" of Fidelis to the Receiver. This allegation is also brand new, and has not been previously identified as a basis for a finding of civil contempt, much less been presented in compliance with Rule 7. Nor has it been shown how this allegation satisfies the pleading requirements for a finding of civil contempt that is properly linked to the allegedly perjurious Declaration of Mr. Blust.

A second newly crafted theory embedded in the Receiver's Post-Hearing Brief as support for his civil contempt application directed to the Blust Declaration is to allege the existence of a conspiracy involving not only Mr. Blust, Cameron Christo, and Michelle Hinds, but also their counsel. This contention was mentioned in passing, but without elaboration, in the Receiver's Hearing Brief, but had not at any point been raised prior to that time. Doc. 576 at page 30. The following constitute the statements of the Receiver that are cited in support of this accusation:

1. It is first alleged that the "deception was multi-faceted, as not only did Blust submit a false declaration, but his top lieutenant Michelle Hinds and front man Cameron Christo also submitted a combined total of five false declarations to this court, offering numerous claims to support the falsehood that Blust had nothing to do with Fidelis." Doc. 622 at page 1.

2. It is next contended that "Christo, in obvious coordination with Blust, falsely presented himself to the Court as the owner, operator, and controller of Fidelis. . . And for her part, defendant Michelle Hinds supported this canard by offering her own false testimony that Christo was her 'boss' and going so far as to claim Blust would have gotten upset with her if she asked him about a Fidelis matter." *Id*. at page 2.

3. As troubling as it is disappointing, the Receiver next implicates counsel in this alleged conspiracy as follows: "While Blust and LitDef admitted LitDef continued to operate in violation of the TRO until at least the end of January (*see* Blust Defendants' Pre-Hearing Memorandum, Dkt. No. 572 at 2), this admission was an

12

          attempt to hide and minimize the scope and extent of the ongoing contempt. The much more egregious contempt involved the continued secretive operations of Fidelis and then the choreographed submission of false sworn testimony designed to keep Fidelis from ever becoming a Receivership Defendant. The perjurious and coordinated efforts of Blust, Hinds, and Christo to mislead the Court is an affront to the Court and harmed the Receivership by keeping Fidelis out of the estate and precluding access to Fidelis's corporate records and Assets." *Id*. at pages 4-5 (footnotes omitted).

4. Returning to this argument later in his brief, the Receiver alleges the following: "Blust coordinated the contents of his false declaration about Fidelis with Hinds and Christo, who submitted five false declarations of their own, seeking to sell the fiction that Blust had nothing to do with Fidelis." *Id*. at page 31.

5. Then, for a final time, the Receiver alleges the following: "And, of course, at the same time, he [Blust], Hinds, and Christo coordinated to file perjurious declarations with the Court to distance Fidelis." *Id*. at pages 31-32.

It is respectfully requested that the Court not pause to give serious consideration to these scandalous allegations of coordinated impropriety, implicating not only three of the parties, but also their counsel, both explicitly and implicitly. Innuendo aside, there is no factual basis for these claims of concerted, coordinated misconduct. Not only were these serious accusations never before raised over the preceding 12 months that this matter has been pending, with the exception of the above-referenced passing statement in the Receiver's Hearing Brief, no attempt was made at the fact-finding hearing conducted on January 23 and 24, 2025 to develop a record in support of these allegations. No questions were posed that touched upon this alleged conspiracy. At this late date, they also suffer from the deficiencies referred to above regarding noncompliance with the pleading and notice requirements of Rule 7 and the elements of proof that are needed to support a finding of civil contempt.

An additional consideration as well is the higher standard of proof – clear and convincing evidence – that must be shown to support a civil contempt finding.

13

## V. THE RECEIVER'S FRAUD ON THE COURT INVITATION IS NOT WELL TAKEN

As he did in his Hearing Brief (Doc. 576 at page 30 n.12), the Receiver once more, verbatim, reiterates his suggestion that the Court *sua sponte* address the evidence that has been presented from the perspective of a fraud having been committed on the Court. As discussed in the preceding section, the Receiver has utterly failed to satisfy the pleading requirements of Fed.R.Civ.P. 7 in connection with his allegation that the Declaration of Mr. Blust, dated March 14, 2024 (Doc. 211), forms the basis for a finding of civil contempt. We also argue that the required elements to establish a civil contempt have not been proven. Perhaps recognizing his failure to follow proper pleading practice, he now advocates after the fact in favor of an alternative basis for relief; that is, fraud upon the court.

To the contrary, in both of the cases relied upon by the Receive to support this proposed course of action, proper pleading practice had been followed by the moving party. In *McMunn v. Memorial Sloan-Kettering Cancer Center*, 191 F.Supp.2d 40, 442 (S.D.N.Y. 2002), the Court recognizes that: "Memorial moved for dismissal of Ms. McMunn's lawsuit and monetary sanctions pursuant to Federal Rule of Civil Procedure 37 and the inherent power of this Court to 'fashion an appropriate sanction for conduct which abuses the judicial process.'" (Citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). In the second decision cited by the Receiver, *CDR Creances S.A.S. v. Cohen*, 23 N.Y.3d 307, 315 (2014), the Court also observes that a request for relief had been properly framed: "Shortly after defendants' sentencing, plaintiff again moved pursuant to CPLR 3126 to strike defendants' pleadings and for a default judgment in the consolidated 2003 and 2006 actions, alleging all of the defendants perpetrated fraud on the court."

By comparison, the Receiver in this instance has failed to follow proper notice pleading protocol and has framed a request for relief out of time. Under these circumstances, the Court

14

should not even pause to consider the suggestion that the pending matter be adjudicated as a fraud upon the court.

## VI. PROPOSED SANCTIONS

At pages 34-36 of the Receiver's Post-Hearing brief, the subject of sanctions is addressed. The following discussion is subject to the Court certifying, in whole or in part, the Receiver's contempt application and electing to exercise its discretion to recommend a sanction.

The articulated basis for the previously unannounced and very significant sanctions now being proposed by the Receiver is embodied in the following statement: "Significant sanctions are necessary to achieve compliance here, given the history of non-compliance, the pattern of delay and obfuscation, and the willingness to submit false testimony coordinated with others." Doc. 622 at 34. Aside from issues associated with the truthfulness of the Blust Declaration, the Receiver announced at oral argument on May 23, 2024 his satisfaction with the cooperation then being offered by counsel for Mr. Blust and LitDef: "At this point, I can't[3] say I believe Mr. Personius has done a good job for his client, you know, in getting us the e-mails, which we finally got -- giving us access to the accounting records, doing other things that I can say to you that I believe the contempt has been remedied, right?" Doc. 619-1, **Exhibit A**, excerpt of transcript of proceedings held on 5/23/24, at page 74. As well, following the May 2024 appearance, the Receiver was provided with all additional electronic data requested by him. There has never been any complaint regarding the completeness of this production. Accordingly, the allegation about a "history of noncompliance," especially after the May 2024 court appearance, is misplaced.

---

[3] Given its context, it is believed the word used by the Receiver was "can," not "can't."

15

With respect to the question of a "pattern of delay and obfuscation," the Receiver filed his original contempt motion in February 2024. Briefing followed, giving rise to a court appearance on May 23, 2024. The Receiver never requested that an earlier date for oral argument be scheduled. At that proceeding, it was agreed a fact-finding hearing needed to be conducted. It was originally scheduled for July 2024, and was then held in abeyance before finally being scheduled for January 23 and 24, 2025. Over the passage of the eight months between oral argument and the hearing, the Receiver never complained about the delay, nor would it be fair to attribute this passage of time to Mr. Blust and LitDef. There has been no pattern of delay over the objection of the Receiver.

As discussed above, the allegation regarding "false testimony coordinated with others" is entirely new. We object to this characterization, which we submit is devoid of any factual basis.

On the subject of harm, which again is referred to by the Receiver without being defined, the record demonstrates that the Receiver has acquiesced over the past year in the continued operation of Fidelis. We understand as well, upon information and belief, that during this period of time there actually has been a coordination of effort between the Receiver and Fidelis with respect to certain matters. Simply, the Receiver has not objected to Fidelis's continued operation.

Prior to the submission of his Post-Hearing brief on February 24, 2025, more than one year after the filing of his original contempt application, the Receiver has at no time suggested that a monetary sanction of any type, much less a fine of $1,000 per day, should be assessed against Mr. Blust and LitDef. Even more so, the sanction of imprisonment has never been mentioned, but is now alluded to in a footnote to the Receiver's brief. Doc. 622 at pages 36-37 n.20. In fact, prior to this submission, the sole sanction ever identified by the Receiver with respect to Mr. Blust and

LitDef has been an assessment of attorney fees, which was discussed during the court appearance on May 23, 2024. *See* Doc. 619 at page 13, and cited references to **Exhibit A** of that pleading.

Aside from the factually unsupported, incendiary allegations of the Receiver, nothing factual has happened since the May 23rd proceeding to justify the outlandish proposals now being advanced by the Receiver. To the contrary, as also outlined in our Post-Hearing Memorandum (Doc. 619 at pages 15-16) and our separately filed Declaration of Counsel, with supporting exhibits (Doc. 620 and 620-1), we have endeavored since the May 23, 2024 court appearance, albeit unsuccessfully, to engage the Receiver in a discussion of settlement of all issues surrounding his contempt application.

For all of these reasons, we strongly object to the sanction proposals being advanced by the Receiver.

Dated: Buffalo, New York
       March 4, 2025.

**/s/ Rodney O. Personius**
Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
*Attorneys for Defendant*
  JASON BLUST
        and
*Relief Defendant*
  LITDEF STRATEGIES, LLC
2100 Main Place Tower
350 Main Street
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com