UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――

CONSUMER FINANCIAL PROTECTION,
BUREAU, *et al.*,

          Plaintiffs,

     v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), *et al.*,

         Defendants, and

STRATEGIC ESOP, *et al.*,

         Relief Defendants.

―――――――――――――――――――

24-CV-40-EAW-MJR

REPORT, RECOMMENDATION
AND ORDER



     Receiver Thomas McNamara has moved for an order to show cause why defendants Lit Def Strategies, LLC and Jason Blust should not be held in civil contempt. (Dkt. No. 179) For the following reasons, it is recommended that the motion for an order to show cause be granted and the Court recommends that the District Court issue a finding of civil contempt against Lit Def Strategies, LLC and Jason Blust. The Court further orders that defendant Fidelis Legal Support Services, LLC be designated a receivership defendant pursuant to the preliminary injunction, and denies Fidelis Legal Support Services LLC's motion challenging such designation.[1] (Dkt. No. 190)

―――――――――――――――――――

[1] Upon the commission of any act that constitutes civil contempt, "the magistrate judge shall forthwith certify the facts to a district judge and may serve…any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge to show cause why that person should not be adjudicated in contempt by reason of the facts so certified." *See* 28 U.S.C. § 636(e)(6)(B). Thus, the Court issues its finding of civil contempt by report and recommendation to the District Court. The parties consented to this Court's authority to decide plaintiff's motion for a preliminary injunction. (Dkt. Nos. 5, 158-159) The Court granted that motion and issued a preliminary injunction on March 4, 2024. (Dkt. Nos. 183, 184) Thus, the Court issues its determination regarding Fidelis Legal Support Services, LLC's designation as a receivership defendant, pursuant to the March 4, 2024 preliminary injunction, by decision and order.

## FINDINGS OF FACT[2]

### *Lit Def Strategies, LLC*

Defendant Lit Def Strategies, LLC ("Lit Def") is owned and controlled by defendant Jason Blust. (Dkt. No. 115-1, pg. 15) Lit Def provided litigation support services to law firms. (*Id*. at 14, 39) The law firms supported by Lit Def engaged in consumer debt settlement and debt litigation, in exchange for fees. (Dkt. No. 183, pgs. 10-11) The law firms provided these services together with defendant StratFS, LLC ("StratFS") and its related entities and affiliates (hereinafter referred to as "Strategic's debt-relief services" or "Strategic's debt-relief operation").[3] (*Id*.) Plaintiffs allege, *inter alia*, that Lit Def, together with Blust, provided substantial assistance to the law firms in collecting unlawful advance fees from consumers in exchange for debt-relief services, in violation of the Telemarketing Sales Rules ("TSR"). (Dkt. No. 366) Blust controlled the law firms supported by Lit Def, and Blust served as a liaison between the law firms and StratFS with regard to the Strategic's advance fee debt-relief services.[4] (Dkt. No. 183, pg. 47)

---

[2] On January 23 and 24, 2025, this Court held an evidentiary hearing addressing, *inter alia*, the receiver's request to hold Lit Def Strategies, LLC and Jason Blust in civil contempt. (Dkt. Nos. 589, 590) The Findings of Fact stated herein are comprised of testimony and evidence introduced at that hearing; prior decisions of the Court in this lawsuit; and other declarations and documents submitted to the Court through the parties' and the receiver's various filings. The Findings of Fact constitute this Court's certification of facts to the District Court, pursuant to Section 636(e)(6)(B), in support of its recommendation that Lit Def Strategies, LLC and Jason Blust be found in civil contempt.

[3] StratFS also offered a contingency fee model of debt relief, separate and apart from the law firm model of debt relief at issue in this lawsuit. (Dkt. No. 183, pg. 11, n. 9) However, the law firm debt relief model was the primary business of StratFS and the receiver's various filings. The Findings of Fact constitute this Court's and accounted for roughly 80% of its revenue.

[4] The law firms moved to intervene and have been actively participating in this lawsuit. (Dkt. No. 50) While the law firms are not listed in Blust's name, evidence in the record indicates that Blust controls the law firms and receives a significant portion of their revenue from advance-fee debt relief. (Dkt. No. 183, pgs. 10) It is alleged that between March 2020 and April 2021, Blust transferred $36,000,000 in illegal advance fee proceeds to the Blust Trust, which is named as a relief defendant in this lawsuit. (Dkt. No. 281, pgs. 7-8)

When a consumer enrolled in Strategic's debt-relief services was sued by a creditor, the legal documents, including the summons and complaint, were not forwarded to the law firm listed on the consumer's engagement letter. (Dkt. No. 115-1, pg. 14) Instead, a representative employed by StratFS would send the legal documents to Lit Def. (*Id.*) Lit Def then acted as a hub and sent these filings on to contracted litigation or appearance attorneys. (*Id.*)

### *The TRO*

On January 11, 2024, the Honorable Lawrence J. Vilardo issued a temporary restraining order ("TRO") with asset-freeze, appointment of Receiver Thomas McNamara (the "Receiver"), and other equitable relief. (Dkt. No. 12) The TRO defined "defendants" as all corporate and individual defendants named in the lawsuit, including Jason Blust. (Dkt. No. 12, pg. 6) The TRO identified Lit Def as a "receivership defendant."[5] (*Id.* at 8-9) The TRO extended the definition of "receivership defendant" to include Lit Def's subsidiaries, affiliates, divisions, successors, and assigns. (*Id.*) The TRO also identified, as receivership defendants, "any other business related to the [d]efendants' debt-relief services and which the….Receiver has reason to believe is owned or controlled in whole or in part by any of the [defendants or relief defendants included in this definition], and includes the fictitious names under which they do business." (*Id.*)

The TRO imposed a number of cooperation requirements on Lit Def and Blust. Specifically, the TRO required Lit Def and Blust to provide the Receiver with physical and electronic access to their business operations, and to identify to the Receiver the

_____

[5] At the time the TRO was issued the complaint named Lit Def as a relief defendant only. (Dkt. No. 1) The second amended complaint named Lit Def as a defendant. (Dkt. No. 366)

location of any business assets. (*Id.* at 26-28) Lit Def and Blust were also required provide any information the Receiver deemed necessary to discharge his responsibilities under the TRO. (*Id.* at 30) The TRO prohibited Blust from (1) transacting any business of the receivership defendants, including Lit Def; (2) failing to notify the Receiver of any asset held in any other name; (3) failing to provide assistance or information requested by the Receiver in connection with obtaining custody and control of such assets; and (4) interfering with the Receiver's ability to take control of any asset subject to receivership, or otherwise refusing to cooperate with the Receiver. (*Id.* at 31-33) The TRO further required Blust and Lit Def to transfer possession of all Lit Def's assets to the Receiver, and to transfer to the Receiver all assets "belonging to other [p]ersons or entities whose interests were under the direction, possession, custody, or control of Lit Def."[6] (*Id.* at 33-34)

### *Continued Operation of Lit Def*

On January 25, 2024, counsel for Lit Def informed the Receiver that, upon entry of the TRO, Lit Def had ceased all operations and laid off all employees. (Dkt. No. 150, pgs. 6-7) The Receiver relayed this information in a preliminary report to the Court. (Dkt. No. 115-1, pgs. 14-15) Likewise, Blust and Lit Def jointly represented to the Court that Lit Def had ceased operations when the TRO was entered. (Dkt. No. 149, pgs. 2-3)

On February 23, 2024, the Receiver became aware of a series of emails suggesting that, contrary to the representations made by defendants to the Receiver

---

[6] On March 4, 2024, this Court granted plaintiffs' motion for a preliminary injunction ("PI") with asset freeze, the continued appointment of the Receiver, and other equitable relief. (Dkt. Nos. 183) Lit Def continued to be designated as a receivership defendant under the PI, and Blust and Lit Def's responsibilities and obligations to cooperate with the Receiver remain the same under the PI as under the TRO. (Dkt. No. 184)

and the Court, Lit Def was continuing to operate.[7] (Dkt. No. 179, pgs. 5-8) Specifically, the Receiver discovered a string of emails sent on February 23, 2024, that were ultimately forwarded by Michelle Gallagher (née Hinds) (hereinafter "Gallagher"), the manager of Lit Def, to the StratFS VP of Client Relations.[8] (Dkt. No. 179-1, pgs. 6-8) The emails concerned "LitDef file #CS0031210376" and two of the individuals included in the email chain were contacted using their Lit Def email addresses, suggesting that Lit Def's email system was still in use and that Lit Def files were being worked on. (Id.)

The Receiver then found additional client-related emails in StratFS's records suggesting that Lit Def had continued to operate after the imposition of the TRO. On January 30, 2024, Gallagher was copied on an email asking that an attached complaint be sent "to litigation." (Dkt. No. 179-13) On January 31, 2024, Gallagher responded "Thank you…[w]e will assign this to a litigation attorney." (Id.) Also on January 31, 2024, Gallagher received an email from one of the law firms asking about a client with an "upcoming hearing." (Dkt. No. 179-14) Later that same day, Gallagher requested litigation documents from a StratFS employee "so that [Gallagher] could get an attorney on it immediately." (Id.) On February 23, 2024, the StratFS VP of Client Relations emailed Blust asking about the "status of Lit Attorneys and Non-Lit Attorneys." (Dkt. No. 179-1, pgs. 13-14) Later that same day, Gallagher, who had been copied on the email by Blust, responded by stating "[w]e haven't had much turnover on the lit side, and the

---

[7] Defendant StratFS and all of its related entities and affiliates are also named as receivership defendants under both the TRO and PI. (Dkt. Nos. 12, 184) Thus, the Receiver has access to all StratFS systems, records, and documents, including its stored email communications.

[8] At the time to TRO was entered, Michelle Gallagher was not a defendant in this lawsuit. The second amended complaint named Gallagher as a defendant. (Dkt. No. 366) Plaintiffs allege, inter alia, that Gallagher, like Lit Def and Blust, provided substantial assistance to the law firms in collecting unlawful advance fees from consumers in exchange for debt-relief services, in violation of the TSR. (Id.)

lit attorneys continue to work on their files, attend hearings, contact clients, etc." (*Id.* at 14)

The receiver brought these emails to the attention of the Court and the parties on February 26, 2024. (Dkt. No. 179) Blust then admitted that Lit Def had continued to operate "for a short period of time on a limited basis" after the issuance of the TRO.[9] (Dkt. No. 211, ¶ 5; Dkt. No. 572, pg. 2)

### *The Receiver's Discovery of Fidelis Legal Services, LLC*

Also on February 23, 2024, the Receiver received information suggesting that Fidelis Legal Support Services LLC ("Fidelis"), another litigation support services company potentially owned and/or controlled by Blust, was operating in tandem with Lit Def in assisting Strategic's debt-relief operation, past the imposition of the TRO.[10] (Dkt. No. 179-1, pg. 6) Specifically, in at least one of the email communications discussed previously, Gallagher received the initial communication or inquiry through her Lit Def email account, but responded using an email account associated with the domain "fidelissupport.com." (Dkt. No. 179-1, pgs. 12) These email exchanges suggested to the Receiver that Gallagher, manager of Lit Def, was continuing to conduct Lit Def's operations utilizing both a Lit Def email account and a Fidelis email account.

The Receiver further reviewed StratFS's client records and found various emails from individuals using the "fidelissupport.com" domain as far back as February 2022.

---

[9] The parties and the Receiver all appear to agree that Lit Def continued to operate in January 2024. The emails cited herein suggest that Lit Def may have been operating for some period of time in February of 2024 as well. It undisputed that Lit Def ceased operations prior to a May 23, 2024 oral argument addressing the contempt issue. However, it is unclear from the record the exact date Lit Def ceased operations.

[10] Fidelis was not initially named as a defendant in this lawsuit. (Dkt. No. 1) The second amended complaint named Fidelis as a defendant. (Dkt. No. 366) Plaintiffs allege, *inter alia*, that Fidelis, like Lit Def, Blust, and Gallagher, provided substantial assistance to the law firms in collecting unlawful advance fees from consumers in exchange for debt-relief services, in violation of the TSR. (*Id.*)

(Dkt. No. 179-6) The StratFS data showed email interactions between StratFS employees and Lit Def employees Gallagher, Katherine Rosenberg, Peggy Slivka, and Jennifer Moy.[11] (*Id.*) Prior to February 2022, each of these individuals used a Lit Def email account only. (Dkt. No. 179-11) After 2022, these individuals contemporaneously used both a Lit Def email account and a Fidelis email account. (Dkt. No. 179-12) Using both Lit Def email accounts and Fidelis email accounts interchangeably, these individuals acted as liaisons between clients and law firms for litigation-related inquiries, such as asking a consumer's lawyer to respond to a consumer question or inquiring about settlement status of a lawsuit. (Dkt. Nos. 179-6; 179-11; 179-12)

Prior to the discovery of these emails, the Receiver was unaware of Fidelis. (Dkt. No. 179-1, pg. 8) Upon further investigation, the Receiver learned that Fidelis was formed on January 25, 2021 as a Nevada limited liability company. (Dkt. No. 179-3) The sole manager listed for Fidelis is Cameron Christo, an individual with a residential address in Chicago, Illinois.[12] (*Id.*) Fidelis' website lists a Las Vegas virtual office and indicates that it provides "top quality support to assist lawyers for complicated cases." (Dkt. No. 179-4) Lit Def and Fidelis' websites are similar, and indicate that the two businesses provide the same types of services. (Dkt. Nos. 179-4; 179-5)

The Receiver later uncovered additional emails suggesting that Blust was involved with Fidelis. Specially, the Receiver located an October 2021 email thread between the StratFS Controller and Blust's accountant, ostensibly concerning a transfer

---

[11] On February 9, 2024, Blust and Lit Def represented to the Court that Lit Def employed a staff of six individuals, including Blust. (Dkt. No. 149, pg. 2). Based on the Receiver's review of StratFS data, Lit Def employees included Gallagher, Rosenberg, Slivka, and Moy. (Dkt. No. 179-1, pg. 11)

[12] Cameron Christo and Bush Lake Trust, an irrevocable trust established by Christo on March 1, 2021, are named as relief defendants in the second amended complaint. (Dkt. No. 366) On the same day that Christo established the Bush Lake Trust, he transferred ownership of Fidelis to his trust. (*Id.* at ¶ 104)

of $750,000 from StratFS to the law firms controlled by Blust for "technology." (Dkt. No. 179-7) Rather than paying the law firms, Blust's accountant informed the StratFS Controller that the payment should be paid to Fidelis, at "$100k for 7 mos, $50k for 1 month." (Dkt. No. 179-7, pg. 5) In a later email exchange between StratFS executives in March 2022 discussing the Fidelis payments and how to draft a contract for the fee, the CFO of StratFS told the others on the email chain, "You can land the plane with Blust as you see fit." (Dkt. No. 179-10) These email communications, indicating that Blust directed that a large payment owed to his law firms be made to Fidelis instead, suggested to the Receiver that Fidelis may be under Blust's ownership and/or control. (Dkt. No. 179-1, pgs. 10)

Based on this investigation, the Receiver notified Fidelis that it qualified as a receivership defendant under the TRO.[13] (Dkt. No. 190-1, pg. 9) The Receiver also filed the instant order to show cause as to why Blust and Lit Def should not be held in civil contempt, on the basis that Lit Def continued to operate both on its own, and under the guise of Fidelis, in violation of the TRO. (Dkt. No. 179)

### *Blust Declares No Involvement in Fidelis*

In response to the motion for contempt, Blust filed a signed declaration, pursuant to 28 U.S.C. § 1746, expressly declaring that the statements made therein were true under penalty of perjury.[14] (Dkt. No. 211) In his declaration, Blust denied that he owned or controlled Fidelis, or that he diverted any assets or resources from Lit Def to Fidelis.

---

[13] The TRO provided that "[i]f the Receiver identifies a non party entity as a Receivership Entity," the Receiver is authorized to "promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court." (Dkt. No. 12, at pg. 24)

[14] Pursuant to Section 1746, an unsworn declaration subscribed by the declarant as true under penalty of perjury has the same force and effect as a sworn declaration. *See* 28 U.S.C. § 1746; *Edwards v. Arocho*, 125 F.4th 336 (2d Cir. 2004).

(*Id.* at ¶ 7) Blust stated that in late 2020, he told Cameron Christo that he intended to "gradually step away from the debt-settlement business," which would include an eventual wind-down of Lit Def.[15] (*Id.* at ¶ 8) Blust therefore claimed he did not "mind" when Christo responded that he "might consider forming his own litigation support services operation." (*Id.*) Blust averred that he played "no role whatsoever" in Christo's formation of Fidelis; that he had nothing to do with funding Fidelis before or after its formation; and that he held no interest of any kind in Fidelis. (*Id.* at ¶ 9)

Blust further declared that when Lit Def took on less business from 2021 to 2023, he "became aware that a few employees of [Lit Def] began simultaneously working for Fidelis, and that he approved of their doing so." (*Id.* at ¶ 10) Blust averred that "this arrangement in no fashion involved an interest of any kind on [his] part, including financial *or supervisory*, in the operation of Fidelis." (*Id.* at ¶ 11, emphasis added) Blust further declared that any statement by the Receiver that he "beneficially owned or controlled Fidelis" was false, as was the Receiver's claims that Fidelis was "operating in parallel with, as a proxy of, or as successor to" Lit Def. (*Id.* at ¶ 15)

### *Christo and Fidelis Deny Involvement by Blust*

On March 4, 2024, Fidelis filed a motion challenging the Receiver's determination that it is a receivership defendant. (Dkt. No. 190) In support, Cameron Christo filed a signed declaration, pursuant to 28 U.S.C. § 1746, expressly declaring that all statements made therein were true and correct under penalty of perjury. (Dkt. No. 190-4) In his declaration, Christo stated that he is the founder and chief executive of Fidelis,

---

[15] According to the preliminary report filed by the Receiver, in a November 9, 2022 email, Blust wrote to defendant Ryan Sasson, the owner of Strategic, about a potential fee increase for consumers, and how that would affect revenue for the law firms. (Dkt. No. 115-1, pgs. 27-28) This evidence appears to contradict Blust's statement that, in 2020, he planned to "gradually step away" from the debt settlement business.

and that he oversees the company and directs its operations. (*Id.* at ¶ 1; ¶ 4) Christo averred that Blust makes no decisions for Fidelis and has never received a benefit from Fidelis (*Id.* at ¶ 4; ¶ 16) Christo declared that he funded Fidelis and that he makes "all executive decisions [for Fidelis] regarding personnel, payroll, purchasing, contracting, and the like." (*Id.* at ¶ 4, ¶ 25)

Christo further stated that Shirley Saavedra, Jean Komis, Jennifer Moy, Peggy Slivka, and Katherine Rosenberg all worked for him at Fidelis while also working at Lit Def. (*Id.* at ¶ 26) Christo stated that Michelle Gallagher worked at Fidelis as a manager of these employees while also continuing to work as a manager at Lit Def. (*Id.* at ¶ 24, ¶ 27) Christo declared that while Fidelis' employees partially overlapped with Lit Def, their work did not. (*Id* at ¶ 22) Christo declared that in the fall of 2021, Strategic Client Support, LLC hired him to "vet a new software program." (*Id.* at ¶ 36) Christo stated that this fee had nothing to do with litigation support, that Blust did not receive any portion of the fee, and that Blust "does not own or control Fidelis." (*Id.* at ¶ 38)

### *Katherine Rosenberg Declaration*

In his response to Fidelis' motion challenging the receivership designation, the Receiver submitted, *inter alia*, a declaration by Katherine Rosenberg. (Dkt. No. 212-1) Rosenberg's declaration directly contradicted Blust and Christo's averments that Lit Def and Fidelis were wholly separate companies. (*Id.*) Rosenberg's declaration instead suggested that Fidelis was Lit Def's successor, with the companies sharing employees, management, customers, procedures, equipment, and software accounts. (*Id.*)

Rosenberg explained that, in August of 2021, she applied for a paralegal role and was contacted by an individual who represented themselves as being from Fidelis. (*Id.*

at ¶ 2) Following the interview, however, Rosenberg was offered a position with Lit Def and was informed that she was being put on the "Lit Def" team. (*Id.* at ¶ 3) The relationship between Lit Def and Fidelis was not explained to Rosenberg at that time. (*Id.*) Rosenberg was provided with a Microsoft Surface tablet computer for work. (*Id.* at ¶ 4) Her username was associated with Clientfirstbankruptcy.com, a domain owned and controlled by Jason Blust.[16] (*Id.* at ¶ 15) Rosenberg was given a Lit Def email address and assigned to work on Lit Def files. (*Id.* at ¶ 5) One of her supervisors was Michelle Gallagher. (*Id.* at ¶ 4)

Rosenberg further stated that, in the fall of 2021, Gallagher informed her and her co-workers that Lit Def would "soon formerly become Fidelis" and that Lit Def employees "would transition over to become Fidelis employee." (*Id.* at ¶ 6) Rosenberg recalled Gallagher describing this as a "merger" of Lit Def and Fidelis, and also stating that Fidelis was "buying" Lit Def. (*Id.*) According to Rosenberg, employes were not given a choice regarding the transition of their work to Fidelis. (*Id.*)

Rosenberg stated that management set February 1, 2022 as the official transition date. (*Id.* at ¶ 7) Employees were told that ligation files originating before that date would be treated as "Lit Def" files and serviced from "litdefstrategies.com" email accounts, but that new litigation files after that date would be "Fidelis" files and serviced from "fidelissupport.com" email accounts. (*Id.*) Rosenberg explained that before February 1, 2022, she serviced only Lit Def litigation files. (*Id.* at ¶ 8) Between February 2022 and April 2023, she serviced both Lit Def and Fidelis files. (*Id.*) Beginning on April 10, 2023, Rosenberg was assigned Fidelis files only. (*Id.*) She used the same tablet computer initially provided by Lit Def to perform work for both companies. (*Id.* at ¶ 4)

---

[16] It is undisputed that Client First Bankruptcy is a law firm owned by Blust.

Rosenberg stated that during and after the transition to Fidelis, emails sent to her Lit Def email account were automatically forwarded to her Fidelis email account. (*Id.* at ¶ 9) When emails concerning Fidelis files were sent to Lit Def email accounts, employees were instructed to copy and paste the email exchange into a reply email from the Fidelis account and remove all references to Lit Def. (*Id.*) This process was referred to as "making the email clean." (*Id.*) Rosenberg indicated that she found this process strange, since employees "worked with the same network of attorneys and performed the same tasks regardless of whether the file was formally allocated to Lit Def or Fidelis." (*Id.*)

During the transition, Rosenberg received two paychecks, with the first $1,000 of her pay coming from Lit Def and the remainder from Fidelis. (*Id.* at ¶ 11) She was not asked to clock out, keep separate time sheets, or otherwise formally differentiate her time spent working on Lit Def as opposed to Fidelis files. (*Id.*)

Rosenberg explained that the transition from Lit Def to Fidelis had virtually no impact on her day-to-day work. (*Id.* at ¶ 10) To that end, she worked with the same attorneys, co-workers, and management; followed the same procedures; and used the same computer and software programs. (*Id.*) Beginning in April 2023, Rosenberg was paid by Fidelis only and she worked solely on Fidelis files. (*Id.* at ¶ 12) A co-worker was assigned to service only Lit Def files (*Id.*) Rosenberg stated that she met Christo only once, and that she did not recall Christo having any involvement in Fidelis' day-to-day operations. (*Id.* at ¶ 13) Based on Rosenberg's experience, she believed Fidelis was a successor to Lit Def. (*Id.*)

Rosenberg further recounted that, in January of 2024, employees were told that they could not access any email accounts, payroll information, or tax information related

to Lit Def. (*Id.* at ¶ 18) Employees were further told that if they were to receive an email to their Lit Def email address, they were to reply by copying and pasting the email into an email from their Fidelis email address, and removing any references to Lit Def. (*Id.*)

### *Christo and Gallagher Further Deny Involvement by Blust*

In a reply to the Receiver's response, Christo submitted another declaration, also under penalty of perjury. (Dkt. No. 233-1) Christo stated that Rosenberg's assertion that Fidelis was Lit Def's successor was inaccurate; that Fidelis did not receive anything from Lit Def; and that Fidelis did not take over any litigations supported by Lit Def. (*Id.* at ¶ 14) Christo stated that Lit Def never transferred any asset to Fidelis. (*Id.* at ¶ 10) Christo further stated that employees working for Lit Def and Fidelis "scrupulously segregated their work for the two companies." (*Id.*)

Christo's declaration again emphasized that Blust does not own or control Fidelis. (*Id.* at ¶ 4, ¶ 6) Christo specifically declared that "Blust is not a consultant for Fidelis and he does not control it in any respect...[h]e does not set policy, he does not prescribe strategy, he does not make decisions, he does not direct operations...he has no role in the running of Fidelis's business". (*Id.* at ¶ 7) Christo also averred that "[f]rom the moment I first heard the Receiver's allegation, it has mystified me. Jason Blust simply does not own or control Fidelis is any way, and Fidelis is not, and never was, Lit Def's successor or alter ego." (*Id.* at ¶ 19)

In further support of its opposition to the receivership designation, Fidelis submitted the declaration of Michelle Gallagher. (Dkt. No. 233-5) Gallagher's declaration was also submitted under penalty of perjury, pursuant to 28 U.S.C. § 1746. (*Id.*) Gallagher stated that between 2020 and 2024, she helped manage day-to-day

operations at Lit Def and Fidelis. (*Id.* at ¶ 4) Gallagher declared that Christo was the "boss" at Fidelis and that, as far as she knew, Blust exercised no control over Fidelis and had no role in its operations. (*Id.*) Gallagher denied telling Rosenberg, or anyone else, that Fidelis "bought, merged with, or was the same company as, Lit Def." (*Id.* at ¶ 5, ¶ 24) Gallagher maintained that throughout the time that Lit Def and Fidelis were operating, they remained distinct companies performing separate work. (*Id.* at ¶ 24) Gallagher stated that employees working at Lit Def and Fidelis received separate email accounts and separate software logins, and were instructed to switch between the two depending on the litigation being supported. (*Id.* at ¶ 25) Gallagher represented that when Lit Def closed, following the issuance of the TRO, Fidelis did not take over supporting litigations previously supported by Lit Def. (*Id.* at ¶ 27)

Gallagher also declared that, while working at Fidelis, she reported to Christo. (*Id.* ¶ 28) Gallagher averred that she would contact Christo, and not Blust, with any Fidelis issues she could not resolve. (*Id.*) Gallagher stated that if she ever asked Blust for help with a Fidelis matter "he would have asked me, in colorful terms, why I was bothering him with Fidelis." (*Id.*) Gallagher stated that, based on her observations, Christo made "all executive decisions with regard to personnel, payroll, purchasing, and contracting." (*Id.* at ¶ 29)

### *Discovery of Lit Def and Fidelis Emails*

On March 20, 2024, Lit Def provided the Receiver with passwords for its email accounts. (Dkt. No. 237-1 at 1) The Receiver then found numerous internal Lit Def communications showing that Blust was directly involved in directing Fidelis' business operations and vendor contracts, and that Blust personally dictated Fidelis employees'

work assignments and compensation. These emails directly contradicted the declarations of Gallagher, Christo, and Blust, all filed with the Court and offered under penalty of perjury. The Lit Def emails revealed the following:

On January 11, 2022, Blust sent Gallagher an email with "going forward" instructions wherein he indicated that any new file coming in after 2/1/22 would be worked on by "this new team." Blust then told Gallagher how employees' weekly compensation should be divided between Fidelis and Lit Def.[17] Blust suggested telling attorneys that Fidelis is a "new company working files but same personnel." Christo was not included in the discussion. (Dkt. No. 237-3)

On January 11, 2022, Blust sent Gallagher a list of law firms that would be "moving" to Fidelis. Blust told Gallagher to "get everyone moving over [to Fidelis] new login/passwords for lit def software so they can continue to work just under Fidelis, etc. Should be that simple." Blust further stated "I don't want Charles [the managing director of a vendor] asking for a contact for Fidelis – so, same people different name if he asks[.]" Gallagher responded with suggestions to Blust as to which employees to "move." Christo was not included in the discussion  (Dkt. No. 237-4)

Gallagher sent Blust weekly employee productivity reports for both Lit Def and Fidelis employees for years. (Dkt. No. 237-5) There is no indication a similar report was provided to Christo. (Dkt. No. 576, pg. 13)

Blust periodically instructed Gallagher to "move" employees between Lit Def and Fidelis payrolls. (Dkt. No. 237-6; Dkt. No. 237-12)

Blust determined the 2022 and 2023 bonus amounts for all Lit Def and Fidelis employees, apparently without Christo's involvement. (Dkt. No. 237-10; Dkt. No. 237-14)

After the Court issued the TRO and the Receiver entered StratFS's offices, Blust instructed Gallagher to make sure there would be no communication with Strategic, and Gallagher passed this message along to Fidelis's employees, including Rosenberg. (Dkt. No. 576, pgs. 13-14)

---

[17] Blust told Gallagher to pay the transitioned employees "a nominal amount" from Fidelis, "[i]deally…$1,000 a month," and to pay the remainder from Lit Def but gradually increase the proportion of their pay that Fidelis would cover ("eventually it moves to 100% for Fidelis"). (Dkt. No. 237-3)

Blust complained that Fidelis employees Hayfa Zayad and Kisten Power had decreased work productivity.[18] (Dkt. No. 27-5)

Blust and Gallagher discussed hiring a new Fidelis employee to work only on Fidelis files, and not on Lit Def files, without including Christo in the conversation. (Dkt. No. 270-6)

Gallagher told an HR manager to pay Zayed a bonus "from Fidelis" and included Blust on the email, but did not include Christo. (Dkt. No. 270-7)

Blust set Fidelis's holiday schedule. (Dkt. No. 270-9)

On May 23, 2024, the Court heard oral argument addressing the Receiver's contempt motion and Fidelis' motion challenging the receivership designation, at which time the Court determined that an evidentiary hearing was necessary to address the contempt motion. The Court ordered that Fidelis provide discovery to the Receiver, including emails. The Receiver's review of that discovery produced more evidence that Blust exercised control over Fidelis:

A text message from Gallagher to Christo regarding an apparent falsehood they agreed to tell a vendor: "[The vendor] doesn't know about fidelis because [Blust] doesn't want him to… Essentially the messaging is that we want to create 2 separate paralegal teams." (Dkt. No. 606-3 at 3)

An email from Gallagher to Christo, in which Gallagher stated she needed to check with Blust regarding Fidelis work assignments. (Dkt. No. 606-4)

An email exchange showing Blust determined Fidelis's December 2022 employee bonuses and communicating them to Gallagher; Gallagher then asked Christo to enter the bonuses Blust set "on website," referring to Fidelis's payroll account. (Dkt. No. 606-5)

In response to the Receiver's production of these emails, Christo and Gallagher submitted supplemental declarations, again under penalty of perjury. (Dkt. Nos. 320-1; 320-3) Both attempted to downplay the apparent contradictions between their prior

---

[18] In his first declaration, Christo insisted that he had personally hired two Fidelis employees, Hayfa Zayed and Kristen Powers, and that these individuals had never been employed by Lit Def. (Dkt. No. 190-4, ¶ 26, ¶ 40)

declarations and the documentary evidence discovered by the Receiver. Christo stated that the emails "viewed in isolation, do not reflect the reality at Fidelis." (Dkt. No. 320-1, ¶ 5) With regard to emails where Blust told Gallagher how much bonus to pay to Fidelis employees, Gallagher stated that she "cannot recall why [Blust] sent those or what [she] thought at the time." (Dkt. No. 320-3, ¶ 6)

The Receiver also discovered additional information about the $750,000 "technology" payment from StratFS to Fidelis, which Christo claimed, in his first two declarations, was compensation he received from StratFS for vetting a software program. The Receiver's search of StratFS emails revealed no evidence of engagement with Fidelis for work during this time period. (Dkt. No. 622, pg. 16) The Receiver found no evidence of a contract, deliverables, or correspondence as to any consulting services or software "vetting" by Christo. (*Id*.) In addition, Brian Reiss, StratFS's former Senior Vice President of Technology and Data Security, stated, in a sworn declaration, that he had no knowledge of Christo, Fidelis, or any IT contractor performing the work described by Christo. (Dkt. No. 576-11) Moreover, the Receiver uncovered evidence indicating that the $750,000 was actually intended as reimbursement to Blust, from Strategic, for half of a $1.5 million dollar settlement reached with Daniel Rufty, an attorney formerly associated with one of the law firms controlled by Blust, that was paid via Lit Def.[19] (Dkt. No. 576, pgs. 28-32; Dkt. No. 576-7; Dkt. No. 576-9 at 2)

---

[19] In 2020, Rufty was suspended from the practice of law by the North Carolina State Bar for, *inter alia*, aiding and abetting the unauthorized practice of law by Carolina Client Services, LLC ("CCS"), a StratFS subsidiary. (Dkt. No. 576, pg. 29) The Bar found that while Blust arranged for Rufty to be the owner of the law firm, Blust had also arranged for 97% of the profits received by Rufty to be transferred to Blust and another out-of-state attorney as "consultant fees." (*Id*.) In 2021, Rufty and his firm filed an arbitration demand against CCS alleging, *inter alia*, that CCS was engaging in the unauthorized practice of law. (*Id*.) Rufty later filed a lawsuit in the Western District of North Carolina against Blust and Lit Def. *See Daniel Rufty Legal, PLLC v. Jason Blust, et al.*, W.D.N.C., Case No. 3:21-cv-191. These various actions were globally settled by Rufty, Blust, Lit Def, and StratFS in 2021. (*Id*.)

### *Evidentiary Hearing*

An evidentiary hearing addressing the Receiver's contempt motion against Blust and Lit Def was held, before this Court, on January 23 and 24, 2025. Katherine Rosenberg, Jason Blust, Cameron Christo, and Michelle Gallagher were all called as witnesses. When questioned on direct examination, Blust, Christo, and Gallagher all invoked their Fifth Amendment privilege against self-incrimination in response to every question asked of them.

#### *Jason Blust Testimony*

Blust was asked if it was correct that he arranged with Christo to establish Fidelis in 2021 to replace Lit Def, as an entity to support Blust's law firms, in part because Blust and his companies had been sued numerous times in 2019 and 2020. (Dkt. No. 622, Exh. 1, 40:14-21; 40:22-41:22) Blust was asked if, after Fidelis was formed, he began shifting litigation defense work from Lit Def to Fidelis. (*Id*. at 21:4-18) Blust was asked to confirm whether he determined which law firms associated with Strategic's debt-relief operation would stop being serviced by Lit Def and begin being serviced by Fidelis, and whether he controlled which law firms were assigned to which entity going forward. (*Id*. at 42:17-43:1; 16:16-25) Blust was asked to acknowledge that he instructed Gallagher to begin assigning Lit Def employes to Fidelis to assist with the law firms he had transferred to Fidelis, and that he later controlled whether and when employees worked for each entity. (*Id*. at 12:15-3:2; 43:2-9) Blust asserted his Fifth Amendment privilege in response to each of these questions.

Blust was questioned whether he or his law firm, Client First Bankruptcy, provided tablet computers to Lit Def employees, which those employees retained and

continued to use even after they began working on Fidelis files. (*Id.* at 47:20-48:14) Blust was asked to confirm that he controlled Fidelis, from the time of Fidelis' establishment in 2021, through the Court's entry of the TRO. (*Id.* at 12:5-9; 20:18-22; 20:23-21:2) Blust was asked to confirm that he exercised control over Fidelis beyond the entry of the TRO. (*Id.* at 46:20-25) Blust was asked if it was true that Fidelis is actually the successor to Lit Def. (*Id.* at 20:9-12) Blust asserted his Fifth Amendment privilege in response to each of these questions.

The Receiver further questioned Blust regarding his control over the compensation for Lit Def and Fidelis employees, including setting annual bonuses and pay raises, without the involvement of Christo. (*Id.* at 15:23-16:6; 44:12-45:13; 45:14-22; 45:23-46:3) Blust was asked if it was correct that he made the final decision as to whether to hire a Fidelis employee. (*Id.* at 17:11-15) Blust was asked to confirm that (1) Gallagher sent him, and not Christo, weekly employee production reports for Fidelis employees until January 2024; and (2) based on these production reports, he would instruct Gallagher to transfer employees from Lit Def to Fidelis, without consulting Christo. (*Id.* at 43:10-44:4; 44:5-11) Blust was asked to acknowledge that Christo was the owner of Fidelis in name only. (*Id.* at 18:21-19:1; 47:1-6) Blust was also questioned as to whether he received things of value from Christo and Fidelis. (*Id.* at 19:8-13) Blust asserted his Fifth Amendment privilege as to each of these questions.

The Receiver asked Blust to confirm that (1) Lit Def funded a $1.5 million settlement with attorney Daniel Rufty; and (2) Blust had an agreement with defendant Ryan Sasson, the owner of StratFS, that StratFS would reimburse Lit Def for one half of the settlement amount. (*Id.* at 49:11-18; 49:19-24) Blust was asked to acknowledge that

(1) StratFS's payment of half the settlement was falsely portrayed, in company records, as a "tech spend" to the law firms and (2) he directed StratFS to pay the $750,000 to Fidelis instead of to Lit Def. (*Id*. at 49:25-50:4; 50:11-17) Blust was asked if it was true that, even though Christo submitted invoices, Christo provided no services, consultation or "vetting" of software for StratFS. (*Id*. at 51:4-9) Blust was asked to confirm that a "Lit Def asset of $750,000 was thereby transferred to fidelis." (*Id*. at 50:24-51:3) Blust asserted his Fifth Amendment privilege in response to each of these questions.

Blust was asked to acknowledge that he concealed his control of Fidelis from the Receiver and the parties to the lawsuit. (*Id*. at 47:7-12) Blust was asked if it was true that he knowingly violated the TRO by continuing to operate Lit Def after having knowledge of the TRO. (*Id*. at 57:10-15) Blust was asked if it was true that he knowingly violated the TRO by also continuing to operate Fidelis. (*Id*. at 57:24-58:5) Blust was asked if it was true that he knowingly violated the TRO by submitting false testimony in order to conceal his control of Fidelis and prevent the Receiver from taking control of assets of the receivership. (*Id*. at 58:6-15) Blust asserted his Fifth Amendment privilege in response to each of these questions.

### *Cameron Christo Testimony*

Christo was asked to confirm that (1) Blust controlled whether former Lit Def employees worked at Fidelis; (2) Blust made all compensation decisions for Fidelis; and (3) Blust made all hiring and staffing decision for Fidelis. (Dkt. No. 622, Exh. 2 at 26:17-19; 37:22-38:16) Christo was asked if it was correct that he was not involved in overseeing Fidelis' day-to-day operations, and that Blust and Gallagher actually oversaw daily operations. (*Id*. at 30:10-12; 30:13-32:24; 32:25-34:10) Christo was asked

to acknowledge that he was head of Fidelis in name only, and that Blust actually controlled Fidelis. (*Id.* at 40:24-41:2; 41:3-7) Christo was asked to acknowledge that his statement, in his declaration, that Fidelis was his company and that he funded it and founded it, was false. (*Id.* at 73:13-74:2) Christo asserted his Fifth Amendment privilege in response to each of these questions.

Christo was asked to admit that the following statements in his declaration were false: (1) Blust exercised no control over Fidelis, (2) Blust made no decisions for Fidelis; and (3) Blust had no role in the running of Fidelis' business. (*Id.* at 71:13-72:1) Christo was asked to acknowledge that Blust provided Fidelis with all of its clients, most of its employees, and the "infrastructure for Fidelis to operate." (*Id.* at 60:19-73:2) Christo was asked to confirm that (1) he did not bring in any new law firms to Fidelis; and that (2) all of the law firms serviced by Fidelis were controlled by Blust. (*Id.* at 20:23-21:2; 21:3-7) Christo was asked if it was true that, directly contrary to the statements in his declaration, Fidelis was Lit Def's successor. (*Id.* at 17:22-18:1; 20:18-22; 72:13-73:2) Christo asserted his Fifth Amendment privilege in response to each of these questions.

Christo was asked to confirm that he was never actually hired by StratFS to perform any vetting of a software platform. (*Id.* at 63:19-23) Christo was further asked to acknowledge that, contrary to the assertions in his declarations, he did not perform any work for Strategic in exchange for the $750,000 payment that was transferred to Fidelis. (*Id.* at 42:6-43:9; 63:4-18; 64:16-22) Christo was also asked to acknowledge that his statement, in his declaration, that "Lit Def never transferred any asset, right, duty, obligation or liability to Fidelis," was false. (*Id.* at 72:2-12) Christo was asked to confirm

that he never actually funded Fidelis' operation.[20] (*Id.* at 70:7-10) Christo asserted the Fifth Amendment privilege in response to each of these questions.

*Michelle Gallagher Testimony*

Gallagher was asked if she and Blust jointly made hiring and firing decisions at Fidelis. (Dkt. No. 622, Exh. 1 at 87:11-15) Gallagher was asked if it was true that she sent Blust file submission reports from both Lit Def and Fidelis until at least January 8, 2024, and that Blust used those reports to decide whether to move certain Lit Def staff to Fidelis. (*Id.* at 88:9-13; 89:5-10; 99:14-18) Gallagher was asked whether it was true that Blust controlled the bonuses and salaries of Fidelis employees, including her own. (*Id.* at 89:21-25; 90: 1-5; 90: 16-21; 90:22-91:2; 102:15-21) Gallagher was asked to confirm that Blust did not consult Christo in making these decisions. (*Id.* at 103:4-1; 103:12-16; 90:11-15) Gallagher asserted the Fifth Amendment privilege in response to every question.

Gallagher was asked whether it was true that in January of 2022, Blust told her which employes to switch over to Fidelis' files and payrolls, without consulting Christo, and that Blust directed her as to how to split the employees' compensation between Fidelis and Lit Def. (*Id.* at 10:22-102:3; 102: 4-9) Gallagher was asked if it was true that Blust periodically transferred employees from Lit Def to Fidelis without consulting with Christo. (*Id.* at 103:24-104:4) Gallagher was asked to confirm that she regularly brought Fidelis matters to Blust's attention and that statements to the contrary, made in her declaration, were false. (*Id.* at 105:3-7; 105:8-18) Gallagher asserted the Fifth Amendment privilege in response to each of these questions.

---

[20] It is the Receiver's position, based on the evidence he uncovered, that it may be inferred that the $750,000 payment directed by Blust, to Fidelis, in October 2021 through July 2022, the time period when Fidelis was starting operations, provided the initial funding for the company. (Dkt. No. 622, pg. 30, n. 13)

Gallagher was asked to confirm that Lit Def employees were provided computers associated with Client First Bankruptcy, a Blust law firm, and that employees kept those same computers when they moved from Lit Def to Fidelis. (*Id.* at 105:24-106:16) Gallagher was asked if it was correct that Fidelis did not pay for those computers. (*Id.* at 105:24-106:16; 106:20-23) Gallagher was asked to confirm that Fidelis provided the same services using the same software as Lit Def, and that the companies had mostly the same employees. (*Id.* at 76:3-12; 82:24-83:3) Gallagher was asked to confirm that Blust instructed her to conceal Fidelis' existence from one of the vendors used by Fidelis and Lit Def, and to tell the vendor that Fidelis was the "same people, different name" as Lit Def. (*Id.* at 84:2-7; 84:8-13; 84:14-19) Gallagher was asked if Fidelis and Lit Def were interchangeable. (*Id.* at 96:3-7; 101:14-21) Gallagher was asked if it was correct that the entirety of Fidelis' revenue was generated through law firms controlled or owned by Blust. (*Id.* at 85:21-86:1) Gallagher asserted her Fifth Amendment privilege in response to each of these questions.

Gallagher was asked if she was aware that Blust continued to be involved in the operation of Fidelis after entry of the TRO. (*Id.* at 91:3-8; 91:14-19; 91:20-25) She was asked to confirm that Blust emailed her account login information of employees after entry of the TRO, and that he instructed her as to how Fidelis employees could continue to work with StratFS after entry of the TRO. (*Id.*) Gallagher was asked to confirm that the statement she provided in her declaration, namely that Blust had no role in Fidelis' operation and exercised no control over the running of Fidelis' business, was untruthful. (*Id.* at 100:22-101:8) Gallagher invoked her Fifth Amendment privilege in response to each of these questions.

### Katherine Rosenberg Testimony

Rosenberg testified, in a consistent mater, about many of the same facts set forth in her prior declaration. Rosenberg testified that she is a paralegal and that she applied to a job posting in August of 2021. (Dkt. No. 595, pgs. 112-13) She received a call for an interview with Fidelis. (*Id*. at 113) She interviewed with Michelle Gallagher and was hired to work for Lit Def as a support specialist/legal assistant. (*Id*. at 113-114) Rosenberg worked remotely and was provided a Microsoft Surface tablet. (*Id*. at 114-15) Her login name was associated with Client First Bankruptcy. (*Id*.) Around February of 2022, Rosenberg was told by Gallagher that Lit Def employees would be "moving over" to a new company, and Gallagher explained the change was "like a merger." (*Id*. at 121-22) Employees were told that all of their day-to-day work would remain the same. (*Id*.) Rosenberg was not given a choice as to whether to stay with Lit Def or begin working on files with the new company. (*Id*. at 124)

After Rosenberg began working on Fidelis files, her managers remained the same and there were no changes to her day-to-day work activities. (*Id*. at 127, 157) Rosenberg received no new or additional training from Fidelis (*Id*. at 129) She never interviewed with Christo and met him only one. (*Id*. at 130) Fidelis did not send her any new technology or a new computer; she used the same software programs as she used at Lit Def; and she continued using her Client First Bankruptcy login as she had done with Lit Def. (*Id*. at 128-29, 139-40, 159) Rosenberg testified that employees were told that if an email associated with a Fidelis file was sent to their Lit Def email address, they were to copy and paste the message to a Fidelis email, in order to make it a "clean" email. (*Id*. at 127)

Rosenberg testified that, in the beginning of the transition, when she worked on files associated with Lit Def and files associated with Fidelis, she was paid $1,000 from Lit Def, and the remainder of her paycheck was paid by Fidelis. (*Id.* at 124) Rosenberg did not believe this payment structure was a fair or accurate representation as to how she divided her time between Lit Def and Fidelis files. (*Id.* at 124, 129) She did not keep separate timesheets for Lit Def and Fidelis. (*Id.* at 130) Instead, submitted a list of her working hours with no differentiation between the time she spent on Fidelis matters and the time she spent on Lit Def matter. (*Id.* at 130, 158)  Eventually, Rosenberg worked on Fidelis files only. (*Id.* at 143) In January of 2024, Rosenberg was told that "something big was going on in New York" and that she should log the work she had been doing on files on spreadsheets. (*Id.* at 147-48) Rosenberg discovered the TRO through an internet search. (*Id.* at 149) Gallagher asked Rosenberg to reach out to attorneys associated with the files she had been working on and Rosenberg said she was not comfortable doing so because of the TRO. (*Id.* at 150) Gallagher indicated that she would reach out to the attorneys herself. (*Id.*)

### Credibility

After having the opportunity to listen to the in-person testimony of Katherine Rosenberg and observe her demeanor during the evidentiary hearing, the Court finds her to be wholly credible. In addition, Rosenberg's testimony was consistent with her prior declaration and was corroborated by the Lit Def and Fidelis internal communications discovered by the Receiver. Thus, the Court credits Rosenberg's hearing testimony as well as the statements in her declaration.

The Court finds Jason Blust, Cameron Christo, and Michelle Gallagher not credible. The declarations filed by these individuals, stated under penalty of perjury, were wholly contradicted by the internal Lit Def and Fidelis email and text message communications found by the Receiver. These communications, authored by Blust, Christo, and Gallagher themselves, were exchanged contemporaneously to the events at issue here and were corroborated by the declaration and testimony of Rosenberg. When questioned, during the evidentiary hearing, about the apparent falsities in their declarations, Blust, Christo, and Gallagher each invoked their Fifth Amendment privilege against self-incrimination in response to every questioned asked.[21] Thus, the Court does not credit any statements in the Blust, Christo, or Gallagher declarations and does not find any of these individuals to be credible declarants or witnesses. Further, the Cour finds that the declarations filed by Blust, Christo, and Gallagher contained material false statements.

## CONCLUSIONS OF LAW

### ***Adverse Inferences***

Unlike in a criminal proceeding, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)). Thus, where parties or material witnesses invoke their Fifth Amendment right against self-incrimination in response to questions, the Court has broad discretion to draw adverse inferences that the testimony those witnesses would

---

[21] In its Conclusions of Law, the Court discusses the adverse inferences it has drawn as a result of Blust, Christo, and Gallagher's assertions of the Fifth Amendment privilege during the evidentiary hearing.

have offered would not have been favorable to them. *See SEC v. Martino*, 255 F. Supp 2d 268 (S.D.N.Y. 2003) (litigants denied discovery based upon an assertion of the privilege against self-incrimination may ask the court or trier of fact to draw a negative inference from the invocation of that right). Moreover, "[a]n adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *Libutti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999). Adverse inferences are properly admitted against parties where they are supported by other independent corroborative evidence. *See United States v. Inc. Village of Island Park*, 888 F. Supp. 419, 432 (E.D.N.Y. 1995).

The Court may also draw adverse inferences against parties based on the invocations of the Fifth Amendment by other parties in the case or non-parties, where there is some relationship or loyalty established between the witness and the other party. *LiButti*, 107 F.3d at 122. *See also Brinks' Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (adverse inference based on former employee's Fifth Amendment assertion); *Willingham v. County of Albany*, 593 F. Supp. 2d 446 (N.D.N.Y. 2006) (party's invocation of Fifth Amendment merited adverse inference as to another party where both parties' interests "have remained intertwined leading up to and continuing through this litigation"). "[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.* at 452-53 (internal citations omitted).

Here, Blust, Christo, and Gallagher all asserted their Fifth Amendment privilege with respect to every question asked during the evidentiary hearing. The majority of that questioning concerned apparent false statements, in these witnesses' prior declarations,

regarding (1) the establishment of Fidelis as a successor or continuation of Lit Def; (2) Blust's control over Fidelis' operations and personnel matters; (3) the overlap of Lit Def and Fidelis' employees, clients, vendors, and infrastructure; (4) Christo's apparent lack of participation in Fidelis' day-to-day operations; and (4) Blust's diversion of a $750,000 asset to Fidelis around the time of its creation. The Court therefore draws adverse inferences against these witnesses and finds that the testimony they would have offered, in response to the questions posed on these topics, would not have been favorable to them. Even more specifically, the Court finds that this testimony would not have been favorable to Blust and Lit Def's defense of the Receiver's request to hold them in contempt of the TRO, and Fidelis' opposition to the Receiver's designation.

Indeed, the record indicates a relationship or loyalty between these witnesses. They are all presently defendants or relief defendants in this action. Blust is Gallagher's former employer. Christo has an interest in preventing Fidelis from being named as a receivership defendant. Gallagher and Blust have an interest in showing that Fidelis was not created as a successor to, or continuation of, Lit Def. Gallagher and Blust also have an interest in showing that they did not operate Lit Def and/or Fidelis in violation of the TRO. Moreover, these adverse inferences are corroborated by independent evidence, including the contemporaneous, internal Lit Def and Fidelis communications discovered by the Receiver, as well as the credible declaration and testimony offered by Rosenberg.

### Fidelis is a Successor to Lit Def and is Controlled by Jason Blust

Based on the adverse inferences drawn from the testimony of Blust, Christo, and Gallagher, and the other evidence in the record, the Court finds that, in or around

January of 2021, Blust, with the help of Christo and Gallagher, established Fidelis in order for it to become a successor of Lit Def. The record suggests that Blust took these actions in light of increased litigation against Lit Def, and that Christo was named as Fidelis' owner and chief officer in order to conceal Blust's involvement with the new company. Less than one year after Fidelis was established, Blust diverted, to Fidelis, a $750,000 payment owed to him and Lit Def by StratFS. Blust and Christo concealed the true nature of this payment by falsely indicating that Christo had "vetted" a software program for StratFS.

Beginning in February of 2022, Blust directed which Lit Def employees would begin transitioning to Fidelis and which employees would remain at Lit Def. Blust directed how those shared employees would be paid by each company. Blust also directed how certain Lit Def files would be transitioned to Fidelis and which Lit Def law firms would become clients of Fidelis. Lit Def computers were transferred, at no cost, to Fidelis.

During the transition, Lit Def and Fidelis were interchangeable. Stated another way, they operated in parallel or as essentially one entity. They serviced the same law firms. The majority of these law firms were related to Strategic's debt-relief operation and most, if not all, were controlled by or connected to Blust.[22] Lit Def and Fidelis had

---

[22] Indeed, Christo's declaration stated that "approximately 40% of Fidelis' revenue comes from firms not involved in [this] litigation." (Dkt. No. 109-4, ¶ 23) Thus, Christo appears to acknowledge that more than half of the law firms supported by Fidelis were Blust-controlled law firms engaged in Strategic's debt-relief operation. Other evidence in the record corroborates this fact. (Dkt. No. 209-1, ¶ 10-13) In fact, between April 2022 and October 2023, Fidelis received an average of $823,996 per month from Blust-controlled law firms associated with Strategic's advance fee debt relief-operation, for a total of over $16 million in payments. (*Id.*) As to the 40% of outside revenue cited by Christo, the Receiver's research suggested that most the law firms noted by Christo, in this regard, still appeared to be connected to Blust, even if they did not engage in advance fee debt-relief. (Dkt. No. 212, pg. 16-23) For example, Christo referenced Turnbull, LLC, Turnbull NJ, and Turnbull SC. (Dkt. No. 190-4, ¶ 23) Evidence in the record shows that Blust had an email address with the Turnbull Law Group. (Dkt. No. 209-2, ¶ 15) Moreover, Lit Def,

substantially the same employees, engaged the same vendors, utilized the same software, and had the same operating procedures. Employees performing work for both companies did not keep separate time sheets or otherwise differentiate the work they performed for each entity when recording their work hours. Rosenberg credibly testified that after the transition, she worked on files for both Lit Def and Fidelis, and that she eventually worked on Fidelis files only. She credibly testified that Gallagher described the transition from Fidelis to Lit Def as a merger, and that employees were instructed that when they received an email to their Lit Def email address, they should copy and paste the content into a new email at their Fidelis email address, and remove all references to Lit Def. The totality of this evidence indicates that it was Blust's intention for Lit Def to essentially become Fidelis.[23]

The record also shows that Blust exercised control, in whole or in part, over Fidelis. He directed employee assignments and monitored employee productivity at Fidelis. Blust was directly involved in the hiring of Fidelis employees. He set the holiday schedule. He determined employee compensation and bonuses. When Gallagher, the manager of Fidelis, had questions regarding Fidelis' employees or operations, she regularly contacted Blust. The record further shows that Christo had minimal involvement in Fidelis' day-to-day operations, including personnel management, and

---

Turnbull Law Group, and the "Law Office of Jason Blust d/b/a Client First Bankruptcy" all shared, on paper, the same building address and office suits. (*Id.* at ¶¶ 16-18)

[23] The record here further reflects that Blust has a past pattern of changing the names of his litigation support companies, and then transitioning the law firms that he owns and/or controls to become clients of those newly named companies. Blust previously owned a litigation support company named Relialit. (Dkt. No. 9, Exh. 15, pgs. 17, 36-37) From March 2019 through January 2020, Relialit regularly received payments from the Blust law firms involved in the Strategic's debt-relief operation. (Dkt. No. 209-1, ¶ 8) In or around 2019, these law firms shifted their work to Lit Def. Between December 30, 2019 and March 30, 2021, the Blust law firms paid over $30,000,000 to Lit Def. (*Id.* at ¶ 9) Lit Def stopped receiving payments in or around March 2021. (*Id.* at ¶ 10) Beginning in December 2021, Fidelis started receiving payments from various Blust law firms affiliated with Strategic's debt-relief operation. (*Id.* at ¶¶ 10-13)

there is little evidence in the record that Christo generated any significant business for the company.

### *Fidelis is a Receivership Defendant*

The TRO named Lit Def, as well as its "subsidiaries, affiliates, successors, and assigns" as receivership defendants. (Dkt. No. 12, pg. 9) The TRO also defined receivership defendants to include "any other business related to the Defendants' debt-relief services and which the…Receiver has reason to believe is owned or controlled in whole or in part by any of the Defendants, and includes fictitious names under which they do business." (*Id*. at 8) These definitions of receivership defendants remain the same in the PI issued by this Court on March 4, 2024. (Dkt. No. 184, pg. 8)

Fidelis meets the definition of a receivership defendant under both the TRO and the PI. For all of the reasons just stated, the Court finds that Fidelis is a successor and assign of Lit Def. Also for the reasons just stated, the Court finds that Fidelis is controlled, in whole or in part, by defendant Jason Blust, and that it is related to defendants' debt-relief services.[24] Thus, the Court orders that, consistent with the Receiver's designation, the receivership is expanded to include Fidelis Legal Support Services, LLC.

Fidelis previously argued that the Receiver does not have jurisdiction over it because the Receiver did not file copies of the complaint and an appointment order in Nevada, where Fidelis is registered, or in Illinois, where Fidelis' assets are located. The Court rejects this argument. Fidelis is a defendant in this lawsuit and meets the

---

[24] As noted previously, the record indicates that approximately 50% or more of the law firms serviced by Fidelis were related to Strategic's debt-relief operation. Much, if not all, of Fidelis' remaining business appears to involve law firms that were connected to Blust and engaged in debt settlement or debt litigation, even if those firms did not receive advance fees. This evidence is sufficient to show that Fidelis is related to defendants' debt-relief operation.

definition of a receivership defendant under the PI currently in place. Thus, it falls under the jurisdiction of the Court and the Receiver. Moreover, on January 22, 2024, the Receiver filed a Notice of Order Appointing Receiver Pursuant to 28 U.S.C. § 754 and a copy of the complaint in the Northern District of Illinois. (Dkt. No. 212, pg. 5, n. 1) On March 6, 2024, the Receiver filed a Notice of Order Appointing Receiver Pursuant to 28 U.S.C. § 754 and a copy the complaint in the District of Nevada.[25] (*Id.*)

### *Jason Blust and Lit Def Should be Found in Civil Contempt for Violating the TRO*

A court may hold a party in contempt for violation of an order "if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Where a court order requires or prohibits an action by a corporation, the order is also "in effect a command to those who are officially responsible for the conduct of its affairs." *Id.* at 100. Failure to comply with a TRO in a receivership justifies a contempt order. *See S.E.C. v. Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d 456, 459 (S.D.N.Y. 2001) (finding contempt for failure to turn over corporate assets to receiver in compliance with the TRO).

---

[25] Before it was named as a defendant, Fidelis argued that the Receiver must prove, by clear and convincing evidence, that it is a receivership defendant. The Receiver argued that this standard did not apply. Because Fidelis is now a defendant, this argument is largely moot. And even if it was not moot, there is clear and convincing evidence here that Fidelis qualifies as a receivership defendant. Fidelis also argues that there is no proof that Fidelis funnels or pays money to Blust. But such proof is not required for an entity to qualify as a receivership defendant under the terms of the PI. In its opposition, Fidelis submitted some emails where Christo is included in discussions of Fidelis' business operations and the hiring of an employee. However, these emails do not prove, in light of all the other evidence in the record, that Christo, and not Blust, directed the day-to-day operations of the company. Also, under the terms of the PI, the Receiver must prove that Fidelis is controlled, in whole *or in part*, by Blust. This standard has easily been met. Stated another way, even if Christo had some involvement in Fidelis' operations, the evidence is more than sufficient to demonstrate that Blust still exercised substantial control over Fidelis.

Here, the TRO clearly and unambiguously prohibited Blust from transacting any business of either Lit Def or any other receivership defendant. Blust represented to the parties, the Court, and the Receiver that Lit Def ceased operations upon entry of the TRO on January 11, 2024. However, clear and convincing evidence, including the email communications discovered by the Receiver, shows that Lit Def continued to operate at least through January 2024, and possibly for some period of time into February 2024, without the Receiver's authorization and in violation of the TRO. Indeed, Blust and Lit Def admit that Lit Def continued to operate on a "limited basis" after the entry of the TRO. (Dkt. No. 210, ¶ 29) Moreover, these email communications involved the use of Fidelis email addresses by Gallagher and others. The evidence before the Court further shows that Fidelis, a receivership defendant controlled in whole or in part by Blust, was acting as an assign or successor of Lit Def both before and after the entry of the TRO. Thus, Blust and Lit Def violated the TRO by continuing to operate Lit Def's business, both directly through Lit Def, and indirectly through the use of Fidelis, following the entry of the TRO.

The TRO also clearly and unambiguously required Blust and Lit Def to provide the Receiver with any information necessary for the Receiver to identify and recover assets of the receivership estate. The TRO required Blust and Lit Def to notify the Receiver of any receivership assets, including those held in any other name. The TRO further required Blust and Lit Def to cooperate with the Receiver, and prohibited Blust and Lit Def from taking any action that would interfere with the Receiver's ability to take control of any assets subject to receivership. Here, the Receiver has put forth clear and convincing evidence that Blust and Lit Def violated these requirements by failing to

33

disclose the existence of Fidelis as well as its obvious connection to the receivership estate both as a successor and/or an assign of Lit Def as well as an entity owned or controlled, in whole or in part, by Blust, that was related to defendants' debt-relief operation.

Moreover, Blust and Lit Def's conduct, in violation of the TRO, went beyond a mere failure to disclose the existence of Fidelis. The record shows that once the Receiver himself discovered Fidelis and its likely connection to Blust and Lit Def, Blust refused to cooperate with the Receiver by providing truthful information regarding his own involvement with Fidelis and Fidelis' apparent connection to the receivership estate. Instead, Blust steadfastly denied that he had any interest in, or control over, Fidelis. Blust also steadfastly denied that Fidelis was, in any manner, a proxy, assign, or successor to Lit Def. To that end, Blust, together with Christo and Gallagher, went to significant lengths to hide Blust's involvement with, and control over, Fidelis, as well as Fidelis' significant connections to Lit Def. These lengths included filing multiple declarations with the Court, under penalty of perjury, that have now been determined to contain material falsities.[26] Thus, the Court finds that not only did Lit Def and Blust violate the TRO, but that they did so in a knowing and willful manner.[27]

---

[26] Blust argues that his declaration cannot serve as a basis for a finding of contempt since no separate pleading has been filed seeking to hold him in contempt of Court, based specifically on his filing of a false declaration. While the Court has determined that Blust's affidavit contained material false statements, the recommendation of contempt is not based upon Blust's filing of the declaration. Instead, the Court recommends that Blust be found in civil contempt based upon his violation of the TRO. The declaration, which Blust filed in attempt to avoid disclosing his involvement with Fidelis and in attempt to prevent Fidelis' inclusion in the receivership estate, is evidence that Blust violated the TRO.

[27] Blust's failure to cooperate with the Receiver began while the TRO was still in effect and continued after the PI was entered on March 3, 2024. Indeed, Blust, Christo and Gallagher's declarations denying Blust's involvement with Fidelis were filed after the entry of the PI. Thus, while some of the conduct discussed here occurred after the TRO ended, the Court finds it is all relevant conduct in assessing Blust and Lit Def's initial violation of the TRO, insofar as that conduct was in furtherance of the initial TRO violations. Moreover, the PI contained all the same requirements as the TRO with regard to cooperation with the

### *Recommended Sanction*

"Civil contempt fines seek one of two objectives. One is coercion—to force the contemnor to conform his conduct to the court's order. The second is compensation. Where the contumacious conduct has caused injury to the beneficiary of the court's order, a civil fine may be imposed on the contemnor to compensate the victim for the loss or harm caused by the unlawful conduct." *New York State Nat'l Org. for Women v. Terry, 159 F.3d 86, 93 (2d Cir. 1998). See also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir. 1989) ("monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience"). Courts are authorized to assess attorney's fees where the contempt was willful. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45 (1991).

The Receiver has requested that Blust and Lit Def be assessed a fine of $1,000 per day during the period of non-compliance, which dates back to shortly after January 11, 2024. However, the parties appear to agree, and the record appears to indicate, that Lit Def ceased operating, at the latest, in January or February of 2024. While Fidelis continues to operate, the parties appear to agree that Fidelis does not currently service any law firms that collect advance fees from consumers in exchange for debt-relief.[28] There is no evidence in the record that Blust is currently transacting any business on behalf of Fidelis. The Receiver argues that Blust and Lit Def remain in contempt

---

Receiver, disclosure of assets, and the prohibition of transacting any business of any receivership defendant.

[28] During oral argument, the parties discussed the fact that the law firms which Fidelis currently supports engage in contingency fee debt-relief. Moreover, the Receiver indicated that to the extent consumers previously enrolled in Strategic's debt-relief services are involved in litigation with creditors, the Receiver has been using Fidelis' litigation support service with regard to those litigations, in order to minimize any harm to consumers.

because, as a result of their actions, Fidelis continues to operate outside of the receivership estate. However, the Court has determined herein that Fidelis is a receivership defendant. Therefore, it will now be under the control of the Receiver and part of the receivership estate going forward. For these reasons, there does not appear to be an ongoing need to coerce compliance by Blust or Lit Def. Thus, the Court declines to recommend that the District Court impose a daily fine.

However, the Court finds that Lit Def and Blust's violation of the TRO caused injury to receivership estate, including forcing the Receiver to expend substantial money and time in (1) bringing the instant contempt motion; and (2) defending the related motion by Fidelis challenging his conclusion that Fidelis is a receivership defendant. Thus, the Court recommends that the District Court require Blust and Lit Def to pay all attorney's fees and costs of the Receiver associated with both motions.[29]

The Receiver also requests that, with respect to a contempt remedy, the Court issue an order "requiring Lit Def and Blust to cooperate immediately and completely with the Receiver, including turning over to the Receiver all Assets and corporate records of Fidelis and turning over control of all business operations of Fidelis to the Receiver, and providing a complete financial accounting of Fidelis, including all transfers to third parties." As noted previously, the Court has determined that Fidelis qualifies as a receivership defendant under the PI. Thus, Fidelis will now be required to comply with

---

[29] Blust argues that any award of attorney's fees should end as of May 23, 2024, because the Receiver informed the Court, on that date, that he did not believe there was any ongoing contempt. The Court rejects this argument. Blust, Christo, and Gallagher took significant action to hide Blust's involvement in Fidelis, in an apparent attempt to undermine the Receiver and keep Fidelis out of the receivership estate. Their actions involved the filing of false declarations, which resulted in extended filings with the Court and an evidentiary hearing. At no time during these proceedings has Blust admitted his involvement with Fidelis nor has he admitted that Fidelis should properly be included in the receivership estate. Thus, the Court finds that Blust and Lit Def should be obligated to make the receivership whole for all expenses incurred in regard to both the contempt motion and the motion practice necessary to designate Fidelis as a receivership defendant.

the PI in all respects. To that end, Fidelis must, *inter alia*, turn over the control of its business operations to the Receiver and disclose to the Receiver all of its corporate records and financial accountings. Therefore, this request for a remedy, insofar as it is made based on the contempt motion, is moot.

### *Referral to the United States Attorney's Office*

"Perjury goes to the very heart of the fair administration of justice [and] no legal system can long remain viable if lying under oath is treated as no more than a social solecism." *United States v. Cornielle*, 171 F.3d 748, 753 (2d Cir. 1999). "Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. . . . Congress has made the giving of false answers a criminal act punishable by severe penalties." *United States v. Mandujano*, 425 U.S. 564, 576 (1976).

As discussed at length previously, the Court finds that the declarations filed with the Court by Jason Blust, Cameron Christo, and Michelle Gallagher contained material false statements. (Dkt. Nos. 211; 190-4; 233-1; 233-5; 320-1; 320-3) The Court bases these finding on the documentary evidence submitted by the Receiver over the course of these proceedings. The Court also bases these findings on all of the testimony and evidence entered at the evidentiary hearing, including the credible testimony of Katherine Rosenberg and the adverse inferences drawn as to Blust, Christo, and Gallagher's testimony. The declarations submitted by Blust, Christo, and Gallagher were made under penalty of perjury, pursuant to 28 U.S.C. § 1746. Thus, the Court further recommends that the District Court refer the conduct of Blust, Christo, and Gallagher to the United States Attorney's Office for the Western District of New York for investigation

and, if appropriate, prosecution for perjury pursuant to 18 U.S.C. § 1621, 18 U.S.C. § 1623, or any other criminal statute as may be deemed applicable by that office.

## CONCLUSION

For the foregoing reasons, it is recommended that the Receiver's motion for an order to show cause as to why defendants Lit Def Strategies, LLC and Jason Blust should not be held in civil contempt be granted (Dkt. No. 179), and it is recommended that the District Court issue a finding of civil contempt against Lit Def Strategies, LLC and Jason Blust. It is further recommended that the District Court require Lit Def Strategies, LLC and Jason Blust to pay all attorney's fees and costs associated with the Receiver's motion for contempt and the Receiver's defense of Fidelis' motion challenging its designation as a receivership defendant. It is also recommended that the District Court refer the conduct of Jason Blust, Cameron Christo, and Michelle Gallagher to the United States Attorney's Office for the Western District of New York for investigation and, if deemed appropriate, the filing of criminal charges for perjury. It is ordered that the receivership be expanded to encompass Fidelis Legal Support Services, LLC, and Fidelis' motion challenging such designation (Dkt. No. 190) is denied.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to the recommendation portion of this Report, Recommendation, and Order must be filed with the Clerk of Court within fourteen days of service of this Report, Recommendation, and Order in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal

Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72.  Any requests for an extension of this deadline must be made to Judge Wolford.

**_Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER._**  See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. See  Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

Dated:        March 24, 2025
              Buffalo, New York

MICHAEL J. ROEMER
United States Magistrate Judge