UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al.*,

        Plaintiffs,

   v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), *et al.*,

        Defendants, and

DANIEL BLUMKIN, *et al.*,

        Relief Defendants.

24-CV-40 (EAW) (MJR)

---

# MEMORANDUM IN SUPPORT OF DEFENDANT FIDELIS LEGAL SUPPORT SERVICES, LLC'S <u>MOTION FOR A STAY</u>

**HOOVER & DURLAND LLP**
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*

*Attorneys for Defendant Fidelis
Legal Support Services, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

FACTS ............................................................................................................... 3

    A.   Fidelis's business. ................................................................. 3

    B.   The Complaint. ..................................................................... 4

    C.   The TRO and Preliminary Injunction. ................................. 7

    D.   The Receiver attempts to extend the Preliminary Injunction to cover nonparty Fidelis Legal Support Services, LLC. ................................ 8

    E.   Fidelis continues to lawfully operate, to receive new requests for litigation-support services from Strategic/the Receiver, and to provide support services on contingent-fee cases for unrelated law firms. ................................ 9

    F.   The fate of the law firm debt-relief program, post-TRO. ........................ 10

    G.   Plaintiffs file a Second Amended Complaint, and Judge Roemer attempts to broker a settlement. ................................ 11

    H.   Plaintiffs move for a preliminary injunction against Fidelis in November 2024, and Judge Roemer presides over a hearing on that motion in late January 2025, but does not conduct a hearing on Fidelis's motion challenging the receivership defendant designation. ................................ 12

    I.   On March 26, 2025, a decision is entered that Fidelis qualifies as a Receivership Defendant. ................................ 16

ARGUMENT ..................................................................................................... 18

I.   JUDGE ROEMER'S DECISION ADDRESSED A DISPOSITIVE MOTION, SO IT CANNOT BE ENFORCED UNLESS AND UNTIL A DISTRICT JUDGE RATIFIES IT FOLLOWING OBJECTIONS. ................... 18

II.   EVEN IF JUDGE ROEMER'S DECISION WERE IMMEDIATELY ENFORCEABLE, ENFORCEMENT SHOULD BE STAYED. .......................... 20

    A.   Fidelis's objections are likely to succeed because the mechanism used to subject Fidelis to the Injunction violates longstanding Second Circuit precedent. ................................ 21

    B.   Absent a stay, Fidelis is likely to suffer the partial or total destruction of its business. ................................ 25

C.     Granting a stay does not prejudice anyone, since the Receiver has consented to Fidelis operating outside his control for the past year ...... 26

D.     The public interest favors a stay, since the service Fidelis provides helps consumers. ....................................................................................... 26

CONCLUSION ................................................................................................................ 27

## **INTRODUCTION**

On March 4, 2024, after conducting a two-day hearing, Hon. Michael J. Roemer issued a preliminary injunction under Federal Rule of Civil Procedure 65. (Dkt. 184 (the "Injunction" or "Preliminary Injunction").) The Injunction imposed numerous restrictions and obligations on the named parties, and subjected them to the control of Receiver Thomas W. McNamara. Fidelis Legal Support Services, LLC was not a party to the preliminary-injunction hearing or the action, Judge Roemer made no findings as to Fidelis, and Fidelis was not named in the Injunction.

On March 26, 2025, however, the Clerk entered[1] an Order issued by Judge Roemer finding that Fidelis too is bound by the Injunction, and subject to the Receiver's absolute control, because Fidelis is controlled "in whole or in part" by one of the parties named in the Injunction, and is a successor to one of the parties named in the injunction. (Dkt. 646 (the "Decision").) Fidelis will file objections to the Decision by April 9, 2025.

Fidelis moves the Chief District Judge to declare that the Decision is, in fact, a report and recommendation that does not take effect until reviewed and decided by the District Court following objections, and/or, to enter an administrative stay while this motion is considered and then to stay the Decision, such that it is not enforced, until Fidelis's forthcoming objections are resolved.

First, though the Decision is cast as a final ruling, magistrate judges have no authority to award "injunctive relief," 28 U.S.C. § 636(b)(1)(A), or the functional equivalent of injunctive relief. The Decision does precisely that when it adds Fidelis to the list of entities bound by the Injunction. Thus, the Decision must be considered a mere recommendation, which is not enforceable unless and until it is adopted by a district judge.

---

[1]    The Decision is dated and signed March 24, 2025, bears a manual filing stamp from the Clerk's Office of March 25, 2025, but was not entered and transmitted to the undersigned counsel via CM-ECF until today, March 26, 2025.

Second, even if Judge Roemer had the authority to issue a ruling awarding injunctive relief, Fidelis still has the right to appeal his Decision to the Chief District Judge, and Fidelis will be exercising that right in short order. Until Fidelis's appeal is resolved, the Decision should be stayed, per the four-factor test set forth in *Nken v. Holder*, 556 U.S. 418 (2009).

(i) *Likelihood of success*. Fidelis's objections are likely to succeed because the Decision rests on a patent legal error. Plaintiffs who want a preliminary injunction must satisfy the stringent legal test used to determine whether this extraordinary remedy is justified. No such showing was ever made as to Fidelis, however, because the Injunction that Judge Roemer issued includes a mechanism for expanding the roster of enjoined parties *without* the need for a new motion and preliminary-injunction hearing. Instead, all this mechanism requires is a showing that the new entity is (or was) at least partially controlled by one of the parties already named in the Injunction. This short-cut device is unlawful. Under Rule 65(d) and a line of Second Circuit precedent stretching from 1930 to 2023, a non-party to a preliminary-injunction proceeding can be bound by the resulting injunction *only* if the non-party helps a named party circumvent *the named party's* obligations under the injunction (which all agree did not happen here).

(ii) *Prejudice to Fidelis*. Denying a stay, and allowing the Receiver to take over Fidelis, risks irreparable harm to the business. The Receiver lacks the expertise needed to run Fidelis, particularly since the company has already lost a key senior manager and two additional employees, and Fidelis's only paying client could take its business elsewhere if Fidelis is commandeered by a federal receiver.

(iii) *Prejudice to others*. Recent experience proves that granting a stay will not prejudice anyone. The attempt to bind Fidelis to the Injunction began in February 2024. Since that time, while Judge Roemer heard and considered the parties' competing positions, Fidelis continued to operate independently with the express consent of all concerned. There can be no credible complaint about maintaining the stand-still a bit longer.

(iv) *Public interest*. Everyone has agreed to Fidelis continuing regular operations because its business is wholly salutary. All Fidelis does is provide administrative support to law firms defending debtors against creditors' lawsuits. Indeed, the Receiver—who is prohibited from furthering any unlawful business practice—has continued sending work to Fidelis throughout the litigation before Judge Roemer. Allowing Fidelis's consumer-friendly business to continue only furthers the public interest. There is no emergency or illegality occurring at all. In fact, Magistrate Judge Roemer agrees that Fidelis continues normal operations, and that Blust has not currently involved in it:

> While Fidelis continues to operate, the parties appear to agree that Fidelis does not currently service any law firms that collect advance fees from consumers in exchange for debt-relief. There is no evidence in the record that Blust is currently transacting any business on behalf of Fidelis.

(Decision at 35.)  More specifically:

> During oral argument [on the Blust contempt motion and the preliminary injunction motion], the parties discussed the fact that the law firms which Fidelis currently supports engage in contingency fee debt-relief. Moreover, the Receiver indicated that to the extent consumers previously enrolled in Strategic's debt-relief services are involved in litigation with creditors, the Receiver has been using Fidelis' litigation support service with regard to those litigations, in order to minimize any harm to consumers.

(*Id.* at 35 n.28.)

Accordingly, the Court should issue an expedited order barring enforcement of the Decision pending resolution of Fidelis's objections.

## FACTS

### A.   Fidelis's business.

Fidelis is a Nevada LLC created by Cameron Christo in January 2021. (Dkt. 190-4 (Christo Decl.) ¶ 12; Dkt. 179-3 (Nevada business-information report); Dkt. 190-5 (Fidelis operating agreement).) Its sole owner is The Bush Lake Trust ("Bush Lake"). (Dkt. 190-4 (Christo Decl.) ¶ 14; Dkt. 190-6 (ownership transfer); Dkt. 190-7

(trust agreement).) Bush Lake's beneficiaries are Christo's two children and their descendants. (Dkt. 190-4 (Christo Decl.) ¶ 15.)

In basic terms, Fidelis provides administrative support to debt-settlement law firms. As the name implies, debt-settlement companies offer programs designed to help debtors reduce their debt. Debtors enrolled in such programs are sometimes sued by their creditors. (Dkt. 190-4 (Christo Decl.) ¶ 17.) When the debtor is served with a creditor's summons and complaint, the legal file comes to Fidelis, where a Fidelis legal assistant reviews the file to ensure it has everything an attorney will need to defend the suit. (*Id.* ¶ 18.) If so, the legal assistant assigns the file to a litigation attorney within the consumer's law firm. (*Id.*) If not, the legal assistant assembles the necessary material and then assigns the file. (*Id.*) Once a settlement is reached, the Fidelis legal assistant double-checks that the consumer has saved enough money to make the agreed-upon payments. (*Id.* ¶ 19.) If so, the legal assistant submits the settlement for processing. (*Id.*) If issues arise post-settlement, such as a missed payment, Fidelis will assist as needed and notify the assigned attorney. (*Id.*) Fidelis does not enroll consumers in debt-settlement programs or touch consumer money. (*Id.* ¶ 20.) It just helps law firms defend consumers who have been sued by creditors. (*Id.*)

Fidelis provides these services pursuant to month-to-month agreements with its law-firm clients. (*Id.* ¶ 21.) Generally speaking, debt-settlement law firms operate on one of two models: advance-fee models (where the firm gets paid up front) and contingency-fee models (where the firm receives a percentage of the sum the debtor saved). Fidelis works with both types of firms. (*Id.* ¶¶ 22-23.) Historically, about 40 to 50 percent of its revenue came from contingency-fee law firms. At present, all of its revenue comes from contingency-fee law firms.

**B.      The Complaint.**

On January 10, 2024, the Consumer Financial Protection Bureau ("CFPB") and three state attorneys general filed a complaint principally alleging violations of the Telemarketing Sales Rule ("TSR"). (Dkt. 1.) One section of the TSR, codified at 16 C.F.R.

§ 310.4, prohibits abusive telemarketing practices. Abusive telemarketing practices include charging advance fees[2] for a debt-relief service sold over the telephone, *id.* § 310.4(a)(5)(i), unless the fee is not paid "until after a face-to-face sales . . . presentation by the seller," *id.* § 310.6(b)(3). The Complaint alleged that a debt-relief business known as "SFS" collected advance fees in violation of § 310.4(a)(5)(i). (Dkt. 1.)

According to the Complaint, SFS was founded in 2016 by Ryan Sasson, Daniel Blumkin, and Albert Ian Behar. SFS's business consists of several corporate entities[3] and a number of "Client-Services Subsidiaries."[4] Ryan Sasson, along with one Jason Blust, also created various law firms, which, in partnership with SFS and the Client-Services Subsidiaries, provided debt-relief services to consumers.[5] The Law

---

[2]    Advance fees come in two varieties: fees taken before any of the consumer's debt has been settled, 16 C.F.R. § 310.4(a)(5)(i)(A)-(B), and fees taken after some of the consumer's debt has been settled, where the size of the fee is disproportionate to the total fee charged or the amount the consumer saved, *id.* § 310.4(a)(5)(i)(C). Because this distinction is immaterial to our motion, we refer to any fee defined in 16 C.F.R. § 310.4(a)(5) as an "advance fee," and we refer to any advance fee not subject to the face-to-face exemption set forth in 16 C.F.R. § 310.6(b)(3) as an "unlawful advance fee."

[3]    The corporate entities are StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Support, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Strategic Consulting, LLC; Versara Lending, LLC; and Strategic Family, Inc. (SAC ¶ 1.)

[4]    The client-services entities are Anchor Client Services, LLC; Bedrock Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Carolina Client Services, LLC; Great Lakes Client Services, LLC; Guidestone Client Services, LLC; Harbor Client Services, LLC; Heartland Client Services, LLC; Monarch Client Services, LLC; Newport Client Services, LLC; Northstar Client Services, LLC; Option 1 Client Services, LLC; Pioneer Client Servicing, LLC; Rockwell Client Services, LLC; Royal Client Services, LLC; Stonepoint Client Services, LLC; Summit Client Services, LLC; and Whitestone Client Services, LLC. (SAC ¶ 1.)

[5]    These firms are Anchor Law Firm, PLLC; Bedrock Legal Group; Boulder Legal Group; Brandon Ellis Law Firm LLC; Canyon Legal Group, LLC; Chinn Legal Group, LLC; Clear Creek Legal, LLC; Credit Advocates Law Firm, LLC; Great Lakes Law Firm; Greenstone Legal Group; Gustafson Consumer Law Group, LLC; Hailstone Legal Group; Hallock & Associates LLC; Harbor Legal Group; Heartland Legal Group; The Law Firm of Derek Williams, LLC; The Law Office of Melissa Michel LLC; Leigh Legal Group, PLLC; Level One Law; Meadowbrook Legal Group; Michel Law, LLC; Monarch Legal Group; Moore Legal Group, LLC; Newport Legal Group, LLC; Northstar Legal Group; Option 1 Legal; Pioneer Law Firm P.C.; Rockwell Legal Group; Royal Legal

Firms, whose operations were overseen by Blust, typically utilized virtual offices and outsourced support and administrative functions to third parties.

According to the Complaint, SFS recruited customers using a direct-mail campaign. Debtors who responded to the campaign were pitched on a debt-relief program in which lawyers would negotiate with creditors for reduced payoff amounts, and would defend against creditors' lawsuits. Consumers who wished to enroll in SFS's debt-relief program were scheduled for a face-to-face meeting with a notary. To facilitate these face-to meetings, the Law Firms contracted with three notary-provision companies. Notaries supplied by these three companies were expected to deliver an in-person presentation on the debt-relief program, using a script and other materials provided by SFS, and SFS trained and tested the notaries on the presentation they were to deliver.

The Complaint alleges that Consumers who received the face-to-face notary presentation and signed the necessary documents were enrolled in SFS's debt-relief program. SFS instructed new enrollees to stop paying and communicating with their creditors. Instead, participants were to begin making payments into an escrow account maintained by payment processors hired by SFS or the Law Firms. The payment processors promptly withdrew various fees, and distributed this money to themselves, the Client-Services Subsidiaries, the Law Firms, and SFS. The Complaint alleged that these advance fees violate the TSR.

According to the Complaint, once consumers accumulated enough money in their escrow accounts for debt-reduction negotiations to begin negotiators from SFS and the Client-Services Subsidiaries sought to obtain reduced payoff amounts from creditors. When a program participant was sued by a creditor, SFS sent the legal filing to one of the litigation-support vendors hired by the Law Firms, who would These vendors would "perform data entry for the[] lawsuits" and then transmit the filings "to

Group; Slate Legal Group; Spring Legal Group; Stonepoint Legal Group; Whitestone Legal Group; and Wyolaw, LLC.

contracted litigation or appearance attorneys" who would represent the consumer in the litigation. As explained above, although not mentioned in the Complaint, Fidelis is one of these litigation-support vendors. Another, Lit Def Strategies, LLC ("Lit Def"), was founded and owned by Jason Blust.

### C.    The TRO and Preliminary Injunction.

The CFPB also sought, and the Court issued, an *ex parte* Temporary Restraining Order appointing Thomas W. McNamara, Esq. as Receiver. (Dkt. 12 at 18-19.) The TRO directed the Receiver to, among other things, assume full control over "Receivership Defendants" (*id.* at 19), and to operate them to the extent doing so was both lawful and profitable. "Receivership Defendants" were defined as

> the Corporate Defendants and their subsidiaries, affiliates, divisions, successors, and assigns, *as well as any other business related to the Defendants' debt-relief services and which the temporary Receiver has reason to believe owned or controlled in whole or in part by any of the Defendants*, and includes fictious names under which they do business. "Receivership Defendants" also includes Relief Defendants Strategic ESOP; Strategic ESOT; Twist Financial, LLC; Duke Enterprises, LLC; Blaise Investments, LLC; the Blust Family Irrevocable Trust through Donald J. Holmgren, Trustee; Lit Def Strategies, LLC; and Relialit, LLC; (excluding Relief Defendants Daniel Blumkin, Albert Ian Behar, and Jaclyn Blust), and their subsidiaries, affiliates, divisions, successors, and assigns, as well as any other business related to the Defendants' debt-relief services and which the temporary Receiver has reason to believe is owned or controlled in whole or in part by the Relief Defendants included in this definition, and includes fictious names under which they do business.

(*Id.* at 7-8 (emphasis added).) The TRO further provided that if the Receiver "identifies" a nonparty as a Receivership Defendant, the nonparty "can challenge the Receiver's determination by filing a motion with the Court." (*Id.* at 24.)

Under the TRO, Receivership Defendants are subjected to onerous restrictions and obligations. They are, among other things, barred from initiating litigation, required to surrender their assets to the Receiver, and required to surrender absolute control of their operations. Once an entity is named as a Receivership Defendant, the Receiver can shut it down, lock its premises, empty its bank accounts,

fire its employees and rummage through their cellphones, initiate and settle litigation on its behalf, and, most remarkably of all, prescribe the manner in which the entity will comply with the TRO and "all other applicable laws" (*id*. at 23).

Desiring to keep such restrictions in place throughout the litigation, Plaintiffs moved for a preliminary injunction. (Dkt. 5.) Plaintiffs, Defendants, and the intervenor Law Firms all consented to Judge Roemer deciding this motion. (Dkt. 158.) As noted, Fidelis was not named in the Complaint, and has not consented to Magistrate Judge jurisdiction for either this action or any motion. After holding a two-day hearing in early February 2024, focused largely on whether the in-person notary presentations satisfied the face-to-face exemption set forth in 16 C.F.R. § 310.6(b)(3), Judge Roemer issued a Preliminary Injunction that essentially mirrors the TRO. (Dkt. 184.) In particular, the Preliminary Injunction continues the Receiver's appointment, imposes the same restrictions and obligations on Receivership Defendants, and includes the same mechanism for adding new Receivership Defendants. (*Id*. at 8.)

### D. The Receiver attempts to extend the Preliminary Injunction to cover nonparty Fidelis Legal Support Services, LLC.

On February 25, 2024, the Receiver sent Fidelis a letter declaring it a Receivership Defendant. (Dkt. 190-9 at 4-5.) In response, Fidelis filed a challenge with Judge Roemer. (Dkt. 190.) The Receiver agreed to refrain from attempting to freeze Fidelis's assets while this challenge was pending, so long as Fidelis confined itself to normal operations. (Dkt. 190-2 (Hoover Decl.) ¶ 8.)

Over the next two months, Fidelis and the Receiver completed several rounds of briefing. (Dkt. 190 – Dkt. 190-10 (Fidelis challenge); Dkt. 212 – Dkt. 212-20 (Receiver response); Dkt. 233 – Dkt. 233-22 (Fidelis reply); Dkt. 237-1 – Dkt. 237-18 (Receiver sur-reply); Dkt. 270 – Dkt. 270-9 (Receiver supplemental submission); Dkt. 320 – Dkt. 320-15 (Fidelis supplemental submission); Dkt. 346 (Receiver sur-sur reply).) Fidelis principally argued that the Preliminary Injunction's mechanism for adding new Receivership Defendants violates FRCP 65(d) and a long line of Second

Circuit precedent. Fidelis also argued that, even if the Court had authority to expand an injunction in the manner the Preliminary Injunction prescribes, Fidelis is not owned or controlled by Jason Blust, and it is not a successor to Lit Def. The Receiver argued that the Preliminary Injunction's expansion mechanism is proper, and that Fidelis is a "Receivership Defendant" because it is owned or controlled by Jason Blust, and is the "successor" to Lit Def.

Oral argument was held on March 23, 2024. (Dkt. 361; Dkt. 367 (Transcript).) Judge Roemer indicated that he was not interested in arguments about the legal validity of the Injunction's definition of "Receivership Defendant." He was only interested in whether Fidelis satisfied that definition. Feeling unable to decide that question on the papers, Judge Roemer scheduled a hearing for July 10 and 11, 2024.

### E. Fidelis continues to lawfully operate, to receive new requests for litigation-support services from Strategic/the Receiver, and to provide support services on contingent-fee cases for unrelated law firms.

Throughout this process, Fidelis continued normal operations without objection or incident, and the SFS employees working under the Receiver's direction continued to send litigation files to Fidelis. (*See generally, e.g.*, Dkt. 639; *see id.* at 39 (Receiver states that "I'm trying to protect the consumers. When a summons from a lawsuit comes in to Strategic I send it to Fidelis to get to the law firms so somebody can protect the consumers.").)

Upon seizing control of Strategic's operations post-TRO, the Receiver realized that many already-enrolled consumers continued to need litigation defense for new lawsuits. The Receiver could have chosen any number of courses of action to ensure that those consumers received litigation defense. What he decided to do is direct Strategic employees to continue sending litigation files to Fidelis, so that Fidelis could continue to perform the administrative services by which it facilitates litigation defense. That process has continued from February 2024 onward, including into early 2025.

- 9 -

In all, Strategic employees working under the Receiver's direction have sent over 6,000 new litigation files to Fidelis for Fidelis to provide administrative services so that lawyers could defend these newly filed court cases. That is in addition to the existing Law Firm litigation files that Fidelis had been supporting. And it is also in addition to the 9,503 unrelated, new Turnbull (contingency) litigation files that Fidelis received from the Turnbull firms in 2024. Throughout 2024, Fidelis continued to provide administrative services to Law Firms and lawyers so they could defend these clients in litigation.

Fidelis received no payments from the Law Firms for its work for this Law Firm litigation support in 2024, principally because of the fallout from the TRO and the preliminary injunction. Still, rather than leave the Law Firms' clients stranded, Fidelis continued to provide these services. Fidelis did receive payments in 2024 for work on behalf of the Turnbull contingent-fee law firms.

**F.    The fate of the law firm debt-relief program, post-TRO.**

In a decision approving the Receiver's second fee request, the Court found that the Receiver had "devoted substantial time and effort to stopping the expansive and excessively complicated law firm debt relief program provided by defendant StratFS, LLC and its related entities." (Dkt. 488 at 4.) "Stopping" is just the right verb.

Immediately after the TRO was issued in January 2024, the Receiver seized control of Strategic and halted its three business lines while he assessed their legality and profitability. (Dkt. 115-1 at 2-9.) Soon afterwards, the Receiver brought back 78 Strategic employees to perform client-services functions under his direction. (Dkt. 56 at 4-5; Dkt. 115-1 at 10.) By the end of January 2024, the Receiver had concluded that the so-called "law firm debt relief model"—the debt-relief program at issue in this lawsuit—was neither lawful nor profitable, and he determined to wind it down. (Dkt. 115-1 at 1-2.) Strategic and the Law Firms proposed migrating existing clients to a contingency-fee model, but the Receiver rejected this alternative. (Dkt. 292-1 at 1, 8-14.)

In May 2024, the Receiver proposed a wind-down plan. (Dkt. 359-1 at 5-6.) Consumers with no active payment plans, and consumers who completed their active payment plans, would have their escrow accounts closed and any remaining money returned. (*Id.* at 7-12.) For consumers still completing active payment plans, Strategic would continue to provide limited support services. (*Id.*) At a December 2024 status conference, no party opposed this proposal (Dkt. 524), and the Court recently ordered the closure of consumers' escrow accounts (Dkt. 557).

Law Firm operations have followed a similar trajectory. As noted above, the Receiver concluded (on behalf of Strategic) that Law Firm clients could not be migrated to a contingency-fee model. When Law Firm representative Richard K. Gustafson II sent clients a letter inviting them to convert to a contingency-fee model, the Receiver intervened and disseminated a corrective notice approved by the Court. (Dkt. 292-1 at 1-2, 15-20; Dkt. 352.)

In November 2024, the Court approved a notice informing Law Firm clients that the Firm would no longer represent them. (Dkt. 489; *see also* Dkt. 538-2 ¶ 9 (Receiver alluding to "the recent withdrawal of representation by the Law Firms").) Since the TRO was issued, the Receiver reports, no Law Firm or Strategic entity has received any fees from the debt-relief program at issue in this lawsuit. (Dkt. 359-1 at 8.)

### G. Plaintiffs file a Second Amended Complaint, and Judge Roemer attempts to broker a settlement.

On May 28, 2024, Plaintiffs filed a Second Amended Complaint. It consists of 229 substantive paragraphs, followed by 11 formulaic "counts." The first two counts allege that SFS and others violated the TSR by collecting unlawful advance fees. (*Id.* ¶¶ 230-46.) Count 3 alleges that Fidelis violated the TSR by knowingly and substantially assisting in the Law Firms' TSR violations. (*Id.* ¶¶ 247-56.) Count 7 alleges that Fidelis violated New York Executive Law § 63(12) by engaging in repeated fraud or persistent fraudulent acts. (*Id.* ¶¶ 290-95.) Count 8 alleges that Fidelis violated New York General Business Law § 349 by engaging in deceptive acts or practices. (*Id.* ¶¶ 296-

301.) Count 9 alleges that Christo and Bush Lake received money from Fidelis, lack any legitimate claim to it, and must disgorge it. (*Id.* ¶¶ 105, 302-06.) The Second Amended Complaint added other parties as well.

Plaintiffs did not seek a second preliminary injunction when they filed the Second Amended Complaint.

On July 12, 2024, Judge Roemer suspended all deadlines (including any deadlines for new parties to answer or to move to dismiss) to enable the parties to discuss a potential resolution. (Dkt. 425.) These discussions with some parties continued through September 20, 2024, at which point the parties returned to litigation. (Dkt. 434.) During this timeframe, Fidelis continued normal operations without objection or incident, and the SFS employees working under the Receiver's control continued to send it litigation files.

### H.    Plaintiffs move for a preliminary injunction against Fidelis in November 2024, and Judge Roemer presides over a hearing on that motion in late January 2025, but does not conduct a hearing on Fidelis's motion challenging the receivership defendant designation.

At the appearance held on September 20, 2024, Judge Roemer and Plaintiffs' counsel had the following exchange:

> THE COURT: . . . And then we – now, Mr. Boyd, at the – like I say, the plaintiffs are – I don't know you – if you want these new defendants held to the preliminary hearing, you have to make a motion to do that.
>
> MR. BOYD: Understood, Your Honor.
>
> THE COURT: Okay. All right. And we're going to we'll put a scheduling order in place for all of that. So that would be for the plaintiffs' motion for preliminary injunction against the new defendants, correct Mr. Boyd?
>
> MR. BOYD: I need to confer with my colleagues in terms of what –
>
> THE COURT: Let me complete my thought –
>
> MR. BOYD: Sure.
>
> THE COURT: — because I guess I would tie that up with the motion from Fidelis, right, to not be in?

- 12 -

MR. BOYD: Understood, Judge.

THE COURT: And I guess in a sense tie up that end of the contempt. That would all — you know, would have one evidentiary hearing to cover all of that. Does that make sense?

MR. BOYD: Understood.

. . . .

THE COURT: Okay. All right. So, Mr. Boyd, your preference is we go ahead and put a schedule in place?

MR. BOYD: Yes, Judge. I think that is — in terms of the PIs to the new defendants, I would have to — I need to consult with my colleagues. But I do hear you. I think it does make sense. If we are going to run an evidentiary hearing —

THE COURT: Well, do you want them bound by a preliminary injunction or you don't want them bound? If you want them bound, you are going to have a preliminary injunction hearing. I don't know who you have to check with for that, but —

MR. BOYD: No, no, no. I do understand those are our options. It's just which of the two we want to choose.

THE COURT: Okay. You might not want them bound by the preliminary injunction?

MR. BOYD: Potentially.

THE COURT: Okay.

MR. BOYD: Could we take five right now or a short break?

THE COURT: Okay.

. . . .

THE CLERK: We are back on the record, Judge.

THE COURT: Mr. Boyd —

MR. BOYD: Judge, thank you for the indulgence. So after consulting with my colleagues, we — we will file a preliminary injunction motion as to the newly added defendants. Our plan if it is successful to Your Honor, would be to file that in three weeks by October 11th and then if we could key their response deadlines and the evidentiary hearing off of that, if that's workable.

THE COURT: Okay.

- 13 -

(Dkt. 445 at 14-18.)

Fidelis, Christo, and Bush Lake each moved to dismiss the Complaint (Dkts. 440, 441, 442) and filed a joint memorandum in support (Dkt. 443 ("Mem.")). Plaintiffs opposed (Dkt. 460 ("Opp."), Fidelis, Christo, and Bush Lake filed a joint reply (Dkt. 480 ("Reply")), Judge Roemer heard oral argument (Dkt. 492), and, on December 19, 2024, issued the R&R recommending denial of the motions. (R&R at 1.) Fidelis, Christo, and Bush Lake objected to the R&R (Dkt. 542). The state Plaintiffs responded to the Objections (Dkt. 600), Fidelis replied (Dkt. 626), and the motion to dismiss and objections are pending before Chief Judge Wolford.

Six weeks after the September appearance, on November 1, 2024, Plaintiffs filed their motion for a second preliminary injunction. (Dkt. 477.) The Court did not immediately schedule a hearing on this motion and Plaintiffs did not seek one. Thus, another seven weeks passed without any further activity.

In December 2024, Judge Roemer scheduled an evidentiary hearing for January 23 and 24, 2025. (Dkt. 532 at 38-39.) The hearing was limited to Plaintiffs' motion to enjoin Fidelis, Christo, and Bush Lake, and to the Receiver's motion to hold Jason Blust and Lit Def in contempt. (*Id.*) Judge Roemer has not scheduled a hearing on Plaintiffs' motion to enjoin other newly added defendants, and Plaintiffs have not sought one. Fidelis's motion challenging the designation as a Receivership Defendant was not scheduled as part of the January 2025 hearing.

As noted above, during this entire period, and into at least February 2025, Strategic, at the Receiver's direction, continued to send new litigation matters to Fidelis for processing and to ensure an attorney was assigned to defendant them.

The parties filed pre-hearing memoranda, and Fidelis opposed the preliminary injunction motion. (Dkt. 569.)

Because they were the motions that were scheduled, the hearing focused on the second preliminary injunction motion, and the motion to hold Blust and Lit Def in contempt. (Dkt. 595; Dkt. 596.) Following the filing of pre-hearing briefs, including

by Fidelis, Christo, and Bush Lake (Dkt. 569), Plaintiffs conducted a short hearing that was largely a paper exercise. No evidence was offered by Plaintiffs (or the Receiver) to establish that Fidelis violated a regulation, or provided substantial assistance to any TSR violation, or facilitated the collection of advance fees, or engaged in conscious wrongdoing.

Rather, Plaintiffs focused on showing that the Court had previously granted a preliminary injunction involving different issues, under a different standard, against different defendants, and that Jason Blust used to control Fidelis (an assertion Fidelis has previously rebutted, *e.g.*, Dkts. 233, 320).

Three witnesses—Jason Blust, Michelle Gallagher (Hinds), and Cameron Christo—all of whom are defendants in this action, and all of whom had repeatedly been subjected to vociferous (and mistaken) claims that they previously submitted intentionally false declarations and could be referred to the U.S. Attorney's Office—invoked their Fifth Amendment privilege and declined to testify.

Jewell Hewett, a former Law Firm client, gave brief testimony that did not relate to any of the issues to be determined in conjunction with the present motion. Hewitt provided no information about Fidelis at all.

Katherine Rosenberg, a former employee of Fidelis (and Lit Def), was called to give testimony purportedly supportive of the claim that Blust formerly controlled Fidelis and Fidelis is a successor to LitDef. Rosenberg confirmed Fidelis's work facilitating litigation defense by the Law Firms for their clients in litigation, but offered no testimony regarding present Fidelis operations, and offered no testimony regarding any noncompliance with the law by Fidelis. The other aspects of Rosenberg's testimony have been sufficiently addressed elsewhere. (*See, e.g.*, Dkts. 233, 320.)

Plaintiffs decided not to call three CFPB employees that it had noticed as witnesses.

Plaintiffs did not call any witnesses to describe Fidelis's current operations, or to explore how the Receiver has continued to direct Strategic to send new

litigation files to Fidelis for administrative litigation support. Plaintiffs did not call any witnesses, and offered no evidence showing, that Fidelis, Christo or Bush Lake have or will dissipate any assets.

Each party moved exhibits into evidence. At the conclusion of testimony, and over Fidelis's objection, Plaintiffs introduced en masse all of the exhibits from the February 2024 hearing (which Fidelis was not a part of), without any explication of how the exhibits were relevant or admissible, and without Fidelis having a chance to respond or rebut them.

At the close of the hearing, the parties were directed to file post-hearing briefs and responses, and all (except Plaintiff CFPB) did so in February and March 2025.

Judge Roemer heard oral argument on March 6, 2025 (Dkt. 636; Dkt. 640 (Transcript).)  Judge Roemer expressed skepticism about whether Plaintiffs had proven their entitlement to a preliminary injunction. In response to his suggestion that it was possible that he could deem Fidelis a Receivership Defendant under the original preliminary injunction without a heightened showing of the required factors under Rule 65, Fidelis's counsel argued and explained why such a determination was not possible, contravened the law and Rule 65, and that the designation was moot since Fidelis was now a party.  (Dkt. 640 at 15-16, 37-39.)

**I.    On March 26, 2025, a decision is entered that Fidelis qualifies as a Receivership Defendant.**

On March 26, 2025, Judge Roemer issued rulings on the Receiver's motion seeking contempt findings against Blust and Lit Def, and on Fidelis's motion challenging the Receivership Defendant designation, styled a "Report, Recommendation and Order." (Dkt. 646.)  The Order/Decision portion of Dkt. 646 pertains to Fidelis's challenge to the Receivership Defendant designation, and finds that Fidelis qualifies as a "Receivership Defendant."

The Decision rests its determination solely on Judge Roemer's conclusion that Fidelis is a successor to Lit Def and is controlled in whole or in part by Blust. (Decision at 28-29.)  As such, Judge Roemer found, per the TRO and the preliminary injunction, Fidelis is a Receivership Defendant.  (*Id.* at 31-32.)  The Decision, so far as we can discern from the short time we have had to study it, nowhere applies the standards required for a preliminary injunction to issue, nowhere addresses the heightened burden required for a preliminary injunction issue, and nowhere addresses what risk of irreparable harm will occur without injunctive relief.  The Decision simply uses the invalid Receivership Defendant mechanism in the TRO and preliminary injunction to make Fidelis subject to the preliminary injunction and injunctive relief, while ignoring the invalidity of the mechanism itself and the required test.  And, the Decision nowhere addresses the second preliminary injunction motion that was briefed, was the subject of a hearing, and was the subject of post-hearing brief, and was the subject of the March 6 argument.

With regard to the ability to issue a decision as opposed to make a report and recommendation on the Fidelis motion, Judge Roemer implicitly recognized that the January 2025 hearing was not scheduled to address Fidelis's motion. (Decision at 2 n.2.)  Judge Roemer wrote that he could issue a decision on Fidelis's motion, rather then pen a report and recommendation, because:

> The parties consented to this Court's authority to decide plaintiff's motion for a preliminary injunction. (Dkt. Nos . 5, 158-159[.]) The Court granted that motion and issued a preliminary injunction on March 4, 2024. (Dkt. Nos . 183 , 184[.]) Thus, the Court issues its determination regarding Fidelis Legal Support Services, LLC 's designation as a receivership defendant, pursuant to the March 4, 2024 preliminary injunction, by decision and order.

(Decision at 1 n.1.) This short explication of the Magistrate Judge's power is, for the reasons outlined below, wrong, and is premised on a mistaken assertion that Fidelis consented to the Magistrate Judge's authority to decide Fidelis's motion. Fidelis did not

consent, and Fidelis was not a party when the first preliminary injunction motion was filed, litigated, or decided. Fidelis became a party in late May 2024.

Fidelis will file objections to the Decision by April 9, 2025.

Fidelis's motion to dismiss is pending before the District Court.

Consolidated appeals by parties enjoined by the Injunction in March 2024 is pending at the United States Court of Appeals for the Second Circuit, and will be argued on April 9, 2025. Fidelis is not a party to those appeals.

## **ARGUMENT**

### I.    **JUDGE ROEMER'S DECISION ADDRESSED A DISPOSITIVE MOTION, SO IT CANNOT BE ENFORCED UNLESS AND UNTIL A DISTRICT JUDGE RATIFIES IT FOLLOWING OBJECTIONS.**

Magistrate judges are empowered to resolve any pretrial matter

> except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.

28 U.S.C. § 636(b)(1)(A). Because "many of the powers withheld from magistrate judges by § 636(b)(1)(A) involve the determination of the suit or of a claim," the class of rulings withheld from magistrate judges often goes by the "imprecise shorthand" phrase "dispositive matters," while the class of "rulings over which magistrate judges are granted authority" are known as non-dispositive matters. *Kiobel v. Millson*, 592 F.3d 78, 92 (2d Cir. 2010) (Leval, J., concurring).[6]

The dispositive/non-dispositive dichotomy has three procedural implications. First, "as to dispositive matters, the magistrate judge may do no more than

---

[6] This shorthand is reflected in Federal Rule of Civil Procedure 72, which refers to matters "not dispositive of a party's claim or defense," but the Advisory Committee's note makes "clear this terminology is not to be taken literally." *Kiobel*, 592 F.3d at 92 n.3 (Leval, C.J., concurring). Rather, as in the common parlance, Rule 72 is using "dispositive" to "distinguish[] between matters upon which the magistrate judge is empowered to rule, and matters as to which the magistrate judge has the power only to recommend." *Id.*

recommend," while "as to nondispositive matters, the magistrate judge may rule." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 25 (2d Cir. 2012) (cleaned up). Second, recommendations on dispositive matters are reviewed *de novo*, whereas rulings on non-dispositive matters are reviewed more deferentially. Third, and most importantly for present purposes, recommendations on dispositive matters are not enforceable unless and until a district judge adopts them, whereas rulings on non-dispositive matters "shall be effective unless and until a stay is obtained." W.D.N.Y. Local R. Civ. P. 72(a).

In determining which matters are "dispositive," the list of matters set forth in § 636(b)(1)(A) "is non-exhaustive." *Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008). Instead, to avoid the constitutional dangers inherent in "delegating Article III judges' duties to magistrate judges," the Second Circuit takes an expansive view of the exclusions set forth in § 636(b)(1)(A). *Id.* at 264. Matters not explicitly listed in § 636(b)(1)(A), which are akin or functionally equivalent to the listed matters, are deemed dispositive. *See id.* at 265-66; *see also Gomez v. United States*, 490 U.S. 858, 874 (1989) (holding that jury selection, though not listed in § 636(b)(1)(A), "is more akin to those precisely defined, 'dispositive' matters" than to "'nondispositive' pretrial matter[s]"); *Jean-Laurent*, 461 F. App'x at 25 (holding that denying leave to add state-law claims is functionally equivalent to dismissing state-law claims, and so qualifies as a dispositive matter); *Williams*, 527 F.3d at 266 (holding that a motion to remand a case to state court is functionally equivalent to "a motion to dismiss the action from federal court," and so qualifies as a dispositive matter).

Judge Roemer's decision declaring Fidelis a Receivership Defendant is, or is functionally equivalent to, an enumerated dispositive matter—namely, an award of "injunctive relief," 28 U.S.C. § 636(b)(1)(A). An injunction is "a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing." INJUNCTION, BLACK'S LAW DICTIONARY (12th ed. 2024) (quoting 1 Howard C. Joyce, A Treatise on the Law Relating to Injunctions § 1, at 2-3 (1909)); *see also Nken v. Holder*, 556 U.S. 418,

- 19 -

428 (2009) (observing that an *in personam* injunction "is directed at someone, and governs that party's conduct"). As noted above, the Preliminary Injunction directs Receivership Defendants to do many things (such as surrender their assets to the Receiver (Dkt. 184 at 28-29), surrender control over to the Receiver (*id*. at 17-20), do whatever the Receiver instructs them to do (*id*. at 19) and prohibits them from doing many things (such as initiate litigation (*id*. at 32), operate independently (*id*. at 17-20), and collect advance fees.

Because Judge Roemer's decision is, or is functionally equivalent to, an award of "injunctive relief," it must be construed as a recommendation only. 28 U.S.C. § 636(b)(1)(A); *Williams*, 527 F.3d at 265-66. As such, it cannot take effect unless and until it is adopted by a district judge.

## II. EVEN IF JUDGE ROEMER'S DECISION WERE IMMEDIATELY ENFORCEABLE, ENFORCEMENT SHOULD BE STAYED.

Assuming for the sake of argument that Judge Roemer's decision resolved a non-dispositive matter, and so is "effective unless and until a stay is obtained," W.D.N.Y. Local R. Civ. P. 72(a), an immediate stay is warranted. *See Sheehy v. Wehlage*, No. 02-CV-592-A, 2007 WL 836811, at *1 (W.D.N.Y. Mar. 15, 2007) (granting stay pending review of objections).

In deciding whether to grant a stay, the Court considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (cleaned up).[7]

---

[7]  The traditional stay factors discussed in *Nken* apply to all manner of stays, including stays pending review of a magistrate judge's decision. *See Alvarez v. Larose*, No. 20-CV-00782, 2020 WL 5632659, at *2 (S.D. Cal. Sept. 21, 2020); *In re Kidd*, No. 20-MC-00016, 2020 WL 3035960, at *3 (D. Conn. June 5, 2020); *LEG Q LLC v. RSR Corp.*, No. 17-CV-1559-N-BN, 2017 WL 4222690, at *2 (N.D. Tex. Sept. 22, 2017); *Faconnable USA Corp. v. Doe*, No. 11-CV-00941, 2011 WL 2173736, at *1 (D. Colo. June 2, 2011).

The Second Circuit treats these factors "somewhat like a sliding scale," in that "more of one [factor] excuses less of the other." *Thapa v. Gonzalez*, 460 F.3d 323, 334 (2d Cir. 2006) (cleaned up). At bottom, "the basic goal is to avoid prejudice." *In re Kidd*, 2020 WL 3035960, at \*3. Here, each factor favors a stay.

### A. Fidelis's objections are likely to succeed because the mechanism used to subject Fidelis to the Injunction violates longstanding Second Circuit precedent.

To establish likelihood of success on the merits, "[i]t is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434. But neither does the stay applicant need to establish a certainty of success. The first factor weighs in favor of a stay if Fidelis has raised "a plausible argument that Judge [Roemer] misapplied Second Circuit precedent," or if its arguments raise "substantial questions regarding the merits of Judge [Roemer]'s ruling that warrant more careful consideration." *In re Kidd*, 2020 WL 3035960, at \*3. That is easily done.

***First***, injunctions can bind only the acts of parties—those who were served with process and "ha[d] their day in court." *Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023) (cleaned up). If a litigant believes it has grounds to enjoin a nonparty, it should file suit, obtain personal jurisdiction, seek injunctive relief, and allow the now-defendant to respond. *See Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 305 (2d Cir. 1999); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1397 (Fed. Cir. 1996).

There is one wrinkle to this doctrine, codified in Rule 65(d): "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors." *Doctor's Assocs.*, 191 F.3d at 302 (cleaned up). Thus, an injunction can bind the named parties' "officers, agents, servants, employees, and attorneys," and any other person who is "in active concert or participation" with them. Fed. R. Civ. P. 65(d)(2). Crucially, though, the nonparties listed in Rule 65(d)(2) are bound only insofar as they are acting as an instrumentality of the enjoined party. In other words, while a court can enjoin the acts of a party, whether carried out directly or through a nonparty instrumentality, it

cannot enjoin a nonparty acting in its separate capacity. *See Havens*, 76 F.4th at 122 ("Having a relationship to an enjoined party of the sort set forth in Rule 65(d) exposes a non-party to contempt for assisting the party to violate the injunction, but does not justify granting injunctive relief against the non-party in its separate capacity." (cleaned up)).

This vital distinction dictated the result in *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930) (Hand, J.). The defendant in that case, John Staff, was sued for patent infringement. *Id.* at 832. The court enjoined John, along with his employees and agents, from further infringement. *Id.* After litigation began, one of John's employees, Joseph Staff, started his own business. *Id.* Though Joseph's new business did exactly what his former employer was enjoined from doing, the Second Circuit held that Joseph was not bound by the injunction because he was no longer acting as an agent of the enjoined party. *See id.* at 832-33. In other words, while Joseph Staff's post-litigation conduct may have exposed him to a new suit for patent infringement, "the decree ha[d] not been disobeyed" because the decree could only ever forbid "an act of a party," and Joseph's post-litigation activity was not John's infringement. *Id.*

These principles have the same vitality in 2024 that they had in the days of Learned Hand. Just last year, when the New York Attorney General sought to apply an abortion-access injunction to allies of the enjoined defendants, individuals who themselves had "had no day in court," *Havens*, 76 F.4th at 116, the Second Circuit rejected its position as "inconsistent with Rule 65(d) and the principles of equity it codified," *id.* at 118 (cleaned up) (citing *Alemite* for the proposition that "only a named party's actions may be enjoined").

The strict limits that *Alemite* and *Havens* identify, and that Rule 65(d) codifies, constrain the permissible scope of the Injunction. The Plaintiffs sought the Injunction under Rule 65 (Dkt. 5 at 1-4; Dkt. 5-1 at 44; Dkt. 5-3), Judge Roemer granted the Injunction under Rule 65 (Dkt. 12 at 1, 3, 46; Dkt. 184 at 1, 3), and even if

Judge Roemer had intended the Injunction to define "Receivership Defendants" more broadly than Rule 65(d) permits, "[i]t is well established . . . that the terms of an injunction may not enlarge its scope beyond that defined in the Federal Rules of Civil Procedure," *O & L Assocs. V. Del Conte*, 601 F. Supp. 1463, 1464 (S.D.N.Y. 1985).[8]

That the definition of Receivership Defendants violates the law and Rule 65 is beyond cavil. The preliminary injunction provides that the definition of Receivership Defendant includes "any other business related to the Defendants' debt-relief services and which the Receiver has reason to believe is owned or controlled in whole or in part by any of the Defendants . . . ." (Dkt. 184 at 8.) There is no requirement that the mandatory factors necessary to issue preliminary injunctive relief be met or addressed at all. Under the traditional test, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Irreparable harm cannot be presumed: "[i]n the preliminary-injunction context, "the four criteria identified in *Winter* encompass the relevant equitable principles," *id.*, and "absent a clear command from Congress, courts must adhere to the traditional four-factor test," *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). The issuance of massive and drastic injunctive relief based on the meager designation standard, grounded in the Receiver's mere belief, is erroneous in its issuance and inception, and it is erroneous to apply it to provide the resulting full injunction against Fidelis without the necessity of a showing that any of the requirements of *Winter* and Rule 65 are met.

---

[8]     *See also Havens*, 76 F.4th at 122 ("The reference to unknown persons in the Arcara Injunction cannot enlarge its scope beyond that defined by the Federal Rules of Civil Procedure." (cleaned up)); *Sumpter v. Skiff*, 260 F. App'x 350, 351 (2d Cir. 2008) (holding that "the district court did not have the authority to order injunctive relief against" a nonparty which "d[id] not fall within any of the exceptions listed in Rule 65(d)").

Judge Roemer decided that the Injunction binds Fidelis due to Fidelis's alleged relationship to Blust and Lit Def. As explained above, however, the Court cannot enjoin a nonparty "in its separate capacity" simply because it has "a relationship to an enjoined party of the sort set forth in Rule 65(d)." *Havens*, 76 F.4th at 122 (cleaned up). Rule 65(d) merely ensures that enjoined parties like Blust and Lit Def do not "nullify a decree by carrying out prohibited acts through [nonparties]" like Fidelis. *Id*. at 112 (cleaned up).[9]

The Decision purports to bind Fidelis without any showing that Fidelis is helping a named party, or being used by a named party, to circumvent the Injunction. That is unlawful. Fidelis's objections are likely to be sustained.

***Second***, even if the "Receivership Defendant" mechanism were a lawful means of expanding a preliminary injunction, that mechanism applies only to non-party entities. The sole specification of the process by which the Receiver designates a "Receivership Defendant" states: "If the Receiver identifies a nonparty entity as a Receivership Entity, [he must] promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court." (Dkt. 184 at 21.)  This limit does make sense, given that the mechanism is already a stretch and is indeed unlawful. Named parties are undoubtedly entitled to the full process of a motion under Rule 65. Rule 65 explicitly requires "notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Fidelis was a nonparty entity at the time it filed its challenge. But it is no longer a nonparty entity, having been named in the Second Amended Complaint.

---

[9]    *See also Doctor's Assocs*., 191 F.3d at 303 ("We conclude that the district court's injunction was not authorized by Rule 65(d) because the injunction bars the nonparty appellants from prosecuting lawsuits that do not aid or abet the federal defendants in violating the injunctions entered against them."); *Alemite*, 42 F.2d at 833 (holding that an injunction binds a nonparty only when the nonparty "has helped to bring about . . . an act of a party" that violates the party's obligations under the injunction); *GMA Accessories*, 2008 WL 2355826, at *14 ("[T]here is no indication in the record that [the defendant] sought to nullify the injunction by carrying out prohibited acts through [the nonparty]" (cleaned up)).

Accordingly, Fidelis can no longer be swept into the original injunction, and can be preliminarily enjoined only by motion under Rule 65. Because the Receivership Defendant device is ultra vires and, in any event, is expressly limited to "nonparty" entities, the Designation of Fidelis is unenforceable. Because the Designation is unenforceable, Fidelis's challenge to judicial enforcement of the Designation no longer presents a live controversy. *Compare Tequila Cuervo la Rojena, S.A. de C.V. v. Jim Beam Brands Co.*, No. 10-CV-0203, 2011 WL 407938, at *3 (S.D.N.Y. Feb. 8, 2011) (suit based on threat of future action became moot when threat dissipated). Thus, the Court's jurisdiction extends only to declaring the Designation unenforceable and terminating further proceedings with regard to the Receivership Defendant designation. The Decision necessarily must be vacated.

### B.    Absent a stay, Fidelis is likely to suffer the partial or total destruction of its business.

If the Receivership Defendant designation is permitted to take effect pending a determination on Fidelis's objections, Fidelis is likely to suffer the partial or total destruction of its business. The equities weigh in favor of not imposing a takeover of a lawfully-operating company, putting employees, their livelihoods, and positive work for contingency-fee firms (and for consumers sent to it by the Receiver) at risk. This is especially true when the work Fidelis is doing is legal, involves Law Firm clients sent to it by the Receiver, is not receiving fees derived from advance-fees, and also involves lawful work for contingent fee firms. There is no basis to impose a receivership that would effectively shut down Fidelis given that there is nothing it does that violates the TSR or any law. At a minimum, the Decision should be stayed so that the Chief District Judge can review and assess the validity of the Receivership Defendant designating mechanism, which has not, as far as Fidelis is aware, been undertaken by the Court at any point in the case. This is even more appropriate given that Fidelis (and Christo and Bush Lake) have a pending motion to dismiss which, if granted, will end the case against them.

While Fidelis continues to provide administrative litigation support services for the clients of the Law Firms, it has not been paid by the Law firms since January 2024, even though the Receiver has continued to send new clients to Fidelis for litigation support assistance. Fidelis's other work is for the Turnbull contingency firms. The Receiver taking over Fidelis could impact Fidelis's work for contingency firms, and it is entirely possible that Turnbull will cease using Fidelis for litigation support services if Fidelis is taken over.

At the same time, we are not aware that the Receiver has not demonstrated any ability to run this business; that is, the Receiver needed to send new litigation matters to Fidelis for Fidelis to provide litigation support services. Employees have already left for other positions. An exodus of other employees is likely to occur.

### C. Granting a stay does not prejudice anyone, since the Receiver has consented to Fidelis operating outside his control for the past year.

Fidelis has continued normal operations since February 2024, except that it does not receive fees derived from advance fees. It agreed with the Receiver in early March 2024 to continue normal operations as detailed above, and as all are aware. The Receiver (operating Strategic) has sent consumers to Fidelis for litigation support services through at least February 2025, including following the shut down of the work of the Law Firms, so that the consumers can have litigation attorneys provide them litigation defense. There is no prejudice to any party from a stay, as "a stay in this case would simply maintain the status quo existing prior to the district court's order and thus not generate an appreciable harm." *In re Kidd*, No. 20-MC-00016, 2020 WL 3035960, at *4 (D. Conn. June 5, 2020) (cleaned up).

### D. The public interest favors a stay, since the service Fidelis provides helps consumers.

There is no dispute that the service Fidelis provides helps consumers. That's why Strategic (under the control of the Receiver and at his direction) continues to send consumers to Fidelis for assistance. Whether it is because there was no other

practical option, or it is the best option, the Receiver determined he could lawfully direct consumers to Strategic, and has continued to do so.  Fidelis has nothing to do with signing up consumers for a debt-relief program, notary meetings, or debt-relief services. It handles administrative support for back-end litigation.  And, of course, as noted, there are no more new consumers entering the Strategic and Law Firm debt relief program for over fourteen months.  The consumers being assisted face new litigation (post-TRO) but were signed up for the program before the TRO was issued.

## **CONCLUSION**

The Court should (i) issue an order declaring that the Decision is a report and recommendation, that does not take effect until reviewed and decided by the District Court following objections, and/or staying the Decision pending decision by the Chief District Judge on Fidelis's objections to the ruling; and (ii) award any other or additional relief that the Court deems appropriate.

Dated:        Buffalo, New York
              March 26, 2025

                                    Respectfully submitted,

                                    **HOOVER & DURLAND LLP**
                                    *Attorneys for Defendant Fidelis Legal*
                                    *Support Services, LLC*

                                    By:  s/Timothy W. Hoover
                                           Timothy W. Hoover
                                           Spencer L. Durland
                                    561 Franklin Street
                                    Buffalo, New York 14202
                                    (716) 800-2600
                                    *thoover@hooverdurland.com*
                                    *sdurland@hooverdurland.com*