UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al._____Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al._____Defendants, and<br><br>STRATEGIC ESOP, et al.,_____Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**RECEIVER'S THIRD INTERIM APPLICATION
FOR ORDER APPROVING FEES AND EXPENSES OF
THE RECEIVER AND PROFESSIONALS**

I.     INTRODUCTION

The receiver, Thomas W. McNamara ("Receiver"), respectfully submits this third application for fees and expenses to the Court. The requested fees and expenses are based on work performed during the six-month period from August 1, 2024 through January 31, 2025 (the "Application Period").

The Receiver continues to serve pursuant to the Preliminary Injunction ("PI") entered March 4, 2024 (Dkt. No. 184). The PI authorizes the Receiver to "[c]hoose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order[.]" PI, Section IX.I, page 20. The PI further provides that the "Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in the possession or control of, or which may be received by the Receivership Defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation." PI, Section XV, pages 30-31.

II.    LEGAL STANDARD

"A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred…[t]he amount of the compensation is to be determined by the court in the exercise of its reasonable discretion." *SEC v. Morgan*, 504 F. Supp. 3d 221, 223 (W.D.N.Y. 2020) (quoting *SEC v. Byers,* 590 F Supp. 2d 637, 644 (S.D.N.Y. 2008)). A "Court may also consider 'the reasonableness of the hourly rate charged and the reasonableness of the number of hours billed.'" *Id.* (citing *SEC v. Amerindo*

1

*Inv. Advisors Inc.*, No. 05 Civ. 5231 (RJS), 2015 WL 13678841, at *1 (S.D.N.Y. Sept. 14, 2015)).  The "presumption of reasonable compensation extends to a receiver's counsel and professionals."  *SEC v. Platinum Mgmt. (NY) LLC*, No. 16-CV-6848, 2018 U.S. Dist. LEXIS 165797 (E.D.N.Y. Sept. 26, 2018).

Whether a fee is reasonable requires consideration of several factors, "including '(1) the complexity of problems faced, (2) the benefits to the receivership estate, (3) the quality of the work performed, and (4) the time records presented.'"  *Id.* (quoting *SEC v. Platinum Mgmt. (NY) LLC*, No. 16-CV-6848 (BMC), 2018 WL 4623012, at *4 (E.D.N.Y. Sept. 26, 2018)).  In assessing the Receiver's first interim fee application (Dkt. No. 241), the Court found the hourly rates of the Receiver, counsel, and accountants to be reasonable (Dkt. No. 358 at 8-9), and those rates remain the same in this application.

### III.  DISCUSSION OF RECEIVERSHIP ACTIVITIES DURING THE APPLICATION PERIOD

#### A.  Day-to-Day Oversight of the Receivership Estate

As the Court is well aware, the debt settlement relief businesses within the Receivership Estate were complex and had many tentacles.  During the Application Period, a significant amount of the work by the receivership team, counsel, and accountants continued to concern the traditional receivership duties of managing and running the remaining aspects of the businesses.  As expected, this work has lessened over time, given the Receivership Defendants are not soliciting new customers and are largely devoted to resolving the debt of pre-existing contingent customers (Atlas and Timberline), and continuing to collect the payments of Versara Lending borrowers.

The invoices attached to the Receiver's declaration provide time entries which reflect detailed descriptions of the work performed. A high-level description of some major work follows.

    1.    <u>Management of Customer Service Operations for and Wind Down of Law Firm Debt Relief Business</u>

The Receiver team and counsel continued to address operational tasks associated with service to the law firm debt relief consumers and, then later in the Application Period, coordinating with the Intervenor Law Firms when they withdrew. These efforts included taking steps to protect the tens of thousands of consumers enrolled in debt settlement programs affiliated with StratFS-related law firms.[1] In order to protect consumers and run the remaining businesses, it was necessary during the Application Period to keep a substantial customer service and technology staff and maintain the substantial technology resources necessary to serve the consumers.[2]

    a.    <u>Receiver's Request for Further Instruction regarding Business Operations and Consumer Protection Efforts</u>

Consistent with the Court's Order to protect consumers, the Receiver requested instructions from the Court in May 2024 and recommended a plan to address how to handle the more than 50,000+ law firm debt relief consumers. *See* Dkt. No. 359. The Intervenor Law Firms and the Strategic Defendants initially opposed the request. However, some months later,

---

[1] Early in the Application Period, the Receiver investigated several potential options to recommend to consumers who could no longer use the law firms to resolve their existing debts; these included a proposal by the National Foundation for Credit Counseling (NFCC), a nonprofit organization that provides financial counseling services, to create a new service that would negotiate these debts. Ultimately, after consultations with the Court and in consideration of issues raised by the parties, the proposal was not feasible.

[2] After the Application Period and consistent with the termination of customer service for most law firm debt relief consumers, personnel and technology expenditures have been reduced.

3

their position changed. The Law Firms sought to withdraw from representation of these consumers, and, as a result, they withdrew the objection to the Receiver's plan. On October 25, 2024, the Intervenor Law Firms gave notice to the Court and the Parties they were withdrawing from representation of all law firm debt relief clients. Dkt. No. 469 (on November 13, 2024, the Court granted a Stipulated Order on the request to withdraw under certain conditions (Dkt. No. 489)). The Receiver's request was addressed at a hearing on November 20, 2024 (Dkt. No. 500), and the Court ordered the Parties to discuss and confirm there were no objections to the Receiver's plan. After confirming this, the Receiver submitted supplemental information and a revised proposed order on December 10, 2024, which slightly modified the original requested plan of action regarding consumers. Dkt. No. 525. The modifications were necessary because of the Intervenor Law Firms' withdrawal and the response of payment processor Global Holdings LLC ("Global").[3] The Court issued an Order consistent with the recommendations on December 11, 2024 (Dkt. No. 526). Thereafter, the Receiver team carried out the necessary steps regarding the law firm debt relief StratFS consumers. This included promptly sending notices to the tens of thousands of consumers, providing an update on recent events, including the Intervenor Law Firms' withdrawal, the sunsetting of customer service for consumers without payment plans, and instructions on how to access debt and settlement information.

---

[3] The Receiver team had to address a number of logistical matters arising from the Intervenor Law Firm's withdrawal. Global, the payment processor which services the vast majority of the consumers (roughly 90%), terminated the Law Firms' access to the Global consumer accounts upon withdrawal. Global also terminated Strategic's access because it acted as an agent of the Intervenor Law Firms. This termination prevented Strategic from assisting consumers with payment issues or active payment plans. Global confirmed that it would take over that servicing role going forward. Also, the Receiver team had to investigate referrals of Law Firm clients/consumers that we learned were being made by Global to a third party, as this conduct appeared to violate the terms of the PI. The Receiver immediately raised this issue with Global, which agreed to halt the referrals.

     b.  Receiver's Work with Third Party Payment Processors Global and RAM

The Receiver's team has maintained a working relationship with Strategic's payment processors, Global and RAM, and has coordinated with them to assist consumers. In December 2024, we developed a termination plan for consumers without active payment plans and those whose payment plans would terminate in the future. The payment processors indicated they did not oppose this request. On December 20, 2024, the Receiver filed a proposed order directing the two payment processors to end servicing of consumers without active payment plans, to return funds held in the consumers' accounts to them, and to otherwise automatically end servicing (and associated fees) for all consumers with active payment plans once those consumers completed their payments. Dkt. No. 538-3. While the Intervenor Law Firms were no longer representing them, several thousand consumers had active payment plans to fund settlements with creditors, which included monthly charges of the payment processors. The Court issued the Order on January 7, 2025. Dkt. No. 557.

Presently, the number of consumers with active payment plans who require StratFS customer service declines every month, as consumers complete payment plans. As a result, the Receiver has scaled back customer service staff and will continue to do so as dictated by the business.

    2.  Remaining Direct to Consumer Debt Relief Operations

The Receiver team has continued to oversee the operations of the direct-to-consumer ("DTC") contingency debt relief operations of Timberline and Atlas, which do not involve the Intervenor Law Firms, for those consumers who were customers at the time of the implementation of the TRO. These businesses now have roughly 50 employees and contractors.

Since restarting operations in January 2024, the contingent operations (primarily Timberline and Atlas) have generated monthly average revenue of $1,230,439, through January 2025.

Providing support for the law firm debt relief model customers and operating the DTC businesses has required continuous coordination with CIBC and Valley Bank, the Receivership Defendants' primary lenders, which assert a security interest over many Receivership Estate Assets. The revenues generated by DTC operations have allowed the Receiver to pay the banks interest of roughly $300,000 per month.

3. <u>Management of Versara Lending Loan Portfolio</u>

The Receiver team has also continued to supervise the Versara Lending loan portfolio servicing operation. During the Application Period, Versara Lending was able to continue to reduce the principal balance of the Credit Suisse (UBS) warehouse loan. At the time of the TRO, the principal balance due to UBS was $83,333,333.33. During the reporting period, StratFS was able to make principal payments totaling $25,215,406. As of January 2025, the loan balance totaled $32,244,824, and by March 2025, it had been reduced to $21,289,386. It is expected UBS will be paid off during 2025.[4]

4. <u>Accounting Expense</u>

The Receiver's internal accountant and support team continue to have many responsibilities. For the Application Period, they continued to do the following: monitor daily bank transactions; maintain records of all receipts and disbursements; monitor payroll processing and employee benefits; work with the retirement plan administrator to terminate the ESOP and retirement plans; review and coordinate the distribution of employee and employer payroll tax

---

[4] Once UBS is paid off, then the secondary lender, Zais Group LLC, will begin to be paid. The principal amount owed Zais is $16,666,667, along with accumulating interest and penalties.

6

reports; work with outside accountants to complete the preparation of annual tax returns; work with secured warehouse line creditors to provide financial reporting related to collection of Versara Lending consumer loan repayments; coordinate with the StratFS team to review and prepare refunds to Versara Lending clients whose debt consolidation loans had not been distributed to creditors; and complete the migration of the Versara Lending loans to a third-party loan servicer.  Additionally, as discussed below, the Receiver's team conducted a forensic accounting asset tracing review, which led to the naming of five new Receivership Defendants.

      **B.**      **Other Court-ordered Receivership Responsibilities and Tasks**

Beyond these traditional receivership activities, the Receiver team also addressed a number of other issues, including: responding to inquiries from state regulators; investigating potential Assets belonging to the Receivership Estate; engaging in discussions with third parties and, as necessary, pursuing claims to recover estate Assets; and investigating, identifying, and naming additional Receivership Defendants, and participating in related legal briefing.

As detailed in the attached invoices, a substantial amount of the fee application relates to the following additional matters:[5]

      1.      <u>Participation in Settlement Conferences and Other Status Hearings</u>

During the summer of 2024, the Court and the Parties made a concentrated effort to resolve the case.  The Court held several settlement conferences (on August 1, August 26, and September 20) (*see* Dkt. Nos. 428, 429 & 434).  The Receiver attended as an independent party available to address issues pertaining to the Receivership Estate.  Ultimately, after the Parties were not able to resolve matters, the Court indicated that it would set dates to resolve pending

---

[5] The narrative here is limited given the Court's intimate familiarity with the case and the detailed time entries provided.  But the Receiver stands ready to provide further background and factual summaries should it become necessary.

7

issues before the Court. Thereafter, the Receiver and team devoted time to those matters, as described below.

The Receiver and/or his legal team participated in several subsequent hearings in October, November, and December to address pending matters.[6] *See* Dkt. No. 475 (October 30, 2024 hearing); Dkt. No. 492 (November 13, 2024 hearing); Dkt. No. 500 (November 20, 2024 hearing); and Dkt. No. 524 (December 10, 2024 hearing).

      2.    <u>Taking Legal Actions to Obtain Compliance with Court Orders and Cooperation from Fidelis, Lit Def, Jason Blust, Cameron Christo, and the Intervenor Law Firms</u>

          a.    <u>Receiver's OSC Contempt Motion against Intervenor Law Firms</u>

During the Application Period, the Receiver continued to deal with matters relating to parties who were violating their court-ordered obligations under the TRO and PI. Specifically,

---

[6] On October 30, 2024, the Court held a status hearing addressing numerous motions, including, the Receiver's pending contempt motion against the Intervenor Law Firms (Dkt. No. 353), the Receiver's pending motion requesting instruction from the Court regarding efforts to protect consumers (Dkt. No. 359), the Intervenor Law Firms' Motion to Withdraw, discussed above (Dkt. No. 469), and a motion to modify the Preliminary Injunction (Dkt. No. 472).

On November 13, 2024, the Court held another hearing addressing numerous matters, including certain parties' motions to dismiss, which were taken under submission. The Court also discussed with the parties the Intervenor Law Firms' Motion to Withdraw, which was ultimately resolved through a stipulated order entered on the same day as this hearing. *See* Dkt. Nos. 492 and 489.

On November 20, 2024, the Court held another hearing addressing a variety of pending motions, including a motion to modify the Preliminary Injunction (Dkt. No. 458), which was ultimately resolved by the parties, and the Receiver's request for instruction relating to efforts to protect consumers, which was resolved by Court order, as discussed below. Dkt. No. 500.

On December 10, 2024, the Court held another hearing to address and obtain status updates from the parties and the Receiver on numerous issues, including the Receiver's contempt motion regarding the Intervenor Law Firms, which was the subject of active settlement discussions, and the Receiver's request for instruction regarding efforts to protect consumers, for which the Receiver submitted an updated order to the Court in light of intervening events (the Intervenor Law Firms' withdrawal), which the Court granted. Dkt. Nos. 524, 525 & 526.

the Receiver resolved the Motion for an OSC re Contempt concerning the Intervenor Law Firms' continued consumer contact[7] after being specifically ordered by the Court at the April 22nd hearing not to contact consumers without Court permission.[8]  The Receiver held productive settlement discussions regarding the OSC with the Intervenor Law Firms, which ultimately led to a stipulated settlement (entered on February 11, 2025), Dkt. No. 608, under which the Intervenor Law Firms agreed to pay the attorneys' fees of $17,5000, to remain in compliance with PI and the Court's April 22, 2024 Order, and to obtain prior approval from the Court before sending other communications to current or former clients.

> b.  The Receiver's Order to Show Cause regarding Blust and Lit Def's Contempt and related Evidentiary Hearing

The Receiver continued during the Application Period to devote time and energy in pursuit of cooperation from Individual Defendant Blust, Individual Defendant Cameron Christo, and related entities Lit Def and Fidelis.  Given the protracted lack of cooperation, this required substantially more time than expected.  One component of this work dealt with pursuing a motion for contempt based on Defendant Blust's lack of cooperation and failure, among other things, to identify and turn over assets relating to Fidelis; another component related to Fidelis's challenge to the Receiver's determination that it was a Receivership Defendant.

---

[7] The Receiver's OSC Motion followed the April 2024 unauthorized communications by the Intervenor Law Firms to approximately 60,000 consumers requesting they electronically sign amended engagement agreements.

[8] Receiver's Emergency Motion for an Order to Show Cause Why Intervenor Law Firms Should Not Be Held in Civil Contempt (Dkt. No. 353, filed May 6, 2024); Intervenor Law Firms' Memorandum of Law in Response to Motion for an Order to Show Cause Why They Should Not Be Held in Civil Contempt (Dkt. No. 363, filed May 24, 2024); and Receiver's Reply in Support of Emergency Motion for an Order to Show Cause Why Intervenor Law Firms Should Not Be Held in Civil Contempt (Dkt. No. 371, filed May 31, 2024).

An evidentiary hearing was scheduled to resolve the Blust and Lit Def's OSC Contempt Motion; the hearing was scheduled at the same time as the hearing on the Plaintiffs' amended motion for a Preliminary Injunction against Fidelis, Christo, and Bush Lake Trust. Dkt. Nos. 589 & 590. In advance of the hearing, the Receiver prepared an extensive Hearing Brief, as well as a witness and exhibit list. *See* Dkt. Nos. 576, 576-1-11, 577 & 578. Also, before the hearing, the Receiver responded to the letters by Christo and Blust (Dkt. Nos. 579 & 581) seeking to excuse their attendance at the hearing. *See* Dkt. No. 584. On January 23rd and 24th, the Court held its evidentiary hearing on the Blust OSC Contempt Motion. Dkt. Nos. 589 & 590. Thereafter, the Court issued a Report and Recommendation determining that Blust and Lit Def should be held in contempt and awarding fees. Dkt. No. 646. The Court also issued an Order denying Fidelis's motion challenging the Receivership determination, a decision which Fidelis has challenged on appeal.[9] *Id.*

          3.     Investigating and Identifying New Receivership Defendants

During the Application Period, the Receiver team investigated and conducted due diligence and related asset tracing analysis to identify additional Receivership Defendants connected to Individual Defendants Ian Behar and Ryan Sasson. In the process, forensic accountant Stacy Chiang was engaged to oversee a comprehensive tracing analysis of the funds received from the 2019 Strategic ESOP transaction. This analysis confirmed five businesses qualified as Receivership Defendants, specifically (1) Timberline Capital LLC, (2) T.C.I.G. LLC, (3) MyG Investments, LLC, (4) Axel Development Sag Harbor, LLC, and (5) Fusion

---

[9] In the Court's Report and Recommendation, the Court held that the Receiver was entitled to recover attorneys' fees and costs from Blust relating to the OSC Motion re: Contempt, as well as Fidelis's challenge to the Receiver's determination that it was a Receivership Defendant. Blust has challenged the Report and Recommendation, and the Receiver will seek to recover these amounts from Blust once the matter is determined by Judge Wolford.

Capital, LLC. The Receiver subsequently brought a Cross-Motion to Add New Receivership Defendants (Dkt. No. 615), which the newly-identified Receivership Defendants opposed. Dkt. No. 631. The Court granted the Receiver's motion after a hearing on March 6, 2025. *See* Dkt. Nos. 636 & 643.

The investigation of potential new Receivership Defendants continues, and several additional entities have since been identified.

4. Investigation and Pursuit of Third Parties

During the Application Period, the Receiver also carried out the duties to identify, recover, and preserve additional Receivership Estate "Assets" (as defined in the PI) from third parties. The identification and investigation into the recovery of Assets from third parties continues. Several third parties who received asset transfers and/or owed Strategic money were investigated during the Application Period, and the Receiver team is now pursuing third parties in two separate cases as described below.

a. Monevo Litigation and Arbitration

The Receiver discovered that a British-based company named Monevo owed hundreds of thousands of dollars in unpaid commissions under a contract it had with StratFS. After Monevo delayed for significant time, it then refused to pay the amounts owed. A lawsuit was filed in the Western District of New York (Case 1:24-cv-00977-EAW); afterwards, Monevo filed a motion to compel arbitration. The parties have engaged in active settlement discussions, but have been unable to resolve matters. They jointly moved to stay the case, pending arbitration. The Receiver filed an Arbitration Demand in JAMS, which is proceeding.

b. Ice Legal Litigation

The Receiver's team also investigated legal malpractice and other claims against a law firm (named Ice Legal, P.A.), which had charged numerous Receivership Defendants (StratFS,

11

Lit Def Strategies, and Hedgewick) and a tribal entity called MEC Development LLC more than $2.5 million dollars in legal fees, while providing approximately 60 hours of work.  The Receiver attempted to resolve matters without resorting to litigation and entered into a Tolling Agreement with Ice Legal during those discussions.  The discussions were ultimately not successful, and a lawsuit to recover the fees has been filed in the Western District of New York (Case No. 1:25-cv-00275-EAW).

### C.  Benefits to the Receivership Estate and Quality of the Work

All the services covered by the submitted invoices were directly related to the Receiver's duties and obligations under the PI.  All told, this work covers a wide range of areas related to the sprawling receivership.  The Receiver's work, and that of his counsel, accountants, and data forensics professionals during the Application Period materially benefited the Receivership Estate and protected consumers and creditors.

The activities of the Receiver team, counsel, and accountants are set forth in the Receiver's Declaration and the detailed invoices attached thereto.  As described in the Receiver's Declaration, the Receiver has examined the invoices carefully before presenting the application to the Court.

### IV.   CONCLUSION

The Receiver now respectfully submits this Third Interim Fee Application for approval to pay the following fees and expenses for services during the six-month period of August 1, 2024 through January 31, 2025, which are detailed in the Receiver's Declaration filed with this Application:  (1) fees and expenses of the Receiver and staff to be paid to TWM Receiverships, Inc. dba **Regulatory Resolutions** as follows: August fees of $90,847.50 and expenses of $1,695.33; September fees of $60,321.00 and expenses of $2,109.91; October fees of $78,370.00 and expenses of $3,414.74; November fees of $61,200.00 and expenses of $1,688.80; December

12

fees of $82,373.50 and expenses of $192.00; January fees of $91,550.00 and expenses of $2,273.57; (2) fees and expenses for the Receiver's counsel, **McNamara Smith LLP** as follows: August fees of $65,635.00 and expenses of $39.95; September fees of $53,043.00 and expenses of $58.11; October fees of $73,305.50 and expenses of $674.85; November fees of $61,276.00 and expenses of $41.40; December fees of $85,532.50 and expenses of $351.64; January fees of $113,797.00 and expenses of $1,802.69; (3) fees and expenses for the Receiver's counsel, **Hodgson Russ LLP** as follows: August fees of $13,078.00; September fees of $10,121.00; October fees of $14,568.00 and expenses of $424.68; November fees of $8,730.50; December fees of $9,865.50 and expenses of $553.28; January fees of $10,806.50 and expenses of $394.76; (4) fees and expenses of the Receiver's counsel, **Ballard Spahr LLP** as follows: August fees of $903.15 and expenses of $27.60; September fees of $903.15; October fees of $1,180.80; November fees of $17,342.55; December fees of $1,204.20; January fees of $1,926.00; (5) fees and expenses for the Receiver's counsel, **Hilgers Graben LLP** as follows: August fees of $165.00; October fees of $497.50; November fees of $2,392.50; January fees of $2,475.00; (6) fees for the Receiver's forensic accountants **Mercadien, P.C.** as follows: August fees of $2,255.00; September fees of $17,345.00; October fees of $43,154.50; November fees of $16,739.50; December fees of $15,510.00; January fees of $8,166.50; (7) fees for the Receiver's forensic accountants **Scithe Consulting Group, LLC** as follows: December fees of $3,200.00; January fees of $5,150.00; and (8) fees and expenses for the Receiver's data forensic consultants **Bright Labs Services, LLC (Ankura)** as follows: August fees of $2,453.00 and expenses of

$9,866.52; September fees of $2,094.50 and expenses of $7,684.97; October fees of $328.00 and expenses of $442.49; November expenses of $300.00; December expenses of $300.00; January expenses of $300.00.

Dated: April 23, 2025

                              **MCNAMARA SMITH LLP**

                              By:   /s/ *Logan D. Smith*
                              Logan D. Smith (*Pro Hac Vice*)
                              Alexander D. Wall (*Pro Hac Vice*)
                              McNamara Smith LLP
                              655 West Broadway, Suite 900
                              San Diego, California 92101
                              Telephone: (619) 269-0400
                              Facsimile: (619) 269-0401
                              Email: lsmith@mcnamarallp.com;
                              awall@mcnamarallp.com
                              *Attorneys for Court-appointed Receiver,*
                              *Thomas W. McNamara*