UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.<br><br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al.<br><br>　　　　　　　　Defendants, and<br><br>STRATEGIC ESOP, et al.,<br><br>　　　　　　　　Relief Defendants. | Case No. 1:24-cv-00040-EAW-MJR |

**DECLARATION OF THOMAS W. MCNAMARA IN SUPPORT OF RECEIVER'S THIRD INTERIM APPLICATION FOR ORDER APPROVING FEES AND EXPENSES OF THE RECEIVER AND PROFESSIONALS**

　　　　I, Thomas W. McNamara, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the We also following is true and correct:

　　　　1.　　I am an attorney licensed in the state of California and the Court-appointed receiver ("Receiver") in this matter. I have personal knowledge of the facts set forth in this declaration except where, as noted, those facts have been obtained by staff acting at my direction. If called as a witness, I could and would competently testify to the facts stated herein.

　　　　2.　　By this Third Interim Fee Application, I seek approval for the payment of fees and expenses for the six-month period of August 1, 2024 through January 31, 2025 (the "Application Period"), as detailed below.

　　　　3.　　I was initially appointed temporary receiver of the Receivership Defendants by the Temporary Restraining Order entered January 11, 2024 ("TRO," Dkt. No. 12). The

1

appointment was confirmed, and the temporary designation removed, by the Preliminary Injunction ("PI") entered March 4, 2024 (Dkt. No. 184).

4.  The TRO and PI authorize the Receiver to "[c]hoose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order[.]"  PI, Section IX.I., page 20.

5.  The TRO and PI also provide that the "Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in the possession or control of, or which may be received by the Receivership Defendants.  The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation."  PI, Section XV, pages 30-31.

*Receivership Activities*

6.  As previously reported in several filings by the parties and my office, the underlying Receivership Defendants' business was sweeping in scale and complexity.  During the Application Period, and as detailed in the invoices of the Receiver team, counsel, and accountants, some of the receivership work continued to concern what I consider to be traditional receivership duties connected to running the remaining business operations.

7.  As the Court is aware, there were only limited business operations determined to be lawful *and* profitable that could continue, and the vast majority of the Strategic businesses could not be continued.  Nevertheless, we prioritized continuing customer service and oversight of the law firm debt relief support functions pending the Court's determination on how to proceed with these 50,000+ customers.  In December 2024, the Court issued an Order allowing

the permanent cessation of the law firm debt relief model operations, and we undertook many tasks associated with that termination and have since scaled back the customer support operations. During the Application Period, we provided regular communications to consumers with updates on the receivership website and also sought and obtained approval to implement a transition plan, under which consumers without active payment plans were provided notice that Strategic customer support would sunset; at the same time, in their Strategic portals consumers were provided relevant information about their settlements and remaining debts.

8. We also worked with the payment processors (Global and RAM) and then sought and received a Court Order requiring the payment processors to close consumers' dedicated accounts and return funds in those accounts to those consumers without active payment plans. We coordinated with the Intervenor Law Firms when they decided in October 2024 to withdraw representation and then worked with Global when it terminated Strategic's access to Global consumer data because of the withdrawal by the firms.

9. We have continued to operate the direct to consumer ("DTC") contingency debt relief operations of Timberline and Atlas for those customers enrolled at the time the TRO was entered; no new customers have been enrolled. Average monthly revenue of $1,230,439 has been generated by DTC during the period January 2024 through January 2025. Operating the DTC businesses requires coordination with CIBC Bank and Valley National Bank, the Receivership Defendants' primary lenders, which assert security interests over most Receivership Estate assets. DTC operations have allowed the Receivership Estate to pay monthly interest of roughly $300,000 per month to the banks.

10. Our forensic accountant and her team performed a variety of tasks vital to operating the receivership. As reflected in the invoices, this includes: interfacing with the banks;

providing cash flow projections and other financial reporting data; monitoring daily bank transactions and maintaining records of all receipts and disbursements; payroll processing and employee benefit acquisition and assistance; coordinating with outside accountants for annual tax returns; providing the Versara Lending secured creditors with financial reporting related to the collection of Versara Lending client loan repayments; and migration of the Versara Lending loan portfolio to a third-party servicer.

11. In some respects, certain aspects of managing the receivership have become less contentious during this Application Period. But the continued lack of cooperation from Individual Defendants Blust and Christo and Lit Def and Fidelis, which Blust controls, and the seemingly endless serial litigation, primarily by Fidelis, has caused the Receivership Estate to incur hundreds of thousands in unnecessary fees and expenses, a portion of which occurred during the Application Period.[1] We have had to engage in more than a year of extensive litigation to address Blust's and Lit Def's contempt of Court, and bring Fidelis into the receivership. As this Court is intimately familiar with this litigation, I will not summarize it here.

12. During the Application Period, the receivership team also devoted time and energy towards investigating whether there were other entities which qualify as Receivership Defendants. The Individual Defendants ran not only a complex and sophisticated common enterprise, which relied upon numerous corporate LLCs, but they also created numerous LLCs which they used to hold and invest the proceeds of the Strategic business. Some of these entities (namely the Birds investments) are being managed by stipulated agreements of the Parties; since

---

[1] If Judge Roemer's Report and Recommendation regarding Blust's and Lit Def's Contempt of Court is accepted by Judge Wolford, the estate will look to Blust and Lit Def to reimburse the Receivership Estate for these fees and costs.

those Assets are protected and managed in a transparent manner outside of the receivership, I have not formally named the related LLCs as Receivership Defendants (but have made clear in filings that they do qualify as Receivership Defendants and will act accordingly should it become necessary). As to other entities, I engaged a forensic accountant (Stacy Chiang) to trace the flow of funds out of the Strategic businesses to determine whether there were other businesses that should be identified as Receivership Defendants. That led to a motion to expand the receivership to add five new Receivership Defendants, which the Court granted.

13. Additionally, my team has continued to investigate whether there are additional Receivership Assets that need to be brought within the Receivership Estate. We attempted to recover, without resorting to litigation, Assets from two entities (a British based company named Monevo and a law firm named Ice Legal). After pre-litigation settlement discussions were not successful in either, it was necessary to file suit. In the case of Monevo, the parties have agreed to arbitrate the dispute, which is now proceeding. In the case of Ice Legal, the case was filed suit in the Western District of New York.

14. My team continues to investigate both whether there is a need to name additional Receivership Defendants and also whether there are Assets that need to be brought into the Receivership Estate.

15. During the Application Period, I participated in three hearings devoted to settlement efforts (on August 1, August 29, and September 20), all of which ultimately were not successful (*see* Dkt. Nos. 428, 429 & 434). After those efforts failed, the priority became resolving several pending matters with one focus being gaining control of Fidelis's assets and bringing Fidelis and any related entities into the Receivership Estate. Thereafter, my team and or I participated in multiple other status conferences in October, November, and December. *See*

Dkt. No. 475 (October 30, 2024 hearing); Dkt. No. 492 (November 13, 2024 hearing); Dkt. No. 500 (November 20, 2024 hearing); and Dkt. No. 524 (December 10, 2024 hearing). The Court also held a two-day evidentiary hearing in late January relating to this issue, which included consideration of the Receiver's OSC Motion against Blust and Lit Def for their roles in hiding the existence of Fidelis and refusing to cooperate in bringing those Assets into the Receivership Estate. *See* Dkt. Nos. 589 & 590.

**Professional Fees and Expenses**

16. The receivership company, counsel, and accountants agreed to discount normal rates in this receivership as reflected in our Statement of Interest and Qualification filed with the Court (Dkt. No. 4-1).[2] In addition, as part of my obligation to maximize the value of the Receivership Estate, I have examined my bills and the bills of counsel and professional vendors very carefully. A significant amount of charges of the receivership team and counsel were cut prior to presenting this fee application to the Court. While the time and fees were properly incurred and recorded, I excised these amounts from this request to assure that the fees were congruent with the tangible benefits realized by the Receivership Estate for the time entries.

**Fees and Expenses of the Receiver and Staff**

17. The fees for my time as Receiver and professional staff during this period and as set forth in the invoices from Regulatory Resolutions which are attached as **Exhibit 1** are as follows:

    a.    August 1-31, 2024: $90,847.50;

    b.    September 1-30, 2024: $60,321.00;

---

[2] Although not noted in the Statement of Interest (Dkt. No. 4-1), James Thoman of Hodgson Russ LLP also agreed to discount his firm's rates in this receivership matter. Similarly, the Receiver's data forensics firm, Ankura, discussed below, agreed to discount its standard rates.

  c. October 1-31, 2024:  $78,370.00;

  d. November 1-30, 2024:  $61,200.00;

  e. December 1-31, 2024:  $82,373.50; and

  f. January 1-31, 2025:  $91,550.00.

18. During the Application Period, my work included oversight of the day-to-day operations and business decisions of the receivership, and direct participation in and oversight of the many legal filings made on my behalf and attendance at Court hearings and settlement conferences.  Additionally, as described above, our accountant team's work spanned a variety of essential tasks, including, among other things, daily review and analysis of all bank transactions across all Receivership Defendant accounts, account reconciliation and maintenance, payroll distribution, vendor payments, and ongoing work with secured creditors regarding payments and distributions.

19. During this six-month period, receivership and law firm administrators and staff also spent time addressing numerous StratFS issues which were not billed.  These unbilled services included staff assistance to employees concerning insurance, COBRA, benefits, 401k rights, and coordinating with the administrator (Principal) to assist employees.

20. The invoices from Regulatory Resolutions also include expenses totaling $1,695.33 in August; $2,109.91 in September; $3,414.74 in October; $1,688.80 in November; $192.00 in December; and $2,273.57 in January as detailed in **Exhibit 1**.

**Fees and Expenses of the Receiver's Counsel, McNamara Smith LLP**

21. The fees for counsel McNamara Smith LLP ("McNamara Smith") during this period and as set forth in the invoices attached as **Exhibit 2** are as follows:

  a. August 1-31, 2024:  $65,635.00;

      b.      September 1-30, 2024:  $53,043.00;

      c.      October 1-31, 2024:  $73,305.50;

      d.      November 1-30, 2024:  $61,276.00;

      e.      December 1-31, 2024:  $85,532.50; and

      f.      January 1-31, 2025:  $113,797.00.

22.    The work of McNamara Smith attorneys and staff has covered a wide range of areas related to the sprawling receivership.  They have been involved in numerous aspects of the wind down of the law firm debt relief business, continued consumer protection efforts, and working with Strategic's payment processors.  They have been extensively involved in the efforts to recover Assets from third parties, and related investigation, document review, and data mining.  This has included pursuing litigation against third parties Monevo and Ice Legal.  They have also been heavily involved in the review, investigation, and due diligence regarding new entities to be brought into the Receivership Estate.  They have been involved in the efforts to pursue cooperation from Blust, Lit Def, Christo, and Fidelis, and the related litigation resulting from their noncompliance, including contempt proceedings.  The firm has been directly involved in all receivership activities and their services are more thoroughly described in the invoices attached as **Exhibit 2**.

23.    The McNamara Smith attorneys have substantial experience with regulatory receiverships.  As reflected in the invoices, the attorneys' fees were incurred primarily in connection with the filings identified above.

24.    The invoices from McNamara Smith also include expenses totaling $39.95 in August; $58.11 in September; $674.85 in October; $41.40 in November; $351.64 in December; and $1,802.69 in January, as detailed in **Exhibit 2**.

8

**Fees and Expenses of the Receiver's Counsel, Hodgson Russ LLP**

25. Fees for Hodgson Russ LLP ("Hodgson Russ") during this period and as set forth in the invoices attached as **Exhibit 3** are as follows:

    a.    August 1-31, 2024:  $13,078.00;

    b.    September 1-30, 2024:  $10,121.00;

    c.    October 1-31, 2024:  $14,568.00;

    d.    November 1-30, 2024:  $8,730.50;

    e.    December 1-31, 2024:  $9,865.50; and

    f.    January 1-31, 2025:  $10,806.50.

26. As reflected in the invoices, Hodgson Russ's fees were incurred primarily in negotiating with creditors of the Receivership Defendants and parties to pending litigation against the Receivership Defendants, supporting McNamara Smith in extensive motion practice, counseling the Receiver on labor law issues, and managing communication with counsel for secured creditors.

27. The invoices from Hodgson Russ also include expenses totaling $424.68 in October; $553.28 in December; and $394.76 in January, as detailed in **Exhibit 3**.

**Fees and Expenses of the Receiver's Counsel, Ballard Spahr LLP**

28. The fees for ESOP counsel, Ballard Spahr LLP ("Ballard Spahr"), during this period and as set forth in the invoices attached as **Exhibit 4** are as follows:

    a.    August 1-31, 2024:  $903.15;

    b.    September 1-30, 2024:  $903.15;

    c.    October 1-31, 2024:  $1,180.80;

    d.    November 1-30, 2024:  $17,342.55;

  e.  December 1-31, 2024:  $1,204.20; and

  f.  January 1-31, 2025:  $1,926.00.

29. Ballard Spahr provided expert legal analysis and advice regarding the proper handling of the Strategic ESOP and Strategic ESOT and, ultimately, the termination of the plan at year-end 2024.  The invoices from Ballard Spahr also include expenses totaling $27.60 in August, as detailed in **Exhibit 4**.

**Fees and Expenses of the Receiver's Counsel, Hilgers Graben**

30. The fees for Hilgers Graben LLP ("Hilgers Graben") during this period and as set forth in the invoices attached as **Exhibit 5** are as follows:

  a.  August 1-31, 2024:  $165.00;

  b.  October 1-31, 2024:  $497.50;

  c.  November 1-30, 2024:  $2,392.50; and

  d.  January 1-31, 2025:  $2,475.00.

31. Hilgers Graben was retained primarily to represent the receivership in two lawsuits pending in the Chicago area (one in federal court and the other in state court).

**Fees and Expenses of the Receiver's Forensic Accountants, Mercadien, P.C.**

32. The fees for forensic accountants Mercadien, P.C. ("Mercadien") during this period and as set forth in the invoices attached as **Exhibit 6** are as follows:

  a.  August 1-31, 2024:  $2,255.00;

  b.  September 1-30, 2024:  $17,345.00;

  c.  October 1-31, 2024:  $43,154.50;

  d.  November 1-30, 2024:  $16,739.50;

  e.  December 1-31, 2024:  $15,510.00; and

      f.      January 1-31, 2025: $8,166.50.

33.    The firm was retained to provide a comprehensive and sophisticated forensic analysis of Receivership Defendants' complex and intertwined finances.

**Fees and Expenses of the Receiver's Forensic Accountants, Scithe Consulting Group, LLC**

34.    The fees for forensic accountants Scithe Consulting Group, LLC ("Scithe") during this period and as set forth in the invoices attached as **Exhibit 7** are as follows:

      a.      December 1-31, 2024: $3,200.00; and

      b.      January 1-31, 2025: $5,150.00.

35.    The firm's principal, Stacy Chiang, was retained to conduct a forensic accounting review and asset tracing analysis relating to Strategic, which Ms. Chiang conducted in connection with my team's investigation of determining whether to add Receivership Defendants, related to Strategic's debt relief business. Ms. Chiang's primary focus was tracing the funds flowing from StratFS's 2019 ESOP transaction to a variety of entities related to Individual Defendants.

**Fees and Expenses of the Receiver's Data Forensic Consultants, Bright Labs Services, LLC**

36.    The fees for data forensic consultants Bright Labs Services, LLC ("Ankura") during this period and as set forth in the invoices attached as **Exhibit 8** are as follows:

      a.      August 1-31, 2024: $2,453.00;

      b.      September 1-30, 2024: $2,094.50; and

      c.      October 1-31, 2024: $328.00.

37. Ankura's fees primarily related to professional services relating to data collection, extraction, and preservation.

38. Ankura's invoices also include monthly technology and data-related expenses, including expenses for database storage, data processing, hosting of the Relativity database, and user licenses. These expenses total $9,866.52 in August; $7,684.97 in September; $442.49 in October; and $300.00 in November, December, and January as detailed in **Exhibit 8**.

**The Fees and Expenses Requested are Reasonable and Necessary**

39. I submit to the Court that the identified services provided by me, as Receiver, and by the other designated professionals, were reasonable, necessary, and appropriate and brought significant value to the receivership. I have monitored the efforts of the team and have reviewed and approved the invoices which are the subject of this Third Interim Fee Application. I request that the Court approve immediate payment of these invoices.

Executed this 23rd day of April 2025, in San Diego, California.

_____
Thomas W. McNamara