**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Strategic Consulting, LLC; Versara Lending, LLC; Strategic Family, Inc.; Anchor Client Services, LLC (now known as CS 1 Paas Services, LLC); Bedrock Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Carolina Client Services, LLC; Great Lakes Client Services, LLC; Guidestone Client Services, LLC; Harbor Client Services, LLC; Heartland Client Services, LLC; Monarch Client Services, LLC (now known as CS 2 Paas Services, LLC); Newport Client Services, LLC; Northstar Client Services, LLC; Option 1 Client Services, LLC; Pioneer Client Servicing, LLC; Rockwell Client Services, LLC; Royal Client Services, LLC; Stonepoint Client Services, LLC; Summit Client Services, LLC (now known as CS 3 Paas Services, LLC); Whitestone Client Services, LLC; Twist Financial, LLC; Duke Enterprises, LLC; Blaise Investments, LLC; Lit Def Strategies, LLC; Relialit, LLC; Atlas Debt Relief, LLC; Timberline Financial, LLC; Acorn 21 Services, LLC; Atlas Client Services, LLC; Chinn Client Services, LLC; Cs0621Jade, LLC; Cs0821Creek, LLC; Cseternal1121, LLC; Csstorm1121, LLC; Gardner Client Services, LLC; Hallock Client Services, LLC; Spring Client Services, LLC; Fidelis Legal Support Services, LLC; Hedgewick Consulting, LLC; The Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee; The Bush Lake Trust Through Timothy Miller, Trustee; Cell Gramercy 2 of Contego Insurance, Inc.; Strategic LD, LLC; Versara DST 2019-2; Fusion Services, LLC; Axel Development Sag Harbor LLC; MyG Investments, LLC; T.C.I.G., LLC; and Timberline Capital LLC, | Case No. **RECEIVER'S COMPLAINT FOR: (1) BREACH OF FIDUCIARY DUTY; (2) PROFESSIONAL NEGLIGENCE; (3) RESCISSION OF PER SE INVALID NONREFUNDABLE RETAINER; (4) VOIDABLE OR FRAUDULENT TRANSFER; (5) BREACH OF CONTRACT; (6) UNJUST ENRICHMENT** Related Cases: *Consumer Financial Protection Bureau, et al. v. StratFS, LLC, et al.* Western District of New York Case No. 1:24-cv-00040-EAW-MJR *McNamara v. Monevo Inc.* Western District of New York Case No. 1:24-cv-00977-EAW |
|                    Plaintiff, | |
| vs. | |
| ICE LEGAL, P.A., a Florida Profit Corporation, THOMAS ICE, an individual, and ARIANE ICE, an individual, | |
|              Defendants. | |

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the Court-appointed receiver in *Consumer Financial Protection Bureau, et al. v. StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), et al.*, 1:24-cv-00040-EAW-MJR (W.D.N.Y.) (the "CFPB Action"), brings this action against Defendants Ice Legal, P.A ("Ice Legal"), Thomas Ice, and Ariane Ice (collectively, "Defendants").

## **INTRODUCTION**

1.      This lawsuit arises from the breaches of fiduciary duties and deficient legal services provided by Ice Legal, Thomas Ice, and Ariane Ice to certain Receivership Entities that operated a large debt settlement operation at issue in the CFPB Action, as well as from Ice Legal's use of an unenforceable and void nonrefundable retainer agreement.

2.      By way of background, in 2019 and 2020, Ice Legal sued Strategic Financial Solutions, LLC ("Strategic"), Lit Def Solutions, LLC ("Lit Def"), various associated Law Firms, and several other related entities at least eighteen times in state courts.  By late 2020, Ice Legal had represented substantially more than fifty clients against Strategic, Lit Def, and related entities and had threatened to continue bringing one hundred suits per year.  In these actions, Defendants alleged fraud and claimed Strategic, Lit Def, and related entities were operating a RICO racketeering enterprise.

3.      During settlement discussions about these lawsuits, counsel for Strategic and Lit Def, both of which are Receivership Entities in the CFPB Action (collectively with

Hedgewick Consulting, LLC ("Hedgewick")[1], the "Strategic Parties"[2]), raised the concern that

they did not want to settle these cases only to be sued by Ice Legal in dozens more lawsuits.  To

resolve this issue, the Strategic Parties began discussions with Defendants about instead having

Defendants represent the Strategic Parties, as well as a tribal entity doing business with Strategic

named MEC Distribution LLC ("MEC").  In other words, the Strategic Parties and Defendants

discussed having Ice Legal flip sides, stop representing consumers suing the Strategic Parties,

and begin representing the very parties Ice Legal had claimed in dozens of cases constituted a

RICO enterprise.  Defendants and the Strategic Parties initially discussed this change in sides

while continuing to negotiate the claims of Ice Legal's clients but agreed to first settle the

clients' claims and only then proceed with overt negotiations regarding the Strategic Parties'

hiring of Defendants.

     4.     After quickly settling the final nine claims against the Strategic Parties in

November 2020, Defendants immediately began negotiations to enter into an attorney-client

relationship with the Strategic Parties, ostensibly for Defendants to provide legal services

relating to legal and regulatory compliance.  And after executing a fee agreement, Ice Legal was

then paid more than $2.625 million over the next three years.  The first payments to Ice Legal

were initially exchanged for minimal, insufficient, and deficient work during early 2021, which

failed to remedy any of the illegality or regulatory non-compliance that Defendants had been

alleging in their lawsuits against Strategic and related entities.  After that, Ice Legal was paid for

---

[1] Hedgewick was not a defendant in any of Ice Legal's lawsuits, but is a related entity that subsequently signed the Engagement Agreement with Ice Legal along with Strategic, Lit Def, and MEC Distribution LLC.

[2] While these entities were separate companies, they were collectively operating a common debt settlement enterprise and thus are referred to as the Strategic Parties.

doing almost nothing over the next three years and submitting zero-hour invoices.  Indeed, on an hourly basis, Ice Legal was paid more than $40,000 per hour (based on invoices showing Ice Legal worked approximately 60 hours in total on the engagement).

5.      At Ice Legal's insistence, its engagement agreement with the Strategic Parties was ostensibly structured as a nonrefundable "true" or "classic" retainer agreement where all legal fees were earned on receipt.  This type of engagement agreement is unlawful, unenforceable, and void under New York law, and the Strategic Parties are entitled to restitution of amounts paid pursuant to the agreement.  In fact, the agreement contained an especially confusing fee structure, which though purporting to be a nonrefundable "true" or "classic" retainer agreement, mixed elements of a "true" or "classic" retainer with elements of fixed fee and hourly engagement agreements.

6.      Moreover, the legal fees Ice Legal invoiced and received were unreasonable, grossly excessive, and untethered to any work actually done.  Incredibly, Defendants continued pursuit of payment of their no-work invoices even *after* a Court issued a Preliminary Injunction and implemented a receivership in 2024.  Defendants – who did essentially no work to entitle them to payment – advocated for prioritizing Ice Legal's payments *over* the claims of other creditors, including consumers.

7.      Among other things, the Defendants breached their fiduciary duties by charging and accepting fees that violated specific professional rules prohibiting nonrefundable fees and unreasonable fees (*see, e.g.,* Rule 1.5 of New York's Rules of Professional Conduct, N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0); these payments also constituted fraudulent transfers made by a company that was financially underwater as a result of its liability to consumers.  Defendants' conduct also violated their obligations to their corporate clients under Rule 1.13 of the Rules of

Professional Conduct, which required them to act in the best interests of the organizations they represented.

8.      As detailed herein, Defendants' receipt of millions of dollars in payments from the Strategic Parties, and Defendants' conduct prior to and while receiving these payments, gives rise to numerous actionable legal claims, including (1) breach of their fiduciary duties, (2) professional negligence, (3) rescission of Ice Legal's *per se* invalid nonrefundable retainer, with concomitant restitution, (4) voidable or fraudulent transfer, (5) breach of contract, and (6) unjust enrichment.

## PARTIES

9.      Plaintiff is the Court-appointed Receiver in the CFPB Action, appointed by the Preliminary Injunction entered March 4, 2024 (Dkt. No. 184).

10.      The Preliminary Injunction directs the Receiver, *inter alia*, to preserve the value of the assets in the Receivership Estate and authorizes the Receiver to institute actions to preserve or recover those assets.  It further authorizes the Receiver to "sue for, collect, receive, take possession of, hold, and manage all Assets and Document of the Receivership Defendants" and to "[i]nstitute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants[.]"

11.      The Preliminary Injunction defines the Receivership Estate to include the "Receivership Entities," which are: StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Strategic Consulting, LLC; Versara Lending, LLC; Strategic Family, Inc.; Anchor Client Services, LLC (now known

as CS 1 Paas Services, LLC); Bedrock Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Carolina Client Services, LLC; Great Lakes Client Services, LLC; Guidestone Client Services, LLC; Harbor Client Services, LLC; Heartland Client Services, LLC; Monarch Client Services, LLC (now known as CS 2 Paas Services, LLC); Newport Client Services, LLC; Northstar Client Services, LLC; Option 1 Client Services, LLC; Pioneer Client Servicing, LLC; Rockwell Client Services, LLC; Royal Client Services, LLC; Stonepoint Client Services, LLC; Summit Client Services, LLC (now known as CS 3 Paas Services, LLC); Whitestone Client Services, LLC; Twist Financial, LLC; Duke Enterprises, LLC; Blaise Investments, LLC; Lit Def Strategies, LLC; Relialit, LLC; Atlas Debt Relief, LLC; Timberline Financial, LLC; Acorn 21 Services, LLC; Atlas Client Services, LLC; Chinn Client Services, LLC; Cs0621Jade, LLC; Cs0821Creek, LLC; Cseternal1121, LLC; Csstorm1121, LLC; Gardner Client Services, LLC; Hallock Client Services, LLC; Spring Client Services, LLC; Fidelis Legal Support Services, LLC; Hedgewick Consulting, LLC; The Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee; The Bush Lake Trust Through Timothy Miller, Trustee; Cell Gramercy 2 of Contego Insurance, Inc.; Strategic LD, LLC; Versara DST 2019-2; Fusion Services, LLC; Axel Development Sag Harbor LLC; MyG Investments, LLC; T.C.I.G., LLC; and Timberline Capital LLC.

  12. Defendant Ice Legal, P.A. is a Florida Profit Corporation, organized and existing under the laws of the State of Florida, with a current or most recent principal place of business at 6586 Hypoluxo Road, Suite 350, Lake Worth, Florida 33467 and a registered agent for service located at 3458 Lakeshore Drive, Tallahassee, Florida 32312.

13.     Upon information and belief, Defendant Thomas Ice is an individual having a last and usual place of abode in Florida, and was, at all relevant times, an owner of Ice Legal, President of Ice Legal, and an attorney employed by Ice Legal.

14.     Upon information and belief, Defendant Ariane Ice is an individual having a last and usual place of abode in Florida, and was, at all relevant times, an owner of Ice Legal and an attorney employed by Ice Legal.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28 U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction. *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("the receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

16.     Venue in the District of Western District of New York is proper pursuant to 28 U.S.C. § 1391.  Additionally, the Court retained jurisdiction of the CFPB Action for all purposes (*see* Preliminary Injunction at 39), and this proceeding is supplemental to the CFPB Action.  *See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("where jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well").

17.     The Court may exercise personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Receivership Estate under the Court's Orders issued the CFPB Action.

## ALLEGATIONS COMMON TO ALL COUNTS

18.     As discussed herein, Defendants agreed to provide legal services to the following Receivership Entities: Strategic Financial Solutions, LLC, Strategic Client Support, LLC,

Strategic CS, LLC, Strategic Consulting, LLC, T Fin, LLC, Timberline Financial, LLC, Atlas

Debt Relief, LLC, Anchor Client Services, LLC, Boulder Client Services, LLC, Canyon Client

Services, LLC, Heartland Client Services, LLC, Rockwell Client Services, LLC, Summit Client

Services, LLC, Versara Lending, LLC, and Strategic LD, LLC; Hedgewick, LLC; and Litigation

Defense Strategies, LLC.

19.     As part of their arrangement with these Receivership Entities, Ice Legal was paid

$2.625 million in supposed "legal fees," which it knew were proceeds from Strategic's debt

relief operation.  Ice Legal collected these fees, despite doing essentially no legal work to earn

these fees over the course of the engagement.  At first, in 2021, Ice Legal provided minimal

work, which failed to remedy any issues in the Strategic business.  Before long, as is facially

evident from Ice Legal's zero-hour invoices, no work was being done, or was going to be done,

to earn any of the fees being charged by the firm.  In fact, Ice Legal ceased doing any work at all

for these Receivership Entities, providing no legal services whatsoever during 2022 and 2023.

Nevertheless, Ice Legal invoiced and was paid $1.625 million over that two-year period.

**A.     Ice Legal's Prior Lawsuits *Against* Strategic on Behalf of 51 Plaintiffs**

20.     At the time that Defendants received these millions of dollars from the

Receivership Entities in supposed "legal fees," they had only recently filed, and threatened to

file, lawsuits on behalf of more than 50 individuals against Strategic, Lit Def, several related law

firms, and other related parties.  In those lawsuits, Defendants made stunning allegations,

specifically alleging that Strategic's law-firm-based debt relief model was a fraudulent enterprise

and this group of entities and individuals were a running a massive corrupt scheme.  Initially,

Defendants demanded that *each* individual plaintiff should recover hundreds of thousands of

dollars.

21.     For example, on or about July 4, 2019, Defendants filed suit against Strategic,

Lit Def, and various affiliated companies and individuals, on behalf of a putative class of

"victims" of Strategic's "scheme."  Defendants' lawsuit alleged, *inter alia*, fraud, conspiracy,

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1962 *et seq.*, breach of fiduciary duty, unjust enrichment, and violation of consumer protection

laws.

22.     In 2019-20, Defendants filed at least 18 separate civil actions against Strategic

and/or Strategic-affiliated law firms in Colorado, Connecticut, Florida, New Hampshire, New

Jersey, and Wyoming.

23.     Among the many serious allegations Defendants made against Strategic in the

complaints they filed in the foregoing lawsuits were the following:

a.      Strategic is a "a debt settlement scheme involving numerous entities that conspire

        to defraud Florida consumers";

b.      "The scheme begins with bait-and-switch advertising through interstate mailings

        to initiate contact with the consumers. The mailers promise the consumer a low-

        interest loan, but upon calling the number on the mailer, they are pressured to

        instead enter into a debt settlement program";

c.      Strategic "defrauds consumers by posing as lawyers and law firms and by

        enlisting real lawyers and law firms to provide their names for the scheme even

        though they do not—and generally, cannot—perform legal services themselves in

        Florida where the consumers reside";

d.      Strategic "adopted a business structure that fraudulently mimics the 'attorney

        model' of debt settlement—a controversial structure in its own right—in order to

evade the licensing and fee-limitation requirements for non-attorney settlement companies in various states and to project an aura of trustworthiness to lure unsuspecting consumers";

e.    Strategic "creates and maintains a collection of entities being held out as law firms…  It does so with the complicity of lawyers in various states for the purpose of evading laws relating to non-lawyer debt settlement companies and to falsely create an aura of trustworthiness that will attract and entrap consumers";

f.    "Consumers responding to [Strategic's] 'mailers' never receive a loan at the advertised terms.  The lead generation letters are a bait-and-switch scheme designed by SFS to provide it with leads for its unlawful 'debt relief' program";

g.    "As is typically the case, the Plaintiff's monthly payments were consumed by the costs of the debt management programs during the first several months of the program and were substantially consumed by such fees throughout the remainder of her participation in the program";

h.    "The Defendants engaged in a centrally orchestrated scheme to mislead consumers through a standardized protocol that SFS sales agents were carefully trained to perform";

i.    Strategic is a "fraudulent debt settlement enterprise, whose members and associates engaged in fraudulent and deceptive practices designed to enroll consumers in useless 'debt settlement' plans and extract unearned fees from them";

j.     Strategic "fraudulently induc[ed] Class Members to enter into illegal contracts through which members of the SFS Enterprise extracted illegal fees directly from Class Members' bank accounts";

k.     Strategic "conducted and participated in the affairs of the above-referenced SFS Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 2314 (relating to the interstate transportation of stolen property); 18 U.S.C. § 1341 (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud); and 18 U.S.C. § 1344 (relating to bank fraud)"; and

l.     Strategic's "racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud Class Members."

24.     In 2019, Defendants began negotiations with Strategic and its related entities regarding claims of numerous claimants that they represented in pending and anticipated civil actions against them.

25.     During these negotiations, Defendants took the position that their clients' claims were worth millions of dollars in total and demanded hundreds of thousands of dollars for each individual claimant Defendants represented.

26.     By August 2020, Defendants represented 51 claimants and were in the process of negotiating settlements with the Strategic, Lit Def, and related entities on those clients' behalf.

27.     During these settlement negotiations Strategic, Lit Def, and related entities indicated they were reluctant to settle these claims unless they received assurances that Ice Legal would not bring new claims after the pending claims were settled.

28.     Faced with the prospect that settlements could not be achieved without a solution regarding future litigation, Defendants and Strategic discussed the possibility of having Ice Legal

become legal counsel to the Strategic Parties – the parties they were suing. The engagement of Ice Legal by the Strategic Parties would then preclude Defendants from further representation of consumers against the Strategic Parties.

29.     During a phone call with Strategic's counsel on August 20, 2020 to discuss resolution of Ice Legal's consumer clients' claims, Thomas Ice stated that once those claims were settled, he understood that Ice Legal and the Strategic would discuss forming a relationship. Mr. Ice also commented that, because he is licensed in so many states, he would be an ideal person to represent Strategic on ethics and compliance in the future.

30.     Given that entering an engagement agreement with Strategic would create a conflict of interest for Ice Legal while they had active cases against Strategic and related entities, the discussions about representing Strategic were initially kept to a preliminary level (such as Mr. Ice's above-referenced statements about a future relationship). It was agreed they would need to settle Ice Legal's current clients' claims before proceeding to negotiate the terms of the proposed representation of the Strategic Parties.

31.     On or about August 27, 2020, Ice Legal agreed to settle the claims of its fifty-one clients for a total of $3.7 million, or approximately $75,000 for each client, which Ariane Ice characterized as a "very fair and reasonable number."

32.     Defendants, Strategic, and related entities executed these settlements in September 2020 and Strategic ultimately wired settlement funds of $3,700,050 to Ice Legal by October 27, 2020.

**B.      Ice Legal's Offer of Reduced Settlements for Nine Plaintiffs Right Before Defendants Negotiated the Engagement Agreement**

33.     In September and October 2020, Defendants informed Strategic, Lit Def, and related entities that they had been retained by additional consumers, eight of whom possessed

claims against Strategic-associated law firms and one of whom had a claim against a Timberline, another Strategic-related entity.

34.     Despite having just completed settlements with Strategic and related entities on behalf of fifty-one clients for approximately $75,000 per client, which Ms. Ice had characterized as "very fair," Ice Legal only initially demanded $20,000 to $30,000 per client in settlement for the new clients.

35.     In October and November 2020, Strategic, Lit Def, and related entities and the Defendants worked to quickly resolve all pending Ice Legal client claims, with a mutual understanding that once those claims were resolved, they could move forward with the proposed attorney-client relationship between Defendants and the Strategic Parties.

36.     Strategic and Ice Legal agreed that they needed to find a lull when Defendants were not representing any clients with active claims against the Strategic Parties for the Strategic Parties and Defendants to discuss and enter into the attorney-client agreement they had been contemplating.

37.     Strategic, Lit Def, and related entities quickly settled these last seven cases with Defendants; in many instances, they did not even bother to counter the $20,000 demands made by Ice Legal and simply accepted the initial settlement demands.  By November 6, 2020, the Strategic Parties had already settled seven of the eight cases for $20,000 per case.  The case against Timberline was settled for $15,000.  Ms. Ice also identified a ninth client in November 2020, and that case also quickly settled for $20,000 that same month.

38.     Once these pending claims were settled, Defendants and the Strategic Parties began to expressly negotiate having Ice Legal switch teams to become the Strategic Parties' lawyers and stop bringing claims against any of the Strategic Parties.

39.     To achieve that end, while in the midst of finalizing the November 2020 settlements, Ariane Ice conveyed to Strategic, Lit Def, and the related entities that she was expecting someone from Strategic to reach out to Defendants about the proposed consulting agreement and wondered if that would be happening soon.

40.     At that time, the Strategic Parties were not yet able to talk with Defendants about entering into an attorney-client relationship, because they were still technically adverse as not all settlements had been finalized.  But by late November, Strategic, Lit Def, and related entities had funded the final settlements, and Ice Legal and Strategic began negotiating, with the goal nominally being to enter an attorney-client relationship.

41.     On December 4, 2020, Ariane Ice conveyed to the Strategic Parties:

> Given the nature of the proposed role you outlined yesterday, we feel we must now take steps to remain 'non-adverse' to [the Strategic Parties] until these negotiations conclude.  As you can imagine, it's not preferable to our firm to refrain from consulting with potential plaintiffs.  This period of limbo necessitates a need for these talks to conclude sooner than later.  We ask that we move toward conclusion of these discussions (one way or the other) very quickly.

In other words, if the Strategic Parties did not act fast, Ice Legal would start signing up more consumers to sue them and again become adverse.

42.     Negotiations continued throughout the month of December.  During these negotiations, the parties went back and forth with each other.  There is scant evidence that the parties were attempting to tie the money that Ice Legal would receive to the amount of actual legal work to be performed; rather, the parties appear instead to have been negotiating as two adverse parties making numerous counterdemands and counteroffers, with Ice Legal seeking to obtain more money and the Strategic Parties desiring to buy off Ice Legal so it would stop bringing lawsuits.

43.     Defendants initially demanded $8 million over 4 years.  After the Strategic Parties countered, Defendants brought their demand down to $7.2 million, and then to $6 million.  In December, Defendants' posture grew more aggressive: on December 18, 2020, Ms. Ice wrote to counsel for the Strategic Parties: "we really need to finalize these discussions.  Can we jump on a call?"  In the subsequent call, Ice Legal offered to take $6 million ($1.5 million per year for each of four years), and informed the Strategic Parties that if no settlement was reached, they would bring 100 suits per year against them.

44.     On December 22, 2020, Ice Legal offered two options to the Strategic Parties: the Strategic Parties could pay Ice Legal either: (1) $3.6 million for a three-year engagement, plus $500 per hour for any work they actually do; or (2) $4.5 million, front-loaded with $2 million at the start of year 1, $1.5 million at the start of year two, and $1 million at the start of year 3.  Under the second proposal, Ice Legal would provide: 800 hours in year 1; 600 hours in year 2; and 400 hours in year 3.

45.     In response, in late December, the Strategic Parties suggested that Ice Legal could be paid some combination of money and "phantom equity," which Strategic used as a form of deferred employee compensation that was linked to the company's valuation.

46.     On January 5, 2021, Defendants made another counter to the Strategic Parties.  This time, Defendants offered to take $3.5 million paid over three years and $775,000 in phantom equity in Strategic.  Ms. Ice specifically indicated that Defendants were willing to take phantom equity but wanted to see a copy of the plan documents for the Employee Stock Ownership Plan (ESOP), which was the mechanism by which the phantom equity had been created.  Defendants' proposal to receive phantom equity – having a financial stake tied to Strategic's business performance – is particularly shocking given that, up until that point,

Defendants had repeatedly alleged in court pleadings that Strategic was operating a RICO enterprise.

47. The Strategic Parties and Ice Legal continued to counter one another, acting more like litigation adversaries negotiating a settlement than clients seeking to engage attorneys and sign a retainer agreement.

48. The Strategic Parties offered $2.9 million over four years on January 7, 2021. And back and forth it went, with Ms. Ice writing to the Strategic Parties' counsel on January 8, 2021: "Your clients showed some movement by doubling ours so we have doubled theirs.

> $3,750,000
> Year 1 $1.6 hours 700
> Year 2 $1.1 hours 500
> Year 3 $700,000 hours 200
> Year 4 $350,000 hours 50."

49. After several more rounds of negotiations, on January 14, 2021, the Strategic Parties conveyed a best and final offer of $3.1 million.

50. On or about January 20, 2021, the parties reached agreement to the following financial terms for a total settlement of $3.25 million: in year 1, Ice Legal would receive $1 million (paid $500,000 upon signing, and then $250,000 at the mid-point of Q3 and Q4) for up to 700 hours of work; in year 2, $1 million (paid $250,000 at the mid-point of each quarter) for up to 500 hours of work; in year 3, $625,000 (paid in equal installments at the mid-point of each quarter) for up to 200 hours work; and in year 4, $625,000 (paid in equal installments at the mid-point of each quarter) for up to 50 hours of work.

51. Over the course of February 2021, the parties continued to negotiate the terms of the engagement. They also agreed that the Strategic Parties, not Ice Legal, would prepare the initial draft of the engagement agreement.

52.     Ultimately, in March 2021, Defendants and the Strategic Parties reached an agreement, which was memorialized in a written fee agreement (the "Engagement Agreement") between Ice Legal and the Strategic Parties.  *See* **Exhibit A**.

53.     Immediately after executing the Engagement Agreement, Ice Legal radically revised its website and altogether scrubbed it clean of any mention of its prior primary Practice Area, entitled "Debt Relief Scams," which had been exclusively devoted to cases against the Strategic Parties.  Previously, Ice Legal's website claimed, among other things: "our latest industry targets are fraudulent debt resolution companies.  Often fronted by facade law firms, the real players behind these debt relief schemes have been taking advantage of consumers for more than a decade…."  The website contained pages of negative information specific to the Strategic Parties.  In contrast, Ice Legal's newly sanitized website removed any reference to its primary Practice Area of "Debt Relief Scams" or to Strategic and instead generically described Ice Legal as a "consumer protection" firm.

**C.      Ice Legal's Atypical Engagement Agreement with Strategic**

54.     According to its website, Ice Legal markets itself as a "multi-state, online law firm" that "practice[s] in an office-free environment so that [it] may serve you more affordably and without geographical limitation."

55.     While there were four signatories (Strategic, Lit Def, Hedgewick, and MEC), the services described in the Engagement Agreement were principally for the benefit of Strategic Family, Inc. and its various subsidiaries listed in the Agreement (*see* **Exhibit A** at 7), all of which are domiciled in New York, headquartered in New York, and maintain their business operations in New York.

56.     While the Engagement Agreement contained no governing law provision, the attorney-client relationship between Ice Legal and the Strategic Parties is in fact governed by New York law.

57.     The attorney-client relationship between Ice Legal and Strategic Parties was not a traditional legal relationship.

58.     The Strategic Parties primarily intended to use this arrangement as a way to buy off Defendants and avoid the hundreds more lawsuits Defendants threatened to file.

59.     Ice Legal did not use a standard, or even its own, attorney fee agreement with Strategic Parties.  Rather, Strategic was the initial author of the Engagement Agreement.  Having a client serve as the primary drafter of an attorney fee agreement under these circumstances is outside of the normal practice and unusual.

60.     After counsel for Strategic sent its draft of the Engagement Agreement to Ice Legal, Defendants made specific edits, including adding a provision that all of the fees would be considered a nonrefundable "classic retainer" or "true retainer."  There is no indication that Ice Legal ever discussed with its clients the related requirements and limitations on attorneys having true retainers or accepting fees on an earned-on-receipt basis.  And this provision remained in the final, executed version of the Engagement Agreement.

61.     Nonrefundable attorney fee agreements, including so-called "classic retainer" and "true retainer" agreements, are unlawful, void, unenforceable, and contrary to public policy under New York law, including, without limitation, the New York Rules of Professional Conduct and applicable case law.

62.     Because the Engagement Agreement was structured as a nonrefundable retainer agreement, it is unlawful, void, unenforceable, and against public policy.

63.    The Engagement Agreement does not include a reasonable minimum fee clause meeting the requirements of the New York Rules of Professional Conduct.

64.    Even looking beyond New York's prohibition on nonrefundable fee agreements, the Engagement Agreement was not a properly structured "true retainer" or "classic retainer," which is intended only to ensure an attorney's ***availability***, and not to compensate an attorney ***to any extent*** for legal services provided or to be provided.  Rather, the Engagement Agreement was a confusing amalgamation of nonrefundable fee, fixed fee, and hourly fee arrangements, with caps set on the maximum number of hours to be worked on an annual basis before the hourly fees kicked in.  For example, the Engagement Agreement requires specific legal "Services."  *See* **Exhibit A** at Attachment B, entitled "Scope of Engagement and Fees," including: 1) "Advice Regarding Compliance with Consumer Protection and Debt Reduction Laws"; 2) "Advice Regarding Compliance with Bar Ethics Rules and Rules of Professional Conduct"; and 3) "Regulatory Investigations."  The Engagement Agreement itself explained in Sections 2.3 and 2.4 that Ice Legal was required to provide monthly statements describing "Services" performed during the representation; Ice Legal agreed not to incur additional hours of "Services" beyond the maximum hours unless agreed by the parties, and these additional hours would be billed at rates identified in a "Fees Chart."  For instance, the "Fees Chart" set the annual maximum of hours for each year of the contract (700 hours for 2021, 500 hours for 2022, 200 hours for 2023, and 50 hours for 2024), and an incremental hourly services rate of $500/per hour for 2021.  Given this confusing and impermissible mix of nonrefundable fee, fixed fee, and hourly fee arrangements, the Engagement Agreement would not be valid and enforceable in any U.S. jurisdiction.

65.     Attorney fee agreements, including fixed fee agreements and nonrefundable retainer agreements where permitted by law, must be reasonable, and attorneys are always prohibited from charging unreasonable, excessive, or unconscionable fees.

66.     A main distinguishing feature between a "true retainer" and a fixed fee or other type of fee is that while the "true retainer" is earned on receipt, the other types of fees are subject to rules requiring that they must be returned if the work is not performed to earn the money.  The Engagement Agreement, which purported to charge the Strategic Parties a "true retainer" in the total amount of $3.25 million ($2.625 million of which was actually paid) for minimal legal services totaling 63.4 hours of work, was unreasonable, unconscionable, and unenforceable.

67.     Attorneys are not permitted to contract their way out of their obligations to charge reasonable fees based on the work they actually perform, and attorneys are required to refund any portion of a fixed or flat fee where work originally contemplated in the engagement agreement was never done.

68.     Regardless of the fact the fees are characterized as "non-refundable," they do not qualify as nonrefundable under the law and had to be *earned* through actual work completed by Ice Legal.  All that Ice Legal was entitled to receive under the contract was, at the most, a quantum meruit amount for the reasonable value of their services.  That amount is below $40,000.

69.     Ice Legal's invoices confirm that the minimal legal services, totaling 63.4 hours of work, were unreasonable, excessive, and unconscionable.  *See* **Exhibits B and C** (gathering invoices and supporting time records).  In fact, Ice Legal's 2022-2023 invoices are literally blank, reflecting that Ice Legal provided *no* legal services whatsoever for the benefit of any of

their clients (including several Receiver Entities) during those two years, and yet the firm was paid $1.625 million for the period.

70.     Defendants breached their fiduciary duty to Strategic Parties with respect to the Engagement Agreement by, among other things: structuring Ice Legal's fee as an unlawful "nonrefundable" "true retainer"; unlawfully characterizing a refundable fee arrangement as a "nonrefundable" "true retainer"; and charging an unreasonable, excessive, and unconscionable fee in light of the limited work that was actually performed.

71.     Additionally, the Engagement Agreement included a "Termination of Engagement Agreement" provision that was not permitted under the law.  New York law requires that a client always possesses the unqualified right to terminate the attorney-client relationship at any time.  Rule 1.6(e) of the New York Rules of Professional Conduct also requires that an attorney promptly refund any unearned fees paid in advance upon termination of representation. In instances where a client terminates an attorney, the discharged attorney is protected because he is entitled to receive compensation measured by the fair and reasonable value of the *completed* legal services.

72.     All attorney retainer agreements must be terminable at will, but the Engagement Agreement here was not.  Notwithstanding this bedrock legal principle protecting the client, the Engagement Agreement contained the following unlawful provision (Section 5.4 of the Agreement), which impinged on the Strategic Parties' absolute right to terminate Ice Legal:  "If Client terminates the Engagement [for certain reasons], such termination **will not relieve Client from the obligation to pay for all retainer fees contemplated through the end of the Term** …." *See* **Exhibit A** § 5.4 (emphasis added).

73.      Under this same "Termination of Engagement" Provision, the Parties also agreed to arbitrate in a limited number of situations *relating to termination of the agreement only. See* **Exhibit A** § 5.  This lawsuit, which alleges, among other things, breaches of fiduciary duties, professional negligence, breach of contract, and unjust enrichment, is not the limited type of dispute the parties agreed to arbitrate.

74.      During the negotiations regarding the Engagement Agreement, the Strategic Parties had desired and proposed an expansive arbitration provision under which all disputes relating to the agreement would be arbitrated, but Defendants rejected this proposal and agreed only to arbitration in a very narrow set of circumstances relating to termination of the agreement not applicable here.

**D.      Ice Legal Charged More than Two and Half Million Dollars for Minimal and Deficient Legal Services**

75.      Defendants' supposed "true retainer" arrangement with the Strategic Parties is unconscionable and void as against public policy, and Defendants' conduct representing the Strategic Parties under that agreement constitutes a breach of Defendants' fiduciary duties and legal malpractice.

76.      During Ice Legal's fiduciary relationship with the Strategic Parties, it did not provide reasonably equivalent value, or any value, in exchange for the millions of dollars in payments it received.  It also did not earn the fees, since it did not perform the legal work described in the Engagement Agreement.  Moreover, Defendants did not take any of these payments in good faith, since Defendants were aware that these payments were in fact the proceeds of businesses Ice Legal had expressly alleged were operating illegally.

77.     As detailed below, Ice Legal was paid a total of $2.625 million for its "legal work" for Strategic Parties.  Specifically, it was paid $1,000,000 in 2021, $1,000,000 in 2022, and $625,000 in 2023.

78.     Based on invoices and records of Ice Legal's time records sent to Strategic, during the entire engagement, Ice Legal worked a ***total*** of 63.4 hours over three years; this "legal work" consisted of the following: providing an 8-page outline of bullet-point "issues" for the Strategic Parties' consideration shortly after being engaged; participating in 4 one-hour meetings and a phone call with Strategic; and doing limited "research" and "preparation" for these meetings.

79.     Ice Legal breached the fiduciary duties they owed to the Strategic Parties by violating the applicable rules of professional conduct requiring that fees charged and earned be reasonable.  Based on the work done, and the $2.625 million paid, Defendants charged an effective hourly rate of *$41,403.79 per hour.*

80.     By comparison, at the rate of $500 per hour rate, which is the rate listed in the Engagement Agreement as the "Incremental Hourly Services Rate" for Defendants Thomas and Ariane Ice, the work performed would have cost a total of $31,700.

81.     Moreover, as evidenced by what Ice Legal identified in its 8-page outline of bullet-point "issues" that Defendants drafted for the Strategic Parties, and by facts Ice Legal had previously alleged in its lawsuits against Strategic, Lit Def, and related entities, Defendants were aware that the officers and employees of the Strategic Parties were not acting in the best interests of the organizations whom Ice Legal represented and were engaged in activity that was a violation of a legal obligation to the organization or a violation of law that reasonably might be imputed to the organization, and which was likely to result, and did in fact result, in substantial injury to the organization.

82.    Additionally, very shortly into the engagement, Defendants became aware that the Strategic Parties were not seeking to obtain any further legal advice from Ice Legal in any respect and that the Strategic Parties' management was not making changes to their operations to address the issues identified in Defendants' bullet-point outline.  After performing their limited initial work in early 2021, Defendants were well aware that they were not providing any of the "Services" discussed in the Engagement Agreement.

83.    While Defendants in theory had numerous clients on paper, in reality they interacted with a limited number of the Strategic Parties' officers and employees; in many cases, Defendants did not ever communicate with their supposed clients (like MEC and its affiliates), who were listed as "Clients."  Under the Engagement Agreement, there were two "Client Liaisons" (Strategic's General Counsel and Jason Blust) established to interact with Defendants. Based on Defendants' knowledge that certain Strategic Parties' officers and employees were not acting in the best interests of their clients and were not taking any steps to address the legal issues Defendants had identified, and furthermore, had no desire to obtain any further legal advice from Ice Legal, Defendants were obligated to proceed as was reasonably necessary in the best interests of all of their clients, including the Strategic Parties and MEC, all of which were organizational clients.  Under these circumstances, Defendants were required to undertake measures reasonably necessary to protect their corporate clients – the Strategic Parties and MEC – from harm.  Such measures should have included, without limitation: following up with the Strategic Parties' and MEC's management and requesting reconsideration of "issues" identified in their 8-page outline; referring the matter to higher authorities in the organizations, like other management of all clients (and not just Client Liaisons or certain officers and employees), Boards of Directors, Boards of Advisors, and affiliates/parent companies; and, if those measures

were unsuccessful, taking steps to withdraw from representation. There is no indication that Ice Legal took any of the appropriate steps to protect all of their clients, namely Strategic Parties and MEC, despite their knowledge of the conduct of certain officers and employees.

84.    Defendants were negligent by failing to undertake reasonable measures to protect their organizational clients, the Strategic Parties and MEC, upon becoming aware that the officers and employees of the organizations were engaged in activities that were violations of legal obligations to the organizations or violations of law that reasonably might be imputed to the organizations and were failing to implement necessary changes to prevent harm to the organizations.

1.    <u>Ice Legal Provided Negligent Legal Services in 2021</u>

85.    In March 2021, Strategic and Defendants entered into the Engagement Agreement with an effective date of March 10, 2021.

86.    On March 15, 2021, Ms. Ice emailed the two client liaisons identified in the Engagement Agreement for the Strategic Parties – Jason Blust, the principal of Lit Def, and Marc Lemberg, the General Counsel for Strategic and numerous affiliated entities – a copy of Ice Legal's initial invoice for $500,000. The invoice listed the clients as "Strategic Family, Inc., Hedgewick, LLC, Litigation Defense Strategies, LLC, and MEC Distribution, LLC." The amount charged was $500,000 and was described as the "Initial Payment upon signing of agreement." The Strategic Parties promptly paid Defendants $500,000.

87.    Based on Ice Legal's invoice and time records for March and April 2021, Defendants' 49.5 hours of legal work consisted of writing an 8-page introductory bullet-point outline listing various "issues" for the Strategic Parties' consideration. This outline included Defendants' belief and legal opinions that the Strategic Parties were violating the law and

engaged in numerous deceptive and illegal practices, including the unauthorized practice of law, but Ice Legal offered limited specific advice to remedy these issues.

88.    For the month of May 2021, Ice Legal performed 2.9 hours of work in connection with a one-hour meeting with the Strategic Parties, based on Defendants' time records sent to the Strategic Parties.

89.    For the month of June 2021, Ice Legal performed zero hours of work for the Strategic Parties, based on Defendants' time records sent to the Strategic Parties.

90.    For the month of July 2021, Defendants Thomas and Ariane Ice met with Strategic for one hour, based on Ice Legal's time records sent to the Strategic Parties.

91.    On July 2, 2021, Ms. Ice emailed Lit Def's Jason Blust and Strategic's Marc Lemberg a copy of the Ice Legal's invoice to the Strategic Parties for $250,000.  The Strategic Parties promptly paid Ice Legal.

92.    For the month of August 2021, Ice Legal performed zero hours of work for the Strategic Parties, based on Defendants' time records sent to the Strategic Parties.

93.    For the month of September 2021, Ice Legal performed zero hours of work for the Strategic Parties, based on Defendants' time records sent to the Strategic Parties.

94.    For the month of October 2021, Ice Legal performed 5 hours of work for the Strategic Parties, consisting of legal research, based on Ice Legal's time records sent to the Strategic Parties.

95.    For the month of November 2021, Mr. and Mrs. Ice met with Strategic for one hour, based on Ice Legal's time records sent to the Strategic Parties.

96. On November 5, 2021, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $250,000. The Strategic Parties promptly paid Ice Legal.

97. For the month of December 2021, Defendant had a one hour call on December 15th with Strategic, based on Ice Legal's time records sent to the Strategic Parties.

98. ***Ice Legal did not perform any legal work for the Strategic Parties after the December 15, 2021 call***, based on Defendants' own time records sent to the Strategic Parties.

2. <u>Ice Legal Provided No Legal Services to the Strategic Parties in 2022</u>

99. Ice Legal performed no legal work for the Strategic Parties during the entirety of 2022, based on Defendants' time records sent to the Strategic Parties.

100. For the month of January 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

101. On February 1, 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $250,000. The Strategic Parties promptly paid Ice Legal.

102. For the month of February 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

103. For the month of March 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

104. On April 1, 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $250,000. The Strategic Parties promptly paid Ice Legal.

105. For the month of April 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

106.    For the month of May 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

107.    For the month of June 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to Strategic for work done that month.

108.    In July 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $250,000.  The Strategic Parties promptly paid Ice Legal.

109.    For the month of July 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

110.    For the month of August 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

111.    For the month of September 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

112.    For the month of October 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

113.    On October 31, 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $250,000.  The Strategic Parties promptly paid Ice Legal.

114.    For the month of November 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

115.    For the month of December 2022, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

3.    Ice Legal Provided No Legal Services in 2023

116.    Ice Legal performed no legal work for the Strategic Parties during the entirety of 2023, based on Defendants' time records sent to the Strategic Parties.

117.    For the month of January 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

118.    On January 31, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $156,250.  The Strategic Parties promptly paid Ice Legal.

119.    For the month of February 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

120.    For the month of March 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

121.    On March 31, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $156,250.  The Strategic Parties promptly paid Ice Legal.

122.    For the month of April 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

123.    For the month of May 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

124.    For the month of June 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

125.    On June 29, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $156,250.  The Strategic Parties promptly paid Ice Legal.

126.    For the month of July 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

127.    For the month of August 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

128.    For the month of September 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

129.    For the month of October 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

130.    On October 31, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to the Strategic Parties for $156,250.  The Strategic Parties promptly paid Ice Legal.

131.    For the month of November 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

132.    For the month of December 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

**E.    Defendants Demand That the Receiver Pay Ice Legal Invoices on a Priority Basis Ahead of Alleged Consumer Victims and Other Creditors**

133.    During January 2024, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

134.    The Court appointed the Receiver on January 11, 2024, initially temporarily in connection with a Temporary Restraining Order, and the Court then re-appointed the Receiver in March 2024 when issuing the Preliminary Injunction.

135.    On January 31, 2024, *after the issuance of the Temporary Restraining Order against Strategic, and after appointment of the Receiver,* Ms. Ice sent an email to Blust and

Lemberg with a copy of Ice Legal's invoice to the Strategic Parties for $156,250.  Strategic and Lit Def, which were now under the control of the Receiver, did not pay this amount.

136.    During February 2024, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

137.    Ice Legal's continued position that it is owed money under the Engagement Agreement, regardless of the actual amount of work that it performed, is inconsistent with established law that its fees must be reasonable.

138.    On March 4, 2024, the Court entered the Preliminary Injunction, continuing the appointment of the Receiver.

139.    During March 2024, Ice Legal performed no legal work for the Strategic Parties and sent no time records to the Strategic Parties for work done that month.

140.    On March 31, 2024, *after the issuance of the Preliminary Injunction against numerous individuals and entities, including many entities and individuals related to Strategic, and with the continued appointment of the Receiver,* Ice Legal invoiced the Strategic Parties for $156,250.  Strategic and Lit Def, now under the control of the Receiver, did not pay this amount.

141.    Once again, even though Ice Legal had performed no legal work for several years, Defendants continued to demand payment even after a United States District Court issued the Preliminary Injunction in March 2024, finding that Strategic had likely been operating illegally by charging consumers millions of dollars in prohibited advance fees (while Ice Legal was ostensibly compliance counsel for Strategic).

142.    In May 2024, Defendants reached out to the Receiver, demanding that the Receiver pay Ice Legal's two unpaid invoices.  All told, after having received $2.625 million for approximately 60 hours of work, Ice Legal wanted to be paid more.

143.    In their demand to the Receiver, Defendants took credit for "spearhead[ing] far-ranging multistate litigation against these entities" and highlighted the purported "successful settlements for each of our consumer clients."  In other words, Defendants attempted to justify further billing their clients, including Receivership Entities Strategic and Lit Def, on the grounds that Ice Legal had successfully sued these very same clients years ago.  Defendants then vaguely claimed that "[a]fter these settlements, we were engaged by the Defendants in a multiyear retainer agreement (2021-2024) to directly do what our consumer litigation had indirectly done — help them comply with consumer-oriented 'state and federal laws and regulations.'"

144.    Defendants claimed that Ice Legal's scope of engagement included providing legal advice to comply with the law.  Specifically, Defendants claimed that "[u]nder this agreement, we provided, and have been available to provide, legal advice that would ultimately benefit the consumer."

145.    Mr. Ice's email to the Receiver omitted several key facts.  Nowhere did he mention the fact that Defendants had in fact provided no legal work at all for the Strategic Parties since December 2021.  Nowhere did Mr. Ice mention that in total Defendants had only worked for the Strategic Parties for approximately 60 hours over the course of nearly three years.  Nor did he mention the fact that Defendants had given only limited legal advice which had failed to remedy any issues for the Strategic Parties.

146.    Instead, Defendants explained to the Receiver that the Strategic Parties "have missed their first two 2024 payments."  They then went further and made a remarkable request: "Due to the nature of our work, *we ask for the prioritization of the payment of this and the remainder of the 2024 fees*, either through the captive insurance policy … or the receivership estate" (emphasis added).  In other words, Defendants demanded that Ice Legal be paid *before*

*all other unsecured creditors, including the consumers.* And Defendants did this, even though they knew they had performed no legal work at all during 2022, 2023, and 2024.

147.    After receiving the demand, the Receiver undertook to review Ice Legal's claims and demand to be paid ahead of other creditors.

148.    On August 14, 2024, the Receiver requested that Ice Legal provide the entire client file to the Receiver to evaluate the claim.

149.    Despite having a fiduciary duty to provide a copy of the client file upon request to all of its clients, which include the Receivership Entities Strategic, Lit Def, and Hedgewick, Defendants failed to and/or refused to produce the client file to the Receiver. Despite repeated requests from the Receiver to provide a copy of the client file to its clients, which include Receivership Entities Strategic, Lit Def, and Hedgewick, Defendants have refused to provide a copy of the client files to their clients up to the filing of this Complaint.

**F.    Ice Legal Breached Numerous Fiduciary Duties to the Strategic Defendants and Committed Malpractice**

150.    As noted above, Ice Legal did approximately 60 hours of total work under the Engagement Agreement. That is it.

151.    The Agreement, at Attachment B ("Scope of Engagement"), indicates that Defendants' assigned legal work would be comprehensive and covered the following areas:

a.    <u>Advice Regarding Compliance with Consumer Protection and Debt Reduction Laws</u>. Provision of legal advice and counsel with respect to compliance with state and federal laws and regulations ("laws") relating to the marketing, sale and delivery of services to consumer clients relating to debtor rights and the negotiation and resolution of consumer debt. This includes the marketing, sale and delivery of a program or service to renegotiate, settle, or in any way alter the

terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. These include without limitation state consumer protection laws, state debt settlement or debt resolution laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade Commission, Federal Reserve and similar laws. This may include the review of forms of agreements with and disclosures to consumers, review of Client operations, procedures and policies and the development and delivery of training materials for Client staff.

b. <u>Advice Regarding Compliance with Bar Ethics Rules and Rules of Professional Conduct</u>. Provision of legal advice and counsel with respect to compliance with applicable rules of professional conduct and similar regulations governing the practice of law and the required supervision by lawyers of non-lawyer professionals incidental to the practice of law. This may include the review of forms of agreements with and disclosures to consumer clients, review of Client operations, procedures and policies and the development and delivery of training materials for Client staff.

c. <u>Regulatory Investigations</u>. Providing advice, counsel and support in Client's response to investigative demands, inquiries or enforcement actions brought by or on behalf of state or federal regulators or bar regulators arising out or related to the scope of services described in items 1 and 2 above.

152. Despite being paid for three years and continuing to send invoices for full payment, Defendants substantially failed to provide the "legal advice and counsel" set forth in

Attachment B of the Engagement Agreement.  In total, Defendants only produced a single short, preliminary bullet-point "outline" memorandum of potential legal issues affecting the Strategic Parties and negligently failed to reasonably and sufficiently advise the Strategic Parties of the full scope and extent of the financial liability and regulatory peril arising from their business practices.

153.    Furthermore, Defendants knew that the Strategic Parties' officers and employees were not acting in the best interests of the corporate entities that were Defendants' clients. Defendants were aware that the conduct of these officers and employees was reasonably likely to be imputed to, or cause substantial injury to, their organizational clients, the Strategic Parties.  At that time, Defendants became obligated under Rule 1.13 to undertake reasonable measures to protect the Strategic Parties from harm.  Defendants negligently failed to take any such measures.

154.    After submitting their meager April 21, 2021 bullet-point outline, Defendants performed little or no further legal work for the Strategic Parties to help comply with consumer-oriented state and federal law laws and regulations.  Instead, Defendants sat back for almost three years and passively collected millions of dollars in payments that they knew derived from businesses that Defendants had specifically alleged constituted a RICO enterprise that, among other things, was using bait-and-switch advertising mailers to defraud consumers.  Under the law, Defendants were not permitted to sit back and charge and accept these unreasonable amounts for work they never did.

155.    On January 21, 2025, the Receiver and Defendants entered into a Tolling Agreement whereby they agreed to toll the statutes of limitations for all claims relating to this matter from November 1, 2024 (the "Effective Date" of the Tolling Agreement) until June 30,

2025, or such earlier time as either party gives notice of termination in accordance with the terms of the Tolling Agreement.

156.     On March 11, 2025, the Receiver, by and through counsel, gave written seven-day notice of termination of the Tolling Agreement to counsel for Defendants in accordance with the terms of the Tolling Agreement, and the Tolling Agreement thus terminated on March 18, 2025.

## COUNTS OF THE COMPLAINT

### COUNT 1
### BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

157.     Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

158.     The Engagement Agreement dated March 10, 2021 created an attorney-client relationship, and, therefore, a fiduciary relationship, between Ice Legal and its attorneys Thomas Ice and Ariane Ice, on the one hand, and the Strategic Parties, on the other hand.

159.     Defendants breached their fiduciary obligations to the Strategic Parties, all of which were Receivership Entities, in numerous ways, including by charging unreasonable and unearned fees of $2.625 million in exchange for approximately 60 hours of legal work performed, which included charging Receivership Entities $1.625 million in fees in 2022 and 2023 without performing any legal work for the Receivership Entities.  Defendants had not earned these fees, and they should forfeit and return the fees charged and received, apart from quantum meruit value, if any, of the approximately 60 hours of work set forth on their invoices.

160.     Defendants further breached their fiduciary duties by entering into a fee arrangement that contained a special nonrefundable retainer agreement not permitted under the law, by directly impinging on the Strategic Parties' absolute right to discharge their attorney, and

by requiring the Strategic Parties to pay all retainer fees through the end of the contract's term in the event of certain termination events under the Engagement Agreement.

161.    Defendants further breached their fiduciary obligations to the Receivership Entities by substantially failing to provide the "legal advice and counsel" required in Attachment B of the Engagement Agreement.  Among other things, Defendants failed to reasonably and sufficiently advise Receivership Entities of the full scope and extent of the financial liability and regulatory risks arising from the business practices of their clients, the Strategic Parties.  Instead, after submitting their meager April 21, 2021 bullet-point memorandum listing potential "issues," Defendants continued to invoice the Strategic Parties for amounts, which Defendants were aware derived from businesses Ice Legal had recently alleged comprised a RICO enterprise and were collecting advance fees from consumers.  Defendants did this while performing little or no further legal services for the Strategic Parties.

162.    Moreover, Defendants breached their fiduciary duties owed to their corporate clients because they became aware that the officers and employees of the Strategic Defendants were not seeking any of Ice Legal's advice and were instead continuing to engage in activity that was a violation of a legal obligation to the organization or a violation of law that reasonably might be imputed to the organization.  Defendants knew this conduct by the Strategic Parties' officers and employees was likely to result, and did in fact result, in substantial injury to the organization.  Defendants owed fiduciary obligations to proceed as was reasonably necessary in the best interest of their organizational clients (the Strategic Parties and MEC) and should have undertaken measures reasonably necessary to protect these organizational clients from injury. Such measures should have included, without limitation, requesting reconsideration of "issues" identified in their 8-page outline, referring the matter to other management or higher authorities

in the organizations, and if no corrective actions were taken, terminating the engagement and not charging further legal fees. Defendants breached their fiduciary duties to the Strategic Parties by failing to take appropriate steps to protect the Strategic Parties despite having knowledge of management's conduct.

163.    Defendants' breach of their fiduciary duties was a substantial factor in causing identifiable losses, including the payment of unreasonable fees to Defendants, by the Strategic Parties in an amount to be determined at trial.

164.    Further, as a result of Defendants' breach of their fiduciary duties to the Strategic Parties, Plaintiff is entitled to disgorgement of all amounts paid to Ice Legal under the Engagement Agreement.

**COUNT 2**
**PROFESSIONAL NEGLIGENCE**
**(Against All Defendants)**

165.    The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

166.    Pursuant to the Engagement Agreement dated March 10, 2021, Defendants, on the one hand, and the Strategic Parties, on the other hand, entered into an attorney-client relationship.

167.    Pursuant to the Engagement Agreement, Ice Legal and its attorneys, including Thomas Ice and Ariane Ice, agreed to provide the legal services described in Attachment B to the agreement ("Scope of Engagement"), which legal services included, *inter alia*, "[p]rovision of legal advice and counsel with respect to compliance with state and federal laws and regulations ('laws') relating to the marketing, sale and delivery of services to consumer clients… [t]hese include without limitation state consumer protection laws, state debt settlement or debt resolution

laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal

Trade Commission, Federal Reserve and similar laws."

168.    Defendants committed professional negligence by negligently and substantially

failing to provide the "legal advice and counsel" required under the Engagement Agreement.

Based on the Engagement Agreement, Defendants were hired in a multiyear retainer agreement

to help the Strategic Parties and MEC comply with consumer-oriented state and federal laws and

regulations.  Despite being hired for this purpose, Defendants negligently failed to provide the

Strategic Parties and MEC with legal advice sufficient for their clients to comply with consumer-

oriented state and federal laws and regulations.

169.    More particularly, Defendants' "legal advice and counsel" to the Strategic Parties

consisted primarily of a short memo dated April 21, 2021, which was a bullet-point "outline" of

potential legal issues affecting the Strategic Parties.  Defendants failed to reasonably and

sufficiently advise the Strategic Parties and MEC of the full scope and extent of the financial

liability and regulatory peril arising from the Strategic Parties and MEC's business practices or

to provide sufficient advice to remedy identified issues.  After submitting their meager April 21,

2021 outline, Defendants performed little or no further legal services for the Strategic Parties and

MEC.

170.    Furthermore, during the course of their professional relationship with the

Strategic Parties and MEC, Defendants were aware that the Strategic Parties' officers and

employees were not complying with consumer-oriented state and federal laws and regulations.

Within months of the start of the Engagement Agreement, it was apparent to Defendants that

officers and employees of the Strategic Parties were engaged in activity that was a violation of a

legal obligation to the organization or a violation of law that reasonably might be imputed to the

organization, and which was likely to result, and did in fact result, in substantial injury to the organization. It was apparent to Defendants that certain Strategic Parties' officers and employees were not implementing any changes as a result of Defendants' bullet-point "outline" of potential legal issues or otherwise seeking to obtain the legal advice of Defendants, while still paying Defendants millions of dollars in unearned legal fees for which no work was provided.

171. Under these circumstances, Defendants were obligated to proceed as was reasonably necessary in the best interest of all of their organizational clients, including the Strategic Parties and MEC, and should have undertaken measures reasonably necessary to protect the Strategic Parties and MEC from injury. Such measures should have included, without limitation, requesting reconsideration of "issues," identified in their 8-page outline and referring the matter to higher authorities in the organizations, like other management of all clients (and not just Client Liaisons or certain officers and employees), Boards of Directors, Boards of Advisors, and affiliates/parent companies. If these measures to protect their clients, namely Strategic Parties and MEC, were unsuccessful, Defendants should have terminated the attorney-client relationship and stopped charging and collecting unearned fees. Defendants negligently failed to take any of the appropriate steps to protect the Strategic Parties and MEC despite their knowledge of the circumstances. Due to Defendants' negligent provision of the "legal advice and counsel" required under the Engagement Agreement, including their negligent failure to undertake measures reasonably necessary to protect the interests of their organizational clients in light of their officers' and employees' ongoing conduct, Defendants proximately caused the Strategic Parties (each of which is a Receivership Entity) to suffer harm, including increased their liabilities and regulatory exposure.

172.    As an actual and proximate effect of Defendants' negligent provision of legal service, the Strategic Parties were harmed in numerous ways in an amount to be determined at trial.

## COUNT 3
## RESCISSION OF PER SE INVALID NONREFUNDABLE RETAINER
### (Against All Defendants)

173.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

174.    The Engagement Agreement between Ice Legal and the Strategic Parties was structured as a nonrefundable "true" or "classic" retainer agreement, which is *per se* unenforceable, void, and not permitted under the law.

175.    Ice Legal's engagement agreement with the Strategic Parties also presented a confusing and unenforceable fee structure, purporting to have fees "earned on receipt" but in it impermissibly mixing elements of a prohibited "true" or "classic" retainer with elements of fixed fee and hourly engagement agreements.

176.    Moreover, the Engagement Agreement charged an unreasonable and grossly excessive fee, which was improperly untethered to any work actually done.

177.    The Engagement Agreement also improperly impinged upon the Strategic Parties' unbridled prerogative as Ice Legal's clients to terminate their attorney at will.

178.    Furthermore, Defendants did not, in fact, provide substantial legal services to earn the fee charged, based on the amount of work they actually did.

179.    The Strategic Parties are entitled to rescission of the Engagement Agreement and restitution of amounts paid pursuant to the agreement.

**COUNT 4**
**VOIDABLE OR FRAUDULENT TRANSFER**
**(Against All Defendants)**

180.    Plaintiff repeats and realleges the allegations of each and every one of the prior

paragraphs, inclusive, as if fully set forth herein.

181.    Effective April 4, 2020, New York (similar to the majority of other States)

adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at N.Y. Debt.

& Cred. Law §§ 270, *et seq*. (the "NY-UVTA").

182.    The NY-UVTA defines a voidable transfer to include a transfer made by a debtor

"[w]ithout receiving a reasonably equivalent value in exchange for the transfer," and where the

debtor "was engaged or was about to engage in a business or a transaction for which the

remaining assets of the debtor were unreasonably small in relation to the business or transaction"

or "[i]ntended to incur, or believed or reasonably should have believed that the debtor would

incur, debts beyond the debtor's ability to pay as they became due."  N.Y. Debt. & Cred. Law

§ 273(a)(2).

183.    The Strategic Parties paid Defendants as alleged herein without receiving

reasonably equivalent value in exchange.  Specifically, they paid Defendants $2.625 million in

exchange for only 63.4 invoiced hours of legal services.  Indeed, in 2022 and 2023, they paid

Defendants a total of $1.625 million in exchange for *no* legal work whatsoever.

184.    At the time of their transfers to Defendants, the Strategic Parties were engaged in

a business involving the collection of advance fees from consumers, which resulted in a

regulatory enforcement action and potential regulatory liability for which the Strategic Parties'

remaining assets were unreasonably small in relation to their liability to creditors, including

consumers.

41

185.    In its various state court lawsuits against Strategic and its related entities, Defendants had alleged that the advance fees Strategic was collecting from consumers were unlawful.

186.    At the time of their transfers to Defendants, the Strategic Parties believed, or reasonably should have believed, that as a result of collecting advance fees from consumers, they were incurring, and would continue to incur, liabilities to creditors, including consumers, that exceeded their ability to pay when due.

187.    Accordingly, the Receiver seeks to recover as voidable or fraudulent transfers all funds received by Defendants from the Strategic Parties. The Receiver therefore requests that the Court order Defendants, jointly and severally, to pay to the Receiver all voidable or fraudulent transfers of funds they received, as alleged herein and as further shown by proof at trial.

188.    The Receiver further asks that he be awarded pre- and post-judgment interest from Defendants from the date of the receipt of each voidable or fraudulent transfer.

**COUNT 5**
**BREACH OF CONTRACT**
**(Against Ice Legal)**

189.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

190.    The Engagement Agreement dated March 10, 2021 purported to create an attorney-client relationship between Ice Legal, on the one hand, and the Strategic Parties, on the other hand.

191.    Pursuant to the Engagement Agreement dated March 10, 2021, Ice Legal was contractually obligated to provide the legal services described in Attachment B to the agreement ("Scope of Engagement"), which legal services included, *inter alia*, "[p]rovision of legal advice

and counsel with respect to compliance with state and federal laws and regulations ('laws')
relating to the marketing, sale and delivery of services to consumer clients… [t]hese include
without limitation state consumer protection laws, state debt settlement or debt resolution laws as
well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade
Commission, Federal Reserve and similar laws."

192.     Defendant Ice Legal breached its contractual duties to the Strategic Parties by
substantially failing to provide the "legal advice and counsel" required in Attachment B of the
Engagement Agreement.  More particularly, Ice Legal's "legal advice and counsel" to the
Strategic Parties consisted primarily of a short memorandum dated April 21, 2021, which was a
short bullet-point "outline" of potential legal issues affecting the Strategic Parties' debt relief
enterprise.  Ice Legal failed to reasonably and sufficiently advise the Strategic Parties of the full
scope and extent of the financial liability and regulatory peril arising from their business
practices.  Instead, after submitting their meager April 21, 2021 memorandum, Defendants
continued to invoice the Strategic Parties for and accept as payments amounts, which Defendants
were aware derived from businesses Ice Legal had recently alleged comprised a RICO enterprise
and were collecting advance fees from consumers.  Defendants did this while providing little or
no further legal services for the Strategic Parties.

193.     Defendants materially breached their express and implied contractual obligations
owed to the Strategic Parties.  Furthermore, in entering a contract to provide legal services to the
Strategic Parties, Defendants made an implied promise to exercise due care in performing the
services required by the contract and breached these obligations by failing to perform the legal
services set forth in the agreement while nevertheless charging unreasonable and excessive fees
despite their nonperformance.

194.     As an actual and proximate effect of Ice Legal's breaches of its obligations under the Engagement Agreement, the Strategic Parties were harmed in an amount to be determined at trial, including payment of excess legal fees.

**COUNT 6**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

195.     Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

196.     Defendants received payments of $2.625 million from the Strategic Parties.

197.     Defendants characterized these payments as "true retainer" payments for legal services.  In fact, Defendants were required to perform services for these fees but performed services that were either deficient or non-existent.  Defendants received $2.625 million between March 2021 and December 2023 in exchange for only 63.4 invoiced hours of legal services. Defendants received $1.625 million in 2022 and 2023 despite performing no services whatsoever.

198.     Defendants obtained these payments from the Strategic Parties after informing the Strategic Parties that Ice Legal planned  to bring future litigation ("100 suits a year") on behalf of consumers against the Strategic Parties if the Strategic Parties refused to agree to Defendants' terms.

199.     Defendants obtained these payments despite their awareness that the payments were made using advance fees collected from consumers, which Defendants had previously alleged were not legal.

200.     Defendants also obtained these payments despite having recently alleged in multiple lawsuits that Strategic was, *inter alia*, a "fraudulent debt settlement enterprise, whose members and associates engaged in fraudulent and deceptive practices designed to enroll

consumers in useless 'debt settlement' plans and extract unearned fees from them," "conspir[ing] to defraud Florida consumers," "defraud[ing] consumers by posing as lawyers and law firms," "evading laws relating to non-lawyer debt settlement companies," carrying out a "a bait-and-switch scheme," "fraudulently induc[ing] Class Members to enter into illegal contracts," and engaging in a "pattern of racketeering activity."

201.    As a result of said payments, Defendants were unjustly enriched.

202.    The Receiver seeks an equitable remedy ordering that Defendants are holding, and shall continue to hold, the amount of the payments the Receivership Entities made to the Defendants in constructive trust for the Receiver.

203.    The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of Defendants' receipt of each payment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Receiver, as Court-appointed Receiver for the Strategic Parties, respectfully prays for judgment in his favor and against Defendants Ice Legal, LLC, Thomas Ice, and Ariane Ice, as follows:

1.    For the relief stated herein, including all money damages of the Strategic Parties resulting from Defendants' conduct, in an amount to be determined at trial;

2.    For money damages, disgorgement, and/or restitution in the amount of all payments made by the Strategic Parties to Defendants in connection with the Engagement Agreement, which the Receiver understands to be $2,625,000, plus all interest from the date of each payment;

3.    For an order rescinding the Engagement Agreement as *per se* invalid under applicable law;

4.      For an order imposing a constructive trust for the benefit of the Receiver over all moneys transferred by the Strategic Parties to Defendants pursuant to the Engagement Agreement;

5.      For pre- and post-judgment interest;

6.      For attorneys' fees, expenses, and costs; and

7.      For such other and further relief as the Court may deem proper.

Dated: March 27, 2025

**HODGSON RUSS LLP**

By:   */s/ James C. Thoman*
James C. Thoman, Esq.
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone:  (716) 856-4000
Facsimile:  (716) 849-0349
Email:  jthoman@hodgsonruss.com

**MCNAMARA SMITH LLP**

By:   */s/ Logan D. Smith*
Logan D. Smith  (*Pro Hac Vice Pending*)
Alexander D. Wall (*Pro Hac Vice Pending*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email:  lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Plaintiff, Court-appointed Receiver,*
*Thomas W. McNamara*