UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————

CONSUMER FINANCIAL PROTECTION,                24-CV-40-EAW-MJR
BUREAU, *et al.*,

                Plaintiffs,                REPORT AND
                              RECOMMENDATION
     v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), *et al.*,

             Defendants, and

STRATEGIC ESOP, *et al.*,

             Relief Defendants.

—————————————————

Before the Court are defendants Relialit, LLC, Lit Def Strategies, LLC, Hedgewick Consulting, LLC, Jason Blust, Richard Gustafson, Michelle Gallagher, and Timothy Burnette's motions to dismiss the second amended complaint. (Dkt. Nos. 450, 452, 453, 493) For the following reasons, it is recommended that the motions to dismiss be denied.

## **BACKGROUND**

On January 10, 2024, plaintiffs Consumer Financial Protection Bureau ("the CFPB"), the People of the State of New York, by Letitia James, Attorney General of the State of New York, the State of Colorado *ex rel.* Philip J. Weiser, Attorney General, the State of Delaware *ex rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney General Keith Ellison, the State of North Carolina *ex rel.* Joshua H. Stein, Attorney General, and the State of Wisconsin (collectively "plaintiffs"), filed a complaint alleging that defendants were violating the Telemarketing Sales Rule (the "TSR"), 16 C.F.R. pt.

310, which implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c), 6105(d); New York Executive Law § 63(12); New York General Business Law (GBL) Article 22-A; Wis. Stat. § 218.02; and Wis. Admin. Code § DFI-Bkg ch. 73. (Dkt. No. 1) Defendants named in the complaint included StratFS, LLC and its related entities as well as Ryan Sasson and Jason Blust. (*Id.*) The complaint named Daniel Blumpkin, Albert Ian Behar, Strategic ESOP, Strategic ESOT, Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments LLC, the Blust Family Irrevocable Trust, Jaclyn Blust, Lit Def Strategies, LLC, and Relialit, LLC as relief defendants. (*Id.*)

Also on January 10, 2024, plaintiffs filed an *ex parte* motion for a temporary restraining order ("TRO") with asset freeze, appointment of a receiver, and other equitable relief, as well as a request for defendants to be ordered to show cause as to why a preliminary injunction should not issue. (Dkt. No. 5) The Honorable Lawrence J. Vilardo granted plaintiffs' request for a TRO on January 11, 2024. (Dkt. No. 12) On February 1 and 2, 2024, this Court held an evidentiary hearing to address plaintiffs' motion for a preliminary injunction. (Dkt. Nos. 129, 130) This Court granted plaintiffs' motion for a preliminary injunction on March 4, 2024.[1] (Dkt. Nos. 183, 184)

Plaintiffs filed an amended complaint on March 27, 2024, which, among other things, added Daniel Blumpkin, Albert Ian Behar, Twist Financial, LLC, Duke Enterprises, LLC, and Blaise Investments, LLC as defendants. (Dkt. No. 249) A second amended complaint, the operative pleading here, was filed on May 28, 2024. (Dkt. No. 366) The second amended complaint added Fidelis Legal Support Services LLC, Lit Def Strategies,

---

[1] Defendants appealed this Court's preliminary injunction order to the Second Circuit Court of Appeals. (Dkt. Nos. 192-93, 198, 203, 206) On June 2, 2025, the Second Circuit affirmed the preliminary injunction order and remanded the case for further proceedings. *See Consumer Fin. Prot. Bureau v. StratFS, LLC,* 24-CV-697, 2025 U.S. App. LEXIS 13336 (2d Cir. June 2, 2025) (summary order).

LLC, Relialit, LLC, Hedgewick Consulting, Richard Gustafson, Timothy Burnette, and Michelle Gallagher as defendants. (*Id.*) The second amended complaint ("SAC") also added Cameron Christo and The Bush Lake Trust as relief defendants. (*Id.*)

## SECOND AMENDED COMPLAINT ALLEGATIONS[2]

### Overview

Since at least January 2016, through the granting of the TRO on January 11, 2024, the individual and corporate defendants operated an elaborate and complicated scheme to collect exorbitant, illegal advance fees for debt-relief services from consumers facing significant financial difficulty. (Dkt. No. 366, ¶ 13) This scheme violated the TSR, which, *inter alia*, (1) prohibits a telemarketer or seller from taking a fee from a consumer for providing debt-relief services before the seller or telemarketer has renegotiated, settled, or reduced at least one of the consumer's debts and the consumer has made at least one payment under the new terms; (2) prohibits a seller or telemarketer from taking a fee from a consumer for debt-relief services that is not proportional to the amount of debt actually settled or based on a fixed percentage of the amount saved by the consumer; and (3) prohibits a seller or telemarketer from making false statements and/or material misrepresentations as to any aspect of a debt-relief service. (*Id.* at ¶¶ 230-89) The scheme also violated various New York and Wisconsin state laws. (*Id.* at ¶¶ 290-315)

### The Individual and Corporate Defendants

The individual defendants operated this scheme to charge illegal advance fees for debt-relief services through a complicated web of interrelated companies and law firms.

---

[2] For purposes of evaluating the motions to dismiss, the Court accepts as true all allegations in the second amended complaint.

*Strategic*

StratFS, LLC (f/k/a Strategic Financial Solutions, LLC) was founded by defendants Ryan Sasson, Albert Ian Behar, and Daniel Blumpkin. (Dkt. No. 366, ¶ 24) Strategic Family, Inc. is the parent company of other corporate defendants, including: StratFS, LLC; Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Versara Lending, LLC; and Strategic Consulting, LLC. (*Id.* at ¶ 39) StratFS, LLC and Sasson also owned and controlled numerous client services subsidiaries (the "Client Services Subsidiaries").[3] (*Id.* at ¶ 25, ¶ 51). StratFS, LLC, Strategic Family, Inc., their related corporate entities, and their affiliated Client Services Subsidiaries are all referred to collectively herein as "Strategic."

Defendants Sasson, Blumpkin, and Behar each created a single-member shell-holding company, namely defendants Duke Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC, respectively (the "Holding Companies"). (*Id.* at ¶ 24) These shell companies funneled money from Strategic's business to Sasson, Blumpkin, and Behar. (*Id.*) Until 2017, each of these holding companies owned a percentage of Strategic Financial Solutions, LLC. (*Id.*) Those ownership interests were converted to stock, and the Holding Companies sold their stock to relief defendant Strategic ESOP in 2017. (*Id.*)

---

[3] The Client Services Subsidiaries included defendants Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC), and Whitestone Client Services, LLC. (Dkt. No. ¶ 51)

Since at least January of 2016, Strategic marketed and sold debt-relief services to consumers. (*Id.* at ¶ 106) Strategic operated an advance-fee model of debt-relief that took fees from consumers before the consumers' debts were settled.[4] (*Id.* at ¶ 107) Strategic marketed its debt-relief services via U.S. mail, the internet, and outbound or inbound calls both to and from consumers, including via interstate phone calls. (*Id.* at ¶ 41, ¶ 108)

### The Law Firms and Hedgewick

Ryan Sasson, together with defendant Jason Blust, an attorney, created a number of law firms across the country. (Dkt. No. 366, ¶ 26, ¶ 45, ¶ 83) These law firms worked together with Strategic's Client Services Subsidiaries to provide advance-fee debt-relief services, as well as litigation assistance, to consumers.[5] (*Id.* at ¶ 45) Each Strategic-owned Client Services Subsidiary corresponded to one or more of the law firms created by Blust and Sasson, and most of the Client Services Subsidiaries shared a name with their corresponding law firm. (*Id.* at ¶¶ 47-48) For example, Great Lakes Client Services, LLC, a Client Services Subsidiary, corresponded with Great Lakes Law Firm, LLC. (*Id.*) The law firms that worked in conjunction with Strategic to facilitate the advance-fee debt-relief operation are hereinafter referred to as the "law firms." (*Id.* at ¶ 47)[6]

Blust controlled and oversaw all law firm operations. (*Id.* at ¶¶ 83-84, ¶ 187, ¶¶ 191-92) He established the law firms' policies and practices and exercised managerial

---

[4] Strategic also operated a deferred-fee model of debt-relief where consumers did not pay a fee until their debt was settled. (Dkt. No. 366, ¶ 107) While the deferred-fee model accounted for approximately 16% of Strategic's revenue, the advance-fee model accounted for roughly 80% of Strategic's revenue. (*Id.*)

[5] Both Strategic and the law firms qualify as "sellers" offering "debt-relief services" under the TSR. (*Id.* at ¶ 42, ¶ 46)

[6] A number of the law firms filed a motion to intervene in this case. (Dkt. Nos. 34, 50) This Court granted the motion and the law firms have participated throughout the case, including during the preliminary injunction hearing.

responsibility over them.[7] (*Id.*) Blust registered domain names for the law firms and controlled their websites. (*Id.* at ¶ 203) Blust held official positions in some of the law firms, such as vice president. (*Id.* at ¶ 193) Entities that Blust controlled or was the beneficiary of, including the Law Office of Jason Blust, LLC and the Blust Family 2019 Irrevocable Trust, used addresses at a co-working space located at 211 W Wacker Drive, Chicago, Illinois, 60606. (*Id.* at ¶ 203) At least ten of the law firms used addresses in the same building, including Great Lakes Law Firm, LLC and Gustafson Legal, P.C. (*Id.* at ¶ 204) Blust acted as a liaison between the law firms and Strategic, facilitating communications between the firms and Strategic's Client Services Subsidiaries. (*Id.* at ¶ 84, ¶ 197) Blust regularly emailed and spoke on the phone with employees of Strategic and the Client Services Subsidiaries about consumers enrolled in Strategic's debt-relief services. (*Id.* at ¶ 198) Blust also participated in meetings between Strategic, the Client Services Subsidiaries, and many of the law firms, regardless of whether he held at a position at the particular firm involved.[8] (*Id.* at ¶ 202) Blust controlled when law firm attorneys worked on the files of Strategic clients. (*Id.* at ¶ 201)

Blust also recruited attorneys to help run, or serve as figureheads for, the law firms. (*Id.* ¶ 84, ¶¶ 194-95) To that end, defendants Richard Gustafson, Timothy Burnette, and Michelle Gallagher each owned and controlled multiple law firms. (*Id.* at ¶ 85, ¶ 89, ¶ 91)

---

[7] In 2021, the North Carolina State Bar Disciplinary Commission issued a finding of fact that Blust "started or helped start various law firms…in multiple states with the goal of convincing debtors struggling to pay their bills to hire one of the [law firms] to negotiate reduced payoff amounts with the debtor's creditors." (Dkt. No. 366, ¶ 188) The North Carolina State Bar Disciplinary Hearing Commission made this finding at a hearing regarding the license of Daniel Rufty, an attorney at Carolina Legal Services, one of the law firms controlled by Blust. (*Id.*)

[8] The law firms involved in these meetings included Anchor Law Firm, PLLC; Bedrock Legal, LLC; Boulder Legal Group, LLC, Carolina Legal Services, LLC, Canyon Legal Group LLC, Great Lakes Law Firm LLC, Harbor Legal Group, LLC, Heartland Legal Group, LLC, Monarch Legal Group, LLC, and Royal Legal Group, LLC. (Dkt. No. 366, ¶ 202)

Gustafson, an attorney, owned and managed nine law firms.[9] (*Id.* at ¶ 85) Gustafson exercised substantial control over the nine law firms. (*Id.* at ¶ 88) To that end, Gustafson signed the tax returns, approved expenses, reviewed metrics, and communicated with service providers. (*Id.*) Gustafson is a "minority member or Class B member" of three additional law firms. (*Id.* at ¶ 85) On March 15, 2024, various law firms submitted an insurance claim for attorney's fees. (*Id.* at ¶ 86) Gustafson was listed as the contact person for twenty of those firms. (*Id.*)

Burnette, an attorney, also exercised substantial control over, and involvement in, at least three law firms. (*Id.* at ¶ 90) To that end, he was the sole owner of bank accounts for these same three firms, and he responded to consumer complaints for five law firms. (*Id.* at ¶ 89) Burnette signed a document filed with the Florida Secretary of State on behalf of WyoLaw, LLC and filed a document with the Wyoming Secretary of State on behalf of The Sands Law Group, LLP. (*Id.*) The March 15, 2024 insurance claim lists Burnette as the contact person, together with Gustafson, for three of the law firms. (*Id.*)

Gallagher, an attorney who previously worked for Blust at Client First Bankruptcy, also exercised substantial control over, and involvement in, various law firms. (*Id.* at ¶ 92) Gallagher owned Chabner Legal Group, LLC and Hinds Law LLC a/k/a First America Law, and was the sole owner for bank accounts for three additional law firms. (*Id.* at ¶ 91) Some of the firms linked to Gallagher or Burnette used the same co-working space address as the Law Offices of Jason Blust and the Blust Family 2019 Irrevocable Trust. (*Id.* at ¶ 204) Blust also recruited Lauren Smaldon, a Strategic employee, to become a member or

---

[9] Two of the law firms owned by Gustafson, Royal Legal Group and Hailstone Legal Group, purported to offer only contingent or "deferred-fee debt settlement services," while the other seven firms owned by Gustafson offered advance-fee debt relief services. (Dkt. No. 366, ¶ 85)

supervising attorney of multiple law firms, including the Great Lakes Law Firm, LLC. (*Id.* at ¶ 195)

Hedgewick Consulting, LLC ("Hedgewick") is a consulting company owned and controlled by Blust that provided services to the law firms in exchange for consulting fees. (*Id.* at ¶ 98) Hedgewick arranged the partnership between the law firms and Strategic, and specifically designed and set-up the law firms' websites, drafted the client enrollment forms, recommended lawyers to join the firms, and coordinated contracts between the law firms and service providers. (*Id.*)

### *Relialit, Lit Def, and Fidelis*

Relialit, LLC ("Relialit"), Lit Def Strategies, LLC ("Lit Def") and Fidelis Legal Support Services, LLC ("Fidelis") substantially assisted the debt-relief operation by participating in the day-to-day operations of the law firms. (Dkt. No. 366, ¶ 252) Specifically, these companies purportedly provided litigation support to the law firms. (*Id.* at ¶ 94, ¶ 97)

Lit Def was owned and controlled by Blust. (*Id.* at ¶ 95) Relialit, a predecessor to Lit Def that is now defunct, was also owned and controlled by Blust. (*Id.* at ¶ 97) Around 2021, Lit Def transitioned to Fidelis, and Fidelis ultimately became the successor company of Lit Def. (*Id.* at ¶¶ 95-96) Blust controlled Fidelis (*Id.* at ¶ 95) The operations of Lit Def and Fidelis were interwoven. (*Id.* at ¶ 96) The companies lacked formal boundaries and shared a single set of staff, management, customers, procedures, and work. (*Id.*) Between 2020 and 2024, Gallagher helped manage the day-to-day operations at both Lit Def and Fidelis. (*Id.* at ¶ 91) Many people who worked for Lit Def and Fidelis previously worked for Relialit. (*Id.* at ¶ 96)

**The Debt-Relief Services Scheme**

*Solicitation of Consumers*

Strategic employed third parties to mail personalized letters to consumers claiming that they were "pre-approved" for a debt consolidation loan at attractive interest rates, *e.g.,* 3.11% APR.[10] (Dkt. No. 366, ¶ 13, ¶ 108) The letters cited a rotating list of companies that ostensibly offered the debt consolidation loans, but, in reality, these lenders did not exist and the consumers had not been pre-approved for any loan. (*Id.* at ¶ 14) The letters included a unique offer code or personal reservation code ("PRC"), and consumers were instructed to call a phone number or submit a request to a designated website using the PRC. (*Id.* at ¶ 13)

When the consumer responded by calling the number or visiting the website advertised on the letter, their information was sent to Strategic salespeople as "leads." (*Id.* at ¶ 16) Strategic salespeople would then contact the consumer and would almost always inform the consumer that they did not qualify for the debt-consolidation loan as advertised. (*Id.* at ¶ 17, ¶ 110) Strategic salespeople would then encourage the consumer to enroll in Strategic's advance-fee debt-relief program by promising that a network of lawyers would negotiate reduced payoff amounts with the consumer's creditors and would also defend the consumer in the event they were sued by a creditor. (*Id.* at ¶ 18, ¶ 110) Strategic marketed litigation support services as an additional benefit of its debt-relief

---

[10] Strategic often caused 2-3 million direct-mail solicitation letters to be sent to consumers each week. (Dkt. No. 366, ¶ 15) Most or all of these solicitations were sent by MEC Distribution, LLC, a company that claimed to be owned by Three Affiliated Tribes of the Fort Berthold Reservation in North Dakota. (*Id.* at ¶ 109) Between November 2016 and March 2021, Strategic paid at least $135 million to MEC Distribution and its subsidiaries. (*Id.*)

services. (*Id.* at ¶ 94) Also during the sales calls, Strategic salespeople would routinely refer to its debt-relief services as the "zero percent interest option." (*Id.* at ¶ 21)

### *Notary Meetings*

When a consumer agreed to enroll in the program, Strategic salespeople connected the consumer with a law firm to provide the debt-relief services in exchange for fees. (*Id.* at ¶¶ 111-12) Strategic would then arrange a meeting between an independent contractor notary and the consumer, for purposes of the consumer signing enrollment paperwork and a retainer agreement with the assigned law firm. (*Id.* at ¶ 113, ¶ 123) The notaries were neither employees nor agents of Strategic or the law firms. (*Id.* at ¶ 125, ¶¶ 135-36) The notaries were typically paid a nominal fee to get the enrollment documents signed. (*Id.* at ¶ 113, ¶ 128) The notaries had limited knowledge about the contents of the enrollment documents and could not answer consumers' questions. (*Id.* at ¶ 127, ¶¶ 131-32) As a result, the meetings between consumers and the notaries were typically brief, formulaic, and non-substantive. (*Id.* at ¶ 129)

Contracts between the notaries and the law firms required the notaries to provide an "in-person presentation" to consumers. (*Id.* at ¶ 131) However, the notaries were not required to have substantive knowledge of the debt-relief services. (*Id.*) If a consumer had a question or concern about the program before signing the enrollment documents, the notaries called a Strategic employee on the telephone to discuss the issue with the consumer. (*Id.* at ¶¶ 132-33) Thus, the consumer had no in-person, substantive interaction with a seller of the debt-relief service before enrolling in the program. (*Id.* at ¶ 136) Instead, their only substantive interaction was with a Strategic salesperson over the telephone. (*Id.*) And sometimes, not even that. (*Id.* at ¶ 126, ¶¶ 133-36)

10

Blust, Sasson, and Blumpkin were involved with the notary process. (*Id.* at ¶ 139-40) Hedgewick, owned by Blust, drafted the scripts and training materials for the notaries. (*Id.*) Hedgewick also coordinated and maintained copies of contracts between the law firms and the notaries. (*Id.*) Burnette signed contracts with a company providing notary services on behalf of Henry Legal Group LLP d/b/a Heartland Legal Group and Gardner Legal LLC d/b/a Option 1 Legal. (*Id.* at ¶ 89) Gallagher signed a contract with a company providing notary services on behalf of the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group. (*Id.* at ¶ 91)

### *How the Debt-Relief Program Functioned*

After a consumer signed the enrollment documents, an attorney from the law firm assigned to that consumer contacted the consumer and read a short script welcoming the consumer to the program. (Dkt. No. 366, ¶ 114) However, this attorney-welcome call was often the only time a consumer spoke with an attorney about the debt-relief program. (*Id.*) When a consumer tried to call their assigned law firm after the initial welcome call, their calls were routed to employees of Strategic. (*Id.* at ¶ 121) These employees were primarily located in call centers in Buffalo, New York or New York City. (*Id.*) These employees were not attorneys but held themselves out to be representatives of whichever law firm had been assigned to represent that consumer. (*Id.*) Specifically, consumer calls were routed to Strategic customer service representatives who would use the name of the Client Services Subsidiary or the law firm that the consumer believed was representing them. (*Id.* at ¶ 79) Thus, the entity name under which a Strategic employee answered a consumer call could change with each call. (*Id.*) For example, a Strategic employee who answered calls from consumers held themselves out to be a

representative of at least six different law firms, even though their salary was paid by Strategic. (*Id.*)

Although consumers were promised that attorneys would negotiate with creditors on their behalf to settle their debts, the law firms actually performed little to no work on behalf of consumers. (*Id.* at ¶ 26) Instead, the law firms acted as a façade for Strategic's debt-relief operation. (*Id.*) Many of the law firms did not have physical offices and some utilized mailboxes rented though a UPS store. (*Id.* at ¶ 44) For some of the law firms, incoming mail was scanned by a third-party and uploaded to Strategic rather than the law firm. (*Id.*) Further, nearly all of consumers' interactions with their assigned law firms were with employees of Strategic rather than employees of the law firm.[11] (*Id.* at ¶ 120) To the extent that any debts were settled for consumers enrolled in the program, the settlements were negotiated by non-attorney employees of Strategic and not law firm attorneys. (*Id.* at ¶ 43, ¶ 120)

Upon enrollment, Strategic representatives instructed consumers to stop paying their debts.[12] (*Id.* at ¶ 115) Some consumers were told that creditors were more likely to enter into settlements when the consumer's account became delinquent. (*Id.*) When Strategic received notice that a creditor sued a consumer enrolled in the debt-relief program, Strategic did not send the legal filings to the law firm assigned to represent the consumer. (*Id.* at ¶ 95; ¶ 201) Instead, Strategic forwarded those filings to Lit Def and/or Fidelis. (*Id.* at ¶ 95) Lit Def and Fidelis performed data entry for the lawsuits. (*Id.*) Then,

---

[11] The law firms were assigned huge numbers of clients. (Dkt. No. 366, ¶ 120) For example, in 2023, one attorney was assigned to 1,554 clients and had a caseload of 2,778 clients. (*Id.*)

[12] Many consumers were concerned about the potential adverse impact of stopping payment on their credit cards. (Dkt. No. 366, ¶ 170) However, Strategic salespeople routinely told consumers that they were unlikely to be sued by their creditors, that their credit scores would only suffer a small reduction, that any reduction in their score would only be temporary, and that their credit score would substantially increase once their debt were settled through the program. (*Id.*)

Lit Def and Fidelis acted as hubs in the course of the litigations by purportedly sending filings to contracted litigation and appearance attorneys. (*Id.*) Lit Def also coordinated payments from consumers' escrow accounts to pay any litigation-related expenses, such as filing fees and attorney appearance fees. (*Id.*)

During the enrollment process, consumers were told that the debt-relief program included litigation defense services and that a lawyer would represent them in the event they were sued by their creditors, for non-payment of their enrolled debts, while participating in the program. (*Id.* at ¶ 122) Likewise, the retainer agreements consumers signed with the law firms promised that firm lawyers would provide litigation defense if the consumer was sued by creditors while participating in the debt-relief program. (*Id.*) These representations were misleading and deceptive. (*Id.* at ¶ 174) Each contract contained a loophole provision allowing the assigned law firm to avoid participating in litigation if the assigned lawyer determined that the consumer was unlikely to gain a favorable result. (*Id.* at ¶ 122) Consumers often learned through creditors that the law firms never contacted them. (*Id.* at ¶ 173) Consumers reported that the law firms almost never represented them when they were sued by creditors, even though they paid a significant retainer and legal fees. (*Id.* at ¶ 95, ¶ 122, ¶ 174) Thus, consumers sometimes had default judgments entered against them or had to represent themselves in court. (*Id.* at ¶ 174)

### *Fees*

Upon enrolling in the debt-relief program, consumers were required to begin making monthly payments into an escrow account. (Dkt. No. 366, ¶ 117) Defendants immediately began collecting substantial fees from consumers through these accounts, including "service fees," "retainer fees," "legal admin fees," and "banking fees." (*Id.* at ¶

143, ¶ 146) The fees were heavily front-loaded and were charged upon enrollment, before any of the consumer's debts were settled. (*Id.* at ¶ 144, 146) The service fees were not based on the individual debt settlements achieved by the program, and, likewise, the retainer fees, administrative fees, and other fees were not based on the amount of debt actually enrolled or the savings realized by consumers through debt settlements actually achieved. (*Id.* at ¶ 149) Despite the labels ascribed to the various fees, the money was not always distributed consistent with its described purpose. (*Id.* at ¶ 153) For example, the Client Services Subsidiaries, which were not law firms, sometimes received legal retainer fees. (*Id.*) And the law firms received not only legal retainer fees, but also sometimes received service fees and administrative fees. (*Id.* at ¶ 154)

Because defendants were withdrawing substantial fees from consumers' escrow accounts every month, consumers were left with little money in their accounts to fund potential settlements. (*Id.* at ¶ 150) In the meantime, consumers' debts continued to accrue interest as they remained outstanding. (*Id.* at ¶ 22) The amounts that consumers paid in fees were significantly greater than the amounts of debts actually settled. (*Id.* at ¶ 165) During the relevant time period, well over 100,000 consumers were enrolled in Strategic's debt business. (*Id.* at ¶ 168) Since January of 2016, Strategic and the law

firms have received hundreds of millions of dollars in advance fees from consumers.[13] (*Id.* at ¶ 181)

Blust and Sasson had an agreement whereby Strategic received 80% of all fees and the law firms received 20% of all fees. (*Id.* at ¶ 160) Blust received financial benefits through both the law firms and the Client Services Subsidiaries. (*Id.* at ¶ 206, ¶ 214) The law firms made payments to Blust personally as well as to the Law Offices of Jason Blust. (*Id.* at ¶¶ 214-17) Blust controlled the bank accounts for certain law firms, which received money from the Client Services Subsidiaries. (*Id.* at ¶ 206) In addition, Blust's companies, including Hedgewick, Lit Def, and Relialit, all received significant payments from the law firms. (*Id.* at ¶¶ 208-213) From December 2019 through April 2021 specifically, Lit Def received over $37,000,000 from the law firms. (*Id.* at ¶¶ 208-09) One of the law firms that regularly sent payments to Lit Def, Relialit, and Hedgewick was Great Lakes Law Firm, LLC. (*Id.* at ¶ 209, ¶¶ 212-13) From April 2022 to October 2023, Fidelis received a total of $16.4 million from the law firms. (*Id.* at ¶ 211) Two of at least 17 law firms that made payments to Fidelis included Gustafson Consumer Law Group, LLC d/b/a White Oak and Great Lakes Law Firm, LLC. (*Id.* at ¶¶ 210-11)

---

[13] The SAC alleges that, since January of 2016, Strategic and the law firms "have taken at least $100,000,000 in fees from consumers" before any of the consumer's debts were settled or reduced. (Dkt. No. 366, ¶ 181) But the allegations in the SAC in total, and the reasonable inferences to be drawn therefrom, indicate that consumers have likely paid *hundreds of millions* in fees to Strategic and the law firms. For example, well over 100,000 consumers have participated in defendants' debt-relief program. Sample payment data for approximately 34,000 consumers enrolled in the program over an approximately five-year period shows that these 34,000 consumers alone paid a total of $104,000,000 to Strategic and the law firms before any debt-relief payments were made to creditors. (Dkt. No. 366, ¶ 147) During this same five-year period, no one working for Strategic or the law firms settled any debt for approximately one-third of the consumers who paid into the program. (*Id.* at ¶ 148)

*Defendants' Use of Multiple and Changing Entities*

Sasson and Blust created the law firms to provide consumers with the sense that the debt-relief services were professional and trustworthy, and to conceal Strategic's involvement in the debt-relief operation from consumers and the public in general. (Dkt. No. 366, ¶ 182-83) Consumer complaints, bank records, and website records suggest that Strategic also operated through additional companies, many of which purported to be law firms. (*Id.* at ¶ 161) Plaintiffs allege that based on defendants' practice of regularly changing company names or establishing new entities, it is plaintiffs' belief that there are additional Client Services Subsidiaries and law firms yet to be identified. (*Id.*) Further, banks records show that at least one of the law firms received money from nine other law firms. (*Id.* at ¶ 162) In addition, a number of other law firms or companies affiliated with Blust made payments to Relialit or Lit Def. (*Id.* at ¶ 163)

*Consumer Complaints*

Consumer complaints reflect that Strategic and the law firms collected advance and non-proportional fees. (Dkt. No. 366, ¶¶ 179-80) In 2023, there were approximately 127 complaints in a Federal Trade Commission database involving the law firms. (*Id.*) One consumer complained that he was charged nearly $10,000 in advance fees between July 2020 and June 2023, and that none of his debts were settled. (*Id.* at ¶ 180)

Blust responded to consumer complaints about the law firms.[14] (*Id.* at ¶ 84) Blust often consulted with Strategic employees and law firm employees regarding consumer complaints against the law firms, including complaints to various state bar associations

---

[14] When consumers complained to various government entities about the debt-relief program, they complained about their assigned law firm, whose name they had been provided, and not about Strategic, whose name they had not been provided. (Dkt. No. 366, ¶ 183) This structure also made it more difficult for consumers to sue Strategic. (*Id.*)

and the Better Business Bureau. (*Id.* at ¶¶ 199-200) Likewise, when Strategic employees were unable to resolve escalated consumer issues, they often consulted with Blust. (*Id.*) Blust also coordinated efforts by Strategic and the law firms to pressure consumers to take down negative reviews of the law firms. (*Id.*)

### Defendants' Knowledge and Prior Involvement in the Debt-Relief Business

Blust, Sasson, and Gustafson are all former employees or partners of Legal Helpers Debt Resolution, LLC ("Legal Helpers"). (Dkt. No. 366, ¶ 53, ¶ 83, ¶ 87) Legal Helpers is a debt-relief firm that was sued and eventually shut-down as a result of actions by the Attorneys General of Illinois, Wisconsin, North Carolina, and West Virginia. (*Id.* at ¶ 53) It was alleged that Legal Helpers charged unlawful up-front fees, failed to reduce consumers' debt as promised, and attempted to avoid advance-fee bans by recruiting attorneys to act as "fronts" for the business. (*Id.*) These lawsuits resulted in consent judgments enjoining Legal Helpers from engaging in debt-relief in certain states. (*Id.*) In 2018, Blust entered into a stipulated judgment with the United States Bankruptcy Trustee for the District of Kansas regarding numerous violations of bankruptcy law arising from the same facts as alleged in the SAC. (*Id.* at ¶ 83)

Gustafson was a former "Class B member" or local attorney with The Mortgage Law Group (TMLG), a mortgage-assistance relief services provider that the CFPB sued for taking up-front fees, failing to make required disclosures, and making deceptive statements. (*Id.* at ¶ 87) As a result of that lawsuit, a federal court in the Western District of Wisconsin awarded restitution and penalties to the CFPB and banned several of the

TMLG principals from participating in mortgage-assistance relief services.[15] (*Id.*)

### *The Federal and State Charges*

Counts 1 and 2 of the SAC allege that Strategic, Sasson, Behar, and Blumpkin committed abusive practices, in violation of the TSR, by charging advance fees and non-proportional fees for debt-relief services.[16] (Dkt. No. 366, ¶¶ 230-46) Count 3 of the SAC alleges that, by controlling the law firms and/or participating in their day-to-day operations, defendants Strategic, Relialit, Lit Def, Hedgewick, and Fidelis provided substantial assistance to the abusive telemarketing practices committed by the law firms, including the taking of advance and non-proportional fees, in violation of the TSR.[17] (*Id.* at ¶¶ 247-56) Count 4 charges Sasson, Behar, Blumpkin, Blust, Gustafson, Burnette, and Gallagher with violating the TSR by providing substantial assistance to the abusive telemarketing practices committed by Strategic and the law firms.[18] (*Id.* at ¶¶ 257-70)

Count 7 of the SAC charges Strategic, Relialit, Lit Def, Hedgewick, Fidelis, Sasson, Blumkin, Behar, Blust, Gustafson, Gallagher, and Burnette with fraudulent acts in support of the debt-relief operation, in violation of New York Executive Law § 63(12). (*Id.* at ¶¶

---

[15] The Wisconsin District Court noted that the role of Class B attorneys, such as Gustafson, in TMLG was "by design almost always perfunctory, rather than substantive," and further stated that "apart from responding to simple questions posed by a national attorney from a checklist during a 15-minute phone call, clients did not have a substantive discussion, if any at all, with any attorney until after they had been informed (or in many cases misinformed) about the scope of defendants' services, signed a retainer agreement, paid a sizable advance fee, and submitted their financial documentation." (Dkt. No. 366, ¶ 87) The Wisconsin District Court described these actions as an "obvious…attempt to avoid the [CFPB's] ability to regulate practices that have otherwise been deemed illegal for many years." (*Id.*)

[16] Counts 1 and 2 also name the Holding Companies. (Dkt. No. 366, ¶ 230-46)

[17] Count 3 also names the Holding Companies. (Dkt. No. 366, ¶¶ 247-256)

[18] Counts 5 and 6 charge Strategic, Sasson, Blumpkin, and the Holding Companies with engaging in deceptive practices in violation of the TSR. (Dkt. No. 366, ¶¶ 271-89) These charges involve the allegedly false and deceptive claims made to consumers regarding the debt-relief services, including telling consumers they were "pre-approved" for a low interest loan when they had not been approved for any loan and there was no lender, as well as referring to the debt-relief services as the "zero percent interest option," even though the program involved advance fees and the continued accrual of interest on consumers' outstanding debts. (*Id.*)

290-95) Count 8 charges these same defendants with engaging in deceptive acts or practices in support of the debt-relief operation, in violation of New York General Business Law § 349. (*Id.* at ¶¶ 296-301) Count 10 alleges that Strategic, Great Lakes Client Services, LLC, the Holding Companies, Sasson, Behar, Blumkin, Blust, Gustafson, Gallagher, and Burnette operated as adjustment services companies in Wisconsin without a license, in violation of Wis. Stat. § 218.02(1)(a). (*Id.* at ¶¶ 307-11) Count 11 alleges that these same defendants violated the Wisconsin Adjustment Services Company Rules by charging advance fees and excessive fees for debt-relief services.[19] (*Id.* at ¶¶ 312-15)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. When evaluating a motion to dismiss, a court must accept as true the factual allegations contained in a complaint and draw all inferences in plaintiff's favor. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 662. "Determining whether a

---

[19] Count 9 of the SAC alleges that the relief defendants received funds or assets from defendants that were obtained from consumers through the unlawful practices alleged in the SAC; that relief defendants have no legitimate claims to the funds; and that the funds are subject to disgorgement. (*Id.* at ¶¶ 302-06)

complaint states a plausible claim for relief...requires the...court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Plaintiffs allege that Relialit, Lit Def, and Hedgewick (collectively referred to as the "Blust Companies"), along with Blust, Gustafson, Gallagher, and Burnette (collectively referred to as the "Individual Defendants") violated the TSR by providing substantial assistance to the law firms in collecting unlawful advance and non-proportional fees from consumers for debt-relief services. A substantial assistance claim requires (1) an underlying TSR violation; (2) proof that defendant provided substantial assistance or support to the seller or telemarketer responsible for the violation; and (3) proof that defendant knew, or consciously avoided knowing, that the seller or telemarketer engaged in the TSR violation. *See* 16 C.F.R. § 310.3(b); *FTC v. Consumer Health Benefits Ass'n*, 10 Civ. 3551, 2012 U.S. Dist. LEXIS 72161 (E.D.N.Y. May 23, 2012).

Blust, Gustafson, and the Blust Companies argue that the substantial assistance provision of the TSR is invalid insofar as it seeks to prohibit providing substantial assistance to abusive telemarketing practices.[20] Relialit, Lit Def, Gallagher, and Burnette further argue that the SAC fails to allege that they provided substantial assistance to the debt-relief operations. The Blust Companies and the Individual Defendants contend that the allegations in the SAC are insufficient to show that they knew, or consciously avoided knowing, that the law firms were violating the TSR. The Blust Companies and the Individual Defendants argue that the SAC fails to state any valid claims under New York

---

[20] Gallagher and Burnette argue that if the Court determines that the substantial assistance portion of the TSR is invalid as it relates to abusive telemarketing practices, this claim fails as to them as well.

law, and the Individual Defendants argue that the SAC fails to state any valid claims under Wisconsin law. The Court addresses defendants' arguments in turn below.

### The Substantial Assistance Provision of the TSR is Valid

The Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Act") granted the Federal Trade Commission (the "FTC") the power to prescribe rules prohibiting certain conduct by telemarketers and sellers. *See* 15 U.S.C § 6102. These rules make up the Telemarketing Sales Rule, or the TSR. To that end, Sections 310.3(a), (c) and (d) of the TSR prohibit a telemarketer or seller from engaging in certain "deceptive telemarketing acts or practices," while Section 310.4 of the TSR prohibits a telemarketer or seller from engaging in certain "abusive telemarketing acts or practices." *See* 16 C.F.R. § 310.3; § 310.4. Section 310.3(b) of the TSR prohibits anyone from providing substantial assistance to any telemarketer or seller engaged in *either* deceptive or abusive telemarketing acts or practices. *See* 16 C.F.R. § 310.3(b) ("It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.").

Here, defendants are alleged to have violated Section 310.3(b) of the TSR by providing substantial assistance to the law firms in taking advance and non-proportional fees for debt-relief, both of which are defined as abusive telemarketing practices under the TSR. *See* 16 C.F.R. § 310.4(a)(5)(i). Defendants maintain, however, that these allegations cannot stand because the FTC exceeded its authority under the Act by

including abusive telemarking acts in Section 310.3(b), the substantial assistance provision of the TSR.

Defendants' argument is premised on the specific language of the Act itself. Section 6102(a)(1) of the Act generally states that the FTC "shall prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." *See* 15 U.S.C. § 6102(a)(1). Section 6102(a)(2), the following subsection, directs the FTC to define deceptive telemarking and further states that such definition "may include acts or practices of entities or individuals *that assist or facilitate* deceptive telemarketing[.]" *Id.* at § 6102(a)(2) (emphasis added). Section 6102(a)(3), the very next subsection, provides a list of prohibited conduct the FTC "shall include in [its] rules respecting other abusive telemarketing acts or practices." *Id.* at § 6102(3). Unlike Section 6102(a)(2), which mentions the assistance and facilitation of *deceptive acts*, Section 6102(a)(3) does not expressly state that the FTC may prohibit the assistance and facilitation of *abusive acts*. Defendants posit that because Congress did not expressly include language addressing assistance and facilitation in Section 6102(a)(3)'s discussion of abusive acts, like it did in Section 6102(a)(2)'s discussion of deceptive acts, Congress only authorized the FTC to outlaw the assistance and facilitation of deceptive telemarketing. Stated another way, defendants argue that the Act permits the FTC to create a rule prohibiting substantial assistance of deceptive telemarketing but does not permit the FTC to create a rule prohibiting substantial assistance of abusive telemarketing. Thus, according to defendants, the substantial assistance provision of the TSR charged here is invalid.

The Court does not read the Act so narrowly. To begin, Section 6102(a)(1) of the Act, which appears *before* the more specific discussion of deceptive and abusive acts found in Sections 6102(a)(2) and 6102(a)(3) respectively, provides broad authorization to the FTC to create rules "prohibiting deceptive telemarketing acts or practices *and other abusive telemarketing acts or practices.*" 15 U.S.C. § 6102(a)(1) (emphasis added). *See CFPB v. Commonwealth Equity Grp., LLC*, 554 F. Supp.3d 202, 209 (D. Mass. 2021) (recognizing the breath of FTC's authority to create rules addressing telemarketing "at its discretion"). Section 310.3(b) of the TSR, the provision charged here, prohibits an entity or an individual, like the Blust Companies or the Individual Defendants, from providing substantial assistance to a telemarketer or seller engaged in abusive conduct. This provision of the TSR appears to fall squarely within the plain and general grant of authority given to the FTC, in Section 6102(a)(1) of the Act, to create rules prohibiting both "deceptive telemarketing acts or practices and *other abusive telemarketing acts or practices.*" *See* 15 U.S.C. § 6102(a)(1) (emphasis added).

Defendants are correct that Sections 6102(a)(2) and 6102(a)(3) of the Act list certain rules and requirements that the FTC either "may include" or "shall include" in its rules governing deceptive and abusive telemarketing practices. However, these lists do not appear to limit the FTC's general authority, under Section 6102(a)(1), to restrict a wide variety of *other* abusive telemarketing conduct. In fact, a reading of Sections 6102(a)(2) and 6102(a)(3) that limits the ability of the FTC to promulgate rules against other abusive acts or practices in telemarketing would seem to render Section 6102(a)(1) mere surplusage.

Defendants argue that because Congress expressly stated, in Section 6102(a)(2), that the FTC "may" include rules against assistance of deceptive practices, but did not similarly state, in Section 6102(a)(3), that the FTC may include rules against assistance of abusive practices, Congress must have intended to prohibit the FTC from attaching secondary liability to abusive conduct. Defendants contend that telling the FTC that it may impose secondary liability for deceptive telemarketing is meaningless if the FTC may also impose secondary liability as broadly as it likes. The Court disagrees.

Section 6102(a)(2) of the Act does not appear to provide any additional authority to the FTC that is not *already granted* under Section 6102(a)(1)'s general mandate to write rules prescribing deceptive and abusive telemarketing. Instead, the language of Section 6102(a)(2) provides guidance to the FTC in writing those rules as they pertain to deceptive telemarketing. To that end, Section 6102(a)(2) instructs the FTC to define deceptive telemarking and suggests that such a definition may include the assistance and facilitation of deceptive acts. Contrary to defendants' interpretation, this language does not suggest, to this Court, that assistance and facilitation of abusive acts cannot *also* be prohibited under the general and broad mandate found in Section 6102(a)(1). *See Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d at 209 ("Although Congress directed the FTC to create rules regarding specific telemarketing activities (for example, calls that are made late at night or that are coercive), Congress also authorized the FTC to create additional rules addressing 'deceptive telemarketing acts or practices' at its discretion. 15 U.S.C. § 6102(a)(1). Defendants have not demonstrated that Congress intended the FTC to exclusively address unsolicited telemarketing calls that would cause the TSR to exceed the Commission's authorized scope of rulemaking."). In fact, the Court finds such an

interpretation, namely that Congress meant to allow for a rule against assisting with deceptive acts but to specifically prohibit a rule against assisting with abusive acts, to be illogical. *See Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) (a presumption that expressly including one matter excludes other matters "applies only when it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").

Like Section 6102(a)(2) of the Act accomplishes with regard to deceptive acts, Section 6102(a)(3) provides the FTC with guidance in writing the rules against abusive acts that it is already empowered to create pursuant to Section 6102(a)(1). To that end, Section 6102(a)(3) provides a list of certain abusive telemarketing conduct that the FTC "shall include" in the TSR, including restrictions on the hours of the day and night that unsolicited phone calls can be made and requirements that telemarketers disclose the purpose and nature of the call. *See* 15 U.S.C. § 6102(a)(3)(A)-(D). But the list of abusive practices found in Section 6102(a)(3) was clearly not meant to be exhaustive or limiting. To be sure, Section 310.4 of the TSR outlaws myriad additional abusive telemarketing acts that, like the substantial assistance rule at issue here, are not expressly mentioned in Section 6102(a)(3).[21] *See* 16 C.F.R. § 310.4. Thus, it is apparent that the abusive practices which Congress specifically listed in Section 6102(a)(3) were to be treated by the FTC as a floor, and not a ceiling, in writing rules prohibiting "other abusive telemarketing acts." The non-limiting nature of Section 6102(a)(3) serves as further proof that the assistance and facilitation of abusive telemarketing conduct is itself an "other

---

[21] Indeed, the charging of advance fees for debt-relief services, the main subject of this lawsuit, is an abusive practice pursuant to Section 310.4(a)(5)(1) of the TSR that is not also specifically listed in Section 6102(a)(3) of the Act's discussion of abusive practices.

abusive telemarketing act[] or practice" that the FTC can prohibit pursuant to the broad and general mandate given to the FTC in Section 6102(a)(1) of the Act.[22]

Finally, the different formulations of Sections 6102(a)(2) and 6102(a)(3) of the Act further indicate that Congress' mention of assisting and facilitating deceptive conduct should not be read to suggest that Congress intended to foreclose the FTC from addressing the assistance and facilitation of abusive conduct. Section 6102(a)(2) requires the FTC to define deceptive telemarketing and suggests that such a definition may include assistance or facilitation of deceptive acts. In contrast, Section 6102(a)(3) does not require the FTC to define abusive telemarketing and instead provides a non-exhaustive list of abusive conduct the FTC shall include in its rules regarding abusive acts. This lack of parallelism between Sections 6102(a)(2) and 6102(a)(3) belies defendants' argument that if Congress wanted to permit the FTC to promulgate a rule against substantially assisting abusive conduct, like it did with regard to deceptive conduct, Congress would have so stated. *See United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) ("[I]f the language of the two provisions at issue is not parallel, then Congress may not have envisioned that the two provisions would be closely compared in search of terms present

---

[22] Defendants appear to concede that Section 6102(a)(3) of the Act does not prohibit the FTC from addressing other abusive telemarketing conduct not specifically listed therein, and that Section 310.4 of the TSR does, in fact, limit a whole host of additional abusive conduct not expressly enumerated by the Act. But defendants point to the fact that the provision addressing substantial assistance of abusive acts is found in Section 310.3 of the TSR (addressing deceptive acts) and not in Section 310.4 of the TSR (addressing abusive acts). The Court does not find the placement of the substantial assistance rule to change the analysis here. Indeed, the plain language of Section 6102(a)(1)'s directive, to the FTC, to prescribe rules prohibiting "deceptive telemarketing acts or practices *and other abusive telemarketing acts or practices*" appears to combine both deceptive and abusive acts into a large, general category of wrongful telemarketing conduct that the FTC has broad power to both identify and prohibit.

in one and absent in the other.").[23]

For these reasons, the Court find that the substantial assistance provision of the TSR charged in Count 3 is not invalid.[24]

### The SAC Sufficiently Alleges Substantial Assistance by Relialit, Lit Def, Gallagher, and Burnette

Relialit, Lit Def, Gallagher, and Burnette argue that the SAC fails to allege that they provided substantial assistance to the underlying TSR violations charged here. For the following reasons, the Court disagrees.

The threshold for what constitutes substantial assistance is low. *See Consumer Health Benefits Ass'n*, 2012 U.S. Dist. LEXIS 72161 at *17. It requires only a "connection between the assistance provided and the resulting violations of the core provisions of the TSR." *Id.*; *United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009). Plaintiffs must identify something more than "casual or incidental" help to the telemarketer that is unrelated to the TSR violation, but plaintiffs do not have to show a "direct connection" between the assistance and the alleged violation. *See F.T.C. v. HES Merch. Servs., Co.*, 6:12-CV-1618, 2014 U.S. Dist. LEXIS 171292 (M.D. Fla. Nov. 18, 2014), *aff'd*

---

[23] The Court notes that even though the charging of advance fees is specifically listed as an abusive telemarketing act or practice in Section 310.4(a)(5)(1) of the TSR, the charging of advance fees, and specifically the manner in which it is alleged to have been done here, also involves deceptive conduct. Plaintiffs note that in promulgating the advance fee prohibition, the FTC emphasized that the charging of advance fees was an abusive practice that "ha[d] been an integral part of the widespread deception and abuse in the debt settlement industry." *See* TSR, 75 Fed. Reg. 48458, 48484 (Aug. 10, 2010). The FTC went on to note that advance fees create incentives for debt-relief providers to "deceive consumers about the fundamental aspects of the program in order to get them to enroll." *Id.*

[24] The Court notes that in the recent Summary Order affirming the preliminary injunction issued in this case, the Second Circuit recognized that an individual may be liable under the TSR if he "provide[s] substantial assistance" to a seller when he "knows or consciously avoids knowing" that the seller is "engaged in any act or practice that violates… § 310.4." *See Consumer Fin. Prot. Bureau v. StratFS, LLC*, 24-CV-697, 2025 U.S. App. LEXIS 13336 (2d Cir. June 2, 2025) (summary order). While the Second Circuit did not address any of the constitutional or statutory interpretation arguments raised by defendants in the instant motion, the Second Circuit did acknowledge that the "facts are sufficient to render Sasson and Blust liable" for substantially assisting in the TSR violations charged here. (*Id.*)

652 F. App'x 837 (11th Cir. 2016); *accord FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013). For example, "cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or facilitator." *Chapman*, 714 F.3d at 1216-17 (internal citations omitted). However, "[p]roviding lists of contacts to a seller or telemarketer that identify persons over the age of 55" could be sufficient to constitute substantial assistance. *See FTC v. Capital Choice Consumer Credit, Inc.*, 02-21050 CIV, 2004 U.S. Dist. LEXIS 32306 (S.D. Fla. Feb. 20, 2004) (quoting *Telemarketing Sales Rule Statement of Basis and Purpose*, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995)).

Thus, the question before the Court is not whether Relialit, Lit Def, Gallagher, and Burnette directly engaged in the collection of advance fees from consumers, but instead whether there are sufficient facts stated to make it plausible that these entities and individuals provided something more than "casual or incidental dealing with [the law firms] that [was] unrelated to [the] violation of the Rule." *See FTC v. Nudge, LLC*, 2:19-CV-867, 2021 U.S. Dist. LEXIS 139831 (D. Utah July 26, 2021). That standard is met here.

Strategic provided debt-relief services together with the law firms. In fact, the debt-relief program was marketed and sold to consumers with the promise that each consumer was retaining the services of a law firm. Consumers were told that attorneys would both negotiate their debt settlements and provide them with legal representation in the event they were sued by creditors. Immediately upon enrollment, consumers were instructed to stop paying their debts and start paying significant advance fees that were shared between Strategic and the law firms. Moreover, it is alleged that the law firms were, in

reality, created as a façade to obfuscate Strategic's involvement in the debt-relief program and to provide consumers with assurances that the debt-relief services sold to them were reliable and trustworthy. It is alleged that Blust and Sasson used the law firms to hide the fact that most, if not all, of the debt-relief work was conducted by Strategic employees located in call centers, as opposed to lawyers actually affiliated with the firms listed on consumer's retainer agreements. It is further alleged that Sasson and Blust employed the law firm debt-relief model to make it more difficult for consumers to complaint about, or file lawsuits against, Strategic. Thus, the totality of the allegations in the SAC, which the Court must assume to be true, indicate that affiliation with law firms, and more specifically the promise of legal representation, was essential to the success of the alleged unlawful advance-fee debt-relief operation at issue here.

As to the involvement of the moving defendants specifically, it is alleged that attorneys Burnette and Gallagher owned, operated, and/or controlled numerous law firms that ostensibly provided debt-relief services and litigation assistance with Strategic, and were otherwise critical to the marketing of Strategic's advance-fee debt-relief business. The SAC contains allegations tying Burnette to at least eight different law firms, and it is alleged that Burnette exercised substantial control over, and involvement in, at least three of these firms. Burnette filed paperwork with regulatory bodies on behalf of the some of the law firms, and he responded to consumer complaints for other firms. Burnette is listed as a contact person on insurance paperwork for three of the firms. The SAC alleges that Gallagher owned two of the law firms and that she has been the sole owner of bank accounts for three other firms. It is alleged that Burnette and Gallagher both signed contracts with notary companies on behalf of firms they were affiliated with. These

allegations are sufficient to state a claim, at this early stage of the litigation, that Gallagher and Burnette rendered assistance to the debt-relief program that was more than mere incidental or casual dealing, unrelated to the underlying TSR violation. *See Chapman*, 714 F.3d at 1211 (rejecting defendant's claim that she did not provide substantial assistance to the underlying TSR violation where "she was the one who provided the services and products [the telemarketers] marketed to consumers in misleading ways.").[25]

The SAC further alleges that when Strategic received notice that a creditor sued a consumer enrolled in the debt-relief program, Strategic did not notify that consumer's assigned law firm. Instead, Strategic notified Lit Def of the lawsuit. Lit Def, and prior to that Relialit, facilitated litigation support by acting as a "hub" over the course of the litigation and sending legal documents to other contract attorneys and litigation attorneys. Lit Def also coordinated payments from consumers' escrow accounts for litigation-related expenses such as filing fees and attorney appearance fees. In sum, the allegations here indicate that litigation services were an essential part of the advance-fee debt-relief program sold to consumers by Strategic and the law firms, and that Relialit and Lit Def played a major role in the facilitation of those litigation services. Moreover, the reasonable inferences to be drawn from the SAC indicate that the law firms could not have provided their promised litigation support services to consumers without Relialit and Lit Def's

---

[25] Gallagher and Burnette also seem to contend that they cannot be charged with substantial assistance of the TSR violation because all of the allegations in the SAC relate to their involvement with the law firms, and the law firms have not been named as defendants in this lawsuit. Defendants fail to cite any case for the proposition that an individual or entity can only be charged with substantial assistance of an abusive telemarketing practice if all primary violators of the TSR are also charged, and the Court is unaware of any such requirement in the law. In any event, the law firms are now defendant-intervenors in this lawsuit and, as discussed in more detail *infra*, the law firms and the named defendants are all part of a single, large, interconnected web of entities that worked in tandem to perpetuate the advance-fee debt-relief scheme at issue here.

assistance.[26] These allegations are sufficient, at this early stage of the lawsuit, to state a claim that the assistance Relialit and Lit Def rendered to the debt-relief operation was more than mere incidental or casual dealing, unrelated to the underlying TSR violation. *See FTC v. Partner in Health Car Ass'n*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016) (substantial assistance found where, *inter alia*, multiple telemarketers testified that they could not have done business without defendants).[27]

Relialit and Lit Def argue that they cannot be liable because they provided support services that were tangential to the underlying TSR violation, namely the collection of advance fees. Defendants emphasize that they were not involved in the initial sales pitch or onboarding of consumers; that they played no role in the face-to-face presentations by the notaries; and that they themselves did not collect advance fees.[28] Similarly, Gallagher and Burnette maintain that they did not personally charge advance fees nor did they make false or misleading representations directly to consumers. But even assuming all this to be true, such direct connections to the initial sale of the debt-relief program and the actual

---

[26] The Court rejects defendants' argument that they cannot have provided substantial assistance based on either their ownership and control of the law firms or their facilitation of litigation support services to the law firms, where the SAC also alleges that the law firms did not actually deliver on their promise of litigation defense. First, plaintiffs do not allege that a defense was never provided but instead that it was often not provided. Regardless, the promise of litigation support was marketed to consumers when they enrolled in the program and started paying fees. Gallagher, Burnette, Lit Def, and Relialit's respective roles in the operation facilitated, or helped facilitate, that service in the manner sold to consumers.

[27] Defendants cite aiding and abetting cases brought under the Securities and Exchange Act, which hold that secondary liability requires that a defendant render assistance to the primary violation, not merely to the person committing the violation. *See Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991). Assuming *arguendo* that the SEC cases apply here, the allegations are still sufficient. Here, Gallagher and Burnette are alleged to have controlled and/or operated law firms that worked together with Strategic to charge and receive advance fees for debt-relief services. In addition, plaintiffs allege that by playing an essential role in providing the litigation services promised to consumers at the time they enrolled in the debt-relief service and began paying fees, Lit Def and Relialit rendered assistance not just to the law firms generally, but specifically to the generation of advance fees by Strategic and the law firms.

[28] The Court notes that while it is not alleged that Relialit and Lit Def directly took advance fees from consumers, the SAC alleges that these entities profited significantly from the advance fee debt-relief operation. For example, it is alleged that from March of 2019 through December of 2020, the law firms paid over $258,000 to Relialit. It is further alleged that from December 2019 through April 2021, the law firms paid over $37 million to Lit Def.

taking of advance fees are not necessary to plausibly allege a claim of substantial assistance under the TSR. *See Chapman,* 714 F.3d at 1216 (rejecting defendant's argument that she did not provide substantial assistance to the TSR violation because "she was not involved in the marketing efforts and thus her assistance was not directly connected to the misrepresentations made to consumers" [because] "this type of direction connection is not required."); *F.T.C. v. Lake,* 181 F. Supp. 3d 692, 696 (C.D. Cal 2016) (where "back-end work" played an "integral part" in the scheme to collect fees, defendant could be held liable on a substantial assistance theory).

Moreover, the allegations here, which the Court must assume to be true, reflect that the law firms, Relialit, and Lit Def did not exist or operate in a vacuum. Relialit and Lit Def were not wholly separate businesses, contracted to provide ancillary support services to the law firms, like a cleaning company or copier service. Instead, Lit Def and Relialit were owned and operated by Blust. It is alleged that Blust controlled the law firms, which he and Sasson created to help facilitate the collection of heavily front-loaded advance fees from consumers. It is alleged that Gallagher and Burnette were recruited by Blust to own, control, and/or operate some of these firms.[29] It is alleged that Relialit and Lit Def, and later Fidelis, provided critical support to the law firms in the ongoing advance-fee debt-relief operation. Indeed, Blust personally received advance fee profits not only through his ownership and control of the law firms, but also through his ownership and control of Relialit and Lit Def. It is alleged that some of the law firms linked to Burnette

---

[29] Gallagher and Burnette appear to argue that if, according to the SAC, Blust and/or Sasson controlled the law firms, they cannot be liable for substantially assisting a TSR violation based on their alleged control over, or involvement in, the law firms. Gallagher and Burnette cite no case law in support of this proposition. The SAC contains sufficient allegations that Gallagher and Burnette substantially assisted the alleged violations through their ownership, operation, and/or control of some of the law firms. The fact that others may have also provided substantial assistance through similar involvement with these firms does not alter this conclusion.

and Gallagher sent regular payments to the Blust Companies. Thus, the allegations, read in totality, indicate that the law firms, Relialit, and Lit Def existed as part of a large, interconnected, and complicated scheme created by Sasson and Blust, and assisted by Gallagher, Burnette, and others, to circumvent the TSR and collect illegal advance fees from consumers.[30]

Lastly, the Court notes that this matter is at the pleading stage. Discovery will likely bear out greater factual detail as to exactly how the litigation services were marketed and provided to consumers; the nature of Gallagher and Burnette's ownership, control, and/or involvement in various law firms; the extent of Relialit and Lit Def's involvement in the litigation services provided by the law firms; and each defendants' specific connections to the debt-relief operation as a whole. It may be the case that defendants are able to successfully raise this argument at the dispositive motion stage. However, the allegations and all reasonable inferences to be drawn therefrom, viewed in a light most favorable to plaintiffs, are sufficient to allege substantial assistance at the pleadings stage.[31]

### The SAC Sufficiently Alleges Knowledge by the Blust Companies and the Individual Defendants

In order to maintain a claim of substantial assistance against the Individual Defendants and the Blust Companies, plaintiffs must allege that these individuals and entities knew, or consciously avoided knowing, that Strategic and/or the law firms "were

---

[30] Gallagher is also alleged to have managed the day-to day operations at Lit Def and Fidelis. Allegations of Gallagher's involvement with Lit Def and Fidelis also support plaintiffs' claim that Gallagher provided substantial assistance to the law firms in the collection of advance fees for debt-relief.

[31] Relialit and Lit Def argue that because Royal Legal Group and Hailstone Legal Group did not charge advance fees, Lit Def and Relialit could not have violated the TSR with regard to any litigation services provided to these firms. However, the law firms are alleged to have violated the TSR by charging both advance fees and non-proportional fees. Moreover, the SAC alleges that Lit Def and Relialit provided litigation support services to all of the law firms, the majority of which charged advance fees for debt-relief.

engaged in any act or practice that violated…. ¶ 310.4 of [the TSR]." 16 C.F.R. § 310.3(b).

The allegations in the SAC satisfy this requirement.

The SAC alleges that Blust and Sasson created the law firms to work with Strategic in marketing and providing debt-relief services to consumers in exchange for unlawful advance fees. It is alleged that since 2016, Strategic and the law firms have received hundreds of millions of dollars from consumers in advance fees and that, pursuant to an agreement between Blust and Sasson, Strategic received 80% of those fees and the law firms received 20% of those fees. It is alleged that Blust personally received funds from the law firms. The Blust Companies, which were owned and controlled by Blust and intimately involved in the debt-relief operation, all received significant payments from the law firms.

Thus, the SAC plainly alleges that Blust and the Blust Companies knew that the law firms and Strategic were collecting advance fees for debt-relief, and that Blust, both directly and through the Blust Companies, received a significant portions of those fees. *See Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246 (2d Cir. 1995) ("The knowledge of a director, officer…or controlling person of a corporation is imputable to that corporation."); *S.E.C. v. Franco*, 253 F. Supp. 2d 720 (S.D.N.Y. 2003) (imputing knowledge of the person controlling a group of entities to the entities themselves, even though plaintiff did not allege a veil piercing theory).

Moreover, it is alleged that Gustafson, an attorney, owned and managed nine law firms associated with Strategic's debt-relief business, seven of which offered advanced-

fee debt-relief services.[32] It is alleged that Gustafson exercised substantial control over these firms, and specifically that he signed tax returns, approved expenses, reviewed metrics, and communicated with service provides. As noted above, it is alleged that Gallagher and Burnette also exercised similar ownership, control, and/or involvement in a number of the law firms providing advance-fee debt-relief together with Strategic. This involvement included ownership of law firm bank accounts, filing documents with state regulatory authorities on behalf of the firms, and signing notary contracts on behalf of the firms. These allegations, considered in totality with the other facts alleged in the SAC and viewed in a light most favorable to plaintiffs, are sufficient to demonstrate that Gustafson, Burnette, and Gallagher knew, or consciously avoided knowing, that the law firms were charging and receiving advance fees for debt-relief.

Defendants contend that even if the SAC sufficiently alleges that they knew the law firms were collecting advance fees, the substantial assistance claims still fail because the SAC does not specifically allege that they knew this conduct was unlawful. But defendants "confuse[] factual knowledge with legal knowledge; only the former is required to establish a knowing statutory violation." *In re Axa Equitable Life Ins. Co., COI Litig.*, 595 F. Supp. 3d 196, 236 (S.D.N.Y. 2022). To that end, the Second Circuit has held that "the phrase 'knowingly violates' requires knowledge of the facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001). Indeed,

---

[32] Gustafson argues that because Hailstone Legal Group and Royal Legal Group received deferred fees, as opposed to advance fees, he cannot be held liable for any TSR violation with regard to these entities. However, the SAC alleges that Gustafson exercised control over numerous other law firms which did collect advance fees. Moreover, the SAC alleges that Gustafson and other defendants violated the TSR by substantially assisting in the collection of both advance and non-proportional fees. Thus, Gustafson's argument as to Royal and Hailstone does not serve as a basis to dismiss any claims against him.

the Second Circuit appears to have already rejected this same argument in this very case. Indeed, the Second Circuit rejected Blust and Sasson's contention that this Court erred in subjecting them to the preliminary injunction order because they lacked specific knowledge that their conduct was illegal. *See SratFS, LLC.*, 2025 U.S. App. LEXIS 13336. Citing *Weintraub*, the Second Circuit found that "the District Court needed only to conclude that Sasson and Blust had 'knowledge of facts and attendant circumstances that comprise a violation of' the TSR, not that they knew that their conduct was illegal." *Id.*; *quoting Weintraub*, 271 F.3d at 147.

And even if this was not the state of the law, the SAC does in fact allege that the Individual Defendants and the Blust Companies knew, or consciously avoided knowing, that charging advance fees for debt-relief was a violation of the TSR.[33] It is alleged that consumers complained about the fees charged by the law firms. "Knowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations." *Consumer Health Benefits Ass'n*, 2011 U.S. Dist. LEXIS 92389 at *18 (citing *Dish Network, L.L.C.*, 667 F. Supp. 2d at 961). Here, Burnette is alleged to have responded to consumer complaints for five of the law firms. Blust is alleged to have not only responded to consumer complaints, but also to have coordinated efforts by Strategic and the law firms to pressure consumers to withdraw their complaints about the law firms. *See Nudge, LLC*, 2021 U.S. Dist. LEXIS 139831 (FTC plausibly alleged that defendants knew or consciously avoided knowing that other defendants were

---

[33] As previously stated, Blust's knowledge "is imputed to the [Blust Companies] which he [owned and] controlled." *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096 n. 17 (2d Cir. 1972) (two corporate defendants were liable for violations of securities law because they were "corporate embodiments" of an individual defendant, "and [the individual's] awareness of the securities law violations [is] imputed to them.").

violating the TSR, where defendants received or were made aware of consumer complaints regarding the conduct charged).

The SAC also alleges that Blust and Gustafson were former employees of Legal Helpers, a company that was sued, and ultimately shutdown, for charging up-front fees for debt-relief. It alleges that Gustafson was previously an attorney with TMLG, a mortgage-assistance relief service provider that the CFPB successfully sued for taking up-front fees, failing to make required disclosures, and making deceptive statements. Even if these lawsuits did not specifically involve the TSR's advance-fee ban, Blust and Gustafson are alleged to have previously been involved in the wrongful collection of advance or up-front fees. To that end, it is reasonable to infer that Blust and Gustafson's involvement with Legal Helpers, and Gustafson's involvement with TMLG, would have served as a "red flag" to them regarding the conduct charged here. *See FTC v. Walmart*, 22 CV 3372, 2024 U.S. Dist. LEXIS 117532 (N.D. Ill. July 3, 2024) (A person consciously avoids knowing about a TSR violation when "there are facts and evidence that support an inference of deliberate ignorance.") (quoting *Telemarketing Sales Rule*, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995); *Consumer Fin. Prot. Bureau v. Daniel A. Rosen, Inc.*, 21-CV-07492, 2022 U.S. Dist. LEXIS 91254 (C.D. Cal. April 5, 2022) ("Courts have found it is sufficient to establish knowledge, or conscious avoidance of the prohibited practice, and not of the TSR violation.").

Moreover, the TSR exempts—and thus does not prohibit advance fees for—transactions involving "[t]elephone calls in which the sale of goods or services…is not completed, and payment or authorization of payment is not required, until after a face-to-face sales…presentation by the seller[.]" *See* 16 C.F.R. § 310.6(b)(3). Here, the SAC

alleges that the law firms contracted with notaries to provide "in person presentations" to consumers before the consumers formally enrolled in the debt-relief program.[34] It is alleged that Blust was involved in the notary process. Hedgewick, Blust's consulting company, drafted the scripts and training materials for the notaries as well as coordinated and maintained copies of contracts between the law firms and the notaries. Gustafson, Gallagher, and Burnette owned and/or exercised substantial control over law firms that contracted with notaries, and Gallagher and Burnette signed contracts between law firms and the notary companies. These allegations, considered in totality, also lead to a reasonable inference that the Individual Defendants knew that the collection of advance fees was prohibited under the TSR and that they attempted to use the notary presentations to avoid or circumvent the advance fee ban.[35]

Defendants contend that while it is plaintiffs' position that the notary presentations to consumers did not satisfy the face-to-face exemption to the TSR's ban on advance fees, the SAC does not allege any facts suggesting that they knew, or consciously avoided knowing, that the notary presentations failed to qualify for the exemption. Thus, according to defendants, the SAC fails to charge them with the knowledge necessary to state a claim of substantial assistance. Here again, defendants misconstrue the knowledge requirement under the law and what is required of plaintiffs at the pleading stage. Whether defendants had "legal knowledge," *e.g.*, about whether a statutory exception exempted their conduct from a clearly stated bar on such conduct, is not

---

[34] The SAC further alleges that the meetings between the notaries and the consumers were brief, perfunctory, and did not provide the consumers with any direct or substantive interaction with the actual sellers of the debt-relief services, *i.e.*, the law firms and Strategic.

[35] The Court again notes that this is a motion to dismiss. Plaintiffs are not required to definitively prove the knowledge element at the pleading stage. Assuming the facts alleged to be true, and drawing all reasonable inferences in plaintiffs' favor, it is sufficiently alleged that defendants knew, or consciously avoided knowing, that the law firms collected advance fees in violation of the TSR.

relevant here. *See Bryan  v. United States*, 524 U.S. 184, 192-93 (1998) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."). Defendants' argument is premised on the theory that a mistaken belief about the legality of their conduct is sufficient to establish lack of knowledge of the violation. But for the reasons set forth previously, ignorance of the law is not a defense. Stated another way, the fact that defendants may have tried to comply with a law and failed does not demonstrate that defendants did not have the requisite knowledge of the acts constituting the violation, sufficient to state a claim against them at the pleading stage.

Moreover, the TSR expressly prohibits the taking of advance fees for debt-relief. The face-to-face presentation is an exemption to that prohibition. Exemptions are an affirmative defense, and defendants bear the burden of proof as to this issue. See *Dish Network*, 75 F. Supp. 3d at 937 (noting that an exemption under Section 310.6 of the TSR is an affirmative defense for which defendant bears the burden of proof); *In re Stock Exchs. Options Trading Antitrust Litigation*, 317 F.3d 134, 151 (2d Cir. 2003) (affirmative defenses have been found to include exemption under a statute or regulation). By that same token, plaintiffs are not required to plead facts negating an affirmative defense in the complaint. *See In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 144 (2d Cir. 2023). *See also Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1987 n.9 (2017) (An affirmative defense to a plaintiff's claim for relief "is not something the plaintiff must anticipate and negate in her pleading.").

Plaintiffs are not obligated, at this stage of the litigation, to plead facts demonstrating that the face-to-face exemption to the TSR's ban on advance fees did not

apply to the debt-relief operation perpetuated by Strategic and the law firms. Likewise, it is not plaintiffs' obligation to plead facts showing that defendants were aware, or were likely aware, that this exemption did not apply. The applicability of the exemption here, and whether any good faith defense may exist based on that exemption, is to be determined later.

### *The New York State Law Claims are Sufficiently Pled*

The Blust Companies and the Individual Defendants argue that Counts 7 and 8 must be dismissed because the SAC fails to allege that they engaged in any fraud or deceptive business practices under New York law. The Court disagrees.

Section 63(12) of the New York Executive Law defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." N.Y. Exec. Law § 63(12). The definition of fraud under the Executive Law is very broad. *See Lefkowitz v. Bull Inv. Grp.*, 360 N.Y.S.2d 488, 491 (3d Dep't 1974). Under Section 63(12), the test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud. *See People v. Gen. Elec. Co.*, 302 A.D.2d 314 (1st Dep't 2003). Moreover, the statute authorizes relief as to corporate entities as well as directors, officers, and owners who participated in or were aware of the fraud. *People v. One Source Networking, Inc.*, 3 N.Y.S.3d 505, 509 (4th Dep't 2015).

Section 349 of the New York General Business Law prohibits deceptive acts or practices in business. *See* N.Y. Gen. Bus. Law § 349. Pursuant to Section 349, plaintiffs must show (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way; and (3) that the consumer suffered an injury as a result of

the deceptive act. *See People v. One Source Networking, Inc.*, 125 A.D.3d 1354 (4th Dep't 2015). The deceptive act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gen. Elec. Co.*, 302 A.D.2d at 315.

The SAC alleges that Strategic salespeople would convince consumers to sign-up for advance-fee debt relief services by promising that they were retaining attorneys to negotiate their debs and defend them in the event they were sued by creditors. After consumers agreed to sign-up and notaries obtained their signatures, an attorney from the law firm purportedly assigned to the consumer contacted the consumer and read a short welcome script. It is alleged that this call was often the only time a consumer spoke with an attorney about the debt-relief program. It is alleged that the law firms performed little to no work on behalf of consumers and instead acted as a façade for Strategic's debt-relief business. To the extent any debts were settled, the terms of those settlements were negotiated by Strategic salespeople and not members of the assigned law firms. It is further alleged that the law firms regularly failed to provide a litigation defense to consumers when they were sued by their creditors. Often no defense was provided at all, and if one was provided, it was by "appearance attorneys" and not members of the consumers' assigned law firms.

Drawing all reasonable inferences in plaintiffs' favor and assuming the facts stated in the SAC to be true, the allegations here are sufficient to state a claim for fraud under Section 63(12) of the Executive Law as well as for deceptive business practices under Section 349 of the General Business Law. Simply put, defendants promised consumers debt negotiation by attorneys and legal representation when they were sued by creditors, and these services were routinely not provided. *See People v. Apple Health & Sports*

*Clubs*, 206 A.D.2d 266 (1st Dept. 1994) (broadly construing the definition of fraud under Section 63(12) so as to include acts characterized as dishonest or misleading and eliminating the necessity for proof of an intent to defraud); *People by Koppell v. Empyre Inground Pools*, 227 A.D.2d 731 (3d Dep't 1996) (repeatedly offering contracts to consumers containing extended warranties and then failing to fulfill these warranties constituted deceptive practices in violation of Section 349).

Executive Law § 63(12) permits relief against "any person" who participates in a fraudulent scheme, including by use of a corporate entity so long as the individual participated in the fraud or was aware of the fraud. Here, the SAC adequately alleges that the Blust Companies and the Individual Defendants directly participated in, or were aware of, the fraudulent and deceptive business practices. Blust is alleged to have owned and controlled the law firms that failed to deliver the promised services. He is alleged to have maintained the firms' websites, registered their domain names, controlled when firm attorneys worked on client files, and coordinated efforts to take down negative reviews of the law firms by consumers. Gustafson, Burnette, and Gallagher are each alleged to have also owned and/or substantially controlled various law firms. Gustafson himself owned nine law firms and was the contact person for at least twenty firms. Burnette handled consumer complaints for some of the law firms. Gallagher managed the day-to-day operations at Lit Def and Fidelis, companies ostensibly tasked with facilitating litigation support for consumers.

The same is true as to the Blust Companies. It is alleged that Hedgewick coordinated contracts with notary companies, created notary scripts and tests, and helped design websites that falsely suggested to consumer that they were retaining the services

of the law firms. The law firms paid Lit Def and Relialit millions of dollars, generated from consumer funds, to coordinate and facilitate the litigation defense marketed to consumers when they enrolled in the debt-relief program. It is alleged that despite being promised, and paying for, this service, consumers often did not receive a defense when they were sued by their creditors, resulting in consumers having to represent themselves or having default judgments entered against them. *See People v. Abraham Operations Assoc. LLC,* 2024 N.Y. Misc. LEXIS 5337, 2024 NY Slip Op 32976(U) (Sup. Ct. N.Y. Cnty. Aug. 23, 2024) ("Executive Law § 63(12) claims have been applied to a wide array of respondents, including persons with knowledge of fraudulent schemes, individuals who perpetrated those schemes, and pass-through entities and knowing recipients of fraudulent proceeds.")

The Blust Companies and the Individual Defendants argue that because Strategic made the sales pitch to consumers, and they engaged with consumers only after those allegedly false representations were made, they cannot be liable for fraud or deceptive business practices under New York law. The Court rejects this argument. Here, the SAC alleges that the law firms, Hedgewick, Relialit, and Lit Def all acted together, under the ownership, control, and/or direction of the Individual defendants, to facilitate the advance fee debt-relief operation together with Strategic. *See Apple Health & Sports Clubs,* 80 N.Y.2d at 803 ("[T]here was a substantial likelihood that the Attorney-General could prove that the corporations were interlocking and acted in concert, thereby subjecting [one corporation] to liability for the fraudulent and illegal activities pursued by" the other corporation). And while Lit Def and Relialit did not market the debt-relief and litigation defense services to consumers, they are alleged to have acted together with the law firms

in failing to provide those services in a manner that was injurious to consumers. Likewise, the Individual Defendants are alleged to have owned and/or controlled the law firms that failed to provide the promised service. *New York v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 369 (S.D.N.Y. 2019) (even if defendant did not create the deceptive marketing content, plaintiffs could still establish liability for the deceptive scheme by showing that defendant "engage[d] in deceptive acts or practices that are injurious to consumers with at least some knowledge of the deception.") (internal citations omitted); *Apple Health*, 80 N.Y.2d at 807 (holding it "sufficiently likely to be shown at trial that…as the 50% owner and eventual sole director of [defendant company], [owner] had actual knowledge of [defendant's] fraudulent activities.").

For all of these reasons, the allegations in Counts 7 and 8 are sufficient to state claims at the pleading stage.[36]

### *The Wisconsin State Law Claims are Sufficiently Pled*

Counts 10 and 11 allege that Strategic, the Holding Companies, Great Lakes Client Services, LLC, and the Individual Defendants acted as "adjustment service companies" as defined by Wis. Stat. § 218.02 (the "Wisconsin ASC Statute"). Count 10 alleges that defendants violated Section 218.02(2)(a)1 of the Wisconsin ASC Statute by acting in their

---

[36] Gallagher and Burnette maintain that the SAC fails to adequately describe their involvement in, or knowledge of, the fraudulent businesses practices alleged here. The SAC alleges that Gallagher and Burnette owned and/or controlled multiple law firms, and that they were substantially involved in the operations and business dealings of those firms. Both are attorneys who would presumably have been aware of their law firms' obligations to their retained clients. They signed contracts with notaries, who were involved in the initial sale of debt-relief services, which supposedly included legal representation. Defendants' firms paid Fidelis, Lit Def, and Relialit for litigation support. Gallagher managed day-to-day operations at Lit Def and Fidelis. Burnette answered consumer complaints. These allegations are sufficient, at the pleadings stage, when the Court must draw all reasonable inferences in plaintiffs' favor, to state a claim that Gallagher and Burnette were involved in, or had knowledge of, the manner in which the law firms allegedly deceived consumers by providing false assurances of legal services and litigation defense. Gallagher and Burnette are entitled to raise this argument again at the dispositive motion stage, should discovery demonstrate that they did have the requisite knowledge or involvement in the scheme.

capacities as adjustment service companies without a license. Count 11 alleges that defendants violated Wis. Admin. Code § DFI-Bkg 73, as promulgated by the Wisconsin ASC Statute, by charging excessive and advance fees for debt-relief.

The Individual Defendants contend that Counts 10 and 11 fail because the Wisconsin ASC Statute applies only to corporate entities, not individuals.[37] The Wisconsin ASC Statute regulates those "in the business of prorating the income of a debtor to the debtor's creditor or creditors...in return for which the principal receives a service charge or other consideration." Wis. Stat. § 218.02(1)(a). The Individual Defendants all allegedly owned, controlled, and/or operated law firms that, together, with Strategic, engaged in the business of prorating a debtor's income to the debtors' creditors in exchange for fees, namely the business of debt-relief. *See JK Harris Fin. Recovery Sys., LLC v. Dep't of Fin. Instit.*, 718 N.W.2d 739, 744 (Wis. Ct. App. 2006) ("When JK H[arris] negotiates a reduction or extended payment on behalf of the debtor for the debtor's outstanding debt it is in fact dividing the debtor's income proportionately and is engaged in the activity of prorating the debtor's income, and as such is an entity subject to the requirements of [Wis. Stat. §] 218.02"); SAC (¶¶ 115-20) (alleging that defendants collected consumer funds into dedicated accounts from which settlement were to be paid to creditors according to agreement negotiated by defendants).

---

[37] Blust argues that because the State of Wisconsin failed to respond to his arguments in favor of dismissal of Counts 10 and 11, any such arguments have been waived or abandoned. Plaintiffs responded to arguments made by defendants Gustafson, Gallagher, and Burnette, who raised essentially the same arguments as Blust in favor of dismissal of the Wisconsin state law claims. During oral argument, counsel for the State of Wisconsin stated that the failure to specifically respond to Blust's same arguments was an oversight. Because plaintiffs raised the same arguments in response to the other defendants' motions to dismiss the Wisconsin law claims, the Court does not consider these arguments waived or abandoned as to Blust. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005) (noting that district courts have discretion to consider belatedly-raised arguments).

Moreover, the ASC Statute is broadly worded and applies not only to corporations and other business entities, but also to an "individual engaged as a principal" in the business of prorating consumer debts in exchange for fees. *See* Wis. Stat. § 218.02(1)(a). The Individual Defendants submit that this language is intended to impose liability on an individual only to the extent that they were a sole proprietor and not, as here, where the conduct involved a separate legal entity, such as a law firm. The Individual Defendants are alleged to have owned and/or controlled law firms which did little to no work on behalf of debtors and instead existed as facades for defendants' debt-relief business. These allegations are minimally sufficient, on their face, to state a claim that the Individual Defendants were "engaged as principal[s]" in a debt-relief business. *Morgan Drexen, Inc. v. Wis. Dep't of Fin. Instit.*, 862 N.W.2d 329, 333-34 (Wis. Ct. App. 2005) (recognizing that the ASC Statute can require licensure of individuals acting as principals of adjustment services companies). Should further discovery reveal facts to the contrary, defendants may raise this argument again at that time.

The Individual Defendants further argue that even if they are considered adjustment service companies under Wisconsin Law, Counts 10 and 11 still fail because there are no allegations in the SAC indicating that they engaged in debt-relief in Wisconsin or represented Wisconsin debtors. Defendants are correct that the SAC does not contain specific allegations linking all of the Individual Defendants to law firms that represented Wisconsin consumers.[38] However, the SAC alleges that the instant debt-relief operation

---

[38] The Court notes that Counts 10 and 11 are also asserted against Great Client Services, LLC, one of Strategic's Client Services Subsidiaries. Great Lakes LLC, a law firm listed in the SAC, shares a name with Great Lake Client Services, LLC. While not specifically alleged in the SAC, defendants seem to agree that Great Lakes Law Firm represented debtors in Wisconsin. The SAC does, in fact, contain allegations connecting Blust to Great Lakes Law Firm. First, Blust is alleged to have owned and controlled all of the law firms. Ten of the law firms used the same co-working space address that was used by the Blust Trust and the Law Office of Jason Blust, including Great Lakes Law Firm and Gustafson Legal PC.

was nationwide in scope and involved over 100,000 consumers. It is alleged that Strategic, the law firms, and the Blust Companies were all interrelated and worked together to facilitate the collection of advance fees across the country. It is alleged that the various entities and law firms received fees from the debt-relief operation that were not necessarily tied to their specific role or location. For example, it is alleged that, according to bank records, one of the law firms received money from nine other law firms. The Individual Defendants' alleged ownership and/or control of various law firms, considered in light of the interrelatedness of all the entities and firms, the sharing of fees, and the nationwide scope of the debt-relief operation as a whole, are minimally sufficient, at the pleadings stage, to state a claim under the Wisconsin ASC Statute.[39]

Finally, the Court rejects the Individual Defendants' argument that Counts 10 and 11 must be dismissed because the Wisconsin ASC Statute cannot be applied to attorneys. First, the statute itself contains no exception for attorneys. *See* Wis. Stat. § 218.02.[40] Moreover, the argument itself is premature. The SAC does not allege that any of the Individual Defendants were actually engaged in the practice of law, either in Wisconsin or anywhere else. Instead, the SAC alleges that the Individual Defendants

---

Blust participated in meetings between Strategic, the Client Services Subsidiaries, and many of the law firms, including the Great Lakes Law Firm. It is also alleged that Great Lakes Law Firm regularly sent payments to the Blust Companies.

[39] The Court notes that, in order to ultimately prevail on the Wisconsin state law claims, plaintiffs will need to produce credible and detailed evidence supporting their position that, in light of the interconnectedness of all the law firms and other entities, the Individual Defendants are subject to the Wisconsin ASC Statute. This is especially so with regard to Gustafson, Gallagher, and Burnette. In their reply brief, Burnette and Gallagher note that the SAC does not allege that they "targeted New York consumers or engaged in any consumer-oriented conduct in New York." The Court rejects this argument for the same reasons it rejects defendants' contention that the SAC does not sufficiently tie their conduct to Wisconsin.

[40] By comparison, Wisconsin Stat. § 218.04, which regulates debt collection, expressly states that the targeted conduct "does not include attorneys at law authorized to practice in this state." Wis. Stat. § 218.04. The Wisconsin ASC Statute does not include any similar exemption or exclusion for attorneys. In addition, plaintiffs note that in the 2009-2010 session of the Wisconsin Legislature, a bill seeking to exempt attorneys from the scope of the Wisconsin ASC statute was introduced but failed to pass. *See* 2009 Assembly 820.

owned and/or operated law firms that acted as fronts or facades for Strategic's debt-relief business; that the debt negotiation work was almost always done by Strategic employees as opposed to attorneys or employees of the law firms; and that the law firms rarely provided a legal defense as promised to consumers. Should discovery prove these allegations to be incorrect, or should the facts demonstrate that the Individual Defendants were actually engaged in the practice of law in Wisconsin, this argument may be raised at that time.[41]

## CONCLUSION

For the foregoing reasons, it is recommended that defendants Relialit, LLC, Lit Def Strategies, LLC, Hedgewick Consulting, LLC, Jason Blust, Richard Gustafson, Michelle Gallagher, and Timothy Burnette's motions to dismiss the second amended complaint. (Dkt. Nos. 450, 452, 453, 493) be denied.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Wolford.

---

[41] Defendants cite *Persels & Assocs., LLC v. Banking Comm'r*, 318 Conn. 652, 122 A.3d 592 (Sep't 15, 2015) in support of their position that the Wisconsin ASC Statute cannot be applied to attorneys. But in *Persels*, the Connecticut statute at issue provided an express exemption for attorneys licensed in Connecticut and the Supreme Court of Connecticut noted that the statute *was* likely to apply in the event that "in a particular case, the plaintiff or another debt negotiation company was merely using Connecticut attorneys as a front or façade to circumvent the debt negotiation statutes." *Id.* at 607.

**Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**  See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."*  **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

Dated:      June 12, 2025
            Buffalo, New York

MICHAEL J. ROEMER
United States Magistrate Judge