UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

CONSUMER FINANCIAL PROTECTION,
BUREAU, *et al.*,

               Plaintiffs,

     v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), *et al.*,

               Defendants, and

STRATEGIC ESOP, *et al.*,

               Relief Defendants.

———————————————————

24-CV-40-EAW-MJR

DECISION AND
ORDER

     Before the Court are Fidelis Legal Support Services, LLC, The Bush Lake Trust,

Two Square Enterprises, Inc., BDC Group, LLC, and Veteris Capital, LLC's motion for a

stay pending appeal. (Dkt. No. 703)  For the following reasons, the motion for a stay is

denied.

## BACKGROUND

### *The TRO and PI*

     On January 11, 2024, the Honorable Lawrence J. Vilardo issued a temporary

restraining order ("TRO") with asset-freeze, appointment of Receiver Thomas McNamara

(the "Receiver"), and other equitable relief. (Dkt. No. 12) The TRO defined "defendants"

as all corporate and individual defendants named in the lawsuit, including Jason Blust.

(*Id.* at 6) The TRO extended the definition of "receivership defendant" to defendant Lit Def

Strategies, LLC ("Lit Def") as well as Lit Def's "subsidiaries, affiliates, divisions,

successors, and assigns." (*Id.* at 8-9) The TRO also identified, as receivership

defendants, any other business related to defendants' debt-relief services which the Receiver has reason to believe is owned or controlled in whole or in part by any of the defendants or by Lit Def, including any fictitious names under which they do business. (*Id.*)

The parties consented to this Court's authority to issue a final decision and order as to plaintiffs' motion for a preliminary injunction. (Dkt. Nos. 158, 159) On March 4, 2024, following a two-day evidentiary hearing, this Court granted plaintiffs' motion for a preliminary injunction with continuation of the asset freeze, appointment of the Receiver, and other equitable relief (the "PI"). (Dkt. Nos. 183, 184) Defendants filed appeals of the PI with the Second Circuit Court of Appeals. (Dkt. Nos. 192-93, 198, 203, 206) Defendants also moved before the Second Circuit for a stay of the PI pending the adjudication of their appeals, which was denied on September 9, 2024. *See* Case No. 24-697, Dkt. No. 118-1. On June 2, 2025, the Second Circuit affirmed the PI issued by this Court. *See Consumer Fin. Prot. Bureau v. Sasson*, 24-CV-697, 2025 U.S. App. LEXIS 13336 (2d Cir. June 2, 2025) (summary order).

The PI retains the same definitions of defendants and receivership defendants as stated in the TRO, and continues to name Lit Def, as well as Lit Def's subsidiaries, affiliates, divisions, successors, and assigns, as receivership defendants. (Dkt. No. 184, pgs. 6-8) The PI further contains a provision for identifying new, non-party entities that belong in the receivership. (*Id.* at 22) To that end, when the Receiver identifies a new receivership entity, the Receiver must notify the entity and the parties, and must inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. (*Id.*)

### Designation of Fidelis as Receivership Defendant

On February 25, 2024, the Receiver notified defendant Fidelis Legal Support Services, LLC ("Fidelis") that it qualified as a receivership defendant.[1] (Dkt. No. 667, pg. 6) Fidelis filed a motion objecting to the designation. (Dkt. No. 190) On March 25, 2025, following briefing and an evidentiary hearing, this Court issued a Decision and Order denying Fidelis' challenge to the receivership designation. (Dkt. No. 646) Therein, the Court found that Fidelis qualified as a receivership defendant, pursuant to the terms of the PI, because it was a successor or assign of Lit Def. (*Id.*) The Court found that Fidelis also qualified as a receivership defendant, pursuant to the terms of the PI, because Fidelis was owned or controlled, in whole or in part, by Blust, and was related to defendants' debt-relief business.[2] (*Id.*)

### Fidelis' Transfers of Funds

With the help of a forensic accountant, the Receiver determined that, from February 2021 through May 2024, Fidelis received more than $57.6 million from law firms controlled by Blust.[3] (Dkt. No. 667-1, ¶ 3, ¶ 5) In particular, during 2022 and 2023, Fidelis received more than $29.4 million from Blust-controlled law firms that, together with defendant StratFS, LLC and its related entities, provided consumer debt settlement and

---

[1] Fidelis was not named as a defendant in the initial complaint, but was added as a defendant in the second amended complaint. (Dkt. Nos. 1, 366)

[2] Also on March 25, 2025, the Court recommended to the District Court that Blust be held in contempt for operating Lit Def after entry of the TRO as well as for failing to disclose to the Receiver the existence of Fidelis and its obvious connection to the receivership estate. (Dkt. No. 646, pgs. 33-34) The Court found that Blust's attempts to conceal his control over Fidelis culminated in the filing of multiple false declarations with the Court, under penalty of perjury, by Blust, defendant Michelle Gallagher, and relief defendant Cameron Christo. (*Id.*) Thus, this Court also recommended that the District Court refer the conduct of Blust, Gallagher, and Christo to the United States Attorney's Office for investigation and, if deemed appropriate, the filing of criminal charges for perjury. (*Id.* at 38) This Court's contempt recommendations are presently on appeal before the District Court.

[3] The second amended complaint alleges, *inter alia*, that Blust, Lit Def, and Fidelis provided substantial assistance to Blust-controlled law firms in collecting illegal advance fees from consumers in exchange for debt-relief services, in violation of the Telemarketing Sales Rules. (Dkt. No. 366)

debt-relief services in exchange for advance fees. (*Id.*) Between May 2021 and December 2023, Fidelis received $24.796 million from the Turnbull law firms. (*Id.*) The Turnbull law firms engage in contingency-fee debt relief services and are also connected to, or controlled by, Blust. (Dkt. No. 190-4, ¶ 23; Dkt. No. 646, pgs. 29-30; Dkt. No. 692, pg. 6) The Receiver further determined that despite Fidelis receiving more than $50 million from Blust-controlled law firms engaged in debt-relief work between 2021 and May of 2024, there was less than $4,000 in Fidelis' bank account when the Receiver took control of the company in March of 2025, following this Court's designation of Fidelis as a receivership defendant. (Dkt. No. 667, pgs. 9-10; Dkt. No. 667-1; Dkt. No. 692, pgs. 6-7)

According to analysis conducted by the Receiver and his forensic accountant, Fidelis transferred more than $37.3 million to The Bush Lake Trust ("Bush Lake"); BDC Group LLC ("BDC Group"); Veteris Capital, LLC ("Veteris"); and Two Square Enterprises, Inc. ("Two Square") between July 2021 and February 2025. (Dkt. No. 667-1, ¶ 6) A significant portion of these transfers occurred between January 16, 2024 and February 28, 2024, almost immediately after Judge Vilardo's entry of the TRO on January 11, 2024. (Dkt. No. 692, pgs. 7-10)

### *Designation of Other Receivership Defendants*

The Receiver sent letters to Bush Lake, BDC Group, Veteris, and Two Square, designating them as receivership defendants.[4] (Dkt. Nos. 655-1, Exh. A; 659-1) These entities in turn filed motions before the Court objecting to the Receiver's designation. (Dkt. Nos. 655, 659) Following briefing by the parties and the Receiver, this Court issued a Decision and Order denying the motions and designating Bush Lake, BDC Group, Veteris,

---

[4] Bush Lake is named as a relief defendant in the second amended complaint. (Dkt. No. 366) BDC Group, Veteris, and Two Square are not named defendants or relief defendants in this lawsuit.

and Two Square as receivership defendants pursuant to the terms of PI. (Dkt. No. 692)

The Court concluded that these entities qualified as receivership defendants, pursuant to

the terms of the PI, because (1) they were affiliates of Fidelis and, by extension, Lit Def;

and (2) they were controlled by defendants and were related to defendants' debt-relief

business.[5] (Dkt. No. 692, pgs. 11-14)

This Court further concluded, based upon the totality of evidence in the record,

that millions of dollars were transferred to Bush Lake, BDC Group, Veteris, and Two

Square in order to divert assets that were the product of defendants' debt-relief operation,

and which defendants concluded would otherwise have been subject to the receivership

and asset freeze. (*Id.* at pgs. 14-17) Thus, the Court found it was necessary to expand

the receivership to include these entities in order to "maintain the status quo, prevent any

further dissipation of assets, and protect consumers should plaintiffs ultimately prevail in

this lawsuit." (*Id.*)

### Appeal and Request for a Stay

Fidelis, Bush Lake, BDC Group, Veteris, and Two Square (hereinafter "movants")

have filed interlocutory appeals of this Court's Decisions and Orders designating them as

receivership defendants with the Second Circuit Court of Appeals. (Dkt. Nos. 695, 696,

698) Movants now seek a stay of this Court's orders designating them as receivership

defendants or, in the alternative, a short-term stay to allow them to seek a stay pending

---

[5] In particular, the Court found, based on prior hearing testimony and all of documentary evidence in the record, that Bush Lake, BDC Group, Veteris, and Two Square were all controlled, at least on paper, by relief defendant Cameron Christo, who had worked together with Blust to (1) create Fidelis as a secret successor to Lit Def, and (2) hide Blust's involvement with Fidelis from the Receiver and the Court. (Dkt. No. 692, pgs. 11-14) The Court also found that the record was devoid of evidence that these entities performed any tangible work or services in exchange for the substantial transfers of money they received from Fidelis, and instead appeared to serve merely as repositories for Fidelis' profits, which emanated almost exclusively from defendants' debt-relief business. (*Id.*)

appeal in the Second Circuit, with the stay to expire upon the Second Circuit's decision on that motion. (Dkt. No. 703) The Court denies the movants' requests for a stay *in toto*.

## DISCUSSION

### *Appellate Jurisdiction*

The Court first declines to grant a stay because it is likely movants' appeal will be dismissed by the Second Circuit for lack of appellate jurisdiction. Jurisdiction is a threshold matter that must exist before a court can decide the merits of an appeal. *See Liberty Synergistics, Inc. v. Microflo, Ltd.*, 718 F.3d 138, 146 (2d Cir. 2013). Appellate jurisdiction is usually limited to "final decisions of the district court." 28 U.S.C. § 1291. However, an appellate court may adjudicate interlocutory appeals in certain instances. *See* 28 U.S.C. § 1292(a). This is not one of those instances.

As relevant here, 28 U.S.C. § 1292(a) authorizes appellate review of interlocutory orders of a district court "(1)…granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions" and "(2)…appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof." But neither Section 1292(a)(1) nor Section 1292(a)(2) apply to the facts at hand. In *SEC v. Complete Business Solutions Group., Inc.*, 44 F.4th 1326 (11th Cir. 2022), the Eleventh Circuit looked at this very issue and determined that it lacked jurisdiction to review a district court order expanding the scope of a previously created receivership estate because the receivership-expansion order was neither an order "appointing [a] receiver[]" within the meaning of Section 1292(a)(2) nor was it an order "granting, continuing, modifying, refusing or dissolving [an] injunction[]" within the meaning of Section 1292(a)(1).

*Complete Business Solutions* involved almost identical facts to the matter at hand. There, the receiver moved to expand an existing receivership to include entities and properties that had received proceeds of a fraudulent scheme, including a family trust and a defendant's personal real estate. *Id.* at 1326. The district court granted the motion, finding "a clear necessity for expansion given that tainted funds…may be found in the entities and properties identified." *Id.* In declining to exercise jurisdiction over defendant's appeal of the expansion order, the Eleventh Circuit expressly rejected the very same argument raised by movants here, namely that the district court's order was appealable under Section 1292(a)(1) because it required defendants to turn over certain properties and entities to the receiver and therefore constituted an order granting an injunction. *Id.* at 1333. The Eleventh Circuit found defendant's argument to be "foreclosed by Supreme Cout precedent, which makes clear that an order appointing a receiver can[not] be construed as 'embrac[ing] within its terms an injunction or the necessary equivalent of an injunction.'" *Id.* (quoting *Highland Ave. & B.R. Co. v. Columbian Equip. Co.*, 168 U.S. 627, 629 (1898) ("Orders granting injunctions and orders appointing receivers are…entirely independent" and "it would savor of judicial legislation to hold that [an order appointing a receiver is] appealable[] as an order granting an injunction.") The Eleventh Circuit further acknowledged that "even if the expansion order incorporated injunctive qualities, it was entered in the context of a receivership." *Id.*[6]

---

[6] Movants cite *SEC v. Torchia*, 922 F.3d 1307 (11th Cir. 2019) for the proposition that orders subjecting new defendants to provisions of a preliminary injunction are appealable. But *Torchia* is plainly distinguishable from the situation here. In *Torchia*, the receiver directed individuals who had directly invested in a Ponzi scheme by purchasing life insurance policies to either assign those policies to the receiver or remit to the receiver any "fictitious profits." *Id.* at 1314-15. *Torchia* did not involve expansion of a receivership estate to entities directly connected to the defendant and the alleged fraudulent scheme, nor was there any indication that the receiver in *Torchia* took the disputed actions pursuant to an express provision of a previously issued PI.

Likewise, this Court's expansion of the receivership estate to include movants is not appealable pursuant to Section 1292(a)(2) because it is not an order "appointing" a receiver. *See Complete Business Solutions Group*, 44 F.4th at 1331 (noting that defendants acknowledged, "as they must, given the existing precedent," that an order expanding a receivership to include new assets is not a new appointment order, and noting that an order expanding a receiver's authority to encompass additional entities is no different); *Netsphere, Inc. v. Baron*, 799 F.3d 327, 332-33 (5th Cir. 2015) (orders entered in the normal course of a receivership are unappealable); *United States v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (same); *Florida v. United States*, 285 F.2d 596, 600 (8th Cir. 1960) (construing Section 1292(a)(2) strictly and disposing of argument that an expansion order was "in practical effect the appointment of a receiver").[7]

### *Merits of a Stay*

Even if the Second Circuit has jurisdiction to adjudicate the merits of the appeal, the Court finds that movants are still not entitled to a stay. A stay is "an exercise of judicial discretion" and the party requesting it "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433-

---

[7] The Court also notes that in *Complete Business Solutions*, the Eleventh Circuit found defendant's reading of Section 1292(a)(2) to "contravene the general policy regarding piecemeal appeals." 44 F.4th at 1331. The Eleventh Circuit remarked that this policy is "especially salient in the receivership context," given that a receivership is "fluid" and "its scope will often evolve as proceedings unfold." *Id.* Thus, district courts have "broad power and wide discretion to determine relief in an equity receivership." *Id.* (internal citations omitted). The fluid nature of a receivership is especially accurate and relevant in this case. Since his appointment in March of 2024, the Receiver has identified a number of new entities that either (1) directly aided the debt-relief operation, like Fidelis, or (2) directly received proceeds from the scheme, like Bush Lake, Two Square, Veteris, and BDC Group. Moreover, the record before the Court indicates that defendants have actively attempted to hide the existence of some of these entities as well as the transfer of assets that otherwise would have been subject to receivership and the asset freeze. "Were [the Second Circuit] to immediately review all scope-related orders of the sort that this case entails, [the Circuit] would, in effect, become the micromanagers of district courts' day-to-day administration of receiverships." *Complete Business Solutions,* 44 F.4th at 1331. Indeed, reviewing an expansion order in a receivership is the "very sort of meddling the final-judgment rule was designed to prevent." *Id.*

34 (2009). In deciding whether to grant a stay, courts typically consider "(1) whether the stay applicant has made a strong showing that [they] are likely to succeed on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426. These factors are not met here.

*Likelihood of Success on the Merits*

The movants contend that this Court's orders expanding the receivership will be vacated by the Second Circuit for lack of jurisdiction because they did not consent to the Magistrate Court's jurisdiction to either issue the PI or issue orders designating them as receivership defendants. The Court disagrees for the following reasons.

On February 13, 2024, the original parties to this action, including Lit Def and Jason Blust, consented to this Court's jurisdiction to conduct all proceedings, and enter a final order, as to plaintiffs' motion for a preliminary injunction, in accordance with 28 U.S.C. § 636(c). (Dkt. Nos. 158-59) A Section 636(c)(1) referral "gives the magistrate judge full authority over dispositive motions…and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003). A court with authority to enter an order "necessarily has ancillary…jurisdiction to enter orders and judgments designated to effectuate that decree." *In re Lafayette Radio Elecs. Corp.*, 761 F.2d 84, 92-93 (2d Cir. 1985).

This Court entered the PI as a final order, pursuant to Section 636(c), in the same manner as a final order and judgment from the District Court. The PI has a specific provision allowing the Receiver to designate qualifying entities as new receivership defendants, and the PI has a further mechanism allowing any such entity to challenge

9

that designation before this Court. This procedure was followed here. The Court's orders designating movants as receivership defendants were issued to effectuate the terms of the PI, pursuant to a process specifically authorized by the PI. Because the receivership designations at issue here were made under the directives of the PI, this Court had the authority to enter them as final orders, without district court review and without additional consent by either the original parties to the case or movants.[8]

Movants continue to insist that because they were not original parties to this lawsuit, and thus did not consent to this Court's jurisdiction to adjudicate the PI, this Court had no authority to order them receivership defendants under the terms of the PI. That is not so. As just stated, this Court's authority to issue the receivership expansion orders did not emanate from the referral of a dispositive motion nor did it emanate from any particular party's consent to this Court's jurisdiction. It emanated from the terms of the PI. In fact, the entire purpose of the receivership, including the Receiver's ability to identify and designate new receivership defendants, is to ensure compliance with the PI, disentangle defendants' companies and bank accounts, and preserve assets for restitution to consumers should plaintiffs untimely prevail. To that end, this Court's ability to designate new receivership defendants is not dependent on whether those entities are parties to the underlying lawsuit, nor is it dependent on those entities' consent regarding adjudication of the prior PI motion. In fact, a number of movants here are not parties named in the complaint. It would defy both logic, and the entire purpose of the receivership, if every

---

[8] The movants seem to agree that a Court has inherent power to oversee the administration of a receivership estate. However, they claim that this power lies with the District Judge and not the Magistrate Judge. What movants consistently overlook here is the fact that in granting the PI and appointing the Receiver, this Court was acting as the District Court and now retains the attendant ability to oversee its own order.

time the Receiver found an entity controlled by defendants and directly connected to defendants' debt-relief scheme, consent would be needed from those entities before the Court could decide whether they should be included within the receivership estate.

Moreover, movants are directly connected to and completely enmeshed with consenting defendants Lit Def and Blust. This Court has found, based on an extensive evidentiary record, that Fidelis is a successor to Lit Def and is controlled by Blust. The remaining movants are all affiliates of Fidelis that are owned, controlled, or managed, in whole or in part, by Christo, who worked together with Blust to create Fidelis as a secret successor to Lit Def. All of the movants received millions of dollars in proceeds from defendants' debt-relief business. Thus, this Court did not need express consent from the movants before issuing a final order interpreting the definitions in the PI and the scope of the receivership estate. *See Roell*, 538 U.S. at 590 (holding that Section 636(c) jurisdiction can be valid based on "implied consent" because the rule "checks the risk of gamesmanship").[9]

Movants rely on *New York Chinese TV Programs, Inc. v. U.E. Enterprises*, 996 F.2d 21 (2d Cir. 1993), for the proposition that when original parties consent to magistrate jurisdiction, that consent does not bind new parties, even if the new parties are closely affiliated with the consenting defendants. *Chinese TV Programs* is plainly distinguishable from the instant matter. There, the Second Circuit found that a magistrate judge lacked jurisdiction to adjudicate a motion to intervene when the intervenors did not consent to

---

[9] Movants argue that for the same reasons that this Court lacked jurisdiction to adjudicate the receivership-expansion orders, this Court also lacked authority to decide that movants were controlled by, and or affiliated with, Blust and Lit Def. These determinations were part and parcel of the Court's authority to effectuate its PI, including its duty to determine whether certain entities identified by the Receiver were properly within the bounds of the receivership estate. Thus, the Court rejects this argument for the same reasons it finds that it had jurisdiction to issue the receivership-expansion orders.

the magistrate court's jurisdiction. *Chinese TV Programs* did not involve a receivership, nor did it involve a PI that contained an express provision allowing a receiver, and the issuing court, to identify and designate new receivership defendants. Moreover, the court in *Chinese TV Programs* held that the intervenors' consent could not be inferred from their earlier role as majority shareholders of the plaintiff corporation, "for they now seek to protect different interests." *Id.* at 23-24. Much differently here, movants are basically one and the same as the prior consenting defendants. Movants here also share the very same interests as the prior consenting defendants, namely to avoid inclusion of their assets within the receivership estate. The other cases cited by movants are likewise inapposite.[10]

Movants further argue that they are likely to succeed on the merits of their appeal because adding them as receivership defendants violated Rule 65(d) of the Federal Rules of Civil Procedure. But as the Eleventh Circuit recently confirmed in *Complete Business Solutions*, Supreme Court precedent makes clear that "an order appointing a receiver can[not] be construed as 'embarc[ing] within in its terms an injunction or the necessary equivalent of an injunction.'" 44 F.4th at 1333 (quoting *Highland Ave. & B.R. Co.*, 168 U.S. at 629). Thus, the expansion of the receivership estate to include movants was not the functional equivalent of an injunction, nor did it fall under the requirements of Rule 65. *See In re Saffady*, 524 F.3d 799, 804 (6th Cir. 2008) ("By distinguishing between injunctions in § 1292(a)(1) and receiverships in § 1292(a)(2), Congress expressed its desire to treat orders relevant to receiverships differently than orders relevant to

---

[10] *See Burton v. Schamp*, 25 F.4th 198 (3d Cir. 2022) (consent to magistrate jurisdiction by inmates who bring civil rights lawsuits against prison officials); *Mark v. Gruber*, 38 F.3d 369 (7th Cir. 1994) (consent to magistrate jurisdiction after a corporate official is named as a defendant in a case following a defendant corporation's bankruptcy); *Murret v. Kenner*, 894 F.2d 693, 695 (5th Cir. 1990) (vacatur of a referral to a magistrate after newly-named parties, who never consented to a magistrate jurisdiction over a jury trial, sought relief from a jury verdict).

injunctions,"); *CFTC v. Walso*, 618 F.3d 218, 225 n. 3 (2d Cir. 2010) (distinguishing between injunction and order appointing receiver).[11]

*Irreparable Harm*

Next, the Court finds that movants will not suffer irreparable harm absent a stay. Fidelis claims that it has been harmed, and will continue to be harmed, because its clients have all terminated their relationship with the company as a result of the imposition of the receivership. Fidelis further emphasizes that a significant amount of its business involves providing litigation support services to law firms that do not charge advance-fees for debt-relief and are not implicated in this litigation. But what Fidelis does not mention, and also does not seem to dispute, is that most, if not all, of its clients were law firms controlled by Blust. Indeed, many of these law firms engaged in advance-fee debt relief, while others engaged in contingency-fee debt relief. Thus, to the extent that Fidelis serviced clients engaged in legitimate, contingency-fee debt-relief work that could have been continued after the granting of PI, the loss of those clients appears to be attributable to Blust, and not to the imposition of the receivership.[12]

---

[11] And even if Rule 65 somehow did apply here, this Court was permitted to extend the terms of an injunction to movants here, who the record showed were "in active concert or participation" with defendants. *See* Fed. R. Civ. P. 65(d)(2); *NML Cap., Ltd. v. Republic of Argentina*, 727 F.3d 230, 239 (2d Cir. 2013) (noting that injunctions may also bind a party's agents, and those in active concert and participation with a party).

[12] The Receiver indicates that to the extent any aspect of Fidelis' business could have been operated lawfully and profitably, the Receiver would have permitted Fidelis to continue to service those entities. (Dkt. No. 718, pgs. 13-14) However, according to the Receiver, immediately after this Court issued its order designating Fidelis as a receivership defendant on March 25, 2025, the Turnbull law firms, who engage in contingency-fee debt relief, terminated Fidelis' access to the software utilized to provide their legal support services. (*Id.*) The record here shows that the Turnbull law firms are controlled by, or connected to, Blust. (*Id.*) The Receiver also notes that at the time the Turnbull law firms ceased ties with Fidelis in March of 2025, they had already stopped paying Fidelis' invoices one year earlier, in or about March 2024, the same month the PI was entered. (*Id.*) Fidelis does not expressly name any law firms that are independent of Blust and that stopped doing business with Fidelis after the Court designated Fidelis as a receivership defendant. (*Id.*)

Movants further claim that Bush Lake will suffer irreparable harm because the Receiver is interfering with a "legitimate construction project in Florida." They note that the construction company involved in the project has placed a lien on the property and has threatened a lawsuit against Bush Lake should the company fail to receive the payments owed. The determination as to whether a receivership entity will pursue a construction project, or any other investment for that matter, lies with the Receiver. *See Golden Pac. v. Bancorp v. F.D.I.C.*, 95 Civ. 9281, 2002 WL 31875395, at *8-9 (S.D.N.Y. Dec. 26, 2002) ("[R]eceivers, just like corporate directors, are entitled to the deference of the business judgment rule in their decision-making concerning the management of a corporation.").[13] As to Two Square, Veteris, and BDC Group, there is no evidence in the record that these entities conducted any business other than serving as repositories or investment vehicles for Fidelis' profits, which emanated, also exclusively, from defendants' debt-relief operation.[14] Thus, the Court fails to see what irreparable harm

---

[13] Moreover, the "legitimate construction project" highlighted by movants only serves as further proof that movants should be included in the receivership estate in order to maintain the status quo and prevent further dissipation of assets. The record here shows that Fidelis transferred $13 million to Bush Lake between January 17, 2024 and February 12, 2024, immediately after the TRO was issued. (Dkt. No. 667-1, ¶ 8) Bush Lake then used this money to purchase an undeveloped lot is Boca Baton, Florida. (*Id.* at ¶¶ 7-10) The Receiver indicates that the purchase was originally negotiated by the seller/builder and Thomas Macey, an individual apparently associated with Blust who was also involved in, and later barred from, the debt-relief business in a number of states. (Dkt. No. 718, pgs. 15-16) Before the purchase agreement and construction agreement were executed, Bush Lake was substituted in place of Macey on the documents. (*Id.*) When Bush Lake executed the contracts, it assigned an "Option Agreement" on the property in favor of Macey and also assigned the construction agreement to Macey. (*Id.*) Macey signed a personal guaranty for the construction contract, which requires Bush Lake to pay $725 per square foot to build the 8,500 square foot house. (*Id.*) Thus, according to the Receiver and supported by evidence submitted by the Receiver, it appears that Bush Lake is "acting as some sort of middleman entity for purposes of transferring a Receivership Estate asset to a third-party individual (Macey), who in turn appears to be building a personal home on the property." (Dkt. No. 718-1; Exhs. 1-7)

[14] In its receivership-expansion order, this Court found no evidence in the record that Two Square, BDC Group, or Veteris performed any tangible work or services for Fidelis in exchange for the substantial payments they received. (Dkt. No. 692, pg. 12) Christo used Two Square to bill the law firms for "software support" and "consulting." But this was work supposedly performed for the law firms, not for Fidelis, and was directly related to defendants' debt-relief business.

movants will suffer from remaining in receivership, which maintains the status quo, while they pursue their appeal.

<u>Substantial Injury and Public Interest</u>

In affirming this Court's imposition of the receivership, the Second Circuit noted that "[s]uch an appointment may be appropriate to 'preserve the status quo' during the pendency of the litigation or 'obtain an accurate picture' of defendants' finances, especially if the court concludes that it "[can]not rely on the defendant for those purposes." *Sasson*, 2025 U.S. App. LEXIS 13336, *8 (quoting *S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972). Here, not only was expansion of the receivership estate consistent with the terms of the PI, but it was also necessary to maintain the status quo, prevent any further asset dissipation, and protect consumers.

Blust and Christo created Fidelis as a secret successor to Lit Def. (Dkt. No. 646; Dkt. No. 692, pgs. 3-4) After the TRO was entered, and through entry of the PI, Blust and Christo schemed to hide Fidelis, an asset of the receivership estate, from both the Receiver and the Court.[15] (*Id.*) Between July 2021 and 2025, Fidelis transferred over $37 million to Bush Lake, BDC Group, Two Square, and Veteris, each of which are controlled, in whole or in part, by Christo. (Dkt. No. 692, pgs. 7-11) In particular, at least $14 million dollars of apparent debt-relief proceeds were transferred by Fidelis to Bush Lake and other movants almost immediately after this lawsuit began and the TRO was entered. (*Id.*) As this Court previously recognized, the record here strongly suggests that these funds

---

[15] This scheme culminated in the filing of numerous false declarations with the Court.

were transferred in order to divert assets of defendants' debt-relief operation which otherwise would have been subject to receivership and the asset-freeze.[16]

Here, the status quo will be maintained by denying the stay and preserving the assets while movants pursue their appeal. Returning the assets to the control of movants will only risk further dissipation and encourage the potential hiding of assets, which is likely to harm the interests of the opposing parties as well as the millions of consumers entitled to restitution should plaintiffs ultimately prevail in this lawsuit.

## CONCLUSION

For the foregoing reasons, Fidelis Legal Support Services, LLC, The Bush Lake Trust, Two Square Enterprises, Inc., BDC Group, LLC, and Veteris Capital, LLC's motion for a stay pending appeal is denied. (Dkt. No. 703)


**SO ORDERED.**


Dated:        July 1, 2025
              Buffalo, New York


                              MICHAEL J. ROEMER
                              United States Magistrate Judge

---

[16] This Court also previously recognized that movants made significant real estate purchases and transferred money overseas after the TRO and PI were entered. (Dkt. No. 692, pg. 16, n. 15) In light of the record as a whole, these purchases and transfers appeared to be further attempts to distance the profits of defendants' debt-relief operation from the named defendants and relief defendants in this lawsuit, in order to prevent such profits from being subject to receivership and the asset freeze.