UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CONSUMER FINANCIAL PROTECTION,
BUREAU, *et al.*,

                Plaintiffs,

      v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL
SOLUTIONS, LLC), *et al.*,

            Defendants, and

STRATEGIC ESOP, *et al.*,

            Relief Defendants.

_____

24-CV-40-EAW-MJR

REPORT, RECOMMENDATION
AND ORDER

On April 23, 2025, the Court-appointed receiver Thomas W. McNamara (the "Receiver") filed a "Third Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals" that have rendered services on the Receiver's behalf ("Third Fee Application"). (Dkt. No. 669) On May 7, 2025, non-parties Ice Legal, P.A., Thomas Ice, and Ariane Ice (collectively referred to as "Ice Legal") filed a motion to intervene in this lawsuit, entitled "Motion to Intervene for Purposes of Filing an Objection to Receiver's Report and a Motion to Appoint Special Receiver and for Other Purposes." (Dkt. No. 680) On June 25, 2025, Ice Legal filed a "Motion to Modify or Dissolve the Preliminary Injunction (and Appointment of Receiver) on the Grounds that the Consumer Financial Protection Bureau has Abandoned its Case." (Dkt. No. 721)

For the following reasons, the Court grants the Receiver's Third Fee Application; recommends dismissal of Ice Legal's motion to intervene; and denies Ice Legal's motion to modify or dissolve the preliminary injunction.[1] This Report, Recommendation, and Order assumes familiarity with the all prior proceedings and filings in this case.

### *The Receiver's Third Fee Application*

The Receiver was appointed by District Judge Lawrence J. Vilardo, pursuant to the Temporary Restraining Order ("TRO"), on January 11, 2024. (Dkt. No. 12) The Receiver's appointment was confirmed, and the temporary designation removed, by this Court, pursuant to the Preliminary Injunction ("PI") entered on March 4, 2024. (Dkt. No. 184) The Receiver has continued to serve in this capacity through the present.

On May 22, 2024, this Court granted the Receiver's First Fee application, for the period of January 11, 2024 through February 29, 2024. (Dkt. No. 358) On November 13, 2024, this Court granted the Receiver's Second Fee Application, for the period of March

---

[1] Motions to intervene are not among those enumerated in 28 U.S.C. § 636(b)(1)(A) as dispositive when referred to a magistrate judge. However, that list is non-exhaustive, and other motions may be dispositive depending upon their "practical effect of the challenged action on the instant litigation." *Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008). "There is authority within the Second Circuit holding that a motion to intervene is dispositive, at least insofar as it is brought as of right under Rule 24(a)." *Global Auto Inc. v. Hitrinov*, 13 Civ. 2479, 2021 U.S. Dist. LEXIS 63668 (E.D.N.Y. Mar. 31, 2021); *Medina v. Fischer*, 11 Civ. 0176, 2013 U.S. Dist. LEXIS 46435 (S.D.N.Y. Mar. 29, 2013) (finding motion to intervene as of right to be dispositive). Conversely, some courts in this Circuit have held that motions to intervene are non-dispositive, at least where the motion is brought as one for permissive intervention pursuant to Rule 24(b). *See Chen-Oster v. Goldman, Sachs & Co.*, 10-CV-6950, 2016 U.S. Dist. LEXIS 197579 (S.D.N.Y. June 6, 2016) (collecting district court cases which affirm magistrate judge orders granting permissive intervention pursuant to Rule 24(b) as not clearly erroneous); *Int'l Chem. Corp. v. Nautilus Ins. Co.*, 09 Civ. 359S, 2010 U.S. Dist. LEXIS 77913 (W.D.N.Y. Aug. 3, 2010) ("Motions to intervene are considered as non-dispositive."); *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 96 (E.D.N.Y. 1996) (same). The Second Circuit has not definitively ruled on this issue, but has suggested that motions to intervene may be dispositive. *See Stackhouse v. McKnight*, 168 F. App'x 464, 466 (2d Cir. 2006) (summary order) (noting the "critical role of consent" in permitting a magistrate judge to adjudicate a motion to intervene). Here, Ice Legal brought its motion to intervene under both Federal Rule of civil Procedure 24(a) and 24(b). Out of an abundance of caution, and because this Court finds that both intervention as of right and permissive intervention should be denied, it treats Ice Legal's motion to intervene as dispositive and issues a report and recommendation. Because Ice Legal's Motion to Dissolve or Modify the Preliminary Injunction relates to the PI issued by this Court, the Court denies that motion in the form of a Decision and Order.

2

1, 2024 through July 31, 2024. (Dkt. No. 488) The Third Fee Application now seeks fees and expenses for services rendered by the Receiver and other professionals from August 1, 2024 through January 31, 2025 (the "Application Period"). [2] (Dkt. No. 669)

"A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred. The amount of the compensation is to be determined by the court in the exercise of its reasonable discretion." *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008) (citations omitted). "This presumption of reasonable compensation extends to a receiver's counsel and professionals." *SEC v. Platinum Mgmt. (NY) LLC*, No. 16-CV-6848, 2018 U.S. Dist. LEXIS 165797 (E.D.N.Y. Sept. 26, 2018). Indeed, the PI here specifically provides that the "Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them[.]"(Dkt. No. 184, Section XV)

The Court considers several factors in determining a reasonable fee, including "(1) the complexity of problems faced, (2) the benefits to the receivership estate, (3) the quality of the work performed, and (4) the time records presented." *Platinum Mgmt. (NY) LLC*, 2018 U.S. Dist. LEXIS 165797, *12 (quotations omitted). The Court may also consider "the reasonableness of the hourly rate charged and the reasonableness of the number of

---

[2] The Blust Family Irrevocable Trust (the "Blust Trust") was the only named party to this litigation to file a response in opposition to the Receiver's Third Fee Application. (Dkt. No. 675) Consistent with its objections to the First and Second Fee Applications, the Blust Trust partially opposes the Third Fee Application to the extent that assets of the Blust Trust may be used to pay the fees and expenses of the Receiver and his team. (*Id.*) The Blust Trust also continues to argue that because its various appeals of this Court's Decisions and Orders granting the Receiver's First and Second Fee Applications remain pending, funds from the Blust Trust should not be dissipated. (*Id.*)

hours billed." *SEC v. Amerindo Inv. Advisors Inc.*, 05 Civ. 5231, 2015 U.S. Dist. LEXIS 197890 (S.D.N.Y. Sept. 14, 2015) (citations omitted).

The Court previously noted that, during the time period of the First and Second Fee Applications, the Receiver faced extremely complex factual, legal, and administrative issues in performing his duties. (Dkt. Nos. 358, 488) These challenges have remained throughout the present Application Period. The debt-relief operations run by defendant StratFS, LLC and its related entities (collectively referred to as "Strategic") were sweeping in scale and complexity. Since August 1, 2024, the Receiver and his team, including legal counsel and accountants, have continued to carry out traditional receivership duties of managing and running the ongoing aspects of Strategic's debt-relief business. These efforts have been largely devoted to continuing to operate the contingency-fee debt relief operations of Atlas and Timberline, which presently have around 50 employees and contractors. The Receiver and his team have also managed the continued operation of Versara Lending, including the migration of Versara Lending loans to a third-party servicer.

Moreover, in December 2024, this Court issued an order allowing the permanent cessation of Strategic's advance-fee debt-relief business, previously operated in conjunction with the intervenor law firms. The Receiver and his team then crafted and implemented a transition plan to service and protect consumers through the wind-down. Notices were sent to tens of thousands of consumers, which provided updates on the withdrawal of the law firms and other ongoing events in the lawsuit. These notices also informed consumers about the sunsetting of customer service for consumers without payment plans, and provided instructions as to how consumers could continue to access

4

debt and settlement information. In order to both service consumers during the wind-down of the advance-fee debt-relief operation and continue to run Strategic's remaining lawful business lines, it has been necessary for the Receiver to retain a substantial customer service and technology staff, as well as to maintain substantial technology resources. These duties have also required continuous coordination between the Receiver's team and CIBC Bank USA and Valley National Bank, Strategic's primary secured lenders.

The Receiver's internal accountants have also engaged in significant work to support the receivership estate during the Application Period. This work has included providing cash flow projections and other financial reporting data; monitoring daily bank transactions; maintaining records of all receipts and disbursements; monitoring payroll processing and employee benefits; working with retirement plan administrators to terminate the ESOP and retirement plans; reviewing and coordinating the distribution of employee and employer payroll tax reports; and working with outside accountants to complete annual tax returns. The accounting team has further worked with secured creditors to provide financial reporting related to the collection of Versara Lending consumer loan repayments, and has conducted a forensic accounting asset trace review.

Since his appointment and continuing through the Application Period, the Receiver and his legal team have engaged in comprehensive and sophisticated legal work both in conjunction with the pending lawsuit and specifically to benefit the receivership estate. They have participated in settlement conferences, oral arguments, hearings, and extensive legal briefing. Notably, the Receiver previously brought contempt motions against various parties that were violating their court-ordered obligations under the TRO and the PI, including the intervenor law firms as well as defendants Jason Blust and Lit

Def Strategies, LLC. The Receiver participated in an evidentiary hearing to address the contempt motions, and filed thorough briefing, which resulted in a recommendation from this Court that Mr. Blust and Lit Def be held in contempt of the TRO and the PI.[3]

The Receiver and his team have also engaged in comprehensive efforts to investigate, identify, and name additional entities and assets that belong within the receivership estate. The Receiver previously named Fidelis Legal Support Services, LLC as a receivership defendant. This designation resulted in significant litigation and an evidentiary hearing held in conjunction with the contempt request, and culminated in a decision by this Court naming Fidelis as a receivership defendant. The Receiver and his team also conducted due diligence and asset tracing analysis to identify five additional receivership entities associated with individual defendants Ian Behar and Ryan Sasson. To that end, forensic accountant Stacey Chiang oversaw a comprehensive tracing analysis of funds received from the 2019 Strategic ESOP transaction.[4]

Also during the Application Period, the Receiver and his team have investigated and pursued the recovery of assets from third parties on behalf of the receivership estate. To that end, the Receiver sued Monevo, a British-based company that apparently owes hundreds of thousands of dollars in unpaid commissions pursuant to a contract it had with Strategic. (*See McNamara v. Monevo, Inc.*, Case No. 24-CV-977) The parties have jointly moved to stay the case pending arbitration, and the Receiver recently filed an arbitration

---

[3] In that Report and Recommendation, this Court found that the Receiver was entitled to recover all attorney's fees and costs associated with the contempt motion, from Blust and Lit Def. Defendants have appealed that determination to the District Court. The Receiver indicates that if this Court's recommendation is adopted by the District Court, he will pursue reimbursement for these fees and costs from Blust and Lit Def. (Dkt. No. 669-2, ¶ 11, n. 1)

[4] The analysis confirmed that the following five businesses qualified as receivership defendants: (1) Timberline Capital, LLC; (2) T.C.I.G. LLC; (3) MyG Investments, LLC; (4) Axel Development Sag Harbor, LLC; and (5) Fusion Capital, LLC. Defendants challenged the Receiver's designation of these entities as receivership defendants, and this Court granted the Receiver's request over defendants' objections.

demand in JAMS. (*Id.*) The Receiver has also brought legal malpractice and other claims against Ice Legal, alleging that Ice Legal charged Strategic and other receivership entities more than $2.5 million in legal fees, while providing only around 60 hours of legal work. (*See McNamara v. Ice Legal, P.A., et al.*, Case No. 25-CV-275) (hereinafter referred to as the "Ice Legal Lawsuit").[5] The Ice Legal Lawsuit is discussed in greater detail below, when the Court addresses Ice Legal's motion to intervene.

Next, the Court finds that the Receiver, his counsel, and the other professionals retained by the Receiver have continued to perform high quality work, during the Application Period, which has benefited the receivership estate. Since restarting the contingent fee operations in January 2024, Atlas and Timberline have generated an average revenue of $1,230,439 per month, through January 2025. Based on the Receiver's coordination with Credit Suisse (UBS), Versara Lending has significantly reduced its principal loan balance.[6] The continued operations of Atlas and Timberline has allowed the receivership estate to make interest payments of roughly $300,000 per month to creditors CIBC Bank USA and Valley National Bank. The Receiver entered into a stipulated settlement with the intervenor law firms as to his motion for contempt against them, resulting in the law firms agreeing to pay attorney's fees of $17,500; remain in compliance with the PI; and obtain approval prior to sending any communications to

---

[5] The Ice Legal Lawsuit alleges that Ice Legal sued Startegic in 2019 and 2020 on behalf of at least 50 consumer clients, claiming that Startegic was engaging in fraud and operating a RICO enterprise. (*See* 25-CV-275, Dkt. Nos. 1, 24) During settlement negotiations, the parties discussed having Ice Legal flip sides, stop representing consumers suing Startegic, and begin representing Startegic. (*Id.*) Then, after quickly settling the remaining consumer claims for reduced settlement amounts, Ice Legal entered into an attorney-client "consulting" relationship with Strategic, whereby Ice Legal received millions of dollars for performing little to no substantive legal work. (*Id.*)

[6] At the time the TRO was entered, the principal balance due to UBS was $83,333,333.33. As of January 2025, the loan balance totaled $32,244,824. By March 2025, the balance had been reduced to $21,289,386. The Receiver anticipates that UBS will be paid off during 2025.

consumers. Indeed, the work of the Receiver and his team has significantly benefited the receivership estate and has protected both consumers and creditors.

The time records submitted by the Receiver, his counsel, and the other professionals continue to be extremely detailed.[7] The Court finds that the entries justify the fees, costs, and expenses incurred. The nature and extent of the work performed by the Receiver, his counsel, and the other professionals during Application Period continues to be reasonable and necessary here, in order to continue to operate the large receivership estate and all of its attendant issues, as well as to respond to the frequent litigation demands which continue to arise in this case.

In the Decision and Order granting the First Fee Application, the Court found the hourly rates of the Receiver, his counsel, and the other professionals used to provide services to the receivership estate to be reasonable. (Dkt. No. 358, pgs. 8-9) Those rates remained the same in the Second Fee Application, and they remain the same in the instant application. (Dkt. No. 432-1, pg. 3; Dkt. No. 669-1, pg. 3) Moreover, the hourly rates of the Receiver, his counsel, and his accountants were presented to the Court in a

---

[7] Consistent with time records and bills from the First and Second Fee Applications, time records and bills from the Third Fee Application include (1) work performed by the Receiver and his staff; (2) legal work performed by the Receiver's counsel at McNamara Smith, Hodgson Russ, and Ballard Spahr; (3) forensic accounting performed by Mercadien; and (4) forensic data consulting performed by Ankura. (Dkt. No. 669-2, ¶¶ 17-38) As the Court previously noted, the McNamara Smith attorneys appear to be experienced in regulatory receiverships, and they have been extensively involved in the myriad of litigation activity that has arisen with regard to the pending lawsuit and the receivership estate. (Dkt. No. 358, pg. 7) Hodgson Russ has been involved with negotiating with creditors of the receivership defendants and parties to the pending litigation, assisting with litigation, counseling the Receiver on labor issues, and managing communication with counsel for secure creditors. (Dkt. No. 669-2, ¶ 26) Ballard Spahr has provided expert legal advice and analysis as to the proper handling of the Strategic ESOP and ESOT. (*Id.* at ¶ 29) Time records and bills from both the Second and Third Fee Applications also include legal work performed by Hilgers Graben. The Receiver indicates that Hilgers Graben was retained to represent the receivership estate in two lawsuits pending in the Chicago area. (*Id.* at ¶ 31) Time records and bills from the Third Fee Application also include a forensic accounting review and asset tracing by Scithe Consulting Group, LLC, primarily focused on tracing funds flowing from Strategic's 2019 ESOP transaction to a variety of entities related to the individual defendants. (*Id.* at ¶¶ 34-35)

Statement of Interest and Qualification prior to Judge Vilardo's appointment of Receiver pursuant to the TRO. (Dkt. No. 4-1) The receivership company, counsel, and accountants agreed to discount their normal rates in this receivership as reflected in the Statement of Interest and Qualification.[8] (Dkt. No. 241-2, ¶ 9; Dkt. No. 432-2, ¶ 12; Dkt. No. 669-2, ¶ 16) Further, the Receiver affirms that he closely examined his bills, and the bills of his counsel and other professionals, and that he cut significant charges of the receivership team and counsel, as part of his obligation to maximize the value of the receivership estate. (*Id.*)

Ice Legal indicates that if their motion to intervene is granted, they will raise objections to the Receiver's Third Fee Application, a copy of which they have attached to their motion to intervene. (Dkt. No. 680-2) First, for the reasons discussed later, the Court recommends that Ice Legal's motion to intervene be denied. Thus, Ice Legal has no standing to object to the Receiver's Third Fee Application. Second, even if Ice Legal had standing, the Court has reviewed their objections and finds them to be without merit. Indeed, Ice Legal does not object to the amount of fees requested by the Receiver. Instead, their objections center on the Receiver's factual descriptions of the work he performed in connection with the Ice Legal Lawsuit as well as Ice Legal's belief that the Receiver unfairly refused to engage in pre-suit mediation. Ice Legal asks the Court to "strike the portion of the [Third Fee Application] discussing the [Ice Legal Lawsuit] or require that it be rewritten to comport with [the Receiver's] duty of honesty and full disclosure." The Court finds nothing improper as to how the Receiver has described any

---

[8] Although not reflected in the Statement of Interest, Hodgson Russ agreed to discount their typical rate in this matter. (Dkt. No. 241-2, ¶ 9, n. 5; Dkt. No. 432-2, ¶ 12, n. 2; Dkt. No. 669-2, ¶16, n. 2) Similarly, Ankura, the data forensics firm, also agreed to discount its standard rates. (*Id.*)

of the legal work performed by him and his team on behalf of the receivership estate, including with respect to the Ice Legal Lawsuit.[9] There is no valid basis to strike any portion of the Third Fee Application, and Ice Legal's objections have no relevance as to the Receiver's entitlement to fees and expenses pursuant to the PI.

For all of these reasons, as well as for the reasons stated in the Memorandum in Support and the Declaration of Thomas W. McNamara and its accompanying exhibits (Dkt. No. 669), the Court grants the Receiver's Third Fee Application in its entirety.

## ICE LEGAL'S MOTION TO INTERVENE

Ice Legal moves to intervene in this case either as of right or by permission, pursuant to Federal Rule of Civil Procedure 24. Both requests should be denied.[10]

### *Intervention as of Right*

To intervene as of right pursuant to Rule 24(a)(2), a petitioner must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected

---

[9] The Court notes that records submitted by Ice Legal themselves demonstrate that before filing the Ice Legal Lawsuit, the Receiver attempted to resolve matters by sharing an initial draft of the complaint, proposing a tolling agreement, and discussing the possibility of pre-suit mediation. (Dkt. No. 680-3, pg. 32) While Ice Legal claims that the Receiver "needlessly aborted" the mediation, there is no requirement that any party engage in pre-suit mediation. Ice Legal also claims that the Receiver used the Third Fee Application to make *ex parte* submissions to the Court about the Ice Legal Lawsuit, which presented a "skewed, partisan impression of the compensation structure of Ice Legal's retainer" with Strategic. First, statements in the Receiver's Third Fee Application do not qualify as *ex parte*. They were made in a wholly separate lawsuit to which Ice Legal is not a party. They were also made in a public document which Ice Legal can, and apparently did, access. Moreover, the Receiver's statements reflect allegations made by the receivership estate as plaintiff in the Ice Legal lawsuit, which Ice Legal will have the opportunity to fully defend against as that case is litigated.

[10] In support of the motion to intervene, Ice Legal submits a Memorandum in Support of the Motion to Intervene (Dkt. No. 680-1); Objections to the Receiver's Third Fee Application and Exhibits (Dkt. No. 680-2); and a Memorandum in Support of its Motion to Appoint a Special Receiver (Dkt. No. 680-3). The Court has considered all of the arguments raised in each of these submissions. The Receiver and plaintiffs have objected to Ice Legal's motion to intervene. (Dkt. Nos. 693, 694) None of the named defendants have responded to the motion to intervene.

adequately by the parties to the action. *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003). The proposed intervenor bears the burden of demonstrating that it meets the requirements for intervention, *Kamdem–Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016), and the failure to satisfy any one of these four requirements is a sufficient ground to deny the application, *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (citations omitted). Here, Ice Legal's motion to intervene as of right fails because (1) it is untimely; (2) Ice Legal does not have a legally protected interest in the instant lawsuit; (3) Ice Legal has not shown that any claimed interest will be impaired in the absence of intervention; and (4) Ice Legal has not established that any claimed interest will be inadequately protected.

### *Ice Legal's request is untimely.*

Ice Legal has been aware of this lawsuit since shortly after the PI was filed, in March of 2024. It was in May of 2024, over a year ago and during the pendency of this case, that Ice Legal contacted the Receiver and demanded he pay two outstanding invoices totaling $625,000. (Dkt. No. 680-3, pgs. 29-30) These invoices were for purported legal services rendered by Ice Legal, on behalf of Strategic and other defendants, pursuant to a retainer agreement. (*Id.*) Ice Legal represented themselves as "creditors" and asked that their claim be prioritized for payment through either the receivership estate or a captive insurance policy held by defendants for payment of legal fees.[11] (*Id.*)

---

[11] By way of explanation as to the legal services rendered, Ice Legal indicated that they "spearheaded far-ranging multistate litigation against [defendants]" and highlighted the purported "successful settlements for [their] consumer clients." (Dkt. No. 680-3, pgs. 29-30) Ice Legal then claimed that "[a]fter these settlements, we were engaged by the Defendants in a multiyear retainer agreement (2021-2024) to directly do what our consumer litigation had indirectly done — help [defendants] comply with consumer-oriented 'state and federal laws and regulations.'" (*Id.*)

The Receiver then undertook a review of Ice Legal's request, ultimately denying Ice Legal's demand for payment and affirmatively asserting claims against Ice Legal, on behalf of the receivership estate. (Dkt. No. 680-3, pg. 32) To that end, in October of 2024, counsel for the Receiver sent a draft complaint to Ice Legal. (*Id.*) The draft complaint alleged that Ice Legal (1) breached its fiduciary duties to Strategic and its related entities by conduct including charging an unconscionable fee of $2.65 million as a "true retainer"; (2) provided deficient or non-existent legal services to Strategic between 2021 and 2024; (3) knew the amounts it received were illegal proceeds; (4) worked less than 65 hours on behalf of Strategic in total between 2021 and 2024, which equated to charging approximately $40,000 per hour; and (5) performed no work after 2021. (*Id.*) The Receiver inquired if Ice Legal was interested in attempting to engage in settlement discussions before the complaint was filed. (*Id.*) Ice Legal did not move to intervene in this lawsuit at that time, or for the following six months.

On March 27, 2025, the Receiver filed the complaint in the Ice Legal Lawsuit, alleging, *inter alia*, that the retainer agreement between Strategic and Ice Legal was illegal and that Ice Legal charged and received millions of dollars in fraudulent and/or improper fees from Strategic. (*See* 25-CV-275, Dkt. No. 1) It was only then, over sixteen months after this case began and a year after Ice Legal demanded payment from the receivership estate, that Ice Legal moved to intervene in this case. *See Alvarez v. Experian Info. Sols., Inc.*, 758 F. Supp. 3d 60, 90 (E.D.N.Y. 2024) (collecting cases where courts have routinely denied intervention where the delay in moving to intervene was comparable to, or shorter than, the delay in this case).

Ice Legal's interest in the instant litigation is the same as it was in October 2024, when the Receiver declined to pay Ice Legal's invoices and notified Ice Legal of the receivership's claims of professional negligence, breach of fiduciary duty, and fraudulent transfer. And as explained in further detail below, Ice Legal is pursuing collateral issues, irrelevant to this litigation, which will only serve to delay resolution of this case and prejudice the proper parties. *See Sec. & Exch. Comm'n v. Callahan*, 193 F. Supp. 3d 177, 205 (E.D.N.Y. 2016) ("Case law is clear that if an intervenor attempts to introduce collateral issues in a proceeding, a court may be justified in denying a motion to intervene based on undue delay or prejudice."); *Floyd v. City of New York*, 770 F.3d 1051, 1059–60 (2d Cir. 2014) (denying untimely motion to intervene where granting the motion would cause delay and prejudice to existing parties, and would undermine the orderly administration of justice.").

### *Ice Legal has no legally protectable interest in this lawsuit.*

An interest sufficient to support intervention as of right exists where a proposed intervenor possesses an interest that is "direct, substantial, and legally protectable." *New York New, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992). *See also F.T.C. v. First Cap. Consumer Membership Servs., Inc.*, 206 F.R.D. 358, 362 (W.D.N.Y. 2001) (Rule 24 does not cover "any interest the applicant can put forward, only [] a legally protectable one."). Ice Legal has no legally protectable interest in this case.

Ice Legal argues it has an interest in intervening here for purposes of objecting to the Receiver's Third Fee Application. But for the reasons stated previously, Ice Legal's objections to the fee application are without merit. *SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 443 (2d Cir. 1987)("[T]he court was not required to grant leave to intervene

to file a clearly meritless complaint"). Ice Legal also contends that it is entitled to receive e-filing notices as to this case, otherwise it "cannot know what is being said about [it] without regularly checking the docket and paying for copies." The receipt of e-filings in a case to which you are not a named party is not a legally protectable interest.[12] Ice Legal claims intervention is necessary to "counter any incorrect or inappropriate information about Ice Legal presented to the Judge in this case." But any statements made in this case, whether by the Receiver or anyone else, have no *res judicata* or other legal effect as to the Ice Legal Lawsuit. Stated another way, Ice Legal has no legal right to intervene in this case for purposes of knowing what the Receiver may represent, to this Court, about its allegations against Ice Legal in a wholly separate matter.

Ice Legal further claims an interest in intervention for purposes of requesting that the Court appoint a special or "*ad litem*" receiver, on the grounds that the Receiver "has repeatedly failed to comply with the requirements of his office in his dealings with Ice Legal and the Third-Party case." (Dkt. No. 680-3) Ice Legal then recites a litany of grievances against the Receiver and the manner in which he has pursed the Ice Legal Lawsuit on behalf of the receivership estate. (*Id.*) The Court has reviewed these grievances and finds them either to be without merit or insufficient to necessitate the appointment of a special or *ad litem* receiver. *See Oneida Indian Nation v. New York*, 732 F.2d 261, 265 (2d Cir. 1984) (no right to intervene to add "frivolous" claim). Indeed, none of Ice Legal's grievances or criticisms of the Receiver represent a legally protectable

---

[12] Non-parties can receive case notifications in this District using CM/ECF. Regardless, it is abundantly clear that Ice Legal has accessed the docket in this case, and is aware of all filings made.

interest *in this case*. Instead, these are issues to be raised and litigated, if necessary, in the Ice Legal Lawsuit.[13]

Ice Legal also claims that a special receiver is necessary to address the "inherent conflict between treating Ice Legal as a creditor of the receivership estate and Ice Legal as a target of [the Receiver's] third-party claim objective." Ice Legal's purported status as a creditor is the subject of the Ice Legal Lawsuit, and will be fully addressed in that separate proceeding. If Ice Legal did indeed breach its fiduciary duty to Strategic, engage in professional negligence, and/or receive a voidable or fraudulent transfer from Strategic, as the Receiver alleges, then it is not a creditor and has no claim against the receivership estate. Conversely, if Ice Legal is successful in defending against the Receiver's claims and the Ice Legal Lawsuit is dismissed, then Ice Legal will take its place in line with Strategic's other unsecured creditors. It would be a waste of both receivership resources and judicial resources to appoint a special receiver to handle litigation regarding one

---

[13] For example, Ice Legal claims that the Receiver breached his fiduciary duty to Ice Legal as a creditor when it requested documents to review Ice Legal's claim for payment as a "pretext to obtain pre-suit discovery." Ice Legal also claims that the Receiver failed to conduct certain "due diligence" protocols before filing the Ice Legal Lawsuit, such as hiring an expert to evaluate the malpractice claims or seeking the Court's permission, in this case, to initiate a separate lawsuit against Ice Legal. As previously noted, the record here reflects that Ice Legal contacted the Receiver to demand payment for attorney's fees from Strategic. The Receiver, who stands in the shoes of Strategic, then requested Ice Legal's client file in order to evaluate Ice Legal's claim for fees. The Receiver indicates that no client file was ever produced. (Dkt. Nos. 680-3, pg. 32; 694, pgs. 13-14) After conducting his own investigation and reviewing relevant invoices from Strategic, the Receiver concluded that Ice Legal was not a proper creditor, and that there were claims to pursue against Ice Legal on behalf of the receivership estate. (*Id.*) The Court finds nothing improper with regard to the Receiver's conduct in requesting documents to investigate Ice Legal's demand for payment, nor did the Receiver act improperly when he initiated the Ice Legal Lawsuit. To the extent that Ice Legal disputes the merits of the Receiver's claims that their retainer agreement was improper or illegal, they will have a full and fair opportunity to defend against these claims in the Ice Legal Lawsuit. Ice Legal also claims that a special receiver is needed because the Receiver is using his fee application in this case to have *ex parte* communications with the Court and, by extension, taint the Court's view of Ice Legal. For the reasons previously stated, these complaints are without merit and insufficient to support a request for intervention. Ice Legal also claims that the Receiver "unnecessarily breached the confidentiality of numerous settlements by failing to redact that [Ice Legal Lawsuit] complaint or filing it under seal." Should Ice Legal believe that certain documents in the Ice Legal Lawsuit should be redacted or filed under seal, they may make a motion in that case for such relief.

unsecured creditor's claim, when a separate lawsuit is now pending which will address this very issue.[14] Ice Legal repeatedly maintains that it has an interest in this case, separate and apart from the Ice Legal Lawsuit, because certain of the Receiver's actions in pursuing and filing the Ice Legal Lawsuit constituted a breach or dereliction of his fiduciary duties as a court-appointed receiver in this case. But the Court has reviewed all of the filings here and finds no credible evidence to support such claims.

Ice Legal further contends that it has an interest in opposing the "unlawful pursuit of litigation against it." Here again, this interest relates to the Ice Legal Lawsuit and not this case.[15] Ice Legal further notes that, in the Ice Legal Lawsuit, the Receiver has alleged that Ice Legal is responsible to pay all costs incurred by receivership defendants in defending actions brought by state and federal regulators, including costs associated with the instant receivership. Ice Legal seems to contend that it is entitled to raise any issues here which it believes would improperly increase the amount of fees incurred by the Receiver in this lawsuit, since it may be liable for those fees in the Ice Legal Lawsuit. The possibility that Ice Legal may be responsible for some or all of the Receiver's fees in this

---

[14] Ice Legal's motion to intervene is distinguishable from the motion to intervene filed by CIBC Bank USA and Valley National Bank, which was granted by this Court on April 22, 2024. (Dkt. Nos. 213, 325) Unlike Ice Legal, a purported unsecured creditor, the banks are undisputed secured creditors of the receivership estate. *See* Dkt. No. 325 (granting intervention by banks based on secured lien of over $35 million on Strategic's assets). Also, as reported by the Receiver at the time of his appointment, Strategic was highly undercapitalized, holding only $7 million in liquid assets as of January 31, 2024. Thus, even if Ice Legal is an unsecured creditor with a legitimate interest, intervention here seems to have little potential impact on its chances for recovery. Finally, unlike Ice Legal's claims, the validity of the banks' interest in receivership assets is not the subject of an entirely separate litigation.

[15] Ice Legal cites *FTC v. Apex Cap. Grp., LLC*, 22-55342, 2023 U.S. App. LEXIS 32741 (9th Cir. Dec. 12, 2023), in support of its argument that objecting to the unlawful pursuit of litigation by a receiver is a legally protectable interest. However, in that case, the Ninth Circuit did not specifically find that the unlawful pursuit of litigation was a legally protectable interest under Rule 24, but instead that it was sufficient to confer standing. Nevertheless, the court denied the motion to intervene as untimely. The Ninth Circuit also noted that the intervening party argued that the receiver's litigation was unlawful because one of the statutory basis for the district court's appointment of the receiver no longer authorized monetary relief, which is notably different from the facts here.

action, based on the outcome of the Ice Legal Lawsuit, is entirely speculative and does not constitute a direct, substantial, or legally protected interest in this litigation. *See Seils v. Rochester City Sch. Dist.*, 199 F.R.D. 506 (W.D.N.Y. 2001) (interest in intervention cannot be remote or contingent). Moreover, should the Receiver prevail in the Ice Legal Lawsuit, Ice Legal would have a full and fair opportunity to contest fees and damages at that time, and in that separate action. Finally, Ice Legal seeks to intervene for purposes of "potential challenges to the Preliminary Injunction or the appointment of the Receiver." This statement is also entirely speculative and cannot support a request for intervention.[16]

> *Ice Legal's purported interests will not be impaired or inadequately protected absent intervention.*

Courts in this Circuit have "denied motions for intervention by right from applicants who remain free to pursue adjudication of their rights in independent actions or in other proceedings." *FTC v. First Cap. Consumer Membership Servs., Inc.*, 206 F.R.D. 358, 363 (W.D.N.Y. 2001) (*citing United States v. City of New York*, 198 F.3d 360 (2d Cir. 1999)). As explained previously, the entirety of Ice Legal's claims against the Receiver relate to the Receiver's conduct in the context of the Ice Legal Lawsuit, as well as Ice Legal's belief that the Ice Legal Lawsuit is without merit. Ice Legal is free to pursue these arguments in the already existing, independent action. In fact, it appears that Ice Legal has already filed at least seven motions in the Ice Legal Lawsuit, including an over 60-page joint brief compiling six separate motions, and another motion to dismiss for lack of subject matter

---

[16] A little over a month after filing the motion to intervene, Ice Legal filed a "Motion to Modify or Dissolve the Preliminary Injunction (And Appointment of the Receiver) on the Grounds that the Consumer Financial Protection Bureau has Abandoned its Case." (Dkt. No. 721) As discussed *infra*, this motion is without merit and cannot form the basis of a "direct, substantial, and legally protectable interest in this case." *Madison Stock Transfer, Inc. v. NetCo Invs., Inc.*, CV 06-3926, 2007 U.S. Dist. LEXIS 73700 (E.D.N.Y. Sept. 27, 2007). Indeed, the nature of this motion only underscores the lack of a legitimate interest Ice Legal has in the instant litigation, and the prejudice intervention would have on the proper parties to this case in the form of distraction and delay.

jurisdiction. (See 25-CV-276, Dkt. Nos. 30, 31) Thus, intervention should also be denied because there has been no showing that any purported interest on the part of Ice Legal would be impaired or inadequately protected absent intervention.

## Permissive Intervention

The Court has the discretion to permit intervention under Rule 24(b)(2). The rule provides that "the Court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(2). A motion for permissive intervention must be timely, *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, 289 F. Supp. 3d 595 (S.D.N.Y. 2018), and courts consider substantially the same factors for intervention of right and permissive intervention, *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006). For all of the reasons just stated, Ice Legal's motion to intervene is untimely, and Ice Legal has not meet any of the requirements to intervene as of right. Thus, permissive intervention should likewise be denied.

Moreover, in evaluating a request for permissive intervention, the court must consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *New York v. Abraham*, 204 F.R.D. 62, 66 (S.D.N.Y. 2001). Here, not only has Ice Legal failed to show a protectable interest likely to be impaired absent intervention, but permitting intervention would only serve to prejudice the proper parties to this case. The parties, and the Receiver, have been involved in vigorous and contentious litigation for over a year. Indeed, there are already over 700 docket entries in this matter. Recently, this Court's PI has been affirmed by the Second Circuit Court of Appeals, and this Court has issued Reports and Recommendations as to all but one of

the extensive motions to dismiss filed by a number of defendants. Indeed, the matter finally appears to be approaching the entry of a scheduling order and the start of discovery. Allowing Ice Legal to intervene, in order to raise collateral matters that are either meritless or can be adjudicated in their separate lawsuit with the Receiver, will only serve to introduce confusion and unnecessary delay. *See First Cap. Consumer Membership Servs., Inc.*, 206 F.R.D. at 364 ("Additional parties always take additional time. Even if they have no witnesses of their own, they are the source of additional questions, objections, briefs, arguments, motions and the like.").

### ICE LEGAL'S MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION

On June 25, 2025, Ice Legal moved to modify or dissolve the PI, including appointment of the Receiver. (Dkt. No. 721) The apparent basis for this motion is that plaintiff Consumer Financial Protection Bureau (the "CFPB") has "abandoned its case." (*Id.*) Because the Court finds that Ice Legal's motion to intervene should be denied, Ice Legal's motion to dissolve or modify the PI is likewise denied for lack of standing.

Ice Legal's motion to dissolve or modify the PI is also denied because it has no merit. On February 4, 2025, the CFPB brought a motion for a temporary stay of its deadlines in this case on the grounds that "Acting Director Bessent directed Bureau counsel on February 3, 2025, not to make any filings or appearances in litigation except to ask for a pause in proceedings." (Dkt. No. 598-1) The motion for a stay was denied by the Court. (Dkt. Nos. 604, 605) Timely filings and responses to motions continued to be made by other plaintiffs in this litigation. (Dkt. Nos. 600, 614, 623)

On February 28, 2025, the CFPB wrote a letter to the Court indicating that it intended to participate in an upcoming motion hearing on March 6, 2025. (Dkt. No 627)

At that appearance, this Court asked counsel for the CFPB about the status of the CFPB in regard to participation in this lawsuit. (Dkt. No. 721-1, pg. 9; Dkt. No. 639, pg. 67) Counsel for the CFPB informed the Court that the agency was "authorized to fully prosecute the case" and that counsel for the CFPB would be actively participating in the case going forward. (*Id.*) Since that time, the CFPB was a signatory to plaintiffs' response in opposition to defendants' renewed cross-motion to stay the preliminary injunction pending appeal as well as to the joint stipulations for entry of stipulated preliminary injunction orders as to defendants Timothy Burnette, Michelle Gallagher, and Richard Gustafson. (Dkt. Nos. 641, 720, 722, 734) Counsel for the CFPB was present at a status conference before the Court on July 2, 2025. (Dkt. No. 735) The CFPB was also a signatory to the renewed motion for a preliminary injunction as to relief defendant Cameron Cristo, filed on July 16, 2025.[17] (Dkt. No. 743) Because the CFPB remains an active plaintiff in this lawsuit, Ice Legal's motion to modify or dissolve the PI is denied in its entirety.

## CONCLUSION

For the foregoing reasons, it is ordered that the Receiver's Third Fee Application (Dkt. No. 669) is granted in its entirety; it is ordered that Ice Legal's Motion to Modify or Dissolve the Preliminary Injunction (and Appointment of Receiver) on the Grounds that the Consumer Financial Protection Bureau has Abandoned its Case (Dkt. No. 721) is denied; and it is recommended that Ice Legal's Motion to Intervene for Purposes of Filing

---

[17] Ice Legal points to other pleadings or documents submitted on behalf of plaintiffs, since March 6, 2025, that were not filed or signed by counsel for the CFPB. Ice Legal does not cite a case indicating that where a party is one of multiple plaintiffs in a lawsuit, that party must be a signatory to every document or pleading filed, or are otherwise deemed to have abandoned their case. And the Court knows of no such requirement.

an Objection to Receiver's Report and a Motion to Appoint Special Receiver and for Other Purposes be denied (Dkt. No. 680).

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to the recommendation portion of this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72.  Any requests for an extension of this deadline must be made to Judge Wolford.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*  See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

Dated:       July 23, 2025
             Buffalo, New York


_____
MICHAEL J. ROEMER
United States Magistrate Judge