**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

CONSUMER FINANCIAL
PROTECTION BUREAU, et al.,

                    Plaintiff,

vs.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.

                Defendants, and

DANIEL BLUMKIN, et al.,

                Relief Defendants.

Case No. 1:24-cv-00040-EAW-MJR

---

**MEMORANDUM IN SUPPORT OF PROPOSED INTERVENORS, ICE
LEGAL'S, MOTION FOR RECONSIDERATION OF ORDER
APPROVING SETTLEMENT (DKT. 805)**

**Lundergan Legal, LLC**
Amanda L. Lundergan, Esq.
Post Office Box 211474
Royal Palm Beach, FL 33421
Direct: (561) 779-4126
Assistant: (561) 629-2643
Email:  amanda@lunderganlegal.com

*Attorney for Proposed Intervenors,
Ice Legal, P.A., Thomas Ice and
Ariane Ice*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

I.  Introduction ........................................................................................... 1

II.  Background .............................................................................................. 1

III.  Ice Legal's Standing ............................................................................... 3

IV.  Statement of Objections ......................................................................... 4

V.  Legal Standard: The Court must find that the Stipulation is "fair and reasonable" after providing an opportunity for objections. ........................................... 7

VI.  The Stipulation is an improper liquidation of the Estate by the Receiver. ................. 8

VII.  The only discernable purpose for the Stipulation is to assign a fifty-percent interest in McNamara's third-party litigation to the Creditor in exchange for continued payment of McNamara's fees. ........................................... 11

   A.  The Stipulation does nothing to benefit the Receivership Estate. ........................ 11

   B.  Meanwhile, the Stipulation sets aside millions of dollars to pay McNamara's fees. ........................................... 13

VIII.  The agreement for the Creditor to fund litigation unrelated to its loans is highly inappropriate. ........................................... 14

   A.  The assignment of half of the litigation proceeds in exchange for funding of that litigation inappropriately involves McNamara (and therefore, the Court) in encouraging litigation between creditors. ........................................... 14

   B.  The assignment of half of the litigation proceeds in exchange for funding of that litigation is champertous under New York law. ........................................... 15

IX.  Conclusion ............................................................................................ 16

## TABLE OF AUTHORITIES

Page

**Cases**

*Aretakis v. Caesars Entertainment*,
  No. 16-cv-8751, 2018 WL 1069450 (S.D.N.Y. 2018) .............................................. 15

*Gordon v. Dadante*,
  336 Fed. Appx. 540 (6th Cir. 2009) ........................................................................... 7

*Micolo v. Fuller*,
  No. 6:15-CV-06374 EAW, 2017 WL 2297026 (W.D.N.Y. May 25, 2017) ............................ 1

*Phoenix Light SF Ltd. v. U.S. Bank Natl. Assn.*,
  612 F. Supp. 3d 263 (S.D.N.Y. 2020),
  *aff'd sub nom. Phoenix Light SF DAC v. U.S. Bank Natl. Assn.*,
  No. 20-1312-CV, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) ................................... 15

*SEC v. American Board of Trade*,
  830 F.2d 431 (2d Cir. 1987) ...................................................................................... 9

*SEC v. Credit Bancorp, Ltd.*,
  290 F.3d 80 (2d Cir. 2002) ........................................................................................ 7

*SEC v. Illarramendi*,
  No. 3:11CV78 JBA, 2014 WL 5460816, at *2 n.4 (D. Conn. Oct. 27, 2014), *aff'd sub nom.
  SEC v. Michael Kenwood Capital Mgmt., LLC*, 630 F. App'x 89 (2d Cir. 2015) ..................... 4

*SEC v. Wang*,
  944 F.2d 80 (2d Cir. 1991) ........................................................................................ 7

*Securities and Exch. Comm'n v. Morgan*,
  No. 1:19-CV-00661 EAW, 2020 WL 6536894 (W.D.N.Y. Nov. 6, 2020) .......................... 3, 7

*Tr. For the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*,
  918 N.E.2d 889 (N.Y. 2009) ................................................................................... 15

**Statutes and Regulations**

28 U.S. Code § 3103(d) .................................................................................................. 8

N.Y. Judiciary Law § 489 ............................................................................................. 15

**Rules**

Rule 54(b) Fed. R. Civ. P. ......................................................................................... 1, 16

# DEFINED TERMS

| | |
|---|---|
| Ice Legal | Ice Legal, P.A. and its two attorneys (the defendants in the *McNamara* case) |
| Stipulation | Settlement Stipulation between CIBC Bank USA and Thomas W. McNamara, as the Court-appointed Receiver (Kdt. 802-1) |
| Stip. Order or Order (unless otherwise indicated) | Order approving the Settlement entered by Magistrate Roemer on September 25, 2025 (Dkt. 805). |
| *McNamara* case | *McNamara as the Court-Appointed Receiver v. Ice Legal P.A. et al.*, Case No. 1:25-CV-00275 (W.D.N.Y.) |
| CFPB | Consumer Financial Protection Bureau |
| State AGs | The seven "et al." Plaintiffs: The People of the State of New York, by Letitia James, Attorney General of the State of New York; State of Colorado, Ex Rel. Philip J. Weiser, Attorney General; State of Delaware Ex Rel. Kathleen Jennings, Attorney General State of Delaware; the People of the State of Illinois, through Attorney General Kwame Raoul; the State of Minnesota, by its Attorney General Keith Ellison; the State of North Carolina, ex rel. Joshua H. Stein, Attorney General; and the State of Wisconsin |
| Transcript | Transcript of Hearing on April 22, 2024 (Dkt. 351) |
| Motion to Intervene | Memorandum in Support of Third-party Motion to Intervene for Purposes of Filing an Objection to Receiver's Report and a Motion to Appoint Special Receiver and for Other Purposes (Dkt. 680-1) |
| Receiver's Opp | Receiver's opposition to the Motion to Intervene (Dkt. 694) |

## I.      Introduction

Proposed Intervenors (Ice Legal, P.A. and its two attorneys, Thomas Ice and Ariane Ice; collectively, "Ice Legal") specially appear[1] and move this Court for reconsideration of the Order approving the Settlement Stipulation (between CIBC Bank USA and Thomas W. McNamara, as the Court-appointed Receiver) ("Stipulation") entered by Magistrate Roemer on September 25, 2025 (Dkt. 805) ("Stip. Order" or "Order" unless otherwise indicated).[2]

Ice Legal brings this motion under Rule 54(b) Fed. R. Civ. P., which provides that the Court may revise any interlocutory order before the entry of a final judgment when there is a need to correct a clear error or prevent a manifest injustice. *Micolo v. Fuller*, No. 6:15-CV-06374 EAW, 2017 WL 2297026, at *2 (W.D.N.Y. May 25, 2017) (Judge Wolford).

## II.     Background

On September 23, 2025, Magistrate Roemer held a settlement conference or mediation in which all parties were invited to attend.  While Ice Legal is not privy to anything that occurred at the mediation, the following day, McNamara filed a cover letter (Dkt. 802) enclosing a stipulation between himself as Receiver and CIBC Bank USA ("CIBC") as agent for secured

---

[1] Ice Legal has objected to the imposition of personal jurisdiction over the defendants in the case in which McNamara has sued Ice Legal. *McNamara as the Court-Appointed Receiver v. Ice Legal P.A. et al.*, Case No. 1:25-CV-00275 (W.D.N.Y.) (*McNamara* case).  It expressly preserves this jurisdictional objection here and does not waive it by filing this motion in the same court (but different case). *See*, jurisdictional arguments in the memorandum submitted in support of them in the *McNamara* case which are adopted herein, (Dkt. 30-1, p. 24).

[2] The docket entry incorrectly indicates that the agreement is "between the plaintiffs, CIBC Bank USA and the receiver" (emphasis added).  In reality, the Plaintiffs' signatures merely indicate that they have no objection (Stip. Order, p. 2).

1

lenders[3] (the "Creditor") and a proposed order.  The letter characterized the settlement as one which "permits the use of [the Lender's] collateral to continue to operate the Atlas and Timberline (contingency fee model) business lines subject to the Receiver's control."  Neither the letter, nor the Stipulation itself, say that the settlement is fair and reasonable or that it benefits the Receivership Estate.

Despite the fact that the Preliminary Injunction prohibits the acceleration of the Lender's loans to the Defendants—and requires the Receiver to maintain the status quo—the agreement pays the Lender:

- $1,500,000.00 immediately (¶3.1);[4]

- Profits from the continued operation of the "Atlas Business" (the Receivership Defendants' Direct-to-Consumer debt settlement business currently operated through Atlas Client Services, LLC, Atlas Debt Relief, LLC and Timberline Financial, LLC) (¶¶ 3.4, 3.6);

- Half (plus the reimbursement of expenses) of any recovery from third parties (¶3.7).

Even though the agreement disposes of funds and other interests of the Receivership Estate, Magistrate Roemer signed the proposed order the day after the Receiver filed his letter (September 25, 2025) without inviting formal objection from parties or prospective (or otherwise interested) parties such as Ice Legal (Dkt. 805).

---

[3] "Secured Lenders" is defined in the Stipulation as both CIBC and Valley National Bank as successor to Bank Leumi ("Valley").  The Stipulation also asserts that CIBC is the agent for Valley although it did not sign the Stipulation as such.  For purposes of this objection, they will be referred to as a single entity ("the Creditor").

[4] This $1.5 million, along with $1.1 million earmarked for McNamara, is purportedly being withdrawn from the Strategic Family, Inc. account (0577) which, as of September 2, 2025 had only $103,160.80 according to Schedule 2 of the Stipulation.

### III.    Ice Legal's Standing

Paragraph 3.7 of the agreement gives Lender a fifty percent interest in any choses in action that McNamara brings against third parties, like Ice Legal:

> In the event the Receiver files a complaint to recover monies from non-defendant parties and funds such litigation with proceeds from Secured Lenders' Collateral, the Secured Lenders and Receiver would share any such proceeds as follows:
>
> > First, to cover all of the Receiver's expenses in bringing such claims;
> >
> > Second, to replenish the amount of legal expenses and fees drawn from the Corporate Bank Accounts used in pursuing such claims (which is 100% for the benefit of the Secured Lenders); and
> >
> > Third, such excess is split 50% to the Receivership estate, which such portion shall not be subject to any liens or claims of the Secured Lenders and 50% for the benefit of the Secured Lenders.

(emphasis original).

While the paragraph appears limited to lawsuits filed in the future (and the lawsuit against Ice Legal has already been filed), attorneys for the Receiver could not, or would not, answer Ice Legal's inquiry as to whether the paragraph was intended to apply to Ice Legal. Moreover, the Receiver's bills do not indicate any preparation for filing suits against other third parties. And finally, if the Receiver refiles his lawsuit (for example, in a court that actually has jurisdiction), then the provision would unquestionably apply to McNamara's claims against Ice Legal. Accordingly, Ice Legal has standing to object because the settlement directly involves the third-party litigation against Ice Legal.

Moreover, Ice Legal has standing as a creditor to object to a settlement distributing assets of the Estate. *See Securities and Exch. Comm'n v. Morgan*, No. 1:19-CV-00661 EAW, 2020 WL 6536894, at *5 (W.D.N.Y. Nov. 6, 2020) (Judge Wolford) ("[c]laimants to receivership property have standing to object to a distribution plan where the method of distribution will affect their financial interests;" *quoting, SEC v. Illarramendi*, No. 3:11CV78 JBA, 2014 WL 5460816, at *2

n.4 (D. Conn. Oct. 27, 2014) (quotation omitted), *aff'd sub nom. SEC v. Michael Kenwood Capital Mgmt., LLC*, 630 F. App'x 89 (2d Cir. 2015)).

Lastly, Ice Legal has standing as a proposed intervenor and adopts all the reasons in support of such intervention set forth in its Motion to Intervene and the memoranda in support of its as-yet-unresolved objections to the Magistrate's recommendation to deny such motion.[5] Conversely, Ice Legal suggests that the objections raised herein constitute further support for its Motion to Intervene.

## IV.    Statement of Objections

The Stipulation is shockingly improper on many different levels:

***First,*** it promises not only to reimburse the Creditor for accrued and unpaid interest but also for the payment of its principal.  It does this in the face of Plaintiffs' assertions that the Creditor never perfected its security interests in the alleged collateral and that the Creditor's claim can be offset by its own liability for knowingly participating in the Defendants' alleged regulatory violations.  Worse, there is no cap on what it can be paid from its fifty percent interest in any of the Receiver's third-party actions, <u>which means the Creditor could ultimately be paid more than its principal and interest—i.e. more than the Defendants ever borrowed or agreed to pay.</u>

***Second***, the Stipulation provides this preferential treatment in direct violation of the Preliminary Injunction's stay on any creditor's action to accelerate a loan or to take possession,

---

[5] Proposed Intervenors, Ice Legal's, Objections to Report, Recommendation and Order: Recommending Denial of Motion to Intervene for Purposes of Filing an Objection to Receiver's Report and a Motion to Appoint Special Receiver and for Other Purposes --and-- Denying Proposed Motion to Modify or Dissolve the Preliminary Injunction (and Appointment of Receiver) on the Grounds That the Consumer Financial Protection Bureau Has Abandoned Its Case (Dkt. 755).

custody or control of any Asset. (Dkt.184, Section XX).  The stay has never been lifted as to the Creditor.  Worse, the Creditor specifically asked this Court to lift the stay—a request that (after much debate) this Court denied without prejudice.[6]  The Creditor has never renewed that motion and yet it has now attained the very same relief that was denied by the Court by stipulating—not with the parties to this litigation, but with McNamara.  The Stipulation, therefore, is an end-run around the Preliminary Injunction and this Court's order.

*Third*, the Receivership Estate gets nothing in return for this wholesale capitulation to the Creditor.  McNamara's cover letter (Dkt. 802) tells this Court that the purpose of the Settlement is to permit him to use the bank's collateral to continue to operate the Atlas Business subject to the Receiver's control.  But McNamara was already doing that with the Court's blessing (and possibly, with the help of some undisclosed agreement with the Creditor).  Moreover, if the Atlas Business were as profitable as McNamara claims both in his reports to this Court, and in the stipulation itself, the business would be self-sustaining and there is no need to bow to the wishes of a single creditor.  Nor would there be a need to financially eviscerate what little is left of the Receivership Estate in the process.  Conversely, if the Atlas Business is not, or will not be self-sustaining, there has been no explanation as to why it would not benefit the Estate to simply shut it down.

*Fourth*, while the Stipulation purports to settle some unidentified "disputes" between the Creditor and McNamara,[7]  Section 4 of the Stipulation says exactly the opposite.  It states that nothing has been settled other than the outlined mechanism to prematurely pay the Creditor's

---

[6] Secured Lenders' Motion to Intervene (Dkt. 213-1);  Order (Minute Entry for Proceedings Held Before Hon. Michael J. Roemer (Dkt. 325);  Transcript of Hearing on April 22, 2024 (Dkt. 351, pp. 54-56; "Transcript").

[7] WHEREAS clause, Dkt. 802-1, p. 9.

claim even before the Creditor's assertions of priority have been resolved and before any adjudication of fault on the part of the Defendants.

*Fifth*, McNamara personally benefits from the deal with the Creditor because it sets aside millions of dollars to cover his fees—not just for running the Atlas Business, but for all the matters to which he claims he must attend in the next four years under this Court's Preliminary Injunction.  It also ensures he—and presumably his law firm—will be paid for the pursuit of any third-party claims regardless of the likelihood of success or whether such success would benefit the Estate.  McNamara, therefore, has a disconcertingly blatant conflict of interest in the negotiation of this deal (see, more detailed discussion below).

*Sixth*, the agreement for the Creditor to fund litigation unrelated to its loans is champertous. As such, the agreement is unethical and void under New York Law (see, more detailed discussion below).

*Seventh*, McNamara is impermissibly administering the liquidation of the Receivership Estate.  The Preliminary Injunction does not authorize him to liquidate the claims of any creditors of an insolvent enterprise.  Nor would it be appropriate to appoint him for that purpose (see, more detailed discussion below).

*Eighth*, Paragraph 3.2 of the Stipulation appears to free McNamara from obtaining Court approval of amounts below a certain amount in the Approved Atlas Forecast ($100,000 per month for the next two years and $75,000 per month for the years after that).  The Creditor's written consent is sufficient for the approval of Receivership Expenses above those amounts (as an alternative to a Court's permission)—thereby equating the Creditor's permission with a Court order.

## V.    Legal Standard: The Court must find that the Stipulation is "fair and reasonable" after providing an opportunity for objections.

In determining whether to approve a settlement proposed by a receiver, a court must assess whether it "is fair and reasonable." *Securities and Exch. Comm'n v. Morgan*, No. 1:19-CV-00661 EAW, 2020 WL 6536894, at *5 (W.D.N.Y. Nov. 6, 2020) (Judge Wolford, citing *SEC v. Wang*, 944 F.2d 80, 83-84 (2d Cir. 1991). The Court's approval of a proposed settlement that distributes assets is reviewable for abuse of discretion. *See Securities and Exch. Comm'n v. Morgan*, at *5 (Judge Wolford citing *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002)). However, it is an abuse of discretion to approve a settlement between a receiver and a creditor without inclusive procedures to evaluate the fairness of the settlement. *See*, *Gordon v. Dadante*, 336 Fed. Appx. 540, 551 (6th Cir. 2009) (concluding that the district court did not abuse its discretion in approving the receiver's settlement agreement "[g]iven the inclusive and extensive procedures used by the district court to evaluate the fairness of the settlement").

Here, the Court abused its discretion (and exceeded its equitable authority) because it did not use procedures that were extensive or inclusive. The Receiver filed no motion for approval of the settlement, and the Magistrate approved the Stipulation without a hearing or even an opportunity for parties or non-parties to object. The Receiver made no representation in the cover letter or the Stipulation itself that the settlement was fair and reasonable and benefited the Receivership Estate. Likewise, the Magistrate's order makes no such findings.

The Stipulation is not fair and reasonable (and does not benefit the Estate) because it is premature and because it gives the Estate nothing more than it already has. Instead, it squanders the assets of the Estate by transferring value (a portion of choses in action) that were never part of the Creditor's alleged "collateral." Worse, the settlement gives the Creditor unfair preferential treatment by granting it the potential of recovering even more than the entirety of its claim.

7

**VI.    The Stipulation is an improper liquidation of the Estate by the Receiver.**

The only tasks that McNamara is authorized to perform are to marshal the assets of the Receivership Estate (for whomever may be entitled to them in the end) and preserve the status quo during the pendency of the State AG's lawsuit. He has no authority to involve himself in the piecemeal negotiation and settlement of individual debts that have no impact on the daily operations of the Defendants' businesses.

This is doubly true because the Estate is insolvent. To be sure, McNamara has never, since his initial report, given this Court (nor the Parties) an accounting of what remains in the Estate. And, despite several requests, McNamara has refused to open his accounts for inspection by Ice Legal as required by 28 U.S. Code § 3103(d). McNamara's initial report, however, estimated that the Receivership Defendants' liabilities exceed their assets by over $400 million. There has been no dispute that the Receivership Estate does not have sufficient resources to pay all claims of putative secured creditors—should their claims be approved—much less, to provide any compensation for consumers if the Defendants should be found to have committed any wrongdoing.[8]

Additionally, McNamara's settlement seems to suggest that he cannot continue to operate the Atlas Business without dissipating the Creditor's alleged collateral. If so, then the business is not self-supporting, and the Court should be considering whether it should permit an unprofitable business to continue. In fact in the last two years of the forecast, the Atlas Business is projected

---

[8] In his Opposition to Ice Legal's Motion to Intervene (Dkt. 694, p. 11) McNamara stated: "Given the undercapitalization of the Strategic business, there is little hope that unsecured creditors will receive payment and secured creditors, like the banks here, will likely receive pennies on the dollar."

to lose $456,067 (but only because, during that same time $2.1 million is being set aside for McNamara's "fees and expenses").[9]

It appears that, no matter who prevails in this litigation, the Estate will need to be liquidated in bankruptcy. But it is premature for the Court to begin liquidating the Estate by individually disposing of creditor claims at the very outset of this litigation. Moreover, it is not only premature, but improper, for McNamara to be inserting himself in that process. He has never been granted the power to liquidate the Estate, and the Second Circuit would not approve of such an appointment. *SEC v. American Board of Trade*, 830 F.2d 431, 436-38 (2d Cir. 1987) (the liquidation of a receivership estate by the receiver criticized for selective application of bankruptcy concepts and for transforming the court into a court of bankruptcy).

Additionally, despite having charged the estate for the drafting a proof of claim form for creditors,[10] to Ice Legal's knowledge no such form has been circulated to them (at least none was supplied to Ice Legal even when it specifically requested one). Thus, even if McNamara were permitted to independently liquidate the Defendant companies, he has exercised no diligence to gather the claims of creditors and provide them with due process (as would be required of a bankruptcy trustee).

---

[9] The financial projections of the Atlas Business's profitability should be taken with a very large grain of salt. To take but one example, profits are generated when McNamara discontinues the use of Salesforce (the Customer Relationship Management software) and 8x8 technology (a cloud communications platform that integrates business phone systems, team chat, video conferencing, contact centers, and communications APIs). McNamara never explains how he can continue to operate the Atlas Business without these fundamental technology services—or if he can, why he is paying for these expensive services today.

[10] Second Interim Fee Application, entry of June 5, 2024 (Dkt. 432-3, p. 4).

Nor has he addressed the Plaintiffs' claims that the Creditor's loans are not entitled to priority or may be void due to its knowledge of the Defendants' alleged wrongdoing.[11]  It has been the Plaintiffs' position that the Creditor's claim to the Defendants' collateral was never perfected.[12]  They have also posited that the Creditor knew that the Defendants were "violating the law and yet they funded them and allowed them to continue to harm consumers."[13]  The Plaintiffs asked that they be permitted discovery on these issues before the Creditor be allowed to "sweep the accounts.".[14]  They also asked for the imposition of a constructive trust after the final adjudication.[15]  The Court denied the Creditor's attempt to lift the stay on the grounds that the Creditor's collateral was not being depleted and that it was not clear who had priority.[16]

Even though the Creditor has never renewed its request to lift the stay, the Court has now granted the Creditor the relief it previously denied—all without argument or notice.  And while the Plaintiffs' "no objection" stance on the Stipulation may indicate an abandonment of the "lack of perfection" and "knowing participation" arguments (or simply the de-facto absence of the main proponent of those arguments at that time, the CFPB), there has been no public discourse as to why abandonment of those arguments would benefit the Estate.

---

[11] McNamara has had no problem asserting that Ice Legal has no status as a creditor on the grounds that its contract is void for similar (albeit unfounded) reasons.

[12] Transcript, pp. 12, 30-33; Plaintiffs' Response to CIBC Bank USA and Valley Bank's Motion to Intervene (Dkt. 265, pp. 4-5).

[13]  Transcript, at p. 25; Plaintiffs' Response to CIBC Bank USA and Valley Bank's Motion to Intervene (Dkt. 265, pp. 5-7).

[14] Transcript, at p. 27, 33.

[15] *Id*. at 28.

[16] *Id*. at 54-56.

**VII.    The only discernable purpose for the Stipulation is to assign a fifty-percent interest in McNamara's third-party litigation to the Creditor in exchange for continued payment of McNamara's fees.**

**A.  The Stipulation does nothing to benefit the Receivership Estate.**

McNamara's cover letter represents that the purpose of the settlement was to enable him to use the bank's collateral to operate the Atlas Business.  There is no explanation in the letter or the Stipulation as to how this is different than what he has already been doing.  Nor is there an explanation as to why the Atlas Business cannot fund itself, and if not, why it should not be shut down.  There simply is no representation that this preferential deal with the Creditor will benefit the Estate.

The true profitability of the Atlas Business is shrouded in mystery.  In January of last year, McNamara initially represented to this Court that the Atlas Business could be operated legally, but with limited profitability.[17]    Around six months later, McNamara represented that the Atlas Business has "enabled payment to current vendors and continued interest payments to the banks (but not principal repayment)."[18]  In September of 2024, McNamara represented that the Atlas Business generated revenue that averaged $1.6 million per month.[19] By April of this year, the monthly average revenue was reported to be $1,230,439 which allowed for the payment of roughly $300,000 in interest per month to the Creditor.[20]  In July of 2025, the average

---

[17] Preliminary Report of Temporary Receiver, January 31, 2024 (Dkt. 115-1, p. 2).

[18] Receiver's Combined Reply in Support of Request for Further Instruction, dated June 14, 2024 (Dkt. 382, p. 9, n. 1); *see also*, Transcript, pp. 34-37 (Receiver represents that "there is a fixed amount of debt out there and that can be serviced in generated fees [by the Atlas Business]. And if you lift the stay, and sweep the accounts, that's all over."  The Receiver further represents that the Creditor's collateral is not being depleted by operation of the Atlas Business).

[19] Receiver's Second Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals (Dkt. 432-1, p. 3).

[20] Receiver's Third Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals (Dkt. 669-1).

monthly revenue increased to $1,250,328 and McNamara was continuing to pay interest to the Creditor of approximately $300,000 per month.[21]  The Stipulation does not explain why the "forecast" projects a 34% decrease in revenue for the next month (August of 2025) or why, given that the referenced month is in the past, it needs to be "forecast" at all.

    None of McNamara's reports state what the net income of the Atlas Business has been, but it appears that there has been sufficient profit to pay $300,000 of interest to the Creditor for many months.  Assuming these payments have been made over the entire time of the Estate's existence, it has paid the Creditor over $6.3 million in interest.  Meanwhile, the Corporate Bank Accounts in Schedule 2 of the Stipulation have remained relatively static (currently at around $4.5 million).

    Accordingly, the Parties to the Stipulation have not demonstrated any reason for changing the status quo, let alone one that is so urgent it cannot wait for this case to be resolved. Yet, McNamara has inked a deal that not only pays the Creditor the interest when it comes due (which has been the status quo anyway), but also its principal.  And the assignment of a fifty-percent interest in the proceeds of third-party cases could potentially pay the Creditor even more than its entire claim against the Estate—money that could, and should, be reserved for other creditors or consumers.

    In the end, the Parties to the Stipulation have not explained to this Court how this astonishingly preferential treatment of the Creditor (which includes the payment of principal prior to any distribution plan approved by the Court) is "reasonable and fair" and benefits the

---

[21] Declaration of Thomas W. McNamara in Support of Receiver's Fourth Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals (Dkt. 744-1, p. 3).

Estate.  Nor have they explained how the Creditor will suffer substantial injury such that the preliminary injunction must be modified through the back-door method of the Stipulation.

To summarize, the "Forecast for Operations" in the Stipulation says it best: operating the Atlas Business for four more years will generate just under $4 million for the Creditor and $4.5 million for the Receiver—and nothing for the Receivership Estate.  (In fact, if McNamara does not spend the fees allotted to him, the savings will benefit the Creditor, not the Estate).  The Estate would benefit more by simply shutting down the Atlas Business and keeping the $1.5 million that the Stipulation gives to the Creditor until its entitlement to such funds is determined by the Court by way of public debate.[22]

### B.  Meanwhile, the Stipulation sets aside millions of dollars to pay McNamara's fees.

For no stated reason, the Stipulation reserves $1.1 million to be applied subject to Court approval to "outstanding" professional fees and expenses of the Receivership Estate.  Moreover, McNamara is already entitled to have his fees paid from the Receivership Estate, so this negotiated "permission" from the Creditor is unnecessary.  Likewise, the Stipulation sets aside over $4.5 million over the next four years for be used to pay McNamara's fees and expenses from the profits of the Atlas Business—again something that has been happening under the status quo.

*    *    *

---

[22] Also hidden from the public is the reporting that McNamara must do each month for the Creditor—reporting that reflects "the actual revenues and expenses with respect to the Atlas Business … and the actual cash receipts and cash disbursements with respect to the Corporate Bank Accounts for such month, the dollar variance and the percentage variance of such actual amounts from the budgeted amounts reflected in the Approved Atlas Forecast for such month." At a minimum, these reports should be filed with the Court so that the parties and the public will have the same ability as the Creditor to monitor the progress and profitability of the deal.

13

Accordingly, McNamara has never explained how this Settlement benefits the Estate.  On its face, the Stipulation appears to benefit only the Creditor and himself.

**VIII.  The agreement for the Creditor to fund litigation unrelated to its loans is highly inappropriate.**

**A.  The assignment of half of the litigation proceeds in exchange for funding of that litigation inappropriately involves McNamara (and therefore, the Court) in encouraging litigation between creditors.**

As if it were not problematic enough that the claims brought by McNamara in his lawsuit against Ice Legal are choses in action that are partly owned by entities that are not in the Receivership Estate,[23] he now has given a non-receivership entity—and a creditor—a fifty percent share of those already-shared choses in action.

He has not, however, merely taken the highly unusual step of giving away (essentially assigned) half of the proceeds from his lawsuits (after expenses) to a creditor.  He has, in exchange, agreed to use "proceeds"[24] from the Creditor's collateral to fund these lawsuits.  In short, the Creditor is funding the actions against third parties and now has an interest in the outcome of that litigation.  It is mind-numbingly inappropriate for McNamara to permit, and even encourage, one creditor to litigate against another creditor, both of whom are equally entitled to the fiduciary protections owed to them by this judicial officer and arm of the Court itself.

---

[23] Motion to Dismiss for Failure to Join a Party under Rules 19 and 12(b)(7) Fed. R. Civ. P. (Dkt. 30-1, pp. 18-20).

[24] The language of ¶3.7 appears to use "proceeds" to refer to both where the funding is coming from and what is being shared with the Creditor, making the intent of this paragraph something less than transparent.

**B.  The assignment of half of the litigation proceeds in exchange for funding of that litigation is champertous under New York law.**

Even if Ice Legal were not a creditor, it is inappropriate for the Receiver and the Court to bless an agreement with a creditor to fund a lawsuit against a third party where the Creditor has no interest other than the money that could be recovered.  An agreement such as this is champertous—which is unethical and illegal in New York. N.Y. Judiciary Law § 489; *Tr. For the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 918 N.E.2d 889 (N.Y. 2009) (stating that "[t]he doctrine of champerty developed to prevent or curtail the commercialization of or trading in litigation" and holding that the statute did not apply where purchaser had a preexisting proprietary interest in the cause of action) (internal quote omitted); *Phoenix Light SF Ltd. v. U.S. Bank Natl. Assn.*, 612 F. Supp. 3d 263, 282 (S.D.N.Y. 2020), *aff'd sub nom. Phoenix Light SF DAC v. U.S. Bank Natl. Assn.*, No. 20-1312-CV, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) (finding assignments void as champertous where plaintiffs agreed to fund any litigation arising out of assignments, despite not being entitled to their proceeds); *Aretakis v. Caesars Entertainment*, No. 16-cv-8751, 2018 WL 1069450, at *10 (S.D.N.Y. 2018) (holding assignment was void as champertous).

Paragraph 3.7 presents other conflicts for McNamara.  ***First,*** the Stipulation itself does not state that the Receiver will be the sole decisionmaker concerning the conduct of litigation, including settlement.  Because the Creditor's collateral is being used for the Receiver's "expenses" (which presumably includes his attorneys' fees), the Creditor has an interest in controlling the litigation for its own benefit, rather than for the benefit of the estate.  It is unlikely that it intended to give McNamara free reign to spend its collateral on lawsuits that may or may not have merit (but for which he and his firm will be paid win or lose).  If there is any agreement as to how litigation decisions will be made, it has not been revealed to the Court.  In any event, it

is improper for a Creditor to be involved (even tangentially) in the Receiver's decisions that will impact the Receivership Estate.

**Second**, Paragraph 3.7 of the Stipulation does not speak to whether the Court will have any oversight of the litigation fees and costs that McNamara will pay himself from what the Stipulation calls the Creditor's "Collateral." Given that the Stipulation says that "substantially all of the "Collateral is subject to the Receivership" (p. 2), the agreement in ¶ 3.7 is that McNamara can fund his third-party litigation from Receivership funds (apparently without Court oversight). Additionally, ¶ 6.3 provides that the Settlement can be amended or modified "by an agreement in writing signed by the Parties." This means, now that the Court has approved this language, McNamara and the Creditor can change the Settlement completely without having to obtain approval from the Court.

## IX.    Conclusion

McNamara's Settlement with the Creditor essentially divvies up what remains of the Receivership Estate between the Creditor and himself. For the reasons above, the Order approving the Settlement should be vacated under Rule 54(b) Fed. R. Civ. P. to correct a clear error and prevent manifest injustice.

Ice Legal, therefore requests that the Court vacate the Order approving the Settlement and enter an Order denying approval of the agreement. In the alternative, Ice Legal requests that the Order approving the Settlement be vacated with leave for McNamara to file an actual motion seeking Settlement approval. Upon such filing, the Court should set a briefing schedule open to all interested persons, including all targets of McNamara's present and planned third-party litigation. And finally, the Court should hold a hearing in which those same parties may participate.

Dated: September 30, 2025

**Lundergan Legal, LLC**

*/s/ Amanda L. Lundergan*

Amanda L. Lundergan, Esq.
Post Office Box 211474
Royal Palm Beach, FL 33421
Direct: (561) 779-4126
Assistant: (561) 629-2643
Email:  amanda@lunderganlegal.com

*Attorneys for Proposed Intervenors,*
*Ice Legal, P.A., Thomas Ice and*
*Ariane Ice*