## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

                  Plaintiffs,

   v.

STRATFS, LLC (f/k/a STRATEGIC
FINANCIAL SOLUTIONS, LLC), et al.

                Defendants,

and DANIEL BLUMKIN, et al.

                Relief Defendants.

Case No. 24-cv-00040-EAW-MJR

### JACLYN BLUST'S ANSWER AND AFFIRMATIVE DEFENSES
### TO SECOND AMENDED COMPLAINT

Relief Defendant JACLYN BLUST ("Blust") hereby responds to the Second

Amended Complaint of Plaintiffs, CONSUMER FINANCIAL PROTECTION

BUREAU, THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES,

ATTORNEY GENERAL OF THE STATE OF NEW YORK, STATE OF COLORADO,

ex. rel. PHILIP J. WEISER, ATTORNEY GENERAL, STATE OF DELAWARE, ex.

rel. KATHLEEN JENNINGS, ATTORNEY GENERAL, STATE OF DELAWARE,

THE PEOPLE OF THE STATE OF ILLINOIS, through ATTORNEY GENERAL

KWAME RAOUL, THE STATE OF MINNESOTA, by its ATTORNEY GENERAL,

KEITH ELLISON, THE STATE OF NORTH CAROLINA, ex rel. JOSHUA H. STEIN,

ATTORNEY GENERAL, and THE STATE OF WISCONSIN, in like-numbered

paragraphs as follows:

## **INTRODUCTION**

1.　　The Consumer Financial Protection Bureau (Bureau) and the State of New York, the State of Colorado, the State of Delaware, *ex rel*. Kathleen Jennings, Attorney General, the People of the State of Illinois, the State of Minnesota, the State of North Carolina, and the State of Wisconsin (collectively, the States) file this Complaint against StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Support, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Versara Lending, LLC, Strategic Family, Inc. (collectively, SFS), Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC), Whitestone Client Services, LLC (collectively, Client Services Subsidiaries), Ryan Sasson, Jason Blust, Richard K. Gustafson II, Timothy F. Burnette, Michelle Gallagher, Daniel Blumkin, Albert Ian Behar (collectively, Individual Defendants), Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments, LLC (collectively, Holding Companies), Lit Def Strategies, LLC, Relialit, LLC, Fidelis Legal Support Services, LLC, and Hedgewick Consulting, LLC (collectively, Blust Companies), and Unidentified John Does 1-50, which are additional SFS companies and Client Services Subsidiaries that are currently unknown.

**ANSWER:** Blust admits only that the Plaintiffs have filed this action. Blust denies

that the claims asserted therein have merit, denies that Plaintiffs are entitled to any

relief, and denies all remaining allegations in Paragraph 1.

2. The Bureau and the States (collectively Plaintiffs) file this Complaint against Strategic ESOP, Strategic ESOT, the Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee, Jaclyn Blust, Cameron Christo, and the Bush Lake Trust Through Timothy Miller, Trustee, as Relief Defendants.

**ANSWER:** Blust admits only that Plaintiffs have named the referenced individuals and entities as Relief Defendants in this action. Blust denies that those parties are proper relief defendants, denies that Plaintiffs are entitled to any relief, and denies all remaining allegations in Paragraph 2.

3. The Bureau brings this action under the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6102(c), 6105(d); the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310; and Sections 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, and 5565, in connection with the marketing and sale of debt-relief services.

**ANSWER:** Blust admits only that the CFPB has brought claims in this case. Blust denies that those claims have merit, denies that the CFPB is entitled to any relief, and denies all remaining allegations in Paragraph 3.

4. The State of New York, by its Attorney General (NYAG), is authorized to take action to enjoin repeated and persistent fraudulent and illegal conduct under New York Executive Law § 63(12) and deceptive business acts and practices under New York General Business Law (GBL) Article 22-A.

**ANSWER:** Paragraph 4 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 4.

5. Pursuant to the Telemarketing Act, 15 U.S.C. §§ 6103(a) and (f)(2), the NYAG is authorized to initiate federal district court proceedings to

enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of New York residents, or to obtain such further and other relief as the court may deem appropriate. The NYAG is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 5 does not contain any allegations of fact and only asserts

conclusions of law. Thus, no answer is required. To the extent an answer is required,

Blust denies the allegations in Paragraph 5.

6.      Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Colorado, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Colorado residents, or to obtain such further and other relief as the court may deem appropriate. The State of Colorado is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 6 does not contain any allegations of fact and only asserts

conclusions of law. Thus, no answer is required. To the extent an answer is required,

Blust denies the allegations in Paragraph 6.

7.      Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), Kathleen Jennings, Attorney General of Delaware, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Delaware residents, or to obtain such further and other relief as the court may deem appropriate. The State of Delaware is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 7 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 7.

8. Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Illinois, by its Attorney General Kwame Raoul, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Illinois residents, or to obtain such further and other relief as the court may deem appropriate. The State of Illinois is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 8 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 8.

9. Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Minnesota, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Minnesota residents, or to obtain such further and other relief as the court may deem appropriate. The State of Minnesota is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 9 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 9.

10. Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of North Carolina, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other

compensation on behalf of North Carolina residents, or to obtain such further and other relief as the court may deem appropriate. The State of North Carolina is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 10 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 10.

11. The State of Wisconsin, by its Attorney General and Department of Justice (WIAG), is authorized under Wis. Stat. §§ 165.25(1m), 220.04(10), and 220.12 to take action to enforce compliance with the State's adjustment service company law, Wis. Stat. § 218.02, and the administrative rule promulgated thereunder, Wis. Admin. Code § DFI-Bkg. Ch. 73, and to seek a permanent or temporary injunction or restraining order, appointment of a receiver, and order for recission of any acts determined to be unlawful.

**ANSWER:** Paragraph 11 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 11.

12. Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the WIAG is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Wisconsin residents, or to obtain such further and other relief as the court may deem appropriate. The WIAG is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**ANSWER:** Paragraph 12 does not contain any allegations of fact and only asserts conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 12.

## OVERVIEW

13.    Since at least January 2016, Defendants have operated a debt-relief scheme that collects exorbitant, illegal advance fees from vulnerable consumers suffering financial difficulties. SFS employs third parties to mail personalized letters to debt-distressed consumers in the name of a rotating cast of companies (e.g., Lucky Marketing, Patriot Funding, and Pebblestone Financial). The letters claim the consumers are "pre-approved" for a debt-consolidation loan at attractive rates, e.g., 3.11% APR. The letters include a unique Offer Code or Personal Reservation Code (PRC). Consumers are directed to call a phone number or submit a request to a designated website using the unique PRC. Sometimes the packages sent to consumers also include fake checks payable to the consumer.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

14.    SFS is the invisible orchestrator of the solicitations, and the rotating list of companies used in the mailers exists only on the face of the letters; in reality, there is no actual lender and no actual pre-approval.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

15.    SFS often causes 2-3 million direct-mail solicitation letters to be sent to consumers each week. SFS projects the mailers will generate between 12,000 and 16,000 leads per week.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

16.    When consumers respond to the pre-approval letters (by calling or by visiting the website and entering the PRC), their information is captured by SFS's computer systems and is sent to SFS's sales employees as "leads."

7

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    17.    SFS's sales employees then contact the consumer and almost always advise them that they do not qualify for the loan. After reviewing a sampling of 100 sales calls from January 9 and 10, 2024, the court-appointed Receiver of SFS found that consolidated loans were offered as an option to just five consumers (and never at interest rates similar to what was advertised in the pre-approval letter), while the debt-relief service was offered to all 100 consumers.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    18.    SFS's sales employees encourage the consumers to enroll in SFS's debt-relief service by promising that Defendants' network of lawyers will negotiate reduced payoff amounts with consumers' creditors and defend consumers in the event of a creditor lawsuit. This sales process is dictated by tightly choreographed scripts that include rebuttal responses to every possible consumer push back.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    19.    At least one of the scripts used by SFS's sales employees presumes that the loan was not provided to the consumer and directs the SFS sales employee to say, "although your file was not approved for a debt consolidation loan (due to your credit score and/or debt to income ratio) . . . we have approved you for a great option which is perfectly in line with the goals we previously discussed."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    20.    Another SFS sales script includes the following scripted question and answer:

> Q: The flyer said I was already approved for a loan. Why do I have to submit an application?
>
> A: Many people take the term "pre-approved" to mean already approved and I apologize for that confusion. It actually means you have been pre-approved to go through our application process, but we do need some additional information to complete your application.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

21.    SFS sales employees routinely refer to the debt-relief service as the "0% interest option." SFS provides a script for its sales employees that describes the debt- relief service as follows:

> This program will still provide you the convenience factor of one single lower monthly payment, it will allow you to get all of this debt taken care of in an average of just 3-4 years, while saving you a significant amount of money off of your principal balance, but most importantly this option will be charging *zero interest throughout the entire length and duration of this option.* (emphasis added).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

22.    Immediately after consumers enroll in the debt-relief service, Defendants begin collecting substantial fees from them, despite admitting to consumers that any settlements with creditors will take months to secure. Meanwhile, consumers' debts continue to accrue interest while they remain outstanding.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

23.    Defendants' front-loaded fees leave the consumers with little money for any such potential settlements. As a result, consumers regularly pay into the debt-relief service for months before Defendants reach a settlement with even one creditor, and Defendants collect a significant

amount of fees in the interim. Some consumers exit the program having paid substantial fees but with none of their debts settled or reduced. Many consumers end up with more debt than they started with, see their credit scores decrease substantially, and end up getting sued by creditors. Already-vulnerable consumers often end up in a worse financial situation than before, while Defendants profit. Since at least January 2016, Defendants have collected over $84,000,000 in unlawful fees from consumers through these schemes.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

24. The Individual Defendants conduct this operation using a web of interrelated companies they have created. Individual Defendants Sasson, Blumkin, and Behar founded SFS. Each of them created a single-member shell Holding Company (Duke Enterprises LLC (Duke Enterprises), Twist Financial LLC (Twist Financial), and Blaise Investments LLC (Blaise Investments), respectively) that funneled money from SFS's businesses to Sasson, Behar, and Blumkin. Until 2017, each of these Holding Companies owned a percentage of Strategic Financial Solutions, LLC. Collectively, their ownership constituted a majority, which allowed them to control Strategic Financial Solutions, LLC. Their ownership interests were converted to stock, and then the Holding Companies sold their stock to the Strategic ESOT in 2017. Defendants Sasson, Blumkin, and Behar currently serve as directors on Strategic Family's Board of Directors.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

25. Individual Defendant Sasson also created the Client Services Subsidiaries.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

26. Individual Defendants Sasson and Blust created façade law firms (the Façade Firms) that correspond to each Client Services Subsidiary. These

law firms serve as a façade for SFS's debt-relief operation and perform little to no work on behalf of consumers. Individual Defendants Gustafson, Burnette, and Gallagher each own and control multiple Façade Firms.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

27. In addition, Individual Defendants Sasson, Blust, Blumkin, and Behar created shell companies and consulting firms that funnel money back to each of them.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## JURISDICTION

28. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

**ANSWER:** Paragraph 28 does not contain any allegation of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust admits federal question jurisdiction but denies the remaining allegations in Paragraph 28.

29. This Court has supplemental jurisdiction over the States' state law claims because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

**ANSWER:** Paragraph 29 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 29.

## VENUE

30.    Venue is proper in this district because SFS is located, resides, and does business here and because a substantial part of the events or omissions giving rise to the claims occurred in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(2).

**ANSWER:** Paragraph 30 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 30.

## THE PARTIES

31.    The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§ 6102(c)(2), 6105(d).

**ANSWER:** Blust admits only that the CFPB is an agency of the United States. The remainder of Paragraph 31 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the remaining allegations in Paragraph 31.

32.    Letitia James, Attorney General of New York, is authorized to bring this action on behalf of the State of New York and its citizens to enforce New York law, the TSR, and the CFPA.

12

**ANSWER:** Paragraph 32 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 32.

33.     Philip J. Weiser, Attorney General for Colorado, is authorized to bring this action on behalf of the State of Colorado and its citizens to enforce the TSR and CFPA.

**ANSWER:** Paragraph 33 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 33.

34.     Kathleen Jennings, Attorney General of Delaware, is authorized to bring this action on behalf of the State of Delaware and its citizens to enforce the TSR and CFPA.

**ANSWER:** Paragraph 34 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 34.

35.     Kwame Raoul, Illinois Attorney General is authorized to bring this action on behalf of the People of the State of Illinois to enforce the TSR and CFPA.

**ANSWER:** Paragraph 35 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 35.

36.     Keith Ellison, Attorney General of Minnesota, is authorized to bring this action on behalf of the State of Minnesota and its citizens to enforce the TSR and CFPA.

**ANSWER:** Paragraph 36 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 36.

    37.    Joshua H. Stein, Attorney General of the State of North Carolina, is authorized to bring this action on behalf of the State of North Carolina and its citizens to enforce the TSR, and the CFPA.

**ANSWER:** Paragraph 37 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 37.

    38.    Joshua L. Kaul, Attorney General of Wisconsin, is authorized to bring this action on behalf of the State of Wisconsin to enforce Wisconsin law, the TSR, and the CFPA.

**ANSWER:** Paragraph 38 does not contain any allegations of fact and asserts only conclusions of law. Thus, no answer is required. To the extent an answer is required, Blust denies the allegations in Paragraph 38.

### SFS

    39.    Strategic Family, Inc. is the parent company of other SFS defendants, including StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Versara Lending, LLC, and Strategic Consulting, LLC (collectively, SFS, as defined above).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    40.    SFS maintains its principal place of business at 115 Lawrence Bell Drive, Buffalo, NY 14221. SFS's website (stratfs.com) says that its main

office is located at this address. SFS offers and provides "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

41.    In connection with a campaign to induce consumers to purchase its services, SFS initiates and receives interstate telephone calls to and from consumers. During these calls, SFS offers to renegotiate, settle, or alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors. Thus, SFS is a "telemarketer" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (ff).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

42.    SFS provides, offers to provide, or arranges for others to provide debt-relief services to consumers in exchange for consideration. Thus, SFS is also a "seller" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## NON-PARTY FAÇADE FIRMS

43.    On paper, SFS partners with purported law firms around the country, and the firms offer and promise to provide services, including debt-relief services, to consumers owing unsecured debts to creditors. Each firm is paired with an SFS-owned Client Services Subsidiary that usually has a name similar to the firm, and non-attorney negotiators from SFS and its Client Services Subsidiaries are the ones tasked with renegotiating a consumer's debt – if such negotiations happen at all. Because most or all of the services are carried out by non-attorneys who are not employees of the firm, the firms are referred to herein as "Façade

15

Firms."

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

44.    Many of the Façade Firms appear not to have physical offices, and instead utilize virtual offices and mailboxes, like UPS Store-rented mailboxes. For at least some of the Façade Firms, incoming mail is scanned by a third party and then uploaded not to the law firm but rather to SFS.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

45.    The Façade Firms work on behalf of SFS to offer and provide "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

46.    In connection with SFS's telemarketing transactions, the Façade Firms offer to provide or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, the Façade Firms are "sellers" offering "debt-relief services" under the TSR. 16 C.F.R. §

310.2(o), (dd).

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

47.    The Façade Firms include but are not limited to:

- A. Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio & Associates, PLLC;
- Anchor Law Firm, PLLC;
- Boulder Legal Group, LLC;
- The Brian A Moore Law Firm LLC d/b/a Guidestone Law Group;
- Brandon Ellis Law Firm LLC;
- Burnette Legal Group, LLC d/b/a Monarch Legal Group;
- Chinn Legal Group, LLC d/b/a Slate Legal Group and Halo Law Group;
- Credit Advocates Law Firm, LLC;
- Dakis Legal Group LLC d/b/a Clear Creek Legal, LLC;
- Daniel Rufty Legal PLLC d/b/a Carolina Legal Services;
- Donald Norris Associates PLLC d/b/a Stonepoint Legal Group;
- Gardner Legal LLC d/b/a Option 1 Legal;
- Great Lakes Law Firm, LLC;
- Greene Legal Group LLC d/b/a Newport Legal Group;
- Gustafson Consumer Law Group, LLC d/b/a White Oak Law Group;
- Hallock and Associates, LLC;
- Harbor Legal Group, LLC;
- Henry Legal Group, PLLC d/b/a Heartland Legal Group;
- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;
- JMS Industries, LLC d/b/a Canyon Legal Group;
- The Law Firm of Derek Williams, LLC f/k/a Infinite Law Firm;
- The Law Office of Melissa Michel LLC d/b/a Spring Legal Group;
- Leigh Legal Group, PLLC d/b/a Greenstone Legal Group;
- Michel Law, LLC d/b/a Level One Law;
- Moore Legal Group, LLC d/b/a Meadowbrook Legal Group;
- Northstar Legal Group, LLC;

- Pioneer Law Firm, P.C., f/k/a John B. Dougherty P.C.;
- The Sands Law Group, LLP d/b/a Whitestone Legal Group; and
- WyoLaw, LLC d/b/a Summit Law Firm.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## CLIENT SERVICES SUBSIDIARIES

48. The SFS-owned Client Services Subsidiaries perform services to facilitate the scheme. Each SFS-owned Client Services Subsidiary corresponds to one or more Façade Firms, and most of the Client Services Subsidiaries share a name with a Façade Firm. For example, Anchor Client Services, LLC corresponds to Anchor Law Firm, PLLC. SFS uses the Client Services Subsidiaries to siphon money from consumers' accounts and profits from the Façade Firms and to mask SFS's involvement in the debt- relief operation.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

49. The Client Services Subsidiaries work on behalf of SFS and the Façade Firms to offer and provide "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks

knowledge and information sufficient to form a belief as to the truth or falsity of the

allegations in this Paragraph.

50.    In connection with SFS's telemarketing transactions, the Client Services Subsidiaries offer to provide or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, the Client Services Subsidiaries are "sellers" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

51.    As discussed below, the Client Services Subsidiaries are in a common enterprise with SFS. The Client Services Subsidiaries involved in the common enterprise include:

- Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC);
- Bedrock Client Services, LLC;
- Boulder Client Services, LLC;
- Canyon Client Services, LLC;
- Carolina Client Services, LLC;
- Great Lakes Client Services, LLC;
- Guidestone Client Services, LLC;
- Harbor Client Services, LLC;
- Heartland Client Services, LLC;
- Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC);
- Newport Client Services, LLC;
- Northstar Client Services, LLC;
- Option 1 Client Services, LLC;
- Pioneer Client Services, LLC;
- Rockwell Client Services, LLC;
- Royal Client Services, LLC;
- Stonepoint Client Services, LLC;
- Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC); and
- Whitestone Client Services, LLC.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

### DEFENDANTS RYAN SASSON, ALBERT IAN BEHAR,
### DANIEL BLUMKIN, AND THE HOLDING COMPANIES

52.    Ryan Sasson is one of the founders and was the Chief Executive Officer of SFS. Sasson and Blumkin were the two initial members of Encore Capital USA, LLC (Encore) in 2010; Encore later became Strategic Financial Solutions, LLC. Along with Blumkin and Behar, Sasson was also a "Common Manager" at Strategic Client Support, LLC and Strategic Financial Solutions, LLC. According to Strategic Financial Solutions' Second Amended and Restated Operating Agreement, Sasson, along with Blumkin and Behar, was a manager of SFS, and managers have authority to act on behalf of and bind the company. Sasson is currently a director on Strategic Family's Board of Directors and is listed as an officer of SFS on corporate tax filings.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

53.    Sasson is a former employee of Legal Helpers Debt Resolution, LLC (Legal Helpers), a debt-relief firm that was sued and eventually shut down as a result of actions by the Attorneys General of Illinois, Wisconsin, North Carolina, and West Virginia. The Attorneys General alleged that Legal Helpers charged unlawful up-front fees, failed to reduce consumers' debts as promised, and attempted to avoid advance-fee bans by recruiting attorneys to act as fronts for the business. Compl., *Illinois v. Legal Helpers Debt Resol., LLC*, No. 2011 CH 00286 (Sangamon Cty., Ill. Mar. 2, 2011); Compl., *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis. June 12, 2013); Compl., *North Carolina v. Legal Helpers Debt Resol., LLC*, No. 14CV006409 (Wake Cty., N.C. May 15, 2014); Compl., *West Virginia v. Legal Helpers Debt Resol., LLC*, No. 13-C-2330 (Kanawha Cty., W. Va. Dec. 20, 2013). The Illinois and North Carolina Attorneys General actions resulted in consent judgments enjoining Legal Helpers from engaging in debt relief in their respective states. Judgment, *Illinois v. Legal Helpers Debt Resol., LLC*, No. 2011 CH 00286 (Sangamon Cty., Ill. July 2, 2012); Judgment, *North Carolina v. Legal Helpers Debt Resol.,*

*LLC*, No. 14CV006409 (Wake Cty., N.C. Sept. 29, 2014). The North Carolina consent judgment also enjoined the principals of the firm from engaging in debt relief and entered judgments in the amounts of $1,533,000 and $122,000 against Legal Helpers and the individual defendants, respectively. *Id*. The Wisconsin Attorney General's action and the West Virginia Attorney General's action resulted in judgments for $12,272,000 and $135,000, respectively, and settlement agreements enjoining Legal Helpers and the principals of the firm from engaging in debt relief in Wisconsin and West Virginia. Judgment, *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis. Feb. 15, 2016); Settlement Agreement, *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis. May 13, 2016); Judgment, *West Virginia v. Legal Helpers Debt Resol., LLC,* No. 13-C-2330 (Kanawha Cty., W.Va. June 2, 2014).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

54.    In October 2010, LHDR Help, Inc. (LDHR Help) was formed. Sasson was the President at inception and remained in that role until 2012, at least. LDHR Help referred clients to Legal Helpers and Credit Advocates Law Firm, LLC (owned by Blust).

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

55.    Sasson knows or should know, based on the matters discussed in Paragraphs 53 and 54, that it is illegal to charge up-front fees for telemarketer-sold debt-relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

56.    Sasson is the sole owner and sole member of Duke Enterprises, LLC. Duke Enterprises owned 25.69% of Strategic Financial Solutions, LLC. In 2017, those ownership shares converted to an ownership stake in

21

Strategic Family, Inc. Duke Enterprises owned 25.22% of Strategic Family's voting stock before the sale of the stock to the Strategic ESOT in 2017. Duke Enterprises was also a member of LHDR Help. Defendants use Duke Enterprises to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Ryan Sasson.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

57. At all times material to this Complaint, acting alone or in concert with others, Sasson has exercised substantial control over and involvement in the establishment of business policies and practices described in this Complaint for SFS, the Client Services Subsidiaries, and Duke Enterprises. At all times material to this Complaint, Sasson has exercised managerial responsibility for these companies and has materially participated in the conduct of their affairs.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

58. Daniel Blumkin lives in Port Washington, NY and New York City, NY. He is one of the founders of SFS. Blumkin and Sasson were the two initial members of SFS's predecessor, Encore. Along with Sasson and Behar, Blumkin was also a "Common Manager" at Strategic Client Support, LLC and Strategic Financial Solutions, LLC. Blumkin was Chief Sales Officer of SFS and head of sales at Strategic Consulting, LLC. He is listed as an officer of SFS on corporate tax filings and previously served as President of Strategic Financial Solutions, LLC. A Credit Agreement with CIBC Bank lists Blumkin and Sasson as "Key Men" to SFS. According to Strategic Financial Solutions' Second Amended and Restated Operating Agreement, Blumkin, along with Sasson and Behar, was a manager of SFS, and managers have authority to act on behalf of and bind the company. From approximately 2008 until recently, Blumkin oversaw all sales operations at Strategic Family, Inc.

22

Blumkin is currently a director on Strategic Family's Board of Directors. Blumkin had an office in the sales portion of SFS's Manhattan office suite as of January 2024.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

59. Blumkin is a former employee of LHDR Help, and in 2012, at least, Blumkin served as the Vice President of Sales for that company.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

60. Blumkin is the sole owner and sole member of Twist Financial, LLC. Twist Financial owned 17.85% of Strategic Financial Solutions, LLC. In 2017, those ownership shares converted to an ownership stake in Strategic Family, Inc. Twist Financial owned 17.13% of Strategic Family's voting stock before the sale of the stock to the Strategic ESOT in 2017. Blumkin and Twist Financial share an address: 1 Greenwood Ln, Port Washington, NY 11050. Twist Financial and SFS share an address: 711 3rd Avenue, 6th Fl., New York, NY 10017. Twist Financial was also a member of LHDR Help. Defendants use Twist Financial to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Daniel Blumkin.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

61. At all times material to this Complaint, acting alone or in concert with others, Blumkin exercised substantial control over and involvement in the business policies and practices described in this Complaint for SFS and Twist Financial. At all times material to this Complaint, Blumkin has exercised managerial responsibility for SFS and has materially participated in the conduct of its affairs.

23

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

62.    Albert Ian Behar is one of the founding members of SFS. Along with Blumkin, Behar signed his name as a "Common Manager" on the Operating Agreement of Encore. Along with Sasson and Blumkin, Behar was also a "Common Manager" at Strategic Client Support, LLC and Strategic Financial Solutions, LLC. Behar is currently a director on Strategic Family's Board of Directors. According to Strategic Financial Solutions' Second Amended and Restated Operating Agreement, Behar, along with Sasson and Blumkin, was a manager of SFS, and managers have authority to act on behalf of and bind the company. Behar signed account agreements with large financial institutions on behalf of various SFS entities, including Strategic Financial Solutions and Strategic, Family Inc. Behar had an office next to Sasson's office in SFS's Manhattan office suite as of January 2024.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

63.    Behar is the sole owner and sole member of Blaise Investments, LLC. Blaise Investments owned 25.69% of Strategic Financial Solutions, LLC. In 2017, those ownership shares converted to an ownership stake in Strategic Family, Inc. Blaise Investments owned 25.22% of Strategic Family's voting stock before the sale of the stock to the Strategic ESOT in 2017. Blaise Investments was also a member of LHDR Help. Defendants use Blaise Investments to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Albert Ian Behar. At all times material to this Complaint, acting alone or in concert with others, Behar exercised substantial control over the business policies and practices described in this Complaint for SFS and Blaise Investments. At all times material to this Complaint, Behar has exercised managerial responsibility for SFS and hasmaterially participated in the conduct of its affairs.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks

knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

64.   Through their combined voting stock ownership in Strategic Family, Inc., the Holding Companies were able to control Strategic Family, Inc. Through their owners, Sasson, Behar, and Blumkin, the Holding Companies controlled Strategic Family Inc.'s business.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

65.   Sasson, Blumkin, and Behar know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## COMMON ENTERPRISE

66.   SFS, its Client Services Subsidiaries, and the Holding Companies operate as a common enterprise controlled by Sasson, Behar, and Blumkin.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

67.   SFS, Client Services Subsidiaries, and holding companies Twist Financial and Blaise Investments share addresses at 711 3rd Ave, 6th Floor, New York, NY 10017. The Client Services Subsidiaries do not

have distinct spaces within that address.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

68.    The same people control the bank accounts for SFS, its Client Services Subsidiaries, and the Holding Companies. For example, account-opening documents from Valley Bank show that Individual Defendant Sasson, SFS's CEO, opened accounts for Strategic Client Support, LLC, Atlas Client Services, LLC (related to a company that may be another façade firm), Strategic Financial Solutions, LLC, Strategic LD, LLC (another company likely owned by SFS), Versara Lending, Strategic CS, LLC, Anchor Client Services, LLC, and Duke Enterprises.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

69.    Behar opened a bank account for Blaise Investments, and Blumkin opened a bank account for Twist Financial.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

70.    As of January 2024, Ryan Sasson and Albert Ian Behar were also signers for the bank accounts of Strategic Family, Inc. and Versara Lending, LLC at CIBC Bank USA, and Sasson was the only signer for the bank accounts of Strategic Financial Solutions, LLC and Strategic NYC, LLC.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

71.    Similarly, Ryan Sasson was the signer for the bank accounts of nineteen Defendants at Key Bank. Sasson was the signer for Strategic Financial Solutions, LLC, Anchor Client Services, LLC, BCF Capital, LLC, Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client

Services, LLC, Harbor Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Strategic Client Support, LLC, Strategic Consulting, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC , Strategic NYC, LLC, and Summit Client Services, LLC.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

72.    SFS commingles funds with the Client Services Companies and the Holding Companies.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

73.    For example, records for bank accounts held by three Client Services Subsidiaries show that they each transferred millions of dollars to various companies in the common enterprise, including Strategic Client Support, LLC, Strategic NYC, LLC, Strategic CS, LLC, and Strategic Consulting, LLC. The following chart shows the transfers into and out of an account held by Strategic NYC, LLC between October 2017 and December 2020. This SFS entity received money from multiple Client Services Subsidiaries and distributed that money throughout the common enterprise.

| Account 7645 - STRATEGIC NYC, LLC | | | |
|---|---|---|---|
| **Account / Activity** | **Account Name** | **Incoming** | **Outbound** |
| 3931 | BEDROCK CLIENT SERVICES, LLC | 20,961,075.22 | - |
| 7076 | BOULDER CLIENT SERVICES LLC | 17,787,737.97 | - |
| WIRE IN | | 17,584,963.27 | - |
| 9379 | ANCHOR CLIENT SERVICES LLC | 13,353,426.79 | - |
| 2687 | ROCKWELL CLIENT SERVICES, LLC | 10,532,106.15 | - |
| 3847 | TIMBERLINE FINANCIAL, LLC | 8,711,564.85 | - |
| 5085 | HARBOR CLIENT SERVICES, LLC | 4,499,204.86 | - |
| 9557 | PIONEER CLIENT SERVICING, LLC | 3,114,446.29 | - |
| 5128 | STONEPOINT CLIENT SERVICES, LLC | 1,128,877.69 | - |
| 7649 | CANYON CLIENT SERVICES, LLC | 843,238.61 | - |
| 8385 | ROYAL CLIENT SERVICES, LLC | 786,341.94 | - |

| | | | |
|---|---|---|---|
| **1538** | **CELL GRAMERCY OF CONTEGO INSURANCE LLC** | 400,000.00 | - |
| **7514** | **BCF CAPITAL, LLC** | 39,402.70 | - |
| **3206** | **ATLAS DEBT RELIEF, LLC** | 4,378.34 | - |
| **3458** | **ATLAS CLIENT SERVICES LLC** | 4,300.00 | - |
| **1294** | **VERSARA LENDING LLC** | - | 34,251,717.68 |
| **7922** | **STRATEGIC CS, LLC** | - | 17,736,230.06 |
| **9204** | **STRATEGIC  CONSULTING,  LLC** | - | 16,962,610.30 |
| **1894** | **STRATEGIC FINANCIAL  SOLUTIONS, LLC** | - | 13,010,883.31 |
| **1286** | **STRATEGIC CLIENT SUPPORT LLC** | - | 12,978,297.03 |
| **5354** | **PEERFORM  INC.** | - | 2,398,698.15 |
| **9490** | **STRATEGIC FS BUFFALO, LLC** | - | 952,219.15 |
| **3204** | **STRATEGIC LD, LLC** | - | 723,384.53 |
| **WIRE OUT** | | - | 701,262.47 |
| **5847** | **F SOLUTIONS LLC** | - | 24,257.72 |
| **5269** | **STRATEGIC FAMILY,  INC.** | - | 10,250.00 |
| **Grand Total** | | **99,751,064.69** | **99,749,810.40** |

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

> 74.    In addition, records from another bank show that Anchor Client Services, LLC, Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, and Whitestone Client Services, LLC, at least, sent millions of dollars to T Fin, LLC and Strategic NYC, LLC between approximately 2018 and 2021.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

> 75.    Additionally, Strategic Financial Solutions, LLC transferred funds from its account at Valley Bank to the Holding Companies from October 2016 through at least September 2017. Strategic Family Inc. transferred

> funds from its account at KeyBank to the Holding Companies from May 2018 through at least January 2021.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

76. SFS and its Client Services Subsidiaries share a phone system. The phone system has a common set of extensions across SFS and its Client Services Subsidiaries such that employees of the common enterprise can call each other without dialing outside of the system.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

77. In December 2018, SFS contracted with a data analytics firm to analyze the common enterprise's phone calls for sales and retention purposes. As part of this process, SFS sent recorded phone calls to the data analytics firm. The calls included those from phone lines named Anchor Creditor Line, Bedrock Creditor Line, Boulder Creditor Line, Canyon Creditor Line, Carolina Creditor Line, Great Lakes Creditor Line, Harbor Creditor Line, Pioneer Creditor Line, Rockwell Creditor Line, Royal Creditor Line, Stonepoint Creditor Line, and Summit Creditor Line. SFS also shared call recordings from a phone line named "Generic CS Creditor Line," which exemplifies the internal interchangeability of the Client Services Subsidiaries.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

78. SFS and its Client Services Subsidiaries also share employees. Although individual employees' salaries may be paid by SFS or a Client Services Subsidiary, such employees perform work for all of the Client Services Subsidiaries. In some instances, the same employees answer phone lines associated with multiple Client Services Subsidiaries. For example, one employee whose salary was paid by SFS answered consumer calls to multiple phone lines associated with Client Services Subsidiaries, including the Boulder Creditor Line, the Harbor Creditor Line, the Rockwell Creditor Line, the Royal Creditor Line, and the Summit

Creditor Line.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

79. Similarly, when consumers enrolled in the debt-relief service try to call the law firm they believe is representing them, the call is routed to SFS where SFS employees answer the phone using the name of the Client Services Subsidiary or Façade Firm associated with each consumer. The entity name under which an SFS employee answers a consumer phone call can change with each call. Thus, a single SFS employee will answer dozens of consumer calls in any given day, representing themselves as an employee of numerous different Client Services Subsidiaries or Façade Firms. One employee who answers calls from consumers holds himself out to be a representative of at least six different Façade Firms, although his salary is paid by Strategic Client Support, LLC.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

80. SFS and the Holding Companies do not appear to share employees as the Holding Companies have no employees. Sasson, Blumkin, and Behar are the sole owner, member, and manager of their respective Holding Company.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

81. SFS, its Client Services Subsidiaries, and the Holding Companies also share leadership. Consumers who attempt to call the Façade Firm they believe represents them reach customer service representatives who are often paid by SFS. Ryan Sasson has represented that these customer service representatives work for SFS's Client Services Subsidiaries. The customer service representatives report to the Senior Director of Client

Services and Senior Director of Customer Services. Both of these Senior Directors report to the Vice President of Client Service Operations who directly reports to SFS CEO Ryan Sasson. Sasson, Blumkin, and Behar are each the sole owner, member, and manager of their respective Holding Company and also serve as Directors on SFS's Board. Sasson and Blumkin have also served as officers of SFS.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

82.    Because the Client Services Subsidiaries and the Holding Companies are in a common enterprise with SFS, they are liable for SFS's actions under the TSR. *See infra* ¶¶ 66-81.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## INDIVIDUAL DEFENDANTS BLUST, GUSTAFSON, BURNETTE AND GALLAGHER

83.    Jason Blust is an attorney who created and maintains multiple Façade Firms designed to conceal SFS's involvement in the debt-relief service. He controls and oversees the operations of all of the Façade Firms and the Blust Companies. He directs consumer funds to himself through some of the Blust Companies, at least, including Relialit, LLC (Relialit) and Lit Def Strategies, LLC (Lit Def). Jason Blust resides in Lake Barrington, Illinois. He entered into a stipulated judgment with the United States Bankruptcy Trustee for the District of Kansas regarding numerous violations of bankruptcy law arising from the scheme alleged in this complaint. Judgment, *U.S. Trustee Lashinsky v. Blust,* No. 18-06046, Doc #17 (Bankr. D. Kan. 2018). Jason Blust knows or should know that the conduct alleged herein is illegal. He is also a former attorney at Legal Helpers. Jason Blust knows or should know, based on the Legal Helpers matters discussed in Paragraph 53, that it is illegal to charge up-front fees for telemarketer-sold debt-relief services and

that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.

**ANSWER:** Blust admits only that Jason Blust is an attorney who has worked with multiple law firms and entities during his career, and that Jason Blust resides in Lake Barrington, Illinois. Blust denies that the claims in the Second Amended Complaint as to Jason Blust have merit and denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

84.    At all times material to this Complaint, acting alone or in concert with others, Jason Blust has exercised substantial control over and involvement in the establishment of the Façade Firms' business policies and practices described in this Complaint. Jason Blust recruited attorneys to help run, or serve as figureheads for, the Façade Firms, including at least one SFS employee who simultaneously serves as a member of multiple Façade Firms while working for SFS. At all times material to this Complaint, Jason Blust has exercised managerial responsibility for the Façade Firms and has materially participated in the conduct of their affairs, in part through the Blust Companies. He also has responded to consumer complaints regarding the Façade Firms and acts as a liaison between the Façade Firms and SFS.

**ANSWER:** Blust admits only that Jason Blust has worked with multiple law firms and entities during his career. Blust denies that Plaintiffs have defined "Façade Firm" in the Second Amended Complaint and denies the claims in the Second Amended Complaint as to Jason Blust have merit. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

85. Richard K. Gustafson II is an attorney who owns and manages nine Façade Firms. He formed Boulder Legal Group in 2015, Canyon Legal Group in 2017, Gustafson Consumer Law Group, LLC d/b/a White Oak Law Firm in 2020 (registered in New York as a foreign corporation), and Meadowbrook Legal Group in 2021. He also owns Hailstone Legal Group, which was founded in 2022. In approximately 2022 he became owner of Stonepoint Legal, Harbor Legal Group, Royal Legal Group, and Slate Legal Group. According to Gustafson, of those nine firms, only White Oak Law Firm, Meadowbrook Legal Group, and Hailstone Legal Group were actively enrolling clients in the beginning of 2024; the other six firms purportedly continued to represent consumers that were previously assigned to them by SFS. Royal Legal Group and Hailstone Legal Group purportedly offer or offered only deferred-fee debt-settlement products, while the other firms offer or offered advance-fee debt-settlement products. Gustafson is also a minority member or Class B member of Golden Law, the Brandon Ellis Law Firm, and Whitestone Legal.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

86. On March 15, 2024, various Façade Firms submitted an insurance claim for attorney's fees; that claim lists Gustafson as the current contact person for every one of those firms, including the following:

- Anchor Law Firm, PLLC d/b/a Law Offices of Stacy Robinson and Associates;
- Florio & Associates, PLLC d/b/a Bedrock Legal Group;
- Boulder Legal Group, LLC;
- Jon Schulte & Associates, LLC d/b/a Canyon Legal Group;
- Henry Legal Group, PLLC d/b/a Heartland Legal Group;
- Burnette Legal Group, LLC d/b/a Monarch Legal Group;
- Law Office of Mercedes Gustafson, d/b/a Northstar Legal Group, LLC;
- Law Offices of Gardner Legal LLC d/b/a Option 1 Legal;
- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

33

- Donald Norris & Associates, LLC d/b/a Royal Legal Group, LLC;
- Law Office of Melissa Michel LLC d/b/a Spring Legal Group;
- Gustafson Consumer Law Group, LLC d/b/a White Oak Law;
- Law Offices of the Sands Law Group, LLP d/b/a Whitestone Legal Group;
- Law Office of Guillermo Geisse, d/b/a WyoLaw, LLC;
- Brandon Ellis Law Firm, LLC;
- Dakis Legal Group LLC d/b/a Clear Creek Legal, LLC;
- The Law Firm of Derek Williams, LLC d/b/a Infinite;
- Hallock and Associates, LLC;
- Michel Law, LLC d/b/a Level One; and
- Pioneer Law Firm, PC.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

87. Gustafson is a former partner of Legal Helpers. Gustafson was also a former Class B member (i.e. local attorney) at The Mortgage Law Group (TMLG), a mortgage-assistance relief services provider that the CFPB sued for taking up-front fees, failing to make required disclosures, and making deceptive statements. Similar to SFS, TMLG used Class B attorneys. The district court in the TMLG case found that the Class B attorneys' involvement consisted primarily of "pro forma document review" and that their relationship to the defendants was an "obvious, even cynical, attempt to avoid the Bureau's ability to regulate practices that have otherwise been deemed illegal for many years." *CFPB v. The Mortgage Law Group*, 366 F. Supp. 3d 1039, 1050 (W.D. Wis. 2018). The Court, in finding that the role of the Class B attorney was "by design almost always perfunctory, rather than substantive," further explained that "apart from responding to simple questions posed by a national attorney from a checklist during a 15-minute phone call, clients did not have a substantive discussion, if any at all, with any attorney until after they had been informed (or in many cases, misinformed) about the scope of the defendants' services, signed a retainer agreement, paid a sizable advance fee, and submitted their financial documentation." *Id.* at 1051. The court awarded restitution and penalties to the Bureau while also

banning several of the principals from participating in mortgage-assistance relief services.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

88.    At all times material to this Complaint, acting alone or in concert with others, Gustafson has exercised substantial control over and involvement in White Oak Law Firm, Meadowbrook Legal Group, Hailstone Legal Group, Boulder Legal Group, and Canyon Legal Group. Since 2022, he has exercised substantial control over and involvement in Stonepoint Legal, Royal Legal Group, Harbor Legal Group, and Slate Legal Group. On behalf of these nine Façade Firms, Gustafson signs the tax returns, approves the expenses, reviews metrics, and communicates with all of the service providers.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

89.    Timothy F. Burnette is an attorney. As of 2018, he was the sole owner of bank accounts for Gardner Legal LLC; as of 2019, he was the sole owner of bank accounts for Burnette Legal Group, d/b/a Monarch Legal Group (registered in New York as a foreign corporation); and as of 2020, he was the sole owner of bank accounts for Henry Legal Group LLP. Burnette was also involved with WyoLaw: he is listed on the LLC formation paperwork as a party to receive notices on behalf of WyoLaw, and in 2019 he signed a document filed with the Florida Secretary of State on behalf of WyoLaw, LLC. In 2019, he filed a document with the Wyoming Secretary of State on behalf of The Sands Law Group, LLP and he signed contracts with a notary-provision company on behalf of Henry Legal Group LLP d/b/a Heartland Legal Group and Gardner Legal LLC d/b/a Option 1 Legal. In 2020, Burnette signed an affidavit claiming that he was outside counsel for Anchor Law Firm, PLLC. Burnette also responded to consumer complaints on behalf of Boulder Legal Group, LLC, Gardner Legal LLC d/b/a Option 1 Legal, Northstar

Legal Group, LLC, and WyoLaw, LLC, and in his responses he identified himself as the attorney for those firms. Moreover, the 2024 insurance claim document described in Paragraph 86 lists Burnette as the current contact person (along with Gustafson) for the Law Offices of Gardner Legal LLC d/b/a Option 1 Legal, Burnette Legal Group, d/b/a Monarch Legal Group, and Henry Legal Group PLLC d/b/a Heartland Legal Group.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

90.    At all times material to this Complaint, acting alone or in concert with others, Burnette has exercised substantial control over and involvement in various Façade Firms, including Gardner Legal LLC d/b/a Option 1 Legal, Burnette Legal Group, d/b/a Monarch Legal Group, and Henry Legal Group PLLC d/b/a Heartland Legal Group.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

91.    Michelle Gallagher (née Hinds) is an attorney who owns Façade Firms Chabner Legal Group, LLC and Hinds Law LLC a/k/a First America Law (registered in New York as a foreign corporation). As of 2020, she was the sole owner of bank accounts for Façade Firms Hallock & Associates, LLC, the Brian A Moore Law Firm LLC, and the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group. In March 2020, Gallagher signed a contract with a notary-provision company on behalf of the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group. Between approximately 2020 and 2024, she helped manage the day-to-day operations at Lit Def and Fidelis Support Services, LLC (Fidelis). In the past, she also worked for Client First Bankruptcy, owned by Jason Blust.

36

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    92.    At all times material to this Complaint, acting alone or in concert with others, Gallagher has exercised substantial control over and involvement in Lit Def, Fidelis, Chabner Legal Group, LLC, Hinds Law LLC a/k/a First America Law, Hallock & Associates, LLC, the Brian A Moore Law Firm LLC, and the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    93.    Blust, Gustafson, Burnette, and Gallagher know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## BLUST COMPANIES

    94.    Lit Def and Fidelis provide substantial assistance to SFS's debt-relief operations by purportedly facilitating litigation support on behalf of the Façade Firms. SFS markets this litigation support to consumers as an

additional benefit of the debt- relief products.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

95.    When SFS receives notice that creditors have sued a consumer enrolled in the law firm debt-relief service, SFS does not send the filings to the law firm listed on the consumer's engagement letter. Instead, SFS forwards those filings to Lit Def and Fidelis. Lit Def and Fidelis perform data entry for these lawsuits. Then Lit Def or Fidelis acts as a hub and purportedly sends filings to contracted litigation or appearance attorneys. Lit Def also coordinates payments from consumers' escrow accounts at RAM and Global to pay any litigation-related expenses such as filing fees and attorney appearance fees, although many consumers complained that the promised litigation defense was not provided. Jason Blust owns Lit Def and controls Lit Def and Fidelis.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

96.    In approximately 2021, Lit Def began transitioning into Fidelis; Fidelis is Lit Def's successor. Fidelis hired many of the same people who worked for Relialit and Lit Def, and, for a period of time, those employees performed the same litigation support roles for both Fidelis and Lit Def. The operations of the two companies are interwoven. The companies lack formal boundaries and share a single set of staff, management, customers, procedures, instrumentalities, and work.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

97.    Relialit was a predecessor to Lit Def and, like Lit Def and Fidelis, provided litigation support to the Façade Firms. Relialit was owned and controlled by Jason Blust and is, according to Blust, now defunct.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

98. Hedgewick Consulting, LLC (Hedgewick) is a consulting company owned and controlled by Jason Blust that provides services to the Façade Firms in exchange for consulting fees. One of the Façade Firm attorneys described Hedgewick as providing a "team of experts" who arranged the partnership between his Façade Firms and SFS, designed and set up the firms' websites, drafted the client enrollment forms, recommends lawyers to join the firms, and coordinates contracts between Façade Firms and service providers. The Blust Companies know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust owned Hedgewick Consulting, LLC. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## RELIEF DEFENDANTS

99.     Relief Defendant Strategic Employee Stock Ownership Trust (Strategic ESOT) holds all the shares of SFS stock. In May 2017, Strategic Financial Solutions, LLC adopted the Strategic Employee Stock Ownership Plan (Strategic ESOP) and became the ESOP's sponsor. SFS companies reorganized in December 2017, and Strategic Family, Inc. became the parent company. In December 2017, the Strategic ESOP purchased all the shares of Strategic Family, Inc.'s common stock funded by the Strategic ESOT, thus making Strategic Family, Inc. wholly employee owned. The Strategic ESOT may maintain funds held in trust, while the ESOP determines how the ESOT is administered, who participates in it, and who runs the day-to-day operations.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

100.    Relief Defendant the Blust Family 2019 Irrevocable Trust is controlled by Paul Hull, Jr., Trustee. Hull was a partner in TMLG and Legal Helpers. The trust owns Lit Def. Jason Blust funnels consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS into the Blust Family 2019 Irrevocable Trust via Lit Def.

**ANSWER:** Blust admits only that Paul Hull is the Trustee for the Blust Family 2019 Irrevocable Trust. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations regarding Hull's employment history. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint and denies the remaining allegations in this Paragraph.

101.    Jason Blust funnels consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Relief Defendant Jaclyn Blust via Lit Def and the Blust Family 2019 Irrevocable Trust.

40

**ANSWER:** Denied.

102.    Relief Defendant Cameron Christo is purportedly the founder and chief executive of Defendant Fidelis, but, in reality, Jason Blust controls Fidelis. Many of the debt-settlement law firms that Fidelis claims to service are controlled by or related to Jason Blust.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

103.    Emails suggest that Blust was involved in management decisions for Fidelis as recently as late 2023. For example, in November 2023, Blust sent emails to employees of Lit Def or Fidelis directing them to gather documents for an ongoing litigation. Christo was not on the email.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

104.    On March 1, 2021, Christo established the Bush Lake Trust, an irrevocable trust for the benefit of Christo's children. Timothy Miller is the Trustee. On the same day, Christo transferred his ownership of Fidelis to the trust.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

105.    From May 2021 to October 2023, Fidelis paid more than $15.7 million to Christo (including payments to an LLC formed by Christo) and more than $3.6 million to the Bush Lake Trust.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

**OVERVIEW OF DEFENDANTS' DEBT-RELIEF SERVICES SCHEME**

106.    Since at least January 2016, SFS has marketed and sold debt-relief services to consumers.

41

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

107.    Defendants operate two different debt-relief programs: (a) a deferred-fee model in which consumers often do not pay fees until Defendants settle a debt for them, and (b) an advance-fee model that generally takes advance fees before the relevant debt has been settled. According to the court-appointed Receiver, the advance-fee model is the primary business of SFS and, prior to January 2024, "account[ed] for roughly 80% of their revenues," while the deferred-fee model "account[ed] for 16% of revenue."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

108.    Through at least late 2022, SFS marketed its debt-relief services via the U.S. Mail, the Internet, and outbound or inbound telephone calls to or from consumers, including via interstate phone calls. One way that SFS attracted financially distressed consumers is through direct mail solicitations suggesting that the consumers had been pre-approved for a debt-consolidation loan or might be eligible for such a loan. These solicitations encouraged the consumer to "apply" and provided a phone number to call for more information.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

109.    Most or all of these solicitations were sent by MEC Distribution, LLC (formerly known as Mandaree Enterprises, LLC). This company claims to be owned by the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara Nation) of the Fort Berthold Reservation in North Dakota. From November 2016 to March 2021, SFS paid at least $135 million to MEC Distribution and its subsidiaries.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

110.    When a consumer called the number provided on the solicitation, an SFS sales employee who was not an attorney answered the phone and

42

gathered additional information from the consumer. In the end, the consumer who was trying to apply for a loan was typically told that they did not qualify for the debt-consolidation loan, and the SFS sales representative tried to convince the consumer to enroll in the debt-relief service instead.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    111. The SFS sales employees go over the structure of the debt-relief service and the paperwork with consumers by phone. For those consumers who enroll in the program, the decision concerning whether to enroll in the debt-relief service is made by phone.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    112. If the consumer agreed to enroll in the debt-relief service, then SFS connected the consumer with a Façade Firm and arranged for the Façade Firm to provide debt-relief services for the consumer in exchange for the consumer paying fees.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    113. Generally, once a consumer agreed to sign up for the debt-relief service, a team at SFS decided which notary would be assigned to the enrollment and then considered the cost of using that particular notary against the projected amount that SFS would likely make in fees from the debt that consumer would enroll. If SFS decided to move forward with enrolling the consumer, SFS (not the Façade Firm) arranged a meeting between the consumer and a third-party notary, who was not an employee of SFS, a Client Services Subsidiary, or a Façade Firm. The notary was typically paid a nominal fee simply to get the documents signed, had limited

knowledge about the contents of the documents being signed, and could not answer any questions about their content. Some notaries were paid more for the meeting if the documents were fully signed.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

114. Once a consumer signed the enrollment documents, an attorney from the assigned Façade Firm contacted the consumer and read a short script welcoming the consumer to the program. This rote "attorney welcome call" was often the only time the consumer spoke to an attorney in connection with the SFS debt relief program.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

115. Upon enrollment, SFS representatives instructed consumers to stop paying debts they enrolled in the program. The SFS representatives also told some consumers that creditors were more likely to settle debts when their accounts were delinquent.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

116. SFS representatives also instructed consumers not to speak with their creditors if the creditors contacted the consumers, and SFS sometimes gave consumers a script to follow during calls with creditors.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

117.    Upon enrolling in the program, consumers enrolled in the advance-fee model were required to immediately begin making monthly payments into an escrow account managed by either RAM or Global, two payment processors with which SFS or the Façade Firms have contracted.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

118.    Representatives of SFS or the Client Services Subsidiaries told consumers that once they had saved enough money in those escrow accounts, the money would be used to settle the consumers' debts for less than they owe.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

119.    Some consumers reported that when they started to complain about the fact that their debts were not being settled or their creditors were not being paid, SFS or the Client Services Subsidiaries instructed them that they could pay even more into their escrow accounts so that the debts could be resolved.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

120.    To the extent that debts are settled for consumers enrolled in the debt-relief service, these negotiations were carried out under the supervision of SFS. From 2016 to 2020, the negotiators were employees of SFS. In late 2020, the negotiators were re-classified as employees of the Façade Firms, but they continued to operate functionally as SFS employees. These negotiators were hired and fired by SFS, they were paid through SFS (even if they also received W-2s from the Façade Firms), they reported to SFS personnel, and some of them worked from SFS's Buffalo office. Once a consumer was enrolled in the debt-relief service, nearly all

45

their interactions with their assigned law firm were not with law firm employees but with SFS employees. In fact, the Façade Firm attorneys were assigned to huge numbers of clients: in 2023, one attorney was assigned to 1,554 clients and had a current caseload of 2,778 clients.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

121. When consumers tried to call their designated Façade Firm after they enrolled in the program, their calls were typically routed to SFS representatives who were not attorneys but who held themselves out as representatives of the Façade Firm the consumer believed was representing them. In reality, these representatives were employed by SFS-controlled entities, including the Client Services Subsidiaries. These representatives are primarily located in a call center in Buffalo, NY or New York, NY.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

122. During the enrollment process, SFS representatives often told consumers that enrollment in the program included litigation defense services and that a lawyer would represent them in any lawsuit related to non-payment of enrolled debts. Similarly, the retainer agreements consumers signed with Façade Firms promised that the firm lawyers would provide litigation defense if the consumer was sued by creditors while participating in the debt-relief service. But each contract also contained a loophole provision allowing the Façade Firm to avoid participating in the litigation if the assigned lawyer determined that the consumer is not likely to gain a favorable result. Indeed, consumers reported that Façade Firm lawyers almost never represented them when

46

they were sued by creditors even after the consumers paid the retainer fee.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## NOTARY MEETINGS AS PART OF THE ENROLLMENT PROCESS

123. As noted in Paragraph 113 above, as part of the enrollment process the Façade Firms contracted with third party notary-provision companies, including Sunshine Signing Connection, Inc., NotaryGO, and National Paralegal & Notary (collectively Notary Companies), to send independent contractor notaries to obtain signatures on the enrollment paperwork and the retainer agreement.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

124. The contracts required the notaries to confirm appointments with the consumers and to oversee the execution of documents, including "getting all appropriate signatures from the client."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

125. The notaries operated as independent contractors of the notary-provision companies. The notaries chose when they wanted to work and which assignments they accepted.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

47

truth or falsity of the allegations in this Paragraph.

126.    The notaries met with consumers at locations convenient for the consumer, including coffee shops and restaurants. The meetings did not all occur in person, however. In particular, during the COVID-19 pandemic, many of these notary meetings took place through Zoom or over the phone without any in-person meeting at all. Even apart from the pandemic, some consumers report never having met in person with anyone in connection with enrolling in the debt-relief service.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

127.    According to representatives from and owners of the notary companies, the notaries' job during these meetings was *not* to sell debt-relief services for SFS or the Façade Firms. Rather, the notaries were present to notarize the consumer's signature.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used

throughout the Second Amended Complaint. Answering further, Blust lacks

knowledge and information sufficient to form a belief as to the truth or falsity of the

allegations in this Paragraph.

128.    Notaries also did not consider themselves to be sales agents. One notary testified: "I do not sell them the content of the documents, I do not market them, and I'm specifically told that I do not provide any legal, financial, or accounting advice. I do not represent the credit card company. I do not represent the law firm. I do not represent the requester. My job is simply a notary. I get the documents, and I show them the instructions, and they initial and they sign, and I notarize. That's what I do. I don't do anything else."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

129.    The notary meetings were typically brief, formulaic, and non-

48

substantive. For instance, one consumer described the notary process as a "flyby presentation" and said that the notary, who made clear he could not explain things because he was just a notary and not an employee, seemed "like a robot going through a script."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

130.    SFS executives have acknowledged that the notary meetings are cursory and non-substantive. According to a Senior Vice President of Sales at SFS:

[A]ll we do is just get these people to just kind of pencil whip and sign [the contract] . . . . It doesn't seem like it's as meaty as we make it sound. . . I didn't realize we don't give 'em a copy of the contract when they sign.

In the same conversation, a Senior Director of Negotiations replied:

I agree with you, it's almost like you're pencil-whipped into signing that day because since you already came all the way here, you know just let's get through this – and I think they just made it more fluffy you know as far as the um presentation, if you will, and they sign the presentation – so I mean it's almost like a CYA on our end.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

131.    The contracts between the Façade Firms and the Notary Companies did not require the individual notaries to have any substantive knowledge of the product or the company or to be able to meaningfully interact with consumers on behalf of the company about the product. While the contracts required the notaries to give an "in- person presentation," they did not require the notary to have any understanding of the presentation or to even read it beforehand. Although SFS sometimes provided a script for notaries to read, the notaries often did not read the script or make any type of presentation to the consumer. Moreover, some notaries testified that even when they received the script or presentation and read that document to the consumer, they simply read the document verbatim and did not tell the consumer anything about the debt- relief service beyond the words contained in that document.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

132. The contracts between Façade Firms and the Notary Companies also did not require the individual notaries to answer consumers' questions about the product or the company. And at least two notary companies used by SFS specifically instructed the notaries *not* to answer questions from consumers during in-person meetings related to the debt-relief services.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

133. In practice, if a consumer had a question or concerns while signing the contract, the Notary Companies or the individual notaries called SFS by phone so that the consumer could direct their question or concerns to someone from SFS.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

134. Consumers also reported that when they asked the notaries substantive questions, the notaries often advised the consumer to direct their questions to the sales representative (an employee of SFS or the Client Services Subsidiary) with whom the consumer previously spoke or referred the consumer to the documents they were signing.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

135. Neither the notaries nor the notary-provision companies were agents of the Façade Firms. In fact, the contracts between several Façade Firms and at least one notary company that receives 90% of its revenue from the Façade Firms stated that "no relationship is created by this Agreement that could any way imply . . . (b) an authorization for either party to act as agent or representative of the other…."

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

136. The meetings between these third-party contractors and consumers were brief and perfunctory and did not provide the consumers with direct or substantive interaction with the seller of the product the consumer was purchasing; the only direct or substantive interaction consumers could have with anyone from SFS before they signed the contract was by phone.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

137. At the conclusion of the notary meeting, the consumer was generally left with a "Welcome Packet" that contained only an email and phone number, which both routed to SFS. The Welcome Packet generally did not contain contact information for the assigned Façade Firm or any lawyer.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

138. At times, SFS offered notaries limited training concerning the process

51

to notarize the consumer enrollment documents, which sometimes consisted of reviewing  a script and PowerPoint presentation to use during the signing, watching a video, and taking a quiz. But the training was not always required or may have occurred after the in-person meeting with the consumer. Moreover, when notaries were required to take a quiz, they could retake that quiz as many times as needed to obtain a passing score. Although training documents often listed the names of the Façade Firms, in reality the Façade Firms had little to no involvement in the notaries' training.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

139. Outside consultants, including Hedgewick, drafted the scripts and tests for the notaries. Hedgewick had the final say on changes to the scripts. Hedgewick also coordinated contracts between Façade Firms and notary companies and maintained signed copies of the contracts.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

140. Defendants Sasson, Blumkin, and Blust, at least, were involved with the notary process. In 2020, the head of a notary company emailed Sasson and Blust and expressed concerns about how shelter-in-place rules during the pandemic (and a resulting decline in in-person notary meetings) would affect her business. Sasson responded, copying Blust, and said "[g]ive us some time to talk to the law firms and come back to you." Also in 2020, Blumkin emailed himself a list titled "Notary Companies Reached Out To." In 2020, Sasson and Blust received an email about the switch from in-person meetings to video presentations due to COVID-19. And in 2019, an SFS employee forwarded feedback

from notaries about the retainer agreements to Jason Blust.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## FEES DEFENDANTS CHARGE CONSUMERS

141.    Individual Defendants Sasson, Behar, and Blumkin controlled SFS and oversaw development of the company's debt-relief products, including the practice under the advance-fee model of taking advance fees prior to any settlement, and each of these Individual Defendants was aware that SFS took these advance fees.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

142.    A PowerPoint presentation submitted to CIBC bank in Q3 2017 seeking financing for SFS identifies Sasson, Behar, and Blumkin as owners and founders of Strategic Financial Solutions. The report states that Strategic Financial Solutions "developed the sales and servicing process to offer a compliant advance fee product . . . [t]he decision to operate sales and servicing functions in house allows the Company to exercise complete control over the sales and servicing process."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

143.    The documents that consumers signed often included information about the fees the consumers would be charged and advised that such fees would begin at the outset of the arrangement, regardless of whether any settlements had been reached with the consumers' creditors. One example provided by a consumer included fees such as a "retainer fee," "a service cost," "a legal admin fee," and "a banking fee."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

144.    According to M.L. Clark, President of SFS, SFS's schedule of fees

53

"heavily" front-loaded the advance fees for the advance-fee model.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

> 145. Consistent with Defendants' direction, RAM and Global: (i) withdrew funds from a consumer's bank account through ACH transfer and deposited them into the consumer's escrow account; and (ii) transmitted funds for processing and servicing fees from the consumer's escrow account to themselves, the Client Services Subsidiaries, the Façade Firms, and sometimes SFS.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

> 146. Immediately after a consumer enrolled in the advance-fee service, fees were deducted from their escrow accounts with RAM or Global. This deduction occurred before SFS, the Client Services Subsidiaries, or the Façade Firms settled any debts. These fees included retainer fees, service fees, and legal administrative fees. Consumer testimony confirms that fees were withdrawn from their escrow accounts before any debts were settled.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

> 147. The fees Defendants charged consumers as part of this debt-relief service were substantial. A sample of payment data from RAM for approximately 34,000 consumers enrolled in SFS's advance-fee program over an approximately five-year period shows that these consumers

54

collectively paid over $104,000,000 in fees to Defendants and the Façade Firms (including retainer fees, legal admin fees, and service fees) before any debt-relief payments were made to creditors. This figure does not include fees collected from Global. As explained below, a large portion of the fees collected through RAM and Global was ultimately funneled to SFS or the Individual Defendants.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

148. During the five-year period of time covered by the sample, no one working on behalf of SFS (including representatives for the Client Services Subsidiaries and Façade Firms) settled any debt for approximately one-third of consumers who paid into the advance-fee program.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

149. Furthermore, the service fee that Defendants charge for the debt-relief program was often based solely on a percentage of the consumer's enrolled debt; the fee was not based on the individual debt settlements that the program achieves. In particular, when the consumer had multiple debts that were eventually settled one at a time, the service fee was not proportional to the amount of debt actually settled or based on a fixed percentage of the amount saved. Likewise, the retainer fee, administrative fees, and other fees were not based on individual debt amounts or the debt settlements that the program achieved.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

55

truth or falsity of the allegations in this Paragraph.

150.     Charging consumers these high fees and withdrawing them from their accounts on the front-end, before settling any of their debts, hindered Defendants' ability to settle consumers' debts at all. For instance, some advance-fee consumer contracts advised that individuals often needed to accumulate approximately 25% of the "then-current balance of a debt" in their account (e.g., $2,500 for a $10,000 debt) before a good-faith offer could be made to settle a debt with a creditor. But it was difficult for a consumer to accumulate a balance that high in their escrow account when SFS, the Client Services Subsidiaries, and the Façade Firms were withdrawing large fees from it each month, leaving only a small amount to fund potential settlements.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

151.     According to account statements for one consumer who enrolled in the debt-relief service, E.S., she paid approximately $2,114 into her account before the first payment was made to a creditor. Prior to this payment being made, approximately 91% of the funds the consumer paid into her account (roughly $1,900) were withdrawn as fees. During the entire period this consumer was enrolled in the debt-relief service, approximately 84% of the funds she paid into her account were deducted as fees and only 16% of the funds were paid to creditors.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

152.     Similarly, another consumer, P.G., paid approximately $7,452 into her account before the first payment was made to a creditor. Before that payment was made, roughly 68% of the funds the consumer paid into her account had been deducted to cover fees. During the entire period the consumer was enrolled in the debt-relief service, roughly 64% of the funds she paid into her account were deducted as fees and only 6.5% of

the funds were paid to creditors. The remainder was refunded after the attorney that she believed had been representing her, Daniel Rufty, was suspended by the North Carolina State Bar.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## ALLOCATION OF FEES AMONG DEFENDANTS

153. Despite the labels associated with each fee charged to consumers enrolled in the debt-relief service, the money was not always distributed consistent with its described purpose. For example, records from RAM show that at times, the Client Services Subsidiaries—which purportedly did not provide legal services—received legal retainer fees, in addition to service fees and legal administrative fees.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

154. Similarly, records from RAM show that the Façade Firms received not just legal retainer fees, but also sometimes received service fees and legal administrative fees.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

155. The lack of concern about which entities received which fees demonstrates the interrelatedness of SFS, the Client Services Subsidiaries, and the Façade Firms.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks

knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

156. An analysis of bank records further demonstrated that SFS and its Client Services Subsidiaries operated as a common enterprise.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

157. Although the Façade Firms typically signed the contracts with RAM and Global, RAM and Global directly paid the Client Services Subsidiaries substantial amounts of money. For example, from September 2016 to July 2018, bank records showed that Global paid Boulder Client Services approximately $46,000,000 and paid Anchor Client Services approximately $21,000,000. Similarly, from February 2017 to July 2018, RAM paid Bedrock Client Services approximately $30,000,000.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

158. Bank records show that shortly after receiving money from RAM and Global, the Client Services Subsidiaries transferred nearly all of the money to SFS. For example, between October 2016 and August 2018, Boulder Client Services transferred approximately $46,000,000—the same amount it received from Global—to various SFS accounts, including accounts held by Strategic Client Support, LLC, Strategic Financial Solutions, LLC, Strategic NYC, Inc., Strategic CS, LLC, and Strategic Consulting, LLC. Similarly, between November 2016 and August 2018, Anchor Client Services transferred approximately $20,000,000—around 95% of what it received from Global— to various SFS accounts, and between February 2017 and August 2018, Bedrock Client Services transferred approximately $29,000,000—around 96% of what it received from RAM— to various SFS accounts.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

159. RAM records show that Defendant Versara Lending, LLC, ostensibly a lender, received fees from debt-relief consumers. Records from Valley Bank show that, from October 2016 through August 2022, Versara Lending, LLC received over $177 million in incoming wires and net transfers from various SFS entities. Records from Valley Bank also show that Versara Lending, LLC wired over $85 million to Versara DNLFA, LLC, which may be another name for Versara Lending, LLC.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

160. Indeed, Defendants Blust and Sasson had an agreement that overall, SFS would receive 80% of all client (or consumer) fees while the Façade Firms would receive 20%.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

### SFS'S MODEL EVOLVES OVER TIME

161. Consumer complaints, bank records, and website records suggest that SFS currently operates through additional companies, many of which purport to be law firms. Based on Defendants' practice of regularly changing company names or establishing new entities, Plaintiffs believe that there are additional Client Services Subsidiaries and Façade Firms that Plaintiffs have yet to identify. Façade Firm attorney James Agosto testified in January 2024 that he was in the process of creating a new debt-settlement firm when the Temporary Restraining Order was issued. Dkt. 12.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

162.  Bank records also show that Law Offices of Amber Florio, LLC d/b/a The Commonwealth Law Group, PLLC received money from the following Façade Firms:

- Florio & Associates, PLLC, d/b/a Bedrock Legal Group, f/k/a Raggio & Associates, PLLC;
- Boulder Legal Group, LLC;
- Greene Legal Services, LLC d/b/a Newport Legal Group;
- Harbor Legal Group, LLC;
- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;
- JMS Industries, LLC d/b/a Canyon Legal Group;
- Royal Legal Group, LLC;
- The Sands Law Group d/b/a Whitestone Legal Group; and
- WyoLaw d/b/a Summit Law Firm.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

163.  In addition, the following companies are affiliated with Blust or made payments to Relialit or Lit Def:

- Chinn Legal Group d/b/a Slate Legal Group;
- Colonial Law Group;
- Crimson Legal Group, LLC d/b/a Fontana Law Group, LLC;
- Dubin Legal Group d/b/a Ascend Legal Group;
- Frontier Consumer Law Group a/k/a Leigh and Laruwe Law Firm;
- The Law Office 554;

60

- Law Office of Melissa Michel LLC d/b/a Spring Legal;
- Law Offices of Arne Skatrud & Associates d/b/a Cornerstone Legal Group LLC;
- Law Offices of Brandon S Chabner d/b/a Golden Law LLP;
- Lori Leigh & Associates d/b/a Phoenix Legal;
- Northstar Legal Group , LLC;
- Strong Law Group PLLC; Turnbull Law Group, LLC f/k/a Turnbull & Associates; and
- Watson Law d/b/a Corporate Legal Network.

**ANSWER:** Blust admits only that Jason Blust has worked with multiple law firms and entities during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

## CONSUMER HARM

164.    Regardless of how SFS changes its corporate form, consumers continue to be harmed. For example, consumer C.E. was still paying fees to the common enterprise in September 2023. After being enrolled in the common enterprise's debt relief program for nearly four years and paying around $26,000 in fees, he still owed approximately $18,000 to four creditors for debts that he had enrolled in the debt-relief program.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

165.    The amounts that consumers paid Defendants were significantly greater than the actual amounts of debt that Defendants settled for the consumers. In fact, most of the amounts consumers paid were applied by Defendants to pay fees, rather than towards building reserves to pay consumers' creditors.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

166.    Many consumers enrolled in SFS's debt-relief service received zero or little benefit in the form of settled debts and, instead, ended up owing

creditors more money than when they started.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

168. The data sample from RAM referenced above in Paragraph 147 indicates that, on average, consumers participated in the program for eight months before Defendants settled any of their debts. It also suggests that Defendants do not settle *any* debts for many consumers enrolled in their program.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

168. The court-appointed Receiver found that approximately 70% of consumers who enrolled in the advance-fee program later cancelled their service. From January 2017 to January 2024, approximately 107,185 enrollees in the advance-fee service who later cancelled paid SFS $64.7 million more than the amount they saved off the face value of their debts.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

169. In addition, when consumers stopped paying their debts (as directed by Defendants), creditors often added interest and fees to their accounts and were likely to, and did in fact, sue them for nonpayment. If the creditors obtained judgments, they could garnish consumers' wages or freeze their bank accounts. Consumers' credit scores often plummeted.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

170. Many consumers were understandably concerned about the potential adverse impact of stopping payment on their credit cards. When consumers asked direct questions about these issues SFS's salespersons routinely told consumers that they were very unlikely to be sued and that their credit scores would only suffer a small reduction, that the

reduction would be temporary, and that their score would increase substantially once their debts were settled through the program. These representations were misleading and deceptive.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

171. Defendants also routinely describe their programs as having a "zero percent" interest rate, since the amount of their payments were fixed at the time of enrollment. These representations were misleading and deceptive because Defendants were not offering consumers enrolled in in their debt-relief program a loan and many creditors did in fact add interest and fees once consumers stopped paying. Many consumers ended up exiting Defendants' debt relief program owing creditors more than when they began the program.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

172. When attempting to enroll consumers in the SFS debt-relief program, salespersons often made misleading, deceptive, and fraudulent statements to encourage consumers to enroll. Defendants were aware of hardball sales tactics and encouraged such behavior. SFS paid bonuses to sales representatives that successfully sold their debt-relief scheme, which resulted in substantial fees to Defendants, while promptly terminating those that failed to do so.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

173. Consumers often learned from creditors that neither Defendants nor the Façade Firms ever contacted them. Unaware that this could occur, consumers often stopped communicating with their creditors based on Defendants' instruction. For example, one consumer, K.L., enrolled in the debt-relief service in October 2019. After a default judgment was entered against the consumer with regard to one debt in June 2021, the consumer reached out to two other creditors with whom Defendants were supposed to be negotiating. The consumer learned from these

creditors that nothing had been paid on these debts since she enrolled in the debt-relief service twenty months prior and no one from any of the Defendants or the Façade Firms had contacted the creditors.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

174.  Consumers were led to believe that they had an attorney and law firm to represent them should their creditors sue, but many consumers received no such representation, despite having paid significant retainer and legal fees. These representations by Defendants were misleading and deceptive. When consumers relied on these false representations, sometimes courts entered default judgments against them or the consumers had to represent themselves in court.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

175.  Even when consumers withdrew early from the program, the amount of money in their escrow account had been substantially drained by fees, regardless of whether any enrolled debts have been settled.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

176.  For example, one consumer, S.M., was in the program for approximately four years, during which his Global account statements show he made net payments into his escrow account of approximately $19,841 and only one debt was settled in the amount of approximately $8,524. Yet when the consumer withdrew from SFS's program, his escrow account contained only $666. The remaining $10,651 had been deducted from his account to cover fees.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

177.    A Senior Director of Client Services acknowledged this problem in a call with a Senior Director of Customer Service:

I gave him [VP of Client Service Operations] the scenario I've given him 1200 times, which is[:] a client's been in the program four months, wants to cancel. Can't save, [consumer]I want my money back. [SFS rep] Here's your $20. [consumer] Where is the other $900 I gave you? [SFS rep]Oh, sorry, that was service fees.' [consumer] Well I want it back. What do they [SFS reps] do? What do they do? Do we give them the authority to refund the $900 or is it going to Tier 2? So he's like well no, I think it needs to go to Tier 2.

The Senior Director of Client Services went on to explain that Tier 2 was not adequately staffed to handle the volume of calls in which consumers request refunds: "[a]lmost every single call, people want refunds."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

178.    SFS designed its program to extract more fees from consumers early in the debt-relief program. SFS worked to keep consumers in the program while SFS was collecting fees, but, as fees declined later in the program, SFS often would not invest resources in attempting to settle the consumers' debts. A Vice President of Client Service Operations described the situation: "I know this sounds terrible, but if [a consumer] just wants to pay us and then leave to save us money, then OK."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the

truth or falsity of the allegations in this Paragraph.

179.    Consumer complaints suggest that SFS, working through the Façade Firms, continued until January 2024, at least, to collect fees (a) before resolving any debt for consumers; (b) that do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (c) that are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. In 2023 alone, there were approximately 127 consumer complaints in the FTC's Sentinel database

involving the Façade Firms. These consumers were harmed by Defendants' ongoing unlawful conduct.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

180. For example, one consumer, R.O., complained that he was charged nearly $10,000 in advance fees between July 2020 and June 2023, and none of his debts were settled. All of those fees were prohibited by the TSR.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

181. Since January 2016, SFS and the Façade Firms have taken at least $100,000,000 in fees from consumers before any of the consumers' debts were renegotiated, settled, reduced, or otherwise altered.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## THE FAÇADE FIRMS ARE CONTROLLED BY RYAN SASSON AND JASON BLUST AND ACT AS COVER FOR SFS

182. Individual Defendants Ryan Sasson and Jason Blust created the Façade Firms to provide consumers with the sense that SFS's debt-relief service is professional and trustworthy, and to conceal the role of SFS from consumers and the public.

66

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    183.    SFS and Sasson benefit from the concealment of SFS as the primary actor in the debt-relief service. When consumers complain to regulators, prosecutors, or the Better Business Bureau, they complain about the Façade Firm (whose name they have), not SFS (whose name they do not have). This shields SFS from scrutiny and could make it more difficult for consumers to bring lawsuits against the SFS operation.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

    184.    Despite Defendants' efforts to present Façade Firms as separate from SFS, Ryan Sasson and Jason Blust maintain and control the Façade Firms as part of their debt-relief scheme.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

## SASSON'S ROLE IN THE FAÇADE FIRMS

    185.    As the CEO of SFS, Ryan Sasson coordinates with Jason Blust and other Façade Firm attorneys to conceal SFS's role in providing debt-relief services. Sasson created and controls the Client Services Subsidiaries that correspond to each Façade Firm.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

> 186. Sasson also created and owns Façade Firm websites, including websites for Northstar Legal Group, Atlas Law Group, Anchor Law Firm, Harbor, Boulder, Bedrock, Royal, Stonepoint, Rockwell, Canyon, Summit, Great Lakes, Heartland, Whitestone, Monarch, Option 1, and WyoLaw. SFS pays the domain bills for these websites and for the websites of Hallock & Associates, Law Office of Melissa Michel LLC d/b/a Spring Legal, and Moore Legal Group, LLC d/b/a Meadowbrook Legal Group.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

### JASON BLUST CONTROLS THE FAÇADE FIRMS

> 187. Jason Blust coordinates the web of Façade Firms and exercises extensive control over them. He also helped create several of the Façade Firms. For example, Jason Blust orchestrated the creation of WyoLaw. He advised Traci Mears, a figurehead attorney, on setting up bank accounts, Employer Identification Numbers and the firm's mailing address, among other decisions.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining

68

allegations in this Paragraph.

188.   In 2021, the North Carolina State Bar Disciplinary Hearing Commission held a hearing regarding the license of Daniel Rufty, an attorney at Carolina Legal Services, which is one of the Façade Firms. The Commission issued a finding of fact that Jason Blust "started or helped start various law firms . . . in multiple states with the goal of convincing debtors struggling to pay their bills to hire one of the [Façade Firms] to negotiate reduced payoff amounts with the debtor's creditors."

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

189.   In its ruling, the Commission referred to various Façade Firms as the "Blust Law Firms."

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

190.   The Commission concluded that "[Jason] Blust was in charge of the operations of [Carolina Legal Services] and regularly told [Rufty] what to do."

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

191.   In addition to his role in the creation of numerous Façade Firms, Jason Blust plays a continuing role in the management and oversight of many of them.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

> 192.   Jason Blust directly manages some of the Façade Firms' operations. For example, he stated in 2020 in a sworn affidavit that he began managing the operations of the Anchor Law Firm, PLLC in 2016, including managing Anchor Law's attorneys and Anchor Law's non-attorney support services, which consist primarily of SFS and Client Services Subsidiary employees. Blust stated in the affidavit that he was still managing the firms at the time of the affidavit.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

> 193.   Jason Blust also holds official positions in some Façade Firms. For example, he is a Vice President at Pioneer Law Firm, P.C.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

## JASON BLUST RECRUITS ATTORNEYS FOR FAÇADE FIRMS

194.  Jason Blust also recruits attorneys for several of the Façade Firms, including Bedrock, Boulder, Carolina, Canyon, Harbor, Heartland, Rockwell, and Royal.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

195.  For example, he recruited an SFS employee, Lauren Smaldon (née Montanile), to become a member or supervising attorney of multiple Façade Firms, including Bedrock, Boulder, Carolina, Canyon, Harbor, and Heartland. She is also a member-owner of Great Lakes. Smaldon still works at SFS but also reports to Jason Blust pursuant to her position at certain Façade Firms.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

196.  As SFS CEO, Ryan Sasson also exercises control over Smaldon, an SFS employee. Smaldon's business address on file with the New York Bar is one of SFS's addresses: 711 3rd Avenue, 6th Floor, New York, New York 10017.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

71

## JASON BLUST IS A CONDUIT BETWEEN FAÇADE FIRMS AND SFS

197.   Jason Blust also serves as a conduit between the Façade Firms, SFS, and the Client Services Subsidiaries, facilitating communications between the Façade Firms, on one hand, and SFS and its Client Services Subsidiaries, on the other hand.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

198.   Jason Blust regularly emails and talks on the phone with employees of SFS and its Client Services Subsidiaries about consumers in SFS's debt-relief service.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

199.   When employees of SFS or its Client Services Subsidiaries, including Smaldon, are unable to resolve escalated consumer issues, they often consult with Jason Blust or send the issue to him for resolution.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

200.   Jason Blust consults with employees of SFS, Client Services Subsidiaries, and Façade Firms regarding consumer complaints against Façade Firms, including complaints to state bars and the Better Business Bureau (BBB). Blust coordinates efforts by SFS, Client Services Subsidiaries, and Façade Firms to pressure consumers to take down negative reviews of Façade Firms to keep BBB ratings higher. The BBB ratings are used by SFS as a sales pitch, with SFS representatives suggesting that high BBB ratings are a reason that consumers should sign up for SFS's debt-relief service.

72

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

201. Jason Blust controls when Façade Firm attorneys are allowed to work on client files. When SFS receives notice that creditors have sued a consumer enrolled in the program, SFS forwards those filings to Lit Def. Then Lit Def, controlled by Jason Blust, acts as a hub and sends filings to contracted litigation or appearance attorneys. SFS does not send litigation filings to the law firms listed on clients' engagement letters.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

202. Jason Blust also participates in meetings between SFS, Client Services Subsidiaries, and many of the Façade Firms, including Anchor Law Firm, PLLC, Bedrock Legal, LLC, Boulder Legal Group, LLC, Carolina Legal Services, LLC, Canyon Legal Group, LLC, Great Lakes Law Firm, LLC, Harbor Legal Group, LLC, Heartland Legal Group, LLC, Monarch Legal Group, LLC, and Royal Legal Group, LLC. At least one of the meetings between Blust and an attorney from Carolina Legal Services, LLC took place in New York State. Notably, Jason Blust participates regardless of whether he holds an official position with each firm.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has

worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

## JASON BLUST PROVIDES WEBSITES FOR, AND SHARE AN ADDRESS WITH, MULTIPLE FAÇADE FIRMS

203.    Jason Blust also registered domain names for Façade Firms, including Pioneer Law Firm, P.C., Harbor Legal Group, LLC, and Phoenix Legal Group, PLLC. Jason Blust controls the Façade Firm websites by selecting the vendor that creates the websites. Entities that Jason Blust controls or is the beneficiary of, including the Law Office of Jason Blust, LLC, Lit Def, and Relief Defendant Blust Family 2019 Irrevocable Trust, use addresses in a co-working space at 211 Wacker Drive, Chicago, IL 60606.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

204.    Numerous Façade Firms use addresses in the same co-working space at 211 W. Wacker Dr. Chicago, IL 60606. At least ten Façade Firms have used addresses in that building:

- Anchor Law Firm, PLLC;
- Boulder Legal Group, LLC;
- Burnette Legal Group, LLC, a/k/a Monarch Legal Group;
- Credit Advocates Law Firm, LLC
- Great Lakes Law Firm, LLC;
- Gustafson Legal, P.C.;
- Hallock & Associates;
- Harbor Legal Group;
- Henry Legal Group LLP;

74

- Hinds Law LLC d/b/a First America Law;
- Law Offices of Timothy F. Burnette;
- Option 1 Legal;
- Pioneer Law Firm, P.C.; and
- WyoLaw, LLC, d/b/a Summit Law Firm, LLC.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

## TRANSFER OF ASSETS TO INDIVIDUAL DEFENDANTS AND RELIEF DEFENDANTS

205. The Individual Defendants and Relief Defendants received funds obtained from consumers through the unlawful practices described in this Complaint.

**ANSWER:** Denied.

## THE FAÇADE FIRMS AND CLIENT SERVICES SUBSIDIARIES BENEFIT JASON BLUST FINANCIALLY

206. Individual Defendant Jason Blust benefits financially from the Façade Firms and the Client Services Subsidiaries. Specifically, Blust has control over bank accounts for certain Façade Firms which receive substantial funds from Client Services Subsidiaries, and Blust funnels money from the Façade Firms to his consulting companies.

**ANSWER:** Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint and denies all remaining allegations in this Paragraph.

207. Jason Blust is the beneficial owner and signatory on bank accounts for Pioneer Law Firm, P.C. As such, he has control over and entitlement to

the funds in those accounts. Bank account records show that in May and June 2018 alone, these accounts received over $51,000 in payments from Pioneer Client Services, LLC, the related Client Services Subsidiary.

**ANSWER:** Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

208.   Jason Blust also uses consulting companies to direct consumer funds from the Façade Firms to himself. Jason Blust directs and controls Lit Def and Relialit. He is the sole beneficial owner for bank accounts for those two entities. As of June 2021, Jason Blust was the sole member and manager of Relialit and the manager of Lit Def.

**ANSWER:** Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint and denies all remaining allegations in this Paragraph.

209.   Jason Blust and his various companies received significant payments from Façade Firms. For example, the following Façade Firms regularly sent payments to Lit Def:

- Florio Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio & Associates, PLLC;
- Anchor Law Firm, PLLC;
- Burnette Legal Group, LLC d/b/a Monarch Legal Group;
- Daniel Rufty Legal d/b/a Carolina Legal Services;
- Gardner Legal LLC d/b/a Option 1 Legal;
- Great Lakes Law Firm, LLC;
- Green Legal Services, LLC d/b/a Newport Legal Group;
- Harbor Legal Group, LLC;
- Henry Legal Group, LLP d/b/a Heartland Legal Group;
- Northstar Legal Group, LLC;
- The Sands Law Group d/b/a Whitestone Legal Group; and
- WyoLaw d/b/a Summit Law Firm.

From December 2019 to April 2021, payments from the foregoing Façade Firms to Lit Def totaled over $37 million.

**ANSWER:**  Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

210.  In December 2021, Fidelis began receiving payments from Hallock and Associates, Brian Moore Law Firm, LLC d/a/a Guidestone Law, and the Gustafson Consumer Law Group, LLC d/b/a White Oak.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

211.  From March or April 2022 through at least October 2023, Fidelis received payments from the following Façade Firms:

- Chinn Legal Group;
- Donald Norris Associates PLLC d/b/a/ Stonepoint Legal
- Gardner Legal, LLC d/b/a Option 1 Legal
- Great Lakes Law Firm, LLC;
- Greene Legal Group, LLC d/b/a Newport Legal;
- Henry Legal Group, LLP d/b/a Heartland Legal Group;
- JMS Industries, LLC;
- Leigh Legal Group, PLLC d/b/a Greenstone Legal;
- The Law Firm of Derek Williams, LLC d/b/a Infinite Law Group;
- Moore Legal Group, LLC d/b/a Meadowbrook Legal Group
- The Sands Law Group, LLP d/b/a Whitestone Law;
- WyoLaw, LLC d/b/a Summit Law Firm, LLC.

From April 2022 to October 2023, these firms paid a total of approximately $16.4 million to Fidelis. Consumer complaints suggest that the following firms, at least, provided debt-relief services to consumers in New York: Gardner Legal, LLC, d/b/a Option 1 Legal; Dakis Legal Group d/b/a Clear Creek Legal, LLC; The Law Firm of Derek Williams, LLC d/b/a Infinite Law Group; and

77

WyoLaw, LLC d/b/a Summit Law Firm, LLC.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

212.   The following Façade Firms regularly sent payments to Relialit: Anchor Law Firm, PLLC; Boulder Legal Group, LLC; Burnette Legal Group, LLC; Chabner Legal and Associates, LLP; Daniel Rufty Legal, PLLC; Donald Norris Associates PLLC; Gardner Legal Group LLC; Great Lakes Law Firm, LLC; Harbor Legal Group, LLC; Henry Legal Group LLP; Hodyno & Associates, PLLC; JMS Industries, LLC; Law Office of Amber Florio, PLLC; Lighthouse Tax & Financial, LLC; Meg Sohmer Wood, PLLC; Pioneer Law Firm, P.C.; Raggio and Associates PLLC; The Sands Law Group, LLP; and WyoLaw, LLC. From March 2019 to January 2020, these payments to Relialit totaled over $258,000.

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

213.   The following Façade Firms sent payments to Hedgewick: Anchor Law Firm, PLLC; Boulder Legal Group, LLC; Burnette Legal Group, LLC; Chabner Legal and Associates, LLP; Chinn Legal Group d/b/a Slate Legal Group; Donald Norris Associates PLLC d/b/a Stonepoint Legal Group; Gardner Legal LLC d/b/a Option 1 Legal; Great Lakes Law Firm, LLC; Greene Legal Services, LLC d/b/a Newport Legal Group; Harbor Legal Group, LLC; Henry Legal Group, PLLC d/b/a Heartland Legal Group; Hodyno & Associates, PLLC d/b/a Rockwell Legal Group; JMS Industries, LLC d/b/a Canyon Legal Group; Law Office of Amber Florio, PLLC; Moore Legal Group, LLC d/b/a Meadowbrook Legal Group; Northstar Legal Group, LLC; Raggio and Associates PLLC; The Sands Law Group d/b/a Whitestone Legal Group; Spring Legal Group, LLC;

and WyoLaw d/b/a Summit Law Firm. From February 2021 to December 2023, these payments to Hedgewick totaled over $920,000.

**ANSWER:** Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

214. Façade Firms also pay both Jason Blust personally and the Law Office of Jason Blust. For example, from January 2019 to May 2021, Monarch Legal Group paid Jason Blust $18,311 and the Law Office of Jason Blust $215,000. From at least December 2020 to at least January 2021, Blust received payments in a personal bank account from Anchor Law Firm, PLLC, Boulder Legal Group, LLC, Burnette Legal Group, LLC d/b/a Monarch Legal Group, Chabner Legal and Associates, LLP, Henry Legal Group, PLLC d/b/a Heartland Legal Group, JMS Industries, LLC d/b/a Canyon Legal Group, and Raggio and Associates PLLC.

**ANSWER:** Blust admits only that Jason Blust has worked with multiple law firms during his career. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this Paragraph.

215. Similarly, Daniel Rufty, the local attorney for Façade Firm Carolina Legal Services referenced above in Paragraphs 188-90, testified in a 2021 North Carolina State Bar investigation that his firm paid consultants including Jason Blust and that Global sent payments from consumers' escrow accounts to Carolina Client Services, LLC (an SFS-owned entity).

**ANSWER:** Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint. Answering further, Blust lacks

79

knowledge and information sufficient to form a belief as to the truth or falsity of the

allegations in this Paragraph.

216.   Rufty further testified that although he owned 99% of Carolina Legal Services, he had rights to only 3% of its profits. The remaining 97% of profits were sent to Jason Blust and his associates, either directly or through his companies. Rufty testified that the payments were ostensibly for consulting work, data entry, and administrative services.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity

of the allegations in this Paragraph.

217.   The North Carolina State Bar ultimately found that consumer funds were used to pay Lit Def, Jason Blust, and SFS.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity

of the allegations in this Paragraph.

## TRANSFER TO THE ESOP BENEFITS BLUMKIN

218.   Prior to the formation of Strategic ESOP and Strategic ESOT, Twist Financial, LLC (Blumkin's company) owned 17.99% of SFS.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity

of the allegations in this Paragraph.

219.   When SFS formed Strategic ESOP and Strategic ESOT, Twist (i.e., Blumkin) loaned Strategic ESOT approximately $43,000,000 at 3% interest rather than taking a lump sum payout for its ownership stake. Between December 2017 and March 2020, Strategic ESOT paid Twist (i.e., Blumkin) over $1,900,000 in interest payments and over $16,200,000 in principal repayments on the loan. Blumkin receives regular payments of interest and principal on this loan.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity

of the allegations in this Paragraph.

80

**TRANSFER OF ASSETS TO SHELL HOLDING COMPANIES OWNED BY
THE INDIVIDUAL DEFENDANTS**

220.    Defendant Sasson, Blumkin and Behar direct and control the Holding Companies.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

221.    Between October 2016 and September 2017, SFS transferred almost $9,000,000 to the Holding Companies. Ryan Sasson was the signatory on the SFS account that transferred the funds. As such, Sasson had control over the flow of money into and out of the account.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

222.    Between October 2016 and September 2017, SFS transferred over $3,200,000 to Blaise Investments, LLC.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

223.    Between October 2016 and September 2017, SFS transferred over $3,400,000 to Duke Enterprises, LLC.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

224.    Between October 2016 and September 2017, SFS transferred over $2,200,000 to Twist Financial, LLC.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

81

225.    Paul Hull, Jr. is the trustee of the Blust Family 2019 Irrevocable Trust. Jason Blust's family is the beneficiary of the Blust Family 2019 Irrevocable Trust.

**ANSWER:** Blust admits that Hull is the trustee of the referenced Trust and the Blust family, excluding Jason Blust, is the beneficiary.

226.    Between March 2020 to April 2021, Lit Def paid $36,000,000 to the Blust Family 2019 Irrevocable Trust.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

227.    Defendant Jason Blust directs and controls Lit Def and Relialit. Jason Blust is the sole beneficial owner on bank accounts for these entities at Associated Bank, at least.

**ANSWER:** Blust lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

228.    Relief Defendant Jaclyn Blust received millions of dollars from the debt-relief enterprise involving SFS and the Façade Firms. For example, between July 2020 and April 2021, the Blust Family 2019 Irrevocable Trust transferred at least $8,300,000 to Relief Defendant Jaclyn Blust.

**ANSWER:** Blust admits only that she received certain transfers in the millions of dollars from the Blust Trust for tax payments, and that those funds were used for tax payments. Blust denies that Plaintiffs have defined "Façade Firms" as used throughout the Second Amended Complaint and denies the remaining allegations in this Paragraph.

229.    Relief Defendants the Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee, Jaclyn Blust, Strategic ESOP, Strategic ESOT, Christo, and the Bush Lake Trust have received, directly or indirectly,

82

funds and other assets from Defendants that were obtained from consumers through Defendants' unlawful practices.

**ANSWER:** Denied.

## COUNT 1

### *By the Bureau and the States Charging Advance Fees in Violation of the TSR By Collecting Money Before the Consumer Has Made At Least One Payment Under a Settlement Plan*

**(Against SFS, the Client Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar)**

230. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 230.

231. It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service to request or receive payment of any fee or consideration for any debt-relief service until and unless: (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment under that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

232. From at least January 2016 through the present, SFS, the Client Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar have engaged in ongoing conduct to request and receive fees from consumers in connection with enrolled debts even though Defendants had not yet renegotiated, settled, reduced, or otherwise altered the terms of these debts under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the

consumers. Indeed, as noted above, Defendants have frequently requested and received fees from consumers for whom they have not renegotiated, settled, or reduced any debt.

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

233. In addition, as discussed above, from at least January 2016 and continuing through the present, Defendants have requested and received fees from consumers in connection with enrolled debts even though consumers had not yet made any payments under a settlement agreement, debt-management plan, or other valid contractual agreement between the consumers and the creditor or debt collector and relating to those enrolled debts.

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

234. As discussed above, Individual Defendants Sasson, Blumkin, and Behar participated in this practice of requesting and receiving fees (including but not limited to retainer fees, service fees, and administrative fees) before consumers made the first debt-relief payment to a creditor. Sasson, Blumkin, and Behar were on the Board of Directors of Strategic Family, Inc. Sasson also controlled SFS and its Client Services Subsidiaries and had authority to control the manner and timing of their requests for and receipt of fees and SFS's use of telemarketing. Sasson, Blumkin, and Behar either knew or consciously avoided knowing that SFS was selling debt-relief services by phone, including through interstate calls, and the manner and timing of SFS's and its Client Services Subsidiaries' requests for and receipt of fees.

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

235. Defendants' practice of requesting or receiving payment of fees (including but not limited to service fees, administrative fees, and retainer fees) from consumers under the circumstances described in Paragraphs 141-52 is an abusive act or practice in telemarketing that violates the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

236. Individual Defendants Sasson, Blumkin, and Behar control SFS, its Client Services Subsidiaries, and the Holding Companies and have

authority to control practices regarding telemarketing and fees. Sasson, Blumkin, and Behar also know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls and that they request or receive fees from consumers before consumers made the first debt-relief payment to a creditor. Thus, Sasson, Blumkin, and Behar are individually liable for these violations of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

237.    The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

238.    The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**ANSWER:** Count 1 is not directed to Blust. Thus, no answer is required.

## COUNT 2

*By the Bureau and the States Charging Advance Fees in Violation of the TSR by Collecting Fees After Settling Some But Not All of a Consumer's Debts When the Fees Are Not Proportional to the Amount of Debt Actually Settled or Based on a Fixed Percentage of the Amount Saved*

**(Against SFS, the Client Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar)**

239.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 239.

240.    To the extent a seller or telemarketer renegotiates, settles, reduces, or otherwise alters a consumer's enrolled debts individually over time, the

85

TSR prohibits the seller or telemarketer from requesting or receiving any fee or consideration unless such fee or consideration: (1) bears the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i)(C).

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

241. From at least January 2016 through the present, SFS, its Client Services Subsidiaries, the Holding Companies, Sasson, Blumkin, and Behar have settled consumers' debts individually over time and after doing so, have requested or received fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

242. As discussed above, Individual Defendants Sasson, Blumkin, and Behar participated in settling consumers' debts individually over time and while doing so, requesting or receiving fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

243. Defendants' practice of requesting or receiving fees described in Paragraphs 141-52 constitutes an abusive act or practice in telemarketing that violates the TSR. 16 C.F.R. § 310.4(a)(5)(i)(C).

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

244. Individual Defendants Sasson, Blumkin, and Behar control SFS, its Client Services Subsidiaries, and the Holding Companies and have

authority to control practices regarding telemarketing and fees. Sasson, Blumkin, and Behar also know or consciously avoid knowing that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. Thus, Sasson, Blumkin, and Behar are individually liable for these violations of the TSR. 16 C.F.R. §310.4(a)(5)(i)(C).

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

245. The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

246. The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**ANSWER:** Count 2 is not directed to Blust. Thus, no answer is required.

## COUNT 3

### *By the Bureau and the States Substantial Assistance in Violation of the TSR*

### (Against SFS, The Client Services Subsidiaries, The Holding Companies, and The Blust Companies)

247. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though

fully restated as the answer to this Paragraph 247.

248. The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

**ANSWER:** Count 3 is not directed to Blust. Thus, no answer is required.

249. As explained above, the Façade Firms constitute "sellers" in connection with their provision of, or arranging for others to provide, debt-relief services. 16 C.F.R.§ 310.2(o), (dd), (ff).

**ANSWER:** Count 3 is not directed to Blust. Thus, no answer is required.

250. As explained above, in the course of offering to provide or providing debt-relief services to consumers, the Façade Firms have engaged, and continue to engage in, abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

**ANSWER:** Count 3 is not directed to Blust. Thus, no answer is required.

251. SFS, the Holding Companies, and the Client Services Subsidiaries provided, and continue to provide, substantial assistance or support to the Façade Firms by, among other things: creating and controlling the Façade Firms; handling all (or almost all) of the negotiation work on behalf of the Façade Firms; handling all (or almost all) consumer interactions while holding themselves out as Façade Firms; interacting with RAM and Global on behalf of the Façade Firms; and participating in the day-to-day business operations of the Façade Firms.

**ANSWER:** Count 3 is not directed to Blust. Thus, no answer is required.

252. The Blust Companies provided, and continue to provide, substantial assistance or support to the Façade Firms by, among other things: controlling the Façade Firms and participating in the day-to-day business operations of the Façade Firms.

**ANSWER:** Count 3 is not directed to Blust. Thus, no answer is required.

253.   SFS, the Holding Companies, the Client Services Subsidiaries, and the Blust Companies knew or consciously avoided knowing that the Façade Firms were requesting or receiving fees from consumers before consumers made the first debt-relief payment to a creditor; and knew or consciously avoided knowing that the Façade Firms were settling consumer debts one at a time and taking fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:**  Count 3 is not directed to Blust. Thus, no answer is required.

254.   SFS, the Holding Companies, the Client Services Subsidiaries, and the Blust Companies have violated, and continue to violate, the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

**ANSWER:**  Count 3 is not directed to Blust. Thus, no answer is required.

255.   The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

**ANSWER:**  Count 3 is not directed to Blust. Thus, no answer is required.

256.   The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**ANSWER:**  Count 3 is not directed to Blust. Thus, no answer is required.

## COUNT 4

### *By the Bureau and the States Substantial Assistance in Violation of the TSR*

### (Against Individual Defendants)

257.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

89

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 257.

258.    As explained above, SFS constitutes a "telemarketer" and SFS, the Client Services Subsidiaries, and the Façade Firms constitute "sellers" in connection with their provision of, or arranging for others to provide, debt-relief services. 16 C.F.R. § 310.2(o), (dd), (ff).

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

259.    In the course of offering to provide or providing debt-relief services to consumers, the Façade Firms, the Client Services Subsidiaries, and SFS (largely acting through the Façade Firms and its Client Services Subsidiaries) have engaged, and continue to engage in, abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

260.    The Individual Defendants provided, and continue to provide, substantial assistance or support to SFS, the Façade Firms, and the Client Services Subsidiaries.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

261.    Ryan Sasson oversees all employees at SFS. He participated in the creation of the Façade Firms, the Client Services Subsidiaries, and Duke Enterprises; he exerts control over them all. Sasson interacted with RAM and Global on behalf of SFS, the Façade Firms, and the Client Services Subsidiaries. He participates in the day-to-day business operations of SFS, the Façade Firms, and the Client Services Subsidiaries.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

262.    Daniel Blumkin was Chief Sales Officer of Strategic Financial Solutions, LLC and head of sales at Strategic Consulting, LLC. Blumkin is on the Board of Directors of Strategic Family, Inc. His company, Twist Financial, owned voting stock in Strategic Family, Inc. Blumkin was

also a manager at Strategic Financial Solutions, LLC and Strategic Client Support, LLC.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

263.    Albert Ian Behar is a member of Strategic Financial Solutions, LLC and also on Strategic Family's Board of Directors. His company, Blaise Investments, LLC, owned voting stock in Strategic Family, Inc. Behar was also a manager at Strategic Financial Solutions, LLC and Strategic Client Support, LLC.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

264.    Blumkin, Behar, and Sasson controlled the business of Strategic Family, Inc. through their collective ownership in Strategic Family's stock, by way of their respective Holding Companies in which they are the sole owner, manager, and member.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

265.    Jason Blust supervises all of the Façade Firms. He hires attorneys for the firms, addresses consumer complaints, serves as a liaison between the firms and SFS (at least partly through the Blust Companies), and actively participates in business decisions concerning the firms and SFS. More specifically, he is a vice president for one Façade Firm, a member of another, and was involved in the creation of yet another. He also registered the domains for two of the Façade Firms. Jason Blust recruited attorneys to the Façade Firms and managed the operations of Anchor Law Firm, PLLC from 2016 until at least 2020.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

266.    Gustafson owns and manages nine Façade Firms and, according to insurance paperwork, is the current contact person for 20 Façade Firms.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

267.    Burnette has been the sole owner of bank accounts for three Façade Firms and has signed documents on behalf of other firms. According to insurance paperwork, he is the current contact person for three Façade Firms.

91

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

268.  Gallagher owns two Façade Firms and has been the sole owner of bank accounts for three additional Façade Firms. Since 2020, she has worked directly for Blust as a manager at Lit Def, and in approximately March 2021 she began performing the same work for Fidelis.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

269.  The Individual Defendants knew or consciously avoided knowing: (1) that SFS was selling debt-relief services by phone, including through interstate calls; (2) that following the phone sales, SFS, the Façade Firms, and the Client Services Subsidiaries were providing debt-relief services for consideration; (3) that SFS, the Façade Firms, and the Client Services Subsidiaries were requesting or receiving fees from consumers before consumers made the first debt-relief payment to a creditor; and (4) that SFS, the Façade Firms and the Client Services Subsidiaries were settling consumer debts one at a time and taking fees that: (a) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (b) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

270.  The Individual Defendants have violated, and continue to violate, the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

**ANSWER:** Count 4 is not directed to Blust. Thus, no answer is required.

## COUNT 5

### *By the Bureau and the States Deception in Violation of the TSR*

### **(Against SFS, The Client Services Subsidiaries, The Holding Companies, Sasson, and Blumkin)**

271.  Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

92

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 271.

272.   The TSR prohibits a seller or telemarketer from engaging in deceptive acts or practices which include "[m]aking a false or misleading statement to induce any person to pay for goods or services . . ." 16 C.F.R. § 310.3(a)(4).

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

273.   SFS made several false or misleading statements to induce persons to pay for debt-relief services in violation of the TSR.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

274.   SFS employs third parties to mail personalized letters to debt-distressed consumers that claim the consumers are "pre-approved" for a debt-consolidation loan at attractive rates. Sometimes the packages sent to consumers also include fake checks payable to the consumer. In reality, there is no actual lender and no actual pre-approval.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

275.   When consumers respond to the pre-approval letters, SFS's sales employees almost always advise them that they do not qualify for the loan. Instead, they follow choreographed scripts that encourage the consumers to enroll in SFS's debt-relief service. The scripts assume that the consumer was not approved for the loan and explain that "pre-approved" means the consumer has been pre-approved to go through the loan application process.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

276.   Individual Defendants Sasson and Blumkin, in their roles as Chief Executive Officer and Chief Sales Officer, respectively, control the processes of selling the debt-relief service, including the practice described above. They also knew or consciously avoided knowing that: (1) SFS misrepresented the availability of consumer loans in order to

sell debt-relief services and (2) SFS was selling debt-relief services by phone, including through interstate calls.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

277. By telling consumers they are "pre-approved" for a loan but then rescinding that offer and pushing them into the debt-relief service instead, Defendants made false or misleading statements to induce those consumers to pay for the debt- relief service. 16 C.F.R. § 310.3(a)(4). As such, this practice constitutes a deceptive act or practice in telemarketing that violates the TSR.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

278. The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

279. The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**ANSWER:** Count 5 is not directed to Blust. Thus, no answer is required.

## COUNT 6

### *By the Bureau and the States Deception in Violation of the TSR*

### **(Against SFS, The Client Services Subsidiaries, The Holding Companies, Sasson, and Blumkin)**

280. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 280.

94

281. The TSR prohibits a seller or telemarketer from engaging in deceptive acts or practices which include "[m]isrepresenting, directly or by implication, . . .[a]ny material aspect of any debt relief service . . ." 16 C.F.R. § 310.3(a)(2)(x).

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

282. SFS made several misrepresentations about material aspects of the debt- relief services offered by Defendants and the Façade Firms in violation of the TSR.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

283. During the sales process, SFS employees routinely refer to the debt-relief service as the "0% interest option" while speaking with consumers.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

284. Referring to the debt-relief service as the "0% interest option" creates confusion for consumers, particularly in light of the mailers many consumers received claiming they were "preapproved" for a debt-consolidation loan.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

285. In truth, the debt-relief service is not a loan. So, while SFS does not charge consumers interest for using this service, SFS charges exorbitant fees to consumers who enroll. Further, SFS's debt-relief program is not interest-free: while consumers are enrolled in the debt-relief service, they continue to accrue interest on their outstanding debts.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

286. Individual Defendants Sasson and Blumkin, in their roles as Chief Executive Officer and Chief Sales Officer, respectively, control the processes of selling the debt-relief service, including the practice described above. Sasson and Blumkin knew or consciously avoided knowing that: (1) SFS employees made deceptive statements about the accrual of interest while consumers were in the debt-relief program; and (2) SFS was selling debt-relief services by phone, including through interstate calls.

95

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

287.  Defendants' practice of referring to the law firm debt-relief service as the "0% interest option" is a misrepresentation of a material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(x). As such, this practice constitutes a deceptive act or practice in telemarketing that violates the TSR.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

288.  The Holding Companies are liable for these violations of the TSR because they controlled SFS and because they operated in a common enterprise with SFS and the Client Services Subsidiaries.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

289.  The Client Services Subsidiaries are liable for these violations of the TSR because they were involved in the practices and because they operated in a common enterprise with SFS and the Holding Companies.

**ANSWER:** Count 6 is not directed to Blust. Thus, no answer is required.

## COUNT 7

### *By the People of the State of New York Repeated Fraudulent Acts in Violation of Exec. Law § 63(12)*

### (Against SFS, The Client Services Subsidiaries, The Blust Companies and The Individual Defendants)

290.  The NYAG incorporates by reference the allegations contained in Paragraphs 1-229 of the Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 290.

291.  New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or

otherwise demonstrates persistent fraud or illegality in the carrying on, conducting, or transaction of business. Statutory fraud under Executive Law § 63(12) is broader than common law fraud and includes any acts that have a tendency to deceive.

**ANSWER:** Count 7 is not directed to Blust. Thus, no answer is required.

292. Defendants have engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of their debt-relief business.

**ANSWER:** Count 7 is not directed to Blust. Thus, no answer is required.

293. Individual Defendants Sasson, Blumkin, and Behar participated in, had the ability to control, were aware of, or should have been aware of, these fraudulent acts of SFS and the Client Services Subsidiaries.

**ANSWER:** Count 7 is not directed to Blust. Thus, no answer is required.

294. Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, both directly and through the Façade Firms, engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of business in support of the debt-relief business of SFS and the Client Services Subsidiaries.

**ANSWER:** Count 7 is not directed to Blust. Thus, no answer is required.

295. Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, participated in, had the ability to control, were aware of, or should have been aware of, these fraudulent acts.

**ANSWER:** Count 7 is not directed to Blust. Thus, no answer is required.

## COUNT 8

### *By the People of the State of New York Engaging in Deceptive Acts or Practices in Violation of GBL § 349*

**(Against SFS, the Client Services Subsidiaries,  the Blust Companies and Individual Defendants)**

97

296. The NYAG incorporates by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 296.

297. New York General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business in this state are hereby declared unlawful."

**ANSWER:** Count 8 is not directed to Blust. Thus, no answer is required.

298. In numerous instances, Defendants have violated GBL § 349 by engaging in deceptive acts or practices in connection with conducting their debt-relief business.

**ANSWER:** Count 8 is not directed to Blust. Thus, no answer is required.

299. Individual Defendants Sasson, Blumkin, and Behar participated in, had the ability to control, were aware of, or should have been aware of, the deceptive acts and practices of SFS and the Client Services Subsidiaries.

**ANSWER:** Count 8 is not directed to Blust. Thus, no answer is required.

300. Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, both directly and through the Façade Firms, engaged in deceptive acts or practices in connection with the debt-relief business of SFS and the Client Services Subsidiaries.

**ANSWER:** Count 8 is not directed to Blust. Thus, no answer is required.

301. Individual Defendants Blust, Gustafson, Gallagher, and Burnette, and the Blust Companies, participated in, had the ability to control, were aware of, or should have been aware of, these deceptive acts.

**ANSWER:** Count 8 is not directed to Blust. Thus, no answer is required.

## COUNT 9

### *By the Bureau and the States Funds and Assets Obtained Through Unlawful Practices Held in Constructive Trust*

### (Relief Defendants)

302.  Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-229 of the Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 302.

303.  Relief Defendants have received, directly or indirectly, funds or other assets from Defendants that were obtained from consumers through the unlawful practices described in this Complaint.

**ANSWER:** Denied.

304.  Relief Defendants are not bona fide purchasers with legal or equitable title or other legitimate claim to the funds or other assets received from Defendants.

**ANSWER:** Denied.

305.  Relief Defendants would be unjustly enriched if not required to disgorge, compensate consumers for, or provide restitution with respect to the funds or the value of the benefits received as a result of Defendants' unlawful acts or practices.

**ANSWER:** Denied.

306.  The Relief Defendants hold funds and assets in constructive trust for the benefit of affected consumers.

**ANSWER:** Denied.

## COUNT 10

### *By the State of Wisconsin Operating as Adjustment Service Company in Wisconsin Without License*

### (SFS, Great Lakes Client Services, LLC, the Holding Companies, and the Individual Defendants)

307. The State of Wisconsin incorporates by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 307.

308. Wisconsin Stat. § 218.02(1)(a) defines "adjustment service company," in relevant part, as a "corporation, limited liability company, association, partnership or individual engaged as principal in the business of prorating the income of a debtor to the debtor's creditor or creditors . . . in return for which the principal receives a service charge or other consideration."

**ANSWER:** Count 10 is not directed to Blust. Thus, no answer is required.

309. Defendants SFS, Great Lakes Client Services, LLC, the Holding Companies, and the Individual Defendants are each "adjustment service companies" within the scope of Wis. Stat. § 218.02(1)(a).

**ANSWER:** Count 10 is not directed to Blust. Thus, no answer is required.

310. Wis. Stat. § 218.02(2)(a)1. requires every adjustment service company to "apply to the division [of banking] for a license to engage in such business."

**ANSWER:** Count 10 is not directed to Blust. Thus, no answer is required.

311. None of Defendants has ever applied for an adjustment service company license as required by Wis. Stat. § 218.02(2)(a)1.

**ANSWER:** Count 10 is not directed to Blust. Thus, no answer is required.

## COUNT 11

### *By the State of Wisconsin Violations of Wisconsin Adjustment Service Company Rules*

### (SFS, Great Lakes Client Services, LLC, the Holding Companies, and the Individual Defendants)

312.  The State of Wisconsin incorporates by reference the allegations contained in Paragraphs 1-229 of this Complaint.

**ANSWER:** Blust restates and realleges her answers to Paragraphs 1-229 as though fully restated as the answer to this Paragraph 312.

313.  Wisconsin Stat. § 218.02(7) provides that "It shall be the duty of the division [of banking] and the division shall have the power, jurisdiction and authority. . . [t]o issue general or special orders in execution of or supplementary to this section, but not in conflict therewith, to protect debtors from oppressive or deceptive practices of licensees." Subsection (7)(d) further authorizes the division "[t]o determine and fix by general order the maximum fees or charges that such companies may make."

**ANSWER:** Count 11 is not directed to Blust. Thus, no answer is required.

314.  The division has promulgated Wis. Admin. Code § DFI-Bkg chapter 73 pursuant to the preceding legislative authorizations.

**ANSWER:** Count 11 is not directed to Blust. Thus, no answer is required.

315.  Defendants SFS, Great Lakes Client Services, LLC, the Holding Companies, and the Individual Defendants have violated Wis. Admin. Code § DFI-Bkg 73 by: (a) charging fees far in excess of what is permitted under the rule, and (b) charging fees before any of the debtors' funds are remitted to the debtors' creditors as part of settlement.

**ANSWER:** Count 11 is not directed to Blust. Thus, no answer is required.

## AFFIRMATIVE DEFENSES

Relief Defendant Jaclyn Blust submits the following affirmative and other defenses to the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 8:

### FIRST

1.    Plaintiffs' claims are barred because Blust is not a proper relief defendant.

### SECOND

2.    Plaintiffs' claims are barred because the Law Firms (and their agents and those working at the direction and under the supervision of the Law Firms, including StratFS and its subsidiaries, Lit Def Strategies, Relialit, and Fidelis) are exempt from the statutes and regulations at issue because they are engaged in the practice of law.

### THIRD

3.    The Law Firms (and their agents and those working at the direction and under the supervision of the Law Firms, including StratFS and its subsidiaries, Lit Def Strategies, Relialit, and Fidelis) are engaged in the practice of law. Thus, such claims are barred by the separation of powers under the Constitutions of the states in which the Law Firms practice.

## FOURTH

4.    The Law Firms (and their agents and vendors, including StratFS and its subsidiaries, Lit Def Strategies, Relialit, and Fidelis) are exempt from the advance fee ban in the Telemarketing Sales Rule, 16 C.F.R. § 310.04, because the Law Firms comply with the face-to-face sales presentation requirement.

## FIFTH

5.    Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitation.

## SIXTH

6.    The State Attorneys General claims under the Telemarketing Sales Rule, 16 C.F.R. § 310.01, *et seq.*, are barred because those claims are preempted by the claims brought by the Consumer Financial Protection Bureau.

## SEVENTH

7.    Plaintiffs' claims are barred, in whole or in part, because they fail to state a claim upon which relief may be granted.

## EIGHTH

8.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## NINTH

9.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

103

### TENTH

10.    Plaintiffs' claims are barred to the extent that consumers (or states or other regulatory bodies on behalf of consumers) have already entered into settlement agreements, releases, and/or waivers of claims with respect to the Law Firms, their agents, and/or their vendors and the provision of services to consumers, who have therefore waived the right to receive the restitution Plaintiffs seek on their behalf.

### ELEVENTH

11.    Plaintiffs' claims are barred, in whole in or part, to the extent that consumers have already entered into settlement agreements, obtained judgments, or received refunds or other payments in full or partial satisfaction of any claims they may have against the Law Firms, StratFS and its subsidiaries, Lit Def Strategies, Relialit, and Fidelis, and their agents, and/or their vendors.

### TWELFTH

12.    Plaintiffs' claims are barred to the extent that Plaintiffs' claims allege statements, representations, or omissions that are not contained in and/or contrary to the express terms of consumers' written agreements with the Law Firms.

### THIRTEENTH

13.    Plaintiffs' claims are barred because the Consumer Financial Protection Bureau, as a federal agency, is unconstitutional and therefore lacks standing and cannot sustain this action. Accordingly, this action is illegal, unconstitutional, and a violation of Blust's procedural and substantive due process rights.

**FOURTEENTH**

14.    The Telemarketing Sales Rule, 16 C.F.R. § 310.01, *et seq.*, is unconstitutionally vague and violates the Due Process Clause.

**FIFTEENTH**

15.    Plaintiffs' claims based on the Telemarketing Sales Rule, 16 C.F.R. § 310.01, *et seq.*, fail as a matter of law because the Federal Trade Commission's 2010 amendment to the Telemarketing Sales Rule (including the "advance fee ban") exceeded the scope of statutory jurisdiction, was enacted without observance of the procedures required by law, and was unsupported by substantial evidence. Under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, the 2010 amendment to the Telemarketing Sales Rule is unlawful and must be set aside.

**SIXTEENTH**

16.    Plaintiffs' claims are barred, in whole or in part, because Defendants did not know nor consciously avoid knowing that Defendants or any third-party law firm had engaged in violations of the Telemarketing Sales Rule, 16 C.F.R. § 310.01, *et seq.*

**INCORPORATION BY REFERENCE**

17.    Blust hereby incorporates by reference all other applicable affirmative defenses that have been, or will be, asserted by any Defendant, Relief Defendant, and Intervenor in this matter.

18.    Blust expressly reserves the right to amend her affirmative defenses based upon information learned in discovery or further proceedings in this matter.

**WHEREFORE**, Relief Defendant Jaclyn Blust respectfully requests that this Court: (1) dismiss all claims in this action on the merits and with prejudice; (2) deny all of Plaintiffs' requests for relief including, without limitation, monetary and injunctive relief, restitution and civil penalties; and (3) award Jaclyn Blust such other relief as this Court deems just and proper.

Dated:    Buffalo, New York
          November 7, 2025

                                      ***/s/Rodney O. Personius***
                                      Rodney O. Personius, Esq.
                                      PERSONIUS MELBER LLP
                                      *Attorneys for Relief Defendant*
                                      JACLYN BLUST
                                      2100 Main Place Tower
                                      350 Main Street
                                      Buffalo, NY 14202
                                      (716) 855-1051
                                      rop@personiusmelber.com

TO:    All Parties of Record (via CM/ECF)

106