**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | |
| Plaintiffs, | |
| v. | Case No.: 1:24-cv-40 EAW-MJR |
| STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al., | |
| Defendants, and | |
| STRATEGIC ESOP, et al., | |
| Relief Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT BLUMKIN'S
MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION
OR, IN THE ALTERNATIVE, TO MODIFY IT**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

   A.   Plaintiffs have acted as responsible stewards of the frozen assets, balancing the individual Defendants' requests with the conservation of the assets for future redress.................................. 1

   B.   Based on Blumkin's representations, he has received substantial consumer funds since this litigation began. ............................................................................................................ 2

   C.   Blumkin did not curtail his spending habits or get a job after entry of the injunction. ....... 3

   D.   Blumkin inaccurately portrays several facts relating to his disbursements. ........................ 4

LEGAL STANDARDS .................................................................................................... 8

   A.   Motion to Modify or Dissolve Injunction .............................................................. 8

   B.   Motion to Reconsider ......................................................................................... 8

ARGUMENT .................................................................................................................. 9

   A.   Blumkin's renewed challenge to the lawfulness of the preliminary injunction is an untimely motion to reconsider and should be denied. .................................................................. 9

   B.   Blumkin's request to modify the asset freeze fails because he cannot show that the frozen assets are untainted or that the remaining funds would be sufficient to satisfy consumer redress in the future. .......................................................................................................... 10

   C.   Blumkin is not entitled to receive payments of more than $30,000 per month from the assets frozen to preserve potential relief to consumers. ............................................. 11

       1.   Blumkin's request for $33,000 per month far exceeds the modest sums courts have approved.................................................................................................................... 11

       2.   Blumkin's failures to document his assets or seek employment independently doom his request. ....................................................................................................................... 14

       3.   Blumkin's reliance on the parties' so-called "custom and practice" highlights a fundamental flaw in his reasoning. ................................................................................ 16

       4.   Plaintiffs are acting to conserve the frozen assets for potential redress to consumers. . 16

CONCLUSION .............................................................................................................. 17

i

# TABLE OF AUTHORITIES

*CFPB v. Blust Family 2019 Irrevocable Tr.*,
No. 25-1541, 2026 WL 574908 (2d Cir. Mar. 2, 2026)...................................................9

*CFPB v. Stratfs, LLC*,
No. 24-697, 2025 WL 1554514 (2d Cir. June 2, 2025)........................................9, 10

*FTC v. Am. Tax Serv. LLC*,
No. 2:25-CV-01894, 2025 WL 3564724 (D. Nev. Dec. 11, 2025) ................................ 11, 12, 15

*FTC v. Elegant Sols., Inc.*,
No. SACV 19-1333, 2019 WL 9358567 (C.D. Cal. Dec. 10, 2019) ............................ 12, 14, 15

*FTC v. Health Formulas, LLC*,
No. 14-cv-1649, 2015 WL 4623126 (D. Nev. Aug. 3, 2015).......................................14

*FTC v. Health Formulas, LLC*,
No. 14-cv-01649, 2015 WL 2130504 (D. Nev. May 6, 2015).....................................13

*FTC v. IAB Marketing Associates, LP*,
972 F. Supp. 2d 1307 (S.D. Fla. Sept. 18, 2013) ........................................................15

*FTC v. Vantage Point Servs., LLC*,
No. 15-CV-6S, 2018 WL 2120139 (W.D.N.Y. May 8, 2018)......................................14

*Lashify, Inc. v. Qingdao Network Tech. Co.*,
No. 25-CV-4183 (LJL), 2026 WL 112022 (S.D.N.Y. Jan. 15, 2026)........................8, 9

*NEM Re Receivables, LLC v. Fortress Re, Inc.*,
187 F. Supp. 3d 390 (S.D.N.Y. 2016)........................................................................8, 9

*Salamone v. Douglas Marine Corp.*,
111 F.4th 221 (2d Cir. 2024) ........................................................................................8

*SEC v. Abdallah*,
No. 1:14-cv-1155, 2017 WL 11680997 (N.D. Ohio Aug. 1, 2017) ...........................15

*SEC v. Ahmed*,
123 F. Supp. 3d 301 (D. Conn. 2015).........................................................................10

*SEC v. Carver*,
No. SACV 08-627, 2008 WL 11342958 (C.D. Cal. Aug. 28, 2008)..........................14

*SEC v. Cope*,
    No. 14-CV-7575 (DLC), 2016 WL 7429445 (S.D.N.Y. Dec. 23, 2016) ..................................... 11

*SEC v. Dowdell,*
    175 F. Supp. 2d 850 (W.D. Va. 2001) .......................................................................... 11, 13

*SEC v. Drive Planning, LLC*,
    No. 1:24-CV-03583-VMC, 2024 WL 3811989 (N.D. Ga. Aug. 13, 2024) ................................ 13

*SEC v. Duclaud Gonzalez de Castilla*,
    170 F. Supp. 2d 427 (S.D.N.Y. 2001) .................................................................................. 12

*SEC v. Heartland Grp. Ventures, LLC*,
    No. 4:21-CV-01310-O, 2022 WL 1527542 (N.D. Tex. Mar. 18, 2022), *report and
    recommendation adopted*, No. 4:21-CV-01310-O, 2022 WL 1523471 (N.D. Tex. May 13,
    2022) ..................................................................................................................... 12, 15

*SEC v. Lauer*,
    445 F. Supp. 2d 1362 (S.D. Fla. 2006) ................................................................................ 13

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972) ............................................................................................. 11

*SEC v. Miller*,
    No. 10-cv-05760-SAS (S.D.N.Y. Oct. 16, 2014) ............................................................. 13–14

*SEC v. N. Star Fin., LLC*,
    No. GJH-15-1339, 2017 WL 476602 (D. Md. Feb. 3, 2017) ...................................................... 15

*SEC v. Private Equity Mgmt. Grp., Inc.*,
    No. 09-2901, 2009 WL 2058247 (C.D. Cal. July 9, 2009) .................................................. 12, 14

*SEC v. Santillo*,
    No. 18-CV-.5491, 2018 WL 3392881 (S.D.N.Y. July 11, 2018) ................................. 11, 12, 13

*SEC v. Stein*,
    No. 07-CV-3125 (GEL), 2009 WL 1181061 (S.D.N.Y. Apr. 30, 2009) .............................. 10, 12

*SEC v. Tadrus*,
    No. 23-CV-5708, 2023 WL 7222705 (E.D.N.Y. Nov. 2, 2023) ................................................ 10

*Sierra Club v. United States Army Corps of Eng'rs*,
    732 F.2d 253 (2d Cir. 1984) ................................................................................................. 8

Plaintiffs oppose Defendant Daniel Blumkin's Motion to Dissolve the Preliminary Injunction or, in the Alternative, to Modify It. Dkt. No. 841. In his supporting memorandum of law, Blumkin misstates and omits material facts, makes illogical assertions, raises untimely claims, ignores applicable precedent, and fails to cite a single case that actually supports his remarkable, unprecedented request. Dkt. No. 841-1. There is no basis—factual or legal—for granting Defendant's motion.

## BACKGROUND

**A. Plaintiffs have acted as responsible stewards of the frozen assets, balancing the individual Defendants' requests with the conservation of the assets for future redress.**

For most of the first two years of this litigation, Plaintiffs agreed to regular, significant payments to Blumkin from the pool of assets frozen for potential disbursement to harmed consumers. Between January 2024 and November 2025, those payments totaled more than $1.8 million, which included recurring payments of more than $30,000 per month on average for living expenses along with numerous other payments in response to one-off requests. Hanson Decl. ¶ 11. When Plaintiffs first agreed to release frozen funds, they made clear that they were "unfreezing the below amounts for this month only" and that Plaintiffs "will need to review and assess any future such requests." Siegel Decl. ¶ 2. Since that initial disbursement, Plaintiffs and the individual Defendants have engaged in extensive negotiations regarding the unfreezing of assets.

In November 2025, Plaintiffs informed Blumkin and the other individual Defendants that, going forward, Plaintiffs would no longer consent to large monthly payments because "of the protracted nature of [the] litigation" and "the need to preserve the assets for consumer redress." Naftalis Decl. Ex. 3, Dkt. No. 841-2 at 79−80. Plaintiffs also noted that, although Blumkin had two years to make changes, it appeared that he had "taken few meaningful steps to reduce his

monthly expenses." *Id*. Rather than continuing monthly payments, Plaintiffs agreed to an upfront payment equal to one year's Area Median Income (AMI) for Nassau County, where Mr. Blumkin lives: $164,900. Plaintiffs also encouraged Blumkin to seek employment to make up for any shortfall, assuring him that they would not "seek to freeze [] new employment income." *Id*.

Plaintiffs unfroze $164,900 on November 25, 2025. Siegel Decl. ¶ 3. Instead of getting a job or decreasing his expenditures to make up the difference, Blumkin filed this motion.

**B. Based on Blumkin's representations, he has received substantial consumer funds since this litigation began.**

Plaintiffs have authorized $1.8 million unfrozen on Blumkin's behalf in the 25 months since this Court imposed the asset freeze, which breaks down as follows:

- Monthly living costs and various extra expenses: $1,057,224.08;

- Taxes: $290,474;

- Attorneys' fees: $210,000; and

- Interest payments for personal loans and capital calls for investments: $242,272.[1]

Hanson Decl. ¶ 11. On average, Blumkin has received $71,987.92 per month in frozen assets, either directly or for his benefit.

Blumkin's budget, submitted with his sworn financial disclosures and summarized in his motion, initially formed the basis for his monthly living expense payments of more than $30,000 per month. Yet that budget covers far more than "basic" living expenses. Blumkin requested money for two luxury car payments each month (for a Mercedes S-Class and a Lincoln Navigator), even though he owned a third car outright and only two adults live in his household.

---

[1] Recognizing that these payments preserve assets for consumer redress, Plaintiffs will continue to unfreeze funds for this purpose. Plaintiffs remain open to considering requests to unfreeze funds related to taxes and attorneys' fees as well.

Hanson Decl. ¶ 15. Although he admits to not working since entry of the injunction, Dkt. No. 841-1 at 5, he also claims to need $4,650 for monthly housekeeping and childcare/enrichment costs, *id.* at 7. The allowance he claims is necessary to cover his "basic" expenses totals $396,000 per year.

### C. Blumkin did not curtail his spending habits or get a job after entry of the injunction.

Even after Plaintiffs unfroze funds to cover Blumkin's proclaimed monthly budget, he demanded more. Though his budget claimed to cover $2,100 for monthly utilities and $2,600 for "other household expenses" ($56,400 per year), he submitted extra requests for $16,400 in gas bills,[2] $5,300 in water bills, and $11,600 in landscaping bills. Hanson Decl. ¶ 14. One water bill he submitted shows that 80% of his water costs—thousands of dollars per year—are related exclusively to lawn irrigation. Siegel Decl. ¶ 5. Plaintiffs unfroze a total of approximately $159,000 in response to these one-off requests. Hanson Decl. ¶ 14.

On at least three occasions Plaintiffs advised Blumkin in writing to reduce his expenses. Siegel Decl. ¶¶ 6–7; Naftalis Decl. Ex. 3 (Dkt. No. 841-2 at 79–81). Instead, Blumkin continued to spend significant sums on lavish services and unnecessary activities, including an average of $6,000 per year for pool maintenance; $20,600 per year for landscaping contractors; $9,700 per year for gambling; and more than $234,000 total in credit card charges. Hanson Decl. ¶ 12. Between January 2024 to January 2026, he paid more than $74,000 to collectible-card companies and another $30,000 in connection with unspecified Ebay purchases. Hanson Decl. ¶¶ 4–5, 8. During the two summers since the asset freeze, his children attended a summer camp that costs a

---

[2] Plaintiffs lack visibility into the exact division of gas and utility expenses. But it appears likely from the amounts and an overhead picture of Blumkin's residence that at least a significant percentage of the utility expenses relate to the energy needed to heat an outdoor pool and hot tub. *See* Siegel Decl. ¶ 4.

total of $33,900 each year ($53,900 of which came from the frozen-asset pool in response to one-off requests). Siegel Decl. ¶¶ 2, 6. Blumkin also transferred about $86,000 to his wife's business. Hanson Decl. ¶ 13.

In February 2025, Plaintiffs asked the status of Blumkin's job search or other sources of income. Siegel Decl. ¶ 6. Blumkin never answered. In November 2025, Plaintiffs again asked Blumkin the status of his job search and sources of other income, but much like his motion, Blumkin provided only a vague response about the lawsuit's interference with his employment prospects. *Id*. ¶ 8. Despite his self-serving, unsupported claim that he "has been unable" to find work, Dkt. No. 841-1 at 5, Blumkin offers no evidence that he has taken any meaningful steps to obtain employment.

Despite his repeated claim that he had "no notice" of the Plaintiffs' decision to limit the amount of assets they would agree to unfreeze for living expenses, *Id.* at 8-9, Blumkin had months of notice to prepare for the change to his disbursements. Plaintiffs sent Blumkin a letter on November 5, 2025, informing him that he would get a 12-month AMI payment of $164,900 in December 2025. Dkt. No. 841-2 at 79. Plaintiffs volunteered to pay that amount upfront in a lump sum, permitting Blumkin to spend that lump sum at any rate he wanted. At the rate of $33,000 per month, it gave him five additional months of support and time to adjust. And even on top of that, Plaintiffs have unfrozen an additional $72,000 to cover two quarterly tax payments. Siegel Decl. ¶¶ 9–10.

### D. Blumkin inaccurately portrays several facts relating to his disbursements.

*Medical expenses*. Blumkin's assertions about his medical-payment requests are incomplete. He claims that the Bureau "refused to release additional funds for Blumkin to pay *necessary* medical expenses," pointing to the Bureau's reported "refus[al] to release $3,923.31 and $5,020.28, respectively, to pay medical bills." Dkt. No. 841-1 at 10. This is not true.

Blumkin ignores that, just days prior to his medical requests in December 2025 and January 2026, Plaintiffs had released a full year's AMI of $164,900—more than enough to pay those medical expenses. Plaintiffs explained this to Blumkin and, with respect to the later request of $5,020.28 (which encompassed the earlier $3,923.31 medical bill), did not even refuse to pay. Plaintiffs indicated only that Blumkin would need to show why he could not use a portion of the $164,900 to pay for the expenses before Plaintiffs would release even more money. Siegel Decl. ¶ 11. To date, Blumkin has failed to provide any explanation.

*Tax payments*. Blumkin's statements about his request for money to pay taxes are incomplete and misleading. According to Blumkin, "for months, plaintiffs also took the baseless position that they would not release funds for Blumkin to pay his federal and state taxes." Dkt. No. 841-1 at 10 n.5. But Plaintiffs never refused to provide money for Blumkin's taxes. Instead, to assess the reasonableness of the requests, Plaintiffs sought basic information from Blumkin, including evidence of the source of the liabilities, an understanding of where past refunds had been deposited, and an explanation for whether there would be ongoing requests for similar amounts. Siegel Decl. ¶¶ 9–10, 12–13. And even when Blumkin did not respond in full to Plaintiffs' requests for information, Plaintiffs always ultimately agreed to provide money to cover taxes. *Id.*

Blumkin also claims that, because there was a "delay" in getting money for taxes, he will need "to pay unnecessary penalties and interest, as well as legal fees."[3] Dkt. No. 841-1 at 10 n.5.

---

[3] It is unclear why Blumkin would incur attorney fees to pay alleged late fees and interest. He also makes a passing reference to attorney fees in the same footnote, claiming that "Plaintiffs have also improperly refused to release funds so that he can pay his legal fees." Blumkin does not, however, appear to be making any argument concerning attorney fees or requesting any relief based on the alleged nonreceipt of attorney fees. Plaintiffs asked for information about other sources of funds for attorney fees in response to Blumkin's requests for fees. Siegel Decl.

While it is unclear exactly what penalties and fees Blumkin is referencing, many of the delays, if not all of them, were attributable at least in part to the timing of his own requests.[4] He sent one request on April 17, 2025, two days *after* the tax payment was due. Siegel Decl. ¶ 13. He sent another on September 15, 2025, the day the payment was due. *Id*. ¶ 15. On January 8, 2026, he requested $42,000 by a supposed due date of January 15. *Id*. ¶ 10. Plaintiffs ultimately agreed to release the funds on January 14, but requested that, for future tax requests, he provide 45 days' notice along with "documentation showing the source of the income being taxed." *Id.* Blumkin declined to take these or any other steps to avoid future late fees, stating: "As to future requests, we don't agree that you are entitled to 'documentation.' . . . Nor is it reasonable for your team to take 45 days to review these basic requests and cause Mr. Blumkin to incur penalties and late fees." *Id.* At the same time he complained about incurring these fees, Blumkin received large tax refunds that he failed to deposit for months: his 2023 refund of $140,940 was issued on December 10, 2024, but not deposited until April 28, 2025, and his 2024 refund of $16,735 was issued on November 6, 2025, and not yet deposited as of February 26, 2026. *Id*. ¶¶ 16–18.

*Claimed offer to increase living-expense payments*. Blumkin also inaccurately asserts that the Wisconsin Attorney General's Office "had offered to increase Blumkin's living expenses in August 2025." Dkt. No. 841-1 at 8. In reality, after seeing Blumkin submit numerous "one-off" expense requests, that office told Blumkin's counsel that it was "open to considering an

---

¶¶ 7, 13–14. Aside from simply pointing to a state-court docket for a case Blumkin brought to obtain insurance coverage for fees for this litigation, Blumkin was not willing to provide any additional information or confirmation. *Id.*

[4] Some delay was also attributable to Blumkin's refusal to provide information sufficient for the Bureau to understand the nature of the supposed tax liabilities. The Bureau explained in an October 29, 2025 email, for example, that it "has not refused to unfreeze assets for Mr. Blumkin's taxes" but was instead "requesting documentation in support of the request." Siegel Decl. ¶ 12.

adjustment of Mr. Blumkin's base funds," but Blumkin would need to "provide a monthly breakdown for reasonable living expenses that includes recurring household expenses he omitted from his initial list." Siegel Decl. ¶ 7. The State, then, was open to considering raising the monthly allotment to decrease the burdens of handling numerous "one-off" requests; it did not "offer[] to increase Blumkin's living expenses." Blumkin never provided the monthly breakdown.

*Car Payments*. Blumkin's request for $2,730 in monthly car payments for a Mercedes and Lincoln rests solely on counsel's assertion, repeated from Blumkin's claimed monthly budget, that Blumkin is still incurring these monthly expenses. Dkt. No. 841-1 at 7 (claiming to "have monthly expenses of approximately $32,100," including $2,730 for "car payments"). But Blumkin's credit report contradicts counsel's claim. His credit report shows that, following a lump sum payment of $34,455 to TD Auto Finance in March 2025, Blumkin made no other loan payments. Hanson Decl. ¶ 9. And back in October and November 2024, Blumkin made final payments on a lease to Mercedes-Benz Financial Services totaling $69,813. *Id.* ¶ 10. Both accounts are now listed as paid and closed, and his credit report does not show any additional open car loans or leases *Id.* ¶¶ 9–10.

Plaintiffs raised this issue with Blumkin's counsel in preparation for this filing. Counsel now admits that Blumkin's car payments are no longer as high as he claimed in his initial filing. Siegel Decl. ¶ 19. He admits that the lease on the Mercedes was not renewed but implies (without any support) that Blumkin continues to make the loan payment for the Lincoln, for a revised monthly amount of "around $1,327." *Id.* Blumkin's credit report, however, contradicts that assertion, showing that both car payments had concluded by early 2025. Hanson Decl. ¶¶ 9–10. Moreover, counsel's response raises more questions than it answered, including why

Blumkin paid $70,000 to end a lease on a car he claims he does not own, why he knowingly continued to request monthly allotments for car payments even after he stopped making them, and what is the source of the more than $100,000 Blumkin used for lump sum payments for the cars in fall 2024 and spring 2025.

<u>LEGAL STANDARDS</u>

### A. Motion to Modify or Dissolve Injunction

In the Second Circuit, a district court may modify or dissolve a preliminary injunction using "the same discretion it exercised in granting or denying injunctive relief in the first place." *Sierra Club v. United States Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984). "The test of that discretion is measured by whether the requested modification effectuates or thwarts the purpose behind the injunction." *Id*. at 257. Often, modifications of injunctions are justified by a "significant change in facts or law." *Lashify, Inc. v. Qingdao Network Tech. Co.*, No. 25-CV-4183 (LJL), 2026 WL 112022, at *3 (S.D.N.Y. Jan. 15, 2026).

### B. Motion to Reconsider

Motions to reconsider are reviewed "under the lens of Rule 59(e)." *Lashify*, 2026 WL 112022, at *6. A Rule 59(e) motion may be granted "only when the moving party identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Salamone v. Douglas Marine Corp*., 111 F.4th 221, 232 (2d Cir. 2024) (alterations and emphasis omitted). "A motion to reconsider [pursuant to Rule 59] is not petitioner's opportunity to put forward evidence that he could have, but failed, to provide the Court when the Court initially considered the motion." *NEM Re Receivables, LLC v. Fortress Re, Inc.*, 187 F. Supp. 3d 390, 396 (S.D.N.Y. 2016). A motion to reconsider must be filed within 28 days of the original order under Rule 59(e). *Salamone*, 111 F.4th at 232.

8

## <u>ARGUMENT</u>

### A. Blumkin's renewed challenge to the lawfulness of the preliminary injunction is an untimely motion to reconsider and should be denied.

Although styled as a motion to dissolve or modify the preliminary injunction, Blumkin's argument—that the Court lacked sufficient evidence at the outset to freeze his assets, Dkt. No. 841-1 at 2, 13–14—is fundamentally a time-barred motion for reconsideration. *See Lashify, Inc.*, 2026 WL 112022, at *5 ("[A] motion that asks the Court whether the injunction should have been granted in the first place based on facts as they existed at the time the injunction was entered is properly considered a motion for reconsideration."); *see also CFPB v. Blust Family 2019 Irrevocable Tr.*, No. 25-1541, 2026 WL 574908, at *2 (2d Cir. Mar. 2, 2026) (denying Blust Trust's appeal, describing its underlying motion as "best understood as an attempt to relitigate the issuance of the original preliminary injunction …. The Trust's objection to placement of its assets into receivership is a challenge it already raised—and lost—in its appeal of the preliminary injunction.").

The Court issued its preliminary injunction order on March 4, 2024. Nearly two years later Blumkin filed this motion alleging fundamental deficiencies in the original order, Dkt. No. 183, which has already been affirmed on appeal. *CFPB v. Stratfs, LLC*, No. 24-697, 2025 WL 1554514 (2d Cir. June 2, 2025). Blumkin's motion to reconsider the preliminary injunction because of the supposed insufficiency of the original evidence is thus untimely under Rule 59(e) and should be denied. Moreover, Blumkin does not offer any reason why he could not have made the arguments about the sufficiency of the evidence at the original preliminary injunction hearing two years ago. His motion to reconsider also should be denied because he offers no new evidence or changes in the law to justify reconsideration. *See NEM Re Receivables*, 187 F. Supp. 3d at 396.

**B. Blumkin's request to modify the asset freeze fails because he cannot show that the frozen assets are untainted or that the remaining funds would be sufficient to satisfy consumer redress in the future.**

Blumkin acknowledges that he has the burden of "establish[ing] that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." Dkt. No. 841-1 at 11 (quoting *SEC v. Ahmed*, 123 F. Supp. 3d 301, 313 (D. Conn. 2015)). Plaintiffs agree that a modification of the asset freeze requires evidence that the funds to be released are untainted by the alleged misconduct and that the remaining frozen assets would be sufficient to satisfy consumer redress in this case. *See SEC v. Stein*, No. 07-CV-3125 (GEL), 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009).

Despite acknowledging this standard, Blumkin submits no evidence that any of the frozen funds were acquired through legitimate means or activity unrelated to the fraudulent conduct at issue. To the contrary, he asserts that his family's sole source of income "from 2007 until this case was filed in 2024" came from the SFS scheme. Dkt. No. 841-1 at 5. Nor does he argue that sufficient assets would remain after dissolving or otherwise modifying the preliminary injunction. The absence of evidence on either front is fatal to his argument; here, he fails both.

Conversely, Plaintiffs have already established a likelihood of prevailing and a likely judgment that exceeds $500 million. Decision and Order, Dkt. No. 183 at 45; *Stratfs, LLC*, 2025 WL 1554514 (affirming injunction on appeal); Kelly Decl. ¶¶ 19, 27, Dkt. No. 477-43. Plaintiffs estimate (and no defendant claims otherwise) that no more than $150 million remains frozen— considerably less than half of the anticipated judgment. Dkt. No. 842-2 at 79. As the court held in *SEC v. Tadrus*, "there is no legal basis for unfreezing allegedly tainted assets, especially where the currently frozen assets cannot cover likely disgorgement liability." No. 23-CV-5708, 2023 WL 7222705, *5 (E.D.N.Y. Nov. 2, 2023). For these reasons alone, Blumkin's motion must be

10

denied in full.

**C. Blumkin is not entitled to receive payments of more than $30,000 per month from the assets frozen to preserve potential relief to consumers.**

In addition to the foregoing bases for denying Blumkin's motion, the equitable factors that federal courts have applied to decide whether to unfreeze assets for living expenses further confirm that Blumkin's requests are unwarranted. "With respect to requests for living expenses, courts may consider whether the defendant has any additional sources of income and whether the defendant is seeking funds for luxuries rather than necessities." *SEC v. Cope*, No. 14-CV-7575 (DLC), 2016 WL 7429445, at *2 (S.D.N.Y. Dec. 23, 2016); *see also SEC v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001). *Cf. SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) (when considering whether to impose an asset freeze, "the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief").

*1. Blumkin's request for $33,000 per month far exceeds the modest sums courts have approved.*

Blumkin's request for almost $400,000 a year is not for mere "living expenses," but a demand to bankroll his extravagant lifestyle with money belonging to the consumers he harmed. The components of his spending—luxury cars, household employees, gambling, and extravagant credit card bills—reflect the expenses of a wealthy household.

"To determine the reasonableness of requested living expenses, a district court must be comfortable that the requested funds involve necessities and would not support luxuries or a lavish lifestyle." *FTC v. Am. Tax Serv. LLC*, No. 2:25-CV-01894, 2025 WL 3564724, at *4 (D. Nev. Dec. 11, 2025) (finding even "fixed monthly costs" are facially unreasonable where they support lavish lifestyle); *see also SEC v. Santillo*, No. 18-CV-.5491, 2018 WL 3392881, at *3 (S.D.N.Y. July 11, 2018) (noting courts may "carve out *modest* sums from asset freeze orders

when necessary to meet the defendant's reasonable living expenses") (emphasis added). Thus, courts routinely reject line-item expenses like the ones Blumkin proffers here. *See SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) (denying defendant's request for living expenses that included a nanny and a housekeeper); *SEC v. Heartland Grp. Ventures, LLC*, No. 4:21-CV-01310-O, 2022 WL 1527542, at *6 (N.D. Tex. Mar. 18, 2022), *report and recommendation adopted*, No. 4:21-CV-01310-O, 2022 WL 1523471 (N.D. Tex. May 13, 2022) (denying request to unfreeze funds for "luxuries" such as multiple cars); *SEC v. Private Equity Mgmt. Grp., Inc.*, No. 09-2901, 2009 WL 2058247, *4 (C.D. Cal. July 9, 2009) (finding that a defendant's requests for living expenses was "facially unreasonable" because he asked for an amount that would fund "a lavish lifestyle" including owning multiple homes and cars); *Am. Tax Serv. LLC*, 2025 WL 3564724, at *5 (identifying a "pool" as a "luxury" while denying "facially unreasonable" request for extravagant living expenses).

Indeed, Blumkin's request *exceeds* monthly amounts that courts have deemed excessive. *See Private Equity Mgmt. Grp., Inc.*, 2009 WL 2058247, *4 ("$27,000 a month is a tremendously high overhead, an overhead that by no stretch of the imagination can be considered reasonable"); *Stein*, 2009 WL 1181061 at *2 (rejecting request for up to $20,000 a month in living expenses); *Heartland Grp. Ventures, LLC*, 2022 WL 1527542, at *6 (rejecting request for $17,500 in monthly living expenses); *FTC v. Elegant Sols., Inc.*, No. SACV 19-1333, 2019 WL 9358567, at *2 (C.D. Cal. Dec. 10, 2019) ($15,000 per month "facially unreasonable"); *Santillo*, 2018 WL 3392881, at *4 (rejecting $12,535 per month as "far too high in view of the significant potential disgorgement penalty"); *Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d at 430 (rejecting request for approximately $9,000 monthly budget).

Where courts have granted relief at all, the approved amounts reflect basic living

expenses. *See SEC v. Drive Planning, LLC*, No. 1:24-CV-03583-VMC, 2024 WL 3811989, at *1–2 (N.D. Ga. Aug. 13, 2024) (unfreezing amounts of $55,000 and $62,000 to cover two defendants' respective expenses for *a six-month period*); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1364 (S.D. Fla. 2006) (noting prior order requiring a receiver to "release $10,000 per month for [] living expenses and attorneys' fees"); *Santillo*, 2018 WL 3392881, at *4 (holding defendant was entitled to only $5,000 per month, in part because of his ability to "seek new sources of income to support his income"); *Dowdell*, 175 F. Supp. 2d at 855 (ordering the release of between $1,700 and $4,000 per month for "living expenses" because the amounts were appropriate to cover "necessities" rather than "luxuries").

Blumkin's own cases, accurately read, confirm that courts approve basic living expenses, not extravagant sums. Blumkin selectively cites *Santillo* in his brief, Dkt. No. 841-1 at 11, to excise the one word in this quotation that matters most: *modest. See Santillo*, 2018 WL at *3 (approving disbursements of "modest sums from asset freeze orders"). His brief also employs an ellipsis in describing *Health Formulas*, Dkt. No. 841-1 at 12, thus obscuring the critical mitigating factor contemplated by the court: the defendants' "ability to seek other employment." *FTC v. Health Formulas, LLC*, No. 14-cv-01649, 2015 WL 2130504, at *20 (D. Nev. May 6, 2015).

*SEC v. Miller*—the only case even on par with the AMI-based amount Plaintiffs already agreed to disburse here—is inapposite. There, a temporary freeze was imposed post-liability as part of judgment collection efforts against newly named relief defendants. *See* Letter from Bridget Fitzpatrick, Supervisory Trial Counsel, SEC, to Judge Scheindlin, *SEC v. Miller*, No. 10-cv-05760-SAS (S.D.N.Y. Oct. 16, 2014), Dkt. No. 487; Letter from Bridget Fitzpatrick, Supervisory Trial Counsel, SEC, to Judge Scheindlin, *SEC v. Miller*, No. 10-cv-05760-SAS

(S.D.N.Y. Oct. 16, 2014), Dkt. No. 500. Here, Blumkin (now a liability defendant) was named prior to the preliminary injunction, discovery has not started, and an eventual judgment date is not foreseeable. Blumkin's remaining cases fare no better, having approved only expenses that were modest in amount or limited in duration, and in one instance accompanied by a judicial warning to spend less. *See SEC v. Carver*, No. SACV 08-627, 2008 WL 11342958, at *2 (C.D. Cal. Aug. 28, 2008) (approving $23,850 for a three-month period while advising the defendants to "consider less expensive housing in the future as the Court is reluctant to release further funds next quarter to pay for their current housing").

    2.   *Blumkin's failures to document his assets or seek employment independently doom his request.*

Blumkin's claims of hardship collapse under scrutiny: he has not demonstrated a lack of assets, and he has not obtained a job. Despite contending that he "will run out money in April 2026," Dkt. No. 841-1 at 5, Blumkin fails to substantiate his claim that he does not have other available funds to support his living expenses or, tellingly, even what his actual monthly expenses currently are. Indeed, Blumkin offers no accounting of where the $164,900 Plaintiffs released less than three months ago have gone. There is no basis to release more. *See FTC v. Vantage Point Servs., LLC*, No. 15-CV-6S, 2018 WL 2120139, at *2 (W.D.N.Y. May 8, 2018) (denying motion to release frozen funds absent "full financial disclosure" and noting "[t]hose financial disclosures must be current, not months or years out of date"); *Elegant Sols., Inc.*, 2019 WL 9358567, at *2 ("The Court finds that Defendants have not demonstrated that the funds currently frozen are the only funds available to them to pay for living expenses."); *FTC v. Health Formulas, LLC*, No. 14-cv-1649, 2015 WL 4623126, at *2 (D. Nev. Aug. 3, 2015) ("[T]he Court denies the Defendants' request for a third release of funds because it is not persuaded that other funds are not available to them."); *Private Equity Mgmt. Grp., Inc.*, 2009 WL 2058247, at *4

(denying request for funds based on monthly bills that, while detailed, were unauthenticated).

Blumkin blames this lawsuit for his unemployment but offers zero evidence of a job application, interview, or effort to generate income. And a defendant who has not sought employment may not tap funds held for consumer redress. *See Am. Tax Serv. LLC*, 2025 WL 3564724, at *4 (declining to release funds where defendants were capable of working to support their basic necessities); *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1314 (S.D. Fla. Sept. 18, 2013) ("Absent persuasive evidence to the contrary, the Court can conclude only that [Defendants] are capable of working to support their basic necessities."). Inexplicably, Blumkin's motion asserts he was the sole provider for his family but is silent on his wife's capacity to work, a notable omission in light of the fact that she owns a business to which he has transferred $86,000. Hanson Decl. ¶ 13. *See Heartland Grp. Ventures*, 2022 WL 1527542 at *5 (noting that defendants' non-party spouses could work to defray household costs).

Indeed, the fact that Blumkin—after receiving $1.8 million in frozen assets over the last two years—has failed to find a job or adjust his expenses is more than justification for the Plaintiffs' changed approach to disbursements. *See Elegant Sols., Inc.*, 2019 WL 9358567, at *2 (C.D. Cal. Dec. 10, 2019) (six months was "more than sufficient time to obtain employment to address any personal needs."); *SEC v. N. Star Fin., LLC*, No. GJH-15-1339, 2017 WL 476602, at *2 (D. Md. Feb. 3, 2017) (conditioning additional payments, even at a lower amount than previously approved, on a defendant getting a job and reducing expenses because, "21 months after the initial asset freeze, [defendant] still ha[d] not found a way to independently support his livelihood, nor does it appear that he has significantly modified his lifestyle"); *SEC v. Abdallah*, No. 1:14-cv-1155, 2017 WL 11680997, at *3 (N.D. Ohio Aug. 1, 2017) (agreeing to end "carve-out" for living expenses in part because the defendant "had the opportunity, during the two-year

pendency of the asset freeze, to establish an alternate source of income and may no longer look

to the funds necessary to compensate the victims").

### 3. *Blumkin's reliance on the parties' so-called "custom and practice" highlights a fundamental flaw in his reasoning.*

Unable to marshal either law or fact in support of his position, Blumkin claims that the

Court should restore his monthly distribution—or dissolve the injunction entirely—because it

was the parties' "custom and practice" that he receive more than $30,000 every month for his

living expenses. Dkt. No. 841-1 at 7–8, 11–12. This argument defies logic. Not only does

Blumkin ignore Plaintiffs' statements that they were not guaranteeing these high disbursements

in perpetuity, but the undisputed implication from his argument is that, had Plaintiffs not given

Blumkin time to adjust his lifestyle or find a new job, then a lesser monthly payout could have

been appropriate. Plaintiffs' reasonableness in this regard is not a basis to further fund Blumkin's

lavish lifestyle, especially at the expense of the vulnerable consumers he harmed.

### 4. *Plaintiffs are acting to conserve the frozen assets for potential redress to consumers.*

The Court ordered Defendants' assets frozen to preserve them for potential distribution to

harmed consumers. Blumkin's repeated assertion that Plaintiffs' newly restrictive approach is to

incentivize Defendants to settle, *Id.* at 5, 9, 12–13, fails to address the most logical reason

Plaintiffs seek to curtail his expenditures: for the good of consumers. Indeed, Plaintiffs stated as

much in their November 5, 2025 letter. Dkt. No. 842-2 at 79 ("Plaintiffs are no longer willing to

continue unfreezing assets for Mr. Blumkin indefinitely, especially given that Mr. Blumkin

appears to have taken few meaningful steps to reduce his monthly expenses. To do so would be

at the expense of preserving relief for consumers.").

Blumkin seemingly forgets that Defendants made the exact same argument when, in

March 2025, there was an earlier disagreement about certain disbursements. Naftalis Decl. Ex. 2,

Tr. 35:2–5 (Dkt. No. 842-2 at 40) ("[T]he defendants have to live and they're entitled to get money every month to continue to live and they shouldn't be nickelled [sic] and dimed in a transparent attempt to resolve this case via settlement."). Nearly a year later, Blumkin again invokes "the timing" of Plaintiffs' seeking to limit disbursements in November 2025 as somehow improper because it occurred after an unsuccessful court-ordered mediation in September 2025. Dkt. No. 841-1 at 5, 8–9.

But nothing about Plaintiffs' approach is extraordinary or inappropriate. Plaintiffs allowed Blumkin almost two years to find new employment or adjust his lifestyle. And even now, Plaintiffs elected to provide him with an upfront payment of an entire year's living expenses tied to Nassau County's comparatively high area median income. This is more generous than the case law requires in these circumstances. Nothing in Plaintiffs' conduct warrants a modification, much less the dissolution, of the preliminary injunction's asset freeze meant to preserve assets to provide potential redress to harmed consumers.

## CONCLUSION

Because there is no factual or legal basis for Blumkin's extraordinary request that the Court now dissolve the preliminary injunction or make any modifications, the Court should deny the motion in full.


Dated:  March 9, 2026                    Respectfully submitted,

                                         Attorneys for Plaintiff
                                         Consumer Financial Protection Bureau

                                         DEBORAH MORRIS
                                         Principal Deputy Enforcement Director

                                         TIMOTHY M. BELSAN
                                         Assistant Litigation Deputy

/s/ *Lindsey Siegel*
Lindsey Siegel
E-mail: lindsey.siegel@cfpb.gov
Phone: 202-407-0498
Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov
Phone: 202-309-8084
Jacob Schunk
Email: jacob.schunk@cfpb.gov
Phone: 202-718-0394
Leah McCallister Ray
Email: leah.ray@cfpb.gov
Phone: 681-528-2409
Senior Litigation Counsel
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7722

LETITIA JAMES
Attorney General of the State of New York

/s/ *Christopher L. Boyd*
Christopher L. Boyd
Genevieve S. Rados
Assistant Attorneys General
350 Main Street, Suite 300A
Buffalo, NY 14202
Phone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov

PHILIP J. WEISER
Attorney General State of Colorado

/s/ *Kevin J. Burns*
Kevin J. Burns, CO Reg. No. 44527
(pro hac vice)
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 9th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

18

*Attorney for Plaintiff State of Colorado, ex rel. Philip J. Weiser, Attorney General*

KATHLEEN JENNINGS
Attorney General State of Delaware

*/s/ Marion M. Quirk*
Marion M. Quirk (*pro hac vice*)
Director of Consumer Protection
Victoria Finkle (*pro hac vice forthcoming*)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8843
marion.quirk@delaware.gov

*Attorney for State of Delaware ex rel. Kathleen Jennings, Attorney General*

KWAME RAOUL
Attorney General
State of Illinois

By: */s/ Matthew Davies*
Matthew Davies
Supervising Attorney
Consumer Fraud Bureau
(*pro hac vice*)
Amanda E. Bacoyanis, Assistant Attorney
General, Consumer Fraud Bureau
(*pro hac vice*)
Office of the Illinois Attorney General
115 S. LaSalle St., 26th Floor
Chicago, Illinois 60603
(312) 814-2218
Matthew.Davies@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Amanda.Bacoyanis@ilag.gov

*Attorneys for the People of the State of Illinois*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Evan Romanoff*

19

Evan Romanoff *(pro hac vice)*
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2130
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

*Attorney for the State of Minnesota*

JEFF JACKSON
Attorney General of North Carolina
*/s/ M. Lynne Weaver*
M. Lynne Weaver (*pro hac vice*)
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

*Attorney for the State of North Carolina*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Lewis W. Beilin*
Lewis W. Beilin *(pro hac vice)*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
Lewis.Beilin@wisdoj.gov

*Attorney for State of Wisconsin*