UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,

Plaintiffs,

v.

STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), *et al.*,

Defendants, and

STRATEGIC ESOP, *et al.*,

Relief Defendants.

---

**DECISION AND ORDER**

1:24-cv-00040 EAW

## I. INTRODUCTION

Presently pending before the Court are motions to dismiss filed by defendants Fidelis Legal Support Services, LLC ("Fidelis"), the Bush Lake Trust through Timothy Miller, Trustee ("Bush Lake Trust"), and Cameron Christo (Dkt. 440; Dkt. 441; Dkt. 442), a motion to dismiss filed by Richard K. Gustafson II (Dkt. 450), a motion to dismiss filed by Jason Blust (Dkt. 452), a motion to dismiss filed by Hedgewick Consulting, LLC ("Hedgewick"), Lit Def Strategies, LLC ("Lit Def"), and Relialit, LLC ("Relialit") (Dkt. 453), and a joint motion to dismiss filed by Timothy Burnette and Michelle Gallagher (Dkt. 493) (collectively, "the Moving Defendants"), the Reports and Recommendations

("R&Rs") issued by the Magistrate Judge, recommending denial of the motions to dismiss (Dkt. 532; Dkt. 715), and the corresponding objections thereto (Dkt. 542 (appeal filed by Fidelis, the Bush Lake Trust, and Christo); Dkt. 724 (joint objections filed by Gustafson, Blust, Relialit, Lit Def, Hedgewick, Burnette, and Gallagher)).

The Court held oral argument on the motions on September 24, 2025, and reserved decision. (Dkt. 804; Dkt. 813 (oral argument transcript)). For the following reasons, the Court overrules Defendants' objections, adopts the R&Rs in their entirety, and denies the motions to dismiss.

## II. BACKGROUND

### A. The Complaint, Temporary Restraining Order, and Entry of the Preliminary Injunction

Plaintiffs the Consumer Financial Protection Bureau ("CFPB"), the People of the State of New York, by Letitia James, Attorney General of the State of New York, the State of Colorado *ex rel.* Philip J. Weiser, Attorney General, the State of Delaware *ex rel.* Kathleen Jennings, Attorney General, the People of the State of Illinois through Attorney General Kwame Raoul, the State of Minnesota by its Attorney General Keith Ellison, the State of North Carolina *ex rel.* Joshua H. Stein, Attorney General, and the State of Wisconsin (collectively, "Plaintiffs"), brought this action against defendants StratFS, LLC and its related entities, Ryan Sassion, Jason Blust, and against relief defendants Daniel Blumpkin, Albert Ian Behar, Strategic ESOP, Strategic ESOT, Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments LLC, the Blust Family Irrevocable Trust, Jaclyn

Blust, Lit Def, and Relialit, alleging that they violated the Telemarketing Sales Rule (the "TSR"), 16 C.F.R. 310, which implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c) and 6105(d), and that Defendants violated New York Executive Law § 63(12), New York General Business Law (GBL) Article 22-A, Wis. Stat. § 218.02, and Wis. Admin Code § DFI-Bkg ch. 73. (*See* Dkt. 1).

Plaintiffs filed their complaint on January 10, 2024, along with an *ex parte* motion for a temporary restraining order (TRO) with an asset freeze, for the appointment of a receiver, and a request that Defendants show cause as to why the Court should not grant a preliminary injunction. (Dkt. 1; Dkt. 4; Dkt. 5). On January 11, 2024, the Hon. Lawrence J. Vilardo, United States District Judge, granted the request for a TRO and for the appointment of a receiver, and granted the request for a hearing on the motion for a preliminary injunction. (Dkt. 12). The case was subsequently reassigned to the undersigned. (*See* Dkt. 66; Dkt. 122). An evidentiary hearing on Plaintiffs' motion for a preliminary injunction was held on February 1 and 2, 2024, before the Hon. Michael J. Roemer, United States Magistrate Judge. (Dkt. 129; Dkt. 130). On March 4, 2024, the Magistrate Judge granted Plaintiffs' motion for a preliminary injunction. (Dkt. 183; Dkt. 184).

Plaintiffs filed an amended complaint on March 27, 2024. (Dkt. 249). The amended complaint added Blumpkin, Behar, Twist Financial, LLC, Duke Enterprises, LLC, and Blaise Investments, LLC, as defendants. (*Id.*). Plaintiffs filed a second amended complaint

("SAC") on May 28, 2024. (Dkt. 366). The SAC added Fidelis, Lit Def, Relialit, Hedgewick, Gustafson, Burnette, and Gallagher as defendants, and added Christo and the Bush Lake Trust as relief defendants. (*Id.*).

### B. Relevant Factual Allegations in the SAC

The parties are familiar with the R&Rs addressing the motions to dismiss (Dkt. 532; Dkt. 715), both of which include detailed factual recitations of the allegations in the SAC. The Court hereby incorporates those factual recitations in this Decision and Order and reiterates below any especially relevant allegations. As required on a motion to dismiss, the Court treats Plaintiffs' well-pleaded factual allegations as true.

***The Alleged Scheme and Harm to Consumers***

Plaintiffs allege that from at least January 2016, through March 4, 2024, the Moving Defendants and others operated a debt-relief scheme that collected exorbitant, illegal advance fees from consumers suffering from financial difficulties. (Dkt. 366 at ¶ 13). StratFS, a/k/a Strategic Financial Solutions ("Strategic"), founded by Sasson, Blumkin, and Behar, was the "invisible orchestrator" of the consumer solicitations driving the scheme. (*Id*. at ¶¶ 14, 24).

According to the SAC, Defendants operated two different debt-relief programs, including a deferred-fee model, for which consumers did not pay fees until Defendants settled a debt for them, and an advance-fee model, which took fees before the relevant debt has been settled. (*Id*. at ¶ 107). The advance-fee model was the primary business of

Strategic and accounted for approximately 80 percent of Strategic's revenue. (*Id.*; *see also id*. at ¶¶ 141-52 (describing advance-fee model)).

Strategic employed third parties to mail letters to consumers, which stated that consumers were "pre-approved" for a debt-consolidation loan; when the consumers responded to the solicitation, their information was captured by Strategic's computer systems. (*Id*. at ¶¶ 13, 16). Strategic employees then contacted the consumer, and almost always advised them that they did not qualify for the loan. (*Id*. at ¶ 17). Instead, Strategic employees used a script to encourage consumers to enroll in Strategic's debt-relief service by promising that Defendants' network of lawyers would negotiate reduced payoff amounts with consumers' creditors and defend consumers in the event of a creditor lawsuit. (*Id*. at ¶¶ 18-20). The SAC alleges that consumers were led to believe that they had an attorney and law firm to represent them should their creditors sue, but many consumers received no such representation despite having paid a significant retainer and legal fees. (*Id*. at ¶ 174).

After consumers enrolled in the debt-relief service, Defendants began collecting substantial fees from them while the consumers' debts continued to accrue interest and remained outstanding. (*Id*. at ¶ 22). The SAC alleges that Defendants front-loaded the fees, which left consumers with little money for potential settlements. (*Id*. at ¶ 23). As a result, consumers paid into the debt-relief service for months before Defendants reached a settlement with even one creditor, and some consumers exited the program having paid

substantial fees but with no debts settled or reduced at all. (*Id.*). Some consumers left the program with more debt than they started with. (*Id.*). In addition, when consumers stopped paying their debts (as directed by Defendants), creditors added interest and fees to their accounts and sued them for nonpayment. (*Id.* at ¶ 169). If the creditors obtained judgments, they could garnish consumers' wages or freeze their bank accounts, and consumers' credit scores dropped. (*Id.*). The SAC alleges that since at least January 2016, Defendants have collected over $84,000,000 in unlawful fees from consumers through these schemes. (*Id.* at ¶ 23).

***Façade Firms and Notaries***

If the consumer agreed to enroll in the above-described debt-relief service, Strategic connected the consumer with a "façade firm" and arranged for the firm to provide debt-relief services for the consumer in exchange for the consumer paying fees. (*Id.* at ¶ 112). According to the SAC, the law firms served as a "façade" for Strategic's debt-relief operation and performed little to no work on behalf of consumers. (*Id.* at ¶ 26). Strategic (not the façade firm) arranged a meeting between the consumer and a third-party notary. (*Id.* at ¶ 113). The notaries were independent contractors and were paid a nominal fee to have documents signed; they had limited knowledge about the contents of the documents and could not answer any questions about their content. (*Id.* at ¶¶ 113, 125). The notaries met with consumers at locations convenient for the consumer, and many took place through Zoom or over the phone without any in-person meeting at all. (*Id.* at ¶ 126). The contracts

between the façade firms and the notaries did not require the notaries to have any substantive knowledge of the debt-relief program, did not require the individual notaries to answer consumers' questions, and if a consumer had a question while signing the contract, the notary called Strategic by phone, so that the consumer could ask the question to someone from Strategic. (*Id*. at ¶¶ 131-33).

Once a consumer signed the enrollment documents, an attorney from the assigned façade firm contacted the consumer and read a short script welcoming the consumer to the program, and this was often the only time the consumer spoke with an attorney in connection with the debt-relief program. (*Id*. at ¶ 114).

During the enrollment process, Strategic representatives told consumers that enrollment included litigation defense services, a lawyer would represent them in any lawsuit related to non-payment of enrolled debts, and retainer agreements consumers signed with façade firms promised that firm lawyers would provide litigation defense if the consumer was sued by creditors. (*Id*. at ¶ 122). But consumers reported that firm lawyers almost never represented them when they were sued, even after the consumers paid the retainer fee. (*Id*.). Sasson, Blumkin, and Blust were involved with the notary process. (*Id*. at ¶ 140).

***The Strategic Companies and Owners***

The SAC alleges that Strategic operated the debt-relief scheme using a "web of interrelated companies." (*Id*. at ¶¶ 14, 24). Specifically, Sasson, Blumpkin, and Behar

each created a single-member shell-holding company (Duke Enterprises, LLC; Twist Financial LLC; and Blaise Investments LLC), which funneled them money from Strategic's business. (*Id*. at ¶ 24). In addition, Sasson and Blust created the façade firms, which corresponded with "Client Services Subsidiaries" created by Sasson, to provide services on behalf of the firms. (*Id*. at ¶¶ 25-26, 49-50). The SAC alleges that Sasson and Blust created the façade firms to conceal the role of Strategic from consumers and the public. (*Id*. at ¶ 182). Further, Strategic used the Client Services Subsidiaries to siphon money from consumers' accounts and profits from the façade firms, and to mask Strategic's involvement in the debt-relief operation. (*Id*. at ¶ 48). Blust directly controlled and managed the firms' operations and recruited attorneys for the firms. (*Id*. at ¶¶ 187-96). In addition, Blust was a conduit between the façade firms and Strategic, and Blust provided websites for and shared an address with multiple façade firms. (*Id*. at ¶¶ 197-204). Blust had control over bank accounts for certain façade firms, and he funneled money from the façade firms to his consulting companies, including Relialit and Lit Def. (*Id*. at ¶¶ 83, 206-09).

The SAC alleges that Sasson knew or should have known, due to previous lawsuits brought against his debt resolution company Legal Helpers Debt Resolution, LLC, that it is illegal to charge up-front fees for telemarketer-sold debt-relief services, and that using third-parties to act as fronts does not relieve him from liability. (*Id*. at ¶ 55). The SAC also alleges that Blust previously entered a stipulated judgment with the United States

Bankruptcy Trustee for the District of Kansas, and that he knew or should have known that the conduct alleged in the SAC is illegal. (*Id.* at ¶ 83). Blust was a former attorney at Legal Helpers. (*Id.*).

Individual defendants Gustafson, Burnette, and Gallagher each owned and controlled multiple façade firms. (*Id.* ¶ 26). The SAC alleges that Gustafson was a former partner at Legal Helpers, and that he owns and manages nine façade firms. (*Id.* at ¶¶ 85, 87). Burnette is an attorney who was also involved in several of the façade firms. (*Id.* at ¶¶ 89-90). Gallagher is an attorney who owns façade firms, and she previously worked for Client First Bankruptcy, owned by Blust. (*Id.* at ¶ 91).

The SAC alleges that Fidelis and Lit Def provided substantial assistance to Strategic's debt-relief operations by facilitating litigation support on behalf of the façade firms. (*Id.* at ¶ 94). When Strategic received notice that a creditor had sued a consumer enrolled in the debt-relief service, Strategic forwarded the filings to Lit Def and Fidelis (not to the law firms), which performed data entry for the lawsuits. (*Id.* at ¶ 95). In other words, Lit Def and Fidelis acted as a "hub" and sent filings to contracted litigation or appearance attorneys. (*Id.*). In approximately 2021, Lit Def began transitioning into Fidelis, and the operations of the two companies were interwoven. (*Id.* at ¶ 96). The SAC alleges that while Christo is purportedly the founder and chief executive of Fidelis, in reality Blust controlled Fidelis, and many of the debt-settlement law firms that Fidelis claimed to service are controlled by or related to Blust. (*Id.* at ¶ 102).

Relialit, which was also owned and controlled by Blust, was a predecessor company to Lit Def. (*Id*. at ¶ 97). Hedgewick, a consulting company also owned and controlled by Blust, provided services to the façade firms in exchange for consulting fees. (*Id*. at ¶ 98). Hedegwick provided a "team of experts" to arrange the partnership between the façade firms and Strategic, designed and set up the firms' websites, drafted the client enrollment forms, and recommended lawyers to join the firms. (*Id*.). Hedgewick also coordinated contracts between façade firms and notary companies and maintained signed copies of the contracts. (*Id*. at ¶ 139).

The Blust Family 2019 Irrevocable Trust is controlled by Paul Hull, Jr., Trustee. (*Id*. at ¶ 100). Hull was a partner in Legal Helpers. (*Id*.). The trust owns Lit Def, and Blust funneled consumer funds from the façade firms, the Client Services Subsidiaries, and Strategic into the Blust Family 2019 Irrevocable Trust, via Lit Def. (*Id*.). Blust funneled consumer funds from the façade firms, the Client Services Subsidiaries, and Strategic to Jaclyn Blust via Lit Def and the Blust Family 2019 Irrevocable Trust. (*Id*. at ¶ 101). Between March 2020 to April 2021, Lit Def paid $36,000,000 to the Blust Family 2019 Irrevocable Trust. (*Id*. at ¶ 226). According to the SAC, Relief Defendants the Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee, Jaclyn Blust, Strategic ESOP, Strategic ESOT, Christo, and the Bush Lake Trust have received, directly or indirectly, funds and other assets from Defendants that were obtained from consumers through Defendants' unlawful practices. (*Id*. at ¶ 229).

On March 1, 2021, Christo established the Bush Lake Trust, an irrevocable trust for the benefit of Christo's children and, on the same day, Christo transferred his ownership of Fidelis to the trust. (*Id*. at ¶ 104). From May 2021 to October 2023, Fidelis paid more than $15.7 million to Christo (including payments to an LLC formed by Christo) and more than $3.6 million to the Bush Lake Trust. (*Id*. at ¶ 105).

**C. Claims Alleged Against the Moving Defendants**

The SAC includes the following counts as to the moving defendants:

> Count 3 of the SAC alleges that Relialit, Lit Def, Hedgewick, and Fidelis provided substantial assistance to abusive telemarketing practices.
>
> Count 4 of the SAC charges Blust, Gustafson, Burnette, and Gallagher with providing substantial assistance to abusive telemarketing practices.
>
> Count 7 of the SAC charges Relialit, Lit Def, Hedgewick, Fidelis, Blust, Gustafson, Gallagher, and Burnette with repeated fraudulent acts, in violation of New York Executive Law § 63(12).
>
> Count 8 of the SAC charges Relialit, Lit Def, Hedgewick, Fidelis, Blust, Gustafson, Gallagher, and Burnette with engaging in deceptive acts or practices, in violation of New York General Business Law ("GBL") § 349.
>
> Count 9 of the SAC alleges that the Blust Family 2019 Irrevocable Trust, Jaclyn Blust, Cameron Christo, and The Bush Lake Trust received and must disgorge, funds obtained as a result of unlawful acts or practices.
>
> Count 10 of the SAC alleges that Blust, Gustafson, Gallagher, and Burnette operated as adjustment services companies in Wisconsin without a license, in violation of Wis. Stat. § 218.02(1)(a).
>
> Count 11 of the SAC alleges that Blust, Gustafson, Gallagher, and Burnette violated the Wisconsin Adjustment Services Company Rules by charging advance fees and excessive fees for debt-relief services in violation of Wis. Admin. Code § DFI-BKG 73.

(Dkt. 336 at 70-75, 78-82).

**D. Motions to Dismiss**

Fidelis, the Bush Lake Trust, and Christo (collectively, "the Fidelis Defendants") filed their motions to dismiss on September 30, 2024. (Dkt. 440 (Fidelis motion to dismiss); Dkt. 441 (Bush Lake Trust motion to dismiss); Dkt. 442 (Christo motion to dismiss); Dkt. 443 (joint memorandum of law)). Plaintiffs filed a response to the motions on October 18, 2024 (Dkt. 460), and the Fidelis Defendants filed a reply on November 6, 2024. (Dkt. 480). On December 19, 2024, the Magistrate Judge issued a Report and Recommendation (the "R&R"), recommending that the undersigned deny the motions (Dkt. 532 (hereinafter, "the December 19 R&R")). The Fidelis Defendants filed an appeal of the December 19 R&R on January 2, 2025. (Dkt. 542). Plaintiffs responded on February 4, 2025 (Dkt. 600), and the Fidelis Defendants filed a reply on February 28, 2025 (Dkt. 626).

Blust, as well as Relialit, Lit Def, and Hedgewick (hereinafter referred to as "the Blust Companies"), filed motions to dismiss on October 15, 2024. (Dkt. 452 (Blust motion to dismiss); Dkt. 453 (Blust Companies motion to dismiss)). Gustafson filed a motion to dismiss on October 14, 2024. (Dkt. 450). Plaintiffs filed a response to those three motions on November 5, 2024 (Dkt. 479), and Blust, the Blust Companies, and Gustafson filed a joint reply on November 29, 2024 (Dkt. 506).

Gallagher and Burnette filed a joint motion to dismiss on November 15, 2024. (Dkt. 493). Plaintiffs filed a response on December 16, 2024 (Dkt. 527), and Gallagher and Burnette filed a reply on January 6, 2025 (Dkt. 548).

On June 12, 2025, the Magistrate Judge issued a Report and Recommendation recommending denial of the motions to dismiss filed by Blust, the Blust Companies, Gustafson, Gallagher, and Burnette. (Dkt. 715 (hereinafter, "the June 12 R&R")). Blust, the Blust Companies, Gustafson, Gallagher, and Burnette filed joint objections to the June 12 R&R on June 26, 2025 (Dkt. 724), and Plaintiffs filed a response on July 18, 2025 (Dkt. 745).

## III. DISCUSSION

### A. Legal Standards

#### 1. Motion to Dismiss

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

**2. Review of Report and Recommendation**

If a party makes specific objections to a magistrate judge's report and recommendation, the district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). "The Court reviews unobjected-to findings for clear error." *Am. Ins. Co. v. City of Jamestown*, 914 F. Supp. 2d 377, 384 (W.D.N.Y. 2012). After conducting its review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**B. Fidelis Defendants' Motions to Dismiss**

The Court turns first to the motions to dismiss filed by the Fidelis Defendants. (Dkt. 440; Dkt. 441; Dkt. 442). The Fidelis Defendants advanced the following arguments in support of dismissal: (1) count 3 must be dismissed because the SAC does not plausibly allege that Fidelis substantially assisted the law firms' TSR violations, including because the relevant portion of the TSR is invalid, Fidelis did not aid in any wrongdoing, and Fidelis did not know that the law firms were collecting advance fees without an adequate face-to-face sales presentation; (2) counts 7 and 8 must be dismissed because the SAC does not allege that Fidelis violated N.Y. Exec. Law § 63(12) or GBL § 349; and (3) count 9 must be dismissed because the SAC does not state a valid claim against Christo or the Bush Lake Trust, as this claim depends on Fidelis being a wrongdoer. (*See* Dkt. 443 at 16-42).

The Magistrate Judge rejected these arguments in the December 19 R&R. (Dkt. 532). Specifically, the Magistrate Judge found that the substantial assistance provision of the TSR is valid, and the FTC did not exceed its authority under the Telemarketing Act by including "abusive" telemarketing acts in the substantial assistance provision to the TSR, 16 C.F.R. § 310.3(b). (*Id*. at 18-23). In addition, the Magistrate Judge found that the SAC sufficiently alleges substantial assistance by Fidelis, and the totality of the allegations in the SAC sufficiently connect Fidelis's activities with the alleged abusive telemarketing practices of the law firms. (*Id*. at 23-28). The Magistrate Judge also found that the SAC sufficiently pleads knowledge by Fidelis, the New York claims were sufficiently pled, and

Christo and the Bush Lake Trust were properly named as relief defendants at the pleading stage. (*Id*. at 28-38).

**1. The TSR provision is valid.**

Fidelis's first objection is that the Magistrate Judge erred by concluding that the TSR substantial assistance provision is valid, since the Telemarketing Act authorizes secondary liability only for facilitating *deceptive* telemarketing, whereas collecting unlawful advance fees, as alleged in the SAC, is an *abusive* telemarketing practice. Fidelis admits that it can point to no case law supporting its position that the substantial assistance provision applies only to deceptive telemarketing. (*See* Dkt. 542 at 11 ("This is a pure question of statutory interpretation; no court has ever addressed it. . . ."); *see also* Dkt. 813 at 14)). Fidelis argues that in concluding that the TSR is valid, the Magistrate Judge relied on the "generic" grant of rulemaking authority found in 15 U.S.C. § 6102(a)(1) and not on the express authorization of secondary liability found in subsection (a)(2), and that this reliance was improper. (Dkt. 542 at 21).

In response, Plaintiffs argue that the Telemarketing Act grants the Federal Trade Commissioner (FTC) broad authority to prohibit deceptive and abusive telemarketing practices, including by adopting the substantial assistance provision, any arguments for a narrower construction of the FTC's rulemaking authority are unpersuasive, and the other canons of statutory interpretation invoked by Fidelis do not support its reading of § 6102(a)(2). (Dkt. 600 at 6-18). Fidelis argues in reply that support for Plaintiffs'

interpretation of the Telemarketing Act is "almost non-existent," that Congress's limited authorization of secondary liability in § 6102(a)(2) must be given effect, and the specific directive in § 6102(a)(2) governs the general grant of rulemaking authority in § 6102(a)(1). (Dkt. 626 at 10-20).

The FTC's authority to promulgate the TSR arises from the Telemarketing Act, 15 U.S.C. §§ 6101-08. The Telemarketing Act states, in relevant part:

> (a) In general
> (1) The Commission shall prescribe rules *prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices*.
> (2) The Commission shall include in such rules respecting deceptive telemarketing acts or practices a definition of deceptive telemarketing acts or practices which shall include fraudulent charitable solicitations, *and which may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing, including credit card laundering*.
> (3) The Commission shall include in such rules *respecting other abusive telemarketing acts or practices*—
> (A) a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy,
> (B) restrictions on the hours of the day and night when unsolicited telephone calls can be made to consumers,
> (C) a requirement that any person engaged in telemarketing for the sale of goods or services shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to sell goods or services and make such other disclosures as the Commission deems appropriate, including the nature and price of the goods and services; and
> (D) a requirement that any person engaged in telemarketing for the solicitation of charitable contributions, donations, or gifts of money or any other thing of value, shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to solicit charitable contributions, donations, or gifts, and make such other disclosures as the Commission considers appropriate, including the name and mailing address of the charitable organization on behalf of which the solicitation is made.

15 U.S.C. § 6102(a) (emphasis added).

According to Fidelis, subsection (a)(1) begins with a general delegation of rulemaking authority that divides prohibited conduct into two categories: deceptive telemarketing and abusive telemarketing. The next two subparagraphs—one directed to deceptive telemarketing ((a)(2)), and the other directed to abusive telemarketing ((a)(3))—"refine and channel (a)(1)'s general authorization." (Dkt. 542 at 19). Subparagraph (a)(2) states that the FTC shall define deceptive telemarketing; that its definition of deceptive telemarketing "shall include fraudulent charitable solicitations"; and that its definition of deceptive telemarketing "*may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing*." *Id*. § 6102(a)(2) (emphasis added). Fidelis argues that because Congress did not expressly include language addressing substantial assistance in § 6102(a)(3)'s discussion of abusive acts (as it did in § 6102(a)(2)'s discussion of deceptive acts), Congress only authorized the FTC to outlaw the assistance and facilitation of *deceptive* telemarketing, and not for *abusive* telemarketing. (Dkt. 542 at 20).

The Court disagrees with the narrow reading of the Telemarketing Act endorsed by Fidelis. First, § 6102(a)(1), which appears *before* the more specific discussions of deceptive and abusive acts in §§ 6102(a)(2) and 6102(a)(3), provides a broad authorization to the FTC to create rules "prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). To read the remainder of the statute as "refining and channeling" this broad authorization would render subsection

(a)(1) meaningless. Following subsection (a)(1)'s general and broad grant of rulemaking authority, subsections (a)(2) and (a)(3) provide further direction regarding what acts could constitute deceptive or abusive telemarketing practices. For example, § 6102(a)(3) provides a list of examples, or sets a floor for, what types of conduct could be considered "other abusive telemarketing acts or practices." But there is nothing in the statute indicating that abusive telemarketing practices should be limited to those listed in subsection (a)(3).

The substantial assistance provision of the TSR, 16 C.F.R. § 310.3(b), prohibits an entity from providing substantial assistance to a telemarketer or seller engaged in abusive conduct. This regulation is within the general grant of authority provided to the FTC in § 6102(a)(1), to create rules prohibiting both "deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." In *CFPB v. Commonwealth Equity Grp., LLC,* 554 F. Supp. 3d 202 (D. Mass. 2021), the court addressed a similar issue with respect to the scope of the language in the Telemarketing Act. The court rejected the defendants' argument that the FTC exceeded its authority in promulgating rules targeting their conduct because Congress intended that only unsolicited telemarketing calls would be addressed by the FTC's regulations:

> The authorizing statute, 15 U.S.C. § 6101 *et seq.*, however, is not as narrowly written as defendants assert. Instead, the statute defines "telemarketing" using the same definition later adopted by the FTC in the TSR. *Id.* § 6106(4); 16 C.F.R. § 310.2(gg). This definition does not require an individual to make unsolicited calls in order to engage in telemarketing, but only requires the use of a telephone—which can both make *and* receive calls. 15 U.S.C.

> § 6016(4). *Although Congress directed the FTC to create rules regarding specific telemarketing activities (for example, calls that are made late at night or that are coercive), Congress also authorized the FTC to create additional rules addressing "deceptive telemarketing acts or practices" at its discretion*. 15 U.S.C. § 6102(a)(1). Defendants have not demonstrated that Congress intended the FTC to *exclusively* address unsolicited telemarketing calls that would cause the TSR to exceed the Commission's authorized scope of rulemaking.

*Id*. at 208-09 (emphasis added). In other words, the Telemarketing Act includes one general grant authorization at section (a)(1), followed by two sections ((a)(2) and (a)(3)), which provide examples of what the FTC must and may include in the regulations. To that end, Section 310.4 prohibits several additional "abusive" telemarketing practices not expressly listed in § 6102(a)(3), including a prohibition from engaging in threats, intimidation, or the use of profane of obscene language; requesting or receiving payment of fees or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, record, or rating; and disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing. *See* 16 C.F.R. § 310.4(1), (2), and (6). While these specific prohibitions are not specifically listed in § 6102(a)(3), they are included as abusive telemarketing practices in 16 C.F.R. § 310.4.

The language in §§ 6102(a)(1) and 6102(a)(3) further supports that Congress's inclusion of assisting and facilitating deceptive conduct, does not foreclose the FTC from addressing the assistance and facilitation of abusive conduct. 15 U.S.C. § 6102(a)(2) requires the FTC to define deceptive telemarketing, and states that such definition *may* include assistance or facilitation. Subsection (a)(3), on the other hand, does not require the

FTC to define abusive telemarketing, and instead provides a list of conduct the FTC shall include in its rule regarding abusive acts. As noted by the Magistrate Judge, the lack of parallelism between §§ 6102(a)(2) and 6102(a)(3) undercuts Fidelis's argument that if Congress wanted to promulgate a rule against substantially assisting abusive conduct, it would have done so. (*See* Dkt. 532 at 23); *see also United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) ("[I]f the language of the two provisions at issue is not parallel, then Congress may not have envisioned that the two provisions would be closely compared in search of terms present in one and absent in the other.").

Fidelis cites to various canons of statutory interpretation it argues support its position that Congress intended to impose liability for substantial assistance only in connection with deceptive telemarketing practices. (*See* Dkt. 542 at 21). For example, Fidelis argues that the Magistrate Judge's reading of the Telemarketing Act violates the canon against surplusage. (*Id.*). "Under the surplusage canon, 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Avon Nursing & Rehab. v. Becerra*, 667 F. Supp. 3d 47, 58 (S.D.N.Y. 2023) (citation omitted), *aff'd on other grounds*, 119 F.4th 286 (2d Cir. 2024). "The anti-surplusage canon is not an iron rule." *Mullin v. Al Otro Lado*, 609 U.S. ____, 146 S. Ct. 2079, 2092 (2026). In support of its argument, Fidelis cites *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) and *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003), for the proposition that in the context of a

stand-alone statutory authorization, the use of the word "may" should be read exclusively, as opposed to permissively, and it follows that 15 U.S.C. § 6102(a)(2)'s language telling the FTC that it *may* write rules imposing secondary liability for assisting or facilitation deceptive telemarketing would be superfluous, unless it limits the FTC's authority to impose secondary liability. (Dkt. 542 at 22). The Court disagrees with this interpretation of the statute because § 6102(a)(2) is not isolated and must be read in conjunction with subsection (a)(1) which, as explained above, contains a broad grant of authority for the FTC to draft rules prescribing both abusive *and* deceptive telemarketing. *See Commonwealth Equity Grp., LLC,* 554 F. Supp. 3d at 208-09 (noting that while the Telemarketing Act directs the FTC to create rules regarding specific telemarketing activities, Congress also authorized the FTC to create additional rules in 15 U.S.C. § 6102(a)(1), at its discretion).

Fidelis next cites to the *expressio unius* canon in support of its argument that Congress intended to prohibit substantial assistance only in the context of deceptive telemarketing—in other words, that the express mention of the substantial assistance in one subsection of the statute implies the exclusion in the other subsection. (Dkt. 542 at 25); *see also Spadaro v. CBP*, 978 F.3d 34, 46-47 (2d Cir. 2020) (the canon of *expressio unius* is that "the explicit mention of one thing is the exclusion of another left unmentioned"). The Second Circuit has held that this canon is only an aid to statutory construction, and not a rule of law, and that it "applies only when it is fair to suppose that Congress considered

the unnamed possibility and meant to say no to it." *Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) (quotations and citations omitted).

Fidelis cites *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988), arguing that case rejected "the means by which the R&R negates the choice Congress made in (a)(2)—resort to (a)(1)'s general rulemaking authority." (Dkt. 542 at 25). In *Bowen*, the Supreme Court rejected the Secretary of Health and Human Service's claim that a general grant of rulemaking authority allowed him to issue rules that would apply retroactively, where the statute elsewhere expressly granted authority to make certain retroactive adjustments. *Bowen*, 488 U.S. at 213-14. The Court does not read *Bowen* for the proposition that when Congress expressly provides for certain rulemaking in one area, it forecloses similar rulemaking in other areas where that type of rulemaking is not expressly mentioned. Rather, in *Bowen*, the Court was concerned about retroactivity and its application where not specifically designated by Congress, since "retroactivity is not favored in the law." (*Id*. at 208; *see also id*. at 208, 214 ("congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result," and "the absence of any express authorization for retroactive cost-limit rules weighs heavily against the Secretary's position")). Fidelis cites no case law confirming that the *expressio unius* canon would or should apply to the Telemarketing Act, including because it is not fair to suppose from the Telemarketing Act that Congress considered the imposition of secondary liability for abusive telemarketing practices, and meant to say no to it.

At oral argument, counsel for Fidelis advanced an argument relating to the TSR's incorporation of the Telemarketing Act. (*See* Dkt. 813 at 20-23). Specifically, counsel argued that Section 310.3(b) of the TSR—which defines "deceptive telemarketing"—improperly references "abusive" telemarketing acts by cross-referencing Section 310.4. To that end, the TSR at 16 C.F.R. § 310.3 prohibits deceptive telemarketing practices. That section defines deceptive telemarketing practices to include misrepresenting "[a]ny material aspect of any debt relief service," *id.* § 310.3(a)(2)(x), and "[m]aking a false or misleading statement to induce any person to pay for goods or services," *id.* § 310.3(a)(4). On the other hand, 16 C.F.R. § 310.4 prohibits abusive telemarketing practices. Abusive telemarketing practices include charging advance fees for a debt-relief service sold over the telephone, *id*. § 310.4(a)(5)(i), unless the fee is not paid "until after a face-to-face sales . . . presentation by the seller," *id.* § 310.6(b)(3). Further, 16 C.F.R. § 310.3(b), the "substantial assistance provision," which outlaws acts "that assist or facilitate deceptive telemarketing," as included in 15 U.S.C. § 6102(a)(2) of the Telemarketing Act, provides:

> Assisting and facilitating. It is a deceptive telemarketing act or practice and a violation of this part for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice *that violates §§ 310.3(a), (c) or (d), or § 310.4 of this part*.

16 C.F.R. § 310.3(b) (emphasis added). According to Fidelis, the problem with the cross-reference to Section 310.4 is that Section 310.3(b) is authorized by 15 U.S.C. § 6102(a)(2) (also governing deceptive telemarketing). Therefore, 16 C.F.R. § 310.3(b)'s reference to

abusive telemarketing acts exceeds the scope of what is authorized by § 6102(a)(2) of the statute. In other words, if the FTC wanted to impose secondary liability for abusive telemarketing acts, it should have done so in 16 C.F.R. § 310.4, which corresponds to 15 U.S.C. § 6102(a)(3), addressing abusive telemarketing practices.

This argument was briefly referenced in the papers before the Magistrate Judge (*see* Dkt. 443 at 19), but it was not framed in the same manner as it was at oral argument before the undersigned. And there was only limited reference to the issue during rebuttal oral argument on the motion to dismiss before the Magistrate Judge. (*See* Dkt. 504 at 40-41 (Fidelis responding to the plaintiffs' argument that § 6102(a)(1) has a broad grant of authority for the FTC to address deceptive and abusive telemarketing practices, noting "that argument would hold more water if the portion of the—if the source for this substantial assistance rule were in 310.4," and "when the Commission wrote its substantial assistance provision, it put it in 310.3. It is the provision that corresponds to A-2. . . . And the Commission certainly did not promulgate secondary liability under 310.4, which is the part of the TSR that corresponds to A-3.")). The Magistrate Judge briefly addressed the issue in the December 19 R&R, noting that he did not find the placement of the substantial assistance rule to change the analysis, including because § 6102(a)(1)'s broad directive to prescribe rules prohibiting "deceptive telemarketing acts or practices and other abusive telemarketing acts or practices," combines both deceptive and abusive acts into one general category of wrongful telemarketing conduct that the FTC has broad power to both identify

and prohibit. (*See* Dkt. 532 at 22 n.21). This Court agrees. Given § 6102(a)(1)'s broad grant of rulemaking authority, the specific placement of the substantial assistance language does not render the TSR invalid, and Fidelis cites no authority supporting their position because § 310.3 is authorized by § 6102(b), it cannot reference § 310.4, which is authorized by a separate provision in the same enabling statute.

Accordingly, for the reasons set forth above, Fidelis has failed to demonstrate that Congress intended the FTC to exclusively address substantial assistance in the context of deceptive telemarketing only. Had Congress intended to do so, there were better ways to make any such directive clearer in the Telemarketing Act—but it did not. Fidelis has not raised any argument that would cause the undersigned to reject or modify the Magistrate Judge's recommendation to deny the motion to dismiss based on the argument that the substantial assistance provision of the TSR is invalid. Accordingly, the Court adopts the Magistrate Judge's thorough and well-reasoned recommendation on that issue and the motion to dismiss on this ground is denied.

**2. The SAC alleges that Fidelis substantially assisted unlawful telemarketing practices.**

Fidelis next objects to the Magistrate Judge's finding that it substantially assisted unlawful telemarketing practices. (Dkt. 542 at 28). Fidelis argues that according to the allegations in the SAC, Fidelis took no part in the front-end sales process, including the collection of advance fees. (*Id*. at 34). Rather, Fidelis's role was confined to the back-end provision of debt relief services to program participants sued by creditors, and Fidelis

provided only "rote and ministerial" administrative support to the law firms and helped consumers obtain the legal defense for which they had paid. (*Id*. at 35). In response, Plaintiffs argue that the SAC alleges that Fidelis substantially assisted in the law firms' collection of legal fees, including that Fidelis was "a central cog in the debt-relief machine . . . to act as a hub for the litigation defense promised to consumers paying advance fees. . . ." (Dkt. 600 at 18). Plaintiffs further assert that the pleading standard for substantial assistance is not onerous. (*Id*. at 18-20).

To state a claim for substantial assistance, the complaint must allege: (1) an underlying TSR violation; (2) that the defendant provided substantial assistance or support to the seller or telemarketer responsible for the violation; and (3) that the defendant knew, or consciously avoided knowing, that the seller or telemarketer engaged in the TSR violation. *See* 16 C.F.R. § 310.3(b); *FTC v. Consumer Health Benefits Assoc.,* 10 Civ. 3551, 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012). "The threshold for what constitutes 'substantial assistance' is low: 'there must be a connection between the assistance provided and the resulting violations of the core provisions of the TSR.'" *Consumer Health Benefits Assoc.*, 2012 WL 1890242, at *6 (citation omitted). But a *direct* connection between the actor providing substantial assistance and the misrepresentations made to consumers is not required. *FTC v. Partners in Health Care Assoc., Inc.*, 189 F. Supp. 3d 1356, 1369 (S.D. Fla. 2016) ("The FTC must identify something more than 'casual or incidental' help to the telemarketer, but does not have to show a 'direct

connection' between the assistance and the misrepresentation for an entity to be liable under § 310.3(b)." (citation omitted)), *appeal dismissed*, 2017 WL 5127324 (11th Cir. July 19, 2017). As explained in *FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013):

> Ms. Chapman argues her actions did not constitute substantial assistance under the Telemarketing Sales Rule because she was not involved in the marketing efforts and thus her assistance was not directly connected to the misrepresentations made to consumers. However, this type of direct connection is not required. Although the originally proposed rule would have applied only where "such substantial assistance is related to the commission or furtherance of that act or practice," Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995), the FTC rejected this requirement in the final rule, *see* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed.Reg. 43,842, 43,851 (Aug. 23, 1995). As the FTC's published guidance states, the substantial assistance standard will not be met if the third party provides only "casual or incidental" help to the telemarketer. *FTC, Complying with the Telemarketing Sales Rule, available at* http://business.ftc.gov/documents/bus27–complying–telemarketing–sales–rule# assisting (Feb. 2011). Thus, "cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or facilitator." *Id.* However, Ms. Chapman's assistance was much more than casual or incidental—she was the one who provided the services and products they marketed to consumers in misleading ways.

*Id*. at 1216-17. Accordingly, the question to be considered by the Court is "whether there are sufficient facts alleged to make it plausible that they provided 'substantial assistance,' something more than 'causal or incidental dealing with a seller or telemarketer that is unrelated to a violation of the Rule.'" *FTC v. Nudge, LLC*, No. 2:19-cv-00867-DBB-DAO, 2021 WL 3145700, at *5 (D. Utah July 26, 2021).

The SAC alleges that Fidelis provided substantial assistance to Strategic and the law firms' debt-relief operations by controlling and participating in the day-to-day business operations of the law firms. (Dkt. 366 at ¶ 252). Specifically, Fidelis provided litigation support on behalf of the law firms, and Strategic then marketed the litigation support to consumers as an additional benefit of the debt-relief products. (*Id*. at ¶ 94). When Strategic received notice that a creditor sued a consumer enrolled in the debt-relief program, it notified Fidelis (and not the law firm) of the lawsuit, and Fidelis performed data entry for the lawsuit. (*Id*. at ¶ 95). The SAC alleges that Fidelis facilitated litigation support by acting as a "hub" during the litigation, including by sending documents and paperwork to other contract attorneys. (*Id*.). Fidelis received funds obtained from consumers through the advance-fee debt relief scheme. For instance, from April 2022 to October 2023, Fidelis received $16.4 million from façade firms (*id*. at ¶ 211), and from May 2021 to October 2023, Fidelis paid more than $15.7 million to Christo, and more than $3.6 million to the Bush Lake Trust (*id*. at ¶ 105). Finally, the SAC alleges that Blust controlled and oversaw both Fidelis and the façade firms. (*Id*. at ¶¶ 83, 95). Based on these allegations, the Magistrate Judge concluded that taken as a whole, the SAC alleges that the litigation services provided by Fidelis were an essential part of the advance-fee debt-relief program, and that Fidelis played a major role in facilitating those services—and that was enough to survive a motion to dismiss.

The Court agrees that the SAC adequately alleges that Fidelis's services were integral to the debt-relief scheme. (Dkt. 366 ¶ 95 (alleging that when Strategic receives notice that creditors have sued a consumer, Strategic does not send the filings to the law firm listed on the consumer's engagement letter; instead, Strategic sends the filings to Lit Def and Fidelis, which perform data entry and "acts as a hub" and sends filings to contracted litigation or appearance attorneys)); *see Partners in Health Care Assoc., Inc.*, 189 F. Supp. 3d at 1369 (substantial assistance found where multiple marketers testified that they could not have done business without the support of defendants, including that the defendants "handled the processing of all payments for the Discount Card, sent the handbook and materials to the customers, and opened merchant accounts for marketers which were essential to their operations," and the defendants "continued to provide this assistance even after receiving numerous customer complaints about the marketers' misrepresentations").

Fidelis suggests that the aiding-and-abetting standard from securities cases should apply when assessing TSR substantial assistance. (Dkt. 542 at 30). At least one court considering this argument has rejected application of the aiding-and-abetting standard to substantial assistance claims, and other courts have concluded that the standard for substantial assistance claims is not high. *See*, *e.g.*, *CFPB v. Daniel A. Rosen*, No. 2:21-cv-07492-VAP, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) ("Although it is true that the Federal Trade Commission . . . invoked securities law in promulgating the TSR . . . it

also rejected any requirement that the assistance be related to the commission or furtherance' of a core rule violation," and therefore, "Defendants' reliance on aider-abettor principles under securities laws is misplaced" (quotations omitted)); *see also Chapman*, 714 F.3d at 1216 ("Although the originally proposed [TSR] would have applied only where 'such substantial assistance is related to the commission or furtherance of that act or practice,' . . . the FTC rejected this requirement in the final rule"); *FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-1618, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014) (explaining that "the threshold for substantial assistance is not nearly as high as [the defendant] seems to believe"), *aff'd*, 652 F. App'x 837 (11th Cir. 2016). Given this standard, the Court agrees with the Magistrate Judge that the SAC's allegations regarding Fidelis plausibly state a claim for substantial assistance. Of course, following discovery Plaintiffs will need to present evidence supporting their claim of substantial assistance against Fidelis. But the allegations in the SAC are sufficient at this juncture.

With respect to Fidelis's argument that it provided only "back-end" services to the debt relief program (*see* Dkt. 542 at 34), this does not absolve it of liability under the TSR. The TSR does not require the provision of "front-end" services, or direct involvement in the alleged TSR violation. Rather, as explained above, the question is whether there are sufficient facts alleged to make it plausible that the defendant provided substantial assistance, which is something more than "causal or incidental" dealing with a seller or telemarketer. *See*, *e.g.*, *FTC v. Lake*, 181 F. Supp. 3d 692, 700 (C.D. Cal. 2016) (rejecting

the defendant's argument that he performed only "back end" processing services on client files, noting that his involvement was not casual or incidental; rather, "[o]n the contrary, Lake played an integral part in the HOPE Defendants' scheme, because his 'advocacy' on the back end meant that clients continued to make 'trial payments' to the HOPE Defendants in the hope that they were actually getting something for their money"). In other words, Fidelis's argument is based on a misapplication of the law regarding substantial assistance.

In sum, the law does not require that Fidelis provide front-end services to be held liable for substantial assistance of a TSR violation, nor does it require a direct connection between the actor providing substantial assistance and the misrepresentations made to consumers. The SAC plainly alleges that Fidelis is vital to the interrelated "web" of companies facilitating the debt-relief scheme, and that Fidelis coordinated the litigation support promised to consumers when they enrolled in the scheme and started paying illegal advance fees. The SAC further alleges that Blust, who also is alleged to have direct involvement and knowledge of the fraudulent scheme, controlled both the law firms and Fidelis. As noted by the Magistrate Judge, discovery will reveal greater factual detail regarding Fidelis's connection to the debt-relief scheme, and it may be that Fidelis can successfully make this argument on a motion for summary judgment. But this case is only at the pleading stage, and the allegations in the SAC are sufficient to meet the low threshold for substantial assistance. Accordingly, the Court has identified no basis to vacate or modify the Magistrate Judge's recommendation on this issue, and Fidelis's motion to

dismiss on the basis that the SAC fails to allege that it substantially assisted in abusive telemarketing practices is denied.

**3. The SAC adequately alleges knowledge.**

Fidelis next objects to the Magistrate Judge's finding that it knew, or consciously avoided knowing, that the law firms were collecting advance fees. (Dkt. 542 at 39). Specifically, Fidelis argues that the SAC does not allege that Blust knew that the notary presentations failed to satisfy the face-to-face exemption, and that 16 C.F.R. § 310.3(b) requires conscious wrongdoing. (*Id*. at 39-54). In response, Plaintiffs argue that the SAC sufficiently alleges that Fidelis knew or consciously avoided knowing that the façade firms were collecting advance fees, which is sufficient to allege knowledge of a TSR violation. (Dkt. 600 at 23-27). Plaintiffs further argue that the SAC sufficiently alleges that the individuals controlling Fidelis—specifically, Blust and Gallagher—knew that the façade firms charged advance fees. (*Id*. at 27-29).

The Magistrate Judge found that Blust's knowledge could be imputed to Fidelis, and that Blust knew, or consciously avoided knowing, the TSR violation. (Dkt. 532 at 28). Specifically, among other points, the Magistrate Judge explained that the SAC alleges that Blust owned and controlled Lit Def and Fidelis, with Gallagher working directly under Blust and managing the daily operations of Fidelis and Lit Def. (*Id*.). The Magistrate Judge also noted the allegations that Blust had a history of taking illegal fees in violation of the TSR, since he and Sasson were both previously employed by Legal Helpers Debt

Resolution, LLC, a debt-relief firm that was shut down after several Attorneys General brought actions alleging unlawful conduct similar to that detailed in the SAC. (*Id*. at 31; *see also* Dkt. 366 at ¶¶ 53, 83).

It is well-settled that the knowledge of a corporate officer or director may be imputed to that of the corporation. *See SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 728 (S.D.N.Y. 2003) ("The Court of Appeals for the Second Circuit has held that a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take."); *see also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) (knowledge of a controlling person of a corporation imputable to the corporation). The SAC alleges that Blust owned and controlled Lit Def, and that around 2021, Lit Def began transitioning to Fidelis. (Dkt. 366 at ¶¶ 95-96). The companies shared employees and performed the same litigation support services. (*Id*. at ¶¶ 96). The SAC alleges that while Christo was named the founder of Fidelis, Blust actually controlled Fidelis. (*Id*. at ¶ 102). And Blust knew of the advance fee restrictions from his time at Legal Helpers. (*Id*. at ¶¶ 53, 83). In other words, the totality of the allegations in the SAC and the reasonable inferences to be drawn from them are minimally sufficient to state a claim that Blust controlled Fidelis, that he knew the conduct was unlawful, and because of this control, Blust's knowledge can be imputed to Fidelis.

Fidelis next argues that the SAC fails to plead knowledge because it does not allege that Fidelis knew that the face-to-face meetings held by notaries with the consumers were inadequate to meet the face-to-face exemption to the TSR's ban on advance and disproportionate fees. (*See* Dkt. 542 at 50). In other words, even if Fidelis had factual knowledge of the acts forming the basis for the TSR violations, it lacked legal knowledge. The Magistrate Judge rejected this argument, noting that it confuses factual knowledge with legal knowledge, the latter of which is not required. (Dkt. 532 at 33).

As explained above, 16 C.F.R. § 310.3(b) states that it is unlawful "for a person to provide substantial assistance or support to any seller or telemarketer when that person *knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice* that violates §§ 310.3(a), (c) or (d), or § 310.4 of this part." Fidelis's position with respect to the mental state required is not supported by the law, which requires knowledge of the facts (the act or practice) comprising the violation, and not knowledge that the conduct was illegal. "[T]he phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001) (rejecting view that the government must prove that the defendant knew that he was violating the law as precluded by the Supreme Court's decision in *United States v. International Minerals & Chem. Corp.*, where the Supreme Court held that the phrase "knowingly violates" did not require knowledge that the defendant's conduct was

unlawful, and noting that "the Court found no evidence of congressional intent to abrogate the bedrock common law principle that ignorance of the law is not a defense"); *see also Bryan v. United States*, 524 U.S. 184, 193 (1998) (explaining that "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law," and "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense"). Here, there is no indication from the statute or the regulation that legal knowledge of a TSR violation is required.

None of the cases cited by Fidelis on this issue (*i.e.*, that legal knowledge is required) are helpful. Rather, the cases cited by Fidelis address conscious avoidance or joint-and-several liability. *See*, *e.g.*, *FTC v. Walmart*, 664 F. Supp. 3d 808, 826 (N.D. Ill. 2023) (discussing conscious avoidance standard, and noting that the FTC failed to sufficiently allege enough about the circumstances of money transfers to show that Walmart knew or consciously avoided knowing about TSR violations); *FTC v. WV Univ. Mgmt., LLC*, 877 F.3d 1234, 1242 (11th Cir. 2017) (discussing joint and several liability for substantial assistance, and that "[l]iability for substantial assistance under the TSR can attach only if the defendant knows or consciously avoids knowing that the person to whom the defendant renders such assistance is engaged in telemarketing violations"). But neither case engages in a meaningful analysis of whether "knowingly" requires knowledge of facts and circumstances comprising violation of the statute or specific knowledge that the conduct is

illegal. *Cf. Rosen*, 2022 WL 1514439, at *5 ("Courts have found it is sufficient to establish knowledge, or conscious avoidance, of the prohibited practice, and not of the TSR violation.").

Fidelis fails to advance any argument as to why the Court should reach a different conclusion, and its position is undercut by the Second Circuit's decision affirming the grant of the preliminary injunction in this case, which indicates that Defendants need only have knowledge of the facts underlying the violation—and not knowledge that they knew their conduct was illegal. *See CFPB v. Sasson*, No. 24-697-cv, 2025 WL 1554514, at *2 (2d Cir. June 2, 2025) ("Sasson and Blust argue that they lacked specific knowledge that their conduct was unlawful. But the District Court needed only to conclude that Sasson and Blust had 'knowledge of facts and attendant circumstances that comprise a violation of' the TSR, not that they knew that their conduct was illegal." (quoting *Weintraub*, 273 F.3d at 147)).

Even if Plaintiffs had to allege legal knowledge of a TSR violation, the SAC alleges, at a minimum, that Fidelis consciously avoided knowing of the TSR violations in this case. Specifically, the SAC alleges that Blust, who controlled Fidelis, was an attorney at Sasson's Legal Helpers, which entered into a stipulated judgment for conducting a similar scheme, wherein Legal Helpers charged unlawful up-front fees, failed to reduce consumers' debts as promised, and attempted to avoid advance-fee bans by recruiting attorneys to act as fronts for the business. (Dkt. 366 at ¶¶ 53, 83 ("Jason Blust knows or

should know, based on the Legal Helpers matters discussed in Paragraph 53, that it is illegal to charge up-front fees for telemarketer-sold debt-relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.")). Further, the SAC alleges that Blust responded to consumer complaints regarding the law firms. (*Id*. at ¶ 84). In other words, there is a fair inference to be drawn from the SAC that Blust (and therefore also Fidelis) was aware that the conduct at issue violated the TSR, or at the very least he should have been apprised that the conduct at issue was illegal. *See*, *e.g.*, *Nudge*, 2021 WL 3145700, at *6 (complaint sufficiently alleged knowledge or conscious avoidance where the defendants received or were aware of complaints posted on a consumer review site); *see also Walmart, Inc.,* 664 F. Supp. 3d at 826 ("A person consciously avoids knowing about a violation when there are facts and evidence that support an inference of deliberate ignorance." (quotations and citation omitted)); *People v. Debt Resolve, Inc*., 387 F. Supp. 3d 358, 369-70 (S.D.N.Y. 2019) (entity on notice of fraudulent nature of scheme where it "received hundreds of complaints from the BBB, the CFPB, and other sources over the past several years, which describe in detail the illicit practices of Marketing and Contracting Defendants alleged in the Complaint").

Finally, to the extent that Fidelis maintains that it is not a successor to Lit Def and therefore Blust's knowledge cannot be imputed to Fidelis (*see* Dkt. 542 at 44 ("Only

Christo's knowledge can be imputed to Fidelis. . . .")), that is a factual issue, and the SAC includes sufficient allegations to impute Blust's knowledge to Fidelis.

In sum, the SAC alleges that Fidelis had knowledge of the TSR violations. The Court finds no basis to reject or modify the Magistrate Judge's recommendation as to this issue, and therefore Fidelis is not entitled to dismissal on the basis that it lacked knowledge.

**4. The SAC adequately alleges violations of New York law**

Fidelis next objects to the Magistrate Judge's finding that the SAC adequately alleges violations of New York law. Fidelis contends that the allegations are a formulaic recitation of the elements of the New York offenses, and the SAC does not allege that Fidelis (as opposed to Strategic and the law firms) engaged in any deceptive conduct in violation of New York law. (Dkt. 542 at 54-57). In response, Plaintiffs argue that the SAC adequately alleges that Fidelis violated the New York Executive Law and General Business Law. (Dkt. 600 at 29-32).

N.Y. Exec. Law § 63(12) states:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper.

N.Y. Exec. Law § 63(12). That section defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." (*Id.*). The definition of fraud under this section is construed broadly, "so as to include acts characterized as dishonest or misleading and eliminating the necessity for proof of an intent to defraud." *People v. Apple Health & Sports Clubs*, 206 A.D.2d 266, 267 (1st Dep't 1994); *see also Matter of Allstate Ins. Co. v. Foschio*, 93 A.D.2d 328, 332 (2d Dep't 1983) ("Since the purpose of such restrictions on commercial activity is to afford the consuming public expanded protection from deceptive and misleading fraud, the application is ordinarily not limited to instances of intentional fraud in the traditional sense."); *see also People v. Credit Suisse Securities LLC*, 31 N.Y.3d 622, 633 (2018).

Similarly, Section 349 of the New York General Business Law provides that "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." *See* N.Y. Gen. Bus. Law § 349(a). "To state a claim for a § 349 violation, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (citation omitted). "Whether a representation or an omission, the deceptive practice

must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (citation omitted).

The SAC alleges that consumers paid the law firms for litigation defense in the event they were sued by their creditors; during the enrollment process, consumers were told that the debt-relief program included litigation defense services; and a lawyer would represent them if they were sued by creditors for non-payment of their debts. (Dkt. 366 at ¶ 122). Similarly, the retainer agreements consumers signed with façade firms promised that lawyers would provide litigation defense if the consumer was sued by creditors while participating in the debt-relief service. (*Id.*). However, this representation was misleading, and consumers reported that the law firms almost never represented them when they were sued by creditors, even though they had paid the retainer fee. (*Id.*; *see also id.* at ¶ 174 ("Consumers were led to believe that they had an attorney and law firm to represent them should their creditors sue, but many consumers received no such representation, despite having paid significant retainer and legal fees. These representations by Defendants were misleading and deceptive. When consumers relied on these false representations, sometimes courts entered default judgments against them or the consumers had to represent themselves in court."); *id.* at ¶ 173 (alleging that one consumer, K.L., enrolled in the debt-relief service, but a default judgment was entered against her, and when K.L. reached out to two other creditors with whom Defendants were supposed to be negotiating, the K.L.

learned that nothing had been paid on her debts since she enrolled in the service twenty months prior, and Defendants had not even contacted the creditors)).

Although the SAC does not specifically allege that Fidelis acted together with the law firms in declining to provide litigation defense services, it alleges that Fidelis acted as a "hub" for arranging the litigation defense services. (*Id*. at ¶ 95 ("When SFS receives notice that creditors have sued a consumer enrolled in the law firm debt-relief service, SFS does not send the filings to the law firm listed on the consumer's engagement letter. Instead, SFS forwards those filings to Lit Def and Fidelis. Lit Def and Fidelis perform data entry for these lawsuits. Then Lit Def or Fidelis acts as a hub and purportedly sends filings to contracted litigation or appearance attorneys."); *see also id*. at ¶¶ 26, 94 (alleging that the firms performed little to no work on behalf of consumers, and any litigation defense work was facilitated by Lit Def or Fidelis)). In other words, the SAC alleges that Blust controlled both the law firms and Fidelis, that these entities acted together to facilitate the debt-relief operation, and that the law firms, in working with Fidelis, failed to provide the promised services to consumers.

The Court agrees with the Magistrate Judge that, drawing all reasonable inferences in Plaintiffs' favor and assuming the facts alleged in the SAC are true, these allegations are sufficient to state violations of New York law by Fidelis. *See*, *e.g.*, *People v. Apple Health & Sports Clubs*, 80 N.Y.2d 803, 807-08 (1992) (rejecting the respondents' argument that the court was without a basis to freeze their bank accounts or impose the bond requirement

on them because Apple Health "was a completely separate and distinct corporation which was not controlled by Thurman or connected to Thurcon Properties," explaining that "[o]fficers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it," and noting that "there was a substantial likelihood that petitioner could prove at trial that Thurcon Properties and Apple Health were interlocking corporations and acted in concert in operating the Apple Health clubs, subjecting Thurcon Properties to liability for the fraudulent and illegal activities pursued by Apple Health"); *see also Debt Resolve, Inc.*, 387 F. Supp. 3d at 369 (in case involving claims that the defendants were engaged in a deceptive scheme to sell debt-relief services to individuals with student loans, in violation of N.Y. Exec. Law § 63(12), the GBL, the TSR, and other statutes, denying motions to dismiss and concluding that complaint adequately alleged deceptive conduct by entity that provided financing to consumers to allow them to purchase the deceptive debt-relief services peddled by the other defendants, and explaining that "[t]he plans . . . allegedly lack required disclosures and require consumers to pay Equitable usurious interest rates," and thus "Equitable's alleged actions are . . . directly injurious to the consumers who enter into the credit plans."). The Court concludes that there is no basis to reject or modify the Magistrate Judge's recommendation on this issue. Accordingly, Fidelis's motion to dismiss the New York law claims is denied.

**5. The SAC adequately alleges a valid claim against Christo and the Bush Lake Trust.**

Finally, Fidelis argues that the complaint does not state a valid claim against Christo and the Bush Lake Trust because Fidelis is not a wrongdoer. (Dkt. 542 at 57-58). In response, Plaintiffs argue that Christo and the Bush Lake Trust are proper relief defendants. (Dkt. 600 at 32-33).

The Fidelis Defendants' argument depends on the undersigned's acceptance that Fidelis is not a wrongdoer which, as explained above, it does not. Accordingly, the Court overrules the Fidelis Defendants' objections on this basis.

**C. Motions to Dismiss Filed by the Blust Companies and Individual Defendants (Relialit, Lit Def, Hedgewick, Blust[1], Gustafson, Gallagher, and Burnette Motions to Dismiss)**

The Court turns next to the motions to dismiss filed by the Blust Companies and the individual defendants. As outlined in the June 12 R&R, the parties advanced the following arguments in favor of dismissal: (1) Blust, Gustafson, and the Blust Companies argue that the substantial assistance provision of the TSR is invalid to the extent it seeks to prohibit substantial assistance to abusive telemarketing practices (Dkt. 715 at 20); (2) Relialit, Lit Def, Gallagher, and Burnette argue that the SAC fails to allege that they provided

1 Blust's wife, Jaclyn Blust, also filed a motion to dismiss. (Dkt. 454). The Magistrate Judge recommended the denial of that motion. (*See* Dkt. 754). Ms. Blust did not file objections to the report and recommendation, and the undersigned adopted the report and and recommendation in its entirety and denied the motion to dismiss on September 29, 2025. (Dkt. 807).

substantial assistance to the debt-relief operations (*id*.); (3) the Blust Companies, as well as Blust, Gustafson, Gallagher, and Burnette, contend that the allegations in the SAC are insufficient to show that they knew, or consciously avoided knowing, that the law firms violated the TSR (*id*.); (4) the Blust Companies, Blust, Gustafson, Gallagher, and Burnette argue that the SAC fails to state any valid claims under New York law (*id*. at 20-21); and (5) Blust, Gustafson, Gallagher, and Burnette argue that the SAC fails to state any valid claims under Wisconsin law (*id*. at 21; *see also* Dkt. 450; Dkt. 452; Dkt. 453; Dkt. 493).

The Magistrate Judge rejected these arguments in the June 12 R&R. (*See* Dkt. 715). Specifically, the Magistrate Judge found that the substantial assistance provision of the TSR is valid. (*Id*. at 21-27). The Magistrate Judge also found that the SAC sufficiently alleges substantial assistance by Relialit, Lit Def, Gallagher, and Burnette. (*Id*. at 27-33). The Magistrate Judge concluded that the SAC sufficiently alleges knowledge by the Blust Companies and Blust, Gustafson, Gallagher, and Burnette. (*Id*. at 33-40). Finally, the Magistrate Judge found that both the New York law claims, and the claims based on violations of Wisconsin law, are sufficiently pled. (*Id*. at 40-48). As explained above, the Blust Companies, Blust, Gustafson, Gallagher, and Burnette filed joint objections. (Dkt. 724).

**1. The TSR provision is valid.**

The first objection raised by the Blust Companies, Blust, and Gustafson, similar to that raised by the Fidelis Defendants, is that the TSR is invalid to the extent it prohibits

substantial assistance to abusive telemarketing practices. (Dkt. 724 at 16). They largely raise the same arguments as raised by Fidelis with respect to the TSR; specifically, the portion of 16 C.F.R. § 310.3(b) that creates secondary liability with respect to "abusive" telemarketing practices was promulgated without Congressional authority. (*Id*. at 21). The Blust Companies, Blust, and Gustafson contend that the Magistrate Judge placed undue emphasis on 15 U.S.C. § 6102(a)(1), and that the Magistrate Judge's approach is contrary to *Cooper Indus., Inc.*, *Photopaint Tech., LLC*, and *Bowen*, all discussed *supra* at Section III(B)(1), since those cases were also cited by Fidelis in support of the same argument. (*See id*. at 24-26). The Blust Companies, Blust, and Gustafson also concede that there is no case directly addressing this issue. (*See id*. at 10 (describing secondary liability under the TSR as an "issue of first impression")).

In response, Plaintiffs argue that the TSR's prohibition on substantially assisting violations of the advance-fee provision falls within the FTC's broad grant of rulemaking authority under the Telemarketing Act. (Dkt. 745 at 8-17). Plaintiffs contend that Defendants rely on inapplicable case law (*id*. at 14), that 16 C.F.R. § 310.3(b) "comfortably fits under the Congressional authority in §§ 6102(a)(1) and (a)(2), and no canons of construction require otherwise," and also that none of the case law cited by Defendants is controlling or dispositive (*id*. at 16).

For the reasons explained above at Section III(B)(1), the Court rejects this argument as the basis for dismissal and overrules the objections advanced by the Blust Companies and the individual defendants on the same basis.

**2. The SAC adequately alleges that Relialit, Lit Def, Burnette, and Gallagher substantially assisted deceptive telemarketing practices.**

The next objection raised by Relialit, Lit Def, Burnette, and Gallagher is that the SAC does not adequately allege that they substantially assisted deceptive telemarketing. (Dkt. 724 at 29-32). In response, Plaintiffs argue that the SAC plausibly alleges Relialit, Lit Def, Burnette, and Gallagher substantially assisted in Strategic's and the façade firms' TSR violations, including because the assistance was more than "casual or incidental," and the allegations show how Burnette, Gallagher, Relialit, and Lit Def were critical to the broader debt-relief operation that coordinated the litigation services that Strategic and the façade firms promised to consumers. (Dkt. 745 at 17-25).

As explained above at Section III(B)(2), the threshold for conduct constituting substantial assistance under the TSR is low, and requires only a connection between the assistance provided and the resulting TSR violations. The assistance provided must be more than casual or incidental, but the government does not have to show a direct connection between the assistance and the alleged misrepresentation. *See*, *e.g.*, *Chapman*, 714 F.3d at 1216-17; *Nudge, LLC*, 2021 WL 3145700, at *5; *Partners in Health Care Assoc., Inc.*, 189 F. Supp. 3d at 1369.

As concluded by the Magistrate Judge, the totality of the allegations in the SAC indicate that affiliation with the law firms and the promised legal representation was essential to the success of Strategic's debt-relief operation. (Dkt. 715 at 29). The Court will not re-hash all the allegations in the SAC here, but as explained above, SAC alleges that, as part of Strategic's debt relief program, consumers were promised that attorneys would negotiate with creditors to settle their debts, but the law firms actually performed little to no work for the consumers; rather, the law firms operated as a façade for Strategic's debt-relief business. (Dkt. 366 at ¶¶ 26, 43, 120). Strategic (not the façade firm) arranged a meeting between the consumer and a third-party notary to sign the documents enrolling the consumer in the debt-relief program. (*Id*. at ¶ 113). The contracts between the firms and the notaries did not require the notaries to have any substantive knowledge of the product, and if a consumer had a question while signing the contract, the notary called Strategic by phone, so that the consumer could ask the question to someone from Strategic. (*Id*. at ¶¶ 131-33).

With respect to Gallagher and Burnette and their connection to the façade firms, the SAC alleges that Gallagher and Burnette are both attorneys at the façade firms, and Gallagher owns two of the façade firms. (*Id*. at ¶¶ 89, 91). Burnette owned bank accounts affiliated with two façade firms, he responded to consumer complaints on behalf of several façade firms, and exercised substantial control over and involvement in various façade firms. (*Id*. at ¶¶ 89-90). Gallagher, in addition to owning two façade firms, was the sole

owner of bank accounts for three firms. (*Id*. at ¶ 91). The SAC further alleges that Gallagher exercised substantial control and involvement in Lit Def and Fidelis. (*Id*. at ¶ 92). Since 2020, Gallagher worked directly for Blust as a manager at Lit Def, and around March 2021 she began performing the same work for Fidelis. (*Id*. at ¶ 268).

With respect to Relialit and Lit Def, the SAC alleges that both of those entities were directed and controlled by Blust, and Blust is the sole beneficial owner on bank accounts for these entities at Associated Bank. (*Id*. at ¶¶ 208, 227). When a consumer enrolled in the debt-relief service, Lit Def (not the law firm) was notified; thereafter, Lit Def performed data entry for the law suits, facilitated litigation support for the façade firms by acting as a hub and sending filings to contracted litigation or appearance attorneys, and coordinated payments from consumers' escrow accounts at payment processors RAM and Global to pay any litigation-related expenses such as filing fees and attorney appearance fees—but many consumers complained they never received any such representation. (*Id*. at ¶¶ 94-95). Relialit was a predecessor to Lit Def and, like Lit Def, it provided litigation support to the façade firms. (*Id*. at ¶¶ 96-97). Some façade firms regularly sent payments to Li Def and Relialit. (*Id*. at ¶ 209 (listing façade firms that sent payments to Lit Def); *id*. at ¶ 212 (listing façade firms that sent payments to Relialit); *see also id*. at ¶ 163 (listing companies affiliated with Blust or that made payments to Relialit or Lit Def)).

In addition, the SAC alleges that Blust (who owned Lit Def and predecessor Relialit), Burnette, and Gallagher were involved in and connected to the notary process,

which the SAC alleges was unlawful. For example, Sasson and Blust corresponded by email with the head of a notary company, and they also received emails regarding a switch from in-person meetings to video presentations during the Covid-19 pandemic, and about feedback on the notary retainer agreements. (*See id*. at ¶ 14). The SAC also alleges that Hedgewick (also allegedly controlled by Blust) arranged the partnership between the façade firms and Strategic, designed and set up the firms' websites, drafted client enrollment forms, recommended lawyers to join the firms, and coordinated contracts between façade firms and service providers. (*Id*. at ¶ 98). Hedgewick also was involved in the notary process, including that it drafted the scripts and tests for the notaries, had "final say" on changes to the scripts, and coordinated and maintained copies of contracts between law firms and the notaries. (*Id*. at ¶ 139). Both Burnette and Gallagher signed contracts with the companies providing notary services. (*Id*. at ¶¶ 89 ("In 2019, [Burnette] filed a document with the Wyoming Secretary of State on behalf of The Sands Law Group, LLP and he signed contracts with a notary-provision company on behalf of Henry Legal Group LLP d/b/a Heartland Legal Group and Gardner Legal LLC d/b/a Option 1 Legal."); *id*. at ¶ 91 ("In March 2020, Gallagher signed a contract with a notary-provision company on behalf of the Law Office of Melissa Michel, LLC d/b/a Spring Legal Group.")).

Defendants' objections on this issue focus on what is required to establish substantial assistance. Defendants cite *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), where the Supreme Court analyzed civil aiding-and-abetting liability and concluded that

liability for "knowingly providing substantial assistance," requires assistance in the "specific wrongful acts" themselves. *Id*. at 494-95. *Twitter* did not involve the interpretation of statutory text and, as explained above, other cases have concluded that aiding and abetting principles, like those discussed in *Twitter*, are inapplicable to substantial assistance claims. *See, e.g.*, *Rosen*, 2022 WL 1514439, at *4; *see also Chapman*, 714 F.3d at 1216. As explained above, there is no requirement that liability may be predicated only on direct participation in the unlawful act. It is plain from the allegations SAC—specifically, from the control exercised by these individuals and the companies owned by them—that their involvement in the debt-relief process was instrumental to the scheme. For those reasons, the Court sees no reason to reject or modify the Magistrate Judge's recommendation on whether the SAC alleges substantial assistance. Accordingly, the motion to dismiss on this basis is denied.

**3. The SAC adequately alleges knowledge as to the Blust Companies, Blust, Gustafson, Gallagher, and Burnette.**

The Blust Companies and individual defendants next object to the Magistrate Judge's finding that 16 C.F.R. § 310.3(b) does not require knowledge of unlawful conduct. (Dkt. 724 at 32-38). The Blust Companies and individual defendants also object to the Magistrate Judge's finding that the SAC alleges that they knew or consciously avoided knowing that the law firms were violating the TSR. (*Id*. at 38-41). In response, Plaintiffs argue that the SAC plausibly alleges that Defendants knew or consciously avoided

knowing that the façade firms were collecting advance fees, and that factual knowledge, as opposed to legal knowledge, is sufficient to state a claim. (Dkt. 745 at 25-33).

With respect to the argument that the substantial assistance provision requires *legal* knowledge—in other words, knowledge that the underlying conduct violates the TSR—the Court considered the arguments advanced by the Blust Companies and individual defendants and, for the reasons discussed at Section III(B)(3), concludes that the TSR requires only knowledge of the underlying conduct—in other words, factual knowledge, as opposed to legal knowledge. *See, e.g.*, *Sasson*, 2025 WL 1554514, at *2; *Rosen*, 2022 WL 1514439, at *5.

Given that standard, the Court concludes that the SAC alleges that the Blust Companies and the individual defendants knew of the conduct underlying the TSR violations, including the collection of the advance fees and the failure to provide consumers with legal representation. With respect to Blust, the SAC alleges that Blust exercised substantial control over and involvement in the establishment of the façade firms business practices, responded to consumer complaints regarding the law firms' collection of advance fees, and acted as a liaison between the façade firms and Strategic. (*Id*. at ¶¶ 84, 179-80). Blust also consulted with Strategic employees and law firm employees regarding consumer complaints against the law firms, including consumer complaints to various bar associations and to the Better Business Bureau. (*Id*. at ¶¶ 199-200; *see also id*. at ¶ 200 ("Blust coordinates efforts by SFS, Client Services Subsidiaries, and Façade Firms to

pressure consumers to take down negative reviews of Façade Firms to keep BBB ratings higher.")). In other words, Blust had knowledge of unlawful activities because he was involved in the implementation and facilitation of them. Blust's knowledge is imputed to that of his companies—Relialit, Lit Def, and Hedgewick—over which he exercised substantial control. (*See, e.g.*, *id*. at ¶ 83 (explaining that Blust is an attorney who created and maintained multiple façade firms designed to conceal Strategic, he controlled and oversaw the operations of all the façade firms and his companies, and he directed consumer funds to himself through his companies, including Relialit and Lit Def); *id*. at ¶ 98 (Hedgewick is a consulting company owned and controlled by Jason Blust that provides services to façade firms in exchange for consulting fees)).

The SAC alleges that Blust and Gustafson were associated with Legal Helpers Debt Resolution, LLC, which was owned by Sasson and was a debt-relief firm that was sued and eventually shut down by Attorney General's Offices in Illinois, Wisconsin, North Carolina, and West Virgina. (*Id*. at ¶¶ 53, 83, 87). Blust was a former attorney and Gustafson was a former partner at Legal Helpers. (*Id*. at ¶¶ 83, 87). The SAC alleges that Legal Helpers charged unlawful up-front fees, failed to reduce consumers' debt as promised, and attempted to avoid advance-fee bans by recruiting attorneys to act as "fronts" for the business (*id* at ¶ 53)—all of which are similar in nature to the unlawful actions alleged in the SAC. Further, in 2018, Blust entered a stipulated judgment with the United States Bankruptcy Trustee for the District of Kansas, regarding numerous violations of

bankruptcy law arising from the same facts as alleged in the SAC. (*Id*. at ¶ 83). As to Gustafson, the SAC alleges that he was a former local attorney at The Mortgage Law Group, a mortgage-assistance relief services provider that the CFPB sued for taking up-front fees, failing to make required disclosures, and making deceptive statements. (*Id*. at ¶ 87). Accordingly, it is a fair inference to draw from the SAC that Blust and Gustafson had engaged in similar conduct in the past and knew it was unlawful. (*See*, *e.g.*, *id*. at ¶ 83 ("Jason Blust knows or should know, based on the Legal Helpers matters . . . that it is illegal to charge up-front fees for telemarketer-sold debt-relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.")).

With respect to Burnette, the SAC alleges that Burnette is an attorney, and he exercised substantial control over and involvement in serval façade firms, owned bank accounts for numerous façade firms, and signed contracts with a notary-provision company. (*Id*. at ¶¶ 89-90). Burnette also responded to consumer complaints on behalf of the façade firms (*id*. at ¶ 89 ("Burnette also responded to consumer complaints on behalf of Boulder Legal Group, LLC, Gardner Legal LLC d/b/a Option 1 Legal, Northstar Legal Group, LLC, and WyoLaw, LLC, and in his responses he identified himself as the attorney for those firms."))—and therefore presumably he knew that the service was not operating as advertised. Gallagher is an attorney who owned two façade firms, was the sole owner of bank accounts for other firms, signed a contract with a notary-provision company, and

helped to manage the day-to-day operations at Lit Def and Fidelis between 2020 and 2024. (*Id*. at ¶ 91). Gallagher also previously worked for Client First Bankruptcy, owned by Blust. (*Id*.). Given the substantial control Gallager and Burnette allegedly exercised over the façade firms, Lit Def, and Fidelis, as well as their involvement in the notary process and handling on consumer complaints, it is a fair inference from the SAC that Gallagher and Burnette were aware of the conduct forming the basis for the TSR violations in this case. *See*, *e.g.*, *Nudge*, 2021 WL 3145700, at *6 (complaint sufficiently alleged knowledge or conscious avoidance where the defendants received or were aware of complaints).

Defendants argue that the SAC does not allege any facts suggesting that they knew, or consciously avoided knowing, that the notary presentations failed to qualify for the exemption. (*See* Dkt. 724 at 38). But as noted above, Defendants' argument is not supported by the law, nor is it supported by the Second Circuit's ruling on the preliminary injunction in this case. *See*, *e.g.*, *Sasson*, 2025 WL 1554514, at *2 ("Sasson and Blust argue that they lacked specific knowledge that their conduct was unlawful. But the District Court needed only to conclude that Sasson and Blust had 'knowledge of facts and attendant circumstances that comprise a violation of' the TSR, not that they knew that their conduct was illegal." (quoting *Weintraub*, 273 F.3d at 147)). In other words, the fact that Defendants may have believed their conduct to be legal, or that they attempted to comply with the law regarding the face-to-face presentations, does not mean that they did not have knowledge of the acts constituting the TSR violation, which is sufficient to state a claim

against them at the pleading stage. Second, as explained above, at least some of the individual defendants, including Blust and Gustafson, were previously sued for engaging in similar illegal practices, which simply belies the assertion that they did not know that their conduct was illegal. Accordingly, the Court finds no reason to reject or modify the Magistrate Judge's finding with respect to knowledge, and the motion to dismiss on this basis is denied.

**4. The SAC adequately alleges violations of New York law.**

The Blust Companies and individual defendants next object to the Magistrate Judge's finding that the SAC fails to allege violations of New York law. (Dkt. 724 at 41). Specifically, the Blust Companies and the individual defendants argue that there are no allegations that they were "involved in pre-retention mailers." (*Id.*). In other words, like Fidelis, they argue that because they were involved in the back-end sales process, they are insulated from liability. In response, Plaintiffs argue that the SAC plausibly alleges violations of New York law, including violations of Executive Law § 63(12) and the GBL, as against both the individual defendants and the Blust Companies. (Dkt. 745 at 34-37).

Section 63(12) of the New York Executive Law defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." N.Y. Exec. Law § 63(12). Similarly, Section 349 of the New York General Business Law provides that "[u]nfair, deceptive, or abusive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." *See* N.Y. Gen. Bus. Law § 349(a).

As explained above in connection with the discussion of the alleged TSR violations, the SAC plausibly alleges that the Blust Companies and the individual defendants participated in, or were aware of, the fraudulent and deceptive business practices; specifically, the taking of advance fees and failing to settle consumers' debts as promised. The SAC alleges that Blust owned and controlled the law firms that failed to perform the promised debt-resolution services, including that Blust selected the vendor to create the law firms' websites, registered domain names for the façade firms, controlled when attorneys were permitted to work on client files, and coordinated efforts to take down negative reviews of law firms by consumers. (*See*, *e.g.*, Dkt. 366 at ¶¶ 197-203). The SAC further alleges that Gustafson, Burnette, and Gallagher owned and/or substantially controlled various law firms. (*See id*. at ¶ 266 (Gustafson owned nine law firms and was the contact person for 20 firms); *id*. at ¶¶ 89, 267 (Burnette handled consumer complaints for some of the law firms); *id*. at ¶ 91 (between 2020 and 2024, Gallagher managed the day-to-day operations at Lit Def and Fidelis)).

As to the Blust Companies, the SAC alleges that Hedgewick coordinated contracts between the law firms and notary companies, created notary scripts and tests, and helped design websites that suggested to the consumer that they were retaining the services of the law firms. (*Id*. at ¶¶ 98, 139). The law firms also paid Lit Def and Relialit millions of

dollars generated from the consumer funds. (*Id*. at ¶¶ 209, 212). Finally, the SAC alleges that despite being promised and paying for the debt relief service, consumers often did not receive a defense when they were sued. (*Id*. at ¶ 174 ("Consumers were led to believe that they had an attorney and law firm to represent them should their creditors sue, but many consumers received no such representation, despite having paid significant retainer and legal fees. These representations by Defendants were misleading and deceptive.")).

The individual defendants and the Blust Companies argue that because they were not involved in the direct sales pitch to consumers, they cannot be liable for fraud or deceptive business practices under New York law. (Dkt. 724 at 41). While it is true that these entities and individuals did not participate in the initial contact with consumers, the SAC contains specific allegations that the law firms, Hedgewick, Relialit, and Lit Def acted together, under the control of the individual defendants, to facilitate the debt-relief operation together with Strategic. It was by design that these entities became involved after the initial sales pitch to consumers. (*See, e.g.*, Dkt. 366 at ¶ 14 ("SFS is the invisible orchestrator of the solicitations, and the rotating list of companies used in the mailers exists only on the face of the letters; in reality, there is no actual lender and no actual pre-approval."); *id*. at ¶ 24 ("The Individual Defendants conduct this operation using a web of interrelated companies they have created.")). Based on the allegations in the SAC, the Blust Companies and individual defendants were closely affiliated with Strategic. At this stage, those allegations are sufficient to state a claim for violation of New York law. *See*,

*e.g.*, *Debt Resolve, Inc*., 387 F. Supp. 3d at 369 (explaining that "[i]n the Second Circuit, 'a defendant may be held liable for engaging in deceptive practices and acts if, with knowledge of that deception, it either directly participates in a deceptive scheme or has the authority to control the deceptive content at issue.' Accordingly, even if Equitable did not itself create the deceptive content used by Marketing Defendants to lure borrowers to enter into the credit plans, Plaintiff can still establish liability for the deceptive scheme by showing that Equitable 'engage[d] in deceptive acts or practices that are injurious to customers with at least some knowledge of the deception.'" (citation omitted)). In other words, the Blust Companies and the individual defendants are not disconnected from the initial contact with consumers.

As explained above, discovery will reveal greater factual detail regarding the Blust Companies' and the individual defendants' connection to the debt-relief scheme, and it may be that these entities can successfully challenge their role on a motion for summary judgment. But this case is only at the pleading stage, and the allegations in the SAC are sufficient to state claims for violations of the N.Y. Exec. Law § 63(12) and GBL § 349. For those reasons, the motion to dismiss on this basis is denied.

**5. The SAC adequately alleges violations of Wisconsin law.**

The individual defendants (Blust, Gustafson, Gallagher, and Burnette) next object to the Magistrate Judge's finding that the SAC alleges violations of Wisconsin law. (Dkt. 724 at 43-45). The individual defendants argue that they did not personally represent or

contract with clients in Wisconsin—rather, they only managed, controlled, or assisted certain law firms—and that this is fatal to counts 10 and 11, which regulate "adjustment services companies," and not individuals, unless the person is engaged as a sole proprietor. (*Id*. at 43).

In response, Plaintiffs argue that the SAC plausibly alleges that the individual defendants violated Wisconsin law. (Dkt. 745 at 38-40). Plaintiffs contend that Wisconsin law regulates all people engaged as principals of a business, and the allegations in the SAC that the individual defendants owned, controlled, and managed various firms are sufficient to qualify them as "principals." (*Id*. at 38-39).

Counts 10 and 11 allege that the individual defendants and others operated as "adjustment services companies" under Wisconsin law, as defined in Wis. Stat. § 218.02 ("the ASC statute"). Count 10 alleges that the individual defendants and others violated the statute by operating as adjustment services companies because they operated without a license, and count 11 alleges that they violated the statute by charging excessive and advance fees for debt-relief.

The ASC statute defines an "adjustment service company," as "a corporation, limited liability company, association, partnership *or individual engaged as principal* in the business of prorating the income of a debtor to the debtor's creditor or creditors, or of assuming the obligations of any debtor by purchasing the accounts the debtor may have with the debtor's several creditors, in return for which the principal receives a service

charge or other consideration." Wis. Stat. § 218.02(1)(a) (emphasis added); *see also Morgan Drexen, Inc v. Wisc. Dep't of Fin. Institutions*, 361 Wis.2d 271, 279-80 (Wis. Ct. App. 2015) (Wisconsin cannot pursue claim under the ASC statute against an individual, unless the individual is engaged as a principal).

While the individual defendants argue that counts 10 and 11 cannot state a claim against them because the ASC statute applies only to corporate entities, as opposed to individuals, the ASC statute itself plainly states that it applies to individuals engaged as a principal in the business. Here, the SAC alleges that the individual defendants owned, controlled, and managed the firms engaging in alleged deceptive business practices. The Court agrees with the Magistrate Judge that, drawing all reasonable inferences in Plaintiffs' favor, these allegations are minimally sufficient to establish them as principals at this stage of the litigation. The individual defendants may make this argument on summary judgment should discovery reveal that their relationship with the law firms falls short of their being a principal.

Defendants also argue that even if they are considered adjustment services companies under Wisconsin law, counts 10 and 11 fail because there are no allegations in the SAC indicating that they engaged in debt relief in Wisconsin, or represented Wisconsin debtors. (Dkt. 724 at 43). While there are no allegations in the SAC that the individual defendants represented specific consumers in Wisconsin, the Court agrees with the Magistrate Judge that the SAC alleges that Strategic's debt relief operation was nationwide

in scope (underscored by the fact that the case was sued by eight state attorney general's offices), and that Strategic, the law firms, and the Blust Companies were connected and worked together to facilitate the debt-relief scheme. These allegations are minimally sufficient to state a claims under the Wisconsin ASC statute at this juncture. Again, the individual defendants are entitled to pursue this argument on summary judgment, at which time Plaintiffs would likely be required present evidence establishing some contact in Wisconsin.

Accordingly, for those reasons, the Court finds no reason to reject or modify the Magistrate Judge's recommendation on the ASC statute. The individual defendants' motion to dismiss on this basis is denied.

## CONCLUSION

For the foregoing reasons, the Court overrules the pending objections (Dkt. 542; Dkt. 724), adopts the December 9 R&R and the July 12 R&R (Dkt. 532; Dkt. 715) in their entirety, and denies the motions to dismiss (Dkt. 440; Dkt. 441; Dkt. 442; Dkt. 450; Dkt. 452; Dkt. 453; Dkt. 493).

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 15, 2026
Rochester, New York